1  JASON C. LO, SBN 219030
      jlo@gibsondunn.com
2  MATTHEW BENJAMIN (*pro hac vice*)
      mbenjamin@gibsondunn.com
3  RAYMOND A. LAMAGNA, SBN 244821
      rlamagna@gibsondunn.com
4  GIBSON, DUNN & CRUTCHER LLP
5  333 South Grand Avenue
   Los Angeles, CA  90071-3197
6  Telephone:  213.229.7000
   Facsimile:   213.229.7520
7

JASON SHEASBY, SBN 205455
      jsheasby@irell.com
IRELL & MANELLA LLP
1800 Ave. of the Stars
Los Angeles, CA 90067
Telephone: 310.203.7096
Facsimile: 310.203.7199

8  Attorneys for Plaintiff Netlist Inc.

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                  SOUTHERN DIVISION

12
13  NETLIST INC., a Delaware
    corporation,
14
                   Plaintiff,
15
        v.
16
    SAMSUNG ELECTRONICS CO.,
17  LTD., a Korean corporation,
18
                   Defendant.
19

CASE NO. 8:20-cv-993-MCS (ADS)

**REDACTED VERSION OF NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON THE PLEADINGS PROPOSED TO BE FILED UNDER SEAL**

20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

I.    FACTUAL BACKGROUND ..................................................................2

    A.    Samsung's breach of its supply obligation ................................2

    B.    Samsung's breach of Section 3 of the JDLA ............................6

II.   ARGUMENT ....................................................................................7

    A.    The JDLA is a valid and enforceable contract......................9

        1.    Section 6.2 imposes a binding supply obligation ......................9

        2.    Consideration is plainly present here........................................10

        3.    Options to purchase require no exclusivity ..............................13

        4.    Courts consistently imply exclusivity provisions....................14

        5.    Section 6.2 is not void for indefiniteness .................................17

        6.    There is no bar to consequential damages because of Samsung's behavior......................................................................20

    B.    Samsung's motion fails as to Netlist's JDLA § 3 claim.....................21

    C.    The Motion fails as to Netlist's declaratory judgment claim..................................................................................................22

        1.    Samsung is barred from raising election of remedies .............22

        2.    There has been no waiver or election of remedies ..................22

III.  CONCLUSION ..............................................................................25

10981150.52

- i -

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

# TABLE OF AUTHORITIES

**Cases**                                               **Page(s)**

*159 MP Corp. v. Redbridge Bedford, LLC,*
    33 N.Y.3d 353 (2019) ............................................................................ 18

*166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.,*
    78 N.Y.2d 88 (1991) ...................................................................... 18, 19

*Advent Sys. Ltd. v. Unisys Corp.,*
    925 F.2d 670 (3d Cir. 1991) ............................................................... 11

*Am. Tel. & Tel. Co. v. New York City Hum. Res. Admin.,*
    833 F. Supp. 962 (S.D.N.Y. 1993) ...................................................... 20

*Amber Chem., Inc. v. Reilly Indus., Inc.*
    No. 106-CV-06090O-WWSMS, 2007 WL 512410 (E.D. Cal. Feb.
    14, 2007) .............................................................................................. 12

*Apple Computer, Inc. v. Microsoft Corp.,*
    35 F.3d 1435 (9th Cir. 1994) ............................................................. 10

*Awards.com v. Kinko's, Inc.,*
    42 A.D.3d 178 (N.Y. App. Div. 2007) ............................................... 24

*Bigda v. Fischbach Corp.,*
    898 F. Supp. 1004 (S.D.N.Y. 1995) .............................................. 24, 25

*Calvin Klein Trademark Trust v. Wachner,*
    129 F. Supp. 2d 254 (S.D.N.Y. 2001) ................................................ 25

*CenturyLink, Inc. v. DISH Network, L.L.C.,*
    554 F. App'x 51 (2d Cir. 2014) ............................................................ 7

*Ceredo Mortuary Chapel v. U.S.,*
    29 Fed. Cl. 346 (Fed. Cl. 1993) ......................................................... 15

*Corning Inc. v. VWR Int'l, Inc.,*
    2007 WL 841780 (W.D.N.Y. Mar. 16, 2007) .................................... 12

*CSL Behring, LLC v. Bayer Healthcare, LLC,*
    2019 WL 4451368 (D. Del. Sept. 17, 2019) ..................................... 12

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

10981150.52        - ii -

|     |                                                                                      | **Page** |
| --- | ------------------------------------------------------------------------------------ | -------- |
| 1   |                                                                                      |          |
| 2   | *Cyril Bath Co. v. Winters Indus.*,                                                  |          |
| 3   |   892 F.2d 465 (6th Cir. 1989) .................................................. 15 |          |
| 4   | *de Fontbrune v. Wofsy*,                                                             |          |
| 5   |   838 F.3d 992 (9th Cir. 2016) .................................................. 21 |          |
| 6   | *Dun & Bradstreet Corp. v. Harpercollins Pubs., Inc.*,                               |          |
|     |   872 F. Supp. 103 (S.D.N.Y. 1995) .......................................... 25     |          |
| 7   | *Edison Elec. v. Thacher*,                                                           |          |
| 8   |   229 N.Y. 172 (1920) ............................................................. 15 |          |
| 9   | *ESPN, Inc. v. Office of Com'r of Baseball*,                                         |          |
| 10  |   76 F. Supp. 2d 383 (S.D.N.Y. 1999) ............................... 23, 24, 25      |          |
| 11  | *Essco Geometric v. Harvard Indus.*,                                                 |          |
| 12  |   46 F.3d 718 (8th Cir. 1995) .................................................. 18 |          |
| 13  | *Federal Ins. Co. v. Americas Ins. Co.*,                                             |          |
| 14  |   258 A.D.2d 39 (N.Y. App. Div. 1999) .................................. 8, 18       |          |
| 15  | *Feld v. Henry S. Levy & Sons, Inc.*,                                                |          |
| 16  |   37 N.Y.2d 466 (1975) .......................................................... 15 |          |
| 17  | *Fireguard Sprinkler Sys. v. Scottsdale Ins.*,                                       |          |
| 18  |   864 F.2d 648 (9th Cir. 1988) .................................................. 10 |          |
| 19  | *Fleming v. Pickard*,                                                                |          |
|     |   581 F.3d 922 (9th Cir. 2009) .................................................... 7 |          |
| 20  | *Gamble v. Synchrony Bank*,                                                          |          |
| 21  |   2020 WL 4258646 (C.D. Cal. Apr. 30, 2020) ......................... 8             |          |
| 22  | *Gen. Motors Corp. v. Paramount Metal Prod. Co.*,                                    |          |
| 23  |   90 F. Supp. 2d 861 (E.D. Mich. 2000) .................................. 12        |          |
| 24  | *Godchaux-Henderson Sugar Co. v. Dr. Pepper-Pepsi Cola Bottling*                     |          |
| 25  |   *Co.*,                                                                             |          |
|     |   1985 WL 13561 (6th Cir. 1985) .......................................... 15        |          |
| 26  | *Golisano v. Vitoch Interiors Ltd.*,                                                 |          |
| 27  |   54 N.Y.S.3d 244 (App. Div. 2017) ...................................... 13        |          |
| 28  |                                                                                      |          |

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

10981150.52                                - iii -

**Page**

*Greenfield v. Philles Recs., Inc.*,
    98 N.Y.2d 562 (2002) ..................................................................... 9

*HML Corp. v. Gen. Foods Corp.*,
    365 F.2d 77 (3d Cir. 1966) ........................................................... 17

*Hoover's Hatchery, Inc. v. Utgaard*,
    447 N.W.2d 684 (Iowa Ct. App. 1989) ........................................ 12

*In re Lipper Holdings, LLC*,
    766 N.Y.S.2d 561 (1st Dept. 2003) .............................................. 10

