# Exhibit 19

REDACTED VERSION OF EXHIBIT 19 PROPOSED TO BE FILED UNDER SEAL

JASON C. LO, SBN 219030~~jlo@gibsondunn.com~~
   jlo@gibsondunn.com
**MATTHEW BENJAMIN (*pro hac vice*)**
   **mbenjamin@gibsondunn.com**
~~BROOKE WALLACE, SBN 259169~~
**RAYMOND A. LAMAGNA, SBN 244821**
      ~~bwallace@gibsondunn.com CAROLINE MONROY, SBN 329018~~
   **rlamagna@gibsondunn.com**
~~cmonroy@gibsondunn.com~~
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile:   213.229.7520

ATTORNEYS FOR PLAINTIFF NETLIST INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>Defendant. | CASE NO. 8:20-cv-993-~~JAK~~**MCS** (~~DFMx~~**ADS**)<br><br>SEALED ~~FIRST~~**[PROPOSED] SECOND** AMENDED COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF<br><br>DEMAND FOR JURY TRIAL<br><br>~~FILED UNDER SEAL PURUSANT TO ORDER OF COURT DATED AUGUST 12, 2020~~ |

REDACTED VERSION OF EXHIBIT 19, REDLINE OF NETLIST INC.'S SECOND AMENDED COMPLAINT PROPOSED TO BE FILED UNDER SEAL

10979005.31  01

Plaintiff Netlist Inc. ("Netlist") complains and alleges the following against Defendant Samsung Electronics Co., Ltd. ("Samsung"):

## THE PARTIES

1. Netlist is a Delaware corporation having its principal place of business at 175 Technology Drive, Suite 150, Irvine, CA 92618.

2. Samsung is a Korean corporation with its principal offices at 129 Samsung-Ro, Yeontong-gu, Suwon-si, Gyeonggi-do, South Korea. Samsung manufactures and sells a wide range of products, including semiconductors, memory components, and memory modules, in the United States.

## JURISDICTION

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds seventy-five thousand dollars ($75,000) exclusive of interest and costs, and there is complete diversity of citizenship because Defendant Samsung is a citizen of South Korea and Plaintiff Netlist is a citizen of California.

4. This Court has personal jurisdiction over Samsung because Samsung transacted and continues to transact business in this District and its actions caused and continue to cause injury to Netlist within this District.

5. This Court has the power to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. An actual controversy exists between the Parties within the meaning of 28 U.S.C. § 2201(a), which is of sufficient immediacy and reality to warrant declaratory relief.

## VENUE

6. Venue is proper within this District under 28 U.S.C. § 1391(b) and (c). Samsung transacts business and contracted to sell its products to Netlist within this District. Venue also is proper because Netlist's principal place of business is in this

District, and Netlist suffered harm in this District. Finally, a substantial part of the events giving rise to the claims occurred in this District.

## BACKGROUND

7. Netlist is a leading provider of high-performance modular memory subsystems to original equipment manufacturers, and specializes in hybrid memory that merges DRAM and NAND flash raw materials to create efficient memory solutions.

8. Samsung is South Korea's largest company and one of the world's largest producers of semiconductors. Among other things, Samsung develops, manufactures, and sells memory components and memory modules.

9. On November 12, 2015, Netlist and Samsung entered into a Joint Development and License Agreement (the "Agreement"). Netlist and Samsung entered into the Agreement ███████████████████████████████████████████████████████████████████████████████████████."

**Supply Terms**

10. As part of the consideration of the Agreement, Netlist sought to ensure that it would have a dependable and stable supply of NAND and DRAM products from Samsung. **Samsung's supply obligation was critical from Netlist's perspective for two main reasons. First, the semiconductor industry has historically experienced cyclical shortages of NAND and DRAM, so Netlist aimed to reduce business risk stemming from the possibility that these shortages would disrupt the flow of products to its customers. Second, Samsung supplies NAND and DRAM directly only to a handful of select companies worldwide. An agreement with Samsung for direct product supply would elevate Netlist into an elite group of industry players and provide assurances to Netlist's customers that if they engaged Netlist, they would have good access to**

supply. Thus, Samsung agreed to supply Netlist with certain products *on request*. Section 6.2 of the Agreement states, "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products)."

