1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION - SANTA ANA

NETLIST INC.,                  )   Case No. SACV 20-993-MCS (ADSx)
                               )
        Plaintiff,             )   Santa Ana, California
                               )   Thursday, July 29, 2021
            v.                 )
                               )   TELEPHONIC HEARING
SAMSUNG ELECTRONICS CO.,       )
LTD.,                          )
                               )
        Defendant.             )
_____)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

Appearances:              See Page 2

Deputy Clerk:             Kristee Hopkins

Court Reporter:           Recorded; CourtSmart

Transcription Service:    JAMS Certified Transcription
                          16000 Ventura Boulevard #1010
                          Encino, California  91436
                          (661) 609-4528

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

```
 1  APPEARANCES:

 2

 3  For the Plaintiff:       Gibson, Dunn & Crutcher LLP
                             By:  RAYMOND A. LA MAGNA
 4                               MARISSA MULLIGAN
                             333 South Grand Avenue, 46th Floor
 5                           Los Angeles, California  90071
                             (213) 229-7000
 6                           rlamagna@gibsondunn.com
                             mmulligan@gibsondunn.com
 7

 8

 9  For the Defendant:       Bird, Marella, Boxer, Wolpert,
                             Nessim, Drooks, Lincenberg & Rhow
10                           By:  MARC E. MASTERS
                                 JUMIN "CHRISTOPHER" LEE
11                           1875 Century Park East, 23rd Floor
                             Los Angeles, California  90067
12                           (310) 201-2100
                             mmasters@birdmarella.com
13                           clee@birdmarella.com

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SANTA ANA, CALIFORNIA, THURSDAY, JULY 29, 2021

2       (Call to Order of the Court.)

3          THE CLERK:  Calling Case SACV 20-993, *Netlist Inc.*

4  *v. Samsung Electronics Company*.

5          And, counsel, please state your appearances,

6  starting with plaintiff.

7          RAYMOND A. LA MAGNA:  This is Raymond LaMagna of

8  Gibson, Dunn & Crutcher on behalf of Plaintiff Netlist, Inc.,

9  and I'm joined by my colleague Marissa Mulligan.

10         THE COURT:  All right.  Good morning.

11         MARC E. MASTERS:  Good morning, Your Honor.  This

12 is Marc Masters from Bird Marella representing Defendant

13 Samsung.  I'm here with my colleague Christopher Lee.

14         THE COURT:  All right.  Good morning, gentlemen.

15         All right.  Well, so we are here on our continued

16 informal discovery conference, and as I understand it, we

17 have potentially on the table the logistical questions

18 regarding depositions, the 30(b)(6) deposition topics, we

19 have the -- certain written discovery; is that correct?

20         MR. LA MAGNA:  That is correct, Your Honor.  On the

21 written discovery we have --

22         THE COURT:  Just say -- I'm sorry.  Would you

23 please identify yourself for the record.

24         MR. LA MAGNA:  My apologies.  This is Ray LaMagna

25 for plaintiff.

1          We have some RFPs that basically match the same

2     issues that come up the 30(b)(6) notice so those are the same

3     issue but in -- just discovery in two different forms, and a

4     couple of issues with some rogs, and a couple of issues with

5     some RFAs.  So it's --

6               THE COURT:  All right.

7               MR. LA MAGNA:  -- kind of a bit of everything.

8               THE COURT:  Okay.  Well, why don't we start with --

9               MR. MASTERS:  Your Honor -- Your Honor, this is --

10              THE COURT:  (Inaudible) --

11              MR. MASTERS:  This is Marc Masters.  I apologize

12    for interrupting.

13              I wanted to ask whether, we do it now or at the end

14    -- we have received and reviewed your order from the last

15    hearing regarding the document production.  We just need some

16    clarification on certain aspects of the order, and we can

17    either deal with that now or at the end, whatever Your Honor

18    prefers.

19              THE COURT:  Oh, why don't we do that at the end.

20              MR. MASTERS:  Sure.

21              THE COURT:  All right.  So why don't we start with

22    the deposition issues.

23              MR. LA MAGNA:  Sure.  In terms of logistics, I

24    think we're down to basically one logistical --

25              THE COURT:  I'm sorry.  Is this Mr. LaMagna?

1           MR. LA MAGNA:  My -- yeah.  My apologies again,

2    Your Honor.

3           THE COURT:  I know it's hard to remember but just

4    -- if you -- if you ever need a transcript, trust me, you

5    want your name on there.

6           MR. LA MAGNA:  Oh, I know it's in my self-interest,

7    and I'm, as usual, cutting myself off at the knees.

8           So -- yeah, this is Ray LaMagna for plaintiff.

9           Basically, the issue is this: A fair number of

10   Samsung's deponents are, you know, outside the United States.

11   One's in Germany, and the others are in Korea and speak, as I

12   understand, Korean.  Defendant has requested that, you know,

13   given, obviously, current country conditions, et cetera, that

14   these be done by video versus requiring people to travel to

15   the United States and have to, you know, go through a

16   quarantine period and that there be sequential translation

17   for that.

18          And we have, you know, offered to agree provided

19   that -- with respect to translation that there be basically a

20   time adjustment to account for the translation in that, you

21   know, there's a substantial convenience to the -- to

22   defendant to do the depositions this way, but it'll be very

23   difficult.  If we have to go through, obviously, sequential

24   translation, it doubles the time.  Basically, everything gets

25   asked in English, it gets translated, it gets answered in a

1  foreign language, it gets translated back, and so we

2  basically asked that the questioning time be counted that is

3  subject to translation at, you know, 50 percent.

4          In practical terms, I don't think this has an

5  impact on most of the witnesses.  So most of these witnesses,

6  I think, we should be able to get through in a 7-hour

7  deposition, notwithstanding the fact that there's translation

8  involved.  So it's not a practical problem.  It may be a

9  practical problem for some of the 30(b)(6) deponents because,

10 quite frankly, they're sitting simultaneously in their

11 30(b)(1) capacity and also in their 30(b)(6) capacity.

12 They're going to have more questions, I assume, you know, and

13 so we want to be able to reserve the ability to roll to a

14 second day, still subject to the 7-hour limitation but, you

15 know, with this adjustment given the translation, and the

16 parties have not yet reached an agreement on that.

17         THE COURT:  Okay.  Let me hear from defense

18 counsel.

19         JUMIN "CHRISTOPHER" LEE:  Your Honor, this is

20 Christopher Lee.  I can address that.

21         Your Honor, we're certainly not categorically

22 opposed to providing additional time for depositions if there

23 are questions that need to be asked and the translation

24 causes us to run over, but we really think this is -- should

25 be addressed on a case-by-case basis.  I don't think we're

1    able to categorically agree to have plaintiffs take an

2    additional day for all of our witnesses who require

3    translation, and as my colleague mentioned, I don't think it

4    will be an issue for most of these witnesses.

5          In addition, given the fact that we are splitting

6    our 30(b)(6) topics across two separate witnesses, I think

7    it's highly unlikely this issue will come up in any context,

8    but if it does, we're certainly happy to meet and confer

9    after the -- during the deposition and reach an equitable

10   solution, but I just don't think there's any basis in the law

11   or practically for us to categorically agree to that prior to

12   a deposition actually happening.

13         MR. LA MAGNA:  And this is Ray again for plaintiff.

14         I think -- you know, like I said, I think we're all

15   in agreement that this is not likely to be needed for all

16   witnesses, and our concern is primarily with 30(b)(6)

17   witnesses.  You know, maybe the middle-ground approach -- you

18   know, what I want to avoid, for the Court, is, you know,

19   seriatim disputes on this, and given the short time that we

20   have, having to then tee up disputes over the fact that we

21   need an extra hour or two hours -- or something -- with a

22   witness for whatever reason.

23         So perhaps a good middle-ground position would be

24   if Your Honor indicated that you thought that an extra day,

25   if necessary -- you know, of course, if we can finish up

1  earlier, that's great -- would be appropriate for the

2  30(b)(6) deponents and that should, you know, we have any

3  issue with the -- should plaintiff have problems completing

4  their questioning in one day for the other witnesses that the

5  parties will meet and confer and, if they don't reach an

6  agreement, that they can come back to Your Honor but -- I

7  hate to push it off, but maybe that's the best sort of

8  middle-ground position.

9          THE COURT:  Well, so rather than specifically

10 agreeing to additional days, have the parties talked about

11 agreeing to the, you know, time issue?  You mentioned a

12 50 percent estimate of additional time because of

13 translation.  Have the parties talked about it that way?

14         MR. LA MAGNA:  We have -- this is Ray again for

15 plaintiff.

16         We have, Your Honor, but as you heard from defense

17 counsel, they have not agreed.

18         THE COURT:  Okay.

19         MR. LEE:  Your Honor, we're certainly amenable on

20 the day of to discuss additional time as a possibility if the

21 questioning is actually going over.  Of course, there might

22 be issues with the scheduling of our witnesses.  Obviously,

23 we're scheduling these all on very short notice in a very

24 short turnaround, very tightly packed together.  So I just

25 think it doesn't make sense for us to -- it's difficult for

1   us to commit to, say, 10-hour depositions for all of our

2   witnesses in advance.  We'd like to address this on more of a

3   case-by-case basis as it arises.  We sincerely don't think it

4   will be an issue because, as we mentioned, our 30(b)(6)

5   topics are being split across two witnesses.

6           MR. LA MAGNA:  And this is Ray again for --

7           THE COURT:  But the -- these witnesses are also

8   having independent testimony taken as well; correct?

9           MR. LEE:  Yes, Your Honor, to an extent, but it's

10  -- I -- it is also the case that these witnesses, I think --

11  as Mr. LaMagna mentioned, many of these witnesses have

12  limited percipient issues to be addressed.  It's our

13  assessment that it's fairly unlikely that we'll actually run

14  into this as an issue even with 30(b)(6) witnesses.

15          THE COURT:  Mr. LaMagna, for the individuals who

16  you are mentally identifying as -- where this issue is going

17  to come up, are they both the 30(b)(6) and what -- how much

18  time do you estimate will be spent on percipient witness

19  issues versus 30(b)(6) issues?

20          MR. LA MAGNA:  If -- speaking just to the 7-hour

21  limit because it's hard -- I guess I'd have to double all

22  these numbers -- you know, I would say that we would probably

23  spend -- for one of them that we've asked for two days -- so

24  there's one witness that comes last that's the main 30(b)(6).

25  We've specifically requested two days for that witness.  I

1   would say that we would use the full 7 hours if it were in

2   English.  So it would be probably be, like, a 2-hour and 4

3   and -- you know, 2-ish hours, 4-ish -- 4-plus-ish hours split

4   between 30(b)(1) and 30(b)(6).  So we might be able to pull

5   it in a little bit below that.  So it might -- over two days.

6   If translated, you know, it might end up being more close to,

7   like, 6 hours in English, 12 hours total -- you know, in that

8   range.

9              There's another 30- --

10             THE COURT:  I'm sorry.  So -- I'm sorry because I'm

11  not sure I'm understanding you.  Let's just talk in terms of,

12  if you were taking the deposition in English, how much of it,

13  would you imagine, would be percipient witness, and how much

14  time would be 30(b)(6)?

15             MR. LA MAGNA:  I would say probably 2 hours or so

16  percipient witness, and then 5 hours or so for the -- you

17  know, the 30(b)(6) out of 7.

18             THE COURT:  So you're anticipating already that

19  you're going to need two days.  And how many individuals is

20  this?  Two?

