UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)


NETLIST, INC,                    ) CASE NO: 8:20-CV-00993-MCS-DFMx
                                 )
              Plaintiff,         )              CIVIL
                                 )
      vs.                        )      Santa Ana, California
                                 )
SAMSUNG ELECTRONICS CO, LTD,     )      Friday, June 4, 2021
                                 )
              Defendant.         )
_____

INFORMAL DISCOVERY CONFERENCE

BEFORE THE HONORABLE DOUGLAS F. McCORMICK,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:

For Plaintiff:          JASON C. LO, ESQ.
                        RAYMOND A. LaMAGNA, ESQ.
                        Gibson Dunn & Crutcher, LLP
                        333 S. Grand Ave.
                        Los Angeles, CA 90071


For Defendant:          JUMIN (CHRIS) LEE, ESQ.
                        Bird Marella Boxer, et al.
                        1875 Century Park East
                        23rd Floor
                        Los Angeles, CA 90067


Court Reporter:         Recorded; AT&T; digital

Courtroom Deputy:       Nancy Boehme

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          <u>**Santa Ana, California; Friday, June 4, 2021**</u>

2                        **(Remote Appearances)**

3                        **(Call to Order)**

4          **THE CLERK:**  On the record on Case SA CV 20-00993.

5     It's *Netlist, Inc. v. Samsung Electronics*.

6          Counsel, your appearances, please.

7          **MR. LaMAGNA:**  This is Raymond LaMagna of Gibson Dunn

8     and Crutcher on behalf of Plaintiff, Netlist, and I'm joined by

9     my colleague, Jason Lo.

10         **MR. LEE:**  Good morning, Your Honor.  This is

11    Christopher J. Lee of Bird Marella on behalf of Samsung

12    Electronics.

13         **THE COURT:**  Okay.  Is it Mr. Lee?  I'm sorry, it

14    broke up for half a second there.

15         **MR. LEE:**  I apologize, Your Honor.  This is

16    Christopher J. Lee on behalf of Samsung Electronics.

17         **THE COURT:**  Okay, it's Lee then?  I'm correct on the

18    last name?

19         **MR. LEE:**  Yes, Your Honor.  It's L-e-e, Lee.

20         **THE COURT:**  Okay.  Thank you, Counsel, for joining me

21    this morning.  I have received and reviewed the letters that

22    were sent yesterday, and I've reviewed also the attachments.

23    Not as carefully as the letters themselves, of course, but I've

24    at least skimmed them.  And since this is our first

25    conversation in the matter, let me give you the 90-second

1   overview of how these work.

2          It's been my experience over the last seven plus

3   years of being a Magistrate Judge in this Court that the

4   Rule 37 process can be very expensive and time consuming and

5   cumbersome for the parties and doesn't always prove that

6   helpful to me as the Court and so I adopted many years ago this

7   approach of being willing to get on the phone earlier in the

8   process, before the motion is filed, a motion is filed with

9   that big joint stipulation and all the paperwork that goes

10  along with it to try to head some of that off at the pass.  And

11  oftentimes through this discussion we can short circuit that

12  time and expense associated with that more lengthy process.

13         We do that through a couple different ways.  Number

14  one is sometimes there are issues that are so ripe and amenable

15  to being just handled in a short discussion that I can just

16  handle them with, you know, a two-page letter from the parties

17  and a 15-minute phone call with counsel.  I've got one of those

18  on Monday.  The parties can't agree on a deposition date.  Hey,

19  you know, we don't need the full Rule 37 process for that.  We

20  can have two two-page letters and a 15-minute discussion and at

21  the end of the day the parties are going to get a deposition

22  date.  It may not be the deposition date everyone likes, but it

23  will be a deposition date.

24         The second thing that sometimes happens is the

25  parties come to me and they've got a really nasty issue or

1  nasty set of issues or they're just having some trouble working

2  some things out and we kind of have to work through a process

3  for that.  Maybe it's a big privilege issue.  Maybe, like it is

4  here, it's a bunch of written discovery.  And it would just be

5  helpful to have me work with you guys to maybe get some

6  briefing on a couple of issues that would be helpful to get an

7  early resolution of, or something like that, and we don't need

8  to go through that whole Rule 37 process.

9          And occasionally there are disputes in which I just

10  say, hey, look, I think Rule 37 would actually work best here

11  and we go down that road.  That doesn't happen very often.

12  Maybe once or twice a year if that.  But it does happen

13  sometimes.

14          So, the only limitation is if we do the first way,

15  which probably is not going to work out for today, but if we do

16  that first way where it's just those two-page letters and then

17  you ask me for a ruling, you know, there's nothing on the

18  docket with the Court and you're not going to get anything in

19  writing from me, so you really have to agree to abide by my

20  ruling.  You can't take it up with Judge Scarsi by a motion for

21  review.  So, you know, if at some point we decide to do that

22  for an issue, we just need to keep that in mind.

23          Any questions about that, Mr. LaMagna or Mr. Lo or

24  Mr. Lee?

25          **MR. LaMAGNA:**  No, we very much appreciate -- this is

5

1   Mr. LaMagna for Gibson.  We very much appreciate Your Honor

2   making the Court available for this.  This is an enormous help

3   to streamline this process.  We understand the conditions.

4           **MR. LEE:**  Thank you, Your Honor --

5           **THE COURT:**  Mr. Lee?

