```
                        UNITED STATES DISTRICT COURT
                        CENTRAL DISTRICT OF CALIFORNIA
                        (SOUTHERN DIVISION - SANTA ANA)



NETLIST, INC,                    ) CASE NO: 8:20-CV-00993-MCS-DFMx
                                 )
              Plaintiff,         )            CIVIL
                                 )
     vs.                         )      Santa Ana, California
                                 )
SAMSUNG ELECTRONICS CO, LTD,     )     Tuesday, June 29, 2021
                                 )
              Defendant.         )
_____)


                    INFORMAL DISCOVERY CONFERENCE

            BEFORE THE HONORABLE DOUGLAS F. McCORMICK,
                 UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

For Plaintiff:          JASON C. LO, ESQ.
                        RAYMOND A. LaMAGNA, ESQ.
                        Gibson Dunn & Crutcher, LLP
                        333 S. Grand Ave.
                        Los Angeles, CA 90071

For Defendant:          JUMIN (CHRIS) LEE, ESQ.
                        Bird Marella Boxer, et al.
                        1875 Century Park East
                        23rd Floor
                        Los Angeles, CA 90067


Court Reporter:         Recorded; AT&T; digital

Courtroom Deputy:       Nancy Boehme

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          <u>Santa Ana, California; Tuesday, June 29, 2021</u>

2                       <u>(Remote Appearances)</u>

3                          <u>Call to Order</u>

4          **THE CLERK:**  We're on the record on Case SACV20-00993

5   *Netlist, Inc. versus Samsung Electronics.*

6          Counsel, your appearances, please?

7          **MR. LaMAGNA:**  Raymond LaMagna of Gibson, Dunn and

8   Crutcher for Plaintiff Netlist, joined by my colleague, Jason

9   Lo.

10         **MR. LEE:**  Good morning, Your Honor.  Christopher Lee,

11  Bird Marella on behalf of Samsung.

12         **THE COURT:**  All right, Counsel, this is Judge

13  McCormick.  Apologies for keeping you waiting for a couple of

14  minutes.  I got a little over-committed this morning and was

15  running a few minutes late.

16         I have the following before me to discuss today:

17         First of all, you were both kind enough to provide me

18  with a couple of short letters, and if I can get the right

19  screen open here it looks to me like we have some depositions

20  for which there may be some apex issues that are perhaps better

21  discussed in the future.

22         We are continuing to work on refining our search

23  terms and it sounds like the ball is in Samsung's court to get

24  some search terms, I'm going to get some hit counts to it.

25         And then, finally, there are a couple of

1    Interrogatories for which Netlist, I think, would like and has

2    asked for additional information.  It sounds like Samsung is

3    going to provide those.

4            So we can discuss those three in some more detail.

5            We also have, the parties have filed a Docket 56 and

6    62, the further briefing regarding -- let me get the specific

7    numbers here, Interrogatory Number 8 and RFP Number 11 that we

8    discussed way back I think at the beginning of the month.

9            We've not spent enough -- as much time with those two

10   pleadings yesterday as I would have liked, but I did review

11   them.  I did review some of the stuff I need to review to get

12   to a decision on it, but I'd like to hear your comments on

13   those, and then probably we'll have something for you in the

14   next day or two on that.

15           Mr. LaMagna, where would you like to start?  Would

16   you like to start with some comments -- additional comments on

17   the issues, the RP-8 -- I'm sorry, RP-11 and Interrogatory

18   Number 8, or should we go ahead and talk about the informal

19   issues?

20           **MR. LaMAGNA:**  Why don't we just -- I think we can

21   dispatch the informal issues very quickly, Your Honor.

22           As I understand now from reading both side's letters,

23   as you pointed out, the issue of the apex deposition is really

24   more to inform your court of where we're at.

25           We will likely, I think, probably have -- end up with

1    at least one out of two of those disputes, but we should

2    probably then schedule a call for perhaps -- well, next week is

3    a partial holiday week, so it depends on the Court's

4    availability, but at the Court's next convenience we probably

5    have that as a ripe issue.

