```
               UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
               (SOUTHERN DIVISION - SANTA ANA)



NETLIST, INC,                   ) CASE NO: 8:20-CV-00993-MCS-ADSx
                                )
              Plaintiff,        )              CIVIL
                                )
       vs.                      )        Santa Ana, California
                                )
SAMSUNG ELECTRONICS CO, LTD,    )      Friday, August 6, 2021
                                )
              Defendant.        )
_____ )



            FURTHER INFORMAL DISCOVERY CONFERENCE

              BEFORE THE AUTUMN D. SPAETH,
              UNITED STATES MAGISTRATE JUDGE



APPEARANCES:              SEE PAGE 2


Court Reporter:           Recorded; AT&T; digital


Courtroom Deputy:         Kristee Hopkins


Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

2

<u>**APPEARANCES:**</u>


For Plaintiff:                    JASON C. LO, ESQ.
                                  RAYMOND A. LaMAGNA, ESQ.
                                  BROOKE L. WALLACE, ESQ.
                                  MARISSA M. MULLIGAN, ESQ.
                                  Gibson Dunn & Crutcher, LLP
                                  333 S. Grand Ave.
                                  Los Angeles, CA 90071


                                  SOOLEAN CHOY, ESQ.
                                  Gibson Dunn & Crutcher, LLP
                                  1881 Page Mill Road
                                  Palo Alto, CA 94304


                                  MATTHEW BENJAMIN, ESQ.
                                  Gibson Dunn & Crutcher, LLP
                                  200 Park Avenue
                                  New York, NY 10166


                                  JASON G. SHEASBY, ESQ.
                                  Irell & Manella
                                  1800 Avenue of the Stars
                                  Suite 900
                                  Los Angeles, CA 90067


For Defendant:                    JUMIN (CHRIS) LEE, ESQ.
                                  KATE S. SHIN, ESQ.
                                  EKWAN E. RHOW, ESQ.
                                  DAVID I. HURWITZ, ESQ.
                                  MARC E. MASTERS, ESQ.
                                  Bird Marella Boxer, et al.
                                  JONG-MIN CHOI, ESQ.
                                  1875 Century Park East
                                  23rd Floor
                                  Los Angeles, CA 90067

1          <u>**Santa Ana, California; Friday, August 6, 2021**</u>

2                        **(Call to Order)**

3       **(Case Called)**

4       **(In progress)**

5          **MR. CHOI:**  Jong-min Choi for Defendant Samsung.  I'm

6   joined by my colleague David Hurwitz.

7          **MR. HURWITZ:**  Good morning, Your Honor.

8          **THE COURT:**  Good morning.

9          All right.  And is there anyone else making an

10  appearance today?

11         **MR. LaMAGNA:**  For Plaintiff, that's it.

12         **MR. CHOI:**  This is all for the Defendant, too, Your

13  Honor.

14         **THE COURT:**  All right.  Well, so we are here on an

15  informal discovery conference related to Netlist's

16  interrogatories to Samsung.  And we previously started oral

17  argument and so now we are coming back to it.

18         I guess I will ask the question first of both of you

19  if any -- if there has been any resolution.  Are there any of

20  the -- I believe it's Interrogatories 1, 3, 9 and 6, the last I

21  recall, that were still at issue.

22         **MR. LaMAGNA:**  This is Ray LaMagna for Plaintiffs.  I

23  have talked to various different counsel, particularly Marc

24  Masters, over the last couple of days.  We have not reached a

25  further resolution on this.  And I should note that it's 4 and

```
 1  6.  They're kind of twins, more or less.  I don't know that
 2  there's that much of a difference between the two but --
 3           THE COURT:  Oh, okay.  And during our last hearing,
 4  you didn't identify Number 4 and so I thought that that meant
 5  it had been resolved.
 6           MR. LaMAGNA:  I apologize if I omitted that.  I think
 7  that they're really very, very similar if not almost the same
 8  issue.
 9           THE COURT:  Okay.  And let me hear from counsel for
10  the Defendant.  Do you have any comments?  Do you agree?  Do
11  you have a different answer to my question?
12           MR. CHOI:  Your Honor, just to the extent that
13  Samsung served supplemental responses to 1 and 3 and 6 but not
14  to Number 4.  So may I have a moment -- because I do have
15  Samsung's second supplemental pulled up.  But I have just a
16  moment to pull up our latest response Number 4 that Mr. LaMagna
17  just mentioned?
18           THE COURT:  Yes.
19           MR. LaMAGNA:  Yes.  And if it helps the Court, just
20  to make sure we're looking at the correct documents, the latest
21  response, as I understand, to 1, 3 -- and I don't know if --
22  did Your Honor say 9?  So 1, 3 and 9 are in one document which
23  is called, "Defendant Samsung electronic code with its further
24  supplemental responses to Plaintiff's Interrogatories Sets 1
25  and 2."  And so 1, 3 and 9 may have a second supplemental
```

1    response, I think, and those that is their latest and greatest.

2            As for 4 and 6, those deal with the parties' joint

3    development agreement.  Those are in a different -- the latest

4    version is in a different document called, "Second supplemental

5    responses to Plaintiff Netlist's first set of interrogatories."

6    And if you want -- if Your Honor would like, I'm happy to dive

7    in on the substance whenever folks are ready.

8            **THE COURT:**  Well, let me hear from Mr. Choi when he

9    is ready.

10           **MR. CHOI:**  Yes, Your Honor.  I have the Samsung

11   second supplemental response and I have had the further

12   supplemental response, I think.  I have both documents.  So I

13   believe we're ready to proceed.

14           **THE COURT:**  All right.  Mr. LaMagna.

15           **MR. LaMAGNA:**  Thank you.  This is Ray LaMagna again

16   for Plaintiff.  So the issue, I think, is fairly narrow here.

17   Rog Number 1, we were asking for an identity of and I think we

18   had in the definitions defined and asked as well for, like,

19   what the person's role was or why they're being identified,

20   what the -- when somebody is doing something, what are the

21   various different contributions that they have to the facts, if

22   you will, at least at a summary level.

23           And this rog relates to the people that were involved

24   in negotiating and executing the agreement.  If their answer

25   principally can be found on Page 6, the second supplemental

6

1   response, it repeats the information from the prior

2   supplemental response.  And around Page -- on Line -- let's

3   just say 24 to 27 or so, you will see, for example,

4   identification of a half-dozen or so people and each of these

5   individuals was involved with the negotiation and execution of

6   the agreement.

7          Now, two points, first of all, one thing we do happen

8   to know is Mr. Jung (phonetic) Bai (phonetic) Lee (phonetic)

9   who we previously had an Apex dispute about is oddly omitted,

10  notwithstanding the fact that he was the person who actually

11  executed the agreement.

12          But, secondly, and the main issue here is we just

13  don't know what it means to be involved.  Is there one person

14  who's the decision-maker?  At bottom, I think in terms of

15  narrowing discovery, knowing who we need to be directing

16  certain questions to in depositions that are pending in the

17  next week, it's helpful to know who is the person who is the

18  decision-maker or was it a group decision, was it collectively

19  done by two or three people, was it a committee?

20          I don't care what the answer is.  I think it just is

21  helpful to know what the respective roles are.  Now, we had a

22  mirror-image interrogatory posed to us which we did answer by

23  trying to explain to them what the different cast of characters

24  was and what their respective roles were.

25          The same issue comes up for Interrogatory 3.  This is

1    asking --

2          THE COURT:  Let's take one interrogatory at a time

3    (indisc.), okay?

4          MR. LaMAGNA:  Good idea.  Then I'm essentially done

5    on Interrogatory 1.

6          THE COURT:  All right.  Mr. Choi.

7          MR. CHOI:  Thank you, Your Honor.  What Mr. LaMagna

8    is asking for is it seems like have us explain exactly what

9    each person did in the negotiation and that asks the Defendant

10   unfairly to tell the entire story and state an entire factual

11   theory of the case down to a level of minute detail that is not

12   warranted on an interrogatory.

13         Mr. LaMagna asked for identities of the people who

14   are (indisc.) and what they are involved in and Samsung served

15   an answer and certainly they could have and, in fact, are

16   deposing the people who are in a gun fight.  So the level of

17   detail that Plaintiff is asking for is just not reasonable or

18   warranted in this discovery tool.

19         MR. LaMAGNA:  And this is --

20         THE COURT:  Are you taking the deposition of all

21   these five individuals?

22         MR. LaMAGNA:  I regret that I'm not due to all these

23   depositions being stacked on each other.  We have multiple

24   people that are involved.

25         THE COURT:  Okay.  I'm sorry.  I guess I should have

1  said, is your client taking the deposition of all of these

2  individuals?

3          **MR. LaMAGNA:**  I don't believe all of them.  I would

4  have to check.  I believe there's one or two that we are not

5  and a few that we are.

6          **THE COURT:**  How did you decide who to depose?

7          **MR. LaMAGNA:**  Well, Your Honor, the Federal Rules

8  gave us ten and we tried to work with our client and identify

9  the ten people that we, from our negotiating with them, knew

10 about that we thought were the most prominent and that's ten

11 across all issues in the case.  So, obviously, all ten were not

12 assigned to the negotiate -- of our witness choices were

13 assigned to this issue.

14         But, again, we're operating from our knowledge, not

15 necessarily from what's happening inside Samsung and when you

16 -- as you can appreciate, when you negotiate with somebody, you

17 don't know -- you may be talking to one person but behind the

18 scenes, you're not sure who is actually calling the shots.

19         And so going to the point that Defense raised, I'm

20 not -- again, this is another sort of a straw-man argument.

21 I'm not asking for every single fact to be -- I'm not asking

22 for anything wrong.  We gave them -- I don't know, it was about

23 a half a page on this topic.  It was a sentence or so -- a

24 sentence or two about each person, like what they did.  This

25 person did this.  This person was responsible for that.  It's

1    not very much.

2         So I think it's -- to suggest that that is

3    burdensome, difficult, unfair at this point in the case when

4    fact discovery closes in seven days is -- I just think

5    stretches credibility.

6         **THE COURT:**  Okay.  How -- and I don't have any

7    discovery requests.  How was the word "identify" defined?

8         **MR. LaMAGNA:**  Your Honor, I actually don't have those

9    in front of me.  I think it's also -- let me look at this

10   request.  I apologize, Your Honor.  I don't have those and it's

11   defined -- it may be defined differently from -- for Number 9

12   because that was a different set of requests.

13        Let me look at the request for a moment here.  I

14   believe as I recall -- and I apologize, Your Honor.  This is my

15   just going off of memory that "identify" also included some use

16   of the word "describe," like identify and describe the role or

17   something like that or describe their job responsibility -- the

18   job responsibility, something along those lines.  And I think

19   "describe" was also perhaps also defined.

20        **THE COURT:**  All right.  I noticed somewhere else that

21   "describe" appears to be a defined term but, again, I don't

22   have the description.

23        And has your client already noticed all ten of its

24   depositions?

25        **MR. LaMAGNA:**  No.  That's a good point, Your Honor.

10

1    We were -- we had noticed ten including the two Apex

2    individuals.  And so at present, we were planning to perhaps

3    notice a -- lower-level substitutes for the two Apex

4    individuals per Your Honor's Apex ruling.

5          But I don't think that that would necessarily go to

6    this issue because there's the negotiation issue and there's

7    also the question of the disputes the parties have in

8    execution.  And so those two may go to some other issue.  I

9    just don't know.  We're still working on that today.

10         **THE COURT:**  What I'm struggling with, Mr. LaMagna, is

11   that Interrogatory Number 1, many would argue is that calling

12   for a large number of pieces of information, right, identifies

13   a defined term directly or indirectly, negotiating or executing

14   or receiving information.  You want to identify the city and

15   the country.  Describe in detail a person's role and

16   responsibilities.  Now it's a (indisc.) term involving

17   withholding taxes or fees.

