Ekwan E. Rhow - State Bar No. 174604
    erhow@birdmarella.com
Marc E. Masters - State Bar No. 208375
    mmasters@birdmarella.com
Kate S. Shin - State Bar No. 279867
    kshin@birdmarella.com
Christopher J. Lee - State Bar No. 322140
    clee@birdmarella.com
Jong-min Choi - State Bar No. 329474
    jmchoi@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Samsung
Electronics Co., Ltd.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,,<br><br>Defendant. | CASE NO. 8:20-cv-00993-MCS-ADS<br><br>**DEFENDANT SAMSUNG ELECTRONICS CO., LTD'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:      September 20, 2021<br>Time:     9:00 a.m.<br>Crtrm.:   7C<br><br>Assigned to Hon. Mark C. Scarsi<br>Courtroom 7C |

3742241.1

## NOTICE OF MOTION

### TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

**PLEASE TAKE NOTICE** that on September 20, 2021, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 7C of the United States District Court for the Central District of California, located at 350 W. 1st Street, Los Angeles, CA 90012, Defendant Samsung Electronics Co. Ltd. ("Samsung") will and hereby does move this Court for summary judgment, or in the alternative partial summary judgment, in its favor and against Netlist Inc. ("Netlist") pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law, the accompanying Declaration of Joyce J. Choi and exhibits, the record of this proceeding to date, and any and all evidence that may be presented at the hearing of this matter.

This motion is made following a conference of counsel pursuant to Local Rule 7-3, which took place on August 7, 2021.

DATED:  August 16, 2021

Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:  _Ekwan E. Rhow_ (signature)

_____

Ekwan E. Rhow
Attorneys for Defendant Samsung
Electronics Co., Ltd.

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................ 9

II. ARGUMENT ................................................................................................... 11

    A. The Best Evidence For Contract Interpretation Are the Writings That the Parties Signed .............................................................. 11

    B. Samsung Is Entitled to Judgment on Plaintiff's First Cause of Action for Breach of Contract (Supply) ..................................... 12

        1. Section 6.2 Is Limited To the Supply And Pricing Of Components For The Joint Development Project ..................... 12

            a. The Parties' Long Standing Business Relationship Involved $200 Million of Purchases Over 15 Years .......... 12

            b. The JDLA Involved Joint Development of a "Game Changing" Product Based On the NVDIMM-P Standard ................................................................................ 13

            c. Section 6.2 Is Limited To Joint Development Work Under The JDLA ................................................................ 15

            d. The Negotiating History Shows That Section 6.2 Is Limited To Joint Development ............................................ 16

            e. Netlist Admits The JDLA Is Not A Contract to Supply DRAM and NAND Beyond Joint Development ................................................................................ 19

            f. The Parties' Course of Conduct Shows Samsung Had No Obligation To Supply All Chips At Request ................ 21

            g. Netlist Did Not Fully Perform Its Obligations ................. 24

            h. Netlist Should Be Estopped From Arguing Its Patent Licenses Provide Consideration For A Broader Supply Obligation ............................................................ 25

        2. Section 6.2 Is Too Indefinite To Be A Valid Supply Contract. ........................................................................... 26

            a. The Phrase "At Netlist's Request" Is Not A Definite Quantity Term ................................................................ 27

            b. The JDLA Is Not A Requirements Contract .................... 28

            c. The JDLA Is Not A Valid Options Contract..................... 28

    C. Samsung Reasonably Deducted Withholding Taxes From Payment

To Netlist And Cooperated With Netlist's Efforts To Obtain A
Refund ............................................................................................. 29

D. Netlist Is Barred From Recovering Consequential Damages .................. 31

E. Netlist Has No Right To Terminate the JDLA ....................................... 32

III. CONCLUSION ............................................................................................. 33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Bird v. Computer Technology, Inc.*,
    364 F. Supp. 1336 (S.D.N.Y.1973) .................................................16, 18, 20, 21

*Churchill v. Winter Chevrolet*,
    No. C-04-0489 JCS, 2005 WL 281170 (N.D. Cal. Feb. 4, 2005).....................25

*Corning Inc. v. VWR Int'l, Inc.*,
    No. 05 CV 6532 CJS, 2007 WL 841780 (W.D.N.Y. Mar. 16, 2007)...............28

*CSL Behring, LLC v. Bayer Healthcare, LLC*,
    2019 WL 4451368 (D. Del. Sep. 17, 2019) .......................................................28

*Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*,
    872 F. Supp. 103 (S.D.N.Y. 1995) ....................................................................32

*Embedded Moments, Inc. v. Int'l Silver Co.*,
    648 F. Supp. 187 (E.D.N.Y. 1986) ....................................................................28

*GT Beverage Co. LLC v. Coca Cola Co.*,
    No. SACV1000209JVSRNBX, 2010 WL 11595832 (C.D. Cal. Aug.
    2, 2010) ..............................................................................................................25

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) .............................................................................25

*Indep. Energy Corp. v. Trigen Energy Corp.*,
    944 F. Supp. 1184 (S.D.N.Y. 1996) ..................................................................23

*International Gateway Exchange, LLC v. Western Union Financial
    Services, Inc.*,
    333 F. Supp. 2d 131 (S.D.N.Y. 2004) ...............................................................31

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009) ..............................................................................12

*Johnson v. Oregon*,
    141 F.3d 1361 (9th Cir. 1998) ...........................................................................25

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ....................................................................25, 26

*Miller v. McLean Cnty. Unit Dist. No. 5* (*In re Mod. Dairy of
    Champaign, Inc.*),
    171 F.3d 1106 (7th Cir. 1999) ...........................................................29

*Rapture Shipping, Ltd. v. Allround Fuel Trading B.V.*,
    350 F. Supp. 2d 369 (S.D.N.Y. 2004) ................................................25

*Rissetto v. Plumbers & Steamfitters Local 343*,
    94 F.3d 597 (9th Cir. 1996) ................................................................25

*Septembertide Publ'g, B.V. v. Stein & Day, Inc.*,
    884 F.2d 675 (2d Cir. 1989) ...............................................................32

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007) .................................................................31

*United States, for the Use of Integrated Energy, LLC v. Siemens Gov't
    Techs., Inc.*,
    No. SACV1501534JVSDFMX, 2017 WL 10562969 (C.D. Cal. May
    19, 2017) ............................................................................................31

