# EXHIBIT 11

**FULL VERSION OF EXHIBIT 11 PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 12

**FULL VERSION OF EXHIBIT 12 PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 13

**FULL VERSION OF EXHIBIT 13 PROPOSED TO BE FILED UNDER SEAL**

| | |
|---|---|
| **From:** | Paik Ki Hong <pkhong@netlist.com> |
| **Sent:** | Mon, 4 Dec 2017 19:36:41 -0500 (EST) |
| **To:** | "C.K. Hong" <ckhong@netlist.com>; Ji Bum Kim <jbkim@netlist.com> |
| **Cc:** | Sebastian Lee <SLee@netlist.com> |
| **Subject:** | RE: Netlist Overview |

OK

**From:** C.K. Hong
**Sent:** Monday, December 04, 2017 4:35 PM
**To:** Ji Bum Kim <jbkim@netlist.com>
**Cc:** Paik Ki Hong <pkhong@netlist.com>; Sebastian Lee <SLee@netlist.com>
**Subject:** Re: Netlist Overview

This is too much information. I will summarize and send tonight.

Best regards
On Dec 4, 2017, at 3:32 PM, Ji Bum Kim <jbkim@netlist.com> wrote:

I got the contents from BOD material as below and
I think we don't need show the amount of NRE and royalty %, just NRE and royalty for mass
production.

Currently BU is waiting for engineering's feedback and BU'll counter propose at the end of this week
or early next week.

## Current status of JDLA 2nd phase



Pls let me know if you have any further question.

Thanks.

**From:** C.K. Hong
**Sent:** Tuesday, December 5, 2017 8:23 AM

NL004679

**To:** Paik Ki Hong <pkhong@netlist.com>
**Cc:** Ji Bum Kim <jbkim@netlist.com>; Sebastian Lee <SLee@netlist.com>
**Subject:** Re: Netlist Overview

JB, Please draft initial content.

Best regards
On Dec 4, 2017, at 3:21 PM, Paik Ki Hong <pkhong@netlist.com> wrote:

Our Samsung Sales guy- Neal is meeting with JS Choi this week in San Jose. Can we update SSI on 2nd phase discussions regarding HDIMM with SEC

Our end goal is to get this $1M/month allocation removed and get more support.

Please advise.

**From:** Devon Park
**Sent:** Monday, December 04, 2017 3:18 PM
**To:** Paik Ki Hong <pkhong@netlist.com>; Raymond Jiang <rjiang@netlist.com>
**Subject:** RE: Netlist Overview

Modified below. Can't get the bottom border to show up on the chart for some reason.

**From:** Devon Park
**Sent:** Monday, December 04, 2017 2:44 PM
**To:** Paik Ki Hong <pkhong@netlist.com>; Raymond Jiang <rjiang@netlist.com>
**Subject:** RE: Netlist Overview

**2017 Review / 2018 Plan**

1. 2016/early 2017 efforts made to convert customers from Micron DRAM and Intel/Micron SSDs negatively impacted by limited allocation support
2. Need monthly allocation increased to $5M per month to maximize our ability to support customers with Samsung products
3. Losing qualification opportunities with inability to guarantee support when required, Micron (Crucial) supporting directly at our larger customers and assuring support
4. Purchase history – Q3'17 & Q4'17 impacted by support

<image001.png>

5. **[Modify status]** Have met and discussed JDLA phase two with xxx groups or people…targeting close in 1H'18
6. Credit line increase to between $3M and $5M in Samsung legal awaiting approval

**From:** Paik Ki Hong
**Sent:** Monday, December 04, 2017 2:21 PM
**To:** Devon Park <dpark@netlist.com>; Raymond Jiang <rjiang@netlist.com>
**Subject:** RE: Netlist Overview

Credit Line update

                                    NL004680

- We are working on a $3 to $5M credit line
- It is in Samsung legal. Some delays due to some management changes. But apparently close

  ○ We are giving them more collateral to get this done – no need to tell Samsung

---

**From:** Devon Park
**Sent:** Monday, December 04, 2017 2:12 PM
**To:** Paik Ki Hong <pkhong@netlist.com>; Raymond Jiang <rjiang@netlist.com>
**Subject:** RE: Netlist Overview

**2017 Review / 2018 Plan**

1. 2016/early 2017 efforts made to convert customers from Micron DRAM and Intel/Micron SSDs negatively impacted by limited allocation support
2. Need monthly allocation increased to $5M per month to maximize our ability to support customers with Samsung products
3. Losing qual opportunities with inability to guarantee support when required, Micron (Crucial) supporting directly at our larger customers and assuring support
4. [Modify status] Have met and discussed JDLA phase two with xxx groups or people…targeting close in 1H'18
5. Credit line increase to between $3M and $5M in Samsung legal awaiting approval

I don't think we mention anything else:
1. Saying we've been buying from brokers or other third party Samsung dealers just says they don't need to sell to us if we can find it in the channel.
2. Complaining about high SSD pricing is not going to help with anything. Volumes are still too small to matter to them and as Neal said, they're not going to give us special pricing on our small volumes and wreck their standard pricing to everyone else.
3. eMMC and mobile DRAM, I'm a little mixed on. We want to sell them but if I'm JS Choi, I'm thinking "Why does Netlist need these products? Where is the value add they're providing? This has no tie-in to NVDIMMs or storage class memories." Think we get our allocation increased and keep working on this later.

---

**From:** Neal Knuth [mailto:n.knuth@samsung.com]
**Sent:** Friday, December 01, 2017 10:14 AM
**To:** Paik Ki Hong <pkhong@netlist.com>; Raymond Jiang <rjiang@netlist.com>; Devon Park <dpark@netlist.com>
**Subject:** RE: Netlist Overview

Perfect.  Thanks.

Thanks,

Neal Knuth
949 910 2835

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**From:** Paik Ki Hong [mailto:pkhong@netlist.com]
**Sent:** Friday, December 1, 2017 9:21 AM
**To:** Neal Knuth <n.knuth@samsung.com>; Raymond Jiang <rjiang@netlist.com>; Devon Park <dpark@netlist.com>
**Subject:** RE: Netlist Overview

When do you need this by?

Can we provide to you by the end of day Monday

---

**From:** Neal Knuth [mailto:n.knuth@samsung.com]
**Sent:** Friday, December 01, 2017 9:19 AM
**To:** Raymond Jiang <rjiang@netlist.com>; Paik Ki Hong <pkhong@netlist.com>; Devon Park <dpark@netlist.com>
**Subject:** Netlist Overview

Can I get the latest?  Would like for a meeting I need to go to next week in San Jose.

Thank you,

감사합니다
Neal Knuth
Samsung Semiconductor, INC
Southwest Regional Manager
**New Office Number:**  949 910 2835

nealk@ssi.samsung.com

Notice: Unless specifically identified as a firm offer or an offer to sell, this message is not an offer of sale. Any terms stated in this message or prices quoted are merely indications of terms on which Samsung Semiconductor, Inc. may consider selling, and are not intended to be binding.
*Privacy Notice*: This message is intended only for the use of the individual to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for the delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this email in error, please notify us immediately by telephone or return email and delete the original email and any copies thereof. Thank you.

NL004682

# EXHIBIT 14

JASON LO, SBN 219030
  jlo@gibsondunn.com
MATTHEW BENJAMIN, SBN 4533246
  mbenjamin@gibsondunn.com
RAYMOND A. LAMAGNA, SBN 244821
  rlamagna@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

Attorneys for Plaintiff Netlist Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| NETLIST INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, <br><br> Defendant. | CASE NO. 8:20-cv-993-MCs (ADSx) <br><br> **PLAINTIFF NETLIST, INC.'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION** |

PROPOUNDING PARTY:     PLAINTIFF NETLIST INC.

RESPONDING PARTY:     DEFENDANT SAMSUNG ELECTRONICS CO., LTD.

SET NO.:     ONE (1)

**Exhibit
0014**

Gibson, Dunn & Crutcher LLP

PLAINTIFFS RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION

the extent that any withholding taxes [were] required by applicable law for the payment set forth in th[e] Agreement."  Netlist otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 16:**

ADMIT that the document produced under the bates number SEC000027 is a true and genuine copy of the "Certificate for Non-resident's Tax Payment" which YOU received from SAMSUNG, relating to the NRE FEES.

**OBJECTION AND RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Netlist restates and incorporates by reference its General Response and General Objections as though fully set forth herein.  Netlist objects that information sufficient to form a response to this Request is known only to Samsung and not to Netlist.

Subject to and without waiving the foregoing objections, Netlist responds as follows:  Netlist lacks the information and independent knowledge to ascertain whether documents produced by Samsung are authentic, and on that basis denies the Request.

**REQUEST FOR ADMISSION NO. 17:**

ADMIT that the document produced under the bates range SEC000020–SEC000021 is a true and genuine copy of the "Application for Entitlement to Reduced Tax Rate on Domestic Source Income (for Foreign Corporation)" you filed on November 5, 2015, relating to the NRE FEES.

**OBJECTION AND RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Netlist restates and incorporates by reference its General Response and General Objections as though fully set forth herein.  Netlist objects to the phrase "relating to the NRE FEES" as misstating the document, argumentative, vague, and calling for a legal conclusion, in particular to the extent it is intended to convey that the tax rate listed on the document applicable to "royalties" applies instead applies to "NRE fees."

Subject to and without waiving the foregoing objections, Netlist responds as follows:  Netlist admits that the document produced under the bates range SEC000020–SEC000021 is an authentic copy of the "Application for Entitlement to

Gibson, Dunn &
Crutcher LLP

**PLAINTIFFS RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION**

1   Reduced Tax Rate on Domestic Source Income (for Foreign Corporation)" that Netlist

2   executed on November 5, 2015 and then filed.  Netlist otherwise denies the request.

3   **REQUEST FOR ADMISSION NO. 18:**

4       ADMIT that in 2015, YOU contacted SAMSUNG with allegations of potential

5   IP infringement.

6   **OBJECTION AND RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

7       Netlist restates and incorporates by reference its General Response and General

8   Objections as though fully set forth herein.  Netlist further objects to this Request on

9   the grounds that it seeks information that is neither relevant to the subject matter of this

10  litigation nor proportional, and is otherwise outside the proper scope of discovery—

11  whether or not Netlist asserted allegations of infringement against Samsung in 2015 or

12  otherwise has no bearing on any issue in the case.  Netlist also objects that the phrase

13  "allegations of potential IP infringement" is vague and ambiguous, as it is not clear

14  what constitutes an "allegation" of "potential" infringement (versus an actual

15  allegation of infringement itself).

16      Subject to and without waiving the foregoing objections, Netlist responds as

17  follows:  Netlist admits that, in 2015, it informed Samsung that Netlist is the owner

18  and assignee of standard essential patents as shown in, for example, NL107804 and its

19  attachment.  Netlist otherwise denies the request.

20  **REQUEST FOR ADMISSION NO. 19:**

21      ADMIT that on February 1 or February 2, 2021 YOUR Chief Licensing Officer,

22  Marc Frechette, made a demand to SAMSUNG to discuss a new license agreement for

23  the patents licensed under the AGREEMENT.

24  **OBJECTION AND RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

25      Netlist restates and incorporates by reference its General Response and General

26  Objections as though fully set forth herein.  Netlist objects to the use of the term

27  "demand" as argumentative and vague.  Netlist further objects that this Request seeks

28

Gibson, Dunn & Crutcher LLP

PLAINTIFFS RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION

1  information that is neither admissible, nor relevant to, nor proportional to the litigation

2  and outside the proper scope of discovery.  Specifically, all communications between

3  Netlist's Chief Licensing Officer and Samsung during this period of February 2021

4  were expressly made subject to Federal Rule of Evidence 408.  Regardless, whether

5  Netlist requested a "new license agreement" as a means of resolving the parties'

6  dispute is neither relevant to nor admissible with any claim or defense in the case.

7       Subject to and without waiving the foregoing objections, Netlist responds as

8  follows:  Netlist admits that, as reflected in the parties' February 2021 correspondence,

9  Netlist communicated with Samsung to discuss resolution of this matter, but denies

10  that Netlist "made a demand" as stated in the Request.  Netlist otherwise denies the

11  request.

12

13  Dated:  July 30, 2021

14                              GIBSON, DUNN & CRUTCHER LLP

15

16                              By:    /s/ Raymond LaMagna

17                              Raymond LaMagna

18                              333 South Grand Avenue

19                              Los Angeles, CA 90071

20                              213.229.7101
                                rlamagna@gibsondunn.com

21                              Attorneys for Plaintiff Netlist Inc.

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET
OF REQUESTS FOR ADMISSION

1

## **CERTIFICATE OF SERVICE**

2     I, Raymond A. LaMagna, an attorney, hereby certify that **PLAINTIFF**

3 **NETLIST INC.'S OBJECTIONS AND RESPONSES TO DEFENDANT'S**

4 **FIRST SET OF REQUESTS FOR ADMISSION,** was emailed to counsel for

5 Samsung Electronics Inc., Ltd., on July 30, 2021.

6                                By: _____*/s/ DRAFT*_____

                                        Raymond A. LaMagna
7

8                                Attorney for Plaintiff Netlist Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

15

PLAINTIFFS RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET
OF REQUESTS FOR ADMISSION

# EXHIBIT 15

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1
 2                    UNITED STATES DISTRICT COURT
 3                  SOUTHERN DISTRICT OF CALIFORNIA
 4
 5      NETLIST, INC.,                )
                                      )
 6                   Plaintiff,       )
                                      )
 7         vs.                        )   Case No.
                                      )   8:20-cv-00993-MCS-DFM
 8                                    )
        SAMSUNG ELECTRONICS, CO.,     )
 9      LTD.,                         )
                                      )
10                   Defendant.       )
        _____)
11
12                  CONFIDENTIAL ATTORNEYS' EYES ONLY
13            REMOTE VIDEOTAPED DEPOSITION OF HO-JUNG KIM
14                           South Korea
15                   Thursday, August 13, 2021
16
17
                REPORTED BY: Dayna Michelle Glaysher
18                           CSR No. 13079; RPR, CRR No. 28081
19
20
21
22
23
24
25
                                                     Page 1
```

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    can you tell me if I'm wrong to understand that you and

 2    your two supervisors would discuss what terms should go

 3    in into the JDLA and then -- and then -- and sorry.

 4    Strike that.

 5         So for the business terms that go in the JDLA,        09:13:31

 6    including how much the NRE fee should be, is it correct

 7    to understand that you, Mr. Han, and Mr. Ji would

 8    collectively decide?

 9              MR. MASTERS:  Object to form.

10              THE WITNESS:  Of course there were             09:14:27

11    discussions.  But it's not like we made the decision on

12    our own.  There were some terms that were proposed by

13    the other party.  So of course those had to be

14    considered.  So it's not like we decided on the amount

15    all by ourselves.                                        09:15:15

16    BY MS. LEE:

17       Q.  Right.  I'm trying to understand what Samsung

18    was -- sorry.  Strike that.

19         What I'm trying to understand is how Samsung

20    decided what to offer.  Not the outcome of the          09:15:29

21    negotiation, but how you internally arrived at the terms

22    that you proposed to the other party.

23         So for the business terms that Samsung offered to

24    Netlist, was there anyone else other than you, Mr. Ji,

25    and Mr. Han who was involved in deciding what term --    09:16:30
```

Page 17

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    terms and conditions need to be included in your draft

2    of the JDLA?

3              MR. MASTERS:  Object to form.

4              THE WITNESS:  Well, when -- if you're asking

5    about having discussions, we're talking about a very          09:18:03

6    broad range of people being involved.  This wasn't a

7    small company run by only three people.  We -- we're

8    talking about other bosses above my supervisors or other

9    executives, officers at the company.  And it could all

10   -- also mean other related departments and teams.            09:18:33

11              So if you want to look at it in a broad

12   term, then we could say that almost everybody in the

13   Memory business organization was probably involved.

14   It's very broad.

15   BY MS. LEE:                                                    09:19:04

16      Q.  So is it your testimony that almost everybody in

17   the memory business unit was involved in the negotiation

18   of the JDLA?

19              MR. MASTERS:  Object to form.

20              THE WITNESS:  No.                                   09:19:25

21   BY MS. LEE:

22      Q.  So who was involved in the negotiation of the

23   JDLA on the Samsung side?

24              MR. MASTERS:  Object to form.

25              THE WITNESS:  In terms of handling the              09:19:55

                                                         Page 18

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1        A.  Yes, I suppose so.

 2        Q.  So there's one part about this email that I want

 3   to ask about, starting with the word "finally" in the

 4   middle of the second paragraph.

 5            Do you see that?                              10:28:09

 6        A.  Yes.

 7        Q.  So Mr. Han, your supervisor says, "Finally, we

 8   hope the supply of NAND, DRAM, and NVDIMM-P related

 9   chipsets will help enable your vision of being a

10   products company."                                    10:28:46

11            Do you see that?

12        A.  Yes, yes, I see it.

13        Q.  So obviously you didn't write this email.  But

14   what I'm curious about is do you recall speak --

15   communicating with your supervisors, Mr. Han or Mr. Ji  10:29:35

16   about what he says here?

17            MR. MASTERS:  Object to form.

18            THE WITNESS:  I don't recall for sure, since

19   this was from six years ago.

20   BY MS. LEE:                                            10:30:17

21        Q.  And at this point in May 2015, if there were

22   draft term sheets or draft JDLA that Samsung was sending

23   to Netlist, were you responsible for drafting that

24   document?

25            MR. MASTERS:  Object to form.                 10:31:09
```

Page 36

CONFIDENTIAL-ATTORNEYS' EYES ONLY

1

2                                    * * *

3

4

5              I, HO-JUNG KIM, do solemnly declare under

6      penalty of perjury, under the laws of the State of

7      California, that the foregoing is my deposition under

8      oath; that these are the questions asked of me and my

9      answers thereto; that I have read same and have made the

10     necessary corrections, additions, or changes to my

11     answers that I deem necessary.

12              In witness thereof, I hereby subscribe my name

13     this day of _____, 2021.

14

15

16

17

18

19

20                     _____

21                            WITNESS SIGNATURE

22

23

24

25

                                              Page 139

CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
 1        I,_____, a translator in and for

 2    the County of Los Angeles, State of California, do

 3    hereby certify:

 4

 5        That the witness in the foregoing deposition

 6    appeared before me on the date subscribed to below; that

 7    the deposition was submitted to the witness and

 8    translated by me from English into Korean, at which time

 9    any changes desired were made upon the deposition by the

10    witness; that the deposition was the signed by the

11    witness in my presence.

12

13

14        Executed this _____ day of _____,

15    2021 at _____, California.

16

17

18                        _____

19                        Translator

20

21

22

23

24

25

                                        Page 140
```

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1                      CERTIFICATE

 2                          OF

 3              CERTIFIED SHORTHAND REPORTER

 4

 5

 6          The undersigned certified shorthand reporter

 7   of the State of California does hereby certify:

 8          That the foregoing deposition was taken

 9   before me at the time and place therein set forth, at

10   which time the witness was duly sworn by me.

11          That the testimony of the witness and all

12   objections made at the time of the deposition were

13   recorded stenographically by me and thereafter

14   transcribed, said transcript being a true copy of my

15   shorthand notes thereof.

16          In witness whereof, I have subscribed my

17   name this date: August 13, 2021

18

19

20

21

22          CSR Number 13079

23          RPR, CRR Number 28081

24

25

                                            Page 141
```

# EXHIBIT 16

Message

| | |
|---|---|
| **From**: | Neal Knuth [n.knuth@samsung.com] |
| **Sent**: | 6/11/2021 11:40:11 AM |
| **To**: | Harrison Yoo [hsang.yoo@samsung.com] |
| **CC**: | Daniel (Kyong Yong) Lee-mySingle [ky1217.lee@samsung.com] |
| **Subject**: | Presentation file |
| **Attachments**: | Netlist DSK Visit Feburary 21, 2017.eml; Netlist DSK Visit Feburary 21, 2017.eml; PPT(Netlist Meeting).eml |

Attached is what I have.

Thanks,

Neal Knuth
949 910 2835

---

**From:** 유혁상 [mailto:hsang.yoo@samsung.com]
**Sent:** Thursday, June 10, 2021 4:53 PM
**To:** Neal Knuth <n.knuth@samsung.com>
**Cc:** Daniel (Kyong Yong) Lee-mySingle <ky1217.lee@samsung.com>
**Subject:** Presentation file

Neal,
Can you please try to find the presenation material which Netlist presented on Feb 2017 when they visited DSK with you?
 :  their comany introduction and business discussion

Regards

*Hyeoksang(Harrison) Yoo*
*America Sales (Consumer & EDP)*

**Hyeoksang Yoo**

B2B Sales Management, Principal Professional
Memory Sales Group 1
Samsung Electronics

T. +82.31.208.3733    M. +82.10.8861.9054    F. +82.31.208.3959
hsang.yoo@samsung.com
www.samsung.com

**Exhibit 0060**
8/12/2021
PK Hong

Confidential

The above message is intended solely for the named addressee and may contain trade secret, industrial technology or privileged and confidential information otherwise protected under applicable law including the Unfair Competition Prevention and Trade Secret Protection Act. Any unauthorized dissemination, distribution, copying or use of the information contained in this communication is strictly prohibited. If you have received this communication in error, please notify the sender by email and delete this communication immediately.

상기 메일은 지정된 수신인만을 위한 것이며 부정경쟁 방지 및 영업비밀 보호에 관한 법률을 포함하여 관련 법령에 따라 보호의 대상이 되는 **영업비밀, 산업기술 등을 포함**하고 있을 수 있습니다. 본 문서에 포함된 정보의 전부 또는 일부를 **무단으로 제3자에게 공개, 배포, 복사 또는 사용하는 것은 엄격히 금지** 됩니다. 본 메일이 잘못 전송된 경우, 발신인에게 알려 주시고 즉시 삭제하여 주시기 바랍니다.

**Hyeoksang Yoo**

B2B Sales Management, Principal Professional
Memory Sales Group 1
Samsung Electronics

T. +82.31.208.3733    M. +82.10.8861.9054    F. +82.31.208.3959
hsang.yoo@samsung.com
www.samsung.com

Confidential

Message

| | |
|---|---|
| **From:** | Neal Knuth [n.knuth@samsung.com] |
| **Sent:** | 3/3/2017 12:34:08 AM |
| **To:** | Howard Sung [hwanam.sung@samsung.com]; Yejin Moon [yejin.moon@samsung.com]; Daniel (Kyong Yong) Lee-mySingle [ky1217.lee@samsung.com]; Harrison Yoo [hsang.yoo@samsung.com] |
| **CC:** | Steven Metz [s.metz@samsung.com]; Lane Kim [kihoon74.kim@samsung.com]; Rick (Chun Ching) Yeh [rick.yeh@samsung.com]; Tim Le [tim.le@samsung.com]; Michael (Sie Pook) Law [michael.law@samsung.com]; In Dong Kim [indong2.kim@samsung.com] |
| **Subject:** | Netlist DSK Visit Feburary 21, 2017 |
| **Attachments:** | Samsung 4PM 2-20.pdf; HybriDIMM Status Feb 21 v2.pdf |

Attached are both presentations that Netlist presented.  Can we please make sure the Technical Team in Korea gets the Hybrid DIMM update as attached.

Thanks for everyone hospitality and support during the meeting last week.

Thank you,
감사합니다
Neal Knuth
Samsung Semiconductor, INC
Southwest Regional Manager
**New Office Number:**  949 910 2835

nealk@ssi.samsung.com

Notice: Unless specifically identified as a firm offer or an offer to sell, this message is not an offer of sale. Any terms stated in this message or prices quoted are merely indications of terms on which Samsung Semiconductor, Inc. may consider selling, and are not intended to be binding.
*Privacy Notice*: This message is intended only for the use of the individual to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for the delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this email in error, please notify us immediately by telephone or return email and delete the original email and any copies thereof. Thank you.

**From:** Neal Knuth
**Sent:** Tuesday, February 21, 2017 12:22 AM
**To:** Howard Sung; Yejin Moon; Daniel (Kyong Yong) Lee-mySingle; Harrison Yoo
**Cc:** Steven Metz; Lane Kim
**Subject:** Netlist DSK Visit Feburary 21, 2017

Howard,

Harrison just translated what was said on two key topics that were discussed in Korean.  I edited below.   Any other feedback?

Thanks,

Neal Knuth
949 910 2835

**From:** Neal Knuth
**Sent:** Monday, February 20, 2017 11:35 PM
**To:** Howard Sung; Yejin Moon; Daniel (Kyong Yong) Lee-mySingle; Harrison Yoo
**Cc:** Steven Metz; Lane Kim
**Subject:** Netlist DSK Visit Feburary 21, 2017

SEC008148

Thanks Howard for the Samsung presentations.

I will send off to Netlist after we get their presentations (both Technical and Sales have been requested).   Until I get, here are my first pass of notes without the overviews (it was difficult to read what was on the Netlist presentations).  Also, as so much Korean was spoken for some topics, I hope someone can add to the below (including SEC attendees as both groups were quite large.

Please help distribute as needed within SEC after adding Team's comments or editing.  (I did not copy DS).

**Sales Portion**

**Netlist Attendees:**

Paik Ki Hong        VP WW Operations
Brian Anderson  VP Sales
JB Kim               VP Sales
Sebastian Lee    Director Engineering

**Samsung Attendees:**

Dong Sung Yang
Daniel Lee
Harrison Yoo
Kate Moon
Hyoungseok Kwon
Jaehyung Park
Younggyun Lee
Neal Knuth

**Technical:**

Indong Kim
Benjamin Lim
KC Roo
Kate Moon
Neal Knuth

**Netlist Sales Overview** (will attach when have)

- Brain Peterson presented Netlist overview, discussing his responsibility on North America and EU sales while JB Kim handles Asia Pacific.
- Netlist described 17 years of DRAM development and invention, which includes over 100 patents in DRAM technology.
- Netlist was a pioneer in the development of DRAM, including patents on LRDIMM, VLP and NVDIMM.
- Discussed the JDLA signed with Samsung in November of 2015 which is active for 5 years.
- Hybrid DIMM announced publicly in August of 2016, expanding Netlist Patents.
- Discussed ITC litigation against SK Hynix.  Trial to begin in May, with resolution by October 2017.
- Netlist first company to develop NV function in support of Dell.
- Hypercloud product was first LRIDMM in industry.
- Netlist Solutions and Offerings include a:
  o   PCI Offering
  o   NVDIMM
  o   HyperDIMM

Confidential

- These solutions and customer discussions lead naturally into Samsung Storage Solutions including DRAM and SSD (finished prodcuts) besides using components in their actual products above.
o Typical DRAM Netlist solutions consists of 18-36 x4 8Gb D4 components along with 10-20 256Gb/32GB eMMC.
- Netlist main revenue driver today is a PCI express card that is plug and play along with finished Samsung solutions.  Offering mainly 8GB and 16GB today.
- NVDIMM market continues to be delayed, weak demand, competing solutions yet to be proven from companies like Smart and Micron.
- NV VAULT is Netlist brand of NVDIMM-P.
- With the JDLA, and strategic partnership, Samsung is the single largest investor in Netlist.
- One stop solution for Samsung customers with NV/EV along with Samsung Finished SSD and DRAM.
- There was a very long discussion of Uber in Korean, and DongSung Yang clearly stated our intention was to follow the customer direction, whatever channel that may be (Direct or through Netlist or others).
- Netlist positioned themselves as a Dedicated Sales Channel to Samsung vs. the Disti and Rep networks.
o Synergistic sales and dedicated to Samsung products.
- Netlist showed 2016 Samsung purchases to be 9M, over ½ in Q4 (~5M)
- Netlist showed a purchase forecast for 2017 of $100M from Samsung  (neither credit line or PA can support).  DongSung was sure to point out anyone could achieve this in current market.  This 100M was not broken out by customer, product, or sales strategy, seemed arbitrary forecast.

**At the end of Netlist presentation, these were the Asks from Netlist:**

1. Better product support and allocation to achieve 2017 goal.
2. Vendor Managed Inventory (VMI), this request was ignored obviously.
3. OEM Pricing
4. Referral of small customers to Netlist for support, stock, etc.
5. Official Distribution Partner Agreement, this became a heated topic as DongSung described our current structure.  Netlist has brought this up in the past and all requests have been denied.  This discussion also went on in Korean for a while.  DongSung also let Netlist know that the JDLA is clearly focused on Technology, and is not an avenue to support Netlist with standard products.  This should be separate and handled on the business not executive levels.

**Samsung Presented:**

- Flash Market Overview (as time was over, this was brief).   Jaehyung Park
- DRAM Market Overview  Younggyun Lee
- 32GB price discussion ended the meeting.

Lunch at Japanese Restaurant.

**Prior Meeting was Technical Update for progress of NVDIMM  (will attach Netlist presentation when available)**

**Key Takeaways:**

- Need JEDEC standard for Hybrid/NVDIMM.  Samsung Netlist discussions ongoing for last 18 months.
- Recapping today, booting has worked on Large Memory Systems.
- 2 FPGA synch problem has been resolved.
- Indong Kim asking for more transparency from Netlist.
- Several timelines given on presentation, will forward when possible.
- Sebastian Lee stated we should have first samples in end of June, they expect to have internally in May.
- Netlist displayed their product roadmap for NV solutions.
- Partnered with AMD on NVDIMM-N launch.  Also HyperDIMM reference design will be announced.
- Hardware solution has now been passed off to software team.   Now eMMC recognized, stress testing underway.

- Next step is ES sample to Samsung, as mentioned in June.
- Indong was asked about competitive landscape, described mostly delay and Intel/Lenovo vs. Micron Quantex solutions.
- Indong stressed the SK Hynix and other ITC issues need to be resolved soon.  Netlist stated trial to begin in May with resolution by October.
- Need to strive for standardization with JEDEC.


Thank you,
감사합니다
Neal Knuth
Samsung Semiconductor, INC
Southwest Regional Manager
**New Office Number**:  949 910 2835

nealk@ssi.samsung.com

  Notice: Unless specifically identified as a firm offer or an offer to sell, this message is not an offer of sale. Any terms stated in this message or prices quoted are merely indications of terms on which Samsung Semiconductor, Inc. may consider selling, and are not intended to be binding.
***Privacy Notice***: This message is intended only for the use of the individual to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for the delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this email in error, please notify us immediately by telephone or return email and delete the original email and any copies thereof. Thank you.



# Samsung-Netlist Partnership

## February, 2017

Confidential

# COMPANY OVERVIEW

- Pioneer in DIMM architectures since 2000
  - Inventor of industry standard LRDIMM and NVDIMM
  - 100+ patents
  - Long-time custom DIMM supplier to global OEMs

- 5-year JDLA partnership, investment from Samsung Nov. 2015

- HybriDIMM (Storage Class Memory) Technology Announced Aug. 2016

- SK Hynix ITC patent litigation commenced Sep. 2016, trial May 2017

Netlist, Inc. Confidential

2

SEC008153

# INNOVATION IN HIGH-PERFORMANCE MEMORY



2000                                                                2017

Confidential

# LEADERSHIP TEAM

| | | | |
|---|---|---|---|
| **Chuck Hong** CEO & Co-Founder (2000) | LG | VIKING | |
| **Gail Sasaki** CFO (2006) | ERNST & YOUNG | | |
| **Brian Peterson** SVP Sales & Marketing (2015) | EMULEX | 3com | **USRobotics** A Division of UNICOM Global |
| **Chris Lopes** VP Sales & Co-Founder (2000) | TOSHIBA | LSI | PHILIPS |
| **Jibum Kim** EVP Asia Pacific Sales & Marketing (2015) | LG | SK hynix | |
| **Noel Whitley** VP Intellectual Property (2013) | BROADCOM | | |
| **Vahid Ordoubadian** VP Advanced Engineering (2015) | BROADCOM | cādence | STEC |
| **Dr. Hyun Lee** VP & CTO (2007) | Lucent Technologies | AT&T Bell Laboratories | CONEXANT |

**Netlist, Inc. Confidential**

4

SEC008155

# PIONEERING PRODUCTS
## FOR MEMORY - STORAGE CONVERGENCE

**NETLIST SOLUTIONS**



Confidential

# BASE PRODUCTS
## *POSITIONED FOR NEAR-TERM GROWTH*

### NVvault™



### EXPRESSvault™




- DDR3 and DDR4 NVDIMM-N modules
- For industry standard server and storage systems
- Application acceleration and data protection
- Incorporates proprietary Vault controller IP

- PCI Express 3.0 plug-and-play memory card
- Designed for server and storage appliances
- Disaster recovery and write buffer acceleration
- 5x faster than SSDs in write environment

~$350 million TAM (1)

~$100 million TAM (1)










(1) Management estimate.

Netlist, Inc.

6

Confidential

SEC008157

# HybriDIMM™
## *FIRST PLUG & PLAY STORAGE CLASS MEMORY*



- Industry's 1st "on-DIMM" intelligent co-processor

- TB capacity of low-cost NAND into the memory channel, and enables DRAM-like access speeds to NAND

  ✓ 1000x faster than fastest storage solution today, at up to 80% lower cost

- DDR4 LRDIMM standard interface allows plug & play

- Concurrently block and byte addressable: applications can now access storage as if it was memory unlocking in-memory computing and big data analytics for the masses

- Sampling in 1H; volume production expected year-end

### Pre-Sight Technology

- Predictive algorithm ensures data is at the right place at the right time
- Eliminates SSD access penalty
- Allows memory and storage to reside in the DIMM channel concurrently



### Launch Partner Ecosystem








### Target Applications

| IN-MEMORY COMPUTING | BIG DATA ANALYTICS | DATABASE SQL, NoSQL, OBJECT |
|---|---|---|









**Netlist, Inc. Confidential**

7

SEC008158

# HybriDIMM™ ADDRESSABLE MARKET



**$15B Storage Class Memory Market thru 2021**

Billions of Dollars

| | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| ■ Storage Class Memory | 0.6 | 1.2 | 2.1 | 4.6 | 6.2 |

**Source: Objective Analysis, 2016**.

Netlist, Inc. Confidential

8

Confidential

SEC008159

# NEW MARKETS FOR NETLIST AND SAMSUNG

**Netlist NVM + SCM**

**Samsung DRAM + SSD**

| | Enterprise Storage | Hyperscale | Cloud | In-Memory Compute | Telco | FSI (Financial Services Institution) | Business Intelligence | Machine Learning | IoT |
|---|---|---|---|---|---|---|---|---|---|
| Write Cache | | | | | | | | | |
| Metadata | | EV3 | | | | | | | |
| Transaction Logs | | | | | | | | | |
| Ceph | | | NV4 | | | | | | |
| In-Memory Database | | | | | | | | | |
| Key-Value Store | | | | | | | | | |
| OLTP | | | | | | | | | |
| No SQL Database | | | HybriDIMM | | | | | | |
| Big Data | | | | | | | | | |
| Real-Time Analytics | | | | | | | | | |
| Decision Support | | | | | | | | | |

**New Markets**

Source: Objective Analysis, 2016.

 
 
 
 
 
 
 
 


Netlist, Inc. Confidential

 9

SEC008160

# 15-YEAR SAMSUNG RELATIONSHIP

- **$200M+ purchase history beginning in 2001**
  - ✓ DRAM & NAND components
  - ✓ NAND wafers
  - ✓ DIMMs
  - ✓ SSDs

**Netlist, Inc. Confidential**

10

SEC008161

# STRATEGIC & FINANCIAL PARTNERSHIP

**SAMSUNG**

### *5-Year Joint Development and Licensing Agreement*

- **Partnership on Storage Class Memory (SCM) technology**

- **Netlist - one of select group with a license to all Samsung's patents**

- **Access to Samsung DRAM, NAND, SSDs at competitive-cost**

- **Samsung is Netlist's largest investor**

Netlist, Inc. Confidential

11

SEC008162

# NETLIST CUSTOMERS CREATE SAMSUNG SSD & DRAM HIGH-END OPPORTUNITIES



Netlist design-in work in high-end applications locks in Samsung SSD and DRAM products while locking out competition

Netlist, Inc. Confidential

12

# CREATING LONG TERM SAMSUNG DEMANDS

- Extending Samsung reach to high-end customers
- Extensive qualifications result in inability to switch away from Samsung
- Creates consistent demand regardless of market conditions

| | | | | |
|---|---|---|---|---|
| **Automotive** |  | | | |
| **Data Center** |  |  |  |  |
| **Storage** |  |  |  |   |
| **Audio/Video** |  |  |  |   |
| **Appliances / Government** |  |  |  |   |

**Netlist, Inc. Confidential**

13

SEC008164

# CASE STUDIES: NETLIST ENABLED CUSTOMERS

## Uber ATC - Pittsburgh

- Autonomous vehicles & mapping
  - ✓ 1.92TB SSDs

- Experienced 40%+ failure rates with competitive supplier

- Netlist advised switch to OEM grade SSD - SM863

- Monthly technical meetings in PA to optimize customer use case with Samsung solution

- Netlist provided PM863a samples and driving customer to qualify – currently in test

## Riot Games - LA

- Online Gaming (League of Legends)
  - ✓ DIMMs, 2.5" & AIC SSDs
  - ✓ > 60% share of online gaming
  - ✓ > 200K installed server base

- Drove switch to Samsung products
  - ✓ Kingston RDIMMs
  - ✓ HGST SSDs (3TB)

- Evaluating PM1725 AIC (6TB) & qualifying 16/32GB RDIMMs

- Netlist enabling key take-away win

**Netlist, Inc. Confidential**

14

# SALES CHANNEL COMPARISON

| Value Provided | Netlist | Distribution | Manufacturer's Rep |
|---|---|---|---|
| **Samsung Products Only** | ✔ | ✘ | ✘ |
| Dedicated Samsung Product FAE with Pre & Post Support | ✔ | ✘ | ✘ |
| Create Samsung Qual Sockets | ✔ | ✘ | ✔ |
| Provide Samples within limited qual windows under long lead time of sample | ✔ | ✘ | ✘ |
| On-hand Inventory (Support for Non-Forecasted & Small Odd Lot Requirements) | ✔ | ✔ | ✘ |
| Deep Technical Engagement with Architects/Engineering on current and future products and designs | ✔ | ✘ | ✘ |

Confidential

# NETLIST BRINGS UNIQUE VALUE TO SAMSUNG



Samsung Only

NVDIMM / SCM Synergies

Support Growth High End Customers

Netlist Growth Benefits Samsung in many ways









**Netlist, Inc. Confidential**

16

SEC008167

# 2016 BUSINESS HISTORY



**Netlist Purchase History**

New customers and qualifications resulting in rapid and sustainable growth

Confidential

SEC008168

# 2017 SALES PLAN – SAMSUNG PRODUCTS



**Total $100M**

**Netlist, Inc. Confidential**

18

SEC008169

# NETLIST – NEW PARTNER TYPE
# STRATEGIC DEVELOPMENT and DISTRIBUTION

- Required Samsung support for Netlist
  - Product allocation support
  - Vendor Managed Inventory (VMI)
  - OEM pricing
  - Referred business for small or unique customers
  - **Official Distributor-Partner Agreement**

19

SEC008170



*The Storage Class Memory Company* ™

# Samsung – Netlist
# HybriDIMM Program Review
### February 21, 2017
### Hwasung, Korea

SEC008171

# Agenda

- Samsung's view of SCM technology and market

- Netlist HybriDIMM Status Update

- Next Steps

**Netlist, Inc. Confidential**

2

# HybriDIMM Timeline

| Dec 2015 | Aug 2016 | Feb 2017 |
|---|---|---|
| • DDR3 LRDIMM 800MT/s<br><br>• 8GB DRAM + 256GB NAND<br><br>• 1 FPGA<br><br>• Proprietary OS drivers and library | • DDR4 LRDIMM 1866 MT/s<br><br>• 8GB DRAM + 256GB NAND<br><br>• Added 2nd FPGA (higher SI)<br><br>• Added PMEM support (drivers and library)<br><br>• Implemented unified data path<br><br>• Completed custom command processor<br><br>• **HybriDIMM reveal at FMS demonstrating:**<br>   o **System boot without BIOS change**<br>   o **FPGA slave IO training & calibration**<br>   o **Data move between DRAM and FPGA** | • DDR4 LRDIMM 1866 MT/s<br><br>• 8GB DRAM + 256GB NAND<br><br>• **AppDirect API alpha released**<br><br>• **PreSight™ technology basic write functionality**<br><br>• **JEDEC compliance testing underway** |

Netlist, Inc. Confidential

3

SEC008173

# HybriDIMM Product Roadmap

| 2H'16 | 1H'17 | 2H'17 | 1H'18 | 2H'18 | 1H'19 | 2H'19 | 1H'20 | 2H'20 |
|---|---|---|---|---|---|---|---|---|

## HybriDIMM

Reveal – Q3 | ES-6 | CS-Q3 | GA–Q4

- FPGA-based
- DDR4 1866 LRDIMM
- 8GB/16GB DRAM
- 256GB/512GB Flash
- 1Rx4/2Rx4 rank config
- Linux
- AppDirect SDK

## HybriDIMM Gen 2

Gen 2 ES – Q3 | Gen 2 CS – Q4 | Gen 2 GA – Q1

- **ASIC-based**
- DDR4 **3200** LRDIMM
- **32GB** DRAM
- **1TB** Flash
- 2Rx4 rank config
- Linux, **Windows, VMware**
- AppDirect SDK
- **NVDIMM-N**

## HybriDIMM Gen 3

Gen 3 ES – 2H | Gen 3 CS – 1H | Gen 3 GA – 2H

- ASIC-based
- **DDR5** 3200 LRDIMM
- 32/**64GB** DRAM
- 1TB/**2TB** Flash
- 2Rx4 rank config
- Linux, Windows, VMware
- AppDirect SDK
- NVDIMM-N

*HybriDIMM-processors alignment*

*HybriDIMM-processors alignment*

SKL-EP B0 - Q3 | SKL-EP C0 - Q2 | SKL-EP GA - Q3 | ICL-EP B0 - Q1 | ICL-EP C0 - Q4'18 | ICL-EP GA – 2H19

**Intel Broadwell / Grantley**
22 cores / 24 DDR4 DIMMs
2133 LRDIMM / 1866 RDIMM

**Intel Skylake / Purley (SKL-EP)**
28 cores / 24 DDR4 DIMMs
2666 LR/R/NVDIMM

**Intel Ice Lake/Purley (ICL-EP)**
24 DDR4 DIMMs
3200 LRDIMM / 2933 R/NVDIMM

Sapphire-EP GA –1H20

**Sapphire/Tinsley**
DDR5
3200 L/RDIMM

Naples Beta-Q2 | Naples GA-Q3 | Starship GA-1Q'19

**AMD Zen / Naples**
32 cores / 32 DDR4 DIMMs
2667 L/R/U/NVDIMM

**AMD Zen / Rome**
48 cores / 32 DDR4 DIMMs
2667 L/R/U/NVDIMM

**AMD Rome Follow-on**
DDR5 DIMMs

# High-level Hardware Development Schedule



- Design verification
- FPGA RTL
- DIMM Design

# Current Status

- Hardware (working DIMM) released to Software team
- System recognizes Storage (eMMC) capacity
- eMMC IP optimization for full performance

- Software driver work done over the past 12 months
- Stress testing of Command driver connection w DIMM
- PMEM driver interface w Command driver
- User space interface work using NVML

**Netlist, Inc. Confidential**

6

SEC008176

# Next Steps

- ## ES Release in June 2017
  - ✓ Provide ES to Samsung
  - ✓ Provide Performance Data
  - ✓ Hold follow-up technical meeting

- ## Samsung requests and expectations from Netlist

**Netlist, Inc. Confidential**

7

SEC008177

Message

| | |
|---|---|
| **From**: | Neal Knuth [n.knuth@samsung.com] |
| **Sent**: | 2/21/2017 5:21:41 PM |
| **To**: | Howard Sung [hwanam.sung@samsung.com]; Yejin Moon [yejin.moon@samsung.com]; Daniel (Kyong Yong) Lee-mySingle [ky1217.lee@samsung.com]; Harrison Yoo [hsang.yoo@samsung.com] |
| **CC**: | Steven Metz [s.metz@samsung.com]; Lane Kim [kihoon74.kim@samsung.com] |
| **Subject**: | Netlist DSK Visit Feburary 21, 2017 |

Howard,

Harrison just translated what was said on two key topics that were discussed in Korean.  I edited below.   Any other feedback?

Thanks,

Neal Knuth
949 910 2835

---

**From:** Neal Knuth
**Sent:** Monday, February 20, 2017 11:35 PM
**To:** Howard Sung; Yejin Moon; Daniel (Kyong Yong) Lee-mySingle; Harrison Yoo
**Cc:** Steven Metz; Lane Kim
**Subject:** Netlist DSK Visit Feburary 21, 2017

Thanks Howard for the Samsung presentations.

I will send off to Netlist after we get their presentations (both Technical and Sales have been requested).   Until I get, here are my first pass of notes without the overviews (it was difficult to read what was on the Netlist presentations).  Also, as so much Korean was spoken for some topics, I hope someone can add to the below (including SEC attendees as both groups were quite large.

Please help distribute as needed within SEC after adding Team's comments or editing.  (I did not copy DS).

**Sales Portion**

**Netlist Attendees:**

Paik Ki Hong        VP WW Operations
Brian Anderson  VP Sales
JB Kim                  VP Sales
Sebastian Lee    Director Engineering

**Samsung Attendees:**

Dong Sung Yang
Daniel Lee
Harrison Yoo
Kate Moon
Hyoungseok Kwon
Jaehyung Park
Younggyun Lee
Neal Knuth

SEC008178

**Technical:**

Indong Kim
Benjamin Lim
KC Roo
Kate Moon
Neal Knuth

**Netlist Sales Overview** (will attach when have)

- Brain Peterson presented Netlist overview, discussing his responsibility on North America and EU sales while JB Kim handles Asia Pacific.
- Netlist described 17 years of DRAM development and invention, which includes over 100 patents in DRAM technology.
- Netlist was a pioneer in the development of DRAM, including patents on LRDIMM, VLP and NVDIMM.
- Discussed the JDLA signed with Samsung in November of 2015 which is active for 5 years.
- Hybrid DIMM announced publicly in August of 2016, expanding Netlist Patents.
- Discussed ITC litigation against SK Hynix.  Trial to begin in May, with resolution by October 2017.
- Netlist first company to develop NV function in support of Dell.
- Hypercloud product was first LRIDMM in industry.
- Netlist Solutions and Offerings include a:
- o   PCI Offering
- o   NVDIMM
- o   HyperDIMM
- These solutions and customer discussions lead naturally into Samsung Storage Solutions including DRAM and SSD (finished prodcuts) besides using components in their actual products above.
- o   Typical DRAM Netlist solutions consists of 18-36 x4 8Gb D4 components along with 10-20 256Gb/32GB eMMC.
- Netlist main revenue driver today is a PCI express card that is plug and play along with finished Samsung solutions.  Offering mainly 8GB and 16GB today.
- NVDIMM market continues to be delayed, weak demand, competing solutions yet to be proven from companies like Smart and Micron.
- NV VAULT is Netlist brand of NVDIMM-P.
- With the JDLA, and strategic partnership, Samsung is the single largest investor in Netlist.
- One stop solution for Samsung customers with NV/EV along with Samsung Finished SSD and DRAM.
- There was a very long discussion of Uber in Korean, and DongSung Yang clearly stated our intention was to follow the customer direction, whatever channel that may be (Direct or through Netlist or others).
- Netlist positioned themselves as a Dedicated Sales Channel to Samsung vs. the Disti and Rep networks.
- o   Synergistic sales and dedicated to Samsung products.
- Netlist showed 2016 Samsung purchases to be 9M, over ½ in Q4 (~5M)
- Netlist showed a purchase forecast for 2017 of $100M from Samsung  (neither credit line or PA can support).  DongSung was sure to point out anyone could achieve this in current market.  This 100M was not broken out by customer, product, or sales strategy, seemed arbitrary forecast.

**At the end of Netlist presentation, these were the Asks from Netlist:**

1. Better product support and allocation to achieve 2017 goal.
2. Vendor Managed Inventory (VMI), this request was ignored obviously.
3. OEM Pricing
4. Referral of small customers to Netlist for support, stock, etc.
5. Official Distribution Partner Agreement, this became a heated topic as DongSung described our current structure.  Netlist has brought this up in the past and all requests have been denied.  This discussion also went on in

SEC008179

Korean for a while.  DongSung also let Netlist know that the JDLA is clearly focused on Technology, and is not an avenue to support Netlist with standard products.  This should be separate and handled on the business not executive levels.

**Samsung Presented:**

- Flash Market Overview (as time was over, this was brief).   Jaehyung Park
- DRAM Market Overview  Younggyun Lee
- 32GB price discussion ended the meeting.

Lunch at Japanese Restaurant.

**Prior Meeting was Technical Update for progress of NVDIMM  (will attach Netlist presentation when available)**

**Key Takeaways:**

- Need JEDEC standard for Hybrid/NVDIMM.  Samsung Netlist discussions ongoing for last 18 months.
- Recapping today, booting has worked on Large Memory Systems.
- 2 FPGA synch problem has been resolved.
- Indong Kim asking for more transparency from Netlist.
- Several timelines given on presentation, will forward when possible.
- Sebastian Lee stated we should have first samples in end of June, they expect to have internally in May.
- Netlist displayed their product roadmap for NV solutions.
- Partnered with AMD on NVDIMM-N launch.  Also HyperDIMM reference design will be announced.
- Hardware solution has now been passed off to software team.   Now eMMC recognized, stress testing underway.
- Next step is ES sample to Samsung, as mentioned in June.
- Indong was asked about competitive landscape, described mostly delay and Intel/Lenovo vs. Micron Quantex solutions.
- Indong stressed the SK Hynix and other ITC issues need to be resolved soon.  Netlist stated trial to begin in May with resolution by October.
- Need to strive for standardization with JEDEC.

Thank you,
감사합니다
Neal Knuth
Samsung Semiconductor, INC
Southwest Regional Manager
**New Office Number**:  949 910 2835

nealk@ssi.samsung.com

  Notice: Unless specifically identified as a firm offer or an offer to sell, this message is not an offer of sale. Any terms stated in this message or prices quoted are merely indications of terms on which Samsung Semiconductor, Inc. may consider selling, and are not intended to be binding.
*Privacy Notice*: This message is intended only for the use of the individual to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for the delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this email in error, please notify us immediately by telephone or return email and delete the original email and any copies thereof. Thank you.

SEC008180

Message

---

**From:**          Howard Sung [hwanam.sung@samsung.com]
**Sent:**          2/21/2017 8:11:12 AM
**To:**            Neal Knuth [n.knuth@samsung.com]
**Subject:**       PPT(Netlist Meeting)
**Attachments:**   Netlist _ Samsung 022117_rev.pptx

Hi Neal,

When Dram material is updated, I will re-send the PPT

감사합니다.

Howard SUNG
(NWSA: Qualcomm)
+82-31-208-4327
+82-10-7727-1868



The above message is intended solely for the named addressee and may contain trade secret, industrial technology or privileged and confidential information otherwise protected under applicable law including the Unfair Competition Prevention and Trade Secret Protection Act. Any unauthorized dissemination, distribution, copying or use of the information contained in this communication is strictly prohibited. If you have received this communication in error, please notify the sender by email and delete this communication immediately.

상기 메일은 지정된 수신인만을 위한 것이며 부정경쟁 방지 및 영업비밀 보호에 관한 법률을 포함하여 관련 법령에 따라 보호의 대상이 되는 **영업비밀, 산업기술 등을 포함**하고 있을 수 있습니다. 본 문서에 포함된 정보의 전부 또는 일부를 **무단으로 제3자에게 공개, 배포, 복사 또는 사용하는** 것은 엄격히 금지됩니다. 본 메일이 잘못 전송된 경우, 발신인에게 알려 주시고 즉시 삭제하여 주시기 바랍니다.

SEC008181

Confidential

# Netlist – Samsung Executive meeting

Feb 21st , 2017 l Memory Division l Samsung Electronics Co.,Ltd

SAMSUNG

Confidential

# Attendees

■ **Date & Time: Feb 21st, 2017(Tue.), 09:15 – 11:45**

■ **Place: @ Hwasung, Korea(Room #108)**

**NETLIST**

| | |
|---|---|
| J.B. Kim | EVP of Asia Pacific Sales and Strategic Biz |
| Brian Peterson | SVP of Sales and Marketing |
| Paik Ki Hong | VP of Operation |
| Sebastian Lee | Director of Engineering |

**SAMSUNG**

| | |
|---|---|
| Dongsung Yang | VP, Sales group 1 |
| Indong Kim | Principal Engineer, Product planning |
| Daniel Lee | Dir, Sales group 1 |
| Harrison Yoo | Dir, Sales group 1 |
| Kate Moon | Dir, Sales group 1 |
| Neal Knuth | Sr. Manager, DSA West2 Sales |

Confidential

SEC008183

Confidential

# Time table

| Time | Subject |
|---|---|
| 09:15 ~ 10:20 | - Engineering Meeting |
| 10:20 ~ 10:30 | - Break Time |
| 10:30 ~ 11:45 | - Sales Meeting |
| 11:45 ~ | - Lunch |

SAMSUNG

3

SEC008184



* Version : 22.0
* Subject : Strategy Marketing Team Org

Confidential

SEC008185

Confidential

# SSD Update
## Samsung Memory

Feb. 2017 | Samsung Memory NAND Marketing

SAMSUNG

SEC008186



Confidential

SEC008187



SEC008188



Confidential



Confidential



Confidential

SEC008191



Confidential



Confidential

# EXHIBIT 17

**FULL VERSION OF EXHIBIT 17 PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 18

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
## FORM 10 - K

**(Mark One)**

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the f iscal year ended January 2, 2016

or

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from      to
Commission file number 001 - 33170

## NETLIST, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 95-4812784 |
|---|---|
| State or other jurisdiction of incorporation or organization | (I.R.S. employer Identification No.) |

**175 Technology Drive, Suite 150**
**Irvine, CA 92618**

(Address of principal executive offices) (Zip Code)

**(949) 435 - 0025**

(Registrant ' s telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.001 per share | The NASDAQ Capital Market |

Securities registered pursuant to Section 12(g) of the Act:

None

(Title of class)

Indicate by check mark if the registrant is a well - known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S - T ( § 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S - K is not contained herein, and will not be contained, to the best of registrant ' s knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10 - K or any amendment to this Form 10 - K .   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non - accelerated filer, or a smaller reporting company. See the definitions of " large accelerated filer, " " accelerated filer " and " smaller reporting company " in Rule 12b - 2 of the Exchange Act.

| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☒ |
|---|---|---|---|
| | | (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b - 2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant ' s common stock held by non - affiliates, based on the closing price of the registrant ' s common stock as reported on Th e NASD AQ Global Market on June 2 7 , 201 5 , the last business day of the registrant ' s most recently completed second fiscal quarter, was approximately $ 24 .4  million. For purposes of this calculation, it has been assumed that all shares of the registrant ' s common stock held by directors, executive officers and persons beneficially owning ten percent or more of the registrant ' s common stock are held by affiliates. The treatment of these persons as affiliates for purposes of this calculation is not conclusive as to whether such persons are, in fact, affiliates of the registrant for any other purpose .

The number of shares outstanding of the registrant ' s common stock, as of the latest practicable date:

Common Stock, par value $0.001 per share
50 ,354,363  s hares  of common stock outstanding at February 2 9 ,  2016

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the definitive p roxy s tatement for the registrant's Annual Meeting of Stockholders for 201 6  have been incorporated by reference into Part III of this Annual Report on Form 10-K.

**Exhibit 0018**

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| PART I | | |
| Item 1 | Business | 2 |
| Item 1A | Risk Factors | 9 |
| Item 1B | Unresolved Staff Comments | 31 |
| Item 2 | Properties | 31 |
| Item 3 | Legal Proceedings | 31 |
| Item 4 | Mine Safety Disclosures | 31 |
| PART II | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 31 |
| Item 6 | Selected Financial Data | 32 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 48 |
| Item 8 | Financial Statements and Supplementary Data | 48 |
| Item 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 48 |
| Item 9A | Controls and Procedures | 48 |
| Item 9B | Other Information | 49 |
| PART III | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 49 |
| Item 11 | Executive Compensation | 49 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 49 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 49 |
| Item 14 | Principal Accounting Fees and Services | 50 |
| PART IV | | |
| Item 15 | Exhibits, Financial Statement Schedules | 50 |
| SIGNATURES | | 54 |

INDEX TO EXHIBITS

*This Annual Report on Form 10-K includes "forward -looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These forward -looking statements relate to future events and our future performance, and are generally identified by words such as "believe", "expect", "anticipate", "estimate", "intend", "strategy", "may", "will likely" and similar words or phrases. A forward -looking statement is neither a prediction nor a guarantee of future events or circumstances, and our actual results could differ materially and adversely from those expressed in any forward -looking statement. These forward -looking statements are all based on currently available market, operating, financial and competitive information and assumptions and are subject to various risks and uncertainties. Important information regarding factors that could cause actual results to differ materially from such expectations is disclosed under the heading " Risk Factors " in Part I, Item 1A. and elsewhere in this report. These risks and uncertainties include, among others, risks associated with the launch and commercial success of our products, programs and technologies; the success of product, joint development and licensing partnerships; continuing development, qualification and volume production of HyperVault, EXPRESSvault™, NVvault™, HyperCloud® and VLP Planar-X RDIMM; the timing and magnitude of the continued decrease in our sales; our ability to leverage our NVvault™ and EXPRESSvault™ technology into a more diverse customer base; our need to raise additional capital and our ability to obtain financing when necessary; the rapidly-changing nature of technology; risks associated with intellectual property, including patent infringement litigation against us as well as the costs and unpredictability of litigation over infringement of our intellectual property and the possibility of our patents being reexamined or reviewed by the USPTO and PTAB; volatility in the pricing of DRAM ICs and NAND flash; changes in and uncertainty of customer acceptance of, and demand for, our existing products and products under development, including uncertainty of and/or delays in product orders and product qualifications; delays in our and our customers' product releases and development; introductions of new products by competitors; changes in end-user demand for technology solutions; our ability to attract and retain skilled personnel; our reliance on suppliers of critical components and vendors in the supply chain; fluctuations in the market price of critical components; evolving industry standards; the political and regulatory environment in the PRC; and general economic and market conditions. Given these risks, uncertainties and other important factors, you should not place undue reliance on these forward-looking statements. These forward-looking statements represent our estimates and assumptions only as of the date made. Except as required by law, we undertake no obligation to revise or update publicly any forward -looking statements for any reason.*

<div align="center">

**PART I**

</div>

**Item 1.  Business**

**Overview**

We design, manufacture and sell a wide variety of high-performance, logic -based memory subsystems for the global datacenter, data storage and high -performance computing markets. Our memory subsystems consist of combinations of dynamic random access memory integrated circuits ("DRAM ICs" or "DRAM"), NAND flash memory ("NAND flash"), application -specific integrated circuits ("ASICs") and other components assembled on printed circuit boards ("PCBs"). We primarily market and sell our products to leading original equipment manufacturer ("OEM") customers, hyperscale datacenter operators and data storage vendors. Our solutions are targeted at applications where memory plays a key role in meeting system performance requirements. We leverage a portfolio of proprietary technologies and design techniques, including combining discrete semiconductor technologies from third parties such as DRAM and NAND flash to function as one efficient planar design, and alternative packaging techniques to deliver memory subsystems with persistence, high density, small form factor, high signal integrity, attractive thermal characteristics, reduced power consumption and low cost per bit. Our NVvault™ product is the first to offer both DRAM and NAND flash in a standard form factor memory subsystem as a persistent dual -in line memory module ("DIMM") in mission critical applications. Our HyperCloud ®technology incorporates our patented rank multiplication and load reduction technologies. We also have pending and issued patents covering fundamental aspects of hybrid memory DIMM designs that incorporate combinations of DRAM and/or NAND flash, such as our NVvault™ product. We are focused on monetizing our patent portfolio through our products business and, where appropriate, through licensing arrangements with third parties that wish to incorporate our patented technologies in their products.

<div align="center">2</div>

**Intellectual Property Rights and Enforcement**

Our high-performance memory subsystems are developed in part using our proprietary technologies, and we believe that the strength of our intellectual property rights will be important to the success of our business. We utilize patent and trade secret protection, confidentiality agreements with customers and partners, disclosure and invention assignment agreements with employees and consultants and other contractual provisions to protect our intellectual property and other proprietary information. As of January 2, 2016, we had 60 U.S. and foreign patents issued and 33 U.S. and foreign patent applications pending. Assuming that they are properly maintained, our patents will expire at various dates between 2022 and 2030. Our issued patents and patent applications relate to the use of custom logic in high-performance memory subsystems, PCB design, layout and packaging techniques. We intend to actively pursue the filing of additional patent applications related to our technology advancements in order to expand and strengthen our portfolio. Our patents cover different aspects of our technology innovations and various claim scopes and, as such, we believe that our business is not materially dependent upon any one claim in any of our existing patents or pending patent applications.

We intend to vigorously defend our patent and other intellectual property rights, including, when necessary, pursuit of enforcement actions against entities we believe are using our patented solutions in their products. We may seek injunctive relief in the course of enforcing our intellectual property rights in certain instances, and in other instances we may enter into settlement or license agreements. We dedicate substantial resources to protecting our intellectual property, including efforts to defend our patents against challenges made by way of reexamination and review proceedings at the U.S. Patent and Trademark Office ("USPTO") and Patent Trial and Appeal Board ("PTAB"). These activities are likely to continue for the foreseeable future, without any guarantee that any ongoing or future patent protection and litigation activities will be successful. We also are subject to litigation based on claims that we have infringed on the intellectual property of others, against which we intend to defend ourselves vigorously.

**Licensing and Joint Development Partnerships**

We intend to seek opportunities to monetize our intellectual property rights through joint development or licensing arrangements, such as our November 2015 Joint Development and License Agreement ("JDLA") with Samsung Electronics Co., Ltd. ("Samsung"), pursuant to which, among other things, we and Samsung will work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of this new technology, we and Samsung have cross-licensed our respective patent portfolios for this purpose, and we may enter into an additional agreement with Samsung in the future to grant Samsung a commercial license to our NVDIMM-P technology. Commercial licensing arrangements, whether arising from partnerships such as the JDLA with Samsung or from patent infringement enforcement actions, can be structured in a variety of ways, including one-time paid up license fees or ongoing royalty arrangements. We aim to generate a portion of our revenues with these types of licensing arrangements in the future, but our efforts to monetize our intellectual property rights and technologies may not be successful.

**Our Products**

Our technical expertise and our ability to introduce new or enhanced products that achieve customer or market acceptance in a timely manner has been and we believe will continue to be important factors in developing and maintaining our competitive position. Below are descriptions of our commercially available products and new products that have been publicly announced.

*NVvault™ Family*

We were the first to develop and market memory subsystems that incorporate both DRAM and NAND flash in a single NVvault™ persistent DIMM solution. NVvault™ was originally used for mission critical backups during power interruption in Redundant Array of Independent Disks ("RAID") and main memory. NVvault™ has evolved beyond its original application to a variety of other applications, including hyperscale computing for cloud, big data, on-line banking and other real time applications where NVvault™ is also used as a data accelerator. We are working to further enhance the capabilities of our NVvault™ technology in these new applications, and we are also seeking to expand our

3

customer base through the integration of NVvault™ into leading storage motherboards. NVvault™ is incorporated in our EXPRESSvault™ PCIe solution for both acceleration and backup in storage applications. Our NVvault™ product line consists primarily of battery-free and battery-powered flash backed cache memory subsystems targeting RAID storage, application acceleration and mission critical data integrity. NVvault™ battery-free provides server and storage OEMs a solution for enhanced datacenter fault recovery. We have experienced a steady decline in NVvault sales in recent years, due in large part to our loss of our most significant NVvault customer, Dell, beginning in 2012. We have also experienced supply chain disruptions with respect to the components of our NVvault products, which has contributed to the decrease in sales of these products. There were no sales of NVvault™ products to Dell in the years ended January 2, 2016 and December 27, 2014, and we expect no future demand from Dell for our NVvault™ products. We continue to pursue qualifications with other potential significant customers for these products and we are working to remedy our ongoing supply chain disruptions, however, our efforts to expand our qualifications and manage our supply chain may not result in significant revenues from the sale of the NVvault™ family of products.

HyperVault, a future product that combines DRAM and NAND flash, is still under development and may require substantial additional investment and the services and attention of key employees who have competing demands on their available time. We believe that our JDLA will advance the development of this product and that Samsung will prove to be an important strategic partner that can facilitate getting this technology to market.

For the years ended January 2, 2016 and December 27, 2014, our NVvault™ non-volatile RDIMM used in cache-protection and data logging applications, including our NVvault™ battery-free, the flash-based cache system, accounted for approximately 20 % and 44 % of total net product sales, respectively.

*HyperCloud ®*

Our HyperCloud ® product incorporates our patented rank multiplication technology, which increases memory capacity, and our patented load reduction technology, which increases memory bandwidth. We expect that these patented technologies will make possible improved levels of performance for memory intensive datacenter applications and workloads, including enterprise virtualization, cloud computing infrastructure, business intelligence real- time data analytics, and high-performance computing .

*Specialty Memory Modules and Flash-Based Products*

The remainder of our product revenues is primarily from OEM sales of specialty memory modules and flash-based products, the majority of which are utilized in data center and industrial applications. When developing custom modules for an equipment product launch, we engage with our OEM customers from the earliest stages of new product definition, providing us unique insight into their full range of system architecture and performance requirements. This close collaboration has also allowed us to develop a significant level of systems expertise. We leverage a portfolio of proprietary technologies and design techniques, including efficient planar design, alternative packaging techniques and custom semiconductor logic, to deliver memory subsystems with persistence, high density, small form factor, high signal integrity, attractive thermal characteristics, reduced power consumption and low cost per bit. Revenues from our specialty modules and flash-based products are subject to fluctuation as a result of the life cycles of the products into which our modules are incorporated. Our ability to continue to generate revenues from specialty memory modules and flash-based products is dependent on our ability to qualify our products on new platforms as current platforms reach the end of their lifecycles, and on the state of the global economy.

**Technology**

We have a portfolio of proprietary technologies and design techniques and have assembled an engineering team with expertise in semiconductors, printed circuit boards, memory subsystem and system design. Our technology competencies include:

4

*IC Design Expertise.*

We have designed special algorithms that can be implemented in stand-alone integrated circuits or integrated into other functional blocks in ASICs. We utilize these algorithms in the HyperCloud ® chipset to incorporate rank multiplication and load reduction functionality. We also incorporate these algorithms in our NVvault™ product line of RDIMMS.

*NVvault™.*

      NVvault is a memory subsystem that incorporates both DRAM and NAND flash in a single persistent DIMM solution. NVvault™ combines the best attributes of DRAM, including speed, durability and reliability, with high densities, lower power and lowest costs provided by NAND flash. This combination enables us to provide application acceleration and mission critical backup during power interruption for cloud infrastructure, virtualization, analytics and database applications. NVvault™ is incorporated in our EXPRESSvault™ PCIe solution for both acceleration and backup in storage applications.

*Proprietary PCB Designs.*

We utilize advanced techniques to optimize electronic signal strength and integrity within a PCB. These techniques include the use of 8-layer or 10-layer boards, matching conductive trace lengths, a minimized number of conductive connectors, or vias, and precise load balancing to, among other benefits, help reduce noise and crosstalk between adjacent traces. In addition, our proprietary designs for the precise placement of intra-substrate components allow us to assemble memory subsystems with significantly smaller physical size, enabling OEMs to develop products with smaller footprints for their customers.

*Very Low Profile Designs.*

We were the first company to create memory subsystems in a form factor of less than one inch in height. We believe our proprietary board design technology is particularly useful in the blade server market, where efficient use of motherboard space is critical. Our technology has allowed us to decrease the system board space required for memory, and improve thermal performance and operating speeds, by enabling our customers to use alternative methods of component layout.

*Thermal Management Designs.*

We design our memory subsystems to ensure effective heat dissipation. We use thermal cameras to obtain thermal profiles of the memory subsystem during the design phase, allowing us to rearrange components to enhance thermal characteristics and, if necessary, replace components that do not meet specifications. We also develop and use proprietary heat spreaders to enhance the thermal management characteristics of our memory subsystems.

**Customers**

      During our 2015 fiscal year we primarily marketed and sold our products to leading OEMs in the server, data storage and communications markets. Consistent with the concentrated nature of the OEM customer base in our target markets, a small number of large customers have historically accounted for a significant portion of our net sales.  Net product sales to our two largest customers, Dell and Singh Semiconductors and Systems, represented approximately 27% and 10% of our net product sales in 2015, respectively. Dell, IBM and Nimble Storage, Inc. represented approximately 20%, 14% and 19% of our net product sales in 2014, respectively. For further information regarding our sales to our OEM customer base, please refer to Note 10 to our consolidated financial statements included in Part II, Item 8 of this report.

      The composition of major customers and their respective contributions to our net sales have varied and will likely continue to vary from period to period as our OEMs progress through the life cycle of the products they produce and sell.

Our sales are made primarily pursuant to standard purchase orders that may be rescheduled on relatively short notice, which reduces our backlog of firm orders and our ability to accurately estimate future customer requirements for our products. Customers are generally allowed limited rights of return for up to 30 days, except for sales of excess inventories, which contain no right-of-return privileges. Estimated returns are provided for at the time of sale based on historical experience or specific identification of an event necessitating a reserve. While these returns have historically been within our expectations and the provisions established, we cannot guarantee that we will continue to experience similar return rates in the future. Any significant increase in product failure rates and the resulting product returns could have a material adverse effect on our operating results for the period or periods in which such returns materialize.

We offer warranties on our memory subsystems generally ranging from one to three years, depending on the product and negotiated terms of purchase agreements with our customers. Such warranties require us to repair or replace defective product returned to us during such warranty period at no cost to the customer. Our estimates for warranty related costs are recorded at the time of sale based on historical and estimated future product return rates and expected repair or replacement costs. While such costs have historically been within our expectations and the provisions established, unexpected changes in failure rates could have a material adverse impact on us, requiring additional warranty reserves, and adversely affecting our gross profit and gross margins.

For additional information regarding our net product sales from external customers by geographic area, refer to Note 11 to our consolidated financial statements included in Part II, Item 8 of this report.

## Sales and Marketing

We market and sell our products through a direct sales force and a network of independent sales representatives. Our sales activities focus primarily on developing strong relationships at the technical, marketing and executive management levels within market-leading OEMs.

We utilize well-trained, highly technical program management teams to successfully drive new product development and quickly respond to our customers' needs and expectations. Our program management teams provide quick response times and act as a single point-of-contact for routine issues during the sales process. Additionally, they address the long-term business and technology goals of our customers. We employ a team approach to business development whereby our sales team and independent representatives identify, qualify and prioritize customer prospects through offices in a number of locations worldwide.

## Manufacturing

We manufacture substantially all of our products at our facility in Suzhou in the People's Republic of China (the "PRC"). Our advanced engineering and design capabilities, combined with our in-house manufacturing processes, allow us to assemble our memory subsystems reliably and in high volume. Our advanced, customized manufacturing facilities are capable of surface mount assembly, subsystem testing, system -level burn-in testing, programming, marking, labeling and packaging. At each stage of the production cycle, including product prototyping, qualification sample production and high-volume manufacturing and delivery, we focus on providing our customers with rapid response and short manufacturing turn-around times. Manufacturing cycle times for our products are typically one week or less, and in some cases as short as two days, from receipt of order.

We acquire components and materials such as ASICs, DRAM ICs and NAND flash directly from integrated circuit manufacturers and assemble them into finished subsystems. We believe that one of our key strengths is the efficient procurement and management of components for our subsystems, which benefits our customers in the form of lower costs and increased product availability. We have a limited number of suppliers, including Arrow Electronics and Barun Electronics, Inc. each of which comprised more than 10% of our total purchases in 2015 and Arrow Electronics comprised more than 10% of our total purchases in 2014. Further, our JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us on our request at competitive prices. For further information regarding our supplier concentrations, refer to Note 10 to our consolidated financial statements included in Part II, Item 8 of this report.  We have developed strong supplier relationships with these and other key DRAM IC and NAND flash manufacturers, which we believe gives us direct and ready access to the critical components that we need for our

6

production activities. We typically qualify our products with our customers using multiple manufacturers of DRAM ICs and NAND flash. The flexibility to choose from several DRAM IC and NAND flash providers allows us to minimize product cost and maximize product availability. We schedule production based on purchase order commitments and anticipated orders. We release raw materials to the manufacturing floor by means of an on-line shop floor control system, which allows for internal quality analysis, direct access to inventory information and production floor material tracking. We have a flexible manufacturing workforce which allows us to manage unforecasted demand. In addition, in order to mitigate inventory risks, we have the capability to sell excess quantities of certain component inventories of DRAM ICs and NAND flash to distributors and other users of memory integrated circuits.

Our quality assurance engineers work with our suppliers to ensure that the raw materials we receive meet our high quality standards. These engineers also perform onsite supplier factory audits and use our internal test and inspection systems to verify that purchased components and materials meet our specifications. Our supplier quality program and incoming material quality control program are important aspects of our overall manufacturing process.

We perform ongoing reliability testing on our memory subsystems and share the results of that testing with our customers. We believe that this improves the system design process and allows for the elimination of potential problems at the earliest possible stage. In addition, we have implemented procedures which require that all of our memory subsystems undergo functional and system burn-in testing prior to delivery to the customer. We complement our test capabilities with advanced imaging technology to inspect the quality of our assemblies.

We are certified in International Organization for Standardization ("ISO") 9001:2008 Quality Management Systems and ISO 14001:2004 Environmental Management Standards.

**Competition**

Our products are primarily targeted for the server, high -performance computing and communications markets. These markets are intensely competitive, as numerous companies vie for business opportunities at a limited number of large OEMs. We face competition from DRAM suppliers, memory module providers and logic suppliers for many of our products, including NVvault and HyperCloud [®].   Additionally, if and to the extent we enter new markets or pursue licensing arrangements to monetize our technologies and intellectual property portfolio , we may face competition from a large number of competitors that produce solutions utilizing similar or competing technologies.

Some of our customers and suppliers may have proprietary products or technologies that are competitive with our products, or could develop internal solutions or enter into strategic relationships with, or acquire, existing high-density memory module providers. Any of these actions could reduce our customers' demand for our products. Some of our significant suppliers of memory integrated circuits may be able to manufacture competitive products at lower costs by leveraging internal efficiencies, or could choose to reduce our supply of memory integrated circuits, adversely affecting our ability to manufacture our memory subsystems on a timely basis, if at all.

Certain of our competitors have substantially greater financial, technical, marketing, distribution and other resources, broader product lines, lower cost structures, greater brand recognition and longer standing relationships with customers and suppliers. Some of our competitors may also have a greater ability to influence industry standards than we do, as well as more extensive patent portfolios.

We expect our competitors to continue to improve the performance of their current products, reduce their prices and introduce new or enhanced technologies that may offer greater performance and improved pricing. If we are unable to match or exceed the improvements made by our competitors, our market position would deteriorate and our net sales would decline. In addition, our competitors may develop future generations and enhancements of competitive products that may render our technologies obsolete or uncompetitive. Our ability to compete in our current target markets and in future markets will depend in large part on our ability to successfully develop, introduce and sell new and enhanced products or technologies on a timely and cost-effective basis and to respond to changing market requirements. We

7

believe that the principal competitive factors in the selection of high - performance memory subsystems by potential customers are:

- understanding of OEM system and business requirements;

- timeliness of new value-add product introductions;

- development of advanced technologies that we could license to third parties before our competitors;

- design characteristics and performance;

- quality and reliability;

- track record of volume delivery;

- credibility with the customer;

- fulfillment capability and flexibility; and

- price.

We believe that we compete favorably with respect to these factors. However, our current and future competitors could develop competing products that could cause a decline in sales or loss of market acceptance of our products or technologies.

**Research and Development**

The market for high-performance memory subsystems is constantly changing and therefore continuous development of new technology, processes and product innovation is necessary in order to be successful as a leading supplier. We believe that the continued and timely development of new products and improvement of existing products are critical to maintaining our competitive position. Our team of engineers focuses on developing custom semiconductor logic devices, hybrid memory, DRAM and NAND flash products with innovative packaging solutions, improved electrical signal integrity and thermal characteristics that enhances reliability over the life of the system and achieves higher speeds and lowers power consumption. Also, our engineers incorporate various new techniques and methodologies for testing as well as new processes for manufacturing our products.

Our engineering staff closely engages with our customers and their engineering teams at early stages in their system development. This collaboration allows our engineers to understand the customer's system architecture, power budget, operating environment such as air flow and operating temperature and any mechanical constraints. Our engineers use this information to provide guidance and solutions to implement optimum memory subsystems to our customers. An important aspect of our research and development effort is to understand the challenges faced by our customers and provide cost effective solutions that satisfy their requirements by utilizing our industry knowledge, proprietary technologies and technical expertise.

We use advanced design tools in development of our products that allow us to model behavior of a signal trace on our memory modules as well as airflow and thermal profiles of all components in the system. These design tools enable real-time simulation for signal integrity and behavioral modeling of our designs using the Input/Output Buffer Information Specification and Simulation Program with Integrated Circuit Emphasis models of our suppliers' components. These simulation tools help us reduce or eliminate electronic signal reflections, clock skews, signal jitter and noise, which can reduce system performance and reliability. These efforts allow our engineers to develop optimum thermal solutions for our customer base.

We believe that to remain competitive we must continue to focus on developing advanced memory technologies. We have invested significant resources in the design of custom semiconductor logic devices. These logic

8

Table of Contents

devices are integrated into our next-generation memory subsystems in order to improve their performance. Logic devices in our NVvault™ and EXPRESSVault™ hybrid memory products enable DRAM and flash memory to be efficiently combined for the purposes of accelerating system performance and providing mission critical back-up. The development of these semiconductor devices is an important part of our overall effort to maintain a strong competitive position in our industry based on advanced memory technologies.

Our customers typically do not separately compensate us for design and engineering work involved in developing application -specific products for them.  Our total expenditures for research and development were approximately $6.0 million and $4.6 million for 2015 and 2014, respectively.

**Employees**

At January 2, 2016, we had approximately 110 employees (including 87 regular employees and 23 temporary employees). Approximately 45 of the regular employees were located in the U.S., and approximately 42 were located in the PRC. We had 63 employees in operations, 28 employees in research and development, 12 employees in sales and marketing, and 7 employees engaged in other administrative functions. We are not party to any collective bargaining agreements with any of our employees. We have never experienced a work stoppage, and we believe our employee relations are good.

**Compliance with Environmental Laws**

We are subject to various and frequently changing U.S. federal, state and local and foreign governmental laws and regulations relating to the protection of the environment, including those governing the discharge of pollutants into the air and water, the management and disposal of hazardous substances and wastes, the cleanup of contaminated sites and the maintenance of a safe workplace. In particular, some of our manufacturing processes may require us to handle and dispose of hazardous materials from time to time. For example, in the past our manufacturing operations have used lead-based solder in the assembly of our products. Today, we use lead-free soldering technologies in our manufacturing processes, as this is required for products entering the European Union. We could incur substantial costs, including clean-up costs, civil or criminal fines or sanctions and third-party claims for property damage or personal injury as a result of violations of, or noncompliance with, environmental laws and regulations. Although we have not incurred significant costs to date to comply with these laws and regulations, new laws or changes to current laws and regulations to make them more stringent could require us to incur significant costs to remain in compliance.

**General Information**

We were incorporated in Delaware in June 2000 and commenced operations in September 2000.  Our principal executive offices are located at 175 Technology Drive, Suite 150, Irvine, California 92618 and our telephone number at that address is (949) 435-0025. We maintain a website at *www.netlist.com* (this reference to our website is an inactive textual reference only and is not intended to incorporate our website into this report). We file reports with the Securities and Exchange Commission ("SEC") and make available, free of charge, on or through our website, our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy and information statements and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. Our website also contains copies of our corporate governance policy, code of business conduct and ethics, insider trading policy and whistleblower policy, as well as copies of the charters for our audit committee, compensation committee and nominating and corporate governance committee.

**Item 1A.   Risk Factors**

*You should consider each of the following factors as well as the other information in this report in evaluating our business and our prospects.  The risks described below are not the only ones we face. Additional risks we are not presently aware of or that we currently believe are immaterial may also impair our business operations. If any of the events described below were to occur, our financial condition, our ability to access capital resources, our results of*

9

*operations and/or our future growth prospects could be materially and adversely affected and the market price of our common stock could decline. In assessing these risks, you should also refer to the other information contained or incorporated by reference in this report, including our consolidated financial statements and related notes.*

**Risks related to our business**

**We have historically incurred losses and may continue to incur losses.**

Since the inception of our business in 2000, we have only experienced one fiscal year (2006) with profitable results. In order to regain profitability, or to achieve and sustain positive cash flows from operations in the future, we must reduce operating expenses and/or increase our revenues and gross margins. Although we have in the past engaged in a series of cost reduction actions, and believe that we could reduce our current level of expenses through elimination or reduction of strategic initiatives, such expense reductions alone may not make us profitable or allow us to sustain profitability if it is achieved and eliminating or reducing strategic initiatives could limit our opportunities and prospects. Our ability to achieve profitability will depend on increased revenue growth from, among other things, monetization of our intellectual property, increased demand for our memory subsystems and other product offerings, as well as our ability to expand into new and emerging markets. We may not be successful in achieving the necessary revenue growth or the expected expense reductions. Moreover, we may be unable to sustain past or expected future expense reductions in subsequent periods. We may not achieve profitability or sustain such profitability, if achieved, on a quarterly or annual basis in the future.

Any failure to achieve profitability could result in increased capital requirements and pressure on our liquidity position. We believe our future capital requirements will depend on many factors, including our levels of net sales, the timing and extent of expenditures to support sales, marketing, research and development activities, the expansion of manufacturing capacity both domestically and internationally, the continued market acceptance of our products, intellectual property enforcement activities and strategic collaborations or other transactions. Our capital requirements could result in our having to, or otherwise choosing to, seek additional funding through public or private equity offerings or debt financings. Such funding may not be available when needed, on terms acceptable to us or at all, any of which could result in our inability to meet our financial obligations and other related commitments.

**We may not have sufficient working capital to fund our planned operations, and, as a result, we may need to raise additional capital in the future in order to continue operating our business and developing new products and technologies, which capital may not be available when needed, on acceptable terms or at all.**

We believe that, taking into account our planned activities, we have sufficient cash resources to satisfy our capital needs for at least the next twelve months. However, our estimates of our operating expenses and working capital requirements could be incorrect, and we may use our cash resources faster than we presently anticipate. Further, some or all of our ongoing or planned investments may not be successful and could result in further losses. In addition, irrespective of our cash resources, we may be contractually or legally obligated to make certain investments which cannot be postponed.

Our capital requirements will depend on many factors, including, among others:

- the acceptance of, and demand for, our products;
- our success and that of our strategic partners in developing and selling products derived from our technology;
- our continued listing on NASDAQ;
- the costs of further developing our existing, and developing new, products or technologies;
- the extent to which we invest in new technology, testing and product development;
- Costs associated with defending and enforcing our intellectual property rights;
- the timing of vendor payments and the collection of receivables, among other factors affecting our working capital;
- the exercise of outstanding options or warrants to acquire our common stock;
- the number and timing of acquisitions and other strategic transactions in which we participate, if any; and
- the costs associated with the continued operation, and any future growth, of our business.

We expect to rely in the near term on funds raised pursuant to recent public and private placement offerings of debt and equity securities (although we have used certain of those funds to repay certain indebtedness as required by the repayment terms thereof).  However, until we can generate a sufficient amount of revenue to finance our cash requirements, which we may never do, we may need to increase our liquidity and capital resources by one or more measures, which may include, among others, reducing operating expenses, restructuring our balance sheet by negotiating with creditors and vendors, entering into strategic partnerships or alliances, raising additional financing through the issuance of debt, equity, or convertible securities and working to increase revenue growth through new product sales. There is no guarantee that we will be able to obtain capital when needed, on terms acceptable to us, or at all.

Insufficient funds would have a material adverse effect on our business and operations and could cause us to fail to execute our business plan, fail to take advantage of future opportunities or fail to respond to competitive pressures or customer requirements, and further may require us to significantly modify our business model and/or reduce our operations, which could include delaying, scaling back or eliminating some or all of our ongoing and planned investments in corporate infrastructure, research and development projects, regulatory submissions, business development initiatives, and sales and marketing activities, among other investments. Modification of our business model and operations could result in an impairment of assets, the effects of which cannot be determined. Furthermore, if we continue to issue equity or convertible debt securities to raise additional funds, our existing stockholders may experience significant dilution, and the new equity or debt securities may have rights, preferences and privileges that are superior to those of our existing stockholders. If we incur additional debt, it may increase our leverage relative to our earnings or to our equity capitalization.

***We have incurred a material amount of indebtedness to fund our operations, the terms of which require that we pledge substantially all of our assets as security.  Our level of indebtedness and the terms of such indebtedness, could adversely affect our operations and liquidity.***

We have incurred debt secured by all of our assets under our credit facilities and term loans with Samsung Venture Investment Corporation ("SVIC") and Silicon Valley Bank ("SVB"). Our convertible promissory note issued to SVIC is secured by a first priority security interest in our patent portfolio and a second priority security interest in substantially all of our other assets. Our credit facility with SVB is secured by a first priority security interest in all of our assets other than our patent portfolio, to which SVB has a second priority security interest. The SVIC and/or SVB debt instruments contain customary representations, warranties and indemnification provisions, as well as affirmative and negative covenants that, among other things, restrict our ability to:

- incur additional indebtedness or guarantees;

- incur liens;

- make investments, loans and acquisitions;

- consolidate or merge;

- sell, lease, lend, exclusively license or otherwise transfer assets, including capital stock of subsidiaries;

- alter our business;

- change any provision of our organizational documents;

- engage in transactions with affiliates; and

- pay dividends or make distributions.

The SVIC and SVB debt instruments also include events of default, including, among other things, payment defaults, breaches of representations, warranties or covenants, certain bankruptcy events, and certain material adverse

11

changes. If we were to default under either debt instrument and were unable to obtain a waiver for such a default, among other remedies, the lenders could accelerate our obligations under the debt instruments and exercise their rights to foreclose on their security interests, which would cause substantial harm to our business and prospects.

Incurrence and maintenance of this debt could have material consequences, such as:

- requiring us to dedicate a portion of our cash flow from operations and other capital resources to debt service, thereby reducing our ability to fund working capital, capital expenditures, and other cash requirements;

- increasing our vulnerability to adverse economic and industry conditions;

- limiting our flexibility in planning for, or reacting to, changes and opportunities in, our business and industry, which may place us at a competitive disadvantage; and

- limiting our ability to incur additional debt on acceptable terms, if at all.

***Our revenues and results of operations have been substantially dependent on NVvault™ and we may be unable to replace revenue lost from the rapid decline in prior generation NVvault™ sales.***

For the years ended January 2, 2016 and December 27, 2014, our NVvault™ non -volatile RDIMM used in cache -protection and data logging applications, including our NVvault™ battery -free, the flash -based cache system, accounted for approximately 20% and 44% of total net product sales, respectively. We have experienced a steady decline in NVvault sales in recent years, due in large part to our loss of our most significant NVvault customer, Dell, beginning in 2012. We recognized no NVvault™ sales to Dell in the years ended January 2, 2016 and December 27, 2014. We expect no future demand from Dell for our NVvault™ products. In order to leverage our NVvault™ technology and diversify our customer base, and to secure one or more new key customers, we continue to pursue additional qualifications of NVvault™ with other OEMs and to target new customer applications such as online transaction processing, virtualization, big data analytics, high speed transaction processing, high-performance database, and in -memory database applications. We also introduced EXPRESSvault™ in March 2011 and the next generation of EXPRESSvault™ (EV3) in July 2015 and we continue to pursue qualification of the next generation DDR3 NVvault™ and DDR4 NVvault™ with customers. Our future operating results will depend on our ability to commercialize these NVvault™ product extensions, as well as other products such as HyperVault™ and other high -density and high-performance solutions. HyperVault™ is still under development and may require substantial additional investment and the services and attention of key employees who have competing demands on their available time. Although we believe that our JDLA will advance the development of this product and that Samsung will prove to be an important strategic partner that can facilitate getting this technology to market, our partnership with Samsung and any other steps we take to further the development of this or any other products in development could fail. If we are not successful in expanding our qualifications or marketing any new or enhanced products, we will be unable to secure revenues sufficient to replace lost NVvault revenue and our results of operations and prospects could be materially harmed.

***We are subject to risks relating to our focus on developing our HyperCloud® and NVvault™ products and lack of market diversification.***

We have historically derived a substantial portion of our net sales from sales of our high-performance memory subsystems for use in the server market. We expect these memory subsystems to continue to account for a portion of our net sales in the near term. We believe that continued market acceptance of these products or derivative products that incorporate our core memory subsystem technology for use in servers is critical to our success.

We have invested a significant portion of our research and development budget into the design of ASIC and hybrid devices, including the HyperCloud ® memory subsystem, introduced in November 2009, as well as our NVvault family of products. These products are subject to increased risks as compared to our legacy products. For example:

- we are dependent on a limited number of suppliers for both the DRAM ICs and the ASIC devices that are essential to the functionality of the HyperCloud ® memory subsystem, and we have experienced supply chain disruptions and shortages of DRAM and flash required to create our HyperCloud ®, our NVvault ™ and Planar X VLP products as a result of business issues that are specific to our suppliers or the industry as a whole;

- we may be unable to achieve new qualifications or customer or market acceptance of the HyperCloud ® memory subsystem, NVvault ™ products or other new products such as HyperVault ™, or achieve such acceptance in a timely manner;

- the HyperCloud ® memory subsystem, NVvault ™ products or other new products such as HyperVault ™ may contain currently undiscovered flaws, the correction of which would result in increased costs and time to market; and

- we are required to demonstrate the quality and reliability of the HyperCloud ® memory subsystem or other new products to our customers, and are required to qualify these new products with our customers, which requires a significant investment of time and resources prior to the receipt of any revenue from such customers.

We experienced a longer qualification cycle than anticipated with our HyperCloud ® memory subsystems, and as a result, we have not generated significant HyperCloud ® product revenues to date relative to our investment in the product. We entered into collaborative agreements with both IBM and HP pursuant to which these OEMs qualified the 16GB and 32GB versions of HyperCloud ® for use with their products. While we and each of the OEMs committed financial and other resources toward the collaborations, the efforts undertaken for each of these collaborative agreements have not resulted in significant revenues or product margins for us to date. As a result, we have not achieved and we may never achieve sufficient revenues or margins from our HyperCloud ® products to justify their costs.

Additionally, if the demand for servers deteriorates or if the demand for our products to be incorporated in servers declines, our operating results would be adversely affected, and we would be forced to diversify our product portfolio and our target markets. We may not be able to achieve this diversification, and our inability to do so may adversely affect our business.

***We use a small number of FPGAs, DRAM ICs and NAND flash suppliers and are subject to risks of disruption in the supply of FPGAs, DRAM ICs and NAND flash.***

Our ability to fulfill customer orders or produce qualification samples is dependent on a sufficient supply of field-programmable gate arrays ("FPGAs"), DRAM ICs and NAND flash, which are essential components of our memory subsystems. There are a relatively small number of suppliers of FPGAs, DRAM ICs and NAND flash, and we purchase from only a subset of these suppliers. We have no long -term FPGA, DRAM or NAND flash supply contracts.

From time to time, shortages in DRAM ICs and NAND flash have required some suppliers to limit the supply of their DRAM ICs and NAND flash. We have experienced supply chain disruptions and shortages of DRAM and flash required to create our HyperCloud ®, NVvault ™ and Planar X VLP products, and we are continually working to secure adequate supplies of DRAM and flash necessary to fill customers' orders for our products in a timely manner. If we are unable to obtain a sufficient supply of DRAM ICs or NAND flash to meet our customers' requirements, these customers may reduce future orders for our products or not purchase our products at all, which would cause our net sales to decline and harm our operating results. In addition, our reputation could be harmed and, even assuming we are successful in resolving supply chain disruptions, we may not be able to replace any lost business with new customers, and we may lose market share to our competitors.

13

Our dependence on a small number of suppliers and the lack of any guaranteed sources of FPGAs, DRAM and NAND flash supply expose us to several risks, including the inability to obtain an adequate supply of these important components, price increases, delivery delays and poor quality.

Historical declines in customer demand and our revenues caused us to reduce our purchases of DRAM ICs and NAND flash. Such fluctuations could continue in the future. If we fail to maintain sufficient purchase levels with some suppliers, our ability to obtain supplies of raw materials may be impaired due to the practice of some suppliers to allocate their products to customers with the highest regular demand.

Our customers qualify the FPGAs, DRAM ICs and NAND flash of our suppliers for use in their systems. If one of our suppliers should experience quality control problems, it may be disqualified by one or more of our customers. This would disrupt our supplies of FPGAs, DRAM ICs and NAND flash and reduce the number of suppliers available to us, and may require that we qualify a new supplier. If our suppliers are unable to produce qualification samples on a timely basis or at all, we could experience delays in the qualification process, which could have a significant impact on our ability to sell that product.

***We may be unsuccessful in establishing and operating a licensing business.***

Although we intend to pursue an intellectual property-based licensing business in order to monetize our intellectual property rights, we are currently operating based on a products-based business model and we may never be successful in developing any licensing business . Although we may pursue an additional agreement with Samsung in the future to grant Samsung a commercial license to our NVDIMM-P technology pursuant to the terms of our JDLA with Samsung, we may never successfully enter into any such agreement with Samsung or any other third party. Further, the terms of any such agreements that we may reach with third party licensees are uncertain and may not provide significant royalty or other licensing revenues to us to justify our costs of developing and maintaining the licensed intellectual property or may otherwise include terms that are not favorable to us. Additionally, the pursuit of a licensing business would require by its nature that we relinquish certain of our rights to our technologies and intellectual property that we license to third parties, which could limit our ability to base our own products on such technologies. Additionally, the establishment of this new business may be more difficult or costly than expected and require additional personnel, investments and may be a significant distraction for management. In connection with any licensing business we may develop, our licenses and royalties revenue may be uncertain from period to period and we may be unable to attract sufficient licensing customers, which would materially and adversely affect our results of operations. Our ability to increase our license revenue will depend on a variety of factors, including novelty, utility, performance, quality, breadth and depth of our current and future intellectual property and technology, all as compared to that of our competitors, as well as our sales and marketing capabilities. Once secured, license revenue may be negatively affected by factors within and outside our control, including reductions in our customers' sales prices, sales volumes and the terms of such license arrangements. If we are not successful in achieving a licensing business, we may never recoup the costs associated with developing, maintaining, defending and enforcing our intellectual property portfolio and our financial condition would be harmed.

***We may lose our competitive position if we are unable to timely and cost-effectively develop new or enhanced products that meet our customers' requirements and achieve market acceptance or technologies that we can monetize through licensing arrangements or otherwise.***

Our industry is characterized by intense competition, rapid technological change, evolving industry standards and rapid product obsolescence. Evolving industry standards and technological change or new, competitive technologies could render our existing products and technologies obsolete. Accordingly, our ability to compete in the future will depend in large part on our ability to identify and develop new or enhanced products and technologies on a timely and cost-effective basis, and to respond to changing customer requirements. In order to develop and introduce new or enhanced products and technologies, we need to:

- identify and adjust to the changing requirements of our current and potential customers;

- identify and adapt to emerging technological trends and evolving industry standards in our markets;

14

- design and introduce cost-effective, innovative and performance- enhancing features that differentiate our products and technologies from those of our competitors;

- develop relationships with potential suppliers of components required for these new or enhanced products and technologies;

- qualify these products for use in our customers' products; and

- develop and maintain effective marketing strategies.

Our product development efforts are costly and inherently risky. It is difficult to foresee changes or developments in technology or anticipate the adoption of new standards. Moreover, once these changes or developments are identified, if at all, we will need to hire the appropriate technical personnel or retain third-party designers, develop the product, identify and eliminate design flaws, and manufacture the product in production quantities either in-house or through third-party manufacturers. As a result, we may not be able to successfully develop new or enhanced products or we may experience delays in the development and introduction of new or enhanced products. Delays in product development and introduction could result in the loss of, or delays in generating, net sales or other revenues and the loss of market share, as well as damage to our reputation. Even if we develop new or enhanced products or technologies, they may not meet our customers' requirements or gain market acceptance.

***Our customers require that our products undergo a lengthy and expensive qualification process without any assurance of net sales.***

Our prospective customers generally make a significant commitment of resources to test and evaluate our memory subsystems prior to purchasing our products and integrating them into their systems. This extensive qualification process involves rigorous reliability testing and evaluation of our products, which may continue for nine months or longer and is often subject to delays. In addition to qualification of specific products, some of our customers may also require us to undergo a technology qualification if our product designs incorporate innovative technologies that the customer has not previously encountered. Such technology qualifications often take substantially longer than product qualifications and can take over a year to complete. Qualification by a prospective customer does not ensure any sales to that prospective customer. Even after successful qualification and sales of our products to a customer, changes in our products, our manufacturing facilities, our production processes or our component suppliers may require a new qualification process, which may result in additional delays.

In addition, because the qualification process is both product specific and platform specific, our existing customers sometimes require us to re-qualify our products, or to qualify our new products, for use in new platforms or applications. For example, as our OEM customers transition from prior generation architectures to current generation architectures, we must design and qualify new products for use by those customers. In the past, the process of design and qualification has taken up to nine months to complete, during which time our net sales to those customers declined significantly. After our products are qualified, it can take several months before the customer begins production and we begin to generate net sales from such customer.

Likewise, when our memory and NAND flash component vendors discontinue production of components, it may be necessary for us to design and qualify new products for our customers. Such customers may require of us or we may decide to purchase an estimated quantity of discontinued memory components necessary to ensure a steady supply of existing products until products with new components can be qualified. Purchases of this nature may affect our liquidity. Additionally, our estimation of quantities required during the transition may be incorrect, which could adversely impact our results of operations through lost revenue opportunities or charges related to excess and obsolete inventory.

We must devote substantial resources, including design, engineering, sales, marketing and management efforts, to qualify our products with prospective customers in anticipation of sales. Significant delays in the qualification process, could result in an inability to keep up with rapid technology change or new, competitive technologies. If we

15

delay or do not succeed in qualifying a product with an existing or prospective customer, we will not be able to sell that product to that customer, which may result in our holding excess and obsolete inventory and harm our operating results and business.

***Sales to a limited number of customers represent a significant portion of our net sales and the loss of, or a significant reduction in sales to, any one of these customers could materially harm our business.***

Sales to certain of our OEM customers have historically represented a substantial majority of our net product sales. Approximately 27% and 10% of our net product sales in the fiscal year ended January 2, 2016 were to two customers. Approximately 20%, 14% and 19% of our net product sales in the fiscal year ended December 27, 2014 were to three customers. The composition of major customers and their respective contributions to our net product sales have varied and will likely continue to vary from period to period as our OEMs progress through the life cycle of the products they produce and sell. We do not have long-term agreements with any of our customers and, as such, any or all of them could decide at any time to discontinue, decrease or delay their purchase of our products. In addition, the prices that these customers pay for our products could change at any time. The loss of any of our OEM customers, or a significant reduction in sales to any of them, could significantly reduce our net sales and adversely affect our operating results. Further, we may not be able to sell some products developed for one customer to a different customer because our products are often designed to address specific customer requirements, and even if we are able to sell these products to another customer, our margin on such products may be reduced.

Our ability to maintain or increase our net sales to our key customers depends on a variety of factors, many of which are beyond our control. These factors include our customers' continued sales of servers and other computing systems that incorporate our memory subsystems and our customers' continued incorporation of our products into their systems. Because of these and other factors, net sales to these customers may not continue and the amount of such net sales may not reach or exceed historical levels in any future period. Because these customers account for a substantial portion of our net sales, the failure of any one of these customers to pay on a timely basis would negatively impact our cash flow. In addition, while we may not be contractually obligated to accept returned products, we may determine that it is in our best interest to accept returns in order to maintain good relations with our customers.

***A limited number of relatively large potential customers dominate the markets for our products.***

Our target markets are characterized by a limited number of large companies. Consolidation in one or more of our target markets may further increase this industry concentration. As a result, we anticipate that sales of our products will continue to be concentrated among a limited number of large customers in the foreseeable future. We believe that our financial results will depend in significant part on our success in establishing and maintaining relationships with, and effecting substantial sales to, these potential customers. Even if we establish and successfully maintain these relationships, our financial results will be largely dependent on these customers' sales and business results.

***If a standardized memory solution that addresses the demands of our customers is developed, our net sales and market share may decline.***

Many of our memory subsystems are specifically designed for our OEM customers' high-performance systems. In a drive to reduce costs and assure supply of their memory module demand, our OEM customers may endeavor to design Joint Electron Device Engineering Council (" JEDEC ")  standard DRAM modules into their new products. Although we also manufacture JEDEC modules, this trend could reduce the demand for our higher priced customized memory solutions, which would have a negative impact on our financial results. In addition, the adoption of a JEDEC standard module instead of a previously custom module might allow new competitors to participate in a share of our customers' memory module business that previously belonged to us.

If our OEM customers were to adopt JEDEC standard modules, our future business may be limited to identifying the next generation of high-performance memory demands of OEM customers and developing solutions that address such demands. Until fully implemented, any next generation of products may constitute a significantly smaller market, which would reduce our net sales and market share.

16

***We may not be able to maintain our competitive position because of the intense competition in our targeted markets.***

Our products are primarily targeted for the server, high-performance computing and communications markets. These markets are intensely competitive, as numerous companies vie for business opportunities at a limited number of large OEMs. We face competition from DRAM suppliers, memory module providers and logic suppliers for many of our products, including NVvault and HyperCloud ®. Additionally, if and to the extent we enter new markets or pursue licensing arrangements to monetize our technologies and intellectual property portfolio, we may face competition from a large number of competitors that produce solutions utilizing similar or competing technologies.

Some of our customers and suppliers may have proprietary products or technologies that are competitive with our products, or could develop internal solutions or enter into strategic relationships with, or acquire, existing high-density memory module providers. Any of these actions could reduce our customers' demand for our products. Some of our significant suppliers of memory integrated circuits may be able to manufacture competitive products at lower costs by leveraging internal efficiencies, or could choose to reduce our supply of memory integrated circuits, adversely affecting our ability to manufacture our memory subsystems on a timely basis, if at all.

Certain of our competitors have substantially greater financial, technical, marketing, distribution and other resources, broader product lines, lower cost structures, greater brand recognition and longer standing relationships with customers and suppliers. Some of our competitors may also have a greater ability to influence industry standards than we do, as well as more extensive patent portfolios.

Our ability to compete in our current target markets and in future markets will depend in large part on our ability to successfully develop, introduce and sell new and enhanced products or technologies on a timely and cost-effective basis and to respond to changing market requirements. We expect our competitors to continue to improve the performance of their current products, reduce their prices and introduce new or enhanced technologies that may offer greater performance and improved pricing. If we are unable to match or exceed the improvements made by our competitors, our market position would deteriorate and our net sales would decline. In addition, our competitors may develop future generations and enhancements of competitive products that may render our technologies obsolete or uncompetitive.

***If we fail to protect our proprietary rights, our customers or our competitors might gain access to our proprietary designs, processes and technologies, which could adversely affect our operating results.***

We rely on a combination of patent protection, trade secret laws and restrictions on disclosure to protect our intellectual property rights. We have submitted a number of patent applications regarding our proprietary processes and technology. It is not certain when or if any of the claims in the remaining applications will be allowed. As of January 2, 2016 , we had 60 U.S. and foreign patents issued and over 3 3   pending applications worldwide. We intend to continue filing patent applications with respect to most of the new processes and technologies that we develop. However, patent protection may not be available for some of these processes or technologies.

It is possible that our efforts to protect our intellectual property rights may not:

- prevent challenges to, or the invalidation or circumvention of, our existing intellectual property rights;

- prevent our competitors from independently developing similar products or technologies, duplicating our products or technologies or designing around any patents that may be issued to us;

- prevent disputes with third parties regarding ownership of our intellectual property rights;

- prevent disclosure of our trade secrets and know -how to third parties or into the public domain;

- result in valid patents, including international patents, from any of our pending or future applications; or

-  otherwise adequately protect our intellectual property rights.

17

Table of Contents

Others may attempt to reverse engineer, copy or otherwise obtain and use our proprietary technologies without our consent. Monitoring the unauthorized use of our technologies is difficult. We cannot be certain that the steps we have taken will prevent the unauthorized use of our technologies. This is particularly true in foreign countries, such as the PRC, where we have established a manufacturing facility and where the laws may not protect our proprietary rights to the same extent as applicable U.S. laws.

If some or all of the claims in our patent applications are not allowed, or if any of our intellectual property protections are limited in scope by the USPTO or our foreign patents being subjected to invalidation proceedings with their respective authorities, or by a court or circumvented by others, we could face increased competition with regard to our products and be unable to execute on our strategy of monetizing our intellectual property. Increased competition or an inability to monetize our intellectual property could significantly harm our business, our operating results and prospects . Currently four of our patents are the subject of *Inter Partes* Reexamination proceedings with the USPTO, or appeals therefrom, and we cannot assure you that any of these proceedings will result in an outcome favorable to us.

***We are involved in and expect to continue to be involved in costly legal and administrative proceedings to defend against claims that we infringe the intellectual property rights of others or to enforce or protect our intellectual property rights.***

As is common in the semiconductor industry, we have experienced substantial litigation regarding patent and other intellectual property rights. Lawsuits claiming that we are infringing others' intellectual property rights have been and may in the future be brought against us, and we are currently defending against claims of invalidity in the USPTO.

The process of obtaining and protecting patents is inherently uncertain. In addition to the patent issuance process established by law and the procedures of the USPTO, we must comply with JEDEC administrative procedures in protecting our intellectual property within its industry standard setting process. These procedures evolve over time, are subject to variability in their application, and may be inconsistent with each other. Failure to comply with JEDEC's administrative procedures could jeopardize our ability to claim that our patents have been infringed.

By making use of new technologies and entering new markets there is an increased likelihood that others might allege that our products infringe on their intellectual property rights. Litigation is inherently uncertain, and an adverse outcome in existing or any future litigation could subject us to significant liability for damages or invalidate our proprietary rights. An adverse outcome also could force us to take specific actions, including causing us to:

- cease manufacturing and/or selling products, or using certain processes, that are claimed to be infringing a third-party's intellectual property;

- pay damages (which in some instances may be three times actual damages), including royalties on past or future sales;

- seek a license from the third-party intellectual property owner to use their technology in our products, which license may not be available on reasonable terms, or at all; or

- redesign those products that are claimed to be infringing a third-party's intellectual property.

If any adverse ruling in any such matter occurs, any resulting limitations in our ability to market our products, or delays and costs associated with redesigning our products or payments of license fees to third parties, or any failure by us to develop or license a substitute technology on commercially reasonable terms could have a material adverse effect on our business, financial condition and results of operations.

There is a limited pool of experienced technical personnel that we can draw upon to meet our hiring needs. As a result, a number of our existing employees have worked for our existing or potential competitors at some point during their careers, and we anticipate that a number of our future employees will have similar work histories. In the past, some of these competitors have claimed that our employees misappropriated their trade secrets or violated non -competition or

18

non -solicitation agreements. Some of our competitors may threaten or bring legal action involving similar claims against us or our existing employees or make such claims in the future to prevent us from hiring qualified candidates. Lawsuits of this type may be brought, even if there is no merit to the claim, simply as a strategy to drain our financial resources and divert management's attention away from our business.

Our business strategy also includes litigating claims against others, including our competitors, customers and former employees, to enforce our intellectual property, contractual and commercial rights including, in particular, our trade secrets, as well as to challenge the validity and scope of the proprietary rights of others. We could become subject to counterclaims or countersuits against us as a result of this litigation. Moreover, any legal disputes with customers could cause them to cease buying or using our products or delay their purchase of our products and could substantially damage our relationship with them.

Any litigation, regardless of its outcome, would be time consuming and costly to resolve, divert our management's time and attention and negatively impact our results of operations. As a result, any current or future infringement claims by or against third parties or claims for indemnification by customers or end users of our products resulting from infringement claims could materially adversely affect our business, financial condition or results of operations.

As a result of the unfavorable outcome in connection with the litigation against Diablo Technologies, Inc., for controller chips used by SanDisk Corporation in its high -speed ULLtraDIMM SSD product line, we may expend significant resources to pursue an appeal in the case, which may not be resolved in a timely manner and may not yield a more favorable outcome. Moreover, the expenses associated with the matter, including a $900,000 bond that has been forfeited, may materially adversely affect our financial condition and operating results. See Note 7 to our consolidated financial statements included in this report for further information about this litigation.

***We may become involved in non-patent related litigation and administrative proceedings that may materially adversely affect us.***

From time to time, we may become involved in various legal proceedings relating to matters incidental to the ordinary course of our business, including commercial, product liability, employment, class action, whistleblower and other litigation and claims and governmental and other regulatory investigations and proceedings. Such matters can be time-consuming, divert management's attention and resources and cause us to incur significant expenses. Furthermore, because litigation is inherently unpredictable, the results of these actions could have a material adverse effect on our business, results of operations and financial condition.

***Our operating results may be adversely impacted by worldwide economic and political uncertainties and specific conditions in the markets we address, including the cyclical nature of and volatility in the memory market and semiconductor industry.***

Adverse changes in domestic and global economic and political conditions have made it extremely difficult for our customers, our vendors and us to accurately forecast and plan future business activities, and these conditions have caused and could continue to cause U.S. and foreign businesses to slow spending on our products and services, which would further delay and lengthen sales cycles. In addition, sales of our products are dependent upon demand in the computing, networking, communications, printer, storage and industrial markets. These markets have been cyclical and are characterized by wide fluctuations in product supply and demand. These markets have also experienced significant downturns, often connected with, or in anticipation of, maturing product cycles, reductions in technology spending and declines in general economic conditions. These downturns have been characterized by diminished product demand, production overcapacity, high inventory levels and the erosion of average selling prices and may result in reduced willingness of potential licensees to enter into license agreement with us.

We may experience substantial period-to-period fluctuations in operating results due to factors affecting the computing, networking, communications, printers, storage and industrial markets. A decline or significant shortfall in demand in any one of these markets could have a material adverse effect on the demand for our products and as a result, our sales would likely decline. In addition, because many of our costs and operating expenses are relatively fixed, if we

19

are unable to control our expenses adequately in response to reduced sales, our gross margins, operating income and cash flow would be negatively impacted.

During challenging economic times our customers may face issues gaining timely access to sufficient credit, which could impair their ability to make timely payments to us. If that were to occur, we may be required to increase our allowance for doubtful accounts and our ability to timely collect payments would be negatively impacted. Furthermore, our vendors may face similar issues gaining access to credit, which may limit their ability to supply components or provide trade credit to us. We cannot predict the timing, strength or duration of any economic slowdown or subsequent economic recovery, either worldwide or in the memory market and related semiconductor industry. If the economy or markets in which we operate do not improve or if conditions worsen, our business, financial condition and results of operations will likely be materially and adversely affected. Additionally, the combination of our lengthy sales cycle coupled with challenging macroeconomic conditions could compound the negative impact on the results of our operations.

***Our lack of a significant backlog of unfilled orders and the difficulty inherent in estimating customer demand makes it difficult to forecast our short-term production requirements to meet that demand, and any failure to optimally calibrate our production capacity and inventory levels to meet customer demand could adversely affect our revenues, gross margins and earnings.***

We make significant decisions regarding the levels of business that we will seek and accept, production schedules, component procurement commitments, personnel needs and other resource requirements based on our estimates of customer requirements. We do not have long-term purchase agreements with any of our customers. Instead, our customers often place purchase orders no more than two weeks in advance of their desired delivery date, and these purchase orders generally have no cancellation or rescheduling penalty provisions. The short-term nature of commitments by many of our customers, the fact that our customers may cancel or defer purchase orders for any reason, and the possibility of unexpected changes in demand for our customers' products each reduce our ability to accurately estimate future customer requirements for our products. This fact, combined with the quick turn-around times that apply to each order, makes it difficult to forecast our production needs and allocate production capacity efficiently. As a result, we attempt to forecast the demand for the DRAM ICs, NAND flash and other components needed to manufacture our products, but any such forecasts could turn out to be wrong. Further, lead times for components vary significantly and depend on various factors, such as the specific supplier and the demand and supply for a component at a given time.

Our production expense and component purchase levels are based in part on our forecasts of our customers' future product requirements and to a large extent are fixed in the short term. As a result, we likely would be unable to adjust spending on a timely basis to compensate for any unexpected shortfall in customer orders. If we overestimate customer demand, we may have excess raw material inventory of DRAM ICs and NAND flash. If there is a subsequent decline in the prices of DRAM ICs or NAND flash, the value of our inventory will fall. As a result, we may need to write-down the value of our DRAM IC or NAND flash inventory, which may result in a significant decrease in our gross margin and financial condition. Also, to the extent that we manufacture products in anticipation of future demand that does not materialize, or in the event a customer cancels or reduces outstanding orders, we could experience an unanticipated increase in our finished goods inventory. In the past, we have had to write-down inventory due to obsolescence, excess quantities and declines in market value below our costs. Any significant shortfall of customer orders in relation to our expectations could hurt our operating results, cash flows and financial condition.

Also, any rapid increases in production required by our customers could strain our resources and reduce our margins. If we underestimate customer demand, we may not have sufficient inventory of DRAM ICs and NAND flash on hand to manufacture enough product to meet that demand. We also may not have sufficient manufacturing capacity at any given time to meet our customers' demands for rapid increases in production. These shortages of inventory and capacity would lead to delays in the delivery of our products, and we could forego sales opportunities, lose market share and damage our customer relationships.

***Declines in our average sales prices, driven by volatile prices for DRAM ICs and NAND flash, among other factors, may result in declines in our revenues and gross profit.***

Our industry is competitive and historically has been characterized by declines in average sales price, based in part on the market price of DRAM ICs and NAND flash, which have historically constituted a substantial portion of the total cost of our memory subsystems. Our average sales prices may decline due to several factors, including overcapacity in the worldwide supply of DRAM and NAND flash memory components as a result of worldwide economic conditions, increased manufacturing efficiencies, implementation of new manufacturing processes and expansion of manufacturing capacity by component suppliers.

Once our prices with a customer are negotiated, we are generally unable to revise pricing with that customer until our next regularly scheduled price adjustment. Consequently, we are exposed to the risks associated with the volatility of the price of DRAM ICs and NAND flash during that period. If the market prices for DRAM ICs and NAND flash increase, we generally cannot pass the price increases on to our customers for products purchased under an existing purchase order. As a result, our cost of sales could increase and our gross margins could decrease. Alternatively, if there are declines in the price of DRAM ICs and NAND flash, we may need to reduce our selling prices for subsequent purchase orders, which may result in a decline in our expected net sales.

In addition, since a large percentage of our sales are to a small number of customers that are primarily distributors and large OEMs, these customers have exerted, and we expect they will continue to exert, pressure on us to make price concessions. If not offset by increases in volume of sales or the sales of newly-developed products with higher margins, decreases in average sales prices would likely have a material adverse effect on our business and operating results.

***If the supply of component materials used to manufacture our products is interrupted or if our inventory becomes obsolete, our results of operations and financial condition could be adversely affected.***

We use consumables and other components, including PCBs, to manufacture our memory subsystems. We sometimes procure PCBs and other components from single or limited sources to take advantage of volume pricing discounts. Material shortages or transportation problems could interrupt the manufacture of our products. These delays in manufacturing could adversely affect our results of operations.

Frequent technology changes and the introduction of next-generation products also may result in the obsolescence of other items of inventory, such as our custom-built PCBs, which could reduce our net sales and gross margin and adversely affect our operating performance and financial condition.

***A prolonged disruption of our manufacturing facility could have a material adverse effect on our business, financial condition and results of operations.***

We maintain a manufacturing facility in the PRC for producing most of our products, which allows us to utilize our materials and processes, protect our intellectual property and develop the technology for manufacturing. A prolonged disruption or material malfunction of, interruption in or the loss of operations at our manufacturing facility or the failure to maintain a sufficient labor force at such facility could require us to rely on third parties for our manufacturing needs, which generally increases our manufacturing costs and decreases our profit margins and could limit our capacity to meet customer demand and delay new product development until a replacement facility and equipment, if necessary, were secured. The replacement of the manufacturing facility could take an extended amount of time before manufacturing operations could restart. The potential delays and costs resulting from these steps could have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to manufacture our products efficiently, our operating results could suffer.***

We must continuously review and improve our manufacturing processes in an effort to maintain satisfactory manufacturing yields and product performance, to lower our costs and to otherwise remain competitive. As we manufacture more complex products, the risk of encountering delays or difficulties increases. The start-up costs

21

associated with implementing new manufacturing technologies, methods and processes, including the purchase of new equipment, and any resulting manufacturing delays and inefficiencies, could negatively impact our results of operations.

If we need to add manufacturing capacity, an expansion of our existing manufacturing facility or establishment of a new facility could be subject to factory audits by our customers. Any delays or unexpected costs resulting from this audit process could adversely affect our net sales and results of operations. In addition, we cannot be certain that we would be able to increase our manufacturing capacity on a timely basis or meet the standards of any applicable factory audits.

***We depend on third-parties to design and manufacture custom components for some of our products.***

Significant customized components, such as ASICs, that are used in HyperCloud ® and some of our other products are designed and manufactured by third parties. The ability and willingness of such third parties to perform in accordance with their agreements with us is largely outside of our control. If one or more of our design or manufacturing partners fails to perform its obligations in a timely manner or at satisfactory quality levels, our ability to bring products to market or deliver products to our customers, as well as our reputation, could suffer. In the event of any such failures, we may have no readily available alternative source of supply for such products, since, in our experience, the lead time needed to establish a relationship with a new design and/or manufacturing partner is at least 12 months, and the estimated time for our OEM customers to re-qualify our product with components from a new vendor ranges from four to nine months. If we need to replace one of our manufacturers, we may not be able to redesign, or cause to have redesigned, our customized components to be manufactured by the new manufacturer in a timely manner, and we could infringe on the intellectual property of our current design or manufacturing partner when we redesign the custom components or cause such components to be redesigned by the new manufacturer. A manufacturing disruption experienced by our manufacturing partners, the failure of our manufacturing partners to dedicate adequate resources to the production of our products, the financial instability of our manufacturing or design partners, or any other failure of our design or manufacturing partners to perform according to their agreements with us would have a material adverse effect on our business, financial condition and results of operations.

We have many other risks due to our dependence on third-party manufacturers, including: reduced control over delivery schedules, quality, manufacturing yields and cost; the potential lack of adequate capacity during periods of excess demand; limited warranties on products supplied to us; and potential misappropriation of our intellectual property. We are dependent on our manufacturing partners to manufacture products with acceptable quality and manufacturing yields, to deliver those products to us on a timely basis and to allocate a portion of their manufacturing capacity sufficient to meet our needs. Although our products are designed using the process design rules of the particular manufacturers, our manufacturing partners may not be able to achieve or maintain acceptable yields or deliver sufficient quantities of components on a timely basis or at an acceptable cost. Additionally, our manufacturing partners may not continue to devote adequate resources to produce our products or continue to advance the process design technologies on which the qualification and manufacturing of our products are based.

***If our products do not meet the quality standards of our customers, we may be forced to stop shipments of products until the quality issues are resolved.***

Our customers require our products to meet strict quality standards. Should our products not meet such standards, our customers may discontinue purchases from us until we are able to resolve the quality issues that are causing us to not meet the standards. Such "quality holds" could have a significant adverse impact on our revenues and operating results.

***If our products are defective or are used in defective systems, we may be subject to warranty, product recalls or product liability claims.***

If our products are defectively manufactured, contain defective components or are used in defective or malfunctioning systems, we could be subject to warranty and product liability claims and product recalls, safety alerts or advisory notices. While we have product liability insurance coverage, it may not be adequate to satisfy claims made against us. We also may be unable to obtain insurance in the future at satisfactory rates or in adequate amounts.

22

Although we generally attempt to contractually limit our exposure to incidental and consequential damages, if these contract provisions are not enforced or are unenforceable or if liabilities arise that are not effectively limited, we could incur substantial costs in defending or settling product liability claims.

Warranty and product liability claims or product recalls, regardless of their ultimate outcome, could have an adverse effect on our business, financial condition and reputation, and on our ability to attract and retain customers. In addition, we may determine that it is in our best interest to accept product returns in circumstances where we are not contractually obligated to do so in order to maintain good relations with our customers. Accepting product returns may negatively impact our operating results.

***If we are required to obtain licenses to use third-party intellectual property and we fail to do so, our business could be harmed.***

Although some of the components used in our final products contain the intellectual property of third parties, we believe that our suppliers bear the sole responsibility to obtain any rights and licenses to such third-party intellectual property. While we have no knowledge that any third-party licensor disputes our belief, we cannot assure you that disputes will not arise in the future. The operation of our business and our ability to compete successfully depends significantly on our continued operation without claims of infringement or demands resulting from such claims, including demands for payments of money in the form of, for example, ongoing licensing fees.

We are also developing new products that we intend to launch in new customer markets. Similar to our current products, we may use components in these new products that contain the intellectual property of third parties. While we plan to exercise precautions to avoid infringing on the intellectual property rights of third parties, disputes regarding intellectual property ownership could arise.

If it is determined that we are required to obtain inbound licenses and we fail to obtain licenses, or if such licenses are not available on economically feasible terms, then we would be forced to redesign the applicable product without the infringing component, which may be costly or not possible, or we may be forced to cease all manufacture and sales of the applicable product. Any such outcome would harm our business, operating results and financial condition.

***The flash memory market is constantly evolving and competitive, and we may not have rights to manufacture and sell certain types of products utilizing emerging flash formats, or we may be required to pay a royalty to sell products utilizing these formats.***

The flash-based storage market is constantly undergoing rapid technological change and evolving industry standards. Many consumer devices, such as digital cameras, PDAs and smartphones, are transitioning to emerging flash memory formats, such as the Memory Stick and xD Picture Card formats, which we do not currently manufacture and do not have rights to manufacture. Although we do not currently serve the consumer flash market, it is possible that certain OEMs may choose to adopt these higher-volume, lower-cost formats. This could result in a decline in demand, on a relative basis, for other products that we manufacture, such as CompactFlash, SD and embedded USB drives. If we decide to manufacture flash memory products utilizing emerging formats, we would be required to secure licenses to give us the right to manufacture such products that may not be available at reasonable rates or at all. If we are not able to supply flash card formats at competitive prices or if we were to have product shortages, our net sales could be adversely impacted and our customers would likely cancel orders or seek other suppliers to replace us.

***Our indemnification obligations for the infringement by our products of the intellectual property rights of others could require us to pay substantial damages.***

As is common in our industry, we have in effect a number of agreements in which we have agreed to defend, indemnify and hold harmless our customers and suppliers from damages and costs that may arise from the infringement by our products of third-party patents, trademarks or other proprietary rights. The scope of such indemnity varies, but may, in some instances, include indemnification for damages and expenses, including attorneys' fees. Our insurance

23

does not cover intellectual property infringement. The term of these indemnification agreements is generally perpetual after execution of the applicable agreement. The maximum potential amount of future payments we could be required to make under these indemnification agreements is unlimited. We may periodically have to respond to claims and litigate these types of indemnification obligations. Although our suppliers may bear responsibility for the intellectual property inherent in the components they sell to us, they may lack the financial ability to stand behind such indemnities. Additionally, it may be costly to enforce any indemnifications that they have granted to us. Accordingly, any indemnification claims by customers could require us to incur significant legal fees and could potentially result in the payment of substantial damages, either of which could result in a material adverse effect on our business and results of operations.

***We depend on a few key employees, and if we lose the services of any of these employees or are unable to attract and retain other qualified personnel, our business could be harmed.***

To date, we have been highly dependent on the experience, relationships and technical knowledge of certain key employees. We believe that our future success will be dependent on our ability to retain the services of these key employees, develop their successors, reduce our reliance on them, and properly manage the transition of their roles should departures occur. The loss of these key employees or their inability to provide their services could delay the development and introduction of, and negatively impact our ability to sell, our products and otherwise harm our business. We do not have employment agreements with any of these key employees other than Chun K. Hong, our President, Chief Executive Officer and Chairman of the Board. We maintain "Key Man" life insurance on Chun K. Hong; however, we do not carry "Key Man" life insurance on any of our other key employees.

Our future success also depends on our ability to attract, retain and motivate highly skilled engineering, manufacturing, and other technical and sales personnel. Competition for experienced personnel is intense. We may not be successful in attracting new engineers or other technical personnel or in retaining or motivating our existing personnel. If we are unable to hire and retain engineers with the skills necessary to keep pace with the evolving technologies in our markets, our ability to continue to provide our current products and to develop new or enhanced products will be negatively impacted, which would harm our business. In addition, a general shortage of experienced engineers could lead to increased recruiting, relocation and compensation costs for such engineers, which may exceed our expectations and resources. These increased costs may make hiring new engineers difficult or may increase our operating expenses.

Historically, a significant portion of our workforce has consisted of contract personnel. We invest considerable time and expense in training these contract employees. We may experience high turnover rates in our contract employee workforce, which may require us to expend additional resources in the future. If we convert any of these contract employees into permanent employees, we may have to pay finder's fees to the contract agency.

***We rely on third-party manufacturers' representatives to sell our products and the failure of these manufacturers' representatives to perform as expected could reduce our sales.***

We sell some of our products to customers through manufacturers' representatives. We are unable to predict the extent to which our manufacturers' representatives will be successful in marketing and selling our products. Moreover, many of our manufacturers' representatives also market and sell other, potentially competing products. Our representatives may terminate their relationships with us at any time. Our future performance will also depend, in part, on our ability to attract additional manufacturers' representatives that will be able to market and support our products effectively, especially in markets in which we have not previously distributed our products. If we cannot retain our current manufacturers' representatives or recruit additional or replacement manufacturers' representatives, our sales and operating results will be harmed.

***Economic, political and other risks associated with international sales and operations expose us to significant risks.***

Since 2009, most of our world-wide manufacturing production has been performed at our manufacturing facility in the People's Republic of China, or PRC. Language and cultural differences, as well as the geographic distance from our headquarters in Irvine, California, further compound the difficulties of running a manufacturing operation in

24

the PRC. Our management has limited experience in creating or overseeing foreign operations, and the ongoing management of our PRC facility may require our management team to divert substantial amounts of their time, particularly if we encounter operational difficulties or manufacturing disruptions at our PRC facility.  We may not be able to maintain control over product quality, delivery schedules, manufacturing yields and costs. Furthermore, the costs related to having excess capacity have in the past and may in the future continue to have an adverse impact on our gross margins and operating results.

We manage a local workforce that may subject us to regulatory uncertainties. Changes in the labor laws of the PRC could increase the cost of employing the local workforce. The increased industrialization of the PRC, as well as general economic and political conditions in the PRC, could also increase the price of local labor. Any or all combination of these factors could negatively impact the cost savings we currently enjoy from having our manufacturing facility in the PRC.

***Economic, political and other risks associated with international sales and operations could adversely affect our net sales.***

Part of our growth strategy involves making sales to foreign corporations and delivering our products to facilities located in foreign countries. To facilitate this process and to meet the long-term projected demand for our products, we have established a manufacturing facility in the PRC, which performs most of our worldwide manufacturing production. Selling and manufacturing in foreign countries subjects us to additional risks not present with our domestic operations, as we are operating in business and regulatory environments in which we have limited previous experience. Further, the geographic distance from our headquarters in Irvine, California, compounds the difficulties of running a manufacturing operation in the PRC. We will need to continue to overcome language and cultural barriers to effectively conduct our operations in these environments. Changes in the labor laws of the PRC could increase the cost of employing the local workforce. The increased industrialization of the PRC, as well as general economic and political conditions in the PRC, could also increase the price of local labor. Any of these factors could negatively impact the cost savings we experience from locating our manufacturing facility in the PRC. Our management has limited experience creating or overseeing foreign operations, and the ongoing management of our PRC facility may require our management team to divert substantial amounts of their time, particularly if we encounter operational difficulties or manufacturing disruptions at our PRC facility. We may not be able to maintain control over product quality, delivery schedules, manufacturing yields and costs.

In addition, the economies of the PRC and other countries have been highly volatile in the past, resulting in significant fluctuations in local currencies and other instabilities. These instabilities affect a number of our customers and suppliers in addition to our own foreign operations.

In the future, some of our net sales may be denominated in Chinese Renminbi ("RMB"). The Chinese government controls the procedures by which RMB is converted into other currencies, and conversion of RMB generally requires government consent. As a result, RMB may not be freely convertible into other currencies at all times. If the Chinese government institutes changes in currency conversion procedures, or imposes restrictions on currency conversion, those actions may negatively impact our operations and could reduce our operating results. In addition, fluctuations in the exchange rate between RMB and U.S. dollars may adversely affect our expenses and results of operations as well as the value of our assets and liabilities. These fluctuations may also adversely affect the comparability of our period-to-period results. If we decide to declare dividends and repatriate funds from our Chinese operations, we will be required to comply with the procedures and regulations of applicable Chinese law. Any changes to these procedures and regulations, or our failure to comply with these procedures and regulations, could prevent us from making dividends and repatriating funds from our Chinese operations, which could adversely affect our financial condition. If we are able to make dividends and repatriate funds from our Chinese operations, these dividends would be subject to U.S. corporate income tax.

International turmoil and the threat of future terrorist attacks, both domestically and internationally, have contributed to an uncertain political and economic climate, both in the U.S. and globally, and have negatively impacted the worldwide economy. The occurrence of one or more of these instabilities could adversely affect our foreign operations and some of our customers or suppliers, which could adversely affect our net sales. In addition, our failure to

25

meet applicable regulatory requirements or overcome cultural barriers could result in production delays and increased turn-around times, which would adversely affect our business.

Our international sales are subject to other risks, including regulatory risks, tariffs and other trade barriers, timing and availability of export licenses, political and economic instability, difficulties in accounts receivable collections, difficulties in managing distributors, lack of a significant local sales presence, difficulties in obtaining governmental approvals, compliance with a wide variety of complex foreign laws and treaties and potentially adverse tax consequences. In addition, the U.S. or foreign countries may implement quotas, duties, taxes or other charges or restrictions upon the importation or exportation of our products, leading to a reduction in sales and profitability in that country.

***Our operations could be disrupted by power outages, natural disasters or other factors.***

Due to the geographic concentration of our manufacturing operations in our PRC facility and the operations of certain of our suppliers, a disruption resulting from equipment failure, power failures, quality control issues, human error, government intervention or natural disasters, including earthquakes and floods, could interrupt or interfere with our manufacturing operations and consequently harm our business, financial condition and results of operations. Such disruptions would cause significant delays in shipments of our products and adversely affect our operating results. In July 2014, our PRC facility suffered water damage as a result of heavy rain and floods, which forced us to temporarily halt manufacturing at the facility while necessary repairs or replacements were made to the facility and to certain of our manufacturing equipment. This incident caused us to incur additional expenses as we shifted our manufacturing activities to a third-party manufacturing facility in the PRC to enable us to mitigate the disruption in shipments to our customers. While we believe we have contained the disruptions we expect that our relationships with our key customers could be materially harmed if we incur additional manufacturing disruptions in the future. While we were able to favorably resolve our claim with our insurance carrier, similar events could occur in the future and, in such event, we may not be able to secure alternative manufacturing capabilities if manufacturing at our PRC facility is disrupted.

***Difficulties with our global information technology systems and/or unauthorized access to such systems, could harm our business.***

Any failure or malfunctioning of our global information technology system, errors or misuse by system users, difficulties in migrating standalone systems to our centralized systems, or inadequacy of the system in addressing the needs of our operations could disrupt our ability to timely and accurately manufacture and ship products, which could have a material adverse effect on our business, financial condition and results of operations. Any such failure, errors, misuse or inadequacy could also disrupt our ability to timely and accurately process, report and evaluate key operations metrics and key components of our results of operations, financial position and cash flows. Any such disruptions would likely divert our management and key employees' attention away from other business matters. Any disruptions or difficulties that may occur in connection with our global information technology system could also adversely affect our ability to complete important business process, such as maintenance of our disclosure controls and procedures and evaluation of our internal control over financial reporting and attestation activities pursuant to Section 404 of the Sarbanes-Oxley Act of 2002.

In connection with our daily business transactions, we store data about our business, including certain customer data, on our global information technology systems. While our systems are designed with security measures to prevent unauthorized access, third parties may gain unauthorized access to our systems. This unauthorized be the result of intentional misconduct by computer hackers, employee error, employee malfeasance or other causes. Additionally, third parties may attempt to fraudulently induce employees or customers into disclosing sensitive information such as user names, passwords or other information in order to gain access to our information technology system for the purpose of sabotage or to access our data, including our and our customers' intellectual property and confidential business information. Because the techniques used to obtain unauthorized access to information technology systems evolve frequently and generally are not recognized until successful, we may be unable to anticipate these techniques or to implement adequate preventative measures. Any security breach could result in disruption to our business, misappropriation or loss of data, loss of confidence in us by our customers, damage to our reputation, legal liability and a negative impact on our sales.

***Our failure to comply with environmental laws and regulations could subject us to significant fines and liabilities or cause us to incur significant costs.***

We are subject to various and frequently changing U.S. federal, state and local and foreign governmental laws and regulations relating to the protection of the environment, including those governing the discharge of pollutants into the air and water, the management and disposal of hazardous substances and wastes, the cleanup of contaminated sites and the maintenance of a safe workplace. In particular, some of our manufacturing processes may require us to handle and dispose of hazardous materials from time to time. For example, in the past our manufacturing operations have used lead-based solder in the assembly of our products. Today, we use lead-free soldering technologies in our manufacturing processes, as this is required for products entering the European Union. We could incur substantial costs, including clean-up costs, civil or criminal fines or sanctions and third-party claims for property damage or personal injury as a result of violations of, or noncompliance with, environmental laws and regulations. Although we have not incurred significant costs to date to comply with these laws and regulations, new laws or changes to current laws and regulations to make them more stringent could require us to incur significant costs to remain in compliance.

***Regulations related to "conflict minerals" may cause us to incur additional expenses and could limit the supply and increase the cost of certain metals used in manufacturing our products.***

In August 2012, the SEC adopted a rule requiring disclosure of specified minerals, known as conflict materials, that are necessary to the functionality or production of products manufactured or contracted to be manufactured by public companies. The rule requires companies to verify and disclose whether or not such minerals originate from the Democratic Republic of Congo or an adjoining country. To comply with this rule, we are required to conduct a reasonable country of origin inquiry each year and, depending on the results of that inquiry, we may be required to exercise due diligence on the source and chain of custody of conflict minerals contained in our products. Such due diligence must conform to a nationally or internationally recognized due diligence framework. We are required to file a disclosure report with the SEC in May of each year relating to the preceding calendar year. In addition, commencing with the disclosure report relating to the 2015 calendar year, to the extent that we are required to exercise due diligence on the source and chain of custody of conflict minerals, we will be required to obtain an independent private sector audit of our disclosure report and underlying due diligence measures.

The due diligence activities required to determine the source and chain of custody of minerals contained in our products are time consuming and may result in significant costs.  Due to the size and complexity of our supply chain, we face significant challenges in verifying the origins of the minerals used in our products.  Further, this rule could affect the availability in sufficient quantities and at competitive prices of certain minerals used in the manufacture of our products, including tantalum, tin, gold and tungsten.  There may be only limited number of sources of "conflict-free" minerals, which could result in increased material and component costs, as well as additional costs associated with potential changes to our products, processes or sources of supply.

If we are unable to sufficiently verify the origin of the minerals used in our products through the due diligence measures that we implement, or if we are unable to obtain an audit report each year that concludes that our due diligence measures are in conformity with the criteria set forth in the relevant due diligence framework, our reputation could be harmed. In addition, we may not be able to satisfy customers who require that our products be certified as "conflict-free," which could place us at a competitive disadvantage.

***Our internal controls over financial reporting may not be effective, which could have a significant and adverse effect on our business.***

Section 404 of the Sarbanes-Oxley Act of 2002 and the related rules and regulations of the SEC, which we collectively refer to as Section 404, require us to evaluate our internal controls over financial reporting to allow management to report on these internal controls as of the end of each year. Effective internal controls are necessary for us to produce reliable financial reports and are important in our effort to prevent financial fraud. In the course of our Section 404 evaluations, we may identify conditions that may result in significant deficiencies or material weaknesses and we may conclude that enhancements, modifications or changes to our internal controls are necessary or desirable.

27

Implementing any such changes would divert the attention of our management, could involve significant costs, and may negatively impact our results of operations.

We note that there are inherent limitations on the effectiveness of internal controls, as they cannot prevent collusion, management override or failure of human judgment. If we fail to maintain an effective system of internal controls or if management or our independent registered public accounting firm were to discover material weaknesses in our internal controls, we may be unable to produce reliable financial reports or prevent fraud, which could harm our financial condition and results of operations, result in a loss of investor confidence and negatively impact our stock price.

***If we do not effectively manage any future growth we may experience, our resources, systems and controls may be strained and our results of operations may suffer.***

Any future growth we may experience could strain our resources, management, information and telecommunication systems and operational and financial controls. To manage future growth effectively, including any expansion of volume in our manufacturing facility in the PRC, we must be able to improve and expand our systems and controls. We may not be able to do this in a timely or cost-effective manner, and our current systems and controls may not be adequate to support our future operations. In addition, our officers have relatively limited experience in managing a rapidly growing business. As a result, they may not be able to provide the guidance necessary to manage future growth or maintain future market position. Any failure to manage any growth we may experience or improve or expand our existing systems and controls, or unexpected difficulties in doing so, could harm our business.

***If we acquire businesses or technologies or pursue other strategic transactions in the future, these transactions could disrupt our business and harm our operating results and financial condition.***

We will evaluate opportunities to acquire businesses or technologies or pursue other strategic transactions, including collaboration or joint development arrangements such as our JDLA with Samsung, that might complement our current product offerings or enhance our intellectual property portfolio or technical capabilities. We have no experience in acquiring other businesses or technologies. Acquisitions and other strategic transactions entail a number of risks that could adversely affect our business and operating results, including, among others:

- difficulties in integrating the operations, technologies or products of acquired companies or working with third parties with which we may partner on joint development or collaboration relationships;

- the diversion of management's time and attention from the normal daily operations of the business;

- insufficient increases in net sales to offset increased expenses associated with the acquisitions or strategic transaction;

- difficulties in retaining business relationships with suppliers and customers;

- over-estimation of potential synergies or a delay in realizing those synergies;

- entering markets in which we have no or limited experience and in which competitors have stronger market positions; and

- the potential loss of key employees of our or any acquired companies.

Future acquisitions or other strategic transactions also could cause us to incur debt or be subject to contingent liabilities. In addition, acquisitions could cause us to issue equity or debt securities that could dilute the ownership interests of our existing stockholders or increase our leverage relative to our earnings or to our equity capitalization. Furthermore, acquisitions or other strategic transactions may result in material charges or adverse tax consequences, substantial depreciation, deferred compensation charges, in-process research and development charges, the amortization

28

of amounts related to deferred stock-based compensation expense and identifiable purchased intangible assets or impairment of goodwill, any or all of which could negatively affect our results of operations.

**Risks Related to Our Common Stock**

***Our results of operations fluctuate significantly and are difficult to predict, and any failure to meet investor or analyst expectations of our performance could cause the price of our common stock to decline.***

O ur operating results have varied significantly in the past and will continue to fluctuate from quarter-to-quarter or year-to-year in the future due to a variety of factors, many of which are beyond our control. Factors relating to our business that may contribute to these quarterly and annual fluctuations include, among other, those described in the risk factors in this Item 1A. Due to the various factors described herein and others, the results of any prior quarterly or annual periods should not be relied upon as an indication of our future operating performance. If our quarterly results of operations fall below the expectations of securities analysts or investors, the price of our common stock could decline substantially. As a result of the significant fluctuations of our operating results in prior periods, period-to-period comparisons of our operating results may not be meaningful and investors in our common stock should not rely on the results of any one quarter as an indicator of future performance.

***Our principal stockholders have significant voting power and may take actions that may not be in the best interest of our other stockholders.***

As of February 29, 2016, approximately 11.6% of our outstanding common stock was held by affiliates, including 10.4% held by Chun K. Hong, our Chief Executive Officer and Chairman of our board of directors. As a result, Mr. Hong has the ability to exert substantial influence over all matters requiring approval by our stockholders, including the election and removal of directors and any proposed merger, consolidation or sale of all or substantially all of our assets and other corporate transactions. This concentration of control could be disadvantageous to other stockholders with interests different from those of Mr. Hong.

***Anti-takeover provisions under our charter documents and Delaware law could delay or prevent a change of control and could also limit the market price of our stock.***

Our certificate of incorporation and bylaws contain provisions that could delay or prevent a change of control of our company or changes in our board of directors that our stockholders might consider favorable. In addition, these provisions could limit the price that investors would be willing to pay in the future for shares of our common stock. The following are examples of provisions which are included in our certificate of incorporation and bylaws, each as amended:

- our board of directors is authorized, without prior stockholder approval, to designate and issue preferred stock, commonly referred to as "blank check" preferred stock, with rights senior to those of our common stock;

- stockholder action by written consent is prohibited;

- nominations for election to our board of directors and the submission of matters to be acted upon by stockholders at a meeting are subject to advance notice requirements; and

- our board of directors is expressly authorized to make, alter or repeal our bylaws.

In addition, we are governed by the provisions of Section 203 of the Delaware General Corporation Law, which may prohibit certain business combinations with stockholders owning 15% or more of our outstanding voting stock. These and other provisions in our certificate of incorporation and bylaws and of Delaware law could make it more difficult for stockholders or potential acquirers to obtain control of our board of directors or initiate actions that are opposed by the then-current board of directors, including delaying or impeding a merger, tender offer, or proxy contest or other change of control transaction involving our company. Any delay or prevention of a change of control transaction

29

or changes in our board of directors could prevent the consummation of a transaction in which our stockholders could receive a substantial premium over the then-current market price for their shares.

***We do not currently intend to pay dividends on our common stock, and any return to investors is expected to come, if at all, only from potential increases in the price of our common stock.***

We intend to use all available funds to finance our operations. Accordingly, while payment of dividends rests within the discretion of our board of directors, no cash dividends on our common shares have been declared or paid by us in the past and we have no intention of paying any such dividends in the foreseeable future. Any return to investors is expected to come, if at all, only from potential increases in the price of our common stock.

***The price of and volume in trading of our common stock has and may continue to fluctuate significantly.***

Our common stock has been publicly traded since November 2006. The price of our common stock and the trading volume of our shares are volatile and have in the past fluctuated significantly. This volatility could continue and an active trading market in our common stock may never develop or be sustained. The market price at which our common stock trades may be influenced by many factors, including, among others, the following:

- our operating and financial performance and prospects, including our ability to achieve and sustain profitability in the future;

- investor perception of us and the industry in which we operate;

- the availability and level of research coverage of and market making in our common stock;

- results of litigation;

- changes in earnings estimates or buy/sell recommendations by analysts;

- sales of newly issued common stock or other securities associated with our registration statement on Form S-3, or the perception that such sales may occur;

- general financial and other market conditions; and

- changing and recently volatile domestic and international economic conditions.

In addition, shares of our common stock and the public stock markets in general have experienced, and may continue to experience, extreme price and trading volume volatility. These fluctuations may adversely affect the market price of our common stock and a stockholder's ability to sell its shares into the market at the desired time or at the desired price.

In 2007, following a drop in the market price of our common stock, securities litigation was initiated against us. Given the historic volatility of our industry, we may become engaged in this type of litigation in the future. Securities litigation, like other types of litigation that are discussed above, is expensive and time-consuming and could subject us to unfavorable results.

***We may not be able to maintain our NASDAQ listing.***

During 2015 and into early 2016, we experienced periods in which we were not compliant with the continued listing standards of The NASDAQ Global Market. As a result of a compliance process, we transferred the listing of our common stock from The NASDAQ Global Market tier to The NASDAQ Capital Market tier. On February 10, 2016, we received a compliance letter from The NASDAQ Stock Market notifying us that we had regained compliance with the applicable requirements for continued listing on The NASDAQ Stock Market. Our common stock continues to trade on

30

The NASDAQ Capital Market tier under the symbol "NLST." Notwithstanding our current compliance, there can be no assurance that we will continue to comply with the applicable continued listing standards of The NASDAQ Capital Market.  If we are delisted from The NASDAQ Capital Market, the liquidity of our common stock may be impaired, which could reduce the trading value of our common stock.

**Item 1B.  Unresolved Staff Comments .**

Not applicable.

**Item 2.  Properties**

Our corporate headquarters is located in approximately 8,203 square feet of space in Irvine, California, under a lease that expires in October 2016. We also currently lease approximately 42,200 square feet of space for our manufacturing facility in the PRC under a lease that expires in March 2017.

We believe that our current facilities are adequate for our current and expected operations for the next twelve months and that additional space c ould be obtained if needed.

**Item 3.  Legal Proceedings**

The information under the heading " Litigation and Patent Reexaminations" in Note 7 to our consolidated financial statements included in Part II, Item 8 of this report is incorporated herein by reference.

**Item 4.  Mine Safety Disclosures**

Not applicable.

**PART II**

**Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securitie s**

Our common stock began trading on The NASDAQ Global Market tier under the trading symbol "NLST" on November 30, 2006. As of January 14, 2016, our common stock commenced trading on The NASDAQ Capital Market tier. The following table sets forth the high and low sale prices for our common stock on the NASDAQ Global Market tier for the periods indicated:

|  | High | | Low | |
|---|---|---|---|---|
| **Year Ended January 2, 2016** | | | | |
| Fourth Quarter | $ | 1.10 | $ | 0.35 |
| Third Quarter | | 0.60 | | 0.28 |
| Second Quarter | | 0.76 | | 0.50 |
| First Quarter | | 2.09 | | 0.52 |
| | | | | |
| **Year Ended December 27, 2014** | | | | |
| Fourth Quarter | $ | 1.23 | $ | 0.57 |
| Third Quarter | | 1.59 | | 0.95 |
| Second Quarter | | 2.15 | | 0.93 |
| First Quarter | | 2.41 | | 0.70 |

**Holders**

As of February 29, 2016 there were approximately 7 holders of record of our shares of common stock, plus an indeterminate number of additional stockholders whose shares of our common stock are held on their behalf by brokerage firms or other agents.

**Recent Sales of Unregistered Securities**

On November 18, 2015, we issued to a law firm a warrant to purchase up to 300,000 shares of our common stock at an exercise price per share of $0.64, and on November 20, 2015, we issued to another law firm a warrant to purchase up to 60,000 shares of our common stock at an exercise price per share of $0.45. Each such warrant has a term of ten years and was issued as partial consideration for legal services rendered. Neither the warrants nor the common stock issuable upon exercise of the warrants have been registered under the Securities Act of 1933, as amended (the "Securities Act"). These securities were sold and issued in reliance on an exemption from the registration requirements of the Securities Act afforded by Section 4(a)(2) thereof in reliance on the following facts: we did not use general solicitation or advertising to market or sell the securities; each warrant holder represented to us that it was an accredited investor (as that term is defined in Rule 501 of Regulation D under the Securities Act) and that it was acquiring the securities with the present intention of holding them for purposes of investment and not with a view to their public resale or distribution within the meaning of the Securities Act; and the securities were issued as restricted securities.

**Dividend Policy**

We have never declared or paid cash dividends on our capital stock. Our credit facility with SVB prohibits the payment of cash dividends. Accordingly, we do not anticipate declaring or paying cash dividends on our capital stock in the foreseeable future. Any payments of cash dividends will be at the discretion of our board of directors, and will depend upon our results of operations, earnings, capital requirements, legal and contractual restrictions, and other factors deemed relevant by our board of directors.

**Item 6.  Selected Financial Data**

Not applicable.

32

Item 7.  Management ' s Discussion and Analysis of Financial Condition and Results of Operation s

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our audited consolidated financial statements and the related notes included elsewhere in this Annual Report on Form 10-K.*

*This discussion and analysis contains forward-looking statements regarding future events and our future performance.  These forward-looking statements involve risks and uncertainties that could cause actual results to differ materially and adversely from those expressed in any forward-looking statement.  These risks and uncertainties include, among others, risks associated with the launch and commercial success of our products, programs and technologies; the success of product, licensing and joint development partnerships; continuing development, qualification and volume production of HyperVault, EXPRESSvault™, NVvault™, HyperCloud® and VLP Planar-X RDIMM; the timing and magnitude of the continued decrease in our sales; our ability to leverage our NVvault™ and EXPRESSvault™ technology into a more diverse customer base; our need to raise additional capital and our ability to obtain financing when necessary; the rapidly-changing nature of technology; risks associated with intellectual property, including patent infringement litigation against us as well as the costs and unpredictability of litigation over infringement of our intellectual property and the possibility of our patents being reexamined or reviewed by the U.S. Patent and Trademark Office ("USPTO") and Patent Trial and Appeal Board ("PTAB"); volatility in the pricing of DRAM ICs and NAND flash; changes in and uncertainty of customer acceptance of, and demand for, our existing products and products under development, including uncertainty of and/or delays in product orders and product qualifications; delays in our and our customers' product releases and development; introductions of new products by competitors; changes in end-user demand for technology solutions; our ability to attract and retain skilled personnel; our reliance on suppliers of critical components and vendors in the supply chain; fluctuations in the market price of critical components; evolving industry standards; the political and regulatory environment in the PRC; and general economic and market conditions.  Other risks and uncertainties are described under the heading "Risk Factors" in Part I, Item IA of this Annual Report on Form 10-K.  Except as required by law, we undertake no obligation to revise or update publicly any forward-looking statements for any reason.*

**Overview**

We design, manufacture and sell a wide variety of high - performance, logic-based memory subsystems for the global datacenter, storage and high-performance computing markets. Our memory subsystems consist of combinations of dynamic random access memory integrated circuits ("DRAM ICs" or "DRAM"), NAND flash memory ("NAND flash"), application-specific integrated circuits ("ASICs") and other components assembled on printed circuit boards ("PCBs"). We primarily market and sell our products to leading original equipment manufacturer ("OEM") customers, hyperscale datacenter operators and storage vendors.  Our solutions are targeted at applications where memory plays a key role in meeting system performance requirements. We leverage a portfolio of proprietary technologies and design techniques, including combining discrete semiconductor technologies from third parties such as DRAM and NAND flash to function as one, efficient planar design, and alternative packaging techniques to deliver memory subsystems with persistence, high density, small form factor, high signal integrity, attractive thermal characteristics, reduced power consumption and low cost per bit. Our NVvault™ product is the first to offer both DRAM and NAND flash in a standard form factor memory subsystem as a persistent dual-in line memory module ("DIMM") in mission critical applications.  Our HyperCloud® technology incorporates our patented rank multiplication and load reduction technologies. We also have pending and issued patents covering fundamental aspects of hybrid memory DIMM designs that incorporate combinations of DRAM and/or NAND flash, such as our NVvault™ product.  We are focused on monetizing our patent portfolio through our products business and, where appropriate, through licensing arrangements with third parties that wish to incorporate our patented technologies in their products.

Our high-performance memory subsystems are developed in part using our proprietary technologies, and we believe that the strength of our intellectual property rights will be important to the success of our business. We utilize patent and trade secret protection, confidentiality agreements with customers and partners, disclosure and invention assignment agreements with employees and consultants and other contractual provisions to protect our intellectual property and other proprietary information. We also intend to seek opportunities to monetize our intellectual property through joint development or licensing arrangements and to vigorously defend our intellectual property rights, which

may include, when necessary, launching enforcement actions against entities we believe are using our patented solutions in their products. We may seek injunctive relief in the course of enforcing our intellectual property rights in certain instances, and in other instances we may enter into settlement or license agreements, which can be structured in a variety of ways, including one-time paid up licenses or ongoing royalty arrangements. We aim to generate a portion of our revenues with these types of licensing arrangements, but our efforts to monetize our intellectual property rights and technologies may not be successful.

**Recent Developments**

On November 12, 2015, we entered into a Joint Development and License Agreement ("JDLA") with Samsung Electronics Co., Ltd. ("Samsung"), pursuant to which agreed to work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of this new technology. We received $8.0 million of non-recurring engineering fees (NRE) from Samsung for the joint development. The JDLA includes a Right of First Refusal wherein we will provide Samsung the right to acquire our NVDIMM-P technology in a separate, subsequent transaction before we offer the technology to a third party. Both parties may enter into an additional agreement in the future for Samsung to be granted commercial license for our NVDIMM-P technology. The JDLA also includes cross licensing of each party's respective patent portfolios, as well as access to raw materials (DRAM and NAND flash) at competitive prices, and an important strategic partner that can facilitate getting our HyperVault technology to market.

On November 18, 2015 ("Closing Date"), we also entered into a Senior Secured Convertible Promissory Note and Warrant Purchase Agreement ("SVIC Purchase Agreement"), with SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership ("SVIC") and an affiliate of Samsung Venture Investment Co., pursuant to which we sold SVIC a Senior Secured Convertible Promissory Note ("SVIC Note") and a Stock Purchase Warrant ("SVIC Warrant"), each dated as of the Closing Date. The SVIC Note has an original principal amount of $15.0 million, accrues interest at a rate of 2% per year, is due and payable in full on December 31, 2021 ("SVIC Note Maturity Date") and the principal and accrued but unpaid interest of which are convertible into shares of our Common Stock at a conversion price of $1.25 per share (the "Conversion Price"), subject to certain adjustments as set forth therein on the SVIC Note Maturity Date. Upon a change of control prior to the SVIC Note Maturity Date, the SVIC Note may, at our option, be assumed by the surviving entity or be redeemed upon the consummation of such change of control for the principal and accrued but unpaid interest as of the redemption date. The SVIC Warrant grants SVIC a right to purchase 2,000,000 shares of our common stock at an exercise price of $0.30 per share, subject to certain adjustments as set forth therein, is only exercisable in the event we exercise our right to redeem the SVIC Note prior to the SVIC Note Maturity Date and expires on December 31, 2025. In connection with the SVIC Note, SVIC was granted a first priority security interest in our patents and a second priority security interest in all of our other assets. On the Closing Date, we, Silicon Valley Bank ("SVB") and SVIC entered into an Intercreditor Agreement in connection with the SVIC Note pursuant to which SVB and SVIC agreed to their relative security interest priorities in our assets. On the Closing Date, we and SVIC also entered into a Registration Rights Agreement pursuant to which we are obligated to register with the SEC the shares of Common Stock issued upon conversion of the SVIC Note or upon exercise of the SVIC Warrant.

On November 19, 2015, pursuant to the terms of a payoff letter (the "Payoff Letter"), the Company repaid all sums due under the 2013 Loan Agreement with Fortress Credit Opportunities I LP ("Fortress"), an affiliate of Fortress Investment Group LLC and successor to DBD Credit Funding, LLC, and terminated the 2013 Loan Agreement in full. Pursuant to the Payoff Letter, the parties also terminated the Monetization Letter Agreement (as amended, the "Letter Agreement"), dated July 18, 2013, by and between us and Drawbridge Special Opportunities Fund LP. In connection with the Payoff Letter, we made a lump sum payment of $1.0 million to Fortress as an early termination fee, and agreed to amend the outstanding warrant issued in connection with the entry of the 2013 Loan Agreement and Letter Agreement to reduce the exercise price per share to $0.47. Additionally, pursuant to the Payoff Letter, we issued to Fortress a new ten-year warrant to purchase 1,000,000 shares of our Common Stock with an exercise price per share of $0.47.

**Key Business Metrics**

The following describes certain line items in our consolidated statements of operations that are important to management's assessment of our financial performance:

Table of Contents

*Net Product Sales.*

Net product sales consist primarily of sales of our high performance memory subsystems, net of a provision for estimated returns under our right of return policies, which generally range up to 30 days. We generally do not have long-term sales agreements with our customers. Although OEM customers typically provide us with non-binding forecasts of future product demand over specific periods of time, they generally place orders with us approximately two weeks in advance of scheduled delivery. Selling prices are typically negotiated monthly, based on competitive market conditions and the current price of DRAM ICs and NAND flash . Purchase orders generally have no cancellation or rescheduling penalty provisions. We often ship our products to our customers' international manufacturing sites. All of our sales to date, however, are denominated in U.S. dollars. We also sell excess component inventory of DRAM ICs and NAND flash to distributors and other users of memory ICs. Component inventory sales are a relatively small percentage of net sales as a result of our efforts to diversify both our customer and product line bases. This diversification effort has also allowed us   to use   components in a wider range of memory subsystems. We expect that component inventory sales will continue to represent a minimal portion of our net sales in future periods.

*Engineering Services.*

We provide engineering services to our customers. We recognize revenue from these services when all of the following conditions are met: (1) evidence existed of an arrangement with the customer, typically consisting of a purchase order or contract; (2) our services were performed and risk of loss passed to the customer; (3) we completed all of the necessary terms of the contract; (4) the amount of revenue to which we were entitled was fixed or determinable; and (5) we believed it was probable that we would be able to collect the amount due from the customer. To the extent that one or more of these conditions has not been satisfied, we defer recognition of revenue.

Generally, we recognize revenue as the engineering services stipulated under the contract are completed and accepted by our custom ers. Engineering services are performed under a signed Statement of Work ("SOW") with a customer. The deliverables and payment terms stipulated under the SOW provide guidance on the project revenue recognition.

Revenues from contracts with substantive defined milestones that we have determined are reasonable, relevant to all the deliverables and payment terms in the SOW that are commensurate with the efforts required to achieve the milestones are recognized under the milestone recognition method.

Estimated losses on all SOW projects are recognized in full as soon as they become evident.

*Cost of Sales .*

Our cost of sales includes the cost of materials, labor and other manufacturing costs, depreciation and amortization of equipment, inventory valuation provisions, stock-based compensation, and occupancy costs and other allocated fixed costs. The DRAM ICs and NAND flash incorporated into our products constitute a significant portion of our cost of sales, and thus our cost of sales will fluctuate based on the current price of DRAM ICs and NAND flash. We attempt to pass through such DRAM IC and NAND flash memory cost fluctuations to our customers by frequently renegotiating pricing prior to the placement of their purchase orders. However, the sales prices of our memory subsystems can also fluctuate due to competitive situations unrelated to the pricing of DRAM ICs and NAND flash, which affects gross margins. In addition, we have experienced shortages of DRAM and flash required for our HyperCloud® and NVvault products from time to time, which can cause disruptions in our revenues and gross profits. In addition, the gross margin on our sales of any excess component DRAM IC and NAND flash inventory is much lower than the gross margin on our sales of our memory subsystems. As a result, fluctuations in DRAM IC and NAND flash inventory sales as a percentage of our overall sales could impact our overall gross margin. We assess the valuation of our inventories on a quarterly basis and record a provision to cost of sales as necessary to reduce inventories to the lower of cost or net realizable value.

*Research and Development.*

Research and development expense consists primarily of employee and independent contractor compensation and related costs, stock -based compensation, non-recurring engineering fees, computer -aided design software licenses, reference design development costs, depreciation or rental of evaluation equipment, and occupancy and other allocated overhead costs. Also included in research and development expense are the costs of material and overhead related to the production of engineering samples of new products under development or products used solely in the research and development process. Our customers typically do not separately compensate us for design and engineering work involved in developing application -specific products for them. All research and development costs are expensed as incurred. We anticipate that research and development expenditures will increase in future periods as we seek to expand new product opportunities, increase our activities related to new and emerging markets and continue to develop additional proprietary technologies.

*Intellectual Property Legal Fees .*

Intellectual property legal fees consists of legal fees incurred for patent filings and protection. We anticipate that intellectual property legal fees will increase in future periods as we seek to protect our patent portfolio.

*Selling, General and Administrative.*

Selling, general and administrative expenses consist primarily of employee salaries and related costs, stock-based compensation, independent sales representative commissions, professional services, promotional and other selling and marketing expenses, and occupancy and other allocated overhead costs. A significant portion of our selling effort is directed at building relationships with OEMs and other customers and working through the product approval and qualification process with them. Therefore, the cost of material and overhead related to products manufactured for qualification is included in selling expenses. In order to conserve capital resources in light of the year over year revenue decline, we have reduced our selling, general and administrative expenditures by eliminating headcount and other related expenses.

*Provision for Income Taxes.*

The federal statutory rate was 35% for fiscal year 201 5 and 20 14 .  Our effective tax rate differs from the statutory rate due to the company providing a full valuation allowance against net deferred tax assets, and accordingly did not recognize an income tax benefit related to losses incurred.

**Recent and Anticipated Future Trends**

For the years ended January 2, 2016 and December 27, 2014, our NVvault™ non -volatile RDIMM used in cache -protection and data logging applications, including our NVvault™ battery -free, the flash -based cache system, accounted for approximately 20% and 44% of total net product sales, respectively. We have experienced a steady decline in NVvault sales in recent years, due in large part to our loss of our most significant NVvault customer, Dell, beginning in 2012. There were no sales of NVvault™ products to Dell in the years ended January 2, 2016 and December 27, 2014, and we expect no future demand from Dell for our NVvault™ products. In order to leverage our NVvault™ technology and diversify our customer base, and to secure one or more new key customers, we continue to pursue additional qualifications of NVvault™ with other OEMs and to target new customer applications such as online transaction processing, virtualization, big data analytics, high speed transaction processing, high-performance database, and in -memory database applications. We also introduced EXPRESSvault™ in March 2011 and the next generation of EXPRESSvault™ (EV3) in July 2015 and we continue to pursue qualification of the next generation DDR3 NVvault™ and DDR4 NVvault™ with customers. Our future operating results will depend on our ability to commercialize these NVvault™ product extensions, as well as other products such as HyperVault™ and other high -density and high-performance solutions. If we are not be successful in expanding our qualifications or marketing any new or enhanced products, we will be unable to secure revenues sufficient to replace lost NVvault revenue and our results of operations and prospects could be materially harmed.

During our 2014 and 2015 fiscal years, we primarily marketed and sold our products to leading OEMs in the server, storage and communications markets. Consistent with the concentrated nature of the OEM customer base in our target markets, a small number of large customers have historically accounted for a significant portion of our net product sales. Two customers represented approximately 27% and 10% of our net product sales in 2015 and three customers represented approximately 20%, 14% and 19% of our net product sales in 2014. Because our target markets are characterized by a limited number of large companies, we anticipate that sales of our products will continue to be concentrated among a limited number of large customers in the foreseeable future. Additionally, the composition of major customers and their respective contributions to our net product sales have varied and will likely continue to vary from period to period as our OEMs progress through the life cycle of the products they produce and sell. We do not have long-term agreements with any of our customers and, as such, any or all of them could decide at any time to discontinue, decrease or delay their purchase of our products. In addition, the prices that these customers pay for our products could change at any time. The loss of any of our OEM customers, or a significant reduction in sales to any of them, could significantly reduce our net sales and adversely affect our operating results.

We have invested a significant portion of our research and development budget into the design of ASIC and field-programmable gate array ("FGPA") devices, including the HyperCloud® and HyperVault memory subsystems, and the NVvault family of products. These products are subject to increased risks as compared to our legacy products, and we may be unable to achieve customer or market acceptance of these or any other existing or future products or achieve such acceptance in a timely manner. Further, we experienced a longer qualification cycle than anticipated with our HyperCloud® memory subsystems, as well as supply chain disruption and a shortage of DRAM and flash required to create the HyperCloud® memory subsystem and our NVvault products. These and other risks attendant to the production of our currently available and potential future products could reduce our achievable revenues from these products and prevent us from recouping our investments in the products.

We dedicate substantial resources to protecting our intellectual property, including our efforts to defend our patents against challenges made by way of reexamination proceedings at the USPTO and PTAB. These activities are likely to continue for the foreseeable future, without any guarantee that any ongoing or future patent protection and litigation activities will be successful. We are also subject to litigation based on claims that we have infringed on the intellectual property of others, against which we intend to defend ourselves vigorously. Litigation, whether or not eventually decided in our favor or settled, is costly and time-consuming and could divert management's attention and resources. Because of the nature and inherent uncertainties of litigation, should the outcome of any of such actions be unfavorable, our business, financial condition, results of operations or cash flows could be materially and adversely affected.

Although we intend to pursue an intellectual property-based licensing business in order to monetize our intellectual property rights, we are currently operating based on a products-based business model and we may never be successful in developing any licensing business. Although we may pursue agreements with third parties to commercially license certain of our products or technologies, we may never successfully enter into any such agreement. Further, the terms of any such agreements that we may reach with third party licensees are uncertain and may not provide significant royalty or other licensing revenues to us to justify our costs of developing and maintaining the licensed intellectual property or may otherwise include terms that are not favorable to us. Additionally, the pursuit of a licensing business would require by its nature that we relinquish certain of our rights to our technologies and intellectual property that we license to third parties, which could limit our ability to base our own products on such technologies. If we are not successful in achieving a licensing business, we may never recoup the costs associated with developing, maintaining, defending and enforcing our intellectual property portfolio and our financial condition would be harmed.

Our operations in the People's Republic of China ("PRC") are subject to various political, geographical and economic risks and uncertainties inherent to conducting business in the PRC. These include, among others, (i) potential changes in economic conditions in the region, (ii) managing a local workforce that may subject us to uncertainties or certain regulatory policies, (iii) changes in other policies of the Chinese governmental and regulatory agencies, and (iv) changes in the laws and policies of the U.S. government regarding the conduct of business in foreign countries, generally, or in the PRC, in particular. Additionally, the Chinese government controls the procedures by which its local currency, the Chinese Renminbi ("RMB"), is converted into other currencies and by which dividends may be declared or capital distributed for the purpose of repatriation of earnings and investments. If restrictions in the conversion of RMB or

in the repatriation of earnings and investments through dividend and capital distribution restrictions are instituted, our operations and results may be negatively impacted. In addition, fluctuations in the exchange rate between RMB and U.S. dollars may adversely affect our expenses and results of operations, the value of our assets and liabilities and the comparability of our period-to-period results.

**Business Risks and Uncertainties**

Our business and prospects are exposed to numerous risks and uncertainties. For more information, see the discussion under "Risk Factors" in Part I, Item 1A of this report.

**Critical Accounting Policies**

The preparation of our consolidated financial statements in conformity with accounting principles generally accepted in the U.S. requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of net sales and expenses during the reporting period. By their nature, these estimates and assumptions are subject to an inherent degree of uncertainty. We base our estimates on our historical experience, knowledge of current conditions and our beliefs of what could occur in the future considering available information. We review our estimates on an on - going basis. Actual results may differ from these estimates, which may result in material adverse effects on our operating results and financial position. We believe the following critical accounting policies involve our more significant assumptions and estimates used in the preparation of our consolidated financial statements:

*Revenue Recognition.*

*Product Sales*

Our revenue from product sales primarily consists of product sales of high performance memory subsystems to OEMs, hyperscale data center operators and storage vendors.

We recognize revenues in accordance with FASB Accounting Standards Codification ("ASC") Topic 605. Accordingly, we recognize revenues when there is persuasive evidence that an arrangement exists, product delivery and acceptance have occurred, the sales price is fixed or determinable, and collectability of the resulting receivable is reasonably assured.

We generally use customer purchase orders and/or contracts as evidence of an arrangement. Delivery occurs when goods are shipped for customers with shipping point terms and upon receipt for customers with destination terms, at which time title and risk of loss transfer to the customer. Shipping documents are used to verify delivery and customer acceptance. We assess whether the sales price is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to refund. Customers are generally allowed limited rights of return for up to 30 days, except for sales of excess component inventories, which contain no right-of-return privileges. Estimated returns are provided for at the time of sale based on historical experience or specific identification of an event necessitating a reserve. We offer a standard product warranty to our customers and have no other post-shipment obligations. We assess collectability based on the creditworthiness of the customer as determined by credit checks and evaluations, as well as the customer's payment history.

All amounts billed to customers related to shipping and handling are classified as net sales, while all costs incurred by us for shipping and handling are classified as cost of sales.

*Engineering Services*

We provide engineering services to our customers. We recognize revenue from these services when all of the following conditions are met: (1) evidence existed of an arrangement with the customer, typically consisting of a purchase order or contract; (2) our services were performed and risk of loss passed to the customer; (3) we completed all of the necessary terms of the contract; (4) the amount of revenue to which we were entitled was fixed or determinable;

38

and (5) we believed it was probable that we would be able to collect the amount due from the customer. To the extent that one or more of these conditions has not been satisfied, we defer recognition of revenue.

Generally, we recognize revenue as the engineering services stipulated under the contract are completed and accepted by our customers. Engineering services are performed under a signed Statement of Work ("SOW") with a customer. The deliverables and payment terms stipulated under the SOW provide guidance on the project revenue recognition.

Revenues from contracts with substantive defined milestones that we have determined are reasonable, relevant to all the deliverables and payment terms in the SOW that are commensurate with the efforts required to achieve the milestones are recognized under the milestone recognition method.

Estimated losses on all SOW projects are recognized in full as soon as they become evident

*Fair Value of Financial Instruments.*

Our financial instruments consist principally of cash and cash equivalents, restricted cash, accounts receivable, accounts payable, accrued expenses and debt instruments.  The fair value of our cash equivalents is determined based on quoted prices in active markets for identical assets or Level 1 inputs. We recognize transfers between Levels 1 through 3 of the fair value hierarchy at the beginning of the reporting period.  We believe that the carrying values of all other financial instruments approximate their current fair values due to their nature and respective durations.

*Allowance for Doubtful Accounts.*

We perform credit evaluations of our customers' financial condition and limit the amount of credit extended to our customers as deemed necessary, but generally require no collateral. We evaluate the collectability of accounts receivable based on a combination of factors. In cases where we are aware of circumstances that may impair a specific customer's ability to meet its financial obligations subsequent to the original sale, we will record an allowance against amounts due, and thereby reduce the net recognized receivable to the amount that we reasonably believe will be collected. For all other customers, we record allowances for doubtful accounts based primarily on the length of time the receivables are past due based on the terms of the originating transaction, the current business environment and our historical experience. Uncollectible accounts are charged against the allowance for doubtful accounts when all cost effective commercial means of collection have been exhausted.  Generally, our credit losses have been within our expectations and the provisions established. However, we cannot guarantee that we will continue to experience credit loss rates similar to those we have experienced in the past.

Our accounts receivable are highly concentrated among a small number of customers, and a significant change in the liquidity or financial position of one of these customers could have a material adverse effect on the collectability of our accounts receivable, our liquidity and our future operating results.

*Inventories.*

We value our inventories at the lower of the actual cost to purchase or manufacture the inventory or the net realizable value of the inventory. Cost is determined on an average cost basis which approximates actual cost on a first - in, first - out basis and includes raw materials, labor and manufacturing overhead. At each balance sheet date, we evaluate ending inventory quantities on hand and record a provision for excess quantities and obsolescence. Among other factors, we consider historical demand and forecasted demand in relation to the inventory on hand, competitiveness of product offerings, market conditions and product life cycles when determining obsolescence and net realizable value. In addition, we consider changes in the market value of DRAM ICs and NAND flash in determining the net realizable value of our raw material inventory. Once established, any write downs are considered permanent adjustments to the cost basis of our excess or obsolete inventories.

A significant decrease in demand for our products could result in an increase in the amount of excess inventory quantities on hand. In addition, our estimates of future product demand may prove to be inaccurate, in which case we

Table of Contents

may have understated or overstated the provision required for excess and obsolete inventory. In the future, if our inventories are determined to be overvalued, we would be required to recognize additional expense in our cost of sales at the time of such determination. Likewise, if our inventories are determined to be undervalued, we may have over - reported our costs of sales in previous periods and would be required to recognize additional gross profit at the time such inventories are sold. In addition, should the market value of DRAM ICs or NAND flash decrease significantly, we may be required to lower our selling prices to reflect the lower current cost of our raw materials. If such price decreases reduce the net realizable value of our inventories to less than our cost, we would be required to recognize additional expense in our cost of sales in the same period. Although we make every reasonable effort to ensure the accuracy of our forecasts of future product demand, any significant unanticipated changes in demand, technological developments or the market value of DRAM ICs or NAND flash could have a material effect on the value of our inventories and our reported operating results.

*Deferred Financing Costs, Debt Discount and Detachable Debt-Related Warrants* .

Costs incurred to issue debt are deferred and recorded as a reduction to the debt balance in the accompanying consolidated balance sheets. We amortize debt issuance costs over the expected term of the related debt using the effective interest method. Debt discounts relate to the relative fair value of any warrants issued in conjunction with the debt are recorded as a reduction to the debt balance and accreted over the expected term of the debt to interest expense using the effective interest method.

*Impairment of Long - Lived Assets.*

We evaluate the recoverability of the carrying value of long - lived assets held and used in our operations for impairment on at least an annual basis or whenever events or changes in circumstances indicate that their carrying value may not be recoverable. When such factors and circumstances exist, we compare the projected undiscounted future net cash flows associated with the related asset or group of assets over their estimated useful lives against their respective carrying amount. These projected future cash flows may vary significantly over time as a result of increased competition, changes in technology, fluctuations in demand, consolidation of our customers and reductions in average selling prices. If the carrying value is determined not to be recoverable from future operating cash flows, the asset is deemed impaired and an impairment loss is recognized to the extent the carrying value exceeds the estimated fair value of the asset. The fair value of the asset or asset group is based on market value when available, or when unavailable, on discounted expected cash flows.

*Warranty Liability* .

We offer product warranties generally ranging from one to three years, depending on the product and negotiated terms of purchase agreements with our customers. Such warranties require us to repair or replace defective product returned to us during the warranty period at no cost to the customer. Warranties are not offered on sales of excess inventory. Our estimates for warranty -related costs are recorded at the time of sale based on historical and estimated future product return rates and expected repair or replacement costs. While such costs have historically been consistent between periods and within our expectations and the provisions established, unexpected changes in failure rates could have a material adverse impact on us, requiring additional warranty reserves, and adversely affecting our gross profit and gross margins.

*Stock-Based Compensation.*

We account for equity issuances to non-employees in accordance with ASC Topic 505.  All transactions in which goods or services are the consideration received for the issuance of equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date used to determine the fair value of the equity instrument issued is the earlier of the date on which the third-party performance is complete or the date on which it is probable that performance will occur.

In accordance with ASC Topic 718, employee and director stock-based compensation expense recognized during the period is based on the value of the portion of stock-based payment awards that is ultimately expected to vest

Table of Contents

during the period.  Given that stock-based compensation expense recognized in the consolidated statements of operations is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. ASC Topic 718 requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. Our estimated average forfeiture rates are based on historical forfeiture experience and estimated future forfeitures.

The fair value of common stock option awards to employees and directors is calculated using the Black-Scholes option pricing model.  The Black-Scholes model requires subjective assumptions regarding future stock price volatility and expected time to exercise, along with assumptions about the risk-free interest rate and expected dividends, all of which affect the estimated fair values of our common stock option awards. The expected term of options granted is calculated as the average of the weighted vesting period and the contractual expiration date of the option.  This calculation is based on the safe harbor method permitted by the Securities and Exchange Commission ("SEC") in instances where the vesting and exercise terms of options granted meet certain conditions and where limited historical exercise data is available.  The expected volatility is based on the historical volatility of our common stock.  The risk-free rate selected to value any particular grant is based on the U.S. Treasury rate that corresponds to the expected term of the grant effective as of the date of the grant. The expected dividends assumption is based on our history and our expectations regarding dividend payouts. We evaluate the assumptions used to value our common stock option awards on a quarterly basis. If factors change and we employ different assumptions, stock- based compensation expense may differ significantly from what we have recorded in prior periods.  Compensation expense for common stock option awards with graded vesting schedules is recognized on a straight-line basis over the requisite service period for the last separately vesting portion of the award, provided that the accumulated cost recognized as of any date at least equals the value of the vested portion of the award.

We recognize the fair value of restricted stock awards issued to employees and outside directors as stock-based compensation expense on a straight-line basis over the vesting period for the last separately vesting portion of the awards.  Fair value is determined as the difference between the closing price of our common stock on the grant date and the purchase price of the restricted stock award, if any, reduced by expected forfeitures.

If there are any modifications or cancellations of the underlying vested or unvested stock-based awards, we may be required to accelerate, increase or cancel any remaining unearned stock-based compensation expense, or record additional expense for vested stock-based awards.  Future stock-based compensation expense and unearned stock- based compensation may increase to the extent that we grant additional common stock options or other stock-based awards.

*Income Taxes.*

Deferred tax assets and liabilities are recognized to reflect the estimated future tax effects of future deductible or taxable amounts attributable to events that have been recognized on a cumulative basis in the consolidated financial statements, calculated at enacted tax rates for expected periods of realization. We regularly review our deferred tax assets for recoverability and establish a valuation allowance, when determined necessary, based on historical taxable income, projected future taxable income, and the expected timing of the reversals of existing temporary differences. Because we have operated at a loss for an extended period of time, we did not recognize deferred tax assets related to losses incurred in 201 5 or 201 4 .  In the future, if we realize a deferred tax asset that currently carries a valuation allowance, we may record an income tax benefit or a reduction to income tax expense in the period of such realization.

ASC Topic 740 prescribes a recognition threshold and measurement requirement for the financial statement recognition of a tax position that has been taken or is expected to be taken on a tax return and also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. Under ASC Topic 740 we may only recognize or continue to recognize tax positions that meet a "more likely than not" threshold.

The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws and regulations themselves are subject to change as a result of changes in fiscal policy, changes in legislation, the evolution of regulations and court rulings. Therefore, the actual liability for U.S. or foreign taxes may be materially different from our estimates, which could result in the need to record additional tax liabilities or potentially reverse previously recorded tax liabilities.

*Interest expense .*

Interest expense consists primarily of interest associated with our debt issued to SVIC and Fortress, including fees related to the term loans, accretion of debt discount and amortization of debt issuance costs.  We recognize the accretion of debt discount s and the amortization of interest costs using the effective interest method.

**Results of Operations**

*Y ear Ended January 2, 2016 Compared to the Year Ended December 27, 2014*

The following table sets forth our consolidated statements of operations as a percentage of total net revenues for the years indicated:

| | Year Ended | |
| --- | --- | --- |
| | **January 2, 2016** | **December 27, 2014** |
| Net product sales | 86 % | 100 % |
| NRE revenues | 14 | - |
| Total net revenues | 100 | 100 |
| Cost of sales | 74 | 79 |
| Gross profit | 26 | 21 |
| Operating expenses: | | |
| Research and development | 75 | 24 |
| Intellectual property legal fees | 70 | 33 |
| Selling, general and administrative | 98 | 35 |
| Total operating expenses | 243 | 93 |
| Operating loss | (217) | (72) |
| Other expense, net: | | |
| Interest expense, net | (26) | (8) |
| Other expense, net | (13) | - |
| Total other expense, net | (39) | (8) |
| Loss before provision for income tax | (256) | (80) |
| Provision for income taxes | - | - |
| Net loss | (256)% | (80)% |

42

*Net Product Sales, NRE Revenue s , Cost of Sales and Gross Profit*

The following table presents net product sales, NRE revenue s , cost of sales and gross profit for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Net product sales | $ 6,869 | $ 19,195 | $ (12,326) | (64)% |
| NRE revenues | 1,143 | - | 1,143 | 100 % |
| Total net revenues | 8,012 | 19,195 | (11,183) | (58)% |
| Cost of sales | 5,915 | 15,231 | (9,316) | (61)% |
| Gross profit | $ 2,097 | $ 3,964 | $ (1,867) | (47)% |
| Gross margin | 26.2% | 20.7% | 5.5 % | |

*Net Product Sales.* The decrease in net product sales for 2015 as compared with 2014 resulted primarily from decreases of approximately (i) $7. 1 million in sales of our first generation NVvault (ii) $1.7 million of sales of HyperCloud® (iii) $1.9 million of VLP sales (iv) $1.0 million in sales of Planar X and (v) $0.6 million of flash sales.

*NRE R evenue s .* The increase in NRE revenue s for 2015 as compared with 2014 resulted from revenue recognized from our JDLA with Samsung entered into in November 2015.

*Gross Profit, Gross Margin and Cost of Sales.* The increase in gross margin for 2015 as compared to 2014 is the result of our NRE revenue s from the JDLA offset by a decrease in our gross profit from our product sales as a result of a change in our product mix and reduced sales of our higher margin first generation NVvault™ sales in 2015. In addition, the allocation of overhead over a lower revenue base has also impacted our gross margin.

*Research and Development.*

The following table presents research and development expenses for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Research and development | $ 6,049 | $ 4,586 | $ 1,463 | 32 % |

The increase in research and development expense for 201 5 as compared to 201 4 resulted primarily from an increase of (i) $1.2 million in headcount costs and related overhead and travel expenses (ii) $0.0 7 million in product research expense and (iii) $0.2 million in professional and outside services.

43

*Intellectual Property Legal Fees.*

The following table presents intellectual property legal fees for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Intellectual property legal fees | $    5,588 | $    6,387 | $    (799) | (13)% |

The decrease in intellectual property legal fees for 2015 as compared to 2014 resulted from a decrease in legal fees incurred for trade secret lit igation and patent litigation primarily as the result of agreements where warrants were issued for professional services rendered in 2015 reducing legal expenses .

*Selling, General and Administrative.*

The following table presents selling, general and administrative expenses for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Selling, general and administrative | $    7,841 | $    6,796 | $    1,045 | 15 % |

Selling, general and administrative expenses increased by approximately $1.0 million in 2015 as compared to 2014.  These increases were primarily due to an increase of  (i) $0.9 million in headcount costs and related overhead and travel expenses and (ii) an increase of $0.4 million in outside services offset by decreases of (i) $0.1 million in advertising and product evaluation expenses and (ii) $0.2 million related to commission payments to sales representatives .

*Other Expense, Net.*

The following table presents other expense, net for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Interest expense, net | $    (2,064) | $    (1,574) | $    (490) | (31)% |
| Other expense, net | (1,081) | - | (1,081) | (100)% |
| Total other expense, net | $    (3,145) | $    (1,574) | $    (1,571) | (100)% |

The increase in interest expense for 2015 as compared to 2014 is primarily due to interest expense from increased outstanding principal balances and the accelerated amortization of debt discount and debt issuance costs associated with repayment of our term debt with Fortress.

Table of Contents

The increases in other expense, net for 2015 as compared to 2014 is primarily due to funds in the amount of $1.5 million received from our insurance company as compensation for damages to our facility in the PRC, offset by (i) payment of $0.9 million associated with litigation (ii) $1.0 million lump sum payment to terminate the Letter Agreement with Fortress and (iii) $0.8 million in warrant expense associated with amending pricing on the existing warrants and issuance of new warrants associated with the termination of our agreement with Fortress.

*Income Tax Provision.*

The followi ng table presents the provision for income taxes for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | | |
| | January 2, 2016 | December 27, 2014 | | Change | % Change |
|---|---|---|---|---|---|
| Provision for income taxes | $       1 | $       2 | $ | (1) | (50)% |

The federal statutory rate was 35% for 2015 and 2014.  In both 2015 and 2014, we continued to provide a full valuation allowance against our net deferred tax assets, which consist primarily of net operating loss carry-forwards.  In 2015 and 2014, our effective tax rate differed from the 35% statutory rate primarily due to the valuation allowance on newly generated loss carry-forwards.  For further discussion see Note 6 to our consolidated financial statements included in Part II, Item 8 of this report.

**Liquidity and Capital Resources**

We have historically financed our operations primarily through issuances of equity and debt securities and cash generated from operations. We have also funded our operations with a revolving line of credit and term loans under our bank credit facility and capitalized lease oblig ations.

*Working Capital and Cash and Cash Equivalents.*

The following table presents working capital and cash and cash equivalents (in thousands):

| | January 2, 2016 | December 27, 2014 |
|---|---|---|
| Working capital | $       11,945 | $       7,907 |
| Cash and cash equivalents(1) | $       19,684 | $       11,040 |

(1)   Included in working capital

Our working capital increased in 2015 primarily as a result of (i) net proceeds from the issuance of long-term debt of approximately $ 18.6 million and net proceeds from a public offering of approximately $10.5 million offset by (i) payments on long-term debt of $10.8 million and cash used in operations of $9. 3 million.

45

*Cash Provided by and Used in the Years Ended January 2, 2016 and December 27, 2014 .*

The following table summarizes our cash flows for the periods indicated (in thousands):

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| **Net cash provided by (used in):** | | |
| Operating activities | $ (9,334) | $ (6,401) |
| Investing activities | (361) | (138) |
| Financing activities | 18,339 | 10,878 |
| Net change in cash and cash equivalents | $ 8,644 | $ 4,339 |

*Operating Activities.*

Net cash used in operating activities for the year ended January 2, 2016 was primarily the result of a net loss of approximately $20.5 million offset by (i) approximately $6. 8 million in net cash provided by changes in operating assets and liabilities, primarily deferred revenue and (ii) approximately $4.4 million in net non-cash operating expenses, mainly comprised of depreciation and amortization, amortization of debt discount and debt issuance costs, issuance of warrants and stock-based compensation.

Net cash used in operating activities for the year ended December 27, 2014 was primarily the result of a net loss of approximately $15.4 million offset by  (i) approximately $5.0 million in net cash provided by changes in operating assets and liabilities, primarily accounts receivable, restricted cash, accounts payable, accrued payroll and related liabilities and inventory and (ii) approximately $4.0 million in net non-cash operating expenses, mainly comprised of depreciation and amortization, amortization of debt discount and debt issuance costs and stock-based compensation.

*Investing Activities.*

Net cash used in investing activities for the years ended January 2, 2016 and December 27, 2014 was primarily the result of the purchase of $0.4 million and $0.1 million of property and equipment, respectively.

*Financing Activities.*

Net cash provided by financing activities for the year ended January 2, 2016 was primarily the result of net proceeds from the issuance of long-term debt and net proceeds from a public offering in the amounts of $ 18.6 million and $10.5 million offset by payment on long-term debt of $10.8 million.

Net cash provided by financing activities for the year ended December 27, 2014 was primarily the result of our February 2014 public offering, which raised net proceeds of approximately $10.3 million and our receipt of an aggregate of approximately $0.8 million in proceeds from the partial exercise of an outstanding warrant for the purchase of our common stock and the exercise of employee stock options in February 2014.

***Capital Resources .***

Our sources of cash generally consist of revenues from our operations, including product sales and NRE revenue s from our JDLA, debt and equity financings and equipment leasing arrangements.

*SVB Credit Agreement*

On October 31, 2009, we entered into a credit agreement with Silicon Valley Bank ("SVB"), which was most recently amended on January 29, 2016 (as amended, the "SVB Credit Agreement"). Currently, the SVB Credit

46

Agreement provides that we can borrow up to the lesser of (i) 80% of eligible accounts receivable, or (ii) $5.0 million, subject to certain adjustments as set forth in the SVB Credit Agreement.

We made no borrowings under the Silicon Valley Bank line of credit in the years ended January 2, 2016 and December 27, 2014.  At January 2, 2016 and December 27, 2014 we had borrowing availability of approximately $0. 5  million a nd $0.9 million, respectively.

*Convertible Promissory Note with SVIC*

On the Closing Date, we entered into the SVIC Purchase Agreement, with SVIC, an affiliate of Samsung Venture Investment Co., pursuant to which we sold SVIC the SVIC Note and the SVIC Warrant, each dated as of the Closing Date. The SVIC Note has an original principal amount of $15 million, accrues interest at a rate of 2% per year, is due and payable in full on the SVIC Note Maturity Date and the principal and accrued but unpaid interest of which are convertible into shares of our common stock at the Conversion Price, subject to certain adjustments as set forth therein on the SVIC Note Maturity Date. Upon a change of control prior to the SVIC Note Maturity Date, the SVIC Note may, at our option, be assumed by the surviving entity or be redeemed upon the consummation of such change of control for the principal and accrued but unpaid interest as of the redemption date. The SVIC Warrant grants SVIC a right to purchase 2,000,000 shares of our common stock at an exercise price of $0.30 per share, subject to certain adjustments as set forth therein, is only exercisable in the event we exercise our right to redeem the SVIC Note prior to the SVIC Note Maturity Date and expires on December 31, 2025.  Proceeds from the SVIC Note were used to pay off our 2013 Loan Agreement and terminate our Letter Agreement with Fortress.

*February 2015 Public Offering of Common Stock*

On February 24, 2015, we completed a registered firm commitment underwritten public offering of shares of our common stock (the "2015 Offering"). In the 2015 Offering, we issued and sold to the Underwriter 8,846,154 shares of common stock pursuant to an underwriting agreement, dated as of February 19, 2015, by and between the Company and the Underwriter, at a price of $1.209 per share, including 1,153,846 shares resulting from the Underwriter's exercise in full of its option to purchase additional shares of common stock to cover over-allotments. The price per share to the public in the 2015 Offering was $1.30 per share. The net proceeds from the 2015 Offering were approximately $10. 5  million, after deducting underwriting discounts and commissions and estimated offering expenses.

*Equipment Leasing Arrangements*

We have in the past utilized equipment leasing arrangements to finance certain capital expenditures. Equipment leases continue to be a financing alternative that we expect to pursue in the future.

*Sufficiency of Cash Balances and Potential Sources of Additional Capital*

We believe our existing cash balances, borrowing availability under our bank credit facility, borrowing availability under the SVB Credit Agreement, net of cash expected to be used in operations, will be sufficient to meet our anticipated cash needs for at least the next 12 months. Should we need additional capital, we may seek to raise capital through, among other things, public and private equity offerings and debt financings. Our future capital requirements will depend on many factors, including our levels of net sales, the timing and extent of expenditures to support research and development activities, the expansion of manufacturing capacity both domestically and internationally and the continued market acceptance of our products. Additional funds may not be available on terms acceptable to us, or at all. If adequate working capital is not available when needed, we may be required to significantly modify our business model and operations to reduce spending to a sustainable level. It could cause us to be unable to execute our business plan, take advantage of future opportunities, or respond to competitive pressures or customer requirements. It may also cause us to delay, scale back or eliminate some or all of our research and development programs, or to reduce or cease operations.

47

**Off-Balance Sheet Arrangements.**

We do not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. In addition, we do not have any undisclosed borrowings or debt, and we have not entered into any synthetic leases. We are, therefore, not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

**Item 7A.  Quantitative and Qualitative Disclosures About Market Risk**

Not applicable.

**Item 8.  Financial Statements and Supplementary Dat a**

The financial statements and supplementary data required by this item are included immediately following the signature page of this report and are incorporated herein by reference.

**Item 9.  Changes in and Disagreements With Accountants on Accounting and Financial Disclosur e**

None.

**Item 9A.  Controls and Procedure s**

**Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Exchange Act, as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective. Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.

**Management ' s  Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Exchange Act. Our management, with the participation of our principal executive officer and principal financial officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of January 2, 2016 based on the criteria set forth in the *[2013] Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of January 2, 2016.

This Annual Report does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting. Management ' s report was not subject to attestation by our independent registered public accoun ting firm pursuant to the rules of the Securities and Exchange Commission that permit us to provide only management ' s report in this Annual Report.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on Internal Control**

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple errors. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and any design may not succeed in achieving its stated goals under all potential conditions. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

In addition, projections of any evaluation of effectiveness to future periods are subject to risks that controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate.

**I tem 9B.  Other Informatio n**

None .

## PART II I

**Item 10.  Directors, Executive Officers and Corporate Governanc e**

The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.

**Item 11.  Executive Compensatio n**

The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.

**Item 12.  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matter s**

The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.

**Item 13.  Certain Relationships and Related Transactions, and Director Independenc e**

The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.

**Item 14.  Principal Accounting Fees and Service s**

The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.
.

**Item 15.  Exhibits, Financial Statement Schedule s**

(a)(1)  The following financial statements are included immediately following the signature page hereof and are filed as part of this report:

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F- 2 |
| Consolidated Balance Sheets | F- 3 |
| Consolidated Statements of Operations | F- 4 |
| Consolidated Statements of Stockholders' (Deficit) Equity | F- 5 |
| Consolidated Statements of Cash Flows | F- 6 |
| Notes to Consolidated Financial Statements | F- 7 |

(a)(2)  Exhibits

| Exhibit No. | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation of Netlist, Inc. (incorporated by reference to exhibit 3.1 of the registration statement on Form S-1 of the registrant (No. 333-136735) filed with the SEC on October 23, 2006) |
| 3.2 | Amended and Restated Bylaws of Netlist, Inc. (incorporated by reference to exhibit number 3.1 of the registrant's Current Report on Form 8-K filed with the SEC on December 20, 2012) |
| 4.1 | Form of Warrant issued pursuant to the Securities Purchase Agreement, dated July 17, 2013 (incorporated by reference to exhibit 4.1 of the registrant's Current Report on Form 8-K filed with the SEC on July 18, 2013) |
| 4.2 | Senior Secured Convertible Promissory Note, dated November 18, 2015, issued by Netlist, Inc. to SVIC No. 28 New Technology Business Investment LLP (incorporated by reference to exhibit 4.1 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 4.3 | Stock Purchase Warrant, dated November 18, 2015, issued by Netlist, Inc. to SVIC No. 28 New Technology Business Investment LLP (incorporated by reference to exhibit 4.2 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 4.4 | Stock Purchase Warrant, dated November 18, 2015, issued by Netlist, Inc. to CF DB EZ LLC (incorporated by reference to exhibit 4.3 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 4.5 | Amendment No. 1 to Stock Purchase Warrant, dated November 18, 2015, between Netlist, Inc. and Drawbridge Special Opportunities Fund LP (incorporated by reference to exhibit 4.4 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 10.1# | Amended and Restated 2000 Equity Incentive Plan of Netlist, Inc. (incorporated by reference to exhibit 10.7 of the registration statement on Form S-1 of the registrant (No. 333-136735) filed with the SEC on October 23, 2006) |

Table of Contents

10.2#    Employment Agreement, dated September 5, 2006, between Netlist, Inc. and Chun K. Hong (incorporated by reference to exhibit 10.13 of the registration statement on Form S-1 of the registrant (No. 333-136735) filed with the SEC on September 27, 2006)

10.3#    Amended and Restated 2006 Equity Incentive Plan of Netlist, Inc. (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on August 12, 2010)

10.4#    Form of Restricted Stock Award Agreement issued pursuant to the 2006 Equity Incentive Plan of Netlist, Inc. (incorporated by reference to exhibit 10.2 of the Quarterly Report on Form 10-Q of the registrant filed with the SEC on May 17, 2010)

10.5    Loan and Security Agreement, dated October 31, 2009, between Silicon Valley Bank and Netlist, Inc. (incorporated by reference to exhibit 10.1 of the registrant's Current Report on Form 8-K filed with the SEC on November 2, 2009)

10.6    Intercompany Subordination Agreement, dated October 31, 2009, among Silicon Valley Bank, Netlist, Inc., and Netlist Technology Texas, L.P. (incorporated by reference to exhibit 10.2 of the registrant's Current Report on Form 8-K filed with the SEC on November 2, 2009)

10.7    Guarantor Security Agreement, dated October 31, 2009, between Silicon Valley Bank and Netlist Technology Texas LP (incorporated by reference to exhibit 10.3 of the registrant's Current Report on Form 8-K filed with the SEC on November 2, 2009)

10.8    Intellectual Property Security Agreement, dated October 31, 2009, between Silicon Valley Bank and Netlist, Inc. (incorporated by reference to exhibit 10.4 of the registrant's Current Report on Form 8-K filed with the SEC on November 2, 2009)

10.9    Amendment to Loan Documents, dated March 24, 2010, between Silicon Valley Bank and Netlist, Inc. (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on May 17, 2010)

10.10    Amendment to Loan Documents, dated June 30, 2010, between Silicon Valley Bank and Netlist, Inc. (incorporated by reference to exhibit 10.2 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on August 12, 2010)

10.11    Amendment to Loan Documents, dated September 30, 2010, between Silicon Valley Bank and Netlist, Inc. (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on November 17, 2010)

10.12    Amendment to Loan Documents, dated May 11, 2011, between Silicon Valley Bank and Netlist, Inc. (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on May 12, 2011)

10.13    Amendment to Loan Documents, dated August 10, 2011, between Silicon Valley Bank and Netlist, Inc. (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on August 15, 2011)

10.14    Amendment to Loan Documents, dated May 14, 2012, between Silicon Valley Bank and Netlist, Inc. (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on May 15, 2012)

10.15    Forbearance to Loan and Security Agreement, dated March 27, 2013, between Netlist, Inc. and Silicon Valley Bank (incorporated by reference to exhibit 10.32 of the registrant's Annual Report on Form 10-K for the fiscal year ended December 29, 2012 filed with the SEC on March 29, 2013)

Table of Contents

| 10.16 | Amendment to Credit Agreement, dated July 18, 2013, between Netlist, Inc. and Silicon Valley Bank (incorporated by reference to exhibit 10.6 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on November 12, 2013) |
|---|---|
| 10.17 | Securities Purchase Agreement, dated July 17, 2013, between Netlist, Inc. and the purchaser identified therein (incorporated by reference to exhibit 10.1 of the registrant's Current Report on Form 8-K filed with the SEC on July 18, 2013) |
| 10.18 | Amendment to Loan Documents, dated September 30, 2014, between Netlist, Inc. and Silicon Valley Bank (incorporated by reference to exhibit 10.24 of the registrant's Annual Report on Form 10-K filed with the SEC on March 27, 2015) |
| 10.19 | Stock Purchase Warrant, issued by Netlist, Inc. on July 18, 2013 to Drawbridge Special Opportunity Fund LP (incorporated by reference to exhibit 10.3 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on May 12, 2015) |
| 10.20+ | Intercreditor Agreement, dated November 18, 2015, among Netlist, Inc., Silicon Valley Bank and SVIC No. 28 New Technology Business Investment LLP |
| 10.21 | Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated November 18, 2015, between Netlist, Inc. and SVIC No. 28 New Technology Business Investment LLP (incorporated by reference to exhibit 10.1 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 10.22 | Registration Rights Agreement, dated November 18, 2015, between Netlist, Inc. and SVIC No. 28 New Technology Business Investment LLP (incorporated by reference to exhibit 10.2 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 10.23 | Payoff Letter, dated November 18, 2015, from Fortress Credit Opportunities I LP and Drawbridge Special Opportunities Fund LP to Netlist, Inc. (incorporated by reference to exhibit 10.3 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 10.24 | Amendment to Loan Documents, dated January 29, 2016, between Netlist, Inc. and Silicon Valley Bank (incorporated by reference to exhibit 10.1 of the registrant's Current Report on Form 8-K filed with the SEC on February 1, 2016) |
| 21.1+ | Subsidiaries of Netlist, Inc. |
| 23+ | Consent of KMJ Corbin & Company LLP |
| 24.1+ | Power of Attorney (included on the signature page to this report) |
| 31.1+ | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2+ | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32++ | Certification by Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS+ | XBRL Instance Document |

101.SCH+     XBRL Taxonomy Extension Schema Document

101.CAL+     XBRL Taxonomy Extension Calculation Linkbase Document

101.LAB+     XBRL Taxonomy Extension Label Linkbase Document

101.PRE+     XBRL Taxonomy Extension Presentation Linkbase Document

101.DEF+     XBRL Taxonomy Extension Definition Linkbase Document

---

+        Filed herewith.

++       Furnished herewith.

#        Management contract or compensatory plan or arrangement.

    (b) E xhibits

See subsection (a)(2) above.

53

**SIGNATURE S**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:  March 4, 2016

Netlist, Inc.

By: _____/s/ Chun K. Hong_____

Chun K. Hong

*President, Chief Executive Officer and Chairman of the Board*

**POWER OF ATTORNEY**

IN WITNESS WHEREOF, each person whose signature appears below constitutes and appoints Chun K. Hong and Gail Sasaki as his or her true and lawful agent, proxy and attorney-in-fact, each acting alone, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to (i) act on and sign any amendments to this Annual Report on Form 10-K, with exhibits thereto and other documents in connection therewith, (ii) act on and sign such certificates, instruments, agreements and other documents as may be necessary or appropriate in connection therewith, and in each case file the same with the Securities and Exchange Commission, hereby approving, ratifying and confirming all that such agent, proxy and attorney-in-fact or any of his substitutes may lawfully do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Chun K. Hong<br>Chun K. Hong | President, Chief Executive Officer and Chairman of the Board (Principal Executive Officer) | March 4, 2016 |
| /s/ Gail Sasaki<br>Gail Sasaki | Vice President and Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) | March 4, 2016 |
| /s/ Charles F. Cargile<br>Charles F. Cargile | Director | March 4, 2016 |
| /s/ Jun S. Cho<br>Jun S. Cho | Director | March 4, 2016 |
| /s/ Vincent Sheeran<br>Vincent Sheeran | Director | March 4, 2016 |
| /s/ Blake A. Welcher<br>Blake A. Welcher | Director | March 4, 2016 |

54

Table of Contents

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F - 2 |
| Consolidated Balance Sheets | F - 3 |
| Consolidated Statements of Operations | F - 4 |
| Consolida ted Statements of Stockholders' (Deficit)  Equity | F - 5 |
| Consolidated Statements of Cash Flows | F - 6 |
| Notes to Consolidated Financial Statements | F - 7 |

F- 1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIR M**

Board of Directors and Stockholders
Netlist, Inc.

We have audited the accompanying consolidated balance sheets of Netlist, Inc. and subsidiaries (the "Company") as of January 2, 2016 and December 27, 2014 , and the related consolidated statements of operations, stockholders' (deficit) equity and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit on its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company ' s internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Netlist, Inc. and subsidiaries as of January 2, 2016  and December 27, 2014 , and the consolidated results of their operations and their cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

/s/ KMJ Corbin & Company LLP
Costa Mesa, California
March 4 , 20 16

F- 2

Table of Contents

**NETLIST, INC. AND SUBSIDIARIES**

**Consolidated Balance Sheet s**

**(in thousands, except par value)**

|  | January 2, 2016 | December 27, 2014 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 19,684 | $ 11,040 |
| Restricted cash | 400 | 700 |
| Accounts receivable, net of allowance for doubtful accounts of $40 (2015) and $61 (2014) | 716 | 1,091 |
| Inventories | 1,658 | 1,880 |
| Prepaid expenses and other current assets | 1,739 | 735 |
| Total current assets | 24,197 | 15,446 |
| | | |
| Property and equipment, net | 408 | 393 |
| Other assets | 61 | 69 |
| Total assets | $ 24,666 | $ 15,908 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' (DEFICIT) EQUITY** | | |
| Current Liabilities: | | |
| Accounts payable | $ 3,299 | $ 3,957 |
| Accrued payroll and related liabilities | 1,243 | 710 |
| Accrued expenses and other current liabilities | 340 | 420 |
| Deferred revenue | 6,857 | - |
| Accrued engineering charges | 500 | 500 |
| Current portion of long-term debt, net of debt discount | 13 | 1,952 |
| Total current liabilities | 12,252 | 7,539 |
| Long-term debt, net of current portion and debt discount | 13,699 | 3,551 |
| Long-term warranty liability | 49 | 99 |
| Total liabilities | 26,000 | 11,189 |
| Commitments and contingencies | | |
| Stockholders' (deficit) equity: | | |
| Preferred stock, $0.001 par value - 10,000 shares authorized; no shares issued and outstanding | - | - |
| Common stock, $0.001 par value - 90,000 shares authorized; 50,354 (2015) and 41,498 (2014) shares issued and outstanding | 50 | 41 |
| Additional paid-in capital | 132,011 | 117,546 |
| Accumulated deficit | (133,395) | (112,868) |
| Total stockholders' (deficit) equity | (1,334) | 4,719 |
| Total liabilities and stockholders' (deficit) equity | $ 24,666 | $ 15,908 |

See accompanying notes to consolidated financial statements.

F- 3

Table of Contents

**NETLIST, INC. AND SUBSIDIARIES**

**Consolidated Statements of Operations**

**(in thousands, except per share amounts)**

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| Net product sales | $ 6,869 | $ 19,195 |
| Non-recurring engineering revenues | 1,143 | - |
| Total net revenues | 8,012 | 19,195 |
| Cost of sales(1) | 5,915 | 15,231 |
| Gross profit | 2,097 | 3,964 |
| Operating expenses: | | |
| Research and development(1) | 6,049 | 4,586 |
| Intellectual property legal fees | 5,588 | 6,387 |
| Selling, general and administrative(1) | 7,841 | 6,796 |
| Total operating expenses | 19,478 | 17,769 |
| Operating loss | (17,381) | (13,805) |
| Other expense, net: | | |
| Interest expense, net | (2,064) | (1,574) |
| Other expense, net | (1,081) | - |
| Total other expense, net | (3,145) | (1,574) |
| Loss before provision for income tax | (20,526) | (15,379) |
| Provision for income taxes | 1 | 2 |
| Net loss | $ (20,527) | $ (15,381) |
| | | |
| Net loss per common share: | | |
| Basic and diluted | $ (0.42) | $ (0.38) |
| Weighted-average common shares outstanding: | | |
| Basic and diluted | 48,967 | 40,304 |

(1) Amounts include stock-based compensation expense as follows:

| | | | |
| --- | --- | --- | --- |
| Cost of sales | $ | 53 | $ 56 |
| Research and development | | 613 | 726 |
| Selling, general and administrative | | 1,104 | 1,230 |

See accompanying notes to consolidated financial statements.

F- 4

Table of Contents

**NETLIST, INC. AND SUBSIDIARIES**

**Consolidated Statements of Stockholders' (Deficit) Equity**

**(in thousands)**

| | Series A Preferred Stock | | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' (Deficit) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | Capital | Deficit | Equity |
| Balance, December 28, 2013 | - | - | 31,776 | $ 31 | $ 104,469 | $ (97,487) | $ 7,013 |
| Stock-based compensation | - | - | - | - | 2,012 | - | 2,012 |
| Exercise of stock options | - | - | 303 | - | 153 | - | 153 |
| Repurchase of common stock | - | - | (12) | - | (22) | - | (22) |
| Issuance of common stock, net | - | - | 8,681 | 9 | 10,267 | - | 10,276 |
| Exercise of warrant | - | - | 750 | 1 | 667 | - | 668 |
| Net loss | - | - | - | - | - | (15,381) | (15,381) |
| Balance, December 27, 2014 | - | - | 41,498 | 41 | 117,546 | (112,868) | 4,719 |
| Stock-based compensation | - | - | - | - | 1,770 | - | 1,770 |
| Exercise of stock options | - | - | 10 | - | 8 | - | 8 |
| Issuance of common stock, net | - | - | 8,846 | 9 | 10,535 | - | 10,544 |
| Warrants issued in connection with debt and settlement transactions | - | - | - | - | 2,152 | - | 2,152 |
| Net loss | - | - | - | - | - | (20,527) | (20,527) |
| Balance, January 2, 2016 | - | - | 50,354 | $ 50 | $ 132,011 | $ (133,395) | $ (1,334) |

See accompanying notes to consolidated financial statements.

F- 5

Table of Contents

**NETLIST, INC. AND SUBSIDIARIES**

**Consolidated Statements of Cash Flow s**

**(in thousands)**

| | Year Ended | |
|---|---|---|
| | January 2, 2016 | December 27, 2014 |
| Cash flows from operating activities: | | |
| Net loss | $ (20,527) | $ (15,381) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 349 | 882 |
| Capitalized payment -in- kind interest | 170 | 251 |
| Amortization of debt discount and debt issuance costs | 1,149 | 803 |
| Realized (gain) loss on sale of equipment | (3) | 6 |
| Stock-based compensation | 1,770 | 2,012 |
| Issuance of warrant in lieu of payment | 234 | - |
| Issuance and repricing of warrants | 753 | - |
| Changes in operating assets and liabilities: | | |
| Restricted cash | 300 | 400 |
| Accounts receivable | 375 | 3,775 |
| Inventories | 222 | 740 |
| Prepaid expenses and other assets | (728) | (12) |
| Accounts payable | (658) | 162 |
| Accrued payroll and related liabilities | 533 | 75 |
| Accrued expenses and other current liabilities | (130) | (114) |
| Deferred revenue | 6,857 | - |
| Net cash used in operating activities | (9,334) | (6,401) |
| Cash flows from investing activities: | | |
| Acquisition of property and equipment | (366) | (141) |
| Proceeds from sale of equipment | 5 | 3 |
| Net cash used in investing activities | (361) | (138) |
| Cash flows from financing activities: | | |
| Proceeds from long- term loans, net of issuance costs | 18,571 | - |
| Payments on debt | (10,784) | (197) |
| Proceeds from issuance of common stock, net | 10,544 | 10,276 |
| Proceeds from exercise of equity awards, net of taxes remitted for restricted stock | 8 | 799 |
| Net cash provided by financing activities | 18,339 | 10,878 |
| Net change in cash and cash equivalents | 8,644 | 4,339 |
| Cash and cash equivalents at beginning of period | 11,040 | 6,701 |
| Cash and cash equivalents at end of period | $ 19,684 | $ 11,040 |

See accompanying notes to consolidated financial statements.

F- 6

Table of Contents

**NETLIST, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENT S**

**January 2, 2016**

**Note 1—Description of Business**

Netlist, Inc. (the "Company" or "Netlist") designs, manufactures and sells a wide variety of high-performance, logic-based memory subsystems for the global datacenter, storage and high-performance computing markets. The Company's memory subsystems consist of combinations of dynamic random access memory integrated circuits ("DRAM ICs" or "DRAM"), NAND flash memory ("NAND flash"), application-specific integrated circuits ("ASICs") and other components assembled on printed circuit boards ("PCBs"). Netlist primarily markets and sells its products to leading original equipment manufacturer ("OEM") customers, hyperscale datacenter operators and storage vendors. The Company's solutions are targeted at applications where memory plays a key role in meeting system performance requirements. The Company leverages a portfolio of proprietary technologies and design techniques, including combining discrete semiconductor technologies from third parties such as DRAM and NAND flash to function as one efficient planar design and alternative packaging technique, to deliver memory subsystems with persistence, high density, small form factor, high signal integrity, attractive thermal characteristics, reduced power consumption and low cost per bit. The Company's NVvault™ product is the first to offer both DRAM and NAND flash in a standard form factor memory subsystem as a persistent dual-in line memory module ("DIMM") in mission critical applications. The Company's HyperCloud ® technology incorporates its patented rank multiplication and load reduction technologies. The Company also has pending and issued patents covering fundamental aspects of hybrid memory DIMM designs that incorporate combinations of DRAM and/or NAND flash, such as its NVvault™ product. The Company is focused on monetizing its patent portfolio through its products business and, where appropriate, through licensing arrangements with third parties that wish to incorporate its patented technologies in their products.

Netlist was incorporated in June 2000 and is headquartered in Irvine, California. In 2007, the Company established a manufacturing facility in the People's Republic of China (the "PRC"), which became operational in July 2007 upon the successful qualification of certain key customers.

*Liquidity*

The Company incurred net losses of approximately $ 20 . 5   million and $ 15.4 million for the years ended January 2, 2016 and December 27, 2014 , respectively.

On February 24, 2015, the Company completed a registered firm commitment underwritten public offering (the "2015 Offering") of shares of the Company's common stock. In the 2015 Offering, the Company issued and sold to the underwriter (" Underwriter ")  8,846,154 shares of common stock pursuant to an underwriting agreement, dated as of February 19, 2015, by and between the Company and the Underwriter, at a price of $1.209   per share, including 1,153,846 shares resulting from the Underwriter's exercise in full of its option to purchase additional shares of Common Stock to cover over-allotments. The price per share to the public in the 2015 Offering was $1.30 per share. The net proceeds from the 2015 Offering were approximately $10. 5 million, after deducting underwriting discounts and commissions and estimated offering expenses.

On November 12, 2015, the Company entered into a Joint Development and License Agreement ("JDLA") with Samsung Electronics Co., Ltd. ("Samsung"), pursuant to which the Company and Samsung agreed to work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of this new technology. The Company received an $8.0 million non-recurring engineering fee ("NRE") from Samsung for the joint development. Both parties may enter into an additional agreement in the future for Samsung to be granted commercial license for the Company's NVDIMM-P technology.  The JDLA also includes a Right of First Refusal wherein the Company will provide Samsung the right to acquire the Company's NVDIMM-P technology in a separate, subsequent transaction before the Company offers the technology to a third party. The Company also received $15.0 million under a Senior Secured Convertible Note and Warrant Purchase Agreement ("SVIC Purchase Agreement")

Table of Contents

with SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership and an affiliate of Samsung Venture Investment Co. ("SVIC") (see Note 5).

If adequate working capital is not available when needed, the Company may be required to significantly modify its business model and operations to reduce spending to a sustainable level. Insufficient working capital could cause the Company to be unable to execute its business plan, take advantage of future opportunities, or respond to competitive pressures or customer requirements. It may also cause the Company to delay, scale back or eliminate some or all of its research and development programs, or to reduce or cease operations. While there is no assurance that the Company can meet its revenue forecasts, management anticipates that it can continue operations for at least the next twelve months.

*Reclassifications*

Certain prior period amounts have been reclassified to conform to the current period presentation, including certain expenses from research and development to intellectual properly legal fees in the consolidated statement of operations and combining other assets with prepaid expenses and other current assets in the consolidated statement of cash flows.

**Note 2—Summary of Significant Accounting Policies**

**Change in Accounting Principle**

On January 2, 2016, the Company retrospectively adopted Financial Accounting Standards Board ("FASB") Accounting Standards Update ("ASU") No. 2015-03, *Interest - Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03"). ASU 2015-03 requires that debt issuance costs be presented as a direct reduction from the carrying amount of debt. As a result of the adoption of ASU 2015-03, the consolidated balance sheet at December 27, 2014 was adjusted to reflect the reclassification of $253,000 from prepaid expenses and other current assets and $81,000 from other assets to long-term debt.

**Basis of Presentation**

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

**Principles of Consolidation**

The consolidated financial statements include the accounts of Netlist, Inc. and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

**Fiscal Year**

The Company operates under a 52 or 53week fiscal year ending on the Saturday closest to December 31. The 2015 and 2014 fiscal years ended on January 2, 2016 and December 27, 2014, respectively. Fiscal year 2015 consisted of 53 weeks and fiscal year 2014 consisted of 52 weeks.

**Use of Estimates**

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements, and the reported amounts of net sales and expenses during the reporting period. By their nature, these estimates and assumptions are subject to an inherent degree of uncertainty. Significant estimates made by management include, among others, provisions for uncollectible receivables and sales returns, warranty liabilities, valuation of inventories, fair value of financial instruments, recoverability of long-lived assets, valuation of stock-based transactions , estimates for completion of NRE revenue milestones and realization of deferred tax assets. The Company bases its estimates on historical experience, knowledge of current conditions and the

Company's belief of what could occur in the future considering available information.  The Company reviews its estimates on an on-going basis. The actual results experienced by the Company may differ materially and adversely from its estimates. To the extent there are material differences between the estimates and the actual results, future results of operations will be affected.

**Revenue Recognition**

**Product Sales**

The Company's revenues primarily consist of product sales of high performance memory subsystems to OEMs , hyperscale data center operators and storage vendors.

The Company recognizes revenues in accordance with FASB Accounting Standards Codification ("ASC") Topic 605. Accordingly, the Company recognizes revenues when there is persuasive evidence that an arrangement exists, product delivery and acceptance have occurred, the sales price is fixed or determinable, and collectability of the resulting receivable is reasonably assured.

The Company generally uses customer purchase orders and/or contracts as evidence of an arrangement. Delivery occurs when goods are shipped for customers with shipping point terms and upon receipt for customers with destination terms, at which time title and risk of loss transfer to the customer. Shipping documents are used to verify delivery and customer acceptance. The Company assesses whether the sales price is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to refund. Customers are generally allowed limited rights of return for up to 30  days, except for sales of excess component inventories, which contain no right-of-return privileges. Estimated returns are provided for at the time of sale based on historical experience or specific identification of an event necessitating a reserve. The Company offers a standard product warranty to its customers and has no other post-shipment obligations. The Company assesses collectability based on the creditworthiness of the customer as determined by credit checks and evaluations, as well as the customer's payment history.

All amounts billed to customers related to shipping and handling are classified as revenues, while all costs incurred by the Company for shipping and handling are classified as cost of sales.

**Engineering Services**

We provide engineering services to our customers. We recognize revenue from these services when all of the following conditions are met: (1) evidence existed of an arrangement with the customer, typically consisting of a purchase order or contract; (2) our services were performed and risk of loss passed to the customer; (3) we completed all of the necessary terms of the contract; (4) the amount of revenue to which we were entitled was fixed or determinable; and (5) we believed it was probable that we would be able to collect the amount due from the customer. To the extent that one or more of these conditions has not been satisfied, we defer recognition of revenue.

Generally, we recognize revenue as the engineering services stipulated under the contract are completed and accepted by our customers. Engineering services are performed under a signed Statement of Work ("SOW") with a customer. The deliverables and payment terms stipulated under the SOW provide guidance on the project revenue recognition.

Revenues from contracts with substantive defined milestones that we have determined are reasonable, relevant to all the deliverables and payment terms in the SOW that are commensurate with the efforts required to achieve the milestones are recognized under the milestone recognition method.

Estimated losses on all SOW projects are recognized in full as soon as they become evident.

F- 9

**Deferred Revenue**

From time-to-time the Company receives pre-payments from its customers related to future services. Engineering development fee revenues, including non-recurring engineering ("NRE") fees, are deferred and recognized ratably over the period the engineering work is completed.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of cash and short-term investments with original maturities of three months or less, other than short-term investments in securities that lack an active market.

**Restricted Cash**

Restricted cash of $0.4  million, as of January 2, 2016 , consists of cash to secure three standby letters of credit.

**Fair Value of Financial Instruments**

The Company's financial instruments consist principally of cash and cash equivalents, restricted cash, accounts receivable, accounts payable, accrued expenses and debt instruments. The fair value of the Company's cash equivalents is determined based on quoted prices in active markets for identical assets or Level 1 inputs.  The Company recognizes transfers between Levels 1 through 3 of the fair value hierarchy at the beginning of the reporting period.  The Company believes that the carrying values of all other financial instruments approximate their current fair values due to their nature and respective durations.

**Allowance for Doubtful Accounts**

The Company evaluates the collectibility of accounts receivable based on a combination of factors. In cases where the Company is aware of circumstances that may impair a specific customer's ability to meet its financial obligations subsequent to the original sale, the Company will record an allowance against amounts due, and thereby reduce the net recognized receivable to the amount the Company reasonably believes will be collected. For all other customers, the Company records allowances for doubtful accounts based primarily on the length of time the receivables are past due based on the terms of the originating transaction, the current business environment, and its historical experience. Uncollectible accounts are charged against the allowance for doubtful accounts when all commercial means of collection have been exhausted.  Generally, the Company's credit losses have been within expectations and the provisions established. However, the Company cannot guarantee that it will continue to experience credit loss rates similar to those experienced in the past.

**Concentration of Credit Risk**

Financial instruments that potentially subject the Company to significant concentrations of credit risk consist principally of cash and cash equivalents, and accounts receivable.

The Company invests its cash equivalents primarily in money market mutual funds.  Cash equivalents are maintained with high quality institutions, the composition and maturities of which are regularly monitored by management. At times, deposits held with financial institutions may exceed the amount of insurance provided by the Federal Deposit Insurance Corporation and the Securities Investor Protection Corporation.

The Company's trade accounts receivable are primarily derived from sales to OEMs in the computer industry. The Company performs credit evaluations of its customers' financial condition and limits the amount of credit extended when deemed necessary, but generally requires no collateral. The Company believes that the concentration of credit risk in its trade receivables is moderated by its credit evaluation process, relatively short collection terms, the high level of credit worthiness of its customers (see Note 10), foreign credit insurance , and letters of credit issued in its favor.  Reserves are maintained for potential credit losses, and such losses historically have not been significant and have been within management's expectations.

F- 10

**Inventories**

Inventories are valued at the lower of actual cost to purchase or manufacture the inventory or the net realizable value of the inventory. Cost is determined on an average cost basis which approximates actual cost on a first-in, first-out basis and includes raw materials, labor and manufacturing overhead. At each balance sheet date, the Company evaluates its ending inventory quantities on hand and on order and records a provision for excess quantities and obsolescence. Among other factors, the Company considers historical demand and forecasted demand in relation to the inventory on hand, competitiveness of product offerings, market conditions and product life cycles when determining obsolescence and net realizable value. In addition, the Company considers changes in the market value of components in determining the net realizable value of its inventory. Once established, lower of cost or market write-downs are considered permanent adjustments to the cost basis of the excess or obsolete inventories.

**Property and Equipment**

Property and equipment are recorded at cost and depreciated on a straight-line basis over their estimated useful lives, which generally range from three to seven years. Leasehold improvements are recorded at cost and amortized on a straight-line basis over the shorter of their estimated useful lives or the remaining lease term.  Ex penditures for repairs and maintenance are charged to expense as incurred.  Upon retirement or sale, the cost and related accumulated depreciation and amortization of assets disposed of are removed from the accounts and any resulting gain or loss is included in other expense, net.

**Deferred Financing Costs, Debt Discount and Detachable Debt-Related Warrants**

Costs incurred in connection with debt are deferred and recorded as a reduction to the debt balance in the accompanying consolidated balance sheets. The Company amortizes debt issuance costs over the expected term of the related debt using the effective interest method. Debt discounts relate to the relative fair value of warrants issued in conjunction with the debt are also recorded as a reduction to the debt balance and accreted over the expected term of the debt to interest expense using the effective interest method .

**Impairment of Long-Lived Assets**

The Company evaluates the recoverability of the carrying value of long-lived assets held and used by the Company for impairment on at least an annual basis or whenever events or changes in circumstances indicate that their carrying value may not be recoverable. When such factors and circumstances exist, the Company compares the projected undiscounted future net cash flows associated with the related asset or group of assets over their estimated useful lives against their respective carrying amount. If the carrying value is determined not to be recoverable from future operating cash flows, the asset is deemed impaired and an impairment loss is recognized to the extent the carrying value exceeds the estimated fair value of the asset. The fair value of the asset or asset group is based on market value when available, or when unavailable, on discounted expected cash flows. The Company's management believes there is no impairment of long-lived assets as of January 2, 2016 . There can be no assurance, however, that market conditions will not change or demand for the Company's products will continue, which could result in future impairment of long-lived assets.

**Warranty Liability**

The Company offers product warranties generally ranging from one to three years, depending on the product and negotiated terms of any purchase agreements with customers. Such warranties require the Company to repair or replace defective product returned to the Company during such warranty period a t no cost to the customer. Warranties are not offered on sales of excess component inventory. The Company records an estimate for warranty -related costs at the time of sale based on its historical and estimated product return rates and expected repair or replacement costs (see Note 3). While s uch costs have historically been within management's expectations and the provisions established, unexpected changes in failure rates could have a material adverse impact on the Company, requiring additional warranty liability , and could adversely affect the Company's gross profit and gross margins.

**Stock-Based Compensation**

The Company accounts for equity issuances to non-employees in accordance with ASC Topic 505.  All transactions in which goods or services are the consideration received for the issuance of equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date used to determine the fair value of the equity instrument issued is the earlier of the date on which the third-party performance is complete or the date on which it is probable that performance will occur.

In accordance with ASC Topic 718, employee and director stock-based compensation expense recognized during the period is based on the value of the portion of stock-based payment awards that is ultimately expected to vest during the period.  Given that stock-based compensation expense recognized in the consolidated statements of operations is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. ASC Topic 718 requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The Company's estimated average forfeiture rates are based on historical forfeiture experience and estimated future forfeitures.

The estimated fair value of common stock option awards to employees and directors is calculated using the Black-Scholes option pricing model. The Black-Scholes model requires subjective assumptions regarding future stock price volatility and expected time to exercise, along with assumptions about the risk-free interest rate and expected dividends, all of which affect the estimated fair values of the Company's common stock option awards.  The expected term of options granted is calculated as the average of the weighted vesting period and the contractual expiration date of the option.  This calculation is based on the safe harbor method permitted by the SEC in instances where the vesting and exercise terms of options granted meet certain conditions and where limited historical exercise data is available.  The expected volatility is based on the historical volatility of the Company's common stock.  The risk-free rate selected to value any particular grant is based on the U.S. Treasury rate that corresponds to the expected term of the grant effective as of the date of the grant. The expected dividend assumption is based on the Company's history and management's expectation regarding dividend payouts.  The Company evaluates the assumptions used to value their common stock awards on a quarterly basis.  If factors change and the Company employs different assumptions, stock-based compensation may differ significantly from what has been recorded in prior periods.  Compensation expense for common stock option awards with graded vesting schedules is recognized on a straight-line basis over the requisite service period for the last separately vesting portion of the award, provided that the accumulated cost recognized as of any date at least equals the value of the vested portion of the award.

The Company recognizes the estimated fair value of restricted stock awards issued to employees and outside directors as stock-based compensation expense on a straight-line basis over the vesting period for the last separately vesting portion of the awards. Estimated fair value is determined as the difference between the closing price of our common stock on the grant date and the purchase price of the restricted stock award, if any, reduced by expected forfeitures.

If there are any modifications or cancellations of the underlying vested or unvested stock-based awards, the Company may be required to accelerate, increase or cancel any remaining unearned stock-based compensation expense, or record additional expense for vested stock-based awards.  Future stock-based compensation expense and unearned stock- based compensation may increase to the extent that the Company grants additional common stock options or other stock-based awards.

**Income Taxes**

Deferred tax assets and liabilities are recognized to reflect the estimated future tax effects, calculated at currently effective tax rates, of future deductible or taxable amounts attributable to events that have been recognized on a cumulative basis in the consolidated financial statements. A valuation allowance related to a net deferred tax asset is recorded when it is more likely than not that some portion of the deferred tax asset will not be realized.

ASC Topic 740 prescribes a recognition threshold and measurement requirement for the financial statement recognition of a tax position that has been taken or is expected to be taken on a tax return and also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. Under ASC Topic 740 the Company may only recognize or continue to recognize tax positions that meet a "more likely than not" threshold.

The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws and regulations themselves are subject to change as a result of changes in fiscal policy, changes in legislation, the evolution of regulations and court rulings. Therefore, the actual liability for U.S. or foreign taxes may be materially different from the Company's estimates, which could result in the need to record additional tax liabilities or potentially reverse previously recorded tax liabilities.

**Research and Development Expenses**

Research and development expenditures are expensed in the period incurred.

**Risks and Uncertainties**

The Company is subject to certain risks and uncertainties including its ability to obtain profitable operations due to the Company's history of losses and accumulated deficits, the Company's dependence on a few customers for a significant portion of revenues, risks related to intellectual property matters, market development of and demand for the Company's products, and the length of the sales cycle.  Such risks could have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

The Company dedicates substantial resources in protecting its intellectual property, including its efforts to defend its patents against challenges made by way of reexamination proceedings at the United States Patent and Trademark Office ("USPTO"). These activities are likely to continue for the foreseeable future, without any guarantee that any ongoing or future patent protection and litigation activities will be successful. The Company is also subject to litigation based on claims that it has infringed on the intellectual property of others, against which the Company intends to defend itself vigorously. Litigation, whether or not eventually decided in the Company's favor or settled, is costly and time-consuming and could divert management's attention and resources. Because of the nature and inherent uncertainties of litigation, should the outcome of any of such actions be unfavorable, the Company's business, financial condition, results of operations or cash flows could be materially and adversely affected.

The Company has also invested a significant portion of its research and development budget into the design of ASIC and field-programmable gate array ("FGPA") devices, including the HyperCloud® and HyperVault memory subsystems, and the NVvault family of products. These products are subject to increased risks as compared to the Company's legacy products. The Company may be unable to achieve customer or market acceptance of its products, or achieve such acceptance in a timely manner. The Company experienced a longer qualification cycle than anticipated with its HyperCloud® memory subsystems, and did experience supply chain disruption and a shortage of DRAM and flash required to create the HyperCloud® memory subsystem and NVvault products.  As of January 2, 2016, Hypercloud has not generated significant revenue relative to the Company's investment in the product.

The Company's operations in the PRC are subject to various political, geographical and economic risks and uncertainties inherent to conducting business in the PRC. These include, but are not limited to, (i) potential changes in economic conditions in the region, (ii) managing a local workforce that may subject the Company to uncertainties or certain regulatory policies, (iii) changes in other policies of the Chinese governmental and regulatory agencies, and (iv) changes in the laws and policies of the U.S. government regarding the conduct of business in foreign countries, generally, or in the PRC, in particular. Additionally, the Chinese government controls the procedures by which its local currency, the Chinese Renminbi ("RMB"), is converted into other currencies and by which dividends may be declared or capital distributed for the purpose of repatriation of earnings and investments. If restrictions in the conversion of RMB or in the repatriation of earnings and investments through dividend and capital distribution restrictions are instituted, the Company's operations and may be negatively impacted. The liabilities of the Company's subsidiaries in the PRC exceeded its assets as of January 2, 2016 and December 27, 2014 .

F- 13

Table of Contents

**Foreign Currency Remeasurement**

The functional currency of the Company's foreign subsidiary is the U.S. dollar. Local currency financial statements are remeasured into U.S. dollars at the exchange rate in effect as of the balance sheet date for monetary assets and liabilities and the historical exchange rate for nonmonetary assets and liabilities. Expenses are remeasured using the average exchange rate for the period, except items related to nonmonetary assets and liabilities, which are remeasured using historical exchange rates. All remeasurement gains and losses are included in determining net loss.  Transaction gains and losses were not significant in 201 5 and 201 4 .

**Net Loss Per Share**

Basic net loss per share is calculated by dividing net loss by the weighted-average common shares outstanding during the year, excluding unvested shares issued pursuant to restricted share awards under the Company's share-based compensation plans.  Diluted net loss per share is calculated by dividing the net loss by the weighted-average shares and dilutive potential common shares outstanding during the year. Dilutive potential shares consist of dilutive shares issuable upon the exercise or vesting of outstanding stock options and restricted stock awards, respectively, computed using the treasury stock method and shares issuable upon conversion of the SVIC Note (as defined below) using the "if converted method" .  In periods of losses, basic and diluted loss per share are the same, as the effect of stock options and unvested restricted share awards on loss per share is anti-dilutive.

***Recent Accounting Pronouncements***

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers* ("ASU 2014-09"). ASU 2014-09 supersedes the revenue recognition requirements in FASB Topic 605, *Revenue Recognition* . ASU 2014-9 implements a five-step process for customer contract revenue recognition that focuses on transfer of control, as opposed to transfer of risk and rewards. The amendment also requires enhanced disclosures regarding the nature, amount, timing and uncertainty of revenues and cash flows from contracts with customers. Other major provisions include the capitalization and amortization of certain contract costs, ensuring the time value of money is considered in the transaction price, and allowing estimates of variable consideration to be recognized before contingencies are resolved in certain circumstances. Entities can transition to the standard either retrospectively or as a cumulative-effect adjustment as of the date of adoption.  On July 9, 2015, the FASB approved amendments deferring the effective date by one year to December 15, 2017 for annual reporting periods beginning after that date and permitting early adoption of the standard, but not before the original effective date or for reporting periods beginning after December 15, 2016.  The Company has not yet selected a transition method and is currently assessing the impact of the adoption of AUS 2014-9 will have on its consolidated financial statements and disclosures.

In August 2014, the FASB issued ASU No. 2014-15, *Presentation of Financial Statements - Going Concern.* The amendments in this update provide guidance in accounting principles generally accepted in the United States of America about management's responsibilities to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern and to provide related footnote disclosures. The main provision of the amendments are for an entity's management, in connection with the preparation of financial statements, to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that the financial statements are issued. Management's evaluation should be based on relevant conditions and events that are known or reasonably knowable at the date the consolidated financial statements are issued. When management identifies conditions or events that raise substantial doubt about an entity's ability to continue as a going  concern, the entity should disclose information that enables users of the consolidated financial statements to understand all of the following: (1) principal conditions or events that raised substantial doubt about the entity's ability to continue as a going concern (before consideration of management's plans); (2) management's evaluation of the significance of those conditions or events in relation to the entity's ability to meet its obligations; and (3) management's plans that alleviated substantial doubt about the entity's ability to continue as a going concern or management's plans that are intended to mitigate the conditions or events that raise substantial doubt about the entity's ability to continue as a going concern. The amendments in this update are effective for interim and annual reporting periods after December 15, 2016 and early application is permitted. The Company is currently assessing this guidance for future implementation.

F- 14

Table of Contents

In April 2015, the FASB issued ASU No. 2015-03, *Interest - Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03"). The amendments in ASU 2015-03 require that debt issuance costs related to a recognized debt liability be presented in the balance sheet as a direct deduction from the carrying amount of that debt liability, consistent with debt discounts. ASU 2015-03 is effective for annual and interim periods beginning on or after December 15, 2015. The amendments in this update should be applied on a retrospective basis, wherein the balance sheet of each individual period presented should be adjusted to reflect the period-specific effects of applying the new guidance. Upon transition, an entity is required to comply with the applicable disclosures for a change in an accounting principle. These disclosures include the nature of and reason for the change in accounting principle, the transition method, a description of the prior-period information that has been retrospectively adjusted, and the effect of the change on the financial statement line items (that is, debt issuance cost asset and the debt liability). The Company has elected to early adopt ASU 2015-03.  The Company has reclassified its debt issuance costs previously included in prepaid expenses and other current assets and other assets to a direct reduction in long-term debt in the prior year in the accompanying consolidated balance sheet.

In July 2015, the FASB issued ASU No. 2015-11, *Inventory (Topic 330)* ("ASU 2015-11"). The amendments in ASU 2015-11 require that an entity measure inventory within the scope at the lower of cost and net realizable value. Net realizable value is the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transaction. The amendments in this update more closely align the measurement of inventory in U.S. GAAP with the measurement of inventory in International Financial Reporting Standards. ASU 2015-11 is effective for annual and interim periods beginning on or after December 15, 2016. The amendments in this update should be applied prospectively with early application permitted as of the beginning of the interim or annual reporting period. The Company is currently assessing this guidance for future implementation.

 In November 2015, FASB issued ASU 2015-17,  *Income Taxes (Topic 740), Balance Sheet Classification of Deferred Taxes* ("ASU 2015-17") , which eliminates the current requirement for an entity to separate deferred income tax liabilities and assets into current and non-current amounts in a classified balance sheet. Instead, the ASU requires deferred tax liabilities, deferred tax assets and valuation allowances be classified as non-current in a classified balance sheet. ASU 2015-17 will be effective for annual reporting periods beginning after December 15, 2016 and interim periods within those annual periods. Early adoption is permitted. Additionally, this guidance may be applied either prospectively or retrospectively to all periods presented. The Company elected not to early adopt ASU 2015-17 and is evaluating the effect of the adoption of this ASU to its consolidated financial statements.

In February 25, 2016, the FASB issued ASU No. 2016-02, *Leases* ("ASU 2016-02"). Under ASU 2016-02 , lessees will be required recognize the following for all leases (with the exception of short-term leases) at the commencement date: a lease liability, which is a lessee's obligation to make lease payments arising from a lease, measured on a discounted basis; and a right-of-use asset, which is an asset that represents the lessee's right to use, or control the use of, a specified asset for the lease term. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early application is permitted. Lessees must apply a modified retrospective transition approach for leases existing at, or entered into after, the beginning of the earliest comparative period presented in the financial statements. The modified retrospective approach would not require any transition accounting for leases that expired before the earliest comparative period presented. Lessees may not apply a full retrospective transition approach.

Table of Contents

**Note 3—Supplemental Financial Information**

**Inventories**

Inventories consist of the following (in thousands):

|  | January 2, 2016 | December 27, 2014 |
|---|---|---|
| Raw materials | $ 1,174 | $ 984 |
| Work in process | 98 | 23 |
| Finished goods | 386 | 873 |
|  | $ 1,658 | $ 1,880 |

**Property and Equipment**

Property and equipment consist of the following (dollars in thousands):

|  | Estimated Useful Lives | January 2, 2016 | December 27, 2014 |
|---|---|---|---|
| Machinery and equipment | 3 - 7 yrs. | $ 8,934 | $ 8,956 |
| Leasehold improvements | * | 867 | 1,915 |
| Furniture and fixtures | 5 yrs. | 368 | 367 |
| Computer equipment and software | 3 - 7 yrs. | 3,788 | 3,490 |
|  |  | 13,957 | 14,728 |
| Less accumulated depreciation and amortization |  | (13,549) | (14,335) |
|  |  | $ 408 | $ 393 |

_____

\*     Estimated useful life is generally 7  years, or the remaining lease term, whichever is shorter.

**Warranty Liability**

The following table summarizes the activity related to the warranty liability (in thousands):

|  | Year Ended | |
|---|---|---|
|  | January 2, 2016 | December 27, 2014 |
| Beginning balance | $ 246 | $ 249 |
| Estimated cost of warranty claims charged to cost of sales | 41 | 116 |
| Cost of actual warranty claims | (165) | (119) |
| Ending balance | 122 | 246 |
| Less current portion | (73) | (147) |
| Long-term warranty liability | $ 49 | $ 99 |

The allowance for warranty liabilities expected to be incurred within one year is included as a component of accrued expenses and other current liabilities in the accompanying consolidated balance sheets.  The allowance for warranty liabilities expected to be incurred after one year is classified as long-term warranty liabilit y in the accompanying consolidated balance sheets.

**Computation of Net Loss Per Share**

The following table sets forth the computation of basic and diluted net loss per share, including the reconciliation of the numerator and denominator used in the calculation of basic and diluted net loss per share (in thousands, except per share data):

| | Year Ended | |
|---|---|---|
| | January 2, 2016 | December 27, 2014 |
| **Basic and diluted net loss per share:** | | |
| Numerator: Net loss | $ (20,527) | $ (15,381) |
| Denominator: Weighted-average common shares | | |
| outstanding, basic and diluted | 48,967 | 40,304 |
| Basic and diluted net loss per share | $ (0.42) | $ (0.38) |

The following table sets forth potentially dilutive common share equivalents, consisting of shares issuable upon the exercise or vesting of outstanding stock options and restricted stock awards, respectively, and the exercise of warrants, computed using the treasury stock method.  These potential common shares have been excluded from the diluted net loss per share calculations above as their effect would be anti-dilutive for the years then ended (in thousands):

| | Year Ended | |
|---|---|---|
| | January 2, 2016 | December 27, 2014 |
| Common share equivalents | 101 | 277 |

The above common share equivalents would have been included in the calculation of diluted earnings per share had the Company reported net income for the years then ended.

**Cash Flow Information**

The following table sets forth supplemental disclosures of cash flow information and non-cash investing and financing activities (in thousands):

| | Year Ended | |
|---|---|---|
| | January 2, 2016 | December 27, 2014 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for: | | |
| Interest | $ 906 | $ 479 |
| Income taxes | $ 4 | $ 4 |
| | | |
| Supplemental disclosure of non-cash financing activities: | | |
| | | |
| Debt issuance costs associated with February debt financing | $ 108 | $ - |
| Detachable warrant issued with November debt financing | $ 1,165 | $ - |
| Debt financing of directors and officers and cargo insurance | $ 268 | $ 198 |

**Note 4—Credit Agreements**

**SVB Credit Agreement**

On October 31, 2009, the Company entered into a credit agreement with Silicon Valley Bank ("SVB"), which was most recently amended on January 29, 2016 (as amended, the "SVB Credit Agreement and such amendment, the "SVB Amendment"). Pursuant to the terms of the SVB Credit Agreement, the Company is eligible to borrow, in a revolving line of credit, up to the lesser of (i) 80% of its eligible accounts receivable, or (ii) $5.0 million, subject to certain adjustments as set forth in the SVB Credit Agreement. The SVB Amendment modifies certain terms of the SVB Credit Agreement in order to (i) extend the maturity date of advances under the SVB Credit Agreement to January 31, 2017, (ii) adjust the rate at which advances under the SVB Credit Agreement accrue interest to the Wall Street Journal " prime rate" plus 2.75% (p rior to the SVB Amendment, advances under the SVB Credit Agreement accrued interest at a rate equal to SVB's most recently announced "prime rate" plus 2.75%) , and (iii) effective as of December 1, 2015, adjust certain of the Company's financial covenants under the SVB Credit Agreement, including relaxing the Company's adjusted quick ratio covenant and removing the Company's tangible net worth covenant. Additionally, pursuant to the terms of the SVB Amendment, SVB allowed for the financing and security interests contemplated under the debt instrument issued to SVIC (see Note 5) and released certain patents and related assets relating to the NVvault™ product line from the collateral subject to SVB's security interest under the SVB Credit Agreement.

The SVB Amendment requires letters of credit to be secured by cash, which is classified as restricted cash in the accompanying consolidated balance sheet. At January 2, 2016 and December 27, 2014, letters of credit in the amount of $0.4 million and $0.7 million, respectively, were outstanding.

The following tables present details of interest expense related to borrowings on the line of credit with SVB, along with availability under our credit line with SVB (in thousands):

The following table presents details of the Company's availability under our line of credit with SVB:

| | January 2, 2016 | December 27, 2014 |
|---|---|---|
| Availability under the revolving line of credit | $      530 | $      882 |

All obligations under the SVB Credit Agreement are secured by a first priority lien on the Company's tangible and intangible assets, other than its patent portfolio, which is subject to a first priority lien held by SVIC. The SVB Credit Agreement subjects the Company to certain affirmative and negative covenants, including financial covenants with respect to the Company's liquidity and restrictions on the payment of dividends. As of January 2, 2016, the Company was in compliance with its covenants under the SVB Credit Agreement.

**Fortress Credit Opportunities I LP Loan and Security Agreement and Related Agreements**

On July 18, 2013, the Company, entered into a loan agreement ("2013 Loan Agreement") with Fortress Credit Opportunities I LLP ("Fortress"), an affiliate of Fortress Investment Group LLC and successor to DBD Credit Funding, LLC, which provided for up to $10 million in term loans and up to $5 million in revolving loans.  The term loans were available in an initial $6 million tranche (the "Initial Term Loan") with a second tranche in the amount of $4 million becoming available upon achievement of certain performance milestones relating to intellectual property matters (the "IP Monetization Milestones" and such second tranche loan, "IP Milestone Term Loan").  The $5 million in revolving loans were available at Fortress's discretion and subject to customary conditions precedent.  The $6 million Initial Term Loan was fully drawn at closing on July 18, 2013.  Proceeds from the Initial Term Loan were used in part to repay the Company's Consolidated Term Loan with SVB. The remainder of such funds was used to fund the Company's working capital needs. On February 17, 2015, the 2013 Loan Agreement was amended to accelerate the availability of the term loan and the Company borrowed the remaining $4 million in term loans.

F- 18

Table of Contents

The loans bore interest at a stated fixed rate of 11.0% per annum.  Until the last business day of February 2015, the payments on the term loans were interest-only at a cash rate of 7.0% per annum and a payment-in-kind deferred cash interest rate of 4.0% , which payment-in-kind interest was capitalized semi-annually, beginning with December 31, 2013.  Beginning with the last business day of February 2015, the term loans were amortized with 65% of the principal amount due in equal monthly installments over the following seventeen (17) months with a balloon payment equal to 35% of the remaining principal amount of the term loans, plus accrued interest, being payable on July 18, 2016 (the "Maturity Date").  Term loan payments, including the $4 million borrowed on February 17, 2015, of approximately $370,000 were due monthly through June 18, 2016, with the remaining amount of approximately $4.3 million due on July 18, 2016.

In November 2015, the Company repaid all amounts owed under the 2013 Loan Agreement with the proceeds from the SVIC Note, as defined and discussed in Note 5, and terminated the 2013 Loan Agreement in full.

Concurrently with the execution of the 2013 Loan Agreement, the Company and Drawbridge Special Opportunities Fund LP ("Drawbridge") entered into a Monetization Letter Agreement (as amended, the "Letter Agreement").  In connection with an amendment to the 2013 Loan Agreement, the Company also amended the Letter Agreement on February 17, 2015.  The Letter Agreement provided, among other things, that DBD may have been entitled to share in certain monetization revenues that we may have derived in the future related to our patent portfolio (the "Patent Portfolio").  The Patent Portfolio did not include certain patents relating to the NVvault™ product line.  Monetization revenues subject to this arrangement included revenues recognized during the seven year term of the Letter Agreement from amounts (whether characterized as settlement payments, license fees, royalties, damages, or otherwise) actually paid to the Company or its subsidiaries in connection with any assertion of, agreement not to assert, or license of, the Patent Portfolio (in whole or in part) either (A) in consideration of the grant of a license or covenant not sue, or other immunity with respect to the Patent Portfolio, or (B) as a damages award with respect to such assertion of the Patent Portfolio, less certain legal fees and expenses (subject to a cap on such fees and expenses).  Monetization revenues also included the value attributable to the Patent Portfolio in any sale of the Company during the seven year term, subject to a maximum amount payable to Drawbridge.  The Letter Agreement also required that the Company use commercially reasonable efforts to pursue opportunities to monetize the Patent Portfolio during the term of the Letter Agreement, provided the Company was under no obligation to pursue any such opportunities that it did not deem to be in its best interest.

Concurrently with the termination of the 2013 Loan Agreement in November 2015, the Company also terminated the Letter Agreement in full, as discussed further in Note 5.

Concurrently with the execution of the 2013 Loan Agreement, the Company issued to Drawbridge a seven -year warrant (the "Drawbridge Warrant") to purchase an aggregate of 1,648,351 shares of the Company's common stock at an exercise price of $1.00 per share. In connection with an amendment to the 2013 Loan Agreement, on February 17, 2015, the Company cancelled the Drawbridge Warrant and issued a replacement warrant in substantially the same form except for the removal of the restrictions upon exercise contained in the original Drawbridge Warrant with respect to an aggregate of 659,340 shares of the Company's common stock thereunder relating to the achievement of the Company of the IP Monetization Milestones and the borrowing by the Company of amounts under the IP Milestone Term Loan. As used herein, the term "Drawbridge Warrant" refers to the originally issued warrant and the replacement warrant, as the context dictates.

The Company accounted for the Drawbridge Warrant as a debt discount and has valued it based on the relative fair value to the debt instrument, at approximately $1,215,000 , to be amortized over the term of the debt instrument, or three years, using the effective interest method. For the years ended January 2, 2016 and December 27, 2014, the Company amortized approximately $524,000 and $487,000 respectively, as interest expense in the consolidated statements of operations.

In connection with the SVIC Purchase Agreement, as further described in Note 5, the Company amended the Drawbridge Warrant to reduce the exercise price per share to $0.47 . See Note 8 for further details.

F- 19

Table of Contents

Also in connection with the 2013 Loan Agreement, the Company agreed to pay to a consultant a consulting fee equal to (i) $300,000 in connection with the Company's receipt of the Initial Term Loan and (ii) 5% of any additional principal amount loaned to the Company as an IP Milestone Term Loan. The initial $300,000 and $485,925 of additional debt financing costs were recorded as debt issuance cost to be amortized over the term of the debt instrument, or three years, using the effective interest method.

In connection with an amendment to the 2013 Loan Agreement, on February 17, 2015, the Company modified its agreement with the consultant and agreed to pay a consulting fee of 3.5% of $4,000,000 of additional principal loaned to the Company under the 2013 Loan Agreement. The amended consulting fee was equal to $140,000 . The amended consulting fee and $132,899 of additional debt financing costs has been recorded as debt issuance cost to be amortized over the term of the debt instrument, or seventeen months, using the effective interest method. During the years ended January 2, 2016 and December 27, 2014, the Company amortized approximately $607,000 and $316,000 respectively, as interest expense in the consolidated statements of operations.

In connection with the repayment of all amounts owed under the 2013 Loan Agreement the debt issuance costs and debt discount costs were expensed in their entirety as interest expense.

**Note 5- Long-term Debt**

The Company's long-term debt consists of the following (in thousands):

|  | January 2, 2016 | | December 27, 2014 | |
|---|---|---|---|---|
| Term Loan, Fortress, net of debt discount and debt issuance costs of $0 and $858 | $ | - | $ | 5,503 |
| Convertible promissory note, SVIC, net of debt discount and debt issuance costs of $1,301 and $0 |  | 13,699 |  | - |
| Note payable to others |  | 13 |  | - |
|  | $ | 13,712 | $ | 5,503 |
| Less current portion (including debt discount and debt issuance costs) |  | (13) |  | (1,952) |
|  | $ | 13,699 | $ | 3,551 |

On November 18, 2015 ("Closing Date"), the Company entered into the SVIC Purchase Agreement with SVIC, pursuant to which the Company sold SVIC a Senior Secured Convertible Promissory Note ("SVIC Note") and a Stock Purchase Warrant ("SVIC Warrant"), each dated as of the Closing Date. The SVIC Note has an original principal amount of $15 million, accrues interest at a rate of 2% per year, is due and payable in full on December 31, 2021 ("SVIC Note Maturity Date") and the principal and accrued but unpaid interest are convertible into shares of the Company's common stock at a conversion price of $1.25 per share (the "Conversion Price"), subject to certain adjustments as set forth therein on the SVIC Note Maturity Date. Upon a change of control of the Company prior to the SVIC Note Maturity Date, the SVIC Note may, at the Company's option, be assumed by the surviving entity or be redeemed upon the consummation of such change of control for the principal and accrued but unpaid interest as of the redemption date. The SVIC Warrant grants SVIC a right to purchase 2,000,000 shares of the Company's common stock at an exercise price of $0.30 per share, subject to certain adjustments as set forth therein, is only exercisable in the event the Company exercises its right to redeem the SVIC Note prior to the SVIC Note Maturity Date, and expires on December 31, 2025. The SVIC Warrant was valued at $1,165,000 , based on its relative fair value, and was recorded as a debt discount . The Company also recorded $154,000 as a debt discount for professional services rendered.  These amounts will be amortized over the term of the SVIC Note using the effective interest method. For the year ended January 2, 2016, the Company amortized approximately $18,000 to interest expense in the consolidated statement of operations.

In connection with the SVIC Note, SVIC was granted a first priority security interest in the Company's patent portfolio and a second priority security interest in all of the Company's other assets. On the Closing Date, the Company, SVB and SVIC entered into an Intercreditor Agreement pursuant to which SVB and SVIC agreed to their relative security interest in the Company's assets.  On the Closing Date, the Company and SVIC also entered into a Registration

Table of Contents

Rights Agreement pursuant to which the Company is obligated to register with the SEC the shares of the Company's common stock issuable upon conversion of the SVIC Note or upon exercise of the SVIC Warrant.

On November 19, 2015, pursuant to the terms of a payoff letter (the "Payoff Letter") the Company repaid all sums due under the 2013 Loan Agreement with Fortress. The parties also terminated the Letter Agreement with Drawbridge. In connection with the Payoff Letter, the Company made a lump sum payment of $1.0 million to Fortress as an early termination fee, which was included in other expense in the consolidated statement of operations for the year ended January 2, 2016. The Company also agreed to amend the outstanding Drawbridge Warrant to reduce the exercise price per share to $0.47 (see Note 4). Additionally, pursuant to the terms of the Payoff Letter, the Company issued to Fortress a new ten -year warrant to purchase 1,000,000 shares of the Company's common stock at an exercise price per share of $0.47 (the "Fortress Warrant") (see Note 8). The estimated value of the new warrant and the estimated incremental value of the amended warrant totaled $0.8 million and were included in other expense on the consolidated statement of operations for the year ended January 2, 2016.

As of January 2, 2016, maturities of long-term debt, including amortization of debt discounts and debt issuance costs were as follows (in thousands):

| Fiscal Year | | |
|---|---|---|
| 2016 | $ | 13 |
| 2017 | | - |
| 2018 | | - |
| 2019 | | - |
| 2020 | | - |
| Thereafter | | 15,000 |
| Total payments on long-term debt | | 15,013 |
| Less current portion (including debt discount and debt issuance costs) | | (1,314) |
| Long-term debt | $ | 13,699 |

Interest expense, including amortization of debt discounts and debt issuance costs, net of interest income, is presented in the following table (in thousands):

| | Year Ended | | | |
|---|---|---|---|---|
| | January 2, 2016 | | December 27, 2014 | |
| Interest expense: | | | | |
| SVB | $ | 71 | $ | 79 |
| Fortress | | 1,940 | | 1,492 |
| SVIC | | 54 | | - |
| Others | | 4 | | 3 |
| | | 2,069 | | 1,574 |
| Interest income | | (5) | | - |
| | $ | 2,064 | $ | 1,574 |

F- 21

**Note 6—Income Taxes**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and liabilities are as follows (in thousands):

| | January 2, 2016 | December 27, 2014 |
|---|---|---|
| Deferred tax assets: | | |
| Reserves and allowances | $ 1,548 | $ 1,542 |
| State taxes, net of federal income tax benefit | 2 | 2 |
| Depreciation and amortization | 543 | 570 |
| Other accruals | 394 | 534 |
| Compensatory stock options and rights | 2,598 | 2,364 |
| Other | 28 | 24 |
| Tax credit carryforwards | 3,302 | 3,034 |
| Operating loss carryforward | 30,315 | 23,664 |
| Foreign operating loss carryforward | 1,480 | 1,604 |
| Total deferred tax assets | 40,210 | 33,338 |
| Deferred tax liabilities: | | |
| Prepaid expenses | (63) | (96) |
| Basis difference in warrant value | (452) | (200) |
| Total deferred tax liabilities | (515) | (296) |
| Subtotal | 39,695 | 33,042 |
| Valuation allowance | (39,695) | (33,042) |
| | $ - | $ - |

The Company evaluates whether a valuation allowance should be established against its deferred tax assets based on the consideration of all available evidence using a "more likely than not" standard. In making such judgments, significant weight is given to evidence that can be objectively verified.  As of January 2, 2016 and December 27, 2014 , a valuation allowance of $ 39.7 million and $ 33.0  million, respectively, has been provided based on the Company's assessment that it is more likely than not, that sufficient taxable income will not be generated to realize the tax benefits of the temporary differences. The valuation allowance increased by approximately $ 6.7 million and $ 4.9 million during the years ended January 2, 2016 and December 27, 2014 , respectively, primarily related to the increase in the net operating loss carryforward.

At January 2, 2016 , the Comp any had approximately $ 82.9 million of federal net operating loss carryforwards which begin to expire in year 2029 , and approximately $ 50.1 million of state net operating loss carryforwards which begin to expire in year 2017 , and federal and state tax credit carryforwards of approximately $1.5  million and $1.6  million, respectively at January 2, 2016.  Federal tax credit carryforwards begin to expire in 2025 and state tax credits carry forward indefinitely.  In addition, the Company has approximately $ 5.9 million of operating loss carryforwards in the PRC and Taiwan and had $ 1.7 million of net operating losses expire at the end of the current year. Utilization of the net operating loss and tax credit carryforwards is subject to an annual limi tation due to the ownership percentage change limitations provided by Section 382 of the Internal Revenue Code and similar state provisions. The annual limitation may result in the expiration of the net operating losses and tax credit carryforwards before utilization. As of January 2, 2016, we had not completed the determination of the amount to be limited under the provision.

The deferred tax asset at January 2, 2016 does not include approximately $ 1.7   million and $1.9 million of excess tax benefits from employee stock option exercises that are a component of the federal and state net operating loss carryover, respectively. The Company's stockholders' equity balance will be increased if and when such excess tax benefits are ultimately realized.

For financial reporting purposes, loss before provision for income taxes includes the following components (in thousands):

| | Year Ended | |
|---|---|---|
| | January 2, 2016 | December 27, 2014 |
| United States | $ (19,737) | $ (14,187) |
| Foreign | (789) | (1,192) |
| | $ (20,526) | $ (15,379) |

The Company's income tax provision consists of the following (in thousands):

| | Year Ended | |
|---|---|---|
| | January 2, 2016 | December 27, 2014 |
| Current: | | |
| Federal | $ - | $ - |
| State | 1 | 2 |
| Total current | 1 | 2 |
| Deferred: | | |
| Federal | (6,093) | (4,477) |
| State | (684) | (771) |
| Foreign | 344 | 262 |
| Change in valuation allowance | 6,433 | 4,986 |
| Total deferred | - | - |
| Income tax provision | $ 1 | $ 2 |

A reconciliation of income taxes computed by applying the statutory U.S. income tax rate to the Company's loss before income taxes to the income tax provision is as follows:

| | Year Ended | |
|---|---|---|
| | January 2, 2016 | December 27, 2014 |
| U.S. federal statutory tax | 35 % | 35 % |
| Valuation allowance | (32) | (30) |
| Loss from foreign subsidiary | (2) | (3) |
| Other | (1) | (2) |
| | % | |
| Effective income tax provision rate | 0 | 0 % |

The Company files tax returns with federal, state and foreign jurisdictions. The Company is no longer subject to Internal Revenue Service ("IRS") or state examinations for periods prior to 2012 although certain carryforward attributes that were generated prior to 2012 may still be adjusted by the IRS.

The Company follows the policy to classify accrued interest and penalties as part of the accrued tax liability in the provision for income taxes. For the years ended January 2, 2016 and December 27, 2014 , the Company did not recognize any interest or penalties related to unrecognized tax benefits.

The Company's continuing practice is to recognize interest and/or penalties related to income tax matters in income tax expense. As of January 2, 2016 and December 27, 2014 , the Company had no accrued interest and penalties related to uncertain tax matters.

F- 23

As of January 2, 2016 , the Company had no uncertain tax positions that would be reduced as a result of a lapse of the applicable statute of limitations.

**Note 7—Commitments and Contingencies**

**Leases**

The Company leases certain of its facilities and equipment under non - cancelable operating leases that expire at various dates through 2017. Rental expense, net of amortization of deferred gain and sublease income, is presented in the following table (in thousands):

|  | Year Ended | |
|  | January 2, 2016 | December 27, 2014 |
| --- | --- | --- |
| Rental expense, net | $ 526 | $ 604 |

A summary of future minimum payments under operating lease commitments as of January 2, 2016 is as follows (in thousands):

| Fiscal Year | Operating Leases |
| --- | --- |
| 2016 | $ 325 |
| 2017 | 52 |
| Total minimum lease payments | $ 377 |

**Litigation and Patent Reexaminations**

The Company owns numerous patents and continues to enlarge and strengthen its patent portfolios, which cover different aspects of the Company's technology innovations with various claim scopes. The Company plans to generate revenue by selling or licensing its technology, and intends to vigorously enforce its patent rights against infringers of such rights. The Company dedicates substantial resources in protecting its intellectual property, including its efforts to defend its patents against challenges made by way of reexamination proceedings at the USPTO. These activities are likely to continue for the foreseeable future, without any guarantee that any ongoing or future patent protection and litigation activities will be successful. The Company is also subject to litigation claims that it has infringed on the intellectual property of others, against which the Company intends to defend vigorously.

Litigation, whether or not eventually decided in the Company's favor or settled, is costly and time-consuming and could divert management's attention and resources. Because of the nature and inherent uncertainties of litigation, should the outcome of any of such actions be unfavorable, the Company's business, financial condition, results of operations or cash flows could be materially and adversely affected. Additionally, the outcome of pending litigation, and the related patent reexaminations, as well as any delay in their resolution, could affect the Company's ability to license its intellectual property in the future or to protect against competition in the current and expected markets for its products.

*Google Litigation*

In May 2008, the Company initiated discussions with Google, Inc. ("Google") based on information and belief that Google had infringed on a U.S. patent owned by the Company, U.S. Patent No. 7,289,386 ("the '386 patent"), which relates generally to technologies to implement rank multiplication in memory modules. Preemptively, Google filed a declaratory judgment lawsuit against the Company in the U.S. District Court for the Northern District of California (the "Northern District Court"), seeking a declaration that Google did not infringe the '386 patent and that the '386 patent

was invalid. The Company filed a counterclaim for infringement of the '386 patent by Google. Claim construction proceedings were held in November 2009, and the Company prevailed on every disputed claim construction issue. In June 2010, the Company filed motions for summary judgment of patent infringement and dismissal of Google's affirmative defenses. In May 2010, Google requested and was later granted an *Inter Partes* Reexamination of the '386 patent by the USPTO. The reexamination proceedings are described below. The Northern District Court granted Google's request to stay the litigation pending result of the reexamination, and therefore has not ruled on the Company's motions for summary judgment.

In December 2009, the Company filed a patent infringement lawsuit against Google in the Northern District Court, seeking damages and injunctive relief based on Google's infringement of U.S. Patent No. 7,619,912 ("the '912 patent"), which is related to the '386 patent and relates generally to technologies to implement rank multiplication. In February 2010, Google answered the Company's complaint and asserted counterclaims against the Company seeking a declaration that the patent is invalid and not infringed, and claiming that the Company committed fraud, negligent misrepresentation and breach of contract based on the Company's activities in the JEDEC standard-setting organization. The counterclaim seeks unspecified compensatory damages. Accruals have not been recorded for loss contingencies related to Google's counterclaim because it is not probable that a loss has been incurred and the amount of any such loss cannot be reasonably estimated. In October 2010, Google requested and was later granted an *Inter Partes* Reexamination of the '912 patent by the USPTO. The reexamination proceedings are described below. In connection with the reexamination request, the Northern District Court granted the Company and Google's joint request to stay the '912 patent infringement lawsuit against Google until the completion of the reexamination proceedings.

*Inphi Litigation*

In September 2009, the Company filed a patent infringement lawsuit against Inphi Corporation ("Inphi") in the U.S. District Court for the Central District of California (the "Central District Court"). The complaint, as amended, alleges that Inphi is contributorily infringing and actively inducing the infringement of U.S. patents owned by the Company, including the '912 patent, U.S. Patent No. 7,532,537 ("the '537 patent"), which relates generally to memory modules with load isolation and memory domain translation capabilities, and U.S. Patent No. 7,636,274 ("the '274 patent"), which is related to the '537 patent and relates generally to load isolation and memory domain translation technologies. The Company is seeking damages and injunctive relief based on Inphi's use of the Company's patented technology. Inphi denied infringement and claimed that the three patents are invalid. In April 2010, Inphi requested but was later denied *Inter Partes* Reexaminations of the '912, '537 and '274 patents by the USPTO. In June 2010, Inphi submitted new requests and was later granted *Inter Partes* Reexaminations of the '912, '537 and '274 patents by the USPTO. The reexamination proceedings are described below. In connection with the reexamination requests, Inphi filed a motion to stay the patent infringement lawsuit with the Central District Court, which was granted. The Central District Court has requested that the Company notify it within one week of any action taken by the USPTO in connection with the reexamination proceedings, at which time the Central District Court may decide to maintain or lift the stay.

*SanDisk, Smart Modular, Smart Worldwide, and Diablo Litigations*

In September 2012, Smart Modular, Inc. ("Smart Modular") filed a patent infringement lawsuit against the Company in the U.S. District Court for the Eastern District of California (the "Eastern District Court"). The complaint alleges that the Company willfully infringes and actively induces the infringement of six claims of a U.S. patent newly issued to Smart Modular, U.S. Patent No. 8,250,295 ("the '295 patent"), and seeks damages and injunctive relief. Smart Modular also filed a motion for preliminary injunction and a memorandum in support of the motion on the same day of the complaint. The Company promptly filed a request for reexamination of the '295 patent with the USPTO setting forth six different combinations of prior art that would render the six asserted claims of the '295 patent unpatentable. The Company also filed an answer to Smart Modular's complaint with the Eastern District Court in October 2012 to deny infringement of the '295 patent, assert that the '295 patent is invalid and unenforceable, and bring a set of counterclaims against Smart Modular. Smart Modular filed various motions on the pleadings on November 1, 2012, which were opposed by the Company in its briefs filed in late November 2012.

In December 2012, the USPTO granted the Company's request for the reexamination of the '295 patent, and issued an Office Action rejecting all of the six asserted claims over the six different combinations of prior art set forth by

Table of Contents

the Company in its request. The Company promptly moved to stay litigation pending result of reexamination. On February 19, 2013, a few days after Smart Modular filed replies in support of its motions, the Eastern District Court issued a Minute Order, in which the court on its own motion took the preliminary injunction; the motion to dismiss and the motion to stay under submission without oral argument and vacated the hearing dates.

On February 7, 2013, Smart Modular filed a response to the Office Action in the reexamination of the '295 patent. Thereafter, the Company and Smart Modular made various filings to address certain apparent defects contained in Smart Modular's response. On March 13, 2013, the USPTO issued a Notice of Defective Paper, in which the USPTO found Smart Modular's responses, both the initial filing and a supplemental filing, to be improper, and both responses were expunged from the record. The USPTO gave Smart Modular 15 days to submit another response, which Smart Modular submitted on March 26, 2013. The Company timely filed its comments on Smart Modular's corrected response on April 25, 2013. The USPTO ultimately accepted Smart Modular's corrected response on July 17, 2013. On April 29, 2014, the USPTO issued an Action Closing Prosecution ("ACP"), confirming some claims and rejecting others. Smart Modular filed a response to the ACP on May 29, 2014, and Netlist filed comments related to Smart Modular's response on June 30, 2014. On August 4, 2015, the USPTO issued a Right of Appeal Notice confirming all pending claims. On September 4, 2015, the Company appealed to the Patent Trial and Appeal Board ("PTAB") at the USPTO. Thus, the reexamination of the '295 patent remains pending and will continue in accordance with established procedures for reexamination proceedings.

On May 30, 2013, the Eastern District Court issued an order granting Netlist's motion to stay pending results of the reexamination of the '295 patent and denied Smart Modular's motion for preliminary injunction.

On July 1, 2013, Netlist filed a complaint against Smart Modular in the Santa Ana Division of the U.S. District Court for the Central District of California ("Central District Court"), seeking, among other things, relief under federal antitrust laws for Smart Modular's violation of Section 2 of the Sherman Act, and damages and other equitable relief under California statutory and common law for Smart Modular's unfair competition, deceptive trade practices and fraud.

On August 23, 2013, Netlist filed an amended complaint for patent infringement, antitrust violations and trade secret misappropriation against Smart Modular, Smart Storage Systems ("Smart Storage"), Smart Worldwide Holdings ("Smart Worldwide") and Diablo Technologies ("Diablo") in the Central District Court. Smart Storage was acquired by SanDisk Corporation ("SanDisk") on August 22, 2013. Netlist's amended complaint alleges infringement of five Netlist patents by the defendants based on the manufacture and sale of the ULLtraDIMM memory module. Netlist's complaint also alleges antitrust violations by Smart Modular and Smart Worldwide, contending that Smart Modular procured the '295 patent with blatant inequitable conduct at the USPTO, withheld the patent application leading to the patent from relevant JEDEC committees for more than eight years, sought to improperly enforce that patent against Netlist's JEDEC-compliant HyperCloud® product by seeking a preliminary injunction against Netlist based on the patent, which was denied by the Eastern District Court, and made deceptive statements to the public about its lawsuit against Netlist. Netlist's complaint also alleges trade secret misappropriation and trademark infringement against Diablo, claiming that Diablo misused Netlist trade secrets to create the ULLtraDIMM product for Smart Storage (now SanDisk), and that Diablo used Netlist's HyperCloud® technology to create competing products.

On the same day Netlist filed its amended complaint, Smart Modular and Diablo each filed a complaint in the San Francisco Division of the U.S. District Court Northern District of California ("Northern District Court"), seeking declaratory judgment of non-infringement and invalidity of the patents asserted in the Netlist's amended complaint. On September 9, 2013, Netlist filed a Motion to Dismiss or Transfer these declaratory judgment complaints to the Central District Court. This motion was denied by the Northern District Court on October 10, 2013.

In the Central District Court, Smart Modular and Smart Worldwide filed motions on September 13, 2013, to dismiss or sever various counts related to the '295 patent. On September 26, 2013, Diablo filed a motion to dismiss Netlist's claims for trade secret misappropriation, breach of contract, and unfair competition. On October 29, 2013, Smart Modular and Diablo filed motions to dismiss or transfer the patent claims related to the ULLtraDIMM memory module. On November 26, 2013, the Central District Court: (i) severed and transferred the claims related to the '295 patent to the Eastern District Court, which were stayed by the Eastern District Court on March 7, 2014, along with the other '295 related claims pending results of the '295 reexamination; (ii) severed and transferred to the Northern District

F- 26

Table of Contents

Court the patent claims related to the ULLtraDIMM memory module; (iii) issued an order to show cause why the remaining claims should not also be transferred to the Northern District Court; and (iv) held in abeyance Diablo's pending motion to dismiss and motion for judgment on the pleadings. The parties filed briefs in response to the order to show cause, and then on December 23, 2013, the Central District Court ordered the remaining claims to be transferred to the Northern District Court. All of the claims from the amended complaint filed on August 23, 2013, in the Central District Court have now been transferred to either the Northern District Court or the Eastern District Court.

As reported in its Current Report on Form 8-K filed on December 13, 2013, Netlist received a whistleblower letter postmarked from Canada (where Diablo is based) on November 13, 2013, and obviously written by a current or former Diablo employee. The letter begins by bluntly stating that Diablo stole Netlist's architecture and design, and goes on to explain that Diablo used Netlist's HyperCloud TM product to create the ULLtraDIMM product, which it then used in demonstrations to major customers including IBM and Hewlett-Packard. The letter further states that Diablo's management conspired to hide this theft by instructing its employees not to speak to customers about the fact that Netlist's product was incorporated into ULLtraDIMM. The letter includes diagrams showing how Diablo implemented the theft of Netlist's trade secrets, as well as the names of former Diablo employees, customers and suppliers who can verify the theft. The Current Report on Form 8-K included as an exhibit a partially redacted copy of the whistleblower letter. On December 13, 2013, Diablo filed an ex parte application in the Northern District Court requesting that the Court issue an order to show cause why Netlist should not be sanctioned for attaching the redacted copy of the whistleblower letter to the Current Report on Form 8-K. The Northern District Court heard the parties' arguments on December 16, 2013, and on January 3, 2014, issued an order denying Diablo's application for sanctions, finding that Diablo had not established a basis for finding the information in the Current Report on Form 8-K and its attachments "confidential" and therefore had not shown why it should be granted the relief sought.

On January 21, 2014, Netlist filed a motion for leave to file a second amended answer and counterclaims in the Northern District Court to assert two additional patents, bringing the total to seven patents asserted against the ULLtraDIMM. Diablo did not oppose Netlist's motion, and the parties filed a joint stipulation and proposed order on February 3, 2014, requesting an additional two months be added to the case schedule to account for the additional patents. On February 5, 2014, the Northern District Court granted Netlist's motion to add the two patents and entered a new case schedule.  On February 12, 2014, the Northern District Court granted the parties' joint stipulation dismissing Smart Modular without prejudice.  On April 7, 2014, the Northern District Court granted Netlist's motion for leave to file a Second Amended Complaint in the patent case.

On March 21, 2014, Netlist filed a Second Amended Complaint against Diablo in the Northern District Court, Case No. 4:13-CV-05962 (the "trade secret case"), alleging, among other things, that in stealing Netlist's proprietary HyperCloud® and DxD and LRD technologies, Diablo breached its contracts with Netlist, committed trademark violations, and misappropriated Netlist's trade secrets.  Also on March 21, 2014, Netlist served Diablo with its Amended Trade Secret Disclosure, detailing approximately 60 trade secrets Netlist taught to Diablo in connection with the contracted and confidential work on the HyperCloud® project.  On April 9, 2014, Diablo filed a motion to dismiss Netlist's Second Amended Trade Secret Complaint, as well as a motion for judgment on the pleadings.  That motion was heard by the Northern District Court on May 13, 2014, and on September 4, 2014, denied the motion with respect to all grounds except one , which Netlist did not contest.

On April 1, 2014, the Northern District Court denied Diablo's motion to strike Netlist's infringement contentions, finding that Netlist's contentions did indeed satisfy the relevant requirements and, on April 7, 2014, granted Netlist's motion to compel defendants to produce certain discovery materials related to the ULLtraDIMM.  Diablo filed a motion for relief from these two rulings, which was denied on April 8, 2014.  Also on April 7, 2014, the Northern District Court granted Netlist's motion for issuance of Letters Rogatory to the Canadian courts requesting that summons be issued for two former Diablo employees living in Canada and named in the whistleblower letter to produce documents and to be deposed.  These depositions occurred in late August 2014.

On April 8, 2014, the Northern District Court granted Netlist's motion to consolidate the patent related cases (Case Nos. 4:13-CV-05889-YGR and 4:13-CV-03901-YGR) and to coordinate discovery with the trade secret case (4:13-CV-05962-YGR), and denied Diablo's motion to further consolidate the patent and trade secret cases.  On April 15, 2014, the Northern District Court granted the parties' joint stipulation dismissing Smart Worldwide without

F- 27

prejudice.  On April 30, 2014, the Northern District Court denied Diablo's request that Netlist's Amended Trade Secret Disclosure and exhibits thereto be re-designated as "Confidential" from the current designation of "Highly Confidential -- Attorneys' Eyes Only".

Between June 18, 2014 and June 24, 2014, SanDisk filed petitions in the USPTO requesting *Inter Partes* Review ("IPR") of the five Netlist patents asserted in the August 23, 2013 amended complaint.  Diablo similarly filed petitions requesting IPR of the two Netlist patents added in the second amended answer filed on January 21, 2014.  Netlist filed patent owner preliminary responses to all of the petitions associated with the seven asserted Netlist patents.  The USPTO issued decisions on the petitions in December, 2014, denying the petitions in their entirety as to three patents (U.S. Patent Nos. 8,516,187; 8,301,833; 8,516,185), granting a partial institution on one patent (U.S. Patent No. 8,001,434), and instituting a review of all claims in three patents  (U.S. Patent Nos. 7,881,150; 8,081,536; 8,359,501).  Reviews will therefore proceed related to four Netlist patents (U.S. Patent Nos. 8,001,434; 7,881,150; 8,081,536; 8,359,501) in accordance with established procedures.  On April 7, 2015, SanDisk filed additional petitions in the USPTO requesting IPR of the '150 and '536 patents that were already under review.  On October 8, 2015, the USPTO issued decisions on the additional petitions, instituting reviews of the '150 and '536 patents which will proceed in accordance with established procedures.  On December 14, 2015, the PTAB issued decisions in the first wave of reviews of the '434 and '501 patents, finding that certain of the challenged claims in the '434 and '501 patents were valid, and that others were not.  On the same day, the PTAB also issued decisions on the first wave of reviews of the '150 and '536 patents, finding all of the challenged claims invalid.  Netlist and the petitioners will have an opportunity to appeal all of these decisions to the Court of Appeals for the Federal Circuit ("Federal Circuit") in accordance with established procedures.

On August 23, 2014, Smart Modular also filed petitions in the USPTO requesting IPR of the five Netlist patents asserted in the August 23, 2013 amended complaint.  Netlist filed patent owner preliminary responses to all of the Smart Modular petitions in December, 2014.  On March 13, 2015, the USPTO issued decisions on the Smart Modular petitions, denying the petitions in their entirety as to the same three patents that survived the petitions filed by SanDisk in June, 2014 (U.S. Patent Nos. 8,516,187; 8,301,833; 8,516,185), and instituted additional reviews of the two other patents already under review (U.S. Patent No. 8,001,434; 8,359,501) that will proceed in accordance with established procedures.

SanDisk filed a motion on June 24, 2014, to stay the Northern District patent cases pending completion of the IPRs (Diablo later joined this motion).  Netlist filed its opposition to the motion to stay on July 10, 2014.  The Northern District Court heard oral arguments on the motion to stay in early August 2014, and issued an order on August 21, 2014, denying the motion without prejudice.  SanDisk renewed its motion to stay on January 20, 2015 and on April 9, 2015, the Court granted the motion for a stay pending resolution of the IPRs.

On October 6, 2014, Netlist filed a Motion for Preliminary Injunction in the Northern District Court trade secret suit, asking that Diablo and its partner SanDisk be immediately enjoined from any further manufacture or sale of the ULLtraDIMM module.  The Court granted in part Netlist's motion on January 6, 2015, and entered a preliminary injunction halting the manufacture, use, sale, or distribution of the Diablo Rush and Bolt chips and any ULLtraDIMM module containing those chips, and advanced the trial date to March 9, 2015 on the trade secret misappropriation, breach of contract, and other related claims (4:13-CV-05962-YGR).  SanDisk and Diablo filed motions with the U.S. Court of Appeals for the Federal Circuit appealing the January 6, 2015, preliminary injunction and asking for expedited briefing and a stay of the preliminary injunction during the pendency of the appeals.  The Federal Circuit denied both requests for expedited briefing, denied Diablo's request for a stay, but granted SanDisk's narrower request for a stay of the preliminary injunction as to SanDisk's existing inventory of enjoined products.

The trial commenced on schedule and continued for two weeks , with closing arguments on March 23, 2015.   On March 25, 2015, the jury came back with a verdict finding for the defendant on the breach of contract, misappropriation of trade secret and inventorship counts, while finding for Netlist on the trademark and false advertising counts. After the verdict, the court ordered briefing to determine the effect of the jury verdict on the preliminary injunction entered on January 6, 2015, and following oral argument on April 24, 2015, issued an order dissolving the preliminary injunction.  The court further issued Findings of Fact and Conclusions of Law on Netlist's unfair competition claims granting no relief under the statute based on the jury's verdict.  The parties briefed their post-trial

F- 28

Table of Contents

motions in May and June of 2015, including Netlist's motion for Judgment as a Matter of Law ("JMOL") to reverse the jury's verdict as to breach of contract and for a new trial on misappropriation of trade secrets. Oral arguments on the post-trial motions were heard by the court on July 8, 2015. On September 1, 2015, the Court denied motions from both parties for JMOL, Netlist's motion for a new trial, and Diablo's motion for attorney's fees, but granted Diablo's motion to recover on the preliminary injunction a $900,000 bond posted early in the litigation and its bill of costs. This expense is included in other expense, net in the accompanying consolidated statements of operation for the year ended January 2, 2016. On September 29, 2015, Netlist filed a Notice of Appeal to the Federal Circuit and on December 8, 2015, filed an Opening Brief. Netlist's appeal will continue in accordance with established procedures.

*'386 Patent Reexamination*

As noted above, in May 2010, Google requested and was later granted an *Inter Partes* Reexamination of the '386 patent by the USPTO. In October 2010, Smart Modular requested and was later granted an *Inter Partes* Reexamination of the '386 patent. The reexaminations requested by Google and Smart Modular were merged by the USPTO into a single proceeding. In April 2011, a Non-Final Action was issued by the USPTO, rejecting all claims in the patent. In July 2011, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims in view of cited references. Both Google and Smart Modular filed their comments to the Company's response in October 2011. In October 2012, the USPTO issued an ACP rejecting all 60 claims . The Company filed a response to the ACP on December 3, 2012. On June 21, 2013, the USPTO issued a Right of Appeal Notice ("RAN") in which the examiner maintained his rejection of the claims. Netlist filed a notice of appeal on July 19, 2013. Google filed a notice of cross-appeal on August 2, 2013, and a cross-appeal brief on October 1, 2013. The Company filed an appeal brief and an amendment canceling some of the remaining claims on October 2, 2013 to further focus the issues on appeal. On February 24, 2014, the examiner entered the amendment canceling claims, withdrew the rejections related to those claims, but otherwise maintained the positions previously set forth in the RAN. On September 24, 2014, the USPTO set a hearing date of November 19, 2014. After the hearing, on February 25, 2015, the PTAB issued a decision affirming the examiner's rejections of the pending claims. The Company requested rehearing of the PTAB's decision on March 25, 2015. On August 27, 2015, the PTAB denied the Company's request for rehearing. Netlist appealed to the Federal Circuit on October 26, 2015. The appeal was dismissed on January 28, 2016 by Netlist. Thus, while the reexamination of the '386 patent remains pending, it will terminate in accordance with established procedures for merged reexamination proceedings in due course with the cancellation of the original claims.

*'912 Patent Reexamination*

As noted above, in April 2010, Inphi requested but was later denied an *Inter Partes* Reexamination of the '912 patent by the USPTO. In June 2010, Inphi submitted a new request and was later granted an *Inter Partes* Reexamination of the '912 patent by the USPTO. In September 2010, the USPTO confirmed the patentability of all fifty-one claims of the '912 patent. In October 2010, Google and Smart Modular each filed and were later granted requests for reexamination of the '912 patent. In February 2011, the USPTO merged the Inphi, Google and Smart Modular '912 reexaminations into a single proceeding. In an April 2011 Non-Final Action in the merged reexamination proceeding, the USPTO rejected claims 1-20 and 22-51 and confirmed the patentability of claim 21 of the '912 patent. In July 2011, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Inphi, Google, and Smart Modular filed their comments on the Company's response in August 2011. In October 2011, the USPTO mailed a second Non-Final Action confirming the patentability of twenty claims of the '912 patent, including claims that were added in the reexamination process. In January 2012, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Google, Inphi and Smart Modular filed their comments to the Company's response in February 2012. The USPTO determined that Smart Modular's comments were defective, and issued a notice to Smart Modular to rectify and resubmit its comments. Smart Modular filed corrected comments and a petition for the USPTO to withdraw the notice in March 2012. The USPTO issued a non-final Office Action on November 13, 2012 maintaining the patentability of many key claims while rejecting some claims that were previously determined to be patentable. The Company filed a response to the Office Action on January 14, 2013. The requesters filed their comments on February 13, 2013. On March 21, 2014, the USPTO issued an ACP, confirming the patentability of 92 claims and maintaining the rejection of 11 other claims. On June 18, 2014, the USPTO issued a RAN, maintaining the substantive positions taken by the examiner in the ACP. Smart Modular, Inphi and Google filed notices of appeal on July 16,

Table of Contents

July 18 and July 18, 2014, respectively. Netlist filed a notice of cross-appeal on July 30, 2014. Smart Modular, Inphi and Google filed their respective appeal briefs on September 16, September 30 and September 30, 2014. Netlist filed its cross-appeal brief on September 30, 2014. On January 14, 2015, the examiner maintained his positions previously set forth in the RAN. The parties filed respective rebuttal briefs in February 2015. On September 29, 2015, the PTAB set a hearing date for November 24, 2015 on the parties' appeals. The hearing was conducted on November 24, 2015, and the parties are awaiting the USPTO's decision. Thus, the reexamination of the '912 patent remains pending and will continue in accordance with established procedures for merged reexamination proceedings.

### *'627 Patent Reexamination*

In September 2011, Smart Modular filed a request for reexamination of U.S. Patent No. 7,864,627 ("the '627 patent") issued to the Company on January 4, 2011. The '627 patent is related to the '912 patent. In November 2011, the USPTO granted Smart Modular's request for reexamination of the '627 patent and concurrently issued a Non-Final Action confirming the patentability of three claims. In February 2012, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Smart Modular filed its comments to the Company's response in February 2012. The USPTO determined that Smart Modular's comments were defective and issued a notice in April 2012 to Smart Modular to rectify and resubmit its comments. Smart Modular filed corrected comments and a petition for the USPTO to withdraw the notice in April 2012. The USPTO posted an Office Action on December 19, 2012, confirming one claim and rejecting the rest of the claims in the '627 patent. The Company filed a response to the Office Action on March 19, 2013. Smart Modular filed its comments on the Office Action on April 24, 2013. The USPTO issued another Non-Final Office Action on September 26, 2013, withdrawing certain rejections while adopting new rejections for certain of the pending claims. The Company responded to the Non-Final Office Action on November 26, 2013, by amending some of the claims and making arguments as to the validity of the rejected claims. On March 27, 2014, the USPTO issued an ACP, maintaining the claim rejections. On June 27, 2014, the USPTO issued a RAN, maintaining the substantive positions taken by the examiner in the ACP. Netlist filed a notice of appeal on July 28, 2014. On October 14, 2014, the Company filed its appeal brief and, on November 13, 2014, Smart Modular filed its respondent's brief. On April 27, 2015, the USPTO issued an Examiner's Answer to Appeal Brief in which the examiner continued to maintain the substantive positions taken previously. On May 27, 2015, the Company filed a Patent Owner Rebuttal Brief in response to the Examiner's Answer. On October 9, 2015, the PTAB set a hearing date for December 11, 2015 on the Company's appeal. The hearing was conducted on November 24, 2015, and the parties are awaiting the USPTO's decision. Thus, the reexamination of the '627 patent remains pending and will continue in accordance with established *Inter Partes* Reexamination procedures.

### *'537 Patent Reexamination*

As noted above, in April 2010, Inphi requested and was later denied an *Inter Partes* Reexamination of the '537 patent by the USPTO. In June 2010, Inphi submitted a new request and was later granted an *Inter Partes* Reexamination of the '537 patent by the USPTO. In September 2010, the USPTO issued a Non-Final Action confirming the patentability of four claims. In October 2010, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Inphi filed its comments on the Company's response in January 2011. In June 2011, the USPTO issued an ACP, which reconfirmed the patentability of the four claims. In August 2010, the Company responded by amending some of the claims and making arguments as to the validity of the rejected claims. Inphi filed its comments to the Company's response in September 2011. The USPTO issued a Right of Appeal Notice in February 2012, in which the claim rejections were withdrawn, thus confirming the patentability of all sixty (60) claims in view of all the previously submitted comments by both Inphi and the Company. Inphi filed a notice of appeal in March 2012 followed by an appeal brief in May 2012. In response, the USPTO issued a Notice of Defective Appeal Brief. Inphi filed a corrective appeal brief in late May 2012, and the Company filed its reply brief to the corrected Inphi appeal brief in early July 2012. The examiner responded to Inphi's corrected appeal brief as well as the Company's reply brief by Examiner's Answer on April 16, 2013, in which he maintained his position confirming all sixty (60) claims. Inphi filed a rebuttal brief on May 16, 2013. Netlist filed a request for oral hearing on June 14, 2013. The Company and the examiner jointly defended the '537 patent in a hearing on November 20, 2013 before the PTAB. On January 16, 2014, the PTAB issued a decision upholding the validity of all 60 claims, dismissing every single validity challenge raised by Inphi and affirming the examiner's decision to allow the claims . On August 13, 2014, the PTAB denied Inphi's request for rehearing and made its decision final for judicial review to the Federal

Table of Contents

Circuit.  On October 15, 2014, Inphi filed a Notice of Appeal to the Federal Circuit.  On February 3, 2015, Inphi filed an appellant's brief in its appeal to the Federal Circuit.  The Company filed its appellee's brief on May 18, 2015, and Inphi filed a reply brief on June 4, 2015.  On October 9, 2015, the Federal Circuit conducted a hearing on Inphi's appeal.  On November 13, 2015, a panel of the Federal Circuit unanimously ruled in favor of Netlist in a precedential decision.  Inphi petitioned for panel rehearing and en banc rehearing on December 14, 2015.  Both petitions were denied on January 22, 2016.  Inphi has 90 days to petition the U.S. Supreme Court for certiorari.  Thus, the reexamination of the '537 patent remains pending and will continue in accordance with established procedures for *Inter Partes* Reexamination and judicial appeals therefrom.

### '274 Patent Reexamination

As noted above, in April 2010, Inphi requested and was later denied an *Inter Partes* Reexamination of the '274 patent by the USPTO. In June 2010, Inphi submitted a new request and was later granted an *Inter Partes* Reexamination of the '274 patent by the USPTO. In September 2011, the USPTO issued a Non-Final Action, confirming the patentability of six claims. The Company has responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Inphi filed its comments on the Company's response in November 2011. The USPTO issued an ACP in March 2012, which confirmed the patentability of one hundred and four (104)  claims in view of all the previously submitted comments by both Inphi and the Company. The USPTO subsequently issued a RAN in June 2012. This RAN triggered Inphi's right as the losing party to file a notice of appeal and corresponding appeal brief, which Inphi filed when due. The Company responded to Inphi's appeal brief by filing a reply brief in October 2012. The examiner responded to Inphi's appeal brief and the reply brief by Examiner's Answer on April 16, 2013, in which he maintained his position confirming the one hundred and four (104) claims. Inphi filed a rebuttal brief on May 16, 2013. Netlist filed a request for oral hearing on June 14, 2013. The Company and the USPTO examiner jointly defended the '274 patent in a hearing on November 20, 2013 before the PTAB, in accordance with established procedures for *Inter Partes* Reexamination. On January 16, 2014, the PTAB issued a decision affirming the examiner in part, but reversing the examiner on new grounds and rejecting the one hundred and four (104) claims.  On March 28, 2014, Netlist filed a Patent Owner's Response Requesting to Reopen Prosecution along with certain claim amendments and arguments.  On June 26, 2014, the PTAB issued a decision granting-in-part Inphi's request to modify the January 16, 2014, decision as to two of the rejected claims.  On June 15, 2015, the USPTO issued an Examiner's Determination, rejecting the amended claims.  On July 8, 2015, the USPTO vacated sua sponte the June 15 Examiner's Determination.  On September 11, 2015, the examiner issued a new Examiner's Determination which rejected the amended claims based on multiple grounds.  On October 13, 2015, the Company filed a response to the Examiner's Determination.  The reexamination of the '274 patent remains pending and will continue in accordance with established procedures for *Inter Partes* Reexamination.

**Other Contingent Obligations**

During its normal course of business, the Company has made certain indemnities, commitments and guarantees pursuant to which it may be required to make payments in relation to certain transactions. These include: (i) intellectual property indemnities to the Company's customers and licensees in connection with the use, sales and/or license of Company products; (ii) indemnities to vendors and service providers pertaining to claims based on the Company's negligence or willful misconduct; (iii) indemnities involving the accuracy of representations and warranties in certain contracts; (iv) indemnities to directors and officers of the Company to the maximum extent permitted under the laws of the State of Delaware; (v) indemnities to Fortress, SVIC, and SVB pertaining to all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with transactions contemplated by the loan documents; and (vi) certain real estate leases, under which the Company may be required to indemnify property owners for environmental and other liabilities, and other claims arising from the Company's use of the applicable premises. The duration of these indemnities, commitments and guarantees varies and, in certain cases, may be indefinite. The majority of these indemnities, commitments and guarantees do not provide for any limitation of the maximum potential for future payments the Company could be obligated to make. Historically, the Company has not been obligated to make significant payments for these obligations, and no liabilities have been recorded for these indemnities, commitments and guarantees in the accompanying consolidated balance sheets.

**Note 8—Stockholders' Equity**

**Serial Preferred Stock**

The Company's authorized capital includes 10,000,000 shares of Serial Preferred Stock, with a par value of $0.001 per share.  No shares were outstanding at January 2, 2016 or December 27, 2014 .

**Common Stock**

On February 11, 2014, the Company completed a registered firm commitment underwritten public offering (the  " 2014 Offering ") of shares of the Company's common stock. In the 2014 Offering, the Company issued and sold to the Underwriter 8,680,775 shares of common stock pursuant to an underwriting agreement, dated as of February 6, 2014, by and between the Company and the Underwriter, at a price of $1.2115 per share, including 1,132,275 shares resulting from the Underwriter's exercise in full of its option to purchase additional shares of c ommon s tock to cover over-allotments. The price per share to the public in the 2014 Offering was $1.30 per share. The net proceeds from the 2014 Offering were approximately $10.3  million, after deducting underwriting discounts and commissions and offering expenses.

On February 24, 2015, the Company completed the 2015 Offering of shares of the Company's common stock. In the 2015 Offering, the Company issued and sold to the Underwriter 8,846,154 shares of common stock pursuant to an underwriting agreement, dated as of February 19, 2015, by and between the Company and the Underwriter, at a price of $1.209  per share, including 1,153,846 shares resulting from the Underwriter's exercise in full of its option to purchase additional shares of c ommon s tock to cover over-allotments. The price per share to the public in the 2015 Offering was $1.30 per share. The net proceeds from the 2015 Offering were approximately $10.5  million, after deducting underwriting discounts and commissions and offering expenses.

**Cancellation of Shares of Common Stock**

During the fiscal year   ended December 27, 2014 , the Company cancelled 10,015 shares of common stock, valued at approximately $21,000   in connection with its obligation to holders of restricted stock to withhold the number of shares required to satisfy the holders' tax liabilities in connection with the vesting of such shares.

The Company is incorporated in the state of Delaware, and as such, is subject to various state laws which may restrict the payment of dividends or purchase of treasury shares.

**Stock-Based Compensation**

The Company has stock-based compensation awards outstanding pursuant to the Amended and Restated 2000 Equity Incentive Plan (the "2000 Plan") and the Amended and Restated 2006 Equity Incentive Plan (the "2006 Plan"), under which a variety of option and direct stock-based awards may be granted to employees and nonemployees of the Company. Further grants under the 2000 Plan were suspended upon the adoption of the 2006 Plan. In addition to awards made pursuant to the 2006 Plan, the Company periodically issues inducement grants outside the 2006 Plan to certain new hires.

Subject to certain adjustments, as of January 2, 2016, the Company was authorized to issue a maximum of 10,205,566 shares of common stock pursuant to awards under the 2006 Plan. Pursuant to the terms of the 2006 Plan, the maximum number of shares of common stock subject to the plan automatically increased on the first day of each subsequent calendar year through January 1, 2016, by the lesser of (i)  5.0% of the number of shares of common stock that are issued and outstanding as of the first day of the calendar year, and (ii)  1,200,000 shares of common stock, subject to adjustment for certain corporate actions. At January 2, 2016, the Company had 1,179,375 shares available for issuance under the 2006 Plan.  Options granted under the 2000 Plan and the 2006 Plan equity incentive plans primarily vest at a rate of at least 25% per year over four years and expire 10  years from the date of grant.

Table of Contents

A summary of the Company's common stock option activity is presented below (shares in thousands):

| | Options Outstanding | | | |
|---|---|---|---|---|
| | Number of Shares (in thousands) | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value (in thousands) |
| Options outstanding - December 28, 2013 | 5,837 | $ 2.58 | | |
| Options granted | 2,115 | 1.46 | | |
| Options exercised | (303) | 0.51 | | |
| Options cancelled | (415) | 1.57 | | |
| Options outstanding - December 27, 2014 | 7,234 | 2.40 | | |
| Options granted | 2,515 | 0.81 | | |
| Options exercised | (10) | 0.73 | | |
| Options cancelled | (795) | 2.06 | | |
| Options outstanding - January 2, 2016 | 8,944 | $ 1.98 | 6.5 | $ 757 |
| Options exercisable - January 2, 2016 | 5,159 | $ 2.70 | 5.1 | $ 240 |
| Options exercisable and expected to vest - January 2, 2016 | 8,319 | $ 2.07 | 6.5 | $ 650 |

The following table summarizes information about stock options outstanding and exercisable at January 2, 2016:

| | Options Outstanding | | | Options Exercisable | | |
|---|---|---|---|---|---|---|
| Exercise Price Range | Number of shares (in thousands) | Weighted Average Remaining Contractual Life (in years) | Weighted Average Exercise Price | Number of shares (in thousands) | Weighted Average Remaining Contractual Life (in years) | Weighted Average Exercise Price |
| $0.20 - $1.00 | 4,076 | 8.3 | $ 0.70 | 1,435 | 7.0 | $ 0.72 |
| $1.01 - $3.00 | 3,224 | 6.2 | $ 1.88 | 2,124 | 5.3 | $ 2.00 |
| $3.01 - $5.00 | 779 | 5.9 | $ 3.58 | 735 | 5.9 | $ 3.58 |
| $5.01 - $8.45 | 865 | 0.6 | $ 6.98 | 865 | 0.6 | $ 7.00 |
| | 8,944 | 6.5 | $ 1.98 | 5,159 | 5.1 | $ 2.70 |

Table of Contents

The following table summarizes the Company's restricted stock awards (shares in thousands):

| | Restricted Stock Outstanding | |
| --- | --- | --- |
| | Number of Shares | Weighted-Average Grant-Date Fair Value per Share |
| Balance outstanding at December 28, 2013 | 54 | $ 3.17 |
| Restricted stock granted | - | - |
| Restricted stock vested | (50) | 3.30 |
| Restricted stock forfeited | (2) | 1.51 |
| Balance outstanding at December 27, 2014 | 2 | $ 1.51 |
| Restricted stock granted | - | - |
| Restricted stock vested | (1) | 1.51 |
| Restricted stock forfeited | (1) | 1.51 |
| Balance outstanding at January 2, 2016 | - | $ - |

The following table presents details of the assumptions used to calculate the weighted-average grant date fair value of common stock options granted by the Company:

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| Expected term (in years) | 6.2 | 6.3 |
| Expected volatility | 113 % | 124 % |
| Risk-free interest rate | 1.65 % | 1.86 % |
| Expected dividends | $ - | $ - |
| Weighted-average grant date fair value per share | $ 0.69 | $ 1.29 |
| Grant date fair value of options vested | $ 1,692 | $ 1,842 |
| Intrinsic value of options exercised (in thousands) | $ 5 | $ 410 |

At January 2, 2016 , the amount of unearned stock-based compensation currently estimated to be expensed from 201 6 through 201 8   related to unvested common stock options is approximately $2.8   million , net of estimated forfeitures. The weighted-average period over which the unearned stock-based compensation is expected to be recognized is approximately 2.4 years. If there are any modifications or cancellations of the underlying unvested awards, the Company may be required to accelerate, increase or cancel any remaining unearned stock-based compensation expense or calculate and record additional expense.  Future stock-based compensation expense and unearned stock-based compensation will increase to the extent that the Company grants additional common stock options or other stock-based awards.

**Warrants**

Concurrently with the execution of the SVIC Purchase Agreement (see Note 5), the Company issued to SVIC a warrant to purchase an aggregate of 2,000,000 shares of the Company's common stock at an exercise price of $0.30 per share, with a relative fair value of  approximately $1,165,000 which was recorded as a debt discount.

In connection with the termination of the 2013 Loan Agreement with Fortress and the Letter Agreement with Drawbridge, the Company issued to Fortress the Fortress Warrant and amended the exercise price per share of the Drawbridge Warrant. See Note 5 for further information. The Fortress Warrant and amended Drawbridge Warrant were valued using the Black-Scholes option pricing model which computed an estimated fair value of   $624,000 and an estimated incremental fair value of $129,000 , respectively.

In November 2015, the Company issued warrants to purchase an aggregate of 300,000 and 60,000 shares of the Company's stock at an exercise price of $0.64 and $0.45 , respectively, to two law firms as partial consideration for legal

Table of Contents

services rendered. The warrants were valued at approximately $185,000 and $49,000 , respectively, based on their fair values.

A summary of the Company's warrant activity is presented below:

| | Number of Shares (in thousands) | | Weighted-Average Exercise Price |
|---|---|---|---|
| Warrants outstanding - December 28, 2013 | 5,023 | $ | 0.95 |
| Warrant granted | - | | - |
| Warrants exercised | (750) | | 0.89 |
| Warrants outstanding - December 27, 2014 | 4,273 | $ | 0.96 |
| | | | |
| Warrant granted | 3,360 | | 0.38 |
| Warrants exercised | - | | - |
| Warrants outstanding - January 2, 2016 | 7,633 | $ | 0.59 |

**Note 9 —401(k) Plan**

The Company sponsors a 401(k) defined contribution plan. Employees are eligible to participate in this plan provided they are employed full-time and have reached 21 years of age. Participants may make pre-tax contributions to the plan subject to a statutorily prescribed annual limit. Each participant is fully vested in his or her contributions and investment earnings. The Company may make matching contributions on the contributions of a participant on a discretionary basis. In fiscal 2012, the Company adopted a limited matching contribution policy and made approximately $0 . 09 and $0.0 8 million in contributions to participants in this plan in the year s ended January 2, 2016 and December 27, 2014 , respectively.

**Note 1 0 -Major Customers, Suppliers and Products**

The Company's product sales have historically been concentrated in a small number of customers. The following table sets forth sales to customers comprising 10% or more of the Company's net product sales as follows:

| | Year Ended | |
|---|---|---|
| | January 2, 2016 | December 27, 2014 |
| Customer A | 27 % | 20 % |
| Customer B | * | 14 % |
| Customer C | * % | 19 % |
| Customer D | 10 % | * % |

---

\*      less than 10% of total net product sales

Sales of the Company's NVvault™ products represented 20 % and 44 % of net product sales in 201 5  and 201 4 .

The Company's accounts receivable are concentrated with three customer s at January 2, 2016 representing approximately 24 % ,  19 % and 1 4 % of aggregate gross receivables. At December 27, 2014 ,  three customer s represented approximately 13 % ,  4 9% and 11%  of aggregate gross receivables. A significant reduction in sales to, or the inability to collect receivables from, a significant customer could have a material adverse impact on the Company.  The Company mitigates risk with foreign receivables by purchasing comprehensive foreign credit insurance.

F- 35

Table of Contents

The Company's purchases have historically been concentrated in a small number of suppliers. The following table sets forth purchases from suppliers comprising 10% or more of the Company's total purchases as follows:

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| Supplier A | 14 % | 10 % |
| Supplier B | 12 % | * |

----

\*     less than 10% of total purchases

While the Company believes alternative suppliers could be utilized, any inability to obtain components or products in the amounts needed on a timely basis or at commercially reasonable prices could result in delays in product introductions, interruption in product shipments or increases in product costs, which could have a material adverse effect on the Company.

**Note 11 — Segment and Geographic Information**

The Company operates in one reportable segment: the design and manufacture of high-performance memory subsystems for the server, high-performance computing and communications markets. The Company evaluates financial performance on a company-wide basis.

To date, a majority of the Company's international sales relate to shipments of products to its U.S. customers' international manufacturing sites or third - party hubs. Net product sales derived from shipments to international destinations, primarily to Hong Kong (including foreign subsidiaries of customers that are headquartered in the U.S.), represented approximately 48 % and 33 % of the Company's net product sales in 201 5 and 201 4 , respectively. All of the Company's net sales to date have been denominated in U.S. dollars.

As of January 2, 2016 and December 27, 2014 , approximately $0. 1 million and $ 0. 2  million, respectively, of the Company's long-lived assets, net of depreciation and amortization, were located outside the U.S., primarily in the PRC. Substantially all other long-lived assets were located in the U.S.

**Note 1 2 — Subsequent Events**

The Company has evaluated subsequent events through the filing date of this Annual Report on Form 10-K and determined that no subsequent events have occurred that would require recognition in the consolidated financial statements or disclosures in the notes thereto other than as discussed in the accompanying notes.

**Note 13—Quarterly Summary (Unaudited, in thousands except per share data)**

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | January 2, 2016 | September 26, 2015 | June 27, 2015 | March 28, 2015 |
| Net product sales | $ 1,709 | $ 1,617 | $ 1,429 | $ 2,114 |
| NRE revenue | 1,143 | - | - | - |
| Total net revenues | 2,852 | 1,617 | 1,429 | 2,114 |
| Cost of sales | 1,583 | 1,593 | 1,324 | 1,415 |
| Gross profit | 1,269 | 24 | 105 | 699 |
| Operating expenses: | | | | |
| Research and development | 1,680 | 1,449 | 1,536 | 1,384 |
| Intellectual property legal fees, net of settlement transactions | (1,091) | 899 | 2,238 | 3,542 |
| Selling, general and administrative | 2,628 | 1,710 | 1,744 | 1,759 |
| Total operating expenses | 3,217 | 4,058 | 5,518 | 6,685 |
| Operating loss | (1,948) | (4,034) | (5,413) | (5,986) |
| Other expense, net: | | | | |
| Interest expense, net | (648) | (447) | (489) | (480) |
| Other income (expense), net | (1,749) | (889) | 1,548 | 9 |
| Total other expense, net | (2,397) | (1,336) | 1,059 | (471) |
| Loss before provision for income taxes | (4,345) | (5,370) | (4,354) | (6,457) |
| Provision for income taxes | - | - | - | 1 |
| Net loss | $ (4,345) | $ (5,370) | $ (4,354) | $ (6,458) |
| Net loss per common share: | | | | |
| Basic and diluted | $ (0.09) | $ (0.11) | $ (0.09) | $ (0.14) |
| Weighted-average common shares outstanding: | | | | |
| Basic and diluted | 50,353 | 50,354 | 50,354 | 44,708 |

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | December 27, 2014 | September 27, 2014 | June 28, 2014 | March 29, 2014 |
| Net sales | $ 2,516 | $ 4,791 | $ 4,887 | $ 7,001 |
| Cost of sales | 2,629 | 3,678 | 3,908 | 5,016 |
| Gross profit | (113) | 1,113 | 979 | 1,985 |
| Operating expenses: | | | | |
| Research and development | 1,234 | 1,305 | 1,168 | 878 |
| Intellectual property legal fees | 2,465 | 1,692 | 1,134 | 1,097 |
| Selling, general and administrative | 1,611 | 1,782 | 1,781 | 1,622 |
| Total operating expenses | 5,310 | 4,779 | 4,083 | 3,597 |
| Operating loss | (5,423) | (3,666) | (3,104) | (1,612) |
| Other expense, net: | | | | |
| Interest expense, net | (393) | (393) | (393) | (395) |
| Other income (expense), net | 5 | - | 6 | (11) |
| Total other expense, net | (388) | (393) | (387) | (406) |
| Loss before provision for income taxes | (5,811) | (4,059) | (3,491) | (2,018) |
| Provision for income taxes | - | - | 2 | - |
| Net loss | $ (5,811) | $ (4,059) | $ (3,493) | $ (2,018) |
| Net loss per common share: | | | | |
| Basic and diluted | $ (0.14) | $ (0.10) | $ (0.08) | $ (0.05) |
| Weighted-average common shares outstanding: | | | | |
| Basic and diluted | 41,483 | 41,472 | 41,472 | 36,881 |

Table of Contents

Each of the Company's quarters in fiscal 2015 was comprised of 13 weeks, except for the fourth quarter which consisted of 14 weeks.  Each of the Company's quarters in fiscal 2014 was comprised of 13 weeks.

Quarterly and year-to-date computations of per share amounts are made independently. Therefore, the sum of per share amounts for the quarters may not agree with the per share amounts for the year.

F- 38

Exhibit 10.20

# INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT, dated November 18 , 2015 , is entered into between **SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.**   (" Creditor "), and **SILICON VALLEY BANK** (" Bank "). Creditor and Bank are sometimes referred to herein as the " Secured Parties ."

## RECITALS

A.          Netlist, Inc., a Delaware corporation (" Borrower "), and Creditor have entered into the Security Agreement, dated as of November 18 , 2015, a true copy of which is attached hereto as Exhibit A (as amended from time to time, the " Creditor Security Agreement ").  The Creditor Security Agreement and the documents executed in connection therewith, including without limitation the Purchase Agreement and the Note (each as defined in the Creditor Security Agreement) and the Creditor Control Agreement s , each as amended from time to time, are referred to in this Agreement as the " Creditor Loan Documents ." All of Borrower's present and future indebtedness, liabilities and obligations under or in connection with the Creditor Loan Documents are referred to in this Agreement collectively as the " Creditor Debt ."

B.          Borrower and Bank have entered into a Loan and Security Agreement, dated as of October 31, 2009 (as amended from time to time, the " Bank Loan Agreement ").  The Bank Loan Agreement and the documents executed in connection therewith are referred to in this Agreement as the " Bank Loan Documents ." All of Borrower's present and future indebtedness, liabilities and obligations under or in connection with the Bank Loan Documents are referred to in this Agreement collectively as the " Bank Debt ."  Creditor Debt and Bank Debt are referred to herein collectively as " Secured Party Debt " and Bank Documents and the Creditor Loan Documents are referred to herein collectively as " Loan Documents ."

The parties agree as follows:

1.          Definitions .  As used in this Agreement, the following terms have the following meanings:

(a) " Accounts Collateral " means Borrower's present and future "accounts" (as defined in the UCC), including accounts arising from testing and other services performed, or goods created, by Borrower using patents, copyrights or other intellectual property of Borrower, but not including proceeds of any sale of any Creditor Priority Collateral.

(b) " Bank Priority Collateral " means any and all properties, rights and assets of Borrower described on Exhibit B, but excluding the Creditor Priority Collateral.

(a) " Bankruptcy Code " means the federal bankruptcy law of the United States as from time to time in effect, currently as Title 11 of the United States Code.  Section references

to current sections of the Bankruptcy Code shall refer to comparable sections of any revised version thereof if section numbering is changed.

(b) "<u>Claim</u>" means, (i) in the case of Bank, any and all present and future "claims" (used in its broadest sense, as contemplated by and defined in Section 101(5) of the Bankruptcy Code, but without regard to whether such claim would be disallowed under the Bankruptcy Code) of Bank now or hereafter arising or existing under or relating to the Bank Loan Documents, whether joint, several, or joint and several, whether fixed or indeterminate, due or not yet due, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, or disputed or undisputed, whether under a guaranty or a letter of credit, and whether arising under contract, in tort, by law, or otherwise, any interest or fees thereon (including interest or fees that accrue after the filing of a petition by or against Borrower under the Bankruptcy Code, irrespective of whether allowable under the Bankruptcy Code), any costs of Enforcement Actions, including reasonable attorneys' fees and costs, and any prepayment or termination, and (ii) in the case of Creditor, any and all present and future "claims" (used in its broadest sense, as contemplated by and defined in Section 101(5) of the Bankruptcy Code, but without regard to whether such claim would be disallowed under the Bankruptcy Code) of Creditor now or hereafter arising or existing under or relating to the Creditor Loan Documents, whether joint, several, or joint and several, whether fixed or indeterminate, due or not yet due, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, or disputed or undisputed, whether under a guaranty or a letter of credit, and whether arising under contract, in tort, by law, or otherwise, any interest or fees thereon (including interest or fees that accrue after the filing of a petition by or against Borrower under the Bankruptcy Code, irrespective of whether allowable under the Bankruptcy Code), any costs of Enforcement Actions, including reasonable attorneys' fees and costs, and any prepayment or termination.

(c) "<u>Collateral</u>" means, collectively, Creditor Priority Collateral and Bank Priority Collateral.

(d) "<u>Common Collateral</u>" means all Collateral in which both Bank and Creditor have a security interest.

(e) "<u>Creditor Priority Collateral</u>" means (i) all letters patent of Borrower, or rights corresponding thereto, in the United States or in any other country, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto, in the United States or any other country, including, without limitation, improvements, divisions, continuations and continuations in part of the same, (ii) all written or oral agreements granting any right to the Borrower with respect to any invention on which a patent is in existence or a patent application is pending, in which agreement the Borrower now holds or hereafter acquires any interest, and all license fees and royalties arising therefrom and (iii) the proceeds of any sale of the foregoing , but excluding any Accounts Collateral.

(f) "<u>Creditor Control Agreement s</u>" means (i) that certain Deposit Account Control Agreement, dated as of November 12 , 2015, among Creditor, Borrower and Silicon Valley Bank, as account bank ("Account Bank") and (ii) that certain Securities Account Control Agreement, dated as of November 12 , 2015, among Creditor, Borrower, U.S. Bank, N.A., as securities intermediary, and SVB Asset Management, as investment advisor .

2

(g) " <u>Enforcement Action</u> " means, with respect to any Secured Party and with respect to any Claim of such Secured Party or any item of Collateral in which such Secured Party has or claims a security interest, lien, or right of offset, any action, whether judicial or nonjudicial, to repossess, collect, offset, recoup, give notification to third parties with respect to, sell, dispose of, foreclose upon, give notice of sale, disposition, or foreclosure with respect to, or obtain equitable or injunctive relief with respect to, such Claim or Collateral.  The filing by any Secured Party of, or the joining in the filing by any Secured Party of, an involuntary bankruptcy or insolvency proceeding against Borrower also is an Enforcement Action.

(h) " <u>Event of Default</u> " means an "Event of Default" under the Bank Loan Documents or the Creditor Loan Documents.

(i) " <u>Proceeds of Collection</u> " means, collectively, the proceeds of all Collateral, or any part thereof, and the proceeds of any remedy with respect to such Collateral under the Loan Documents after the occurrence and during the continuance of an Event of Default.

(j) " <u>UCC</u> " means the Uniform Commercial Code as in effect from time to time in the State of California or any other applicable jurisdiction.

2.     <u>Priorities</u> .

(a) Notwithstanding any contrary priority established by the time or order of attachment or perfection of any security interest or the time or order of filing of any financing statements or other documents, or the giving of any notices of purchase money security interests or other notices, or possession or control of any Collateral, or any statutes, rules or law, or court decisions to the contrary, the Secured Parties agree that:

(i) all security interests now or hereafter acquired by Creditor in the Creditor Priority Collateral shall at all times be prior and superior to all security interests and other interests and claims now held or hereafter acquired by Bank in Creditor Priority Collateral;

(ii) all security interests now or hereafter acquired by Bank in the Bank Priority Collateral shall at all times be prior and superior to all security interests and other interests or claims now held or hereafter acquired by Creditor in the Bank Priority Collateral; and

(iii) the proceeds resulting from any sale, transfer or other disposition of the Collateral shall be distributed as provided in Section 5 below.

(b)     Each Secured Party hereby:

(i) acknowledges and consents to (A) Borrower granting to the other Secured Party a security interest in the Common Collateral of such other Secured Party, (B) the other Secured Party filing any and all financing statements and other documents as deemed necessary by the other Secured Party in order to perfect its security interest in its Common Collateral, and (C) Borrower's entry into the Loan Documents to which the other Secured Party is a party; and

3

(ii) acknowledges and agrees that the other Secured Party's Claims, the Borrower's entry into the applicable Loan Documents with the other Secured Party, and the security interests in the Common Collateral granted by Borrower to the other Secured Party shall be permitted under such Secured Party's Loan Documents, notwithstanding any provision of such Secured Party's Loan Documents to the contrary.

(c) If Creditor, for any reason, receives Bank Priority Collateral and receives a written notice from Bank that an Event of Default has occurred under the Bank Loan Documents and a demand for possession of the Bank Priority Collateral, Creditor shall promptly deliver any such Bank Priority Collateral in Creditor's possession to Bank.  If Bank, for any reason, receives Creditor Priority Collateral and receives a written notice from Creditor that an Event of Default has occurred under the Creditor Loan Documents and a demand for possession of the Creditor Priority Collateral, Bank shall promptly deliver any such Creditor Priority Collateral in Bank's possession to Creditor.

3.     Permitted Payments of Creditor Debt .

(a)     Except as otherwise provided for in this Agreement, Creditor will not demand or receive from Borrower (and Borrower will not pay to Creditor) any cash payment of all or any part of the Creditor Debt, by way of payment, prepayment, setoff or otherwise, until such time as (i) the Bank Debt has been fully paid in cash, (ii) Bank has no commitment or obligation to lend any further funds to Borrower under the Bank Loan Documents, and (iii) all of the Bank Loan Documents are terminated (such time, " Bank Payment in Full ").

(b)     Notwithstanding the foregoing prohibition on Creditor receiving (and Borrower paying) any cash payment of any of the Creditor Debt, Creditor shall be entitled to receive the proceeds of any sale of the Collateral as provided herein.   Further, nothing in this Agreement shall prohibit Creditor from converting all or any part of the Creditor Debt into equity securities of Borrower or exercising any warrants issued to Creditor, provided that, if such securities have any call, put or other conversion features that would obligate Borrower to pay any cash dividends or distributions to Creditor, Creditor hereby acknowledges the Bank Loan Agreement evidencing the Bank Debt may prohibit Borrower from paying or making such dividends or distributions to Creditor and, to the extent Creditor has knowledge that Borrower is so prohibited by the Bank Loan Agreement, Creditor will not accept such cash dividends or distribution.

(c)     Creditor shall promptly deliver to Bank in the form received (except for endorsement or assignment by Creditor where required by Bank) for application to the Bank Debt any cash payment, distribution or proceeds received by Creditor with respect to the Creditor Debt other than in accordance with this Agreement.

4.     Secured Parties' Rights .

(a) Except as otherwise provided for in this Agreement, Creditor agrees that Bank may at any time, and from time to time, without the consent of Creditor and without notice to Creditor, renew or extend any of the Bank Debt, accept partial payments of the Bank Debt, settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate

4

any of the Bank Debt, release, exchange, fail to perfect, delay the perfection of, fail to resort to, or realize upon any Bank Priority Collateral, or change, alter or vary any other terms or provisions of the Bank Debt (other than any increase in the maximum principal amount of the Bank Debt), and take any other action or omit to take any other action with respect to its Bank Debt as it deems necessary or advisable in its sole discretion.  No amendment of the Bank Loan Documents shall directly or indirectly modify the provisions of this Agreement in any manner that might terminate or impair the subordination of the security interest or lien that Bank may have in the Creditor Priority Collateral.

(b) Except as otherwise provided for in this Agreement, Bank agrees that Creditor may at any time, and from time to time, without the consent of Bank and without notice to Bank, renew or extend any of the Creditor Debt, accept partial payments of the Creditor Debt, settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of the Creditor Debt, release, exchange, fail to perfect, delay the perfection of, fail to resort to, or realize upon any Creditor Priority Collateral, or change, alter or vary any other terms or provisions of the Creditor Debt (other than any increase in the interest rate applicable to, or the maximum principal amount of the Creditor Debt, or any change in the dates on which payments are to be made with respect to the Creditor Debt (other than extensions of time)) and take any other action or omit to take any other action with respect to its Creditor Debt as it deems necessary or advisable in its sole discretion. No amendment of the Creditor Loan Documents shall directly or indirectly modify the provisions of this Agreement in any manner that might terminate or impair the subordination of the security interest or lien that Creditor may have in the Bank Priority Collateral.

(c) Creditor and Bank each waive any right to require the other to marshal any Collateral or other assets in favor of it or against or in payment of any or all of its Secured Party Debt.

(d) Except as otherwise provided for herein, prior to Bank Payment in Full, Bank shall have the sole and exclusive right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of Bank Priority Collateral of Borrower except in accordance with the terms of the Bank Debt.  Bank agrees to provide Creditor with at least ten (10) days' prior written notice of any such sale, transfer or disposition of the Bank Priority Collateral approved by Bank.  Upon written notice from Bank to Creditor of Bank's agreement to release its lien on all or any portion of the Bank Priority Collateral in connection with the sale, transfer or other disposition thereof by Bank (or by Borrower with consent of Bank), Creditor shall be deemed to have also, automatically and simultaneously, released its lien on the Bank Priority Collateral, and Creditor shall upon written request by Bank, promptly take such action as shall be necessary or appropriate to evidence and confirm such release.  All proceeds resulting from any such sale, transfer or other disposition shall be applied as provided in Section 5 below.  If Creditor fails to release its lien as required hereunder, Creditor hereby appoints Bank as attorney in fact for Creditor with full power of substitution to release Creditor's liens in the Bank Priority Collateral as provided hereunder.  Such power of attorney being coupled with an interest shall be irrevocable.

(e) Except as otherwise provided for herein, until such time as (a) the Creditor Debt has been fully paid, (b) Creditor has no commitment or obligation to lend any further funds

to Borrower under the Creditor Loan Documents, and (ii) all of the Creditor Loan Documents are terminated (such time, " Creditor Payment in Full "), Creditor shall have the sole and exclusive right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of Creditor Priority Collateral of Borrower except in accordance with the terms of the Creditor Debt.  Creditor agrees to provide Bank with at least ten (10) days' prior written notice of any such sale, transfer or disposition of the Creditor Priority Collateral approved by Creditor.  Upon written notice from Creditor to Bank of Creditor's agreement to release its lien on all or any portion of the Creditor Priority Collateral in connection with the sale, transfer or other disposition thereof by Creditor (or by Borrower with consent of Creditor), Bank shall be deemed to have also, automatically and simultaneously, released its lien on the Creditor Priority Collateral, and Bank shall upon written request by Creditor, promptly take such action as shall be necessary or appropriate to evidence and confirm such release.  All proceeds resulting from any such sale, transfer or other disposition shall be applied as provided in Section 5 below.  If Bank fails to release its lien as required hereunder, Bank hereby appoints Creditor as attorney in fact for Bank with full power of substitution to release Bank's liens in the Creditor Priority Collateral as provided hereunder.  Such power of attorney being coupled with an interest shall be irrevocable.

5.    Actions/Remedies .

(a) Creditor shall be free at all times to exercise or to refrain from exercising any and all rights and remedies it may have with respect to the Creditor Priority Collateral.  In conducting any public or private sale under the UCC of the Creditor Priority Collateral, Creditor shall give Bank such notice of such sale as may be required by the UCC.  Bank shall be free at all times to exercise or to refrain from exercising any and all rights and remedies it may have with respect to the Bank Priority Collateral.  In conducting any public or private sale under the UCC of the Bank Priority Collateral, Bank shall give Creditor such notice of such sale as may be required by the UCC.

(b) Whether or not an Event of Default has occurred, (i) Creditor shall not collect, take possession of, foreclose upon, or exercise any other rights or remedies with respect to the Bank Priority Collateral, judicially or nonjudicially (including without limitation the exercise of any remedies with respect to Bank Priority Collateral in any bankruptcy or insolvency proceeding relating to Borrower), without the prior written consent of Bank, until Bank Payment in Full and (ii) Bank shall not collect, take possession of, foreclose upon, or exercise any other rights or remedies with respect to the Creditor Priority Collateral, judicially or nonjudicially (including without limitation the exercise of any remedies with respect to Creditor Priority Collateral in any bankruptcy or insolvency proceeding relating to Borrower), without the prior written consent of Creditor, until Creditor Payment in Full.

(c) Notwithstanding anything to the contrary in the Loan Documents, as among the Secured Parties, the Proceeds of Collection of all of the Bank Priority Collateral shall, upon receipt by either Secured Party, be paid to and applied as follows:

(i) First , to the payment of then outstanding reasonable out-of-pocket costs and expenses of Bank expended to preserve the value of the Bank Priority Collateral, of

foreclosure or suit with respect to Bank Priority Collateral, if any, and of such sale with respect to the Bank Priority Collateral;

(ii)     Second , to Bank in an amount up to Bank's Claims until Bank Payment in Full;

(iii) Third , to Creditor in an amount up to Creditor's Claims until Creditor Payment in Full;

(iv) Fourth , to Borrower, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

(d) Notwithstanding anything to the contrary in the Loan Documents, as among the Secured Parties, the Proceeds of Collection of all of the Creditor Priority Collateral shall, upon receipt by either Secured Party, be paid to and applied as follows:

(i) First , to the payment of then outstanding reasonable out-of-pocket costs and expenses of Creditor expended to preserve the value of the Creditor Priority Collateral, of foreclosure or suit with respect to Creditor Priority Collateral, if any, and of such sale with respect to the Creditor Priority Collateral;

(ii) Second , to Creditor in an amount up to Creditor's Claims until Creditor Payment in Full;

(iii)     Third , to Bank in an amount up to Bank's Claims until Bank Payment in Full;

(iv) Fourth , to Borrower, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

6. No Commitment by Secured Parties .  This Agreement shall in no way be construed as a commitment or agreement by Creditor or Bank to provide financing to the Borrower or continue financing arrangements with Borrower.  Creditor and Bank may terminate such arrangements at any time, in accordance with their agreements with Borrower.

7. Option to Purchase .  Bank hereby grants Creditor an option to purchase all Bank Debt and all security and collateral therefor and all guarantees thereof for a purchase price (" Purchase Price ") equal to the total unpaid principal balance of the Bank Debt, plus all accrued and unpaid interest thereon, and all out-of-pocket fees, costs and expenses incurred by Bank in connection therewith.  This option may be exercised by Creditor at any time by giving written notice thereof to Bank.  Within five business days after written notice of the exercise of this option is given, Creditor shall pay Bank the Purchase Price in immediately available funds, and Bank shall execute assignments of the Bank Debt and all documents and instruments relating thereto, in such form as Creditor shall reasonably request, but without recourse, warranty or representation of any kind on the part of Bank, except a warranty as to (i) the unpaid balance of the Bank Debt, (ii) that Bank has good title to the Bank Debt, free and clear of liens, claims and encumbrances created or authorized by Bank and (iii) that Bank has the right to assign the Bank Debt, and that such assignment is duly authorized.  To the extent any Bank Services (as defined

7

in the Bank Loan Agreement), including, without limitation, letters of credit and cash management services, are not assigned to Creditor, such Bank Services shall be cash collateralized by Borrower in form and substance satisfactory to Bank in its discretion.

8. <u>Insurance</u>.   Subject to the terms of this Agreement, the Secured Party having a senior security interest or lien in the Collateral shall, subject to such Secured Party's rights under its agreements with Borrower, have the sole and exclusive right (but not the obligation), as against the other Secured Party, to adjust settlement of any insurance policy in the event of any loss affecting such Collateral.   All proceeds of such policy shall be applied by the Secured Party having the senior security interest as set forth in Section 5 of this Agreement.

9.   <u>Bankruptcy</u>.

(a)   In the event of Borrower's insolvency, reorganization or any case or proceeding under any bankruptcy or insolvency law or laws relating to the relief of debtors, including, without limitation, any voluntary or involuntary bankruptcy, insolvency, receivership or other similar statutory or common law proceeding or arrangement involving Borrower, the readjustment of its liabilities, any assignment for the benefit of its creditors or any marshalling of its assets or liabilities (each, an " <u>Insolvency Proceeding</u> "), (a) this Agreement shall remain in full force and effect in accordance with Section 510(a) of the United States Bankruptcy Code, (b) each Secured Party's Collateral shall include, without limitation, all Collateral arising during or after any such Insolvency Proceeding, and (c) all payments and distributions of any kind or character, whether in cash or property or securities, in respect of the Secured Parties' Claims shall be distributed pursuant to the provisions of Section 5 hereof.

(b)   Until Bank Payment in Full, Creditor irrevocably appoints Bank as Creditor's attorney-in-fact, and grants to Bank a power of attorney with full power of substitution, in the name of Creditor or in the name of Bank, for the use and benefit of Bank, with prior notice to Creditor, to file the appropriate claim or claims in respect of the Creditor Debt on behalf of Creditor in any Insolvency Proceeding involving Borrower, if Creditor does not do so prior to 20 days before the expiration of the time to file claims in such Insolvency Proceeding and if Bank elects, in its sole discretion, to file such claim or claims.

(c)   In addition to and without limiting the foregoing, if an Insolvency Proceeding occurs:  (i) neither Secured Party shall assert or approve, without the prior written consent of the other Secured Party, any claim, motion, objection or argument in respect of the Collateral in connection with any Insolvency Proceeding which could otherwise be asserted or raised in connection with such Insolvency Proceeding, including, without limitation, any claim, motion, objection or argument seeking adequate protection or relief from the automatic stay in respect of the Collateral, which is inconsistent with the terms of this Agreement, (ii) Bank may consent to the use of cash collateral on such terms and conditions and in such amounts as it shall in good faith determine without seeking or obtaining the consent of Creditor as (if applicable) holder of an interest in the Collateral and, if use of cash collateral by Borrower is consented to by Bank, Creditor shall not oppose such use of cash collateral on the basis that Creditor's interest in the Collateral (if any) is impaired by such use or inadequately protected by such use, so long as (x) Creditor retains a lien on such Collateral (including proceeds thereof arising after the commencement of such Insolvency Proceeding) with the same priority as existed prior to the

8

commencement of the case under the Bankruptcy Code, (ii) Creditor receives a replacement lien on post-petition assets to the same extent granted to Bank, with the same priority as existed prior to the commencement of the case under the Bankruptcy Code, (iii) Creditor shall not object to, or oppose, any sale or other disposition of any assets comprising all or part of the Bank Priority Collateral, free and clear of security interests, liens and claims of any party, including Creditor, under Section 363 of the United States Bankruptcy Code or otherwise, on the basis that the interest of Creditor in the Collateral (if any) is impaired by such sale or inadequately protected as a result of such sale, or on any other ground , if Bank has consented to, or supports, such sale or disposition of such assets, provided that to the extent the Proceeds of Collection of such Collateral are not applied to reduce the Bank Debt, Creditor shall retain a lien on such Proceeds of Collection in accordance with the terms of this Agreement and (iv) Bank shall not object to, or oppose, any sale or other disposition of any assets comprising all or part of the Creditor Priority Collateral, free and clear of security interests, liens and claims of any party, including Bank, under Section 363 of the United States Bankruptcy Code or otherwise, on the basis that the interest of Bank in the Collateral (if any) is impaired by such sale or inadequately protected as a result of such sale, or on any other ground, if Creditor has consented to, or supports, such sale or disposition of such assets, provided that to the extent the Proceeds of Collection of such Collateral are not applied to reduce the Creditor Debt, Bank shall retain a lien on such Proceeds of Collection in accordance with the terms of this Agreement.

(d)     Nothing in this Section 9 shall preclude any Secured Party from seeking to be the purchaser, assignee or other transferee of any Collateral in connection with any sale or other disposition of Collateral under the Bankruptcy Code.   Bank agrees that Creditor shall have the right to credit bid under Section 363(k) of the Bankruptcy Code with respect to the Bank Priority Collateral, and Creditor agrees that Bank shall have the right to credit bid under Section 363(k) of the Bankruptcy Code with respect to the Bank Priority Collateral.

10. <u>Notice of Events of Default</u> .   Each Secured Party shall give the other Secured Party prompt written notice of the occurrence of an Event of Default under its Loan Documents, and shall, simultaneously with giving any notice of default to Borrower, provide such other Secured Party with a copy of any notice of default given to Borrower.   Neither Secured Party will incur liability for negligently or inadvertently failing to provide such notice to the other Secured Party.   Creditor acknowledges and agrees that any default or event of default under the Creditor Loan Documents shall be deemed to be a default and an event of default under the Bank Loan Documents.

11. <u>Revivor</u> .   If, after payment of any Bank Debt, Borrower thereafter becomes liable to Bank on account of the Bank Debt, or any payment made on the Bank Debt shall for any reason be required to be returned or refunded by Bank, this Agreement shall thereupon in all respects become effective with respect to such subsequent or reinstated Bank Debt, without the necessity of any further act or agreement between Secured Parties.   If, after payment of any Creditor Debt, Borrower thereafter becomes liable to Creditor on account of the Creditor Debt, or any payment made on the Creditor Debt shall for any reason be required to be returned or refunded by Creditor, this Agreement shall thereupon in all respects become effective with respect to such subsequent or reinstated Creditor Debt, without the necessity of any further act or agreement between Secured Parties.

9

12. <u>Notices</u>.  Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except informal documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by certified mail, postage prepaid, return receipt requested, or by facsimile, or by reputable overnight delivery service, to the Secured Parties, at their respective addresses or fax numbers set forth below:

If to Creditor:  SVIC No. 28 New Technology Business Investment L.L.P.
29F, Samsung Electronics Building
1320-10, Seocho 2-dong, Seocho-gu
Seoul 137-857, Korea
Attention:  Dr. Dong-su Kim, Vice President
Email:  dongkim@samsung.com

with a copy (which shall not constitute notice) to:

DLA Piper LLP (US)
2000 University Avenue
Palo Alto, California  94303
Attention:  Louis Lehot
Email:  louis.lehot@dlapiper.com

If to Bank:  Silicon Valley Bank
4370 La Jolla Village Drive, Suite 1050
San Diego, California 92122
Attn:  Mr. Andrew Skalitzky
Email: askalitzky@svb.com

with a copy (which shall not constitute notice) to:

Levy, Small & Lallas
815 Moraga Drive
Los Angeles, California  90049
Attention:  Angel F. Castillo
Email:  acastillo@lsl-la.com

The Secured Parties may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

13. <u>Relationship Of Parties</u>.  The relationship between the Secured Parties is, and at all times shall remain solely that of lenders.  Secured Parties shall not under any circumstances be construed to be partners or joint venturers of one another; nor shall the Secured Parties under any circumstances be deemed to be in a relationship of confidence or trust or a fiduciary relationship with one another, or to owe any fiduciary duty to one another.  Secured Parties do not undertake or assume any responsibility or duty to one another to select, review, inspect, supervise, pass judgment upon or otherwise inform each other of any matter in connection with Borrower's property, any Collateral held by any Secured Party or the operations of Borrower.  Each Secured Party shall rely entirely on its own judgment with respect to such matters, and any

10

review, inspection, supervision, exercise of judgment and supply of information undertaken or assumed by any Secured Party in connection with such matters is solely for the protection of such Secured Party.

14. <u>Governing Law; Jurisdiction; Jury Trial Waiver.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflicts of laws principles.  Creditor and Bank submit to the exclusive jurisdiction of the state and federal courts located in Santa Clara County, California in any action, suit, or proceeding of any kind, against it which arises out of or by reason of this Agreement. **CREDITOR AND BANK WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN** .

15. <u>Judicial Reference</u> .  WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court.  The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive.  The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers.  All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed.  If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief.  The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings.  The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings.  The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge.  The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a).  Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies.  The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

16. <u>General</u> .  Each Secured Party shall execute all such documents and instruments and take all such actions as the other shall reasonably request in order to carry out the purposes of this Agreement, including without limitation (if requested by a Secured Party) appropriate

11

amendments to financing statements in favor of the other Secured Party in order to refer to this Agreement (but this Agreement shall remain fully effective notwithstanding any failure to execute any additional documents, instruments, or amendments). Each Secured Party represents and warrants to the other that it has not heretofore transferred or assigned any financing statement naming Borrower as debtor and it as secured party, and that it will not do so without first delivering a copy of this Agreement to the proposed transferee or assignee, and any transfer or assignment shall be subject to all of the terms of this Agreement. This Agreement is solely for the benefit of Secured Parties and their successors and assigns, and neither the Borrower nor any other person (including any successor-in-interest) shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. This Agreement sets forth in full the terms of agreement between the Secured Parties with respect to the subject matter hereof, and may not be modified or amended, nor may any rights hereunder be waived, except in a writing signed by the Secured Parties. In the event of any litigation between the parties based upon or arising out of this Agreement, the prevailing party shall be entitled to recover all of its reasonable costs and expenses (including without limitation reasonable attorneys' fees) from the non-prevailing party. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

17.    <u>Limited Agency for Perfection</u> .

(a) Bank acknowledges that applicable provisions of the UCC may require, in order to properly perfect Creditor's security interest in the Common Collateral securing the Creditor Claims, that Creditor possess or control certain of such Common Collateral. In order to help ensure that Creditor's security interest in such Common Collateral is properly perfected (but subject to and without waiving the other provisions of this Agreement), Bank agrees to hold both for itself and, solely for the purposes of perfection and without incurring any duties or obligations to Creditor as a result thereof or with respect thereto, for the benefit of Creditor, any such Common Collateral, and agrees that Creditor's lien in such Common Collateral shall be deemed perfected in accordance with applicable law.

(b) Creditor acknowledges that applicable provisions of the UCC may require, in order to properly perfect Bank's security interest in the Common Collateral securing the Bank Claims, that Bank possess or control certain of such Common Collateral. In order to help ensure that Bank's security interest in such Common Collateral is properly perfected (but subject to and without waiving the other provisions of this Agreement), Creditor agrees to hold both for itself and, solely for the purposes of perfection and without incurring any additional duties or obligations to Bank as a result thereof or with respect thereto, for the benefit of Bank, any such Common Collateral, and agrees that Bank's lien in such Common Collateral shall be deemed perfected in accordance with applicable law.

(c) No party shall have, or be deemed to have, by this Agreement or otherwise a fiduciary relationship in respect of the other party.

[Signature Page Follows]

12

SILICON VALLEY BANK                     SVIC NO. 28 NEW TECHNOLOGY
                                        BUSINESS INVESTMENT L.L.P.


By _____          By _____
Title _____          Title _____


Signature Page to Intercreditor Agreement

BORROWER'S CONSENT AND AGREEMENT

Borrower consents to the terms of this Intercreditor Agreement and agrees not to take any actions inconsistent therewith. Borrower agrees to execute all such documents and instruments and take all such actions as any Secured Party shall reasonably request in order to carry out the purposes of this Agreement. Borrower further agrees that, at any time and from time to time, the foregoing Agreement may be altered, modified or amended by the Creditor and Bank without notice to or the consent of Borrower.

NETLIST, INC.

By _____

Title _____

Exhibit A

Creditor Security Agreement

Exhibit 5

Bank Priority Collateral

Bank Priority Collateral consists of all of Borrower's right, title and interest in and to the following personal property exclusive of Creditor Priority Collateral:

All right, title and interest of Borrower in and to the following, whether now owned or hereafter arising or acquired and wherever located: all Accounts; all Inventory; all Equipment; all Deposit Accounts; all General Intangibles (including without limitation all Intellectual Property); all Investment Property; all Other Property; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds  (including proceeds of any insurance policies, pro ceeds of proceeds and claims against third parties) of, all of the above, and all Borrower's books relating to any of the above.

As used above the following terms have the following meanings:

"Accounts" means all present and future "accounts" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all accounts receivable and other sums owing to Borrower.

"Deposit Accounts" means all present and future "deposit accounts" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all general and special bank accounts, demand accounts, checking accounts, savings accounts and certificates of deposit.

"Equipment" means all present and future "equipment" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"General Intangibles" means all present and future "general intangibles" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all Intellectual Property, payment intangibles, royalties, contract rights, goodwill, franchise agreements, purchase orders, customer lists, route lists, telephone numbers, domain names, claims, income tax refunds, security and other deposits, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"Intellectual Property" means all present and future (a) copyrights, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship

and derivative work thereof, whether published or unpublished, (b) trade secret rights, including all rights to unpatented inventions and know -how, and confidential information; (c) mask work or similar rights available for the protection of semiconductor chips; (d) patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same; (e) trademarks, servicemarks, trade styles, and trade names, whether or not any of the foregoing are registered, and all applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by any such trademarks; (f) computer software and computer software products; (g) designs and design rights; (h) technology; (i) all claims for damages by way of past, present and future infringement of any of the rights included above; (j) all licenses or other rights to use any property or rights of a type described above.

"Inventory" means all present and future "inventory" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"Investment Property" means all present and future investment property, securities, stocks, bonds, debentures, debt securities, partnership interests, limited liability company interests, options, security entitlements, securities accounts, commodity contracts, commodity accounts, and all financial assets held in any securities account or otherwise, wherever located, and all other securities of every kind, whether certificated or uncertificated.

"Other Property" means the following as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and all rights relating thereto: all present and future "commercial tort claims", "documents", "instruments", "promissory notes", "chattel paper", "letters of credit", "letter-of-credit rights", "fixtures", "farm products" and "money"; and all other goods and personal property of every kind, tangible and intangible, whether or not governed by the California Uniform Commercial Code.

EXHIBIT 21.9

**SUBSIDIARIES**

Each of the following is a wholly owned direct subsidiary of Netlist, Inc.:

| Entity Name | Jurisdiction of Organization |
| --- | --- |
| Netlist Electronics (Suzhou) Co., Ltd | People ' s Republic of China |
| Netlist HK Limited | Hong Kong |

**EXHIBIT 23**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

    We consent to the incorporation by reference in Registration Statements Nos. 333-139435, 333-146141, 333-151644, 333-161832, 333-161834, 333-164261, 333-165916, 333-168330, 333-173646, 333-179776 and 333-193862 on Form S-8 and 333-164290, 333-177118 and 333-199446 on Form S-3 of our report dated March 4, 2016, relating to the consolidated financial statements of Netlist, Inc. and subsidiaries, appearing in this Annual Report on Form 10-K of Netlist, Inc. for the year ended January 2, 2016.

                /s/KMJ Corbin & Company LLP

Costa Mesa, California
March 4, 2016

EXHIBIT 31.9

**CERTIFICATION PURSUANT TO RULE 13A - 14 OF THE SECURITIES EXCHANGE ACT OF 1934
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES -OXLEY ACT OF 2002**

I, Chun K. Hong, certify that:

1.     I have reviewed this Annual Report on Form 10 - K for the   fiscal year ended January 2, 2016 of Netlist, Inc., a Delaware corporation (the " Registrant " );

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.     The Registrant ' s other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a - 15(e) and 15d - 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a - 15(f) and 15d - 15(f)) for the Registrant and have:

   a)     D esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)     D esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)     E valuated the effectiveness of the Registrant ' s disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)     D isclosed in this report any change in the Registrant ' s internal control over financial reporting that occurred during the Registrant ' s most recent quarter (the Registrant ' s fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant ' s internal control over financial reporting .

5.     The Registrant ' s other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant ' s auditors and the audit committee of the Registrant ' s board of directors (or persons performing the equivalent functions):

   a)     A ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant ' s ability to record, process, summarize and report financial information; and

   b)     A ny fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant ' s internal control over financial reporting.

March 4, 2016                                     /s/ Chun K. Hong
                                                 Chun K. Hong
                                                 *President, Chief Executive Officer and Chairman of*
                                                 *the Board (Principal Executive Officer)*

EXHIBIT 31.9

**CERTIFICATION PURSUANT TO RULE 13A - 14 OF THE SECURITIES EXCHANGE ACT OF 1934**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES -OXLEY ACT OF 2002**

I, Gail Sasaki , certify that:

1.       I have reviewed this Annual Report on Form 10 - K for the fiscal year ended January 2, 2016 of Netlist, Inc., a Delaware corporation (the " Registrant " );

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.       The Registrant ' s other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a - 15(e) and 15d - 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a - 15(f) and 15d - 15(f)) for the Registrant and have:

a)       D esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)       D esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)       E valuated the effectiveness of the Registrant ' s disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)       D isclosed in this report any change in the Registrant ' s internal control over financial reporting that occurred during the Registrant ' s most recent quarter (the Registrant ' s fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant ' s internal control over financial reporting .

5.       The Registrant ' s other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant ' s auditors and the audit committee of the Registrant ' s board of directors (or persons performing the equivalent functions):

a)       A ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant ' s ability to record, process, summarize and report financial information; a nd

b)       A ny fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant ' s internal control over financial reporting.

March 4, 2016                                           /s/ Gail Sasaki
                                                                   _____
                                                                   Gail Sasaki
                                                                   *Vice President and Chief Financial Officer*
                                                                   *(Principal Financial Officer)*

Exhibit 33

**CERTIFICATIONS PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES -OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10 - K of Netlist, Inc., a Delaware corporation ( " Netlist " ) for the fiscal year ended January 2, 2016 , as filed with the Securities and Exchange Commission on March 4 , 201 6 (the " Report " ), Chun K. Hong, president, chief executive officer and chairman of the board of Netlist, and Gail Sasaki , vice president and chief financial officer of Netlist, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes -Oxley Act of 2002, that, to his or her knowledge:

(1)     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Netlist.

March 4, 2016                                        /s/ Chun K. Hong
                                                             Chun K. Hong
                                                             *President, Chief Executive Officer and Chairman of*
                                                             *the Board (Principal Executive Officer)*


March 4, 2016                                        /s/ Gail Sasaki
                                                             Gail Sasaki
                                                             *Vice President and Chief Financial Officer*
                                                             *(Principal Financial Officer)*

# EXHIBIT 19

## FULL VERSION OF EXHIBIT 19 PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT 20

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, DC 20549

---

# FORM 8-K

### CURRENT REPORT
#### Pursuant to Section 13 or 15(d) of
#### the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **November 12, 2015**

# NETLIST, INC.
#### (Exact name of registrant as specified in its charter)

| **Delaware** | **001-33170** | **95-4812784** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

**175 Technology Drive, Suite 150**
**Irvine, California 92618**
(Address of principal executive offices, including zip code)

**(949) 435-0025**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry Into a Material Definitive Agreement.**

*Joint Development and License Agreement; Senior Secured Convertible Promissory Note and Warrant Sale; Payoff Letter*

On November 12, 2015, Netlist, Inc. (the "Company") entered into a Joint Development and License Agreement ("JDLA") with Samsung Electronics Co., Ltd. ("Samsung"), pursuant to which the Company and Samsung agreed to work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of this new technology. The Company received $8 million non-recurring engineering fee (NRE) from Samsung for the joint development. The JDLA also includes cross licensing of each party's respective patent portfolios, as well as access to raw materials (DRAM and NAND flash) at competitive prices, and an important strategic partner that can facilitate getting the Company's HyperVault technology to market. Both parties may enter into an additional agreement in the future for Samsung to be granted commercial license for the Company's NVDIMM-P technology. The JDLA also includes a Right of First Refusal wherein the Company will provide Samsung the right to acquire the Company's NVDIMM-P technology in a separate, subsequent transaction before the Company offers the technology to a third party. The Company also received $15 million under the SVIC Note (as defined below).

On November 18, 2015 ("Closing Date"), the Company also entered into a Senior Secured Convertible Promissory Note and Warrant Purchase Agreement ("SVIC Purchase Agreement"), with SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership ("SVIC") and an affiliate of Samsung Venture Investment Co., pursuant to which the Company sold SVIC a Senior Secured Convertible Promissory Note ("SVIC Note") and a Stock Purchase Warrant ("SVIC Warrant"), each dated as of the Closing Date. The SVIC Note has an original principal amount of $15 million, accrues interest at a rate of 2% per year, is due and payable in full on December 31, 2021 ("SVIC Note Maturity Date") and the principal and accrued but unpaid interest of which are convertible into shares of the Company's Common Stock at a conversion price of $1.25 per share (the "Conversion Price"), subject to certain adjustments as set forth therein on the SVIC Note Maturity Date. Upon a change of control of the Company prior to the SVIC Note Maturity Date, the SVIC Note may, at the Company's option, be assumed by the surviving entity or be redeemed upon the consummation of such change of control for the principal and accrued but unpaid interest as of the redemption date. The SVIC Warrant grants SVIC a right to purchase 2,000,000 shares of the Company's Common Stock at an exercise price of $0.30 per share, subject to certain adjustments as set forth therein, is only exercisable in the event the Company exercises its right to redeem the SVIC Note prior to the SVIC Note Maturity Date and expires on December 31, 2025. In connection with the SVIC Note, SVIC was granted a first priority security interest in the Company's patents and a second priority security interest in all of the Company's other assets. On the Closing Date, the Company, Silicon Valley Bank ("SVB") and SVIC entered into an Intercreditor Agreement in connection with the SVIC Note pursuant to which SVB and SVIC agreed to their relative security interest priorities in the Company's assets. On the Closing Date, the Company and SVIC also entered into a Registration Rights Agreement pursuant to which the Company is obligated to register with the SEC the shares of the Company's Common Stock issued upon conversion of the SVIC Note or upon exercise of the SVIC Warrant.

On November 19, 2015, pursuant to the terms of a payoff letter (the "Payoff Letter") the Company repaid all sums due under that certain Loan and Security Agreement (as amended, the "Loan Agreement"), dated July 18, 2013, by and between the Company and Fortress Credit Opportunities I LP, a Delaware limited liability company ("Fortress"), as successor to DBD Credit Funding LLC and terminated the Loan Agreement. Pursuant to the Payoff Letter, the parties also terminated the Monetization Letter Agreement (as amended, the "Letter Agreement"), dated July 18, 2013, by and between the Company and Drawbridge Special Opportunities Fund LP. In connection with the Payoff Letter, the Company made a lump sum payment of $1 million to Fortress, and agreed to amend the outstanding warrant issued in connection with the entry of the Loan Agreement and Letter Agreement to reduce the exercise price per share to $0.47. Additionally, pursuant to the Payoff Letter, the Company issued to Fortress a new ten year warrant to purchase 1 million shares of our Common Stock with an exercise price per share of $0.47.

Copies of the SVIC Purchase Agreement, the SVIC Note, the registration rights agreement, the warrants and the Payoff Letter are all attached hereto and incorporated herein by this reference.

2

NL074567

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information set forth above in Item 1.01 of this Current Report on Form 8-K that relates to the creation of a direct financial obligation of the Company is incorporated by reference herein.

**Item 3.02 Unregistered Sales of Equity Securities.**

The Company relied on the exemption from registration contained in Section 4(a)(2) of the Securities Act in connection with the issuance of the SVIC Note and the warrants. The SVIC Note and the warrants have not been registered under the Securities Act, or state securities laws, and may not be offered or sold in the United States without being registered with the SEC or through an applicable exemption from SEC registration requirements. This Current Report on Form 8-K is not an offer to sell or the solicitation of an offer to buy the SVIC Note nor the securities issuable upon exercise thereof. The other information called for by this item is contained in Item 1.01, which is incorporated herein by reference.

**Item 8.01 Other Events.**

On November 19, 2015, the Company issued press releases announcing the execution of the SVIC Purchase Agreement and the JDLA. A copy of the press release is attached hereto as Exhibit 99.1 and is incorporated herein by this reference.

3

NL074568

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 4.1 | Senior Secured Convertible Promissory Note, dated November 18, 2015. |
| 4.2 | Stock Purchase Warrant (SVIC), dated November 18, 2015. |
| 4.3 | Stock Purchase Warrant (Fortress), dated November 18, 2015. |
| 4.4 | Amendment No. 1 to Stock Purchase Warrant (Fortress), dated November 18, 2015. |
| 10.1 | Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated November 18, 2015. |
| 10.2 | Registration Rights Agreement, dated November 18, 2015. |
| 10.3 | Payoff Letter, dated November 18, 2015. |
| 99.1 | Press Release of Netlist, Inc., dated November 19, 2015. |

4

NL074569

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**NETLIST, INC.**

Dated: November 19, 2015

By:  */s/ Gail M. Sasaki*
Gail M. Sasaki
Vice President and Chief Financial Officer

5

NL074570

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 4.1 | Senior Secured Convertible Promissory Note, dated November 18, 2015. |
| 4.2 | Stock Purchase Warrant (SVIC), dated November 18, 2015. |
| 4.3 | Stock Purchase Warrant (Fortress), dated November 18, 2015. |
| 4.4 | Amendment No. 1 to Stock Purchase Warrant (Fortress), dated November 18, 2015. |
| 10.1 | Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated November 18, 2015. |
| 10.2 | Registration Rights Agreement, dated November 18, 2015. |
| 10.3 | Payoff Letter, dated November 18, 2015. |
| 99.1 | Press Release of Netlist, Inc., dated November 19, 2015. |

6

CONFIDENTIAL

NL074571

Exhibit 4.1

### SENIOR SECURED CONVERTIBLE PROMISSORY NOTE

THIS SENIOR SECURED CONVERTIBLE PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  IT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD IN ACCORDANCE WITH RULE 144 UNDER SUCH ACT.

THIS SENIOR SECURED CONVERTIBLE PROMISSORY NOTE IS SUBJECT TO, AND MAY BE TRANSFERRED ONLY IN COMPLIANCE WITH, THE SENIOR SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE PURCHASER, A COPY OF WHICH IS ON FILE AT THE COMPANY'S PRINCIPAL OFFICE.

THIS SENIOR SECURED CONVERTIBLE PROMISSORY NOTE IS SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED AS OF NOVEMBER *18*, 2015, AMONG THE COMPANY, THE PURCHASER AND SILICON VALLEY BANK (AS AMENDED AND RESTATED FROM TIME TO TIME, THE "INTERCREDITOR AGREEMENT"), A COPY OF WHICH IS ON FILE AT THE COMPANY'S PRINCIPAL OFFICE. THE INTERCREDITOR AGREEMENT IS INCORPORATED HEREIN BY THIS REFERENCE

**No. 1**                                                        **Date of Issuance**
$15,000,000                                                 November 18, 2015

For value received, **Netlist Inc.**, a Delaware corporation (the "***Company***"), hereby promises to pay to the order of **SVIC No. 28 New Technology Business Investment L.L.P.**, a Korean limited liability partnership (the "***Holder***"), the principal sum of Fifteen Million Dollars ($15,000,000) (the "***Principal Amount***").   This Senior Secured Convertible Promissory Note (the "***Note***") is issued pursuant to the Senior Secured Promissory Note and Warrant Purchase Agreement, dated as of November 18, 2015, between the Company and the Holder (as amended from time to time, the "***Purchase Agreement***") and is entitled to the benefits of and is subject to the terms contained in the Purchase Agreement, including, without limitation, the security interest granted in the Company's assets pursuant to the Security Agreement (as defined in the Purchase Agreement) and the other Transaction Documents (as defined in the Purchase Agreement).   Capitalized terms used but not defined herein shall have the meaning set forth in the Purchase Agreement.

       1.     **Interest**.  The Principal Amount shall bear interest from the Closing Date at the rate of two percent (2.0%) per annum, based on a year consisting of 365 days, with interest computed daily based on the actual number of days elapsed.

       2.     **Principal and Interest Payment**.  The Principal Amount and all accrued but unpaid interest hereunder shall be due and payable on December 31, 2021 (the "***Maturity Date***").  The Company shall make all payments under this Note without setoff, recoupment or deduction and regardless of any counterclaim or defense.

       3.     **Maximum Interest**.  Notwithstanding any provision in this Note or any other Transaction Document, it is the parties' intent not to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by law that a court of competent jurisdiction shall deem applicable hereto (which under the laws of the State of New York shall be deemed to be the laws relating to permissible rates of interest on commercial loans) (the "***Maximum Rate***").  If a court of competent jurisdiction finally determines that the Company has paid to the Holder an amount of interest in excess of the amount that would have been payable if all of the Secured Obligations (as defined in the Purchase Agreement) had at all times borne interest at the Maximum Rate, then such excess interest paid by the Company shall be applied as follows: first, to the payment of the Principal Amount outstanding; second, to the payment of the Holder's accrued interest and any Secured Obligations; and third, the excess (if any) shall be refunded to the Company.

NL074572

4.      **Optional Conversion**.

(a)     The Holder may convert the Principal Amount and the accrued interest hereunder into shares of the Company's Common Stock at the Conversion Price (as defined below) on the Maturity Date or during the continuance of an Event of Default. To exercise such conversion right (the "*Conversion Right*"), the Holder shall give written notice of such exercise not less than ten (10) days prior to the Maturity Date or prior to the proposed date of conversion during the continuance of an Event of Default, as applicable (the Maturity Date or the proposed conversion date each the "*Conversion Date*"), and shall deliver the original of this Note to the Company on the Conversion Date. On the Conversion Date, the Company shall issue a certificate for the shares of Common Stock acquired upon conversion of this Note, provided that the Company shall pay a cash adjustment for any fractional share, determined by multiplying such fractional share by the Conversion Price. The foregoing notwithstanding, in no event shall any outstanding Principal Amount and the accrued interest hereunder be converted pursuant to exercise of the Conversion Right to the extent that Holder and its Affiliates would own, after such conversion, shares of Common Stock representing, in the aggregate, in excess of nineteen and nine tenths of one percent (19.9%) of the Common Stock Outstanding (as defined below). The Company shall pay the Holder the amount equal to the Principal Amount and the accrued interest hereunder not converted as a result of such restriction, which payment shall be made on the Conversion Date.

(b)     The "*Conversion Price*" shall be One Dollar and Twenty-Five Cents ($1.25), as adjusted from time to time as follows:

(i)     **Split, Subdivision or Combination of Shares**. If the Company splits, subdivides or combines the Common Stock, the Conversion Price shall be proportionately decreased in the case of a split or subdivision and proportionately increased in the case of a combination; and

(ii)    **Adjustments for Common Stock Dividends**. If the holders of Common Stock at the time after November 18, 2015, receive, or, on or after the record date fixed for the determination of eligible stockholders, shall have become entitled to receive, without payment therefor, any shares of Common Stock by way of dividend, then the Conversion Price shall be adjusted to the amount determined by multiplying such Conversion Price by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately prior to such dividend and the denominator of which is the sum of the number of shares of Common Stock outstanding immediately prior to such dividend and the number of shares of Common Stock issued as such dividend.

(c)     If the Company, by reclassification of securities or otherwise, changes the Common Stock into any other class or classes of securities, the Conversion Right shall thereafter represent the right to acquire such number and kind of securities as would have been issuable as the result of such change with respect to the shares of Common Stock that were subject to the Conversion Right immediately prior to such reclassification or other change and the Conversion Price shall be appropriately adjusted.

5.      **Redemption**. The Company may, on thirty (30) days advance written notice to the Holder, elect to redeem this Note for a redemption price equal to the sum of (i) the Principal Amount and (ii) the accrued interest as of the redemption date (the "*Redemption Price*"). On the redemption date (the "*Redemption Date*"), the Company shall pay the Redemption Price in cash. Except as provided in this section, the Company may not prepay any of the Principal Amount or the accrued interest hereunder.

6.      **Repayment on Change of Control**. If a Change of Control occurs prior to the Maturity Date, the Company shall have the option to require the surviving entity to either (i) assume this Note, or (ii) redeem this Note in accordance with **Section 5** upon the consummation of such Change of Control. The Company shall give the Holder written notice of the option it has selected not less than three (3) Business Days prior to the consummation of such Change of Control.

7.      **Payments**. All payments shall be made in lawful money of the United States of America at the Holder's principal office, or at such other place as the Holder may from time to time designate in writing to the Company. Payments shall be credited first to costs of collection if any, second to accrued interest due and payable and any remainder applied to the Principal Amount.

CONFIDENTIAL

8.      **Remedies**. The acceleration of the obligations under this Note and the exercise of remedies under this Note shall be governed by the provisions of Article 8 of the Purchase Agreement. The Company waives presentment, demand, protest or (except as expressly provided in the Purchase Agreement or the other Transaction Documents) notice of any kind, all of which are hereby expressly waived.   The Company will give prompt written notice to the Holder of the occurrence of any Event of Default.

9.      **Governing Law**. This Note shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

10.     **WAIVER OF JURY TRIAL**. EACH PARTY HERETO WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

11.     **Titles and Subtitles**. The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

12.     **Amendments and Waivers.** The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice shall be conducted pursuant to the terms of the Purchase Agreement.

13.     **Severability**. If any provision of this Note is held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

*[Signature Page Follows]*

This Note is executed and delivered as of the date first written above.

NETLIST INC.

/s/ Gail Sasaki
By: Gail Sasaki
Its: CFO, VP, Secretary

*SIGNATURE PAGE TO THE SENIOR SECURED CONVERTIBLE PROMISSORY NOTE*

CONFIDENTIAL

NL074575

Exhibit 4.2

NEITHER THIS SECURITY NOR THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER, SUCH OFFER, SALE, PLEDGE OR OTHER TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

NETLIST, INC.

STOCK PURCHASE WARRANT

Date of Issuance: November 18, 2015                                        Certificate No. W-4

FOR VALUE RECEIVED, Netlist, Inc., a Delaware corporation (the "Company"), hereby grants to SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership, or its registered assigns (the "Registered Holder") the right (this "Warrant") to purchase from the Company 2,000,000 shares of Warrant Stock at a price per share of $0.30 (as adjusted from time to time hereunder, the "Exercise Price"). Certain capitalized terms used herein are defined in Section 5. The amount and kind of securities obtainable pursuant to the rights granted hereunder and the purchase price for such securities are subject to adjustment pursuant to the provisions contained in this Warrant. Contemporaneously herewith, the Company and the Registered Holder are entering into a registration rights agreement pursuant to which the Registered Holder or its registered assigns shall have certain rights to request registration by the Company of the Warrant Stock under the Securities Act.

This Warrant is subject to the following provisions:

Section 1.    Exercise of Warrant.

1A.    Exercise Period.  The Registered Holder may exercise, in whole or in part (but not as to a fractional share of Warrant Stock), the purchase rights represented by this Warrant at any time and from time to time after the date on which the Company exercises its redemption right under Section 5 of the Note pursuant to the terms thereof, up to and including December 31, 2025 (the "Exercise Period"). This Warrant shall terminate and be of no further force or effect upon the earlier to occur of the conversion of the Note into Common Stock of the Company pursuant to the terms and conditions of the Note or upon the Company's payment in full of the unpaid principal and accrued but unpaid interest of the Note upon its maturity.

1B.    Exercise Procedure.

(i)    This Warrant shall be deemed to have been exercised (in whole or in part) when the Company has received all of the following items (as the case may be from time to time, the "Exercise Time"):

(a)    a completed Exercise Agreement, as described in Section 1C, executed by the Person exercising all or part of the purchase rights represented by this Warrant (the "Purchaser");

(b)    this Warrant (delivery of which shall be subject to the Company's obligations with respect to delivery of a new Warrant as provided in Section 1B(iii));

(c)    if this Warrant is not registered in the name of the Purchaser, an Assignment or Assignments in the form of Exhibit A attached hereto (each, an "Assignment") evidencing the assignment of this Warrant to the Purchaser, in which case the Registered Holder shall have complied with the provisions set forth in Section 7; and

(d)    Subject to Section 1B(ii), wire transfer of immediately available funds or a check payable to the Company in an amount equal to the product of the Exercise Price multiplied by the number of shares of Warrant Stock being purchased upon such exercise (the "Aggregate Exercise Price").

(ii)    As an alternative to the exercise of this Warrant as provided in Section 1B(i) and for purposes of Section 9, the holder of this Warrant may, at its sole discretion, exchange all or part of the purchase rights represented by this Warrant by surrendering this Warrant to the Company, together with a written notice to the Company that the holder is exchanging this Warrant (or a portion thereof) for an aggregate number of shares of Warrant Stock specified in the notice, from which the Company shall withhold and not issue to the holder the number of shares of Warrant Stock with an aggregate Market Price equal to the Aggregate Exercise Price of the number of shares of Warrant Stock specified in such notice (and such withheld shares shall no longer be issuable under this Warrant).

(iii)    The Company shall cause the Transfer Agent to deliver to the Purchaser, within five (5) Business Days after the date of each Exercise Time, certificates for shares of Warrant Stock purchased upon exercise of this Warrant; provided, that no failure or delay in such delivery shall affect the issuance of any Warrant Stock as provided in Section 1B(iv). Unless this Warrant has expired or all of the purchase rights represented hereby have been exercised, the

2

NL074577

Company shall prepare a new Warrant, substantially identical hereto, representing the rights formerly represented by this Warrant which have not expired or been exercised and shall, within such five (5) Business Day period, deliver such new Warrant to the Person designated for delivery in the Exercise Agreement.

(iv)     The Warrant Stock issuable upon the exercise of this Warrant shall be deemed to have been issued to the Purchaser at the Exercise Time, and the Purchaser shall be deemed for all purposes to have become the record holder of such Warrant Stock at the Exercise Time.

(v)     The issuance of certificates for shares of Warrant Stock upon exercise of this Warrant shall be made without charge to the Registered Holder or the Purchaser for any issuance tax in respect thereof or other cost incurred by the Company in connection with such exercise and the related issuance of shares of Warrant Stock. Each share of Warrant Stock issuable upon exercise of this Warrant shall, upon payment of the Exercise Price therefor, be fully paid and nonassessable and free from all liens and charges with respect to the issuance thereof.

(vi)     The Company shall not close its books against the transfer of this Warrant or of any share of Warrant Stock issued or issuable upon the exercise of this Warrant in any manner which interferes with the timely exercise of this Warrant. The Company shall from time to time take all such action as may be necessary to assure that the par value per share of the unissued Warrant Stock acquirable upon exercise of this Warrant is at all times equal to or less than the Exercise Price then in effect.

(vii)     The Company shall assist and cooperate with any Registered Holder or Purchaser required to make any filings with, or obtain any approvals of, any Governmental Authority prior to or in connection with any exercise of this Warrant (including making any filings required to be made by the Company).

(viii)     Notwithstanding any other provision hereof, if an exercise of any portion of this Warrant is to be made in connection with a registered public offering or the Sale of the Company, the exercise of any portion of this Warrant may, at the election of the holder hereof, be conditioned upon the consummation of the public offering or the Sale of the Company in which case such exercise shall not be deemed to be effective until the consummation of such transaction.

(ix)     The Company shall at all times reserve and keep available out of its authorized but unissued shares of Warrant Stock solely for the purpose of issuance upon the exercise of this Warrant, such number of shares of Warrant Stock issuable upon the exercise in full of this Warrant. The Company shall take all such actions as may be necessary to assure that all such shares of Warrant Stock may be so issued without violation by the Company of any applicable law or governmental regulation or any requirements of the Financial Industry Regulatory Authority ("FINRA"), the National Association of Securities Dealers Automated Quotation ("NASDAQ") or any domestic securities exchange upon which shares of Warrant Stock may be listed (except for official notice of issuance which shall be immediately delivered

3

by the Company upon each such issuance).  The Company shall not take any action which would cause the number of authorized but unissued shares of Warrant Stock to be less than the number of such shares required to be reserved hereunder for issuance upon the exercise in full of this Warrant.

(x)     The Company shall not take any action which would materially conflict with or frustrate the purpose of this Warrant or any adjustment or exercise thereof, including that the Company shall not adopt any rights plan or similar agreement unless the potential adverse effects of any such plan or agreement expressly exclude the Registered Holder, any Purchaser, their respective Affiliates and their respective ownership (beneficial or of record) of any securities acquirable pursuant to this Warrant.

1C.     Exercise Agreement.  Upon any exercise of this Warrant, the Exercise Agreement shall be substantially in the form of Exhibit B attached hereto, except that if any shares of Warrant Stock are not to be issued in the name of the Person in whose name this Warrant is registered, the Exercise Agreement shall also state the name of the Person to whom the certificates for such shares of Warrant Stock are to be issued, and if the number of shares of Warrant Stock to be issued does not include all the shares of Warrant Stock purchasable hereunder, it shall also state the name of the Person(s) to whom a new Warrant(s) for the unexercised portion of the rights hereunder is to be delivered.  Such Exercise Agreement shall be dated the actual date of execution thereof.

1D.     Fractional Shares.  If a fractional share of Warrant Stock would, but for the provisions of Section 1A, be issuable upon exercise of the rights represented by this Warrant, the Company shall, within five (5) Business Days after the date of the Exercise Time, deliver to the Purchaser a check payable to the Purchaser in lieu of such fractional share in an amount equal to the difference between the Market Price of such fractional share as of the date of the Exercise Time and the Exercise Price of such fractional share.

1E.     Registered Holder's Exercise Limitations.  The Company shall not effect any exercise of this Warrant, and a Registered Holder shall not have the right to exercise any portion of this Warrant, pursuant to Section 1 or otherwise, to the extent that after giving effect to such issuance after exercise as set forth in the Exercise Agreement, the Registered Holder (together with the Registered Holder's Affiliates, and any other Persons acting as a group together with the Registered Holder or any of the Registered Holder's Affiliates), would beneficially own in excess of the Beneficial Ownership Limitation (as defined below).  For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Registered Holder and its Affiliates shall include the number of shares of Warrant Stock issuable upon exercise of this Warrant with respect to which such determination is being made, but shall exclude the number of shares of Warrant Stock which would be issuable upon (i) exercise of the remaining, nonexercised portion of this Warrant beneficially owned by the Registered Holder or any of its Affiliates and (ii) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any other Common Stock Equivalents) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Registered Holder or any of its Affiliates.  Except as set forth in the preceding sentence, for purposes of this Section 1E, beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, it being acknowledged by the Registered Holder that the Company is not representing to the Registered Holder that such calculation is in compliance with Section 13(d) of the

4

CONFIDENTIAL

NL074579

Exchange Act and the Registered Holder is solely responsible for any schedules required to be filed in accordance therewith. To the extent that the limitation contained in this Section 1E applies, the determination of whether this Warrant is exercisable (in relation to other securities owned by the Registered Holder together with any Affiliates) and of which portion of this Warrant is exercisable shall be in the sole discretion of the Registered Holder, and the submission of an Exercise Agreement or conversion pursuant to Section 9 hereof shall be deemed to be the Registered Holder's determination of whether this Warrant is exercisable (in relation to other securities owned by the Registered Holder together with any Affiliates) and of which portion of this Warrant is exercisable, in each case subject to the Beneficial Ownership Limitation, and the Company shall have no obligation to verify or confirm the accuracy of such determination and shall have no liability for exercises of this Warrant that are not in compliance with the Beneficial Ownership Limitation, provided that the information contained in (A) the Company's most recent periodic or annual report filed with the Commission, as the case may be, (B) a more recent public announcement by the Company or (C) if requested by the Registered Holder, which request shall be answered by the Company in writing within two (2) Trading Days as of receipt of such request, a written notice by the Company or the Transfer Agent, in each case of (A), (B) and (C), setting forth the number of shares of Common Stock outstanding (the "Outstanding Common Stock Information") is true, complete and accurate as of the date it was provided. In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. For purposes of this Section 1E, in determining the number of outstanding shares of Common Stock, Registered Holder may rely on the number of outstanding shares of Common Stock as reflected in the Outstanding Common Stock Information. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by the Registered Holder or its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported. The "Beneficial Ownership Limitation" shall be 19.9% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Warrant Stock issuable upon exercise of this Warrant. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 1E to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitations contained in this paragraph shall apply to a successor Registered Holder of this Warrant.

Section 2.      Adjustment of Exercise Price and Number of Shares.  The Exercise Price shall be subject to adjustment from time to time as provided in this Section 2, and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be subject to adjustment from time to time as provided in this Section 2.

2A.      Subdivision or Combination of Common Stock.  If the Company at any time subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be proportionately increased.  If the Company at

5

any time combines (by reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be proportionately decreased.

2B.    Reorganization, Reclassification, Consolidation, Merger or Sale.  Any recapitalization, reorganization, reclassification, consolidation, merger, sale of all or substantially all of the Company's assets or other transaction, which in each case is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) stock, securities or assets (including cash) with respect to or in exchange for Common Stock is referred to herein as "Organic Change." Prior to the consummation of any Organic Change, the Company shall make appropriate provision (in form and substance satisfactory to the Registered Holder of this Warrant representing a majority of the shares of Warrant Stock obtainable upon exercise of this Warrant (the "Majority Holders")) to ensure that the Registered Holder of this Warrant shall thereafter have the right to acquire and receive, in lieu of or addition to (as the case may be) the shares of Warrant Stock immediately theretofore acquirable and receivable upon the exercise of this Warrant, such shares of stock, securities or assets (including cash) as would have been issued or payable in such Organic Change (if the Registered Holder had exercised this Warrant immediately prior to such Organic Change) with respect to or in exchange for the number of shares of Warrant Stock immediately theretofore acquirable and receivable upon exercise of this Warrant had such Organic Change not taken place, including that if the holders of Common Stock are given any choice as to the securities or assets (including cash) to be received in such Organic Change, then the Registered Holder shall be given the same choice in respect thereof. Notwithstanding anything to the contrary, if an Organic Change involving a Person whose common stock is not traded on a national securities exchange (a "Non-Listed Company") in which all outstanding shares of Common Stock as of immediately prior to the Organic Change are converted into or exchanged or tendered for stock, securities or assets (other than cash) or the right to receive stock, securities or assets (other than cash) of such Non-Listed Company, the Company (or as applicable, the successor entity) and the purchaser entity shall, at the Registered Holder's election, exercisable at any time prior to, concurrently with, or within 30 days after, the consummation of such Organic Change, purchase this Warrant (or any stock, securities or assets into which this Warrant or the Warrant Stock underlying this Warrant may have been converted or exchanged or for which any of them may have been tendered in such Organic Change) from the Registered Holder by paying to the Registered Holder cash, in immediately available funds payable upon the consummation of such Organic Change (or within 10 days following notice of such election by the Registered Holder in the case of an election delivered after such consummation), in an amount equal to the value thereof reflected by the terms of such Organic Change. In the case of any Organic Change, the Company shall make appropriate provision (in form and substance satisfactory to the Majority Holders) with respect to such holders' rights and interests to ensure that the provisions of this Section 2 and Sections 2D and 4 shall thereafter be applicable to the Warrants (including, in the case of any such Organic Change in which the successor entity or purchasing entity is other than the Company, an immediate adjustment of the Exercise Price to the value for the Common Stock reflected by the terms of such Organic Change and a corresponding immediate adjustment in the number of shares of Warrant Stock acquirable and receivable upon exercise of the Warrants, if the value so reflected is less than the Exercise Price in effect immediately prior to such Organic

6

Change). The Company shall not effect any Organic Change unless prior to the consummation thereof, the successor entity (if other than the Company) and the purchasing entity assume by written instrument (in form and substance satisfactory to the Majority Holders), the obligation to deliver to each such holder such shares of stock, securities or assets (including cash) as, in accordance with the foregoing provisions, such holder may be entitled to acquire.

      2C.   <u>Notices</u>.

      (i)   Promptly upon any adjustment of the Exercise Price, the Company shall give written notice thereof to the Registered Holder, setting forth in reasonable detail and certifying the calculation of such adjustment.

      (ii)   The Company shall give written notice to the Registered Holder at least thirty (30) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any *pro rata* subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Organic Change, dissolution or liquidation.

      (iii)   The Company shall also give written notice to the Registered Holder at least thirty (30) days prior to the date on which any Organic Change, dissolution or liquidation shall take place.

      2D.   <u>Pro Rata Distributions</u>. If the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including any distribution of cash, stock or other securities, property or options) by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "Distribution"), at any time after the issuance of this Warrant, then, in each such case, upon the exercise of this Warrant, the Holder shall be entitled to participate in such Distribution to the same extent that the Registered Holder would have participated therein if the Registered Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof) immediately before the date of which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution.

      Section 3.   <u>Liquidating Dividends</u>. If the Company declares or pays a dividend upon the Common Stock payable otherwise than in cash out of earnings or earned surplus (determined in accordance with generally accepted accounting principles, consistently applied) (a "Liquidating Dividend"), then, upon the exercise of this Warrant, the Company shall pay to the Registered Holder of this Warrant the Liquidating Dividend which would have been paid to such Registered Holder on the Warrant Stock had this Warrant been fully exercised immediately prior to the date on which a record is taken for such Liquidating Dividend, or, if no record is taken, the date as of which the record holders of Common Stock entitled to such dividends are to be determined.

      Section 4.   <u>Purchase Rights</u>. If at any time during the Exercise Period the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property *pro rata* to the record holders of any class of Common Stock (the "Purchase Rights"), then the Registered holder of this Warrant shall be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which such holder could have acquired if such holder had held the number of shares of Warrant Stock acquirable upon complete exercise of this Warrant immediately before the date on which a record is taken for the grant, issuance or sale of

<p style="text-align:center">7</p>

such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

        Section 5.      Definitions.  The following terms have meanings set forth below:"Affiliate" means, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

        "Business Day" means any day that is not a Saturday, Sunday or a day on which banks located in the State of New York are authorized or obligated to close.

        "Common Stock" means, collectively, the Company's Common Stock and any capital stock of any class of the Company hereafter authorized which is not limited to a fixed sum or percentage of par or stated value in respect to the rights of the holders thereof to participate in dividends or in the distribution of assets upon any liquidation, dissolution or winding up of the Company.

        "Convertible Securities" means any stock, indebtedness, or securities (directly or indirectly) convertible into or exchangeable for, with or without payment of additional consideration, Common Stock, either immediately or upon the arrival of a specified date or the happening of a specified event or both.

        "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

        "Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

        "Market Price" means as to any security the volume weighted average (rounded to the nearest cent) of the closing prices of such security's sales on all domestic securities exchanges on which such security may at the time be listed, or, if there have been no sales on any such exchange on any day, the volume weighted average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day such security is not so listed, the volume weighted average of the highest bid and lowest asked prices on such day in the domestic over-the-counter market as reported by Pink OTC Markets, Inc., or any similar successor organization, in each such case averaged over a period of ten (10) days consisting of the day as of which "Market Price" is being determined and the nine (9) consecutive Business Days prior to such day; provided that if such security is listed on any domestic securities exchange or quoted in a domestic over-the-counter market the term "Business Days" as used in this sentence means Business Days on which such exchange is open for trading.  If at any time such security is not listed on any domestic securities exchange or quoted in the domestic over-the-counter market, the "Market Price" shall be the fair value thereof determined jointly by the Company and the Majority Holders (without applying any marketability, minority or other

8

NL074583

discounts); _provided_ that if such parties are unable to reach agreement within a reasonable period of time, such fair value shall be determined (without applying any marketability, minority or other discounts) by an appraiser jointly selected by the Company and the Majority Holders. The determination of such appraiser shall be final and binding on the Company and the Registered Holders, and the fees and expenses of such appraiser shall be paid by the Company.

"Note" means that certain Senior Secured Convertible Promissory Note, dated as of date hereof, by and between the Registered Holder and the Company (as amended, restated supplemented, or otherwise modified from time to time).

"Options" means any rights, warrant or options to subscribe for or purchase Common Stock or Convertible Securities.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"Sale of the Company" means (i) a merger or consolidation of the Company with or into another Person, (ii) the sale, transfer, or other disposition of all or substantially all of the Company's assets to one or more other Persons in a single transaction or series of related transactions, or (iii) the acquisition of beneficial ownership (determined pursuant to SEC Rule 13d 3 promulgated under the Exchange Act, as amended and in effect from time to time) by any Person of more than 50% of the Company's outstanding common stock pursuant to a tender or exchange offer made directly to the Company's stockholders, other than an underwriter temporarily holding common stock pursuant to an offering of such common stock. Notwithstanding the foregoing, a transaction shall not constitute a "Sale of the Company" if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction.

"Trading Day" means a day on which the principal Trading Market is open for trading.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE MKT, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange or the OTC Bulletin Board (or any successors to any of the foregoing).

"Transfer Agent" means Computershare Trust Company, N.A., the current transfer agent of the Company, with a mailing address of 330 N. Brand Blvd., Ste. 701, Glendale, CA 91203-2149 and a facsimile number of, and any successor transfer agent of the Company.

"Warrant Stock" means the Company's Common Stock, par value $0.001 per share; _provided_ that if there is a change such that the securities issuable upon exercise of the Warrants are issued by an entity other than the Company or there is a change in the type or class

9

NL074584

of securities so issuable, then the term "Warrant Stock" shall mean that number of securities issuable upon conversion of the Company's Common Stock into such security.

Section 6.   No Voting Rights; Limitations of Liability.  This Warrant shall not entitle the holder hereof to any voting rights or other rights as a stockholder of the Company.  No provision hereof, in the absence of affirmative action by the Registered Holder to purchase Warrant Stock, and no enumeration herein of the rights or privileges of the Registered Holder shall give rise to any liability of such holder for the Exercise Price of Warrant Stock acquirable by exercise hereof or as a stockholder of the Company.

Section 7.   Warrant Transferable.  Subject to compliance with applicable securities laws and the transfer conditions referred to in the legend endorsed hereon, this Warrant and all rights hereunder are transferable, in whole or in part, without charge to the Registered Holder, upon surrender of this Warrant with a properly executed Assignment (in the form of Exhibit A attached hereto) at the principal office of the Company.

Section 8.   Warrant Exchangeable for Different Denominations.  This Warrant is exchangeable, upon the surrender hereof by the Registered Holder at the principal office of the Company, for new Warrants of like tenor representing in the aggregate the purchase rights hereunder, and each of such new Warrants shall represent such portion of such rights as is designated by the Registered Holder at the time of such surrender.  The date the Company initially issues this Warrant shall be deemed to be the "Date of Issuance" hereof regardless of the number of times new certificates representing the unexpired and unexercised rights formerly represented by this Warrant shall be issued.  All Warrants representing portions of the rights hereunder are referred to herein as the "Warrants."

Section 9.   Automatic Conversion upon Expiration.  Subject to Section 1E, if at the last Business Day of the Exercise Period, the Market Price is greater than the Exercise Price in effect on such date, then this Warrant shall automatically be deemed on and as of such date to be converted pursuant to this Warrant as to all shares of Warrant Stock (or such other securities) for which it shall not previously have been exercised or converted, and the Company shall promptly deliver a certificate representing such shares issued upon such conversion to the Holder.

Section 10.   Replacement.  Upon receipt of evidence reasonably satisfactory to the Company (an affidavit of the Registered Holder shall be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing this Warrant, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Company, or, in the case of any such mutilation upon surrender of such certificate, the Company shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the same rights represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

Section 11.   Notices.  Except as otherwise expressly provided herein, all notices, demands or other communications referred to in this Warrant shall be in writing and shall be deemed to have been given (i) when delivered personally to the recipient, (ii) when sent to the recipient by confirmed electronic mail or facsimile if delivered prior to 5:00 p.m. local time of the recipient on a Business Day or otherwise on the next Business Day, (iii) one business day after it is sent to the recipient by reputable overnight courier service (charges prepaid) or (iv) three Business Days after it is mailed to the recipient by first class mail, return receipt requested, and shall be addressed (a) to the Company, at its principal executive offices and (b) to the Registered Holder of this Warrant, to:

        SVIC No. 28 New Technology Business Investment L.L.P.
        Attention: Dr. Dong-su Kim, Vice President

CONFIDENTIAL
NL074585

Address: 29F, Samsung Electronics Building,
1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, Korea,
Email: dongkim@samsung.com

with a copy (which shall not constitute notice) to:

DLA Piper LLP (US)
2000 University Avenue
Palo Alto, California 94303
Attention: Louis Lehot
Email: louis.lehot@dlapiper.com

Section 12.    Investment Representations. By accepting this Warrant from the Company, Registered Holder represents and warrants to the Company that it (a) is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act, (b) it is acquiring this Warrant with the present intention of holding this Warrant for purposes of investment and not with a view to the public resale or distribution within the meaning of the Securities Act, and (c) understands that this Warrant and the securities issuable upon exercise hereof have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Registered Holder's investment intent as expressed herein.

Section 13.    Amendment and Waiver. Except as otherwise provided herein, the provisions of this Warrant may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Majority Holders.

Section 14.    Descriptive Headings; Governing Law. The descriptive headings of the several Sections and paragraphs of this Warrant are inserted for convenience only and do not constitute a part of this Warrant. The corporation laws of the State of Delaware shall govern all issues concerning the relative rights of the Company and its stockholders. All other questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be governed by the internal law of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.

*   *   *   *

11

NL074586

IN WITNESS WHEREOF, the Company has caused this Warrant to be signed and attested by its duly authorized officers and to be dated the Date of Issuance hereof.

**NETLIST, INC.**

By: /s/ Gail Sasaki
Name: Gail Sasaki
Title: CFO, VP, Secretary

*Signature Page to Warrant*

NL074587

**EXHIBIT A**

ASSIGNMENT

      FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers all of the rights of the undersigned under the attached Warrant (Certificate No. W-___) with respect to the number of shares of the Warrant Stock covered thereby set forth below, unto:

| Names of Assignee | Address | No. of Shares |
|---|---|---|
|  |  |  |
|  |  |  |

**[Assignor]**

By: _____
Name: _____
Title: _____

NL074588

**EXHIBIT B**

EXERCISE AGREEMENT

To:                                           Dated:

The undersigned, pursuant to the provisions set forth in the attached Warrant (Certificate No. W-   ), hereby agrees to subscribe for the purchase of       shares of the Warrant Stock covered by such Warrant and makes payment herewith in full therefor at the price per share provided by such Warrant.

Check one box:

☐   I am attaching a cashier's, personal or certified check, or have arranged for a wire transfer of immediately available funds to the Company, in an amount equal to the Aggregate Exercise Price.

☐   In lieu of paying cash, I have elected to receive such lesser number of shares of Common Stock as determined pursuant to Section 1B(ii) of the attached Warrant.

By:      _____
Name:   _____
Title:   _____

NL074589

Exhibit 4.3

NEITHER THIS SECURITY NOR THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). AND. ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER, SUCH OFFER, SALE, PLEDGE OR OTHER TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

<div align="center">NETLIST, INC.</div>

<div align="center">STOCK PURCHASE WARRANT</div>

Date of Issuance: November 18. 2015                                        Certificate No. W-3

FOR VALUE RECEIVED, Netlist, Inc., a Delaware corporation (the "Company"), hereby grants to CF DB EZ LLC, a Delaware limited liability company or its registered assigns (the "Registered Holder") the right (this "Warrant") to purchase from the Company 1,000,000 shares of Warrant Stock at a price per share of $0.47 (as adjusted from time to time hereunder, the "Exercise Price"). Certain capitalized terms used herein are defined in Section 5. The amount and kind of securities obtainable pursuant to the rights granted hereunder and the purchase price for such securities are subject to adjustment pursuant to the provisions contained in this Warrant.

This Warrant is subject to the following provisions:

Section 1.            Exercise of Warrant.

1A.     Exercise Period. The Registered Holder may exercise, in whole or in part (but not as to a fractional share of Warrant Stock), the purchase rights represented by this Warrant at any time and from time to time after the Date of Issuance to and including the tenth (10th) anniversary thereof (the "Exercise Period").

1B.     Exercise Procedure.

(i)     This Warrant shall be deemed to have been exercised (in whole or in part) when the Company has received all of the following items (as the case may be from time to time, the "Exercise Time"):

(a)     a completed Exercise Agreement, as described in Section 1C, executed by the Person exercising all or part of the purchase rights represented by this Warrant (the "Purchaser");

(b)     this Warrant (delivery of which shall be subject to the Company's obligations with respect to delivery of a new Warrant as provided in Section 1B(iii));

(c)    if this Warrant is not registered in the name of the Purchaser, an Assignment or Assignments in the form of Exhibit A attached hereto (each, an "Assignment") evidencing the assignment of this Warrant to the Purchaser, in which case the Registered Holder shall have complied with the provisions set forth in Section 7; and

(d)    wire transfer of immediately available funds or a check payable to the Company in an amount equal to the product of the Exercise Price multiplied by the number of shares of Warrant Stock being purchased upon such exercise (the "Aggregate Exercise Price").

(ii)    As an alternative to the exercise of this Warrant as provided in Section 1B(i), the holder of this Warrant may exchange all or part of the purchase rights represented by this Warrant by surrendering this Warrant to the Company, together with a written notice to the Company that the holder is exchanging the Warrant (or a portion thereof) for an aggregate number of shares of Warrant Stock specified in the notice, from which the Company shall withhold and not issue to the holder a number of shares of Warrant Stock with an aggregate Market Price equal to the Aggregate Exercise Price of the number of shares of Warrant Stock specified in such notice (and such withheld shares shall no longer be issuable under this Warrant).

(iii)    The Company shall cause the Transfer Agent to deliver to the Purchaser, within five (5) Business Days after the date of each Exercise Time, certificates for shares of Warrant Stock purchased upon exercise of this Warrant; provided, that no failure or delay in such delivery shall affect the issuance of any Warrant Stock as provided in Section 1B(iv). Unless this Warrant has expired or all of the purchase rights represented hereby have been exercised, the Company shall prepare a new Warrant, substantially identical hereto, representing the rights formerly represented by this Warrant which have not expired or been exercised and shall, within such five (5) Business Day period, deliver such new Warrant to the Person designated for delivery in the Exercise Agreement.

(iv)    The Warrant Stock issuable upon the exercise of this Warrant shall be deemed to have been issued to the Purchaser at the Exercise Time, and the Purchaser shall be deemed for all purposes to have become the record holder of such Warrant Stock at the Exercise Time.

(v)    The issuance of certificates for shares of Warrant Stock upon exercise of this Warrant shall be made without charge to the Registered Holder or the Purchaser for any issuance tax in respect thereof or other cost incurred by the Company in connection with such exercise and the related issuance of shares of Warrant Stock. Each share of Warrant Stock issuable upon exercise of this Warrant shall, upon payment of the Exercise Price therefor, be fully paid and nonassessable and free from all liens and charges with respect to the issuance thereof.

(vi)    The Company shall not close its books against the transfer of this Warrant or of any share of Warrant Stock issued or issuable upon the exercise of this Warrant in any manner which interferes with the timely exercise of this Warrant. The Company shall from time to time take all such action as may be necessary to assure that the par value per share of the unissued Warrant Stock acquirable upon exercise of this Warrant is at all times equal to or less than the Exercise Price then in effect.

2

CONFIDENTIAL

(vii)    The Company shall assist and cooperate with any Registered Holder or Purchaser required to make any filings with, or obtain any approvals of, any Governmental Authority prior to or in connection any exercise of this Warrant (including making any filings required to be made by the Company).

(viii)    Notwithstanding any other provision hereof, if an exercise of any portion of this Warrant is to be made in connection with a registered public offering or the sale of the Company, the exercise of any portion of this Warrant may, at the election of the holder hereof, be conditioned upon the consummation of the public offering or the sale of the Company in which case such exercise shall not be deemed to be effective until the consummation of such transaction.

(ix)    The Company shall at all times reserve and keep available out of its authorized but unissued shares of Warrant Stock solely for the purpose of issuance upon the exercise of the Warrants, such number of shares of Warrant Stock issuable upon the exercise of all outstanding Warrants. The Company shall take all such actions as may be necessary to assure that all such shares of Warrant Stock may be so issued without violation by the Company of any applicable law or governmental regulation or any requirements of the Financial Industry Regulatory Authority (FINRA), the National Association of Securities Dealers Automated Quotation ("NASDAQ") or any domestic securities exchange upon which shares of Warrant Stock may be listed (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance). The Company shall not take any action which would cause the number of authorized but unissued shares of Warrant Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the Warrants.

(x)    The Company shall not take any action which would materially conflict with or frustrate the purpose of this Warrant or any adjustment or exercise thereof, including that the Company shall not adopt any rights plan or similar agreement unless the potential adverse effects of any such plan or agreement expressly exclude the Registered Holder, any Purchaser, their respective Affiliates and their respective ownership (beneficial or of record) of any securities acquirable pursuant to this Warrant.

1C.    Exercise Agreement. Upon any exercise of this Warrant, the Exercise Agreement shall be substantially in the form of Exhibit B attached hereto, except that if any shares of Warrant Stock are not to be issued in the name of the Person in whose name this Warrant is registered, the Exercise Agreement shall also state the name of the Person to whom the certificates for such shares of Warrant Stock are to be issued, and if the number of shares of Warrant Stock to be issued does not include all the shares of Warrant Stock purchasable hereunder, it shall also state the name of the Person(s) to whom a new Warrant(s) for the unexercised portion of the rights hereunder is to be delivered. Such Exercise Agreement shall be dated the actual date of execution thereof.

1D.    Fractional Shares. If a fractional share of Warrant Stock would, but for the provisions of Section 1A, be issuable upon exercise of the rights represented by this Warrant, the Company shall, within five (5) Business Days after the date of

3

NL074592

the Exercise Time, deliver to the Purchaser a check payable to the Purchaser in lieu of such fractional share in an amount equal to the difference between the Market Price of such fractional share as of the date of the Exercise Time and the Exercise Price of such fractional share.

Section 2.       Adjustment of Exercise Price and Number of Shares.  The Exercise Price shall be subject to adjustment from time to time as provided in this Section 2, and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be subject to adjustment from time to time as provided in this Section 2.

2A.       Subdivision or Combination of Common Stock.  If the Company at any time subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be proportionately increased.  If the Company at any time combines (by reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be proportionately decreased.

2B.       Reorganization, Reclassification, Consolidation, Merger or Sale.  Any recapitalization, reorganization, reclassification, consolidation, merger, sale of all or substantially all of the Company's assets or other transaction, which in each case is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) stock, securities or assets (including cash) with respect to or in exchange for Common Stock is referred to herein as "Organic Change."  Prior to the consummation of any Organic Change, the Company shall make appropriate provision (in form and substance satisfactory to the Registered Holders of Warrants representing a majority of the shares of Warrant Stock obtainable upon exercise of such Warrants (the "Majority Holders") to insure that each of the Registered Holders of the Warrants shall thereafter have the right to acquire and receive, in lieu of or addition to (as the case may be) the shares of Warrant Stock immediately theretofore acquirable and receivable upon the exercise of such holder's Warrant, such shares of stock, securities or assets (including cash) as would have been issued or payable in such Organic Change (if the holder had exercised this Warrant immediately prior to such Organic Change) with respect to or in exchange for the number of shares of Warrant Stock immediately theretofore acquirable and receivable upon exercise of such holder's Warrant had such Organic Change not taken place, including that if the holders of Common Stock are given any choice as to the securities or assets (including cash) to be received in such Organic Change, then the Registered Holders shall be given the same choice in respect thereof.  Notwithstanding anything to the contrary, in the event of an Organic Change involving a Person whose common stock is not traded on a national securities exchange (a "Non-Listed Company") in which all outstanding shares of Common Stock as of immediately prior to the Organic Change are converted into or exchanged or tendered for stock, securities or assets (other than cash) or the right to receive stock, securities or assets (other than cash) of such Non-Listed Company, the Company (or as applicable, the successor entity) and the purchaser entity shall, at the Registered Holder's election, exercisable at any time prior to, concurrently with, or within 30 days after, the consummation of such Organic Change, purchase this Warrant (or any stock, securities or assets into which this Warrant or the Warrant Stock underlying this Warrant may have been converted or exchanged or for which any of them may have been tendered in such Organic Change) from the Registered Holder by paying to the Holder cash, in immediately

4

NL074593

available funds payable upon the consummation of such Organic Change (or within 10 days following notice of such election by the Registered Holder in the case of an election delivered after such consummation), in an amount equal to the value thereof reflected by the terms of such Organic Change. In the case of any Organic Change, the Company shall make appropriate provision (in form and substance satisfactory to the Majority Holders) with respect to such holders' rights and interests to insure that the provisions of this Section 2 and Sections 2D and 4 shall thereafter be applicable to the Warrants (including, in the case of any such Organic Change in which the successor entity or purchasing entity is other than the Company, an immediate adjustment of the Exercise Price to the value for the Common Stock reflected by the terms of such Organic Change and a corresponding immediate adjustment in the number of shares of Warrant Stock acquirable and receivable upon exercise of the Warrants, if the value so reflected is less than the Exercise Price in effect immediately prior to such Organic Change). The Company shall not effect any Organic Change unless prior to the consummation thereof, the successor entity (if other than the Company) and the purchasing entity assume by written instrument (in form and substance satisfactory to the Majority Holders), the obligation to deliver to each such holder such shares of stock, securities or assets (including cash) as, in accordance with the foregoing provisions, such holder may be entitled to acquire.

   2C. <u>Notices</u>.

    (i) Promptly upon any adjustment of the Exercise Price, the Company shall give written notice thereof to the Registered Holder, setting forth in reasonable detail and certifying the calculation of such adjustment.

    (ii) The Company shall give written notice to the Registered Holder at least twenty (20) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any *pro rata* subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Organic Change, dissolution or liquidation.

    (iii) The Company shall also give written notice to the Registered Holders at least twenty (20) days prior to the date on which any Organic Change, dissolution or liquidation shall take place.

   2D. <u>Pro Rata Distributions</u>.  During such time as this Warrant is outstanding, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "Distribution"), at any time after the issuance of this Warrant, then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Registered Holder would have participated therein if the Registered Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof) immediately before the date of which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution.

   Section 3. <u>Liquidating Dividends</u>.  If the Company declares or pays a dividend upon the Common Stock payable otherwise than in cash out of earnings or earned surplus (determined in accordance with generally accepted accounting principles, consistently applied) except for a stock dividend payable in shares of Common Stock (a "Liquidating

<div align="center">5</div>

CONFIDENTIAL                    NL074594

Dividend"), then the Company shall pay to the Registered Holder of this Warrant at the time of payment thereof the Liquidating Dividend which would have been paid to such Registered Holder on the Warrant Stock had this Warrant been fully exercised immediately prior to the date on which a record is taken for such Liquidating Dividend, or, if no record is taken, the date as of which the record holders of Common Stock entitled to such dividends are to be determined.

Section 4.    Purchase Rights.  If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property *pro rata* to the record holders of any class of Common Stock (the "Purchase Rights"), then the Registered holder of this Warrant shall be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which such holder could have acquired if such holder had held the number of shares of Warrant Stock acquirable upon complete exercise of this Warrant immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

Section 5.    Definitions.  The following terms have meanings set forth below:

"Affiliate" means, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

"Business Day" means any day that is not a Saturday, Sunday or a day on which banks located in the State of New York are authorized or obligated to close.

"Common Stock" means, collectively, the Company's Common Stock and any capital stock of any class of the Company hereafter authorized which is not limited to a fixed sum or percentage of par or stated value in respect to the rights of the holders thereof to participate in dividends or in the distribution of assets upon any liquidation, dissolution or winding up of the Company.

"Convertible Securities" means any stock or securities (directly or indirectly) convertible into or exchangeable for Common Stock.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Market Price" means as to any security the volume weighted average (rounded to the nearest cent) of the closing prices of such security's sales on all domestic securities exchanges on which such security may at the time be listed, or, if there have been no sales on any such exchange on any day, the volume weighted average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day such security is not so

6

NL074595

listed, the volume weighted average of the highest bid and lowest asked prices on such day in the domestic over-the-counter market as reported by Pink OTC Markets, Inc., or any similar successor organization, in each such case averaged over a period of ten (10) days consisting of the day as of which "Market Price" is being determined and the nine (9) consecutive Business Days prior to such day; provided that if such security is listed on any domestic securities exchange or quoted in a domestic over-the-counter market the term "Business Days" as used in this sentence means Business Days on which such exchange is open for trading.  If at any time such security is not listed on any domestic securities exchange or quoted in the domestic over-the-counter market, the "Market Price" shall be the fair value thereof determined jointly by the Company and the Majority Holders (without applying any marketability, minority or other discounts); provided that if such parties are unable to reach agreement within a reasonable period of time, such fair value shall be determined (without applying any marketability, minority or other discounts) by an appraiser jointly selected by the Company and the Majority Holders.  The determination of such appraiser shall be final and binding on the Company and the Registered Holders of the Warrants, and the fees and expenses of such appraiser shall be paid by the Company.

"Options" means any rights or options to subscribe for or purchase Common Stock or Convertible Securities.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"Subsidiary" means, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"Transfer Agent" means Computershare Trust Company, N.A., the current transfer agent of the Company, with a mailing address of 330 N. Brand Blvd., Ste. 701, Glendale, CA 91203-2149 and a facsimile number of, and any successor transfer agent of the Company.

"Warrant Stock" means the Company's Common Stock, par value $0.001 per share; provided that if there is a change such that the securities issuable upon exercise of the Warrants are issued by an entity other than the Company or there is a change in the type or class of securities so issuable, then the term "Warrant Stock" shall mean one share of the security issuable upon exercise of the Warrants if such security is issuable in shares, or shall mean the smallest unit in which such security is issuable if such security is not issuable in shares.

7

CONFIDENTIAL

NL074596

Section 6.    No Voting Rights; Limitations of Liability.  This Warrant shall not entitle the holder hereof to any voting rights or other rights as a stockholder of the Company.  No provision hereof, in the absence of affirmative action by the Registered Holder to purchase Warrant Stock, and no enumeration herein of the rights or privileges of the Registered Holder shall give rise to any liability of such holder for the Exercise Price of Warrant Stock acquirable by exercise hereof or as a stockholder of the Company.

Section 7.    Warrant Transferable.  Subject to compliance with applicable securities laws and the transfer conditions referred to in the legend endorsed hereon, this Warrant and all rights hereunder are transferable, in whole or in part, without charge to the Registered Holder, upon surrender of this Warrant with a properly executed Assignment (in the form of Exhibit A attached hereto) at the principal office of the Company.

Section 8.    Warrant Exchangeable for Different Denominations.  This Warrant is exchangeable, upon the surrender hereof by the Registered Holder at the principal office of the Company, for new Warrants of like tenor representing in the aggregate the purchase rights hereunder, and each of such new Warrants shall represent such portion of such rights as is designated by the Registered Holder at the time of such surrender.  The date the Company initially issues this Warrant shall be deemed to be the "Date of Issuance" hereof regardless of the number of times new certificates representing the unexpired and unexercised rights formerly represented by this Warrant shall be issued.  All Warrants representing portions of the rights hereunder are referred to herein as the "Warrants."

Section 9.    [RESERVED].

Section 10.    Replacement.  Upon receipt of evidence reasonably satisfactory to the Company (an affidavit of the Registered Holder shall be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing this Warrant, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Company, or, in the case of any such mutilation upon surrender of such certificate, the Company shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the same rights represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

Section 11.    Notices.  Except as otherwise expressly provided herein, all notices, demands or other communications referred to in this Warrant shall be in writing and shall be deemed to have been given (i) when delivered personally to the recipient, (ii) when sent to the recipient by confirmed electronic mail or facsimile if delivered prior to 5:00 p.m. local time of the recipient on a Business Day or otherwise on the next Business Day, (iii) one business day after it is sent to the recipient by reputable overnight courier service (charges prepaid) or (iv) three Business Days after it is mailed to the recipient by first class mail, return receipt requested, and shall be addressed (a) to the Company, at its principal executive offices and (b) to the Registered Holder of this Warrant, to CF DB EZ LLC, 1345 Avenue of the Americas, 46th Floor, New York, New York 10105, Attention: James K. Noble, III - General Counsel, Telephone: (212) 798-6100, Telecopier: (646) 224-8716, Email: dbsloanops@fortress.com, with a copy (which shall not constitute notice) to Kirkland & Ellis LLP, 333 South Hope Street, Los Angeles, California 90071, Attention: Hamed Meshki, Telephone: (213) 680-8360, Telecopier: (213) 808-8145, Email: hamed.meshki@kirkland.com.

Section 12.    Investment Representations.  By accepting this Warrant from the Company, CF DB EZ LLC represents and warrants to the Company that it (a) is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Act"), (b) it is acquiring this Warrant with the present intention of holding this Warrant for purposes of investment and not with a view to the public resale or distribution within the meaning of the Act, and (c) understands that this Warrant and the securities issuable upon exercise hereof have not been registered under the Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of CF DB EZ LLC's investment intent as expressed herein.

8

NL074597

Section 13.    Amendment and Waiver.  Except as otherwise provided herein, the provisions of the Warrants may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Majority Holders.

Section 14.    Descriptive Headings; Governing Law.  The descriptive headings of the several Sections and paragraphs of this Warrant are inserted for convenience only and do not constitute a part of this Warrant.  The corporation laws of the State of New York shall govern all issues concerning the relative rights of the Company and its stockholders.  All other questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be governed by the internal law of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.

* * * *

9

CONFIDENTIAL

NL074598

IN WITNESS WHEREOF, the Company has caused this Warrant to be signed and attested by its duly authorized officers and to be dated the Date of Issuance hereof.

**NETLIST, INC.**

By: /s/ Gail Sasaki
Name: Gail Sasaki
Title: VP, CFO, Secretary

*[Signature Page - Netlist Warrant]*

NL074599

**EXHIBIT A**

<u>ASSIGNMENT</u>

FOR VALUE RECEIVED,                           hereby sells, assigns and transfers all of the rights of the undersigned under the attached Warrant (Certificate No. W-        ) with respect to the number of shares of the Warrant Stock covered thereby set forth below, unto:

| Names of Assignee | Address | No. of Shares |
|---|---|---|
|  |  |  |
|  |  |  |

**[Assignor]**

By: _____
Name: _____
Title: _____

NL074600

**EXHIBIT B**

EXERCISE AGREEMENT

To:                                              Dated:

      The undersigned, pursuant to the provisions set forth in the attached Warrant (Certificate No. W-   ), hereby agrees to subscribe for the purchase of     shares of the Warrant Stock covered by such Warrant and makes payment herewith in full therefor at the price per share provided by such Warrant.

Check one box:

☐   I am attaching a cashier's, personal or certified check, or have arranged for a wire transfer of immediately available funds to the Company, in an amount equal to the Aggregate Exercise Price.

☐   In lieu of paying cash, I have elected to receive such lesser number of shares of Common Stock as determined pursuant to <u>Section 1B(ii)</u> of the attached Warrant.

| | |
|---|---|
| By: | _____ |
| Name: | _____ |
| Title: | _____ |

NL074601

Exhibit 4.4

AMENDMENT NO. 1 TO

<u>STOCK PURCHASE WARRANT</u>

This AMENDMENT NO. 1 (this "<u>Amendment</u>") to Stock Purchase Warrant is entered into as of November 18, 2015 by and between Netlist, Inc., a Delaware corporation (the "<u>Company</u>"), and Drawbridge Special Opportunities Fund LP, a Delaware limited partnership (the "<u>Registered Holder</u>").  This Amendment No. 1 amends certain provisions of the Stock Purchase Warrant (Certificate No. W-2) issued by the Company to the Registered Holder as of July 18, 2013, as set forth below (the "<u>Original Warrant</u>").  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Original Warrant.

WHEREAS, the Parties desire to amend the Original Warrant in accordance with the terms of this Amendment (the Original Warrant, as so amended by this Amendment, the "<u>Warrant</u>");

WHEREAS, Section 13 of the Original Warrant provides that no amendment of any provision of the Original Warrant shall be valid unless the same shall be in writing and signed by the Majority Holders; and

WHEREAS, as of the date of this Amendment, the Registered Holder is the sole holder of the Original Warrant and as such constitutes the Majority Holders.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises herein made, and in consideration of the representations, warranties, covenants and agreements herein contained, the Company and the Registered Holder agree as follows:

1.     **Introductory Paragraph of the Original Warrant.**  The introductory paragraph of the Original Warrant is hereby amended and restated by deleting "$1.00" and replacing it with "$0.47".

2.     **Section 5 of the Original Warrant.**  Section 5 of the Original Warrant is hereby amended and restated by deleting the definition of "Loan Agreement" in its entirety.

3.     **Miscellaneous.**

(a)     <u>Descriptive Headings; Governing Law</u>.  The descriptive headings of the several sections and paragraphs of this Amendment are inserted for convenience only and do not constitute a part of this Amendment.  The corporation laws of the State of New York shall govern all issues concerning the relative rights of the Company and its stockholders.  All matters concerning the construction, validity, enforcement and interpretation of this Amendment shall be governed by the internal law of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.

(b)    <u>Counterparts</u>.  This Amendment may be executed in counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument.  This Amendment and any amendments hereto, to the extent signed and delivered by means of digital imaging and electronic mail or a facsimile machine, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

(c)    <u>Effect of this Amendment</u>.  Except as expressly set forth in this Amendment, all of the provisions of the Original Warrant shall remain in full force and effect in accordance with their terms, and this Amendment shall reaffirm the Original Warrant in all respects.  This Amendment shall be deemed to have effect as of, and from and after, the date of the Original Warrant.

[Remainder of Page Intentionally Left Blank]

2

CONFIDENTIAL

NL074603

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

**NETLIST, INC.**

By: /s/ Gail Sasaki
    Name: Gail Sasaki
    Title:  Chief Financial Officer

*[Signature Page - Amendment to Stock Purchase Warrant]*

NL074604

**DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LP**

By: Drawbridge Special Opportunities GP LLC, its general partner

By:   /s/ Mark K. Furstein
      Name: Mark K. Furstein
      Title: Chief Operating Officer

*[Signature Page - Amendment to Stock Purchase Warrant]*

CONFIDENTIAL

NL074605

Exhibit 10.1

SENIOR SECURED CONVERTIBLE PROMISSORY NOTE AND WARRANT

PURCHASE AGREEMENT

BY AND BETWEEN

NETLIST, INC.

AND

SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.

NOVEMBER 18, 2015

i

### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE 1 | AUTHORIZATION AND SALE OF SECURITIES | 1 |
| 1.1 | Authorization and Sale of Note and Warrant | 1 |
| 1.2 | Use of Proceeds | 1 |
| 1.3 | Definitions | 1 |
| ARTICLE 2 | CLOSING CONDITIONS | 9 |
| 2.1 | Closing | 9 |
| ARTICLE 3 | REPRESENTATIONS AND WARRANTIES OF THE COMPANY | 11 |
| 3.1 | Corporate Status | 11 |
| 3.2 | Authorization and Enforceability | 11 |
| 3.3 | No Conflict or Third Party Authorization Requirements | 12 |
| 3.4 | Note and Underlying Securities | 12 |
| 3.5 | Material Adverse Effect | 12 |
| 3.6 | Laws | 12 |
| 3.7 | Information Correct and Current | 13 |
| 3.8 | Tax Matters | 13 |
| 3.9 | Intellectual Property Claims | 13 |
| 3.10 | Intellectual Property | 13 |
| 3.11 | Company Products | 13 |
| 3.12 | Title to Property | 14 |
| 3.13 | Employee Loans | 14 |
| 3.14 | Transactions with Affiliates | 14 |
| 3.15 | Not a Regulated Entity | 14 |
| 3.16 | No General Solicitation; No Directed Selling Efforts | 14 |
| 3.17 | Margin Stock | 14 |
| 3.18 | Filings | 15 |
| 3.19 | Contracts | 15 |
| 3.20 | USRPHC | 15 |
| 3.21 | Subsidiaries | 15 |
| 3.22 | Litigation | 16 |
| 3.23 | Environmental Laws | 16 |
| 3.24 | Board Vote | 16 |
| 3.25 | No Finder's Fee | 16 |

NL074607

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER | 16 |
| ARTICLE 5 | INDEMNIFICATION | 18 |
| 5.1 | Indemnification and Contribution | 18 |
| ARTICLE 6 | COMPANY COVENANTS | 18 |
| 6.1 | Financial Reports; Notices | 18 |
| 6.2 | Inspection Rights | 18 |
| 6.3 | Formation of Subsidiaries | 18 |
| 6.4 | Authorized Common Stock | 19 |
| 6.5 | Further Assurances | 19 |
| 6.6 | Negative Covenants | 20 |
| 6.7 | Compliance with Laws | 20 |
| 6.8 | Register | 20 |
| 6.9 | Amendment to Existing Loan | 20 |
| ARTICLE 7 | RESTRICTIONS ON TRANSFERABILITY | 20 |
| 7.1 | Restrictions on Transferability | 20 |
| ARTICLE 8 | EVENTS OF DEFAULT | 21 |
| 8.1 | Payments | 21 |
| 8.2 | Covenants | 21 |
| 8.3 | Other Transaction Documents | 21 |
| 8.4 | Representations | 21 |
| 8.5 | Cross Default | 21 |
| 8.6 | Insolvency | 21 |
| 8.7 | Attachments; Judgments | 22 |
| 8.8 | Invalidity | 22 |
| 8.9 | Other Obligations | 22 |
| 8.10 | Guarantor | 22 |
| ARTICLE 9 | REMEDIES | 22 |
| 9.1 | General | 22 |
| 9.2 | Collection; Foreclosure | 23 |
| 9.3 | Cumulative Remedies | 23 |

ii

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| ARTICLE 10 | MISCELLANEOUS | 23 |
| 10.1 | Survival of Representations, Warranties and Agreements | 23 |
| 10.2 | Notices | 23 |
| 10.3 | Entire Agreement; Amendments | 24 |
| 10.4 | No Strict Construction | 24 |
| 10.5 | No Waiver | 24 |
| 10.6 | Severability | 24 |
| 10.7 | Governing Law | 24 |
| 10.8 | Waiver of Jury Trial | 25 |
| 10.9 | Counterparts | 25 |
| 10.10 | Assignment | 25 |
| 10.11 | Further Assurances | 25 |
| 10.12 | Replacement Facility | 25 |
| ARTICLE 11 | GUARANTEE | 25 |
| 11.1 | Guarantee | 25 |
| 11.2 | Security Interest | 27 |
| 11.3 | Successors and Assigns | 27 |
| 11.4 | No Waiver | 28 |
| 11.5 | Modification | 28 |

iii

CONFIDENTIAL

NL074609

**NETLIST, INC.**
**SENIOR SECURED CONVERTIBLE PROMISSORY NOTE AND WARRANT**
**PURCHASE AGREEMENT**

**NOVEMBER 18, 2015**

This **SENIOR SECURED CONVERTIBLE PROMISSORY NOTE AND WARRANT PURCHASE AGREEMENT** (this "*Agreement*") is entered into as of the date set forth above by and between Netlist, Inc., a Delaware corporation (the "*Company*"), and SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership (the "*Purchaser*"), and each Subsidiary that becomes a party hereto after the Closing Date in accordance with **Section 6.2**. The parties hereby agree as follows:

**ARTICLE 1**
**Authorization and Sale of Securities**

1.1     **Authorization and Sale of Note and Warrant.**

(A)     Subject to the terms and conditions of this Agreement, the Purchaser agrees to purchase, and the Company agrees to sell and issue to the Purchaser, a Note in the principal amount of Fifteen Million Dollars ($15,000,000) (the "*Note Amount*"). The purchase and sale of the Note shall take place remotely via the exchange of documents and signatures immediately following the execution and delivery of this Agreement, subject to the satisfaction of each of the Closing Conditions set forth in **Section 2.1(A)** and **Section 2.1(B)** (which time and place are designated as the "*Closing*"). At the Closing, the Company shall deliver to the Purchaser the executed Note being purchased by the Purchaser against payment of the purchase price therefor by wire transfer to the bank account that has been designated by the Company.

(B)     At the Closing, the Company shall issue to the Purchaser a Warrant, in the form attached hereto as **EXHIBIT A** (the "*Warrant*"), which shall be exercisable for 2,000,000 shares of Common Stock at an exercise price of $0.30 per share on the terms and conditions set forth in the Warrant.

1.2     **Use of Proceeds.** The Company shall use the proceeds from the sale of the Note for general corporate purposes in accordance with the Board of Directors' directions.

1.3     **Definitions.** As used in this Agreement, the following terms shall have the following meanings:

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person.

"*Agreement*" means this Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, as amended from time to time.

"*Amendment to the Silicon Valley Bank Loan and Security Documents*" means the Amendment to the Silicon Valley Bank Loan and Security Documents, dated as of a date on or immediately prior to Closing, by and among Silicon Valley Bank, the Company and the other parties thereto.

"*Assets*" means all of the assets (real and personal, tangible and intangible, including all Intellectual Property) that are used or held for use in connection with the Company's or any Subsidiary's business or are reflected on the Financial Statements.

CONFIDENTIAL

"*Board of Directors*" means the Company's Board of Directors.

"*Business Day*" means any day, except Saturday, Sunday or legal holiday on which banking institutions in the City of New York are authorized or obligated by law or executive order to close.

"*CFC*" means a controlled foreign corporation (as that term is defined in the Code).

"*Change of Control*" means:  (i) a merger or consolidation of the Company with or into another Person, (ii) the sale, transfer, or other disposition of all or substantially all of the Company's Assets to one or more other Persons in a single transaction or series of related transactions, or (iii) the acquisition of beneficial ownership (determined pursuant to SEC Rule 13d-3 promulgated under the Exchange Act, as amended and in effect from time to time) by any Person of more than 50% of the Company's outstanding common stock pursuant to a tender or exchange offer made directly to the Company's stockholders, other than an underwriter temporarily holding common stock pursuant to an offering of such common stock.  Notwithstanding the foregoing, a transaction shall not constitute a "Change of Control" if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the Persons who held the Company's securities immediately prior to such transaction.

"*Closing*" has the meaning set forth in **Section 1.1(A)**.

"*Closing Date*" has the meaning set forth in **Section 2.1(B)(vii)**.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended.

"*Collateral*" means all assets of the Company, now owned or hereafter acquired, upon which a Lien is purported to be created by any Transaction Document.

"*Common Stock*" means the common stock of the Company as defined in its Certificate of Incorporation, as amended and restated from time to time during the term of the Note.

"*Common Stock Outstanding*" means as of any date, (i) all shares of Common Stock that are outstanding as of such date, plus (ii) all shares of Common Stock issuable upon conversion of Convertible Securities outstanding as of such date, whether or not convertible as of such date, plus (iii) all shares of Common Stock issuable upon exercise of Options outstanding as of such date, whether or not such Options are exercisable as of such date (assuming for this purpose that Convertible Securities acquirable upon exercise of any such Options are converted into Common Stock as of such date), plus (iv) all shares of Common Stock issuable with respect to Options authorized but not granted as of such date pursuant to the Company's employee stock option plans then in effect.

"*Company Products*" means all products, processes, software, service offerings, technical data or technology currently being designed, manufactured or sold by the Company or which the Company intends to sell, license or distribute in the future including any products or service offerings under development, collectively, together with all products, software, service offerings, technical data or technology that have been sold, licensed or distributed by the Company since its incorporation.

"*Controlling Stakeholder*" has the meaning set forth in **Section 6.5(B)**.

2

"*Convertible Securities*" means evidence of indebtedness, shares of stock or other securities which are convertible into or exchangeable for, with or without payment of additional consideration, shares of Common Stock, either immediately or upon the arrival of a specified date or the happening of a specified event or both.

"*Copyright License*" means any written or oral agreement granting any right to the Company to use any Copyright or Copyright registration, now owned or hereafter acquired by the Company or in which the Company now holds or hereafter acquires any interest and all license fees and royalties arising therefrom.

"*Copyrights*" means all copyrights, whether registered or unregistered, held pursuant to the laws of the United States or of any other country.

"*Equity Interests*" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, and its regulations, as amended from time to time.

"*Event of Default*" has the meaning given to it in **Article 8**.

"*Environmental Laws*" has the meaning given to it in **Section 3.23**.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the Rules and Regulations promulgated thereunder.

"*Financial Statements*" has the meaning given to it in **Section 6.1**.

"*Fortress Loan Documents*" means (i) the loan and security agreement, the intellectual property security agreement and the subordination agreement entered by the Company and DBD Credit Funding LLC, a Delaware limited liability company ("*DBD*"), on July 18, 2013 (the "*FT Loan Documents*"), as amended by the first amendment to the loan and security agreement entered by the Company and DBD on February 17, 2015 and the second amendment to the loan and security agreement entered by the Company and Fortress Credit Opportunities I LP (successor of DBD under the Fortress Loan Documents) on February 17, 2015, and (ii) any other amendment to the FT Loan Documents entered into by the Company and Fortress Credit Opportunities I LP (or any of its successors thereof) not described on item (i) above.

"*GAAP*" means generally accepted accounting principles in the United States of America, as in effect from time to time, provided that the parties agree that GAAP as in effect on the date of this Agreement shall be applicable for the interpretation of "capital lease obligations" in the definition of "Indebtedness", unless the parties otherwise agree in writing.

"*Governmental Authority*" means the government of the United States of America or of any other nation, or any political subdivision of any of them, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Guarantee*" has the meaning set forth in **Section 11.1(D)**.

3

CONFIDENTIAL

NL074612

"*Guarantee Secured Obligations*" has the meaning set forth in **Section 11.2(A)**.

"*Guarantor*" means each Subsidiary that executes and delivers a Joinder Agreement in accordance with **Section 6.3**.

"*Guarantor Collateral*" has the meaning set forth in **Section 11.2(A)**.

"*Guaranty Documents*" has the meaning set forth in **Section 8.11**.

"*Indebtedness*" means with respect to a Person (a) all indebtedness for borrowed money or the deferred purchase price of property or services (excluding trade credit entered into in the ordinary course of business due within ninety (90) days), including reimbursement and other obligations with respect to surety bonds, bankers acceptances or letters of credit, (b) all obligations evidenced by notes, bonds evidencing borrowed money, debentures or similar instruments, (c) all capital lease obligations, (d) all indebtedness of other Persons secured by a Lien on the assets of such Person, whether or not such Indebtedness is assumed by such Person, (e) all obligations to purchase, redeem, retire, defease or otherwise acquire for value any Preferred Stock.

"*Indemnified Liabilities*" has the meaning set forth in **Section 5.1**.

"*Indemnified Person*" has the meaning set forth in **Section 5.1**.

"*Insolvency Proceeding*" means any proceeding by or against any Person as a debtor under the United States Bankruptcy Code, or any other state, federal or foreign bankruptcy or insolvency law, including assignments of all or substantially all of such Person's assets for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"*Intellectual Property*" means all of the Copyrights, Trademarks, Patents, Licenses, trade secrets, trade secrets rights, proprietary information, processes and inventions, mask works, domain names and internet websites, designs rights, source code, rights in computer software and computer software products used in connection with, and material to the conduct of, the Company's business; the applications therefor and reissues, extensions, or renewals thereof; and the goodwill associated with any of the foregoing, together with the rights to sue for past, present and future infringement of any of the foregoing and the goodwill associated therewith.

"*Intellectual Property Security Agreement*" means the Intellectual Property Security Agreement entered by the Company and the Purchaser on or prior to the Closing, in the form attached hereto as **EXHIBIT F**.

"*Intercreditor Agreement*" means the Intercreditor Agreement entered by Silicon Valley Bank, the Purchaser and the Company on the date hereof.

"*Joinder Agreement*" means for each Subsidiary, other than a CFC, a completed and executed Joinder Agreement in substantially the form attached hereto as **EXHIBIT B**.

"*License*" means any Copyright License, Patent License, Trademark License or other license of Intellectual Property rights or interests.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest.

4

"*Litigation*" means any action, cease and desist letter, demand, suit, arbitration proceeding, administrative or regulatory proceeding, citation, summons or subpoena of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"*Material Adverse Effect*" means the occurrence of an event, effect, development, change, state of facts, condition, or occurrence that, individually or in the aggregate with all other events, effects, developments, changes, states of fact, conditions or occurrences has a material adverse effect upon: (i) the business, operations, results of operations, properties, assets, liabilities or financial condition of the Company and its Subsidiaries taken as a whole, or (ii) the ability of the Company and its Subsidiaries taken as a whole to perform any of their obligations under the Transaction Documents, including, without limitation, repayment of the Secured Obligations when due in accordance with the terms of the Transaction Documents, or the ability of the Purchaser to enforce any of its rights or remedies with respect to the Secured Obligations or the Collateral in accordance with the Transaction Documents; or (iii) the Collateral or the status, existence, perfection, priority, or enforceability of Purchaser's Liens on the Collateral; *provided, however*, that any such change or effect caused by or resulting from any of the following shall not be considered, and shall not be taken into account in determining the existence of, a "Material Adverse Effect": (A) the announcement, pendency or consummation of the transactions contemplated hereby, or the execution or delivery of this Agreement or the Transaction Documents or the performance of obligations hereunder or thereunder, including the impact of any of the foregoing on relationships with customers, suppliers or employees, (B) conditions affecting the global economy or financial markets as a whole, or generally affecting the industries in which the Company and its Affiliates conduct their business, (C) any change after the date hereof in any applicable law or in GAAP or any interpretation thereof, (D) the commencement, occurrence or continuation of any war, armed hostilities or acts of terrorism, (E) earthquakes, hurricanes, floods or other natural disasters, (F) the failure by the Company or its Affiliates to meet any revenue or earnings projections, forecasts or predictions, (G) any action required by this Agreement or the Transaction Documents, or (viii) any action taken by, or with the consent of the Purchaser or any of its Affiliates with respect to the transactions contemplated hereby or with respect to the Company, other than actions taken by Purchaser to enforce its rights under the Transaction Documents; provided, that (x) the matters described in clauses (B), (C), (D), and (E) shall be included and taken into account in the term "Material Adverse Effect" to the extent any such matter has a materially disproportionate impact on the business, financial condition or results of operations of the Company and its Affiliates, taken as a whole, relative to other participants in the industries in which they operate and (y) clause (F) will not be a factor in determining whether any change or effect underlying any such failure to meet revenue or earnings projections, forecasts or predictions has resulted in a Material Adverse Effect.

"*Note*" means a Senior Secured Convertible Promissory Note in the form attached hereto as **EXHIBIT C**.

"*Option*" means any right, warrant or option to subscribe or purchase shares of Common Stock or Convertible Securities.

"*Patent License*" means any written or oral agreement granting any right to the Company with respect to any invention on which a Patent is in existence or a Patent application is pending, in which agreement the Company now holds or hereafter acquires any interest, and all license fees and royalties arising therefrom.

5

NL074614

"*Patents*" means all letters patent of, or rights corresponding thereto, in the United States or in any other country, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto, in the United States or any other country, including, without limitation, improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"*Payoff Lender*" means Fortress Credit Opportunities I LP or any other creditor under the Fortress Loan Documents.

"*Payoff Letter*" means a letter signed by each Payoff Lender providing for the release of all Liens in favor of the Payoff Lenders on the Company's Assets and equity, if applicable, effective upon receipt of the payments to be made by the Company to the Payoff Lenders in conjunction with the Closing.

"*Permitted Liens*" means the following:  (i) Liens existing on the date of the Closing which are disclosed in **SCHEDULE 2**; (ii) Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings; provided, that the Company maintains adequate reserves therefor in accordance with GAAP; (iii) Liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of the Company's business and imposed without action of such parties; provided, that the payment thereof is not yet required or is being contested in good faith by appropriate proceedings; (iv) Liens arising from judgments, decrees or attachments in circumstances which do not constitute an Event of Default hereunder; (v) the following deposits, to the extent made in the ordinary course of business:  deposits under worker's compensation, unemployment insurance, social security and other similar laws, or to secure the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure indemnity, performance or other similar bonds for the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure statutory obligations (other than liens securing a material obligation and arising under ERISA or environmental laws) or surety or appeal bonds, or to secure indemnity, performance or other similar bonds or obligations (other than for the repayment of borrowed money); (vi) leasehold interests in leases or subleases and licenses granted in the ordinary course of business and not interfering in any material respect with the business of the licensor; (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties that are promptly paid on or before the date they become due; (viii) Liens on insurance policies and proceeds thereof (including money that is or may become due to the insured, any unearned premiums, any dividends which may become due and any interests arising under a state guarantee fund) securing the payment of financed insurance premiums that are promptly paid on or before the date they become due (provided that such Liens extend only to such insurance proceeds and not to any other property or assets); (ix) statutory, common law and contractual rights of set-off and other similar rights as to deposits of cash and securities in favor of banks, other depository institutions and brokerage firms solely to the extent incurred in connection with the maintenance of such deposit or securities accounts in the ordinary course of business; (x) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business so long as they do not materially impair the value or marketability of the related property; (xi) Liens in connection with operating leases; (xii) Liens securing obligations under the Transaction Documents; (xiii) Liens under the Silicon Valley Bank Loan and Security Documents or any

6

NL074615

Replacement Facility; Liens existing on equipment, computers or software acquired by the Borrower at the time of Borrower's acquisition thereof, provided that such Liens are confined solely to the property so acquired or the proceeds thereof and related books, records and proceeds and were not incurred in anticipation of such acquisition; and (xiv) non-exclusive licenses of Intellectual Property.

"*Permitted Transferee*" means any Affiliate of the Purchaser.

"*Person*" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, other entity or government.

"*Preferred Stock*" means at any given time any equity security issued by the Company that has any rights, preferences or privileges senior to the Common Stock.

"*Register*" has the meaning set forth in **Section 6.8**.

"*Registration Rights Agreement*" means the registration rights agreement entered by the Company and the Purchaser substantially in the form attached hereto as **EXHIBIT D**.

"*Regulation S*" has the meaning set forth in *Section 3.16*.

"*Replacement Facility*" means any credit facility entered into by the Company to refinance or replace the credit facility provided pursuant to the Silicon Valley Bank Loan and Security Documents, and shall include all "loan documents" or documents of a similar defined term thereunder.

"*Rules and Regulations*" means the rules and regulations of the SEC.

"*SEC*" means the United States Securities and Exchange Commission.

"*SEC Documents*" has the meaning set forth in *Section 3.18*.

"*Secured Obligations*" means all loans, debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), premiums, liabilities, obligations (including indemnification obligations), fees, guaranties, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest (and paid in kind interest) not paid when due and all other expenses or other amounts that the Company is required to pay or reimburse pursuant to the Transaction Documents.

"*Securities Act*" means the Securities Act of 1933, as amended, and the Rules and Regulations promulgated thereunder.

"*Security Agreement*" means the Security Agreement entered by the Company and the Purchaser on or prior to the Closing, in the form attached hereto as **EXHIBIT E**.

"*Silicon Valley Bank*" means Silicon Valley Bank, a California corporation.

"*Silicon Valley Bank Loan and Security Documents*" means (i) the Loan and Security Agreement, the Security Agreement and the Intellectual Property Security Agreement entered by Company and Silicon Valley Bank on October 31, 2009 (the "*SVB Loan Documents*"), as amended by the amendment to the Loan Documents entered by the Company and Silicon Valley Bank on March 24, 2010, June 30, 2010, September 30, 2010, August 10, 2011, May 14, 2012.

7

NL074616

July 18, 2013, September 30, 2014, and April 23, 2015 (ii) any other amendment to the SVB Loan Documents entered by the Company and Silicon Valley Bank not described on item (i) above and any other "Loan Document" as defined in the SVB Loan Documents, and (iii) the Forbearance to Loan and Security Agreement entered by the Company and Silicon Valley Bank on March 27, 2013.

"*Subsidiary*" means an entity, whether corporate, partnership, limited liability company, joint venture or otherwise, in which the Company owns or controls, directly or indirectly, more than 50% of the outstanding voting securities, including each entity listed on **SCHEDULE 1** hereto.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges in the nature of a tax imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Trademark License*" means any written or oral agreement granting any right to the Company to use any Trademark or Trademark registration, now owned or hereafter acquired by the Company or in which the Company now holds or hereafter acquires any interest, and all license fees and royalties arising therefrom.

"*Trademarks*" means all trademarks, service marks, trade names and trade dress (with respect to all of the foregoing, whether registered, common law or otherwise) and any applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof and the entire goodwill associated with and symbolized by such trademarks.

"*Transaction Documents*" means this Agreement, the certificates delivered pursuant to Section 2.1(B)v), Section 2.1(B)vi) and Section 2.1(B)x), the Note, the Warrant, the Intercreditor Agreement, the Security Agreement, the Intellectual Property Security Agreement, and the Registration Rights Agreement, as the same may from time to time be amended, modified, supplemented or restated.

"*Treasury Regulation*" means the regulations (including any proposed and temporary regulations) promulgated by the United States Department of Treasury with respect to the Code or other United States federal Tax statutes.

"*UCC*" means the Uniform Commercial Code as the same is, from time to time, in effect in the State of New York; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lien on any Collateral is governed by the Uniform Commercial Code as the same is, from time to time, in effect in a jurisdiction other than the State of New York, then the term "UCC" shall mean the Uniform Commercial Code as in effect, from time to time, in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"*Underlying Shares*" means shares of the Common Stock into which the Note is convertible.

"*USRPHC*" means "United States real property holding corporation" as defined in Section 897(c)(2) of the Code, and Treasury Regulation Section 1.897-2(b).

8

CONFIDENTIAL

NL074617

"*Warrant*" means the Warrant in the form attached hereto as **EXHIBIT A.**

Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, Exhibit, Annex, or Schedule in or to this Agreement. Unless otherwise specifically provided herein, any accounting term used in this Agreement or the other Transaction Documents shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP, consistently applied. Unless otherwise defined herein, terms that are used herein and defined in the UCC shall have the meanings given to them in the UCC. The table of contents and headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole (including the Schedules and Exhibits) and not to any particular provision of this Agreement. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and, except as otherwise expressly provided or unless the context otherwise requires, any noun or pronoun will be deemed to cover all genders. Any statute, rule, order or regulation defined or referred to in this Agreement or in any agreement or instrument that is referred to in this Agreement will mean such statute, rule, order or regulation as from time to time amended, updated, modified, supplemented or superseded, including by succession of comparable successor statutes, rules, orders or regulations and references to all attachments thereto and instruments incorporated therein. References herein to any agreement or letter will be deemed references to such agreement or letter as it may be amended, restated or otherwise revised from time to time in accordance with the terms hereof. Where specific language is used to clarify by example a general statement contained herein, such specific language will not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. Capitalized terms used herein without definition shall have the meanings assigned to them in the Note, the Security Agreement or other applicable Transaction Document.

**ARTICLE 2**
**Closing Conditions**

2.1    **Closing**

    **(A)**    The Company's obligation to sell the Note is subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived by the Company (except for the conditions set forth in clause (i), which shall not be waivable by the Company):

        i.    consummation of the transactions contemplated hereby or by the other Transaction Documents shall not have been restrained, enjoined or otherwise prohibited or made illegal by, or conditioned upon the receipt of any approvals or consents from Governmental Authorities under, any applicable law;

        ii.    the Purchaser shall have delivered to each other party an executed original of this Agreement, the other Transaction Documents to which the Purchaser is a party and all other documents and instruments reasonably required to effectuate the transactions contemplated hereby and thereby; and

9

NL074618

iii.      the Purchaser shall have paid to the Company, by wire transfer of immediately available funds, the Note Amount.

(B)      The Purchaser's obligation to purchase the Note is subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived by the Purchaser (except for the conditions set forth in clause (i) below, which shall not be waivable by the Purchaser):

i.      consummation of the transactions contemplated hereby or by the other Transaction Documents shall not have been restrained, enjoined or otherwise prohibited or made illegal by, or conditioned upon the receipt of any approvals or consents from Governmental Authorities under, any applicable law;

ii.      the Company shall have delivered to each other party an executed original of this Agreement, the other Transaction Documents to which the Company is a party to and all other documents and instruments reasonably required to effectuate the transactions contemplated hereby and thereby;

iii.      the Company shall have delivered to the Purchaser certified copies of resolutions of the Company's Board of Directors, and with respect to each Subsidiary party hereto, sole member, as applicable, evidencing approval of this Agreement, the transactions contemplated hereunder and other transactions evidenced by the Transaction Documents;

iv.      the Company and each of its Subsidiaries party hereto shall have delivered to the Purchaser certified copies of their certificate of incorporation and their bylaws, or other organizational documents, as applicable, each as amended through the Closing, of the Company and each Subsidiary party hereto;

v.      the Company and each Subsidiary party hereto shall have delivered to the Purchaser a certificate of good standing for the Company and each Subsidiary party hereto from its state of incorporation and similar certificates from all other jurisdictions in which it does business and where the failure to be qualified would have a Material Adverse Effect;

vi.      the Company shall have delivered to the Purchaser an officer's certificate, dated as of the Closing and signed by an authorized officer of the Company, certifying (i) that the resolutions of the Company, as attached to such certificate, were duly adopted by the Board of Directors, authorizing and approving the execution and delivery of this Agreement and the other Transaction Documents, the Company's and the Subsidiaries' performance of each of its respective obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby, and that such resolutions remain in full force and effect, and have not been amended, modified or rescinded; (ii) as to the incumbency of the Persons signing this Agreement and the other Transaction Documents on behalf of the Company; and (iii) that the copies of the certificate of incorporation and the bylaws, or other organizational documents, as applicable, each as amended of the Company and the Subsidiaries party hereto, as attached to such certificate, are true, complete and correct and remain in full force and effect;

vii.      the Purchaser shall have received an opinion, dated as of the date of the Closing ("*Closing Date*"), from Morrison & Foerster LLP, counsel for the Company, addressed to the Purchaser, in the agreed form and substance reasonably satisfactory to the Purchaser, to the effect set forth in **ANNEX A** hereto;

10

viii.     the representations and warranties of the Company set forth in **Article 3** of this Agreement shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by "materiality" or "Material Adverse Effect" in the text thereof) on and as of the Closing;

ix.     the Company shall have performed and complied with any covenants, agreements, obligations and conditions contained in this Agreement and the other Transaction Documents that are required to be performed or complied with by the Company on or before the Closing;

x.     the Company's Chief Executive Officer shall have delivered to the Purchaser a certificate certifying that the conditions specified in **Sections 2.1(B)(viii)** and **2.1(B)(ix)** have been fulfilled;

xi.     the Company shall have received all consents, authorizations or approvals referred to in **SCHEDULE 4.3**, in form and substance reasonably satisfactory to the Purchaser, and no such consent, authorization or approval shall have been revoked;

xii.     the Company shall have effected the Amendment to the Silicon Valley Bank Loan and Security Documents;

xiii.     the Company, and Silicon Valley Bank and the Purchaser shall have entered into the Intercreditor Agreement;

xiv.     the Company shall have terminated the Fortress Loan Documents and delivered to the Purchaser a copy of the Payoff Letters duly signed by each Payoff Lender; and

xv.     the Company shall have delivered to the Purchaser the Note in the principal amount of the Note Amount and the Warrant.

## ARTICLE 3
### Representations and Warranties of the Company

The Company represents and warrants to the Purchaser as of the Closing that:

**3.1     Corporate Status.**  The Company is a corporation duly organized, legally existing and in good standing under the laws of the State of Delaware, and is duly qualified as a foreign corporation in all jurisdictions in which the nature of its business or location of its properties require such qualifications and where the failure to be qualified would reasonably be expected to have a Material Adverse Effect.  In the five years preceding the Closing, the Company has not been party to any merger or combination.

**3.2     Authorization and Enforceability.**  This Agreement and the other Transaction Documents have been duly and validly authorized, executed and delivered on behalf of the Company and are valid and binding agreements of the Company enforceable against the Company in accordance with their terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar laws affecting creditors' and contracting parties' rights generally and except as enforceability may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

11

CONFIDENTIAL

NL074620

**3.3**   **No Conflict or Third Party Authorization Requirements**.  The Company's execution, delivery and performance of this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, (i) do not violate any provisions of any the Company's Certificate of Incorporation or Bylaws or any material law, regulation, order, injunction, judgment, decree or writ to which the Company is subject, (ii) require no action by or in respect of, or filing with, any Governmental Authority, other than the filing of Form D with the SEC, and (iii) do not violate any material contract or agreement or require the consent or approval of any other Person that has not been obtained.

**3.4**   **Note and Underlying Securities**.  When the Note is delivered and paid for pursuant to this Agreement, it will be convertible into the Underlying Shares in accordance with its terms and the Underlying Shares, upon issuance, will be validly issued, fully paid and nonassessable; the Underlying Shares initially issuable upon conversion of the Note have been duly authorized and reserved for issuance upon such conversion, will conform to the information provided by the Company in this Agreement; the authorized equity capitalization of the Company is as set forth in **SCHEDULE 3.4**; all outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable; the Company's stockholders have no preemptive rights with respect to the Note or the Underlying Shares, and none of the outstanding shares of capital stock of the Company have been issued in violation of any preemptive or similar rights of any security holder. Except as described in **SCHEDULE 3.4**, there are no bonds, debentures, notes or other indebtedness of any type whatsoever of the Company or any of its Subsidiaries having the right to vote (or are convertible into, or exchangeable for, securities having the right to vote) on any matters on which any holders of equity securities of the Company or its Subsidiaries may vote.  Except as disclosed in **SCHEDULE 3.4** and except for rights granted to the Purchaser under this Agreement, there are no outstanding options, warrants, calls, demands, stock appreciation rights, contracts or other rights of any nature to purchase, obtain or acquire or otherwise relating to, or any outstanding securities or obligations convertible into or exchangeable for, or any voting agreements with respect to, any equity securities of the Company or any of its Subsidiaries or any interest in or assets of the Company or any of its Subsidiaries to or from an Person or to issue, deliver, sell, purchase or redeem any stock appreciation rights or other contracts of the Company or any of its Subsidiaries relating to any equity securities of any of the Company or any of its Subsidiaries or other securities of the Company or any of its Subsidiaries to or from any Person.

**3.5**   **Material Adverse Effect**.  Except as set forth in the SEC Documents, since August 11, 2015, no event that has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing.

**3.6**   **Laws**.  The Company is not in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any governmental authority, where such violation or default is reasonably expected to be materially adverse to the Company taken as a whole.  Except as set forth in the SEC Documents, the Company is not in default in any manner under any provision of any material agreement or instrument evidencing Indebtedness, or any other material agreement to which it is a party or by which it is bound, in each case, where such default is reasonably expected to be materially adverse to the Company taken as a whole.

12

  **3.7**  <u>**Information Correct and Current**</u>. No information in any financial statement, exhibit or schedule furnished by or on behalf of the Company to the Purchaser contained in any Transaction Document contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading in any material respect at the time such statement was made or deemed made.

  **3.8**  <u>**Tax Matters**</u>. Except as described on **SCHEDULE 3.8** or adequately reserved for in the Company's financial statements in accordance with GAAP, (a) the Company and its Subsidiaries have filed all material federal and state and local Tax returns that they are required to file (or extensions thereof) within the time and manner required by applicable law, (b) the Company and its Subsidiaries have duly paid or fully reserved for all material Taxes or installments thereof (including any interest or penalties) as and when due, which have or may become due pursuant to such returns, and (c) the Company and its Subsidiaries have paid or fully reserved for any Tax assessment they have received, if any other than any Taxes being contested in good faith and by appropriate proceedings.

  **3.9**  <u>**Intellectual Property Claims**</u>. Except for Permitted Liens, the Company is the sole owner of, or otherwise has the right to use, the Intellectual Property used in the conduct of the Company's business, provided that, solely as to the right to use (but not ownership) of Patents, the representation provided herein is given to the Company's knowledge. Except as described on **SCHEDULE 3.9**, (i) each of the Trademarks, Patents and material Copyrights, is valid and enforceable, subject to, solely with respect to Patents, third party rights which the Company has no knowledge of, (ii) no Intellectual Property has been judged invalid or unenforceable, in whole or in part, by a final, non-appealable decision of a court of competent jurisdiction, and (iii) no claim has been made in writing to the Company that any Intellectual Property violates the rights of any third party. Except as set forth on **SCHEDULE 3.9**, the Company is not in breach of, nor has the Company failed to perform any obligations under, any of the foregoing contracts, licenses or agreements and, to the Company's knowledge, no third party to any such contract, license or agreement is in material breach thereof or has failed to perform any material obligations thereunder.

  **3.10**  <u>**Intellectual Property**</u>. Except as described on **SCHEDULE 3.10**, the Company has all rights with respect to Intellectual Property necessary in the operation or conduct of the Company's business as currently conducted. The Company owns or has the right to use, pursuant to valid licenses, all material software development tools, library functions, compilers and all other material third-party software and other material items that are used in the design, development, promotion, sale, license, manufacture, import, export, use or distribution of Company Products.

  **3.11**  <u>**Company Products**</u>. Except as described on **SCHEDULE 3.11**, to the Company's knowledge, no Intellectual Property owned by the Company or Company Product has been or is subject to any actual or, to the knowledge of the Company, threatened (in writing) litigation, proceeding (including any proceeding in the United States Patent and Trademark Office or any corresponding foreign office or agency) or outstanding decree, order, judgment, settlement agreement or stipulation that restricts in any manner the Company's use, transfer or licensing thereof or that affects the validity, use or enforceability thereof. Except as set forth on **SCHEDULE 3.11**, there is no decree, order, judgment, agreement, stipulation, arbitral award or other provision entered into in connection with any litigation or proceeding against the Company that obligates the Company to grant licenses or ownership interest in any future Intellectual Property related to the operation or conduct of the business of the Company or Company

13

NL074622

Products. Except as set forth on **SCHEDULE 3.11**, the Company has not received any written notice or claim challenging or questioning the Company's ownership in any Intellectual Property (or written notice of any claim challenging or questioning the ownership in any licensed Intellectual Property of the owner thereof) or suggesting that any third party has any claim of legal or beneficial ownership with respect thereto. To the Company's knowledge and except as set forth on **SCHEDULE 3.11**, neither the Company's use of Intellectual Property nor the production and sale of Company Products infringes the Intellectual Property or other rights of others.

     3.12   **Title to Property**. To the Company's knowledge, the Company has good and marketable title to all material real properties and all material other properties and assets it owns, in each case free from Liens, charges, encumbrances and defects, other than Permitted Liens; the Company holds any material leased real or personal property under valid and enforceable leases with no terms or provisions that would materially interfere with the use made or to be made thereof by it.

     3.13   **Employee Loans**. The Company has no outstanding loans to any executive officer or director of the Company nor has the Company guaranteed the payment of any loan made to an executive officer or director of the Company by a third party.

     3.14   **Transactions with Affiliates**. Except as described on **SCHEDULE 3.14**, no relationship, direct or indirect, exists between or among any of the Company or any Affiliate of the Company, on the one hand, and of the Company or any Affiliate of the Company, on the other hand, which is required to be disclosed by the Securities Act, and the Rules and Regulations.

     3.15   **Not a Regulated Entity**. The Company is not (a) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940; or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other applicable law regarding its authority to incur Indebtedness.

     3.16   **No General Solicitation; No Directed Selling Efforts**. Neither the Company nor any of its Affiliates, nor any Person acting on its or their behalf, (i) has, within the six-month period prior to the Closing Date, offered or sold in the United States or to any Person (as such terms are defined in Regulation S under the Securities Act) any notes or (ii) has offered or will offer or sell notes (A) in the United States by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) or (B) with respect to any such securities sold in reliance on Rule 903 of Regulation S (the "*Regulation S*") under the Securities Act, by means of any directed selling efforts within the meaning of Rule 902(c) of Regulation S. Assuming the accuracy of the representations and warranties of the Purchaser, the Company, its Affiliates and any Person acting on its or their behalf have complied with and will comply with the offering restrictions requirement of Regulation S.

     3.17   **Margin Stock**. The Company is not engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock (as defined in Regulation U of the Board of Governors of the Federal Reserve). No proceeds from the sales of the Notes will be used by the Company to purchase or carry, or to reduce or refinance any Indebtedness incurred to purchase or carry, any Margin Stock or for any related purpose in violation of Regulations T, U or X of the Board of Governors of the Federal Reserve.

<div align="center">14</div>

NL074623

**3.18**   **Filings**.  The Company has timely filed with the SEC each report or other document that it is required to file pursuant to Section 13(a), 14 or 15(d) of the Exchange Act and no such report or document, as of the date it was so filed, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (all of the foregoing filed prior to the date hereof, as each may have been amended, and all exhibits included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "*SEC Documents*").  As of their respective dates, the SEC Documents complied in all material respects with the requirements of the Exchange Act and the Rules and Regulations promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  As of their respective dates, the financial statements of the Company included in the SEC Documents complied in all material respects with applicable accounting requirements and the published Rules and Regulations with respect thereto as in effect as of the time of filing.  Such financial statements have been prepared in accordance with GAAP during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and fairly present in all material respects the Company's financial position as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments) which will not be material either individually or in the aggregate.

**3.19**   **Contracts**.  Except as described on **SCHEDULE 3.19**, with respect to any contract to which the Company is a party and which is required to be filed as an exhibit to the Company's Annual Report on Form 10-K, (a) each such contract is valid, binding and enforceable in accordance with its respective terms against the Company and, to the knowledge of the Company, each other party thereto, and is in full force and effect in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and (b) neither the Company nor, to the knowledge of the Company, any counterparty to any such contract, is in violation or breach of such contract except where such breach or violation would not reasonably be expected to have a Material Adverse Effect.

**3.20**   **USRPHC**.  The Company is not a USRPHC.

**3.21**   **Subsidiaries**.  Netlist Electronics (Suzhou) Co., Ltd and Netlist HK Limited are the only Subsidiaries.  Each Subsidiary is duly organized, legally existing and in good standing under the laws of its jurisdiction of incorporation, and is duly qualified as a foreign corporation in all jurisdictions in which the nature of its business or location of its properties require such qualifications and where the failure to be qualified would reasonably be expected to have a Material Adverse Effect.  In the five years preceding the Closing, neither Subsidiary has been party to any merger or combination.

<center>15</center>

3.22   **Litigation**.  Except as described on **SCHEDULE 3.22**, (a) there is no Litigation pending or, to the knowledge of the Company, threatened against or affecting the Company or any of the Assets involving more than $100,000 individually, or $250,000 in the aggregate; and (b) there are no material settlement agreements or similar written agreements with any Governmental Authority and no outstanding orders, judgments, stipulations, decrees, injunctions, determinations or awards issued by any Governmental Authority against or affecting the Company or any of its Subsidiaries or any of the Assets.

3.23   **Environmental Laws**.  To the Company's knowledge, neither the Company nor any of its Subsidiaries is in violation of any material statute, any rule, regulation, decision or order of any Governmental Authority or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, the "***Environmental Laws***"), owns or operates any real property contaminated with any substance that is subject to any Environmental Laws, is liable for any material off-site disposal or contamination pursuant to any Environmental Laws, or is subject to any material claim relating to any Environmental Laws; and the Company is not aware of any pending investigation which might lead to such a claim.

3.24   **Board Vote**.  The Board of Directors, at a meeting duly called and held, has, by unanimous vote of all directors then in office (other than any director abstaining from such vote), (a) determined that this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby are advisable and in the best interest of the Company's stockholders; and (b) approved and adopted this Agreement, the other Transaction Documents, and the transactions contemplated hereby and thereby.

3.25   **No Finder's Fee**.  There are no contracts, agreements or understandings between the Company and any Person that would give rise to a valid claim against the Company for a brokerage commission, finder's fee or other like payment for the transactions contemplated by this Agreement or any other of the Transaction Documents.

**ARTICLE 4**
**Representations and Warranties of the Purchaser**

The Purchaser hereby represents and warrants to the Company as of the Closing and acknowledges, as applicable, that:

4.1   This Agreement and the other Transaction Documents have been duly and validly authorized, executed and delivered on behalf of the Purchaser and are valid and binding agreements of the Purchaser enforceable against the Purchaser in accordance with their terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar laws affecting creditors' and contracting parties' rights generally and except as enforceability may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and except to the extent enforcement of the Purchaser's indemnification obligations set forth in the Registration Rights Agreement may be limited by federal or state securities laws or the public policy underlying such laws.

16

CONFIDENTIAL

NL074625

**4.2**      (i) the Purchaser is knowledgeable, sophisticated and experienced in making, and is qualified to make, decisions with respect to investments in securities representing an investment decision like that involved in the purchase of the Note and the Warrant, including investments in securities issued by the Company and comparable entities, and has had the opportunity to request, receive, review and consider all information it deems relevant in making an informed decision to purchase the Note and the Warrant; (ii) the Purchaser is acquiring the Note and the Warrant in the ordinary course of its business and for its own account for investment only and with no present intention of distributing it or any arrangement or understanding with any other Persons regarding its distribution; (iii) the Purchaser has not been organized, reorganized or recapitalized specifically for the purpose of investing in the Note or the Warrant; (iv) the Purchaser has had an opportunity to discuss this investment with representatives of the Company and ask questions of them; (v) the Purchaser is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act; and (vi) the Purchaser will not, directly or indirectly, offer, sell, pledge, transfer or otherwise dispose of (or solicit any offers to buy, purchase or otherwise acquire to take a pledge of) the Note or the Warrant except in compliance with the Securities Act, the Rules and Regulations, and applicable state securities laws.

**4.3**      The Purchaser understands that the Note and the Warrant are being offered and sold to it in reliance upon specific exemptions from the registration requirements of the Securities Act, the Rules and Regulations and state securities laws and that the Company is relying upon the truth and accuracy of, and the Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of the Purchaser to acquire the Note and the Warrant.

**4.4**      The Purchaser understands that no United States federal or state agency or any other Governmental Authority has passed upon or made any recommendation or endorsement of the Note.

**4.5**      The Purchaser's principal executive office is at the address set forth below next to the Purchaser's signature block.

**4.6**      (i) The Purchaser is not a U.S. person and is not acquiring the Note for the account or benefit of any U.S. person; (ii) the Purchaser will not offer or sell the Note or the Warrant to a U.S. person or to or for the account or benefit of a U.S. person prior to the expiration of the six-month period after the date on which the Purchaser purchased the Note or the Warrant; (iii) the Purchaser understands and acknowledges that the Note and the Warrant have not been registered under the Securities Act. Accordingly, the Note may not be offered or sold in the U.S. or to U.S. persons unless it is registered under the Securities Act, or an exemption for the regulation requirements is available. Furthermore, hedging transactions involving the Note or the Warrant may not be conducted unless in compliance with the Securities Act; and (iv) the Purchaser acknowledges and agrees that, notwithstanding anything in this Agreement to the contrary, the Company shall, and shall instruct its transfer agent to, refuse to register any transfer of Securities Act that is not made in accordance with the provisions of Regulation S, pursuant to registration under Securities Act or pursuant to an available exemption from registration required under the Securities Act.

17

NL074626

**ARTICLE 5**
**Indemnification**

5.1     **Indemnification and Contribution**.  The Company shall indemnify, defend and hold harmless the Purchaser and its Affiliates and their respective officers, directors, employees, agents and advisors (each, an "*Indemnified Person*") from and against all third party claims, damages, losses, liabilities, damages, penalties, actions, judgments, costs and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be imposed on, incurred by, or asserted or awarded against any Indemnified Person (jointly or severally), in each case arising out of or in connection with or by any reason of, or in connection with the preparation for a defense of, any claim, investigation, litigation or proceeding arising out of, related to or in connection with (i) any breach by the Company of any representation, warranty, covenant or agreement contained in any Transaction Document, and (ii) any actions the Purchaser takes in enforcing its rights hereunder or under any Transaction Document (the "*Indemnified Liabilities*"); provided, however, that the Company shall not be liable to any Indemnified Person for any portion of such Indemnified Liabilities to the extent that they are found by a final decision of a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.  If the indemnification provided for in this **Section 5.1** is held by a court of competent jurisdiction to be unavailable to an Indemnified Person with respect to any Indemnified Liabilities, then the Company, in lieu of indemnifying the Indemnified Person, shall contribute to the amount paid or payable by such Indemnified Person with respect to such loss, liability, claim, damage or expense in the proportion that is appropriate to reflect the relative fault of the Company and the Indemnified Person in connection with the statements or omissions that resulted in such Indemnified Liabilities, as well as any other relevant equitable considerations.

**ARTICLE 6**
**Company Covenants**

The Company agrees as follows:

6.1     **Financial Reports; Notices**.  The Company shall furnish to the Purchaser regular updates which shall include financial information ("*Financial Statements*") and selected business updates as set forth on **SCHEDULE 6.1**.

6.2     **Inspection Rights**.  At least once every four (4) months, but in any case no more than three (3) times a year, the Company shall, upon request of the Purchaser, cause its executive officers to discuss the Company's affairs, finances, and accounts with the Purchaser and permit, upon reasonable request of the Purchaser, at the Purchaser's expense, Purchaser to visit and inspect the Company's properties; examine its books of account and records, during normal business hours of the Company; *provided, however*, that the Company shall not be obligated pursuant to this **Section 6.2** to provide access to any information the disclosure of which would adversely affect (per the Company's outside counsel's opinion), the attorney-client privilege between the Company and its counsel.

6.3     **Formation of Subsidiaries**.  The Company shall, at the time that its forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Closing, within 30 days of such formation or acquisition (or such later date as permitted by the Purchaser in its sole discretion) (a) cause such new Subsidiary to execute and deliver to the Purchaser a Joinder Agreement, together with such other security agreements, as well as appropriate financing

18

NL074627

statements, all in form and substance reasonably satisfactory to the Purchaser provided that the Joinder Agreement, and such other security agreements shall not be required to be provided to the Purchaser with respect to any Subsidiary that is a CFC, (b) provide to the Purchaser appropriate certificates and powers pledging the outstanding Equity Interests of such Subsidiary; provided, however, that only 65% of the total outstanding voting Equity Interests of any first tier Subsidiary that is a CFC shall be required to be pledged if pledging a greater amount would result in adverse tax consequences or the costs to the Company of providing such pledge would be unreasonably excessive (as reasonably determined by the Purchaser in consultation with the Company) in relation to the benefits to the Purchaser of the security afforded thereby (which pledge, if reasonably requested by the Purchaser, shall be governed by the laws of the jurisdiction of such Subsidiary), and (c) provide to the Purchaser such other documentation, as is reasonably required, including opinions of counsel, with respect to the execution and delivery of the applicable documentation referred to above.

**6.4**    **Authorized Common Stock**.  The Company shall at all times cause to be reserved and kept available out of its authorized and unissued shares such number of shares of its Common Stock and other securities as will be sufficient to permit the exercise in full of the Conversion Right, as defined in the Note.

**6.5**    **Further Assurances**.  The Company shall from time to time execute, deliver and file, alone or with the Purchaser, any financing statements, security agreements, collateral assignments, notices or other documents necessary to perfect or give the Purchaser a Lien on the Collateral with the priority provided for in the Security Agreement.  The Company shall from time to time procure any instruments or documents as may be reasonably requested by Purchaser, and take all further action that may be necessary to perfect and protect the Liens granted under the Security Agreement.  In addition, and for such purposes only, the Company hereby authorizes the Purchaser to execute and deliver on behalf of the Company and to file financing statements without the signature of the Company either in the Purchaser's name or in the name of the Purchaser as agent and attorney-in-fact for the Company.  Without limiting the foregoing, so long as the Note remains outstanding:

    **(A)**    The Company shall protect and defend the Company's title to the Collateral thereon against all Persons claiming any interest adverse to the Company or to the Purchaser other than Permitted Liens.

    **(B)**    The Company shall, no less than 10 days prior to the consummation of a Change of Control, inform the Purchaser as to whether the Company has elected to have (i) the Note redeemed by the surviving entity or Person acquiring control of the Company in connection with the transaction which results in such Change of Control (the "***Controlling Stakeholder***"), or (ii) the Controlling Stakeholder assume all obligations that the Company has, or will have, under this Agreement or any of the other Transaction Documents; *provided, however*, that the Company will not be entitled proceed with a transaction which results or may result in a Change of Control unless it complies with this **Section 6.5(B)** and the Controlling Stakeholder either redeems the Note pursuant to its election under **Section 6.5(B)(i)** or assumes all obligations pursuant to its election under **6.5(B)(ii)**.

    **(C)**    Within 30 days after the end of each calendar quarter, the Company will notify the Purchaser of (i) any registration by the Company of any material Copyright, Patent or Trademark, or (ii) the Company's entry into a material License constituting Collateral, and shall take such actions as the Purchaser reasonably requests to perfect the Purchaser's security interest therein pursuant to the terms of the Security Agreement.

19

CONFIDENTIAL

NL074628

**6.6**      **Negative Covenants.** For so long as the Note remains outstanding, the Company shall not, and shall cause each Subsidiary not to, either directly or indirectly, without the prior written consent of the Purchaser, take any of the following actions:

(A)      change, modify, amend or waive any provision of the Company's organizational documents which would reasonably be expected to adversely affect the Note or the rights of the Purchaser with respect to the Note or the other Transaction Documents; or

(B)      the Company shall not, and shall not permit any Subsidiary to, voluntarily or involuntarily transfer, sell, lease, lend or in any other manner convey any Patents or Assets of the Company or any of its Subsidiaries which were granted as Collateral under the Security Agreement; *provided, that* nothing herein shall prevent the Company from granting licenses of Patents in the ordinary course of the Company's business; *provided, further,* that none of such licenses infringes, violates or otherwise adversely affects the licenses granted by the Company to Purchaser prior to or after the date hereof.

**6.7**      **Compliance with Laws.** The Company shall comply in all material respects with all applicable laws, Rules and Regulations.

**6.8**      **Register.** The Company shall maintain at its offices a register for the recordation of the name and address of the Purchaser and the amount of principal and interest due and payable or to become due and payable from the Company to the Purchaser hereunder or under the Note or any other Transaction Documents (the "*Register*"). Any assignment or transfer of an interest in the Note shall be effective only upon appropriate entries with respect thereto being made in the Register, which the Company shall promptly record upon receiving notice of any such proposed assignment or transfer. The Register shall be available for the Purchaser's inspection at any reasonable time and from time to time upon reasonable prior notice. Notwithstanding the generality of the foregoing, the Company shall reflect ownership interests in the Note in a book entry system in accordance with all applicable provisions of the Code and Treasury Regulations, including for purposes of establishing that the Note is in registered form under Sections 1.871-14(c)(1)(i) and 5f.103-1(c) of the Treasury Regulations.

**6.9**      **Amendment to Existing Loan.** The Company shall not directly or indirectly, change or amend the terms of the Silicon Valley Bank Loan and Security Documents in a manner prohibited by the Intercreditor Agreement, it being understood and agreed that the Silicon Valley Bank Loan and Security Documents may be amended to provide additional collateral security to the extent that such collateral is provided to the Purchaser under the Transaction Documents.

### ARTICLE 7
### Restrictions on Transferability

**7.1**      **Restrictions on Transferability.** The Purchaser shall be entitled to, at its own discretion, sell, transfer, assign or hypothecate the Note to any Permitted Transferee provided that such sale, transfer assignment or hypothecation complies with the requirements of the Securities Act, the Exchange Act, the Rules and Regulations or any other law applicable to the Company, the Purchaser and the Permitted Transferee; provided further, that the Permitted Transferee agrees in writing to take and hold the Note subject to the provisions and upon the conditions specified in this **Section 7.1**. For purposes of this Agreement and the other Transaction Documents, upon a transfer of the Note to a Permitted Transferee in accordance with this **Section 7.1**, such Permitted Transferee shall be deemed to be the "Purchaser" of the Note.

20

## ARTICLE 8
### Events of Default

The occurrence of any one or more of the following events shall be an Event of Default:

**8.1**   <u>Payments</u>. The Company fails to pay the principal and interest under the Note when due;

**8.2**   <u>Covenants</u>. The Company materially breaches or defaults in the performance of any covenant under this Agreement and such default continues for more than thirty (30) days after the earlier of the date on which (i) the Purchaser has given notice of such default to the Company and (ii) the Company has actual knowledge of such default;

**8.3**   <u>Other Transaction Documents</u>. The occurrence of any material default or breach of any provision of any other Transaction Document and such material default or breach continues for more than thirty (30) days after the earlier of (A) the Purchaser has given notice of such default to the Company, or (B) the Company has actual knowledge of such default;

**8.4**   <u>Representations</u>. Any representation or warranty made by the Company in this Agreement or any other Transaction Document shall have been false or misleading in any material respect when made or deemed made, and the Company fails to cure such breach within ten (10) days of written notice thereof from the Purchaser; *provided*, that for purposes of this Section 8.4 a breach shall be deemed to have been cured if, prior to the expiration of the cure period, the Company shall have (x) to the extent practicable, remedied the circumstance that resulted in such breach and (y) taken appropriate action to indemnify and hold the Purchaser harmless from and against any losses that it has incurred or that it could reasonably expect to incur as a result of such breach.

**8.5**   <u>Cross Default</u>. A third party creditor with a security interest in or lien against any of the Collateral declares the Company to be in default of its obligations to it and exercises its right to attach or seize any of the Collateral as a result of such default.

**8.6**   <u>Insolvency</u>. The Company or any Subsidiary (A) (i) shall make an assignment for the benefit of creditors; or (ii) shall admit in writing that it is unable to pay its debts as they become due, or is unable to pay the Secured Obligations under the Transaction Documents, or shall become insolvent; or (iii) shall file a voluntary petition in bankruptcy; or (iv) shall file any petition, answer, or document seeking for itself, as debtor, any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation pertinent to such circumstances; or (v) shall seek or consent to or acquiesce in the appointment of any trustee, receiver, or liquidator for itself or for all or any substantial part of its assets or property; or (vi) its or its directors or majority stockholders shall take any action initiating any of the foregoing actions described in clauses (i) through (v); or (B) either (i) sixty (60) days shall have expired after the commencement of an involuntary action against such Company seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, without such action being dismissed or all orders or proceedings thereunder affecting the operations or the business of such Company being stayed; or (ii) a stay of any such order or

21

CONFIDENTIAL

NL074630

proceedings shall thereafter be set aside and the action setting it aside shall not be timely appealed; or (iii) it shall file any answer admitting or not contesting the material allegations of a petition filed against it in any such proceedings; or (iv) the court in which such proceedings are pending shall enter a decree or order granting the relief sought in any such proceedings; or (v) sixty (60) days shall have expired after the appointment, without its consent or acquiescence, of any trustee, receiver or liquidator of it or of all or any substantial part of its assets without such appointment being vacated;

8.7 **Attachments; Judgments**. Any substantial part of the Collateral is attached or seized, or a levy is filed against any such Collateral, or the Company is enjoined or in any way prevented by a final non-appealable court order by a court of competent jurisdiction from conducting any material part of its business, and in each case, such attachment, seizure, levy, judgment or injunction is not stayed, satisfied, bonded or discharged within ninety (90) days after the entry thereof;

8.8 **Invalidity**. Any of the Transaction Documents shall cease for any reason to be in full force and effect (other than pursuant to the terms hereof or thereof), or the Company shall so assert in writing, or the Lien created by any of the Transaction Documents shall cease to be perfected and enforceable in accordance with its terms or of the same effect as to perfection and priority purported to be created thereby with respect to any significant portion of the Collateral (other than in connection with any termination of such Lien in respect of any Collateral as permitted hereby, or as a result of any action or failure to act by Purchaser), and such failure of such Lien to be perfected and enforceable with such priority shall have continued unremedied for a period of twenty five (25) days;

8.9 **Other Obligations**. The occurrence of any "event of default" or other similar event under any agreement or obligation of the Company involving any Indebtedness in an aggregate principal amount in excess of $1,000,000 which is secured by the Collateral, which event continues without waiver or forbearance beyond any period of grace provided therein;

8.10 **Guarantor**. If any Guarantee ceases for any reason to be in full force and effect, or any Guarantor fails to perform any obligation under its Guarantee or any other Transaction Document to which it is a party or is bound (collectively, the "***Guaranty Documents***"), or any event of default occurs under any Guaranty Document or any Guarantor revokes or purports to revoke its Guarantee, or any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth in any Guaranty Document, or if any of the circumstances described in **Section 8.4** or **Section 8.9** occurs with respect to any Guarantor. For purposes of clarification and not by way of limitation, as of the date hereof, each Subsidiary is a CFC.

### ARTICLE 9
### Remedies

The following provisions in this **Article 9** shall apply:

9.1 **General**. Upon and during the continuance of any one or more Events of Default, without the Company's approval, (i) the Purchaser may accelerate and demand payment of all or any part of the Secured Obligations and declare them to be immediately due and payable (provided that upon the occurrence of an Event of Default of the type described in **Section 8.7**, the Secured Obligations shall automatically be accelerated and made due and payable, without

22

any further notice or act), and (ii) the Purchaser may notify any of the Company's account debtors to make payment directly to the Purchaser, compromise the amount of the accounts of any such account debtors on the Company's behalf. All of the Purchaser's rights and remedies shall be cumulative and not exclusive.

9.2     **Collection; Foreclosure**. Upon the occurrence and during the continuance of any Event of Default, the Purchaser may, at any time or from time to time, apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, pursuant to the terms of the Security Agreement.

9.3     **Cumulative Remedies**. The rights, powers and remedies of the Purchaser hereunder on in any Transaction Document shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative. The exercise of any one or more of the rights, powers and remedies provided herein or therein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of the Purchaser.

**ARTICLE 10**
**Miscellaneous**

10.1     **Survival of Representations, Warranties and Agreements**. Notwithstanding any investigation made by any party to this Agreement, all covenants, agreements, representations and warranties made by the Company and the Purchaser herein shall survive the execution of this Agreement.

10.2     **Notices**. Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication (including the delivery of Financial Statements) that is required, contemplated, or permitted under the Transaction Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received upon the earlier of: (i) the day of transmission by facsimile, email or hand delivery or delivery by an overnight express service or overnight mail delivery service; or (ii) when received if sent by United States mail, with proper first class postage prepaid, in each case addressed to the party to be notified as follows:

      (A)     if to the Company, to:

           Netlist, Inc.
           175 Technology, Suite 150
           Irvine, California 92618
           Attention:  Gail Sasaki
           Email:  gsasaki@netlist.com

           with a copy (which shall not constitute notice) to:

           Morrison & Foerster LLP
           12531 High Bluff Drive, Suite 100
           San Diego, California 92130
           Attention: Scott M. Stanton
           Email: sstanton@mofo.com

23

NL074632

**(B)**   if to Purchaser, to:

SVIC No. 28 New Technology Business Investment L.L.P.
29F, Samsung Electronics Building
1320-10, Seocho 2-dong, Seocho-gu
Seoul 137-857, Korea
Attention: Dr. Dong-su Kim, Vice President
Email: dongkim@samsung.com

with a copy (which shall not constitute notice) to:

DLA Piper LLP (US)
2000 University Avenue
Palo Alto, California 94303
Attention: Louis Lehot
Email: louis.lehot@dlapiper.com

10.3   **Entire Agreement; Amendments**.  This Agreement and the other Transaction Documents constitute the parties' entire agreement and understanding in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof.  No amendment, waiver or other modification of any provision of this Agreement or any other Transaction Document, and no consent with respect to any departure by the Company therefrom, shall be effective unless it is in writing and signed by the Purchaser and the Company and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which it is given.

10.4   **No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any provisions of this Agreement.

10.5   **No Waiver**.  The powers conferred upon the Purchaser by this Agreement are solely to protect its rights hereunder and under the other Transaction Documents and its interest in the Collateral and shall not impose any duty upon the Purchaser to exercise any such powers.  No omission or delay by the Purchaser at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by the Company at any time designated, shall be a waiver of any such right or remedy to which the Purchaser is entitled, nor shall it in any way affect the right of the Purchaser to enforce such provisions thereafter.

10.6   **Severability**.  In case any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

10.7   **Governing Law**.  This Agreement and the other Transaction Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

24

NL074633

**10.8**   **Waiver of Jury Trial**. EACH PARTY HERETO WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

**10.9**   **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument. and shall become effective when one or more counterparts have been signed by each party hereto and delivered (including by facsimile) to the other parties.

**10.10**   **Assignment**. Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of. and be binding upon, the parties hereto and their respective permitted successors, assigns, heirs, executors and administrators. This Agreement and the rights of the Purchaser hereunder may not be assigned by the Purchaser without the prior written consent of Netlist, except such consent shall not be required in cases of assignments by a Purchaser as permitted under **Section 7.1**, provided that such assignee agrees in writing to be bound by the terms of this Agreement and shall be deemed to have made each of the representations and warranties of the Purchaser herein and in the Transaction Documents: provided further that in the event that only a portion of a Note is transferred, only the Purchaser or with the election of such Purchaser, only one Permitted Transferee designated by such Purchaser shall have the right to exercise rights hereunder on behalf of all holders of such Purchaser's Notes.

**10.11**   **Further Assurances**. Each party agrees to cooperate fully with the other parties and to execute such further instruments. documents and agreements and to give such further written assurance as may be reasonably requested by any other party to evidence and reflect the transactions described herein and contemplated hereby and to carry into effect the intents and purposes of this Agreement.

**10.12**   **Replacement Facility**. Purchaser agrees that in the event that the Company wishes to refinance or replace the Silicon Valley Bank Loan and Security Documents with a Replacement Facility, Purchaser will enter into an intercreditor agreement with the provider of such Replacement Facility providing relative lien priority as set forth in (and otherwise on terms substantially similar to) the Intercreditor Agreement.

<div align="center">

**ARTICLE 11**
**Guarantee**

</div>

**11.1**   **Guarantee**.

(A)      Each Guarantor unconditionally and irrevocably guarantees, jointly and severally, to the Purchaser the full and punctual payment or performance. as applicable, of the Secured Obligations.

(B)      Each Guarantor further agrees that the Secured Obligations may be extended or renewed, in whole or in part. without notice to it or its further assent and that such Guarantor will remain bound under this **Article 11** notwithstanding any extension or renewal of any Secured Obligation.

<div align="center">25</div>

(C)     Each Guarantor waives presentation to, demand of, payment from and protest to Netlist of any of the Secured Obligations and also waives notice of protest for nonpayment. Each Guarantor waives notice of any Default or Event of Default. Each Guarantor's liability for the Secured Obligations shall not be affected by:  (i) the Purchasers' failure to assert any claim or demand or to enforce any right or remedy against the Company or any other Person under this Agreement, the Notes or any other agreement (including, but not limited to any other Transaction Document) or otherwise; (ii) any extension or renewal of any thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Agreement, the Notes or any other agreement (including, but not limited to any other Transaction Document); (iv) the release of any security held by the Purchaser for the Secured Obligations; or (v) the Purchaser's failure to exercise any right or remedy against any other guarantor of the Secured Obligations.

(D)     Each Guarantor further agrees that its guarantee pursuant to this **Article 11** (each, a "*Guarantee*") constitutes a guarantee of payment and performance (and not merely a guarantee of collection) and waives any right to require that any resort be had by the Purchaser or to any security held for payment of the Secured Obligations.

(E)     The Secured Obligations shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Secured Obligations or otherwise (other than payment in full of the Secured Obligations other than contingent indemnification obligations and any other obligations which survive the payment of the Note).  Without limiting the generality of the foregoing, the Secured Obligations shall not be discharged or impaired or otherwise affected by the failure of the Purchaser to assert any claim or demand or to enforce any remedy under this Agreement, the Notes or any other agreement (including but not limited to any Transaction Document), by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(F)     Each Guarantor further agrees that its Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of, premium or interest on any Secured Obligation is rescinded or must otherwise be restored by the Purchaser upon the bankruptcy or reorganization of the Company or otherwise.

(G)     Each Guarantor agrees that it shall subordinate any right of subrogation in respect of the Secured Obligations until payment in full of all Secured Obligations (other than contingent indemnification obligations and any other obligations which survive the payment of the Note).

(H)     Each Guarantor further agrees that, as between it, on the one hand, and the Purchaser, on the other hand: (i) the maturity of the Secured Obligations may be accelerated as provided herein for the purposes of such Guarantor's Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Secured Obligations; and (ii) in the event of any declaration of acceleration of such Secured Obligations, such Secured Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this **Section 11.1(I)**.

26

NL074635

(I)     Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees) incurred by the Purchaser in enforcing any rights under this **Article 11**.

11.2    **Security Interest**.

(A)     To secure the payment and performance of its obligations under this **Article 11** (the "*Guarantee Secured Obligations*"), each Guarantor grants to the Purchaser a security interest in all of such Guarantor's right, title and interest in and to all of the Collateral, whether now existing or hereafter acquired or arising and wherever located, including all of the property described in **Annex B** attached hereto (the "*Guarantor Collateral*").

(B)     Each Guarantor shall execute and deliver to the Purchaser, and each Guarantor authorizes the Purchaser to file (with or without such Guarantor's signature), at any time and from time to time, all financing statements, assignments, continuation financing statements, termination statements and other documents and instruments, in form reasonably satisfactory to the Purchaser, and each Guarantor shall take all other action as the Purchaser may reasonably request, to perfect and continue perfected, maintain the priority of or provide notice of the security interest of the Purchaser in the Guarantor Collateral of such Guarantor and to accomplish the purposes of this **Article 11**. Whenever the Secured Party's so requests, a Guarantor shall provide the Purchaser with control (as defined in the UCC) of Guarantor Collateral of such Guarantor consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper. A Guarantor will join with the Purchaser in notifying any third party who has possession of any Guarantor Collateral of such Guarantor of the Purchaser's security interests therein and in obtaining such third party's acknowledgment that it is holding such Guarantor Collateral for the Purchaser's benefit.

(C)     The security interest each Guarantor grants herein shall create a continuing security interest in the Guarantor Collateral of such Guarantor, which shall remain in effect until the Termination Date.

(D)     Each Guarantor, as of the date it becomes a Guarantor, makes the representations and warranties with respect to its Guarantor Collateral as set forth in Section 3 of the Security Agreement, which is incorporated herein, mutatis mutandis.

(E)     Each Guarantor covenants and agrees until the Termination Date with respect to its Guarantor Collateral as set forth in Section 4 of the Security Agreement, which is incorporated herein, mutatis mutandis.

(F)     If any Event of Default shall occur and be continuing, the Purchaser shall have any may exercise all rights and remedies of a secured party under the UCC and other Applicable Law with respect to the Guarantor Collateral.

11.3    **Successors and Assigns**. This **Article 11** will be binding upon each Guarantor and its successors and assigns and will inure to the benefit of the successors and permitted assigns of the Purchaser.

27

CONFIDENTIAL

NL074636

**11.4**   **No Waiver**.  Neither a failure nor a delay on the part of the Purchaser in exercising any right, power or privilege under this **Article 11** will operate as a waiver thereof, nor will a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Purchaser herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which they may have under this **Article 11**, at law, in equity, by statute or otherwise.

**11.5**   **Modification**.  No modification, amendment or waiver of any provision of this **Article 11**, nor the consent to any departure by any Guarantor therefrom, will in any event be effective unless the same is in writing and signed by the Purchaser and such Guarantor in accordance with **Section 10.3** and then such waiver or consent will be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case will entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

28

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

COMPANY:

NETLIST, INC.

/s/ Gail Sasaki
_____

**By:** Gail Sasaki
**Its:** CFO, VP, Secretary

*Signature Page to Senior Secured Convertible Promissory Note and Warrant Purchase Agreement*

CONFIDENTIAL

NL074638

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

PURCHASER:

**SVIC NO. 28 NEW TECHNOLOGY
BUSINESS INVESTMENT L.L.P.**

/s/ Seon Jong Lee
**By:** Seon Jong Lee
**Its:** Chief Executive Officer

*Signature Page to Senior Secured Convertible Promissory Note and Warrant Purchase Agreement*

CONFIDENTIAL

NL074639

## SCHEDULE 1

### SUBSIDIARIES

1. Netlist Electronics (Suzhou) Co., Ltd.
2. Netlist HK Limited

## SCHEDULE 2

### PERMITTED LIENS

None.

NL074641

**SCHEDULE 6.1**

**FINANCIAL STATEMENTS**

Communications between the Company and any of its creditors.

NL074642

## ANNEX A

### MORRISON & FOERSTER LLP LEGAL OPINION

NL074643

## ANNEX B

### GUARANTOR COLLATERAL

The Guarantor Collateral consists of all of each Guarantor's right, title and interest in and to the following personal property:

(a)        all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles and software), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of such Guarantor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b)        all cash proceeds and/or noncash proceeds of any of the foregoing, including insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

All terms above have the meanings given to them in the New York Uniform Commercial Code, as amended or supplemented from time to time.

NL074644

**EXHIBIT A**

WARRANT

NL074645

**EXHIBIT B**

**JOINDER AGREEMENT**

The undersigned, [Name of Subsidiary], a [●], in its capacity as Subsidiary (together with its successors and assigns in such capacity) hereby agrees to become a party as a Guarantor under the Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated as of November     , 2015 (the "*Purchase Agreement*"), between Netlist, Inc., a Delaware corporation, and SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership, as supplemented, amended and restated or otherwise modified and in effect from time to time, for all purposes thereof and on the terms set forth therein, and to be bound by the terms of the Purchase Agreement and Transaction Documents (as defined in the Purchase Agreement) as fully as if the undersigned had executed and delivered the Purchase Agreement as of the date thereof.

The provisions of Articles 10 of the Purchase Agreement will apply with like effect to this Joinder Agreement.

**IN WITNESS WHEREOF**, the undersigned has executed, or has caused to be executed, this Joinder Agreement on [date].

**SUBSIDIARY:**
**[NAME]**

By: _____

Its:

NL074646

**EXHIBIT C**

NOTE

NL074647

## EXHIBIT D

### REGISTRATION RIGHTS AGREEMENT

CONFIDENTIAL

NL074648

EXHIBIT E

SECURITY AGREEMENT

BY AND BETWEEN

NETLIST, INC.

AND

SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.

NOVEMBER   , 2015

**NETLIST, INC.**

**SECURITY AGREEMENT**

THIS SECURITY AGREEMENT (the "*Agreement*") is entered into as of November    , 2015, between **NETLIST, INC.**, a Delaware corporation (the "*Company*"), and **SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.,** a Korean limited liability partnership (the "*Secured Party*").

**RECITALS**

WHEREAS, Secured Party is extending a term loan to the Company pursuant to the Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated as of the date hereof, between the Company and Secured Party (as amended and restated from time to time, the "*Purchase Agreement*"); and

WHEREAS, it is a requirement under the Purchase Agreement that the Company grant to Secured Party (i) a continuing, first priority security interest in and to all of its Patents and Patent applications, and (ii) a continuing, second priority security interest in and to all other property and assets, to secure payment and performance of all indebtedness, liabilities and obligations of the Company to Secured Party arising under or in connection with the Purchase Agreement, the Note (as defined in the Purchase Agreement), this Agreement, and the other Transaction Documents (as defined in the Purchase Agreement), and the Company is willing to comply with such requirement on the terms and conditions set forth herein;

**NOW, THEREFORE, IT IS AGREED THAT**:

1.  **DEFINED TERMS.**

All terms used without definition in this Agreement shall have the meaning assigned to them in the Purchase Agreement and, if not defined therein, in the Note. All terms used without definition in this Agreement, the Purchase Agreement or the Note shall have the meaning assigned to them in the UCC (as defined below) to the extent they are defined therein. Unless otherwise expressly stated in this Agreement, capitalized terms used in this Agreement shall have the following meanings:

(a)     "*Applicable Law*" means, in respect of any Person, all provisions of constitutions, statutes, rules, regulations and orders of governmental bodies or regulatory agencies applicable to such Person, and all orders and decrees of all courts, tribunals and arbitrators in proceedings or actions to which the Person in question is a party or by which it or its properties are bound or affected.

(b)     "*Article 9*" means Article 9 of the UCC.

(c)     "*Collateral*" means has the property and assets described on **Exhibit A** attached hereto, whether now existing or hereafter acquired or arising and wherever located.

NL074650

(d)    "*Collection Costs*" means all costs and expenses of enforcing this Agreement, the Note and the other Transaction Documents, including all costs and expenses of collecting the Secured Obligations and exercising Secured Party's rights and remedies under this Agreement and the other Transaction Documents, or under any Applicable Law, as against the Collateral, or as against Company or any other Person, and all costs and expenses incurred by Secured Party at any time in enforcing or defending Secured Party's Lien and priority in the Collateral, and any other costs and expenses incurred by Secured Party after the occurrence of any Default or Event of Default, with regard to any matters relating to this Agreement, the Note or the other Transaction Documents, regardless of whether a Default or Event of Default shall have been declared or any remedies shall have been exercised, and including all such costs and expenses incurred by Secured Party in or relating to any bankruptcy or insolvency proceedings. Without limiting the generality of the preceding sentence, Collection Costs include all reasonable attorneys' fees and legal expenses incurred by Secured Party in enforcing this Agreement and the other Transaction Documents, in collecting the Secured Obligations, and in exercising Secured Party's rights and remedies under this Agreement and the other Transaction Documents, or under any Applicable Law.

(e)    "*Company's Books*" means all of Company's books and records including: ledgers; records concerning Company's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

(f)    "*Default*" means any event or circumstance, which with notice or passage of time or both, could reasonably be substantially likely to become or constitute an Event of Default.

(g)    "*Inventory*" means all present and future inventory, as defined in the UCC, including merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products including such inventory as is temporarily out of Company's custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Company's Books relating to any of the foregoing.

(h)    "*Ordinary Course of Business*" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with (a) the usual and customary customs and practices in the kind of business in which such Person is engaged, and (b) the past practice and operations and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Transaction Document.

(i)    "*Patent Collateral*" means (i) the Patents, (ii) the Patent Licenses, and (iii) the proceeds of the Patents and the Patent Licenses.

(j)    "*Property*" means any property of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, and any right, title or interest in or to property of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, including the Collateral.

2

NL074651

**(k)** "*Termination Date*" means that date on which all of the following have occurred: (a) all of the Secured Obligations (other than inchoate indemnity obligations) have been fully and indefeasibly paid, in cash; and (b) the Secured Party's commitment (contingent or otherwise) to make advances or to otherwise extend credit to the Company has irrevocably terminated.

**2.    SECURITY INTEREST.**

**2.1    Grant of Security Interest.** To secure the payment and performance of the Secured Obligations, the Company grants to the Secured Party a security interest in all of the Company's right, title and interest in and to all of the Collateral, whether now existing or hereafter acquired or arising and wherever located.

**2.2    Financing Statements, Etc.** The Company shall execute and deliver to the Secured Party, and the Company authorizes the Secured Party to file (with or without the Company's signature), at any time and from time to time, all financing statements, assignments, continuation statements, termination statements and other documents and instruments, in form reasonably satisfactory to the Secured Party, and the Company shall take all other action as the Secured Party may reasonably request, to perfect and continue perfected, maintain the priority of or provide notice of the security interest of the Secured Party in the Collateral and to accomplish the purposes of this Agreement. Without limiting the generality of the foregoing, the Company ratifies and authorizes the Secured Party's filing of any financing statements filed prior to the date hereof. Whenever the Secured Party's so requests, the Company shall provide the Secured Party with control (as defined in the UCC) of Collateral consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper, except to the extent that (i) such Collateral is subject to the control of Silicon Valley Bank or the provider of a Replacement Facility (each, a "*First Priority Lender*"), and Secured Party has a perfected lien on such Collateral by virtue of an intercreditor or other agreement between Secured Party and a First Priority Lender or (ii) Secured Party has a perfected lien on such Collateral by virtue of filing a UCC Financing Statement with respect to such Collateral. The Company will join with the Secured Party in notifying any third party who has possession of any Collateral of the Secured Party's security interests therein and in obtaining such third party's acknowledgment that it is holding the Collateral for the Secured Party's benefit.

**2.3    Continuing Security Interest.** The security interest granted herein shall create a continuing security interest in the Collateral, which shall remain in effect until the Termination Date.

**2.4    Liability under Contracts.** Anything herein to the contrary notwithstanding, (i) the Company shall remain liable under any contracts, agreements and other documents included in the Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the Secured Party's exercise of any of the rights hereunder shall not release the Company from any of its duties or obligations under such contracts, agreements and other documents, and (c) the

3

NL074652

Secured Party shall not have any obligation or liability under such contracts, agreements and other documents by reason of this Agreement, nor shall the Secured Party be obligated to perform any of the Secured Obligations or duties of the Company thereunder or to take any action to collect or enforce any such contract, agreement or other document.

3.    **REPRESENTATIONS AND WARRANTIES OF THE COMPANY.**

The Company represents and warrants to the Secured Party as of the Closing as set forth below.

3.1    Collateral.

(a)    **Title; Priority.**  The Collateral is solely owned by the Company and is free of all Liens (i) other than Permitted Liens, in the case of the Collateral other than the Patent Collateral, (ii) other than Liens in favor of a First Priority Lender, in the case of cash, funds, deposit accounts or securities accounts comprising proceeds of the Patents and the Patent Licenses (such Collateral, "***Common Collateral***"), and (iii) other than (A) the security interest granted to the Secured Party hereunder and (B) Liens securing taxes, assessments and other governmental charges, the payment of which is not yet due or are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted, in the case of the Patent Collateral other than Common Collateral.

(b)    **License Rights.**  Except as provided in the attached Disclosure Schedule, all licenses included in the Collateral and all of the Company's rights under such licenses are freely assignable or, to the extent they are not, the Company has obtained all waivers and consents necessary to permit the attachment and perfection of the Secured Party's security interest therein and to permit the Secured Party to exercise its remedies provided hereunder with respect to such licenses and license rights.

(c)    **Location of Collateral.**  The attached Disclosure Schedule accurately and completely sets forth: (i) the Company's exact legal name, (ii) the Company's jurisdiction of organization, (iii) the location of the Company's chief executive office and principal place of business, (iv) and all locations where the Company's conducts business or where Collateral or the Company's Books related to the Collateral are located.

(d)    **Control Agreements.**  No agreements providing for "control," as defined in Article 9 of the UCC, over the Collateral are currently in effect, other than those in favor of a First Priority Lender.

(e)    **Securities and Instruments.**  The Company does not have, hold or own any promissory notes, stocks, bonds, chattel paper, letter-of-credit rights or commercial tort claims except as disclosed in the Disclosure Schedule.

(f)    **Bank Accounts.**  The names and addresses of all financial institutions and other Persons at which the Company maintains its deposit, investment and securities accounts, and the account numbers and account names of such accounts, are set forth in the Disclosure Schedule.

4

NL074653

      (g)    **Intellectual Property Collateral**.

      (i)    The Company has taken all steps to preserve the secrecy of all its Intellectual Property Collateral except where a failure to do so could not reasonably be expected to result in a Material Adverse Effect, and to otherwise preserve its rights with respect to Intellectual Property Collateral except where a failure to do so could not reasonably be expected to result in a Material Adverse Effect.

      (ii)    The Company has not granted, and, to the Company's knowledge, there are no outstanding options relating to any Intellectual Property Collateral, nor is the Company bound by or a party to any option with respect to any Intellectual Property Collateral. The Company is not obligated to pay any royalties to third parties with respect to the marketing, sale, distribution, manufacture, license or use of any Intellectual Property Collateral.

      (iii)    Each current officer, employee and consultant of the Company and each former employee that contributed to the Intellectual Property Collateral that the Company is currently using has executed in the Company's favor the Company's standard agreement regarding confidentiality and proprietary information. To the Company's knowledge, none of its current or former employees, officers and consultants are in violation thereof. No such person has excluded works or inventions made prior to his or her employment or other contractual relationship with the Company from his or her assignment of inventions pursuant to such agreement that could reasonably be expected to have a Material Adverse Effect. Subject to any limitations on such vesting imposed by Applicable Law, full title and ownership of all inventions and proprietary rights, processes or methods developed or invented by all employees and consultants during the period of their employment and/or consultancy and resulting directly or indirectly from their work for the Company vest in the Company pursuant to each such agreement.

      (iv)    To the Company's knowledge, the carrying on of the Company's business by the Company's employees and contractors and the conduct of the Company's business do not conflict with or breach the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which any of such employees or contractors is now obligated (including with former employers).

      **3.2**    **Full Disclosure**. The Company has provided the Secured Party with all information that the Secured Party requested in connection with its decision to purchase the Note, including all information the Company believes is reasonably necessary to make such investment decision.

    4.    **COVENANTS**.  Until the Termination Date, the Company covenants and agrees to:

      **4.1**    **Protection of Collateral**.  Keep the Collateral in good condition and repair, maintain, preserve, defend and protect the Collateral from loss, damage or deterioration (ordinary wear and tear excepted) or other adverse claims that may affect its title to, or rights or interest in the Collateral, except as otherwise permitted under the Transaction Documents.

5

NL074654

4.2     **Clear Title; Priority.**  Keep the Collateral free of Liens, unpaid taxes or other encumbrances, (i) except for Permitted Liens, in the case of the Collateral other than the Patent Collateral, (ii) except for Liens in favor of a First Priority Lender, in the case of Common Collateral, and (iii) except for (A) the security interest granted to the Secured Party hereunder and (B) Liens securing taxes, assessments and other governmental charges, the payment of which is not yet due or are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted, in the case of the Patent Collateral other than Common Collateral.

4.3     **Compliance With Applicable Law.**  Comply with Applicable Law with respect to (i) the Collateral, or (ii) the Company's business.

4.4     **Taxes.**  Make due and timely payment or deposit of all material federal, state, and local taxes, assessments, or contributions required of it by Applicable Law.

4.5     **Notice of Certain Actions; Location of Collateral.**

(a)     Give the Secured Party prompt written notice of:  (i) any change in the location of the Company's chief executive office or principal place of business; (ii) any change in its corporate name; (iii) any changes in its capital or organizational structure; and (iv) any change in its registration as an organization; provided, however, that the Company shall not: (A) except in the ordinary course of business, locate any Collateral outside of the United States, or (B) change its jurisdiction of organization without the Secured Party's prior written consent.

(b)     Give the Secured Party prompt written notice of (i) any Intellectual Property being judged invalid or unenforceable, in whole or in part, (ii) any claim being made in writing to the Company that any Intellectual Property violates the rights of any third party, (iii) any material breach by any party to any license or other agreement with respect to any Intellectual Property or any termination or expiration of any such license or other agreement.

4.6     **Inspection.**  Upon reasonable prior notice, provide the Secured Party with access to the Collateral and all the Company's Books relating thereto for the purpose of conducting inspections and audits of the Collateral at reasonable times during regular business hours; provided, however, after the occurrence of any Default or Event of Default the Company shall provide the Secured Party with access to the Collateral and all of the Company's Books relating thereto at such times required by the Secured Party.

4.7     **Insurance.**  Carry and maintain in full force and effect, at its own expense and with financially sound and reputable insurance companies, insurance with respect to the Collateral in such amounts, with such deductibles and covering such risks as is customarily carried by companies engaged in the same or similar businesses of similar size and owning similar properties in the localities where the Company operates (provided that, for purposes of clarification only, this requirement shall not include intellectual property insurance). All insurance policies shall provide that the Secured Party shall be loss payee and additional insured and shall provide that they shall not be terminated or cancelled without at least thirty (30) days' prior written notice to the Secured Party.

6

CONFIDENTIAL

NL074655

**4.8**     **Disposition of Patents.**  Not sell, transfer, lease, license or otherwise dispose of any of its Patents, other than: (i) exclusive or non-exclusive licenses of Patents in the ordinary course of the Company's business and (ii) the Lien hereby created.

**4.9**     **Transactions with Affiliates.**  Not directly or indirectly enter into or permit to exist any material transaction with any Affiliate of the Company except for transactions existing as of the Closing that are disclosed in writing to, and approved by, the Secured Party, and transactions that are in the Ordinary Course of Business, upon fair and reasonable terms that are no less favorable to the Company than would be obtained in an arm's length transaction with a non-affiliated Person.

**4.10**     **Limitations on Security Interest.**  Not permit the inclusion in any contract to which it becomes a party of, or amend any contract to include, any provisions that purport to prevent the creation hereunder of a security interest in the Company's rights and interests in any property included in the Collateral, except for (a) prohibitions on assignment of any license agreement or other contract without the other contracting party's consent, (b) restrictions contained in the Silicon Valley Bank Loan and Security Documents or any Replacement Facility and (c) restrictions contained in documentation governing Permitted Liens on equipment, computers or software, provided that such restrictions apply solely to Liens on the applicable equipment, computers or software or the proceeds thereof and related books, records and proceeds.

**4.11**     **Commercial Tort Claims.**  Notify the Secured Party, promptly after any responsible officer's acquiring actual knowledge thereof, of any commercial tort claim related to the Patent Collateral that it acquires with a value in excess of $100,000 and shall enter into a supplement to this Agreement, granting the Secured Party a security interest in such commercial tort claim.

**4.12**     **Deposit Accounts.**  Obtain and maintain in effect authenticated control agreements for each of the Company's deposit accounts in favor of the Secured Party, in form and substance satisfactory to the Secured Party.

**4.13**     **Securities, Instruments, Chattel Paper.**  Upon the Secured Party's request, the Company shall (a) deliver to the Secured Party all Collateral consisting of negotiable documents, letters of credit, certificated securities (accompanied by stock powers executed in blank), chattel paper, electronic chattel paper and instruments promptly after the Company receives them unless a First Priority Lender has possession of such Collateral for perfection purposes, and (b) obtain authenticated control agreements from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities to or for the Company.

**4.14**     **Notice of Registration of Intellectual Property.**  If and when the Company applies for registration of, or shall become the registered owner of, any new Patents, Trademarks, or Copyrights: (i) promptly notify the Secured Party thereof; and (ii) the Company authorizes the Secured Party to modify, amend, or supplement the Intellectual Property Security Agreement (and its exhibits), from time to time to include any of the foregoing and make all necessary or appropriate filings with respect thereto.

7

NL074656

**4.15    Defense of Intellectual Property Rights.** (i) Protect, defend and maintain the validity and enforceability of (A) the Patents and (B) Trademarks and Copyrights that are material to the operation of its business, except to the extent that the Secured Party consents to the Company electing not to protect, defend or maintain any of such Intellectual Property Collateral, which consent shall not be unreasonably withheld, conditioned or delayed, and (ii) not allow any material Trademarks, Patents (which, for this purpose, shall not include Patent Applications) or material Copyrights to be abandoned, forfeited or dedicated to the public without the Secured Party's prior written consent, which shall not be unreasonably withheld, conditioned, or delayed.

**4.16    Notice of Certain New Collateral.** Give the Secured Party prompt notice of the acquisition of any material instruments or securities, and the establishment of any new deposit account or any new securities account.

**4.17    Notice of Adverse Events.** Promptly notify the Secured Party in writing of any event that materially adversely affects the value of the Collateral taken as a whole, or the rights and remedies of the Secured Party in relation thereto, including the levy of any legal process against any of the Collateral.

5.        **RIGHTS AND REMEDIES DURING EVENT OF DEFAULT.**

5.1    **Rights and Remedies.**

(a)        If any Event of Default shall occur and be continuing, the Secured Party, at its option, may, by notice to the Company, declare the entire unpaid principal amount of the Note, all interest accrued and unpaid thereon and all other Secured Obligations to be forthwith due and payable, whereupon all unpaid principal of the Note, all such accrued interest and all such other Secured Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Company, provided, that, if an Event of Default described in Section 8.5 of the Purchase Agreement occurs, acceleration of the Secured Obligations shall occur automatically without the giving of any such notice.

(b)        If any Event of Default shall occur and be continuing, whether or not the actions referred to in Section 5.2(a) have been taken, the Secured Party shall have and may exercise, in addition to all other rights and remedies granted to it in this Agreement or the other Transaction Documents, all rights and remedies of a secured party under the UCC and other Applicable Law. Without limiting the generality of the foregoing, the Secured Party may sell, resell, lease, use, assign, license, sublicense, transfer or otherwise dispose of any or all of the Collateral in its then condition or following any commercially reasonable preparation or processing (utilizing in connection therewith any of the Company's assets, without charge or liability to the Secured Party therefor) at public or private sale, by one or more contracts, in one or more parcels, at the same or different times, for cash or credit, or for future delivery without assumption of any credit risk, all as the Secured Party deems advisable; provided, however, that the Company shall be credited with the net proceeds of sale only when the Secured Party finally collects them. The Secured Party shall have the right upon any such public sale, and, to the extent permitted by law, upon any such private sale, to purchase the whole or any part of the

8

Collateral so sold, free of any right or equity of redemption, which right or equity of redemption the Company releases to the extent permitted by law. The Company agrees that the sending of notice by ordinary mail, postage prepaid, in accordance with Section 6.9 of the place and time of any public sale or of the time after which any private sale or other intended disposition is to be made, shall be deemed reasonable notice thereof if such notice is sent ten (10) days prior to the date of such sale or other disposition or the date on or after which such sale or other disposition may occur.

(c)     The cash proceeds actually received from the sale or other disposition or collection of Collateral, and any other amounts received in respect of the Collateral, shall be applied <u>first</u>, to the payment of the Collection Costs; <u>second</u> to the payment of the other Secured Obligations (other than the principal outstanding and the interest accrued under the Note); <u>third</u> to the payment of the accrued interest under the Note and <u>fourth</u>, to the payment of the principal outstanding under the Note. Any surplus thereof which exists after the indefeasible payment and performance in full of the Secured Obligations shall be paid over to the Company or otherwise disposed of in accordance with the UCC or other Applicable Law. The Company shall remain liable to the Secured Party for any deficiency that exists after any sale or other disposition or collection of Collateral.

(d)     The Secured Party shall have the right to, in the Company's or the Secured Party's name, without the requirement of the Company's assent, and the Company constitutes and appoints the Secured Party (and any of the Secured Party's officers, employees or agents that the Secured Party designates) as the Company's true and lawful attorney-in-fact, with full power and authority to: (i) sign any of the financing statements and other documents and instruments necessary or reasonably advisable to perfect or continue perfected, to maintain the priority of or to provide notice of the Secured Party's security interest in the Collateral (including any notices to or agreements with any securities intermediary); (ii) assert, adjust, sue for, compromise or release any claims under any policies of insurance; and (iii) execute all such other documents and instruments, and do all acts and things for and on behalf of the Company which the Secured Party may deem necessary or advisable to maintain, protect, realize upon and preserve the Collateral and the Secured Party's security interest therein and to accomplish the purposes of this Agreement, including, (A) to defend, settle, adjust or institute any action, suit or proceeding with respect to Intellectual Property Collateral, (B) to assert or retain any rights under any license agreement for any Intellectual Property Collateral, including any rights of the Company arising under Section 365(n) of the United States Bankruptcy Code, and (C) to execute all applications, documents, papers and instruments for the Secured Party to use Intellectual Property Collateral, to grant or issue any exclusive or non-exclusive license or sub-license with respect to any Intellectual Property Collateral, and to assign, convey or otherwise transfer title in or dispose of the Intellectual Property Collateral. The Secured Party agrees that, except upon and during the continuance of an Event of Default, it shall not exercise the power of attorney hereunder, or any rights granted to the Secured Party, pursuant to clauses (ii) and (iii). The foregoing power of attorney is coupled with an interest and is irrevocable until the Termination Date. The Company ratifies, to the extent permitted by law, all that the Secured Party shall lawfully and in good faith do or cause to be done by virtue of and in compliance with this Section 5.1(d).

<div align="center">9</div>

NL074658

(e) For the limited purpose of enabling the Secured Party to exercise its rights and remedies under this Agreement if any Event of Default shall occur and be continuing, the Company grants to the Secured Party an irrevocable, non-exclusive license (exercisable without payment or royalty or other compensation to the Company) to use, license or sublicense any Intellectual Property Collateral.

6. **MISCELLANEOUS.**

6.1 **Governing Law.** This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

6.2 **WAIVER OF JURY TRIAL.** EACH PARTY HERETO WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

6.3 **Payment of Expenses.** The Company agrees to pay on demand all Purchaser Expenses incurred in connection with the enforcement of and preservation of any rights and remedies under this Agreement, the Note, and the other Transaction Documents, including in any out-of-court workout or other refinancing or restructuring or in any bankruptcy case, and the protection, sale or collection of, or other realization upon, any of the Collateral, including all expenses of taking, collection, holding, sorting, handling, preparing for sale, selling, or the like, and other such expenses of sales and collections of Collateral. At its option, the Secured Party may, after providing written notice to the Company: (a) discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral; (b) obtain insurance on the Collateral; and (c) pay for the maintenance and preservation of the Collateral. The Company agrees that such payments by the Secured Party shall constitute Purchaser Expenses and that it shall reimburse the Secured Party on demand for such Purchaser Expenses. If the Company fails to reimburse the Secured Party within ten (10) days of receipt of a written invoice for any such Purchaser Expenses, they shall bear interest from the date incurred to the date reimbursed at a rate of ten percent (10%) per annum.

6.4 **Survival.** The representations, warranties, covenants and agreements made herein shall survive the Closing. The representations, warranties, covenants and obligations of the Company, and the rights and remedies that the Secured Party may exercise, shall not be limited or otherwise affected by or as a result of any information furnished to, or any investigation made by or knowledge of the Secured Party or any of its representatives.

6.5 **Successors and Assigns.** Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon the parties hereto and their respective successors and permitted assigns as provided in Section 7.7 of the Purchase Agreement.

6.6 **Entire Agreement; Amendments and Waivers.** This Agreement (including the Exhibit and the Disclosure Schedule) and the other Transaction Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term

10

sheets, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof. No amendment, waiver or other modification of any provision of this Agreement, and no consent with respect to any departure by the Company therefrom, shall be effective unless the same shall be in writing and signed by the Secured Party and the Company and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

6.7     **No Strict Construction**. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any provisions of this Agreement.

6.8     **No Waiver**. The powers conferred upon the Secured Party by this Agreement are solely to protect its rights hereunder and under the other Transaction Documents and its interest in the Collateral and shall not impose any duty upon the Secured Party to exercise any such powers. No omission or delay by the Secured Party at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by the Company at any time designated, shall be a waiver of any such right or remedy to which the Secured Party is entitled, nor shall it in any way affect the right of the Secured Party to enforce such provisions thereafter.

6.9     **Notices**. All notices and other communications hereunder shall be given in accordance, and shall be governed by, Section 10.2 of the Purchase Agreement.

6.10     **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument, and shall become effective when one or more counterparts have been signed by each party and delivered (including by facsimile) to the other party.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

11

NL074660

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

<div style="text-align:right">

**SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.**

By: _____

Its:

</div>

*Signature Page to Security Agreement*

CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

**NETLIST, INC.**

By: _____
Its:

*Signature Page to Security Agreement*

NL074662

EXHIBIT A

COLLATERAL

1

NL074663

<u>EXHIBIT F</u>

**INTELLECTUAL PROPERTY SECURITY AGREEMENT**

**THIS INTELLECTUAL PROPERTY SECURITY AGREEMENT**, dated as of November      . 2015 (the "*Agreement*"), between **SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.**, a Korean limited liability partnership ("*Secured Party*"), and **NETLIST, INC.**, a Delaware corporation ("*Grantor*"), is made with reference to the Security Agreement, dated as of the date hereof. by and between Grantor and Secured Party (as amended from time to time, the "*Security Agreement*"). Terms defined in the Security Agreement have the same meaning when used in this Agreement.

For good and valuable consideration. receipt of which is hereby acknowledged. Grantor hereby covenants and agrees as follows:

To secure the Secured Obligations under the Security Agreement, Grantor grants to Secured Party a security interest in all right, title, and interest of Grantor in any of the following, whether now existing or hereafter acquired or created in any and all of the following property (collectively, the "*Intellectual Property Collateral*"):

(a)   copyright rights, copyright applications. copyright registrations and like protections in each work or authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret. now or hereafter existing. created. acquired or held (collectively, the "*Copyrights*"), including the Copyrights described in **Exhibit A**;

(b)   trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections. and the entire goodwill of the business of Grantor connected with and symbolized by such trademarks (collectively, the "*Trademarks*"). including the Trademarks described in **Exhibit B**;

(c)   patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same (collectively. the "*Patents*"), including the Patents described in **Exhibit C**;

(d)   trade secrets, and any and all intellectual property rights in computer software and computer software products;

(e)   claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation. to sue for and collect such damages for said use or infringement of the intellectual property rights identified above;

(f)   licenses or other rights to use any of the Copyrights, Patents or Trademarks and all license fees and royalties arising from such use to the extent permitted by such license or rights;

1

CONFIDENTIAL

NL074664

(g)   amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and

(h)   proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

The rights and remedies of Secured Party with respect to the security interests granted hereunder are in addition to those set forth in the Security Agreement, and those which are now or hereafter available to Secured Party as a matter of law or equity.  Each right, power and remedy of Secured Party provided for herein or in the Security Agreement, or now or hereafter existing at law or in equity shall be cumulative and concurrent and shall be in addition to every right, power or remedy provided for herein, and the exercise by Secured Party of any one or more of such rights, powers or remedies does not preclude the simultaneous or later exercise by Secured Party of any other rights, powers or remedies.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

2

CONFIDENTIAL

NL074665

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

**NETLIST, INC.**

By: _____

Its:

*Signature Page to Intellectual Property Security Agreement*

NL074666

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

SVIC NO. 28 NEW TECHNOLOGY BUSINESS
INVESTMENT L.L.P.

By:
Its:

*Signature Page to Intellectual Property Security Agreement*

CONFIDENTIAL

NL074667

**EXHIBIT A**
**COPYRIGHTS**

1

CONFIDENTIAL

NL074668

**EXHIBIT B**
**TRADEMARKS**

Exhibit B-1

NL074669

**EXHIBIT C**
**PATENTS**

Exhibit C-1

CONFIDENTIAL

NL074670

Exhibit 10.2

**REGISTRATION RIGHTS AGREEMENT**

**BY AND BETWEEN**

**NETLIST, INC.,**

**AND**

**SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.**

**NOVEMBER 18, 2015**

CONFIDENTIAL

## REGISTRATION RIGHTS AGREEMENT

This **REGISTRATION RIGHTS AGREEMENT** (this "*Agreement*") is made as of November 18, 2015 by and between Netlist, Inc., a Delaware corporation (the "*Company*") and SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership (together with its designated affiliates, the "*Investor*"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Purchase Agreement (defined below).

### RECITALS

**WHEREAS**, pursuant to the Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated as of November 18, 2015, by and between the Company and the Investor (the "*Purchase Agreement*"), the Company has agreed to issue and sell to the Investor (i) a Senior Secured Convertible Promissory Note (the "*Note*") in the principal amount of $15,000,000 and (ii) a Common Stock Purchase Warrant to purchase up to 2,000,000 shares of Common Stock (the "*Warrant*");

**WHEREAS**, the obligations of the Company and the Investor under the Purchase Agreement are conditioned upon, among other things, the execution and delivery of this Agreement by the Company and the Investor.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

### AGREEMENT

**ARTICLE I    DEFINITIONS**

1.1    <u>Definitions</u>. As used in this Agreement, and unless the context requires a different meaning, the following terms have the meanings indicated:

"*Affiliate*" means any Person who is an "affiliate" as defined in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

"*Agreement*" means this Agreement as the same may be amended, supplemented or modified in accordance with the terms hereof.

"*Board of Directors*" means the Board of Directors of the Company.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks in the State of New York are authorized or required by law or executive order to close.

"*Charter Documents*" means the Certificate of Incorporation and the Bylaws of the Company, each as may be amended from time to time.

"*Closing Date*" has the meaning set forth in the Purchase Agreement.

"*Common Stock*" means the common stock, par value $0.001 per share, of the Company and any other capital stock of the Company into which such stock is reclassified or reconstituted, and any securities of the Company or any successor which may be issued on or after the date hereof in respect of, or in exchange for, shares of Common Stock pursuant to, among others, merger, consolidation, stock split, stock dividend, recapitalization of the Company or otherwise.

"*Common Stock Equivalents*" means any security or obligation which is by its terms, directly or indirectly, substantively analogous to, convertible into or exchangeable or exercisable into or for shares of Common Stock, including, without limitation, any option, warrant or other subscription or purchase right with respect to Common Stock.

NL074672

"*Company*" has the meaning set forth in the preamble to this Agreement.

"*Company Underwriter*" has the meaning set forth in **Section 4.1**.

"*Demand*" has the meaning set forth in **Section 3.1(a)**.

"*Designated Holder*" means the Investor and any permitted transferee of the Investor to whom Registrable Securities have been transferred in accordance with **Section 9.5** of this Agreement, other than a transferee to whom Registrable Securities have been transferred pursuant to a Registration Statement under the Securities Act or Rule 144 or Regulation S under the Securities Act (or any successor rules thereto), but in each case solely for so long as such Investor or transferee continues to be a holder of Registrable Securities.

"*Dollars*," "*dollars*" and "*$*" has the meaning set forth in **Section 9.12**.

"*Eligible Market*" has the meaning set forth in the definition of "Trading Day" as set forth in this **Section 1.1**.

"*Effectiveness Period*" has the meaning set forth in **Section 3.2(a)**.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder.

"*FINRA*" means the Financial Industry Regulatory Authority (or any successor entity thereto).

"*Governmental Authority*" means the government of any nation, state, province, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"*Holder's Counsel*" has the meaning set forth in **Section 6.1(a)**.

"*Incidental Registration*" has the meaning set forth in **Section 4.1**.

"*Indemnified Party*" has the meaning set forth in **Section 7.3**.

"*Indemnifying Party*" has the meaning set forth in **Section 7.3**.

"*Investor*" has the meaning set forth in the preamble to this Agreement and shall also include any permitted transferee thereof.

"*Inspector*" has the meaning set forth in **Section 5.2(b)**.

"*Issuance Date*" means the date on which the Registrable Securities are issued upon conversion of the Note or exercise of the Warrant.

"*Liability*" has the meaning set forth in **Section 7.1**.

"*Other Stockholders*" has the meaning set forth in **Section 4.1**.

"*Person*" means any individual, firm, corporation, partnership, limited liability company, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

"*Plan of Distribution*" has the meaning set forth in **Section 3.1(a)**.

"*Purchase Agreement*" has the meaning set forth in the recitals to this Agreement.

"*Records*" has the meaning set forth in **Section 5.2(b)**.

"*Registrable Securities*" means, subject to **Section 2.2** below (a) shares of Common Stock issued upon conversion of the Note or upon the exercise of the Warrant; and (b) any Common Stock issued as

2

CONFIDENTIAL

NL074673

(or issuable upon the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of the securities referenced in clause (a) above.

"*Registration Expenses*" has the meaning set forth in **Section 6.3**.

"*Registration Statement*" means a registration statement filed pursuant to the Securities Act.

"*Required Effectiveness Date*" means the date that is forty-five (45) days from the Required Filing Date; *provided, that*, if the SEC reviews and has written comments to the filed Registration Statement, then the Required Effectiveness Date under this clause shall be five (5) Business Days following the date the SEC or the Staff notifies the Company that it will not review the Registration Statement or that the Company may request effectiveness of the Registration Statement.

"*Required Filing Date*" has the meaning set forth in **Section 3.1**.

"*SEC*" means the United States Securities and Exchange Commission or any similar or successor agency then having jurisdiction to enforce the Securities Act.

"*SEC Approved Registrable Securities*" means Registrable Securities other than SEC Non-Registrable Securities.

"*SEC Non-Registrable Securities*" means the Registrable Securities excluded from the Registration Statement either pursuant to **Section 3.2(b)** because the SEC or the Staff has indicated through comment letters or otherwise that such securities are not eligible to be resold under Rule 415 of the Securities Act.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Staff*" has the meaning set forth in **Section 3.2(b)**.

"*Trading Day*" means (a) any day on which the Common Stock is listed or quoted and traded on any national securities exchange, market or trading or quotation facility on which the Common Stock is then listed or quoted (an "*Eligible Market*"), or (b) if the Common Stock is not then listed or quoted and traded on any Eligible Market, then a day on which trading occurs on the OTC Bulletin Board (or any successor thereto), or (c) if trading ceases to occur on the OTC Bulletin Board (or any successor thereto), any Business Day.

"*Underwriter Identification*" has the meaning set forth in **Section 3.2(b)**.

"*Warrant*" has the meaning set forth in the recitals to this Agreement.

**ARTICLE II          GENERAL; SECURITIES SUBJECT TO THIS AGREEMENT**

2.1      **Grant of Rights**.  The Company hereby grants registration rights to the Designated Holder upon the terms and conditions set forth in this Agreement.

2.2      **Registrable Securities**.  For the purposes of this Agreement, securities of the Company listed in clauses (a) and (b) of the definition of "Registrable Securities" in **Section 1.1** hereof will cease to be Registrable Securities, when (i) a Registration Statement covering such Registrable Securities has been declared effective under the Securities Act by the SEC and all such Registrable Securities have been sold or transferred pursuant to such effective Registration Statement, (ii) the entire amount of the Registrable Securities owned by a Designated Holder may be sold in a single sale, in the opinion of counsel satisfactory to the Company and such Designated Holder, each in their reasonable judgment (it being agreed that DLA Piper LLP (US) shall be satisfactory counsel), without any limitation as to volume pursuant to Rule 144 (or any successor provision then in effect) under the Securities Act or (iii) such Registrable Securities have been sold pursuant to Rule 144 under the Securities Act.

3

CONFIDENTIAL

NL074674

**2.3**   **Holder of Registrable Securities.**  A Person is deemed to be a holder of Registrable Securities whenever such Person owns of record Registrable Securities, or holds an option to purchase, or a security convertible into or exercisable or exchangeable for, Registrable Securities whether or not such acquisition or conversion has actually been effected.  If the Company receives conflicting instructions, notices or elections from two or more Persons with respect to the same Registrable Securities, the Company shall act upon the basis of the instructions, notice or election received from the record owner of such Registrable Securities.

**ARTICLE III**          **DEMAND REGISTRATION**

**3.1**   **Demand Registration Rights.**

(a)          Subject to the conditions of this **ARTICLE III**, if at any time or from time to time following the Issuance Date, the Company receives a written request from the Investor (a "*Demand*") that the Company file a registration statement under the Securities Act covering the registration for resale of the Registrable Securities, then the Company shall, within thirty (30) days of the receipt thereof (the "*Required Filing Date*"), file with the SEC a registration statement pursuant to Rule 415 of the Securities Act (the "*Registration Statement*") on Form S-3 (or any successor form thereto), or if Form S-3 may not be used by the Company pursuant to applicable law, on Form S-1 (or any successor form thereto) with respect to the resale, from time to time, covering all of the Registrable Securities held by the Designated Holder.  The Registration Statement shall contain substantially the "*Plan of Distribution*" attached hereto as Exhibit A.  The disposition of Registrable Securities from the Registration Statement may occur, at any time, in one or more underwritten offerings, block transactions, broker transactions, at-market transactions or in such other manner or manners as may be specified by the applicable Designated Holder.  Notwithstanding the above, if the Company is required to file the Registration Statement on a Form S-1, then the Company shall have sixty (60) days from the Demand to prepare and file the Registration Statement and the Required Filing Date shall be, in such case, the sixtieth (60th) day after the Demand.

(b)          Notwithstanding the foregoing, the Company shall not be required to effect a registration pursuant to this **ARTICLE III** if the Company shall furnish to the Designated Holder requesting a registration statement pursuant to this Section 3 a certificate signed by the Company's Chief Executive Officer or Chairman of the Board of Directors stating that, in the good faith judgment of the Board of Directors of the Company, it would be seriously detrimental to the Company and its stockholders for such registration statement to be effected at such time.  In such case, the Company shall have the right to defer such filing for a period of not more than one hundred twenty (120) days after receipt of the Demand of the Investor, provided that such right shall be exercised by the Company not more than once in any twelve (12) month period and provided further that the Company shall not register any securities for the account of itself or any other stockholder during such one hundred twenty (120) day period (other than a registration relating to a corporate reorganization or transaction under Rule 145 of the Securities Act, a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the resale of the Registrable Securities, or a registration in which the only Common Stock being registered is Common Stock issuable upon conversion of debt securities that are also being registered).

**3.2**   **Effective Registration Statement.**

(a)          The Company shall use its reasonable best efforts to cause the Registration Statement to become effective as soon as practicable, but not later than the Required Effectiveness Date, and shall use its reasonable best efforts to keep the Registration Statement continuously effective under the Securities Act, subject to the provisions of **Sections 6.4** and **6.5** hereof, until the earlier of (i) such time as the Company delivers an opinion of counsel reasonably acceptable to the Designated Holder (it being agreed that DLA Piper LLP (US) shall be satisfactory counsel) that the Designated Holder may sell in the open market in a single transaction all Registrable Securities then held by the Investor pursuant to Rule 144 of the Securities Act (or any similar provision then in force) without being subject to the volume limitations

4

          NL074675

thereof or otherwise under an applicable exemption from the registration requirements of the Securities Act, as amended, and all other applicable securities and blue sky laws or (ii) all Registrable Securities covered by such Registration Statement have been sold pursuant to such Registration Statement or pursuant to Rule 144 (such period in respect of such Registrable Securities being the applicable "*Effectiveness Period*").

(b)　　Notwithstanding anything to the contrary in this Agreement (other than Section 3.2(d) below), in the event the staff of the SEC (the "*Staff*") or the SEC seeks to characterize any offering pursuant to a Registration Statement filed pursuant to this Agreement as constituting an offering of securities by or on behalf of the Company such that Rule 415 is not available to the Company to register the resale of such Registrable Securities and, as a result, the Staff or the SEC does not permit such Registration Statement to become effective and used for resales in a manner that permits the continuous resale at the market by the Designated Holder participating therein without being named therein as an "underwriter," then the Company shall reduce the number of shares to be included in such Registration Statement (in accordance with the following sentence) until such time as the Staff and the SEC shall so permit such Registration Statement to become effective as aforesaid.  In addition, in the event that the Staff or the SEC requires any Designated Holder seeking to sell securities under a Registration Statement filed pursuant to this Agreement to be specifically identified as an "underwriter" (an "*Underwriter Identification*") in order to permit such Registration Statement to become effective, and such Designated Holder (subject to Section 3.2(d) below) does not consent to being so named as an underwriter in such Registration Statement, then, in each such case, the Company shall reduce the total number of Registrable Securities to be registered on behalf of such Designated Holder, only to the extent necessary as would cause the Staff or the SEC not to require such Underwriter Identification or until such Designated Holder accepts such Underwriter Identification and the manner thereof.  In the event of any reduction in Registrable Securities pursuant to this section), if requested by a Designated Holder holding Registrable Securities that were so excluded from such registration, the Company shall use its reasonable best efforts to cause such Registrable Securities to be registered to the greatest extent and at the earliest opportunity practicable and in any event not later sixty (60) days after the earliest practicable date permitted under applicable guidance of the SEC and the Staff (and shall use its reasonable best efforts to effect additional registrations of Registrable Securities until all such securities have been included in additional Registration Statements); *provided, however,* that in no event shall the Company be required to file more than three (3) Registration Statements pursuant to this **Section 3.2(b)**.

(c)　　Notwithstanding anything to the contrary in this Agreement, a Designated Holder shall have the right to require the Company to exclude all or any portion of such Designated Holder's Registrable Securities from any Registration Statement, by written notice to the Company upon such Designated Holder's reasonable belief that (i) inclusion of such Registrable Securities in the Registration Statement could subject such Designated Holder to underwriter liability, or (ii) the SEC or the Staff will impose restrictions and terms on the disposition of such Registrable Securities that are materially inconsistent with the Plan of Distribution attached hereto as <u>Exhibit B</u>.  In such event, the Company shall be required to file a new Registration Statement for such excluded shares in accordance with **Section 3.2(b)**.

(d)　　If any such Registration Statement and related prospectus refers to any Designated Holder by name or otherwise as the holder of any securities of the Company and if in such holder's sole and exclusive judgment, such holder is or might be deemed to be an underwriter or a controlling person of the Company, or that such reference could reasonably be expected to result in an Underwriting Identification requirement, such holder shall have the right to (i) require the insertion therein of language, in form and substance satisfactory to such holder and presented to the Company in writing, to the effect that the holding by such holder of such securities is not to be construed as a recommendation by such holder of the investment quality of the Company's securities covered thereby and that such holding does not imply that such holder will assist in meeting any future financial requirements of the Company, or (ii)

5

NL074676

in the event that such reference to such holder by name or otherwise is not required by the Securities Act or any similar federal statute then in force, require the deletion of the reference to such holder.

    **3.3**    **Expenses**. The Company shall bear all Registration Expenses in connection with this **ARTICLE III**, whether or not the Registration Statement becomes effective.

**ARTICLE IV**    **INCIDENTAL OR "PIGGY-BACK" REGISTRATION**

    **4.1**    **Request for Incidental Registration**. At any time after the Issuance Date until the end of the Effectiveness Period, if (i) the Company proposes to file a Registration Statement under the Securities Act with respect to an offering by the Company for its own account (other than a Registration Statement on Form S-4 or S-8 or any successor thereto), or (ii) the Company proposes to file a Registration Statement under the Securities Act with respect to an offering for the account of any stockholder of the Company other than any Designated Holder, then in each case the Company shall give written notice of such proposed filing to each Designated Holder at least thirty (30) days before the anticipated filing date, and such notice shall specify, at minimum, the proposed date of filing of such Registration Statement, any proposed means of distribution of such Registrable Securities or other securities, any proposed managing underwriter or underwriters of such Registrable Securities or other securities and a good faith estimate by the Company of the proposed maximum offering price thereof, as such price is proposed to appear on the facing page of such registration statement, and offer such Designated Holder the opportunity to register the number of Registrable Securities as such Designated Holder may request (an "***Incidental Registration***"). The Company shall use its best efforts (within twenty (20) days of the notice by the Designated Holder provided for below in this sentence) to cause the managing underwriter or underwriters in the case of a proposed underwritten offering (the "***Company Underwriter***") to permit each Designated Holder who has requested in writing to the Company within ten (10) Business Days of the giving of the notice by the Company to participate in the Incidental Registration to include its, his or her Registrable Securities in such offering on the same terms and conditions as the securities of the Company or the account of such other stockholder, as the case may be, included therein. In connection with any Incidental Registration under this section involving an underwritten offering, the Company shall not be required to include any Registrable Securities in such underwritten offering unless the Designated Holder thereof accepts the terms of the underwritten offering as reasonably agreed upon between the Company, such other stockholders, if any, and the Company Underwriter. If the **Company Underwriter determines in writing to the Company** that the registration of all or part of the Registrable Securities which the Designated Holder has requested to be included in an offering by the Company for its own account (other than a Registration Statement on Form S-4 or S-8 or any successor thereto) would materially adversely affect the price, timing or distribution of the securities offered or the price per security that will derive from such registration, then the Company shall be required to include in such Incidental Registration, to the extent of the amount that the Company Underwriter believes may be sold without causing such adverse effect, (i) all of the securities to be offered for the account of the Company, (ii) the Registrable Securities to be offered for the account of the Designated Holder pursuant to this **ARTICLE IV**, and (iii) other securities requested to be included in such offering; *provided, however*, that no such reduction shall reduce the shares of Registrable Securities held by the Designated Holder included in the registration to below 20% of the total amount of securities included in such registration, unless such adverse effect is related to any of the matters contemplated by **Section 3.2(b)** hereof, in which case such 20% floor shall not apply and such Registrable Securities may be excluded pursuant to the provisions of **Section 3.2 (b)** hereof. If the Company Underwriter determines in writing that the registration of all or part of the Registrable Securities which the Designated Holder has requested to be included in an offering for the account of any stockholder of the Company other than the Designated Holder ("***Other Stockholders***") would materially adversely affect the price, timing or distribution of the securities offered or the price per security that will derive from such registration, then the Company shall be required to include in such Incidental Registration, to the extent of the amount that

6

the Company Underwriter believes may be sold without causing such adverse effect, (i) all of the securities to be offered for the account of such Other Stockholders, (ii) the Registrable Securities to be offered for the account of the Designated Holder pursuant to this **ARTICLE IV**, (iii) all of the securities to be offered for the account of the Company, and (iv) other securities requested to be included in such offering; *provided, however,* that no such reduction shall reduce the shares of Registrable Securities held by the Designated Holder included in the registration to below 40% of the total amount of securities included in such registration unless such adverse effect is related to any of the matters contemplated by **Section 3.2(b)** above, in which case such 40% floor shall not apply and such Registrable Securities may be excluded pursuant to the provisions of **Section 3.2(b)**.  For the avoidance of doubt, no registration pursuant to this section shall relieve the Company of its obligations to register Registrable Securities pursuant to **Sections 3.1** and **3.2**.

4.2     **Right to Terminate Registration**.  The Company shall have the right to terminate or withdraw any registration initiated by it under **Section 4.1** prior to the effectiveness of such registration whether or not any Designated Holder has elected to include Registrable Securities in such registration.  A Designated Holder shall have the right, by written notice to the Company, to exclude all or any portion of such Designated Holder's Registrable Securities from any Registration Statement effected pursuant to this **ARTICLE IV** at any time prior to its effectiveness.

4.3     **Expenses**.  The Company shall bear all Registration Expenses in connection with any Incidental Registration pursuant to this **ARTICLE IV**, whether or not such Incidental Registration becomes effective.

**ARTICLE V          UNDERWRITTEN OFFERINGS**

5.1     **Market Underwritten Offering**.  After one (1) year from the Issuance Date, the Designated Holder may distribute all or any portion of the Registrable Securities by means of an underwritten offering; *provided, that:* (i) the Designated Holder has requested such underwritten offering, (ii) the Designated Holder provides written notice to the Company of its intention to distribute Registrable Securities by means of an underwritten offering, (iii) the managing underwriter or underwriters thereof shall be designated by the Designated Holder; *(provided, however,* that such designated managing underwriter or underwriters shall be reasonably acceptable to the Company); (iv) the Designated Holder completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; and (v) the underwritten sale pursuant to this Section must be for a number of Registrable Securities, which based on the good faith determination by the Designated Holder, would result in gross proceeds of at least $5 million.

5.2     The Company agrees that in the event an underwritten offering pursuant to **Section 5.1** is undertaken, the Company shall (without limitation to the obligations of the Company set forth in **Article VI**):

(a)     enter into and perform customary agreements (including an indemnity agreement with customary indemnification provisions) and take such other actions as reasonably required in order to expedite or facilitate the disposition of such Registrable Securities, including causing its officers to participate in "road shows" and other information meetings organized by the underwriter, if applicable;

(b)     make available at reasonable times for inspection by any Designated Holder, any managing underwriter participating in any disposition of such Registrable Securities pursuant to a Registration Statement, Holder's Counsel and any attorney, accountant or other agent retained by any such Designated Holder or any managing underwriter (each, an "*Inspector*" and, collectively, the "*Inspectors*"), all financial and other records, pertinent corporate documents and properties of the Company and its subsidiaries and such other information (collectively, the "*Records*") as shall be reasonably necessary to enable any such Inspector to exercise their due diligence responsibility, and cause

7

the Company's and its subsidiaries' officers, directors and employees, and the independent public accountants of the Company, to supply all information reasonably requested by any such Inspector in connection with such Registration Statement. Notwithstanding the foregoing, Records and other information that the Company determines, in good faith, to be confidential, and which is delivered to the Inspectors pursuant to written instruction to keep such information confidential, shall not be disclosed by the Inspectors or used for any purpose other than as necessary or appropriate for the purpose of such inspection (and the Inspectors shall confirm their agreement in writing in advance to the Company if the Company shall so request) unless (i) the disclosure of such Records is necessary, in the Company's judgment, to avoid or correct a misstatement or omission in the Registration Statement, (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction after exhaustion of all appeals therefrom or (iii) the information in such Records was and/or becomes otherwise known to the Inspectors on a non-confidential basis, prior to or after its disclosure by the Company, or was and/or becomes generally available to the public. Each Designated Holder agrees that it shall promptly, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, give notice to the Company and allow the Company, at the Company's expense, to undertake appropriate action to prevent disclosure of the Records deemed confidential, and such Designated Holder shall reasonably cooperate with the Company in connection therewith.

(c)　　furnish, at the request of any seller of Registrable Securities on the date such securities are delivered to the underwriters for sale pursuant to such registration or, if such securities are not being sold through underwriters, on the date the Registration Statement with respect to such securities becomes effective and dated as of such date, an opinion of counsel representing the Company for the purposes of such registration, addressed to the underwriters, if any, and to the seller making such request, covering such legal matters with respect to the registration in respect of which such opinion is being given as the underwriters, if any, and such seller may reasonably request and are customarily included in such opinions; and

(d)　　obtain one or more "cold comfort" letters, dated the effective date of such Registration Statement and dated the date of the closing under the applicable underwriting agreement, signed by the independent certified public accountants of the Company who have certified the financial statements included in such Registration Statement, in customary form and covering such matters of the type customarily covered by "cold comfort" letters as the Designated Holder.

**ARTICLE VI　　　REGISTRATION PROCEDURES**

6.1　　**Obligations of the Company.** Whenever registration of Registrable Securities has been requested pursuant to **ARTICLE III** or **ARTICLE IV** of this Agreement, the Company shall use its reasonable best efforts to effect the registration of such Registrable Securities in accordance with the intended method of distribution thereof, and in connection with any such request, the Company shall, as expeditiously as possible:

(a)　　before filing a Registration Statement or prospectus or any amendments or supplements thereto relating to Registrable Securities, the Company shall provide a single counsel selected by the Designated Holder ("**Holder's Counsel**") with an adequate and appropriate opportunity to review and comment on such Registration Statement and each prospectus included therein (and each amendment or supplement thereto) to be filed with the SEC, provided, that in no event shall such review period be required to be more than ten (10) days. The Company shall reasonably cooperate with Holder's Counsel in performing the Company's obligations under this Agreement. The Company shall promptly notify the Holder's Counsel and each seller of Registrable Securities of any stop order issued or threatened by the SEC relating to Registrable Securities and use all best efforts to prevent the entry of such stop order or to remove it if entered;

(b)　　prepare and file with the SEC such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be reasonably necessary to keep such

8

NL074679

Registration Statement effective for the period specified in such **ARTICLE III**, or with respect to **ARTICLE IV** and if not so specified therein, the lesser of (A) one hundred and eighty (180) days and (B) such shorter period which will terminate when all Registrable Securities covered by such Registration Statement have been sold and shall comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement;

(c)     furnish to each seller of Registrable Securities, prior to filing a Registration Statement relating to Registrable Securities, at least one executed copy of such Registration Statement as is proposed to be filed, and thereafter such number of conformed copies of such Registration Statement, each amendment and supplement thereto (in each case including all exhibits thereto), the prospectus included in such Registration Statement (including each preliminary prospectus and any summary prospectus) and such other documents or prospectus as each such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(d)     register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as any seller of Registrable Securities may reasonably request, and continue such registration or qualification in effect in such jurisdiction for as long as permissible pursuant to the laws of such jurisdiction, or for as long as any such seller reasonably requests or until all of such Registrable Securities are sold, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable any such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller; *provided, however*, that the Company shall not be required to (i) qualify generally to do business as a foreign entity in any jurisdiction where it would not otherwise be required to qualify but for this section, (ii) subject itself to taxation in any such jurisdiction or (iii) consent to general service of process in any such jurisdiction;

(e)     promptly notify each seller of Registrable Securities: (i) when a prospectus, any prospectus supplement, a Registration Statement or a post-effective amendment to a Registration Statement (but only if relating to Registrable Securities) has been filed with the SEC, and, with respect to a Registration Statement or any post-effective amendment (but only if relating to Registrable Securities), when the same has become effective; (ii) of any comments or request by the SEC or any other federal or state Governmental Authority for amendments or supplements to a Registration Statement or related prospectus or for additional information (but only if relating to Registrable Securities); (iii) of the issuance by the SEC or any other Governmental Authority of any stop order suspending the effectiveness of a Registration Statement relating to Registrable Securities or of any order suspending or preventing the use of any related prospectus or the initiation or threatening of any proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceedings for such purpose; (v) of the existence of any fact or happening of any event (including the passage of time) of which the Company has knowledge which makes any statement of a material fact in such Registration Statement or related prospectus or any document incorporated or deemed to be incorporated therein by reference untrue or which would require the making of any changes to the Registration Statement or prospectus in order that, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of such prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and (vi) determination by counsel of the Company that a post-effective amendment to a Registration Statement relating to Registrable Securities is advisable;

(f)     upon the occurrence of any event contemplated by clause (v) of **Section 6.1(e)**, as promptly as practicable, prepare a supplement, amendment or post-effective amendment to such

9

Registration Statement or related prospectus and furnish to each seller of Registrable Securities a reasonable number of copies of such supplement to or an amendment or post-effective amendment of such Registration Statement or prospectus as may be necessary so that, after delivery to the purchasers of such Registrable Securities, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of such prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

     (g)     Upon the occurrence of any event contemplated by clauses (iii) or (iv) of **Section 6.1(e)**, as promptly as practicable, the Company shall use its reasonable best efforts to promptly obtain the withdrawal of any such order or suspension and shall immediately notify each seller of Registrable Securities of any such withdrawal;

     (h)     cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed; provided, that the applicable listing requirements are satisfied;

     (i)     keep Holder's Counsel reasonably advised in writing as to the initiation and progress of any registration hereunder; provided, that the Company shall provide Holder's Counsel with all correspondence with Staff or the SEC in connection with any Registration Statement filed hereunder to the extent that such Registration Statement has not been declared effective on or prior to the date required hereunder;

     (j)     provide reasonable cooperation to each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA; provided, that the Company shall not be required to incur material expenses or obligations in connection with its obligations under this section;

     (k)     cooperate with the Designated Holder of the Registrable Shares to facilitate the timely preparation and delivery of certificates representing such Registrable Shares to be delivered to a transferee pursuant to a Registration Statement, which certificates shall be free of any restrictive legends and in such denominations and registered in such names as such Designated Holder may request;

     (l)     not later than the Required Effectiveness Date of any Registration Statement, the Company shall provide CUSIP numbers for the Registrable Securities registered for resale under such Registration Statement, and provide the transfer agent for the Registrable Shares one or more certificates for such Registrable Shares, in a form eligible for deposit with the Depository Trust Company; and

     (m)     take all other steps reasonably necessary and advisable to effect the registration of the Registrable Securities contemplated hereby.

     6.2     **Seller Information**.  The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish, and such seller shall furnish, to the Company such information regarding the distribution of such securities as the Company may from time to time reasonably request in writing in response to requests made by the Staff or to permit the Company to comply with the rules and regulations of the SEC.  The furnishing of such information shall be a condition to the inclusion of the seller's shares in such registration.

     6.3     **Registration Expenses**.  The Company shall pay all expenses arising from or incident to its performance of, or compliance with, this Agreement, including, without limitation, (i) SEC, stock exchange and FINRA registration and filing fees, (ii) all fees and expenses incurred in complying with securities or "blue sky" laws (including reasonable fees, charges and disbursements of counsel to any underwriter incurred in connection with "blue sky" qualifications of the Registrable Securities as may be

10

set forth in any underwriting agreement), (iii) all printing, messenger and delivery expenses, (iv) the reasonable fees, charges and expenses of the Holder's Counsel (including without limitation the fees charges and expenses incurred in connection with any amendments to a Registration Statement), and (v) the reasonable fees, charges and expenses of counsel to the Company and of its independent certified public accountants and any other accounting fees, charges and expenses incurred by the Company (including, without limitation, any expenses arising from any "cold comfort" letters or any special audits incident to or required by any registration or qualification), regardless of whether such Registration Statement is declared effective.  All of the expenses described in the preceding sentence of this section are referred to herein as "**_Registration Expenses._**"  The Designated Holder of Registrable Securities sold pursuant to a Registration Statement shall bear the expense of any broker's commission or underwriter's discount or commission relating to registration and sale of such Designated Holder's Registrable Securities.

      6.4    <u>Notice to Discontinue</u>.  Each Designated Holder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in clause (v) of **Section 6.1(e)**, such Designated Holder shall forthwith discontinue disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities until such Designated Holder's receipt of the copies of the supplemented or amended prospectus contemplated by **Section 6.1(f)** and, if so directed by the Company, such Designated Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Designated Holder's possession, of the prospectus covering such Registrable Securities which is current at the time of receipt of such notice.  If the Company shall give any such notice, the Company shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement (including, without limitation, the period referred to in **Section 6.1(b)**) by the number of days during the period from and including the date of the giving of such notice pursuant to clause (v) of **Section 6.1(e)** to and including the date when sellers of such Registrable Securities under such Registration Statement shall have received the copies of the supplemented or amended prospectus contemplated by, and meeting the requirements of, **Section 6.1 (f)**; _provided, that_, no single suspension under this section shall exceed forty-five (45) days in any one hundred and eighty (180) day period and in no event shall more than one suspension event exceed, in the aggregate, sixty (60) days in any twelve (12) month period.

      6.5    <u>Suspension of Sales</u>.  Notwithstanding anything in this Agreement to the contrary, so long as the Registration Statement is on Form S-1 or on any other form that does not allow for forward incorporation by reference of reports and other materials filed by the Company pursuant to Section 13(a) or 15(d) of the Exchange Act, the Company may suspend sales under such Registration Statement as follows (but, in any event, no single suspension event shall exceed forty-five (45) days in any one hundred and eighty (180) day period) and in no event shall more than one suspension event exceed, in the aggregate, sixty (60) days in any twelve (12) month period: (i) for the period commencing at the time that the Company disseminates a press release announcing its preliminary financial results for any fiscal period and ending on the third (3rd) Business Day after the earlier of (A) the date that the related report on Form 10-K or 10-Q, as applicable, under the Exchange Act is filed with the SEC and (B) the date on which such report is required to be filed under the Exchange Act (giving effect to Rule 12b-25 promulgated thereunder); (ii) for the period commencing at the time the Company disseminates a press release announcing a material development that would make a statement of a material fact in such Registration Statement untrue or misleading and ending on the third (3rd) Business Day after the earlier of (A) the date that the related report on Form 8-K is filed with the SEC and (B) the date on which such report is required to be filed under the Exchange Act (giving effect to Rule 12b-25 promulgated thereunder); (iii) to the extent necessary to allow any post-effective amendment to the Registration Statement or supplement to the prospectus to be prepared and, if necessary, filed with the SEC and, in the case of a post-effective amendment, declared effective; and (iv) for a period during which the Company, in the good faith opinion of the Board of Directors, determines that the disclosure of material, non-public information concerning the Company or any of its subsidiaries would be materially detrimental to the

11

Company; *provided, that* the Company shall promptly notify the Designated Holder in writing (I) of the existence of such material, non-public information (provided that in each notice the Company will not disclose the content of such material, non-public information to the Designated Holder) and the date on which such suspension will begin and (II) of the date on which such suspension ends. The Company will use its reasonable best efforts to minimize periods during which the Registration Statement is not effective.

**ARTICLE VII          INDEMNIFICATION; CONTRIBUTION**

7.1      **Indemnification by the Company**. The Company agrees to indemnify and hold harmless each Designated Holder, its general or limited partners, members, directors, officers, Affiliates and each Person who controls (within the meaning of Section 15 of the Securities Act) any of the foregoing from and against any and all losses, claims, damages, liabilities and expenses (including reasonable costs of investigation) (each, a "*Liability*" and collectively, "*Liabilities*"), (i) arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary, final or summary prospectus, or document incorporated by reference into any of the foregoing, or notification or offering circular (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto), (ii) arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which such statements were made, except insofar as such Liability arises out of or is based upon any untrue statement or omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning such Designated Holder furnished in writing to the Company by such Designated Holder specifically for use therein, or (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any state securities laws or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities laws in connection with the sale of securities by such Designated Holder pursuant to any Registration Statement in which such Designated Holder is participating. The Company shall also provide customary indemnities to any underwriters (or persons, including broker-dealers or agents deemed "underwriters" within the meaning of the Securities Act) of the Registrable Securities, their officers, directors and employees and each Person who controls such underwriters (within the meaning of Section 15 of the Securities Act) to the same extent as provided above with respect to the indemnification of the Designated Holder of Registrable Securities.

7.2      **Indemnification by Designated Holder**. In connection with any Registration Statement in which a Designated Holder is participating pursuant to **ARTICLE III** or **ARTICLE IV** hereof, each such Designated Holder shall promptly furnish to the Company in writing such information with respect to such Designated Holder as may be required by law or regulation for use in connection with any such Registration Statement or prospectus and all information required to be disclosed in order to make the information previously furnished to the Company by such Designated Holder not materially misleading or necessary to cause such Registration Statement or prospectus not to omit a material fact with respect to such Designated Holder necessary in order to make the statements therein not misleading. Each Designated Holder agrees to indemnify and hold harmless the Company, its directors, officers, Affiliates, and each Person who controls the Company to the same extent as the foregoing indemnity from the Company to the Designated Holder, but only if such untrue statement or omission was made in reliance upon and in conformity with information with respect to such Designated Holder furnished in writing to the Company by such Designated Holder specifically for use in such Registration Statement or preliminary, final or summary prospectus or amendment or supplement, or a document incorporated by reference into any of the foregoing; *provided, however*, that the total amount to be indemnified by such Designated Holder pursuant to this **Section 7.2** shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by such Designated Holder in the offering to which the Registration Statement or prospectus relates.

12

7.3     **Conduct of Indemnification Proceedings**.  Any Person entitled to indemnification hereunder (the "*Indemnified Party*") agrees to give prompt written notice to the indemnifying party (the "*Indemnifying Party*") after the receipt by the Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; *provided, however*, that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to the Indemnified Party hereunder (except to the extent that the Indemnifying Party is materially prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure).  If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party.  The Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Indemnified Party unless (i) the Indemnifying Party agrees to pay the same, (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably satisfactory to the Indemnified Party or (iii) such parties have been advised in writing by such counsel that either (x) representation of such Indemnified Party and the Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (y) there may be one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party, in any of such cases, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all similarly-situated Indemnified Parties.  No Indemnifying Party shall be liable for any settlement entered into without its written consent, which consent shall not be unreasonably withheld.  No Indemnifying Party shall, without the consent of such Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is a party and indemnity has been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability for claims that are the subject matter of such proceeding.

7.4     **Contribution**.

(a)     If the indemnification provided for in this **ARTICLE VII** from the Indemnifying Party is unavailable to an Indemnified Party hereunder in respect of any Liabilities referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such Liabilities, as well as any other relevant equitable considerations.  The relative faults of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action.  The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in **Sections 7.1** and **7.2**, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; *provided, that* the total amount to be contributed by such Designated Holder shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by such Designated Holder in the offering.  No Person involved in the sale of Registrable Securities who is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) in connection with such sale shall be entitled to indemnification or contribution from any Person involved in such sale of Registrable Securities who is not guilty of fraudulent misrepresentation.

13

NL074684

**(b)**   The parties hereto agree that it would not be just and equitable if contribution pursuant to this section were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in **Section 7.4(a)**. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

**ARTICLE VIII**        **COVENANTS**

**8.1**      <u>Rule 144</u>. The Company covenants that from and after the date hereof it shall use its best efforts to (a) file any reports required to be filed by it under the Exchange Act and (b) take such further action as each Designated Holder may reasonably request (including providing any information necessary to comply with Rule 144 under the Securities Act), all to the extent required from time to time to enable such Designated Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (i) Rule 144 under the Securities Act, as such rule may be amended from time to time, or Regulation S under the Securities Act or (ii) any similar rules or regulations hereafter adopted by the SEC. The Company shall, upon the request of any Designated Holder, deliver to such Designated Holder a written statement as to whether it has complied with such requirements.

**8.2**      <u>Limitations on Registration Rights</u>. No Person shall, without the prior written consent of the Designated Holder, be permitted to include securities of the Company in any registration filed under **ARTICLE III** hereto.

**ARTICLE IX**        **MISCELLANEOUS**

**9.1**      <u>Recapitalizations, Exchanges, etc</u>. The provisions of this Agreement shall apply to the full extent set forth herein with respect to (i) the shares of Common Stock and the Common Stock Equivalents, (ii) any and all shares of voting common stock of the Company into which the shares of Common Stock or Common Stock Equivalents are converted, exchanged or substituted in any recapitalization or other capital reorganization by the Company and (iii) any and all equity securities of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in conversion of, in exchange for or in substitution of, the shares of Common Stock or Common Stock Equivalents and shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the date hereof. The Company shall cause any successor or assign (whether by merger, consolidation, sale of assets or otherwise) to assume the Company's obligations hereunder as a condition of any such transaction.

**9.2**      <u>Other Registration Rights</u>. The Company shall not enter into any agreement with respect to its securities that is inconsistent with the rights granted to the Designated Holder in this Agreement.

**9.3**      <u>Remedies</u>. The Designated Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, shall be entitled to specific performance of their rights under this Agreement. The Company agrees that monetary damages alone would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Agreement and hereby agrees to waive in any action for specific performance the defense that a remedy at law would be adequate.

**9.4**      <u>Notices</u>. All notices, demands and other communications provided for or permitted hereunder shall be made in the manner provided for under the Purchase Agreement.

**9.5**      <u>Successors and Assigns; Third Party Beneficiaries</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto; *provided, that* the rights of the Designated Holder contained in this Agreement shall be automatically transferred to the

14

transferee of any Registrable Security provided that (i) such transferee agrees to become a party to this Agreement and be fully bound by, and subject to, all of the terms and conditions of the Agreement as though an original party hereto; (ii) the Company is furnished with written notice of (a) the name and address of such transferee, and (b) the securities with respect to which such registration rights are being transferred; (iii) immediately following such transfer the further disposition of such securities by the transferee is restricted under the Securities Act or applicable state securities laws if so required; and (iv) such transfer shall have been conducted in accordance with all applicable federal and state securities laws.  All of the obligations of the Company hereunder shall survive any transfer. Except as provided in **ARTICLE VII**, no Person other than the parties hereto and their successors and permitted assigns are intended to be a beneficiary of this Agreement.

      9.6      **Aggregation of Stock**.  All shares of Registrable Securities held or acquired by Affiliated entities or Persons or entities or Persons under common management or control shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

      9.7      **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument, and shall become effective when one or more counterparts have been signed by each party hereto and delivered (including by facsimile) to the other parties.

      9.8      **Headings**.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

      9.9      **Governing Law; Consent to Jurisdiction**.  This agreement shall be governed by and construed in accordance with the laws of the state of New York without regard to the principles of conflicts of law thereof that would implicate or cause the laws of another jurisdiction to apply. The parties hereto irrevocably submit to the exclusive jurisdiction of any federal court sitting in the borough of Manhattan in the City and State of New York over any suit, action or proceeding arising out of or relating to this Agreement. To the fullest extent they may effectively do so under applicable law, the parties hereto irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that they are not subject to the jurisdiction of any such court, any objection that they may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

      9.10      **WAIVER OF JURY TRIAL**.  EACH PARTY HERETO WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

      9.11      **Severability**.  In case any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

      9.12      **Rules of Construction**.  Unless the context otherwise requires (a) the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the terms "Dollars," "dollars" and "$" mean United States Dollars; (d) references herein to a specific Section, Subsection, recital. Schedule or Exhibit shall refer, respectively, to Sections, Subsections, recitals. Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation;" (f) references herein to any gender or no gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; *provided, however*, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not

15

NL074686

otherwise permitted by this Agreement; (h) references herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity; (i) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding;" (j) the word "or" shall be disjunctive but not exclusive; (k) references herein to any law (including any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative statute, regulation, order, rule, directive, ordinance, code, constitution, principle of common law, equity or treaty) shall be deemed to refer to such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part and in effect from time to time, and also to all rules and regulations promulgated thereunder; (l) references to any contract means such contract as amended, supplemented or modified in accordance with the terms thereof; and (m) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

     **9.13**    <u>**Entire Agreement; Amendments.**</u>  This Agreement constitutes the entire agreement and understanding of the parties hereto in respect of the subject matter hereof, and supersede and replace in their entirety any prior proposals, term sheets, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof. No amendment, waiver or other modification of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Company and the Designated Holder and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

     **9.14**    <u>**Further Assurances**</u>.  Each of the parties shall execute such documents and perform such further acts (including, without limitation, obtaining any consents, exemptions, authorizations or other actions by, or giving any notices to, or making any filings with, any governmental authority or any other Person) as may be reasonably required or desirable to carry out or to perform the provisions of this Agreement.

     **9.15**    <u>**Other Agreements**</u>.  Nothing contained in this Agreement shall be deemed to be a waiver of, or release from, any obligations any party hereto may have under any other agreement including, but not limited to, the Charter Documents and the Purchase Agreement.

<div align="center">[Remainder of page intentionally left blank]</div>

<div align="center">16</div>

 NL074687

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Registration Rights Agreement on the date first written above.

**COMPANY:**

**NETLIST, INC.**

/s/ Gail Sasaki
By: Gail Sasaki
Its: CFO, VP, Secretary

**SIGNATURE PAGE TO THE REGISTRATION RIGHTS AGREEMENT**

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Registration Rights Agreement on the date first written above.

INVESTOR:

**SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.**

/s/ Seon Jong Lee
By: Seon Jong Lee
Its: Chief Executive Officer

**SIGNATURE PAGE TO THE REGISTRATION RIGHTS AGREEMENT**

CONFIDENTIAL

NL074689

EXHIBIT A

**PLAN OF DISTRIBUTION**

The selling stockholders may, from time to time, sell any or all of their shares of common stock on any stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. The selling stockholders may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- short sales;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- one or more underwritten offerings on a firm commitment or best efforts basis;

- a combination of any such methods of sale; and

- any other method permitted pursuant to applicable law.

The selling stockholders may also sell shares under Rule 144 under the Securities Act, if available, rather than under this prospectus.

Broker-dealers engaged by the selling stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, which commissions or discounts may be less than or in excess of those customary in the types of transactions involved. Any profits on the resale of shares of common stock by a broker-dealer acting as principal might be deemed to be underwriting discounts or commissions under the Securities Act. Discounts, concessions, commissions and similar selling expenses, if any, attributable to the sale of shares will be borne by a selling stockholder.

The selling stockholders may from time to time pledge or grant a security interest in some or all of the shares of common stock owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell the shares of common stock from time to time under this prospectus after we have filed a supplement to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933 supplementing or amending the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus.

The selling stockholders also may transfer the shares of common stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus and may sell the shares of common stock from time to time under this prospectus after we have filed a supplement to this prospectus under Rule 424(b)(3) or other applicable

CONFIDENTIAL

NL074690

provision of the Securities Act of 1933 supplementing or amending the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus.

Any broker-dealers or agents that are involved in selling the shares of common stock may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares of common stock purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act.

We are required to pay all fees and expenses incident to the registration of the shares of common stock. We have agreed to indemnify the selling stockholders (as well as persons, including broker-dealers or agents deemed to be "underwriters" within the meaning of the Securities Act) against certain losses, claims, damages and liabilities, including liabilities under the Securities Act, in accordance with a registration rights agreement, or the selling stockholders will be entitled to contribution.

The selling stockholders have advised us that they have not entered into any agreements, understandings or arrangements with any underwriters or broker-dealers regarding the sale of their shares of common stock, nor is there an underwriter or coordinating broker acting in connection with a proposed sale of shares of common stock by any selling stockholder. If we are notified by any selling stockholder that any material arrangement has been entered into with any underwriters or broker-dealers for the sale of shares of common stock, if required, we will file a supplement to this prospectus.

NL074691

Exhibit 10.3

Execution Version

**FORTRESS CREDIT OPPORTUNITIES I LP**
**DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LP**
c/o Fortress Credit Corp.
1345 Avenue of the Americas, 46th Floor
New York, NY 10105

November 18, 2015

Netlist, Inc.
51 Discovery, Suite 150
Irvine, CA 92618
Attn: Gail M. Sasaki, CFO
Email: gsasaki@netlist.com

<u>PAYOFF LETTER</u>

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement, dated as of July 18, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among DRB CREDIT FUNDING LLC, a Delaware limited liability company (the "<u>Initial Lender</u>" and together with the other persons from time to time party to the Credit Agreement as lenders, including Fortress Credit Opportunities I LP ("<u>FCO</u>") and Drawbridge Special Opportunities Fund LP ("<u>Drawbridge</u>"), collectively, "<u>Lender</u>") and NETLIST, INC., a Delaware corporation ("<u>Borrower</u>").  Capitalized terms used herein but not specifically defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

We understand that, on or prior to the Payoff Expiration Time (as hereinafter defined), Borrower desires to repay in full all of the Obligations (including, without limitation, for principal, interest and fees, but excluding any prepayment premium required to be paid in accordance with Section 2.1.5 of the Credit Agreement or any early prepayment obligations in accordance with Section 1 of the Monetization Side Letter, which the parties acknowledge have not accrued, and any unasserted contingent indemnification Obligations) and, in connection therewith, terminate the Monetization Side Letter, the Credit Agreement and the other Loan Documents and Liens granted thereunder.

1.       This payoff letter (this "<u>Payoff Letter</u>") confirms that upon:

(a)       receipt by FCO (as representative for each lender party to the Credit Agreement and Drawbridge in its capacity under the Monetization Side Letter) no later than 12:00 noon (New York city time) on November 23, 2015 (such time and date, the "<u>Payoff Expiration Time</u>") of:

(i)       a wire transfer of immediately available funds in the aggregate amount of $8,136,608.82 plus the aggregate amount, if any, of Per Diem (as hereinafter defined) (the sum of such amounts, the "<u>Payoff Amount</u>"), consisting of:

(1)       $6,988,692.26 in respect of the principal amount of Obligations outstanding under the Credit Agreement (assuming no further loans or repayments are made);

NL074692

(2)    $147,916.56 in respect of accrued and unpaid interest on such outstanding principal amount, assuming no changes in applicable interest rates and no changes in such outstanding principal amount (the per diem accrual of such interest being $2,135.43 per day (the "Per Diem") for each day or portion thereof that elapses after the date first written above before Lender receives payment in full in immediately available funds of the Payoff Amount); and

(3)    $1,000,000. which is consideration for the early termination of the Monetization Side Letter and the release of the Borrower from its obligations thereunder (except to the extent set forth herein);

(ii)    a fully-executed counterpart of this Payoff Letter signed by Borrower;

(iii)    a fully executed Amendment No. 1 to Stock Purchase Warrant, dated as of the Payoff Date, by and between Netlist, Inc., a Delaware corporation ("Netlist") and Drawbridge, which amends that certain Stock Purchase Warrant (Certificate No. W-2) issued by Netlist to Drawbridge as of July 18. 2013 in the form attached hereto as Exhibit A; and

(iv)    a fully executed Stock Purchase Warrant. dated as of the Payoff Date, by and between Netlist and CF DB EZ LLC, a Delaware limited liability company, or its registered assigns (Certificate No. W-3) issued by Netlist to CF DB EZ LLC as of the Payoff Date in the form attached hereto as Exhibit B; and

(b)    receipt by Kirkland & Ellis LLP of $31,514.17 (the "Legal Expense Payment") in respect of the unpaid legal fees and expenses of Lender, which are payable in connection with the Monetization Side Letter, the Warrant Documents, Loan Documents and/or this Payoff Letter (the first date on which all of the conditions set forth in Section 1(a) and this Section 1(b) are satisfied, the "Payoff Date");

all of the Obligations (and any guarantees thereof by any Person) (other than unasserted contingent indemnification Obligations) and all of the Borrower's obligations under the Monetization Side Letter (the "Monetization Obligations") shall be satisfied in full and terminate; all obligations, duties and responsibilities of Lender and/or Drawbridge in connection with the Monetization Side Letter, the Credit Agreement and all other Loan Documents shall automatically terminate; the Monetization Side Letter, the Credit Agreement and all other Loan Documents shall be terminated and of no further force and effect; and all Liens granted or created thereunder shall be deemed to be released and terminated: provided, however, that (1) any provision of the Monetization Side Letter, the Credit Agreement or any other Loan Document that by its terms expressly survives termination shall remain in full force and effect (including, without limitation, Borrower's Obligations to indemnify each Indemnitee under Section 12.3 of the Credit Agreement and corresponding obligations under Section 11(c) of the Monetization Side Letter, in each case, to the extent such obligations survive the termination of the Credit Agreement and to reimburse Lender and/or Drawbridge for fees and expenses owed to Lender pursuant to the Credit Agreement). and Section 11 of the Credit Agreement and Section 10 of the Monetization Side Letter relating to governing law, consent to jurisdiction and jury trial waiver shall remain in full force and effect, (2) to the extent that any payments or proceeds (or any portion thereof) received by Lender are subsequently set aside, required to be repaid or asserted, invalidated or declared to be void or voidable, in each case, under any state or federal law relating to creditors' rights (including, without limitation, provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property), and/or Lender and/or Drawbridge is required to repay or restore any payment made

2

NL074693

to Lender and/or Drawbridge (in whole or in part) to a trustee, receiver or any other party under any Debtor Relief Law, other applicable law or equitable cause, then the liability of the Borrower with respect thereto (and as to all reasonable costs, expenses, and attorneys' fees of Lender related thereto) shall immediately and automatically be revived, reinstated, and restored and shall exist as though such payment or proceeds had never been made or received, and the Obligations, the Monetization Obligations and other Indebtedness of the Borrower to Lender and/or Drawbridge, or part thereof, which were or was intended to be satisfied by any such payment or proceeds shall immediately and automatically be revived and continue to be in full force and effect as if the payment or proceeds had never been received by Lender and or Drawbridge, as applicable, and this Payoff Letter shall in no way impair the claims of Lender with respect to the revived Obligations, the Monetization Obligations or other Indebtedness of the Borrower to Lender and/or Drawbridge (or as to all reasonable costs, expenses, and attorneys' fees of Lender and/or Drawbridge related thereto). If the assumptions contained herein regarding the calculation of each of the components of the Payoff Amount are not correct, we will advise Borrower in writing on or before the Payoff Expiration Time, of the adjusted figure for the Payoff Amount, reflecting the appropriate changes in the amounts of principal, interest, fees and other amounts.

2.      Borrower shall transfer the Payoff Amount, by wire transfer of immediately available funds, for receipt on the Payoff Date, using the following wire instructions:

| | |
|---|---|
| Bank: | US Bank N.A. |
| FFC | 710254 |
| ABA Number: | 091 000 022 |
| Account Number: | 104790894125 |
| Account Name: | Fortress Credit Opportunities I LP / FORT0401 |
| Reference: | Netlist / Fortress Credit Opportunities I, LP |
| Attention: | Myra Ilagan / FORT0401 |

3.      Borrower shall transfer the Legal Expense Payment to Citibank, 227 W. Monroe Street, Suite 200, Chicago, IL 60606, ABA No. 271070801, SWIFT Address: CITIUS33 (if wire transfer is from a non U.S. bank), Account No. 800418399, Account Name: Kirkland & Ellis LLP, reference: 41152-59, Attention: David Nemecek, by wire transfer of immediately available funds.

4.      Lender, on the Payoff Date, (a) authorizes Borrower or its designee to prepare and file any UCC termination statements and other filings necessary to terminate any and all UCC financing statements previously filed by Lender with respect to the Obligations, and (b) agrees to, at Borrower's expense (including attorneys' fees and expenses), execute and deliver any lien releases, mortgage releases, discharges of security interests, and other similar discharge or release documents (in recordable form if applicable) as Borrower may reasonably request to effectuate the termination and release of the security interests and liens securing the Obligations.

5.      Lender will, as promptly as practicable after the Payoff Date, all at the expense of Borrower (including attorneys' fees and expenses), return to Borrower, at the address for Borrower set forth on the first page of this Payoff Letter or as otherwise directed by Borrower, the originals of any and all promissory notes previously delivered to Lender in connection with the Credit Agreement, if any, duly marked "paid in full" or "cancelled" (or with written authorizations to so mark such documents after the Payoff Date actually occurs) as may be appropriate, and any and all stock certificates, stock powers, or other investment property and all negotiable instruments, as well as any other possessory collateral, in each case, that are in its possession or control, or, in lieu thereof, a certificate or affidavit confirming that such items are lost.

3

NL074694

6.     Borrower, for itself and on behalf of its successors, assigns, officers, directors, employees, limited partners, general partners, investors, attorneys, subsidiaries, shareholders, trustees, agents, and other professionals, and any Person acting for or on behalf of, or claiming through it, hereby waives, releases, remises, and forever discharges Lender, Drawbridge and each Related Person of any of the foregoing Persons, together with each of their respective successors in title, past, present and future officers, directors, employees, limited partners, general partners, investors, attorneys, assigns, subsidiaries, consultants, experts, advisors, shareholders, trustees, agents, and other professionals (and all other Persons to whom any of the foregoing would be liable if such Persons were found to be liable to Borrower) (each a "Releasee" and collectively, the "Releasees"), from any and all past, present and future claims, demands, suits, liens, lawsuits, adverse consequences, amounts paid in settlement, debts, deficiencies, diminution in value, disbursements, demands, obligations, liabilities, causes of action, damages, losses, costs and expenses of any kind or character, whether based in equity, law, contract, tort or otherwise (including without limitation those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), implied or express warranty, strict liability, criminal or civil statute or common law (each a "Claim" and collectively, the "Claims"), whether known or unknown, fixed or contingent, direct, indirect, or derivative, held in a personal or representative capacity, asserted or unasserted, matured or unmatured, foreseen or unforeseen, past or present, liquidated or unliquidated, suspected or unsuspected, that Borrower ever had from the beginning of the world, now has or might hereafter have against any such Releasee, which Claims relate, directly or indirectly, to any act or omission by any Releasee that occurred on or prior to the date of this Payoff Letter and relate, directly or indirectly, to the Warrants, Monetization Side Letter, the Credit Agreement, any other Loan Document, or any acts or omissions of any such Releasee in connection with, as a result of, arising out of, related to, or with respect to the Monetization Side Letter, the Credit Agreement or any other Loan Document, or to the lender-borrower relationship or the debtor-creditor relationship evidenced by any of the Loan Documents or the Monetization Side Letter, except for the duties and obligations set forth in this Payoff Letter.  As to each and every Claim released hereunder, Borrower hereby represents that it has received the advice of legal counsel with regard to the releases contained herein, and having been so advised, specifically waives the benefit of the provisions of Section 1542 of the Civil Code of California which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

As to each and every Claim released hereunder, Borrower also waives the benefit of each other similar provision of applicable federal or state law (including, without limitation, the laws of the State of New York), if any, pertaining to general releases after having been advised by legal counsel to Borrower with respect thereto.  Borrower hereby agrees and acknowledges that the foregoing waiver was separately bargained for.  This waiver is an essential term of this Payoff Letter, without which Lender would not have agreed to execute this Payoff Letter.  The release contained herein and the related provisions shall survive the termination of the Credit Agreement and payment in full of the Lender Obligations.

Borrower acknowledges that it may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such Claims and agrees that this Payoff Letter shall be and remain effective in all respects notwithstanding any such differences or additional facts.  Borrower understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

4

NL074695

Borrower hereby agrees, represents, and warrants that (a) such party has not voluntarily, by operation of law or otherwise, assigned, conveyed, transferred or encumbered, either directly or indirectly, in whole or in part, any right to or interest in any of the Claims released pursuant to this Section 6; (b) this Payoff Letter has been entered into without force or duress and of the free will of Borrower, the decision of such undersigned to enter into this Payoff Letter is a fully informed decision and such undersigned is aware of all legal and other ramifications of each such decision; and (c) Borrower has read and understands this Payoff Letter (including, without limitation, the release granted in this Section 6), has consulted with and been represented by independent legal counsel of its own choosing in negotiations for and the preparation of this Payoff Letter, has read this Payoff Letter in full and final form, and has been advised by its counsel of its rights and obligations hereunder.

The release contained herein and the related provisions shall survive the termination of the Credit Agreement and payment in full of the Obligations and the Monetization Obligations.

7.      Borrower acknowledges that the amounts referred to in Section 1 above are enforceable obligations of it owed to Lender pursuant to the provisions of the Monetization Side Letter, the Credit Agreement, the other Loan Documents and this Payoff Letter and confirms its agreement to the terms and provisions of this Payoff Letter by returning to Lender a signed counterpart of this Payoff Letter. Borrower hereby represents and warrants that, as of the date of this payoff letter and as of the Payoff Effective Time, it is not party to any contract, agreement or any document giving rise to any contractual obligation, nor is it subject to any other prohibition (whether contractual or otherwise (including any prohibition by any Governmental Authority or arising out of any Requirement of Law)), which would, in either case, prohibit or purport to prohibit any of the payments contemplated by Section 1 hereof.

8.      This Payoff Letter may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Payoff Letter by signing any such counterpart. Delivery of an executed counterpart of this Payoff Letter by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart. Any party delivering an executed counterpart of this Payoff Letter by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Payoff Letter.

9.      This Payoff Letter shall be determined under, governed by, and construed and enforced in accordance with, the laws of the State of New York. Whenever possible, each provision of this Payoff Letter shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Payoff Letter shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Payoff Letter.

10.     This is the entire agreement between the parties with respect to the subject matter of this Payoff Letter. There are no other agreements or understandings, written or oral, express or implied.

11.     Neither this Payoff Letter nor any uncertainty or ambiguity herein shall be construed against Lender or the Borrower, whether under any rule of construction or otherwise. On the contrary, this Payoff Letter has been reviewed by all of the parties to this Payoff Letter and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

[signature pages follow]

5

NL074696

Very truly yours,

FORTRESS CREDIT OPPORTUNITIES I LP, a Delaware
limited partnership

By: Fortress Credit Opportunities I GP LLC,
a Delaware limited liability company,
its general partner

By:     /s/ Mark K. Furstein
Name:   Mark K. Furstein
Title:  Chief Operating Officer


Drawbridge Special Opportunities Fund LP

By: Drawbridge Special Opportunities GP LLC,
a Delaware limited liability company,
its general partner

By:     /s/ Mark K. Furstein
Name:   Mark K. Furstein
Title:  Chief Operating Officer

[SIGNATURE PAGE TO PAYOFF LETTE

NL074697

ACKNOWLEDGED, ACCEPTED and AGREED to by the
undersigned as of the date first written above:

**NETLIST, INC.,**
a Delaware corporation,
as Borrower


By: /s/ Gail Sasaki
Name:   Gail Sasaki
Title:    VP, CFO, Secretary

[SIGNATURE PAGE TO PAYOFF LETTER]

NL074698

**Exhibit A: Amendment No. 1 to Stock Purchase Warrant**

[See attached]

**Exhibit B: Stock Purchase Warrant**

[See attached]

CONFIDENTIAL

NL074700

<div align="right">**Exhibit 99.1**</div>

### NETLIST ANNOUNCES STRATEGIC PARTNERSHIP WITH SAMSUNG FOR NEW STORAGE CLASS MEMORY

Partnership to Deliver NVDIMM-P, the Fastest Non-Volatile Memory-Storage Solution for Cloud Computing, Analytics and Other Data Intensive Applications

**IRVINE, CALIFORNIA.** November 19, 2015 – Netlist, Inc. (NASDAQ: NLST), today announced that it has entered into a five year Joint Development and License Agreement (the "Agreement") with Samsung Electronics Co., Ltd., to produce a new class of NVDIMM-P (NV-P) memory solutions based on Samsung's industry leading NAND Flash and DRAM, and Netlist's pioneering work on HyperVault®. The companies will work to create a standardized product interface to facilitate rapid market adoption and bring the compelling benefits of this new technology to a large group of customers in cloud computing, big data, and server and storage markets.

Under the terms of the Agreement, which includes licensing of each company's respective patent portfolios, Netlist will receive $23 million, consisting of $8 million in cash from Samsung Electronics and $15 million in the form of investment from Samsung Venture Investment Corporation. The Agreement calls for additional exchange of consideration as progress is made toward market introduction of the product. The companies plan to sample NV-P products with select customers in 2016.

NV-P is an emerging industry standard for a new class of NAND-based storage which operates in the memory channel, the fastest data path in a computer. With HyperVault®, Netlist created the industry's first unified memory-storage architecture where low cost, high density NAND storage can achieve the performance of high cost, high speed DRAM memory. This breakthrough patented architecture will be combined with Samsung's industry leading DRAM and NAND, to produce NV-P solutions that deliver cost and performance benefits vastly superior to those of traditional storage solutions.

"At Samsung, we are taking the lead in defining the right standards for storage class memory with industry partners, and creating new markets for DRAM and NAND flash memory based on the new standards. By using a standardized hybrid storage solution, our customers will be able to efficiently extract intelligence from large amounts of data in storage systems," said Dr. Jung-Bae Lee, Senior Vice President of Memory Product Planning and Application Engineering Team, Samsung Electronics. "We are pleased to partner with Netlist, a company with a long-history of innovative memory technology solutions and IP, to productize and drive broad market adoption of this new standard," he added.

"This is a transformational partnership that validates our unique IP and provides an accelerated path for delivering NV-P to the mainstream market. Samsung is the unparalleled leader in memory and recognizes the value of disruptive technology in this sector," said C.K. Hong, President and CEO of Netlist. "Samsung's leadership in memory and Netlist's expertise in hybrid storage are highly complementary, and together create a powerful platform for driving broad market adoption of this new storage class memory solution."

"Computer architecture is going through important changes fueled by the advent of a new memory layer based on alternative memory types," said Jim Handy, General Director of Objective Analysis, a leading independent research firm. "This brings to computing a much faster kind of storage that can harness the raw speed of the memory bus through the NVDIMM-P memory module format. Objective Analysis projects that the market for such modules in servers could grow to $2 billion by 2019."

NVDIMM-P is nomenclature adopted by the Storage Network Industry Association to describe storage class memory products that combine the functionalities of persistent DRAM and block accessed NAND

Flash, and operate in the memory channel. HyperVault®, a "superset" of NVDIMM-P, further expands the capabilities of NAND so that they achieve near-DRAM performance and DDR4 compatibility with no system software modifications. NV-P solutions are expected to be initially targeted at the fastest tiers of storage where data throughput and latency are critical. These applications include big data analytics, virtualization, in-memory database, online transaction processing and high performance database.

Additional details regarding the transaction are available in Netlist's Current Report on Form 8-K filed concurrently with the issuance of this release.

**About Netlist, Inc.**

Netlist creates solutions that accelerate turning data into information. We design and manufacture controller and software-based memory solutions for our OEM and Hyperscale customers in the server and storage space. Flagship products NVvault® and EXPRESSvault™ accelerate system performance and provide mission critical fault tolerance. HyperVault®, Netlist's next-generation architecture, expands the performance and capacity of memory channel storage. The company holds a portfolio of patents, many seminal, in the area of hybrid memory, rank multiplication and load-reduction, among others. To learn more, visit www.netlist.com

**Safe Harbor Statement:**

This news release contains forward-looking statements regarding future events and the future performance of Netlist. These forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those expected or projected. These risks and uncertainties include, but are not limited to, risks associated with the joint development efforts with Samsung described above; the launch and commercial success of our products, programs and technologies; the success of product partnerships; continuing development, qualification and volume production of HyperVault™, EXPRESSvault™, NVvault®, HyperCloud® and VLP Planar-X RDIMM; the timing and magnitude of the decrease in sales to our key customer; our ability to leverage our NVvault® and EXPRESSvault™ technology in a more diverse customer base; the rapidly-changing nature of technology; risks associated with intellectual property, including risks associated with the inherent uncertainty of the litigation process, patent infringement litigation against us as well as the costs and unpredictability of litigation over infringement of our intellectual property and the possibility of our patents being reexamined by the United States Patent and Trademark office; volatility in the pricing of DRAM ICs and NAND; changes in and uncertainty of customer acceptance of, and demand for, our existing products and products under development, including uncertainty of and/or delays in product orders and product qualifications; delays in the Company's and its customers' product releases and development; introductions of new products by competitors; changes in end-user demand for technology solutions; the Company's ability to attract and retain skilled personnel; the Company's reliance on suppliers of critical components and vendors in the supply chain; fluctuations in the market price of critical components; evolving industry standards; and the political and regulatory environment in the People's Republic of China. Other risks and uncertainties are described in the Company's annual report on Form 10-K filed on March 27, 2015, and subsequent filings with the U.S. Securities and Exchange Commission made by the Company from time to time. Except as required by law, Netlist undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

For more information, please contact:

| Investors: | Press: |
|---|---|
| Brainerd Communicators, Inc. | Brainerd Communicators, Inc. |
| Mike Smargiassi/Jenny Perales | Sharon Oh |
| NLST@braincomm.com | NLST@braincomm.com |
| (212) 986-6667 | (212) 986-6667 |

CONFIDENTIAL

NL074702

# EXHIBIT 21

**FULL VERSION OF EXHIBIT 21 PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 22

| From: | Jibum Kim <jbkim@netlist.com> |
|---|---|
| Sent: | Tue, 21 Apr 2015 20:52:23 -0400 (EDT) |
| To: | JUNG-BAE LEE <jung-bae.lee@samsung.com> |
| Subject: | Term sheet from Netlist |
| Attachments: | SAMSUNG TERM SHEET OUTLINE.docx |

Dear Mr. Lee,

It was nice meeting you last week.

Following up on our discussion, attached is the term sheet outline proposed by Netlist.

We tried to make this simple and address key concerns from Samsung side.

Please review and let me know if you have any questions.


Best regards


**********************************************************************************************************

JB Kim
Executive Vice President
Netlist, Inc.
Tel:010.2414.3760

www.netlist.com
175 Technology
Irvine, CA 92618

CONFIDENTIAL

# EXHIBIT 23

**FULL VERSION OF EXHIBIT 23 PROPOSED TO
BE FILED UNDER SEAL**

# EXHIBIT 24

**FULL VERSION OF EXHIBIT 24 PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 25

**FULL VERSION OF EXHIBIT 25 PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 26

| | |
|---|---|
| **From:** | Ho-jung Kim <hojung4623.kim@samsung.com> |
| **Date:** | Thursday, October 8, 2015 05:02:26 -0400 (EDT) |
| **To:** | <jbkim@netlist.com> |
| **Cc:** | Jung-bae Lee <jung-bae.lee@samsung.com>, Hyun-ki Ju <hyunki.ji@samsung.com>, Kyu-han Han <kyuhan_han@samsung.com>, Seung-min Sung <jeff.sung@samsung.com>, In-dong Kim <indong2.kim@samsung.com> |
| **Subject:** | Draft Joint Development/License Agreement & SoW |
| **Attachments:** | 151008-Neptune-SEC SoW.xlsx; Joint Development and License Agreement (100815 SEC).docx |

Hello, EVP Ji-bum Kim,
This is Mgr. Ho-jung Kim from Samsung Electronics.

I am sending you the Draft of the Joint Development and License Agreement.
I am also sending the SoW as a separate excel file for your reference.
After the holidays, we would like to have a conference call to explain the details of the agreement and SoW. If you can provide your availability, I will make arrangement to attend the call with the related persons.

Thank you.
Ho-jung Kim


Ho-jung Kim | Jay Kim

Manager | Strategic Planning Team | Memory Division | Samsung Electronics co.,Ltd.
Office +82-31-208-6159 | Mobile +82-10-5361-0001 | hojung4623.kim@samsung.com


The above message is intended solely for the named addressee and may contain trade secret, industrial technology or privileged and confidential information otherwise protected under applicable law including the Unfair Competition Prevention and Trade Secret Protection Act. Any unauthorized dissemination, distribution, copying or use of the information contained in this communication is strictly prohibited. If you have received this communication in error, please notify the sender by email and delete this communication immediately.

The above message is intended solely for the named addressee and may contain trade secret, industrial technology or privileged and confidential information otherwise protected under applicable law including the Unfair Competition Prevention and Trade Secret Protection Act. Any unauthorized dissemination, distribution, copying or use of the information contained in this communication is strictly prohibited. If you have received this communication in error, please notify the sender by email and delete this communication immediately.

 151008-Neptune-SEC


**Exhibit**
**PX 0122**

# CERTIFICATION OF TRANSLATION

# and

# DECLARATION

State of California      )

                                 )     S. S.

Los Angeles County     )

        I, Soomi Ko, the undersigned, declare under penalty of perjury that I am a duly certified Korean Court Interpreter approved by the United States District Courts, certified by the State of California and the Los Angeles County Superior Courts, with competent knowledge of Korean and English, and that I have truthfully and correctly translated Document with Bates No. NL049006 from Korean to English and that the said translation is, to the best of my knowledge and belief, a true and correct translation. I further declare under penalty of perjury that I am neither counsel for, related to, nor employed by any of the parties, and that I have no financial or other interest in the outcome of any action related to this translation. I declare under penalty of perjury that the foregoing is true and correct.

### Description of Translated Documents

Document with Bates No. NL049006

Executed on August 12, 2021

_____

Soomi Ko
California State Certified Court Interpreter
#300732
(213) 999-7848(Cell)
soomi@komartin.com
www.komartin.com

Ko & Martin Certified Interpreters and Translators
Specializing in Korean and Chinese Languages

| | |
|---|---|
| **From:** | 김호정 <hojung4623.kim@samsung.com> |
| **Sent:** | Thu, 8 Oct 2015 05:02:26 -0400 (EDT) |
| **To:** | <jbkim@netlist.com> |
| **Cc:** | 이정배 <jung-bae.lee@samsung.com>; 지현기 <hyunki.ji@samsung.com>; 한규한 <kyuhan_han@samsung.com>; 성승민 <jeff.sung@samsung.com>; 김인동 <indong2.kim@samsung.com> |
| **Subject:** | Draft Joint Development/License Agreement & SoW |
| **Attachments:** | 151008-Neptune-SEC SoW.xlsx;Joint Development and License Agreement (100815 SEC).docx |

안녕하세요, 김지범 부사장님,
삼성전자 김호정 과장입니다.

공동개발 및 라이선스 본계약 Draft 버젼을 송부드립니다.
아울러 SoW도 별도 엑셀 파일로 송부드리오니 참조하시기바랍니다.
연휴 이후에 본계약 내용 및 SoW 관련 설명을 드릴 수 있도록 컨퍼런스콜을 진행했으면 합니다.
가능하신 시간 알려주시면 관련자들과 함께 참석할 수 있도록 하겠습니다.

감사합니다.
김호정 드림

**김호정 | Jay Kim**

Manager | Strategic Planning Team | Memory Division | Samsung Electronics co.,Ltd.
Office +82-31-208-6159 | Mobile +82-10-5361-0001 | hojung4623.kim@samsung.com

The above message is intended solely for the named addressee and may contain trade secret, industrial technology or privileged and confidential information otherwise protected under applicable law including the Unfair Competition Prevention and Trade Secret Protection Act. Any unauthorized dissemination, distribution, copying or use of the information contained in this communication is strictly prohibited. If you have received this communication in error, please notify the sender by email and delete this communication immediately.

상기 메일은 지정된 수신인만을 위한 것이며 부정경쟁 방지 및 영업비밀 보호에 관한 법률을 포함하여 관련 법령에 따라 보호의 대상이 되는 **영업비밀, 산업기술 등을 포함**하고 있을 수 있습니다. 본 문서에 포함된 정보의 전부 또는 일부를 **무단으로 제3자에게 공개, 배포, 복사 또는 사용하는 것은 엄격히 금지**됩니다. 본 메일이 잘못 전송된 경우, 발신인에게 알려 주시고 즉시 삭제하여 주시기 바랍니다.

151008-Neptune-SEC
SoW.xlsx

# EXHIBIT 27

**FULL VERSION OF EXHIBIT 27 PROPOSED TO
BE FILED UNDER SEAL**

# EXHIBIT 28

**FULL VERSION OF EXHIBIT 28 PROPOSED TO
BE FILED UNDER SEAL**

# EXHIBIT 29

**FULL VERSION OF EXHIBIT 29 PROPOSED TO BE FILED UNDER SEAL**

# EXHIBIT 30

Netlist DRAFT 10/13/15

# JOINT DEVELOPMENT AND LICENSE AGREEMENT

This Joint Development and License Agreement (this "Agreement") is made and entered into as of October 31, 2015 ("Effective Date") by and between Netlist, Inc., having its principal place of business at 175 Technology, Suite 150, Irvine, CA 92618 (hereinafter referred to as "Netlist") and Samsung Electronics Co., Ltd., having its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon-Si, Gyeonggi-do, Korea (hereinafter referred to as "Samsung"). (Each of Netlist and Samsung is referred to as a "Party" and collectively the "Parties".)

WHEREAS, Samsung develops and manufactures, among other things, memory components and memory modules, and Netlist develops and manufactures memory components and memory modules;

WHEREAS, the Parties intend to work together to jointly develop an interface and associated technologies for certain memory modules and promote such interface to standards-setting organizations;

WHEREAS, the Parties are concurrently executing an agreement for convertible note financing; and

WHEREAS, in connection with their collaboration hereunder, the Parties wish to grant to each other a cross license under each Party's patents.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein, the Parties agree as follows:

**Section 1.   DEFINITIONS**

"**Background IPR**" of a Party means Technology and IPR which is owned or controlled by such Party prior to the Effective Date or created or developed outside the scope of the JDP and without use of or reference to the other Party's Confidential Information.

"**Capture Period**" means a period of five (5) years beginning on the Effective Date, subject to Sections 10.1.4 and 10.2.4.

"**Change of Control**" means (i) an acquisition of a Party or its Parent Company by another entity, including by way of merger or consolidation of such Party or its Parent Company with or into another entity, as a result of which transaction the shareholders that had Control of the Party or its Parent Company immediately prior to such transaction do not have Control, immediately after such transaction, of such Party, or its Parent Company, or the surviving entity; or (ii) the sale to another entity of all or substantially all of the assets of a Party or its Parent Company.   Such other entity that acquires Control or assets pursuant to the foregoing is referred to herein as the "**Acquirer**".   An internal reorganization as a result of which ultimate Control of the entity in question does not change is not a Change of Control.

"**Control**" means (a) possession, directly or indirectly, of the power to direct or cause direction of the management or policies of an entity, and (b) beneficial ownership of more than fifty percent (50%) of the voting securities or other ownership interest or other

CONFIDENTIAL

NL049029

Exhibit
0019

Netlist DRAFT 10/13/15

comparable equity interests of an entity.

"**Deliverables**" means any Technology specifically identified as a "deliverable" in, and required to be provided by one Party to the other Party pursuant to, the Statement of Work.

"**Developed Product**" means a~~a~~n NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications.

"**Foundry Product**" means, subject to Section 8.3, any product produced by a Party or its Subsidiary for a third party (a) based on designs, specifications, and working drawings owned by such third party and~~/or~~ (b) that the manufacturing Party does not have a right to sell to others as its own product.

"**Intellectual Property Rights**" or "**IPR**" means all rights in all countries or jurisdictions of the world that arise under or are associated with: (i) patents (of all types including patents, utility models and design patents, including originals or divisions, continuations, continuations-in-part or reissues) ("Patents"); (ii) copyrights and similar rights in works of authorship, including in software; (iii) trade secret rights and similar rights in confidential business or technical information or materials; (iv) any similar or equivalent rights to any of the foregoing; and all (v) registrations, applications, originals divisions, continuations, continuations-in-part or reissues, as the case may be, of, or for, any of the foregoing.

"**JDP**" or "**Joint Development Project**" means the collaborative efforts by the Parties to develop the Product Specifications and the Developed Product under this Agreement pursuant to, and within the scope of, the Statement of Work, and to promote a standard interface for the Developed Product pursuant to the Development Milestones and otherwise as set forth in this Agreement.

"**Joint IPR**" means (a) Non-Patent IPR in Technology jointly created by the Parties in the course and within the scope of the JDP, and (b) Patents seeking protection for and/or issuing on inventions that are jointly invented by the Parties in the course and within the scope of the JDP ("**Joint Inventions**"). Whether Technology was "jointly" created or inventions were "jointly" made shall be determined by applicable joint authorship or joint inventorship standards under U.S. law.

"**Licensed Patents**" means Netlist's Licensed Patents and Samsung's Licensed Patents, as applicable.

"**Licensed Products**" means Netlist's Licensed Products and Samsung's Licensed Products, as applicable.

"**Memory Solution Product**" means a memory controller or a combination of memory and a memory controller (e.g., memory module or MCP), together with any supporting circuitry. Example of the Memory Solution Product includes, without limitation, NVDIMM-P Product.

"**Netlist's Licensed Patents**" means any and all Patents owned or controlled ~~and licensable~~ by Netlist or any of its Subsidiaries and having an effective first filing date on or prior to the end of Capture Period.

2

sf-3584904

Netlist DRAFT 10/13/15

"**Netlist's Licensed Products**" means all ~~Netlist-branded~~ Memory Solution Product manufactured or have manufactured by or for Netlist or its Subsidiaries, but excluding any Foundry Products (other than as set forth in Section 8.3).

"**Non-Patent IPR**" means all Intellectual Property Rights other than Patents and trademarks.

"**NVDIMM-P Product**" means non-volatile dual in-line memory module, which combines a smaller density of fast memory like DRAM with a higher density of slower memory like NAND or other device such as PRAM and controller IC for the foregoing memory within the same package or on the same board, together with any supporting circuitry. This module can be considered as large (non-volatile) memory or fast storage in system.

"**Parent Company**" means, with respect to a first entity, any other entity that directly or indirectly Controls the first entity, but only for so long as such Control exists.

"**Product Specifications**" means the target specifications for the Developed Product as set forth in Appendix A attached hereto, as may be amended by the Parties from time to time.

"**Restricted Information**" means Deliverables or other Technology of a Party, if any, that such Party considers highly confidential and that are identified as "restricted" in the Statement of Work or in writing at the time of delivery. [NEED FURTHER REVIEW]

"**Samsung's Licensed Patents**" means any and all Patents owned or controlled ~~and licensable~~ by Samsung or any of its Subsidiaries and having an effective first filing date on or prior to the end of Capture Period.

"**Samsung's Licensed Products**" means all ~~Samsung-branded~~ semiconductor products manufactured or have manufactured by or for Samsung or its Subsidiaries, but excluding Foundry Products (other than as set forth in Section 8.3).

"**Subsidiary**" means, with respect to a first entity, any other entity that is directly or indirectly Controlled by the first entity, but only for so long as such Control exists.

"**Technology**" means inventions, creations, know-how, processes, designs, design information, databases, schematics, layouts, RTL files, libraries, interface information, specifications, algorithms, software and other copyrightable material (in object code and source code format), technical information, IP blocks, and other developments and technology.

"**Term**" means the period beginning the Effective Date and ending with the expiration of the last to expire of the Licensed Patents.

**Section 2.   COLLABORATIVE DEVELOPMENT WORK**

2.1      JDP. The Parties shall perform the collaborative development work in accordance with the Product Specifications and the Development Milestones as set forth in Appendix A ("Development Milestones") and the Statement of Work set forth in Appendix B ("Statement of Work").

3

CONFIDENTIAL                                                                                 NL049031

Netlist DRAFT 10/13/15

2.2     Deliverables. Each Party shall provide the Deliverables to the other Party as stated in the Statement of Work in accordance with the Development Milestones.

2.3     Acceptance. Samsung shall evaluate the Developed Product in accordance with the Product Specifications. Netlist shall provide Samsung with samples and relevant information and reports therefor. In the event that, as a result of such evaluation, the Developed Product does not satisfy the Product Specifications, both Parties shall use their best efforts to resolve the problem and conform the Developed Product to the Product Specifications. For the purpose of this Agreement, the JDP shall be deemed completed when the evaluation result is accepted by Samsung, provided that such acceptance shall not be unreasonably withheld.

**Section 3.   DEVELOPMENT COSTS**

3.1     Fees and Costs. Samsung shall pay to Netlist eight million United States dollars (US $8,000,000) as non-refundable NRE fees within thirty (30) days from the date of Samsung's receipt of invoice issued by Netlist on or after on the Effective Date. Except as provided herein, each Party shall bear its own costs and expenses with respect to any development work and provision of any Deliverables under this Agreement.

**Formatted:** Font:

3.2     Taxes. All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the Party required to do so by applicable law. To the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea in remitting payment to Netlist under this Agreement, provided that Samsung shall pay such withholding taxes to the Korean tax authorities and promptly provide Netlist with a certificate of payment for such withholding tax, as required by applicable law or treaty, and cooperate with Netlist in any efforts to claim a credit or refund or exemption with respect to any such withholding taxes.

**Section 4.   IPR OWNERSHIP**

4.1     Background and Sole IPR. Samsung and Netlist shall each retain sole ownership of their respective Background IPR and any other Technology and IPR created or developed by or for each of them that is not Joint IPR.

4.2     Solely- and Jointly-Owned Patents. Any inventions arising out of the JDP (and any Patents resulting therefrom) shall belong to the Party whose employees made the invention. Notwithstanding the foregoing, the Parties shall jointly own Joint Inventions and any Patents seeking protection for and/or issuing on Joint Inventions ("Joint Patent").

4.3     Administration of Joint Patents. Regardless of which Party files and prosecutes such application for a Joint Patent, any Joint Patent issued therefrom shall be jointly owned and each Party shall own a one-half undivided interest in each such Joint Patent without accounting to the other. The Parties shall share equally the costs of, and shall cooperate with one another in, filing and maintaining such Joint Patents and in any action to enforce such Joint Patents against third parties. Notwithstanding the foregoing, if a Party does not wish to share in the costs and duties associated with filing or maintaining any Joint Patent in any country (or countries), it shall, at no charge, transfer all of its interest in such Joint Patent in such country (or countries), subject to a retained perpetual, royalty-free, non-exclusive,

sf-3584904

CONFIDENTIAL                                                                                                        NL049032

worldwide license under such Joint Patent to make, have made, use, sell, offer to sell, and import any products and practice any process or method.

**Section 5.   TECHNOLOGY STANDARDIZATION AND PRODUCTIZATION**

5.1     Standardization. The Parties will work together to standardize NVDIMM-P Product specifications with appropriate standards bodies according to the schedule for standardization as specified in Appendix C attached hereto. This effort will be limited to the form factor and interface protocol between the NVDIMM-P Product and the computing system and will not define the design of the NVDIMM-P Product, the on-DIMM controller, or the product driver. The Parties agree to grant patent licenses under the terms of the intellectual property policy of the relevant standards body with respect to any such form factor and/or interface protocol that is adopted as a standard.

5.2     Right of First Refusal. Netlist will provide Samsung a right of first refusal to acquire Netlist's NVDIMM-P technology and/or any related business assets in a separate, subsequent transaction before Netlist offers ~~to divest such technology together with all related business assets~~ to any third party.

5.3     Productization. The Parties will work together to bring a Developed Product to market according to the schedule for standardization and productization as specified in Appendix C attached hereto. Details for further technical collaboration for such productization and any IPR licenses for commercialization will be negotiated at a later date.

5.4     Productization License. Each Party agrees to grant and shall hereby grant to the other Party a non-exclusive, perpetual, paid-up, irrevocable, non-transferable, worldwide license (without a right to sublicense) its Non-Patent IPR to use, copy, modify and distribute the Deliverables and Product Specifications with respect to the Developed Product.

> **Formatted:** Underline

> **Formatted:** Font:

**Section 6.   SUPPLY OF COMPONENTS**

6.1     Supply by Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer.

6.2     Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (i.e., among customers purchasing similar volumes of similar products). ~~Samsung will supply NVDIMM-P controllers to Netlist on Netlist's request on an at-cost basis.~~

6.3     Nothing in this Agreement shall prevent either Party from making semiconductor components using its own Technology and from selling such components to any third party~~, as long as no Confidential Information or other Technology of the other Party is used or referenced in such components or the development or manufacture thereof.   No license or other right is granted or implied under this Agreement under any Non-Patent IPR of the other Party with respect to any such components.~~

6.4     Nothing in this Agreement shall be deemed to require either Party to purchase any products from the other Party.

> **Formatted:** Font:

sf-3584904

CONFIDENTIAL

NL049033

Netlist DRAFT 10/13/15

**Section 7.   RELEASE**

7.1     Release of Samsung. Netlist, on behalf of itself and its respective Subsidiaries, successors and assigns hereby releases, acquits and forever discharges Samsung and its current Subsidiaries, and their directors, officers, employees, agents, successors, and assigns, each only in their capacity as such, from any and all actions, causes of action, suits, debts, liability, claims and demands for infringement of Netlist's Licensed Patents, whether known or unknown, matured or unmatured, by reason of any ~~activity of Samsung and its current Subsidiaries~~action, omission, matter, cause or thing whatsoever occurring prior to the Effective Date and relating to Samsung's Licensed Products only to the extent that such ~~activity and~~ Samsung's Licensed Products would have been licensed under the licenses granted in Section 8 below if such licenses had been in existence prior to the Effective Date.

7.2     Release of Netlist. Samsung, on behalf of itself and its respective Subsidiaries, successors and assigns hereby releases, acquits and forever discharges Netlist and its current Subsidiaries, and their directors, officers, employees, agents, successors, assigns, each only in their capacity as such, from any and all actions, causes of action, suits, debts, liability, claims and demands for infringement of Samsung's Licensed Patents, whether known or unknown, matured or unmatured, by reason of any ~~activity of Netlist and its current Subsidiaries~~action, omission, matter, cause or thing whatsoever occurring prior to the Effective Date and relating to Netlist's Licensed Products only to the extent that such ~~activity and~~ Netlist's Licensed Products would have been licensed under the licenses granted in Section 8 below if such licenses had been in existence prior to the Effective Date.

7.3     Unknown Claims. The Parties expressly understand and acknowledge the possibility that unknown claims may exist that arise from or relate to the claims being released in this Agreement, and that the Parties have bargained for a full accord, satisfaction and discharge of all such claims as expressly set forth in Sections 7.1 and 7.2, respectively. Consequently, each Party expressly waives all rights under section 1542 of the California Civil Code and all statutes or other law of similar effect in other jurisdictions throughout the world. Section 1542 reads as follows:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

**Section 8.   GRANT OF LICENSE**

8.1     License to Netlist. Samsung, on its own behalf and on behalf of its Subsidiaries, hereby grants, and shall grant, to Netlist and its Subsidiaries a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Samsung's Licensed Patents to make and have made (subject to Section 8.4) Netlist's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of ~~Netlist's Licensed Products~~such products.

8.2     License to Samsung. Netlist, on its own behalf and on behalf of its Subsidiaries, hereby grants, and shall grant, to Samsung and its Subsidiaries a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under

6

sf-3584904

NL049034

Netlist DRAFT 10/13/15

Netlist's Licensed Patents to make and have made (subject to Section 8.4) Samsung's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of ~~Samsung's Licensed Products~~such products.

8.3     Foundry Products. For the avoidance of doubt, a Party's or its Subsidiary's Foundry Products are not Licensed Product, provided that, notwithstanding anything to the contrary, any portions, and only those portions, of such Foundry Products that embody a Party's or its Subsidiary's own (a) designs, (b) manufacturing processes, and (c) semiconductor packaging technologies shall be deemed to be released and licensed, respectively, under Sections 7 and 8.

8.4     Have Made Rights. The licenses in Section 8.1 and 8.2 to "have made" Licensed Products shall only apply when ~~the Licensed Products are made under a contract manufacturing agreement by the contract manufacturer only for the Party or its Subsidiaries and~~ (a) all or substantially all the designs, specifications, and working drawings for such products were designed by or exclusively for a Party or its Subsidiary, and (b) such products are sold exclusively to Netlist or Samsung, respectively (or their respective Subsidiaries)~~ by the contract manufacturer~~. For the avoidance of doubt, off-the-shelf products of a third party shall not receive the benefit of the "have made" rights in Section 8.1 and 8.2.

8.5     Subsidiaries. Each Party must ensure that its Subsidiaries are bound by, and comply with, all provisions of this Agreement applicable to them, which includes ensuring that the releases and licenses granted by a Party under this Agreement are effective under Licensed Patents held or licensable by such Party's Subsidiaries.   ~~A Party's license and release of the other Party's Subsidiaries under Sections 7 and 8 are contingent on such Subsidiary's Licensed Patents being validly licensed and released to such first Party hereunder.~~

**Section 9.    RESERVATION OF RIGHTS**

Except for the release and licenses expressly granted hereunder, nothing contained in the Agreement confers, or will be construed as conferring, any other rights, whether by implication, estoppel or otherwise, under any IPR of a Party or its Subsidiaries.

**Section 10.    CHANGE OF CONTROL**

10.1 Change of Control of Netlist. In the event Netlist experiences a Change of Control:

        10.1.1 Netlist shall promptly give notice of such Change of Control to Samsung including an identification of the Acquirer;

        10.1.2 the licenses granted pursuant to this Agreement by Samsung to Netlist shall automatically terminate, effective as of the effective date of the Change of Control;

        10.1.3 the licenses granted pursuant to this Agreement by Netlist to Samsung shall survive, subject to Section 10.1.4 below; and

        10.1.4 the Capture Period shall automatically end effective as of the effective date of the Change of Control and after the effective date of the Change of Control of Netlist,

7

sf-3584904

                                                                                       NL049035

Netlist DRAFT 10/13/15

Netlist's Licensed Patents that are subject to this Agreement shall include only those Netlist's Licensed Patents owned or controlled by Netlist or its Subsidiaries immediately prior to the effective date of the Change of Control, and any subsequently filed patents and patent applications claiming priority to any of those Netlist's Licensed Patents (but will in no event include any other Patents of the Acquirer or its other affiliates).

10.2 <u>Change of Control of Samsung</u>. In the event Samsung experiences a Change of Control:

10.2.1 Samsung shall promptly give notice of such Change of Control to Netlist including an identification of the Acquirer;

10.2.2 the licenses granted pursuant to this Agreement by Netlist to Samsung shall automatically terminate, effective as of the effective date of the Change of Control;

10.2.3 the licenses granted pursuant to this Agreement by Samsung to Netlist shall survive, subject to Section 10.2.4 below; and

10.2.4 the Capture Period shall automatically end effective as of the effective date of the Change of Control and after the effective date of the Change of Control of Samsung, Samsung's Licensed Patents that are subject to this Agreement shall include only those Samsung's Licensed Patents owned or controlled by Samsung or its Subsidiaries immediately prior to the effective date of the Change of Control, and any subsequently filed patents and patent applications claiming priority to any of those Samsung's Licensed Patents (but will in no event include any other Patents of the Acquirer or its other affiliates).

**Section 11.   CONFIDENTIALITY**

11.1   <u>Confidential Information</u>. Each Party acknowledges that all business, financial, contractual, and/or marketing information, including Deliverables and other Technology, received from the other Party may be considered confidential and proprietary. Such information may be furnished in any tangible or intangible form including, but not limited to, writings, drawings, computer tapes and other electronic media, email, samples, and verbal communications.   "<u>Confidential Information</u>" of Party means any such information, including Deliverables and other Technology, disclosed by or on behalf of such Party ("<u>Discloser</u>"), directly or through its Subsidiaries or representatives, to the other Party ("<u>Recipient</u>"), directly or through its Subsidiaries or representatives, by any of the foregoing means, to the extent such information (a) ~~would ordinarily be regarded as confidential in the course of business under the circumstances, (b)~~ if disclosed in writing, is marked "confidential", "proprietary" or with another similar marking at the time of disclosure, or (<u>eb</u>) if provided orally or visually, it is identified as confidential at the time of disclosure and confirmed in writing to Recipient within fifteen (15) days of such disclosure<mark>, or (d) constitutes Restricted Information</mark>[NEED FURTHER REVIEW].   Discloser's Confidential Information also includes any copies, portions, and extracts of any of the foregoing that may be made or obtained by Recipient.

> **Formatted:** Highlight

11.2   <u>Restrictions</u>.   Recipient will not disclose Confidential Information of Discloser to anyone without the prior written consent of Discloser, except to Recipient's employees with a need to know to carry out this Agreement and who are bound by use and disclosure restrictions consistent with those herein.   Recipient will protect Discloser's Confidential

8

sf-3584904

NL049036

Netlist DRAFT 10/13/15

Information from disclosure to others with at least the same degree of care as Recipient exercises to protect its own information of similar type and importance, but in no event with less than reasonable care.   Recipient shall not use Discloser's Confidential Information for any purpose other than in furtherance of the JDP as expressly permitted in this Agreement, and shall return such Confidential Information to Discloser at any time upon request.

11.3   Term; Exceptions.   These obligations of confidentiality will continue for a period of ~~ten  (10)~~five  (5) years from the date of disclosures notwithstanding any expiration, termination, or cancellation of this Agreement; provided, however, that the restrictions pursuant to Section 11.2 will not apply, or will cease to apply, to any information to the extent such information:

(a) was known to Recipient prior to its receipt hereunder as evidenced by Recipient's pre-existing written records;
(b) is or becomes publicly available without breach of this Agreement;
(c) is received from another party without an obligation of confidentiality to Discloser and without breach of this Agreement;
(d) is developed independently by employees of Recipient who have not had access to Discloser's Confidential Information and without use of or reference to such information ~~as evidenced by Recipient's contemporaneous written records~~.

In addition, Recipient's disclosure of Discloser's Confidential Information will not be a violation of Section 11.2 to the extent such disclosure is compelled by court order provided that Discloser is given a reasonable opportunity to object to or restrict such disclosure requirement to the extent practicable, and then such disclosure will be permitted only subject to the terms and conditions of such order.

11.4   Other Restrictions.   Neither Party will (a) attempt to decompile, disassemble, or reverse engineer any Confidential Information of the other Party ~~or use any other process to gain access to any Technology contained in or underlying the Confidential Information of the other Party~~, or (b) attempt to decrypt or circumvent any controls, restrictions, or security measures applied to any Confidential Information of the other Party.

11.5   Restricted Information.   Restricted Information is subject to such additional terms and conditions as may be set forth in the Statement of Work.[NEED FURTHER REVIEW]

**Section 12.   REPRESENTATIONS, WARRANTIES AND DISCLAIMERS**

12.1   Corporate Authority.   Each Party represents and warrants to each other Party and its Subsidiaries that: (a) it has all requisite corporate power and authority, on behalf of itself and its Subsidiaries, to execute and deliver this Agreement and to carry out the provisions of this Agreement, and (b) the execution, delivery, and performance of this Agreement by such Party and its Subsidiaries has been approved by all requisite action on the part of such Party and its Subsidiaries, and no other proceedings, approvals, consents, authorizations, or other acts on the part of such Party or its Subsidiaries are necessary to authorize this Agreement.

12.2   Authority to Grant Licenses and Releases.   Each Party represents and warrants that it has the right to grant the licenses and releases under its Licensed Patents of the full scope set forth in this Agreement.

sf-3584904

CONFIDENTIAL                                                                           NL049037

Netlist DRAFT 10/13/15

12.3    No Sale of Patent. Netlist warrants that it has not sold, assigned or transferred any patents to any third party within twelve (12) months prior to the Effective Date.

12.4    No Warranty. ALL INFORMATION, TECHNOLOGY, SUPPORT AND/OR ASSISTANCE PROVIDED UNDER THIS AGREEMENT ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND. NEITHER PARTY MAKES, AND EACH PARTY HEREBY EXPRESSLY DISCLAIMS, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, REGARDING INFORMATION, TECHNOLOGY, ~~LICENSES,~~ SUPPORT AND/OR ASSISTANCE, OR OTHERWISE WITH RESPECT TO THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF PERFORMANCE, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, ~~TITLE,~~ NON-INFRINGEMENT OF ANY THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, OR ANY WARRANTY THAT MAY ARISE FROM COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

12.5    Consequential Damages. EXCEPT FOR CLAIMS RESULTING FROM EITHER PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCLUDED DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, LOSS OF SAVINGS, LOSS OF USE OR PUNITIVE DAMAGES. IN NO EVENT SHALL ~~NETLIST~~EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED THE AMOUNT OF NRE FEES RECEIVED BY NETLIST HEREUNDER.

**Section 13.    TERM AND TERMINATION**

13.1    Term. This Agreement, including the license, shall become effective on the Effective Date and shall remain in effect until the expiration of the Term unless earlier terminated as provided herein.

13.2    Termination. Notwithstanding the Term of this Agreement as set forth in Section 13.1 herein above, the other Party shall have a right to terminate this Agreement upon written notice to a Party if:

      1) such Party is in material breach of this Agreement and it is not cured within thirty (30) days period from the other Party's written demand, or as a consequence of the breach the purpose of this Agreement cannot be achieved; or

      2) such Party becomes insolvent or files or has a petition filed against it under bankruptcy or insolvency law, makes an assignment for the benefit of creditors or takes any similar action under applicable bankruptcy or insolvency law.

13.3    Effect of Termination. Upon the earlier termination of this Agreement by reason of material breach or insolvency pursuant to Section 13.2 1) and 2) by a Party, all licenses and other rights granted to such defaulting Party pursuant to this Agreement will cease forthwith as of the effective date of such termination; provided, however, that the license granted to the

10

CONFIDENTIAL

NL049038

Netlist DRAFT 10/13/15

non-defaulting Party will continue in full force and effect.   Upon any expiration or termination of this Agreement, each Party shall return all Confidential Information of the other Party in such first Party's possession or under such first Party's control and certify in writing its compliance with such obligation.

**Section 14.   GOVERNING LAW**

This Agreement shall be construed under and governed by ~~the federal laws of the United States of America and~~ the state laws of the State of New York without reference to its conflicts of law principles.   All disputes and litigation arising out of or related to this Agreement, including matters connected with its performance, shall be subject to the exclusive jurisdiction of the courts of the state and county of New York, or of the federal courts sitting therein.   Each Party hereby irrevocably submits to the personal jurisdiction of such courts and irrevocably waives all objections to such venue.

**Section 15.   NOTICES**

All notices required hereunder shall be in writing and sent by registered or certified mail or facsimile and shall be valid upon receipt thereof by the addressee. The addresses of the Parties hereto shall be as follows (or such other address as a Party may give notice of hereunder):

If to Netlist :

Name:
Title:
Address:
Phone:
Email:

If to Samsung :

Name:
Title:
Address:
Phone:
Email:

**Section 16.   GENERAL PROVISIONS**

16.1     <u>Assignment</u>. The rights and obligations of each Party under this Agreement shall not be assigned or transferred, in whole or in part, to any third party without prior written consent of the other Party and any attempt to do so without such consent shall be null and void, including in connection with a Change of Control.

16.2     <u>No Waiver</u>. The failure by either Party to enforce any of the terms and conditions of this Agreement shall not constitute a waiver of such Party's right thereafter to enforce that or any other terms and conditions of this Agreement.

11

sf-3584904

CONFIDENTIAL                                                                 NL049039

Netlist DRAFT 10/13/15

16.3  <u>Compliance with Laws</u>. Either Party shall comply with all applicable laws, rules, and regulations of any governmental or quasi-governmental authority or any country having authority over such matters with respect to the development, and provision of, the Developed Product; and either Party shall require and verify that its employees, or any subcontractor (if permitted hereunder) has complied with all applicable laws, rules and regulations of any governmental authority or quasi-governmental authority or any country having authority over such matters with respect to the JDP, and shall be responsible and liable for any act, inaction, non-compliance, performance, non-performance, or breach of this Agreement, applicable laws, rules and regulations by either Party's employees or third parties engaged by such Party, as applicable.

16.4  <u>Independent Contractors</u>. Samsung and Netlist are independent contractors. Neither Party nor their employees, consultants, contractors or agents are agents, employees or joint ventures of the other Party, nor do they have the authority to bind the other Party by contract or otherwise to any obligation. Neither Party will represent to the contrary, either expressly, implicitly, by appearance or otherwise.

16.5  <u>Survival</u>. Sections 1, 4, 7, 8 (subject to Section 13.3), 9, 10, 11, 12, 13.3, 14, 15, and 16 will survive the termination or expiration of this Agreement to the extent applicable, subject to Section 13.3.

16.6  <u>Severability</u>. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, such provision shall be severed from this Agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

16.7  <u>Complete Agreement</u>. Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement. Any amendment to this Agreement and any Appendices attached hereto requires the signatures of the authorized representatives of the Parties.

16.8  <u>Press-Release</u>.   Upon execution of this Agreement the Parties will issue a joint press release announcing the transaction in the form as set forth in Appendix D.   Except for such press release, neither Party shall, without the approval of the other, make any press release or other public announcement concerning this Agreement or the transactions contemplated by this Agreement; provided, however, that the foregoing shall not preclude communications and disclosures required under accounting, stock exchange or federal securities or labor relations laws.

16.9  <u>Non-Solicitation</u>.   Subject to applicable laws, neither Party and its Subsidiaries shall ~~not~~, during the term of Parties' collaboration under this Agreement and for two years thereafter, directly or indirectly, whether through their employees, officers, representatives, agents, advisors or otherwise, solicit the employment of, or seek or enter into an independent contractor relationship with any employees of the other Party that are engaged in the JDP under this Agreement without the other Party's prior written consent.   The term "solicit the employment" shall not be deemed to include generalized searches for employees through media advertisements of general circulation, job fairs or employment firms; provided, however, that ~~Seller~~the Party does not focus on or target or identify any of such Party's

**Formatted:** Not Highlight

12

CONFIDENTIAL                                                                                NL049040

Netlist DRAFT 10/13/15

employees.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives.

**Samsung Electronics Co., Ltd.**          **Netlist, Inc.**


By:_____          By:_____

Name:_____          Name:_____

Title:_____          Title:_____

Date:_____          Date:_____

13

sf-3584904

Netlist DRAFT 10/13/15

**Appendix A**

## **Product Specifications and Development Milestone**

**1. Product Specifications**

**2. Development Milestone**

14

sf-3584904

CONFIDENTIAL

NL049042

Netlist DRAFT 10/13/15

**Appendix B**

<u>**Statement of Work**</u>

sf-3584904

CONFIDENTIAL

NL049043

Netlist DRAFT 10/13/15

**Appendix C**

## Schedule for Standardization and Productization

sf-3584904

CONFIDENTIAL

NL049044

Netlist DRAFT 10/13/15

**Appendix D**

**<u>Joint Press Release</u>**

sf-3584904

CONFIDENTIAL

NL049045