JASON C. LO, SBN 219030
  jlo@gibsondunn.com
MATTHEW BENJAMIN (*pro hac vice*)
  mbenjamin@gibsondunn.com
RAYMOND A. LAMAGNA, SBN 244821
  rlamagna@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

JASON SHEASBY, SBN 205455
  jsheasby@irell.com
IRELL & MANELLA LLP
1800 Ave. of the Stars
Los Angeles, CA 90067
Telephone: 310.203.7096
Facsimile: 310.203.7199

Attorneys for Plaintiff Netlist Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| NETLIST INC., a Delaware corporation, | CASE NO. 8:20-cv-993-MCS (ADS) |
| Plaintiff, | **NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, | |
| Defendant. | **[REDACTED PUBLIC VERSION]** |

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56-1, Plaintiff Netlist Inc. ("Netlist") respectfully submits the following uncontroverted facts and conclusions of law in support of its Motion for Partial Summary Judgment.

### Statement of Uncontroverted Facts

**Samsung materially breached the parties' contract.** *See, e.g.*, *Aquino v. Alexander Cap., L.P.*, 2021 WL 3185533, at \*14 (S.D.N.Y. July 27, 2021); *Wiljeff, LLC v. United Realty Mgmt. Corp.*, 920 N.Y.S.2d 495, 497 (App. Div. 2011).

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 1. Netlist was founded in 2000. | C.K. Hong Decl. ¶ 3 |
| 2. Netlist is an innovator in high-performance memory module technologies. It designs and manufactures a variety of high-performance products used in servers and storage systems, and its technology enables users to derive useful information from vast amounts of data in a short period of time. | C.K. Hong Decl. ¶ 2 |
| 3. Customers engage Netlist to create custom, proprietary products to satisfy their unique requirements. | C.K. Hong Decl. ¶ 3 |
| 4. As of its 2015 Annual Report, Netlist had total assets of $24,666,000. | LaMagna Decl. Ex. 37 at F-3[1] |
| 5. As of its 2015 Annual Report, Netlist had annual total net revenues of $8,012,000. | LaMagna Decl. Ex. 37 at F-4 |

---

[1] Citations in the form of "LaMagna Decl. Ex." refer to the declaration of Raymond A. LaMagna in Support of Netlist Inc.'s Motion for Summary Judgment, filed herewith. Pursuant to the Court's Initial Standing Order for Civil Cases § 10(c)(ii), the parties have agreed to stipulate that (i) all documents and communications produced by the parties are authentic, and (ii) all correspondence produced by the parties were sent and received by the individuals identified on the face of the correspondence.

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 6.  Samsung Electronics Co., Ltd.'s ("Samsung") Memory Business directly or indirectly employs approximately 30,000 individuals in 33 offices across the world. | Jung Bae Lee Decl., Dkt. 94-1, ¶ 2 |
| 7.  The revenue of Samsung's Memory Business in 2020 was in excess of $47 billion. | Jung Bae Lee Decl., Dkt. 94-1, ¶ 3 |
| 8.  Samsung's Memory Business accounts for a global market share of over 40% for DRAM products and 30% for NAND products. | Jung Bae Lee Decl., Dkt. 94-1, ¶ 3 |
| 9.  The market for NAND and DRAM is effectively an oligopoly with Micron, SK Hynix and Samsung controlling approximately 95% of the world's supply. | C.K. Hong Decl. ¶ 6 |
| 10.    Micron, SK Hynix and Samsung memory chips are not interchangeable because each company implements different design and fabrication processes which result in varying speed, power and endurance characteristics when their products are used in server and storage systems. | C.K. Hong Decl. ¶ 6 |
| 11.    Server or storage manufacturers cannot easily replace Samsung NAND or DRAM with Micron or SK Hynix NAND or DRAM. | C.K. Hong Decl. ¶ 6 |
| 12.    On April 16, 2015, Netlist proposed to Samsung that Netlist license its patents for five years to Samsung for $85 million and ongoing | LaMagna Decl. Ex. 2 at -07; LaMagna Ex. 48 at 15:16-18 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn & Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| royalty payments ranging from 0.5% to 1.0%. | |
| 13. On May 18, 2015, Samsung provided a "counter-proposal" to Netlist, in which Samsung would receive a perpetual patent license and listed three forms of "Consideration provided by Samsung," consisting of (1) a $5 million non-recurring engineering fee; (2) a $10 million debt instrument, and (3) "Supply of NAND, DRAM and/or NVDIMM-P controllers on terms to be negotiated." | LaMagna Decl. Ex. 3 at -68, -69 |
| 14. In its May 18, 2015 email, Samsung stated that its counter-proposal would "enable[ ] Netlist to expand it's [sic] business," that "the implicit backing of Samsung should help Netlist as it endeavours to expand it's [sic] business arrangements in the memory industry," and that Samsung "hope[d] the supply of NAND, DRAM, and NVDIMM-P related chipsets will help enable [Netlist's] vision of being a products company." | LaMagna Decl. Ex. 3 at -68 |
| 15. Netlist viewed a commitment from Samsung to supply NAND and DRAM as being of "crucial value" and providing a "significant strategic advantage" to Netlist. "Because securing direct supply of NAND and DRAM was so critical to Netlist, Netlist was willing to make a number of important concessions to Samsung in exchange for Samsung's contractual commitment to provide supply." | C.K. Hong Decl. ¶¶ 4-5 |

