Ekwan E. Rhow - State Bar No. 174604
    erhow@birdmarella.com
Marc E. Masters - State Bar No. 208375
    mmasters@birdmarella.com
David I. Hurwitz - State Bar No. 174632
    dhurwitz@birdmarella.com
Kate S. Shin - State Bar No. 279867
    kshin@birdmarella.com
Christopher J. Lee - State Bar No. 322140
    clee@birdmarella.com
Jong-min Choi - State Bar No. 329474
    jmchoi@birdmarella.com
Joyce J. Choi - State Bar No. 256165
    jchoi@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant
Samsung Electronics Co., Ltd.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>Defendant. | CASE NO. 8:20-cv-00993-MCS-ADS<br><br>**DEFENDANT SAMSUNG ELECTRONICS CO., LTD.'S SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS**<br><br>[Filed Concurrently with (1) Defendant's Opposition; (2) Defendant's Statement of Genuine Dispute of Material Facts; (3) Defendant's Evidentiary Objections to Declarations; (4) [Proposed] Order (5) Declaration of Hyeoksang Yoo and (6) Lee Declaration].<br><br>Assigned to Hon. Mark C. Scarsi<br>Courtroom 7C |

| DEFENDANT'S ADDITIONAL MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 1. In early 2015, Netlist approached Samsung to discuss a strategic partnership involving joint development of a product based on a new standard called NVDIMM-P and licensing of Netlist's patents. | Dkt. 150-1 (Declaration of Joyce J. Choi in Support of Samsung's Motion for Summary Judgment ("Choi Decl.")) ¶ 15, Exh. 14 at RFA No. 18. |
| 2. The NVDIMM-P-related product was a "game changer" according to Chuck Hong and, based on presentation materials, was designed to take market share in a $15 billion industry. | Choi Decl. ¶ 8, Exh. 7 at 139:7-25; ¶ 17, Exh. 16 at SEC008159. |
| 3. At that time, Netlist also raised a licensing component and the potential that Samsung would be subject to an injunction for infringement of Netlist's patents. | Choi Decl. ¶ 18, Exh. 17 at NL107807; ¶ 8, Exh. 7 at 42:4-14. |
| 4. Netlist's first proposal to Samsung in April 2015 focused on the cash consideration, and did not mention a long term supply agreement. ("Q Now, at least on this proposal, Netlist didn't list supply as a component of the deal; correct? A Yes, it's not here.") | Choi Decl. ¶ 18, Exh. 17 at NL107807; ¶ 8, Exh. 7 at 51:3-52:18. |
| 5. When Netlist sent Samsung the first draft of the term sheet on April 21, 2015, | Choi Decl. ¶ 23, Exh. 22; ¶ 24, Exh. 23 at § II. |

| | | |
|---|---|---|
| 1 2 3 4 5 | Netlist proposed, as part of the "Joint development and marketing" for the "Technology Collaboration," that Samsung supply NAND and DRAM product. | |
| 6 7 8 9 10 11 | 6. In Netlist's June 9, 2015 revision to the term sheet, under the heading "Technology Collaboration," Netlist proposed: "Raw Materials: Samsung will supply NAND, DRAM on mutually agreed terms." | Choi Decl. ¶ 25, Exh. 24, § II.5. |
| 12 13 14 15 16 17 18 19 | 7. Netlist CEO Chuck Hong testified that "Technology Collaboration" in Netlist's revised term sheet referred to the parties' joint efforts to standardize NVDIMM-P, and that "Raw Materials" referred to various DRAM and NAND flash components necessary to support the NVDIMM-P commercialization. | Choi Decl. ¶ 8, Exh. 7 at 91:4-17; 92:4-12. *See also* 101:25-102:7 ("Q. And so those were raw materials that were provided in connection with commercialization of the dash P product; correct? A. That's correct.") |
| 20 21 22 23 24 25 26 27 | 8. In Netlist's June 25, 2015 updated term sheet, under the heading "Phase 2: Technology Productization," Netlist proposed: "1. Parties will work together to bring an NVDIMM-P product to market. Details of the technical collaboration to be negotiated at a later date" and "Raw Materials: Samsung will | Choi Decl. ¶ 26, Exh. 25 at NL005090, NL005092. |
| 28 | | |

| | | |
|---|---|---|
| 1<br>2 | supply NAND and DRAM on mutually agreed terms." | |
| 3<br>4<br>5<br>6<br>7<br>8<br>9 | 9. In the drafts leading up to the final and executed MOU, Netlist understood that Samsung's supply obligations would only arise in the event of commercialization of the NVDIMM-P product subject to the parties' joint development but this never occurred. | Choi Decl. ¶ 8, Exh. 7 at 104:6-24. |
| 10<br>11<br>12<br>13<br>14<br>15<br>16<br>17 | 10. Netlist CEO Chuck Hong testified that Netlist's intent underlying the MOU was to get Samsung's commitment to supply NAND and DRAM products for the NVDIMM-P product so that Netlist would have sufficient supply if and when it was able to commercialize the technology. | Choi Decl. ¶ 8, Exh. 7 at 109:9-110:1. |
| 18<br>19<br>20<br>21<br>22<br>23<br>24 | 11. According to Chuck Hong, NVDIMM-P was "industry changing" technology and Netlist's attempt to standardize a NVDIMM-P product was a significant business opportunity and one that Netlist had invested more than $10 million in engineering costs into. | Choi Decl. ¶ 8, Exh. 7 at 79:13-80:23, 139:7-141:6. |
| 25<br>26<br>27 | 12. The MOU reflected both parties' intent on the important points of the parties' agreement. | Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 80:13-23, 92:4-12, 109:9-110:1, 116:3-9; ¶ 22, Exh. 21 at NL069668-69. |

28

Section 6 of the MOU states in full (emphasis added):

> 6. Most Favored Nation (MFN): Netlist will provide Samsung any NVDIMM-P* controller at a price lower than the price Netlist provides to any other buyer. Either party may produce NVDIMM-P controller using its own technology and has no obligation to buy from the other party. *Raw Materials: Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM products.*

As to the MOU, Chuck Hong again testified in deposition that section 6.2 limited Samsung's supply obligation to the NVDIMM-P development and that this obligation would arise only if and to the extent that the NVDIMM-P product was ever commercialized.

| | |
|---|---|
| 13. On October 8, 2015, when the parties began drafting the JDLA from the MOU, Samsung proposed the following language to Netlist: "6.2 Supply by Samsung. Samsung will supply NAND and DRAM to Netlist on Netlist's request at a competitive price similar to the customers purchasing similar volumes of similar products. For the avoidance of doubt, any of the provisions under this Agreement will not be deemed to require Netlist to purchase any products from Samsung or to require Samsung to supply any products to Netlist." | Choi Decl. ¶ 27, Exh. 26 at NL049006; ¶ 28, Exh. 27 at NL049012, § 6.2. |
| 14. Whitley was Netlist's main contributor to the JDLA. | Choi Decl. ¶ 8, Exh. 7 at 130:6-24. |
| 15. On October 14, 2015, as to the new Section 6.2 of its proposed JDLA, Whitley wrote in bold "**Conflicts with MOU**" and "Samsung states that nothing in this agreement will 'require Samsung to supply any products to Netlist.' Netlist removed this qualification and returned the language to reflect what was agreed to in the MOU." Samsung agreed to this change. | Choi Decl. ¶ 29, Exh. 28 at NL045877; ¶ 30, Exh. 29 at NL049026; ¶ 31, Exh. 30 at NL049033; ¶ 32, Exh. 31 at NL118147 and NL118149. |

| | |
|---|---|
| 16. As expressed by Whitley, it was Netlist's position that the MOU should govern the supply term. As set forth in SUF nos. 20 and 31, the MOU only required that Samsung supply product in the event that the NVDIMM-P product was ever commercialized. | Choi Decl. ¶ 29, Exh. 28 at NL045877; ¶ 8, Exh. 7 at 130:6-132:10. |
| 17. Netlist wanted Samsung's assurance that it would supply NAND and DRAM to support NVDIMM-P sales if the joint development proved successful, and demand for the product took off. | Choi Decl. ¶ 8, Exh. 7 at 80:13-23. |
| 18. During the contract negotiations, Netlist's CFO Gail Sasaki wrote to Samsung: "Both sides understood from the outset that this was a strategic deal, not a financial one. *The value that would be transferred and created resided in the patents and the technology.*" | Choi Decl. ¶ 33, Exh. 32 at NL048993. |
| 19. On November 12, 2015, after months of negotiations, Samsung and Netlist entered into the JDLA. | Choi Decl. ¶ 20, Exh. 19 at p.1. |
| 20. The structure and terms of the JDLA reflect that the parties intend "to work together to jointly develop an interface and associated technologies for certain memory modules and promote such | Choi Decl. ¶ 20, Exh. 19 at p.1. |

| | | |
|---|---|---|
| 1<br>2 | interface to standards-setting organizations." | |
| 3<br>4<br>5<br>6<br>7 | 21. The "Developed Product" in the JDLA means an NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications. | Choi Decl. ¶ 20, Exh. 19 at p.2. |
| 8<br>9<br>10 | 22. The JDLA also includes a grant of cross-licenses and a release of threatened claims. | Choi Decl. ¶ 20, Exh. 19 at p.7, § 7. |
| 11<br>12<br>13<br>14<br>15<br>16<br>17<br>18 | 23. The JDLA states that Netlist was to receive $8 million for non-recurring engineering on the NVDIMM-P development work, and concurrently with the JDLA, provide an additional $15 million convertible loan at 2% interest that allowed Netlist to pay off existing debt with less favorable financial terms. | Choi Decl. ¶ 20, Exh. 19 at p.5, § 3.1; ¶ 21, Exh. 20 at p.2; ¶ 22, Exh. 21 at NL069669, § II.7. |
| 19<br>20<br>21<br>22<br>23<br>24<br>25<br>26 | 24. In addition to its receipt of cash and financing from Samsung, Netlist stood to benefit from the relationship, especially if the parties were able to develop this "game changing" standard for NVDIMM-P and produce a commercially feasible product under this standard. | Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 33:12-34:6, 79:6-80:23, 139:7-25. |

#:6440

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13 | 25. The terms of the JDLA seek to implement these objectives, including terms for the collaborative development work in accordance with product specification and development milestones and a Statement of Work (Section 2, Appendices A and B); development costs (Section 3); IPR ownership (Section 4); schedule for standardization and productization (Section 5); supply (Section 6); a mutual release of claims (Section 7); and licensing of intellectual property (Section 8). | Choi Decl. ¶ 20, Exh. 19 at pp.4-8. |
| 14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27 | 26. Pursuant to the JDLA, Samsung and Netlist agreed to supply components to each other for the NVDIMM-P product which they had agreed to jointly develop and therefore did not yet exist. Specifically, Section 6.1 states: "<u>Supply by Netlist</u>. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." Section 6.2, the parallel provision, states: "<u>Supply by Samsung</u>. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a | Choi Decl. ¶ 20, Exh. 19 at p.6, §§ 6.1, 6.2. |

9

Case No. 8:20-cv-00993-MCS-ADS

DEFENDANT'S SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | | |
|---|---|---|
| | competitive price (i.e., among customers purchasing similar volumes of similar products)." | |
| | 27. Samsung's supply obligations would only arise if and to the extent that the NVDIMM-P product was commercialized but this never occurred. | Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 80:13-23, 92:4-12, 109:9-110:1, 116:3-9; ¶ 22, Exh. 21 at NL069668-69. |
| | 28. Netlist received all of the chips it needed to complete the initial phase of the NVDIMM-P product under the JDLA. | Choi Decl. ¶ 8, Exh. 7 at 88:10-89:5. |
| | 29. The NVDIMM-P product was never commercialized. | Choi Decl. ¶ 8, Exh. 7 at 109:21-110:1. |
| | 30. Netlist disclosed an agreement with SK Hynix on April 5, 2021, stating that contract "entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term . . ." | Choi Decl. ¶ 34, Exh. 33 at p.2. |
| | 31. Netlist CEO Chuck Hong's presentation to the Board in November 2015, prepared by Netlist CFO Gail Sasaki, describes the technology collaboration and the cross-licensing of patents but makes no mention of Netlist's supposed broad supply agreement. | Choi Decl. ¶ 35, Exh. 34 at NL117923; ¶ 36, Exh. 35 at p.1. |

| | |
|---|---|
| 32. In its first annual report following the JDLA, Netlist disclosed the risks associated with not having a supply contract:<br>"Our ability to fulfill customer orders or produce qualification samples is dependent on a sufficient supply of field programmable gate arrays ("FPGAs"), DRAM ICs and NAND flash, which are essential components of our memory subsystems. There are a relatively small number of suppliers of FPGAs, DRAM ICs and NAND flash, and we purchase from only a subset of these suppliers. *We have no long-term FPGA, DRAM or NAND flash supply contracts.*" (emphasis added) | Choi Decl. ¶ 19, Exh. 18 at p.13. |
| 33. Netlist repeatedly and consistently disclosed the risks associated with not having a long-term supply contract for DRAM and NAND in its annual reports before and after execution of the JDLA, each time stating that Netlist had "no long-term supply contracts" for these products. | Choi Decl. ¶ 74, Exh. 73 at p.18; ¶ 75, Exh. 74 at p.22; ¶ 4, Exh. 3 at p.14; ¶ 37, Exh. 36 at p.14; ¶ 19, Exh. 18 at p.13; ¶ 38, Exh. 37 at p.19; ¶ 7, Exh. 6 at p.20; ¶ 5, Exh. 4 at p.22; ¶ 39, Exh. 38 at p.20; ¶ 40, Exh. 39 at p.15. |
| 34. A November 2, 2015 press release announcing the JDLA that Netlist was | Choi Decl. ¶ 41, Exh. 40 at pp.2-5. |

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | preparing had a headline stating "Netlist and Samsung Announce Strategic Alliance To Commercialize the First Unified Memory-Storage Architecture" and makes no mention of a supply agreement. | |
| 7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16 | 35. At a February 21, 2017 meeting, Netlist asked Samsung for a "New Partner Type" relationship that would require Samsung to provide "Product Allocation support for Netlist" and an "Official-Distributor Partnership Agreement." When Netlist made this ask, Samsung told Netlist that the JDLA was not an avenue to support Netlist's standard products. | Choi Decl. ¶ 17, Exh. 16 at SEC008148, SEC008169; ¶ 42, Exh. 41 at SEC000474; ¶ 43, Exh. 42 at 43:22-45:3. |
| 17<br>18<br>19<br>20 | 36. Netlist has been a customer of Samsung since at least 2001, purchasing over $200 million of products, including NAND and DRAM components. | Choi Decl. ¶ 2, Exh. 1 at SEC008161; ¶ 3, Exh. 2 at 11:21-12:12, 13:10-20, 14:8-15. |
| 21<br>22<br>23<br>24<br>25 | 37. Both before and after the JDLA and to the present, Samsung has been a significant and continuous supplier of NAND and DRAM to Netlist, as reflected in Netlist's annual reports. | Choi Decl. ¶ 4, Exh. 3 at p.6; ¶ 5, Exh. 4 at p.8; ¶ 6, Exh. 5 at 294:4-18; ¶ 7, Exh. 6 at F-36; ¶ 3, Exh. 2 at 185:10-186:1, 187:21-188:5. |
| 26<br>27<br>28 | 38. Netlist also purchased NAND and DRAM products from SK Hynix and | Choi Decl. ¶ 4, Exh. 3 at p.6; ¶ 6, Exh. 5 at 194:2-22, 294:4-18; |

| | | |
|---|---|---|
| 1 2 3 | Micron, as well as from sellers who purchased the products from the manufacturers for resale. | ¶ 3, Exh. 2 at 205:23-206:18, 207:21-208:10. |
| 4 5 6 7 8 | 39. The amount of NAND and DRAM product that Samsung can manufacture for sale is limited and demand for its products oftentimes exceeds available supply. | Choi Decl. ¶ 8, Exh. 7 at 121:24-122:13; Dkt. 89-21 at ¶ 4. |
| 9 10 11 12 13 14 15 | 40. Due to the nature of the industry, Netlist, like other customers, provides Samsung with forecasts of the amount of product it wishes to purchase, and Samsung lets Netlist know how much product it can allocate to Netlist for purchase. | Choi Decl. ¶ 9, Exh. 8; ¶ 10, Exh. 9; ¶ 3, Exh. 2 at 35:10-36:13, 37:9-22, 61:25-62:5. |
| 16 17 18 19 20 | 41. Following these discussions regarding allocations and availability, Netlist issued purchase orders for specific amounts of product that Samsung approved beforehand. | Choi Decl. ¶ 12, Exh. 11 at 23:23-24:5; ¶ 3, Exh. 2 at 62:6-14; ¶ 13, Exh. 12 at 28:4-25. |
| 21 22 23 24 | 42. Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others, just as it did with other customers. | Choi Decl. ¶ 12, Exh. 11 at 36:8-11; Choi Decl. ¶ 3, Exh. 2 at 45:2-46:8, 62:6-14. |
| 25 26 27 | 43. This business protocol—the use of backlogs, forecasts, allocations, and purchases orders—remained the same | Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 62:6-14; ¶ 14, Exh. 13 at NL004680. |

| | | |
|---|---|---|
| 1 2 3 | throughout the parties' long standing business relationship and even after the JDLA was executed. | |
| 4 5 6 7 | 44. After the JDLA, Samsung continued to supply Netlist with NAND and DRAM outside of the joint development context. | Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 54:24-55:10, 183:3-15, 184:8-20. |
| 8 9 10 11 12 13 14 | 45. Samsung's sales to Netlist have continued from 2001 to the present day, according to the same course of dealing that existed before the JDLA, after the JDLA, and continue to this day after Netlist purported to terminate the JDLA and filed this lawsuit. | Choi Decl. ¶ 21, Exh. 11 at 25:6-25, 201:9-18; ¶ 3, Exh. 2 at 27:21-28:12, 35:23-36:13, 37:18-22, 47:24-50:4, 183:3-15, 184:8-20. |
| 15 16 17 18 19 | 46. Netlist understood that the JDLA did not guarantee it access to all of the Samsung product it requested, but only the product that Samsung actually agreed to sell. | Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 54:24-55:10, 91:10-93:24, 94:6-21, 183:3-15, 184:8-20; ¶ 53, Exh. 52 at NL002024-2027; ¶ 54, Exh. 53; ¶ 46, Exh. 45; ¶ 49, Exh. 48. |
| 20 21 22 23 24 | 47. Due to Samsung needing lead time for production, Netlist submitted forecasts of its requests, and discussed with Samsung how much material would be allocated and made available to it. | Choi Decl. ¶ 3, Exh. 2 at 48:10-12.; ¶ 13, Exh. 12 at 152:5-153:24. |
| 25 26 27 | 48. Netlist only submitted purchase orders for specific quantities of product after Samsung indicated that such | Choi Decl. ¶ 12, Exh. 11 at 23:23-24:5; ¶ 3, Exh. 2 at 62:6-14, 93:18-24; ¶ 13, Exh. 12 at 154:3-20. |

| | | |
|---|---|---|
| 1 | product would be available. | |
| 2-6 | 49. Netlist purchased a substantial amount of NAND and DRAM from Samsung in each quarter from November 2015 to the present, although the amounts varied over time. | Choi Decl. ¶ 51, Exh. 50 at F-36, F-34, F-36, F-36, F-36, 77; ¶ 52, Exh. 51; ¶ 3, Exh. 2 at 186:16-188:5; ¶ 7, Exh. 6 at p.8. |
| 7-12 | 50. According to their own terms, Netlist's purchase orders superseded any prior agreements or discussions with Samsung, such as forecasts and informal e-mail or oral requests to purchase product. | Choi Decl. ¶ 55, Exh. 54 at pp.3, 6, 9, § 28; ¶ 53, Exh. 52 at NL002029. |
| 13-15 | 51. In 2017, Netlist asked Samsung for Embedded MultiMediaCard (eMMC) supply. | Choi Decl. ¶ 3, Exh. 2 at 195:10-12. |
| 16-21 | 52. Samsung does not normally sell eMMC to channel distributors like Netlist, but, after CEO Chuck Hong asked President Jun for support, Samsung agreed to support Netlist's requests. | Choi Decl. ¶ 11, Exh. 10 at 63:17-64:16, 85:17-87:2. |
| 22-25 | 53. Samsung allocated a significant amount of EMMC product to Netlist for 2017, much of which been allocated to another customer. | Choi Decl. ¶ 11, Exh. 10 at 85:17-87:2. |
| 26-27 | 54. After purchases orders had been submitted and prices for eMMC dropped | Choi Decl. ¶ 3, Exh. 2 at 194:8-196:10; ¶ 59, Exh. 58 at NL000091; ¶ 11, Exh. |

| | | |
|---|---|---|
| 1 2 3 4 5 | unexpectedly in the second half of 2017, Netlist cancelled half of its eMMC order. Netlist CEO Chuck Hong testified that cancelling a purchase order constitutes non-performance under the JDLA. | 10 at 85:17-87:2; ¶ 8, Exh. 7 at 164:11-21. |
| 6 7 8 9 10 11 12 13 14 15 | 55. Netlist argued in its Korean tax appeal that: "the granting of cross licenses under the [JDLA] is limited to the joint research and development, and hence in cases where Samsung Electronics uses intellectual property rights of [Netlist] in the course of its own research and development, it does not constitute something that can be subject to the [JDLA]." | Choi Decl. ¶ 60, Exh. 59 at p.4. |
| 16 17 18 | 56. The Korean tax tribunal relied on Netlist's position that the license was limited in making its ruling. | Dkt. 88-7 at p.7. |
| 19 20 21 22 23 24 25 26 27 | 57. Section 3.2 of the JDLA states, in pertinent part: "Taxes. . . . To the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea . . . provided that Samsung shall pay such | Choi Decl. ¶ 20, Exh. 19 at p.5, § 3.2. |

| | | |
|---|---|---|
| 1 2 3 4 5 6 7 8 | withholding taxes to the Korean tax authorities and promptly provide Netlist with a certificate of payment for such withholding tax, as required by applicable law or treaty, and reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes. | |
| 9 10 11 12 13 | 58. On November 5, 2015, shortly before the JDLA was signed, Samsung sent Netlist a tax form for Netlist to apply for a reduced tax rate as a foreign corporation. | Choi Decl. ¶ 61, Exh. 60; ¶ 6, Exh. 5 at 140:23-141:22, 143:14-24. ¶ 15, Exh. 14 at RFA No. 17; ¶ 61, Exh. 60 at NL046086-89. |
| 14 15 16 | 59. The form indicated that the tax rate on royalties pursuant to a treaty with the US was 16.5%. | Choi Decl. ¶ 61, Exh. 60 at p. 3; ¶ 15, Exh. 14 at RFA No. 17; ¶ 61, Exh. 60 at NL046086-89. |
| 17 18 19 | 60. Netlist CFO Gail Sasaki reviewed, signed, and returned the form to Samsung. | Choi Decl. ¶ 61, Exh. 60 at pp.1, 3; ¶ 6, Exh. 5 at 144:1-145:4. |
| 20 21 22 23 24 25 26 27 | 61. According to Netlist's CEO Chuck Hong, Sasaki had the authority to approve and sign such tax form without his approval. In her capacity as Netlist's CFO, Sasaki was expected to consult with a tax expert before executing the form to ensure it was appropriate for Netlist to sign. | Choi Decl. ¶ 8, Exh. 7 at 175:9-176:14. |

28

| | | |
|---|---|---|
| 1 2 3 4 5 6 7 | 62. Samsung withheld 16.5% tax and paid it to the Korean National Tax Service because it considered the $8 million as consideration for Netlist's grant of patent licenses, and Korean law requires withholding of payments on such royalties. | Choi Decl. ¶ 63, Exh. 62 at p.1; ¶ 61, Exh. 60 at p. 3; Dkt. 88-7 at p.4. |
| 8 9 10 11 | 63. What Netlist wanted was for Samsung to deny that the $8 million was for patent royalties, which Samsung did not believe to be true. | Choi Decl. ¶ 63, Exh. 62 at p.1; ¶ 61, Exh. 60 at p.3; Dkt. 88-7 at p.4; ¶ 67, Exh. 66 at NL118556; ¶ 6, Exh. 5 at 123:19- 124:24 |
| 12 13 14 15 16 17 18 | 64. Netlist executives internally discussed whether to provide notice of breach over the tax withholding dispute in March 4, 2016, but decided not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung. | Choi Decl. ¶ 70, Exh. 69 at p.1; ¶ 6, Exh. 5 at 57:4-64:2. |
| 19 20 21 22 | 65. As to the supply claim, Netlist asserts that "starting as early as the second quarter of 2017, Samsung began to refuse and/or cancel orders from Netlist. | Choi Decl. ¶ 71, Exh. 70 at p.13, ROG No. 8. |
| 23 24 25 26 | 66. Instead, Netlist waited to provide notice of alleged breach until May 27, 2020, more than *four years* after it first considered doing so. | Dkt. 18-2 at ¶ 19 (First Amended Complaint); Choi Decl. ¶ 72, Exh. 71. |

| | |
|---|---|
| 67. In consideration for the JDLA, Samsung provided a $15 million convertible note that offered the potential that Samsung would take an equity stake in Netlist. The $15 million note is due December 31, 2021. | Choi Decl. ¶ 73, Exh. 72 at NL000342 § 4; Choi Decl. ¶ 20, Exh. 19 at p. 1 ("WHEREAS, the Parties are concurrently executing an agreement for convertible note financing") <br><br> For note due date, *see* Choi Decl. ¶ 73, Exh. 72 at NL000339 § 2. |
| 68. Section 8.1 of the JDLA grants to Netlist and its subsidiaries "a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Samsung's Licensed Patents to make and have made (subject to Section 8.4) Netlist's Licensed Products, and to use, sell, offer for sale, import, and otherwise transfer or dispose of such products." | Choi Decl. ¶ 20, Exh. 19 at p. 8, § 8.1 |
| 69. Section 16.7 of the JDLA provides that any amendment "requires the signatures of the authorized representatives of the Parties." | Choi Decl. ¶ 20, Exh. 19 at p.14, § 16.7 |
| 70. Around the time the JDLA was being negotiated, Netlist was having cash flow issues. | Choi Decl. ¶ 19, Exh. 18 at F-7. |

| | |
|---|---|
| 71. Chuck Hong's close friend, YH Jun, who had been President of Samsung's memory division, moved to a separate company in 2017. Up until that point, Chuck Hong had been able to use this relationship to "push through" certain orders and obtain red-carpet treatment. | Choi Decl. ¶ 8, Exh. 7 at 119:6-120:7. |

DATED: August 30, 2021                Bird, Marella, Boxer, Wolpert, Nessim,
                                      Drooks, Lincenberg & Rhow, P.C.


                                      By:  */s/ Ekwan E. Rhow*
                                           Ekwan E. Rhow
                                           Attorneys for Defendant Samsung
                                           Electronics Co., Ltd.