# EXHIBIT 60

```
 1                UNITED STATES DISTRICT COURT
 2               CENTRAL DISTRICT OF CALIFORNIA
 3                      SOUTHERN DIVISION
 4    NETLIST INC., a Delaware      )
      corporation,                  ) CASE NO.
 5                                  ) 8:20-cv-993-JAK (DFMx)
                   Plaintiff,       )
 6    v.                            )
                                    )
 7    SAMSUNG ELECTRONICS CO.,      )
      LTD., a Korean corporation,   )
 8                                  )
                   Defendant.       )
 9    ------------------------------)
10                           - - -
11                MONDAY, AUGUST 9, 2021
12                           - - -
13         ***CONFIDENTIAL - ATTORNEYS EYES ONLY***
14
15        Videotaped Deposition of KYUHAN (KENNY) HAN,
16    beginning at 2:19 P.M., before Nancy J. Martin, a
17    Registered Merit Reporter, Certified Shorthand
18    Reporter.  All parties appeared remotely.
19
20
21
22
23
24    Job no. 4743996
25    Pages 1 - 151
                                                    Page 1
```

```
 1      priority in access to Samsung's NAND and DRAM products
 2      before the JDLA was signed?
 3              MS. CHOI:  Objection.  Calls for a legal
 4      conclusion.  Speculation.  Foundation.
 5              THE WITNESS:  No, I did not know.
 6      BY MS. LEE:
 7          Q.  Was it your understanding during the JDLA
 8      negotiation that supply to Samsung's -- supply of
 9      Samsung's NAND and DRAM products was beneficial to
10      Netlist?
11              MS. CHOI:  Objection.  Calls for a legal
12      conclusion.  Assumes facts not in evidence.  Calls for
13      speculation.  Lacks foundation.
14              THE WITNESS:  Well, it goes without saying
15      that if we were to supply such a thing, definitely
16      that would have been beneficial to their development.
17      BY MS. LEE:
18          Q.  What about Netlist as a whole -- sorry.
19      Would its DRAM products be beneficial to Netlist as a
20      company?
21              THE INTERPRETER:  Nicole.  Can you repeat
22      that question?  I didn't understand.
23              MS. LEE:  Right.  He said it would have been
24      beneficial to their development, but I'm saying to the
25      company as a whole, would supply of Samsung's products
```

Page 34

```
 1    ahead and wait for the objection and do it question
 2    and objection at the same time so it will be less
 3    confusing to the witness.
 4            MS. LEE:  That's fine.
 5            (The Reporter requested clarification.)
 6            MS. CHOI:  Can we repeat the question?  My
 7    earphones went out for a little bit.
 8            MS. LEE:  Nancy, can you please repeat the
 9    question.
10            (Record read.)
11            MS. CHOI:  Objection.  Calls for a legal
12    conclusion.  Calls for speculation.  Lacks foundation.
13    Assumes facts not in evidence.  Vague and ambiguous.
14            THE WITNESS:  Yes, I do believe that is why.
15    BY MS. LEE:
16       Q.  And did Samsung agree to that request?
17            MS. CHOI:  Objection.  Calls for a legal
18    conclusion and speculation.  Lacks foundation.  Vague
19    and ambiguous.
20            THE WITNESS:  Yes, I believe Samsung did.
21    BY MS. LEE:
22       Q.  So was it your understanding that Samsung was
23    obligated to provide NAND and DRAM products to Netlist
24    under the JDLA?
25            MS. CHOI:  Objection.  Calls for a legal
```

```
 1    conclusion and speculation.  Lacks foundation.
 2    Assumes facts not in evidence.  Vague and ambiguous.
 3              THE WITNESS:  Yes, that's correct.  Pursuant
 4    to the agreement.
 5    BY MS. LEE:
 6        Q.  And did you ever discuss with anybody at
 7    Samsung whether -- sorry.  Strike that.
 8              Did you ever discuss with anybody at Samsung
 9    about this obligation?
10              MS. CHOI:  Objection.  Vague and ambiguous.
11    Calls for attorney-client privileged communications.
12    BY MS. LEE:
13        Q.  And let me remind you, you don't have to
14    discuss what you discussed with your lawyers or
15    Samsung's lawyers.
16              Did you discuss this obligation with anybody
17    that's not a lawyer at Samsung?
18        A.  No, I have not.
19              MS. LEE:  Okay.  I think I'm going to start
20    showing you some documents.  Give me one second so I
21    can mark this.
22              MS. CHOI:  Nicole, it's 7:00 o'clock.  Can we
23    take a short break before you move on to a new topic
24    or documents?
25              MS. LEE:  Sure.
```

Page 38

```
 1         Q.   And you mentioned earlier that you do not
 2    have prior E-mails?
 3              (The Reporter requested clarification.)
 4              THE WITNESS:  As to my E-mails, that is
 5    correct.
 6    BY MS. LEE:
 7         Q.   So you do not have any documentation stating
 8    that Netlist requested this to Samsung?
 9         A.   That's correct.
10         Q.   Why did you think that the supply of NAND,
11    DRAM, and NVDIMM-P related chipsets would help
12    Netlist?
13         A.   That is because that's what that side
14    requested.
15         Q.   You say in this E-mail, "we hope the supply
16    of NAND, DRAM, and NVDIMM-P related chipsets will help
17    enable your vision of being a products company."  It
18    doesn't say we hope the supply of NAND, DRAM, and
19    NVDIMM chipsets will respond to your request.
20              What was your basis for thinking that it
21    would enable Netlist's vision of being a products
22    company?
23              MS. CHOI:  Objection.  Vague and ambiguous.
24    Argumentative.
25              THE WITNESS:  Okay.  I didn't see that.  To
```

Page 44

```
1    my understanding, what Netlist wanted to do was to
2    develop and sell NVDIMM.  So for them to have the NAND
3    and DRAM which is part of that module would be
4    beneficial to Netlist.
5    BY MS. LEE:
6        Q.   To your understanding, did Samsung offer the
7    supply of NAND, DRAM, and NVDIMM products to Netlist
8    as part of the JDLA negotiation because Samsung was
9    not paying a high price for the patent licenses?
10             MS. CHOI:  Objection.  Calls for a legal
11   conclusion.  Lacks foundation.  Calls for speculation.
12   Vague and ambiguous.
13             THE WITNESS:  "High price"?  Can you repeat
14   that question once more?  I didn't quite understand.
15   BY MS. LEE:
16       Q.   Okay.  So I'm asking did Samsung offer the
17   supply of products along with the NRE fee for Netlist
18   patents because Samsung was not paying a high value or
19   a high amount for Netlist patents?
20             MS. CHOI:  Objection.  Calls for a legal
21   conclusion.  Calls for speculation.  Lacks foundation.
22   Assumes facts not in evidence.  Vague and ambiguous.
23             (The Reporter requested clarification.)
24             THE WITNESS:  Well, what undertook was based
25   on agreed-upon conditions between two companies.  As
```

Page 45

```
 1                    THE WITNESS:  Well, as the title indicates,
 2         it was a joint development.
 3         BY MS. LEE:
 4              Q.   Do you recall earlier this morning you said
 5         that the joint development and license agreement was
 6         primarily to license Netlist patents?
 7                    MS. CHOI:  Objection.  Misstates prior
 8         testimony.  Lacks foundation.  Calls for a legal
 9         conclusion.
10                    THE WITNESS:  Yes, I remember.
11                    MS. LEE:  So we can go back to his testimony
12         because I don't think I'm misstating his statement.
13         Before we do that, let me ask him one more time.
14              Q.   Do you recall telling me that the JDLA --
15         sorry.  Strike that.
16                   Do you recall telling me that the primary
17         purpose of the JDLA was to access Netlist patents?
18              A.   Yes, but I think your description of that
19         word "access," that was somewhat different.
20              Q.   Okay.  So in your words, what was the purpose
21         of the JDLA?
22                    THE INTERPRETER:  Can I have that question
23         back?  I'm not sure if that's --
24                    MS. LEE:  Do you want me to reask the
25         question?
```

Page 89

1          THE INTERPRETER:  Is that the correct
2     question, Ms. Lee?
3          MS. LEE:  Nancy, can you read my question
4     again.
5          (Record read.)
6          THE WITNESS:  Well, to me, it had two
7     purposes, and first of all, it was to license, as the
8     document title indicates, as the joint development
9     licensing agreement.  And pursuant to this, both
10    companies tried to find a mutual way to cooperate in
11    this regard.
12         And the second method of this effort was the
13    joint development.
14    BY MS. LEE:
15        Q.  Okay.  In your view, would Samsung have
16    entered into this agreement with Netlist had there
17    been no licensing provision?
18         MS. CHOI:  Objection.  Calls for a legal
19    conclusion and speculation.
20         MS. LEE:  Actually, strike that question.
21    Let me ask a different question.
22        Q.  In your view, would Samsung have entered into
23    a joint development agreement had Netlist not had the
24    patent that Samsung licensed?
25         THE INTERPRETER:  Counsel, would you like the

Page 90

```
 1              MS. CHOI:  Objection.  Calls for a legal
 2      conclusion and speculation.
 3              THE WITNESS:  No, I do not agree with that
 4      statement.
 5      BY MS. LEE:
 6          Q.  So your view is that the JDLA is a licensing
 7      arrangement, not a joint development project.
 8              Is that your statement?
 9              MS. CHOI:  Objection.  Misstates prior
10      testimony.  Argumentative.  Vague.
11              THE WITNESS:  To me, it was both a joint
12      development and licensing agreement.
13      BY MS. LEE:
14          Q.  Okay.  Again, earlier, you said the primary
15      purpose of the JDLA was the patent licensing of
16      Netlist's patents.  Is that not what you said?
17              MS. CHOI:  Objection.  Misstates prior
18      testimony.
19              THE WITNESS:  That's correct.
20      BY MS. LEE:
21          Q.  So was it your understanding that the NRE fee
22      should have been taxed as patent royalties, then?
23              MS. CHOI:  Objection.  Calls for a legal
24      conclusion and speculation.
25              THE WITNESS:  I don't know since I'm not an
```

Page 126

```
 1      what you describe was the request.
 2      BY MS. LEE:
 3          Q.  Do you have any other understanding of these
 4      two paragraphs?
 5              MS. CHOI:  Objection.  Calls for a legal
 6      conclusion and speculation.
 7              THE WITNESS:  Well, presently, I don't really
 8      understand this E-mail very well since I did not read
 9      it in detail back then.
10      BY MS. LEE:
11          Q.  And why did you not read it in detail back
12      then?
13          A.  Based on the time frame, I think I may have
14      transferred to another department.
15          Q.  And when did you transfer to another
16      department, if you recall?
17          A.  Midst of December, on or about.
18          Q.  Okay.  So this is from December 16.  So are
19      you saying that you would have transferred within a
20      few days of this E-mail?
21              MS. CHOI:  Objection.  Asked and answered.
22              THE WITNESS:  Yes, that's what I'm saying.
23      BY MS. LEE:
24          Q.  And when you transferred over to a different
25      department, did you hand over your existing work to
```

```
 1        somebody else?
 2                MS. CHOI:  Objection.  Vague.
 3                THE WITNESS:  Yes, I did.
 4        BY MS. LEE:
 5             Q.  And did you forward this to your successor as
 6        part of the handover?
 7             A.  I don't think I did.
 8             Q.  And why is that?
 9             A.  That is because the remaining members
10        remained.
11             Q.  Okay.  So let's go back to Exhibit 24, which
12        is the cover E-mail.  It looks like the E-mail was
13        copied to Ho-Jung Kim, Hyun-Ki Ji, and Jungbae Lee.
14                Do you see that?
15             A.  Yes, I see that.
16             Q.  Was it your understanding that one of these
17        people will handle the Netlist tax matter?
18                MS. CHOI:  Objection.  Vague.
19                THE WITNESS:  Yes, that's correct.
20        BY MS. LEE:
21             Q.  And did you speak to any of them about this
22        matter?
23                MS. CHOI:  Objection.  Vague and ambiguous.
24                THE WITNESS:  I don't think I did.
25        BY MS. LEE:
```

Page 130

```
 1          Q.  Did you instruct anyone, including Ho-Jung
 2    Kim, to cooperate reasonably with Netlist's efforts to
 3    claim a tax refund?
 4              MS. CHOI:  Objection.  Calls for a legal
 5    conclusion.
 6              THE WITNESS:  No, I did not.
 7    BY MS. LEE:
 8          Q.  Did you remind anyone within Samsung that the
 9    JDLA has a provision that says Samsung has to
10    reasonably cooperate with Netlist in tax refunds?
11              MS. CHOI:  Objection.  Calls for a legal
12    conclusion.
13              THE WITNESS:  I did not involve myself
14    further since it was not my responsibility anymore
15    since I left that department.
16    BY MS. LEE:
17          Q.  Okay.  Mr. Han, are you aware that Netlist
18    sent a letter to Samsung in May of 2020 terminating
19    the JDLA?
20              MS. CHOI:  Objection.  Calls for a legal
21    conclusion and speculation.  Lacks foundation.
22              THE WITNESS:  I'm just finding out now.
23    BY MS. LEE:
24          Q.  Are you aware that Netlist sent a letter
25    titled "Notice of Breach" to Samsung sometime last
```

Page 134

```
 1                    C E R T I F I C A T E
 2          I do hereby certify that the aforesaid testimony
 3     was taken before me, pursuant to notice, at the time
 4     and place indicated; that said deponent was by me duly
 5     sworn to tell the truth, the whole truth, and nothing
 6     but the truth; that the testimony of said deponent was
 7     correctly recorded in machine shorthand by me and
 8     thereafter transcribed under my supervision with
 9     computer-aided transcription; that the deposition is a
10     true and correct record of the testimony given by the
11     witness; and that I am neither of counsel nor kin to
12     any party in said action, nor interested in the
13     outcome thereof.
14
15
                          [signature]
16                   Nancy J. Martin, RMR, CSR
17
18     Dated:  August 10, 2021
19
20     (The foregoing certification of this transcript does
21     not apply to any reproduction of the same by any
22     means, unless under the direct control and/or
23     supervision of the certifying shorthand reporter.)
24
25
```

Page 147