JASON C. LO, SBN 219030
  jlo@gibsondunn.com
MATTHEW BENJAMIN (*pro hac vice*)
  mbenjamin@gibsondunn.com
RAYMOND A. LAMAGNA, SBN 244821
  rlamagna@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

JASON SHEASBY, SBN 205455
  jsheasby@irell.com
IRELL & MANELLA LLP
1800 Ave. of the Stars
 Los Angeles, CA 90067
 Telephone: 310.203.7096
 Facsimile: 310.203.7199

Attorneys for Plaintiff Netlist Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>               Plaintiff,<br><br>    v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>               Defendant. | CASE NO. 8:20-cv-993-MCS (ADS)<br><br>**NETLIST INC.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT** |

PUBLIC

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Plaintiff Netlist Inc. ("Netlist") hereby submits its Statement of Genuine Disputes of Material Fact in response to Defendant Samsung's Statement of Uncontroverted Facts and Genuine Issues.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

**Defendant's Allegation that Samsung Is Entitled to Judgment on Plaintiff's First Cause of Action for Breach of Contract (Supply)**

1. **Defendant's Allegation that Section 6.2 Is Limited To the Supply And Pricing Of Components For The Joint Development Project**

    a. **Defendant's Allegation that The Parties' Long Standing Business Relationship Involved $200 Million of Purchases Over 15 Years**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 1. Netlist has been a customer of Samsung since at least 2001, purchasing over $200 million of products, including NAND and DRAM components.<br><br>Declaration of Joyce J. Choi filed concurrently herewith ("Choi Decl.") ¶ 2, Exh. 1 at p. SEC008161; ¶ 3, Exh. 2 at 11:21-12:12, 13:10-20, 14:8-15. | Undisputed but immaterial.<br><br>The fact that Netlist purchased products from Samsung in prior years does not illuminate whether Netlist had a supply obligation that was breached. |
| 2. Both before and after the JDLA and | Disputed and immaterial.  It is |

| | |
|---|---|
| to the present, Samsung has been a significant and continuous supplier of NAND and DRAM to Netlist, as reflected in Netlist's annual reports.<br><br>Choi Decl. ¶ 4, Exh. 3 at p.6;<br>¶ 5, Exh. 4 at p.8;<br>¶ 6, Exh. 5 at 294:4-18;<br>¶ 7, Exh. 6 at p.F-36;<br>¶ 3, Exh. 2 at 185:10-186:1, 187:21-188:5. | immaterial because the fact that Samsung and Netlist had an at-will sales relationship prior to the JDLA is immaterial to whether Samsung had a contractual obligation under the JDLA and whether Samsung breached it.<br><br>Also, the amount of products Netlist purchased from Samsung varied dramatically from year to year. Samsung was ***not*** "continuous[ly]" a "significant" supplier of NAND and DRAM to Netlist before the parties entered into the JDLA.<br><br>For example, in the year leading up to the execution of the JDLA, Samsung was a relatively minor supplier for Netlist and did not consistently supply products to Netlist.<br><br>Evidence:<br><br>• Ex. 75 to the August 30, 2021 LaMagna Declaration ("8-30-21 LaMagna Decl. (Samsung invoices from 2015 prior to signing of the JDLA, totaling |

$23,343.00)

- Chuck Hong Decl. [Dkt. 145-3], ¶ 8 ("Before the JDLA was signed, Samsung supplied effectively no product to Netlist and the relationship was *ad hoc*.").

To the extent that SUF No. 2 is read as covering the period during the contract (November 2015 through July 2020), Samsung was also not "continuous[ly]" a "significant" supplier of NAND and DRAM to Netlist during the breach period because they also periodically cut supply, including setting Netlist's allocation at times to zero. *See* Defendant's response and evidence to SUF No. 58 incorporated herein.

Evidence:

- Ex. 76 to 8-30-21 LaMagna Decl. (Akemann Report), ¶¶ 123, 127, Exhibit 4 (Monthly Samsung Orders)
- Chuck Hong Decl. [Dkt. 145-

3], ¶ 10 ("In the quarters after Samsung's zero-allocation decision, Samsung's supply to Netlist of DRAM and NAND dropped by more than two thirds. By the third quarter after this decision, the supply from Samsung trickled to virtually nothing.")

Defendant's cited supporting evidence does not support the alleged fact.

Evidence:
- Dkt. 150-2 [Samsung MSJ Ex. 4] at p.8 indicates that among Netlist's suppliers in 2018, Samsung was the *smallest* supplier.
- Dkt. 151-1 [Samsung MSJ Ex. 5] (Gail Sasaki Dep. Tr.) at 294:4-18 states that Samsung comprised "more than 10% of our total purchases in 2013."
- None of Defendant's exhibits cited covers post-2018 time frame.

| | |
|---|---|
| 3. Netlist also purchased NAND and DRAM products from SK Hynix and Micron, as well as from sellers who purchased the products from the manufacturers for resale.<br><br>Choi Decl. ¶ 4, Exh. 3 at p.6; ¶ 6, Exh. 5 at 194:2-22, 294:4-18; ¶ 3, Exh. 2 at 205:23-206:18, 207:21-208:10. | Undisputed but immaterial.<br><br>The fact that Netlist purchased products from other manufacturers when Netlist's customers needed a product specifically manufactured by SK Hynix or Micron, where Samsung's product was not qualified, is immaterial to the motion.<br><br>Evidence:<br>• Chuck Hong Decl. [Dkt. 145-3], ¶¶ 6 ("Therefore, a server or storage manufacturer cannot simply replace a Hynix or Micron server memory for a Samsung server memory without re-qualification or, in some cases, a redesign of their server systems. Further, NAND and DRAM sourced in secondary channels from a third party are often of inferior quality compared to those components procured directly from the manufacturer. It would thus be risky to buy Samsung |

| | |
|---|---|
| | products from a third party without screening those products ahead of manufacturing and shipment."), 7 ("For these reasons, after the JDLA was signed, Netlist attempted to fill its entire requirement for Samsung-qualified NAND and DRAM from Samsung.").<br>• Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) 218:17-220:2. |
| 4. The amount of NAND and DRAM product that Samsung can manufacture for sale is limited and demand for its products oftentimes exceeds available supply.<br><br>Choi Decl. ¶ 8, Exh. 7 at 121:24-122:13; Dkt. 89-21 at ¶ 4. | Disputed and immaterial.<br><br>There is no allegation of breach based on Netlist's requests for products that exceeded Samsung's manufacturing capacity.  Nor is there evidence that Netlist's demand for products "often times" exceeded Samsung's supply.  To the extent there was ever a supply constraint, Netlist should have been prioritized over other customers to whom Samsung did not have a supply obligation. |

Evidence:

- Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001), § 6
- Ex. 77 to 8-30-21 LaMagna Decl. (Harrison Yoo Dep. Tr.) at 68:11-18 (testifying that the allocation for Netlist was moved to Ma Lab)
- Ex. 78 to 8-30-21 LaMagna Decl. (SEC0003842) ("We should make a decision for Netlist support, then we can utilize Netlist SSD PA for Ma Lab support.")
- Dkt. 142-8 [Netlist MSJ Ex. 21] (SEC116009) ("As of now, we pulled all PAs for Netlist and distributed them to other customers such as Ma Lab.")
- Ex. 79 to 8-30-21 LaMagna Decl. (SEC060292) █████

While Samsung was scaling back

| | |
|---|---|
| | allocation for Netlist, it was increasing allocation for its other customers.<br><br>• Dkt. 142-12 [Netlist MSJ Ex. 33] (SEC126794) ([REDACTED]).<br><br>Netlist is one of the few customers that has a supply agreement with Samsung; Samsung does not have a supply agreement with most of its customers.<br><br>Evidence:<br><br>• Samsung's Interrogatory Response No. 22 ("Excluding individual purchase orders, none of the Similarly Situated Customers currently has an agreement with Samsung that obligates Samsung to supply any quantity of NAND or |

| | |
|---|---|
| | DRAM products.") |
| | • Ex. 77 to LaMagna Decl. (Harrison Yoo Dep. Tr.) at 13:4-24 (identifying only Ma Lab as a customer other than Netlist with a supply agreement). |
| 5. Due to the nature of the industry, Netlist, like other customers, provides Samsung with forecasts of the amount of product it wishes to purchase, and Samsung lets Netlist know how much product it can allocate to Netlist for purchase.<br><br>Choi Decl. ¶ 9, Exh. 8; ¶ 10, Exh. 9; ¶ 3, Exh. 2 at 35:10-36:13, 37:9-22, 61:25-62:5. | Undisputed in part that Netlist submitted forecasts for the amount of products requested.  Disputed in part that Netlist submitted the forecasts "due to the nature of the industry." Netlist did so because Samsung demanded that this be the process.<br><br>Evidence:<br>• Ex. 81 to 8-30-21 LaMagna Decl. (Lane Kim Dep. Tr.) at 27:21-29:23 (testifying about Samsung's forecast and purchase order process).<br>• Ex. 82 to 8-30-21 LaMagna Decl. (Raymond Jiang Dep. Tr.) at 32:18-33:9 (testifying that in addition to submitting forecasts via email, he would also call Samsung to ask about |

| | |
|---|---|
| | product availability). |
| 6. Following these discussions regarding allocations and availability, Netlist issued purchase orders for specific amounts of product that Samsung approved beforehand. | Disputed. |
| | Samsung did not engage in "discussions regarding allocations and availability" with Netlist. |
| Choi Decl. ¶ 12, Exh. 11 at 23:23-24:5; | Between November 15, 2015 until Q2 2017, Samsung agreed to allow Netlist to submit purchase orders for amounts commensurate with Netlist's requests. |
| ¶ 3, Exh. 2 at 62:6-14; | |
| ¶ 13, Exh. 12 at 28:4-25. | |
| | Evidence: |
| | • Ex. 81 to 8-30-21 LaMagna Decl. at (Lane Kim Dep. Tr.) 27:21-29:23 (testifying about forecast and purchase order process). |
| | • P.K. Hong Decl. [Dkt. 145-2], ¶¶ 3-4. |
| | • Chuck Hong Decl. [Dkt. 145-3], ¶ 8. |
| | From Q3 2017 onward, Samsung unliterally determined what it would or would not sell to Netlist (there were |

| | |
|---|---|
| | no "discussions").  *See* Defendant's response and evidence to SUF No. 58 incorporated herein. |
| 7. Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others, just as it did with other customers.<br><br>Choi Decl. ¶ 12, Exh. 11 at 36:8-11; Choi Decl. ¶ 3, Exh. 2 at 45:2-46:8, 62:6-14. | Undisputed that Samsung put "some on backlog, and rejected others." Undisputed but immaterial that Samsung "fulfilled some of the purchase orders."  Netlist's claims concern the requests and purchase orders that Samsung *did not* fulfill.<br><br>Disputed as to the comparison to "other customers."  The evidence shows that Samsung treated Netlist worse than other customers, by unilaterally capping and cutting supply.  *See* Defendant's response and evidence to SUF No. 58 incorporated herein.<br><br>In addition, with respect to backlogs, Samsung frequently did not carry over backlog for Netlist.<br><br>Evidence:<br>• Dkt. 142-3 [Netlist MSJ Ex. 15] (SEC005294) (June 2017 email |

| | |
|---|---|
| | in which Knuth reports that he convinced Netlist to cancel $2 million in backlog).<br><br>Defendant's cited supporting evidence does not support the fact.<br><br>Evidence:<br>• Defendant cites to the deposition testimony of Netlist witnesses (Steven Yu and P. K. Hong deposition transcripts, respectively). Neither exhibit speaks to what Samsung did with "other customers." |
| 8. This business protocol—the use of backlogs, forecasts, allocations, and purchases orders—remained the same throughout the parties' long standing business relationship and even after the JDLA was executed.<br><br>Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 62:6-14;  ¶ 14, Exh. 13 at p.NL004680. | As to the parties' dealings outside of the contract period, those dealings are irrelevant to Samsung's breach during the contract period.<br><br>Disputed as to the "business protocol," which per Defendant's responses to SUF Nos. 5-7 incorporated herein, is disputed between the parties.<br><br>In particular, during the contract |

| 1 | | period, the use of backlogs, forecasts, |
| 2 | | allocations, and purchases orders did |
| 3 | | not "remain the same." *See* |
| 4 | | Defendant's response and evidence to |
| 5 | | SUF Nos. 5-7 incorporated herein. |
| 6 | | |
| 7 | | During the term of the JDLA, in Q2 |
| 8 | | 2017, notwithstanding any historical |
| 9 | | business protocol, Samsung began to |
| 10 | | refuse to supply any products to |
| 11 | | Netlist, regardless of protocol, and/or |
| 12 | | capped the amount of products that |
| 13 | | could be purchased. *See* Defendant's |
| 14 | | response and evidence to SUF No. 58 |
| 15 | | incorporated herein. |
| 16 | | |
| 17 | | Defendant's cited supporting evidence |
| 18 | | does not support the proposition that |
| 19 | | the "business protocol . . . ***remained*** |
| 20 | | ***the same*** throughout the parties' |
| 21 | | longstanding business relationship." |

**Defendant's Allegation that the JDLA Involved Joint Development of a "Game Changing" Product Based On the NVDIMM-P Standard**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 9. In early 2015, Netlist approached | Disputed but immaterial. Samsung |

| | |
|---|---|
| Samsung to discuss a strategic partnership involving joint development of a product based on a new standard called NVDIMM-P and licensing of Netlist's patents.<br><br>Choi Decl. ¶ 15, Exh. 14 at p. 13, RFA No. 18. | initiated the discussion that led to the JDLA.<br><br>Evidence:<br>• Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 61:22-62:16 ("they came to us to discuss patents")<br><br>There were also multiple aspects to a strategic partnership discussed in early 2015, including joint development, financing, license to patents, supply of products to Netlist.<br><br>Evidence:<br>• Dkt. 144-3 [Netlist MSJ Ex. 3] (NL108668-69) (May 18, 2015 Technology Partnership and IP Cooperation Agreement).<br>• Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 43:19-44:17.<br><br>Defendant's cited supporting evidence does not support the fact.  Netlist's interrogatory response simply states |

| | that "in 2015, it informed Samsung that Netlist is the owner and assignee of standard essential patents as shown in, for example, NL107804 and its attachment." |
| --- | --- |
| | |
| | Evidence: |
| | • Dkt. 150-3 [Samsung MSJ Ex. 14] at p. 13, RFA No. 18. |
| 10. The NVDIMM-P-related product was a "game changer" according to Chuck Hong and, based on presentation materials, was designed to take market share in a $15 billion industry.<br><br>Choi Decl. ¶ 8, Exh. 7 at 139:7-25; ¶ 17, Exh. 16 at SEC008159. | Undisputed that the NVDIMM-P related product discussed in the cited testimony was intended to be a "game changer."<br><br>Disputed as to the characterization that the NVDIMM-P related product "was" a game changer because it never *became* a product. (i.e., it was *expected* to become a game changer).<br><br>Evidence:<br>• Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 139:7-25. |
| 11. At that time, Netlist also raised a licensing component and the potential that Samsung would be subject to an | Disputed.<br><br>First, Samsung is the one that raised a |

| | |
|---|---|
| injunction for infringement of Netlist's patents.<br><br>Choi Decl. ¶ 18, Exh. 17 at NL107807; ¶ 8, Exh. 7 at 42:4-14. | licensing component.<br><br>Evidence:<br>• Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 61:22-62:16 ("they came to us to discuss patents").<br><br>Second, Netlist never threatened Samsung with an infringement claim or an injunction.<br><br>Evidence:<br>• Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 45:20-24 ("Q:  "[D]o you recall ever mentioning the potential that Samsung might be infringing [Netlist's] patent?  A: No, no.")<br><br>Defendant's cited supporting evidence does not support the alleged fact.  The cited testimony of Chuck Hong does not reference any claim of infringement by Samsung of Netlist's patents (the discussion of litigation and |

| | |
|---|---|
| | infringement concerns allegations directed to Hynix). |
| | |
| | Evidence: |
| | • Dkt. 151-1 [Samsung MSJ Ex. 17 (NL107804-809) at NL107807. |
| | • Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 42:4-14 (testifying that the April 2015 proposal was for "the patent license" and for "other components of an overall strategic relationship with Samsung."). |
| 12. Around this time, Netlist was having cash flow issues.<br><br>Choi Decl. ¶ 19, Exh. 18 at F-7. | Disputed and immaterial.<br><br>Defendant's cited supporting evidence does not state the characterization ascribed to it by Defendant. The document speaks for itself. |
| 13. On November 12, 2015, after months of negotiations, Samsung and Netlist entered into the JDLA.<br><br>Choi Decl. ¶ 20, Exh. 19 at p. 1. | Undisputed. |
| 14. The structure and terms of the | Undisputed that the quoted language |

| | |
|---|---|
| JDLA reflect that the parties intend "to work together to jointly develop an interface and associated technologies for certain memory modules and promote such interface to standards-setting organizations."<br><br>Choi Decl. ¶ 20, Exh. 19 at p. 1. | appears in the recital to the contract, but disputed that the "structure and terms" of the JDLA are defined by that recital.  The structure in terms of the JDLA on their face contain rights and obligations beyond the subject matter of that recital.  *See* Dkt. 148-1 [Samsung MSJ Ex. 19] in *passim*. |
| 15. The "Developed Product" in the JDLA means an NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications.<br><br>Choi Decl. ¶ 20, Exh. 19 at p. 2. | Undisputed. |
| 16. The JDLA also includes a grant of cross-licenses and a release of threatened claims.<br><br>Choi Decl. ¶ 20, Exh. 19 at p. 7, § 7. | Undisputed that the JDLA includes a grant of license (Section 8) and a release of claims (Section 7), but disputed as to the characterization of "threatened" claims as no claims were threatened.<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at pp. 7-8, §§ 7-8. |

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO  8:20-CV-993-MCS (ADS)

| | | |
|---|---|---|
| | | *See also* Defendant's response and evidence to SUF No. 11 incorporated herein. |
| 17. The JDLA states that Netlist was to receive $8 million for non-recurring engineering on the NVDIMM-P development work, and concurrently with the JDLA, provide an additional $15 million convertible loan at 2% interest that allowed Netlist to pay off existing debt with less favorable financial terms.<br><br>Choi Decl. ¶ 20, Exh. 19 at p. 5, § 3.1; ¶ 21, Exh. 20 at p. 2; ¶ 22, Exh. 21 at NL069669, § II.7. | Undisputed that the JDLA states that Netlist was to receive $8 million for in non-recurring engineering fees and that Netlist entered into "an agreement for convertible note financing."<br><br>Disputed as to the characterization—the JDLA does not identify the amount or interest rate of the debt, which was entered into in a separate contact with a separate entity that is not Defendant.<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001).<br>• Dkt. 151-2 [Samsung MSJ Ex. 72] (NL000341). |
| 18. In addition to its receipt of cash and financing from Samsung, Netlist stood to benefit from the relationship, especially if the parties were able to develop this "game changing" standard for NVDIMM-P and produce a commercially feasible product under | Undisputed that in addition to its receipt of cash, Netlist stood to benefit from the relationship defined in the JDLA.<br><br>Disputed that Netlist received financing from Defendant.  Netlist |

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT CASE NO  8:20-CV-993-MCS (ADS)

| | |
|---|---|
| this standard.<br><br>Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 33:12-34:6, 79:6-80:23, 139:7-25. | receives secured debt financing (a loan) from a different entity.<br><br>Evidence:<br>• *See* Dkt. 151-2 [Samsung MSJ Ex. 72] (NL000341).<br><br>Also disputed as to the characterization imposed by the phrase "especially if." Netlist stood to benefit from the relationship regardless of the joint development, as did Samsung.<br><br>Defendant's cited supporting evidence does not support the fact.  Defendant mischaracterizes Chuck Hong's deposition testimony regarding "HybriDIMM," which is what Mr. Hong was referring to by the "game changing" reference. *See also* Defendant's response and evidence to SUF No. 10 incorporated herein. |
| 19. The terms of the JDLA seek to implement these objectives, including terms for the collaborative development work in accordance with product specification and development | Netlist does not dispute the terms of what is written in the JDLA, which contains the various sections described in SUF No. 19.  The document speaks for itself. |

| | |
|---|---|
| milestones and a Statement of Work (Section 2, Appendices A and B); development costs (Section 3); IPR ownership (Section 4); schedule for standardization and productization (Section 5); supply (Section 6); a mutual release of claims (Section 7); and licensing of intellectual property (Section 8).<br><br>Choi Decl. ¶ 20, Exh. 19 at pp. 4-8. | Disputed as to Defendant's reference of "these objectives" which is not defined here.  The parties dispute the objective of the JDLA.  Plaintiff asserts that one objective of the JDLA was to obtain a supply obligation from Samsung, which is disputed by Samsung.<br><br>Evidence:<br>• Complaint, Dkt 13, at 4.<br>• Answer, Dkt. 27 at 2-3. |

**Defendant's Allegation that Section 6.2 Is Limited To Joint Development Work Under The JDLA**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 20. Pursuant to the JDLA, Samsung and Netlist agreed to supply components to each other for the NVDIMM-P product which they had agreed to jointly develop and therefore did not yet exist. Specifically, Section 6.1 states: "<u>Supply by Netlist</u>. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than | Undisputed that Sections 6.1 and 6.2 of the JDLA contain the language quoted by Defendant.<br><br>Disputed that Section 6.2 is a "parallel" provision to Section 6.1.<br><br>Disputed as to Samsung's characterization and contention that |

| | |
|---|---|
| the price Netlist provides to any other buyer." Section 6.2, the parallel provision, states: "<u>Supply by Samsung</u>. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (i.e., among customers purchasing similar volumes of similar products)." | Section 6.2 is limited to components for the NVDIMM-P products.  Nothing in Section 6.2 referring to such a limitation. |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at § 6.2. |
| Choi Decl. ¶ 20, Exh. 19 at p. 6, §§ 6.1, 6.2. | Samsung's own employees also recognized that the supply obligation was ***not*** limited to components for the NVDIMM-P product. |
| | Evidence: |
| | • Dkt. 142-10 [Netlist MSJ Ex. 23] (SEC000263) (February 2018 email from Yong Hwangbo, "there is an obligation to supply NAND/DRAM at a competitive price if N company makes a request.") |
| | • Dkt. 145-12 [Netlist MSJ Ex. 8] (SEC000315) (February 2018 email from Yong Hwangbo, "there is an obligation to supply |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NAND/DRAM at a competitive price if N company makes a request.")

- Dkt. 145-11 [Netlist MSJ Ex. 7] (SEC001269) (January 2018 email from Hojung Kim, "Pursuant to the agreement, supply for NAND and DRAM products is necessary if there is a request from Netlist.")

Netlist has publicly, over multiple years, indicated that the Section 6.2 supply obligation was not limited to merely components for NVDIMM-P.

Evidence:

- *E.g.*, Dkt. 150-4 [Samsung MSJ Ex. 37] at p.5 ("We also resell certain Samsung products that we purchase under the terms of our JDLA"); p.7 ("we resell certain Samsung products that we purchase under the terms of our JDLA"), p.8 ("[O]ur JDLA with Samsung contractually commits Samsung to supply

1 | NAND flash and DRAM
2 | products to us upon our request
3 | at competitive prices.")
4 | • Dkt. 150-2 [Samsung MSJ Ex.
5 | 6] at p.5 ("We have purchased
6 | certain of these products,
7 | including NAND flash and
8 | DRAM products, from Samsung
9 | under the terms of the JDLA."),
10 | p.8 ("We also purchase some of
11 | these component products from
12 | Samsung under the terms of the
13 | JDLA.")
14 | • Dkt. 150-2 [Samsung MSJ Ex.
15 | 4] at p.5 ("We have purchased
16 | certain of these products,
17 | including NAND flash and
18 | DRAM products, from Samsung
19 | under the terms of the JDLA"),
20 | p. 8 ("We also purchase some of
21 | these component products from
22 | Samsung under the terms of the
23 | JDLA, and from alternative
24 | suppliers, for the purpose of
25 | resale to customers directly").
26 | • Dkt. 150-4 [Samsung MSJ Ex.
27 | 38] at p.5 ("We have purchased
28 |

certain of these products, including SSDs, NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p.7 ("We also purchase some of these component products from Samsung under the terms of the JDLA").

- *See also* Ex. 85 to 8-30-21 LaMagna Decl. (Gail Sasaki Dep. Tr.) at 305:14-306:3, 309:1-21 (In connection with the SEC filings' statements concerning the absence of long-term supply contracts, Gail testified that the statement appeared in portions of Netlist's filings concerning "risk factors" in which its general approach was to "be[ ] very conservative to say all the negative things that [it] would to make sure that should anything go wrong with anything" all risks had been fully disclosed to "the public.").
- Ex. 96 to 8-30-21 LaMagna Decl. (Q2 2016 Earnings Call)

("[T]hat was part of the partnership and agreement that we have with Samsung to have access to their raw materials as well as their – some of their selected product lines and we are seeing the benefit of that.").

- Ex. 97 to 8-30-21 LaMagna Decl. (Q3 2016 Earnings Call) ("In our partnership with Samsung, we continue to benefit from the unique access we have . . . to certain Samsung products in the enterprise space.  This includes enterprise-grade, high-capacity SSDs and high-density DRAM modules.  Product lines [that] Samsung is committed to supporting for the long-term.  We have continued to grow the customer base for these products since we began shipments earlier this year.").

- *Id*. ("Further, the Samsung Corporation products provide synergistic value for our own product portfolio and open doors

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

allowing our sales team to establish relationships with OEMs and data center customers.").

- Ex. 98 to 8-30-21 LaMagna Decl. (Q1 2017 Earnings Call) ("The year-over-year increase in revenue primarily reflects the multiple benefits of our Joint Development Agreement with Samsung, which added the synergistic Samsung high-end memory products to our product offering.  On a consecutive quarterly basis, product revenue improved by 70%.).

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24 (testifying that Netlist never "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P.")

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at

| | |
|---|---|
| | 220:3-24, 222:19-223:8, 221:11-14, 238:15-24 (Netlist "absolutely [did] not" understand that the JDLA's supply provisions were "limited to NVDIMM-P" and it would not have executed the JDLA had that been its understanding because it would not have provided sufficient consideration to Netlist. Nor did Samsung ever state to Netlist that its mandatory supply obligation was "limited to components for making NVDIMM-P products.") |
| | *See also* Defendant's response and evidence to SUF Nos. 21, 37 incorporated herein. |
| 21. Samsung's supply obligations would only arise if and to the extent that the NVDIMM-P product was commercialized but this never occurred.<br><br>Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 80:13-23, 92:4-12, 109:9-110:1, 116:3- | Disputed.  Samsung's own employees understood that it had a supply obligation to Netlist, and that this supply obligation was ***not*** dependent on the commercialization of NVDIMM-P.  *See* Defendant's response and evidence to SUF No. 20 |

| | |
|---|---|
| 9; ¶ 22, Exh. 21 at NL069668-69. | incorporated herein. |
| | |
| | Evidence: |
| | • Dkt. 145-18 [Netlist MSJ Ex. 14] (NL119258) (P.K. Hong's notes from meeting with Samsung in February 2016: "HS mentioned that he is now being **told to support Netlist and will**", "HS stated he **will support any requests**"; "But the positive note is Samsung **will support**") |
| | • Dkt. 142-10 [Netlist MSJ Ex. 23] (SEC000263) (February 2018 email from Yong Hwangbo, "there is an obligation to supply NAND/DRAM at a competitive price if N company makes a request.") |
| | • Dkt. 145-12 [Netlist MSJ Ex. 8] (SEC000315) (February 2018 email from Yong Hwangbo, "there is an obligation to supply NAND/DRAM at a competitive price if N company makes a request.") |

- Dkt. 145-11 [Netlist MSJ Ex. 7] (SEC001269) (January 2018 email from Hojung Kim, "Pursuant to the agreement, supply for NAND and DRAM products is necessary if there is a request from Netlist.")

From "day one," Netlist's position from 2015 to present has always been that Section 6.2's supply obligation was not limited to NVDIMM-P products. *See* Defendant's response and evidence to SUF Nos. 20, 37 incorporated herein.

Netlist understood that by entering into the JDLA, it had transitioned from an "at-will customer . . . into a contractual supply customer, which means [it] would go right to the front of the line" in obtaining the products that Samsung had for sale and that its requests "must be filled ahead of everyone" else.

Evidence:

- *E.g.*, Dkt. 150-4 [Samsung MSJ

Ex. 37] at p.5 ("We also resell certain Samsung products that we purchase under the terms of our JDLA"); p.7 ("we resell certain Samsung products that we purchase under the terms of our JDLA"), p.8 ("[O]ur JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us upon our request at competitive prices.")

• Dkt. 150-2 [Samsung MSJ Ex. 6] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung under the terms of the JDLA."), p.8 ("We also purchase some of these component products from Samsung under the terms of the JDLA.")

• Dkt. 150-2 [Samsung MSJ Ex. 4] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung

under the terms of the JDLA"),
p. 8 ("We also purchase some of
these component products from
Samsung under the terms of the
JDLA, and from alternative
suppliers, for the purpose of
resale to customers directly").

- Dkt. 150-4 [Samsung MSJ Ex.
  38] at p.5 ("We have purchased
  certain of these products,
  including SSDs, NAND flash
  and DRAM products, from
  Samsung under the terms of the
  JDLA"), p.7 ("We also purchase
  some of these component
  products from Samsung under
  the terms of the JDLA").

- *See also* Ex. 85 to 8-30-21
  LaMagna Decl. (Gail Sasaki
  Dep. Tr.) at 305:14-306:3,
  309:1-21 (In connection with the
  SEC filings' statements
  concerning the absence of long-
  term supply contracts, Gail
  testified that the statement
  appeared in portions of Netlist's
  filings concerning "risk factors"

in which its general approach was to "be[ ] very conservative to say all the negative things that [it] would to make sure that should anything go wrong with anything" all risks had been fully disclosed to "the public.").

- Ex. 96 to 8-30-21 LaMagna Decl. (Q2 2016 Earnings Call) ("[T]hat was part of the partnership and agreement that we have with Samsung to have access to their raw materials as well as their – some of their selected product lines and we are seeing the benefit of that.").

- Ex. 97 to 8-30-21 LaMagna Decl. (Q3 2016 Earnings Call) ("In our partnership with Samsung, we continue to benefit from the unique access we have . . . to certain Samsung products in the enterprise space.  This includes enterprise-grade, high-capacity SSDs and high-density DRAM modules.  Product lines [that] Samsung is committed to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

supporting for the long-term. We have continued to grow the customer base for these products since we began shipments earlier this year.").

- *Id*. ("Further, the Samsung Corporation products provide synergistic value for our own product portfolio and open doors allowing our sales team to establish relationships with OEMs and data center customers.").

- Ex. 98 to 8-30-21 LaMagna Decl. (Q1 2017 Earnings Call) ("The year-over-year increase in revenue primarily reflects the multiple benefits of our Joint Development Agreement with Samsung, which added the synergistic Samsung high-end memory products to our product offering.  On a consecutive quarterly basis, product revenue improved by 70%.).

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at

| | |
|---|---|
| | 124:5-9 (testifying that "the JDLA represented to move us from a non-customer and bypass the at-will customer . . . and tun us into a contractual supply customer."); 124:13-19 ("contracted customers, their obligations . . . must be filled ahead of everyone".). |

**Defendant's Allegation that the Negotiating History Shows That Section 6.2 Is Limited To Joint Development**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 22. Netlist's first proposal to Samsung in April 2015 focused on the cash consideration, and did not mention a long term supply agreement. ("Q Now, at least on this proposal, Netlist didn't list supply as a component of the deal; correct? A Yes, it's not here.")<br><br>Choi Decl. ¶ 18, Exh. 17 at pp. 2-4; ¶ 18, Exh. 17 at NL107807; ¶ 8, Exh. 7 at 51:3-52:18. | Undisputed that the document does not mention a long-term supply agreement, but also immaterial.<br><br>Disputed that Netlist's proposal to Samsung in April 2015 focused on any one item.<br><br>Also disputed as to the materiality of the April 2015 proposal given that the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices |

| | |
|---|---|
| | attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement.").

Evidence:
- Dkt. 151-1 [Samsung MSJ Ex. 17] (NL107804) at NL107807.
- Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 23. When Netlist sent Samsung the first draft of the term sheet on April 21, 2015, Netlist proposed, as part of the "Joint development and marketing" for the "Technology Collaboration," that Samsung supply NAND and DRAM product.

Choi Decl. ¶ 23, Exh. 22; ¶ 24, Exh. 23 at § II. | Undisputed that the document contains a section header titled "Technology Collaboration," which contains reference to "joint development and marketing," but immaterial.

Disputed as to the materiality of the April 2015 proposal given that the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between |

| | |
|---|---|
| | the Parties relating to the subject matter of this Agreement.").<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014.<br><br>Disputed that as to the characterization that supply of NAND and DRAM products are "as part of" the joint development and marketing.  The cited document merely lists examples of possible options ("Joint development and marketing *(TBD) – i.e.*, Samsung supplies Netlist HV ASIC controller, Flash and DRAM; Samsung includes HV in its product roadmap.") (emphasis added).<br><br>Evidence:<br>• Dkt. 151-1 [Samsung MSJ Ex. 23] (NL100004) at § II. |
| 24.  In Netlist's June 9, 2015 revision to the term sheet, under the heading "Technology Collaboration," Netlist proposed: "Raw Materials: Samsung | Undisputed but immaterial.<br><br>The JDLA contains an integration clause ("Except as otherwise stated |

| | |
|---|---|
| will supply NAND, DRAM on mutually agreed terms." | herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."), so what the earlier term sheets stated is not material. |
| Choi Decl. ¶ 25, Exh. 24, § II.5. | |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 25. Netlist CEO Chuck Hong testified that "Technology Collaboration" in Netlist's revised term sheet referred to the parties' joint efforts to standardize NVDIMM-P.<br><br>Choi Decl. ¶ 8, Exh. 7 at 91:4-17. | Disputed to the extent that Defendant's statement implies that Chuck Hong testified that the proposed "technology collaboration" was limited exclusively to "efforts to standardize NVDIMM-P" as opposed to the inclusion of such efforts.<br><br>While Chuck Hong testified that NVDIMM-P standardization certainly fell under the parties' proposed collaboration, he did not testify that this would be the only thing that would |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

be covered by the Technology
Collaboration.

To the contrary, Mr. Hong testified
that, "from day one" Netlist had not
ever "communicate[d] to Samsung that
Samsung's obligation to supply NAND
and DRAM products would be limited
to NVDIMM-P."

Evidence:
- Ex. 84 to 8-30-21 LaMagna
  Decl. (Chuck Hong Dep. Tr.) at
  238:15-24.

In fact, Mr. Hong repeatedly testified
that the proposed supply term was not
worded to be limited to NVDIMM-P.

Evidence:
- Ex. 84 to 8-30-21 LaMagna
  Decl. (Chuck Hong Dep. Tr.) at
  225:17-19, 227:4-23, 228:16-
  229:7, 229:16-230:11, 231:11-
  21, 232:5-233:2, 234:20-25
  (testifying that prior iterations of
  the supply provision in earlier

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

drafts from the negotiation
history are not worded to be
limited to NVDIMM-P).

- Ex. 84 to 8-30-21 LaMagna
Decl. (Chuck Hong Dep. Tr.) at
222:19-22 (testifying that "the
supply commitment was never
about NVDIMM-P"); 220:3-
221:3 (testifying that it was
never his understanding that the
supply provision was to be
limited to NVDIMM-P)

- *See also* Ex. 84 to 8-30-21
LaMagna Decl. (Chuck Hong
Dep. Tr.) at 222:6-11 (testifying
that "it's not even within the
realm of possibility" to limit the
supply provision to NVDIMM-
P; "[i]t wouldn't make logical
sense"); 233:10-22 (testifying
that the supply provision was for
"all products," and that "it
would make no sense" for it to
have meant a supply provision
confined to raw material for
NVDIMM-P"; this "was clearly

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

understood, and I believe that is reflected in the JDLA")

In addition, the alleged fact is immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting in differences between the MOU and the JDLA.

Evidence:
- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7.

Moreover, the alleged fact is immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement.").

Evidence:

| | |
|---|---|
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 26. Netlist CEO Chuck Hong testified that the "Raw Materials" in Netlist's revised term sheet referred to various DRAM and NAND flash components necessary for the parties' joint efforts to standardize NVDIMM-P.<br><br>Choi Decl. ¶ 8, Exh. 7 at 92:4-12. | Disputed to the extent that Defendant is characterizing Chuck Hong's testimony about "raw materials" as being limited exclusively to "components necessary for the parties' joint efforts to standardize NVDIMM-P" as opposed to the materials being inclusive of such components.<br><br>Mr. Hong expressly testified that raw materials included "DRAM, various DRAMs, and various NAND Flash components" without limitation.<br><br>Evidence:<br>• Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 92:4-8.<br><br>To the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND |

and DRAM products would be limited to NVDIMM-P."

Evidence:

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24.

In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P.

Evidence:

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, 228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier drafts from the negotiation history do not contain a reference to NVDIMM-P).
- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:19-22 (testifying that "the supply commitment was never

about NVDIMM-P"); 220:3-221:3 (testifying that it was never his understanding that the supply provision was to be limited to NVDIMM-P)

- *See also* Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:6-11 (testifying that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"; this "was clearly understood, and I believe that is reflected in the JDLA")

In addition, it's immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA.

| | |
|---|---|
| | Evidence: |
| | • Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7. |
| | Moreover, it's immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 27. In Netlist's June 25, 2015 updated term sheet, under the heading "Phase 2: Technology Productization," Netlist proposed: "1. Parties will work together to bring an NVDIMM-P product to market. Details of the technical collaboration to be negotiated at a later | Undisputed that the quoted language appears in that order in the term sheet.

Disputed to the extent that Defendant is implying that the supply language is limited exclusively to the Phase II stage simply because of its the order in |

| | |
|---|---|
| date" and "Raw Materials: Samsung will supply NAND and DRAM on mutually agreed terms."<br><br>Choi Decl. ¶ 26, Exh. 25 at NL005090, NL005092. | which the terms are placed under the headers.<br><br>To the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P."<br><br>Evidence:<br>   • Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24.<br><br>In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P.<br><br>Evidence:<br>   • Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, 228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

drafts from the negotiation
history do not contain a
reference to NVDIMM-P).

- Ex. 84 to 8-30-21 LaMagna
  Decl. (Chuck Hong Dep. Tr.) at
  222:19-22 (testifying that "the
  supply commitment was never
  about NVDIMM-P"); 220:3-
  221:3 (testifying that it was
  never his understanding that the
  supply provision was to be
  limited to NVDIMM-P)

- *See also* Ex. 84 to 8-30-21
  LaMagna Decl. (Chuck Hong
  Dep. Tr.) at 222:6-11 (testifying
  that "it's not even within the
  realm of possibility" to limit the
  supply provision to NVDIMM-
  P; "[i]t wouldn't make logical
  sense"); 233:10-22 (testifying
  that the supply provision was for
  "all products," and that "it
  would make no sense" for it to
  have meant a supply provision
  confined to raw material for
  NVDIMM-P"; this "was clearly

understood, and I believe that is reflected in the JDLA")

In addition, it's immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA.

Evidence:

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7.

Moreover, it's immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement.").

Evidence:

| | |
|---|---|
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 28. CEO Chuck Hong testified that the "Raw Materials" in Netlist's updated term sheet referred to various DRAM and NAND flash components necessary for commercialization of the NVDIMM-P product which the parties were developing.<br><br>Choi Decl. ¶ 8, Exh. 7 at 101:25-102:7. | Disputed to the extent that Defendant is characterizing Chuck Hong's testimony about "raw materials" as being limited exclusively to "various DRAM and NAND flash components necessary for commercialization of the NVDIMM-P product which the parties were developing" as opposed to the materials being inclusive of such components.<br><br>To the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P."<br><br>Evidence:<br>• Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24. |

In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P.

Evidence:

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, 228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier drafts from the negotiation history do not contain a reference to NVDIMM-P).

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:19-22 (testifying that "the supply commitment was never about NVDIMM-P"); 220:3-221:3 (testifying that it was never his understanding that the supply provision was to be limited to NVDIMM-P)

- *See also* Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:6-11 (testifying

that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"); this "was clearly understood, and I believe that is reflected in the JDLA")

In addition, it's immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA.

Evidence:
- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7.

Moreover, it's immaterial because the JDLA contains an integration clause

| | |
|---|---|
| | ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 29. In the drafts leading up to the final and executed MOU, Netlist understood that Samsung's supply obligations would only arise in the event of commercialization of the NVDIMM-P product subject to the parties' joint development but this never occurred.<br><br>Choi Decl. ¶ 8, Exh. 7 at 104:6-24. | Disputed.<br><br>In the cited testimony, Chuck Hong testified that the proposed supply provision "applies to the dash-P product to the extent it ever got commercialized."<br><br>Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 104:21-24.<br><br>But Mr. Hong does not ever testify that that term applied to NVDIMM-P to the exclusion of components for all other products. |

To the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P."

Evidence:

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24.

In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P.

Evidence:

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, 228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier drafts from the negotiation

history do not contain a
reference to NVDIMM-P).

- Ex. 84 to 8-30-21 LaMagna
  Decl. (Chuck Hong Dep. Tr.) at
  222:19-22 (testifying that "the
  supply commitment was never
  about NVDIMM-P"); 220:3-
  221:3 (testifying that it was
  never his understanding that the
  supply provision was to be
  limited to NVDIMM-P)

- *See also* Ex. 84 to 8-30-21
  LaMagna Decl. (Chuck Hong
  Dep. Tr.) at 222:6-11 (testifying
  that "it's not even within the
  realm of possibility" to limit the
  supply provision to NVDIMM-
  P; "[i]t wouldn't make logical
  sense"); 233:10-22 (testifying
  that the supply provision was for
  "all products," and that "it
  would make no sense" for it to
  have meant a supply provision
  confined to raw material for
  NVDIMM-P"; this "was clearly
  understood, and I believe that is
  reflected in the JDLA")

| | In addition, it's immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA.<br><br>Evidence:<br>• Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7.<br><br>Moreover, it's immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement.").<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 30. Netlist CEO Chuck Hong testified | Disputed. |

| | |
|---|---|
| that Netlist's intent underlying the MOU was to get Samsung's commitment to supply NAND and DRAM products for the NVDIMM-P product so that Netlist would have sufficient supply if and when it was able to commercialize the technology.<br><br>Choi Decl. ¶ 8, Exh. 7 at 109:9-110:1. | Defendant's cited supporting evidence does not state the characterization ascribed to it by Defendant. For example, nowhere in Chuck Hong's deposition testimony cited by Defendant does Mr. Hong testify as to Netlist's intent underlying the MOU.<br><br>Furthermore, to the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P."<br><br>Evidence:<br>• Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24.<br><br>In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P.<br><br>Evidence: |

- Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:19-22 (testifying that "the supply commitment was never about NVDIMM-P"); 220:3-221:3 (testifying that it was never his understanding that the supply provision was to be limited to NVDIMM-P)

- *See also* Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:6-11 (testifying that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"); this "was clearly understood, and I believe that is reflected in the JDLA")

Mr. Hong testified that raw materials

for standardization of NVDIMM-P
would fall within the supply provision,
not that that was the only thing that
would be covered by the supply
provision.

In addition, it's immaterial because as
Mr. Hong testified, after the MOU was
signed, the parties engaged in further
negotiations resulting differences
between the MOU and the JDLA.

Evidence:
- Ex. 84 to 8-30-21 LaMagna
  Decl. (Chuck Hong Dep. Tr.) at
  133:1-7.

Moreover, it's immaterial because the
JDLA contains an integration clause
("Except as otherwise stated herein,
this Agreement and all Appendices
attached hereto supersede all prior
proposals, consents, agreements, and
discussions, oral or written, between
the Parties relating to the subject
matter of this Agreement.").

| | Evidence: |
|---|---|
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 31. According to Chuck Hong, NVDIMM-P was "industry changing" technology and Netlist's attempt to standardize a NVDIMM-P product was a significant business opportunity and one that Netlist had invested more than $10 million in engineering costs into.<br><br>Choi Decl. ¶ 8, Exh. 7 at 79:13-80:23, 139:7-141:6. | Disputed.<br><br>Defendant's cited supporting evidence does not state the characterization ascribed to it by Defendant. The document speaks for itself.<br><br>Chuck Hong did not testify that NVDIMM-P was industry changing technology, but that hybriDIMM was a game changing technology and "was supposed to sync up with the dash P." *See* Defendant's response and evidence to SUF No. 10 incorporated herein.<br><br>Evidence:<br>• Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 139:10-21, 140:1-19.<br><br>In addition, the quoted material says the HybriDIMM product was "significant," not the attempt to |

| | |
|---|---|
| | standardize was a "significant business opportunity." |
| | Evidence: |
| | • Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 139:12, 80:16. |
| | Undisputed that Netlist spent $10 million on engineering costs related to the parties' joint development. |
| | Evidence: |
| | • Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 212:10-14. |
| | Disputed as to the remainder of the characterization.  Nowhere in the quoted evidence does it reference "industry changing."  *See also* Defendant's response and evidence to SUF No. 10 incorporated herein. |
| 32. The MOU reflected both parties' intent on the important points of the parties' agreement. | Undisputed that Section 6 of the MOU contains the quoted language. |
| Section 6 of the MOU states in | Disputed as to the remaining |

| | |
|---|---|
| full (emphasis added): | characterization. |
|     6.  Most Favored Nation (MFN): Netlist will provide Samsung any NVDIMM-P* controller at a price lower than the price Netlist provides to any other buyer. Either party may produce NVDIMM-P controller using its own technology and has no obligation to buy from the other party. *Raw Materials: Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM products.* As to the MOU, Chuck Hong again testified in deposition that section 6.2 limited Samsung's supply obligation to the NVDIMM-P development and that this obligation would arise only if and to the extent that the NVDIMM-P | To the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P." <br><br> Evidence: <br> • Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24. <br><br> In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P. <br><br> Evidence: <br> • Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, 228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier drafts from the negotiation |

| | |
|---|---|
| product was ever commercialized. | history do not contain a reference to NVDIMM-P). |
| Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 80:13-23, 92:4-12, 109:9-110:1, 116:3-9; ¶ 22, Exh. 21 at NL069668-69. | • *Id*. at 222:19-22 (testifying that "the supply commitment was never about NVDIMM-P"); 220:3-221:3 (testifying that it was never his understanding that the supply provision was to be limited to NVDIMM-P) |
| | • *See also id*. at 222:6-11 (testifying that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"; this "was clearly understood, and I believe that is reflected in the JDLA") |
| | In addition, it's immaterial because as Mr. Hong testified, after the MOU was |

| | |
|---|---|
| | signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA. |
| | Evidence: |
| | • Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7. |
| | Moreover, it's immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 33. On October 8, 2015, when the parties began drafting the JDLA from the MOU, Samsung proposed the following language to Netlist: | Undisputed that in the October 8, 2015 draft of the JDLA, the language proposed by Samsung for Section 6.2 was as quoted. |

| | | |
|---|---|---|
| 1 | "6.2 Supply by Samsung. Samsung will | Disputed that Samsung drafted this |
| 2 | supply NAND  and DRAM to Netlist | from the MOU.  Defendant's cited |
| 3 | on Netlist's request at a competitive | supporting evidence does not support |
| 4 | price similar to the customers | the fact. |
| 5 | purchasing similar volumes of similar | |
| 6 | products. For the avoidance of doubt, | |
| 7 | any of the provisions under this | In addition, it's immaterial because as |
| 8 | Agreement will not be deemed to | Mr. Hong testified, after the MOU was |
| 9 | require Netlist to purchase any products | signed, the parties engaged in further |
| 10 | from Samsung or to require Samsung to | negotiations resulting differences |
| 11 | supply any products to Netlist." | between the MOU and the JDLA. |
| 12 | | |
| 13 | Choi Decl. ¶ 27, Exh. 26 at p. 1; ¶ 28, | Evidence: |
| 14 | Exh. 27 at p. 5, § 6.2. | • Ex. 84 to 8-30-21 LaMagna |
| 15 | | Decl. (Chuck Hong Dep. Tr.) at |
| 16 | | 133:1-7. |
| 17 | | |
| 18 | | Moreover, it's immaterial because the |
| 19 | | JDLA contains an integration clause |
| 20 | | ("Except as otherwise stated herein, |
| 21 | | this Agreement and all Appendices |
| 22 | | attached hereto supersede all prior |
| 23 | | proposals, consents, agreements, and |
| 24 | | discussions, oral or written, between |
| 25 | | the Parties relating to the subject |
| 26 | | matter of this Agreement."). |
| 27 | | |
| 28 | | |

| | Evidence: |
|---|---|
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 34. Whitley was Netlist's main contributor to the JDLA.<br><br>Choi Decl. ¶ 8, Exh. 7 at 130:6-24. | Disputed.  Chuck Hong testified that he did not know whether Mr. Whitley was "overseeing" the negotiation of the JDLA.  He was working with outside counsel on the project.<br><br>Mr. Hong testified that Mr. Whitley is "a" main contributor to the JDLA, not "the" only main contributor.<br><br>Evidence:<br>• Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 130:13-24. |
| 35. On October 14, 2015, as to the new Section 6.2 of its proposed JDLA, Whitley wrote in bold "**Conflicts with MOU**" and "Samsung states that nothing in this agreement will 'require Samsung to supply any products to Netlist.' Netlist removed this qualification and returned the language to reflect what was agreed to in the | Undisputed that the quoted language appears in the document.  Disputed as to the characterization.<br><br>The draft agreement was not Netlist's proposed JDLA.  Netlist was responding to Samsung's proposed language.  Here, Netlist via Mr. Whitley is removing Samsung's |

| | |
|---|---|
| MOU." Samsung agreed to this change.<br><br>Choi Decl. ¶ 29, Exh. 28 at p. 2; ¶ 30, Exh. 29 at p. 1; ¶ 31, Exh. 30 at p. 5; ¶ 32, Exh. 31 at NL118147 and NL118149. | prohibition that it would not be required "to supply any products to Netlist."<br><br>Disputed to the extent Samsung is implying that Netlist believe that the supply provision should be limited to NVDIMM-P (as this SUF is cited in Samsung's brief). Nowhere does any of the cited material indicate that Netlist or Mr. Whitley were proposing to limit the supply provision to NVDIMM-P.<br><br>Also disputed as to the materiality of the statement, because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement.").<br><br>Evidence: |

| | |
|---|---|
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 36. As expressed by Whitley, it was Netlist's position that the MOU should govern the supply term.  As set forth in SUF nos. 20 and 31, the MOU only required that Samsung supply product in the event that the NVDIMM-P product was ever commercialized.<br><br>Choi Decl. ¶ 29, Exh. 28 at p. 2.; ¶ 8, Exh. 7 at 130:6-132:10. | Disputed.<br><br>Neither Mr. Whitley nor Netlist has ever taken the position that the MOU and not the final JDLA should govern the parties' obligations.<br><br>Plaintiff disputes the characterization of SUF 20 and 31.  *See* Defendant's response and evidence to SUF No. 20 and 31 incorporated herein.<br><br>Nowhere does any of the cited material indicate that Netlist or Mr. Whitley were proposing to limit the supply provision to NVDIMM-P.<br><br>Also disputed as to the materiality of the statement, because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and |

| | |
|---|---|
| | discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). Evidence: • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 37. Netlist wanted Samsung's assurance that it would supply NAND and DRAM to support NVDIMM-P sales if the joint development proved successful, and demand for the product took off. Choi Decl. ¶ 8, Exh. 7 at 80:13-23. | Disputed. Netlist wanted Samsung's assurance that it would supply NAND and DRAM at Netlist's request, regardless of whether the joint development proved successful or the demand for the product took off, without limitation to NVDIMM-P. Evidence: • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC0000006-0007. To the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND |

| | and DRAM products would be limited to NVDIMM-P." |
|---|---|
| | Evidence: |
| | • Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24. |
| | *See also* Defendant's response and evidence to SUF Nos. 20-21 incorporated herein. |
| 38. During the contract negotiations, Netlist's CFO Gail Sasaki wrote to Samsung: "Both sides understood from the outset that this was a strategic deal, not a financial one. *The value that would be transferred and created resided in the patents and the technology.*" <br><br> Choi Decl. ¶ 33, Exh. 32 at p. 1. | Undisputed that the quoted sentence appears in the document. Disputed as to the characterization to the extent Defendant is suggesting that the supply provision was not a strategic consideration to the deal. <br><br> This sentence is taken out of context and in an email with a Samsung Semiconductor Industries employee, not a Samsung Electronics employee, about a separate negotiation from the JDLA negotiation. The email goes on to state that "*Samsung's top management commented that this was not a financial deal* and that Samsung |

|  |  |
|---|---|
|  | did not intend to make money using money," and that the terms "now introduced by *Samsung Ventures* are, in fact, those of a financial deal."<br><br>Evidence:<br><br>• Dkt. 151-2 [Samsung MSJ Ex. 32] (NL048993) at NL048993. |

**Defendant's Allegation that Netlist Admits JDLA Is Not A Contract to Supply DRAM and NAND Beyond Joint Development**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 39. In his declaration to this Court, Netlist CEO Chuck Hong indicated that the purported supply arrangement that Netlist is litigating was "crucial" and "critical."<br><br>Dkt. 89-21 at ¶¶ 4, 5. | Undisputed. |
| 40. Netlist disclosed an agreement with SK Hynix on April 5, 2021, stating that contract "entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term . . ."<br><br>Choi Decl. ¶ 34, Exh. 33 at p. 2. | Undisputed. |

| | |
|---|---|
| 41. Netlist CEO Chuck Hong's presentation to the Board in November 2015, prepared by Netlist CFO Gail Sasaki, describes the technology collaboration and the cross-licensing of patents but makes no mention of Netlist's supposed broad supply agreement. | Disputed.<br><br>Defendant's cited supporting evidence does not support the fact. Defendant does not cite to any board presentation, but rather to an email containing draft materials. Defendant fails to identify supporting evidence for its fact. |
| Choi Decl. ¶ 35, Exh. 34 at p. 1; 36, Exh. 35 at p. 1. | Also disputed as immaterial. The absence of a specific reference to Samsung's supply obligation in a presentation to Netlist's Board does not negate the existence of Samsung's contractual obligations, as stated in Section 6.2.<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at Section 6.2.<br><br>In addition, it's immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior |

| | | |
|---|---|---|
| 1 | | proposals, consents, agreements, and |
| 2 | | discussions, oral or written, between |
| 3 | | the Parties relating to the subject |
| 4 | | matter of this Agreement."). |
| 5 | | |
| 6 | | Evidence: |
| 7 | | • Dkt. 148-1 [Samsung MSJ Ex. |
| 8 | | 19] (SEC0000001) at |
| 9 | | SEC000014. |
| 10 | 42. In its first annual report following | Undisputed that the language quoted |
| 11 | the JDLA, Netlist disclosed the risks | appears in the cited document. |
| 12 | associated with not having a supply | |
| 13 | contract: | Disputed as to the characterization that |
| 14 | "Our ability to fulfill customer orders or | Netlist disclosed that it did "not hav[e] |
| 15 | produce qualification samples is | a supply contract" (*i.e.*, with |
| 16 | dependent on a sufficient supply of field | Samsung), as the quoted language is |
| 17 | programmable gate arrays ("FPGAs"), | taken out of context.  Samsung quotes |
| 18 | DRAM ICs and NAND flash, which are | only the generalized "risk factors" for |
| 19 | essential components of our memory | the company—carried over from |
| 20 | subsystems. There are a relatively small | disclosures made in earlier years (*see* |
| 21 | number of suppliers of FPGAs, DRAM | Ex. 3 (2014 10-K) at p. 14, Ex. 73 |
| 22 | ICs and NAND flash, and we purchase | (2012 10-K) at p. 18, Ex. 74 (2013 10- |
| 23 | from only a subset of these suppliers. | K) at p. 22)—without regard to the |
| 24 | *We have no long-term FPGA, DRAM or* | specific disclosures expressly related |
| 25 | *NAND flash supply contracts.*" | to the JDLA made in the very same |
| 26 | (emphasis added) | document. |
| 27 | | |
| 28 | | |

| | |
|---|---|
| Choi Decl. ¶ 19, Exh. 18 at p. 13. | First, Samsung ignores the express disclosure in the same cited document (Samsung MSJ Ex. 18, which is the same document as Samsung MSJ Ex. 36) that expressly states that Netlist has a supply contract with Samsung: **"Further, our JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us on our request at competitive prices**." |

Evidence:
- Dkt. 150-3 [Samsung MSJ Ex. 18 (*see also* Ex. 36, same)] at p. 6 (emphasis added).

Consistently and continuously, for every year since 2015, Netlist likewise repeatedly represented in other SEC filings that it had a supply contract with Samsung.

Evidence:
- *E.g.*, Dkt. 150-4 [Samsung MSJ Ex. 37] at p.5 ("We also resell certain Samsung products that

we purchase under the terms of our JDLA"); p.7 ("we resell certain Samsung products that we purchase under the terms of our JDLA"), p.8 ("[O]ur JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us upon our request at competitive prices.")

- Dkt. 150-2 [Samsung MSJ Ex. 6] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung under the terms of the JDLA."), p.8 ("We also purchase some of these component products from Samsung under the terms of the JDLA.")

- Dkt. 150-2 [Samsung MSJ Ex. 4] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p. 8 ("We also purchase some of

these component products from Samsung under the terms of the JDLA, and from alternative suppliers, for the purpose of resale to customers directly").

- Dkt. 150-4 [Samsung MSJ Ex. 38] at p.5 ("We have purchased certain of these products, including SSDs, NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p.7 ("We also purchase some of these component products from Samsung under the terms of the JDLA").

- *See also* Ex. 85 to 8-30-21 LaMagna Decl. (Gail Sasaki Dep. Tr.) at 305:14-306:3, 309:1-21 (In connection with the SEC filings' statements concerning the absence of long-term supply contracts, Gail testified that the statement appeared in portions of Netlist's filings concerning "risk factors" in which its general approach was to "be[ ] very conservative

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
CASE NO  8:20-CV-993-MCS (ADS)

to say all the negative things that [it] would to make sure that should anything go wrong with anything" all risks had been fully disclosed to "the public.").

And this is consistent with Netlist's other public statements, such as on investor earnings calls, when Netlist repeatedly referenced its agreement with Samsung, including the fact that the agreement covered the sale of NAND and DRAM product without being limited to components for NVDIMM-P.

Evidence:

- Ex. 96 to 8-30-21 LaMagna Decl. (Q2 2016 Earnings Call) ("[T]hat was part of the partnership and agreement that we have with Samsung to have access to their raw materials as well as their – some of their selected product lines and we are seeing the benefit of that.").

- Ex. 97 to 8-30-21 LaMagna

Decl. (Q3 2016 Earnings Call) ("In our partnership with Samsung, we continue to benefit from the unique access we have . . . to certain Samsung products in the enterprise space.  This includes enterprise-grade, high-capacity SSDs and high-density DRAM modules.  Product lines [that] Samsung is committed to supporting for the long-term.  We have continued to grow the customer base for these products since we began shipments earlier this year.").

- *Id*. ("Further, the Samsung Corporation products provide synergistic value for our own product portfolio and open doors allowing our sales team to establish relationships with OEMs and data center customers.").

- Ex. 98 to 8-30-21 LaMagna Decl. (Q1 2017 Earnings Call) ("The year-over-year increase in revenue primarily reflects the

| | |
|---|---|
| | multiple benefits of our Joint Development Agreement with Samsung, which added the synergistic Samsung high-end memory products to our product offering.  On a consecutive quarterly basis, product revenue improved by 70%.). |
| 43. Netlist repeatedly and consistently disclosed the risks associated with not having a long-term supply contract for DRAM and NAND in its annual reports before and after execution of the JDLA, each time stating that Netlist had "no long-term supply contracts" for these products.<br><br>Choi Decl. ¶ 74, Exh. 73 at p. 18; ¶ 75, Exh. 74 at p. 22; ¶ 4, Exh. 3 at p. 14; ¶ 37, Exh. 36 at p. 14; ¶ 19, Exh. 18 at p. 13; ¶ 38, Exh. 37 at p. 19; ¶ 7, Exh. 6 at p. 20; ¶ 5, Exh. 4 at p. 22; ¶ 39, Exh. 38 at p. 20; ¶ 40, Exh. 39 at p. 15. | Undisputed that the language quoted appears in the cited document.<br><br>Disputed as to the characterization that Netlist disclosed that it did "not hav[e] a supply contract" (*i.e.*, with Samsung), as the quoted language is taken out of context.  Samsung quotes only the generalized "risk factors" for the company—carried over from disclosures made in earlier years (*see* Ex. 3 (2014 10-K) at p. 14, Ex. 73 (2012 10-K) at p. 18, Ex. 74 (2013 10-K) at p. 22)—without regard to the specific disclosures expressly related to the JDLA made in the same document.<br><br>First, Samsung ignores the express |

disclosure in the quoted document (Samsung MSJ Ex. 18, which is the same document as Samsung MSJ Ex. 36) that expressly states that Netlist has a supply contract with Samsung: "Further, our JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us on our request at competitive prices."

Evidence:
- Dkt. 150-3 [Samsung MSJ Ex. 18 (*see also* Ex. 36, same)] at p. 6.

Consistently and continuously, for every year since 2015, Netlist likewise repeatedly represented in other SEC filings that it had a supply contract with Samsung.

Evidence:
- *E.g.*, Dkt. 150-4 [Samsung MSJ Ex. 37] at p.5 ("We also resell certain Samsung products that we purchase under the terms of

| | |
|---|---|
| 1 | our JDLA"); p.7 ("we resell |
| 2 | certain Samsung products that |
| 3 | we purchase under the terms of |
| 4 | our JDLA"), p.8 ("[O]ur JDLA |
| 5 | with Samsung contractually |
| 6 | commits Samsung to supply |
| 7 | NAND flash and DRAM |
| 8 | products to us upon our request |
| 9 | at competitive prices.") |

- Dkt. 150-2 [Samsung MSJ Ex. 6] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung under the terms of the JDLA."), p.8 ("We also purchase some of these component products from Samsung under the terms of the JDLA.")

- Dkt. 150-2 [Samsung MSJ Ex. 4 (2018 10-K)] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p. 8 ("We also purchase some of these

component products from Samsung under the terms of the JDLA, and from alternative suppliers, for the purpose of resale to customers directly").

- Dkt. 150-4 [Samsung MSJ Ex. 38 (2019 10-K)] at p.5 ("We have purchased certain of these products, including SSDs, NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p.7 ("We also purchase some of these component products from Samsung under the terms of the JDLA").

- *See also* Ex. 85 to 8-30-21 LaMagna Decl. (Gail Sasaki Dep. Tr.) at 305:14-306:3, 309:1-21 (In connection with the SEC filings' statements concerning the absence of long-term supply contracts, Gail testified that the statement appeared in portions of Netlist's filings concerning "risk factors" in which its general approach

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

was to "be[ ] very conservative
to say all the negative things that
[it] would to make sure that
should anything go wrong with
anything" all risks had been
fully disclosed to "the public.")

And this is consistent with Netlist's
other public statements, such as on
investor earnings calls, when Netlist
repeatedly referenced its agreement
with Samsung, including the fact that
the agreement covered the sale of
NAND and DRAM product without
being limited to components for
NVDIMM-P.

Evidence:

- Ex. 96 to 8-30-21 LaMagna
  Decl. (Q2 2016 Earnings Call)
  ("[T]hat was part of the
  partnership and agreement that
  we have with Samsung to have
  access to their raw materials as
  well as their – some of their
  selected product lines and we
  are seeing the benefit of that.").

- 83 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Ex. 97 to 8-30-21 LaMagna
  Decl. (Q3 2016 Earnings Call)
  ("In our partnership with
  Samsung, we continue to benefit
  from the unique access we have
  . . . to certain Samsung products
  in the enterprise space.  This
  includes enterprise-grade, high-
  capacity SSDs and high-density
  DRAM modules.  Product lines
  [that] Samsung is committed to
  supporting for the long-term.
  We have continued to grow the
  customer base for these products
  since we began shipments earlier
  this year.").

- *Id.* ("Further, the Samsung
  Corporation products provide
  synergistic value for our own
  product portfolio and open doors
  allowing our sales team to
  establish relationships with
  OEMs and data center
  customers.").

- Ex. 98 to 8-30-21 LaMagna
  Decl. (Q1 2017 Earnings Call)
  ("The year-over-year increase in

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO  8:20-CV-993-MCS (ADS)

| | |
|---|---|
| 1 | revenue primarily reflects the |
| 2 | multiple benefits of our Joint |
| 3 | Development Agreement with |
| 4 | Samsung, which added the |
| 5 | synergistic Samsung high-end |
| 6 | memory products to our product |
| 7 | offering.  On a consecutive |
| 8 | quarterly basis, product revenue |
| 9 | improved by 70%.). |
| 10 | |
| 11 | Samsung even ignores nearby |
| 12 | language in the "risk factors" |
| 13 | disclosures in Netlist's statements |
| 14 | where Netlist expressly discusses |
| 15 | Samsung's supply of products to |
| 16 | Netlist under the JDLA. |
| 17 | |
| 18 | Evidence: |
| 19 | • *E.g.*, Dkt. 150-4 [Samsung MSJ |
| 20 | Ex. 37] at p. 24 ("we resell |
| 21 | certain Samsung products that |
| 22 | we purchase under the terms of |
| 23 | our JDLA with Samsung") |
| 24 | • Ex. 6 (2017 10-K) at p. 17 |
| 25 | (referring to Samsung's "failure |
| 26 | to comply with the terms of the |
| 27 | JDLA regarding the supply of |
| 28 | |

| | |
|---|---|
| | these products") |
| | • Ex. 4 (2018 10-K) at p. 19 (referring to Samsung's "failure to comply with the terms of the JDLA regarding the supply of these products") |
| | • Dkt. 150-4 [Samsung MSJ Ex. 38 (2019 10-K)] at p. 18 (referring to Samsung's "failure to comply with the terms of the JDLA regarding the supply of these products") |
| 44. A November 2, 2015 press release announcing the JDLA that Netlist was preparing had a headline stating "Netlist and Samsung Announce Strategic Alliance To Commercialize the First Unified Memory-Storage Architecture" and makes no mention of a supply agreement.<br>Choi Decl. ¶ 41, Exh. 40 at pp. 2-5. | Disputed and immaterial.<br><br>Defendant's cited supporting evidence does not support the fact. Defendant's cited evidence is a draft containing proposed edits in tracked changes. It is not a November 2, 2015 press release. Moreover, the JDLA contains a confidentiality clause whereby Netlist cannot disclose in a press release unless Samsung consents to that disclosure. Here, Defendant offers no evidence that it ever consented to that disclosure. Regardless, it is immaterial because the presence or the absence of |

| | |
|---|---|
| | a discussion about Section 6.2 in a press release does not negate the existence of Section 6.2 in the contract itself. |
| 45. At a February 21, 2017 meeting, Netlist asked Samsung for a "New Partner Type" relationship that would require Samsung to provide "Product Allocation support for Netlist" and an "Official-Distributor Partnership Agreement."  When Netlist made this ask, Samsung told Netlist that the JDLA was not an avenue to support Netlist's standard products.<br><br>Choi Decl. ¶ 17, Exh. 16 at SEC008148, SEC008169; ¶ 42, Exh. 41 at p. 3; ¶ 43, Exh. 42 at 43:22-45:3. | Disputed but immaterial.<br><br>Defendant's cited supporting evidence does not state the characterization ascribed to it by Defendant.<br><br>It is immaterial because the fact that Netlist wanted to discuss a "***new partner type strategic development and distribution***" with Samsung, which would include recognition of Netlist as "an Official-Distributor partner[]" even lower OEM pricing, inventory management by Samsung (instead of Netlist needing to take delivery of all orders), does not mean that Samsung did not have an existing supply obligation under the JDLA.  Rather, on the face of the document cited by Samsung, Netlist is seeking additional benefits to what it had in the JDLA.<br><br>Evidence: |

| | |
|---|---|
| | • Dkt. 150-3 [Samsung MSJ Ex. 16] (SEC008145) at SEC008170. |

**Defendant's Allegation that the Parties' Course of Conduct Shows That Samsung Had No Obligation To Supply All Chips At Request**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 46. Netlist received all of the chips it needed to complete the initial phase of the NVDIMM-P product under the JDLA.<br><br>Choi Decl. ¶ 8, Exh. 7 at 88:10-89:5. | Disputed.<br><br>Defendant's cited supporting evidence does not support the fact. Mr. Chuck Hong did not testify as to this fact. As noted below, the development of the NVDIMM-P product itself was never finished under the JDLA.<br><br>Evidence:<br>• Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 139:19-21 ("[D]ash P, again, dash P never became a product…").<br><br>Also disputed as immaterial because Section 6.2 of the JDLA is not limited to the completion of the initial phase of |

| | |
|---|---|
| | the NVDIMM-P product. |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at pp. 6-7, § 6.2. |
| 47. The NVDIMM-P product was never commercialized.<br><br>Choi Decl. ¶ 8, Exh. 7 at 109:21-110:1. | Undisputed. |
| 48. Samsung's performance was satisfactory in 2015, 2016 and into 2017.<br><br>Choi Decl. ¶ 3, Exh. 2 at 52:21-53:10; ¶ 44, Exh. 43 at ¶ 4; ¶ 45, Exh. 44 at ¶ 7. | Disputed and immaterial.<br><br>As a predicate, Samsung does not define "satisfactory."<br><br>As discussed below, Netlist does not contend that Samsung was in material breach of the supply obligation prior to Q2 2017, which is not equivalent to the claim that no breach has occurred.<br><br>With respect to 2015, prior to November 2015 before the parties entered into the JDLA, is irrelevant to Samsung's contractual obligations under the JDLA.  During the period between November 2015 and Q1 2017, Samsung largely supplied products |

1  | requested by Netlist, and to the extent
2  | Samsung failed to supply products,
3  | Netlist worked with Samsung to
4  | resolve any issues.
5  |
6  | Evidence:
7  | • P.K. Hong Decl. [Dkt. 145-2],
8  |   ¶¶ 3-4.
9  | • Chuck Hong Decl. [Dkt. 145-3],
10 |   ¶ 8.
11 |
12 | Starting in Q2 2017, Samsung made
13 | the express and intentional decision to
14 | severely limit product supply to
15 | Netlist, at times down to "zero
16 | allocation" or capped to no more than
17 | $500,000 per month.  Samsung often
18 | refused to supply Netlist with products
19 | not because they weren't available, but
20 | because Samsung decided to provide
21 | them to other customers.
22 |
23 | Evidence:
24 | • Dkt. 142-5 [Netlist MSJ Ex. 18]
25 |   (SEC058105) (May 2017 email
26 |   from Steven Metz stating that he
27 |   informed Netlist that "Samsung
28 |

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO  8:20-CV-993-MCS (ADS)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

had zero allocation in Q3 to
support Netlist" or Netlist's
customers)

- Ex. 87 to 8-30-21 LaMagna
  Decl. (NL063129) (April 2017
  email from Raymond Jiang to
  Neal Knuth, in which Samsung
  refused to supply Netlist with
  SM863a and PM863a products
  not because they weren't
  available, but because Samsung
  decided to provide them to Ma
  Labs instead.  Jiang emails
  Knuth, "with lack of support
  from Samsung, we may end up
  losing these OEM customers.")

- Ex. 88 to 8-30-21 LaMagna
  Decl. (SEC143892) (In
  September 2017, Lane Kim
  instructs Neal Knuth to not ship
  out $250k of products that
  Netlist requested in September
  2017, even though the products
  were on hand in the warehouse
  ready for shipment because of
  the $1 million allocation cap)

- P.K. Hong Decl. [Dkt. 145-2], ¶

| | |
|---|---|
| | 5.<br>• Chuck Hong Decl. [Dkt. 145-3], ¶ 10. |
| 49. In 2015, 2016 and into 2017, Samsung did not fulfill all of Netlist's requested orders.<br><br>Choi Decl. ¶ 3, Exh. 2 at 54:24-55:10; ¶ 44, Exh. 43; ¶ 46, Exh. 45;  ¶ 47, Exh. 46; ¶ 48, Exh. 47; ¶ 49, Exh. 48; ¶ 50, Exh. 49 ¶ 8, Exh. 7 at 122:20-123:5, 152:15-24; ¶ 51, Exh. 50; ¶ 55, Exh. 51. | Undisputed.<br><br>As to the period preceding the JDLA, irrelevant to Samsung's contractual obligations under the JDLA. |
| 50. For all orders both before and after the JDLA, Netlist has always used purchase orders.<br><br>Choi Decl. ¶ 3, Exh. 2 at 29:7-24, 47:24-48:18; ¶ 13, Exh. 12 at 151:5-19. | Disputed and immaterial.<br><br>The cited evidence does not support their representation that Netlist has **always** used purchase orders for **all** orders ever placed universally.<br><br>Immaterial because Samsung's conduct before and after the JDLA is irrelevant to Samsung's contractual obligations under the JDLA.<br><br>To the extent that Defendant interprets SUF No. 50 as covering conduct during the JDLA, it is immaterial.  The |

| | |
|---|---|
| | alleged breach is that Samsung denied Netlist's requests to even submit purchase orders, and/or did not fulfill those purchase orders when submitted.<br><br>Evidence:<br><br>• Dkt. 142-3 [Netlist MSJ Ex. 15] (SEC005294) at SEC005295, SEC005301 (Samsung acknowledging that it had rejected requests for orders from Netlist)<br><br>As to the failure to fulfill, see Defendant's response and evidence to SUF No. 48 incorporated herein. |
| 51. Netlist's purchase orders indicate as follows:<br>1. Acceptance<br><br>The terms and conditions hereof become the exclusive and binding agreement between the parties covering the purchase of goods owr services ordered herein when this purchase order is accepted by acknowledgment or commencement of performance. This order may be accepted only on these terms and conditions.<br><br>[…] | Undisputed that some of Netlist's purchase orders contain the quoted terms among others.<br><br>The evidence provided does not confirm that all of Netlist's purchase orders over time have the same language.<br><br>Regardless, the cited language is immaterial.  The terms or contents of |

| | |
|---|---|
| 12. Entire Agreement<br><br>This agreement sets forth the entire agreement between parties with respect to the subject matter hereof and supersedes all prior agreements and discussion between them. No modification or amendment here will be effective unless in writing and signed by a daily authorized representative of each party. Any terms and conditions set forth in any order confirmation or acknowledgement or any other documents shall be of no force or effect whatsoever.<br><br>All of Netlist's purchase orders contain the same terms and conditions for all its purchases from Samsung.<br><br>Choi Decl. ¶ 53, Exh. 52 at NL002028-29; ¶ 13, Exh. 12 at 151:5-19; ¶ 3, Exh. 2 at 29:7-24, 47:24-48:18. | the Purchase Orders are not relevant to interpreting the JDLA. |
| 52. After the JDLA, Samsung continued to supply Netlist with NAND and DRAM outside of the joint development context.<br><br>Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 54:24-55:10, 183:3-15, 184:8-20. | To the extent this is construed to mean after the JDLA (i.e., after termination July 15, 2020), it is undisputed that Samsung continued to supply Netlist with *some* NAND and DRAM products.  But this is immaterial because conduct after the JDLA is not relevant to whether was a breach of the JDLA prior to termination. |

| | |
|---|---|
| | To the extent Defendant is referring to the period after the ***execution*** of the JDLA, disputed to the extent it is construed as meaning in compliance with Section 6.2 of the JDLA.<br><br>In Q2 2017, Samsung began to refuse to supply any products to Netlist, and/or capped the amount of products that could be purchased.  *See* Defendant's response and evidence to SUF Nos. 2, 48, 53 incorporated herein. |
| 53. Samsung's sales to Netlist have continued from 2001 to the present day, according to the same course of dealing that existed before the JDLA, after the JDLA, and continue to this day after Netlist purported to terminate the JDLA and filed this lawsuit.<br><br>Choi Decl. ¶ 21, Exh. 11 at 25:6-25, 201:9-18; ¶ 3, Exh. 2 at 27:21-28:12, 35:23-36:13, 37:18-22, 47:24-50:4, 183:3-15, 184:8-20. | Disputed and immaterial.<br><br>The fact that Samsung and Netlist conducted at-will sales transactions prior to or after the JDLA is immaterial to whether Samsung had a contractual obligation under the JDLA and whether Samsung breached it.<br><br>Disputed as to the representation that the "same course of dealing" existed or "continued" from 2001 to the present—it did not.  For example, in |

| | |
|---|---|
| 1 | 2015 prior to the signing of the JDLA, |
| 2 | Samsung sold close to no products to |
| 3 | Netlist. |
| 4 | |
| 5 | Evidence: |
| 6 | • Ex. 75 to 8-30-21 LaMagna |
| 7 | Decl. (excerpt of NL117869) |
| 8 | (Samsung invoices from 2015 |
| 9 | prior to signing of the JDLA, |
| 10 | totaling $23,343.00) |
| 11 | • Chuck Hong Decl. [Dkt. 145-3], |
| 12 | ¶ 8 ("Before the JDLA was |
| 13 | signed, Samsung supplied |
| 14 | effectively no product to Netlist |
| 15 | and the relationship was *ad* |
| 16 | *hoc*."). |
| 17 | |
| 18 | In 2016, Samsung largely supplied |
| 19 | Netlist with NAND and DRAM |
| 20 | products that Netlist requested. |
| 21 | |
| 22 | Evidence: |
| 23 | • P.K. Hong Decl. [Dkt. 145-2], |
| 24 | ¶¶ 3-4. |
| 25 | • Chuck Hong Decl. [Dkt. 145-3], |
| 26 | ¶ 8. |
| 27 | |
| 28 | |

But starting in Q2 2017 and until the termination of the JDLA, Samsung frequently and repeatedly rejected purchase orders and/or refused to supply products, including by imposing a "zero allocation" on Netlist, in derogation of the supply obligation.

Evidence:

- Dkt. 142-5 [Netlist MSJ Ex. 18] (SEC058105) (May 2017 email from Steven Metz stating that he informed Netlist that "Samsung had zero allocation in Q3 to support Netlist" or Netlist's customers)

- Ex. 87 to 8-30-21 LaMagna Decl. (NL063129) (April 2017 email from Raymond Jiang to Neal Knuth, in which Samsung refused to supply Netlist with SM863a and PM863a products not because they weren't available, but because Samsung decided to provide them to Ma Labs instead.  Jiang emails

Knuth, "with lack of support from Samsung, we may end up losing these OEM customers.")

- Ex. 88 to 8-30-21 LaMagna Decl. (SEC143892) (In September 2017, Lane Kim instructs Neal Knuth to not ship out $250k of products that Netlist requested in September 2017, even though the products were on hand in the warehouse ready for shipment because of the $1 million allocation cap)

- Chuck Hong Decl. [Dkt. 145-3], ¶ 8.

- Dkt. 145-18 [Netlist MSJ Ex. 14] (NL119258) (PK Hong circulates notes from meeting with Samsung in February 2016: "***HS mentioned that up to a year ago – he was told not to support Netlist***.  He actually was not allowed to visit Netlist. GAM conflict.  This comes from our VLP business at IBM.  He mentioned that he is now being told to support Netlist and will")

- Dkt. 142-5 [Netlist MSJ Ex. 18]
  (SEC058105) (in May 2017,
  Knuth conveyed to Netlist that
  ***Samsung had no support*** for Q3
  2017; Metz also communicated
  to Paik Ki Hong that "Samsung
  had ***zero allocation in Q3 to***
  ***support Netlist and/or the end***
  ***customers Netlist is currently***
  ***supporting***")

- Dkt. 145-38 [Netlist MSJ Ex.
  34] (NL020770) (January 2018
  email from Paik Ki Hong to
  Steven Metz, "I was just told
  that Samsung North America
  had decided to give Netlis***t $0***
  ***allocation and no support***. This
  is a problem . . . We have a
  JDLA that states Samsung will
  support Netlist. We have on
  paper that Samsung will support
  Netlist with components for
  NVDIMM.")

- Ex. 89 to 8-30-21 LaMagna
  Decl. (SEC000379) at
  SEC000383 (

1
2
3                                                       );
4              SEC000387
5                                              ).
6              • Dkt. 145-39 [Netlist MSJ Ex.
7                35] (NL020775) (In February
8                2018, Paik Ki Hong emailed
9                Neal Knuth, "In Jan. '18,
10               Samsung *stopped shipments all*
11               *together*. *These drastic*
12               *changes have impacted our*
13               *business and impacted our*
14               *ability to support our*
15               *customers*. We need Samsung
16               to support the forecast we have
17               included in this email."
18             • Ex. 90 to 8-30-21 LaMagna
19               Decl. (Knuth Dep. Tr.) at
20               165:19-24 (testifying that in
21               February 2018, Samsung had
22               imposed a zero allocation for
23               Netlist).
24
25             *See also* Defendant's response and
26             evidence to SUF Nos. 2 and 48
27             incorporated herein.
28

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO  8:20-CV-993-MCS (ADS)

| | |
|---|---|
| 54. Netlist understood that the JDLA did not guarantee it access to all of the Samsung product it requested, but only the product that Samsung actually agreed to sell.<br><br>Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 54:24-55:10, 91:10-93:24, 94:6-21, 183:3-15, 184:8-20;<br>¶ 53, Exh. 52 at NL002024-2027;<br>¶ 54, Exh. 53 at pp. 1, 2;<br>¶ 46, Exh. 45;<br>¶ 49, Exh. 48. | Disputed.<br><br>Pursuant to the JDLA, Netlist expected that Samsung would be obligated under the supply provision to "supply NAND and DRAM products to Netlist on Netlist's request at a competitive price," not "only the product that Samsung actually agreed to sell."<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at § 6.2.<br><br>Contrary to Defendant's representation of Mr. Paik Ki Hong's deposition testimony, Mr. Hong in fact testified that Samsung did not fulfill **Netlist's requests** for products.<br>• Ex. 83 to 8-30-21 LaMagna Decl. (Paik Ki Hong Dep. Tr.) at 261:23-262:22.<br>• Paik Ki Hong Decl. [Dkt. 145-2], ¶ 3 ("Samsung agreed to supply NAND and DRAM to Netlist at Netlist's request and at a competitive price."). |

- *See also* Dkt. 145-38 [Netlist MSJ Ex. 34] (NL020770) (January 2018 email from P.K. Hong to Steven Metz, "I was just told that Samsung North America had decided to give Netlist $0 allocation and no support. This is a problem . . . **We have a JDLA that states Samsung will support Netlist**. We have on paper that Samsung will support Netlist with components for NVDIMM.")

Likewise, Netlist's other employees held the same belief.

- Chuck Hong Decl. [Dkt. 145-3], ¶ 5 (the "supply obligation was firm and binding. Netlist and Samsung executed a Joint Development and License Agreement ("JDLA") in November 2015.")
- Ex. 82 to 8-30-21 LaMagna Decl. (Raymond Jiang Dep. Tr.) at 206:6-19.

|  |  |
|---|---|
|  | Netlist's reasonable accommodations to Samsung do not prove that Netlist believed that Samsung was only required to sell what it wanted to.<br><br>Evidence:<br><ul><li>Choi Decl. ¶ 53, Exh. 52 at NL002024-2027; ¶ 54, Exh. 53 at pp. 1, 2; ¶ 46, Exh. 45; ¶ 49, Exh. 48.</li><li>Dkt. 151-1 [Samsung MSJ Ex. 2] (Paik Ki Hong Dep. Tr.) at 93:22-24 (testifying that Netlist "would submit POs for whatever Samsung told us they could support, *but it's still a fraction of our request*.  To get parts, you have to issue a PO.")</li></ul> |
| 55. Due to Samsung needing led time for production, Netlist submitted forecasts of its requests, and discussed with Samsung how much material would be allocated and made available to it.<br><br>Choi Decl. ¶ 3, Exh. 2 at 48:10-12.; Choi Decl. ¶ 13, Exh. 12 at 152:5- | Disputed and immaterial.<br><br>Netlist did not submit forecasts *due to* Samsung needing lead time. Netlist submitted forecasts because that is what Samsung required Netlist to do. Even when Samsung had products in stock, they chose not to ship products to Netlist because of its product |

—

| | | |
|---|---|---|
| 1 | 153:24. | allocation cap and/or zero allocation. |
| 2 | | |
| 3 | | Evidence: |
| 4 | | • Ex. 88 to 8-30-21 LaMagna |
| 5 | | Decl. (SEC143892) (In |
| 6 | | September 2017, Lane Kim |
| 7 | | instructs Neal Knuth to not ship |
| 8 | | out $250k of products that |
| 9 | | Netlist requested in September |
| 10 | | 2017, even though the products |
| 11 | | were on hand in the warehouse |
| 12 | | ready for shipment because of |
| 13 | | the $1 million allocation cap). |
| 14 | | |
| 15 | | Defendant's cited supporting evidence |
| 16 | | does not support the fact.  Defendant |
| 17 | | cites to the deposition transcripts of |
| 18 | | Netlist's Chuck Hong and Raymond |
| 19 | | Jiang.  Neither witness testified as to |
| 20 | | Samsung's production schedule or |
| 21 | | knowledge regarding Samsung's need |
| 22 | | for lead time. |
| 23 | | |
| 24 | | Also disputed that the parties |
| 25 | | "discussed with Samsung how much |
| 26 | | material would be allocated and made |
| 27 | | available to it."  After Q2 2017, |
| 28 | | |

| | |
|---|---|
| | Samsung unilaterally decided what product it would sell to Netlist or not. There was no "discussion." *See* Defendant's response and evidence to SUF No. 53 incorporated herein.<br><br>Regardless, it is immaterial because whether we submit forecasts or not, Samsung still refused to sell Netlist the requested product and/or did not fulfill orders placed by Netlist. *See* Defendant's response and evidence to SUF Nos. 8 and 53 incorporated herein. |
| 56. Netlist only submitted purchase orders for specific quantities of product after Samsung indicated that such product would be available.<br><br>Choi Decl. ¶ 12, Exh. 11 at 23:23-24:5; ¶ 3, Exh. 2 at 62:6-14, 93:18-24.; Choi Decl. ¶ 13, Exh. 12 at 154:3-20. | Disputed.<br><br>Defendant's cited supporting evidence does not support the fact.  Defendant refused orders even when it had products available but were expected to be forthcoming.  From time to time, Samsung also took orders for products that were not immediately available and placed Netlist's orders on backlogs.<br><br>Evidence: |

- Ex. 87 to 8-30-21 LaMagna Decl. (NL063129) (April 2017 email from Raymond Jiang to Neal Knuth, in which Samsung refused to supply Netlist with SM863a and PM863a products not because they weren't available, but because Samsung decided to provide them to Ma Labs instead. Jiang emails Knuth, "with lack of support from Samsung, we may end up losing these OEM customers.")

- Ex. 88 to 8-30-21 LaMagna Decl. (SEC143892) (In September 2017, Lane Kim instructs Neal Knuth to not ship out $250k of products that Netlist requested in September 2017, even though the products were on hand in the warehouse ready for shipment because of the $1 million allocation cap).

Evidence:

- Paik Ki Hong Depo Tr. 62:8-9 ("*in most cases, we would issue POs on*

| | |
|---|---|
| | what Samsung could support.") (emphasis added). |
| 57. According to their own terms, Netlist's purchase orders superseded any prior agreements or discussions with Samsung, such as forecasts and informal e-mail or oral requests to purchase product.<br><br>Choi Decl. ¶ 55, Exh. 54 at pp. 3, 6, 9, § 28; ¶ 53, Exh. 52 at NL002029. | Disputed.<br><br>Netlist's purchase orders do not "supersede any prior agreements or discussions with Samsung."  There is nothing in the purchase orders that requires superseding the JDLA or absolves Samsung of its obligation to fulfill Netlist's requests for products. Section 28 of the cited purchase order (in Samsung MSJ Ex. 54) states the agreement sets forth the entire agreement for the subject matter hereof.  The subject matter of the purchase orders is the specific quantity, price, and delivery terms for the products listed in the purchase order.  Those terms supplied by the purchase order are not in the JDLA, and therefore there is no tension between the two.  The purchase order does not cover the requests for product that Samsung refuses that are then not memorialized in the purchase order to begin with. |

| | |
|---|---|
| | Evidence:<br><br>• Choi Decl. ¶ 55, Exh. 54 at pp. 3, 6, 9, § 28; ¶ 53, Exh. 52 at NL002029. |
| 58. Netlist purchased a substantial amount of NAND and DRAM from Samsung in each quarter from November 2015 to the present, although the amounts varied over time.<br><br>Choi Decl. ¶ 51, Exh. 50 at F-36, F-34, F-36, F-36, F-36, 77; ¶ 52, Exh. 51; Choi Decl. ¶ 3, Exh. 2 at 186:16-188:5; ¶ 7, Exh. 6 at p.8. | Undisputed that Samsung sold to Netlist some amount of product in every quarter from November 2015 to the present, but immaterial because Netlist's claim is that not that Samsung failed to supply any product—Netlist's claim is that Samsung did not supply Netlist the amount of products requested.<br><br>Disputed as to the characterization of "a substantial amount." Starting in Q2 2017, Samsung at times allocated Netlist anywhere from zero allocation to no more than a $1 million per month, which was insubstantial to meet Netlist's product needs.<br><br>Evidence:<br><br>• Ex. 76 to 8-30-21 LaMagna Decl. (Akemann Opening Report), ¶ 123 ("from Q2 2017 |

through July 15, 2020, Netlist
only received 48% of units
ordered and 67% of dollar
volume ordered.  And in the
period leading up to this lawsuit
and Netlist's notice to cure and
termination (i.e., from April 1,
2020 through July 15, 2020),
Netlist only received 7% of units
ordered and 51% of dollar
volume ordered")

- Ex. 76 to 8-30-21 LaMagna
  Decl. (Akemann Report),
  Exhibit 4 (Monthly Samsung
  Orders)
- Ex. 90 to 8-30-21 LaMagna
  Decl. (Knuth Dep. Tr.) at
  165:19-24 (testifying that in
  February 2018, Samsung had
  imposed a ***zero allocation*** for
  Netlist).
- Dkt. 142-15 [Netlist MSJ Ex.
  18] (SEC058105) (in May 2017,
  Knuth conveyed to Netlist that
  ***Samsung had no support*** for Q3
  2017; Metz also communicated
  to Paik Ki Hong that "Samsung

had *zero allocation in Q3 to support Netlist and/or the end customers Netlist is currently supporting*"; Metz also writes, "Heads up.  Since Samsung is nearly 100% of their support, and Revenue this will have a dramatic impact on their financials and future business.")

- Dkt. 145-38 [Netlist MSJ Ex. 34] (NL020770) (January 2018 email from Paik Ki Hong to Steven Metz, "I was just told that Samsung North America had decided to give Netlist *$0 allocation and no support*. This is a problem . . .  We have a JDLA that states Samsung will support Netlist.  We have on paper that Samsung will support Netlist with components for NVDIMM.")

- Ex. 89 to 8-30-21 LaMagna Decl. (SEC000379) at SEC000383 (

| | |
|---|---|
| | ■■■■■■■■■■■■ ■■■■■■■■■■■■■; SEC000387 ■■■■■■■ ■■■■■■■ ). |
| | • Dkt. 145-39 [Netlist MSJ Ex. 35] (NL020775) (In February 2018, Paik Ki Hong emailed Neal Knuth, "In Jan. '18, Samsung *stopped shipments all together*. *These drastic changes have impacted our business and impacted our ability to support our customers*. We need Samsung to support the forecast we have included in this email.") |
| | • Dkt. 152-2 [Samsung MSJ Ex. 58] (NL000078). |
| | *See* Defendant's response and evidence to SUF Nos. 48 and 53 incorporated herein. |
| 59. Samsung supplied to Netlist despite repeated credit issues and cancelled orders by Netlist.<br><br>Choi Decl. ¶ 13, Exh. 12 at 40:17-42:6; ¶ 56, Exh. 55 at NL008985; ¶ 57, Exh. | Disputed and immaterial.<br><br>As to the characterization of "repeated credit issues," Netlist had a collateralized letter of credit with Samsung. |

| | |
|---|---|
| 56 at NL041573; Choi Decl. ¶ 3, Exh. 2 at 142:15-25; ¶ 56, Exh. 55 at NL008985; *see also* SUF Nos. 62-64, *infra*. | Evidence: |
| | • Ex. 83 to 8-30-21 LaMagna Decl. (Paik Ki Hong Dep. Tr.) at 101:21-102:1, 137:25-138:15, 143:5-10, 264:25-265:3, 265:20-266:14, 267:2-12. |
| | Netlist was also willing to and did pay cash in advance for orders if it reached its credit limit. |
| | Evidence: |
| | • Ex. 82 to 8-30-21 LaMagna Decl. (Raymond Jiang Dep. Tr.) at 42:13-43:2. |
| | Therefore, there was no credit issue that limited Samsung from supplying Netlist. |
| | As to cancellations, it is undisputed that there was one instance of a cancellation by Netlist.  The only cancellation that Samsung cites is when Samsung refused to timely |

provide product to Netlist at a

competitive.

Evidence:

- Dkt. 152-2 [Samsung MSJ Ex.
  58] (NL000078) at NL000091.
- Ex. 81 to 8-30-21 LaMagna
  Decl. (Lane Kim Dep. Tr.) at
  13:3-9; 22:22-23:24.
- *See* Defendant's response and
  evidence to SUF No. 64
  incorporated herein.

This cancellation was immaterial

because the terms of the parties'

purchase orders make clear that Netlist

was entitled to alter or cancel its

purchase orders even after they were

accepted by Samsung.

Evidence:

- Dkt. 150-4 [Samsung MSJ Ex.
  52] (NL002024) at NL002031 (§
  10: "Buyer may at any time . . .
  suspend performance hereunder,
  [or] increase or decrease the
  order quantities"), § 11 ("Buyer
  may . . . cancel this order in

whole or in part if" specified
conditions are met), § 12 ("In
addition to [Buyer's] right to
reject delayed deliveries . . . ,
Buyer may cancel all or any
undelivered portion of this
order" if specified conditions are
met).

Immaterial because Samsung's
decision to limit or supply to Netlist
was not made with regard to credit or
cancellations.

Evidence:
- Dkt. 142-5 [Netlist MSJ Ex. 18
  (SEC058105) (in May 2017,
  Knuth conveyed to Netlist that
  *Samsung had no support* for Q3
  2017; Metz also communicated
  to Paik Ki Hong that "Samsung
  had *zero allocation in Q3 to
  support Netlist and/or the end
  customers Netlist is currently
  supporting*"; Metz also writes,
  "Heads up. Since Samsung is
  nearly 100% of their support,

and Revenue this will have a dramatic impact on their financials and future business.")

- Dkt. 145-36 [Netlist MSJ Ex. 32] (NL020700-703) (in December 2017, [at -701] Netlist informed Samsung that it was *losing business opportunities* as a consequence of not being allocated all of the products it requested from Samsung)

- Dkt. 145-38 (Netlist MSJ Ex. 34) (NL020770) (January 2018 email from Paik Ki Hong to Steven Metz, "I was just told that Samsung North America had decided to give Netlist *$0 allocation and no support*. This is a problem . . .  We have a JDLA that states Samsung will support Netlist.  We have on paper that Samsung will support Netlist with components for NVDIMM.")

- Ex. 89 to 8-30-21 LaMagna Decl. (SEC000379) at

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO  8:20-CV-993-MCS (ADS)

SEC000383 (███████████
████████████████
████████████████
████████████████
██████████████████);
SEC000387 ████████████
██████████████).

- Dkt. 145-39 [Netlist MSJ Ex. 35] (NL020775) (In February 2018, Paik Ki Hong emailed Neal Knuth, "In Jan. '18, Samsung *stopped shipments all together*. *These drastic changes have impacted our business and impacted our ability to support our customers*. We need Samsung to support the forecast we have included in this email.")

- Ex. 90 to 8-30-21 LaMagna Decl. (Knuth Dep. Tr.) at 165:19-24 (testifying that in February 2018, Samsung had imposed a *zero allocation* for Netlist).

No one at Samsung ever suggested to

| | |
|---|---|
| | the Samsung employee in charge of overseeing the Netlist channel account that the allocation to Netlist should be lowered because of cancellations or credit concerns. |
| | • Ex. 81 to 8-30-21 LaMagna Decl. (Lane Kim Dep. Tr.) at 13:3-9; 22:22-23:24 (testifying that no one ever suggested that the allocation to Netlist should be lowered because of cancellations or credit concerns). |

**Defendant's Allegation that Netlist Did Not Fully Perform Its Obligations**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 60. Netlist abandoned the NVDIMM-P standardization project and moved to a different product and never obtained a written amendment to the JDLA allowing this alteration.<br><br>Choi Decl. ¶ 58, Exh. 57 at 45:4-49:3.; Choi Decl. ¶ 8, Exh. 7 at 198:21-199:13. | Disputed.  Netlist did not "abandon the NVDIMM-P standardization project" or "moved to a different product."<br><br>Under the JDLA, the initial phase of work was developing a NVDIMM-P *product*.  Under Section 2.1.1 of the agreement, the "initial phase" was limited to "demonstrations of products and technologies" and other related |

high level discussions. Standardization was not listed as part of the initial phase. Under Section 2.1, the scope of the joint development "shall be "limited to demonstrations and high-level discussions . . . as provided in Section 2.1.1 unless the parties agree in advance to expand the scope . . ." Here, Samsung never agreed to continue past the initial product development stage to the subsequent phases that would involve standardization. In sum, product development came first, under the JDLA, and standardization came second. Samsung did not ever agree to move to the subsequent standardization phase. Netlist's discussion of HybriDIMM with Samsung was not discussion of a "different product" as Samsung alleges. HybriDIMM is Netlist's tradename for the NVDIMM-P product it was developing under the JDLA.

Evidence:
- Dkt. 148-1 [Samsung MSJ Ex.

19] (SEC0000001), § 2.1,
Statement of Work.

- Dkt. 157-4 [Samsung MSJ Ex.
  7] (Chuck Hong Dep. Tr.) at
  139:17-21 (testifying that
  HybriDIMM was being
  developed as an NVDIMM-P
  product).

It was Samsung—not Netlist—that
abandoned the joint development.

Evidence:
- Dkt. 157-4 [Samsung MSJ Ex.
  7] (Chuck Hong Dep. Tr.) at
  119:6-7 ("Samsung left it, you
  know, abandoned it, whenever,
  and then afterwards we
  continued to work on it.")

Nor is it true that Netlist did not pursue
standardization of the HybriDIMM
product.

Evidence:
- Ex. 92 to 8-30-21 LaMagna
  Decl. (SEC001918) (December

| | |
|---|---|
| | 2018 internal Samsung email from Indong Kim, "recently, they have been moving ahead with standardization of HybriDIMM a bit more specifically via JEDEC.") |
| 61. In 2017, Netlist asked Samsung for Embedded MultiMediaCard (eMMC) supply.<br><br>Choi Decl. ¶ 3, Exh. 2 at 195:10-12. | Undisputed. |
| 62. Samsung does not normally sell eMMC to channel distributors like Netlist, but, after CEO Chuck Hong asked President Jun for support, Samsung agreed to support Netlist's requests.<br><br>Choi Decl. ¶ 11, Exh. 10 at 63:17-64:16, 85:17-87:2 | Disputed and immaterial. Whether Samsung "normally" sells EMMC to channel distributors is irrelevant, because Netlist has a supply agreement with Samsung that others do not have.<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001), § 6.2.<br><br>Defendant's cited supporting evidence also does not support the fact.<br><br>Evidence:<br>• Dkt. 150-2 [Samsung MSJ Ex. |

| | |
|---|---|
| | 10] (Harrison Yoo Dep. Tr.) just states that it is "difficult to locate those products," not that Samsung "does not normally sell" eMMC. |
| 63. Samsung allocated a significant amount of EMMC product to Netlist for 2017, much of which been allocated to another customer.<br><br>Choi Decl. ¶ 11, Exh. 10 at 85:17-87:2 | Undisputed that Samsung offered to sell eMMC products to Netlist in 2017.<br><br>Disputed in part as to the characterization of "significant amount."<br><br>Defendant's cited supporting evidence does not support the fact.  The deponent cited by Defendant (Samsung MSJ Ex. 10) does not say that it was a "significant" amount nor does he say that "much of" the products were previously allocated to another customer. |
| 64. After purchases orders had been submitted and prices for eMMC dropped unexpectedly in the second half of 2017, Netlist cancelled half of its eMMC order.<br>Netlist CEO Chuck Hong testified that cancelling a purchase order constitutes | Undisputed that Netlist cancelled part of the eMMC order but immaterial because Netlist's cancellation was not a violation of the JDLA (or of the related purchase order).<br><br>Netlist cancelled part of the eMMC |

| | |
|---|---|
| non-performance under the JDLA.<br><br>Choi Decl. ¶ 3, Exh. 2 at 194:8-196:10; ¶ 59, Exh. 58 at NL000091. Choi Decl. ¶ 11, Exh. 10 at 85:17-87:2; Choi Decl. ¶ 8, Exh. 7 at 164:11-21. | order only after Samsung refused to timely provide product to Netlist at a competitive price as required by Section 6.2.<br><br>Evidence:<br>• Dkt. 152-2 [Samsung MSJ Ex. 58] (NL000078) at NL000091.<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001), § 6.2.<br><br>Disputed that Chuck Hong testified that Netlist's cancellation of a purchase order constitutes non-performance under the JDLA.<br><br>Chuck Hong testified that ***Samsung's*** cancellation of purchase orders violates the Section 6.2 of the JDLA—Mr. Hong never testified that it was a violation of the JDLA for Netlist to cancel orders, much less to do so after Samsung had breached its obligations, e.g., by failing to provide a competitive price or by failing to deliver ordered products. |

| | Evidence: |
|---|---|
| | • Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 164:11-21. |

**Defendant's Allegation that Netlist Should Be Estopped From Arguing That Its Patent Licenses Provide Consideration For A Broader Supply Obligation**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 65. Netlist argued in its Korean tax appeal that: "the granting of cross licenses under the [JDLA] is limited to the joint research and development, and hence in cases where Samsung Electronics uses intellectual property rights of [Netlist] in the course of its own research and development, it does not constitute something that can be subject to the [JDLA]<br><br>Choi Decl. ¶ 60, Exh. 59 at p. 4. | Netlist does not dispute that the quoted language appears in documents. Disputed to the extent that Samsung characterizes this quote as suggesting that the patent license overall was limited to the parties' "joint research and development."<br><br>The document quoted is a submission to Korean tax authorities describing the applicability of the patent license to conduct with a territorial nexus to the Republic of Korea. Netlist has no Korean patents, and therefore no patent coverage as described in the quote.<br><br>Evidence: |

| | |
|---|---|
| | • Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), ¶¶ 32-40.<br><br>Disputed as to the materiality of the statement and immaterial.  Neither of Samsung's breaches are related to the scope of the licenses granted under the JDLA.<br><br>Evidence:<br>• Complaint, Dkt 13, at 4. |
| 66. The Korean tax tribunal relied on Netlist's position that the license was limited in making its ruling.<br><br>Dkt. 88-7 at p. 7. | Disputed.<br><br>Defendant's cited supporting evidence does not state the characterization ascribed to it by Defendant. Defendant's citation to Dkt. 88-7 at p.7 does not show that the Korean tax tribunal *relied* on Netlist's position, but is rather a recitation of each party's positions.<br><br>Evidence:<br>• Dkt. 88-7 at p. 7.<br><br>Defendant's cited supporting evidence does not support the fact.  Defendant |

| | |
|---|---|
| | fails to identify any relevant evidentiary citation for their claim that "the Korean tax tribunal relied on Netlist's position that the license was limited in making its ruling." |

**Defendant's Allegation that Samsung Is Entitled to Judgment on Plaintiff's Second Cause of Action for Breach of Contract (Tax Withholding)**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 67. Uncontroverted Fact Nos. 1-66 are incorporated herein. | Plaintiff's responses to Nos. 1-66 are incorporated herein. |
| 68. Section 3.2 of the JDLA states, in pertinent part:<br>"Taxes. . . . To the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea . . . provided that Samsung shall pay such withholding taxes to the Korean tax authorities and promptly provide Netlist with a certificate of payment for such withholding tax, as required by applicable law or treaty, and reasonably cooperate with Netlist in any lawful | Disputed as to the characterization of the quoted language as "pertinent." Undisputed as to the quoted portion of the language from Section 3.2 of the JDLA. |

| | |
|---|---|
| efforts to claim a credit or refund or exemption with respect to any such withholding taxes.<br><br>Choi Decl. ¶ 20, Exh. 19 at p. 5, § 3.2. | |
| 69. On November 5, 2015, shortly before the JDLA was signed, Samsung sent Netlist a tax form for Netlist to apply for a reduced tax rate as a foreign corporation.<br><br>Choi Decl. ¶ 61, Exh. 60; ¶ 6, Exh. 5 at 140:23-141:22, 143:14-24. ¶ 15, Exh. 14 at RFA No. 17; ¶ 61, Exh. 60 at NL046086-89. | Disputed that Samsung sent Netlist a tax form on November 5, 2015.  The November 5, 2015 email referenced in the cited document does not attach a tax form.<br><br>Disputed as to the characterization that the tax form was "for Netlist to apply for a reduced tax rate."  Samsung sent this form to Netlist on October 29, 2015 (not November 5, 2015), among other documents including a vendor registration form, stating that the tax form was among the "necessary documents to remit NRE expenses." This is not factually accurate.  The NRE Fees were not subject to taxes in Korea, so Netlist never had a reason to apply for a reduced tax rate.<br><br>Evidence:<br>• Ex. 93 to 8-30-21 LaMagna |

| | |
|---|---|
| | Decl.  (NL044878), at 1. |
| | • Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), at ¶¶ 22, 32-40. |
| 70. The form indicated that the tax rate on royalties pursuant to a treaty with the US was 16.5%. <br><br> Choi Decl. ¶ 61, Exh. 60 at p. 3; ¶ 15, Exh. 14 at RFA No. 17; ¶ 61, Exh. 60 at  NL046086-89. | Disputed.  The form Samsung sent to Netlist does not indicate any tax rate or the type of income.  It was Samsung that instructed Netlist to fill in certain information in the form, which Samsung claimed was one of the "necessary documents to remit NRE expenses." <br><br> Evidence: <br> • Dkt. 150-5 [Samsung MSJ Ex. 60] (NL046086) at NL046088. <br> • Ex. 93 to 8-30-21 LaMagna Decl.  (NL044878), at 1. <br><br> Regardless, the alleged fact is immaterial because filling in and signing the tax form does not transform untaxable income into taxable income, nor does filling in a particular percentage constitute a declaration or a determination that all or any of the payment are taxable at |

| | |
|---|---|
| | that rate.  Not all royalties for patents are taxable in Korea at a rate of 16.5%, as foreign patents not registered in Korea are not taxable in Korea.<br><br>Evidence:<br>• Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), ¶¶ 22, 32-40. |
| 71. Netlist CFO Gail Sasaki reviewed the form, signed, and returned it to Samsung.<br><br>Choi Decl. ¶ 61, Exh. 60 at pp. 1, 3; ¶ 6, Exh. 5 at 144:1-145:4. | Undisputed that Ms. Gail Sasaki signed and returned the form to Samsung.<br><br>Disputed as to the extent which Ms. Sasaki "reviewed" the form.<br><br>Disputed as to the extent to which Ms. Sasaki "reviewed the form."  To the extent Defendant implies by review that Ms. Sasaki made an independent evaluation of the form and independently decided to sign and return it of Samsung, it was Samsung that instructed Netlist to fill in certain information in the form, which Samsung claimed was one of the "necessary documents to remit NRE |

| | |
|---|---|
| | expenses." |
| | |
| | Evidence: |
| | &bull; Dkt. 150-5 [Samsung MSJ Ex. 60] (NL046086) at NL046088 |
| | &bull; Ex. 93 to 8-30-21 LaMagna Decl.  (NL044878), at 1. |
| | |
| | Regardless, the alleged fact is immaterial because filling in and signing the tax form does not transform untaxable income into taxable income, nor does filling in a particular percentage constitute a declaration or a determination that all or any of the payment are taxable at that rate. |
| | |
| | Evidence: |
| | &bull; Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), ¶ 22. |
| 72. According to Netlist's CEO Chuck Hong, Sasaki had the authority to approve and sign such tax form without his approval. In her capacity as Netlist's CEO, was expected to consult with a tax expert before executing the form to | Undisputed that Netlist's CEO stated that Ms. Sasaki had the authority to approve and sign the tax form. <br><br> Disputed that Ms. Gail Sasaki "was expected to consult with a tax expert." |

| | |
|---|---|
| ensure it was appropriate for Netlist to sign.<br><br>Choi Decl. ¶ 8, Exh. 7 at 175:9-176:14. | Ms. Sasaki testified that she consulted with tax professionals concerning an earlier version of Choi Exh. 60, which at that time did not identify any tax statutes or tax rates, after which Samsung asked her to fill in the very information on which Samsung now relies. She complied with Samsung's request because this was just one amongst "several other forms" that Samsung asked Netlist to fill out "in the process of setting [Netlist] up as a vendor." Ms. Sasaki "just figured it was something going into a file . . . in [Samsung's] accounting system." She was not told, and did not understand, that rather than a submission that would be made to the Korean tax authorities. She trusted Samsung and "took it on face value what [they] said" as to why she was being asked to provide them with a new version of the form. She thought it "was of no importance" to Netlist and "didn't seem to affect [Netlist] one way or the other." |

| | |
|---|---|
| | Evidence:<br><br>• Ex. 85 to 8-30-21 LaMagna Decl. (Sasaki Dep. Tr.) at 146:6-20, 147:21-150:13, 154:7-24, 155:21-156:8, 157:9-17;<br><br>• Ex. 93 to 8-30-21 LaMagna Decl. (NL044878), at 1;<br><br>• Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), ¶ 22. |
| 73. After the JDLA was signed, Samsung made the contractually required cash payment to Netlist of $8 million, less 16.5% deducted for withholding taxes, and paid that amount to the tax authority.<br><br>Dkt. 18-2 at ¶ 16; Dkt. 88-7 at p. 4; Choi Decl. ¶ 62, Exh. 61 at NL118221. | Disputed.<br><br>Samsung did not make the contractually required cash payment of $8 million to Netlist, but instead only paid $6.68 million. The 16.5% deduction was not for withholding taxes, because no taxes were due on the $8 million of NRE fees.<br><br>Evidence:<br><br>• Dkt. 150-5 [Samsung MSJ Ex. 61] (NL118219) at NL118221.<br><br>• Dkt. 88-7 at NL108752-8760.<br><br>• Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), ¶¶ 32-40. |
| 74. Samsung did so because it | Disputed. |

| | |
|---|---|
| considered the $8 million as consideration for Netlist's grant of patent licenses, and Korean law requires withholding of payments on such royalties.<br><br>Choi Decl. ¶ 63, Exh. 62 at p. 1; ¶ 61, Exh. 60 at p. 3; Dkt. 88-7 at p. 4. | As to whether Samsung "considered $8 million as consideration for Netlist's grant of patent licenses," the contract Samsung signed expressly stated that the $8 million was for "non-refundable NRE fees."<br><br>Evidence:<br><ul><li>Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at p. 5, § 3.1.</li></ul><br>As to whether "Korean law requires withholding of payments on such royalties," even if the NRE fees were royalties, they were not taxable under Korean law because none of Netlist's patents are registered in Korea.  Also, the Korean Tax Tribunal has already found that the NRE fees were not taxable under Korean law.<br><br>Evidence:<br><ul><li>Dkt. 144-7 [Netlist MSJ Ex. 13] (NL108731) at 1, 29.</li><li>Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), ¶¶ 32-40.</li></ul> |

| | |
|---|---|
| 75. Samsung had numerous communications with Netlist and PWC, Netlist's tax consultant, shared drafts of what Samsung proposed to submit to the tax authorities, and even asked Netlist and PWC to propose language that it wanted Samsung to use. | Undisputed that Samsung had communications with Netlist and PWC, disclosed drafts (with redactions and content Netlist disagreed with), and nominally asked for proposed language. |
| Choi Decl. ¶ 64, Exh. 63; ¶ 65, Exh. 64; ¶ 66, Exh. 65 at p. 1. | Disputed to the extent that Samsung is arguing that these communications reflect cooperation with Netlist.  The fact that Samsung had communications with Netlist and PWC is immaterial to whether Samsung reasonably cooperated. |
| ¶ 64, Exh. 63 at  NL118533-34; | |
| ¶ 66, Exh. 65 at NL118544-48; | |
| ¶ 67, Exh. 66 at NL118556-57. | |
| | Samsung submitted responses to the Korean tax authorities (and sent draft to Netlist and PWC) that were inconsistent with the express language of the JDLA and adverse to Netlist's interests.  Samsung also refused to disclose certain information in its intended submissions citing "trade secrets," included language that Netlist and PWC objected to in the submissions, and insisted that it would represent to the NTS that the NRE fees |

| | | |
|---|---|---|
| 1 | | were royalties despite Netlist's |
| 2 | | objection and disagreement. |
| 3 | | |
| 4 | | Evidence: |
| 5 | | • Ex. 94 to 8-30-21 LaMagna |
| 6 | | Decl. (Kam Report), at pp. 8-12. |
| 7 | | • Ex. 95 to 8-30-21 LaMagna |
| 8 | | Decl. (NL005043), at |
| 9 | | NL005043. |
| 10 | | • Dkt. 150-5 [Samsung MSJ Ex. |
| 11 | | 62] (NL118609), at NL118609. |
| 12 | 76. PWC even thanked Samsung for its | Disputed.  Plaintiff's response to No. |
| 13 | cooperation, showing that cooperation | 75 is incorporated herein. |
| 14 | is not what Netlist complains of here. | |
| 15 | | In an effort to be polite, a PWC |
| 16 | Choi Decl. ¶ 65, Exh. 64 at p. 1; | employee thanked Samsung for |
| 17 | ¶ 65, Exh. 64 at  NL118535. | Samsung's email.  This expression of |
| 18 | | professional courtesy does not |
| 19 | | transform Samsung's refusal to |
| 20 | | cooperate and its submission of |
| 21 | | factually inaccurate information into |
| 22 | | cooperation. |
| 23 | | |
| 24 | | As noted in the response for No. 75, |
| 25 | | Samsung did not ultimately submit |
| 26 | | accurate information to the NTS and |
| 27 | | insisted that Samsung "should reply to |
| 28 | | |

| | |
|---|---|
| | the effect that the nature of the agreement was viewed as license" despite Netlist's disagreement.  In fact, in the very next email exchange from the email Samsung cites, the same PWC employee notes that "there are instances where we Netlist do [sic] not agree," and asks Samsung to respond to NTS "on the basis that the $8 million is an NRE payment not a license fee and that you stick to the factual background."<br><br>Evidence:<br>• Dkt. 150-5 [Samsung MSJ Ex. 62] (NL118609), at NL118609-10. |
| 77. What Netlist wanted was for Samsung to deny that the $8 million was for patent royalties, which Samsung did not believe to be true.<br><br>Choi Decl. ¶ 63, Exh. 62 at p. 1; Choi Decl. ¶ 61, Exh. 60 at p. 3; Dkt. 88-7 at p. 4; ¶ 67, Exh. 66 at  NL118556; ¶ 6, Exh. 5 at 123:19- 124:24. | Undisputed that Netlist wanted Samsung to accurately represent the provision of the JDLA, including Section 3.1, which provides "Samsung shall pay to Netlist eight million United States dollars (US $8,000,000) as non-refundable NRE fees."<br><br>Disputed that Samsung believed that the $8 million was for patent royalties when the JDLA expressly listed the |

| | |
|---|---|
| | payment under "Development Costs" and defined it as "non-refundable NRE fees."<br><br>Evidence:<br><ul><li>Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at p. 5, §§ 3, 3.1.</li></ul> |
| 78. Netlist won its tax appeal, and received a full refund plus interest.<br><br>Dkt. 88-7 at p. 3; Choi Decl. ¶ 68, Exh. 67 at p. 2;<br>¶ 6, Exh. 5 at 136:13-137:6. | Undisputed that Netlist received a full refund, but immaterial.  Whether Netlist ultimately received a refund is irrelevant to Netlist's claim because Netlist is not seeking to recover the wrongfully withheld taxes, but other damages instead.<br><br>Disputed as to the characterization that Netlist received "interest" for the tax refund.  Under Art. 52 of the Republic of Korea's Framework Act on National Taxes, Netlist received a statutory refund named 국세환급가산금 (an additional Refund on National Taxes) after the Tax Tribunal determined that the NRE payments on which Samsung withheld taxes were not taxable. |

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO  8:20-CV-993-MCS (ADS)

| | Also, whether Netlist received interest on the refund of wrongfully withheld taxes is not relevant to Samsung's duty to reasonably cooperate with Netlist's efforts to seek a refund, nor is it relevant to whether Samsung breached by wrongfully withholding taxes in the first place.  Netlist is seeking other damages, including those caused by Samsung's lack of cooperation in recovering the wrongfully withheld taxes that were ultimately returned to Netlist.<br><br>Evidence:<br>• Ex. 80 to 8-30-21 LaMagna Decl. (Art. 52 of the Framework Act on National Taxes). |
|---|---|

**Defendant's Allegation that Netlist Is Barred From Recovering Consequential Damages**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 79. Uncontroverted Fact Nos. 1-78 are incorporated herein. | Plaintiff's responses to Nos. 1-78 are incorporated herein. |
| 80. Netlist seeks damages including lost revenues and lost profits from allegedly | Undisputed. |

| | |
|---|---|
| lost business opportunities with third party customers.<br><br>Dkt. 18-2 at ¶ 14; Choi Decl. ¶ 69, Exh. 68 at 5:23-26. | Lost revenues and lost profits are only one component of damages.  Lost revenues were from lost resales of Samsung products that were required to be supplied, which was a direct result of Samsung's breach of the contract. |
| 81.  Section 12.5 of the JDLA states: "IN NO EVENT SHALL (A) EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHERE EXCLUDED DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, LOSS OF SAVINGS, LOSS OF USE OR PUNITIVE DAMAGES."<br><br>Choi Decl. ¶ 20, Exh. 19 at p. 11. | Undisputed that these words appear in the JDLA; disputed to the extent Samsung is making a legal argument in consequence of that language. |

**Defendant's Allegation that Samsung Is Entitled to Judgment on Plaintiff's Third Cause of Action for Declaratory Relief: Termination of Contract**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 82. Uncontroverted Fact Nos. 1-81 are incorporated herein. | Plaintiff's responses to Nos. 1-81 are incorporated herein. |

**Defendant's Allegation that Netlist Waived Any Right To Terminate The JDLA**

| Defendant's Alleged Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 83. Uncontroverted Fact Nos. 1-82 are incorporated herein. | Plaintiff's responses to Nos. 1-82 are incorporated herein. |
| 84. Netlist executives internally discussed whether to provide notice of breach over the tax withholding dispute in March 4, 2016, but decided not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung.<br><br>Choi Decl. ¶ 70, Exh. 69 at p. 1; ¶ 6, Exh. 5 at 57:4-64:2. | Immaterial, in that the allegation appears directed to Defendant's prior "election of remedies" defense, on which the Court has already ruled.<br><br>Undisputed that individuals at Netlist discussed whether to provide notice of breach.<br><br>Disputed as to the characterization that Netlist decided "not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung." |

| | | |
|---|---|---|
| 1 | | Gail Sasaki specifically testified that, |
| 2 | | in part, "the breach comes from lack of |
| 3 | | cooperation, and [she] was still hopeful |
| 4 | | that [she] would get cooperation from |
| 5 | | Samsung," and that she thought |
| 6 | | Samsung "had not yet breached as |
| 7 | | [her] recollection was that [Netlist] |
| 8 | | was still trying to get cooperation." |
| 9 | | Because of this, the individuals |
| 10 | | involved in this email chain (who did |
| 11 | | not have authority to decide this issue) |
| 12 | | opted not to recommend sending |
| 13 | | notice at this time. |
| 14 | | |
| 15 | | Evidence: |
| 16 | | • Ex. 85 to 8-30-21 LaMagna |
| 17 | | Decl. (Sasaki Dep. Tr.) at 67:3- |
| 18 | | 8, 67:17-19. |
| 19 | 85. As to the supply claim, Netlist | Undisputed. |
| 20 | asserts that "starting as early as the | |
| 21 | second quarter of 2017, Samsung began | |
| 22 | to refuse and/or cancel orders from | |
| 23 | Netlist. | |
| 24 | | |
| 25 | Choi Decl. ¶ 71, Exh. 70 at p. 13, ROG | |
| 26 | No. 8. | |
| 27 | 86. Instead, Netlist waited to provide | Disputed. |
| 28 | | |

| | | |
|---|---|---|
| 1 | notice of alleged breach until May 27, | Netlist as a company did not consider |
| 2 | 2020, more than *four years* after it first | sending a breach notice in 2016. *See* |
| 3 | considered doing so. | Defendant's response and evidence to |
| 4 | | SUF No. 84 incorporated herein. |
| 5 | Dkt. 18-2 at ¶ 19; Choi Decl. ¶ 72, Exh. | |
| 6 | 71. | As to Samsung's wrongful withholding |

notice of alleged breach until May 27, 2020, more than *four years* after it first considered doing so.

Dkt. 18-2 at ¶ 19; Choi Decl. ¶ 72, Exh. 71.

Netlist as a company did not consider sending a breach notice in 2016. *See* Defendant's response and evidence to SUF No. 84 incorporated herein.

As to Samsung's wrongful withholding and failure to cooperate in the tax return, Netlist made repeated efforts throughout the time period to engage Samsung in cooperation.

Evidence:
- Ex. 95 to 8-30-21 LaMagna Decl. (NL005043), at NL005043.
- Dkt. 150-5 [Samsung MSJ Ex. 62] (NL118609), at NL118609, NL118611-13.

As to the breach of the supply provision, Netlist does not allege any material breach in 2016.

After Samsung cut off product supply in Q2 2017, Netlist expended significant effort to try to work through

| | |
|---|---|
| | the issues with Samsung. |
| | |
| | Evidence: |
| | • Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 187:15-188:14. |
| | • Chuck Hong Decl. [Dkt. 145-3], ¶ 10. |
| | |
| | Ultimately, Samsung's multiple breaches added up to a point where Netlist had to send an official notice of breach, and when Samsung failed to cure, Netlist terminated the contract. *See* Defendant's response and evidence to SUF No. 84 incorporated herein. |
| 87. The $15 million note is due December 31, 2021.<br><br>Choi Decl. ¶ 73, Exh. 72 at p. 1 § 2. | Undisputed. |

Dated: August 30, 2021          GIBSON, DUNN & CRUTCHER LLP

1

2          By: /s/ *Jason Lo*
           Jason C. Lo
3          333 South Grand Avenue
           Los Angeles, CA 90071
4          213.229.7000
           jlo@gibsondunn.com
5
           Attorneys for Plaintiff Netlist Inc.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28