# EXHIBIT 76

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| Netlist Inc., <br>     Plaintiff, <br><br> v. <br><br> Samsung Electronics Co., Ltd. <br>     Defendant. | CASE NO. 8:20-cv-993-JAK (DFMx) <br><br> **HIGHLY CONFIDENTIAL** |

**Expert Report of Dr. Michael P. Akemann**

**August 23, 2021**

## Table of Contents

| | |
|---|---|
| **1. Introduction** | **3** |
|   1.1. Qualifications | 3 |
|   1.2. Assignment | 4 |
|   1.3. Netlist | 5 |
|     1.3.1. Customers | 5 |
|     1.3.2. Suppliers | 6 |
|     1.3.3. Products | 7 |
|     1.3.4. SK Hynix Strategic Partnership | 7 |
|   1.4. Samsung | 10 |
| **2. Summary of Primary Opinions** | **11** |
| **3. History of the Parties' Business Relationship** | **12** |
|   3.1. Overview of the JDLA | 12 |
|   3.2. Netlist Financial Results Reflect the Importance of the JDLA | 17 |
|   3.3. Supply Assurance Under the JDLA Was Important to Netlist | 18 |
| **4. Framework for Assessing Direct Contract Damages** | **21** |
| **5. Economic Analysis of Direct Contract Damages** | **23** |
|   5.1. Introduction | 23 |
|   5.2. Korean Tax Damages | 24 |
|   5.3. Cover Damages | 26 |
| **6. Other Economic Harms to Netlist from the Alleged Breach of Contract** | **29** |
|   6.1. Introduction | 29 |
|   6.2. Economics of Vertical Supply Relationships | 30 |
|   6.3. Economic Evidence on the Value to Netlist of Supply Assurance | 31 |
|   6.4. Economic Evidence on Unfulfilled Forecasts and Orders | 35 |
|     6.4.1. Evidence from Communications | 35 |
|     6.4.2. Evidence from Netlist Purchase Data | 40 |
|   6.5. Economic Evidence on Lost Sales and Customers | 41 |
|   6.6. Conclusion on Other Economic Harms to Netlist | 44 |

# 1. INTRODUCTION

## 1.1. Qualifications

1. My name is Michael P. Akemann. I am an economist and Managing Director at Berkeley Research Group, LLC ("BRG"), a global expert services firm headquartered in Emeryville, California. I have been engaged in economic research and consulting for approximately 25 years. A significant portion of my professional experience has related to intellectual property and breach of contract disputes, including the calculation of damages in patent, trade secret, and contract cases. I have worked on litigation matters in a wide variety of industries, including the smartphone, computer, semiconductor, telecommunications, biotechnology, pharmaceutical, transportation, food products, and other industries.

2. I have testified at deposition and/or trial in U.S. federal courts on patent damages, FRAND considerations, antitrust matters, and other commercial damages issues including matters involving alleged breach of contract damages. I have also testified at deposition and trial on public interest and domestic industry issues in matters before the U.S. International Trade Commission and at trial on FRAND-related issues before the Shenzhen (China) People's Intermediate Court.

3. I earned a BA in Economics and Political Science from the University of California at San Diego, and an MA and a PhD in Economics from the University of California at Los Angeles. I have published articles on a variety of economic issues, including analyses of exclusive dealing contracts, other vertical contractual restraints, and complex damages issues. These publications have appeared in outlets such as the *Journal of Development Economics*, *Journal of Corporation Law, Intellectual Asset Management Magazine*, *Handbook on Marketing Analytics*, and *Research in Law and Economics*.

4. **Attachment 1** is my CV, which sets forth my biographical information in further detail, including a list of matters in which I have given expert testimony.

5. The documents considered in performing my analysis in this case are cited throughout this report and exhibits, and/or listed in **Attachment 2**. I have also relied on information from an interview with Netlist CEO Chun K. Hong and Netlist CFO Gail Sasaki.

6. BRG is being compensated for my work on this matter at $675 per hour, plus expenses. Work on this matter has also been performed by members of my staff, acting under my direction. Neither BRG nor I have any financial stake in the outcome of this litigation.

## 1.2. Assignment

7. The Plaintiff in this matter is Netlist Inc. ("Netlist").

8. The Defendant in this matter is Samsung Electronics Co., Ltd. ("Samsung").

9. I have been retained by Counsel for Netlist to provide an economic analysis of alleged breach of contract damages in this matter and to explain other economic harms suffered by Netlist due to the alleged breach.

10. I assume as a legal matter that the JDLA obligated Samsung to supply NAND and DRAM products to Netlist at Netlist's request at a competitive price.[1] I understand that Samsung disputes this and contends that "Section 6.2 of the JDLA contains only a pricing obligation by Samsung to sell certain semiconductor (NAND/DRAM) products to Netlist at a competitive price."[2]

11. I assume for purposes of my analysis that liability will be established in this matter and that Samsung breached the JDLA by failing to supply products to Netlist, forcing Netlist to obtain Samsung products from resellers.

12. I am an economist, not a lawyer or technical expert, and do not express any opinion on legal or technical issues. For purposes of my analysis, I have been asked by counsel to make certain assumptions and have been informed of the relevant law, which I note in the relevant sections of this report.

---

[1] SEC000001 – SEC000019 at 0006.
[2] Samsung Electronics Co., Ltd.'s Notice of Motion and Motion for Judgment on the Pleadings, p. 8. I understand that, alternatively, Samsung contends that Section 6.2 is limited to NVDIMM-P components.

4

operating profit of $8.3 billion for its Semiconductor segment in 2014.[38] In 2019, Samsung reported $198 billion in revenues and $24 billion in operating profits.[39] Samsung reported net revenues of $55.7 billion and operating profit of $12.0 billion for its Semiconductor segment in 2019.[40]

## 2. SUMMARY OF PRIMARY OPINIONS

28. My primary opinions in this matter are as follows.

29. My direct contract damages analysis assumes that Samsung had a contractual obligation to supply Netlist with NAND and DRAM products at Netlist's request at a competitive price. Where Samsung allegedly failed to do so (i.e., where Samsung breached this supply obligation), and Netlist was then required to purchase those products from an alternative source, Netlist was harmed to the extent that it had to pay more to other suppliers than it would have paid to Samsung. I analyze and quantify the "cover damages" (i.e., the higher amount Netlist paid to other vendors over what it would have paid Samsung) Netlist suffered due to the alleged breach in **Section 5.3** below and summarize my quantitative conclusions in **Exhibit 1**.

30. My direct contract damages analysis also assumes that Samsung had a contractual obligation not to withhold any portion of the $8 million NRE fee because no taxes were owed on it and that Samsung was obligated under Section 3.2 to "reasonably cooperate" with any effort by Netlist to seek a refund. Assuming Netlist is entitled to recover direct expenses incurred related to recovering the money from the Korean tax authority that was withheld by Samsung, I summarize those direct expenses in **Section 5.2** below.

---

[38] Samsung Electronics Co. Ltd. Consolidated Statements of Financial Position, 2014, p. 81. Converted to U.S. dollars at 1,052.70 to US $1, the average exchange rate for the year ended December 31, 2014. p. 31.

[39] Consolidated Financial Statements of Samsung Electronics Co Ltd. and its Subsidiaries, 2019, p. 9.

[40] Consolidated Financial Statements of Samsung Electronics Co Ltd. and its Subsidiaries, 2019, p. 86. Converted to U.S. dollars at 1,165.46 to US $1, the average exchange rate for the year ended December 31, 2019. p. 41.

11

31. Economic theory and the economic evidence available in this case show that the Samsung supply assurance in the JDLA had substantial value to Netlist and that that supply assurance was a primary benefit to Netlist from the JDLA.

32. Economic evidence also shows that Samsung failed to comply with that supply assurance on numerous occasions over an extended period, substantially undermining a main economic purpose of the JDLA for Netlist.

33. Samsung's failure to comply with the supply assurance under the JDLA therefore substantially undermined the economic value to Netlist of the supply assurance from Samsung. As a result, the alleged breach of contract caused economically significant harm to Netlist.

34. The alleged breach of contract caused multiple types of economic harms to the company that are not captured in my quantification of direct contract damages above. My direct contract damages calculations therefore do not address all the economic harms that Netlist suffered when it was unable to obtain suitable cover products to mitigate Samsung's alleged failure to supply NAND and DRAM products on Netlist's request. They do not, for example, address lost sales, lost customers, reputational harm, or other losses that Netlist suffered. As such, from an economic perspective, my estimated direct contract damages would not fully compensate Netlist for the economic harms it suffered from the alleged breach of contract.

## 3. HISTORY OF THE PARTIES' BUSINESS RELATIONSHIP

### 3.1. Overview of the JDLA

35. On November 12, 2015, Netlist and Samsung entered into a Joint Development and License Agreement (JDLA). The agreement term began on November 12, 2015 and was set to run until the "expiration of the last to expire of the Licensed Patents."[41] Netlist received from Samsung $8 million for non-recurring engineering costs related to the

---

[41] Joint Development and License Agreement, Nov 12, 2015, p. 4.

12



### 6.4.2. Evidence from Netlist Purchase Data

121. In **Exhibits 2, 4, and 5** I show the Netlist purchase patterns from Samsung and resellers. These data show that Netlist ramped up its purchases from Samsung substantially following the signing of the JDLA, and later began substituting reseller purchases when Samsung did not provide sufficient supply to Netlist.

122. Purchase data produced by Netlist indicates orders placed to Samsung for Samsung products and indicates the portion of ordered products received by Netlist.[136] Substantial fulfillment of such orders by Samsung in these data does not account fully for products that Netlist requested or desired to order, but for which Samsung refused to accept a purchase order. As indicated above, I understand that, starting in Q2 2017 Samsung began capping the amount of products that Netlist could order. As such, fulfillment of the constrained or capped orders does not indicate that Samsung was supplying Netlist with all the products that it requested or desired to order.

---

[134] SEC126794 – SEC126806 at 6795.
[135] SEC058105 – SEC058107 at 8106.
[136] NL117868.

123. From Q2 2017 to the time of termination by Netlist (i.e., July 15, 2020), Samsung failed to supply a substantial fraction of the orders that Samsung allowed Netlist to place. Analyzing the relationship between the products Netlist ordered from Samsung directly and those that it received shows that, from Q2 2017 through July 15, 2020, Netlist only received 48% of units ordered and 67% of dollar volume ordered.[137] And in the period leading up to this lawsuit and Netlist's notice to cure and termination (i.e., from April 1, 2020 through July 15, 2020), Netlist only received 7% of units ordered and 51% of dollar volume ordered.[138]

124. In conducting this analysis, I understand that the quantity ordered recorded in this Netlist dataset was sometimes overwritten (as compared to the originally ordered amounts) in cases when Samsung indicated it would not supply the initial amount requested. That is, the database was dynamic in the sense that orders were written down in the database in certain cases to account for Samsung's failure to supply products as ordered. Therefore, my above analysis understates the differences between products (originally) ordered (or originally desired) and products received.

## 6.5. Economic Evidence on Lost Sales and Customers

125. There is economic evidence that Netlist lost sales and customers due to the alleged breach of contract in this case.

126. Mr. Hong described the impact of the alleged breach of contract as follows:

> "We lost important customers that we had developed from 2015-2017 for our Samsung-related products business, and our reputation with those customers and others was damaged. Moreover, we were no longer able to supply predictable quantities of Samsung NAND and DRAM products to many of our customers. And Netlist has no assurance that Samsung will not, as soon as this case ends, again refuse to supply Netlist with product, meaning that this part of our business can again be damaged any time Samsung chooses."

---

[137] 2,299,459 units ($27,658,016) delivered out of 4,751,968 ($41,322,856) ordered. See NL117868.
[138] 3,699 units ($749,593) delivered out of 54,769 ($1,464,208) ordered. See NL117868.

41

> "When Samsung failed to honor its legal obligations and fulfill Netlist's orders, Netlist could not supply its customers and lost business opportunities and profits it otherwise would have earned had Samsung performed as required under the JDLA. Netlist lost major customers, and its reputation in the industry was damaged. Samsung's decision to limit Netlist's direct supply of NAND and DRAM prevented Netlist from growing a stable products business. Samsung's refusal to supply caused extreme commercial harm to Netlist."[139]

127. As shown in **Exhibit 4**, Netlist purchase records show that direct purchases from Samsung declined substantially during the relevant period (before eventually rebounding more recently). **Exhibit 2 and 4** show that Netlist was only able to find alternate supply from resellers to make up some of the Samsung volumes.

128. Along with Mr. Hong's declaration, there is contemporaneous economic evidence which indicates that Samsung's refusal to provide products to Netlist resulted in lost sales by Netlist and negatively impacted Netlist's relationships and reputation with its customers. I have reviewed several instances of this in the record and provide examples below:



---

[139] 8/16/21 Hong Declaration, p. 5.
[140] NL006166 – NL006168; NL018742 – NL018743; NL117825 – NL117835.
[141] SEC126794 – SEC126806 at 6800.

     public filings and Mr. Hong's declaration and deposition testimony describe the importance and expected benefits to Netlist of the supply assurance from Samsung.

130. Economic evidence also shows that Samsung failed to comply with that supply assurance on numerous occasions over an extended period, substantially undermining a main economic purpose of the JDLA for Netlist. I summarize elements of this evidence in the subsections above.

131. Samsung's failure to comply with the supply assurance under the JDLA therefore substantially undermined the economic value to Netlist of the supply assurance from Samsung. As a result, and as detailed above, the alleged breach of contract caused economically significant harm to Netlist.

132. The alleged breach of contract caused multiple types of economic harms to the company that are not captured in my quantification of direct contract damages above. I have been asked to quantify the direct cover damages that Netlist suffered from having to purchase replacement products from other suppliers at a higher cost, along with direct expenses Netlist incurred to obtain a tax refund in Korea. My direct contract damages calculations therefore do not address the economic harms that Netlist suffered when it was unable to obtain suitable cover products to mitigate Samsung's alleged failure to supply NAND and DRAM products on Netlist's request. They do not, for example, address lost sales, lost customers, reputational harm, or other losses that Netlist suffered. As such, from an economic perspective, my estimated direct contract damages would not fully compensate Netlist for the economic harms it suffered from the alleged breach of contract.

I declare under penalty of perjury of the laws of the United States that the foregoing represents my true opinion and the facts as I understand them.

_____
Dr. Michael P. Akemann
August 23, 2021
Redwood City, CA



Exhibit 4
Monthly Samsung Orders