# EXHIBIT 94

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>           Plaintiff,<br><br>     vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>           Defendant. | CASE NO. 8:20-cv-00993-MCS-ADS<br><br>**EXPERT REPORT OF BYUNGWOOK KAM**<br><br>**[CORRECTED VERSION]** |

## I. INTRODUCTION

1. I have been retained as an expert witness by Gibson, Dunn & Crutcher LLP ("Gibson Dunn") on behalf of Netlist, Inc. ("Netlist") in connection with the above-captioned action. More particularly, I have been asked to review the issues related to the taxes withheld from the Non-Recurring Engineering Fees ("NRE Fees") Netlist received from Samsung Electronics, Co. Ltd. ("Samsung"). The opinions stated in this report are based on my review of the materials provided to me, and my own personal knowledge, experience, and professional judgment.

2. I understand that I may be called upon to testify in this case regarding my opinions and analyses. If called as a witness in this matter, I am prepared to testify competently about them. As English is not my first language, I may require a translator for clarify of testimony.

## II. RELEVANT EXPERIENCE AND QUALIFICATIONS

3. I am a lawyer duly licensed and in good standing to practice in the Republic of Korea ("Korea"). I am the founding partner of Jinyeong Law Offices, a Seoul-based law firm specializing in Korean tax matters.

4. I received my J.D. from Korea University School of Law in 2012, and my M.P.A. and B.A. in Economics from Seoul National University. I have close to 20 years of experience in the Korean tax matters, both as a tax attorney and as a former tax officer for the Korean government.

5. Between 2003 and 2009, I served as an officer of the National Tax Service ("NTS") of Korea, including as the Team Lead for an investigative unit, and later as a Deputy to the Director of the Tax Ruling Department of the NTS.

6. After being admitted as a lawyer to the Korean Bar in 2012, I practiced as a tax attorney at Lee & Ko, one of Korea's largest premier full-service law firms, where I advised on numerous tax litigation matters, tax appeals, and tax audits. I currently manage a law firm specializing in Korean tax law issues and advise on all aspects of tax matters. As an attorney, I have served as an external member of the Legal Interpretation and Deliberation Committee of the NTS, an Outside Advisor to the Jungbu Regional Tax Service and as a Member of the Jungbu Regional Tax Appeal. I have taught at the National Tax Officials Training Institute, an educational institution for NTS officers.

7. Based on my experience in Korean tax law, I have authored two books, including Introduction to Tax Law, published in 2017, and Tax Investigation Procedures and Practices, published in 2018. My *curriculum vitae* and the list of my publications are attached as **Exhibit A**.

8. As described in my *curriculum vitae* ("CV"), I have extensive experience in the field Korean tax law. Specifically, I have considerable experience with all aspects of Korean tax matters, including corporate tax matters, criminal and civil tax litigation, tax refund proceedings, tax appeals, tax investigations, and tax strategies related to corporate tax, income tax, local tax, among others.

### III.     COMPENSATION

9. I am being compensated for my services at the rate of $570 per hour. My compensation does not depend on the outcome of this litigation, and I have no personal interest in its disposition.

### IV.     MATERIALS RELIED UPON IN FORMING OPINIONS

10. To prepare this report, I have reviewed the documents and materials cited herein and those listed listed at **Exhibit B**. In addition, I have studied the relevant case law that I have discovered through my own research. I have also relied upon my years of general experience, education, and background in Korean tax law matters.

11. In this report, I provide opinions concerning Samsung's withholding of taxes from NRE Fees payable to Netlist under the parties Joint Development and License Agreement ("JDLA") as discussed below. My training and experience, as well as my work as a former NTS officer and a tax attorney licensed in Korea, qualify me to evaluate the issues related to Samsung's withholding of taxes from these NRE Fees.

### V.     Background for Analysis

12. The following summarizes my understanding of the factual background as it pertains to the taxes withheld from the NRE Fees.

13. Netlist entered into a JDLA with Samsung Electronics, Co. Ltd. ("Samsung") on November 12, 2015. NL045696. The JDLA states that "Samsung shall pay to Netlist eight million United States dollars, (US $8,000,000) as non-refundable NRE fees." JDLA, at 5, § 3.1. I understand that "NRE" stands for "non-recurring engineering"—that is, the "NRE fees" stated in the JDLA are identified there as a payment for engineering services. Netlist is a U.S. company, with

principal operations in Irvine, California. I understand that Netlist does not maintain engineering staff in the Republic of Korea, and that, accordingly, engineering services that Netlist would provide under the JDLA would not be provided in the Republic of Korea.

14. The JDLA also contains a provision governing taxes for the NRE Fees, which states (emphases added):

> 3.2 <u>Taxes</u>. All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the Party required to do so by applicable law. **To the extent that any withholding taxes are required by applicable law** for the payment set forth in this Agreement, **Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea in remitting payment to Netlist under this agreement, provided that Samsung shall** pay such withholding taxes to the Korean tax authorities and promptly provide Netlist with a certificate of payment for such withholding tax, as required by applicable law or treaty, and **reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes.**

15. In remitting payment to Netlist for the amount owed under § 3.1 of the JDLA, Samsung did not remit the $8,000,000 as required by § 3.1 of the JDLA. Samsung instead withheld 16.5%—$1,320,000 (the "Taxes")—from the above payment of the NRE Fees and only remitted $6,680,000 to Netlist. *See* NL074716, NL048003.

16. Netlist sent a letter to Samsung on December 16, 2015, expressing surprise that Samsung withheld taxes from the NRE Fees, noting that the NRE Fees are not subject to Korean taxes per Articles [4](1) and 6(6) of the Tax Convention Treaty between the United States and Korea (the "Treaty"). NL000173, NL000174. Specifically, Netlist expressed that, as stated in § 3.1 of the JDLA, the NRE Fees "are service payments… for non-recurring engineering services," rather than royalty payments, and asked Samsung to remit the taxes withheld. NL000174. As noted below, I agree that, based on my professional experience and knowledge of Korean law, fees for engineering services to be conducted outside of the Republic of Korea are not subject to Korean taxes per Articles 4(1) and 6(6) of the Treaty between the United States and Korea.

17. In the same letter, Netlist also indicated that, as a sign of good faith, Netlist would

indemnify Samsung for any tax liabilities that could be imposed on Samsung for not withholding taxes on the NRE Fees. NL000174. I understand that Samsung did not accept Netlist's offer.

18. On December 18, 2015, Netlist also provided excerpts of the Treaty, as well as the Treaty itself as an attachment, in an email to Samsung. NL047963. Specifically, Netlist cited Article 6 of the Treaty, which provides, "income received by a corporation for furnishing the personal services of its employees or others[] shall be treated as income from sources within one of the Contracting States only to the extent that such services are performed in that Contracting State." *Id*.

19. Samsung sent a response to Netlist on December 31, 2015, noting that Samsung "deducted withholding tax of $1,320,000 (16.5%) from $8,000,000 NRE fee, calculated according to the United States-Republic of Korea Income Tax Convention, Article 14 and Republic of Korea Corporate Tax Act, Article 93 (Domestic Source Income)." NL048003. Samsung further noted that the taxes were withheld based on the Application for Entitlement to Reduced Tax Rate on Domestic Source Income (for Foreign Corporation), signed by Netlist's CFO and submitted to Samsung on November 5, 2015. *Id*. Lastly, Samsung noted that, because Samsung has already reported and paid withholding tax of $1,320,000 to NTS on December 10, 2015, Netlist should discuss the matter directly with the NTS. *Id*.

20. Earlier, Samsung had sent Netist an email on October 29, 2015, attaching the Application for Entitlement to Reduced Tax Rate on Domestic Source Income (the "Form") noted above. *See* NL044878. Samsung stated that this form was one of the "necessary documents to remit the NRE expenses," and that it was a "document necessary for discount on tax withholding." NL044878.

21. After Netlist initially filled out the Form, Samsung responded to Netlist and directed Netlist that it must also fill in "16.5%" under the "claim of applicable tax treaty provisions" section of the form. NL044860. The screen captured image Samsung included in this email contained the word "royalties" under "Type of Income." *Id*. Samsung did not state that by filling out the Form, Netlist would be authorizing Samsung to withhold 16.5% in taxes from the NRE Fees. *Id*. Nor did Samsung inform Netlist that it was going to withhold 16.5% in taxes from the NRE Fees based on the Form, or that Samsung would be withholding taxes from the NRE Fees because it viewed the NRE

1  Fees as a patent royalty.  *See, e.g., id*.

2  22.  Netlist filled out and returned the Application for Entitlement to Reduced Tax Rate on Domestic Source Income as Samsung requested, and Samsung subsequently withheld 16.5% of Netlist's $8,000,000 engineering fee for taxes that Samsung purported that Netlist owed under Korean law.  An Application for Entitlement to Reduced Tax Rate on Domestic Source Income identifies for the signatory the treaty-specified tax rate to which the entity is entitled, *to the extent a category of income under a contract is taxable in Korea*.  This form does not transform untaxable income into taxable income.  Neither does filling out the form constitute a declaration that all sources of income under a contract are taxable in Korea or taxable at the specified rate.

23.  On February 4, 2016, Netlist responded to Samsung's December 31, 2015 letter, stating that Netlist "disagree[s] with the withholding tax" and attached a letter from Kim & Chang, the largest Korean law firm, stating that "based on our reading of the JDLA, the NRE fee paid under the caption 'Development Costs' does not appear to be compensation for Samsung's use or right to use Netlist's IP, but rather compensation for engineering services and such fee should not be treated as royalty under Article 14 of the Korea-US Tax Treaty."  NL048061, NL048063.  For the reasons stated above and below, I can find no error in Kim & Chang's analsyis, with which I concur.

24.  Netlist also stated in its communication of February 4, 2016, that it never applied for any tax withholding, noting that "it was Samsung who directed us to fill out the form as part of the vendor set up process.  We have an audit trail of emails and can prove that we did NOT request withholding."  NL048061.  Netlist also noted that it "did not find out about Samsung's plans to withhold tax until after the funds were remitted," and that it "has been advised by counsel that it will take over four years of effort and sizeable [sic] legal fees to attempt to get our money back from NTS."  *Id*.  Netlist also reminded Samsung of the obligation to reasonably cooperate with Netlist in claiming an exemption from the withholding, as specified under § 3.2 of the JDLA, noting that "asking Netlist to take care of it directly and [sic] doesn't offer any assistance from Samsung."  *Id*.

25.  On February 24, 2016, Samsung responded to Netlist, stating that Samsung's "view remains the same," and that "Netlist should discuss all matters relating to the refund of cases withheld."  NL048111.

26. Netlist submitted a tax refund request on October 23, 2018, objecting to Samsung's withholding and payment of the Taxes. *See* NL108733. On April 11, 2019, the NTS requested that Samsung confirm the nature of the NRE Fees in its review of Netlist's tax refund request, noting that Netlist was claiming that the NRE Fees were compensation for personal services rather than patent royalties. NL005039. Two months later, on June 19, 2019, Samsung contacted Netlist and noted that NTS had requested information from Samsung regarding the taxes withheld from the NRE Fees. NL005038.

27. Prior to Samsung's submission of responses to the NTS, Netlist had expressed disagreement with Samsung's proposed responses regarding the nature of the JDLA and the NRE Fees. NL005055, NL118609. Specifically, Netlist told Samsung that Samsung's "letter is factually incorrect and therefore Netlist cannot provide written consent for Samsung to submit the letter to the NTS." NL005055.

28. Samsung informed Netlist that, in response to the NTS questionnaire, Samsung intended to declare that the $8,000,000 engineering fee under § 3.1 of the JDLA was in fact a payment for patent royalties (that is, not a payment for engineering services). *See* NL118609. Samsung responded to Netlist's email, arguing instead that "the original purpose of the agreement… was for granting of license," and that Samsung did not view the payment identified in § 3.1 of the JDLA as "NRE Fees" as non-recurring engineering fees because "there aren't any product resulting from development." *Id*. Samsung further noted that it "should reply [to the NTS] to the effect that the nature of the agreement was viewed as license and tax was withheld accordingly." *Id*.

29. Netlist disagreed with Samsung's characterization of the $8,000,000 payment for "NRE Fees" owed under § 3.1 of the JDLA, and expressed its disagreement with Samsung. NL005055, NL118609. Samsung nevertheless responded to the NTS that the NRE Fees were royalties rather than a business income. NL107763, NL107769. Based on Samsung's response, the NTS rejected Netlist's request for the tax refund on January 30, 2020. NL108733.

30. Netlist appealed the matter to the Tax Tribunal on April 1, 2020.[1] NL108733. The

---

[1] I understand that Netlist was represented by PriceWaterhouseCoopers in Korea in that process.

Tax Tribunal is an agency under the Prime Minister's office that independently exercises authority to review and adjudicate appeals of NTS tax decisions. The Tax Tribunal consists of a commission and eight standing committee members, with around 35 non-standing committee memembers. The non-standing members typically consist of professors, lawyers, and other experts in the field.

31. In this case, on November 17, 2020, the Tax Tribunal ultimately granted Netlist's appeal, overturning NTS's refusal to issue a tax refund. NL108731, NL108760. Specifically, the Tax Tribunal noted that, although the NTS relied on Samsung's responses as "a primary basis for the taxation," NL108759, it was "difficult to totally trust the content of the response given by Samsung" in light of the language of the contract and the fact that Netlist was able to provide various communications with Samsung regarding the joint development in 2018, refuting Samsung's argument that the joint development activities ended in 2017. NL108759–8760.

## VI. THE NRE FEES UNDER THE JDLA ARE NOT TAXABLE UNDER KOREAN LAW

32. The JDLA permits Samsung only to withhold taxes "[t]o the extent that any withholding taxes are *required by applicable law*." JDLA, at 5 (emphasis added). As the Tax Tribunal has already ruled on the issue, Netlist was not required to pay taxes on the NRE Fees. NL108760. Therefore, Samsung should not have withheld money for such taxes.

33. The NTS and the Tax Tribunal appear to have focused on whether the NRE Fees were a business income or a royalty to determine whether the NRE Fees were taxable in Korea. Royalties for foreign patents may be, in certain circumstances, taxable in Korea. Business incomes of non-resident foreign entities are not taxable in Korea.

34. However, royalties for foreign patents are only taxable in Korea *if the patents are registered in Korea*. As a result, Netlist would not have had any reason to pay taxes on the NRE Fees even if the NRE Fees were deemed to be royalties, unless Netlist's patents related to those royalties were registered in Korea. Here, I understand that none of Netlist's patents were registered in Korea. (And regardless, the JDLA itself expressly stated that the $8,000,000 payment was "non-refundable NRE fees" and not attributed to or allocated to patent royalties.)

35. The Supreme Court of Korea has held on several occasions that, because of the territorial nature of patents, royalties for licensing foreign patents not registered in Korea cannot be

viewed as domestic income, and thus cannot be taxed in Korea. *See* 2005Du8641 (September 7, 2007, Supreme Court of Korea); 2012Du18356 (November 27, 2014, Supreme Court of Korea).

36. In fact, there have been a number of recent cases involving royalties for licensing foreign patents in which Samsung itself was a related party. For example, in one case involving Semiconductor Components Industries, LLC ("SCI"), Samsung had withheld 15% of taxes from the royalties for the patents it licensed from SCI after a patent infringement lawsuit. *See* 2012Du18356. In that case, Samsung had withheld 15% in taxes for all patents licensed from SCI, and SCI had sought a refund of taxes paid on the royalties for the patents not registered in Korea. *Id*. The Korean Supreme Court found in favor of SCI, granting a refund for taxes paid on royalties in connection with patents not registered in Korea. *Id*.

37. In another case, Samsung and Microsoft had cross-licensed patents to each other, and Samsung had offset the royalties it owed to Microsoft and only withheld taxes from the remaining amount. 2017Guhap69411 (January 24, 2019, District Court of Suwon). The NTS sought taxes on the royalties Samsung would have paid to Microsoft. *Id*. Notably, Samsung argued that royalties for foreign patents are taxable only if they are registered within Korea. *Id*. The District Court of Suwon found in favor of Samsung, ruling that Samsung was not obligated to withhold taxes from the royalties it owed to Microsoft. *Id*. NTS has appealed this decision, but the Appellate Court of Suwon affirmed the lower court's decision. 2019Nu10395 (July 24, 2019, Appellate Court of Suwon). The case is currently pending the decision by the Supreme Court of Korea. 2019Du50946 (decision pending).

38. As shown above, Samsung is likely aware of the law in this area, as it has itself claimed that royalties for foreign patents not registered in Korea are not taxable in Korea. In this case, however, Samsung asserted a contrary position with Netlist that conflicts with the positions it had previously taken for itself in Korea, both by withholding an amount for taxes not required under Korean law, as well as representing to the NTS that the amount should be taxed in Korea.

39. Taxability of royalties for foreign patents not registered in Korea has been a well-known topic in the field of Korean tax law since the first Supreme Court decision dealing with the issue in 2007. *See* 2005Du8641. Although the Supreme Court of Korea has affirmed its previous

holding in another matter in 2014 (*see* 2012Du18356), NTS has continued to maintain its position that royalties for foreign patents not registered in Korea should also be taxed in Korea. Several companies including Samsung, LG Electronics, Hyundai Motors, Kia Motors, NTP Incorporate, etc., have sought refunds for the taxes paid on royalties for foreign pantents not registered in Korea and have argued that royalties for foreign patents are not taxable unless they are registered in Korea. To my knowledge, no Korean court has ruled in favor of NTS on this issue to date.

40. It is unclear whether, in this matter, the NTS or the Tax Tribunal was aware that none of Netlist's patents is registered in Korea. The Tax Tribunal ultimately appears to have found that, consistent with Netlist's position, the NRE Fees were indeed a business income for the engineering services provided by Netlist in the joint development activities. Nonetheless, given that none of Netlist's patents are registered in Korea, Netlist would not have been required to pay taxes on the NRE Fees even if the payment were deemed to be royalties for the patent licenses.

### VII. SAMSUNG'S RESPONSES TO THE NTS WERE INCONSISTENT WITH KOREAN LEGAL PRECEDENTS REGARDING CONTRACT INTERPRETATION

41. Samsung's response that the nature of the NRE fee was a royalty rather than a business income, which directly contradicts the objective language of the JDLA as written, is quite unusual and inconsistent with the Korean legal precedents regarding the interpretation of contracts.

42. The Supreme Court of Korea has held that, with respect to the interpretation of contracts, "if parties have documented their agreement in a written format and the objective meaning of the language is clear, the existence and content of the parties' intent must be acknowledged as written; particularly when the interpretation of the contractual language that deviates from the objective reading would cause a significant effect on the legal relationship between the parties, the content of the contractual language must be interpreted in a stricter manner." *See* 2012Da21621 (Supreme Court of Korea, November 27, 2014); 2008Da46531 (Appellate Court of Seoul, November 13, 2008).

43. Reading the JDLA in light of the precedents, Korean courts would have viewed the NRE fee as a business income for Netlist's development efforts, rather than a royalty. It is clear on its face that the NRE fee is for the non-recurring engineering fee related to the initial development phase: Section 3 is titled "Development Costs," and Section 3.1 of the JDLA lists the $8,000,000

compensation due to Netlist as a "non-refundable NRE fees."

44. Other provisions in the JDLA would not likely have changed the established jurisprudence of the Supreme Court of Korea regarding the interpretation of contractual language based on the objective reading of the written language. Section 8.1 (License to Netlist) and Section 8.2 (License to Samsung) appear to be general patent cross-licensing provisions, and Section 11 (Confidentiality) also appears to be a typical confidentiality provision that was intended to protect tangible and intangible assets from the ancillary disclosures of information. In light of the foregoing, Samsung's response to the NTS that the NRE fee was a royalty is quite unusual and out of the ordinary because it conflicts with the express terms of the JDLA and with applicable Korean law.

## VIII. GIVEN THE RELATIONSHIP OF A TAX WITHHOLDING AGENT TO THE PRESUMED TAXPAYER, SAMSUNG'S RESPONSE WAS EXTRAORDINARY

45. There is a general understanding that a tax withholding agent is one that handles the affairs of the presumed taxpayer on behalf of the presumed taxpayer (Article 734 of the Civil Code) and that the tax withholding agent is one that receives reimbursement of the taxes already paid from the presumed taxpayer (Article 741 of the Civil Code). *See* A Study on the Responsibilities of the Withholding agent, September 2011. Tax Law Center, Korea Tax Research Institute, pp. 22-23. The Korean courts have also held that a tax withholding agent is one that manages the affairs of the presumed taxpayer on the latter's behalf. *See* 73Na1515 (March 8, 1974, Supreme Court of Korea); 74Da586 (June 25, 1974, Supreme Court of Korea).

46. In this case, Samsung had the role of a tax withholding agent, and Netlist was the presumed taxpayer.

47. Article 734 (1) of the Civil Code provides that "a person who manages affairs for others without obligations shall manage them in a way that is most beneficial to the person according to the nature of the work." As a result, a tax withholding agent must manage matters in the way that is most beneficial to the presumed taxpayer. Although some courts have noted that the duty of a tax withholding agent typically ends when the presumed taxpayer has paid the taxes it owes, *see* 73Na1515; 74Da586, in a matter where the presumed taxpayer is disputing whether the tax withholding was proper or lawful, the "handling of the affairs of the presumed taxpayer" is not likely deemed to have ended upon the payment of taxes.

48. Samsung's response that the NRE fee was a royalty, which knowingly contradicted Netlist's position and was in opposition of Netlist's interests (as well as contrasting Samsung's own legal positions on this issue in other matters), appears to have violated the standard under Aritrcle 734 (1). In particular, as noted above, Samsung's position regarding the nature of the NRE Fees was in contrast to the plain written language of the JDLA. Given the above, Samsung's conduct in this matter significantly deviates from the typical conduct expected of tax withholding agents, and appears to have been arbitrary and unnecessary.

## IX. NETLIST WOULD HAVE RECEIVED A REFUND SOONER AND WITH LESS EFFORT AND EXPENSE HAD SAMSUNG COOPERATED

49. In this matter, the NTS did not conduct a separate investigation to secure documentation or testimony. Instead, the NTS relied solely on Netlist and Samsung for the factual representations. As a result, the NTS would not have had any grounds to determine that the NRE fee must be taxed in Korea as a royalty absent Samsung's representations to the NTS that the NRE Fees were royalties.

50. Under Korean law, Samsung did not need to withhold taxes from the NRE Fees as they were not taxable under Korean law. Without Samsung's affirmative representation that the NRE Fees should be taxed as royalties, the NTS would not have viewed the NRE Fees as royalties.

51. Based on the above facts, Samsung does not appear to have made any effort to cooperate with Netlist in Netlist's lawful effort to claim a refund. To the contrary, Samsung appears to have been actively working against Netlist in Netlist's efforts to obtain a refund, including by directly opposing Netlist's position regarding the nature of the NRE Fees to the NTS.

52. Had Samsung cooperated and supported Netlist in its refund efforts, Netlist's request for a tax refund would have been processed much quicker and without the need to seek significant support from PriceWaterhouseCoopers. Under Article 45.2 (3) of the Framework Act on National Taxes, the Head of the Regional Tax Office is generally required to notify the result of the outcome of a tax refund request within two months of receiving the request. Based on my experience, most tax refund requests without a dispute in the facts are decided within two to three months of the initial request.

53. Without Samsung contradicting Netlist's representations regarding the nature of the

NRE Fees, the NTS would not have had any reason to extend its review of Netlist's request for refund, both in the length of time and the scope of review. Based on my experience in the tax field, if Samsung had provided factual representations consistent with the language of the JDLA and the parties' joint development efforts, I estimate that typical tax professionals or tax attorneys would have charged around USD 30,000~40,000 to assist Netlist in seeking the tax refund, and that it would would have taken two to three months to obtain a tax refund.

54. Likewise, had the NTS granted Netlist's tax refund claim, of course, Netlist would not have had to appeal the decision to the Tax Tribunal. As a result, Netlist would have obtained the refund much sooner and without needing to engage PriceWaterhouseCoopers for assistance with the appeal.

## X. RESERVATION OF RIGHTS

55. I reserve the right to supplement and/or amend the opinions expressed herein as necessary to respond to positions taken (or to be taken) by experts for Samsung. Accordingly, I expect to amplify what is stated above, where necessary, especially in view of information not presently known to me or new information presented by Samsung or Samsung's experts prior to, or at trial, and to supplement this report should additional information be brought to my attention during the course of this proceeding. I plan to continue my investigation and study as needed.

/
/
/
/
/
/
/
/
/
/
/

1  I declare under penalty of perjury under the laws of the United States of America that the foregoing is
2  a true and correct summary of my opinions and of the facts as I understand them.

*[signature]*

**Byungwook Kam**
August 23, 2021
Seoul, Korea
Date of Birth: September 24 1976

14

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER