1  Ekwan E. Rhow - State Bar No. 174604
     erhow@birdmarella.com
2  Marc E. Masters - State Bar No. 208375
     mmasters@birdmarella.com
3  David I. Hurwitz - State Bar No. 174632
     dhurwitz@birdmarella.com
4  Kate S. Shin - State Bar No. 279867
     kshin@birdmarella.com
5  Christopher J. Lee - State Bar No. 322140
     clee@birdmarella.com
6  Jong-min Choi - State Bar No. 329474
     jmchoi@birdmarella.com
7  Joyce J. Choi - State Bar No. 256165
     jchoi@birdmarella.com
8  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
9  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
10 Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
11
12 Attorneys for Defendant Samsung
   Electronics Co., Ltd.

13

14 **UNITED STATES DISTRICT COURT**

15 **CENTRAL DISTRICT OF CALIFORNIA**

16

| | |
|---|---|
| 17  NETLIST INC., a Delaware corporation, | CASE NO. 8:20-cv-00993-MCS-ADS |
| 18                        Plaintiff, | **DEFENDANT SAMSUNG ELECTRONICS CO., LTD'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| 19            vs. | |
| 20  SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,, | [Filed Concurrently with: (1) Defendant's Reply to Plaintiff's Statement of Genuine Disputes of Material Fact; (2) Defendant's Responses to Plaintiff's Objections to Samsung's Evidence in Support of its Motion for Summary Judgment; and (3) Request for Judicial Notice] |
| 21                        Defendant. | |
| 22 | |
| 23 | |
| 24 | Date:      September 20, 2021 |
| 25 | Time:      9:00 a.m.<br>Crtrm.:   7C |
| 26 | |
| 27 | Assigned to Hon. Mark C. Scarsi<br>Courtroom 7C |
| 28 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ....................................................................... 2

TABLE OF AUTHORITIES .................................................................. 3

I.      INTRODUCTION ....................................................................... 5

II.     ARGUMENT ................................................................................ 6

    A.      Samsung Is Entitled To Summary Judgment On The First Claim ............. 6

        1.      Section 6.2 Is Limited To The Supply And Pricing Of Components For The NVDIMM-P Joint Development ................. 6

            a.      The Parties' Negotiating History ............................................. 6

            b.      The Title, Structure, And Express Terms Of The JDLA ...................................................................... 8

            c.      Netlist's Other Admissions ........................................... 9

            d.      The Parties' 2015 To Mid-2017 Performance ...................... 10

        2.      Section 6.2 Is Too Indefinite To Be A Valid Supply Contract ....... 11

        3.      Netlist Failed To Perform Its Obligations Under The JDLA ........ 11

    B.      Samsung Is Entitled To Summary Judgment On The Second Claim ....... 12

        1.      Samsung Reasonably Deducted Withholding Taxes ....................... 12

        2.      Samsung Reasonably Cooperated With Netlist ............................... 13

    C.      Samsung Is Entitled To Summary Judgment On The Third Claim .......... 13

    D.      The Consequential Damages Claim Fails ..................................................... 14

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

5
*Bentley v. AutoZoners, LLC,*
   935 F.3d 76 (2d Cir. 2019)..................................................................... 5, 8, 12

6

7
*Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.,*
   872 F. Supp. 103 (S.D.N.Y. 1995).................................................................14

8

9
*In re Fosamax Products Liability Litig.,*
   707 F.3d 189 (2d. Cir. 2013)............................................................... 5, 8, 12

10

11
*Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.,*
   2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010).................................................11

12

13
*Hudson & Broad, Inc. v. J.C. Penney Corp.,*
   553 F. App'x 37 (2d Cir. 2014) ..................................................................11

14

15
*Septembertide Publ'g, B.V. v. Stein & Day, Inc.,*
   884 F.2d 675 (2d Cir. 1989)........................................................................14

16
*Williams v. Buffalo Pub. Sch.,*
   758 F. App'x 59 (2d Cir. 2018) ..................................................................14

17

**State Cases**

18

19
*Cty. of Jefferson v. Onondaga Dev., LLC,*
   59 N.Y.S.3d 203 (2017)...............................................................................11

20

21
*Fed. Ins. Co. v. Americas Ins. Co.,*
   258 A.D.2d 39 (1999)...................................................................................10

22

23
*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,*
   84 N.Y.2d 430 (1994)..................................................................................14

24

25
*Rudman v. Cowles Commc'ns, Inc.,*
   30 N.Y.2d 1 (1972).........................................................................................6

26
*Westmoreland Coal Co. v. Entech, Inc.,*
   100 N.Y.2d 352 (2003)..............................................................................8, 9

27

28

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**Federal Statutes**

26 U.S.C. § 7421 ...........................................................................................13

**State Statutes**

NY Tax Law § 675 ..........................................................................................13

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# I.     INTRODUCTION

While it tries to sidestep the testimony of its own CEO, Netlist cannot actually raise a genuine dispute as to what Chuck Hong plainly admitted at deposition. That is because he is not only Netlist's CEO, but also *Netlist's 30(b)(6) representative on all issues related to the contract negotiations*. His admissions are binding on Netlist and mandate that Samsung's motion for summary judgment be granted.

Hong admitted the Memorandum of Understanding ("MOU") was designed to cover all critical points of the Joint Development and License Agreement ("JDLA"); the MOU included supply terms such as Section 6.2 which were tied *exclusively* to the future NVDIMM-P product to be jointly developed (not Netlist's other requirements); and such supply terms would be activated only if and to the extent the future NVDIMM-P product was ever "commercialized." *See* Samsung's Statement of Uncontroverted Facts ("SUF") 21, 30, 32. Hong further admitted – and Netlist's opposition does not even mention, much less dispute – Netlist's other lead negotiator (in-house counsel and VP of Intellectual Property & Licensing Noel Whitley) wrote an e-mail during negotiations stating the language of the JDLA and Section 6.2 were designed to "reflect what was agreed to in the MOU." SUF 35. And Netlist does not dispute there was no commercialization of an NVDIMM-P product. SUF 46-47.

Tying together the factual conclusions that must be drawn from these admissions, it is undisputed the MOU served as the foundation for the JDLA, and the limited scope of Section 6.2 flows from the MOU. Netlist tries to invent disputes based on internal contradictions in its own evidence, but the law prohibits such gamesmanship. *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019) (holding plaintiff cannot manufacture issues of fact by using different things it said); *In re Fosamax Products Liability Litig.*, 707 F.3d 189, 193 (2d. Cir. 2013) ("sham issue of fact" doctrine prohibits a party from defeating summary judgment by contradicting its own sworn testimony.) Thus, based on undisputed material facts supporting *Netlist's own interpretation of the JDLA*, Section 6.2's limited supply term was never triggered and

5

Netlist's first breach of contract claim must fail.

Netlist also offers no genuine dispute as to the material facts regarding (i) Netlist's second breach of contract claim concerning the tax withholding, (ii) Netlist's third claim for declaratory judgment, and (iii) Netlist's request for consequential damages. Thus, Samsung's motion should be granted in full.

## II.    ARGUMENT

### A.    Samsung Is Entitled To Summary Judgment On The First Claim

#### 1.    Section 6.2 Is Limited To The Supply And Pricing Of Components For The NVDIMM-P Joint Development

##### a.    The Parties' Negotiating History

Where a contract is ambiguous, extrinsic evidence of the parties' intent as evidenced by their negotiations is admissible. *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 11 (1972). Netlist does not dispute evidence that the foundation of the negotiations was an NVDIMM-P-related product that would be a "game changer." SUF 9-10. Nor does Netlist dispute Hong's repeated testimony that the Netlist proposals leading up to the MOU either omitted supply obligations altogether or limited them exclusively to the future NVDIMM-P product that was to be developed. SUF 22-29. Netlist's original term sheet included a section entitled "Technology Collaboration" and a subsection entitled "Raw Materials: Samsung will supply NAND, DRAM on mutually agreed terms." SUF 24. Hong indisputably testified the supply section applied only to NVDIMM-P, and only if and when commercialized. For example: "Q. And so those were raw materials that were provided in connection with commercialization of the dash P product; correct? A. That's correct." SUF 25. Hong also admitted subsequent drafts of the term sheet confirmed these supply obligations would only arise if and to the extent an NVDIMM-P product was ever commercialized. SUF 27-29.

Hong explained his intent during the negotiations was to get Samsung's commitment to supply NAND and DRAM for the NVDIMM-P product so Netlist would have sufficient supply if and when it was able to commercialize the new

technology. SUF 25, 26, 28, 30. That is why Netlist put the "raw material" language in the term sheet under Technology Collaboration and Productization for the NVDIMM-P initiative. SUF 24, 26, 27, 28. And, after exchanging more drafts, the parties signed the MOU intended to reflect all important deal terms. SUF 32. Section 6 of the MOU indisputably states NAND and DRAM were raw materials for the joint development.[1]

Netlist does not dispute evidence that, during the JDLA negotiation, Whitley confirmed the MOU was the sole basis for what became Section 6.2. When the parties began drafting the JDLA from the MOU, Samsung proposed language stating Section 6.2 "will not be deemed to require … Samsung to supply any products to Netlist." SUF 33. Netlist replied to Samsung, forwarding an e-mail from Whitley with his comments. SUF 35. As to the new Section 6.2, Whitley wrote in all bold this proposed language "**Conflicts with MOU**" and noted "Netlist removed this qualification and returned the language *to reflect what was agreed to in the MOU*." *Id.* Thus, there is no dispute the JDLA reflects the MOU, which limited supply to the NVDIMM-P joint development.

Netlist insists the JDLA, not the MOU, is the governing contract due to the JDLA's integration clause. Dkt. 171 (Netlist's Opposition to Samsung's MSJ ("Opp.")) at 12:4-8. Samsung agrees, but this is irrelevant. Samsung relies on the MOU, not because it is the operative contract, but because it shows the parties' intent to limit Section 6.2 to the joint development. An integration clause does not change that fact.

Despite these clear admissions from its CEO, 30(b)(6) representative, and lead negotiators, Netlist tries to manufacture a dispute by claiming Hong testified the MOU was not limited to joint development. Opp. 7:18-25, 8:3-7. That ignores and contradicts all of Hong's testimony above. Netlist also asserts the MOU does not limit itself to the joint development, Opp. 4:12-6:9, but that ignores and contradicts both Hong's

---

[1]    "Either party may produce NVDIMM-P controller using its own technology and has no obligation to buy from the other party. *Raw Materials: Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM products.*" *Id.*

testimony and the clear import of the language above. Moreover, Netlist contends the MOU did not contain a comprehensive list of all terms, Opp. 6:26-7:8, but that ignores and contradicts Hong's testimony and Whitley's e-mail stating the MOU was intended to cover all material deal terms. SUF 32, 35. Netlist may not contradict its lead negotiators' separate admissions and other evidence to concoct a dispute. *Bentley*, 935 F.3d at 88; *In re Fosamax Products Liability Litig.*, 707 F.3d at 193.

      **b.**  **The Title, Structure, And Express Terms Of The JDLA**

   Ignoring the Hong and Whitley admissions, Netlist contends Section 6.2 *unambiguously* requires Samsung to supply whatever NAND and DRAM products Netlist requests irrespective of whether such products are for the NVDIMM-P joint development. Opp. 4:20-6:21. That is not only wrong, but it flatly contradicts the Court's earlier ruling that Section 6.2 is ambiguous. Dkt. 120 (Aug. 5, 2021 Order) at 4.

   Clearly, Netlist's argument relies entirely on a myopic reading of Section 6.2 – specifically focused on the omission of the particular terms "joint development" and "NVDIMM-P" from Section 6.2 and the title of Section 6. Opp. 4:20-5:11. This self-serving observation ignores the remainder of the JDLA, with which Section 6.2 must be read in context. *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) ("The meaning of a writing may be distorted where undue force is given to single words or phrases"). Consistent with its title referring to "joint development," the JDLA's preamble indicates the parties are "to work together to jointly develop an interface and associated technologies for certain memory modules and promote such interface to standards-setting organizations." SUF 14. The JDLA defines the "Developed Product" to be a "NVDIMM-P Product developed by the Parties hereunder pursuant to the Statement of Work that meets the Product Specifications." SUF 15. The JDLA seeks to implement these objectives, including terms for the collaborative NVDIMM-P development work, development milestones and a Statement of Work (Section 2, Appendices A and B); development costs (Section 3); IPR ownership (Section 4); schedule for standardization and productization (Section 5);

and supply of components for the joint development work (Section 6). SUF 19.

In particular, Section 6, entitled "Supply of Components," includes mutual promises regarding the supply and pricing of components in connection with the NVDIMM-P joint development. SUF 20.[2] Thus, viewing the JDLA as a whole, Section 6.2 is limited to the supply and pricing of NAND and DRAM components for the NVDIMM-P joint development. *Westmoreland Coal Co.*, 100 N.Y.2d at 358.

### c.   Netlist's Other Admissions

Netlist's admissions following the execution of the JDLA also confirm Section 6.2 is limited to the joint development. In its first 10-K *after* the JDLA, and in all subsequent 10-Ks, Netlist stated it had "no long-term supply contracts" for NAND and DRAM. SUF 42, 43. Indeed, Netlist stated this *in the very same section it described its JDLA with and purchases from Samsung.* SUF 42. This statement directly undercuts Netlist's contention the language was just "boilerplate" and not about the JDLA. Opp. 8:22-9:3. Netlist also asserts the "no long-term supply contracts" admission was simply part of its "conservative" approach, Opp. 10:3-10, but that would apply to *projections*, not to *facts* about whether or not a contract exists. Netlist points out its public filings paraphrase the supply language of Section 6.2, Opp. 8:13-21, but notably the filings do not claim Section 6.2 extends beyond the joint development. Indeed, the filings actually cabin this Section 6.2 language by stating there are "no long-term supply contracts."

Also, it is undisputed Hong's presentation to the board, prepared by Gail Sasaki, makes no mention the JDLA is a supply agreement for Netlist's requirements outside the joint development. AMF 41. Netlist suggests the actual board discussions *might* have been different, Opp. 9:11-19, but offers no such *evidence*. There is also no dispute Netlist's press release characterized the JDLA as focused on NVDIMM-P joint

---

[2]   Section 6.1 states: "<u>Supply by Netlist</u>. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." *Id.* Section 6.2 is the parallel NVDIMM-P-related provision and was focused on supply of NAND and DRAM for the NVDIMM-P product. *Id.*

1  collaboration, not a supply agreement for Netlist's other requirements. SUF 44. Netlist

2  claims this was just a draft, but the version on its own website reveals the same. *See*

3  https://investors.netlist.com/websites/netlist/English/2120/us-press-

4  release.html?airportNewsID=7d8d45e2-f057-412e-96d2-0a46a45c83b8.

5     Finally, it is undisputed that over a year after the JDLA was executed, Netlist

6  met with Samsung to request a "New Partner Type" that would require Samsung to

7  provide "Product Allocation support for Netlist" and an "Official-Distributor

8  Partnership Agreement." SUF 45. To avoid the obvious implication that Netlist

9  understood the JDLA did not guarantee it supply outside the joint development, Netlist

10  asks the Court to ignore the plain meaning of the quoted terms, Opp. 10:6-15, and that

11  Samsung told Netlist the JDLA did not support their other requirements. SUF 45.

12          d.      **The Parties' 2015 To Mid-2017 Performance**

13     Extrinsic evidence of the parties' performance further reveals their intent to limit

14  Section 6.2. *Fed. Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 44 (1999). The parties'

15  performance in the first two years following the JDLA shows they did not intend

16  Section 6.2 to obligate Samsung to supply all of Netlist's needs. During this time,

17  Netlist and Samsung continued to operate based on advance forecasts, supply inquiries,

18  purchase orders, limited allocations, and backlogs, and Netlist understood the JDLA

19  did not guarantee it supply on request. SUF 52-56; *see also* Dkt. 168-1 (Samsung's

20  Statement of Genuine Disputes of Material Facts ("GMF")) 71. Netlist does not

21  dispute the numerous examples from 2015-mid 2017 when Samsung declined Netlist's

22  requests. SUF 7-8; GMF 71 (NL039163-64; NL024952). Nor does Netlist dispute its

23  30(b)(6) witnesses testified Samsung's performance was satisfactory from 2015-mid

24  2017. GMF 71; GMF 114 (Chuck Hong Deposition testimony at 121:24-123:5, 152:15-

25  24); Dkt. 84-18 at ¶ 4 (P.K. Hong 7/20/21 Decl.). Instead, Netlist asserts the

26  difference was that Samsung was *unable* to supply during 2015-mid 2017, but *chose* not

27  to supply afterward. There is no evidence to support this claim but, in any event, it is a

28  distinction without a difference. Either the JDLA guaranteed supply for all Netlist

requirements or it did not. Netlist cannot have it both ways. That Netlist admits Samsung's 2015-mid 2017 performance was *not* a breach despite Samsung failing to supply on request, undercuts Netlist's breach of contract claim here.

### 2.   Section 6.2 Is Too Indefinite To Be A Valid Supply Contract

Whether described as a contract to supply on request, a requirements contract, or an options contract, Section 6.2 lacks a sufficiently definite or ascertainable quantity term required for an enforceable supply contract. Dkt. 150 at 26:22-29:24; *Hudson & Broad, Inc. v. J.C. Penney Corp.*, 553 F. App'x 37, 39 (2d Cir. 2014) (it is a "well-settled principle" that a contract must be "reasonably certain in its material terms"); *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 2010 WL 4892646, at *4 (S.D.N.Y. Dec. 2, 2010) (quantity term is material). In light of the undisputed facts, Netlist's response is weak. First, it pretends the Court rejected Samsung's arguments, Opp. 18:2-7, but that is false. Dkt. 120 at 5 ("the Court declines to decide . . . whether any of the theories of contract Netlist proposes is valid."). Second, Netlist argues "on request" is sufficiently definite and the UCC does not apply, Opp. 18:27-19:17, but relevant case law contradicts Netlist. Dkt. 150 at 27:8-28:4; *Hudson & Broad, Inc.*, 553 F. App'x at 39; *Ho Myung Moolsan Co.*, 2010 WL 4892646, at *4. Third, Netlist asserts the parties understood there was exclusivity, Opp. 19:17-20:1, but Section 6.4 of the JDLA states the opposite. Dkt. 150 at 28:20-25. Finally, Netlist contends Samsung misread *Heyman Cohen*, Opp. 20:5-13, but in fact Netlist is guilty of the misreading. Dkt. 150 at 29:6-10.

### 3.   Netlist Failed To Perform Its Obligations Under The JDLA

Samsung is also entitled to summary judgment because Netlist did not perform its obligations under the JDLA, and thus cannot prevail on *any of its claims. Cty. of Jefferson v. Onondaga Dev., LLC*, 59 N.Y.S.3d 203, 206 (2017). Samsung engineer Indong Kim testified Netlist abandoned the NVDIMM-P *standardization* project that was a core component of the joint development work under the JDLA at some point before 2017. SUF 60. Section 16.7 of the JDLA requires a written amendment signed by the parties for any such change, but there is no evidence that an amendment was executed. *Id.*

And, as Hong himself testified, Netlist went its "separate ways" from Samsung in 2017 and, instead of continuing work under the NVDIMM-P protocol, used the foundational work for a different product without Samsung. GMF 91.

Notably, Netlist concedes its non-performance, but claims Samsung waived this argument by not raising it until August 16. Opp. 2:7-14. That is false. Samsung disclosed Netlist's non-performance during Kim's deposition above, which occurred *before* the other Samsung employee depositions, including Samsung's 30(b)(6) witnesses. GMF 91. Netlist thus had ample opportunity to discover the facts about its non-performance from all Samsung witnesses. Moreover, Netlist also knew about its non-performance from its CEO Hong, who testified about it. *Id.* Plus, Samsung's August 16 amendment to its written discovery response was well within the rules and the discovery deadline in this case. Netlist has suffered no prejudice whatsoever.

Netlist also argues Samsung did not identify the provisions of the JDLA requiring *standardization*, but that too is false. SUF 19.

Finally, Netlist failed to perform its obligations under the JDLA by cancelling eMMC purchase orders. SUF 61-64. Hong testified it would be a breach of the JDLA if a purchase order was cancelled. SUF 64. Rather than disputing it cancelled these orders, Netlist claims Hong testified only Samsung cancellations qualify as a breach. Opp. 15:20-16:5. But again, Netlist may not fabricate a dispute based on Hong's conflicting testimony. *Bentley*, 935 F.3d at 88; *In re Fosamax Products Liability Litig.*, 707 F.3d at 193. Because Netlist failed to perform under its own interpretation of the JDLA, Samsung is entitled to summary judgment on *all three of Netlist's claims*.

## B.   Samsung Is Entitled To Summary Judgment On The Second Claim

### 1.   Samsung Reasonably Deducted Withholding Taxes

Netlist does not dispute that, after consulting with its own tax professionals, it voluntarily submitted a tax form to Samsung a week before executing the JDLA in which it indicated the $8 million was a *royalty* payment and authorized the very 16.5% tax withholding that Netlist now complains about. SUF 69-72. Nor does Netlist dispute

1  that, before the Korean NTS eventually sided with Netlist, a lower Korean tax tribunal

2  ruled against Netlist and found the $8 million was taxable. GMF 52-53. Instead, Netlist

3  argues it did not understand the tax form, and the Korean NTS ruled that Samsung was

4  not required to withhold. Opp. 20:15-22:4. The first point is irrelevant (even if true)

5  and the second is false. The Korean NTS did not opine on the propriety of the

6  withholding; it only ruled Netlist was later entitled to a refund.[3] GMF 52.

7              **2.      Samsung Reasonably Cooperated With Netlist**

8         Critically, Netlist does not dispute (i) Samsung provided Netlist with drafts of

9  what it eventually submitted to the Korean NTS for Netlist's review and comment; (ii)

10  Netlist's accountants admitted Samsung's written submission to the Korean NTS was

11  essential for Netlist to obtain a refund; and (iii) Netlist's accountants thanked Samsung

12  for its cooperation. GMF 48. What Netlist complains about is Samsung's refusal to

13  adopt Netlist's after-the-fact view that the $8 million was not a royalty. Samsung's

14  contrary belief was held in good faith,[4] was consistent with Samsung's articulated

15  position throughout the negotiations, and was consistent with Netlist's initial view in its

16  signed tax form acknowledging the $8 million was a royalty. SUF 69-77. Thus, based on

17  the undisputed facts, Netlist's second breach of contract claim also fails.

18      **C.      Samsung Is Entitled To Summary Judgment On The Third Claim**

19         Because Netlist's first two claims collapse under the weight of the undisputed

20

21  _____

    [3]   Korea's Act No. 7008 of December 30, 2003 created Article 45-2, § 4 of the

22  Framework Act for National Taxes, which for the first time empowered taxpayers to

23  seek refunds of withheld taxes from the tax authority. *See* Request for Judicial Notice.
    As expert testimony will show, no case in Korea since that time has held the taxpayer

24  has a right of action against the withholding entity. Federal and New York law are

25  similar. *See* 26 U.S.C. § 7421; NY Tax Law § 675.

26  [4]   As expert testimony will show, the Korean Supreme Court has held that even a false
    statement to an investigating official, absent an added effort to impede the official's

27  ability to determine the falsity of the statement, has *no causal link* to any subsequent

28  incorrect determination by a government authority.

1  evidence, its third claim for declaratory relief premised on these two claims also fails.

2  Moreover, as Netlist received a full refund of the tax withholding plus interest, SUF 78,

3  it suffered no harm based on Samsung's alleged tax withholding breach. Thus, this

4  alleged breach could not be a material one as required for declaratory relief. *Septembertide*

5  *Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989).

6       Further, by waiting years to bring its claims, SUF 83-86, Netlist waived *all of its*

7  *claims* and any right to terminate the JDLA. *Dun & Bradstreet Corp. v. Harpercollins*

8  *Publishers, Inc.*, 872 F. Supp. 103, 110 (S.D.N.Y. 1995). Netlist concedes its delay, but

9  contends a waiver may not be inferred from such delay. Opp. 25:5-25. However,

10  *Optima Media Group Ltd. v. Bloomberg L.P.,* the case on which Netlist relies, is

11  distinguishable because there, unlike here, the party in breach assured the other it

12  would perform, concealed its inability to perform, and the suit was filed as soon as the

13  inability to perform "became clear." 2021 WL 1941878 at *14. Where, as here, the

14  breach is known, the choice to continue the contract may be a waiver despite a "no

15  waiver" clause. *Williams v. Buffalo Pub. Sch.*, 758 F. App'x 59, 63-64 (2d Cir. 2018).

16      **D.**     **The Consequential Damages Claim Fails**

17       Netlist does not dispute it seeks consequential damages which are barred by

18  Section 12.5 of the JDLA. SUF 80-81. Rather, Netlist claims Samsung acted in bad

19  faith because Samsung imposed a $500,000 supply limit for certain months, a Samsung

20  employee joked about the impact such limitation might have on Netlist, and Netlist

21  gave the Korean NTS its good faith understanding of the royalty payment consistent

22  with the tax form Netlist itself had signed. Opp. 22:18-24:7. But to overcome Section

23  12.5, Netlist needs much more – *i.e.*, "truly culpable, harmful conduct, not merely

24  intentional nonperformance of the Agreement motivated by financial self-interest."

25  *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 438-39 (1994). At best,

26  Netlist's evidence would show intentional nonperformance, nothing more. Thus,

27  Section 12.5 is valid and bars Netlist from seeking consequential damages here.

28       For all the above reasons, Samsung's motion should be granted in full.

14

DATED:  September 6, 2021

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: _____

Ekwan E. Rhow
Attorneys for Defendant Samsung
Electronics Co., Ltd.