Ekwan E. Rhow - State Bar No. 174604
 erhow@birdmarella.com
Marc E. Masters - State Bar No. 208375
 mmasters@birdmarella.com
David I. Hurwitz - State Bar No. 174632
 dhurwitz@birdmarella.com
Kate S. Shin - State Bar No. 279867
 kshin@birdmarella.com
Christopher J. Lee - State Bar No. 322140
 clee@birdmarella.com
Jong-min Choi - State Bar No. 329474
 jmchoi@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Samsung
Electronics Co., Ltd.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>                  Plaintiff,<br><br>        vs.<br><br>SAMSUNG ELECTRONICS CO.,<br>LTD., a Korean corporation,,<br><br>                  Defendant. | CASE NO. 8:20-cv-00993-MCS-ADS<br><br>**DEFENDANT SAMSUNG ELECTRONICS CO., LTD'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:      September 20, 2021<br>Time:      9:00 a.m.<br>Crtrm.:   7C<br><br>Assigned to Hon. Mark C. Scarsi<br>Courtroom 7C |

# NOTICE OF MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on September 20, 2021, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 7C of the United States District Court for the Central District of California, located at 350 W. 1st Street, Los Angeles, CA 90012, Defendant Samsung Electronics Co. Ltd. ("Samsung") will and hereby does move this Court for summary judgment, or in the alternative partial summary judgment, in its favor and against Netlist Inc. ("Netlist") pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law, the accompanying Declaration of Joyce J. Choi and exhibits, the record of this proceeding to date, and any and all evidence that may be presented at the hearing of this matter.

This motion is made following a conference of counsel pursuant to Local Rule 7-3, which took place on August 7, 2021.

DATED: October 21, 2021

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: _Eh Rhow_

_____

Ekwan E. Rhow
Attorneys for Defendant Samsung
Electronics Co., Ltd.

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................. 9

II.  ARGUMENT ....................................................................................... 11

   A.   The Best Evidence For Contract Interpretation Are the Writings That the Parties Signed ............................................................. 11

   B.   Samsung Is Entitled to Judgment on Plaintiff's First Cause of Action for Breach of Contract (Supply) ................................... 12

      1.   Section 6.2 Is Limited To the Supply And Pricing Of Components For The Joint Development Project ...................... 12

         a.   The Parties' Long Standing Business Relationship Involved $200 Million of Purchases Over 15 Years .......... 12

         b.   The JDLA Involved Joint Development of a "Game Changing" Product Based On the NVDIMM-P Standard ............................................................................... 13

         c.   Section 6.2 Is Limited To Joint Development Work Under The JDLA ................................................................. 15

         d.   The Negotiating History Shows That Section 6.2 Is Limited To Joint Development ............................................. 16

         e.   Netlist Admits The JDLA Is Not A Contract to Supply DRAM and NAND Beyond Joint Development ............................................................................ 19

         f.   The Parties' Course of Conduct Shows Samsung Had No Obligation To Supply All Chips At Request ............... 21

         g.   Netlist Did Not Fully Perform Its Obligations ................. 24

         h.   Netlist Should Be Estopped From Arguing Its Patent Licenses Provide Consideration For A Broader Supply Obligation ............................................................. 25

      2.   Section 6.2 Is Too Indefinite To Be A Valid Supply Contract. ............................................................................... 26

         a.   The Phrase "At Netlist's Request" Is Not A Definite Quantity Term ................................................................... 27

         b.   The JDLA Is Not A Requirements Contract ..................... 28

         c.   The JDLA Is Not A Valid Options Contract..................... 28

   C.   Samsung Reasonably Deducted Withholding Taxes From Payment

To Netlist And Cooperated With Netlist's Efforts To Obtain A
Refund ............................................................................................ 29

D.    Netlist Is Barred From Recovering Consequential Damages ................. 31

E.    Netlist Has No Right To Terminate the JDLA ...................................... 32

III.    CONCLUSION ............................................................................... 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Bird v. Computer Technology, Inc.*,
    364 F. Supp. 1336 (S.D.N.Y.1973) ................................................... 16, 18, 20, 21

*Churchill v. Winter Chevrolet*,
    No. C-04-0489 JCS, 2005 WL 281170 (N.D. Cal. Feb. 4, 2005) ..................... 25

*Corning Inc. v. VWR Int'l, Inc.*,
    No. 05 CV 6532 CJS, 2007 WL 841780 (W.D.N.Y. Mar. 16, 2007) ............... 28

*CSL Behring, LLC v. Bayer Healthcare, LLC*,
    2019 WL 4451368 (D. Del. Sep. 17, 2019) ....................................................... 28

*Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*,
    872 F. Supp. 103 (S.D.N.Y. 1995) ................................................................... 32

*Embedded Moments, Inc. v. Int'l Silver Co.*,
    648 F. Supp. 187 (E.D.N.Y. 1986) ................................................................... 28

*GT Beverage Co. LLC v. Coca Cola Co.*,
    No. SACV1000209JVSRNBX, 2010 WL 11595832 (C.D. Cal. Aug. 2, 2010) ............................................................................................................. 25

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) ............................................................................ 25

*Indep. Energy Corp. v. Trigen Energy Corp.*,
    944 F. Supp. 1184 (S.D.N.Y. 1996) ................................................................. 23

*International Gateway Exchange, LLC v. Western Union Financial Services, Inc.*,
    333 F. Supp. 2d 131 (S.D.N.Y. 2004) ............................................................. 31

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009) ............................................................................. 12

*Johnson v. Oregon*,
    141 F.3d 1361 (9th Cir. 1998) .......................................................................... 25

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ...................................................................................25, 26

*Miller v. McLean Cnty. Unit Dist. No. 5 (In re Mod. Dairy of*
    *Champaign, Inc.)*,
    171 F.3d 1106 (7th Cir. 1999) ...........................................................................29

*Rapture Shipping, Ltd. v. Allround Fuel Trading B.V.*,
    350 F. Supp. 2d 369 (S.D.N.Y. 2004) ...............................................................25

*Rissetto v. Plumbers & Steamfitters Local 343*,
    94 F.3d 597 (9th Cir. 1996) ...............................................................................25

*Septembertide Publ'g, B.V. v. Stein & Day, Inc.*,
    884 F.2d 675 (2d Cir. 1989) ...............................................................................32

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007) .................................................................................31

*United States, for the Use of Integrated Energy, LLC v. Siemens Gov't*
    *Techs., Inc.*,
    No. SACV1501534JVSDFMX, 2017 WL 10562969 (C.D. Cal. May
    19, 2017) .............................................................................................................31

**State Cases**

*Ashwood Capital, Inv. v. OTG Mgmt., Inc.*,
    99 A.D.3d 1 (2012) .............................................................................................28

*Contrast Edison Elec. v. Thacher*,
    229 N.Y. 172 (1920) ...........................................................................................28

*Cty. of Jefferson v. Onondaga Dev., LLC*,
    59 N.Y.S.3d 203 (2017) ......................................................................................24

*Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*,
    93 N.Y.2d 584 (1999) .........................................................................................29

*Fed. Ins. Co. v. Americas Ins. Co.*,
    258 A.D.2d 39 (1999) .........................................................................................12

*Greenfield v. Philles Recs., Inc.*,
    98 N.Y.2d 562 (2002) .........................................................................................11

*Heyman Cohen & Sons v. M. Lurie Woolen Co.*,
    232 N.Y. 112 (1921)......................................................................................29

*Jarecki v. Shung Moo Louie*,
    95 N.Y.2d 665 (2001)....................................................................................29

*Lee v. Wright*,
    108 A.D.2d 678 (1985)...................................................................................33

*Mar-Jon Mach. & Tool Co. v. Eastman Kodak Co.*,
    534 N.Y.S.2d 47 (1988) ................................................................................27

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
    84 N.Y.2d 430 (1994)....................................................................................32

*Rudman v. Cowles Commc'ns, Inc.*,
    30 N.Y.2d 1 (1972)........................................................................................12

*Scott v. Palermo*,
    233 A.D.2d 869 (1998)...................................................................................32

*Slamow v. Del Col*,
    79 N.Y.2d 1016 (1992)...................................................................................11

*Sommer v. Federal Signal Corp.*,
    79 N.Y.2d 540 (1992)....................................................................................32

*Studley v. Nat'l Fuel Gas Supply Corp.*,
    107 A.D.2d 122 (1985).............................................................................22, 23

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470 (2004)......................................................................................27

*Webster's Red Seal Publications, Inc. v. Gilberton World-Wide
    Publications, Inc.*,
    67 A.D.2d 339 (1979)....................................................................................21

*Westmoreland Coal Co. v. Entech, Inc.*,
    100 N.Y.2d 352 (2003)...................................................................................15

**Federal Statutes**

Fed. R. Civ. P. 12............................................................................................31

Fed. R. Civ. P. 56............................................................................................30

7

**State Statutes**

N.Y.U.C.C. § 2-311 ................................................................................................. 29

# I.     INTRODUCTION

The Complaint in this action marks the first time that Netlist disclosed its now-alleged interpretation of Section 6.2 of the Joint Development and License Agreement ("JDLA") – namely that Samsung was required to supply *all* chips that it requested for *all* of its DRAM and NAND needs, including beyond the joint development work contemplated therein. For the five years prior while Samsung was performing, Netlist never once described the JDLA in the manner it now alleges despite the fact that, as Netlist CEO Chuck Hong recently declared, this supposedly broad supply arrangement was "crucial" and "critical" to its business. SUF 39.

In every single 10-K certified to the SEC and Netlist's public shareholders since the JDLA was signed, Netlist never once described it as a supply contract, instead stating unequivocally and repeatedly that Netlist does not have "any long term supply contracts." In press releases touting the JDLA, Netlist makes no mention of the supposedly "crucial" supply provisions but instead touts the "long term partnership" focused on the development of a potential new standard and product–NVDIMM-P. In Netlist board presentations and resolutions, Netlist failed to mention to its own board the JDLA had solved its "critical" supply shortage issues. In other words, prior to this dispute and when obligated to be accurate to the SEC, its shareholders, and its board, Netlist never once described the JDLA as it now alleges here. That is because Netlist's interpretation of Section 6.2 is contrived.

The manufactured nature of Netlist's interpretation is further established by the contract negotiation documents and Chuck Hong's deposition admissions regarding the same. The only other document the parties ever jointly signed was the Memorandum of Understanding ("MOU") related to the JDLA. Chuck Hong admitted this MOU was designed to capture all important terms that would be included in the JDLA. If supply was "critical" as Chuck Hong now says, it would have been included in the MOU. But as he admitted, the MOU contained no such provision, instead providing for supply by Samsung if and to the extent the NVDIMM-P product that

1  was the subject of the JDLA was ever commercialized. SUF 30. But it never was, which

2  meant Samsung never became obligated to supply any chips.

3        This evidence of intent is dispositive and undisputed. And Netlist cannot evade

4  the MOU because Netlist's in-house attorney during negotiations on the JDLA

5  confirmed Section 6.2 of the JDLA needed to conform with the MOU – the same

6  MOU that Chuck Hong confirmed did not contain any obligation to supply *all chips*

7  *requested for all products.* Summary judgment can be granted on this evidence alone.

8        But, even absent such evidence, Samsung should still prevail as the parties'

9  subsequent course of conduct rebuts any notion of a guaranteed supply. Chuck Hong

10 and his brother, Paik Ki Hong, who is Netlist's Vice President of Worldwide

11 Operations, both confirmed in their recent declarations to this Court that Samsung

12 fully performed under the JDLA in 2015, 2016 and into 2017. Yet they also confirmed

13 in deposition that during that exact same time period, Samsung regularly did not fulfill

14 all of Netlist's chip orders. As explained by both, this is simply a "reality" of the

15 memory industry, which functions like any other commodity industry with buyers vying

16 for limited supply and where allocation is the norm. This means that, contrary to

17 Netlist's interpretation of the JDLA, it was never intended that Samsung could or

18 would supply all chips that Netlist requested.

19       The better explanation for the parties' course of conduct is that Netlist's

20 purchases in 2015 and thereafter were not pursuant to the JDLA but simply followed

21 the practice of buying chips that Netlist had been following between 2000 and 2015 in

22 which it had purchased more than $10 million per year on average from Samsung.

23 Under that "industry norm" protocol, Netlist would provide forecasts, inquire about

24 supply, obtain an allocation of available chips and then submit purchase orders.

25 Notably, after the JDLA was executed and even after it was purportedly terminated,

26 this exact same protocol continued and Netlist accepted the fact it was not receiving all

27 the chips it wanted – establishing by conduct that Netlist did not believe the JDLA

28 required Samsung to supply all of the chips it requested.

Netlist's alleged breach relating to tax withholdings suffers from a similar lack of disputed evidence undermining Netlist's allegation. It is undisputed that Netlist's CFO Gail Sasaki signed a tax form prior to execution of the JDLA, and after independently consulting with Netlist's tax professionals, that required withholdings. As Chuck Hong confirmed, Sasaki had authority to do so and would have done all necessary investigation prior to doing so. After this tax was withheld, Netlist had second thoughts and demanded the withholdings be released. Samsung cooperated to the extent it could but was not willing to simply adopt Netlist's tax position. Samsung's position was not unreasonable given Netlist's CFO had herself adopted a similar position. In any event, Netlist ultimately obtained a full refund with interest, negating its claim for damages.

Putting aside whether Netlist's interpretation of the JDLA is reasonable, Netlist's delay in bringing both its supply and tax-related breaches begs the question: why did Netlist file its complaint after years of supposedly repeated non-performance? The answer is simple: by terminating the JDLA and the cross-licenses contained therein, Netlist can set up a patent infringement claim which as its 10-K discloses, is part of its long-standing business plan to monetize its intellectual property through litigation. Such strategic maneuvering, however, cannot replace the clear terms of the JDLA and sidestep the undisputed evidence that has been uncovered. Summary judgment should be granted in Samsung's favor.

## II.   ARGUMENT

### A.   The Best Evidence For Contract Interpretation Are the Writings That the Parties Signed

Under New York law, which governs pursuant to the choice of law provision in the JDLA, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002). Where the contractual language is ambiguous, "extrinsic

evidence as to the parties' intent may properly be considered." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). Such extrinsic evidence may include the parties' course of performance under a contract, which is compelling extrinsic evidence of the parties' intent. *Fed. Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 44 (1999) ("the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties."). Evidence of contracting parties' negotiations may also be admissible to prove the meaning of an ambiguous contract term. *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 11 (1972) ("the court may and should look to the prior negotiations to determine what was intended.").

### B. Samsung Is Entitled to Judgment on Plaintiff's First Cause of Action for Breach of Contract (Supply)

Netlist's first cause of action alleges that Samsung breached a promise to supply it with all NAND and DRAM at Netlist's request. Samsung is entitled to summary judgment on this claim because (1) the supply obligation in Section 6.2 is limited to the NVDIMM-P joint development project, (2) Section 6.2 does not contain a definite or ascertainable quantity term necessary to create an enforceable supply obligation, and (3) Netlist cannot show that it fully performed its obligations under the contract.

#### 1. Section 6.2 Is Limited To the Supply And Pricing Of Components For The Joint Development Project

The express terms of the JDLA and the extrinsic evidence show that Samsung's promise in Section 6.2 was limited to the supply and pricing of NAND and DRAM products for the NVDIMM-P joint development project. Section 6.2 does not create a long-term supply contract for existing products or requirements outside of the joint development context. The JDLA, including Section 6.2, must initially be construed in the context of the long-standing business relationship between the parties.

##### a. The Parties' Long Standing Business Relationship Involved $200 Million of Purchases Over 15 Years

Netlist has been a customer of Samsung since at least 2001, purchasing over $200 million of NAND and DRAM products. SUF 1. Both before and after the JDLA,

Samsung has been a significant and continuous supplier of NAND and DRAM to Netlist, as reflected in Netlist's annual reports. SUF 2. In addition to purchasing memory products from Samsung, Netlist also purchased NAND and DRAM products from SK Hynix and Micron, as well as from sellers who purchased the products from the manufacturers for resale. SUF 3.

The DRAM and NAND industry functions like other commodity industries, such as crude oil. It has three primary suppliers – Samsung, SK Hynix and Micron. Dkt. 89-21 at ¶ 6. The amount of NAND and DRAM product that the overall market can supply is limited and demand for products exceeds available supply. SUF 4. Accordingly, Netlist, like other customers, would provide Samsung with advance forecasts of the amount of product it wishes to purchase, and Samsung would then let Netlist know how much product it could allocate and make available to Netlist to purchase. SUF 5. Following these discussions regarding allocations and availability, Netlist would issue purchase orders for specific amounts of product that Samsung had approved. SUF 6. Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others, just as it did with other customers. SUF 7. The practice of forecasts, purchase orders, allocations and backlogs are "industry norms" according to Chuck Hong and continued after the JDLA was executed. SUF 4, 8.

> **b.** **The JDLA Involved Joint Development of a "Game Changing" Product Based On the NVDIMM-P Standard**

In early 2015, Netlist approached Samsung to discuss a strategic partnership involving, among other things, joint development of a product based on a new standard called NVDIMM-P and licensing of Netlist's patents. SUF 9. The NVDIMM-P-related product was a "game changer" according to Chuck Hong and, based on presentation materials, was designed to take market share in a $15 billion industry. SUF 10. At that time, Netlist also raised a licensing aspect which was a subtle threat by Netlist of a potential claim for infringement of its LRDIMM patents and designed to convince Samsung to agree to the joint development route. SUF 11.

On November 12, 2015, after months of negotiations, Samsung and Netlist entered into the JDLA. SUF 13. The structure and terms of the JDLA reflect the express purpose of the contract, which as the recitals in the preamble indicate, is for the parties "to work together to jointly develop an interface and associated technologies for certain memory modules and promote such interface to standards-setting organizations," and grant each other licenses for intellectual property. SUF 14, 16. The JDLA defines the "Developed Product" to be a "NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications." SUF 15. The JDLA also includes a grant of cross-licenses and a release of threatened claims. SUF 16.

The JDLA states Netlist was to receive $8 million for non-recurring engineering on the NVDIMM-P development work, and concurrently with the JDLA, Samsung provided an additional $15 million convertible loan at 2% interest that allowed Netlist to pay off existing debt with less favorable financial terms.[1] SUF 17. In addition to its receipt of cash and financing from Samsung, Netlist would generate significant profits and obtain market share if the parties were able to develop this "game changing" standard for NVDIMM-P and produce a commercially feasible product under this new standard. SUF 18.

The JDLA seeks to implement these objectives, including terms for the collaborative NVDIMM-P development work, development milestones and a Statement of Work (Section 2, Appendices A and B); development costs (Section 3); IPR ownership (Section 4); schedule for standardization and productization (Section 5); supply of components for the joint development work (Section 6); a mutual release of claims (Section 7); and licensing of intellectual property (Section 8). SUF 19.

---

[1]   Netlist was having cash flow issues which explains its overall approach. SUF 12.

### c. Section 6.2 Is Limited To Joint Development Work Under The JDLA

The Court should construe the meaning of Section 6.2 in light of the JDLA as a whole, rather than attempt to give meaning to those words outside of the context of the agreement. *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) ("The meaning of a writing may be distorted where undue force is given to single words or phrases"). Taken as a whole, the JDLA is an agreement for NVDIMM-P joint development and cross-licensing of intellectual property, as its terms, structure and title expressly show.

Section 6 of the JDLA, entitled "Supply of Components," includes mutual promises regarding the supply and pricing of components in connection with the NVDIMM-P joint development project. SUF 20. Section 6.1 states: "Supply by Netlist. Netlist will provide Samsung any *NVDIMM-P* controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." *Id.* As the NVDIMM-P product did not exist, Netlist was not required to supply anything yet.

Section 6.2 is the parallel provision and, if interpreted consistently with the remainder of Section 6 and the JDLA as a whole, was focused on providing supply for the NVDIMM-P product that was being developed. It states: "Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (i.e., among customers purchasing similar volumes of similar products)." SUF 20. Based on the testimony of Chuck Hong, Netlist's 30(b)(6) witness on the JDLA's negotiations, this supply obligation would arise only if and to the extent the NVDIMM-P product was commercialized. SUF 21. This also makes sense in the context of the overall joint development whereby Netlist had expertise with the controller of the NVDIMM-P product while Samsung had the NAND and DRAM supply necessary for the NVDIMM-P product.

Viewing the JDLA as a whole, the express terms of Section 6.2 were limited to the supply and pricing of NAND and DRAM components that Netlist requested for

the NVDIMM-P joint development. Section 6.2 has nothing to do with Netlist's requests for product outside of the joint development, which was covered by the parties' prior course of conduct which continued after the JDLA was executed. This reading is consistent with the express terms of the contract, the negotiating history, Netlist's admissions, and the parties' course of dealing. Netlist's contrary interpretation is inconsistent with the uncontroverted material facts.

### d. The Negotiating History Shows That Section 6.2 Is Limited To Joint Development

Extrinsic evidence from the negotiations of this supply and pricing provision through drafts of the term sheet, Memorandum of Understanding, and the JDLA evince the parties' intent that Samsung was agreeing to supply the necessary raw materials only for the NVDIMM-P joint development project at a competitive price. *Bird v. Computer Technology, Inc.*, 364 F. Supp. 1336, 1343 (S.D.N.Y.1973) ("the Court may look to prior negotiations to determine what was intended."). There is no evidence Netlist asked Samsung during these negotiations to commit to a broader supply contract covering its needs for existing products and requirements, and no evidence Samsung ever agreed to any such term.

Chuck Hong testified Netlist's first proposal to Samsung in April 2015 focused on the cash consideration and did not mention a long term supply agreement. SUF 22. When Netlist sent Samsung the first draft of the term sheet on April 21, 2015, Netlist proposed, as part of the "Joint development and marketing" for the "Technology Collaboration," that Samsung supply "Flash" (which means NAND) and "DRAM" for the NVDIMM-P-related product.[2] SUF 23.

When the parties moved into negotiations of a term sheet, Netlist drafted a section entitled "Technology Collaboration" and proposed a subsection entitled "Raw

---

[2]   The HVDIMM product (sometimes referred to as "HV" or "HyperDIMM" in the term sheets and elsewhere) would incorporate the proposed new NVDIMM-P standard the parties were supposed to work on under the JDLA. SUF 23.

Materials: Samsung will supply NAND, DRAM on mutually agreed terms." SUF 24, 25. Chuck Hong testified unequivocally that *the supply obligation Netlist is alleging here was not contained therein.* Instead, he conceded the supply section applied only to NVDIMM-P if and when it was ever commercialized: "Q. And so those were raw materials that were provided in connection with commercialization of the dash P product; correct? A. That's correct." SUF 26. In subsequent drafts of the term sheet, Netlist continued to express this clear understanding that Samsung's supply obligations would only arise if and to the extent the NVDIMM-P standard and products were ever commercialized—which never occurred. SUF 27-29.

Chuck Hong testified that his intent during the contract negotiations was to get Samsung's commitment to supply NAND and DRAM products for the NVDIMM-P product so Netlist would have sufficient supply if and when it was able to commercialize the technology. SUF 30. According to Chuck Hong, the NVDIMM-P was "industry changing" technology and its attempt to standardize a NVDIMM-P product was a significant business opportunity and Netlist had invested more than $10M in engineering costs. SUF 31. That is why Netlist put that "raw material" language in the term sheet under Technology Collaboration and Productization for the NVDIMM-P initiative. SUF 24-29. After exchanging additional drafts, the parties signed a final MOU that was intended to reflect all important deal terms. SUF 32. Section 6 of the MOU states:

> 6. Most Favored Nation (MFN): Netlist will provide Samsung any NVDIMM-P* controller at a price lower than the price Netlist provides to any other buyer. Either party may produce NVDIMM-P controller using its own technology and has no obligation to buy from the other party. *Raw Materials: Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM products.* (emphasis added.) SUF 32.

As to the MOU, Chuck Hong again admitted this language limited Samsung's

supply obligation to the NVDIMM-P development and this obligation would arise only if and to the extent the NVDIMM-P product "ever became commercialized." SUF 32. Thus, according to Chuck Hong's repeated testimony and the undisputed terms of the MOU, the parties expressly agreed the MOU did not contain the supply obligation that Netlist is now alleging.

Netlist cannot now evade the MOU as, during the negotiations of the JDLA, Netlist's in house attorney made clear the MOU was the sole basis for what became section 6 of the JDLA. On October 8, 2015, when the parties began drafting the JDLA from the MOU, Samsung proposed the following language to Netlist:

> 6.2 Supply by Samsung. Samsung will supply NAND and DRAM to Netlist on Netlist's request at a competitive price similar to the customers purchasing similar volumes of similar products. For the avoidance of doubt, any of the provisions under this Agreement will not be deemed to require Netlist to purchase any products from Samsung or to require Samsung to supply any products to Netlist. SUF 33.

On October 14, 2015, Netlist replied to Samsung, forwarding an email from Noel Whitley (Netlist's in-house counsel and VP of IP & Licensing) with his comments on the JDLA. SUF 34, 35. As to the new Section 6.2 of its proposed JDLA, Whitley wrote in all bold that this language "**Conflicts with MOU**" and that "Samsung states that nothing in this agreement will 'require Samsung to supply any products to Netlist.' Netlist removed this qualification and returned the language to reflect what was agreed to in the MOU." SUF 35. Samsung agreed to this change. *Id.*

The MOU's intent is clear based on Chuck Hong's testimony and Netlist's statements at the time. Under that MOU, the supply of NAND and DRAM as raw materials was limited to the NVDIMM-P joint project. SUF 32. That intent was carried forward into the terms of Section 6.2, which refers to the supply of components for the NVDIMM-P-related product. Indeed, when Samsung asked to add language stating it was not required to supply NAND and DRAM at all, Netlist rejected this addition and

demanded they revert to the MOU – namely, supply of raw materials for joint development of the NVDIMM-P standard and product. SUF 36.

Netlist CEO Chuck Hong admitted this repeatedly during his deposition. He testified Netlist wanted Samsung's assurance that it would supply NAND and DRAM to support "game-changing" NVDIMM-P sales if the joint development proved successful, and demand for the product took off. SUF 26, 28, 30, 31, 32, 37. Thus, the JDLA was never about ensuring Netlist a supply of product for its other requirements beyond the joint development; the mutual supply provisions were in connection with and limited to the joint development.

Netlist's CFO Gail Sasaki made this intent clear when she characterized the MOU during the discussions regarding the drafting of the JDLA, telling Samsung: "Both sides understood from the outset that this was a strategic deal, not a financial one. *The value that would be transferred and created resided in the patents and the technology.*" (emphasis added.) SUF 38. If a supply agreement was the key consideration for Netlist in the deal (as Netlist now claims), Sasaki surely would have mentioned it. That she did not is further compelling evidence that Netlist understood the deal did not include an agreement to supply anything beyond what was necessary for the joint development project and only to the extent the NVDIMM-P was commercialized.[3]

e.    **Netlist Admits The JDLA Is Not A Contract to Supply DRAM and NAND Beyond Joint Development**

While Netlist asserts in this litigation the JDLA is a supply contract, Netlist has repeatedly admitted that the JDLA is not, in fact, a supply contract that extends to Netlist's other requirements and requests.

While the exact language has changed over the years, Netlist has repeatedly and consistently disclosed the risks associated with not having a long-term supply contract

---

[3]   It is not disputed that Netlist got the chips it needed for its initial development work and that the NVDIMM-P product was never commercialized. SUF 46, 47. Thus, Samsung's obligation to supply DRAM and NAND was never triggered.

for DRAM and NAND in its annual reports before 2015. SUF 43. But in its first 10-K after the JDLA was executed, Netlist continued to state that Netlist had "no long-term supply contracts" for these products. SUF 42.[4] This is no mere boilerplate disclosure of risk. Netlist said it had no long term supply contracts for DRAM and NAND in the very same section that it described its contract with and purchases from Samsung. *Id.* By contrast, in 2021, when Netlist entered into an actual supply contract with SK Hynix, it disclosed that the supply contract "entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term . . ." SUF 40.

Netlist management's presentation of the JDLA to its Board of Directors in November 2015 confirms this understanding. Chuck Hong's presentation to the Board, prepared by Netlist CEO Gail Sasaki, describes the technology collaboration and the cross-licensing of patents. SUF 41. No mention is made of the JDLA being a supply agreement for all of its existing DRAM and NAND requirements, which Chuck Hong now declares to be "crucial" and "critical." SUF 39, 41. This clearly would have been material to the Board had there been such a contract.

While Netlist disclaimed in its 10-K disclosures that the JDLA was a long-term supply agreement, Netlist proclaimed in its press release what the JDLA was in fact a "strategic alliance" and "long term partnership" focused on development of a "new class of NVDIMM-P." SUF 44. No mention is made that Netlist has been given a supply agreement for all of its existing products and requirements. *Id.*

Netlist's public filings, press releases, and Board materials are consistent with its statements to Samsung in the period before any dispute arose. Netlist's understanding

---

[4]   Netlist's 2015 10-K states: "Our ability to fulfill customer orders or produce qualification samples is dependent on a sufficient supply of field programmable gate arrays ("FPGAs"), DRAM ICs and NAND flash, which are essential components of our memory subsystems. There are a relatively small number of suppliers of FPGAs, DRAM ICs and NAND flash, and we purchase from only a subset of these suppliers. *We have no long-term FPGA, DRAM or NAND flash supply contracts.*" (emphasis added ) SUF 42. All subsequent Netlist's 10-Ks attest to the same. SUF 43.

that the JDLA was not a supply agreement for all of its existing needs and products is evident by Netlist's continued efforts to obtain a supply agreement in the years following the JDLA, long *before* it sought to terminate the contract. In February 2017, Netlist met with Samsung to request a "New Partner Type" that would actually require Samsung to provide "Product Allocation support for Netlist" and an "Official-Distributor Partnership Agreement." SUF 45. Netlist understood the JDLA did not guarantee it the product allocation or supply it wanted; otherwise it would not have proposed a new business relationship 18 months later, before there was any dispute under the JDLA. Indeed, when Netlist made this ask, Samsung told Netlist the JDLA was not an avenue to support Netlist's standard products. *Id.*

In sum, Netlist's repeated statements in its SEC filings, characterization of the JDLA to its own Board, and subsequent asks of Samsung show Netlist did not believe the JDLA was a supply contract in the manner it now alleges. This compelling evidence is uncontroverted and directly contradicts Netlist's position in this litigation.

### f.     The Parties' Course of Conduct Shows Samsung Had No Obligation To Supply All Chips At Request

The parties' performance in the pre-litigation period, particularly in the first two years following the JDLA, shows neither party intended Section 6.2 to create an obligation for Samsung to supply all of Netlist's requests for Samsung's NAND and DRAM products. *Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*, 67 A.D.2d 339, 341 (1979) (actual performance is the "most persuasive evidence of the agreed intention of the parties").

As to the development work, it is not disputed that Netlist received all of the chips it needed. SUF 46. And given the NVDIMM-P product was never commercialized, Samsung's duty to provide further chips was never triggered. SUF 47.

For Netlist's other needs outside the JDLA, Samsung continued to supply Netlist with NAND and DRAM in the same manner as it had done before. SUF 52. Samsung's sales to Netlist have continued from 2001 to the present day, according to

the same course of dealing that existed before the JDLA, after the JDLA, and that continues to this day even after Netlist purported to terminate the JDLA and filed this lawsuit. SUF 53. This consistent course of dealing before and after the JDLA provides strong evidence Netlist understood the JDLA did not guarantee it access to all of the Samsung product it requested, but only the product Samsung actually agreed to sell based on the parties' historical course of dealing. SUF 54; *Studley v. Nat'l Fuel Gas Supply Corp.*, 107 A.D.2d 122, 128 (1985) (following "the established rule that the practical construction put upon a contract by the parties in performing under it is of great importance in determining its meaning").

Based on their prior course of dealing and industry norms, Netlist and Samsung operated using advance forecasts, supply inquiries, purchase orders, limited allocations and backlogs. SUF 52-56. Prior to 2015, Samsung often could not supply Netlist's requested amount or any amounts. SUF 53. And this practice continued after the JDLA. SUF 49. For example, on April 6, 2016, less than six months after the JDLA, Raymond Jiang of Netlist wrote to Neal Knuth of SSI in hopes of buying more NAND: "I know it's insane but want to see try our luck...I know it's not something easy or possible, but want to give it try. Please let me know if any of these can be found." SUF 49 at NL039163-64. Knuth responded the next day: "No bid." *Id.* To provide just one more example of many, on December 14, 2016, Jiang asked Knuth: "How possible is it for you to get us 2100pcs of this DDR … DRAM?" Knuth replied: "Straight from SEC: we cannot support. Securing any additional stock and Product Allocation is not possible." SUF 49 at NL024952.

The fact Samsung could not fulfill all of Netlist's orders was not a breach of the agreement. As both Chuck Hong and Paik Ki Hong admitted as Netlist's 30(b)(6) witnesses and in their prior declarations, Samsung's performance was satisfactory in 2015, 2016 and into 2017. SUF 48. But in those same years, the order history and their testimony establishes Samsung regularly did not fulfill orders. SUF 49. Chuck Hong admitted this was "reality" and that allocations in the fixed supply DRAM/NAND

industry were "industry norms." SUF 49 (Exh. 7, Chuck Hong Dep.). Given the industry involves a commoditized product with limited supply, Netlist understood it could not get all chips it requested.[5]

What this evidence further shows is Netlist never believed the JDLA contained a supply component on anything beyond the NVDIMM-P product that had not yet been developed. Netlist's course of conduct with Samsung was established for the 15 years prior to the JDLA and continued even after Netlist purported to terminate the JDLA in 2020. SUF 53. Indeed, Samsung continues to supply chips to Netlist to the present day based on this very same protocol. *Id.*

Netlist's use of purchase orders both before and after the JDLA's execution provides another basis to dismiss Netlist's interpretation of Section 6.2. By their very terms, Netlist's purchase orders indicate they constitute new "offers" and supersede any prior agreements or discussions with Samsung, such as forecasts and informal e-mail or oral requests to purchase product. SUF 51, 57. Thus, Netlist cannot argue Samsung was obligated to supply any product beyond the amount reflected in Netlist's purchase orders, regardless of any earlier requests. *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1195 (S.D.N.Y. 1996) ("Prior agreements and negotiations are deemed to merge and be subsumed in a later written agreement.").

The end result is that Netlist purchased a substantial amount of NAND and DRAM from Samsung in each quarter from November 2015 to the present, although the amounts varied over time. SUF 58. Accordingly, Netlist has no evidence of breach

---

[5]   What Netlist and Chuck Hong appear to be complaining about is that the allocation to Netlist changed after Hong's close friend, YH Jun, who was President of Samsung's memory division, moved to a separate company in 2017. Choi Decl. Exh. 7 at 119:6-120:7. Up until that point, Chuck Hong had been able to use this relationship to "push through" certain orders and obtain red-carpet treatment. *Id.* Such treatment ended in 2017 when his friend moved. *Id.* Thereafter, Samsung continued to supply chips but not with the same level of attention that Netlist had previously enjoyed. SUF 52. That is not a breach of contract. The JDLA and the purchase orders – and not Chuck Hong's personal friendships – govern the parties' obligations.

1   of Section 6.2.

2                 **g.**        **Netlist Did Not Fully Perform Its Obligations**

3         Samsung is also entitled to summary judgment because Netlist did not fully

4   perform its obligations under the JDLA, and thus cannot prevail on its breach of

5   contract claim. *Cty. of Jefferson v. Onondaga Dev., LLC*, 59 N.Y.S.3d 203, 206 (2017)

6   ("[O]ne of the essential elements of a cause of action for breach of contract is the

7   performance of its obligations by the party asserting the cause of action for breach[.]")

8         Samsung engineer Indong Kim testified Netlist abandoned the NVDIMM-P

9   standardization project that was a core component of the joint development work

10  under the JDLA at some point before 2017. SUF 60. There was no written amendment

11  authorizing Netlist to do so. And Chuck Hong testified that, in 2017, Netlist went its

12  "separate ways" from Samsung and, instead of continuing work under the NVDIMM-

13  P protocol, used the foundational development work and moved to a different product

14  without Samsung. *Id.*

15        Even under Netlist's erroneous theory that the JDLA applied to product outside

16  of the joint development project, Netlist also failed to perform by cancelling purchase

17  orders. Chuck Hong testified it would be a breach of the JDLA if a purchase order was

18  cancelled. SUF 64. While Netlist contends Samsung cancelled orders improperly,

19  Netlist was forced to admit during depositions that it too cancelled such orders, as it

20  did with the eMMC purchase orders in the second half of 2017. *Id.* The evidence

21  establishes the eMMC orders at issue were a significant ask by Netlist as Samsung did

22  not normally sell eMMC to customers like Netlist. SUF 61-62. Samsung allocated a

23  significant amount of eMMC product to Netlist for 2017, much of which had

24  previously been allocated to another customer. SUF 63. After prices for eMMC

25  dropped unexpectedly in the second half of 2017, Netlist cancelled half of its eMMC

26  order. SUF 64. If Netlist contends the failure to fulfill all purchase orders is a breach of

27  the JDLA, Netlist's own cancellation of any purchase orders must also be one.  Having

28  failed to perform under its own interpretation of the JDLA, Netlist cannot prevail on

its claims for breach.

### h. Netlist Should Be Estopped From Arguing Its Patent Licenses Provide Consideration For A Broader Supply Obligation

Netlist argued in its prior declarations to this Court that during the course of the JDLA negotiations, it agreed to accept less monetary consideration in return for a broader supply promise, and that the consideration it provided in return was a broad license to its patents. Dkt. 89-21 at ¶¶ 4-5. But this argument is directly contrary to Netlist's assertion to the Korean tax tribunal that the license granted in the JDLA was limited solely to the joint development project, which the tribunal relied upon in ruling for Netlist. SUF 65. Accordingly, Netlist should be estopped from making that argument in this case.

Under the equitable doctrine of judicial estoppel, a litigant is barred from obtaining an advantage by asserting a position in a case, and then later seeking to obtain an advantage by taking a clearly inconsistent position. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600–01 (9th Cir. 1996); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001)(doctrine provides for the orderly administration of justice and dignity of proceedings).

The doctrine of judicial estoppel applies to statements made in prior administrative proceedings. *Rissetto*, 94 F.3d at 604, 605; *Churchill v. Winter Chevrolet*, No. C-04-0489 JCS, 2005 WL 281170, at *8 (N.D. Cal. Feb. 4, 2005). The doctrine also applies to foreign proceedings. *GT Beverage Co. LLC v. Coca Cola Co.*, No. SACV1000209JVSRNBX, 2010 WL 11595832, at *5 (C.D. Cal. Aug. 2, 2010) (discussing favorable authority on application to foreign proceedings); *Rapture Shipping, Ltd. v. Allround Fuel Trading B.V.*, 350 F. Supp. 2d 369, 374 (S.D.N.Y. 2004) (plaintiff estopped based on statements made in a Dutch Court).

"Federal law governs the application of judicial estoppel in federal courts." *Johnson v. Oregon*, 141 F.3d 1361, 1364 (9th Cir. 1998). Courts generally consider three factors when deciding whether to apply the doctrine. *New Hampshire v. Maine*, 532 U.S.

742, 743 (2001). First, courts determine whether "a party's later position [is] clearly inconsistent with its earlier position." *Id.* Second, courts consider whether a litigant successfully persuaded a court to accept one position, so that subsequent judicial acceptance of an incompatible position "would create the perception that either the first or the second court was misled." *Id.* Finally, courts take into account "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*

Here, the inconsistency in Netlist's position is clear. In this case, Netlist asserts that its grant of patent licenses provides sufficient consideration for a long term supply obligation. In stark contrast, Netlist argued in its Korean tax appeal that: "the granting of cross licenses under the [JDLA] is limited to the joint research and development, and hence in cases where Samsung Electronics uses intellectual property rights of [Netlist] in the course of its own research and development, it does not constitute something that can be subject to the [JDLA]." SUF 65. Second, the Korean tax tribunal relied on Netlist's position that the license was limited in making its ruling. SUF 66. And third, Samsung would be prejudiced by Netlist's assertion of inconsistent positions here. On the one hand, Netlist is trying to use the Korean tax court decision to show that Samsung's withholding was improper. At the same time, Netlist asserts that its patent licensing provided valuable consideration for a long-term supply agreement.

Accordingly, Netlist should be estopped from asserting a position in this case that is inconsistent with its position in the Korean tax appeal.[6]

### 2.     Section 6.2 Is Too Indefinite To Be A Valid Supply Contract.

As shown, the express terms and extrinsic evidence show that Section 6.2 is limited to the supply and pricing of DRAM and NAND for joint development. If the

---

[6]     Samsung has consistently taken the position that the main purpose of the JDLA was patent licensing, which is why Samsung deducted withholding tax as a royalty. While Samsung agrees the licenses are broad, Netlist should not be allowed to argue one thing to its advantage in Korea and the direct opposite here.

Court were to find this term ambiguous on this point, Samsung would still be entitled to summary judgment because Section 6.2 lacks a definite or ascertainable quantity term. Netlist posits several theories as to how the provision could be sufficiently definite, either as (1) a contract to supply at request; (2) a requirements contract; or (3) an options contract. None of these proffered theories provides a sufficiently definite quantity term that could make Section 6.2 an enforceable supply contract.[7]

### a. The Phrase "At Netlist's Request" Is Not A Definite Quantity Term

First, the phrase "at Netlist's request" in Section 6.2 is too indefinite to state a valid quantity term. The phrase neither states a definite quantity nor provides a fixed means to determine a volume of product. *Mar-Jon Mach. & Tool Co. v. Eastman Kodak Co.*, 534 N.Y.S.2d 47, 48 (1988) (contract of sale must be definite as to the quantity of the goods sold, or provide fixed means by which the quantities can be determined).[8] Rather, Netlist's theory is that it can request any quantity it wants, subject only to the implied covenant of good faith and fair dealing that would prohibit Netlist from requesting products beyond what it could possibly need for its channel distribution. But even as cabined by the implied covenant, there is no enforceable contract, as there was no meeting of the minds as to the quantity of product that Samsung would supply.

Nor is there any basis for the Court to imply a missing quantity term where none exists. *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include"). That is especially true where,

---

[7]   Samsung does not ask the Court infer the JDLA is any of these species of contract. Rather, after conferring with Netlist to understand its theories, Samsung shows why each theory is insufficient to create a binding supply obligation.

[8]   Contrary to Netlist's argument, this is not an issue Samsung must raise as an affirmative defense under the Statute of Frauds, but rather an element of Netlist's breach of contract claim – namely to prove the existence of a valid enforceable contract. There is no evidence of any agreement (oral or written) as to quantity.

as here, the parties are sophisticated companies that could be expected to have negotiated a quantity term had they chosen to do so. *Ashwood Capital, Inv. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (2012). Moreover, there is no objective method for the Court to imply a quantity term here.

### b. The JDLA Is Not A Requirements Contract

Second, Section 6.2 cannot be a valid requirements contract. The JDLA does not contain any promise by Samsung to supply products to meet Netlist's requirements or needs, and Netlist has no obligation to purchase any quantity of product from Samsung whatsoever. There can be no requirements contract without a commitment from Netlist to buy exclusively from Samsung, or at the very least, a commitment to buy a minimum quantity or percentage of its requirements exclusively from Samsung. *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 192 n. 3 (E.D.N.Y. 1986) ("Absent [the promise of exclusivity], the agreement is an indefinite quantities contract, where without more, the buyer's promise is illusory and the contract unenforceable against the seller."); *Corning Inc. v. VWR Int'l, Inc.*, No. 05 CV 6532 CJS, 2007 WL 841780, at *6 (W.D.N.Y. Mar. 16, 2007) (requirements contract is valid where buyer must purchase its requirements of product exclusively from seller up to a certain quantity); *CSL Behring, LLC v. Bayer Healthcare, LLC*, 2019 WL 4451368 at *2 (D. Del. Sep. 17, 2019) (exclusivity required under New York law).

Given the express language in Section 6.4 disclaiming any obligation to purchase any amount of product at all, the Court may not imply terms necessary to render the contract as an enforceable requirements contract. *Contrast Edison Elec. v. Thacher*, 229 N.Y. 172, 176 (1920) (where the court implied terms based on the clear intent of the parties to form a requirements contract). Thus, the JDLA cannot be interpreted as a requirements contract to satisfy the missing quantity term.

### c. The JDLA Is Not A Valid Options Contract

Nor can the JDLA be construed as a valid options contract; it lacks a necessary quantity term. It is true, as the Court noted, that an options contract does not

necessarily require exclusivity. However, that does not mean that an options contract is exempt from the rule that any sales contract must have a definite or ascertainable quantity term to create an enforceable obligation. *See* N.Y.U.C.C. § 2-311 (an option contract must still be "otherwise sufficiently definite"); *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 590-91 (1999) (an option contract requires definiteness). While an option to buy "all" or "a stated minimum" of a buyer's requirements could supply the requisite definiteness, no such quantity term is found in the JDLA. *Heyman Cohen & Sons v. M. Lurie Woolen Co.*, 232 N.Y. 112, 115 (1921) (option contract not invalid for indefinite quantity term because "[t]he privilege to order more is coupled with the promise and obligation to accept a stated minimum").

The holding of the Seventh Circuit in *Miller v. McLean Cnty. Unit Dist. No. 5* (*In re Mod. Dairy of Champaign, Inc.)*, 171 F.3d 1106 (7th Cir. 1999), is not to the contrary. The court held in that case that given the absence of any evidence the schools were obligated to buy all of their milk requirements from the dairy, the dairy had no obligation to supply the schools' requirements. *Id.,* at 1110. While the court suggests in dicta that the schools could have argued the contracts were a buyer's option, they did not do so. *Id.,* at 1109. Thus, whether the contract was a valid buyer's option was neither litigated nor adjudicated in that case.

The opinion of New York's Court of Appeals in *Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665 (2001), also is inapposite. Because that case involved a sublease with an option to purchase a single apartment at a stated price, there was no issue about a definite quantity. *Id.,* at 667. Consistent with the case law governing sales contracts that require a definite quantity, a valid options contract still requires a specific quantity – which does not exist in the JDLA.

C.   **Samsung Reasonably Deducted Withholding Taxes From Payment To Netlist And Cooperated With Netlist's Efforts To Obtain A Refund**

Netlist's second claim for breach of contract alleges Samsung improperly deducted withholding taxes from the fee paid to Netlist under Section 3.1, and failed to

cooperate with Netlist's efforts to seek a refund from the Korean tax authorities. Neither contention is supported by evidence sufficient to withstand a Rule 56 motion. The JDLA provides Samsung may deduct applicable withholding taxes from payments due Netlist under the agreement, and that is what Samsung did. Section 3.1 sets forth Netlist's $8 million "NRE fee." SUF 17. Section 3.2 acknowledges Samsung may be required to deduct withholding taxes from this payment: "To the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, *Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea* . . . . SUF 68.

In that regard, on November 5, 2015, shortly before the JDLA was signed, Samsung sent Netlist a tax form for Netlist to apply for a reduced tax rate as a foreign corporation. SUF 69. The form indicated that the tax rate on royalties pursuant to a treaty with the US was 16.5%. SUF 70. Sasaki reviewed the form, signed it, and returned it to Netlist after having consulted with tax professionals of Netlist's choosing. SUF 71. As Netlist's CFO, Sasaki had the authority to approve and sign the form, and consulted with a tax expert to ensure it was appropriate. SUF 72.

Immediately after the JDLA was signed, Samsung made the contractually required cash payment to Netlist of $8 million, less 16.5% deducted for withholding taxes, and paid that amount to the tax authority. SUF 73. Samsung did so because it considered the $8 million as consideration for Netlist's grant of patent licenses, and Korean law requires withholding of payments on such royalties.[9] SUF 74.

Second, Samsung did in fact cooperate with Netlist. What Samsung allegedly refused to do was "cooperate" the way (or how) Netlist wanted. Samsung had numerous communications with Netlist and PWC, Netlist's tax consultant, shared

---

[9]   The Court correctly characterized Netlist's theory as alleging that "the NRE fee was not properly taxable," even if the withholding was lawful. (Dkt. 120 at 6.) But there is no evidence Samsung was not required to withhold taxes, even if such taxes ultimately were refunded.

drafts of what Samsung proposed to submit to the tax authorities, and even asked Netlist and PWC to propose language that they wanted Samsung to use. SUF 75. PWC even thanked Samsung for its cooperation, showing that cooperation is not what Netlist complains of here. SUF 76. What Netlist wanted was for Samsung to further Netlist's economic interests and deny that the $8 million was for patent royalties. SUF 77. Samsung had no contractual duty to provide such "cooperation" and could not do so based on its good faith belief.

Third, Netlist suffered no injury from Samsung's alleged failure to cooperate. Netlist won its tax appeal, and received a full refund plus interest. SUF 78. While Netlist did pay consultants and lawyers to obtain that result, there is no evidence that they would not have had to pay the same consultants' and lawyers' fees to obtain a refund even if Samsung had provided the kind of "cooperation" that Netlist wanted.

### D.   Netlist Is Barred From Recovering Consequential Damages

The parties to the JDLA expressly waived any claim to consequential damages for breach of the JDLA.[10] There is no dispute Netlist seeks damages including lost revenues and lost profits from allegedly lost business opportunities with third party customers. SUF 80. Such claims of lost profits and lost revenues are consequential damages. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements.").

Netlist's claimed damages for lost revenues and lost profits are barred by Section 12.5 of the JDLA. SUF 81. Such express waivers of consequential damages are enforceable under New York law. *International Gateway Exchange, LLC v. Western Union*

---

[10]   The Court denied Samsung's motion for judgment on the pleadings on this issue, stating that a Rule 12 "motion is not the proper vehicle for seeking adjudication of this issue." (DE 120 at 5.) Summary judgment is the proper vehicle for the Court to decide this issue. *United States, for the Use of Integrated Energy, LLC v. Siemens Gov't Techs., Inc.*, No. SACV1501534JVSDFMX, 2017 WL 10562969, at *5-6 (C.D. Cal. May 19, 2017) (partial summary judgment as to consequential damages barred by contractual waiver).

*Financial Services, Inc.*, 333 F. Supp. 2d 131, 149 (S.D.N.Y. 2004). This is particularly true where the contract is between sophisticated businesses, removing any potential concern about the waiver being unconscionable. *Scott v. Palermo*, 233 A.D.2d 869, 872 (1998).

There is no evidence of the kind of wrongful conduct that would be necessary for Netlist to avoid the consequences of this waiver. This would require evidence of "truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 438–39 (1994); *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554 (1992) (conduct necessary "to pierce an agreed-upon limitation of liability in a commercial contract, must 'smack[ ] of intentional wrongdoing.'"). Thus, the Court should grant partial summary judgment as to the issue of consequential damages.

### E.   Netlist Has No Right To Terminate the JDLA

Netlist seeks a declaration the JDLA be terminated based on the alleged breaches, but the undisputed facts show there was no supply obligation as alleged by Netlist and therefore no material breach of the JDLA. And Samsung supplied NAND and DRAM to Netlist every year following the JDLA. Netlist also received a full refund with interest, so the tax withholding claim could not possibly constitute a *material* breach. *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (for a breach to be material, it must "go to the root of the agreement between the parties.") Samsung is entitled to summary judgment on the declaratory relief claim.

#### 1.   Netlist Waived Any Right To Terminate The JDLA

Netlist long ago waived any right to terminate the contract based on its claims.[11] *Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*, 872 F. Supp. 103, 110 (S.D.N.Y. 1995) (termination on the basis of material breaches "must be sought promptly" or it is deemed waived). Netlist executives internally discussed whether to provide notice of

---

[11]   The Court's ruling on the MJOP addressed the election of remedies defense but not the separate defense of waiver. (DE 120 at 7.)

breach over the tax withholding dispute in March 4, 2016, but decided not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung. SUF 84. And as to the supply claim, Netlist asserts that "starting as early as the second quarter of 2017, Samsung began to refuse and/or cancel orders from Netlist. SUF 85. Instead, Netlist waited to provide notice of alleged breach until May 27, 2020, more than *four years* after it first considered doing so. SUF 86. Not coincidentally, the $15 million note is due December 31, 2021. SUF 87.

While the JDLA includes a "no waiver" clause, even broad "no waiver" clauses may themselves be waived if circumstances warrant, as they do here. *Lee v. Wright*, 108 A.D.2d 678, 680, 485 N.Y.S.2d 543, 544 (1985) ("Contrary to its conclusion that the non-waiver clause in the lease precluded any finding of waiver, it has long been the rule that parties may waive a "no-waiver" clause."). Netlist intentionally delayed suing for years, all the while benefiting from its business relationship with Samsung.

Netlist cannot have it both ways. Either the alleged breaches were not material and there is no right to terminate. Or if there were a material breach, then Netlist waived its claim by acquiescing in the alleged breaches since early 2016 (as to the tax withholding claim) and the first half of 2017 (as to the supply claim). Whether based on waiver (or other concepts such as laches or election of remedies), that is far too long for Netlist to have sat on its rights before trying to terminate the contract.

## III.   CONCLUSION

For all these reasons, Samsung respectfully requests that the Court grant it summary judgment or, in the alternative, partial summary judgment.

DATED:  October 21, 2021

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: _____

Ekwan E. Rhow
Attorneys for Defendant Samsung
Electronics Co., Ltd.