# EXHIBIT 20

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of
### the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **November 12, 2015**

# NETLIST, INC.
### (Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-33170** | **95-4812784** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

**175 Technology Drive, Suite 150**
**Irvine, California 92618**
(Address of principal executive offices, including zip code)

**(949) 435-0025**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry Into a Material Definitive Agreement.**

*Joint Development and License Agreement; Senior Secured Convertible Promissory Note and Warrant Sale; Payoff Letter*

On November 12, 2015, Netlist, Inc. (the "Company") entered into a Joint Development and License Agreement ("JDLA") with Samsung Electronics Co., Ltd. ("Samsung"), pursuant to which the Company and Samsung agreed to work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of this new technology. The Company received $8 million non-recurring engineering fee (NRE) from Samsung for the joint development. The JDLA also includes cross licensing of each party's respective patent portfolios, as well as access to raw materials (DRAM and NAND flash) at competitive prices, and an important strategic partner that can facilitate getting the Company's HyperVault technology to market. Both parties may enter into an additional agreement in the future for Samsung to be granted commercial license for the Company's NVDIMM-P technology. The JDLA also includes a Right of First Refusal wherein the Company will provide Samsung the right to acquire the Company's NVDIMM-P technology in a separate, subsequent transaction before the Company offers the technology to a third party. The Company also received $15 million under the SVIC Note (as defined below).

On November 18, 2015 ("Closing Date"), the Company also entered into a Senior Secured Convertible Promissory Note and Warrant Purchase Agreement ("SVIC Purchase Agreement"), with SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership ("SVIC") and an affiliate of Samsung Venture Investment Co., pursuant to which the Company sold SVIC a Senior Secured Convertible Promissory Note ("SVIC Note") and a Stock Purchase Warrant ("SVIC Warrant"), each dated as of the Closing Date. The SVIC Note has an original principal amount of $15 million, accrues interest at a rate of 2% per year, is due and payable in full on December 31, 2021 ("SVIC Note Maturity Date") and the principal and accrued but unpaid interest of which are convertible into shares of the Company's Common Stock at a conversion price of $1.25 per share (the "Conversion Price"), subject to certain adjustments as set forth therein on the SVIC Note Maturity Date. Upon a change of control of the Company prior to the SVIC Note Maturity Date, the SVIC Note may, at the Company's option, be assumed by the surviving entity or be redeemed upon the consummation of such change of control for the principal and accrued but unpaid interest as of the redemption date. The SVIC Warrant grants SVIC a right to purchase 2,000,000 shares of the Company's Common Stock at an exercise price of $0.30 per share, subject to certain adjustments as set forth therein, is only exercisable in the event the Company exercises its right to redeem the SVIC Note prior to the SVIC Note Maturity Date and expires on December 31, 2025. In connection with the SVIC Note, SVIC was granted a first priority security interest in the Company's patents and a second priority security interest in all of the Company's other assets. On the Closing Date, the Company, Silicon Valley Bank ("SVB") and SVIC entered into an Intercreditor Agreement in connection with the SVIC Note pursuant to which SVB and SVIC agreed to their relative security interest priorities in the Company's assets. On the Closing Date, the Company and SVIC also entered into a Registration Rights Agreement pursuant to which the Company is obligated to register with the SEC the shares of the Company's Common Stock issued upon conversion of the SVIC Note or upon exercise of the SVIC Warrant.

On November 19, 2015, pursuant to the terms of a payoff letter (the "Payoff Letter") the Company repaid all sums due under that certain Loan and Security Agreement (as amended, the "Loan Agreement"), dated July 18, 2013, by and between the Company and Fortress Credit Opportunities I LP, a Delaware limited liability company ("Fortress"), as successor to DBD Credit Funding LLC and terminated the Loan Agreement. Pursuant to the Payoff Letter, the parties also terminated the Monetization Letter Agreement (as amended, the "Letter Agreement"), dated July 18, 2013, by and between the Company and Drawbridge Special Opportunities Fund LP. In connection with the Payoff Letter, the Company made a lump sum payment of $1 million to Fortress, and agreed to amend the outstanding warrant issued in connection with the entry of the Loan Agreement and Letter Agreement to reduce the exercise price per share to $0.47. Additionally, pursuant to the Payoff Letter, the Company issued to Fortress a new ten year warrant to purchase 1 million shares of our Common Stock with an exercise price per share of $0.47.

Copies of the SVIC Purchase Agreement, the SVIC Note, the registration rights agreement, the warrants and the Payoff Letter are all attached hereto and incorporated herein by this reference.

2

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information set forth above in Item 1.01 of this Current Report on Form 8-K that relates to the creation of a direct financial obligation of the Company is incorporated by reference herein.

**Item 3.02 Unregistered Sales of Equity Securities.**

The Company relied on the exemption from registration contained in Section 4(a)(2) of the Securities Act in connection with the issuance of the SVIC Note and the warrants. The SVIC Note and the warrants have not been registered under the Securities Act, or state securities laws, and may not be offered or sold in the United States without being registered with the SEC or through an applicable exemption from SEC registration requirements. This Current Report on Form 8-K is not an offer to sell or the solicitation of an offer to buy the SVIC Note nor the securities issuable upon exercise thereof. The other information called for by this item is contained in Item 1.01, which is incorporated herein by reference.

**Item 8.01 Other Events.**

On November 19, 2015, the Company issued press releases announcing the execution of the SVIC Purchase Agreement and the JDLA. A copy of the press release is attached hereto as Exhibit 99.1 and is incorporated herein by this reference.

3

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 4.1 | Senior Secured Convertible Promissory Note, dated November 18, 2015. |
| 4.2 | Stock Purchase Warrant (SVIC), dated November 18, 2015. |
| 4.3 | Stock Purchase Warrant (Fortress), dated November 18, 2015. |
| 4.4 | Amendment No. 1 to Stock Purchase Warrant (Fortress), dated November 18, 2015. |
| 10.1 | Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated November 18, 2015. |
| 10.2 | Registration Rights Agreement, dated November 18, 2015. |
| 10.3 | Payoff Letter, dated November 18, 2015. |
| 99.1 | Press Release of Netlist, Inc., dated November 19, 2015. |

4

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**NETLIST, INC.**

Dated: November 19, 2015

By: /s/ Gail M. Sasaki
Gail M. Sasaki
Vice President and Chief Financial Officer

5

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 4.1 | Senior Secured Convertible Promissory Note, dated November 18, 2015. |
| 4.2 | Stock Purchase Warrant (SVIC), dated November 18, 2015. |
| 4.3 | Stock Purchase Warrant (Fortress), dated November 18, 2015. |
| 4.4 | Amendment No. 1 to Stock Purchase Warrant (Fortress), dated November 18, 2015. |
| 10.1 | Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated November 18, 2015. |
| 10.2 | Registration Rights Agreement, dated November 18, 2015. |
| 10.3 | Payoff Letter, dated November 18, 2015. |
| 99.1 | Press Release of Netlist, Inc., dated November 19, 2015. |

6

Exhibit 4.1

## SENIOR SECURED CONVERTIBLE PROMISSORY NOTE

THIS SENIOR SECURED CONVERTIBLE PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  IT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD IN ACCORDANCE WITH RULE 144 UNDER SUCH ACT.

THIS SENIOR SECURED CONVERTIBLE PROMISSORY NOTE IS SUBJECT TO, AND MAY BE TRANSFERRED ONLY IN COMPLIANCE WITH, THE SENIOR SECURED CONVERTIBLE NOTE PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE PURCHASER, A COPY OF WHICH IS ON FILE AT THE COMPANY'S PRINCIPAL OFFICE.

THIS SENIOR SECURED CONVERTIBLE PROMISSORY NOTE IS SUBJECT TO THE TERMS OF THE INTERCREDITOR AGREEMENT, DATED AS OF NOVEMBER *18*, 2015, AMONG THE COMPANY, THE PURCHASER AND SILICON VALLEY BANK (AS AMENDED AND RESTATED FROM TIME TO TIME, THE "INTERCREDITOR AGREEMENT"), A COPY OF WHICH IS ON FILE AT THE COMPANY'S PRINCIPAL OFFICE. THE INTERCREDITOR AGREEMENT IS INCORPORATED HEREIN BY THIS REFERENCE

No. 1                                                                                    Date of Issuance
$15,000,000                                                                           November 18, 2015

For value received, **Netlist Inc.**, a Delaware corporation (the "***Company***"), hereby promises to pay to the order of **SVIC No. 28 New Technology Business Investment L.L.P.**, a Korean limited liability partnership (the "***Holder***"), the principal sum of Fifteen Million Dollars ($15,000,000) (the "***Principal Amount***").  This Senior Secured Convertible Promissory Note (the "***Note***") is issued pursuant to the Senior Secured Promissory Note and Warrant Purchase Agreement, dated as of November 18, 2015, between the Company and the Holder (as amended from time to time, the "***Purchase Agreement***") and is entitled to the benefits of and is subject to the terms contained in the Purchase Agreement, including, without limitation, the security interest granted in the Company's assets pursuant to the Security Agreement (as defined in the Purchase Agreement) and the other Transaction Documents (as defined in the Purchase Agreement).  Capitalized terms used but not defined herein shall have the meaning set forth in the Purchase Agreement.

1.      **Interest**.  The Principal Amount shall bear interest from the Closing Date at the rate of two percent (2.0%) per annum, based on a year consisting of 365 days, with interest computed daily based on the actual number of days elapsed.

2.      **Principal and Interest Payment**.  The Principal Amount and all accrued but unpaid interest hereunder shall be due and payable on December 31, 2021 (the "***Maturity Date***").  The Company shall make all payments under this Note without setoff, recoupment or deduction and regardless of any counterclaim or defense.

3.      **Maximum Interest**.  Notwithstanding any provision in this Note or any other Transaction Document, it is the parties' intent not to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by law that a court of competent jurisdiction shall deem applicable hereto (which under the laws of the State of New York shall be deemed to be the laws relating to permissible rates of interest on commercial loans) (the "***Maximum Rate***").  If a court of competent jurisdiction finally determines that the Company has paid to the Holder an amount of interest in excess of the amount that would have been payable if all of the Secured Obligations (as defined in the Purchase Agreement) had at all times borne interest at the Maximum Rate, then such excess interest paid by the Company shall be applied as follows: first, to the payment of the Principal Amount outstanding; second, to the payment of the Holder's accrued interest and any Secured Obligations; and third, the excess (if any) shall be refunded to the Company.

4.      **Optional Conversion**.

(a)      The Holder may convert the Principal Amount and the accrued interest hereunder into shares of the Company's Common Stock at the Conversion Price (as defined below) on the Maturity Date or during the continuance of an Event of Default. To exercise such conversion right (the "*Conversion Right*"), the Holder shall give written notice of such exercise not less than ten (10) days prior to the Maturity Date or prior to the proposed date of conversion during the continuance of an Event of Default, as applicable (the Maturity Date or the proposed conversion date each the "*Conversion Date*"), and shall deliver the original of this Note to the Company on the Conversion Date.  On the Conversion Date, the Company shall issue a certificate for the shares of Common Stock acquired upon conversion of this Note, provided that the Company shall pay a cash adjustment for any fractional share, determined by multiplying such fractional share by the Conversion Price.  The foregoing notwithstanding, in no event shall any outstanding Principal Amount and the accrued interest hereunder be converted pursuant to exercise of the Conversion Right to the extent that Holder and its Affiliates would own, after such conversion, shares of Common Stock representing, in the aggregate, in excess of nineteen and nine tenths of one percent (19.9%) of the Common Stock Outstanding (as defined below).  The Company shall pay the Holder the amount equal to the Principal Amount and the accrued interest hereunder not converted as a result of such restriction, which payment shall be made on the Conversion Date.

(b)      The "*Conversion Price*" shall be One Dollar and Twenty-Five Cents ($1.25), as adjusted from time to time as follows:

(i)      **Split, Subdivision or Combination of Shares**.  If the Company splits, subdivides or combines the Common Stock, the Conversion Price shall be proportionately decreased in the case of a split or subdivision and proportionately increased in the case of a combination; and

(ii)      **Adjustments for Common Stock Dividends**.  If the holders of Common Stock at the time after November 18, 2015, receive, or, on or after the record date fixed for the determination of eligible stockholders, shall have become entitled to receive, without payment therefor, any shares of Common Stock by way of dividend, then the Conversion Price shall be adjusted to the amount determined by multiplying such Conversion Price by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately prior to such dividend and the denominator of which is the sum of the number of shares of Common Stock outstanding immediately prior to such dividend and the number of shares of Common Stock issued as such dividend.

(c)      If the Company, by reclassification of securities or otherwise, changes the Common Stock into any other class or classes of securities, the Conversion Right shall thereafter represent the right to acquire such number and kind of securities as would have been issuable as the result of such change with respect to the shares of Common Stock that were subject to the Conversion Right immediately prior to such reclassification or other change and the Conversion Price shall be appropriately adjusted.

5.      **Redemption**.  The Company may, on thirty (30) days advance written notice to the Holder, elect to redeem this Note for a redemption price equal to the sum of (i) the Principal Amount and (ii) the accrued interest as of the redemption date (the "*Redemption Price*").  On the redemption date (the "*Redemption Date*"), the Company shall pay the Redemption Price in cash. Except as provided in this section, the Company may not prepay any of the Principal Amount or the accrued interest hereunder.

6.      **Repayment on Change of Control**.  If a Change of Control occurs prior to the Maturity Date, the Company shall have the option to require the surviving entity to either (i) assume this Note, or (ii) redeem this Note in accordance with **Section 5** upon the consummation of such Change of Control.  The Company shall give the Holder written notice of the option it has selected not less than three (3) Business Days prior to the consummation of such Change of Control.

7.      **Payments**.  All payments shall be made in lawful money of the United States of America at the Holder's principal office, or at such other place as the Holder may from time to time designate in writing to the Company.  Payments shall be credited first to costs of collection if any, second to accrued interest due and payable and any remainder applied to the Principal Amount.

8.      **Remedies**. The acceleration of the obligations under this Note and the exercise of remedies under this Note shall be governed by the provisions of Article 8 of the Purchase Agreement. The Company waives presentment, demand, protest or (except as expressly provided in the Purchase Agreement or the other Transaction Documents) notice of any kind, all of which are hereby expressly waived. The Company will give prompt written notice to the Holder of the occurrence of any Event of Default.

9.      **Governing Law**. This Note shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

10.     **WAIVER OF JURY TRIAL**. EACH PARTY HERETO WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

11.     **Titles and Subtitles**. The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

12.     **Amendments and Waivers.** The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice shall be conducted pursuant to the terms of the Purchase Agreement.

13.     **Severability**. If any provision of this Note is held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

*[Signature Page Follows]*

This Note is executed and delivered as of the date first written above.

**NETLIST INC.**

/s/ Gail Sasaki
By: Gail Sasaki
Its: CFO, VP, Secretary

*SIGNATURE PAGE TO THE SENIOR SECURED CONVERTIBLE PROMISSORY NOTE*

Exhibit 4.2

NEITHER THIS SECURITY NOR THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER, SUCH OFFER, SALE, PLEDGE OR OTHER TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

NETLIST, INC.

STOCK PURCHASE WARRANT

Date of Issuance: November 18, 2015                                      Certificate No. W-4

FOR VALUE RECEIVED, Netlist, Inc., a Delaware corporation (the "Company"), hereby grants to SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership, or its registered assigns (the "Registered Holder") the right (this "Warrant") to purchase from the Company 2,000,000 shares of Warrant Stock at a price per share of $0.30 (as adjusted from time to time hereunder, the "Exercise Price"). Certain capitalized terms used herein are defined in Section 5. The amount and kind of securities obtainable pursuant to the rights granted hereunder and the purchase price for such securities are subject to adjustment pursuant to the provisions contained in this Warrant. Contemporaneously herewith, the Company and the Registered Holder are entering into a registration rights agreement pursuant to which the Registered Holder or its registered assigns shall have certain rights to request registration by the Company of the Warrant Stock under the Securities Act.

This Warrant is subject to the following provisions:

Section 1.      Exercise of Warrant.

1A.      Exercise Period.  The Registered Holder may exercise, in whole or in part (but not as to a fractional share of Warrant Stock), the purchase rights represented by this Warrant at any time and from time to time after the date on which the Company exercises its redemption right under Section 5 of the Note pursuant to the terms thereof, up to and including December 31, 2025 (the "Exercise Period"). This Warrant shall terminate and be of no further force or effect upon the earlier to occur of the conversion of the Note into Common Stock of the Company pursuant to the terms and conditions of the Note or upon the Company's payment in full of the unpaid principal and accrued but unpaid interest of the Note upon its maturity.

1B.      Exercise Procedure.

(i)      This Warrant shall be deemed to have been exercised (in whole or in part) when the Company has received all of the following items (as the case may be from time to time, the "Exercise Time"):

(a)      a completed Exercise Agreement, as described in Section 1C, executed by the Person exercising all or part of the purchase rights represented by this Warrant (the "Purchaser");

(b)      this Warrant (delivery of which shall be subject to the Company's obligations with respect to delivery of a new Warrant as provided in Section 1B(iii));

(c)      if this Warrant is not registered in the name of the Purchaser, an Assignment or Assignments in the form of Exhibit A attached hereto (each, an "Assignment") evidencing the assignment of this Warrant to the Purchaser, in which case the Registered Holder shall have complied with the provisions set forth in Section 7; and

(d)      Subject to Section 1B(ii), wire transfer of immediately available funds or a check payable to the Company in an amount equal to the product of the Exercise Price multiplied by the number of shares of Warrant Stock being purchased upon such exercise (the "Aggregate Exercise Price").

(ii)      As an alternative to the exercise of this Warrant as provided in Section 1B(i) and for purposes of Section 9, the holder of this Warrant may, at its sole discretion, exchange all or part of the purchase rights represented by this Warrant by surrendering this Warrant to the Company, together with a written notice to the Company that the holder is exchanging this Warrant (or a portion thereof) for an aggregate number of shares of Warrant Stock specified in the notice, from which the Company shall withhold and not issue to the holder the number of shares of Warrant Stock with an aggregate Market Price equal to the Aggregate Exercise Price of the number of shares of Warrant Stock specified in such notice (and such withheld shares shall no longer be issuable under this Warrant).

(iii)      The Company shall cause the Transfer Agent to deliver to the Purchaser, within five (5) Business Days after the date of each Exercise Time, certificates for shares of Warrant Stock purchased upon exercise of this Warrant; provided, that no failure or delay in such delivery shall affect the issuance of any Warrant Stock as provided in Section 1B(iv). Unless this Warrant has expired or all of the purchase rights represented hereby have been exercised, the

2

Company shall prepare a new Warrant, substantially identical hereto, representing the rights formerly represented by this Warrant which have not expired or been exercised and shall, within such five (5) Business Day period, deliver such new Warrant to the Person designated for delivery in the Exercise Agreement.

(iv)    The Warrant Stock issuable upon the exercise of this Warrant shall be deemed to have been issued to the Purchaser at the Exercise Time, and the Purchaser shall be deemed for all purposes to have become the record holder of such Warrant Stock at the Exercise Time.

(v)    The issuance of certificates for shares of Warrant Stock upon exercise of this Warrant shall be made without charge to the Registered Holder or the Purchaser for any issuance tax in respect thereof or other cost incurred by the Company in connection with such exercise and the related issuance of shares of Warrant Stock. Each share of Warrant Stock issuable upon exercise of this Warrant shall, upon payment of the Exercise Price therefor, be fully paid and nonassessable and free from all liens and charges with respect to the issuance thereof.

(vi)    The Company shall not close its books against the transfer of this Warrant or of any share of Warrant Stock issued or issuable upon the exercise of this Warrant in any manner which interferes with the timely exercise of this Warrant. The Company shall from time to time take all such action as may be necessary to assure that the par value per share of the unissued Warrant Stock acquirable upon exercise of this Warrant is at all times equal to or less than the Exercise Price then in effect.

(vii)    The Company shall assist and cooperate with any Registered Holder or Purchaser required to make any filings with, or obtain any approvals of, any Governmental Authority prior to or in connection with any exercise of this Warrant (including making any filings required to be made by the Company).

(viii)    Notwithstanding any other provision hereof, if an exercise of any portion of this Warrant is to be made in connection with a registered public offering or the Sale of the Company, the exercise of any portion of this Warrant may, at the election of the holder hereof, be conditioned upon the consummation of the public offering or the Sale of the Company in which case such exercise shall not be deemed to be effective until the consummation of such transaction.

(ix)    The Company shall at all times reserve and keep available out of its authorized but unissued shares of Warrant Stock solely for the purpose of issuance upon the exercise of this Warrant, such number of shares of Warrant Stock issuable upon the exercise in full of this Warrant. The Company shall take all such actions as may be necessary to assure that all such shares of Warrant Stock may be so issued without violation by the Company of any applicable law or governmental regulation or any requirements of the Financial Industry Regulatory Authority ("FINRA"), the National Association of Securities Dealers Automated Quotation ("NASDAQ") or any domestic securities exchange upon which shares of Warrant Stock may be listed (except for official notice of issuance which shall be immediately delivered

3

by the Company upon each such issuance).  The Company shall not take any action which would cause the number of authorized but unissued shares of Warrant Stock to be less than the number of such shares required to be reserved hereunder for issuance upon the exercise in full of this Warrant.

(x)      The Company shall not take any action which would materially conflict with or frustrate the purpose of this Warrant or any adjustment or exercise thereof, including that the Company shall not adopt any rights plan or similar agreement unless the potential adverse effects of any such plan or agreement expressly exclude the Registered Holder, any Purchaser, their respective Affiliates and their respective ownership (beneficial or of record) of any securities acquirable pursuant to this Warrant.

1C.      Exercise Agreement.  Upon any exercise of this Warrant, the Exercise Agreement shall be substantially in the form of Exhibit B attached hereto, except that if any shares of Warrant Stock are not to be issued in the name of the Person in whose name this Warrant is registered, the Exercise Agreement shall also state the name of the Person to whom the certificates for such shares of Warrant Stock are to be issued, and if the number of shares of Warrant Stock to be issued does not include all the shares of Warrant Stock purchasable hereunder, it shall also state the name of the Person(s) to whom a new Warrant(s) for the unexercised portion of the rights hereunder is to be delivered.  Such Exercise Agreement shall be dated the actual date of execution thereof.

1D.      Fractional Shares.  If a fractional share of Warrant Stock would, but for the provisions of Section 1A, be issuable upon exercise of the rights represented by this Warrant, the Company shall, within five (5) Business Days after the date of the Exercise Time, deliver to the Purchaser a check payable to the Purchaser in lieu of such fractional share in an amount equal to the difference between the Market Price of such fractional share as of the date of the Exercise Time and the Exercise Price of such fractional share.

1E.      Registered Holder's Exercise Limitations.  The Company shall not effect any exercise of this Warrant, and a Registered Holder shall not have the right to exercise any portion of this Warrant, pursuant to Section 1 or otherwise, to the extent that after giving effect to such issuance after exercise as set forth in the Exercise Agreement, the Registered Holder (together with the Registered Holder's Affiliates, and any other Persons acting as a group together with the Registered Holder or any of the Registered Holder's Affiliates), would beneficially own in excess of the Beneficial Ownership Limitation (as defined below).  For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Registered Holder and its Affiliates shall include the number of shares of Warrant Stock issuable upon exercise of this Warrant with respect to which such determination is being made, but shall exclude the number of shares of Warrant Stock which would be issuable upon (i) exercise of the remaining, nonexercised portion of this Warrant beneficially owned by the Registered Holder or any of its Affiliates and (ii) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any other Common Stock Equivalents) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Registered Holder or any of its Affiliates.  Except as set forth in the preceding sentence, for purposes of this Section 1E, beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, it being acknowledged by the Registered Holder that the Company is not representing to the Registered Holder that such calculation is in compliance with Section 13(d) of the

4

Exchange Act and the Registered Holder is solely responsible for any schedules required to be filed in accordance therewith. To the extent that the limitation contained in this Section 1E applies, the determination of whether this Warrant is exercisable (in relation to other securities owned by the Registered Holder together with any Affiliates) and of which portion of this Warrant is exercisable shall be in the sole discretion of the Registered Holder, and the submission of an Exercise Agreement or conversion pursuant to Section 9 hereof shall be deemed to be the Registered Holder's determination of whether this Warrant is exercisable (in relation to other securities owned by the Registered Holder together with any Affiliates) and of which portion of this Warrant is exercisable, in each case subject to the Beneficial Ownership Limitation, and the Company shall have no obligation to verify or confirm the accuracy of such determination and shall have no liability for exercises of this Warrant that are not in compliance with the Beneficial Ownership Limitation, provided that the information contained in (A) the Company's most recent periodic or annual report filed with the Commission, as the case may be, (B) a more recent public announcement by the Company or (C) if requested by the Registered Holder, which request shall be answered by the Company in writing within two (2) Trading Days as of receipt of such request, a written notice by the Company or the Transfer Agent, in each case of (A), (B) and (C), setting forth the number of shares of Common Stock outstanding (the "Outstanding Common Stock Information") is true, complete and accurate as of the date it was provided. In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. For purposes of this Section 1E, in determining the number of outstanding shares of Common Stock, Registered Holder may rely on the number of outstanding shares of Common Stock as reflected in the Outstanding Common Stock Information. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by the Registered Holder or its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported. The "Beneficial Ownership Limitation" shall be 19.9% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Warrant Stock issuable upon exercise of this Warrant. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 1E to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitations contained in this paragraph shall apply to a successor Registered Holder of this Warrant.

Section 2.     Adjustment of Exercise Price and Number of Shares.  The Exercise Price shall be subject to adjustment from time to time as provided in this Section 2, and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be subject to adjustment from time to time as provided in this Section 2.

2A.     Subdivision or Combination of Common Stock.  If the Company at any time subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be proportionately increased. If the Company at

5

any time combines (by reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be proportionately decreased.

2B.    Reorganization, Reclassification, Consolidation, Merger or Sale.  Any recapitalization, reorganization, reclassification, consolidation, merger, sale of all or substantially all of the Company's assets or other transaction, which in each case is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) stock, securities or assets (including cash) with respect to or in exchange for Common Stock is referred to herein as "Organic Change." Prior to the consummation of any Organic Change, the Company shall make appropriate provision (in form and substance satisfactory to the Registered Holder of this Warrant representing a majority of the shares of Warrant Stock obtainable upon exercise of this Warrant (the "Majority Holders") to ensure that the Registered Holder of this Warrant shall thereafter have the right to acquire and receive, in lieu of or addition to (as the case may be) the shares of Warrant Stock immediately theretofore acquirable and receivable upon the exercise of this Warrant, such shares of stock, securities or assets (including cash) as would have been issued or payable in such Organic Change (if the Registered Holder had exercised this Warrant immediately prior to such Organic Change) with respect to or in exchange for the number of shares of Warrant Stock immediately theretofore acquirable and receivable upon exercise of this Warrant had such Organic Change not taken place, including that if the holders of Common Stock are given any choice as to the securities or assets (including cash) to be received in such Organic Change, then the Registered Holder shall be given the same choice in respect thereof. Notwithstanding anything to the contrary, if an Organic Change involving a Person whose common stock is not traded on a national securities exchange (a "Non-Listed Company") in which all outstanding shares of Common Stock as of immediately prior to the Organic Change are converted into or exchanged or tendered for stock, securities or assets (other than cash) or the right to receive stock, securities or assets (other than cash) of such Non-Listed Company, the Company (or as applicable, the successor entity) and the purchaser entity shall, at the Registered Holder's election, exercisable at any time prior to, concurrently with, or within 30 days after, the consummation of such Organic Change, purchase this Warrant (or any stock, securities or assets into which this Warrant or the Warrant Stock underlying this Warrant may have been converted or exchanged or for which any of them may have been tendered in such Organic Change) from the Registered Holder by paying to the Registered Holder cash, in immediately available funds payable upon the consummation of such Organic Change (or within 10 days following notice of such election by the Registered Holder in the case of an election delivered after such consummation), in an amount equal to the value thereof reflected by the terms of such Organic Change. In the case of any Organic Change, the Company shall make appropriate provision (in form and substance satisfactory to the Majority Holders) with respect to such holders' rights and interests to ensure that the provisions of this Section 2 and Sections 2D and 4 shall thereafter be applicable to the Warrants (including, in the case of any such Organic Change in which the successor entity or purchasing entity is other than the Company, an immediate adjustment of the Exercise Price to the value for the Common Stock reflected by the terms of such Organic Change and a corresponding immediate adjustment in the number of shares of Warrant Stock acquirable and receivable upon exercise of the Warrants, if the value so reflected is less than the Exercise Price in effect immediately prior to such Organic

6

Change).  The Company shall not effect any Organic Change unless prior to the consummation thereof, the successor entity (if other than the Company) and the purchasing entity assume by written instrument (in form and substance satisfactory to the Majority Holders), the obligation to deliver to each such holder such shares of stock, securities or assets (including cash) as, in accordance with the foregoing provisions, such holder may be entitled to acquire.

       2C.    <u>Notices</u>.

       (i)    Promptly upon any adjustment of the Exercise Price, the Company shall give written notice thereof to the Registered Holder, setting forth in reasonable detail and certifying the calculation of such adjustment.

       (ii)    The Company shall give written notice to the Registered Holder at least thirty (30) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any *pro rata* subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Organic Change, dissolution or liquidation.

       (iii)    The Company shall also give written notice to the Registered Holder at least thirty (30) days prior to the date on which any Organic Change, dissolution or liquidation shall take place.

       2D.    <u>Pro Rata Distributions</u>.  If the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including any distribution of cash, stock or other securities, property or options) by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "Distribution"), at any time after the issuance of this Warrant, then, in each such case, upon the exercise of this Warrant, the Holder shall be entitled to participate in such Distribution to the same extent that the Registered Holder would have participated therein if the Registered Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof) immediately before the date of which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution.

       Section 3.    <u>Liquidating Dividends</u>.  If the Company declares or pays a dividend upon the Common Stock payable otherwise than in cash out of earnings or earned surplus (determined in accordance with generally accepted accounting principles, consistently applied) (a "Liquidating Dividend"), then, upon the exercise of this Warrant, the Company shall pay to the Registered Holder of this Warrant the Liquidating Dividend which would have been paid to such Registered Holder on the Warrant Stock had this Warrant been fully exercised immediately prior to the date on which a record is taken for such Liquidating Dividend, or, if no record is taken, the date as of which the record holders of Common Stock entitled to such dividends are to be determined.

       Section 4.    <u>Purchase Rights</u>.  If at any time during the Exercise Period the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property *pro rata* to the record holders of any class of Common Stock (the "Purchase Rights"), then the Registered holder of this Warrant shall be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which such holder could have acquired if such holder had held the number of shares of Warrant Stock acquirable upon complete exercise of this Warrant immediately before the date on which a record is taken for the grant, issuance or sale of

7

such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

        Section 5.      Definitions.  The following terms have meanings set forth below:"Affiliate" means, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

        "Business Day" means any day that is not a Saturday, Sunday or a day on which banks located in the State of New York are authorized or obligated to close.

        "Common Stock" means, collectively, the Company's Common Stock and any capital stock of any class of the Company hereafter authorized which is not limited to a fixed sum or percentage of par or stated value in respect to the rights of the holders thereof to participate in dividends or in the distribution of assets upon any liquidation, dissolution or winding up of the Company.

        "Convertible Securities" means any stock, indebtedness, or securities (directly or indirectly) convertible into or exchangeable for, with or without payment of additional consideration, Common Stock, either immediately or upon the arrival of a specified date or the happening of a specified event or both.

        "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

        "Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

        "Market Price" means as to any security the volume weighted average (rounded to the nearest cent) of the closing prices of such security's sales on all domestic securities exchanges on which such security may at the time be listed, or, if there have been no sales on any such exchange on any day, the volume weighted average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day such security is not so listed, the volume weighted average of the highest bid and lowest asked prices on such day in the domestic over-the-counter market as reported by Pink OTC Markets, Inc., or any similar successor organization, in each such case averaged over a period of ten (10) days consisting of the day as of which "Market Price" is being determined and the nine (9) consecutive Business Days prior to such day; provided that if such security is listed on any domestic securities exchange or quoted in a domestic over-the-counter market the term "Business Days" as used in this sentence means Business Days on which such exchange is open for trading. If at any time such security is not listed on any domestic securities exchange or quoted in the domestic over-the-counter market, the "Market Price" shall be the fair value thereof determined jointly by the Company and the Majority Holders (without applying any marketability, minority or other

8

discounts); provided that if such parties are unable to reach agreement within a reasonable period of time, such fair value shall be determined (without applying any marketability, minority or other discounts) by an appraiser jointly selected by the Company and the Majority Holders. The determination of such appraiser shall be final and binding on the Company and the Registered Holders, and the fees and expenses of such appraiser shall be paid by the Company.

"Note" means that certain Senior Secured Convertible Promissory Note, dated as of date hereof, by and between the Registered Holder and the Company (as amended, restated supplemented, or otherwise modified from time to time).

"Options" means any rights, warrant or options to subscribe for or purchase Common Stock or Convertible Securities.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association. corporation. institution. public benefit corporation, firm, joint stock company, estate, entity or government agency.

"Sale of the Company" means (i) a merger or consolidation of the Company with or into another Person, (ii) the sale, transfer, or other disposition of all or substantially all of the Company's assets to one or more other Persons in a single transaction or series of related transactions, or (iii) the acquisition of beneficial ownership (determined pursuant to SEC Rule 13d 3 promulgated under the Exchange Act, as amended and in effect from time to time) by any Person of more than 50% of the Company's outstanding common stock pursuant to a tender or exchange offer made directly to the Company's stockholders, other than an underwriter temporarily holding common stock pursuant to an offering of such common stock.  Notwithstanding the foregoing, a transaction shall not constitute a "Sale of the Company" if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction.

"Trading Day" means a day on which the principal Trading Market is open for trading.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE MKT. the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange or the OTC Bulletin Board (or any successors to any of the foregoing).

"Transfer Agent" means Computershare Trust Company, N.A.. the current transfer agent of the Company, with a mailing address of 330 N. Brand Blvd., Ste. 701, Glendale, CA 91203-2149 and a facsimile number of, and any successor transfer agent of the Company.

"Warrant Stock" means the Company's Common Stock, par value $0.001 per share; provided that if there is a change such that the securities issuable upon exercise of the Warrants are issued by an entity other than the Company or there is a change in the type or class

9

of securities so issuable, then the term "Warrant Stock" shall mean that number of securities issuable upon conversion of the Company's Common Stock into such security.

        Section 6.   No Voting Rights; Limitations of Liability.  This Warrant shall not entitle the holder hereof to any voting rights or other rights as a stockholder of the Company.  No provision hereof, in the absence of affirmative action by the Registered Holder to purchase Warrant Stock, and no enumeration herein of the rights or privileges of the Registered Holder shall give rise to any liability of such holder for the Exercise Price of Warrant Stock acquirable by exercise hereof or as a stockholder of the Company.

        Section 7.   Warrant Transferable.  Subject to compliance with applicable securities laws and the transfer conditions referred to in the legend endorsed hereon, this Warrant and all rights hereunder are transferable, in whole or in part, without charge to the Registered Holder, upon surrender of this Warrant with a properly executed Assignment (in the form of Exhibit A attached hereto) at the principal office of the Company.

        Section 8.   Warrant Exchangeable for Different Denominations.  This Warrant is exchangeable, upon the surrender hereof by the Registered Holder at the principal office of the Company, for new Warrants of like tenor representing in the aggregate the purchase rights hereunder, and each of such new Warrants shall represent such portion of such rights as is designated by the Registered Holder at the time of such surrender.  The date the Company initially issues this Warrant shall be deemed to be the "Date of Issuance" hereof regardless of the number of times new certificates representing the unexpired and unexercised rights formerly represented by this Warrant shall be issued.  All Warrants representing portions of the rights hereunder are referred to herein as the "Warrants."

        Section 9.   Automatic Conversion upon Expiration.  Subject to Section 1E, if at the last Business Day of the Exercise Period, the Market Price is greater than the Exercise Price in effect on such date, then this Warrant shall automatically be deemed on and as of such date to be converted pursuant to this Warrant as to all shares of Warrant Stock (or such other securities) for which it shall not previously have been exercised or converted, and the Company shall promptly deliver a certificate representing such shares issued upon such conversion to the Holder.

        Section 10.   Replacement.  Upon receipt of evidence reasonably satisfactory to the Company (an affidavit of the Registered Holder shall be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing this Warrant, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Company, or, in the case of any such mutilation upon surrender of such certificate, the Company shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the same rights represented by such lost, stolen or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

        Section 11.   Notices.  Except as otherwise expressly provided herein, all notices, demands or other communications referred to in this Warrant shall be in writing and shall be deemed to have been given (i) when delivered personally to the recipient, (ii) when sent to the recipient by confirmed electronic mail or facsimile if delivered prior to 5:00 p.m. local time of the recipient on a Business Day or otherwise on the next Business Day, (iii) one business day after it is sent to the recipient by reputable overnight courier service (charges prepaid) or (iv) three Business Days after it is mailed to the recipient by first class mail, return receipt requested, and shall be addressed (a) to the Company, at its principal executive offices and (b) to the Registered Holder of this Warrant, to:

                SVIC No. 28 New Technology Business Investment L.L.P.
                Attention: Dr. Dong-su Kim, Vice President

10

Address: 29F, Samsung Electronics Building,
1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, Korea,
Email: dongkim@samsung.com

with a copy (which shall not constitute notice) to:

DLA Piper LLP (US)
2000 University Avenue
Palo Alto, California 94303
Attention: Louis Lehot
Email: louis.lehot@dlapiper.com

Section 12.       Investment Representations. By accepting this Warrant from the Company, Registered Holder represents and warrants to the Company that it (a) is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act, (b) it is acquiring this Warrant with the present intention of holding this Warrant for purposes of investment and not with a view to the public resale or distribution within the meaning of the Securities Act, and (c) understands that this Warrant and the securities issuable upon exercise hereof have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Registered Holder's investment intent as expressed herein.

Section 13.       Amendment and Waiver. Except as otherwise provided herein, the provisions of this Warrant may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Majority Holders.

Section 14.       Descriptive Headings; Governing Law. The descriptive headings of the several Sections and paragraphs of this Warrant are inserted for convenience only and do not constitute a part of this Warrant. The corporation laws of the State of Delaware shall govern all issues concerning the relative rights of the Company and its stockholders. All other questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be governed by the internal law of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.

*   *   *   *

11

IN WITNESS WHEREOF, the Company has caused this Warrant to be signed and attested by its duly authorized officers and to be dated the Date of Issuance hereof.

**NETLIST, INC.**

By: /s/ Gail Sasaki
Name: Gail Sasaki
Title: CFO, VP, Secretary

*Signature Page to Warrant*

**EXHIBIT A**

ASSIGNMENT

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers all of the rights of the undersigned under the attached Warrant (Certificate No. W-____) with respect to the number of shares of the Warrant Stock covered thereby set forth below, unto:

| Names of Assignee | Address | No. of Shares |
| --- | --- | --- |
| | | |
| | | |

**[Assignor]**

By: _____
Name: _____
Title: _____

**EXHIBIT B**

EXERCISE AGREEMENT

To:                                                    Dated:

The undersigned, pursuant to the provisions set forth in the attached Warrant (Certificate No. W-   ), hereby agrees to subscribe for the purchase of        shares of the Warrant Stock covered by such Warrant and makes payment herewith in full therefor at the price per share provided by such Warrant.

Check one box:

☐   I am attaching a cashier's, personal or certified check, or have arranged for a wire transfer of immediately available funds to the Company, in an amount equal to the Aggregate Exercise Price.

☐   In lieu of paying cash, I have elected to receive such lesser number of shares of Common Stock as determined pursuant to Section 1B(ii) of the attached Warrant.

By:      _____

Name:   _____

Title:   _____

Exhibit 4.3

NEITHER THIS SECURITY NOR THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER, SUCH OFFER, SALE, PLEDGE OR OTHER TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

NETLIST, INC.

## STOCK PURCHASE WARRANT

Date of Issuance: November 18, 2015                                        Certificate No. W-3

FOR VALUE RECEIVED, Netlist, Inc., a Delaware corporation (the "Company"), hereby grants to CF DB EZ LLC, a Delaware limited liability company or its registered assigns (the "Registered Holder") the right (this "Warrant") to purchase from the Company 1,000,000 shares of Warrant Stock at a price per share of $0.47 (as adjusted from time to time hereunder, the "Exercise Price"). Certain capitalized terms used herein are defined in Section 5. The amount and kind of securities obtainable pursuant to the rights granted hereunder and the purchase price for such securities are subject to adjustment pursuant to the provisions contained in this Warrant.

This Warrant is subject to the following provisions:

Section 1.        Exercise of Warrant.

1A.        Exercise Period. The Registered Holder may exercise, in whole or in part (but not as to a fractional share of Warrant Stock), the purchase rights represented by this Warrant at any time and from time to time after the Date of Issuance to and including the tenth (10th) anniversary thereof (the "Exercise Period").

1B.        Exercise Procedure.

(i)        This Warrant shall be deemed to have been exercised (in whole or in part) when the Company has received all of the following items (as the case may be from time to time, the "Exercise Time"):

(a)        a completed Exercise Agreement, as described in Section 1C, executed by the Person exercising all or part of the purchase rights represented by this Warrant (the "Purchaser");

(b)        this Warrant (delivery of which shall be subject to the Company's obligations with respect to delivery of a new Warrant as provided in Section 1B(iii));

(c)     if this Warrant is not registered in the name of the Purchaser, an Assignment or Assignments in the form of Exhibit A attached hereto (each, an "Assignment") evidencing the assignment of this Warrant to the Purchaser, in which case the Registered Holder shall have complied with the provisions set forth in Section 7; and

(d)     wire transfer of immediately available funds or a check payable to the Company in an amount equal to the product of the Exercise Price multiplied by the number of shares of Warrant Stock being purchased upon such exercise (the "Aggregate Exercise Price").

(ii)     As an alternative to the exercise of this Warrant as provided in Section 1B(i), the holder of this Warrant may exchange all or part of the purchase rights represented by this Warrant by surrendering this Warrant to the Company, together with a written notice to the Company that the holder is exchanging the Warrant (or a portion thereof) for an aggregate number of shares of Warrant Stock specified in the notice, from which the Company shall withhold and not issue to the holder a number of shares of Warrant Stock with an aggregate Market Price equal to the Aggregate Exercise Price of the number of shares of Warrant Stock specified in such notice (and such withheld shares shall no longer be issuable under this Warrant).

(iii)     The Company shall cause the Transfer Agent to deliver to the Purchaser, within five (5) Business Days after the date of each Exercise Time, certificates for shares of Warrant Stock purchased upon exercise of this Warrant; provided, that no failure or delay in such delivery shall affect the issuance of any Warrant Stock as provided in Section 1B(iv). Unless this Warrant has expired or all of the purchase rights represented hereby have been exercised, the Company shall prepare a new Warrant, substantially identical hereto, representing the rights formerly represented by this Warrant which have not expired or been exercised and shall, within such five (5) Business Day period, deliver such new Warrant to the Person designated for delivery in the Exercise Agreement.

(iv)     The Warrant Stock issuable upon the exercise of this Warrant shall be deemed to have been issued to the Purchaser at the Exercise Time, and the Purchaser shall be deemed for all purposes to have become the record holder of such Warrant Stock at the Exercise Time.

(v)     The issuance of certificates for shares of Warrant Stock upon exercise of this Warrant shall be made without charge to the Registered Holder or the Purchaser for any issuance tax in respect thereof or other cost incurred by the Company in connection with such exercise and the related issuance of shares of Warrant Stock. Each share of Warrant Stock issuable upon exercise of this Warrant shall, upon payment of the Exercise Price therefor, be fully paid and nonassessable and free from all liens and charges with respect to the issuance thereof.

(vi)     The Company shall not close its books against the transfer of this Warrant or of any share of Warrant Stock issued or issuable upon the exercise of this Warrant in any manner which interferes with the timely exercise of this Warrant. The Company shall from time to time take all such action as may be necessary to assure that the par value per share of the unissued Warrant Stock acquirable upon exercise of this Warrant is at all times equal to or less than the Exercise Price then in effect.

2

(vii)     The Company shall assist and cooperate with any Registered Holder or Purchaser required to make any filings with, or obtain any approvals of, any Governmental Authority prior to or in connection any exercise of this Warrant (including making any filings required to be made by the Company).

(viii)     Notwithstanding any other provision hereof, if an exercise of any portion of this Warrant is to be made in connection with a registered public offering or the sale of the Company, the exercise of any portion of this Warrant may, at the election of the holder hereof, be conditioned upon the consummation of the public offering or the sale of the Company in which case such exercise shall not be deemed to be effective until the consummation of such transaction.

(ix)     The Company shall at all times reserve and keep available out of its authorized but unissued shares of Warrant Stock solely for the purpose of issuance upon the exercise of the Warrants, such number of shares of Warrant Stock issuable upon the exercise of all outstanding Warrants.  The Company shall take all such actions as may be necessary to assure that all such shares of Warrant Stock may be so issued without violation by the Company of any applicable law or governmental regulation or any requirements of the Financial Industry Regulatory Authority (FINRA), the National Association of Securities Dealers Automated Quotation ("NASDAQ") or any domestic securities exchange upon which shares of Warrant Stock may be listed (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).  The Company shall not take any action which would cause the number of authorized but unissued shares of Warrant Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the Warrants.

(x)     The Company shall not take any action which would materially conflict with or frustrate the purpose of this Warrant or any adjustment or exercise thereof, including that the Company shall not adopt any rights plan or similar agreement unless the potential adverse effects of any such plan or agreement expressly exclude the Registered Holder, any Purchaser, their respective Affiliates and their respective ownership (beneficial or of record) of any securities acquirable pursuant to this Warrant.

1C.     Exercise Agreement.  Upon any exercise of this Warrant, the Exercise Agreement shall be substantially in the form of Exhibit B attached hereto, except that if any shares of Warrant Stock are not to be issued in the name of the Person in whose name this Warrant is registered, the Exercise Agreement shall also state the name of the Person to whom the certificates for such shares of Warrant Stock are to be issued, and if the number of shares of Warrant Stock to be issued does not include all the shares of Warrant Stock purchasable hereunder, it shall also state the name of the Person(s) to whom a new Warrant(s) for the unexercised portion of the rights hereunder is to be delivered.  Such Exercise Agreement shall be dated the actual date of execution thereof.

1D.     Fractional Shares.  If a fractional share of Warrant Stock would, but for the provisions of Section 1A, be issuable upon exercise of the rights represented by this Warrant, the Company shall, within five (5) Business Days after the date of

3

the Exercise Time, deliver to the Purchaser a check payable to the Purchaser in lieu of such fractional share in an amount equal to the difference between the Market Price of such fractional share as of the date of the Exercise Time and the Exercise Price of such fractional share.

Section 2.    Adjustment of Exercise Price and Number of Shares.  The Exercise Price shall be subject to adjustment from time to time as provided in this Section 2, and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be subject to adjustment from time to time as provided in this Section 2.

2A.    Subdivision or Combination of Common Stock.  If the Company at any time subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be proportionately increased.  If the Company at any time combines (by reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased and the number of shares of Warrant Stock obtainable upon exercise of this Warrant shall be proportionately decreased.

2B.    Reorganization, Reclassification, Consolidation, Merger or Sale.  Any recapitalization, reorganization, reclassification, consolidation, merger, sale of all or substantially all of the Company's assets or other transaction, which in each case is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) stock, securities or assets (including cash) with respect to or in exchange for Common Stock is referred to herein as "Organic Change." Prior to the consummation of any Organic Change, the Company shall make appropriate provision (in form and substance satisfactory to the Registered Holders of Warrants representing a majority of the shares of Warrant Stock obtainable upon exercise of such Warrants (the "Majority Holders") to insure that each of the Registered Holders of the Warrants shall thereafter have the right to acquire and receive, in lieu of or addition to (as the case may be) the shares of Warrant Stock immediately theretofore acquirable and receivable upon the exercise of such holder's Warrant, such shares of stock, securities or assets (including cash) as would have been issued or payable in such Organic Change (if the holder had exercised this Warrant immediately prior to such Organic Change) with respect to or in exchange for the number of shares of Warrant Stock immediately theretofore acquirable and receivable upon exercise of such holder's Warrant had such Organic Change not taken place, including that if the holders of Common Stock are given any choice as to the securities or assets (including cash) to be received in such Organic Change, then the Registered Holders shall be given the same choice in respect thereof.  Notwithstanding anything to the contrary, in the event of an Organic Change involving a Person whose common stock is not traded on a national securities exchange (a "Non-Listed Company") in which all outstanding shares of Common Stock as of immediately prior to the Organic Change are converted into or exchanged or tendered for stock, securities or assets (other than cash) or the right to receive stock, securities or assets (other than cash) of such Non-Listed Company, the Company (or as applicable, the successor entity) and the purchaser entity shall, at the Registered Holder's election, exercisable at any time prior to, concurrently with, or within 30 days after, the consummation of such Organic Change, purchase this Warrant (or any stock, securities or assets into which this Warrant or the Warrant Stock underlying this Warrant may have been converted or exchanged or for which any of them may have been tendered in such Organic Change) from the Registered Holder by paying to the Holder cash, in immediately

4

available funds payable upon the consummation of such Organic Change (or within 10 days following notice of such election by the Registered Holder in the case of an election delivered after such consummation). in an amount equal to the value thereof reflected by the terms of such Organic Change.  In the case of any Organic Change, the Company shall make appropriate provision (in form and substance satisfactory to the Majority Holders) with respect to such holders' rights and interests to insure that the provisions of this Section 2 and Sections 2D and 4 shall thereafter be applicable to the Warrants (including. in the case of any such Organic Change in which the successor entity or purchasing entity is other than the Company, an immediate adjustment of the Exercise Price to the value for the Common Stock reflected by the terms of such Organic Change and a corresponding immediate adjustment in the number of shares of Warrant Stock acquirable and receivable upon exercise of the Warrants, if the value so reflected is less than the Exercise Price in effect immediately prior to such Organic Change).  The Company shall not effect any Organic Change unless prior to the consummation thereof, the successor entity (if other than the Company) and the purchasing entity assume by written instrument (in form and substance satisfactory to the Majority Holders), the obligation to deliver to each such holder such shares of stock, securities or assets (including cash) as, in accordance with the foregoing provisions, such holder may be entitled to acquire.

2C.     Notices.

(i)     Promptly upon any adjustment of the Exercise Price, the Company shall give written notice thereof to the Registered Holder, setting forth in reasonable detail and certifying the calculation of such adjustment.

(ii)     The Company shall give written notice to the Registered Holder at least twenty (20) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any *pro rata* subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Organic Change, dissolution or liquidation.

(iii)     The Company shall also give written notice to the Registered Holders at least twenty (20) days prior to the date on which any Organic Change, dissolution or liquidation shall take place.

2D.     Pro Rata Distributions.  During such time as this Warrant is outstanding, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "Distribution"), at any time after the issuance of this Warrant, then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Registered Holder would have participated therein if the Registered Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof) immediately before the date of which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution.

Section 3.     Liquidating Dividends.  If the Company declares or pays a dividend upon the Common Stock payable otherwise than in cash out of earnings or earned surplus (determined in accordance with generally accepted accounting principles, consistently applied) except for a stock dividend payable in shares of Common Stock (a "Liquidating

5

Dividend"), then the Company shall pay to the Registered Holder of this Warrant at the time of payment thereof the Liquidating Dividend which would have been paid to such Registered Holder on the Warrant Stock had this Warrant been fully exercised immediately prior to the date on which a record is taken for such Liquidating Dividend, or, if no record is taken, the date as of which the record holders of Common Stock entitled to such dividends are to be determined.

Section 4.      Purchase Rights.  If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property *pro rata* to the record holders of any class of Common Stock (the "Purchase Rights"), then the Registered holder of this Warrant shall be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which such holder could have acquired if such holder had held the number of shares of Warrant Stock acquirable upon complete exercise of this Warrant immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

Section 5.      Definitions.  The following terms have meanings set forth below:

"Affiliate" means, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

"Business Day" means any day that is not a Saturday, Sunday or a day on which banks located in the State of New York are authorized or obligated to close.

"Common Stock" means, collectively, the Company's Common Stock and any capital stock of any class of the Company hereafter authorized which is not limited to a fixed sum or percentage of par or stated value in respect to the rights of the holders thereof to participate in dividends or in the distribution of assets upon any liquidation, dissolution or winding up of the Company.

"Convertible Securities" means any stock or securities (directly or indirectly) convertible into or exchangeable for Common Stock.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Market Price" means as to any security the volume weighted average (rounded to the nearest cent) of the closing prices of such security's sales on all domestic securities exchanges on which such security may at the time be listed, or, if there have been no sales on any such exchange on any day, the volume weighted average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day such security is not so

6

listed, the volume weighted average of the highest bid and lowest asked prices on such day in the domestic over-the-counter market as reported by Pink OTC Markets, Inc., or any similar successor organization, in each such case averaged over a period of ten (10) days consisting of the day as of which "Market Price" is being determined and the nine (9) consecutive Business Days prior to such day; provided that if such security is listed on any domestic securities exchange or quoted in a domestic over-the-counter market the term "Business Days" as used in this sentence means Business Days on which such exchange is open for trading. If at any time such security is not listed on any domestic securities exchange or quoted in the domestic over-the-counter market, the "Market Price" shall be the fair value thereof determined jointly by the Company and the Majority Holders (without applying any marketability, minority or other discounts); provided that if such parties are unable to reach agreement within a reasonable period of time, such fair value shall be determined (without applying any marketability, minority or other discounts) by an appraiser jointly selected by the Company and the Majority Holders. The determination of such appraiser shall be final and binding on the Company and the Registered Holders of the Warrants, and the fees and expenses of such appraiser shall be paid by the Company.

"Options" means any rights or options to subscribe for or purchase Common Stock or Convertible Securities.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"Subsidiary" means, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"Transfer Agent" means Computershare Trust Company, N.A., the current transfer agent of the Company, with a mailing address of 330 N. Brand Blvd., Ste. 701, Glendale, CA 91203-2149 and a facsimile number of, and any successor transfer agent of the Company.

"Warrant Stock" means the Company's Common Stock, par value $0.001 per share: provided that if there is a change such that the securities issuable upon exercise of the Warrants are issued by an entity other than the Company or there is a change in the type or class of securities so issuable, then the term "Warrant Stock" shall mean one share of the security issuable upon exercise of the Warrants if such security is issuable in shares, or shall mean the smallest unit in which such security is issuable if such security is not issuable in shares.

7

Section 6.    No Voting Rights; Limitations of Liability.  This Warrant shall not entitle the holder hereof to any voting rights or other rights as a stockholder of the Company.  No provision hereof, in the absence of affirmative action by the Registered Holder to purchase Warrant Stock, and no enumeration herein of the rights or privileges of the Registered Holder shall give rise to any liability of such holder for the Exercise Price of Warrant Stock acquirable by exercise hereof or as a stockholder of the Company.

Section 7.    Warrant Transferable.  Subject to compliance with applicable securities laws and the transfer conditions referred to in the legend endorsed hereon, this Warrant and all rights hereunder are transferable, in whole or in part, without charge to the Registered Holder, upon surrender of this Warrant with a properly executed Assignment (in the form of Exhibit A attached hereto) at the principal office of the Company.

Section 8.    Warrant Exchangeable for Different Denominations.  This Warrant is exchangeable, upon the surrender hereof by the Registered Holder at the principal office of the Company, for new Warrants of like tenor representing in the aggregate the purchase rights hereunder, and each of such new Warrants shall represent such portion of such rights as is designated by the Registered Holder at the time of such surrender.  The date the Company initially issues this Warrant shall be deemed to be the "Date of Issuance" hereof regardless of the number of times new certificates representing the unexpired and unexercised rights formerly represented by this Warrant shall be issued.  All Warrants representing portions of the rights hereunder are referred to herein as the "Warrants."

Section 9.    [RESERVED].

Section 10.    Replacement.  Upon receipt of evidence reasonably satisfactory to the Company (an affidavit of the Registered Holder shall be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing this Warrant, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Company, or, in the case of any such mutilation upon surrender of such certificate, the Company shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the same rights represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

Section 11.    Notices.  Except as otherwise expressly provided herein, all notices, demands or other communications referred to in this Warrant shall be in writing and shall be deemed to have been given (i) when delivered personally to the recipient, (ii) when sent to the recipient by confirmed electronic mail or facsimile if delivered prior to 5:00 p.m. local time of the recipient on a Business Day or otherwise on the next Business Day, (iii) one business day after it is sent to the recipient by reputable overnight courier service (charges prepaid) or (iv) three Business Days after it is mailed to the recipient by first class mail, return receipt requested, and shall be addressed (a) to the Company, at its principal executive offices and (b) to the Registered Holder of this Warrant, to CF DB EZ LLC, 1345 Avenue of the Americas, 46th Floor, New York, New York 10105, Attention: James K. Noble, III - General Counsel, Telephone: (212) 798-6100, Telecopier: (646) 224-8716, Email: dbsoloanops@fortress.com, with a copy (which shall not constitute notice) to Kirkland & Ellis LLP, 333 South Hope Street, Los Angeles, California 90071, Attention: Hamed Meshki, Telephone: (213) 680-8360, Telecopier: (213) 808-8145, Email: hamed.meshki@kirkland.com.

Section 12.    Investment Representations. By accepting this Warrant from the Company, CF DB EZ LLC represents and warrants to the Company that it (a) is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Act"), (b) it is acquiring this Warrant with the present intention of holding this Warrant for purposes of investment and not with a view to the public resale or distribution within the meaning of the Act, and (c) understands that this Warrant and the securities issuable upon exercise hereof have not been registered under the Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of CF DB EZ LLC's investment intent as expressed herein.

8

Section 13.    <u>Amendment and Waiver</u>. Except as otherwise provided herein, the provisions of the Warrants may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Majority Holders.

Section 14.    <u>Descriptive Headings; Governing Law</u>. The descriptive headings of the several Sections and paragraphs of this Warrant are inserted for convenience only and do not constitute a part of this Warrant. The corporation laws of the State of New York shall govern all issues concerning the relative rights of the Company and its stockholders. All other questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be governed by the internal law of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.

*   *   *   *

9

IN WITNESS WHEREOF, the Company has caused this Warrant to be signed and attested by its duly authorized officers and to be dated the Date of Issuance hereof.

**NETLIST, INC.**

By: /s/ Gail Sasaki
Name: Gail Sasaki
Title: VP, CFO, Secretary

*[Signature Page - Netlist Warrant]*

**EXHIBIT A**

<u>ASSIGNMENT</u>

FOR VALUE RECEIVED,                                 hereby sells, assigns and transfers all of the rights of the
undersigned under the attached Warrant (Certificate No. W-    ) with respect to the number of shares of the Warrant Stock covered
thereby set forth below, unto:

| Names of Assignee | Address | No. of Shares |
|---|---|---|
|  |  |  |

**[Assignor]**

By:     _____
Name:   _____
Title:  _____

**EXHIBIT B**

<u>EXERCISE AGREEMENT</u>

To:                                        Dated:

       The undersigned, pursuant to the provisions set forth in the attached Warrant (Certificate No. W-   ), hereby agrees to subscribe for the purchase of        shares of the Warrant Stock covered by such Warrant and makes payment herewith in full therefor at the price per share provided by such Warrant.

<u>Check one box</u>:

    ☐   I am attaching a cashier's, personal or certified check, or have arranged for a wire transfer of immediately available funds to the Company, in an amount equal to the Aggregate Exercise Price.

    ☐   In lieu of paying cash, I have elected to receive such lesser number of shares of Common Stock as determined pursuant to <u>Section 1B(ii)</u> of the attached Warrant.

                                      By: _____
                                      Name: _____
                                      Title: _____

Exhibit 4.4

AMENDMENT NO. 1 TO

STOCK PURCHASE WARRANT

This AMENDMENT NO. 1 (this "Amendment") to Stock Purchase Warrant is entered into as of November 18, 2015 by and between Netlist, Inc., a Delaware corporation (the "Company"), and Drawbridge Special Opportunities Fund LP, a Delaware limited partnership (the "Registered Holder"). This Amendment No. 1 amends certain provisions of the Stock Purchase Warrant (Certificate No. W-2) issued by the Company to the Registered Holder as of July 18, 2013, as set forth below (the "Original Warrant"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Original Warrant.

WHEREAS, the Parties desire to amend the Original Warrant in accordance with the terms of this Amendment (the Original Warrant, as so amended by this Amendment, the "Warrant");

WHEREAS, Section 13 of the Original Warrant provides that no amendment of any provision of the Original Warrant shall be valid unless the same shall be in writing and signed by the Majority Holders; and

WHEREAS, as of the date of this Amendment, the Registered Holder is the sole holder of the Original Warrant and as such constitutes the Majority Holders.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises herein made, and in consideration of the representations, warranties, covenants and agreements herein contained, the Company and the Registered Holder agree as follows:

1.   **Introductory Paragraph of the Original Warrant.** The introductory paragraph of the Original Warrant is hereby amended and restated by deleting "$1.00" and replacing it with "$0.47".

2.   **Section 5 of the Original Warrant.** Section 5 of the Original Warrant is hereby amended and restated by deleting the definition of "Loan Agreement" in its entirety.

3.   **Miscellaneous.**

      (a)   <u>Descriptive Headings; Governing Law</u>. The descriptive headings of the several sections and paragraphs of this Amendment are inserted for convenience only and do not constitute a part of this Amendment. The corporation laws of the State of New York shall govern all issues concerning the relative rights of the Company and its stockholders. All matters concerning the construction, validity, enforcement and interpretation of this Amendment shall be governed by the internal law of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.

      (b)   <u>Counterparts</u>. This Amendment may be executed in counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument. This Amendment and any amendments hereto, to the extent signed and delivered by means of digital imaging and electronic mail or a facsimile machine, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

      (c)   <u>Effect of this Amendment</u>. Except as expressly set forth in this Amendment, all of the provisions of the Original Warrant shall remain in full force and effect in accordance with their terms, and this Amendment shall reaffirm the Original Warrant in all respects. This Amendment shall be deemed to have effect as of, and from and after, the date of the Original Warrant.

[Remainder of Page Intentionally Left Blank]

2

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

**NETLIST, INC.**

By: /s/ Gail Sasaki
    Name: Gail Sasaki
    Title:  Chief Financial Officer

*[Signature Page - Amendment to Stock Purchase Warrant]*

**DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LP**

By: Drawbridge Special Opportunities GP LLC, its general partner

By:   /s/ Mark K. Furstein
      Name: Mark K. Furstein
      Title: Chief Operating Officer

*[Signature Page - Amendment to Stock Purchase Warrant]*

Exhibit 10.1

SENIOR SECURED CONVERTIBLE PROMISSORY NOTE AND WARRANT

PURCHASE AGREEMENT

BY AND BETWEEN

NETLIST, INC.

AND

SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.

NOVEMBER 18, 2015

i

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 | AUTHORIZATION AND SALE OF SECURITIES | 1 |
| 1.1 | Authorization and Sale of Note and Warrant | 1 |
| 1.2 | Use of Proceeds | 1 |
| 1.3 | Definitions | 1 |
| ARTICLE 2 | CLOSING CONDITIONS | 9 |
| 2.1 | Closing | 9 |
| ARTICLE 3 | REPRESENTATIONS AND WARRANTIES OF THE COMPANY | 11 |
| 3.1 | Corporate Status | 11 |
| 3.2 | Authorization and Enforceability | 11 |
| 3.3 | No Conflict or Third Party Authorization Requirements | 12 |
| 3.4 | Note and Underlying Securities | 12 |
| 3.5 | Material Adverse Effect | 12 |
| 3.6 | Laws | 12 |
| 3.7 | Information Correct and Current | 13 |
| 3.8 | Tax Matters | 13 |
| 3.9 | Intellectual Property Claims | 13 |
| 3.10 | Intellectual Property | 13 |
| 3.11 | Company Products | 13 |
| 3.12 | Title to Property | 14 |
| 3.13 | Employee Loans | 14 |
| 3.14 | Transactions with Affiliates | 14 |
| 3.15 | Not a Regulated Entity | 14 |
| 3.16 | No General Solicitation; No Directed Selling Efforts | 14 |
| 3.17 | Margin Stock | 14 |
| 3.18 | Filings | 15 |
| 3.19 | Contracts | 15 |
| 3.20 | USRPHC | 15 |
| 3.21 | Subsidiaries | 15 |
| 3.22 | Litigation | 16 |
| 3.23 | Environmental Laws | 16 |
| 3.24 | Board Vote | 16 |
| 3.25 | No Finder's Fee | 16 |

**TABLE OF CONTENTS**
(continued)

|  |  |  | Page |
|---|---|---|---|
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER | | 16 |
| ARTICLE 5 | INDEMNIFICATION | | 18 |
| | 5.1 | Indemnification and Contribution | 18 |
| ARTICLE 6 | COMPANY COVENANTS | | 18 |
| | 6.1 | Financial Reports; Notices | 18 |
| | 6.2 | Inspection Rights | 18 |
| | 6.3 | Formation of Subsidiaries | 18 |
| | 6.4 | Authorized Common Stock | 19 |
| | 6.5 | Further Assurances | 19 |
| | 6.6 | Negative Covenants | 20 |
| | 6.7 | Compliance with Laws | 20 |
| | 6.8 | Register | 20 |
| | 6.9 | Amendment to Existing Loan | 20 |
| ARTICLE 7 | RESTRICTIONS ON TRANSFERABILITY | | 20 |
| | 7.1 | Restrictions on Transferability | 20 |
| ARTICLE 8 | EVENTS OF DEFAULT | | 21 |
| | 8.1 | Payments | 21 |
| | 8.2 | Covenants | 21 |
| | 8.3 | Other Transaction Documents | 21 |
| | 8.4 | Representations | 21 |
| | 8.5 | Cross Default | 21 |
| | 8.6 | Insolvency | 21 |
| | 8.7 | Attachments; Judgments | 22 |
| | 8.8 | Invalidity | 22 |
| | 8.9 | Other Obligations | 22 |
| | 8.10 | Guarantor | 22 |
| ARTICLE 9 | REMEDIES | | 22 |
| | 9.1 | General | 22 |
| | 9.2 | Collection; Foreclosure | 23 |
| | 9.3 | Cumulative Remedies | 23 |

ii

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| ARTICLE 10 | MISCELLANEOUS | 23 |
| 10.1 | Survival of Representations, Warranties and Agreements | 23 |
| 10.2 | Notices | 23 |
| 10.3 | Entire Agreement; Amendments | 24 |
| 10.4 | No Strict Construction | 24 |
| 10.5 | No Waiver | 24 |
| 10.6 | Severability | 24 |
| 10.7 | Governing Law | 24 |
| 10.8 | Waiver of Jury Trial | 25 |
| 10.9 | Counterparts | 25 |
| 10.10 | Assignment | 25 |
| 10.11 | Further Assurances | 25 |
| 10.12 | Replacement Facility | 25 |
| ARTICLE 11 | GUARANTEE | 25 |
| 11.1 | Guarantee | 25 |
| 11.2 | Security Interest | 27 |
| 11.3 | Successors and Assigns | 27 |
| 11.4 | No Waiver | 28 |
| 11.5 | Modification | 28 |

iii

**NETLIST, INC.**
**SENIOR SECURED CONVERTIBLE PROMISSORY NOTE AND WARRANT**
**PURCHASE AGREEMENT**

**NOVEMBER 18, 2015**

This **SENIOR SECURED CONVERTIBLE PROMISSORY NOTE AND WARRANT PURCHASE AGREEMENT**
(this "*Agreement*") is entered into as of the date set forth above by and between Netlist, Inc., a Delaware corporation (the
"*Company*"), and SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership (the
"*Purchaser*"), and each Subsidiary that becomes a party hereto after the Closing Date in accordance with **Section 6.2**. The parties
hereby agree as follows:

**ARTICLE 1**
**Authorization and Sale of Securities**

1.1     **Authorization and Sale of Note and Warrant.**

(A)     Subject to the terms and conditions of this Agreement, the Purchaser agrees to purchase, and the Company
agrees to sell and issue to the Purchaser, a Note in the principal amount of Fifteen Million Dollars ($15,000,000) (the "*Note
Amount*"). The purchase and sale of the Note shall take place remotely via the exchange of documents and signatures immediately
following the execution and delivery of this Agreement, subject to the satisfaction of each of the Closing Conditions set forth in
**Section 2.1(A)** and **Section 2.1(B)** (which time and place are designated as the "*Closing*"). At the Closing, the Company shall deliver
to the Purchaser the executed Note being purchased by the Purchaser against payment of the purchase price therefor by wire transfer
to the bank account that has been designated by the Company.

(B)     At the Closing, the Company shall issue to the Purchaser a Warrant, in the form attached hereto as
**EXHIBIT A** (the "*Warrant*"), which shall be exercisable for 2,000,000 shares of Common Stock at an exercise price of $0.30 per
share on the terms and conditions set forth in the Warrant.

1.2     **Use of Proceeds.** The Company shall use the proceeds from the sale of the Note for general corporate purposes in
accordance with the Board of Directors' directions.

1.3     **Definitions.** As used in this Agreement, the following terms shall have the following meanings:

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under
common control with such Person.

"*Agreement*" means this Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, as amended from
time to time.

"*Amendment to the Silicon Valley Bank Loan and Security Documents*" means the Amendment to the Silicon Valley Bank
Loan and Security Documents, dated as of a date on or immediately prior to Closing, by and among Silicon Valley Bank, the
Company and the other parties thereto.

"*Assets*" means all of the assets (real and personal, tangible and intangible, including all Intellectual Property) that are used or
held for use in connection with the Company's or any Subsidiary's business or are reflected on the Financial Statements.

"*Board of Directors*" means the Company's Board of Directors.

"*Business Day*" means any day, except Saturday, Sunday or legal holiday on which banking institutions in the City of New York are authorized or obligated by law or executive order to close.

"*CFC*" means a controlled foreign corporation (as that term is defined in the Code).

"*Change of Control*" means:  (i) a merger or consolidation of the Company with or into another Person, (ii) the sale, transfer, or other disposition of all or substantially all of the Company's Assets to one or more other Persons in a single transaction or series of related transactions, or (iii) the acquisition of beneficial ownership (determined pursuant to SEC Rule 13d-3 promulgated under the Exchange Act, as amended and in effect from time to time) by any Person of more than 50% of the Company's outstanding common stock pursuant to a tender or exchange offer made directly to the Company's stockholders, other than an underwriter temporarily holding common stock pursuant to an offering of such common stock.  Notwithstanding the foregoing, a transaction shall not constitute a "Change of Control" if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the Persons who held the Company's securities immediately prior to such transaction.

"*Closing*" has the meaning set forth in **Section 1.1(A)**.

"*Closing Date*" has the meaning set forth in **Section 2.1(B)(vii)**.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended.

"*Collateral*" means all assets of the Company, now owned or hereafter acquired, upon which a Lien is purported to be created by any Transaction Document.

"*Common Stock*" means the common stock of the Company as defined in its Certificate of Incorporation, as amended and restated from time to time during the term of the Note.

"*Common Stock Outstanding*" means as of any date, (i) all shares of Common Stock that are outstanding as of such date, plus (ii) all shares of Common Stock issuable upon conversion of Convertible Securities outstanding as of such date, whether or not convertible as of such date, plus (iii) all shares of Common Stock issuable upon exercise of Options outstanding as of such date, whether or not such Options are exercisable as of such date (assuming for this purpose that Convertible Securities acquirable upon exercise of any such Options are converted into Common Stock as of such date), plus (iv) all shares of Common Stock issuable with respect to Options authorized but not granted as of such date pursuant to the Company's employee stock option plans then in effect.

"*Company Products*" means all products, processes, software, service offerings, technical data or technology currently being designed, manufactured or sold by the Company or which the Company intends to sell, license or distribute in the future including any products or service offerings under development, collectively, together with all products, software, service offerings, technical data or technology that have been sold, licensed or distributed by the Company since its incorporation.

"*Controlling Stakeholder*" has the meaning set forth in **Section 6.5(B)**.

2

"*Convertible Securities*" means evidence of indebtedness, shares of stock or other securities which are convertible into or exchangeable for, with or without payment of additional consideration, shares of Common Stock, either immediately or upon the arrival of a specified date or the happening of a specified event or both.

"*Copyright License*" means any written or oral agreement granting any right to the Company to use any Copyright or Copyright registration, now owned or hereafter acquired by the Company or in which the Company now holds or hereafter acquires any interest and all license fees and royalties arising therefrom.

"*Copyrights*" means all copyrights, whether registered or unregistered, held pursuant to the laws of the United States or of any other country.

"*Equity Interests*" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, and its regulations, as amended from time to time.

"*Event of Default*" has the meaning given to it in **Article 8**.

"*Environmental Laws*" has the meaning given to it in **Section 3.23**.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the Rules and Regulations promulgated thereunder.

"*Financial Statements*" has the meaning given to it in **Section 6.1**.

"*Fortress Loan Documents*" means (i) the loan and security agreement, the intellectual property security agreement and the subordination agreement entered by the Company and DBD Credit Funding LLC, a Delaware limited liability company ("*DBD*"), on July 18, 2013 (the "*FT Loan Documents*"), as amended by the first amendment to the loan and security agreement entered by the Company and DBD on February 17, 2015 and the second amendment to the loan and security agreement entered by the Company and Fortress Credit Opportunities I LP (successor of DBD under the Fortress Loan Documents) on February 17, 2015, and (ii) any other amendment to the FT Loan Documents entered into by the Company and Fortress Credit Opportunities I LP (or any of its successors thereof) not described on item (i) above.

"*GAAP*" means generally accepted accounting principles in the United States of America, as in effect from time to time, <u>provided</u> that the parties agree that GAAP as in effect on the date of this Agreement shall be applicable for the interpretation of "capital lease obligations" in the definition of "Indebtedness", unless the parties otherwise agree in writing.

"*Governmental Authority*" means the government of the United States of America or of any other nation, or any political subdivision of any of them, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Guarantee*" has the meaning set forth in **Section 11.1(D)**.

3

"*Guarantee Secured Obligations*" has the meaning set forth in **Section 11.2(A)**.

"*Guarantor*" means each Subsidiary that executes and delivers a Joinder Agreement in accordance with **Section 6.3**.

"*Guarantor Collateral*" has the meaning set forth in **Section 11.2(A)**.

"*Guaranty Documents*" has the meaning set forth in **Section 8.11**.

"*Indebtedness*" means with respect to a Person (a) all indebtedness for borrowed money or the deferred purchase price of property or services (excluding trade credit entered into in the ordinary course of business due within ninety (90) days), including reimbursement and other obligations with respect to surety bonds, bankers acceptances or letters of credit, (b) all obligations evidenced by notes, bonds evidencing borrowed money, debentures or similar instruments, (c) all capital lease obligations, (d) all indebtedness of other Persons secured by a Lien on the assets of such Person, whether or not such Indebtedness is assumed by such Person, (e) all obligations to purchase, redeem, retire, defease or otherwise acquire for value any Preferred Stock.

"*Indemnified Liabilities*" has the meaning set forth in **Section 5.1**.

"*Indemnified Person*" has the meaning set forth in **Section 5.1**.

"*Insolvency Proceeding*" means any proceeding by or against any Person as a debtor under the United States Bankruptcy Code, or any other state, federal or foreign bankruptcy or insolvency law, including assignments of all or substantially all of such Person's assets for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"*Intellectual Property*" means all of the Copyrights, Trademarks, Patents, Licenses, trade secrets, trade secrets rights, proprietary information, processes and inventions, mask works, domain names and internet websites, designs rights, source code, rights in computer software and computer software products used in connection with, and material to the conduct of, the Company's business; the applications therefor and reissues, extensions, or renewals thereof; and the goodwill associated with any of the foregoing, together with the rights to sue for past, present and future infringement of any of the foregoing and the goodwill associated therewith.

"*Intellectual Property Security Agreement*" means the Intellectual Property Security Agreement entered by the Company and the Purchaser on or prior to the Closing, in the form attached hereto as **EXHIBIT F**.

"*Intercreditor Agreement*" means the Intercreditor Agreement entered by Silicon Valley Bank, the Purchaser and the Company on the date hereof.

"*Joinder Agreement*" means for each Subsidiary, other than a CFC, a completed and executed Joinder Agreement in substantially the form attached hereto as **EXHIBIT B**.

"*License*" means any Copyright License, Patent License, Trademark License or other license of Intellectual Property rights or interests.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest.

4

"*Litigation*" means any action, cease and desist letter, demand, suit, arbitration proceeding, administrative or regulatory proceeding, citation, summons or subpoena of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"*Material Adverse Effect*" means the occurrence of an event, effect, development, change, state of facts, condition, or occurrence that, individually or in the aggregate with all other events, effects, developments, changes, states of fact, conditions or occurrences has a material adverse effect upon:  (i) the business, operations, results of operations, properties, assets, liabilities or financial condition of the Company and its Subsidiaries taken as a whole, or (ii) the ability of the Company and its Subsidiaries taken as a whole to perform any of their obligations under the Transaction Documents, including, without limitation, repayment of the Secured Obligations when due in accordance with the terms of the Transaction Documents, or the ability of the Purchaser to enforce any of its rights or remedies with respect to the Secured Obligations or the Collateral in accordance with the Transaction Documents; or (iii) the Collateral or the status, existence, perfection, priority, or enforceability of Purchaser's Liens on the Collateral; *provided, however,* that any such change or effect caused by or resulting from any of the following shall not be considered, and shall not be taken into account in determining the existence of, a "Material Adverse Effect": (A) the announcement, pendency or consummation of the transactions contemplated hereby, or the execution or delivery of this Agreement or the Transaction Documents or the performance of obligations hereunder or thereunder, including the impact of any of the foregoing on relationships with customers, suppliers or employees, (B) conditions affecting the global economy or financial markets as a whole, or generally affecting the industries in which the Company and its Affiliates conduct their business, (C) any change after the date hereof in any applicable law or in GAAP or any interpretation thereof, (D) the commencement, occurrence or continuation of any war, armed hostilities or acts of terrorism, (E) earthquakes, hurricanes, floods or other natural disasters, (F) the failure by the Company or its Affiliates to meet any revenue or earnings projections, forecasts or predictions, (G) any action required by this Agreement or the Transaction Documents, or (viii) any action taken by, or with the consent of the Purchaser or any of its Affiliates with respect to the transactions contemplated hereby or with respect to the Company, other than actions taken by Purchaser to enforce its rights under the Transaction Documents; provided, that (x) the matters described in clauses (B), (C), (D), and (E) shall be included and taken into account in the term "Material Adverse Effect" to the extent any such matter has a materially disproportionate impact on the business, financial condition or results of operations of the Company and its Affiliates, taken as a whole, relative to other participants in the industries in which they operate and (y) clause (F) will not be a factor in determining whether any change or effect underlying any such failure to meet revenue or earnings projections, forecasts or predictions has resulted in a Material Adverse Effect.

"*Note*" means a Senior Secured Convertible Promissory Note in the form attached hereto as **EXHIBIT C**.

"*Option*" means any right, warrant or option to subscribe or purchase shares of Common Stock or Convertible Securities.

"*Patent License*" means any written or oral agreement granting any right to the Company with respect to any invention on which a Patent is in existence or a Patent application is pending, in which agreement the Company now holds or hereafter acquires any interest, and all license fees and royalties arising therefrom.

5

"*Patents*" means all letters patent of, or rights corresponding thereto, in the United States or in any other country; all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto, in the United States or any other country, including, without limitation, improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"*Payoff Lender*" means Fortress Credit Opportunities I LP or any other creditor under the Fortress Loan Documents.

"*Payoff Letter*" means a letter signed by each Payoff Lender providing for the release of all Liens in favor of the Payoff Lenders on the Company's Assets and equity, if applicable, effective upon receipt of the payments to be made by the Company to the Payoff Lenders in conjunction with the Closing.

"*Permitted Liens*" means the following:  (i) Liens existing on the date of the Closing which are disclosed in **SCHEDULE 2**; (ii) Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings; provided, that the Company maintains adequate reserves therefor in accordance with GAAP; (iii) Liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of the Company's business and imposed without action of such parties; provided, that the payment thereof is not yet required or is being contested in good faith by appropriate proceedings; (iv) Liens arising from judgments, decrees or attachments in circumstances which do not constitute an Event of Default hereunder; (v) the following deposits, to the extent made in the ordinary course of business:  deposits under worker's compensation, unemployment insurance, social security and other similar laws, or to secure the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure indemnity, performance or other similar bonds for the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure statutory obligations (other than liens securing a material obligation and arising under ERISA or environmental laws) or surety or appeal bonds, or to secure indemnity, performance or other similar bonds or obligations (other than for the repayment of borrowed money); (vi) leasehold interests in leases or subleases and licenses granted in the ordinary course of business and not interfering in any material respect with the business of the licensor; (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties that are promptly paid on or before the date they become due; (viii) Liens on insurance policies and proceeds thereof (including money that is or may become due to the insured, any unearned premiums, any dividends which may become due and any interests arising under a state guarantee fund) securing the payment of financed insurance premiums that are promptly paid on or before the date they become due (provided that such Liens extend only to such insurance proceeds and not to any other property or assets); (ix) statutory, common law and contractual rights of set-off and other similar rights as to deposits of cash and securities in favor of banks, other depository institutions and brokerage firms solely to the extent incurred in connection with the maintenance of such deposit or securities accounts in the ordinary course of business; (x) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business so long as they do not materially impair the value or marketability of the related property; (xi) Liens in connection with operating leases; (xii) Liens securing obligations under the Transaction Documents; (xiii) Liens under the Silicon Valley Bank Loan and Security Documents or any

6

Replacement Facility; Liens existing on equipment, computers or software acquired by the Borrower at the time of Borrower's acquisition thereof, provided that such Liens are confined solely to the property so acquired or the proceeds thereof and related books, records and proceeds and were not incurred in anticipation of such acquisition; and (xiv) non-exclusive licenses of Intellectual Property.

"*Permitted Transferee*" means any Affiliate of the Purchaser.

"*Person*" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, other entity or government.

"*Preferred Stock*" means at any given time any equity security issued by the Company that has any rights, preferences or privileges senior to the Common Stock.

"*Register*" has the meaning set forth in **Section 6.8**.

"*Registration Rights Agreement*" means the registration rights agreement entered by the Company and the Purchaser substantially in the form attached hereto as **EXHIBIT D**.

"*Regulation S*" has the meaning set forth in **Section 3.16**.

"*Replacement Facility*" means any credit facility entered into by the Company to refinance or replace the credit facility provided pursuant to the Silicon Valley Bank Loan and Security Documents, and shall include all "loan documents" or documents of a similar defined term thereunder.

"*Rules and Regulations*" means the rules and regulations of the SEC.

"*SEC*" means the United States Securities and Exchange Commission.

"*SEC Documents*" has the meaning set forth in **Section 3.18**.

"*Secured Obligations*" means all loans, debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), premiums, liabilities, obligations (including indemnification obligations), fees, guaranties, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest (and paid in kind interest) not paid when due and all other expenses or other amounts that the Company is required to pay or reimburse pursuant to the Transaction Documents.

"*Securities Act*" means the Securities Act of 1933, as amended, and the Rules and Regulations promulgated thereunder.

"*Security Agreement*" means the Security Agreement entered by the Company and the Purchaser on or prior to the Closing, in the form attached hereto as **EXHIBIT E**.

"*Silicon Valley Bank*" means Silicon Valley Bank, a California corporation.

"*Silicon Valley Bank Loan and Security Documents*" means (i) the Loan and Security Agreement, the Security Agreement and the Intellectual Property Security Agreement entered by Company and Silicon Valley Bank on October 31, 2009 (the "*SVB Loan Documents*"), as amended by the amendment to the Loan Documents entered by the Company and Silicon Valley Bank on March 24, 2010, June 30, 2010, September 30, 2010, August 10, 2011, May 14, 2012.

7

July 18, 2013, September 30, 2014, and April 23, 2015 (ii) any other amendment to the SVB Loan Documents entered by the Company and Silicon Valley Bank not described on item (i) above and any other "Loan Document" as defined in the SVB Loan Documents, and (iii) the Forbearance to Loan and Security Agreement entered by the Company and Silicon Valley Bank on March 27, 2013.

"*Subsidiary*" means an entity, whether corporate, partnership, limited liability company, joint venture or otherwise, in which the Company owns or controls, directly or indirectly, more than 50% of the outstanding voting securities, including each entity listed on **SCHEDULE 1** hereto.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges in the nature of a tax imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Trademark License*" means any written or oral agreement granting any right to the Company to use any Trademark or Trademark registration, now owned or hereafter acquired by the Company or in which the Company now holds or hereafter acquires any interest, and all license fees and royalties arising therefrom.

"*Trademarks*" means all trademarks, service marks, trade names and trade dress (with respect to all of the foregoing, whether registered, common law or otherwise) and any applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof and the entire goodwill associated with and symbolized by such trademarks.

"*Transaction Documents*" means this Agreement, the certificates delivered pursuant to **Section 2.1(B)v**), **Section 2.1(B)vi**) and **Section 2.1(B)x**), the Note, the Warrant, the Intercreditor Agreement, the Security Agreement, the Intellectual Property Security Agreement, and the Registration Rights Agreement, as the same may from time to time be amended, modified, supplemented or restated.

"*Treasury Regulation*" means the regulations (including any proposed and temporary regulations) promulgated by the United States Department of Treasury with respect to the Code or other United States federal Tax statutes.

"*UCC*" means the Uniform Commercial Code as the same is, from time to time, in effect in the State of New York; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lien on any Collateral is governed by the Uniform Commercial Code as the same is, from time to time, in effect in a jurisdiction other than the State of New York, then the term "UCC" shall mean the Uniform Commercial Code as in effect, from time to time, in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"*Underlying Shares*" means shares of the Common Stock into which the Note is convertible.

"*USRPHC*" means "United States real property holding corporation" as defined in Section 897(c)(2) of the Code, and Treasury Regulation Section 1.897-2(b).

8

"*Warrant*" means the Warrant in the form attached hereto as **EXHIBIT A.**

Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, Exhibit, Annex, or Schedule in or to this Agreement. Unless otherwise specifically provided herein, any accounting term used in this Agreement or the other Transaction Documents shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP, consistently applied. Unless otherwise defined herein, terms that are used herein and defined in the UCC shall have the meanings given to them in the UCC. The table of contents and headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole (including the Schedules and Exhibits) and not to any particular provision of this Agreement. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and, except as otherwise expressly provided or unless the context otherwise requires, any noun or pronoun will be deemed to cover all genders. Any statute, rule, order or regulation defined or referred to in this Agreement or in any agreement or instrument that is referred to in this Agreement will mean such statute, rule, order or regulation as from time to time amended, updated, modified, supplemented or superseded, including by succession of comparable successor statutes, rules, orders or regulations and references to all attachments thereto and instruments incorporated therein. References herein to any agreement or letter will be deemed references to such agreement or letter as it may be amended, restated or otherwise revised from time to time in accordance with the terms hereof. Where specific language is used to clarify by example a general statement contained herein, such specific language will not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. Capitalized terms used herein without definition shall have the meanings assigned to them in the Note, the Security Agreement or other applicable Transaction Document.

**ARTICLE 2**
**Closing Conditions**

2.1     **Closing**

    (A)     The Company's obligation to sell the Note is subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived by the Company (except for the conditions set forth in clause (i), which shall not be waivable by the Company):

        i.     consummation of the transactions contemplated hereby or by the other Transaction Documents shall not have been restrained, enjoined or otherwise prohibited or made illegal by, or conditioned upon the receipt of any approvals or consents from Governmental Authorities under, any applicable law;

        ii.     the Purchaser shall have delivered to each other party an executed original of this Agreement, the other Transaction Documents to which the Purchaser is a party and all other documents and instruments reasonably required to effectuate the transactions contemplated hereby and thereby; and

9

iii.       the Purchaser shall have paid to the Company, by wire transfer of immediately available funds, the Note Amount.

(B)       The Purchaser's obligation to purchase the Note is subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived by the Purchaser (except for the conditions set forth in clause (i) below, which shall not be waivable by the Purchaser):

i.        consummation of the transactions contemplated hereby or by the other Transaction Documents shall not have been restrained, enjoined or otherwise prohibited or made illegal by, or conditioned upon the receipt of any approvals or consents from Governmental Authorities under, any applicable law;

ii.       the Company shall have delivered to each other party an executed original of this Agreement, the other Transaction Documents to which the Company is a party to and all other documents and instruments reasonably required to effectuate the transactions contemplated hereby and thereby;

iii.      the Company shall have delivered to the Purchaser certified copies of resolutions of the Company's Board of Directors, and with respect to each Subsidiary party hereto, sole member, as applicable, evidencing approval of this Agreement, the transactions contemplated hereunder and other transactions evidenced by the Transaction Documents;

iv.      the Company and each of its Subsidiaries party hereto shall have delivered to the Purchaser certified copies of their certificate of incorporation and their bylaws, or other organizational documents, as applicable, each as amended through the Closing, of the Company and each Subsidiary party hereto;

v.       the Company and each Subsidiary party hereto shall have delivered to the Purchaser a certificate of good standing for the Company and each Subsidiary party hereto from its state of incorporation and similar certificates from all other jurisdictions in which it does business and where the failure to be qualified would have a Material Adverse Effect;

vi.      the Company shall have delivered to the Purchaser an officer's certificate, dated as of the Closing and signed by an authorized officer of the Company, certifying (i) that the resolutions of the Company, as attached to such certificate, were duly adopted by the Board of Directors, authorizing and approving the execution and delivery of this Agreement and the other Transaction Documents, the Company's and the Subsidiaries' performance of each of its respective obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby, and that such resolutions remain in full force and effect, and have not been amended, modified or rescinded; (ii) as to the incumbency of the Persons signing this Agreement and the other Transaction Documents on behalf of the Company; and (iii) that the copies of the certificate of incorporation and the bylaws, or other organizational documents, as applicable, each as amended of the Company and the Subsidiaries party hereto, as attached to such certificate, are true, complete and correct and remain in full force and effect;

vii.     the Purchaser shall have received an opinion, dated as of the date of the Closing ("**Closing Date**"), from Morrison & Foerster LLP, counsel for the Company, addressed to the Purchaser, in the agreed form and substance reasonably satisfactory to the Purchaser, to the effect set forth in **ANNEX A** hereto;

10

viii.      the representations and warranties of the Company set forth in **Article 3** of this Agreement shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by "materiality" or "Material Adverse Effect" in the text thereof) on and as of the Closing;

ix.      the Company shall have performed and complied with any covenants, agreements, obligations and conditions contained in this Agreement and the other Transaction Documents that are required to be performed or complied with by the Company on or before the Closing;

x.      the Company's Chief Executive Officer shall have delivered to the Purchaser a certificate certifying that the conditions specified in **Sections 2.1(B)(viii)** and **2.1(B)(ix)** have been fulfilled;

xi.      the Company shall have received all consents, authorizations or approvals referred to in **SCHEDULE 4.3**, in form and substance reasonably satisfactory to the Purchaser, and no such consent, authorization or approval shall have been revoked;

xii.      the Company shall have effected the Amendment to the Silicon Valley Bank Loan and Security Documents;

xiii.      the Company, and Silicon Valley Bank and the Purchaser shall have entered into the Intercreditor Agreement;

xiv.      the Company shall have terminated the Fortress Loan Documents and delivered to the Purchaser a copy of the Payoff Letters duly signed by each Payoff Lender; and

xv.      the Company shall have delivered to the Purchaser the Note in the principal amount of the Note Amount and the Warrant.

### ARTICLE 3
### Representations and Warranties of the Company

The Company represents and warrants to the Purchaser as of the Closing that:

**3.1**    **Corporate Status**.  The Company is a corporation duly organized, legally existing and in good standing under the laws of the State of Delaware, and is duly qualified as a foreign corporation in all jurisdictions in which the nature of its business or location of its properties require such qualifications and where the failure to be qualified would reasonably be expected to have a Material Adverse Effect.  In the five years preceding the Closing, the Company has not been party to any merger or combination.

**3.2**    **Authorization and Enforceability**.  This Agreement and the other Transaction Documents have been duly and validly authorized, executed and delivered on behalf of the Company and are valid and binding agreements of the Company enforceable against the Company in accordance with their terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar laws affecting creditors' and contracting parties' rights generally and except as enforceability may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

11

**3.3**   **No Conflict or Third Party Authorization Requirements**.  The Company's execution, delivery and performance of this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, (i) do not violate any provisions of any the Company's Certificate of Incorporation or Bylaws or any material law, regulation, order, injunction, judgment, decree or writ to which the Company is subject, (ii) require no action by or in respect of, or filing with, any Governmental Authority, other than the filing of Form D with the SEC, and (iii) do not violate any material contract or agreement or require the consent or approval of any other Person that has not been obtained.

**3.4**   **Note and Underlying Securities**.  When the Note is delivered and paid for pursuant to this Agreement, it will be convertible into the Underlying Shares in accordance with its terms and the Underlying Shares, upon issuance, will be validly issued, fully paid and nonassessable; the Underlying Shares initially issuable upon conversion of the Note have been duly authorized and reserved for issuance upon such conversion, will conform to the information provided by the Company in this Agreement; the authorized equity capitalization of the Company is as set forth in **SCHEDULE 3.4**; all outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable; the Company's stockholders have no preemptive rights with respect to the Note or the Underlying Shares, and none of the outstanding shares of capital stock of the Company have been issued in violation of any preemptive or similar rights of any security holder. Except as described in **SCHEDULE 3.4**, there are no bonds, debentures, notes or other indebtedness of any type whatsoever of the Company or any of its Subsidiaries having the right to vote (or are convertible into, or exchangeable for, securities having the right to vote) on any matters on which any holders of equity securities of the Company or its Subsidiaries may vote.  Except as disclosed in **SCHEDULE 3.4** and except for rights granted to the Purchaser under this Agreement, there are no outstanding options, warrants, calls, demands, stock appreciation rights, contracts or other rights of any nature to purchase, obtain or acquire or otherwise relating to, or any outstanding securities or obligations convertible into or exchangeable for, or any voting agreements with respect to, any equity securities of the Company or any of its Subsidiaries or any interest in or assets of the Company or any of its Subsidiaries to or from an Person or to issue, deliver, sell, purchase or redeem any stock appreciation rights or other contracts of the Company or any of its Subsidiaries relating to any equity securities of any of the Company or any of its Subsidiaries or other securities of the Company or any of its Subsidiaries to or from any Person.

**3.5**   **Material Adverse Effect**.  Except as set forth in the SEC Documents, since August 11, 2015, no event that has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing.

**3.6**   **Laws**.  The Company is not in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any governmental authority, where such violation or default is reasonably expected to be materially adverse to the Company taken as a whole.  Except as set forth in the SEC Documents, the Company is not in default in any manner under any provision of any material agreement or instrument evidencing Indebtedness, or any other material agreement to which it is a party or by which it is bound, in each case, where such default is reasonably expected to be materially adverse to the Company taken as a whole.

12

**3.7**     **Information Correct and Current**.  No information in any financial statement, exhibit or schedule furnished by or on behalf of the Company to the Purchaser contained in any Transaction Document contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading in any material respect at the time such statement was made or deemed made.

**3.8**     **Tax Matters**.  Except as described on **SCHEDULE 3.8** or adequately reserved for in the Company's financial statements in accordance with GAAP, (a) the Company and its Subsidiaries have filed all material federal and state and local Tax returns that they are required to file (or extensions thereof) within the time and manner required by applicable law, (b) the Company and its Subsidiaries have duly paid or fully reserved for all material Taxes or installments thereof (including any interest or penalties) as and when due, which have or may become due pursuant to such returns, and (c) the Company and its Subsidiaries have paid or fully reserved for any Tax assessment they have received, if any other than any Taxes being contested in good faith and by appropriate proceedings.

**3.9**     **Intellectual Property Claims**.  Except for Permitted Liens, the Company is the sole owner of, or otherwise has the right to use, the Intellectual Property used in the conduct of the Company's business, provided that, solely as to the right to use (but not ownership) of Patents, the representation provided herein is given to the Company's knowledge.  Except as described on **SCHEDULE 3.9**, (i) each of the Trademarks, Patents and material Copyrights, is valid and enforceable, subject to, solely with respect to Patents, third party rights which the Company has no knowledge of, (ii) no Intellectual Property has been judged invalid or unenforceable, in whole or in part, by a final, non-appealable decision of a court of competent jurisdiction, and (iii) no claim has been made in writing to the Company that any Intellectual Property violates the rights of any third party.  Except as set forth on **SCHEDULE 3.9**, the Company is not in breach of, nor has the Company failed to perform any obligations under, any of the foregoing contracts, licenses or agreements and, to the Company's knowledge, no third party to any such contract, license or agreement is in material breach thereof or has failed to perform any material obligations thereunder.

**3.10**     **Intellectual Property**.  Except as described on **SCHEDULE 3.10**, the Company has all rights with respect to Intellectual Property necessary in the operation or conduct of the Company's business as currently conducted.  The Company owns or has the right to use, pursuant to valid licenses, all material software development tools, library functions, compilers and all other material third-party software and other material items that are used in the design, development, promotion, sale, license, manufacture, import, export, use or distribution of Company Products.

**3.11**     **Company Products**.  Except as described on **SCHEDULE 3.11**, to the Company's knowledge, no Intellectual Property owned by the Company or Company Product has been or is subject to any actual or, to the knowledge of the Company, threatened (in writing) litigation, proceeding (including any proceeding in the United States Patent and Trademark Office or any corresponding foreign office or agency) or outstanding decree, order, judgment, settlement agreement or stipulation that restricts in any manner the Company's use, transfer or licensing thereof or that affects the validity, use or enforceability thereof.  Except as set forth on **SCHEDULE 3.11**, there is no decree, order, judgment, agreement, stipulation, arbitral award or other provision entered into in connection with any litigation or proceeding against the Company that obligates the Company to grant licenses or ownership interest in any future Intellectual Property related to the operation or conduct of the business of the Company or Company

13

Products. Except as set forth on **SCHEDULE 3.11**, the Company has not received any written notice or claim challenging or questioning the Company's ownership in any Intellectual Property (or written notice of any claim challenging or questioning the ownership in any licensed Intellectual Property of the owner thereof) or suggesting that any third party has any claim of legal or beneficial ownership with respect thereto. To the Company's knowledge and except as set forth on **SCHEDULE 3.11**, neither the Company's use of Intellectual Property nor the production and sale of Company Products infringes the Intellectual Property or other rights of others.

      3.12   **Title to Property**. To the Company's knowledge, the Company has good and marketable title to all material real properties and all material other properties and assets it owns, in each case free from Liens, charges, encumbrances and defects, other than Permitted Liens; the Company holds any material leased real or personal property under valid and enforceable leases with no terms or provisions that would materially interfere with the use made or to be made thereof by it.

      3.13   **Employee Loans**. The Company has no outstanding loans to any executive officer or director of the Company nor has the Company guaranteed the payment of any loan made to an executive officer or director of the Company by a third party.

      3.14   **Transactions with Affiliates**. Except as described on **SCHEDULE 3.14**, no relationship, direct or indirect, exists between or among any of the Company or any Affiliate of the Company, on the one hand, and of the Company or any Affiliate of the Company, on the other hand, which is required to be disclosed by the Securities Act, and the Rules and Regulations.

      3.15   **Not a Regulated Entity**. The Company is not (a) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940; or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other applicable law regarding its authority to incur Indebtedness.

      3.16   **No General Solicitation; No Directed Selling Efforts**. Neither the Company nor any of its Affiliates, nor any Person acting on its or their behalf, (i) has, within the six-month period prior to the Closing Date, offered or sold in the United States or to any Person (as such terms are defined in Regulation S under the Securities Act) any notes or (ii) has offered or will offer or sell notes (A) in the United States by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) or (B) with respect to any such securities sold in reliance on Rule 903 of Regulation S (the "*Regulation S*") under the Securities Act, by means of any directed selling efforts within the meaning of Rule 902(c) of Regulation S. Assuming the accuracy of the representations and warranties of the Purchaser, the Company, its Affiliates and any Person acting on its or their behalf have complied with and will comply with the offering restrictions requirement of Regulation S.

      3.17   **Margin Stock**. The Company is not engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock (as defined in Regulation U of the Board of Governors of the Federal Reserve. No proceeds from the sales of the Notes will be used by the Company to purchase or carry, or to reduce or refinance any Indebtedness incurred to purchase or carry, any Margin Stock or for any related purpose in violation of Regulations T, U or X of the Board of Governors of the Federal Reserve.

14

**3.18**   **Filings**.  The Company has timely filed with the SEC each report or other document that it is required to file pursuant to Section 13(a), 14 or 15(d) of the Exchange Act and no such report or document, as of the date it was so filed, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (all of the foregoing filed prior to the date hereof, as each may have been amended, and all exhibits included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "*SEC Documents*").  As of their respective dates, the SEC Documents complied in all material respects with the requirements of the Exchange Act and the Rules and Regulations promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  As of their respective dates, the financial statements of the Company included in the SEC Documents complied in all material respects with applicable accounting requirements and the published Rules and Regulations with respect thereto as in effect as of the time of filing.  Such financial statements have been prepared in accordance with GAAP during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and fairly present in all material respects the Company's financial position as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments) which will not be material either individually or in the aggregate.

**3.19**   **Contracts**.  Except as described on **SCHEDULE 3.19**, with respect to any contract to which the Company is a party and which is required to be filed as an exhibit to the Company's Annual Report on Form 10-K, (a) each such contract is valid, binding and enforceable in accordance with its respective terms against the Company and, to the knowledge of the Company, each other party thereto, and is in full force and effect in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and (b) neither the Company nor, to the knowledge of the Company, any counterparty to any such contract, is in violation or breach of such contract except where such breach or violation would not reasonably be expected to have a Material Adverse Effect.

**3.20**   **USRPHC**.  The Company is not a USRPHC.

**3.21**   **Subsidiaries**.  Netlist Electronics (Suzhou) Co., Ltd and Netlist HK Limited are the only Subsidiaries.  Each Subsidiary is duly organized, legally existing and in good standing under the laws of its jurisdiction of incorporation, and is duly qualified as a foreign corporation in all jurisdictions in which the nature of its business or location of its properties require such qualifications and where the failure to be qualified would reasonably be expected to have a Material Adverse Effect.  In the five years preceding the Closing, neither Subsidiary has been party to any merger or combination.

15

**3.22** **Litigation**. Except as described on **SCHEDULE 3.22**, (a) there is no Litigation pending or, to the knowledge of the Company, threatened against or affecting the Company or any of the Assets involving more than $100,000 individually, or $250,000 in the aggregate, and (b) there are no material settlement agreements or similar written agreements with any Governmental Authority and no outstanding orders, judgments, stipulations, decrees, injunctions, determinations or awards issued by any Governmental Authority against or affecting the Company or any of its Subsidiaries or any of the Assets.

**3.23** **Environmental Laws**. To the Company's knowledge, neither the Company nor any of its Subsidiaries is in violation of any material statute, any rule, regulation, decision or order of any Governmental Authority or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, the "***Environmental Laws***"), owns or operates any real property contaminated with any substance that is subject to any Environmental Laws, is liable for any material off-site disposal or contamination pursuant to any Environmental Laws, or is subject to any material claim relating to any Environmental Laws; and the Company is not aware of any pending investigation which might lead to such a claim.

**3.24** **Board Vote**. The Board of Directors, at a meeting duly called and held, has, by unanimous vote of all directors then in office (other than any director abstaining from such vote), (a) determined that this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby are advisable and in the best interest of the Company's stockholders; and (b) approved and adopted this Agreement, the other Transaction Documents, and the transactions contemplated hereby and thereby.

**3.25** **No Finder's Fee**. There are no contracts, agreements or understandings between the Company and any Person that would give rise to a valid claim against the Company for a brokerage commission, finder's fee or other like payment for the transactions contemplated by this Agreement or any other of the Transaction Documents.

**ARTICLE 4**
**Representations and Warranties of the Purchaser**

The Purchaser hereby represents and warrants to the Company as of the Closing and acknowledges, as applicable, that:

**4.1** This Agreement and the other Transaction Documents have been duly and validly authorized, executed and delivered on behalf of the Purchaser and are valid and binding agreements of the Purchaser enforceable against the Purchaser in accordance with their terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar laws affecting creditors' and contracting parties' rights generally and except as enforceability may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and except to the extent enforcement of the Purchaser's indemnification obligations set forth in the Registration Rights Agreement may be limited by federal or state securities laws or the public policy underlying such laws.

16

4.2     (i) the Purchaser is knowledgeable, sophisticated and experienced in making, and is qualified to make, decisions with respect to investments in securities representing an investment decision like that involved in the purchase of the Note and the Warrant, including investments in securities issued by the Company and comparable entities, and has had the opportunity to request, receive, review and consider all information it deems relevant in making an informed decision to purchase the Note and the Warrant; (ii) the Purchaser is acquiring the Note and the Warrant in the ordinary course of its business and for its own account for investment only and with no present intention of distributing it or any arrangement or understanding with any other Persons regarding its distribution; (iii) the Purchaser has not been organized, reorganized or recapitalized specifically for the purpose of investing in the Note or the Warrant; (iv) the Purchaser has had an opportunity to discuss this investment with representatives of the Company and ask questions of them; (v) the Purchaser is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act; and (vi) the Purchaser will not, directly or indirectly, offer, sell, pledge, transfer or otherwise dispose of (or solicit any offers to buy, purchase or otherwise acquire to take a pledge of) the Note or the Warrant except in compliance with the Securities Act, the Rules and Regulations, and applicable state securities laws.

4.3     The Purchaser understands that the Note and the Warrant are being offered and sold to it in reliance upon specific exemptions from the registration requirements of the Securities Act, the Rules and Regulations and state securities laws and that the Company is relying upon the truth and accuracy of, and the Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of the Purchaser to acquire the Note and the Warrant.

4.4     The Purchaser understands that no United States federal or state agency or any other Governmental Authority has passed upon or made any recommendation or endorsement of the Note.

4.5     The Purchaser's principal executive office is at the address set forth below next to the Purchaser's signature block.

4.6     (i) The Purchaser is not a U.S. person and is not acquiring the Note for the account or benefit of any U.S. person; (ii) the Purchaser will not offer or sell the Note or the Warrant to a U.S. person or to for the account or benefit of a U.S. person prior to the expiration of the six-month period after the date on which the Purchaser purchased the Note or the Warrant; (iii) the Purchaser understands and acknowledges that the Note and the Warrant have not been registered under the Securities Act. Accordingly, the Note may not be offered or sold in the U.S. or to U.S. persons unless it is registered under the Securities Act, or an exemption for the regulation requirements is available. Furthermore, hedging transactions involving the Note or the Warrant may not be conducted unless in compliance with the Securities Act; and (iv) the Purchaser acknowledges and agrees that, notwithstanding anything in this Agreement to the contrary, the Company shall, and shall instruct its transfer agent to, refuse to register any transfer of Securities Act that is not made in accordance with the provisions of Regulation S, pursuant to registration under Securities Act or pursuant to an available exemption from registration required under the Securities Act.

17

**ARTICLE 5**
Indemnification

5.1     **Indemnification and Contribution**.  The Company shall indemnify, defend and hold harmless the Purchaser and its Affiliates and their respective officers, directors, employees, agents and advisors (each, an "***Indemnified Person***") from and against all third party claims, damages, losses, liabilities, damages, penalties, actions, judgments, costs and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be imposed on, incurred by, or asserted or awarded against any Indemnified Person (jointly or severally), in each case arising out of or in connection with or by any reason of, or in connection with the preparation for a defense of, any claim, investigation, litigation or proceeding arising out of, related to or in connection with (i) any breach by the Company of any representation, warranty, covenant or agreement contained in any Transaction Document, and (ii) any actions the Purchaser takes in enforcing its rights hereunder or under any Transaction Document (the "***Indemnified Liabilities***"); provided, however, that the Company shall not be liable to any Indemnified Person for any portion of such Indemnified Liabilities to the extent that they are found by a final decision of a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.  If the indemnification provided for in this **Section 5.1** is held by a court of competent jurisdiction to be unavailable to an Indemnified Person with respect to any Indemnified Liabilities, then the Company, in lieu of indemnifying the Indemnified Person, shall contribute to the amount paid or payable by such Indemnified Person with respect to such loss, liability, claim, damage or expense in the proportion that is appropriate to reflect the relative fault of the Company and the Indemnified Person in connection with the statements or omissions that resulted in such Indemnified Liabilities, as well as any other relevant equitable considerations.

**ARTICLE 6**
Company Covenants

The Company agrees as follows:

6.1     **Financial Reports; Notices**.  The Company shall furnish to the Purchaser regular updates which shall include financial information ("***Financial Statements***") and selected business updates as set forth on **SCHEDULE 6.1**.

6.2     **Inspection Rights**.  At least once every four (4) months, but in any case no more than three (3) times a year, the Company shall, upon request of the Purchaser, cause its executive officers to discuss the Company's affairs, finances, and accounts with the Purchaser and permit, upon reasonable request of the Purchaser, at the Purchaser's expense, Purchaser to visit and inspect the Company's properties; examine its books of account and records, during normal business hours of the Company; *provided, however*, that the Company shall not be obligated pursuant to this **Section 6.2** to provide access to any information the disclosure of which would adversely affect (per the Company's outside counsel's opinion), the attorney-client privilege between the Company and its counsel.

6.3     **Formation of Subsidiaries**.  The Company shall, at the time that its forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Closing, within 30 days of such formation or acquisition (or such later date as permitted by the Purchaser in its sole discretion) (a) cause such new Subsidiary to execute and deliver to the Purchaser a Joinder Agreement, together with such other security agreements, as well as appropriate financing

18

statements, all in form and substance reasonably satisfactory to the Purchaser provided that the Joinder Agreement, and such other security agreements shall not be required to be provided to the Purchaser with respect to any Subsidiary that is a CFC, (b) provide to the Purchaser appropriate certificates and powers pledging the outstanding Equity Interests of such Subsidiary; provided, however, that only 65% of the total outstanding voting Equity Interests of any first tier Subsidiary that is a CFC shall be required to be pledged if pledging a greater amount would result in adverse tax consequences or the costs to the Company of providing such pledge would be unreasonably excessive (as reasonably determined by the Purchaser in consultation with the Company) in relation to the benefits to the Purchaser of the security afforded thereby (which pledge, if reasonably requested by the Purchaser, shall be governed by the laws of the jurisdiction of such Subsidiary), and (c) provide to the Purchaser such other documentation, as is reasonably required, including opinions of counsel, with respect to the execution and delivery of the applicable documentation referred to above.

      6.4    **Authorized Common Stock**.  The Company shall at all times cause to be reserved and kept available out of its authorized and unissued shares such number of shares of its Common Stock and other securities as will be sufficient to permit the exercise in full of the Conversion Right, as defined in the Note.

      6.5    **Further Assurances**.  The Company shall from time to time execute, deliver and file, alone or with the Purchaser, any financing statements, security agreements, collateral assignments, notices or other documents necessary to perfect or give the Purchaser a Lien on the Collateral with the priority provided for in the Security Agreement.  The Company shall from time to time procure any instruments or documents as may be reasonably requested by Purchaser, and take all further action that may be necessary to perfect and protect the Liens granted under the Security Agreement.  In addition, and for such purposes only, the Company hereby authorizes the Purchaser to execute and deliver on behalf of the Company and to file financing statements without the signature of the Company either in the Purchaser's name or in the name of the Purchaser as agent and attorney-in-fact for the Company.  Without limiting the foregoing, so long as the Note remains outstanding:

          (A)    The Company shall protect and defend the Company's title to the Collateral thereon against all Persons claiming any interest adverse to the Company or to the Purchaser other than Permitted Liens.

          (B)    The Company shall, no less than 10 days prior to the consummation of a Change of Control, inform the Purchaser as to whether the Company has elected to have (i) the Note redeemed by the surviving entity or Person acquiring control of the Company in connection with the transaction which results in such Change of Control (the "*Controlling Stakeholder*"), or (ii) the Controlling Stakeholder assume all obligations that the Company has, or will have, under this Agreement or any of the other Transaction Documents; *provided, however,* that the Company will not be entitled proceed with a transaction which results or may result in a Change of Control unless it complies with this **Section 6.5(B)** and the Controlling Stakeholder either redeems the Note pursuant to its election under **Section 6.5(B)(i)** or assumes all obligations pursuant to its election under **6.5(B)(ii)**.

          (C)    Within 30 days after the end of each calendar quarter, the Company will notify the Purchaser of (i) any registration by the Company of any material Copyright, Patent or Trademark, or (ii) the Company's entry into a material License constituting Collateral, and shall take such actions as the Purchaser reasonably requests to perfect the Purchaser's security interest therein pursuant to the terms of the Security Agreement.

19

6.6     **Negative Covenants**. For so long as the Note remains outstanding, the Company shall not, and shall cause each Subsidiary not to, either directly or indirectly, without the prior written consent of the Purchaser, take any of the following actions:

(A)     change, modify, amend or waive any provision of the Company's organizational documents which would reasonably be expected to adversely affect the Note or the rights of the Purchaser with respect to the Note or the other Transaction Documents; or

(B)     the Company shall not, and shall not permit any Subsidiary to, voluntarily or involuntarily transfer, sell, lease, lend or in any other manner convey any Patents or Assets of the Company or any of its Subsidiaries which were granted as Collateral under the Security Agreement; *provided, that* nothing herein shall prevent the Company from granting licenses of Patents in the ordinary course of the Company's business; *provided, further,* that none of such licenses infringes, violates or otherwise adversely affects the licenses granted by the Company to Purchaser prior to or after the date hereof.

6.7     **Compliance with Laws**. The Company shall comply in all material respects with all applicable laws, Rules and Regulations.

6.8     **Register**. The Company shall maintain at its offices a register for the recordation of the name and address of the Purchaser and the amount of principal and interest due and payable or to become due and payable from the Company to the Purchaser hereunder or under the Note or any other Transaction Documents (the "***Register***"). Any assignment or transfer of an interest in the Note shall be effective only upon appropriate entries with respect thereto being made in the Register, which the Company shall promptly record upon receiving notice of any such proposed assignment or transfer. The Register shall be available for the Purchaser's inspection at any reasonable time and from time to time upon reasonable prior notice. Notwithstanding the generality of the foregoing, the Company shall reflect ownership interests in the Note in a book entry system in accordance with all applicable provisions of the Code and Treasury Regulations, including for purposes of establishing that the Note is in registered form under Sections 1.871-14(c)(1)(i) and 5f.103-1(c) of the Treasury Regulations.

6.9     **Amendment to Existing Loan**. The Company shall not directly or indirectly, change or amend the terms of the Silicon Valley Bank Loan and Security Documents in a manner prohibited by the Intercreditor Agreement, it being understood and agreed that the Silicon Valley Bank Loan and Security Documents may be amended to provide additional collateral security to the extent that such collateral is provided to the Purchaser under the Transaction Documents.

**ARTICLE 7**
**Restrictions on Transferability**

7.1     **Restrictions on Transferability**. The Purchaser shall be entitled to, at its own discretion, sell, transfer, assign or hypothecate the Note to any Permitted Transferee provided that such sale, transfer assignment or hypothecation complies with the requirements of the Securities Act, the Exchange Act, the Rules and Regulations or any other law applicable to the Company, the Purchaser and the Permitted Transferee; provided further, that the Permitted Transferee agrees in writing to take and hold the Note subject to the provisions and upon the conditions specified in this **Section 7.1**. For purposes of this Agreement and the other Transaction Documents, upon a transfer of the Note to a Permitted Transferee in accordance with this **Section 7.1**, such Permitted Transferee shall be deemed to be the "Purchaser" of the Note.

20

## ARTICLE 8
## Events of Default

The occurrence of any one or more of the following events shall be an Event of Default:

    **8.1**    <u>Payments</u>. The Company fails to pay the principal and interest under the Note when due;

    **8.2**    <u>Covenants</u>. The Company materially breaches or defaults in the performance of any covenant under this Agreement and such default continues for more than thirty (30) days after the earlier of the date on which (i) the Purchaser has given notice of such default to the Company and (ii) the Company has actual knowledge of such default;

    **8.3**    <u>Other Transaction Documents</u>. The occurrence of any material default or breach of any provision of any other Transaction Document and such material default or breach continues for more than thirty (30) days after the earlier of (A) the Purchaser has given notice of such default to the Company, or (B) the Company has actual knowledge of such default;

    **8.4**    <u>Representations</u>. Any representation or warranty made by the Company in this Agreement or any other Transaction Document shall have been false or misleading in any material respect when made or deemed made, and the Company fails to cure such breach within ten (10) days of written notice thereof from the Purchaser; *provided*, that for purposes of this <u>Section 8.4</u> a breach shall be deemed to have been cured if, prior to the expiration of the cure period, the Company shall have (x) to the extent practicable, remedied the circumstance that resulted in such breach and (y) taken appropriate action to indemnify and hold the Purchaser harmless from and against any losses that it has incurred or that it could reasonably expect to incur as a result of such breach.

    **8.5**    <u>Cross Default</u>. A third party creditor with a security interest in or lien against any of the Collateral declares the Company to be in default of its obligations to it and exercises its right to attach or seize any of the Collateral as a result of such default.

    **8.6**    <u>Insolvency</u>. The Company or any Subsidiary (A) (i) shall make an assignment for the benefit of creditors; or (ii) shall admit in writing that it is unable to pay its debts as they become due, or is unable to pay the Secured Obligations under the Transaction Documents, or shall become insolvent; or (iii) shall file a voluntary petition in bankruptcy; or (iv) shall file any petition, answer, or document seeking for itself, as debtor, any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation pertinent to such circumstances; or (v) shall seek or consent to or acquiesce in the appointment of any trustee, receiver, or liquidator for itself or for all or any substantial part of its assets or property; or (vi) its or its directors or majority stockholders shall take any action initiating any of the foregoing actions described in clauses (i) through (v); or (B) either (i) sixty (60) days shall have expired after the commencement of an involuntary action against such Company seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, without such action being dismissed or all orders or proceedings thereunder affecting the operations or the business of such Company being stayed; or (ii) a stay of any such order or

21

proceedings shall thereafter be set aside and the action setting it aside shall not be timely appealed; or (iii) it shall file any answer admitting or not contesting the material allegations of a petition filed against it in any such proceedings; or (iv) the court in which such proceedings are pending shall enter a decree or order granting the relief sought in any such proceedings; or (v) sixty (60) days shall have expired after the appointment, without its consent or acquiescence, of any trustee, receiver or liquidator of it or of all or any substantial part of its assets without such appointment being vacated;

8.7     **Attachments; Judgments**.  Any substantial part of the Collateral is attached or seized, or a levy is filed against any such Collateral, or the Company is enjoined or in any way prevented by a final non-appealable court order by a court of competent jurisdiction from conducting any material part of its business, and in each case, such attachment, seizure, levy, judgment or injunction is not stayed, satisfied, bonded or discharged within ninety (90) days after the entry thereof;

8.8     **Invalidity**.  Any of the Transaction Documents shall cease for any reason to be in full force and effect (other than pursuant to the terms hereof or thereof), or the Company shall so assert in writing, or the Lien created by any of the Transaction Documents shall cease to be perfected and enforceable in accordance with its terms or of the same effect as to perfection and priority purported to be created thereby with respect to any significant portion of the Collateral (other than in connection with any termination of such Lien in respect of any Collateral as permitted hereby, or as a result of any action or failure to act by Purchaser), and such failure of such Lien to be perfected and enforceable with such priority shall have continued unremedied for a period of twenty five (25) days;

8.9     **Other Obligations**.  The occurrence of any "event of default" or other similar event under any agreement or obligation of the Company involving any Indebtedness in an aggregate principal amount in excess of $1,000,000 which is secured by the Collateral, which event continues without waiver or forbearance beyond any period of grace provided therein;

8.10    **Guarantor**.  If any Guarantee ceases for any reason to be in full force and effect, or any Guarantor fails to perform any obligation under its Guarantee or any other Transaction Document to which it is a party or is bound (collectively, the "*Guaranty Documents*"), or any event of default occurs under any Guaranty Document or any Guarantor revokes or purports to revoke its Guarantee, or any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth in any Guaranty Document, or if any of the circumstances described in **Section 8.4** or **Section 8.9** occurs with respect to any Guarantor. For purposes of clarification and not by way of limitation, as of the date hereof, each Subsidiary is a CFC.

## ARTICLE 9
### Remedies

The following provisions in this **Article 9** shall apply:

9.1     **General**.  Upon and during the continuance of any one or more Events of Default, without the Company's approval, (i) the Purchaser may accelerate and demand payment of all or any part of the Secured Obligations and declare them to be immediately due and payable (provided that upon the occurrence of an Event of Default of the type described in **Section 8.7**, the Secured Obligations shall automatically be accelerated and made due and payable, without

22

any further notice or act), and (ii) the Purchaser may notify any of the Company's account debtors to make payment directly to the Purchaser, compromise the amount of the accounts of any such account debtors on the Company's behalf. All of the Purchaser's rights and remedies shall be cumulative and not exclusive.

     9.2    **Collection; Foreclosure**. Upon the occurrence and during the continuance of any Event of Default, the Purchaser may, at any time or from time to time, apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, pursuant to the terms of the Security Agreement.

     9.3    **Cumulative Remedies**. The rights, powers and remedies of the Purchaser hereunder on in any Transaction Document shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative. The exercise of any one or more of the rights, powers and remedies provided herein or therein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of the Purchaser.

**ARTICLE 10**
**Miscellaneous**

     10.1    **Survival of Representations, Warranties and Agreements**. Notwithstanding any investigation made by any party to this Agreement, all covenants, agreements, representations and warranties made by the Company and the Purchaser herein shall survive the execution of this Agreement.

     10.2    **Notices**. Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication (including the delivery of Financial Statements) that is required, contemplated, or permitted under the Transaction Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received upon the earlier of: (i) the day of transmission by facsimile, email or hand delivery or delivery by an overnight express service or overnight mail delivery service; or (ii) when received if sent by United States mail, with proper first class postage prepaid, in each case addressed to the party to be notified as follows:

          (A)    if to the Company, to:

               Netlist, Inc.
               175 Technology, Suite 150
               Irvine, California 92618
               Attention:  Gail Sasaki
               Email:  gsasaki@netlist.com

               with a copy (which shall not constitute notice) to:

               Morrison & Foerster LLP
               12531 High Bluff Drive, Suite 100
               San Diego, California 92130
               Attention: Scott M. Stanton
               Email: sstanton@mofo.com

23

    **(B)**   if to Purchaser, to:

SVIC No. 28 New Technology Business Investment L.L.P.
29F, Samsung Electronics Building
1320-10, Seocho 2-dong, Seocho-gu
Seoul 137-857, Korea
Attention:  Dr. Dong-su Kim, Vice President
Email:  dongkim@samsung.com

with a copy (which shall not constitute notice) to:

DLA Piper LLP (US)
2000 University Avenue
Palo Alto, California 94303
Attention: Louis Lehot
Email: louis.lehot@dlapiper.com

    **10.3**   **Entire Agreement; Amendments**.  This Agreement and the other Transaction Documents constitute the parties' entire agreement and understanding in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof.  No amendment, waiver or other modification of any provision of this Agreement or any other Transaction Document, and no consent with respect to any departure by the Company therefrom, shall be effective unless it is in writing and signed by the Purchaser and the Company and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which it is given.

    **10.4**   **No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any provisions of this Agreement.

    **10.5**   **No Waiver**.  The powers conferred upon the Purchaser by this Agreement are solely to protect its rights hereunder and under the other Transaction Documents and its interest in the Collateral and shall not impose any duty upon the Purchaser to exercise any such powers.  No omission or delay by the Purchaser at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by the Company at any time designated, shall be a waiver of any such right or remedy to which the Purchaser is entitled, nor shall it in any way affect the right of the Purchaser to enforce such provisions thereafter.

    **10.6**   **Severability**.  In case any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

    **10.7**   **Governing Law**.  This Agreement and the other Transaction Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

24

**10.8**    **Waiver of Jury Trial**. EACH PARTY HERETO WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

**10.9**    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument. and shall become effective when one or more counterparts have been signed by each party hereto and delivered (including by facsimile) to the other parties.

**10.10**    **Assignment**. Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of. and be binding upon, the parties hereto and their respective permitted successors, assigns, heirs, executors and administrators. This Agreement and the rights of the Purchaser hereunder may not be assigned by the Purchaser without the prior written consent of Netlist, except such consent shall not be required in cases of assignments by a Purchaser as permitted under **Section 7.1**, provided that such assignee agrees in writing to be bound by the terms of this Agreement and shall be deemed to have made each of the representations and warranties of the Purchaser herein and in the Transaction Documents; provided further that in the event that only a portion of a Note is transferred, only the Purchaser or with the election of such Purchaser, only one Permitted Transferee designated by such Purchaser shall have the right to exercise rights hereunder on behalf of all holders of such Purchaser's Notes.

**10.11**    **Further Assurances**. Each party agrees to cooperate fully with the other parties and to execute such further instruments, documents and agreements and to give such further written assurance as may be reasonably requested by any other party to evidence and reflect the transactions described herein and contemplated hereby and to carry into effect the intents and purposes of this Agreement.

**10.12**    **Replacement Facility**. Purchaser agrees that in the event that the Company wishes to refinance or replace the Silicon Valley Bank Loan and Security Documents with a Replacement Facility, Purchaser will enter into an intercreditor agreement with the provider of such Replacement Facility providing relative lien priority as set forth in (and otherwise on terms substantially similar to) the Intercreditor Agreement.

## ARTICLE 11
### Guarantee

**11.1**    **Guarantee**.

(A)    Each Guarantor unconditionally and irrevocably guarantees, jointly and severally, to the Purchaser the full and punctual payment or performance. as applicable, of the Secured Obligations.

(B)    Each Guarantor further agrees that the Secured Obligations may be extended or renewed, in whole or in part, without notice to it or its further assent and that such Guarantor will remain bound under this **Article 11** notwithstanding any extension or renewal of any Secured Obligation.

25

**(C)**        Each Guarantor waives presentation to, demand of, payment from and protest to Netlist of any of the Secured Obligations and also waives notice of protest for nonpayment. Each Guarantor waives notice of any Default or Event of Default. Each Guarantor's liability for the Secured Obligations shall not be affected by: (i) the Purchasers' failure to assert any claim or demand or to enforce any right or remedy against the Company or any other Person under this Agreement, the Notes or any other agreement (including, but not limited to any other Transaction Document) or otherwise; (ii) any extension or renewal of any thereof; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Agreement, the Notes or any other agreement (including, but not limited to any other Transaction Document); (iv) the release of any security held by the Purchaser for the Secured Obligations; or (v) the Purchaser's failure to exercise any right or remedy against any other guarantor of the Secured Obligations.

**(D)**        Each Guarantor further agrees that its guarantee pursuant to this **Article 11** (each, a "*Guarantee*") constitutes a guarantee of payment and performance (and not merely a guarantee of collection) and waives any right to require that any resort be had by the Purchaser or to any security held for payment of the Secured Obligations.

**(E)**        The Secured Obligations shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Secured Obligations or otherwise (other than payment in full of the Secured Obligations other than contingent indemnification obligations and any other obligations which survive the payment of the Note). Without limiting the generality of the foregoing, the Secured Obligations shall not be discharged or impaired or otherwise affected by the failure of the Purchaser to assert any claim or demand or to enforce any remedy under this Agreement, the Notes or any other agreement (including but not limited to any Transaction Document), by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

**(F)**        Each Guarantor further agrees that its Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of, premium or interest on any Secured Obligation is rescinded or must otherwise be restored by the Purchaser upon the bankruptcy or reorganization of the Company or otherwise.

**(G)**        Each Guarantor agrees that it shall subordinate any right of subrogation in respect of the Secured Obligations until payment in full of all Secured Obligations (other than contingent indemnification obligations and any other obligations which survive the payment of the Note).

**(H)**        Each Guarantor further agrees that, as between it, on the one hand, and the Purchaser, on the other hand: (i) the maturity of the Secured Obligations may be accelerated as provided herein for the purposes of such Guarantor's Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Secured Obligations; and (ii) in the event of any declaration of acceleration of such Secured Obligations, such Secured Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purposes of this **Section 11.1(I)**.

26

(I)   Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees) incurred by the Purchaser in enforcing any rights under this **Article 11**.

11.2   <u>**Security Interest**</u>.

(A)   To secure the payment and performance of its obligations under this **Article 11** (the "***Guarantee Secured Obligations***"), each Guarantor grants to the Purchaser a security interest in all of such Guarantor's right, title and interest in and to all of the Collateral, whether now existing or hereafter acquired or arising and wherever located, including all of the property described in **Annex B** attached hereto (the "***Guarantor Collateral***").

(B)   Each Guarantor shall execute and deliver to the Purchaser, and each Guarantor authorizes the Purchaser to file (with or without such Guarantor's signature), at any time and from time to time, all financing statements, assignments, continuation financing statements, termination statements and other documents and instruments, in form reasonably satisfactory to the Purchaser, and each Guarantor shall take all other action as the Purchaser may reasonably request, to perfect and continue perfected, maintain the priority of or provide notice of the security interest of the Purchaser in the Guarantor Collateral of such Guarantor and to accomplish the purposes of this **Article 11**. Whenever the Secured Party's so requests, a Guarantor shall provide the Purchaser with control (as defined in the UCC) of Guarantor Collateral of such Guarantor consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper. A Guarantor will join with the Purchaser in notifying any third party who has possession of any Guarantor Collateral of such Guarantor of the Purchaser's security interests therein and in obtaining such third party's acknowledgment that it is holding such Guarantor Collateral for the Purchaser's benefit.

(C)   The security interest each Guarantor grants herein shall create a continuing security interest in the Guarantor Collateral of such Guarantor, which shall remain in effect until the Termination Date.

(D)   Each Guarantor, as of the date it becomes a Guarantor, makes the representations and warranties with respect to its Guarantor Collateral as set forth in Section 3 of the Security Agreement, which is incorporated herein, <u>mutatis mutandis</u>.

(E)   Each Guarantor covenants and agrees until the Termination Date with respect to its Guarantor Collateral as set forth in Section 4 of the Security Agreement, which is incorporated herein, <u>mutatis mutandis</u>.

(F)   If any Event of Default shall occur and be continuing, the Purchaser shall have any may exercise all rights and remedies of a secured party under the UCC and other Applicable Law with respect to the Guarantor Collateral.

11.3   <u>**Successors and Assigns**</u>. This **Article 11** will be binding upon each Guarantor and its successors and assigns and will inure to the benefit of the successors and permitted assigns of the Purchaser.

27

**11.4** **No Waiver**.  Neither a failure nor a delay on the part of the Purchaser in exercising any right, power or privilege under this **Article 11** will operate as a waiver thereof, nor will a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Purchaser herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which they may have under this **Article 11**, at law, in equity, by statute or otherwise.

**11.5** **Modification**.  No modification, amendment or waiver of any provision of this **Article 11**, nor the consent to any departure by any Guarantor therefrom, will in any event be effective unless the same is in writing and signed by the Purchaser and such Guarantor in accordance with **Section 10.3** and then such waiver or consent will be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case will entitle such Guarantor to any other or further notice or demand in the same, similar or other circumstances

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

28

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

COMPANY:

NETLIST, INC.

/s/ Gail Sasaki
_____
By: Gail Sasaki
Its: CFO, VP, Secretary

*Signature Page to Senior Secured Convertible Promissory Note and Warrant Purchase Agreement*

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

PURCHASER:

**SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.**

/s/ Seon Jong Lee
_____
**By:** Seon Jong Lee
**Its:** Chief Executive Officer

*Signature Page to Senior Secured Convertible Promissory Note and Warrant Purchase Agreement*

## SCHEDULE 1

### SUBSIDIARIES

1. Netlist Electronics (Suzhou) Co., Ltd.
2. Netlist HK Limited

## SCHEDULE 2

### PERMITTED LIENS

None.

## SCHEDULE 6.1

### FINANCIAL STATEMENTS

Communications between the Company and any of its creditors.

## ANNEX A

### MORRISON & FOERSTER LLP LEGAL OPINION

## ANNEX B

### GUARANTOR COLLATERAL

The Guarantor Collateral consists of all of each Guarantor's right, title and interest in and to the following personal property:

(a)        all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles and software), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of such Guarantor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b)        all cash proceeds and/or noncash proceeds of any of the foregoing, including insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

All terms above have the meanings given to them in the New York Uniform Commercial Code, as amended or supplemented from time to time.

**EXHIBIT A**

WARRANT

**EXHIBIT B**

**JOINDER AGREEMENT**

The undersigned, [Name of Subsidiary], a [●], in its capacity as Subsidiary (together with its successors and assigns in such capacity) hereby agrees to become a party as a Guarantor under the Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated as of November    , 2015 (the "*Purchase Agreement*"), between Netlist, Inc., a Delaware corporation, and SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership, as supplemented, amended and restated or otherwise modified and in effect from time to time, for all purposes thereof and on the terms set forth therein, and to be bound by the terms of the Purchase Agreement and Transaction Documents (as defined in the Purchase Agreement) as fully as if the undersigned had executed and delivered the Purchase Agreement as of the date thereof.

The provisions of Articles 10 of the Purchase Agreement will apply with like effect to this Joinder Agreement.

    **IN WITNESS WHEREOF**, the undersigned has executed, or has caused to be executed, this Joinder Agreement on [date].

                    **SUBSIDIARY:**
                    **[NAME]**


                    By: _____
                    Its:

**EXHIBIT C**

NOTE

**EXHIBIT D**

**REGISTRATION RIGHTS AGREEMENT**

CONFIDENTIAL

NL074648 848

<u>EXHIBIT E</u>

SECURITY AGREEMENT

BY AND BETWEEN

NETLIST, INC.

AND

SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.

NOVEMBER   , 2015

NETLIST, INC.

SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "*Agreement*") is entered into as of November   , 2015, between **NETLIST, INC.**, a Delaware corporation (the "*Company*"), and **SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.,** a Korean limited liability partnership (the "*Secured Party*").

RECITALS

**WHEREAS**, Secured Party is extending a term loan to the Company pursuant to the Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated as of the date hereof, between the Company and Secured Party (as amended and restated from time to time, the "*Purchase Agreement*"); and

**WHEREAS**, it is a requirement under the Purchase Agreement that the Company grant to Secured Party (i) a continuing, first priority security interest in and to all of its Patents and Patent applications, and (ii) a continuing, second priority security interest in and to all other property and assets, to secure payment and performance of all indebtedness, liabilities and obligations of the Company to Secured Party arising under or in connection with the Purchase Agreement, the Note (as defined in the Purchase Agreement), this Agreement, and the other Transaction Documents (as defined in the Purchase Agreement), and the Company is willing to comply with such requirement on the terms and conditions set forth herein;

**NOW, THEREFORE, IT IS AGREED THAT**:

1.  **DEFINED TERMS.**

All terms used without definition in this Agreement shall have the meaning assigned to them in the Purchase Agreement and, if not defined therein, in the Note. All terms used without definition in this Agreement, the Purchase Agreement or the Note shall have the meaning assigned to them in the UCC (as defined below) to the extent they are defined therein. Unless otherwise expressly stated in this Agreement, capitalized terms used in this Agreement shall have the following meanings:

(a)     "*Applicable Law*" means, in respect of any Person, all provisions of constitutions, statutes, rules, regulations and orders of governmental bodies or regulatory agencies applicable to such Person, and all orders and decrees of all courts, tribunals and arbitrators in proceedings or actions to which the Person in question is a party or by which it or its properties are bound or affected.

(b)     "*Article 9*" means Article 9 of the UCC.

(c)     "*Collateral*" means has the property and assets described on **Exhibit A** attached hereto, whether now existing or hereafter acquired or arising and wherever located.

(d)    "*Collection Costs*" means all costs and expenses of enforcing this Agreement, the Note and the other Transaction Documents, including all costs and expenses of collecting the Secured Obligations and exercising Secured Party's rights and remedies under this Agreement and the other Transaction Documents, or under any Applicable Law, as against the Collateral, or as against Company or any other Person, and all costs and expenses incurred by Secured Party at any time in enforcing or defending Secured Party's Lien and priority in the Collateral, and any other costs and expenses incurred by Secured Party after the occurrence of any Default or Event of Default, with regard to any matters relating to this Agreement, the Note or the other Transaction Documents, regardless of whether a Default or Event of Default shall have been declared or any remedies shall have been exercised, and including all such costs and expenses incurred by Secured Party in or relating to any bankruptcy or insolvency proceedings. Without limiting the generality of the preceding sentence, Collection Costs include all reasonable attorneys' fees and legal expenses incurred by Secured Party in enforcing this Agreement and the other Transaction Documents, in collecting the Secured Obligations, and in exercising Secured Party's rights and remedies under this Agreement and the other Transaction Documents, or under any Applicable Law.

(e)    "*Company's Books*" means all of Company's books and records including: ledgers; records concerning Company's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

(f)    "*Default*" means any event or circumstance, which with notice or passage of time or both, could reasonably be substantially likely to become or constitute an Event of Default.

(g)    "*Inventory*" means all present and future inventory, as defined in the UCC, including merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products including such inventory as is temporarily out of Company's custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Company's Books relating to any of the foregoing.

(h)    "*Ordinary Course of Business*" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with (a) the usual and customary customs and practices in the kind of business in which such Person is engaged, and (b) the past practice and operations and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Transaction Document.

(i)    "*Patent Collateral*" means (i) the Patents, (ii) the Patent Licenses, and (iii) the proceeds of the Patents and the Patent Licenses.

(j)    "*Property*" means any property of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, and any right, title or interest in or to property of any kind whatsoever, whether real, personal, or mixed, and whether tangible or intangible, including the Collateral.

2

(k)     "*Termination Date*" means that date on which all of the following have occurred: (a) all of the Secured Obligations (other than inchoate indemnity obligations) have been fully and indefeasibly paid, in cash; and (b) the Secured Party's commitment (contingent or otherwise) to make advances or to otherwise extend credit to the Company has irrevocably terminated.

2.     **SECURITY INTEREST.**

2.1     **Grant of Security Interest.**  To secure the payment and performance of the Secured Obligations, the Company grants to the Secured Party a security interest in all of the Company's right, title and interest in and to all of the Collateral, whether now existing or hereafter acquired or arising and wherever located.

2.2     **Financing Statements, Etc.**  The Company shall execute and deliver to the Secured Party, and the Company authorizes the Secured Party to file (with or without the Company's signature), at any time and from time to time, all financing statements, assignments, continuation statements, termination statements and other documents and instruments, in form reasonably satisfactory to the Secured Party, and the Company shall take all other action as the Secured Party may reasonably request, to perfect and continue perfected, maintain the priority of or provide notice of the security interest of the Secured Party in the Collateral and to accomplish the purposes of this Agreement.  Without limiting the generality of the foregoing, the Company ratifies and authorizes the Secured Party's filing of any financing statements filed prior to the date hereof.  Whenever the Secured Party's so requests, the Company shall provide the Secured Party with control (as defined in the UCC) of Collateral consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper, except to the extent that (i) such Collateral is subject to the control of Silicon Valley Bank or the provider of a Replacement Facility (each, a "***First Priority Lender***"), and Secured Party has a perfected lien on such Collateral by virtue of an intercreditor or other agreement between Secured Party and a First Priority Lender or (ii) Secured Party has a perfected lien on such Collateral by virtue of filing a UCC Financing Statement with respect to such Collateral.  The Company will join with the Secured Party in notifying any third party who has possession of any Collateral of the Secured Party's security interests therein and in obtaining such third party's acknowledgment that it is holding the Collateral for the Secured Party's benefit.

2.3     **Continuing Security Interest.**  The security interest granted herein shall create a continuing security interest in the Collateral, which shall remain in effect until the Termination Date.

2.4     **Liability under Contracts.**  Anything herein to the contrary notwithstanding, (i) the Company shall remain liable under any contracts, agreements and other documents included in the Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the Secured Party's exercise of any of the rights hereunder shall not release the Company from any of its duties or obligations under such contracts, agreements and other documents, and (c) the

3

Secured Party shall not have any obligation or liability under such contracts, agreements and other documents by reason of this Agreement, nor shall the Secured Party be obligated to perform any of the Secured Obligations or duties of the Company thereunder or to take any action to collect or enforce any such contract, agreement or other document.

> 3.   **REPRESENTATIONS AND WARRANTIES OF THE COMPANY.**

The Company represents and warrants to the Secured Party as of the Closing as set forth below.

> 3.1   **Collateral.**

(a)   **Title; Priority.** The Collateral is solely owned by the Company and is free of all Liens (i) other than Permitted Liens, in the case of the Collateral other than the Patent Collateral, (ii) other than Liens in favor of a First Priority Lender, in the case of cash, funds, deposit accounts or securities accounts comprising proceeds of the Patents and the Patent Licenses (such Collateral, "*Common Collateral*"), and (iii) other than (A) the security interest granted to the Secured Party hereunder and (B) Liens securing taxes, assessments and other governmental charges, the payment of which is not yet due or are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted, in the case of the Patent Collateral other than Common Collateral.

(b)   **License Rights.** Except as provided in the attached Disclosure Schedule, all licenses included in the Collateral and all of the Company's rights under such licenses are freely assignable or, to the extent they are not, the Company has obtained all waivers and consents necessary to permit the attachment and perfection of the Secured Party's security interest therein and to permit the Secured Party to exercise its remedies provided hereunder with respect to such licenses and license rights.

(c)   **Location of Collateral.** The attached Disclosure Schedule accurately and completely sets forth: (i) the Company's exact legal name, (ii) the Company's jurisdiction of organization, (iii) the location of the Company's chief executive office and principal place of business, (iv) and all locations where the Company's conducts business or where Collateral or the Company's Books related to the Collateral are located.

(d)   **Control Agreements.** No agreements providing for "control," as defined in Article 9 of the UCC, over the Collateral are currently in effect, other than those in favor of a First Priority Lender.

(e)   **Securities and Instruments.** The Company does not have, hold or own any promissory notes, stocks, bonds, chattel paper, letter-of-credit rights or commercial tort claims except as disclosed in the Disclosure Schedule.

(f)   **Bank Accounts.** The names and addresses of all financial institutions and other Persons at which the Company maintains its deposit, investment and securities accounts, and the account numbers and account names of such accounts, are set forth in the Disclosure Schedule.

4

      (g)    **Intellectual Property Collateral.**

      (i)    The Company has taken all steps to preserve the secrecy of all its Intellectual Property Collateral except where a failure to do so could not reasonably be expected to result in a Material Adverse Effect, and to otherwise preserve its rights with respect to Intellectual Property Collateral except where a failure to do so could not reasonably be expected to result in a Material Adverse Effect.

      (ii)    The Company has not granted, and, to the Company's knowledge, there are no outstanding options relating to any Intellectual Property Collateral, nor is the Company bound by or a party to any option with respect to any Intellectual Property Collateral. The Company is not obligated to pay any royalties to third parties with respect to the marketing, sale, distribution, manufacture, license or use of any Intellectual Property Collateral.

      (iii)    Each current officer, employee and consultant of the Company and each former employee that contributed to the Intellectual Property Collateral that the Company is currently using has executed in the Company's favor the Company's standard agreement regarding confidentiality and proprietary information. To the Company's knowledge, none of its current or former employees, officers and consultants are in violation thereof. No such person has excluded works or inventions made prior to his or her employment or other contractual relationship with the Company from his or her assignment of inventions pursuant to such agreement that could reasonably be expected to have a Material Adverse Effect. Subject to any limitations on such vesting imposed by Applicable Law, full title and ownership of all inventions and proprietary rights, processes or methods developed or invented by all employees and consultants during the period of their employment and/or consultancy and resulting directly or indirectly from their work for the Company vest in the Company pursuant to each such agreement.

      (iv)    To the Company's knowledge, the carrying on of the Company's business by the Company's employees and contractors and the conduct of the Company's business do not conflict with or breach the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which any of such employees or contractors is now obligated (including with former employers).

      **3.2**    **Full Disclosure.** The Company has provided the Secured Party with all information that the Secured Party requested in connection with its decision to purchase the Note, including all information the Company believes is reasonably necessary to make such investment decision.

    4.    **COVENANTS.** Until the Termination Date, the Company covenants and agrees to:

      **4.1**    **Protection of Collateral.** Keep the Collateral in good condition and repair, maintain, preserve, defend and protect the Collateral from loss, damage or deterioration (ordinary wear and tear excepted) or other adverse claims that may affect its title to, or rights or interest in the Collateral, except as otherwise permitted under the Transaction Documents.

5

**4.2**     **Clear Title; Priority.**  Keep the Collateral free of Liens, unpaid taxes or other encumbrances, (i) except for Permitted Liens, in the case of the Collateral other than the Patent Collateral, (ii) except for Liens in favor of a First Priority Lender, in the case of Common Collateral, and (iii) except for (A) the security interest granted to the Secured Party hereunder and (B) Liens securing taxes, assessments and other governmental charges, the payment of which is not yet due or are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted, in the case of the Patent Collateral other than Common Collateral.

**4.3**     **Compliance With Applicable Law.**  Comply with Applicable Law with respect to (i) the Collateral, or (ii) the Company's business.

**4.4**     **Taxes.**  Make due and timely payment or deposit of all material federal, state, and local taxes, assessments, or contributions required of it by Applicable Law.

**4.5**     **Notice of Certain Actions; Location of Collateral.**

**(a)**     Give the Secured Party prompt written notice of:  (i) any change in the location of the Company's chief executive office or principal place of business; (ii) any change in its corporate name; (iii) any changes in its capital or organizational structure; and (iv) any change in its registration as an organization: provided, however, that the Company shall not: (A) except in the ordinary course of business, locate any Collateral outside of the United States, or (B) change its jurisdiction of organization without the Secured Party's prior written consent.

**(b)**     Give the Secured Party prompt written notice of (i) any Intellectual Property being judged invalid or unenforceable, in whole or in part, (ii) any claim being made in writing to the Company that any Intellectual Property violates the rights of any third party, (iii) any material breach by any party to any license or other agreement with respect to any Intellectual Property or any termination or expiration of any such license or other agreement.

**4.6**     **Inspection.**  Upon reasonable prior notice, provide the Secured Party with access to the Collateral and all the Company's Books relating thereto for the purpose of conducting inspections and audits of the Collateral at reasonable times during regular business hours; provided, however, after the occurrence of any Default or Event of Default the Company shall provide the Secured Party with access to the Collateral and all of the Company's Books relating thereto at such times required by the Secured Party.

**4.7**     **Insurance.**  Carry and maintain in full force and effect, at its own expense and with financially sound and reputable insurance companies, insurance with respect to the Collateral in such amounts, with such deductibles and covering such risks as is customarily carried by companies engaged in the same or similar businesses of similar size and owning similar properties in the localities where the Company operates (provided that, for purposes of clarification only, this requirement shall not include intellectual property insurance).  All insurance policies shall provide that the Secured Party shall be loss payee and additional insured and shall provide that they shall not be terminated or cancelled without at least thirty (30) days' prior written notice to the Secured Party.

6

**4.8     Disposition of Patents.**  Not sell, transfer, lease, license or otherwise dispose of any of its Patents, other than: (i) exclusive or non-exclusive licenses of Patents in the ordinary course of the Company's business and (ii) the Lien hereby created.

**4.9     Transactions with Affiliates.**  Not directly or indirectly enter into or permit to exist any material transaction with any Affiliate of the Company except for transactions existing as of the Closing that are disclosed in writing to, and approved by, the Secured Party, and transactions that are in the Ordinary Course of Business, upon fair and reasonable terms that are no less favorable to the Company than would be obtained in an arm's length transaction with a non-affiliated Person.

**4.10     Limitations on Security Interest.**  Not permit the inclusion in any contract to which it becomes a party of, or amend any contract to include, any provisions that purport to prevent the creation hereunder of a security interest in the Company's rights and interests in any property included in the Collateral, except for (a) prohibitions on assignment of any license agreement or other contract without the other contracting party's consent, (b) restrictions contained in the Silicon Valley Bank Loan and Security Documents or any Replacement Facility and (c) restrictions contained in documentation governing Permitted Liens on equipment, computers or software, provided that such restrictions apply solely to Liens on the applicable equipment, computers or software or the proceeds thereof and related books, records and proceeds.

**4.11     Commercial Tort Claims.**  Notify the Secured Party, promptly after any responsible officer's acquiring actual knowledge thereof, of any commercial tort claim related to the Patent Collateral that it acquires with a value in excess of $100,000 and shall enter into a supplement to this Agreement, granting the Secured Party a security interest in such commercial tort claim.

**4.12     Deposit Accounts.**  Obtain and maintain in effect authenticated control agreements for each of the Company's deposit accounts in favor of the Secured Party, in form and substance satisfactory to the Secured Party.

**4.13     Securities, Instruments, Chattel Paper.**  Upon the Secured Party's request, the Company shall (a) deliver to the Secured Party all Collateral consisting of negotiable documents, letters of credit, certificated securities (accompanied by stock powers executed in blank), chattel paper, electronic chattel paper and instruments promptly after the Company receives them unless a First Priority Lender has possession of such Collateral for perfection purposes, and (b) obtain authenticated control agreements from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities to or for the Company.

**4.14     Notice of Registration of Intellectual Property.**  If and when the Company applies for registration of, or shall become the registered owner of, any new Patents, Trademarks, or Copyrights: (i) promptly notify the Secured Party thereof; and (ii) the Company authorizes the Secured Party to modify, amend, or supplement the Intellectual Property Security Agreement (and its exhibits), from time to time to include any of the foregoing and make all necessary or appropriate filings with respect thereto.

7

**4.15      Defense of Intellectual Property Rights.** (i) Protect, defend and maintain the validity and enforceability of (A) the Patents and (B) Trademarks and Copyrights that are material to the operation of its business, except to the extent that the Secured Party consents to the Company electing not to protect, defend or maintain any of such Intellectual Property Collateral, which consent shall not be unreasonably withheld, conditioned or delayed, and (ii) not allow any material Trademarks, Patents (which, for this purpose, shall not include Patent Applications) or material Copyrights to be abandoned, forfeited or dedicated to the public without the Secured Party's prior written consent, which shall not be unreasonably withheld, conditioned, or delayed.

**4.16      Notice of Certain New Collateral.** Give the Secured Party prompt notice of the acquisition of any material instruments or securities, and the establishment of any new deposit account or any new securities account.

**4.17      Notice of Adverse Events.** Promptly notify the Secured Party in writing of any event that materially adversely affects the value of the Collateral taken as a whole, or the rights and remedies of the Secured Party in relation thereto, including the levy of any legal process against any of the Collateral.

**5.      RIGHTS AND REMEDIES DURING EVENT OF DEFAULT.**

**5.1      Rights and Remedies.**

(a)      If any Event of Default shall occur and be continuing, the Secured Party, at its option, may, by notice to the Company, declare the entire unpaid principal amount of the Note, all interest accrued and unpaid thereon and all other Secured Obligations to be forthwith due and payable, whereupon all unpaid principal of the Note, all such accrued interest and all such other Secured Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Company, <u>provided</u>, that, if an Event of Default described in Section 8.5 of the Purchase Agreement occurs, acceleration of the Secured Obligations shall occur automatically without the giving of any such notice.

(b)      If any Event of Default shall occur and be continuing, whether or not the actions referred to in Section 5.2(a) have been taken, the Secured Party shall have and may exercise, in addition to all other rights and remedies granted to it in this Agreement or the other Transaction Documents, all rights and remedies of a secured party under the UCC and other Applicable Law. Without limiting the generality of the foregoing, the Secured Party may sell, resell, lease, use, assign, license, sublicense, transfer or otherwise dispose of any or all of the Collateral in its then condition or following any commercially reasonable preparation or processing (utilizing in connection therewith any of the Company's assets, without charge or liability to the Secured Party therefor) at public or private sale, by one or more contracts, in one or more parcels, at the same or different times, for cash or credit, or for future delivery without assumption of any credit risk, all as the Secured Party deems advisable; <u>provided, however</u>, that the Company shall be credited with the net proceeds of sale only when the Secured Party finally collects them. The Secured Party shall have the right upon any such public sale, and, to the extent permitted by law, upon any such private sale, to purchase the whole or any part of the

8

Collateral so sold, free of any right or equity of redemption, which right or equity of redemption the Company releases to the extent permitted by law. The Company agrees that the sending of notice by ordinary mail, postage prepaid, in accordance with Section 6.9 of the place and time of any public sale or of the time after which any private sale or other intended disposition is to be made, shall be deemed reasonable notice thereof if such notice is sent ten (10) days prior to the date of such sale or other disposition or the date on or after which such sale or other disposition may occur.

        (c)      The cash proceeds actually received from the sale or other disposition or collection of Collateral, and any other amounts received in respect of the Collateral, shall be applied first, to the payment of the Collection Costs; second to the payment of the other Secured Obligations (other than the principal outstanding and the interest accrued under the Note); third to the payment of the accrued interest under the Note and fourth, to the payment of the principal outstanding under the Note. Any surplus thereof which exists after the indefeasible payment and performance in full of the Secured Obligations shall be paid over to the Company or otherwise disposed of in accordance with the UCC or other Applicable Law. The Company shall remain liable to the Secured Party for any deficiency that exists after any sale or other disposition or collection of Collateral.

        (d)      The Secured Party shall have the right to, in the Company's or the Secured Party's name, without the requirement of the Company's assent, and the Company constitutes and appoints the Secured Party (and any of the Secured Party's officers, employees or agents that the Secured Party designates) as the Company's true and lawful attorney-in-fact, with full power and authority to: (i) sign any of the financing statements and other documents and instruments necessary or reasonably advisable to perfect or continue perfected, to maintain the priority of or to provide notice of the Secured Party's security interest in the Collateral (including any notices to or agreements with any securities intermediary); (ii) assert, adjust, sue for, compromise or release any claims under any policies of insurance; and (iii) execute all such other documents and instruments, and do all acts and things for and on behalf of the Company which the Secured Party may deem necessary or advisable to maintain, protect, realize upon and preserve the Collateral and the Secured Party's security interest therein and to accomplish the purposes of this Agreement, including, (A) to defend, settle, adjust or institute any action, suit or proceeding with respect to Intellectual Property Collateral, (B) to assert or retain any rights under any license agreement for any Intellectual Property Collateral, including any rights of the Company arising under Section 365(n) of the United States Bankruptcy Code, and (C) to execute all applications, documents, papers and instruments for the Secured Party to use Intellectual Property Collateral, to grant or issue any exclusive or non-exclusive license or sub-license with respect to any Intellectual Property Collateral, and to assign, convey or otherwise transfer title in or dispose of the Intellectual Property Collateral. The Secured Party agrees that, except upon and during the continuance of an Event of Default, it shall not exercise the power of attorney hereunder, or any rights granted to the Secured Party, pursuant to clauses (ii) and (iii). The foregoing power of attorney is coupled with an interest and is irrevocable until the Termination Date. The Company ratifies, to the extent permitted by law, all that the Secured Party shall lawfully and in good faith do or cause to be done by virtue of and in compliance with this Section 5.1(d).

9

(e)      For the limited purpose of enabling the Secured Party to exercise its rights and remedies under this Agreement if any Event of Default shall occur and be continuing, the Company grants to the Secured Party an irrevocable, non-exclusive license (exercisable without payment or royalty or other compensation to the Company) to use, license or sublicense any Intellectual Property Collateral.

6.      **MISCELLANEOUS.**

6.1      **Governing Law.**  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

6.2      **WAIVER OF JURY TRIAL.**  EACH PARTY HERETO WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

6.3      **Payment of Expenses.**  The Company agrees to pay on demand all Purchaser Expenses incurred in connection with the enforcement of and preservation of any rights and remedies under this Agreement, the Note, and the other Transaction Documents, including in any out-of-court workout or other refinancing or restructuring or in any bankruptcy case, and the protection, sale or collection of, or other realization upon, any of the Collateral, including all expenses of taking, collection, holding sorting, handling, preparing for sale, selling, or the like, and other such expenses of sales and collections of Collateral.  At its option, the Secured Party may, after providing written notice to the Company:  (a) discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral; (b) obtain insurance on the Collateral; and (c) pay for the maintenance and preservation of the Collateral.  The Company agrees that such payments by the Secured Party shall constitute Purchaser Expenses and that it shall reimburse the Secured Party on demand for such Purchaser Expenses.  If the Company fails to reimburse the Secured Party within ten (10) days of receipt of a written invoice for any such Purchaser Expenses, they shall bear interest from the date incurred to the date reimbursed at a rate of ten percent (10%) per annum.

6.4      **Survival.**  The representations, warranties, covenants and agreements made herein shall survive the Closing.  The representations, warranties, covenants and obligations of the Company, and the rights and remedies that the Secured Party may exercise, shall not be limited or otherwise affected by or as a result of any information furnished to, or any investigation made by or knowledge of the Secured Party or any of its representatives.

6.5      **Successors and Assigns.**  Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon the parties hereto and their respective successors and permitted assigns as provided in Section 7.7 of the Purchase Agreement.

6.6      **Entire Agreement; Amendments and Waivers.**  This Agreement (including the Exhibit and the Disclosure Schedule) and the other Transaction Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirely any prior proposals, term

10

sheets, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof. No amendment, waiver or other modification of any provision of this Agreement, and no consent with respect to any departure by the Company therefrom, shall be effective unless the same shall be in writing and signed by the Secured Party and the Company and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

6.7    **No Strict Construction.** The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any provisions of this Agreement.

6.8    **No Waiver.** The powers conferred upon the Secured Party by this Agreement are solely to protect its rights hereunder and under the other Transaction Documents and its interest in the Collateral and shall not impose any duty upon the Secured Party to exercise any such powers. No omission or delay by the Secured Party at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by the Company at any time designated, shall be a waiver of any such right or remedy to which the Secured Party is entitled, nor shall it in any way affect the right of the Secured Party to enforce such provisions thereafter.

6.9    **Notices.** All notices and other communications hereunder shall be given in accordance, and shall be governed by, Section 10.2 of the Purchase Agreement.

6.10    **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument, and shall become effective when one or more counterparts have been signed by each party and delivered (including by facsimile) to the other party.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

11

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

**SVIC NO. 28 NEW TECHNOLOGY BUSINESS
INVESTMENT L.L.P.**

By: _____

Its:

*Signature Page to Security Agreement*

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

**NETLIST, INC.**

By: _____

Its:

*Signature Page to Security Agreement*

EXHIBIT A

COLLATERAL

1

**EXHIBIT F**

**INTELLECTUAL PROPERTY SECURITY AGREEMENT**

      **THIS INTELLECTUAL PROPERTY SECURITY AGREEMENT**, dated as of November  . 2015 (the "*Agreement*"), between **SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.**, a Korean limited liability partnership ("*Secured Party*"), and **NETLIST, INC.**, a Delaware corporation ("*Grantor*"), is made with reference to the Security Agreement, dated as of the date hereof. by and between Grantor and Secured Party (as amended from time to time, the "*Security Agreement*"). Terms defined in the Security Agreement have the same meaning when used in this Agreement.

      For good and valuable consideration. receipt of which is hereby acknowledged. Grantor hereby covenants and agrees as follows:

      To secure the Secured Obligations under the Security Agreement, Grantor grants to Secured Party a security interest in all right, title. and interest of Grantor in any of the following, whether now existing or hereafter acquired or created in any and all of the following property (collectively, the "*Intellectual Property Collateral*"):

      (a)  copyright rights, copyright applications. copyright registrations and like protections in each work or authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret. now or hereafter existing. created. acquired or held (collectively, the "*Copyrights*"), including the Copyrights described in **Exhibit A**;

      (b)  trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections. and the entire goodwill of the business of Grantor connected with and symbolized by such trademarks (collectively, the "*Trademarks*"). including the Trademarks described in **Exhibit B**;

      (c)  patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same (collectively. the "*Patents*"), including the Patents described in **Exhibit C**;

      (d)  trade secrets, and any and all intellectual property rights in computer software and computer software products;

      (e)  claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation. to sue for and collect such damages for said use or infringement of the intellectual property rights identified above;

      (f)  licenses or other rights to use any of the Copyrights, Patents or Trademarks and all license fees and royalties arising from such use to the extent permitted by such license or rights;

1

(g)   amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and

(h)   proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

The rights and remedies of Secured Party with respect to the security interests granted hereunder are in addition to those set forth in the Security Agreement, and those which are now or hereafter available to Secured Party as a matter of law or equity.  Each right, power and remedy of Secured Party provided for herein or in the Security Agreement, or now or hereafter existing at law or in equity shall be cumulative and concurrent and shall be in addition to every right, power or remedy provided for herein, and the exercise by Secured Party of any one or more of such rights, powers or remedies does not preclude the simultaneous or later exercise by Secured Party of any other rights, powers or remedies.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

2

**IN WITNESS WHEREOF**, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

NETLIST, INC.

By: _____
Its:

*Signature Page to Intellectual Property Security Agreement*

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Agreement on the date first written above.

SVIC NO. 28 NEW TECHNOLOGY BUSINESS
INVESTMENT L.L.P.

By:
Its:

*Signature Page to Intellectual Property Security Agreement*

**EXHIBIT A**
**COPYRIGHTS**

1

CONFIDENTIAL

NL074668   868

**EXHIBIT B**
**TRADEMARKS**

Exhibit B-1

NL074669   869

**EXHIBIT C**
**PATENTS**

Exhibit C-1

Exhibit 10.2

**REGISTRATION RIGHTS AGREEMENT**

**BY AND BETWEEN**

**NETLIST, INC.,**

**AND**

**SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.**

**NOVEMBER 18, 2015**

### REGISTRATION RIGHTS AGREEMENT

This **REGISTRATION RIGHTS AGREEMENT** (this "*Agreement*") is made as of November 18, 2015 by and between Netlist, Inc., a Delaware corporation (the "*Company*") and SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership (together with its designated affiliates, the "*Investor*"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Purchase Agreement (defined below).

### RECITALS

**WHEREAS**, pursuant to the Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated as of November 18, 2015, by and between the Company and the Investor (the "*Purchase Agreement*"), the Company has agreed to issue and sell to the Investor (i) a Senior Secured Convertible Promissory Note (the "*Note*") in the principal amount of $15,000,000 and (ii) a Common Stock Purchase Warrant to purchase up to 2,000,000 shares of Common Stock (the "*Warrant*");

**WHEREAS**, the obligations of the Company and the Investor under the Purchase Agreement are conditioned upon, among other things, the execution and delivery of this Agreement by the Company and the Investor.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

### AGREEMENT

**ARTICLE I     DEFINITIONS**

1.1    **Definitions**. As used in this Agreement, and unless the context requires a different meaning, the following terms have the meanings indicated:

"*Affiliate*" means any Person who is an "affiliate" as defined in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

"*Agreement*" means this Agreement as the same may be amended, supplemented or modified in accordance with the terms hereof.

"*Board of Directors*" means the Board of Directors of the Company.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks in the State of New York are authorized or required by law or executive order to close.

"*Charter Documents*" means the Certificate of Incorporation and the Bylaws of the Company, each as may be amended from time to time.

"*Closing Date*" has the meaning set forth in the Purchase Agreement.

"*Common Stock*" means the common stock, par value $0.001 per share, of the Company and any other capital stock of the Company into which such stock is reclassified or reconstituted, and any securities of the Company or any successor which may be issued on or after the date hereof in respect of, or in exchange for, shares of Common Stock pursuant to, among others, merger, consolidation, stock split, stock dividend, recapitalization of the Company or otherwise.

"*Common Stock Equivalents*" means any security or obligation which is by its terms, directly or indirectly, substantively analogous to, convertible into or exchangeable into or for shares of Common Stock, including, without limitation, any option, warrant or other subscription or purchase right with respect to Common Stock.

"*Company*" has the meaning set forth in the preamble to this Agreement.

"*Company Underwriter*" has the meaning set forth in **Section 4.1**.

"*Demand*" has the meaning set forth in **Section 3.1(a)**.

"*Designated Holder*" means the Investor and any permitted transferee of the Investor to whom Registrable Securities have been transferred in accordance with **Section 9.5** of this Agreement, other than a transferee to whom Registrable Securities have been transferred pursuant to a Registration Statement under the Securities Act or Rule 144 or Regulation S under the Securities Act (or any successor rules thereto), but in each case solely for so long as such Investor or transferee continues to be a holder of Registrable Securities.

"*Dollars*," "*dollars*" and "*$*" has the meaning set forth in **Section 9.12**.

"*Eligible Market*" has the meaning set forth in the definition of "Trading Day" as set forth in this **Section 1.1**.

"*Effectiveness Period*" has the meaning set forth in **Section 3.2(a)**.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder.

"*FINRA*" means the Financial Industry Regulatory Authority (or any successor entity thereto).

"*Governmental Authority*" means the government of any nation, state, province, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"*Holder's Counsel*" has the meaning set forth in **Section 6.1(a)**.

"*Incidental Registration*" has the meaning set forth in **Section 4.1**.

"*Indemnified Party*" has the meaning set forth in **Section 7.3**.

"*Indemnifying Party*" has the meaning set forth in **Section 7.3**.

"*Investor*" has the meaning set forth in the preamble to this Agreement and shall also include any permitted transferee thereof.

"*Inspector*" has the meaning set forth in **Section 5.2(b)**.

"*Issuance Date*" means the date on which the Registrable Securities are issued upon conversion of the Note or exercise of the Warrant.

"*Liability*" has the meaning set forth in **Section 7.1**.

"*Other Stockholders*" has the meaning set forth in **Section 4.1**.

"*Person*" means any individual, firm, corporation, partnership, limited liability company, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

"*Plan of Distribution*" has the meaning set forth in **Section 3.1(a)**.

"*Purchase Agreement*" has the meaning set forth in the recitals to this Agreement.

"*Records*" has the meaning set forth in **Section 5.2(b)**.

"*Registrable Securities*" means, subject to Section 2.2 below (a) shares of Common Stock issued upon conversion of the Note or upon the exercise of the Warrant; and (b) any Common Stock issued as

2

(or issuable upon the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of the securities referenced in clause (a) above.

"*Registration Expenses*" has the meaning set forth in **Section 6.3.**

"*Registration Statement*" means a registration statement filed pursuant to the Securities Act.

"*Required Effectiveness Date*" means the date that is forty-five (45) days from the Required Filing Date; *provided, that,* if the SEC reviews and has written comments to the filed Registration Statement, then the Required Effectiveness Date under this clause shall be five (5) Business Days following the date the SEC or the Staff notifies the Company that it will not review the Registration Statement or that the Company may request effectiveness of the Registration Statement.

"*Required Filing Date*" has the meaning set forth in **Section 3.1.**

"*SEC*" means the United States Securities and Exchange Commission or any similar or successor agency then having jurisdiction to enforce the Securities Act.

"*SEC Approved Registrable Securities*" means the Registrable Securities other than SEC Non-Registrable Securities.

"*SEC Non-Registrable Securities*" means the Registrable Securities excluded from the Registration Statement either pursuant to Section 3.2(b) because the SEC or the Staff has indicated through comment letters or otherwise that such securities are not eligible to be resold under Rule 415 of the Securities Act.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Staff*" has the meaning set forth in **Section 3.2(b).**

"*Trading Day*" means (a) any day on which the Common Stock is listed or quoted and traded on any national securities exchange, market or trading or quotation facility on which the Common Stock is then listed or quoted (an "*Eligible Market*"), or (b) if the Common Stock is not then listed or quoted and traded on any Eligible Market, a day on which trading occurs on the OTC Bulletin Board (or any successor thereto), or (c) if trading ceases to occur on the OTC Bulletin Board (or any successor thereto), any Business Day.

"*Underwriter Identification*" has the meaning set forth in **Section 3.2(b).**

"*Warrant*" has the meaning set forth in the recitals to this Agreement.

**ARTICLE II          GENERAL; SECURITIES SUBJECT TO THIS AGREEMENT**

2.1      **Grant of Rights**.  The Company hereby grants registration rights to the Designated Holder upon the terms and conditions set forth in this Agreement.

2.2      **Registrable Securities**.  For the purposes of this Agreement, securities of the Company listed in clauses (a) and (b) of the definition of "Registrable Securities" in **Section 1.1** hereof will cease to be Registrable Securities, when (i) a Registration Statement covering such Registrable Securities has been declared effective under the Securities Act by the SEC and all such Registrable Securities have been sold or transferred pursuant to such effective Registration Statement, (ii) the entire amount of the Registrable Securities owned by a Designated Holder may be sold in a single sale, in the opinion of counsel satisfactory to the Company and such Designated Holder, each in their reasonable judgment (it being agreed that DLA Piper LLP (US) shall be satisfactory counsel), without any limitation as to volume pursuant to Rule 144 (or any successor provision then in effect) under the Securities Act or (iii) such Registrable Securities have been sold pursuant to Rule 144 under the Securities Act.

3

NL074674   874

**2.3** **Holder of Registrable Securities.** A Person is deemed to be a holder of Registrable Securities whenever such Person owns of record Registrable Securities, or holds an option to purchase, or a security convertible into or exercisable or exchangeable for, Registrable Securities whether or not such acquisition or conversion has actually been effected. If the Company receives conflicting instructions, notices or elections from two or more Persons with respect to the same Registrable Securities, the Company shall act upon the basis of the instructions, notice or election received from the record owner of such Registrable Securities.

## ARTICLE III          DEMAND REGISTRATION

**3.1** **Demand Registration Rights.**

**(a)** Subject to the conditions of this **ARTICLE III**, if at any time or from time to time following the Issuance Date, the Company receives a written request from the Investor (a "**Demand**") that the Company file a registration statement under the Securities Act covering the registration for resale of the Registrable Securities, then the Company shall, within thirty (30) days of the receipt thereof (the "**Required Filing Date**"), file with the SEC a registration statement pursuant to Rule 415 of the Securities Act (the "**Registration Statement**") on Form S-3 (or any successor form thereto), or if Form S-3 may not be used by the Company pursuant to applicable law, on Form S-1 (or any successor form thereto) with respect to the resale, from time to time, covering all of the Registrable Securities held by the Designated Holder. The Registration Statement shall contain substantially the "**Plan of Distribution**" attached hereto as Exhibit A. The disposition of Registrable Securities from the Registration Statement may occur, at any time, in one or more underwritten offerings, block transactions, broker transactions, at-market transactions or in such other manner or manners as may be specified by the applicable Designated Holder. Notwithstanding the above, if the Company is required to file the Registration Statement on a Form S-1, then the Company shall have sixty (60) days from the Demand to prepare and file the Registration Statement and the Required Filing Date shall be, in such case, the sixtieth (60th) day after the Demand.

**(b)** Notwithstanding the foregoing, the Company shall not be required to effect a registration pursuant to this **ARTICLE III** if the Company shall furnish to the Designated Holder requesting a registration statement pursuant to this Section 3 a certificate signed by the Company's Chief Executive Officer or Chairman of the Board of Directors stating that, in the good faith judgment of the Board of Directors of the Company, it would be seriously detrimental to the Company and its stockholders for such registration statement to be effected at such time. In such case, the Company shall have the right to defer such filing for a period of not more than one hundred twenty (120) days after receipt of the Demand of the Investor, provided that such right shall be exercised by the Company not more than once in any twelve (12) month period and provided further that the Company shall not register any securities for the account of itself or any other stockholder during such one hundred twenty (120) day period (other than a registration relating to a corporate reorganization or transaction under Rule 145 of the Securities Act, a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the resale of the Registrable Securities, or a registration in which the only Common Stock being registered is Common Stock issuable upon conversion of debt securities that are also being registered).

**3.2** **Effective Registration Statement.**

**(a)** The Company shall use its reasonable best efforts to cause the Registration Statement to become effective as soon as practicable, but not later than the Required Effectiveness Date, and shall use its reasonable best efforts to keep the Registration Statement continuously effective under the Securities Act, subject to the provisions of **Sections 6.4** and **6.5** hereof, until the earlier of (i) such time as the Company delivers an opinion of counsel reasonably acceptable to the Designated Holder (it being agreed that DLA Piper LLP (US) shall be satisfactory counsel) that the Designated Holder may sell in the open market in a single transaction all Registrable Securities then held by the Investor pursuant to Rule 144 of the Securities Act (or any similar provision then in force) without being subject to the volume limitations

4

thereof or otherwise under an applicable exemption from the registration requirements of the Securities Act, as amended, and all other applicable securities and blue sky laws or (ii) all Registrable Securities covered by such Registration Statement have been sold pursuant to such Registration Statement or pursuant to Rule 144 (such period in respect of such Registrable Securities being the applicable "*Effectiveness Period*").

(b)      Notwithstanding anything to the contrary in this Agreement (other than **Section 3.2(d)** below), in the event the staff of the SEC (the "*Staff*") or the SEC seeks to characterize any offering pursuant to a Registration Statement filed pursuant to this Agreement as constituting an offering of securities by or on behalf of the Company such that Rule 415 is not available to the Company to register the resale of such Registrable Securities and, as a result, the Staff or the SEC does not permit such Registration Statement to become effective and used for resales in a manner that permits the continuous resale at the market by the Designated Holder participating therein without being named therein as an "underwriter," then the Company shall reduce the number of shares to be included in such Registration Statement (in accordance with the following sentence) until such time as the Staff and the SEC shall so permit such Registration Statement to become effective as aforesaid.  In addition, in the event that the Staff or the SEC requires any Designated Holder seeking to sell securities under a Registration Statement filed pursuant to this Agreement to be specifically identified as an "underwriter" (an "*Underwriter Identification*") in order to permit such Registration Statement to become effective, and such Designated Holder (subject to **Section 3.2(d)** below) does not consent to being so named as an underwriter in such Registration Statement, then, in each such case, the Company shall reduce the total number of Registrable Securities to be registered on behalf of such Designated Holder, only to the extent necessary as would cause the Staff or the SEC not to require such Underwriter Identification or until such Designated Holder accepts such Underwriter Identification and the manner thereof.  In the event of any reduction in Registrable Securities pursuant to this section), if requested by a Designated Holder holding Registrable Securities that were so excluded from such registration, the Company shall use its reasonable best efforts to cause such Registrable Securities to be registered to the greatest extent and at the earliest opportunity practicable and in any event not later sixty (60) days after the earliest practicable date permitted under applicable guidance of the SEC and the Staff (and shall use its reasonable best efforts to effect additional registrations of Registrable Securities until all such securities have been included in additional Registration Statements); *provided, however,* that in no event shall the Company be required to file more than three (3) Registration Statements pursuant to this **Section 3.2(b)**.

(c)      Notwithstanding anything to the contrary in this Agreement, a Designated Holder shall have the right to require the Company to exclude all or any portion of such Designated Holder's Registrable Securities from any Registration Statement, by written notice to the Company upon such Designated Holder's reasonable belief that (i) inclusion of such Registrable Securities in the Registration Statement could subject such Designated Holder to underwriter liability, or (ii) the SEC or the Staff will impose restrictions and terms on the disposition of such Registrable Securities that are materially inconsistent with the Plan of Distribution attached hereto as Exhibit B.  In such event, the Company shall be required to file a new Registration Statement for such excluded shares in accordance with **Section 3.2(b)**.

(d)      If any such Registration Statement and related prospectus refers to any Designated Holder by name or otherwise as the holder of any securities of the Company and if in such holder's sole and exclusive judgment, such holder is or might be deemed to be an underwriter or a controlling person of the Company, or that such reference could reasonably be expected to result in an Underwriting Identification requirement, such holder shall have the right to (i) require the insertion therein of language, in form and substance satisfactory to such holder and presented to the Company in writing, to the effect that the holding by such holder of such securities is not to be construed as a recommendation by such holder of the investment quality of the Company's securities covered thereby and that such holding does not imply that such holder will assist in meeting any future financial requirements of the Company, or (ii)

5

in the event that such reference to such holder by name or otherwise is not required by the Securities Act or any similar federal statute then in force, require the deletion of the reference to such holder.

      3.3    **Expenses**. The Company shall bear all Registration Expenses in connection with this **ARTICLE III**, whether or not the Registration Statement becomes effective.

**ARTICLE IV**      **INCIDENTAL OR "PIGGY-BACK" REGISTRATION**

      4.1    **Request for Incidental Registration**. At any time after the Issuance Date until the end of the Effectiveness Period, if (i) the Company proposes to file a Registration Statement under the Securities Act with respect to an offering by the Company for its own account (other than a Registration Statement on Form S-4 or S-8 or any successor thereto), or (ii) the Company proposes to file a Registration Statement under the Securities Act with respect to an offering for the account of any stockholder of the Company other than any Designated Holder, then in each case the Company shall give written notice of such proposed filing to each Designated Holder at least thirty (30) days before the anticipated filing date, and such notice shall specify, at minimum, the proposed date of filing of such Registration Statement, any proposed means of distribution of such Registrable Securities or other securities, any proposed managing underwriter or underwriters of such Registrable Securities or other securities and a good faith estimate by the Company of the proposed maximum offering price thereof, as such price is proposed to appear on the facing page of such registration statement, and offer such Designated Holder the opportunity to register the number of Registrable Securities as such Designated Holder may request (an "***Incidental Registration***"). The Company shall use its best efforts (within twenty (20) days of the notice by the Designated Holder provided for below in this sentence) to cause the managing underwriter or underwriters in the case of a proposed underwritten offering (the "***Company Underwriter***") to permit each Designated Holder who has requested in writing to the Company within ten (10) Business Days of the giving of the notice by the Company to participate in the Incidental Registration to include its, his or her Registrable Securities in such offering on the same terms and conditions as the securities of the Company or the account of such other stockholder, as the case may be, included therein. In connection with any Incidental Registration under this section involving an underwritten offering, the Company shall not be required to include any Registrable Securities in such underwritten offering unless the Designated Holder thereof accepts the terms of the underwritten offering as reasonably agreed upon between the Company, such other stockholders, if any, and the Company Underwriter. If the **Company Underwriter determines in writing to the Company** that the registration of all or part of the Registrable Securities which the Designated Holder has requested to be included in an offering by the Company for its own account (other than a Registration Statement on Form S-4 or S-8 or any successor thereto) would materially adversely affect the price, timing or distribution of the securities offered or the price per security that will derive from such registration, then the Company shall be required to include in such Incidental Registration, to the extent of the amount that the Company Underwriter believes may be sold without causing such adverse effect, (i) all of the securities to be offered for the account of the Company, (ii) the Registrable Securities to be offered for the account of the Designated Holder pursuant to this **ARTICLE IV**, and (iii) other securities requested to be included in such offering; *provided, however*, that no such reduction shall reduce the shares of Registrable Securities held by the Designated Holder included in the registration to below 20% of the total amount of securities included in such registration, unless such adverse effect is related to any of the matters contemplated by **Section 3.2(b)** hereof, in which case such 20% floor shall not apply and such Registrable Securities may be excluded pursuant to the provisions of **Section 3.2 (b)** hereof. If the Company Underwriter determines in writing that the registration of all or part of the Registrable Securities which the Designated Holder has requested to be included in an offering for the account of any stockholder of the Company other than the Designated Holder ("***Other Stockholders***") would materially adversely affect the price, timing or distribution of the securities offered or the price per security that will derive from such registration, then the Company shall be required to include in such Incidental Registration, to the extent of the amount that

6

the Company Underwriter believes may be sold without causing such adverse effect, (i) all of the securities to be offered for the account of such Other Stockholders, (ii) the Registrable Securities to be offered for the account of the Designated Holder pursuant to this **ARTICLE IV**, (iii) all of the securities to be offered for the account of the Company, and (iv) other securities requested to be included in such offering; *provided, however*, that no such reduction shall reduce the shares of Registrable Securities held by the Designated Holder included in the registration to below 40% of the total amount of securities included in such registration unless such adverse effect is related to any of the matters contemplated by **Section 3.2(b)** above, in which case such 40% floor shall not apply and such Registrable Securities may be excluded pursuant to the provisions of **Section 3.2(b)**.  For the avoidance of doubt, no registration pursuant to this section shall relieve the Company of its obligations to register Registrable Securities pursuant to **Sections 3.1** and **3.2**.

4.2    **Right to Terminate Registration**.  The Company shall have the right to terminate or withdraw any registration initiated by it under **Section 4.1** prior to the effectiveness of such registration whether or not any Designated Holder has elected to include Registrable Securities in such registration.  A Designated Holder shall have the right, by written notice to the Company, to exclude all or any portion of such Designated Holder's Registrable Securities from any Registration Statement effected pursuant to this **ARTICLE IV** at any time prior to its effectiveness.

4.3    **Expenses**.  The Company shall bear all Registration Expenses in connection with any Incidental Registration pursuant to this **ARTICLE IV**, whether or not such Incidental Registration becomes effective.

**ARTICLE V       UNDERWRITTEN OFFERINGS**

5.1    **Market Underwritten Offering**.  After one (1) year from the Issuance Date, the Designated Holder may distribute all or any portion of the Registrable Securities by means of an underwritten offering; *provided, that*: (i) the Designated Holder has requested such underwritten offering, (ii) the Designated Holder provides written notice to the Company of its intention to distribute Registrable Securities by means of an underwritten offering, (iii) the managing underwriter or underwriters thereof shall be designated by the Designated Holder; *(provided, however,* that such designated managing underwriter or underwriters shall be reasonably acceptable to the Company); (iv) the Designated Holder completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; and (v) the underwritten sale pursuant to this Section must be for a number of Registrable Securities, which based on the good faith determination by the Designated Holder, would result in gross proceeds of at least $5 million.

5.2    The Company agrees that in the event an underwritten offering pursuant to **Section 5.1** is undertaken, the Company shall (without limitation to the obligations of the Company set forth in **Article VI**):

(a)    enter into and perform customary agreements (including an indemnity agreement with customary indemnification provisions) and take such other actions as reasonably required in order to expedite or facilitate the disposition of such Registrable Securities, including causing its officers to participate in "road shows" and other information meetings organized by the underwriter, if applicable;

(b)    make available at reasonable times for inspection by any Designated Holder, any managing underwriter participating in any disposition of such Registrable Securities pursuant to a Registration Statement, Holder's Counsel and any attorney, accountant or other agent retained by any such Designated Holder or any managing underwriter (each, an "*Inspector*" and, collectively, the "*Inspectors*"), all financial and other records, pertinent corporate documents and properties of the Company and its subsidiaries and such other information (collectively, the "*Records*") as shall be reasonably necessary to enable any such Inspector to exercise their due diligence responsibility, and cause

7

the Company's and its subsidiaries' officers, directors and employees, and the independent public accountants of the Company, to supply all information reasonably requested by any such Inspector in connection with such Registration Statement. Notwithstanding the foregoing, Records and other information that the Company determines, in good faith, to be confidential, and which is delivered to the Inspectors pursuant to written instruction to keep such information confidential, shall not be disclosed by the Inspectors or used for any purpose other than as necessary or appropriate for the purpose of such inspection (and the Inspectors shall confirm their agreement in writing in advance to the Company if the Company shall so request) unless (i) the disclosure of such Records is necessary, in the Company's judgment, to avoid or correct a misstatement or omission in the Registration Statement, (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction after exhaustion of all appeals therefrom or (iii) the information in such Records was and/or becomes otherwise known to the Inspectors on a non-confidential basis, prior to or after its disclosure by the Company, or was and/or becomes generally available to the public. Each Designated Holder agrees that it shall promptly, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, give notice to the Company and allow the Company, at the Company's expense, to undertake appropriate action to prevent disclosure of the Records deemed confidential, and such Designated Holder shall reasonably cooperate with the Company in connection therewith.

(c)   furnish, at the request of any seller of Registrable Securities on the date such securities are delivered to the underwriters for sale pursuant to such registration or, if such securities are not being sold through underwriters, on the date the Registration Statement with respect to such securities becomes effective and dated as of such date, an opinion of counsel representing the Company for the purposes of such registration, addressed to the underwriters, if any, and to the seller making such request, covering such legal matters with respect to the registration in respect of which such opinion is being given as the underwriters, if any, and such seller may reasonably request and are customarily included in such opinions; and

(d)   obtain one or more "cold comfort" letters, dated the effective date of such Registration Statement and dated the date of the closing under the applicable underwriting agreement, signed by the independent certified public accountants of the Company who have certified the financial statements included in such Registration Statement, in customary form and covering such matters of the type customarily covered by "cold comfort" letters as the Designated Holder.

## ARTICLE VI          REGISTRATION PROCEDURES

6.1   **Obligations of the Company.**   Whenever registration of Registrable Securities has been requested pursuant to **ARTICLE III** or **ARTICLE IV** of this Agreement, the Company shall use its reasonable best efforts to effect the registration of such Registrable Securities in accordance with the intended method of distribution thereof, and in connection with any such request, the Company shall, as expeditiously as possible:

(a)   before filing a Registration Statement or prospectus or any amendments or supplements thereto relating to Registrable Securities, the Company shall provide a single counsel selected by the Designated Holder ("*Holder's Counsel*") with an adequate and appropriate opportunity to review and comment on such Registration Statement and each prospectus included therein (and each amendment or supplement thereto) to be filed with the SEC, provided, that in no event shall such review period be required to be more than ten (10) days. The Company shall reasonably cooperate with Holder's Counsel in performing the Company's obligations under this Agreement. The Company shall promptly notify the Holder's Counsel and each seller of Registrable Securities of any stop order issued or threatened by the SEC relating to Registrable Securities and use all best efforts to prevent the entry of such stop order or to remove it if entered;

(b)   prepare and file with the SEC such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be reasonably necessary to keep such

8

Registration Statement effective for the period specified in such **ARTICLE III**, or with respect to **ARTICLE IV** and if not so specified therein, the lesser of (A) one hundred and eighty (180) days and (B) such shorter period which will terminate when all Registrable Securities covered by such Registration Statement have been sold and shall comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement;

(c)     furnish to each seller of Registrable Securities, prior to filing a Registration Statement relating to Registrable Securities, at least one executed copy of such Registration Statement as is proposed to be filed, and thereafter such number of conformed copies of such Registration Statement, each amendment and supplement thereto (in each case including all exhibits thereto), the prospectus included in such Registration Statement (including each preliminary prospectus and any summary prospectus) and such other documents or prospectus as each such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(d)     register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as any seller of Registrable Securities may reasonably request, and continue such registration or qualification in effect in such jurisdiction for as long as permissible pursuant to the laws of such jurisdiction, or for as long as any such seller reasonably requests or until all of such Registrable Securities are sold, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable any such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller; *provided, however*, that the Company shall not be required to (i) qualify generally to do business as a foreign entity in any jurisdiction where it would not otherwise be required to qualify but for this section, (ii) subject itself to taxation in any such jurisdiction or (iii) consent to general service of process in any such jurisdiction;

(e)     promptly notify each seller of Registrable Securities: (i) when a prospectus, any prospectus supplement, a Registration Statement or a post-effective amendment to a Registration Statement (but only if relating to Registrable Securities) has been filed with the SEC, and, with respect to a Registration Statement or any post-effective amendment (but only if relating to Registrable Securities), when the same has become effective; (ii) of any comments or request by the SEC or any other federal or state Governmental Authority for amendments or supplements to a Registration Statement or related prospectus or for additional information (but only if relating to Registrable Securities); (iii) of the issuance by the SEC or any other Governmental Authority of any stop order suspending the effectiveness of a Registration Statement relating to Registrable Securities or of any order suspending or preventing the use of any related prospectus or the initiation or threatening of any proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceedings for such purpose; (v) of the existence of any fact or happening of any event (including the passage of time) of which the Company has knowledge which makes any statement of a material fact in such Registration Statement or related prospectus or any document incorporated or deemed to be incorporated therein by reference untrue or which would require the making of any changes to the Registration Statement or prospectus in order that, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of such prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and (vi) determination by counsel of the Company that a post-effective amendment to a Registration Statement relating to Registrable Securities is advisable;

(f)     upon the occurrence of any event contemplated by clause (v) of **Section 6.1(e)**, as promptly as practicable, prepare a supplement, amendment or post-effective amendment to such

9

Registration Statement or related prospectus and furnish to each seller of Registrable Securities a reasonable number of copies of such supplement to or an amendment or post-effective amendment of such Registration Statement or prospectus as may be necessary so that, after delivery to the purchasers of such Registrable Securities, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of such prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(g)    Upon the occurrence of any event contemplated by clauses (iii) or (iv) of **Section 6.1(e)**, as promptly as practicable, the Company shall use its reasonable best efforts to promptly obtain the withdrawal of any such order or suspension and shall immediately notify each seller of Registrable Securities of any such withdrawal;

(h)    cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed; provided, that the applicable listing requirements are satisfied;

(i)    keep Holder's Counsel reasonably advised in writing as to the initiation and progress of any registration hereunder; provided, that the Company shall provide Holder's Counsel with all correspondence with Staff or the SEC in connection with any Registration Statement filed hereunder to the extent that such Registration Statement has not been declared effective on or prior to the date required hereunder;

(j)    provide reasonable cooperation to each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA; provided, that the Company shall not be required to incur material expenses or obligations in connection with its obligations under this section;

(k)    cooperate with the Designated Holder of the Registrable Shares to facilitate the timely preparation and delivery of certificates representing such Registrable Shares to be delivered to a transferee pursuant to a Registration Statement, which certificates shall be free of any restrictive legends and in such denominations and registered in such names as such Designated Holder may request;

(l)    not later than the Required Effectiveness Date of any Registration Statement, the Company shall provide CUSIP numbers for the Registrable Securities registered for resale under such Registration Statement, and provide the transfer agent for the Registrable Shares one or more certificates for such Registrable Shares, in a form eligible for deposit with the Depository Trust Company; and

(m)    take all other steps reasonably necessary and advisable to effect the registration of the Registrable Securities contemplated hereby.

6.2    **Seller Information**.  The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish, and such seller shall furnish, to the Company such information regarding the distribution of such securities as the Company may from time to time reasonably request in writing in response to requests made by the Staff or to permit the Company to comply with the rules and regulations of the SEC.  The furnishing of such information shall be a condition to the inclusion of the seller's shares in such registration.

6.3    **Registration Expenses**.  The Company shall pay all expenses arising from or incident to its performance of, or compliance with, this Agreement, including, without limitation, (i) SEC, stock exchange and FINRA registration and filing fees, (ii) all fees and expenses incurred in complying with securities or "blue sky" laws (including reasonable fees, charges and disbursements of counsel to any underwriter incurred in connection with "blue sky" qualifications of the Registrable Securities as may be

10

set forth in any underwriting agreement), (iii) all printing, messenger and delivery expenses, (iv) the reasonable fees, charges and expenses of the Holder's Counsel (including without limitation the fees charges and expenses incurred in connection with any amendments to a Registration Statement), and (v) the reasonable fees, charges and expenses of counsel to the Company and of its independent certified public accountants and any other accounting fees, charges and expenses incurred by the Company (including, without limitation, any expenses arising from any "cold comfort" letters or any special audits incident to or required by any registration or qualification), regardless of whether such Registration Statement is declared effective. All of the expenses described in the preceding sentence of this section are referred to herein as "***Registration Expenses***." The Designated Holder of Registrable Securities sold pursuant to a Registration Statement shall bear the expense of any broker's commission or underwriter's discount or commission relating to registration and sale of such Designated Holder's Registrable Securities.

     6.4    <u>**Notice to Discontinue**</u>. Each Designated Holder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in clause (v) of **Section 6.1(e)**, such Designated Holder shall forthwith discontinue disposition of Registrable Securities pursuant to the Registration Statement covering such Registrable Securities until such Designated Holder's receipt of the copies of the supplemented or amended prospectus contemplated by **Section 6.1(f)** and, if so directed by the Company, such Designated Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Designated Holder's possession, of the prospectus covering such Registrable Securities which is current at the time of receipt of such notice. If the Company shall give any such notice, the Company shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement (including, without limitation, the period referred to in **Section 6.1(b)**) by the number of days during the period from and including the date of the giving of such notice pursuant to clause (v) of **Section 6.1(e)** to and including the date when sellers of such Registrable Securities under such Registration Statement shall have received the copies of the supplemented or amended prospectus contemplated by, and meeting the requirements of, **Section 6.1 (f)**; *provided, that*, no single suspension under this section shall exceed forty-five (45) days in any one hundred and eighty (180) day period and in no event shall more than one suspension event exceed, in the aggregate, sixty (60) days in any twelve (12) month period.

     6.5    <u>**Suspension of Sales**</u>. Notwithstanding anything in this Agreement to the contrary, so long as the Registration Statement is on Form S-1 or on any other form that does not allow for forward incorporation by reference of reports and other materials filed by the Company pursuant to Section 13(a) or 15(d) of the Exchange Act, the Company may suspend sales under such Registration Statement as follows (but, in any event, no single suspension event shall exceed forty-five (45) days in any one hundred and eighty (180) day period) and in no event shall more than one suspension event exceed, in the aggregate, sixty (60) days in any twelve (12) month period: (i) for the period commencing at the time that the Company disseminates a press release announcing its preliminary financial results for any fiscal period and ending on the third (3rd) Business Day after the earlier of (A) the date that the related report on Form 10-K or 10-Q, as applicable, under the Exchange Act is filed with the SEC and (B) the date on which such report is required to be filed under the Exchange Act (giving effect to Rule 12b-25 promulgated thereunder); (ii) for the period commencing at the time that the Company disseminates a press release announcing a material development that would make a statement of a material fact in such Registration Statement untrue or misleading and ending on the third (3rd) Business Day after the earlier of (A) the date that the related report on Form 8-K is filed with the SEC and (B) the date on which such report is required to be filed under the Exchange Act (giving effect to Rule 12b-25 promulgated thereunder); (iii) to the extent necessary to allow any post-effective amendment to the Registration Statement or supplement to the prospectus to be prepared and, if necessary, filed with the SEC and, in the case of a post-effective amendment, declared effective; and (iv) for a period during which the Company, in the good faith opinion of the Board of Directors, determines that the disclosure of material, non-public information concerning the Company or any of its subsidiaries would be materially detrimental to the

11

Company; *provided, that* the Company shall promptly notify the Designated Holder in writing (I) of the existence of such material, non-public information (provided that in each notice the Company will not disclose the content of such material, non-public information to the Designated Holder) and the date on which such suspension will begin and (II) of the date on which such suspension ends. The Company will use its reasonable best efforts to minimize periods during which the Registration Statement is not effective.

**ARTICLE VII**       **INDEMNIFICATION; CONTRIBUTION**

     7.1       <u>**Indemnification by the Company**</u>. The Company agrees to indemnify and hold harmless each Designated Holder, its general or limited partners, members, directors, officers, Affiliates and each Person who controls (within the meaning of Section 15 of the Securities Act) any of the foregoing from and against any and all losses, claims, damages, liabilities and expenses (including reasonable costs of investigation) (each, a "*Liability*" and collectively, "*Liabilities*"), (i) arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary, final or summary prospectus, or document incorporated by reference into any of the foregoing, or notification or offering circular (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto), (ii) arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which such statements were made, except insofar as such Liability arises out of or is based upon any untrue statement or omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning such Designated Holder furnished in writing to the Company by such Designated Holder specifically for use therein, or (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any state securities laws or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities laws in connection with the sale of securities by such Designated Holder pursuant to any Registration Statement in which such Designated Holder is participating. The Company shall also provide customary indemnities to any underwriters (or persons, including broker-dealers or agents deemed "underwriters" within the meaning of the Securities Act) of the Registrable Securities, their officers, directors and employees and each Person who controls such underwriters (within the meaning of Section 15 of the Securities Act) to the same extent as provided above with respect to the indemnification of the Designated Holder of Registrable Securities.

     7.2       <u>**Indemnification by Designated Holder**</u>. In connection with any Registration Statement in which a Designated Holder is participating pursuant to **ARTICLE III** or **ARTICLE IV** hereof, each such Designated Holder shall promptly furnish to the Company in writing such information with respect to such Designated Holder as may be required by law or regulation for use in connection with any such Registration Statement or prospectus and all information required to be disclosed in order to make the information previously furnished to the Company by such Designated Holder not materially misleading or necessary to cause such Registration Statement or prospectus not to omit a material fact with respect to such Designated Holder necessary in order to make the statements therein not misleading. Each Designated Holder agrees to indemnify and hold harmless the Company, its directors, officers, Affiliates, and each Person who controls the Company to the same extent as the foregoing indemnity from the Company to the Designated Holder, but only if such untrue statement or omission was made in reliance upon and in conformity with information with respect to such Designated Holder furnished in writing to the Company by such Designated Holder specifically for use in such Registration Statement or preliminary, final or summary prospectus or amendment or supplement, or a document incorporated by reference into any of the foregoing; *provided, however*, that the total amount to be indemnified by such Designated Holder pursuant to this **Section 7.2** shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by such Designated Holder in the offering to which the Registration Statement or prospectus relates.

12

---

7.3    **Conduct of Indemnification Proceedings**.  Any Person entitled to indemnification hereunder (the "*Indemnified Party*") agrees to give prompt written notice to the indemnifying party (the "*Indemnifying Party*") after the receipt by the Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; *provided, however*, that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to the Indemnified Party hereunder (except to the extent that the Indemnifying Party is materially prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure).  If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party.  The Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Indemnified Party unless (i) the Indemnifying Party agrees to pay the same, (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably satisfactory to the Indemnified Party or (iii) such parties have been advised in writing by such counsel that either (x) representation of such Indemnified Party and the Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (y) there may be one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party, in any of such cases, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all similarly-situated Indemnified Parties.  No Indemnifying Party shall be liable for any settlement entered into without its written consent, which consent shall not be unreasonably withheld.  No Indemnifying Party shall, without the consent of such Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is a party and indemnity has been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability for claims that are the subject matter of such proceeding.

7.4    **Contribution**.

(a)    If the indemnification provided for in this **ARTICLE VII** from the Indemnifying Party is unavailable to an Indemnified Party hereunder in respect of any Liabilities referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such Liabilities, as well as any other relevant equitable considerations.  The relative faults of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action.  The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in **Sections 7.1** and **7.2**, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; *provided, that* the total amount to be contributed by such Designated Holder shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by such Designated Holder in the offering.  No Person involved in the sale of Registrable Securities who is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) in connection with such sale shall be entitled to indemnification or contribution from any Person involved in such sale of Registrable Securities who is not guilty of fraudulent misrepresentation.

13

**(b)**    The parties hereto agree that it would not be just and equitable if contribution pursuant to this section were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in **Section 7.4(a)**. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

## ARTICLE VIII        COVENANTS

8.1    <u>Rule 144</u>. The Company covenants that from and after the date hereof it shall use its best efforts to (a) file any reports required to be filed by it under the Exchange Act and (b) take such further action as each Designated Holder may reasonably request (including providing any information necessary to comply with Rule 144 under the Securities Act), all to the extent required from time to time to enable such Designated Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (i) Rule 144 under the Securities Act, as such rule may be amended from time to time, or Regulation S under the Securities Act or (ii) any similar rules or regulations hereafter adopted by the SEC. The Company shall, upon the request of any Designated Holder, deliver to such Designated Holder a written statement as to whether it has complied with such requirements.

8.2    <u>Limitations on Registration Rights</u>. No Person shall, without the prior written consent of the Designated Holder, be permitted to include securities of the Company in any registration filed under **ARTICLE III** hereto.

## ARTICLE IX        MISCELLANEOUS

9.1    <u>Recapitalizations, Exchanges, etc</u>. The provisions of this Agreement shall apply to the full extent set forth herein with respect to (i) the shares of Common Stock and the Common Stock Equivalents, (ii) any and all shares of voting common stock of the Company into which the shares of Common Stock or Common Stock Equivalents are converted, exchanged or substituted in any recapitalization or other capital reorganization by the Company and (iii) any and all equity securities of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in conversion of, in exchange for or in substitution of, the shares of Common Stock or Common Stock Equivalents and shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the date hereof. The Company shall cause any successor or assign (whether by merger, consolidation, sale of assets or otherwise) to assume the Company's obligations hereunder as a condition of any such transaction.

9.2    <u>Other Registration Rights</u>. The Company shall not enter into any agreement with respect to its securities that is inconsistent with the rights granted to the Designated Holder in this Agreement.

9.3    <u>Remedies</u>. The Designated Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, shall be entitled to specific performance of their rights under this Agreement. The Company agrees that monetary damages alone would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Agreement and hereby agrees to waive in any action for specific performance the defense that a remedy at law would be adequate.

9.4    <u>Notices</u>. All notices, demands and other communications provided for or permitted hereunder shall be made in the manner provided for under the Purchase Agreement.

9.5    <u>Successors and Assigns; Third Party Beneficiaries</u>. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto; *provided, that* the rights of the Designated Holder contained in this Agreement shall be automatically transferred to the

14

transferee of any Registrable Security provided that (i) such transferee agrees to become a party to this Agreement and be fully bound by, and subject to, all of the terms and conditions of the Agreement as though an original party hereto; (ii) the Company is furnished with written notice of (a) the name and address of such transferee, and (b) the securities with respect to which such registration rights are being transferred; (iii) immediately following such transfer the further disposition of such securities by the transferee is restricted under the Securities Act or applicable state securities laws if so required; and (iv) such transfer shall have been conducted in accordance with all applicable federal and state securities laws. All of the obligations of the Company hereunder shall survive any transfer. Except as provided in **ARTICLE VII**, no Person other than the parties hereto and their successors and permitted assigns are intended to be a beneficiary of this Agreement.

9.6 **Aggregation of Stock**. All shares of Registrable Securities held or acquired by Affiliated entities or Persons or entities or Persons under common management or control shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

9.7 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument, and shall become effective when one or more counterparts have been signed by each party hereto and delivered (including by facsimile) to the other parties.

9.8 **Headings**. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

9.9 **Governing Law; Consent to Jurisdiction**. This agreement shall be governed by and construed in accordance with the laws of the state of New York without regard to the principles of conflicts of law thereof that would implicate or cause the laws of another jurisdiction to apply. The parties hereto irrevocably submit to the exclusive jurisdiction of any federal court sitting in the borough of Manhattan in the City and State of New York over any suit, action or proceeding arising out of or relating to this Agreement. To the fullest extent they may effectively do so under applicable law, the parties hereto irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that they are not subject to the jurisdiction of any such court, any objection that they may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

9.10 **WAIVER OF JURY TRIAL**. EACH PARTY HERETO WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

9.11 **Severability**. In case any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

9.12 **Rules of Construction**. Unless the context otherwise requires (a) the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the terms "Dollars," "dollars" and "$" mean United States Dollars; (d) references herein to a specific Section, Subsection, recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation;" (f) references herein to any gender or no gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; *provided, however,* that nothing contained in this clause (g) is intended to authorize any assignment or transfer not

15

otherwise permitted by this Agreement; (h) references herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity; (i) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding;" (j) the word "or" shall be disjunctive but not exclusive; (k) references herein to any law (including any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative statute, regulation, order, rule, directive, ordinance, code, constitution, principle of common law, equity or treaty) shall be deemed to refer to such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part and in effect from time to time, and also to all rules and regulations promulgated thereunder; (l) references to any contract means such contract as amended, supplemented or modified in accordance with the terms thereof; and (m) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

> **9.13** **Entire Agreement; Amendments.** This Agreement constitutes the entire agreement and understanding of the parties hereto in respect of the subject matter hereof, and supersede and replace in their entirety any prior proposals, term sheets, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof. No amendment, waiver or other modification of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Company and the Designated Holder and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

> **9.14** **Further Assurances.** Each of the parties shall execute such documents and perform such further acts (including, without limitation, obtaining any consents, exemptions, authorizations or other actions by, or giving any notices to, or making any filings with, any governmental authority or any other Person) as may be reasonably required or desirable to carry out or to perform the provisions of this Agreement.

> **9.15** **Other Agreements.** Nothing contained in this Agreement shall be deemed to be a waiver of, or release from, any obligations any party hereto may have under any other agreement including, but not limited to, the Charter Documents and the Purchase Agreement.

[Remainder of page intentionally left blank]

16

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Registration Rights Agreement on the date first written above.

COMPANY:

NETLIST, INC.

/s/ Gail Sasaki
By: Gail Sasaki
Its: CFO, VP, Secretary

SIGNATURE PAGE TO THE REGISTRATION RIGHTS AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Registration Rights Agreement on the date first written above.

INVESTOR:

**SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.**

/s/ Seon Jong Lee
By: Seon Jong Lee
Its: Chief Executive Officer

**SIGNATURE PAGE TO THE REGISTRATION RIGHTS AGREEMENT**

EXHIBIT A

PLAN OF DISTRIBUTION

The selling stockholders may, from time to time, sell any or all of their shares of common stock on any stock exchange, market or trading facility on which the shares are traded or in private transactions. These sales may be at fixed or negotiated prices. The selling stockholders may use any one or more of the following methods when selling shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- short sales;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

- one or more underwritten offerings on a firm commitment or best efforts basis;

- a combination of any such methods of sale; and

- any other method permitted pursuant to applicable law.

The selling stockholders may also sell shares under Rule 144 under the Securities Act, if available, rather than under this prospectus.

Broker-dealers engaged by the selling stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the selling stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated, which commissions or discounts may be less than or in excess of those customary in the types of transactions involved. Any profits on the resale of shares of common stock by a broker-dealer acting as principal might be deemed to be underwriting discounts or commissions under the Securities Act. Discounts, concessions, commissions and similar selling expenses, if any, attributable to the sale of shares will be borne by a selling stockholder.

The selling stockholders may from time to time pledge or grant a security interest in some or all of the shares of common stock owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell the shares of common stock from time to time under this prospectus after we have filed a supplement to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933 supplementing or amending the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus.

The selling stockholders also may transfer the shares of common stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus and may sell the shares of common stock from time to time under this prospectus after we have filed a supplement to this prospectus under Rule 424(b)(3) or other applicable

provision of the Securities Act of 1933 supplementing or amending the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus.

Any broker-dealers or agents that are involved in selling the shares of common stock may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the shares of common stock purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act.

We are required to pay all fees and expenses incident to the registration of the shares of common stock. We have agreed to indemnify the selling stockholders (as well as persons, including broker-dealers or agents deemed to be "underwriters" within the meaning of the Securities Act) against certain losses, claims, damages and liabilities, including liabilities under the Securities Act, in accordance with a registration rights agreement, or the selling stockholders will be entitled to contribution.

The selling stockholders have advised us that they have not entered into any agreements, understandings or arrangements with any underwriters or broker-dealers regarding the sale of their shares of common stock, nor is there an underwriter or coordinating broker acting in connection with a proposed sale of shares of common stock by any selling stockholder. If we are notified by any selling stockholder that any material arrangement has been entered into with any underwriters or broker-dealers for the sale of shares of common stock, if required, we will file a supplement to this prospectus.

**Exhibit 10.3**

**Execution Version**

**FORTRESS CREDIT OPPORTUNITIES I LP**
**DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LP**
c/o Fortress Credit Corp.
1345 Avenue of the Americas, 46th Floor
New York, NY 10105

November 18, 2015

Netlist, Inc.
51 Discovery, Suite 150
Irvine, CA 92618
Attn: Gail M. Sasaki, CFO
Email: gsasaki@netlist.com

<u>PAYOFF LETTER</u>

Ladies and Gentlemen:

   Reference is made to that certain Loan and Security Agreement, dated as of July 18, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among DRB CREDIT FUNDING LLC, a Delaware limited liability company (the "<u>Initial Lender</u>" and together with the other persons from time to time party to the Credit Agreement as lenders, including Fortress Credit Opportunities I LP ("<u>FCO</u>") and Drawbridge Special Opportunities Fund LP ("<u>Drawbridge</u>"), collectively, "<u>Lender</u>") and NETLIST, INC., a Delaware corporation ("<u>Borrower</u>"). Capitalized terms used herein but not specifically defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

   We understand that, on or prior to the Payoff Expiration Time (as hereinafter defined), Borrower desires to repay in full all of the Obligations (including, without limitation, for principal, interest and fees, but excluding any prepayment premium required to be paid in accordance with Section 2.1.5 of the Credit Agreement or any early prepayment obligations in accordance with Section 1 of the Monetization Side Letter, which the parties acknowledge have not accrued, and any unasserted contingent indemnification Obligations) and, in connection therewith, terminate the Monetization Side Letter, the Credit Agreement and the other Loan Documents and Liens granted thereunder.

   1. This payoff letter (this "<u>Payoff Letter</u>") confirms that upon:

    (a) receipt by FCO (as representative for each lender party to the Credit Agreement and Drawbridge in its capacity under the Monetization Side Letter) no later than 12:00 noon (New York city time) on November 23, 2015 (such time and date, the "<u>Payoff Expiration Time</u>") of:

     (i) a wire transfer of immediately available funds in the aggregate amount of $8,136,608.82 plus the aggregate amount, if any, of Per Diem (as hereinafter defined) (the sum of such amounts, the "<u>Payoff Amount</u>"), consisting of:

      (1) $6,988,692.26 in respect of the principal amount of Obligations outstanding under the Credit Agreement (assuming no further loans or repayments are made);

(2)     $147,916.56 in respect of accrued and unpaid interest on such outstanding principal amount, assuming no changes in applicable interest rates and no changes in such outstanding principal amount (the per diem accrual of such interest being $2,135.43 per day (the "Per Diem") for each day or portion thereof that elapses after the date first written above before Lender receives payment in full in immediately available funds of the Payoff Amount); and

(3)     $1,000,000, which is consideration for the early termination of the Monetization Side Letter and the release of the Borrower from its obligations thereunder (except to the extent set forth herein);

(ii)     a fully-executed counterpart of this Payoff Letter signed by Borrower;

(iii)     a fully executed Amendment No. 1 to Stock Purchase Warrant, dated as of the Payoff Date, by and between Netlist, Inc., a Delaware corporation ("Netlist") and Drawbridge, which amends that certain Stock Purchase Warrant (Certificate No. W-2) issued by Netlist to Drawbridge as of July 18, 2013 in the form attached hereto as Exhibit A; and

(iv)     a fully executed Stock Purchase Warrant, dated as of the Payoff Date, by and between Netlist and CF DB EZ LLC, a Delaware limited liability company, or its registered assigns (Certificate No. W-3) issued by Netlist to CF DB EZ LLC as of the Payoff Date in the form attached hereto as Exhibit B; and

(b)     receipt by Kirkland & Ellis LLP of $31,514.17 (the "Legal Expense Payment") in respect of the unpaid legal fees and expenses of Lender, which are payable in connection with the Monetization Side Letter, the Warrant Documents, Loan Documents and/or this Payoff Letter (the first date on which all of the conditions set forth in Section 1(a) and this Section 1(b) are satisfied, the "Payoff Date");

all of the Obligations (and any guarantees thereof by any Person) (other than unasserted contingent indemnification Obligations) and all of the Borrower's obligations under the Monetization Side Letter (the "Monetization Obligations") shall be satisfied in full and terminate; all obligations, duties and responsibilities of Lender and/or Drawbridge in connection with the Monetization Side Letter, the Credit Agreement and all other Loan Documents shall automatically terminate; the Monetization Side Letter, the Credit Agreement and all other Loan Documents shall be terminated and of no further force and effect; and all Liens granted or created thereunder shall be deemed to be released and terminated: provided, however, that (1) any provision of the Monetization Side Letter, the Credit Agreement or any other Loan Document that by its terms expressly survives termination shall remain in full force and effect (including, without limitation, Borrower's Obligations to indemnify each Indemnitee under Section 12.3 of the Credit Agreement and corresponding obligations under Section 11(c) of the Monetization Side Letter, and such obligations survive the termination of the Credit Agreement and to reimburse Lender and/or Drawbridge for fees and expenses owed to Lender pursuant to the Credit Agreement), and Section 11 of the Credit Agreement and Section 10 of the Monetization Side Letter relating to governing law, consent to jurisdiction and jury trial waiver shall remain in full force and effect, (2) to the extent that any payments or proceeds (or any portion thereof) received by Lender are subsequently set aside, required to be repaid or asserted, invalidated or declared to be void or voidable, in each case, under any state or federal law relating to creditors' rights (including, without limitation, provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property), and/or Lender and/or Drawbridge is required to repay or restore any payment made

2

to Lender and/or Drawbridge (in whole or in part) to a trustee, receiver or any other party under any Debtor Relief Law, other applicable law or equitable cause, then the liability of the Borrower with respect thereto (and as to all reasonable costs, expenses, and attorneys' fees of Lender related thereto) shall immediately and automatically be revived, reinstated, and restored and shall exist as though such payment or proceeds had never been made or received, and the Obligations, the Monetization Obligations and other Indebtedness of the Borrower to Lender and/or Drawbridge, or part thereof, which were or was intended to be satisfied by any such payment or proceeds shall immediately and automatically be revived and continue to be in full force and effect as if the payment or proceeds had never been received by Lender and or Drawbridge, as applicable, and this Payoff Letter shall in no way impair the claims of Lender with respect to the revived Obligations, the Monetization Obligations or other Indebtedness of the Borrower to Lender and/or Drawbridge (or as to all reasonable costs, expenses, and attorneys' fees of Lender and/or Drawbridge related thereto). If the assumptions contained herein regarding the calculation of each of the components of the Payoff Amount are not correct, we will advise Borrower in writing on or before the Payoff Expiration Time, of the adjusted figure for the Payoff Amount, reflecting the appropriate changes in the amounts of principal, interest, fees and other amounts.

2.      Borrower shall transfer the Payoff Amount, by wire transfer of immediately available funds, for receipt on the Payoff Date, using the following wire instructions:

| | |
|---|---|
| Bank: | US Bank N.A. |
| FFC | 710254 |
| ABA Number: | 091 000 022 |
| Account Number: | 104790894125 |
| Account Name: | Fortress Credit Opportunities I LP / FORT0401 |
| Reference: | Netlist / Fortress Credit Opportunities I, LP |
| Attention: | Myra Ilagan / FORT0401 |

3.      Borrower shall transfer the Legal Expense Payment to Citibank, 227 W. Monroe Street, Suite 200, Chicago, IL 60606, ABA No. 271070801, SWIFT Address: CITIUS33 (if wire transfer is from a non U.S. bank). Account No. 800418399, Account Name: Kirkland & Ellis LLP, reference: 41152-59, Attention: David Nemecek, by wire transfer of immediately available funds.

4.      Lender, on the Payoff Date, (a) authorizes Borrower or its designee to prepare and file any UCC termination statements and other filings necessary to terminate any and all UCC financing statements previously filed by Lender with respect to the Obligations, and (b) agrees to, at Borrower's expense (including attorneys' fees and expenses), execute and deliver any lien releases, mortgage releases, discharges of security interests, and other similar discharge or release documents (in recordable form if applicable) as Borrower may reasonably request to effectuate the termination and release of the security interests and liens securing the Obligations.

5.      Lender will, as promptly as practicable after the Payoff Date, all at the expense of Borrower (including attorneys' fees and expenses), return to Borrower, at the address for Borrower set forth on the first page of this Payoff Letter or as otherwise directed by Borrower, the originals of any and all promissory notes previously delivered to Lender in connection with the Credit Agreement, if any, duly marked "paid in full" or "cancelled" (or with written authorizations to so mark such documents after the Payoff Date actually occurs) as may be appropriate, and any and all stock certificates, stock powers, or other investment property and all negotiable instruments, as well as any other possessory collateral, in each case, that are in its possession or control, or, in lieu thereof, a certificate or affidavit confirming that such items are lost.

3

6.    Borrower, for itself and on behalf of its successors, assigns, officers, directors, employees, limited partners, general partners, investors, attorneys, subsidiaries, shareholders, trustees, agents, and other professionals, and any Person acting for or on behalf of, or claiming through it, hereby waives, releases, remises, and forever discharges Lender, Drawbridge and each Related Person of any of the foregoing Persons, together with each of their respective successors in title, past, present and future officers, directors, employees, limited partners, general partners, investors, attorneys, assigns, subsidiaries, consultants, experts, advisors, shareholders, trustees, agents, and other professionals (and all other Persons to whom any of the foregoing would be liable if such Persons were found to be liable to Borrower) (each a "Releasee" and collectively, the "Releasees"), from any and all past, present and future claims, demands, suits, liens, lawsuits, adverse consequences, amounts paid in settlement, debts, deficiencies, diminution in value, disbursements, demands, obligations, liabilities, causes of action, damages, losses, costs and expenses of any kind or character, whether based in equity, law, contract, tort or otherwise (including without limitation those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), implied or express warranty, strict liability, criminal or civil statute or common law (each a "Claim" and collectively, the "Claims"), whether known or unknown, fixed or contingent, direct, indirect, or derivative, held in a personal or representative capacity, asserted or unasserted, matured or unmatured, foreseen or unforeseen, past or present, liquidated or unliquidated, suspected or unsuspected, that Borrower ever had from the beginning of the world, now has or might hereafter have against any such Releasee, which Claims relate, directly or indirectly, to any act or omission by any Releasee that occurred on or prior to the date of this Payoff Letter and relate, directly or indirectly, to the Warrants, Monetization Side Letter, the Credit Agreement, any other Loan Document, or any acts or omissions of any such Releasee in connection with, as a result of, arising out of, related to, or with respect to the Monetization Side Letter, the Credit Agreement or any other Loan Document, or to the lender-borrower relationship or the debtor-creditor relationship evidenced by any of the Loan Documents or the Monetization Side Letter, except for the duties and obligations set forth in this Payoff Letter. As to each and every Claim released hereunder, Borrower hereby represents that it has received the advice of legal counsel with regard to the releases contained herein, and having been so advised, specifically waives the benefit of the provisions of Section 1542 of the Civil Code of California which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

As to each and every Claim released hereunder, Borrower also waives the benefit of each other similar provision of applicable federal or state law (including, without limitation, the laws of the State of New York), if any, pertaining to general releases after having been advised by legal counsel to Borrower with respect thereto. Borrower hereby agrees and acknowledges that the foregoing waiver was separately bargained for. This waiver is an essential term of this Payoff Letter, without which Lender would not have agreed to execute this Payoff Letter. The release contained herein and the related provisions shall survive the termination of the Credit Agreement and payment in full of the Lender Obligations.

Borrower acknowledges that it may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such Claims and agrees that this Payoff Letter shall be and remain effective in all respects notwithstanding any such differences or additional facts. Borrower understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

4

Borrower hereby agrees, represents, and warrants that (a) such party has not voluntarily, by operation of law or otherwise, assigned, conveyed, transferred or encumbered, either directly or indirectly, in whole or in part, any right to or interest in any of the Claims released pursuant to this Section 6; (b) this Payoff Letter has been entered into without force or duress and of the free will of Borrower, the decision of such undersigned to enter into this Payoff Letter is a fully informed decision and such undersigned is aware of all legal and other ramifications of each such decision; and (c) Borrower has read and understands this Payoff Letter (including, without limitation, the release granted in this Section 6), has consulted with and been represented by independent legal counsel of its own choosing in negotiations for and the preparation of this Payoff Letter, has read this Payoff Letter in full and final form, and has been advised by its counsel of its rights and obligations hereunder.

The release contained herein and the related provisions shall survive the termination of the Credit Agreement and payment in full of the Obligations and the Monetization Obligations.

7.     Borrower acknowledges that the amounts referred to in Section 1 above are enforceable obligations of it owed to Lender pursuant to the provisions of the Monetization Side Letter, the Credit Agreement, the other Loan Documents and this Payoff Letter and confirms its agreement to the terms and provisions of this Payoff Letter by returning to Lender a signed counterpart of this Payoff Letter. Borrower hereby represents and warrants that, as of the date of this payoff letter and as of the Payoff Effective Time, it is not party to any contract, agreement or any document giving rise to any contractual obligation, nor is it subject to any other prohibition (whether contractual or otherwise (including any prohibition by any Governmental Authority or arising out of any Requirement of Law)), which would, in either case, prohibit or purport to prohibit any of the payments contemplated by Section 1 hereof.

8.     This Payoff Letter may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Payoff Letter by signing any such counterpart. Delivery of an executed counterpart of this Payoff Letter by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart. Any party delivering an executed counterpart of this Payoff Letter by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Payoff Letter.

9.     This Payoff Letter shall be determined under, governed by, and construed and enforced in accordance with, the laws of the State of New York. Whenever possible, each provision of this Payoff Letter shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Payoff Letter shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Payoff Letter.

10.     This is the entire agreement between the parties with respect to the subject matter of this Payoff Letter. There are no other agreements or understandings, written or oral, express or implied.

11.     Neither this Payoff Letter nor any uncertainty or ambiguity herein shall be construed against Lender or the Borrower, whether under any rule of construction or otherwise. On the contrary, this Payoff Letter has been reviewed by all of the parties to this Payoff Letter and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

[signature pages follow]

5

Very truly yours,

FORTRESS CREDIT OPPORTUNITIES I LP, a Delaware limited partnership

By: Fortress Credit Opportunities I GP LLC, a Delaware limited liability company, its general partner

By:      /s/ Mark K. Furstein
Name:  Mark K. Furstein
Title:   Chief Operating Officer

Drawbridge Special Opportunities Fund LP

By: Drawbridge Special Opportunities GP LLC, a Delaware limited liability company, its general partner

By:      /s/ Mark K. Furstein
Name:  Mark K. Furstein
Title:   Chief Operating Officer

[SIGNATURE PAGE TO PAYOFF LETTE

ACKNOWLEDGED, ACCEPTED and AGREED to by the undersigned as of the date first written above:

**NETLIST, INC.,**
a Delaware corporation,
as Borrower


By: /s/ Gail Sasaki
Name:   Gail Sasaki
Title:    VP, CFO, Secretary

[SIGNATURE PAGE TO PAYOFF LETTER]

**Exhibit A: Amendment No. 1 to Stock Purchase Warrant**

[See attached]

**Exhibit B: Stock Purchase Warrant**

[See attached]

---

CONFIDENTIAL

NL074700

900

Exhibit 99.1

**NETLIST ANNOUNCES STRATEGIC PARTNERSHIP WITH SAMSUNG FOR NEW STORAGE CLASS MEMORY**

Partnership to Deliver NVDIMM-P, the Fastest Non-Volatile Memory-Storage Solution for Cloud Computing, Analytics and Other Data Intensive Applications

**IRVINE, CALIFORNIA.** November 19, 2015 - Netlist, Inc. (NASDAQ: NLST), today announced that it has entered into a five year Joint Development and License Agreement (the "Agreement") with Samsung Electronics Co., Ltd., to produce a new class of NVDIMM-P (NV-P) memory solutions based on Samsung's industry leading NAND Flash and DRAM, and Netlist's pioneering work on HyperVault®. The companies will work to create a standardized product interface to facilitate rapid market adoption and bring the compelling benefits of this new technology to a large group of customers in cloud computing, big data, and server and storage markets.

Under the terms of the Agreement, which includes licensing of each company's respective patent portfolios, Netlist will receive $23 million, consisting of $8 million in cash from Samsung Electronics and $15 million in the form of investment from Samsung Venture Investment Corporation. The Agreement calls for additional exchange of consideration as progress is made toward market introduction of the product. The companies plan to sample NV-P products with select customers in 2016.

NV-P is an emerging industry standard for a new class of NAND-based storage which operates in the memory channel, the fastest data path in a computer. With HyperVault®, Netlist created the industry's first unified memory-storage architecture where low cost, high density NAND storage can achieve the performance of high cost, high speed DRAM memory. This breakthrough patented architecture will be combined with Samsung's industry leading DRAM and NAND, to produce NV-P solutions that deliver cost and performance benefits vastly superior to those of traditional storage solutions.

"At Samsung, we are taking the lead in defining the right standards for storage class memory with industry partners, and creating new markets for DRAM and NAND flash memory based on the new standards. By using a standardized hybrid storage solution, our customers will be able to efficiently extract intelligence from large amounts of data in storage systems," said Dr. Jung-Bae Lee, Senior Vice President of Memory Product Planning and Application Engineering Team. Samsung Electronics. "We are pleased to partner with Netlist, a company with a long-history of innovative memory technology solutions and IP, to productize and drive broad market adoption of this new standard," he added.

"This is a transformational partnership that validates our unique IP and provides an accelerated path for delivering NV-P to the mainstream market. Samsung is the unparalleled leader in memory and recognizes the value of disruptive technology in this sector," said C.K. Hong, President and CEO of Netlist. "Samsung's leadership in memory and Netlist's expertise in hybrid storage are highly complementary, and together create a powerful platform for driving broad market adoption of this new storage class memory solution."

"Computer architecture is going through important changes fueled by the advent of a new memory layer based on alternative memory types," said Jim Handy, General Director of Objective Analysis, a leading independent research firm. "This brings to computing a much faster kind of storage that can harness the raw speed of the memory bus through the NVDIMM-P memory module format. Objective Analysis projects that the market for such modules in servers could grow to $2 billion by 2019."

NVDIMM-P is nomenclature adopted by the Storage Network Industry Association to describe storage class memory products that combine the functionalities of persistent DRAM and block accessed NAND

Flash, and operate in the memory channel. HyperVault®, a "superset" of NVDIMM-P, further expands the capabilities of NAND so that they achieve near-DRAM performance and DDR4 compatibility with no system software modifications. NV-P solutions are expected to be initially targeted at the fastest tiers of storage where data throughput and latency are critical. These applications include big data analytics, virtualization, in-memory database, online transaction processing and high performance database.

Additional details regarding the transaction are available in Netlist's Current Report on Form 8-K filed concurrently with the issuance of this release.

**About Netlist, Inc.**

Netlist creates solutions that accelerate turning data into information. We design and manufacture controller and software-based memory solutions for our OEM and Hyperscale customers in the server and storage space. Flagship products NVvault® and EXPRESSvault™ accelerate system performance and provide mission critical fault tolerance. HyperVault®, Netlist's next-generation architecture, expands the performance and capacity of memory channel storage. The company holds a portfolio of patents, many seminal, in the area of hybrid memory, rank multiplication and load-reduction, among others. To learn more, visit www.netlist.com

**Safe Harbor Statement:**

This news release contains forward-looking statements regarding future events and the future performance of Netlist. These forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those expected or projected. These risks and uncertainties include, but are not limited to, risks associated with the joint development efforts with Samsung described above; the launch and commercial success of our products, programs and technologies; the success of product partnerships; continuing development, qualification and volume production of HyperVault™, EXPRESSvault™, NVvault®, HyperCloud® and VLP Planar-X RDIMM; the timing and magnitude of the decrease in sales to our key customer; our ability to leverage our NVvault® and EXPRESSvault™ technology in a more diverse customer base; the rapidly-changing nature of technology; risks associated with intellectual property, including risks associated with the inherent uncertainty of the litigation process, patent infringement litigation against us as well as the costs and unpredictability of litigation over infringement of our intellectual property and the possibility of our patents being reexamined by the United States Patent and Trademark office; volatility in the pricing of DRAM ICs and NAND; changes in and uncertainty of customer acceptance of, and demand for, our existing products and products under development, including uncertainty of and/or delays in product orders and product qualifications; delays in the Company's and its customers' product releases and development; introductions of new products by competitors; changes in end-user demand for technology solutions; the Company's ability to attract and retain skilled personnel; the Company's reliance on suppliers of critical components and vendors in the supply chain; fluctuations in the market price of critical components; evolving industry standards; and the political and regulatory environment in the People's Republic of China. Other risks and uncertainties are described in the Company's annual report on Form 10-K filed on March 27, 2015, and subsequent filings with the U.S. Securities and Exchange Commission made by the Company from time to time. Except as required by law, Netlist undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future information or otherwise.

For more information, please contact:

| Investors: | Press: |
|---|---|
| Brainerd Communicators, Inc. | Brainerd Communicators, Inc. |
| Mike Smargiassi/Jenny Perales | Sharon Oh |
| NLST@braincomm.com | NLST@braincomm.com |
| (212) 986-6667 | (212) 986-6667 |