# EXHIBIT 30

Netlist DRAFT 10/13/15

# JOINT DEVELOPMENT AND LICENSE AGREEMENT

This Joint Development and License Agreement (this "Agreement") is made and entered into as of October 31, 2015 ("Effective Date") by and between Netlist, Inc., having its principal place of business at 175 Technology, Suite 150, Irvine, CA 92618 (hereinafter referred to as "Netlist") and Samsung Electronics Co., Ltd., having its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon-Si, Gyeonggi-do, Korea (hereinafter referred to as "Samsung"). (Each of Netlist and Samsung is referred to as a "Party" and collectively the "Parties".)

WHEREAS, Samsung develops and manufactures, among other things, memory components and memory modules, and Netlist develops and manufactures memory components and memory modules;

WHEREAS, the Parties intend to work together to jointly develop an interface and associated technologies for certain memory modules and promote such interface to standards-setting organizations;

WHEREAS, the Parties are concurrently executing an agreement for convertible note financing; and

WHEREAS, in connection with their collaboration hereunder, the Parties wish to grant to each other a cross license under each Party's patents.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the Parties agree as follows:

**Section 1. DEFINITIONS**

"**Background IPR**" of a Party means Technology and IPR which is owned or controlled by such Party prior to the Effective Date or created or developed outside the scope of the JDP and without use of or reference to the other Party's Confidential Information.

"**Capture Period**" means a period of five (5) years beginning on the Effective Date, subject to Sections 10.1.4 and 10.2.4.

"**Change of Control**" means (i) an acquisition of a Party or its Parent Company by another entity, including by way of merger or consolidation of such Party or its Parent Company with or into another entity, as a result of which transaction the shareholders that had Control of the Party or its Parent Company immediately prior to such transaction do not have Control, immediately after such transaction, of such Party, or its Parent Company, or the surviving entity; or (ii) the sale to another entity of all or substantially all of the assets of a Party or its Parent Company. Such other entity that acquires Control or assets pursuant to the foregoing is referred to herein as the "**Acquirer**". An internal reorganization as a result of which ultimate Control of the entity in question does not change is not a Change of Control.

"**Control**" means (a) possession, directly or indirectly, of the power to direct or cause direction of the management or policies of an entity, and (b) beneficial ownership of more than fifty percent (50%) of the voting securities or other ownership interest or other

1

sf-3584904

Exhibit 0019

Netlist DRAFT 10/13/15

comparable equity interests of an entity.

"**Deliverables**" means any Technology specifically identified as a "deliverable" in, and required to be provided by one Party to the other Party pursuant to, the Statement of Work.

"**Developed Product**" means ~~a~~ an NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications.

"**Foundry Product**" means, subject to Section 8.3, any product produced by a Party or its Subsidiary for a third party (a) based on designs, specifications, and working drawings owned by such third party and/~~or~~ (b) that the manufacturing Party does not have a right to sell to others as its own product.

"**Intellectual Property Rights**" or "**IPR**" means all rights in all countries or jurisdictions of the world that arise under or are associated with: (i) patents (of all types including patents, utility models and design patents, including originals or divisions, continuations, continuations-in-part or reissues) ("Patents"); (ii) copyrights and similar rights in works of authorship, including in software; (iii) trade secret rights and similar rights in confidential business or technical information or materials; (iv) any similar or equivalent rights to any of the foregoing; and all (v) registrations, applications, originals divisions, continuations, continuations-in-part or reissues, as the case may be, of, or for, any of the foregoing.

"**JDP**" or "**Joint Development Project**" means the collaborative efforts by the Parties to develop the Product Specifications and the Developed Product under this Agreement pursuant to, and within the scope of, the Statement of Work, and to promote a standard interface for the Developed Product pursuant to the Development Milestones and otherwise as set forth in this Agreement.

"**Joint IPR**" means (a) Non-Patent IPR in Technology jointly created by the Parties in the course and within the scope of the JDP, and (b) Patents seeking protection for and/or issuing on inventions that are jointly invented by the Parties in the course and within the scope of the JDP ("**Joint Inventions**"). Whether Technology was "jointly" created or inventions were "jointly" made shall be determined by applicable joint authorship or joint inventorship standards under U.S. law.

"**Licensed Patents**" means Netlist's Licensed Patents and Samsung's Licensed Patents, as applicable.

"**Licensed Products**" means Netlist's Licensed Products and Samsung's Licensed Products, as applicable.

"**Memory Solution Product**" means a memory controller or a combination of memory and a memory controller (e.g., memory module or MCP), together with any supporting circuitry. Example of the Memory Solution Product includes, without limitation, NVDIMM-P Product.

"**Netlist's Licensed Patents**" means any and all Patents owned or controlled ~~and licensable~~ by Netlist or any of its Subsidiaries and having an effective first filing date on or prior to the end of Capture Period.

2

sf-3584904

CONFIDENTIAL    NL049030

Netlist DRAFT 10/13/15

"**Netlist's Licensed Products**" means all ~~Netlist-branded~~ Memory Solution Product manufactured or have manufactured by or for Netlist or its Subsidiaries, but excluding any Foundry Products (other than as set forth in Section 8.3).

"**Non-Patent IPR**" means all Intellectual Property Rights other than Patents and trademarks.

"**NVDIMM-P Product**" means non-volatile dual in-line memory module, which combines a smaller density of fast memory like DRAM with a higher density of slower memory like NAND or other device such as PRAM and controller IC for the foregoing memory within the same package or on the same board, together with any supporting circuitry. This module can be considered as large (non-volatile) memory or fast storage in system.

"**Parent Company**" means, with respect to a first entity, any other entity that directly or indirectly Controls the first entity, but only for so long as such Control exists.

"**Product Specifications**" means the target specifications for the Developed Product as set forth in Appendix A attached hereto, as may be amended by the Parties from time to time.

"**Restricted Information**" means Deliverables or other Technology of a Party, if any, that such Party considers highly confidential and that are identified as "restricted" in the Statement of Work or in writing at the time of delivery. [NEED FURTHER REVIEW].

> Formatted: Highlight
> Formatted: Font:

"**Samsung's Licensed Patents**" means any and all Patents owned or controlled ~~and licensable~~ by Samsung or any of its Subsidiaries and having an effective first filing date on or prior to the end of Capture Period.

"**Samsung's Licensed Products**" means all ~~Samsung-branded~~ semiconductor products manufactured or have manufactured by or for Samsung or its Subsidiaries, but excluding Foundry Products (other than as set forth in Section 8.3).

"**Subsidiary**" means, with respect to a first entity, any other entity that is directly or indirectly Controlled by the first entity, but only for so long as such Control exists.

"**Technology**" means inventions, creations, know-how, processes, designs, design information, databases, schematics, layouts, RTL files, libraries, interface information, specifications, algorithms, software and other copyrightable material (in object code and source code format), technical information, IP blocks, and other developments and technology.

"**Term**" means the period beginning the Effective Date and ending with the expiration of the last to expire of the Licensed Patents.

**Section 2.    COLLABORATIVE DEVELOPMENT WORK**

2.1    JDP. The Parties shall perform the collaborative development work in accordance with the Product Specifications and the Development Milestones as set forth in Appendix A ("Development Milestones") and the Statement of Work set forth in Appendix B ("Statement of Work").

Netlist DRAFT 10/13/15

2.2     Deliverables. Each Party shall provide the Deliverables to the other Party as stated in the Statement of Work in accordance with the Development Milestones.

2.3     Acceptance. Samsung shall evaluate the Developed Product in accordance with the Product Specifications. Netlist shall provide Samsung with samples and relevant information and reports therefor. In the event that, as a result of such evaluation, the Developed Product does not satisfy the Product Specifications, both Parties shall use their best efforts to resolve the problem and conform the Developed Product to the Product Specifications. For the purpose of this Agreement, the JDP shall be deemed completed when the evaluation result is accepted by Samsung, provided that such acceptance shall not be unreasonably withheld.

### Section 3.   DEVELOPMENT COSTS

3.1     Fees and Costs. Samsung shall pay to Netlist eight million United States dollars (US $8,000,000) as non-refundable NRE fees within thirty (30) days from the date of Samsung's receipt of invoice issued by Netlist on or after on the Effective Date. Except as provided herein, each Party shall bear its own costs and expenses with respect to any development work and provision of any Deliverables under this Agreement.

3.2     Taxes. All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the Party required to do so by applicable law. To the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea in remitting payment to Netlist under this Agreement, provided that Samsung shall pay such withholding taxes to the Korean tax authorities and promptly provide Netlist with a certificate of payment for such withholding tax, as required by applicable law or treaty, and cooperate with Netlist in any efforts to claim a credit or refund or exemption with respect to any such withholding taxes.

### Section 4.   IPR OWNERSHIP

4.1     Background and Sole IPR. Samsung and Netlist shall each retain sole ownership of their respective Background IPR and any other Technology and IPR created or developed by or for each of them that is not Joint IPR.

4.2     Solely- and Jointly-Owned Patents. Any inventions arising out of the JDP (and any Patents resulting therefrom) shall belong to the Party whose employees made the invention. Notwithstanding the foregoing, the Parties shall jointly own Joint Inventions and any Patents seeking protection for and/or issuing on Joint Inventions ("Joint Patent").

4.3     Administration of Joint Patents. Regardless of which Party files and prosecutes such application for a Joint Patent, any Joint Patent issued therefrom shall be jointly owned and each Party shall own a one-half undivided interest in each such Joint Patent without accounting to the other. The Parties shall share equally the costs of, and shall cooperate with one another in, filing and maintaining such Joint Patents and in any action to enforce such Joint Patents against third parties. Notwithstanding the foregoing, if a Party does not wish to share in the costs and duties associated with filing or maintaining any Joint Patent in any country (or countries), it shall, at no charge, transfer all of its interest in such Joint Patent in such country (or countries), subject to a retained perpetual, royalty-free, non-exclusive,

4

sf-3584904

CONFIDENTIAL     NL049032

Netlist DRAFT 10/13/15

worldwide license under such Joint Patent to make, have made, use, sell, offer to sell, and import any products and practice any process or method.

### Section 5. TECHNOLOGY STANDARDIZATION AND PRODUCTIZATION

5.1     Standardization. The Parties will work together to standardize NVDIMM-P Product specifications with appropriate standards bodies according to the schedule for standardization as specified in Appendix C attached hereto. This effort will be limited to the form factor and interface protocol between the NVDIMM-P Product and the computing system and will not define the design of the NVDIMM-P Product, the on-DIMM controller, or the product driver. The Parties agree to grant patent licenses under the terms of the intellectual property policy of the relevant standards body with respect to any such form factor and/or interface protocol that is adopted as a standard.

5.2     Right of First Refusal. Netlist will provide Samsung a right of first refusal to acquire Netlist's NVDIMM-P technology and/or any related business assets in a separate, subsequent transaction before Netlist offers ~~to divest such technology together with all related business assets~~ to any third party.

5.3     Productization. The Parties will work together to bring a Developed Product to market according to the schedule for standardization and productization as specified in Appendix C attached hereto. Details for further technical collaboration for such productization and any IPR licenses for commercialization will be negotiated at a later date.

5.4     Productization License. Each Party agrees to grant and shall hereby grant to the other Party a non-exclusive, perpetual, paid-up, irrevocable, non-transferable, worldwide license (without a right to sublicense) its Non-Patent IPR to use, copy, modify and distribute the Deliverables and Product Specifications with respect to the Developed Product.

### Section 6. SUPPLY OF COMPONENTS

6.1     Supply by Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer.

6.2     Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products). ~~Samsung will supply NVDIMM-P controllers to Netlist on Netlist's request on an at-cost basis.~~

6.3     Nothing in this Agreement shall prevent either Party from making semiconductor components using its own Technology and from selling such components to any third party~~, as long as no Confidential Information or other Technology of the other Party is used or referenced in such components or the development or manufacture thereof. No license or other right is granted or implied under this Agreement under any Non-Patent IPR of the other Party with respect to any such components~~.

6.4     Nothing in this Agreement shall be deemed to require either Party to purchase any products from the other Party.

5
sf-3584904

CONFIDENTIAL    NL049033

**Section 7.    RELEASE**

7.1    Release of Samsung. Netlist, on behalf of itself and its respective Subsidiaries, successors and assigns hereby releases, acquits and forever discharges Samsung and its current Subsidiaries, and their directors, officers, employees, agents, successors, and assigns, each only in their capacity as such, from any and all actions, causes of action, suits, debts, liability, claims and demands for infringement of Netlist's Licensed Patents, whether known or unknown, matured or unmatured, by reason of any ~~activity of Samsung and its current Subsidiaries~~<u>action, omission, matter, cause or thing whatsoever</u> occurring prior to the Effective Date and relating to Samsung's Licensed Products only to the extent that such ~~activity and~~ Samsung's Licensed Products would have been licensed under the licenses granted in Section 8 below if such licenses had been in existence prior to the Effective Date.

7.2    Release of Netlist. Samsung, on behalf of itself and its respective Subsidiaries, successors and assigns hereby releases, acquits and forever discharges Netlist and its current Subsidiaries, and their directors, officers, employees, agents, successors, assigns, each only in their capacity as such, from any and all actions, causes of action, suits, debts, liability, claims and demands for infringement of Samsung's Licensed Patents, whether known or unknown, matured or unmatured, by reason of any ~~activity of Netlist and its current Subsidiaries~~<u>action, omission, matter, cause or thing whatsoever</u> occurring prior to the Effective Date and relating to Netlist's Licensed Products only to the extent that such ~~activity and~~ Netlist's Licensed Products would have been licensed under the licenses granted in Section 8 below if such licenses had been in existence prior to the Effective Date.

7.3    Unknown Claims. The Parties expressly understand and acknowledge the possibility that unknown claims may exist that arise from or relate to the claims being released in this Agreement, and that the Parties have bargained for a full accord, satisfaction and discharge of all such claims as expressly set forth in Sections 7.1 and 7.2, respectively. Consequently, each Party expressly waives all rights under section 1542 of the California Civil Code and all statutes or other law of similar effect in other jurisdictions throughout the world. Section 1542 reads as follows:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

**Section 8.    GRANT OF LICENSE**

8.1    License to Netlist. Samsung, on its own behalf and on behalf of its Subsidiaries, hereby grants, and shall grant, to Netlist and its Subsidiaries a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Samsung's Licensed Patents to make and have made (subject to Section 8.4) Netlist's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of ~~Netlist's Licensed Products~~<u>such products</u>.

8.2    License to Samsung. Netlist, on its own behalf and on behalf of its Subsidiaries, hereby grants, and shall grant, to Samsung and its Subsidiaries a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under

6

CONFIDENTIAL    Ex 30    921    NL049034

Netlist DRAFT 10/13/15

Netlist's Licensed Patents to make and have made (subject to Section 8.4) Samsung's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of ~~Samsung's Licensed Products~~such products.

8.3 Foundry Products. For the avoidance of doubt, a Party's or its Subsidiary's Foundry Products are not Licensed Product, provided that, notwithstanding anything to the contrary, any portions, and only those portions, of such Foundry Products that embody a Party's or its Subsidiary's own (a) designs, (b) manufacturing processes, and (c) semiconductor packaging technologies shall be deemed to be released and licensed, respectively, under Sections 7 and 8.

8.4 Have Made Rights. The licenses in Section 8.1 and 8.2 to "have made" Licensed Products shall only apply when ~~the Licensed Products are made under a contract manufacturing agreement by the contract manufacturer only for the Party or its Subsidiaries and~~ (a) all or substantially all the designs, specifications, and working drawings for such products were designed by or exclusively for a Party or its Subsidiary, and (b) such products are sold exclusively to Netlist or Samsung, respectively (or their respective Subsidiaries) ~~by the contract manufacturer~~. For the avoidance of doubt, off-the-shelf products of a third party shall not receive the benefit of the "have made" rights in Section 8.1 and 8.2.

8.5 Subsidiaries. Each Party must ensure that its Subsidiaries are bound by, and comply with, all provisions of this Agreement applicable to them, which includes ensuring that the releases and licenses granted by a Party under this Agreement are effective under Licensed Patents held or licensable by such Party's Subsidiaries. ~~A Party's license and release of the other Party's Subsidiaries under Sections 7 and 8 are contingent on such Subsidiary's Licensed Patents being validly licensed and released to such first Party hereunder.~~

**Section 9. RESERVATION OF RIGHTS**

Except for the release and licenses expressly granted hereunder, nothing contained in the Agreement confers, or will be construed as conferring, any other rights, whether by implication, estoppel or otherwise, under any IPR of a Party or its Subsidiaries.

**Section 10. CHANGE OF CONTROL**

10.1 Change of Control of Netlist. In the event Netlist experiences a Change of Control:

10.1.1 Netlist shall promptly give notice of such Change of Control to Samsung including an identification of the Acquirer;

10.1.2 the licenses granted pursuant to this Agreement by Samsung to Netlist shall automatically terminate, effective as of the effective date of the Change of Control;

10.1.3 the licenses granted pursuant to this Agreement by Netlist to Samsung shall survive, subject to Section 10.1.4 below; and

10.1.4 the Capture Period shall automatically end effective as of the effective date of the Change of Control and after the effective date of the Change of Control of Netlist,

7
sf-3584904

CONFIDENTIAL　　NL049035

Netlist DRAFT 10/13/15

Netlist's Licensed Patents that are subject to this Agreement shall include only those Netlist's Licensed Patents owned or controlled by Netlist or its Subsidiaries immediately prior to the effective date of the Change of Control, and any subsequently filed patents and patent applications claiming priority to any of those Netlist's Licensed Patents (but will in no event include any other Patents of the Acquirer or its other affiliates).

10.2 Change of Control of Samsung. In the event Samsung experiences a Change of Control:

    10.2.1 Samsung shall promptly give notice of such Change of Control to Netlist including an identification of the Acquirer;

    10.2.2 the licenses granted pursuant to this Agreement by Netlist to Samsung shall automatically terminate, effective as of the effective date of the Change of Control;

    10.2.3 the licenses granted pursuant to this Agreement by Samsung to Netlist shall survive, subject to Section 10.2.4 below; and

    10.2.4  the Capture Period shall automatically end effective as of the effective date of the Change of Control and after the effective date of the Change of Control of Samsung, Samsung's Licensed Patents that are subject to this Agreement shall include only those Samsung's Licensed Patents owned or controlled by Samsung or its Subsidiaries immediately prior to the effective date of the Change of Control, and any subsequently filed patents and patent applications claiming priority to any of those Samsung's Licensed Patents (but will in no event include any other Patents of the Acquirer or its other affiliates).

**Section 11.   CONFIDENTIALITY**

11.1   Confidential Information. Each Party acknowledges that all business, financial, contractual, and/or marketing information, including Deliverables and other Technology, received from the other Party may be considered confidential and proprietary. Such information may be furnished in any tangible or intangible form including, but not limited to, writings, drawings, computer tapes and other electronic media, email, samples, and verbal communications.  "Confidential Information" of Party means any such information, including Deliverables and other Technology, disclosed by or on behalf of such Party ("Discloser"), directly or through its Subsidiaries or representatives, to the other Party ("Recipient"), directly or through its Subsidiaries or representatives, by any of the foregoing means, to the extent such information (a) ~~would ordinarily be regarded as confidential in the course of business under the circumstances, (b)~~ if disclosed in writing, is marked "confidential", "proprietary" or with another similar marking at the time of disclosure, or (~~c~~b) if provided orally or visually, it is identified as confidential at the time of disclosure and confirmed in writing to Recipient within fifteen (15) days of such disclosure, or (d) constitutes Restricted Information[NEED FURTHER REVIEW].  Discloser's Confidential Information also includes any copies, portions, and extracts of any of the foregoing that may be made or obtained by Recipient.

[Formatted: Highlight]

11.2   Restrictions.  Recipient will not disclose Confidential Information of Discloser to anyone without the prior written consent of Discloser, except to Recipient's employees with a need to know to carry out this Agreement and who are bound by use and disclosure restrictions consistent with those herein.   Recipient will protect Discloser's Confidential

Netlist DRAFT 10/13/15

Information from disclosure to others with at least the same degree of care as Recipient exercises to protect its own information of similar type and importance, but in no event with less than reasonable care. Recipient shall not use Discloser's Confidential Information for any purpose other than in furtherance of the JDP as expressly permitted in this Agreement, and shall return such Confidential Information to Discloser at any time upon request.

11.3 Term; Exceptions. These obligations of confidentiality will continue for a period of ~~ten (10)~~ five (5) years from the date of disclosures notwithstanding any expiration, termination, or cancellation of this Agreement; provided, however, that the restrictions pursuant to Section 11.2 will not apply, or will cease to apply, to any information to the extent such information:

(a) was known to Recipient prior to its receipt hereunder as evidenced by Recipient's pre-existing written records;
(b) is or becomes publicly available without breach of this Agreement;
(c) is received from another party without an obligation of confidentiality to Discloser and without breach of this Agreement;
(d) is developed independently by employees of Recipient who have not had access to Discloser's Confidential Information and without use of or reference to such information ~~as evidenced by Recipient's contemporaneous written records~~.

In addition, Recipient's disclosure of Discloser's Confidential Information will not be a violation of Section 11.2 to the extent such disclosure is compelled by court order provided that Discloser is given a reasonable opportunity to object to or restrict such disclosure requirement to the extent practicable, and then such disclosure will be permitted only subject to the terms and conditions of such order.

11.4 Other Restrictions. Neither Party will (a) attempt to decompile, disassemble, or reverse engineer any Confidential Information of the other Party ~~or use any other process to gain access to any Technology contained in or underlying the Confidential Information of the other Party~~, or (b) attempt to decrypt or circumvent any controls, restrictions, or security measures applied to any Confidential Information of the other Party.

11.5 Restricted Information. Restricted Information is subject to such additional terms and conditions as may be set forth in the Statement of Work. [NEED FURTHER REVIEW]

Section 12. REPRESENTATIONS, WARRANTIES AND DISCLAIMERS

12.1 Corporate Authority. Each Party represents and warrants to each other Party and its Subsidiaries that: (a) it has all requisite corporate power and authority, on behalf of itself and its Subsidiaries, to execute and deliver this Agreement and to carry out the provisions of this Agreement, and (b) the execution, delivery, and performance of this Agreement by such Party and its Subsidiaries has been approved by all requisite action on the part of such Party and its Subsidiaries, and no other proceedings, approvals, consents, authorizations, or other acts on the part of such Party or its Subsidiaries are necessary to authorize this Agreement.

12.2 Authority to Grant Licenses and Releases. Each Party represents and warrants that it has the right to grant the licenses and releases under its Licensed Patents of the full scope set forth in this Agreement.

9
sf-3584904

CONFIDENTIAL　NL049037

Netlist DRAFT 10/13/15

12.3 No Sale of Patent. Netlist warrants that it has not sold, assigned or transferred any patents to any third party within twelve (12) months prior to the Effective Date.

12.4 No Warranty. ALL INFORMATION, TECHNOLOGY, SUPPORT AND/OR ASSISTANCE PROVIDED UNDER THIS AGREEMENT ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND. NEITHER PARTY MAKES, AND EACH PARTY HEREBY EXPRESSLY DISCLAIMS, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, REGARDING INFORMATION, TECHNOLOGY, ~~LICENSES,~~ SUPPORT AND/OR ASSISTANCE, OR OTHERWISE WITH RESPECT TO THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF PERFORMANCE, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, ~~TITLE,~~ NON-INFRINGEMENT OF ANY THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, OR ANY WARRANTY THAT MAY ARISE FROM COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

12.5 Consequential Damages. EXCEPT FOR CLAIMS RESULTING FROM EITHER PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCLUDED DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, LOSS OF SAVINGS, LOSS OF USE OR PUNITIVE DAMAGES. IN NO EVENT SHALL ~~NETLIST~~EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED THE AMOUNT OF NRE FEES RECEIVED BY NETLIST HEREUNDER.

**Section 13. TERM AND TERMINATION**

13.1 Term. This Agreement, including the license, shall become effective on the Effective Date and shall remain in effect until the expiration of the Term unless earlier terminated as provided herein.

13.2 Termination. Notwithstanding the Term of this Agreement as set forth in Section 13.1 herein above, the other Party shall have a right to terminate this Agreement upon written notice to a Party if:

 1) such Party is in material breach of this Agreement and it is not cured within thirty (30) days period from the other Party's written demand, or as a consequence of the breach the purpose of this Agreement cannot be achieved; or
 2) such Party becomes insolvent or files or has a petition filed against it under bankruptcy or insolvency law, makes an assignment for the benefit of creditors or takes any similar action under applicable bankruptcy or insolvency law.

13.3 Effect of Termination. Upon the earlier termination of this Agreement by reason of material breach or insolvency pursuant to Section 13.2 1) and 2) by a Party, all licenses and other rights granted to such defaulting Party pursuant to this Agreement will cease forthwith as of the effective date of such termination; provided, however, that the license granted to the

10
sf-3584904

CONFIDENTIAL NL049038

Netlist DRAFT 10/13/15

non-defaulting Party will continue in full force and effect. Upon any expiration or termination of this Agreement, each Party shall return all Confidential Information of the other Party in such first Party's possession or under such first Party's control and certify in writing its compliance with such obligation.

Section 14. GOVERNING LAW

This Agreement shall be construed under and governed by ~~the federal laws of the United States of America and~~ the state laws of the State of New York without reference to its conflicts of law principles. All disputes and litigation arising out of or related to this Agreement, including matters connected with its performance, shall be subject to the exclusive jurisdiction of the courts of the state and county of New York, or of the federal courts sitting therein. Each Party hereby irrevocably submits to the personal jurisdiction of such courts and irrevocably waives all objections to such venue.

Section 15. NOTICES

All notices required hereunder shall be in writing and sent by registered or certified mail or facsimile and shall be valid upon receipt thereof by the addressee. The addresses of the Parties hereto shall be as follows (or such other address as a Party may give notice of hereunder):

If to Netlist :

Name:
Title:
Address:
Phone:
Email:

If to Samsung :

Name:
Title:
Address:
Phone:
Email:

Section 16. GENERAL PROVISIONS

16.1    Assignment. The rights and obligations of each Party under this Agreement shall not be assigned or transferred, in whole or in part, to any third party without prior written consent of the other Party and any attempt to do so without such consent shall be null and void, including in connection with a Change of Control.

16.2    No Waiver. The failure by either Party to enforce any of the terms and conditions of this Agreement shall not constitute a waiver of such Party's right thereafter to enforce that or any other terms and conditions of this Agreement.

11
sf-3584904

CONFIDENTIAL    NL049039

Netlist DRAFT 10/13/15

16.3     Compliance with Laws. Either Party shall comply with all applicable laws, rules, and regulations of any governmental or quasi-governmental authority or any country having authority over such matters with respect to the development, and provision of, the Developed Product; and either Party shall require and verify that its employees, or any subcontractor (if permitted hereunder) has complied with all applicable laws, rules and regulations of any governmental authority or quasi-governmental authority or any country having authority over such matters with respect to the JDP, and shall be responsible and liable for any act, inaction, non-compliance, performance, non-performance, or breach of this Agreement, applicable laws, rules and regulations by either Party's employees or third parties engaged by such Party, as applicable.

16.4     Independent Contractors. Samsung and Netlist are independent contractors. Neither Party nor their employees, consultants, contractors or agents are agents, employees or joint ventures of the other Party, nor do they have the authority to bind the other Party by contract or otherwise to any obligation. Neither Party will represent to the contrary, either expressly, implicitly, by appearance or otherwise.

16.5     Survival. Sections 1, 4, 7, 8 (subject to Section 13.3), 9, 10, 11, 12, 13.3, 14, 15, and 16 will survive the termination or expiration of this Agreement to the extent applicable, subject to Section 13.3.

16.6     Severability. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, such provision shall be severed from this Agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

16.7     Complete Agreement. Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement. Any amendment to this Agreement and any Appendices attached hereto requires the signatures of the authorized representatives of the Parties.

16.8     Press-Release.   Upon execution of this Agreement the Parties will issue a joint press release announcing the transaction in the form as set forth in Appendix D.   Except for such press release, neither Party shall, without the approval of the other, make any press release or other public announcement concerning this Agreement or the transactions contemplated by this Agreement; provided, however, that the foregoing shall not preclude communications or disclosures required under accounting, stock exchange or federal securities or labor relations laws.

16.9     Non-Solicitation.   Subject to applicable laws, neither Party and its Subsidiaries shall not, during the term of Parties' collaboration under this Agreement and for two years thereafter, directly or indirectly, whether through their employees, officers, representatives, agents, advisors or otherwise, solicit the employment of, or seek or enter into an independent contractor relationship with any employees of the other Party that are engaged in the JDP under this Agreement without the other Party's prior written consent.   The term "solicit the employment" shall not be deemed to include generalized searches for employees through media advertisements of general circulation, job fairs or employment firms; provided, however, that Sellerthe Party does not focus on or target or identify any of such Party's

12
sf-3584904

CONFIDENTIAL

Ex 30     927
NL049040

Netlist DRAFT 10/13/15

employees.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives.

| **Samsung Electronics Co., Ltd.** | **Netlist, Inc.** |
|---|---|
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| Date:_____ | Date:_____ |

13

sf-3584904

CONFIDENTIAL NL049041

Netlist DRAFT 10/13/15

**Appendix A**

<u>**Product Specifications and Development Milestone**</u>

**1. Product Specifications**

**2. Development Milestone**

14

sf-3584904

CONFIDENTIAL NL049042

Netlist DRAFT 10/13/15

**Appendix B**

## Statement of Work

15

sf-3584904

CONFIDENTIAL

Netlist DRAFT 10/13/15

**Appendix C**

## Schedule for Standardization and Productization

CONFIDENTIAL NL049044

Netlist DRAFT 10/13/15

**Appendix D**

<u>**Joint Press Release**</u>

Ex 30
932
CONFIDENTIAL
NL049045