# EXHIBIT 36

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# FORM 10 - K

**(Mark One)**

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the f iscal year ended January 2, 2016**

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from     to**
**Commission file number 001 - 33170**

# NETLIST, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 95-4812784 |
|---|---|
| State or other jurisdiction of incorporation or organization | (I.R.S. employer Identification No.) |

**175 Technology Drive, Suite 150**
**Irvine, CA 92618**

(Address of principal executive offices) (Zip Code)

**(949) 435 - 0025**

(Registrant ' s telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.001 per share | The NASDAQ Capital Market |

**Securities registered pursuant to Section 12(g) of the Act:**

None

(Title of class)

Indicate by check mark if the registrant is a well - known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S - T ( § 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S - K is not contained herein, and will not be contained, to the best of registrant ' s knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10 - K or any amendment to this Form 10 - K . ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non - accelerated filer, or a smaller reporting company. See the definitions of " large accelerated filer, " " accelerated filer " and " smaller reporting company " in Rule 12b - 2 of the Exchange Act.

| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☒ |
|---|---|---|---|
| | | (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b - 2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant ' s common stock held by non - affiliates, based on the closing price of the registrant ' s common stock as reported on Th e NASD AQ Global Market on June 2 7 , 201 5 , the last business day of the registrant ' s most recently completed second fiscal quarter, was approximately $ 24 .4 million. For purposes of this calculation, it has been assumed that all shares of the registrant ' s common stock held by directors, executive officers and persons beneficially owning ten percent or more of the registrant ' s common stock are held by affiliates. The treatment of these persons as affiliates for purposes of this calculation is not conclusive as to whether such persons are, in fact, affiliates of the registrant for any other purpose .

The number of shares outstanding of the registrant ' s common stock, as of the latest practicable date:

Common Stock, par value $0.001 per share
50 ,354,363  s hares  of common stock outstanding at February 2 9 , 2016

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the definitive p roxy s tatement for the registrant's Annual Meeting of Stockholders for 201 6  have been incorporated by reference into Part III of this Annual Report on Form 10-K.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| PART I |  |  |
| Item 1 | Business | 2 |
| Item 1A | Risk Factors | 9 |
| Item 1B | Unresolved Staff Comments | 31 |
| Item 2 | Properties | 31 |
| Item 3 | Legal Proceedings | 31 |
| Item 4 | Mine Safety Disclosures | 31 |
| PART II |  |  |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 31 |
| Item 6 | Selected Financial Data | 32 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 48 |
| Item 8 | Financial Statements and Supplementary Data | 48 |
| Item 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 48 |
| Item 9A | Controls and Procedures | 48 |
| Item 9B | Other Information | 49 |
| PART III |  |  |
| Item 10 | Directors, Executive Officers and Corporate Governance | 49 |
| Item 11 | Executive Compensation | 49 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 49 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 49 |
| Item 14 | Principal Accounting Fees and Services | 50 |
| PART IV |  |  |
| Item 15 | Exhibits, Financial Statement Schedules | 50 |
| SIGNATURES |  | 54 |

INDEX TO EXHIBITS

*This Annual Report on Form 10-K includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements relate to future events and our future performance, and are generally identified by words such as "believe", "expect", "anticipate", "estimate", "intend", "strategy", "may", "will likely" and similar words or phrases. A forward-looking statement is neither a prediction nor a guarantee of future events or circumstances, and our actual results could differ materially and adversely from those expressed in any forward-looking statement. These forward-looking statements are all based on currently available market, operating, financial and competitive information and assumptions and are subject to various risks and uncertainties. Important information regarding factors that could cause actual results to differ materially from such expectations is disclosed under the heading "Risk Factors" in Part I, Item 1A. and elsewhere in this report. These risks and uncertainties include, among others, risks associated with the launch and commercial success of our products, programs and technologies; the success of product, joint development and licensing partnerships; continuing development, qualification and volume production of HyperVault, EXPRESSvault™, NVvault™, HyperCloud® and VLP Planar-X RDIMM; the timing and magnitude of the continued decrease in our sales; our ability to leverage our NVvault™ and EXPRESSvault™ technology into a more diverse customer base; our need to raise additional capital and our ability to obtain financing when necessary; the rapidly-changing nature of technology; risks associated with intellectual property, including patent infringement litigation against us as well as the costs and unpredictability of litigation over infringement of our intellectual property and the possibility of our patents being reexamined or reviewed by the USPTO and PTAB; volatility in the pricing of DRAM ICs and NAND flash; changes in and uncertainty of customer acceptance of, and demand for, our existing products and products under development, including uncertainty of and/or delays in product orders and product qualifications; delays in our and our customers' product releases and development; introductions of new products by competitors; changes in end-user demand for technology solutions; our ability to attract and retain skilled personnel; our reliance on suppliers of critical components and vendors in the supply chain; fluctuations in the market price of critical components; evolving industry standards; the political and regulatory environment in the PRC; and general economic and market conditions. Given these risks, uncertainties and other important factors, you should not place undue reliance on these forward-looking statements. These forward-looking statements represent our estimates and assumptions only as of the date made. Except as required by law, we undertake no obligation to revise or update publicly any forward-looking statements for any reason.*

**PART I**

**Item 1.  Business**

**Overview**

We design, manufacture and sell a wide variety of high-performance, logic-based memory subsystems for the global datacenter, data storage and high-performance computing markets. Our memory subsystems consist of combinations of dynamic random access memory integrated circuits ("DRAM ICs" or "DRAM"), NAND flash memory ("NAND flash"), application-specific integrated circuits ("ASICs") and other components assembled on printed circuit boards ("PCBs"). We primarily market and sell our products to leading original equipment manufacturer ("OEM") customers, hyperscale datacenter operators and data storage vendors. Our solutions are targeted at applications where memory plays a key role in meeting system performance requirements. We leverage a portfolio of proprietary technologies and design techniques, including combining discrete semiconductor technologies from third parties such as DRAM and NAND flash to function as one efficient planar design, and alternative packaging techniques to deliver memory subsystems with persistence, high density, small form factor, high signal integrity, attractive thermal characteristics, reduced power consumption and low cost per bit. Our NVvault™ product is the first to offer both DRAM and NAND flash in a standard form factor memory subsystem as a persistent dual-in-line memory module ("DIMM") in mission critical applications. Our HyperCloud ® technology incorporates our patented rank multiplication and load reduction technologies. We also have pending and issued patents covering fundamental aspects of hybrid memory DIMM designs that incorporate combinations of DRAM and/or NAND flash, such as our NVvault™ product. We are focused on monetizing our patent portfolio through our products business and, where appropriate, through licensing arrangements with third parties that wish to incorporate our patented technologies in their products.

2

Table of Contents

**Intellectual Property Rights and Enforcement**

Our high-performance memory subsystems are developed in part using our proprietary technologies, and we believe that the strength of our intellectual property rights will be important to the success of our business. We utilize patent and trade secret protection, confidentiality agreements with customers and partners, disclosure and invention assignment agreements with employees and consultants and other contractual provisions to protect our intellectual property and other proprietary information. As of January 2, 2016, we had 60 U.S. and foreign patents issued and 33 U.S. and foreign patent applications pending. Assuming that they are properly maintained, our patents will expire at various dates between 2022 and 2030. Our issued patents and patent applications relate to the use of custom logic in high-performance memory subsystems, PCB design, layout and packaging techniques. We intend to actively pursue the filing of additional patent applications related to our technology advancements in order to expand and strengthen our portfolio. Our patents cover different aspects of our technology innovations and various claim scopes and, as such, we believe that our business is not materially dependent upon any one claim in any of our existing patents or pending patent applications.

We intend to vigorously defend our patent and other intellectual property rights, including, when necessary, pursuit of enforcement actions against entities we believe are using our patented solutions in their products. We may seek injunctive relief in the course of enforcing our intellectual property rights in certain instances, and in other instances we may enter into settlement or license agreements. We dedicate substantial resources to protecting our intellectual property, including efforts to defend our patents against challenges made by way of reexamination and review proceedings at the U.S. Patent and Trademark Office ("USPTO") and Patent Trial and Appeal Board ("PTAB"). These activities are likely to continue for the foreseeable future, without any guarantee that any ongoing or future patent protection and litigation activities will be successful. We also are subject to litigation based on claims that we have infringed on the intellectual property of others, against which we intend to defend ourselves vigorously.

**Licensing and Joint Development Partnerships**

We intend to seek opportunities to monetize our intellectual property rights through joint development or licensing arrangements, such as our November 2015 Joint Development and License Agreement ("JDLA") with Samsung Electronics Co., Ltd. ("Samsung"), pursuant to which, among other things, we and Samsung will work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of this new technology, we and Samsung have cross-licensed our respective patent portfolios for this purpose, and we may enter into an additional agreement with Samsung in the future to grant Samsung a commercial license to our NVDIMM-P technology. Commercial licensing arrangements, whether arising from partnerships such as the JDLA with Samsung or from patent infringement enforcement actions, can be structured in a variety of ways, including one-time paid up license fees or ongoing royalty arrangements. We aim to generate a portion of our revenues with these types of licensing arrangements in the future, but our efforts to monetize our intellectual property rights and technologies may not be successful.

**Our Products**

Our technical expertise and our ability to introduce new or enhanced products that achieve customer or market acceptance in a timely manner has been and we believe will continue to be important factors in developing and maintaining our competitive position. Below are descriptions of our commercially available products and new products that have been publicly announced.

*NVvault™ Family*

We were the first to develop and market memory subsystems that incorporate both DRAM and NAND flash in a single NVvault™ persistent DIMM solution. NVvault™ was originally used for mission critical backups during power interruption in Redundant Array of Independent Disks ("RAID") and main memory. NVvault™ has evolved beyond its original application to a variety of other applications, including hyperscale computing for cloud, big data, on-line banking and other real time applications where NVvault™ is also used as a data accelerator. We are working to further enhance the capabilities of our NVvault™ technology in these new applications, and we are also seeking to expand our

3

customer base through the integration of NVvault™ into leading storage motherboards. NVvault™ is incorporated in our EXPRESSvault™ PCIe solution for both acceleration and backup in storage applications.  Our NVvault™ product line consists primarily of battery-free and battery-powered flash backed cache memory subsystems targeting RAID storage, application acceleration and mission critical data integrity. NVvault™ battery-free provides server and storage OEMs a solution for enhanced datacenter fault recovery. We have experienced a steady decline in NVvault sales in recent years, due in large part to our loss of our most significant NVvault customer, Dell, beginning in 2012. We have also experienced supply chain disruptions with respect to the components of our NVvault products, which has contributed to the decrease in sales of these products. There were no sales of NVvault™ products to Dell in the years ended January 2, 2016 and December 27, 2014, and we expect no future demand from Dell for our NVvault™ products. We continue to pursue qualifications with other potential customers for these products and we are working to remedy our ongoing supply chain disruptions, however, our efforts to expand our qualifications and manage our supply chain may not result in significant revenues from the sale of the NVvault™ family of products.

HyperVault, a future product that combines DRAM and NAND flash, is still under development and may require substantial additional investment and the services and attention of key employees who have competing demands on their available time. We believe that our JDLA will advance the development of this product and that Samsung will prove to be an important strategic partner that can facilitate getting this technology to market.

For the years ended January 2, 2016 and December 27, 2014, our NVvault™ non-volatile RDIMM used in cache-protection and data logging applications, including our NVvault™ battery-free, the flash-based cache system, accounted for approximately 20 % and 44 % of total net product sales, respectively.

*HyperCloud ®*

Our HyperCloud ® product incorporates our patented rank multiplication technology, which increases memory capacity, and our patented load reduction technology, which increases memory bandwidth. We expect that these patented technologies will make possible improved levels of performance for memory intensive datacenter applications and workloads, including enterprise virtualization, cloud computing infrastructure, business intelligence real- time data analytics, and high-performance computing **.**

*Specialty Memory Modules and Flash-Based Products*

The remainder of our product revenues is primarily from OEM sales of specialty memory modules and flash-based products, the majority of which are utilized in data center and industrial applications. When developing custom modules for an equipment product launch, we engage with our OEM customers from the earliest stages of new product definition, providing us unique insight into their full range of system architecture and performance requirements. This close collaboration has also allowed us to develop a significant level of systems expertise. We leverage a portfolio of proprietary technologies and design techniques, including efficient planar design, alternative packaging techniques and custom semiconductor logic, to deliver memory subsystems with persistence, high density, small form factor, high signal integrity, attractive thermal characteristics, reduced power consumption and low cost per bit. Revenues from our specialty modules and flash-based products are subject to fluctuation as a result of the life cycles of the products into which our modules are incorporated. Our ability to continue to generate revenues from specialty memory modules and flash-based products is dependent on our ability to qualify our products on new platforms as current platforms reach the end of their lifecycles, and on the state of the global economy.

**Technology**

We have a portfolio of proprietary technologies and design techniques and have assembled an engineering team with expertise in semiconductors, printed circuit boards, memory subsystem and system design. Our technology competencies include:

Case 8:20-cv-00993-MCS-ADS   Document 187-38   Filed 10/21/21   Page 7 of 116   Page ID
#:8938
Table of Contents

*IC Design Expertise.*

We have designed special algorithms that can be implemented in stand-alone integrated circuits or integrated into other functional blocks in ASICs. We utilize these algorithms in the HyperCloud ® chipset to incorporate rank multiplication and load reduction functionality. We also incorporate these algorithms in our NVvault™ product line of RDIMMS.

*NVvault™.*

NVvault is a memory subsystem that incorporates both DRAM and NAND flash in a single persistent DIMM solution. NVvault™ combines the best attributes of DRAM, including speed, durability and reliability, with high densities, lower power and lowest costs provided by NAND flash. This combination enables us to provide application acceleration and mission critical backup during power interruption for cloud infrastructure, virtualization, analytics and database applications. NVvault™ is incorporated in our EXPRESSvault™ PCIe solution for both acceleration and backup in storage applications.

*Proprietary PCB Designs.*

We utilize advanced techniques to optimize electronic signal strength and integrity within a PCB. These techniques include the use of 8-layer or 10-layer boards, matching conductive trace lengths, a minimized number of conductive connectors, or vias, and precise load balancing to, among other benefits, help reduce noise and crosstalk between adjacent traces. In addition, our proprietary designs for the precise placement of intra-substrate components allow us to assemble memory subsystems with significantly smaller physical size, enabling OEMs to develop products with smaller footprints for their customers.

*Very Low Profile Designs.*

We were the first company to create memory subsystems in a form factor of less than one inch in height. We believe our proprietary board design technology is particularly useful in the blade server market, where efficient use of motherboard space is critical. Our technology has allowed us to decrease the system board space required for memory, and improve thermal performance and operating speeds, by enabling our customers to use alternative methods of component layout.

*Thermal Management Designs.*

We design our memory subsystems to ensure effective heat dissipation. We use thermal cameras to obtain thermal profiles of the memory subsystem during the design phase, allowing us to rearrange components to enhance thermal characteristics and, if necessary, replace components that do not meet specifications. We also develop and use proprietary heat spreaders to enhance the thermal management characteristics of our memory subsystems.

**Customers**

During our 2015 fiscal year we primarily marketed and sold our products to leading OEMs in the server, data storage and communications markets. Consistent with the concentrated nature of the OEM customer base in our target markets, a small number of large customers have historically accounted for a significant portion of our net sales. Net product sales to our two largest customers, Dell and Singh Semiconductors and Systems, represented approximately 27% and 10% of our net product sales in 2015, respectively. Dell, IBM and Nimble Storage, Inc. represented approximately 20%, 14% and 19% of our net product sales in 2014, respectively. For further information regarding our sales to our OEM customer base, please refer to Note 10 to our consolidated financial statements included in Part II, Item 8 of this report.

The composition of major customers and their respective contributions to our net sales have varied and will likely continue to vary from period to period as our OEMs progress through the life cycle of the products they produce and sell.

5

Our sales are made primarily pursuant to standard purchase orders that may be rescheduled on relatively short notice, which reduces our backlog of firm orders and our ability to accurately estimate future customer requirements for our products. Customers are generally allowed limited rights of return for up to 30 days, except for sales of excess inventories, which contain no right-of-return privileges. Estimated returns are provided for at the time of sale based on historical experience or specific identification of an event necessitating a reserve. While these returns have historically been within our expectations and the provisions established, we cannot guarantee that we will continue to experience similar return rates in the future. Any significant increase in product failure rates and the resulting product returns could have a material adverse effect on our operating results for the period or periods in which such returns materialize.

We offer warranties on our memory subsystems generally ranging from one to three years, depending on the product and negotiated terms of purchase agreements with our customers. Such warranties require us to repair or replace defective product returned to us during such warranty period at no cost to the customer. Our estimates for warranty related costs are recorded at the time of sale based on historical and estimated future product return rates and expected repair or replacement costs. While such costs have historically been within our expectations and the provisions established, unexpected changes in failure rates could have a material adverse impact on us, requiring additional warranty reserves, and adversely affecting our gross profit and gross margins.

For additional information regarding our net product sales from external customers by geographic area, refer to Note 11 to our consolidated financial statements included in Part II, Item 8 of this report.

**Sales and Marketing**

We market and sell our products through a direct sales force and a network of independent sales representatives. Our sales activities focus primarily on developing strong relationships at the technical, marketing and executive management levels within market-leading OEMs.

We utilize well-trained, highly technical program management teams to successfully drive new product development and quickly respond to our customers' needs and expectations. Our program management teams provide quick response times and act as a single point-of-contact for routine issues during the sales process. Additionally, they address the long-term business and technology goals of our customers. We employ a team approach to business development whereby our sales team and independent representatives identify, qualify and prioritize customer prospects through offices in a number of locations worldwide.

**Manufacturing**

We manufacture substantially all of our products at our facility in Suzhou in the People's Republic of China (the "PRC"). Our advanced engineering and design capabilities, combined with our in-house manufacturing processes, allow us to assemble our memory subsystems reliably and in high volume. Our advanced, customized manufacturing facilities are capable of surface mount assembly, subsystem testing, system -level burn-in testing, programming, marking, labeling and packaging. At each stage of the production cycle, including product prototyping, qualification sample production and high-volume manufacturing and delivery, we focus on providing our customers with rapid response and short manufacturing turn-around times. Manufacturing cycle times for our products are typically one week or less, and in some cases as short as two days, from receipt of order.

We acquire components and materials such as ASICs, DRAM ICs and NAND flash directly from integrated circuit manufacturers and assemble them into finished subsystems. We believe that one of our key strengths is the efficient procurement and management of components for our subsystems, which benefits our customers in the form of lower costs and increased product availability. We have a limited number of suppliers, including Arrow Electronics and Barun Electronics, Inc. each of which comprised more than 10% of our total purchases in 2015 and Arrow Electronics comprised more than 10% of our total purchases in 2014. Further, our JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us on our request at competitive prices. For further information regarding our supplier concentrations, refer to Note 10 to our consolidated financial statements included in Part II, Item 8 of this report.  We have developed strong supplier relationships with these and other key DRAM IC and NAND flash manufacturers, which we believe gives us direct and ready access to the critical components that we need for our

6

production activities. We typically qualify our products with our customers using multiple manufacturers of DRAM ICs and NAND flash. The flexibility to choose from several DRAM IC and NAND flash providers allows us to minimize product cost and maximize product availability. We schedule production based on purchase order commitments and anticipated orders. We release raw materials to the manufacturing floor by means of an on-line shop floor control system, which allows for internal quality analysis, direct access to inventory information and production floor material tracking. We have a flexible manufacturing workforce which allows us to manage unforecasted demand. In addition, in order to mitigate inventory risks, we have the capability to sell excess quantities of certain component inventories of DRAM ICs and NAND flash to distributors and other users of memory integrated circuits.

Our quality assurance engineers work with our suppliers to ensure that the raw materials we receive meet our high quality standards. These engineers also perform onsite supplier factory audits and use our internal test and inspection systems to verify that purchased components and materials meet our specifications. Our supplier quality program and incoming material quality control program are important aspects of our overall manufacturing process.

We perform ongoing reliability testing on our memory subsystems and share the results of that testing with our customers. We believe that this improves the system design process and allows for the elimination of potential problems at the earliest possible stage. In addition, we have implemented procedures which require that all of our memory subsystems undergo functional and system burn-in testing prior to delivery to the customer. We complement our test capabilities with advanced imaging technology to inspect the quality of our assemblies.

We are certified in International Organization for Standardization ("ISO") 9001:2008 Quality Management Systems and ISO 14001:2004 Environmental Management Standards.

**Competition**

Our products are primarily targeted for the server, high -performance computing and communications markets. These markets are intensely competitive, as numerous companies vie for business opportunities at a limited number of large OEMs. We face competition from DRAM suppliers, memory module providers and logic suppliers for many of our products, including NVvault and HyperCloud ® .   Additionally, if and to the extent we enter new markets or pursue licensing arrangements to monetize our technologies and intellectual property portfolio , we may face competition from a large number of competitors that produce solutions utilizing similar or competing technologies.

Some of our customers and suppliers may have proprietary products or technologies that are competitive with our products, or could develop internal solutions or enter into strategic relationships with, or acquire, existing high-density memory module providers. Any of these actions could reduce our customers' demand for our products. Some of our significant suppliers of memory integrated circuits may be able to manufacture competitive products at lower costs by leveraging internal efficiencies, or could choose to reduce our supply of memory integrated circuits, adversely affecting our ability to manufacture our memory subsystems on a timely basis, if at all.

Certain of our competitors have substantially greater financial, technical, marketing, distribution and other resources, broader product lines, lower cost structures, greater brand recognition and longer standing relationships with customers and suppliers. Some of our competitors may also have a greater ability to influence industry standards than we do, as well as more extensive patent portfolios.

We expect our competitors to continue to improve the performance of their current products, reduce their prices and introduce new or enhanced technologies that may offer greater performance and improved pricing. If we are unable to match or exceed the improvements made by our competitors, our market position would deteriorate and our net sales would decline. In addition, our competitors may develop future generations and enhancements of competitive products that may render our technologies obsolete or uncompetitive. Our ability to compete in our current target markets and in future markets will depend in large part on our ability to successfully develop, introduce and sell new and enhanced products or technologies on a timely and cost-effective basis and to respond to changing market requirements. We

7

believe that the principal competitive factors in the selection of high - performance memory subsystems by potential customers are:

- understanding of OEM system and business requirements;

- timeliness of new value-add product introductions;

- development of advanced technologies that we could license to third parties before our competitors;

- design characteristics and performance;

- quality and reliability;

- track record of volume delivery;

- credibility with the customer;

- fulfillment capability and flexibility; and

- price.

We believe that we compete favorably with respect to these factors. However, our current and future competitors could develop competing products that could cause a decline in sales or loss of market acceptance of our products or technologies.

**Research and Development**

The market for high-performance memory subsystems is constantly changing and therefore continuous development of new technology, processes and product innovation is necessary in order to be successful as a leading supplier. We believe that the continued and timely development of new products and improvement of existing products are critical to maintaining our competitive position. Our team of engineers focuses on developing custom semiconductor logic devices, hybrid memory, DRAM and NAND flash products with innovative packaging solutions, improved electrical signal integrity and thermal characteristics that enhances reliability over the life of the system and achieves higher speeds and lowers power consumption. Also, our engineers incorporate various new techniques and methodologies for testing as well as new processes for manufacturing our products.

Our engineering staff closely engages with our customers and their engineering teams at early stages in their system development. This collaboration allows our engineers to understand the customer's system architecture, power budget, operating environment such as air flow and operating temperature and any mechanical constraints. Our engineers use this information to provide guidance and solutions to implement optimum memory subsystems to our customers. An important aspect of our research and development effort is to understand the challenges faced by our customers and provide cost effective solutions that satisfy their requirements by utilizing our industry knowledge, proprietary technologies and technical expertise.

We use advanced design tools in development of our products that allow us to model behavior of a signal trace on our memory modules as well as airflow and thermal profiles of all components in the system. These design tools enable real-time simulation for signal integrity and behavioral modeling of our designs using the Input/Output Buffer Information Specification and Simulation Program with Integrated Circuit Emphasis models of our suppliers' components. These simulation tools help us reduce or eliminate electronic signal reflections, clock skews, signal jitter and noise, which can reduce system performance and reliability. These efforts allow our engineers to develop optimum thermal solutions for our customer base.

We believe that to remain competitive we must continue to focus on developing advanced memory technologies. We have invested significant resources in the design of custom semiconductor logic devices. These logic

8

devices are integrated into our next-generation memory subsystems in order to improve their performance. Logic devices in our NVvault™ and EXPRESSVault™ hybrid memory products enable DRAM and flash memory to be efficiently combined for the purposes of accelerating system performance and providing mission critical back-up. The development of these semiconductor devices is an important part of our overall effort to maintain a strong competitive position in our industry based on advanced memory technologies.

Our customers typically do not separately compensate us for design and engineering work involved in developing application -specific products for them.  Our total expenditures for research and development were approximately $6.0 million and $4.6 million for 2015 and 2014, respectively.

**Employees**

At January 2, 2016, we had approximately 110 employees (including 87 regular employees and 23 temporary employees). Approximately 45 of the regular employees were located in the U.S., and approximately 42 were located in the PRC. We had 63 employees in operations, 28 employees in research and development, 12 employees in sales and marketing, and 7 employees engaged in other administrative functions. We are not party to any collective bargaining agreements with any of our employees. We have never experienced a work stoppage, and we believe our employee relations are good.

**Compliance with Environmental Laws**

We are subject to various and frequently changing U.S. federal, state and local and foreign governmental laws and regulations relating to the protection of the environment, including those governing the discharge of pollutants into the air and water, the management and disposal of hazardous substances and wastes, the cleanup of contaminated sites and the maintenance of a safe workplace. In particular, some of our manufacturing processes may require us to handle and dispose of hazardous materials from time to time. For example, in the past our manufacturing operations have used lead-based solder in the assembly of our products. Today, we use lead-free soldering technologies in our manufacturing processes, as this is required for products entering the European Union. We could incur substantial costs, including clean-up costs, civil or criminal fines or sanctions and third-party claims for property damage or personal injury as a result of violations of, or noncompliance with, environmental laws and regulations. Although we have not incurred significant costs to date to comply with these laws and regulations, new laws or changes to current laws and regulations to make them more stringent could require us to incur significant costs to remain in compliance.

**General Information**

We were incorporated in Delaware in June 2000 and commenced operations in September 2000.  Our principal executive offices are located at 175 Technology Drive, Suite 150, Irvine, California 92618 and our telephone number at that address is (949) 435-0025. We maintain a website at *www.netlist.com* (this reference to our website is an inactive textual reference only and is not intended to incorporate our website into this report). We file reports with the Securities and Exchange Commission ("SEC") and make available, free of charge, on or through our website, our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy and information statements and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. Our website also contains copies of our corporate governance policy, code of business conduct and ethics, insider trading policy and whistleblower policy, as well as copies of the charters for our audit committee, compensation committee and nominating and corporate governance committee.

**Item 1A.  Risk Factors**

*You should consider each of the following factors as well as the other information in this report in evaluating our business and our prospects.  The risks described below are not the only ones we face. Additional risks we are not presently aware of or that we currently believe are immaterial may also impair our business operations. If any of the events described below were to occur, our financial condition, our ability to access capital resources, our results of*

9

*operations and/or our future growth prospects could be materially and adversely affected and the market price of our common stock could decline. In assessing these risks, you should also refer to the other information contained or incorporated by reference in this report, including our consolidated financial statements and related notes.*

***Risks related to our business***

***We have historically incurred losses and may continue to incur losses.***

Since the inception of our business in 2000, we have only experienced one fiscal year (2006) with profitable results. In order to regain profitability, or to achieve and sustain positive cash flows from operations in the future, we must reduce operating expenses and/or increase our revenues and gross margins. Although we have in the past engaged in a series of cost reduction actions, and believe that we could reduce our current level of expenses through elimination or reduction of strategic initiatives, such expense reductions alone may not make us profitable or allow us to sustain profitability if it is achieved and eliminating or reducing strategic initiatives could limit our opportunities and prospects. Our ability to achieve profitability will depend on increased revenue growth from, among other things, monetization of our intellectual property, increased demand for our memory subsystems and other product offerings, as well as our ability to expand into new and emerging markets. We may not be successful in achieving the necessary revenue growth or the expected expense reductions. Moreover, we may be unable to sustain past or expected future expense reductions in subsequent periods. We may not achieve profitability or sustain such profitability, if achieved, on a quarterly or annual basis in the future.

Any failure to achieve profitability could result in increased capital requirements and pressure on our liquidity position. We believe our future capital requirements will depend on many factors, including our levels of net sales, the timing and extent of expenditures to support sales, marketing, research and development activities, the expansion of manufacturing capacity both domestically and internationally, the continued market acceptance of our products, intellectual property enforcement activities and strategic collaborations or other transactions. Our capital requirements could result in our having to, or otherwise choosing to, seek additional funding through public or private equity offerings or debt financings. Such funding may not be available when needed, on terms acceptable to us or at all, any of which could result in our inability to meet our financial obligations and other related commitments.

***We may not have sufficient working capital to fund our planned operations, and, as a result, we may need to raise additional capital in the future in order to continue operating our business and developing new products and technologies, which capital may not be available when needed, on acceptable terms or at all.***

We believe that, taking into account our planned activities, we have sufficient cash resources to satisfy our capital needs for at least the next twelve months. However, our estimates of our operating expenses and working capital requirements could be incorrect, and we may use our cash resources faster than we presently anticipate. Further, some or all of our ongoing or planned investments may not be successful and could result in further losses. In addition, irrespective of our cash resources, we may be contractually or legally obligated to make certain investments which cannot be postponed.

Our capital requirements will depend on many factors, including, among others:

- the acceptance of, and demand for, our products;
- our success and that of our strategic partners in developing and selling products derived from our technology;
- our continued listing on NASDAQ;
- the costs of further developing our existing, and developing new, products or technologies;
- the extent to which we invest in new technology, testing and product development;
- Costs associated with defending and enforcing our intellectual property rights;
- the timing of vendor payments and the collection of receivables, among other factors affecting our working capital;
- the exercise of outstanding options or warrants to acquire our common stock;
- the number and timing of acquisitions and other strategic transactions in which we participate, if any; and
- the costs associated with the continued operation, and any future growth, of our business.

10

Table of Contents

We expect to rely in the near term on funds raised pursuant to recent public and private placement offerings of debt and equity securities (although we have used certain of those funds to repay certain indebtedness as required by the repayment terms thereof).   However, until we can generate a sufficient amount of revenue to finance our cash requirements, which we may never do, we may need to increase our liquidity and capital resources by one or more measures, which may include, among others, reducing operating expenses, restructuring our balance sheet by negotiating with creditors and vendors, entering into strategic partnerships or alliances, raising additional financing through the issuance of debt, equity, or convertible securities and working to increase revenue growth through new product sales. There is no guarantee that we will be able to obtain capital when needed, on terms acceptable to us, or at all.

Insufficient funds would have a material adverse effect on our business and operations and could cause us to fail to execute our business plan, fail to take advantage of future opportunities or fail to respond to competitive pressures or customer requirements, and further may require us to significantly modify our business model and/or reduce our operations, which could include delaying, scaling back or eliminating some or all of our ongoing and planned investments in corporate infrastructure, research and development projects, regulatory submissions, business development initiatives, and sales and marketing activities, among other investments. Modification of our business model and operations could result in an impairment of assets, the effects of which cannot be determined. Furthermore, if we continue to issue equity or convertible debt securities to raise additional funds, our existing stockholders may experience significant dilution, and the new equity or debt securities may have rights, preferences and privileges that are superior to those of our existing stockholders. If we incur additional debt, it may increase our leverage relative to our earnings or to our equity capitalization.

***We have incurred a material amount of indebtedness to fund our operations, the terms of which require that we pledge substantially all of our assets as security.  Our level of indebtedness and the terms of such indebtedness, could adversely affect our operations and liquidity.***

We have incurred debt secured by all of our assets under our credit facilities and term loans with Samsung Venture Investment Corporation ("SVIC") and Silicon Valley Bank ("SVB"). Our convertible promissory note issued to SVIC is secured by a first priority security interest in our patent portfolio and a second priority security interest in substantially all of our other assets. Our credit facility with SVB is secured by a first priority security interest in all of our assets other than our patent portfolio, to which SVB has a second priority security interest. The SVIC and/or SVB debt instruments contain customary representations, warranties and indemnification provisions, as well as affirmative and negative covenants that, among other things, restrict our ability to:

- incur additional indebtedness or guarantees;

- incur liens;

- make investments, loans and acquisitions;

- consolidate or merge;

- sell, lease, lend, exclusively license or otherwise transfer assets, including capital stock of subsidiaries;

- alter our business;

- change any provision of our organizational documents;

- engage in transactions with affiliates; and

- pay dividends or make distributions.

The SVIC and SVB debt instruments also include events of default, including, among other things, payment defaults, breaches of representations, warranties or covenants, certain bankruptcy events, and certain material adverse

11

changes. If we were to default under either debt instrument and were unable to obtain a waiver for such a default, among other remedies, the lenders could accelerate our obligations under the debt instruments and exercise their rights to foreclose on their security interests, which would cause substantial harm to our business and prospects.

Incurrence and maintenance of this debt could have material consequences, such as:

- requiring us to dedicate a portion of our cash flow from operations and other capital resources to debt service, thereby reducing our ability to fund working capital, capital expenditures, and other cash requirements;

- increasing our vulnerability to adverse economic and industry conditions;

- limiting our flexibility in planning for, or reacting to, changes and opportunities in, our business and industry, which may place us at a competitive disadvantage; and

- limiting our ability to incur additional debt on acceptable terms, if at all.

***Our revenues and results of operations have been substantially dependent on NVvault™ and we may be unable to replace revenue lost from the rapid decline in prior generation NVvault™ sales.***

For the years ended January 2, 2016 and December 27, 2014, our NVvault™ non -volatile RDIMM used in cache -protection and data logging applications, including our NVvault™ battery -free, the flash -based cache system, accounted for approximately 20% and 44% of total net product sales, respectively. We have experienced a steady decline in NVvault sales in recent years, due in large part to our loss of our most significant NVvault customer, Dell, beginning in 2012. We recognized no NVvault™ sales to Dell in the years ended January 2, 2016 and December 27, 2014. We expect no future demand from Dell for our NVvault™ products. In order to leverage our NVvault™ technology and diversify our customer base, and to secure one or more new key customers, we continue to pursue additional qualifications of NVvault™ with other OEMs and to target new customer applications such as online transaction processing, virtualization, big data analytics, high speed transaction processing, high-performance database, and in -memory database applications. We also introduced EXPRESSvault™ in March 2011 and the next generation of EXPRESSvault™ (EV3) in July 2015 and we continue to pursue qualification of the next generation DDR3 NVvault™ and DDR4 NVvault™ with customers. Our future operating results will depend on our ability to commercialize these NVvault™ product extensions, as well as other products such as HyperVault™ and other high -density and high-performance solutions. HyperVault™ is still under development and may require substantial additional investment and the services and attention of key employees who have competing demands on their available time. Although we believe that our JDLA will advance the development of this product and that Samsung will prove to be an important strategic partner that can facilitate getting this technology to market, our partnership with Samsung and any other steps we take to further the development of this or any other products in development could fail. If we are not successful in expanding our qualifications or marketing any new or enhanced products, we will be unable to secure revenues sufficient to replace lost NVvault revenue and our results of operations and prospects could be materially harmed.

***We are subject to risks relating to our focus on developing our HyperCloud® and NVvault™ products and lack of market diversification.***

We have historically derived a substantial portion of our net sales from sales of our high-performance memory subsystems for use in the server market. We expect these memory subsystems to continue to account for a portion of our net sales in the near term. We believe that continued market acceptance of these products or derivative products that incorporate our core memory subsystem technology for use in servers is critical to our success.

12

Table of Contents

We have invested a significant portion of our research and development budget into the design of ASIC and hybrid devices, including the HyperCloud ® memory subsystem, introduced in November 2009, as well as our NVvault family of products. These products are subject to increased risks as compared to our legacy products. For example:

- we are dependent on a limited number of suppliers for both the DRAM ICs and the ASIC devices that are essential to the functionality of the HyperCloud ® memory subsystem, and we have experienced supply chain disruptions and shortages of DRAM and flash required to create our HyperCloud ®, our NVvault ™ and Planar X VLP products as a result of business issues that are specific to our suppliers or the industry as a whole;

- we may be unable to achieve new qualifications or customer or market acceptance of the HyperCloud ® memory subsystem, NVvault ™ products or other new products such as HyperVault ™, or achieve such acceptance in a timely manner;

- the HyperCloud ® memory subsystem, NVvault ™ products or other new products such as HyperVault ™ may contain currently undiscovered flaws, the correction of which would result in increased costs and time to market; and

- we are required to demonstrate the quality and reliability of the HyperCloud ® memory subsystem or other new products to our customers, and are required to qualify these new products with our customers, which requires a significant investment of time and resources prior to the receipt of any revenue from such customers.

We experienced a longer qualification cycle than anticipated with our HyperCloud ® memory subsystems, and as a result, we have not generated significant HyperCloud ® product revenues to date relative to our investment in the product. We entered into collaborative agreements with both IBM and HP pursuant to which these OEMs qualified the 16GB and 32GB versions of HyperCloud ® for use with their products. While we and each of the OEMs committed financial and other resources toward the collaborations, the efforts undertaken for each of these collaborative agreements have not resulted in significant revenues or product margins for us to date. As a result, we have not achieved and we may never achieve sufficient revenues or margins from our HyperCloud ® products to justify their costs.

Additionally, if the demand for servers deteriorates or if the demand for our products to be incorporated in servers declines, our operating results would be adversely affected, and we would be forced to diversify our product portfolio and our target markets. We may not be able to achieve this diversification, and our inability to do so may adversely affect our business.

***We use a small number of FPGAs, DRAM ICs and NAND flash suppliers and are subject to risks of disruption in the supply of FPGAs, DRAM ICs and NAND flash.***

Our ability to fulfill customer orders or produce qualification samples is dependent on a sufficient supply of field-programmable gate arrays ("FPGAs"), DRAM ICs and NAND flash, which are essential components of our memory subsystems. There are a relatively small number of suppliers of FPGAs, DRAM ICs and NAND flash, and we purchase from only a subset of these suppliers. We have no long -term FPGA, DRAM or NAND flash supply contracts.

From time to time, shortages in DRAM ICs and NAND flash have required some suppliers to limit the supply of their DRAM ICs and NAND flash. We have experienced supply chain disruptions and shortages of DRAM and flash required to create our HyperCloud ®, NVvault ™ and Planar X VLP products, and we are continually working to secure adequate supplies of DRAM and flash necessary to fill customers' orders for our products in a timely manner. If we are unable to obtain a sufficient supply of DRAM ICs or NAND flash to meet our customers' requirements, these customers may reduce future orders for our products or not purchase our products at all, which would cause our net sales to decline and harm our operating results. In addition, our reputation could be harmed and, even assuming we are successful in resolving supply chain disruptions, we may not be able to replace any lost business with new customers, and we may lose market share to our competitors.

13

Our dependence on a small number of suppliers and the lack of any guaranteed sources of FPGAs, DRAM and NAND flash supply expose us to several risks, including the inability to obtain an adequate supply of these important components, price increases, delivery delays and poor quality.

Historical declines in customer demand and our revenues caused us to reduce our purchases of DRAM ICs and NAND flash. Such fluctuations could continue in the future. If we fail to maintain sufficient purchase levels with some suppliers, our ability to obtain supplies of raw materials may be impaired due to the practice of some suppliers to allocate their products to customers with the highest regular demand.

Our customers qualify the FPGAs, DRAM ICs and NAND flash of our suppliers for use in their systems. If one of our suppliers should experience quality control problems, it may be disqualified by one or more of our customers. This would disrupt our supplies of FPGAs, DRAM ICs and NAND flash and reduce the number of suppliers available to us, and may require that we qualify a new supplier. If our suppliers are unable to produce qualification samples on a timely basis or at all, we could experience delays in the qualification process, which could have a significant impact on our ability to sell that product.

***We may be unsuccessful in establishing and operating a licensing business.***

Although we intend to pursue an intellectual property-based licensing business in order to monetize our intellectual property rights, we are currently operating based on a products-based business model and we may never be successful in developing any licensing business . Although we may pursue an additional agreement with Samsung in the future to grant Samsung a commercial license to our NVDIMM-P technology pursuant to the terms of our JDLA with Samsung, we may never successfully enter into any such agreement with Samsung or any other third party. Further, the terms of any such agreements that we may reach with third party licensees are uncertain and may not provide significant royalty or other licensing revenues to us to justify our costs of developing and maintaining the licensed intellectual property or may otherwise include terms that are not favorable to us. Additionally, the pursuit of a licensing business would require by its nature that we relinquish certain of our rights to our technologies and intellectual property that we license to third parties, which could limit our ability to base our own products on such technologies. Additionally, the establishment of this new business may be more difficult or costly than expected and require additional personnel, investments and may be a significant distraction for management. In connection with any licensing business we may develop, our licenses and royalties revenue may be uncertain from period to period and we may be unable to attract sufficient licensing customers, which would materially and adversely affect our results of operations. Our ability to increase our license revenue will depend on a variety of factors, including novelty, utility, performance, quality, breadth and depth of our current and future intellectual property and technology, all as compared to that of our competitors, as well as our sales and marketing capabilities. Once secured, license revenue may be negatively affected by factors within and outside our control, including reductions in our customers' sales prices, sales volumes and the terms of such license arrangements. If we are not successful in achieving a licensing business, we may never recoup the costs associated with developing, maintaining, defending and enforcing our intellectual property portfolio and our financial condition would be harmed.

***We may lose our competitive position if we are unable to timely and cost-effectively develop new or enhanced products that meet our customers' requirements and achieve market acceptance or technologies that we can monetize through licensing arrangements or otherwise.***

Our industry is characterized by intense competition, rapid technological change, evolving industry standards and rapid product obsolescence. Evolving industry standards and technological change or new, competitive technologies could render our existing products and technologies obsolete. Accordingly, our ability to compete in the future will depend in large part on our ability to identify and develop new or enhanced products and technologies on a timely and cost-effective basis, and to respond to changing customer requirements. In order to develop and introduce new or enhanced products and technologies, we need to:

- identify and adjust to the changing requirements of our current and potential customers;

- identify and adapt to emerging technological trends and evolving industry standards in our markets;

14

- design and introduce cost-effective, innovative and performance- enhancing features that differentiate our products and technologies from those of our competitors;

- develop relationships with potential suppliers of components required for these new or enhanced products and technologies;

- qualify these products for use in our customers' products; and

- develop and maintain effective marketing strategies.

Our product development efforts are costly and inherently risky. It is difficult to foresee changes or developments in technology or anticipate the adoption of new standards. Moreover, once these changes or developments are identified, if at all, we will need to hire the appropriate technical personnel or retain third-party designers, develop the product, identify and eliminate design flaws, and manufacture the product in production quantities either in-house or through third-party manufacturers. As a result, we may not be able to successfully develop new or enhanced products or we may experience delays in the development and introduction of new or enhanced products. Delays in product development and introduction could result in the loss of, or delays in generating, net sales or other revenues and the loss of market share, as well as damage to our reputation. Even if we develop new or enhanced products or technologies, they may not meet our customers' requirements or gain market acceptance.

***Our customers require that our products undergo a lengthy and expensive qualification process without any assurance of net sales.***

Our prospective customers generally make a significant commitment of resources to test and evaluate our memory subsystems prior to purchasing our products and integrating them into their systems. This extensive qualification process involves rigorous reliability testing and evaluation of our products, which may continue for nine months or longer and is often subject to delays. In addition to qualification of specific products, some of our customers may also require us to undergo a technology qualification if our product designs incorporate innovative technologies that the customer has not previously encountered. Such technology qualifications often take substantially longer than product qualifications and can take over a year to complete. Qualification by a prospective customer does not ensure any sales to that prospective customer. Even after successful qualification and sales of our products to a customer, changes in our products, our manufacturing facilities, our production processes or our component suppliers may require a new qualification process, which may result in additional delays.

In addition, because the qualification process is both product specific and platform specific, our existing customers sometimes require us to re-qualify our products, or to qualify our new products, for use in new platforms or applications. For example, as our OEM customers transition from prior generation architectures to current generation architectures, we must design and qualify new products for use by those customers. In the past, the process of design and qualification has taken up to nine months to complete, during which time our net sales to those customers declined significantly. After our products are qualified, it can take several months before the customer begins production and we begin to generate net sales from such customer.

Likewise, when our memory and NAND flash component vendors discontinue production of components, it may be necessary for us to design and qualify new products for our customers. Such customers may require of us or we may decide to purchase an estimated quantity of discontinued memory components necessary to ensure a steady supply of existing products until products with new components can be qualified. Purchases of this nature may affect our liquidity. Additionally, our estimation of quantities required during the transition may be incorrect, which could adversely impact our results of operations through lost revenue opportunities or charges related to excess and obsolete inventory.

We must devote substantial resources, including design, engineering, sales, marketing and management efforts, to qualify our products with prospective customers in anticipation of sales. Significant delays in the qualification process, could result in an inability to keep up with rapid technology change or new, competitive technologies. If we

15

delay or do not succeed in qualifying a product with an existing or prospective customer, we will not be able to sell that product to that customer, which may result in our holding excess and obsolete inventory and harm our operating results and business.

***Sales to a limited number of customers represent a significant portion of our net sales and the loss of, or a significant reduction in sales to, any one of these customers could materially harm our business.***

Sales to certain of our OEM customers have historically represented a substantial majority of our net product sales. Approximately 27% and 10% of our net product sales in the fiscal year ended January 2, 2016 were to two customers. Approximately 20%, 14% and 19% of our net product sales in the fiscal year ended December 27, 2014 were to three customers. The composition of major customers and their respective contributions to our net product sales have varied and will likely continue to vary from period to period as our OEMs progress through the life cycle of the products they produce and sell. We do not have long-term agreements with any of our customers and, as such, any or all of them could decide at any time to discontinue, decrease or delay their purchase of our products. In addition, the prices that these customers pay for our products could change at any time. The loss of any of our OEM customers, or a significant reduction in sales to any of them, could significantly reduce our net sales and adversely affect our operating results. Further, we may not be able to sell some products developed for one customer to a different customer because our products are often designed to address specific customer requirements, and even if we are able to sell these products to another customer, our margin on such products may be reduced.

Our ability to maintain or increase our net sales to our key customers depends on a variety of factors, many of which are beyond our control. These factors include our customers' continued sales of servers and other computing systems that incorporate our memory subsystems and our customers' continued incorporation of our products into their systems. Because of these and other factors, net sales to these customers may not continue and the amount of such net sales may not reach or exceed historical levels in any future period. Because these customers account for a substantial portion of our net sales, the failure of any one of these customers to pay on a timely basis would negatively impact our cash flow. In addition, while we may not be contractually obligated to accept returned products, we may determine that it is in our best interest to accept returns in order to maintain good relations with our customers.

***A limited number of relatively large potential customers dominate the markets for our products.***

Our target markets are characterized by a limited number of large companies. Consolidation in one or more of our target markets may further increase this industry concentration. As a result, we anticipate that sales of our products will continue to be concentrated among a limited number of large customers in the foreseeable future. We believe that our financial results will depend in significant part on our success in establishing and maintaining relationships with, and effecting substantial sales to, these potential customers. Even if we establish and successfully maintain these relationships, our financial results will be largely dependent on these customers' sales and business results.

***If a standardized memory solution that addresses the demands of our customers is developed, our net sales and market share may decline.***

Many of our memory subsystems are specifically designed for our OEM customers' high-performance systems. In a drive to reduce costs and assure supply of their memory module demand, our OEM customers may endeavor to design Joint Electron Device Engineering Council (" JEDEC ")  standard DRAM modules into their new products. Although we also manufacture JEDEC modules, this trend could reduce the demand for our higher priced customized memory solutions, which would have a negative impact on our financial results. In addition, the adoption of a JEDEC standard module instead of a previously custom module might allow new competitors to participate in a share of our customers' memory module business that previously belonged to us.

If our OEM customers were to adopt JEDEC standard modules, our future business may be limited to identifying the next generation of high-performance memory demands of OEM customers and developing solutions that address such demands. Until fully implemented, any next generation of products may constitute a significantly smaller market, which would reduce our net sales and market share.

16

***We may not be able to maintain our competitive position because of the intense competition in our targeted markets.***

Our products are primarily targeted for the server, high-performance computing and communications markets. These markets are intensely competitive, as numerous companies vie for business opportunities at a limited number of large OEMs. We face competition from DRAM suppliers, memory module providers and logic suppliers for many of our products, including NVvault and HyperCloud [®]. Additionally, if and to the extent we enter new markets or pursue licensing arrangements to monetize our technologies and intellectual property portfolio, we may face competition from a large number of competitors that produce solutions utilizing similar or competing technologies.

Some of our customers and suppliers may have proprietary products or technologies that are competitive with our products, or could develop internal solutions or enter into strategic relationships with, or acquire, existing high-density memory module providers. Any of these actions could reduce our customers' demand for our products. Some of our significant suppliers of memory integrated circuits may be able to manufacture competitive products at lower costs by leveraging internal efficiencies, or could choose to reduce our supply of memory integrated circuits, adversely affecting our ability to manufacture our memory subsystems on a timely basis, if at all.

Certain of our competitors have substantially greater financial, technical, marketing, distribution and other resources, broader product lines, lower cost structures, greater brand recognition and longer standing relationships with customers and suppliers. Some of our competitors may also have a greater ability to influence industry standards than we do, as well as more extensive patent portfolios.

Our ability to compete in our current target markets and in future markets will depend in large part on our ability to successfully develop, introduce and sell new and enhanced products or technologies on a timely and cost-effective basis and to respond to changing market requirements. We expect our competitors to continue to improve the performance of their current products, reduce their prices and introduce new or enhanced technologies that may offer greater performance and improved pricing. If we are unable to match or exceed the improvements made by our competitors, our market position would deteriorate and our net sales would decline. In addition, our competitors may develop future generations and enhancements of competitive products that may render our technologies obsolete or uncompetitive.

***If we fail to protect our proprietary rights, our customers or our competitors might gain access to our proprietary designs, processes and technologies, which could adversely affect our operating results.***

We rely on a combination of patent protection, trade secret laws and restrictions on disclosure to protect our intellectual property rights. We have submitted a number of patent applications regarding our proprietary processes and technology. It is not certain when or if any of the claims in the remaining applications will be allowed. As of January 2, 2016 , we had 60 U.S. and foreign patents issued and over 3 3   pending applications worldwide. We intend to continue filing patent applications with respect to most of the new processes and technologies that we develop. However, patent protection may not be available for some of these processes or technologies.

It is possible that our efforts to protect our intellectual property rights may not:

- prevent challenges to, or the invalidation or circumvention of, our existing intellectual property rights;

- prevent our competitors from independently developing similar products or technologies, duplicating our products or technologies or designing around any patents that may be issued to us;

- prevent disputes with third parties regarding ownership of our intellectual property rights;

- prevent disclosure of our trade secrets and know -how to third parties or into the public domain;

- result in valid patents, including international patents, from any of our pending or future applications; or

-  otherwise adequately protect our intellectual property rights.

17

Others may attempt to reverse engineer, copy or otherwise obtain and use our proprietary technologies without our consent. Monitoring the unauthorized use of our technologies is difficult. We cannot be certain that the steps we have taken will prevent the unauthorized use of our technologies. This is particularly true in foreign countries, such as the PRC, where we have established a manufacturing facility and where the laws may not protect our proprietary rights to the same extent as applicable U.S. laws.

If some or all of the claims in our patent applications are not allowed, or if any of our intellectual property protections are limited in scope by the USPTO or our foreign patents being subjected to invalidation proceedings with their respective authorities, or by a court or circumvented by others, we could face increased competition with regard to our products and be unable to execute on our strategy of monetizing our intellectual property. Increased competition or an inability to monetize our intellectual property could significantly harm our business, our operating results and prospects . Currently four of our patents are the subject of *Inter Partes* Reexamination proceedings with the USPTO, or appeals therefrom, and we cannot assure you that any of these proceedings will result in an outcome favorable to us.

***We are involved in and expect to continue to be involved in costly legal and administrative proceedings to defend against claims that we infringe the intellectual property rights of others or to enforce or protect our intellectual property rights.***

As is common in the semiconductor industry, we have experienced substantial litigation regarding patent and other intellectual property rights. Lawsuits claiming that we are infringing others' intellectual property rights have been and may in the future be brought against us, and we are currently defending against claims of invalidity in the USPTO.

The process of obtaining and protecting patents is inherently uncertain. In addition to the patent issuance process established by law and the procedures of the USPTO, we must comply with JEDEC administrative procedures in protecting our intellectual property within its industry standard setting process. These procedures evolve over time, are subject to variability in their application, and may be inconsistent with each other. Failure to comply with JEDEC's administrative procedures could jeopardize our ability to claim that our patents have been infringed.

By making use of new technologies and entering new markets there is an increased likelihood that others might allege that our products infringe on their intellectual property rights. Litigation is inherently uncertain, and an adverse outcome in existing or any future litigation could subject us to significant liability for damages or invalidate our proprietary rights. An adverse outcome also could force us to take specific actions, including causing us to:

- cease manufacturing and/or selling products, or using certain processes, that are claimed to be infringing a third-party's intellectual property;

- pay damages (which in some instances may be three times actual damages), including royalties on past or future sales;

- seek a license from the third-party intellectual property owner to use their technology in our products, which license may not be available on reasonable terms, or at all; or

- redesign those products that are claimed to be infringing a third-party's intellectual property.

If any adverse ruling in any such matter occurs, any resulting limitations in our ability to market our products, or delays and costs associated with redesigning our products or payments of license fees to third parties, or any failure by us to develop or license a substitute technology on commercially reasonable terms could have a material adverse effect on our business, financial condition and results of operations.

There is a limited pool of experienced technical personnel that we can draw upon to meet our hiring needs. As a result, a number of our existing employees have worked for our existing or potential competitors at some point during their careers, and we anticipate that a number of our future employees will have similar work histories. In the past, some of these competitors have claimed that our employees misappropriated their trade secrets or violated non -competition or

18

non -solicitation agreements. Some of our competitors may threaten or bring legal action involving similar claims against us or our existing employees or make such claims in the future to prevent us from hiring qualified candidates. Lawsuits of this type may be brought, even if there is no merit to the claim, simply as a strategy to drain our financial resources and divert management's attention away from our business.

Our business strategy also includes litigating claims against others, including our competitors, customers and former employees, to enforce our intellectual property, contractual and commercial rights including, in particular, our trade secrets, as well as to challenge the validity and scope of the proprietary rights of others. We could become subject to counterclaims or countersuits against us as a result of this litigation. Moreover, any legal disputes with customers could cause them to cease buying or using our products or delay their purchase of our products and could substantially damage our relationship with them.

Any litigation, regardless of its outcome, would be time consuming and costly to resolve, divert our management's time and attention and negatively impact our results of operations. As a result, any current or future infringement claims by or against third parties or claims for indemnification by customers or end users of our products resulting from infringement claims could materially adversely affect our business, financial condition or results of operations.

As a result of the unfavorable outcome in connection with the litigation against Diablo Technologies, Inc., for controller chips used by SanDisk Corporation in its high -speed ULLtraDIMM SSD product line, we may expend significant resources to pursue an appeal in the case, which may not be resolved in a timely manner and may not yield a more favorable outcome. Moreover, the expenses associated with the matter, including a $900,000 bond that has been forfeited, may materially adversely affect our financial condition and operating results. See Note 7 to our consolidated financial statements included in this report for further information about this litigation.

***We may become involved in non-patent related litigation and administrative proceedings that may materially adversely affect us.***

From time to time, we may become involved in various legal proceedings relating to matters incidental to the ordinary course of our business, including commercial, product liability, employment, class action, whistleblower and other litigation and claims and governmental and other regulatory investigations and proceedings. Such matters can be time-consuming, divert management's attention and resources and cause us to incur significant expenses. Furthermore, because litigation is inherently unpredictable, the results of these actions could have a material adverse effect on our business, results of operations and financial condition.

***Our operating results may be adversely impacted by worldwide economic and political uncertainties and specific conditions in the markets we address, including the cyclical nature of and volatility in the memory market and semiconductor industry.***

Adverse changes in domestic and global economic and political conditions have made it extremely difficult for our customers, our vendors and us to accurately forecast and plan future business activities, and these conditions have caused and could continue to cause U.S. and foreign businesses to slow spending on our products and services, which would further delay and lengthen sales cycles. In addition, sales of our products are dependent upon demand in the computing, networking, communications, printer, storage and industrial markets. These markets have been cyclical and are characterized by wide fluctuations in product supply and demand. These markets have also experienced significant downturns, often connected with, or in anticipation of, maturing product cycles, reductions in technology spending and declines in general economic conditions. These downturns have been characterized by diminished product demand, production overcapacity, high inventory levels and the erosion of average selling prices and may result in reduced willingness of potential licensees to enter into license agreement with us.

We may experience substantial period-to-period fluctuations in operating results due to factors affecting the computing, networking, communications, printers, storage and industrial markets. A decline or significant shortfall in demand in any one of these markets could have a material adverse effect on the demand for our products and as a result, our sales would likely decline. In addition, because many of our costs and operating expenses are relatively fixed, if we

19

are unable to control our expenses adequately in response to reduced sales, our gross margins, operating income and cash flow would be negatively impacted.

During challenging economic times our customers may face issues gaining timely access to sufficient credit, which could impair their ability to make timely payments to us. If that were to occur, we may be required to increase our allowance for doubtful accounts and our ability to timely collect payments would be negatively impacted. Furthermore, our vendors may face similar issues gaining access to credit, which may limit their ability to supply components or provide trade credit to us. We cannot predict the timing, strength or duration of any economic slowdown or subsequent economic recovery, either worldwide or in the memory market and related semiconductor industry. If the economy or markets in which we operate do not improve or if conditions worsen, our business, financial condition and results of operations will likely be materially and adversely affected. Additionally, the combination of our lengthy sales cycle coupled with challenging macroeconomic conditions could compound the negative impact on the results of our operations.

***Our lack of a significant backlog of unfilled orders and the difficulty inherent in estimating customer demand makes it difficult to forecast our short-term production requirements to meet that demand, and any failure to optimally calibrate our production capacity and inventory levels to meet customer demand could adversely affect our revenues, gross margins and earnings.***

We make significant decisions regarding the levels of business that we will seek and accept, production schedules, component procurement commitments, personnel needs and other resource requirements based on our estimates of customer requirements. We do not have long-term purchase agreements with any of our customers. Instead, our customers often place purchase orders no more than two weeks in advance of their desired delivery date, and these purchase orders generally have no cancellation or rescheduling penalty provisions. The short-term nature of commitments by many of our customers, the fact that our customers may cancel or defer purchase orders for any reason, and the possibility of unexpected changes in demand for our customers' products each reduce our ability to accurately estimate future customer requirements for our products. This fact, combined with the quick turn-around times that apply to each order, makes it difficult to forecast our production needs and allocate production capacity efficiently. As a result, we attempt to forecast the demand for the DRAM ICs, NAND flash and other components needed to manufacture our products, but any such forecasts could turn out to be wrong. Further, lead times for components vary significantly and depend on various factors, such as the specific supplier and the demand and supply for a component at a given time.

Our production expense and component purchase levels are based in part on our forecasts of our customers' future product requirements and to a large extent are fixed in the short term. As a result, we likely would be unable to adjust spending on a timely basis to compensate for any unexpected shortfall in customer orders. If we overestimate customer demand, we may have excess raw material inventory of DRAM ICs and NAND flash. If there is a subsequent decline in the prices of DRAM ICs or NAND flash, the value of our inventory will fall. As a result, we may need to write-down the value of our DRAM IC or NAND flash inventory, which may result in a significant decrease in our gross margin and financial condition. Also, to the extent that we manufacture products in anticipation of future demand that does not materialize, or in the event a customer cancels or reduces outstanding orders, we could experience an unanticipated increase in our finished goods inventory. In the past, we have had to write-down inventory due to obsolescence, excess quantities and declines in market value below our costs. Any significant shortfall of customer orders in relation to our expectations could hurt our operating results, cash flows and financial condition.

Also, any rapid increases in production required by our customers could strain our resources and reduce our margins. If we underestimate customer demand, we may not have sufficient inventory of DRAM ICs and NAND flash on hand to manufacture enough product to meet that demand. We also may not have sufficient manufacturing capacity at any given time to meet our customers' demands for rapid increases in production. These shortages of inventory and capacity would lead to delays in the delivery of our products, and we could forego sales opportunities, lose market share and damage our customer relationships.

20

***Declines in our average sales prices, driven by volatile prices for DRAM ICs and NAND flash, among other factors, may result in declines in our revenues and gross profit.***

Our industry is competitive and historically has been characterized by declines in average sales price, based in part on the market price of DRAM ICs and NAND flash, which have historically constituted a substantial portion of the total cost of our memory subsystems. Our average sales prices may decline due to several factors, including overcapacity in the worldwide supply of DRAM and NAND flash memory components as a result of worldwide economic conditions, increased manufacturing efficiencies, implementation of new manufacturing processes and expansion of manufacturing capacity by component suppliers.

Once our prices with a customer are negotiated, we are generally unable to revise pricing with that customer until our next regularly scheduled price adjustment. Consequently, we are exposed to the risks associated with the volatility of the price of DRAM ICs and NAND flash during that period. If the market prices for DRAM ICs and NAND flash increase, we generally cannot pass the price increases on to our customers for products purchased under an existing purchase order. As a result, our cost of sales could increase and our gross margins could decrease. Alternatively, if there are declines in the price of DRAM ICs and NAND flash, we may need to reduce our selling prices for subsequent purchase orders, which may result in a decline in our expected net sales.

In addition, since a large percentage of our sales are to a small number of customers that are primarily distributors and large OEMs, these customers have exerted, and we expect they will continue to exert, pressure on us to make price concessions. If not offset by increases in volume of sales or the sales of newly-developed products with higher margins, decreases in average sales prices would likely have a material adverse effect on our business and operating results.

***If the supply of component materials used to manufacture our products is interrupted or if our inventory becomes obsolete, our results of operations and financial condition could be adversely affected.***

We use consumables and other components, including PCBs, to manufacture our memory subsystems. We sometimes procure PCBs and other components from single or limited sources to take advantage of volume pricing discounts. Material shortages or transportation problems could interrupt the manufacture of our products. These delays in manufacturing could adversely affect our results of operations.

Frequent technology changes and the introduction of next-generation products also may result in the obsolescence of other items of inventory, such as our custom-built PCBs, which could reduce our net sales and gross margin and adversely affect our operating performance and financial condition.

***A prolonged disruption of our manufacturing facility could have a material adverse effect on our business, financial condition and results of operations.***

We maintain a manufacturing facility in the PRC for producing most of our products, which allows us to utilize our materials and processes, protect our intellectual property and develop the technology for manufacturing. A prolonged disruption or material malfunction of, interruption in or the loss of operations at our manufacturing facility or the failure to maintain a sufficient labor force at such facility could require us to rely on third parties for our manufacturing needs, which generally increases our manufacturing costs and decreases our profit margins and could limit our capacity to meet customer demand and delay new product development until a replacement facility and equipment, if necessary, were secured. The replacement of the manufacturing facility could take an extended amount of time before manufacturing operations could restart. The potential delays and costs resulting from these steps could have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to manufacture our products efficiently, our operating results could suffer.***

We must continuously review and improve our manufacturing processes in an effort to maintain satisfactory manufacturing yields and product performance, to lower our costs and to otherwise remain competitive. As we manufacture more complex products, the risk of encountering delays or difficulties increases. The start-up costs

21

associated with implementing new manufacturing technologies, methods and processes, including the purchase of new equipment, and any resulting manufacturing delays and inefficiencies, could negatively impact our results of operations.

If we need to add manufacturing capacity, an expansion of our existing manufacturing facility or establishment of a new facility could be subject to factory audits by our customers. Any delays or unexpected costs resulting from this audit process could adversely affect our net sales and results of operations. In addition, we cannot be certain that we would be able to increase our manufacturing capacity on a timely basis or meet the standards of any applicable factory audits.

***We depend on third-parties to design and manufacture custom components for some of our products.***

Significant customized components, such as ASICs, that are used in HyperCloud ® and some of our other products are designed and manufactured by third parties. The ability and willingness of such third parties to perform in accordance with their agreements with us is largely outside of our control. If one or more of our design or manufacturing partners fails to perform its obligations in a timely manner or at satisfactory quality levels, our ability to bring products to market or deliver products to our customers, as well as our reputation, could suffer. In the event of any such failures, we may have no readily available alternative source of supply for such products, since, in our experience, the lead time needed to establish a relationship with a new design and/or manufacturing partner is at least 12 months, and the estimated time for our OEM customers to re-qualify our product with components from a new vendor ranges from four to nine months. If we need to replace one of our manufacturers, we may not be able to redesign, or cause to have redesigned, our customized components to be manufactured by the new manufacturer in a timely manner, and we could infringe on the intellectual property of our current design or manufacturing partner when we redesign the custom components or cause such components to be redesigned by the new manufacturer. A manufacturing disruption experienced by our manufacturing partners, the failure of our manufacturing partners to dedicate adequate resources to the production of our products, the financial instability of our manufacturing or design partners, or any other failure of our design or manufacturing partners to perform according to their agreements with us would have a material adverse effect on our business, financial condition and results of operations.

We have many other risks due to our dependence on third-party manufacturers, including: reduced control over delivery schedules, quality, manufacturing yields and cost; the potential lack of adequate capacity during periods of excess demand; limited warranties on products supplied to us; and potential misappropriation of our intellectual property. We are dependent on our manufacturing partners to manufacture products with acceptable quality and manufacturing yields, to deliver those products to us on a timely basis and to allocate a portion of their manufacturing capacity sufficient to meet our needs. Although our products are designed using the process design rules of the particular manufacturers, our manufacturing partners may not be able to achieve or maintain acceptable yields or deliver sufficient quantities of components on a timely basis or at an acceptable cost. Additionally, our manufacturing partners may not continue to devote adequate resources to produce our products or continue to advance the process design technologies on which the qualification and manufacturing of our products are based.

***If our products do not meet the quality standards of our customers, we may be forced to stop shipments of products until the quality issues are resolved.***

Our customers require our products to meet strict quality standards. Should our products not meet such standards, our customers may discontinue purchases from us until we are able to resolve the quality issues that are causing us to not meet the standards. Such "quality holds" could have a significant adverse impact on our revenues and operating results.

***If our products are defective or are used in defective systems, we may be subject to warranty, product recalls or product liability claims.***

If our products are defectively manufactured, contain defective components or are used in defective or malfunctioning systems, we could be subject to warranty and product liability claims and product recalls, safety alerts or advisory notices. While we have product liability insurance coverage, it may not be adequate to satisfy claims made against us. We also may be unable to obtain insurance in the future at satisfactory rates or in adequate amounts.

22

Table of Contents

Although we generally attempt to contractually limit our exposure to incidental and consequential damages, if these contract provisions are not enforced or are unenforceable or if liabilities arise that are not effectively limited, we could incur substantial costs in defending or settling product liability claims.

Warranty and product liability claims or product recalls, regardless of their ultimate outcome, could have an adverse effect on our business, financial condition and reputation, and on our ability to attract and retain customers. In addition, we may determine that it is in our best interest to accept product returns in circumstances where we are not contractually obligated to do so in order to maintain good relations with our customers. Accepting product returns may negatively impact our operating results.

***If we are required to obtain licenses to use third-party intellectual property and we fail to do so, our business could be harmed.***

Although some of the components used in our final products contain the intellectual property of third parties, we believe that our suppliers bear the sole responsibility to obtain any rights and licenses to such third-party intellectual property. While we have no knowledge that any third-party licensor disputes our belief, we cannot assure you that disputes will not arise in the future. The operation of our business and our ability to compete successfully depends significantly on our continued operation without claims of infringement or demands resulting from such claims, including demands for payments of money in the form of, for example, ongoing licensing fees.

We are also developing new products that we intend to launch in new customer markets. Similar to our current products, we may use components in these new products that contain the intellectual property of third parties. While we plan to exercise precautions to avoid infringing on the intellectual property rights of third parties, disputes regarding intellectual property ownership could arise.

If it is determined that we are required to obtain inbound licenses and we fail to obtain licenses, or if such licenses are not available on economically feasible terms, then we would be forced to redesign the applicable product without the infringing component, which may be costly or not possible, or we may be forced to cease all manufacture and sales of the applicable product. Any such outcome would harm our business, operating results and financial condition.

***The flash memory market is constantly evolving and competitive, and we may not have rights to manufacture and sell certain types of products utilizing emerging flash formats, or we may be required to pay a royalty to sell products utilizing these formats.***

The flash-based storage market is constantly undergoing rapid technological change and evolving industry standards. Many consumer devices, such as digital cameras, PDAs and smartphones, are transitioning to emerging flash memory formats, such as the Memory Stick and xD Picture Card formats, which we do not currently manufacture and do not have rights to manufacture. Although we do not currently serve the consumer flash market, it is possible that certain OEMs may choose to adopt these higher-volume, lower-cost formats. This could result in a decline in demand, on a relative basis, for other products that we manufacture, such as CompactFlash, SD and embedded USB drives. If we decide to manufacture flash memory products utilizing emerging formats, we would be required to secure licenses to give us the right to manufacture such products that may not be available at reasonable rates or at all. If we are not able to supply flash card formats at competitive prices or if we were to have product shortages, our net sales could be adversely impacted and our customers would likely cancel orders or seek other suppliers to replace us.

***Our indemnification obligations for the infringement by our products of the intellectual property rights of others could require us to pay substantial damages.***

As is common in our industry, we have in effect a number of agreements in which we have agreed to defend, indemnify and hold harmless our customers and suppliers from damages and costs that may arise from the infringement by our products of third-party patents, trademarks or other proprietary rights. The scope of such indemnity varies, but may, in some instances, include indemnification for damages and expenses, including attorneys' fees. Our insurance

23

does not cover intellectual property infringement. The term of these indemnification agreements is generally perpetual after execution of the applicable agreement. The maximum potential amount of future payments we could be required to make under these indemnification agreements is unlimited. We may periodically have to respond to claims and litigate these types of indemnification obligations. Although our suppliers may bear responsibility for the intellectual property inherent in the components they sell to us, they may lack the financial ability to stand behind such indemnities. Additionally, it may be costly to enforce any indemnifications that they have granted to us. Accordingly, any indemnification claims by customers could require us to incur significant legal fees and could potentially result in the payment of substantial damages, either of which could result in a material adverse effect on our business and results of operations.

***We depend on a few key employees, and if we lose the services of any of these employees or are unable to attract and retain other qualified personnel, our business could be harmed.***

To date, we have been highly dependent on the experience, relationships and technical knowledge of certain key employees. We believe that our future success will be dependent on our ability to retain the services of these key employees, develop their successors, reduce our reliance on them, and properly manage the transition of their roles should departures occur. The loss of these key employees or their inability to provide their services could delay the development and introduction of, and negatively impact our ability to sell, our products and otherwise harm our business. We do not have employment agreements with any of these key employees other than Chun K. Hong, our President, Chief Executive Officer and Chairman of the Board. We maintain "Key Man" life insurance on Chun K. Hong; however, we do not carry "Key Man" life insurance on any of our other key employees.

Our future success also depends on our ability to attract, retain and motivate highly skilled engineering, manufacturing, and other technical and sales personnel. Competition for experienced personnel is intense. We may not be successful in attracting new engineers or other technical personnel or in retaining or motivating our existing personnel. If we are unable to hire and retain engineers with the skills necessary to keep pace with the evolving technologies in our markets, our ability to continue to provide our current products and to develop new or enhanced products will be negatively impacted, which would harm our business. In addition, a general shortage of experienced engineers could lead to increased recruiting, relocation and compensation costs for such engineers, which may exceed our expectations and resources. These increased costs may make hiring new engineers difficult or may increase our operating expenses.

Historically, a significant portion of our workforce has consisted of contract personnel. We invest considerable time and expense in training these contract employees. We may experience high turnover rates in our contract employee workforce, which may require us to expend additional resources in the future. If we convert any of these contract employees into permanent employees, we may have to pay finder's fees to the contract agency.

***We rely on third-party manufacturers' representatives to sell our products and the failure of these manufacturers' representatives to perform as expected could reduce our sales.***

We sell some of our products to customers through manufacturers' representatives. We are unable to predict the extent to which our manufacturers' representatives will be successful in marketing and selling our products. Moreover, many of our manufacturers' representatives also market and sell other, potentially competing products. Our representatives may terminate their relationships with us at any time. Our future performance will also depend, in part, on our ability to attract additional manufacturers' representatives that will be able to market and support our products effectively, especially in markets in which we have not previously distributed our products. If we cannot retain our current manufacturers' representatives or recruit additional or replacement manufacturers' representatives, our sales and operating results will be harmed.

***Economic, political and other risks associated with international sales and operations expose us to significant risks.***

Since 2009, most of our world-wide manufacturing production has been performed at our manufacturing facility in the People's Republic of China, or PRC. Language and cultural differences, as well as the geographic distance from our headquarters in Irvine, California, further compound the difficulties of running a manufacturing operation in

24

the PRC. Our management has limited experience in creating or overseeing foreign operations, and the ongoing management of our PRC facility may require our management team to divert substantial amounts of their time, particularly if we encounter operational difficulties or manufacturing disruptions at our PRC facility.  We may not be able to maintain control over product quality, delivery schedules, manufacturing yields and costs. Furthermore, the costs related to having excess capacity have in the past and may in the future continue to have an adverse impact on our gross margins and operating results.

We manage a local workforce that may subject us to regulatory uncertainties. Changes in the labor laws of the PRC could increase the cost of employing the local workforce. The increased industrialization of the PRC, as well as general economic and political conditions in the PRC, could also increase the price of local labor. Any or all combination of these factors could negatively impact the cost savings we currently enjoy from having our manufacturing facility in the PRC.

***Economic, political and other risks associated with international sales and operations could adversely affect our net sales.***

Part of our growth strategy involves making sales to foreign corporations and delivering our products to facilities located in foreign countries. To facilitate this process and to meet the long-term projected demand for our products, we have established a manufacturing facility in the PRC, which performs most of our worldwide manufacturing production. Selling and manufacturing in foreign countries subjects us to additional risks not present with our domestic operations, as we are operating in business and regulatory environments in which we have limited previous experience. Further, the geographic distance from our headquarters in Irvine, California, compounds the difficulties of running a manufacturing operation in the PRC. We will need to continue to overcome language and cultural barriers to effectively conduct our operations in these environments. Changes in the labor laws of the PRC could increase the cost of employing the local workforce. The increased industrialization of the PRC, as well as general economic and political conditions in the PRC, could also increase the price of local labor. Any of these factors could negatively impact the cost savings we experience from locating our manufacturing facility in the PRC. Our management has limited experience creating or overseeing foreign operations, and the ongoing management of our PRC facility may require our management team to divert substantial amounts of their time, particularly if we encounter operational difficulties or manufacturing disruptions at our PRC facility. We may not be able to maintain control over product quality, delivery schedules, manufacturing yields and costs.

In addition, the economies of the PRC and other countries have been highly volatile in the past, resulting in significant fluctuations in local currencies and other instabilities. These instabilities affect a number of our customers and suppliers in addition to our own foreign operations.

In the future, some of our net sales may be denominated in Chinese Renminbi ("RMB"). The Chinese government controls the procedures by which RMB is converted into other currencies, and conversion of RMB generally requires government consent. As a result, RMB may not be freely convertible into other currencies at all times. If the Chinese government institutes changes in currency conversion procedures, or imposes restrictions on currency conversion, those actions may negatively impact our operations and could reduce our operating results. In addition, fluctuations in the exchange rate between RMB and U.S. dollars may adversely affect our expenses and results of operations as well as the value of our assets and liabilities. These fluctuations may also adversely affect the comparability of our period-to-period results. If we decide to declare dividends and repatriate funds from our Chinese operations, we will be required to comply with the procedures and regulations of applicable Chinese law. Any changes to these procedures and regulations, or our failure to comply with these procedures and regulations, could prevent us from making dividends and repatriating funds from our Chinese operations, which could adversely affect our financial condition. If we are able to make dividends and repatriate funds from our Chinese operations, these dividends would be subject to U.S. corporate income tax.

International turmoil and the threat of future terrorist attacks, both domestically and internationally, have contributed to an uncertain political and economic climate, both in the U.S. and globally, and have negatively impacted the worldwide economy. The occurrence of one or more of these instabilities could adversely affect our foreign operations and some of our customers or suppliers, which could adversely affect our net sales. In addition, our failure to

25

meet applicable regulatory requirements or overcome cultural barriers could result in production delays and increased turn-around times, which would adversely affect our business.

Our international sales are subject to other risks, including regulatory risks, tariffs and other trade barriers, timing and availability of export licenses, political and economic instability, difficulties in accounts receivable collections, difficulties in managing distributors, lack of a significant local sales presence, difficulties in obtaining governmental approvals, compliance with a wide variety of complex foreign laws and treaties and potentially adverse tax consequences. In addition, the U.S. or foreign countries may implement quotas, duties, taxes or other charges or restrictions upon the importation or exportation of our products, leading to a reduction in sales and profitability in that country.

***Our operations could be disrupted by power outages, natural disasters or other factors.***

Due to the geographic concentration of our manufacturing operations in our PRC facility and the operations of certain of our suppliers, a disruption resulting from equipment failure, power failures, quality control issues, human error, government intervention or natural disasters, including earthquakes and floods, could interrupt or interfere with our manufacturing operations and consequently harm our business, financial condition and results of operations. Such disruptions would cause significant delays in shipments of our products and adversely affect our operating results. In July 2014, our PRC facility suffered water damage as a result of heavy rain and floods, which forced us to temporarily halt manufacturing at the facility while necessary repairs or replacements were made to the facility and to certain of our manufacturing equipment. This incident caused us to incur additional expenses as we shifted our manufacturing activities to a third-party manufacturing facility in the PRC to enable us to mitigate the disruption in shipments to our customers. While we believe we have contained the disruptions we expect that our relationships with our key customers could be materially harmed if we incur additional manufacturing disruptions in the future. While we were able to favorably resolve our claim with our insurance carrier, similar events could occur in the future and, in such event, we may not be able to secure alternative manufacturing capabilities if manufacturing at our PRC facility is disrupted.

***Difficulties with our global information technology systems and/or unauthorized access to such systems, could harm our business.***

Any failure or malfunctioning of our global information technology system, errors or misuse by system users, difficulties in migrating standalone systems to our centralized systems, or inadequacy of the system in addressing the needs of our operations could disrupt our ability to timely and accurately manufacture and ship products, which could have a material adverse effect on our business, financial condition and results of operations. Any such failure, errors, misuse or inadequacy could also disrupt our ability to timely and accurately process, report and evaluate key operations metrics and key components of our results of operations, financial position and cash flows. Any such disruptions would likely divert our management and key employees' attention away from other business matters. Any disruptions or difficulties that may occur in connection with our global information technology system could also adversely affect our ability to complete important business process, such as maintenance of our disclosure controls and procedures and evaluation of our internal control over financial reporting and attestation activities pursuant to Section 404 of the Sarbanes-Oxley Act of 2002.

In connection with our daily business transactions, we store data about our business, including certain customer data, on our global information technology systems. While our systems are designed with security measures to prevent unauthorized access, third parties may gain unauthorized access to our systems. This unauthorized be the result of intentional misconduct by computer hackers, employee error, employee malfeasance or other causes. Additionally, third parties may attempt to fraudulently induce employees or customers into disclosing sensitive information such as user names, passwords or other information in order to gain access to our information technology system for the purpose of sabotage or to access our data, including our and our customers' intellectual property and other confidential business information. Because the techniques used to obtain unauthorized access to information technology systems evolve frequently and generally are not recognized until successful, we may be unable to anticipate these techniques or to implement adequate preventative measures. Any security breach could result in disruption to our business, misappropriation or loss of data, loss of confidence in us by our customers, damage to our reputation, legal liability and a negative impact on our sales.

26

***Our failure to comply with environmental laws and regulations could subject us to significant fines and liabilities or cause us to incur significant costs.***

We are subject to various and frequently changing U.S. federal, state and local and foreign governmental laws and regulations relating to the protection of the environment, including those governing the discharge of pollutants into the air and water, the management and disposal of hazardous substances and wastes, the cleanup of contaminated sites and the maintenance of a safe workplace. In particular, some of our manufacturing processes may require us to handle and dispose of hazardous materials from time to time. For example, in the past our manufacturing operations have used lead-based solder in the assembly of our products. Today, we use lead-free soldering technologies in our manufacturing processes, as this is required for products entering the European Union. We could incur substantial costs, including clean-up costs, civil or criminal fines or sanctions and third-party claims for property damage or personal injury as a result of violations of, or noncompliance with, environmental laws and regulations. Although we have not incurred significant costs to date to comply with these laws and regulations, new laws or changes to current laws and regulations to make them more stringent could require us to incur significant costs to remain in compliance.

***Regulations related to "conflict minerals" may cause us to incur additional expenses and could limit the supply and increase the cost of certain metals used in manufacturing our products.***

In August 2012, the SEC adopted a rule requiring disclosure of specified minerals, known as conflict materials, that are necessary to the functionality or production of products manufactured or contracted to be manufactured by public companies. The rule requires companies to verify and disclose whether or not such minerals originate from the Democratic Republic of Congo or an adjoining country. To comply with this rule, we are required to conduct a reasonable country of origin inquiry each year and, depending on the results of that inquiry, we may be required to exercise due diligence on the source and chain of custody of conflict minerals contained in our products. Such due diligence must conform to a nationally or internationally recognized due diligence framework. We are required to file a disclosure report with the SEC in May of each year relating to the preceding calendar year. In addition, commencing with the disclosure report relating to the 2015 calendar year, to the extent that we are required to exercise due diligence on the source and chain of custody of conflict minerals, we will be required to obtain an independent private sector audit of our disclosure report and underlying due diligence measures.

The due diligence activities required to determine the source and chain of custody of minerals contained in our products are time consuming and may result in significant costs. Due to the size and complexity of our supply chain, we face significant challenges in verifying the origins of the minerals used in our products. Further, this rule could affect the availability in sufficient quantities and at competitive prices of certain minerals used in the manufacture of our products, including tantalum, tin, gold and tungsten. There may be only limited number of sources of "conflict-free" minerals, which could result in increased material and component costs, as well as additional costs associated with potential changes to our products, processes or sources of supply.

If we are unable to sufficiently verify the origin of the minerals used in our products through the due diligence measures that we implement, or if we are unable to obtain an audit report each year that concludes that our due diligence measures are in conformity with the criteria set forth in the relevant due diligence framework, our reputation could be harmed. In addition, we may not be able to satisfy customers who require that our products be certified as "conflict-free," which could place us at a competitive disadvantage.

***Our internal controls over financial reporting may not be effective, which could have a significant and adverse effect on our business.***

Section 404 of the Sarbanes-Oxley Act of 2002 and the related rules and regulations of the SEC, which we collectively refer to as Section 404, require us to evaluate our internal controls over financial reporting to allow management to report on these internal controls as of the end of each year. Effective internal controls are necessary for us to produce reliable financial reports and are important in our effort to prevent financial fraud. In the course of our Section 404 evaluations, we may identify conditions that may result in significant deficiencies or material weaknesses and we may conclude that enhancements, modifications or changes to our internal controls are necessary or desirable.

27

Implementing any such changes would divert the attention of our management, could involve significant costs, and may negatively impact our results of operations.

We note that there are inherent limitations on the effectiveness of internal controls, as they cannot prevent collusion, management override or failure of human judgment. If we fail to maintain an effective system of internal controls or if management or our independent registered public accounting firm were to discover material weaknesses in our internal controls, we may be unable to produce reliable financial reports or prevent fraud, which could harm our financial condition and results of operations, result in a loss of investor confidence and negatively impact our stock price.

***If we do not effectively manage any future growth we may experience, our resources, systems and controls may be strained and our results of operations may suffer.***

Any future growth we may experience could strain our resources, management, information and telecommunication systems and operational and financial controls. To manage future growth effectively, including any expansion of volume in our manufacturing facility in the PRC, we must be able to improve and expand our systems and controls. We may not be able to do this in a timely or cost-effective manner, and our current systems and controls may not be adequate to support our future operations. In addition, our officers have relatively limited experience in managing a rapidly growing business. As a result, they may not be able to provide the guidance necessary to manage future growth or maintain future market position. Any failure to manage any growth we may experience or improve or expand our existing systems and controls, or unexpected difficulties in doing so, could harm our business.

***If we acquire businesses or technologies or pursue other strategic transactions in the future, these transactions could disrupt our business and harm our operating results and financial condition.***

We will evaluate opportunities to acquire businesses or technologies or pursue other strategic transactions, including collaboration or joint development arrangements such as our JDLA with Samsung, that might complement our current product offerings or enhance our intellectual property portfolio or technical capabilities. We have no experience in acquiring other businesses or technologies. Acquisitions and other strategic transactions entail a number of risks that could adversely affect our business and operating results, including, among others:

- difficulties in integrating the operations, technologies or products of acquired companies or working with third parties with which we may partner on joint development or collaboration relationships;

- the diversion of management's time and attention from the normal daily operations of the business;

- insufficient increases in net sales to offset increased expenses associated with the acquisitions or strategic transaction;

- difficulties in retaining business relationships with suppliers and customers;

- over-estimation of potential synergies or a delay in realizing those synergies;

- entering markets in which we have no or limited experience and in which competitors have stronger market positions; and

- the potential loss of key employees of our or any acquired companies.

Future acquisitions or other strategic transactions also could cause us to incur debt or be subject to contingent liabilities. In addition, acquisitions could cause us to issue equity or debt securities that could dilute the ownership interests of our existing stockholders or increase our leverage relative to our earnings or to our equity capitalization. Furthermore, acquisitions or other strategic transactions may result in material charges or adverse tax consequences, substantial depreciation, deferred compensation charges, in-process research and development charges, the amortization

28

of amounts related to deferred stock-based compensation expense and identifiable purchased intangible assets or impairment of goodwill, any or all of which could negatively affect our results of operations.

**Risks Related to Our Common Stock**

*Our results of operations fluctuate significantly and are difficult to predict, and any failure to meet investor or analyst expectations of our performance could cause the price of our common stock to decline.*

O ur operating results have varied significantly in the past and will continue to fluctuate from quarter-to-quarter or year-to-year in the future due to a variety of factors, many of which are beyond our control. Factors relating to our business that may contribute to these quarterly and annual fluctuations include, among other, those described in the risk factors in this Item 1A. Due to the various factors described herein and others, the results of any prior quarterly or annual periods should not be relied upon as an indication of our future operating performance. If our quarterly results of operations fall below the expectations of securities analysts or investors, the price of our common stock could decline substantially. As a result of the significant fluctuations of our operating results in prior periods, period-to-period comparisons of our operating results may not be meaningful and investors in our common stock should not rely on the results of any one quarter as an indicator of future performance.

*Our principal stockholders have significant voting power and may take actions that may not be in the best interest of our other stockholders.*

As of February 29, 2016, approximately 11.6% of our outstanding common stock was held by affiliates, including 10.4% held by Chun K. Hong, our Chief Executive Officer and Chairman of our board of directors. As a result, Mr. Hong has the ability to exert substantial influence over all matters requiring approval by our stockholders, including the election and removal of directors and any proposed merger, consolidation or sale of all or substantially all of our assets and other corporate transactions. This concentration of control could be disadvantageous to other stockholders with interests different from those of Mr. Hong.

*Anti-takeover provisions under our charter documents and Delaware law could delay or prevent a change of control and could also limit the market price of our stock.*

Our certificate of incorporation and bylaws contain provisions that could delay or prevent a change of control of our company or changes in our board of directors that our stockholders might consider favorable. In addition, these provisions could limit the price that investors would be willing to pay in the future for shares of our common stock. The following are examples of provisions which are included in our certificate of incorporation and bylaws, each as amended:

- our board of directors is authorized, without prior stockholder approval, to designate and issue preferred stock, commonly referred to as "blank check" preferred stock, with rights senior to those of our common stock;

- stockholder action by written consent is prohibited;

- nominations for election to our board of directors and the submission of matters to be acted upon by stockholders at a meeting are subject to advance notice requirements; and

- our board of directors is expressly authorized to make, alter or repeal our bylaws.

In addition, we are governed by the provisions of Section 203 of the Delaware General Corporation Law, which may prohibit certain business combinations with stockholders owning 15% or more of our outstanding voting stock. These and other provisions in our certificate of incorporation and bylaws and of Delaware law could make it more difficult for stockholders or potential acquirers to obtain control of our board of directors or initiate actions that are opposed by the then-current board of directors, including delaying or impeding a merger, tender offer, or proxy contest or other change of control transaction involving our company. Any delay or prevention of a change of control transaction

29

or changes in our board of directors could prevent the consummation of a transaction in which our stockholders could receive a substantial premium over the then-current market price for their shares.

***We do not currently intend to pay dividends on our common stock, and any return to investors is expected to come, if at all, only from potential increases in the price of our common stock.***

We intend to use all available funds to finance our operations. Accordingly, while payment of dividends rests within the discretion of our board of directors, no cash dividends on our common shares have been declared or paid by us in the past and we have no intention of paying any such dividends in the foreseeable future. Any return to investors is expected to come, if at all, only from potential increases in the price of our common stock.

***The price of and volume in trading of our common stock has and may continue to fluctuate significantly.***

Our common stock has been publicly traded since November 2006. The price of our common stock and the trading volume of our shares are volatile and have in the past fluctuated significantly. This volatility could continue and an active trading market in our common stock may never develop or be sustained. The market price at which our common stock trades may be influenced by many factors, including, among others, the following:

- our operating and financial performance and prospects, including our ability to achieve and sustain profitability in the future;

- investor perception of us and the industry in which we operate;

- the availability and level of research coverage of and market making in our common stock;

- results of litigation;

- changes in earnings estimates or buy/sell recommendations by analysts;

- sales of newly issued common stock or other securities associated with our registration statement on Form S-3, or the perception that such sales may occur;

- general financial and other market conditions; and

- changing and recently volatile domestic and international economic conditions.

In addition, shares of our common stock and the public stock markets in general have experienced, and may continue to experience, extreme price and trading volume volatility. These fluctuations may adversely affect the market price of our common stock and a stockholder's ability to sell its shares into the market at the desired time or at the desired price.

In 2007, following a drop in the market price of our common stock, securities litigation was initiated against us. Given the historic volatility of our industry, we may become engaged in this type of litigation in the future. Securities litigation, like other types of litigation that are discussed above, is expensive and time-consuming and could subject us to unfavorable results.

***We may not be able to maintain our NASDAQ listing.***

During 2015 and into early 2016, we experienced periods in which we were not compliant with the continued listing standards of The NASDAQ Global Market. As a result of a compliance process, we transferred the listing of our common stock from The NASDAQ Global Market tier to The NASDAQ Capital Market tier. On February 10, 2016, we received a compliance letter from The NASDAQ Stock Market notifying us that we had regained compliance with the applicable requirements for continued listing on The NASDAQ Stock Market. Our common stock continues to trade on

30

The NASDAQ Capital Market tier under the symbol "NLST." Notwithstanding our current compliance, there can be no assurance that we will continue to comply with the applicable continued listing standards of The NASDAQ Capital Market.  If we are delisted from The NASDAQ Capital Market, the liquidity of our common stock may be impaired, which could reduce the trading value of our common stock.

**Item 1B.  Unresolved Staff Comments .**

Not applicable.

**Item 2.  Properties**

Our corporate headquarters is located in approximately 8,203 square feet of space in Irvine, California, under a lease that expires in October 2016. We also currently lease approximately 42,200 square feet of space for our manufacturing facility in the PRC under a lease that expires in March 2017.

We believe that our current facilities are adequate for our current and expected operations for the next twelve months and that additional space c ould be obtained if needed.

**Item 3.  Legal Proceedings**

The information under the heading " Litigation and Patent Reexaminations" in Note 7 to our consolidated financial statements included in Part II, Item 8 of this report is incorporated herein by reference.

**Item 4.  Mine Safety Disclosures**

Not applicable.

**PART II**

**Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securitie s**

Our common stock began trading on The NASDAQ Global Market tier under the trading symbol "NLST" on November 30, 2006. As of January 14, 2016, our common stock commenced trading on The NASDAQ Capital Market tier. The following table sets forth the high and low sale prices for our common stock on the NASDAQ Global Market tier for the periods indicated:

|  | High | Low |
|---|---|---|
| **Year Ended January 2, 2016** | | |
| Fourth Quarter | $ 1.10 | $ 0.35 |
| Third Quarter | 0.60 | 0.28 |
| Second Quarter | 0.76 | 0.50 |
| First Quarter | 2.09 | 0.52 |
| | | |
| **Year Ended December 27, 2014** | | |
| Fourth Quarter | $ 1.23 | $ 0.57 |
| Third Quarter | 1.59 | 0.95 |
| Second Quarter | 2.15 | 0.93 |
| First Quarter | 2.41 | 0.70 |

31

**Holders**

As of February 29, 2016 there were approximately 7 holders of record of our shares of common stock, plus an indeterminate number of additional stockholders whose shares of our common stock are held on their behalf by brokerage firms or other agents.

**Recent Sales of Unregistered Securities**

On November 18, 2015, we issued to a law firm a warrant to purchase up to 300,000 shares of our common stock at an exercise price per share of $0.64, and on November 20, 2015, we issued to another law firm a warrant to purchase up to 60,000 shares of our common stock at an exercise price per share of $0.45. Each such warrant has a term of ten years and was issued as partial consideration for legal services rendered. Neither the warrants nor the common stock issuable upon exercise of the warrants have been registered under the Securities Act of 1933, as amended (the "Securities Act"). These securities were sold and issued in reliance on an exemption from the registration requirements of the Securities Act afforded by Section 4(a)(2) thereof in reliance on the following facts: we did not use general solicitation or advertising to market or sell the securities; each warrant holder represented to us that it was an accredited investor (as that term is defined in Rule 501 of Regulation D under the Securities Act) and that it was acquiring the securities with the present intention of holding them for purposes of investment and not with a view to their public resale or distribution within the meaning of the Securities Act; and the securities were issued as restricted securities.

**Dividend Policy**

We have never declared or paid cash dividends on our capital stock. Our credit facility with SVB prohibits the payment of cash dividends. Accordingly, we do not anticipate declaring or paying cash dividends on our capital stock in the foreseeable future. Any payments of cash dividends will be at the discretion of our board of directors, and will depend upon our results of operations, earnings, capital requirements, legal and contractual restrictions, and other factors deemed relevant by our board of directors.

**Item 6.  Selected Financial Data**

Not applicable.

32

**Item 7. Management ' s Discussion and Analysis of Financial Condition and Results of Operation s**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our audited consolidated financial statements and the related notes included elsewhere in this Annual Report on Form 10-K.*

*This discussion and analysis contains forward-looking statements regarding future events and our future performance. These forward-looking statements involve risks and uncertainties that could cause actual results to differ materially and adversely from those expressed in any forward-looking statement. These risks and uncertainties include, among others, risks associated with the launch and commercial success of our products, programs and technologies; the success of product, licensing and joint development partnerships; continuing development, qualification and volume production of HyperVault, EXPRESSvault™, NVvault™, HyperCloud® and VLP Planar-X RDIMM; the timing and magnitude of the continued decrease in our sales; our ability to leverage our NVvault™ and EXPRESSvault™ technology into a more diverse customer base; our need to raise additional capital and our ability to obtain financing when necessary; the rapidly-changing nature of technology; risks associated with intellectual property, including patent infringement litigation against us as well as the costs and unpredictability of litigation over infringement of our intellectual property and the possibility of our patents being reexamined or reviewed by the U.S. Patent and Trademark Office ("USPTO") and Patent Trial and Appeal Board ("PTAB"); volatility in the pricing of DRAM ICs and NAND flash; changes in and uncertainty of customer acceptance of, and demand for, our existing products and products under development, including uncertainty of and/or delays in product orders and product qualifications; delays in our and our customers' product releases and development; introductions of new products by competitors; changes in end-user demand for technology solutions; our ability to attract and retain skilled personnel; our reliance on suppliers of critical components and vendors in the supply chain; fluctuations in the market price of critical components; evolving industry standards; the political and regulatory environment in the PRC; and general economic and market conditions. Other risks and uncertainties are described under the heading "Risk Factors" in Part I, Item IA of this Annual Report on Form 10-K. Except as required by law, we undertake no obligation to revise or update publicly any forward-looking statements for any reason.*

**Overview**

We design, manufacture and sell a wide variety of high - performance, logic-based memory subsystems for the global datacenter, storage and high-performance computing markets. Our memory subsystems consist of combinations of dynamic random access memory integrated circuits ("DRAM ICs" or "DRAM"), NAND flash memory ("NAND flash"), application-specific integrated circuits ("ASICs") and other components assembled on printed circuit boards ("PCBs"). We primarily market and sell our products to leading original equipment manufacturer ("OEM") customers, hyperscale datacenter operators and storage vendors. Our solutions are targeted at applications where memory plays a key role in meeting system performance requirements. We leverage a portfolio of proprietary technologies and design techniques, including combining discrete semiconductor technologies from third parties such as DRAM and NAND flash to function as one, efficient planar design, and alternative packaging techniques to deliver memory subsystems with persistence, high density, small form factor, high signal integrity, attractive thermal characteristics, reduced power consumption and low cost per bit. Our NVvault™ product is the first to offer both DRAM and NAND flash in a standard form factor memory subsystem as a persistent dual-in line memory module ("DIMM") in mission critical applications. Our HyperCloud® technology incorporates our patented rank multiplication and load reduction technologies. We also have pending and issued patents covering fundamental aspects of hybrid memory DIMM designs that incorporate combinations of DRAM and/or NAND flash, such as our NVvault™ product. We are focused on monetizing our patent portfolio through our products business and, where appropriate, through licensing arrangements with third parties that wish to incorporate our patented technologies in their products.

Our high-performance memory subsystems are developed in part using our proprietary technologies, and we believe that the strength of our intellectual property rights will be important to the success of our business. We utilize patent and trade secret protection, confidentiality agreements with customers and partners, disclosure and invention assignment agreements with employees and consultants and other contractual provisions to protect our intellectual property and other proprietary information. We also intend to seek opportunities to monetize our intellectual property through joint development or licensing arrangements and to vigorously defend our intellectual property rights, which

33

may include, when necessary, launching enforcement actions against entities we believe are using our patented solutions in their products. We may seek injunctive relief in the course of enforcing our intellectual property rights in certain instances, and in other instances we may enter into settlement or license agreements, which can be structured in a variety of ways, including one-time paid up licenses or ongoing royalty arrangements. We aim to generate a portion of our revenues with these types of licensing arrangements, but our efforts to monetize our intellectual property rights and technologies may not be successful.

**Recent Developments**

On November 12, 2015, we entered into a Joint Development and License Agreement ("JDLA") with Samsung Electronics Co., Ltd. ("Samsung"), pursuant to which agreed to work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of this new technology. We received $8.0 million of non-recurring engineering fees (NRE) from Samsung for the joint development. The JDLA includes a Right of First Refusal wherein we will provide Samsung the right to acquire our NVDIMM-P technology in a separate, subsequent transaction before we offer the technology to a third party. Both parties may enter into an additional agreement in the future for Samsung to be granted commercial license for our NVDIMM-P technology. The JDLA also includes cross licensing of each party's respective patent portfolios, as well as access to raw materials (DRAM and NAND flash) at competitive prices, and an important strategic partner that can facilitate getting our HyperVault technology to market.

On November 18, 2015 ("Closing Date"), we also entered into a Senior Secured Convertible Promissory Note and Warrant Purchase Agreement ("SVIC Purchase Agreement"), with SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership ("SVIC") and an affiliate of Samsung Venture Investment Co., pursuant to which we sold SVIC a Senior Secured Convertible Promissory Note ("SVIC Note") and a Stock Purchase Warrant ("SVIC Warrant"), each dated as of the Closing Date. The SVIC Note has an original principal amount of $15.0 million, accrues interest at a rate of 2% per year, is due and payable in full on December 31, 2021 ("SVIC Note Maturity Date") and the principal and accrued but unpaid interest of which are convertible into shares of our Common Stock at a conversion price of $1.25 per share (the "Conversion Price"), subject to certain adjustments as set forth therein on the SVIC Note Maturity Date. Upon a change of control prior to the SVIC Note Maturity Date, the SVIC Note may, at our option, be assumed by the surviving entity or be redeemed upon the consummation of such change of control for the principal and accrued but unpaid interest as of the redemption date. The SVIC Warrant grants SVIC a right to purchase 2,000,000 shares of our c ommon s tock at an exercise price of $0.30 per share, subject to certain adjustments as set forth therein, is only exercisable in the event we exercise our right to redeem the SVIC Note prior to the SVIC Note Maturity Date and expires on December 31, 2025. In connection with the SVIC Note, SVIC was granted a first priority security interest in our patents and a second priority security interest in all of our other assets. On the Closing Date, we, Silicon Valley Bank ("SVB") and SVIC entered into an Intercreditor Agreement in connection with the SVIC Note pursuant to which SVB and SVIC agreed to their relative security interest priorities in our assets. On the Closing Date, we and SVIC also entered into a Registration Rights Agreement pursuant to which we are obligated to register with the SEC the shares of Common Stock issued upon conversion of the SVIC Note or upon exercise of the SVIC Warrant.

On November 19, 2015, pursuant to the terms of a payoff letter (the "Payoff Letter"), the Company repaid all sums due under the 2013 Loan Agreement with Fortress Credit Opportunities I LP ("Fortress"), an affiliate of Fortress Investment Group LLC and successor to DBD Credit Funding, LLC, and terminated the 2013 Loan Agreement in full. Pursuant to the Payoff Letter, the parties also terminated the Monetization Letter Agreement (as amended, the "Letter Agreement"), dated July 18, 2013, by and between us and Drawbridge Special Opportunities Fund LP. In connection with the Payoff Letter, we made a lump sum payment of $1.0 million to Fortress as an early termination fee, and agreed to amend the outstanding warrant issued in connection with the entry of the 2013 Loan Agreement and Letter Agreement to reduce the exercise price per share to $0.47. Additionally, pursuant to the Payoff Letter, we issued to Fortress a new ten-year warrant to purchase 1,000,000 shares of our Common Stock with an exercise price per share of $0.47.

**Key Business Metrics**

The following describes certain line items in our consolidated statements of operations that are important to management's assessment of our financial performance:

Table of Contents

*Net Product Sales.*

Net product sales consist primarily of sales of our high performance memory subsystems, net of a provision for estimated returns under our right of return policies, which generally range up to 30 days. We generally do not have long-term sales agreements with our customers. Although OEM customers typically provide us with non-binding forecasts of future product demand over specific periods of time, they generally place orders with us approximately two weeks in advance of scheduled delivery. Selling prices are typically negotiated monthly, based on competitive market conditions and the current price of DRAM ICs and NAND flash . Purchase orders generally have no cancellation or rescheduling penalty provisions. We often ship our products to our customers' international manufacturing sites. All of our sales to date, however, are denominated in U.S. dollars. We also sell excess component inventory of DRAM ICs and NAND flash to distributors and other users of memory ICs. Component inventory sales are a relatively small percentage of net sales as a result of our efforts to diversify both our customer and product line bases. This diversification effort has also allowed us   to use   components in a wider range of memory subsystems. We expect that component inventory sales will continue to represent a minimal portion of our net sales in future periods.

*Engineering Services.*

We provide engineering services to our customers. We recognize revenue from these services when all of the following conditions are met: (1) evidence existed of an arrangement with the customer, typically consisting of a purchase order or contract; (2) our services were performed and risk of loss passed to the customer; (3) we completed all of the necessary terms of the contract; (4) the amount of revenue to which we were entitled was fixed or determinable; and (5) we believed it was probable that we would be able to collect the amount due from the customer. To the extent that one or more of these conditions has not been satisfied, we defer recognition of revenue.

Generally, we recognize revenue as the engineering services stipulated under the contract are completed and accepted by our custom ers. Engineering services are performed under a signed Statement of Work ("SOW") with a customer. The deliverables and payment terms stipulated under the SOW provide guidance on the project revenue recognition.

Revenues from contracts with substantive defined milestones that we have determined are reasonable, relevant to all the deliverables and payment terms in the SOW that are commensurate with the efforts required to achieve the milestones are recognized under the milestone recognition method.

Estimated losses on all SOW projects are recognized in full as soon as they become evident.

*Cost of Sales .*

Our cost of sales includes the cost of materials, labor and other manufacturing costs, depreciation and amortization of equipment, inventory valuation provisions, stock-based compensation, and occupancy costs and other allocated fixed costs. The DRAM ICs and NAND flash incorporated into our products constitute a significant portion of our cost of sales, and thus our cost of sales will fluctuate based on the current price of DRAM ICs and NAND flash. We attempt to pass through such DRAM IC and NAND flash memory cost fluctuations to our customers by frequently renegotiating pricing prior to the placement of their purchase orders. However, the sales prices of our memory subsystems can also fluctuate due to competitive situations unrelated to the pricing of DRAM ICs and NAND flash, which affects gross margins. In addition, we have experienced shortages of DRAM and flash required for our HyperCloud® and NVvault products from time to time, which can cause disruptions in our revenues and gross profits. In addition, the gross margin on our sales of any excess component DRAM IC and NAND flash inventory is much lower than the gross margin on our sales of our memory subsystems. As a result, fluctuations in DRAM IC and NAND flash inventory sales as a percentage of our overall sales could impact our overall gross margin. We assess the valuation of our inventories on a quarterly basis and record a provision to cost of sales as necessary to reduce inventories to the lower of cost or net realizable value.

35

*Research and Development.*

Research and development expense consists primarily of employee and independent contractor compensation and related costs, stock -based compensation, non-recurring engineering fees, computer -aided design software licenses, reference design development costs, depreciation or rental of evaluation equipment, and occupancy and other allocated overhead costs. Also included in research and development expense are the costs of material and overhead related to the production of engineering samples of new products under development or products solely in the research and development process. Our customers typically do not separately compensate us for design and engineering work involved in developing application -specific products for them. All research and development costs are expensed as incurred. We anticipate that research and development expenditures will increase in future periods as we seek to expand new product opportunities, increase our activities related to new and emerging markets and continue to develop additional proprietary technologies.

*Intellectual Property Legal Fees .*

Intellectual property legal fees consists of legal fees incurred for patent filings and protection. We anticipate that intellectual property legal fees will increase in future periods as we seek to protect our patent portfolio.

*Selling, General and Administrative.*

Selling, general and administrative expenses consist primarily of employee salaries and related costs, stock-based compensation, independent sales representative commissions, professional services, promotional and other selling and marketing expenses, and occupancy and other allocated overhead costs. A significant portion of our selling effort is directed at building relationships with OEMs and other customers and working through the product approval and qualification process with them. Therefore, the cost of material and overhead related to products manufactured for qualification is included in selling expenses. In order to conserve capital resources in light of the year over year revenue decline, we have reduced our selling, general and administrative expenditures by eliminating headcount and other related expenses.

*Provision for Income Taxes.*

The federal statutory rate was 35% for fiscal year 201 5 and 20 14 .  Our effective tax rate differs from the statutory rate due to the company providing a full valuation allowance against net deferred tax assets, and accordingly did not recognize an income tax benefit related to losses incurred.

**Recent and Anticipated Future Trends**

For the years ended January 2, 2016 and December 27, 2014, our NVvault™ non -volatile RDIMM used in cache -protection and data logging applications, including our NVvault™ battery -free, the flash -based cache system, accounted for approximately 20% and 44% of total net product sales, respectively. We have experienced a steady decline in NVvault sales in recent years, due in large part to our loss of our most significant NVvault customer, Dell, beginning in 2012. There were no sales of NVvault™ products to Dell in the years ended January 2, 2016 and December 27, 2014, and we expect no future demand from Dell for our NVvault™ products. In order to leverage our NVvault™ technology and diversify our customer base, and to secure one or more new key customers, we continue to pursue additional qualifications of NVvault™ with other OEMs and to target new customer applications such as online transaction processing, virtualization, big data analytics, high speed transaction processing, high-performance database, and in -memory database applications. We also introduced EXPRESSvault™ in March 2011 and the next generation of EXPRESSvault™ (EV3) in July 2015 and we continue to pursue qualification of the next generation DDR3 NVvault™ and DDR4 NVvault™ with customers. Our future operating results will depend on our ability to commercialize these NVvault™ product extensions, as well as other products such as HyperVault™ and other high -density and high-performance solutions. If we are not be successful in expanding our qualifications or marketing any new or enhanced products, we will be unable to secure revenues sufficient to replace lost NVvault revenue and our results of operations and prospects could be materially harmed.

36

Table of Contents

During our 2014 and 2015 fiscal years, we primarily marketed and sold our products to leading OEMs in the server, storage and communications markets. Consistent with the concentrated nature of the OEM customer base in our target markets, a small number of large customers have historically accounted for a significant portion of our net product sales. Two customers represented approximately 27% and 10% of our net product sales in 2015 and three customers represented approximately 20%, 14% and 19% of our net product sales in 2014. Because our target markets are characterized by a limited number of large companies, we anticipate that sales of our products will continue to be concentrated among a limited number of large customers in the foreseeable future. Additionally, the composition of major customers and their respective contributions to our net product sales have varied and will likely continue to vary from period to period as our OEMs progress through the life cycle of the products they produce and sell. We do not have long-term agreements with any of our customers and, as such, any or all of them could decide at any time to discontinue, decrease or delay their purchase of our products. In addition, the prices that these customers pay for our products could change at any time. The loss of any of our OEM customers, or a significant reduction in sales to any of them, could significantly reduce our net sales and adversely affect our operating results.

We have invested a significant portion of our research and development budget into the design of ASIC and field-programmable gate array ("FGPA") devices, including the HyperCloud® and HyperVault memory subsystems, and the NVvault family of products. These products are subject to increased risks as compared to our legacy products, and we may be unable to achieve customer or market acceptance of these or any other existing or future products or achieve such acceptance in a timely manner. Further, we experienced a longer qualification cycle than anticipated with our HyperCloud® memory subsystems, as well as supply chain disruption and a shortage of DRAM and flash required to create the HyperCloud® memory subsystem and our NVvault products. These and other risks attendant to the production of our currently available and potential future products could reduce our achievable revenues from these products and prevent us from recouping our investments in the products.

We dedicate substantial resources to protecting our intellectual property, including our efforts to defend our patents against challenges made by way of reexamination proceedings at the USPTO and PTAB. These activities are likely to continue for the foreseeable future, without any guarantee that any ongoing or future patent protection and litigation activities will be successful. We are also subject to litigation based on claims that we have infringed on the intellectual property of others, against which we intend to defend ourselves vigorously.  Litigation, whether or not eventually decided in our favor or settled, is costly and time-consuming and could divert management's attention and resources. Because of the nature and inherent uncertainties of litigation, should the outcome of any of such actions be unfavorable, our business, financial condition, results of operations or cash flows could be materially and adversely affected.

Although we intend to pursue an intellectual property-based licensing business in order to monetize our intellectual property rights, we are currently operating based on a products-based business model and we may never be successful in developing any licensing business. Although we may pursue agreements with third parties to commercially license certain of our products or technologies, we may never successfully enter into any such agreement. Further, the terms of any such agreements that we may reach with third party licensees are uncertain and may not provide significant royalty or other licensing revenues to us to justify our costs of developing and maintaining the licensed intellectual property or may otherwise include terms that are not favorable to us. Additionally, the pursuit of a licensing business would require by its nature that we relinquish certain of our rights to our technologies and intellectual property that we license to third parties, which could limit our ability to base our own products on such technologies. If we are not successful in achieving a licensing business, we may never recoup the costs associated with developing, maintaining, defending and enforcing our intellectual property portfolio and our financial condition would be harmed.

Our operations in the People's Republic of China ("PRC") are subject to various political, geographical and economic risks and uncertainties inherent to conducting business in the PRC. These include, among others, (i) potential changes in economic conditions in the region, (ii) managing a local workforce that may subject us to uncertainties or certain regulatory policies, (iii) changes in other policies of the Chinese governmental and regulatory agencies, and (iv) changes in the laws and policies of the U.S. government regarding the conduct of business in foreign countries, generally, or in the PRC, in particular. Additionally, the Chinese government controls the procedures by which its local currency, the Chinese Renminbi ("RMB"), is converted into other currencies and by which dividends may be declared or capital distributed for the purpose of repatriation of earnings and investments. If restrictions in the conversion of RMB or

37

in the repatriation of earnings and investments through dividend and capital distribution restrictions are instituted, our operations and results may be negatively impacted. In addition, fluctuations in the exchange rate between RMB and U.S. dollars may adversely affect our expenses and results of operations, the value of our assets and liabilities and the comparability of our period-to-period results.

**Business Risks and Uncertainties**

Our business and prospects are exposed to numerous risks and uncertainties. For more information, see the discussion under "Risk Factors" in Part I, Item 1A of this report.

**Critical Accounting Policies**

The preparation of our consolidated financial statements in conformity with accounting principles generally accepted in the U.S. requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of net sales and expenses during the reporting period. By their nature, these estimates and assumptions are subject to an inherent degree of uncertainty. We base our estimates on our historical experience, knowledge of current conditions and our beliefs of what could occur in the future considering available information. We review our estimates on an on - going basis. Actual results may differ from these estimates, which may result in material adverse effects on our operating results and financial position. We believe the following critical accounting policies involve our more significant assumptions and estimates used in the preparation of our consolidated financial statements:

*Revenue Recognition.*

*Product Sales*

Our revenue from product sales primarily consists of product sales of high performance memory subsystems to OEMs, hyperscale data center operators and storage vendors.

We recognize revenues in accordance with FASB Accounting Standards Codification ("ASC") Topic 605. Accordingly, we recognize revenues when there is persuasive evidence that an arrangement exists, product delivery and acceptance have occurred, the sales price is fixed or determinable, and collectability of the resulting receivable is reasonably assured.

We generally use customer purchase orders and/or contracts as evidence of an arrangement. Delivery occurs when goods are shipped for customers with shipping point terms and upon receipt for customers with destination terms, at which time title and risk of loss transfer to the customer. Shipping documents are used to verify delivery and customer acceptance. We assess whether the sales price is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to refund. Customers are generally allowed limited rights of return for up to 30 days, except for sales of excess component inventories, which contain no right-of-return privileges. Estimated returns are provided for at the time of sale based on historical experience or specific identification of an event necessitating a reserve. We offer a standard product warranty to our customers and have no other post-shipment obligations. We assess collectability based on the creditworthiness of the customer as determined by credit checks and evaluations, as well as the customer's payment history.

All amounts billed to customers related to shipping and handling are classified as net sales, while all costs incurred by us for shipping and handling are classified as cost of sales.

*Engineering Services*

We provide engineering services to our customers. We recognize revenue from these services when all of the following conditions are met: (1) evidence existed of an arrangement with the customer, typically consisting of a purchase order or contract; (2) our services were performed and risk of loss passed to the customer; (3) we completed all of the necessary terms of the contract; (4) the amount of revenue to which we were entitled was fixed or determinable;

38

and (5) we believed it was probable that we would be able to collect the amount due from the customer. To the extent that one or more of these conditions has not been satisfied, we defer recognition of revenue.

Generally, we recognize revenue as the engineering services stipulated under the contract are completed and accepted by our customers. Engineering services are performed under a signed Statement of Work ("SOW") with a customer. The deliverables and payment terms stipulated under the SOW provide guidance on the project revenue recognition.

Revenues from contracts with substantive defined milestones that we have determined are reasonable, relevant to all the deliverables and payment terms in the SOW that are commensurate with the efforts required to achieve the milestones are recognized under the milestone recognition method.

Estimated losses on all SOW projects are recognized in full as soon as they become evident

*Fair Value of Financial Instruments.*

Our financial instruments consist principally of cash and cash equivalents, restricted cash, accounts receivable, accounts payable, accrued expenses and debt instruments. The fair value of our cash equivalents is determined based on quoted prices in active markets for identical assets or Level 1 inputs. We recognize transfers between Levels 1 through 3 of the fair value hierarchy at the beginning of the reporting period. We believe that the carrying values of all other financial instruments approximate their current fair values due to their nature and respective durations.

*Allowance for Doubtful Accounts.*

We perform credit evaluations of our customers' financial condition and limit the amount of credit extended to our customers as deemed necessary, but generally require no collateral. We evaluate the collectability of accounts receivable based on a combination of factors. In cases where we are aware of circumstances that may impair a specific customer's ability to meet its financial obligations subsequent to the original sale, we will record an allowance against amounts due, and thereby reduce the net recognized receivable to the amount that we reasonably believe will be collected. For all other customers, we record allowances for doubtful accounts based primarily on the length of time the receivables are past due based on the terms of the originating transaction, the current business environment and our historical experience. Uncollectible accounts are charged against the allowance for doubtful accounts when all cost effective commercial means of collection have been exhausted. Generally, our credit losses have been within our expectations and the provisions established. However, we cannot guarantee that we will continue to experience credit loss rates similar to those we have experienced in the past.

Our accounts receivable are highly concentrated among a small number of customers, and a significant change in the liquidity or financial position of one of these customers could have a material adverse effect on the collectability of our accounts receivable, our liquidity and our future operating results.

*Inventories.*

We value our inventories at the lower of the actual cost to purchase or manufacture the inventory or the net realizable value of the inventory. Cost is determined on an average cost basis which approximates actual cost on a first - in, first - out basis and includes raw materials, labor and manufacturing overhead. At each balance sheet date, we evaluate ending inventory quantities on hand and record a provision for excess quantities and obsolescence. Among other factors, we consider historical demand and forecasted demand in relation to the inventory on hand, competitiveness of product offerings, market conditions and product life cycles when determining obsolescence and net realizable value. In addition, we consider changes in the market value of DRAM ICs and NAND flash in determining the net realizable value of our raw material inventory. Once established, any write downs are considered permanent adjustments to the cost basis of our excess or obsolete inventories.

A significant decrease in demand for our products could result in an increase in the amount of excess inventory quantities on hand. In addition, our estimates of future product demand may prove to be inaccurate, in which case we

39

may have understated or overstated the provision required for excess and obsolete inventory. In the future, if our inventories are determined to be overvalued, we would be required to recognize additional expense in our cost of sales at the time of such determination. Likewise, if our inventories are determined to be undervalued, we may have over - reported our costs of sales in previous periods and would be required to recognize additional gross profit at the time such inventories are sold. In addition, should the market value of DRAM ICs or NAND flash decrease significantly, we may be required to lower our selling prices to reflect the lower current cost of our raw materials. If such price decreases reduce the net realizable value of our inventories to less than our cost, we would be required to recognize additional expense in our cost of sales in the same period. Although we make every reasonable effort to ensure the accuracy of our forecasts of future product demand, any significant unanticipated changes in demand, technological developments or the market value of DRAM ICs or NAND flash could have a material effect on the value of our inventories and our reported operating results.

*Deferred Financing Costs, Debt Discount and Detachable Debt-Related Warrants .*

Costs incurred to issue debt are deferred and recorded as a reduction to the debt balance in the accompanying consolidated balance sheets. We amortize debt issuance costs over the expected term of the related debt using the effective interest method. Debt discounts relate to the relative fair value of any warrants issued in conjunction with the debt are recorded as a reduction to the debt balance and accreted over the expected term of the debt to interest expense using the effective interest method.

*Impairment of Long - Lived Assets.*

We evaluate the recoverability of the carrying value of long - lived assets held and used in our operations for impairment on at least an annual basis or whenever events or changes in circumstances indicate that their carrying value may not be recoverable. When such factors and circumstances exist, we compare the projected undiscounted future net cash flows associated with the related asset or group of assets over their estimated useful lives against their respective carrying amount. These projected future cash flows may vary significantly over time as a result of increased competition, changes in technology, fluctuations in demand, consolidation of our customers and reductions in average selling prices. If the carrying value is determined not to be recoverable from future operating cash flows, the asset is deemed impaired and an impairment loss is recognized to the extent the carrying value exceeds the estimated fair value of the asset. The fair value of the asset or asset group is based on market value when available, or when unavailable, on discounted expected cash flows.

*Warranty Liability .*

We offer product warranties generally ranging from one to three years, depending on the product and negotiated terms of purchase agreements with our customers. Such warranties require us to repair or replace defective product returned to us during the warranty period at no cost to the customer. Warranties are not offered on sales of excess inventory. Our estimates for warranty -related costs are recorded at the time of sale based on historical and estimated future product return rates and expected repair or replacement costs. While such costs have historically been consistent between periods and within our expectations and the provisions established, unexpected changes in failure rates could have a material adverse impact on us, requiring additional warranty reserves, and adversely affecting our gross profit and gross margins.

*Stock-Based Compensation.*

We account for equity issuances to non-employees in accordance with ASC Topic 505.  All transactions in which goods or services are the consideration received for the issuance of equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date used to determine the fair value of the equity instrument issued is the earlier of the date on which the third-party performance is complete or the date on which it is probable that performance will occur.

In accordance with ASC Topic 718, employee and director stock-based compensation expense recognized during the period is based on the value of the portion of stock-based payment awards that is ultimately expected to vest

40

during the period. Given that stock-based compensation expense recognized in the consolidated statements of operations is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. ASC Topic 718 requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. Our estimated average forfeiture rates are based on historical forfeiture experience and estimated future forfeitures.

The fair value of common stock option awards to employees and directors is calculated using the Black-Scholes option pricing model. The Black-Scholes model requires subjective assumptions regarding future stock price volatility and expected time to exercise, along with assumptions about the risk-free interest rate and expected dividends, all of which affect the estimated fair values of our common stock option awards. The expected term of options granted is calculated as the average of the weighted vesting period and the contractual expiration date of the option. This calculation is based on the safe harbor method permitted by the Securities and Exchange Commission ("SEC") in instances where the vesting and exercise terms of options granted meet certain conditions and where limited historical exercise data is available. The expected volatility is based on the historical volatility of our common stock. The risk-free rate selected to value any particular grant is based on the U.S. Treasury rate that corresponds to the expected term of the grant effective as of the date of the grant. The expected dividends assumption is based on our history and our expectations regarding dividend payouts. We evaluate the assumptions used to value our common stock option awards on a quarterly basis. If factors change and we employ different assumptions, stock- based compensation expense may differ significantly from what we have recorded in prior periods. Compensation expense for common stock option awards with graded vesting schedules is recognized on a straight-line basis over the requisite service period for the last separately vesting portion of the award, provided that the accumulated cost recognized as of any date at least equals the value of the vested portion of the award.

We recognize the fair value of restricted stock awards issued to employees and outside directors as stock-based compensation expense on a straight-line basis over the vesting period for the last separately vesting portion of the awards. Fair value is determined as the difference between the closing price of our common stock on the grant date and the purchase price of the restricted stock award, if any, reduced by expected forfeitures.

If there are any modifications or cancellations of the underlying vested or unvested stock-based awards, we may be required to accelerate, increase or cancel any remaining unearned stock-based compensation expense, or record additional expense for vested stock-based awards. Future stock-based compensation expense and unearned stock- based compensation may increase to the extent that we grant additional common stock options or other stock-based awards.

*Income Taxes.*

Deferred tax assets and liabilities are recognized to reflect the estimated future tax effects of future deductible or taxable amounts attributable to events that have been recognized on a cumulative basis in the consolidated financial statements, calculated at enacted tax rates for expected periods of realization. We regularly review our deferred tax assets for recoverability and establish a valuation allowance, when determined necessary, based on historical taxable income, projected future taxable income, and the expected timing of the reversals of existing temporary differences. Because we have operated at a loss for an extended period of time, we did not recognize deferred tax assets related to losses incurred in 201 5 or 201 4 . In the future, if we realize a deferred tax asset that currently carries a valuation allowance, we may record an income tax benefit or a reduction to income tax expense in the period of such realization.

ASC Topic 740 prescribes a recognition threshold and measurement requirement for the financial statement recognition of a tax position that has been taken or is expected to be taken on a tax return and also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. Under ASC Topic 740 we may only recognize or continue to recognize tax positions that meet a "more likely than not" threshold.

The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws and regulations themselves are subject to change as a result of changes in fiscal policy, changes in legislation, the evolution of regulations and court rulings. Therefore, the actual liability for U.S. or foreign taxes may be materially different from our estimates, which could result in the need to record additional tax liabilities or potentially reverse previously recorded tax liabilities.

41

*Interest expense .*

Interest expense consists primarily of interest associated with our debt issued to SVIC and Fortress, including fees related to the term loans, accretion of debt discount and amortization of debt issuance costs.  We recognize the accretion of debt discount s and the amortization of interest costs using the effective interest method.

**Results of Operations**

*Y ear Ended January 2, 2016 Compared to the Year Ended December 27, 2014*

The following table sets forth our consolidated statements of operations as a percentage of total net revenues for the years indicated:

| | Year Ended | |
|---|---|---|
| | **January 2, 2016** | **December 27, 2014** |
| Net product sales | 86 % | 100 % |
| NRE revenues | 14 | - |
| Total net revenues | 100 | 100 |
| Cost of sales | 74 | 79 |
| Gross profit | 26 | 21 |
| Operating expenses: | | |
| Research and development | 75 | 24 |
| Intellectual property legal fees | 70 | 33 |
| Selling, general and administrative | 98 | 35 |
| Total operating expenses | 243 | 93 |
| Operating loss | (217) | (72) |
| Other expense, net: | | |
| Interest expense, net | (26) | (8) |
| Other expense, net | (13) | - |
| Total other expense, net | (39) | (8) |
| Loss before provision for income tax | (256) | (80) |
| Provision for income taxes | - | - |
| Net loss | (256)% | (80)% |

42

Table of Contents

*Net Product Sales, NRE Revenue s , Cost of Sales and Gross Profit*

The following table presents net product sales, NRE revenue s , cost of sales and gross profit for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Net product sales | $ 6,869 | $ 19,195 | $ (12,326) | (64)% |
| NRE revenues | 1,143 | - | 1,143 | 100 % |
| Total net revenues | 8,012 | 19,195 | (11,183) | (58)% |
| Cost of sales | 5,915 | 15,231 | (9,316) | (61)% |
| Gross profit | $ 2,097 | $ 3,964 | $ (1,867) | (47)% |
| Gross margin | 26.2% | 20.7% | 5.5 % | |

*Net Product Sales.* The decrease in net product sales for 2015 as compared with 2014 resulted primarily from decreases of approximately (i) $7. 1 million in sales of our first generation NVvault (ii) $1.7 million of sales of HyperCloud® (iii) $1.9 million of VLP sales (iv) $1.0 million in sales of Planar X and (v) $0.6 million of flash sales.

*NRE R evenue s .* The increase in NRE revenue s for 2015 as compared with 2014 resulted from revenue recognized from our JDLA with Samsung entered into in November 2015.

*Gross Profit, Gross Margin and Cost of Sales.* The increase in gross margin for 2015 as compared to 2014 is the result of our NRE revenue s from the JDLA offset by a decrease in our gross profit from our product sales as a result of a change in our product mix and reduced sales of our higher margin first generation NVvault™ sales in 2015. In addition, the allocation of overhead over a lower revenue base has also impacted our gross margin.

*Research and Development.*

The following table presents research and development expenses for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Research and development | $ 6,049 | $ 4,586 | $ 1,463 | 32 % |

The increase in research and development expense for 201 5 as compared to 201 4 resulted primarily from an increase of (i) $1.2 million in headcount costs and related overhead and travel expenses (ii) $0.0 7 million in product research expense and (iii) $0.2 million in professional and outside services.

43

Table of Contents

*Intellectual Property Legal Fees.*

The following table presents intellectual property legal fees for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Intellectual property legal fees | $    5,588 | $    6,387 | $   (799) | (13)% |

The decrease in intellectual property legal fees for 2015 as compared to 2014 resulted from a decrease in legal fees incurred for trade secret lit igation and patent litigation primarily as the result of agreements where warrants were issued for professional services rendered in 2015 reducing legal expenses .

*Selling, General and Administrative.*

The following table presents selling, general and administrative expenses for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Selling, general and administrative | $    7,841 | $    6,796 | $   1,045 | 15 % |

Selling, general and administrative expenses increased by approximately $1.0 million in 2015 as compared to 2014.  These increases were primarily due to an increase of  (i) $0.9 million in headcount costs and related overhead and travel expenses and (ii) an increase of $0.4 million in outside services offset by decreases of (i) $0.1 million in advertising and product evaluation expenses and (ii) $0.2 million related to commission payments to sales representatives .

*Other Expense, Net.*

The following table presents other expense, net for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

| | Year Ended | | | |
| | January 2, 2016 | December 27, 2014 | Change | % Change |
|---|---|---|---|---|
| Interest expense, net | $   (2,064) | $   (1,574) | $   (490) | (31)% |
| Other expense, net | (1,081) | - | (1,081) | (100)% |
| Total other expense, net | $   (3,145) | $   (1,574) | $   (1,571) | (100)% |

The increase in interest expense for 2015 as compared to 2014 is primarily due to interest expense from increased outstanding principal balances and the accelerated amortization of debt discount and debt issuance costs associated with repayment of our term debt with Fortress.

44

Table of Contents

The increases in other expense, net for 2015 as compared to 2014 is primarily due to funds in the amount of $1.5 million received from our insurance company as compensation for damages to our facility in the PRC, offset by (i) payment of $0.9 million associated with litigation (ii) $1.0 million lump sum payment to terminate the Letter Agreement with Fortress and (iii) $0.8 million in warrant expense associated with amending pricing on the existing warrants and issuance of new warrants associated with the termination of our agreement with Fortress.

*Income Tax Provision.*

The followi ng table presents the provision for income taxes for the years ended January 2, 2016 and December 27, 2014 (in thousands, except percentages):

|  | Year Ended | | | |
|  | January 2, 2016 | December 27, 2014 | Change | % Change |
| --- | --- | --- | --- | --- |
| Provision for income taxes | $          1 | $          2 | $        (1) | (50)% |

The federal statutory rate was 35% for 2015 and 2014.  In both 2015 and 2014, we continued to provide a full valuation allowance against our net deferred tax assets, which consist primarily of net operating loss carry-forwards.  In 2015 and 2014, our effective tax rate differed from the 35% statutory rate primarily due to the valuation allowance on newly generated loss carry-forwards.  For further discussion see Note 6 to our consolidated financial statements included in Part II, Item 8 of this report.

**Liquidity and Capital Resources**

We have historically financed our operations primarily through issuances of equity and debt securities and cash generated from operations. We have also funded our operations with a revolving line of credit and term loans under our bank credit facility and capitalized lease oblig ations.

*Working Capital and Cash and Cash Equivalents.*

The following table presents working capital and cash and cash equivalents (in thousands):

|  | January 2, 2016 | December 27, 2014 |
| --- | --- | --- |
| Working capital | $          11,945 | $          7,907 |
| Cash and cash equivalents(1) | $          19,684 | $          11,040 |

---

(1)   Included in working capital

Our working capital increased in 2015 primarily as a result of (i) net proceeds from the issuance of long-term debt of approximately $ 18.6 million and net proceeds from a public offering of approximately $10.5 million offset by (i) payments on long-term debt of $10.8 million and cash used in operations of $9. 3 million.

45

Table of Contents

*Cash Provided by and Used in the Years Ended January 2, 2016 and December 27, 2014 .*

The following table summarizes our cash flows for the periods indicated (in thousands):

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| **Net cash provided by (used in):** | | |
| Operating activities | $ (9,334) | $ (6,401) |
| Investing activities | (361) | (138) |
| Financing activities | 18,339 | 10,878 |
| Net change in cash and cash equivalents | $ 8,644 | $ 4,339 |

*Operating Activities.*

Net cash used in operating activities for the year ended January 2, 2016 was primarily the result of a net loss of approximately $20.5 million offset by (i) approximately $6. 8  million in net cash provided by changes in operating assets and liabilities, primarily deferred revenue and (ii) approximately $4.4 million in net non-cash operating expenses, mainly comprised of depreciation and amortization, amortization of debt discount and debt issuance costs, issuance of warrants and stock-based compensation.

Net cash used in operating activities for the year ended December 27, 2014 was primarily the result of a net loss of approximately $15.4 million offset by  (i) approximately $5.0 million in net cash provided by changes in operating assets and liabilities, primarily accounts receivable, restricted cash, accounts payable, accrued payroll and related liabilities and inventory and (ii) approximately $4.0 million in net non-cash operating expenses, mainly comprised of depreciation and amortization, amortization of debt discount and debt issuance costs and stock-based compensation.

*Investing Activities.*

Net cash used in investing activities for the years ended January 2, 2016 and December 27, 2014 was primarily the result of the purchase of $0.4 million and $0.1 million of property and equipment, respectively.

*Financing Activities.*

Net cash provided by financing activities for the year ended January 2, 2016 was primarily the result of net proceeds from the issuance of long-term debt and net proceeds from a public offering in the amounts of $ 18.6 million and $10.5 million offset by payment on long-term debt of $10.8 million.

Net cash provided by financing activities for the year ended December 27, 2014 was primarily the result of our February 2014 public offering, which raised net proceeds of approximately $10.3 million and our receipt of an aggregate of approximately $0.8 million in proceeds from the partial exercise of an outstanding warrant for the purchase of our common stock and the exercise of employee stock options in February 2014.

***Capital Resources* .**

Our sources of cash generally consist of revenues from our operations, including product sales and NRE revenue s from our JDLA, debt and equity financings and equipment leasing arrangements.

*SVB Credit Agreement*

On October 31, 2009, we entered into a credit agreement with Silicon Valley Bank ("SVB"), which was most recently amended on January 29, 2016 (as amended, the "SVB Credit Agreement"). Currently, the SVB Credit

46

Agreement provides that we can borrow up to the lesser of (i) 80% of eligible accounts receivable, or (ii) $5.0 million, subject to certain adjustments as set forth in the SVB Credit Agreement.

We made no borrowings under the Silicon Valley Bank line of credit in the years ended January 2, 2016 and December 27, 2014.  At January 2, 2016 and December 27, 2014 we had borrowing availability of approximately $0. 5  million a nd $0.9 million, respectively.

*Convertible Promissory Note with SVIC*

On the Closing Date, we entered into the SVIC Purchase Agreement, with SVIC, an affiliate of Samsung Venture Investment Co., pursuant to which we sold SVIC the SVIC Note and the SVIC Warrant, each dated as of the Closing Date. The SVIC Note has an original principal amount of $15 million, accrues interest at a rate of 2% per year, is due and payable in full on the SVIC Note Maturity Date and the principal and accrued but unpaid interest of which are convertible into shares of our common stock at the Conversion Price, subject to certain adjustments as set forth therein on the SVIC Note Maturity Date. Upon a change of control prior to the SVIC Note Maturity Date, the SVIC Note may, at our option, be assumed by the surviving entity or be redeemed upon the consummation of such change of control for the principal and accrued but unpaid interest as of the redemption date. The SVIC Warrant grants SVIC a right to purchase 2,000,000 shares of our common stock at an exercise price of $0.30 per share, subject to certain adjustments as set forth therein, is only exercisable in the event we exercise our right to redeem the SVIC Note prior to the SVIC Note Maturity Date and expires on December 31, 2025.  Proceeds from the SVIC Note were used to pay off our 2013 Loan Agreement and terminate our Letter Agreement with Fortress.

*February 2015 Public Offering of Common Stock*

On February 24, 2015, we completed a registered firm commitment underwritten public offering of shares of our common stock (the "2015 Offering"). In the 2015 Offering, we issued and sold to the Underwriter 8,846,154 shares of common stock pursuant to an underwriting agreement, dated as of February 19, 2015, by and between the Company and the Underwriter, at a price of $1.209 per share, including 1,153,846 shares resulting from the Underwriter's exercise in full of its option to purchase additional shares of common stock to cover over-allotments. The price per share to the public in the 2015 Offering was $1.30 per share. The net proceeds from the 2015 Offering were approximately $10. 5  million, after deducting underwriting discounts and commissions and estimated offering expenses.

*Equipment Leasing Arrangements*

We have in the past utilized equipment leasing arrangements to finance certain capital expenditures. Equipment leases continue to be a financing alternative that we expect to pursue in the future.

*Sufficiency of Cash Balances and Potential Sources of Additional Capital*

We believe our existing cash balances, borrowing availability under our bank credit facility, borrowing availability under the SVB Credit Agreement, net of cash expected to be used in operations, will be sufficient to meet our anticipated cash needs for at least the next 12 months. Should we need additional capital, we may seek to raise capital through, among other things, public and private equity offerings and debt financings. Our future capital requirements will depend on many factors, including our levels of net sales, the timing and extent of expenditures to support research and development activities, the expansion of manufacturing capacity both domestically and internationally and the continued market acceptance of our products. Additional funds may not be available on terms acceptable to us, or at all. If adequate working capital is not available when needed, we may be required to significantly modify our business model and operations to reduce spending to a sustainable level. It could cause us to be unable to execute our business plan, take advantage of future opportunities, or respond to competitive pressures or customer requirements. It may also cause us to delay, scale back or eliminate some or all of our research and development programs, or to reduce or cease operations.

47

**Off-Balance Sheet Arrangements.**

We do not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. In addition, we do not have any undisclosed borrowings or debt, and we have not entered into any synthetic leases. We are, therefore, not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

## Item 7A.  Quantitative and Qualitative Disclosures About Market Risk

Not applicable.

## Item 8.  Financial Statements and Supplementary Dat a

The financial statements and supplementary data required by this item are included immediately following the signature page of this report and are incorporated herein by reference.

## Item 9.  Changes in and Disagreements With Accountants on Accounting and Financial Disclosur e

None.

## Item 9A.  Controls and Procedure s

**Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Exchange Act, as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective. Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.

**Management ' s   Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Exchange Act. Our management, with the participation of our principal executive officer and principal financial officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of January 2, 2016 based on the criteria set forth in the *[2013] Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of January 2, 2016.

This Annual Report does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting. Management ' s report was not subject to attestation by our independent registered public accoun ting firm pursuant to the rules of the Securities and Exchange Commission that permit us to provide only management ' s report in this Annual Report.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on Internal Control**

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple errors. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and any design may not succeed in achieving its stated goals under all potential conditions. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

In addition, projections of any evaluation of effectiveness to future periods are subject to risks that controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate.

**I tem 9B.  Other Informatio n**

None .

## PART II I

**Item 10.  Directors, Executive Officers and Corporate Governanc e**

The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.

**Item 11.  Executive Compensatio n**

The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.

**Item 12.  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matter s**

The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.

**Item 13.  Certain Relationships and Related Transactions, and Director Independenc e**

The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.

49

Table of Contents

**Item 14.  Principal Accounting Fees and Service s**

      The information required by this item is incorporated by reference to the proxy statement for our 2016 Annual Meeting of Stockholders or an amendment to this report, in either case to be filed with the SEC within 120 days after the end of the fiscal year ended January 2, 2016.

.

**Item 15.  Exhibits, Financial Statement Schedule s**

      (a)(1)  The following financial statements are included immediately following the signature page hereof and are filed as part of this report:

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F- 2 |
| Consolidated Balance Sheets | F- 3 |
| Consolidated Statements of Operations | F- 4 |
| Consolidated Statements of Stockholders' (Deficit) Equity | F- 5 |
| Consolidated Statements of Cash Flows | F- 6 |
| Notes to Consolidated Financial Statements | F- 7 |

      (a)(2)  Exhibits

| Exhibit No. | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation of Netlist, Inc. (incorporated by reference to exhibit 3.1 of the registration statement on Form S-1 of the registrant (No. 333-136735) filed with the SEC on October 23, 2006) |
| 3.2 | Amended and Restated Bylaws of Netlist, Inc. (incorporated by reference to exhibit number 3.1 of the registrant's Current Report on Form 8-K filed with the SEC on December 20, 2012) |
| 4.1 | Form of Warrant issued pursuant to the Securities Purchase Agreement, dated July 17, 2013 (incorporated by reference to exhibit 4.1 of the registrant's Current Report on Form 8-K filed with the SEC on July 18, 2013) |
| 4.2 | Senior Secured Convertible Promissory Note, dated November 18, 2015, issued by Netlist, Inc. to SVIC No. 28 New Technology Business Investment LLP (incorporated by reference to exhibit 4.1 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 4.3 | Stock Purchase Warrant, dated November 18, 2015, issued by Netlist, Inc. to SVIC No. 28 New Technology Business Investment LLP (incorporated by reference to exhibit 4.2 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 4.4 | Stock Purchase Warrant, dated November 18, 2015, issued by Netlist, Inc. to CF DB EZ LLC (incorporated by reference to exhibit 4.3 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 4.5 | Amendment No. 1 to Stock Purchase Warrant, dated November 18, 2015, between Netlist, Inc. and Drawbridge Special Opportunities Fund LP (incorporated by reference to exhibit 4.4 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 10.1# | Amended and Restated 2000 Equity Incentive Plan of Netlist, Inc. (incorporated by reference to exhibit 10.7 of the registration statement on Form S-1 of the registrant (No. 333-136735) filed with the SEC on October 23, 2006) |

50

10.2#       Employment Agreement, dated September 5, 2006, between Netlist, Inc. and Chun K. Hong (incorporated by
            reference to exhibit 10.13 of the registration statement on Form S-1 of the registrant (No. 333-136735) filed
            with the SEC on September 27, 2006)

10.3#       Amended and Restated 2006 Equity Incentive Plan of Netlist, Inc. (incorporated by reference to exhibit 10.1
            of the registrant's Quarterly Report on Form 10-Q filed with the SEC on August 12, 2010)

10.4#       Form of Restricted Stock Award Agreement issued pursuant to the 2006 Equity Incentive Plan of Netlist, Inc.
            (incorporated by reference to exhibit 10.2 of the Quarterly Report on Form 10-Q of the registrant filed with the
            SEC on May 17, 2010)

10.5        Loan and Security Agreement, dated October 31, 2009, between Silicon Valley Bank and Netlist, Inc.
            (incorporated by reference to exhibit 10.1 of the registrant's Current Report on Form 8-K filed with the SEC
            on November 2, 2009)

10.6        Intercompany Subordination Agreement, dated October 31, 2009, among Silicon Valley Bank, Netlist, Inc.,
            and Netlist Technology Texas, L.P. (incorporated by reference to exhibit 10.2 of the registrant's Current
            Report on Form 8-K filed with the SEC on November 2, 2009)

10.7        Guarantor Security Agreement, dated October 31, 2009, between Silicon Valley Bank and Netlist Technology
            Texas LP (incorporated by reference to exhibit 10.3 of the registrant's Current Report on Form 8-K filed with
            the SEC on November 2, 2009)

10.8        Intellectual Property Security Agreement, dated October 31, 2009, between Silicon Valley Bank and
            Netlist, Inc. (incorporated by reference to exhibit 10.4 of the registrant's Current Report on Form 8-K filed
            with the SEC on November 2, 2009)

10.9        Amendment to Loan Documents, dated March 24, 2010, between Silicon Valley Bank and Netlist, Inc.
            (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the
            SEC on May 17, 2010)

10.10       Amendment to Loan Documents, dated June 30, 2010, between Silicon Valley Bank and Netlist, Inc.
            (incorporated by reference to exhibit 10.2 of the registrant's Quarterly Report on Form 10-Q filed with the
            SEC on August 12, 2010)

10.11       Amendment to Loan Documents, dated September 30, 2010, between Silicon Valley Bank and Netlist, Inc.
            (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the
            SEC on November 17, 2010)

10.12       Amendment to Loan Documents, dated May 11, 2011, between Silicon Valley Bank and Netlist, Inc.
            (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the
            SEC on May 12, 2011)

10.13       Amendment to Loan Documents, dated August 10, 2011, between Silicon Valley Bank and Netlist, Inc.
            (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the
            SEC on August 15, 2011)

10.14       Amendment to Loan Documents, dated May 14, 2012, between Silicon Valley Bank and Netlist, Inc.
            (incorporated by reference to exhibit 10.1 of the registrant's Quarterly Report on Form 10-Q filed with the
            SEC on May 15, 2012)

10.15       Forbearance to Loan and Security Agreement, dated March 27, 2013, between Netlist, Inc. and Silicon Valley
            Bank (incorporated by reference to exhibit 10.32 of the registrant's Annual Report on Form 10-K for the fiscal
            year ended December 29, 2012 filed with the SEC on March 29, 2013)

51

| 10.16 | Amendment to Credit Agreement, dated July 18, 2013, between Netlist, Inc. and Silicon Valley Bank (incorporated by reference to exhibit 10.6 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on November 12, 2013) |
|---|---|
| 10.17 | Securities Purchase Agreement, dated July 17, 2013, between Netlist, Inc. and the purchaser identified therein (incorporated by reference to exhibit 10.1 of the registrant's Current Report on Form 8-K filed with the SEC on July 18, 2013) |
| 10.18 | Amendment to Loan Documents, dated September 30, 2014, between Netlist, Inc. and Silicon Valley Bank (incorporated by reference to exhibit 10.24 of the registrant's Annual Report on Form 10-K filed with the SEC on March 27, 2015) |
| 10.19 | Stock Purchase Warrant, issued by Netlist, Inc. on July 18, 2013 to Drawbridge Special Opportunity Fund LP (incorporated by reference to exhibit 10.3 of the registrant's Quarterly Report on Form 10-Q filed with the SEC on May 12, 2015) |
| 10.20+ | Intercreditor Agreement, dated November 18, 2015, among Netlist, Inc., Silicon Valley Bank and SVIC No. 28 New Technology Business Investment LLP |
| 10.21 | Senior Secured Convertible Promissory Note and Warrant Purchase Agreement, dated November 18, 2015, between Netlist, Inc. and SVIC No. 28 New Technology Business Investment LLP (incorporated by reference to exhibit 10.1 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 10.22 | Registration Rights Agreement, dated November 18, 2015, between Netlist, Inc. and SVIC No. 28 New Technology Business Investment LLP (incorporated by reference to exhibit 10.2 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 10.23 | Payoff Letter, dated November 18, 2015, from Fortress Credit Opportunities I LP and Drawbridge Special Opportunities Fund LP to Netlist, Inc. (incorporated by reference to exhibit 10.3 of the registrant's Current Report on Form 8-K filed with the SEC on November 19, 2015) |
| 10.24 | Amendment to Loan Documents, dated January 29, 2016, between Netlist, Inc. and Silicon Valley Bank (incorporated by reference to exhibit 10.1 of the registrant's Current Report on Form 8-K filed with the SEC on February 1, 2016) |
| 21.1+ | Subsidiaries of Netlist, Inc. |
| 23+ | Consent of KMJ Corbin & Company LLP |
| 24.1+ | Power of Attorney (included on the signature page to this report) |
| 31.1+ | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2+ | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32++ | Certification by Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS+ | XBRL Instance Document |

Table of Contents

101.SCH+      XBRL Taxonomy Extension Schema Document

101.CAL+      XBRL Taxonomy Extension Calculation Linkbase Document

101.LAB+      XBRL Taxonomy Extension Label Linkbase Document

101.PRE+      XBRL Taxonomy Extension Presentation Linkbase Document

101.DEF+      XBRL Taxonomy Extension Definition Linkbase Document

---

+        Filed herewith.

++       Furnished herewith.

#        Management contract or compensatory plan or arrangement.

    (b)  E xhibits

See subsection (a)(2) above.

**SIGNATURE S**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:  March 4, 2016

Netlist, Inc.

By:        /s/ Chun K. Hong
            Chun K. Hong
*President, Chief Executive Officer and
Chairman of the Board*

**POWER OF ATTORNEY**

IN WITNESS WHEREOF, each person whose signature appears below constitutes and appoints Chun K. Hong and Gail Sasaki as his or her true and lawful agent, proxy and attorney-in-fact, each acting alone, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to (i) act on and sign any amendments to this Annual Report on Form 10-K, with exhibits thereto and other documents in connection therewith, (ii) act on and sign such certificates, instruments, agreements and other documents as may be necessary or appropriate in connection therewith, and in each case file the same with the Securities and Exchange Commission, hereby approving, ratifying and confirming all that such agent, proxy and attorney-in-fact or any of his substitutes may lawfully do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Chun K. Hong<br>Chun K. Hong | President, Chief Executive Officer and Chairman of the Board (Principal Executive Officer) | March 4, 2016 |
| /s/ Gail Sasaki<br>Gail Sasaki | Vice President and Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) | March 4, 2016 |
| /s/ Charles F. Cargile<br>Charles F. Cargile | Director | March 4, 2016 |
| /s/ Jun S. Cho<br>Jun S. Cho | Director | March 4, 2016 |
| /s/ Vincent Sheeran<br>Vincent Sheeran | Director | March 4, 2016 |
| /s/ Blake A. Welcher<br>Blake A. Welcher | Director | March 4, 2016 |

54

Table of Contents

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F - 2 |
| Consolidated Balance Sheets | F - 3 |
| Consolidated Statements of Operations | F - 4 |
| Consolida ted Statements of Stockholders' (Deficit)   Equity | F - 5 |
| Consolidated Statements of Cash Flows | F - 6 |
| Notes to Consolidated Financial Statements | F - 7 |

F- 1

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIR M

Board of Directors and Stockholders
Netlist, Inc.

We have audited the accompanying consolidated balance sheets of Netlist, Inc. and subsidiaries (the "Company") as of January 2, 2016 and December 27, 2014 , and the related consolidated statements of operations, stockholders' (deficit) equity and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit on its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company ' s internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Netlist, Inc. and subsidiaries as of January 2, 2016  and December 27, 2014 , and the consolidated results of their operations and their cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

/s/ KMJ Corbin & Company LLP
Costa Mesa, California
March 4 , 20 16

F- 2

Table of Contents

NETLIST, INC. AND SUBSIDIARIES

Consolidated Balance Sheet s

(in thousands, except par value)

| | January 2, 2016 | December 27, 2014 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 19,684 | $ 11,040 |
| Restricted cash | 400 | 700 |
| Accounts receivable, net of allowance for doubtful accounts of $40 (2015) and $61 (2014) | 716 | 1,091 |
| Inventories | 1,658 | 1,880 |
| Prepaid expenses and other current assets | 1,739 | 735 |
| Total current assets | 24,197 | 15,446 |
| | | |
| Property and equipment, net | 408 | 393 |
| Other assets | 61 | 69 |
| Total assets | $ 24,666 | $ 15,908 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' (DEFICIT) EQUITY** | | |
| Current Liabilities: | | |
| Accounts payable | $ 3,299 | $ 3,957 |
| Accrued payroll and related liabilities | 1,243 | 710 |
| Accrued expenses and other current liabilities | 340 | 420 |
| Deferred revenue | 6,857 | - |
| Accrued engineering charges | 500 | 500 |
| Current portion of long-term debt, net of debt discount | 13 | 1,952 |
| Total current liabilities | 12,252 | 7,539 |
| Long-term debt, net of current portion and debt discount | 13,699 | 3,551 |
| Long-term warranty liability | 49 | 99 |
| Total liabilities | 26,000 | 11,189 |
| Commitments and contingencies | | |
| Stockholders' (deficit) equity: | | |
| Preferred stock, $0.001 par value - 10,000 shares authorized; no shares issued and outstanding | - | - |
| Common stock, $0.001 par value - 90,000 shares authorized; 50,354 (2015) and 41,498 (2014) shares issued and outstanding | 50 | 41 |
| Additional paid-in capital | 132,011 | 117,546 |
| Accumulated deficit | (133,395) | (112,868) |
| Total stockholders' (deficit) equity | (1,334) | 4,719 |
| Total liabilities and stockholders' (deficit) equity | $ 24,666 | $ 15,908 |

See accompanying notes to consolidated financial statements.

F- 3

**NETLIST, INC. AND SUBSIDIARIES**

**Consolidated Statements of Operations**

**(in thousands, except per share amounts)**

| | | Year Ended | | |
|---|---|---|---|---|
| | | January 2, 2016 | | December 27, 2014 |
| Net product sales | $ | 6,869 | $ | 19,195 |
| Non-recurring engineering revenues | | 1,143 | | - |
| Total net revenues | | 8,012 | | 19,195 |
| Cost of sales(1) | | 5,915 | | 15,231 |
| Gross profit | | 2,097 | | 3,964 |
| Operating expenses: | | | | |
| Research and development(1) | | 6,049 | | 4,586 |
| Intellectual property legal fees | | 5,588 | | 6,387 |
| Selling, general and administrative(1) | | 7,841 | | 6,796 |
| Total operating expenses | | 19,478 | | 17,769 |
| Operating loss | | (17,381) | | (13,805) |
| Other expense, net: | | | | |
| Interest expense, net | | (2,064) | | (1,574) |
| Other expense, net | | (1,081) | | - |
| Total other expense, net | | (3,145) | | (1,574) |
| Loss before provision for income tax | | (20,526) | | (15,379) |
| Provision for income taxes | | 1 | | 2 |
| Net loss | $ | (20,527) | $ | (15,381) |
| | | | | |
| Net loss per common share: | | | | |
| Basic and diluted | $ | (0.42) | $ | (0.38) |
| Weighted-average common shares outstanding: | | | | |
| Basic and diluted | | 48,967 | | 40,304 |

(1) Amounts include stock-based compensation expense as follows:

| | | | | |
|---|---|---|---|---|
| Cost of sales | $ | 53 | $ | 56 |
| Research and development | | 613 | | 726 |
| Selling, general and administrative | | 1,104 | | 1,230 |

See accompanying notes to consolidated financial statements.

F- 4

**NETLIST, INC. AND SUBSIDIARIES**

**Consolidated Statements of Stockholders' (Deficit) Equity**

**(in thousands)**

| | Series A Preferred Stock | | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' (Deficit) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | Capital | Deficit | Equity |
| Balance, December 28, 2013 | - | - | 31,776 | $ 31 | $ 104,469 | $ (97,487) | $ 7,013 |
| Stock-based compensation | - | - | - | - | 2,012 | - | 2,012 |
| Exercise of stock options | - | - | 303 | - | 153 | - | 153 |
| Repurchase of common stock | - | - | (12) | - | (22) | - | (22) |
| Issuance of common stock, net | - | - | 8,681 | 9 | 10,267 | - | 10,276 |
| Exercise of warrant | - | - | 750 | 1 | 667 | - | 668 |
| Net loss | - | - | - | - | - | (15,381) | (15,381) |
| Balance, December 27, 2014 | - | - | 41,498 | 41 | 117,546 | (112,868) | 4,719 |
| Stock-based compensation | - | - | - | - | 1,770 | - | 1,770 |
| Exercise of stock options | - | - | 10 | - | 8 | - | 8 |
| Issuance of common stock, net | - | - | 8,846 | 9 | 10,535 | - | 10,544 |
| Warrants issued in connection with debt and settlement transactions | - | - | - | - | 2,152 | - | 2,152 |
| Net loss | - | - | - | - | - | (20,527) | (20,527) |
| Balance, January 2, 2016 | - | - | 50,354 | $ 50 | $ 132,011 | $ (133,395) | $ (1,334) |

See accompanying notes to consolidated financial statements.

F- 5

**NETLIST, INC. AND SUBSIDIARIES**

**Consolidated Statements of Cash Flow s**

**(in thousands)**

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| Cash flows from operating activities: | | |
| Net loss | $ (20,527) | $ (15,381) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 349 | 882 |
| Capitalized payment -in- kind interest | 170 | 251 |
| Amortization of debt discount and debt issuance costs | 1,149 | 803 |
| Realized (gain) loss on sale of equipment | (3) | 6 |
| Stock-based compensation | 1,770 | 2,012 |
| Issuance of warrant in lieu of payment | 234 | - |
| Issuance and repricing of warrants | 753 | - |
| Changes in operating assets and liabilities: | | |
| Restricted cash | 300 | 400 |
| Accounts receivable | 375 | 3,775 |
| Inventories | 222 | 740 |
| Prepaid expenses and other assets | (728) | (12) |
| Accounts payable | (658) | 162 |
| Accrued payroll and related liabilities | 533 | 75 |
| Accrued expenses and other current liabilities | (130) | (114) |
| Deferred revenue | 6,857 | - |
| Net cash used in operating activities | (9,334) | (6,401) |
| Cash flows from investing activities: | | |
| Acquisition of property and equipment | (366) | (141) |
| Proceeds from sale of equipment | 5 | 3 |
| Net cash used in investing activities | (361) | (138) |
| Cash flows from financing activities: | | |
| Proceeds from long- term loans, net of issuance costs | 18,571 | - |
| Payments on debt | (10,784) | (197) |
| Proceeds from issuance of common stock, net | 10,544 | 10,276 |
| Proceeds from exercise of equity awards, net of taxes remitted for restricted stock | 8 | 799 |
| Net cash provided by financing activities | 18,339 | 10,878 |
| Net change in cash and cash equivalents | 8,644 | 4,339 |
| Cash and cash equivalents at beginning of period | 11,040 | 6,701 |
| Cash and cash equivalents at end of period | $ 19,684 | $ 11,040 |

See accompanying notes to consolidated financial statements.

F- 6

Table of Contents

**NETLIST, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENT S**

**January 2, 2016**

**Note 1—Description of Business**

Netlist, Inc. (the "Company" or "Netlist") designs, manufactures and sells a wide variety of high-performance, logic-based memory subsystems for the global datacenter, storage and high-performance computing markets. The Company's memory subsystems consist of combinations of dynamic random access memory integrated circuits ("DRAM ICs" or "DRAM"), NAND flash memory ("NAND flash"), application-specific integrated circuits ("ASICs") and other components assembled on printed circuit boards ("PCBs"). Netlist primarily markets and sells its products to leading original equipment manufacturer ("OEM") customers, hyperscale datacenter operators and storage vendors. The Company's solutions are targeted at applications where memory plays a key role in meeting system performance requirements. The Company leverages a portfolio of proprietary technologies and design techniques, including combining discrete semiconductor technologies from third parties such as DRAM and NAND flash to function as one efficient planar design and alternative packaging technique, to deliver memory subsystems with persistence, high density, small form factor, high signal integrity, attractive thermal characteristics, reduced power consumption and low cost per bit. The Company's NVvault™ product is the first to offer both DRAM and NAND flash in a standard form factor memory subsystem as a persistent dual-in line memory module ("DIMM") in mission critical applications. The Company's HyperCloud [®] technology incorporates its patented rank multiplication and load reduction technologies. The Company also has pending and issued patents covering fundamental aspects of hybrid memory DIMM designs that incorporate combinations of DRAM and/or NAND flash, such as its NVvault™ product. The Company is focused on monetizing its patent portfolio through its products business and, where appropriate, through licensing arrangements with third parties that wish to incorporate its patented technologies in their products.

Netlist was incorporated in June 2000 and is headquartered in Irvine, California. In 2007, the Company established a manufacturing facility in the People's Republic of China (the "PRC"), which became operational in July 2007 upon the successful qualification of certain key customers.

*Liquidity*

The Company incurred net losses of approximately $ 20 . 5  million and $ 15.4 million for the years ended January 2, 2016 and December 27, 2014 , respectively.

On February 24, 2015, the Company completed a registered firm commitment underwritten public offering (the "2015 Offering") of shares of the Company's common stock. In the 2015 Offering, the Company issued and sold to the underwriter (" Underwriter ")  8,846,154 shares of common stock pursuant to an underwriting agreement, dated as of February 19, 2015, by and between the Company and the Underwriter, at a price of $1.209  per share, including 1,153,846 shares resulting from the Underwriter's exercise in full of its option to purchase additional shares of Common Stock to cover over-allotments. The price per share to the public in the 2015 Offering was $1.30 per share. The net proceeds from the 2015 Offering were approximately $10. 5  million, after deducting underwriting discounts and commissions and estimated offering expenses.

On November 12, 2015, the Company entered into a Joint Development and License Agreement ("JDLA") with Samsung Electronics Co., Ltd. ("Samsung"), pursuant to which the Company and Samsung agreed to work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of this new technology. The Company received an $8.0 million non-recurring engineering fee ("NRE") from Samsung for the joint development. Both parties may enter into an additional agreement in the future for Samsung to be granted commercial license for the Company's NVDIMM-P technology.  The JDLA also includes a Right of First Refusal wherein the Company will provide Samsung the right to acquire the Company's NVDIMM-P technology in a separate, subsequent transaction before the Company offers the technology to a third party. The Company also received $15.0 million under a Senior Secured Convertible Note and Warrant Purchase Agreement ("SVIC Purchase Agreement")

F- 7

Table of Contents

with SVIC No. 28 New Technology Business Investment L.L.P., a Korean limited liability partnership and an affiliate of Samsung Venture Investment Co. ("SVIC") (see Note 5).

If adequate working capital is not available when needed, the Company may be required to significantly modify its business model and operations to reduce spending to a sustainable level. Insufficient working capital could cause the Company to be unable to execute its business plan, take advantage of future opportunities, or respond to competitive pressures or customer requirements. It may also cause the Company to delay, scale back or eliminate some or all of its research and development programs, or to reduce or cease operations. While there is no assurance that the Company can meet its revenue forecasts, management anticipates that it can continue operations for at least the next twelve months.

*Reclassifications*

Certain prior period amounts have been reclassified to conform to the current period presentation, including certain expenses from research and development to intellectual properly legal fees in the consolidated statement of operations and combining other assets with prepaid expenses and other current assets in the consolidated statement of cash flows.

**Note 2—Summary of Significant Accounting Policies**

**Change in Accounting Principle**

On January 2, 2016, the Company retrospectively adopted Financial Accounting Standards Board ("FASB") Accounting Standards Update ("ASU") No. 2015-03, *Interest - Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03"). ASU 2015-03 requires that debt issuance costs be presented as a direct reduction from the carrying amount of debt. As a result of the adoption of ASU 2015-03, the consolidated balance sheet at December 27, 2014 was adjusted to reflect the reclassification of $253,000 from prepaid expenses and other current assets and $81,000 from other assets to long-term debt.

**Basis of Presentation**

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

**Principles of Consolidation**

The consolidated financial statements include the accounts of Netlist, Inc. and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

**Fiscal Year**

The Company operates under a 52 or 53week fiscal year ending on the Saturday closest to December 31. The 2015 and 2014 fiscal years ended on January 2, 2016 and December 27, 2014, respectively. Fiscal year 2015 consisted of 53 weeks and fiscal year 2014 consisted of 52 weeks.

**Use of Estimates**

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements, and the reported amounts of net sales and expenses during the reporting period. By their nature, these estimates and assumptions are subject to an inherent degree of uncertainty. Significant estimates made by management include, among others, provisions for uncollectible receivables and sales returns, warranty liabilities, valuation of inventories, fair value of financial instruments, recoverability of long-lived assets, valuation of stock-based transactions , estimates for completion of NRE revenue milestones and realization of deferred tax assets. The Company bases its estimates on historical experience, knowledge of current conditions and the

F- 8

Company's belief of what could occur in the future considering available information.  The Company reviews its estimates on an on-going basis. The actual results experienced by the Company may differ materially and adversely from its estimates. To the extent there are material differences between the estimates and the actual results, future results of operations will be affected.

**Revenue Recognition**

**Product Sales**

The Company's revenues primarily consist of product sales of high performance memory subsystems to OEMs , hyperscale data center operators and storage vendors.

The Company recognizes revenues in accordance with FASB Accounting Standards Codification ("ASC") Topic 605. Accordingly, the Company recognizes revenues when there is persuasive evidence that an arrangement exists, product delivery and acceptance have occurred, the sales price is fixed or determinable, and collectability of the resulting receivable is reasonably assured.

The Company generally uses customer purchase orders and/or contracts as evidence of an arrangement. Delivery occurs when goods are shipped for customers with shipping point terms and upon receipt for customers with destination terms, at which time title and risk of loss transfer to the customer. Shipping documents are used to verify delivery and customer acceptance. The Company assesses whether the sales price is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to refund. Customers are generally allowed limited rights of return for up to 30  days, except for sales of excess component inventories, which contain no right-of-return privileges. Estimated returns are provided for at the time of sale based on historical experience or specific identification of an event necessitating a reserve. The Company offers a standard product warranty to its customers and has no other post-shipment obligations. The Company assesses collectability based on the creditworthiness of the customer as determined by credit checks and evaluations, as well as the customer's payment history.

All amounts billed to customers related to shipping and handling are classified as revenues, while all costs incurred by the Company for shipping and handling are classified as cost of sales.

**Engineering Services**

We provide engineering services to our customers. We recognize revenue from these services when all of the following conditions are met: (1) evidence existed of an arrangement with the customer, typically consisting of a purchase order or contract; (2) our services were performed and risk of loss passed to the customer; (3) we completed all of the necessary terms of the contract; (4) the amount of revenue to which we were entitled was fixed or determinable; and (5) we believed it was probable that we would be able to collect the amount due from the customer. To the extent that one or more of these conditions has not been satisfied, we defer recognition of revenue.

Generally, we recognize revenue as the engineering services stipulated under the contract are completed and accepted by our customers. Engineering services are performed under a signed Statement of Work ("SOW") with a customer. The deliverables and payment terms stipulated under the SOW provide guidance on the project revenue recognition.

Revenues from contracts with substantive defined milestones that we have determined are reasonable, relevant to all the deliverables and payment terms in the SOW that are commensurate with the efforts required to achieve the milestones are recognized under the milestone recognition method.

Estimated losses on all SOW projects are recognized in full as soon as they become evident.

F- 9

**Deferred Revenue**

From time-to-time the Company receives pre-payments from its customers related to future services. Engineering development fee revenues, including non-recurring engineering ("NRE") fees, are deferred and recognized ratably over the period the engineering work is completed.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of cash and short-term investments with original maturities of three months or less, other than short-term investments in securities that lack an active market.

**Restricted Cash**

Restricted cash of $0.4   million, as of January 2, 2016 , consists of cash to secure three standby letters of credit.

**Fair Value of Financial Instruments**

The Company's financial instruments consist principally of cash and cash equivalents, restricted cash, accounts receivable, accounts payable, accrued expenses and debt instruments. The fair value of the Company's cash equivalents is determined based on quoted prices in active markets for identical assets or Level 1 inputs.  The Company recognizes transfers between Levels 1 through 3 of the fair value hierarchy at the beginning of the reporting period.  The Company believes that the carrying values of all other financial instruments approximate their current fair values due to their nature and respective durations.

**Allowance for Doubtful Accounts**

The Company evaluates the collectibility of accounts receivable based on a combination of factors. In cases where the Company is aware of circumstances that may impair a specific customer's ability to meet its financial obligations subsequent to the original sale, the Company will record an allowance against amounts due, and thereby reduce the net recognized receivable to the amount the Company reasonably believes will be collected. For all other customers, the Company records allowances for doubtful accounts based primarily on the length of time the receivables are past due based on the terms of the originating transaction, the current business environment, and its historical experience. Uncollectible accounts are charged against the allowance for doubtful accounts when all commercial means of collection have been exhausted.  Generally, the Company's credit losses have been within expectations and the provisions established. However, the Company cannot guarantee that it will continue to experience credit loss rates similar to those experienced in the past.

**Concentration of Credit Risk**

Financial instruments that potentially subject the Company to significant concentrations of credit risk consist principally of cash and cash equivalents, and accounts receivable.

The Company invests its cash equivalents primarily in money market mutual funds.  Cash equivalents are maintained with high quality institutions, the composition and maturities of which are regularly monitored by management. At times, deposits held with financial institutions may exceed the amount of insurance provided by the Federal Deposit Insurance Corporation and the Securities Investor Protection Corporation.

The Company's trade accounts receivable are primarily derived from sales to OEMs in the computer industry. The Company performs credit evaluations of its customers' financial condition and limits the amount of credit extended when deemed necessary, but generally requires no collateral. The Company believes that the concentration of credit risk in its trade receivables is moderated by its credit evaluation process, relatively short collection terms, the high level of credit worthiness of its customers (see Note 10), foreign credit insurance , and letters of credit issued in its favor.  Reserves are maintained for potential credit losses, and such losses historically have not been significant and have been within management's expectations.

F- 10

**Inventories**

Inventories are valued at the lower of actual cost to purchase or manufacture the inventory or the net realizable value of the inventory. Cost is determined on an average cost basis which approximates actual cost on a first-in, first-out basis and includes raw materials, labor and manufacturing overhead. At each balance sheet date, the Company evaluates its ending inventory quantities on hand and on order and records a provision for excess quantities and obsolescence. Among other factors, the Company considers historical demand and forecasted demand in relation to the inventory on hand, competitiveness of product offerings, market conditions and product life cycles when determining obsolescence and net realizable value. In addition, the Company considers changes in the market value of components in determining the net realizable value of its inventory. Once established, lower of cost or market write-downs are considered permanent adjustments to the cost basis of the excess or obsolete inventories.

**Property and Equipment**

Property and equipment are recorded at cost and depreciated on a straight-line basis over their estimated useful lives, which generally range from three to seven years. Leasehold improvements are recorded at cost and amortized on a straight-line basis over the shorter of their estimated useful lives or the remaining lease term. Ex penditures for repairs and maintenance are charged to expense as incurred. Upon retirement or sale, the cost and related accumulated depreciation and amortization of assets disposed of are removed from the accounts and any resulting gain or loss is included in other expense, net.

**Deferred Financing Costs, Debt Discount and Detachable Debt-Related Warrants**

Costs incurred in connection with debt are deferred and recorded as a reduction to the debt balance in the accompanying consolidated balance sheets. The Company amortizes debt issuance costs over the expected term of the related debt using the effective interest method. Debt discounts relate to the relative fair value of warrants issued in conjunction with the debt are also recorded as a reduction to the debt balance and accreted over the expected term of the debt to interest expense using the effective interest method .

**Impairment of Long-Lived Assets**

The Company evaluates the recoverability of the carrying value of long-lived assets held and used by the Company for impairment on at least an annual basis or whenever events or changes in circumstances indicate that their carrying value may not be recoverable. When such factors and circumstances exist, the Company compares the projected undiscounted future net cash flows associated with the related asset or group of assets over their estimated useful lives against their respective carrying amount. If the carrying value is determined not to be recoverable from future operating cash flows, the asset is deemed impaired and an impairment loss is recognized to the extent the carrying value exceeds the estimated fair value of the asset. The fair value of the asset or asset group is based on market value when available, or when unavailable, on discounted expected cash flows. The Company's management believes there is no impairment of long-lived assets as of January 2, 2016 . There can be no assurance, however, that market conditions will not change or demand for the Company's products will continue, which could result in future impairment of long-lived assets.

**Warranty Liability**

The Company offers product warranties generally ranging from one to three years, depending on the product and negotiated terms of any purchase agreements with customers. Such warranties require the Company to repair or replace defective product returned to the Company during such warranty period a t no cost to the customer. Warranties are not offered on sales of excess component inventory. The Company records an estimate for warranty -related costs at the time of sale based on its historical and estimated product return rates and expected repair or replacement costs (see Note 3). While s uch costs have historically been within management's expectations and the provisions established, unexpected changes in failure rates could have a material adverse impact on the Company, requiring additional warranty liability , and could adversely affect the Company's gross profit and gross margins.

F- 11

**Stock-Based Compensation**

The Company accounts for equity issuances to non-employees in accordance with ASC Topic 505. All transactions in which goods or services are the consideration received for the issuance of equity instruments are accounted for based on the fair value of the consideration received or the fair value of the equity instrument issued, whichever is more reliably measurable. The measurement date used to determine the fair value of the equity instrument issued is the earlier of the date on which the third-party performance is complete or the date on which it is probable that performance will occur.

In accordance with ASC Topic 718, employee and director stock-based compensation expense recognized during the period is based on the value of the portion of stock-based payment awards that is ultimately expected to vest during the period. Given that stock-based compensation expense recognized in the consolidated statements of operations is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. ASC Topic 718 requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The Company's estimated average forfeiture rates are based on historical forfeiture experience and estimated future forfeitures.

The estimated fair value of common stock option awards to employees and directors is calculated using the Black-Scholes option pricing model. The Black-Scholes model requires subjective assumptions regarding future stock price volatility and expected time to exercise, along with assumptions about the risk-free interest rate and expected dividends, all of which affect the estimated fair values of the Company's common stock option awards. The expected term of options granted is calculated as the average of the weighted vesting period and the contractual expiration date of the option. This calculation is based on the safe harbor method permitted by the SEC in instances where the vesting and exercise terms of options granted meet certain conditions and where limited historical exercise data is available. The expected volatility is based on the historical volatility of the Company's common stock. The risk-free rate selected to value any particular grant is based on the U.S. Treasury rate that corresponds to the expected term of the grant effective as of the date of the grant. The expected dividend assumption is based on the Company's history and management's expectation regarding dividend payouts. The Company evaluates the assumptions used to value their common stock awards on a quarterly basis. If factors change and the Company employs different assumptions, stock-based compensation may differ significantly from what has been recorded in prior periods. Compensation expense for common stock option awards with graded vesting schedules is recognized on a straight-line basis over the requisite service period for the last separately vesting portion of the award, provided that the accumulated cost recognized as of any date at least equals the value of the vested portion of the award.

The Company recognizes the estimated fair value of restricted stock awards issued to employees and outside directors as stock-based compensation expense on a straight-line basis over the vesting period for the last separately vesting portion of the awards. Estimated fair value is determined as the difference between the closing price of our common stock on the grant date and the purchase price of the restricted stock award, if any, reduced by expected forfeitures.

If there are any modifications or cancellations of the underlying vested or unvested stock-based awards, the Company may be required to accelerate, increase or cancel any remaining unearned stock-based compensation expense, or record additional expense for vested stock-based awards. Future stock-based compensation expense and unearned stock- based compensation may increase to the extent that the Company grants additional common stock options or other stock-based awards.

**Income Taxes**

Deferred tax assets and liabilities are recognized to reflect the estimated future tax effects, calculated at currently effective tax rates, of future deductible or taxable amounts attributable to events that have been recognized on a cumulative basis in the consolidated financial statements. A valuation allowance related to a net deferred tax asset is recorded when it is more likely than not that some portion of the deferred tax asset will not be realized.

F- 12

ASC Topic 740 prescribes a recognition threshold and measurement requirement for the financial statement recognition of a tax position that has been taken or is expected to be taken on a tax return and also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. Under ASC Topic 740 the Company may only recognize or continue to recognize tax positions that meet a "more likely than not" threshold.

The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws and regulations themselves are subject to change as a result of changes in fiscal policy, changes in legislation, the evolution of regulations and court rulings. Therefore, the actual liability for U.S. or foreign taxes may be materially different from the Company's estimates, which could result in the need to record additional tax liabilities or potentially reverse previously recorded tax liabilities.

**Research and Development Expenses**

Research and development expenditures are expensed in the period incurred.

**Risks and Uncertainties**

The Company is subject to certain risks and uncertainties including its ability to obtain profitable operations due to the Company's history of losses and accumulated deficits, the Company's dependence on a few customers for a significant portion of revenues, risks related to intellectual property matters, market development of and demand for the Company's products, and the length of the sales cycle. Such risks could have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

The Company dedicates substantial resources in protecting its intellectual property, including its efforts to defend its patents against challenges made by way of reexamination proceedings at the United States Patent and Trademark Office ("USPTO"). These activities are likely to continue for the foreseeable future, without any guarantee that any ongoing or future patent protection and litigation activities will be successful. The Company is also subject to litigation based on claims that it has infringed on the intellectual property of others, against which the Company intends to defend itself vigorously. Litigation, whether or not eventually decided in the Company's favor or settled, is costly and time-consuming and could divert management's attention and resources. Because of the nature and inherent uncertainties of litigation, should the outcome of any of such actions be unfavorable, the Company's business, financial condition, results of operations or cash flows could be materially and adversely affected.

The Company has also invested a significant portion of its research and development budget into the design of ASIC and field-programmable gate array ("FGPA") devices, including the HyperCloud® and HyperVault memory subsystems, and the NVvault family of products. These products are subject to increased risks as compared to the Company's legacy products. The Company may be unable to achieve customer or market acceptance of its products, or achieve such acceptance in a timely manner. The Company experienced a longer qualification cycle than anticipated with its HyperCloud® memory subsystems, and did experience supply chain disruption and a shortage of DRAM and flash required to create the HyperCloud® memory subsystem and NVvault products.  As of January 2, 2016, Hypercloud has not generated significant revenue relative to the Company's investment in the product.

The Company's operations in the PRC are subject to various political, geographical and economic risks and uncertainties inherent to conducting business in the PRC. These include, but are not limited to, (i) potential changes in economic conditions in the region, (ii) managing a local workforce that may subject the Company to uncertainties or certain regulatory policies, (iii) changes in other policies of the Chinese governmental and regulatory agencies, and (iv) changes in the laws and policies of the U.S. government regarding the conduct of business in foreign countries, generally, or in the PRC, in particular. Additionally, the Chinese government controls the procedures by which its local currency, the Chinese Renminbi ("RMB"), is converted into other currencies and by which dividends may be declared or capital distributed for the purpose of repatriation of earnings and investments. If restrictions in the conversion of RMB or in the repatriation of earnings and investments through dividend and capital distribution restrictions are instituted, the Company's operations and may be negatively impacted. The liabilities of the Company's subsidiaries in the PRC exceeded its assets as of January 2, 2016 and December 27, 2014 .

F- 13

Table of Contents

**Foreign Currency Remeasurement**

The functional currency of the Company's foreign subsidiary is the U.S. dollar. Local currency financial statements are remeasured into U.S. dollars at the exchange rate in effect as of the balance sheet date for monetary assets and liabilities and the historical exchange rate for nonmonetary assets and liabilities. Expenses are remeasured using the average exchange rate for the period, except items related to nonmonetary assets and liabilities, which are remeasured using historical exchange rates. All remeasurement gains and losses are included in determining net loss.  Transaction gains and losses were not significant in 201 5 and 201 4 .

**Net Loss Per Share**

Basic net loss per share is calculated by dividing net loss by the weighted-average common shares outstanding during the year, excluding unvested shares issued pursuant to restricted share awards under the Company's share-based compensation plans.  Diluted net loss per share is calculated by dividing the net loss by the weighted-average shares and dilutive potential common shares outstanding during the year. Dilutive potential shares consist of dilutive shares issuable upon the exercise or vesting of outstanding stock options and restricted stock awards, respectively, computed using the treasury stock method and shares issuable upon conversion of the SVIC Note (as defined below) using the "if converted method" .  In periods of losses, basic and diluted loss per share are the same, as the effect of stock options and unvested restricted share awards on loss per share is anti-dilutive.

*Recent Accounting Pronouncements*

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers* ("ASU 2014-09"). ASU 2014-09 supersedes the revenue recognition requirements in FASB Topic 605, *Revenue Recognition* . ASU 2014-9 implements a five-step process for customer contract revenue recognition that focuses on transfer of control, as opposed to transfer of risk and rewards. The amendment also requires enhanced disclosures regarding the nature, amount, timing and uncertainty of revenues and cash flows from contracts with customers. Other major provisions include the capitalization and amortization of certain contract costs, ensuring the time value of money is considered in the transaction price, and allowing estimates of variable consideration to be recognized before contingencies are resolved in certain circumstances. Entities can transition to the standard either retrospectively or as a cumulative-effect adjustment as of the date of adoption.  On July 9, 2015, the FASB approved amendments deferring the effective date by one year to December 15, 2017 for annual reporting periods beginning after that date and permitting early adoption of the standard, but not before the original effective date or for reporting periods beginning after December 15, 2016.  The Company has not yet selected a transition method and is currently assessing the impact of the adoption of AUS 2014-9 will have on its consolidated financial statements and disclosures.

In August 2014, the FASB issued ASU No. 2014-15, *Presentation of Financial Statements - Going Concern.* The amendments in this update provide guidance in accounting principles generally accepted in the United States of America about management's responsibilities to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern and to provide related footnote disclosures. The main provision of the amendments are for an entity's management, in connection with the preparation of financial statements, to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that the financial statements are issued. Management's evaluation should be based on relevant conditions and events that are known or reasonably knowable at the date the consolidated financial statements are issued. When management identifies conditions or events that raise substantial doubt about an entity's ability to continue as a going  concern, the entity should disclose information that enables users of the consolidated financial statements to understand all of the following: (1) principal conditions or events that raised substantial doubt about the entity's ability to continue as a going concern (before consideration of management's plans); (2) management's evaluation of the significance of those conditions or events in relation to the entity's ability to meet its obligations; and (3) management's plans that alleviated substantial doubt about the entity's ability to continue as a going concern or management's plans that are intended to mitigate the conditions or events that raise substantial doubt about the entity's ability to continue as a going concern. The amendments in this update are effective for interim and annual reporting periods after December 15, 2016 and early application is permitted. The Company is currently assessing this guidance for future implementation.

F- 14

Table of Contents

In April 2015, the FASB issued ASU No. 2015-03, *Interest - Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03"). The amendments in ASU 2015-03 require that debt issuance costs related to a recognized debt liability be presented in the balance sheet as a direct deduction from the carrying amount of that debt liability, consistent with debt discounts. ASU 2015-03 is effective for annual and interim periods beginning on or after December 15, 2015. The amendments in this update should be applied on a retrospective basis, wherein the balance sheet of each individual period presented should be adjusted to reflect the period-specific effects of applying the new guidance. Upon transition, an entity is required to comply with the applicable disclosures for a change in an accounting principle. These disclosures include the nature of and reason for the change in accounting principle, the transition method, a description of the prior-period information that has been retrospectively adjusted, and the effect of the change on the financial statement line items (that is, debt issuance cost asset and the debt liability). The Company has elected to early adopt ASU 2015-03.  The Company has reclassified its debt issuance costs previously included in prepaid expenses and other current assets and other assets to a direct reduction in long-term debt in the prior year in the accompanying consolidated balance sheet.

In July 2015, the FASB issued ASU No. 2015-11, *Inventory (Topic 330)* ("ASU 2015-11"). The amendments in ASU 2015-11 require that an entity measure inventory within the scope at the lower of cost and net realizable value. Net realizable value is the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transaction. The amendments in this update more closely align the measurement of inventory in U.S. GAAP with the measurement of inventory in International Financial Reporting Standards. ASU 2015-11 is effective for annual and interim periods beginning on or after December 15, 2016. The amendments in this update should be applied prospectively with early application permitted as of the beginning of the interim or annual reporting period. The Company is currently assessing this guidance for future implementation.

 In November 2015, FASB issued ASU 2015-17,  *Income Taxes (Topic 740), Balance Sheet Classification of Deferred Taxes* ("ASU 2015-17") , which eliminates the current requirement for an entity to separate deferred income tax liabilities and assets into current and non-current amounts in a classified balance sheet. Instead, the ASU requires deferred tax liabilities, deferred tax assets and valuation allowances be classified as non-current in a classified balance sheet. ASU 2015-17 will be effective for annual reporting periods beginning after December 15, 2016 and interim periods within those annual periods. Early adoption is permitted. Additionally, this guidance may be applied either prospectively or retrospectively to all periods presented. The Company elected not to early adopt ASU 2015-17 and is evaluating the effect of the adoption of this ASU to its consolidated financial statements.

In February 25, 2016, the FASB issued ASU No. 2016-02, *Leases* ("ASU 2016-02"). Under ASU 2016-02 , lessees will be required recognize the following for all leases (with the exception of short-term leases) at the commencement date: a lease liability, which is a lessee's obligation to make lease payments arising from a lease, measured on a discounted basis; and a right-of-use asset, which is an asset that represents the lessee's right to use, or control the use of, a specified asset for the lease term. ASU 2016-02 is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early application is permitted. Lessees must apply a modified retrospective transition approach for leases existing at, or entered into after, the beginning of the earliest comparative period presented in the financial statements. The modified retrospective approach would not require any transition accounting for leases that expired before the earliest comparative period presented. Lessees may not apply a full retrospective transition approach.

F- 15

**Note 3—Supplemental Financial Information**

**Inventories**

Inventories consist of the following (in thousands):

|  | January 2, 2016 | December 27, 2014 |
|---|---|---|
| Raw materials | $ 1,174 | $ 984 |
| Work in process | 98 | 23 |
| Finished goods | 386 | 873 |
|  | $ 1,658 | $ 1,880 |

**Property and Equipment**

Property and equipment consist of the following (dollars in thousands):

|  | Estimated Useful Lives | January 2, 2016 | December 27, 2014 |
|---|---|---|---|
| Machinery and equipment | 3 - 7 yrs. | $ 8,934 | $ 8,956 |
| Leasehold improvements | * | 867 | 1,915 |
| Furniture and fixtures | 5 yrs. | 368 | 367 |
| Computer equipment and software | 3 - 7 yrs. | 3,788 | 3,490 |
|  |  | 13,957 | 14,728 |
| Less accumulated depreciation and amortization |  | (13,549) | (14,335) |
|  |  | $ 408 | $ 393 |

\*      Estimated useful life is generally 7 years, or the remaining lease term, whichever is shorter.

**Warranty Liability**

The following table summarizes the activity related to the warranty liability (in thousands):

|  | Year Ended | |
|---|---|---|
|  | January 2, 2016 | December 27, 2014 |
| Beginning balance | $ 246 | $ 249 |
| Estimated cost of warranty claims charged to cost of sales | 41 | 116 |
| Cost of actual warranty claims | (165) | (119) |
| Ending balance | 122 | 246 |
| Less current portion | (73) | (147) |
| Long-term warranty liability | $ 49 | $ 99 |

The allowance for warranty liabilities expected to be incurred within one year is included as a component of accrued expenses and other current liabilities in the accompanying consolidated balance sheets. The allowance for warranty liabilities expected to be incurred after one year is classified as long-term warranty liabilit y in the accompanying consolidated balance sheets.

F- 16

Table of Contents

**Computation of Net Loss Per Share**

The following table sets forth the computation of basic and diluted net loss per share, including the reconciliation of the numerator and denominator used in the calculation of basic and diluted net loss per share (in thousands, except per share data):

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| **Basic and diluted net loss per share:** | | |
| Numerator: Net loss | $ (20,527) | $ (15,381) |
| Denominator: Weighted-average common shares | | |
| outstanding, basic and diluted | 48,967 | 40,304 |
| Basic and diluted net loss per share | $ (0.42) | $ (0.38) |

The following table sets forth potentially dilutive common share equivalents, consisting of shares issuable upon the exercise or vesting of outstanding stock options and restricted stock awards, respectively, and the exercise of warrants, computed using the treasury stock method. These potential common shares have been excluded from the diluted net loss per share calculations above as their effect would be anti-dilutive for the years then ended (in thousands):

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| Common share equivalents | 101 | 277 |

The above common share equivalents would have been included in the calculation of diluted earnings per share had the Company reported net income for the years then ended.

**Cash Flow Information**

The following table sets forth supplemental disclosures of cash flow information and non-cash investing and financing activities (in thousands):

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for: | | |
| Interest | $ 906 | $ 479 |
| Income taxes | $ 4 | $ 4 |
| Supplemental disclosure of non-cash financing activities: | | |
| Debt issuance costs associated with February debt financing | $ 108 | $ - |
| Detachable warrant issued with November debt financing | $ 1,165 | $ - |
| Debt financing of directors and officers and cargo insurance | $ 268 | $ 198 |

F- 17

**Note 4—Credit Agreements**

**SVB Credit Agreement**

On October 31, 2009, the Company entered into a credit agreement with Silicon Valley Bank ("SVB"), which was most recently amended on January 29, 2016 (as amended, the "SVB Credit Agreement and such amendment, the "SVB Amendment"). Pursuant to the terms of the SVB Credit Agreement, the Company is eligible to borrow, in a revolving line of credit, up to the lesser of (i)  80% of its eligible accounts receivable, or (ii)  $5.0  million, subject to certain adjustments as set forth in the SVB Credit Agreement. The SVB Amendment modifies certain terms of the SVB Credit Agreement in order to (i) extend the maturity date of advances under the SVB Credit Agreement to January 31, 2017, (ii) adjust the rate at which advances under the SVB Credit Agreement accrue interest to the Wall Street Journal " prime rate" plus 2.75% (p rior to the SVB Amendment, advances under the SVB Credit Agreement accrued interest at a rate equal to SVB's most recently announced "prime rate" plus 2.75%) , and (iii) effective as of December 1, 2015, adjust certain of the Company's financial covenants under the SVB Credit Agreement, including relaxing the Company's adjusted quick ratio covenant and removing the Company's tangible net worth covenant. Additionally, pursuant to the terms of the SVB Amendment, SVB allowed for the financing and security interests contemplated under the debt instrument issued to SVIC (see Note 5) and released certain patents and related assets relating to the NVvault™ product line from the collateral subject to SVB's security interest under the SVB Credit Agreement.

The SVB Amendment requires letters of credit to be secured by cash, which is classified as restricted cash in the accompanying consolidated balance sheet. At January 2, 2016 and December 27, 2014, letters of credit in the amount of $0.4 million and $0.7  million, respectively, were outstanding.

The following tables present details of interest expense related to borrowings on the line of credit with SVB, along with availability under our credit line with SVB (in thousands):

The following table presents details of the Company's availability under our line of credit with SVB:

|  | January 2, 2016 | December 27, 2014 |
|---|---|---|
| Availability under the revolving line of credit | $        530 | $        882 |

All obligations under the SVB Credit Agreement are secured by a first priority lien on the Company's tangible and intangible assets, other than its patent portfolio, which is subject to a first priority lien held by SVIC. The SVB Credit Agreement subjects the Company to certain affirmative and negative covenants, including financial covenants with respect to the Company's liquidity and restrictions on the payment of dividends. As of January 2, 2016, the Company was in compliance with its covenants under the SVB Credit Agreement.

**Fortress Credit Opportunities I LP Loan and Security Agreement and Related Agreements**

On July 18, 2013, the Company, entered into a loan agreement ("2013 Loan Agreement") with Fortress Credit Opportunities I LLP ("Fortress"), an affiliate of Fortress Investment Group LLC and successor to DBD Credit Funding, LLC, which provided for up to $10 million in term loans and up to $5 million in revolving loans.  The term loans were available in an initial $6 million tranche (the "Initial Term Loan") with a second tranche in the amount of $4 million becoming available upon achievement of certain performance milestones relating to intellectual property matters (the "IP Monetization Milestones" and such second tranche loan, "IP Milestone Term Loan"). The $5 million in revolving loans were available at Fortress's discretion and subject to customary conditions precedent.  The $6 million Initial Term Loan was fully drawn at closing on July 18, 2013. Proceeds from the Initial Term Loan were used in part to repay the Company's Consolidated Term Loan with SVB. The remainder of such funds was used to fund the Company's working capital needs.  On February 17, 2015, the 2013 Loan Agreement was amended to accelerate the availability of the term loan and the Company borrowed the remaining $4 million in term loans.

F- 18

Table of Contents

The loans bore interest at a stated fixed rate of 11.0% per annum.  Until the last business day of February 2015, the payments on the term loans were interest-only at a cash rate of 7.0% per annum and a payment-in-kind deferred cash interest rate of 4.0% , which payment-in-kind interest was capitalized semi-annually, beginning with December 31, 2013.  Beginning with the last business day of February 2015, the term loans were amortized with 65% of the principal amount due in equal monthly installments over the following seventeen (17) months with a balloon payment equal to 35% of the remaining principal amount of the term loans, plus accrued interest, being payable on July 18, 2016 (the "Maturity Date").  Term loan payments, including the $4 million borrowed on February 17, 2015, of approximately $370,000 were due monthly through June 18, 2016, with the remaining amount of approximately $4.3 million due on July 18, 2016.

In November 2015, the Company repaid all amounts owed under the 2013 Loan Agreement with the proceeds from the SVIC Note, as defined and discussed in Note 5, and terminated the 2013 Loan Agreement in full.

Concurrently with the execution of the 2013 Loan Agreement, the Company and Drawbridge Special Opportunities Fund LP ("Drawbridge") entered into a Monetization Letter Agreement (as amended, the "Letter Agreement").  In connection with an amendment to the 2013 Loan Agreement, the Company also amended the Letter Agreement on February 17, 2015.  The Letter Agreement provided, among other things, that DBD may have been entitled to share in certain monetization revenues that we may have derived in the future related to our patent portfolio (the "Patent Portfolio").  The Patent Portfolio did not include certain patents relating to the NVvault™ product line.  Monetization revenues subject to this arrangement included revenues recognized during the seven year term of the Letter Agreement from amounts (whether characterized as settlement payments, license fees, royalties, damages, or otherwise) actually paid to the Company or its subsidiaries in connection with any assertion of, agreement not to assert, or license of, the Patent Portfolio (in whole or in part) either (A) in consideration of the grant of a license or covenant not sue, or other immunity with respect to the Patent Portfolio, or (B) as a damages award with respect to such assertion of the Patent Portfolio, less certain legal fees and expenses (subject to a cap on such fees and expenses).  Monetization revenues also included the value attributable to the Patent Portfolio in any sale of the Company during the seven year term, subject to a maximum amount payable to Drawbridge.  The Letter Agreement also required that the Company use commercially reasonable efforts to pursue opportunities to monetize the Patent Portfolio during the term of the Letter Agreement, provided the Company was under no obligation to pursue any such opportunities that it did not deem to be in its best interest.

Concurrently with the termination of the 2013 Loan Agreement in November 2015, the Company also terminated the Letter Agreement in full, as discussed further in Note 5.

Concurrently with the execution of the 2013 Loan Agreement, the Company issued to Drawbridge a seven -year warrant (the "Drawbridge Warrant") to purchase an aggregate of 1,648,351 shares of the Company's common stock at an exercise price of $1.00 per share. In connection with an amendment to the 2013 Loan Agreement, on February 17, 2015, the Company cancelled the Drawbridge Warrant and issued a replacement warrant in substantially the same form except for the removal of the restrictions upon exercise contained in the original Drawbridge Warrant with respect to an aggregate of 659,340 shares of the Company's common stock thereunder relating to the achievement of the Company of the IP Monetization Milestones and the borrowing by the Company of amounts under the IP Milestone Term Loan. As used herein, the term "Drawbridge Warrant" refers to the originally issued warrant and the replacement warrant, as the context dictates.

The Company accounted for the Drawbridge Warrant as a debt discount and has valued it based on the relative fair value to the debt instrument, at approximately $1,215,000 , to be amortized over the term of the debt instrument, or three years, using the effective interest method. For the years ended January 2, 2016 and December 27, 2014, the Company amortized approximately $524,000 and $487,000 respectively, as interest expense in the consolidated statements of operations.

In connection with the SVIC Purchase Agreement, as further described in Note 5, the Company amended the Drawbridge Warrant to reduce the exercise price per share to $0.47 . See Note 8 for further details.

F- 19

Also in connection with the 2013 Loan Agreement, the Company agreed to pay to a consultant a consulting fee equal to (i) $300,000 in connection with the Company's receipt of the Initial Term Loan and (ii) 5% of any additional principal amount loaned to the Company as an IP Milestone Term Loan. The initial $300,000 and $485,925 of additional debt financing costs were recorded as debt issuance cost to be amortized over the term of the debt instrument, or three years, using the effective interest method.

In connection with an amendment to the 2013 Loan Agreement, on February 17, 2015, the Company modified its agreement with the consultant and agreed to pay a consulting fee of 3.5% of $4,000,000 of additional principal loaned to the Company under the 2013 Loan Agreement. The amended consulting fee was equal to $140,000 . The amended consulting fee and $132,899 of additional debt financing costs has been recorded as debt issuance cost to be amortized over the term of the debt instrument, or seventeen months, using the effective interest method. During the years ended January 2, 2016 and December 27, 2014, the Company amortized approximately $607,000 and $316,000 respectively, as interest expense in the consolidated statements of operations.

In connection with the repayment of all amounts owed under the 2013 Loan Agreement the debt issuance costs and debt discount costs were expensed in their entirety as interest expense.

**Note 5- Long-term Debt**

The Company's long-term debt consists of the following (in thousands):

| | January 2, 2016 | | December 27, 2014 | |
|---|---|---|---|---|
| Term Loan, Fortress, net of debt discount and debt issuance costs of $0 and $858 | $ | - | $ | 5,503 |
| Convertible promissory note, SVIC, net of debt discount and debt issuance costs of $1,301 and $0 | | 13,699 | | - |
| Note payable to others | | 13 | | - |
| | $ | 13,712 | $ | 5,503 |
| Less current portion (including debt discount and debt issuance costs) | | (13) | | (1,952) |
| | $ | 13,699 | $ | 3,551 |

On November 18, 2015 ("Closing Date"), the Company entered into the SVIC Purchase Agreement with SVIC, pursuant to which the Company sold SVIC a Senior Secured Convertible Promissory Note ("SVIC Note") and a Stock Purchase Warrant ("SVIC Warrant"), each dated as of the Closing Date. The SVIC Note has an original principal amount of $15 million, accrues interest at a rate of 2% per year, is due and payable in full on December 31, 2021 ("SVIC Note Maturity Date") and the principal and accrued but unpaid interest are convertible into shares of the Company's common stock at a conversion price of $1.25 per share (the "Conversion Price"), subject to certain adjustments as set forth therein on the SVIC Note Maturity Date. Upon a change of control of the Company prior to the SVIC Note Maturity Date, the SVIC Note may, at the Company's option, be assumed by the surviving entity or be redeemed upon the consummation of such change of control for the principal and accrued but unpaid interest as of the redemption date. The SVIC Warrant grants SVIC a right to purchase 2,000,000 shares of the Company's common stock at an exercise price of $0.30 per share, subject to certain adjustments as set forth therein, is only exercisable in the event the Company exercises its right to redeem the SVIC Note prior to the SVIC Note Maturity Date, and expires on December 31, 2025. The SVIC Warrant was valued at $1,165,000 , based on its relative fair value, and was recorded as a debt discount . The Company also recorded $154,000 as a debt discount for professional services rendered.  These amounts will be amortized over the term of the SVIC Note using the effective interest method. For the year ended January 2, 2016, the Company amortized approximately $18,000 to interest expense in the consolidated statement of operations.

In connection with the SVIC Note, SVIC was granted a first priority security interest in the Company's patent portfolio and a second priority security interest in all of the Company's other assets. On the Closing Date, the Company, SVB and SVIC entered into an Intercreditor Agreement pursuant to which SVB and SVIC agreed to their relative security interest in the Company's assets.  On the Closing Date, the Company and SVIC also entered into a Registration

F- 20

Rights Agreement pursuant to which the Company is obligated to register with the SEC the shares of the Company's common stock issuable upon conversion of the SVIC Note or upon exercise of the SVIC Warrant.

On November 19, 2015, pursuant to the terms of a payoff letter (the "Payoff Letter") the Company repaid all sums due under the 2013 Loan Agreement with Fortress. The parties also terminated the Letter Agreement with Drawbridge. In connection with the Payoff Letter, the Company made a lump sum payment of $1.0 million to Fortress as an early termination fee, which was included in other expense in the consolidated statement of operations for the year ended January 2, 2016. The Company also agreed to amend the outstanding Drawbridge Warrant to reduce the exercise price per share to $0.47 (see Note 4). Additionally, pursuant to the terms of the Payoff Letter, the Company issued to Fortress a new ten -year warrant to purchase 1,000,000 shares of the Company's common stock at an exercise price per share of $0.47 (the "Fortress Warrant") (see Note 8). The estimated value of the new warrant and the estimated incremental value of the amended warrant totaled $0.8 million and were included in other expense on the consolidated statement of operations for the year ended January 2, 2016.

As of January 2, 2016, maturities of long-term debt, including amortization of debt discounts and debt issuance costs were as follows (in thousands):

| Fiscal Year | | |
| --- | --- | --- |
| 2016 | $ | 13 |
| 2017 | | - |
| 2018 | | - |
| 2019 | | - |
| 2020 | | - |
| Thereafter | | 15,000 |
| Total payments on long-term debt | | 15,013 |
| Less current portion (including debt discount and debt issuance costs) | | (1,314) |
| Long-term debt | $ | 13,699 |

Interest expense, including amortization of debt discounts and debt issuance costs, net of interest income, is presented in the following table (in thousands):

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| Interest expense: | | |
| SVB | $ 71 | $ 79 |
| Fortress | 1,940 | 1,492 |
| SVIC | 54 | - |
| Others | 4 | 3 |
| | 2,069 | 1,574 |
| Interest income | (5) | - |
| | $ 2,064 | $ 1,574 |

F- 21

**Note 6—Income Taxes**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and liabilities are as follows (in thousands):

| | January 2, 2016 | December 27, 2014 |
|---|---|---|
| Deferred tax assets: | | |
| Reserves and allowances | $ 1,548 | $ 1,542 |
| State taxes, net of federal income tax benefit | 2 | 2 |
| Depreciation and amortization | 543 | 570 |
| Other accruals | 394 | 534 |
| Compensatory stock options and rights | 2,598 | 2,364 |
| Other | 28 | 24 |
| Tax credit carryforwards | 3,302 | 3,034 |
| Operating loss carryforward | 30,315 | 23,664 |
| Foreign operating loss carryforward | 1,480 | 1,604 |
| Total deferred tax assets | 40,210 | 33,338 |
| Deferred tax liabilities: | | |
| Prepaid expenses | (63) | (96) |
| Basis difference in warrant value | (452) | (200) |
| Total deferred tax liabilities | (515) | (296) |
| Subtotal | 39,695 | 33,042 |
| Valuation allowance | (39,695) | (33,042) |
| | $ - | $ - |

The Company evaluates whether a valuation allowance should be established against its deferred tax assets based on the consideration of all available evidence using a "more likely than not" standard. In making such judgments, significant weight is given to evidence that can be objectively verified. As of January 2, 2016 and December 27, 2014 , a valuation allowance of $ 39.7 million and $ 33.0 million, respectively, has been provided based on the Company's assessment that it is more likely than not, that sufficient taxable income will not be generated to realize the tax benefits of the temporary differences. The valuation allowance increased by approximately $ 6.7 million and $ 4.9 million during the years ended January 2, 2016 and December 27, 2014 , respectively, primarily related to the increase in the net operating loss carryforward.

At January 2, 2016 , the Comp any had approximately $ 82.9 million of federal net operating loss carryforwards which begin to expire in year 2029 , and approximately $ 50.1 million of state net operating loss carryforwards which begin to expire in year 2017 , and federal and state tax credit carryforwards of approximately $1.5 million and $1.6 million, respectively at January 2, 2016. Federal tax credit carryforwards begin to expire in 2025 and state tax credits carry forward indefinitely. In addition, the Company has approximately $ 5.9 million of operating loss carryforwards in the PRC and Taiwan and had $ 1.7 million of net operating losses expire at the end of the current year. Utilization of the net operating loss and tax credit carryforwards is subject to an annual limi tation due to the ownership percentage change limitations provided by Section 382 of the Internal Revenue Code and similar state provisions. The annual limitation may result in the expiration of the net operating losses and tax credit carryforwards before utilization. As of January 2, 2016, we had not completed the determination of the amount to be limited under the provision.

The deferred tax asset at January 2, 2016 does not include approximately $ 1.7 million and $1.9 million of excess tax benefits from employee stock option exercises that are a component of the federal and state net operating loss carryover, respectively. The Company's stockholders' equity balance will be increased if and when such excess tax benefits are ultimately realized.

F- 22

For financial reporting purposes, loss before provision for income taxes includes the following components (in thousands):

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| United States | $ (19,737) | $ (14,187) |
| Foreign | (789) | (1,192) |
| | $ (20,526) | $ (15,379) |

The Company's income tax provision consists of the following (in thousands):

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| Current: | | |
| Federal | $ - | $ - |
| State | 1 | 2 |
| Total current | 1 | 2 |
| Deferred: | | |
| Federal | (6,093) | (4,477) |
| State | (684) | (771) |
| Foreign | 344 | 262 |
| Change in valuation allowance | 6,433 | 4,986 |
| Total deferred | - | - |
| Income tax provision | $ 1 | $ 2 |

A reconciliation of income taxes computed by applying the statutory U.S. income tax rate to the Company's loss before income taxes to the income tax provision is as follows:

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| U.S. federal statutory tax | 35 % | 35 % |
| Valuation allowance | (32) | (30) |
| Loss from foreign subsidiary | (2) | (3) |
| Other | (1) | (2) |
| | % | |
| Effective income tax provision rate | 0 | 0 % |

The Company files tax returns with federal, state and foreign jurisdictions. The Company is no longer subject to Internal Revenue Service ("IRS") or state examinations for periods prior to 2012 although certain carryforward attributes that were generated prior to 2012 may still be adjusted by the IRS.

The Company follows the policy to classify accrued interest and penalties as part of the accrued tax liability in the provision for income taxes. For the years ended January 2, 2016 and December 27, 2014 , the Company did not recognize any interest or penalties related to unrecognized tax benefits.

The Company's continuing practice is to recognize interest and/or penalties related to income tax matters in income tax expense. As of January 2, 2016 and December 27, 2014 , the Company had no accrued interest and penalties related to uncertain tax matters.

F- 23

As of January 2, 2016 , the Company had no uncertain tax positions that would be reduced as a result of a lapse of the applicable statute of limitations.

**Note 7—Commitments and Contingencies**

**Leases**

The Company leases certain of its facilities and equipment under non - cancelable operating leases that expire at various dates through 2017. Rental expense, net of amortization of deferred gain and sublease income, is presented in the following table (in thousands):

|  | Year Ended | |
|---|---|---|
|  | January 2, 2016 | December 27, 2014 |
| Rental expense, net | $        526 | $        604 |

A summary of future minimum payments under operating lease commitments as of January 2, 2016 is as follows (in thousands):

| Fiscal Year | Operating Leases |
|---|---|
| 2016 | $        325 |
| 2017 | 52 |
| Total minimum lease payments | $        377 |

**Litigation and Patent Reexaminations**

The Company owns numerous patents and continues to enlarge and strengthen its patent portfolios, which cover different aspects of the Company's technology innovations with various claim scopes. The Company plans to generate revenue by selling or licensing its technology, and intends to vigorously enforce its patent rights against infringers of such rights. The Company dedicates substantial resources in protecting its intellectual property, including its efforts to defend its patents against challenges made by way of reexamination proceedings at the USPTO. These activities are likely to continue for the foreseeable future, without any guarantee that any ongoing or future patent protection and litigation activities will be successful. The Company is also subject to litigation claims that it has infringed on the intellectual property of others, against which the Company intends to defend vigorously.

Litigation, whether or not eventually decided in the Company's favor or settled, is costly and time-consuming and could divert management's attention and resources. Because of the nature and inherent uncertainties of litigation, should the outcome of any of such actions be unfavorable, the Company's business, financial condition, results of operations or cash flows could be materially and adversely affected. Additionally, the outcome of pending litigation, and the related patent reexaminations, as well as any delay in their resolution, could affect the Company's ability to license its intellectual property in the future or to protect against competition in the current and expected markets for its products.

*Google Litigation*

In May 2008, the Company initiated discussions with Google, Inc. ("Google") based on information and belief that Google had infringed on a U.S. patent owned by the Company, U.S. Patent No. 7,289,386 ("the '386 patent"), which relates generally to technologies to implement rank multiplication in memory modules. Preemptively, Google filed a declaratory judgment lawsuit against the Company in the U.S. District Court for the Northern District of California (the "Northern District Court"), seeking a declaration that Google did not infringe the '386 patent and that the '386 patent

F- 24

was invalid. The Company filed a counterclaim for infringement of the '386 patent by Google. Claim construction proceedings were held in November 2009, and the Company prevailed on every disputed claim construction issue. In June 2010, the Company filed motions for summary judgment of patent infringement and dismissal of Google's affirmative defenses. In May 2010, Google requested and was later granted an *Inter Partes* Reexamination of the '386 patent by the USPTO. The reexamination proceedings are described below. The Northern District Court granted Google's request to stay the litigation pending result of the reexamination, and therefore has not ruled on the Company's motions for summary judgment.

In December 2009, the Company filed a patent infringement lawsuit against Google in the Northern District Court, seeking damages and injunctive relief based on Google's infringement of U.S. Patent No. 7,619,912 ("the '912 patent"), which is related to the '386 patent and relates generally to technologies to implement rank multiplication. In February 2010, Google answered the Company's complaint and asserted counterclaims against the Company seeking a declaration that the patent is invalid and not infringed, and claiming that the Company committed fraud, negligent misrepresentation and breach of contract based on the Company's activities in the JEDEC standard-setting organization. The counterclaim seeks unspecified compensatory damages. Accruals have not been recorded for loss contingencies related to Google's counterclaim because it is not probable that a loss has been incurred and the amount of any such loss cannot be reasonably estimated. In October 2010, Google requested and was later granted an *Inter Partes* Reexamination of the '912 patent by the USPTO. The reexamination proceedings are described below. In connection with the reexamination request, the Northern District Court granted the Company and Google's joint request to stay the '912 patent infringement lawsuit against Google until the completion of the reexamination proceedings.

*Inphi Litigation*

In September 2009, the Company filed a patent infringement lawsuit against Inphi Corporation ("Inphi") in the U.S. District Court for the Central District of California (the "Central District Court"). The complaint, as amended, alleges that Inphi is contributorily infringing and actively inducing the infringement of U.S. patents owned by the Company, including the '912 patent, U.S. Patent No. 7,532,537 ("the '537 patent"), which relates generally to memory modules with load isolation and memory domain translation capabilities, and U.S. Patent No. 7,636,274 ("the '274 patent"), which is related to the '537 patent and relates generally to load isolation and memory domain translation technologies. The Company is seeking damages and injunctive relief based on Inphi's use of the Company's patented technology. Inphi denied infringement and claimed that the three patents are invalid. In April 2010, Inphi requested but was later denied *Inter Partes* Reexaminations of the '912, '537 and '274 patents by the USPTO. In June 2010, Inphi submitted new requests and was later granted *Inter Partes* Reexaminations of the '912, '537 and '274 patents by the USPTO. The reexamination proceedings are described below. In connection with the reexamination requests, Inphi filed a motion to stay the patent infringement lawsuit with the Central District Court, which was granted. The Central District Court has requested that the Company notify it within one week of any action taken by the USPTO in connection with the reexamination proceedings, at which time the Central District Court may decide to maintain or lift the stay.

*SanDisk, Smart Modular, Smart Worldwide, and Diablo Litigations*

In September 2012, Smart Modular, Inc. ("Smart Modular") filed a patent infringement lawsuit against the Company in the U.S. District Court for the Eastern District of California (the "Eastern District Court"). The complaint alleges that the Company willfully infringes and actively induces the infringement of six claims of a U.S. patent newly issued to Smart Modular, U.S. Patent No. 8,250,295 ("the '295 patent"), and seeks damages and injunctive relief. Smart Modular also filed a motion for preliminary injunction and a memorandum in support of the motion on the same day of the complaint. The Company promptly filed a request for reexamination of the '295 patent with the USPTO setting forth six different combinations of prior art that would render the six asserted claims of the '295 patent unpatentable. The Company also filed an answer to Smart Modular's complaint with the Eastern District Court in October 2012 to deny infringement of the '295 patent, assert that the '295 patent is invalid and unenforceable, and bring a set of counterclaims against Smart Modular. Smart Modular filed various motions on the pleadings on November 1, 2012, which were opposed by the Company in its briefs filed in late November 2012.

In December 2012, the USPTO granted the Company's request for the reexamination of the '295 patent, and issued an Office Action rejecting all of the six asserted claims over the six different combinations of prior art set forth by

F- 25

the Company in its request. The Company promptly moved to stay litigation pending result of reexamination. On February 19, 2013, a few days after Smart Modular filed replies in support of its motions, the Eastern District Court issued a Minute Order, in which the court on its own motion took the preliminary injunction; the motion to dismiss and the motion to stay under submission without oral argument and vacated the hearing dates.

On February 7, 2013, Smart Modular filed a response to the Office Action in the reexamination of the '295 patent. Thereafter, the Company and Smart Modular made various filings to address certain apparent defects contained in Smart Modular's response. On March 13, 2013, the USPTO issued a Notice of Defective Paper, in which the USPTO found Smart Modular's responses, both the initial filing and a supplemental filing, to be improper, and both responses were expunged from the record. The USPTO gave Smart Modular 15 days to submit another response, which Smart Modular submitted on March 26, 2013. The Company timely filed its comments on Smart Modular's corrected response on April 25, 2013. The USPTO ultimately accepted Smart Modular's corrected response on July 17, 2013.  On April 29, 2014, the USPTO issued an Action Closing Prosecution ("ACP"), confirming some claims and rejecting others.  Smart Modular filed a response to the ACP on May 29, 2014, and Netlist filed comments related to Smart Modular's response on June 30, 2014.  On August 4, 2015, the USPTO issued a Right of Appeal Notice confirming all pending claims.  On September 4, 2015, the Company appealed to the Patent Trial and Appeal Board ("PTAB") at the USPTO. Thus, the reexamination of the '295 patent remains pending and will continue in accordance with established procedures for reexamination proceedings.

On May 30, 2013, the Eastern District Court issued an order granting Netlist's motion to stay pending results of the reexamination of the '295 patent and denied Smart Modular's motion for preliminary injunction.

On July 1, 2013, Netlist filed a complaint against Smart Modular in the Santa Ana Division of the U.S. District Court for the Central District of California ("Central District Court"), seeking, among other things, relief under federal antitrust laws for Smart Modular's violation of Section 2 of the Sherman Act, and damages and other equitable relief under California statutory and common law for Smart Modular's unfair competition, deceptive trade practices and fraud.

On August 23, 2013, Netlist filed an amended complaint for patent infringement, antitrust violations and trade secret misappropriation against Smart Modular, Smart Storage Systems ("Smart Storage"), Smart Worldwide Holdings ("Smart Worldwide") and Diablo Technologies ("Diablo") in the Central District Court. Smart Storage was acquired by SanDisk Corporation ("SanDisk") on August 22, 2013.  Netlist's amended complaint alleges infringement of five Netlist patents by the defendants based on the manufacture and sale of the ULLtraDIMM memory module. Netlist's complaint also alleges antitrust violations by Smart Modular and Smart Worldwide, contending that Smart Modular procured the '295 patent with blatant inequitable conduct at the USPTO, withheld the patent application leading to the patent from relevant JEDEC committees for more than eight years, sought to improperly enforce that patent against Netlist's JEDEC-compliant HyperCloud® product by seeking a preliminary injunction against Netlist based on the patent, which was denied by the Eastern District Court, and made deceptive statements to the public about its lawsuit against Netlist. Netlist's complaint also alleges trade secret misappropriation and trademark infringement against Diablo, claiming that Diablo misused Netlist trade secrets to create the ULLtraDIMM product for Smart Storage (now SanDisk), and that Diablo used Netlist's HyperCloud® technology to create competing products.

On the same day Netlist filed its amended complaint, Smart Modular and Diablo each filed a complaint in the San Francisco Division of the U.S. District Court Northern District of California ("Northern District Court"), seeking declaratory judgment of non-infringement and invalidity of the patents asserted in the Netlist's amended complaint. On September 9, 2013, Netlist filed a Motion to Dismiss or Transfer these declaratory judgment complaints to the Central District Court. This motion was denied by the Northern District Court on October 10, 2013.

In the Central District Court, Smart Modular and Smart Worldwide filed motions on September 13, 2013, to dismiss or sever various counts related to the '295 patent. On September 26, 2013, Diablo filed a motion to dismiss Netlist's claims for trade secret misappropriation, breach of contract, and unfair competition. On October 29, 2013, Smart Modular and Diablo filed motions to dismiss or transfer the patent claims related to the ULLtraDIMM memory module. On November 26, 2013, the Central District Court: (i) severed and transferred the claims related to the '295 patent to the Eastern District Court, which were stayed by the Eastern District Court on March 7, 2014, along with the other '295 related claims pending results of the '295 reexamination; (ii) severed and transferred to the Northern District

F- 26

Court the patent claims related to the ULLtraDIMM memory module; (iii) issued an order to show cause why the remaining claims should not also be transferred to the Northern District Court; and (iv) held in abeyance Diablo's pending motion to dismiss and motion for judgment on the pleadings. The parties filed briefs in response to the order to show cause, and then on December 23, 2013, the Central District Court ordered the remaining claims to be transferred to the Northern District Court. All of the claims from the amended complaint filed on August 23, 2013, in the Central District Court have now been transferred to either the Northern District Court or the Eastern District Court.

As reported in its Current Report on Form 8-K filed on December 13, 2013, Netlist received a whistleblower letter postmarked from Canada (where Diablo is based) on November 13, 2013, and obviously written by a current or former Diablo employee. The letter begins by bluntly stating that Diablo stole Netlist's architecture and design, and goes on to explain that Diablo used Netlist's HyperCloud TM product to create the ULLtraDIMM product, which it then used in demonstrations to major customers including IBM and Hewlett-Packard. The letter further states that Diablo's management conspired to hide this theft by instructing its employees not to speak to customers about the fact that Netlist's product was incorporated into ULLtraDIMM. The letter includes diagrams showing how Diablo implemented the theft of Netlist's trade secrets, as well as the names of former Diablo employees, customers and suppliers who can verify the theft. The Current Report on Form 8-K included as an exhibit a partially redacted copy of the whistleblower letter. On December 13, 2013, Diablo filed an ex parte application in the Northern District Court requesting that the Court issue an order to show cause why Netlist should not be sanctioned for attaching the redacted copy of the whistleblower letter to the Current Report on Form 8-K. The Northern District Court heard the parties' arguments on December 16, 2013, and on January 3, 2014, issued an order denying Diablo's application for sanctions, finding that Diablo had not established a basis for finding the information in the Current Report on Form 8-K and its attachments "confidential" and therefore had not shown why it should be granted the relief sought.

On January 21, 2014, Netlist filed a motion for leave to file a second amended answer and counterclaims in the Northern District Court to assert two additional patents, bringing the total to seven patents asserted against the ULLtraDIMM. Diablo did not oppose Netlist's motion, and the parties filed a joint stipulation and proposed order on February 3, 2014, requesting an additional two months be added to the case schedule to account for the additional patents. On February 5, 2014, the Northern District Court granted Netlist's motion to add the two patents and entered a new case schedule.  On February 12, 2014, the Northern District Court granted the parties' joint stipulation dismissing Smart Modular without prejudice.  On April 7, 2014, the Northern District Court granted Netlist's motion for leave to file a Second Amended Complaint in the Northern District Court.

On March 21, 2014, Netlist filed a Second Amended Complaint against Diablo in the Northern District Court, Case No. 4:13-CV-05962 (the "trade secret case"), alleging, among other things, that in stealing Netlist's proprietary HyperCloud® and DxD and LRD technologies, Diablo breached its contracts with Netlist, committed trademark violations, and misappropriated Netlist's trade secrets.  Also on March 21, 2014, Netlist served Diablo with its Amended Trade Secret Disclosure, detailing approximately 60 trade secrets Netlist taught to Diablo in connection with the contracted and confidential work on the HyperCloud® project.  On April 9, 2014, Diablo filed a motion to dismiss Netlist's Second Amended Trade Secret Complaint, as well as a motion for judgment on the pleadings.  That motion was heard by the Northern District Court on May 13, 2014, and on September 4, 2014, denied the motion with respect to all grounds except one , which Netlist did not contest.

On April 1, 2014, the Northern District Court denied Diablo's motion to strike Netlist's infringement contentions, finding that Netlist's contentions did indeed satisfy the relevant requirements and, on April 7, 2014, granted Netlist's motion to compel defendants to produce certain discovery materials related to the ULLtraDIMM.  Diablo filed a motion for relief from these two rulings, which was denied on April 8, 2014.  Also on April 7, 2014, the Northern District Court granted Netlist's motion for issuance of Letters Rogatory to the Canadian courts requesting that summons be issued for two former Diablo employees living in Canada and named in the whistleblower letter to produce documents and to be deposed.  These depositions occurred in late August 2014.

On April 8, 2014, the Northern District Court granted Netlist's motion to consolidate the patent related cases (Case Nos. 4:13-CV-05889-YGR and 4:13-CV-03901-YGR) and to coordinate discovery with the trade secret case (4:13-CV-05962-YGR), and denied Diablo's motion to further consolidate the patent and trade secret cases.  On April 15, 2014, the Northern District Court granted the parties' joint stipulation dismissing Smart Worldwide without

F- 27

prejudice.  On April 30, 2014, the Northern District Court denied Diablo's request that Netlist's Amended Trade Secret Disclosure and exhibits thereto be re-designated as "Confidential" from the current designation of "Highly Confidential -- Attorneys' Eyes Only".

Between June 18, 2014 and June 24, 2014, SanDisk filed petitions in the USPTO requesting *Inter Partes* Review ("IPR") of the five Netlist patents asserted in the August 23, 2013 amended complaint.  Diablo similarly filed petitions requesting IPR of the two Netlist patents added in the second amended answer filed on January 21, 2014.  Netlist filed patent owner preliminary responses to all of the petitions associated with the seven asserted Netlist patents.  The USPTO issued decisions on the petitions in December, 2014, denying the petitions in their entirety as to three patents (U.S. Patent Nos. 8,516,187; 8,301,833; 8,516,185), granting a partial institution on one patent (U.S. Patent No. 8,001,434), and instituting a review of all claims in three patents  (U.S. Patent Nos. 7,881,150; 8,081,536; 8,359,501).  Reviews will therefore proceed related to four Netlist patents (U.S. Patent Nos. 8,001,434; 7,881,150; 8,081,536; 8,359,501) in accordance with established procedures.  On April 7, 2015, SanDisk filed additional petitions in the USPTO requesting IPR of the '150 and '536 patents that were already under review.  On October 8, 2015, the USPTO issued decisions on the additional petitions, instituting reviews of the '150 and '536 patents which will proceed in accordance with established procedures.  On December 14, 2015, the PTAB issued decisions in the first wave of reviews of the '434 and '501 patents, finding that certain of the challenged claims in the '434 and '501 patents were valid, and that others were not.  On the same day, the PTAB also issued decisions on the first wave of reviews of the '150 and '536 patents, finding all of the challenged claims invalid.  Netlist and the petitioners will have an opportunity to appeal all of these decisions to the Court of Appeals for the Federal Circuit ("Federal Circuit") in accordance with established procedures.

On August 23, 2014, Smart Modular also filed petitions in the USPTO requesting IPR of the five Netlist patents asserted in the August 23, 2013 amended complaint.  Netlist filed patent owner preliminary responses to all of the Smart Modular petitions in December, 2014.  On March 13, 2015, the USPTO issued decisions on the Smart Modular petitions, denying the petitions in their entirety as to the same three patents that survived the petitions filed by SanDisk in June, 2014 (U.S. Patent Nos. 8,516,187; 8,301,833; 8,516,185), and instituted additional reviews of the two other patents already under review (U.S. Patent No. 8,001,434; 8,359,501) that will proceed in accordance with established procedures.

SanDisk filed a motion on June 24, 2014, to stay the Northern District patent cases pending completion of the IPRs (Diablo later joined this motion).  Netlist filed its opposition to the motion to stay on July 10, 2014.  The Northern District Court heard oral arguments on the motion to stay in early August 2014, and issued an order on August 21, 2014, denying the motion without prejudice.  SanDisk renewed its motion to stay on January 20, 2015 and on April 9, 2015, the Court granted the motion for a stay pending resolution of the IPRs.

On October 6, 2014, Netlist filed a Motion for Preliminary Injunction in the Northern District Court trade secret suit, asking that Diablo and its partner SanDisk be immediately enjoined from any further manufacture or sale of the ULLtraDIMM module.  The Court granted in part Netlist's motion on January 6, 2015, and entered a preliminary injunction halting the manufacture, use, sale, or distribution of the Diablo Rush and Bolt chips and any ULLtraDIMM module containing those chips, and advanced the trial date to March 9, 2015 on the trade secret misappropriation, breach of contract, and other related claims (4:13-CV-05962-YGR).  SanDisk and Diablo filed motions with the U.S. Court of Appeals for the Federal Circuit appealing the January 6, 2015, preliminary injunction and asking for expedited briefing and a stay of the preliminary injunction during the pendency of the appeals.  The Federal Circuit denied both requests for expedited briefing, denied Diablo's request for a stay, but granted SanDisk's narrower request for a stay of the preliminary injunction as to SanDisk's existing inventory of enjoined products.

The trial commenced on schedule and continued for two weeks , with closing arguments on March 23, 2015.   On March 25, 2015, the jury came back with a verdict finding for the defendant on the breach of contract, misappropriation of trade secret and inventorship counts, while finding for Netlist on the trademark and false advertising counts. After the verdict, the court ordered briefing to determine the effect of the jury verdict on the preliminary injunction entered on January 6, 2015, and following oral argument on April 24, 2015, issued an order dissolving the preliminary injunction.  The court further issued Findings of Fact and Conclusions of Law on Netlist's unfair competition claims granting no relief under the statute based on the jury's verdict.  The parties briefed their post-trial

F- 28

motions in May and June of 2015, including Netlist's motion for Judgment as a Matter of Law ("JMOL") to reverse the jury's verdict as to breach of contract and for a new trial on misappropriation of trade secrets.  Oral arguments on the post-trial motions were heard by the court on July 8, 2015.  On September 1, 2015, the Court denied motions from both parties for JMOL, Netlist's motion for a new trial, and Diablo's motion for attorney's fees, but granted Diablo's motion to recover on the preliminary injunction a $900,000 bond posted early in the litigation and its bill of costs. This expense is included in other expense, net in the accompanying consolidated statements of operation for the year ended January 2, 2016. On September 29, 2015, Netlist filed a Notice of Appeal to the Federal Circuit and on December 8, 2015, filed an Opening Brief.  Netlist's appeal will continue in accordance with established procedures.

### '386 Patent Reexamination

As noted above, in May 2010, Google requested and was later granted an *Inter Partes* Reexamination of the '386 patent by the USPTO. In October 2010, Smart Modular requested and was later granted an *Inter Partes* Reexamination of the '386 patent. The reexaminations requested by Google and Smart Modular were merged by the USPTO into a single proceeding. In April 2011, a Non-Final Action was issued by the USPTO, rejecting all claims in the patent. In July 2011, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims in view of cited references. Both Google and Smart Modular filed their comments to the Company's response in October 2011. In October 2012, the USPTO issued an ACP rejecting all 60 claims . The Company filed a response to the ACP on December 3, 2012. On June 21, 2013, the USPTO issued a Right of Appeal Notice ("RAN") in which the examiner maintained his rejection of the claims. Netlist filed a notice of appeal on July 19, 2013. Google filed a notice of cross-appeal on August 2, 2013, and a cross-appeal brief on October 1, 2013. The Company filed an appeal brief and an amendment canceling some of the remaining claims on October 2, 2013 to further focus the issues on appeal. On February 24, 2014, the examiner entered the amendment canceling claims, withdrew the rejections related to those claims, but otherwise maintained the positions previously set forth in the RAN.  On September 24, 2014, the USPTO set a hearing date of November 19, 2014.  After the hearing, on February 25, 2015, the PTAB issued a decision affirming the examiner's rejections of the pending claims.  The Company requested rehearing of the PTAB's decision on March 25, 2015.  On August 27, 2015, the PTAB denied the Company's request for rehearing.   Netlist appealed to the Federal Circuit on October 26, 2015.  The appeal was dismissed on January 28, 2016 by Netlist.  Thus, while the reexamination of the '386 patent remains pending, it will terminate in accordance with established procedures for merged reexamination proceedings in due course with the cancellation of the original claims.

### '912 Patent Reexamination

As noted above, in April 2010, Inphi requested but was later denied an *Inter Partes* Reexamination of the '912 patent by the USPTO. In June 2010, Inphi submitted a new request and was later granted an *Inter Partes* Reexamination of the '912 patent by the USPTO. In September 2010, the USPTO confirmed the patentability of all fifty-one claims of the '912 patent. In October 2010, Google and Smart Modular each filed and were later granted requests for reexamination of the '912 patent. In February 2011, the USPTO merged the Inphi, Google and Smart Modular '912 reexaminations into a single proceeding. In an April 2011 Non-Final Action in the merged reexamination proceeding, the USPTO rejected claims 1-20 and 22-51 and confirmed the patentability of claim 21 of the '912 patent. In July 2011, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Inphi, Google, and Smart Modular filed their comments on the Company's response in August 2011. In October 2011, the USPTO mailed a second Non-Final Action confirming the patentability of twenty claims of the '912 patent, including claims that were added in the reexamination process. In January 2012, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Google, Inphi and Smart Modular filed their comments to the Company's response in February 2012. The USPTO determined that Smart Modular's comments were defective, and issued a notice to Smart Modular to rectify and resubmit its comments. Smart Modular filed corrected comments and a petition for the USPTO to withdraw the notice in March 2012. The USPTO issued a non-final Office Action on November 13, 2012 maintaining the patentability of many key claims while rejecting some claims that were previously determined to be patentable. The Company filed a response to the Office Action on January 14, 2013. The requesters filed their comments on February 13, 2013.  On March 21, 2014, the USPTO issued an ACP, confirming the patentability of 92 claims and maintaining the rejection of 11 other claims.  On June 18, 2014, the USPTO issued a RAN, maintaining the substantive positions taken by the examiner in the ACP.  Smart Modular, Inphi and Google filed notices of appeal on July 16,

F- 29

July 18 and July 18, 2014, respectively.  Netlist filed a notice of cross-appeal on July 30, 2014.  Smart Modular, Inphi and Google filed their respective appeal briefs on September 16, September 30 and September 30, 2014.  Netlist filed its cross-appeal brief on September 30, 2014.  On January 14, 2015, the examiner maintained his positions previously set forth in the RAN.  The parties filed respective rebuttal briefs in February 2015.  On September 29, 2015, the PTAB set a hearing date for November 24, 2015 on the parties' appeals.  The hearing was conducted on November 24, 2015, and the parties are awaiting the USPTO's decision.  Thus, the reexamination of the '912 patent remains pending and will continue in accordance with established procedures for merged reexamination proceedings.

### '627 Patent Reexamination

In September 2011, Smart Modular filed a request for reexamination of U.S. Patent No. 7,864,627 ("the '627 patent") issued to the Company on January 4, 2011. The '627 patent is related to the '912 patent. In November 2011, the USPTO granted Smart Modular's request for reexamination of the '627 patent and concurrently issued a Non-Final Action confirming the patentability of three claims. In February 2012, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Smart Modular filed its comments to the Company's response in March 2012. The USPTO determined that Smart Modular's comments were defective and issued a notice in April 2012 to Smart Modular to rectify and resubmit its comments. Smart Modular filed corrected comments and a petition for the USPTO to withdraw the notice in April 2012. The USPTO posted an Office Action on December 19, 2012, confirming one claim and rejecting the rest of the claims in the '627 patent. The Company filed a response to the Office Action on March 19, 2013. Smart Modular filed its comments on the Office Action on April 24, 2013. The USPTO issued another Non-Final Office Action on September 26, 2013, withdrawing certain rejections while adopting new rejections for certain of the pending claims. The Company responded to the Non-Final Office Action on November 26, 2013, by amending some of the claims and making arguments as to the validity of the rejected claims. On March 27, 2014, the USPTO issued an ACP, maintaining the claim rejections.  On June 27, 2014, the USPTO issued a RAN, maintaining the substantive positions taken by the examiner in the ACP.  Netlist filed a notice of appeal on July 28, 2014.  On October 14, 2014, the Company filed its appeal brief and, on November 13, 2014, Smart Modular filed its respondent's brief. On April 27, 2015, the USPTO issued an Examiner's Answer to Appeal Brief in which the examiner continued to maintain the substantive positions taken previously.  On May 27, 2015, the Company filed a Patent Owner Rebuttal Brief in response to the Examiner's Answer. On October 9, 2015, the PTAB set a hearing date for December 11, 2015 on the Company's appeal. The hearing was conducted on November 24, 2015, and the parties are awaiting the USPTO's decision. Thus, the reexamination of the '627 patent remains pending and will continue in accordance with established *Inter Partes* Reexamination procedures.

### '537 Patent Reexamination

As noted above, in April 2010, Inphi requested and was later denied an *Inter Partes* Reexamination of the '537 patent by the USPTO. In June 2010, Inphi submitted a new request and was later granted an *Inter Partes* Reexamination of the '537 patent by the USPTO. In September 2010, the USPTO issued a Non-Final Action confirming the patentability of four claims. In October 2010, the Company responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Inphi filed its comments on the Company's response in January 2011. In June 2011, the USPTO issued an ACP, which reconfirmed the patentability of the four claims. In August 2010, the Company responded by amending some of the claims and making arguments as to the validity of the rejected claims. Inphi filed its comments to the Company's response in September 2011. The USPTO issued a Right of Appeal Notice in February 2012, in which the claim rejections were withdrawn, thus confirming the patentability of all sixty (60) claims in view of all the previously submitted comments by both Inphi and the Company. Inphi filed a notice of appeal in March 2012 followed by an appeal brief in May 2012. In response, the USPTO issued a Notice of Defective Appeal Brief. Inphi filed a corrective appeal brief in late May 2012, and the Company filed its reply brief to the corrected Inphi appeal brief in early July 2012. The examiner responded to Inphi's corrected appeal brief as well as the Company's reply brief by Examiner's Answer on April 16, 2013, in which he maintained his position confirming all sixty (60) claims. Inphi filed a rebuttal brief on May 16, 2013. Netlist filed a request for oral hearing on June 14, 2013. The Company and the examiner jointly defended the '537 patent in a hearing on November 20, 2013 before the PTAB. On January 16, 2014, the PTAB issued a decision upholding the validity of all 60 claims, dismissing every single validity challenge raised by Inphi and affirming the examiner's decision to allow the claims . On August 13, 2014, the PTAB denied Inphi's request for rehearing and made its decision final for judicial review to the Federal

F- 30

Circuit.  On October 15, 2014, Inphi filed a Notice of Appeal to the Federal Circuit.  On February 3, 2015, Inphi filed an appellant's brief in its appeal to the Federal Circuit.  The Company filed its appellee's brief on May 18, 2015, and Inphi filed a reply brief on June 4, 2015.  On October 9, 2015, the Federal Circuit conducted a hearing on Inphi's appeal.  On November 13, 2015, a panel of the Federal Circuit unanimously ruled in favor of Netlist in a precedential decision.  Inphi petitioned for panel rehearing and en banc rehearing on December 14, 2015.  Both petitions were denied on January 22, 2016.  Inphi has 90 days to petition the U.S. Supreme Court for certiorari.  Thus, the reexamination of the '537 patent remains pending and will continue in accordance with established procedures for *Inter Partes* Reexamination and judicial appeals therefrom.

### '274 Patent Reexamination

As noted above, in April 2010, Inphi requested and was later denied an *Inter Partes* Reexamination of the '274 patent by the USPTO. In June 2010, Inphi submitted a new request and was later granted an *Inter Partes* Reexamination of the '274 patent by the USPTO. In September 2011, the USPTO issued a Non-Final Action, confirming the patentability of six claims. The Company has responded by amending or canceling some of the claims, adding new claims, and making arguments as to the validity of the rejected claims. Inphi filed its comments on the Company's response in November 2011. The USPTO issued an ACP in March 2012, which confirmed the patentability of one hundred and four (104)  claims in view of all the previously submitted comments by both Inphi and the Company. The USPTO subsequently issued a RAN in June 2012. This RAN triggered Inphi's right as the losing party to file a notice of appeal and corresponding appeal brief, which Inphi filed when due. The Company responded to Inphi's appeal brief by filing a reply brief in October 2012. The examiner responded to Inphi's appeal brief and the reply brief by Examiner's Answer on April 16, 2013, in which he maintained his position confirming the one hundred and four (104) claims. Inphi filed a rebuttal brief on May 16, 2013. Netlist filed a request for oral hearing on June 14, 2013. The Company and the USPTO examiner jointly defended the '274 patent in a hearing on November 20, 2013 before the PTAB, in accordance with established procedures for *Inter Partes* Reexamination. On January 16, 2014, the PTAB issued a decision affirming the examiner in part, but reversing the examiner on new grounds and rejecting the one hundred and four (104) claims.  On March 28, 2014, Netlist filed a Patent Owner's Response Requesting to Reopen Prosecution along with certain claim amendments and arguments. On June 26, 2014, the PTAB issued a decision granting-in-part Inphi's request to modify the January 16, 2014, decision as to two of the rejected claims.  On June 15, 2015, the USPTO issued an Examiner's Determination, rejecting the amended claims.  On July 8, 2015, the USPTO vacated sua sponte the June 15 Examiner's Determination.  On September 11, 2015, the examiner issued a new Examiner's Determination which rejected the amended claims based on multiple grounds.  On October 13, 2015, the Company filed a response to the Examiner's Determination.  The reexamination of the '274 patent remains pending and will continue in accordance with established procedures for *Inter Partes* Reexamination.

### Other Contingent Obligations

During its normal course of business, the Company has made certain indemnities, commitments and guarantees pursuant to which it may be required to make payments in relation to certain transactions. These include: (i) intellectual property indemnities to the Company's customers and licensees in connection with the use, sales and/or license of Company products; (ii) indemnities to vendors and service providers pertaining to claims based on the Company's negligence or willful misconduct; (iii) indemnities involving the accuracy of representations and warranties in certain contracts; (iv) indemnities to directors and officers of the Company to the maximum extent permitted under the laws of the State of Delaware; (v) indemnities to Fortress, SVIC, and SVB pertaining to all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with transactions contemplated by the loan documents; and (vi) certain real estate leases, under which the Company may be required to indemnify property owners for environmental and other liabilities, and other claims arising from the Company's use of the applicable premises. The duration of these indemnities, commitments and guarantees varies and, in certain cases, may be indefinite. The majority of these indemnities, commitments and guarantees do not provide for any limitation of the maximum potential for future payments the Company could be obligated to make. Historically, the Company has not been obligated to make significant payments for these obligations, and no liabilities have been recorded for these indemnities, commitments and guarantees in the accompanying consolidated balance sheets.

F- 31

Table of Contents

**Note 8—Stockholders' Equity**

**Serial Preferred Stock**

The Company's authorized capital includes 10,000,000 shares of Serial Preferred Stock, with a par value of $0.001 per share.  No shares were outstanding at January 2, 2016 or December 27, 2014 .

**Common Stock**

On February 11, 2014, the Company completed a registered firm commitment underwritten public offering (the " 2014 Offering ") of shares of the Company's common stock. In the 2014 Offering, the Company issued and sold to the Underwriter 8,680,775 shares of common stock pursuant to an underwriting agreement, dated as of February 6, 2014, by and between the Company and the Underwriter, at a price of $1.2115 per share, including 1,132,275 shares resulting from the Underwriter's exercise in full of its option to purchase additional shares of c ommon s tock to cover over-allotments. The price per share to the public in the 2014 Offering was $1.30 per share. The net proceeds from the 2014 Offering were approximately $10.3 million, after deducting underwriting discounts and commissions and offering expenses.

On February 24, 2015, the Company completed the 2015 Offering of shares of the Company's common stock. In the 2015 Offering, the Company issued and sold to the Underwriter 8,846,154 shares of common stock pursuant to an underwriting agreement, dated as of February 19, 2015, by and between the Company and the Underwriter, at a price of $1.209 per share, including 1,153,846 shares resulting from the Underwriter's exercise in full of its option to purchase additional shares of c ommon s tock to cover over-allotments. The price per share to the public in the 2015 Offering was $1.30 per share. The net proceeds from the 2015 Offering were approximately $10.5 million, after deducting underwriting discounts and commissions and offering expenses.

**Cancellation of Shares of Common Stock**

During the fiscal year  ended December 27, 2014 , the Company cancelled 10,015 shares of common stock, valued at approximately $21,000   in connection with its obligation to holders of restricted stock to withhold the number of shares required to satisfy the holders' tax liabilities in connection with the vesting of such shares.

The Company is incorporated in the state of Delaware, and as such, is subject to various state laws which may restrict the payment of dividends or purchase of treasury shares.

**Stock-Based Compensation**

The Company has stock-based compensation awards outstanding pursuant to the Amended and Restated 2000 Equity Incentive Plan (the "2000 Plan") and the Amended and Restated 2006 Equity Incentive Plan (the "2006 Plan"), under which a variety of option and direct stock-based awards may be granted to employees and nonemployees of the Company. Further grants under the 2000 Plan were suspended upon the adoption of the 2006 Plan. In addition to awards made pursuant to the 2006 Plan, the Company periodically issues inducement grants outside the 2006 Plan to certain new hires.

Subject to certain adjustments, as of January 2, 2016, the Company was authorized to issue a maximum of 10,205,566 shares of common stock pursuant to awards under the 2006 Plan. Pursuant to the terms of the 2006 Plan, the maximum number of shares of common stock subject to the plan automatically increased on the first day of each subsequent calendar year through January 1, 2016, by the lesser of (i)  5.0% of the number of shares of common stock that are issued and outstanding as of the first day of the calendar year, and (ii)  1,200,000 shares of common stock, subject to adjustment for certain corporate actions. At January 2, 2016, the Company had 1,179,375 shares available for issuance under the 2006 Plan.  Options granted under the 2000 Plan and the 2006 Plan equity incentive plans primarily vest at a rate of at least 25% per year over four years and expire 10  years from the date of grant.

F- 32

Table of Contents

A summary of the Company's common stock option activity is presented below (shares in thousands):

| | Options Outstanding | | | |
|---|---|---|---|---|
| | Number of Shares (in thousands) | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (in years) | Aggregate Intrinsic Value (in thousands) |
| Options outstanding - December 28, 2013 | 5,837 | $ 2.58 | | |
| Options granted | 2,115 | 1.46 | | |
| Options exercised | (303) | 0.51 | | |
| Options cancelled | (415) | 1.57 | | |
| Options outstanding - December 27, 2014 | 7,234 | 2.40 | | |
| Options granted | 2,515 | 0.81 | | |
| Options exercised | (10) | 0.73 | | |
| Options cancelled | (795) | 2.06 | | |
| Options outstanding - January 2, 2016 | 8,944 | $ 1.98 | 6.5 | $ 757 |
| Options exercisable - January 2, 2016 | 5,159 | $ 2.70 | 5.1 | $ 240 |
| Options exercisable and expected to vest - January 2, 2016 | 8,319 | $ 2.07 | 6.5 | $ 650 |

The following table summarizes information about stock options outstanding and exercisable at January 2, 2016:

| | Options Outstanding | | | Options Exercisable | | |
|---|---|---|---|---|---|---|
| Exercise Price Range | Number of shares (in thousands) | Weighted Average Remaining Contractual Life (in years) | Weighted Average Exercise Price | Number of shares (in thousands) | Weighted Average Remaining Contractual Life (in years) | Weighted Average Exercise Price |
| $0.20 - $1.00 | 4,076 | 8.3 | $ 0.70 | 1,435 | 7.0 | $ 0.72 |
| $1.01 - $3.00 | 3,224 | 6.2 | $ 1.88 | 2,124 | 5.3 | $ 2.00 |
| $3.01 - $5.00 | 779 | 5.9 | $ 3.58 | 735 | 5.9 | $ 3.58 |
| $5.01 - $8.45 | 865 | 0.6 | $ 6.98 | 865 | 0.6 | $ 7.00 |
| | 8,944 | 6.5 | $ 1.98 | 5,159 | 5.1 | $ 2.70 |

F- 33

The following table summarizes the Company's restricted stock awards (shares in thousands):

| | Restricted Stock Outstanding | |
| --- | --- | --- |
| | Number of Shares | Weighted-Average Grant-Date Fair Value per Share |
| Balance outstanding at December 28, 2013 | 54 | $ 3.17 |
| Restricted stock granted | - | - |
| Restricted stock vested | (50) | 3.30 |
| Restricted stock forfeited | (2) | 1.51 |
| Balance outstanding at December 27, 2014 | 2 | $ 1.51 |
| Restricted stock granted | - | - |
| Restricted stock vested | (1) | 1.51 |
| Restricted stock forfeited | (1) | 1.51 |
| Balance outstanding at January 2, 2016 | - | $ - |

The following table presents details of the assumptions used to calculate the weighted-average grant date fair value of common stock options granted by the Company:

| | Year Ended | |
| --- | --- | --- |
| | January 2, 2016 | December 27, 2014 |
| Expected term (in years) | 6.2 | 6.3 |
| Expected volatility | 113 % | 124 % |
| Risk-free interest rate | 1.65 % | 1.86 % |
| Expected dividends | $ - | $ - |
| Weighted-average grant date fair value per share | $ 0.69 | $ 1.29 |
| Grant date fair value of options vested | $ 1,692 | $ 1,842 |
| Intrinsic value of options exercised (in thousands) | $ 5 | $ 410 |

At January 2, 2016 , the amount of unearned stock-based compensation currently estimated to be expensed from 201 6 through 201 8   related to unvested common stock options is approximately $2.8   million , net of estimated forfeitures. The weighted-average period over which the unearned stock-based compensation is expected to be recognized is approximately 2.4 years. If there are any modifications or cancellations of the underlying unvested awards, the Company may be required to accelerate, increase or cancel any remaining unearned stock-based compensation expense or calculate and record additional expense.  Future stock-based compensation expense and unearned stock-based compensation will increase to the extent that the Company grants additional common stock options or other stock-based awards.

**Warrants**

Concurrently with the execution of the SVIC Purchase Agreement (see Note 5), the Company issued to SVIC a warrant to purchase an aggregate of 2,000,000 shares of the Company's common stock at an exercise price of $0.30 per share, with a relative fair value of  approximately $1,165,000 which was recorded as a debt discount.

In connection with the termination of the 2013 Loan Agreement with Fortress and the Letter Agreement with Drawbridge, the Company issued to Fortress the Fortress Warrant and amended the exercise price per share of the Drawbridge Warrant. See Note 5 for further information. The Fortress Warrant and amended Drawbridge Warrant were valued using the Black-Scholes option pricing model which computed an estimated fair value of   $624,000 and an estimated incremental fair value of $129,000 , respectively.

In November 2015, the Company issued warrants to purchase an aggregate of 300,000 and 60,000 shares of the Company's stock at an exercise price of $0.64 and $0.45 , respectively, to two law firms as partial consideration for legal

F- 34

services rendered. The warrants were valued at approximately $185,000 and $49,000 , respectively, based on their fair values.

A summary of the Company's warrant activity is presented below:

| | Number of Shares (in thousands) | | Weighted-Average Exercise Price |
|---|---|---|---|
| Warrants outstanding - December 28, 2013 | 5,023 | $ | 0.95 |
| Warrant granted | - | | - |
| Warrants exercised | (750) | | 0.89 |
| Warrants outstanding - December 27, 2014 | 4,273 | $ | 0.96 |
| | | | |
| Warrant granted | 3,360 | | 0.38 |
| Warrants exercised | - | | - |
| Warrants outstanding - January 2, 2016 | 7,633 | $ | 0.59 |

**Note 9 —401(k) Plan**

The Company sponsors a 401(k) defined contribution plan. Employees are eligible to participate in this plan provided they are employed full-time and have reached 21 years of age. Participants may make pre-tax contributions to the plan subject to a statutorily prescribed annual limit. Each participant is fully vested in his or her contributions and investment earnings. The Company may make matching contributions on the contributions of a participant on a discretionary basis. In fiscal 2012, the Company adopted a limited matching contribution policy and made approximately $ 0 . 09 and $0.0 8 million in contributions to participants in this plan in the year s ended January 2, 2016 and December 27, 2014 , respectively.

**Note 1 0 -Major Customers, Suppliers and Products**

The Company's product sales have historically been concentrated in a small number of customers. The following table sets forth sales to customers comprising 10% or more of the Company's net product sales as follows:

| | Year Ended | |
|---|---|---|
| | January 2, 2016 | December 27, 2014 |
| Customer A | 27 % | 20 % |
| Customer B | * | 14 % |
| Customer C | * % | 19 % |
| Customer D | 10 % | * % |

---

\* less than 10% of total net product sales

Sales of the Company's NVvault™ products represented 20 % and 44 % of net product sales in 201 5 and 201 4 .

The Company's accounts receivable are concentrated with three customer s at January 2, 2016 representing approximately 24 % , 19 % and 1 4 % of aggregate gross receivables. At December 27, 2014 , three customer s represented approximately 13 % , 4 9% and 11% of aggregate gross receivables. A significant reduction in sales to, or the inability to collect receivables from, a significant customer could have a material adverse impact on the Company. The Company mitigates risk with foreign receivables by purchasing comprehensive foreign credit insurance.

F- 35

The Company's purchases have historically been concentrated in a small number of suppliers. The following table sets forth purchases from suppliers comprising 10% or more of the Company's total purchases as follows:

|  | Year Ended | |
|  | January 2, 2016 | December 27, 2014 |
| --- | --- | --- |
| Supplier A | 14 % | 10 % |
| Supplier B | 12 % | * |

\*     less than 10% of total purchases

While the Company believes alternative suppliers could be utilized, any inability to obtain components or products in the amounts needed on a timely basis or at commercially reasonable prices could result in delays in product introductions, interruption in product shipments or increases in product costs, which could have a material adverse effect on the Company.

**Note 11 —Segment and Geographic Information**

The Company operates in one reportable segment: the design and manufacture of high-performance memory subsystems for the server, high-performance computing and communications markets. The Company evaluates financial performance on a company-wide basis.

To date, a majority of the Company's international sales relate to shipments of products to its U.S. customers' international manufacturing sites or third - party hubs. Net product sales derived from shipments to international destinations, primarily to Hong Kong (including foreign subsidiaries of customers that are headquartered in the U.S.), represented approximately 48 % and 33 % of the Company's net product sales in 201 5 and 201 4 , respectively. All of the Company's net sales to date have been denominated in U.S. dollars.

As of January 2, 2016 and December 27, 2014 , approximately $0. 1 million and $ 0. 2 million, respectively, of the Company's long-lived assets, net of depreciation and amortization, were located outside the U.S., primarily in the PRC. Substantially all other long-lived assets were located in the U.S.

**Note 1 2 —Subsequent Events**

The Company has evaluated subsequent events through the filing date of this Annual Report on Form 10-K and determined that no subsequent events have occurred that would require recognition in the consolidated financial statements or disclosures in the notes thereto other than as discussed in the accompanying notes.

F- 36

**Note 13—Quarterly Summary (Unaudited, in thousands except per share data)**

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | January 2, 2016 | September 26, 2015 | June 27, 2015 | March 28, 2015 |
| Net product sales | $ 1,709 | $ 1,617 | $ 1,429 | $ 2,114 |
| NRE revenue | 1,143 | - | - | - |
| Total net revenues | 2,852 | 1,617 | 1,429 | 2,114 |
| Cost of sales | 1,583 | 1,593 | 1,324 | 1,415 |
| Gross profit | 1,269 | 24 | 105 | 699 |
| Operating expenses: | | | | |
| Research and development | 1,680 | 1,449 | 1,536 | 1,384 |
| Intellectual property legal fees, net of settlement transactions | (1,091) | 899 | 2,238 | 3,542 |
| Selling, general and administrative | 2,628 | 1,710 | 1,744 | 1,759 |
| Total operating expenses | 3,217 | 4,058 | 5,518 | 6,685 |
| Operating loss | (1,948) | (4,034) | (5,413) | (5,986) |
| Other expense, net: | | | | |
| Interest expense, net | (648) | (447) | (489) | (480) |
| Other income (expense), net | (1,749) | (889) | 1,548 | 9 |
| Total other expense, net | (2,397) | (1,336) | 1,059 | (471) |
| Loss before provision for income taxes | (4,345) | (5,370) | (4,354) | (6,457) |
| Provision for income taxes | - | - | - | 1 |
| Net loss | $ (4,345) | $ (5,370) | $ (4,354) | $ (6,458) |
| Net loss per common share: | | | | |
| Basic and diluted | $ (0.09) | $ (0.11) | $ (0.09) | $ (0.14) |
| Weighted-average common shares outstanding: | | | | |
| Basic and diluted | 50,353 | 50,354 | 50,354 | 44,708 |

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | December 27, 2014 | September 27, 2014 | June 28, 2014 | March 29, 2014 |
| Net sales | $ 2,516 | $ 4,791 | $ 4,887 | $ 7,001 |
| Cost of sales | 2,629 | 3,678 | 3,908 | 5,016 |
| Gross profit | (113) | 1,113 | 979 | 1,985 |
| Operating expenses: | | | | |
| Research and development | 1,234 | 1,305 | 1,168 | 878 |
| Intellectual property legal fees | 2,465 | 1,692 | 1,134 | 1,097 |
| Selling, general and administrative | 1,611 | 1,782 | 1,781 | 1,622 |
| Total operating expenses | 5,310 | 4,779 | 4,083 | 3,597 |
| Operating loss | (5,423) | (3,666) | (3,104) | (1,612) |
| Other expense, net: | | | | |
| Interest expense, net | (393) | (393) | (393) | (395) |
| Other income (expense), net | 5 | - | 6 | (11) |
| Total other expense, net | (388) | (393) | (387) | (406) |
| Loss before provision for income taxes | (5,811) | (4,059) | (3,491) | (2,018) |
| Provision for income taxes | - | - | 2 | - |
| Net loss | $ (5,811) | $ (4,059) | $ (3,493) | $ (2,018) |
| Net loss per common share: | | | | |
| Basic and diluted | $ (0.14) | $ (0.10) | $ (0.08) | $ (0.05) |
| Weighted-average common shares outstanding: | | | | |
| Basic and diluted | 41,483 | 41,472 | 41,472 | 36,881 |

F- 37

Table of Contents

Each of the Company's quarters in fiscal 2015 was comprised of 13 weeks, except for the fourth quarter which consisted of 14 weeks.  Each of the Company's quarters in fiscal 2014 was comprised of 13 weeks.

Quarterly and year-to-date computations of per share amounts are made independently. Therefore, the sum of per share amounts for the quarters may not agree with the per share amounts for the year.

F- 38

Exhibit 10.20

# INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT, dated November 18 , 2015 , is entered into between **SVIC NO. 28 NEW TECHNOLOGY BUSINESS INVESTMENT L.L.P.** (" Creditor "), and **SILICON VALLEY BANK** (" Bank "). Creditor and Bank are sometimes referred to herein as the " Secured Parties ."

## RECITALS

A.       Netlist, Inc., a Delaware corporation (" Borrower "), and Creditor have entered into the Security Agreement, dated as of November 18 , 2015, a true copy of which is attached hereto as Exhibit A (as amended from time to time, the " Creditor Security Agreement ").  The Creditor Security Agreement and the documents executed in connection therewith, including without limitation the Purchase Agreement and the Note (each as defined in the Creditor Security Agreement) and the Creditor Control Agreement s , each as amended from time to time, are referred to in this Agreement as the " Creditor Loan Documents ." All of Borrower's present and future indebtedness, liabilities and obligations under or in connection with the Creditor Loan Documents are referred to in this Agreement collectively as the " Creditor Debt ."

B.       Borrower and Bank have entered into a Loan and Security Agreement, dated as of October 31, 2009 (as amended from time to time, the " Bank Loan Agreement ").  The Bank Loan Agreement and the documents executed in connection therewith are referred to in this Agreement as the " Bank Loan Documents ." All of Borrower's present and future indebtedness, liabilities and obligations under or in connection with the Bank Loan Documents are referred to in this Agreement collectively as the " Bank Debt ."  Creditor Debt and Bank Debt are referred to herein collectively as " Secured Party Debt " and Bank Documents and the Creditor Loan Documents are referred to herein collectively as " Loan Documents ."

The parties agree as follows:

1.       Definitions .  As used in this Agreement, the following terms have the following meanings:

(a) " Accounts Collateral " means Borrower's present and future "accounts" (as defined in the UCC), including accounts arising from testing and other services performed, or goods created, by Borrower using patents, copyrights or other intellectual property of Borrower, but not including proceeds of any sale of any Creditor Priority Collateral.

(b) " Bank Priority Collateral " means any and all properties, rights and assets of Borrower described on Exhibit B, but excluding the Creditor Priority Collateral.

(a) " Bankruptcy Code " means the federal bankruptcy law of the United States as from time to time in effect, currently as Title 11 of the United States Code.  Section references

to current sections of the Bankruptcy Code shall refer to comparable sections of any revised version thereof if section numbering is changed.

(b) " Claim " means, (i) in the case of Bank, any and all present and future "claims" (used in its broadest sense, as contemplated by and defined in Section 101(5) of the Bankruptcy Code, but without regard to whether such claim would be disallowed under the Bankruptcy Code) of Bank now or hereafter arising or existing under or relating to the Bank Loan Documents, whether joint, several, or joint and several, whether fixed or indeterminate, due or not yet due, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, or disputed or undisputed, whether under a guaranty or a letter of credit, and whether arising under contract, in tort, by law, or otherwise, any interest or fees thereon (including interest or fees that accrue after the filing of a petition by or against Borrower under the Bankruptcy Code, irrespective of whether allowable under the Bankruptcy Code), any costs of Enforcement Actions, including reasonable attorneys' fees and costs, and any prepayment or termination, and (ii) in the case of Creditor, any and all present and future "claims" (used in its broadest sense, as contemplated by and defined in Section 101(5) of the Bankruptcy Code, but without regard to whether such claim would be disallowed under the Bankruptcy Code) of Creditor now or hereafter arising or existing under or relating to the Creditor Loan Documents, whether joint, several, or joint and several, whether fixed or indeterminate, due or not yet due, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, or disputed or undisputed, whether under a guaranty or a letter of credit, and whether arising under contract, in tort, by law, or otherwise, any interest or fees thereon (including interest or fees that accrue after the filing of a petition by or against Borrower under the Bankruptcy Code, irrespective of whether allowable under the Bankruptcy Code), any costs of Enforcement Actions, including reasonable attorneys' fees and costs, and any prepayment or termination.

(c)     " Collateral " means, collectively, Creditor Priority Collateral and Bank Priority Collateral.

(d) " Common Collateral " means all Collateral in which both Bank and Creditor have a security interest.

(e) " Creditor Priority Collateral " means (i) all letters patent of Borrower, or rights corresponding thereto, in the United States or in any other country, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto, in the United States or any other country, including, without limitation, improvements, divisions, continuations and continuations in part of the same,  (ii) all written or oral agreements granting any right to the Borrower with respect to any invention on which a patent is in existence or a patent application is pending, in which agreement the Borrower now holds or hereafter acquires any interest, and all license fees and royalties arising therefrom and (iii) the proceeds of any sale of the foregoing , but excluding any Accounts Collateral.

(f) " Creditor Control Agreement s " means (i) that certain Deposit Account Control Agreement, dated as of November 12 , 2015, among Creditor, Borrower and Silicon Valley Bank, as account bank ("Account Bank") and (ii) that certain Securities Account Control Agreement, dated as of November 12 , 2015, among Creditor, Borrower, U.S. Bank, N.A., as securities intermediary, and SVB Asset Management, as investment advisor .

2

(g) " Enforcement Action " means, with respect to any Secured Party and with respect to any Claim of such Secured Party or any item of Collateral in which such Secured Party has or claims a security interest, lien, or right of offset, any action, whether judicial or nonjudicial, to repossess, collect, offset, recoup, give notification to third parties with respect to, sell, dispose of, foreclose upon, give notice of sale, disposition, or foreclosure with respect to, or obtain equitable or injunctive relief with respect to, such Claim or Collateral.  The filing by any Secured Party of, or the joining in the filing by any Secured Party of, an involuntary bankruptcy or insolvency proceeding against Borrower also is an Enforcement Action.

(h) " Event of Default " means an "Event of Default" under the Bank Loan Documents or the Creditor Loan Documents.

(i) " Proceeds of Collection " means, collectively, the proceeds of all Collateral, or any part thereof, and the proceeds of any remedy with respect to such Collateral under the Loan Documents after the occurrence and during the continuance of an Event of Default.

(j) " UCC " means the Uniform Commercial Code as in effect from time to time in the State of California or any other applicable jurisdiction.

2.      Priorities .

(a) Notwithstanding any contrary priority established by the time or order of attachment or perfection of any security interest or the time or order of filing of any financing statements or other documents, or the giving of any notices of purchase money security interests or other notices, or possession or control of any Collateral, or any statutes, rules or law, or court decisions to the contrary, the Secured Parties agree that:

(i) all security interests now or hereafter acquired by Creditor in the Creditor Priority Collateral shall at all times be prior and superior to all security interests and other interests and claims now held or hereafter acquired by Bank in Creditor Priority Collateral;

(ii) all security interests now or hereafter acquired by Bank in the Bank Priority Collateral shall at all times be prior and superior to all security interests and other interests or claims now held or hereafter acquired by Creditor in the Bank Priority Collateral; and

(iii) the proceeds resulting from any sale, transfer or other disposition of the Collateral shall be distributed as provided in Section 5 below.

(b)      Each Secured Party hereby:

(i) acknowledges and consents to (A) Borrower granting to the other Secured Party a security interest in the Common Collateral of such other Secured Party, (B) the other Secured Party filing any and all financing statements and other documents as deemed necessary by the other Secured Party in order to perfect its security interest in its Common Collateral, and (C) Borrower's entry into the Loan Documents to which the other Secured Party is a party; and

3

(ii) acknowledges and agrees that the other Secured Party's Claims, the Borrower's entry into the applicable Loan Documents with the other Secured Party, and the security interests in the Common Collateral granted by Borrower to the other Secured Party shall be permitted under such Secured Party's Loan Documents, notwithstanding any provision of such Secured Party's Loan Documents to the contrary.

(c) If Creditor, for any reason, receives Bank Priority Collateral and receives a written notice from Bank that an Event of Default has occurred under the Bank Loan Documents and a demand for possession of the Bank Priority Collateral, Creditor shall promptly deliver any such Bank Priority Collateral in Creditor's possession to Bank.  If Bank, for any reason, receives Creditor Priority Collateral and receives a written notice from Creditor that an Event of Default has occurred under the Creditor Loan Documents and a demand for possession of the Creditor Priority Collateral, Bank shall promptly deliver any such Creditor Priority Collateral in Bank's possession to Creditor.

3.    Permitted Payments of Creditor Debt .

(a)    Except as otherwise provided for in this Agreement, Creditor will not demand or receive from Borrower (and Borrower will not pay to Creditor) any cash payment of all or any part of the Creditor Debt, by way of payment, prepayment, setoff or otherwise, until such time as (i) the Bank Debt has been fully paid in cash, (ii) Bank has no commitment or obligation to lend any further funds to Borrower under the Bank Loan Documents, and (iii) all of the Bank Loan Documents are terminated (such time, " Bank Payment in Full ").

(b)    Notwithstanding the foregoing prohibition on Creditor receiving (and Borrower paying) any cash payment of any of the Creditor Debt, Creditor shall be entitled to receive the proceeds of any sale of the Collateral as provided herein.   Further, nothing in this Agreement shall prohibit Creditor from converting all or any part of the Creditor Debt into equity securities of Borrower or exercising any warrants issued to Creditor, provided that, if such securities have any call, put or other conversion features that would obligate Borrower to pay any cash dividends or distributions to Creditor, Creditor hereby acknowledges the Bank Loan Agreement evidencing the Bank Debt may prohibit Borrower from paying or making such dividends or distributions to Creditor and, to the extent Creditor has knowledge that Borrower is so prohibited by the Bank Loan Agreement, Creditor will not accept such cash dividends or distribution.

(c)    Creditor shall promptly deliver to Bank in the form received (except for endorsement or assignment by Creditor where required by Bank) for application to the Bank Debt any cash payment, distribution or proceeds received by Creditor with respect to the Creditor Debt other than in accordance with this Agreement.

4.    Secured Parties' Rights .

(a) Except as otherwise provided for in this Agreement, Creditor agrees that Bank may at any time, and from time to time, without the consent of Creditor and without notice to Creditor, renew or extend any of the Bank Debt, accept partial payments of the Bank Debt, settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate

4

any of the Bank Debt, release, exchange, fail to perfect, delay the perfection of, fail to resort to, or realize upon any Bank Priority Collateral, or change, alter or vary any other terms or provisions of the Bank Debt (other than any increase in the maximum principal amount of the Bank Debt), and take any other action or omit to take any other action with respect to its Bank Debt as it deems necessary or advisable in its sole discretion.  No amendment of the Bank Loan Documents shall directly or indirectly modify the provisions of this Agreement in any manner that might terminate or impair the subordination of the security interest or lien that Bank may have in the Creditor Priority Collateral.

(b) Except as otherwise provided for in this Agreement, Bank agrees that Creditor may at any time, and from time to time, without the consent of Bank and without notice to Bank, renew or extend any of the Creditor Debt, accept partial payments of the Creditor Debt, settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of the Creditor Debt, release, exchange, fail to perfect, delay the perfection of, fail to resort to, or realize upon any Creditor Priority Collateral, or change, alter or vary any other terms or provisions of the Creditor Debt (other than any increase in the interest rate applicable to, or the maximum principal amount of the Creditor Debt, or any change in the dates on which payments are to be made with respect to the Creditor Debt (other than extensions of time)) and take any other action or omit to take any other action with respect to its Creditor Debt as it deems necessary or advisable in its sole discretion. No amendment of the Creditor Loan Documents shall directly or indirectly modify the provisions of this Agreement in any manner that might terminate or impair the subordination of the security interest or lien that Creditor may have in the Bank Priority Collateral.

(c) Creditor and Bank each waive any right to require the other to marshal any Collateral or other assets in favor of it or against or in payment of any or all of its Secured Party Debt.

(d) Except as otherwise provided for herein, prior to Bank Payment in Full, Bank shall have the sole and exclusive right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of Bank Priority Collateral of Borrower except in accordance with the terms of the Bank Debt.  Bank agrees to provide Creditor with at least ten (10) days' prior written notice of any such sale, transfer or disposition of the Bank Priority Collateral approved by Bank.  Upon written notice from Bank to Creditor of Bank's agreement to release its lien on all or any portion of the Bank Priority Collateral in connection with the sale, transfer or other disposition thereof by Bank (or by Borrower with consent of Bank), Creditor shall be deemed to have also, automatically and simultaneously, released its lien on the Bank Priority Collateral, and Creditor shall upon written request by Bank, promptly take such action as shall be necessary or appropriate to evidence and confirm such release.  All proceeds resulting from any such sale, transfer or other disposition shall be applied as provided in Section 5 below.  If Creditor fails to release its lien as required hereunder, Creditor hereby appoints Bank as attorney in fact for Creditor with full power of substitution to release Creditor's liens in the Bank Priority Collateral as provided hereunder.  Such power of attorney being coupled with an interest shall be irrevocable.

(e) Except as otherwise provided for herein, until such time as (a) the Creditor Debt has been fully paid, (b) Creditor has no commitment or obligation to lend any further funds

5

to Borrower under the Creditor Loan Documents, and (b) all of the Creditor Loan Documents are terminated (such time, " Creditor Payment in Full "), Creditor shall have the sole and exclusive right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of Creditor Priority Collateral of Borrower except in accordance with the terms of the Creditor Debt.  Creditor agrees to provide Bank with at least ten (10) days' prior written notice of any such sale, transfer or disposition of the Creditor Priority Collateral approved by Creditor.  Upon written notice from Creditor to Bank of Creditor's agreement to release its lien on all or any portion of the Creditor Priority Collateral in connection with the sale, transfer or other disposition thereof by Creditor (or by Borrower with consent of Creditor), Bank shall be deemed to have also, automatically and simultaneously, released its lien on the Creditor Priority Collateral, and Bank shall upon written request by Creditor, promptly take such action as shall be necessary or appropriate to evidence and confirm such release.  All proceeds resulting from any such sale, transfer or other disposition shall be applied as provided in Section 5 below.  If Bank fails to release its lien as required hereunder, Bank hereby appoints Creditor as attorney in fact for Bank with full power of substitution to release Bank's liens in the Creditor Priority Collateral as provided hereunder.  Such power of attorney being coupled with an interest shall be irrevocable.

     5.    <u>Actions/Remedies</u> .

     (a) Creditor shall be free at all times to exercise or to refrain from exercising any and all rights and remedies it may have with respect to the Creditor Priority Collateral.  In conducting any public or private sale under the UCC of the Creditor Priority Collateral, Creditor shall give Bank such notice of such sale as may be required by the UCC.  Bank shall be free at all times to exercise or to refrain from exercising any and all rights and remedies it may have with respect to the Bank Priority Collateral.  In conducting any public or private sale under the UCC of the Bank Priority Collateral, Bank shall give Creditor such notice of such sale as may be required by the UCC.

     (b) Whether or not an Event of Default has occurred, (i) Creditor shall not collect, take possession of, foreclose upon, or exercise any other rights or remedies with respect to the Bank Priority Collateral, judicially or nonjudicially (including without limitation the exercise of any remedies with respect to Bank Priority Collateral in any bankruptcy or insolvency proceeding relating to Borrower), without the prior written consent of Bank, until Bank Payment in Full and (ii) Bank shall not collect, take possession of, foreclose upon, or exercise any other rights or remedies with respect to the Creditor Priority Collateral, judicially or nonjudicially (including without limitation the exercise of any remedies with respect to Creditor Priority Collateral in any bankruptcy or insolvency proceeding relating to Borrower), without the prior written consent of Creditor, until Creditor Payment in Full.

     (c) Notwithstanding anything to the contrary in the Loan Documents, as among the Secured Parties, the Proceeds of Collection of all of the Bank Priority Collateral shall, upon receipt by either Secured Party, be paid to and applied as follows:

     (i) <u>First</u> , to the payment of then outstanding reasonable out-of-pocket costs and expenses of Bank expended to preserve the value of the Bank Priority Collateral, of

6

foreclosure or suit with respect to Bank Priority Collateral, if any, and of such sale with respect to the Bank Priority Collateral;

        (ii)    <u>Second</u> , to Bank in an amount up to Bank's Claims until Bank Payment in Full;

        (iii) <u>Third</u> , to Creditor in an amount up to Creditor's Claims until Creditor Payment in Full;

        (iv) <u>Fourth</u> , to Borrower, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

        (d) Notwithstanding anything to the contrary in the Loan Documents, as among the Secured Parties, the Proceeds of Collection of all of the Creditor Priority Collateral shall, upon receipt by either Secured Party, be paid to and applied as follows:

        (i) <u>First</u> , to the payment of then outstanding reasonable out-of-pocket costs and expenses of Creditor expended to preserve the value of the Creditor Priority Collateral, of foreclosure or suit with respect to Creditor Priority Collateral, if any, and of such sale with respect to the Creditor Priority Collateral;

        (ii) <u>Second</u> , to Creditor in an amount up to Creditor's Claims until Creditor Payment in Full;

        (iii)    <u>Third</u> , to Bank in an amount up to Bank's Claims until Bank Payment in Full;

        (iv) <u>Fourth</u> , to Borrower, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

    6. <u>No Commitment by Secured Parties</u> .  This Agreement shall in no way be construed as a commitment or agreement by Creditor or Bank to provide financing to the Borrower or continue financing arrangements with Borrower.  Creditor and Bank may terminate such arrangements at any time, in accordance with their agreements with Borrower.

    7. <u>Option to Purchase</u> .  Bank hereby grants Creditor an option to purchase all Bank Debt and all security and collateral therefor and all guarantees thereof for a purchase price (" <u>Purchase Price</u> ") equal to the total unpaid principal balance of the Bank Debt, plus all accrued and unpaid interest thereon, and all out-of-pocket fees, costs and expenses incurred by Bank in connection therewith.  This option may be exercised by Creditor at any time by giving written notice thereof to Bank.  Within five business days after written notice of the exercise of this option is given, Creditor shall pay Bank the Purchase Price in immediately available funds, and Bank shall execute assignments of the Bank Debt and all documents and instruments relating thereto, in such form as Creditor shall reasonably request, but without recourse, warranty or representation of any kind on the part of Bank, except a warranty as to (i) the unpaid balance of the Bank Debt, (ii) that Bank has good title to the Bank Debt, free and clear of liens, claims and encumbrances created or authorized by Bank and (iii) that Bank has the right to assign the Bank Debt, and that such assignment is duly authorized.  To the extent any Bank Services (as defined

7

in the Bank Loan Agreement), including, without limitation, letters of credit and cash management services, are not assigned to Creditor, such Bank Services shall be cash collateralized by Borrower in form and substance satisfactory to Bank in its discretion.

8. <u>Insurance</u> .  Subject to the terms of this Agreement, the Secured Party having a senior security interest or lien in the Collateral shall, subject to such Secured Party's rights under its agreements with Borrower, have the sole and exclusive right (but not the obligation), as against the other Secured Party, to adjust settlement of any insurance policy in the event of any loss affecting such Collateral.  All proceeds of such policy shall be applied by the Secured Party having the senior security interest as set forth in Section 5 of this Agreement.

9.      <u>Bankruptcy</u> .

(a)      In the event of Borrower's insolvency, reorganization or any case or proceeding under any bankruptcy or insolvency law or laws relating to the relief of debtors, including, without limitation, any voluntary or involuntary bankruptcy, insolvency, receivership or other similar statutory or common law proceeding or arrangement involving Borrower, the readjustment of its liabilities, any assignment for the benefit of its creditors or any marshalling of its assets or liabilities (each, an " <u>Insolvency Proceeding</u> "), (a) this Agreement shall remain in full force and effect in accordance with Section 510(a) of the United States Bankruptcy Code, (b) each Secured Party's Collateral shall include, without limitation, all Collateral arising during or after any such Insolvency Proceeding, and (c) all payments and distributions of any kind or character, whether in cash or property or securities, in respect of the Secured Parties' Claims shall be distributed pursuant to the provisions of Section 5 hereof.

(b)      Until Bank Payment in Full, Creditor irrevocably appoints Bank as Creditor's attorney-in-fact, and grants to Bank a power of attorney with full power of substitution, in the name of Creditor or in the name of Bank, for the use and benefit of Bank, with prior notice to Creditor, to file the appropriate claim or claims in respect of the Creditor Debt on behalf of Creditor in any Insolvency Proceeding involving Borrower, if Creditor does not do so prior to 20 days before the expiration of the time to file claims in such Insolvency Proceeding and if Bank elects, in its sole discretion, to file such claim or claims.

(c)      In addition to and without limiting the foregoing, if an Insolvency Proceeding occurs:  (i) neither Secured Party shall assert or approve, without the prior written consent of the other Secured Party, any claim, motion, objection or argument in respect of the Collateral in connection with any Insolvency Proceeding which could otherwise be asserted or raised in connection with such Insolvency Proceeding, including, without limitation, any claim, motion, objection or argument seeking adequate protection or relief from the automatic stay in respect of the Collateral, which is inconsistent with the terms of this Agreement, (ii) Bank may consent to the use of cash collateral on such terms and conditions and in such amounts as it shall in good faith determine without seeking or obtaining the consent of Creditor as (if applicable) holder of an interest in the Collateral and, if use of cash collateral by Borrower is consented to by Bank, Creditor shall not oppose such use of cash collateral on the basis that Creditor's interest in the Collateral (if any) is impaired by such use or inadequately protected by such use, so long as (x) Creditor retains a lien on such Collateral (including proceeds thereof arising after the commencement of such Insolvency Proceeding) with the same priority as existed prior to the

8

commencement of the case under the Bankruptcy Code, (ii) Creditor receives a replacement lien on post-petition assets to the same extent granted to Bank, with the same priority as existed prior to the commencement of the case under the Bankruptcy Code, (iii) Creditor shall not object to, or oppose, any sale or other disposition of any assets comprising all or part of the Bank Priority Collateral, free and clear of security interests, liens and claims of any party, including Creditor, under Section 363 of the United States Bankruptcy Code or otherwise, on the basis that the interest of Creditor in the Collateral (if any) is impaired by such sale or inadequately protected as a result of such sale, or on any other ground , if Bank has consented to, or supports, such sale or disposition of such assets, provided that to the extent the Proceeds of Collection of such Collateral are not applied to reduce the Bank Debt, Creditor shall retain a lien on such Proceeds of Collection in accordance with the terms of this Agreement and (iv) Bank shall not object to, or oppose, any sale or other disposition of any assets comprising all or part of the Creditor Priority Collateral, free and clear of security interests, liens and claims of any party, including Bank, under Section 363 of the United States Bankruptcy Code or otherwise, on the basis that the interest of Bank in the Collateral (if any) is impaired by such sale or inadequately protected as a result of such sale, or on any other ground, if Creditor has consented to, or supports, such sale or disposition of such assets, provided that to the extent the Proceeds of Collection of such Collateral are not applied to reduce the Creditor Debt, Bank shall retain a lien on such Proceeds of Collection in accordance with the terms of this Agreement.

(d)     Nothing in this Section 9 shall preclude any Secured Party from seeking to be the purchaser, assignee or other transferee of any Collateral in connection with any sale or other disposition of Collateral under the Bankruptcy Code.  Bank agrees that Creditor shall have the right to credit bid under Section 363(k) of the Bankruptcy Code with respect to the Bank Priority Collateral, and Creditor agrees that Bank shall have the right to credit bid under Section 363(k) of the Bankruptcy Code with respect to the Bank Priority Collateral.

10. Notice of Events of Default .  Each Secured Party shall give the other Secured Party prompt written notice of the occurrence of an Event of Default under its Loan Documents, and shall, simultaneously with giving any notice of default to Borrower, provide such other Secured Party with a copy of any notice of default given to Borrower.  Neither Secured Party will incur liability for negligently or inadvertently failing to provide such notice to the other Secured Party.  Creditor acknowledges and agrees that any default or event of default under the Creditor Loan Documents shall be deemed to be a default and an event of default under the Bank Loan Documents.

11. Revivor .  If, after payment of any Bank Debt, Borrower thereafter becomes liable to Bank on account of the Bank Debt, or any payment made on the Bank Debt shall for any reason be required to be returned or refunded by Bank, this Agreement shall thereupon in all respects become effective with respect to such subsequent or reinstated Bank Debt, without the necessity of any further act or agreement between Secured Parties.  If, after payment of any Creditor Debt, Borrower thereafter becomes liable to Creditor on account of the Creditor Debt, or any payment made on the Creditor Debt shall for any reason be required to be returned or refunded by Creditor, this Agreement shall thereupon in all respects become effective with respect to such subsequent or reinstated Creditor Debt, without the necessity of any further act or agreement between Secured Parties.

9

12. <u>Notices</u> .  Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except informal documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by certified mail, postage prepaid, return receipt requested, or by facsimile, or by reputable overnight delivery service, to the Secured Parties, at their respective addresses or fax numbers set forth below:

           If to Creditor:  SVIC No. 28 New Technology Business Investment L.L.P.
                            29F, Samsung Electronics Building
                            1320-10, Seocho 2-dong, Seocho-gu
                            Seoul 137-857, Korea
                            Attention:  Dr. Dong-su Kim, Vice President
                            Email:  dongkim@samsung.com

                            with a copy (which shall not constitute notice) to:

                            DLA Piper LLP (US)
                            2000 University Avenue
                            Palo Alto, California  94303
                            Attention:  Louis Lehot
                            Email:  louis.lehot@dlapiper.com

           If to Bank:     Silicon Valley Bank
                            4370 La Jolla Village Drive, Suite 1050
                            San Diego, California 92122
                            Attn:  Mr. Andrew Skalitzky
                            Email: askalitzky@svb.com

                            with a copy (which shall not constitute notice) to:

                            Levy, Small & Lallas
                            815 Moraga Drive
                            Los Angeles, California  90049
                            Attention:  Angel F. Castillo
                            Email:  acastillo@lsl-la.com

       The Secured Parties may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

13. <u>Relationship Of Parties</u> .  The relationship between the Secured Parties is, and at all times shall remain solely that of lenders.  Secured Parties shall not under any circumstances be construed to be partners or joint venturers of one another; nor shall the Secured Parties under any circumstances be deemed to be in a relationship of confidence or trust or a fiduciary relationship with one another, or to owe any fiduciary duty to one another.  Secured Parties do not undertake or assume any responsibility or duty to one another to select, review, inspect, supervise, pass judgment upon or otherwise inform each other of any matter in connection with Borrower's property, any Collateral held by any Secured Party or the operations of Borrower.  Each Secured Party shall rely entirely on its own judgment with respect to such matters, and any

10

review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by any Secured Party in connection with such matters is solely for the protection of such Secured Party.

14. <u>Governing Law; Jurisdiction; Jury Trial Waiver.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflicts of laws principles.  Creditor and Bank submit to the exclusive jurisdiction of the state and federal courts located in Santa Clara County, California in any action, suit, or proceeding of any kind, against it which arises out of or by reason of this Agreement. **CREDITOR AND BANK WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN** .

15. <u>Judicial Reference</u> .   WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court.  The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive.  The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers.  All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed.  If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief.  The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings.  The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings.  The private judge shall oversee discovery and may enforce all discovery rules and order applicable to judicial proceedings in the same manner as a trial court judge.  The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a).  Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies.  The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

16. <u>General</u> .   Each Secured Party shall execute all such documents and instruments and take all such actions as the other shall reasonably request in order to carry out the purposes of this Agreement, including without limitation (if requested by a Secured Party) appropriate

11

amendments to financing statements in favor of the other Secured Party in order to refer to this Agreement (but this Agreement shall remain fully effective notwithstanding any failure to execute any additional documents, instruments, or amendments).  Each Secured Party represents and warrants to the other that it has not heretofore transferred or assigned any financing statement naming Borrower as debtor and it as secured party, and that it will not do so without first delivering a copy of this Agreement to the proposed transferee or assignee, and any transfer or assignment shall be subject to all of the terms of this Agreement.  This Agreement is solely for the benefit of Secured Parties and their successors and assigns, and neither the Borrower nor any other person (including any successor-in-interest) shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  This Agreement sets forth in full the terms of agreement between the Secured Parties with respect to the subject matter hereof, and may not be modified or amended, nor may any rights hereunder be waived, except in a writing signed by the Secured Parties.  In the event of any litigation between the parties based upon or arising out of this Agreement, the prevailing party shall be entitled to recover all of its reasonable costs and expenses (including without limitation reasonable attorneys' fees) from the non-prevailing party.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

      17.    <u>Limited Agency for Perfection</u> .

      (a)  Bank acknowledges that applicable provisions of the UCC may require, in order to properly perfect Creditor's security interest in the Common Collateral securing the Creditor Claims, that Creditor possess or control certain of such Common Collateral.  In order to help ensure that Creditor's security interest in such Common Collateral is properly perfected (but subject to and without waiving the other provisions of this Agreement), Bank agrees to hold both for itself and, solely for the purposes of perfection and without incurring any duties or obligations to Creditor as a result thereof or with respect thereto, for the benefit of Creditor, any such Common Collateral, and agrees that Creditor's lien in such Common Collateral shall be deemed perfected in accordance with applicable law.

      (b)  Creditor acknowledges that applicable provisions of the UCC may require, in order to properly perfect Bank's security interest in the Common Collateral securing the Bank Claims, that Bank possess or control certain of such Common Collateral.  In order to help ensure that Bank's security interest in such Common Collateral is properly perfected (but subject to and without waiving the other provisions of this Agreement), Creditor agrees to hold both for itself and, solely for the purposes of perfection and without incurring any additional duties or obligations to Bank as a result thereof or with respect thereto, for the benefit of Bank, any such Common Collateral, and agrees that Bank's lien in such Common Collateral shall be deemed perfected in accordance with applicable law.

      (c)  No party shall have, or be deemed to have, by this Agreement or otherwise a fiduciary relationship in respect of the other party.

[Signature Page Follows]

12

SILICON VALLEY BANK

SVIC NO. 28 NEW TECHNOLOGY
BUSINESS INVESTMENT L.L.P.

By _____

Title _____

By _____

Title _____

Signature Page to Intercreditor Agreement

BORROWER'S CONSENT AND AGREEMENT

Borrower consents to the terms of this Intercreditor Agreement and agrees not to take any actions inconsistent therewith.  Borrower agrees to execute all such documents and instruments and take all such actions as any Secured Party shall reasonably request in order to carry out the purposes of this Agreement. Borrower further agrees that, at any time and from time to time, the foregoing Agreement may be altered, modified or amended by the Creditor and Bank without notice to or the consent of Borrower.

NETLIST, INC.

By _____

Title _____

Exhibit A

Creditor Security Agreement

---

Exhibit B

Bank Priority Collateral

Bank Priority Collateral consists of all of Borrower's right, title and interest in and to the following personal property exclusive of Creditor Priority Collateral:

All right, title and interest of Borrower in and to the following, whether now owned or hereafter arising or acquired and wherever located: all Accounts; all Inventory; all Equipment; all Deposit Accounts; all General Intangibles (including without limitation all Intellectual Property); all Investment Property; all Other Property; and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, pro ceeds of proceeds and claims against third parties) of, all of the above, and all Borrower's books relating to any of the above.

As used above the following terms have the following meanings:

"Accounts" means all present and future "accounts" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all accounts receivable and other sums owing to Borrower.

"Deposit Accounts" means all present and future "deposit accounts" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all general and special bank accounts, demand accounts, checking accounts, savings accounts and certificates of deposit.

"Equipment" means all present and future "equipment" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"General Intangibles" means all present and future "general intangibles" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all Intellectual Property, payment intangibles, royalties, contract rights, goodwill, franchise agreements, purchase orders, customer lists, route lists, telephone numbers, domain names, claims, income tax refunds, security and other deposits, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"Intellectual Property" means all present and future (a) copyrights, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship

and derivative work thereof, whether published or unpublished, (b) trade secret rights, including all rights to unpatented inventions and know-how, and confidential information; (c) mask work or similar rights available for the protection of semiconductor chips; (d) patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same; (e) trademarks, servicemarks, trade styles, and trade names, whether or not any of the foregoing are registered, and all applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by any such trademarks; (f) computer software and computer software products; (g) designs and design rights; (h) technology; (i) all claims for damages by way of past, present and future infringement of any of the rights included above; (j) all licenses or other rights to use any property or rights of a type described above.

"Inventory" means all present and future "inventory" as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"Investment Property" means all present and future investment property, securities, stocks, bonds, debentures, debt securities, partnership interests, limited liability company interests, options, security entitlements, securities accounts, commodity contracts, commodity accounts, and all financial assets held in any securities account or otherwise, wherever located, and all other securities of every kind, whether certificated or uncertificated.

"Other Property" means the following as defined in the California Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and all rights relating thereto: all present and future "commercial tort claims", "documents", "instruments", "promissory notes", "chattel paper", "letters of credit", "letter-of-credit rights", "fixtures", "farm products" and "money"; and all other goods and personal property of every kind, tangible and intangible, whether or not governed by the California Uniform Commercial Code.

EXHIBIT 21.9

**SUBSIDIARIES**

Each of the following is a wholly owned direct subsidiary of Netlist, Inc.:

| Entity Name | Jurisdiction of Organization |
| --- | --- |
| Netlist Electronics (Suzhou) Co., Ltd | People ' s Republic of China |
| Netlist HK Limited | Hong Kong |

EXHIBIT 23

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Registration Statements Nos. 333-139435, 333-146141, 333-151644, 333-161832, 333-161834, 333-164261, 333-165916, 333-168330, 333-173646, 333-179776 and 333-193862 on Form S-8 and 333-164290, 333-177118 and 333-199446 on Form S-3 of our report dated March 4, 2016, relating to the consolidated financial statements of Netlist, Inc. and subsidiaries, appearing in this Annual Report on Form 10-K of Netlist, Inc. for the year ended January 2, 2016.


/s/KMJ Corbin & Company LLP


Costa Mesa, California
March 4, 2016

---

EXHIBIT 31.9

**CERTIFICATION PURSUANT TO RULE 13A - 14 OF THE SECURITIES EXCHANGE ACT OF 1934
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES -OXLEY ACT OF 2002**

I, Chun K. Hong, certify that:

1.      I have reviewed this Annual Report on Form 10 - K for the  fiscal year ended January 2, 2016 of Netlist, Inc., a Delaware corporation (the " Registrant " );

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.      The Registrant ' s other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a - 15(e) and 15d - 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a - 15(f) and 15d - 15(f)) for the Registrant and have:

     a)      D esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b)      D esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c)      E valuated the effectiveness of the Registrant ' s disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d)      D isclosed in this report any change in the Registrant ' s internal control over financial reporting that occurred during the Registrant ' s most recent quarter (the Registrant ' s fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant ' s internal control over financial reporting .

5.      The Registrant ' s other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant ' s auditors and the audit committee of the Registrant ' s board of directors (or persons performing the equivalent functions):

     a)      A ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant ' s ability to record, process, summarize and report financial information; and

     b)      A ny fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant ' s internal control over financial reporting.

March 4, 2016                                          /s/ Chun K. Hong
                                                      Chun K. Hong
                                                      *President, Chief Executive Officer and Chairman of
                                                      the Board (Principal Executive Officer)*

EXHIBIT 31.2

**CERTIFICATION PURSUANT TO RULE 13A - 14 OF THE SECURITIES EXCHANGE ACT OF 1934**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES -OXLEY ACT OF 2002**

I, Gail Sasaki , certify that:

1.       I have reviewed this Annual Report on Form 10 - K for the fiscal year ended January 2, 2016 of Netlist, Inc., a Delaware corporation (the " Registrant ");

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.       The Registrant ' s other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a - 15(e) and 15d - 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a - 15(f) and 15d - 15(f)) for the Registrant and have:

a)       D esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)       D esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)       E valuated the effectiveness of the Registrant ' s disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)       D isclosed in this report any change in the Registrant ' s internal control over financial reporting that occurred during the Registrant ' s most recent quarter (the Registrant ' s fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant ' s internal control over financial reporting .

5.       The Registrant ' s other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant ' s auditors and the audit committee of the Registrant ' s board of directors (or persons performing the equivalent functions):

a)       A ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant ' s ability to record, process, summarize and report financial information; a nd

b)       A ny fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant ' s internal control over financial reporting.

March 4, 2016                                                /s/ Gail Sasaki

                                                             Gail Sasaki
                                                             *Vice President and Chief Financial Officer*
                                                             *(Principal Financial Officer)*

Exhibit 32

**CERTIFICATIONS PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES -OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10 - K of Netlist, Inc., a Delaware corporation ( " Netlist " ) for the fiscal year ended January 2, 2016 , as filed with the Securities and Exchange Commission on March 4 , 201 6 (the " Report " ), Chun K. Hong, president, chief executive officer and chairman of the board of Netlist, and Gail Sasaki , vice president and chief financial officer of Netlist, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes -Oxley Act of 2002, that, to his or her knowledge:

(1)      the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)      the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Netlist.

March 4, 2016                                          /s/ Chun K. Hong
                                                      Chun K. Hong
                                                      *President, Chief Executive Officer and Chairman of the Board (Principal Executive Officer)*

March 4, 2016                                          /s/ Gail Sasaki
                                                      Gail Sasaki
                                                      *Vice President and Chief Financial Officer (Principal Financial Officer)*