1   JASON C. LO, SBN 219030
        jlo@gibsondunn.com
2   MATTHEW BENJAMIN (*pro hac vice*)
        mbenjamin@gibsondunn.com
3   RAYMOND A. LAMAGNA, SBN 244821
        rlamagna@gibsondunn.com
4   GIBSON, DUNN & CRUTCHER LLP
5   333 South Grand Avenue
    Los Angeles, CA  90071-3197
6   Telephone:  213.229.7000
    Facsimile:  213.229.7520
7

JASON SHEASBY, SBN 205455
    jsheasby@irell.com
IRELL & MANELLA LLP
1800 Ave. of the Stars
Los Angeles, CA 90067
Telephone: 310.203.7096
Facsimile: 310.203.7199

8   Attorneys for Plaintiff Netlist Inc.

9                 UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11                     SOUTHERN DIVISION

12

13   NETLIST INC., a Delaware
     corporation,
14
                    Plaintiff,
15
16        v.
17   SAMSUNG ELECTRONICS CO.,
     LTD., a Korean corporation,
18
                    Defendant.
19
20

CASE NO. 8:20-cv-993-MCS (ADS)

**NETLIST INC.'S NOTICE OF
MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT
THEREOF**

21

22

23

24

25

26

27

28

# NOTICE OF MOTION AND MOTION

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on September 20, 2021, or as soon thereafter as the matter may be heard, in Courtroom 7C above the above-entitled Court, located at 350 W. 1st Street, Los Angeles, California, Plaintiff Netlist Inc. ("Netlist") will and hereby does move the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for an Order granting Netlist's Motion for Partial Summary Judgment as to the merits of the parties' dispute.

This Motion is based on this Notice; the concurrently filed Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law ("SUF"), the Declarations of C.K. Hong, Gail Sasaki, P.K. Hong and Raymond LaMagna; the concurrently lodged Proposed Order; such matters of which this Court may take judicial notice; the other records, pleadings, and papers filed in this action; and any other documentary evidence or arguments that may be presented to this Court at hearing.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on August 7, 2021.

Dated:         August 16, 2021.

JASON C. LO                                  JASON SHEASBY
MATTHEW BENJAMIN                  IRELL & MANELLA LLP
RAYMOND A. LAMAGNA
GIBSON, DUNN & CRUTCHER LLP

By:     /s/ Jason C. Lo
            Jason C. Lo

Attorneys for Netlist, Inc.

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (acd)

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ................................................................................1

II.  FACTS AND RELEVANT PROCEDURAL HISTORY ............................3

    A.  Netlist and Samsung Enter the JDLA. ......................................3

    B.  Samsung Initially Complies with the JDLA. .............................7

    C.  Samsung Intentionally Breaches the JDLA's Supply
       Requirement. ..........................................................................7

    D.  Samsung Intentionally Breaches the JDLA's Tax
       Provisions. ...........................................................................10

    E.  Netlist Terminates the JDLA. ................................................11

    F.  Relevant Procedural History .................................................11

III.  LEGAL STANDARD ......................................................................12

IV.  ARGUMENT ................................................................................12

    A.  The JDLA is an Enforceable Contract. ..................................12

    B.  Netlist Performed under the JDLA. .......................................13

    C.  Samsung Breached the JDLA. ..............................................14

        1.  Samsung breached its supply obligation. ....................14

        2.  Samsung breached by withholding $1.32 million
           and failing to "reasonably cooperate" with Netlist..................18

    D.  Damages ..............................................................................21

    E.  Samsung's Breaches Were Material. .....................................22

    F.  Netlist Properly Terminated the JDLA. .................................24

V.  CONCLUSION .............................................................................25

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

- i -

1

# **TABLE OF AUTHORITIES**

2

**Cases**                                                                                      **Page(s)**

3

4
5
*10-12 W. 107th St. HDFC v. Vilma,*
   976 N.Y.S.2d 830 (Civ. Ct. 2013) ................................................................. 24

6
7
*151 W. Assocs. v. Prinstiples Fabric Corp.,*
   61 N.Y.2d 732 (1984) ................................................................................. 17

8
9
*Alberts v. CSTV Networks Inc.,*
   945 N.Y.S.2d 555 (App. Div. 2012) .......................................................... 12, 22

10
*Anderson v. Liberty Lobby,*
   477 U.S. 242 (1986) ................................................................................. 12
11

12
*In re Ex Parte Application of Jommi,*
   2013 WL 6058201 (N.D. Cal. Nov. 15, 2013) ............................................. 18

13
14
*Aquino v. Alexander Cap., L.P.,*
   2021 WL 3185533 (S.D.N.Y. July 27, 2021) ............................................... 12

15
16
*Beltrone Const. Co. Inc. v. State,*
   592 N.Y.S.2d 832 (App. Div. 1993) .......................................................... 15, 21

17
18
*Canon Solutions Am., Inc. v. Lucky Games,*
   2017 WL 1653563 (S.D.N.Y. May 1, 2017) ............................................... 24

19
20
*Charlebois v. J.M. Weller Assocs., Inc.,*
   526 N.Y.S.2d 648 (App. Div. 1988) .......................................................... 15

21
22
*DeAngelis v. DeAngelis,*
   962 N.Y.S.2d 328 (App. Div. 2013) .......................................................... 17

23
24
*EFW, Inc. v. Smiths Aerospace, LLC,*
   2008 WL 11349748 (N.D. Tex. Nov. 21, 2008) .......................................... 21

25
*Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.,*
   864 F.2d 648 (9th Cir. 1988) ..................................................................... 16, 21

26
27
*Gardner v. Comm'r of Internal Revenue,*
   704 F. App'x 720 (9th Cir. 2017) ............................................................... 19

28

|  | **Page** |
|---|---|
| *Guzman v. Ramos,*<br>139 N.Y.S. 3d 648 (App. Div. 2021) | 13 |
| *Hoover v. HSBC Mortg. Corp.,*<br>9 F. Supp. 3d 223 (N.D.N.Y. 2014) | 22 |
| *ISG, Corp. v. PLE, Inc.,*<br>917 N.W.2d 23 (S.D. 2018) | 4, 20 |
| *Kenneth v. Yeung Chi Shing Holding (Del.,) Inc.,*<br>2020 WL 409010 (N.D. Cal. Jan. 24, 2020) | 18 |
| *Kronos, Inc. v. AVX Corp.,*<br>81 N.Y.2d 90 (1993) | 21 |
| *Ma v. Biaggi,*<br>54 N.Y.S.3d 46 (App. Div. 2017) | 22 |
| *Malmsteen v. Univ. Music Grp., Inc.,*<br>940 F. Supp. 2d 123 (S.D.N.Y. 2013) | 15, 16 |
| *Matsushita Elec. Indus. Co. v. Zenith,*<br>475 U.S. 574 (1986) | 12 |
| *In re Med. Cap. Sec. Lit.,*<br>2011 WL 5067208 (C.D. Cal. July 26, 2011) | 17 |
| *Miller v. Metro. Life Ins. Co.,*<br>979 F.3d 118 (2d Cir. 2020) | 20 |
| *Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.,*<br>458 F. Supp. 2d 131 (S.D.N.Y. 2006) | 16, 21 |
| *Perrault v. Village Dunes Apt. Corp.,*<br>83 N.Y.S.3d 141 (App. Div. 2018) | 19 |
| *Preferred Mut. Ins. Co. v. SAV Carpentry, Inc.,*<br>844 N.Y.S.2d 363 (App. Div. 2007) | 19 |
| *Ross v. Sherman,*<br>944 N.Y.S.2d 620 (App. Div. 2012) | 21 |

10981150.46

- iii -

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

|    |                                                                              | Page |
| 1  |                                                                              |      |
| 2  | *Stalis v. Sugar Creek Stores, Inc.*,                                        |      |
| 3  | 744 N.Y.S.2d 586 (App. Div. 2002) .................................................... 20 |
| 4  | *Stevens v. Publicis, S.A.*,                                                 |      |
| 5  | 854 N.Y.S.2d 690 (App. Div. 2008) ............................................. 15, 20 |
| 6  | *Stewart v. U.S. Bancorp.*,                                                  |      |
|    | 297 F.3d 953 (9th Cir. 2002) ........................................................ 19 |
| 7  | *Sunbury Textile Mills v. Comm'r of Internal Revenue*,                       |      |
| 8  | 585 F.2d 1190 (3d Cir. 1978) ....................................................... 17 |
| 9  | *Viacom Outdoor, Inc. v. Wixon Jewelers, Inc.*,                              |      |
| 10 | 906 N.Y.S.2d 776 (Sup. Ct. 2009), *aff'd*,                                   |      |
| 11 | 919 N.Y.S.2d 151 (App. Div. 2011) .................................................. 24 |
| 12 | *Westinghouse Elec. Corp. v. Garrett Corp.*,                                 |      |
| 13 | 437 F. Supp. 1301 (D. Md. 1977)..................................................... 21 |
| 14 | *Wiljeff, LLC v. United Realty Mgmt. Corp.*,                                 |      |
|    | 920 N.Y.S.2d 495 (App. Div. 2011) .................................................. 22 |
| 15 | *Zheng v. City of N.Y.*,                                                     |      |
| 16 | 19 N.Y.3d 556 (2012)...................................................................... 15 |
| 17 | **Other Authorities**                                                        |      |
| 18 |                                                                              |      |
| 19 | Alan S. Gutterman, 2 Corporate Counsel's Guide to Technology                 |      |
|    | Management & Transactions § 22.2.................................................... 21 |
| 20 | "Cooperate," Merriam-Webster, https://www.merriam-                           |      |
| 21 | webster.com/dictionary/cooperate.................................................... 20 |
| 22 | **Rules**                                                                    |      |
| 23 | Fed. R. Civ. P. 56.......................................................................... 12 |
| 24 | Fed. R. Evid. 201 ......................................................................... 18 |
| 25 |                                                                              |      |
| 26 |                                                                              |      |
| 27 |                                                                              |      |
| 28 |                                                                              |      |

10981150.46

- iv -

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Netlist Inc. ("Netlist") is a small technology company that has managed to punch far above its weight in the market due to its history of industry-leading research and development efforts. In 2015, Netlist entered into a binding contract with Samsung Electronics Co., Ltd. ("Samsung"), part of the Samsung Group, one of the largest companies in the world. That contract, called the Joint Development and License Agreement ("JDLA"), was carefully negotiated over several months and provided significant consideration to Samsung. As set forth herein, Samsung materially breached the JDLA, there is no genuine issue of material fact as to that breach, and this Court should therefore grant partial summary judgment in favor of Netlist.

In the JDLA, Netlist provided Samsung a fully-paid license to Netlist's broad patent portfolio (for which Netlist had demanded a substantial amount), as well as Netlist's joint research and development efforts. In exchange, Samsung expressly agreed that Samsung "*will* supply NAND and DRAM products to Netlist on Netlist's request at a competitive price"—an unambiguous, *mandatory* supply obligation. That mandatory supply obligation—memorialized in in Section 6.2—was the most important right that Netlist obtained in the JDLA. It gave Netlist a guaranteed, dependable source of vital memory chip products (often in short supply), upon which Netlist would rely in maintaining and growing its customer relationships and downstream business. And it required Samsung to prioritize Netlist over other (often larger) customers without similar agreements in place. Samsung's attempt in this litigation to read that mandatory supply obligation out of the JDLA contradicts not only the unambiguous plain language of Section 6.2, but also the parties' conduct under the JDLA as well as Samsung's internal written admissions—before litigation arose—proving that Samsung did, in fact, have the very same interpretation of this

provision as Netlist.

For nearly two years, Samsung complied with its mandatory supply obligation by supplying Netlist with tens of millions of dollars' worth of memory chips upon Netlist's request. For example, in the first half of 2017 alone, Samsung sold roughly $16 million of product to Netlist, and Samsung knew that Netlist required and was relying on purchasing even more going forward. Samsung's own internal emails and forecasts projected $50 million in sales to Netlist in 2017 and $75 million in 2018. In mid-2017, however, Samsung abruptly reversed course. Having already obtained its desired patent license from Netlist and preferring to service other customers whom it considered more important, Samsung decided not to honor its mandatory supply obligation despite knowing full well that its breach would cause Netlist extensive and irreparable harm. In Samsung's own words from before this lawsuit arose: "Since Samsung is nearly 100% of [Netlist's] support and Revenue this will have a dramatic impact on their financials and future business." And it most certainly did.

Because of Samsung's market power and Netlist's dependence upon Samsung for the supply of critical products, Netlist attempted to work things out with Samsung. Despite Netlist's repeated efforts, Samsung continued to flout its mandatory supply obligation, at times arbitrarily limiting the amount of memory chips it would sell and at other times refusing to sell any memory chips at all to Netlist. Ultimately, Netlist concluded that further efforts to convince Samsung to change its course would not work and it terminated the JDLA.

Netlist now moves for partial summary judgment because the material facts here are not in dispute.  The parties entered into an enforceable contract containing an unambiguous, mandatory supply obligation, as Samsung recognized internally. Samsung also cannot dispute Netlist's performance or that it routinely refused to provide Netlist with memory chips upon request. The materiality of Samsung's breach is obvious—the mandatory supply obligation went to the heart of the JDLA and

prevented achievement of Netlist's **primary purpose** in entering into the contract.

But there is more. The JDLA also required Samsung to pay Netlist $8 million for certain research and development efforts. Samsung was allowed to withhold from that amount taxes that were "required" to be paid under Korean law, and it was obligated to "reasonably cooperate" in any efforts by Netlist to seek a refund of such withholdings. Samsung breached these obligations by (i) withholding money it was not required to withhold under Korean law and (ii) refusing to cooperate with—and, indeed, actively impeding—Netlist's efforts to seek a refund. Once again, there is no genuine dispute as to any material fact concerning these breaches. They provide a second, independent basis on which to grant summary judgment in favor of Netlist.

Following Samsung's material breaches of the parties' contract, Netlist followed the agreement's termination provisions to the letter. After giving Samsung notice and an opportunity to cure, Netlist terminated the parties' contract. Netlist is entitled to summary judgment on Samsung's material breaches of contract and Netlist's proper termination of the contract. Netlist will prove at trial the extensive damages it suffered and is entitled to as a result of Samsung's breaches.

## II.    FACTS AND RELEVANT PROCEDURAL HISTORY

### A.    Netlist and Samsung Enter the JDLA.

Founded in 2000, Netlist is an innovator in memory module technologies that designs and manufactures high-performance products used in servers and storage systems. SUF ¶¶ 1-2.[1] As of 2015, Netlist had total assets of less than $25 million and total revenue of $8 million. *Id.* ¶¶ 4-5. Despite its small size, Netlist holds many valuable patents which, on April 16, 2015, it proposed to license to Samsung for a five-year term in exchange for $85 million plus ongoing royalty payments. *Id.* ¶ 12.

---

[1] Citations in the form of "SUF ¶ __" refer to the Statement of Undisputed Facts filed herewith, and the evidence cited therein. Unless otherwise noted, all emphases to quotations are added, and internal quotation marks and alterations have been removed.

1       Samsung is among the largest companies in the world.  Its memory division

2  supplies over 40% of all DRAM and 30% of NAND memory chips sold worldwide,

3  has tens of thousands of employees, and has annual revenues of nearly $50 billion. *Id.*

4  ¶¶ 6-8. And Samsung wanted a perpetual license for Netlist's valuable patent

5  portfolio. *Id.* ¶ 13. In a counterproposal to Netlist, Samsung offered, among other

6  things, a $5 million "NRE" fee in return for joint development efforts on a new

7  technology[2] and a "[s]upply of NAND, DRAM and/or NVDIMM-P." *Id.* Samsung

8  made clear it understood that its counterproposal would "enable[ ] Netlist to expand

9  its business," as "the implicit backing of Samsung should help Netlist as it endeavours

10  to expand it's [*sic*] business arrangements in the memory industry." *Id.* ¶ 14. Samsung

11  additionally stated that its proposal to "supply . . . NAND, DRAM and NVDIMM-P

12  related chipsets will help enable [Netlist's] vision of being a products company." *Id.*

13       Netlist knew that a direct supply relationship with the world's largest memory

14  chip manufacturer would provide a unique and significant competitive advantage—a

15  guaranteed source of vital product supply, irrespective of temporary supply-chain

16  difficulties or the intermittent semiconductor shortages that occasionally befall the

17  industry, which was especially valuable for a company of Netlist's small size and

18  limited market power. *Id.* ¶¶ 15-17. Ultimately, Netlist agreed not to charge Samsung

19  any royalty at all for a perpetual patent license, in exchange receiving an invaluable

20  mandatory supply obligation. *See id.* ¶¶ 27, 29, 34.

21       The terms of the JDLA were heavily negotiated over several months. Samsung

22  sent the initial draft of the JDLA to Netlist on October 8, 2015. *Id.* ¶ 18. That draft

23  contained two flatly inconsistent provisions. On the one hand, it stated that "Samsung

24  will supply NAND and DRAM to Netlist on Netlist's request at a competitive price."

25

26  ―――――――――――
[2] "NRE" is a commonly used industry acronym not expressly defined in the JDLA.

27  *See, e.g.*, *ISG, Corp. v. PLE, Inc.*, 917 N.W.2d 23, 35 n.7 (S.D. 2018) ("The acronym

28  'NRE' stands for non-recurring engineering fees.").

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

- 4 -

*Id.* ¶ 19. On the other hand, it suggested that the contract would "not be deemed . . . to require Samsung to supply any products to Netlist." *Id.* Netlist rejected Samsung's attempt to treat the supply obligation as anything but mandatory, explaining:

> In Section II.6 of the [parties' memorandum of understanding], Samsung clearly agreed to provide Netlist with NAND and DRAM products. However, in Section 6.2 of its proposed JDLA, Samsung states that nothing in this agreement will 'require Samsung to supply any products to Netlist.' Netlist removed this qualification and returned the language to reflect what was agreed to in the MOU.

*Id.* ¶ 21. The rejected provision—which would have made Samsung's agreement to supply discretionary and optional—was stripped out of the draft JDLA. *Id.* ¶ 20.

The final JDLA contains only the ***first*** of those two Samsung-drafted provisions imposing a mandatory supply obligation, and not the ***second***: "Samsung ***will supply*** NAND and DRAM products to Netlist ***on Netlist's request*** at a competitive price." *Id.* ¶ 34. Internal documents reflect that Samsung understood that Section 6.2 imposed a "volume condition" under which Samsung was ***required to provide*** Netlist with the volume of NAND and DRAM products that Netlist requested. *Id.* ¶ 37.

In light of the value of Samsung's guaranteed supply obligation, Netlist agreed to license its technology to Samsung for a one-time payment of only $8 million—less than 10% of its original ask ***without*** the supply obligation. *Id.* ¶¶ 12, 27. That payment was not a licensing fee accruing to Netlist's bottom-line as profit, as the $85 million and ongoing royalty payments Netlist initially sought would have. Instead, it was a non-recurring engineering fee to fund collaborative development work between Netlist and Samsung. *Id.* ¶ 27. Moreover, the non-recurring engineering fee did not even cover the actual expenses incurred by Netlist in connection with those joint development efforts. *Id.* ¶ 29. The JDLA also permitted Samsung to deduct from that fee "any withholding taxes . . . required by applicable law," while obligating Samsung to "reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption" for such withholdings. *Id.* ¶ 28.

1     In short, Netlist originally sought over $85 million, without any strings
2     attached, in exchange for *a time-limited license* to its broad patent portfolio. It agreed
3     to receive a fraction of that amount, which it was required to *spend* on research efforts
4     that would *benefit Samsung*, in exchange for *a perpetual patent license*. Why did
5     Netlist agree to that drastic reduction in monetary consideration in exchange for a
6     longer license? The reason is obvious: it did so *because* of the *additional*
7     consideration it received via Samsung's guaranteed supply obligation.

8        Given Samsung's international prominence and unrivaled market power, the
9     JDLA—as negotiated and written—was "critical" to Netlist. *See id.* ¶¶ 80, 92, 98.
10    Reflecting its importance, Netlist mentioned the JDLA more than ten times in its 2015
11    Annual Report, which explained that, among other things, the JDLA "contractually
12    commit[ted] Samsung to supply NAND flash and DRAM products to [Netlist] on [its]
13    request" and that the parties had agreed to "work together to jointly develop" certain
14    new technologies that they hoped would be adopted throughout the electronics
15    industry. *Id.* ¶¶ 58-59. The JDLA immediately gave Netlist a strategic competitive
16    advantage and industry credibility, elevating it into an elite circle of companies with
17    direct supply obligations from Samsung. *Id.* ¶¶ 15-17. It was understood that Netlist
18    would purchase all of the Samsung NAND and DRAM it needed directly from
19    Samsung, rather than from secondary sources, as purchasing Samsung products from
20    anyone other than Samsung would be economically nonsensical. *Id.* ¶ 60. In contrast,
21    the sales arrangement was worth little to Samsung, in light of its relative size and
22    market power. Samsung's sales to Netlist were a drop in the bucket from Samsung's
23    perspective: Netlist's $8 million annual revenue for 2015 is less than one-tenth of one
24    percent of the *$50 billion annual revenue* of *only* Samsung's memory division. *Id.*
25    ¶¶ 7, 27. Samsung's admitted "main reason for entering into the agreement" was to
26    obtain the valuable intellectual property licenses that Netlist granted to it under the
27    JDLA and for which Netlist received no royalty at all. *Id.* ¶ 42.

28

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

- 6 -

### B.    Samsung Initially Complies with the JDLA.

Immediately before entering the JDLA, Samsung supplied Netlist effectively no product. *Id.* ¶ 70. Indeed, a senior member of Samsung's sales team had previously been "told to not support Netlist" and "actually was not allowed to visit Netlist" as of 2015. *Id.* ¶ 68. Upon execution of the JDLA, Samsung sales personnel were "told to support Netlist." *Id.* ¶ 69. To comply with Samsung's unconventional ordering process, Netlist provided forecasts and sought permission to submit purchase orders to Samsung to fulfill Netlist's need for Samsung products. *Id.* ¶¶ 61-66. This effectively gave Samsung multiple opportunities to refuse Netlist's requests for NAND and DRAM products: Samsung could decline to allow Netlist to submit a purchase order, or afterwards it could fail to fulfill a purchase order that had already been accepted by Samsung.

For nearly two years, Samsung substantially complied with its mandatory supply obligation under the JDLA by routinely authorizing Netlist to submit purchase orders in amounts commensurate with Netlist's requests, which Samsung then filled. *Id.* ¶ 71. By mid-2017 Samsung had sold more than $25 million of NAND and DRAM to Netlist. *Id.* ¶¶ 72-73. That was an insignificant quantity for Samsung. But for Netlist, it was a crucial lifeline as it invested heavily in sales and marketing efforts and actively promoted its access to Samsung product in order to build its relationships and goodwill with customers who, in turn, relied on Netlist's guaranteed supply under the JDLA. *Id.* ¶¶ 55-57. Samsung was fully aware that its supply obligation to Netlist was likely to continue to grow. As of May 23, 2017, Samsung internally "project[ed] $50M in 2017 revenue and $75M in 2018" from Netlist. *Id.* ¶ 81.

### C.    Samsung Intentionally Breaches the JDLA's Supply Requirement.

In 2017, Samsung began refusing to allow Netlist to submit purchase orders in the amount that Netlist sought and drastically cutting back the NAND and DRAM that it would provide. *Id.* ¶¶ 77, 85-86, 88. Neal Knuth—Netlist's primary contact at

Samsung for submitting purchase orders—was expressly instructed on May 15, 2017 to "not accept [purchase orders] from Netlist," to which he responded that he would implement a "$500k a month limit" on Netlist going forward, that he was "rejecting new orders" from Netlist, and that he had "rejected over $10 Million of business for Q3 already," adding with a smiley face emoji that Netlist "want[ed] to help [the] relationship" so he "convinced them to cancel [a] $2M in backlog" of products that Samsung had previously agreed to sell but which had not yet been delivered. *Id.* ¶¶ 78, 86, 96-97. Netlist told Knuth that it "cannot accept partial support" from Samsung, as Samsung's shirking of its obligation by reducing sales from $8 million per quarter to under $3 million per quarter in late 2017, and eventually "stopp[ing] shipments altogether" in 2018, was having a "drastic" impact on Netlist's business. *Id.* ¶ 108. Internal Samsung emails reflect that a senior executive nevertheless "specifically directed" the company "to minimize sales to Netlist," even as it continued selling the products sought by Netlist to other customers. *Id.* ¶¶ 76, 83, 85-86, 110.

At around the same time that Samsung began preventing Netlist from purchasing its NAND and DRAM products, Samsung began openly expressing its supposed "disappoint[ment]" and "frustrati[on]" concerning the companies' joint research and development efforts. *Id.* ¶ 89. Shortly thereafter, after having benefited from Netlist's intellectual property, Samsung concluded the joint development efforts with Netlist, claiming that they were "unlikely to result in a commercially viable product," notwithstanding Netlist's attempts to demonstrate otherwise. *Id.* ¶ 91. From that point forward, Samsung's supply obligation constituted the only consideration that Netlist was to receive in exchange for the perpetual patent licenses it had granted to Samsung.

Netlist explained to Samsung that its sudden refusal to fulfill Netlist's requests for NAND and DRAM was causing Netlist to lose critical business opportunities and was tarnishing the goodwill that Netlist had established with its customer base. *Id.*

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

¶ 95. In response, Samsung's regional sales manager told Netlist that his superiors had directed that Netlist's allocation of NAND and DRAM products should be cut, and at times that Netlist should be given "$0 allocation and no support." *Id.* ¶ 106. Netlist repeatedly sought to discuss the parties' relationship with Samsung, imploring it to reconsider that decision, "[r]evise [its] ordering process" and provide "confirmation of support & ship dates" because "[p]roduct allocation support" from Samsung was "critical" for Netlist. *Id.* ¶ 92. Netlist begged Samsung to address its supply breach, as it had "a lot of complaints from [its] customers about disruption of supply" which were causing "a lot of difficulties" and threatened to harm its ability "to maintain the trust with [its] customers." *Id.* ¶ 102. Indeed, Netlist's senior management travelled to Samsung's U.S. headquarters and to Korea to raise these matters in 2017 and 2018. *Id.* ¶ 94. Samsung nevertheless flatly informed Netlist that it "would not be able to supply the quantity" sought by Netlist. *Id.* ¶ 102.

In the meantime, Netlist did its best to mitigate its damages by seeking out Samsung NAND and DRAM on the secondary market rather than purchasing directly from Samsung. *Id.* ¶¶ 101, 112.[3] Netlist was often unable to source Samsung NAND and DRAM in sufficient quantities, undermining its ability to satisfy its customers. *Id.* ¶¶ 112-13. Even when Netlist could indirectly obtain Samsung NAND and DRAM, it paid higher prices than if it had purchased directly from Samsung, and it incurred additional expenses for quality testing that was not necessary when purchasing from Samsung directly. *Id.* ¶ 112. As a result of those added costs and shortfalls in supply, Netlist suffered damaged customer relationships, lost revenues

---

[3] The market for NAND and DRAM memory supply is effectively an oligopoly between Micron, SK Hynix, and Samsung, which together control approximately 95% of the world's supply. SUF ¶ 9. The three suppliers' memory chips are not interchangeable because each has different characteristics. *Id.* ¶ 10. Accordingly, end-users cannot replace a Samsung product with a Micron or Hynix product. *Id.* ¶ 11. Netlist thus had to continue seeking to purchase Samsung's products, notwithstanding Samsung's continuing refusal to abide by the plain terms of the JDLA.

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO. 8:20-CV-993-MCS (ADS)

- 9 -

and profits, and irreparable reputational harm. *Id.* ¶¶ 119-20. Yet, as explained by Netlist's co-founder and Chief Executive Officer C.K. Hong, "[b]ecause the supply arrangement with Samsung was so uniquely valuable to Netlist, [Netlist] did not want to walk away from it." *Id.* ¶ 111.

Even as Samsung refused Netlist's product requests, Samsung internally recognized that it was required to fulfill them. For instance, on January 18, 2018, Samsung personnel exchanged emails quoting the text of Section 6.2 and admitting that, "[p]ursuant to the agreement, supply for NAND and DRAM products *is necessary* if there is a request from Netlist." *Id.* ¶ 38. Just one month later, Samsung's Memory Division Vice President and Group Leader for Business Strategy, Yong Hwangbo, reviewed the JDLA and informed his colleagues in writing (while forwarding the relevant provisions and admitting that Samsung charged Netlist prices "higher than [an]other similarly sized company") that the JDLA imposes on Samsung "*an obligation to supply* NAND/DRAM at a competitive price if [Netlist] makes a request." *Id.* ¶ 39. Notwithstanding its *admitted* contractual supply obligation, Samsung concedes that it "routinely rejected requests for product from Netlist." *Id.* ¶ 114; *see also id.* ¶¶ 115-17.

**D.  Samsung Intentionally Breaches the JDLA's Tax Provisions.**

Samsung also withheld $1.32 million of the $8 million NRE fee, falsely asserting that it was taxable under Korean law. *Id.* ¶¶ 46, 49. Samsung's withholding was a breach because no taxes were owed on it. In addition, Samsung was obligated under Section 3.2 to "reasonably cooperate" with any effort by Netlist to seek a refund. *Id.* ¶ 28. Samsung did not do so, instead telling Netlist that it "should discuss this mater directly with the NTS," the Korean National Tax Service. *Id.* ¶¶ 47-49. Samsung then actively undermined Netlist's efforts by advocating over Netlist's objection that the non-taxable engineering fee was a taxable patent royalty. *Id.* ¶¶ 50-52. On November 17, 2020, the Korean Tax Tribunal rejected Samsung's arguments

and agreed with Netlist that Samsung had improperly withheld the funds because they were not taxable under Korean law. *Id.* ¶ 53.

### E.    Netlist Terminates the JDLA.

Over time, it became evident that Samsung was not going to reverse course and honor its contractual commitments. *Id.* ¶ 124. Section 13.2(1) provides that either party may "terminate th[e] Agreement upon written notice" if the other party "is in material breach of th[e] Agreement and it is not cured within thirty (30) days" after receipt of a "written demand," or if "as a consequence of the breach the purpose of th[e] Agreement cannot be achieved." *Id.* ¶ 43. On May 27, 2020, Netlist sent a written demand and notice for cure, in which it reiterated its "commit[ment] to resolving these issues amicably" in the hopes of continuing with the parties' commercial relationship. *Id.* ¶ 125. That letter was also e-mailed to Samsung. *Id.* ¶ 126. Despite receiving both the mailed and e-mailed copies of Netlist's written demand, Samsung ignored them. *Id.* ¶ 127. So, on July 15, 2020, after having "not received a response from Samsung . . . let alone any cure of such breaches," Netlist terminated the JDLA because Samsung's breaches had "fundamentally undermined the purpose of" the contract. *Id.* ¶ 128.

### F.    Relevant Procedural History

Netlist brought this action on May 28, 2020. Dkt. 1. It filed its First Amended Complaint, adding a claim for a declaratory judgment that the JDLA was validly terminated, on July 22, 2020. Dkt. 18-2. Samsung answered the First Amended Complaint on November 6, 2020. Dkt. 27. On June 22, 2021—11 months after the First Amended Complaint was filed—Samsung moved for judgment on the pleadings. Dkt. 61. The Court denied Samsung's motion for judgment on the pleadings on August 5, 2021. Dkt. 120. In that ruling, the Court rejected Samsung's arguments that (1) Section 6.2 imposed only a pricing obligation on Samsung, (2) Section 6.2 is valid only if the JDLA is a U.C.C. requirements contract, (3) Netlist is barred from seeking

1  consequential damages, (4) Samsung complied with Section 3 so long as it did not

2  violate Korean law, (5) Netlist's allegations that Samsung did not reasonably

3  cooperate with Netlist's efforts to seek a refund of the improperly withheld $1.32

4  million were conclusory, and (5) Netlist permanently and irrevocably elected to

5  continue in its contractual relationship with Samsung.  *Id.*

6  ## III.   LEGAL STANDARD

7       Summary judgment is appropriate if "there is no genuine dispute as to any

8  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

9  P. 56(a).  "Where the record taken as a whole could not lead a rational trier of fact to

10 find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec.*

11 *Indus. Co. v. Zenith*, 475 U.S. 574, 587 (1986).  "The mere existence of a scintilla of

12 evidence in support of the [non-movant's] position will be insufficient; there must be

13 evidence on which the jury could reasonably find" against the movant in order for

14 summary judgment to be denied.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252

15 (1986); *see also Matsushita*, 475 U.S. 586 ("metaphysical doubt[s]" are insufficient).

16 ## IV.   ARGUMENT

17      "To prevail on a breach of contract claim under New York law, a plaintiff must

18 prove [i] a contract; [ii] performance of the contract by one party; [iii] breach by the

19 other party; and [iv] damages."  *Aquino v. Alexander Cap., L.P.*, 2021 WL 3185533,

20 at *14 (S.D.N.Y. July 27, 2021). The facts are undisputed that the JDLA is an

21 enforceable contract, Samsung breached its supply obligation and the tax provisions

22 of the JDLA, both are material breaches, Netlist performed its obligations, and Netlist

23 was damaged. Courts can grant summary judgment on such claims.  *See, e.g.*, *Alberts*

24 *v. CSTV Networks Inc.*, 945 N.Y.S.2d 555, 555 (App. Div. 2012) (affirming summary

25 judgment that material breach occurred).

26      ### A.   The JDLA is an Enforceable Contract.

27      The JDLA is a binding contract between Netlist and Samsung. Samsung has

28

admitted that the parties entered into the JDLA on November 12, 2015, SUF ¶ 22, and it has further asserted that "Netlist failed to comply with its obligations" by terminating the JDLA, *id.* ¶ 129; *see also* Dkt. 27 at 5 (asserting as an affirmative defense that Netlist breached).  Samsung's argument necessarily presupposes that the JDLA was an enforceable contract imposing the obligations with which Netlist purportedly failed to comply.

Only after this litigation was filed did Samsung assert that the JDLA fails for lack of consideration, presumably because the JDLA does not expressly obligate Netlist to purchase exclusively from Samsung. *See* Dkt. 27 at 5 ("Failure of Consideration"); Dkt. 58-1 at 17-18 (arguing JDLA is "non-exclusive"). As an initial matter, the Court has already "decline[d] Samsung's invitation to read allegations of a requirements contract"—such as exclusivity—into the JDLA. Dkt. 120 at 5. Moreover, exclusivity is not the *sine qua non* of consideration, which is broadly defined under New York law to encompass any "benefit to the promisor" so long as "something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him." *Guzman v. Ramos*, 139 N.Y.S. 3d 648, 651 (App. Div. 2021). The JDLA is replete with benefits to Samsung, including Netlist's promises to (i) license intellectual property rights to Samsung, (ii) engage in "collaborative development work" on a new product, (iii) "work together" with Samsung on "technology standardization and productization," (iv) "provide Samsung a right of first refusal to acquire" Netlist technology, (v) sell products to Samsung "at a price lower than the price Netlist provides to any other buyer," and (vi) release claims Netlist may have otherwise had against Samsung. SUF ¶¶ 23, 30-33, 40-41. This is more than sufficient consideration for the JDLA to constitute an enforceable agreement.

**B.    Netlist Performed under the JDLA.**

Netlist's performance under the JDLA during the time period at issue is also

undisputed. *Id.* ¶ 130. When asked to identify all facts related to any alleged breach of the JDLA by Netlist, Samsung's sole response was to refer to "Netlist's purported termination" in July 2020—nothing during the course of the parties' commercial relationship. *Id.* ¶ 129. That is a concession Netlist performed under the JDLA.

### C.   Samsung Breached the JDLA.

#### 1.   Samsung breached its supply obligation.

Samsung admits that it did not supply Netlist with all of the NAND and DRAM that Netlist sought to purchase from Samsung. In its own words, Samsung "routinely" did "not support" Netlist's requests for products and instead "routinely rejected" them. *Id.* ¶¶ 114-17. Samsung couches this glaring concession as nothing more than business as usual, because it acted "as it would with any other similarly situated customer during the same time period." *Id.* ¶ 118. But even if that is true, Samsung's breach of other similar contracts is not a defense to its breach of the supply obligation under this contract.

In any event, Samsung's refusal to sell product to Netlist was ***not*** standard operating procedure. Rather, Netlist was intentionally singled out. JS Choi, a Samsung senior executive, "specifically directed" Samsung "to minimize sales to Netlist." *Id.* ¶ 110. Pursuant to Choi's directions, Samsung limited Netlist to purchasing only $500,000 of product per month. *Id.* ¶¶ 85-86, 110. Moreover, an internal Samsung "Sales Review" presentation for Mr. Choi made clear that of ten other Samsung customers serviced by the same sales team, ***only*** sales to Netlist were constrained and expected to significantly decline during this period. *Id.* ¶ 105. Samsung's recognized it would face "a very dangerous situation" if Netlist learned about the arbitrary cap Samsung had imposed, even as its employees openly joked about rejecting millions of dollars in purchase orders from Netlist, while also tricking Netlist into cancelling earlier accepted orders in the vain hope of maintaining the companies' relationship. *Id.* ¶¶ 87, 96-97. At the same time, lower-level Samsung

employees confessed to Netlist that there was "nothing [they could] do," they were "not even supposed to discuss with [Netlist] what [Samsung] ha[d] available," and that they were "not going to get fired" for violating those instructions. *Id.* ¶ 99. Internal Samsung documents confirm that the company told Netlist "that Samsung had zero allocation in Q3 [2017] to support Netlist," even as Samsung recognized that this would "have a dramatic impact on their financials and future business." *Id.* ¶ 82. Samsung deliberately breached Section 6.2, knew the harm it was causing to Netlist, and did not care. That is textbook bad faith.  *See Stevens v. Publicis, S.A.*, 854 N.Y.S.2d 690, 692 (App. Div. 2008) ("bad faith may include evasion of the spirit of the bargain" and "willful rendering of imperfect performance").

Because Samsung's conduct is not in question, whether that undisputed conduct breached Section 6.2 provides only a question of contract interpretation. Summary judgment is proper in contract disputes "if the language of the contract is wholly unambiguous," which presents "a question of law to be decided by the Court" to be resolved without reliance on parol evidence. *Malmsteen v. Univ. Music Grp., Inc.*, 940 F. Supp. 2d 123, 130 (S.D.N.Y. 2013).

Section 6.2 of the JDLA imposes an unambiguous obligation on Samsung, providing that "***Samsung will supply*** NAND and DRAM products to Netlist ***on Netlist's request*** at a competitive price." SUF ¶ 34. The parties chose to use the phrase "will supply," which is mandatory, not discretionary. As New York's highest court has explained, "the usual meaning which the law and common usage impose upon" the word "will" is "one of binding obligation, not election." *Zheng v. City of N.Y.*, 19 N.Y.3d 556, 580 (2012).

Samsung has argued that Section 6.2 does not provide a supply obligation, but its plain and unambiguous language shows otherwise.  In denying Samsung's motion for judgment on the pleadings, this Court has already recognized that "[t]he title of the provision at issue is 'Supply by Samsung,' the title of the encompassing section

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO. 8:20-CV-993-MCS (ADS)

- 15 -

is 'SUPPLY OF COMPONENTS,' and the surrounding terms pertain to supply and purchase obligations." Dkt. 120 at 4 (citing JDLA §§ 6, 6.2, 6.3). That contractual context further confirms that Section 6.2 reflects a mandatory supply obligation. *See, e.g.*, *Beltrone Const. Co. Inc. v. State*, 592 N.Y.S.2d 832, 834 (App. Div. 1993) (relying on headings in interpreting contract); *Charlebois v. J.M. Weller Assocs., Inc.*, 526 N.Y.S.2d 648, 649 (App. Div. 1988) (same). Because any other construction "would strain the contract language beyond its reasonable and ordinary meaning," the Court should look no further. *Malmsteen*, 940 F. Supp. 2d at 131. Indeed, in rejecting Samsung's argument that "the only reasonable interpretation" of Section 6.2 is "that it governs price only," this Court has already determined that it provides "both a price . . . ***and a supply obligation***." Dkt. 120 at 4. That ruling should resolve this aspect of the parties' dispute.

If the Court nevertheless finds that Section 6.2 is ambiguous, summary judgment is still appropriate in light of "relevant extrinsic evidence" of the negotiating history, course of conduct, and Samsung's internal recognition of the JDLA's proper interpretation, all of which leave "no genuine issue of material fact and permit[ ] interpretation of the agreement as a matter of law." *Malmsteen*, 940 F. Supp. 2d at 131.

Samsung is a highly sophisticated company and it is well aware of how to negotiate and draft a contract. Here, the negotiation history is crystal clear. Samsung sent an initial draft agreement to Netlist stating that the JDLA would "not be deemed to require . . . Samsung to supply any products to Netlist." SUF ¶ 19. Netlist responded days later, striking that provision because earlier in their negotiations "Samsung clearly agreed to provide Netlist with NAND and DRAM products." *Id.* ¶¶ 19-21. Samsung's proposed contract term—which would have made the binding supply obligation discretionary—was deleted and never incorporated in subsequent drafts of the JDLA or the final executed version of it. *Id.* ¶ 20. Because the parties' "deletion

of th[at] provision clearly precludes construction of the contract as though it still contained that provision," the JDLA cannot be read to allow Samsung to refuse Netlist's requests to purchase NAND and DRAM. *Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*, 458 F. Supp. 2d 131, 144 (S.D.N.Y. 2006); *see also Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*, 864 F.2d 648, 651 (9th Cir. 1988) ("Words deleted from a contract may be the strongest evidence of the intention of the parties.").

Accordingly, for nearly two years after entering into the JDLA, Samsung largely complied with its mandatory supply obligation. SUF ¶¶ 71-73; *see also In re Med. Cap. Sec. Lit.*, 2011 WL 5067208, at *5 (C.D. Cal. July 26, 2011) ("the conduct of the parties . . . before any controversy has arisen . . . affords the most reliable evidence of the parties intentions"). Samsung's contemporaneous intent and understanding can also be ascertained from its internal discussions. As Samsung acknowledged time and again, it had "an **obligation** to supply NAND/DRAM" because "[p]ursuant to the agreement, supply for NAND and DRAM products is **necessary** if there is a request from Netlist." *Id.* ¶¶ 38-39. Just like the JDLA's use of the term "will supply," Samsung's emails are unequivocal: Samsung knew it did not have any discretion to deny Netlist's requests to purchase NAND and DRAM. There is no better evidence of the JDLA's proper interpretation than that Samsung and Netlist actually agree on it. *See, e.g.*, *Sunbury Textile Mills v. Comm'r of Internal Revenue*, 585 F.2d 1190, 1196 (3d Cir. 1978) ("Where . . . there is no dispute between the contracting parties over the meaning of the terms, . . . [t]heir harmonious recital of what these words mean is conclusive.").

Lastly, to the extent any ambiguity remains as to the parties' understanding, Section 6.2 must be interpreted in favor of Netlist. The key phrase "Samsung will supply" products "on Netlist's request" was drafted by Samsung. SUF ¶¶ 18-19. "It has long been the rule" in New York "that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it." *151*

- 17 -

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

*W. Assocs. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 734 (1984). Section 6.2 "is subject to the rule invoking strict construction of the contract in the light most favorable to the nondrafting party." *DeAngelis v. DeAngelis*, 962 N.Y.S.2d 328, 330 (App. Div. 2013). That, too, requires summary judgment in Netlist's favor.

### 2. Samsung breached by withholding $1.32 million and failing to "reasonably cooperate" with Netlist

Under Section 3.1, Samsung was required to pay Netlist $8 million as a non-recurring engineering fee to fund the companies' joint research and development efforts. SUF ¶ 27. Section 3.2 allowed Samsung to "deduct any applicable withholding taxes due or payable under the laws of Korea" from that fee, but ***only*** "[t]o the extent that any withholding taxes are ***required*** by applicable law." *Id* ¶ 28. And if any funds were withheld, Samsung was still required to "reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes." *Id.* Samsung breached each of these binding obligations by (1) wrongfully withholding $1.32 million from the $8 million fee that was not, in fact, "required" to be paid to Korean tax authorities, and (2) obstructing Netlist's efforts to seek a refund of those wrongfully withheld funds. *Id.* ¶¶ 46-52.

**Wrongful Withholding.** It has now been conclusively determined as a matter of Korean law that Samsung was not "required" to withhold $1.32 million, and thus its withholding breached Sections 3.1 and 3.2. In its disposition of November 17, 2020, the Korean Tax Tribunal decisively ruled in Netlist's favor, finding that that the $8 million owed to Netlist under the JDLA was business income, rather than patent royalties, and thus Samsung's withholding of $1.32 million was not required under Korean law. *Id.* ¶ 53. The substance of the Korean Tax Tribunal's decision "is not subject to reasonable dispute" as it "can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, this Court may take judicial notice of that ruling, which is

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF CASE NO. 8:20-CV-993-MCS (ADS)

- 18 -

dispositive on the question of whether Samsung breached Sections 3.1 and 3.2. *See, e.g.*, *Kenneth v. Yeung Chi Shing Holding (Del.,) Inc.*, 2020 WL 409010, at *4 n.5 (N.D. Cal. Jan. 24, 2020) ("Courts may take notice of proceedings in other courts, both within and without the federal judicial system," including "foreign judgments and court documents"); *In re Ex Parte Application of Jommi*, 2013 WL 6058201, at *1 n.1 (N.D. Cal. Nov. 15, 2013) (similar).

Samsung is barred from attempting to re-argue this issue because that would necessarily re-litigate the merits of the Korean tax proceedings in which Samsung actively participated. *See, e.g.*, *Gardner v. Comm'r of Internal Revenue*, 704 F. App'x 720 (9th Cir. 2017) ("Collateral estoppel applies if (1) the issue at stake is identical to the one alleged in the prior litigation; (2) the issue was actually litigated by the party against whom preclusion is asserted in the prior litigation; and (3) the determination of the issue in the prior litigation was a critical and necessary party of the judgment."); *Stewart v. U.S. Bancorp.*, 297 F.3d 953, 956 (9th Cir. 2002) ("Res judicata applies when there is (1) an identity of claims; (2) a final judgment on the merits; and (3) identity or privity between parties.").

**Failure to Cooperate.** Samsung further and continuously breached Section 3.2 by failing to "reasonably cooperate" with Netlist's efforts to reclaim the wrongfully withheld funds. SUF ¶ 28. Under New York law, questions of reasonableness can be resolved on summary judgment where, as here, there is no "triable issue of fact." *Perrault v. Village Dunes Apt. Corp.*, 83 N.Y.S.3d 141, 143 (App. Div. 2018) (affirming summary judgment award because defendant's actions were "reasonable"). Summary judgment is appropriate because Samsung's non-cooperation is not factually disputed and it "consisted of willful and avowed obstruction." *Preferred Mut. Ins. Co. v. SAV Carpentry, Inc.*, 844 N.Y.S.2d 363, 364 (App. Div. 2007) (affirming summary judgment award for plaintiff with burden of proof as to reasonableness of conduct).

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

- 19 -

When asked via interrogatory to describe any actions it took to "reasonably cooperate" with Netlist's efforts to seek a refund, Samsung gave only two responses. First, "Samsung informed Netlist that if it desired a refund, it could do so by directly contacting the Korean National Tax Service." SUF ¶ 49. In other words, Samsung told Netlist that Netlist was on its own. That is, quite literally, the opposite of the dictionary definition of the term "cooperate." *See, e.g.*, "Cooperate," Merriam-Webster, https://www.merriam-webster.com/dictionary/cooperate ("to act or work ***with another or others***; act ***together*** or in compliance" (first definition)).

Second, Samsung asserts it "provided" the Korean tax authorities with "information within its knowledge relating to the [JDLA] and the payment of any fees owed to Netlist under it." SUF ¶ 52. But Samsung did not offer objective facts to the Korean government.  Rather, it ***argued*** (incorrectly) that the $8 million it owed to Netlist should be regarded as patent licensing income. *Id.* ¶¶ 51-52. In other words, Samsung expressly advocated ***against Netlist's interests*** by arguing an unmeritorious position that the Korean Tax Tribunal has since confirmed is wrong as a matter of law.  That, too, is directly contrary to the notion of cooperation. *See, e.g.*, "Cooperate," Merriam-Webster, https://www. merriam-webster.com/dictionary/cooperate ("to associate with another or others ***for mutual benefit***" (second definition)).[4]

---

[4] This was not a mere one-time breach occurring upon Samsung's initial failure to pay Netlist $8 million. The Korean Tax Tribunal's ruling was not issued until November 2020, four months ***after*** Netlist filed its First Amended Complaint. See Dkt. 17-1. Under the continuing wrong doctrine, ongoing breaches of a contract result in a "cause of action accru[ing] anew every day for each continuation of the wrong," as "the claims for breach of that obligation are not referable exclusively to the day the original wrong was committed." *Stalis v. Sugar Creek Stores, Inc.*, 744 N.Y.S.2d 586, 587 (App. Div. 2002). Netlist's claim "accru[ed] . . . continuously" in light of Samsung's continued failure to pay Netlist what it was owed or to cooperate in Netlist's efforts over the course of several years to pursue a tax refund. *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 122 (2d Cir. 2020). Samsung's failure to cooperate also reflects its bad faith. *See Stevens*, 854 N.Y.S.2d at 692 (bad faith includes "interference with or failure to cooperate in the other party's performance").

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

Section 3.1 expressly states that the $8 million payment constituted "non-refundable NRE fees," SUF ¶ 27, where "NRE" is a common an acronym for "non-recurring engineering," *see, e.g.*, *ISG, Corp.*, 917 N.W.2d at 35 n.7. That term describes fees intended to "provide[ ] reimbursement for design effort and other preproduction work" in connection with researching and developing a new product. *Westinghouse Elec. Corp. v. Garrett Corp.*, 437 F. Supp. 1301, 1306 (D. Md. 1977); *see also*, *e.g.*, *EFW, Inc. v. Smiths Aerospace, LLC*, 2008 WL 11349748, at *1 (N.D. Tex. Nov. 21, 2008) ("non-recurring engineering expenses aris[e] during [product] development"); Alan S. Gutterman, 2 Corporate Counsel's Guide to Technology Management & Transactions § 22.2 ("a customer pay[ing] some or all of the supplier's nonrecurring engineering expenses to develop a product meeting [its] specific needs" is "fairly standard"). Moreover, the context of the JDLA bears this out: the heading "***Development Costs***" appears directly above that payment provision, demonstrating that this payment was for Netlist's efforts in satisfaction of the parties' "Collaborative Development Work" under Section 2 of the JDLA. SUF ¶¶ 23, 26; *cf. Beltrone*, 592 N.Y.S.2d at 834 (relying on contract headings). Samsung's arguments to the Korean tax authorities were thus directly contrary to the plain language of Section 3 itself. While Netlist originally sought patent licensing fees from Samsung, SUF ¶ 12, that is not what the parties ultimately bargained for. Samsung has once again sought to read back into the JDLA terms that were eschewed during the contract's negotiation. *See, e.g., Fireguard Sprinkler Sys*, 864 F.2d at 651; *Oldcastle Precast*, 458 F. Supp. 2d at 144.

### D.   Damages

So long as Samsung breached the JDLA while Netlist performed, Netlist does not also need to prove damages to obtain summary judgment. In New York, it is a "well-established rule of contract law that the law will infer at least nominal damages at the moment of breach." *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993); *see*

*also*, *e.g.*, *Ross v. Sherman*, 944 N.Y.S.2d 620, 621 (App. Div. 2012) (affirming nominal damages award absent "sufficient evidence to demonstrate actual damages"). Because Samsung breached and Netlist did not, *supra* Pt. III(B)-(C), partial summary judgment is warranted. Following expert discovery and on a complete record, Netlist will demonstrate that it suffered multimillion-dollar damages in an amount to be proven at trial.

### E. Samsung's Breaches Were Material.

Section 13.2(1) of the JDLA allows Netlist to terminate the contract if Samsung "is in material breach of th[e] Agreement and it is not cured within thirty (30) days period from [Netlist's] written demand, or as a consequence of the breach the purpose of this Agreement cannot be achieved." SUF ¶ 43. This provision echoes the common law, as the "general rule" is that "rescission of a contract is permitted for such a breach as substantially defeats its purpose," but not "for a slight, casual or technical breach." *Ma v. Biaggi*, 54 N.Y.S.3d 46, 47 (App. Div. 2017). "[T]he question whether a breach is material is for the finder of fact but, where the evidence concerning the materiality is clear and substantially uncontradicted, the question is a matter of law for the court to decide." *Wiljeff, LLC v. United Realty Mgmt. Corp.*, 920 N.Y.S.2d 495, 497 (App. Div. 2011) (affirming partial summary judgment in favor of plaintiff); *see also, e.g.*, *Alberts*, 945 N.Y.S.2d at 555 (affirming summary judgment where "plaintiff materially breached his contract with defendant"); *Hoover v. HSBC Mortg. Corp.*, 9 F. Supp. 3d 223, 242-43 (N.D.N.Y. 2014) (materiality can be "resolved at summary judgment or trial").

The primary benefit promised to Netlist under the JDLA was Samsung's mandatory supply obligation. The exchange of a supply obligation in return for a patent license clearly was the centerpiece of the negotiations, consideration, and transaction. Netlist originally sought $85 million dollars in addition to ongoing royalty payments for a ***five-year*** patent license. Samsung countered with a request for

a *perpetual* license, and offered to fund joint research in the amount of $5 million, loan Netlist $10 million, and provide Netlist with a "[s]upply of NAND, DRAM and/or NVDIMM-P controllers on terms to be negotiated." SUF ¶¶ 12-13. Moreover, the email from Samsung to which its counteroffer was attached establishes that Samsung recognized the value of the supply proposal to Netlist, as Samsung "hope[d] the supply of NAND, DRAM and NVDIMM-P related chipsets will help enable [Netlist's] vision of being a products company." *Id.* ¶ 14. Rather than monetary payment for its valuable patent license, under the final JDLA Netlist instead received a mandatory supply obligation, highly coveted in Netlist's industry. *See id.* ¶¶ 15-17 ("Samsung's commitment to supply NAND and DRAM . . . was of crucial value to Netlist" because it would "reduce business risk stemming from the possibility that [intermittent] shortages would disrupt the flow of products to [Netlist's] customers" and "elevated Netlist into an elite group of industry players and provided assurances to Netlist's customers that if they engaged Netlist, they would have good access to supply.").

After Samsung ceased filling Netlist's orders, Netlist made repeated exhortations for Samsung to reinstate its supply because it was "critical" for Netlist. *Id.* ¶¶ 80, 92, 98. As Netlist explained, it was receiving "a lot of complaints from [its] customers about disruption of supply" which threatened to harm its ability "to maintain the trust with [its] customers." *Id.* ¶ 102. What's more, Samsung knew this harm was occurring and was devastating to Netlist. At the very same time that Netlist was pleading for more NAND and DRAM product, Samsung employees discussed internally how Samsung provided "nearly 100% of [Netlist's] support and Revenue" such that Samsung ceasing to supply Netlist "will have a dramatic impact on their financials and future business" because "they have no other bread and butter." *Id.* ¶ 82. Those are undisputed admissions—Samsung *knew* that its bad-faith breach of contract was material to Netlist. Indeed, Samsung was placing Netlist in precisely the

position it had sought to avoid by entering into the JDLA. The only reason Netlist was willing to license its patents to Samsung for tens of millions of dollars less than its initial ask and without receiving any royalties was "[b]ecause securing direct supply of NAND and DRAM was so critical to Netlist." *Id.* ¶ 15.  This Court thus need look no further than Samsung's breach of its supply obligation to find a material breach.

As if that weren't enough, Samsung also failed to pay nearly 20% of the NRE fee due to Netlist. That was unlawful, gratuitous and counterproductive because that money was intended to support joint research and development efforts that would benefit Samsung just as much as Netlist. Furthermore, while $1.32 million may be a pittance for Samsung, for Netlist it was a material amount. Samsung then rubbed salt in the wound by actively obstructing Netlist's ability to recuperate those wrongfully withheld funds, which took years and significant further costs to accomplish.

Where a party fails to deliver on the "primary consideration" promised to its counterparty, as Samsung has, it "is routinely held to constitute a material breach, justifying contract termination." *Canon Solutions Am., Inc. v. Lucky Games*, 2017 WL 1653563, at *4 (S.D.N.Y. May 1, 2017) (granting partial summary judgment). Samsung materially breached the JDLA through its "fail[ure] to perform a substantial part of the contract or one or more of its essential terms or conditions." *Viacom Outdoor, Inc. v. Wixon Jewelers, Inc.*, 906 N.Y.S.2d 776 (Table), at *3 (Sup. Ct. 2009) (granting summary judgment), *aff'd*, 919 N.Y.S.2d 151 (App. Div. 2011); *see also 10-12 W. 107th St. HDFC v. Vilma*, 976 N.Y.S.2d 830, 833 (Civ. Ct. 2013) ("repeated breaches . . . constitute a breach of a material term"). Because there "are no triable issues of fact with respect to" Samsung's conduct, summary judgment is appropriate with respect to the materiality of Samsung's breaches. *Viacom*, 906 N.Y.S.2d at *3.

### F. Netlist Properly Terminated the JDLA.

The JDLA provides that, in the event of a material breach, Netlist was to send a "written demand" to Samsung to cure such breach within thirty days, after which

Netlist would "have a right to terminate" the JDLA if the breach was "not cured." SUF ¶ 43. The JDLA further clarified that such demand would "be valid upon receipt" by Samsung, so long as it was "sent by registered or certified mail" to the addressee specified in Section 15. *Id.* ¶ 44. Netlist precisely followed that procedure by sending a written demand to the specified address by registered mail, expressly seeking cure of Samsung's material breaches. *Id.* ¶ 125. Samsung admits that it received Netlist's demand letter, but claims it was returned to sender (conspicuously never stating one way or the other whether it was aware of the letter's contents at the time). *Id.* ¶ 127. But the JDLA does not require that Samsung keep or even read the written demand for cure in order to trigger Samsung's thirty-day cure period. Instead, notices sent under the JDLA are "valid upon receipt thereof." *Id.* ¶ 44. The critical, undisputed fact is Samsung's admission that it ***received*** the letter in question. And, in any event, Samsung has also admitted that it received a copy of that same letter from Netlist via email on June 12, 2020. *Id.* ¶¶ 126-27.

When Samsung failed to respond, Netlist followed up with a second letter on July 15, 2020, which was once again sent by registered mail to the same addressee specified in JDLA. *Id.* ¶ 128. As stated in that second letter, "Netlist ha[d] provided Samsung with notice of a material breach," yet "Netlist ha[d] not received a response from Samsung regarding the material breaches set forth" in its first letter, "let alone any cure of such breaches." *Id.* Accordingly, Netlist properly terminated the JDLA pursuant to Section 13.2 "effective immediately." *Id.* Because Netlist complied with all requirements imposed by Sections 13 and 15, it is entitled to a declaration that the JDLA was properly terminated.

## V. CONCLUSION

For the foregoing reasons, Netlist respectfully requests that partial summary judgment be granted on each of its three causes of action, with damages to be determined at trial.

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)

- 25 -

1  | Dated: August 16, 2021

GIBSON, DUNN & CRUTCHER LLP

2

By: /s/ Jason C. Lo

3

Jason C. Lo
333 South Grand Avenue

4

Los Angeles, CA 90071

5

213.229.7000
jlo@gibsondunn.com

6

7

Attorneys for Plaintiff Netlist Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR
PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 8:20-CV-993-MCS (ADS)