# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

## EXPERT REPORT OF JOSEPH C. McALEXANDER III
## REGARDING CUSTOM AND PRACTICE IN THE MEMORY INDUSTRY

### NETLIST INC.,
### vs.
### SAMSUNG ELECTRONICS CO., LTD.

### Case No. 8:20-CV-993-MCS (ADS)

### August 23, 2021

# TABLE OF CONTENTS

1   INTRODUCTION _____ 1

2   QUALIFICATIONS _____ 2

3   PRIOR TESTIMONY _____ 6

4   COMPENSATION _____ 6

5   UNDERSTANDING OF THE LAW _____ 6

6   DOCUMENTS AND MATERIALS REVIEWED _____ 6

7   BACKGROUND OF THE TECHNOLOGY _____ 8

    7.1   The Memory Manufacturing Process _____ 8

    7.2   Computer System Architecture _____ 11

    7.3   Volatile Memory _____ 15

        7.3.1   Static Random Access Memory (SRAM)_____ 16

        7.3.2   Dynamic Random Access Memory (DRAM) _____ 16

            7.3.2.1   JEDEC Standard DRAMs _____ 19

            7.3.2.2   Synchronous DRAM (SDRAM) Technology ___ 20

                7.3.2.2.1   JEDEC SDRAM Standard_____ 20

                7.3.2.2.2   JEDEC DDR (DDR1) SDRAM Standard_____ 23

                7.3.2.2.3   JEDEC DDR2 SDRAM Standard _____ 23

                7.3.2.2.4   JEDEC DDR3 SDRAM Standard _____ 24

        7.3.3   JEDEC DRAM Memory Controllers_____ 25

        7.3.4   SDRAM and DDR SDRAM Memory Systems _____ 27

            7.3.4.1   Dual In-line Memory Module (DIMM)_____ 30

            7.3.4.2   Registered Dual In-line Memory Module RDIMM _____ 32

            7.3.4.3   Load Reduced Dual In-line Memory Module LRDIMM _____ 33

    7.4   Non-volatile Memory _____ 35

        7.4.1   ROM / EPROM / EEPROM Memory _____ 35

        7.4.2   Flash Memory_____ 36

            7.4.2.1   NAND Flash Memory - Physical Organization of Cells _____ 37

            7.4.2.2   NAND Flash Memory - Data Formats and Overhead Data _____ 39

      7.4.2.3   **NAND Flash Memory - Management Operations** _____ **39**

      7.4.2.4   **NAND Flash Memory - Storage** _____ **41**

      7.4.2.5   **NAND Flash Memory - Non-Volatile Dual In-line Memory Module NVDIMM** _____ **42**

**8   OPINIONS – MARKET DEMAND, STANDARD AND ACCEPTABLE INDUSTRY PRACTICES** _____ **45**

  **8.1  Standard and Acceptable Industry Practices: Market Demand Considerations** _ **45**

  **8.2  Standard and Acceptable Industry Practices: Manufacturing Process Considerations** _____ **47**

    **8.2.1  Importance of Accurate, Reasonable Forecasts** _____ **48**

    **8.2.2  Quotations** _____ **51**

    **8.2.3  Purchase Order Requests** _____ **51**

    **8.2.4  Product Allocation** _____ **52**

    **8.2.5  Product Delivery** _____ **54**

**10  CONCLUDING REMARKS** _____ **55**

**Attachment A    – Curriculum Vitae / Other Cases** _____ **55**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA



NETLIST INC.,

  Plaintiff,

  v.

SAMSUNG ELECTRONICS CO., LTD.,
A Korean corporation,

  Defendant.

§
§
§
§
§
§
§
§
§
§
§
§

Case No. 8:20-cv-993-MCS (ADS)

---

## EXPERT REPORT OF JOSEPH C. McALEXANDER III
## REGARDING CUSTOM AND PRACTICE IN THE MEMORY INDUSTRY

---

## 1  INTRODUCTION

1.  The opinions expressed in this report are made under Rule 26(a)(2) of the Federal Rules of Civil Procedure pursuant to my role as an expert witness expected to testify on behalf of Defendant Samsung Electronics Co., Ltd. ("Samsung") in this action. I expect to testify regarding the matters discussed in this report as well as any expert or rebuttal reports that I may later submit, and to respond, as appropriate, to testimony, declarations or expert reports provided on behalf of Plaintiff Netlist, Inc. ("Netlist").

2.  I have been retained by Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, counsel for the Plaintiff Samsung, to review the Netlist / Samsung Joint Development and License Agreement (the "Agreement"), consider the documents produced in this case relevant

to that Agreement, and offer opinions regarding standard and acceptable industry practice of commodity memory product forecast, quotation, purchase order request, product allocation, and product delivery.

## 2    QUALIFICATIONS

3.    My name is Joseph C. M<sup>c</sup>Alexander<sup>III</sup>, President of M<sup>c</sup>Alexander Sound, Inc., located at 101 W. Renner Rd., Richardson, TX 75082.  I am over eighteen years of age and I would be competent to testify as to the matters set forth herein if I am called upon to do so.

4.    I am a technical expert in the subject matter areas relevant to this complaint, including the design and system integration of both volatile and non-volatile integrated circuit memory, and the product procurement, allocation, and delivery process.  In forming my opinions, I rely on my knowledge and experience in the fields relevant to this complaint.  I further rely on documents and information referenced in this report.  I am qualified to reach the opinions and conclusions stated in this report.

5.    I am a Registered Professional Engineer (#79454) in the State of Texas and hold a Bachelor of Science degree in Electrical Engineering from North Carolina State University.  I have been associated with the integrated circuit and electronics industry as a designer, manager, and consultant during the past 49 years and am a named inventor on 31 U.S. patents and a number of foreign patents, some of which are directly related to the design and incorporation of integrated circuit memory in systems, such as personal and mainframe computers and portable electronic devices such as smart phones.

6.    My skills and experience are in areas of circuit design and analysis, device fabrication and assembly, testing, marketing, control system design and analysis, manufacturing

operations, software development, management, and respective areas of quality, reliability, and

defect/failure analysis.  Specifically, I have:

> designed memories, including Dynamic Random Access Memories (DRAMs), Static Random Access Memories (SRAMs), Charge Coupled Devices (CCDs), Shift Registers (SRs), and functional circuits including I/O buffers for address and data, decoders, clocks, sense amplifiers, fault tolerant (incorporating both nonvolatile EPROM and random access memory components), parallel-to-serial data paths for video applications, level shifters, converters, pumps, and logic, as well as wireless communication systems and MEMs;

> managed operations including memory product cost centers for product deliveries and monetization, engineering, training, and quality assurance for device fabrication, assembly, test, analysis, and reliability assessment, as well as manufacturing control, each of which involved both volatile and non-volatile memory; testing, analysis, and control involved use of mechanical calibration and measuring equipment, including optical, scanning e-beam, IR, capacitive, and laser using phase contrast and Fast Fourier Transform (FFT) for High Aspect Ratio Inspection (HARI) applications;

> taught courses in solid-state device physics, integrated circuit design, integrated circuit fabrication, and statistical control;

> provided expert services, investigating both process and design technologies of various devices (microprocessor and controller, volatile and non-volatile memory, programmable logic, card, tag, module, mixed signal, custom, and other), systems (PC and peripheral, computer, control, laser measurement, switch, architecture, software, and other), and consumer products (medical, TV, telephone, VCR, facsimile, copier, lighting, game, and other); and

> designed and managed development, testing, and evaluation of memory devices and systems incorporating such devices, including simulation of operation.   I have also had experience in programming, erasing, and wearout of electrically programmable and erasable non-volatile memories.

7.     Of particular relevance to this report is my experience as an integrated circuit memory designer, manager, and consultant.  I spent nine years designing DRAMs, SRAMs, and non-volatile products at Texas Instruments, Inc., and an additional five years there managing memory-related wafer fabrication operations and assembly (packaging), test, and reliability analysis facilities.  As such, I participated directly in the strategic design and process decisions required to bring competitive products to market and managed cost and revenue (both projected and actual) associated with those marketed products.  I also worked directly with clients regarding product manufacturer-to-customer integration, implementing direct-ship-to-customer productivity enhancements and establishing and executing product reliability and performance assessment studies.  Often, such analyses suggested that certain modifications be made to design, fabrication, or assembly structures or methods, or to product flow and distribution.  It was my responsibility to implement selected improvements to achieve the designated goals without negatively impacting the revenue models and time-to-market projections while maintaining and improving product yield and reliability.

8.     As a designer and design manager, for example, I developed new, leading edge technology DRAM designs from conception to production.  As such, my designs were always created in parallel with innovations in design simulation, in wafer processing, and in packaging architecture.  I had to develop simulation behavioral models, tested against actual prototype designs, to determine the most appropriate fit between design, process, and assembly to deliver the best product to the market.  In each case, my product prototype and production designs worked the first time; and the DRAM products were widely accepted in the market by major OEM companies.

9.      I also worked with DRAM consumers evaluating performance of my designs in system applications to better match those designs to the consumers' requirements.  New outgoing test methods and algorithm test patterns were designed to improve overall performance and reliability and to provide feedback for design and process improvements.  I thus developed a comprehensive understanding of the key factors, such as design, process, assembly, cost, equipment, facility, personnel resources, and timing necessary to bring a product from conception to market.  These factors have continued to be key contributors to the success of DRAM and other memory products throughout the history of integrated circuit memory, even to the present.

10.     Additionally, I have evaluated and provided expert services related to DRAM and NAND Flash memory technology, both as standalone components and as components integrated into memory modules and systems.  I have also provided expert services related to memory product procurement and contract purchase order fulfillment according to contract agreement deliverables. I am also knowledgeable of communication control, addressing, and data transfer protocol as it relates to memory system architecture.  A more detailed account of my work experience and other qualifications is listed sin my Curriculum Vitae attached as **Attachment A** to this Report.

11.     Because of my background, education, training, and experience, I am qualified as an expert to opine on the technology, other technical factors, and the procurement and delivery process pertinent to this case.  A more detailed account of my work experience and other qualifications is listed in my Curriculum Vitae attached as **Attachment A** to this report.

**3      PRIOR TESTIMONY**

12.      A list of the cases during at least the last four years in which I have signed a
Protective Order, have testified as an expert either at a trial, hearing, or deposition, or have
submitted statements / opinions, is attached as **Attachment A** to this Report.

**4      COMPENSATION**

13.      I am being compensated for my work on this case through M<sup>c</sup>Alexander Sound,
Inc., at the rate of $595 per hour.  My compensation is not dependent upon my testimony or the
outcome of this case.

**5      UNDERSTANDING OF THE LAW**

14.      For the purposes of this report, I have been informed about certain aspects of the
law that are relevant to my analysis and opinions.

15.      I understand that evidence of industry custom and practice may be considered in
construing the meaning of an ambiguous contract provision.[1]

**6      DOCUMENTS AND MATERIALS REVIEWED**

16.      A list of all documents and materials which I considered or relied upon in forming
the opinions expressed in this report is provided below:

|   | Reference Material | Source |
|---|---|---|
| 1 | CK Hong Deposition Transcript with Exhibits | |
| 2 | Indong Kim Deposition Transcript with Exhibits | |

---

[1] *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 459-60 (2004).

|  | Reference Material | Source |
|---|---|---|
| 3 | 2015, 11.12 Joint Development and Licensing Agreement (Samsung document) | Sasaki Depo Exhibit 16 (SEC000001-19) |
| 4 | First Amended Complaint | Docket [17-2] |
| 5 | Decl. of CK Hong | Docket [88-11] |
| 6 | Netlist Opposition to Motion for Judgment on the Pleadings | Docket [88-12] |
| 7 | Netlist 2014 10K | Sasaki Depo Ex. 17 |
| 8 | Netlist 8K (November 12, 2015) | |
| 9 | Netlist 10K (January 2016) | Sasaki Depo Ex. 18 |
| 10 | Netlist 10Q, April 2016 | Sasaki Depo Ex. 19 |
| 11 | Netlist 10Q, September 2017 | Sasaki Depo Ex. 20 |
| 12 | Netlist Presentation Slides "Samsung-Netlist Partnership February, 2017" | SEC008152 - 8170 |
| 13 | Netlist Motion for Partial Summary Judgment and Supporting Documents | |
| 14 | Declaration of CK Hong ISO MSJ | |
| 15 | Declaration of PK Hong ISO MSJ | |
| 16 | Declaration of Gail Sasaki ISO MSJ | |
| 17 | Declaration of Raymond LaMagna ISO MSJ | |
| 18 | Netlist Samsung Resale Sales Chart from Q1 2016 to Q4 2020 | NL119892-95 |
| 19 | Native Excel Spreadsheet (Samsung_invoices_data.xls) | Sasaki Depo Ex. 12 (NL117869) |
| 20 | Native Excel Spreadsheet (Samsung_reseller_invoices_data.xls) | Sasaki Depo Ex. 13 (NL118917) |
| 21 | 8/6/2019 PK Hong Email attaching Samsung_DRAM_Support-08-03-19_SL.pptx | SEC032206-15 |
| 22 | 6/2/2016 Email | PK Hong Depo Ex. 58 (SEC001014 - 23) |
| 23 | 4/16/2015 Email | CK Hong Depo Ex. 71 (NL107796 - 803) |
| 24 | 6/11/2021 Email | PK Hong Depo Ex. 42 (SEC008145 - 93) |

# 7    BACKGROUND OF THE TECHNOLOGY

17.    If asked by this Court, I expect to provide a tutorial concerning the operation, architecture, and design of memory devices, including volatile memory (*e.g.*, Static Random Access Memory (SRAM), Dynamic Random Access Memory (DRAM), JEDEC Synchronous Dynamic Random Access Memory (SDRAM), and JEDEC Double Data Rate Synchronous Dynamic Random Access Memory (DDR*)) and non-volatile memory (*e.g.*, Read Only Memory (ROM), Electrically Programmable ROM (EPROM), Electrically Erasable and Programmable ROM (EEPROM), and Flash.  I expect to also provide in that tutorial an overview of the memory module technology, including volatile memory modules using DRAM (*e.g.*, Dual In-line Memory Module (DIMM), Registered DIMM (RDIMM), Load Reduced DIMM (LRDIMM), and Non-volatile DIMM using NAND Flash (*e.g.*, NVDIMM, including NVDIMM-N, NVDIMM-H, NVDIMM-P)).

## 7.1    The Memory Manufacturing Process

18.    The manufacturing of an integrated circuit memory chip occurs in a fabrication facility, often referred to as a "fab" or "wafer fab" for short, that is hundreds of times cleaner than a hospital operating room.  This "contamination free" environment is required to process the memory chips through the wafer fabrication facility so that the chips delivered to customers function correctly and remain reliable over time.  Each wafer, comprising many individual chips, is processed using hundreds of controlled chemical and physical processes performed over a period of typically several months.  These processes include, among others, chemical etching, photolithography, ion implantation, high temperature oxidation and diffusion, and metallization.

19.     Like any manufactured, commodity electrical product, the chips on a wafer must undergo testing.  But unlike most manufactured products, memory chips undergo an initial test, also known as a "probe test," at the end of the wafer fabrication process.  Due to the intricate nature of memory chips, some of the chips on a wafer do not operate as designed.  DRAMs have for 43 years incorporated a method to abate this loss in functional chips by designing on-chip redundancy replacement storage cells.  When a chip fails to function properly during a probe test, the defective memory cells are identified, bypassed, and then replaced with fully operating redundant memory cells.  Those chips that cannot be salvaged are identified as defective.  The number of fully functional chips divided by the total number of potential working chips on an entire wafer is often referred to as the wafer "yield," represented as a percentage.  And this yield percentage represents the overall yield of a wafer having completed all of its wafer processing steps.

20.     The wafers, at this stage, have completed the wafer fabrication process, commonly referred to as the "front end," and are then sent to an assembly and test facility, commonly referred to as the "back end."  Here, each wafer is then cut so that the defective chips can be scrapped and the functional chips can be sent for assembly and final testing prior to shipment to a customer.



**Image of a Single Chip from Finished Wafer**

21.     The assembly process is often referred to as "packaging," in which each memory chip is encased in a non-conductive material, often an epoxy type material.  Within the housing of this epoxy structure, the chip is attached to a conductive (metal) substrate (lead frame) to electrically connect the backside of the chip (this is the side of the chip opposite the front side). As in the front end process, the chip is then subjected to a number of back end process steps in

which certain electrical connection locations on the chip are connected to metal conductors (wires) which will then provide electrical access points at the outside of the package.

22.     Each memory packaged chip is then rigorously tested, including evaluation at different operating temperatures.  The testing may include electrical testing under extreme environmental conditions, such as exposure to high temperature in a process sometimes referred to as "burn in."  In this process, chips that have embedded defects that would cause early failure, when incorporated into a system, are rejected.  Other testing may include electrically operating the memory chip slightly outside the specification margins of the device to verify that the memory chip will operate successfully over its entire operating region (defined by various conditions such as voltage, power, and timing).

23.     Considering the deliverable products (modules) at issue in the present case, these memory chips are then combined together, as described below, with other chips, such as controllers, on a common substrate to form a memory module.

**7.2     Computer System Architecture**

24.     There are a number of different computer system architectures in use; and each of those architectures has evolved alongside advances in the technology.  However, there are some fundamental building blocks of system architecture that are common among the different approaches.  Some of these common architectural building blocks are:

        (1) processor (Central Processing Unit or "CPU");

        (2) fast access memory ("cache");

        (3) main (primary) memory;

        (4) permanent storage memory;

(5) buses;

(6) bus control/arbitration;

7) graphics/display;

(8) input/output ("I/O") peripherals; and

(9) interfaces.

25.     A representative architecture is shown below, embodying each of these common

building blocks:[2]



26.     Even though these building blocks are common, implementation of each is different, depending on the specific system architecture.  A fundamental principle, regardless of the specific architecture, is that each bus within a system architecture operates according to a different information transfer communications protocol, a different speed / frequency / timing for information traffic between the components, and a different bandwidth (amount of information that can be transferred within a given unit of time).

27.     In this computer system architecture example, there are 6 distinct buses across which information is transferred between computer system components:

(1) AGP;

(2) Memory;

(3) Frontside;

(4) ATA;

(5) PCI; and

(6) N. Bridge – to – S. Bridge.

Within the discussion below of the buses, I will also address the function of the system components attached to each of the buses.

1) **AGP**.  The AGP (Accelerated Graphics Port) Bus, between the graphics controller and the North Bridge, is based on the PCI bus, but is specifically designed to handle the traffic demands of graphics, allowing the graphics controller direct access to main memory at a bandwidth that is at least twice that of the PCI bus.[3] AGP connects to a single target and has a single master for the bus.

---

[3] *See* Comparison between the Peripheral Component Interconnect (PCI) and the Accelerated Graphics Port (AGP), https://www.cs.umd.edu/~meesh/cmsc411/website/projects/agp/pci_vs_agp.htm.

The graphics information transferred to the graphics controller is then processed, *e.g.*, for display.

2) **Memory**.  The Memory Bus, between main memory and the North Bridge, serves to tightly couple the SDRAM memory to the CPU.  In most instances, the information traffic on the memory bus is controlled by a separate memory controller, in this instance, part of the North Bridge device.  The memory controller provides the necessary synchronization between the CPU and SDRAM memory.  Since the CPU demands (rate of information exchange request) are greater than the capability of the SDRAM memory bus to deliver (memory bus bottleneck), the CPU cooperates with additional, faster cache memory (as explained above) to handle repetitive, same data access.[4]  Thus, the main memory in cooperation with the cache memory, serves to store temporarily the information associated with a certain task or application(s) that is running on the computer system.  The user (computer) can transfer a copy of that information periodically, or at the completion of the task, to permanent memory for storage.

3) **Frontside**.  The Frontside Bus, between the CPU and the North Bridge, is the primary communication path across which information is transferred between the CPU and other system components.  The Frontside Bus operates at a much lower speed than the internal processing speed of the CPU, closer to the speed of the memory bus.

4) **ATA**.  The ATA (Advanced Technology Attachment) Bus, between the South Bridge and the disk (hard) drive, was originally called the IDE (Integrated Drive Electronics) Bus.  This bus services the information to and from the permanent hard drive storage.  This bus, unlike the other buses in this system architecture, is a serial bus and is often referred to as SATA, meaning Serial ATA.  Compared to the other buses in the system architecture, this is a slow speed bus.  Of note, options are now available in which the hard drive can be replaced by a Flash memory drive known as SSD (Solid State Drive).  The SSD is still connected to the SATA bus.

---

[4] *See, e.g.,* http://en.wikipedia.org/wiki/Bus (computing); *see also h*ttp://www.tomshardware.com/forum/163714-31 -speed-memory-speed.

5) **PCI**.  The PCI (Peripheral Component Interconnect) Bus is, as its name implies, used for communication to any of a number of different system peripherals, such as printers, modems, network cards, sound cards, and video cards.

6) **Bridge**.  The North and South Bridge cooperate to orchestrate the information flow and traffic between the various buses.  The Bridge Bus interconnects the North Bridge with the South Bridge.  The North Bridge arbitrates between the CPU, graphics controller, main memory, and the South Bridge.   The South Bridge arbitrates between peripherals, hard drives/SSD, and the North Bridge.  Although only the PCI bus is shown, among others, South Bridge connections may include Universal Serial Bus (USB), *e.g.*, for USB drives (thumb, jump, etc.), Industry Standard Architecture (ISA) Bus for older peripherals, keyboard, and BIOS to regulate computer start up.

28.     Readily apparent from the above computer system discussion, each interface between a component and a bus must be designed and tailored for communication according to the physical and communications protocol requirements of that bus.  For example, it is not obvious (in fact, it is a technical challenge) to substitute DDR3 SDRAM, modules specifically designed to communicate over a Memory Bus according to JEDEC standards, with Flash modules that do not even use the same command instruction and communication structure and yet, in the substitution, would require conformance to the Memory Bus requirements.

**7.3     Volatile Memory**

29.     Volatile memory is a storage device that requires power to maintain the stored information.  When power to the device is interrupted or removed, the information is lost.  Two primary types of volatile memory discussed below are SRAM and DRAM.  I will address both types below, but an understanding of DRAM is more pertinent to the instant matter before this Court so I will develop that discussing more fully.

### 7.3.1    Static Random Access Memory (SRAM)

30.    One type of volatile memory is SRAM which stores information in each address location without the need to refresh[5] the information, thus the name "static." SRAM can provide superior data retrieval speeds to that of DRAM, but it is relatively expensive to produce and usually lags a generation behind in storage capacity because of the larger physical area associated with each addressed memory location.  Integrated circuit SRAMs have been an integral part of computer systems since the early 1970s, commonly used as cache[6] for personal computers.

### 7.3.2    Dynamic Random Access Memory (DRAM)

31.    Another type of volatile memory is DRAM which also stores information in each address location as in the case of SRAM, but unlike SRAM, has the disadvantage of data volatility over time, even though power remains applied, and thus requires refresh.  The advantage of DRAM is that DRAM memory cell size is significantly smaller than that of SRAM.  At any given point in time, the storage capacity of a DRAM is significantly greater than that of SRAM.

32.    DRAM is one of the primary memory (storage) components of most computers and electronic systems, such as cell phones, PDAs, tablets, servers, and mainframe computers.  While the slower speed "hard drive" in a computer system operates to permanently store large amounts of data and application programs for later, bulk retrieval, the DRAM cooperates with the computer's central processor to temporarily store results of transactions and other information for

---

[5] Refresh refers to a process of periodically reading the state (binary '1' or '0') of stored information and then immediately re-writing the same information back to the same storage location.  This operation is required of some memory devices because the state of the data is volatile over time even if power remains applied to the device.

[6] Cache is smaller, faster memory that is accessed by the computer's processor (central processing unit or "CPU") to reduce the average time it takes to locate copies of data that are frequently used.  Information stored in cache may be instructions or data.

immediate access by the processor.  As discussed above, copies of data in DRAM that is frequently accessed by the processor is also stored in SRAM cache memory for even faster access.

33.     DRAM is a storage device type that stores (writes) and provides (reads) data on a random basis.  "Dynamic" refers to the fact that each memory storage cell in a DRAM is unable to retain valid data without the storage cell periodically being refreshed.  "Random access," as the name implies, means that any of a plurality of storage locations in the memory can be read from, or written to, within a given memory access cycle.  Early DRAM interfaces could be asynchronous (un-clocked) or synchronous (clocked).

34.     In DRAMs, as well as other types of memories, data is stored in memory cells. DRAM memory cells are arranged in "arrays," with each cell located at the intersection of a row ("wordline") and a column ("bitline").  A particular cell or group of cells can be accessed by providing row and column addresses to the memory.  Data to be stored (written) into the memory array is supplied on data lines during a write operation.  Data to be retrieved (read) from the memory array is retrieved using these same data lines during a read operation.

35.     Since the mid-1970's, conventional DRAMs have had one set of pins for address information, a second set of pins for control and timing information (including RAS\ ("row address strobe"), CAS\ ("column address strobe"), WE\ ("write enable"), and CS\ ("chip select")), and a third set of pins for data input and output ("I/O" sometimes referred to as "DQ" pins).  The CS\ signal is used to select one or more chips to be accessed in a memory access cycle.  WE\ controls whether an access cycle is a read cycle or a write cycle.

36.     Reading data from DRAM cells is performed by transferring the stored information from the cells to a row of sense amplifiers.  This process is called "opening," or "activating," a

row.  In order to access data from another row, the open row must first be closed by transferring
the data from the sense amplifiers back into the memory cells.  The sense amplifiers and/or bitlines
(the lines connecting the columns of cells to the sense amplifiers) must then be pre-charged (an
operation that returns the bitlines and sense amplifiers to a balanced, ready state prior to the next
read or write access) before another row can be opened.

37.     These signals convey both logical information and timing to the DRAM to facilitate
access.  The logic portion is conveyed by both the presence of the signal and the state of the other
control signals when each signal became active.  Thus, if RAS\ went active when CS\ was active
and CAS\ was inactive, the DRAM would start the selection of a row of memory cells based on
the address present on the address lines when RAS\ went active.  However, if CAS\ was already
active when RAS\ went active, the DRAM would start a refresh cycle.  The control signals went
through input buffers and directly controlled the operation of the DRAM.

38.     Reading data from DRAM cells is performed by transferring the stored information
from the cells to a row of sense amplifiers.  This process is called "opening," or "activating," a
row.  In order to access data from another row, the open row must first be closed by transferring
the data from the sense amplifiers back into the memory cells.  The sense amplifiers and/or bitlines
(the lines connecting the columns of cells to the sense amplifiers) must then be pre-charged (an
operation that returns the bitlines and sense amplifiers to a balanced, ready state prior to the next
read or write access) before another row can be opened.

39.     Traditional methods for accessing DRAM include "normal mode" and "page
mode."  In both modes, the controller sends address information and the signals necessary to access
a particular row of the DRAM.  Following a normal mode read or write operation, the row is closed

(by RAS\ going "high") and the sense amps pre-charged so that a new row can be accessed.  In

page mode, the information is kept in the sense amplifiers (the page is left open) so that data from

the same row can be accessed again for the next cycle.

40.     Numerous technological advancements over the past forty years have provided

individual memory devices with larger amounts of memory while also improving the performance

of each new generation of products.  Some of these advancements included improvements in areas

such as circuit design, fabrication process, photolithography enhancements, DRAM density,

architecture at both the component and system level, and packaging.  Additionally, improvements

in system speed and parallel processor instruction execution placed additional demands on DRAM

performance.  If asked at trial, I expect to describe various DRAM architectures, clocking schemes,

data paths, timing issues and overall designs as well as the advantages and disadvantages of those

designs.

### 7.3.2.1   JEDEC Standard DRAMs

41.     In 1958, the Electronic Industries Association created the Joint Electronic Device

Engineering Council (JEDEC), initially to develop and control part number assignment to devices.

JEDEC's work continued to expand into test method development and establishment of standards

across the electronics industry.  JEDEC is recognized today as a key, standards forming group,

approved by the American National Standards Institute (ANSI) in 1984 as an accredited standards-

developing organization.[7]

---

[7] *See* http://www.jedec.org.

42.     JEDEC standardized a number of DRAM architectures, including Fast Page Mode ("FP" or "FPM") DRAM, Extended Data Output (EDO) DRAM, and Burst EDO (BEDO) DRAM. FPDRAM introduced sequential access of an entire page of stored information. EDODRAM introduced latching of the data output for a period that extended into the next access cycle, providing a longer period of time for the processor or memory controller to access the memory device for valid data. And BEDODRAM introduced internal DRAM address counting and pipelining of data to produce rapid access to data in small groups, *e.g.*, four consecutive read cycles.

43.     JEDEC, in proposing, reviewing, and approving standards, provides the agreed interface structural and functional requirements associated with each of the components that are to conform to the standard. By adopting these interface standards, companies can design and produce products that are interoperable within systems. These standards are reviewed by JEDEC member companies that are participants in the standards working committees and then approved by JEDEC members.

### 7.3.2.2    Synchronous DRAM (SDRAM) Technology[8]

### 7.3.2.2.1    JEDEC SDRAM Standard

44.     The JEDEC SDRAM ("SDRAM") standard provides a synchronous interface to an asynchronous DRAM core. The DRAM core is organized internally in banks wherein two or more separate memory storage arrays are provided in distinct banks. The JEDEC specification for the

---

[8] *See* http://www.jedec.org, JEDEC standard JESD21-C, JEDEC Configurations for Solid State Memories ("a compilation of some 3000 pages of all memory device standards for solid state memory including DIMM, DRAM, SDRAM, MCP, PROM, and others from September 1989 to present").

SDRAM (and for each evolution of the SDRAM described below) provides standards for the pin and address assignments, functional blocks, functional description, initialization, commands, functional operations, electrical and timing parameters, etc.  Thus, the JEDEC specification defines the interface to the device, how to operate that interface, and the functional results of the operation of the interface.

45.     SDRAM uses fundamentally the same bus lines as conventional DRAMs, such as Fast Page Mode (FPM) or EDO DRAMs.  That is, each SDRAM is connected to three sets of lines: four command lines (RAS\, CAS\, WE\, CS\) used to transmit control information; a set of address lines used to transmit addresses; and a set of 1, 4, 8, 16, or 32 data lines used to transmit data to or from the chip.  Unlike the DRAM control lines, the SDRAM command lines convey only the logical information for controlling the SDRAM.  The timing is provided by a clock that times the interface and all internal operations.  Thus, the operation is synchronous with the clock, and hence, the name "Synchronous DRAM."

46.     The Command signals are internally decoded to determine the desired operation of the SDRAM.  This decoding is determined by an industry Standard that was set by JEDEC after negotiation between industry representatives in a JEDEC working committee and balloting by members for adoption.

47.     The standard also added control functionality to the SDRAM over that of the DRAM.  The decoded command set included the write of a mode register that could be used to make changes to the operation of the SDRAM based on configuration data saved in a mode register.

48.     The external system clock, in addition to telling the SDRAM when to sense the command signals (RAS\, CAS\, etc.) on the control lines and the address bits on the address lines, is also used as a timing reference for data input and output.  SDRAMs are thus sometimes referred to as "fully synchronous."  Also, in SDRAMs, the CAS Latency (intentionally predetermined access delay time from the input of the CAS\ signal (RD in this figure) and the availability of data, $t_{CAC}$) is set so that the output data is available (in a read operation) at the next rising clock edge after the internal processes are completed, regardless of the frequency of the external, system clock, as shown below.



In the above example, the number of clock cycles between CAS\ and the data output is changed from two to three.  This change is controlled by the configuration data stored in the mode register.

49.     Another feature of SDRAM is pipelining, which permits the SDRAM to receive a second memory operation while still working on fulfilling a first memory operation.  A simple analogy for pipelining is an assembly line in which different stages of the process are overlapped in time (*e.g.*, step two of a first memory operation occurs during the same clock cycle as the first

step of the second memory operation).  In this way, the second memory operation does not have

to wait to start after the first memory operation to complete.

### 7.3.2.2.2   JEDEC DDR (DDR1) SDRAM Standard[9]

50.     An extension of the SDRAM standard is the DDR SDRAM (or "double data rate"

SDRAM) standard in which the transfer rate of information is doubled for a given clock frequency

as compared to that of the SDRAM standard.  The doubling of the data rate is achieved by

accepting or delivering data twice within a given clock cycle.  The DDR SDRAM standard also

requires an on-chip delay locked loop (DLL) circuit or similar circuit to meet the standards' timing

specifications.  The DLL ensures that the timing of operations within the DDR SDRAM are locked

in step with the externally received system clock.

### 7.3.2.2.3   JEDEC DDR2 SDRAM Standard[10]

51.     The JEDEC DDR2 SDRAM standard also defines a synchronous double data rate

DRAM which is an evolutionary improvement over the JEDEC DDR SDRAM.  The DDR2

SDRAM standard contains virtually all of the same features found in its predecessor, the DDR

SDRAM, with some additions and modifications.  DDR2 memories support an external clock that

runs at a higher clock frequency than that of DDR SDRAM.  This higher clock frequency permits

an improved rate of data transfer as compared to DDR SDRAM standard.

---

[9] JESD79-F (2008) from rev JESD79-E (2005).
[10] JESD79-2F (2009) from rev JESD79-2E.

#:11403

#### 7.3.2.2.4   JEDEC DDR3 SDRAM Standard[11]

52.     The JEDEC DDR3 SDRAM standard defines a synchronous double data rate
DRAM which is an evolutionary improvement over the JEDEC DDR2 SDRAM.  The DDR3
SDRAM standard contains virtually all of the same features found in its predecessor, the DDR2
SDRAM standard, with some additions and modifications.  DDR3 SDRAM memories support an
external clock that runs at a higher clock frequency than that of DDR2.  This higher clock
frequency permits further improvements in data transfer over the preceding DDR and DDR2
SDRAM memories.

53.     Two additions of interest in the operation were included to facilitate the faster
operation.  They included the addition of an operation mode to support a feature of the memory
controller called "write leveling" and the addition of termination loads on the device outputs to
suppress noise on the system data bus.

54.     For write leveling, an operation was invoked in which the generated DQS signal,
received from the memory controller, sampled the system clock at the DDR3 SDRAM and sent
the sampled clock back to the memory controller over the data lines.  This allowed the memory
controller to align the DQS signal to the clock signal at the DDR3 SDRAM and to adjust for
variations between SDRAM devices.

55.     The Termination feature allowed the SDRAM device to connect a selected load,
internal to the DDR3 SDRAM, to the I/O terminal under control of the mode register and a control
signal called "On Die Termination" (ODT).

---

[11] JESD79-3F (2012) from rev JESD79-3E (2010).

### 7.3.3   JEDEC DRAM Memory Controllers

56.     As long as DRAMs have existed, essentially all DRAM-based memory systems

have included a memory controller to control the DRAM memory chips.  In such systems, memory

controllers issue the control signals and addresses to the DRAM chips (command signals and

configuration data to SDRAM chips), transmit data to the DRAMs (in write operations) and

receive the data from the DRAMs (in read operations).  Synchronous DRAM memory controllers

manage the operation of multiple banks and ranks, manage the complex initialization of the DRAM

chips, schedule and issue refresh and precharge operations, control the entrance to, and exit from,

various low power modes, and perform other maintenance functions.  Memory controllers also are

responsible for sending and/or receiving the proper signals at the specified times and in the orders

required for successful operation of the DRAMs.

57.     Just as the DRAMs have defined standardized interfaces, the controllers must have

complementary interfaces in order to reliably communicate with and inter-operate with the

DRAMs correctly.  As the standards for DRAM interfaces have evolved and changed, new and

corresponding interfaces on the DRAM controllers have similarly had to be designed to

accommodate and correctly inter-operate with each succeeding type of DRAM interface.

58.     In the case of a controller for JEDEC standard DRAMs, the controller must be able

to encode and transmit the proper signals on the CKE, RAS, CAS, WE, CS and optionally other

signal lines such as the address and data lines so that the DRAM will recognize the standard

commands for activating a row, reading data from the DRAM, writing data to the DRAM, pre-

charging a row, issuing a refresh command, setting a mode register, etc., all as specified in the

relevant JEDEC standards.  That is, the controller must be able to send control signals on these lines that the DRAM will recognize as the appropriate commands.

59.     The controller is also responsible for transmitting the correct address bits over the correct address lines so that the DRAM, when it receives these address bits, will access the correct locations in the memory arrays or otherwise correctly use the address data.  The data lines are also connected between the DRAM and the controller; and the controller must be capable of sending and capturing the data on the correct data lines at the correct times.  Finally, there are a variety of other signals such as the clocks, data strobes, mask bits, DQS bits, and ODT signals that are also required for proper operation of the DRAMs, as specified by the relevant JEDEC standards.

60.     All JEDEC SDRAM standards require that the SDRAM include one or more mode registers that can be programmed to store codes configuring the operation of the SDRAMs.  As the JEDEC SDRAM standards have evolved, the mode registers have become more extensive and a greater number of parameters are required to be stored, as codes, in the various mode registers. In all cases, the controller is responsible for configuring the mode registers in these SDRAMs and without this step, the SDRAMs are not expected or required to operate properly.  This includes both sending the correct control signals to the SDRAM such that the SDRAM will recognize them as a command to configure a mode register and sending the correct signals over the address lines so that the corresponding mode register on the SDRAMs will be configured with the correct bits in the correct locations.

61.     All JEDEC standard SDRAMS also are required to include a function known as "autoprecharge," where during a read or write command, one of the address lines (A10 in most of the standards) carries a signal that indicates to the SDRAM to precharge the addressed memory

bank upon the completion of that memory access.  It is the responsibility of the memory controller
to drive the correct information on the correct address line at the correct time to control this feature
in the SDRAM.

62.     The JEDEC standards for DDR and later SDRAMs are required to have data strobe
(DQS) signals that accompany the data from the transmitting chip (SDRAM or controller) to the
receiving chip (controller or SDRAM) during a read or write operation.  These data strobes have
timings that are defined in the JEDEC standards.  In addition to having connections to the required
signal lines for these DQS signals, the memory controller is responsible for generating the correct
strobe signals (at the correct times) that will accompany data to be written to the SDRAM to enable
the SDRAM to sense the data at the correct times.  During such write operations, the memory
controller must ensure that the SDRAM specifications are correctly met, e.g., how the data
strobe(s) are timed relative to the data and to the clock signals.  During read operations, the
controller must reliably sense the data and data strobe(s) that is/are being output by the SDRAM
using various techniques and ultimately use the transitions in the DQS signals to capture the data
at the right time.

### 7.3.4   SDRAM and DDR SDRAM Memory Systems

63.     A typical memory system includes a memory controller chip and a number of
SDRAM or DDR SDRAM memory chips.  The memory controller chip in most personal computer
systems is located on one part of the "chipset," which governs communications between the
computer's microprocessor (or "CPU") and the memory and other connected devices such as the
graphics system, disk drive(s) printers, and other components of the computer.  In typical PCs,
servers, or workstations, the memory chips are arranged on small circuit boards referred to as

memory modules, and such a PC, server, or workstation may have one to four memory modules, each of which will have 4 or 8 or more memory chips.  A schematic diagram of a typical SDRAM or DDR SDRAM based memory system with one controller and four memory modules (each of which has four memory chips and is referenced in the drawing as a "bank") is shown below, along with most (but not all) of the signal lines between the controller and the memory chips.



64.  SDRAMs and DDR SDRAMs are commodity memory devices.  The relevant JEDEC standards describe the interface to which SDRAMs and DDR SDRAMs must conform;

and compliance with the JEDEC standards ensures that all SDRAM and DDR SDRAM devices are interchangeable. The SDRAMs and DDR SDRAMs sold by Hynix, Micron, Nanya, and Samsung (as well as other companies) comply with the JEDEC standards for such devices and, as such, they are interchangeable. These JEDEC specifications also allow the manufacturers of memory controllers and chipsets to reliably manufacture other components of memory systems that interoperate with SDRAMs and DDR SDRAMs.

65. In SDRAM and DDR SDRAM-based memory systems, some of the connections between the memory controller and the memory chips are "bused," or connected to many or all the chips in parallel; other connections are "point-to-point" between the memory controller and particular memory chips. The "Chip Select" (CS\) lines are point-to-point connections between the memory controller and individual chips. Only those chip(s) which are selected by the active CS\ line will respond to commands issued by the memory controller. The RAS\, CAS\, and WE\ control lines and the address lines are typically bused to all modules and memory chips in the system, although separate sets of RAS\, CAS\, and WE\ (and other) control lines may be used for separate memory modules. Additional control lines used in SDRAMs and DDR SDRAMs are the clock enable ("CKE") and data mask ("DM" or "DQM") signals. CKE controls the operation of internal clock signal generators and allows the memory chips to be powered down or set in standby mode; DQM signals control the operation of the chips' output buffers during read operations and can be used to prevent ("mask") writing of selected data during write operations.

66. The chips on a memory module each have their own data line connections to the controller, so that (for example) nine memory chips with 8 DQ pins will together read or write 72 bits of data in parallel. The data lines to the memory controller are connected in parallel to the

different modules, but each data line is connected to only one I/O (DQ) pin in each memory module, so that only chips on the module selected by the chip select signal will use any particular data line at a given time.

### 7.3.4.1   Dual In-line Memory Module (DIMM)[12]

67.     The DIMM is a small circuit board containing multiple DRAM chips that share input/output, control, and address pins in common.  The first SDRAM DIMMs had a 64-bit data path / 168-pin interface (84 pins on each side of the board) and came on the scene around 2000, remaining through around 2007 before being phased out.



A 168-pin SDRAM DIMM

68.     By 2002, technology incorporated DDR SDRAM memory on 184-pin DIMMs.

---

[12] *See, e.g.*, http://www.technologyuk.net/computing/computer_systems/working_memory.shtml.



A 184-pin DDR SDRAM DIMM

69.     Then a year later, 2003, the 240-pin DDR2 DIMM was introduced, providing twice

the bandwidth with the same latency compared to its predecessor, the DDR DIMM.



A 240-pin DDR2 SDRAM DIMM

70.     And then in 2007, 240-pin DDR3 DIMMs were introduced.  Compared to the

DDR2 DIMMS, DDR3 DIMMS were faster, consumed less power, while maintaining the same

internal clock rate as the DDR2 DIMM.



A 240-pin DDR3 SDRAM DIMM

71.     Currently, 288-pin DDR4 DIMMs are available, offering higher density and lower voltage requirements compared to the DDR3 DIMM.



### 7.3.4.2   Registered Dual In-line Memory Module RDIMM

72.     When eight SDRAM chips are used to supply 64 I/O lines, there are 8 I/O lines per SDRAM chip that are uniquely connected directly to the DIMM connector pins and to the memory bus.  Thus, each SDRAM DIMM presented a single load to the I/O data bus.  However, the address, clock and Command signals were shared among the eight SDRAM chips presenting an eight-

device load to those bus lines.  A conventional RDIMM places a register (buffer) between the memory chips and the memory controller for the latter set of signals.  By including a register, the load seen by the memory controller is reduced.  The register is clocked by the system clock, inserting a one cycle clock delay in the path of the buffered signals.  This delay changes the timing seen by the memory controller between control and data, which is accommodated by the controller. This, however, generally precludes mixing conventional DIMMs[13] and RDIMMs on the same memory bus, but it does permit having multiple (up to three) dual-rank DIMMs on the same memory channel thus increasing the amount of data per transaction.



### 7.3.4.3   Load Reduced Dual In-line Memory Module LRDIMM

73.     With the introduction of DDR3 DIMMs having 18 or 36 memory devices on the DIMM board, the I/O lines needed to be shared between memory chips.  This reintroduced a

---

[13] The DDR SDRAM DIMMs having no buffer registers are also referred to as UDIMMs, for Unbuffered DIMM.

loading problem, this time on the data bus.  This problem was solved by introducing the LRDIMM.  LRDIMMs are similar to RDIMMs except LRDIMMs buffer address, control, and data lines and re-drive the clock through a Phase Lock Loop.  With full buffering, LRDIMMs can double the number of DIMMs in a system.  As with the RDIMM, the added register changes the timing from that of a conventional DIMM or an RDIMM.



74.    The introduction of DIMMs with 18 or more memory devices involved the introduction of the concept of Ranks on the DIMM.  If, *e.g.*, the DIMM had 9 SDRAM chips on each side of the board, the chips on each side could be accessed independently using two CS signals, one for each side of the board.  The SDRAM chips associated with one of the CS signals was called a RANK, so the DIMM had two Ranks.  Other organizations were created where each of the Ranks could be split into two or more Ranks by on board routing of the active CS signal to a Rank selected using an address.  This led to the memory controller having two CS signals to control two Ranks when the board actually had four ranks of SDRAM devices.  This operation became known as Rank multiplication and was particularly useful in cost savings by substituting

two lower density SDRAM devices in two Ranks for a single SDRAM device in one Rank that
was twice as big but more than twice as expensive.

75.     Netlist represents that its Hypercloud product was the first industry LRDIMM.[14]

**7.4     Non-volatile Memory**

76.     Concurrent with the development of volatile memory for non-permanent
information storage was the development of commodity non-volatile memory for permanent
information storage.   Unlike DRAMs, non-volatile memory retains data even when power is
removed.   For this reason, non-volatile memory, like the hard disk, is ideal as a storage medium.
Non-volatile memory is simply a type of data storage that can retain its contents without any power
(as opposed to a volatile memory that "forgets" as soon as power is turned off).   Each of these two
basic types of memory were, and still are, essential to the operation of computer-based systems,
each type fulfilling different functions within the architecture of the system.

### 7.4.1   ROM / EPROM / EEPROM Memory

77.     The first non-volatile memory was invented in the 1960's and was called the read
only memory (ROM).   The ROM was invented to meet the customer need to store program code
in a memory that would not lose its data when power was removed from the device.   However,
customers were generally not satisfied because, once a ROM was programmed with code, it could
not be reprogrammed.   A new kind of writeable non-volatile semiconductor memory, one that
could retain its data despite a loss of power, was developed in the late 1960s and early 1970s.   Key

---

[14] Hong Deposition, Exh. 42 at SEC008179.

to the development of this writeable non-volatile memory was the invention of the floating gate transistor by Kahng in 1967.[15]

78.     The first commercial application of a floating gate to create a non-volatile memory was the Erasable Programmable Read Only Memory (EPROM) developed in the early 1970s by Frohman-Bentchkowsky of Intel.[16]  The world's first successful EPROM product, the 1702, was introduced by Intel in 1971.  The EPROM was programmed (written) by electrically transferring electrons across an insulator (non-conductor) to the floating gate, thereby isolating and trapping the electrons.  The One major drawback of the EPROM technology was the way in which it was erased, exposing the IC under an ultraviolet light lamp for close to half an hour.

79.     Over time, further development in non-volatile memory technology led to the Electrically Erasable Programmable Read Only Memory (synonymously called EEPROM, E²PROM or EAROM), which could be both programmed and erased electrically.

### 7.4.2   Flash Memory

80.     The next development in the area of non-volatile memories was the invention of the Flash EEPROM by Masuoka of Toshiba in the early 1980's.[17]  Flash is an electronic nonvolatile computer storage medium that can be electrically erased and reprogrammed.  The name "Flash" was given by Toshiba researchers to reflect the ability of such memory chips to erase a large number of memory cells together and quickly (just like in a "flash").  The first type of flash was called NOR flash memory.  The name came from the fact that NOR flash memory structurally

---

[15] *See* Khang, U.S. Patent No. 3,500,142.
[16] U.S. Patent No. 3,744,036.
[17] U.S. Patent No. 4,531,203.

resembled and functionally operated like another electrical component known as NOR logic.  In

many ways, Flash was quite similar in the memory architecture to past generation EPROM and

EEPROM chips.

81.     NOR flash memory (similar in structure and function to NOR logic) was the

dominant form of flash memory in the late 1980's and early to mid-1990's.  However, NOR flash

memory also had significant limitations on cost and efficiency.  In the mid 1990's, the first

successful NAND flash memory (similar in structure and function to NAND logic) IC-based

storage system was introduced into the marketplace.  NAND flash memories were smaller in size

per bit than the NOR flash memories, and thus could be manufactured for less cost than NOR flash

memories.  By the early 2000s, much of the commodity industry had switched away from NOR

flash based systems to NAND flash-based systems for most information storage applications.  And

that information storage includes both data and control, making flash memory a primary storage

choice for processor and controller instructions, application data, system configurations, and

application programs and program updates.

### 7.4.2.1   NAND Flash Memory - Physical Organization of Cells

82.     As semiconductor processing technology has improved, the density of flash

memory cells which can be fabricated on a single chip has increased dramatically.  As memory

sizes have increased, effective memory management techniques have been developed to handle

large amounts of data.  The techniques can be implemented either by the flash memory chips

themselves with on-board controllers, or by a separate controller in communication with the flash

memory chips.

83. The highest level of organization in a flash memory device is at the chip level. A flash memory system may include one or more flash memory chips, each typically encapsulated in a plastic package. In a multiple chip system, the controller is either programmed during manufacture to enable multiple chip control, or in some cases, may simply auto-detect the presence of multiple chips.

84. Within the chip level, the memory organization is at the cell-array, or simply "array" level. An array is a two-dimensional arrangement of contiguous floating gate memory cells that are structurally arranged in rows and columns to achieve maximum density and simplicity for cell addressing. Circuits known as row and address decoders are placed at the periphery of the array(s) to enable read, write, and erase operations on memory cells in the array. In addition, there might be intelligence included on the Flash memory chip to manage these functions for optimal cost and performance.

85. A single flash memory chip may contain one or more arrays of memory cells. In a chip which includes multiple arrays, the arrays may be physically located on the chip using different arrangements in order to meet various needs of the designer, such as maximizing cell density, increasing performance, and/or simplifying control logic. Typical examples of multiple array chips would include a four-array chip or a dual array chip.

86. A block typically refers to a group of cells which is the minimum grouping of cells that can be erased together. In 1989, the block size was typically 512 Bytes which was also the size of a "sector" of storage in a hard disk. For this reason, at the time, a block of flash memory was also sometimes referred to as a sector. As time went on, the size of a block increased to larger than 512 Bytes, while the size of a sector remained locked at 512 Bytes.

### 7.4.2.2   NAND Flash Memory - Data Formats and Overhead Data

87.     Data stored in a page (or sector) is usually stored according to a specified format. The format will specify certain bytes within the page for storing user data (*e.g.*, an Excel spreadsheet), and will specify other bytes within the page for storing overhead data.  Overhead data generally refers to data generated by the flash memory system itself.  Overhead data is transparent to the user, *i.e.*, the user is unaware of either the presence or contents of overhead data stored in the system.  Overhead data is generally used by the memory system to manage the storage and retrieval of the user data.

88.     Overhead data can relate to the user data itself, for example error correction codes, which are generated by applying a mathematical algorithm to the user data and allow the detection of read or transmission errors.  Another example of overhead data relates to characteristics of the memory itself, such as sector or block erase cycle counts, cell programming thresholds, defective blocks, replacement spare blocks, block addresses, or the block address lookup tables.  Overhead data can be stored in specified bytes of a page, sector or block along with user data, or alternatively may be stored in locations in the memory which are reserved exclusively for overhead data.  It is common practice to protect some or all of the overhead data from user access.

### 7.4.2.3   NAND Flash Memory - Management Operations

89.     A typical flash memory system will perform five distinct operations, usually under the control of firmware stored in the flash controller chip.  The five operations are read, write, erase, write verify and erase verify.  Of these, the erase and write operations are the most time consuming.  As a result, many techniques have been developed to speed up the write and erase functions.  The nature of the floating gate cell is such that an erase operation is typically required

before data in a cell can be rewritten; therefore, many techniques are directed to methods to avoid re-writing previously written cells.

90.     For example, this can be accomplished by performing data updates in a different location in memory from the location where the data was originally stored, and then changing the logical address to physical address in the address lookup table.  Another example of a method used to speed up reading or write/erase operations includes performing an operation simultaneously on multiple blocks or multiple pages of data.  Unlike magnetic disk drives, which frequently use serial programming operations, solid-state memory arrays are inherently amenable to performing such operations in parallel.  Read/write/erase operations can be implemented for simultaneous access to multiple blocks or multiple planes, or multiple decode blocks or multiple chips, depending on the architecture of the system.

91.     Unlike DRAMs that have a short data retention time and must be refreshed, Flash memory (and other nonvolatile memory) has a very long data retention time, even when no power is applied to the device.  However, non-volatile memory has another limitation called wearout. When a non-volatile memory is cycled through read, erase and write cycles many thousands of times, it can wear out and become unable to store valid information.  To reduce this effect, the non-volatile memory management device keeps track of how often each of the memory cells is cycled and moves the memory locations used from high wear cells to low wear cells in operations called "wear leveling."  In addition, the management device stores error correction data in the overhead bits of the memory to facilitate correction of errors and moving the data when cells wear out and cannot be read correctly.

92.     Because of these overhead operations, the management device must keep maps of where data is stored since the data is not simply located at an address that is provided by the system.

### 7.4.2.4   NAND Flash Memory - Storage

93.     The most common consumer encounter with flash storage is generally in the form of a USB flash drive, a thumb-size device that plugs into the USB port of the computer and provides additional storage ranging from Megabits to Gigabits to Terabits.  Another form in common use is a PCI memory card used to store data in cameras and smart phones.  Flash can also be used as a storage medium in a computer's hard drive.  A flash-based hard drive is referred to as a Solid-State Disk (SSD).  A USB flash drive and an SSD drive both serve as storage.  They differ primarily in terms of how they interface with the computers' processor.  How flash storage interfaces with the computer's processor determines how quickly the flash storage can be accessed because different interfaces have differing bandwidths and latencies.

94.     A USB flash drive interfaces with the processor over the Universal Serial Bus, hence "USB," while a flash-based hard drive typically interfaces with the computer processor over the Serial ATA (SATA), the serial IDE bus, or the serial PCI bus.  Each of these interfaces operates at the slower transfer rate of traditional hard drives.  With SDRAM density in a computer (main memory) typically in the Gigabyte (GB) range and large storage memory / hard drives (permanent) in the Terabyte (TB) range, there is a gap in the transfer rate/density hierarchy between main memory and permanent storage.  This gap has proven difficult to fill even with newer Flash memories that are connected to the PCIe bus which is faster than the traditional storage buses.

95.     One method developed to fill this gap focuses on incorporating a set of interface chips that allow a Flash memory to be interfaced to, and accessed over, the much faster memory

bus.  This interface is complex since Flash memory is accessed through a controller that maps the addresses provided to the controller to the addresses that are sent to the Flash chip.  The controller manages address mapping, data moves, block erasing, wear leveling, and error checking.  The Flash interface is completely different from, and will not interface to, the memory bus, so a new bus interface device is required to effect communication between the Flash interface and the memory bus.

### 7.4.2.5   NAND Flash Memory - Non-Volatile Dual In-line Memory Module NVDIMM

96.     The NVDIMM was conceived to preserve data even in the event of power loss. Most NVDIMMs utilize NAND flash technology in combination with, *e.g.*, DDR3 or DDR4 SDRAM.  When power loss occurs, the module can transfer data from the SDRAM to the flash memory (SAVE) and then, when power is restored, reload that data to the SDRAM (RESTORE).



DDR3 NVDIMM

97.     Netlist introduced a non-volatile DIMM (NVDIMM) product circa 2014 called NVvault, primarily a DRAM based memory product that uses Flash only as a back-up for

emergency, such as during a power outage.  On-module caps provide power to the DIMM until

data is transferred from the DRAM to the NAND flash.  Data can then be restored from the NAND

flash to the DRAM when power returned.[18]  The NVvault appears to the system as a JEDEC

RDIMM and is identified as a hybrid -N version,[19] explained below.



NVvault

98.    JEDEC "created multiple nomenclatures for NVDIMM and one was dash P, I

believe there was a dash N, and then dash H."[20]  The dash N type of NVDIMM is a Hybrid version

NVDIMM -N:

> A DDR4 NVDIMM-N is a Hybrid Memory Module with a DDR4
> DIMM interface consisting of DRAM that is made nonvolatile
> through the use of NAND Flash.  NVDIMM-N modules adhere to
> the Byte Addressable Energy Backed Interface Standard, JESD245,
> that provides detailed logical behavior, interface, and register
> definitions.  These DDR4 NVDIMM-N modules are intended for
> use as main memory or storage when installed in PCs.  This standard
> is used in conjunction with JESD245.[21]

---

[18] https://s2.q4cdn.com/000096926/files/doc_downloads/nvault_ddR3/Netlist_NVvault_NVDIMM_Product_Brief_
6v5.pdf; *see also* https://www.hpcwire.com/off-the-wire/netlist-introduces-nvvault-nvdimm-product-family/, 2014.
[19] *See*, *e.g.*, SEC008157.
[20] *See* Hong deposition transcript ("Hong"), 32:1-4.
[21] https://www.jedec.org/standards-documents/docs/jesd248, 2018.

99.     The dash H type of NVDIMM is the Hybrid version NVDIMM -H:

> memory module based on a combination of DRAM and NAND Flash that provides NAND Flash accessed as a block oriented device. Often targeted at data center computer systems, NVDIMM hybrid modules are the foundational hardware supporting the growing trend for persistent memory, which enhances data resilience and system performance.[22]

> NVDIMM-H is a hybrid memory module comprised of DRAM and NAND Flash that provides a block-cached, byte addressable memory resource that enhances data resilience and system performance of data center servers.  NVDIMM-H has a scalable architecture that extends to DDR5 and utilizes off-the-shelf components to provide a cost-effective, high-capacity solution that can be easily adopted by data center customers.[23]

100.    And one of the newest, yet-to-be-released products,[24] is the dash P type of

NVDIMM which is the NVDIMM-P:

> NVDIMM-P provides a full transactional interface protocol compatible with standard DRAM DIMMs along with a firmware programming model for the modules.  NVDIMM-P simultaneously maximizes both re-use and flexibility by minimizing system host changes, providing an interface of the lowest latency to emerging memory, and offering flexible support for varied Persistent Memory media characteristics and use cases.

> NVDIMM-P enables:

> - **Persistence**: lowest latency and high bandwidth access to Persistent Memory modules in a system

> - **Abstraction of Memory Media**: enabling most any memory media on the DDR channel

---

[22] https://www.businesswire.com/news/home/20190910005869/en/JEDEC-Announces-Publication-of-Serial-Presence-Detect-Support-and-Module-Labels-Specifications-to-Support-New-Hybrid-Memory-NVDIMM, 2019.
[23] https://www.prnewswire.com/news-releases/netlist-comments-on-standardization-of-nvdimm-h-at-jedec-300915695.html, 2019.
[24] Hong, 33:17-19.

- **Higher Memory Capacity**: supports expanded memory addressing

- **Plug and Play Interoperability** physically plugs into standard dual in-line memory module (DIMM) sockets and run-time interoperable with DDR DRAM DIMMs on the same bus[25]

101.    This latter version, the NVDIMM-P is the only product that is in the statement of work for the Joint Development and Licensing Agreement (JDLA) between Samsung and Netlist.[26]

# 8    OPINIONS – MARKET DEMAND, STANDARD AND ACCEPTABLE INDUSTRY PRACTICES

102.    There are standard and acceptable industry practices associated with commodity integrated circuit memory deliverables.  I address, in the following sections, those industry practices as they relate to manufacturing process considerations, including forecasts, quotations, purchase order requests, product allocation, and product delivery.  First, consider a primary driver that is fundamentally applicable to DRAM products, NAND products, and Memory Module products that incorporate both DRAM and NAND–Market Demand.

## 8.1    Standard and Acceptable Industry Practices: Market Demand Considerations

103.    Memory integrated circuit technology has been, and continues to be, a rapidly evolving business where the relevant lifespan of a particular level of technology or design is frequently only two to three years before the product demand levels off or begins to decrease, with

---

[25] https://www.jedec.org/news/pressreleases/jedec-publishes-ddr4-nvdimm-p-bus-protocol-standard, 2021.
[26] Hong, 33:12-19; *see also, e.g.,* JDLA, 11/12/15 at 2 ("Developed Product"), 3 ("NVDIMM-P Product"), 4 ("JDP …. For the avoidance of doubt, the scope of JDP shall be limited to the items specified in the Statement of Work."), Appendices A and B.

newer technology or designs ramping up typically by the second year in any given product cycle. This historical advancement in memory technology has been consistent through the years with Moore's Law, which recognizes that the density of an integrated circuit (number of storage locations in an integrated circuit) doubles about every 2 years.



**DRAM bit density[27]**                    **NAND bit density[28]**

104.    Because of this fact, based on my experience, it is important to define over time the memory module price projections, volume requirement projections, and projected market penetration as soon as is practical.  And these three projections must each be periodically updated because market landscape demands do shift during product life cycles.

---

[27] PROCEEDINGS OF THE IEEE, Density Metric for Semiconductor Technology, Wong et al., Vol. 108, No. 4, April 2020, 480.
[28] AIP Advances 8, Fontana, 2018, 056506-2.

105. The marketing efforts by a manufacturer must create, and continue to improve, the downstream memory demand so as to "pull" the product through the manufacturing and sales process based on customer demand, as opposed to the alternative of pushing forward with production at a level that would require creation of and stockpiling of product inventory. The former is consistent with the production model known as Just in Time ("JIT") manufacturing.[29]

### 8.2 Standard and Acceptable Industry Practices: Manufacturing Process Considerations

106. The benefits of JIT manufacturing are well-recognized, respected, and practiced across many industries, including semiconductors and integrated circuits. Although there does exist numerous benefits to JIT manufacturing, including closer communication and cooperation between the memory supplier and the customer, any disruption in the product flow may create unwanted and unexpected delivery delays. Disruptions may be in the form of delayed receipt of raw materials used to manufacture the product, process equipment malfunctions, facility or chemical contamination, wafer breakage, yield and performance distribution, and may further be in the form of shifts in end customer requirements, to name a few.

107. Memory customers must recognize these potential disruption risks and must build in reasonable contingencies to offset end product deliverable issues. This may be in the form of second supplier qualification, parallel ordering across several chip and/or module manufacturers, and advanced ordering to create a buffer from which customer deliverables can be drawn so as to minimize any purchase order increases that may place a strain on the manufacturing supplier.

---

[29] *See*, *e.g.*, https://whatis.techtarget.com/definition/just-in-time-manufacturing-JIT-manufacturing.

108.     It is well-recognized that projected delivery schedules of memory product to the market must comprehend the time required to complete the process from start to finish, including prequalification and reliability assessment as well as ongoing, product status assessments.  One of many articles on this subject provides a good overview of the process requirements circa 2014, which remains true even today.[30]  That article presents the three primary blocks of time required: 1) making the starting wafer; 2) processing the wafer through multiple chemical, photolithographic steps to produce the integrated circuits (*e.g.*, memory chips) on the wafer (as previously noted, a process often referred to as "front end"); and 3) assembling (packaging) individual memory chips from each wafer, testing the packaged products (as previously noted, a process often referred to as "back end"), and further assembling the packaged products into modules, each including associated testing, reliability assessment, and qualification.

109.     Consistent, then, with proper risk assessment, is the need to define, and continually redefine, forecasts, quotations, purchase order requests, product allocation, and product delivery.

### 8.2.1   Importance of Accurate, Reasonable Forecasts

110.     Forecasting, with confidence, is an essential component in business planning, in general, and is critically important for integrated circuit memory manufacturing capacity planning. A forecast enables the manufacturing operations planner to prearrange supply and raw material orders and arrange for equipment, facility, and people allocation.  As with any integrated circuit wafer fabrication facility and packaging and test facility, achievement of a continuous,

---

[30] *See, e.g.*, https://www.anandtech.com/show/8223/an-introduction-to-semiconductor-physics-technology-and-industry/3.

uninterrupted flow of "product in the making" at a maximum throughput rate would be ideal. However, in practice a number of factors negatively impact that ideal rate, such as, for example, equipment malfunction, normal equipment maintenance scheduling, work in progress (WIP) breakage, contamination, and product mix ratios.

111.    More specifically, most integrated circuit manufacturing facilities process in parallel a mix of different products.  This mix could cover multiple generations of the same product (*e.g.*, different scalable densities of DRAM or NAND product) or even entirely different products (*e.g.*, DRAM and logic product).  Each product in the making would require tailored differences in equipment used, recipe chemistry and process time, and often, different raw starting material (*e.g.*, different types of wafer resistivity).

112.    Complicating this planning process further is the fact that commodity products, such as integrated circuits, exhibit different electrical performance characteristics based on the individual chip's location relative to the center of the wafer.  This may translate into a speed distribution difference across a wafer or even the degree of performance margin beyond specification limits.  Many fabrication process steps are also performed concurrently on a group of wafers; and the position of the wafer in the group may also impact speed and performance distribution.

113.    As a further consideration, different end customers may prefer certain speeds; based on the speed distribution calculations, this would translate directly to the number of wafer starts to achieve the required number of end products, at the desired speeds, to fulfill end customer requirements.  And this is true whether the customer is a direct ship OEM customer or an authorized distributor.

114.     Thus, correctly planning the ratio of starting material to load at the beginning of the wafer fabrication process will either make or break achievement of maximum throughput with the correct ratio mix of product types, directly translating to the profitability of the business.  And since a standard, total time of a wafer fabrication process may take 50 to 90 days, any change in, or misrepresentation of, the market demand forecast would have a significant impact on the ability to achieve a continuous flow of product to meet customer requests.  And such a change in forecast originating from even one customer can directly impact the product delivery to a number of other customers.  Customer provided, reasonably accurate forecasts for product delivery scheduling is an essential, crucial input to the wafer fabrication process.

115.     And even though the assembly and testing process of individual integrated circuits takes less time that the wafer fabrication process, these same factors described above apply here as well with comparable results.  The raw starting materials, other than the individual chips from the wafer fabrication facility, include, for example, the metal, conductive lead frames, the wires that electrically connect the chip to the contact points on the lead frame, and the encapsulating material.  Different types of products across multiple customers are assembled in parallel.  For planning purposes, it is essential to have reasonably accurate assembly forecasts.

116.     Thus, for both wafer fabrication and packaging of integrated circuits, timely, reasonably accurate, minimally changing forecasts are key to product delivery that matches market demands.  Shifts in forecasts will have a negative impact on process cycle time and may create WIP bottlenecks in which product may have to sit in queue for extended lengths of time.  Accurate forecasting gives the operations planner the ability to make well-informed business decisions.

### 8.2.2   Quotations

117.   Quotations are documents that identify the number of integrated circuit products at stated price points that the seller is willing to commit to a potential client or customer, for a period of time, based on a number of factors.  These factors include, as described above, product mix and forecasts as well as, among others, time-sensitive volume requests, product ramp up rates, and yield.  Quotations are often provided to a prospective customer based on a Request for Proposal from the buyer (customer).

118.   The seller (in the case of the integrated circuit memory manufacturer, the memory supplier) considers, for example, product volume customer forecasts, speed and performance criteria, historical and predicted yield, fixed cost (*e.g.*, costs associated with the facility, raw materials, equipment depreciation, people, etc.), and variable costs, some of which include cost differentiators associated with raw material price fluctuations and inaccurate forecasts, based on historical trends, or shifts in forecasts based on perceived market demand changes.  The supplier must also factor in a desired profit margin.  Quotations are typically provided with a near-term, expiration date as shifts in any of the above factors over time will change the dynamics of what the supplier can reasonably provide and still maintain a reasonable profit margin.  A precursor to a quotation may be in the form of an estimate which is typically made during preliminary discussions prior to a formal proposal request from the potential customer.  Significant shifts in forecasts post quotation may render such quotation void and require a new or amended quotation.

### 8.2.3   Purchase Order Requests

119.   Purchase Order Requests are documents from the buyer (customer) that inform the seller (supplier) of customer product needs requirements.  For planned purchases of integrated

circuit memory products, the Purchase Order Request identifies the product and the proposed delivery expectations, basically outlining the details required prior to the completion of a memory product purchase.

120.    Purchase Order Requests provide information to the supplier that the supplier can use for estimate purposes, allowing the supplier to plan ahead for actual purchases to be made with a purchase order.  This information also permits the supplier to initiate a budget plan and to set up guidelines to effect customer product allocation.  In instances in which it would be, or would become, problematic to meet the specific requirements of a Purchase Order Request, this affords the supplier with information useable to further purchasing discussions with the customer or potential customer.  This discussion could result in an agreement or understanding for a modification to the Request that may be in the form of a change of quantity, a change in requested delivery schedules, or even a change in product that would still meet the customer's requirements.

121.    Such changes could also include a retesting of some memory product that had previously been, or may be, "binned" into a different performance category during test.  This approach to possibly filling a Request would often necessitate a price adder to cover the cost of additional processing which would be memorialized by an amendment to the Request or the canceling of that request followed by filing of a new Request.

### 8.2.4   Product Allocation

122.    Product allocation is the process of distributing, tracking, and managing product to best fit deliverables to meet customer orders.  As discussed above, product allocation is a major factor in achieving a continuous product manufacturing flow.  And this allocation, at times, reaches all the way back to wafer material selection for loading into the wafer fabrication process.  Multiple

product types, product speed and performance criteria, customer purchase orders, customer order

forecasts, delivery schedules, changes to purchase orders, changes to order forecasts, and

disruptions to the product flow within the fabrication or packaging facility–each is a factor that

directly affects how a supplier is to allocate product to its customers.

123.    Allocations to and across customers are to be equitable within reasonable

constraints that can only be determined by the supplier.  A supplier uses models (algorithms) to

determine the best way to allocate product equitably, ensuring good product flow that will achieve

the best output consistent with the deliverable schedule.  At times, there may be, out of necessity,

a delay in deliverables to a customer to ensure that the product mix to customers overall does not

create a greater disruption in the process that would result in a more severe problem later.  The

best fit for sustained, profitable operation may from time-to-time cause delays in deliverables,

especially if a facility is operating at near capacity.

124.    Such allocation is determined in part consistent with minimizing inventory stacks

at various processing equipment.  Stacks of product awaiting processing increase the risk of

contamination, breakage, or possible mishandling.  In wafer processing, additional cleaning steps

may be required of inventory that has completed one process but may have grown a finite amount

of oxide on top of a processed layer.  This adds further time delay and a potential cost adder to the

end product.  And some process steps within a wafer fabrication facility cannot have inventory

stacks between processes or the entire group of wafers will be damaged and need to be completely

discarded.

125.    Reasonably accurate forecasts and product requests play a significant role in

product allocation.

126.    Manufacturers also take into account a variety of factors relating to the characteristics of the customer and the existing business relationship when determining allocation. Such factors include, but are not limited to, consistency of purchase volume, accuracy of the customer's forecasts, and prior history of order cancellation. These factors also reflect the importance manufacturers place on maintaining a stable and continuous product manufacturing flow.

### 8.2.5   Product Delivery

127.    Product delivery is the result of all of the above–manufacturing process considerations, including forecasts, quotations, purchase order requests, and product allocation. By definition, product delivery is customer-centric, meaning it relates to the flow of integrated circuit memory product to the customer with the goal of meeting the desired price and schedule. As I detailed above, a number of factors feed into the ability to match product delivery to product pricing and product schedule.  From time-to-time, a customer, especially during the startup phase of a product delivery schedule, may choose to modify the forecast and/or requests.  Such practice is not uncommon and, when invoked, is understood to cause changes in the product delivery process that may impact either or both cost and schedule.

## 10   CONCLUDING REMARKS

128.    I understand that additional information may be forthcoming that may require me to amend or supplement my opinions.  I will do so in a timely manner should a response to that additional information be warranted.


Dated: August 23, 2021

_____

Joseph C. M⁵Alexander III


Attachments:

**Attachment A        – Curriculum Vitae / Other Cases**

# ATTACHMENT A

CURRICULUM  VITAE                                     Joseph C. McAlexander III

## PROFESSIONAL  SUMMARY

Currently a Registered Professional Engineer (#79454) and recognized as an inventor on 31 US and a number of foreign patents, I am President of McAlexander Sound, Inc., and the Managing Director of McAlexander Sound Pte Ltd.  I have focused my expertise to support a number of clients in product, process, and operations analysis and investigation.  Forty-eight years of experience in microcircuit and semiconductor technologies has developed my skills in areas of circuit design and analysis, device fabrication and assembly, testing, marketing, control system design and analysis, manufacturing operations and respective areas of quality, reliability, and defect / failure analysis.  I am also the President and CEO of MDFHoldings, Inc., an IP holding company currently engaged in the field of GPS Tracking, and was formerly, among others, a Manager with QM Partners, LP, supporting clients in IP management and licensing.  I have:

   - designed and managed development, testing, and evaluation of devices including Dynamic Random Access Memories (DRAMs), Static Random Access Memories (SRAMs), Charge Coupled Devices (CCDs), Shift Registers (SRs), and functional circuits including I/O buffers for address and data, decoders, clocks, sense amplifiers, fault tolerant, parallel-to-serial data paths for video applications, level shifters, converters, pumps, and logic, as well as wireless communication systems and MEMs applications;

   - managed operations including engineering, training, and quality assurance for device fabrication, assembly, test, analysis, and reliability assessment, as well as manufacturing control, each of which involved both volatile and non-volatile memory; testing, analysis, and control involving use of mechanical calibration and measuring equipment, including optical, scanning e-beam, IR, capacitive, and laser using phase contrast and Fast Fourier Transform (FFT) for High Aspect Ratio Inspection (HARI) applications; audio and video system design and installation;

   - taught courses in solid state device physics, integrated circuit design, integrated circuit fabrication, and statistical control;

   - provided expert services, investigating both process and design technologies of various devices (microprocessor and controller, memory, programmable logic, card, tag, module, mixed signal, custom, and other), systems (PC and peripheral, computer, control, laser measurement, switch, architecture, software, and other), and consumer products (medical, TV, telephone, VCR, facsimile, copier, lighting, game, and other);

   - provided nuclear radiation hardness testing services for military and space clients; and

   - managed the design and installation of audio sound and video systems for private and commercial enterprises.

**CURRICULUM  VITAE**                                    **Joseph C. MᶜAlexander ᴵᴵᴵ**

## PROFESSIONAL  SUMMARY

From 1986-1990, I was Executive Vice President of EPI Technologies, Inc., prior to joining the
staff at Cochran Consulting, Inc. where I served as senior managing consultant from 1991-2002.
From 1972 to 1986, I was employed by Texas Instruments Incorporated.

**CURRICULUM VITAE**           Joseph C. McAlexander III

## EXPERIENCE PROFILE

| | |
|---|---|
| 1988-present | **McAlexander Sound, Inc. (McASI)** - Richardson, TX<br>**President** |

    o System, Product, and Process investigation, expert witness services for protection of intellectual property;
    o Patent portfolio development and valuation;
    o Product liability and insurance claim investigation, expert witness services for matters involving such claims;
    o Quality Systems consulting and engineering;
    o Radiation Hardness Testing Technical Representative;
    o Technical Advisor in High Aspect Ratio and Surface Contour Measurement using Direct-to-Digital Holography.

| | |
|---|---|
| 2005-present | **McAlexander Sound Pte Ltd** - Singapore<br>**Managing Director** |

    o System, Product, and Process investigation, expert witness services for protection of intellectual property;
    o Patent portfolio development and valuation;
    o Contract consultation;
    o Not assigned any patents and is not engaged in any IP related licensing or litigation activities.

| | |
|---|---|
| 2002-present | **MDFHoldings, Inc.** – Las Vegas, NV<br>**CEO** |

    o IP holding and licensing company;
    o Assigned U.S. Patent Nos. 7,340,260 and 7,657,265 and EP 1 557 058 B1, each related to an object locating system;
    o Has not been and is not engaged in any IP related litigation or licensing activities.

| | |
|---|---|
| 2006-2020 | **QM Partners, L.P.** – Texas<br>**Manager** |

    o Management of development, licensing, prosecution and exploitation of assigned intellectual property;
    o Not assigned any patents and is not engaged in any IP related licensing or litigation activities.

**CURRICULUM  VITAE**                                    **Joseph C. MᶜAlexander** **III**

**EXPERIENCE  PROFILE** (continued)

| | |
|---|---|
| 2006-2020 | **Guardian Technologies, LLC** – Texas<br>**Manager** |

    o IP holding and licensing company;
    o Litigated U.S. Patent No. 5,657,076 related to security surveillance 2009-2011 (patent expired 2015);
    o Assigned U.S. Patent No. 8,334,775 related to RFID tracking (reassigned 2020 to personal);
    o Not engaged in any IP related licensing or litigation activities.

| | |
|---|---|
| 2006-2020 | **Appropriate Holdings, LLC** – Delaware<br>**Manager** |

    o IP holding company;
    o Not assigned any patents, has not been and is not engaged in any IP related licensing or litigation activities.

| | |
|---|---|
| 1996-2010 | **RMC Management, LLP** - Plano, TX<br>**Partner** |

    o Asset management.

| | |
|---|---|
| 1991-2002 | **Cochran Consulting, Inc. (CCI)** - Richardson, TX<br>**Managing Consultant** |

    o System, Product, and Process investigation, expert witness services for protection of intellectual property;
    o Design, process, and product reliability;
    o Defect and failure analysis.

| | |
|---|---|
| 1986-Nov'90 | **EPI Technologies, Inc.** - Richardson, TX<br>**Executive Vice President and Company Officer** |

    o Managed Advanced Technology Div., QA, and Engineering, including software program development;
    o Developed strategic, space/energy market growth plans;
    o Negotiated the acquisition of and managed a radiation company;
    o Designed and managed physical analysis, radiation effects, and environmental stress laboratories, including optical and e-beam measurement;
    o Achieved > 30% annual revenue growth and profitability for each laboratory the first 12 months;

**CURRICULUM  VITAE**                                   Joseph C. MᶜAlexander III

**EXPERIENCE   PROFILE** (continued)

            o Product and Process investigation services for protection of intellectual property.

1972 – 1986   **Texas Instruments, Inc.** - Dallas/Houston, TX; Singapore

    '84 - '86   **Quality/Reliability Assurance Manager, TI Dallas** Advanced DRAM semiconductor wafer fabrication facility

        o Developed/implemented on-line, computerized SPC software tools for dimensioning analysis and control and pattern recognition;
        o Coordinated people development, design-of-experiments;
        o Managed chemical and physical analysis laboratories;
        o Implemented control systems to assure product, process, material, equipment, and facility compliance, including Cost of Quality analysis.

    '82 - '84   **Quality/Reliability Assurance and Engineering Manager**, **TI Singapore** assembly/test facility

        o Developed, implemented, and operated an effective Quality/Reliability Assurance program for assembly processing including optical pattern recognition for equipment registration;
        o Supervised 225 people for 7 day/week operation, including QRA, Computer Systems software development, and Training;
        o Trained engineers in Solid State Physics, device fabrication, and statistical process control.

    '81 - '82   **Engineering Operations Manager**, **TI Houston**

        o Managed DRAM memory product cost center;
        o Responsible for division test software generation, product assembly and test quality / yield, cost reduction and quality improvement;
        o Provided technical customer interface for marketing;
        o Coordinated TI Singapore engineering test/assembly.

    '79 - '81   **Product Engineering Manager**, **TI Houston**

        o Responsible for yield improvement, technical customer interface, quality improvement, design evaluation, and device characterization for DRAM and CCD products;
        o Developed device specifications and test software.

**CURRICULUM  VITAE**                                    **Joseph C. McAlexander III**

**EXPERIENCE   PROFILE** (continued)

'72 - '79        **Design Section Manager / Engineer**, **TI Houston**

o Responsible for design and development, process compatibility, production introduction of Dynamic Ram products;
o Activities included electrical and physical layout, SPICE model simulation, test program generation, and product implementation for MOS Dynamic Ram products.

1969 - 1972        **U. S.  Army** - Coventry, Rhode Island; Seoul, Korea
**Captain, Air Defense Artillery**

o Served one year as Communications Officer in Korea;
o Served two years as Tactical Officer, New England Defense.

**CURRICULUM  VITAE**                              Joseph C. McAlexander [III]

ORGANIZATIONS, PUBLICATIONS, EDUCATION

## PROFESSIONAL ORGANIZATIONS AND AWARDS

1 - Institute of Electrical and Electronics Engineers, Inc. (IEEE), Senior Member.  Societies: Computer, Electron Devices, Solid State Circuits
2 - Licensing Executives Society (LES)
3 - National Society of Professional Engineers
4 - Texas Board of Professional Engineers, Registered License #79454
5 - Society of Flight Test Engineers
6 - American Society of Civil Engineers
7 - 2000/2001 Nationwide Register's Who's Who in Executives and Businesses
8 - 1996/1997 Strathmore's Who's Who Registry of Business Leaders

## PUBLICATIONS

1- <u>NUS Proceedings of Engineering Convention '83</u>, Aug '83, pgs. 139-142, The Memory Challenge.

2- <u>Archives of Biochemistry and Biophysics</u>, Dec'81, Vol. 212, No. 2, Equilibrium Constants under Physiological Conditions for the Reactions of D-3-Phosphoglycerate Dehydrogenase and L-Phosphoserine Aminotransferase.

3- <u>International Electron Devices Meeting</u>, Dec '79, pgs. 355-357, Sub 100ns 16K x 1 MOS Dynamic RAM Using a Grounded Substrate.

## EDUCATION  PROFILE

| | |
|---|---|
| 1980 - 1985 | Taught Solid State Device Physics, Semiconductor Processing, Circuit Design Techniques, and Statistical Quality Control Methods |
| | Effectiveness Training and Japanese Manufacturing Techniques, Participative Problem Solving courses |
| 1975 - 1976 | 1.5 years Graduate Study in Neural Science, the University of Texas Graduate School of Biomedical Science |
| 1965 - 1969 | BSEE, North Carolina State University |

CURRICULUM  VITAE                         Joseph C. McAlexander III

## PATENTS (US-31, Foreign-8)

| | |
|---|---|
| 4,239,993 | (1980) High Performance Dynamic Sense Amplifier with Active Loads |
| 4,280,070 | (1981) Balanced Input Buffer Circuit for Semiconductor Memory |
| 4,288,706 | (1981) Noise Immunity in Input Buffer Circuit for Semiconductor Memory |
| 4,370,575 | (1983) High Performance Dynamic Sense Amplifier with Active Loads |
| 4,418,293 | (1983) High Performance Dynamic Sense Amplifier with Multiple Column Outputs |
| 4,533,843 | (1985) High Performance Dynamic Sense Amplifier with Voltage Boost for Row Address Lines |
| 4,543,500 | (1985) High Performance Dynamic Sense Amplifier Voltage Boost for Row Address Lines |
| 4,543,501 | (1985) High Performance Dynamic Sense Amplifier with Dual Channel Grounding Transistor |
| 4,748,349 | (1988) High Performance Dynamic Sense Amplifier with Voltage Boost for Row Address Lines |
| 6,172,640 B1 | (2001) Pet Locator |
| 6,236,358 B1 | (2001) Mobile Object Locator |
| 6,421,001 B1 | (2002) Object Locator |
| 6,441,778 B1 | (2002) Pet Locator |
| 6,480,147 B2 | (2002) Portable Position Determining Device |
| 6,518,919 B1 | (2003) Mobile Object Locator |
| 6,771,213 B2 | (2004) Object Locator |
| 6,859,171 B2 | (2005) Mobile Object Locator |

CURRICULUM  VITAE                                    Joseph C. McAlexander III

**PATENTS** (continued)

| | |
|---|---|
| 7,113,126 B2 | (2006) Portable Positioning Determining Device |
| 7,179,674 B2 | (2007) Bi-Directional Released-Beam Sensor |
| 7,209,075 B2 | (2007) Mobile Object Locator |
| 7,324,044 B2 | (2008) Object Locator |
| 7,336,227 B2 | (2008) Portable Position Determining Device |
| 7,340,260 B2 | (2008) System and Method for Tracking the Location of Multiple Mobile Radio Transceiver Units (assigned to MDFHoldings, Inc.) |
| 7,353,706 B2 | (2008) Weighted Released-Beam Sensor |
| 7,397,097 B2 | (2008) Integrated Released Beam Layer Structure Fabricated in Trenches and Manufacturing Method Thereof |
| 7,564,405 B2 | (2009) Object Locator |
| 7,657,265 B2 | (2010) System and Method for Tracking the Location of Multiple Mobile Radio Transceiver Units (assigned to MDFHoldings, Inc.) |
| 7,760,137 B2 | (2010) Portable Positioning Determining Device |
| 7,764,228 B2 | (2010) Portable Positioning Determining Device |
| 7,989,906 B2 | (2011) Bi-Directional released-Beam Sensor |
| 8,334,775 B2 | (2012) RFID-Based Asset Security and Tracking System, Apparatus and Method (assigned to personal) |
| JP 55-053640 B4 | (1980) Defect Resistant Semiconductor Memory Cell |
| JP 59-044720 B4 | (1984) Semiconductor High Speed Read/Write Memory Unit |
| DE2935121 C2 | (1980) Clock Voltage Generator for Semiconductor Memory with Reduced Power Dissipation |
| DE3043651 A1 | (1981) Clock Voltage Generator for Semiconductor Memory with Reduced Power Dissipation |

**CURRICULUM  VITAE**                                   **Joseph C. McAlexander** **III**

**PATENTS** (continued)

      GB2032211 B2        (1980) High Performance Dynamic MOS Read/Write Memory

      EP 1 557 058 B1      (2011) System and method for tracking the location of multiple mobile radio transceiver units (assigned to MDFHoldings, Inc.) [States: AT BE BG CH CY CZ DE DK EE ES FI FR GB GR HU IE IT LI LU MC NL PT RO SE SI SK TR]

      EP 1 676 809 B1      (2010) Weighted released-beam sensor [States:  DE FR GB IT]

      EP 1 676 810 B1      (2010) Bi-directional released-beam sensor [States:  DE FR GB IT]

CURRICULUM  VITAE                                    Joseph C. M$^c$Alexander $^{III}$

## CASES

Cases over at least the past 7 years, either active or closed, in which I have signed a Protective Order, have testified as an expert either at a trial, hearing, or deposition, or have submitted statements / opinions by declaration, affidavit, or report, are:

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| AMS* v. Crane & Seaga (*firm: Davidson Berquist | 3:03-CV88-JPB, 3:08-CV-97-JPB and 3:04-CV-80,75,48 | ND WVA | 2008-2012 | P, t, TH |
| (Patents related to vending machines) | | | | |
| ITT* v. Celco et al. (*firm: Davidson Berquist) | 09-190-JJF | DE | 2009 - 2012 | P |
| (Patent related to GPS position determination) | | | | |
| TAOS* v. Intersil (*firm: Munck Carter) | 4:08-CV-451 | ED TX, Sherman | 2009 - 2015 | P, TS, t, TH |
| (Patent related to optical detector) | | | | |
| PACT v. Xilinx* (*firm: Kirkland & Ellis) | 2:07-CV-563 | ED TX, Marshall | 2010 - 2012 | P, t |
| (Patents related to Programmable Data Processing) | | | | |
| Opti Inc. v. SIS & Via* (*firm: Buether Joe & Carpenter) | 2:10-CV-279 | ED TX, Marshall | 2010 - 2013 | P, t, TH |
| (Patents related to Cache Memory Snooping) | | | | |
| Avocent* v. Raritan (*firm: Davidson Berquist) | 10-CV-6100 | SD NY | 2010 - 2012 | P, t, TH |
| (Patents related to KVM Switching) | | | | |
| Richtek Technology v. uPI* (*firm: Haynes & Boone) | C09-05679 WHA | ND CA, SF | 2010 – 2013 | P |
| (Patents related to dc-dc Power Controllers | | | | |

---

[1] * = Client

[2] P=Patent,  C=Contract,  ©=Copyright,  TS=Trade Secret,  AT=Antitrust;  CA=Class Action; t=testified, TH=Trial/Hearing

**CURRICULUM  VITAE**                                   Joseph C. McAlexander III

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Princeton* v. Canon (*firm: Duane Morris) | 2:10-CV-00029-TJW | ED TX, Marshall | 2010 – 2012 | P |
| (Patent related to video compression) | | | | |
| The Chamberlain Group* v. Decko et al. (*firm: Fitch Even) | 1:10-CV-07843 | ND IL, ED | 2011 – 2012 | P |
| (Patents related to garage door opener control systems) | | | | |
| CEATS* v. Continental Airlines et al. (*firm: McDermott Will & Emery) | 6:10-CV-120 LED | ED TX, Tyler | 2011 - 2012 | P, t, TH |
| (Patent related to interactive seating selection) | | | | |
| Lutron v. Crestron* (*firm: Quinn Emanuel) | 2:09-cv-707 | CD UT | 2011 - 2012 | P |
| (Patents related to electronic control systems) | | | | |
| Alcohol Monitoring* v. BI (*firm: Latrop & Gage) DME-CBS | 11-cv-00301-DME-CBS | CO | 2011 - 2012 | P |
| (Patent related to alcohol monitoring) | | | | |
| T-Netix, Inc.* v. Pinnacle Public Services, LLC (*firm: Gruber Hurst) | 2:09-CV-00333-CE | ED TX, Marshall | 2011 - 2012 | P |
| (Patents related to penal institution telephone communication control) | | | | |
| TattleTale* v. Calfee (*firm: Cooper & Elliott) | 2:10-CV-226 | SD OH, Columbus | 2011 - 2012 | P |
| (Patents related to portable alarm systems) | | | | |
| Cypress* v. GSI et al (*firm: Morrision & Foerster) | 337-TA-792 | ITC (Bullock) | 2011 - 2012 | P, t, TH |
| (Patents related to memory operation, architecture, and layout) | | | | |

**CURRICULUM  VITAE**                                    **Joseph C. McAlexander III**

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Infineon* v. Atmel (*firm:Kirkland & Ellis) | 1:11-cv-00307 | DE | 2011 - 2012 | P |
| (Patents related to IC circuits and process) | | | | |
| Cherdak v. Rack Room* (*firm: Lathrop & Gage) | 1:11-CV-169 LO/ JFA | ED of VA | 2011 - 2012 | P |
| (Patents related to IC timing device for athletic shoes) | | | | |
| DRAM Mem Tech v. Etron* et al (*firm: Dickstein Shapiro) | 8:11-CV-000332-DOC-SS | CD of CA | 2011-2012 | P |
| (Patents related to IC memory technology) | | | | |
| Richtek Technology v. uPI Semi.* et al (*firm: Haynes and Boone) | 337-TA-698 | ITC (Luckern) | 2011 - 2012 | P, t, TH |
| (Patents related to DC-DC Controllers) | | | | |
| Solid State Storage v. STEC* (*firm: Akin Gump) | 2:11-CV-391 | ED TX, Marshall | 2011 - 2012 | P |
| (Patents related to Memory and Memory Control) | | | | |
| ParkerVision* v.Qualcomm (*firm:Allen,Dyer,McKool) | 3:11-CV-719-J-37 | MD FL, J.ville | 2011 - 2012 | P |
| (Patents related to Signal Down-Converting and Translation) | | | | |
| Oracle v. Micron* (*firm: Gibson Dunn) | CV10-4340 | ND CA, San Jose | 2011 - 2012 | C |
| (Conspiracy, Agreement Compliance) | | | | |
| Grail* v. Mitsubishi et al. (*firm: Niro Haller & Niro) | 1-07-CV-098590 | SC CA, Santa Clara | 2011 - 2012 | TS, t, TH |
| (Improper disclosure and use of Trade Secrets) | | | | |
| Grail* v. Renesas (*firm: Niro Haller &Niro) | C 11-03847 | ND CA, San Fran | 2011 - 2015 | P |
| (Patent related to inductive coupled memory) | | | | |

**CURRICULUM  VITAE**                    **Joseph C. McAlexander [III]**

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Round Rock v. ASUS* (*firm: Perkins Coie) | 11-978-MSG | DE | 2012 - 2013 | P |
| (Patents related to die termination control and memory communication) | | | | |
| Intellectual Ventures v. Hynix* (*firm: Quinn Emanuel) | 1:10-cv-01066-UNA | DE | 2012 | P |
| (Patents related to die memory access and control) | | | | |
| Omega* v. Skypatrol et al.(*firm: Allen Dyer) | 11-24201-Civ-Moore/Torres | SD FL, Miami | 2012 - 2013 | P |
| (Patents related to vehicular tracking) | | | | |
| Creative* v. Nintendo (*firm: Barnes & Thornburg) | 2:10-cv-2735-AHM-VBK | CD CA, Western | 2012 | P |
| (Patents related to ROM memory array design) | | | | |
| Beacon v. Honda* et al. (*firm: Fish & Richardson) | 337-TA-814 | ITC (Pender) | 2012 | P |
| (Patents related to navigation) | | | | |
| AVM* v. Intel (*firm: Goldstein; Boies) | 10-610-RK | DE | 2012 – 2013 | P, t |
| (Patent related to dynamic logic circuits) | | | | |
| Modec v. Floatec* (*firm: Duane Morris) | 2011-68931 | Harris County, TX | 2012 - 2013 | TS |
| (Trade Secrets and Confidential Information) | | | | |
| Cian* v. Aeroflex (*firm: Skiermont) | 3:11-cv-3349 | ND TX, Dallas | 2012 | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |
| Cian* v. Agilent (*firm: Skiermont) | 3:11-cv-3351 | ND TX, Dallas | 2012 | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |

CURRICULUM  VITAE                                    Joseph C. M<sup>c</sup>Alexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Cian* v. National Instruments (*firm: Skiermont) | 3:11-cv-3353 | ND TX, Dallas | 2012 - 2013 | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |
| Cian* v. Pickering (*firm: Skiermont) | 3:11-cv-3354 | ND TX, Dallas | 2012 | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |
| Cian* v. Spirent (*firm: Skiermont) | 3:11-cv-3356 | ND TX, Dallas | 2012 | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |
| Internet Machines v. PLX* (*firm: Baker & McKenzie) | 6:11-cv-00250-MHS | ED TX, Tyler | 2012 | P |
| (Patent re. PCI express switch) | | | | |
| TPL v. Dell et al.*[3] (*firm: Hogan Lovells) | 337-TA-841 | ITC (Essex) | 2012 - 2013 | P, t, TH |
| (Patents related to Memory Interface Ports) | | | | |
| Wacoh* v. Kionix, Inc. (*firm: Clearman Prebeg)) | 3:12-cv-00530 | New York | 2012 - 2013 | P |
| (Patents related to inclinometer/accelerometer) | | | | |
| Solid State Storage v. Fusion* (*firm: Baker Botts) | 2:11-CV-391 | ED TX, Marshall | 2013 | P |
| (Patents related to Memory and Memory Control) | | | | |
| Smart Modular Technologies* v. Netlist (*firm: Schwegman) | 2:12-CV-02319-MCE-EFB | ED CA | 2012 - 2014 | P |
| (Memory Modules) | | | | |

---

[3] Additional Respondents: Seiko Epson (Kirkland & Ellis), HP (Kenyon & Kenyon), Brother (Banner Witcoff), Kingston (S J Christine Yang), Fujitsu (Morrison Foerster), HiTi Digital (Eastwind Consultants), Canon (Jones Day), Acer (K L Gates), Newegg/Rosewill (Web Law)

CURRICULUM VITAE                                      Joseph C. McAlexander III

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| NXP v. RIM*<br>(*firm: Fish & Richardson) | 6:12-cv-498-ACC-GJK | MD FL, Orlando | 2013 - 2014 | P |
| (Mask pattern density) | | | | |
| Kangaroo Media* v. Immersion Entertainment (*firm: Kenyon & Kenyon) | 2:12-cv-00382-JFC, 2:14-cv-01536-JFC | WD PA | 2012 - 2016 | P, t |
| (Audio/Video Entertainment System patent) | | | | |
| Nokia* v. HTC<br>(*firm: Desmarais) | 337-TA-847 | ITC (Pender) | 2012 - 2013 | P, t, TH |
| (Signal transmission and attentuation) | | | | |
| Floatec* v. Magnuson<br>(*firm: Duane Morris) | 2011-54420 | 61st Judicial District, Harris County, TX | 2012 - 2014 | TS |
| (Misappropriation and Misuse) | | | | |
| Affinity* v. Clear Channel<br>(*firm: Duane Morris) | 1:12-CV-00205-LY | WD TX, Austin | 2013 - 2015 | P, t, TH |
| (Patent related to broadcast content) | | | | |
| Synopsys* v. Mentor Graphics<br>(*firm: Sidley Austin) | 3:12-cv-06467-MMC | ND CA | 2013 | P, t, TH |
| (Patents related to logic circuit description and synthesis) | | | | |
| Affinity* v. Ford<br>(*firm: Robins Kaplan ...) | 1:12-cv-00580 | EDTX, Beaumont | 2013 - 2014 | P, t, TH |
| (Patents related to portable audio player) | | | | |
| Affinity* v. GM<br>(*firm: Robins Kaplan ...) | 1:12-cv-00582 | EDTX, Beaumont | 2013 - 2014 | P, t, TH |
| (Patents related to portable audio player) | | | | |
| Nokia* v. HTC<br>(*firm: Desmarais) | 337-TA-885 | ITC (Lord) | 2013 - 2014 | P |
| (Patents related to portable electronic device housing) | | | | |

**CURRICULUM  VITAE**                                      **Joseph C. McAlexander III**

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Rothbaum v. Samsung Telecom America LLC* (*firm: Choate Hall & Stewart) | 11-10509 (MLW) | DMA | 2013 | CL, t |
| (Class Action) | | | | |
| LendingTree* v. Zillow et al. (*firm: Sheppard Mullin) | 3:10-CV-00439 FDW-DCK | WDNC, Charlotte | 2013 - 2014 | P, t, TH |
| (On-Line Mortgage Loan Transactions) | | | | |
| Secure Axcess* v. Nintendo (*firm: Klemchcuk Kubasta) | 2:13-CV-00032 | ED TX, Marshall | 2013 - 2014 | P |
| (patents related to dual screen display) | | | | |
| Fenner* v. CELLCO (*firm: Loewinsohn) | 6:11-cv-348 | ED TX, Tyler | 2013 | P |
| (patent related to telecommunication) | | | | |
| Profectus v. Huawei, … Samsung* (*firm: Fish & Richardson) | 6:11-cv-00474-MHS | ED TX, Tyler | 2014 | P |
| (patent related to digital picture frames) | | | | |
| Galitski v. Samsung* (*firm: Lynn Tillotson Pinker & Cox  ) | 3:12-CV-4782-D | ND TX, Dallas | 2014 - 2015 | CL, t |
| (Class Action) | | | | |
| Chrysler* v. Norman IP Holdings (*firm: Dickstein Shapiro) | PETITION FOR IPR - U.S. PATENT NO. 5,502,689 | USPTO PTAB | 2014 | P |
| (Patent related to IC clock generation) | | | | |
| Allure Energy* v. Nest Labs (*firm: Dickinson Wright) | 9:13-CV-00102-RC | ED TX, Lufkin | 2014 - 2015 | P, t, TH |
| (Smart Thermostat) | | | | |

**CURRICULUM VITAE**                    **Joseph C. M<sup>c</sup>Alexander III**

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Affinity* v. Ford (*firm: Robins Kaplan ...) | WA:13-CV-363 | WD TX, Waco | 2014 | P |
| (Patents related to wireless media connectivity) | | | | |
| Affinity* v. GM (*firm: Robins Kaplan ...) | WA:13-CV-370 | WD TX, Waco | 2014 | P |
| (Patents related to wireless media connectivity) | | | | |
| Affinity* v. Volvo (*firm: Robins Kaplan ...) | WA:13-CV-366 | WD TX, Waco | 2014 | P |
| (Patents related to wireless media connectivity) | | | | |
| Affinity* v. Honda (*firm: Robins Kaplan ...) | WA:13-CV-367 | WD TX, Waco | 2014 | P |
| (Patents related to wireless media connectivity) | | | | |
| Affinity* v. Nissan (*firm: Robins Kaplan ...) | WA:13-CV-369 | WD TX, Waco | 2014 | P |
| (Patents related to wireless media connectivity) | | | | |
| Affinity* v. Jaguar (*firm: Robins Kaplan ...) | WA:13-CV-368 | WD TX, Waco | 2014 | P |
| (Patents related to wireless media connectivity) | | | | |
| Affinity* v. Toyota (*firm: Robins Kaplan ...) | WA:13-CV-365 | WD TX, Waco | 2014 | P |
| (Patents related to wireless media connectivity) | | | | |
| Trover* v. Tyco (*firm: McDole Williams) | 2:13-cv-0052 | ED TX, Marshall | 2014 | P |
| (Patents related to Security Cameras) | | | | |
| Radiall* v. Glenair (*firm: Oliff) | 2:14-CV-00822-ODW | CDCA | 2014 - 2015 | P |
| (Patent related to electrical connector) | | | | |

**CURRICULUM  VITAE**                           Joseph C. McAlexander III

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| LunarEye* v. Independent Witness (*firm: Prebeg Faucett Abbott) | 9:05-CV-00188-RC | EDTX, Lufkin | 2014 - 2015 | P, t |
| *(Patent related to trigger location telemetry)* | | | | |
| AMS* v. Soberlink (*firm: Lathrop & Gage) | IPR013-00577 | USPTO PTAB | 2014 | P |
| *(Patent related to sobriety monitoring)* | | | | |
| Infineon v. Volterra* (*firm: Weil Gotshal) | 3:11-cv-06239-MMC | NDCA | 2014 | P |
| *(Patents related to IC packaging)* | | | | |
| Volterra* v Primarion (*firm: Weil Gotshal) | CV-08-5129 (RS) | NDCA | 2014 | P |
| *(Patents related to IC packaging)* | | | | |
| Infineon v. Volterra* (*firm: Weil Gotshal) | 2:13-cv-684 | EDTX, Marshall | 2014 | P |
| *(Patents related to IC packaging)* | | | | |
| AMS* Reexam (*firm: Lathrop & Gage) | SN: 95/001,609 | USPTO | 2014 - 2015 | P, t |
| *(Patent related to alcohol event monitoring)* | | | | |
| Triune Systems* v. Active-Semi (*firm: Farrow-Gillespie & Heath LLC) | 296-03209-2013 | Collin County | 2014 - 2015 | TS, t |
| *(Covenant not to compete)* | | | | |
| La Crosse* v. Ambient (*firm: Banner & Witcoff) | 13-cv-833 | WD WI | 2014 - 2015 | P |
| *(Patents related to weather detectors)* | | | | |

**CURRICULUM  VITAE**                                    Joseph C. M<sup>c</sup>Alexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Progressive Semiconductor Solutions v. Marvell Scemiconductor* (*firm: Fish & Richardson) | *Inter Partes* review petition re. 6,473,349 | USPTO PTAB | 2014 | P |
| (Patent related to sense amplifiers for memory) | | | | |
| Anderson v. Samsung* (*firm: Bird Marella) | SACV-13-01028 | CD CA, SD | 2014 - 2015 | CL, t |
| (Class Action) | | | | |
| Netlist v. Diablo* (*firm: McDermott Will & Emery) | 4:13-cv-05962-YGR | ND CA, Oakland | 2014 - 2015 | TS, t, TH |
| (Technology related to Misappropriation of Trade Secret) | | | | |
| Netlist v. Diablo* (*firm: McDermott Will & Emery) | 4:13-cv-05889-YGR | ND CA | 2014 - 2015 | P |
| (Patents related to DIMM DDR3 SDRAM load reduction and rank multiplication) | | | | |
| Spherix* v. Uniden (*firm: Skiermont Puckett) | 3:13-cv-03496-M | ND TX, Dallas | 2014 | P |
| (Patents related to cordless phones) | | | | |
| Spherix* v. VTech (*firm: Skiermont Puckett) | 3:13-cv-03494-M | ND TX, Dallas | 2014 | P |
| (Patents related to cordless phones) | | | | |
| Securus* v. Global (*firm: Gruber) | 3:13-CV-03009-K | ND TX | 2014 - 2017 | P, t |
| (Patents related to telecom systems) | | | | |
| Global v. Securus* (*firm: Gruber) | 3:14-CV-0829-K, 3:13-CV-00713-JRS | ND TX / ED VA | 2014 - 2017 | P |
| (Patents related to telecom systems) | | | | |

**CURRICULUM  VITAE**                                   Joseph C. McAlexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Trover* v. Dedicated Micro (*firm: McDole Williams) | 2:13-cv-1047 | ED TX, Marshall | 2014 - 2015 | P |
| (Patents related to Security Cameras) | | | | |
| Gordon Howard v. LunarEye* (*firm: Prebeg Faucett Abbott) | IPR2014-00712 | USPTO PTAB | 2014 - 2015 | P, t |
| (Patent related to trigger location telemetry) | | | | |
| Advanced Audio Devices* (*firm: Clark Hill PLC) | IPR2014-01154 | USPTO PTAB | 2014 - 2015 | P, t |
| (Patent 6,587,403 related to music jukebox) | | | | |
| Advanced Audio Devices* (*firm: Clark Hill PLC) | IPR2014-01155 | USPTO PTAB | 2014 - 2016 | P, t |
| (Patent 7,289,393 related to music jukebox) | | | | |
| Advanced Audio Devices* (*firm: Clark Hill PLC) | IPR2014-01156 | USPTO PTAB | 2014 - 2016 | P, t |
| (Patent 7,817,502 related to a personal digital stereo player) | | | | |
| Advanced Audio Devices* (*firm: Clark Hill PLC) | IPR2014-01157 | USPTO PTAB | 2014 - 2016 | P, t |
| (Patent 7,933,171 related to a personal digital stereo player) | | | | |
| Advanced Audio Devices* (*firm: Clark Hill PLC) | IPR2014-01158 | USPTO PTAB | 2014 – 2016 | P, t |
| (Patent 8,400,888 related to a personal digital stereo player) | | | | |
| One-E-Way* v. Sony, Sennheiser, BlueAnt, Creative Tech, Beats, Jawbone, Jabra (*firm: Knobbe Marten, Olson & Bear) | 337-TA-943 | ITC (Pender) | 2014 - 2018 | P, t |
| (Patents related to bluetooth configured headphones) | | | | |

**CURRICULUM  VITAE**                    Joseph C. M<sup>c</sup>Alexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Samsung* v. NVIDIA (*firm: O'Melveny & Myers LLP) | 3:14-cv-00757 | ED VA, Richmond | 2014 - 2015 | P |
| (Patents related to ICs and systems) | | | | |
| Zhongshan* v. Nidec (*firm: Oliff) | IPR2015-00465 | USPTO PTAB | 2014 | P, t |
| (Patent related to blower motor for HVAC system) | | | | |
| Samsung* v. NVIDIA (*firm: Kirkland & Ellis) | 337-TA-941 | ITC (Shaw) | 2015 | P, t |
| (Patents related to ICs and systems) | | | | |
| Omega* v. Calamp | 6:13-cv-1950-Orl-31DAB | MD, FL | 2015 - 2016 | P, t, TH |
| (Patents related to vehicular control systems and tracking) | | | | |
| Leadfactors* v. Cisco (*firm: Niro Haller & Niro) | 1:13 CV 247926 | CA Superior Court, Santa Clara | 2015 | TS |
| (Misappropriation of Trade Secrets, Breach of Contract) | | | | |
| AVM* v. Intel (*firm: Boies, Schiller & Flexner) | 1:15-cv-00033-RGA | DE | 2015 - 2016 | P, t, TH |
| (Patent related to dynamic logic circuits) | | | | |
| Paice* v. Hyundia (*firm: Fish & Richardson) | WDQ-12-499 | MY, Baltimore | 2015 | P, t, TH |
| (Patents related to Hybrid motor/engine control) | | | | |
| Allure Energy* v. Honeywell (*firm: McKool Smith) | 1:15-cv-00079-RP | WDTX, Austin | 2015 - 2017 | P |
| (Smart Thermostat) | | | | |
| IV* v. Toshiba (*firm: Desmarais) | 13-cv-453-SLR-SRF | DE | 2015 - 2017 | P, t, TH |
| (NAND Flash) | | | | |

CURRICULUM  VITAE                                    Joseph C. McAlexander III

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| SimpleAir, Inc.* v. Amazon (*firm: Dovel & Luner) | 2:14-cv-679 (JRG) | EDTX, Marshall | 2015 | P |
| (Patents related to data transmission) | | | | |
| Microsemi* v. e.Digital (*firm: McDermott Will & Emery) | *Inter Partes* review petition re. 5,839,108 | USPTO PTAB | 2015 | P |
| (Patent related to linked list data segment filing) | | | | |
| IMS v. Micron* (*Weil Gotchal/ Orrick) | 1:14-cv-01480-RGA | DE | 2015 - | P |
| (Patents related to flash memory) | | | | |
| Honeywell v. Allure* (*firm: Dickinson Wright) | IPR201501248, 01251,01253 | USPTO PTAB | 2015 - 2017 | P |
| (Smart Thermostat) | | | | |
| Blitzsafe* v Honda (*firm: Brown Rudnick) | 2:15-cv-01274-JRG-RSP | EDTX, Marshall | 2015 - 2017 | P, t |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v Hyundai (*firm: Brown Rudnick) | 2:15-cv-01275-JRG-RSP | EDTX, Marshall | 2015 - 2017 | P, t |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v Nissan (*firm: Brown Rudnick) | 2:15-cv-01276-JRG-RSP | EDTX, Marshall | 2015 - 2017 | P, t |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v Toyota (*firm: Brown Rudnick) | 2:15-cv-01277-JRG-RSP | EDTX, Marshall | 2015 - 2017 | P, t |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v VW (*firm: Brown Rudnick) | 2:15-cv-01278-JRG-RSP | EDTX, Marshall | 2015 - 2017 | P, t |
| (Patents related to audio device integration systems) | | | | |

CURRICULUM  VITAE                                    Joseph C. McAlexander III

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| 3rd Eye Surveillance* v Stealth (*firm: Kennedy Law) | 6:14-cv-00162 JDL | EDTX, Tyler | 2015 - 2016 | P |
| (Patents related to real-time image processing to response agency) | | | | |
| 3rd Eye Surveillance* v Vision Video (*firm: Kennedy Law) | 6:14-cv-00161-JDL | EDTX, Tyler | 2015 - 2016 | P |
| (Patents related to real-time image processing to response agency) | | | | |
| 3rd Eye Surveillance* v Ft Worth / e-Watch (*firm: Kennedy Law) | 6:14-cv-00725 | EDTX, Tyler | 2015 - 2017 | P, t, TH |
| (Patents related to real-time image processing to response agency) | | | | |
| 3rd Eye Surveillance* v Uinted States (*firm: Kennedy Law) | 1:15-cv-00501-CFL | Court of Federal Claims, DC | 2015 - | P, t |
| (Patents related to real-time image processing to response agency) | | | | |
| Hitachi v TPV* (*firm: O'Melveny & Myers) | 2:14-cv-1121-JRG-RSP | EDTX, Marshall | 2015 - 2016 | P |
| (Patent related to LCD power and signal board arrangement) | | | | |
| Nidec Motor v Broad Ocean Motor* (*firm: Locke Lord) | 2:15-cv-00443 | EDTX, Marshall | 2016 | P |
| (Patent related to blower motor control for HVAC) | | | | |
| TracBeam* v T-Mobile (*firm: Dovel & Luner) | 6:14-cv-678-RWS | EDTX, Tyler | 2016 | P, t |
| (Patents related to geographic location estimates) | | | | |
| SMS v Emerson* (*firm: Davidson Berquist) | 2:15-cv-00032-RWS-RSP | EDTX, Marshall | 2016 | P |
| (Patent related to a method of monitoring a protected space) | | | | |

**CURRICULUM VITAE**                              Joseph C. McAlexander III

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Prong v Sorias* (*firm: Gottlieb, Rackman & Reisman) | IPR2015-01317 | USPTO PTAB | 2016 | P |
| (Patent related to attachable mobile charger) | | | | |
| Skyline Software Systems v Duane Morris* (*firm: Venable) | 2015-08868 | Circuit Court Fairfax County | 2016 | P |
| (3D mapping technology) | | | | |
| SignalQuest v Oncque* (*firm: Duane Morris) | 11-cv-00392-JL | NH | 2016 | P |
| (Patents related to vibration switches) | | | | |
| TiVo v Samsung* (*firm: Fish & Richardson) | 2:15-CV-1503 | EDTX, Marshall | 2016 | P |
| (Patent related to multimedia signal processing) | | | | |
| MLC Intellectual Property v. Micron* (*firm: Fish & Richardson) | 5:14-cv-03657 SI | ND CA | 2014 - | P, t |
| (Patent related to multilevel cell storage) | | | | |
| Richtek v uPi* (*firm: Hogan Lovells) | C 09-05659 WHA LB | NDCA, SF | 2016 | P |
| (Patents related to converter channel current balance and PWM circuit) | | | | |
| Paice* v VW, Porsche, Audi (*firm: Fish & Richardson) | 337-TA-998 | ITC | 2016 – 2017 | P |
| (Patents related to hybid vehicle technology) | | | | |
| Biosonix v Hydrowave* (*firm: Bradley) | 4:16-cv-00139-RC | EDTX, Sherman | 2016 - 2017 | P |
| Patent related to underwater sound) | | | | |
| Univ of S FL* v Fujifilm (*firm: Dickinson Wright) | 8:16-cv-01194-MSS-TGW | MDFL, Tampa | 2017 | P |
| (Patent related to Workstation Interface – Digital Mammography) | | | | |

**CURRICULUM  VITAE**                                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Univ of S FL * v BRIT (*firm: Dickinson Wright) | 8:16-cv-03109-MSS-TGW | MDFL, Tampa | 2017 | P, t |
| (Patent related to Workstation Interface – Digital Mammography) | | | | |
| Univ of IL v Micron* (*firm: Fish & Richardson) | 2:11-cv-02288-SLD-JAG | CDIL, Rock Falls | 2017 | P, C |
| (Patents and contract related to use of deuterium in semicondutor processing) | | | | |
| ZiiLabs v AMD* (*firm: O'Melveny & Myers) | 337-TA-3189 | ITC-Shaw | 2017 | P |
| (Patents related to graphics processors) | | | | |
| MTL* v Sandisk (*firm: Tensegrity) | 337-TA-1034 | ITC-Lord | 2017 | P, t |
| (Patents related to flash memory) | | | | |
| Razberi v Dynacolor* (*firm: McDole Williams) | 01-16-0003-3734 | AAA | 2017 - 2018 | C, TS, t, TH |
| (Arbitration related to contractual obligations) | | | | |
| Seed Spring* v Microsoft (*firm: Dovel) | 6:17-cv-427-RWS | EDTX, Tyler | 2017 | P |
| (Patents related to Wirelss Location) | | | | |
| TracBeam* v Microsoft (*firm: Dovel) | 6:17-cv-426-RWS | EDTX, Tyler | 2017 | P |
| (Patents related to Wirelss Location) | | | | |
| TracBeam* v Cisco (*firm: Dovel) | 6:17-cv-525-RWS | EDTX, Tyler | 2017 - 2018 | P |
| (Patents related to Wirelss Location) | | | | |
| Arris* v Sony (*firm: Fish & Richardson) | 337-TA-1060 | ITC-Lord | 2017 | P, t |
| (Patent related to Broadcast Signals) | | | | |
| Vivint* v Alarm.com (*firm: Weil) | 2:15-cv-00392-CW-BCW | UT | 2017 - | P, t |
| (Patents related to Electronic Message Delivery) | | | | |

**CURRICULUM  VITAE**                              Joseph C. McAlexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Blitzsafe* v Bosch (*firm: Brown Rudnick) | 2:17-cv-00105-JRG | EDTX, Marshall | 2017 - 2019 | P, t |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v Daimler & Mercedes (*firm: Brown Rudnick) | 2:17-cv-00422-JRG | EDTX, Marshall | 2017 – 2019 | P |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v BMW (*firm: Brown Rudnick) | 2:17-cv-00418-JRG | EDTX, Marshall | 2017 - 2019 | P |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v Mazda (*firm: Brown Rudnick) | 2:17-cv-00423-JRG | EDTX, Marshall | 2017 - 2019 | P |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v Mitsubishi (*firm: Brown Rudnick) | 2:17-cv-00430-JRG | EDTX, Marshall | 2017 - 2019 | P |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v Subaru (*firm: Brown Rudnick) | 2:17-cv-00421-JRG | EDTX, Marshall | 2017 - 2019 | P, t |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v Tata & Jaguar (*firm: Brown Rudnick) | 2:17-cv-00424-JRG | EDTX, Marshall | 2017 - 2019 | P |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v Volvo (*firm: Brown Rudnick) | 2:17-cv-00420-JRG | EDTX, Marshall | 2017 - 2019 | P |
| (Patents related to audio device integration systems) | | | | |
| AGIS* v Huawei (*firm: Brown Rudnick) | 2:17-00513-JRG | EDTX, Marshall | 2017 - 2018 | P, t |
| (Patents related to Patents related to interactive remote communications) | | | | |

**CURRICULUM  VITAE**                    **Joseph C. McAlexander [III]**

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| AGIS* v HTC (*firm: Brown Rudnick) | 2:17-00514-JRG | EDTX, Marshall | 2017 - 2019 | P, t |
| (Patents related to Patents related to interactive remote communications) | | | | |
| AGIS* v LG (*firm: Brown Rudnick) | 2:17-00515-JRG | EDTX, Marshall | 2017 - 2019 | P, t |
| (Patents related to Patents related to interactive remote communications) | | | | |
| AGIS* v Apple (*firm: Brown Rudnick) | 2:17-00516-JRG | EDTX, Marshall | 2017 - 2019 | P, t |
| (Patents related to Patents related to interactive remote communications) | | | | |
| AGIS* v ZTE (*firm: Brown Rudnick) | 2:17-00517-JRG | EDTX, Marshall | 2017 - 2019 | P |
| (Patents related to Patents related to interactive remote communications) | | | | |
| Arya v Dufossat* (*firm: Robert Sueiro) | 4:16-cv-03595 | SDYX, Houston | 2017 - | TS, C, t |
| (Dispute related to Trade Secrets) | | | | |
| Seven Networks v Samsung* (*firm: Fish & Richardson) | 2:17-cv-00441-JRG | EDTX, Marshall | 2017 - 2018 | P, t |
| (Patents related to Power Management of Mobile Networks) | | | | |
| ZF Micro Solutions* v. Tat Investment (*firm: Berger) | 1-09-CV-134970 | Santa Clara County | 2018 | C, t, TH |
| (Business tort, unfair practice) | | | | |
| Univ of S FL* v Fujifilm (*firm: Dickinson Wright) | 3:18-cv-00215-AVC | Connecticut | 2018 - | P, t |
| (Patent related to Workstation Interface – Digital Mammography) | | | | |
| Univ of S FL* v BRIT (*firm: Dickinson Wright) | 3:18-CV-0250-K | NDTX, Dallas | 2018 - 2019 | P, t |
| (Patent related to Workstation Interface – Digital Mammography) | | | | |

**CURRICULUM  VITAE**                                      Joseph C. McAlexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Cypress Insurance v Hynix* (*firm: Bird Marella) | C17-467 RAJ | WDWA, Seattle | 2018 - 2019 | C, t, TH |
| (Contract dispute related to product delivery) | | | | |
| Belliveau* v BARCO (*firm: McKool) | 1:17-CV-00379-SS | WDTX, Austin | 2018 | C, t |
| (Patent portfolio liceinsing dispute) | | | | |
| MPS* v Intersil (*firm:  Perkins | 16-1125-LPS | DE | 2018 - | TS, t |
| (Trade Secret dispute) | | | | |
| GoGo v Squire Patton Boggs* (*firm: Cozen O'Connor) | 2016-L-007789 | Cook County, IL | 2018 - 2019 | P |
| (Patent Malpractice claim) | | | | |
| X2Y* v Intel (*firm: Dovel) | 3:18-cv-1394-HZ | DOR, Portland | 2018 - 2020 | P |
| (Patents related to package layer metalization) | | | | |
| Power Integration* v On Semi (*firm: Fish & Richardson) | 1:16-cv-06371-BLF | NDCA, San Jose | 2019 - 2019 | P, t |
| (Patents related to power converter regulation) | | | | |
| ON Semi v Power Integration* (*firm: Fish & Richardson) | 1:17-cv-00247-LPS-CJB | DE | 2019 - 2019 | P, t |
| (Patents related to power converter regulation) | | | | |
| Semcon* v Amazon (*firm: Brown Rudnick) | 2:18-CV-00192-JRG | EDTX, Marshall | 2019 | P |
| (Patent related to Adaptive Power Control) | | | | |
| Semcon* v Asustek (*firm: Brown Rudnick) | 2:18-CV-00193-JRG | EDTX, Marshall | 2019 | P |
| (Patent related to adaptive power control) | | | | |

**CURRICULUM  VITAE**                                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Semcon* v Kyocera (*firm: Brown Rudnick) | 2:18-CV-00197-JRG | EDTX, Marshall | 2019 | P |
| (Patent related to adaptive power control) | | | | |
| Innovation Sciences* v Amazon (*firm: Davidson Berquist) | 4:18-cv-00474-ALM | EDTX, Sherman | 2019 - 2020 | P, t, TH |
| (Patent related to Internet communication) | | | | |
| Innovation Sciences* v HTC (*firm: Davidson Berquist) | 4:18-cv-00476-ALM | EDTX, Sherman | 2019 - 2020 | P, t |
| (Patent related to Internet communication) | | | | |
| Innovation Sciences* v Resideo (*firm: Davidson Berquist) | 4:18-cv-00475-ALM | EDTX, Sherman | 2019 - 2020 | P, t |
| (Patent related to Internet communication) | | | | |
| Innovation Sciences* v Vector (*firm: Davidson Berquist) | 4:18-cv-00477-ALM | EDTX, Sherman | 2019 | P |
| (Patent related to Internet communication) | | | | |
| CXT* v JC Penny (*firm: Brown Rudnick) | 2:18-cv-00171-RWS-RSP (lead)  2:18-CV-233-RWS-RSP | EDTX, Marshall | 2019 - 2020 | P, t |
| (Patents related to storage management and information distribution) | | | | |
| Photonics* v Lenovo (*firm: Brown Rudnick) | 1:18-cv-00489-MN | DE | 2019 | P |
| (Patents related to GDS-II Layout) | | | | |
| Quest NetTech Corp* v Apple (*firm: Brown Rudnick) | 2:19-CV-00118-JRG | EDTX, Marshall | 2019 - 2020 | P |
| (Patent related to programmable credit card system) | | | | |

**CURRICULUM VITAE**                                    Joseph C. McAlexander III

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Pilot, Inc.* v Schumacher (*firm: Bradford) | 1:19-cv-05982-EEC | NDIL, Eastern Div | 2019 - | P |
| (Patents related to battery chargers) | | | | |
| Vocalife* v Amazon (*firm: Brpwn Rudnick) | 2:19-cv-00123-JRG | EDTX, Marshall | 2019 - 2020 | P, t, TH |
| (Patent related to microphone array) | | | | |
| Semcon* v Vuitton (*firm: Brown Rudnick) | 2:18-CV-00197-JRG | EDTX, Marshall | 2019 - | P, t |
| (Patent related to adaptive power control) | | | | |
| Semcon* v Shenzhen (*firm: Brown Rudnick) | 2:18-CV-00197-JRG | EDTX, Marshall | 2019 - | P, t |
| (Patent related to adaptive power control) | | | | |
| Ultravision* v GoVision (*firm: Brown Rudnick) | 2:18-cv-00100-JRG-RSP | EDTX, Marshall | 2019 - | P |
| (Patents related to modular display panels and LED lighting) | | | | |
| Ultravision* v Shenzhen (*firm: Brown Rudnick) | 2:18-cv-00103-JRG-RSP | EDTX, Marshall | 2019 - | P |
| (Patents related to modular display panels and LED lighting) | | | | |
| Ultravision* v Aoto (*firm: Brown Rudnick) | 2:18-cv-00113-JRG-RSP | EDTX, Marshall | 2019 - | P |
| (Patents related to modular display panels and LED lighting) | | | | |
| Ultravision* v Leyard (*firm: Brown Rudnick) | 2:18-cv-00102-JRG-RSP | EDTX, Marshall | 2019 - | P |
| (Patents related to modular display panels and LED lighting) | | | | |
| Ultravision* v NEC (*firm: Brown Rudnick) | 2:18-cv-00150-JRG-RSP | EDTX, Marshall | 2019 - | P |
| (Patents related to Modular Display Panels and LED Lighting) | | | | |
| Ultravision* v Prismaflex (*firm: Brown Rudnick) | 2:18-cv-00108-JRG-RSP | EDTX, Marshall | 2019 - | P |
| (Patents related to modular display panels and LED lighting) | | | | |

**CURRICULUM  VITAE**                                    **Joseph C. M$^{c}$Alexander $^{III}$**

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Ultravision* v Unilumin (*firm: Brown Rudnick) | 2:18-cv-00116-JRG-RSP | EDTX, Marshall | 2019 - | P |
| (Patents related to modular display panels and LED lighting) | | | | |
| Ultravision* v Yaham (*firm: Brown Rudnick) | 2:18-cv-00118-JRG-RSP | EDTX, Marshall | 2019 - | P |
| (Patents related to modular display panels and LED lighting) | | | | |
| Ultravision* v Absen (*firm: Brown Rudnick) | 2:18-cv-00112-JRG-RSP | EDTX, Marshall | 2019 - | P |
| (Patents related to modular display panels and LED lighting) | | | | |
| Birchett* v City of Fort Worth (*firm: Kennedy Law) | DC-19-06941 | Dallas County | 2019 - | C, t |
| (Whistleblower) | | | | |
| Innovation Sciences* v HTC (*firm: Davidson Berquist) | 337-TA-1180 | ITC | 2020 - 2020 | P, t |
| (Patent related to wireless communication) | | | | |
| Innovation Sciences* v Resideo (*firm: Davidson Berquist) | 337-TA-1180 | ITC | 2020 | P, t |
| (Patent related to Internet communication) | | | | |
| CXT* v Neiman Marcus (*firm: Brown Rudnick) | 2:19-cv-00270-RWS-RSP | EDTX, Marshall | 2020 - | P |
| (Patents related to storage management and information distribution) | | | | |
| CXT* v General Nutrition (*firm: Brown Rudnick) | 2:19-cv-00271-RWS-RSP | EDTX, Marshall | 2020 - | P |
| (Patents related to storage management and information distribution) | | | | |
| CXT* v Steven Madden (*firm: Brown Rudnick) | 2:19-cv-00272-RWS-RSP | EDTX, Marshall | 2020 - | P |
| (Patents related to storage management and information distribution) | | | | |

**CURRICULUM  VITAE**                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Consolidated* v Amazon (*firm: Devlin Law) | 1:19-cv-01715-RGA | DE | 2020 - | P, t |
| (Patents related to on-line shopping) | | | | |
| Consolidated* v Ford (*firm: Devlin Law) | 1:19-cv-01916-RGA | DE | 2020 - | P, t |
| (Patents related to on-line shopping) | | | | |
| Consolidated* v JC Penney (*firm: Devlin Law) | 1:19-cv-01918-RGA | DE | 2020 - | P, t |
| (Patents related to on-line shopping) | | | | |
| Consolidated* v Ebay (*firm: Devlin Law) | 1:19-cv-01580-RGA | DE | 2020 - | P, t |
| (Patents related to on-line shopping) | | | | |
| Consolidated* v Walmart (*firm: Devlin Law) | 1:19-cv-01581-RGA | DE | 2020 - | P, t |
| (Patents related to on-line shopping) | | | | |
| Semcon* v TCT Mobile (*firm: Brown Rudnick) | 2:18-CV-00194-JRG | EDTX, Marshall | 2020 - | P |
| (Patent related to adaptive power control) | | | | |
| BNR v Samsung* (*firm: Fish & Richardson) | 2:19-cv-00286-JRG | EDTX, Marshall | 2020 | P |
| (Patents related to portable communication devices) | | | | |
| AGIS* v Google (*firm: Brown Rudnick) | 2:19-cv-00361-JRG | EDTX, Marshall | 2020 - | P, t |
| (Patents related to interactive remote communications) | | | | |
| AGIS* v Waze (*firm: Brown Rudnick) | 2:19-cv-00359-JRG | EDTX, Marshall | 2020 - | P, t |
| (Patents related to interactive remote communications) | | | | |
| Burke* v City of Fort Worth (*firm: Kennedy Law) | DC-19-07239 | Dallas County | 2020 - | C, t |
| (Whistleblower) | | | | |

**CURRICULUM  VITAE**                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Infinera v Oyster Optics* (*firm: Davidson Berquist) | IPR2020-00325 | PTAB | 2020 - | P, t |
| (Patent related to fiber optic telecommunications) | | | | |
| Blitzsafe* v GM (*firm: Fabricant) | 2:19-cv-00403-JRG | EDTX, Marshall | 2020 - | P, t |
| (Patents related to audio device integration systems) | | | | |
| Blitzsafe* v FCA (*firm: Fabricant) | 2:19-cv-00378-JRG | EDTX, Marshall | 2020 - | P, t |
| (Patents related to audio device integration systems) | | | | |
| Kuster v Western Digital* (*firm: Shearman & Sterling) | 6:20-cv-00563 | WDTX, Waco | 2020 - | P, t |
| (Patent related to memory stack storage) | | | | |
| TruSun* v Eaton (*firm: Duane Morris) | 6:19-cv-00656-ADA | WDTX, Waco | 2020 - | P |
| (Patent related to a light-generating system) | | | | |
| RJR v PMI* (*firm: Latham Watkins) | 1:20-cv-00393-LO-TCB | EDVA, Alexandria | 2020 - | P |
| (Patents related to e-cigarette controls) | | | | |
| BMW v Omega Patents* (*firm: Allen Dyer) | IPR2021-00181 | PTAB | 2021 - | P |
| (Patent related to remote start) | | | | |
| Pilot* v The NOCO Co (*firm: Bradford) | 2:20-cv-01452-SRB | AZ | 2021 - | P |
| (Patents related to auto chargers) | | | | |
| Express Mobile* v Atlassian (*firm: Mololamken) | 6:20-cv-00805-ADA | WDTX, Austin | 2021 - | P |
| (Patents related to browser-based web site generation) | | | | |
| AGIS* v Lyft (*firm: Fabricant) | 2:21-cv-00024-JRG-RSP | EDTX, Marshall | 2021 - | P |
| (Patents related to interactive remote communications) | | | | |

**CURRICULUM  VITAE**                                    **Joseph C. McAlexander [III]**

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| AGIS* v T-Mobile (*firm: Fabricant) | 2:21-cv-00072-JRG-RSP | EDTX, Marshall | 2021 - | P |
| (Patents related to interactive remote communications) | | | | |
| AGIS* v Uber (*firm: Fabricant) | 2:21-cv-00026-JRG-RSP) | EDTX, Marshall | 2021 - | P |
| (Patents related to interactive remote communications) | | | | |
| AGIS* v WhatsApp (*firm: Fabricant) | 2:21-cv-00029-JRG-RSP) | EDTX, Marshall | 2021 - | P |
| (Patents related to interactive remote communications) | | | | |
| One E-Way* v Apple (*firm: Knobbe Martin) | 2:20-cv-06339-JSK-PD | CDCA | 2021 - | P |
| (Patent related to Bluetooth Headphones) | | | | |
| Koss* v Apple et al (*firm: K L Gates) | 6:20-cv-00665 | WDTX, Waco | 2020 - | P |
| (Patents related to Wireless Headphones) | | | | |
| Ipcom v ATT et al (Nokia*) (*Alston Bird) | 2:20-cv-322 | EDTX, Marshall | 2020 - | P |
| (Patents related to CDMA communication) | | | | |
| Ipcom v Sprint et al (Nokia*) (*Alston Bird) | 2:20-cv-321 | EDTX, Marshall | 2020 - | P |
| (Patents related to CDMA communication) | | | | |
| Ipcom v Verizon et al (Nokia*) (*Alston Bird) | 2:20-cv-323 | EDTX, Marshall | 2020 - | P |
| (Patents related to CDMA communication) | | | | |
| Altria* v RJR (*firm: Weil Gotshal) | 1:20-cv-00472 | MDNC | 2021 - | P |
| (Patents related to e-cig) | | | | |

**CURRICULUM  VITAE**                                              **Joseph C. McAlexander III**

**Cases** (continued)

| CASE[1] | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Altria* v RJR (*firm: Weil Gotshal) | IPR2021-00725 | PTAB | 2021 - | P |
| (Patents related to e-cig control) | | | | |
| Altria* v RJR (*firm: Weil Gotshal) | IPR2021-00793 | PTAB | 2021 - | P |
| (Patents related to e-cig) | | | | |
| Altria* v RJR (*firm: Weil Gotshal) | IPR2021-00650 | PTAB | 2021 - | P |
| (Patents related to e-cig) | | | | |
| Altria* v RJR (*firm: Weil Gotshal) | IPR2021-00652 | PTAB | 2021 - | P |
| (Patents related to e-cig) | | | | |
| Kiwi Connection* v Anker (*firm: Bradford) | | | 2021 - | P |
| (Patent related to bidirectional connector) | | | | |
| Platform Science* v Omnitracs* (*firm: Kirkland & Ellis) | IPR2020-1517 IPR2020-1518 | PTAB | 2021 | P |
| (Patent related to critical event reporting) | | | | |

**CURRICULUM  VITAE**                    **Joseph C. MᶜAlexander III**

### OTHER MATTERS

I have worked with other clients in various areas of my expertise, including "system, product, and process investigation," "patent valuation," "product liability and insurance claim investigation," "quality systems consulting and engineering," and "IP licensing."  This work generally relates to patents and may involve analysis of products either defensively or offensively.  In no case does any of the work involve design of circuits, processes, packaging, software, or systems.

Non-confidentially, I have represented a radiation effects testing company, ICS Radiation Technology.  Further, I have worked with investment companies, such as Hatcreek Partners, reviewing potential investment opportunities, and have participated as a technical advisor to nLine Corporation, a company that developed a product for semiconductor wafer inspection using holographic High Aspect Ratio Inspection (HARI) technology.  Work associated with each of these matters occurred more than 10 years ago.

 These and other non-confidentially related companies are:

        The Aspire International Foundation (2019-present)
            -   Partner;
            -   Rediscovering and redefining identity and purpose through experiential equine learning programs;
            -   Not assigned any patents and not engaged in any IP related activities.

        Casualty Consulting Group of America (2013-present)
            -   Partner;
            -   Assessment of structural damage caused by extreme weather events;
            -   Not assigned any patents and not engaged in any IP related activities.

        VCSY (2013-present)
            -   Advisory board Member;
            -   Technology related to encrypted communication.

        Bethel Cannon Group / Bethel Cannon Holdings (2011-present)
            -   Partner;
            -   Counseling / Event / Retreat Center / Hunting Lodge;
            -   Not assigned any patents and not engaged in any IP related activities.

        Spirit Song Youth Equestrian Academy / Spirit Song Holdings (2011-present)
            -   CEO;
            -   Equine Assisted Learning Program for abused / traumatized youth, families, corporations, and churches;
            -   Not assigned any patents and not engaged in any IP related activities.

**CURRICULUM  VITAE**                                      **Joseph C. McAlexander III**

## OTHER MATTERS (continued)

E$^3$A (2016-present)
-   President;
-   Certification training of Equine Practitioners;
-   Not assigned any patents and not engaged in any IP related activities.

Novo Tellus Capital Partners (2016-2017)
-   Novo Tellus is an investment firm.  I served as a technical advisor in reviewing the technology and contracts of investment opportunities.

UTAC (2008-2016)
-   Technical consultant in matters related to packaging test and assembly, patents, and contracts.

ICS Radiation Technology (1988-2009)
-   Consulting work related to nuclear radiation effects testing.

Creative Management Consultants (CMC) (2003-2004)
-   Consulting work related to Internet services, such as access service to clients and web site hosting services; providing business co-op services and internet product purchasing sites.

Hatcreek Partners (1999-2003)
-   Hatcreek Partners is an investment firm.  I served as a technical advisor in reviewing the technology of investment opportunities.

nLine Corporation (1999-2003)
-   Member of Technical Advisory Board;
-   nLine Corp.'s business related to semiconductor holographic High Aspect Ratio Inspection (HARI) technology.

Texas Instruments (pre 2002)
        - Patent evaluation and application consulting.

CONTACT :  McAlexander Sound, Inc.
                    101 W. Renner Rd., Suite 350
                    Richardson, TX  75082-2016
                    (972) 421-4411                     direct
                    (214) 542-1772                     cell
                    (972) 421-4422                     fax
                    joemc@ieee.org                    email
<end>

McAlexander Sound, Inc.            CV - Joe McAlexander, 3Q2021                    38