# EXHIBIT B

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4   NETLIST INC., a Delaware          )
     corporation,                      )
 5                                     )
             Plaintiff,                )
 6                                     ) Case No.
             vs.                       ) 8:20-cv-00993-MCS-
 7                                     ) ADS
     SAMSUNG ELECTRONICS CO., LTD.,    )
 8   a Korean corporation,             )
                                       )
 9           Defendant.                )
     _____   )
10
11          CONFIDENTIAL - ATTORNEYS' EYES ONLY
12        VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
13           DEPOSITION OF JOSEPH McALEXANDER
14
15        Remotely Testifying from Anna, Texas
16             Tuesday, September 14, 2021
17
18
19
20
21
22
23   Reported By:
24   Hanna Kim, CLR, CSR No. 13083
25   Job No. 4790919
```

                                              Page 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                   JOSEPH MCALEXANDER,

 2          having been administered an oath over

 3               videoconference, was examined

 4                and testified as follows:

 5                       EXAMINATION

 6     BY MR. BEST:

 7         Q.   Good morning, Mr. McAlexander.

 8         A.   Good morning, Mr. Best.

 9         Q.   I -- as you know, my name's Tim Best, I'll

10     be taking your deposition today.            11:12:52

11              I believe you've been deposed several

12     times before; is that correct?

13         A.   Yes, sir, that's correct.

14         Q.   So, I won't go through too much that I'm

15     sure you already know.  But, if you've not done    11:13:03

16     Zoom depositions before, one thing that is a bit

17     different, is that I think it's more than usually

18     difficult to avoid stepping on each other's words,

19     so I would give it a little bit more a beat, and,

20     I -- I myself will attempt to do the same in order    11:13:20

21     to not overlap your words.

22              Okay?

23         A.   I understand.  And I agree.  It is not --

24     not as easy as when you're in person.

25         Q.   Yep.                              11:13:30
```

Page 7

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              Your opinions in this case were not based

2    on having in front of you quantification of

3    Samsung's overall production of NAND or DRAM

4    products during the JDLA; correct?

5        A.   Generally speaking, I'd say yes, that's      11:20:03

6    correct.

7        Q.   Now, is it also fair to say that you

8    reviewed no documents reflecting disruption in the

9    product flow of Sams' [verbatim] commodity NAND

10   and DRAM products during the JDLA?                   11:20:29

11       A.   And disruption to what extent?  Can you be

12   more specific?

13       Q.   I meant it as a very broad term.  So you

14   understand it to mean any disruption and I'll ask

15   it cleanly.  Withdrawn.                              11:20:46

16              Would you agree with me that you reviewed

17   no documents reflecting any disruption of the

18   product flow of Samsung's NAND or DRAM products

19   during the JDLA?

20       A.   Again, I'm not sure what your meaning of    11:20:58

21   the word "disruption" is.

22              I did see, for instance, presentation

23   slides, I'll call them PowerPoint, but

24   presentation slides, that showed deliverables over

25   time.  That is a deliverable over a time chart.      11:21:14

                                                    Page 13

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   And you based your opinions on no evidence

2    of disruption of production of NAND or DRAM

3    products by Samsung during the term of the JDLA;

4    correct?

5          MR. HURWITZ:   Objection to form.                11:25:39

6          THE WITNESS:   I was not -- I was not asked

7    to look into that.   My -- my -- what I have offered

8    is my opinions regarding the standard and

9    acceptable industry practice as it relates to

10   commodity products in terms of forecasting,            11:25:52

11   quoting, purchase orders request, product

12   allocation, product delivery.   It's the standard

13   industry practice.   That's what I was asked to

14   opine on.

15   BY MR. BEST:                                           11:26:05

16     Q.   Thank you.

17          And when you say you were asked to opine

18   on "standard industry practice," do you mean that

19   you were asked to opine on factors that in

20   general, can impact the production and sale of        11:26:19

21   semiconductor products from semiconductor

22   manufacturers to their customers in the industry?

23     A.   I would broaden that to say factors that

24   can and do impact.

25     Q.   So if -- if I understand your answer           11:26:43

                                               Page 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    correctly, you would agree with me that you opined

2    on factors that, in general, can and do impact the

3    production and sale of semiconductor products in

4    the industry; correct?

5        A.   That is correct.  And the -- and the        11:27:01

6    statements I made, the positions I took, are

7    standard across the industry within any wafer fab

8    within -- within any back end assembly operation

9    of the entire operation from starting material to

10   deliverables.  These are factors that affect that   11:27:17

11   deliverable and the allocation of the

12   deliverables, yes.

13       Q.   And so, you did not focus on Samsung's

14   particular production of semiconductor products

15   including NAND and DRAM products in assessing the   11:27:35

16   factors that can and do impact production of such

17   devices; correct?

18       A.   If you're looking at whether or not I

19   looked at data from Samsung to provide some nexus

20   of my opinion to what actually occurred at         11:28:01

21   Samsung, the answer is no.

22           My statement is that I provided opinions

23   as to the standard industry practice, the factors

24   that affect those types of processing and

25   deliverables, and -- and know -- know that this    11:28:19

Page 18

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    is -- is generally true across the board, across

2    any type of semiconductor manufacturer.

3         Q.   Did you ever ask to see evidence

4    concerning Samsung's particular factors that

5    affected its production of NAND and DRAM products      11:28:35

6    during the JDLA?

7         A.   I didn't ask such, no.

8         Q.   Do you think that that's -- withdrawn.

9              In formulating your opinions in this case,

10   did you review any documents showing Samsung's         11:28:53

11   receipt of raw materials used to manufacture NAND

12   or DRAM products during the term of the JDLA?

13        A.   No, I did not.

14        Q.   And so, your opinions are not based on any

15   such information, specific to Samsung; correct?        11:29:10

16        A.   Not specific to Samsung, no.

17        Q.   In formulating your opinions in this case,

18   did you review any documents showing any

19   malfunctions in Samsung's process equipment used

20   to manufacture NAND or DRAM products?                  11:29:28

21        A.   No, I did not look at specifics within

22   Samsung.  My statements are specifically focused

23   on standard and acceptable industry practice that

24   would apply to Samsung and any other semiconductor

25   manufacturer.                                          11:29:46

                                              Page 19

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   But your opinions are not based on any

 2    evidence from Samsung or particular to Samsung,

 3    concerning malfunctions in its process equipment

 4    used to manufacture NAND or DRAM products;

 5    correct?                                        11:30:07

 6        A.   Well, unless they live in an ideal world

 7    where everything is perfect and nothing breaks,

 8    you know, that -- that happens.  It's a part of

 9    life within a wafer fab, or within a back end

10    assembly process.  There are -- there are        11:30:20

11    equipments that do fail, and there are equipments

12    that are down for maintenance, there's equipment

13    that's required for repair.  So that's part and

14    parcel to a manufacturing operation.

15            But, specifically, did I look for specific  11:30:32

16    information as it applied to Samsung during that

17    period, no.  It was not necessary to form an

18    opinion on the standard and acceptable industry

19    practice.

20        Q.   In general, in the industry, right?       11:30:48

21        A.   In general in the industry and applicable

22    to all manufacturing semiconductor plants within

23    that industry.

24        Q.   In forming your opinions in this case, did

25    you review any documents showing facility or     11:31:02
```

Page 20

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    chemical contamination at Samsung connected with

 2    the manufacturer [verbatim] of NAND or DRAM

 3    products during the term of the JDLA?

 4        A.   No, I can't say that I looked at any

 5    specific documents to that effect.  The only --       11:31:23

 6    the only document that I would think would might

 7    come close to that would possibly be information

 8    that might have been developed within the

 9    deposition -- not the deposition, but the --

10    the -- the report for Dr. Kidder, for Doug Kidder,   11:31:48

11    but, other than that, no.  I did not look specific

12    with any specificity to that type of a document.

13        Q.   In formulating your opinions in this case,

14    did you review any documents quantifying the rate

15    of wafer breakage concerning Samsung's manufacture   11:32:06

16    of NAND or DRAM products during the term of the

17    JDLA?

18        A.   No, I did not.

19        Q.   In forming your opinions in this case, did

20    you review any documents showing inadequate yield    11:32:19

21    or performance distribution connected with

22    Samsung's manufacture of NAND or DRAM products

23    during the term of the JDLA?

24        A.   No, I did not.

25        Q.   In forming your opinions in this case, did   11:32:31
```

Page 21

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Q.    And so, your opinions are not based on

2     evidence of FEOL disruptions at Samsung, correct?

3          A.    My opinions are based upon what I have

4     stated several times already.  And that is the

5     customary and standard industry practice,                11:40:01

6     acceptable industry practice for commodity memory

7     products.  So it'd be forecast, quotations,

8     purchase orders, requests, allocation of product,

9     and delivery of product.

10         Q.    And no such documents that you just listed     11:40:15

11    were provided that were specific to Samsung which

12    reflected any disruptions to the front end of the

13    line process at Samsung; correct?

14         A.    There may have been some information in

15    the documents I reviewed, but I was not looking        11:40:40

16    for that particular.  I was looking for standard

17    industry practice.  So whether it was or was not,

18    I'm not aware of it.

19         Q.    And because you're not aware of it, your

20    opinions are not based on any such evidence;            11:40:55

21    right?

22         A.    I'm aware in -- in general of the industry

23    practice that such disruptions occur, but it's not

24    based upon the specifics of a disruption.

25         Q.    At Samsung?                                    11:41:12

Page 27

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.    It's not based upon a specific disruption

2     or one or more disruptions at Samsung, yes.

3          Q.    Got it.

4               Now, in forming your opinions in case, did

5     you review any evidence showing any disruptions in     11:41:28

6     the back end of the line for Samsung's manufacture

7     of NAND or DRAM products?

8          A.    Not that I recall.

9          Q.    In forming your opinions in this case, did

10    you review any documents or other information          11:41:41

11    showing any disruption in the assembly of package

12    chips into modules during Samsung's manufacture of

13    NAND or DRAM products?

14         A.    I don't recall any that specifically go to

15    the point of disruption.                               11:41:57

16         Q.    In forming your opinions in this a case,

17    did you review any documents showing any reduction

18    in Samsung's manufacture of NAND or DRAM products

19    caused by normal equipment maintenance?

20         A.    I don't recall having seen such.  You       11:42:21

21    know, I'm -- I'm generally aware in the industry

22    of different factors that occur, such as fires or

23    chemical spills.

24               And so I know that there have been

25    disruptions that have occurred during this time        11:42:31

Page  28

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     frame at Samsung fabs.  But as -- as it applies to

2     this case, I didn't base any of my opinions on

3     that.

4         Q.   In forming your opinions in this case, did

5     you review any documents showing any reduction in        11:42:46

6     Samsung's manufacture of NAND or DRAM products

7     caused by work in product breakage?

8         A.   As part of this case, not specifically,

9     no.

10        Q.   In forming your opinions in this case, did       11:43:00

11    you review any documents showing or other evidence

12    showing any reduction in Samsung's manufacture of

13    NAND or DRAM products caused by contamination?

14        A.   Specifically as it applies to this case,

15    no.                                                       11:43:22

16        Q.   In forming your opinions in -- in this

17    case, did you review any evidence showing any

18    reduction in Samsung's manufacture of NAND or DRAM

19    products caused by product mix ratios or changes

20    to them?                                                  11:43:40

21        A.   I don't recall reviewing any data specific

22    to that.  I do know that, clearly, within any

23    wafer fab and back end assembly, there will be

24    product mix decisions that are made.  That's part

25    and parcel to any operation.  But, specifically,         11:43:51

Page 29

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    as related to Samsung as part of this case, no.
 2         Q.   In forming your opinions in this case, did
 3    you review any documents showing -- withdrawn.
 4    Sorry.  My dog is rambunctious.  Withdrawn.
 5              In forming your opinions in this case, did      11:44:10
 6    you review any documents showing any impact on
 7    Samsung's plans for manufacturing NAND or DRAM
 8    products caused by the position particular
 9    microchips had on semiconductor wafers and the
10    variance in the quality between those positions?        11:44:26
11         A.   And I apologize.  At the front end of your
12    question, there was a couple of words I did not
13    hear.  Could you please repeat that?
14         Q.   Yep, sure.  I was -- I was interrupted by
15    my dog, so we'll try again.  Withdrawn.                 11:44:38
16              In forming your opinions in case, did you
17    review any documents showing any impact on
18    Samsung's plans for manufacturing NAND or DRAM
19    products caused by the particular position
20    microchips had on wafers or variances of quality       11:44:54
21    between chips and various positions?
22         A.   Do I know that it exists, yes.  Did I --
23    as far as a part of this case, the answer is no.
24         Q.   You saw no such evidence specific to
25    Samsung that formed a bases for your opinions in        11:45:20
```

Page 30

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    this case; right?

2         A.   I did not review such evidence as a part

3    of my opinion for this case.

4         Q.   Are you aware of any evidence that

5    Samsung's production of NAND or DRAM products        11:45:29

6    decreased during the term of the JDLA with

7    Netlist?

8              MR. HURWITZ:   Objection to the form.

9              THE WITNESS:   And -- and the term of the

10   JDLA is up to the present for purposes of this        11:45:44

11   deposition; correct?

12   BY MR. BEST:

13        Q.   For purposes of my question, you can

14   assume that's true.

15        A.   Okay.  Well, there have been ups and downs   11:45:54

16   in Samsung's product mix and -- and volume over

17   time.  Yes, I know of data that is -- that's just

18   a general available data on the internet, that

19   that has occurred.  It is up and down.  It's not

20   continuously increasing over the past four or         11:46:12

21   five years.  But -- but with regard to looking at

22   that specific data for purposes of this case, the

23   answer is, I did not.

24        Q.   Are you -- I think you mentioned it

25   previously in the discussion.  Withdrawn.            11:46:31

                                            Page 31

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              Are you familiar with the concept of

 2     submitting forecasts in the context of the

 3     manufacture and sale of semiconductor devices?

 4        A.   Yes, and I've commented on that in my

 5     report.                                        11:46:47

 6        Q.   That's right.

 7              And in formulating your opinions in this

 8     case, did you review any forecasts for NAND or

 9     DRAM product purchases submitted to Samsung by any

10     of its customers?                              11:47:01

11        A.   For purposes of this case, as it applies

12     to my report, the answer is no.

13        Q.   Now, in formulating your opinions in this

14     case, then, did -- it's fair to say you saw no

15     evidence that a forecast provided by Samsung by  11:47:17

16     one customer had any impact on NAND or DRAM

17     product delivery to any other Samsung customer;

18     correct?

19              MR. HURWITZ:  Objection to form.

20              THE WITNESS:  I don't recall seeing     11:47:29

21     anything where there is a comparison in terms of a

22     forecast, but -- but clearly, I saw e-mail traffic

23     that indicated that there was some additional

24     products that salesmen would like to -- to produce

25     for a particular client.                       11:47:57
```

Page 32

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    demand when there is a high probability that the

 2    forecast will vaporize.  A lot of that depends

 3    upon the history that you have with a particular

 4    client.

 5        Q.   So if I understand you correctly, because      11:52:15

 6    you did not specifically look for particular

 7    evidence that a forecast provided by one Samsung

 8    customer had any impact on product distribution to

 9    any other customer, your opinions are not based on

10    any such specific information; correct?               11:52:40

11        A.   I would say the answer to that, Tim, is,

12    yes.  It's -- my information is based upon the

13    accepted and customary industry practice, and the

14    reasonableness of forecast, the importance of

15    being accurate.  And that accuracy goes right to     11:52:59

16    the bottom line as to whether you take risk

17    factors or not in terms of expending the

18    procurement of starting material in order to -- to

19    produce according to that.  So it's based upon the

20    industry practice, the customary practice in the     11:53:15

21    industry.

22        Q.   Now, I think you're also familiar with the

23    concept of submitting quotations in the context of

24    manufacture and sale of semiconductor devices;

25    right?                                                11:53:30
```

Page 36

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Yes, sir.  That's correct.

 2        Q.   In formulating your opinions in this case,

 3   did you review any quotations for NAND or DRAM

 4   product purchases submitted by Samsung to any of

 5   its customers?                                    11:53:40

 6        A.   I did not look at any specifics in terms

 7   of quotations, as I recall, to specific suppliers,

 8   no.  I saw -- I saw information in terms of slides

 9   for presentations, and gave general understanding

10   in terms of deliverables to certain clients and    11:54:12

11   what they -- what the price scenario will be for

12   that, and I saw e-mails discussing that.  But in

13   terms of directing to a particular quotation, no.

14        Q.   And so, is it fair to say you did not

15   review any evidence that there were any time        11:54:32

16   sensitive volume requests that had any impact on

17   one or more quotations provided by Samsung?

18        A.   If I understand your question correctly

19   about time-sensitive volume request, most volume

20   request have a time associated with them.  And so,  11:54:54

21   there would be time sensitivity associated with

22   almost any volume request.

23        Q.   Sure.

24             And -- and taking that understanding to be

25   the case, it's fair to say, you saw no evidence     11:55:08
```

Page 37

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    product deliverable.

2         Q.   Thank you for that.

3              But my question is a bit different and a

4    bit more focused.  And -- and so, let me try it

5    again, maybe slightly differently.  Withdrawn.        11:58:09

6              It's fair to say you saw no specific

7    evidence that a product ramp-up rate had any

8    impact on any specific quotation provided by

9    Samsung to any specific customer, such as Netlist;

10   correct?                                              11:58:28

11        A.   I don't recall seeing any breakout that

12   specifically addressed that.  It is standard

13   practice to build ramp-up within a quote.  But in

14   terms of breaking down what part of that quote was

15   based on ramp-up, what part of it was based upon     11:58:49

16   non-recurring engineering, what part of it was

17   based on other factors, I did not see a breakdown

18   in that regard.

19        Q.   And, likewise, it's fair to say, you no --

20   you saw no specific evidence that time sensitivity   11:59:04

21   had any specific impact on any specific quotation

22   provided by Samsung to any specific customer, such

23   as Netlist?

24        A.   I think I've already answered that

25   question.                                            11:59:22

                                               Page 40

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1              Time sensitivity is built into any quote,
 2      built into any purchase order, or any forecast.
 3      There's time sensitivity that's a factor that's a
 4      part of this, so that's built into that process.
 5          Q.   But you saw no specific manner in which      11:59:37
 6      time sensitivity had a specific impact, one way or
 7      the other, on any particular quote provided by
 8      Samsung to any particular customer; correct?
 9          A.   There may have been information in the
10      documents I looked at that -- that had that, but I    11:59:56
11      don't recall seeing it, no.
12          Q.   And your opinions in this matter were
13      did -- were not based on any such specific
14      information; correct?
15          A.   No.   The opinions were not based on         12:00:15
16      specific information in terms of deliverables to
17      other customers.
18          Q.   Or to Netlist in this instance; correct?
19          A.   Slightly different, because the
20      deliverables at least according to the JDLA, there   12:00:40
21      was none to deliver in terms of a product.
22          Q.   Right.
23              And in consequence, you saw no specific
24      evidence that any particular time sensitivity had
25      an impact on any quotation provided by Samsung to    12:01:00
```

Page 41

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that he had no problem with what Samsung

 2    delivered.

 3            MR. BEST:  Now, I'll move to strike

 4    everything after the word "sensitivity" in that

 5    response.                                    12:02:51

 6    BY MR. BEST:

 7        Q.   Is it fair to say you reviewed no evidence

 8    that Samsung's product yield had any specific

 9    impact on one or more specific quotations provided

10    by Samsung to Netlist?                       12:03:00

11        A.   I don't recall seeing such.  There may

12    have been.  I don't recall.

13        Q.   And your opinions were not based on having

14    seen any such specific information because you

15    don't recall seeing it; correct?            12:03:22

16        A.   Well, it's not based upon it, because I

17    was asked and provided information based upon

18    standard and customary industry practice.  It

19    wasn't specifically based on the specific question

20    that you're asking me about.                12:03:36

21        Q.   Now, in formulating your opinions in this

22    case, did you review any evidence that --

23    withdrawn.

24            In formulating your opinions in this case,

25    is it fair to say you saw no specific evidence  12:03:55
```

Page 43

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    that speed or performance criteria had any impact

 2    on any particular quotation Samsung made to

 3    Netlist?

 4        A.   There may have been, but based upon the

 5    documents I did review, I don't recall seeing        12:04:20

 6    that, no.

 7        Q.   And your opinions were not based on any

 8    such specific information because you weren't

 9    asked to look at the specific question; is that

10    correct?                                             12:04:33

11        A.   I would say generally, the predicate for

12    your statement is correct.  I was not asked to

13    specifically look at that.  I'm looking at -- at

14    providing information with regard to the standard

15    and acceptable industry practice, and specifically  12:04:47

16    for product delivery and -- and -- with regard to

17    the specifics of your question.

18        Q.   In forming your opinions in this case, you

19    reviewed no evidence that historical or predicted

20    product yield had any impact on one or more          12:05:04

21    quotations for NAND or DRAM products provided to

22    Netlist by Samsung; correct?

23        A.   There may have been, but again, with --

24    within the documents that I reviewed, the specific

25    purpose that I was asked to address was the          12:05:25
```

Page 44

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    standard and acceptable industry practice, not

 2    specifics with regard to what Samsung did or did

 3    not do with regard to deliverables.  I understand

 4    that there were other experts in this case that

 5    might opine on that.  But that was not in my            12:05:39

 6    charter.

 7        Q.   And so, your opinions in this case do not

 8    rely on any specific evidence concerning Samsung's

 9    product yield and any impact that may have had on

10    quotations provided to Netlist; correct?              12:05:59

11        A.   That my basis of my opinions was not based

12    upon any evidence of what Samsung did or did not

13    do since -- since within the industry yield,

14    always is a factor that is a considerable driver

15    for that type of deliverable, it is -- it is a        12:06:19

16    necessary ingredient.  It's always going to be a

17    factor.  But in terms of looking at specifics, no,

18    because I already know it is a factor.

19             MR. BEST:  And just for the reporter, I

20    think you got my question wrong in terms of its       12:06:37

21    polarity.  But the question was don't rely on,

22    rather than rely on.  The answer only makes sense

23    in -- in that context.

24             THE WITNESS:  Why don't we --

25             THE COURT REPORTER:  Counsel, Excuse me.     12:06:57
```

Page 45

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Counsel, I'm going to ask that we go off the record

 2    for an audio issue.

 3            MR. BEST:  That would be fine.  We can

 4    just go off now from my perspective.

 5            THE VIDEOGRAPHER:  Okay to go off the      12:07:10

 6    record?

 7            MR. BEST:  Before everyone goes --

 8            THE COURT REPORTER:  Excuse me.  Excuse

 9    me.  Are we going off the record?

10            MR. BEST:  I thought we're off, weren't    12:07:20

11    we?

12            THE COURT REPORTER:  No, not yet.

13            MR. BEST:  Go ahead.

14            THE VIDEOGRAPHER:  Thank you.  We're off

15    the record.  It's 12:07 p.m.                       12:07:24

16            (Short recess taken.)

17            THE VIDEOGRAPHER:  We're back on the

18    record.  It's 12:23 p.m.

19    BY MR. BEST:

20        Q.   Welcome back, Mr. McAlexander.            12:24:01

21            In forming your opinions in this case, did

22    you review any evidence that fixed costs had any

23    impact on one or more quotations for NAND or DRAM

24    products provided to Netlist by Samsung?

25        A.   I don't recall reviewing any documentation  12:24:23
```

Page 46

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    with that in particular.  Fixed cost goes into the

2    overall cost of production, which is a -- a major

3    factor in terms of how that fixed cost in terms of

4    equipment is amortized over time or fixed cost in

5    terms of people, people related expenses, I mean      12:24:46

6    that goes into fixed cost, that goes into the

7    fixed cost profit formula.  So that's -- that's

8    automatically in everyone's model.  But I

9    didn't -- I don't recall looking at any particular

10   facts regarding Samsung in this matter, no.         12:25:01

11        Q.   And similarly, in forming your opinions in

12   this case, did you rely on any evidence that

13   variable cost had any impact on one or more

14   quotations for NAND or DRAM products provided by

15   Samsung to Netlist?                                  12:25:21

16        A.   I don't recall looking at any information

17   directed to specifics of variable cost as it may

18   or may not relate to deliverables of NAND or DRAM

19   product to -- to Netlist.

20             Variables always play -- they are a         12:25:49

21   factor.  It's impossible to avoid variables, in

22   any process.  But with specifics, looking at any

23   variable that Samsung considers specifically for

24   that deliverable on a deliverable by deliverable

25   basis, no, I don't recall seeing that.               12:26:04

Page 47

CONFIDENTIAL ATTORNEYS' EYES ONLY

1      Q.   And in formulating your opinions in this

2    case, is it also fair to say, you did not review

3    any evidence that there were significant shifts in

4    forecasts after Samsung provided Netlist with a

5    quotation that rendered that quotation void?        12:26:26

6           MR. HURWITZ:  Objection to form.

7           THE WITNESS:  I only recall statements to

8    that effect.  And as I sit here, I don't recall if

9    it's deposition or e-mail.  But in terms of the

10   factual evidence behind that, I don't recall seeing   12:26:45

11   any.

12   BY MR. BEST:

13      Q.   It's fair to say, you offered no opinion

14   that relied on any particular evidence of a

15   significant shift in forecasts after Samsung          12:27:02

16   supplied a quotation to Netlist then rendering

17   that quotation void; correct?

18      A.   I saw statements to that effect.  But in

19   terms of actual documents showing it, no, I did

20   not.                                                  12:27:18

21      Q.   And you offered no such opinion; correct?

22      A.   Not as it applies to other than the fact

23   that it applies to standard and acceptable

24   industry practice.  I mean, those are variables

25   that go into my statements.  I believe I even         12:27:31

                                                Page 48

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    mentioned in my report that the product delivery

 2    relates to these various factors, including

 3    forecast, quotations and purchase order requests,

 4    and so forth.

 5            So in a general -- in a general level,      12:27:50

 6    yes, those are all factored in every time.  But in

 7    terms of specifically targeting a particular

 8    quotation, forecast versus deliverable aspect

 9    within the framework of this case, no.

10       Q.   In forming your opinions in this case, is   12:28:06

11    it fair to say you also reviewed and relied on --

12    withdrawn.

13            In forming your opinions in this case, you

14    reviewed and relied on no evidence that there were

15    any NAND or DRAM products produced by Samsung that  12:28:25

16    had to be retested in order to confirm or

17    reclassify their performance categories; correct?

18       A.   I didn't see evidence -- I'm not aware of

19    seeing evidence that is a part of this case.

20       Q.   Now, we discussed the concept of product   12:28:49

21    allocation earlier.

22            How do you mean to use that term?

23       A.   I addressed product allocation in my

24    report.  And specifically, I'd indicated that --

25    that -- that relates to a process for tracking,     12:29:12
```

Page 49

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1     reasonable forecasts allow a wafer fab facility to

 2     properly allocate the materials to start to meet

 3     the time sensitive demands, if, in fact, the

 4     forecast is reasonable.  Forecasts that are

 5     unreasonable will cause -- will cause, absolutely    12:33:23

 6     will cause, disruption within a wafer fab process.

 7             And, as a result, allocations will be

 8     disrupted and have to be reassigned based upon

 9     that.  That's -- that is a factor.  So reasonable

10     forecast is always a factor for considerations of   12:33:42

11     allocations for product.

12         Q.    Because you were not asked to look at

13     specifics about any Netlist change in forecast or

14     change in purchase order, is it fair to say you

15     offered no opinion that any such changes had any    12:34:01

16     impact on Samsung's allocation of NAND or DRAM

17     products?

18         A.    You are correct that I did not look with

19     specificity, or have access to specific materials

20     as to that one to one relationship that you are     12:34:23

21     suggesting.

22             But I did state in my report, that

23     forecasts to be reasonable and accurate are very

24     essential, in fact, it's critical to the process.

25     And any change in a forecast is going to have an    12:34:36
```

Page 52

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    impact.  It will have an impact.  Whether I have

 2    specifics of Samsung's results, all that would do

 3    would quantify the degree of the impact, but a

 4    change forecast will have an impact.

 5         Q.   Did you ask to see any specific changes to   12:34:54

 6    Netlist purchase orders if they existed in this

 7    case?

 8         A.   I did not personally ask to receive.  As,

 9    again, -- my -- the charter that I had was to look

10    at offering opinions, with regard to the standard   12:35:13

11    and acceptable industry practice and the factors

12    that affect commodity deliveries.  And that's what

13    I opined on.  So I did not need to ask for

14    something specific when I was asked to look at the

15    industry as a practice.                              12:35:27

16         Q.   In forming your opinions in this case, is

17    it fair to say you do not rely on any evidence

18    that any disruptions to Samsung's product flow had

19    any impact on Samsung's allocation of NAND or DRAM

20    products?                                            12:35:51

21         A.   Say that again, please?

22         Q.   Sure.

23              In forming your opinions in this case, is

24    it fair to say that you did not rely on any

25    evidence that disruptions to Samsung's product      12:35:57
```

Page 53

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     flow had any impact on Samsung's allocations of
 2     NAND or DRAM products?
 3         A.   I did not look with any specific aspect to
 4     a particular one or more disruptions that occurred
 5     within Samsung and what that -- what that impact      12:36:16
 6     was for that specific allocation.
 7             As I said generally, I'm aware just by
 8     keeping my understanding of the way the industry
 9     operates and -- and looking at various factors
10     that affect, we know that Samsung did in fact,       12:36:32
11     over the four or five years, have some
12     disruptions, and they will -- that will drive
13     allocation shifts.  But -- but for this particular
14     case, I was not asked to look at any specific
15     change -- or disruption that had a direct impact     12:36:47
16     on an allocation shift at all.  Mine, again, my
17     charter again, was to look at the -- industry
18     practice and factors that affect the way in which
19     wafer fabs or manufacturers operate in terms of a
20     product, productization and deliverables as a        12:37:06
21     product.
22         Q.   And you offered no opinions concerning
23     specific disruptions to Samsung's product flow;
24     correct?
25         A.   I don't recall having offered an opinion     12:37:18
```

Page 54

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    with a specific disruption, no, or targeting a

2    specific disruption.

3         Q.   In forming your opinions in this case, did

4    you rely on any evidence that minimize --

5    minimizing Samsung's inventory stacks had any        12:37:38

6    impact on Samsung's allocation of NAND or DRAM

7    products?

8         A.   Minimization of inventory stacks is a part

9    of the process that Samsung and any other

10   manufacturer is going to -- to attain or to          12:38:04

11   attempt to attain.  There is a cost factor for

12   inventory.  There's a cost factor for inventory

13   over time.  And so, it will have a financial

14   impact if you have inventory stacks.  And so, the

15   entire process that's set up within any wafer fab    12:38:23

16   is for hand to hand, machine to machine hand off

17   of materials.

18             And having materials that sit waiting for

19   the next step in quotes and inventory stack is

20   always going to have a process of variability of     12:38:40

21   impact.  But I did not look into any specifics

22   about any -- any specific inventory stacks that

23   may or may not have occurred as a cause of any

24   particular, catalyst or something that -- that

25   made that occur.  But from a standard industry       12:39:02

Page 55

1    practice, inventory stack minimization is the way

2    in which it is done across the industry and has

3    been for many, many years.  And there is a cost

4    associated with maintaining inventory.  So you

5    reduce it.                                        12:39:16

6        Q.   In forming your opinions in this case, did

7    you rely on any evidence that the consistency of

8    Netlist's purchase volume had any impact, one way

9    or the other, on Samsung's allocation of NAND or

10   DRAM products to Netlist?                         12:39:36

11       A.   Well, again my charter was to look at the

12   general aspect of deliverables and forecast and

13   allocations and impacts that has.  And I've made

14   those statements based upon the standards of

15   industry practice.  Looking at specific aspects of  12:39:52

16   Netlist changes that might have impacted, I did

17   not look at that specifically, no.

18       Q.   In forming your opinions in this case, did

19   you rely on any evidence that the accuracy of

20   Netlist's forecasts had any impact on Samsung's    12:40:14

21   allocation of NAND or DRAM products?

22       A.   I did not look for that specific aspect.

23   It is not necessary to look for specifics when

24   it's inherently the case.  Any time you have an

25   unreasonable forecast and you have a change in      12:40:35

Page 56

CONFIDENTIAL – ATTORNEYS' EYES ONLY

```
 1    that, it is going to have an impact.  This is not
 2    an open system; it is a closed system.  And the
 3    closed system is your starting material.  And that
 4    goes through a process until it is finalized and
 5    tested for delivery.  And so, within that closed       12:40:52
 6    system, any time of an external stimulus such as a
 7    change in forecast, it's going to have an impact.
 8    That's just a -- that's the way systems work.
 9            But in terms of -- then going with
10    specificity, in terms of a particular change that     12:41:08
11    occurred between Netlist and Samsung, no, because
12    I did not need to know that specific to how the
13    standard industry practices it product delivery.
14        Q.   In forming your opinions in this case, did
15    you rely on any evidence that any prior history of    12:41:26
16    order cancellation had any impact on Samsung's
17    allocation of NAND or DRAM products to Netlist?
18        A.   I -- I did not, but if you have a product
19    cancellation, I think is what you said, an actual
20    cancellation of -- of a purchase order, as an         12:41:47
21    example, well, you're not going to throw the
22    product away.  So it will be reallocated.  So any
23    time you have a cancellation it will have an
24    immediate impact on allocation.
25        Q.   Would you agree with me that memory          12:42:05
```

Page 57

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1        A.   Not over the entire time frame.  I sent
 2   some bills, yes.
 3        Q.   Did you talk to anyone other than
 4   Samsung's lawyers concerning the subject matter of
 5   this report before you signed it?                    14:24:44
 6        A.   I have not talked to anyone other than
 7   Samsung's outside counsel lawyers.
 8        Q.   And by outside counsel, you're
 9   distinguishing Bird Marella from anyone who might
10   be a lawyer internal at Samsung; is that correct?   14:25:03
11        A.   That is correct.
12        Q.   Did you talk to any Samsung employees or
13   ex-employees in formulating your opinions for this
14   report?
15        A.   No, I did not.                             14:25:16
16        Q.   Did you ask to talk to any of Samsung's
17   folks to assist in formulating your opinions in
18   this report?
19        A.   No, I did not.
20        Q.   Who prepared the initial draft of this    14:25:26
21   report?
22        A.   It was a combined effort between myself
23   and the attorneys.  But in terms of the -- some of
24   the substance, I -- I prepared the initial.  But
25   it was, again, it was a cooperative effort with     14:25:51
```

Page 96

CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1        A.   Yes, sir.  I do.

 2        Q.   I believe earlier, you indicated this is

 3   the section of your report that includes the

 4   opinions you've offered in this matter; correct?

 5        A.   Well, the opinions specifically to the       15:55:20

 6   industry practice and standard.  Obviously, all of

 7   the predicate pages up to this point is still my

 8   opinion, my understanding as to the way the

 9   industry operates and the different kinds of

10   components that are part of it.  Those are part of    15:55:38

11   my opinion.  But, specifically, as it's directed

12   to the -- the thing -- the specific aspect that I

13   was asked to comment on, which is opinions

14   regarding standard and acceptable industry

15   practice, basically, the summary of that is found    15:55:53

16   in this section.

17        Q.   Now, if we go to page 47, within this

18   section, paragraph 106, you discuss here several

19   manufacturing process considerations that, in

20   general, can have effects on sales of               15:56:32

21   semiconductor products; correct?

22        A.   Can and do, yes.

23        Q.   Now, I believe we established earlier, you

24   have not reviewed evidence specific to Samsung's

25   manufacture of NAND and DRAM products to which any   15:56:50
```

Page 145

CONFIDENTIAL ATTORNEYS' EYES ONLY

1    of these factors apply; correct?

2        A.    I have not reviewed Samsung's particular

3    factors as a part of this case, no.

4        Q.    Wouldn't you agree that someone at Samsung

5    who's familiar with their own processes would be        15:57:10

6    better positioned to offer views on the factors

7    that you've discussed in this paragraph?

8        A.    No.

9        Q.    And why -- withdrawn.

10            How can it be the case that someone who        15:57:27

11    has actual specific experience with the particular

12    manufacturer in question is not as well positioned

13    to offer views on the facts that pertain to a

14    particular dispute than you are?

15            MR. HURWITZ:  Objection to the form.        15:57:50

16            THE WITNESS:  Well, there's a difference

17    here.  Your first question was better.  The second

18    question was as well.  And I would say that, yes,

19    you will find parties within Samsung that can offer

20    evidence, offer support for what I have also        15:58:08

21    stated.  Mine is an unbiased opinion about what

22    the industry does.  And -- and I would anticipate,

23    that should someone at Samsung offer opinions, they

24    will -- they will come right alongside exactly with

25    what I have portrayed here in my report.  I do        15:58:28

                                              Page 146

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                CERTIFICATE OF REPORTER

 2          I, Hanna Kim, a Certified Shorthand

 3     Reporter, do hereby certify:

 4          That prior to being examined, the witness

 5     in the foregoing proceedings was by me duly sworn

 6     to testify to the truth, the whole truth, and

 7     nothing but the truth;

 8          That said proceedings were taken before me

 9     at the time and place therein set forth and were

10     taken down by me in shorthand and thereafter

11     transcribed into typewriting under my direction and

12     supervision;

13          I further certify that I am neither

14     counsel for, nor related to, any party to said

15     proceedings, not in anywise interested in the

16     outcome thereof.

17          Further, that if the foregoing pertains to

18     the original transcript of a deposition in a

19     federal case, before completion of the proceedings,

20     review of the transcript [X] was [ ] was not

21     requested.

22          In witness whereof, I have hereunto

23     subscribed my name.

24                                  ł: September 15, 2021


25     Hanna Kim, CLR, CSR No. 13083


                                         Page 170
```