# EXHIBIT A

*** CONFIDENTIAL -- ATTORNEYS' EYES ONLY ***

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                      SOUTHERN DIVISION
 4
 5    NETLIST INC., a Delaware       )
      corporation,                   ) Case No.:
 6                                   ) 8:20-cv-993-MCS-DFM
                 Plaintiff,          )
 7                                   )
            v.                       )
 8                                   )
      SAMSUNG ELECTRONICS CO.,       )
 9    LTD., a Korean corporation,    )
                                     )
10               Defendant.          )
      _____)
11
12
13
14       *** CONFIDENTIAL -- ATTORNEYS' EYES ONLY ***
15                      DEPOSITION OF:
16                 MICHAEL P. AKEMANN, Ph.D.
17               THURSDAY, SEPTEMBER 16, 2021
18                        9:05 a.m.
19
20    REPORTED BY:
21    Vickie Blair
22    CSR No. 8940, RPR-CRR
23    JOB NO. 4804970
24
25    PAGES 1 - 247
```

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

```
 1   action, nor am I financially interested in the outcome.        09:06:55
 2              If there are any objections to proceeding,          09:06:59
 3   please state them at the time of your appearance.              09:07:02
 4              At this time, will counsel and all present          09:07:06
 5   please state their appearances and affiliations for the        09:07:09
 6   record starting with the noticing party.                       09:07:13
 7              MR. MASTERS:  Yes, this is Marc Masters              09:07:15
 8   from the law firm Bird Marella on behalf of defendant          09:07:19
 9   Samsung.                                                        09:07:24
10              MR. LAMAGNA:  This is Raymond LaMagna of             09:07:25
11   Gibson, Dunn & Crutcher on behalf of plaintiff Netlist         09:07:28
12   and the witness, and I'm also joined by my colleague           09:07:32
13   Soolean Choy.                                                   09:07:35
14              VIDEOGRAPHER TOGAMI:  Thank you.                     09:07:38
15              Could we please have the oath.                       09:07:39
16
17                  MICHAEL P. AKEMANN, Ph.D.,
18                having been first duly sworn, was
19               examined and testified as follows:
20
21                          EXAMINATION
22   BY MR. MASTERS:
23        Q     Good morning, Dr. Akemann.                          09:07:56
24        A     Good morning, Mr. Masters.                          09:08:03
25        Q     So we did meet briefly right before we got          09:07:59
```

Page 5

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

| | | |
|---|---|---|
| 1 | Kidder's or Mr. Kidder's pictures show, they sometimes | 10:57:32 |
| 2 | stay quite stable for a year or more. | 10:57:39 |
| 3 | My analysis, of course, is an estimation | 10:57:40 |
| 4 | necessarily of reasonable benchmark prices, and I | 10:57:42 |
| 5 | wanted to look at similar points in time to have | 10:57:45 |
| 6 | sufficient data to come up with robust estimates and | 10:57:48 |
| 7 | that's precisely what I've done here, but no part of my | 10:57:51 |
| 8 | analysis assumes that -- that prices never change or, | 10:57:53 |
| 9 | indeed, that they couldn't change more frequently than | 10:57:57 |
| 10 | quarterly. | 10:58:01 |
| 11 | Q    Let me ask you this, we've talked about | 10:58:06 |
| 12 | where you've derived your understanding about the | 10:58:08 |
| 13 | Samsung pricing, this 90-day time -- time period. | 10:58:12 |
| 14 | What economic evidence, if any, was your | 10:58:17 |
| 15 | 90-day time frame based upon? | 10:58:26 |
| 16 | MR. LAMAGNA:   Form. | 10:58:29 |
| 17 | THE WITNESS:   It was based on the economic | 10:58:29 |
| 18 | evidence that I've described, which is factual | 10:58:31 |
| 19 | information that I gleaned in interviews from informed | 10:58:33 |
| 20 | company witnesses, it was also informed by the absence | 10:58:36 |
| 21 | of evidence on the same point from the Samsung | 10:58:42 |
| 22 | witnesses, so, in part, I'm relying on what I believe | 10:58:45 |
| 23 | to be the best available evidence on that point, which | 10:58:47 |
| 24 | is what I was able to obtain in company interviews from | 10:58:50 |
| 25 | informed business people. | 10:58:52 |

Veritext Legal Solutions
866 299-5127

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

| | | |
|---|---|---|
| 1 | BY MR. MASTERS: | 10:58:53 |
| 2 | Q Did you look to see how Samsung prices for | 10:58:54 |
| 3 | Netlist purchases varied over time? | 10:59:01 |
| 4 | A I did consider the temporal pattern, yes, | 10:59:09 |
| 5 | and I see price variance over time in some places and | 10:59:11 |
| 6 | stability over time in other places, as I would expect. | 10:59:16 |
| 7 | Q Did Samsung charge Netlist the same price | 10:59:21 |
| 8 | for all of Netlist's purchases of a given product | 10:59:27 |
| 9 | within a particular quarter? | 10:59:30 |
| 10 | A No, not necessarily. | 10:59:34 |
| 11 | Q When you say, "no, not necessarily," what | 10:59:34 |
| 12 | do you mean? | 10:59:39 |
| 13 | A What I mean is that, based on the data, | 10:59:39 |
| 14 | prices can sometimes change more frequently than that, | 10:59:42 |
| 15 | but there's always a tradeoff between taking a more | 10:59:47 |
| 16 | narrow window in terms of point in time or a broader | 10:59:53 |
| 17 | window. | 11:00:18 |
| 18 | When I conducted my analysis, I | 10:59:56 |
| 19 | considered, for example, a 30-day window or a 180-day | 10:59:58 |
| 20 | either direction window. I decided that 90 days was | 11:00:01 |
| 21 | the best balancing point for purposes of obtaining a | 11:00:04 |
| 22 | robust collection of benchmark prices. So, as shown in | 11:00:08 |
| 23 | my -- I believe it's Exhibit 3 includes that | 11:00:13 |
| 24 | information by look -- using a 90-day window I'm able | 11:00:18 |
| 25 | to cover between 37 and 56 percent of the volume at | 11:00:24 |

Page 79

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

| | | |
|---|---|---|
| 1 | issue, dollar wise. | 11:00:31 |
| 2 | And a narrower window would cover much | 11:00:32 |
| 3 | less of the population than I care about. | 11:00:36 |
| 4 | A broader window, of course, would cover | 11:00:39 |
| 5 | more. | 11:00:41 |
| 6 | So there's always a balancing act in data | 11:00:42 |
| 7 | work to implement the notion of a similar point in time | 11:00:44 |
| 8 | with, you know, some parameters, and what I've tried -- | 11:00:50 |
| 9 | chosen to do here is adopt 90 days as a reasonable | 11:00:54 |
| 10 | balance and balancing point between a broader window | 11:00:58 |
| 11 | and a narrower window, and to tie that, as best I | 11:01:01 |
| 12 | could, to the facts and circumstances in this case, | 11:01:05 |
| 13 | hence my reference to the interview with Mr. Song -- | 11:01:07 |
| 14 | Mr. Hong, rather, and Ms. Sasaki. | 11:01:10 |
| 15 | Q     Other than what you've just described, | 11:01:13 |
| 16 | were there any other reasons why you selected the | 11:01:15 |
| 17 | 90-day window as opposed to a narrower or broader | 11:01:18 |
| 18 | window? | 11:01:25 |
| 19 | MR. LAMAGNA:  Form. | 11:01:26 |
| 20 | THE WITNESS:  I think -- I don't want to | 11:01:26 |
| 21 | limit anything that I might have discussed in my export | 11:01:33 |
| 22 | report, but I believe I've explained the two broad | 11:01:33 |
| 23 | reasons, the first relates to the facts and | 11:01:39 |
| 24 | circumstances of this case, and that's the information | 11:01:40 |
| 25 | I obtained from Mr. Hong and Ms. Sasaki around the | 11:01:41 |

Veritext Legal Solutions
866 299-5127

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

```
 1   relative frequency of price changes, and the other part      11:01:45
 2   of that is in general in doing data work when you were       11:01:49
 3   looking for comparable prices, you attempt to control,       11:01:51
 4   to some extent, for time period.                             11:01:56
 5            And so I wanted to adopt a notion of a              11:01:57
 6   similar point in time, it doesn't mean identical             11:02:01
 7   because that would be too restrictive and we wouldn't        11:02:04
 8   have a sufficient dataset to do the type of analysis         11:02:06
 9   that I need to do, and 90 days was a good balance in my      11:02:09
10   view as an expert between sufficiently broad to capture      11:02:13
11   a wide range of transactions but not so broad as to          11:02:18
12   include further noisy data points or data points that        11:02:27
13   were too far removed from the transaction for which I        11:02:32
14   wanted a comparable price.                                   11:02:35
15   BY MR. MASTERS:                                              11:02:36
16        Q    Why did the fact that Mr. Hong and                 11:02:40
17   Ms. Sasaki tell you that Samsung typically changes           11:02:44
18   pricing on a quarterly basis influence your decision to      11:02:51
19   select the 90-day period?                                    11:02:59
20            MR. LAMAGNA:   Form.                                11:03:01
21            THE WITNESS:   Because a quarter is                 11:03:02
22   approximately 90 days, and so their information              11:03:07
23   indicated to me that during a 90-day period, you would       11:03:13
24   expect, on average, more rather than less stability in       11:03:16
25   prices, so that was a way that I could tie my analysis       11:03:21
```

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

| | | |
|---|---|---|
| 1 | specifically to facts and circumstances in this case. | 11:03:24 |
| 2 | And, as I said, I married that information | 11:03:26 |
| 3 | with broader economic principals of data work about | 11:03:29 |
| 4 | looking for comparable transactions that are at similar | 11:03:34 |
| 5 | points in time. | 11:03:37 |
| 6 | So the whole point of having a temporal | 11:03:38 |
| 7 | restriction in the first place was to try and get data | 11:03:40 |
| 8 | points that were more relevant rather than less | 11:03:43 |
| 9 | relevant, so even a transaction a year later for the | 11:03:48 |
| 10 | exact same product might be relevant to some extent, | 11:03:51 |
| 11 | but it's less relevant, so we restrict the analysis to | 11:03:53 |
| 12 | a narrower time window to focus more on more relevant | 11:03:56 |
| 13 | transactions while still obtaining a sufficient | 11:04:00 |
| 14 | fraction of the population, as I said, between, you | 11:04:05 |
| 15 | know, 37 and 56 percent, I think, of the population is | 11:04:07 |
| 16 | covered directly using the 90-day window. | 11:04:10 |
| 17 | So it was a -- in my view, an appropriate | 11:04:14 |
| 18 | balancing point between getting a sufficient number of | 11:04:18 |
| 19 | transactions covered in the analysis but not having | 11:04:21 |
| 20 | data points that were too distant from the comparable | 11:04:24 |
| 21 | point, and by "too distant" I mean too distant in time. | 11:04:28 |
| 22 | BY MR. MASTERS: | 11:04:31 |
| 23 |     Q    How did you determine whether another time | 11:04:32 |
| 24 | period would be either too narrow or too distant?  Was | 11:04:37 |
| 25 | it based on what Mr. Hong and Ms. Sasaki told you about | 11:04:44 |

Veritext Legal Solutions
866 299-5127

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

| | | |
|---|---|---|
| 1 | Q   I think that -- yeah, I don't think that's | 11:55:20 |
| 2 | the intent, I think he's -- he says reduces your | 11:55:23 |
| 3 | estimate of the price premium from 3.6 percent or 4.6 | 11:55:27 |
| 4 | percent to 1.6 percent or 1.9 percent; but, in any | 11:55:31 |
| 5 | event, I'm not intending to ascribe the 1.6 or 1.9 to | 11:55:37 |
| 6 | you. | 11:55:40 |
| 7 |         What I'm asking, though, is do you agree | 11:55:40 |
| 8 | that, if you do shorten the 90-day window that you use | 11:55:44 |
| 9 | to seven days, the result is a price premium of 1.6 | 11:55:49 |
| 10 | percent or 1.9 percent? | 11:55:54 |
| 11 |             MR. LAMAGNA:  Form. | 11:55:58 |
| 12 |             THE WITNESS:  I can neither agree nor | 11:55:59 |
| 13 | disagree.  I haven't done that analysis. | 11:56:01 |
| 14 | BY MR. MASTERS: | 11:56:03 |
| 15 |     Q   Okay.  And do you know -- earlier you | 11:56:03 |
| 16 | testified that you're assuming that the amount of data | 11:56:04 |
| 17 | within that seven-day period is less robust. | 11:56:09 |
| 18 |         Have you actually done that analysis to | 11:56:13 |
| 19 | determine how much data is available for that seven-day | 11:56:14 |
| 20 | period? | 11:56:18 |
| 21 |     A   No, I haven't done that specifically.  I | 11:56:21 |
| 22 | don't recall ever considering such a narrow time | 11:56:23 |
| 23 | window.  I don't think that would be appropriate in | 11:56:26 |
| 24 | this context. | 11:56:29 |
| 25 |     Q   And why do you feel that it would not be | 11:56:31 |

Veritext Legal Solutions
866 299-5127

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

```
1    appropriate?                                                    11:56:33
2         A    Because I think it fails to account for               11:56:35
3    other relevant data in a reasonable way.                        11:56:37
4              As discussed at some length before the                11:56:40
5    break, part of the analysis here is a need to balance           11:56:42
6    between having sufficient data to assess comparables            11:56:49
7    and sufficient coverage of the transactions that                11:56:52
8    require comparable data points to have robust results,          11:56:55
9    and so using a very narrow time frame, in his footnote          11:56:59
10   95, he even rejects the notion of using the same day as         11:57:06
11   a time frame, but if I were to require that, you'd have         11:57:09
12   very view instances where you could come up with a              11:57:13
13   meaningful comparable comparison.                               11:57:15
14             And so I think that being overly narrow               11:57:18
15   with respect to the time frame being considered throws          11:57:21
16   away too much relevant data.                                    11:57:25
17        Q    Let me -- let me ask you -- well, first of            11:57:29
18   all, let me just ask:  In terms of your assessment that         11:57:32
19   the 90-day period is the -- an appropriate period to            11:57:37
20   use for estimating cover damages, are you relying on            11:57:43
21   any particular literature in your field?                        11:57:48
22        A    For the specific 90-day point?                        11:57:54
23        Q    Yes.                                                  11:57:56
24        A    I don't cite to any academic literature on            11:57:56
25   that point precisely, but I'm certainly relying on my           11:58:03
```

Page 112

1   yours, in running your analysis, that, though, Samsung    13:37:38
2   prices to Netlist were consistent with Samsung's          13:37:44
3   obligations under the JDLA; correct?                      13:37:46
4             MR. LAMAGNA:  Form.                             13:37:48
5             THE WITNESS:  I think that something to         13:37:54
6   that effect is a tacit assumption in my analysis, and I   13:37:55
7   haven't attempted to separately test or assess that       13:38:00
8   assumption in the context of my expert report.            13:38:03
9   BY MR. MASTERS:                                           13:38:05
10       Q    Okay.  Do you -- do you believe that there      13:38:06
11  is some sort of limitation on competition in the market   13:38:12
12  that allows resellers to sell above competitive prices?   13:38:14
13            MR. LAMAGNA:  Form.                             13:38:28
14            THE WITNESS:  I don't recall seeing any         13:38:28
15  economic evidence to suggest that that was so.            13:38:31
16  BY MR. MASTERS:                                           13:38:36
17       Q    And, as part of your analysis supported by      13:38:46
18  an assumption that every purchase from a reseller, that   13:38:51
19  product was available from Samsung at a lower price?      13:38:59
20            MR. LAMAGNA:  Form.                             13:39:05
21            THE WITNESS:  No, I don't assume that in        13:39:05
22  my analysis, and, indeed, my analysis of cover damages    13:39:07
23  indicates that that's not always true.                    13:39:12
24  BY MR. MASTERS:                                           13:39:16
25       Q    In other words, you -- it indicates that        13:39:17

Page 152

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

| | | |
|---|---|---|
| 1 | sometimes the prices from Samsung are above what is | 13:39:22 |
| 2 | available from resellers? | 13:39:25 |
| 3 |     A    That's correct. | 13:39:29 |
| 4 |         In the course of my cover damages | 13:39:30 |
| 5 | analysis, some of the observations where I'm able to do | 13:39:31 |
| 6 | matching suggest what we can think of as a negative | 13:39:35 |
| 7 | price premium; in other words, negative cover damages. | 13:39:39 |
| 8 |         And, as I've talked about earlier today, I | 13:39:41 |
| 9 | take that into account in my analysis, and, in essence, | 13:39:44 |
| 10 | give Samsung credit for damages purposes for that | 13:39:47 |
| 11 | highly effective mitigation, as it were, by Netlist. | 13:39:52 |
| 12 |         If it was able to get a better price in | 13:39:54 |
| 13 | the reseller market, that reduces the cover damages in | 13:39:57 |
| 14 | my model. | 13:40:01 |
| 15 |     Q    Okay.  And, when you say "a better price," | 13:40:06 |
| 16 | that's all premised on your assessment based on the | 13:40:07 |
| 17 | 90-day window; right? | 13:40:12 |
| 18 |     A    It's part of my general matching and | 13:40:14 |
| 19 | benchmarking analysis, and, as part of that, I adopted | 13:40:21 |
| 20 | the 90-day window. | 13:40:22 |
| 21 |         My point is that, in some of those | 13:40:23 |
| 22 | instances where I can match within that time window, | 13:40:25 |
| 23 | the average Samsung price was actually lower -- no, | 13:40:29 |
| 24 | excuse me, higher than the reseller price, and that led | 13:40:33 |
| 25 | to a negative price premium, and, therefore, when I | 13:40:37 |

Veritext Legal Solutions
866 299-5127

```
 1    BY MR. MASTERS:                                          13:43:35
 2         Q    So, when you are evaluating the value of       13:43:35
 3    the patent licenses, were you assuming that those        13:43:39
 4    patent licenses protected Samsung from patent            13:43:44
 5    infringement lawsuits?                                   13:43:48
 6         A    I don't think I was making that specific       13:43:51
 7    assumption.                                              13:43:54
 8              I think what I observed in the record was      13:43:55
 9    that the main reason that Samsung entered into the       13:43:56
10    agreement in the first place, per the testimony of      13:43:59
11    Samsung's own witnesses, was to obtain a license to the 13:44:02
12    patents.                                                 13:44:06
13         Q    And what's the value of a license to the       13:44:09
14    patent, in your understanding?                           13:44:11
15         A    I haven't attempted a specific                 13:44:17
16    quantification.                                          13:44:19
17              But, as discussed in this section of my        13:44:20
18    report, I think there are economic indicators in this    13:44:21
19    case that suggest that that patent license had           13:44:27
20    substantial value.                                       13:44:30
21         Q    And -- but, in terms of practically, what      13:44:31
22    does the patent license do for Samsung that provides     13:44:34
23    Samsung with value?                                      13:44:39
24         A    I'm not sure I understand that question,       13:44:48
25    but what I think you're asking me is how does it         13:44:50
```

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

```
1    covered in the document about the scope of the         14:05:11
2    agreement, there's some background information on the  14:05:15
3    NRE expenses, so general issues being covered, the     14:05:18
4    structure of the document, the back and forth between  14:05:24
5    it looks like petitioner's argument, who I think is    14:05:28
6    Netlist, and the disposition agency, I'm a little less 14:05:31
7    clear on whether that's the Korean tax authority, I    14:05:34
8    think it might be, and the positions they're taking    14:05:37
9    with respect to the dispute in Korea.                  14:05:41
10              So I guess I was trying to say what one      14:05:46
11   would normally say when one skimmed a document, I tried 14:05:50
12   to pick out the basic point of the document, but I     14:05:57
13   don't recall reading every last sentence with care.    14:06:00
14        Q    Okay.  You can put that aside for now.  I    14:06:04
15   want to return to your report.                         14:06:10
16        A    Okay.                                        14:06:31
17        Q    Did -- let -- let me -- let me ask you to    14:06:31
18   turn to the Kidder report, Exhibit 2, and, if you      14:06:43
19   could, go to paragraph 57.                             14:06:47
20        A    Okay.  I'm there.                            14:07:00
21        Q    All right.  Okay.  So let me -- let me       14:07:02
22   read the first part of 57, I'll ask you about it, he   14:07:13
23   writes (as read):                                      14:07:19
24              If Dr. Akemann was going to offer an        14:07:21
25         opinion on the value of Netlist's patents        14:07:23
```

Page 173

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

```
 1              to Samsung, he should have started by              14:07:24
 2              understanding which, if any, of Netlist's          14:07:28
 3              patents were relevant to Samsung's                 14:07:31
 4              business, then reviewed all of Netlist's           14:07:33
 5              and Samsung's relevant licenses, and then          14:07:35
 6              considered such factors as the extent of           14:07:39
 7              use, competitive positions of the parties,         14:07:42
 8              et cetera.                                         14:07:46
 9              Do you see that?                                   14:07:46
10       A      I do.                                              14:07:51
11       Q      Do you agree?                                      14:07:51
12       A      No.                                                14:07:52
13       Q      Why not?                                           14:07:52
14       A      In part because he's got an incorrect              14:07:54
15   premise.  I'm not offering an opinion on the value of         14:08:00
16   Netlist's patents to Samsung.  This isn't a patent            14:08:03
17   damages case, and I wasn't attempting to offer a              14:08:05
18   quantitative opinion on the value of Netlist's patent         14:09:05
19   portfolio, so Mr. Kidder is confused what my analysis         14:08:13
20   was intended to do and mischaracterized what my               14:08:16
21   opinions are.                                                 14:08:20
22       Q      Well, you used the value of the cross              14:08:21
23   licenses that Samsung obtained in order to state that         14:08:24
24   that's an indication of the value of the supply               14:08:32
25   assurance; correct?                                           14:08:37
```

Page 174

```
 1        A    It is correct that I describe some                14:08:39
 2   quantitative information that indicates that Netlist's      14:08:43
 3   patent rights have substantial value, but I didn't set      14:08:47
 4   forth to value that -- those rights quantitatively, nor     14:08:50
 5   conduct the Georgia Pacific analysis, in part because       14:08:55
 6   this isn't a patent damages case.  I didn't see any         14:08:57
 7   call for that in this circumstance.                         14:09:00
 8        Q    Although you don't quantify the value of          14:09:05
 9   the patent licenses to Samsung, you do state your           14:09:10
10   opinion that they are of significant value; correct?        14:09:16
11        A    I do think that there are indications             14:09:21
12   that, as I say in my paragraph 110, Netlist patent          14:09:24
13   rights had very substantial value in the industry, and     14:09:30
14   that's relevant for assessing the value of the supply       14:09:33
15   assurance to Netlist.  Absolutely I think that's            14:09:37
16   correct.                                                    14:09:40
17        Q    Would it not have been relevant -- strike         14:09:40
18   that.                                                       14:09:40
19             Wouldn't it have been relevant to know            14:09:44
20   Samsung's business and whether any of Netlist's patents     14:09:48
21   were relevant to Samsung's business before reaching         14:09:54
22   that opinion?                                               14:09:58
23             MR. LAMAGNA:  Form.                               14:10:01
24             THE WITNESS:  I did have an understanding         14:10:01
25   of Samsung's business when I wrote the proceeding data      14:10:05
```

Page 175

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

```
1    STATE OF CALIFORNIA    )
2                           )  ss.
3    COUNTY OF LOS ANGELES  )
4              I, Vickie Blair, CSR No. 8940, RPR-CRR, in
5    and for the State of California, do hereby certify:
6              That, prior to being examined, the witness
7    named in the foregoing deposition was by me duly sworn
8    to testify as to the truth, the whole truth, and
9    nothing but the truth;
10             That said deposition was taken before me
11   at the time and place therein set forth, and was taken
12   down by me stenographically and thereafter transcribed
13   via computer-aided transcription under my direction and
14   is a true record of the testimony given;
15             I further certify I am neither counsel
16   for, nor related to, any party to said action, nor
17   interested in the outcome thereof;
18             IN WITNESS WHEREOF, I have hereto
19   subscribed my name this 17th day of September, 2021.
20
21
22
23
24          [Signature: Vickie Blair]
25             Vickie Blair, CSR No. 8940, RPR-CRR
```