EKWAN E. RHOW (SB 174604)
erhow@birdmarella.com
MARC E. MASTERS (SB 208375)
mmasters@birdmarella.com
DAVID I. HURWITZ (SB 174632)
dhurwitz@birdmarella.com
BIRD, MARELLA, BOXER,
WOLPERT, NESSIM, DROOKS,
LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

MARC F. FEINSTEIN (SB 158901)
mfeinstein@omm.com
JOSEPH R. O'CONNOR (SB 274421)
joconnor@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone:  (213) 430-6000
Facsimile:   (213) 430-6407

MICHAEL G. YODER (SB 83059)
myoder@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, Suite 1700
Newport Beach, California 92660
Telephone: (949) 823-6900
Facsimile: (949) 823-6994

Attorneys for Defendant Samsung
Electronics Co., Ltd.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>Defendant. | CASE NO. 8:20-cv-00993-MCS-ADS<br><br>**DEFENDANT SAMSUNG'S OPPOSITION TO PLAINTIFF NETLIST'S MOTIONS *IN LIMINE***<br><br>Date:  November 15, 2021<br>Time:  9:00 a.m.<br>Crtrm.: 7C<br><br>Assigned to Hon. Mark C. Scarsi<br>Courtroom 7C |

Netlist's motions *in limine* (Dkt. 211, "Mot.") are based on the erroneous assumption that after the Court's summary judgment order, the only issue left to be tried on Netlist's claim for breach of the supply obligation in Section 6.2 of the JDLA is the "quantum of damages" and that all of Samsung's affirmative defenses have been rejected. Although the Court found that the evidence adduced in the summary judgment proceedings established a breach of Section 6.2 as a matter of law, Netlist did not ask the Court to make findings, and the Court did not make findings, of specific breaches of that provision, including the dates and amounts of unfulfilled orders for NAND and DRAM products. Netlist therefore continues to bear the burden of proving that Netlist suffered actual damages as a result of specific breaches of Section 6.2. Although the Court in granting summary judgment as to Netlist's claim for declaratory relief found that Netlist did not waive the right to terminate, Netlist did not ask the Court to decide, and the Court did not decide, each and every one of Samsung's affirmative defenses to Netlist's claims for damages. Samsung accordingly continues to have the right to assert those defenses. As shown below, Netlist's motion seeks to exclude relevant and important evidence that goes directly to the remaining issues in the case. Netlist has not established a valid basis to exclude such evidence, and the motion should be denied in its entirety.

## I. EVIDENCE THAT NETLIST SEEKS TO SUE SAMSUNG FOR PATENT INFRINGEMENT IS ADMISSIBLE AND RELEVANT

Netlist argues that evidence that Netlist terminated the JDLA so that it could sue Samsung for patent infringement should be excluded because "the only issue left to be tried is damages" and this evidence is not relevant to damages and will confuse the jury. (Mot. at 1:6–2:22.) Netlist is incorrect for several reasons.

*First*, this evidence is relevant to Netlist's claim that Samsung breached Section 3.2 of the JDLA by not reasonably cooperating in Netlist's efforts to claim a refund of the taxes Samsung withheld from the fee under Section 3.1 (the "NRE fee"). Samsung contends that it withheld that amount because, in its view, the $8

1
SAMSUNG'S OPPOSITION TO NETLIST'S MOTIONS *IN LIMINE*

million NRE fee was at least in part a royalty payment taxable under Korean law since the JDLA granted Samsung a license to Netlist's patents. Netlist contends that Samsung breached Section 3.2 by declining to state in response to questions from the Korean National Tax Service that the NRE fee was not a royalty fee. (Request for Judicial Notice, filed concurrently, ("RFN"), Ex. 1, Samsung Genuine Disputes of Material Fact, Dkt. 168-1, at 30.) But the reasonableness of Samsung's position is shown in part by the fact that Netlist has made clear that once the JDLA is terminated, it intends to sue Samsung for patent infringement. Evidence and argument that the termination of the JDLA exposed Samsung to patent infringement liability from Netlist has a tendency to show that it was reasonable for Samsung to take the position that $8 million fee paid under the JDLA was in fact a taxable royalty payment for the license to Netlist's patents, and Samsung's position with the Korean National Tax Service was reasonable.

*Second*, this evidence is relevant to show that Netlist waived at least some of its claims for breach of Section 6.2 by deliberately not demanding strict compliance for years, and is also relevant to Samsung's other affirmative defenses of acquiescence and estoppel. Although Netlist complained after Samsung cut its allocation in mid-2017, Samsung increased the allocation by mid-2018, leading Netlist to accept allocations without protest. In July 2020, when Netlist noticed the termination of the JDLA, Netlist was in the process of securing a substitute supply arrangement with SK Hynix. (RJN Ex. 2, Samsung Add'l Material Facts, Dkt. 168-2 at 10, No. 30.) With an alternative supply, it was more valuable for Netlist to sue Samsung for patent infringement than to continue under the JDLA. That explains why Netlist terminated at that time and, moreover, why it didn't demand strict compliance with Section 6.2 earlier and lulled Samsung into believing that Netlist did not intend to press claims over the supply of products. Those facts support Samsung's affirmative defenses, such as waiver. *Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 281 (N.Y. App. Div. 2017) (waiver prevents the

"waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then [] suing for noncompliance").[1]  It is therefore critical that Samsung be able to put on evidence of why Netlist terminated the agreement because absent that evidence there is a hole in the explanation of why Netlist decided not to protest for years but then suddenly reversed its position.

*Third,* this evidence is not an "attempt to impose a derogatory characterization of patent owners, such as Netlist."  (Mot. at 1:17–20.)  As discussed above, this evidence goes to relevant issues.  Samsung does not intend to call Netlist a "patent troll" and a "shell to sue people" as was the case in *SPEX Techs. v. Apricorn, Inc.*, on which Netlist relies. 2020 WL 1289546, at *2 (C.D. Cal. Jan. 21, 2020); (Mot. at 1:18–21).  And the probative value of this evidence far outweighs any arguable unfair prejudice to Netlist by introducing the reasons why Netlist terminated the JDLA.  To the extent there is any unfair prejudice (there isn't any) that prejudice can be cured with an instruction to the jury.

## II.  NETLIST'S CREDITWORTHINESS IS RELEVANT TO ITS CLAIM FOR BREACH OF JDLA SECTION 6.2 AND IS ADMISSIBLE

Netlist argues that the Court should exclude evidence and argument on Netlist's creditworthiness and cashflow problems on the grounds that it does not go to "the amount of general damages" and may persuade the jury that "Netlist should not be entitled to the significant damages it suffered."  (Mot. at 3:11–4:3.)  This

---

[1] The no-waiver provision in the JDLA only applies to prospective breaches, not retrospective breaches for damages.  The provision states that the "the failure by either party to enforce any of the terms and conditions of this Agreement shall not constitute a waiver of such Party's right thereafter to enforce that or any other terms and conditions of this Agreement."  (MSJ Order, Dkt. 186, at 20:8–11, JDLA §16.2.)  While the Court previously found Netlist did not waive its right to ***terminate*** the JDLA pursuant to this no-waiver provision, the Court was not asked to determine and did not determine whether Netlist waived the right to seek damages for breaches going back as far as 2017.  That remains an issue in the case.

evidence is relevant, however, to whether Samsung breached Section 6.2 of the JDLA resulting in actual damages to Netlist, and whether Netlist failed to mitigate any alleged damages—all issues that remain undecided and that must be submitted to the jury.

As a threshold matter, Netlist is wrong that "the only remaining issue on this claim is the amount of general damages." (Mot. at 3:11–12.) At summary judgment, the Court found that Samsung "declined to fulfill all of Netlist's orders for NAND and DRAM products," and therefore "Samsung breached the JDLA § 6.2." (Order, 186, Dkt. at 9:28–10:3.) But Netlist did not ask the Court to find, and the Court did not find, that specific breaches of Section 6.2 caused Netlist damages—*i.e.*, dates and amounts of unfulfilled "requests" for products and the resulting harm (if any). At trial, Netlist must therefore still prove damages "directly traceable to [Samsung's] breach[es]," *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 731 (2d Cir. 1992), since "causation is an essential element of damages in a breach of contract action." *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

Indeed, permitting Netlist to proceed to trial only on the quantum of damages for breach of Section 6.2 would deny Samsung its Seventh Amendment right to a jury trial. Because Netlist did not ask the Court to make findings of specific breaches of Section 6.2, there is no record from the summary judgment proceedings of factual findings on which the jury could proceed directly to the issue of damages. Accordingly, Samsung is entitled to have the jury decide whether Samsung refused specific requests in breach of the contract causing Netlist to sustain actual damages. *See Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931) (Seventh Amendment guarantees that a trial on separate issues may not be resorted to "unless it clearly appears that the issue to be tried is so distinct and separable from others that a trial of it alone may be had without injustice").

Other issues relating to Netlist's claim for damages under Section 6.2 remain

4

in the case as well. For example, Netlist seeks cover damages, and the jury must therefore decide whether, due to Samsung's failure to fulfill orders, Netlist made purchases of substitute products from third-party suppliers at prices higher than it had the right to purchase those products from Samsung. *See* New York Pattern Jury Instructions § 4:20 Commentary "Market Value." Samsung also may put on a defense that Netlist failed to exercise reasonable efforts to mitigate its damages. *See, e.g., Katz Comm., Inc. v. Evening News Ass'n,* 705 F.2d 20, 26 (2d Cir. 1983).

Since the JDLA does not require Samsung to supply NAND and DRAM products to Netlist on credit, and yet Netlist sought to pay on credit, the evidence that Netlist had poor credit goes to whether Samsung had grounds to refuse requests for product or to limit Netlist's allocation. (*See,* Decl. of J. O'Connor in Support of Samsung's Opp. to Netlist's MIL, filed concurrently ("O'Connor Decl.") Ex. 2 (in April 2018, Samsung informed Netlist: "I cannot support much with current credit issue").) Such evidence also goes to whether Netlist would have been able to complete the purchase. If Netlist cannot show that it would have completed the purchase, then it cannot show damages resulting from breach. This evidence further goes to whether Netlist, in light of its financial difficulties, was forced to pay a premium to third-party suppliers that could have been avoided had Netlist taken reasonable steps to pay its bills on time and maintain good credit standing.

Netlist argues that the evidence might "cast a negative light on Netlist and convince the jury [to] limit its damages award," (Mot. at 7), but there is no legal basis proffered on which to conclude that evidence of a credit issue would have any such effects and, in any event, the probative value of such evidence far outweighs any claimed prejudice.

### III. EVIDENCE OF CHIP ALLOCATION AND SHORTAGES IS RELEVANT AND ADMISSIBLE

Netlist argues that the Court should exclude evidence and argument that it was "impracticable or impossible for Samsung to fill Netlist's orders due to industry chip

'shortages' or demands from other customers" on the grounds that such evidence goes to (1) the issue of breach, which according to Netlist the Court already decided in its summary judgment order, and (2) affirmative defenses that Netlist claims Samsung did not plead. (Mot. at 4:20–6:10.) Netlist is wrong for a number of reasons.

Evidence concerning industry shortages and product allocation is relevant to whether there were specific breaches of the JDLA that caused Netlist damage. This Court, relying on *RES Exhibit Services, LLC v. Genesis Vision, Inc.*, 155 A.D.3d 1515 (4th Dept. 2017), found that that the supply obligation in Section 6.2 was not so indefinite as to be unenforceable. (Order at 11:10–22.) In *RES Exhibit Services*, the court concluded that a contract to set up exhibit booths for trade shows was not too indefinite, despite unspecified terms for price and scope of services, because the parties' obligations could be measured by "objective criteria[, which] may be found in the agreement itself, commercial practice, or other usage and custom." *RES Exhibit Services, LLC*, 155 A.D. 3d at 1519. Netlist admits that it was not entitled to whatever supply it requested and that it was only entitled to a commercially reasonable amount. (*See* O'Connor Decl. Ex. 1, P.K. Hong Dep. at 296:14–20.) Here, consistent with the Court's summary judgment order, Samsung intends to put on evidence of the parties' commercial dealings and industry custom and practice to show that its allocations of product to Netlist were reasonable and non-discriminatory. That includes evidence that the amount of NAND and DRAM product the market can supply is limited and demand for products often exceeds available supply. (*See, e.g.,* RJN Ex. 2, Samsung Add'l Material Facts, Dkt. 168-2 at 13, No. 39.) As a result, customers like Netlist would provide Samsung with advance forecasts of the amount of product it wished to purchase, and Samsung would then inform customers how much product it could allocate and make available to purchase. (*Id.* No. 40.) Nothing in the JDLA eliminated that market reality; evidence of chip allocation and shortages, together with the process for making allocations to customers, goes to whether Netlist suffered actual damages as a result of any specific breaches of Section 6.2.

This Court should also reject Netlist's argument that this evidence goes solely to unpled defenses. (Mot. at 4:27–52.) To be clear, Samsung is not asserting affirmative defenses of impossibility and impracticability. Rather, Samsung intends to argue that the parties' commercial dealings and industry custom and practice are relevant factors that the jury may consider in deciding whether specific breaches of Section 6.2 caused actual damages to Netlist.

Rule 403 also does not preclude this evidence. Netlist claims that "[a]rguing to the jury that it was, for example, 'difficult' to fill Netlist's orders, will no doubt confuse the jury into thinking that Samsung's performance was excused, which conflicts with the Court's ruling that Samsung materially breached the JDLA." (Mot. at 6:1–7.) But Samsung is not asking for an instruction on "excused performance," so there is no potential for juror confusion on that ground. Moreover, as discussed above, this Court did not find specific breaches of Section 6.2 in ruling on summary judgment and, therefore, Netlist still bears the burden to prove specific breaches causing it to sustain actual damages.

## IV. EVIDENCE OF SAMSUNG'S SALES PRACTICES WITH NETLIST IS RELEVANT AND ADMISSIBLE

Netlist argues that evidence of Samsung's sales practices with Netlist before the JDLA (July 12, 2015) and after its termination (July 15, 2020) should be excluded because they have no bearing on the quantum of damages and are irrelevant. (Mot. at 6:13–7:14) However, evidence of Netlist's sales practices with Samsung before, during, and after the JDLA goes to, among other things, whether any damages Netlist seeks are "directly traceable to [Samsung's] breach[es]," *Bausch & Lomb Inc.*, 977 F.2d 720, 731 (2d Cir. 1992), and whether Netlist made cover substitute purchases "in good faith and without unreasonable delay." *Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.,* 887 F. Supp. 2d 459, 480 (E.D.N.Y. 2012). Netlist claims that "Netlist only purchased Samsung NAND and DRAM on the secondary market from sellers other than Samsung when

Samsung refused to fulfill [Netlist's] requests" in breach of the JDLA, and is seeking damages for every product it purchased from a secondary reseller as cover damages. (RJN Ex. 3, P.K. Hong Decl., Dkt. 145-2 ¶¶ 4–5.) Evidence of Samsung's sales practices before, during, and after the JDLA may be offered to rebut Netlist's theory by showing the extent to which Netlist actually went to the secondary market and whether, when it did, Netlist was seeking substitutes for products that Samsung did not supply. If Netlist as a matter of course went to the secondary market, even when Samsung fulfilled its requests, that would tend to show that Netlist's purported "cover" purchases were not always due to lack of supply from Samsung, but were part of Netlist's regular course of business.

### V. TESTIMONY OF SAMSUNG'S EXPERT JOSEPH MCALEXANDER ON INDUSTRY CUSTOM AND PRACTICE AS TO PRODUCT ALLOCATION IS RELEVANT AND ADMISSIBLE

Netlist argues that the Court should exclude the testimony of Samsung's memory chip industry expert Joseph McAlexander, contending that (1) his testimony is irrelevant, (2) his methods are unreliable, and (3) his testimony will confuse the jury. (Mot. at 7:16–10:22.) The Court should reject all these arguments.

*Relevance.* Netlist contends that McAlexander's testimony is irrelevant on the grounds that he "proposes to testify concerning the general state of the semiconductor manufacturing industry," but the "sole remaining disputes concern how much money Samsung owes Netlist." (Mot. at 8:4–18.) But as explained above the jury must still decide among other things whether specific Samsung breaches of Section 6.2 resulted in damages. McAlexander, who has more than thirty years of experience in the memory chip industry, will offer testimony on industry custom and practice as to product allocation relevant to these issues. McAlexander will testify that manufacturers like Samsung must monitor their distribution pipeline, and buyers must provide manufacturers accurate forecasts for products, which "enables the manufacturing operations planner to prearrange supply

8

of raw material orders and arrange for equipment, facility, and people allocation." (Mot. Ex. A ¶ 110.) Manufacturers then provide buyers quotations that identify the "number of integrated circuit products at stated price points" that the seller can supply based on "product ramp up rates, and yield." (*Id.* ¶ 117.) Buyers can then place "Purchase Order Requests" that "identif[y] the product and the proposed delivery expectations." (*Id.* ¶ 119.) Manufacturers use these as a basis for negotiations with the buyer. (*Id.* ¶ 120.) Because of limited supply, and technical manufacturing, manufacturers must then allocate supply among its customers based on customer purchase orders, forecasts, delivery schedules, and purchase order changes. (Mot. Ex. A ¶ 122.) Manufacturers then deliver the product after this dynamic process.

This testimony will help the jury to decide whether Samsung's allocations of product to Netlist were commercially reasonable in light of industry custom and practice. As explained above, Netlist admits that it was not entitled to whatever supply it requested and that it was only entitled to a commercially reasonable amount. Accordingly, McAlexander's testimony is directly relevant to whether Netlist has met its burden to prove that it suffered damages when Samsung failed to fulfill Netlist requests for product in breach of the contract.

*Reliability.* Netlist also contends that McAlexander's testimony is not reliable under Rule 702 because he purportedly did not examine evidence specific to whether Netlist's and Samsung's transactions were affected by any disruptions in product flow, delayed receipt of raw materials, or equipment malfunctions. (Mot. at 9:2–24.) But there is no requirement that McAlexander examine specific transactions between the parties to satisfy the requirements of Rule 702. Netlist makes no suggestion that McAlexander's opinions are not supported or that he is unqualified to offer those opinions. Indeed, the evidence in the record about Samsung's own product allocation practices is consistent with McAlexander's description of how the industry functions. (RJN Ex. 3, P.K. Hong Decl., Dkt. 145-2

9

¶¶ 4–5; RJN Ex. 2, Samsung Add'l Material Facts, Dkt. 168-2 at 13–14, Nos. 39–43.) There is no basis to find that McAlexander's testimony is unreliable.

*No Confusion.* Netlist also argues that McAlexander's testimony will confuse the jury because it will imply that since "many exigencies *can* impede the flow of products" they "*did occur* at Samsung." (Mot. at 12–15.) Netlist misses the point. To provide context to the supply obligation under Section 6.2 and Netlist's claim, Samsung is entitled to put on evidence of industry custom and practice related to determining whether Samsung's allocations of product to Netlist were reasonable and non-discriminatory. Far from confusing the jury, this testimony will educate the jury on important issues they must decide.

## VI. CONCLUSION

For all the foregoing reasons, the Court should deny Netlist's Motions *In Limine*. If the Court is inclined to grant Netlist's motions in whole or in part, Samsung requests that the Court defer its ruling until trial so that these evidentiary issues may be resolved with the benefit of the fuller context the Court will be afforded during the trial.

DATED: November 1, 2021      O'MELVENY & MYERS LLP

By:     /s/ *Michael G. Yoder*
          Michael G. Yoder
       Attorneys for Defendant Samsung