UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

|  |  |  |
|---|---|---|
| NETLIST, INC, | ) | CASE NO: 8:20-CV-00993-MCS-ADSx |
|  | ) |  |
| Plaintiff, | ) | CIVIL |
|  | ) |  |
| vs. | ) | Los Angeles, California |
|  | ) |  |
| SAMSUNG ELECTRONICS CO, LTD, | ) | Monday, November 15, 2021 |
|  | ) |  |
| Defendant. | ) | (1:58 p.m. to 3:00 p.m.) |

FINAL PRETRIAL CONFERENCE

BEFORE THE HONORABLE MARK C. SCARSI,
UNITED STATES DISTRICT JUDGE

APPEARANCES:            SEE PAGE 2

Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Stephen Montes Kerr

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**<u>APPEARANCES:</u>**


For Plaintiff:              RICHARD J. DOREN, ESQ.
                            JASON C. LO, ESQ.
                            TIMOTHY P. BEST, ESQ.
                            RAYMOND A. LaMAGNA, ESQ.
                            Gibson Dunn & Crutcher, LLP
                            333 S. Grand Ave.
                            Los Angeles, CA 90071

Also present:               CFO GAIL SASAKI
                            BLAKE WELCHER, BOARD OF DIRECTORS
                            TOBIN HOBBS, IN-HOUSE COUNSEL


For Defendant:              EKWAN E. RHOW, ESQ.
                            MARC E. MASTERS, ESQ.
                            MARC F. FEINSTEIN, ESQ.
                            Bird Marella Boxer, et al.
                            1875 Century Park East
                            23rd Floor
                            Los Angeles, CA 90067

                            MICHAEL G. YODER, ESQ.
                            O'Melveny & Myers, LLP
                            610 Newport Center Dr., Suite 1700
                            Newport Beach, CA 92660

1    **Los Angeles, California; Monday, November 15, 2021; 1:58 p.m.**

2                              **Call to Order**

3            **THE CLERK:**  All rise.  This United States District

4    Court is now in session; the Honorable Mark C. Scarsi

5    presiding.

6            **THE COURT:**  Please have a seat.

7            **THE CLERK:**  Calling Item Number 5, SA-CV-20-00993,

8    *Netlist Inc. versus Samsung Electronics Co., Ltd.*

9            Counsel, state your appearances, please.

10           **MR. DOREN:**  Good afternoon, Your Honor.  Richard

11   Doren on behalf of Netlist.

12           **THE COURT:**  Good afternoon.

13           **MR. LO:**  Good afternoon, Your Honor.  Jason Lo, also

14   on behalf of Netlist.

15           **THE COURT:**  Good afternoon.

16           **MR. BEST:**  Good afternoon, Your Honor.  Tim Best,

17   also for Netlist.

18           **THE COURT:**  Good afternoon.

19           **MR. BEST:**  Afternoon.

20           **MR. LaMAGNA:**  Good afternoon, Your Honor.  Raymond

21   LaMagna, also for Netlist.

22           **THE COURT:**  Good afternoon.

23           **MR. LaMAGNA:**  And Your Honor, if I might, also in the

24   gallery, we have Ms. Gail Sasaki, Netlist Chief Financial

25   Officer, Mr. Tobin Hobbs, inhouse counsel, and Mr. Blake

4

1    Welcher, a member of the Netlist Board of Directors.

2            THE COURT:  Good afternoon, everyone.

3            MR. RHOW:  Good afternoon, Your Honor.  For Samsung,

4    Ekwan Rhow.

5            MR. YODER:  Yes, Your Honor, good morning.  Good

6    afternoon.  Michael Yoder for Samsung as well.

7            THE COURT:  Good afternoon.

8            MR. FEINSTEIN:  Good afternoon, Your Honor.  Marc

9    Feinstein for Samsung.

10           THE COURT:  Good afternoon.

11           MR. MASTERS:  Good afternoon, Your Honor.  Marc

12   Masters on behalf of Samsung.

13           THE COURT:  Good afternoon.

14           Okay.  We're here on for the pretrial conference.

15   Let me just ask the parties.  Has there been any movement on

16   settlement?  I know the parties had a settlement conference in

17   September.  Anything -- any update there?

18           MR. DOREN:  Your Honor, the parties did have a

19   settlement conference, and while Netlist has remained open to

20   further discussions, Samsung hasn't engaged with us.

21           THE COURT:  Okay.  Anything from Samsung on that?

22           MR. RHOW:  We did have an initial mediation, Your

23   Honor, and the problem isn't that we're not open to it.  It

24   involves another separate case that hasn't even been filed yet

25   that would need to be resolved, so that's the issue right now.

1          **THE COURT:**  So, there's no likelihood this is going

2   to settle before trial.

3          **MR. RHOW:**  Frankly, Your Honor, unlikely.

4          **THE COURT:**  Okay, thanks.  Okay.

5          So, when last we talked, we were talking about which

6   affirmative defenses were still in play based on the summary

7   judgment ruling, and the parties have submitted some materials

8   on that; the Court has reviewed it.

9          Let me ask Samsung, is acquiescence a valid

10  affirmative defense to breach of contract in New York?

11         **MR. YODER:**  Your Honor, may I approach the lectern?

12         **THE COURT:**  Oh, yeah, please.

13         **MR. YODER:**  Okay, thank you.

14         It is.  I will acknowledge that unlike waiver, and

15  estoppel, and failure to mitigate, which are the other three

16  affirmative defenses that we believe we are entitled to raise

17  with respect to their specific claims for damages, that there

18  is no pattern instruction for acquiescence, but we did cite the

19  Court to the *Allen* case.  It was not addressed by Netlist in

20  its opposition.

21         I think we also cited as additional support a

22  trademark case, which is true, but the *Allen* case is a breach

23  of contract case, and it's a New York law case, and it makes

24  quite clear that in that case, the Court found as a defense

25  that there was consent and acquiescence to, in that case, a

6

1  termination of the agreement as opposed to specific breaches,

2  which is what we're saying here that Netlist acquiesced in.

3          **THE COURT:**  Okay.  And so, the *Allen* case -- the

4  trademark case was the *Dial-A-Mattress* case, right?

5          **MR. YODER:**  Correct, Your Honor.

6          **THE COURT:**  And the *Allen* case, I guess there, the

7  plaintiff acquiesced to a termination of the contract?

8          **MR. YODER:**  Correct, Your Honor, and you know, one

9  could argue that's different, right?  But really the concept

10  isn't any different.  It is that there was a consent and

11  acquiescence in this case.

12          We believe the evidence will show with respect to

13  particular requests, whether they are forecasts, whether they

14  are email inquiries, or phone call inquiries, or purchase

15  orders, that there is a dialogue between the parties;

16  ultimately in many of the cases, Netlist submits purchase

17  orders for particular amounts and prices.  Many of those were

18  filled; some weren't, and were backordered, but when one looks

19  at the record of those facts, what's clear is that Netlist, we

20  believe the evidence will show, acquiesced in Samsung not

21  filling forecasts, because that was not the practice of the

22  parties.

23          Instead, the practice was they would ultimately get

24  to purchase orders, and those were the operative requests.  So,

25  we believe those facts, in addition to establishing waiver for

1  claims for damages, estoppel because we believe the evidence

2  will show that Samsung relied upon Netlist acquiescence in this

3  practice and process that the parties had, but also

4  acquiescence.

5         THE COURT:  Okay.  And then, so how do you account

6  for the absence of jury instructions there?

7         MR. YODER:  Well, I can tell you, Your Honor, having

8  spent some time looking at the New York pattern instructions

9  that they are not a model of thoroughness or clarity.  I don't

10  think they come close to what we have here in California.

11         I think there are gaps, but it is something that is

12  recognized in the comments as well.  So, even though there's

13  not a specific proposed instruction, we submit the law is clear

14  that it is an available defense.  I think the *Allen* case makes

15  that clear, and the instruction that we're proposing on that

16  comes from that language.

17         THE COURT:  Okay.  Let me hear from counsel from

18  Netlist on the acquiescence defense.

19         MR. DOREN:  Thank you, Your Honor.  There is no

20  acquiescence affirmative defense under New York law.

21         In -- we've already discussed the *Dial-A-Mattress*

22  case which is a trademark case.  There, the Court talked --

23  spoke about a laches or acquiescence defense that may estop the

24  owner of a mark from asserting his or her rights in the mark

25  under both state and federal law.  That is an issue discrete

8

and separate to trademark law.

As to the *Allen and Company* case, what the Court held there in the first instance was that there had been no agreement entered into in the first instance.

The Court held that "The parties did not enter into or reach a binding agreement".  That was at Page 1059 of the decision, Your Honor.

And the Court then went on in dicta to say that "Had there been, it would find that the parties had consented and acquiesced to the termination, hardly staking out a legal theory so much as using it in a more colloquial meaning along with the term, consent".

There is no other authority cited.  There is no form jury instruction.  There is no other case law that suggests in any way that there is a defense under New York law for breach of contract that's termed "acquiescence".

**THE COURT:**  Okay.  Thank you.  Let me -- let me go back to Samsung.

The defenses of acquiescence, and waiver, and equitable estoppel were not raised on the summary judgment motion.  Why not, and what effect does that have on your ability to press those defenses at trial?

**MR. YODER:**  It shouldn't have any, and there's two reasons really, Your Honor.  And it'll take me a little bit to explain the one, so if the Court would bear with me.

```
 1          Rule 56(a) makes clear that when a plaintiff is
 2  moving for summary judgment, they have to identify each claim
 3  or defense, or the part of each claim or defense on which
 4  summary judgment is sought.
 5          It's clear here that Netlist didn't do that.  They
 6  did not identify in their motion any defense on which they
 7  sought summary judgment.  They did not make any effort to meet
 8  the burden they have under the case law, and the Court cited in
 9  its summary judgment ruling the Nissan fire case.
10          And in that case, the Court made very clear that when
11  a plaintiff wishes to challenge a defense by summary judgment,
12  if they don't have the ultimate burden of persuasion, which
13  obviously the plaintiff wouldn't for an affirmative defense,
14  they still have an initial burden they can meet in one of two
15  ways.
16          They can produce evidence negating an essential
17  element of the defense, or they can show that the defendant
18  doesn't have evidence of an essential element of the defense.
19          Netlist did neither.  They did not put the defenses
20  at issue.  What they argue here is that somehow Samsung waived
21  the right to challenge their argument here that these defenses
22  were decided.  And they rely on the In re Commercial Acceptance
23  Corp case, which is a Ninth Circuit case.  They cite a
24  concurring opinion, and they argue that this shows that a
25  defendant has to affirmatively raise defenses in opposition to
```

1  a plaintiff's motion for summary judgment.

2          The first thing I'd note, Your Honor, is that the *In*

3  *re Commercial Acceptance Corp* case is unpublished.  It's a pre-

4  2007 unpublished opinion, and under Ninth Circuit Rule 36-3, it

5  can't be cited, period.  So, it has no precedential or

6  persuasive effect; it shouldn't have been cited in this case.

7          Number two, it relies on this 1993 D.C. Circuit case,

8  the *Pittston Company* case, which the D.C. Circuit has

9  acknowledged was wrongly decided.  In that case, the defendant

10 had waived defenses from the beginning.  They weren't pled in

11 the Answer, which is not the situation here at all.

12         So, in addition then, Netlist, perhaps recognizing

13 the deficiency of relying on *In re Commercial Acceptance* and

14 the *Pittston* case, cites to the *Duarte Nursery* case.  It relies

15 on a Southern District of Indiana case, *Pantry versus Stop-N-Go*

16 *Foods*.  It's a 1992 Southern District of Indiana case.

17         The *Pantry* case was decided before the 2010 amendment

18 to Rule 56.  When *Pantry* was decided, the language of 56(a)

19 wasn't part of the Rule 56 scheme.  There was no requirement

20 that a plaintiff identify a defense or a part of a defense upon

21 which they sought summary judgment.  The rule now requires

22 that.

23         In addition, in *Pantry*, the reasoning of the Court

24 was flawed.  It reasoned that because a plaintiff need not

25 disprove an affirmative defense in the plaintiff's initial

11

portion of presenting evidence at trial, a plaintiff movant

need not anticipate and raise the nonmovant's affirmative

defenses on summary judgment.

But trial is different than summary judgment, and

under 56(a), a plaintiff has to identify the defense, and at

least show either an absence of evidence or prove that the

material issues of fact that are disputed show that there is no

merit to that defense, which wasn't done here.

So, we submit, Your Honor, that the Court should

follow the *Meridian Project Systems* case, which we've cited.

Consistent with that was Judge David Carter's opinion in the

*United States versus Innovative Biodefense* case, which we've

also cited, which recognizes that if a plaintiff doesn't put at

issue, in their summary judgment motion, defenses raised by the

defendant, they are not fair game in summary judgment.  And

that was the case here.

A couple of other quick points, Your Honor.  First of

all, Netlist says that, well, then, why, Samsung, did you raise

affirmative defenses.  You know, why did you do that if you

weren't required to?

Well, first of all, nonperformance by Netlist is not

an affirmative defense; it's part of their case.  They have to

show performance of the contract.  It was their burden to show

that.  That's why that was an issue.

The reasonableness of Samsung's conduct was also an

1  element of their claim for failure to cooperate.  The heart of

2  that issue was reasonableness, and whether Samsung acted

3  reasonable.  It was not a defense.  We didn't plead it; we

4  didn't assert it because it wasn't a defense.

5       The only one is waiver, Your Honor.  And waiver was

6  not raised by Netlist in their motion.  Samsung raised it in

7  their motion, and in their opposition to Netlist motion, for

8  one reason.  To take issue with the third claim for relief to

9  terminate the JDLA.  That was the only argument that was

10  presented on the waiver defense.  There was no briefing.  There

11  was no argument as to waiver with respect to the claims for

12  damages, the first claim for relief, or the second claim for

13  relief.

14       So, we would submit, Your Honor, that Samsung hasn't

15  waived defenses under the law which we believe is pretty clear.

16  We weren't required to respond because Netlist didn't put the

17  defenses at issue.

18       The final thing I'll say, Your Honor, is that in your

19  ruling, if you look at the notice motion, if you look at the

20  memo of Ps and As, if you look at the proposed order that

21  Netlist submitted, it's a little hard to figure out exactly

22  what they were seeking summary judgment of.

23       We knew that they were trying to establish the

24  elements other than damages.  So, presumably, what they were

25  trying to do is to show that this is the basis.  We're going to

13

1    prove up the basis for damages, and then we're going to try to

2    quantify damages later.

3            But what the Court did was sort of take Netlist at

4    its word, because what the Court relied on in finding a breach

5    of Section 6.2, was the contention by Netlist, which the Court

6    found Samsung didn't really dispute, that it, Samsung, declined

7    to fulfill all of Netlist orders.  All.  Which ones?  Netlist

8    made no effort to prove which ones.  They made no effort to

9    show purchase orders that weren't filled.

10           So, the Court made a determination, well, since its

11   undisputed you didn't do it all, based on my finding as to the

12   interpretation of the agreement, I'm going to find that there's

13   a breach that justifies relief on the third claim.  We

14   understand that.  Disagree with it.  We tried to get Your Honor

15   to relook at it; you declined.  We accept that.

16           But on the first two claims, if they want to recover

17   damages, they have to prove breaches that caused damages.  They

18   have to show the specific breaches.

19           A finding that Samsung didn't fulfill all orders

20   cannot be the basis for an award of damages caused by that

21   breach.  We don't know what it is.  What's the quantity?

22   What's the price?

23           And in terms of the defenses, how do you decide if

24   there was a failure to mitigate?  How do you decide if they

25   waived the right to seek damages on a particular purchase order

14

1  without looking at the circumstances surrounding that purchase

2  order?

3          So, our position, Your Honor, is that we not only

4  didn't waive the defenses, given the way they proceeded in this

5  summary judgment motion, you could even argue they should be

6  bound by it.  They shouldn't be allowed to be proving up

7  specific purchase orders now.  And since they had no basis for

8  damages, they shouldn't be allowed to prove up damages.

9          I think it's a fair argument, but at a minimum, we

10 should be entitled to defend ourselves when they assert that

11 some specific order wasn't filled, and that they suffered

12 damages as a result caused by that breach.

13         **THE COURT:**  And so, you're essentially saying the law

14 changed when the amendment to 56(a), which was made in 2010?

15         **MR. YODER:**  2010, and it's when the language was

16 added that requires identifying the defense or a part of the

17 defense.

18         **THE COURT:**  But the *Meridian* case you cite is from

19 2006 though, right?  So, it's before the amendment.  I mean, is

20 there a case post-2010 that makes this point?

21         **MR. YODER:**  Well, I think -- I think the *United*

22 *States versus Innovative Biodefense* case, Judge Carter's

23 opinion, makes that same point, Your Honor.

24         **THE COURT:**  Okay.  From 2018.

25         **MR. YODER:**  I mean, I will agree.  I think the case

1  law is confusing.  That's why I spent some time going over it,

2  but I think the rule on its face is pretty clear.  And I think

3  here, given how this summary judgment has played out, it makes

4  it apparent why they should be required to specifically

5  identify a defense on which they seek summary judgment for.

6       **THE COURT:**  Yeah, I was looking at the cases myself,

7  and some of the cases, there's a Federal Circuit case that

8  seems persuasive.  It's from 1999.

9       "An affirmative defense must be raised in response to

10 a summary judgment motion, or it is waived".  That's *Diversey*

11 *Lever versus Ecolab*.

12      And several courts in this district -- or excuse me,

13 in California, have followed that.  I don't know if there's a

14 Ninth Circuit case that seems particularly on point, but are

15 you aware of any cases that discuss this sort of wrinkle on the

16 change to 50 -- to Rule 56(a) that you were talking about here?

17      **MR. YODER:**  I'm not, Your Honor.  I think that the

18 point I would make is that most, if not all, of those cases; I

19 can't say "all", because there may be one that doesn't, do rely

20 on the *Pittston* case.

21      **THE COURT:**  Yeah.  Okay.  Thank you.  Let me -- let

22 me hear from counsel for Netlist on this; focus on the rule and

23 the failure to move for summary judgment on the affirmative

24 defenses.

25      **MR. DOREN:**  Thank you, Your Honor.  And there was no

1    failure in moving for -- on defenses.

2              **THE COURT:**  The alleged failure.

3              **MR. DOREN:**  So, I guess I'd start by just taking a

4    step back and ask the Court to imagine a world in which summary

5    judgment motions work as Mr. Yoder suggest they should, where a

6    party who brings a summary judgment motion on a breach of

7    contract case is not only obligated to prove up the elements of

8    the breach claim, but is also obligated to address each and

9    every affirmative defense, and to identify the absence of

10   evidence that supports it, to push the burden back over to the

11   other side to then respond.

12             There are 19 affirmative defenses in this case, Your

13   Honor.  And what we would have to do to satisfy their theory of

14   what an appropriate motion looks like is we couldn't just guess

15   at which ones they might actually rely upon because then we

16   might have left one out.  And that could be incredibly harmful

17   by their theory of the case.

18             So, in our 25-page brief, we would have to address 19

19   different affirmative defenses before we even, or after we did,

20   address our claims, and why summary judgment is appropriate.

21             Now, I haven't been at this as long as Mr. Yoder.

22   I've only been doing it for 35 years, but I have never drafted

23   or submitted, or argued or been subjected to a summary judgment

24   motion or a ruling, or a sidebar with the Court that suggested

25   that's the way these things should work, whether its 2010 or

1    2021, or 2000.

2              So, let's keep that picture in mind as we now proceed

3    to talk about procedurally what's going on here.

4              Now, this Court's summary judgment ruling resolved

5    all issues concerning Samsung's liability for breach of the

6    supply agreement, for improper withholding of dollars from the

7    nonrecurring engineering payment.

8              And this Court also granted our request for a

9    declaratory judgment that Netlist had properly terminated the

10   JDLA.  And that means, of course, that there was a material

11   breach by Samsung before that finding can be made.

12             And by issuing those rulings, this Court resolved all

13   affirmative defenses.  Now, first of all, we've already

14   discussed the fact that two of these 19 affirmative defenses

15   were raised in Samsung's opposition to summary judgment.

16             At Page 10 of their opposition on waiver, they state

17   and declaratively, that by waiting years to bring its claims,

18   Netlist waived them and any right to terminate the JDLA.  And

19   this Court specifically rejected that, finding that there was

20   no waiver.

21             Samsung also, after having pled in their Answer a

22   vague reference to an estoppel affirmative defense, and after

23   not providing any facts specific to that estoppel defense in

24   their -- in response to interrogatories, asserted in their

25   opposition a judicial estoppel argument relating to the North

1    Korean -- or excuse me, the Korean Tax Authorities.  And this

2    Court rejected that estoppel argument.

3           So, those two estoppel arguments have been addressed

4    by this Court, and were specifically and explicitly rejected.

5    Those two affirmative defenses are resolved; were litigated,

6    and are resolved.

7           Now, as to other affirmative defenses, the other 17,

8    those are waived, because if they were not asserted in response

9    to summary judgment on Samsung's liability, they cannot wait

10   for summary judgment to be issued against them and then come in

11   and say, well, wait a minute, okay, now you have ruled that

12   three elements, that the only thing left is damages except for

13   the affirmative defenses that we now want to litigate.  Those

14   are still bases on which we are not liable for breach of

15   contract.

16          That's not how it works.  And we all know that's not

17   how it works.  And we cited two cases separate and apart from

18   the earlier concurrence in the Ninth Circuit, and Your Honor is

19   right, we're not aware of a Ninth Circuit case, a published

20   Ninth Circuit case that is dead-on all fours on this issue.

21          But there are two District Court cases out of

22   California that are dead-on all fours on this issue, and they

23   are both within the last couple of years.

24          One is the _Kaffaga_ decision; _Kaffaga v Steinbeck_.

25   That's actually that Steinbeck.  It was about the rights to his

1   writings.  And this was from Judge Hatter here in this

2   building.  And it's from August 2017.

3        And in *Kaffaga*, the defendant sought to introduce

4   evidence regarding affirmative defenses to claims for breach of

5   contract after partial summary judgment had been granted for

6   plaintiff on liability.

7        And Judge Hatter wrote that "Affirmative defenses not

8   raised in opposition to a motion for partial summary judgment

9   as to liability are deemed abandoned".  He went on to say,

10  "Therefore, defendants are precluded from introducing argument,

11  evidence, and testimony regarding any affirmative defenses it

12  might have had against plaintiff's claims for breach of

13  contract".  It's exactly the situation we find ourselves in

14  here.

15       The other case, *Duarte Nursery*, it didn't rely on an

16  Indiana case.  It cited to the Indiana case and found its logic

17  compelling, and for good reason.

18       In that case, Judge Mueller in the Eastern District

19  of California was confronted with a plaintiff that, after

20  summary judgment rulings, said that they intended to rely on

21  two affirmative defenses that had not been raised in opposition

22  to summary judgment.

23       And Judge Mueller wrote that "The Court finds that

24  allowing these two defenses to lay dormant and then resurface

25  at trial after liability has been determined would undermine

1   judicial economy, efficiency, and fairness to the opposing

2   party".

3          The judge then went on to say, "To hold otherwise

4   would keep the parties and Court in limbo, and allow unargued

5   affirmative defenses to lie dormant, waiting to unravel the

6   Court's prior dispositive liability decisions".

7          And then as that Court summed up what the facts were

8   and what the case in front of it, I couldn't help but think how

9   closely it mirrored the procedural posture of this case.  And

10  I'm quoting now.

11  "The Court determined liability in its summary judgment.  Now,

12  after receiving an unfavorable result, and after the Court has

13  already denied defendant's motion to reconsider the summary

14  judgment order, defendant tries again to circumvent that

15  liability ruling by asserting these affirmative defenses at

16  trial.  The Court refused to let it happen, and appropriately

17  so".

18         Counsel again says that Netlist had an obligation to

19  identify or to take on all affirmative defenses.  No.

20         Samsung had an obligation to identify those

21  affirmative defenses, as it did, by the way, in waiver and

22  estoppel, and to argue which defenses it intends to assert

23  defeat the claim and show that it's not liable.

24         It cannot force a party that is moving on its own

25  claims to separately move on affirmative defenses that Samsung

1  may or may not ever intend to assert, and shooting into the

2  thin blue air, hoping we hit the way they intend to assert it.

3  That's not what any amendment of any FRCP rule requires.

4         Now, a couple of cases were cited --

5         **THE COURT:**  Wait.  Let me just stop you there and ask

6  a question.

7         Do you -- Netlist is -- does agree that mitigation is

8  still part of the case.

9         **MR. DOREN:**  Yes, Your Honor.

10        **THE COURT:**  And so, that's the -- and that's the only

11 affirmative defense that Netlist believes is still in the case.

12        **MR. DOREN:**  Yes, Your Honor.

13        **THE COURT:**  Okay.  Thank you.  Let me go back to

14 counsel for -- let me go back to Mr. Yoder for a second.

15        **MR. DOREN:**  Your Honor, if you want me to address

16 their cases, I'm happy to.  If not, I'm happy with that, too.

17        **THE COURT:**  Yeah.  Yeah, I'm good for now.

18        **MR. DOREN:**  Thank you.

19        **THE COURT:**  So, Mr. Yoder, what about Judge Hatter's

20 case?

21        **MR. YODER:**  Well, first I would say as to *Kaffaga*, it

22 relied on *Pittston*.  Judge Hatter's case, *Duarte*, he finds

23 *Pittston* unpersuasive, and then he goes on to find, in any

24 event, that there was an obligation on the part of defendant.

25 He doesn't --

1          **THE COURT:**  Well, I'm sorry.  Judge Hatter's case is

2   the *Kaffaga* case, right?  *Kaffaga versus Steinbeck*.

3          **MR. YODER:**  I may be confused, Your Honor.

4          **MR. DOREN:**  Yes, it is, Your Honor.

5          **THE COURT:**  Yeah, I just want to just -- can you give

6   me how your -- give me your take on how --

7          **MR. YODER:**  He -- he --

8          **THE COURT:**  -- how the Court would distinguish that

9   case.

10          **MR. YODER:**  Sure.  The only analysis he did was to

11   cite to *Pittston*.  And *Pittston* has been disfavored; it's been

12   rejected by the D.C. Circuit as not providing a basis for this

13   rule.

14          The second thing I would say is Judge Hatter, for

15   whatever reason -- maybe the parties didn't bring it to his

16   attention -- didn't address the language of 56(a) at all in

17   his -- in his opinion, and I would point the Court to, again,

18   Judge Carter's opinion in *United States versus Innovative*

19   *BioDefense*, where he basically says:

20          "Plaintiff argues it has no burden to negate or

21          disprove defendant's affirmative defenses to prevail

22          at the summary judgment stage.  Plaintiff is

23          incorrect.  Instead, to prevail at summary judgment,

24          plaintiff has the burden of pointing out to the Court

25          that there is an absence of evidence to support the

23

 1              non-moving party's affirmative defense.  Plaintiff

 2              did not do that in its motion for summary judgment."

 3              And here, Your Honor, I would say, because of the way

 4  Netlist framed their motion, there was no realistic way for

 5  Samsung to assert these defenses.  Netlist didn't move to prove

 6  breaches of specific orders or request.  They sought a general

 7  finding of breach; presumably, to justify their third claim for

 8  relief.

 9              How is Samsung going to provide defenses to

10  particular orders?  Because you have to look at the context.

11  We didn't know -- we still don't know which ones, because we'll

12  get to, with the experts, their expert's trying to sort of

13  dodge that as well -- and they're going to have to show that

14  there were orders that they submitted that weren't filled in

15  breach of Section 6.2.  They are going to have to show that

16  that failure caused damages.  They're going to have to lay that

17  out.  And we should be able to show with respect to those that

18  they either relinquished the right to pursue a damage claim

19  based on a particular order, that they're estopped from it.

20  They acknowledge we can raise failure to mitigate.  Why weren't

21  we going -- why aren't we held to have not raised failure to

22  mitigate?  Because you couldn't do it without looking at the

23  specific claim for damages.  And it's no different from the

24  other defenses.

25              **THE COURT:**  Okay.

24

1          **MR. YODER:**  It's no different.

2          **THE COURT:**  Thank you.

3          **MR. YODER:**  Thank you, Your Honor.

4          **THE COURT:**  Let me ask counsel just one more

5    question.  Let's talk a little bit about this *U.S. versus*

6    *Innovative BioDefense* case, and why -- why are we different

7    from what Judge Carter decided?

8          **MR. DOREN:**  Thank you, Your Honor.  I appreciate the

9    opportunity to address that.

10          And, Your Honor, the answer is that *U.S. versus*

11    *Innovative BioDefense* was a case involving issues addressing

12    claims under the Food Drug and Cosmetics Act, and I'm quoting

13    the Court now where -- again, recall here you have a plaintiff

14    moving for summary judgment, and according to Samsung it is

15    that plaintiff's obligation to raise the affirmative defenses

16    that it thinks might apply or that it thinks that the defendant

17    might attempt to assert against that claim.  Well, what

18    happened in *Innovative* is that the defendant affirmatively

19    raised affirmative defenses, as it should have, in its

20    opposition.  They weren't raised in the initial motion.  They

21    were raised in the opposition.

22          Now, in fact, the Court says that:

23          "Defendants spend a majority of their opposition

24          arguing that the doctrine of laches and the doctrine

25          of unclean hands create a genuine dispute of material

1          fact as to their liability in this matter."

2          The plaintiff's response to that was to say that it

3     has no burden to negate or disprove the defenses, and it then

4     went on to simply decline to discuss the defenses at all.  So,

5     the defendant raised the defenses that it said defeated

6     liability, and the plaintiff -- I will not say the United

7     States of America -- said:  I am not -- we're -- we're going to

8     ignore those, because that's not what our motion's based on;

9     where that is not what we did.  We took on the affirmative

10    defenses that were raised, that Samsung asserted defeated

11    liability, and we prevailed.

12          Now, the Court stated the plaintiff did have the

13    burden to point out to the Court that there is an absence of

14    evidence to support the non-moving party's affirmative defense.

15    I believe you had that quoted to you.  That was after those

16    affirmative defenses were raised by the other side.  The burden

17    was on the plaintiff to explain why those defenses weren't

18    credible, why they did not defeat liability, and the plaintiff

19    refused to utter a word on them.  So, what happened was trial

20    proceeded as to the two affirmative defenses that were raised

21    in opposition to the summary judgment motion, the ones that

22    were spiked out as relevant to that motion that the plaintiff

23    ignored, and therefore summary judgment as to those two

24    affirmative defenses was denied.

25          Now, here, the issue isn't how to address affirmative

26

1  defenses that were raised in opposition but not responded to;

2  the issue here is what happens to affirmative defenses that are

3  not raised at all in the opposition.  And the answer is they're

4  waived.

5           And very quickly, Your Honor, on the *Meridian* case,

6  out of the Eastern District, that was a trademark case in which

7  the discussion related to the plaintiff not seeking summary

8  adjudication of defenses to infringement, such as fair use.

9  Plaintiff just went in and sought summary adjudication on

10 infringement, but did not take on the affirmative defense in

11 the trademark context of fair use.

12          Now, the affirmative defenses that the plaintiff did

13 not address were expressly raised by the defendant in their

14 opposition, just as in *Innovative*.  Now, if you read that

15 decision, Your Honor, that won't be immediately obvious the way

16 it's framed up.  It's not clear whether they were raised or

17 not.  But, fortunately, that case is recent enough where you're

18 able to go to PACER, and you can still pull the opposition.

19 And, lo and behold, right there at page 15 and 16, there is a

20 discussion of the fair use defense in the opposition to that

21 motion.  And in this case, the Court said that since the

22 plaintiff hadn't engaged on that, which was raised by the

23 defendant, that that -- that affirmative defense would be held

24 for trial.  But, again, it was raised by the defendant in order

25 to engage the plaintiff on a defense to liability, and the

1   plaintiff ignored them.  Here, defenses were raised, they were

2   engaged and defeated, and now they want to raise some more.

3   And that's precisely what is not permitted here.

4           **THE COURT:**  Okay.  Hey, can you just, if you don't

5   mind, that opposition that you just held up, can you just lodge

6   that with the Court so --

7           **MR. DOREN:**  Absolutely, Your Honor.

8           **THE COURT:**  -- just so it's in the record.

9           **MR. DOREN:**  Of course.

10          **THE COURT:**  So, I'll take a look at it.

11          **MR. DOREN:**  Absolutely.

12          **THE COURT:**  Thank you.  Okay.  I'm going to move on.

13  I definitely enjoyed the argument on that point, and the

14  Court -- the Court will give that some thought and issue a

15  written ruling on which defenses are in and which defenses are

16  not in.  It's going to affect some of the motions in limine,

17  obviously, and some of the work to be done going forward, but

18  I'll try to get that out to you this week, and just so we know

19  what we're dealing with moving forward toward trial.

20          The -- moving on to the motions in limine.  Samsung

21  wants to introduce evidence that the treatment of Netlist and

22  product allocations to Netlist were commercially reasonable and

23  non-discriminatory.  What's the -- how is that relevant to the

24  issue here?  How is the fact that Samsung believes that its

25  treatment of Netlist was commercially reasonable and non-

28

1  discriminatory relevant to the -- to the issues that we're

2  going to try in light of the Court's motion?

3      **(Pause)**

4      **MR. FEINSTEIN:**  So, in terms of the relevance of

5  issues of allocation and commercial reasonableness, we would

6  submit to you, Your Honor, that those issues are relevant based

7  on your summary judgment ruling.  The issue that was raised in

8  your summary judgment ruling -- one of the issues that was

9  raised was whether or not the supply obligation was too

10  indefinite to be enforceable.  And you resolved that issue by

11  finding that the supply obligation was sufficiently definite to

12  be enforceable.  And in so doing, you relied on the RES

13  Exchange Services case -- excuse me -- the *RES Exhibit Services*

14  case.

15      And in that, that case, what you described, you know,

16  in a full paragraph in your order involved a contract where it

17  was alleged that that contract was not enforceable for reasons

18  of not being sufficiently definite.  And the particular

19  contract in that case -- and this is a, you know, a decision

20  out of New York -- you know, involved a contract to provide

21  exhibit booths for eyeglass manufacturer and seller.  And in

22  that contract, although it was specified that the party would

23  be providing these exhibit booths, the contract didn't say what

24  the specific services would be at each of these exhibitions,

25  nor did it say what the price would be for the services.  So,

29

1    there was incomplete terms as to some material items, the

2    actual scope of services, as well as the price.

3            However, in that case, the Court found that,

4    nonetheless, the contract was sufficiently definite because

5    one -- the Court could look to objective criteria in order to

6    fill in those terms.  Right?  So, it says, you know,

7            Before rejecting agreement as indefinite, a Court

8            must be satisfied that the agreement cannot be

9            rendered reasonably certain by reference to an

10           extrinsic standard that makes its meaning clear.

11           And in that Court, the Court said,

12           The Court will find and enforce a contract even

13           though the parties have expressly left these other

14           elements for future negotiation and agreement.

15           And it says if some objective method of determination

16   is available, independent of either party's mere wish or

17   desire.  And it said, in that case, such objective criteria may

18   be found in the agreement itself, commercial practice or other

19   usage and custom.  And the Court found that here we conclude

20   that the agreement itself and the parties' prior practice --

21   and it goes on to say -- do provide sufficient objective

22   criteria.

23           So, that's the decision on which you relied in

24   concluding that the supply term, which you do say is indefinite

25   in the sense that it doesn't specify the quantity, is

1   nonetheless enforceable.  So, based on your ruling, we would

2   submit that the -- if that -- if the supply obligation is

3   enforceable, it's only enforceable if you can actually look to

4   objective criteria to interpret what the supply should be.  And

5   here, there is objective criteria -- there -- there is

6   criteria.  Let me put it this way.  There is external criteria

7   that we would submit to Your Honor we should have the ability

8   to put into evidence.  That includes evidence of commercial

9   reasonableness.

10          So, the parties in this case, we have two -- two,

11  really -- two -- two sources of evidence of commercial

12  reasonableness that we would offer to -- as evidence in trial.

13  So, one is the parties' actual custom and -- their actual

14  practice.  So, what was the practice?  You know, there's the --

15  Netlist has been purchasing products from Samsung since 2000.

16  They did it before the JDLA in 2015, they did it during the

17  JDLA, and they've been doing it since the JDLA was, you know,

18  purportedly terminated.  And, so, we have a long history of

19  practice between the parties that we believe provides evidence

20  on which the jury can ascertain what would be a commercially

21  reasonable either request or allocation.  So, that's one thing,

22  the parties' dealings.

23          And the other is this custom and practice in the

24  industry.  All right, Samsung's not the only player.  It's one

25  of three large players here, and we have an expert witness who

1  will testify as to custom and practice in the industry

2  regarding what is a reasonable allocation of product between,

3  you know, one of these memory suppliers, like Samsung, and a

4  customer.

5          THE COURT:  Okay.  And, so -- so, essentially the

6  argument goes that the -- that there needs to be a commercially

7  reasonable element read into the contract for damages purposes,

8  even though the contract doesn't say anything about the non-

9  discriminatory allocations or anything like that.

10          MR. FEINSTEIN:  That's correct.  So, yeah, we believe

11  it has to be read into the agreement.  We're not saying this is

12  an affirmative defense.  I mean, the -- Netlist argues that

13  we're trying to raise the affirmative defense of (indisc.).

14  No.  This is just a matter of how do you actually interpret the

15  contract.

16          It does say -- and Your Honor says it's in some

17  simple unadorned language Samsung has to supply to the request

18  at a competitive price.  Even so, it still has to be read into

19  the agreement, because the supply term is indefinite, some

20  objective criteria to which one would look.  And that's what we

21  would propose that we put into evidence to show what would be

22  commercially reasonable in this case.  And that has to be done

23  on a order-by-order basis.  You've got to look at each purchase

24  order that was submitted; that's the request under the

25  agreement, and you have to -- there has to be some evaluation

1  made as to whether or not Samsung's response to that request --

2  you know, whether it filled it or it didn't fill it in part or

3  in whole or backlog, et cetera, whether Samsung's conduct was

4  commercially reasonable in light of the parties' dealings and

5  custom and practice in the industry.

6          **THE COURT:**  But you'd have to inform the commercially

7  reasonable aspect of it and the non-discriminatory aspect of it

8  by the -- by the contract itself, right?  I mean, so, it

9  wouldn't be enough for Samsung to say:  We're treating Netlist

10  like we're treating all of our other customers; because it's

11  got this agreement with Netlist that requires Samsung to

12  fulfill orders, correct?

13          **MR. FEINSTEIN:**  Well, I mean, the agreement -- you

14  know, like, the agreement may inform the analysis, right, so

15  they can just, you know, make whatever -- they can make the

16  request.  But, nonetheless, in terms of what quantity, and

17  Samsung then has to supply them, you know, I mean, one --

18  one -- I mean, maybe the argument by Netlist is Samsung has to

19  supply whatever Netlist requests.  If they request one chip or

20  they request 10 billion chips, Samsung better get to it and

21  supply it.  Okay?  That's just not a reasonable interpretation

22  of this agreement.  I think your order reflects that that

23  actually would not be reasonable.  So, one has to look at these

24  other criteria to determine it.

25          **THE COURT:**  Thank you.

1          Let me hear from Netlist on this point.  And just --

2     let's pick up where counsel left off.

3          So, there's got to be some limit to what Netlist

4     could request under the agreement; for example, Netlist

5     couldn't request, you know, a hundred billion pieces of product

6     and then, you know, sort of expect Samsung to be able to

7     produce them, correct?

8          **MR. BEST:**  Well, I think that's an interesting

9     question, Your Honor, and the reason why I think this maybe

10    sounds like it's a little on the fly is because this is an

11    argument that they did not raise in response to summary

12    judgment.  When they had the obligation to discuss what is the

13    interpretation and the proper interpretation of Section 6.2 of

14    this agreement, we did not hear about commercial

15    reasonableness.  And we know that that's the case, because the

16    phrase "commercially reasonable" does not appear in their

17    summary judgment briefing; "reasonably" does not appear in Your

18    Honor's order, in consequence; and when speaking of the expert

19    witness of whom -- of whom was just spoken, Mr. McAlexander,

20    critically, that phrase doesn't appear in his own expert

21    report.  This is a wholly -- sort of a whole-cloth new way of

22    trying to retrench from the previous losses.

23          And, in fact, we know how little support

24    Mr. McAlexander has for the positions he wants to take in this

25    case.  And you don't have to believe me; you can simply take

34

1    Mr. McAlexander's word for it, because I asked him when he was

2    deposed, quote:

3              "And, so, you did not focus on Samsung's particular

4              production of semiconductor products, including NAND

5              and DRAM products, in assessing the factors that can

6              and do impact production of such devices, correct?"

7              Answer:

8              "If you're looking at whether or not I looked at data

9              from Samsung to provide some nexus, some nexus of my

10             opinion to what actually occurred at Samsung, the

11             answer is no."

12             Close quote.

13             If this had been an issue that was live and in the

14   mind of the lawyers for Samsung and in the arguments they

15   wanted to raise, no question, Mr. McAlexander would have

16   addressed those issues.  But he didn't; and that's because it's

17   a new issue.

18             THE COURT:  Okay.  And Mr. McAlexander is addressing

19   the issues of, I guess, the affirmative defense of waiver and

20   estoppel, correct?

21             MR. BEST:  So, if I'm honest, it's a little difficult

22   to understand what it is Mr. McAlexander is addressing, because

23   he conceded in many, many places that he didn't actually review

24   the documents that were pertinent to this litigation, and I

25   believe we cited that as one of the exhibits to our motion in

1  limine.  But, in general, it sounds like it's mostly like

2  impossibility; the idea that it would be impossible to fulfill

3  the orders that Netlist raised.  And as we laid out in our

4  supplementary briefing to Your Honor, that was one of the

5  defenses that Samsung could have raised in response to our

6  summary judgment motion, failed to raise, and, therefore, for

7  all the reasons that Mr. Doren has already described, has

8  waived.

9          **(Pause)**

10          **MR. BEST:**  It's also worth noting, if I could just

11  cite my -- the assistance of my counsel here, that none of the

12  interrogatory responses, the discovery responses that we've

13  sought multiple times to get fulsome, let's say, responses to,

14  actually laid out a single order that was -- that they allege

15  was not commercially reasonable.

16          **THE COURT:**  That's what I was going to ask about.  I

17  was going to ask Mr. Feinstein about it, but let me get your

18  take first.

19          **MR. BEST:**  Sure.

20          **THE COURT:**  Has there been -- have there been issues

21  of unreasonable orders?  And is there evidence of that, of

22  Netlist asking for, you know, 500 million NAND chips when it --

23  when it doesn't need them or when it's -- there is some

24  production problem, or is there some, you know, arbitrarize

25  (phonetic) issues or anything?

1          **MR. BEST:**  Yeah, I think that the answer is there is

2    no such evidence in the record because, again, this is a new

3    argument that was raised, and I suspect had there been such

4    strong evidence to be gleaned from the responses we provided on

5    discovery that we would have heard that back at us; maybe even

6    Mr. McAlexander would have offered some opinions about it.

7    Maybe it would have been addressed in the summary judgment

8    briefing.  But, again, it wasn't.

9          **THE COURT:**  Okay.  So, let me hear from Mr. Feinstein

10   again.  I just wanted to ask this question of the theoretical

11   versus the practical.  Do we really have an issue here where we

12   need to worry about commercial standards or commercially

13   reasonable or non-discriminatory treatment?  Are there

14   really -- is there evidence in the record of Netlist orders

15   that are -- you intend to argue are out of bounds?

16         **MR. FEINSTEIN:**  Absolutely.  I mean, we're going to

17   take them order by order, and -- and we have -- you know, we

18   have a variety of evidence that goes to whether or not the

19   orders were reasonable.

20         For example, just an easy one:  credit issues.  You

21   know, Samsung -- Netlist had a long history of credit problems

22   in its dealings with Samsung.  We have a witness who will come

23   here from Korea who is involved in making allocation decisions,

24   you know, across a variety of customers, and one of the issues

25   that Samsung considers, to no surprise, is the creditworthiness

37

1  of the customer.  And, so, there were times when Netlist, you

2  know, had -- was not paying its bills, did not post the letter

3  of credit of a size that would, you know, warrant certain

4  orders of a certain size, and so Samsung took that, that basic

5  factor into account in deciding what would be a reasonable

6  allocation to Netlist.  That's one factor, and there are

7  others, as well.  You know, they take into account other

8  customers' needs.

9          Another thing, for example, Your Honor, like, did --

10  have other customers already submitted purchase orders?  Has

11  Samsung already reserved product for those other customers?

12  What is the capacity of their wafer -- you know, what are the

13  particular products that Netlist is ordering, and what is the

14  capacity available in the wafer fab to produce those products?

15  I mean, those are basic considerations that are entertained by

16  Samsung for any customer, and they were historically

17  entertained between these two parties, even during the years of

18  the JDLA.

19          You know, what the evidence will show, Your Honor, is

20  that although there were complaints by -- the JDLA is, you

21  know, entered in 2015; there is a sort of a honeymoon period.

22  There is a period in 2017 when things go off the tracks between

23  the two parties and the allocations are reduced substantially,

24  but then, from 2018, 2019, into the time of termination in

25  2020, there is another smooth period between them; few, if any,

1   complaints.  And that -- that period of dealings between the

2   parties is what we will introduce as evidence of what they --

3   what Netlist acknowledged was reasonable allocations.  I mean,

4   they're not -- even during that period, they're not getting

5   everything that they asked for.  Right?  And they understood

6   that they would submit a forecast, and then Samsung would

7   respond, and there would be ultimately a request in the form of

8   a purchase order, and they accepted it, without complaint,

9   because that was the parties' -- what parties understood was a

10  reasonable practice.  And we actually have testimony by

11  their -- by -- I believe it's P.K. Hong or Chuck Hong, one of

12  the Netlists, who says:  Samsung is not required to give us

13  everything we want; Samsung is only required to give us what is

14  commercially reasonable.

15          I should also just add, Your Honor, that

16  Mr. McAlexander, he's not testifying about affirmative

17  defenses.  Our expert, he's going to be testifying about

18  commercial reasonableness, because it should be read into the

19  agreement, to use your own words, Your Honor.

20          **THE COURT:**  Thank you.

21          Let me just ask Netlist; you know, what's the --

22  what's the -- I'm trying to figure out the boundaries, you

23  know, what are the boundaries of what we're talking about here

24  with respect to the obligations under the contract.  And, you

25  know, counsel raised the issue of creditworthiness, right?  So,

1   let's say Netlist has got this agreement with Samsung; the

2   practice in the agreement is to post a letter of credit;

3   Netlist, you know, can't or won't do it.  Would Samsung still

4   be obligated to ship product?

5           **MR. BEST:**  So, as I understand it, that would propose

6   the sort of situation where there's -- could be an allegation

7   that Netlist has broken the contract in some way, that it's

8   defected from an obligation.  Again, that is an issue that

9   could have been raised on summary judgment, in fact, was raised

10  in some respect, although I think it's a slightly different

11  one, and Your Honor ruled against.

12          In sort of a broader sense, all of these facts that

13  could potentially be some order -- Your Honor asked for

14  specific examples from Mr. Feinstein of orders that somehow

15  violated the, let's say, the smell test, in some sense.  And I

16  didn't hear any specific orders.  I heard some sort of general

17  notions.  And that's in keeping with Samsung's response to our

18  interrogatory on this point, Interrogatory Number 2, to which

19  they served responses on July 8th this year, which asked for:

20  Describe each instance in which Samsung or any of its

21  affiliates ignored, denied, reduced, limited, restricted,

22  declined to fill Netlist's requests for orders, quote,

23  "including the reasons why such requests or orders were not

24  fulfilled," close quote.  And we did not receive in response to

25  that request any specifics, just as we just did not in this

40

1   instance.

2          In terms of the notion of creditworthiness, this has

3   sort of been bandied about a couple of times; I think it's

4   quite clear in the record that Netlist could have paid cash and

5   offered to pay cash if it had to.  But -- if, in fact, there

6   was a limitation to credit.  But, again, unless there is an

7   allegation of breach by Netlist, which I understand there

8   really hasn't been in this regard at the time it should have

9   been levied, that's not an issue to be raised at this point.

10         **THE COURT:**  What was the answer to the interrogatory

11  that you read?  I mean --

12         **MR. BEST:**  So -- yeah.

13         **THE COURT:**  -- after the five pages of objections,

14  what was the --

15         **MR. BEST:**  Absolutely.  We kept them much more

16  limited, Your Honor.  So, that's Interrogatory Number 2, and I

17  was -- and I was reading from the interrogatory --

18         **THE COURT:**  Right.

19         **MR. BEST:**  -- but the response was dated July 8th of

20  this year.

21      **(Pause)**

22         **MR. BEST:**  If I may, just one additional point.  The

23  question of whether -- you know, we sought -- in seeking, you

24  know, fuller responses to this particular interrogatory, we

25  asked the magistrate judge to compel further responses, and

1    Samsung's counsel responded to our request by simply saying

2    that, quote:

3              "Samsung has put itself in a lane by making this

4              response, and, you know, obviously, it's a lane

5              that's favorable to our client."

6              And I'll go on:

7              "What Samsung answered, and this is the result of it,

8              diligent investigation on our part of what

9              communications went back and forth between Samsung

10             and Netlist is that we rejected requests during that

11             entire period all the time, routinely, because that

12             is what the relationship is like."

13             And in terms of the interrogatory response, I could

14   read it; I could read portions of it.  It is -- it is --

15             THE COURT:  Well, why don't you just go ahead and

16   lodge the interrogatory --

17             MR. BEST:  Perfect.

18             THE COURT:  -- and the response.

19             MR. BEST:  Perfect.

20             THE COURT:  Okay.  I want to wrap this up, because

21   I've got some criminal matters at 3:00 that I need to get to.

22   I wish I could spend more time going through this now, but

23   thank you for the arguments on both sides.  They have been

24   very, very helpful.  I'll go back through and look at these and

25   give you orders on the affirmative defenses and the motions in

42

1    limine, and then I'm going to ask you to go back, after I've

2    done that, to the jury instructions, and make sure the jury

3    instructions conform to the orders.

4           With respect to the verdict form, there was a

5    competing verdict form.  Subject to the ruling on the

6    affirmative defenses the Court's going to adopt Samsung's

7    proposed form.  I think it's -- it presents the three theories

8    of breach separately, and I think that that's appropriate here.

9    So, I'd ask you to go with Samsung's form and modify to the

10   extent we need to for affirmative defenses.  I'll give you some

11   other thoughts on jury instructions in a written order.

12          Just to remind the parties, we're set for trial on

13   November 30th.  The way it's working here is we're limiting the

14   number of trials we're doing in the courthouse because of

15   COVID.  I don't know yet whether we'll be able to keep that

16   date.  We've been lucky so far, so I'm hoping -- hoping we are

17   here.  So, keep that on your calendar.  If we're not able to

18   get that date, then I will -- I'll let you know, you know, as

19   soon as -- as soon as the Court knows.  I'll ask you to submit

20   revised verdict forms, jury instructions, and those things by

21   November 23rd.

22          Any -- in the remaining two minutes we have, any

23   exhibit issues that the parties think we need to talk about

24   now?  Any particular exhibits that are -- need sort of some

25   advance warning to the Court?

1           **MR. DOREN:**  None in mind now, Your Honor.

2           **THE COURT:**  Okay.

3           **MR. RHOW:**  Yeah, nothing from Samsung, Your Honor.

4           **THE COURT:**  Okay.  Okay.

5           **MR. RHOW:**  Your Honor, one -- sorry; one quick

6    question.  Just on the trial availability, we do -- this is not

7    going to be determinative -- if we have witnesses flying in

8    from Korea, is it the expectation that we would know morning

9    of?  Or --

10          **THE COURT:**  No.  No, no.  So, I'm hoping to find

11   out -- well, let me ask the courtroom deputy to put his

12   credibility on the line and tell me when we're going to know.

13          **(Pause; Court confers with Courtroom Deputy)**

14          **THE COURT:**  Okay.  Yeah, so, I'm going to -- looks

15   like we might be good for the 30th.  I'll certainly -- you

16   know, we have to -- our chief judge is scheduling trials, and

17   so the criminal cases take priority, you know, those -- those

18   sorts of things, but I think because of the -- you know,

19   because of witnesses that have to travel and things like that,

20   I'll try to get a confirmation as soon as I can, and if I --

21   and if I don't hear something -- well, today is already the

22   15th, right?  So, I'm hoping to hear something, hopefully,

23   by --

24          **COURTROOM DEPUTY:**  It would be this Friday I think

25   we'd find out about the (indisc.).

44

1          **THE COURT:**  Okay.  So, hopefully, by this Friday.

2          **MR. RHOW:**  And, then, very quickly, Your Honor, in

3    terms of the time estimate, right now we see a four-day

4    estimate, and I'm assuming Your Honor is going to limit us to

5    the four days.

6          **THE COURT:**  Yeah, I think the -- the way it will work

7    is we'll start on a Tuesday.  We'll do voir dire in the

8    morning, and I've got your -- I've got some proposed voir dire

9    questions.  My thought is to -- you know, some of them, I

10   think, are things I'm not going to ask, but I will ask about

11   people -- about prospective jurors', you know, thoughts they

12   have about Samsung and about Netlist, if they've had any bad

13   experiences with the company, do they have any thoughts

14   about -- any strong feelings, those sorts of things.  So, I'll

15   try to tease out any, you know, biases there, and I'll ask

16   about, you know, contract disputes and those things.  So --

17         **MR. RHOW:**  And the final question; we will be on

18   clocks, both sides?

19         **THE COURT:**  Yeah.  So, what I'll do is I'm going to

20   split the time evenly.  I'm sorry; we'll start on Tuesday.

21   We'll do voir dire in the morning; we'll get right into opening

22   statements Tuesday afternoon.  I'm going to split the time

23   evenly, and I'm going to ask each side to reserve 30 minutes

24   for closing, because if I don't, sometimes people use up all

25   their time, and then they beg for more time in closing, and I

1  don't want to do that.  So --

2          **MR. RHOW:**  Understood.

3          **THE COURT:**  So, I'll split it up equally, and you'll

4  have, you know, half the time for -- and it will include

5  openings, direct, cross, and closing.

6          Okay.  Thank you very much.  Really appreciate the

7  arguments.  Really appreciate the thoughtfulness of counsel.

8  Thank you.

9          **ALL:**  Thank you, Your Honor.

10          **COURTROOM DEPUTY:**  All rise.  Court's in recess.

11      **(Proceeding was adjourned at 3:00 p.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

46

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>November 17, 2021</u>

            Signed                                              Dated


*TONI HUDSON, TRANSCRIBER*