UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

NETLIST, INC,                          )
                                       )
          Plaintiff,                   )
                                       )
              vs.                      )
                                       )   8:20-CV-993-MCS
SAMSUNG ELECTRONICS CO., LTD,          )
                                       )
          Defendant.                   )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME IV

PM Session

Los Angeles, California

Thursday, December 2, 2021

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1        APPEARANCES OF COUNSEL:

 2
          For the Plaintiff:
 3

 4                        GIBSON DUNN & CRUTCHER LLP
                          By:  Richard Doren, Attorney at Law
 5                             Jason Lo, Attorney at Law
                               Raymond LaMagna, Attorney at Law
 6                        333 South Grand Avenue, 46th Floor
                          Los Angeles, California 90071
 7
                          GIBSON DUNN & CRUTCHER LLP
 8                        By:  JungEun Lee, Attorney at Law
                          1050 Connecticut Avenue NW
 9                        Washington, DC 20018

10

11
          For Defendant:
12

13                        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
                          LICENBERG & RHOW
14                        By:  Ekwan Rhow, Attorney at Law
                          1875 Century Park East, 23rd Floor
15                        Los Angeles, California 90067

16                        O'MELVENY & MYERS LLP
                          By:  Michael Yoder, Attorney at Law
17                        610 Newport Center Drive, Suite 1700
                          Newport Beach, California 92660
18
                          O'MELVENY & MYERS LLP
19                        By:  Marc Feinstein, Attorney at Law
                          400 South Hope Street, 18th Floor
20                        Los Angeles, California 90071

21

22

23

24

25
```

1                    (Thereupon, the jury returned to the courtroom.)

2              THE COURT:  Okay.  Welcome the jurors back from

3    lunch.  I didn't remind you before you went out, but just

4    remember not to discuss the case.  Don't come to any

5    preliminary conclusions.  Don't discuss the case amongst

6    yourselves.  We want to wait until all the evidence is in,

7    and then you can dig in.

8              So when we left off, Counsel was going to introduce

9    some exhibits.  Where are we?

10             MR. LO:  We have reached an agreement on four

11   exhibits, and I'm prepared to read them to the Court.

12             THE COURT:  Okay.

13             MR. LO:  The first one is 309-A.

14             THE COURT:  Okay.

15             MR. LO:  The next one is 1253.

16             THE COURT:  Okay.

17             MR. LO:  The next one is 0376.  And the last one is

18   1485.

19             THE COURT:  Okay.  And these exhibits are stipulated

20   to be admitted?

21             MR. RHOW:  Yes, Your Honor, we move to admit.

22             THE COURT:  And just by way of -- because the jurors

23   might be confused.  When will they get to see these?  Are

24   they going to be part of argument?  How do you intend to use

25   them?

PAIK HONG - REDIRECT

1          MR. RHOW:  That's correct, Your Honor.  So because

2     of the time limits, I'll deal with them in argument.

3          THE COURT:  So for the record, Exhibit 309-A is

4     admitted.  Exhibit 1253 is admitted.  Exhibit 0376 is

5     admitted.  And Exhibit 1485 is admitted.

6          (Exhibits 309-A, 1253, 0376 and 1485 received in

7     evidence.)

8          And then counsel for Netlist will ask some questions

9     of the witness on what we call redirect examination.

10         Go ahead.

11                    REDIRECT-EXAMINATION

12    BY MR. LO:

13    Q. Good afternoon, Mr. Hong.

14    A. Good afternoon.

15    Q. Let's start by talking about pricing of Samsung products.

16         When Netlist buys a product directly from Samsung,

17    who sets the prices?

18    A. Samsung does.

19    Q. Are they typically negotiable?

20    A. No.  They will set pricing again for DRAM-related

21    products monthly and for SSDs quarterly.

22    Q. How does Samsung communicate the monthly or quarterly

23    pricing to Netlist?

24    A. Usually in an e-mail.  Usually the last week of a month

25    or the first week of a month, or the last week of a quarter

1    or the first week of a quarter.

2     Q. Okay.  And you mentioned that the DRAM prices are set

3    monthly, correct?

4     A. Yes.

5     Q. Okay.  So if Netlist -- it's currently December.  If

6    Netlist says, I want to buy something in January, and submits

7    a forecast, does it know the January prices at the moment?

8     A. No.

9     Q. Okay.  And but is Netlist prepared to buy those products

10   in January, even though it doesn't know the prices today?

11    A. Yes.

12    Q. For those of us who are not in the industry, that may

13   seem a little bit strange.  Why wouldn't Netlist be willing

14   to buy something when it doesn't even know the price?

15    A. Um, in this industry, based on -- there is many ways to

16   sort of forecast the price, based on analysts' reports or

17   market reports.  You could sort of gauge what your price

18   would be.

19         So, yes, you can anticipate a forward price.  It may

20   be accurate, it may not be.  But you can anticipate a forward

21   price.

22         MR. LO:  Let me ask Mr. Kotarski to pull up

23   Exhibit 47, which is the JDLA.

24   BY MR. LO:

25    Q. And you were shown this document, and in particular I

PAIK HONG - REDIRECT

1    think you were shown Section 6.2 earlier on

2    cross-examination.  So let's go there.

3            Now, you indicated to counsel that you have seen at

4    least this provision before; is that correct?

5     A. Yes.

6     Q. And when you previously saw this, did you notice that the

7    wording is that Samsung will provide -- will supply NAND and

8    DRAM products to Netlist, on Netlist's request, at a

9    competitive price.

10           Did you notice that competitive price provision?

11    A. Yes.

12    Q. And what did you understand -- what was your

13    understanding of what the expectations were?

14    A. That we would buy product per our request at a price that

15    we felt was competitive, yes.

16           MR. LO:  You can take that down.  Thank you.

17    BY MR. LO:

18    Q. Now, let's just use November as an example -- December.

19    I keep thinking it's November.  Let's use December as an

20    example.  If Netlist places an order right now and Samsung

21    comes back next week and says, We are ready to deliver, We

22    are ready to ship, does Netlist have a practice of then

23    turning around and canceling the purchase order, when Samsung

24    says, We are going to fulfill it right away?

25    A. No, it is not a practice.

PAIK HONG - REDIRECT

1      Q. What would happen if Netlist developed that practice?

2      Meaning, Samsung comes back and says, We'll give you the

3      products on a timely basis, and then Netlist turns around and

4      says, Never mind, We want to cancel it?

5      A. I think I testified that Samsung usually threatened you

6      and said they would not support you in the future if you did

7      not take the product.

8      Q. Okay.  Now, let's take a different example.  Let's say

9      Netlist places an order today, but Samsung doesn't come back

10     until May of next year and says, Would you still like the

11     products?  Does Netlist, in those circumstances, from time to

12     time cancel a purchase order?

13     A. Generally not, but you may find instances, yes.

14     Q. Okay.  And in the instances where Samsung is coming back

15     six months, seven months later, what are some of the reasons

16     why Netlist might, at that point, say, We don't want the

17     backlog anymore?

18     A. Our customer demand, in the form of a purchase order from

19     a customer, might have a price negotiated between Netlist and

20     our customer.

21         And if Samsung comes back and delivers, very late or

22     in six months, with a much higher price than the customer

23     price, then there is times maybe we would not accept -- we

24     would not accept Samsung support.

25     Q. And taking that scenario again, where Samsung puts an

PAIK HONG - REDIRECT

1    item on backlog, comes back six months later, are there

2    circumstances where in between Netlist might have purchased

3    the product already from a reseller?

4     A. Yes.  It's likely if the customer requests or the

5    customer PO needed product sooner than Samsung's delivery

6    that we would purchase product in the reseller -- from

7    resellers.

8            MR. LO:  Okay.  Mr. Kotarski, if you could pull up

9    Exhibit 1352.

10   BY MR. LO:

11    Q. Which, Mr. Hong, you were shown on cross-examination.

12           Now, on cross-examination, you were shown the first

13   sentence of this e-mail where it says, Please cancel the DRAM

14   backlog in orange below.

15           Do you see that, sir?

16    A. Yes.

17    Q. And do you still have a paper copy of that document with

18   you up there, 1352?

19    A. No, I cannot seemed to find -- I do find it here now,

20   yes.

21    Q. Is your copy in color?

22    A. No.

23    Q. Then let us take a look at the color version.  And let's

24   look below for the orange.  And you have to look on the

25   screen to see which ones are the ones which are in orange.

PAIK HONG - REDIRECT

1              MR. LO:  And if I can ask Mr. Kotarski to focus in

2        on the ones that are in orange.

3        BY MR. LO:

4         Q. Looking at this backlog order, what can you tell about

5        the purchase order date of the items that are in orange?

6         A. That we issued the purchase orders on the first line item

7        October 18, 2017.

8         Q. And the next ones are in September, November, and October

9        of 2017; is that right?

10        A. Correct.

11        Q. And now let's go back to the top of this e-mail.  When

12        does this exchange about canceling the DRAM backlog occur on

13        this e-mail?

14        A. On May 1st of 2018.

15        Q. Did circumstances in the DRAM market change between

16        September of 2017 and May of 2018?

17        A. The DRAM market is very volatile.  It would have changed,

18        but I do not know the exact nature of that change.

19        Q. You were shown also Exhibit 1353 --

20              MR. LO:  And I'll ask you to -- I'll ask

21        Mr. Kotarski just to pull that up.

22        BY MR. LO:

23        Q. And I think you were shown just the first sentence, which

24        is an e-mail from Mr. Jiang at Netlist to Mr. Knuth.  And you

25        were shown the first sentence which says, Cannot take at

PAIK HONG - REDIRECT

1    these prices.

2              Do you remember that discussion with counsel?

3     A. Yes.

4     Q. Now, let's take a look at the following e-mail with the

5     table.  And looking at the actual table, what can you tell us

6     about the order date of the items that were -- that are the

7     subject of this e-mail?

8     A. The first line item was ordered November 2nd, 2017.  The

9     second one, November 30th, 2017.  And the third line item in

10    question, December 6th, 2017.

11    Q. Okay.  And so -- and when did this exchange about the

12    pricing take place between Mr. Jiang and Mr. Knuth?

13    A. On May 16th of 2018.

14    Q. So about seven months after the purchase orders were

15    placed?

16    A. Yes.

17    Q. In the interim seven months, is it possible that Netlist

18    already looked into resellers to try to cover those items?

19    A. Yes.

20    Q. Would that be Netlist's practice -- to go to resellers to

21    cover those items -- if it had not heard from Samsung in

22    seven months?

23    A. Yes.

24              MR. LO:  Let's take a look at Exhibit 1483.

25    BY MR. LO:

PAIK HONG - REDIRECT

1    Q. This was a document you discussed, and I just want to

2    start by looking at the description of the items that are at

3    issue here.  And it says Flash EMMC.  And I think you

4    mentioned on cross-examination that there is something

5    different from EMMC.

6         Can you explain what you were trying to -- what you

7    were alluding to there?

8    A. It is -- it is actually a DRAM and NAND combination

9    product that is very different from the parts we were

10   forecasting.  DRAM and NAND.

11   Q. Okay.  And I think you testified on cross-examination

12   that for some of the EMMC orders that Netlist had placed,

13   Netlist subsequently canceled those orders is that right?

14   A. Yes.

15   Q. Okay.  Do you recall what the timeframe was between

16   placing the order and when Netlist came around to cancel the

17   EMMC orders that's at issue?

18   A. I -- I cannot recall exact dates.

19   Q. Well, was it -- did Samsung immediately fulfill those

20   EMMC orders?

21   A. No.

22   Q. Okay.  Do you have a sense of how long Netlist waited

23   around before it decided to cancel those?

24   A. Three to six months.

25   Q. When Netlist initially placed the EMMC orders with

PAIK HONG - REDIRECT

1    Samsung, was it prepared to take those items if there was

2    timely delivery?

3     A. Yes.

4     Q. Why did -- why, after three to six months, did Netlist

5    cancel the order when Samsung had not delivered in three to

6    six months?

7     A. Um, the market had changed.  The -- the market price,

8    competitive price of EMMC was substantially lower than the

9    price on -- that we issued the PO at with Samsung.

10          And I believe I -- Netlist actually sent Samsung a

11   PowerPoint asking for -- showing that the market had changed

12   and asking Samsung for a lower competitive price, and Samsung

13   refused.

14    Q. Did Samsung -- so after three to six months, Samsung

15   still wanted to charge Netlist the original price from the

16   purchase order date?

17    A. Yes.

18    Q. And what happened when Samsung refused to correct the

19   prices to the then-market prices?

20    A. The balance of the order was canceled.  And Samsung

21   refused to support Netlist with this part in the future.  And

22   we have not ever gotten support of this part since this

23   incident.

24    Q. So since 2017, because of this -- this incident, Netlist

25   has never been able to buy EMMC from Samsung?

PAIK HONG - REDIRECT

1    A. Yeah.  They will not even take a forecast request or they

2    will not give us permission to issue purchase orders.  They

3    will refuse support.  And per their threat of, "If you don't

4    take it, we will never support you," this is an instance of

5    that.

6    Q. In the -- when the EMMC orders were canceled three to six

7    months after they had been placed, did Netlist go out to a

8    reseller and obtain those -- the EMMC from another reseller?

9    A. Um, no.  At the time, we could not source or buy EMMC

10   through resellers.

11   Q. Okay.  So in terms of Netlist, we talked yesterday about

12   Netlist going out to a reseller and replacing a product that

13   Samsung did not deliver.

14           In this instance, did Netlist actually manage to

15   find a reseller to sell those EMMC parts?

16   A. No.

17   Q. Counsel for Samsung asked you some questions about

18   recordkeeping.

19           Do you recall that?

20   A. Yes.

21   Q. And there were some -- there was some questions about,

22   "Well, what are Netlist's records on forecasts and backlogs

23   and cancellations."

24           Do you recall that?

25   A. Yes.

PAIK HONG - REDIRECT

1    Q. Let's take those one at a time.

2           When a forecast for Samsung products is made, who is

3    it sent to by Netlist?  Who does Netlist provide the forecast

4    to?

5    A. We provide that forecast to Samsung.

6    Q. Okay.  So would you expect that for every forecast that

7    was provided, somebody at Samsung would have a copy of it?

8    A. Yes.

9    Q. And who would you think is the most likely individual at

10   Samsung who would have a copy of every single forecast?

11   A. Mr. Knuth.

12   Q. Let's talk about backlogs and cancellations.

13          When an item goes on backlog, how does Netlist

14   typically learn about that?

15   A. Well, Samsung publishes a backlog report and provides to

16   us, generally weekly.  So we see it on a report.  That is how

17   it's communicated.

18   Q. So if -- if the lawyers for Samsung wanted to get a

19   complete record of the backlog, would you expect that the

20   Samsung employees would have that record as well?

21   A. Yes.

22   Q. And who at Samsung would be -- to your knowledge, would

23   have copies of those backlog?

24   A. Um, the backlog reports, if I recollect, they are

25   generated by Mr. Knuth as inside support.  And I think we saw

PAIK HONG - REDIRECT

1    an example of one, Joyce Kim, Violeta Rios.  His inside

2    support people would be generating those backlog or sending

3    those backlog reports to Netlist.

4     Q. What about cancellation communications?  Who -- who does

5    Netlist communicate with on the Samsung side to inform them

6    of the cancellation issues?

7     A. We would be informing Mr. Knuth.

8     Q. And so if Samsung's lawyers wanted a complete record of

9    what was canceled, and did Netlist cancel it or did Samsung

10   cancel it, who at Samsung would you expect would have a

11   complete set of those records?

12    A. Mr. Knuth would have it.

13         MR. LO:  Let's go back to the graphic, the chart,

14   the demonstrative.

15   BY MR. LO:

16    Q. We talked about this on direct examination, and you were

17   asked about this on cross-examination.

18         Do you recall that?

19    A. Yes.

20    Q. Okay.  This is a list of the purchase orders that are

21   submitted; is that correct?

22    A. A summary of -- Netlist's purchase orders through Samsung

23   by dollars.

24    Q. So the cancellations would be in other records; is that

25   right?  In other words, if some of these purchase orders were

PAIK HONG - REDIRECT

1     subsequently canceled by either Samsung or Netlist, would

2     they be in other records, like e-mails?

3      A. Yes, they would be.

4      Q. You were asked questions about -- well, you were asked

5     questions about whether you took any steps to verify the

6     accuracy of this.

7           Did you do so, sir?

8      A. I did review the excel spreadsheet and verified the

9     trends but did not look at every transaction in detail.

10    Because they are tens -- you know, there's thousands of them.

11     Q. Thank you.

12          You were also asked some questions about tracing.

13    And counsel for Samsung asked you whether you looked at a

14    forecasted line item and looked at the reseller database to

15    see if the identical quantity and item was purchased from a

16    reseller.

17          Do you recall that discussion?

18     A. Yes.

19     Q. And I think you testified that you had not done that; is

20    that right?

21     A. Yes.  It would be very difficult.  Because, again, I

22    think I said in my testimony, if Samsung requests for a

23    thousand pieces, could be -- and Samsung said no, and we'd

24    have to buy that thousand pieces from resellers, could be

25    shipped to us in five different shipments, 10 different

PAIK HONG - REDIRECT

1      shipments of 20 pieces, 100 pieces, you know, 200 pieces to

2      get to that, a thousand pieces.

3              So it would be very difficult to track that

4      one-for-one in any records because of the nature of how we

5      were scrambling to find parts that Samsung would say "no" to.

6      Q. You were asked some questions about the purchase process

7      with resellers.  And I want to focus that for a moment.  So

8      just buying Samsung parts from resellers.

9              Do you have that in mind?

10     A. Okay.

11     Q. How does Netlist typically pay for Samsung parts when

12     it's buying from a reseller?

13     A. Typically, we would pay cash.  But there, as we develop

14     relationships with resellers, we would put standby LCs in

15     place to create a credit limit to -- for ease of transactions

16     to the -- that is fully collateralized by our standby LCs.

17             So at times we would place POs with terms.  But most

18     of the times it was done cash basis.

19     Q. What is an LC, or a letter of credit?

20     A. It is a -- it is collateral that you issue to a bank that

21     if we did not pay that particular supplier, they have the

22     rights to that collateral.  So it's a fully, 100 percent

23     collateralized line of credit that it represents.

24     Q. And we talked earlier this morning about the purchases

25     that Netlist made from resellers.

PAIK HONG - REDIRECT

1          Did Netlist, in fact, pay for every one of the

2     purchases in that database?

3      A. Yes, we paid for every one of those purchases.

4      Q. You were shown some documents about the Samsung line of

5     credit.

6          Do you recall that?

7      A. Yes.

8      Q. Was there ever a point in time when Netlist made a

9     request from Samsung that it did not have the means to pay

10    for?

11     A. No.

12     Q. Did Netlist -- did Netlist make its forecasts, keeping in

13    mind exactly what it could or could not pay for?

14     A. Yes.  We made requests, and we knew we were -- if we were

15    going to get parts, we were going to pay for it, yes.

16     Q. And why was it important -- what would be the consequence

17    to Netlist if you made a forecast for, you know, a million

18    units, and it turns out you couldn't pay for it?  What would

19    be the consequence of making a forecast like that?

20     A. That's a little skeptical -- well, I do not know.  It

21    never happens, so I do not know.

22          MR. LO:  Thank you, Mr. Hong.  No further questions.

23          THE COURT:  Counsel, any recross?

24          MR. RHOW:  Yes, Your Honor.

25

PAIK HONG - RECROSS

                              RECROSS-EXAMINATION

BY MR. RHOW:

 Q. Mr. Hong, good afternoon.

 A. Good afternoon.

 Q. You were talking with Mr. Lo about some of the delays in

the purchase orders as it relates to EMMC and something else.

But I want to start with something you said at the beginning

of that which I hadn't heard before.

        You indicated that before you submit that order to

Samsung, you have a negotiated price with the person who is

going to buy that chip, right?

 A. At times, we would have a purchase order from a customer

for -- yes, with a price indicated.

 Q. So you know the price that works or doesn't work, because

you need to buy it from Samsung for less than the price you

are going to sell it, right?

 A. Yes.

 Q. So you don't need time; you know the second you get the

Samsung price whether or not you are going to be able to buy

this from Samsung and make a profit or whether that

transaction does not make business sense, right?

 A. At that time, yes.

 Q. All right.  So time -- well, let me talk about EMMC,

because that's another order where you are again talking

about time as if that makes a difference.

PAIK HONG - RECROSS

1          The EMMC order -- let me be perfectly clear and just

2     clarify your testimony.  You still wanted that product after

3     the three to six months, right?

4      A. Yes.  At a lower competitive price.  Yes.

5      Q. You wanted the product, but you didn't want to pay the

6     price that Samsung had told you was the price?

7      A. Was the price six months previous.  We were asking for a

8     competitive price.  And when Samsung refused, then the order

9     was canceled.

10     Q. You submitted an actual PO with an actual price.  But

11    when the market changed, you still wanted the product, but

12    you no longer wanted to pay that same price; is that right?

13     A. Well, every other product that we buy from Samsung, the

14    price will be reflected -- the market price would be

15    reflected because pricing is sent to us every month and every

16    quarter, as previously discussed.

17          But in this case, there is no -- there was no

18    pricing like that; so, hence, we asked that -- we asked

19    Samsung for a competitive price six months later, and Samsung

20    refused to --

21          MR. RHOW:  Your Honor, move to strike.  I didn't get

22    an answer.

23          THE COURT:  I'll grant the motion.

24          Can you answer the -- well, why don't you ask the

25    question again, and we'll see if the witness can answer.

PAIK HONG - RECROSS

1          MR. RHOW:  Could I ask the court reporter to re-ask

2     it?

3          THE COURT:  No.

4          MR. RHOW:  I'll go ahead and ask it.

5     BY MR. RHOW:

6      Q. In this situation, Mr. Hong, you continued to want the

7     product, you just didn't like the price, right?

8      A. Yes.

9          MR. RHOW:  Nothing further.

10          THE COURT:  Any redirect?

11          MR. LO:  No, Your Honor.

12          THE COURT:  Thank you.  You can call your next

13     witness.

14          MR. LO:  Your Honor, at this point, we would like to

15     play the deposition designation of Lane Kim, Mr. Lane Kim.

16     And the objections have now been resolved.

17          THE COURT:  Okay.  Great.  Go ahead.

18          So just to tell the jury, we have a witness that is

19     not available for trial.  The parties have agreed the witness

20     is not available.  And so they are going to play some

21     testimony from the witness's deposition.  So you should treat

22     it just as if the witness were here.  And you shouldn't read

23     anything into the fact that the witness isn't here, just the

24     parties have stipulated that it's an appropriate reason.

25               (Thereupon, the video was played.)

1            MR. LO:  Your Honor, for our next witness, Netlist

2     calls Dr. Michael Akemann.

3            THE CLERK:  Stand here for me, please.  Raise your

4     right hand.

5     THEREUPON:

6                    DR. MICHAEL AKEMANN,

7            Called in these proceedings, and after having been

8     first duly sworn, testifies as follows:

9            THE CLERK:  Please be seated.

10            Will you please state and spell your full name for

11     the record.

12            THE WITNESS:  My name is Michael Patrick Akemann.

13     M-i-c-h-a-e-l, P-a-t-r-i-c-k, A-k-e-m-a-n-n.

14            THE CLERK:  Thank you.

15            MR. LO:  Your Honor, may we hand up some binders?

16            THE COURT:  Yes, please.

17            THE WITNESS:  Thank you.

18            THE CLERK:  You are welcome.

19            MR. LO:  Your Honor, in the pocket of the binder are

20     a series of demonstratives that we propose to use with

21     Dr. Akemann.

22            And I understand that there are no objections by

23     Samsung.

24            THE COURT:  That's fine.

25            MR. LO:  Thank you, Your Honor.

AKEMANN - DIRECT

1

2                              DIRECT EXAMINATION

3    BY MR. LO:

4     Q. Good afternoon, Dr. Akemann.

5             What is your profession?

6     A. I'm an economist.

7     Q. And economics is kind of a broad field.  Is there some

8    specialty within it that you do?

9     A. Economics is a broad field.  Some economists focus on

10   what we call macroeconomics, big-picture economic issues like

11   inflation, unemployment, interest rates.

12           I focus on the microeconomic side, which hones in

13   more specifically on individual firm and business

14   decisionmaking.  And within microeconomics, I focus in

15   particular in an area called industrial organization, which

16   involves a study of how firms and markets are organized, how

17   firms compete, how businesses are structured to bring their

18   products to market and so forth.

19    Q. How did you get involved in this case?

20    A. I was retained by counsel for Netlist to provide my

21   expert opinion on cover damages.

22    Q. And Dr. Akemann --

23           MR. LO:  Actually, Mr. Kotarski, I'll ask you to put

24   up Graphic Number 2.

25   BY MR. LO:

AKEMANN - DIRECT

1    Q. Dr. Akemann, can you tell us a little bit about your

2    academic background.

3    A. Certainly.  Was shown on the slide, I have a BA in

4    economics and political science from the University of

5    California at San Diego.  And then I have a master's degree

6    and a Ph.D. in economics from UCLA.

7         MR. LO:  And let's go to Graphic Number 3.

8    BY MR. LO:

9    Q. Can you summarize your work experience since graduating

10   from school?

11   A. Certainly.  I actually started working in

12   litigation-related consulting while I was finishing my Ph.D.

13   at UCLA.  And then when I completed my degree, I have been

14   working full-time now in litigation-related consulting for I

15   guess 23 years or so, first at a company called LECG and now

16   at my current company called Berkeley Research Group.

17   Q. You've said the phrase a couple of times.  When is

18   "litigation-related consulting"?

19   A. In my case, it refers to providing expert opinions in

20   things like patent disputes, breach of contract disputes,

21   antitrust matters.  And quite commonly, I come in to quantify

22   damages, to estimate the harm that the plaintiff suffered as

23   a consequence of, for example, a breach of contract.

24   Q. Your current company, Berkeley Research Group, what kind

25   of company is BRG?

AKEMANN - DIRECT

1       A. It's a broad-based economics and finance consulting firm.

2   Many of my partners do what I do:  They focus on litigation

3   related consulting.  But we also have a big healthcare

4   advisory group and a big advisory group that focuses on

5   private equity, bankruptcy restructuring and things like

6   that.

7       Q. Outside of your work at these companies, have you done

8   any kind of teaching?

9       A. I haven't done formal teaching in the classroom since my

10  UCLA days, but I periodically participate in conferences or

11  panels where the audience is lawyers and business people who

12  want to understand how experts like me do the work that we

13  do; the methods, the techniques and the data that we tend to

14  use in our work.

15      Q. This is a -- the jury has heard that this is a breach of

16  contract case.

17             Have you had experience in this specific area?

18      A. I have.  I've worked on several past cases involving

19  breach of contract claims, including calculating damages

20  related to these claims.

21      Q. And have you written or presented on damages issues

22  before?

23      A. I have.  I've published several academic articles and

24  trade publications that discuss the proper way to do damages

25  calculations, both in intellectual property disputes and more

AKEMANN - DIRECT

1      general disputes of the sort that we're focused on here.

2       Q. Have you testified in court before?

3       A. I have.  Approximately 14 or 15 times previously.

4              MR. LO:  Your Honor, I'm not sure if the Court

5      formally requires this, but we would tender Dr. Akemann as an

6      economic expert to testify in this matter in the field of

7      economics and damages.

8              THE COURT:  Any objection, counsel?

9              MR. YODER:  Not at this point, Your Honor.

10             THE COURT:  Okay.  The witness is tendered.

11     BY MR. LO:

12      Q. Dr. Akemann, what were you asked to do in this matter?

13      A. As I mentioned a moment ago, I was retained by counsel

14     for Netlist to calculate what is known as cover damages.

15      Q. And what are cover damages?

16      A. In this context, as the jury has heard, there is a breach

17     of contract claim.  Netlist had a supply agreement with

18     Samsung that wasn't always fulfilled.  And in many instances,

19     Netlist had to go make cover purchases.  It had to go find

20     product from resellers because Samsung didn't honor the

21     contract.

22             So in this case, cover damages refers to whether and

23     by how much they had to pay more when they had to go find the

24     product from a middleman, a marked-up product, instead of

25     directly from Samsung.

AKEMANN - DIRECT

1    Q. And if there is a markup, is there a term you use for

2    that?

3    A. I use in my analysis the term "price premium."  I might

4    sometimes say an "overpayment."  If they had to go to a

5    reseller and pay a bit more than they should have paid to

6    Samsung, I'll describe that as a price premium paid by

7    Netlist.

8    Q. And so in the -- now looking at cover damages in the

9    context of this case, can you describe at a high level, what

10   were you looking for to determine whether Netlist incurred

11   any cover damages?

12   A. Certainly.  The basic idea is fairly straightforward.

13   And it's similar to the way you might consider proceeding if

14   you wanted to buy, say, a used car.  Suppose you were in the

15   market for a 2015 Honda Civic.  You would want to go -- in

16   determining what price you should pay, think about historical

17   data that might tell you what would be a fair price for that

18   product.

19          So the basic concept that I employed here was a sort

20   of benchmarking exercise; to go look at data to figure out

21   what a fair price for that product would be, just as you

22   might look at -- online for recent transactions for that 2015

23   Civic that you are interested in buying.

24   Q. Let's take a look at Demonstrative Number 4.

25          Can you explain to the jury what's being shown here?

AKEMANN - DIRECT

1      A. Absolutely.  So this is a very simplified example of the

2      basic methodology that I just outlined.  In the top row of my

3      table, I have a reseller purchase, a cover purchase that

4      Netlist might have made.

5              I identified just Product A here.  And the date,

6      February 15, 2018.  And a price and a quantity.

7              So that's a cover purchase that is the starting

8      point for my analysis.  And then the methodology, the price

9      benchmark methodology involves looking for similar prices

10     that Netlist paid to Samsung for the same product or a

11     similar product in a similar timeframe.

12             Again, just as you -- today, if you wanted to buy

13     that 2015 Honda Civic, you might look back, three, six or

14     12 months on Craigslist or Kelley Blue Book and figure out a

15     fair price for the car that you were interested in.  And you

16     would use that to benchmark the price.

17             That basic construct is what I have employed here.

18     But the data are messy, thousands of transactions.  So there

19     were several complicated steps that we'll get to in a moment

20     I think.

21     Q. Sure.

22             MR. LO:  Let's go to Slide Number 5.

23     BY MR. LO:

24     Q. What do you mean when you say that the data was messy?

25     A. Well, this is still a simplified example, but it begins

AKEMANN - DIRECT

1    to illustrate some of the complexity in the data that I had

2    to confront.

3           On the right side of this slide, I showed the

4    reseller transaction again; the price of 95, a thousand

5    units.  On the left, I show a set of purchases from Netlist

6    to Samsung, where they were buying product directly from

7    Samsung.

8           And you can see that the price might vary, the date

9    might vary, the quantity might vary.  So I have to take into

10   account those dimensions of these transactions to figure out

11   how to make sure I'm comparing apples to apples.  Just as in

12   that car example, you would want to ensure that if you were

13   benchmarking a price for that 2015 Honda Civic, that you

14   didn't actually accidentally use a Toyota Corolla instead.

15   Or if you wanted a Honda civic that had an automatic

16   transmission, you didn't use a benchmark price based on a

17   stick shift.

18          So you want to make sure you're comparing apples to

19   apples in this type of analysis.

20    Q. Were you able to reach conclusions with respect to

21   Samsung's breach of the supply obligation?

22    A. I was.

23          MR. LO:  Let's take a look at Slide Number 6.

24   BY MR. LO:

25    Q. At a high level, what were your conclusions?

AKEMANN - DIRECT

1          MR. YODER:  Your Honor, I would object on lack of

2     foundation.  Until there has been a foundation of the

3     methodology, I think it would be premature to be offering the

4     opinions.

5          THE COURT:  Are you going to go through the

6     methodology?

7          MR. LO:  That's going to be my next question.

8          THE COURT:  Okay.  Why don't you do that and come

9     back with the ultimate opinions.

10          MR. LO:  Sure, Your Honor.

11     BY MR. LO:

12      Q. Let's start with your methodology, then, Dr. Akemann.

13          First, can you tell us what data you used to perform

14     your cover damages analysis?

15      A. I can.  I think we've got a slide here that summarizes

16     the four basic financial datasets that I focused on in my

17     analysis.  At the top of the slide, I have two Samsung

18     databases, purchase orders and invoices.  And in this case,

19     these are purchases made by Netlist of Samsung products

20     directly.  So those are the top two databases on this slide.

21          And then at the bottom, I have the similar

22     databases, the analogous databases related to Netlist

23     purchases from resellers.  So I'm going to use those to

24     identify the cover purchases, and then I'm going to use the

25     top two datasets to find good benchmark prices.  And the

AKEMANN - DIRECT

1    basic methodology will involve pulling information on dates,

2    product types, quantities, and prices from these four

3    datasets.

4     Q. The jury has seen sort of aspects of these databases.

5    Can you explain what the volume of data was that you looked

6    at?

7     A. Well, as you heard Mr. Hong testify earlier today, there

8    are thousands of transactions at issue, hundreds of product

9    types, spanning a multi-year period.  So the data are pretty

10   voluminous here.

11          THE COURT:  Excuse me, counsel.  Dr. Akemann, we are

12   looking at this slide.  We see Samsung purchase orders and

13   Samsung invoices.  What is the difference between the two?

14          THE WITNESS:  The initial purchase order appears in

15   one database, and there is information about what is

16   expected.  The invoice database contains the record in

17   subsequent months of the actual POs that were fulfilled.

18   They set the price and the quantity in a series of

19   transactions that relate to the original purchase order.  So

20   any given purchase order might be fulfilled over several

21   months, as we've heard Mr. Hong testify.

22          And so the invoice database contains the subsequent

23   records of the actual transactions that were involving

24   quantities delivered and prices paid.

25          THE COURT:  And those invoices would link to a

AKEMANN - DIRECT

1   purchase order?

2           THE WITNESS:  Through the purchase order number.

3   Precisely, Your Honor.

4           THE COURT:  Sorry, counsel.  I just wanted to make

5   sure that was clear.

6           MR. LO:  Thank you, Your Honor.

7   BY MR. LO:

8   Q. Aside from the spreadsheets, did you have any other facts

9   or information available to you to conduct your analysis?

10  A. I did.  I had access to sort of the entire record in the

11  case.  We saw some deposition transcripts played earlier

12  today, so I had access to all that sworn witness testimony.

13  I had access to all the e-mails that we've been seeing here

14  today and yesterday in the court.  Other company documents.

15          I also did my own independent research, with help

16  from my staff, to make sure I understood things about the

17  marketplace that might be relevant to my analysis.

18  Q. And Dr. Akemann, have you been listening to the testimony

19  of the trial yesterday and today?

20  A. I have.  I have been in court for all of the testimony.

21  Q. Is there a point in time when you start to calculate the

22  cover damages caused by the breach?

23  A. There is.  I have assumed that the breach of contract

24  began in the second quarter of 2017.

25  Q. And why did you make that assumption?

AKEMANN - DIRECT

1    A. Well, two broad reasons.  One, I have been asked to

2    assume that liability will be established here, as I think

3    you have; that there has been a breach of contract.  And I

4    was asked to assume that was the starting point.

5         But I also reviewed economic data -- I'll show a few

6    slides in a minute -- that I think are very consistent with a

7    fundamental change in the business relationship, starting

8    right around the second quarter of 2017.

9    Q. And let's take a look at some of that.

10        Would you take a look at Exhibit 503 in your binder?

11   A. I'm there.

12   Q. All right.  What is Exhibit 503?

13   A. This is a chart that I prepared during my work in this

14   matter.

15   Q. And where does the data come from?

16   A. This comes from trial -- Exhibit 311, and it summarizes

17   the purchase order information that we have been discussing

18   throughout this trial.

19        MR. LO:  Your Honor, we move into evidence

20   Exhibit 503.

21        MR. YODER:  Your Honor, no issue using it as a

22   demonstrative, but I don't believe it's appropriate to be

23   admitted into evidence based on the expert preparing it.

24        THE COURT:  I know -- we've already been using this

25   as a demonstrative exhibit, right?

AKEMANN - DIRECT

1          MR. LO:  We have.  And it's a -- we would say it's a

2     1006.

3          THE COURT:  Counsel, what is your response to the

4     1006 exception?

5          MR. YODER:  Well, the underlying records are in

6     evidence, Your Honor.  So it's not a summary prepared by a

7     witness, a fact witness.  It's an expert preparing it for

8     their -- purposes of their expert opinion.  So I don't think

9     it would qualify under 1006.

10         THE COURT:  I think I agree with counsel.  It's not

11    a summary by a fact witness.  It's a summary by an expert.  I

12    think that makes it different.  No?

13         MR. LO:  Your Honor, 1006 doesn't have a requirement

14    as to fact versus expert.  It just has to be a summary of

15    voluminous records.

16         MR. YODER:  The problem, Your Honor, he has no

17    personal knowledge of these records.

18         MR. LO:  And we've satisfied the second sentence of

19    1006.

20         THE COURT:  Yeah, I see, counsel, you are right;

21    that the rule doesn't distinguish between a fact witness and

22    an expert witness.  And I was wrong on that.

23         Can you just -- just ask a couple of questions about

24    how it was prepared, just so I understand exactly the process

25    used?

AKEMANN - DIRECT

1           MR. LO:  Yes.

2       BY MR. LO:

3        Q. Dr. Akemann, what was the methodology used to prepare

4       what has been marked as 503 in your binder?

5        A. I went to the underlying database, I did have help from

6       my staff, who's a little more adept at manipulating

7       spreadsheets at times than I am.  And we simply looked month

8       by month at the purchase order dollars in this case that were

9       reflected in the purchase order database.

10           So it was a very straightforward summing exercise in

11      each month to ensure that we were just tabulating things

12      correctly and presenting them as a line chart.

13           THE COURT:  And are all the underlying records in

14      evidence?

15           MR. LO:  They are, Your Honor.

16           THE COURT:  Okay.  This can be admitted in evidence

17      under 1006.

18           MR. LO:  Thank you, Your Honor.

19           (Exhibit 503 received in evidence.)

20      BY MR. LO:

21       Q. Let's take a look at Exhibit 503.  Did the information

22      in -- summarized in Exhibit 503 inform your analysis at all?

23       A. It did.  When I was describing that I started my analysis

24      of cover damages in the second quarter of 2017, I mentioned

25      some economic data that I thought was very consistent with

AKEMANN - DIRECT

1    that starting point.  And in this line chart that I prepared

2    here, you can see precisely that.

3         During the period after the JDLA was signed, there

4    is a steady, indeed steep, ramp-up in purchase orders placed

5    by Netlist to Samsung.

6         And then right around the second quarter -- start of

7    the second quarter of 2017, that drops very substantially.

8    And you heard Mr. Hong -- both Mr. Chuck Hong and Mr. Paik

9    Hong -- describe how the relationship broke down in that

10   period; and that Samsung put Netlist on allocation, prevented

11   them from submitting purchase orders.

12        And that is very consistent with this economic data

13   that I analyzed.  We can see a very steep increase and then a

14   very substantial drop-off.

15   Q. In your binder, Dr. Akemann, would you turn to what has

16   been marked as 504.

17   A. Okay.

18   Q. Are you familiar with what is marked as 504?

19   A. I am.  Again, this is a line chart that my staff and I

20   prepared during the course of my work in this case.

21   Q. And what was the data that you and your staff used to

22   prepare 504?

23   A. This involved the two reseller databases that I mentioned

24   previously.  You recall there were four on that slide.  The

25   last chart was focused on Samsung purchases directly by

AKEMANN - DIRECT

1    Netlist.

2         These summarize Netlist purchases of Samsung

3    products, but from those resellers, those middlemen.  And I

4    show the dollars on the right-hand side and the cumulative

5    percentage on the left.

6         MR. LO:  Your Honor, we would seek to admit into

7    evidence 504, also as a 1006 summary.

8         THE COURT:  Counsel?

9         MR. YODER:  Same objection, Your Honor.

10        THE COURT:  Okay.  Objection overruled.  This can

11   come in.  504 is admitted.

12        (Exhibit 504 received in evidence.)

13   BY MR. LO:

14    Q. Dr. Akemann, did the information that is summarized in

15   Exhibit 504 inform your damages analysis at all?

16    A. It did.  And I apologize to the jury.  I was describing

17   the slide before they'd had an opportunity to see it.  But

18   now they have it.

19        And it did.  It was, um, consistent with the

20   economic evidence that we have been discussing in this case.

21    Q. And in what way?

22    A. Well, just as we saw orders directly placed to Samsung

23   drop off, what we see in this slide is a steady increase in

24   purchases that Netlist had to make from resellers, because

25   Samsung was not filling -- fulfilling its obligations under

AKEMANN - DIRECT

1   the contract.

2           So this slide summarizes a steady stream and an

3   increasing amount of purchases from resellers over time.

4           MR. LO:  Let's go to the next graphic.  And we'll

5   just use this as a demonstrative.  Yeah, this one.

6   BY MR. LO:

7   Q. Can you explain to the jury what we are looking at on the

8   screen now?

9   A. This is the punch line.  This is the two -- the two

10  graphs put together.

11          So the orange line, again, is those orders that

12  Netlist was making -- purchase orders that it was placing

13  directly to Samsung.  We see a rapid increase and then a very

14  substantial decline.

15          And what we see with the blue dashed line, those are

16  the reseller purchases.  It's very flat during the first part

17  of the JDLA, when things are going well, as both Mr. Chuck

18  Hong and Mr. P.K. Hong described.  But then right around the

19  time that the relationship begins to break down, the end of

20  2016, moving into the first quarter of 2017, we begin to see

21  a steady increase in reseller purchases, where Netlist has to

22  go to a third party, a middleman, to get the Samsung product

23  that it wasn't able to get directly from Samsung under the

24  contract.

25  Q. During the damages period, how much did Netlist actually

AKEMANN - DIRECT

1    spend to buy Samsung products from third-party resellers?

2     A. A little over 53 million in the period that I analyzed,

3    about 53.4 million in purchases from resellers.

4     Q. Okay.  And when you were calculating damages, did you

5    look at anything other than -- did you calculate -- base your

6    damages on anything beyond the reseller purchases that

7    Netlist actually engaged in?

8     A. I did.  So those reseller purchases were the starting

9    point.  Those were the cover transactions that I then needed

10   to assess further to decide whether there was an overpayment

11   related to any given transaction; and if so, how much was

12   that overpayment?  What sort of price premium did Netlist

13   have to pay when it went to the reseller market, when it had

14   to pay a middleman for the product instead of getting it

15   directly from Samsung?

16    Q. And how did you go about doing that?

17    A. Well, I turned back to the two other databases I

18   described, the purchases that Netlist itself was able to make

19   from Samsung.  Because what I decided was the best way to

20   benchmark what it should have paid to Samsung is to look at

21   what it actually did pay to Samsung.

22          So those two databases were the starting point for

23   my benchmarking analysis.  When I wanted to get the price for

24   that 2015 Honda Civic, I went looking for similar information

25   in the Samsung records that described Netlist purchases

AKEMANN - DIRECT

1    directly from Samsung.

2            MR. LO:  Let's turn to the next demonstrative,

3    Number 11.

4    BY MR. LO:

5     Q. Can you describe what's on the screen now.

6     A. My basic benchmarking analysis, the coming up with the

7    comparable prices, involved three basic types of controls.

8    One, I wanted to make sure that I was matching products

9    correctly.  I wanted an apples-to-apples comparison.  I

10   wanted to avoid comparing the Civic to the Corolla if I

11   could.

12           Two, you've seen the contractual language that talks

13   about similar volumes.  And so pricing can vary with volume.

14   I wanted to control for the transaction size when I looked

15   for comparable prices.

16           And lastly, I wanted to acknowledge the fact that

17   prices can vary over time.  And so there is a set of controls

18   in my model for accounting for the fact that sometimes prices

19   are going up, sometimes prices are going down.  So when you

20   are looking for a benchmark for a particular transaction, and

21   you want to look at a similar point in time, how can you best

22   control for the fact that prices can vary over time.

23    Q. So let's take these in a little bit more detail one at a

24   time and start with the product match control.

25           MR. LO:  If we could go to Demonstrative Number 12.

AKEMANN - DIRECT

1    BY MR. LO:

2     Q. Can you explain what we're looking at on the screen right

3    now.

4     A. So we finally move beyond some of the simplified

5    examples.  And this contains some of the actual data that I

6    analyzed in this case.

7           And that highlighted row is a cover purchase.  This

8    is an instance where Netlist had to go to a third party, a

9    company called Tidalink Corporation, to buy a product.  And

10   that transaction occurred on the 23rd of July in 2019 for

11   500 units at a price of $59.75.  So that's the particular

12   product that I care about -- or the transaction, rather.

13          And the product match control involves focusing on

14   the third column, this item code, which is a very specific

15   and detailed description, in code, of what the product is.

16   It describes the size of the chip, the capacity, the speed,

17   and other attributes.

18          And so the first step in my analysis was to make

19   sure when I looked for Samsung transactions, transactions

20   from Netlist directly to Samsung, that I was precisely

21   matching the item code.

22          Honda Civic, Honda Civic.  I set aside the Corollas.

23    Q. Let's talk about the second item, which is Volume

24   Control.

25          MR. LO:  And maybe we could go to the Demonstrative

AKEMANN - DIRECT

1    Number 14.

2    BY MR. LO:

3     Q. Can you explain what you did in terms of transaction

4    volume control?

5     A. Sure.  I'm back to simplified examples because it gets a

6    little complicated, staring too much at the data.

7           In the middle of this slide, I've got that cover

8    purchase, 500 units that was made to that Tidalink

9    Corporation.  And what I'm illustrating in this graph is that

10   when I went to look for comparable transactions, I wanted

11   them to be a similar size.  So if the cover purchase was

12   about 500 units, I looked for similar transactions that were

13   up to a thousand units and down to 250 units.

14           And in particular, I excluded, to the left of the

15   slide, those very small transactions.  And I excluded, to the

16   right of the slide, those very large transactions.  And I

17   narrowed my analysis to what I felt would be good comparable

18   transactions because they occurred at similar volumes.

19    Q. Okay.  Let's talk about the third one.

20           MR. LO:  And if we go to Demonstrative Number 16.

21   BY MR. LO:

22    Q. And let's talk about time control.  What does that mean

23   here?

24    A. Well, as I mentioned a moment ago, prices can and do

25   change over time.  You heard Mr. P.K. Hong describe that some

AKEMANN - DIRECT

1    prices changed on about a quarterly basis for Samsung.  Some

2    more frequently, at a monthly basis.

3         The starting point for my analysis, though, just as

4    you would do with a car, is to look for prices at a similar

5    point in time.  You know, a price from two years prior

6    probably doesn't help you too much -- inform too much what

7    you should pay for that Honda Civic today.  But maybe a price

8    six months ago is pretty relevant.

9         So the first step in the analysis is, shrink the

10   window.  Don't go too far out because the closer-in-time data

11   is going to be more relevant.  A price from three months ago:

12   Very relevant.  A price from three years ago:  Probably not

13   too relevant unless you can figure out how to adjust it to

14   use it in your analysis.

15   Q. And then what do you mean when you say "Look backwards

16   and forwards"?

17   A. Well, unlike the car example, if you want that car today,

18   you could only look back.  Because we don't know what that

19   car is going to be priced at three months from now.

20        But in this case, we are looking at a historical

21   period from the second quarter 2017 to July 15, 2020.  So for

22   any given transaction -- like that February 2019

23   transaction -- I could look in both directions for

24   nearby-in-time transactions that will serve as benchmarks.

25        And in this case, I chose to look 90 days in each

AKEMANN - DIRECT

1    direction.  Which was I thought a reasonable choice to

2    capture enough relevant data, but not go so far out that I'm

3    bringing in less relevant data.

4     Q. The third sub bullet point here is "Account for negative

5    price premiums."

6          What does that mean?

7     A. Well, it's kind of a convoluted phrase, but let me unpack

8    it for you.  The basic model is designed to identify

9    instances where Netlist had to overpay or pay a positive

10    price premium when it had to cover.  When Samsung breached

11    the contract, Netlist had to go to a reseller.  Did it pay

12    more than it should have?

13          But in the real world, when I do this benchmarking

14    exercise, sometimes the benchmarks that I identified involve

15    a negative price premium.  In other words, the Samsung price

16    was higher than the reseller price.

17          I gave Samsung full credit for that in my model.  I

18    didn't count that as damages; and, indeed, I lowered my

19    damages estimate as a consequence of that empirical

20    observation.  If that's what the data told me, I took that

21    into account.  So I thought that was both fair and

22    reasonable.  And it also helps control for the passage of

23    time.  Prices can and do vary over time, but that is why I

24    looked backwards and forwards.  That's why I go out 90 days

25    in either direction, but not too far.  And that is why I

AKEMANN - DIRECT

1    accommodate the notion of a negative price premium, or an

2    underpayment.

3            If Netlist was somehow able to pay a lower price

4    when it covered, I'm not counting that as damages against

5    Samsung here.  I'm only looking at the overpayments, which I

6    thought was appropriate in this context.

7    Q. Mr. P.K. Hong -- were you present when Mr. P.K. Hong

8    testified that in general he thought the reseller prices were

9    higher than the Samsung prices?

10   A. Yes.

11   Q. Does that testimony impact your analysis at all, given

12   that you are taking and seeing some negative price premiums?

13   A. Well, it does, in the sense that -- as an economist, I

14   would fully expect that if you could have a perfect

15   benchmark, an exact comparison, that you would almost always

16   see a positive price premium; if you could control for

17   everything perfectly.  That was -- is what I would expect as

18   an economist.  And so Mr. P.K. Hong's testimony is very

19   consistent with my expectations.

20           But in the real world, my benchmarks aren't perfect.

21   I think they're fair.  I think they're reasonable.  But if I

22   had a perfect bench mark, you probably wouldn't need me; you

23   could just look at the comparison yourselves.

24           So here, I had to make some judgments and come up

25   with what I thought were reasonable estimates.  And

1    sometimes, given the actual data, that shows a negative

2    premium.  But again, I don't count that as damages.  Indeed,

3    I reduce the positive damages that I include in my model any

4    time I observe a negative price premium.

5    Q. With the various controls that you implemented, for how

6    many transactions with resellers were you able to find

7    comparable data in terms of Netlist purchases from Samsung?

8    A. Well, I was fortunate here.  I was able to find coverage

9    amounting to about 36.5 percent of the total population that

10   I care about.  So a very robust sample, a lot of data brought

11   at that bear on the problem, which gave me a lot of

12   confidence that my results were economically significant.

13   Q. And in the context of the facts here, can you explain to

14   the jury, what does it mean if you see a reseller

15   transaction, but was not able to find comparable data?  What

16   does that actually mean in plain terms?

17   A. Well, what it means is there were no nearby transactions

18   with Samsung at a -- of the exact same products.  And that is

19   not surprising.  In the context where, as you heard Mr. P.K.

20   Hong explain, if they couldn't get the product from Samsung,

21   they were scrambling and often couldn't even find the product

22   from a reseller.  But if they could, there isn't necessarily

23   going to be a nearby Samsung transaction that I can use in my

24   analysis.

25            So it was fully expected -- by me anyway -- that I

AKEMANN - DIRECT

1    would not be able to find a good benchmark for every

2    transaction that I care about, for all of the cover

3    purchases.  But I was very happy to see that I could get

4    36.5 percent of the dollars at issue, because that is a very

5    large fraction, in data analysis, of your population.

6            MR. LO:  Now let's turn to Graphic Number 18.

7    BY MR. LO:

8     Q. So with the methodology that you adopted, Dr. Akemann,

9    did you find that there was a price premium?

10           MR. YODER:  Your Honor, before they put that up, I

11   do object on 701C grounds and, with the Court's permission,

12   would request just a short sidebar outside of the presence of

13   the witness.

14           THE COURT:  Sure.

15           (At the bench.)

16           THE COURT:  Okay.

17           MR. YODER:  Under 702C, the methodology that -- this

18   is Michael Yoder for Samsung.  Under 702C, the methodology is

19   not reliable.  It's not based on reliable principles or

20   methods.

21           He has testified as to what cover damages are.  It's

22   a very simple calculation.  It's simply taking the contract

23   price that the product should have been sold for versus the

24   price that had to be paid to cover, and then taking the

25   difference of that price.

AKEMANN - DIRECT

1           What he has done is he has not tried to match up the

2     unfilled orders.  He's done it backwards.  He starts with the

3     reseller purchase price.  He -- and then he tries to match it

4     not to what the price was under the contract, but under

5     similar sales of products that he can match.

6           He testified, rather aggressively, that he found

7     36 percent match transactions and it was robust.  That means,

8     Your Honor, he failed to find 73, 74 percent of transactions

9     where he had no matching.

10          MR. DOREN:  Just to be sure, Mike, it's 64 percent.

11          MR. YODER:  64 percent?  I don't have any calculator

12    with me.  Thank you, counsel.  That was Mr. Doren.

13          -- where he found no matched transactions.  And he

14    applies what he found on the match transactions for different

15    products, different times, different price range, to the

16    unmatched, rather than looking at the purchase orders, which

17    would establish the price, rather than looking at published

18    price lists which would establish the price.

19          So his methodology, at least for the unmatched, is

20    not reliable.  And he shouldn't be allowed to present that to

21    the jury.  And I don't believe, Your Honor, it's just a

22    matter of cross-examination.  There has to be some reliable

23    methodology.  And he has offered no foundation that the

24    products for the matched transactions are similar to those

25    for the unmatched in terms of pricing, in terms of price

AKEMANN - DIRECT

1      fluctuations, or anything of that nature.

2          THE COURT:  So the issue is that on the unmatched

3      transactions, there is no reliable methodology that links

4      those to actual orders that Netlist placed that Samsung

5      didn't fulfill?

6          MR. YODER:  Correct.  Or any evidence of pricing

7      under the contract, either by purchase order, by price list,

8      or the other information.  That has been testified to in this

9      trial that exists and is available.  So there is no reliable

10     method for his opinion that somehow equates the pricing for

11     the matched transactions with the unmatched.

12          Beyond that, just to be clear, we don't think the

13     methodology for the matched is reliable either.  In other

14     words, he could do the same thing for those transactions

15     quite easily.  He could look at the purchase orders, and he

16     could see the pricing.  Or if it's based on a forecast, he

17     could look at the published price list, and he could figure

18     out the pricing.  He didn't do that.

19          He did it backwards, in trying to match it up with

20     what he contends are sales, which are also over a 180-day

21     period; 90 days before the reseller transaction, 90 days

22     after the reseller transaction.

23          So he's not matching the particular unfilled order,

24     that they say is a breach, with the amount that was paid --

25     arguably allegedly -- in order to cover.  They could have

AKEMANN - DIRECT

1   done that.

2          THE COURT:  Counsel, how do you respond to the

3   objection?

4          MR. LO:  This is Jason Lo for Netlist.  These same

5   arguments were made in Samsung's MIL.  The Court denied it

6   and said that this is the subject of cross-examination.  And

7   that is precisely what it is.

8          And if anything, the evidence is stronger now than

9   when the Court considered these arguments on the MIL, because

10  we've now had the chief operating officer explain why we

11  wouldn't run out to a reseller unless there's a really good

12  reason to do so.  And the only time we would go out to a

13  reseller is because we've already asked Samsung and they have

14  already said no.

15         So that's already in the evidence now.  And

16  Mr. Akemann is simply relying upon that as a foundation.

17         Now, they're entitled to try that and cross-examine

18  that.  And they cross-examined Mr. P.K. Hong about that.  And

19  the jury is the factfinder on that.  But that has nothing to

20  do with the methodology.  What Mr. Yoder is trying to argue

21  is that Your Honor should basically discount and rule, as a

22  matter of law, that Mr. Hong's testimony that we only went

23  out to resellers when Samsung said no is somehow invalid or

24  should not be taken into account.

25         MR. YODER:  Your Honor, I'm not arguing that.  That

1    was the first point of our motion in limine.  And Your Honor

2    found that that's a factual issue for the jury; whether, in

3    fact, they only went to resellers if Samsung breached.  I'm

4    not making that argument.  This goes only to the methodology

5    that he used.

6          And Your Honor indicated in your rulings, based on

7    advisory comments to Evidence Code 103 that any in limine

8    ruling is subject to reevaluation at trial.  And I would

9    submit, Your Honor, that the evidence before Your Honor

10   during trial is much more fulsome than it was on the in

11   limine motions, which we targeted very specific issues.

12         And based on that, it is clear that there is no

13   reliable methodology to establish the Samsung pricing that

14   would serve as a basis for an opinion of cover damages for

15   the unmatched transactions.

16         THE COURT:  Explain to me again, Mr. Lo, how is he

17   coming up with the pricing for the unmatched transactions?

18   He's doing it by kind of averaging the pricing Samsung paid

19   around that time period for similar sales?

20         MR. LO:  Yes.  Where he is able to find a match, he

21   calculates what the average is.  He then applies it to the

22   rest of them for which there is an unmatched.  And, as he's

23   just explained, the reason it's unmatched is because Samsung

24   didn't sell us anywhere close to the period in which Netlist

25   made a cover purchase.

AKEMANN - DIRECT

1          So this is, I know it's going to the merits, but

2     it's -- what Mr. Yoder is trying to do is to take advantage

3     of a situation of their own creation.  He's saying that

4     because Samsung didn't sell to you within 90 days before or

5     90 days after, you can't possibly, as a matter of economics,

6     calculate damages.

7          THE COURT:  Okay.  I'm going to allow the witness to

8     testify and then obviously rule without prejudice to bring

9     your motion.

10          MR. YODER:  Thank you, Your Honor.

11          MR. LO:  Thank you, Your Honor.

12          (In open court:)

13          THE COURT:  The problem with the white noise, is it

14     could put you all to sleep, right?  We'll have to run much

15     shorter on the sidebar conferences.  Sorry about that.

16     BY MR. LO:

17     Q. Dr. Akemann, let's go back to Slide 18.  First, before we

18     were -- I was asking you, did you, in fact, calculate whether

19     there was a price premium when Netlist engaged in reseller

20     transactions as opposed to buying directly from Samsung?

21     A. I did.

22     Q. And what was that premium?

23     A. Based on the transactions where I was able to find a

24     comparison -- again, accounting for about 36.5 percent of the

25     dollars -- I estimated the average priced premium for that

AKEMANN - DIRECT

1    part of the population at 4.6 percent.

2    Q. Now, you testified earlier that for some of the reseller

3    transactions, you couldn't find a Samsung transactions

4    90 days before and 90 days after.

5         What did you do there in terms of your analysis?

6    A. Well, for that other 63 percent or so, I extrapolated

7    from the sample where I could analyze.  I used that

8    4.6 percent to estimate a price premium for the rest of the

9    cover transactions.

10   Q. And as a matter of economics, did you think that that was

11   a reasonable thing to do, to apply the 4.6 percent to the

12   other transactions where you couldn't find a match?

13   A. Very much so.  Because where I couldn't find a match, in

14   my view as an economist, that was likely to be circumstances

15   where supply was especially tight or demand was especially

16   high.  Because recall, if I'm not finding a match, it's

17   because Netlist was unable to make any nearby purchase from

18   Samsung.  In other words, that's going to be -- most likely

19   to be in places where Samsung was being especially

20   restrictive with supply.

21        And so I thought it was very reasonable, and

22   probably conservative, to use the 4.6 percent premium to

23   apply to the rest of the transactions where I couldn't make a

24   direct comparison.  I think it was an estimate, but a

25   conservative one in this context.

AKEMANN - DIRECT

1    Q. Dr. Akemann, based on your analysis, what did you

2    calculate the direct cover damages to be to Netlist as a

3    result of the breach?

4    A. Well, as summarized on this slide, based on total cover

5    purchases of about 53.4 million and the price premium of

6    4.6 percent, I concluded that a reasonable calculation of

7    cover damage is -- in this case, was $2,474,993, or about

8    $2.5 million.

9    Q. Thank you, Dr. Akemann.

10         MR. LO:  Your Honor, I have no further questions at

11   this time.

12         THE COURT:  Okay.  Cross-examination?

13         MR. YODER:  Yes, Your Honor.  Should we break first

14   and get organized?

15         THE COURT:  We can do that.  We'll take our

16   afternoon break.  We'll take 10 minutes, and we'll come back.

17         MR. YODER:  Thank you, Your Honor.

18         (Thereupon, the jury retired from the courtroom.)

19         (Thereupon, there was a brief recess.)

20         (Thereupon, the jury returned to the courtroom.)

21         THE COURT:  Counsel, you can proceed.

22         MR. YODER:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24   BY MR. YODER:

25   Q. Good afternoon, Dr. Akemann.

AKEMANN - CROSS

1     A. Good afternoon.

2     Q. We haven't formally met.  As you know, I'm Michael Yoder.

3   I'm one of the lawyers for Samsung.  I now, as you know --

4   being an experienced expert -- get to ask you questions in

5   cross-examination.

6           As you also know, having sat through this trial, we

7   are trying to get this done quickly, so we'll be done

8   tomorrow.  And so I would ask if you would please try to just

9   answer my questions directly, if you would.  It will help

10  things go faster, and we can hopefully accomplish that

11  objective.

12          Will you try to do that?

13    A. Certainly.

14    Q. Sure.

15          You were here yesterday for opening statements,

16  right?

17    A. Yes.

18    Q. And during opening statements, you heard Mr. Doren say

19  that the only damages in this trial that Netlist is seeking

20  are for what has been called cover damages, right?

21    A. I think he said something to that effect, yes.

22    Q. Right.  Now, you also heard the testimony of Mr. P.K.

23  Hong, correct?

24    A. Yes.

25    Q. And Mr. Chuck Hong, correct?

AKEMANN - CROSS

1      A. Yes.

2      Q. And you heard them talking about things like shipping

3      charges and warranties and scrambling -- people scrambling to

4      try to buy cover purchases and the like.  You did not

5      calculate any damages for any of those items, correct?

6      A. That's correct.

7      Q. So let's talk about what you did attempt to calculate,

8      the cover damages, okay?

9      A. Okay.

10     Q. Would you agree with me that the concept of cover damages

11     is pretty simple; in fact, I think you said

12     "straightforward."

13          Agree with that?

14     A. I think I said the basic concept was fairly

15     straightforward, yes.

16     Q. We'll go with "fairly straightforward."

17          But it's basically that someone has a right to buy a

18     product or products from a seller, correct?

19     A. That's my understanding of the typical starting point.

20     And that's what we're focused on here.

21     Q. Typical starting point.

22          Here, it would be Netlist having a right to buy

23     memory chips from Samsung, right?

24     A. Correct.  Under the contract.

25     Q. Under the contract.

AKEMANN - CROSS

1              And you are assuming here that Samsung breached by

2      not supplying those memory chips to Netlist, correct?

3      A. I am assuming there was a breach of contract, that's

4      correct.

5      Q. So for cover damages -- and you are not here to make

6      opinions on liability, right?

7      A. That's correct.  I'm just here to calculate damages.

8      Q. Damages guy, right?

9      A. In this case, yes.

10     Q. Okay.  Well, that's why we're here.

11             So the seller doesn't sell the product to the buyer,

12     so the buyer goes out and buys the product from someone else.

13     That really sort of would be the next step in this analysis,

14     right?

15     A. Um, I'm not sure what the question is.  Perhaps you could

16     rephrase it.

17     Q. Trying to determine cover damages.  It's basically

18     because the buyer can't get the product from the seller, the

19     buyer goes and gets it from someone else, right?

20     A. That's the basic cover transaction, yes.

21     Q. Absolutely.

22             And in terms of cover damages, if the buyer has to

23     pay a higher price to this other source of the product, that

24     would be the cover damages, right?  The difference between

25     the higher price paid to the substitute source and the price

AKEMANN - CROSS

1    under the contract that they would have paid to the seller

2    that they're claiming breach of contract, right?

3    A. Um, I think that was close.  The contract itself doesn't

4    specify prices.  But it's a comparison between the price they

5    did pay and what they should have paid had the contract been

6    honored.

7    Q. Absolutely.  What they should have paid, correct?

8    A. Correct.

9    Q. Had the contract been honored, right?

10   A. That's the basic cover damage construct, yes.

11   Q. And if you had a purchase order, you could look to that

12   purchase order to see what they should have paid, right?

13   A. It depends.  That might shed light on it.

14   Q. Yeah.  I mean, if the purchase order showed the price for

15   the product, that would shed a lot of light on it, wouldn't

16   it?

17   A. If you had a relevant purchase order, it would be

18   information you could consider for that purpose, that's

19   correct.

20   Q. Yeah.  So for example, you gave as a hypothetical buying

21   a Honda Civic.  So let's go with that.

22          If I am the buyer, and I have a contract with a

23   Honda dealership to sell me a Honda Civic for $20,000, and

24   the seller breaches, the dealership refuses to give it to me,

25   and then I have to go out and buy it from someone else, and

AKEMANN - CROSS

1    I've got to pay $25,000 to get it -- you with me?

2     A. I am.

3     Q. So the cover damage is going to be the difference between

4    what I should have gotten the Honda Civic for from the

5    original dealership, versus what I had to pay to the second

6    dealership; in other words, $5,000, right?

7     A. I think in that example, that sounds correct.

8     Q. So a couple of things then.  We'll come back to that.

9          There's no cover damages if the seller actually

10   provides the product, right?  So if we're talking about

11   purchase orders here, if the purchase orders were filled,

12   there's no reason to go out and cover and, hence, no cover

13   damage, right?

14    A. I -- if you're saying if there's no cover transaction at

15   all, there's no cover damages, then, yes, I think I agree

16   with that.

17    Q. Pretty straightforward, correct?

18    A. At a basic level, that's correct.

19    Q. Yeah.  So if it's a purchase order, right, that is not

20   filled, that is one thing.  But if that purchase order is

21   filled, then there's no cover and, thus, no cover damage,

22   right?

23    A. If you're talking about it in a simplified example, yes.

24   There are other ways that cover purchases can be incurred

25   here.  For example, if the forecast was never accepted in the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

AKEMANN - CROSS

1     first place, that might lead to cover damages.

2      Q. Dr. Akemann, I would ask you just to answer my questions.

3     And again, your counsel will have a chance to ask you, but

4     we're under tight time constraints.

5            So will you try to do that, please?

6      A. Sure.

7      Q. Thank you.

8            So if the buyer -- if I decide not to go buy another

9     Honda Civic -- so if the buyer doesn't go buy, make a cover

10    purchase, there would be no cover damages either, right?

11     A. I think in that example, that's correct.  You have to

12    make a cover purchase to generate cover damages in that

13    example.

14     Q. Okay.  And if you have a purchase order where some of the

15    product is supplied and some isn't, there might be cover

16    damages for the product that's not supplied, but there would

17    be no cover -- no need to cover and, thus, no cover damages

18    for that product that was supplied, right?

19     A. I think in that example, if some was supplied directly by

20    Samsung, there would be no need for cover and, hence, no

21    cover damages --

22     Q. And --

23     A. -- on those -- that subset.

24     Q. Right.  And if the buyer is able to go get the substitute

25    goods, the cover purchase, at a lower price or the same

AKEMANN - CROSS

1    price, there's no cover damage, right?

2     A. At least in the way I constructed my model, that's

3    correct.  That's the negative price premium, or zero price

4    premium, would not lead to damages.

5     Q. Yeah.  So if in my -- if in the Honda Civic example, I'm

6    able to go buy that Honda Civic from another dealership for

7    $20,000 or less, there is no cover damage.

8         Would you agree with that?

9     A. I think in that example, that's correct.  If you can go

10   down the street and buy it for the same $20,000, then you

11   were sort of still whole with respect to the price you should

12   have gotten from the first dealer.

13    Q. Okay.  Good.

14        So I'm going to read you a definition of cover

15   damage.  And I want to ask you if this is the definition that

16   you applied in the work that you did as an expert in this

17   case in calculating cover damages.  Okay?

18        "Cover damages are the difference between the price

19   the plaintiff would have paid to the defendant for the goods

20   had defendant sold them to plaintiff, according to the

21   contract, and any higher price that plaintiff, instead, had

22   to pay to a third party for the goods that defendant failed

23   to supply to plaintiff."

24    A. And I'm sorry, could you just -- what is the question?  I

25   think I followed what you read.

AKEMANN - CROSS

1    Q. Is that definition of cover damages that you applied in

2    connection with the work you did in this case calculating

3    cover damages?

4    A. Um, it sounded quite consistent with what I did here,

5    yes.  I don't have the language in front of me, but it sounds

6    consistent with my general approach.

7    Q. So you were here for Mr. P.K. Hong's testimony, right?

8    A. I was.

9    Q. And you saw him -- you saw him explain -- or you heard

10   him explain this chart, his Slide Number 1.

11           MR. YODER:  If we could bring that up.

12   BY MR. YODER:

13   Q. And Mr. P.K. Hong testified that this process starts with

14   one of Netlist's customers giving a forecast or a demand to

15   Netlist.

16           Did you hear that testimony?

17   A. I heard something to that effect, yes.

18   Q. And you also heard his testimony that not surprisingly

19   Netlist actually tracks, keeps a record, of the forecast and

20   demands that it receives from its customers, correct?

21   A. Um, I'm not sure I heard him say that they tracked it

22   systematically, but I did hear him say that he assembled that

23   information for purposes of making the forecast, in turn, to

24   Samsung.

25   Q. Right.  So that's information they had.  And it's

AKEMANN - CROSS

1    important information to them, right?

2     A. It would seem relevant to running their business, that's

3    correct.

4     Q. I would call that important.  But we can go with

5    relevant.

6          So he also said, then, that based on that, and other

7    things, that Netlist would then send a forecast to Samsung.

8          And you heard that testimony as well, right?

9     A. I did.

10    Q. And you also heard Mr. P.K. Hong's testimony that Netlist

11   actually tracks the forecast and has the ability to find

12   those forecasts through its e-mail records, correct?

13    A. I did hear him describe that he thought that it would be

14   found in e-mail records, yes.

15    Q. Their e-mail records, right?

16    A. I think he said both.  But yes.

17    Q. I think he said "his" initially.  But that's all I'm

18   focusing on right now.  We are focusing on Netlist.  It's its

19   damage claim, okay?

20          So let's look at the left side of this chart, all

21   right?  And if Samsung -- according to Mr. P.K. Hong, if

22   Samsung accepted the forecast, Netlist would issue a purchase

23   order, right?

24    A. Yes, he described that process.

25    Q. And he also testified that Netlist tracks its purchase

AKEMANN - CROSS

1    orders to Samsung, right?

2     A. Yes.

3     Q. Has records of that, right?

4     A. That's correct.

5     Q. And then he testified, and you understand, that according

6    to his testimony, for some of the purchase orders, the

7    product was actually supplied by Samsung, right?

8     A. Correct.

9     Q. For some, it was backlogged, it wasn't shipped

10   immediately.  It was put into a status where potentially it

11   could be shipped later, right?

12    A. That's correct.

13    Q. And then in some circumstances, Samsung wouldn't supply

14   and the order was canceled, or the order might be canceled

15   for other reasons, correct?

16    A. Yes, that's correct.

17    Q. And you heard, again, Mr. P.K. Hong testify that they

18   track that information and they had records of it, right?

19    A. Yes.  They did keep track of purchase orders.

20    Q. Now, one of the things that you did in connection with

21   your work as an expert in this case, is you reviewed

22   deposition testimony, right?

23    A. That's correct.

24    Q. And one of the depositions you reviewed was of a Netlist

25   employee named Raymond Jiang, correct?

AKEMANN - CROSS

1      A. Yes.

2              MR. YODER:  J-i-a-n-g for the reporter.  Because I'm

3      not sure I could interpret my pronunciations.

4      BY MR. YODER:

5      Q. So you read that deposition, right?

6      A. At least portions of it, yes.

7      Q. Okay.  And when you read it -- we could pull this up --

8      you saw his testimony.

9              Did you read the transcript or did you watch the

10     video?

11     A. Of the deposition?

12     Q. Yes.

13     A. I read the transcript.

14     Q. Smart man.

15             So you read that his testimony was as follows:

16             Question:  "When you purchased product from Samsung,

17     there is always a purchase order, right?"

18             Answer:  "Correct."

19             Question."  "And these purchase orders, I imagine,

20     have standard terms and conditions attached to them?"

21             Answer:  "Yes."

22             Question:  "And that's been consistent throughout

23     the entire relationship?  So both before the JDLA and after

24     the JDLA, it's always purchased through purchase orders; is

25     that right?"

AKEMANN - CROSS

1              Answer:  "That's correct."

2              Question:  "And it's been the same purchase order

3      the whole time?"

4              Answer:  "It's been the same purchase format the

5      whole time."

6              So that was testimony that you read in connection

7      with your work as an expert, right?

8      A. Yes.

9      Q. So you were aware of that, right?

10     A. Yes.

11     Q. And you looked at some purchase orders, right?

12     A. At least some, yes.

13     Q. Okay.  I would like to have you take a look at what we

14     have marked as Exhibit 309-A.

15             MR. YODER:  It is part of Exhibit 309, Your Honor.

16     But we have pulled it out and, by stipulation, it's been

17     admitted.

18             So with the Court's permission, I would ask to be

19     able to publish it.

20             THE COURT:  Yes.

21             MR. YODER:  And I don't know, Your Honor, whether

22     you want a separate copy or if counsel would?

23             THE COURT:  I'm fine with it.

24             MR. LO:  I have a copy already.  Thank you.

25     BY MR. YODER:

AKEMANN - CROSS

1      Q. So looking at 309-A, this is one of the Netlist purchase

2      orders to Samsung, correct?

3      A. It looks correct, yes.

4      Q. And it has an order date of November 7, 2017, right?

5      A. Yes.

6      Q. And it has a lot of other information on it, such as it

7      has the actual product part number, so you know what the

8      product is, correct?

9      A. That's correct.

10     Q. And that's on the left side, the left column, about

11     halfway down, correct?

12     A. Yes.

13     Q. There's also -- back up at the top right -- a purchase

14     order number that you can refer to to track it, correct?

15     A. That's correct.

16     Q. It shows the quantity of the product, of the parts that

17     are the subject of the purchase order, correct?

18     A. Yes.

19     Q. It shows the price, right?  It shows the unit price of

20     the product, correct?

21     A. Yes.

22     Q. And then shows the total price for that particular

23     product, right?

24     A. Correct.

25     Q. And this purchase order is in the period of time that you

AKEMANN - CROSS

1     looked to in calculating cover damages, right?

2      A. Yes, it is.

3      Q. And then as do many purchase orders, these purchase

4     orders from Netlist to Samsung also had attached terms and

5     conditions, right?

6      A. That's correct.

7      Q. And those are the second and third pages of this exhibit,

8     right?

9      A. Yes.  I don't have a hard copy, but...

10     Q. You can see them on the screen, right?

11     A. Yeah.  I can see it on the screen.

12     Q. So if we can go back to the chart that we were looking

13     at.  So on the right side of this chart showing the process

14     of Netlist purchases of product from Samsung, it shows

15     resellers down on the bottom right-hand corner, correct?

16     A. Yes.

17     Q. And among other situations where Netlist claims it went

18     to resellers were if Samsung backlogged product on a purchase

19     order or if part of a purchase order was canceled.

20         Is that your understanding?

21     A. Yes.

22     Q. And you heard -- and did you look at any of the reseller

23     purchase orders?

24     A. I looked at the purchase order database.  I may have

25     looked at some physical POs of the sort that we have looked

AKEMANN - CROSS

1    at for Samsung there.  I can't recall specifically.

2     Q. And the database was Exhibit 313, I believe.

3     A. You are testing my memory.  I don't recall the number.

4    It's either that or something very close to it.

5     Q. But the database of the reseller purchase orders --

6    purchases by Netlist and the purchase orders that Netlist

7    issued to resellers, they would have the same type of

8    information on the Samsung purchase orders, right?

9         Do you want me to be more specific?

10    A. Yeah.  Or maybe just rephrase it so I can make sure I

11    follow your question.

12    Q. Sure.  The purchase orders to the resellers, and also as

13    included in the database, the spreadsheet of the reseller

14    purchases, would show the product, correct?

15    A. Yes.

16    Q. And the product code would match the Samsung, because

17    these are Samsung products that are being bought from the

18    resellers, right?

19    A. When they're able to buy the same product from each, yes.

20    Q. Yeah.  If you've got a cover purchase, right?

21    A. Yes.

22    Q. Okay.  And so you can -- you can tell which reseller

23    purchase was a purchase of a product from a canceled purchase

24    order to Samsung if there was one, by looking at the product

25    number, right?

AKEMANN - CROSS

1    A. No, that's not correct.

2    Q. Okay.  The same product number would be used in both of

3    them, right?  If there was a purchase of both -- of that

4    product, both from Samsung -- or a purchase order from

5    Samsung and a purchase from a reseller, right?

6    A. I -- if you're asking whether one can match product

7    numbers or observe the same product numbers in each database,

8    the answer is yes.

9    Q. Good.  That's all I'm asking.

10       And the purchase orders to the resellers would also

11   show the quantity being purchased, right?

12   A. In the database.  That's correct.

13   Q. And it would show the unit price, correct?

14   A. Yes.

15   Q. And it would show the total paid, right?

16   A. Yes, at the PO level.  The invoice itself is what

17   contains the actual amounts paid, the invoice database,

18   but...

19   Q. Right.  So if Netlist -- if its position was that when

20   Samsung canceled the particular purchase order, it went out

21   and it bought that product from a reseller, and you had the

22   Samsung purchase order, and you had the matching reseller

23   purchase, you could calculate cover damages by just doing the

24   math and subtracting what they should have got the product

25   from Samsung for, from what they had to pay the reseller for,

AKEMANN - CROSS

1    correct?

2      A. No, that's not correct, given my understanding of the

3    data.

4      Q. Okay.  So let me ask this:  You have a purchase order

5    that reflects the price that Netlist is to pay Samsung,

6    right?

7      A. At the time the PO is issued, yes, that's correct.

8      Q. Correct.

9            And that establishes the contract price, right?

10     A. No.  As I understand the data, the price can change.  And

11   it's the invoice database that sets the actual price that's

12   paid.

13     Q. Okay.  And you also had the invoice database, correct?

14     A. That's correct.

15     Q. So let's use the invoice database.

16           You've got the invoice database from Samsung which

17   shows the purchase price, the quantity.  Netlist's position

18   is it wasn't supplied, okay?  And Netlist says, "This is

19   where I had to go and buy it from a reseller," right?  And

20   you can match up the product.

21           Are you with me so far?

22     A. No, I'm not.  Because if it was a cover purchase, the

23   transaction wouldn't appear in that Samsung database in the

24   first instance, because the reason they had to cover is that

25   Samsung didn't supply under the contract.

AKEMANN - CROSS

1          So there's no contract purchase in that Samsung

2     database if Netlist needed to cover.

3      Q. So when you looked at the purchase orders from Samsung,

4     you looked at those to see what was actually ordered by

5     Netlist that Samsung didn't fill, correct?  Isn't that one of

6     the spreadsheets that you relied upon?

7      A. I did look at the purchase order database, yes.

8      Q. Yeah.  And that spreadsheet would actually show what

9     wasn't filled, right?

10     A. It includes some information on POs that were

11    unfulfilled.

12     Q. Yeah.  It showed the purchase orders that weren't filled,

13    correct?

14     A. Well, it was a dynamic database, so not necessarily.

15    Because the purchase order records, as I understand them,

16    could be altered by Netlist over time, based on

17    communications with Samsung.  So they would go into that

18    database -- it was dynamic -- and sometimes lower the ordered

19    amount if Samsung told them that there would be no support.

20          So the database, as it stands today, doesn't reflect

21    all that history.  Those fields got updated over time, as I

22    understand it.

23     Q. Look at Exhibit 311, Dr. Akemann.  This is one of the

24    documents that you relied upon in your work as an expert in

25    this case in calculating cover damages, right?

AKEMANN - CROSS

1    A. That's correct.

2    Q. And this actually, then, shows for the purchase orders to

3    Samsung -- and I'm just looking on the first page here.  You

4    can see the column I, Quantity Ordered of a particular part

5    in a particular purchase order, correct?

6    A. Yes.

7    Q. And the next column, column J, Quantity Received,

8    correct?

9    A. It does contain that information --

10   Q. Right.

11   A. -- as shown here, correct.

12   Q. And then it also shows the unit cost, correct?

13   A. Yes.

14   Q. And then it shows the dollar value of the amount

15   received, correct?

16   A. Correct.

17   Q. And you heard Mr. P.K. Hong's testimony that Netlist paid

18   those amounts, right?

19   A. I think he may have been looking at the invoice database

20   when he made that statement.  But, yes, the invoice database

21   is what contains the records of what were actually received

22   and paid ultimately.  This database here is what was ordered

23   initially based on the PO number.

24   Q. Right.  But it shows what was actually received, correct?

25   A. It has a Quantity Received field.  But to understand what

AKEMANN - CROSS

1    was actually received, you do need to refer to the invoice

2    database.

3      Q. Do you think this is accurate, the spreadsheet you relied

4    on, Exhibit 311?

5      A. I do.

6      Q. Okay.  Let's go with that, then.

7         So it shows what was received, correct?

8      A. Yes.

9      Q. It shows what the unit cost was, correct?

10     A. Correct.

11     Q. And it shows the amount for the received product,

12    correct?

13     A. That's right.

14     Q. Okay.  And you're not saying this isn't accurate, are

15    you?

16     A. No, definitely not.

17     Q. Okay.  So if I look down -- and first of all, am I

18    correct, though, that this spreadsheet includes transactions

19    prior to the second quarter of 2017, prior to the period of

20    time that you used for calculating cover damages?

21     A. Yes.  The database does contain information on

22    transactions, both before the period that I focused on and I

23    think afterwards as well.

24     Q. And you would agree that during that period of time

25    before the claimed breach, there were instances where Samsung

AKEMANN - CROSS

1    didn't fill purchase orders, right?

2     A. I think that's correct.

3     Q. Okay.  And that also happened, as you understand it,

4    after the point in time that Netlist terminated the contract,

5    correct?  That there were unfilled orders?

6     A. There may have been.  I don't recall looking at that

7    specifically, but it wouldn't surprise me.

8     Q. Not something you specifically looked at, correct?

9     A. I don't recall doing so, as I sit here.  I may have at

10   some point some months ago.

11    Q. So let's go to -- we're still on Exhibit 311.  And if we

12   could, let's take a look at row 912.  And we'll put that up

13   on the screen, and hopefully that will work for you to look

14   at.

15          And that is purchase order, Samsung for Samsung

16   product from Netlist, correct?

17    A. Yes.

18    Q. And column B, it's -- the date is April 16, 2019,

19   correct?

20    A. That's correct.

21    Q. And if you go to column I, that is the quantity ordered.

22          And that is 500, correct?

23    A. Yes.  I don't have the column headings there, but I think

24   that's right.

25    Q. And then J would be the quantity received, correct?

AKEMANN - CROSS

1      A. Again, correct, I think.

2      Q. Okay.  So here there would be no cover purchases and no

3      cover damage, right?

4      A. Well, this is a transaction that Netlist actually made

5      with Samsung.  If they originally desired more than 500, it's

6      possible that there was cover somehow associated with the

7      business arrangement.  But I'm not calculating any cover

8      damages related to row 912.

9      Q. Right.  Good.  Okay.

10             So take a look now at row 921.  And this one is

11     dated May 7, 2019.  So again, with within the damage period,

12     correct?

13     A. That's correct.

14     Q. And this is a Netlist database, correct?  This is their

15     information, right?

16     A. That's correct.

17     Q. That was available to you as an expert, right?

18     A. Yes.

19     Q. Okay.  And if you go to column I, the Quantity Ordered,

20     it's 258, right?

21     A. Yes.

22     Q. And the quantity received is zero, correct?

23     A. Yes.

24     Q. And if you keep going over, it shows the unit price of

25     $37, correct?

AKEMANN - CROSS

1        A. Yes.

2        Q. Okay.  Now, if I understand your testimony correctly, you

3     started not with an unfilled purchase order, or an unfilled

4     forecaster request, you started with the reseller purchased

5     by Netlist, correct?

6        A. With respect to identifying the cover transactions,

7     that's correct.

8        Q. Okay.  So am I correct, you didn't make any effort to try

9     to take this particular unfilled purchase order and look at

10    the reseller data, which has matching product numbers, to see

11    if Netlist covered, by purchasing this product, 258 units

12    within some reasonable timeframe after June 24, 2019,

13    correct?

14       A. That's correct.  I considered whether that was possible,

15    and --

16       Q. Now that -- if you could just answer my question.  And

17    then if you want to try to explain, you will get a chance to

18    do that, sir.

19             Will you please try to do that?

20       A. Yes.

21       Q. Thank you.

22             So if you found -- if you did do that, and you did

23    find a reseller purchase for 258 units within some reasonable

24    time within June 24, 2019, from Netlist's database, you would

25    know what Netlist paid to cover versus what they were

AKEMANN - CROSS

1      required to pay Samsung under the purchase order, correct?

2       A. I'm not sure I followed that question.

3       Q. In other words, if I did look for a matching reseller

4      purchase, and I found one for 258 units within some

5      reasonable period of time after June 24, 2019, and I would

6      know what Netlist had to pay through the reseller purchase

7      data, I could calculate the cover damage.  I could calculate

8      the difference between what Netlist paid the reseller for

9      this matching product and what, under the purchase order, the

10     unit cost was for Samsung, right?

11      A. It's possible you could do that.  I haven't tried to do

12     that in any systematic way here.

13      Q. Absolutely.

14           But you know what?  You don't need a Ph.D. in

15     economics to do that math, do you?

16      A. I don't know.

17      Q. I think I could do that math.

18           But anyway, that's not the way you did it, right?

19      A. No.

20      Q. So I want to talk about the way you did it.

21           And the way you did it is you started with these --

22     the reseller purchases during this second quarter 2017 to

23     July 2020, which you totaled up to be $53.4 million, right?

24      A. That's correct.

25      Q. And I want to pull up an exhibit from your report,

AKEMANN - CROSS

1        Exhibit 2 to your report.

2                MR. YODER:  We can just put that on the screen.

3        BY MR. YODER:

4        Q. And this shows your calculation of this universe of

5        reseller purchases that you used for purposes of your cover

6        damage calculation, right?

7        A. Yes.

8        Q. Now, you assumed, if I understood your testimony

9        correctly, that every dollar within this 53.4 million was

10       paid by Netlist to obtain product that Samsung didn't supply

11       in breach of the JDLA, correct?

12       A. I think that was at least approximately correct.  I do

13       assume that these are cover transactions generating cover

14       damages.

15       Q. You assumed that they're cover damages, right?  Or these

16       are cover purchases that you then used to calculate your

17       cover damages, right?

18       A. They were at least eligible for that.  But as I

19       explained, because there are negative price premium, they

20       don't all generate damages.  But they are eligible for it.

21       Q. Well, you used that $53.4 million number when you did

22       your math, right?

23       A. I did use the data that are shown here in Exhibit 2,

24       that's correct.

25       Q. Yeah.  So every dollar of this 53.4 million -- whether it

AKEMANN - CROSS

1    was a negative price premium or a positive price premium --

2    you counted that when you applied your percentage price

3    premium, correct?

4            You used --

5     A. I'm not sure that's quite correct.

6     Q. Pardon?

7     A. I said, I'm not sure that was quite correct.

8     Q. You used $53.4 million when you multiplied it by your

9    4.6 percent, right?

10    A. No, that doesn't correctly capture the calculation.

11    Q. Well, that is what the calculation was.  You may have an

12    explanation for why you did it that way, but when you came up

13    with your 2.4 million, you took 53.4 million and you

14    multiplied it by 4.6 million, and that was the 2.4 million,

15    right?

16            I don't need you to explain why you did it that way.

17    A. I don't think that correctly describes what I did.

18    Q. Okay.  Let me take a look at your chart.

19            MR. YODER:  If I may ask for a copy of their slides

20    with Dr. Akemann.  I know they gave them to us last night.

21            MR. LO:  It's in your direct binder.  It's in the

22    pocket.

23    BY MR. YODER:

24    Q. Let's take a look at your slide 6.  Maybe I'm missing

25    something.  Tell me when you've got it, if you would, sir.

AKEMANN - CROSS

1      A. I'm there.  Thank you.

2      Q. So if I understand your formula here, C equals A times B.

3      C is cover damages.  A is the 53,399,592.  And -- that's A.

4      And then B is 4.6 percent, right?  That was the formula,

5      right?

6      A. That is correct.

7      Q. Okay.  Now, turn real quickly, if you would, I just want

8      to clarify something on Exhibit 504.

9             MR. YODER:  Do we have that?  It was their slides.

10            I don't know that I have to put it up.

11     BY MR. YODER:

12     Q. But it's this slide.

13     A. It's up.

14     Q. Oh.  Good job.

15            So you said this shows a steady increase in

16     purchases from resellers.  I just want to clarify something.

17     This chart, unlike Exhibit 503 -- which we can look at --

18     isn't showing orders per month, correct?

19     A. That's correct.

20     Q. It's showing --

21     A. Cumulative.

22     Q. -- it's showing cumulative, right?

23            So every month, you're adding on what happened prior

24     to that.  And you're showing the total cumulative amount over

25     this period of time, right?

AKEMANN - CROSS

1      A. That's correct.  As shown on the Y axis.

2      Q. Okay.  Now let's look at 503.  That is a different

3      animal, right?  This isn't showing cumulative; this is

4      actually showing month by month, right?

5      A. That's correct.

6      Q. Yeah.  So if you did 503 the same way you did 504, it

7      would also keep going up, right?  Because every month you're

8      adding what happens to the prior months, right?

9      A. It would keep going up.  That's correct.

10     Q. Okay.  Now, you did look at the purchase order data from

11     Samsung.  We looked at Exhibit 311.  And that had -- you can

12     go back and look, just to make sure you've got it in mind.  I

13     may be more familiar with these exhibits, unfortunately, than

14     you at this point.

15     A. I'm very familiar with the data, just the exhibit

16     numbers --

17     Q. I got it.

18     A. -- aren't at the fore of my mind.

19     Q. I got it.  No, that's fine.  I understand that.

20         So did you total up the amount, the price amount for

21     all of the unfilled orders that are reflected during the

22     damage period on Exhibit 311?

23     A. Um, I did some calculation in my expert report of

24     unfilled orders.  But without referencing my report, I don't

25     recall it specifically.

AKEMANN - CROSS

1    Q. Yeah.  I mean, if I represent to you it was something in

2    the range of the middle of $3.5 million, does that sound

3    about right?

4    A. I don't recall doing that specific calculation, no.

5    Q. Do you have any reason to -- I mean, the numbers are the

6    numbers, and we can all add them up and talk about them in

7    closing argument.

8         Do you have any reason to question that that is the

9    range of the price for the unfilled orders, according to

10   Netlist's database?  Do you have any reason to take issue

11   with that number?

12   A. No, not specifically.  But I just haven't done the

13   calculation, so I don't know that specific number that you

14   are referencing.

15   Q. Okay.  So the point is this:  That it's a lot smaller

16   than $53.4 million, right?

17   A. Um, 3.5 is certainly less than 54, but...

18   Q. Right.

19   A. If that's all you're asking me, yes.

20   Q. So is it fair, then, to assume that the difference

21   between the unfilled purchase orders and that 53.4 million

22   that Netlist claims that Samsung failed to supply in breach,

23   were the subject of forecasts?

24   A. Um, I don't think I would necessarily assume that, given

25   the allocation issues that we've heard about.

AKEMANN - CROSS

1    Q. Okay.  Well, you didn't go back and look at those

2    forecasts, did you?

3    A. Um, I didn't attempt to look at them systematically.  I

4    have seen some forecasts in the context of my work.

5    Q. Yeah, but you didn't try to take the reseller purchase,

6    some of this 53.4 million, minus the 3 and a half million,

7    and look at what those reseller purchases were, and try to

8    match them up with some forecast that Netlist gave Samsung

9    that Netlist -- that Mr. P.K. Hong says Samsung refused to

10   fill in breach of the JDLA?  You didn't do that, did you?

11   A. I don't think I did the specific comparison that you just

12   described, no.

13   Q. Right.

14            Now, would you agree with me that a forecast is an

15   estimate and a prediction?

16   A. I think it depends on the context.

17   Q. Well, why don't we look at the Webster dictionary

18   definition.

19            MR. YODER:  If we could bring that up.

20   BY MR. YODER:

21   Q. See if you disagree with it.  Forecast -- using it as a

22   noun -- first definition is a prophesy, estimate, or

23   prediction of a future happening or condition.

24            Do you disagree with that definition?

25   A. I don't have any reason to disagree with that, no.

AKEMANN - CROSS

1    Q. Okay.  And you were here in court when Mr. P.K. Hong

2    testified that he understood that forecasts were not binding.

3         You heard that, right?

4    A. I don't recall what he said specifically on that point.

5    Q. Seems like an important point.

6         You are saying you were here and you don't recall

7    hearing him testify that he understood that forecasts were

8    not binding?

9    A. I just don't recall him using that specific phrasing.

10   Q. So let's look at a forecast real quickly.  Let's look at

11   Exhibit 376.

12        MR. YODER:

13        And I believe, Your Honor, that's in evidence, if I

14   might publish that.

15        THE COURT:  Sure.

16        MR. YODER:  Actually, before we do that, let's look

17   at 1487.  Which also, Your Honor, I believe is in evidence.

18   So with the Court's permission, if I could publish?

19        THE COURT:  Yes.  Go ahead.

20        MR. YODER:  I misspoke, Your Honor.  I apologize.

21   It's Exhibit 1336.  So let's bring that up, which is in

22   evidence.

23   BY MR. YODER:

24   Q. So Dr. Akemann, you recognize this to be a forecast that

25   Netlist provided to Samsung.  And this one is dated

AKEMANN - CROSS

1    November 7, 2017, which is in your damage period, correct?

2     A. That's correct.

3     Q. And you will note from this forecast that there is --

4    it's forecasting product, particular products, starting in

5    January of 2018 -- so a couple of months later -- all the way

6    through June of 2018 -- some eight months later -- correct?

7     A. That's correct.

8     Q. And you will agree that this forecast does not include a

9    purchase price?

10    A. I think that's correct.  I can't see the whole document,

11    but that is consistent with my recollection.

12    Q. Yeah.  It doesn't have payment terms, correct?

13    A. I don't think so.

14    Q. Yeah.  It doesn't have any kind of information on place

15    of delivery, correct?

16    A. I think that's correct.

17    Q. Okay.

18        MR. YODER:  Now let's look at Exhibit 376.  Which

19    again, Your Honor, has been admitted, I believe, by

20    stipulation.  So if I may publish?

21        THE COURT:  Yes.

22   BY MR. YODER:

23    Q. And this is an e-mail that Mr. P.K. Hong sent to Samsung,

24    Mr. Knuth, on December 13, 2017.  Again, this is within the

25    damage period that you have used for calculating your cover

AKEMANN - CROSS

1    damages, right?

2     A. That's correct.

3     Q. And you will see again it talks about a specific product,

4    right?

5     A. Yeah, appears to.

6     Q. Asking -- telling Samsung that there's a customer asking

7    for a certain amount, correct?

8     A. That's correct.

9     Q. But there is no price indicated here, correct?

10     A. I don't see a price on this page.

11     Q. And there is not a specific quantity, it talks about the

12    customer asking for.  But it's not setting forth a specific

13    quantity to be delivered on a particular day with specific

14    terms, correct?

15     A. It doesn't appear to have that level of granularity,

16    that's right.

17          MR. YODER:  Now, let's look at Exhibits 358 and 359,

18    which Mr. P.K. Hong was asked about.  And --

19          May I publish these, Your Honor?  These were

20    admitted.

21          THE COURT:  Yes, you may.

22    BY MR. YODER:

23     Q. So 358 I think is an e-mail.  So this is March 18, 2019.

24          Again in the damage period, correct?

25     A. March 18, 2019, yes.

AKEMANN - CROSS

1      Q. Okay.  And then if we look at the attachment, 359,

2      Mr. P.K. Hong testified that it was normal practice for

3      Netlist to provide this type of information to Samsung with

4      respect to pending purchase orders.

5            Were you here and did you hear that testimony?

6      A. I heard something to that effect, yes.

7      Q. And he said that when Samsung was not agreeing to supply,

8      it would not offer any comment in the comment column.

9            Did you hear that?

10     A. I did.

11     Q. Now, this document actually shows an amount, a price per

12     unit, and then a total amount, correct?

13     A. Yes.

14     Q. Okay.  Did you make any effort to try to determine if

15     these unfilled orders on this exhibit could be matched to a

16     particular reseller purchase from Netlist's database?

17     A. No, I didn't attempt that specifically.

18     Q. So I guess I do want to go back and clarify something you

19     said.  Because you said that when you did your calculation of

20     cover damages --

21            MR. YODER:  And if we could bring back up the damage

22     calculations slide, Dr. Akemann's slide, where it shows the

23     calculation.

24     BY MR. YODER:

25     Q. You said you only included overpayments in your

AKEMANN - CROSS

1    calculation.

2            Did I hear that testimony right?

3    A. Um, I'm not sure that is exactly what I said.  But I'm

4    happy to explain what I did, if it's unclear.

5    Q. Well, I think you've explained what you did.  I'm just

6    trying to establish that when you -- when you used your

7    $53.4 million number, that included reseller purchases,

8    where, according to your methodology, you found that Netlist

9    had actually paid Samsung more -- or that they had actually

10   paid Samsung less -- more.  I'm getting confused -- that they

11   had paid Samsung more than what they were able to get it from

12   a reseller for.

13           So in other words, they were paying the reseller

14   less than what they were paying Samsung, right?

15   A. That was a long question, but I think the answer is yes.

16   This is the notion of accounting for negative price premium.

17   Q. Right.

18   A. And I did do that in coming up with that 4.6 percent

19   figure.

20   Q. And the 53.4 million, again, includes dollars for

21   reseller purchases, where, according to your methodology, you

22   are saying that Netlist was actually able to get it from a

23   reseller for less than what they would have paid Samsung,

24   correct?

25   A. The figure at the top includes all the transactions, but

AKEMANN - CROSS

1       the calculation --

2        Q. Including those, right?  Just answer my question, please.

3        A. Yes.

4        Q. Okay.  Thank you.

5             Now, I have been handed the testimony of Mr. P.K.

6       Hong that I was asking you about where you couldn't recall.

7       And he testified today that:  "When you send the forecast, it

8       is not binding, correct?"

9             Answer:  "Yes."

10            Did you hear that testimony?

11       A. I heard all of his testimony.  I just don't have perfect

12      recollection of the specific phrasing that he used in that

13      answer.

14       Q. You're not -- you're not denying that he actually so

15      testified, are you?

16       A. Definitely not.  I'm just saying that my memory shouldn't

17      determine how the jury interprets his testimony.

18       Q. Okay.  Let's do this:  Let's go to your slide -- I don't

19      know if it was in the packet today.  I think this was one of

20      the slides that we were given that may not have been marked

21      today, but it's that one.

22            So this was a slide you prepared, correct?

23       A. That's correct.

24       Q. And the purpose of this was to demonstrate at least some

25      aspect of your methodology?

AKEMANN - CROSS

1    A. That's correct.

2    Q. And what you're showing here in this big blue dot in the

3    center, that is a reseller purchase that Netlist made which

4    it is claiming was to cover for Samsung not supplying

5    something in breach, right?

6    A. Yes.  It's meant to illustrate a cover transaction.

7    Q. So the light blue -- is that the right color?

8    A. I'll go with that, yes.

9    Q. The light blue, smaller dots, are instances where you

10   identified purchases by Netlist from Samsung of that same

11   product, right?

12   A. That's correct.  It's meant to illustrate those

13   transactions.

14   Q. And the ones you used for your methodology were Samsung

15   purchases that were either 90 days before the reseller

16   purchase or 90 days after, correct?

17   A. That's correct.

18   Q. And if any Samsung purchases were outside of that 180-day

19   window, you did not consider those, right?

20   A. I considered them, but didn't use them as benchmark

21   prices.

22   Q. Yeah.  You didn't use them for your calculation, right?

23   A. That's correct.

24   Q. Okay.  Now, in your deposition, when you were asked about

25   this, you said that nothing required you to use 180 days, but

 1    one of the reasons you picked it is that someone told you

 2    that Samsung changes prices each quarter.

 3            Do you recall that?

 4    A. I said something to that effect, that's correct.

 5    Q. Right.  But the 180 days doesn't necessarily match up

 6    with a first quarter, second quarter, right?  The quarter

 7    might end at various points in time, correct?

 8    A. Um, well, the quarters end when they end, but that's

 9    right.

10    Q. And you were here for testimony, as well, that Samsung

11    changed its pricing quarterly for some products and monthly

12    for other products, correct?

13    A. That's correct.

14    Q. And you also heard testimony that sometimes the pricing

15    actually changes weekly, correct?

16    A. Yes, I think I heard that as well.

17    Q. And you also heard testimony from Mr. P.K. Hong that

18    Samsung would publish price lists of what pricing was for

19    product at a particular point in time, correct?

20    A. I heard him reference that, yes.

21    Q. Right.  And according to Mr. P.K. Hong, they were

22    nonnegotiable.  Everybody knew that on those price lists,

23    that was the price they had to pay Samsung for that product

24    at that point in time, correct?

25    A. Well, I think he said that at least Netlist couldn't

AKEMANN - CROSS

1    negotiate the prices.  That's what I understood.

2    Q. For Netlist, that was the price, right?

3    A. He said something to that effect, that's correct.

4    Q. Good enough.  Good enough.

5              So I want you to go to Exhibit 3 to your report.

6    And this is a schedule you prepared, correct?

7    A. That's correct.

8    Q. And I want to ask you some questions about this.  I think

9    this one is important.  You -- you went out and you tried to

10   find these matching transactions from -- purchases from

11   Samsung with the reseller purchases.  You figured out what

12   price differential was, and then you came up with this price

13   premium that you ultimately multiplied against the

14   53.4 million.  But you couldn't find matches for all of the

15   reseller purchases, right?

16   A. That's correct.

17   Q. In fact, you couldn't find matches for most of the

18   reseller purchases, correct?

19   A. I don't necessarily agree with that characterization.

20   Q. Most, by my definition, is a majority, which means more

21   than 50 percent.

22              Can we go with that definition?

23   A. If you would like.

24   Q. Okay.  So if I'm looking at your chart, you did a couple

25   of different calculations in terms of how you came up with

AKEMANN - CROSS

1    your price premium.  The one that you're going with here in

2    court is what you call "volume-controlled," right?

3    A. That's correct.

4    Q. So we'll just talk about that one.  Won't have to get

5    into the other one, and we'll save some time.

6          So on your volume-controlled price premium

7    calculation, you show in the second column, "Percent of

8    reseller units, 16.5 percent," right?

9    A. Correct.

10   Q. So what that means is that for all of the reseller

11   purchases that you are using as part of your 53.4 million,

12   you were only able to find matching Samsung purchases within

13   your 180-day window for 16.5 percent, right?

14   A. Of the units.  That's correct.

15   Q. Yeah.  Meaning that for 63.5 percent -- and I'll thank

16   Mr. Doren for correcting my math -- you couldn't find a

17   matching transaction, right?

18   A. You did switch to the dollars as opposed to the units.

19   But on a dollar basis --

20   Q. Oh, you are right.  It's 83.5 percent.  Maybe I couldn't

21   do that calculation.  Maybe that's the problem here.

22          But here's the deal:  If I subtract 16.5 from 100, I

23   think I get 83.5, right?

24   A. I think I get the same figure.

25   Q. Okay.  So for 83.5 percent of these reseller

AKEMANN - CROSS

1    transactions, by unit, based on your methodology, you weren't

2    able to find a matching Samsung purchase, right?

3     A. On a unit basis, that's correct.  If we both did our math

4    right anyway.

5     Q. We're getting there.

6         So on a dollar basis -- because you did that, too.

7    And that's the next column, right?

8     A. Correct.

9     Q. And there, you were able to find a matching transaction

10    for only 36.5 percent of the dollar volume of the reseller

11    purchases, correct?

12    A. Yes.  36.5 percent.

13    Q. So I think if I -- so I think if my math is right on

14    that, it means a majority, or 63.5 percent, you were unable

15    to find a match for, right?

16    A. That's correct.

17    Q. And so for that 53.4 million -- I'm not going to try to

18    do the math -- that would be, you know, 63.5 percent of that,

19    there was no matching transaction, right?

20    A. Correct.  Only 36.5.

21    Q. So you heard Mr. P.K. Hong's testimony about these

22    published price lists, right?

23    A. I heard him say that, yes.

24    Q. Did you ask them to give you those?

25    A. I recall discussing them.  And may have looked at some.

AKEMANN - CROSS

1      I don't have a specific recollection, as I sit here.

2       Q. Okay.  But you didn't make any specific effort, did you,

3      to try to match up these reseller purchases with the Samsung

4      published price at a particular point in time, correct?

5       A. Yeah, I didn't do that specific comparison.

6       Q. Right.  And for these unmatched transactions that

7      represent 83.5 percent of the units, 63.5 percent of the

8      dollar volume, instead of looking for the published price

9      list to show the Samsung price to Netlist at that point, you,

10      instead, applied this price premium that you calculated based

11      upon these matched transactions, right?

12       A. I think that generally describes my methodology

13      correctly.  Excuse me.

14       Q. Thank you very much.

15             THE COURT:  Thank you, counsel.

16             Any redirect?

17             MR. LO:  Yes, Your Honor.

18                        REDIRECT-EXAMINATION

19      BY MR. LO:

20       Q. Dr. Akemann, let me start with where counsel left off.

21             You were asked in situations where -- you were asked

22      a series of questions about a situation in which you found a

23      reseller transaction, but you could not find any purchases of

24      that product from Samsung in the 90 days prior or 90 days

25      post.

                        AKEMANN - REDIRECT

1              Do you recall this discussion you just had?

2        A. I do.

3        Q. And Mr. Yoder asked you whether you did analysis where

4    you simply looked at Samsung's published prices for those

5    90 days period before and after, even though no transactions

6    took place.

7              Do you recall that questioning?

8        A. I do.

9        Q. Given that no transactions took place during that time,

10   as an economist, would you want something -- to know anything

11   more before simply just assuming that the published prices

12   are -- well, would you want to know anything more about those

13   published prices, given no transactions take place, as an

14   economist?

15       A. I would.  What I would want for my analysis -- and,

16   indeed, what I used -- was to look at actual invoice-level

17   transaction prices.  So I felt that the best benchmarks would

18   be driven by actual purchase behavior by Netlist.  Because

19   that's what should have happened if the contract hadn't been

20   breached; Netlist should have been able to make a purchase.

21             So the best benchmarks, from an economic

22   perspective, to me, were based on actual Netlist purchases

23   from Samsung, not price lists and other things of that sort.

24       Q. Let's take, briefly, a look at your graphic 18.  And

25   that's s just a summary of your opinions.

AKEMANN - REDIRECT

1          What does the $53.3 million figure represent?

2      A. Those are all the reseller invoices during the damages

3      period.  In other words, those represent the cover

4      transactions that I'm assuming Netlist had to make because of

5      the breach of contract.

6      Q. When you did your analysis, did you find that for at

7      least some of that 53. -- I'll round up -- $53.4 million,

8      Netlist actually purchased from a reseller at a lower price

9      than it -- than the relevant Samsung transactions?

10     A. I did.  Those were the negative price premiums that we

11     discussed now some time ago.  And I took that into account

12     and reduced my damages -- price premium estimate accordingly

13     and the overall damages as a consequence.

14     Q. Well, let's break that down a little bit.  Because what

15     Mr. Yoder was showing you is that, well, you simply took the

16     entirety of the 53.4 million and multiplied it by the

17     4.6 percent; so therefore, even though some of those

18     transactions were at a higher price than the Samsung

19     transactions, you are essentially punishing Samsung for that.

20          Is that what happened, mathematically?

21     A. No, definitely not.  And that's why I was trying to

22     explain previously that the 4.6 percent itself reflects both

23     places I found a positive price premium, but it also reflects

24     every place I found a negative price premium.  So it's the

25     net result of those sets of calculations.

AKEMANN - REDIRECT

1        And importantly, what it means mathematically is
2   that premium is lower than if I had just counted all the
3   positives.  And damages are lower than they would be if I had
4   just counted all the positives.  I give Samsung credit every
5   time I found a comparison that led to a negative price
6   premium; in other words, the reseller price happened to be
7   lower than what the Samsung price was.
8   Q. Thank you.
9        MR. LO:  No further questions.
10       THE COURT:  I have a question real quick.  The
11  4.6 percent, it's not -- it's actually 4.6 something, right?
12       THE WITNESS:  That's correct, Your Honor.  It's
13  rounded.
14       THE COURT:  Just if somebody was doing the math,
15  it's not going to work.
16                      RECROSS-EXAMINATION
17  BY MR. YODER:
18  Q. And I won't try to do that math.  I've already
19  demonstrated that that is not one of my skill sets.
20       But counsel asked you, "As an economist, would you
21  want to look beyond just the price list?"  And you said, "I
22  would want to see the actual purchases," right?
23       Well, what we're trying to do here is do a legal
24  determination of damages.  And we've already gone over what
25  cover damages are.  Which, as you agreed, are the amount paid

AKEMANN - RECROSS

1    to a reseller above what Netlist should have been able to get

2    the product for from Samsung, right?

3           So for the matched transactions, the ones you could

4    find, the minority of the transactions --

5           MR. YODER:  If we could pull up the slide that just

6    shows the reseller transaction and the window around it?  I

7    got it.

8    BY MR. YODER:

9     Q. It shows the 180-day period.  And you're using for these

10   matched transactions --

11          MR. YODER:  Thank you.

12   BY MR. YODER:

13    Q. -- you're using everything that happens within this

14   180-day window, right?  You are including that in your

15   calculation of this price premium, right?

16    A. Um, as long as the transactions meet the other criteria.

17    Q. Okay.  And you heard Mr. P.K. Hong testify that the price

18   list that Samsung published -- whether weekly, monthly,

19   quarterly -- was nonnegotiable for Netlist, right?

20    A. I heard him testify to that effect.

21    Q. So that is the price Netlist is going to pay Samsung,

22   right?

23    A. Depends when the product's delivered.

24    Q. Okay.  We're going with these resellers, which is when

25   the product's delivered, right?  That is how you determine

AKEMANN - RECROSS

1   this 180 days, right?

2    A. This transaction is at the invoice date.

3    Q. Yeah.  That's what you're doing.

4        So for the matched transactions, did you make any

5   effort to determine if there was a published price list from

6   Samsung to Netlist that would tell you exactly what the price

7   was on July 23, 2019?

8    A. I didn't attempt to do that, no.

9    Q. For the unmatched transactions.  You didn't have any

10  matches at all.  You simply assumed that what you calculated

11  for the matched transactions would apply the same way to the

12  unmatched transactions?

13   A. I did use the matched transactions to estimate the

14  unmatched, that's correct.

15   Q. And for these unmatched transactions, these majority of

16  these unmatched transactions, did you make any effort to see

17  if you could find a published price list that would establish

18  the nonnegotiable price that Netlist would have paid Samsung

19  when these orders weren't filled?

20   A. No, I didn't attempt to do that.

21           MR. YODER:  Thank you very much.

22           THE COURT:  Any redirect?

23           MR. LO:  Nothing further, Your Honor.  Thank you.

24           THE COURT:  You're excused, Dr. Akemann.

25           Please call your next witness.

```
 1              MR. DOREN:  Your Honor, we have a few questions for

 2    Mr. Knuth.  And we have a few designations among the

 3    designations for Mr. Jiang.  But we are ready to rest,

 4    subject to those two witnesses and any rebuttal.

 5              THE COURT:  Okay.  That's fine.  So does Samsung

 6    want to call its first witness at this time?

 7              MR. RHOW:  Your Honor, prior to -- so I take it,

 8    then, the plaintiffs rest.  We would be calling Mr. Yu, who I

 9    assume is here.  But I think we are going to make a motion,

10    if Your Honor so permits.

11              MR. YODER:  Yes, Your Honor.  Should we reserve

12    until they finish?  Or would you like us to do it now?

13              THE COURT:  What I would like to do is I would like

14    to hear your motion after they finish.  So reserve until they

15    finish.  You are reserving until then.  This way we can make

16    use of the 45 minutes we have for the jury.

17              MR. RHOW:  We would then call Mr. Yu.

18              THE COURT:  Yeah.

19              THE CLERK:  Stand here for me, please.  Raise your

20    right hand.

21    THEREUPON:

22                             MR. STEVEN YU,

23    Called in these proceedings, and after having been first duly

24    sworn, testifies as follows:

25              THE CLERK:  Please be seated.
```

YU - CROSS

1            MR. RHOW:  Your Honor, just -- oh, sorry.

2            THE CLERK:  Please state and spell your full name

3      for the record.

4            THE WITNESS:  Steven Yu.  S-t-e-v-e-n, Y-u.

5            THE CLERK:  Thank you.

6            THE COURT:  Counsel?

7            MR. RHOW:  Your Honor, just to confirm -- and I

8      always forget the rule in Federal Court, but we are calling

9      Mr. Yu as an adverse witness.

10           THE COURT:  So you can go ahead and lead.

11                       CROSS-EXAMINATION

12     BY MR. RHOW:

13      Q. Mr. Yu, nice to meet you.  We haven't met before.

14      A. Nice to meet you.

15      Q. Your title at Netlist is commodity manager?

16      A. Correct.

17      Q. I'm sorry?

18      A. Correct.

19      Q. You may want to speak into the mic.  It is a little

20     light.

21      A. Oh, okay.

22           THE COURT:  Move up closer.

23           THE WITNESS:  Correct.

24     BY MR. RHOW:

25      Q. Thank you.

YU - CROSS

1          And you've held that position since 2018?

2     A. Middle of 2018, after Raymond -- Mr. Jiang left the

3     company.

4     Q. Now, your job is to purchase raw materials or finished

5     goods for use by Netlist, correct?

6     A. My job is to purchase Samsung-finished goods or discrete

7     components from Samsung.

8     Q. Mr. Yu, I know you're trying to answer the question, but

9     if you can give me the "yes" or "no."  And if it's "no," that

10    is fine, I'll follow up.  That'll probably make things go

11    faster.

12    A. Yes.

13    Q. So is it true or not true that your job is to purchase

14    raw materials or finished goods for use by Netlist?

15    A. Yes.

16    Q. And in your position as commodity manager, you also do

17    handle purchases of chips from Samsung, correct?

18    A. Yes.

19    Q. You also handle purchases of chips from resellers,

20    correct?

21    A. Yes.

22    Q. And all things being equal, your job is to get the best

23    price you can get.

24          Is that a fair statement?

25    A. No.

YU - CROSS

1    Q. Your job is to get the worst price you can get?

2    A. My job is to fulfill our customers' requests for either

3    Samsung, NAND or DRAM-related products.

4    Q. And for you, do you try to get your customers the best

5    price?

6    A. Not -- not -- it varies on a case by case.

7    Q. In any case, do you ever try to get your customers a good

8    price?

9    A. I always ask Samsung for the product first.  And whatever

10   price that Samsung provides, that's the price that, you know,

11   we -- if they approve, then we will buy from them.

12   Q. Mr. Yu, just listen to my question.  We're not talking

13   about Samsung and requests yet.

14          All I'm asking you, is for your customers -- and you

15   said for some customers, this is a true statement.  For your

16   customers, do you try to get a good price?

17   A. I don't know, since the price that we purchased from

18   Samsung, that's the price that they provide to us.

19   Q. Mr. Yu, you bought $51 million of chips from resellers;

20   is that right?

21   A. I do not know the exact number.

22   Q. From 2000- -- middle 2017 to middle 2020, did you or did

23   you not -- strike that.

24          Since the time you have been with Netlist, you

25   bought a lot of chips from resellers.  No?

YU - CROSS

1    A. I have bought a lot of chips from resellers, yes.

2    Q. Tens of millions of dollars' worth of chips, right?

3    A. I do not know the exact number.

4    Q. Is it more than a million?

5    A. Yes.  It would be more than a million.

6    Q. More than 5 million?

7    A. It would be more than 5 million.

8    Q. And when you make these purchases from resellers, you are

9    trying to get a good price, right?

10   A. No.  The reason why I would go to a reseller is if

11   Samsung couldn't support our initial request of the product.

12   If Samsung said that they could not support it, then we would

13   go out to the reseller to fill -- to fill the products for

14   our customers.

15   Q. I didn't ask anything about Samsung.  I was asking about

16   resellers.

17           Among resellers, when you're trying to find a

18   chip -- forget Samsung right now.  I know this is a Samsung

19   trial, but forget Samsung for now.

20           Among resellers, when you're shopping for prices

21   among resellers, do you try to get a good price?

22   A. We would only go to resellers if Samsung couldn't support

23   it.  The price doesn't matter.

24           MR. RHOW:  Your Honor, I would move to strike that.

25           THE COURT:  Motion granted.

YU - CROSS

1    BY MR. RHOW:

2     Q. Do you understand the question I'm asking?

3     A. Yes, I understand the question.

4     Q. Let's try to tie it to a document. That might be

5    helpful.

6              MR. RHOW: I would like to move -- 1032.

7              Your Honor, this is marked 32, but it is actually

8    1032. And it's in the juror notebooks as 1032.

9              THE COURT: Any objection to 1032 being admitted?

10             MR. DOREN: No objection, Your Honor.

11             THE COURT: It's admitted. You can publish.

12             MR. RHOW: Thank you, Your Honor.

13             (Exhibit 1032 received in evidence.)

14   BY MR. RHOW:

15    Q. Mr. Yu, 1032 is an e-mail chain involving you. I don't

16   mean that as a pun.

17             Do you see that?

18    A. Yes, I see the e-mail.

19    Q. March 15th, 2018.

20             Do you see that?

21    A. Yes, I see the e-mail.

22    Q. All right. Let's go through this e-mail. Let's start --

23   and this starts from the bottom going up. So I want to give

24   you the context. So let's go to the second page. And this

25   is -- and I just want to give some context. If you look at

YU - CROSS

1      the e-mail at the bottom of the page where it says, "Can you

2      please help update PO 324905."

3       A. Yes, I see that on --

4       Q. Do you see that?  And so based on this e-mail, we're

5      talking about a particular purchase order that had been

6      submitted to Samsung, correct?

7       A. Yes.  This is a PO that Samsung was telling us to update.

8       Q. And then if you go to the top of that page, there is an

9      e-mail that you write.  You are writing to Violeta Zendejas

10      at Samsung.

11             Do you see that?

12       A. Yes, I see that e-mail.

13       Q. You are attaching and confirming a PO with her?

14       A. Yes.  I see that on this e-mail, I said, "Please see

15      attached and confirm."

16       Q. And then let's go to page 1.  And Mr. Paik Ki Hong -- who

17      we all met earlier today -- he e-mails you and says, "Who

18      gave you guidance this was okay to buy?"

19             Do you see that?

20       A. Yes, I see that e-mail.

21       Q. And then the e-mail above that, you write, "No one gave

22      me guidance.  I assumed and revised the PO to take parts due

23      to it being backlogged."

24             Do you see that?

25       A. Yes, I see that.

YU - CROSS

1    Q. And let's go up the page.

2         Who is Devon Park?

3    A. Devon Park is former employee at Netlist.

4    Q. And at that time, was he in procurement?

5    A. He was in sales operations.

6    Q. A colleague or a superior?

7    A. A colleague.

8    Q. And he writes to you -- I'm just quoting from the

9    e-mail -- "Crap.  I shouldn't have forwarded.  I didn't think

10   you would move on it from price being too high last time."

11        Do you see that?

12   A. Yes, I see that on the e-mail.

13   Q. And then the next paragraph is the one I want to focus

14   on.  He writes, "Always the same process.  Number one.  How

15   is pricing compared to market?"

16        Do you see that?

17   A. Yes, I see that on the e-mail.

18   Q. And it is true at Netlist, Netlist sales always followed

19   the same process of comparing pricing to the market, correct?

20   A. No.

21   Q. Devon Park was not telling the truth?

22   A. On this -- on this e-mail, he's just -- he is asking the

23   process, is, "How is pricing compared to market?"  But at

24   this time, in March 2018, I was just doing clerical work at

25   the company.  I was just -- I believe on this e-mail chain,

YU - CROSS

1  um, Raymond was traveling, so I was updating the PO, um,

2  following directions from Raymond and --

3  Q. Mr. Yu, I don't mean to put you on the spot.  I

4  understand you were in a clerical position.  But you're not

5  disputing what Devon Park wrote in March 2018 as being the

6  process, correct?

7  A. On this e-mail, he just states that, "How's pricing

8  compared to market?"  I don't know what that means, um, based

9  on this e-mail.

10  Q. Okay.  And he's also saying above that, that it is always

11  the same process.

12          You don't know what he meant by that?

13  A. I was just doing clerical work in 2018.  Like this e-mail

14  was in March of 2018.  I didn't do any purchasing until

15  Raymond Jiang left the company in middle 2018.

16  Q. Fair enough.

17          Let's go to the e-mail above the e-mail that

18  indicates, "It's always the same process."

19          And here's where you write, "Yeah, I recall that we

20  passed up on since Raymond said the market was cheaper than

21  Samsung."

22          Do you see that?

23  A. Yes, I see this.

24  Q. And so what you're talking about here is a situation

25  where Netlist voluntarily chose to pass on a part because the

YU - CROSS

1    market pricing was cheaper than the Samsung price, correct?

2     A. I do not recall the part that -- that, um, you know,

3    we're talking about on this e-mail.  I just have the part

4    number here.  So I don't know what the market pricing was

5    back then.

6     Q. Not my question.

7              Just -- you wrote that -- those words on this

8    e-mail, correct?

9     A. Yes, I wrote the words on this e-mail.

10    Q. And so forget about the specific parts, forget about the

11   specific price.  I don't care about what those are.

12             What I'm asking you is, you recall a situation, in

13   general, where Netlist passed on a part since the market

14   price was cheaper than the Samsung price, correct?

15    A. Yes.  But that is due to the part being backlogged and

16   pushed out.

17             MR. RHOW:  Your Honor, move to strike as

18   nonresponsive after "Yes."

19             THE COURT:  Motion granted.

20   BY MR. RHOW:

21    Q. You just told me, Mr. Yu, that you were a clerical worker

22   who didn't know about sales and wasn't handling sales.  But

23   now you are giving explanations about what is written here.

24             Were you running -- were you in sales or not during

25   this timeframe?

YU - CROSS

1    A. I was not in sales.

2    Q. So in terms of what was happening in sales, would

3    Mr. Paik Ki Hong be the person who was leading the

4    department?

5    A. For sales?

6    Q. Correct.

7    A. It would be the VP of sales.

8    Q. And who was that?

9    A. I do not recall who the VP of sales at that time was.

10   Q. What was Devon Park's position?

11   A. Director of sales operations.

12   Q. That's pretty high up in that list, right?

13   A. I do not know at that time.

14   Q. So you have no reason to question Devon Park's statement

15   about this always being the same process, since he was a

16   director of sales, correct?

17   A. A director of sales operations.

18   Q. You have no reason to question Devon Park's statement,

19   correct?

20   A. This is -- the e-mail that Devon Park wrote on this is

21   what he wrote.  I was just following directions based on this

22   e-mail.

23   Q. Now, it is true, Mr. Yu, is it not, that there were

24   situations where despite the product being available from

25   Samsung, you would go to a reseller, correct?

YU - CROSS

1    A. If the product was available and we requested it from

2    Samsung, then we would issue the PO at Samsung.

3    Q. Well, there are situations you went to a reseller because

4    there was a faster lead time, correct?

5    A. We would go to a reseller if Samsung couldn't support the

6    part in a timely matter.  Then we would go to a reseller to

7    get the part.

8    Q. That's not my question.

9         So is it true, or is it not true, that sometimes our

10   customer needs product on a faster lead time.  And in that

11   situation you would go to Samsung -- I'm sorry, you would go

12   to a reseller, correct?

13   A. We would go to a reseller if Samsung couldn't support it

14   in a timely matter.

15   Q. Now --

16        MR. RHOW:  Actually, Your Honor, I would like to

17   read, then, from Mr. Yu's deposition, page 79, lines 10 --

18   actually, I'll do all the way to page 80, line 14.

19        THE CLERK:  Counsel, we need the depo.

20        MR. RHOW:  Oh, I'm sorry.

21        THE COURT:  Counsel, can you give me that cite

22   again.

23        MR. RHOW:  Yes, Your Honor.  It's Mr. Yu's

24   deposition, page 79, line 10, through 80, line 14.

25        THE COURT:  I think the part that might be

YU - CROSS

1      impeaching is 79, 10 through 20.

2              MR. RHOW:  Correct.  I was going to read the rest

3      for admission, but I think that -- that's fine for now.

4              THE COURT:  Does counsel have an objection to that

5      being read?

6              MR. LAMAGNA:  No objection.

7              THE COURT:  Go ahead.

8              MR. RHOW:  Your Honor, I would like to play it, if

9      that's okay.

10             THE COURT:  Sure.

11             (Thereupon, the video was played.)

12     BY MR. RHOW:

13      Q. Now, in the situation you just mentioned, the product

14     from Samsung, it's available; it's just not as available --

15     it's not as available as fast as you would like it, right?

16      A. The product is available at Samsung, but they communicate

17     that they will ship at a later date.

18      Q. And you understand -- or let me ask you this:  Do you

19     understand that it takes six to eight weeks to make wafer

20     chips through a FAB facility?

21      A. Yes, I understand there's a lead time associated.

22      Q. And so even assuming you want the product in a week, if

23     it takes six to eight weeks to make it, that's when lead

24     times don't match up with production times, right?

25      A. But the product is still being built by the factory, so

YU - CROSS

1    the product should still be available at Samsung.

2    Q. There are situations -- well, let me ask you this:  The

3    FABS you know are running 24 hours a day, or do you, I don't

4    know if you know this?

5    A. I do not know.

6    Q. Do you believe that the FABS are running around the clock

7    or not?

8    A. I believe that they are manufacturing.  I do not know if

9    they are 24/7.

10   Q. The concept of lead times, in general, is common with

11   chip manufacturers, correct?

12   A. Yes.

13   Q. And Netlist understands that in terms of availability,

14   lead time is a factor, correct?

15   A. There is lead time for some products.

16   Q. And so the answer is yes?

17   A. Yes.

18   Q. Now, we just saw your testimony here about a situation

19   where you went to resellers on your own.  Is that the only --

20   is that the majority -- in terms of the times you went to

21   resellers on your own, is that the majority -- strike that.

22   Sorry.

23        The majority of time you went to resellers was

24   because of a lead time issue, correct?

25   A. No.  The times that we go to resellers is if we put in a

YU - CROSS

1      request or quarterly forecast or month-to-month forecast to

2      Samsung and they could not support items, then we would go

3      out to the resellers to look for the parts.

4       Q. The minority of times you went to resellers was because

5      Samsung actually said no to a request, correct?

6       A. If Samsung said no to our request, then we would go to a

7      reseller to try to support the order from our customer.

8       Q. But the majority of times you went to a reseller was not

9      that situation, correct?

10      A. We only go to a reseller if the product, Samsung says no

11     support on the product, then we would go to the reseller.

12             MR. RHOW:  Your Honor, I would like to play 79, line

13     21, through 80, line 14.

14             THE COURT:  Any objection, counsel?

15             MR. RHOW:  Oh, I'm sorry.  It's 79, line 21 -- I

16     just want to make sure I have it right -- through 80, line 6.

17             THE COURT:  Any objection?

18             MR. LAMAGNA:  No objection, Your Honor.

19             THE COURT:  Any objection?  Okay.

20             Go ahead and play it.

21             (Thereupon, the video was played.)

22     BY MR. RHOW:

23      Q. And so based on, Mr. Yu, what you just testified to --

24     first of all, you're aware that at least in this case we have

25     been talking about $51 million of reseller purchases?  Has

YU - CROSS

1   anyone told you that or not?

2    A. I do not know.

3    Q. Okay.  Whatever that amount is, based on your testimony,

4   only a minority of that amount is actually a situation where

5   Samsung said no on a request.

6    A. Samsung -- Samsung very often says no to our requests.

7   So that's why we have to reach out to resellers to --

8             MR. RHOW:  Your Honor, move to strike.

9             THE COURT:  Let the witness finish his answer, and

10   then you can move.

11            MR. RHOW:  I'm sorry.

12            THE WITNESS:  Samsung, for most cases, you know,

13   when they very often don't support our requests, we have to

14   go source the products from our resellers to fill our

15   customer orders.

16            MR. RHOW:  Your Honor, I would move to strike.

17            THE COURT:  Motion granted.

18   BY MR. RHOW:

19    Q. Can you answer that question that I asked?  Did you

20   understand it?

21    A. Can you repeat the question.

22    Q. In terms of the times you go to a reseller, it is a

23   minority of times where it is because Samsung has said no to

24   a request, correct?

25    A. It is not a minority of times that we go to a reseller

YU - CROSS

1    because Samsung says no.

2    Q. Did you watch your testimony just now?

3    A. Yes.

4    Q. All right.  And so are you -- were you truthful during

5    your deposition when the Samsung attorneys questioned you?

6    A. Yes.

7    Q. Okay.  And are you contradicting it now?

8    A. No.

9    Q. All right.  Let's move on to a different subject.

10            Now, have you heard of the phrase EOL?

11   A. Yes.

12   Q. EOL means end of life, right?

13   A. Yes.

14   Q. And you would agree that it is unreasonable to have

15   Samsung build an EOL product when there is no production plan

16   for that, correct?

17   A. Yes.

18   Q. And so submitting forecasts or requests for an EOL

19   product that is not in the production plan, that is

20   unreasonable, correct?

21   A. Yes.

22   Q. Now, Netlist did submit requests for EOL product from

23   time to time, correct?

24   A. I do not remember.

25   Q. Do you recall if you ever did?

YU - CROSS

1    A. I do not remember.

2    Q. And when you say you don't remember, you don't remember,

3    but it could have happened?  Or you firmly do not believe it

4    happened?

5    A. I don't have any -- I don't recall at this moment.

6    Q. Were you aware of general market shortages in the chip

7    industry in 2020?

8    A. What part of 2020?

9    Q. Any part.

10   A. Yes, there was a chip shortage in early 2020.

11   Q. Can you explain that to the jury, please.

12   A. Um, there was a chip shortage in 2020.  And, um, both

13   DRAM and NAND products were short.  And that's part -- part

14   of the reason is just due to the COVID-19 pandemic.  And you

15   know, we had a lot of, um, customers, a lot of companies out

16   there, they wanted to stock up on some products in advance

17   because of the COVID pandemic.

18        And so, you know, it caused a shortage of parts

19   where Samsung had very little parts -- or parts were in short

20   from Samsung.  And it caused a shortage in the market.

21        MR. RHOW:  Your Honor, let me hand to you and to

22   Mr. LaMagna Exhibit 1057.  And again, unfortunately, this is

23   marked 57.  It is actually 1057 for the record.  Apologies.

24   BY MR. RHOW:

25   Q. Mr. Yu, you will get the exhibit in a second.

YU - CROSS

1              MR. RHOW:  I would like to move to admit and

2    publish.

3              THE COURT:  Counsel, any objection?

4              MR. LAMAGNA:  We would reserve on the credit issue

5    we discussed earlier, but otherwise no objection.

6              THE COURT:  Okay.  It can come in.  1057 is in

7    evidence.

8    BY MR. RHOW:

9     Q. Mr. Yu, tell me when you've had a chance to take a look

10   at it.

11             Mr. Yu?

12    A. Oh, I'm still...

13    Q. You're still looking?  Okay.

14    A. I've read the e-mail.

15    Q. Mr. Yu, this is an e-mail chain from April 2018.  Let me

16   start at the bottom, very quickly, of page 1.  This is an

17   e-mail from Violeta Zendejas at Samsung.  It's to folks at

18   Samsung, copying folks at Netlist.

19             But what it says down there at the bottom of the

20   e-mail, it says, "Hi Neal.  Per credit team, these two

21   deliveries will put Netlist over their limit by $34,000 and

22   some-odd change."

23             And if you're going up the e-mail chain, let's go

24   two up.  Neal Knuth writes, "Please advise or I will

25   reallocate this afternoon."  And he's asking you if -- asking

                              YU - CROSS

1    Netlist if they're going to pay the 34,000 bucks.

2            And then what you write at the top e-mail, Mr. Yu,

3    "It's okay to reallocate."

4            Do you see that?

5     A. Yes, I see the e-mail.

6     Q. And so this is a situation -- well, first of all, this

7    was a PO, correct?

8     A. Um, the -- this -- the -- this e-mail, it has e-mails

9    from March.  And then I'm looking at the first page, and it

10   has e-mails from early April.

11    Q. My question wasn't the dates.  This relates to a PO,

12   right, Mr. Yu?

13    A. Just looking at this e-mail chain, it seems to relate to

14   a PO.

15    Q. And so tell me if this is the sequence of events being

16   represented here.  There is an existing PO.  There is a

17   $34,000 amount due on the credit line.  Netlist doesn't pay

18   it.  And then you indicate reallocate the chips, correct?

19    A. I do not know if it's for an order that we already have,

20   but I see the amount that's -- that we need -- that Violeta

21   is asking us to pay 34,000, and -- 34,092.

22    Q. And then you indicate, "It's okay to reallocate."

23            Do you see that?

24    A. Yes, I see that on the e-mail.

25    Q. All right.  Let's -- there's a couple more exhibits I

YU - CROSS

1    really just want you to authenticate.

2              MR. RHOW:  If I could have Exhibit 1021, 1038, 1419.

3    All three of those.  Which I'll hand up to Your Honor.

4              THE CLERK:  1419?

5              MR. RHOW:  1049, I'm sorry.

6              1419, I'm sorry.

7              THE CLERK:  14 --

8              MR. RHOW:  1419.

9              So just for the record, the e-mails that I'm going

10   to move to admit and publish -- or maybe just admit, I'm

11   sorry.  1021, 1038, 1419.

12             THE COURT:  Okay.  Counsel, any objections to 1021,

13   1038, or 1419?

14             MR. LAMAGNA:  If we could have just a second to look

15   at these, Your Honor.

16             THE COURT:  Sure.

17             MR. LAMAGNA:  No objection, Your Honor.

18             THE COURT:  Okay.  1021, 1038, and 1419 are

19   admitted.

20             MR. LAMAGNA:  And apologies, Your Honor.  Subject to

21   the reservation that we had before.

22             THE COURT:  Yes.  Thank you for that qualification.

23             (Exhibits 1021, 1038 and 1419 received in evidence.)

24             MR. RHOW:  And the final exhibit, could I get 1045,

25   please?

                                    YU - CROSS

 1              THE COURT:  And again, I hope Counsel at some point

 2      is going to show you these exhibits --

 3              MR. RHOW:  I will.

 4              THE COURT:  -- just so you know what's going on,

 5      either in closing argument or some other.

 6              MR. RHOW:  I'm sorry, Your Honor.  I just told

 7      Ms. Shin, Make sure they're in the closing slides.

 8              1045, I will move to admit and publish 1045, which

 9      is being handed up.

10              MR. LAMAGNA:  No objection, Your Honor.

11              THE COURT:  1045 is admitted.

12              (Exhibit 1045 received in evidence.)

13              MR. RHOW:  Let's publish this one.

14      BY MR. RHOW:

15      Q. And Mr. Yu, this is an e-mail chain from February 2019.

16      And I'm focused on the bottom e-mail.

17              Do you see that?

18      A. Can I go over the e-mail real quick.

19      Q. Please.  Please.

20      A. I've gone over the e-mail.

21      Q. Okay.  Perfect.  So this relates to a particular PO,

22      correct?

23      A. Yes.  In this e-mail, it seems -- it's for a PO.

24      Q. And if you look at the fourth e-mail from the bottom,

25      Mr. Knuth is indicating that -- he says, quote, "Okay.  We

                    AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

YU - CROSS

1    got them.  Please place PO for $381."

2              Do you see that?

3     A. Yes, I see that on the e-mail.

4     Q. And then in the e-mail above that, you write, to

5    Mr. Knuth, "Neal, sorry.  Our customer was being confusing

6    and messed up the part and quantity.  This is what they need

7    within two weeks.  Is that possible," question mark, end

8    quote.

9              Do you see that?

10    A. Yes, I see that.

11    Q. And I'm certainly not going to blame you if your customer

12    has made a mistake, but I wanted to delve into that just for

13    a second.

14              It was often the case that what you were

15    transmitting to Mr. Knuth was a request that a customer was

16    making to you, correct?

17    A. Yes.  All requests that I sent to Neal was requests that

18    we have from our customers.

19    Q. And in that situation, would you have a PO in hand, or

20    was it just a simple inquiry from the customer?

21    A. When we request parts to Samsung, it's a firm demand from

22    our customers.

23    Q. I'm sorry, it's a what?

24    A. It's a firm demand.

25    Q. And you have a PO in hand?

YU - CROSS

1      A. I do not recall if we have it in this case, but most

2      cases, yes.

3      Q. And the PO includes a quantity?

4      A. From the customers, or from us?  From the customer, yes.

5      Q. Does it include a price?

6      A. It includes a price.

7      Q. And does it include a delivery date?

8      A. For the customer PO?  Or our PO?

9      Q. The customer PO.

10     A. Customer PO should have a ship date.

11     Q. And so when you go to Samsung for a request, you would

12     like to have that PO from your customer in hand, correct?

13     A. Yes.

14     Q. Netlist also gets forecasts from its customers, correct?

15     A. We get forecasts from our customers.

16     Q. But you don't go to Samsung and ask for specific products

17     at specific quantities at specific prices based on a

18     forecast, right?

19     A. Our customers provide us with a forecast of part numbers

20     and quantities.  And we take that forecast and we request it

21     to Samsung, both quantity.

22     Q. Your forecasts are nonbinding that you receive from

23     customers, correct?

24     A. I do not know about the forecasts to our customers.

25     Q. You don't know if they are binding or not?

YU - CROSS

1      A. I do not know if they are binding.  But forecasts that

2      customers sends to us, they place POs for it if we can get

3      support from Samsung to support it.

4      Q. Okay.  So now you are saying two things.  And I just want

5      to clarify.  Because five minutes ago you told me that when

6      you go to Samsung, you have a PO in hand.  Now you're saying

7      when you go to Samsung, you have a forecast in hand?

8      A. They are different instances.

9      Q. What you said -- and tell me if I'm wrong -- Most of the

10     time when I go to Samsung, I have a PO in hand from a

11     customer.

12              Is that true or not true?

13     A. Yes.

14              MR. RHOW:  Nothing further.

15              THE COURT:  Okay.  Okay.  We are almost out of time

16     for today.  We've got five minutes left on the clock.  How

17     long is your redirect going to be?

18              MR. LAMAGNA:  I think, Your Honor, that it will be

19     five minutes.

20              THE COURT:  Okay.  The jury is going to hold you to

21     that.

22                        REDIRECT-EXAMINATION

23     BY MR. LAMAGNA:

24     Q. Thank you, Mr. Yu.  If I could have you just look back

25     again at Exhibit 1032 that came up at the beginning of your

YU - REDIRECT

1    testimony.

2              MR. LAMAGNA:  And, Your Honor, could I publish that?

3              THE COURT:  Yes.

4    BY MR. LAMAGNA:

5    Q. Can you tell me from looking at this exchange, is this

6    related to not taking delivery on a new order or a backlog

7    order?

8    A. This would be not taking delivery on a back order.

9    Q. And at the time, were you involved in placing the

10   original order?

11   A. No, I was not involved with placing the original order.

12   Q. Do you know how long that order had been sitting on

13   backlog?

14   A. I do not -- I do not know.

15   Q. Do you know the extent to which pricing had changed since

16   the original order was put in or what the pricing was for the

17   original order?

18   A. I do not know what the pricing was for the original

19   order.

20   Q. When Samsung put something on backlog, would Samsung tell

21   you at Netlist when it was going to be delivered for sure?

22   A. Samsung didn't -- did not tell us when the product was

23   going to ship to us.

24   Q. When Samsung put a Netlist order on backlog, how often

25   would Netlist actually get the product in the end?

YU - REDIRECT

1       A. Not very often.

2       Q. And when you did get the product, how long would it take?

3       A. It could take months or even longer than a month.

4       Q. Now, we saw some exhibits here, and we heard some mention

5       of payments and credit lines.

6              Do you recall that?

7       A. Yes.

8       Q. Are you aware of any time where Mr. Knuth asked you about

9       a finance issue and it did not get resolved?

10      A. No.

11      Q. Was there ever a time that you know of when Samsung asked

12      about a payment and Netlist did not make the payment?

13      A. No.

14      Q. In your experience, did Netlist always pay its invoices

15      from Samsung?

16      A. Yes, Netlist always paid the invoices from Samsung.

17      Q. In your experience, did Netlist always pay its invoices

18      from its resellers?

19      A. Yes, we paid our resellers.

20      Q. In your experience, has there ever been a time when

21      Netlist's available credit line prevented Netlist from buying

22      product from Samsung?

23      A. Not that -- not that I can remember.

24      Q. And why is that?

25      A. If there was an issue with the credit line, then for an

YU - REDIRECT

1    order from Samsung, most -- we would request the finance --

2    either we would request the order amount for the order, and

3    finance would pay that cash in advance.  Or they would pay

4    down some invoices to get our credit line to be able to ship

5    the product out from Samsung.

6    Q. Was there ever a time at Netlist that you could not buy

7    product that you wanted to because Netlist didn't have the

8    money?

9    A. No.

10   Q. To your knowledge, has Netlist ever canceled an order

11   with Samsung because it couldn't afford the order?

12   A. No, we have not canceled because we could not afford it.

13   Q. Is there ever a time that you can think of where you

14   could not get product from a reseller because of a credit

15   issue?

16   A. No.

17   Q. Is there ever a time that Netlist credit had an impact on

18   the price that Netlist got from resellers?

19   A. No.

20            MR. LAMAGNA:  I have nothing further.

21            THE COURT:  Okay.  Any re --

22            MR. RHOW:  Nothing Your Honor.

23            THE COURT:  Okay.  Thank you.  The witness is

24   excused.

25            THE WITNESS:  Thank you, Your Honor.

1              THE COURT:  Thank you very much.

2              We can excuse the jurors for the day.  Let me tell

3    the jurors, thanks again for sitting through the whole day.

4    I really appreciate your attention.  I know the parties

5    certainly do.

6              We are going to wrap up tomorrow.  We'll get --

7    tomorrow is Friday, so we'll be wrapping up tomorrow with

8    more testimony, closing arguments, and then you will be able

9    to start deliberations.  We'll see you tomorrow.

10             If everybody could try to be on time.  The sooner we

11   get to the case, the better for everybody.  So if you can be

12   on time, that would be great.

13             Remember, don't talk about the case.  I know you're

14   dying to tell your friends all about the forecast and chip

15   disputes and NAND and things, but try to hold off one more

16   day.  Or two more, if it goes -- if you deliberate into the

17   weekend.

18             But thanks for all your time and attention.  Have a

19   good night.

20             (Thereupon, the jury retired from the courtroom.)

21             THE COURT:  Please have a seat.

22             Okay.  So where we are on timing, is -- if we look

23   at what we've allocated to the parties, five and a half

24   hours.  It looks like, according to my informal calculations,

25   it looks like Samsung's got about an hour and 17 minutes

1    left, and Netlist has about two hours and 24 minutes.

2            Does that roughly align with what you all think you

3    have?

4            MR. RHOW:  Roughly, yes.

5            MR. DOREN:  I agree, Your Honor.  I see bowed heads

6    in the back as they are doing the math.  But having checked

7    before this last session, that is roughly accurate.

8            THE COURT:  Okay.  How many more witnesses is

9    Samsung putting up?

10           MR. RHOW:  Live witnesses, it probably is Mr. Knuth

11   and only Mr. Knuth.  Oh, I'm sorry.  Then Mr. Kidder, our

12   damages expert.  I forgot.  And we might call Ms. Sasaki.

13   She -- you guys might call her obviously.  But not many.

14           THE COURT:  I mean, that's a lot -- so the reason

15   why I'm asking is, I was unclear -- I remember being unclear

16   about this, and I wanted to clear it up.  In my timing and

17   giving people time for each side, one of the things I really

18   wanted to focus on was making sure that the parties did

19   reserve time for closing argument, because it's sort of

20   important and especially in a case like this, where you have

21   to sum everything up.

22           And I don't know whether I told you that the five

23   and a half hours included the half-hour for closing argument

24   or whether I wanted you to save it.

25           MR. DOREN:  I'm not saying this just because we have

1    two hours and 24 minutes, Your Honor, but you did tell us to

2    reserve at least 30 minutes for closing.

3          MR. RHOW:  That's true, Your Honor.  We're not

4    disputing.

5          THE COURT:  Okay.  So you have a lot to do, if

6    you're going to reserve a half-hour for closing.  Okay.

7          And then if we want to deal with the -- if we want

8    to deal with your, you know, motion for judgment as a matter

9    of law, since the plaintiff is still going to be putting in

10   some testimony through Mr. Knuth, do you want to do it over

11   lunch tomorrow?

12         MR. RHOW:  Sure.

13         MR. YODER:  That would be before closings then, Your

14   Honor?

15         THE COURT:  Yes.

16         MR. YODER:  I think that is fine.  We will renew as

17   well our -- we will make a motion to strike all or at least

18   some of Dr. Akemann's testimony, which logically probably

19   should come before the judgment for motion as a matter of

20   law.

21         But I think that timing would work fine.

22         THE COURT:  We'll do it during the lunch break

23   tomorrow.  Okay.  And we'll start up -- we'll be here at

24   8:30, just in case there's issues we need to resolve ahead of

25   time.  If there's no issues, then we're fine.  But this way,

1    we don't have to take any more time with the jury.  Thank

2    you.

3              (Thereupon, the Court was in recess.)

4                   *****     *****     *****

5

6    I certify that the foregoing is a correct transcript from the

7    record of proceedings in the above-titled matter.

8

9

10

11    ---------------------------

12

13    Amy C. Diaz, RPR, CRR            December 3, 2021

14    S/  Amy Diaz

15

16     Exhibits 309-A, 1253, 0376 and 1485            4

17     REDIRECT-EXAMINATION                           4

18     BY MR. LO

19     RECROSS-EXAMINATION                           19

20     BY MR. RHOW

21     DR. MICHAEL AKEMANN                           22

22     DIRECT EXAMINATION                            23

23     BY MR. LO

24     Exhibit 503                                   35

25     Exhibit 504                                   37

```
 1                        CROSS-EXAMINATION                    54

 2    BY MR. YODER

 3    REDIRECT-EXAMINATION                                     96

 4    BY MR. LO

 5    RECROSS-EXAMINATION                                      99

 6    BY MR. YODER

 7    MR. STEVEN YU                                           102

 8    CROSS-EXAMINATION                                       103

 9    BY MR. RHOW

10    Exhibit 1032                                            107

11    Exhibits 1021, 1038 and 1419                            122

12    Exhibit 1045                                            123

13    REDIRECT-EXAMINATION                                    126

14    BY MR. LAMAGNA
```

```
15

16

17

18

19

20

21

22

23

24

25
```

# #

**#4455** [1] - 1:23

# $

**$2,474,993** [1] - 54:7
**$20,000** [3] - 58:23, 61:7, 61:10
**$25,000** [1] - 59:1
**$34,000** [2] - 120:21, 121:17
**$37** [1] - 76:25
**$381** [1] - 124:1
**$5,000** [1] - 59:6
**$51** [2] - 105:19, 116:25
**$59.75** [1] - 41:11

# 0

**0376** [4] - 3:17, 4:4, 4:6, 133:16

# 1

**1** [3] - 62:10, 108:16, 120:16
**10** [5] - 16:25, 54:16, 113:17, 113:24, 114:1
**100** [3] - 17:1, 17:22, 94:22
**1006** [7] - 34:2, 34:4, 34:9, 34:13, 34:19, 35:17, 37:7
**102** [1] - 134:7
**1021** [6] - 122:2, 122:11, 122:12, 122:18, 122:23, 134:11
**103** [2] - 51:7, 134:8
**1032** [8] - 107:6, 107:8, 107:9, 107:13, 107:15, 126:25, 134:10
**1038** [6] - 122:2, 122:11, 122:13, 122:18, 122:23, 134:11
**1045** [6] - 122:24, 123:8, 123:11, 123:12, 134:12
**1049** [1] - 122:5
**1050** [1] - 2:8
**1057** [3] - 119:22, 119:23, 120:6
**107** [1] - 134:10
**11** [1] - 40:3
**12** [2] - 28:14, 40:25

**122** [1] - 134:11
**123** [1] - 134:12
**1253** [4] - 3:15, 4:4, 4:6, 133:16
**126** [1] - 134:13
**13** [1] - 86:24
**1336** [1] - 85:21
**1352** [2] - 8:9, 8:18
**1353** [1] - 9:19
**14** [6] - 26:3, 42:1, 113:18, 113:24, 116:13, 122:7
**1419** [9] - 122:2, 122:4, 122:6, 122:8, 122:11, 122:13, 122:18, 122:23, 134:11
**1483** [1] - 10:24
**1485** [4] - 3:18, 4:5, 4:6, 133:16
**1487** [1] - 85:17
**15** [3] - 26:3, 28:6, 43:21
**15th** [1] - 107:19
**16** [2] - 42:20, 75:18
**16.5** [3] - 94:8, 94:13, 94:22
**16th** [1] - 10:13
**17** [1] - 130:25
**1700** [1] - 2:16
**18** [6] - 9:7, 47:6, 52:17, 87:23, 87:25, 97:24
**180** [3] - 91:25, 92:5, 101:1
**180-day** [1] - 49:20, 91:18, 94:13, 100:9, 100:14
**1875** [1] - 2:14
**18th** [1] - 2:19
**19** [1] - 133:19
**1st** [2] - 1:23, 9:14

# 2

**2** [4] - 1:16, 23:24, 79:1, 79:23
**2.4** [2] - 80:13, 80:14
**2.5** [1] - 54:8
**20** [2] - 17:1, 114:1
**200** [1] - 17:1
**2000** [1] - 105:22
**20018** [1] - 2:8
**2015** [5] - 27:15, 27:22, 28:13, 29:13, 39:24
**2016** [1] - 38:20
**2017** [19] - 9:7, 9:9, 9:16, 10:8, 10:9, 10:10, 12:24, 32:24,

33:8, 35:24, 36:7, 38:20, 43:21, 67:4, 74:19, 78:22, 86:1, 86:24, 105:22
**2018** [15] - 9:14, 9:16, 10:13, 28:6, 86:5, 86:6, 104:1, 104:2, 107:19, 109:24, 110:5, 110:13, 110:14, 110:15, 120:15
**2019** [11] - 41:10, 43:22, 75:18, 76:11, 77:12, 77:24, 78:5, 87:23, 87:25, 101:7, 123:15
**2020** [7] - 43:21, 78:23, 105:22, 119:7, 119:8, 119:10, 119:12
**2021** [2] - 1:16, 133:13
**21** [2] - 116:13, 116:15
**22** [1] - 133:21
**23** [3] - 24:15, 101:7, 133:22
**23rd** [2] - 2:14, 41:10
**24** [6] - 77:12, 77:24, 78:5, 115:3, 131:1, 132:1
**24/7** [1] - 115:9
**250** [1] - 42:13
**258** [4] - 76:20, 77:11, 77:23, 78:4
**2nd** [1] - 10:8

# 3

**3** [4] - 24:7, 84:6, 93:5, 133:13
**3.5** [2] - 83:2, 83:17
**30** [1] - 132:2
**309** [1] - 66:15
**309-A** [6] - 3:13, 4:3, 4:6, 66:14, 67:1, 133:16
**30th** [1] - 10:9
**311** [6] - 33:16, 72:23, 74:4, 75:11, 82:11, 82:22
**313** [1] - 69:2
**32** [1] - 107:7
**324905** [1] - 108:2
**333** [1] - 2:5
**34,000** [2] - 121:1, 121:21
**34,092** [1] - 121:21
**35** [1] - 133:24
**358** [2] - 87:17, 87:23
**359** [2] - 87:17, 88:1

**36** [1] - 48:7
**36.5** [6] - 46:9, 47:4, 52:24, 95:10, 95:12, 95:20
**37** [1] - 133:25
**376** [2] - 85:11, 86:18

# 4

**4** [3] - 27:24, 133:16, 133:17
**4.6** [3] - 53:1, 53:8, 53:11, 53:22, 54:6, 80:9, 80:14, 81:4, 89:18, 98:17, 98:22, 99:11
**400** [1] - 2:19
**45** [1] - 102:16
**46th** [1] - 2:5
**47** [1] - 5:23

# 5

**5** [3] - 28:22, 106:6, 106:7
**50** [1] - 93:21
**500** [5] - 41:11, 42:8, 42:12, 75:22, 76:5
**503** [11] - 33:10, 33:12, 33:20, 35:4, 35:19, 35:21, 35:22, 81:17, 82:2, 82:6, 133:24
**504** [10] - 36:16, 36:18, 36:22, 37:7, 37:11, 37:12, 37:15, 81:8, 82:6, 133:25
**53** [2] - 39:2, 98:7
**53,399,592** [1] - 81:3
**53.3** [1] - 98:1
**53.4** [18] - 39:3, 54:5, 78:23, 79:9, 79:21, 79:25, 80:8, 80:13, 83:16, 83:21, 84:6, 89:7, 89:20, 93:14, 94:11, 95:17, 98:7, 98:16
**54** [2] - 83:17, 134:1
**57** [1] - 119:23

# 6

**6** [3] - 29:23, 80:24, 116:16
**6.2** [1] - 6:1
**610** [1] - 2:16
**63** [1] - 53:6
**63.5** [4] - 94:15, 95:14, 95:18, 96:7
**64** [2] - 48:10, 48:11
**6th** [1] - 10:10

# 7

**7** [3] - 67:4, 76:11, 86:1
**701C** [1] - 47:11
**702C** [2] - 47:17, 47:18
**73** [1] - 48:8
**74** [1] - 48:8
**79** [5] - 113:17, 113:24, 114:1, 116:12, 116:15

# 8

**80** [4] - 113:18, 113:24, 116:13, 116:16
**83.5** [4] - 94:20, 94:23, 94:25, 96:7
**8:20-CV-993-MCS** [1] - 1:8
**8:30** [1] - 132:24

# 9

**90** [13] - 43:25, 44:24, 49:21, 52:4, 52:5, 53:4, 91:15, 91:16, 96:24, 97:5
**90012** [1] - 1:24
**90067** [1] - 2:14
**90071** [2] - 2:6, 2:19
**912** [2] - 75:12, 76:8
**921** [1] - 76:10
**92660** [1] - 2:17
**95** [1] - 29:4
**96** [1] - 134:3
**99** [1] - 134:5

# A

**A-k-e-m-a-n-n** [1] - 22:13
**ability** [1] - 63:11
**able** [25] - 12:25, 19:19, 19:20, 38:23, 39:18, 45:3, 46:6, 46:8, 46:15, 47:1, 51:20, 52:23, 60:24, 61:6, 66:19, 69:19, 89:11, 89:22, 94:12, 95:2, 95:9, 97:20, 100:1, 129:4, 130:8
**above-titled** [1] - 133:7
**absolutely** [4] - 28:1, 57:21, 58:7, 78:13
**academic** [2] - 24:2, 25:23
**accept** [2] - 7:23, 7:24

**B**

accepted [2] - 59:25, 63:22
access [3] - 32:10, 32:12, 32:13
accidentally [1] - 29:14
accommodate [1] - 45:1
accomplish [1] - 55:10
according [8] - 61:20, 63:21, 64:5, 83:9, 89:8, 89:21, 92:21, 130:24
accordingly [1] - 98:12
account [4] - 29:10, 44:21, 50:24, 98:11
Account [1] - 44:4
accounting [3] - 40:18, 52:24, 89:16
accuracy [1] - 16:6
accurate [4] - 5:20, 74:3, 74:14, 131:7
acknowledge [1] - 40:16
actual [15] - 10:5, 20:10, 31:17, 31:23, 41:5, 46:1, 49:4, 67:7, 70:17, 71:11, 97:16, 97:18, 97:22, 99:22
add [1] - 83:6
adding [2] - 81:23, 82:8
adept [1] - 35:6
adjust [1] - 43:13
admission [1] - 114:3
admit [6] - 3:21, 37:6, 120:1, 122:10, 123:8
admitted [15] - 3:20, 4:4, 4:5, 33:23, 35:16, 37:11, 66:17, 86:19, 87:20, 107:9, 107:11, 122:19, 123:11
adopted [1] - 47:8
advance [2] - 119:16, 129:3
advantage [1] - 52:2
adverse [1] - 103:9
advise [1] - 120:24
advisory [2] - 25:4, 51:7
afford [2] - 129:11, 129:12
afternoon [9] - 4:13, 4:14, 19:3, 19:4, 23:4, 54:16, 54:25, 55:1, 120:25

afterwards [1] - 74:23
aggressively [1] - 48:6
ago [8] - 26:13, 42:24, 43:8, 43:11, 43:12, 75:10, 98:11, 126:5
agree [11] - 34:10, 56:10, 56:13, 59:15, 61:8, 74:24, 84:14, 86:8, 93:19, 118:14, 131:5
agreed [2] - 21:19, 99:25
agreeing [1] - 88:7
agreement [2] - 3:10, 26:17
ahead [8] - 4:10, 21:4, 21:17, 85:19, 103:10, 114:7, 116:20, 132:24
Akemann [26] - 22:2, 22:12, 22:21, 23:4, 23:22, 24:1, 26:5, 26:12, 30:12, 31:11, 32:18, 35:3, 36:15, 37:14, 47:8, 50:16, 52:17, 54:1, 54:9, 54:25, 60:2, 72:23, 80:20, 85:24, 96:20, 101:24
AKEMANN [2] - 22:6, 133:21
Akemann's [2] - 88:22, 132:18
align [1] - 131:2
allegedly [1] - 49:25
allocated [1] - 130:23
allocation [2] - 36:10, 83:25
allow [1] - 52:7
allowed [1] - 48:20
alluding [1] - 11:7
almost [2] - 45:15, 126:15
altered [1] - 72:16
amount [17] - 38:3, 49:24, 72:19, 73:14, 74:11, 81:24, 82:20, 87:7, 88:11, 88:12, 99:25, 117:3, 117:4, 121:17, 121:20, 129:2
amounting [1] - 46:9
amounts [2] - 70:17, 73:18
AMY [1] - 1:22
Amy [2] - 133:13, 133:14
analogous [1] - 30:22
analysis [26] - 27:3,

28:8, 29:19, 30:14, 30:17, 32:9, 32:17, 35:22, 35:23, 37:15, 39:23, 40:6, 41:18, 42:17, 43:3, 43:9, 43:14, 45:11, 46:24, 47:5, 53:5, 54:1, 57:13, 97:3, 97:15, 98:6
analysts' [1] - 5:16
analyze [1] - 53:7
analyzed [3] - 36:13, 39:2, 41:6
Angeles [5] - 1:15, 1:24, 2:6, 2:14, 2:19
animal [1] - 82:3
answer [19] - 20:22, 20:24, 20:25, 55:9, 60:2, 65:18, 65:21, 66:1, 66:4, 70:8, 77:16, 89:15, 90:2, 90:9, 90:13, 104:8, 115:16, 117:9, 117:19
anticipate [2] - 5:19, 5:20
antitrust [1] - 24:21
anyway [3] - 46:25, 78:18, 95:4
apologies [2] - 119:23, 122:20
apologize [2] - 37:16, 85:20
appear [2] - 71:23, 87:15
APPEARANCES [1] - 2:1
apples [6] - 29:11, 29:18, 29:19, 40:9
apples-to-apples [1] - 40:9
applied [4] - 61:16, 62:1, 80:2, 96:10
applies [2] - 48:14, 51:21
apply [3] - 53:11, 53:23, 101:11
appreciate [1] - 130:4
approach [1] - 62:6
appropriate [3] - 21:24, 33:22, 45:6
approve [1] - 105:11
April [3] - 75:18, 120:15, 121:10
area [2] - 23:15, 25:17
arguably [1] - 49:25
argue [1] - 50:20
arguing [1] - 50:25
argument [7] - 3:24, 4:2, 51:4, 83:7,

123:5, 131:19, 131:23
arguments [3] - 50:5, 50:9, 130:8
arrangement [1] - 76:7
articles [1] - 25:23
aside [2] - 32:8, 41:22
aspect [1] - 90:25
aspects [1] - 31:4
assembled [1] - 62:22
assess [1] - 39:10
associated [2] - 76:6, 114:21
assume [6] - 33:2, 33:4, 79:13, 83:20, 83:24, 102:9
assumed [5] - 32:23, 79:8, 79:15, 101:10, 108:22
assuming [5] - 57:1, 57:3, 97:11, 98:4, 114:22
assumption [1] - 32:25
attached [3] - 65:20, 68:4, 108:15
attaching [1] - 108:13
attachment [1] - 88:1
attempt [5] - 56:7, 84:3, 88:17, 101:8, 101:20
attention [2] - 130:4, 130:18
Attorney [6] - 2:4, 2:5, 2:7, 2:13, 2:16, 2:18
attorneys [1] - 118:5
attributes [1] - 41:17
audience [1] - 25:11
authenticate [1] - 122:1
automatic [1] - 29:15
availability [1] - 115:13
available [13] - 21:19, 21:20, 32:9, 49:9, 76:17, 112:24, 113:1, 114:14, 114:15, 114:16, 115:1, 128:21
Avenue [2] - 2:5, 2:8
average [2] - 51:21, 52:25
averaging [1] - 51:18
avoid [1] - 40:10
aware [6] - 66:9, 116:24, 119:6, 128:8
axis [1] - 82:1

**B**

BA [1] - 24:3
background [1] - 24:2
backlog [16] - 7:17, 8:1, 8:14, 9:4, 9:12, 14:13, 14:15, 14:19, 14:23, 14:24, 15:2, 15:3, 127:6, 127:13, 127:20, 127:24
backlogged [4] - 64:9, 68:18, 108:23, 111:15
backlogs [2] - 13:22, 14:12
backwards [4] - 43:15, 44:24, 48:2, 49:19
balance [1] - 12:20
bank [1] - 17:20
bankruptcy [1] - 25:5
base [1] - 39:5
based [24] - 5:15, 5:16, 25:1, 29:16, 33:23, 47:19, 49:16, 51:6, 51:12, 52:23, 54:1, 54:4, 63:6, 72:16, 73:23, 95:1, 96:10, 97:22, 108:4, 110:8, 112:21, 116:23, 117:3, 125:17
basic [13] - 27:12, 27:19, 28:2, 28:17, 30:16, 31:1, 40:6, 40:7, 44:8, 56:14, 57:20, 58:10, 59:18
basis [8] - 7:3, 17:18, 43:1, 43:2, 51:14, 94:19, 95:3, 95:6
Beach [1] - 2:17
bear [1] - 46:11
began [1] - 32:24
begin [1] - 38:20
beginning [2] - 19:7, 126:25
begins [2] - 28:25, 38:19
behavior [1] - 97:18
below [2] - 8:14, 8:24
bench [2] - 45:22, 47:15
benchmark [9] - 28:9, 28:16, 29:16, 30:25, 39:20, 40:20, 45:15, 47:1, 91:20
benchmarking [5] - 27:20, 29:13, 39:23, 40:6, 44:13
benchmarks [5] -

43:24, 44:14, 45:20, 97:17, 97:21
**Berkeley** [2] - 24:16, 24:24
**best** [6] - 39:19, 40:21, 97:17, 97:21, 104:22, 105:4
**better** [1] - 130:11
**between** [13] - 7:19, 8:2, 9:15, 10:12, 11:15, 31:13, 34:21, 57:24, 58:4, 59:3, 61:18, 78:8, 83:21
**beyond** [4] - 39:6, 41:4, 49:12, 99:21
**big** [4] - 23:10, 25:3, 25:4, 91:2
**big-picture** [1] - 23:10
**binder** [5] - 22:19, 33:10, 35:4, 36:15, 80:21
**binders** [1] - 22:15
**binding** [5] - 85:2, 85:8, 90:8, 125:25, 126:1
**BIRD** [1] - 2:12
**bit** [5] - 5:13, 24:1, 27:5, 40:23, 98:14
**blame** [1] - 124:11
**blue** [4] - 38:15, 91:2, 91:7, 91:9
**Blue** [1] - 28:14
**Book** [1] - 28:14
**bottom** [8] - 30:21, 68:15, 107:23, 108:1, 120:16, 120:19, 123:16, 123:24
**bought** [5] - 69:17, 70:21, 105:19, 105:25, 106:1
**bowed** [1] - 131:5
**BOXER** [1] - 2:12
**breach** [19] - 24:20, 24:23, 25:15, 25:19, 26:16, 29:21, 32:22, 32:23, 33:3, 49:24, 54:3, 57:3, 58:2, 74:25, 79:11, 83:22, 84:10, 91:5, 98:5
**breached** [4] - 44:10, 51:3, 57:1, 97:20
**breaches** [1] - 58:24
**break** [5] - 38:19, 54:13, 54:16, 98:14, 132:22
**BRG** [1] - 24:25
**brief** [1] - 54:19
**briefly** [1] - 97:24
**bring** [5] - 23:17,

62:11, 84:19, 85:21, 88:21
**bringing** [2] - 44:3, 52:8
**broad** [4] - 23:7, 23:9, 25:1, 33:1
**broad-based** [1] - 25:1
**broke** [1] - 36:9
**brought** [1] - 46:10
**bucks** [1] - 121:1
**build** [1] - 118:15
**built** [1] - 114:25
**bullet** [1] - 44:4
**business** [6] - 19:21, 23:13, 25:11, 33:7, 63:2, 76:7
**businesses** [1] - 23:17
**but..** [3] - 68:9, 70:18, 83:17
**buy** [28] - 5:6, 5:9, 5:14, 6:14, 12:25, 13:9, 16:24, 19:11, 19:15, 19:19, 20:13, 27:14, 28:12, 39:1, 41:9, 56:4, 56:17, 56:22, 58:25, 60:8, 60:9, 61:6, 61:10, 69:19, 71:19, 105:11, 108:18, 129:6
**buyer** [9] - 57:11, 57:12, 57:18, 57:19, 57:22, 58:22, 60:8, 60:9, 60:24
**buying** [7] - 17:8, 17:12, 27:23, 29:6, 52:20, 58:20, 128:21
**buys** [2] - 4:16, 57:12
**BY** [63] - 4:12, 5:24, 6:17, 8:10, 9:3, 9:22, 10:25, 15:15, 21:5, 23:3, 23:25, 24:8, 26:11, 28:23, 29:24, 30:11, 32:7, 35:2, 35:20, 37:13, 38:6, 40:4, 41:1, 42:2, 42:21, 47:7, 52:16, 54:24, 62:12, 65:4, 66:25, 79:3, 80:23, 81:11, 84:20, 85:23, 86:22, 87:22, 88:24, 96:19, 99:17, 100:8, 100:12, 103:12, 103:24, 107:1, 107:14, 111:20, 114:12, 116:22, 117:18, 119:24, 120:8, 123:14,

126:23, 127:4, 133:18, 133:23, 134:2, 134:4, 134:6, 134:9, 134:14

---

# C

**CA** [1] - 1:24
**calculate** [13] - 26:14, 32:21, 39:5, 52:6, 52:18, 54:2, 56:5, 56:7, 57:7, 70:23, 78:7, 79:16
**calculated** [2] - 96:10, 101:10
**calculates** [1] - 51:21
**calculating** [9] - 25:19, 39:4, 61:17, 62:2, 68:1, 72:25, 74:20, 76:7, 86:25
**calculation** [17] - 47:22, 54:6, 79:4, 79:6, 80:10, 80:11, 82:23, 83:4, 83:13, 88:19, 88:23, 89:1, 90:1, 91:22, 94:7, 94:21, 100:15
**calculations** [5] - 25:25, 88:22, 93:25, 98:25, 130:24
**calculator** [1] - 48:11
**CALIFORNIA** [1] - 1:2
**California** [8] - 1:15, 2:6, 2:14, 2:17, 2:19, 24:5
**cancel** [8] - 7:4, 7:12, 8:13, 11:16, 11:23, 12:5, 15:9, 15:10
**canceled** [13] - 11:13, 12:20, 13:6, 15:9, 16:1, 20:9, 64:14, 68:19, 69:23, 70:20, 129:10, 129:12
**canceling** [2] - 6:23, 9:12
**cancellation** [2] - 15:4, 15:6
**cancellations** [3] - 13:23, 14:12, 15:24
**cannot** [2] - 8:19, 11:18
**Cannot** [1] - 9:25
**capacity** [1] - 41:16
**capture** [2] - 44:2, 80:10
**car** [7] - 27:14, 28:15, 29:12, 43:4, 43:17, 43:19
**care** [4] - 41:12, 46:10, 47:2, 111:11

**case** [32] - 3:4, 3:5, 20:17, 23:19, 24:19, 25:16, 26:22, 27:9, 30:18, 32:11, 35:8, 36:20, 37:20, 41:6, 43:20, 43:25, 54:7, 57:9, 61:17, 62:2, 64:21, 72:25, 105:6, 105:7, 116:24, 124:14, 125:1, 130:11, 130:13, 131:20, 132:24
**cases** [3] - 25:18, 117:12, 125:2
**cash** [3] - 17:13, 17:18, 129:3
**caused** [3] - 32:22, 119:18, 119:20
**Center** [1] - 2:16
**center** [1] - 91:3
**CENTRAL** [1] - 1:2
**Century** [1] - 2:14
**certain** [1] - 87:7
**certainly** [4] - 24:3, 24:11, 27:12, 55:13, 83:17, 124:11, 130:5
**certify** [1] - 133:6
**chain** [6] - 107:15, 109:25, 120:15, 120:23, 121:13, 123:15
**chance** [3] - 60:3, 77:17, 120:9
**change** [6] - 9:15, 9:18, 33:7, 42:25, 71:10, 120:22
**changed** [7] - 9:17, 12:7, 12:11, 20:11, 43:1, 92:11, 127:15
**changes** [2] - 92:2, 92:15
**characterization** [1] - 93:19
**charge** [1] - 12:15
**charges** [1] - 56:3
**chart** [13] - 15:13, 33:13, 35:12, 36:1, 36:19, 36:25, 62:10, 63:20, 68:12, 68:13, 80:18, 81:17, 93:24
**cheaper** [3] - 110:20, 111:1, 111:14
**checked** [1] - 131:6
**chief** [1] - 50:10
**chip** [8] - 19:11, 41:16, 106:18, 115:11, 119:6, 119:10, 119:12, 130:14
**chips** [10] - 56:23, 57:2, 104:17,

104:19, 105:19, 105:25, 106:1, 106:2, 114:20, 121:18
**choice** [1] - 44:1
**chose** [2] - 43:25, 110:25
**Chuck** [3] - 36:8, 38:17, 55:25
**circumstances** [5] - 7:11, 8:2, 9:15, 53:14, 64:13
**cite** [1] - 113:21
**civic** [1] - 29:15
**Civic** [15] - 27:15, 27:23, 28:13, 29:13, 39:24, 40:10, 41:22, 43:7, 58:21, 58:23, 59:4, 60:9, 61:5, 61:6
**claim** [2] - 26:17, 63:19
**claimed** [1] - 74:25
**claiming** [2] - 58:2, 91:4
**claims** [4] - 25:19, 25:20, 68:17, 83:22
**clarify** [5] - 20:2, 81:8, 81:16, 88:18, 126:5
**classroom** [1] - 25:9
**clear** [5] - 20:1, 32:5, 49:12, 51:12, 131:16
**clerical** [4] - 109:24, 110:4, 110:13, 111:21
**CLERK** [11] - 22:3, 22:9, 22:14, 22:18, 102:19, 102:25, 103:2, 103:5, 113:19, 122:4, 122:7
**clock** [2] - 115:6, 126:16
**close** [3] - 51:24, 58:3, 69:4
**closer** [2] - 43:10, 103:22
**closer-in-time** [1] - 43:10
**closing** [8] - 83:7, 123:5, 123:7, 130:8, 131:19, 131:23, 132:2, 132:6
**closings** [1] - 132:13
**CO** [1] - 1:8
**code** [4] - 43:14, 41:15, 41:21, 69:16
**Code** [1] - 51:7
**collateral** [2] - 17:20, 17:22
**collateralized** [2] -

17:16, 17:23
**colleague** [2] - 109:6, 109:7
**color** [3] - 8:21, 8:23, 91:7
**column** [12] - 41:14, 67:10, 73:4, 73:7, 75:18, 75:21, 75:23, 76:19, 88:8, 94:7, 95:7
**combination** [1] - 11:8
**coming** [4] - 7:14, 40:6, 51:17, 89:18
**comment** [2] - 88:8
**comments** [1] - 51:7
**commodity** [2] - 103:15, 104:16
**common** [1] - 115:10
**commonly** [1] - 24:21
**communicate** [3] - 4:22, 15:5, 114:16
**communicated** [1] - 14:17
**communications** [2] - 15:4, 72:17
**companies** [2] - 25:7, 119:15
**company** [9] - 24:15, 24:16, 24:24, 24:25, 32:14, 41:9, 104:3, 109:25, 110:15
**comparable** [6] - 40:7, 40:15, 42:10, 42:17, 46:7, 46:15
**compared** [3] - 109:15, 109:23, 110:8
**comparing** [4] - 29:11, 29:18, 40:10, 109:19
**comparison** [9] - 40:9, 45:15, 45:23, 52:24, 53:24, 58:4, 84:11, 96:5, 99:5
**compete** [1] - 23:17
**competitive** [8] - 6:9, 6:10, 6:15, 12:8, 12:12, 20:4, 20:8, 20:19
**complete** [3] - 14:19, 15:8, 15:11
**completed** [1] - 24:13
**complexity** [1] - 29:1
**complicated** [2] - 28:19, 42:6
**components** [1] - 104:7
**concept** [4] - 27:19, 56:10, 56:14, 115:10
**concluded** [1] - 54:6
**conclusions** [3] - 3:5,

29:20, 29:25
**condition** [1] - 84:23
**conditions** [2] - 65:20, 68:5
**conduct** [1] - 32:9
**conferences** [2] - 25:10, 52:15
**confidence** [1] - 46:12
**confirm** [2] - 103:7, 108:15
**confirming** [1] - 108:13
**confront** [1] - 29:2
**confused** [2] - 3:23, 89:10
**confusing** [1] - 124:5
**Connecticut** [1] - 2:8
**connection** [3] - 62:2, 64:20, 66:6
**consequence** [5] - 18:16, 18:19, 24:23, 44:19, 98:13
**conservative** [2] - 53:22, 53:25
**consider** [3] - 27:13, 58:18, 91:19
**considered** [3] - 50:9, 77:14, 91:20
**consistent** [9] - 33:6, 35:25, 36:12, 37:19, 45:19, 62:4, 62:6, 65:22, 86:11
**constraints** [1] - 60:4
**construct** [2] - 28:17, 58:10
**constructed** [1] - 61:2
**consulting** [5] - 24:12, 24:14, 24:18, 25:1, 25:3
**contain** [2] - 73:9, 74:21
**contains** [5] - 31:16, 31:22, 41:5, 70:17, 73:21
**contends** [1] - 49:20
**context** [10] - 26:16, 27:9, 45:6, 46:13, 46:19, 53:25, 84:4, 84:16, 107:24, 107:25
**continued** [1] - 21:6
**contract** [30] - 24:20, 24:23, 25:16, 25:19, 26:17, 26:21, 32:23, 33:3, 38:1, 38:24, 44:11, 47:22, 48:4, 49:7, 56:24, 56:25, 57:3, 58:1, 58:2, 58:3, 58:5, 58:9, 58:22, 61:21, 71:9,

71:25, 72:1, 75:4, 97:19, 98:5
**contractual** [1] - 40:12
**contradicting** [1] - 118:7
**control** [8] - 40:14, 40:22, 40:24, 41:13, 42:4, 42:22, 44:22, 45:16
**Control** [1] - 41:24
**controlled** [2] - 94:2, 94:6
**controls** [3] - 40:7, 40:17, 46:5
**convoluted** [1] - 44:7
**copies** [1] - 14:23
**copy** [8] - 8:17, 8:21, 14:7, 14:10, 66:22, 66:24, 68:9, 80:19
**copying** [1] - 120:18
**corner** [1] - 68:15
**Corolla** [2] - 29:14, 40:10
**Corollas** [1] - 41:22
**Corporation** [2] - 41:9, 42:9
**correct** [191] - 4:1, 5:3, 6:4, 9:10, 12:18, 15:21, 49:6, 55:23, 55:25, 56:5, 56:6, 56:18, 56:24, 57:2, 57:4, 57:7, 58:7, 58:8, 58:19, 59:7, 59:17, 59:18, 60:11, 61:3, 61:9, 62:20, 63:3, 63:12, 64:4, 64:8, 64:12, 64:15, 64:16, 64:23, 64:25, 65:18, 66:1, 67:2, 67:3, 67:8, 67:9, 67:11, 67:14, 67:15, 67:17, 67:20, 67:24, 68:6, 68:15, 69:14, 70:1, 70:12, 70:13, 71:1, 71:2, 71:7, 71:8, 71:13, 71:14, 72:5, 72:13, 73:1, 73:5, 73:8, 73:11, 73:12, 73:15, 73:16, 73:24, 74:7, 74:9, 74:10, 74:12, 74:18, 75:2, 75:5, 75:8, 75:16, 75:19, 75:20, 75:22, 75:25, 76:1, 76:12, 76:13, 76:14, 76:16, 76:22, 76:25, 77:5, 77:7, 77:8, 77:13, 77:14, 78:1, 78:24, 79:11, 79:12, 79:24, 80:3, 80:5,

80:7, 81:6, 81:18, 81:19, 82:1, 82:5, 82:9, 86:1, 86:2, 86:6, 86:7, 86:10, 86:12, 86:15, 86:16, 87:2, 87:7, 87:8, 87:9, 87:14, 87:24, 88:12, 89:24, 90:8, 90:22, 90:23, 91:1, 91:12, 91:16, 91:17, 91:23, 92:4, 92:7, 92:12, 92:13, 92:15, 92:19, 92:24, 93:3, 93:6, 93:7, 93:16, 93:18, 94:3, 94:9, 94:14, 95:3, 95:8, 95:11, 95:16, 95:20, 96:4, 99:12, 101:14, 103:16, 103:18, 103:23, 104:5, 104:17, 104:20, 108:6, 109:19, 110:6, 111:1, 111:8, 111:14, 112:6, 112:16, 112:19, 112:25, 113:4, 113:12, 114:2, 115:11, 115:14, 115:24, 116:5, 116:9, 117:24, 118:16, 118:20, 118:23, 121:7, 121:18, 123:22, 124:16, 125:12, 125:14, 125:23, 133:6
**correcting** [1] - 94:16
**correctly** [7] - 35:12, 40:9, 77:2, 79:9, 80:10, 80:17, 96:13
**cost** [3] - 73:12, 74:9, 78:10
**COUNSEL** [1] - 2:1
**Counsel** [2] - 3:8, 123:1
**counsel** [30] - 4:8, 6:3, 10:2, 13:17, 16:13, 18:23, 23:20, 26:8, 26:13, 31:11, 32:4, 34:3, 34:10, 34:20, 37:8, 48:12, 50:2, 54:21, 60:3, 66:22, 96:15, 96:20, 99:20, 103:6, 113:19, 113:21, 114:4, 116:14, 120:3, 122:12
**count** [2] - 44:18, 46:2
**counted** [3] - 80:2, 99:2, 99:4

**counting** [1] - 45:4
**couple** [6] - 24:17, 34:23, 59:8, 86:5, 93:24, 121:25
**course** [1] - 36:20
**Court** [6] - 3:11, 26:4, 50:5, 50:9, 103:8, 133:3
**COURT** [93] - 1:1, 3:2, 3:12, 3:14, 3:16, 3:19, 3:22, 4:3, 18:23, 20:23, 21:3, 21:10, 21:12, 21:17, 22:16, 22:24, 26:8, 26:10, 30:5, 30:8, 31:11, 31:25, 32:4, 33:24, 34:3, 34:10, 34:20, 35:13, 35:16, 37:8, 37:10, 47:14, 47:16, 49:2, 50:2, 51:16, 52:7, 52:13, 54:12, 54:15, 54:21, 66:20, 66:23, 85:15, 85:19, 86:21, 87:21, 96:15, 99:10, 99:14, 101:22, 101:24, 102:5, 102:13, 102:18, 103:6, 103:10, 103:22, 106:25, 107:9, 107:11, 111:19, 113:21, 113:25, 114:4, 114:7, 114:10, 116:14, 116:17, 116:19, 117:9, 117:17, 120:3, 120:6, 122:12, 122:16, 122:18, 122:22, 123:1, 123:4, 123:11, 126:15, 126:20, 127:3, 129:23, 129:21, 129:23, 130:1, 130:21, 131:8, 131:14, 132:5, 132:15, 132:22
**court** [8] - 1:25, 21:1, 26:2, 32:14, 32:20, 52:12, 85:1, 94:2
**Court's** [3] - 47:11, 66:18, 85:18
**courtroom** [4] - 3:1, 54:18, 54:20, 130:20
**cover** [96] - 10:18, 10:21, 23:21, 26:14, 26:15, 26:19, 26:22, 27:8, 27:11, 28:3, 28:7, 30:14, 30:24, 32:22, 35:24, 39:9,

41:7, 42:7, 42:11, 44:10, 47:2, 47:21, 47:24, 49:25, 51:14, 51:25, 53:9, 54:2, 54:4, 54:7, 55:20, 56:4, 56:8, 56:10, 57:5, 57:17, 57:20, 57:22, 57:24, 58:10, 59:3, 59:9, 59:12, 59:14, 59:15, 59:21, 59:24, 60:1, 60:9, 60:10, 60:12, 60:15, 60:17, 60:20, 60:21, 60:25, 61:1, 61:7, 61:14, 61:17, 61:18, 62:1, 62:3, 68:1, 69:20, 70:23, 71:22, 71:24, 72:2, 72:25, 74:20, 76:2, 76:3, 76:6, 76:7, 77:6, 77:25, 78:7, 79:5, 79:13, 79:15, 79:16, 79:17, 81:3, 86:25, 88:20, 91:4, 91:6, 98:3, 99:25
**coverage** [1] - 46:8
**covered** [2] - 45:4, 77:11
**COVID** [1] - 119:17
**COVID-19** [1] - 119:14
**Craigslist** [1] - 28:14
**Crap** [1] - 109:9
**create** [1] - 17:15
**creation** [1] - 52:3
**credit** [15] - 17:15, 17:19, 17:23, 18:5, 44:17, 99:4, 120:4, 120:20, 121:17, 128:5, 128:21, 128:25, 129:4, 129:14, 129:17
**criteria** [1] - 100:16
**cross** [12] - 6:2, 8:11, 8:12, 11:4, 11:11, 15:17, 48:22, 50:6, 50:17, 50:18, 54:12, 55:5
**CROSS** [4] - 54:23, 103:11, 134:1, 134:8
**cross-examination** [10] - 6:2, 8:11, 8:12, 11:4, 11:11, 15:17, 48:22, 50:6, 54:12, 55:5
**CROSS-EXAMINATION** [4] - 54:23, 103:11, 134:1, 134:8
**cross-examine** [1] - 50:17

**cross-examined** [1] - 50:18
**CRR** [2] - 1:22, 133:13
**CRUTCHER** [2] - 2:4, 2:7
**cumulative** [5] - 37:4, 81:21, 81:22, 81:24, 82:3
**current** [2] - 24:16, 24:24
**customer** [22] - 7:18, 7:19, 7:20, 7:22, 8:4, 8:5, 19:12, 87:6, 87:12, 113:10, 116:7, 117:15, 124:5, 124:11, 124:15, 124:20, 125:4, 125:8, 125:9, 125:10, 125:12, 126:11
**customers** [18] - 62:14, 62:20, 105:4, 105:7, 105:14, 105:15, 105:16, 106:14, 119:15, 124:18, 124:22, 125:4, 125:14, 125:15, 125:19, 125:23, 125:24, 126:2
**customers'** [1] - 105:2

## D

**damage** [18] - 54:7, 58:10, 59:3, 59:13, 59:21, 61:1, 61:7, 61:15, 63:19, 76:3, 76:11, 78:7, 79:6, 82:22, 86:1, 86:25, 87:24, 88:21
**damages** [70] - 23:21, 24:22, 25:19, 25:21, 25:24, 26:7, 26:14, 26:15, 26:22, 27:8, 27:11, 30:14, 32:22, 35:24, 37:15, 38:25, 39:4, 39:6, 44:18, 44:19, 45:4, 46:2, 46:3, 47:21, 51:14, 52:6, 54:2, 55:19, 55:20, 56:5, 56:8, 56:10, 57:5, 57:7, 57:8, 57:17, 57:22, 57:24, 59:9, 59:15, 60:1, 60:10, 60:12, 60:16, 60:17, 60:21, 61:4, 61:17, 61:18, 62:1, 62:3, 68:1, 70:23, 72:25, 74:20,

76:8, 79:14, 79:15, 79:17, 79:20, 81:3, 87:1, 88:20, 98:2, 98:12, 98:13, 99:3, 99:24, 99:25, 131:12
**dashed** [1] - 38:15
**data** [32] - 25:13, 27:17, 27:20, 28:18, 28:24, 29:1, 30:13, 31:5, 31:9, 33:5, 33:15, 35:25, 36:12, 36:21, 41:5, 42:6, 43:10, 44:2, 44:3, 44:20, 46:1, 46:7, 46:10, 46:15, 47:5, 71:3, 71:10, 77:10, 78:7, 79:23, 82:10, 82:15
**database** [33] - 16:14, 18:2, 31:15, 31:16, 31:22, 35:5, 35:9, 68:24, 69:2, 69:5, 69:13, 70:7, 70:12, 70:17, 71:11, 71:13, 71:15, 71:16, 71:23, 72:2, 72:7, 72:14, 72:18, 72:20, 73:19, 73:20, 73:22, 74:2, 74:21, 76:14, 77:24, 83:10, 88:16
**databases** [8] - 30:18, 30:20, 30:22, 31:4, 36:23, 39:17, 39:22
**datasets** [3] - 30:16, 30:25, 31:3
**date** [11] - 9:5, 10:6, 12:16, 28:5, 29:8, 67:4, 75:18, 101:2, 114:17, 125:7, 125:10
**dated** [2] - 76:11, 85:25
**dates** [3] - 11:18, 31:1, 121:11
**days** [17] - 25:10, 43:25, 44:24, 49:21, 52:4, 52:5, 53:4, 91:15, 91:16, 91:25, 92:5, 96:24, 97:5, 101:1
**DC** [1] - 2:8
**deal** [4] - 4:2, 94:22, 132:7, 132:18
**dealer** [1] - 61:12
**dealership** [5] - 58:23, 58:24, 59:5, 59:6, 61:6
**December** [7] - 1:16, 5:5, 6:18, 6:19, 10:10, 86:24, 133:13

**decide** [2] - 39:10, 60:8
**decided** [2] - 11:23, 39:19
**decisionmaking** [1] - 23:14
**decline** [1] - 38:14
**defendant** [3] - 61:19, 61:20, 61:22
**Defendant** [2] - 1:9, 2:11
**definitely** [3] - 74:16, 90:16, 98:21
**definition** [8] - 61:14, 61:15, 62:1, 84:18, 84:22, 84:24, 93:20, 93:22
**degree** [2] - 24:5, 24:13
**delays** [1] - 19:5
**deliberate** [1] - 130:16
**deliberations** [1] - 130:9
**deliver** [2] - 6:21, 13:13
**delivered** [6] - 12:5, 31:24, 87:13, 100:23, 100:25, 127:21
**deliveries** [1] - 120:21
**delivers** [1] - 7:21
**delivery** [6] - 8:5, 12:2, 86:15, 125:7, 127:6, 127:8
**delve** [1] - 124:12
**demand** [5] - 7:18, 53:15, 62:14, 124:21, 124:24
**demands** [1] - 62:20
**demonstrate** [1] - 90:24
**demonstrated** [1] - 99:19
**Demonstrative** [4] - 27:24, 40:25, 41:25, 42:20
**demonstrative** [5] - 15:14, 33:22, 33:25, 38:5, 40:2
**demonstratives** [1] - 22:20
**denied** [1] - 50:5
**denying** [1] - 90:14
**department** [1] - 112:4
**depo** [1] - 113:19
**deposition** [11] - 21:15, 21:21, 32:11, 64:22, 65:5, 65:11, 91:24, 113:17, 113:24, 118:5

**depositions** [1] - 64:24
**describe** [6] - 27:6, 27:9, 36:9, 40:5, 42:25, 63:13
**described** [5] - 38:18, 39:18, 39:25, 63:24, 84:12
**describes** [3] - 41:16, 80:17, 96:12
**describing** [2] - 35:23, 37:16
**description** [2] - 11:2, 41:15
**designation** [1] - 21:15
**designations** [2] - 102:2, 102:3
**designed** [1] - 44:8
**desired** [1] - 76:5
**despite** [1] - 112:24
**detail** [2] - 16:9, 40:23
**detailed** [1] - 41:15
**determination** [1] - 99:24
**determine** [6] - 27:10, 57:17, 88:14, 90:17, 100:25, 101:5
**determining** [1] - 27:16
**develop** [1] - 17:13
**developed** [1] - 7:1
**Devon** [8] - 109:2, 109:3, 109:21, 110:5, 112:10, 112:14, 112:18, 112:20
**DIAZ** [1] - 1:22
**Diaz** [2] - 133:13, 133:14
**dictionary** [1] - 84:17
**Diego** [1] - 24:5
**difference** [8] - 19:25, 31:13, 47:25, 57:24, 59:3, 61:18, 78:8, 83:20
**different** [13] - 7:8, 11:5, 11:9, 16:25, 34:12, 48:14, 48:15, 82:2, 93:25, 118:9, 126:8
**differential** [1] - 93:12
**difficult** [2] - 16:21, 17:3
**dig** [1] - 3:7
**dimensions** [1] - 29:10
**direct** [4] - 15:16, 53:24, 54:2, 80:21
**DIRECT** [2] - 23:2,

133:22
**direction** [2] - 44:1, 44:25
**directions** [3] - 43:23, 110:2, 112:21
**directly** [14] - 4:16, 26:25, 29:6, 30:20, 36:25, 37:22, 38:13, 38:23, 39:15, 40:1, 41:20, 52:20, 55:9, 60:19
**director** [3] - 112:11, 112:16, 112:17
**disagree** [3] - 84:21, 84:24, 84:25
**discount** [1] - 50:21
**discrete** [1] - 104:6
**discuss** [3] - 3:4, 3:5, 25:24
**discussed** [4] - 11:1, 20:16, 98:11, 120:5
**discussing** [3] - 33:17, 37:20, 95:25
**discussion** [3] - 10:2, 16:17, 97:1
**disputes** [5] - 24:20, 25:25, 26:1, 130:15
**disputing** [2] - 110:5, 132:4
**distinguish** [1] - 34:21
**DISTRICT** [3] - 1:1, 1:2, 1:3
**DIVISION** [1] - 1:2
**document** [6] - 5:25, 8:17, 11:1, 86:10, 88:11, 107:4
**documents** [3] - 18:4, 32:14, 72:24
**dollar** [7] - 73:14, 79:9, 79:25, 94:19, 95:6, 95:10, 96:8
**dollars** [7] - 15:23, 35:8, 37:4, 47:4, 52:25, 89:20, 94:18
**dollars'** [1] - 106:2
**done** [10] - 16:19, 17:18, 25:7, 25:9, 48:1, 48:2, 50:1, 55:7, 83:12
**DOREN** [5] - 48:10, 102:1, 107:10, 131:5, 131:25
**Doren** [4] - 2:4, 48:12, 55:18, 94:16
**dot** [1] - 91:2
**dots** [1] - 91:9
**down** [12] - 6:16, 36:9, 38:19, 40:19, 42:13, 61:10, 67:11, 68:15, 74:17, 98:14,

120:19, 129:4
**Dr** [26] - 22:2, 22:21, 23:4, 23:22, 24:1, 26:5, 26:12, 30:12, 31:11, 32:18, 35:3, 36:15, 37:14, 47:8, 52:17, 54:1, 54:9, 54:25, 60:2, 72:23, 80:20, 85:24, 88:22, 96:20, 101:24, 132:18
**DR** [2] - 22:6, 133:21
**DRAM** [11] - 4:20, 5:2, 6:8, 8:13, 9:12, 9:15, 9:17, 11:8, 11:10, 105:3, 119:13
**DRAM-related** [2] - 4:20, 105:3
**Drive** [1] - 2:16
**driven** [1] - 97:18
**DROOKS** [1] - 2:12
**drop** [2] - 36:14, 37:23
**drop-off** [1] - 36:14
**drops** [1] - 36:7
**due** [4] - 108:22, 111:15, 119:14, 121:17
**duly** [2] - 22:8, 102:23
**DUNN** [2] - 2:4, 2:7
**during** [15] - 33:13, 36:3, 36:20, 38:16, 38:25, 51:10, 55:18, 74:24, 78:22, 82:21, 97:9, 98:2, 111:24, 118:4, 132:22
**dying** [1] - 130:14
**dynamic** [2] - 72:14, 72:18

## E

**e-mail** [56] - 4:24, 8:13, 9:11, 9:13, 9:24, 10:4, 10:7, 63:12, 63:14, 63:15, 86:23, 87:23, 107:15, 107:18, 107:21, 107:22, 108:1, 108:4, 108:9, 108:12, 108:14, 108:20, 108:21, 109:9, 109:12, 109:17, 109:22, 109:25, 110:7, 110:9, 110:13, 110:17, 111:3, 111:8, 111:9, 112:20, 112:22, 120:14, 120:15, 120:17, 120:20,

120:23, 121:2, 121:5, 121:8, 121:13, 121:24, 123:15, 123:16, 123:18, 123:20, 123:23, 123:24, 124:3, 124:4
**e-mails** [6] - 16:2, 32:13, 108:17, 121:8, 121:10, 122:9
**early** [2] - 119:10, 121:10
**ease** [1] - 17:15
**easily** [1] - 49:15
**East** [1] - 2:14
**economic** [7] - 23:10, 26:6, 33:5, 35:25, 36:12, 37:20, 97:21
**economically** [1] - 46:12
**economics** [9] - 23:7, 23:9, 24:4, 24:6, 25:1, 26:7, 52:5, 53:10, 78:15
**economist** [7] - 23:6, 45:13, 45:18, 53:14, 97:10, 97:14, 99:20
**economists** [1] - 23:9
**effect** [6] - 55:21, 62:17, 88:6, 92:4, 93:3, 100:20
**effort** [5] - 77:8, 88:14, 96:2, 101:5, 101:16
**eight** [3] - 86:6, 114:19, 114:23
**either** [10] - 16:1, 44:25, 49:7, 49:13, 60:10, 69:4, 91:15, 105:2, 123:5, 129:2
**Ekwan** [1] - 2:13
**ELECTRONICS** [1] - 1:8
**eligible** [2] - 79:18, 79:20
**EMMC** [15] - 11:3, 11:5, 11:12, 11:17, 11:20, 11:25, 12:8, 12:25, 13:6, 13:8, 13:9, 13:15, 19:6, 19:23, 20:1
**empirical** [1] - 44:19
**employed** [2] - 27:19, 28:17
**employee** [2] - 64:25, 109:3
**employees** [1] - 14:20
**end** [7] - 38:19, 92:7, 92:8, 118:12, 124:7, 127:25
**engaged** [2] - 39:7,

52:19
**ensure** [2] - 29:12, 35:11
**entire** [2] - 32:10, 65:23
**entirety** [1] - 98:16
**entitled** [1] - 50:17
**EOL** [5] - 118:10, 118:12, 118:15, 118:18, 118:22
**equal** [1] - 104:22
**equals** [1] - 81:2
**equates** [1] - 49:10
**equity** [1] - 25:5
**especially** [4] - 53:15, 53:19, 131:20
**essentially** [1] - 98:19
**establish** [5] - 48:17, 48:18, 51:13, 89:6, 101:17
**established** [1] - 33:2
**establishes** [1] - 71:9
**estimate** [8] - 24:22, 44:19, 53:8, 53:24, 84:15, 84:22, 98:12, 101:13
**estimated** [1] - 52:25
**estimates** [1] - 45:25
**events** [1] - 121:15
**evidence** [22] - 3:6, 4:7, 33:19, 33:23, 34:6, 35:14, 35:16, 35:19, 37:7, 37:12, 37:20, 49:6, 50:8, 50:15, 51:9, 85:13, 85:17, 85:22, 107:13, 120:7, 122:23, 123:12
**Evidence** [1] - 51:7
**exact** [6] - 9:18, 11:18, 45:15, 46:18, 105:21, 106:3
**exactly** [4] - 18:13, 34:24, 89:3, 101:6
**examination** [12] - 4:9, 6:2, 8:11, 8:12, 11:4, 11:11, 15:16, 15:17, 48:22, 50:6, 54:12, 55:5
**EXAMINATION** [16] - 4:11, 19:1, 23:2, 54:23, 96:18, 99:16, 103:11, 126:22, 133:17, 133:19, 133:22, 134:1, 134:3, 134:5, 134:8, 134:13
**examine** [1] - 50:17
**examined** [1] - 50:18
**example** [18] - 6:18,

6:20, 7:8, 15:1, 24:23, 28:1, 28:25, 29:12, 43:17, 58:20, 59:7, 59:23, 59:25, 60:11, 60:13, 60:19, 61:5, 61:9
**examples** [2] - 41:5, 42:5
**excel** [1] - 16:8
**exception** [1] - 34:4
**exchange** [3] - 9:12, 10:11, 127:5
**excluded** [2] - 42:14, 42:15
**excuse** [3] - 31:11, 96:13, 130:2
**excused** [2] - 101:24, 129:24
**exercise** [3] - 27:20, 35:10, 44:14
**Exhibit** [42] - 4:3, 4:4, 4:5, 5:23, 8:9, 9:19, 10:24, 33:10, 33:12, 33:16, 33:20, 35:19, 35:21, 35:22, 37:12, 37:15, 66:14, 66:15, 69:2, 72:23, 74:4, 75:11, 79:1, 79:23, 81:8, 81:17, 82:11, 82:22, 85:11, 85:21, 86:18, 93:5, 107:13, 119:22, 122:2, 123:12, 126:25, 133:24, 133:25, 134:10, 134:12
**exhibit** [7] - 33:25, 68:7, 78:25, 82:15, 88:15, 119:25, 122:24
**exhibits** [7] - 3:9, 3:11, 3:19, 82:13, 121:25, 123:2, 128:4
**Exhibits** [5] - 4:6, 87:17, 122:23, 133:16, 134:11
**existing** [1] - 121:16
**exists** [1] - 49:9
**expect** [5] - 14:6, 14:19, 15:10, 45:14, 45:17
**expectations** [2] - 6:13, 45:19
**expected** [2] - 31:16, 46:25
**experience** [5] - 24:9, 25:17, 128:14, 128:17, 128:20
**experienced** [1] - 55:4
**expert** [17] - 23:21, 24:19, 26:6, 33:23,

34:7, 34:8, 34:11, 34:14, 34:22, 55:4, 61:16, 64:21, 66:7, 72:24, 76:17, 82:23, 131:12

**experts** [1] - 25:12
**explain** [17] - 11:6, 27:25, 31:5, 38:7, 41:2, 42:3, 46:13, 46:20, 50:10, 51:16, 62:9, 62:10, 77:17, 80:16, 89:4, 98:22, 119:11
**explained** [3] - 51:23, 79:19, 89:5
**explanation** [1] - 80:12
**explanations** [1] - 111:23
**extent** [1] - 127:15
**extrapolated** [1] - 53:6

## F

**FAB** [1] - 114:20
**FABS** [2] - 115:3, 115:6
**facility** [1] - 114:20
**fact** [13] - 18:1, 21:23, 34:7, 34:11, 34:14, 34:21, 40:16, 40:18, 40:22, 51:3, 52:18, 56:11, 93:17
**factfinder** [1] - 50:19
**factor** [1] - 115:14
**factory** [1] - 114:25
**facts** [2] - 32:8, 46:13
**factual** [1] - 51:2
**failed** [3] - 48:8, 61:22, 83:22
**fair** [8] - 27:17, 27:21, 28:15, 44:21, 45:21, 83:20, 104:24, 110:16
**fairly** [3] - 27:12, 56:14, 56:16
**familiar** [3] - 36:18, 82:13, 82:15
**far** [4] - 43:10, 44:2, 44:25, 71:21
**fast** [1] - 114:15
**faster** [4] - 55:10, 104:11, 113:4, 113:10
**FCRR** [1] - 1:22
**February** [3] - 28:6, 43:22, 123:15
**Federal** [2] - 1:23, 103:8
**Feinstein** [1] - 2:18

**felt** [3] - 6:15, 42:17, 97:17
**few** [3] - 33:5, 102:1, 102:2
**field** [4] - 23:7, 23:9, 26:6, 73:25
**fields** [1] - 72:21
**figure** [9] - 27:20, 28:14, 29:10, 43:13, 49:17, 89:19, 89:25, 94:24, 98:1
**figured** [1] - 93:11
**fill** [6] - 72:5, 75:1, 84:10, 106:13, 117:14
**filled** [6] - 59:11, 59:20, 59:21, 72:9, 72:12, 101:19
**filling** [1] - 37:25
**final** [1] - 122:24
**finally** [1] - 41:4
**finance** [4] - 25:1, 128:9, 129:1, 129:3
**financial** [1] - 30:16
**fine** [9] - 22:24, 66:23, 82:19, 102:5, 104:10, 114:3, 132:16, 132:21, 132:25
**finish** [4] - 102:12, 102:14, 102:15, 117:9
**finished** [3] - 104:4, 104:6, 104:14
**finishing** [1] - 24:12
**firm** [4] - 23:13, 25:1, 124:21, 124:24
**firmly** [1] - 119:3
**firms** [2] - 23:16, 23:17
**first** [31] - 3:13, 4:25, 5:1, 8:12, 9:6, 9:23, 9:25, 10:8, 22:8, 24:15, 30:13, 38:16, 38:20, 41:18, 43:9, 51:1, 52:17, 54:13, 60:1, 61:12, 71:24, 73:3, 74:17, 84:22, 92:6, 102:6, 102:23, 105:9, 116:24, 121:6, 121:9
**five** [6] - 16:25, 126:5, 126:16, 126:19, 130:23, 131:22
**Flash** [1] - 11:3
**flat** [1] - 38:16
**Floor** [3] - 2:5, 2:14, 2:19
**fluctuations** [1] - 49:1
**focus** [8] - 9:1, 17:7,

23:9, 23:12, 23:14, 25:2, 109:13, 131:18
**focused** [6] - 26:1, 30:16, 36:25, 56:20, 74:22, 123:16
**focuses** [1] - 25:4
**focusing** [3] - 41:13, 63:18
**folks** [2] - 120:17, 120:18
**follow** [2] - 69:11, 104:10
**followed** [3] - 61:25, 78:2, 109:18
**following** [3] - 10:4, 110:2, 112:21
**follows** [3] - 22:8, 65:15, 102:24
**fore** [1] - 82:18
**forecast** [33] - 5:7, 5:16, 13:1, 14:2, 14:3, 14:5, 14:6, 14:10, 18:17, 18:19, 49:16, 59:25, 62:14, 62:19, 62:23, 63:7, 63:11, 63:22, 84:8, 84:14, 84:21, 85:10, 85:24, 86:3, 86:8, 90:7, 116:1, 125:18, 125:19, 125:20, 126:7, 130:14
**forecasted** [1] - 16:14
**forecaster** [1] - 77:4
**forecasting** [2] - 11:10, 86:4
**forecasts** [14] - 13:22, 18:12, 63:12, 83:23, 84:2, 84:4, 85:2, 85:7, 118:18, 125:14, 125:15, 125:22, 125:24, 126:1
**foregoing** [1] - 133:6
**forget** [5] - 103:8, 106:18, 106:19, 111:10
**forgot** [1] - 131:12
**form** [1] - 7:18
**formal** [1] - 25:9
**formally** [2] - 26:5, 55:2
**format** [1] - 66:4
**former** [1] - 109:3
**formula** [2] - 81:2, 81:4
**forth** [2] - 23:18, 87:12
**fortunate** [1] - 46:8
**forward** [2] - 5:19, 5:20
**forwarded** [1] - 109:9

**forwards** [2] - 43:16, 44:24
**foundation** [4] - 30:2, 48:23, 50:16
**four** [4] - 3:10, 30:16, 31:2, 36:24
**fourth** [1] - 123:24
**fraction** [1] - 47:5
**frequently** [1] - 43:2
**Friday** [1] - 130:7
**friends** [1] - 130:14
**front** [1] - 62:5
**fulfill** [4] - 6:24, 11:19, 49:5, 105:2
**fulfilled** [3] - 26:18, 31:17, 31:20
**fulfilling** [1] - 37:25
**full** [4] - 22:10, 24:14, 44:17, 103:2
**full-time** [1] - 24:14
**fully** [4] - 17:16, 17:22, 45:14, 46:25
**fulsome** [1] - 51:10
**fundamental** [1] - 33:7
**future** [3] - 7:6, 12:21, 84:23

## G

**gauge** [1] - 5:17
**general** [6] - 26:1, 45:8, 62:6, 111:13, 115:10, 119:6
**generally** [3] - 7:13, 14:16, 96:12
**generate** [2] - 60:12, 79:20
**generated** [1] - 14:25
**generating** [2] - 15:2, 79:13
**GIBSON** [2] - 2:4, 2:7
**given** [10] - 31:20, 39:11, 43:22, 45:11, 46:1, 71:2, 83:24, 90:20, 97:9, 97:13
**goods** [6] - 60:25, 61:19, 61:22, 104:5, 104:6, 104:14
**graduating** [1] - 24:9
**Grand** [1] - 2:5
**grant** [1] - 20:23
**granted** [3] - 106:25, 111:19, 117:17
**granularity** [1] - 87:15
**graph** [1] - 42:9
**graphic** [3] - 15:13, 38:4, 97:24
**Graphic** [3] - 23:24, 24:7, 47:6
**graphs** [1] - 38:10

**great** [2] - 21:17, 130:12
**grounds** [1] - 47:11
**Group** [2] - 24:16, 24:24
**group** [2] - 25:4
**guess** [2] - 24:15, 88:18
**guidance** [2] - 108:18, 108:22
**guy** [1] - 57:8
**guys** [1] - 131:13

## H

**half** [5] - 84:6, 130:23, 131:23, 132:6
**half-hour** [2] - 131:23, 132:6
**halfway** [1] - 67:11
**hand** [13] - 22:4, 22:15, 37:4, 68:15, 102:20, 119:21, 122:3, 124:19, 124:25, 125:12, 126:6, 126:7, 126:10
**handed** [2] - 90:5, 123:9
**handle** [2] - 104:17, 104:19
**handling** [1] - 111:22
**happy** [2] - 47:3, 89:4
**hard** [1] - 68:9
**harm** [1] - 24:22
**Hasaki** [1] - 131:12
**headings** [1] - 75:23
**heads** [1] - 131:5
**healthcare** [1] - 25:3
**hear** [8] - 62:16, 62:22, 63:13, 88:5, 88:9, 89:2, 90:10, 102:14
**heard** [35] - 10:21, 19:8, 25:15, 26:16, 31:7, 31:21, 36:8, 42:25, 46:19, 55:18, 55:22, 56:2, 62:9, 62:17, 62:18, 62:21, 63:8, 63:10, 64:17, 68:22, 73:17, 83:25, 85:3, 88:6, 90:11, 92:14, 92:16, 92:17, 92:20, 95:21, 95:23, 100:17, 100:20, 118:10, 128:4
**hearing** [1] - 85:7
**held** [1] - 104:1
**help** [5] - 32:15, 35:5, 43:6, 55:9, 108:2
**helpful** [1] - 107:5

helps [1] - 44:22
hence [3] - 20:18, 59:12, 60:20
Hi [1] - 120:20
high [5] - 27:9, 29:25, 53:16, 109:10, 112:12
higher [7] - 7:22, 44:16, 45:9, 57:23, 57:25, 61:21, 98:18
highlighted [1] - 41:7
historical [2] - 27:16, 43:20
history [1] - 72:21
hold [2] - 126:20, 130:15
Honda [15] - 27:15, 28:13, 29:13, 29:15, 39:24, 41:22, 43:7, 58:21, 58:23, 59:4, 60:9, 61:5, 61:6
hones [1] - 23:12
Hong [33] - 4:13, 8:11, 18:22, 19:3, 21:6, 31:7, 31:21, 36:8, 36:9, 38:18, 42:25, 45:7, 46:20, 50:18, 55:23, 55:25, 62:13, 63:21, 64:17, 84:9, 85:1, 86:23, 87:18, 88:2, 90:6, 92:17, 92:21, 100:17, 108:16, 112:3
Hong's [6] - 45:18, 50:22, 62:7, 63:10, 73:17, 95:21
honor [1] - 26:20
Honor [83] - 3:21, 4:1, 18:24, 20:21, 21:11, 21:14, 22:1, 22:15, 22:19, 22:25, 26:4, 26:9, 30:1, 30:10, 32:3, 32:6, 33:19, 33:21, 34:6, 34:13, 34:16, 35:15, 35:18, 37:6, 37:9, 47:10, 48:8, 48:21, 50:21, 50:25, 51:1, 51:6, 51:9, 52:10, 52:11, 54:10, 54:13, 54:17, 54:22, 66:15, 66:21, 85:13, 85:17, 85:20, 86:19, 87:19, 96:17, 99:12, 101:23, 102:1, 102:7, 102:10, 102:11, 103:1, 103:7, 106:24, 107:7, 107:10, 107:12, 111:17, 113:16,

113:23, 114:8, 116:12, 116:18, 117:8, 117:16, 119:21, 122:3, 122:15, 122:17, 122:20, 123:6, 123:10, 126:18, 127:2, 129:22, 129:25, 131:5, 132:1, 132:3, 132:14
HONORABLE [1] - 1:3
honored [2] - 58:6, 58:9
Hope [1] - 2:19
hope [1] - 123:1
hopefully [2] - 55:10, 75:13
hour [3] - 130:25, 131:23, 132:6
hours [5] - 115:3, 130:24, 131:1, 131:23, 132:1
hundreds [1] - 31:8
hypothetical [1] - 58:20

## I

idea [1] - 27:12
identical [1] - 16:15
identified [3] - 28:5, 44:14, 91:10
identify [2] - 30:24, 44:8
identifying [1] - 77:6
illustrate [1] - 29:1, 91:6, 91:12
illustrating [1] - 42:9
imagine [1] - 65:19
immediately [2] - 11:19, 64:10
impact [2] - 45:11, 129:17
impeaching [1] - 114:1
implemented [1] - 46:5
important [6] - 18:16, 63:1, 63:4, 85:5, 93:9, 131:20
importantly [1] - 99:1
INC [1] - 1:5
incident [2] - 12:23, 12:24
include [4] - 46:3, 86:8, 125:5, 125:7
included [4] - 69:13, 88:25, 89:7, 131:23
includes [6] - 72:10, 74:18, 89:20, 89:25,

125:3, 125:6
including [3] - 25:19, 90:2, 100:14
increase [5] - 36:13, 37:23, 38:13, 38:21, 81:15
increasing [1] - 38:3
incurred [2] - 27:10, 59:24
indeed [4] - 36:4, 44:18, 46:2, 97:16
independent [1] - 32:15
indicate [2] - 121:18, 121:22
indicated [5] - 6:3, 19:9, 19:13, 51:6, 87:9
indicates [1] - 110:18
indicating [1] - 123:25
individual [2] - 14:9, 23:13
industrial [1] - 23:15
industry [3] - 5:12, 5:15, 119:7
inflation [1] - 23:11
inform [4] - 15:5, 35:22, 37:15, 43:6
informal [1] - 130:24
information [21] - 31:1, 31:15, 32:9, 33:17, 35:21, 37:14, 39:24, 49:8, 58:18, 62:23, 62:25, 63:1, 64:18, 67:6, 69:8, 72:10, 73:9, 74:21, 76:15, 86:14, 88:3
informing [1] - 15:7
initial [2] - 31:14, 106:11
inquiry [1] - 124:20
inside [2] - 14:25, 15:1
instance [4] - 13:4, 13:14, 41:8, 71:24
instances [7] - 7:13, 7:14, 26:18, 44:9, 74:25, 91:9, 126:8
instead [6] - 26:24, 29:14, 39:14, 61:21, 96:8, 96:10
intellectual [1] - 25:25
intend [1] - 3:24
interest [1] - 23:11
interested [2] - 27:23, 28:15
interim [1] - 10:17
interpret [1] - 65:3
interprets [1] - 90:17
introduce [1] - 3:8
invalid [1] - 50:23

invoice [1] - 31:16, 31:22, 70:16, 70:17, 71:11, 71:13, 71:15, 71:16, 73:19, 73:20, 74:1, 97:16, 101:2
invoice-level [1] - 97:16
invoices [8] - 30:18, 31:13, 31:25, 98:2, 128:14, 128:16, 128:17, 129:4
involve [2] - 31:1, 44:14
involved [5] - 23:19, 36:23, 40:7, 127:9, 127:11
involves [2] - 23:16, 28:9, 41:13
involving [3] - 25:18, 31:23, 107:15
issue [17] - 11:3, 11:17, 13:2, 17:20, 31:8, 33:21, 47:4, 49:2, 51:2, 63:22, 83:10, 113:2, 115:24, 120:4, 128:9, 128:25, 129:15
issued [4] - 9:6, 12:9, 69:7, 71:7
issues [7] - 15:6, 23:10, 25:21, 51:11, 83:25, 132:24, 132:25
item [10] - 8:1, 9:6, 10:8, 10:9, 14:13, 16:14, 16:15, 41:14, 41:21, 41:23
items [8] - 9:5, 10:6, 10:18, 10:21, 11:2, 12:1, 56:5, 116:2
itself [4] - 39:18, 58:3, 70:16, 98:22
IV [1] - 1:13

## J

January [4] - 5:6, 5:7, 5:10, 86:5
Jason [2] - 2:5, 50:4
JDLA [7] - 5:23, 36:3, 38:17, 65:23, 65:24, 79:11, 84:10
Jiang [6] - 9:24, 10:12, 64:25, 102:3, 104:2, 110:15
JIANG [1] - 65:2
job [7] - 81:14, 104:4, 104:6, 104:13, 104:22, 105:1, 105:2

Joyce [1] - 15:1
JUDGE [1] - 1:3
judgment [2] - 132:8, 132:19
judgments [1] - 45:24
July [4] - 41:10, 43:21, 78:23, 101:7
June [2] - 77:12, 77:24, 78:5, 86:6
JungEun [1] - 2:7
juror [1] - 107:8
jurors [4] - 3:2, 3:22, 130:2, 130:3
JURY [1] - 1:12
jury [20] - 3:1, 21:18, 25:15, 26:16, 27:25, 31:4, 37:16, 38:7, 46:14, 48:21, 50:19, 51:2, 54:18, 54:20, 90:17, 102:16, 119:11, 126:20, 130:20, 133:1

## K

Kotarski [4] - 5:22, 8:8, 9:1, 9:21
keep [5] - 6:19, 64:19, 76:24, 82:7, 82:9
keeping [1] - 18:12
keeps [1] - 62:19
Kelley [1] - 28:14
Ki [2] - 108:16, 112:3
Kim [3] - 15:1, 21:15
kind [6] - 23:7, 24:24, 25:8, 44:7, 51:18, 86:14
kiter [1] - 131:11
knowledge [3] - 14:22, 34:17, 129:10
known [1] - 26:14
Knuth [16] - 9:24, 10:12, 14:11, 14:25, 15:7, 15:12, 86:24, 102:2, 120:24, 123:25, 124:5, 124:15, 128:8, 131:10, 131:11, 132:10
Kotarski [1] - 23:23

## L

lack [1] - 30:1
LaMagna [1] - 119:22
LAMAGNA [13] - 114:6, 116:18, 120:4, 122:14, 122:17, 122:20, 123:10, 126:18,

126:23, 127:2, 127:4, 129:20, 134:14
**Lane** [2] - 21:15
**language** [2] - 40:12, 62:5
**large** [2] - 42:16, 47:5
**last** [7] - 3:17, 4:24, 4:25, 36:25, 80:20, 109:10, 131:7
**lastly** [1] - 40:16
**late** [1] - 7:21
**law** [3] - 50:22, 132:9, 132:20
**Law** [6] - 2:4, 2:5, 2:7, 2:13, 2:16, 2:18
**lawyers** [4] - 14:18, 15:8, 25:11, 55:3
**LC** [1] - 17:19
**LCs** [2] - 17:14, 17:16
**lead** [11] - 60:1, 61:4, 103:10, 113:4, 113:10, 114:21, 114:23, 115:10, 115:14, 115:15, 115:24
**leading** [1] - 112:3
**learn** [1] - 14:14
**least** [13] - 6:4, 48:19, 61:2, 65:6, 66:12, 79:12, 79:18, 90:24, 92:25, 98:7, 116:24, 132:2, 132:17
**LECG** [1] - 24:15
**led** [1] - 99:5
**Lee** [1] - 2:7
**left** [12] - 3:8, 29:5, 37:5, 42:14, 63:20, 67:10, 96:20, 104:2, 110:15, 126:16, 131:1
**legal** [1] - 99:23
**less** [7] - 19:15, 44:3, 61:7, 83:17, 89:10, 89:14, 89:23
**letter** [1] - 17:19
**level** [6] - 27:9, 29:25, 59:18, 70:16, 87:15, 97:16
**liability** [1] - 33:2, 57:6
**LICENBERG** [1] - 2:13
**life** [1] - 118:12
**light** [5] - 58:13, 58:15, 91:7, 91:9, 103:20
**likely** [4] - 8:4, 14:9, 53:14, 53:18
**limine** [3] - 51:1, 51:7, 51:11
**limit** [2] - 17:15,

120:21
**limits** [1] - 4:2
**line** [23] - 9:6, 10:8, 10:9, 16:14, 17:23, 18:4, 35:12, 36:1, 36:19, 38:9, 38:11, 38:15, 113:18, 113:24, 116:12, 116:13, 116:15, 116:16, 121:17, 128:21, 128:25, 129:4
**lines** [2] - 113:17, 128:5
**link** [1] - 31:25
**links** [1] - 49:3
**list** [9] - 15:20, 49:7, 49:17, 96:9, 99:21, 100:18, 101:5, 101:17, 112:12
**listen** [1] - 105:12
**listening** [1] - 32:18
**lists** [5] - 48:18, 92:18, 92:22, 95:22, 97:23
**litigation** [4] - 24:12, 24:14, 24:18, 25:2
**litigation-related** [3] - 24:12, 24:14, 24:18
**live** [1] - 131:10
**LLP** [4] - 2:4, 2:7, 2:15, 2:18
**Lo** [4] - 2:5, 19:5, 50:4, 51:16
**LO** [79] - 3:10, 3:13, 3:15, 3:17, 4:12, 5:22, 5:24, 6:16, 6:17, 8:8, 8:10, 9:1, 9:3, 9:20, 9:22, 10:24, 10:25, 15:13, 15:15, 18:22, 21:11, 21:14, 22:1, 22:15, 22:19, 22:25, 23:3, 23:23, 23:25, 24:7, 24:8, 26:4, 26:11, 28:22, 28:23, 29:23, 29:24, 30:7, 30:10, 30:11, 32:6, 32:7, 33:19, 34:1, 34:13, 34:18, 35:1, 35:2, 35:15, 35:18, 35:20, 37:6, 37:13, 38:4, 38:6, 40:2, 40:4, 40:25, 41:1, 41:25, 42:2, 42:20, 42:21, 47:6, 47:7, 50:4, 51:20, 52:11, 52:16, 54:10, 66:24, 80:21, 96:17, 96:19, 99:9, 101:23, 133:18, 133:23, 134:4
**looks** [3] - 67:3, 130:24, 130:25
**Los** [5] - 1:15, 1:24, 2:6, 2:14, 2:19
**lower** [10] - 12:8, 12:12, 20:4, 45:3, 60:25, 72:18, 98:8, 99:2, 99:3, 99:7
**lowered** [1] - 44:18
**LTD** [1] - 1:8
**lunch** [3] - 3:3, 132:11, 132:22

**M**

**macroeconomics** [1] - 23:10
**mail** [56] - 4:24, 8:13, 9:11, 9:13, 9:24,

**logically** [1] - 132:18
**look** [63] - 8:23, 8:24, 10:4, 10:24, 16:9, 27:20, 27:22, 27:24, 28:13, 29:23, 33:9, 33:10, 35:21, 39:5, 39:20, 40:21, 42:10, 43:4, 43:18, 43:23, 43:25, 45:23, 49:15, 49:17, 58:11, 63:20, 66:13, 68:22, 72:7, 72:23, 74:17, 75:12, 75:13, 76:10, 77:9, 78:3, 80:18, 80:24, 81:17, 82:2, 82:10, 82:12, 84:1, 84:3, 84:7, 84:17, 85:10, 85:16, 86:18, 87:17, 88:1, 97:16, 97:24, 99:21, 107:25, 116:3, 120:9, 122:14, 123:24, 126:24, 130:22
**Look** [1] - 43:15
**looked** [20] - 10:18, 16:13, 16:14, 31:5, 35:7, 40:14, 41:19, 42:12, 44:24, 66:11, 68:1, 68:24, 68:25, 72:3, 72:4, 75:8, 82:11, 95:25, 97:4
**looking** [27] - 9:4, 10:5, 11:2, 27:8, 27:10, 28:9, 31:12, 38:7, 39:24, 40:20, 41:2, 43:20, 45:5, 48:16, 48:17, 67:1, 68:12, 69:24, 73:3, 73:19, 75:6, 93:24, 96:8, 120:13, 121:9, 121:13, 127:5

10:4, 10:7, 63:12, 63:14, 63:15, 86:23, 87:23, 107:15, 107:18, 107:21, 107:22, 108:1, 108:4, 108:9, 108:12, 108:14, 108:20, 108:21, 109:9, 109:12, 109:17, 109:22, 109:25, 110:7, 110:9, 110:13, 110:17, 111:3, 111:8, 111:9, 112:20, 112:22, 120:14, 120:15, 120:17, 120:20, 120:23, 121:2, 121:5, 121:8, 121:13, 121:24, 123:15, 123:16, 123:18, 123:20, 123:23, 123:24, 124:3, 124:4
**mails** [6] - 16:2, 32:13, 108:17, 121:8, 121:10, 122:9
**majority** [7] - 93:20, 95:14, 101:15, 115:20, 115:21, 115:23, 116:8
**man** [1] - 65:14
**manage** [1] - 13:14
**manager** [2] - 103:15, 104:16
**manipulating** [1] - 35:6
**manufacturers** [1] - 115:11
**manufacturing** [1] - 115:8
**Marc** [1] - 2:18
**March** [7] - 87:23, 87:25, 107:19, 109:24, 110:5, 110:14, 121:9
**MARELLA** [1] - 2:12
**MARK** [1] - 1:3
**mark** [2] - 45:22, 124:7
**marked** [8] - 26:24, 35:4, 36:16, 36:18, 66:14, 90:20, 107:7, 119:23
**marked-up** [1] - 26:24
**market** [22] - 5:17, 9:15, 9:17, 12:7, 12:11, 12:19, 20:11, 20:14, 23:18, 27:15, 39:13, 109:15, 109:19, 109:23,

110:8, 110:20, 111:1, 111:4, 111:13, 119:6, 119:20
**marketplace** [1] - 32:17
**markets** [1] - 23:16
**markup** [1] - 27:1
**master's** [1] - 24:5
**match** [20] - 40:24, 41:13, 48:1, 48:3, 48:5, 48:7, 48:14, 49:19, 51:20, 53:12, 53:13, 53:16, 69:16, 70:6, 71:20, 84:8, 92:5, 95:15, 96:3, 114:24
**matched** [8] - 48:13, 48:24, 49:11, 49:13, 88:15, 96:11, 100:3, 100:10, 101:4, 101:11, 101:13
**matches** [3] - 93:14, 93:17, 101:10
**matching** [14] - 40:8, 41:21, 48:9, 49:23, 70:22, 77:10, 78:3, 78:9, 93:10, 94:12, 94:17, 95:2, 95:9, 95:19
**materials** [2] - 104:4, 104:14
**math** [11] - 70:24, 78:15, 78:17, 79:22, 94:16, 95:3, 95:13, 95:18, 99:14, 99:18, 131:6
**mathematically** [2] - 98:20, 99:1
**matter** [13] - 26:6, 26:12, 33:14, 48:22, 50:22, 52:5, 53:10, 106:23, 113:6, 113:14, 132:8, 132:19, 133:7
**matters** [1] - 24:21
**mean** [12] - 28:24, 42:22, 43:15, 44:6, 46:14, 46:16, 58:14, 83:1, 83:5, 107:16, 110:3, 131:14
**meaning** [2] - 7:2, 94:15
**means** [9] - 18:9, 46:17, 48:7, 93:20, 94:10, 95:14, 99:1, 110:8, 118:12
**meant** [3] - 91:6, 91:12, 110:12
**meet** [3] - 100:16,

103:13, 103:14
**memory** [4] - 56:23, 57:2, 69:3, 90:16
**mention** [1] - 128:4
**mentioned** [7] - 5:2, 11:4, 26:13, 35:24, 36:23, 42:24, 114:13
**merits** [1] - 52:1
**messed** [1] - 124:6
**messy** [2] - 28:18, 28:24
**met** [3] - 55:2, 103:13, 108:17
**method** [1] - 49:10
**methodology** [24] - 28:2, 28:8, 28:9, 30:3, 30:6, 30:12, 31:1, 35:3, 47:8, 47:17, 47:18, 48:19, 48:23, 49:3, 49:13, 50:20, 51:4, 51:13, 89:8, 89:21, 90:25, 91:14, 95:1, 96:12
**methods** [2] - 25:13, 47:20
**mic** [1] - 103:19
**MICHAEL** [3] - 22:6, 22:13, 133:21
**Michael** [5] - 2:16, 22:2, 22:12, 47:18, 55:2
**microeconomic** [1] - 23:12
**microeconomics** [1] - 23:14
**middle** [6] - 42:7, 83:2, 104:2, 105:22, 110:15
**middleman** [3] - 26:24, 38:22, 39:14
**middlemen** [1] - 37:3
**might** [25] - 3:23, 7:16, 7:19, 8:2, 27:3, 27:13, 27:17, 27:22, 28:4, 28:13, 29:8, 29:9, 31:20, 32:17, 58:13, 60:1, 60:15, 64:14, 85:14, 92:7, 107:4, 113:25, 131:12, 131:13
**Mike** [1] - 48:10
**MIL** [2] - 50:5, 50:9
**million** [33] - 18:17, 39:2, 39:3, 54:5, 54:8, 78:23, 79:9, 79:21, 79:25, 80:8, 80:13, 80:14, 83:2, 83:16, 83:21, 84:6, 89:7, 89:20, 93:14, 94:11, 95:17, 98:1,

98:7, 98:16, 105:19, 106:4, 106:5, 106:6, 106:7, 116:25
**millions** [1] - 106:2
**mind** [5] - 7:4, 17:9, 18:13, 82:12, 82:18
**minority** [5] - 100:4, 116:4, 117:4, 117:23, 117:25
**minus** [1] - 84:6
**minute** [1] - 33:6
**minutes** [9] - 54:16, 102:16, 126:5, 126:16, 126:19, 130:25, 131:1, 132:1, 132:2
**missing** [1] - 80:24
**misspoke** [1] - 85:20
**mistake** [1] - 124:12
**model** [5] - 40:18, 44:8, 44:17, 46:3, 61:2
**moment** [5] - 5:7, 17:7, 26:13, 28:19, 42:24, 119:5
**money** [1] - 129:8
**month** [14] - 4:24, 4:25, 20:15, 35:7, 35:8, 35:11, 81:18, 81:23, 82:4, 82:7, 116:1, 128:3
**month-to-month** [1] - 116:1
**monthly** [6] - 4:21, 4:22, 5:3, 43:2, 92:11, 100:18
**months** [26] - 7:15, 7:22, 8:1, 10:14, 10:17, 10:22, 11:24, 12:4, 12:6, 12:14, 13:7, 20:3, 20:7, 20:19, 28:14, 31:17, 31:21, 43:8, 43:11, 43:19, 75:10, 82:8, 86:5, 86:6, 128:3
**morning** [1] - 17:24
**Most** [1] - 126:9
**most** [8] - 14:9, 17:17, 53:18, 93:17, 93:20, 117:12, 125:1, 129:1
**motion** [11] - 20:23, 51:1, 52:9, 102:9, 102:14, 106:25, 111:19, 117:17, 132:8, 132:17, 132:19
**motions** [1] - 51:11
**move** [16] - 3:21, 20:21, 33:19, 41:4, 103:22, 106:24,

107:6, 109:10, 111:17, 117:8, 117:10, 117:16, 118:9, 120:1, 122:10, 123:8
**moving** [1] - 38:20
**MR** [206] - 3:10, 3:13, 3:15, 3:17, 3:21, 4:1, 4:12, 5:22, 5:24, 6:16, 6:17, 8:8, 8:10, 9:1, 9:3, 9:20, 9:22, 10:24, 10:25, 15:13, 15:15, 18:22, 18:24, 19:2, 20:21, 21:1, 21:4, 21:5, 21:9, 21:11, 21:14, 22:1, 22:15, 22:19, 22:25, 23:3, 23:23, 23:25, 24:7, 24:8, 26:4, 26:9, 26:11, 28:22, 28:23, 29:23, 29:24, 30:1, 30:7, 30:10, 30:11, 32:6, 32:7, 33:19, 33:21, 34:1, 34:5, 34:13, 34:16, 34:18, 35:1, 35:2, 35:15, 35:18, 35:20, 37:6, 37:9, 37:13, 38:4, 38:6, 40:2, 40:4, 40:25, 41:1, 41:25, 42:2, 42:20, 42:21, 47:6, 47:7, 47:10, 47:17, 48:10, 48:11, 49:6, 50:4, 50:25, 51:20, 52:10, 52:11, 52:16, 54:10, 54:13, 54:17, 54:22, 54:24, 62:11, 62:12, 65:2, 65:4, 66:15, 66:21, 66:24, 66:25, 79:2, 79:3, 80:19, 80:21, 80:23, 81:9, 81:11, 84:19, 84:20, 85:12, 85:16, 85:20, 85:23, 86:18, 86:22, 87:17, 87:22, 88:21, 88:24, 96:17, 96:19, 99:9, 99:17, 100:5, 100:8, 100:11, 100:12, 101:21, 101:23, 102:1, 102:7, 102:11, 102:17, 102:22, 103:1, 103:7, 103:12, 103:24, 106:24, 107:1, 107:6, 107:10, 107:12, 107:14, 111:17, 111:20, 113:16, 113:20, 113:23, 114:2,

114:6, 114:8, 114:12, 116:12, 116:15, 116:18, 116:22, 117:8, 117:11, 117:16, 117:18, 119:21, 119:24, 120:1, 120:4, 120:8, 122:2, 122:5, 122:8, 122:14, 122:17, 122:20, 122:24, 123:3, 123:6, 123:10, 123:13, 123:14, 126:14, 126:18, 126:23, 127:2, 127:4, 129:20, 129:22, 131:4, 131:5, 131:10, 131:25, 132:3, 132:12, 132:13, 132:16, 133:18, 133:20, 133:23, 134:2, 134:4, 134:6, 134:7, 134:9, 134:14
**multi** [1] - 31:9
**multi-year** [1] - 31:9
**multiplied** [4] - 80:8, 80:14, 93:13, 98:16
**MYERS** [2] - 2:15, 2:18

# N

**name** [3] - 22:10, 22:12, 103:2
**named** [1] - 64:25
**NAND** [6] - 6:7, 11:8, 11:10, 105:3, 119:13, 130:15
**narrowed** [1] - 42:17
**nature** [3] - 9:18, 17:4, 49:1
**Neal** [4] - 120:20, 120:24, 124:5, 124:17
**nearby** [4] - 43:24, 46:17, 46:23, 53:17
**nearby-in-time** [1] - 43:24
**necessarily** [5] - 46:22, 72:14, 83:24, 92:5, 93:19
**need** [12] - 19:15, 19:18, 45:22, 60:17, 60:20, 74:1, 78:14, 80:16, 113:19, 121:20, 124:6, 132:24
**needed** [3] - 8:5, 39:9,

72:2
**needs** [1] - 113:10
**negative** [13] - 44:4, 44:15, 45:1, 45:12, 46:1, 46:4, 61:3, 79:19, 80:1, 89:16, 98:10, 98:24, 99:5
**negotiable** [1] - 4:19
**negotiate** [1] - 93:1
**negotiated** [2] - 7:19, 19:10
**NESSIM** [1] - 2:12
**net** [1] - 98:25
**Netlist** [169] - 4:8, 4:16, 4:23, 5:5, 5:6, 5:9, 5:13, 6:8, 6:20, 6:22, 7:1, 7:3, 7:9, 7:11, 7:16, 7:19, 8:2, 9:24, 10:17, 11:12, 11:13, 11:16, 11:22, 11:25, 12:4, 12:10, 12:15, 12:21, 12:24, 13:7, 13:11, 13:12, 13:14, 14:3, 14:13, 15:3, 15:5, 15:9, 16:1, 17:11, 17:25, 18:1, 18:8, 18:12, 18:17, 22:1, 23:20, 26:14, 26:17, 26:19, 27:7, 27:10, 28:4, 28:10, 29:5, 30:19, 30:22, 36:5, 36:10, 37:1, 37:2, 37:24, 38:12, 38:21, 38:25, 39:7, 39:12, 39:18, 39:25, 41:8, 41:20, 44:9, 44:11, 45:3, 46:7, 49:4, 50:4, 51:24, 52:19, 53:17, 54:2, 55:19, 56:22, 57:2, 62:15, 62:19, 63:7, 63:10, 63:18, 63:22, 63:25, 64:24, 67:1, 68:4, 68:14, 68:17, 69:6, 70:19, 71:5, 71:18, 72:2, 72:5, 72:16, 73:17, 75:4, 75:16, 76:4, 76:14, 77:5, 77:11, 77:25, 78:6, 78:8, 79:10, 83:22, 84:8, 84:9, 85:25, 88:3, 89:8, 89:22, 91:3, 91:10, 92:25, 93:2, 96:9, 97:18, 97:20, 97:22, 98:4, 98:8, 100:1, 100:19, 100:21, 101:6, 101:18, 103:15, 104:5, 104:14,

105:24, 109:3, 109:18, 110:25, 111:13, 115:13, 118:22, 120:18, 120:21, 121:1, 121:17, 125:14, 127:21, 127:24, 127:25, 128:12, 128:14, 128:16, 128:17, 128:21, 129:6, 129:7, 129:10, 129:17, 129:18, 131:1
**NETLIST** [1] - 1:5
**Netlist's** [10] - 6:8, 10:20, 13:22, 15:22, 62:14, 71:17, 77:24, 83:10, 88:16, 128:21
**never** [4] - 12:25, 13:4, 18:21, 59:25
**Never** [1] - 7:4
**new** [1] - 127:6
**Newport** [2] - 2:16, 2:17
**next** [15] - 3:15, 3:17, 6:21, 7:10, 9:8, 21:12, 22:1, 30:7, 38:4, 40:2, 57:13, 73:7, 95:7, 101:25, 109:13
**nice** [2] - 103:13, 103:14
**night** [2] - 80:20, 130:19
**noise** [1] - 52:13
**nonbinding** [1] - 125:22
**nonnegotiable** [3] - 92:22, 100:19, 101:18
**nonresponsive** [1] - 111:18
**normal** [1] - 88:2
**note** [1] - 86:3
**notebooks** [1] - 107:8
**nothing** [7] - 21:9, 50:19, 91:25, 101:23, 126:14, 129:20, 129:22
**notice** [2] - 6:6, 6:10
**notion** [2] - 45:1, 89:16
**noun** [1] - 84:22
**November** [7] - 6:18, 6:19, 9:8, 10:8, 10:9, 67:4, 86:1
**Number** [11] - 23:24, 24:7, 27:24, 28:22, 29:23, 40:3, 40:25, 42:1, 42:20, 47:6,

62:10
**number** [15] - 32:2, 67:7, 67:14, 69:3, 69:25, 70:2, 73:23, 79:21, 83:11, 83:13, 89:7, 105:21, 106:3, 109:14, 111:4
**numbers** [7] - 70:7, 77:10, 82:16, 83:5, 83:6, 125:19
**NW** [1] - 2:8

## O

**O'MELVENY** [2] - 2:15, 2:18
**object** [2] - 30:1, 47:11
**objection** [16] - 26:8, 37:9, 37:10, 50:3, 107:9, 107:10, 114:4, 114:6, 116:14, 116:17, 116:18, 116:19, 120:3, 120:5, 122:17, 123:10
**objections** [3] - 21:16, 22:22, 122:12
**objective** [1] - 55:11
**obligation** [1] - 29:21
**obligations** [1] - 37:25
**observation** [1] - 44:20
**observe** [2] - 46:4, 70:7
**obtain** [2] - 13:8, 79:10
**obviously** [2] - 52:8, 131:13
**occur** [1] - 9:12
**occurred** [2] - 41:10, 42:18
**October** [2] - 9:7, 9:8
**odd** [1] - 120:22
**OF** [3] - 1:2, 1:12, 2:1
**offer** [1] - 88:8
**offered** [1] - 48:23
**offering** [1] - 30:3
**officer** [1] - 50:10
**Official** [1] - 1:23
**often** [6] - 46:21, 117:6, 117:13, 124:14, 127:24, 128:1
**one** [45] - 3:13, 3:15, 3:17, 10:9, 14:1, 15:1, 17:4, 18:1, 18:3, 31:15, 33:1, 38:5, 40:8, 40:23, 42:19, 53:25, 55:3,

59:20, 62:14, 64:20, 64:24, 67:1, 69:24, 70:6, 72:5, 72:23, 76:10, 78:4, 85:25, 90:19, 90:21, 92:1, 93:9, 94:1, 94:4, 94:5, 99:19, 108:21, 109:13, 109:14, 123:13, 130:15, 131:17
**one-for-one** [1] - 17:4
**ones** [6] - 8:25, 9:2, 9:8, 91:14, 100:3
**online** [1] - 27:22
**open** [1] - 52:12
**opening** [2] - 55:15, 55:18
**operating** [1] - 50:10
**operations** [3] - 109:5, 112:11, 112:17
**opinion** [4] - 23:21, 34:8, 49:10, 51:14
**opinions** [5] - 24:19, 30:4, 30:9, 57:6, 97:25
**opportunity** [1] - 37:17
**opposed** [2] - 52:20, 94:18
**orange** [6] - 8:14, 8:24, 8:25, 9:2, 9:5, 38:11
**order** [80] - 1:25, 6:20, 6:23, 7:9, 7:12, 7:18, 9:4, 9:5, 10:6, 11:16, 12:5, 12:16, 12:20, 19:9, 19:12, 19:24, 20:1, 20:8, 31:14, 31:19, 31:20, 32:1, 32:2, 33:17, 35:8, 35:9, 49:7, 49:23, 49:25, 58:11, 58:12, 58:14, 58:17, 59:19, 59:20, 60:14, 63:23, 64:14, 65:17, 66:2, 67:4, 67:14, 67:17, 67:25, 68:19, 68:24, 69:24, 70:4, 70:20, 70:22, 71:4, 72:7, 72:15, 73:5, 75:15, 77:3, 77:9, 78:1, 78:9, 82:10, 108:5, 116:7, 121:19, 127:6, 127:7, 127:8, 127:10, 127:11, 127:12, 127:16, 127:17, 127:19, 127:24, 129:1, 129:2, 129:10, 129:11

**Ordered** [2] - 73:4, 76:19
**ordered** [4] - 10:8, 72:4, 72:18, 73:22, 75:21
**orders** [55] - 9:6, 10:14, 11:12, 11:13, 11:17, 11:20, 11:25, 13:2, 13:6, 15:20, 15:22, 15:25, 19:6, 30:18, 31:12, 36:4, 36:11, 37:22, 38:11, 38:12, 48:2, 48:16, 49:4, 49:15, 59:11, 64:1, 64:6, 64:19, 65:19, 65:24, 66:11, 67:2, 68:3, 68:4, 68:23, 69:5, 69:6, 69:8, 69:12, 70:10, 72:3, 72:12, 73:2, 75:1, 75:5, 81:18, 82:21, 82:24, 83:9, 83:21, 88:4, 88:15, 101:19, 117:15
**organization** [1] - 23:15
**organized** [2] - 23:16, 54:14
**original** [8] - 12:15, 31:19, 59:5, 127:10, 127:11, 127:16, 127:17, 127:18
**originally** [1] - 76:5
**otherwise** [1] - 120:5
**outlined** [1] - 28:2
**outside** [3] - 25:7, 47:12, 91:18
**overall** [1] - 98:13
**overpay** [1] - 44:9
**overpayment** [3] - 27:4, 39:10, 39:12
**overpayments** [2] - 45:5, 88:25
**overruled** [1] - 37:10
**own** [4] - 32:15, 52:3, 115:19, 115:21

## P

**P.K** [25] - 36:8, 38:18, 42:25, 45:7, 45:18, 46:19, 50:18, 55:22, 62:7, 62:13, 63:10, 63:21, 64:17, 73:17, 84:9, 85:1, 86:23, 87:18, 88:2, 90:5, 92:17, 92:21, 95:21, 100:17
**packet** [1] - 90:19
**page** [12] - 73:3,

87:10, 107:24, 108:1, 108:8, 108:16, 109:1, 113:17, 113:18, 113:24, 120:16, 121:9
**pages** [1] - 68:7
**paid** [31] - 18:3, 27:5, 27:6, 28:10, 31:24, 39:20, 47:24, 49:24, 51:18, 57:25, 58:1, 58:5, 58:7, 58:12, 61:19, 70:15, 70:17, 71:12, 73:17, 73:22, 77:25, 78:8, 79:10, 89:9, 89:10, 89:11, 89:23, 99:25, 101:18, 128:16, 128:19
**Paik** [1] - 108:16
**paik** [1] - 112:3
**pandemic** [2] - 119:14, 119:17
**panels** [1] - 25:11
**paper** [1] - 8:17
**paragraph** [1] - 109:13
**pardon** [1] - 80:6
**Park** [6] - 2:14, 109:2, 109:3, 109:21, 110:5, 112:20
**Park's** [3] - 112:10, 112:14, 112:18
**part** [24] - 3:24, 12:21, 12:22, 38:16, 53:1, 66:15, 67:7, 68:19, 73:4, 94:11, 110:25, 111:2, 111:3, 111:13, 111:15, 113:6, 113:7, 113:25, 119:8, 119:9, 119:13, 124:6, 125:19
**participate** [1] - 25:10
**particular** [19] - 5:25, 17:21, 23:15, 40:20, 41:11, 42:14, 49:23, 67:22, 70:20, 73:4, 73:5, 77:9, 86:4, 87:13, 88:16, 92:19, 96:4, 108:5, 123:21
**parties** [5] - 21:19, 21:24, 130:4, 130:23, 131:18
**partners** [1] - 25:2
**parts** [14] - 11:9, 13:15, 17:5, 17:8, 17:11, 18:15, 67:16, 108:22, 111:10, 116:3, 119:18, 119:19, 124:21

**party** [4] - 38:22, 39:1, 41:8, 61:22
**pass** [1] - 110:25
**passage** [1] - 44:22
**passed** [2] - 110:20, 111:13
**past** [1] - 25:18
**patent** [1] - 24:20
**Patrick** [1] - 22:12
**PATRICK** [1] - 22:13
**pay** [38] - 17:11, 17:13, 17:21, 18:1, 18:9, 18:13, 18:15, 18:18, 20:5, 20:12, 26:23, 27:5, 27:16, 39:13, 39:14, 39:21, 43:7, 44:9, 44:11, 45:3, 57:23, 58:5, 59:1, 59:5, 61:22, 70:25, 71:5, 78:1, 78:6, 92:23, 100:21, 121:1, 121:17, 121:21, 128:14, 128:17, 129:3
**paying** [2] - 89:13, 89:14
**payment** [3] - 86:12, 128:12
**payments** [1] - 128:5
**pending** [1] - 88:4
**people** [4] - 15:2, 25:11, 56:3, 131:17
**per** [5] - 6:14, 13:3, 81:18, 88:11, 120:20
**percent** [32] - 17:22, 46:9, 47:4, 48:7, 48:8, 48:10, 48:11, 52:24, 53:1, 53:6, 53:8, 53:11, 53:22, 54:6, 80:9, 81:4, 89:18, 93:21, 94:8, 94:13, 94:15, 94:20, 94:25, 95:10, 95:12, 95:14, 95:18, 96:7, 98:17, 98:22, 99:11
**Percent** [1] - 94:7
**percentage** [2] - 37:5, 80:2
**perfect** [5] - 45:14, 45:20, 45:22, 90:11, 123:21
**perfectly** [2] - 20:1, 45:17
**perform** [1] - 30:13
**perhaps** [1] - 57:15
**period** [23] - 31:9, 36:3, 36:10, 38:25, 39:2, 43:21, 49:21, 51:19, 51:24, 67:25, 74:19, 74:22, 74:24,

76:11, 78:5, 81:25, 82:22, 86:1, 86:25, 87:24, 97:5, 98:3, 100:9
**periodically** [1] - 25:10
**permission** [4] - 13:2, 47:11, 66:18, 85:18
**permits** [1] - 102:10
**person** [2] - 19:10, 112:3
**personal** [1] - 34:17
**perspective** [1] - 97:22
**Ph.D** [3] - 24:6, 24:12, 78:14
**phrase** [3] - 24:17, 44:7, 118:10
**phrasing** [2] - 85:9, 90:12
**physical** [1] - 68:25
**picked** [1] - 92:1
**picture** [1] - 23:10
**pieces** [6] - 16:23, 16:24, 17:1, 17:2
**place** [11] - 10:12, 17:15, 17:17, 60:1, 86:14, 97:6, 97:9, 97:13, 98:24, 124:1, 126:2
**placed** [7] - 10:15, 11:12, 11:25, 13:7, 36:4, 37:22, 49:4
**places** [4] - 6:20, 7:9, 53:19, 98:23
**placing** [4] - 11:16, 38:12, 127:9, 127:11
**plain** [1] - 46:16
**plaintiff** [6] - 24:22, 61:19, 61:20, 61:21, 61:23, 132:9
**Plaintiff** [2] - 1:6, 2:2
**plaintiffs** [1] - 102:8
**plan** [2] - 118:15, 118:19
**play** [5] - 21:15, 21:20, 114:8, 116:12, 116:20
**played** [4] - 21:25, 32:11, 114:11, 116:21
**PM** [1] - 1:14
**PO** [29] - 8:5, 12:9, 20:10, 70:16, 71:7, 73:23, 108:2, 108:7, 108:13, 108:22, 110:1, 113:2, 121:7, 121:11, 121:14, 121:16, 123:21, 123:23, 124:1,

124:19, 124:25, 125:3, 125:8, 125:9, 125:10, 125:12, 126:6, 126:10
**pocket** [2] - 22:19, 80:22
**point** [28] - 7:16, 18:8, 21:14, 26:9, 28:8, 32:21, 33:4, 36:1, 39:9, 39:22, 40:21, 43:3, 43:5, 44:4, 51:1, 56:19, 56:21, 75:4, 75:10, 82:14, 83:15, 85:4, 85:5, 92:19, 92:24, 96:4, 96:9, 123:1
**points** [1] - 92:7
**political** [1] - 24:4
**population** [2] - 46:9, 47:5, 53:1
**portions** [1] - 65:6
**POs** [5] - 17:17, 31:17, 68:25, 72:10, 126:2
**position** [6] - 70:19, 71:17, 104:1, 104:16, 110:4, 112:10
**positive** [5] - 44:9, 45:16, 46:3, 80:1, 98:23
**positives** [2] - 99:3, 99:4
**possible** [5] - 10:17, 76:6, 77:14, 78:11, 124:7
**possibly** [1] - 52:5
**post** [1] - 96:25
**potentially** [1] - 64:10
**PowerPoint** [1] - 12:11
**practice** [5] - 6:22, 6:25, 7:1, 10:20, 88:2
**precisely** [4] - 32:3, 36:2, 41:20, 50:7
**prediction** [2] - 84:15, 84:23
**prejudice** [1] - 52:8
**preliminary** [1] - 3:5
**premature** [1] - 30:3
**premium** [33] - 27:3, 27:6, 39:12, 44:10, 44:15, 45:1, 45:16, 46:2, 46:4, 47:9, 52:19, 52:22, 52:25, 53:8, 53:22, 54:5, 61:3, 61:4, 79:19, 80:1, 80:3, 89:16, 93:13, 94:1, 94:6, 96:10, 98:12, 98:23,

98:24, 99:2, 99:6, 100:15
**premiums** [3] - 44:5, 45:12, 98:10
**prepare** [2] - 35:3, 36:22
**prepared** [10] - 3:11, 5:9, 12:1, 33:13, 34:6, 34:24, 36:1, 36:20, 90:22, 93:6
**preparing** [2] - 33:23, 34:7
**presence** [1] - 47:12
**present** [2] - 45:7, 48:20
**presented** [1] - 25:21
**presenting** [1] - 35:12
**pretty** [5] - 31:9, 43:8, 56:11, 59:17, 112:12
**prevented** [2] - 36:10, 128:21
**previous** [1] - 20:7
**previously** [6] - 6:6, 20:16, 26:3, 36:24, 98:22
**price** [163] - 5:14, 5:16, 5:17, 5:19, 5:21, 6:9, 6:10, 6:14, 7:19, 7:22, 7:23, 12:7, 12:8, 12:9, 12:12, 12:15, 19:10, 19:13, 19:14, 19:15, 19:19, 20:4, 20:6, 20:7, 20:8, 20:10, 20:12, 20:14, 20:19, 21:7, 27:3, 27:6, 27:16, 27:17, 27:21, 28:6, 28:8, 28:15, 28:16, 29:4, 29:8, 29:13, 29:16, 31:18, 39:12, 39:23, 41:11, 43:5, 43:7, 43:11, 43:12, 44:5, 44:10, 44:15, 44:16, 45:1, 45:3, 45:12, 45:16, 46:4, 47:9, 47:23, 47:24, 47:25, 48:3, 48:4, 48:15, 48:17, 48:18, 48:25, 49:7, 49:17, 52:19, 53:8, 54:5, 57:23, 57:25, 58:4, 58:14, 60:25, 61:1, 61:3, 61:11, 61:18, 61:21, 67:19, 67:22, 70:13, 71:5, 71:9, 71:10, 71:11, 71:17, 76:24, 79:19, 80:1, 80:2, 82:20, 83:9, 86:9, 87:9, 87:10, 88:11, 89:16,

92:18, 92:22, 92:23, 93:2, 93:12, 94:1, 94:6, 95:22, 96:4, 96:8, 96:9, 96:10, 97:23, 98:8, 98:10, 98:12, 98:18, 98:23, 98:24, 99:5, 99:6, 99:7, 99:21, 100:15, 100:17, 100:21, 101:5, 101:6, 101:17, 101:18, 104:23, 105:1, 105:5, 105:8, 105:10, 105:16, 105:17, 105:18, 106:9, 106:21, 106:23, 109:10, 111:1, 111:11, 111:14, 125:5, 125:6, 129:18
**priced** [2] - 43:19, 52:25
**prices** [33] - 4:17, 5:2, 5:7, 5:10, 10:1, 12:19, 28:9, 30:25, 31:2, 31:24, 40:7, 40:15, 40:17, 40:18, 40:19, 40:22, 42:24, 43:1, 43:4, 44:23, 45:8, 45:9, 58:4, 91:21, 92:2, 93:1, 97:4, 97:11, 97:13, 97:17, 106:20, 125:17
**pricing** [27] - 4:15, 4:20, 4:23, 10:12, 20:15, 20:18, 40:13, 48:25, 49:6, 49:10, 49:16, 49:18, 51:13, 51:17, 51:18, 92:11, 92:14, 92:18, 109:15, 109:19, 109:23, 110:7, 111:1, 111:4, 127:15, 127:16, 127:18
**principles** [1] - 47:19
**private** [1] - 25:5
**problem** [4] - 34:16, 46:11, 52:13, 94:21
**proceed** [1] - 54:21
**proceeding** [1] - 27:13
**proceedings** [3] - 22:7, 102:23, 133:7
**process** [12] - 17:6, 34:24, 62:13, 63:24, 68:13, 109:14, 109:19, 109:23, 110:6, 110:11, 110:18, 112:15

procurement [1] - 109:4

Product [1] - 28:5

product [99] - 4:16, 6:14, 7:7, 8:3, 8:5, 8:6, 11:9, 13:12, 20:2, 20:5, 20:11, 20:13, 21:7, 26:20, 26:24, 27:18, 27:21, 28:10, 28:11, 29:6, 31:2, 31:8, 38:22, 39:14, 40:24, 41:9, 41:12, 41:13, 41:15, 46:20, 46:21, 47:23, 56:18, 57:11, 57:12, 57:18, 57:23, 58:15, 59:10, 60:15, 60:16, 60:18, 64:7, 65:16, 67:7, 67:8, 67:16, 67:20, 67:23, 68:14, 68:18, 69:14, 69:16, 69:19, 69:23, 69:24, 70:2, 70:4, 70:6, 70:7, 70:21, 70:24, 71:20, 74:11, 75:16, 77:10, 77:11, 78:9, 79:10, 86:4, 87:3, 91:11, 92:19, 92:23, 96:24, 100:2, 105:9, 106:11, 112:24, 113:1, 113:10, 114:13, 114:16, 114:22, 114:25, 115:1, 116:10, 116:11, 118:15, 118:19, 118:22, 127:22, 127:25, 128:2, 128:22, 129:5, 129:7, 129:14

product's [2] - 100:23, 100:25

production [3] - 114:24, 118:15, 118:19

products [28] - 4:15, 4:21, 5:9, 6:8, 7:3, 7:11, 14:2, 23:18, 30:19, 37:3, 39:1, 40:8, 46:18, 48:5, 48:15, 48:24, 56:18, 69:17, 86:4, 92:11, 92:12, 105:3, 106:13, 115:15, 117:14, 119:13, 119:16, 125:16

profession [1] - 23:5

profit [1] - 19:20

pronunciations [1] - 65:3

proper [1] - 25:24

property [1] - 25:25

prophesy [1] - 84:22

propose [1] - 22:20

provide [7] - 6:7, 14:3, 14:5, 23:20, 88:3, 105:18, 125:19

provided [2] - 14:7, 85:25

provides [3] - 14:15, 59:10, 105:10

providing [1] - 24:19

provision [2] - 6:4, 6:10

publications [1] - 25:24

publish [12] - 66:19, 85:14, 85:18, 86:20, 87:19, 92:18, 107:11, 120:2, 122:10, 123:8, 123:13, 127:2

published [12] - 25:23, 48:17, 49:17, 95:22, 96:4, 96:8, 97:4, 97:11, 97:13, 100:18, 101:5, 101:17

publishes [1] - 14:15

pull [6] - 5:22, 8:8, 9:21, 65:7, 78:25, 100:5

pulled [1] - 66:16

pulling [1] - 31:1

pun [1] - 107:16

punch [1] - 38:9

punishing [1] - 98:19

purchase [121] - 6:23, 7:12, 7:18, 8:6, 9:5, 9:6, 10:14, 12:16, 13:2, 15:20, 15:22, 15:25, 17:6, 19:6, 19:12, 28:3, 28:7, 30:18, 31:12, 31:14, 31:19, 31:20, 32:1, 32:2, 33:17, 35:8, 35:9, 36:4, 36:11, 38:12, 41:7, 42:8, 42:11, 48:3, 48:16, 49:7, 49:15, 51:25, 53:17, 58:11, 58:12, 58:14, 58:17, 59:11, 59:19, 59:20, 60:10, 60:12, 60:14, 60:25, 63:22, 63:25, 64:6, 64:19, 65:17, 65:19, 65:24, 66:2, 66:4, 66:11, 67:1, 67:13, 67:17, 67:25, 68:3, 68:18, 68:19, 68:23, 68:24, 69:5, 69:6, 69:8, 69:12, 69:20, 69:23, 70:3, 70:4, 70:5, 70:10, 70:20, 70:22, 70:23, 71:4, 71:17, 71:22, 72:1, 72:3, 72:7, 72:12, 72:15, 73:2, 73:5, 75:1, 75:15, 77:3, 77:9, 77:23, 78:1, 78:4, 78:6, 78:9, 82:10, 83:21, 84:5, 86:9, 88:4, 88:16, 91:3, 91:16, 95:2, 97:18, 97:20, 104:4, 104:6, 104:13, 108:5

purchased [8] - 8:2, 16:15, 65:16, 65:24, 70:11, 77:4, 98:8, 105:17

purchases [53] - 17:24, 18:2, 18:3, 26:19, 29:5, 30:19, 30:23, 30:24, 36:25, 37:2, 37:24, 38:3, 38:16, 38:21, 39:3, 39:6, 39:8, 39:18, 39:25, 46:7, 47:3, 54:5, 56:4, 59:24, 68:14, 69:6, 69:14, 76:2, 78:22, 79:5, 79:16, 81:16, 84:7, 89:7, 89:21, 91:10, 91:15, 91:18, 93:10, 93:11, 93:15, 93:18, 94:11, 94:12, 95:11, 96:3, 96:23, 97:22, 99:22, 104:17, 104:19, 106:8, 116:25

purchasing [2] - 77:11, 110:14

purpose [2] - 58:18, 90:24

purposes [3] - 34:8, 62:23, 79:5

pushed [1] - 111:16

put [16] - 17:14, 23:23, 36:10, 38:10, 47:10, 52:14, 64:10, 75:12, 79:2, 81:10, 110:3, 115:25, 120:21, 127:16, 127:20, 127:24

puts [1] - 7:25

putting [2] - 131:9, 132:9

## Q

qualification [1] -

122:22

qualify [1] - 34:9

quantify [1] - 24:21

quantities [4] - 31:2, 31:24, 125:17, 125:20

quantity [15] - 16:15, 28:6, 29:9, 31:18, 67:16, 70:11, 71:17, 75:21, 75:25, 76:22, 87:11, 87:13, 124:6, 125:3, 125:21

Quantity [4] - 73:4, 73:7, 73:25, 76:19

quarter [16] - 4:25, 5:1, 20:16, 32:24, 33:8, 35:24, 36:6, 36:7, 38:20, 43:21, 74:19, 78:22, 92:2, 92:6

quarterly [6] - 4:21, 4:22, 43:1, 92:11, 100:19, 116:1

quarters [1] - 92:8

questioned [1] - 118:5

questioning [1] - 97:7

questions [17] - 4:8, 13:17, 13:21, 16:4, 16:5, 16:12, 17:6, 18:22, 34:23, 54:10, 55:4, 55:9, 60:2, 93:8, 96:22, 99:9, 102:1

quick [2] - 99:10, 123:18

quickly [4] - 55:7, 81:7, 85:10, 120:16

quite [5] - 24:21, 49:15, 62:4, 80:5, 80:7

quote [2] - 123:25, 124:8

quoting [1] - 109:8

## R

raise [2] - 22:3, 102:19

ramp [1] - 36:4

ramp-up [1] - 36:4

range [3] - 48:15, 83:2, 83:9

rapid [1] - 38:13

rates [1] - 23:11

rather [4] - 41:12, 48:6, 48:16, 48:17

raw [1] - 104:4, 104:14

Raymond [6] - 64:25, 104:2, 110:1, 110:2, 110:15, 110:20

re [2] - 21:1, 129:21

re-ask [1] - 21:1

reach [2] - 29:20, 117:7

reached [1] - 3:10

read [14] - 3:11, 21:22, 61:14, 61:25, 65:5, 65:7, 65:9, 65:13, 65:15, 66:6, 113:17, 114:2, 114:5, 120:14

ready [3] - 6:21, 6:22, 102:3

real [6] - 44:13, 45:20, 81:7, 85:10, 99:10, 123:18

reallocate [4] - 120:25, 121:3, 121:18, 121:22

really [5] - 50:11, 57:13, 122:1, 130:4, 131:17

reason [14] - 21:24, 50:12, 51:23, 59:12, 71:24, 83:5, 83:8, 83:10, 84:25, 106:10, 112:14, 112:18, 119:14, 131:14

reasonable [10] - 44:1, 44:22, 45:21, 45:25, 53:11, 53:21, 54:6, 77:12, 77:23, 78:5

reasons [4] - 7:15, 33:1, 64:15, 92:1

rebuttal [1] - 102:4

receive [1] - 125:22

received [14] - 4:6, 35:19, 37:12, 73:15, 73:21, 73:24, 74:1, 74:7, 74:11, 75:25, 76:22, 107:13, 122:23, 123:12

Received [2] - 73:7, 73:25

receives [1] - 62:20

recent [1] - 27:22

recess [2] - 54:19, 133:3

recognize [1] - 85:24

recollect [1] - 14:24

recollection [3] - 86:11, 90:12, 96:1

record [12] - 4:3, 14:19, 14:20, 15:8, 22:11, 31:16, 32:10, 62:19, 103:3, 119:23, 122:9, 133:7

recordkeeping [1] - 13:18

records [18] - 13:22, 15:11, 15:24, 16:2,

17:4, 31:23, 34:5, 34:15, 34:17, 35:13, 39:25, 63:12, 63:14, 63:15, 64:3, 64:18, 72:15, 73:21
**recross** [1] - 18:23
**RECROSS** [4] - 19:1, 99:16, 133:19, 134:5
**RECROSS-EXAMINATION** [4] - 19:1, 99:16, 133:19, 134:5
**redirect** [5] - 4:9, 21:10, 96:16, 101:22, 126:17
**REDIRECT** [4] - 4:11, 96:18, 126:22, 133:17, 134:3, 134:13
**REDIRECT-EXAMINATION** [6] - 4:11, 96:18, 126:22, 133:17, 134:3, 134:13
**reduce** [1] - 46:3
**reduced** [1] - 98:12
**reevaluation** [1] - 51:8
**refer** [2] - 67:14, 74:1
**reference** [1] - 92:20
**referencing** [2] - 82:24, 83:14
**refers** [2] - 24:19, 26:22
**reflect** [1] - 72:20
**reflected** [4] - 20:14, 20:15, 35:9, 82:21
**reflects** [3] - 71:5, 98:22, 98:23
**refuse** [1] - 13:3
**refused** [6] - 12:13, 12:18, 12:21, 20:8, 20:20, 84:9
**refuses** [1] - 58:24
**relate** [2] - 31:19, 121:13
**related** [11] - 4:20, 24:12, 24:14, 24:18, 25:3, 25:20, 30:22, 39:11, 76:8, 105:3, 127:6
**relates** [3] - 19:6, 121:11, 123:21
**relationship** [4] - 33:7, 36:9, 38:19, 65:23
**relationships** [1] - 17:14
**relevant** [11] - 32:17, 43:8, 43:11, 43:12, 43:13, 44:2, 44:3, 58:17, 63:2, 63:5,

98:9
**reliable** [8] - 47:19, 48:20, 48:22, 49:3, 49:9, 49:13, 51:13
**relied** [3] - 72:6, 72:24, 74:3
**relying** [1] - 50:16
**remember** [9] - 3:4, 10:2, 118:24, 119:1, 119:2, 128:23, 130:13, 131:15
**remind** [1] - 3:3
**renew** [1] - 132:16
**repeat** [1] - 117:21
**rephrase** [2] - 57:16, 69:10
**replacing** [1] - 13:12
**report** [7] - 14:15, 14:16, 78:25, 79:1, 82:23, 82:24, 93:5
**Reporter** [1] - 1:23
**reporter** [2] - 21:1, 65:2
**REPORTER'S** [1] - 1:12
**reports** [4] - 5:16, 5:17, 14:24, 15:3
**represent** [4] - 83:1, 96:7, 98:1, 98:3
**represented** [1] - 121:16
**represents** [1] - 17:23
**request** [18] - 6:8, 6:14, 13:1, 18:9, 47:12, 77:4, 106:11, 116:1, 116:5, 116:6, 117:5, 117:24, 124:15, 124:21, 125:11, 125:20, 129:1, 129:2
**requested** [1] - 113:1
**requests** [11] - 8:4, 16:22, 18:14, 105:2, 105:13, 117:6, 117:13, 118:18, 118:22, 124:17
**required** [2] - 78:1, 91:25
**requirement** [1] - 34:13
**requires** [1] - 26:5
**research** [1] - 32:15
**Research** [2] - 24:16, 24:24
**reseller** [87] - 8:3, 8:6, 13:8, 13:12, 13:15, 16:14, 16:16, 17:12, 27:5, 28:3, 29:4, 36:23, 38:16, 38:21, 39:6, 39:8, 39:13,

44:11, 44:16, 45:8, 46:14, 46:22, 48:3, 49:21, 49:22, 50:11, 50:13, 52:19, 53:2, 68:22, 69:5, 69:13, 69:22, 70:5, 70:21, 70:22, 70:25, 71:19, 77:4, 77:10, 77:23, 78:3, 78:6, 78:8, 78:22, 79:5, 84:5, 84:7, 88:16, 89:7, 89:12, 89:13, 89:21, 89:23, 91:3, 91:15, 93:11, 93:15, 93:18, 94:8, 94:10, 94:25, 95:10, 96:3, 96:23, 98:2, 98:8, 99:6, 100:1, 100:6, 106:10, 106:13, 112:25, 113:3, 113:5, 113:6, 113:12, 113:13, 116:7, 116:8, 116:10, 116:11, 116:25, 117:22, 117:25, 129:14
**resellers** [48] - 8:7, 10:18, 10:20, 13:10, 16:24, 17:7, 17:8, 17:14, 17:25, 26:20, 30:23, 37:3, 37:24, 38:3, 39:1, 39:3, 46:6, 50:23, 51:3, 68:15, 68:18, 69:7, 69:12, 69:18, 70:10, 81:16, 100:24, 104:19, 105:19, 105:25, 106:1, 106:8, 106:16, 106:17, 106:20, 106:21, 106:22, 115:19, 115:21, 115:23, 115:25, 116:3, 116:4, 117:7, 117:14, 128:18, 128:19, 129:18
**reservation** [1] - 122:21
**reserve** [6] - 102:11, 102:14, 120:4, 131:19, 132:2, 132:6
**reserving** [1] - 102:15
**resolve** [1] - 132:24
**resolved** [2] - 21:16, 128:9
**respect** [4] - 29:20, 61:11, 77:6, 88:4
**respond** [1] - 50:2
**response** [1] - 34:3
**rest** [6] - 51:22, 53:8,

53:23, 102:3, 102:8, 114:2
**restrictive** [1] - 53:20
**restructuring** [1] - 25:5
**result** [2] - 54:3, 98:25
**results** [1] - 46:12
**retained** [2] - 23:20, 26:13
**retired** [2] - 54:18, 130:20
**returned** [2] - 3:1, 54:20
**review** [1] - 16:8
**reviewed** [3] - 33:5, 64:21, 64:24
**revised** [1] - 108:22
**RHOW** [56] - 2:13, 3:21, 4:1, 18:24, 19:2, 20:21, 21:1, 21:4, 21:5, 21:9, 102:7, 102:17, 103:1, 103:7, 103:12, 103:24, 106:24, 107:1, 107:6, 107:12, 107:14, 111:17, 111:20, 113:16, 113:20, 113:23, 114:2, 114:8, 114:12, 116:12, 116:15, 116:22, 117:8, 117:11, 117:16, 117:18, 119:21, 119:24, 120:1, 120:8, 122:2, 122:5, 122:8, 122:24, 123:3, 123:6, 123:13, 123:14, 126:14, 129:22, 131:4, 131:10, 132:3, 132:12, 133:20, 134:9
**Rhow** [1] - 2:13
**Richard** [1] - 2:4
**right-hand** [2] - 37:4, 68:15
**rights** [1] - 17:22
**Rios** [1] - 15:1
**robust** [2] - 46:10, 48:7
**roughly** [3] - 131:2, 131:4, 131:7
**round** [1] - 98:7
**rounded** [1] - 99:13
**row** [5] - 28:2, 41:7, 75:12, 76:8, 76:10
**RPR** [2] - 1:22, 133:13
**rule** [4] - 34:21, 50:21,

52:8, 103:8
**ruling** [1] - 51:8
**rulings** [1] - 51:6
**run** [2] - 50:11, 52:14
**running** [4] - 63:2, 111:24, 115:3, 115:6

**S**

**sales** [16] - 48:5, 49:20, 51:19, 109:5, 109:18, 111:22, 111:24, 112:1, 112:2, 112:5, 112:7, 112:9, 112:11, 112:16, 112:17
**sample** [2] - 46:10, 53:7
**Samsung** [261] - 4:15, 4:16, 4:18, 4:22, 6:7, 6:20, 6:23, 7:2, 7:5, 7:9, 7:14, 7:21, 7:24, 7:25, 10:21, 11:19, 12:1, 12:5, 12:9, 12:10, 12:12, 12:14, 12:18, 12:20, 12:25, 13:13, 13:17, 14:2, 14:5, 14:7, 14:10, 14:15, 14:18, 14:20, 14:22, 15:5, 15:9, 15:10, 15:22, 16:1, 16:13, 16:22, 16:23, 17:5, 17:8, 17:11, 18:4, 18:9, 19:10, 19:15, 19:19, 19:20, 20:6, 20:8, 20:13, 20:19, 22:23, 26:18, 26:20, 26:25, 27:6, 28:10, 29:6, 29:7, 30:17, 30:19, 31:12, 31:13, 36:5, 36:10, 36:25, 37:2, 37:22, 37:25, 38:13, 38:22, 38:23, 39:1, 39:15, 39:19, 39:20, 39:21, 39:25, 40:1, 41:19, 41:20, 43:1, 44:10, 44:15, 44:17, 45:5, 45:9, 46:7, 46:18, 46:20, 46:23, 47:18, 49:4, 50:13, 50:23, 51:3, 51:13, 51:18, 51:23, 52:4, 52:20, 53:3, 53:18, 53:19, 55:3, 56:23, 57:1, 60:20, 62:24, 63:7, 63:21, 63:22, 64:1, 64:7, 64:13, 65:16, 67:2, 68:4, 68:14, 68:18, 69:1, 69:8, 69:16, 69:17, 69:24,

70:4, 70:5, 70:20,
70:22, 70:25, 71:5,
71:16, 71:23, 71:25,
72:1, 72:3, 72:5,
72:17, 72:19, 73:3,
74:25, 75:15, 76:5,
78:1, 78:10, 79:10,
82:11, 83:22, 84:8,
84:9, 85:25, 86:23,
87:6, 88:3, 88:7,
89:9, 89:10, 89:11,
89:14, 89:23, 91:4,
91:10, 91:14, 91:18,
92:2, 92:10, 92:18,
92:23, 93:11, 94:12,
95:2, 96:3, 96:9,
96:24, 97:23, 98:9,
98:18, 98:19, 99:4,
99:7, 100:2, 100:18,
100:21, 101:6,
101:18, 102:5,
104:6, 104:7,
104:17, 105:3,
105:9, 105:10,
105:13, 105:18,
106:11, 106:12,
106:15, 106:18,
106:19, 106:22,
108:6, 108:7,
108:10, 110:21,
111:1, 111:14,
112:25, 113:2,
113:5, 113:11,
113:13, 114:14,
114:16, 115:1,
116:2, 116:5, 116:6,
116:10, 117:5,
117:6, 117:12,
117:23, 118:1,
118:5, 118:15,
119:19, 119:20,
120:17, 120:18,
124:21, 125:11,
125:16, 125:21,
126:3, 126:6, 126:7,
126:10, 127:20,
127:22, 127:24,
128:11, 128:15,
128:16, 128:22,
129:1, 129:5,
129:11, 131:9
**SAMSUNG** [1] - 1:8
**Samsung's** [6] - 8:5,
15:8, 29:21, 50:5,
97:4, 130:25
**Samsung-finished** [1]
- 104:6
**San** [1] - 24:5
**sat** [1] - 55:6
**satisfied** [1] - 34:18

**save** [2] - 94:5, 131:24
**saw** [9] - 6:6, 14:25,
32:11, 37:22, 62:9,
65:8, 115:18, 128:4
**SCARSI** [1] - 1:3
**scenario** [1] - 7:25
**schedule** [1] - 93:6
**school** [1] - 24:10
**science** [1] - 24:4
**scrambling** [4] - 17:5,
46:21, 56:3
**screen** [8] - 8:25,
38:8, 40:5, 41:2,
68:10, 68:11, 75:13,
79:2
**seat** [1] - 130:21
**seated** [2] - 22:9,
102:25
**second** [20] - 10:9,
19:18, 32:24, 33:8,
34:18, 35:24, 36:6,
36:7, 41:23, 43:21,
59:5, 68:7, 74:19,
78:22, 92:6, 94:7,
107:24, 119:25,
122:14, 124:13
**Section** [1] - 6:1
**see** [64] - 3:23, 8:15,
8:25, 14:16, 16:15,
20:25, 29:8, 31:12,
34:20, 36:2, 36:13,
37:17, 37:23, 38:13,
38:15, 38:20, 45:16,
46:14, 47:3, 49:16,
58:12, 68:10, 68:11,
72:4, 73:4, 77:10,
84:21, 86:10, 87:3,
87:10, 99:22,
101:16, 107:17,
107:18, 107:20,
107:21, 108:3,
108:4, 108:11,
108:12, 108:14,
108:19, 108:20,
108:24, 108:25,
109:11, 109:12,
109:16, 109:17,
110:22, 110:23,
121:4, 121:5,
121:20, 121:23,
121:24, 123:17,
124:2, 124:3, 124:9,
124:10, 130:9, 131:5
**seeing** [2] - 32:13,
45:12
**seek** [1] - 37:6
**seeking** [1] - 55:19
**seem** [2] - 5:13, 63:2
**sell** [6] - 13:15, 19:16,
51:24, 52:4, 57:11,

58:23
**seller** [6] - 56:18,
57:11, 57:18, 58:1,
58:24, 59:9
**send** [2] - 63:7, 90:7
**sending** [1] - 15:2
**sends** [1] - 126:2
**sense** [3] - 11:22,
19:21, 45:13
**sent** [5] - 12:10, 14:3,
20:15, 86:23, 124:17
**sentence** [4] - 8:13,
9:23, 9:25, 34:18
**separate** [1] - 66:22
**September** [2] - 9:8,
9:16
**sequence** [1] - 121:15
**series** [3] - 22:20,
31:18, 96:22
**serve** [2] - 43:24,
51:14
**Session** [1] - 1:14
**session** [1] - 131:7
**set** [7] - 4:20, 5:2,
15:11, 29:5, 31:18,
40:17, 41:22
**sets** [4] - 4:17, 71:11,
98:25, 99:19
**setting** [1] - 87:12
**seven** [4] - 7:15,
10:14, 10:17, 10:22
**several** [4] - 25:18,
25:23, 28:19, 31:20
**shed** [2] - 58:13, 58:15
**shift** [1] - 29:17
**shin** [1] - 123:7
**ship** [5] - 6:22, 114:17,
125:10, 127:23,
129:4
**shipments** [2] - 16:25,
17:1
**shipped** [3] - 16:25,
64:9, 64:11
**shipping** [1] - 56:2
**shopping** [1] - 106:20
**short** [3] - 47:12,
119:13, 119:19
**shortage** [4] - 119:10,
119:12, 119:18,
119:20
**shortages** [1] - 119:6
**shorter** [1] - 52:15
**show** [11] - 29:5, 33:5,
37:4, 69:14, 70:11,
70:13, 70:15, 72:8,
94:7, 96:9, 123:2
**showed** [3] - 29:3,
58:14, 72:12
**showing** [10] - 12:11,
68:13, 81:18, 81:20,

81:22, 81:24, 82:3,
82:4, 91:2, 98:15
**shown** [13] - 5:25, 6:1,
8:11, 8:12, 9:19,
9:23, 9:25, 18:4,
24:3, 27:25, 73:11,
79:23, 82:1
**shows** [21] - 46:1,
67:16, 67:19, 67:22,
68:14, 71:17, 73:2,
73:12, 73:14, 73:24,
74:7, 74:9, 74:11,
76:24, 79:4, 81:15,
88:11, 88:22, 100:6,
100:9
**shrink** [1] - 43:9
**side** [8] - 15:5, 23:12,
29:3, 37:4, 63:20,
67:10, 68:13, 131:17
**sidebar** [2] - 47:12,
52:15
**signed** [1] - 36:3
**significant** [1] - 46:12
**similar** [15] - 27:13,
28:9, 28:11, 30:21,
39:24, 40:13, 40:21,
42:11, 42:12, 42:18,
43:4, 48:5, 48:24,
51:19
**simple** [3] - 47:22,
56:11, 124:20
**simplified** [5] - 28:1,
28:25, 41:4, 42:5,
59:23
**simply** [7] - 35:7,
47:22, 50:16, 97:4,
97:11, 98:15, 101:10
**single** [1] - 14:10
**sit** [2] - 75:9, 96:1
**sitting** [2] - 127:12,
130:3
**situation** [12] - 21:6,
52:3, 96:22, 110:24,
111:12, 113:11,
114:13, 115:18,
116:9, 117:4, 121:6,
124:19
**situations** [5] - 68:17,
96:21, 112:24,
113:3, 115:2
**six** [15] - 7:15, 7:22,
8:1, 11:24, 12:4,
12:6, 12:14, 13:6,
20:3, 20:7, 20:19,
28:13, 43:8, 114:19,
114:23
**size** [3] - 40:14, 41:16,
42:11
**skeptical** [1] - 18:20
**skill** [1] - 99:19

**sleep** [1] - 52:14
**Slide** [4] - 28:22,
29:23, 52:17, 62:10
**slide** [21] - 24:3, 29:3,
30:15, 30:17, 30:20,
31:12, 36:24, 37:17,
37:23, 38:2, 42:7,
42:15, 42:16, 54:4,
80:24, 81:12, 88:22,
90:18, 90:22, 100:5
**slides** [5] - 33:6,
80:19, 81:9, 90:20,
123:7
**small** [1] - 42:15
**smaller** [2] - 83:15,
91:9
**smart** [1] - 65:14
**sold** [2] - 47:23, 61:20
**some-odd** [1] - 120:22
**someone** [5] - 56:17,
57:12, 57:19, 58:25,
92:1
**sometimes** [8] - 27:4,
40:18, 40:19, 44:14,
46:1, 72:18, 92:14,
113:9
**sooner** [2] - 8:5,
130:10
**sorry** [17] - 32:4,
52:15, 61:24, 103:1,
103:17, 113:11,
113:20, 115:22,
116:15, 117:11,
122:5, 122:6,
122:11, 123:6,
124:5, 124:23,
131:11
**sort** [12] - 5:16, 5:17,
26:1, 27:19, 31:4,
32:10, 39:12, 57:13,
61:11, 68:25, 97:23,
131:19
**sound** [1] - 83:2
**sounded** [1] - 62:4
**sounds** [2] - 59:7,
62:5
**source** [4] - 13:9,
57:23, 57:25, 117:14
**South** [2] - 2:5, 2:19
**spanning** [1] - 31:9
**specialty** [1] - 23:8
**specific** [21] - 25:17,
41:14, 51:11, 69:9,
83:4, 83:13, 84:11,
85:9, 87:3, 87:11,
87:12, 87:13, 90:12,
96:1, 96:2, 96:5,
111:10, 111:11,
125:16, 125:17
**specifically** [8] -

23:13, 69:1, 75:7, 75:8, 82:25, 83:12, 85:4, 88:17
**specify** [1] - 58:4
**speed** [1] - 41:16
**spell** [2] - 22:10, 103:2
**spend** [1] - 39:1
**spot** [1] - 110:3
**spreadsheet** [5] - 16:8, 69:13, 72:8, 74:3, 74:18
**spreadsheets** [3] - 32:8, 35:7, 72:6
**SSDs** [1] - 4:21
**staff** [4] - 32:16, 35:6, 36:19, 36:21
**stand** [2] - 22:3, 102:19
**standard** [1] - 65:20
**standby** [2] - 17:14, 17:16
**stands** [1] - 72:20
**staring** [1] - 42:6
**start** [12] - 4:15, 11:2, 19:7, 30:12, 32:21, 36:6, 40:24, 96:20, 107:22, 120:16, 130:9, 132:23
**started** [5] - 24:11, 35:23, 77:3, 77:4, 78:21
**starting** [10] - 28:7, 33:4, 33:7, 36:1, 39:8, 39:22, 43:3, 56:19, 56:21, 86:4
**starts** [3] - 48:2, 62:13, 107:23
**state** [2] - 22:10, 103:2
**statement** [5] - 73:20, 104:24, 105:15, 112:14, 112:18
**statements** [2] - 55:15, 55:18
**states** [1] - 110:7
**STATES** [1] - 1:1
**status** [1] - 64:10
**steady** [5] - 36:4, 37:23, 38:2, 38:21, 81:15
**steep** [2] - 36:4, 36:13
**step** [3] - 41:18, 43:9, 57:13
**steps** [2] - 16:5, 28:19
**STEVEN** [3] - 102:22, 103:4, 134:7
**Steven** [1] - 103:4
**stick** [1] - 29:17
**still** [12] - 7:10, 8:17, 12:15, 20:2, 20:11, 28:25, 61:11, 75:11,

114:25, 115:1, 120:13, 132:9
**still..** [1] - 120:12
**stipulated** [2] - 3:19, 21:24
**stipulation** [2] - 66:16, 86:20
**stock** [1] - 119:16
**straightforward** [6] - 27:12, 35:10, 56:12, 56:15, 56:16, 59:17
**strange** [1] - 5:13
**stream** [1] - 38:2
**street** [1] - 61:10
**Street** [2] - 1:23, 2:19
**strike** [8] - 20:21, 105:23, 106:24, 111:17, 115:21, 117:8, 117:16, 132:17
**stronger** [1] - 50:8
**structured** [1] - 23:17
**study** [1] - 23:16
**sub** [1] - 44:4
**subject** [8] - 10:7, 50:6, 51:8, 67:17, 83:23, 102:4, 118:9, 122:20
**submit** [3] - 19:9, 51:9, 118:22
**submits** [1] - 5:6
**submitted** [3] - 15:21, 20:10, 108:6
**submitting** [2] - 36:11, 118:18
**subsequent** [2] - 31:17, 31:22
**subsequently** [2] - 11:13, 16:1
**subset** [1] - 60:23
**substantial** [2] - 36:14, 38:14
**substantially** [2] - 12:8, 36:7
**substitute** [2] - 57:25, 60:24
**subtract** [1] - 94:22
**subtracting** [1] - 70:24
**suffered** [1] - 24:22
**Suite** [1] - 2:16
**sum** [1] - 131:21
**summarize** [2] - 24:9, 37:2
**summarized** [3] - 35:22, 37:14, 54:4
**summarizes** [3] - 30:15, 33:16, 38:2
**summary** [7] - 15:22, 34:6, 34:11, 34:14,

37:7, 97:25
**summing** [1] - 35:10
**superior** [1] - 109:6
**supplied** [6] - 60:15, 60:16, 60:18, 60:19, 64:7, 71:18
**supplier** [1] - 17:21
**supply** [11] - 6:7, 26:17, 29:21, 53:15, 53:20, 61:23, 64:13, 71:25, 79:10, 83:22, 88:7
**supplying** [2] - 57:2, 91:4
**support** [20] - 7:6, 7:24, 12:21, 12:22, 13:3, 13:4, 14:25, 15:2, 72:19, 106:11, 106:12, 106:22, 113:5, 113:13, 116:2, 116:7, 116:11, 117:13, 126:3
**suppose** [1] - 27:14
**surprise** [1] - 75:7
**surprising** [1] - 46:19
**surprisingly** [1] - 62:18
**switch** [1] - 94:18
**sworn** [3] - 22:8, 32:12, 102:24
**systematic** [1] - 78:12
**systematically** [2] - 62:22, 84:3

## T

**table** [3] - 10:5, 28:3
**tabulating** [1] - 35:11
**talks** [3] - 40:12, 87:3, 87:11
**targeted** [1] - 51:11
**teaching** [2] - 25:8, 25:9
**team** [1] - 120:20
**techniques** [1] - 25:13
**tend** [1] - 25:13
**tender** [1] - 26:5
**tendered** [1] - 26:10
**tens** [2] - 16:10, 106:2
**term** [2] - 27:1, 27:3
**terminated** [1] - 75:4
**terms** [18] - 13:11, 17:17, 42:3, 46:7, 46:16, 48:25, 53:5, 57:22, 65:20, 68:4, 86:12, 87:14, 93:25, 112:2, 115:13, 115:20, 117:22
**testified** [17] - 7:5,

11:11, 16:19, 26:2, 45:8, 47:21, 48:6, 49:8, 53:2, 62:13, 63:25, 64:5, 85:2, 88:2, 90:7, 90:15, 116:23
**testifies** [2] - 22:8, 102:24
**testify** [8] - 26:6, 31:7, 31:21, 52:8, 64:17, 85:7, 100:17, 100:20
**testimony** [40] - 16:22, 20:2, 21:21, 32:12, 32:18, 32:20, 45:11, 45:18, 50:22, 55:22, 62:7, 62:16, 62:18, 63:8, 63:10, 64:6, 64:22, 65:8, 65:15, 66:6, 73:17, 77:2, 79:8, 88:5, 89:2, 90:5, 90:10, 90:11, 90:17, 92:10, 92:14, 92:17, 95:21, 115:18, 117:3, 118:2, 127:1, 130:8, 132:10, 132:18
**testing** [1] - 69:3
**that'll** [1] - 104:10
**THE** [112] - 3:2, 3:12, 3:14, 3:16, 3:19, 3:22, 4:3, 18:23, 20:23, 21:3, 21:10, 21:12, 21:17, 22:3, 22:9, 22:12, 22:14, 22:16, 22:17, 22:18, 22:24, 26:8, 26:10, 30:5, 30:8, 31:11, 31:14, 31:25, 32:2, 32:4, 33:24, 34:3, 34:10, 34:20, 35:13, 35:16, 37:8, 37:10, 47:14, 47:16, 49:2, 50:2, 51:16, 52:7, 52:13, 54:12, 54:15, 54:21, 66:20, 66:23, 85:15, 85:19, 86:21, 87:21, 96:15, 99:10, 99:12, 99:14, 101:22, 101:24, 102:5, 102:13, 102:18, 102:19, 102:25, 103:2, 103:4, 103:5, 103:6, 103:10, 103:22, 103:23, 106:25, 107:9, 107:11, 111:19, 113:19, 113:21, 113:25, 114:4, 114:7, 114:10, 116:14,

116:17, 116:19, 117:9, 117:12, 117:17, 120:3, 120:6, 122:4, 122:7, 122:12, 122:16, 122:18, 122:22, 123:1, 123:4, 123:11, 126:15, 126:20, 127:3, 129:21, 129:23, 129:25, 130:1, 130:21, 131:8, 131:14, 132:5, 132:15, 132:22
**then-market** [1] - 12:19
**therefore** [1] - 98:17
**THEREUPON** [2] - 22:5, 102:21
**Thereupon** [9] - 3:1, 21:25, 54:18, 54:19, 54:20, 114:11, 116:21, 130:20, 133:3
**thinking** [1] - 6:19
**third** [9] - 10:9, 38:22, 39:1, 41:8, 41:14, 42:19, 44:4, 61:22, 68:7
**third-party** [1] - 39:1
**thousand** [5] - 16:23, 16:24, 17:2, 29:4, 42:13
**thousands** [3] - 16:10, 28:18, 31:8
**threat** [1] - 13:3
**threatened** [1] - 7:5
**three** [12] - 11:24, 12:4, 12:5, 12:14, 13:6, 20:3, 28:13, 40:7, 43:11, 43:12, 43:19, 122:3
**throughout** [2] - 33:18, 65:22
**Thursday** [1] - 1:16
**Tidalink** [2] - 41:9, 42:8
**tie** [1] - 107:4
**tight** [2] - 53:15, 60:4
**timeframe** [4] - 11:15, 28:11, 77:12, 111:25
**timely** [4] - 7:3, 12:2, 113:6, 113:14
**timing** [3] - 130:22, 131:16, 132:21
**title** [1] - 103:15
**titled** [1] - 133:7
**today** [15] - 5:10, 7:9, 28:12, 31:7, 32:12, 32:14, 32:19, 43:7,

43:17, 72:20, 90:7,
90:19, 90:21,
108:17, 126:16
**together** [1] - 38:10
**tomorrow** [7] - 55:8,
130:6, 130:7, 130:9,
132:11, 132:23
**took** [7] - 16:5, 44:20,
80:13, 97:6, 97:9,
98:11, 98:15
**top** [9] - 9:11, 28:2,
30:17, 30:20, 30:25,
67:13, 89:25, 108:8,
121:2
**total** [7] - 46:9, 54:4,
67:22, 70:15, 81:24,
82:20, 88:12
**totaled** [1] - 78:23
**Toyota** [1] - 29:14
**tracing** - 16:12
**track** [4] - 17:3, 64:18,
64:19, 67:14
**tracked** [1] - 62:21
**tracks** [3] - 62:19,
63:11, 63:25
**trade** [1] - 25:24
**transaction** [28] -
16:9, 19:21, 29:4,
39:11, 40:14, 40:20,
41:10, 41:12, 42:3,
43:22, 43:23, 46:15,
46:23, 47:2, 49:21,
49:22, 57:20, 59:14,
71:23, 76:4, 91:6,
94:17, 95:9, 95:19,
96:23, 97:17, 100:6,
101:2
**transactions** [63] -
17:15, 27:22, 28:18,
29:10, 31:8, 31:19,
31:23, 39:9, 41:19,
42:10, 42:12, 42:15,
42:16, 42:18, 43:24,
46:6, 46:17, 48:7,
48:8, 48:13, 48:14,
48:24, 49:3, 49:11,
49:14, 51:15, 51:17,
52:20, 52:23, 53:3,
53:9, 53:12, 53:23,
74:18, 74:22, 77:6,
79:13, 89:25, 91:13,
93:10, 95:1, 96:6,
96:11, 97:5, 97:9,
97:13, 98:4, 98:9,
98:18, 98:19, 100:3,
100:4, 100:10,
100:16, 101:4,
101:9, 101:11,
101:12, 101:13,
101:15, 101:16
**transcript** [3] - 65:9,
65:13, 133:6
**TRANSCRIPT** [1] -
1:12
**transcripts** [2] - 1:25,
32:11
**transmission** [1] -
29:16
**transmitting** [1] -
124:15
**traveling** [1] - 110:1
**treat** [1] - 21:21
**trends** [1] - 16:9
**trial** [10] - 21:19,
32:19, 33:16, 33:18,
49:9, 51:8, 51:10,
55:6, 55:19, 106:19
**TRIAL** [1] - 1:12
**tried** [3] - 48:1, 78:11,
93:9
**tries** [1] - 48:3
**true** [10] - 104:13,
105:15, 109:18,
112:23, 113:9,
126:12, 132:3
**truth** [1] - 109:21
**truthful** [1] - 118:4
**try** [23] - 10:18, 50:17,
55:8, 55:12, 56:4,
60:5, 77:8, 77:17,
77:19, 84:5, 84:7,
88:14, 95:17, 96:3,
99:18, 105:4, 105:7,
105:16, 106:21,
107:4, 116:7,
130:10, 130:15
**trying** [12] - 11:6,
49:19, 50:20, 52:2,
55:7, 57:17, 89:6,
98:21, 99:23, 104:8,
106:9, 106:17
**turn** [5] - 36:15, 40:2,
47:6, 62:23, 81:7
**turned** [1] - 39:17
**turning** [1] - 6:23
**turns** [2] - 7:3, 18:18
**two** [20] - 30:17,
30:20, 30:25, 31:13,
33:1, 36:23, 38:9,
39:17, 39:22, 40:12,
43:5, 102:4, 120:20,
120:24, 124:7,
126:4, 130:16,
131:1, 132:1
**type** [3] - 29:19, 69:7,
88:3
**types** [3] - 31:2, 31:9,
40:7
**typical** [2] - 56:19,
56:21

**typically** [4] - 4:19,
14:14, 17:11, 17:13

## U

**U.S** [1] - 1:3
**UCLA** [3] - 24:6,
24:13, 25:10
**ultimate** [1] - 30:9
**ultimately** [2] - 73:22,
93:13
**unable** [2] - 53:17,
95:14
**unclear** [3] - 89:4,
131:15
**under** [1] - 34:9,
35:17, 37:25, 38:23,
47:17, 47:18, 48:4,
49:7, 56:24, 56:25,
58:1, 60:4, 71:25,
78:1, 78:9
**underlying** [3] - 34:5,
35:5, 35:13
**underpayment** [1] -
45:2
**understood** [5] -
32:16, 79:8, 85:2,
85:7, 93:1
**unemployment** [1] -
23:11
**unfilled** [11] - 48:2,
49:23, 75:5, 77:3,
77:9, 82:21, 82:24,
83:9, 83:21, 88:15
**unfortunately** [2] -
82:13, 119:22
**unfulfilled** [1] - 72:11
**unit** [9] - 67:19, 70:13,
73:12, 74:9, 76:24,
78:10, 88:12, 95:1,
95:3
**UNITED** [1] - 1:1
**units** [14] - 18:18,
29:5, 41:11, 42:8,
42:12, 42:13, 77:11,
77:23, 78:4, 94:8,
94:14, 94:18, 96:7
**universe** [1] - 79:4
**University** [1] - 24:4
**unless** [2] - 43:13,
50:11
**unlike** [2] - 43:17,
81:17
**unmatched** [15] -
48:16, 48:19, 48:25,
49:2, 49:11, 51:15,
51:17, 51:22, 51:23,
96:6, 101:9, 101:12,
101:14, 101:15,
101:16

**unpack** [1] - 44:7
**unreasonable** [2] -
118:14, 118:20
**up** [61] - 5:22, 8:8,
8:18, 9:21, 22:15,
23:24, 26:24, 36:4,
40:6, 40:19, 42:13,
45:24, 47:10, 48:1,
49:19, 51:17, 62:11,
65:7, 67:13, 71:20,
75:12, 78:23, 78:25,
80:12, 81:10, 81:13,
82:7, 82:9, 82:20,
83:6, 84:8, 84:19,
85:21, 88:21, 89:18,
92:5, 93:12, 93:25,
96:3, 98:7, 100:5,
103:22, 104:10,
107:23, 109:1,
110:20, 112:12,
114:24, 119:16,
120:23, 120:24,
122:3, 123:9, 124:6,
126:25, 130:6,
130:7, 131:9,
131:16, 131:21,
132:23
**update** [2] - 108:2,
108:7
**updated** [1] - 72:21
**updating** [1] - 110:1

## V

**value** [1] - 73:14
**varies** [1] - 105:6
**various** [2] - 46:5,
92:7
**vary** [7] - 29:8, 29:9,
40:13, 40:17, 40:22,
44:23
**verified** [1] - 16:8
**verify** [1] - 16:5
**version** [1] - 8:23
**versus** [4] - 34:14,
47:23, 59:5, 77:25
**video** [4] - 21:25,
65:10, 114:11,
116:21
**view** [1] - 53:14
**Violeta** [4] - 15:1,
108:9, 120:17,
121:20
**volatile** [1] - 9:17
**Volume** [1] - 41:23
**VOLUME** [1] - 1:13
**volume** [7] - 31:5,
40:13, 42:4, 94:2,
94:6, 95:10, 96:8
**volume-controlled** [2]

- 94:2, 94:6
**volumes** [2] - 40:13,
42:18
**voluminous** [2] -
31:10, 34:15
**voluntarily** [1] -
110:25
**VP** [2] - 112:7, 112:9
**vs** [1] - 1:7

## W

**wafer** [1] - 114:19
**wait** [1] - 3:6
**waited** [1] - 11:22
**warranties** [1] - 56:3
**Washington** [1] - 2:8
**watch** [2] - 65:9, 118:2
**ways** [2] - 5:15, 59:24
**Webster** [1] - 84:17
**week** [6] - 4:24, 4:25,
5:1, 6:21, 114:22
**weekend** [1] - 130:17
**weekly** [3] - 14:16,
92:15, 100:18
**weeks** [3] - 114:19,
114:23, 124:7
**welcome** [2] - 3:2,
22:18
**West** [1] - 1:23
**WESTERN** [1] - 1:2
**white** [1] - 52:13
**whole** [5] - 61:11,
66:3, 66:5, 86:10,
130:3
**willing** [1] - 5:13
**window** [5] - 43:10,
91:19, 94:13, 100:6,
100:14
**WITNESS** [9] - 22:12,
22:17, 31:14, 32:2,
99:12, 103:4,
103:23, 117:12,
129:25
**witness** [22] - 4:9,
20:25, 21:13, 21:18,
21:19, 21:22, 21:23,
22:1, 26:10, 32:12,
34:7, 34:11, 34:21,
34:22, 47:13, 52:7,
101:25, 102:6,
103:9, 117:9, 129:23
**witness's** [1] - 21:21
**witnesses** [3] - 102:4,
131:8, 131:10
**WOLPERT** [1] - 2:12
**wording** [1] - 6:7
**words** [11] - 15:25,
44:15, 49:14, 53:18,
59:6, 78:3, 89:13,

98:3, 99:6, 111:7,
111:9
**worker** [1] - 111:21
**works** [1] - 19:14
**world** [2] - 44:13,
45:20
**worst** [1] - 105:1
**worth** [1] - 106:2
**wrap** [1] - 130:6
**wrapping** [1] - 130:7
**write** [5] - 108:9,
108:21, 110:19,
121:2, 124:4
**writes** [3] - 109:8,
109:14, 120:24
**writing** [1] - 108:9
**written** [2] - 25:21,
111:23
**wrote** [5] - 110:5,
111:7, 111:9,
112:20, 112:21
**www.**
**amydiazfedreporter**
**.com** [1] - 1:25

---

## Y

**Y-u** [1] - 103:4
**year** [2] - 7:10, 31:9
**years** [3] - 24:15, 43:5,
43:12
**yesterday** [4] - 13:11,
32:14, 32:19, 55:15
**YODER** [52] - 26:9,
30:1, 33:21, 34:5,
34:16, 37:9, 47:10,
47:17, 48:11, 49:6,
50:25, 52:10, 54:13,
54:17, 54:22, 54:24,
62:11, 62:12, 65:2,
65:4, 66:15, 66:21,
66:25, 79:2, 79:3,
80:19, 80:23, 81:9,
81:11, 84:19, 84:20,
85:12, 85:16, 85:20,
85:23, 86:18, 86:22,
87:17, 87:22, 88:21,
88:24, 99:17, 100:5,
100:8, 100:11,
100:12, 101:21,
102:11, 132:13,
132:16, 134:2, 134:6
**Yoder** [7] - 2:16,
47:18, 50:20, 52:2,
55:2, 97:3, 98:15
**yourselves** [2] - 3:6,
45:23
**Yu** [21] - 102:8,
102:17, 103:4,
103:9, 103:13,

104:8, 105:12,
105:19, 107:15,
110:3, 111:21,
112:23, 116:23,
119:25, 120:9,
120:11, 120:15,
121:2, 121:12,
123:15, 126:24
**YU** [2] - 102:22, 134:7
**Yu's** [2] - 113:17,
113:23

---

## Z

**Zendejas** [2] - 108:9,
120:17
**zero** [2] - 61:3, 76:22