*In re Modern Dairy of Champaign, Inc.*,
    171 F.3d 1106 (7th Cir. 1999) ...................................................... 13

*Int'l Com. Res., Ltd. v. Jamaica Pub. Servs. Co.*,
    612 F. Supp. 1153 (S.D.N.Y. 1985) ............................................. 17

*Ittleson v. Barnett*,
    758 N.Y.S.2d 360 (2d Dept. 2003) ............................................... 13

*Jarecki v. Shung Moo Louie*,
    95 N.Y.2d 665 (2001) ................................................................... 14

*Johnson Controls, Inc. v. TRW Vehicle Safety Sys., Inc.*,
    491 F. Supp. 2d 707 (E.D. Mich. 2007) ...................................... 11

*K.M.L Labs v. Hopper*,
    830 F. Supp. 159 (E.D.N.Y. 1993) .............................................. 25

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ....................................................... 8

*Luitpold Pharms., Inc. v. Ed. Gestilich Sohne A.G.*,
    784 F.3d 78 (2d Cir. 2015) ........................................................... 25

*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo*,
    264 F.3d 32 (2d Cir. 2001) ........................................................... 15

*Matter of Pooling & Servicing Agreements*,
    No. 17 Civ. 1998 (KPF), 2018 WL 1229702 (S.D.N.Y. Mar. 9,
    2018) ............................................................................................. 19

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

10981150.52                    - iv -

**Page**

*Maxim Integrated Prod., Inc. v. Analog Devices, Inc.*,
    1996 WL 117425 (9th Cir. Mar. 15 1996) .......................................................... 22

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
    842 F. Supp. 2d 682 (S.D.N.Y. 2012) ...................................................... 22, 24

*McNally Wellman Co. v. N.Y. State Elec. & Gas Corp.*,
    63 F.3d 1188 (2d Cir. 1995) .......................................................................... 20

*Morgan Elec. Co. v. Neill*,
    198 F.2d 119 (9th Cir. 1952) ......................................................................... 17

*Netbula LLC v. Distinct Corp.*,
    212 F.R.D. 534 (N.D. Cal. 2003) ..................................................................... 8

*O.N. Jonas Co. v. Badische Corp.*,
    706 F.2d 1161 (11th Cir. 1983) ..................................................................... 19

*Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*,
    458 F. Supp. 2d 131 (S.D.N.Y. 2006) ............................................................ 10

*Optima Media Grp. v. Bloomberg*,
    2021 WL 1941878 (S.D.N.Y. May 14, 2021) .......................................... 23, 24

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
    830 F.3d 152 (2d Cir. 2016) ............................................................................ 9

*Pfeifer v. Groisman*,
    997 N.Y.S.2d 706 (2d Dept. 2014) ................................................................ 13

*Prudential Oil Corp. v. Phillips Petroleum C*o.,
    418 F. Supp. 254 (S.D.N.Y. 1975) ................................................................ 24

*R. A. Weaver & Assocs., Inc. v. Asphalt Const., Inc.*,
    587 F.2d 1315 (D.C. Cir. 1978) ..................................................................... 19

*RIJ Pharm. Corp. v. Ivax Pharms, Inc.*,
    322 F. Supp. 2d 406 (S.D.N.Y. 2004) ........................................................... 24

*Rosenfeld v. Basquiat*,
    78 F.3d 84 (2d Cir. 1996) .............................................................................. 17

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

10981150.52                                           - v -

                                                                            **Page**

*S.D. Hicks v J.T. Baker Chem. Co.*,
   307 F.2d 750 (2d Cir. 1962) ......................................................................... 24

*Scantibodies Lab'y v. Church & Dwight Co.*,
   801 F. App'x 39 (2d Cir. 2020) ................................................................... 15

*Scott v. Kuhlmann*,
   746 F.2d 1377 (9th Cir. 1984) ..................................................................... 22

*Stalis v. Sugar Creek Stores, Inc.*,
   295 A.D.2d 939 (N.Y. App. Div. 2002) ....................................................... 23

*Terwilliger v. Terwilliger*,
   206 F.3d 240 (2d Cir. 2000) .......................................................................... 7

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*,
   63 N.Y.2d 396 (1984) ..................................................................................... 9

*U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*,
   950 F. Supp. 504 (E.D.N.Y. 1997) .......................................................... 24, 25

*Weiner v. McGraw-Hill, Inc.*,
   57 N.Y.2d 458 (1982) ................................................................................... 13

*In re World Trade Ctr. Disaster Site Litig.*,
   754 F.3d 114 (2d Cir. 2014) ........................................................................ 19

*Zheng v. City of N.Y.*,
   19 N.Y.3d 556 (2012) ..................................................................................... 9

**Statutes**

N.Y. U.C.C. § 2-204 ......................................................................................... 18

N.Y. U.C.C. § 2-306 ............................................................................. 11, 12, 15

**Rules**

Fed. R. Civ. P. 8(c) ........................................................................................... 17

Fed. R. Civ. P. 12 ..................................................................................... *passim*

10981150.52                                 - vi -

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

1    The plain terms of the Joint Development and License Agreement ("JDLA")

2  obligated Samsung to supply Netlist with NAND and DRAM at Netlist's request, to

3  only withhold taxes as required under Korean law, and to cooperate with Netlist in

4  recovering any withholdings from the Korean tax authority.  Netlist alleges that

5  Samsung failed to comply with each of these contractual obligations.  That is

6  sufficient under the relevant pleadings standards.  Samsung argues that it had no

7  obligation to supply Netlist with product (though Samsung substantially complied

8  with the terms of its supply obligation for nearly two years and never before raised

9  the provision's enforceability) and that it was not required to cooperate with

10  Netlist's efforts to recover payment from the Korean tax authority (despite express

11  contractual language to the contrary).  But Samsung's arguments grossly distort the

12  plain text of the JDLA into something that makes no logical sense and that Samsung

13  knows is contrary to the facts.

14    For instance, during contract negotiations, Samsung proposed that the JDLA

15  state that its provisions ███████████████████████████████████

16  ███████████████████  This language was struck by the parties, and the final version

17  of the JDLA instead incorporates the imperative that Samsung "*will supply* NAND

18  and DRAM products to Netlist *on Netlist's request*."  Samsung's motion for

19  judgment on the pleadings (the "Motion") thus asks this Court to read back into the

20  contract language that the parties chose to exclude.  Samsung's litigation position

21  also flies in the face of Samsung's candid internal assessment of its obligations to

22  Netlist and is directly contradicted by a ruling by the Korean Tax Tribunal

23  confirming that Samsung's withholdings were improper.

24    In short, the Motion should be denied because Samsung's reading of the

25  disputed provisions is unreasonable, will be contradicted by the factual record, and

26  cannot be decided solely from the face of the complaint.

27

28

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

# I.   FACTUAL BACKGROUND

## A.   Samsung's breach of its supply obligation

1.      Netlist and Samsung entered into the JDLA on November 11, 2015, under which Netlist obtained something of significant value:  a dependable and stable supply of NAND and DRAM products from Samsung.  FAC ¶¶ 9-10.  Section 6.2 expressly provides:  "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products)."  *Id.*

2.      In the year prior to entering the JDLA, Samsung supplied less than ███ worth of its products to Netlist.  *Id.* ¶ 11.  After signing, however, Netlist exercised its contractual right and requested product supply from Samsung that was substantially granted.  *Id.*  In 2016, Samsung supplied Netlist approximately ███ in NAND and DRAM products.  In 2017, Samsung's supply increased to approximately ███ *Id.*

3.      But in the second half of 2017, Samsung began refusing to fill Netlist's orders.  *Id.* ¶ 17.

4.      By repeatedly breaching its contractual obligation to supply the requested products, Samsung forced Netlist to forgo business opportunities and purchase NAND and DRAM products at higher prices in the secondary market.  *Id.* ¶ 14.  Netlist was unable to obtain many products that Samsung historically provided and was required to supply under the JDLA.  *Id.*  When Samsung failed to fulfill Netlist's orders, Netlist could not supply its customers and lost business opportunities and profits it otherwise would have earned had Samsung performed as required.  *Id.*  In addition, Netlist paid higher prices for smaller volumes of the NAND and DRAM products that could be purchased in the secondary market.  *Id.*

5.      The facts that will be adduced at trial will provide substantial evidence in support of these allegations.  The supply obligation provision was heavily negotiated and carefully drafted by the parties.  Samsung sent Netlist a term sheet

1   identifying ███████████████████████████████████

2   ████████████████████████████████ Ex. 2.[1]  In explaining

3   this clause, Samsung stated that ███████████████████████

4   ███████████████████████████████████████████

5   ███████████████████████████████████████████

6   ████████████████████████████████████ *See id.*

7       6.     Samsung subsequently proposed an insertion stating that ████████

8   ███████████████████████████████████████████

9   ██████████████████████████ Ex. 3 at '856.  Netlist

10  struck the language, making clear that the supply obligation was firm and binding.

11  *See* Ex. 4 at '877, 885 ████████████████████████████

12  ███████████████████████████████████████

13  ██████████████████████████████████████

14  ███████████████████████████████████████████

15  ██████████████████████████████ Consistent

16  with the language Netlist came back with, the final version of the JDLA excludes

17  Samsung's proposed language and instead states that Samsung "*will supply* NAND

18  and DRAM products to Netlist *on Netlist's request*."  JDLA § 6.2.

19      7.     Samsung's supply obligation was critical from Netlist's perspective.

20  First, the semiconductor industry has historically experienced cyclical shortages of

21  NAND and DRAM, so Netlist aimed to reduce its risk from such disruptions.  Hong

22  Decl. ¶ 4.  Second, Samsung supplies NAND and DRAM directly only to a small,

23  select group of the leading technology companies in the world.  A direct supply

24  relationship with Samsung thus legitimized Netlist in the industry and gave

25  assurance to Netlist's customers.  *Id.*

26

27

28

---

[1] Citations in the form of "Ex. __" refer to exhibits to the LaMagna Decl. filed herewith.  All emphasis is added unless otherwise noted.

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

10981150.52                                    - 3 -

8.    Reflecting the significance of the direct supply relationship, Samsung provided Netlist with written confirmation that Netlist was authorized to purchase "Samsung Electronics Co., Ltd.'s full line of memory semiconductor products to support Netlist's products and customers" and that Netlist was now a "direct customer of Samsung . . . with purchase orders placed directly with Samsung and shipments made from Samsung to Netlist." *See* Ex. 6.

9.    The terms of Samsung's supply obligation were central to the overall negotiation of the JDLA.  Netlist pressed Samsung for a higher non-recurring engineering ("NRE") fee, but ultimately agreed to reduce its ask in exchange for Samsung's commitment that the supply obligation would be firm and binding.  *See* Exs. 1, 4 at '877, 885.  Netlist's earliest term sheet to Samsung sent in April 2015 proposed an ███████████████████████████████ *See* Ex. 1.  Samsung countered with a ████████████████████████████████ ████████████████████████████████████████████████ ████████████ *See* Ex. 2.

10.    Because securing a direct supply of NAND and DRAM was critical to Netlist, it was willing to make a number of important concessions to Samsung in exchange.  Hong Decl. ¶¶ 4-5.  Chief among these, Samsung sought and obtained a valuable license to Netlist's patents, which Netlist ultimately agreed to even though Samsung provided only a smaller monetary payment to support an engineering collaboration between the parties.  *See* Ex. 2; JDLA § 8.2 (granting Samsung "a perpetual . . . paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Netlist's Licensed Patents to make and have made . . . Samsung's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of such products"); § 3.1 ($8 million NRE fee).

11.    Samsung acknowledged to the Korean government that it received significant consideration from Netlist, stating its ████████████████████████

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

10981150.52                                   - 4 -

1 ████████████████████████████████████████████

2 ████████████████████████████ Ex. 14 at '763, '768 (emphasis added).

3    12.    Samsung did not claim at any point prior to this litigation that the

4 supply obligation in JDLA § 6.2 was unenforceable.  To the contrary, Samsung

5 operated under that provision for nearly two years before deciding to breach, and

6 Samsung's own personnel involved in drafting the JDLA expressly acknowledged

7 "Netlist and Samsung's cooperation and supply terms per agreement (JDLA)."  *See*

8 Ex. 5.

9    13.    After the JDLA was signed through the time Netlist sent its notice of

10 material breach, Netlist attempted to fill its entire requirement for Samsung NAND

11 and DRAM from Samsung.  Hong Decl. ¶¶ 6, 8.  The market for NAND and DRAM

12 memory supply is effectively an oligopoly between Micron, SK Hynix, and

13 Samsung.  *Id.*  Although all three offer NAND and DRAM products, the products

14 from the three suppliers are not interchangeable because each company implements

15 different design and fabrication processes, resulting in varying speed, power, and

16 endurance characteristics in customers' server and storage systems.  *Id.*  For those

17 Netlist customers who have qualified a given server or system to run on Samsung

18 NAND and DRAM, the mutual understanding of the parties was that Netlist would

19 obtain Samsung products directly from Samsung.  *Id.*  Thus, Netlist sought to buy

20 all of its NAND and DRAM products for its customers using Samsung designs

21 directly from Samsung.  *Id.*

22    14.    When Samsung failed to fulfill Netlist's orders, Netlist could not

23 supply its customers and lost business opportunities and profits it otherwise would

24 have earned had Samsung performed as required under the JDLA.  In particular,

25 ████████████████████████████████████████████

26 ████████████████████████████████ Hong Decl. ¶¶ 9-12.

27

28

15.     Samsung's breach was intentional and made in bad faith.  Samsung told Netlist that it intended to cease supplying Netlist, even though it knew of Netlist's need for these products.  Dkt. 84-18, Hong Decl. ¶¶ 7-12; Paik Ki Hong Decl. ¶¶ 3-9.  Netlist provided regular forecasts to Samsung showing the amount of Samsung's product it would need.  *See* Ex. 10.  Netlist explained its requirements to Samsung with reference to specifically identified customers and emphasized to Samsung that its "[p]roduct allocation support [was] critical."  *See* Ex. 7 at '039-51.  Netlist was explicit with its concerns, which Samsung ignored.  Netlist's Vice President wrote to Samsung:  "I was just told that Samsung North America has decided to give Netlist $0 allocation and no support.  This is a problem . . . We have a JDLA that states Samsung will support Netlist[.]  We have on paper that Samsung will support Netlist" and lacks another way to "move forward."  *See* Ex. 9.

**B.     Samsung's breach of Section 3 of the JDLA**

16.     Section 3.1 of the JDLA provides that Samsung "shall pay to Netlist eight million United States dollars ($8,000,000) as non-refundable NRE [non-recurring engineering] fees" to compensate Netlist for its development costs.  FAC ¶ 15.  It permits Samsung to withhold taxes due or payable to the Korean tax authority only if "required to do so by applicable law," and, even then, it requires Samsung to "reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes."  *Id.*

17.     Shortly after entering the JDLA, Samsung withheld $1,320,000 of the $8 million owed to Netlist under Section 3.1.  *Id.* ¶ 16.  Samsung claims it paid this withholding to the Korean tax authority, even though, as the Korean Tax Tribunal subsequently ruled, the $8 million payment to Netlist was not properly taxable in Korea.  Ex. 13.  The withholding was a surprise to Netlist, which had understood that the amount would not be taxed in Korea under the applicable law.  *Id.*

18.     Notwithstanding its contractual obligation to cooperate with Netlist,

1    Samsung refused to aid Netlist's efforts to recover the improperly withheld funds.

2    **II.    ARGUMENT**

3         Judgment on the pleadings is only properly granted where "there is no issue

4    of material fact in dispute and [the movant] is entitled to judgment as a matter of

5    law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  The Court "must

6    accept all factual allegations in the complaint as true and construe them in the light

7    most favorable to the non-moving party."  *Id.*  Where the motion for judgment on

8    the pleadings centers on a contract dispute, the moving party must show that the

9    contract's meaning is unambiguous; the motion must be denied unless the moving

10   party has proffered the only reasonable reading of the contract.  *See CenturyLink,*

11   *Inc. v. DISH Network, L.L.C.*, 554 F. App'x 51, 53 (2d Cir. 2014).  In addition,

12   pursuant to Rule 12(d), "[a]ll parties must be given a reasonable opportunity to

13   present all the material that is pertinent to the motion."

14        The pleadings here are sufficient to deny Samsung's motion because

15   Samsung has not demonstrated that the JDLA unambiguously supports Samsung's

16   arguments.  To the contrary, the FAC specifically alleges breach of unambiguous

17   language requiring Samsung to supply NAND and DRAM to Netlist and to

18   cooperate with Netlist in securing the amount over-withheld by the Korean tax

19   authorities.  *See* FAC ¶¶ 10-18.  To prevail on its breach claims under New York

20   law, Netlist must show "(1) a contract; (2) performance of the contract by one party;

21   (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206

22   F.3d 240, 246 (2d Cir. 2000).  It has done so.  First, the parties entered into an

23   enforceable JDLA.  FAC ¶ 9.  That complex commercial agreement was carefully

24   negotiated and supported by multiple forms of consideration.  In exchange for the

25   highly valuable supply obligation Netlist secured from Samsung, Netlist, among

26   other things, provided Samsung with a license to its patents.  *See* JDLA § 8.2; *supra*

27   ¶¶ 5-11.  Contrary to its position now, Samsung supplied product under JDLA § 6.2

28

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

for nearly two years and never once claimed the contract was unenforceable until this litigation.  FAC ¶ 11; *supra* ¶ 12; *see Federal Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999) ("[T]he parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties.").  Second, Netlist has performed all material obligations owed to Samsung under the JDLA, and Samsung does not argue to the contrary.  *Id.* ¶ 28. Third, Samsung breached the plain terms of JDLA § 6.2 by refusing in bad faith to fill Netlist's orders and cutting Netlist's supply allocation without explanation, and it also breached JDLA § 3 by withholding funds from its agreed payment to Netlist and failing to cooperate in the recovery of this money.  *Id.* ¶¶ 12-14, 16-18.  Finally, Samsung's breaches damaged Netlist's business and caused it substantial commercial harm.  *Id.* ¶¶ 14, 18, 29, 34.

However, if the Court determines that additional facts are necessary to sustain Netlist's claims, Netlist requests leave to amend to include the facts in paragraphs 5-15 and 17, *supra*.  *See, e.g.*, *Gamble v. Synchrony Bank*, 2020 WL 4258646, at *4 (C.D. Cal. Apr. 30, 2020) ("Courts retain discretion to grant Rule 12(c) motions with leave to amend," especially where "any delay in amendment stems from [defendant's] decision to file a motion for judgment under Rule 12(c) after the pleadings closed").  The only ground offered by Samsung for refusing leave to amend is its naked assertion that amendment would be futile, which would require Samsung to demonstrate that "there is no set of facts which can be proved under [an] amendment which would constitute a valid claim."  *Netbula LLC v. Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003).  Samsung has made no such demonstration.  Given the strong preference for deciding cases "on the merits, rather than on the pleadings or technicalities," *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*), denial of leave to demand for futility "is rare," *Netbula*, 212 F.R.D. at 539.  A draft proposed amended complaint is attached as Exhibit 18.

**A.      The JDLA is a valid and enforceable contract**

        **1.      Section 6.2 imposes a binding supply obligation**

The JDLA should be "enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002).  And the plain terms of the JDLA expressly provide that "Samsung *will supply* NAND and DRAM products to Netlist *on Netlist's request* at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products)."  JDLA § 6.2 (emphasis added). Section 6.2 means what it says:  Samsung is obligated to supply NAND and DRAM products to Netlist at Netlist's request.

Samsung's reading of § 6.2 as imposing "only a pricing obligation by Samsung" is not a reasonable interpretation of the contract, much less the only reasonable interpretation.  Motion at 7.  And for this reason alone, Samsung's pleadings-based motion fails as a matter of law.  Samsung asserts that what § 6.2 really means is that *if* it chose to supply any NAND or DRAM products to Netlist, it must do so at a competitive price.  But the JDLA does not say that Samsung "may" or "can supply" products to Netlist.  The parties used the imperative "*will* supply," full stop.  Under New York law, the word "'will' . . . is one of binding obligation, not election." *Zheng v. City of N.Y.*, 19 N.Y.3d 556, 580 (2012).  Samsung cannot read that word out of the agreement.  *See, e.g.*, *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016) (A "contract should be construed so as to give full meaning and effect to all of its provisions."); *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403 (1984) (court should "avoid an interpretation that would leave contractual clauses meaningless"). To emphasize that § 6.2 concerns Samsung's supply obligation, the provision is explicitly entitled "Supply by Samsung" and appears in the section of the JDLA entitled "SUPPLY OF COMPONENTS."  JDLA § 6.  Moreover, internal Samsung documents make clear that Samsung understood § 6.2 as imposing an obligation to supply memory chips to Netlist on Netlist's request, rather than imposing a

1  supposed low-cost requirement—that is, Samsung's internal documents conflict

2  with the positions its lawyers now take before the Court.  *See* Exs. 15-17.

3       Indeed, a low-cost requirement for products Samsung could unilaterally

4  refuse to sell would be pointless because a refusal to supply products is, in effect,

5  not offering competitive pricing.  Sophisticated parties do not bargain for

6  commercial nullities.  *See, e.g.*, *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562

7  (1st Dept. 2003) ("contract should not be interpreted to produce a result that is

8  absurd, commercially unreasonable, or contrary to the reasonable expectations of the

9  parties").

10      The negotiating history here also supports Netlist.  It shows that Samsung

11 proposed—and the parties ultimately struck—contractual language suggesting that

12 Samsung would be undertaking no supply obligation.  *See supra* ¶ 6.  The final

13 language of the JDLA confirms that Netlist was able to extract the critical

14 concession from Samsung that § 6.2 would have real teeth and ensure Samsung's

15 stable supply of NAND and DRAM products.  Samsung is thus barred from

16 advancing an interpretation of a contract that reads back in language that was struck

17 during the parties' negotiations.  *See Oldcastle Precast, Inc. v. U.S. Fid. & Guar.*

18 *Co.*, 458 F. Supp. 2d 131, 144 (S.D.N.Y. 2006) ("The deletion of the provision

19 clearly precludes construction of the contract as though it still contained that

20 provision."); *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1441 (9th Cir.

21 1994) (courts may not read back into contracts provisions a party proposed but

22 "gave up" in drafting negotiations); *Fireguard Sprinkler Sys. v. Scottsdale Ins.*, 864

23 F.2d 648, 651 (9th Cir. 1988) ("Words deleted from a contract may be the strongest

24 evidence of the intention of the parties.")

25           **2.     Consideration is present here**

26      Samsung's focus on exclusivity is a red herring.  When evaluating

27 requirements contracts in which a seller agrees to supply a buyer's product

28

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

10981150.52                                           - 10 -

1    requirements, courts that discuss exclusivity appear to do so only where there is no

2    other form of consideration from the buyer.  "An essential element of the valid

3    requirements contract is the promise of the buyer to purchase exclusively from the

4    seller.  In the absence of such a promise, *or some other form of consideration*

5    *flowing from the buyer to the seller*, the requisite mutuality and consideration for a

6    requirement contract is absent." *See* Williston on Contracts § 7:12 n.28 (4th ed.

7    2021) (citations omitted).  Thus, even if the JDLA were treated as a requirements

8    contract, a reasonable jury could conclude that the intellectual property license

9    Samsung received from Netlist constitutes consideration for the supply agreement.

10   Indeed, the evidence presented at trial will show that Samsung acknowledged to the

11   Republic of Korea that the intellectual property license it received from Netlist was

12   significant consideration for the agreement.  *See supra* ¶ 11.

13          Moreover, courts have recognized that the implied requirement of good faith

14   dealing in contracts can, standing alone, provide the requisite consideration to make

15   a non-exclusive requirements agreement enforceable.  In *Advent Sys. Ltd. v. Unisys*

16   *Corp.*, for example, the Third Circuit determined that an expressly non-exclusive

17   supply agreement was enforceable as a requirements contract.  *See* 925 F.2d 670,

18   678 (3d Cir. 1991).  The supply agreement provided that the buyer "desires to

19   purchase, and [seller] desires to sell, *on a non-exclusive basis*, certain of Advent

20   hardware products and software licenses for resale worldwide."  *Id.* at 674

21   (emphasis added).  As the *Advent* court explained:  "The same reasons that led

22   courts to dispense with a specific and certain quantity term in the exclusive

23   requirements context apply equally when a continuing relationship is non-exclusive.

24   The same regulating factor—good faith performance by the parties—applies and

25   prevents the contracts from being illusory."  *Id.* at 678; *see also Johnson Controls,*

26   *Inc. v. TRW Vehicle Safety Sys., Inc.*, 491 F. Supp. 2d 707, 718 (E.D. Mich. 2007).

27   Section 2-306(1) of the New York U.C.C. explicitly adopts this position and defines

28

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

1  a requirements contract as an agreement that measures the "requirements of the
2  buyer . . . as may occur in good faith."  It makes no mention of exclusivity.

3       To the extent Samsung suggests that U.C.C. Section 2-306(1) requires
4  exclusivity, it is wrong.  *See* Motion at 17.  As the court concluded in *Amber Chem.,*
5  *Inc. v. Reilly Indus., Inc.* when interpreting identical language under Section 2306 of
6  the California Commercial Code, "demanding exclusivity for all requirements
7  contracts is contrary to the plain language" of the statute, which clearly
8  distinguishes between requirements contracts measuring the requirements of the
9  buyer "as may occur in good faith" and exclusive dealing agreements.  No. 106-CV-
10  06090O-WWSMS, 2007 WL 512410, at *7 (E.D. Cal. Feb. 14, 2007).  Other federal
11  courts analyzing identical statutory language have reached the same conclusion.
12  *See, e.g.*, *Gen. Motors Corp. v. Paramount Metal Prod. Co.*, 90 F. Supp. 2d 861,
13  873 (E.D. Mich. 2000) (concluding Michigan's version of the U.C.C. "expresses a
14  legislative intent to enforce both exclusive and non-exclusive requirements
15  contracts"); *Hoover's Hatchery, Inc. v. Utgaard*, 447 N.W.2d 684, 688 (Iowa Ct.
16  App. 1989) ("Nothing in the statutory language of [the identical provision in the
17  Iowa Code] . . . suggests that exclusivity is a prerequisite to the establishment of a
18  requirements contract.").

19       The two cases Samsung cites are not on point.  In *CSL Behring, LLC v. Bayer*
20  *Healthcare, LLC*, the court analyzed a simple supply agreement and did not identify
21  any other consideration provided by the buyer.  *See* 2019 WL 4451368, at *2-3 (D.
22  Del. Sept. 17, 2019).  Similarly, in *Corning Inc. v. VWR Int'l, Inc.*, the court found
23  that the only "relevant" portion of the parties' agreement provided that the buyer
24  would purchase its product requirements from the seller, and did not identify any

25
26
27
28

1  reciprocal consideration by the buyer beyond the exclusivity requirement it read into

2  the agreement.  *See* 2007 WL 841780, at *1, 7 (W.D.N.Y. Mar. 16, 2007).[2]

3      The terms of the JDLA make this case categorically different from the ones

4  Samsung identifies.  As part of the JDLA, Netlist provided Samsung with a license

5  to its patents, and the parties agreed to a research collaboration in which Netlist

6  would present design ideas to Samsung.  *See* JDLA §§ 2, 8.2, Appendix A-B.  The

7  facts here also reflect that both parties were aware of the significant value of

8  Samsung's supply obligation to Netlist, that it was a key point of focus in the

9  parties' negotiations, and that Samsung understood § 6.2 to be enforceable because

10  it began to sell substantially to Netlist after the agreement.  *See supra* ¶¶ 2-12, 15.

11      The patent license provided to Samsung clearly qualifies as requisite

12  consideration.  *See, e.g.*, *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982)

13  ("[I]t is enough that something is promised, done, forborne or suffered by the party

14  to whom the promise is made as consideration for the promise made to him.").

15  ### 3.     Options to purchase require no exclusivity

16      Alternatively, if the Court determines that no reasonable jury could conclude

17  there was consideration for a supply agreement because of the absence of the word

18  "exclusive," a reasonable jury could still conclude that § 6.2 is an options contract

19  with an open quantity term.  "An option contract is an agreement to hold an offer

20  open; it confers upon the optionee, for consideration paid, the right to purchase at a

21  later date."  *Pfeifer v. Groisman*, 997 N.Y.S.2d 706, 707 (2d Dept. 2014); *see also*

22  *Ittleson v. Barnett*, 758 N.Y.S.2d 360, 362 (2d Dept. 2003)  For example, in *In re*

23  *Modern Dairy of Champaign, Inc.*, Judge Posner noted that an agreement providing

24

---

25      [2] Moreover, the cases Samsung cites are in the context of the U.C.C.

26  Samsung has the burden of establishing that the U.C.C. applies.  *See, e.g.*, *Golisano*

27  *v. Vitoch Interiors Ltd.*, 54 N.Y.S.3d 244, 245 (App. Div. 2017).  It nevertheless

makes no argument for the U.C.C.'s application, nor does it explain why JDLA §

28  6.2 would be unenforceable if the U.C.C. does not apply.

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON THE PLEADINGS CASE NO. 8:20-CV-993-MCS (ADS)

10981150.52      - 13 -

that the seller was "required to furnish to each location the number of milk
containers requested by the Food Service Supervisor or school principal" could be
read as a valid options contract. *See* 171 F.3d 1106, 1109-10 (7th Cir. 1999).  As
the court explained, the seller's offer "to supply the buyer's needs for some good at
a specified price," if supported by consideration, created an enforceable contract.
*Id.* at 1110.  New York law operates the same:  "Once an optionee gives notice of
intent to exercise the option in accordance with the agreement, the unilateral option
agreement ripens into a fully enforceable bilateral contract." *Jarecki v. Shung Moo
Louie*, 95 N.Y.2d 665, 668 (2001).

Here, a reasonable jury could conclude that Netlist provided consideration in
the form of a license to its intellectual property in exchange for an option to
purchase NAND and DRAM products from Samsung.  Indeed, Samsung highlighted
the value of the consideration it received from Netlist to the Korean government,
stating that the patent license was the ████████████████████████████
████████     Ex. 14 at '763, '768 (emphasis added).  *See* JDLA § 8.2; *supra* ¶¶ 5-
12.  A reasonable jury could conclude that when Netlist sought to exercise the
option triggering Samsung's commitment to supply the products Netlist requested at
low-cost prices, Samsung refused and thus breached the parties' agreement.

### 4.    Courts consistently imply exclusivity provisions

If the Court concludes no reasonable jury could hold that the intellectual
property license granted by Netlist was consideration for the supply agreement when
it is treated as a requirements clause or an options contract, judgment is still not
available to Samsung.  That is because a reasonable jury could conclude there was
an implied commitment by Netlist to buy its requirements of the products Samsung
makes from Samsung directly.  Indeed, courts applying New York law and other
analogous state common laws consistently look at the commercial relationship and
context of the agreement to imply exclusivity.  As the Federal Court of Claims has

1    observed, because "[i]mplied rather than express exclusivity is not unusual in

2    requirements contracts," courts regularly infer exclusivity based on the

3    circumstances surrounding the parties' dealings.  *Ceredo Mortuary Chapel v. U.S.*,

4    29 Fed. Cl. 346, 350 (Fed. Cl. 1993); *see also Edison Elec. v. Thacher*, 229 N.Y.

5    172, 176 (1920) ("The intention is quite apparent that the company also obligated

6    itself to take from the defendant all covers required by it and could only go

7    elsewhere for them in case of strike or noncompliance by the defendant with the

8    terms of the contract."); *Scantibodies Lab'y v. Church & Dwight Co.*, 801 F. App'x

9    39, 40 (2d Cir. 2020) (requiring consideration of extrinsic evidence to determine

10   whether the parties understood their agreement to require exclusivity); *Mario*

11   *Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo*, 264 F.3d 32, 37 n.2 (2d Cir.

12   2001) ("The district court rightly determined that through their course of dealing,

13   the parties substituted Mario Valente for AED as the exclusive distributor of

14   defendants' overcoats."); *Godchaux-Henderson Sugar Co. v. Dr. Pepper-Pepsi Cola*

15   *Bottling Co.*, 1985 WL 13561, at *4 (6th Cir. 1985) ("[T]he only explanation [of the

16   contract] consistent with the course of dealing" was that the contract was a

17   requirements agreement.).

18         Under New York law, the Court must consider commercial context in

19   determining whether exclusivity was intended by the parties.  *See* N.Y. U.C.C. § 2-

20   306, official comment 2 ("requir[ing] the reading of commercial background and

21   intent into the language of any agreement."); *Feld v. Henry S. Levy & Sons, Inc.*, 37

22   N.Y.2d 466, 470 (1975) ("[T]he commercial background and intent must be read

23   into the language of any agreement.").  *Cyril Bath Co. v. Winters Indus.* is

24   particularly instructive here.  *See* 892 F.2d 465 (6th Cir. 1989).  In that case, the

25   Sixth Circuit concluded that a requirements contract was enforceable even though

26   there was no express promise of exclusivity because the seller understood that the

27   buyer would be placing its purchase orders based on its customers' needs.  *Id.* at

28

467.  There is substantial evidence that will be supplied at trial indicating that just this understanding exists in this case.  Among other facts, Netlist provided regular forecasts to Samsung showing the amount of product it would need Samsung to supply based on its customer needs.  *See* Ex. 10.  Netlist even made presentations to Samsung to explain its product requirements based on specifically identified customers and emphasized to Samsung that its "[p]roduct allocation support [was] critical."  *See* Ex. 7 at '039-51; Ex. 8.  For those Netlist customers who have qualified a given server or system to run on Samsung NAND and DRAM, the mutual understanding of the parties was that Netlist would obtain the product directly from Samsung.  Hong Decl. ¶ 6.  Indeed, for Netlist to voluntarily go to another entity for supply of Samsung NAND and DRAM when Samsung was willing to provide it would make no economic sense because ███████████ ████████████████████████████████████████████████████████ ███████████████████████████  *Id.*

Samsung asserts that the "JDLA explicitly states that the supply relationship between Netlist and Samsung is non-exclusive, and does not require either party to purchase any products from the other."  Motion at 11-12.  But neither of the contractual provisions Samsung cites (§§ 6.3, 6.4) supports its contention.  Section 6.3 makes clear that Samsung could continue selling its products to customers other than Netlist.  It says nothing about *buyside* exclusivity, i.e., whether the JDLA requires Netlist to buy NAND and DRAM products exclusively from Samsung.  The absence of a parallel provision on the buyside—one that expressly permits Netlist to purchase NAND and DRAM products from suppliers other than Samsung— reinforces that the parties contemplated that Samsung would be Netlist's supplier of NAND and DRAM for Netlist's Samsung-qualified customers.  And with respect to § 6.4, that provision simply reinforces that Netlist was only obligated to purchase its *requirements* from Samsung.  That is, in the event that Netlist had *no* requirements

1   for NAND and DRAM products, it was not subject to any minimum purchase

2   obligation.  *See, e.g.*, *HML Corp. v. Gen. Foods Corp.*, 365 F.2d 77, 81 (3d Cir.

3   1966) ("[G]enerally the buyer in a requirements contract is required merely to

4   exercise good faith in determining his requirements and the seller assumes the risk

5   of all good faith variations in the buyer's requirements").

6                    **5.    Section 6.2 is not void for indefiniteness**

7          Samsung asserts that § 6.2 is unenforceable because it contains "no explicit

8   quantity term," Motion at 9, 17, but Samsung has waived any such argument.  The

9   argument fails on the merits as well.

10                    a.    Samsung has waived any indefiniteness argument

11         When the absence of a quantity term is deemed fatal to an agreement, it is

12  because the agreement violates the statute of frauds.  *See Rosenfeld v. Basquiat*, 78

13  F.3d 84, 93 (2d Cir. 1996) (under statute of frauds, "the only term that *must* appear

14  in the writing is the quantity."); *Int'l Com. Res., Ltd. v. Jamaica Pub. Servs. Co.*,

15  612 F. Supp. 1153, 1155 (S.D.N.Y. 1985) (U.C.C. statute of frauds "requires that

16  the writing contain a quantity term."); 72 Am. Jur. 2d Statute of Frauds § 223 ("In

17  order to be sufficient as a memorandum of a contract of sale of goods, the writing

18  must state the quantity of the goods sold.").  "Rule 8(c) of the Federal Rules of Civil

19  Procedure enumerates certain matters that a party must plead affirmatively, among

20  which matters is the defense of the Statute of Frauds.  Failure to plead this defense

21  results in waiver of it under Rule 12(b), (h))."  *Morgan Elec. Co. v. Neill*, 198 F.2d

22  119, 122 (9th Cir. 1952).  Because Samsung did not plead statute of frauds in its

23  answer, *see* Dkt. 27 at 4-8, it has waived its "indefiniteness" defense.

24                    b.    Section 6.2 is not indefinite

25         If the Court allows Samsung to present its waived statute of frauds defense,

26  the supply obligation still does not fail for indefiniteness because of the multiple,

27  unmistakable indicia that the parties intended to create an enforceable contract.

28

1    New York law incorporates a clear "public policy in favor of freedom of contract,"

2    which "both promotes certainty and predictability and respects the autonomy of

3    commercial parties in ordering their own business arrangements." *159 MP Corp. v.*

4    *Redbridge Bedford, LLC*, 33 N.Y.3d 353, 359-60 (2019).  Accordingly, "where it is

5    clear from the language of an agreement that the parties intended to be bound and

6    there exists an objective method for supplying a missing term, the court should

7    endeavor to hold the parties to their bargain . . . Striking down a contract as

8    indefinite and in essence meaningless is at best a last resort." *166 Mamaroneck Ave.*

9    *Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991); *see also*, *e.g.*, N.Y. U.C.C.

10   § 2-204 ("Even though one or more terms are left open a contract for sale does not

11   fail for indefiniteness if the parties have intended to make a contract and there is a

12   reasonably certain basis for giving an appropriate remedy."); *Essco Geometric v.*

13   *Harvard Indus.*, 46 F.3d 718, 728 (8th Cir. 1995) (holding contract without

14   specified quantity term enforceable because evidence indicated that parties intended

15   to be bound).

16           Netlist has alleged that the parties intended to be bound—and performed as if

17   they were bound—by the supply clause before Samsung chose to breach the

18   contract.  As recited in the FAC, Samsung supplied only about ███████ worth of

19   products to Netlist prior to entering into the JDLA.  FAC ¶¶ 10-11.  After entering

20   into the JDLA, Samsung substantially complied with Netlist's requests and

21   dramatically increased the product supply it provided in accordance with Netlist's

22   large volume requests (which reached as high as ███████).  *Id.*  Interpreted in the

23   light most favorable to Netlist, these allegations demonstrate that Samsung intended

24   to be bound by the provision it now disavows and that the parties understood the

25   volumes that would be at issue.  *See Federal Ins.*, 258 A.D.2d at 44 ("The parties to

26   an agreement know best what they meant, and their action under it is often the

27   strongest evidence of their meaning.").  At a minimum, any inferences to be drawn

28

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

10981150.52                                - 18 -

1   based on Samsung's initial course of compliance with § 6.2 necessarily preclude

2   granting judgment on the pleadings.  *See Matter of Pooling & Servicing*

3   *Agreements*, No. 17 Civ. 1998 (KPF), 2018 WL 1229702, *6 (S.D.N.Y. Mar. 9,

4   2018) (extrinsic evidence bearing on parties' intent bars judgment on the pleadings).

5         The facts that will be adduced at trial will support Netlist's allegations.

6   Netlist provided regular forecasts to Samsung showing the amount of product it

7   would need Samsung to supply.  *See* Ex. 10.  Moreover, Netlist made multiple

8   presentations to Samsung to explain its product requirements based on specifically

9   identified customers and emphasized to Samsung that its "[p]roduct allocation

10  support [was] critical."  *See* Ex. 7 at '039-51; Ex. 8.  Because a reasonable

11  interpretation of the JDLA is that "both parties intended a requirements contract

12  based on [Netlist's] good faith needs [of product for Samsung-qualified customers],

13  . . . the indefiniteness of the written quantity term does not invalidate the

14  agreement."  *N. Jonas Co. v. Badische Corp.*, 706 F.2d 1161, 1165 (11th Cir. 1983).

15        Moreover, New York law permits courts to "supply a missing term in a

16  contract" where the circumstances warrant it.  *In re World Trade Ctr. Disaster Site*

17  *Litig.*, 754 F.3d 114, 122-23 (2d Cir. 2014).  When a quantity is not mentioned in

18  the contract, it "may be fairly and reasonably fixed by the surrounding

19  circumstances and the parties' intent."  *Id.*; *see also 166 Mamaroneck Ave.*, 78

20  N.Y.2d at 91 (courts look to objective external measures to supply missing terms).

21  Thus, even if Samsung were right on the contract (and it is not), a jury could still

22  evaluate the evidence and testimony and determine that because customers for

23  Netlist's high-performance memory module technologies qualify those technologies

24  based on memory manufacturer, the quantity of NAND and DRAM products Netlist

25  required was the amount that it would need to sell to its customers with Samsung-

26  qualified memory systems.  *See R. A. Weaver & Assocs., Inc. v. Asphalt Const., Inc.*,

27  587 F.2d 1315, 1319 (D.C. Cir. 1978) ("Normally a requirements contract is based

28

on a seller's obligation to supply the designated commodity to the buyer to the extent of the latter's needs during a specified period of time.").  A jury could also find that Netlist's requirements from Samsung were reasonably determinable from Netlist's public filings regarding the size of its business and from regular requests and forecasts Netlist provided to Samsung.  Moreover, this is not a situation in which Netlist made an unexpected request that Samsung in good faith could not supply, after which Netlist immediately sought to terminate the JDLA.  Nor is this a situation in which Netlist brought a claim for material breach because of a minor shortfall in response to a request.  Before the JDLA, Samsung supplied effectively no product to Netlist, and after the execution of the JDLA, Netlist and Samsung engaged in a course of dealing in which Netlist would make regular requests with which Samsung reasonably complied for nearly two years.  FAC ¶¶ 10-11.  The contract was definite and operating until Samsung told Netlist that it was cutting its allocation to zero and repeatedly failed to fill its requests through the period of termination.  FAC ¶¶ 10-14; *supra* ¶ 12; Hong Decl. ¶¶ 7-12; Paik Ki Hong Decl. ¶¶ 4-9.

### 6.    There is no bar to consequential damages because of Samsung's behavior

While JDLA § 12.5 excludes recovery of consequential damages as a general matter, New York law provides that a defendant may not assert this defense where it has acted in bad faith.  *See, e.g.*, *McNally Wellman Co. v. N.Y. State Elec. & Gas Corp.*, 63 F.3d 1188, 1198 n.9 (2d Cir. 1995); *Am. Tel. & Tel. Co. v. New York City Hum. Res. Admin.*, 833 F. Supp. 962, 989-90 (S.D.N.Y. 1993).  Bad-faith breach is a question of fact and is shown by "deliberate intent" or "intentional" conduct under New York law.  *See McNally*, 63 F.3d at 1198.  The FAC pleads allegations that provide substantial evidence of bad faith, including that Samsung performed under the JDLA until it unilaterally determined to reverse course and cut off Netlist's supply.  *See* FAC ¶¶ 11-14.  The facts will provide substantial evidence in support

of these allegations, including that Samsung was specifically aware of the harm cutting Netlist's product supply would cause but still acted intentionally to breach the contract. *See supra* ¶ 14. Moreover, the internal communications Samsung withheld until last week show that it knew the obligation to supply was binding yet intentionally and in bad faith acted otherwise. *See* Exs. 15-17.

**B.    Samsung's motion fails as to Netlist's JDLA § 3 claim**

Samsung's motion on Netlist's breach claims under § 3 of the JDLA is deficient on multiple grounds. First, Samsung's argument is premised on an incorrect and unreasonable reading of the JDLA. Samsung argues that Netlist was required to allege that "Samsung's 16.5% withholding violated Korean law" and specify "what Korean law . . . it violated." Motion at 20. But that is not what the JDLA provides. The relevant provision states:

> *To the extent that any withholding taxes are required by applicable law* for the payment set forth in this Agreement, Samsung may deduct any applicable withholding taxes . . . *and reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund* or exemption with respect to any such withholding taxes.

JDLA § 3.2 (emphasis added): The JDLA is clear: Netlist does not need to allege that Samsung's withholding *violated Korean law*, but only that Samsung *was not "required"* to withhold such taxes. Under the JDLA, even if Samsung had discretion to make a withholding under Korean law, it was not "required by applicable law" to do so. *See id.*

Samsung's misdirection is an attempt to avoid a fact undisclosed anywhere in its brief: Three months after Netlist filed the FAC, the Korean Tax Tribunal found that the NRE fee was *not taxable* in Korea and that Samsung's withholding was *not required*. Ex. 13. Whether Samsung's withholding was required under Korean law was litigated in Korea and Samsung lost. This Court may take judicial notice of that ruling, *see de Fontbrune v. Wofsy*, 838 F.3d 992, 995-99 (9th Cir. 2016), which obviates the need to interpret Korean tax law here.

10981150.52                                                                 - 21 -

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

Second, Netlist's complaint clearly alleges that it has continued to seek a lawful refund from the Korean tax authorities for the amount over-withheld, and that Netlist has "repeatedly requested that Samsung cooperate in claiming a credit, refund, or exemption for this amount."  FAC ¶¶ 15-18.  As pled in the complaint, Samsung "has delayed or declined to provide the cooperation requested, and has not been forthcoming to Netlist regarding what it has done or could do to help." *Id.* Moreover, Netlist specifically alleges it "suffered damages" as a "direct and proximate result of Samsung's breach" of its obligation to "reasonably cooperate with Netlist" in obtaining the refund. *Id.* ¶¶ 15-18, 34.  Samsung does not—and cannot—deny that Netlist's allegations of Samsung's non-cooperation raise issues of fact that can only be resolved by a fact-finder on a full evidentiary record. *See, e.g.*, *Maxim Integrated Prod., Inc. v. Analog Devices, Inc.*, 1996 WL 117425, at *3 (9th Cir. Mar. 15 1996) (rejecting argument "that, as a matter of law, there was no breach" because "a dispute over the interpretation" of a contractual cooperation provision "is "properly one for the jury").  Judgment on the pleadings is improper.

### C.    The Motion fails as to Netlist's declaratory judgment claim

#### 1.    Samsung is barred from raising election of remedies

Because Samsung did not plead election of remedies in its answer, it has waived that defense and cannot now raise it in its motion.  *See* Answer, Dkt. 27 at 4-8; *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 709-10 (S.D.N.Y. 2012) ("Under New York law, election of remedies is an affirmative defense.").  Moreover, even if Samsung had properly pleaded that defense, which it has not, "affirmative defenses may not be raised by motion to dismiss." *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984).

#### 2.    There has been no waiver or election of remedies

The JDLA includes an express no-waiver of rights provision (§ 16.2).  New York law "uniformly enforce[s] these types of clauses," which erect a "high burden" that Samsung can overcome only by providing "evidence sufficient to demonstrate

that [Netlist] intended for the no-waiver clause to have no effect" here. *Optima Media Grp. v. Bloomberg*, 2021 WL 1941878, at *14 (S.D.N.Y. May 14, 2021) (quotes omitted).  In light of the no-waiver clause, "the Court cannot infer" on the pleadings that Netlist intended to waive its right to terminate just because it did not do so immediately upon Samsung's initial breach.  *Id.*

Separately, Samsung has conflated two distinct doctrines:  waiver and election of remedies.  *See ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp. 2d 383, 388-89 (S.D.N.Y. 1999).  Neither applies.  Netlist alleges that Samsung continuously breached JDLA §§ 3.2 and 6.2 through its ongoing failures to reasonably cooperate with Netlist in connection with the improper withholding of Netlist's funds and to properly supply memory products.  FAC ¶¶ 13-14, 17–18, 27, 32.  New York law recognizes the continuing wrong doctrine, under which ongoing breaches of a contract result in a "cause of action accru[ing] anew every day for each continuation of the wrong" because "the claims for breach of that obligation are not referable exclusively to the day the original wrong was committed."  *Stalis v. Sugar Creek Stores, Inc.*, 295 A.D.2d 939, 940-41 (N.Y. App. Div. 2002).  Separate from the no-waiver clause, the continuing nature of Samsung's repeated breaches thus provided Netlist with the ongoing right to terminate.  *See, e.g.*, *Optima*, 2021 WL 1941878, at *15; *ESPN*, 76 F. Supp. 2d at 392.

Waiver.  "Under New York law, waiver is the voluntary and intentional relinquishment of a contract right," which "must be based on a clear manifestation of intent" and "is not to be inferred from a doubtful or equivocal act."  *Optima*, 2021 WL 1941878, at *13.  Samsung's supply obligation was exceedingly valuable to Netlist, and Netlist tried for as long as possible to coax Samsung into resuming compliance.  *See* FAC ¶¶ 12-13, 17-18; Hong Decl. ¶¶ 4-5, 7-11; Paik Ki Hong Decl. ¶¶ 5-9.  That was an attempt by Netlist to mitigate damages, not acquiescence.  Even absent the no-waiver provision, "a party's patience with a contractual partner

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

1  who is struggling to perform does not equate to a waiver." *Optima*, 2021 WL
2  1941878, at *14; *see also S.D. Hicks v J.T. Baker Chem. Co.*, 307 F.2d 750, 752 (2d
3  Cir. 1962).

4      Election of Remedies.  An election of remedies "is not a waiver of rights but
5  an exercise of rights" requiring a party to exercise remedies "in a consistent and
6  binding matter." *ESPN*, 76 F. Supp. 2d at 390.  Upon a material breach "the non-
7  breaching party must choose . . . to terminate the contract or continue it."
8  *Awards.com v. Kinko's, Inc.*, 42 A.D.3d 178, 188 (N.Y. App. Div. 2007).

9      Here, Netlist never made an election not to terminate the JDLA.  "Good faith
10 attempts to realize contractual benefits by negotiating with a counterparty, rather
11 than immediately filing suit, do not constitute an election of remedies," *MBIA*, 842
12 F. Supp. 2d at 711, as the doctrine "permits parties to wait a reasonable time after
13 learning of the alleged breaches before terminating the contract," *Bigda v.
14 Fischbach Corp.*, 898 F. Supp. 1004, 1012 (S.D.N.Y. 1995).  Furthermore, "whether
15 an action has been taken within a reasonable time is a question of fact" that must be
16 evaluated "flexibly" based upon "the nature, purpose and circumstances of the
17 action at issue." *RIJ Pharm. Corp. v. Ivax Pharms, Inc.*, 322 F. Supp. 2d 406, 413
18 (S.D.N.Y. 2004); *see also, e.g.*, *U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*, 950 F.
19 Supp. 504, 518 (E.D.N.Y. 1997) (similar).  Such factual determinations cannot be
20 made on a Rule 12 motion.  Nor can factual determinations be made based on the
21 pleadings as to whether "there has clearly been an irrevocable election," "in
22 reliance" upon which either Netlist "gained an advantage," or Samsung "suffered
23 some detriment." *Prudential Oil Corp. v. Phillips Petroleum C*o., 418 F. Supp. 254,
24 257 (S.D.N.Y. 1975).

25     Lastly, because election "represents a harsh and arbitrary principle designed
26 only to prevent vexatious litigation," *Prudential*, 418 F. Supp. at 257 (quotes
27 omitted), it is "applied sparingly by New York courts." *Optima*, 2021 WL 1941878,
28

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)

at *15.  And it is applied with an eye to ensuring that courts do not inadvertently "create an incentive for parties to litigate" prematurely or excessively, *K.M.L Labs v. Hopper.*, 830 F. Supp. 159, 166 (E.D.N.Y. 1993); *see also U.S. Postal Serv.*, 950 F. Supp. at 518 ("[T]here is no requirement that the injured party commence legal proceedings immediately, and the law should not create an incentive to do so"). That Netlist did not rush to the courthouse "easily could be understood to reflect a belief . . . that immediate suit was unnecessary or was unwarranted because . . . a reconciliation would occur eventually." *Luitpold Pharms., Inc. v. Ed. Gestilich Sohne A.G.,* 784 F.3d 78, 95-96 (2d Cir. 2015).  None of the cases Samsung cites grant a Rule 12 motion on election of remedies grounds, nor do they involve a situation where, as here, the non-breaching party was making good faith attempts to coax the breaching party into resuming compliance.  *See Bigda*, 898 F. Supp. at 1011 (plaintiff "did nothing about his grievances . . . in the face of all [the] breaches that had occurred"); *Dun & Bradstreet Corp. v. Harpercollins Pubs., Inc.*, 872 F. Supp. 103, 110 (S.D.N.Y. 1995) (no attempt made to seek breaching party's compliance); *ESPN*, 76 F. Supp. 2d at (S.D.N.Y. 1999) (party's "fail[ure] to object in any way" to counterparty's breaches may result in waiver); *Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 254 (S.D.N.Y. 2001) (party knowingly accepted royalties from unauthorized sales that were the basis for claim of termination) (noting different outcome would apply if agreement contains express non-waiver clause).

## III.   CONCLUSION

For the foregoing reasons, Netlist respectfully requests that the Motion be denied.  In the alternative, Netlist should be granted leave to amend its complaint.

1

2    Dated: July 26, 2021                    GIBSON, DUNN & CRUTCHER LLP

3                                            By: /s/ Jason C. Lo
                                             Jason C. Lo
4                                            333 South Grand Avenue
5                                            Los Angeles, CA 90071
                                             213.229.7000
6                                            jlo@gibsondunn.com

7
                                             Attorneys for Plaintiff Netlist Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NETLIST INC.'S OPPOSITION TO SAMSUNG
ELECTRONICS CO., LTD.'S MOTION FOR JUDGMENT ON
THE PLEADINGS
CASE NO. 8:20-CV-993-MCS (ADS)