11. The supply obligation provision was heavily negotiated and carefully drafted by the parties. As part of intensive discussion of the size of the payment Samsung would make to Netlist, Samsung sent Netlist a term sheet identifying ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ In explaining this clause, Samsung told Netlist that ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

12. Samsung subsequently proposed an insertion stating that ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ Netlist struck the language, making clear that the supply obligation was firm and binding. As Netlist wrote to Samsung: ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ Consistent with the language Netlist came back with, the final version of the JDLA excludes Samsung's proposed language and instead states that Samsung "*will supply* NAND and DRAM products to Netlist on Netlist's request." JDLA § 6.2.

13.     The negotiations over Samsung's supply obligation were central to the overall commercial terms of the Agreement. In particular, Netlist pressed Samsung for a higher non-recurring engineering ("NRE") fee for development costs, but ultimately agreed to reduce its bottom-line ask in exchange for Samsung's commitment that the supply obligation provision would be enforceable. Netlist's earliest term sheet to Samsung sent in April 2015 proposed ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Samsung countered one month later ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. The parties continued to negotiate terms over the next several months.

14.     Because securing direct supply of NAND and DRAM was critical to Netlist, Netlist was willing to make a number of important concessions to Samsung in exchange for the supply obligation provision. Chief among these, Samsung was focused from the start on obtaining a valuable intellectual property license to Netlist's patents, which Netlist ultimately agreed to provide even though Samsung would make only a small cash payment to support an engineering collaboration between the parties. *See* Agreement § 8.2 (granting Samsung "a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Netlist's Licensed Patents to make and have made (subject to Section 8.4) Samsung's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of such products"); 3.1 ($8 million NRE fee).

15.     Samsung highlighted the importance and value of the intellectual property license to the Korean government, claiming in fact that the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Further

reflecting the significance of the direct supply relationship, Samsung provided Netlist with written confirmation that Netlist was authorized to purchase "Samsung Electronics Co., Ltd's full line of memory semiconductor products to support Netlist's products and customers" and that Netlist was now a "direct customer of Samsung . . . with purchase orders placed directly with Samsung and shipments made from Samsung to Netlist."

16.    ~~11.~~In the year prior to entering the Agreement, Samsung supplied less than ▮▮▮▮ worth of its products to Netlist. After signing the Agreement, Netlist and Samsung increased their transactions. At first, Samsung supplied NAND and DRAM products to Netlist on request in accordance with the Agreement, and Netlist purchased these products regularly. During the first two years, Samsung sold Netlist ▮▮▮▮ worth of products each quarter. In 2016, Netlist purchased approximately ▮▮▮▮ worth of NAND and DRAM products from Samsung. In **early** 2017, Netlist**'**s purchases increased to approximately ▮▮▮▮.

17.    ~~12.However in 2018, Samsung began not to fulfill~~**In May 2017, Samsung announced that it would, on a going forward basis, allocate zero inventory to** Netlist~~'s requests or orders~~. **After this announcement,** Samsung deliberately began to restrict Netlist**'**s access to products and failed to fulfill its orders, often without notice and always in violation of the Agreement. For example, in the first quarter of 2018, Samsung supplied Netlist with only ▮▮▮▮ worth of products—despite Netlist**'**s request for substantially higher volumes—which is less than 5% of the volume supplied in the same quarter of the previous year. **Samsung's internal documents make clear that it recognized it had a binding obligation to Netlist and refused to comply.**

~~13.Samsung continues to restrict the supply of NAND and DRAM products to Netlist.~~

18. Netlist repeatedly tried to convince Samsung employees to reverse course. Because the supply obligation Samsung agreed to was exceedingly valuable to Netlist, Netlist tried for as long as possible to coax Samsung into continued compliance while it was forced to accept the diminishing amount of product Samsung chose to supply.

19. After the Agreement was signed through the time Netlist sent its notice of material breach, Netlist attempted to fill its entire requirement for Samsung-qualified NAND and DRAM from Samsung. The market for NAND and DRAM is effectively an oligopoly with Micron, SK Hynix, and Samsung controlling approximately 95% of the world's supply. Although all three manufacturers offer NAND and DRAM, the products from the three suppliers are not interchangeable. This is because each company implements different design and fabrication processes which result in varying speed, power, and endurance characteristics in customers' server and storage systems. Therefore, a server or storage manufacturer cannot simply replace a Hynix or Micron server memory for a Samsung server memory without re-qualification or in some cases, a redesign of their server systems. [REDACTED]

20. For those Netlist customers who have qualified a given server or storage system to run Samsung NAND and DRAM, Samsung and Netlist's mutual understanding was that Netlist would obtain the product directly from Samsung. Indeed, for Netlist to voluntarily go to a third-party middleman for supply of Samsung NAND and DRAM when Samsung was obligated to provide these products directly would make no sense. [REDACTED]

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **For these**

3 **reasons, after the JDLA was signed, Netlist attempted to fill its entire**

4 **requirement for Samsung-qualified NAND and DRAM from Samsung. And**

5 **because customers for Netlist's high-performance memory module technologies**

6 **qualify those technologies based on memory manufacturer, the quantity of**

7 **NAND and DRAM products Netlist required from Samsung was the amount**

8 **Netlist would need to sell to its customers with Samsung-qualified memory**

9 **systems.**

10 **21.** ~~14.~~ By repeatedly breaching the Agreement, Samsung forced Netlist to

11 forgo business opportunities and purchase NAND and DRAM products at higher

12 prices in the secondary market. Netlist was unable to obtain many products that

13 Samsung provided and was required to supply under the Agreement. When

14 Samsung failed to fulfill ~~Netlists'~~ **Netlist's** orders, Netlist could not supply its

15 customers and lost business opportunities and profits it otherwise would have earned

16 had Samsung performed. In addition, Netlist paid higher prices for smaller volumes

17 of the NAND and DRAM products that could be purchased in the secondary market.

18 **22.** **Samsung told Netlist that it intended to cease supplying to Netlist,**

19 **even though it was specifically aware of Netlist's need to deliver these products**

20 **to its customers. Netlist provided regular forecasts to Samsung showing the**

21 **amount of product it would need Samsung to supply. Netlist even made**

22 **multiple presentations to Samsung to explain its product requirements based**

23 **on specifically identified customers and emphasized to Samsung that its**

24 **"[p]roduct allocation support [was] critical." And when Samsung notified**

25 **Netlist that it was cutting its supply to zero, Netlist wrote to Samsung that the**

26 **decision was a "problem" because the "JDLA states Samsung will support**

27 **Netlist[.] We have on paper that Samsung will support Netlist with components**

28

for NVDIMM. We have been qualifying Samsung everywhere so how do we move forward." But Samsung still failed to remedy its breaches.

23. Samsung did not claim at any point prior to this litigation that the supply obligation provision in Section 6.2 was unenforceable. To the contrary, Samsung substantially complied with the obligations of Section 6.2 for nearly two years before deciding to breach, and Samsung's own personnel involved in drafting the Agreement expressly recognized "Netlist and Samsung's cooperation and supply terms per agreement JDLA."

**Joint Development Fees**

24. In addition, Section 3.1 of the Agreement provides that Samsung "shall pay to Netlist eight million United States dollars ($8,000,000) as non-refundable NRE [non-recurring engineering] fees" to compensate Netlist for its development costs. Section 3.2 of the Agreement permits Samsung to withhold taxes due or payable to the Korean tax authority only if "required to do so by applicable law," and, even then, requires Samsung to "reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes."

25. Shortly after entering the Agreement, Samsung withheld $1,320,000 of the $8 million owed to Netlist under Section 3.1. Samsung claims it paid this withholding to the Korean tax authority, even though, on information and belief, the $8 million payment to Netlist was not properly taxable in Korea. This was a surprise to Netlist, which had understood that the amount would not be taxed in Korea under the applicable law.

26. On November 17, 2020, the Korean Tax Tribunal found that the NRE fee was *not taxable* in Korea and that Samsung's withholding was *not required.*

27. ~~17.~~Netlist **has** sought ~~and continues to seek~~ its lawful refund from the Korean tax authorities for the amount over-withheld and ~~has~~ repeatedly requested that Samsung cooperate in claiming a credit, refund, or exemption for this amount. Samsung ~~has~~ instead responded that it properly withheld taxes~~,~~ ~~has~~ and delayed or declined to provide the cooperation requested, and ~~has~~was not ~~been~~ forthcoming to Netlist regarding what it ~~has~~had done or could do to help.

28. ~~18.~~Samsung ~~has~~ breached the Agreement by wrongfully withholding 16.5% of the payment owed to Netlist, and by failing to cooperate with Netlist as the latter ~~continues~~continued to seek to recover the amount withheld.

**Termination**

29. ~~19.~~On May 27, 2020, Netlist notified Samsung that Netlist was exercising its rights under Section 13.2 of the Agreement. That section provides that a party may terminate the Agreement if the other ~~"~~"Party is in material breach of [the] Agreement and it is not cured within thirty (30) days period from the other Party~~'~~'s written demand, or as a consequence of the breach the purpose of this Agreement cannot be achieved.~~"~~"

30. As Netlist's notice stated: "Under Section 6.2 of the Agreement, Samsung is contractually obligated to 'provide NAND and DRAM products to Netlist on Netlist's request at a competitive price,'" but Samsung "has repeatedly failed to fulfill Netlist's requests for NAND and DRAM products throughout the term of the Agreement." Additionally, "Section 3.2 permits Samsung to deduct withholding taxes only if required by applicable law, and even then, to reasonably cooperate with Netlist to claim a credit, refund, or exemption with respect to any such withholding taxes. Samsung has breached these obligations as well."

**31.** Samsung's breaches preclude a material purpose of the Agreement from being achieved—namely, Netlist's contractual right to obtain NAND and DRAM products on request at a competitive price and to receive full payment.

**32.** Samsung did not cure its breach within thirty days of receiving notice, **nor did it even respond to Netlist's notice of breach**.

**33.** On July 15, 2020, Netlist issued written notice to Samsung terminating the Agreement under Section 13.2.

**34.** Upon a termination pursuant to Section 13.2 of the Agreement, all licenses and other rights previously granted to the defaulting party, Samsung, will "cease forthwith as of the effective date of such termination" [i.e., July 20, 2020]. Moreover, "[u]pon any expiration or termination of [the] Agreement, each Party shall return all Confidential Information of the other Party in such first Party's possession or under such first Party's control and certify in writing its compliance with such obligation."

**35.** Samsung did not respond to Netlist's attempts to notify the company of its breaches and its decision to terminate the Agreement. Samsung has not complied with its obligations upon termination.

## COUNT ONE

### (Breach of Contract)

**36.** Plaintiffs hereby incorporate each preceding and succeeding paragraph as relevant and as though fully set forth herein.

**37.** As alleged above, Samsung entered into an Agreement with Netlist that required Samsung to supply NAND and DRAM products to Netlist on Netlist's request at a competitive price.

**38.** Samsung breached the Agreement by failing to supply these products to Netlist on request **and at a competitive price. These breaches**

occurred repeatedly and continued throughout the term of the Agreement. Samsung's breaches were made in bad faith because, among other things, Samsung determined to cut Netlist's allocation to zero and did so after initially performing under the Agreement until it arbitrarily determined to de-list Netlist. Samsung intentionally cut off Netlist's product supply even though it was specifically aware of the substantial harm it would cause Netlist. Netlist provided regular forecasts to Samsung showing the amount of product it would need Samsung to supply. Netlist even made multiple presentations to Samsung to explain its product requirements based on specifically identified customers and emphasized to Samsung that its "[p]roduct allocation support [was] critical." Netlist was explicit with its concerns, which Samsung ignored. Netlist's Vice President wrote to Samsung: "I was just told that Samsung North America has decided to give Netlist $0 allocation and no support. This is a problem . . . We have a JDLA that states Samsung will support Netlist[.] We have on paper that Samsung will support Netlist" and lack another way to "move forward." But Samsung still refused to remedy its breaches.

**39.** ~~28.~~ Netlist has performed all material obligations owed to Samsung under the Agreement.

**40.** ~~29.~~ As a direct and proximate result of Samsung's breach of the Agreement, Netlist has suffered damages.

## COUNT TWO

### (Breach of Contract)

**41.** ~~30.~~ Plaintiff hereby incorporates each preceding and succeeding paragraph as relevant and as though fully set forth herein.

**42.** ~~31.~~ As alleged above, Samsung entered into an Agreement with Netlist that required Samsung to pay Netlist "eight million United States dollars

10979005 31 01
- 12 -

($8,000,000) as non-refundable NRE [non-recurring engineering] fees to compensate Netlist for its development costs.""

43. **On November 17, 2020, the Korean Tax Tribunal found that the NRE fee was *not taxable* in Korea and that Samsung's withholding was *not required*.**

44. ~~32.~~Samsung breached the Agreement by wrongfully withholding $1,320,000 of the $8 million owed to Netlist as consideration for its development costs and by failing to reasonably cooperate with Netlist as ~~it~~ the latter ~~continues~~continued to seek its refund from the Korean tax authorities for the amount over-withheld.

45. ~~33.~~Netlist has performed all material obligations owed to Samsung under the Agreement.

46. ~~34.~~As a direct and proximate result of Samsung~~'~~'s breach of the Agreement, Netlist has suffered damages ~~at least in the amount of~~ $1,320,000 ~~plus all applicable prejudgment and post-judgment interest, and such further and other relief as this Court shall deem just and proper~~.

## COUNT THREE

### (Declaratory Relief: Termination of Contract)

47. ~~35.~~Plaintiff hereby incorporates each preceding and succeeding paragraph as relevant and as though fully set forth herein.

48. ~~36.~~Samsung repeatedly breached the Agreement and its breaches preclude a material purpose of the Agreement from being achieved.

49. ~~37.~~On May 27, 2020, Netlist sent notice of this breach to Samsung pursuant to the terms of the Agreement stating that Netlist was exercising its rights under Section 13.2 of the Agreement.

50. ~~38.~~Samsung did not cure its breach, and on July 15, 2020, Netlist sent written notice to Samsung terminating the Agreement under Section 13.2.

**51.** ~~39.~~As a result of termination, all licenses and other rights previously granted to Samsung ceased on July 20, 2020. Samsung has not acknowledged Netlist~~'~~'s termination nor has it complied with its obligations upon termination.

**52.** ~~40.~~As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the Parties, and a determination of rights under the Agreement is appropriate under 28 U.S.C. § 2201(a).

**53.** ~~41.~~Accordingly, Netlist seeks a determination that it has terminated the Agreement under Section 13.2, and all license and other rights granted to Samsung under the Agreement have ceased as of July 20, 2020.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

~~(a)~~**(a)** An award of damages to Netlist in an amount to be determined at trial;

~~(b)~~**(b)** A declaratory judgment that Netlist has terminated the Agreement pursuant to Section 13.2 and that Samsung~~'~~'s licenses and rights under the Agreement have ceased;

~~(c)~~**(c)** Prejudgment and post-judgment interest;

~~(d)~~**(d)** Any such other, further, and general relief as is just and proper.

## DEMAND FOR JURY TRIAL

Netlist hereby demands a trial by jury on all issues raised by the First Amended Complaint under Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: ~~August 31, 2020~~**July 26, 2021**

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Jason Lo
Jason Lo

Attorney for Netlist Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28