21             MR. LA MAGNA:  Well, that's one in particular.

22  There's a second 30(b)(6) witness that we're concerned about,

23  and here I think it would flip.  He probably would have a

24  little less on the corporate side, and he's more factually

25  involved.  So I think that would still be, if it were in

1    English, a 7-hour -- you know, 6 1/2-hour deposition.  It

2    would likely be closer to, you know, 3 hours and change for

3    each.  So it'd be about a 50-50 split probably in

4    questioning.  If --

5              THE COURT:  Okay.

6              MR. LA MAGNA:  Although I should caveat that by

7    saying, given the nature of the scope of the topics, many of

8    the people's -- his percipient knowledge may also be

9    subsumed, you know, to some degree.  So the -- it's the same

10   number of questions, Your Honor, the same amount of time.

11   It's kind of hard to judge what -- you know, the parties may

12   agree or disagree on what is a "corporate question" or not

13   but -- but I think it would be about 50-50.

14             THE COURT:  Okay.  And what are these two

15   individual's names?

16             MR. LA MAGNA:  The first one that we spoke of

17   Mr. Jian (phonetic), which we've asked for the very tail of

18   the discovery period, and the second one is Mr. Yu (phonetic)

19   -- he goes by "Harrison."

20             THE COURT:  Okay.

21             So, Mr. Lee, it looks like the plaintiff has

22   already identified that they're going to need more than --

23   when you add translation time, it's going to double the time.

24   So what's the problem with agreeing to either a translation-

25   time equation or an additional-day equation for these two

1   individuals who are already doing double duty, also, as

2   30(b)(6) and percipient witnesses?

3          MR. LEE:  Your Honor, if that's your decision, I

4   have no objection with agreeing to Mr. LaMagna's proposal,

5   which is adding on some hours for each of these witnesses.  I

6   just -- I do kind of -- I do disagree with the contention

7   that translation doubles the time necessary to address these

8   -- to question these witnesses.  Translation, I think, in

9   practice takes a little bit less than the exact amount of

10  time of the original statement just because the translator

11  has the ability to do it more efficiently.

12          I also disagree somewhat with Mr. LaMagna's

13  representations regarding the amount of time it would be

14  necessary to take percipient testimony from these witnesses,

15  also noting that, as he said, that many of the percipient

16  witness questions will be subsumed within the 30(b)(6)

17  witness questions.

18          I also have some reservations about the fact that

19  we -- Netlist has noticed, I think, a total of eight

20  witnesses that we've offered up for deposition, and it's a

21  very tight schedule; so we're just trying to make everything

22  work on the calendar.  That said, if it's Your Honor's -- if

23  it's Your Honor's position that additional time is required,

24  I think we would be willing to agree to, perhaps, an

25  additional 3 hours of time for a 30(b)(6) witness only.

1          THE COURT:  And by that, you mean additional

2    3 hours using the normal math, not the additional 50 percent

3    time?

4          MR. LEE:  I'm sorry, Your Honor.  I didn't quite

5    understand what you were saying there.

6          THE COURT:  Well, I -- when you're saying an

7    "additional 3 hours," what you're saying is that you would be

8    willing to go to 10 hours of deposition time; right?

9          MR. LEE:  Yes, Your Honor.

10          THE COURT:  Okay.

11          Mr. LaMagna, what do you think about that?

12          MR. LA MAGNA:  You know, well, first of all, I --

13    this is Ray for plaintiff again.

14          I've had a different experience with Korean and/or,

15    you know, other, you know, languages -- Chinese or Japanese

16    translation -- where it tends to be that the language is, in

17    some cases, a little less efficient than English, and so the

18    translation time is actually more than 50 percent.  It's,

19    like, a 60-40 split.  So I don't have Mr. Lee's experience.

20    I've had the opposite problem, and that gives me some pause

21    for taking less than what would be 7 hours in English.  You

22    know, so, if we do 10 hours total clock time, that's the

23    equivalent of no more than 5 hours of English questions, and

24    I can see that as being tight.  That might work for -- we can

25    aim for that.

1          I just -- what I'm concerned about, Your Honor, is,

2   if we have a person in a -- in a chair on a second day and we

3   are all asking questions, I hate to have the microphone

4   ripped out, you know, sort of arbitrarily just -- we're all

5   there -- just so that we can bring Your Honor back another

6   dispute to have the witness re-presented for questioning on

7   certain topics, for example.  It seems inefficient for us to

8   do it that way, and we also are giving the defendant a great

9   efficiency by saying, "Look, these people can do this in

10  their homes or in their offices in Korea.  They don't have to

11  travel, where they usually also would have to come to the

12  United States."  So we're making a substantial concession

13  there.

14          I think as to the other witnesses, the non-

15  30(b)(6), I think so long as we reserve the right,

16  Your Honor, that if there is a dispute that the parties can't

17  resolve, we come back to you, but I honestly don't think

18  that's going to be the case, but, you know, we would just

19  reserve our rights to come back if we do have a dispute.

20          THE COURT:  All right.  With regard to Mr. Jian and

21  Mr. Yu, who goes by "Harrison," I think that based on

22  everything I'm hearing, including the fact that they are --

23  they are serving in both an individual deposition capacity

24  and a 30(b)(6) deposition capacity and that translation would

25  be required not only for the question but for the answer, I

1    think that the concept that there is a 50 percent additional

2    time to the questioning is a reasonable amount given that it

3    very easily could more than double the time and -- but, you

4    know, I'm hearing that there's some experience with it being

5    more efficient.  So 50 percent seems a good middle position,

6    and so I -- it's my opinion that for those two depositions,

7    the time should be treated as though there is a 50 percent

8    additional time due to translation that is not counted

9    towards the 7-hour limit.

10             Does that make sense?

11             MR. LEE:  Yes, Your Honor.

12             THE COURT:  So I'm not giving you an extra day, I'm

13   not setting a specific amount of time, but that -- the time

14   that is used to calculate the 7-hour limit should be adjusted

15   based on 50 percent for the translation.

16             MR. LEE:  Yes, Your Honor.  This is

17   Christopher Lee.  If I might just seek one point of

18   clarification?

19             THE COURT:  Sure.

20             MR. LEE:  So we certainly accept your guidance on

21   this issue.  I just want to clarify that to the extent that

22   any of Netlist's 30(b)(6) witnesses require sequential

23   translation -- I haven't been informed of that yet by

24   Mr. LaMagna, but to the extent they do, we would just seek

25   the same mutual accommodation on their end as well.

1          THE COURT:  Mr. LaMagna?

2          MR. LA MAGNA:  None of our currently scheduled

3   witnesses do, but obviously if -- I -- "what's good for the

4   goose is good for the gander," Your Honor.  So I don't think

5   we would be -- come back -- be coming back to you to fight

6   that point.

7          THE COURT:  All right.

8          MR. LA MAGNA:  But there is no -- there is no

9   witness currently schedule from Netlist that would require

10  translation.

11         THE COURT:  Okay.  And again, my order just

12  relates, I guess, specifically to Mr. Jian and Mr. Yu-

13  Harrison who are serving as the -- in dual capacity, and I'll

14  rely on you guys to make reasonable accommodations with each

15  other if anything further comes up, but, again, you know

16  where I -- what I think is reasonable in the situation.  So

17  hopefully you'll use it to (indecipherable).

18         All right.  Now, with regard to 30(b)(6) deposition

19  topics?

20         MR. LA MAGNA:  Thank you, Your Honor.  This is Ray

21  again for plaintiff.

22         Where plaintiff -- the first issue is that where

23  plaintiff has agreed to provide testimony according to the

24  30(b)(6) topics, they've caveated their, shall we say,

25  agreement in an unusual way.  They've said -- I'll read you

1    one example.  It's variants of the same thing.  They said

2    that (reading) Samsung will designate a witness to provide

3    relevant testimony relevant to the claims and defenses at

4    issue on this topic (end reading).

5              And that leaves me, in light of the topic,

6    scratching my head and wondering, "Am I getting testimony on

7    the topic or not?" because we may have differential views on

8    what relevant testimony is relevant to the claims or

9    defenses.  The double -- you know, their use of injecting a

10   limitation in your agreement to provide a witness that the

11   witness will testify as to "relevant questions" or -- seems

12   to suggest a reservation of a right for the witness to not

13   testify as to questions that Samsung, in its unilateral

14   determination, deems to be irrelevant, and, again, my concern

15   is that this is -- again, we don't want to make this case,

16   regrettably, a full-employment program for Your Honor.

17             THE COURT:  I appreciate that.

18             Let me hear from -- is it Mr. Lee?

19             MR. MASTERS:  Your Honor, this is Marc Masters on

20   behalf of Samsung.

21             I think we can meet and confer on that language and

22   amend it.  I'm happy to talk to Mr. LaMagna about that and

23   amend that language.

24             MR. LA MAGNA:  And this is Ray again for plaintiff.

25             I mean, we did actually meet and confer on this

1  language, and subsequent to that, defendant has provided

2  supplemental 30(b)(6) responses -- or, I guess, I should say

3  "amended" 30(b)(6) responses which still contain that

4  language, and so I guess it would be helpful, just so we

5  avoid any dispute, if we could get Your Honor's views on

6  whether it's appropriate to caveat a response by saying, "I

7  will provide you what I deem to be relevant."

8          MR. MASTERS:  Again, this is Marc Masters on behalf

9  of Samsung, Your Honor.

10          I don't believe I was part of that meet-and-confer

11 that Mr. LaMagna is referring to, and I am happy to discuss

12 removing that language with Mr. LaMagna.  I don't have a

13 problem modifying the language.

14          THE COURT:  Mr. LaMagna, are you okay with that, or

15 do you want a ruling?

16          MR. LA MAGNA:  I think it would be helpful to get a

17 ruling only because I don't -- I think it's a pretty easy

18 issue, Your Honor, and I don't think we need to belabor it

19 any further, but it would be helpful to get Your Honor's

20 views.

21          THE COURT:  Okay.  I would deny the request.

22          MR. LA MAGNA:  Okay.  Let's move on, then, to -- we

23 have some substantive topics.  So a few minutes before our

24 call, defense counsel provided an --

25          THE COURT:  -- Mr. LaMagna, I just want to make

 1   clear.  The topic we were discussing as related to your

 2   July 16th letter were the Deposition Topics 1, 2, 4, 6, 7, 9,

 3   11; is that correct?

 4              MR. LA MAGNA:  Hold on.

 5              Yes.  That's expanded because they've agreed -- the

 6   list is now longer.  So they've --

 7              THE COURT:  Okay.  But I --

 8              MR. LA MAGNA:  -- added a --

 9              THE COURT:  -- sure I was tracking the matters

10   raised in that July 16th letter.  So --

11              MR. LA MAGNA:  Yes.

12              THE COURT:  -- that's all the clarification I need.

13   Okay.

14              MR. LA MAGNA:  But, yes, that is the issue, that

15   first sentence at the top of page 2 of our letter.

16              And so turning to the next section, which I guess

17   is stepping back to the list of some of the topics that are

18   at the bottom of page 1 of our letter, here again, as I

19   mentioned, opposing counsel did provide an amendment just a

20   few minutes before this call that, I think, takes away

21   probably half of what we were originally going to raise with

22   Your Honor.  So that's good.  We have a little less work

23   here.

24              We do have a few other issues, where they didn't

25   change their response, where we still have an open dispute.

1  One of these is Topic No. 10, and I'm not quite sure why we

2  have a dispute about this, but there is a --

3            THE COURT:  Well, let me just clarify: Does that

4  mean 3, 5, and 8 are no longer at issue?

5            MR. LA MAGNA:  3 -- that is correct, Your Honor.

6            THE COURT:  So 3, 5, and 8 have been resolved and

7  no longer -- okay -- in dispute.

8            All right.  Go ahead with No. 10.

9            MR. LA MAGNA:  So No. 10 -- just by way of

10 background, like we discussed, the issue in this case is that

11 plaintiff contends that it had a supply agreement with

12 Samsung obligating it to supply it with memory products, and

13 the parties' relationship sort of deteriorated in and around

14 May of 2017.  There was a meeting in San Jose between the two

15 companies in May of 2017 to discuss this problem.  It's

16 important meeting.  Our CFO attended, our head of worldwide

17 operations attended, I think a couple of their deponents

18 attended that meeting, and we've asked for, just, a witness

19 on, you know, Samsung's -- you know, what happened at that

20 meeting, you know, to talk about the meeting, basically,

21 which is our Topic 10, and I'm not sure why we are in a

22 disagreement on this, but that witness has not been

23 forthcoming.

24            THE COURT:  All right.  Let me hear from either

25 Mr. Lee or Mr. Masters.

1              MR. MASTERS:  Yes, Your Honor.  This is

2    Marc Masters on behalf of Samsung.

3              I think counsel has mischaracterized this to some

4    extent.  Our response is that we're willing to meet and

5    confer regarding the topic, and I think part of the original

6    confusion was identifying the -- this meeting, as opposed to

7    numerous other meetings, and so we've had some brief

8    discussions with Mr. LaMagna about this meeting.  We just

9    want to make sure we're talking about the same meeting so

10   that we know whether -- you know, how to find somebody that

11   would have knowledge on this meeting, and we need to know

12   more about the substance of the meeting, at least in

13   Mr. LaMagna's view, so that we understand its relevance.

14             So we did not say "no."  We said, "Let's meet and

15   confer."  We've had some discussion about that, but we didn't

16   complete the meet and confer, at least from my perspective we

17   didn't, and so we're open to further discussion on that.

18             MR. LA MAGNA:  And this is Ray again --

19             THE COURT:  What --

20             MR. LA MAGNA:  Sorry.

21             THE COURT:  -- there's an approximate date here.

22   So what's the confusion?  What makes this difficult for

23   Samsung to identify what meeting is being talked about?

24             MR. MASTERS:  Well, Your Honor, there are numerous

25   meetings on different dates, and so we wanted to make sure --

1   you know, originally we had some internal confusion on --

2   confusing this meeting with one that we now understand to

3   have occurred just slightly before.  So we just want to make

4   sure that we're understanding which meeting this is, that we

5   have an -- you know, a mutual kind of understanding of what

6   the topic is, which is normal in a meet-and-confer to make

7   sure that both sides understand what the topic is and that --

8   what the relevance of it is and --

9           THE COURT:  Well, but my --

10          MR. MASTERS:  -- that's all we're seeking.

11          THE COURT:  -- specific which is what remains

12  unclear for your client today that they haven't been able to

13  identify a witness?  Because it sounds like you've got some

14  clarity, but since you haven't provided a witness, is that

15  because you're still waiting for your client to give you the

16  name or that there's some fact that is still unclear

17  preventing you from being able to identify a witness?

18          MR. MASTERS:  We don't know yet all the

19  participants at this meeting and -- at least I don't, and so

20  I need to track that down and then figure out whether -- you

21  know, who would be the appropriate witness for this, and I

22  also just want to make sure I understand from Mr. LaMagna the

23  relevance of the topic.  But again, we have not said "no,"

24  and so I wouldn't want Your Honor to walk away thinking that

25  there's a dispute where we've said categorically "no."

 1  That's not the case.  We were just looking to meet and confer

 2  with Mr. LaMagna about the topic.

 3          THE COURT:  Okay.

 4          Mr. LaMagna?

 5          MR. LA MAGNA:  Thank you, Your Honor.  This is

 6  Ray LaMagna again.

 7          I believe we did -- we did confer, and as I said,

 8  they did serve supplemental responses, you know, 15 minutes

 9  before our call that still omitted this topic, but setting

10  that aside, if it's constructive, you know, there's a

11  calendar invite from one of the Samsung employees named

12  Neal Knuth that is in Samsung's production at SEC045379, I

13  believe, for this meeting -- or related to this meeting.  I

14  think that I should just note for counsel and the Court that

15  the calendar invite -- whoever collected the discovery I

16  think had the wrong time zone listed because it lists, like,

17  1:00 a.m. or something for the meeting, but I believe that

18  that would be a good lead as to which meeting we're talking

19  about.

20          THE COURT:  Okay.  Well, so, Mr. LaMagna, are you

21  okay with leaving this to continuing your -- you guys

22  discussing on who the person is going to be since what we're

23  -- what Mr. Masters has represented to the Court on the

24  record is that they are not saying "no"; they are just trying

25  to figure out details about which meeting so that they can

1   identify a witness?  Are you okay with taking that off the

2   table for today?

3          MR. LA MAGNA:  Yeah.  This is Ray, Your Honor.

4   That's fine.  If we have -- if we can't resolve it, we'll,

5   unfortunately, be back, but I'm sure we can resolve this.

6          THE COURT:  All right.

7          MR. LA MAGNA:  The next topic I want to turn to is

8   Topic 16, which relates to Samsung's sales to other customers

9   by -- and it goes on to say by product and units and so

10  forth.  The issue --

11         THE COURT:  Okay.  One second.  So you skipped to

12  No. 16.  Does that mean, 12, 13, 14, 15 have been resolved?

13         MR. LA MAGNA:  Not exactly.  I was going to come

14  back to 15, but it starts to hit the RFP; so I thought going

15  slightly out of order --

16         THE COURT:  Okay.

17         MR. LA MAGNA:  -- would be helpful.  I'm not

18  raising --

19         THE COURT:  -- 12 --

20         MR. LA MAGNA:  12 is resolved, Your Honor.

21         THE COURT:  -- been resolved?  12, 13, and 14 have

22  been resolved?

23         MR. LA MAGNA:  I'm not pursuing 13 or 14 at this

24  time.  I'm just trying to cull the herd a little bit.  So

25  that's why we're jumping --

1        THE COURT:  -- not -- okay.  So 12, 13, 14 not at

2  issue.

3        All right.  No. 16?

4        MR. LA MAGNA:  Yeah.  So No. 16 -- by way of

5  background, we had a dispute before Judge McCormick on

6  whether or not Samsung would have to disclose to us, you

7  know, what sort of volumes and pricing it's giving other

8  customers, and the reason for this is that, you know, we have

9  a -- this -- the supply provision that is in dispute

10  requires, in our view, Samsung to supply, you know, product

11  to Netlist at, quote, "a competitive price."  And so that

12  raises two questions -- is if they were shorting Netlist for

13  not -- you know, not filling orders -- were they treating us

14  differentially than, you know, other customers -- for

15  example, they're filling everybody else's orders, but they're

16  not filling ours -- and also -- that's going to go to one

17  type of breach; and a second issue is going to be, well,

18  what's the -- what is the pricing there, and, you know, is it

19  competitive or not?  What are they giving other customers?

20  What are they giving us?

21        As a result of that, Judge McCormick found in favor

22  of plaintiff on that and issued the order that is at

23  Docket 76, and so Docket 76 provides a response to the

24  counterpart RFP, which is 11, and the counterpart

25  interrogatory, which is Interrogatory No. 8 -- that's listed

1    on page 3 of Docket 76 -- and Topic 16 is just the 30(b)(6)

2    analog to that.  So like I said, it's already issued, it was

3    teed up and addressed by Judge McCormick, and we think it

4    should be handled similarly for the purposes of testimony.

5    In other words, if they're providing a response to us or

6    documents to us in response to Interrogatory No. 8 or RFP 11,

7    we should be able to ask a corporate witness any, you know,

8    residual questions we have.

9              THE COURT:  Okay.

10             Counsel for the defense?

11             MR. MASTERS:  Yes, Your Honor.  Marc Masters on

12   behalf of Samsung.

13             This is, again, a topic where we've specifically

14   stated that we're willing to meet and confer; we did not

15   categorically say "no."  The issue is what the appropriate

16   scope of the topic is, and so we're happy to discuss with

17   Mr. LaMagna, as we've already indicated to him that we would

18   -- discuss what the appropriate scope of the topic is.  We're

19   not refusing to designate someone on this topic.  We

20   recognize that we will.  It's just the issue of scope.

21             Clearly, with regard to the issues that Mr. LaMagna

22   raised, he doesn't need to know all the pricing for someone

23   -- an entity like Apple, which is categorically different

24   than his client Netlist.  It's not relevant to his client, it

25   doesn't help with any of the issues that he's identified, and

1    there are other customers of Samsung's that also fill -- fit

2    into that category, whereas there may be -- there are

3    similarly situated customers that we are willing to provide a

4    designee to discuss, and so the issue really is just meeting

5    and conferring with Mr. LaMagna to agree upon that group of

6    customers.

7              THE COURT:  Okay.  And when you say that you have

8    "agreed to meet and confer," was that done in the amendment

9    or -- the further responses served today?  Because I'm sorry.

10   I did not have time to look at those because the one I'm

11   looking at is just an objection.

12             MR. MASTERS:  Understood, Your Honor.  Yes, it's in

13   today's, and I believe we also -- Mr. LaMagna and I

14   previously spoke about this topic in the context of the

15   documents as well, and so I am happy to continue that

16   conversation, but we will designate someone.  It's just a

17   question of figuring out the appropriate scope.

18             THE COURT:  Okay.

19             Mr. LaMagna?

20             MR. LA MAGNA:  Thank you, Your Honor.

21             You know, so I -- we met and conferred on this

22   topic -- I believe it was on the 12th, where Mr. Masters and

23   I, you know, conferred, and the position at that time was a

24   flat "no" and we -- and that's how it made it into our letter

25   to Judge McCormick.

1    I guess one of the, just, administrative

2   difficulties we have is, if every time we go through the

3   meet-and-confer process, we get to a "no," and then we get up

4   to the hearing here, and either we get 15 minutes before the

5   hearing a "Okay.  Fine," you know, "We give" -- "We surrender

6   on certain topics" or we get a -- you know, for the topics

7   that they haven't given us "We think we should meet and

8   confer more," after we've already done the meet-and-confer

9   and they've told us "no," we're never going to get anything

10   done, and we have two weeks, basically, left in discovery

11   effectively -- two weeks and one day -- or two days, I think.

12   So I don't know how much time we have left on this.  It's a

13   pretty plain issue.

14         So in terms of some of the issues Mr. Master [sic]

15   raised, we've already told the Court and told Mr. Masters

16   that the Apple example can be -- is basically out of the

17   case.  We've informed them in writing and informed

18   Judge McCormick that specifically data regarding Apple need

19   not be included.  As to who else must be included, we just

20   have the scope of Judge McCormick's order.

21         What it sounds like Mr. Masters is proposing is

22   that we sort of negotiate against ourselves and get a topic

23   for a deposition that is some subset of the discovery that

24   Judge McCormick ordered.  I don't know how that would work.

25   In other words, if they give us an interrogatory response and

1    they give us documents in response to Judge McCormick's

2    order, what Mr. Masters is proposing is that I would only be

3    able to ask a deponent some questions about some companies

4    who are included in that response, and I don't know which

5    companies those are.  I just don't know how we do that.

6              MR. MASTERS:  Your Honor, if I may respond.  I

7    think --

8              THE COURT:  Well, first let me --

9              MR. MASTERS:  -- first of all, I think --

10             THE COURT:  -- Mr. LaMagna is done.

11             Mr. LaMagna, are you done with your argument?

12             MR. LA MAGNA:  Yes.  Thank you, Your Honor.

13             MR. MASTERS:  Okay.

14             THE COURT:  All right --

15             MR. MASTERS:  Apologies, Your Honor.  Marc Masters.

16   I had understood Mr. LaMagna to be done.  That's why --

17             THE COURT:  I -- this is one of the technical

18   difficulties we have of being on a telephone versus in court.

19   So please know --

20             MR. MASTERS:  Absolutely.

21             THE COURT:  -- I take no offense of it.  It's just

22   something I need to make sure so that we have a clear -- I

23   have a clear record and you have a clear record.  Okay?

24             MR. MASTERS:  Very fair, Your Honor.  Thank you.

25   Again, Marc Masters on behalf of Samsung.

1          I want to just clarify something.  Mr. LaMagna

2   omitted part of the meet-and-confer.  He referred to the

3   12th, but since then, we have had some discussion.

4          In any event, I understand Mr. LaMagna's point

5   about wanting to get this resolved.  What I can propose is

6   that we meet and confer by close of business tomorrow such

7   that, if there is any remaining disagreement, we could take

8   it up on Monday at the hearing that's already scheduled.  I

9   am more than happy to try and get this resolved before then

10  so that we don't have a pending dispute on it.  I just need

11  some additional information from my client, which we're

12  waiting on.  We've been working with our client to get that

13  information so that I can speak more to Mr. LaMagna.  We've

14  invited -- or I have -- Mr. LaMagna to discuss it, and we're

15  happy to meet and confer by close of business tomorrow such

16  that you'll understand on Monday where we are, and hopefully

17  we'll have this all resolved.

18          MR. LA MAGNA:  So this is Ray again for plaintiff.

19          That's fine.  I don't mind -- you know, we can hold

20  this over until Monday.  That's fine.

21          Just to address Mr. Masters's point, I may not be

22  available tomorrow during business hours due to, just, prior

23  commitments and trying to get -- also, we're working on some

24  discovery responses for Mr. Masters as well, but I think we

25  can find a time.  You know, either -- if we can do it, you

1  know, on the weekend or at night or -- you know, we will find

2  a time to fit this in prior to our hearing.

3           THE COURT:  All right.  So I think that, if you

4  guys can keep working on it and have this resolved by Monday,

5  that makes sense.  I think -- you know, I obviously was not a

6  part of your informal discovery conference with

7  Judge McCormick.

8           What -- Mr. LaMagna, you represented that this --

9  sort of this -- the breadth or the scope of the issue raised

10  by Mr. Masters regarding who these other client -- these

11  customers are that need to be included in the information.

12  If in fact the specific issue was argued and therefore ruled

13  upon in that Docket 76 order, then I would anticipate that

14  the parties would use that scope to move forward.  If that

15  specific issue was not, you know, again, I think reasonable

16  minds can come together and mutually agree upon something,

17  but I do expect, since your discovery cutoff is so close,

18  that these meet-and-confers -- well, that you guys will have

19  an answer for me who these witnesses are by our hearing on

20  Monday.  Okay?  And if not, I need a really good reason why

21  not.  All right.?

22           MR. MASTERS:  Understood, Your Honor.

23           MR. LA MAGNA:  Thank you, Your Honor, for

24  plaintiff.

25           This is Ray again for plaintiff.

1           Let's move on, then, to topic -- going back one to

2   Topic 15.  Now, I don't know how Your Honor prefers this.  We

3   have a couple of groups of topics where we are -- we have a

4   parallel dispute on the RFPs.  So we've asked for a deponent,

5   and we've asked for documents, and I can do those either

6   jointly or separately as is convenient for the Court.  I can

7   fly through the RFPs simultaneously, if you prefer, or we

8   could do them separate.

9           THE COURT:  Okay.  One second.  I'm still making

10  notes for myself.

11          (Pause.)

12          THE COURT:  All right.  Well, I think that your

13  idea of doing it by topic, where you would handle the

14  deposition topic as well as the written discovery at the same

15  time -- let's try that and see how it works.

16          MR. LA MAGNA:  Okay.  So the -- this is Ray again

17  for plaintiff.

18          The first issue, Your Honor, is Deposition Topic

19  15, and it maps onto RFP from our second set of RFPs No. 16.

20  Sorry that's a little bit confusing, but it's -- 16 is an

21  RFP, 15 is a depo topic, and what we've requested here is

22  both -- basically, agreements with others to supply, you

23  know, products -- supply agreements, for lack of a better

24  term -- and, again, we understand Apple is a special case so

25  we would exclude Apple from that scope -- and testimony on

1    the same.

2            And by way of background, the issue here is that

3    plaintiff has -- they've brought a 12(c) motion contending

4    that what we have in our agreement as a supply provision is

5    not a supply provision, that it is a different animal, it

6    means a different thing, and that it doesn't rise to be in a

7    supply provision.  I think that that begs the question, then,

8    as to what does rise to be in a supply provision, and to the

9    extent that they contend that our thing is not like the other

10   things, we have a right to examine the other things and

11   compare them.  So to the extent that they contend that they

12   have supply provisions with other companies, I think we

13   should produce those and be able to examine the differences

14   between the language in our agreement and the languages -- or

15   the obligations in those agreements that they would contend

16   are supply agreements.

17           Now, if they don't have any supply agreements,

18   that's fine, too.  And like I said, I think we're -- the

19   Apple agreements are somewhat singular so we would certainly

20   be excluding those but in -- that's basically it, Your Honor,

21   is that, you know, if they're going to contend that our thing

22   does not rise to be in a supply agreement, we have the right

23   to sort of test that and take a look at what they would

24   contend rises to be in a supply agreement.

25           THE COURT:  Okay.  And really quickly I'm reading

1   the topic and then the RFP just so I'm very clear.

2           (Pause.)

3           THE COURT:  Okay.  Let me hear from defense

4   counsel.

5           MR. LEE:  Yes, Your Honor.  This is Christopher Lee

6   again.

7           What Netlist is essentially saying here is that in

8   order to interpret the contract they have with us, they have

9   to see every other contract that Samsung has ever signed.

10  Now, I suppose that's -- there is some attenuated relevance

11  between that and the issues at hand, but as Your Honor knows,

12  after the 2015 amendments to the Federal Rules of Civil

13  Procedure, there is an explicit proportionality requirement,

14  and we would contend that such wide-reaching discovery would

15  not be proportionate to the needs of the case.

16          Now, if we want to interpret the contract at hand,

17  obviously we have the text of the contract, which should be

18  the beginning of any interpretation, and indeed in the 12(c)

19  motion we have filed with Judge Scarsi, our contention is

20  that no extrinsic evidence should be admissible here because

21  the text of the contract is clear and that's a legal issue,

22  but even if we eventually get to the point where extrinsic

23  evidence becomes relevant, there are much more proportionate,

24  good sources of evidence here than just comparing with every

25  other contract Samsung has ever signed.

1          For example, based -- just based on the documents
2    we have already, there is extensive negotiating history
3    between the parties.  We're going to have firsthand testimony
4    from several witnesses who were involved in negotiation.
5    There is extensive course of dealing, course of conduct
6    between the parties.  I just don't see it as proportionate
7    under the new FRCP rules to make this sort of a production
8    when we have much -- when, a, extrinsic evidence is probably
9    not relevant; and, b, we have much better sources of evidence
10   at hand that are already being offered.
11         THE COURT:  Is it correct that your client is
12   asserting that this provision is not a supply provision?
13         MR. LEE:  Yes, Your Honor.  Our assertion at this
14   moment is that it is a pricing term.
15         THE COURT:  Okay.  And does your client have
16   contracts with supply provisions with other customers?
17         MR. LEE:  I honestly don't know off the top of my
18   head, Your Honor.  Our client has contracts with many, many
19   other customers.  Some of them may include supply provisions;
20   some of them may not.
21         MR. LA MAGNA:  And so -- this is Ray for plaintiff,
22   Your Honor.
23         I mean, just to be clear, because I don't want to
24   accidentally walk into sort of a strongman argument here,
25   we're not asking for all of Samsung's contracts, all of

1    Samsung's contracts with customers, or anything of that

2    breadth.  We are simply asking for them to identify the

3    agreements that they have with customers to supply -- where

4    it rises to be a -- an obligation to provide -- and

5    specifically NAND and DRAM products.  So they may have

6    agreements with customers that are not those kind of memory

7    customers.  That would be excluded.  They may have agreements

8    with customers for memory -- for NAND or DRAM memory that

9    they don't contend to be supply agreements.  Those would be

10   excluded.

11          I think the -- it's just the narrow set of

12   agreements where they would say that there is a supply

13   agreement, and, you know, while I think there is going to be

14   some debate as to whether this is -- the contract at issue in

15   this case is solely a contract for goods.  There's a lot of

16   services going on there, but as Your Honor may well know,

17   when you have a contract for goods, the scope of the

18   provision there can be informed by industry custom.  In other

19   words, how -- what is customary in the industry of language

20   to use to create an obligation to vend is a relevant factor.

21   So, if Samsung has ten agreements, let's say -- five

22   agreements -- whatever -- with other customers that rise to

23   being supply obligations using certain language, how they've

24   papered those agreements is relevant to determine whether or

25   not ours meets -- you know, can clear the hurdle of being

1    sufficient language in the contract to give an obligation to

2    supply.

3              THE COURT:  Understood.

4              So here, where we're talking about an RF -- so

5    let's first start with the deposition topic -- right? --

6    which is -- again, let me just make sure I'm looking at the

7    right one -- Deposition Topic No. 15, identify terms and

8    agreements -- (reading) The identity and terms of agreements

9    under which Samsung is obligated to provide NAND and DRAM

10   products to third parties, including any supply agreements,

11   master agreements, contracting agreements, or statements of

12   work but exempting individual purchase orders (end reading).

13             So that reads, to me, to be broader than what you

14   just described, Mr. LaMagna.  Are you limiting really -- or

15   just, you know, refining what you're looking for here?

16             MR. LA MAGNA:  I think what -- Your Honor, this is

17   Ray again from plaintiff.

18             We are trying to avoid sort of a tyranny of labels.

19   So obviously, if somebody submits a -- an order -- a purchase

20   order, says, "I need a thousand units" of this or that

21   product, that could be deemed to be a supply agreement in

22   that it's obligating Samsung, once they accept the order, to

23   supply that item, you know.  We are not looking for that kind

24   of agreement.  We are looking for an umbrella agreement where

25   the parties enter into a supply obligation regarding future

1    orders.

2              And what I was trying to do here with Topic 15 is

3    that I don't know what they call that.  You know, in other

4    words, they may call that -- it may say across the top

5    "Supply Agreement," it may be a master -- I don't know what

6    label they put on it, and I don't care what label they put on

7    it.  I'm just looking for whatever umbrella agreement they

8    have with customers to say that "In the future we will be

9    obligated to supply you product," but I'm excluding the very

10   large number, of course, of individual orders that people

11   have.  You know, every P.O. is going to have a -- boilerplate

12   on the back of the P.O., and that's not what we're looking

13   for.

14             THE COURT:  Okay.  So, as I understand it, what

15   you're saying for Topic No. 15 for the deposition, as well as

16   for request for production of documents, you are looking for

17   testimony and/or production of documents where -- what we are

18   talking about are umbrella agreements where Samsung's

19   required to provide product to the client; is that right?

20             MR. LA MAGNA:  And this is Ray again.

21             Yes, Your Honor, that's correct.

22             THE COURT:  Okay.  I just want to make sure we're

23   all clear on that.

24             Now, Mr. Lee, it's -- what is the problem with

25   providing just that information since your client is taking

1   the position that the provision in this agreement is not a

2   supply agreement?

3          MR. LEE:  Yes, Your Honor.  I think you've begun to

4   identify the problem here -- and this is Christopher Lee.

5   Apologize, Your Honor.

6          I think you've begun to identify the problem

7   yourself in your conversation just now with Mr. LaMagna in

8   that Mr. LaMagna is looking for any document which obligates

9   Samsung to provide NAND or DRAM products to third parties.

10  The only exclusion in this request is individual purchase

11  orders.

12         Now, that means there is not just the convenient

13  box of documents labeled "supply agreements" that Samsung can

14  go to and look for these things.  Samsung has to go through

15  all of the agreements it has with every customer, and I can

16  represent to Your Honor Samsung's customers annually vary

17  similar between the thousands to tens of thousands.  We have

18  to go through all of those agreements.  There may be

19  agreements which are not called a "supply agreement" but

20  there is some kind of supply obligation in there that is

21  incidental to a different agreement, and we would have to

22  review all of those agreements to find which ones have a

23  supply provision.

24         So I'm just saying, Your Honor, given the --

25         THE COURT:  I know.  I understand.  So let me

1   follow up on that, Mr. Lee, because I understand your point.

2          Mr. LaMagna, are you open to them providing one or

3   two or some sampling of umbrella-type agreements that would,

4   in their opinion, be -- constitute supply agreements, rather

5   than asking for them to track down every agreement that would

6   include a supply agreement and a --

7          MR. LA MAGNA:  And so --

8          THE COURT:  -- testify about it?

9          MR. LA MAGNA:  This is Ray LaMagna for plaintiff

10  again.

11          Thank you, Your Honor.  Yeah, I don't want to get

12  -- perfection here is always the enemy of the good.  We're --

13  we are not asking for scorched-earth efforts.  You know,

14  Samsung is a large company and a very --

15          THE COURT:  Okay.

16          MR. LA MAGNA: -- sophisticated company, but I would

17  --

18          THE COURT:  So --

19          MR. LA MAGNA:  -- I would imagine that they know --

20          THE COURT:  -- can you provide -- let's talk about

21  number.  How many do you need to serve your purpose?

22          MR. LA MAGNA:  Well, I think the -- this is Ray

23  again for plaintiff.

24          The challenge there, Your Honor, is sort of what, I

25  guess, you'd call a "no cherry-picking rule," in that we may

1    have, let's say, a range of agreements --

2            THE COURT:  -- I understand.  Uh-huh.  But how do

3    we get past that?

4            MR. LA MAGNA:  Well, I think that in good faith we

5    -- they would respond by providing us the umbrella agreements

6    that they are reasonably aware of subject to a reasonable

7    search.  I'm not asking them to go through every ancillary

8    agreement that they have, but typically with a company like

9    -- for example, with Netlist.  How many umbrella contracts do

10   they have with Netlist?  They have one.  And I'm pretty sure

11   based on the internal documents that we have that they're

12   aware, the company has a notation someplace in its

13   contracting department or legal department that that

14   includes, for example, a patent license, that it includes a

15   supply obligation.  They're aware of the -- in general, the

16   genre of what that contract is.

17           And so I think based off of what they're -- you

18   know, whoever is the custodian of these kinds of agreements

19   for specifically NAND or DRAM memory customers -- so there's

20   a lot of other products that -- or customers they have.

21   We're not talking about all those customers.  I think it

22   would be fair for Mr. Lee to go to that department or those

23   people and say, "Are you aware of any of these kinds of

24   agreements where you have some sort of supply obligation in

25   an umbrella or master agreement?" and if they're aware of

1   them, I think that they should produce them.  And maybe it's

2   5; maybe it's 20.  I don't know.  My concern is, if we say,

3   "Well, give us 4," and there's 20, we're going to get the 4

4   that look really different from our language, and so I think

5   that there's -- you know, that's our concern.

6            THE COURT:  All right.  I understand.  I get your

7   point.

8            Mr. Lee, what do you think about that?  What

9   Mr. LaMagna is saying is just specific to these types of

10  products, to go to the custodian of these documents, say "Are

11  you aware of any such agreements?" and to produce those?

12           MR. LEE:  Your Honor, I don't think we're opposed

13  to the idea of going to the custodian of these supply

14  agreements and saying, "If there are exemplars that you can

15  provide that you are aware of" that, you know, are supply

16  agreements, I think we wouldn't object to that necessarily, I

17  think.  Two caveats to that: The first is that, you know, we

18  should not -- I want to check with the custodian of these

19  documents what the burden -- exactly the burden of that would

20  involve.  Again, if it's a situation where we have to review

21  a thousand agreements with --

22           THE COURT:  Understood.

23           MR. LEE:  -- make sure there's --

24           THE COURT:  Right.

25           MR. LEE:  Yes, Your Honor.  And the second caveat I

1    have with that is that we want to be able, if that's the

2    case, to have this obligation reciprocally applied to Netlist

3    because, if our supply agreements are relevant to their

4    interpretation of the contract, then their supply agreements

5    are also relevant to our interpretation of the contract.  So

6    -- and a company like Netlist is much smaller.  I imagine

7    they have none, or possibly maybe one or two, under supply

8    agreements.  It should be a mutual exchange of supply

9    agreements so that the parties are both able to benefit from

10   this type of discovery.

11                MR. LA MAGNA:  And this is --

12                THE COURT:  Mr. LaMagna?

13                MR. LA MAGNA:  Yeah.  This is Ray LaMagna for

14   plaintiff again.

15                I don't want to be, you know, arguing here for an

16   RFP or discovery that is not in front of the Court.  I'm not

17   sure that that RFP has been served but --

18                THE COURT:  Okay.  And -- but, Mr. LaMagna, your

19   client is arguing it is a supply agreement; is that right?

20                MR. LA MAGNA:  That is correct.

21                One thing that may be a helpful sort of guiderail

22   here, Your Honor, is that we've heard from Mr. Masters, I

23   believe, this notion -- and this will come up a lot in this

24   case -- that Netlist was treated like so-called "similarly

25   situated companies," and so perhaps one thing that we could

1    look at first is that to the extent that there is a supply --

2    or a umbrella contract for these -- I don't know who these

3    similarly situated companies are, and I think in some ways

4    that makes our discussion more difficult, but if they contend

5    that there's ten companies that are similarly situated to

6    Netlist, then included in what they're giving us for this,

7    they should just give us the umbrella contracts for those ten

8    companies, you know, and we can compare the terms of those.

9    You know, that may be a starting point.

10          And then to Mr. -- you know, Mr. Lee's point, you

11   know, they could also ask the custodian, "Are there any

12   other," you know, "supply agreements that you're aware of,"

13   you know, "within this space?" you know, and that seems

14   fairly delineated.

15          THE COURT:  Mr. Lee?

16          MR. LEE:  Your Honor, we're happy to go to the

17   custodian and come back with a proposal, basically these are

18   the supply agreements that exist for companies similarly

19   situated to Netlist, to the extent that they do exist, and

20   we're willing to produce them, and we can meet and confer on

21   that.

22          But I do want to reiterate that we believe that, to

23   the extent that Netlist itself has supply agreements, those

24   would obviously be, you know, quite helpful to this inquiry;

25   so we would like to see those as well.

 1           MR. LA MAGNA:  Well, I -- so -- go -- this is Ray

 2   again for plaintiff.

 3           Maybe the best thing to do here, since we have to

 4   confer anyway, is to, you know, confer on this point further,

 5   as Mr. Lee just said, and we can -- if there is not an

 6   agreement reached, we can recirculate on Monday.

 7           THE COURT:  All right.

 8           Mr. Lee, you okay with that?

 9           MR. LEE:  I think that makes sense, Your Honor.

10           THE COURT:  Okay.  Then the parties can meet and

11   confer, and we can come back to the issue on Monday, and

12   hopefully you can report to me a resolution.

13           MR. LEE:  Understood, Your Honor.

14           MR. LA MAGNA:  Thank you, Your Honor.

15           The next grouping that we have is on the --

16           THE COURT:  Okay.  Actually, will you give me one

17   second so I can just make a note.  All right?

18           MR. LA MAGNA:  Sure.

19           THE COURT:  I'll let you know when I'm done.

20           (Pause.)

21           THE COURT:  All right.  I'm ready to move forward.

22           MR. LA MAGNA:  Thank you, Your Honor.  This is Ray

23   again for plaintiff.

24           The next coupling that we have is Deposition Topics

25   19 and 20 and --

1          THE COURT:  Okay.  Hold on one second.  So we've

2    done 15, 16.  So what's up with 17 and 18?  Have they been

3    resolved?

4          MR. LA MAGNA:  I believe -- yeah, those -- for --

5    those are not in my notes based on having reviewed their most

6    recent response.  The 30(b)(6) notice I reviewed very quickly

7    in the two minutes before the call.  So I think we can skip

8    over those, yes.

9          THE COURT:  All right.  So now we're at No. 19.

10         MR. LA MAGNA:  Yeah.  So 19 and 20 go basically to

11   efforts to value -- or evaluate Netlist's patents or the

12   validity of those patents, and the analog for this on the RFP

13   side is 20 and 21.  So, again, we're off by one number.

14         THE COURT:  And I'm sorry.  Describe the category

15   again?

16         MR. LA MAGNA:  Basically, you know, efforts to

17   value Netlist's patents or a license to Netlist's patents,

18   including the -- whether or not they're valid or not, which I

19   think is just going to be a component of valuation.

20   Basically, it's a subtopic.  That's probably --

21         THE COURT:  Okay.  Understood.

22         MR. LA MAGNA:  So the issue here is that, as both

23   sides here have mentioned, there is a motion pending where

24   the other side contends that it -- that the supply provision

25   is not valid and -- or not enforceable, and one of the bases

1   on -- you know, on which that arises is -- in the case law

2   that they cite in that motion is the -- that because there is

3   not expressly written in words in the agreement an obligation

4   for Netlist to purchase all of its products, that there's no

5   consideration that is provided to the other side -- or

6   there's no -- there's no cross-promise.  So put differently,

7   at a high level, under, like, a typical UCC contract, if all

8   you have in a sale of goods is a buyer that -- a seller that

9   is promising to sell and a buyer that is promising to do

10  nothing, they may or they may not buy, you don't really have

11  a contract because there's no mutual consideration, and so

12  these are some of the cases, the fact pattern that -- on

13  which defendant has brought a Rule 12(c) motion several weeks

14  ago.

15          THE COURT:  Okay.

16          MR. LA MAGNA:  We contend that there is ample

17  consideration, I mean, very, very substantial consideration

18  for the supply agreement because the cross-consideration for

19  the ability for our right to purchase from Samsung on request

20  was the provision of a patent license, and that patent

21  license was originally -- we had originally asked for, like,

22  I don't know, give or take $85 million for that, and

23  basically in the end, instead of the $85 million, we got a

24  supply provision.  So you have something of what we would

25  contend is very great value that is offsetting that.

1          To the extent that they are going to challenge us

2    on that point, then it's fair for us to know if they have any

3    internal valuation of the consideration that we are providing

4    under the contract.

5          THE COURT:  And so just so I'm clear, Netlist

6    licensed their patent to Samsung as part of or along with

7    this agreement, and it's Netlist's position that that was the

8    consideration for the supply agreement?

9          MR. LA MAGNA:  Yeah.  That's the primary

10   consideration.  I don't think we'd say that's the "only," but

11   that is the main consideration for the supply agreement.

12         THE COURT:  Okay.  Did Netlist get other

13   consideration for the patent license?

14         MR. LA MAGNA:  There's --

15         THE COURT:  (Inaudible.)

16         MR. LA MAGNA:  The patent license is a cross-

17   license.  So technically, both sides license each other, but,

18   you know, Netlist is a --

19         THE COURT:  (Inaudible.)

20         MR. LA MAGNA:  -- 50 million -- I'm sorry.  This is

21   Ray LaMagna again for plaintiff.

22         Netlist is doing about $50 million a year at the

23   time in product sales, and Samsung is doing for this category

24   of products closer to probably $50 billion a quarter.  I

25   mean, it's a -- very much a "David and Goliath" licensing

1   situation, and what you typically see in that situation where

2   you have a cross-license between a very, very small user,

3   potentially -- or minute user and a very, very large consumer

4   of a patent license is what they call a "balancing payment,"

5   and here, this contract does not have a balancing payment of

6   that kind.  Instead, it has a supply component, which serves,

7   effectively, as the balancing payment.

8               THE COURT:  Okay.  Understood.

9               MR. LEE:  Your Honor, this is Christopher Lee.

10  Should I address that?

11              THE COURT:  Well, one second.  Let me make sure --

12  so Deposition Topics 19 and 20; right?  Let me read those

13  real quick.

14              MR. LEE:  That's right, Your Honor.

15              (Pause.)

16              THE COURT:  And then the RFPs are 20 and 21; is

17  that correct?

18              MR. LA MAGNA:  This is Ray for plaintiff.

19              Yes, that's correct.

20              (Pause.)

21              THE COURT:  Okay.  I have read them.

22              Mr. Lee?

23              MR. LEE:  Yes, Your Honor.  This is

24  Christopher Lee.

25              I want to make a few things clear upfront, first of

1   all.  As Your Honor no doubt knows, this is not an IP

2   dispute.  This is a dispute about the interpretation of what

3   Netlist purports is a supply provision in a contract, and I

4   think kind of a common theme here is that Netlist is adopting

5   extremely disproportionate, roundabout ways of interpreting

6   that particular provision in order to justify extremely

7   overbroad discovery.

8          Now, a couple of things about what Mr. LaMagna said

9   here: First of all, we don't actually make the argument that

10  the agreement is invalid for lack of consideration,

11  Your Honor.  Maybe that will be more clear to Mr. LaMagna

12  when he receives our reply brief shortly, but we never made

13  that argument.  We are arguing that the supply term is

14  invalid for indefiniteness because, as Your Honor knows, the

15  UCC and New York law dictates that any supply term must have

16  a fixed quantity unless it is a requirement contract, neither

17  of which is the case here.  So we're not making a

18  consideration argument at all, contrary to Mr. LaMagna's

19  representations.

20         Now, even if we were making a consideration

21  argument, I also want to stress that there is ample

22  consideration in this agreement that we don't need to go

23  through this roundabout process of valuing the patents that

24  are not at issue in this case.  For example, Samsung made a

25  $8 million cash payment to Netlist.  That is in the

1   agreement.  Samsung signed a $15 million separate loan

2   agreement with Netlist, and that loan agreement is mentioned

3   in the recitations on the very first page of the agreement.

4   In addition, the agreement is titled a "Joint Development and

5   Licensing Agreement," and that is because the primary thrust

6   of this agreement is a joint effort in Samsung and Netlist

7   bringing kind of a new-generation memory chip to market.

8           So there are numerous other aspects of

9   consideration in this agreement so that, even if we were

10  arguing that there's lack of consideration, I -- it would be

11  a silly argument to make, Your Honor, because the

12  consideration is quite evident on the face of the agreement.

13          THE COURT:  All right.  Well, Mr. LaMagna, what do

14  you have to say about the fact that Mr. Lee has just stated

15  that his client is not making the argument that it's invalid

16  for lack of consideration but only based on indefiniteness?

17          MR. LA MAGNA:  Thank you, Your Honor.  This is Ray

18  for plaintiff again.

19          Well, that is the first that we heard of that, and

20  like I said, the cases that they're citing are ones that are

21  decided on the basis of consideration.

22          But the point is really -- it's beside the point,

23  if you will.  The -- a completely separate question here in

24  this contract is whether or not the objective or purpose of

25  the contract was achieved.  I mean, I think -- the parties

1   will have to agree to disagree on what is -- the important

2   parts of the contract.  So I disagree with Mr. Lee's

3   characterization, but I don't think that we need to fight

4   about that for the purpose of Your Honor deciding this issue.

5          We have a third claim which requests confirmation

6   -- a declaratory claim -- that we properly terminated the

7   agreement.  Under the contract we are allowed to terminate

8   the agreement if there has been a material breach or if the,

9   you know, primary purpose of the contract has essentially

10  been avoided due to the breach, and so the question then is

11  -- as you can appreciate, Your Honor, if there's a breach and

12  there's 50 bucks in harm or, you know, out of thousands and

13  tens of thousands of units of product, you know, a box -- one

14  box with, you know, 50 -- 50 memory chips in it got waylaid

15  or didn't get delivered, that's not going to be a material

16  breach.

17         Here, our contention is that we provided them

18  something worth -- and like I said, we'll just use

19  approximately $85 million -- you know, maybe their number is

20  higher than that or lower than that, but I think that was our

21  initial -- what is in the negotiating history as an offer at

22  the time, but we offered them in exchange for the supply

23  obligation a very substantial thing.

24         So the quid pro quo is very large, and we did not

25  -- you know, we offered the very large quid, we did not get

1  the pro quo, and I think it's important to know for the

2  purposes of whether or not the breach that we're talking

3  about here goes to the centrality of the contract -- to look

4  at the size of what we gave up in exchange for not achieving

5  the supply obligation, if that make sense.  It's an inquiry

6  that is going to be relevant for damages, and it's an inquiry

7  that's going to be relevant for the -- you know, for this

8  declaratory claim as to whether or not this breach was big

9  enough to -- you know, to result in termination.

10            THE COURT:  Mr. Lee?

11            MR. LEE:  Yes, Your Honor.  This is

12  Christopher Lee, and I'm happy to address Mr. LaMagna's new

13  argument as well.

14            So he now argues that these -- this information is

15  necessarily -- necessary due to the issue of materiality.

16  The trouble with that is, if you look at Netlist's Third

17  Cause of Action, they list exactly two material breaches:

18  one, the violation of the purported supply provision; and,

19  two, the violation of a taxation provision.  They do not list

20  any material breach on the basis of any of these patents.  In

21  fact, if they tried to assert a material breach based on that

22  at this stage, it would be per se improper because the

23  contract contained a notification requirement and Samsung was

24  never notified of any material breach on the basis of the

25  patents.  So I simply don't see how the issue of the

 1   valuation of all of these patents is relevant to materiality

 2   when there's no material breach being alleged regarding the

 3   patents.

 4            Now, to the extent that Mr. LaMagna is arguing,

 5   well, he needs to know how important the supply provision is

 6   relevant to other provisions in the agreement, I don't think

 7   that's a particularly good standard for materiality,

 8   Your Honor, and I don't think that varies at all based on

 9   exactly how much the patents were valued at.  So I think it's

10   pretty clear, Your Honor, that there's no relevance of this

11   information here.

12            MR. LA MAGNA:  And this is Ray again for plaintiff,

13   Your Honor.

14            I think if the -- if defendant were willing to

15   agree -- or, you know, stipulate to the fact that the patent

16   license that we provided was, you know, of, you know,

17   substantial value, I mean, you know, that -- of the magnitude

18   I'm talking about, then I don't think we would have this

19   issue.

20            I do think that if the supply provision -- as you

21   can imagine, this -- you know, important contract between

22   these two, you know, fairly substantial companies -- if that

23   supply provision was written as an additional item, "In

24   exchange for a hundred dollars, Netlist shall be able to buy

25   product at" a certain price -- or something like that -- and

1    that provision was breached, when the Court is looking at our

2    D.J. claim on termination, they would say, "Wait a second.

3    This little tiny appendix to the contract on which there's a

4    value placed of a hundred dollars was breached," that does

5    not -- that can't possibly avoid the value of the entire

6    contract -- or the purpose of the entire contract or the

7    benefit to be obtained by Netlist.  It's just too small of an

8    issue.

9           And my point is this is the opposite.  The

10   countervailing -- or a countervailing consideration for the

11   supply provision is a license that's worth, you know,

12   probably upwards to 100-million-or-more dollars to Samsung,

13   and so that is going to color whether or not the breach of

14   that supply provision matters vis-à-vis the contract as a

15   whole.  And right now, you know, defendant is disputing the

16   value of that license, and if they're going to dispute the

17   value of the license component as part of consideration, then

18   they -- all we're asking for is, if they've made any efforts

19   internally to value or assess that license, let us know what

20   they were.  If they haven't made such efforts, no problem.

21   If such efforts are 100 percent privileged, it was only done

22   in a privileged context, well, they can log it.  But what we

23   haven't heard --

24           THE COURT:  So they --

25           MR. LA MAGNA:  Sorry.  Go ahead.

```
 1            THE COURT:  Oh, go ahead, Mr. LaMagna.  I thought
 2   you were done.  Finish your thought.
 3            MR. LA MAGNA:  I was going to say what we don't
 4   have from Mr. Lee is, I think, what should be a very simple
 5   question that's posed to their IP people -- or the people who
 6   negotiated this contract is "Did you guys internally ever do
 7   a valuation of looking at Netlist's patents or patent
 8   products to determine how valuable this thing would be to
 9   Samsung?  Yes or no?" and if they did, look at it and say,
10   "Well, is this privileged?  Do I need to put I on a log, or
11   is it not privileged; I need to produce it?"  It's a fairly
12   straightforward request.
13            And I'm done.
14            THE COURT:  All right.
15            Mr. Lee?
16            MR. LEE:   Well --
17            THE COURT:  Well, actually, Mr. LaMagna, are you
18   willing or offering to resolve this dispute if Samsung is
19   willing to stipulate regarding the value of the license
20   agreement?
21            MR. LA MAGNA:  I think if that -- we would consider
22   that.  You know, the devil is always in the details -- this
23   is Ray again for plaintiff.
24            Your Honor, we would consider that if the
25   stipulation was, you know, shall we say, of an order of
```

1   magnitude, you know, that would resolve this -- that would

2   address the issue that we're raising.  If they simply say,

3   "It's valuable," you know, that's a bit of an amorphous

4   thing.  If they say that they -- that they -- it's undisputed

5   that it's worth, say, tens of millions of dollars, okay.  You

6   know, that's something, I think, we would certainly consider.

7              THE COURT:  Okay.  Let me hear from Mr. Lee.

8              MR. LEE:  Your Honor, this is Chris Lee.

9              First of all, just focusing on that issue of

10  valuation, obviously, as a preliminary matter, I don't think

11  the issue of whether a breach of a particular provision is

12  material is determined by the -- its cash value relative to

13  other provisions in the contract.  I simply haven't seen any

14  law to that effect at any point in my career.

15             But setting aside that issue, Your Honor, we don't

16  need to stipulate to a particular value of these patents

17  because it's already evident from the contract what Samsung's

18  valuation of these patents is.  We paid Netlist $8 million

19  upfront, and we also gave them concurrently a $15 million

20  loan.  So Samsung values these patents at at least

21  $23 million.  Now, do we agree with Netlist's contention that

22  the patents are $100 million?  Probably not, I don't know,

23  but just from the number of $23 million, I think it's pretty

24  clear that the value of these patents is at least material.

25  So I don't understand what value we're getting from this

 1  additional discovery that they're demanding.

 2          MR. LA MAGNA:  And so -- I apologize, Your Honor.

 3  This is Ray LaMagna --

 4          THE COURT:  Well, hold on.  Hold on.  Before we

 5  move on.

 6          Does that mean, Mr. Lee, that you are not willing

 7  to resolve the issue by stipulating in some way, shape, or

 8  form to the value of the -- this license even if it's for the

 9  purposes of this litigation only?

10          MR. LEE:  Your Honor, I think we would happily

11  stipulate to the provision that the licenses are valuable,

12  but I don't think we would stipulate to the exact number that

13  Netlist is providing.  It is not clear to me at that moment

14  -- at this moment what that exact number is.

15          THE COURT:  Would you be able to do a range?

16          MR. LEE:  I mean, Your Honor, as I just told you,

17  the -- we would -- the patents are clearly worth to us tens

18  of millions of dollars just based on the face of the

19  contract, and I think that settles any materiality concerns

20  Netlist may have.

21          THE COURT:  Okay.  One second.

22          (Pause.)

23          THE COURT:  Okay.  Mr. LaMagna?

24          MR. LA MAGNA:  Yeah, I just wanted to -- this is

25  Ray again for plaintiff.  I wanted to correct the record on

1    just a couple of points.

2            So, first of all, yes, there was a separate loan,

3    and like I said, I don't know that loans -- you have to pay

4    the money back unfortunately.  So it's not -- that isn't a

5    gift, something you get to keep, but that was with a separate

6    Samsung entity.  The consideration for that -- the cross-

7    consideration for that is a separate contract, and so it's

8    not part of this contract.  It was a -- in terms of

9    consideration.

10           Secondly, he mentioned an $8 million payment.  I

11   would just remind, you know, counsel that that falls under

12   Section 3 of the agreement.  I apologize.  Your Honor

13   probably doesn't actually have a copy of the agreement in

14   front of the Court, but it's Section 3.1 under "Development

15   Costs," and I'll just read what it says: (Reading) Samsung

16   shall pay to Netlist $8 million U.S. -- United States

17   Dollars, U.S. $8 million, as nonrefundable NRE fees (end

18   reading), and "NRE" is an abbreviation for "nonreoccuring

19   engineering."

20           So, as part of this agreement, as I said, part of

21   it was this patent license and supply agreement.  Part of the

22   agreement was that Netlist was going to do research and

23   development work for Samsung, and there was an advance

24   payment of $8 million specified in the contract as an -- and

25   I'll quote again -- "as nonrefundable" -- and then the

1   abbreviation for nonreoccuring engineering fees.  So it's not

2   -- that money was spent on engineering.  It's not an offset

3   for the patent license.  The supply agreement is the offset

4   for the patent license.

5         THE COURT:  I understand, but what Mr. Lee just

6   said was that he believes that his client would be willing to

7   stipulate that the value of the license is in the tens of

8   millions of dollars.  Does that -- does that -- you --

9         MR. LA MAGNA:  I think if we --

10         THE COURT:  -- your client?  Is that where you

11   would need it to be in order for this to be a potential

12   resolution of the issue?

13         MR. LA MAGNA:  No, I think that that is

14   constructive, that that -- we'd have to look at the language,

15   but I think that would probably resolve it.  If I'm -- if

16   it's a stipulation as in something that I'm agreeing to, I

17   think I would add the words "at least" tens of millions of

18   dollars, from my client's perspective, but if -- you know, if

19   Samsung was to say that they concurred -- they stipulated

20   that the license -- the value of the license to them was at

21   least tens of millions of dollars, I think that's something

22   we could take.

23         THE COURT:  Mr. Lee?

24         MR. LEE:  Your Honor, just to clarify -- this is

25   Christopher Lee -- I did not say that my client was willing

1   to stipulate to the fact that these license agreements are --

2   these licenses are worth tens of millions of dollars, but

3   what I did was I -- Your Honor, I pointed you to the text of

4   the agreement which cites to a $8 million loan and a

5   $15 million payment -- an $8 million payment and a

6   $15 million loan.  So it is fairly easy for Netlist to argue

7   that just based on the face of the contract --

8           THE COURT:  But what we're taking about, Mr. Lee,

9   right now is whether or not we can resolve this dispute over

10  these two deposition topics and two request for productions

11  with a stipulation that the -- the value of the license is at

12  least tens of millions of dollars.  It's either a "Yes, I

13  think my client would agree to that," or a "No, Judge," and

14  let's resolve these discovery disputes.

15          MR. LEE:  No, Your Honor, I do not think my client

16  would agree to that.  I haven't asked them.  So I -- we would

17  have to resolve the discovery issue, then.

18          THE COURT:  Okay.  Okay.  So then let's turn back

19  to the issue of the relevance of the -- we've got

20  Deposition Topics 19 and 20 and RFP 20 to 21, which relate to

21  the efforts to value this license, and as I understand it,

22  Mr. LaMagna has most recently argued relevance to damages, as

23  well as to materiality, on top of the meaning of the -- or

24  the effectiveness of the supply provision or whether in fact

25  it is a supply provision.

```
 1              And so it seems I come back to Mr. Lee.  You argued
 2   that the -- you don't believe that the value of these -- of
 3   this license goes to materiality, and then we got off on this
 4   tangent.  So I will turn it back to you.
 5              MR. LEE:  Yes, Your Honor.  I don't want to belabor
 6   this point, but I'll just reiterate this is a breach-of-
 7   contract case, not an IP-infringement case.  There are no
 8   IP-related claims and they don't need our precise valuation
 9   of any IP involved in this contract to interpret the supply
10   term or to argue whether it's material or not.  That's simply
11   not relevant to this case, in our view.
12              THE COURT:  All right.
13              Mr. LaMagna?
14              MR. LA MAGNA:  We're not -- this is Ray for
15   plaintiff again.
16              We're not looking for a precise number, you know, a
17   specific number necessarily.  We need to know what ballpark
18   that we are playing in because I think that that will affect
19   whether or not the breach of the provision is ultimately
20   undermining the purpose of the agreement and, therefore,
21   material in meeting the requirement to be able -- the
22   prerequisite to be able to terminate the agreement.  So we
23   need to know: Is this agreement worth a dollar? a thousand
24   dollars? a million? a hundred million?  You know, where it
25   falls in that spectrum is going to inform whether or not what
```

```
 1   we've paid for something here and that thing failed --
 2   whether that is -- that failure of the agreement becomes
 3   important as to the agreement as a whole.
 4           And as I said -- I just want to reiterate because
 5   counsel again has pointed us to a couple of different places
 6   when he said he agrees it's worth tens of millions, but he's
 7   pointing to parts of the agreement that are isolated to
 8   completely different issues, you know, payments for --
 9           THE COURT:  Understood.
10           MR. LA MAGNA:  -- completely other things.  So --
11           THE COURT:  Understood. Okay.
12           All right.  Mr. Lee, do you have any further
13   argument?
14           MR. LEE:  Your Honor, just one sentence.  This is
15   Christopher Lee.
16           Mr. LaMagna says he needs to know the ballpark.
17   The ballpark is established.  It's $23 million: the
18   $8 million payment, a $15 million loan.  It's not one dollar.
19   It's -- I don't know if it's a hundred million dollars, but
20   it's clearly a material valuable amount.
21           THE COURT:  Okay.  Thank you.
22           My ruling is to grant the discovery requests with
23   regard to these four items.
24           MR. LA MAGNA:  This is Ray for plaintiff.
25           Thank you, Your Honor.  If we could move just
```

1   quickly to something, I think, that won't take this much time

2   but --

3           THE COURT:  Let's hope not.

4           MR. LA MAGNA:  Topic -- because it's basically an

5   offshoot of the same issue -- Topic 21, and in the deposition

6   topics which lines up essentially with Topic 20 -- with

7   RFP 22 and 23 is trying to identify any other, you know,

8   patent licenses that they have in this space.  So this is

9   sort of a companion to what we just discussed.  What we just

10  discussed is, you know, internal valuations that they may

11  have done, and I don't know if those are privileged, I don't

12  know if there were any, there may be -- we may be fighting

13  about nothing, but there may be another valuation point that

14  they have internally, which is their other patent licenses,

15  you know, in this specific space that may identify sort of

16  what ballpark we're in.

17          THE COURT:  Okay.  So it's Topic No. 21 and RFPs

18  22, 23?

19          MR. LA MAGNA:  Yes, Your Honor.  Thank you.

20          I don't know that we need to reargue it because

21  it's basically the same -- it's the same issue over again.

22          MR. LEE:  Your Honor, this is Christopher Lee.

23  Just one point on this.

24          THE COURT:  Yeah.  Just let me finish reading it,

25  and I'll come to you, Mr. Lee.

1          MR. LEE:  Yes, Your Honor.

2          (Pause.)

3          THE COURT:  Okay.  Mr. Lee, go ahead.

4          MR. LEE:  Your Honor, this is not the same issue we

5    just discussed because we've now moved from Samsung's

6    valuation of Netlist's patents to Samsung's valuation of all

7    patents in the semiconductor space.  That's a significantly

8    broader issue.  It would be extremely burdensome to Samsung

9    to provide these documents for every patent it's ever

10   licensed.  I just think, again, in terms of relevance,

11   burden, proportionality that this just is not a relevant

12   issue to this case.

13         THE COURT:  Mr. LaMagna, final word?

14         MR. LA MAGNA:  Again, it's really the same scope.

15   We -- Mr. Lee continues to try to expand the scope of the

16   request.  We're only looking for datapoints for NAND and DRAM

17   products, and as I said earlier, these also can go away if we

18   could reach the stipulation we discussed earlier.  We're just

19   looking for third-party datapoints.  In other words, if

20   Samsung is paying, say, 3 percent or 2 percent of their sales

21   for a license to other NAND- or DRAM-related patents, that

22   would inform how much our license to NAND- or DRAM-related

23   patents may be.  Now, it's not a dispositive question, but it

24   certainly tells you sort of what the industry is placing a --

25   you know, a valuation on these kinds of patents.

```
 1              THE COURT:  Okay.  With regard to Depo Topic 21 and
 2    RFP 22 and 23, my order is to deny.  I think these requests
 3    go too far.
 4              Let's go to the next.  What's next, gentlemen?
 5              MR. LA MAGNA:  The last deposition topic that we
 6    have is Topic 22, and I'm just looking at the latest response
 7    --
 8              THE COURT:  Does that mean 23, 24 and 25 are no
 9    longer at issue?
10              MR. LA MAGNA:  That is correct, Your Honor.
11              THE COURT:  Okay.
12              MR. LA MAGNA:  So this topic reads: (reading)
13    Samsung's efforts to collect and respond to Netlist's
14    discovery requests (end reading).  Both sides propounded
15    identically worded topics.  We -- it's pretty typical to say,
16    you know, "What did you do to," you know, "search for stuff?"
17    or, you know, "Who were the custodians?" -- those kinds of
18    questions -- and so we responded that we would provide a
19    witness when they propounded the identical topic, and they,
20    oddly, have not.
21              THE COURT:  Okay.
22              MR. LEE:  Your Honor, this is Christopher Lee.
23              We've amended that response.  I think Mr. LaMagna
24    might have just missed it.  We will provide a witness.
25              THE COURT:  All right.
```

1          MR. LA MAGNA:  Okay.  Yeah, if I missed it, I

2    apologize.  If I missed it, then we'll take it off the table.

3          And I defer to Your Honor, but I believe that that

4    now closes out the deposition notice topics and the RFPs.

5    Unfortunately, we do have a few other disputes on rogs and

6    RFAs.  I'm happy to keep marching, but I don't know what the

7    Court's tolerance will allow.

8          THE COURT:  I appreciate that.  We have now spent

9    an hour and 40 minutes, and we have -- why don't we talk

10   right now before I make a decision.

11         With regard to the interrogatories that are

12   outstanding, why don't we go through, and you can inform me

13   on which ones are still at issue.

14         MR. LEE:  Your Honor, this is Chris Lee.  I

15   apologize for interrupting but just one point?

16         THE COURT:  Okay.  Go ahead.

17         MR. LEE:  To the extent that Your Honor plans on

18   covering only part of the issues before us today and

19   deferring some to Monday, we'd ask that you prioritize the

20   points of clarification we have on your July 27th order --

21         THE COURT:  Okay.

22         MR. LEE:  -- just because, obviously, this is a

23   very fast-moving process with --

24         THE COURT:  I (inaudible).  All right.  Okay.  But

25   before we get there, can -- I just want to know -- I think we

1   have -- do we have RFAs and interrogatories still at issue?

2           MR. LA MAGNA:  Regrettably, yes, Your Honor.  This

3   is Ray for plaintiff again.

4           THE COURT:  Okay.  So pick one, and tell me which

5   ones remain at issue.

6           MR. LA MAGNA:  From our Interrogatory Set No. 1, we

7   have items 1 and 3, 4 and 6 -- I mean -- sorry -- Rogs 1 and

8   3, 4 and 6; from our Set No. 2, Rog 9, and those present

9   relatively parallel issues for all of those.

10          THE COURT:  Okay.  What about --

11          MR. LA MAGNA:  The issue --

12          THE COURT:  I'm sorry  What about 5 and 19, 12 and

13  13, and 21?

14          MR. LA MAGNA:  Other than whatever I've just named,

15  I think that we have gotten supplementation from them that

16  has taken most of those off the table.

17          THE COURT:  Okay.  So let me just confirm.  You

18  identified Rogs 1, 3, 4, 6, and 9 as still at issue?

19          MR. LA MAGNA:  Correct.  And I think we're taking

20  your guidance from the last call that we are accepting --

21  where they have provided a substantive response -- we've

22  asked for all facts -- we are accepting that, you know, right

23  now, and if we have a dispute later because of some late

24  dump, you know, of discovery, we will address that later with

25  the Court on other topics.

1          THE COURT:  Okay.  Now, how about the RFAs?  What

2    remains at issue?

3          MR. LA MAGNA:  The RFAs -- on our second set of

4    RFAs there's a long string of RFAs where the -- it's 16 to

5    41, where we ask for "admit" that a certain thing happened,

6    and the response is that they indicated -- quote -- I'll

7    quote -- you know, that (reading) Samsung indicated routinely

8    to plaintiff throughout the time period that it is unable to

9    support every request for products (end reading).  So by way

10   of example --

11         THE COURT:  Okay.  Hold on (inaudible) want to get

12   to the merits.  I really just need to identify --

13         MR. LA MAGNA:  -- apologies.  Yeah.  We are -- we

14   don't know how to read whether the -- what they have is they

15   have a statement, and then they say "otherwise deny," and I'm

16   -- I think I'm reading it as denying the RFA, but I don't

17   know whether or not it's an admission or denial as to the

18   substance of the question based on the wording is basically

19   the issue.  That's for -- there's 26 of them, and I think

20   that present -- or 25 of them that present exactly the same

21   issue.  It's one -- we could look at just RFA 16, and that

22   would answer the question.

23         THE COURT:  Okay.  So I have from my notes, which

24   comes from your July 16th letter, RFAs 16 to 41, 49 to 51,

25   48, 52, 62 to 63.  Do all of those remain at issue, and are

 1   you --

 2              MR. LA MAGNA:  No.

 3              THE COURT:  -- telling me that there are more?  Or

 4   are there less?

 5              MR. LA MAGNA:  No, Your Honor.  Apologies.  This is

 6   Ray again for plaintiff.

 7              So the first category, 16 to 41, remains at issue.

 8              THE COURT:  Okay.

 9              MR. LA MAGNA:  The second category, 49 to 50 and

10   then following up with 48 and 52, there has been some

11   supplementation and so --

12              THE COURT:  Okay.

13              MR. LA MAGNA:  -- we'll -- those will drop away.

14              THE COURT:  Okay.

15              MR. LA MAGNA:  62 and 63, I think, are still, you

16   know, in dispute, although I'm happy to, you know, confer

17   again with, you know, opposing counsel, if we're going to

18   meet and confer, just to see if we can resolve those.

19              THE COURT:  Okay.  Well, why don't you do that

20   because I am not going to have the time to get to those items

21   today.  So we're going to have to move them to Monday.

22              Now, let's get to the issue of -- and so, hey, I

23   would love it if on Monday you guys tell me even more has

24   been resolved but -- and we will regroup on Monday as to

25   what's left over, but let's talk about the clarification that

1   you need.

2         MR. LEE:  Yes, Your Honor.  This is

3   Christopher Lee, and I can address the July 27th order if

4   that's what you're talking about?

5         THE COURT:  Yes.  I'm coming back to the item you

6   asked me to prioritize.

7         MR. LEE:  Thank you, Your Honor.  We appreciate it.

8         Your Honor, so obviously we saw this order on

9   July 27th, digested it very quickly.  We're taking it very

10  seriously.  Processes are underway to move the document

11  production along.  I can represent to Your Honor that these

12  new search terms have hit about 110,000 new documents for

13  search.  That's a monumental task, but we're putting

14  resources we can behind it, and I just want to clarify a few

15  issues on the order before we, you know, go full steam ahead

16  -- as we go full steam ahead on this process.

17        THE COURT:  Okay.  And is it 110,000 documents or

18  110,000 pages?

19        MR. LEE:  110,000 documents, Your Honor.

20        THE COURT:  Okay.

21        MR. LEE:  The first has to do with footnote 2, and

22  this is a footnote regarding privilege, and the only thing I

23  want to clarify with Your Honor is that this footnote does

24  not modify the scope of privilege as it exists under the law

25  because I think there are some aspects of this that are a bit

1   different from what privilege actually is.  So, as long as

2   Your Honor can clarify that this is not meant to mean that

3   privilege is less than it would usually be in this case, I

4   don't think we have an issue.

5           THE COURT:  Well, you know, that came from the form

6   that was provided.  Nobody argued regarding it.  So, no, I

7   did not intend to alter the attorney-client privilege,

8   privilege log rule with it.

9           MR. LEE:  Understood, Your Honor.  Thank you for

10  that clarification.

11          MR. LA MAGNA:  And this is Ray for plaintiff again.

12          And I'm sorry.  I just don't -- obviously, this is

13  meant to just be a somewhat pithy summary of the obligation

14  and not a compendium on privilege logs, but what is the issue

15  that is -- we feel is -- this is overreaching here just so we

16  don't have a later dispute.  Is there some particular point

17  that we have a concern about here?

18          MR. LEE:  Your Honor, would you like me to address

19  that?  This is Christopher Lee.

20          THE COURT:  You know, I'm going to ask you guys to

21  meet and confer or talk about this offline because I really

22  do have to go and so --

23          MR. LEE:  Yes, Your Honor.

24          THE COURT:  -- that you two can chat about it, and

25  then you can alert me, if we have a problem, on Monday.

1       MR. LEE:  Thank you, Your Honor.

2       The second issue has to do with the search terms

3  themselves, and I had understood, based on our discussion on

4  Tuesday, that my colleague Mr. LaMagna was amenable to

5  excluding the search term "Irvine," which is the city Netlist

6  is in, from the list -- from the order that the Court signed.

7  "Irvine" was not excluded in the final order, and I can

8  represent to Your Honor "Irvine," as we expected, produces

9  about 20,000 hits on its own.  So I do want to clarify with

10 Your Honor whether you --

11      THE COURT:  Okay.

12      MR. LEE:  -- intended to include "Irvine" or

13 whether that was inadvertent.

14      THE COURT:  It was inadvertent.

15      MR. LEE:  Thank you, Your Honor.  Thank you for

16 that clarification.

17      THE COURT:  So why don't you guys meet and confer

18 over the privilege issue.  If I need to issue an amended

19 order, we can talk about it on Monday, and we can correct it.

20 If not, you can let me know that as well.

21      MR. LEE:  Thank you, Your Honor.

22      MR. LA MAGNA:  Your Honor, this is Ray for

23 plaintiff.

24      I am perfectly happy to just acknowledge on the

25 record that your order should be deemed to omit the term

1  "Irvine," including in Korean, so that it doesn't make more

2  work for the Court.

3            THE COURT:  I truly appreciate that.

4            MR. LEE:  Thank you, Your Honor.

5            And just one final point, and this is really more

6  of a indulgence that we request.  As we explained to

7  Your Honor, we have an additional 120- -- 110,000 documents

8  to review.  We are putting a lot of resources behind it, but

9  to be honest, it is physically very difficult for us to

10 complete this within five days.

11           THE COURT:  When do you think you can?

12           MR. LEE:  Your Honor, if your -- if we could have

13 anything we wanted, we would ask by the end of next week,

14 that is, August 6th.  So we -- that would have us covering

15 about roughly 10,000-plus documents a day, which is about the

16 maximum speed our reviewers can hit.

17           THE COURT:  Mr. LaMagna, are you okay with that?

18           MR. LA MAGNA:  Well -- this is Ray again for

19 plaintiff.

20           I understand the situation that they are in,

21 although they have had a very, very long time to prepare for

22 this order, and I will note that the difficulty that we have

23 -- and I defer to the Court's judgment how best to handle

24 this -- is Judge Scarsi has a concurrent deadline for summary

25 judgment motions on the 16th -- Monday the 16th, and we have

1    depositions that are scheduled to start before the deadline

2    that Mr. Lee just raised, and the documents are coming to us

3    in Korean and need to be translated.  I mean, quite frankly,

4    I don't know how that's possible.

5           So it's not -- in the abstract, Your Honor, if our

6    deadline for MSJs and if we had -- you know, was a month

7    further out -- you know, as it is, we have a problem, I

8    think.  So I don't know that we can agree to that.  I am open

9    to suggestions, you know, from the Court if you think that

10   there's some other approach we should take vis-à-vis

11   Judge Scarsi.  I'm not trying to be unreasonable to opposing

12   counsel, but given the constraints that the district court

13   judge has given us, I'm not sure how we can act within those

14   confines.

15          THE COURT:  Mr. Lee, how many lawyers do you have

16   working on this -- or professionals?

17          MR. LEE:  Your Honor, we have a team of about ten

18   reviewers, who are devoting their time 100 percent to the

19   project, and I'm giving you an honest estimate when I say the

20   top speed for them is about 10,000 documents a day.

21          THE COURT:  I understand.

22          Mr. LaMagna, how many folks do you have working on

23   this case?

24          MR. LA MAGNA:  In terms of document reviewers?  I

25   believe we have -- I want to say -- it's on the order of a

1   magnitude of 11 or 12 contract attorneys that we've had

2   working on it for several months.

3           THE COURT:  Mm-hmm.

4           MR. LA MAGNA:  I --

5           THE COURT:  Okay.  So here's my ruling: I'm going

6   to leave it for August 6th based on Mr. Lee's representation

7   that this is the maximum speed by which his reviewers can get

8   through this work, and I would ask, Mr. Lee, that one

9   accommodation here is that you do a rolling production, where

10  you produce things as you have them ready to go, so that it

11  reduces any delay for the plaintiff.  All right.?

12          MR. LEE:  Yes, Your Honor.  And I can represent to

13  you that we have actually been making an effort to prioritize

14  the early custodians.  There's actually only one Korean

15  Samsung witness that's being deposed before August 6th, and I

16  can represent to you that substantially all of his documents

17  have already been produced.

18          THE COURT:  All right.

19          MR. LA MAGNA:  And just -- and, Your Honor, maybe

20  we should leave this for Monday, but I think we'd have to

21  entertain at this point an application to take depositions

22  out of time.  Because assume that I get a production, it's in

23  Korean, it's on a disc drive or -- you know, it's in an

24  electronic file and has to be --

25          THE COURT:  Yeah.  Let's -- why don't you spend

1    some more time thinking about it, and let's talk again on

2    Monday.  Okay?

3              MR. LA MAGNA:  Okay.  Thank you, Your Honor.

4              THE COURT:  All right.  Thank you, everybody.  Have

5    a good day.

6              MR. LEE:  Thank you, Your Honor.

7              THE CLERK:  Court is now adjourned.

8         (Proceedings adjourned.)

9    ///

10   ///

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter.

5

6    /s/ Julie Messa_____          August 2, 2021_____
     Julie Messa, CET**D-403        Date
7    Transcriber

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25