6           **MR. LEE:**  This is Chris Lee.  No issues here and we

7   also appreciate Your Honor making the time.

8           **THE COURT:**  Well, look, I'd like to tell you I'm

9   being selfless, but it's really -- I'm really not.  You know,

10  you guys know, because you've probably submitted them to the

11  Court, those giant 18-inch stacks of paper that come with the

12  Rule 37 joint stipulations are no fun.  So, I'm totally not

13  being selfless at all, I'm looking out for number one here.

14          So, like I said, I've looked at everything.  The

15  first question for me is, and this sometimes is the first

16  question in many cases, is you guys need a protective order,

17  right, and what can I do to help you get one?

18          If you were here in person, I'd send you out in the

19  hallway until you got one and we'd get one signed today.  But,

20  you know, I can tell from a quick review of the Complaint,

21  because the first one I pulled up had a bunch of redactions in

22  it, that there's some confidential stuff here and so you

23  probably want a protective order, and there's mentions of a

24  protective order in both of your letters.  So, we need one.

25  I'm happy to sign one if you can get one to me.  What do we

1   need to do?

2       **MR. LaMAGNA:**  Thank you, Your Honor.  This is (**audio**

3   **glitch**) Ray from Gibson on behalf of Plaintiff.  We will send

4   over a draft to opposing counsel for consideration.  They had

5   raised this -- I should just note that in response to our

6   discovery requests they did not actually request a protective

7   order, but in meeting and conferring we said that we'd be

8   amendable of course to entering one.  That's not a problem.

9   We'll draft something up and send it to them.  I think we have

10  an internal draft already circulating.

11      I will note that in conferring the parties did agree

12  that until a protective order is entered that they would treat

13  any production as an attorneys' eyes only production, and so we

14  agreed that there would not be a delay in any discovery due to

15  the lack of a formal order.

16      **THE COURT:**  Okay.  But also, a formal order, you

17  know, I'll give you -- I've given you my introductory speech

18  about the -- sometimes I give the same speeches.  That's okay.

19  I get used to it.  I've given you my introductory speech about

20  these calls, I'll give you my introductory speech about

21  protective orders.

22      You know, the first year or so I was very uptight

23  about them.  Now I just view them as a discovery facilitating

24  device.  So, let's facilitate some discovery and get that

25  protective order on file.

1            And so, Mr. Lee, as soon as you get that from them

2    get back to them, because it's probably your objections that

3    are causing at least some of the concern.  And, you know, you

4    guys have probably all entered into dozens of these.  I sign

5    one almost every day.  And so, let's make it the routine

6    process that it should be.

7            Any concerns about a protective order, Mr. Lee, that

8    I should know about?

9            **MR. LEE:**  No, Your Honor.  We a hundred percent agree

10   with that.  We think it's a routine process.  We are just

11   waiting on a draft from Gibson Dunn.

12            I just want to briefly (**audio glitch**) the record on

13   one thing that Mr. LaMagna has said, that we did not raise the

14   issue of a protective order in our written discovery responses.

15   Your Honor has received the responses.  I'm sure --

16            **THE COURT:**  You objected on privacy grounds and

17   things like that.  I mean that should have sent both parties

18   scrambling for their protective order that's on file on their

19   computers.

20            **MR. LEE:**  Yes, Your Honor.  We agree.

21            **THE COURT:**  Okay.  And look, I mean exceptional is

22   the case these days without a protective order, quite frankly.

23   You know, sometimes I think we should just have one in every

24   case.  So, let's get that done.

25            The next issue for me is Mr. Lee and Mr. Rhow

1    indicate that they've been meeting and conferring and it would

2    benefit the parties to have some more meet and confer efforts

3    before we discuss some of these individual discovery requests.

4    I'm totally fine with that as a general principle going

5    forward.  Let me tell you what I kind of like the parties to do

6    when they meet and confer and then bring me a dispute about an

7    individual, an individual RFP or an individual interrogatory or

8    an individual RFA.

9              You know, my preference and the way it works best is

10   if you meet and confer to a point where you put your absolute

11   best foot forward with each other and you give each other the

12   most reasonable proposal, understanding, you know, experienced

13   counsel with excellent firms, like you all are, that you know,

14   as I've written and most other Magistrate Judges have written,

15   that working out written discovery involves some element of

16   compromise and that you're going to have to work together to

17   figure out those compromises.  And, you know, whether you do

18   ten search terms or twenty search terms or, you know, you do

19   eight custodians or twelve custodians, et cetera, et cetera,

20   et cetera, those are all issues that you're going to be able to

21   work through better than I can.  But if you get to a point

22   where you can't work something out, get that most reasonable

23   proposal out there and then share it with me.

24             And what I really endeavor to do, if you've each

25   given me a reasonable proposal, is I pick the side that I think

1    has been the most reasonable and that encourages you not to

2    take these absolute maximalist positions with each other and

3    essentially then ask me to split the difference.  I don't think

4    that's helpful.  I don't think that's a good use of your time

5    or my time.  And so that's what I prefer.

6          So, if you would like another week or two to meet and

7    confer through some of these requests, I think that would be

8    helpful, and then I'm happy to get back on the phone with you

9    and have you talk to me about, you know, if you want to pick

10   five that you think are worthy of discussion first or ten or,

11   you know, however many you want to do, I think that would be

12   great.  And if we get through ten and then you want to talk

13   about another ten in two weeks after that, you know, no

14   problem.  I'm happy to, you know, have three or four phone

15   calls with you guys, work through these sort of in an iterative

16   process and, you know, maybe by the middle of summer you're so

17   sick of talking to me that you've worked everything out and,

18   you know, everything is now on a nice smooth path to a trial in

19   front of Judge Scarsi sometime in 2023 or 2024, something like

20   that.  The last part was a joke.

21        **(Laughter)**

22        **MR. LaMAGNA:**  This is Ray LaMagna for Gibson again.

23   Thank you, Your Honor, for your indulgence and continuing to

24   work with us.  I will make a couple of points.

25        First, you know, our fact discovery closes in the

1    middle -- fact discovery closes, including depositions have to

2    be complete on documents we do not have, in the middle of

3    August, in just about nine weeks.  We're under a bit of a gun

4    here because we have been waiting now for a month basically for

5    confirmation from opposing counsel on some items where I

6    thought we had reached agreement in our prior conference.

7            To start with, I certainly appreciate Your Honor's

8    approach with baseball arbitration style decision making.  It

9    does help the parties to be reasonable with each other.

10   Netlist is sort of negotiating against ourselves.  I think if

11   you look at our -- the volume and the scope of the discovery

12   that we served, we tried in the first instance to be fairly

13   surgical, limited in the number of requests that we served,

14   limited in the scope to stuff that we think is core discovery

15   that is essentially relevant.  So, we already made a first

16   tranche of cuts from what most litigants would typically ask

17   for just at the drafting stage.

18           Secondarily, as I said, we served a rather detailed,

19   as you probably saw in our Exhibit D, response to their

20   objections.  We met and conferred for multiple hours over two

21   days, during which time I believe we addressed each and every

22   objection that they raised on a document-by-document or, you

23   know, request-by-request basis for every single RFP, RFA, and

24   interrogatory.  So, I think if we were to go in, you know,

25   item-by-item you'd find that there is no unaddressed objection

1    that we have.

2         We reached -- there were certain points on which they

3    said, hey, you know, we're just at an impasse and we're not

4    going to agree to that under any circumstances and then there

5    was a category of items where I thought that the parties were

6    in agreement.  And that's memorialized in our Exhibit E, the

7    letter of I think it was May, May 1st that we sent.  And when I

8    spoke to counsel last on our meet and confer at the end of

9    April, I was told that we'd get a response in a couple of days,

10   you know, were going to go back to their client, just confirm

11   that they're able to provide us the stuff on which we have

12   agreed, and that that would narrow the dispute to probably, you

13   know, three or four points that we would bring to the Court.

14   And then they disengaged for a month.

15        So I think to begin with we already sort of have on

16   the table and included in our letter what we think is a very

17   reasonable and surgical approach.  I'm happy to go through any

18   category and identify why it's relevant to our claims or give

19   you maybe the sort of nickel tour of what this case is about,

20   if that helps.  But I feel like we've already done that.  And,

21   I mean, you know, quite frankly, if we had to go to a baseball

22   arbitration-style, you know, approach now, I'm happy to do that

23   on this call.  You know, I don't -- I feel like we have been

24   very reasonable and gone through that process and have -- you

25   know, it hasn't been reciprocated.

 1          You know, one concern I want to raise just to sharpen

 2  this point, in the Rule 26 disclosures, they identify

 3  categories of documents that the Defendant itself concedes are

 4  relevant and discoverable because they are in the -- their

 5  initial disclosures.  In their letter to us of May 28th I think

 6  it is, which is our Exhibit F, they say that they're not going

 7  to be providing us even that material unless we waive any right

 8  to seek any other discovery under our requests.  I just don't

 9  think that that's reasonable.

10          By way of another example, we've had an issue just

11  getting out of the gate on what the scope of discovery is going

12  to be in terms of just which corporate entities or divisions

13  are going to be looked at at Samsung.  As Your Honor I'm sure

14  is aware, a wholly-owned subsidiary is, you know, target for

15  discovery.

16          Here, the factual allegations regard a breach of

17  contract where the orders were being facilitated and performed.

18  The performance of the contract that is at issue in this case

19  was being done by Samsung subsidiary up in San Jose called

20  Samsung Semiconductor, SSI.  And on our call we discussed this

21  and we came to the understanding I think mutually with Mr. Lee

22  that we would -- that that would be included, you know, that

23  that's reasonable.  If they're doing the contract performance,

24  it's reasonable that that would be within the scope of

25  discovery.  In their letter, they refuse still now to confirm

13

1   that in writing.  And we've pinged them several times in emails

2   we didn't provide the Court but we've had -- that -- this is

3   not the only time that we've gone to them and said, can you

4   just confirm our understanding from our call.  And we've been

5   met with silence.

6           And so my concern, Your Honor, is we are very short

7   on time.  And if you do send us back to the, you know, to the

8   dugout to do some more, you know, negotiating, I just don't

9   know that it's going to get us anywhere further than where

10  we've already gotten in addressing their concerns.

11          **THE COURT:**  Well, so let me address that.  I mean, I

12  -- my goal when I do send you back to the dugout is always to

13  then set up a process that for you as the moving party is going

14  to be more efficient than if you had to, you know, after this

15  call today file a motion, right?  Because you file a motion,

16  you're going to have provide notice and you're going to have to

17  draft a joint stipulation.  And, you know, the truth of the

18  matter is you're not going to get a fully-briefed motion in

19  front of me for several weeks.  And I'm going to set up a

20  process that's going to be far more expeditious than that for

21  you as the moving party.

22          What I don't want to do is, you know, snatch the

23  reins of the process prematurely and, you know, as a result,

24  you know, throw things off track and do more harm than good,

25  which I've done.  And, you know, I'm not afraid to admit when

14

1    I've done something that's been harmful to a case.

2              I'm happy to dive in to a particular example or two,

3    Mr. LaMagna.  I don't know how helpful it would be to dive

4    into, you know, the -- I think there are probably more than a

5    couple dozen here on this call.  I -- it would help me,

6    frankly, I understand I only gave you guys two pages and

7    because, again, teeing up for the most part those sort of

8    easier disputes where it's like, should the deposition be on

9    Saturday, should the deposition be on Sunday, and so, you know,

10   that's what two pages is kind of best for.  But I need from you

11   really then a side-by-side of like, you know, request for

12   production number three, you know, Netlist proposes "X," "Y,"

13   and "Z," Samsung proposes "A," "B," and "C," and we go from

14   there so I can, you know, really see what each side is

15   proposing.  But I'm happy to dive into a couple of them today

16   and get that started.

17             Mr. Lee, do you want to respond quickly to

18   Mr. LaMagna's comments now?

19             **MR. LEE:**  Sure, Your Honor.  I won't belabor the

20   point so -- because I don't think it's productive to get into

21   accusations of, you know, you're in bad faith, we were more

22   reasonable, that sort of thing.  I just don't think this is the

23   right forum for that.

24             What we really want to do here is kind of narrow down

25   a set of issues on which we genuinely disagree and present that

15

```
 1   to Your Honor.  I think there was some difficulty there because
 2   we did not have any indication of which issues, specific
 3   issues, Netlist intended to raise at this conference until they
 4   sent you the letter yesterday.  Netlist and Samsung have a meet
 5   and confer call on a separate issue scheduled on Tuesday.  And
 6   if my colleague is willing, I'm happily willing to discuss
 7   these issues on that call.
 8            I can tell you just looking at the letter, as Your
 9   Honor mentioned, there are dozens of categories here.  If we
10   had a 15-minute, 30-minute call about these, I'm pretty sure we
11   can narrow them down to four or five.  And at that point, if
12   necessary, we can -- you know, we can seek another IDC with
13   Your Honor where we can go through this process.
14            THE COURT:  Why don't we schedule that now.  And if
15   you're going to talk on Tuesday about these, let's look at my
16   calendar and figure out when I'm available in the latter part
17   of next week to follow up.  And that way we'll make sure that
18   we have -- if there are four or five disputes, we get to those
19   four or five disputes.  And if there's not four or five
20   disputes, and if Mr. LaMagna's concerns are correct and we're
21   not going to make a lot of progress with this approach, we'll
22   set something up to get, you know, a larger number of disputes
23   in front of me, you know, within the next week or so after
24   that.
25            I mean, my goal would be, just so everyone's clear,
```

1   you know, we sit here on June 4th, I'd want to be by, you know,

2   the end of the third week in June, June 18th, you know, I'd

3   want to have some significant progress done on these written

4   discovery requests so we could get this written discovery

5   substantially completed by the end of this month or shortly

6   after the end of this month so that the fact discovery deadline

7   of mid-August can be a realistic one.

8        I was kidding about the 2023 or 2024 trial date, you

9   know. You all know, you're experienced practitioners, the

10   Court is emerging from a 14-month-long shutdown, and on top of

11   that had -- has had historic vacancy rates. And so, you know,

12   my district judge colleagues are going to be facing very long

13   trial queues. But that doesn't mean you shouldn't get ready.

14   And you also then can probably engage in a more meaningful ADR

15   process which, you know, whatever process you've chosen.

16        Looking to next week, it's a great week for me. I

17   have kids graduating from elementary school and all that goes

18   along with that. But we could do -- Ms. Boehme, what do we

19   have scheduled for Thursday morning? I know we were bouncing

20   some things around yesterday.

21       **THE CLERK:** Right now we don't have anything

22   scheduled, Your Honor.

23       **THE COURT:** Oh, that's -- so I tried to get somebody

24   Thursday morning and they wouldn't take it; is that what

25   happened?

1          **THE CLERK:**  (No audible response)

2          **MR. LaMAGNA:**  Well we will take it, --

3          **THE COURT:**  How is next --

4          **MR. LaMAGNA:**  -- Your Honor, (indisc.) for Netlist.

5          **THE COURT:**  How is next Thursday, June 10th, at

6    10:00 a.m.?

7          **MR. LaMAGNA:**  That's fine for --

8          **MR. SPEAKER:**  Sorry.

9          **THE COURT:**  Okay.  Would you do me a favor, if you

10   would?  And I'm happy if you guys each just send me a short,

11   two-page follow-up on Wednesday the 9th and let me know

12   generally how you're doing and so keep me up to speed.  I don't

13   need all the attachments again but just let me know what we're

14   going to talk about and that'll help me, you know, know what

15   you've worked out or not worked out.

16         **MR. LaMAGNA:**  Yes, we can do that, Your Honor.  This

17   is Ray again for Netlist.  I would like to if -- before we get

18   off the call, if Your Honor has any more time to perhaps --

19         **THE COURT:**  I do.  I have almost all the time in the

20   world.  Not -- that's a joke.  I have plenty of time.

21         **MR. LaMAGNA:**  I think it would be helpful because I

22   guess part of my concern here just administratively is you're

23   right, there are a lot of issues.  But that's because we

24   haven't been able to get confirmation on any one issue.  So I

25   think our original goal as I said had been to try to agree on

18

1    the prior calls, which I thought we had reached this agreement,

2    to what was undisputable that needed to be produced so that we

3    were bringing to Your Honor what's disputable.  And now

4    unfortunately we're bringing to Your Honor what I think is

5    undisputable plus what's disputable.  And so I think that we

6    can perhaps hone in on a couple of examples and get your

7    guidance.

8          So by way of example -- and I'm happy like I said, if

9    Your Honor isn't familiar with the facts of the case, that's

10   natural since this is our first time in front of you.  I'm

11   happy to recap why these different issues (indisc.) --

12          **THE COURT:**  I read the Complaint for like 90 seconds,

13   just to get a handle on that it was, you know, my first

14   question when I see the names of the parties is, is it a patent

15   dispute, is it, you know, etcetera.  But I understand it's a

16   breach of contract case.  I understand it involves, you know,

17   some underlying technology.  And, you know, that's about the

18   length of it at this point.  I have -- I saw some general

19   numbers in the Complaint which gave me some sense of the size

20   of the case for purposes of Rule 26, proportionality.  You

21   know, it's not a $250 case.  I get it.

22          **MR. LaMAGNA:**  Yeah.  And I believe that the impact to

23   our client is substantial.  At bottom, you know, the parties

24   had a 2015 agreement, and the agreement had three components.

25   The first was there was a supply component where Samsung would

19

1    supply products, memory products, to Netlist at Netlist's

2    requests at particular pricing.  It was described in the

3    contract as "competitive pricing."

4            The second component is that the parties agreed to do

5    joint research and development.

6            And the third component overlying all this, there was

7    a patent cross-license between the companies.

8            And we have basically a couple of types of breach

9    that we are claiming.  We are claiming that they failed to

10   supply us with the products, the memory products that we

11   requested, that was a breach of the supply component.

12           There was some payments that were due for engineering

13   expenses where we are contending that they improperly withheld

14   taxes.  That's a smaller part of the claim, about a million

15   three, that then they did -- we recovered from the Korean tax

16   authority but they were under an obligation -- Samsung was

17   under an obligation to assist, and we contend that they did

18   not.

19           And, lastly, we have a declaratory claim that we

20   subsequently terminated the contract that these above breaches

21   are material and that they had notice, etcetera.  And we're

22   asking for a DJ on the termination.  So that's basically the

23   case, you know, at the nickel tour.

24           So as I mentioned, for example, all of the

25   performance of this contract, at least with respect to the

1    supply components, goes through Samsung's wholly-owned

2    subsidiary in the United States, which is their US sales arm

3    for into which orders are placed and facilitated.  And so one

4    of the issues, and I think it's a really easy issue, Your

5    Honor, is when we talk about, you know, either looking for

6    documents, looking for facts for interrogatory responses, you

7    know, putting up witnesses, etcetera, is this -- is the

8    subsidiary SSI going to be included or not.  And I thought we'd

9    reached agreement with counsel and we were just waiting for

10   confirmation.  And I think that's important for us to

11   understand right now going forward, you know, "yes" or "no," is

12   there a dispute here.  I don't think there is a dispute but we

13   haven't yet gotten a written confirmation that there isn't a

14   dispute.

15          **THE COURT:**  Well let me ask Mr. Lee if there's a

16   dispute.  And then I, you know, I can -- let me start there.

17   Mr. Lee, do you guys have a dispute about the subsidiary or is

18   that something we need to start working on?

19          **MR. LEE:**  I don't think we really have a dispute,

20   Your Honor.  We intend to follow the law in the Ninth Circuit,

21   which is that if you have a hundred percent owned subsidiary

22   and they have responsive documents, you have an -- those

23   documents are considered to be in your possession, custody, and

24   control.  That's -- I think that's exactly what I told

25   Mr. LaMagna on our call about a month ago.

1          They want written confirmation that SSI would be

2     included.  Just the hang up for us right now is that I haven't

3     gotten confirmation from my client that, "A," SSI is indeed a

4     hundred percent owned subsidiary and, "B," what their

5     involvement with Netlist is.  I think -- I suppose I can just

6     tell you what I was going to tell Mr. LaMagna on our call next

7     Tuesday, which is that if perhaps Netlist could on an informal

8     basis just send us a document or two demonstrating that, you

9     know, SSI is a subsidiary and it's really involved here, I can

10    just send that to my client and say, you know, look, we have

11    this information, you don't have to go looking for information

12    for me, let's just confirm based on this.

13          **MR. LaMAGNA:**  And if I could just respond briefly to

14    that, Your Honor.  First of all, I think as Your Honor well

15    knows, the 100 percent rule is not -- that's not a bright line

16    in the sand.  It is absolutely the fact that there is no

17    question that 100 percent subsidiaries are ones that are

18    subject to discovery.  But the rule is whether or not the party

19    in front of the Court has control over the subsidiary in order

20    to request documents, etcetera.  And so I think that there is

21    no actual factual dispute here.  Again, this has been -- this

22    is an example, I think good example, of what I'm concerned

23    about is this has been a live issue in the parties' debate for

24    over a month now.

25          I don't own Samsung.  I -- this seems like a question

22

1    if Samsung is going to contend that this -- that they refuse to

2    provide discovery from this entity, they should do so.  We

3    still do not hear from Mr. Lee right now a simple "yes" or

4    "no."  He says, well, to the extent that they are this or that,

5    then maybe, you know, we think we should follow the law.  But I

6    think we're entitled to a simple, do we have a dispute here or

7    not, yes or no?

8              **MR. LO:**  And, Your Honor, --

9              **THE COURT:**  Well, --

10             **MR. LO:**  -- this is Jason Lo.  If I may just add one

11   thing?

12             **THE COURT:**  Go ahead in a second.  But, you know, I'm

13   going to say this kind of discussion is not unfamiliar to me

14   and it occurs I don't want to say quite often but it has

15   occurred previously in other cases in which foreign companies

16   with foreign-owned subsidiaries are involved.  And counsel I

17   suspect is dealing with the challenge of trying to get an

18   answer from a client, you know, in another part of the world.

19   So, you know, on the one hand I am sensitive to Mr. Lee's, you

20   know, pickle of trying to get the correct answer from his

21   client so that he doesn't, you know, essentially run himself

22   off the runway and get himself into some sort of trouble.  On

23   the other hand, Mr. LaMagna, I think your concerns are well

24   taken.  You know, this is the kind of thing that is a threshold

25   issue we just need to resolve.

1          So, Mr. Lee, with that comment, I mean I think that's

2    the kind of thing we need to get to the bottom of very quickly

3    and so that we can allay Plaintiff's concerns about the

4    subsidiary.  And if there's going to be some holdup with

5    control issues with respect to the subsidiary, you know, we can

6    get that fleshed out and handled because, you know, they are

7    some -- they can be sometimes sticky.  They usually aren't but

8    they occasionally can be.

9          Mr. Lo, go ahead.

10         **MR. LO:**  Thank you, Your Honor.  The only thing I was

11   going to add to that is I'm aware just from having litigated

12   against Samsung in the past and monitoring their litigation

13   that this can't be the first time this question has come up in

14   terms of whether the Korean entity has control over SSI.  So

15   while it may be a new question for Mr. Lee and his firm, I tend

16   to think that this is a question that Samsung's legal

17   department has confronted multiple times.

18         **MR. LaMAGNA:**  And this is Ray again.  If I could just

19   answer one of Mr. Lee's questions here just to move this along.

20   On the page four of the initial disclosures, Docket 35, Samsung

21   lists Netlist purchase orders and they also list "records

22   related to Netlist purchase orders."  The purchase orders are

23   placed through SSI.  So I think that if Mr. Lee looks at the

24   documents that are listed on his own initial disclosures, he

25   will see that those documents are SSI documents.

24

1          **MR. LEE:**  Your Honor, I (indisc.) --

2          **THE COURT:**  Okay.

3          **MR. LEE:**  I'll just address that briefly.  Again, I

4    don't think there's any disagreement on the law here.

5          And I think Your Honor understands your -- my

6    situation quite well.  I'm having conversations with my client

7    that are very similar to the conversation Mr. LaMagna was just

8    having with you, which is that, you know, I would really

9    appreciate a "yes" or "no" answer on this.  I just haven't

10   gotten that yet.  But I don't see any reason why this should be

11   a drawn out dispute.

12         **THE COURT:**  All right.  Well you -- here's what I'll

13   tell you.  You can now share with them that the Court is

14   getting impatient about your inability to get a "yes" or "no"

15   answer; how about that?

16         **MR. LEE:**  I appreciate that, Your Honor, and I'll

17   definitely share (indisc.) --

18         **THE COURT:**  Okay.  And you can also tell them that he

19   seems a little crazy and he might, you know, do something just

20   nuts.

21         **MR. LEE:**  I appreciate that as well, Your Honor.

22         **THE COURT:**  All right.  And it's on the record so,

23   you know.  That's what they say about these judges down in

24   Santa Ana sometimes.  I get it.

25         **MR. LaMAGNA:**  And I --

1        **THE COURT:**  Mr. LaMagna, go ahead.

2        **MR. LaMAGNA:**  I was going to suggest that, you know,

3   if we just look at perhaps one, you know, another example, just

4   turning to the RFP's -- and most of these RFP's have sort of a

5   corollary in the interrogatories.

6        The first bullet that we summarized, you know, on --

7   in the letter to Your Honor at the top of page two is requests

8   and orders from Netlist since November, 2015, and related

9   communications and, you know, documents that they may have.

10  And as -- if you compare that to, for example, the initial

11  disclosures of Samsung, as I said, I think that this -- there

12  is a certainly an overlap between what we've requested here in

13  RFP's five, eight, nine, and ten, and what they themselves

14  contend is discoverable.

15       In response to this, one of the points that they made

16  an objection that our requests were overbroad because we I

17  think cited in some of our requests a 2012 date.  And they

18  said, you know, this really should be 2015.  We said, okay,

19  let's start with 2015.  And I don't know that those -- I don't

20  think in fact that there's any objection to burden.  I don't

21  think there's any other cognizable objection listed.  If we go,

22  actually look at the objections to five, eight, nine, and ten,

23  there's no other specific objection that is asserted that is

24  cognizable here.  I'm not understanding why we're not able to

25  get, you know, simply them to agree to do produce five, eight,

1   nine, and ten.

2        **THE COURT:**  Well that may be something -- I don't

3   want to step on the toes of that process.  That may be

4   something that Mr. Lee can confirm with you next Tuesday.  And

5   we'll take that off our agenda because it does seem to me to be

6   the kind of thing that would be easily resolvable.  And,

7   frankly, if it's not easily resolvable, those are the kinds of

8   disputes where I think you could give me as early as next

9   Thursday your own -- your respective proposals, whether it's

10  for some timeframe or for some other limitations.  And I'll

11  give you a ruling if you can't resolve it.  I mean, that's --

12  you know, that's kind of how I envision this process working,

13  Mr. LaMagna.  So we'll move those -- that kind of ball right

14  along.

15       **MR. LaMAGNA:**  Okay.  I think one of the points that

16  we're likely to have a disagreement on is whether or not search

17  terms are a condition precedent to our being able to obtain

18  discovery.  And these requests I think sort of illustrate that

19  issue.  If --

20       **THE COURT:**  Well, so let me give you a -- let me

21  shortcut that.  I mean, obviously you may have some, you know,

22  these, you know, eight for instance which I have open in front

23  of me requests, all documents relating to Netlist requests for

24  the memory products since, you know, now the date's January --

25  November, 2015.  Okay.  Well, there might be some purchase

1    orders for instance I think you referenced.  The purchase

2    orders, we wouldn't need search terms for that.  But there also

3    might be emails, right, or other written communications, and

4    probably emails are the most likely one.  And we are going to

5    probably need search terms to look for those written

6    communications, those email communications.  So, you know, when

7    it comes time for those search terms then I'd encourage you

8    both to start working on those search -- that search term

9    process.

10           You know, I -- the one thing I will say is I am

11   always concerned and always kind of wondering when I should

12   have the conversation with the parties about what has been done

13   to collect ESI from potential custodians and so forth.  You

14   know, presumably Samsung is a big company that is involved in

15   lots of litigation and so they probably have a well-oiled

16   machine for doing that.  And it may be that all we need to do

17   is fire up that well-oiled machine and plug the search terms

18   into it.  But, yeah, that -- if that is where we're going with

19   this, I have been down that road many times before and I'm

20   happy to help the parties work through that.

21           **MR. LaMAGNA:**  Thank you, Your Honor.  I mean, I think

22   I see the discovery process here that we're requesting sort of

23   operating at two layers.  There are -- I think that Samsung, as

24   well as of course Netlist, is under an obligation to go

25   identify within the company the custodians themselves as part

28

1    of the discovery process that would have relevant documents and

2    inquire about sort of the internal workflow or processes that

3    are relevant to the case.

4            So by way of example, you know, who at Netlist -- I

5    mean, I'm sorry, who at Samsung receives the orders if somebody

6    is setting any limits or saying, you know, we don't want to

7    fulfill that order or we're not going to take that, you know,

8    who is that person and what is the process that that occurs.

9    Does it occur by email, does it occur by phone, is there a set

10   way that that occurs?  If that process is discreet, you know,

11   where there is a particular person who's in charge of that and

12   another person that they communicate with, and when an order

13   comes in it gets forwarded, I don't know that they need our

14   search terms for that.  They should be able to identify those

15   documents themselves.

16           If, however, we go and say, look, that's not good

17   enough for us, we want to know for these custodians any time

18   they're talking about Netlist then, you know, that's fair to

19   say I think that then we're going to have to negotiate search

20   terms.

21           And I think what I want to be sure that we're

22   flagging here is that the discovery process, including for

23   electronic documents, is not limited to merely a search based

24   on search terms, which is I'm concerned what Samsung may be

25   proposing.  They're under an obligation to both for custodial

1   and noncustodial documents, including email, to try to in a

2   good faith effort identify if they're able to under a

3   reasonable search what documents would be, you know, relevant

4   to the case and produce those.  And to the extent we are

5   looking for something where there is a burden where, for

6   example, we're saying, look, there's a hundred thousand emails

7   in this guy's inbox or something that -- during that time

8   period, you know, then that's where I think we need to go to

9   search terms.  So I think that that's -- at least that's our

10   position.

11          **MR. LEE:**  Your Honor, I'll address that briefly I

12   guess.  I mean, to the extent that Mr. LaMagna is arguing that

13   if there are custodial documents that we know exist that do not

14   involve search terms, we do have an obligation to produce them,

15   I agree.  I don't disagree with that process.

16          To the extent that Mr. LaMagna is arguing that they

17   do not have to propose search terms because it's our burden to

18   first do a thorough search of sort of a manual search of every

19   document at Samsung and prove that search terms are necessary

20   before they'll even propose them, I think I disagree with that.

21   And I think Your Honor knows better than I do that that's

22   usually not how ESI discovery works.

23          **MR. LaMAGNA:**  And just to clarify, that's I don't

24   think what we're saying.  We're not at all suggesting someone

25   should do a search of all of, you know, Samsung's documents at

1   all ever, even all documents within a department or a division.

2   We're simply saying that if, for example, there's a specific --

3   let's assume for a moment that there is a specific person that

4   we submit orders to and that person has a boss who he confers

5   with to say, hey, can you -- should I fulfill this order or

6   not, and those emails, for example, those communications, or

7   maybe there's a memo, I don't know, should be readily

8   identifiable without search terms.  And I -- if they come back

9   to us and say, look, that is not the fact pattern, we have no

10  way of finding these documents absent search terms, then I

11  think clearly we need to turn to search terms.

12          **MR. SPEAKER:**  Your Honor, I --

13          **THE COURT:**  I --

14          **MR. SPEAKER:**  (Indisc.) --

15          **THE COURT:**  Look, I think you're going to end up

16  needing to do search terms regardless.  I mean, you know, I'm -

17  - you're going to need to engage in a process of document

18  collection any time you have ESI that involves search terms.

19  Now, I think what, Mr. LaMagna, you're saying, which I think is

20  correct and I think Mr. Lee has recognized, is that search

21  terms are not the be all, end all of making sure that you do a

22  reasonable inquiry and a diligent search.  And I think that's -

23  - I agree with that, that's correct.  But, you know, I think we

24  need to look around the corner here and understand as much as,

25  you know, we started this call talking about a protective

1  order, let's look around the corner, understand we need a

2  protective order.  Look around the corner here and understand

3  that we're going to need search terms.

4          And, you know, Mr. LaMagna, you have, you know, a

5  hand in that, too.  You can go back to your client and say, you

6  know, we communicated with Samsung, we communicated with these

7  folks, you know, person A, person B, person C, these were our

8  primary contacts.  When we discussed things with them, we used

9  this term, that term, you know, etcetera, etcetera, etcetera.

10 You know, it's likely that that is going to be a starting point

11 for the search term discussion and the custodian discussion.

12 So, you know, again, I don't -- you really haven't gotten to

13 that point yet where you're telling me I've got these ten

14 search terms, they've got these ten search terms.  And I don't

15 think there's any disagreement that search terms are not the be

16 all, end all.

17         **MR. LaMAGNA:**  Thank you, Your Honor, yes.  And

18 absolutely we will provide our half of the equation.  We have

19 the people that we know that we deal with.  We will look at our

20 communications to identify what, you know, common terms may be

21 there.  I think that the concern that we have is that we don't

22 know it's, you know, Samsung is a black box after that point.

23 We send them an order or we send them a request.  What happens

24 to that internally, who it goes to, we don't know.  That

25 communication may occur in Korean.  I don't know what words if

32

1    there's -- for example, a lot of times companies will have an

2    internal only either name for a business, you know, a code name

3    for a business, company A or something like that, --

4            **THE COURT:**  Right.

5            **MR. LaMAGNA:**  -- or a code number, an internal

6    customer code number, something like that.  I can't divine what

7    those are.  I need -- we need to have -- the search terms need

8    to be a cooperative effort.

9            **THE COURT:**  Yes.  I -- and I agree with that.  And

10   also, look, the other thing about search terms is they need --

11   they are almost always an iterative process.  And I learned

12   that fancy word to describe this process.  You know, you often

13   have to go back and refine them because you discover that as

14   you just indicated, Mr. LaMagna, is a good example, you know,

15   company -- you know, your client might be referred to by a

16   certain code name and you didn't know that the first time you

17   did the search terms.  And, you know, Mr. Lee may not have

18   discovered that when he was talking with his contacts in the

19   Samsung legal department because the Samsung legal department

20   aren't talking to the lower middle managers who handled the

21   Netlist account.  And so as a result, no one understands the

22   first time that process is done that this code word is used

23   and, you know, then you have to do it again.

24           You know, again, being more thoughtful, working a

25   little harder, trying to work together, it does pay off.  And

1    if you can cut down the number of iterations, because these

2    iterations can be expensive, particularly for smaller companies

3    who are having to do these kinds of document collections maybe

4    for the first time or without an internal process for doing

5    that.  Again, I suspect Samsung has a well-oiled machine for it

6    so it's something that Mr. Lee can just, you know, call over

7    across the Pacific Ocean and ask them to fire up.  Maybe that's

8    being optimistic.

9            So I encourage you guys to have that -- a pretty

10   lengthy and wide-reaching discussion next Tuesday.  And then,

11   you know, queue up some issues for me for Thursday the 10th,

12   and either let's discuss them more -- in more depth and with

13   some more granularity on Thursday, or let's -- or start to

14   think about a process for how those need to be briefed if

15   there's something that's going on that's, you know, involves

16   some burden or some other things like that.  Let's start to get

17   that queued up so that we can meet my sort of mental target

18   dates of getting, you know, the vast majority of this underway

19   and rolling forward by, you know, the middle or late to middle

20   part of this month.

21           **MR. LaMAGNA:**  Thank you, Your Honor, and thank you

22   for your patience and extensive time with us.

23           **THE COURT:**  Did you say expensive?  It's not

24   expensive.  It's --

25           **MR. LaMAGNA:**  Extensive.

34

1          THE COURT:  -- absolutely free.

2          MR. LaMAGNA:  Sorry, extensive.

3          THE COURT:  Oh.  Yeah, no, it's very -- it's not

4   expensive at all.  And it's neither extensive.  It's on a

5   Friday but other than that it's not extensive.  All right.

6   Well, everyone have a great weekend.  Have a great meet and

7   confer discussion next Tuesday.  And Ms. Boehme will send you

8   contact information for next Thursday at 10:00 a.m.

9          MR. LaMAGNA:  Thank you, Your Honor.

10          MR. LEE:  Thank you, Your Honor.

11          MR. LO:  Thank you.

12          THE COURT:  Thank you both.

13          THE CLERK:  This Court's now in recess.

14       (Proceeding adjourned

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          August 5, 2021

           Signed                              Dated


*TONI HUDSON, TRANSCRIBER*