6           On the custodian --

7           **THE COURT:**  Well, let me make a suggestion there.  If

8    you guys can't agree on that, just -- if that's something that

9    Samsung is going to want briefing on, and I can see why they

10   would, frequently companies that are going to raise that kind

11   of objection are going to want it briefed, and I understand

12   that just from client-relation standpoint, let's go ahead and

13   get a briefing schedule very similar to what you've done with

14   Interrogatory Number 8 and RFP Number 11, and just get

15   something in front of me that's, you know, quick and dirty --

16   not dirty, but quick and clean and just the information briefed

17   and we can pick a hearing date for that, we don't need to talk

18   about it further unless you-all want to.

19          **MR. LaMAGNA:**  Yeah, I think that would be fine, Your

20   Honor.

21          I think what we did before for Interrogatory 8 and

22   RFP 11 was, in that case Samsung had submitted the initial

23   Brief and we responded one week later.

24          Maybe we should reverse that for this, I suppose,

25   where we submit, you know, what we believe is the articulation

1   as to why we're entitled to these, you know, any individuals we

2   want that falls within the apex category, and then Samsung

3   responds.

4          I don't feel strongly about it.  Perhaps they should

5   respond a set number of days after we submit?

6          **THE COURT:**  Yeah, that sounds fine.  You guys talk

7   about that and work it out, and I'm available -- I'm available

8   next week, I am in the courthouse next week for criminal duty

9   all week, so -- but, you know, if you need a couple weeks to

10  get those Briefs in we'll find a date for you in July.

11         The only thing I have on my radar screen is a short

12  trip the first week of August but, otherwise, we're here for

13  you.

14         **MR. LaMAGNA:**  Okay.  Thank you, Your Honor.  Yeah,

15  we'll work something out with opposing counsel regarding the

16  specifics of that, and then apprise the Court.

17         On the other two issues, as I understand, I think we

18  have sort of an agreement in principal that Samsung will be

19  providing hit counts for our side, for our proposed search

20  terms and their proposed search terms, and then we can sort of

21  compare those as a guidepost for, you know, what we think is

22  going to be appropriate in the case.

23         And, as well, I understand that they are open to

24  responding substantively on Interrogatories Number 1 and 3 to

25  sort of identify what these people's roles were.

1           As you can appreciate, Your Honor, at this stage

2   we're trying to find custodians, we're trying to find

3   depositions and merely having a list of names is unhelpful for

4   that purpose versus what their roles were.

5           **THE COURT:**  Okay.  Okay.

6           **MR. LaMAGNA:**  I think the question now is just when.

7           My concern here, of course, as I have raised before,

8   is that this process is getting strung along and we are burning

9   daylight here in the discovery window, so I don't know if

10  Mr. --

11          **THE COURT:**  Well, let's ask Samsung's counsel when

12  they think they can do both of those things.  My guess is it's

13  probably not a holiday in Korea this weekend unless my

14  appreciation of Korean history is off base.  Or perhaps they're

15  going strong on this first week of July back in Korea and they

16  can get some of these things for you either this week or even

17  next.

18          **MR. LEE:**  Thank you, Your Honor.  Yes, I can address

19  that.

20          Before I start speaking I do want to seek your

21  indulgence of my physical condition.  I was in the hospital

22  over the weekend.  I am recovering, but my coughing might

23  interrupt our conversation today and I apologize in advance for

24  that.

25          **THE COURT:**  No problem.  I hope you're doing better.

1          **MR. LEE:**  Thank you, Your Honor.

2          So, Your Honor, I think Mr. LaMagna and I are mostly

3    in agreement on substance.

4          We have no objection to producing hit counts so we

5    can move along the search terms conversation, and as for

6    (indisc.) position, responsibility, location and information

7    from some of the people we have named in response to

8    Interrogatories Number 1 and 3 we also have no objection to

9    providing that.  In fact, some of that information is coming in

10   to me right now, I just don't have the complete set yet.

11         Your Honor, I think -- you are accurate in noting

12   that the 4th of July is not a holiday in South Korea.  I think

13   in about a week we should be able to both of those.

14         **MR. LaMAGNA:**  I mean, that's fine, Your Honor, it is

15   what it is.

16         I would say -- just I want to be clear, when we're

17   talking about hit counts, I had talked and I hope Mr. Lee is

18   recovering, I spoke yesterday with his colleague, Mr. Masters,

19   and what we described and I think agreed upon is that we would

20   get the hit counts, you know, we have various different search

21   terms, and then by proposed custodian because, obviously, what

22   may be a very few hits for one custodian may be an onerous

23   amount of hits for another custodian so we sort of need to look

24   at the grid that way and we discussed that.  So if we're going

25   to get that in a week that would be fine.

1           And like I said, on the Interrogatories, I think what

2   -- obviously we don't need to know everything that these people

3   are involved with, it's really just what is their role that is

4   relevant to this case.

5           You know, for example, if they were, you know,

6   involved in the negotiation, what was their role in the

7   negotiation, or if they're involved in the fulfilment process

8   of approving orders or disapproving orders, et cetera, you

9   know, where do they fit into our story?  So if we can get that

10  in a week that would be fine.

11          **THE COURT:**  Okay.  Well, that sounds promising on

12  both ends.  Let's also hope that Counsel is feeling better.

13          And let's then turn to Docket Number -- the Docket

14  Number is screwed up again, 56 and 62.

15          You know, Mr. Lee, I think you wrote last -- or you

16  wrote first.  Do you want to speak first to add anything to

17  what you've put in Docket 56 here?

18          **MR. LEE:**  Yes, Your Honor.  I'd just like to maybe

19  expand the discussion a bit regarding the relevance of these

20  documents.

21          I think Mr. LaMagna cited a couple of cases in his

22  briefing noting that discovery does not necessarily have to be

23  confined to the four corners of the Complaint.

24          Just the one point I want to address specifically on

25  that issue is that while discovery doesn't have to be confined

1    to the four corners of the Complaint, there does have to be

2    some kind of nexus to the claims that are being alleged by the

3    Plaintiff.

4           For example, if you look at the case of *Pasadena Oil*

5    cited by Mr. LaMagna, here we have an issue where the issue is

6    not that Plaintiff is wanting discovery on a different kind of

7    claim; what they're wanting is discovery on the same kind of

8    conduct, just in a different time period.

9           So -- and the other case cited by Mr. LaMagna for his

10   proposition, the case of *Butler*, and that is the case in which

11   actually the Court explicitly grants discovery to a Defendant

12   on the basis that the Plaintiff opened the door to that

13   discovery by filing this action, so I don't think those cases

14   are quite apposite here.

15          I think the distinguishing factor here is that there

16   is nothing really in the Complaint that alleges that Samsung

17   violated its price obligation to Netlist.  So I just don't see

18   how Samsung's prices offered to different factors in the

19   marketplace would be relevant to this issue, particularly

20   concerning the incredible burden that's been imposed on

21   Samsung, which I can address separately if Your Honor wants to

22   hear more about that.

23          And with regards to the final point on relevance

24   raised by Mr. LaMagna in his briefing regarding the material

25   breach, Your Honor, obviously I'm not conceding material breach

10

1   here, but if Samsung did, indeed, have an obligation to supply

2   that list under the contract with as many products as it

3   requests, then I would think it's very likely that a violation

4   of that obligation would be a material breach regardless of

5   what Samsung was doing with its other customers.  I don't think

6   -- in theory, at least, in the abstract I don't think Samsung

7   would have a good faith defense there.  So, again, I just don't

8   think the nexus here with the First Amended Complaint is strong

9   enough to warrant the burden that's been imposed on Samsung.

10          **THE COURT:**  And perhaps --

11          **MR. LaMAGNA:**  Your Honor --

12          **THE COURT:**  -- if you want to speak more to the

13   burden, Mr. Lee, I think now would be the time to do it, and

14   I'll ask Mr. LaMagna to kind of hold his fire on the relevance

15   for now.

16          **MR. LEE:**  Yes, Your Honor, I can address the burden.

17   And I can add a bit more color to the burden issue, as well.

18          So, Your Honor, I'd like to kind of illustrate how

19   Samsung sells these products by comparing them to Oreos.  I

20   don't know if Your Honor is fond of Oreos, but I am very much

21   fond of Oreos, and it's actually quite similar how Samsung

22   sells these products.

23          But if you look at Oreos they're -- Nabisco

24   distributes them through their regional distributors, and then

25   Nabisco will know how much product it's giving to each of its

1   regional distributors, but it's not necessarily going to know

2   how much product exactly is being sold by that distributor to

3   the local Walmarts, the local Targets, to the corner store, to

4   the bodega.

5          So it's similar with Samsung, Your Honor.  And we

6   included numbers about Samsung's market share and their annual

7   revenue just to illustrate the scale of this operation.

8   Substantially about half of the tech companies in the world buy

9   these products from Samsung.

10          Samsung has 12 separate offices across the world.

11   They have offices in Asia, Europe, the Americas.  And each of

12   these offices have within them several independent sales teams

13   which handle groups of similarly situated buyers.  Each sales

14   team maintains their sales data separately.

15          What Samsung does have on an essential database is

16   information on how much product is being sold by region, but

17   they do not have information on how much product is being sold

18   to, you know, companies that are the equivalent of Netlist

19   which are, in this market, kind of the corner store or bodega

20   for semi-conductors.

21          So I do want to say, Your Honor, Mr. LaMagna seems to

22   imply in his briefing that it's implausible that Samsung does

23   not have this data aggregated, but as Mr. Lee, the other

24   Mr. Lee who made the Declaration on Samsung's behalf, clearly

25   states under oath we would need to perform a separate

1    aggregation process to get this data together worldwide, and

2    that process would be incredibly onerous.  I would submit that

3    it would probably be about as onerous as all other discovery in

4    this case combined.

5             THE COURT:  All right.  Mr. LaMagna?

6             MR. LaMAGNA:  Sure.  Let me, I guess, work at this in

7    reverse.  Let's talk about the burden first.

8             As we said in our briefing we're only looking for,

9    you know, rolled up data of sales totals.  So we obviously know

10   that we're talking about billions and billions of dollars, but

11   we're not talking about billions or millions or even thousands

12   of customers, and there's been no -- while I appreciate that

13   Mr. Lee has identified that Samsung has, you know, half of the

14   tech manufacturers in the world as its customers, that is, in

15   and of itself, a fairly rarified group.

16            So by way of example let's assume that we're talking

17   about the SSI subdivision here that is in San Jose.

18            Presumably they have a database of some kind that

19   they could readily run a query and determine how much they sell

20   to different customers.

21            We have no Declaration or showing that that specific

22   example, using just SSI for a moment, would take them more than

23   let's just say an hour, to have somebody just go into -- and

24   say "how much do we sell to these different customers and

25   export into Excel, you know, the type of summary data that

13

1    we're looking for for the United States.

2            Now I appreciate that Mr. Lee has identified that

3    "Well, there's 12 offices around the world."

4            So we have no indication from Samsung or a supporting

5    Declaration that it would take more than let's just say 12

6    hours to do that, you know, worth of work.  And I'm trying to

7    be generous, I don't know how long it would take to have

8    somebody print, you know, an Excel out of certain data, but it

9    doesn't seem like we're asking for something that is very

10   difficult.

11           Now I do -- I appreciate that Counsel is saying that,

12   you know, Samsung in Korea has no visibility into the products

13   that it sells to its specific customers, so what we're hearing

14   from Mr. Lee is that Samsung in Korea, for example, they sell

15   to Amazon or they sell to Dell, or, you know, these kinds of

16   companies that need memory.

17           If you ask Samsung in Korea how much product, or what

18   products Amazon buys, what Mr. Lee is telling us is that

19   Samsung in Korea does not know, that these sales divisions,

20   which all are wholly-owned subsidiaries of Samsung, these are

21   not independent distributors like in the Nabisco situation, for

22   example, that these are fiefdoms that simply don't interact,

23   you know, with the Korean parent.

24           You know, if that's -- I find that implausible and we

25   don't have any evidentiary record in it, but I will take

14

1    Mr. Lee's representation that that is how it works, but even if

2    we accept that representation, we still don't have a showing of

3    actual burden here.  We would have maybe a dozen or so

4    different offices where we need to go to their database and run

5    a query.

6            We're not asking for the data on an aggregated basis,

7    as well.  I don't need him to combine it.  If he has 12

8    different offices he can output 12 different Excel files.

9            If those offices have, you know, a small and a medium

10   team or something that like, that there's more than one sales

11   team in some offices, we can get more than 12 files.  We'll

12   take care of the aggregation.

13           So I don't think that we have here, if you look at

14   the Declaration, Your Honor, actually any supporting facts to

15   identify how many hours this is going to take, and all reason,

16   I think, or common sense suggests this isn't quite the mountain

17   that Mr. Lee is making it out to be.

18           And to be clear, I do think it's a misdirect here to

19   say that there are a lot of products or a lot of customers or a

20   lot of dollars because when you tell your database to output an

21   Excel report it really doesn't care how many lines of code it's

22   exporting, or how big the dollars are that are in the cells, so

23   that is not actually adding to the burden here.

24           To circle back to the concept of relevance, you know,

25   one of the points that we seem to have a disagreement on, we

1  did note in our Brief that, you know, discovery is not limited
2  necessarily to the four corners of a Complaint.
3         However, as we also noted in our Brief, we believe
4  that this discovery is within the four corners of the
5  Complaint, so we have clearly alleged a breach.
6         One of our allegations of breach, as well as our
7  allegation for the Declaration that we terminated
8  appropriately, which implicates a materiality issue, are based
9  upon a provision, and that provision expressly states that the
10  pricing needs to be at a competitive level, vis-a-vis other
11  customers, and we have alleged that that provision was
12  breached.
13         So it is true that in our -- we have some additional
14  specific allegations that don't go to pricing, but that doesn't
15  negate the fact that we have an allegation in this case, a
16  claim, that is based upon there being a breach of a provision
17  that includes this pricing.  We are entitled, I think, then to
18  discovery as to the scope of their breach.
19         The scope of their breach also is going to inform, of
20  course, materiality, whether it's a footfall breach, or did
21  they breach that provision in more than one way which is going
22  to inform the propriety of determination.
23         As to the materiality question I appreciate the
24  representation that Mr. Lee made which, as I understand, is
25  basically if we can show that there was an obligation to

1   provide the product in the way that Netlist contends, that

2   there was a supply obligation, and if Samsung failed in that

3   supply obligation then he does not believe personally that

4   Samsung would be arguing that that breach was not material.

5           And I think that it would certainly help us if we had

6   that representation in writing, but absent that representation

7   I think the question of materiality is still a live issue in

8   the case unless Mr. Lee would like to, you know, submit in

9   writing that they will not oppose materiality if we can prove

10  that there was a supply obligation that was breached.

11          In the absence of that, then I do think that the

12  extent of the breach is clearly relevant, and the willfulness

13  of the breach to the question of materiality.

14          So if, for example, if we can show that Samsung is

15  cutting Netlist by 90, 98, almost 100 percent of the requests

16  while everybody else is having their requests fulfilled,

17  business as usual, that's going to show clearly that that is

18  going to tend to prove that there was a willful act here to

19  apply disparate treatment to Netlist, that will support

20  materiality, that is an element of our request for a

21  Declaration that the termination was appropriate.

22          So right now, perhaps, Your Honor, it would be best

23  for me to stop talking and answer any questions you might have?

24          **THE COURT:**  No.  I think I understand what's at stake

25  here.  I want to review more carefully Mr. Lee's Declaration

1  and think about the burden issue here.

2         You know, a couple of cases you cited me,

3  Mr. LaMagna, are, I think, pre -- one of them is actually post

4  but all us Judges have some bad habits after the Amendments to

5  the Federal Rule of Civil Procedure 26, and sometimes we used

6  some stray language.

7         But those cases are pre-2015 Amendments in the

8  Federal Rules which now, you know, I think pretty explicitly

9  require a balancing of the relevance of the information of the

10 claims and defenses with proportionality concern of the

11 producing party.

12         I want to do that very carefully.

13         I also want to look again at Mr. Lee's suggestion

14 that perhaps this could be a little more targeted.  I did --

15 I'll be candid, I didn't find that persuasive initially, but I

16 want to go back and look at it again just because of the

17 allegations of your Complaint.

18         Let me get you guys something short in writing that

19 addresses these issues.  So, hopefully, we can do that in the

20 next day or two.

21         **MR. LaMAGNA:**  If I could, you know, address the

22 proportionality just for Your Honor, just so we understand

23 what's at issue in this case because, obviously, these -- any

24 small order, specific one order that was put in on a Tuesday

25 doesn't look like it's very large relative to Samsung, and

18

maybe even not relative to a small company like Netlist.

What happened in this case was that Netlist secured an obligation from Samsung to supply it memory.  It went out then to customers and it told customers that if you switched from Hynix or Micron or other competing memory in your products and agreed that you wanted to use Samsung products we could then service them by putting that into a memory module or the products that we create as a component because these customers basically have to pre-clear or qualify, make sure that the memory or each component is appropriate.  So before a product is built for them or delivered, they have already -- the customer has already cleared and qualified and tested the specific components and then they request by component.

And so we -- basically our company hired a sales force, we went out and built out a business that was projecting, you know, sales of -- I want to say at least probably 50 million a year or more where we were looking to probably grow that to 100 million a year, and then Samsung basically cut us off.  We weren't able to fill orders, we had to cancel orders.

A sales team that was directed to this entire business line basically got ripped -- the floor ripped out from underneath them because we were -- our customers were placing orders with us for a product that, by definition, required Samsung's components, and Samsung cut us off from selling us

19

components, and those orders then had to fall away, those
customers fell away.  It had a, you know, an enormous impact on
the company, it had an impact on the company's top, you know,
top line revenue, bottom line profits.  The stock price fell.

This was a major blow to this company.  And so I
think we were sitting here looking at the discovery here.  This
is not about whether or not there was a thousand dollar order
for some memory chips that didn't get fulfilled, this was about
whether or not Samsung basically tried to take a near death
blow to Netlist in -- over the years.  It was really crushing
to the business that had to rejigger their business.

So when I hear Mr. Lee saying "Well, you know,
there's 12 different companies, we'd have to pull 12 different,
you know, databases, or we'd have to give you 12 different
Excel files" I just -- I want to put that out there because I
want to make sure that when we're considering proportionality
we really understand what this case is about.

On the second point regarding limitations, we did
note, you know, for example, a big customer like Apple, we took
that off the table, we think that they're sort of a special
case.  We tried to narrow the timing of this.

Part of the challenge that we have here is because
Samsung has not given us any visibility into who their
customers are, or what they are going to deem is to be
relevant, we really don't have a yardstick on which we can say

1  "Well, we don't need your, you know, data from your Indian

2  subsidiary or your Indonesian subsidiary."  You know, we don't

3  know who the customers are or what that is to make any line in

4  the sand determination at this stage.  And so I think that,

5  basically, while it's theoretically possible to narrow on a

6  sort of geographic basis, you know, for some of these other

7  subsidiaries, unfortunately, Mr. Lee and Samsung have not put

8  forward any (indisc.) facts on which we could evaluate that.

9  And so in the absence of that, you know, I think we've put

10  forth a showing as to why this is relevant, why it's

11  proportional, et cetera, and I just don't think that Samsung

12  has rebutted that.

13       **(Talkovers)**

14          **THE COURT:**  All right, Mr. Lee, any response on that?

15          **MR. LEE:**  Your Honor, if I may -- (indisc.).

16          **THE COURT:**  Go ahead.

17          **MR. LEE:**  So I just want to address a few minor

18  points brought up by Mr. LaMagna, and also address the

19  limitations issue a bit more.

20          I think there's a sense that -- I do get the sense

21  that Mr. LaMagna is kind of miscasting the nature of the market

22  a bit.  We keep talking about examples like Amazon or Dell or

23  Uber, and how it's unlikely that Samsung does not know how much

24  product it sells to those people, but this is a market with

25  thousands, possibly tens of thousands of buyers because Amazon

1   and Dell and Uber buy semi-conductors, yes, but so does

2   Netlist, so do other small producers, so does the toy company

3   that manufactures my daughter's robot doll.

4        This is an incredibly broad market with a huge amount

5   of customers and that's why it's not implausible that all of

6   this data is being kept in a disaggregated form, and it's not

7   merely about 12 offices, Your Honor, it's about the sales teams

8   within those offices.

9        In the European office you're going to have a Spain

10  team, you're going to have a German team, you're going to have

11  a variety of teams, and it's just going to be a huge company-

12  wide production to get all of this done.

13       I do want to address the issue of limitations in a

14  bit more detail.

15       I think we can add a bit more color that will allow

16  Your Honor to set some sign posts if you do believe that these

17  requests are relevant, and I think one limitation that we

18  mention in our Brief and that should definitely be applied here

19  is that this should be limited to products that are actually

20  ordered by Netlist.  Semi-conductors are an incredibly broad

21  diverse market, we understand that.

22       Netlist orders are largely centered around three

23  categories of product.  There are some minor variations within

24  those three categories, but I don't think there's going to be

25  any probative value to that list by getting information on

1   products that they never actually ordered.  That's one

2   limitation.

3          The second limitation is in time.  I think to the

4   extent that Your Honor wants to order production, I think the

5   time should be limited to begin in July 2017, which is when

6   Netlist alleges in their Complaint that the first breach

7   occurred, and while we contend that it should be limited only

8   to times in which Netlist's alleged breach, at the maximum it

9   should only go up to May 27, 2020, which is when Netlist

10  reports that the contract was terminated.

11         And I think the final limitation I'd like to run

12  before Your Honor which, I think, might be particularly helpful

13  here is that the sales team at SSI that handled the Netlist

14  accounts also handled I understand a variety of companies who

15  are similarly situated to Netlist; that is, companies in the

16  Western United States region who order a similar amount of

17  volume.  So I think to the extent that Your Honor is able to

18  order a production that is limited to that particular sales

19  channel; that is, the companies covered by the same sales team,

20  which I understand to be about a dozen customers, possibly a

21  little less, I think that would be something we might be able

22  to produce without excessive burden.

23         **MR. LaMAGNA:**  And if I could -- I apologize, Your

24  Honor, if I could jump in and just respond to a couple of

25  points?

23

1          As Mr. Lee pointed out, there are, of course, a lot

2     of companies that use memory.

3          As they stated in their Declaration, Netlist is

4     actually one of the smaller companies that they sell to, so

5     Samsung sells direct only to the largest of those companies.

6          They have distributors around the world that are

7     basically clearing houses for their product that sell to

8     smaller companies, so Samsung's direct sales do not go to the

9     entire industry, they go to the limited set of the largest

10    players only of which Netlist may be their smallest customer,

11    so that gives you an idea that we're not talking about the

12    universe of equipment manufacturers in the world, and everybody

13    who is making, you know, every doll or whatever that has a chip

14    in it.

15         Regarding the cutoffs and so forth, I think we do

16    need a little bit of time before the May 2017 period because we

17    need to establish a baseline.  You know, if Your Honor, you

18    know, wants --

19         I don't know that it really matters for the purposes

20    of burden because when you tell the Excel -- when you tell the

21    database to spit something out you're just putting a parameter

22    in there, so I'm not sure that we're saving that much by

23    setting a date on say January of 2017 versus January of 2016,

24    which is essentially what we asked for.  But we defer to Your

25    Honor's discretion, and we do need a little bit of lead up time

24

1   to establish a baseline.

2           And the termination was in July 2020, not May 2020,

3   so the notice to cure was in May, he started in May 2020 so we

4   would need to go through July 2020, we're not asking for

5   anything beyond that.

6           In terms of a cutoff for specific order types, if you

7   ask me, that's actually adding burden.  If I have a computer

8   database where you have a bunch of products that are sold to

9   customers I need to have somebody go through on a skew by skew

10  basis and figure out which of those products are like the ones

11  or the same as the ones that Netlist buys.  That, to me -- I

12  appreciate that for Mr. Lee that would limit the amount of

13  information that is disclosed, but I think that that would

14  exponentially increase the burden, I don't think that that's a

15  justifiable way to decrease burden.

16          But regardless I think one of the problems we're

17  going to run into is what does it mean to be the same or like?

18          So as you can appreciate, you know, different --

19          A specific product, let's say that you have a -- and

20  we're only looking for DRAM and NAND products, we're not

21  looking for anything other than those two categories of

22  products.  They may sell other products, and we don't -- that's

23  outside of this request.

24          But within that you may have -- let's say you have a

25  16 gigabyte DRAM chip.  That chip may be sold in a couple

1   different variants, slightly different speeds, you know, just

2   slightly different configurations, but basically the same

3   products.  Sometimes there's differences in the pin

4   configuration as to how they fit into sockets, et cetera, and I

5   think just because Netlist happens to order variety A and a

6   different company orders variety B, let's say a slightly

7   different speed of the same product, I think it would be

8   inappropriate to draw a line where we limit it to just the

9   isolated skews or product codes that Netlist buys.

10          That's not, again, really -- that is not going to the

11  question that we're asking here, which is were we treated

12  differently from everybody else; were we given different

13  pricing from everybody else; and so if you imagine if you have

14  an iPhone and you have sales of the blue ones and sales of the

15  red ones, and they're all the same price, you're really looking

16  at both of those.  The fact that one person bought a blue one

17  and another person bought a red one, you know, that's -- I

18  don't think that's what this case is about.

19          **THE COURT:**  Okay, you've added iPhones to my Oreo --

20          **MR. LaMAGNA:**  I'm sorry, Your Honor.

21          **THE COURT:**  That's okay.  Let me -- let's do this:

22  should we schedule something for maybe the week after next just

23  to touch base on all of the other issues?  We can maybe do it

24  if you're available on Tuesday, the 13th at this same time,

25  9:30?

26

1          **MR. LaMAGNA:**  That would be fine, Your Honor.

2          **MR. LEE:**  I'm just checking my calendar for a moment,

3     Your Honor, just a moment.

4          **THE COURT:**  I actually need to check my calendar,

5     too, so I'm doing that also.

6          **MR. LaMAGNA:**  I'm sorry, you said the 13th, Your

7     Honor?

8          **THE COURT:**  Correct.

9          **MR. LaMAGNA:**  Isn't that two weeks from today?

10         **THE COURT:**  Yes.

11         **MR. LEE:**  Your Honor, I actually have a hearing at

12     8:30 a.m. that morning.  It may end before, but I don't want to

13     risk being late for that bench call so --

14         **THE COURT:**  No, that's fine.  Why don't we go ahead

15     and do it at 10:00, 10:30 then?

16         **MR. LEE:**  10:30, yes, that works, Your Honor.

17         **THE COURT:**  Okay.  Mr. LaMagna, is that all right?

18         **MR. LaMAGNA:**  Perfectly fine.

19         **THE COURT:**  Okay.  Ms. Boehme will have call in

20     information for you at 10:30.

21          I'll hopefully get you something today.  If I don't

22     get it for you today it might be a couple more days because we

23     have settlement conferences on calendar both the next two days

24     and I'm hoping to be --

25          Well, I'll be at my computer on my Zoom trying to

1  settle cases, so I'll do my best to get something out today,

2  and if I don't it will probably be by the end of the week.

3          Thank you both for all of your help and hard work on

4  this, and we'll talk to you on the 13th.

5          **MR. LaMAGNA:**  Thank you, Your Honor.

6          **THE COURT:**  Uh-huh (yes.)

7          **THE CLERK:**  This court is now in recess.

8      **(Proceeding adjourned)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **August 5, 2021**

Signed                                                    Dated



*TONI HUDSON, TRANSCRIBER*