18         And so there's a lot here and I understand why

19   because this is a complicated case and you're trying to fit

20   within the 25 interrogatories.  But I can understand Samsung

21   trying to figure out what information Netlist actually needs in

22   order to be able to further pursue its discovery.  And here

23   there are five individuals.

24         You could have ended up with 50 but you ended up with

25   five individuals being identified with a description that says,

1   each of these individuals was involved with the negotiation and

2   execution of the agreement primarily centered in the

3   agreement's financial terms.  Subsequent to execution, Mr. Gee

4   (phonetic) and Mr. Kim (phonetic) were tasked with managing

5   performance of the agreement including tax-related issues.

6   Mr. Jong (phonetic) also later became tasked with these terms.

7           So, I mean, I understand you want more detail but I

8   don't really -- I don't, as I sit here, understand what that

9   additional detail, how that's going to help you with your case

10  at this point.  How does more nuance to that interrogatory

11  response provide you something that you can't get from your

12  depositions or that you truly still need that you don't have

13  some other way?

14          **MR. LaMAGNA:**  Well, I think that one of the reasons

15  that we're entitled to this, Your Honor, is in order to sort of

16  focus our depositions and make sure that we're not spinning

17  people's wheels and asking -- deposing the wrong people on the

18  wrong topics, especially given how short time is.

19          In terms of what we're looking for, I think it's

20  really quite narrow.  You'll notice, for example, that they say

21  each of these individuals was involved in negotiation,

22  et cetera, primarily centered on the agreement's financial

23  terms.  Well, the primary term at issue in this case is the

24  supply term, Provision 6.2 of the agreement.

25          So by their response alone, they simply haven't

12

1   identified who was involved.  If I'm to read this on its face,

2   it doesn't disclose to me who was involved in deciding whether

3   to include 6.2 or what does it mean.  So if I had a top

4   priority, I would say, who was involved in the decision to

5   include or exclude in negotiating back and forth with respect

6   to Section 6 of the agreement and who is the decision-maker?

7            By way of example, I can just read the Court our

8   response or I'll read a couple sentences of it.  I don't have

9   to read the whole thing.  But it says, "The Netlist individuals

10  who are primarily involved in the drafting and negotiating and

11  execution of the agreement" -- they served back on us the same

12  rog essentially.

13           **THE COURT:**  Okay.

14           **MR. LaMAGNA:**  "They include Chuck Hong" and I go on

15  to name a list of people just like they do.  I go on to say,

16           "Morrison & Foerster represented Netlist in

17           connection with the negotiation of the agreement.

18           Specifically, Rufus Pichler at Morrison & Foerster

19           served as primary outside counsel in the agreement.

20           Mr. Kim, a different person, served as discussion

21           leader and the primary point of contact in

22           communications with Samsung.  Mr. Kim was tasked with

23           negotiating with Samsung and was the lead on many

24           exchanges of terms in the draft."

25           And I go on to say that he was directly involved and

13

1   knowledgeable about communications exchanged.  I then name a

2   different person, Mr. Whitley served as in-house counsel and

3   advised on the drafting.  I say, Mr. Hong, who's our in-house

4   CEO, worked with Ms. Sasaki, the CFO, to approve the final

5   terms and structure of the agreement and executed it.  And then

6   it goes on for a couple of other sentences.

7           But that -- you get the gist.  It is not *War and*

8   *Peace*.  It is not a haiku.  And I think that it's fair to

9   suggest that we are entitled to know this case is about a

10  dispute concerning the supply provision, Section 6.  Who is

11  responsible for agreeing to include or exclude it so that we

12  know who we need to be directing that at?  Maybe that's

13  somebody who we haven't noticed for deposition.  I don't know

14  because they haven't told us.

15          **THE COURT:**  Mr. Choi, can you provide them that

16  information?

17          **MR. CHOI:**  Your Honor, may I be heard about one point

18  that I would like to respond to what Mr. LaMagna said?

19          **THE COURT:**  Sure.

20          **MR. CHOI:**  They have been saying that they want the

21  names of who was the point of contact, who was the counsel, who

22  was the CEO, who was the ultimate decision-maker.  All of that

23  information is known to Netlist just by virtue of Netlist's own

24  CEO and point-of-contact and counsel know who their own

25  counterparts were and I would suspect that that's at least part

14

1   -- information they used partly to determine which ones to

2   depose.

3            And, really, what Mr. LaMagna is asking for is more

4   than he said he's provided because neither side has outlined

5   and really can be expected to outline what we're calling the

6   "behind-the-scenes details" of exactly what each person did

7   because are you asking, like, okay, and then Samsung had an

8   internal team meeting and all of that is to provide the

9   meetings of the meeting where Mr. Gee said this and this and

10   then Mr. Lee said this and that.  That seems like a level of

11   detail that is not supposed to be in an interrogatory.

12            Third, I would submit that what was noted and

13   counterparts are and that probably -- or he should have

14   informed who they chose for deposition.  And in any case,

15   that's -- and that's the information that Netlist has and I

16   think Samsung reasonably provided.

17            **THE COURT:**  Mr. Choi, are you -- to be more pointed,

18   are you able to identify for Mr. LaMagna who -- if there was a

19   person, who was -- what did you say, Mr. LaMagna, responsible

20   for including Section 6 in the agreement?

21            **MR. LaMAGNA:**  Yeah, I think negotiating and including

22   Section 6 in the agreement and perhaps that's -- I don't know

23   if that's two different people or the same person.  And as Your

24   Honor can appreciate, I don't believe that our supposition on

25   who that person may have been is going to be admissible to

1  define the fact that if counsel wants to stipulate that our

2  best guess will bring a fact out of evidence and consider it to

3  be undisputed, that's fine but I don't think that they're going

4  to accept that at trial.

5          THE COURT:  Okay.  So, Mr. Choi, are you able to

6  identify who, if anyone, was responsible or -- for negotiating

7  or including Section 6 in the agreement?

8          MR. CHOI:  Your Honor, we can and we have identified

9  the people who were involved in the negotiation of the

10  agreement, like, in its entirety and they can and will be

11  certainly deposed to answer specific questions about their

12  involvement, if at all, with -- sorry -- they will be deposed

13  and asked about Section 6.2 and I imagine every other provision

14  of the agreement.

15          THE COURT:  Okay.  Well, I don't think you directly

16  answered my question.  Are you saying that all of those people

17  that you've identified are the answer to the question or

18  because I asked you specifically about that Section 6?

19          MR. CHOI:  Right.  Sorry, Your Honor.  I was about to

20  say that, no, I could not identify right now specifically

21  Section 6.2 was negotiated by a particular individual.

22          THE COURT:  Okay.  You said, "not right now."  Does

23  that mean -- are you able to obtain that information from your

24  client?

25          MR. CHOI:  We could ask, Your Honor.

1          **THE COURT:**  Okay.  I'm going to order that you

2     supplement the response with that piece of information.

3          **MR. CHOI:**  Okay.  Yes, Your Honor.

4          **MR. LaMAGNA:**  If we move on -- this is Ray LaMagna

5     for --

6          **THE COURT:**  One second, Mr. LaMagna.  I want to make

7     a note.

8          All right, let's move on.

9          **MR. LaMAGNA:**  If we could move on then to

10    Interrogatory Number 3 -- this is Ray LaMagna again for the

11    Plaintiff.

12         **THE COURT:**  Okay.

13         **MR. LaMAGNA:**  This one's perhaps a little bit easier.

14    It's, identify the persons responsible for addressing and

15    fulfilling our orders and you can look at Page 7, Lines --

16    looking basically at the sentence that starts at Line 26 and

17    goes to the end of that page and sort of spills over a little

18    bit.

19         What they've said is they've given us a list of names

20    again and each of these individuals was involved in the sale of

21    NAND and DRAM products to Netlist in various capacities.  Now,

22    once again, we have a parallel interrogatory and I don't -- I'm

23    sure -- I'm happy to read it to the Court if you'd like but

24    it's -- we identify --

25         **THE COURT:**  I want you to identify for me what is

 1   missing from their answer.

 2          **MR. LaMAGNA:**  Well, this entire dispute is about the

 3   fact that internally Samsung made a decision to cap or cut the

 4   allocation of product to Netlist notwithstanding our supply

 5   agreement and that caused a rise to the claims in this case and

 6   as we've alleged, a substantial amount of damage to the company

 7   and harm.

 8          And I think it's fair to say -- or to ask, who is the

 9   person who was setting those allocations?  Whose decision is it

10   as to whether or not we get no product this month, a million

11   dollars in product or as much product as we want?  Whose

12   decision is it to -- essentially to breach the contract?

13          And as we showed Your Honor as part of the Apex

14   motion, we have internal documents, I think, that point -- or

15   that suggest if not outright establish that it is with

16   Mr. Choi.  However, Mr. Choi's name doesn't even appear on

17   here.  So I think at minimum, this is incomplete and

18   disingenuous.  However, at least, we are entitled to have their

19   position on who it is that decided to cut us off or cut us

20   down.  It's one sentence.

21          **THE COURT:**  Mr. Choi.

22          **MR. LaMAGNA:**  It's one sentence.

23          **THE COURT:**  Mr. Choi.

24          **MR. CHOI:**  Yes, Your Honor.  The interrogatory asks

25   for, identify persons who are directly or indirectly

1  responsible for addressing or fulfilling Netlist's order in the

2  contract as stated and in their interrogatory answers then.

3  Mr. LaMagna is changing interrogatories to first assume that

4  somebody told somebody to, hey, cut off Netlist, set a tab and

5  that person -- number one, that that impression was made and,

6  number two, that a certain person did it and, number three, it

7  was Mr. J.F. Choi.

8           If they asked for prudent words directly or

9  indirectly (indisc.) orders to Netlist and we gave a list of

10  names that are the names of people who are sales professionals

11  who have -- directly or indirectly have duties involving

12  allocation of NAND and DRAM products.  So they can speak to all

13  of the decisions that went into -- and all of the information

14  and factors that went into how much product Netlist would get.

15          And then we identified the sales professionals who

16  are the actual points-of-contact for Netlist.  So I -- in other

17  words, the question was, who was involved in determining the

18  supply with which Netlist orders would be fulfilled and these

19  people have been identified.

20          **THE COURT:**  Mr. LaMagna.

21          **MR. LaMAGNA:**  Well, I think that that is being

22  somewhat of a non-answer.  Just -- we shouldn't -- this should

23  not be a hard point of debate or a lot of argument.  We're

24  asking for one sentence that identifies the decision to set an

25  allocation or the amount that Netlist can order was made by and

1   then they can fill in the blank with whoever that person is,

2   the names of people if it's multiple people, whatever their

3   answer is.

4          Here's the issue that I think that I have.  If we go

5   and we say that it is Mr. Choi and they have not responded here

6   to say otherwise, either they agree with us or they don't agree

7   with us.  If they don't agree with us and they don't put it in

8   this interrogatory response, then I suggest that they should be

9   limited at trial from being able to contradict our position.

10          So let me rephrase my ask here, Your Honor.  They

11   don't have to supplement this.  If they don't supplement it, I

12   do not believe that they should be able to contradict any

13   position to the contrary.

14          **THE COURT:**  Okay.  So as I read this request, it asks

15   to identify persons responsible for addressing or fulfilling

16   that list order and I am denying the motion because I don't

17   think that this interrogatory asks what Mr. LaMagna -- the

18   pieces of information that you are asking for, I don't believe

19   this interrogatory asks for in the first place.  So that

20   request is denied.

21          **MR. LaMAGNA:**  Okay.  Thank you, Your Honor.

22          Let me move on then to Number 9.  So I was giving --

23   I think I gave you maybe the wrong page number on the last one.

24   I apologize if I was directing you to the wrong place.

25          Number 9 is the individuals involved in deciding to

1   withhold taxes and --

2           **THE COURT:**  I have it in front of me.

3           **MR. LaMAGNA:**  And, again, perhaps Your Honor will be

4   of the same mind as with 3 and I understand.  The issue there

5   on Page 9, they identify the individuals involved but, again,

6   we were asking for -- as you can see on Page 9, it says,

7   "Describe their respective roles and involvement" and we are

8   trying to figure out who was it that decided to withhold the

9   $1.3 million in taxes that also is part of -- it's part of our

10  second claim.

11          So by way of background, they owed us a certain

12  amount of money under the contract.  They withheld 1.3 million

13  we allege wrongly for taxes.  The Korean government later gave

14  us the money back because they confirmed that it was -- did not

15  need to be owed under Korean law and, therefore, we contend

16  that it's a -- it was a contract violation and it's our second

17  claim.

18          **THE COURT:**  Mr. Choi.

19          **MR. CHOI:**  Your Honor, the answer, again, gives a

20  list of people and it's affirmatively Mr. Bung (phonetic) Yo

21  (phonetic) Jung and Ho Chun Kim were involved with the

22  fulfillment agreement including decisions regarding tax

23  evolving.  So it seems to me it's actually pretty clear on

24  stating the individuals who were involved with the decision-

25  making.

1          Now, I think what Mr. LaMagna is asking for is the

2   proverbial who -- and is he asking for whose task it was to

3   enter on a keyboard?  It's not so clear here because it seems

4   to me that this answer is -- was faulty.  It gives names of

5   people also who I believe are being deposed, by the way, who

6   were involved with the decision-making.

7          **THE COURT:**  Okay.  Mr. LaMagna, is there a reply?

8          **MR. LaMAGNA:**  Yes, Your Honor.  I think the Court and

9   myself are both involved in this conversation but I make no

10  mistake about it.  You, Your Honor, are the one deciding these

11  issues and so simply saying, if we didn't know a list of names

12  which person is the Magistrate judge and which person are the

13  attorneys and somebody said, who's involved in the conference

14  and there was a list of names of people involved, that's hiding

15  the fact of who the decision-maker is.

16         And I don't see the burden here.  It's clearly

17  relevant.  There is -- the only reason that they are doing this

18  is to obscure the truth, obscure the facts, make discovery

19  harder to just be obstructive.  There can be no reason that

20  they simply wouldn't say, this person was the one who decided

21  this issue.  And I have nothing else.

22         **(Telephonic sound is heard)**

23         Well, we may have lost somebody.  I -- can anybody

24  hear me on the call?

25         **THE CLERK:**  We might have lost the judge.  Let me

1    check.

2              **MR. CHOI:**  Yeah, I can hear you.

3              **MR. LaMAGNA:**  All right.  Well --

4              **MR. CHOI:**  Might be the judge.

5              **THE COURT:**  Hi, this is Autumn Spaeth.  I am back on.

6    I got disconnected.

7              Kristee, are you able to hear me?

8              **THE CLERK:**  Yes, I can hear you.

9              **THE COURT:**  All right.  Are we still on the record?

10             **THE CLERK:**  Yes, we are.

11             **THE COURT:**  All right.  So I don't know if I missed

12   it.  Was there talking before I dropped off or were you all

13   able to identify when I dropped off?

14             **MR. LaMAGNA:**  This is Ray LaMagna for Plaintiff.  We

15   heard a beep, Your Honor.  My last point was simply that this

16   is something -- the request that we're making has no burden.

17   It's clearly relevant and I don't think that there's any -- the

18   only logical reason for such recalcitrance on the part of

19   Samsung to just provide a simple fact is merely to be

20   obstructive.

21             **THE COURT:**  All right, thank you.  With regard to

22   Interrogatory Number 9, it's my opinion that the information

23   that Mr. LaMagna is now asking for is not the information that

24   is called for in the interrogatory request and so I will deny

25   the motion to that request -- that interrogatory.

1          **MR. LaMAGNA:**  Thank you, Your Honor.  Should we move

2   on to 4 and 6?

3          **THE COURT:**  Yes.

4          **MR. LaMAGNA:**  So these are in a different document.

5          **THE COURT:**  Yes, I have them in front of me.

6          **MR. LaMAGNA:**  And so Number 4 says, describe all

7   research and development projects, so on and so forth.

8   Basically part of this agreement had a joint development

9   component and so this is asking to describe the research and

10  development activities that happened as part of that agreement

11  essentially.

12          And Number 6 asks for -- to describe the documents --

13  I'm sorry -- describe documents related to Samsung's analysis

14  of or response to Netlist's position that Samsung and Netlist

15  conducted joint development and research activities.  So

16  there's been a dispute as to whether or not -- or to what

17  extent the parties actually engaged in the joint development

18  that was called for under the contract.  Did any of it happen?

19  Did only Netlist do it?  Did Netlist and Samsung collaborate on

20  research?  What were the parties' respective roles?

21          And so essentially what 4 was asking for was,

22  describe what happened.  And what 6 is asking for is describe

23  the sort of what work product or whatever you want to call it,

24  research documents or that kind of thing which occurred.

25          The answer to 4 is at the top of Page 9 that

1  basically says that the agreement was concluded in late 2017 --

2  or the work -- I'm sorry -- was concluded in late 2017 and it

3  consisted of in-person meetings and et cetera and attempts by

4  Defendant to show that it had a commercially viable product but

5  the very short answer at Lines 4 through 8.

6          But that doesn't describe what the work was.  In

7  other words, if we're talking again about our conference here

8  now and somebody says, well, what did you do this morning and I

9  said, I had a conference, well, I guess that that's true but it

10  doesn't really -- it doesn't tell me what me what type of

11  conference it was, it was a discovery conference in this case

12  or something of that nature so that there's no -- what's

13  unclear, I think -- to get to the point here, what's unclear to

14  me on Item 4 is, did Samsung do any work or not?  It just

15  doesn't say and that's something that we -- that has been

16  disputed is whether -- was Samsung a passive player in this or

17  an active player?  And they say --

18          **THE COURT:**  And --

19          **MR. LaMAGNA:**  So that's my question on Number 4.

20          **THE COURT:**  Okay.

21          **MR. LaMAGNA:**  On Number 6, the answer there is at the

22  top of Page 11, Lines 3 through 5.  And my question there is it

23  says that there were some emails and some meeting minutes,

24  et cetera that were generated.  There's -- I mean, were there

25  research presentations?  What were they?  Are there -- I mean,

1   are there Bates numbers?

2          Is there -- there's no -- put it -- imagine for a

3   moment that there was a damages interrogatory that said, tell

4   me what types of material you -- tell me how you plan to

5   support your damages case and all -- and the facts that support

6   that and I responded and said, we plan to support it with

7   documents and facts that show that we were harmed.

8          I think Your Honor would look at that and say, well,

9   that's not a response and that's basically what they've done

10  here.

11         **THE COURT:**  All right.  Mr. Choi.

12         **MR. CHOI:**  Your Honor, again, this is a lot of the

13  same thing.  I would like to go one by one, if I may, and just

14  to start with Interrogatory Number 4.

15         **THE COURT:**  That's fine.

16         **MR. CHOI:**  Mr. LaMagna is asking, so what was done to

17  show the joint development activity and Samsung's response

18  which is all research and development activities?  So the

19  activities were -- there was discussion and they consisted of

20  in-person meetings where Plaintiff (indisc.) Defendant and

21  attempted to show it was commercially viable.

22         So the activity that the Plaintiff asked for,

23  activities and we answered the activities which, to wit, were

24  meetings where -- meetings to cover some detail where Plaintiff

25  demonstrated to (indisc.) Defendant and attempted to show that

26

1   it was commercially viable.

2          Now, it's not as if that's an accurate statement that

3   those meetings discuss viability and I believe that is a full

4   answer to the interrogatory.  Now, if Mr. LaMagna wanted to see

5   the minutes of the meeting, I would think that's not something

6   you asked us for in the interrogatory.  He certainly had an

7   opportunity to ask for documents.  For Number 4, that is my

8   response.

9          **MR. LaMAGNA:**  And, again -- this is Ray for Plaintiff

10  -- we did ask for documents.  That's Interrogatory Number 6.

11  We split it up.  Tell us the substance.  Tell us -- describe

12  the documents.  This one got split into two.  I don't know why

13  they're -- one is 4 and one is 6 instead of 4 and 5.

14         And here's my concern, Your Honor.  Honestly, if they

15  don't want to say anything more, that's fine but when we go to

16  trial or we're on summary judgment and we say that a certain

17  thing goes one way, are they going to be allowed to contradict

18  that with evidence that describes all the hard work that they

19  did?  If we say, for example, look, they didn't do any of the

20  research.  We -- it was all one-sided.  We did all the work.

21  They did nothing.

22         Let's assume they say that.  That is entirely

23  consistent with their response to Interrogatory Number 5 -- 4,

24  sorry.  I don't think that they're allowed to then come back

25  and say that, no, no, here's all the work we did because that's

1  not in response to Interrogatory Number 4.  It's not listed in

2  there.

3          **THE COURT:**  All right.  I tend to agree with

4  Mr. LaMagna with regard to Interrogatory Number 4 and Number 6.

5  Those responses do not appear to me to be sufficiently detailed

6  to be a good-faith response to Interrogatory 4 and 6.  I -- let

7  me take that back.  I'm not saying it's not in good faith.  I

8  don't want to imply any improper motive as to Samsung.  That's

9  not what I'm trying to say.

10         I just think both of these interrogatories call for

11  more detail than the -- I would have called it million-foot

12  level answer that Samsung gave.  And so I'm going to order

13  further responses as to Interrogatory Number 4 and

14  Interrogatory Number 6.

15         **MR. LaMAGNA:**  Yes, Your Honor.  Could we set for the

16  responses then to 1, 4 and 6 -- Your Honor, this is Ray again

17  for Plaintiff.  Could we set a time for those?

18         **THE COURT:**  Yeah.  We'll go through and we'll talk

19  when responses are due.  And, again, Mr. LaMagna, I think, you

20  may want to make it clear to Mr. Choi what additional

21  information you feel like you need for your client.  So at

22  least you guys have that conversation.

23         Now, with regard to serving the supplemental

24  responses, right now we have additional information with regard

25  to Interrogatory Number 1 and Interrogatory 4 and 6.

1          Mr. Choi, when do you believe you can provide those

2    supplemental responses?

3          **MR. CHOI:**  Your Honor, before I answer that, I have

4    just one point of clarification on Number 6.

5          **THE COURT:**  Okay.

6          **MR. CHOI:**  So since it says, describe the document,

7    it doesn't ask for -- to produce the document and that would

8    really turn on the -- the level of detail that we are required

9    to describe the documents.  For example, if we are talking --

10   so certainly we're meeting and there may very well have been

11   meeting minutes, we couldn't describe the date of -- and the

12   time of each meeting and what the meeting said.  That would

13   amount to produce the meeting minutes which is not what --

14   which surely is not what this interrogatory is asking for.

15         So may I have some clarification on the level of

16   detail that you are thinking -- of how particularly and to a

17   level of detail the documents have to be described?

18         **THE COURT:**  Mr. LaMagna, what do you feel that you

19   need?

20         **MR. LaMAGNA:**  Well, I guess when I've done these in

21   the past, I've often used Rule 33(d) and identified Bates

22   numbers.  For example, what I would say is that parties met on

23   ten occasions over the course of two years.  Minutes of those

24   minutes can be found at Bates, Bates, Bates, Bates, et cetera.

25   That's my typical approach.

1          But I think in general what we want to try to

2    understand is more -- put it this way, Your Honor.  The problem

3    -- the disadvantage that I'm at is I don't know what documents

4    they have.  So -- but, for example, it appears that they have

5    some meeting minutes.  At those meetings, there may have been

6    presentations and perhaps those are the two main documents that

7    exist, meeting minutes and presentations.

8          If there's other work-product-type stuff as a result

9    of this research, then I supposed we want to know about it.

10   Otherwise, I think we want to know an identification of meeting

11   minutes and presentations, for example.  Those are the two

12   things.

13          **THE COURT:**  Mr. Choi, is there a problem with that?

14          **MR. CHOI:**  If the order was to be that, we should

15   identify meetings that took place and the presentations that

16   took place and with a high level description what the

17   presentation was.  Is that your order, Your Honor?

18          **THE COURT:**  The order is that you provide further

19   supplemental responses to Interrogatory Number 6 because

20   currently your response is insufficiently detailed and too

21   high-level.  I don't have what the term "describe" was defined

22   as in the original request and so we all know that sometimes

23   this is an issue that you have to figure out how to do.

24          I think what Mr. LaMagna is asking for in terms of if

25   you describe that there were multiple meetings and that at

30

1  those meetings, meeting minutes were taken -- if you can

2  identify where they were produced, I think that makes sense.

3          But, again, I'm going to leave you with what the term

4  "describe" is defined as and ask you-all to make a reasonable

5  effort and feel free to meet and confer prior to coming back to

6  me because there is -- it's hard to speak in the abstract

7  without knowing what there is.

8          **MR. CHOI:**  Yes, Your Honor.  To answer your earlier

9  question about, like, when we might be able to file this

10  response, I'm considering that we will probably have to meet

11  and confer.  Would a week from today be reasonable?

12          **THE COURT:**  Mr. LaMagna?

13          **MR. LaMAGNA:**  I think due to scheduling, it would

14  very helpful for us if we were able to set a follow-up on, say,

15  Tuesday, not the -- literally like the last business day before

16  discovery closes.  I was going to suggest that anyway for some

17  other housekeeping issues.

18          I think -- and just to answer counsel's question, I

19  think -- look, they don't need to sit and write narratives

20  about what a document does or does not show.  I can understand

21  where that would be cumbersome.  If they have -- like, we had

22  ten minutes.  There was ten-minute meetings -- ten

23  presentations that were given.  They can just say there were

24  meeting minutes and presentations.  See -- and then a string of

25  Bates numbers.  We'll look them up and we'll draw our own

1   conclusions as to what they mean.

2          So they don't have to do more than literally a

3   sentence for any given class of document and just tell us what

4   type of document it is and point this to where in their

5   production that can be found.

6          **THE COURT:**  And I'm sorry, Mr. LaMagna.  I think I

7   missed your point about when you need these supplemental

8   responses.

9          **MR. LaMAGNA:**  Well, I would like to have -- if we had

10  a dispute -- a further dispute with Your Honor, I would prefer

11  to have that conference by Tuesday of this upcoming week or on

12  Tuesday if that's possible.  So you asked if we could meet and

13  confer and then come back to you if we had any further

14  disputes.  I think that we should do that on Tuesday.  If they

15  need an extra day or so for the supplemental response, I

16  suppose we could do that.  I'd prefer to have it on Tuesday

17  given how short we are on the timeline.

18         **THE COURT:**  And I apologize.  What is your discovery

19  cutoff?  Is it the 10th?

20         **MR. LaMAGNA:**  The discovery cutoff is -- technically

21  it's Monday, the 16th and so I believe that the -- let me just

22  check my calendar here.  Today is Friday, the 6th.  So I

23  believe that counsel had suggested that we come back to the

24  Court on the 13th which is a week from today and my suggestion

25  is that we come back on the 10th.

1          **THE COURT:**  Well, so this -- if I misspoke, let me

2    clarify that I am not offering to set another informal

3    discovery conference hearing.  I believe we have resolved all

4    of the issues that, as far as I know, were pending and so

5    unless you tell me right now that there is another dispute out

6    there, really what I -- the date I was trying to get to was the

7    date that supplemental responses would be served.

8          And at least I thought that Mr. Choi's answer was

9    that he could serve supplemental responses on the 13th.  And

10   what I'm hearing from you, Mr. LaMagna, is that your concern is

11   that may be too late in order to trigger another informal

12   discovery conference if one was needed.  Is that correct?

13         **MR. LaMAGNA:**  Yes, Your Honor, that's essentially

14   correct.

15         **THE COURT:**  All right.  Mr. Choi, is there any reason

16   why you cannot provide supplemental responses by Wednesday, the

17   11th?

18         **MR. CHOI:**  Your Honor, it's just a matter of working

19   with the client.  It's 15 times zones away and we would need to

20   -- and that's not counting the time that we would need to meet

21   and confer with Mr. LaMagna on the scope of the responses, not

22   simply splitting the baby down the middle but could we --

23         **THE COURT:**  Well, and I would highly recommend that

24   you take your crack at making a good-faith effort in responding

25   to these things and then talk to him but I suspect since you

33

1  guys are all near the end of your discovery period that I --

2  unless you tell me, Mr. Choi, that there's truly a piece of

3  information here that you don't yet have that would take five

4  or six days to get, it would seem like since this is such a --

5  I mean -- I'm going to order it -- the response by the 11th,

6  the supplemental response, August 11th.

7              And then if -- and, again, I tried to be reasonable.

8  If there ends up being a problem with getting that information

9  by that date, I have no doubt that Mr. LaMagna will trigger an

10  informal discovery conference or we can have another call to

11  talk about why and when.  But let's plan to get that

12  information by the 11th since your cutoff is the 16th.

13              **MR. CHOI:**  Yes, Your Honor.

14              **MR. LaMAGNA:**  This is Ray LaMagna.

15              **THE COURT:**  Is there anything for the --

16              **MR. LaMAGNA:**  Yes.  There is actually a couple of

17  quick issues that I wanted to hit upon that were actually sort

18  of holdovers from prior -- or follow-up, I guess I should say,

19  on the prior stuff that we've discussed.

20              **THE COURT:**  Yes.

21              **MR. LaMAGNA:**  This is Ray LaMagna again for

22  Plaintiff.  So the first issue, as Your Honor may recall, you

23  said for the 30(b)(6) depositions that we could have an extra

24  -- basically what comes out to 3-1/2 hours, an extra 50 percent

25  for translation time for two of the 30(b)(6) deponents.

1           We have not yet been able to schedule that because

2   Defendant has not yet given us any, should we say, rollover

3   time, half-day time or whatever on a different date.  We've

4   expressed a lot of flexibility.  We'll take it any day.  We can

5   do a half-day.  I offered to break up the time in any

6   combination over two days with the -- with counsel but we

7   haven't yet gotten dates.

8           And my concern is unless I ask for an order to give

9   us those dates, I don't know that I'm going to get them.

10          **THE COURT:**  Okay.  Mr. Choi?

11          **MR. CHOI:**  Your Honor, those depositions haven't

12  taken place yet.  So we don't even know that that time will

13  definitely be insufficient.  And my understanding is that we've

14  offered to Plaintiff that if we end up not finishing that day,

15  then we will set a different day within the timeframe.

16          I think what Mr. LaMagna is saying -- and correct me

17  I'm misunderstanding is that he just wants an order to hold us

18  to our word.

19          **MR. LaMAGNA:**  So this is Ray LaMagna again for

20  Plaintiff.  As the Court recalls, we've had a large dispute on

21  the document production that has taken a long time and

22  ultimately resulted in an order and then at their request

23  resulted in a further continuance of the deadline to respond.

24          As a result, that pushed -- we kept pushing and

25  pushing and pushing depositions because they simply were not

1   able to produce the documents for the witnesses that were being

2   deposed and they wouldn't, of course, want to put forth the

3   deponents twice.

4           We moved as you -- I don't know if the Court saw this

5   on, you know, Judge Scarsi's docket, on the main docket, but we

6   moved to request a -- to take some depositions out of time

7   which Judge Scarsi denied on the grounds that we didn't bring

8   that motion earlier in time, some five weeks or so ago.

9           Now, I just don't know what to do about this sort of

10  chicken and egg problem.  When I'm working with counsel to try

11  to set a date or to try to set an obligation, I'm told we need

12  to confer more.  They will come before the Magistrate, before

13  it was, you know, Judge McCormick and now it's yourself, and

14  they will say, you know, we really should be talking more, we

15  need to talk this out, we're going to do it, we're going to fix

16  it.  And so I don't have a ripe dispute.  I can't go to Judge

17  Scarsi and say, Your Honor, we need an extra deadline because I

18  think there could be a train wreck at the end if my suspicions

19  come true.  That of course is not a ripe dispute.  Once my

20  suspicions came true and we did have and we do have a train

21  wreck, we go to Judge Scarsi and Judge Scarsi says, I'm sorry,

22  I won't help you because you didn't come to me before the train

23  wreck occurred.  And you can see that you're damned if you do

24  and you're damned if you don't if you are in my position.

25          Now, Your Honor said that we get an extra couple of

36

1    hours.  I have tried to identify a date with them on which

2    those hours would be scheduled.  Of course if we finish our

3    questions earlier, we won't -- we'll stop the deposition.  And

4    they --

5            THE COURT:  Is there --

6            MR. LaMAGNA:  -- have not identified one.  I don't

7    know what to do procedurally in order to preserve that right at

8    this point.

9            THE COURT:  Understood.  Is there any reason why you

10   couldn't just continue to the next day, you know, as, you know,

11   traditionally, you know, or can be done where the parties just

12   keep going until they're done?

13           MR. LaMAGNA:  This is Ray LaMagna again for

14   Plaintiff.  Yes, I'm happy to do that.  So that the -- we had -

15   - to facilitate that, we had noticed one of the 30(b)(6)'s for

16   in our time zone it would be the 15th and the 16th, the last

17   two days of discovery, Sunday and Monday, Monday the 16th being

18   our last day of discovery.  In Korea, of course over the

19   international dateline, that would be on the -- their Monday

20   and Tuesday business days so starting at 8:00 a.m. their time

21   in Korea on Monday and Tuesday.  The Defendant has said that

22   that -- the witness, because I think there's some holidays or

23   some issue in Korea, is not -- won't appear on Monday and will

24   only appear on Tuesday, their 17th, our 16th.  We asked Judge

25   Scarsi for an order to continue the depositions to allow

1    depositions to occur out of time and he denied that order.  I

2    read that as saying that if I continue that deposition that

3    second day on to the -- on the 17th in the United States, then

4    I'm violating at least the spirit of Judge Scarsi's order.

5    Now, I'm happy to do it.  We are totally available on the 17th,

6    Your Honor, and we will take a half-day deposition of that

7    deponent on the 17th.  But I don't think that I'm allowed to do

8    that.

9            Now, if you -- unless somebody wants to clarify what

10   I should do, I feel like I'm in a pickle.  I need to back that

11   deposition up a half a day and do a half a day instead of

12   after, do a half a day before.  If they want to do most of the

13   deposition on the 17th in Korea, Tuesday, I would still have to

14   do a three and a half hour depo at some earlier point in time;

15   any day, I don't care.

16           **THE COURT:**  Understood.

17           **MR. LaMAGNA:**  Other deponents they have just told us

18   no.  They -- we've said, well can we roll over to the next day

19   and they said he's not available.  So the answer is I'm happy

20   to do it.

21           **THE COURT:**  Mr. Choi, is there a reason at least with

22   regard to that 30(b)(6) deposition where the additional three

23   and a half hours will run onto the 17th that it cannot start a

24   day earlier?

25           **MR. CHOI:**  Well, Your Honor, we are talking about

1  just that one deposition that's supposed to start on the 16th,

2  right?

3         THE COURT:  Well for right now that's what I'm

4  talking about, yeah.

5         MR. CHOI:  Right.  We have no objection if it just

6  (indisc.) going to end up spilling into the next day, that's

7  fine with us.  But I think what you're asking really is why

8  can't it start a day earlier, and that would just be that it

9  seems to assume that they're going to run out of time

10 beforehand.  And there -- and surely ten and a half hours can

11 be done in the one day on the 16th.

12        THE COURT:  (Indisc.)

13        MR. LaMAGNA:  So --

14        THE COURT:  Mr. LaMagna, is --

15        MR. LaMAGNA:  Here, Your Honor, this is Ray LaMagna

16 again.  So if we start a deposition, the idea would be to start

17 it at -- on the 16th U. S. time at 4:00 p.m., which is the 17th

18 in Korea at 8:00 a.m., their Tuesday.  We cannot go ten and a

19 half hours for two reasons.  First, you know, and I -- maybe

20 this could be solved, we would need to switch out court

21 reporters and probably translators halfway through, and that

22 might be solvable if the other side is amenable to that.  In

23 other words, I just don't think those individuals could do it

24 for that long.  But -- and obviously the attorneys, no one

25 cares about us, Your Honor, so we're happy to do it.  It's just

1    I think that there's some logistical challenges.

2              But there are not ten and a half hours of record time

3    between 4:00 p.m. Pacific and midnight Pacific.  And, again, I

4    am just trying to be respectful of the Court and the Court's

5    (indisc.) --

6              **THE COURT:**  Understood.

7              **MR. LaMAGNA:**  -- orders.

8              **THE COURT:**  No.  I understand.

9              **MR. LaMAGNA:**  I would love nothing more, Your Honor,

10   but to do this deposition on rollover time on Tuesday Pacific,

11   you know, do another half a day as has been proposed on the

12   17th.  I would love to do that.  I just don't know that I'm

13   allowed to do that.

14             **MR. CHOI:**  And, Your Honor, for what it's worth, we

15   have no objection to that.  It can rollover after midnight for

16   our part.

17             **THE COURT:**  All right.  Do either of you have any

18   information regarding Judge Scarsi's discovery cutoff, does his

19   order include any detail, because I don't have it in front of

20   me, that says -- that would contradict an interpretation that

21   so long as a deposition is started prior to the discovery

22   cutoff, that that is sufficient?

23             **MR. LaMAGNA:**  This is Ray LaMagna again for

24   Plaintiff.  I'm looking at the order I think is Docket 41.  I

25   just pulled it up on my computer.  And let's see here.  It

1   simply says -- this is all the order says on this point, I'm at

2   least looking at this one part of the order on page three at

3   line nine.  It says:  "Non-expert discovery cutoff."  And then

4   the 16th.  And my reservation here, Your Honor, is only because

5   we moved for -- it's really informed by the fact that we moved

6   to continue the depositions to later for exactly this problem

7   and were specifically denied.  That's I think what's giving me

8   more pause than had I not raised my hand and asked for that

9   relief, I would have been perhaps more comfortable --

10          **THE COURT:**  Understood.

11          **MR. LaMAGNA:**  -- in that.

12          **THE COURT:**  Yeah.  So, again, why couldn't -- instead

13   of starting at 4:00, can you start earlier?

14          **MR. LaMAGNA:**  This is Ray LaMagna again for

15   Plaintiff.  I think the challenge -- I'm trying to be fair to

16   the witness, too -- is that we're already starting at 8:00 a.m.

17   local time.  So I -- we don't want to start depositions at

18   4:00.  I'm happy to start it at 4:00 a.m. local time.  But, you

19   know, noon here, I just don't know that that's humanly

20   possible.

21          Now, I -- if Your Honor like I -- we're happy to

22   indulge the idea, maybe we can get the court reporter to do

23   these transcripts, and I'll talk to the folks on our end about

24   the notion of, well, the deposition started on the 16th,

25   notwithstanding it didn't complete until after deadline if Your

41

1    Honor thinks that's defensible, that's not (indisc.) --

2         **THE COURT:**  You know, I just -- personally I have not

3    had a communication with Judge Scarsi about how he interprets

4    that issue.  Like you said, reading his order, he says all

5    discovery must be completed by that date, and which is why is

6    there, I mean, is there any earlier date other than what you're

7    talking about that the deposition could be moved to?

8         **MR. LaMAGNA:**  And that's -- sorry, go ahead.  That's

9    really for defense because we're happy to take a half-day.  You

10   know, we'll leave the main day where it stands on the 16th in

11   the United States, 17th in Korea.  We just need a half-day

12   somewhere else, anywhere else.

13        **MR. CHOI:**  Your Honor, if I may, the order seems to

14   read a deposition should begin -- discovery must be (indisc.)

15   deposition must begin sufficiently in advance of the cutoff

16   date to permit the discovery (indisc.) enough time to challenge

17   the motion practice (indisc.) deemed to be deficient.  I don't

18   think the transcript of the deposition is going to be

19   challenged as deficient.  So if we begin before -- on or before

20   the cutoff date, isn't it by definition sufficient for any

21   motion practice related to it given that there will be none?

22        **(Pause)**

23        **THE COURT:**  I really just not in a position to make a

24   ruling or give you an opinion on that.  What I am going to

25   order is that Samsung provide a date and time to Mr. LaMagna

42

1    for these additional -- for the additional time that may be

2    needed prior to the discovery cutoff.  And I am going --

3    because you guys are up against such a -- you are up against an

4    immediate deadline.  And so, Mr. Choi, and I will leave it up

5    to you all to decide when and where, but again the additional

6    half-day needs to be arranged and scheduled prior -- for a date

7    prior to that discovery cutoff.  And so today is the 6th.

8    Mr. Choi, are you able to provide Mr. LaMagna -- I think there

9    are two 30(b)(6), two depositions, is that right, Mr. LaMagna,

10   that you need this additional time for?

11           **MR. LaMAGNA:**  Yeah.  This is Mr. LaMagna again.  On

12   the other deposition is Mr. Yu (phonetic) that is currently

13   scheduled, that's the other 30(b)(6), on the U. S. time it's

14   the 12th, that would be Thursday -- I mean if that's Thursday,

15   it would be Friday morning the 13th in Korea.  We're happy to

16   as counsel -- the other defense counsel's election, we can

17   either as needed roll that over to a half-day, which would be

18   Saturday morning in Korea, if needed, so it would be the our

19   13th, their 14th, for a half-day if we need rollover time.  Or

20   we're happy to do a half-day, you know, start to it, if you

21   will, the day prior or at a different day.  So I would defer to

22   them as to which --

23           **THE COURT:**  Okay.

24           **MR. LaMAGNA:**  -- they prefer.

25           **THE COURT:**  Mr. Choi.

1      **MR. CHOI:**  Your Honor, I'm not really able to give

2  you the witness's availability.  But --

3      **THE COURT:**  Understood.  So this is going to be my

4  order, that -- because I understand, Mr. Choi, that you're

5  going to need to communicate with your witnesses and chat with

6  folks to be able to figure out how this works.  So my order is

7  that Samsung does provide and schedule with the Plaintiff a

8  date certain for these additional three and a half hours for

9  the 30(b)(6) depositions, and that you provide that

10  availability by no later than noon on August 10th.

11      **MR. CHOI:**  Your Honor, would that be -- did you say

12  additional three and a half hours?

13      **THE COURT:**  Whatever the additional time was that was

14  already ordered by the Court under the -- when we addressed

15  this 30(b)(6) issue.

16      **MR. CHOI:**  Yes, Your Honor.

17      **MR. LaMAGNA:**  And I believe -- this is Ray LaMagna

18  for Plaintiff.  I believe that was, yes, 50 percent, so 50

19  percent of seven is three and a half.  But and we are open also

20  too if it helps Defendant, we can do a different split of ten

21  and a half.  If they want to do five on one day and five and a

22  half on another, I think we're open to -- we will accommodate

23  whatever is easiest for the witness.  And so --

24      **THE COURT:**  All right.

25      **MR. LaMAGNA:**  -- with that, Your Honor, this is Ray

1    LaMagna, I have one other just follow-up concern that -- you

2    know, so we have a -- two orders that are sort of formal orders

3    in the case.  One is that Samsung -- that comes before Your

4    Honor's involvement in the case.  Judge McCormick had ordered a

5    response on RFP eight and the I think it's ROG 11, or maybe I

6    have that backwards, it might be RFP 11, ROG eight.  I'm sorry,

7    I got that backwards.  And that is due a week from today.  And

8    Your Honor also ordered discovery with respect to documents

9    that are due I think today.

10          So one of the concerns that we have, at least as to

11   the latter, is I don't -- how should I say this?  I want to

12   make sure that we're able to have some sort of a mechanism to

13   complete -- police compliance.  Samsung has made a couple of

14   productions.  And if you look at the Court's order I believe --

15   let me make sure I give the Court the docket number -- the

16   Court's order which is at Docket 93, footnote one identified 20

17   or so custodians.  And so far we've seen data come in from like

18   four or five custodians.  Now, it may be that today I get 15

19   others, and that may be fine.  But I am concerned that we are

20   actually getting what it is that is ordered.

21          And I think that the way to sort of address that is

22   to get a confirmation from Defendant, sort of a verification,

23   that they ran the searches and, you know, and what the search

24   hits were.  So by way of example, assume that we have here, you

25   know, one of the custodians that was -- that the parties have

1   is Jung Bae Lee, by way of example.  And that was the apex

2   person that we talked about last week or earlier this week,

3   sorry.  I would suggest that -- I'd like to know next week, you

4   know, how many hit counts did they get for his, you know, email

5   when they ran it against the items that were ordered, you know,

6   what were the results that -- just the number, you know, 2,000,

7   200, 20, you know, whatever that is, for the search that Your

8   Honor ordered, just so that we can confirm on our end that

9   we've received those documents.  Presumably the -- whatever we

10   get the privilege log from them plus whatever we -- you know,

11   they produce will add up to or be relatively the same as, you

12   know, what they -- you know, what those search counts are.

13          **THE COURT:**  Mr. Choi.

14          **MR. CHOI:**  Yes, Your Honor.  It looks like

15   Mr. LaMagna's saying that we are under order to produce the

16   documents.  And that's the order.  The client -- we understand

17   it.  The client certainly understands it.  And we will -- we'll

18   be producing according to the order.  So I'm not sure I really

19   understand what Mr. LaMagna is asking for beyond the production

20   of the documents that are responsive.

21          **MR. LaMAGNA:**  Well, let me -- this is Ray LaMagna

22   again for Plaintiff.  Let me just tell you where this is coming

23   from, Your Honor.  I had a discussion with opposing counsel

24   when we were conferring.  And one of the things that came up

25   was the notion that for everybody except one or two of these

1    custodians, there really aren't any documents that they --

2    turns out that there's a bunch of -- of course as one would

3    expect, there's a lot of orders, there's a lot of what you call

4    ministerial, you know, documents where you place an order and

5    then they generate a PO or invoice, you know, that kind of

6    stuff.  There's, you know, a lot of that.  And I think we'd

7    expect that, we'd agree on that.

8            But that as to all of these other folks that are in

9    Korea, they're at -- not at the local sales entity but at the

10   Korean, you know, home office there really aren't a substantial

11   number of documents.  And that left me kind of scratching my

12   head because I recall that we had had -- before Judge McCormick

13   and before yourself, we'd had extensive argument about how

14   burdensome this was because there's all these false hits,

15   there's all these, you know, the word "Netlist" can come up in

16   any number of, you know, hundreds of documents, or it's too

17   much to review, there's a hundred thousand documents coming,

18   etcetera.  And I can't line up those two stories.

19           And I'm -- I just -- I'm concerned that we have a

20   situation here where there's -- there is something happening

21   between the search result and what we're getting; because as I

22   read Your Honor's order, if -- and we'll use Mr. Jung Bae Lee

23   as an example, Your Honor says, search his email for "Netlist"

24   and produce the nonprivileged results.  So if he's got a

25   thousand emails for Netlist and a hundred of them are

1   privileged, they should produce 900 emails and there should be

2   a hundred items on their privilege log.  There isn't a culling

3   that should be occurring under this order because they think

4   that some of the references to Netlist are not really relevant

5   to the case.  And I -- based on my conversation with opposing

6   counsel, I'm concerned that we have a culling that is occurring

7   between the search hit and the production that is not for

8   privilege.  There's something else going on.

9            **THE COURT:**  Mr. Choi.

10           **MR. CHOI:**  Your Honor, it seems to be that suggestion

11  that Samsung is unfairly withholding documents that are

12  responsive and nonprivileged so -- but I don't hear like a --

13  any basis for the assertion that there is some kind of culling

14  going on.  It seems to me that Mr. LaMagna is saying, if such

15  culling were going -- that such culling must be going on and I

16  can't prove it but I also can't prove it's not going on,

17  therefore we should get (indisc.) --

18           **THE COURT:**  Well, Mr. Choi, let me ask you this

19  question.  Is there culling going on beyond privileged

20  documents?

21           **MR. CHOI:**  Not to my knowledge, Your Honor.

22           **THE COURT:**  Okay.  Who would be the person who would

23  know the answer to that?

24           **MR. CHOI:**  I apologize, Your Honor, but what request

25  for production are we even talking about here?  Is it -- and

48

1    Mr. LaMagna gave an example of emails from custodians and

2    (indisc.) --

3             THE COURT:   This is an order, it's Document Number

4    93, is an order that was issued on July 27th.  And it says,

5    having considered the arguments of counsel on July 27th, the

6    Court hereby orders Defendant to produce any email and

7    attachments sent to, from, or CC'ing a Netlist dot com email

8    address, Netlist, or Netlist employee, from January 15th (sic)

9    on, and all documents from January 15th (sic) on that reference

10   Netlist -- asterisk Netlist dot com, some words in Korean which

11   include "Netlist" in Korean, N Company (phonetic) or Neptune or

12   other Samsung code for Netlist, Irvine -- well, actually we

13   struck Irvine so it may not be -- did we do an amended order?

14   So it's a different document number but we ended up striking

15   Irvine.  Or the JDLA or joint development and license

16   agreement, including any family documents such as forwarding,

17   attaching, or transmitting materials.  Mr. LaMagna, am I

18   referring to the right order?

19            MR. LaMAGNA:   Yes, Your Honor.  And I don't know that

20   we did a formal striking of Irvine but we stated on the record

21   we're -- that that can be considered struck.

22            THE COURT:   Oh, that's right.  That's right.  And

23   then it lists a number of custodians.

24            MR. CHOI:   Yes, Your Honor.  I remember that now.  I

25   apologize for that.

1          **THE COURT:**  It's been a whirlwind for all of us.

2          **MR. CHOI:**  I'm sorry?

3          **THE COURT:**  I said it's been a whirlwind for all of

4     us.

5          **MR. CHOI:**  Yes.  So as far as I know, we are not

6     culling, in fact Mr. LaMagna made a (indisc.) argument in the

7     hearing that Netlist already has those emails.  And Netlist has

8     the emails.  Couldn't they match up what Samsung produces to

9     what Netlist has in their record and that should be --

10         **THE COURT:**  Well, my question to you was just more

11    specific, which is, is your client culling these emails beyond

12    removing privileged documents in its review for production?

13         **MR. CHOI:**  Your Honor, I want to say I have no

14    knowledge of that sort of culling.  And it would be easy to

15    police on Netlist's part because if we're talking about emails

16    that are sent to or CC or from Netlist, that number is as

17    ascertainable to Netlist as it would be to Samsung.  So

18    contrary to Mr. LaMagna's assertion, if this -- if Samsung were

19    unfairly culling documents, and why would we when it's all

20    documents that Netlist already possesses, that would become

21    readily apparent to Netlist.  They would say, hey, we have this

22    email on record, why aren't you producing this email that we

23    were on the "CC" line to, or this email that we sent to you, or

24    this email that we're on the "to" line to.

25         **THE COURT:**  Mr. LaMagna.

1           **MR. LaMAGNA:**  So as -- this is Ray LaMagna for

2     Plaintiff.  As you will see of course in the order there, 93,

3     there's two bullets.  As to the first bullet, it is any email

4     and attachments to, from, CC, etcetera.  Of course we have

5     probably a substantial overlap because we do have -- the first

6     bullet is email exchanged between the two parties.  We will

7     have overlap there.  Now, it's possible that certain folks

8     maybe deleted an email or something over the years.  This is

9     going back some five or six years.  And so our records may not

10    exactly match.

11           I think rather than have disputes on disputes on

12    disputes, the simplest thing to do is for counsel to verify

13    that they have produced all of the email back and forth to

14    Netlist for these custodians, period; because there can't be

15    any privilege there.  So that would be one thing is have they

16    produced all these folks' emails with Netlist?  Yes or no.

17           Now, I can go forensically and try to find examples

18    of where that didn't occur.  I then have to present it to Your

19    Honor.  They then have to go back and see, well, did the person

20    delete it, you know, is there a reason it wasn't captured for

21    some electronic reason, it was in the archives.  That's a

22    laborious, time-consuming process versus a simple

23    representation from counsel, you know, either in writing or on

24    the record here that, yes, we searched the 20 people that are

25    in footnote one, we produced all of their email with Netlist.

51

1          Secondly, as to the second bullet, the second bullet

2     is internal only.  Essentially it's everything that's not in

3     the first bullet that hits on certain search terms.  I don't

4     have any of those unless they produce them to me.  I can't

5     police that or verify that.  I can only police it or verify it

6     if I get some sort of a verification of counsel or -- and this

7     is inferentially by looking at the search hits, if I look at

8     the search hits and I see that I've got no hits for say, you

9     know, Joo Sun Choi, I can either infer that he has no such

10    documents or I can infer that they didn't search his records or

11    that they withheld them or culled them in some way.  And

12    ultimately we don't know whether it's A or B unless counsel

13    tells us.  So I think at bottom --

14          **THE COURT:**  Let me draw this to a close.  I

15    understand your concern.  However, I think that this concern is

16    true in virtually every case that exists.  And I'm not -- it is

17    not my practice or do I think it is appropriate for me to issue

18    an order before we have a problem.  And so I'm going to deny

19    that request, Mr. LaMagna.  I appreciate your concern but --

20          **MR. LaMAGNA:**  Thank you, Your Honor.  Then I guess

21    from again a housekeeping point of view, and I know that we're

22    on a -- we've been working with you, and thank you very much

23    for your gracious time, on a procedure that's perhaps atypical

24    for how you usually handle these disputes, it's because of your

25    kindness in allowing it to carry over how we were working with

52

1   Judge McCormick, is that basically next week is the last week

2   of discovery for us.  If we have a concern regarding the

3   fulsomeness of the production that they've given us, what is

4   the mechanism that you prefer for us to contact you or to set -

5   - if you don't want to set a hearing now for next week, is

6   there -- how would we best raise that with Your Honor?

7           THE COURT:  There -- the informal discovery

8   conference form that's on my procedures page.

9           MR. LaMAGNA:  Okay.

10          THE COURT:  And you fill that out and you email it to

11  my chamber's email.  And that's the way to trigger it.  And,

12  you know, obviously I understand and know about your timing

13  issues so that's the best method for doing that.

14          MR. LaMAGNA:  Okay.  Thank you, Your Honor.  And then

15  I think that the last -- I don't know if there's any questions

16  that Your Honor has regarding the -- I guess it was our topic

17  15, RFP 16, they submitted some material late last night in

18  response to Your Honor's request for a further declaration.  I

19  don't know if there's anything to discuss there.

20          THE COURT:  Well, first let me make sure Mr. Choi

21  knows what we're talking about.

22          MR. CHOI:  Yes, Your Honor.  We are ready to discuss

23  that.

24          THE COURT:  All right.  So I received the declaration

25  of, and I know I'm going to say this wrong, but I'll do -- for

1  of a Mr. Yu to establish the burden on Samsung in having to

2  produce all contracts with a supply provision regarding the

3  sale of NAND and DRAM products.  So let me -- I guess what we

4  should do is let me hear from Mr. LaMagna about I assume that

5  you have a response to this declaration.

6          **MR. LaMAGNA:**  Well, here's the tension.  This is Ray

7  LaMagna for the Plaintiff again.  Here's the tension that I'm

8  trying to unpack here.  Mr. Yu, who actually, you know, we've

9  heard him before in the case, as he says, he's an employee at

10  Samsung's headquarters and in the sales division, or he is a

11  sales-related employee.  As he says in paragraph two, he says

12  he's a sales manager for the memory products.

13          And he then goes on to provide a declaration that

14  comprehensively discusses all of Samsung's global, you know,

15  not just the department he works in but all of what's happening

16  globally in Samsung and how all their contracts are handled, so

17  beyond sales, and the legal and so forth.  So he says he has

18  personal knowledge of this in paragraph one.  And then he has

19  quite a declaration that talks about all -- how this is going

20  to take 50,000, maybe a hundred thousand hours of manpower to

21  do this, and there's thousands of contracts that would have to

22  be reviewed word-for-word, line-for-line.

23          Here's the problem that I have with that.  On the

24  other side, what he's saying is that that has to be done

25  because Samsung has no idea about any of this stuff.  They

54

 1   don't have the -- no one knows, you know, really what the

 2   answer to this question is and so we would have to go and

 3   search everywhere for it.  Yet Mr. Yu knows everything about

 4   Samsung.  How is it that he has this omniscient knowledge,

 5   right, about where all these documents are and what would be

 6   involved and so forth about divisions he's not even in in India

 7   or wherever this is, and yet the company as a whole is so

 8   disorganized and so confused that they don't have an

 9   understanding as to what types of contracts they have?  I don't

10   think those two things can be credibly reconciled.

11          So to use an analogy, Your Honor, if you were to ask

12   me to identify for the Court my children, I would say, well,

13   Your Honor, I have two kids, I have a nine-year-old boy and a

14   four-year-old girl, and I give you their names.  Now, that's

15   the simple answer by just asking me.  The hard road, which is

16   the one that Samsung wants to choose, I say, well, Your Honor,

17   to be completely certain, I'm going to have to go and do a DNA

18   test of every man, woman, and child on the planet Earth who is

19   under 30, just to be sure to answer this question.  And that's

20   -- that is the strawman argument that's being made here.

21          We are simply asking whether the company is aware of

22   any of these types of contracts like -- they attached one.

23   They found one.  You know, any of those kinds of contracts that

24   have a supply obligation and, you know, to give them to us and

25   to put up a deponent about them.  It's -- I don't think that's

55

1    the heavy lift that they are making it out to be.

2           And if they want to start like in terms of focus, we

3    could look at the companies that are in North America through

4    SSI, the division that's -- I'm sorry, Samsung Semiconductor,

5    Inc.  It's the company at San Jose that handles sales to us and

6    to other North American -- other companies here in the United

7    States.

8           But, again, I just -- I don't think Mr. Yu's

9    omniscience and I would suggest speculation can be reconciled

10   with what becomes the disorganization, confusion and, you know,

11   lack of knowledge that the company purports to have about

12   everything except what Mr. Yu knows.

13          **THE COURT:**  All right.  And so am I understanding,

14   Mr. LaMagna, that this issue perhaps could be reduced down to a

15   deponent and production of documents regarding supply contracts

16   with supply provisions for NAND and DRAM products from Samsung

17   Semiconductor, Inc.; is that what you're saying?

18          **MR. LaMAGNA:**  Well, so, yeah, one of the things they

19   raise is that some of these contracts are in foreign languages

20   and so forth.  So I'm happy to stick to, you know, English

21   language contracts.  I think the one caveat there, Your Honor,

22   is that the contracts, the umbrella contract, that we're

23   looking for may not be with the U. S. subsidiary.  Like ours is

24   not.  Ours is with the parent.  The subsidiary handles the

25   fulfillment obligations.  So you have the contract with the

1    parent but then you buy the stuff from the local subsidiary.

2            But if we want to start with, you know, looking at

3    companies, customers, if you will, like, you know, customers

4    that are serviced or that purchase things through the U. S.

5    subsidiary, that's a fine place to start.  And I think those

6    are all going to be English language contracts.

7            But I think the contracts technically are going to be

8    with the parent.  They may be with the subsidiary but I suspect

9    that they are largely with the parent so I just want to caveat

10   that so that we don't say the wrong thing.

11           **THE COURT:**  Mr. Choi.

12           **MR. CHOI:**  Well, Your Honor, if Mr. LaMagna means

13   that he's happy to accept limitations of just with U. S.-based

14   customers, we are -- that's -- that would relieve the burden.

15   Because here's the disconnect that Mr. LaMagna sees that's not

16   really a disconnect.  Mr. Yu is the sales professional at

17   Samsung headquarters.  He knows generally how many countries

18   and how many potential -- how many customers that Samsung sells

19   semiconductors to.  And he knows general -- he knows how the

20   sales teams operate.

21           The burden really comes from having to identify going

22   through Samsung's hundred and thousands of "contracts" and

23   seeing which one of them is responsive to the request.

24   Remember, Your Honor, this entire litigation is over whether

25   this contract is "a supply contract."  To -- so to ask Samsung

1    to go through all of it and identify whether it has a supply

2    provision is a much more burdensome task than when Mr. LaMagna

3    compared to identifying his children.  So we're asking is some

4    sort of a limitation.

5           So, for example, could we limit it to as providing a

6    sample customers in the United States where the face of the

7    contract, something in the title, the first page, plainly,

8    facially, and obviously says "supply contract" rather than

9    having Samsung dig through all of its contracts and checking if

10   they have some kind of a provision like the one at issue in

11   this that spawned this litigation that could be interpreted as

12   a supply obligation, and have Samsung (indisc.) employees and

13   attorneys interpret that to see if it is or is not responsive?

14           **THE COURT:**  Mr. LaMagna.

15           **MR. LaMAGNA:**  So I'm trying to be as constructive as

16   I can and, you know, and sort of focusing this down.  And I

17   don't want to overly focus it because, mind you, our own

18   contract that is in dispute regarding a supply provision says,

19   joint development and license agreement is the title.  So the

20   constraint that counsel has just suggested is one that would

21   knock out the contract in dispute, by way of example.  I think

22   that's part of the issue that we're looking at.

23           I think if we're focusing on I would say companies

24   that are, you know, customers that are purchasing through SSI

25   or Samsung Semiconductor, Inc., whether their contract is with

1   SSI, the supply contract, or with Samsung Electronics, the

2   parent, I think should be irrelevant.

3          But I think they -- there's no showing that that is

4   some ginormous number of contracts to review.  And I -- and nor

5   do we have any showing here that even as to when we limit it

6   down to SSI, that the person -- there isn't someone at SSI who

7   can't just answer that question.  That's one of the things that

8   they've never done that I -- we suggested a long time ago, is

9   go to your client, go to the humans that you're working with,

10  and ask whoever is the president of sales or, you know, whoever

11  your contact, the person who would know this question, say

12  which ones.  And they've never done that and they've never

13  identified that doing that would be hard.  And so I think now

14  that we're at this stage, it's not unreasonable to say that

15  they just have to produce them to us.

16         **THE COURT:**  Okay.  Mr. Choi, what's your response

17  about a person to testify and producing contracts where the

18  customer is purchasing through Samsung Semiconductor, Inc.?

19         **MR. CHOI:**  Your Honor, if the order (indisc.) say

20  that, we will -- did you need a list of customers, Your Honor?

21  Because if you're meaning like is there a supply contract,

22  there may very well be a lot of customers that don't have some

23  sort of a master supply agreement (indisc.) purchase through

24  purchase order which gets accepted.  So I'm --

25         **THE COURT:**  Yeah.  So my recollection of this issue

1  specifically is that Netlist is looking for the supply

2  contracts where Samsung is required under the terms of the

3  contract to supply NAND and DRAM products.  So it's not a list

4  of the companies but rather they're looking for the contracts

5  and then a person who can -- a 30(b)(6) witness who can testify

6  about them.  Mr. LaMagna, correct me if I'm wrong.

7          **MR. LaMAGNA:**  No, that's correct, Your Honor.

8          **MR. CHOI:**  The struggle I'm having, Your Honor, is if

9  you were to tell me, produce all contracts that are

10  substantially identical to the one we produced as a sample,

11  that's probably doable (indisc.) expect Mr. LaMagna's not going

12  to be happy with that because as he says, by way of example,

13  the contract at issue in this litigation is entitled "joint

14  development and license agreement," not say "memorandum of

15  understanding regarding supply cooperation."

16          So that's the burden on Samsung is how do we -- do we

17  really need to look at every contract that Samsung has with

18  someone in the United States, read through it to see if there's

19  a term, and draw our own conclusion of law where that contract

20  does obligate Samsung to supply NAND or DRAM products and then,

21  I mean, even the review of it would be a burdensome process.

22          **THE COURT:**  Well, one question that came up during

23  the last hearing and that I agree with Mr. LaMagna is that we

24  don't necessarily have the answer to is presumably there is

25  someone who is knowledgeable about whether Samsung has

1   contracts that require it to provide and sell these products if

2   a customer orders them, you know, potentially.  And I

3   understand that things don't always work this way.  But

4   potentially there's someone out there who knows whether or not

5   there are such contracts because potentially Samsung would

6   treat those orders differently than they would when you get an

7   order from somebody who you're not contractually required to

8   provide and sell everything that they order.  And so we asked

9   the question at the last hearing, is there somebody who knows

10  whether or not those exist.  I think the answer we got back was

11  we talked to a contract person or somebody who holds contracts

12  and they only located one contract.  And, Mr. LaMagna, you can

13  correct me if I'm wrong, but I don't know that we ever heard if

14  there was an inquiry made to and attempt to find if there was

15  somebody who knows whether or not there are such contracts and

16  what they might be.

17         **MR. CHOI:**  Your Honor, may I --

18         **THE COURT:**  And that is my horrible, rough

19  description based on having a terrible memory.  Okay?

20         **MR. LaMAGNA:**  And this is Ray LaMagna for Plaintiff.

21  I believe that that's correct, Your Honor.  We've been trying

22  to get the fact that there should be that inquiry and get a

23  confirmation of that for a while now.  I don't know if it's

24  been done.

25         **MR. CHOI:**  How about this, Your Honor.  Samsung could

1   provide something by way of (indisc.) the contracts that we

2   think affirmatively certainly obligates us to sell NAND and

3   DRAM products to this U.S.-based customer.  Now, so could we

4   exclude all contracts where we're not sure?  Because until this

5   action was filed, if somebody asked Samsung, do you believe

6   that JDLA obligates you to (indisc.) give Netlist every NAND

7   and DRAM product they asked for, Samsung would in good faith,

8   honest belief said, no.  So would it be a reasonable limitation

9   to say that Samsung will produce all contracts that it

10  objectively and affirmatively believes puts them on an

11  obligation to supply NAND or DRAM products like on the

12  (indisc.) as many or as few as they ask for?

13          **THE COURT:**  And this is to U. S. customers?

14      **MR. CHOI:**  Yes, Your Honor.  So that would obviate

15  the need for Samsung to review its contracts for potentially

16  obligating or --

17          **THE COURT:**  No.  I understand.  I understand that

18  concern.  Mr. LaMagna, does that work?

19      **MR. LaMAGNA:**  That's fine, Your Honor, with one

20  caveat to help Samsung out.  We've already said that they don't

21  have to produce Apple.  So it would be "X" Apple.  And I assume

22  that they have -- they probably have some sort of contract like

23  that with Apple.  They don't have to produce that.

24      **MR. CHOI:**  So, Your Honor, could we -- just to get a

25  clarification, we say that Samsung will produce (indisc.) if

 1  there's any contract that obligates it to provide NAND

 2  components to U. S.-based buyers who are certainly less like

 3  Apple and more like Netlist so where -- Mr. LaMagna's already

 4  said we don't have to produce individual purchase orders and we

 5  don't have to produce like Apple or Amazon.

 6          **THE COURT:**  Right.

 7          **MR. CHOI:**  (Indisc.)

 8          **THE COURT:**  So he's been very clear he wants the

 9  umbrella agreement, not the individual purchase order.

10          **MR. CHOI:**  Right.  So that --

11          **THE COURT:**  But this comes back to the issue which

12  I've already ruled on which is attempting to limit the issue to

13  similar customers, okay?  And we've sort of gone past that.

14  And so what I'm thinking just off the top of my head so we can

15  talk about like the terms of an order, okay, Samsung will

16  produce a witness and contracts that it believes obligates it

17  to provide NAND and DRAM products to U. S. customers, to a U.

18  S. or to U. S. customers, not including any contract with

19  Apple.

20          **MR. LaMAGNA:**  And, Your Honor, this is Ray LaMagna

21  for Plaintiff.  I would stop there in that I don't want my

22  generous nature to be used against me here.  We've excluded

23  Apple because they are I think sort of a unicorn.  But we have

24  -- I think there would be a dispute if we went farther and

25  start to splice and dice as you said.

63

1          **MR. CHOI:**  Well, Your Honor, so two points if I may

2    raise.  I'm certainly not going to revisit the ruling of a

3    similar customer to Netlist because Your Honor has already

4    ruled on that, and Mr. LaMagna -- I don't want to, as

5    Mr. LaMagna said, to exploit his generous nature.  One part of

6    the burden involved was that NAND and DRAM can be a broad or

7    narrow definition (indisc.) concluding --

8          **THE COURT:**  So I understand.

9          **MR. CHOI:**  (Indisc.)

10         **THE COURT:**  So if we included a limitation that said

11   of products of a similar nature to those purchased by Netlist.

12         **MR. LaMAGNA:**  And this is Ray LaMagna for Plaintiff.

13   I would avoid doing that, Your Honor, because I think it just

14   opens up another category for dispute.  Any time lawyers are

15   going to have discretion to look at something and then to --

16   and potentially disagree over what it means, there's going to

17   be a later discovery fight as to whether it's inclusive or not.

18         What I think would be better is slightly broader is

19   just to say as you -- as Your Honor identified before, NAND or

20   DRAM products, U. S. customers, that they contend is supply.

21   If they don't contend there's any of them, if they have a

22   narrow reading of what it means to supply, that's fine, they

23   will produce none of them.  But then that will be their

24   position that they have no supply obligations to U. S.

25   customers.  If they produce five, their position will be that

64

1   there -- here are the five times that they have supply

2   obligations to U. S. customers.  I just want them to take a

3   position as to what that is.  So I don't -- they can produce

4   what they want, but I think that the order should be U. S., you

5   know, U. S. customers NAND or DRAM, period, with the exclusion

6   of Apple.  And they can produce what they contend falls in that

7   category.

8          **MR. CHOI:**  Your Honor, may I offer a compromise that

9   I think will be workable?

10          **THE COURT:**  Sure.

11          **MR. CHOI:**  I'll accept Mr. LaMagna's contention that

12   discretion might lead to just another discovery dispute.  So

13   were Samsung to agree that it produce contracts subjective to

14   its -- sorry, its subjective belief obligation to provide NAND

15   or DRAM to U. S. customers like on the same terms at Netlist

16   contends it has, which is like any quantity it wants, something

17   somewhere between zero to entire (indisc.) excluding Apple,

18   just in case Samsung has other unicorn-type customers, could

19   Netlist and Samsung agree to Samsung will give on like

20   attorney-eyes-only basis a list of customers it considers

21   unicorn?  I imagine it's a very short list.  It's probably

22   Apple, Amazon, and other household name companies.  And I'm

23   sure it won't be too hard to figure out.  And if there is a

24   dispute, it's -- it'll probably be fairly quick and easy.  So

25   no more than a few -- other than a few like (indisc.) unicorn

1  customers like Apple or Amazon or other household name

2  customers, we would say we'll produce the contracts where

3  Samsung has a subjective belief of obligation to provide NAND

4  or DRAM for U. S. customers on terms that Netlist contends it

5  has, which is as many as we ask for on the (indisc.) at a

6  competitive price.  I know I -- that this was not very

7  eloquently worded but maybe we can come up with a more

8  sophisticated and concise wording to that.

9             **THE COURT:**  Mr. LaMagna.

10            **MR. LaMAGNA:**  Well, we've now managed to -- here's

11  the issue, Your Honor.  We at bottom need to know when we're

12  comparing ourselves to fulfillment with other customers that

13  they have whether or not they have an agreement with those

14  other customers to supply product.  Now, if they do, that

15  agreement may be different, it may be nuanced.  So by way of

16  example, they may have an agreement with, you know, Acme Corp.

17  to supply up to a hundred thousand dollars' worth of product

18  per month.  And that will inform them we -- when we then see in

19  response to Judge McCormick's order how much they are selling

20  to Acme Corp. and what their fulfillment is and we compare that

21  to us, did we get treated differentially from Acme Corp., we

22  will know that Acme Corp. had a cap at a hundred, you know, at

23  whatever, a hundred thousand dollars, and that can be factored

24  in.

25             What Mr. Choi seems to be suggesting is that they

1   will go out and produce all of the documents that have the

2   clause in them that is in our agreement.  And I know what the

3   answer is going to be on that.  There are none, Your Honor.

4   Nobody has those words in that order in their agreement.  It's

5   bespoke in our agreement.  And so we're setting ourselves up

6   again for failure.

7          I think what we've asked is really simple, is I've

8   narrowed down and I've taken out foreign language documents,

9   I've taken -- we've -- we're not talking about India anymore.

10  We're focused on the United States, U. S. customers, NAND or

11  DRAM products, whatever they contend they have a supply

12  obligation.  If they want to take the position they don't have

13  any supply obligations, then don't produce anything.

14         **MR. CHOI:**  Your Honor, I'll concede that Mr. LaMagna

15  makes a good point.  So how about subjective belief of

16  obligation to provide some either defined or ascertainable

17  quantity of DRAM products to U. S. customers, and then the same

18  what I said before about "unicorn" customers that I'm sure

19  Mr. LaMagna and Samsung's counsel can probably easily agree to.

20         **THE COURT:**  I'm sorry, Mr. Choi, you were really

21  muffled and so I couldn't understand what you said.

22         **MR. CHOI:**  Oh.  So I'll just say everything again.

23  I'll concede that Mr. LaMagna makes a good point.  So how about

24  Samsung will produce contracts it subjectively believes

25  obligates Samsung to provide either like a defined or

67

 1   ascertainable quantity of NAND or DRAM products --

 2          THE COURT:  A what or ascertainable?

 3          MR. CHOI:  Like defined or ascertainable or on

 4   request quantity of DRAM.

 5          THE COURT:  Why do we need that limitation?  I'm not

 6   understanding why we need to call that out.  What's your

 7   concern?  The obligation regarding defined or ascertainable or

 8   why (indisc.) --

 9          MR. CHOI:  (Indisc.) I'm just trying to be more

10   inclusive for Mr. LaMagna.  We can take that out easily.  We'll

11   say Samsung's subjective belief obligation provide NAND or DRAM

12   products to U. S. customers.

13          THE COURT:  All right.  So as I understand it, what

14   we're talking about is an order that says that Samsung will

15   produce contracts it believes obligates it to provide NAND --

16   to U. S. customers NAND and DRAM or DRAM products to -- sorry,

17   to U. S. customers, not including Apple.

18          MR. CHOI:  And if we may leave room --

19          THE COURT:  What?

20          MR. CHOI:  -- for other unicorn customers, and I

21   think that'll be a minimal dispute.  Certainly Netlist doesn't

22   contend that it deserves to be treated on the same terms as

23   like Amazon, right?

24          MR. LaMAGNA:  I don't think that -- so, again, here's

25   -- Your Honor, I think that the order that you just dictated

68

1    sounds appropriate.  I don't think -- if there is a specific

2    issue where there is a confidentiality consideration or problem

3    with a particular customer, like say Amazon that he's raised,

4    then I think it's best that the parties just confer on that and

5    come back to Your Honor if there needs to be a modification of

6    the order or we can't reach an agreement.  I don't want to

7    agree ex ante to have a category that is a reservation

8    category.  I don't know what's going to get put in that.  I

9    don't know how many disputes we're going to have on that.  And

10   we're going to have to come, you know, then be back here again.

11   I'm trying to drive a stake through this and get off Your

12   Honor's calendar.

13          **MR. CHOI:**  Your Honor, that's -- Samsung's fine with

14   that.  I think we're trying to say the same thing, I just said

15   it less eloquently.  Mr. LaMagna agrees that Samsung can come

16   back and say we have a few unicorn customers and he's amenable

17   to considering it, then the order as expressed I believe is

18   certainly less burdensome to Samsung.

19          **THE COURT:**  Okay.  So the order will be that Samsung

20   will produce a witness and its -- a 30(b)(6) witness and its

21   contract that it believes obligates it to provide NAND and DRAM

22   products to U. S. customers, excluding Apple.

23          **MR. CHOI:**  Thank you, Your Honor.

24          **THE COURT:**  I'm trying to remember, did we set a

25   production date for that during the last hearing?

1          **MR. LaMAGNA:**  This is Ray for Plaintiff.  I don't

2     recall if we got to that stage or not.  I apologize.

3          **THE COURT:**  I'm thinking maybe we didn't since we

4     knew that this burden issue was coming up.  Mr. Choi, when do

5     you believe you can produce those documents?

6          **MR. CHOI:**  Your Honor, if it's being produced with

7     30(b)(6), wouldn't they be -- wouldn't the date of the

8     deposition be the date the documents should be due?

9          **THE COURT:**  I don't know what the 30(b)(6) notice

10    calls for.  Mr. LaMagna.

11         **MR. LaMAGNA:**  So it depends on who -- first of all, I

12    think I of course disfavor walking into the deposition and

13    receiving the documents.  I'm not sure that that's a fair way

14    to handle, you know, civil litigation but -- of this

15    complexity.

16         But setting that aside, we have Mr. Harrison is

17    scheduled for this upcoming Thursday.  And we have Mr. Jung

18    which we're discussing -- that was the one we're discussing for

19    the -- whether it's going to be Sunday and Monday, the 15th,

20    16th.  I don't know which witness they will assign that topic

21    to.  But I guess I would ask for if it's going to be Mr. Jung,

22    I would ask that this stuff be produced a couple business days

23    in advance, so that would be Thursday the 12th.  If it's going

24    to be Mr. Yu, I would say -- and his deposition presumably is I

25    think that's Wednesday perhaps in the United States, so then I

1  would back that up to let's just say Tuesday by during business

2  hours.

3          **THE COURT:**  I need the dates.

4          **MR. LaMAGNA:**  That would be the 10th at say 5:00 p.m.

5          **MR. CHOI:**  Well, Your Honor, (indisc.) our client is

6  already in their weekend.  It's Saturday over there.  Could we

7  (indisc.) conceding that Mr. LaMagna raises a good point, could

8  we get the 12th?

9          **THE COURT:**  How about this?  Why don't I order that

10  they be produced 24 hours prior to the deposition of the expert

11  if they are -- if the 30(b)(6) witness is going to be one of

12  the two who has already been identified and set?

13          **MR. CHOI:**  That's fair, Your Honor.

14      **(Pause)**

15          **THE COURT:**  And if it's going -- if for some reason

16  this creates -- do we believe it's -- there's a chance it's

17  going to create a separate 30(b)(6) witness or no?

18          **MR. CHOI:**  I don't believe so, Your Honor.  At any

19  rate, the (indisc.) 30(b)(6) witnesses could certainly bring

20  the contract and testify to those.

21          **THE COURT:**  All right.

22          **MR. LaMAGNA:**  Could I ask one more thing, Your Honor,

23  on this topic?  So in terms of designating who the witness is,

24  just for preparation reasons, is there any reason that they

25  couldn't identify for us by Monday morning so they have all day

71

1  Monday with their client in Korea to decide which witness it

2  will be for planning purposes?

3          THE COURT:  Mr. Choi.

4          MR. CHOI:  Your Honor, that puts us in a -- puts in

5  us really tight timeline.  Since Your Honor has decided that 24

6  hours is enough time for Netlist to -- Netlist counsel to

7  review the document and prepare the questions to ask based on

8  it, does it -- and given the 30(b)(6) deponents are

9  representatives of the corporation anyway, does it really

10 matter in this instance?  I mean wouldn't --

11         THE COURT:  I think it probably matters for

12 preparation.  But why don't we do this?  Why don't you notify

13 Mr. LaMagna as soon as you have an answer and by no later than

14 24 hours prior to the deposition?

15         MR. CHOI:  Yes, Your Honor.  We'll do that.

16         THE COURT:  All right.  I believe that resolves

17 everything that is in front of me.

18         MR. LaMAGNA:  Thank you for your extensive time and

19 exceptional patience, Your Honor.

20         THE COURT:  I will warn you all that I have criminal

21 duty next week which (indisc.) makes my schedule more hectic

22 and less predictable.  And so I will just warn you about that,

23 especially on Monday.  So just a warning, okay?

24         MR. LaMAGNA:  Thank you, Your Honor.  Probably after

25 dealing with us, that will be a relief for Your Honor.

1          **MR. CHOI:**  Thank you, Your Honor.

2          **THE COURT:**  (Indisc.) all right.  Thank you,

3     everybody.

4          **MR. LaMAGNA:**  Thank you.

5          **THE CLERK:**  This Court is now adjourned.

6       **(Proceeding adjourned)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **August 10, 2021**

            Signed                                              Dated

                    *TONI HUDSON, TRANSCRIBER*