**State Cases**

*Ashwood Capital, Inv. v. OTG Mgmt., Inc.*,
    99 A.D.3d 1 (2012).............................................................................28

*Contrast Edison Elec. v. Thacher*,
    229 N.Y. 172 (1920)...........................................................................28

*Cty. of Jefferson v. Onondaga Dev., LLC*,
    59 N.Y.S.3d 203 (2017) .....................................................................24

*Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*,
    93 N.Y.2d 584 (1999).........................................................................29

*Fed. Ins. Co. v. Americas Ins. Co.*,
    258 A.D.2d 39 (1999).........................................................................12

*Greenfield v. Philles Recs., Inc.*,
    98 N.Y.2d 562 (2002).........................................................................11

*Heyman Cohen & Sons v. M. Lurie Woolen Co.*,
　232 N.Y. 112 (1921)........................................................................29

*Jarecki v. Shung Moo Louie*,
　95 N.Y.2d 665 (2001)......................................................................29

*Lee v. Wright*,
　108 A.D.2d 678 (1985)....................................................................33

*Mar-Jon Mach. & Tool Co. v. Eastman Kodak Co.*,
　534 N.Y.S.2d 47 (1988) ..................................................................27

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
　84 N.Y.2d 430 (1994)......................................................................32

*Rudman v. Cowles Commc'ns, Inc.*,
　30 N.Y.2d 1 (1972) .........................................................................12

*Scott v. Palermo*,
　233 A.D.2d 869 (1998)....................................................................32

*Slamow v. Del Col*,
　79 N.Y.2d 1016 (1992)....................................................................11

*Sommer v. Federal Signal Corp.*,
　79 N.Y.2d 540 (1992)......................................................................32

*Studley v. Nat'l Fuel Gas Supply Corp.*,
　107 A.D.2d 122 (1985)...............................................................22, 23

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
　1 N.Y.3d 470 (2004)........................................................................27

*Webster's Red Seal Publications, Inc. v. Gilberton World-Wide*
　*Publications, Inc.*,
　67 A.D.2d 339 (1979)......................................................................21

*Westmoreland Coal Co. v. Entech, Inc.*,
　100 N.Y.2d 352 (2003)....................................................................15

**Federal Statutes**

Fed. R. Civ. P. 12..............................................................................31

Fed. R. Civ. P. 56..............................................................................30

**State Statutes**

N.Y.U.C.C. § 2-311 ................................................................................................29

## I.        INTRODUCTION

The Complaint in this action marks the first time that Netlist disclosed its now-alleged interpretation of Section 6.2 of the Joint Development and License Agreement ("JDLA") – namely that Samsung was required to supply *all* chips that it requested for *all* of its DRAM and NAND needs, including beyond the joint development work contemplated therein. For the five years prior while Samsung was performing, Netlist never once described the JDLA in the manner it now alleges despite the fact that, as Netlist CEO Chuck Hong recently declared, this supposedly broad supply arrangement was "crucial" and "critical" to its business. SUF 39.

In every single 10-K certified to the SEC and Netlist's public shareholders since the JDLA was signed, Netlist never once described it as a supply contract, instead stating unequivocally and repeatedly that Netlist does not have "any long term supply contracts." In press releases touting the JDLA, Netlist makes no mention of the supposedly "crucial" supply provisions but instead touts the "long term partnership" focused on the development of a potential new standard and product–NVDIMM-P. In Netlist board presentations and resolutions, Netlist failed to mention to its own board the JDLA had solved its "critical" supply shortage issues. In other words, prior to this dispute and when obligated to be accurate to the SEC, its shareholders, and its board, Netlist never once described the JDLA as it now alleges here. That is because Netlist's interpretation of Section 6.2 is contrived.

The manufactured nature of Netlist's interpretation is further established by the contract negotiation documents and Chuck Hong's deposition admissions regarding the same. ███████████████████████████████████ ██████████████████████████████ related to the JDLA. Chuck Hong admitted ███████████████████████████████████████ ███. If supply was "critical" as Chuck Hong now says, it would have been included ██████████████. But as he admitted, ██████████████████████████ ███████████████████████████████████████

1    ███████████████████████████████████████. SUF 30. █████████████████

2    ███████████████████████████████████

3    This evidence of intent is dispositive and undisputed. And Netlist cannot evade

4    ████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████

6    ██████████████████████████████████████████████████████████

7    █████████████████████ Summary judgment can be granted on this evidence alone.

8    But, even absent such evidence, Samsung should still prevail as the parties'

9    subsequent course of conduct rebuts any notion of a guaranteed supply. Chuck Hong

10   and his brother, Paik Ki Hong, who is Netlist's Vice President of Worldwide

11   Operations, both confirmed in their recent declarations to this Court that Samsung

12   fully performed under the JDLA in 2015, 2016 and into 2017. Yet they also confirmed

13   in deposition that █████████████████████████████████████████████████

14   ██████████████████. As explained by both, ████████████████████

15   ███████████████████████████████████████████████████████████

16   ██████████████████████████████. This means that, contrary to

17   Netlist's interpretation of the JDLA, it was never intended that Samsung could or

18   would supply all chips that Netlist requested.

19   The better explanation for the parties' course of conduct is that Netlist's

20   purchases in 2015 and thereafter were not pursuant to the JDLA but simply followed

21   the practice of buying chips that Netlist had been following between 2000 and 2015 in

22   which it had purchased more than ████████████████ on average from Samsung.

23   Under that "industry norm" protocol, Netlist would provide forecasts, inquire about

24   supply, obtain an allocation of available chips and then submit purchase orders.

25   Notably, after the JDLA was executed and even after it was purportedly terminated,

26   this exact same protocol continued and Netlist accepted the fact it was not receiving all

27   the chips it wanted – establishing by conduct that Netlist did not believe the JDLA

28   required Samsung to supply all of the chips it requested.

Netlist's alleged breach relating to tax withholdings suffers from a similar lack of disputed evidence undermining Netlist's allegation. It is undisputed that Netlist's CFO Gail Sasaki ████████████████████████████████████████████████████████ ██████████████████████████████████████████████. As Chuck Hong confirmed, ████████████████████████████████████████ ██████████████████████████. After this tax was withheld, Netlist had second thoughts and demanded the withholdings be released. Samsung cooperated to the extent it could but was not willing to simply adopt Netlist's tax position. Samsung's position was not unreasonable given Netlist's CFO had herself adopted a similar position. In any event, ████████████████████████████████████████████████████████████.

Putting aside whether Netlist's interpretation of the JDLA is reasonable, Netlist's delay in bringing both its supply and tax-related breaches begs the question: why did Netlist file its complaint after years of supposedly repeated non-performance? The answer is simple: by terminating the JDLA and the cross-licenses contained therein, Netlist can set up a patent infringement claim which as its 10-K discloses, is part of its long-standing business plan to monetize its intellectual property through litigation. Such strategic maneuvering, however, cannot replace the clear terms of the JDLA and sidestep the undisputed evidence that has been uncovered. Summary judgment should be granted in Samsung's favor.

## II.   ARGUMENT

### A.   The Best Evidence For Contract Interpretation Are the Writings That the Parties Signed

Under New York law, which governs pursuant to the choice of law provision in the JDLA, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002). Where the contractual language is ambiguous, "extrinsic

evidence as to the parties' intent may properly be considered." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). Such extrinsic evidence may include the parties' course of performance under a contract, which is compelling extrinsic evidence of the parties' intent. *Fed. Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 44 (1999) ("the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties."). Evidence of contracting parties' negotiations may also be admissible to prove the meaning of an ambiguous contract term. *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 11 (1972) ("the court may and should look to the prior negotiations to determine what was intended.").

## B.   Samsung Is Entitled to Judgment on Plaintiff's First Cause of Action for Breach of Contract (Supply)

Netlist's first cause of action alleges that Samsung breached a promise to supply it with all NAND and DRAM at Netlist's request. Samsung is entitled to summary judgment on this claim because (1) the supply obligation in Section 6.2 is limited to the NVDIMM-P joint development project, (2) Section 6.2 does not contain a definite or ascertainable quantity term necessary to create an enforceable supply obligation, and (3) Netlist cannot show that it fully performed its obligations under the contract.

### 1.   Section 6.2 Is Limited To the Supply And Pricing Of Components For The Joint Development Project

The express terms of the JDLA and the extrinsic evidence show that Samsung's promise in Section 6.2 was limited to the supply and pricing of NAND and DRAM products for the NVDIMM-P joint development project. Section 6.2 does not create a long-term supply contract for existing products or requirements outside of the joint development context. The JDLA, including Section 6.2, must initially be construed in the context of the long-standing business relationship between the parties.

#### a.   The Parties' Long Standing Business Relationship Involved $200 Million of Purchases Over 15 Years

Netlist has been a customer of Samsung since at least 2001, purchasing over $200 million of NAND and DRAM products. SUF 1. Both before and after the JDLA,

Samsung has been a significant and continuous supplier of NAND and DRAM to Netlist, as reflected in Netlist's annual reports. SUF 2. In addition to purchasing memory products from Samsung, Netlist also purchased NAND and DRAM products from SK Hynix and Micron, as well as from sellers who purchased the products from the manufacturers for resale. SUF 3.

The DRAM and NAND industry functions like other commodity industries, such as crude oil. It has three primary suppliers – Samsung, SK Hynix and Micron. Dkt. 89-21 at ¶ 6. The amount of NAND and DRAM product that the overall market can supply is limited and demand for products exceeds available supply. SUF 4. Accordingly, Netlist, like other customers, would provide Samsung with advance forecasts of the amount of product it wishes to purchase, and Samsung would then let Netlist know how much product it could allocate and make available to Netlist to purchase. SUF 5. Following these discussions regarding allocations and availability, Netlist would issue purchase orders for specific amounts of product that Samsung had approved. SUF 6. Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others, just as it did with other customers. SUF 7. The practice of forecasts, purchase orders, allocations and backlogs are ███████████ according to Chuck Hong and continued after the JDLA was executed. SUF 4, 8.

        **b.**     **The JDLA Involved Joint Development of a "Game Changing" Product Based On the NVDIMM-P Standard**

In early 2015, Netlist approached Samsung to discuss a strategic partnership involving, among other things, joint development of a product based on a new standard called NVDIMM-P and licensing of Netlist's patents. SUF 9. ███████████ ███████████████████ according to Chuck Hong and, based on presentation materials, was designed to take market share in a $15 billion industry. SUF 10. At that time, Netlist also raised a licensing aspect ███████████ ████████████████████████ and designed to convince Samsung to agree to the joint development route. SUF 11.

On November 12, 2015, after months of negotiations, Samsung and Netlist entered into the JDLA. SUF 13. The structure and terms of the JDLA reflect the express purpose of the contract, which as the recitals in the preamble indicate, is for the parties ███████████████████████████████████████ ████████████████████████████████████ ████████████ and ███████████████████████████████. SUF 14, 16. The JDLA defines the ██████████████ to be a ██████████████████████ ███████████████████████████████████████ ████████████ SUF 15. The JDLA also includes ███████████████████ ████████████████ SUF 16.

The JDLA states Netlist was to receive $8 million for non-recurring engineering on the NVDIMM-P development work, and concurrently with the JDLA, Samsung provided an additional $15 million convertible loan at 2% interest that allowed Netlist to pay off existing debt with less favorable financial terms.[1] SUF 17. In addition to its receipt of cash and financing from Samsung, Netlist would generate significant profits and obtain market share if the parties were able to develop this ████████████ ███████████████████████████████████████ ███████. SUF 18.

The JDLA seeks to implement these objectives, including terms for the collaborative ████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████. SUF 19.

---

[1]   Netlist was having cash flow issues which explains its overall approach. SUF 12.

### c.   Section 6.2 Is Limited To Joint Development Work Under The JDLA

The Court should construe the meaning of Section 6.2 in light of the JDLA as a whole, rather than attempt to give meaning to those words outside of the context of the agreement. *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) ("The meaning of a writing may be distorted where undue force is given to single words or phrases"). Taken as a whole, the JDLA is an agreement for NVDIMM-P joint development and cross-licensing of intellectual property, as its terms, structure and title expressly show.

Section 6 of the JDLA, entitled ███████████ includes mutual promises regarding the supply and pricing of components in connection with the ███████████. SUF 20. Section 6.1 states: ███████████ ███████████ *Id.* As the ███████████ ███████████, Netlist was not required to supply anything yet.

Section 6.2 is the parallel provision and, if interpreted consistently with the remainder of Section 6 and the JDLA as a whole, was focused on providing supply for the NVDIMM-P product that was being developed. It states: ███████████ ███████████ ███████████ SUF 20. Based on the testimony of Chuck Hong, Netlist's 30(b)(6) witness on the JDLA's negotiations, ███████████ ███████████. SUF 21. This also makes sense in the context of the overall joint development whereby Netlist had expertise with the controller of the NVDIMM-P product while Samsung had the NAND and DRAM supply necessary for the NVDIMM-P product.

Viewing the JDLA as a whole, the express terms of Section 6.2 were limited to the supply and pricing of NAND and DRAM components that Netlist requested for

1    the NVDIMM-P joint development. Section 6.2 has nothing to do with Netlist's

2    requests for product outside of the joint development, which was covered by the

3    parties' prior course of conduct which continued after the JDLA was executed. This

4    reading is consistent with the express terms of the contract, the negotiating history,

5    Netlist's admissions, and the parties' course of dealing. Netlist's contrary interpretation

6    is inconsistent with the uncontroverted material facts.

7              **d.    The Negotiating History Shows That Section 6.2 Is Limited To Joint Development**

8

9         Extrinsic evidence from the negotiations of this supply and pricing provision

10   through drafts of the term sheet, Memorandum of Understanding, and the JDLA

11   evince the parties' intent that Samsung was agreeing to supply the necessary raw

12   materials only for the NVDIMM-P joint development project at a competitive price.

13   *Bird v. Computer Technology, Inc.*, 364 F. Supp. 1336, 1343 (S.D.N.Y.1973) ("the Court

14   may look to prior negotiations to determine what was intended."). There is no evidence

15   Netlist asked Samsung during these negotiations to commit to a broader supply

16   contract covering its needs for existing products and requirements, and no evidence

17   Samsung ever agreed to any such term.

18        Chuck Hong testified ███████████████████████████████████████

19   ███████████████████████████████████████████████████████. SUF 22.

20   When Netlist sent Samsung the first draft of the term sheet on April 21, 2015, Netlist

21   proposed, ████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████

23   ███████████████████████[2] SUF 23.

24        When the parties moved into negotiations of a term sheet, Netlist drafted a

25   section entitled "Technology Collaboration" and proposed a subsection entitled "Raw

26   ────────────────────

27   [2] ████████████████████████████████████████████████████████

28   ███████████████████████. SUF 23.

1  ████████████████████████████████████████████ SUF 24,

2  25. Chuck Hong testified unequivocally that █████████████████████████

3  ███████████████████████. Instead, he conceded █████████████████

4  ████████████████████████████████████████████

5  ████████████████████████████████████████

6  ██████████████████████████ SUF 26. In subsequent drafts of the term sheet,

7  Netlist continued to ███████████████████████████████████████

8  █████████████████████████████████████████████

9  ████████████████████████. SUF 27-29.

10     Chuck Hong testified that ████████████████████████████

11  ████████████████████████████████████████████

12  █████████████████████████████████████

13  ██████████████████. SUF 30. According to Chuck Hong, ██████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████

16  ██████████████████. SUF 31. That is why Netlist put that ████████

17  ████████████████████████████████████████████

18  ████████████████. SUF 24-29. After exchanging additional drafts, the parties

19  signed a final MOU that was intended to reflect all important deal terms. SUF 32.

20  Section 6 of the MOU states:

21       ████████████████████████████████████

22       ████████████████████████████████████████

23       ███████████████████████████████████

24       ████████████████████████████████████

25       ████████████████████████████████████████

26       ████████████████████████████████████████

27       ████████████████ (emphasis added.) SUF 32.

28     As to the MOU, Chuck Hong again admitted ████████████████████

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████ SUF 32.

3 Thus, according to Chuck Hong's repeated testimony and the undisputed terms of the

4 ████████████████████████████████████████████████ that

5 Netlist is now alleging.

6       Netlist cannot now evade the MOU as, during the negotiations of the JDLA,

7 Netlist's in house attorney made clear the MOU was the sole basis for what became

8 section 6 of the JDLA. On October 8, 2015, when the parties began drafting the JDLA

9 from the MOU, Samsung proposed the following language to Netlist:

10 ████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████ SUF 33.

16       On October 14, 2015, Netlist replied to Samsung, forwarding an email from

17 Noel Whitley (Netlist's in-house counsel and VP of IP & Licensing) with his comments

18 on the JDLA. SUF 34, 35. As to the new Section 6.2 of its proposed JDLA, Whitley

19 wrote in all bold that this language ████████████████ and that ██████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████ SUF 35. ████████████████████ *Id.*

23       The MOU's intent is clear based on Chuck Hong's testimony and Netlist's

24 statements at the time. Under that MOU, ████████████████████████████

25 ████████████████████████████████. SUF 32. That intent was carried

26 forward into the terms of Section 6.2, which refers to ████████████████████████

27 ████████████████. Indeed, ████████████████████████████

28 ████████████████████████████████████████████████

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████. SUF 36.

3       Netlist CEO Chuck Hong admitted this repeatedly during his deposition. He

4 testified ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████. SUF 26, 28, 30, 31, 32, 37. Thus, the

7 JDLA was never about ensuring Netlist a supply of product for ████████████████

8 ████████████████████████████████████████████████████

9 ███████████████████████████.

10       Netlist's CFO Gail Sasaki made this intent clear when she ████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 (emphasis added.) SUF 38. If ██████████████████████████████████████

15 █████████ (as Netlist now claims), Sasaki surely would have mentioned it. That she did

16 not is further compelling evidence that Netlist understood the ████████████████████

17 ████████████████████████████████████████████████████

18 ███████████████████████████████████.[3]

       e.       **Netlist Admits The JDLA Is Not A Contract to Supply DRAM and NAND Beyond Joint Development**

21       While Netlist asserts in this litigation the JDLA is a supply contract, Netlist has

22 repeatedly admitted that the JDLA is not, in fact, a supply contract that extends to

23 Netlist's other requirements and requests.

24       While the exact language has changed over the years, Netlist has repeatedly and

25 consistently disclosed the risks associated with not having a long-term supply contract

26 ─────────────────────────
[3]   It is not disputed that Netlist got the chips it needed █████████████████████████

27 ████████████████████████████████████████████████. SUF 46, 47. Thus,

28 ███████████████████████████████████████████████████.

for DRAM and NAND in its annual reports before 2015. SUF 43. But in its first 10-K after the JDLA was executed, Netlist continued to state that Netlist had "no long-term supply contracts" for these products. SUF 42.[4] This is no mere boilerplate disclosure of risk. Netlist said it had no long term supply contracts for DRAM and NAND in the very same section that it described its contract with and purchases from Samsung. *Id.* By contrast, in 2021, when Netlist entered into an actual supply contract with SK Hynix, it disclosed that the supply contract "entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term . . ." SUF 40.

Netlist management's presentation of the JDLA to its Board of Directors in November 2015 ███████████████. Chuck Hong's presentation to the Board, prepared by Netlist CEO Gail Sasaki, ███████████████████████ ██████████████████. SUF 41. No mention is made of ███████████ ██████████████████████████████████, which Chuck Hong now declares to be "crucial" and "critical." SUF 39, 41. This clearly would have been material to the Board ███████████████████.

While Netlist disclaimed in its 10-K disclosures that the JDLA was ████████ ██████████, Netlist proclaimed in its press release what the JDLA was in fact a ████████████████████████████████████████ ████████████ SUF 44. No mention is made that ████████████████ ████████████████████████████████. *Id.*

Netlist's public filings, press releases, and Board materials are consistent with its statements ███████████████████████████. Netlist's understanding

---

[4] Netlist's 2015 10-K states: "Our ability to fulfill customer orders or produce qualification samples is dependent on a sufficient supply of field programmable gate arrays ("FPGAs"), DRAM ICs and NAND flash, which are essential components of our memory subsystems. There are a relatively small number of suppliers of FPGAs, DRAM ICs and NAND flash, and we purchase from only a subset of these suppliers. **We have no long-term FPGA, DRAM or NAND flash supply contracts.**" (emphasis added ) SUF 42. All subsequent Netlist's 10-Ks attest to the same. SUF 43.

1   that ██████████████████████████████████████████ is

2   evident by Netlist's continued efforts ████████████████████

3   ████████████████████████████████. In February 2017,

4   Netlist ████████████████████████████████████████

5   ████████████████████████████

6   ██████████████████████ SUF 45. Netlist understood the JDLA did not

7   ████████████████████████████████████████

8   ████████████████████████████████████████

9   ██████████. Indeed, when Netlist made this ask, Samsung ██████████

10  ████████████████████████. *Id.*

11      In sum, Netlist's repeated statements in its SEC filings, characterization of the

12  JDLA to its own Board, and subsequent asks of Samsung show ████████████

13  ████████████████████████. This compelling evidence

14  is uncontroverted and directly contradicts Netlist's position in this litigation.

15          **f.      The Parties' Course of Conduct Shows Samsung Had
                      No Obligation To Supply All Chips At Request**
16

17      The parties' performance in the pre-litigation period, particularly in the first two

18  years following the JDLA, shows neither party intended Section 6.2 to create an

19  obligation for Samsung to supply all of Netlist's requests for Samsung's NAND and

20  DRAM products. *Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications,*

21  *Inc.*, 67 A.D.2d 339, 341 (1979) (actual performance is the "most persuasive evidence of

22  the agreed intention of the parties").

23      As to ████████████, it is not disputed that ████████████

24  ████████. SUF 46. And given ████████████████████

25  ████████████, Samsung's duty to ████████████ was never triggered. SUF 47.

26      For Netlist's ████████████████████████

27  ████████████████████████████████. SUF 52.

28  ████████████████████████████████████████

1 ███████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████. SUF 53. This consistent course of dealing before and after the JDLA provides

4 strong evidence ██████████████████████████████████████

5 ███████████████████████████████████████████

6 ██████████████████████████████████. SUF 54; *Studley v. Nat'l Fuel Gas Supply*

7 *Corp.*, 107 A.D.2d 122, 128 (1985) (following "the established rule that the practical

8 construction put upon a contract by the parties in performing under it is of great

9 importance in determining its meaning").

10       Based on their prior course of dealing and industry norms, Netlist and Samsung

11 operated using ████████████████████████████████████████

12 ██████████. SUF 52-56. Prior to 2015, Samsung often could not supply Netlist's

13 requested amount or any amounts. SUF 53. And this ████████████████████

14 ████. SUF 49. For example, ████████████████████████████████

15 ███████████████████████████████████

16 █████████████████████████████████████████████

17 ██████████████████████████████████████

18 ████████ SUF 49 at NL039163-64.

19 ██████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ██████████████████████████████████████

22 ████████████████████ SUF 49 at NL024952.

23       The fact Samsung could not fulfill all of Netlist's orders was not a breach of the

24 agreement. As both Chuck Hong and Paik Ki Hong admitted as Netlist's 30(b)(6)

25 witnesses and in their prior declarations, Samsung's performance was satisfactory in

26 2015, 2016 and into 2017. SUF 48. But in those same years, ████████████████

27 █████████████████████████████████. SUF 49. Chuck Hong

28 admitted ████████████████████████████████████████



1    █████████ SUF 49 (Exh. 7, Chuck Hong Dep.). Given the

2    industry involves a commoditized product with limited supply, ████████

3    █████████.[5]

4         What this evidence further shows is Netlist never ████████████

5    ████████████████████████████

6    ████. Netlist's course of conduct with Samsung ████████████

7    ████████████████████████████

8    ███. SUF 53. Indeed, ████████████████████

9    ████████████. *Id.*

10         Netlist's use of ████████████████████

11    provides another basis to dismiss Netlist's interpretation of Section 6.2. By their very

12    terms, Netlist's purchase orders indicate they constitute new "offers" and supersede

13    any prior agreements or discussions with Samsung, such as forecasts and informal e-

14    mail or oral requests to purchase product. SUF 51, 57. Thus, Netlist cannot argue

15    Samsung was obligated to supply any product beyond the amount reflected in Netlist's

16    purchase orders, regardless of any earlier requests. *Indep. Energy Corp. v. Trigen Energy*

17    *Corp.*, 944 F. Supp. 1184, 1195 (S.D.N.Y. 1996) ("Prior agreements and negotiations are

18    deemed to merge and be subsumed in a later written agreement.").

19         The end result is that Netlist purchased a substantial amount of NAND and

20    DRAM from Samsung in each quarter from November 2015 to the present, although

21    the amounts varied over time. SUF 58. Accordingly, Netlist has no evidence of breach

22    ─────────────────

[5]   What Netlist and Chuck Hong appear to be complaining about is that █████████

23    ████████████████████████████

24    ██████████████████████ Choi Decl. Exh. 7 at 119:6-

     120:7. Up until that point, Chuck Hong ████████████████

25    ████████████████████. *Id.*

26    ██████████. *Id.* Thereafter, Samsung ████████████

27    ████████████████████████. SUF 52. That

     is not a breach of contract. ████████████████

28    ████████████.

1  of Section 6.2.

2          **g.**       **Netlist Did Not Fully Perform Its Obligations**

3        Samsung is also entitled to summary judgment because Netlist did not fully

4  perform its obligations under the JDLA, and thus cannot prevail on its breach of

5  contract claim. *Cty. of Jefferson v. Onondaga Dev., LLC*, 59 N.Y.S.3d 203, 206 (2017)

6  ("[O]ne of the essential elements of a cause of action for breach of contract is the

7  performance of its obligations by the party asserting the cause of action for breach[.]")

8        Samsung engineer Indong Kim testified █████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████. SUF 60. There was no written amendment

11 authorizing Netlist to do so. And Chuck Hong testified that, ██████████████

12 ████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████

14 ████████████████. *Id.*

15       Even under Netlist's erroneous theory that █████████████████

16 ██████████████████████, Netlist also failed to perform by ████████████

17 ████. Chuck Hong ███████████████████████████████████████████

18 ██████. SUF 64. While Netlist contends Samsung cancelled orders improperly,

19 Netlist was forced to admit during depositions that ████████████████████

20 ████████████████████████████████████. *Id.* The evidence

21 establishes ██████████████████████████████████████████

22 ████████████████████████████████. SUF 61-62. Samsung ████████

23 ████████████████████████████████████████████

24 ████████████████████████████████. SUF 63. After prices for eMMC

25 dropped unexpectedly in the second half of 2017, Netlist ██████████████████

26 ██████. SUF 64. If Netlist contends the failure to fulfill all purchase orders is a breach of

27 the JDLA, ████████████████████████████████████ must also be one.  Having

28 failed to perform under its own interpretation of the JDLA, Netlist cannot prevail on

1   its claims for breach.

2   **Netlist Should Be Estopped From Arguing** ███████████

3   ███████████████

4   Netlist argued in its prior declarations to this Court that during the course of the

5   JDLA negotiations, it ████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ██████████████. Dkt. 89-21 at ¶¶ 4-5. But this argument is directly contrary to

8   ████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████

10   ████████. SUF 65. Accordingly, Netlist should be estopped from making that

11   argument in this case.

12   Under the equitable doctrine of judicial estoppel, a litigant is barred from

13   obtaining an advantage by asserting a position in a case, and then later seeking to obtain

14   an advantage by taking a clearly inconsistent position. *Rissetto v. Plumbers & Steamfitters

15   Local 343*, 94 F.3d 597, 600–01 (9th Cir. 1996); *Hamilton v. State Farm Fire & Cas. Co.*,

16   270 F.3d 778, 782 (9th Cir. 2001)(doctrine provides for the orderly administration of

17   justice and dignity of proceedings).

18   The doctrine of judicial estoppel applies to statements made in prior

19   administrative proceedings. *Rissetto*, 94 F.3d at 604, 605; *Churchill v. Winter Chevrolet*, No.

20   C-04-0489 JCS, 2005 WL 281170, at *8 (N.D. Cal. Feb. 4, 2005). The doctrine also

21   applies to foreign proceedings. *GT Beverage Co. LLC v. Coca Cola Co.*, No.

22   SACV1000209JVSRNBX, 2010 WL 11595832, at *5 (C.D. Cal. Aug. 2, 2010)

23   (discussing favorable authority on application to foreign proceedings); *Rapture Shipping,

24   Ltd. v. Allround Fuel Trading B.V.*, 350 F. Supp. 2d 369, 374 (S.D.N.Y. 2004) (plaintiff

25   estopped based on statements made in a Dutch Court).

26   "Federal law governs the application of judicial estoppel in federal courts."

27   *Johnson v. Oregon*, 141 F.3d 1361, 1364 (9th Cir. 1998). Courts generally consider three

28   factors when deciding whether to apply the doctrine. *New Hampshire v. Maine*, 532 U.S.

742, 743 (2001). First, courts determine whether "a party's later position [is] clearly inconsistent with its earlier position." *Id.* Second, courts consider whether a litigant successfully persuaded a court to accept one position, so that subsequent judicial acceptance of an incompatible position "would create the perception that either the first or the second court was misled." *Id.* Finally, courts take into account "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*

Here, the inconsistency in Netlist's position is clear. In this case, Netlist asserts that ███████████████████████████████████████████████. In stark contrast, Netlist argued in its Korean tax appeal that: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ SUF 65. Second, the Korean tax tribunal relied on Netlist's position ██████████████████████████████. SUF 66. And third, Samsung would be prejudiced by Netlist's assertion of inconsistent positions here. On the one hand, Netlist is trying to use the Korean tax court decision to show that ███████████████████████. At the same time, Netlist asserts that ██ ███████████████████████████████████████████.

Accordingly, Netlist should be estopped from asserting a position in this case that is inconsistent with its position in the Korean tax appeal.[6]

### 2.  Section 6.2 Is Too Indefinite To Be A Valid Supply Contract.

As shown, the express terms and extrinsic evidence show that Section 6.2 is limited to the supply and pricing of DRAM and NAND for joint development. If the

---

[6]  Samsung has consistently taken the position that the main purpose of the JDLA was patent licensing, which is why Samsung deducted withholding tax as a royalty. While Samsung agrees the licenses are broad, Netlist should not be allowed to argue one thing to its advantage in Korea and the direct opposite here.

1   Court were to find this term ambiguous on this point, Samsung would still be entitled

2   to summary judgment because Section 6.2 lacks a definite or ascertainable quantity

3   term. Netlist posits several theories as to how the provision could be sufficiently

4   definite, either as (1) a contract to supply at request; (2) a requirements contract; or (3)

5   an options contract. None of these proffered theories provides a sufficiently definite

6   quantity term that could make Section 6.2 an enforceable supply contract.[7]

### a. The Phrase "At Netlist's Request" Is Not A Definite Quantity Term

First, the phrase "at Netlist's request" in Section 6.2 is too indefinite to state a
valid quantity term. The phrase neither states a definite quantity nor provides a fixed
means to determine a volume of product. *Mar-Jon Mach. & Tool Co. v. Eastman Kodak
Co.*, 534 N.Y.S.2d 47, 48 (1988) (contract of sale must be definite as to the quantity of
the goods sold, or provide fixed means by which the quantities can be determined).[8]
Rather, Netlist's theory is that it can request any quantity it wants, subject only to the
implied covenant of good faith and fair dealing that would prohibit Netlist from
requesting products beyond what it could possibly need for its channel distribution. But
even as cabined by the implied covenant, there is no enforceable contract, as there was
no meeting of the minds as to the quantity of product that Samsung would supply.

Nor is there any basis for the Court to imply a missing quantity term where none
exists. *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("courts
should be extremely reluctant to interpret an agreement as impliedly stating something
which the parties have neglected to specifically include"). That is especially true where,

---

[7]   Samsung does not ask the Court infer the JDLA is any of these species of contract.
Rather, after conferring with Netlist to understand its theories, Samsung shows why
each theory is insufficient to create a binding supply obligation.

[8]   Contrary to Netlist's argument, this is not an issue Samsung must raise as an
affirmative defense under the Statute of Frauds, but rather an element of Netlist's
breach of contract claim – namely to prove the existence of a valid enforceable
contract. There is no evidence of any agreement (oral or written) as to quantity.

1    as here, the parties are sophisticated companies that could be expected to have

2    negotiated a quantity term had they chosen to do so. *Ashwood Capital, Inv. v. OTG*

3    *Mgmt., Inc.*, 99 A.D.3d 1, 7 (2012). Moreover, there is no objective method for the

4    Court to imply a quantity term here.

5                    **b.      The JDLA Is Not A Requirements Contract**

6            Second, Section 6.2 cannot be a valid requirements contract. The JDLA does not

7    contain any promise by Samsung to supply products to meet Netlist's requirements or

8    needs, and Netlist has no obligation to purchase any quantity of product from Samsung

9    whatsoever. There can be no requirements contract without a commitment from

10   Netlist to buy exclusively from Samsung, or at the very least, a commitment to buy a

11   minimum quantity or percentage of its requirements exclusively from Samsung.

12   *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 192 n. 3 (E.D.N.Y. 1986)

13   ("Absent [the promise of exclusivity], the agreement is an indefinite quantities contract,

14   where without more, the buyer's promise is illusory and the contract unenforceable

15   against the seller."); *Corning Inc. v. VWR Int'l, Inc.*, No. 05 CV 6532 CJS, 2007 WL

16   841780, at *6 (W.D.N.Y. Mar. 16, 2007) (requirements contract is valid where buyer

17   must purchase its requirements of product exclusively from seller up to a certain

18   quantity); *CSL Behring, LLC v. Bayer Healthcare, LLC*, 2019 WL 4451368 at *2 (D. Del.

19   Sep. 17, 2019) (exclusivity required under New York law).

20           Given the express language in Section 6.4 disclaiming any obligation to purchase

21   any amount of product at all, the Court may not imply terms necessary to render the

22   contract as an enforceable requirements contract. *Contrast Edison Elec. v. Thacher*, 229

23   N.Y. 172, 176 (1920) (where the court implied terms based on the clear intent of the

24   parties to form a requirements contract). Thus, the JDLA cannot be interpreted as a

25   requirements contract to satisfy the missing quantity term.

26                    **c.      The JDLA Is Not A Valid Options Contract**

27           Nor can the JDLA be construed as a valid options contract; it lacks a necessary

28   quantity term. It is true, as the Court noted, that an options contract does not

necessarily require exclusivity. However, that does not mean that an options contract is exempt from the rule that any sales contract must have a definite or ascertainable quantity term to create an enforceable obligation. *See* N.Y.U.C.C. § 2-311 (an option contract must still be "otherwise sufficiently definite"); *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 590-91 (1999) (an option contract requires definiteness). While an option to buy "all" or "a stated minimum" of a buyer's requirements could supply the requisite definiteness, no such quantity term is found in the JDLA. *Heyman Cohen & Sons v. M. Lurie Woolen Co.*, 232 N.Y. 112, 115 (1921) (option contract not invalid for indefinite quantity term because "[t]he privilege to order more is coupled with the promise and obligation to accept a stated minimum").

The holding of the Seventh Circuit in *Miller v. McLean Cnty. Unit Dist. No. 5* (*In re Mod. Dairy of Champaign, Inc.*), 171 F.3d 1106 (7th Cir. 1999), is not to the contrary. The court held in that case that given the absence of any evidence the schools were obligated to buy all of their milk requirements from the dairy, the dairy had no obligation to supply the schools' requirements. *Id.,* at 1110. While the court suggests in dicta that the schools could have argued the contracts were a buyer's option, they did not do so. *Id.,* at 1109. Thus, whether the contract was a valid buyer's option was neither litigated nor adjudicated in that case.

The opinion of New York's Court of Appeals in *Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665 (2001), also is inapposite. Because that case involved a sublease with an option to purchase a single apartment at a stated price, there was no issue about a definite quantity. *Id.,* at 667. Consistent with the case law governing sales contracts that require a definite quantity, a valid options contract still requires a specific quantity – which does not exist in the JDLA.

## C. Samsung Reasonably Deducted Withholding Taxes From Payment To Netlist And Cooperated With Netlist's Efforts To Obtain A Refund

Netlist's second claim for breach of contract alleges Samsung improperly deducted withholding taxes from the fee paid to Netlist under Section 3.1, and failed to

1  cooperate with Netlist's efforts to seek a refund from the Korean tax authorities.

2  Neither contention is supported by evidence sufficient to withstand a Rule 56 motion.

3  The JDLA provides ████████████████████████████████████████████████

4  ██████████████████████████, and that is what Samsung did. Section 3.1 sets forth

5  Netlist's ████████████████ SUF 17. Section 3.2 acknowledges ████████████

6  ██████████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████████████

9  ████████████████████████████████████. SUF 68.

10      In that regard, on November 5, 2015, shortly before the JDLA was signed,

11  Samsung sent Netlist a tax form for Netlist to apply for a reduced tax rate as a foreign

12  corporation. SUF 69. The form indicated that the tax rate on royalties pursuant to a

13  treaty with the US was 16.5%. SUF 70. Sasaki reviewed the form, signed it, and

14  returned it to Netlist after having consulted with tax professionals of Netlist's choosing.

15  SUF 71. ████████████████████████████████████████████████████████

16  ██████████████████████████████████████. SUF 72.

17      Immediately after the JDLA was signed, Samsung made the contractually

18  required cash payment to Netlist of $8 million, less 16.5% deducted for withholding

19  taxes, and paid that amount to the tax authority. SUF 73. Samsung did so because it

20  considered the $8 million as consideration for Netlist's grant of patent licenses, and

21  Korean law requires withholding of payments on such royalties.[9] SUF 74.

22      Second, Samsung did in fact cooperate with Netlist. What Samsung allegedly

23  refused to do was "cooperate" the way (or how) Netlist wanted. Samsung had

24  numerous communications with Netlist and PWC, Netlist's tax consultant, shared

25  _____

26  [9]   The Court correctly characterized Netlist's theory as alleging that "the NRE fee was
not properly taxable," even if the withholding was lawful. (Dkt. 120 at 6.) But there is
27  no evidence Samsung was not required to withhold taxes, even if such taxes ultimately
28  were refunded.

1  drafts of what Samsung proposed to submit to the tax authorities, and ███████

2  ████████████████████████████████████████████. SUF 75. PWC

3  even thanked Samsung for its cooperation, showing that cooperation is not what

4  Netlist complains of here. SUF 76. What Netlist wanted was ████████████

5  ████████████████████████████████████████████. SUF

6  77. Samsung had no contractual duty to provide such "cooperation" and could not do

7  so based on its good faith belief.

8      Third, Netlist suffered no injury from Samsung's alleged failure to cooperate.

9  Netlist won its tax appeal, and received a full refund plus interest. SUF 78. While

10  Netlist did pay consultants and lawyers to obtain that result, there is no evidence that

11  they would not have had to pay the same consultants' and lawyers' fees to obtain a

12  refund even if Samsung had provided the kind of "cooperation" that Netlist wanted.

13     **D.  Netlist Is Barred From Recovering Consequential Damages**

14      The parties to the JDLA expressly waived any claim to consequential damages

15  for breach of the JDLA.[10] There is no dispute Netlist seeks damages including lost

16  revenues and lost profits from allegedly lost business opportunities with third party

17  customers. SUF 80. Such claims of lost profits and lost revenues are consequential

18  damages. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir.

19  2007) ("Lost profits are consequential damages when, as a result of the breach, the

20  non-breaching party suffers loss of profits on collateral business arrangements.").

21      Netlist's claimed damages for lost revenues and lost profits are barred by ████

22  ████████████. SUF 81. Such express waivers of consequential damages are

23  enforceable under New York law. *International Gateway Exchange, LLC v. Western Union*

---

[10]  The Court denied Samsung's motion for judgment on the pleadings on this issue, stating that a Rule 12 "motion is not the proper vehicle for seeking adjudication of this issue." (DE 120 at 5.) Summary judgment is the proper vehicle for the Court to decide this issue. *United States, for the Use of Integrated Energy, LLC v. Siemens Gov't Techs., Inc.*, No. SACV1501534JVSDFMX, 2017 WL 10562969, at *5-6 (C.D. Cal. May 19, 2017) (partial summary judgment as to consequential damages barred by contractual waiver).

*Financial Services, Inc.*, 333 F. Supp. 2d 131, 149 (S.D.N.Y. 2004). This is particularly true where the contract is between sophisticated businesses, removing any potential concern about the waiver being unconscionable. *Scott v. Palermo*, 233 A.D.2d 869, 872 (1998).

There is no evidence of the kind of wrongful conduct that would be necessary for Netlist to avoid the consequences of this waiver. This would require evidence of "truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 438–39 (1994); *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554 (1992) (conduct necessary "to pierce an agreed-upon limitation of liability in a commercial contract, must 'smack[ ] of intentional wrongdoing.'"). Thus, the Court should grant partial summary judgment as to the issue of consequential damages.

### E.   Netlist Has No Right To Terminate the JDLA

Netlist seeks a declaration the JDLA be terminated based on the alleged breaches, but the undisputed facts show there was no supply obligation as alleged by Netlist and therefore no material breach of the JDLA. And Samsung supplied NAND and DRAM to Netlist every year following the JDLA. Netlist also received a full refund with interest, so the tax withholding claim could not possibly constitute a *material* breach. *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (for a breach to be material, it must "go to the root of the agreement between the parties.") Samsung is entitled to summary judgment on the declaratory relief claim.

#### 1.   Netlist Waived Any Right To Terminate The JDLA

Netlist long ago waived any right to terminate the contract based on its claims.[11] *Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*, 872 F. Supp. 103, 110 (S.D.N.Y. 1995) (termination on the basis of material breaches "must be sought promptly" or it is deemed waived). Netlist executives internally discussed whether to provide notice of

---

[11]   The Court's ruling on the MJOP addressed the election of remedies defense but not the separate defense of waiver. (DE 120 at 7.)

breach over the tax withholding dispute in March 4, 2016, but decided not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung. SUF 84. And as to the supply claim, Netlist asserts that "starting as early as the second quarter of 2017, Samsung began to refuse and/or cancel orders from Netlist. SUF 85. Instead, Netlist waited to provide notice of alleged breach until May 27, 2020, more than *four years* after it first considered doing so. SUF 86. Not coincidentally, the $15 million note is due December 31, 2021. SUF 87.

While the JDLA includes a "no waiver" clause, even broad "no waiver" clauses may themselves be waived if circumstances warrant, as they do here. *Lee v. Wright*, 108 A.D.2d 678, 680, 485 N.Y.S.2d 543, 544 (1985) ("Contrary to its conclusion that the non-waiver clause in the lease precluded any finding of waiver, it has long been the rule that parties may waive a "no-waiver" clause."). Netlist intentionally delayed suing for years, all the while benefiting from its business relationship with Samsung.

Netlist cannot have it both ways. Either the alleged breaches were not material and there is no right to terminate. Or if there were a material breach, then Netlist waived its claim by acquiescing in the alleged breaches since early 2016 (as to the tax withholding claim) and the first half of 2017 (as to the supply claim). Whether based on waiver (or other concepts such as laches or election of remedies), that is far too long for Netlist to have sat on its rights before trying to terminate the contract.

## III.  CONCLUSION

For all these reasons, Samsung respectfully requests that the Court grant it summary judgment or, in the alternative, partial summary judgment.

DATED:  August 16, 2021

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By:  _____

Ekwan E. Rhow
Attorneys for Defendant Samsung
Electronics Co., Ltd.