Gibson, Dunn & Crutcher LLP

4

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 16.    First, a supply commitment from Samsung would "reduce business risk stemming from the possibility that [intermittent semiconductor] shortages would disrupt the flow of products to [Netlist's] customers." | C.K. Hong Decl. ¶ 4 |
| 17.    Second, a supply commitment from Samsung would "elevat[e] Netlist into an elite group of industry players and provid[e] assurances to Netlist's customers that if they engaged Netlist, they would have good access to supply." | C.K. Hong Decl. ¶ 4 |
| 18.    On October 8, 2015, Samsung provided the initial draft of an agreement to Netlist. | LaMagna Decl. Ex. 4 |
| 19.    Section 6.2 of Samsung's October 8, 2015 draft provided: "Samsung will supply NAND and DRAM to Netlist on Netlist's request at a competitive price similar to the customers purchasing similar volumes of similar products. For the avoidance of doubt, any of the provisions under this Agreement will not be deemed to require Netlist to purchase any products from Samsung or to require Samsung to supply any products to Netlist." | LaMagna Decl. Ex. 4 at -56 |
| 20.    On October 13, 2015, Netlist provided to Samsung revisions to Samsung's draft agreement in which, among other changes, Netlist removed the following sentence: "For the avoidance of doubt, any of the | LaMagna Decl. Ex. 5 at -85 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn & Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| provisions under this Agreement will not be deemed to require Netlist to purchase any products from Samsung or to require Samsung to supply any products to Netlist." | |
| 21.   Netlist explained this change as follows: "In Section II.6 of the MOU, Samsung clearly agreed to provide Netlist with NAND and DRAM products. However, in Section 6.2 of its proposed JDLA, Samsung states that nothing in this agreement will 'require Samsung to supply any products to Netlist.' Netlist removed this qualification and returned the language to reflect what was agreed to in the MOU." | LaMagna Decl. Ex. 5 at -77; *see also* LaMagna Ex. 48 at 65:21-67:11 (██████████████████████ ██████████████████████ ██████████████████). |
| 22.   Netlist and Samsung executed the agreed-upon Joint Development and License Agreement ("JDLA") on November 12, 2015. | C.K. Hong Decl. ¶ 5; LaMagna Ex. 1 at 1; Answer to First Amended Complaint, Dkt. 27, ¶ 9. |
| 23.   Section 2 of the JDLA is entitled "Collaborative Development Work" and addresses the parties' efforts to jointly develop certain new technologies. | LaMagna Ex. 1 at § 2; *see also* LaMagna Ex. 49 at 21:10-11 (██████████████████████ ██████████████████████ ████████████). |
| 24.   ███████████████████ ████████████████████████ ████████████████████████ ████████████ | LaMagna Ex. 49 at 24:12-20; *see also id.* 38:17-39:4, 87:8-14 |
| 25.   ███████████████████ ████████████████████████ ████████████████████████ ████████████ | LaMagna Ex. 49 at 30:17-32:7; *see also id.* 29:5-20 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 26.     Section 3 of the JDLA is entitled "Development Costs." | LaMagna Ex. 1 at § 3 |
| 27.     Section 3.1 of the JDLA provides, in part: "<u>Fees and Costs</u>. Samsung shall pay to Netlist eight million United States dollars (US $8,000,000) as non-refundable NRE fees . . . ." | LaMagna Ex. 1 at § 3.1 |
| 28.     Section 3.2 of the JDLA provides, in part: "<u>Taxes</u>. . . . To the extent that any withholding taxes are required by applicable law for the payments set forth in this Agreement, Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea in remitting payment to Netlist under this Agreement, providing that Samsung shall . . . reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes." | LaMagna Ex. 1 at § 3.2 |
| 29.     "As part of this [joint development] effort, Netlist, among other things, spent nearly $10 million in research and development, reported on test results to Samsung, sent Samsung samples, met with Samsung regularly to discuss the results of Netlist's development efforts, and responded to Samsung's inquiries." | C.K. Hong Decl. ¶ 14 |
| 30.     Section 5 of the JDLA is entitled "Technology Standardization and Productization," and it provides, in | LaMagna Ex. 1 at §§ 5, 5.1 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| part, that "The Parties will work together" towards those goals. | |
| 31.     Section 5.2 of the JDLA provides: "<u>Right of First Refusal</u>. Netlist will provide Samsung a right of first refusal to acquire Netlist's NVDIMM-P technology in a separate, subsequent transaction before Netlist offers such technology to any third party." | LaMagna Ex. 1 at § 5.2 |
| 32.     Section 6 of the JDLA is entitled "Supply of Components." | LaMagna Ex. 1 at § 6 |
| 33.     Section 6.1 of the JDLA provides: "<u>Supply by Netlist</u>. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." | LaMagna Ex. 1 at § 6.1 |
| 34.     Section 6.2 of the JDLA provides: "<u>Supply by Samsung</u>. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products)." | LaMagna Ex. 1 at § 6.2 |
| 35. ████████████████ | LaMagna Ex. 48 at 20:15-18, 37:22-38:4, 96:12-18 |
| 36. ████████████████ | LaMagna Ex. 48 at 49:13-23; *cf. id.* 65:21-66:2 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 37.    On June 1, 2016, Samsung's Principal Engineer for Memory Product Planning & Application Engineering, Indong Kim, sent an internal email in which he quoted JDLA § 6.2 and wrote that "It is a provision limited to the volume condition, so Netlist claiming that it is low cost is an overinterpretation that's extending beyond the agreement." | LaMagna Decl. Ex. 6 at -59 |
| 38.    On January 18, 2018, the Director of Samsung's Memory Sales Team, Hyeok-Sang Yoo, received an email from a Samsung colleague containing a screenshot of JDLA § 6.2 and stating that "Pursuant to the agreement, supply for NAND and DRAM products is necessary if there is a request from Netlist." | LaMagna Decl. Ex. 7 at -69 |
| 39.    On February 2, 2018, Samsung's Vice President and Group Leader for Business Strategy in its Memory Division, Yong Hwangbo, sent an internal email in which he quoted and highlighted JDLA § 6.2, and wrote that "there is an obligation to supply NAND/DRAM at a competitive price if N company [*i.e.*, Netlist] makes a request." Mr. Hwangbo also added that "the supply price" for Netlist "is somewhat higher than other similarly sized company (Smart Modular)." | LaMagna Decl. Ex. 8 at -15-16; *see also* LaMagna Ex. 50 at 59:15-60:6 (███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ ███████████████████████████ █████████████████████████) |
| 40.    Section 7.1 of the JDLA provides, in part: "Release of Samsung. Netlist . . . releases, acquits and forever discharges Samsung . . . from any and | LaMagna Ex. 1 at § 7.1 |

9

Gibson, Dunn & Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| all actions, causes of action, suits, debts, liability, claims and demands for infringement of Netlist's Licensed Patents . . . prior to the Effective Date" of the JDLA. | |
| 41.    Section 8.2 of the JDLA provides, in part: "License to Samsung. Netlist . . . hereby grants . . . to Samsung . . . a perpetual . . . paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Netlist's Licensed Patents to make and have made . . . Samsung's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of such products." | LaMagna Ex. 1 at § 8.2 |
| 42.    Samsung stated to Korean tax authorities that its "main reason for entering into the [JDLA] was . . . to resolve the risk of Netlist, Inc. filing a patent infringement suit" against Samsung. | LaMagna Decl. Ex. 9 at -63; *see also, e.g.*, LaMagna Ex. 48 at 27:6-21, 30:1-32:1, 89:4-10, 93:3-13, 126:14-19 (████████████████████████████ ; LaMagna Ex. 51 at 24:9-22 (similar) |
| 43.    Section 13.2 of the JDLA, provides, in part: "Termination. . . . the other party shall have a right to terminate this Agreement upon written notice to a Party if: 1) such party is in material breach of this Agreement and it is not cured within thirty (30) days period [*sic*] from the other Party's written demand, or as a consequence of the breach the purpose of this Agreement cannot be achieved . . . ." | LaMagna Ex. 1 at § 13.2 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 44. Section 15 of the JDLA provides, in part: "All notices required hereunder shall be in writing and sent by registered or certified mail or facsimile and shall be valid upon receipt thereof by the addressee. The addresses of the Parties hereto shall be as follows . . . . If to Samsung: Name: Seung Min Sung[,] Title: Director[,] Address: San #16 Banwol-Dong, Hwasung City, Gyongi-Do 445-701, Korea" | LaMagna Ex. 1 at § 15 |
| 45. Section 16.2 of the JDLA provides: "No Waiver. The failure by either Party to enforce any of the terms and conditions of this Agreement shall not constitute a waiver of such Party's right thereafter to enforce that or any other terms and conditions of this Agreement." | LaMagna Ex. 1 at § 16.2 |
| 46. After the execution of the JDLA, Samsung withheld $1,320,000 of the $8,000,000 non-recurring engineering fee owed to Netlist. | LaMagna Decl. Ex. 10; LaMagna Decl. Ex. 11; Sasaki Decl. ¶ 3 |
| 47. On December 16, 2015, Netlist wrote to Mr. Han requesting that the remainder of the non-recurring engineering fees be paid to Netlist because it "was not subject to [a] royalty withholding tax under the applicable law." | LaMagna Decl. Ex. 11; Sasaki Decl. ¶ 4 |
| 48. ███████████████████ | LaMagna Ex. 48 at 133:10-24; *see also* LaMagna Ex. 51 at 117:8-119:3 (similar) |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn & Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| ████████████████ | |
| 49.      In a December 31, 2015 letter, Samsung stated to Netlist that the funds were withheld "according to the United States-Republic of Korea Income Tax Convention . . . and Republic of Korea Corporate Tax Act," and that "Netlist should discuss this matter directly with the NTS," referring to the Korean National Tax Service. | LaMagna Decl. Ex. 10; Sasaki Decl. ¶ 4; *see also* LaMagna Decl. Ex. 39 at 12 (Supplemental Response to Interrogatory No. 11: "Samsung informed Netlist that if it desired a refund, it could do so by directly contacting the Korean National Tax Service.") |
| 50.      On behalf of Netlist, PricewaterhouseCoopers "request[ed] that [Samsung] submit Samsung's Q&A to the [Korean National Tax Service] on the basis that the $8 million is an NRE payment not a license fee and that [Samsung] stick to the factual background." | LaMagna Decl. Ex. 12; Sasaki Decl. ¶ 5 |
| 51.      Samsung responded that "our company believes that we should reply" to the Korean National Tax Service "to the effect that the nature of the agreement was viewed as license and tax was withheld accordingly." | LaMagna Decl. Ex. 12; Sasaki Decl. ¶ 5 |
| 52.      Samsung told the Korean National Tax Service that the $8,000,000 non-recurring engineering fee owed to Netlist under the JDLA was a patent royalty payment. | LaMagna Decl. Ex. 9 at -68; Sasaki Decl. ¶ 6; *see also* LaMagna Decl. Ex. 13 at -44-45 (Korean Tax Tribunal decision summarizing Samsung's argument); LaMagna Decl. Ex. 39 at 12 (Supplemental Response to Interrogatory No. 11: "Samsung provided truthful information within its knowledge relating to the Agreement and the payment of any fees owed to |

Gibson, Dunn & Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
|  | Netlist under it upon request by the Korean National Tax Service.") |
| 53.    On November 17, 2020, the Korean Tax Tribunal rejected Samsung's arguments, finding that the $8,000,000 non-recurring engineering fee owed to Netlist under the JDLA was not a patent royalty payment. | LaMagna Decl. Ex. 13; Sasaki Decl. ¶ 7 |
| 54.    Netlist suffered harm as a direct result of Samsung's wrongful tax withholding and refusal to cooperate with Netlist in securing payment, including because Netlist was not able to use nearly 20% of the non-recurring engineering fee for five years and expended significant costs, resources and effort in recovering that amount. | Sasaki Decl. ¶ 8 |
| 55.    After execution of the JDLA, Netlist invested heavily in sales and marketing efforts to expand the market for Samsung-based products. | C.K. Hong Decl. ¶ 9 |
| 56.    Netlist convinced its customers who previously had not had access to Samsung products to qualify server systems with Samsung NAND and DRAM. | C.K. Hong Decl. ¶ 9 |
| 57.    Netlist actively promoted its access to Samsung memory chips, building relationships with customers who relied on Netlist's access.  Netlist thus built important goodwill with its customers, who relied on Netlist for a supply of Samsung NAND and DRAM for products designed to utilize Samsung memory. | C.K. Hong Decl. ¶ 9 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 58.    Netlist mentioned the JDLA more than ten times in its 2015 Annual Report. | LaMagna Decl. Ex. 37 at 3-4, 6, 12, 14, 28, 34, 43, 46, F-7 |
| 59.    Netlist's 2015 Annual Report explained that, among other provisions, the JDLA "contractually comit[ted] Samsung to supply NAND flash and DRAM products to [Netlist] on [its] request at competitive prices," and that the parties had agreed to "work together to jointly develop" certain new technologies that they hoped would be adopted throughout the electronics industry. | LaMagna Decl. Ex. 37 at 6, 34 |
| 60.    It was Samsung and Netlist's mutual understanding that Netlist would obtain Samsung products directly from Samsung.  For Netlist to voluntarily go to a third-party for supply of Samsung NAND and DRAM would not make economic sense. | C.K. Hong Decl. ¶ 6; *see also* LaMagna Decl. Ex. 6 at -61 (internal Samsung email recognizing Netlist "are committed to selling 100% Samsung product"); P.K. Hong MSJ Decl. ¶ 6 (explaining economic incentive to purchase directly from Samsung)[2] |
| 61.    The first step in the process of purchasing NAND and DRAM from Samsung involved the regular submission of forecasts by Netlist showing the amount of Samsung product Netlist would need going forward.  Such forecasts included line | P.K. Hong MSJ Decl. ¶ 4; *see also* LaMagna Ex. 50 at 27:9-29:23, 55:2-19 |

---

[2]  Citations to "P.K. Hong MSJ Decl." refer to the Declaration of Paik Ki Hong in Support of Netlist Inc.'s Motion for Partial Summary Judgment, filed herewith. Citations to "P.K. Hong Decl., Dkt. 84-18" refer to the previously filed Declaration of Paik Ki Hong in Support of Netlist Inc.'s Motion to Compel the Deposition of Jung Bae Lee and Joo Sun Choi, filed on July 20, 2021 at Dkt. 84-18.

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| items with particular SKU numbers, volumes and delivery dates. | |
| 62.    Upon receipt of a forecast, Samsung would inform Netlist which line items Samsung was willing to fulfill. | P.K. Hong MSJ Decl. ¶ 4; *see also* LaMagna Ex. 50 at 27:9-29:23, 55:2-19 |
| 63.    Beginning in mid-2017, Samsung often refused to fill the entire quantity reflected in Netlist's forecasts. | P.K. Hong MSJ Decl. ¶ 5; *see also* LaMagna Ex. 50 at 27:9-29:23, 55:2-19 |
| 64.    After receiving Samsung's response, Netlist would issue a purchase order reflecting the amount of product Samsung had stated it was willing to sell. | P.K. Hong MSJ Decl. ¶ 5 |
| 65.    If Samsung followed through on a purchase order, it would deliver NAND and DRAM products to Netlist. | P.K. Hong MSJ Decl. ¶ 5 |
| 66.    Beginning in mid-2017, Samsung frequently failed to follow through on Netlist's purchase orders and instead required Netlist to cancel purchase orders that it had already placed. | P.K. Hong MSJ Decl. ¶ 5 |
| 67.    Netlist only purchased Samsung NAND and DRAM on the secondary market from sellers other than Samsung when Samsung refused to fulfill Netlist's requests to purchase such products directly from Samsung. | P.K. Hong MSJ Decl. ¶ 6 |
| 68.    At a meeting on February 22, 2016, Mr. Yoo, informed Netlist that "up to a year ago [ ] he was told not to | LaMagna Decl. Ex. 14 |

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| support Netlist" and "actually was not allowed to visit Netlist." | |
| 69.     At that February 22, 2016 meeting, Mr. Yoo informed Netlist "that he is now being told to support Netlist and will." | LaMagna Decl. Ex. 14 |
| 70.     Before the JDLA was signed, Samsung supplied effectively no product to Netlist. | C.K. Hong Decl. ¶ 8 |
| 71.     After Netlist and Samsung entered the JDLA, Samsung routinely supplied Netlist with its requests and needs for Samsung NAND and DRAM products. Overall, Netlist's orders with and fulfillment by Samsung went smoothly and continued to increase rapidly throughout 2016 and 2017. | P.K. Hong Decl., Dkt. 84-18, ¶ 4; P.K. Hong MSJ Decl. ¶ 3 |
| 72.     In 2016, Netlist purchased approximately $9 million worth of NAND and DRAM from Samsung. | C.K. Hong Decl. ¶ 8 |
| 73.     In the first half of 2017, Samsung's supply of NAND and DRAM to Netlist was approximately $16 million. | C.K. Hong Decl. ¶ 8 |
| 74. ████████████████████████ | LaMagna Decl. Ex. 15 at -302 |

16

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| ████████████████ | |
| 75. ████████████████████████████████████████████████████████████████████ | LaMagna Decl. Ex. 15 at -301 |
| 76. ██████████████████████████████ | LaMagna Decl. Ex. 16 |
| 77.    In or about May 2017, Samsung stopped agreeing to support Netlist's NAND and DRAM product requests and began refusing to allow Netlist to submit purchase orders for such products. | P.K. Hong Decl., Dkt. 84-18, ¶ 5; P.K. Hong MSJ Decl. ¶ 3; C.K. Hong Decl. ¶ 10 |
| 78. ████████████████████ | LaMagna Decl. Ex. 15 at -97, 99 |
| 79.    On or about May 18, 2017, Netlist and Samsung executives met, at which time Netlist requested product support for NAND and DRAM as previously provided by Samsung. Samsung did not indicate whether product support would be forthcoming. | P.K. Hong Decl., Dkt. 84-18, ¶ 7 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 80. ███████████████ | LaMagna Decl. Ex. 18 at -07 |
| 81. ███████████████ | LaMagna Decl. Ex. 18 at -06; *see also* LaMagna Ex. 50 at 49:6-14 ███ |
| 82. ███████████████ | LaMagna Decl. Ex. 18; *see also* LaMagna Decl. Ex. 19 ███████ |
| 83. ███████████████ | LaMagna Ex. 50 at 50:10-16; *see also* LaMagna Ex. 52 at 128:12-18( ██████ 129:12-130:10 ██████ |
| 84. ███████████████ | LaMagna Decl. Ex. 20 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| ██████████████████ | |
| 85. ████████████████ | *See, e.g.*, LaMagna Decl. Ex. 21 ███████████████████████ ); LaMagna Decl. Ex. 40 (" ████████ ; LaMagna Decl. Ex. 43 at -07 ███████████ ); LaMagna Ex. 53 at 93:22-94:17, 103:11-24, 135:1-11 |
| 86.    Samsung continued to impose that cap thereafter. | *See, e.g.*, LaMagna Decl. Ex. 15 at -95-96 ███████████ ; LaMagna Decl. Ex. 29 (July 2017, Mr. Knuth "realized that we are capped at $500k limit"); LaMagna Decl. Ex. 44 ██████████ ); LaMagna Decl. Ex. 22 at -57-58 ███████████████ ); LaMagna Ex. 50 at 64:21-65:3 (" ██████████ |
| 87. ██████████████ . | LaMagna Decl. Ex. 19 at -26-27 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 88. ███████████████████ ████████████████ . | *See, e.g.*, LaMagna Decl. Ex. 23 at -63 ( ██████████████████████ |
| 89.    On June 8, 2017, in response to information provided by Netlist concerning the parties' joint research and development efforts, Mr. I. Kim, stated that the information provided by Netlist was "quite surprising and disappointing," as well as "extremely frustrating." Mr. I. Kim further referenced a "big challenge" as to the collaboration's future prospects. | LaMagna Decl. Ex. 24 at -73-74 |
| 90. ██████████████████ ███████████████████ ████████████ | LaMagna Ex. 49 at 49:4-18; *see also* LaMagna Decl. Ex. 25 at -16 ████████████████████ █████████████████████████ ) |
| 91.    While Netlist "attempted to show" Samsung that the product on which they had collaborated "was commercially viable," Samsung nevertheless "determin[ed] that the [collaborative] activities were unlikely to result in a commercially viable product." | LaMagna Decl. Ex. 26 at 9 (Supplemental Response to Interrogatory No. 4); *see also* LaMagna Ex. 49 at 31:1-11 ███████ ) |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn & Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 92.   On June 9, 2017, Netlist met with Mr. Knuth and provided a presentation that stated, in part:<br>• Netlist was "Extending Samsung reach to high-end customers," which was "leading to consistent demand" and "require[d] ongoing support";<br>• Netlist projected continuing to ramp up its purchases of Samsung products to more than $15 million per quarter by the end of 2017;<br>• Netlist "Need[ed] product support" from Samsung "to maintain and grow [Netlist's] business";<br>• Netlist "Need[ed] confirmation of support & ship dates" for specific purchases;<br>• Samsung's "Product allocation support [was] critical"; and<br>• A "Revised ordering process would be appreciated." | LaMagna Decl. Ex. 27; P.K. Hong Decl., Dkt. 84-18, ¶ 8 |
| 93.   At the June 9, 2017 meeting, Mr. Knuth informed Netlist that Joo Sun Choi, a Samsung executive overseeing memory sales in the United States, had instructed the Samsung U.S. sales team to cut Netlist's product allocation to zero. | P.K. Hong Decl., Dkt. 84-18, ¶ 8 |
| 94.   Between the second half of 2017 and the first half of 2018, several additional meetings were held between Netlist and Samsung in the United States and Korea. | C.K. Hong Decl. ¶ 10 |
| 95.   Netlist explained to Samsung that its refusal to fulfill Netlist's | C.K. Hong Decl. ¶ 10 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| requests for NAND and DRAM was causing Netlist to lose valuable business opportunities and tarnish the goodwill Netlist had established with a customer base that had come to rely on Netlist. | |
| 96. ███████████ | LaMagna Decl. Ex. 15 at -95 |
| 97. ███████████ | LaMagna Decl. Ex. 15 at -95 |
| 98.      On July 12, 2017, Netlist wrote to Samsung to inquire as to "any decision made in regard to sales volume," noting that "It's a very critical matter for us." | LaMagna Decl. Ex. 28 at -80 |
| 99.      On July 12, 2017, Mr. Knuth informed Netlist that he could not fulfill an order it sought to submit. In a subsequent discussion with Netlist, Mr. Knuth expressed that there was "Nothing he can do and he mentioned he is not even supposed to discuss with [Netlist] what he has available or he gets in trouble," further stating that he was "Not going to get fired for this." | LaMagna Decl. Ex. 29 |
| 100. ███████████ | LaMagna Decl. Ex. 15 at -97 |

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| ▮▮▮▮▮▮▮▮▮▮▮▮▮ . | |
| 101.   On July 20, 2017, Netlist wrote to Mr. Knuth that it was "Dropp[ing]" a request for certain products because Mr. Knuth had informed Netlist its request was "not realistic," and referencing discussions in which Netlist had been told that "partial of [its] requested items cannot ship." | LaMagna Decl. Ex. 30 |
| 102. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | LaMagna Decl. Ex. 31 |
| 103.   On December 5, 2017, Netlist provided Samsung with "slides/talking points" for an upcoming internal Samsung meeting concerning Netlist. Netlist's email reiterated that Netlist "need[s Samsung's] management support to get more allocation." | LaMagna Decl. Ex. 32 |
| 104.   The slides that Netlist provided to Samsung on December 5, 2017 stated, in part:<br>• Netlist's "Efforts to convert customers from Micron" products to Samsung were "negatively impacted by allocation support"<br>• Netlist "Need[ed its] monthly allocation increased . . . to | LaMagna Decl. Ex. 32 at -01 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn & Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| maximize ability to support customers with Samsung products"<br>• Netlist was "Losing qualification opportunities with inability to guarantee support when required due to limited allocation." | |
| 105. <span>█████</span> | LaMagna Decl. Ex. 33 at -95 |
| 106.   In or about January 2018, Netlist was informed that Samsung "ha[d] decided to give Netlist $0 allocation and no support." | LaMagna Decl. Ex. 34; *see also, e.g.*, P.K. Hong Decl., Dkt. 84-18, ¶ 6 |
| 107.   On February 2, 2018, Mr. Hwangbo acknowledged that "The quantity for N company [*i.e.*, Netlist] has decreased a lot to the level of '17.1Q $8.2M → 4Q $2.5M, and the supply price is somewhat higher than other similarly sized company (Smart Modular)." | LaMagna Decl. Ex. 8 |
| 108.   On February 19, 2018, Netlist provided a forecast of its 2018 demand to Samsung, explaining that Netlist | LaMagna Decl. Ex. 35 |

Gibson, Dunn &
Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| "need[s] this supported" and "cannot accept partial support." Netlist further noted that "In the 1st half of 2017, we were growing our business and Samsung was supporting $8M/QTR. Then in 2H'17 Samsung lowered this support to under $3M/QTR, even though we had requested $15M/QTR for 2H'17 in June 2017. Then in Jan'18 Samsung stopped shipments altogether. These drastic changes have impacted our business and impacted our ability to support our customers. We need Samsung to support the forecast we have included . . . ." | |
| 109. ███████████████████ | LaMagna Decl. Ex. 22 at -58 |
| 110. ███████████████████ | LaMagna Decl. Ex. 36 at -86 |
| 111.  Because the supply arrangement with Samsung was so uniquely valuable to Netlist, Netlist did not want to walk away from it. | C.K. Hong Decl. ¶ 10 |
| 112.  When Netlist was unable to procure NAND and DRAM from Samsung, it had to scramble to find Samsung NAND and DRAM on the secondary market, often at higher prices and/or in insufficient quantities than if it had been supplied directly from Samsung. Products purchased on | P.K. Hong Decl., Dkt. 84-18, ¶ 9; C.K. Hong Decl. ¶ 6 |

Gibson, Dunn & Crutcher LLP

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| the secondary market purchases also required quality testing that was not necessary when purchasing directly from Samsung. | |
| 113.   These higher prices and shortfalls in quantity resulted in Netlist's inability to fulfill its customers' orders. | P.K. Hong Decl., Dkt. 84-18, ¶ 9 |
| 114.   Samsung "routinely rejected requests for product from Netlist." | LaMagna Decl. Ex. 39 at 17 (Supplemental Response to Interrogatory No. 16) |
| 115.   Samsung "indicated routinely" to Netlist that it was "unable to support individual requests for product." | LaMagna Decl. Ex. 26 at 6 (Supplemental Response to Interrogatory No. 2); LaMagna Decl. Ex. 38 at 3-32 (Response & Amended Response to Request for Admission Nos. 16-41) |
| 116.   Samsung "routinely declined to support requests for product" from Netlist. | LaMagna Decl. Ex. 39 at 13 (Supplemental Response to Interrogatory No. 14), 19 (Supplemental Response to Interrogatory No. 17), 23 (Supplemental Response to Interrogatory No. 20) |
| 117.   Samsung "indicated routinely" to Netlist that it would not "support every request for products from Netlist, and it "ultimately did not support [such] requests." | LaMagna Decl. Ex. 38 at 3-32 (Amended Response to Request for Admission Nos. 16-41) |
| 118.   Samsung claims that through its "routine[ ]" failure to fulfill Netlist's requests for product, it acted "as it would with any other similarly situated customer." | LaMagna Decl. Ex. 38 at 3-32 (Response & Amended Response to Request for Admission Nos. 16-41) |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 119.   As a result of Samsung's refusal to supply NAND and DRAM to Netlist, Netlist lost major customers, business opportunities and profits. | C.K. Hong Decl. ¶¶ 11-12 |
| 120.   As a result of Samsung's refusal to supply NAND and DRAM to Netlist, Netlist's reputation suffered. | C.K. Hong Decl. ¶¶ 11-12 |
| 121.   As a result of Samsung's refusal to supply NAND and DRAM to Netlist, Netlist was prevented from growing into a stable products business. | C.K. Hong Decl. ¶ 12 |
| 122.   As a result of Samsung's refusal to supply NAND and DRAM to Netlist, Netlist has suffered extreme commercial harm. | C.K. Hong Decl. ¶ 12 |
| 123.   Netlist has no assurance that Samsung will not once again refuse to supply Netlist with NAND and DRAM in the future. | C.K. Hong Decl. ¶ 12 |
| 124.   It eventually became clear to Netlist that Samsung would continue to decide unilaterally when, if ever, it would honor its obligations under the JDLA to supply Netlist. | C.K. Hong Decl. ¶ 10 |
| 125.   On May 27, 2020, Netlist sent via registered mail to the addressee listed in JDLA § 15 a written demand (i) informing Samsung that it was in material breach of JDLA §§ 3.2 and 6.2, (ii) informing Samsung that these material breaches had "caused Netlist to suffer significant damages," | LaMagna Decl. Ex. 41 |

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

Gibson, Dunn & Crutcher LLP

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| (iii) expressing its "commit[ment] to resolving these issues amicably," and (iv) providing an opportunity for Samsung to cure those material breaches. | |
| 126.  On June 12, 2020, Netlist emailed a copy of its May 27, 2020 letter to Samsung. | LaMagna Decl. Ex. 46 |
| 127.  Samsung received Netlist's letter of May 27, 2020. | LaMagna Decl. Ex. 47 at 22-23 (Response to Request for Admission No. 51) |
| 128.  On July 15, 2020, after having "not received a response from Samsung . . . let alone any cure of such breaches," Netlist sent a second letter by registered mail to the same addressee at Samsung stating that "Netlist ha[d] provided Samsung with notice of a material breach" but "ha[d] not received a response from Samsung regarding the material breaches set forth" in its earlier letter.  Accordingly, Netlist terminating the JDLA, "effective immediately," because Samsung's breaches had "fundamentally undermined the purpose of the Agreement." | LaMagna Decl. Ex. 45; *see also* LaMagna Decl. Ex. 42 (emailed copy of same) |
| 129.  Samsung has claimed that Netlist failed to comply with its obligations under the JDLA only through "Netlist's purported termination was improper." | LaMagna Decl. Ex. 39 at 18 (Supplemental Response to Interrogatory No. 18); *see also* Answer to First Amended Complaint, Dkt. 27, at 5 (asserting as affirmative defense that Netlist breached) |

Gibson, Dunn & Crutcher LLP

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| Uncontroverted Facts | Supporting Evidence |
|---|---|
| 130.  Netlist performed all material obligations owed to Samsung under the JDLA. | C.K. Hong Decl. ¶ 13 |

### Conclusions of Law

1.      Netlist is entitled to summary judgment on its first cause of action for breach of the JDLA because Samsung failed to supply NAND and DRAM products to Netlist on Netlist's request at a competitive price.

2.      Netlist is entitled to summary judgment on its second cause of action for breach of the JDLA because Samsung wrongfully withheld $1,320,000 of the $8 million owed to Netlist as consideration for its development costs, and because Samsung failed to reasonably cooperate with Netlist in its efforts to seek a refund from the Korean tax authorities for the $1,320,000 that was wrongfully withheld.

3.      Netlist is entitled to summary judgment on its third cause of action for declaratory relief because it has properly terminated the JDLA under § 13.2 thereof.

Dated: August 16, 2021          Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Jason C. Lo
Jason C. Lo
333 South Grand Avenue
Los Angeles, CA 90071
213.229.7000
jlo@gibsondunn.com

Attorneys for Plaintiff Netlist Inc.

NETLIST INC.'S STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW