1                    UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

4

5

NETLIST, INC,                        )
6                                     )
              Plaintiff,              )
7                                     )
                   vs.               )
8                                     )   8:20-CV-993-MCS
SAMSUNG ELECTRONICS CO., LTD,        )
9                                     )
              Defendant.             )
10   _____)

11

12

13                  REPORTER'S TRANSCRIPT OF JURY TRIAL

14                             VOLUME VI

15                             PM Session

16                        Los Angeles, California

17                       Friday, December 3, 2021

18

19

20            _____

21

22

23                    AMY DIAZ, RPR, CRR, FCRR
                      Federal Official Reporter
24                    350 West 1st Street, #4455
                      Los Angeles, CA 90012
25

        *Please order court transcripts here:  www.amydiazfedreporter.com*

1     APPEARANCES OF COUNSEL:

2

      For the Plaintiff:

3

4                         GIBSON DUNN & CRUTCHER LLP
                          By:  Richard Doren, Attorney at Law
5                              Jason Lo, Attorney at Law
                               Raymond LaMagna, Attorney at Law
6                         333 South Grand Avenue, 46th Floor
                          Los Angeles, California 90071
7
                          GIBSON DUNN & CRUTCHER LLP
8                         By:  JungEun Lee, Attorney at Law
                          1050 Connecticut Avenue NW
9                         Washington, DC 20018

10

11

      For Defendant:

12

13                        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
                          LICENBERG & RHOW
14                        By:  Ekwan Rhow, Attorney at Law
                          1875 Century Park East, 23rd Floor
15                        Los Angeles, California 90067

16                        O'MELVENY & MYERS LLP
                          By:  Michael Yoder, Attorney at Law
17                        610 Newport Center Drive, Suite 1700
                          Newport Beach, California 92660
18
                          O'MELVENY & MYERS LLP
19                        By:  Marc Feinstein, Attorney at Law
                          400 South Hope Street, 18th Floor
20                        Los Angeles, California 90071

21

22

23

24

25

1          THE COURT:  So the plaintiff has at this point

2      closed its case, correct?  Everything is in that you are

3      going to put in?

4          MR. DOREN:  Yes, Your Honor.

5          THE COURT:  So does the defense have a motion?

6          MR. YODER:  Yes, Your Honor.  Michael Yoder for

7      defendant Samsung.  We actually have two motions.  I'll

8      address the first, and with the Court's permission,

9      Mr. Feinstein will address the second.

10          The first motion is a motion to strike Dr. Akemann's

11      opinion testimony.

12          At a minimum, his testimony that offered an opinion

13      on cover damages with respect to reseller purchase

14      transactions for which he had no matching Samsung price.

15          And further, that since he did not make any effort

16      to differentiate between that component of damages versus the

17      matched transactions, we would ask that the entire opinion be

18      stricken, in that there is no basis for the jury to separate

19      out the matched from the unmatched.

20          I would say this to begin, Your Honor, and it

21      highlights the problem with his methodology, which really was

22      backwards, as I think we covered a fair amount during

23      Dr. Akemann's testimony.  I don't need to repeat it here.

24      But this morning in the argument over the deposition

25      designations for Raymond Jiang, and Exhibit 23, which the

1    Court sustained the objections and didn't allow it, at least

2    in part, as I understood it, on the representations of

3    Netlist counsel that they were not seeking cover damages

4    based upon those requests for that product.

5           We went back and we looked at the database.  I

6    believe it's Exhibit 313.  And on that database, those

7    products appear as reseller purchases on a date after that

8    e-mail exchange.

9           When you do it backwards, and you don't identify

10   what the unfilled order is, there is no real certainty, it's

11   speculation, as to whether any reseller purchase was actually

12   a result of a breach.

13          We would ask, Your Honor, that that deposition

14   testimony should be allowed and Exhibit 23 should be

15   admitted, given that, in fact, it appears from their own

16   records they are asking for cover damages based upon the

17   purchase of those products.

18          Again, since they didn't start with a starting

19   point, we are speculating a bit.

20          But in any event, at a minimum, that should be

21   allowed.  But it really highlights the problem with

22   Dr. Akemann's testimony and why it doesn't meet the

23   requirements of Rule 702(c).  You know, he takes his universe

24   of reseller purchases as the starting point.  He then tries

25   to match them up with Samsung sales, 90 days before, 90 days

 1     after, and he's only able to find matching transactions for

 2     16.5 percent of those units.

 3         So he calculates those average premiums.  He doesn't

 4     really offer any justification for the 180-day window.  He

 5     doesn't really offer any justification for not having gone to

 6     the published price list to determine what the price was --

 7     the non-negotiable price was at the time.  He offers no

 8     justification for that.

 9         But more importantly, he takes this percentage and

10     he applies it to everything.  He applies it to reseller

11     purchases where he found that Netlist was able to buy the

12     product for less than from Samsung.  He applies it.  And he

13     applies it, most importantly, to the 83.5 percent of the unit

14     transactions where he has no matches, without any attempt to

15     justify it.

16         THE COURT:  I think, Counsel, I mean, his

17     percentage -- I forget what it was, 26 or 2.6 or .6.

18     Whatever it was, that percentage took into account or was

19     modified to adjust for prices that were up or down?

20         MR. YODER:  The 4.6 percent included what he called

21     negative price premiums, as well as positive price premiums.

22         And he claims that is the way to do it.

23         What we know, though, is the negative ones, there

24     was no damage.  He could have easily just calculated it based

25     on where he found that there was a positive delta, and he

1     could have done it by product.  Which would make sense,

2     because they are different products with different pricing,

3     different pricing patterns.

4             But he didn't do it.

5             And the thing -- there is no justification.  He made

6     no effort to establish why this methodology was reliable.

7     Most importantly, even if you assume the 4.6 is appropriate

8     for those transactions he matched, there was no basis offered

9     for why it would apply to the majority of the transactions,

10    which weren't matched.

11            THE COURT:  Okay.

12            MR. YODER:  And then the final point, Your Honor, is

13    simply that, again, since he made no effort to differentiate,

14    there is no basis for the jury to exclude the unmatched from

15    the matched.

16            THE COURT:  Thank you.

17            MR. YODER:  So we would ask that it be stricken and

18    the jury be told to disregard it.

19            MR. LO:  Good afternoon, Your Honor.

20            Let me start with the Court's point in terms of the

21    4.6 percent.

22            The Court is exactly right, and that was the

23    testimony of Dr. Akemann.  If he had not taken into account

24    those negative transaction -- negative premium transactions,

25    the percentage would be higher.  So mathematically, his

1    testimony was it's done correctly.  And of course they are

2    entitled -- they were entitled, and they did challenge him on

3    cross-examination, and that is for the jury to decide.

4           And with respect to the 90-day window, again, there

5    was testimony.  They may not like it, they may not agree with

6    it.  But he said, I heard the testimony, that they are doing

7    things on the quarterly basis and that, you know, on a

8    monthly basis, but in general it has certain trends from

9    quarter to quarter.

10          Again, they may not agree with that, but that is

11   something that is for the jury to decide.

12          With respect to this published price list -- well,

13   actually, with respect to all of this, the fundamental

14   argument that Samsung is making is Dr. Akemann compared the

15   reseller price to A, instead of comparing it to B.  He should

16   have compared it to something else.

17          And when one articulates it that way, that alone

18   makes this an improper 702 motion.

19          The Court's role here is not an arbiter between

20   different economic theories and different economic analysis.

21          THE COURT:  Just to short-circuit this, let me move

22   you along just a little bit to this matched versus unmatched

23   transactions.

24          MR. LO:  Sure.

25          So first of all, let me be clear here:  What Samsung

1    is suggesting is that what Dr. Akemann should have done is to

2    take the unmatched transactions, and instead of applying the

3    4.6 percent, they should look at the published prices.

4              Now, they don't show the Court what the published

5    prices look like, and I want to do that for just a minute

6    here, Your Honor.

7              First, the Court has seen Exhibit 312, and that is

8    our list of transactions.  And everything has an item code

9    and an item description.  And there are about 9,000 entries

10   in here, all with these dizzying part numbers.  This is what

11   the price list looks like.

12             It's an e-mail there Neal Knuth.  Its --

13             MR. YODER:  May I ask if this is in evidence, Your

14   Honor?

15             MR. LO:  It is not in evidence, but it's a *Daubert*

16   and it's 702.  So this is not on a motion for judgment on the

17   pleadings, or a motion for directed verdict.

18             MR. YODER:  I would object, Your Honor, because we

19   are basing it on his testimony.

20             THE COURT:  I want to move beyond the price list

21   issue.

22             And I understand the dispute there.

23             MR. LO:  Okay.

24             THE COURT:  But I want to get to this point of the

25   matched versus the unmatched transactions, and just so I

1    understand your damages case.

2           MR. LO:  Yes.

3           THE COURT:  Are you indicating that all of the

4    reseller transactions in the relevant time period are

5    transactions that you should get damages for?  Or a subset of

6    the reseller transactions?

7           MR. LO:  It is all of them.

8           THE COURT:  All of them.  And you are saying that

9    some of those reseller transactions will match up to specific

10   requests you made to Samsung, others may not match up because

11   they are requests that you didn't make to Samsung because you

12   were prohibited from making them?

13          MR. LO:  Correct.

14          THE COURT:  That is the gist of the argument?

15          MR. LO:  Correct.

16          THE COURT:  I'm going to overrule the motion.  I

17   think you can make your points on cross-examination, which

18   you did, and I think you can make your points in closing.

19              So let's get to the other motion.

20          MR. YODER:  I would ask, Your Honor, then that we be

21   allowed to play deposition 214/24 to 215/7 and Exhibit 23.

22          THE COURT:  Let me get your response to that,

23   Counsel.

24          MR. LO:  Well, this is the thing with

25   cross-examination.  We haven't -- I don't know what Mr. Yoder

1    is talking about.  I'm taking it at his word, but I don't

2    know when these transactions occurred.  So I have no way of

3    evaluating whether -- what his basis is for saying that the

4    cover transaction is based on something earlier.

5              THE COURT:  Yeah.  So we talked about a specific

6    transaction in a document, and the representation we got from

7    counsel was that this was not a transaction from which

8    Samsung was seeking damages.  Correct?

9              MR. LO:  Yes.

10             Your Honor, after conferring with my colleague, we

11   are fine if they want to play this in order to resolve this

12   issue.

13             THE COURT:  Okay.  Great.  We'll do that.

14             Quickly, Mr. Feinstein, you have the other motion.

15             MR. FEINSTEIN:  Your Honor, Samsung hereby moves for

16   judgment as a matter of law under Rule 50 on the basis that

17   Netlist has not presented legally sufficient evidence to

18   support its claim for damages under Section 6.2 of the JDLA.

19   The motion is brought on the following grounds:

20             Netlist's damages claim is significantly based on

21   the assumption that forecasts that Netlist provided to

22   Samsung are requests within the meaning of Section 6.2.

23             But, Your Honor, as a matter of law, forecasts are

24   not sufficient to create an enforceable obligation to supply.

25   Forecasts are not sufficient to create an enforceable

obligation on Samsung to supply product to Netlist.

In the Court's summary judgment order, the Court
observed correctly that Section 6.2, "Provided a framework
for future transactions."

Section 6.2 plainly provides that those transactions
must commence with a "request" by Netlist to Samsung.

Our position, Your Honor, and it's very
straightforward, is that under New York law such a request
must be in the form of a binding offer, with sufficiently
definite terms in order to create an enforceable obligation
by Samsung.

And the principles of law that apply here are basic.
They are law school 101.  An offer is an act on the part of
one person whereby he gives to another the legal power of
creating the obligation called a contract.

That is not a forecast.  That doesn't do that.

To give rise to an enforceable agreement, the offer
must be definite and certain, and not simply informational or
exploratory.  Forecasts are informational or exploratory.

In addition, before the power of law can be invoked
to enforce a promise, it must be sufficiently certain and
specific so that what was promised can be ascertained.

So here, purchase orders meet those requirements.
Right?  They are a binding commitment to purchase.  There is
no dispute on that -- in that regard.  Purchase orders also

```
1    contain the material terms:  price, quantity, delivery date,

2    place of delivery, payment terms.  There is no dispute

3    between the parties that purchase orders meet those

4    requirements.

5         Forecasts, on the other hand, do not include binding

6    commitments to purchase on sufficiently definite terms.  They

7    simply don't.  They do not contain a promise from Netlist to

8    actually purchase the products.  There is no actually legal

9    promise to do it.  Nor material terms, including an offer

10   price -- excuse me, an offer price, date of delivery, place

11   of delivery, payment terms.

12        So we looked, Your Honor, for -- to some federal law

13   in interpreting, characterizing forecasts.  This is from an

14   Eastern District of Michigan Federal Court, and this is

15   not -- would be a controversial observation by the Court.

16   But the Court found a "forecast is a nonbinding estimate

17   only".  And, "Does not constitute a firm commitment to

18   purchase a specific quantity of product."

19        That is the Sundram Fasteners vs. Flexitech case,

20   2009, Eastern District of Michigan.

21        In fact, Netlist admits that forecasts of future

22   product demand are not binding.  You heard that from P. K.

23   Hong when he testified.

24        So, you know, therefore, Your Honor, forecasts

25   cannot form the basis for a claim for damages here.  Purchase
```

```
1    orders -- unfilled purchase orders, they could potentially do

2    it, but not forecasts.

3              THE COURT:  So are you looking for the -- that

4    dispute to be resolved as a motion -- as a matter of law?

5    Because there are -- there is evidence in the record, isn't

6    there, that there were purchase orders that weren't fulfilled

7    by Samsung?

8              MR. FEINSTEIN:  I'm going to get to that.  That's

9    correct.  I'm going to get to that.

10             THE COURT:  All right.

11             MR. FEINSTEIN:  So --

12             THE COURT:  Why don't we jump to that.

13             MR. FEINSTEIN:  Let's jump right to it.  Okay.

14             Well, so Netlist also -- well, here is the thing:

15   The point is their damages calculation, the $53 million in

16   reseller purchases, almost all of it is because of forecasts

17   that they allegedly submitted that Samsung said it would not

18   support.

19             There is only $3 million or so of unfilled purchase

20   orders that have been identified in this case.  So only

21   $3 million in unfilled purchase orders.

22             So if you take the $53 million of reseller purchases

23   for which they are seeking damages, you can only -- there is

24   only $3 million of unfilled purchase orders.  That means the

25   rest is something else, like forecasts.
```

1           And so let me get to that.  So Netlist has failed to

2      prove the damages arising from the unfilled purchase orders.

3           So let's say Your Honor actually agreed with me and

4      said, you know, Mr. Feinstein, you are right, I don't see how

5      a forecast can be a request under 6.2.  Doesn't even matter

6      whether the parties may have negotiated that it would be --

7      that it would be a request.  It can't be.  Because it doesn't

8      have the terms that would make out a binding request, a

9      binding obligation.

10          And then you said, Well, okay, is there enough

11     evidence in the record from which you could determine the

12     damages from the unfilled purchase orders?  No.  That is for

13     the very reason that Mr. Yoder said, that Netlist presented

14     one overall damages figure that purports to include damages

15     from -- you name it:  unfilled forecasts, unfilled e-mail

16     inquiries, unfilled purchase orders.

17              You can't disaggregate their damages figure.

18          And by the way, they are not claiming, and there is

19     no evidence in the record to support, that each unfilled

20     purchase order resulted in a cover purchase.  Their claim is

21     that every reseller purchase is a result of an unfilled

22     request.

23          It is not, and they have not provided evidence, that

24     every unfilled purchase order, forecast, or e-mail inquiry

25     actually resulted in the cover purchase.  And, in fact -- you

1    heard the record -- they would scramble around; maybe they

2    would be able to find a product, maybe they wouldn't be.

3           And so you cannot take their damages figure and --

4    that they have offered and figure out even what would be the

5    damages from the unfilled purchase orders.

6           So their whole case unravels.  There is no -- there

7    is no legally sufficient evidence on which the question of

8    damages can be put to the jury.

9           And I'll just -- the only -- and then for the

10   record, Your Honor, I just need to say that we also bring

11   this motion on the basis that Mr. Akemann's opinions are

12   inadmissible and unreliable.

13          THE COURT:  Thank you.  Any response from counsel?

14          MR. DOREN:  Yes, Your Honor.

15          Section 6.2 does not require that there be a

16   purchase order or a legal offer to create a separate

17   contract.  Section 6.2 says that NAND and DRAM products will

18   be provided upon request at a competitive price.

19          The testimony before the Court is that forecasts or,

20   as we heard them referred to this morning, demands were sent

21   by Netlist to Samsung with the expectation that they would be

22   fulfilled.  And when they were not fulfilled, Netlist would

23   then go to resellers in order to replace those products that

24   they could not get from Samsung.

25          And it's on that premise that, first of all, the

1    damage claim is based:  That every reseller transaction

2    during the damage period is, in fact, the result of Samsung

3    not having met its obligation to provide product upon

4    request.

5                 Counsel just talked about situations where there may

6    not have been resale purchases because there was all this

7    scrambling about, and maybe they could find them and maybe

8    they couldn't.  We are not seeking any damages for the

9    absence of a resale transaction.  We are only seeking damages

10   for where resale transactions were completed.

11                THE COURT:  Thank you, Counsel.

12                I'm going to deny the motion.

13                I think that there is -- certainly, as a JMOL

14   motion, I think that there is two issues here:  One is the

15   issue that there are purchase orders that -- there is

16   evidence in the record that there were purchase orders that

17   Samsung didn't fulfill.  So there is -- that sort of defeats

18   the judgment as a matter of law right there.

19                But the other issue is that the request in the

20   contract, Samsung's refusal to accept purchase orders --

21   there is evidence that Samsung's refusal to accept purchase

22   orders hampered Netlist from making them.

23                And I think that is part of what Netlist's damages

24   theory is.  So I don't think I can grant summary judgment.

25                MR. FEINSTEIN:  May I just make one thing for the

 1    record?

 2            THE COURT:  Yeah.

 3            MR. FEINSTEIN:  One brief point?

 4            All right.  And I skipped over this during my

 5    presentation a moment ago.

 6            But I thought this issue would come up.  It's their

 7    case -- and you have now alluded to it -- is essentially that

 8    Samsung prevented Netlist from submitting requests, purchase

 9    orders.

10            THE COURT:  Right.  They didn't make purchase orders

11    because Samsung told them not to.  That is what the testimony

12    has been.

13            MR. FEINSTEIN:  Sure.

14            There are at least two problems with that argument,

15    Your Honor.

16            What they are arguing is a classic case of

17    anticipatory repudiation.  Right?  What they are arguing is

18    that Samsung said they -- that they weren't going to support

19    their requests, even if they made them, so don't make them.

20    In other words, Samsung said, We are going to -- We, Samsung,

21    are going to breach.  Right?  We are not going to comply with

22    our obligation to fulfill your requests.  And so don't make

23    them.

24            Okay.  The problem is that is -- that is a different

25    claim.  That is a claim for anticipatory repudiation.  It's

1    not a claim for the breach of the actual performance that

2    they have alleged in this case.

3         So the Complaint in this case does not plead a claim

4    for anticipatory repudiation.  It wasn't in the summary

5    judgment briefing.  You won't see it there.  You won't see it

6    in the pretrial conference order.  That is not the horse that

7    they rode from the very beginning of this case to today.

8         And the other thing I'll point out, Your Honor, is

9    that under New York law, in the event of an anticipatory

10   repudiation -- and this is very clear -- Netlist had an

11   option to do one of two things, but not both:  They could

12   either seek damages for breach of contract, thereby -- for

13   repudiation, thereby seeking -- thereby terminating the

14   contractual relation between the parties.

15        That was their first option, right?  Back in 2017,

16   they could have just, you know -- We are done.  We are -- you

17   are telling us you are not going to support us.  And they

18   could have sued for anticipatory repudiation.

19        Or they can continue to treat the contract as valid

20   and await the designated time for performance before bringing

21   suit.

22        So under the second option, they actually wait to

23   see whether or not, once they make their request -- they

24   could always submit the purchase order.  Right?  They are a

25   sophisticated party.  And then see if we actually perform.

```
 1        That is the road -- that is the path that they traveled.

 2        Right?  They did not do what New York law requires if they

 3        were going to pursue that claim.

 4                So that is not the claim in this case.

 5                THE COURT:  Thank you.  Thank you.

 6                Brief response, if you want to make one?

 7                MR. DOREN:  Thank you, Your Honor.

 8                Requests were made.  They were rejected.  And

 9        therefore, no purchase order was submitted.  The requests

10        were made under 6.2, they were rejected.  That was the breach

11        of 6.2.

12                It's not an anticipatory breach or anticipatory

13        repudiation or anticipatory anything else.  It was an active,

14        ongoing breach of the contract.

15                THE COURT:  Okay.  Thank you, Counsel.  The Court

16        denies the motion.

17                Let's bring the jury in and get started.

18                (Thereupon, the jury returned to the courtroom.)

19                THE COURT:  Welcome back from lunch.  Thank you

20        again for all of your time and attention to this matter.  We

21        are going to start right in.  We are going to finish up

22        witnesses and give you some instructions, and then we'll get

23        to closing arguments.

24                So go ahead, Mr. Yoder.

25                MR. YODER:  Yes, Your Honor.  We would play an
```

1    additional excerpt from the video deposition of Raymond Jiang

2    and display, as well, Plaintiff's Exhibit -- PX23, which we

3    would ask to be admitted.

4              THE COURT:  Okay.  Any objection, Counsel?

5              MR. LO:  No, Your Honor.

6              THE COURT:  Okay.  Go ahead, Mr. Yoder.

7              Counsel, can you give me that exhibit number again?

8              MR. YODER:  PX23.

9              THE COURT:  So is that -- is that Exhibit 23?  Or

10   does it have an exhibit number?

11             MR. YODER:  Let me figure that out, Your Honor.

12             THE COURT:  Thank you.

13             MR. YODER:  If it doesn't, we'll tag it with a trial

14   exhibit number.

15             THE COURT:  Thank you.

16             MR. DOREN:  It is PX, Your Honor.

17             THE COURT:  It is PX23.

18             MR. LO:  Yes, that is our understanding.  Trial

19   Exhibit 23, yes.

20             THE COURT:  Okay.  So Trial Exhibit 23 will be

21   admitted.

22             (Exhibit Number 23 received in evidence.)

23             (Thereupon, the video was played.)

24             MR. YODER:  That concludes it, Your Honor.

25             THE COURT:  And you have the document there.  Okay.

KIDDER - DIRECT

1    Thank you.  Call your next witness then.

2              MR. YODER:  Yes, we would call Doug Kidder.

3              THE CLERK:  Raise your right hand for me.

4    THEREUPON:

5                        DOUGLAS KIDDER,

6    Called in these proceedings, and after having been called in

7    these proceedings, testifies as follows:

8              THE CLERK:  Please be seated.

9              Will you please state and spell your full name for

10   the record.

11             THE WITNESS:  Sure.  Douglas George Kidder.

12   D-o-u-g-l-a-s, G-e-o-r-g-e, K-i-d-d-e-r.

13             THE CLERK:  Thank you.

14                      DIRECT EXAMINATION

15   BY MR. YODER:

16    Q. So, Mr. Kidder, who are you and why are you here?

17    A. I'm a damages expert.  I was retained by Samsung to

18   review Dr. Akemann's analysis.

19    Q. So if you could, please, explain to the jury your

20   educational background.

21    A. Yes.  I have an undergraduate degree in mathematics and

22   English.  I have a master's of science in engineering from

23   UC Berkeley.  And, yeah, that's the education.

24    Q. And then what about your work experience?  How long have

25   you been working in this field?

KIDDER - DIRECT

1      A. So basically I have been doing business analysis for

2      about 35 years now, starting out with Booz Allen Hamilton

3      doing business strategy consulting.  I was a vice president

4      at Walt Disney Imagineering, looking at new businesses for

5      Disney.

6              And I have been doing the litigation work now for

7      over 20 years.  I have testified in about 65 cases, 17 of

8      which involved breach of contract.

9      Q. And in those cases in which you have testified, has the

10     Court ever ruled that you are not qualified to offer your

11     opinions?

12     A. No.

13     Q. And here, what is it about your experience that you

14     believe gives you the expertise to talk about what we are

15     talking about here, cover damages?

16     A. A lot of years of doing damages calculations.  I taught a

17     course on damages to the Graduate School of Accounting at

18     Golden Gate University for about six years.

19             MR. YODER:  Your Honor, the parties had actually

20     stipulated that each of the experts were qualified, so I

21     would tender Mr. Kidder as an expert.

22             THE COURT:  The Court will allow him to testify as

23     an expert.

24             MR. YODER:  Thank you very much.

25     Q. So what work did you do in this case?  How did you get to

KIDDER - DIRECT

1      the point of being able to evaluate Dr. Akemann's opinions or

2      his calculation?

3       A. So basically, since my work was to really take a look at

4      what he had done in some depth, the first thing we did was

5      re-created his work, so we understood how his model worked.

6            And then we reviewed the files that he looked at,

7      and about 1300 files in total, depositions, financial data,

8      and really looked in depth at the -- essentially, the raw

9      data that he was relying on.

10      Q. And why did you do that?

11      A. In my experience, you know, the numbers are what the

12      numbers are.  And -- but your conclusion is based on how you

13      analyze that data.

14            And so I wanted to really understand the data, to

15      see whether his analysis was, in fact, reliable.

16      Q. And did you also drill down on Dr. Akemann's analysis?

17      A. Yes.  Absolutely.

18      Q. Okay.  We'll get into that.

19            What type of damages did you understand Dr. Akemann

20      to have calculated?

21      A. He was focused on cover damages, which is really just the

22      price premium.  You know, how much more that Netlist might

23      have paid because it had to purchase from a reseller as

24      opposed to that same order from Samsung.

25      Q. And we have a slide here.  There has been testimony

KIDDER - DIRECT

1   previously about cover damages and what they are or aren't,

2   so we don't need to spend a lot of time on it.  But if you

3   could just explain to the jury, then, from your view as a

4   damages expert, what cover damages are.

5            And hang on one minute.  There we go.

6    A. Sure.  And this is just a graph that we have put

7   together.  And I won't go into it in too much detail, because

8   you've seen it before.

9            But the idea of cover damages is that Netlist makes

10   a request to Samsung.  And if that request is not filled,

11   then they say, Okay, well, I have to get it from somewhere.

12   So Netlist then makes that same request to one or more

13   resellers.

14            And the resellers come back, and if the reseller

15   price -- in the example I have shown here, Samsung was

16   offering $50 a unit, and they had to buy it from a reseller

17   at $55 a unit.  So all in all, Netlist got what it needed,

18   but it paid $500 more.  The 500 bucks is your cover damages.

19    Q. Did Dr. Akemann calculate cover damages in this fashion?

20    A. No, he did not.

21    Q. What did he do?

22    A. Well, he went backwards, basically.  He said, Look, every

23   single purchase that Netlist ever made from a reseller was

24   because Samsung couldn't fill a request.

25            He didn't go back and see, well, what requests were

KIDDER - DIRECT

1    unfilled?  He said everything.  And so he sort of -- he ran

2    the causal chain back upstream.

3     Q. And we'll get to that assumption, and we'll talk about

4    it.  But just in terms of what he had available to him, did

5    Dr. Akemann have available data on orders that Netlist placed

6    with Samsung that it claimed were not filled?

7     A. Yes.  Those were the Samsung purchase orders.

8     Q. Okay.  Did he make any effort, from the work you've done

9    here, to try to match those unfilled orders with a cover

10   purchase?

11    A. Um, I didn't see any effort in his work.  And I think he

12   testified that he didn't try to do that.

13    Q. Okay.  And so what did he do?

14    A. Well, again, he started with a reseller transaction, and

15   he knew -- since he had an actual transaction, he had the

16   actual price that was paid to the reseller.  And the open

17   question for him was to go backwards and see if he could find

18   a price that would -- that they would have paid to Samsung in

19   a but-for world.

20    Q. Did Dr. Akemann make any effort to try to determine which

21   reseller purchases in this database were actually cover

22   purchases?

23    A. No.  He just -- you know, I think he stated very clearly

24   that he just assumed that if it was bought from a reseller,

25   that it was for cover.

KIDDER - DIRECT

1    Q. Okay.  And you were here for Dr. Akemann's testimony,

2    correct?

3    A. Yes.

4    Q. And did he testify to underlying evidence, if any, that

5    he reviewed to try to verify that assumption?

6    A. No.  He just -- he just took it as an assumption.  He

7    didn't appear to verify it.

8    Q. So just a couple of questions:  If it turns out that

9    every reseller purchase among this $53.4 million was not

10   caused by a Samsung breach, what would that mean for

11   Dr. Akemann's calculation?

12   A. It would mean he's wrong.  Right?  If you are assuming

13   that everything is a cover purchase, but they are not, then I

14   don't know which ones aren't.  The only thing I can say with

15   some certainty is that the final number is wrong.

16   Q. So, for example, if it turned out that some of those

17   purchases were made by Netlist because Samsung was no longer

18   making the product, it was an end-of-life product, would that

19   affect Dr. Akemann's calculation?

20   A. Yeah.  It would mean that he was wrong.

21   Q. Okay.  Same if some of those purchases were because

22   Netlist was able to find the product from a reseller at a

23   lower price and, therefore, just bought from the reseller?

24   A. Again, it's -- that would be in his calculation, and it

25   would make his entire calculation wrong.

KIDDER - DIRECT

1    Q. And what if some of those purchases were because Netlist

2    had a customer that needed a product quickly, and there

3    wasn't enough lead time with Samsung but they could get it

4    immediately from the reseller, and that is why they bought

5    it?  What would that do to Dr. Akemann's calculation?

6    A. Again, it would make it wrong.

7    Q. So let's talk about how he went about it.  And we've got

8    a slide, if we could bring that up, to help us walk through.

9         And what are we looking at here, Mr. Kidder?

10   A. So this is a graphic I prepared by just pulling out a

11   section of Dr. Akemann's report.  This was his actual

12   analysis.  And so I thought it was helpful because, as I

13   said, you sort of have to get into the details to understand

14   what is going on here.

15        And so the various columns you have seen, you may

16   have recognized from some of the exhibits.  And I don't

17   remember the exhibit numbers either, but the -- the -- each

18   row, excuse me, is a specific transaction.

19        So you can see in the far left, you have an invoice

20   date, just sort of reading across, and then an item code,

21   item code description, you have unit cost, so how much is

22   that per unit, the extension amount, which is just total unit

23   cost times total number of units.

24        And then you see the first of the sort of yellowed

25   columns is Samsung 90-day price.  And that is Dr. Akemann's

KIDDER - DIRECT

1    calculation of the amount that he believes would have been

2    paid by Netlist if they get to Samsung within this 180-day

3    window.  So plus or minus 90 days.

4          And you see in this first row, it's NA.  And you see

5    that price premium, 90-day price premium in the far right,

6    which is what percentage they had to pay above or below the

7    Samsung price, is an NA as well.

8    Q. So what does the NA mean?

9    A. It means not applicable, not available.  It means that

10   for this first transaction -- and I just -- by the way, I

11   just started at the beginning.  So you will see the 4/6/2017

12   is the first transaction that he considers to be in the

13   breach period.

14          So you see the NA here, the first two rows, he was

15   not able to find a price in a 180-day window around this

16   transaction at which Netlist had purchased the same product

17   in similar quantities from Samsung.

18   Q. Okay.  So how many of these unmatched reseller purchases

19   were there?

20   A. So in terms of units, he had about 83 percent of the

21   units he couldn't find, and something like 63 percent of the

22   dollars he couldn't find.  So he was able to find matching

23   transactions for, you know, an eighth to a third of the total

24   volume here.

25          So the majority of the transaction volume actually

KIDDER - DIRECT

1    is unmatched.

2    Q. We'll come back to this in a second.  Let's just find

3    that slide, if we could.  Yeah.

4    A. Oh, sorry.

5    Q. So can you explain to the jury, then, of this universe --

6    and we are talking about this universe of $53.4 million, the

7    universe of reseller purchases where Dr. Akemann assumed

8    every dollar was because of a Samsung breach, right?

9    A. Yes.

10   Q. So how many was he unable to match out of that universe?

11   A. Sorry.  This is -- so he could -- about 54 percent of the

12   transactions, 83 percent of the units, he couldn't find.

13   63 percent of all dollars, he couldn't find.

14           So basically, the point is that Dr. Akemann doesn't

15   have a matching price for most of the transactions or most of

16   the dollars.

17   Q. Even though he couldn't find matches for a majority of

18   these reseller purchases, did he still include the dollars

19   from those unmatched purchases in his damage calculation?

20   A. Yes.  So we are back to this slide where what you can see

21   is you've got the extension amount here, and you see the red

22   box sort of in the middle of the page, about $53.4 million.

23   That is Dr. Akemann's total of the dollar value of the

24   reseller transactions.

25           And you will see that that includes, when he does

KIDDER - DIRECT

1    his math, even though he does -- he can't find a matching

2    price transaction, has absolutely no idea what premium was

3    paid for that, if any at all, he's included that in his total

4    dollar figure.

5    Q. And so just to be clear, the 4.6 percent premium that he

6    calculated was based solely on the minority of matched

7    reseller purchase transactions he found, correct?

8    A. That is correct.

9    Q. And as to the majority, the unmatched, he took that same

10   percentage and then he applied it to those dollars as well?

11   A. That is correct.

12   Q. Did you hear anything in Dr. Akemann's testimony

13   justifying why this percentage for these matched transactions

14   would apply to unmatched transactions?

15   A. No.  I mean, from a statistical point of view, you would

16   want to make sure -- if you've got a sample, you would want

17   to make sure that your sample is representative.

18        And he's done absolutely no work to make sure that

19   that 4.6 percent that he calculated for the matched

20   transactions would be the same number for the unmatched

21   transactions.

22   Q. And is that something a statistician should do?

23   A. Yes, absolutely.

24   Q. So let's talk about the 180-day window.  Did you look to

25   see how Dr. Akemann went about trying to identify matching

KIDDER - DIRECT

1    transactions?

2     A. Yes, I did.

3     Q. And you said that he used a 180-day window.  What -- how

4    did he use that?

5     A. Well, so what he did -- and I hesitate to bore you, but

6    basically what he did was he found a transaction.  And let's

7    just say it was, you know, April 1st, 2017.  He looked

8    90 days before it, 90 days after it, to see if Samsung had

9    purchased a product in that same window.

10            And he described it as like, you know, doing a

11    comparable on Craigslist for a car you are buying.

12     Q. So what did he do then?

13     A. So what I've done here is I've drawn a chart.

14            Can you go back a moment?

15            What I've done is I've drawn a chart that is for one

16    particular product.  And it's one of the high-volume

17    products.  So I picked one that just had a lot of dots on it.

18    And the one I'm looking at still has gray dots.

19            Can I get back to the one with the blue and the red

20    dots?  Thank you.

21            And so the vertical axis here is the price that was

22    paid.  And each dot represents a separate transaction.  And

23    the horizontal axis is the date.  And so what you see here is

24    essentially the curve of prices over time.

25            Now, the orange dots here are reseller transactions,

KIDDER - DIRECT

1     where they bought this particular product from a reseller.

2     And the blue dots are Samsung transactions, where they bought

3     this particular product from Samsung.

4      Q. So can you give an example of how Dr. Akemann came up

5     with a premium percentage for this?

6      A. Yes.

7            So if you start with the very furthestmost left

8     point -- thank you.  That is a reseller invoice.  Okay?  And

9     so let's look at the price comparison he had within 90 days

10    for this reseller invoice.

11           So here is your 90-day window, which is now in

12    yellow.  And within that 90-day window, there were two

13    Samsung invoices that showed up that provided him a basis to

14    say, Oh, well, had they not bought from the reseller, they

15    would have bought from Samsung.

16           And on the next page here, what I've done is just

17    sort of made it bigger and more obvious.  So we have a

18    purchase from Techtronics of 412 units.  We have purchases

19    from Samsung of a thousand, and Samsung of 500.

20           Can we go to the next slide?

21           So what Dr. Akemann did was he said that because the

22    Techtronics was 412 units, and he wanted to limit it

23    according to the size of the transaction, he did not consider

24    the thousand units.

25           The only price point he had was the purchase from

KIDDER - DIRECT

1    Samsung of 500 units in, roughly, April.

2     Q. Let me just stop you for a second.

3         Did you hear during Dr. Akemann's testimony any

4    justification for why he disregarded the thousand-unit

5    transaction?

6     A. No.  He -- well, sort of.  He waved his hands and he

7    said, Well, I've heard that the volume should make a

8    difference.

9         But he had all the data, but he never went to look

10   to see whether, in fact, the volume made a difference.  He

11   has no idea whether, in fact, a purchase of a thousand units

12   gets a better or worse price than a purchase of 412 units.

13   It was just an assumption he made.

14    Q. Okay.  So in any event, this Samsung price that is

15   closest to the reseller price, he disregards that one and he

16   just uses the 500-unit price, right?

17    A. That's correct.

18    Q. Okay.  And then what does he do with that 500-unit price?

19    A. Well, so the Techtronics purchase was at about $72, and

20   the Samsung purchase some months later was at about $49.  And

21   so for this transaction, he says there is a 49 percent price

22   premium.  Right?  That they paid 49 percent more.

23        But what he's completely failed to account for is

24   that in the intervening time, the price has gone down

25   substantially.

KIDDER - DIRECT

1    Q. And so does the data reflect that this 49 percent premium

2    is an accurate reflection of the price difference?

3    A. No, not for -- if he had bought it -- what Dr. Akemann's

4    trying to assess is:  If they bought from Samsung at about

5    the same time, how much more -- or how much less or more

6    would they have paid?  And it's just completely inaccurate.

7    Q. So time makes a difference?

8    A. Time makes a big difference.

9    Q. If we could do the next slide.

10            So here is another slide we are looking at.  What is

11   this?

12   A. So this is exactly that same graph I referred to as the

13   red-and-blue dot graph.  And there are some other points I

14   want to make in here.

15            If you look down -- can you go to the next graph,

16   please?

17            So if you look at here, we've got a reseller invoice

18   and a Samsung invoice.  It's one day prior.  And those two

19   invoices have exactly the same price on them.  Okay?

20            So if you were going to go and look and see, well,

21   what is the cover damages for that particular invoice, and

22   you've got a transaction a day before, you would say, well,

23   you know what?  That is probably the right price, and I'm

24   going to ignore everything else.

25   Q. So what did Dr. Akemann do?

KIDDER - DIRECT

1      A. So if we can go to the next slide.

2           So he's got his 180-day window.  So what he does is

3      he compares -- you can kind of see a little bit of red poking

4      out there from the middle dot.  So he compares that reseller

5      transaction with the Samsung purchases, both before it and

6      after it.  And he does an average of those four blue dots.

7           And when he does that average, what he finds is that

8      that transaction to the reseller, in his view, they paid

9      about a 10 percent premium to acquire the product from a

10     reseller as opposed to from Samsung.  Even though, the day

11     before, they bought it at exactly the same price.

12     Q. So does that make a difference in the premium?  If you

13     had just used the one transaction the day before the reseller

14     purchase versus the way he did it, would that make a

15     difference?

16     A. Yes, it would.

17     Q. How big of a difference?

18     A. In this case, 10 percent.  I mean, you'd take zero

19     percent, and he finds 10 percent.

20     Q. Let's go to the next slide.

21          I want to talk about -- there were some matching

22     transactions, according to Dr. Akemann, where Netlist

23     actually was able to get the product from a reseller for less

24     than they -- he says, they would have gotten it from Samsung.

25     Right?

KIDDER - DIRECT

1    A. Yes.

2    Q. So what are we looking at here?

3    A. A lot of dots.

4    Q. What are the dots?

5    A. So what I did here was I used Dr. Akemann's work, where

6    he calculated the price premium for all the transactions he

7    could find.  Okay?  And so the vertical axis here is his

8    calculation of the price premium.  You will see the zero

9    lines kind of in the middle.  And each dot is put on a

10   different date for a specific transaction.

11          So this is just a graphic showing his calculation of

12   the price premium for every transaction across time.

13   Q. And some of these were negative?

14   A. Yes.  So every -- all the green dots below the zero line

15   there, the reseller price, by his calculation, is less than

16   the Samsung price.

17   Q. So Netlist actually got the product for less than what

18   they should have paid Samsung, if you go with his

19   methodology?

20   A. If you go with his methodology.

21   Q. And did he apply his premium to these transactions, these

22   negative premium transactions, when he came up with his

23   damage calculation?

24   A. Yes.  So when he -- when he takes his 4.6 percent of the

25   sum of all of the purchases from resellers, he's including

KIDDER - DIRECT

1    these.

2              So implicitly, what he's saying is:  Even though you

3    might have paid 10 percent less to the reseller than you

4    should have paid to Samsung, I'm actually going to give you

5    credit for another 4.6.  We think it would have been --

6    instead of minus 10 percent, it would have been minus

7    14.6 percent.

8    Q. I want to go back to the 180 days.  This will be my last

9    set of questions, Mr. Kidder.

10             And the last slide, if we could bring it up.

11             Did you do any analysis to try to see whether it

12   made a difference how long this time period was that you

13   applied if you used Dr. Akemann's sort of reverse methodology

14   to try to come up with a price premium?

15   A. Yes, I did.

16   Q. And what does this chart show?

17   A. So what I did was I kind of asked the obvious question,

18   which is:  Why 90 days, plus or minus?  And does that affect

19   his answer?  Right?  What happens if you changed the window

20   from 90 days, plus and minus, to 30 days, plus and minus?  Or

21   60 days, plus and minus?

22             And so the red bar here is Dr. Akemann's opinion.

23   And you can see that the -- it's the 180-day window.  And you

24   can see on the vertical axis, it's at 4.6 percent.  That is

25   his average.  That is what he's applying.

KIDDER - DIRECT

1           If, instead of a 180-day window -- I re-replicated

2      his entire analysis.  And I said, Let's change it from 90 to

3      120 days.  It turns out to be reasonably mechanical, once you

4      understand how his analysis works.

5           And lo and behold, if you use a 240-day window, you

6      get about a 6 percent premium.  On the other end, if you

7      narrow the window down to just the transactions that are plus

8      or minus 7 days, so 14-day window, if you narrow the window,

9      what you get is slightly less than a 2 percent average

10     premium.

11      Q. And when you were here in court, did you hear Dr. Akemann

12     provide any justification for why he chose the 180 rather

13     than a shorter time, which would give transactions closer to

14     the reseller purchase date?

15      A. I heard no justification.  And I heard Dr. Akemann state

16     that he knows that prices further away from the transaction

17     are less relevant.

18           So what I'm telling you:  If you get rid of those

19     less relevant transactions that we all agree are less

20     relevant, his percentage goes down substantially.  It cuts it

21     from about 4.6 to about 2 percent, if you narrow it down to

22     plus or minus 7 days.

23      Q. As an expert, would you agree that bad assumptions make

24     bad opinions?

25      A. Yes.  This is my point:  The data is what the data is,

KIDDER - DIRECT

1    but if you make bad assumptions and you do bad analysis, you

2    are going to get a bad outcome.  You are not going to get a

3    reliable outcome.

4              MR. YODER:  No further questions.  Pass the witness,

5    Your Honor.

6              THE COURT:  Thank you, Counsel.

7              Cross-examination.

8                          CROSS-EXAMINATION

9    BY MR. LO:

10    Q. Good afternoon, Mr. Kidder.

11    A. Good afternoon.

12    Q. My name is Jason Lo, and I represent Netlist.

13              Let's start with your slide number 17.  And you said

14    that the -- you acknowledged that in the data that

15    Dr. Akemann analyzed, there were some transactions in which

16    it appeared that the reseller transaction occurred at a lower

17    price than the Samsung -- than the surrounding Samsung

18    transactions.  Is that correct?

19    A. According to Dr. Akemann's analysis, when he does his

20    averaging, yes.

21    Q. Okay.  And you know that Dr. Akemann's math is that he

22    multiplies the $53.3 million by the 4.6 percent premium that

23    he found.  Is that right?

24    A. Yes, that's correct.

25    Q. Does the 4.6 percent premium that he calculated take into

KIDDER - CROSS

1    account these negative premium transactions?

2     A. It does in the mathematical sense.  The problem is

3    that --

4     Q. Thank you.

5     A. -- every single data point that he's calculated is wrong.

6     Q. Sure.  Thank you.

7           Now, let's go to slide number 18.  And this is the

8    one where you said that closer in time equals lower

9    calculated premium.  Do you recall that testimony, sir?

10    A. Yes, sir.

11    Q. All right.  And one of the things you said is that if you

12   move closer in time to a 14-day window, your graphic says

13   more relevant comparisons.  Correct?

14    A. Yes.  I think you put the bar on, yes, the more relevant

15   comparisons.

16    Q. That was -- this is your bar, I believe.  Okay.  That's

17   fine.

18          Now, the other thing that you testified during

19   direct examination relates to slide number 8.  And that is

20   the number of unmatched transactions.  Do you recall that?

21    A. Yes, sir.

22    Q. All right.  Now, if Dr. Akemann had gone, as you

23   demonstrated in slide 18, and used a 14-day window, would

24   that result in more or less unmatched transactions, do you

25   think?

KIDDER - CROSS

1      A. There would be fewer -- sorry.  There would be fewer

2      matched transactions, so there would be more unmatched

3      transactions.

4      Q. So you understand that one of the tradeoffs to making

5      these time restrictions is the number of matched transactions

6      that you would get; it's just a mathematical truth.  Is that

7      correct?

8      A. It's not a tradeoff.  If you do it incorrectly, you are

9      adding in a bunch of irrelevant transactions and it affects

10     your answer.

11            And so my point is that the closer in time you get,

12     the less of a premium you get, which tells me that a good

13     chunk of Dr. Akemann's premium is because he's included

14     transactions that are not relevant.

15     Q. Would you answer my question yes or no.

16            Looking at the data as you did, do you understand

17     that if one chooses only transactions in a shorter period,

18     that would result in more unmatched transactions?  Yes or no.

19     Mathematically.

20     A. I think we answered that one already, yes, that as a

21     mathematical -- the way he does his analysis, yes.

22     Q. Mr. Kidder, you understand that one of the issues in this

23     case is whether Netlist has suffered any damages as a result

24     of Samsung's breach, correct?

25     A. That is correct.

KIDDER - CROSS

1    Q. And another issue is, if there were damages, the monetary

2    amount of those damages, correct?

3    A. That is correct.

4    Q. And you've been involved in plenty of cases where you've

5    answered or helped to give guidance to both of those types of

6    questions, correct?

7    A. That is correct.

8    Q. You've opined in situations about whether a party

9    suffered damages, correct?

10   A. That is correct.

11   Q. And you've opined on many occasions on, if a party did

12   suffer damages, is it a dollar, is it $10, or is it

13   $10 million.  You've done plenty of that work, correct?

14   A. Yes, sir.

15   Q. But that is not what Samsung hired you to do here; isn't

16   that correct?

17   A. That is correct.

18   Q. Right.  Because Samsung did not hire you to give any

19   guidance as to whether Netlist actually suffered harm here.

20   That is not your job, correct?

21   A. That is correct.  As I stated, I was here to review

22   Dr. Akemann's work.

23   Q. Exactly.  In other words, you are not here to tell the

24   jury whether Netlist suffered monetary harm or the amount of

25   monetary harm suffered by Netlist, you are here to take a

KIDDER - CROSS

1    look at Dr. Akemann's report and to try to find flaws with

2    it.  That was what Samsung hired you to do, correct?

3     A. Well, they hired me to review it and see how reliable it

4    was, and asked my opinion on that, yes.

5     Q. Okay.  Did you let Samsung know that one of your

6    expertise and one of your qualifications is to actually

7    answer the question of whether harm occurred here?  Do you

8    think they knew that?

9     A. I -- you would have to ask Samsung what they knew.

10    Q. Okay.

11            MR. LO:  Thank you.  I have no further questions.

12            THE COURT:  Mr. Yoder, any?

13            MR. YODER:  None, Your Honor.

14            THE COURT:  Okay.  Mr. Kidder, you are excused.

15    Thank you.

16            THE WITNESS:  Thank you, sir -- Your Honor.  Sorry.

17            THE COURT:  That's okay.

18            Okay.  Does the -- do the defendants rest at this

19    point?

20            MR. RHOW:  We do, Your Honor.

21            THE COURT:  Okay.  Any rebuttal case?

22            MR. DOREN:  No, Your Honor.

23            THE COURT:  Okay.  So we are done with the testimony

24    at this point.  So what we are going to do now is I'm going

25    to read you the closing jury instructions.

 1              Just like before, at the beginning of the trial, I

 2       read you a bunch of instructions, I'm going to read you the

 3       rest of them.  You will have these instructions back with you

 4       in the jury room.  So don't feel like you need to scratch

 5       everything down.

 6              So you will have these with you.  I'm going to read

 7       you the jury instructions, then we are going to give you a

 8       little bit of a break.  We'll take our afternoon break, and

 9       then we'll come back to do closing arguments.  And you can

10       start deliberating after that.

11              These are the jury instructions.

12              Members of the jury, now that you have heard all of

13       the evidence, it's my duty to instruct you on the law that

14       applies to the case.  A copy of these instructions will be

15       sent to the jury room for you to consult during your

16       deliberations.

17              It is your duty to find the facts from all the

18       evidence in the case.  To those facts you will apply the law

19       as I give it to you.  You must follow the law as I give it to

20       you, whether you agree with it or not, and you must not be

21       influenced by any personal likes or dislikes, opinions,

22       prejudices, or sympathy.

23              This means you must decide the case solely on the

24       evidence before you.  You will recall that you took an oath

25       to do so.  Please do not read into these instructions or

1    anything I may say or do or have said or done that I have an

2    opinion regarding the evidence or what your verdict should

3    be.

4           Before you begin your deliberations, you should

5    elect one of your members as the presiding juror.  The

6    presiding juror will preside over the deliberations and serve

7    as the spokesperson for the jury here in court.

8           You shall diligently strive to reach agreement with

9    all of the other jurors, if you can do so.  Your verdict in

10   this case must be unanimous.  Each of you must decide the

11   case for yourself, but you should do so only after you have

12   considered all of the evidence, discussed it fully with the

13   other jurors, and listened to their views.

14          It is important that you attempt to reach a

15   unanimous verdict, but of course only if each of you can do

16   so after having made your own conscientious decision.  Do not

17   be unwilling to change your opinion if the discussion

18   persuades you that you should, but do not come to a decision

19   simply because other jurors think it's right or change an

20   honest belief about the weight and effect of the evidence

21   simply to reach a verdict.

22          Because you must base your verdict only on the

23   evidence received in the case and on these instructions, I

24   remind you that you must not be exposed to any other

25   information about the case or to issues it involves, except

1     for discussing the case with your fellow jurors during your

2     deliberations.  Do not communicate with anyone in any way,

3     and do not let anyone else communicate with you in any way

4     about the merits of the case or anything to do with it.

5            This includes discussing the case in person, in

6     writing, by phone, tablet, computer, or other means, via

7     e-mail, via text message, or any Internet chat room, blog,

8     website, or application, including but not limited to

9     Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat,

10    TikTok, or any other form of social media.

11           This applies to communicating with your family

12    members, your employer, the media or press, and the people

13    involved in the trial.

14           If you are asked or approached in any way about your

15    jury service, or anything about the case, you must respond

16    that you have been ordered not to discuss the matter and to

17    report the contact to the Court.

18           Do not read, watch, or listen to any news or media

19    accounts or commentary about the case, or anything to do with

20    it.  Although I have no information that there will be news

21    reports about this case, do not do any research such as

22    consulting dictionaries, searching the Internet, or using

23    other reference materials, and do not make any investigation

24    or in any other way try to learn about the case on your own.

25           Do not visit or view any place discussed in the

1      case, do not use Internet programs or other devices to search

2      for or view any place discussed during the trial.  Also, do

3      not do any research about the case, the law, or the people

4      involved, including the parties, the witnesses, or the

5      lawyers, until you have been excused as jurors.

6              If you happen to read or hear anything touching

7      about -- touching on the case in the media, please report it

8      to me right away.

9              These rules protect each party's right to have this

10     case decided only on evidence that has been presented here in

11     court.  Witnesses here in court take an oath to tell the

12     truth, and the accuracy of their testimony is tested through

13     the trial process.

14             If you do research or investigation outside the

15     courtroom or gain information through improper

16     communications, then your verdict may be influenced by

17     inaccurate, incomplete, or misleading information that has

18     not been tested by the trial process.

19             Each of the parties is entitled to a fair and

20     impartial jury, and if you decide the case based on

21     information not presented in court, you will have denied the

22     parties a fair trial.

23             Remember, you have taken an oath to follow the

24     rules, and it is very important that you follow these rules.

25             A juror who violates these restrictions jeopardizes

1      the fairness of these proceedings, and a mistrial could

2      result, which could result in the entire trial process

3      starting over.

4              If any juror is exposed to outside information,

5      please notify the Court immediately.

6              If it becomes necessary during your deliberations to

7      communicate with me, you may send a note through the bailiff,

8      signed by any one or more of you.  No members of the jury

9      should ever attempt to communicate with me except by a signed

10     writing.

11             I will not communicate with any members of the jury

12     on anything concerning the case except in writing or here in

13     open court.

14             If you send out a question, I'll consult with the

15     lawyers on the question before answering it, which may take

16     some time.  You may continue your deliberations while waiting

17     for the answer to any question.

18             Remember that you are not to tell anyone, including

19     the Court, how the jury stands, whether in terms of vote

20     count or otherwise, until after you have reached a unanimous

21     verdict or have been discharged.

22             A verdict form has been prepared for you.  After you

23     have reached a unanimous agreement on a verdict, your

24     presiding juror should complete the verdict form according to

25     your deliberations, sign it and date it, and advise the

1    bailiff that you are ready to return to the courtroom.

2         Now, a deposition, as we've discussed, is the sworn

3    testimony of a witness taken before trial.  The witness is

4    placed under oath to tell the truth, and lawyers for each

5    party may ask questions.  The questions and answers are

6    recorded.  Insofar as possible, you should consider

7    deposition testimony presented to you in lieu of court

8    testimony, in lieu of live testimony, in the same way as if

9    the witness had been present to testify.

10        Do not place any significance on the behavior or

11   tone of any person reading the questions on the video.

12        You've heard testimony of a witness who testified in

13   the Korean language.  Witnesses who do not speak English or

14   are more proficient in another language testify through an

15   official court interpreter.  Although some of you may know

16   the Korean language, it's important that all jurors consider

17   the same evidence; therefore, you must accept the

18   interpreter's translation of the witness's testimony.  You

19   must disregard any different meaning.

20        You must not make any assumptions about a witness

21   solely based on the use of an interpreter to assist that

22   witness or party.

23        You've heard testimony by experts who testified to

24   opinions and the reasons for those opinions.  This opinion

25   testimony is allowed because of the education or experience

1    of these witnesses.

2            Such opinion testimony should be judged just like --

3    should be judged like any other testimony.  You may accept it

4    or reject it and give it as much weight as you think it

5    deserves, considering the witness's education and experience,

6    the reasons given for the opinion, and all of the other

7    evidence in the case.

8            Certain charts and summaries not admitted into

9    evidence have been shown to you in order to help explain the

10   contents of books, records, documents, or other evidence in

11   the case.

12           Charts and summaries are only as good as the

13   underlying evidence that supports them.  You should,

14   therefore, give them only such weight as you think the

15   underlying evidence deserves.

16           Certain charts and summaries have been admitted into

17   evidence to illustrate information brought out in trial.

18   Charts and summaries, again, are only as good as the

19   testimony or other admitted evidence that supports them.  You

20   should, therefore, give them only such weight as you think

21   the underlying evidence deserves.

22           When a party has the burden of proving any claim by

23   a preponderance of the evidence, it means you must be

24   persuaded by the evidence that the claim is probably more

25   true than not true.  You should base your decision on all of

1     the evidence, regardless of which party presented it.

2          Now, the elements of a cause of action for breach of

3     contract are:  Formation of a contract between plaintiff and

4     defendant, performance by plaintiff, defendant's failure to

5     perform, and resulting damages.

6          The basic principle of damages in a contract action

7     is to leave the injured party in as good a position as it

8     would have been if the contract had been fully performed.  It

9     is equally fundamental that the injured party should not

10    recover more from the breach than the party would have gained

11    had the contract been fully performed.

12         Where actual damages have been pleaded, and are to

13    be proved, plaintiff must establish a causal relationship

14    between the breach of contract and the damages.  The burden

15    is on the plaintiff to establish -- plaintiff to establish

16    damages.  Where actual damages are claimed, the plaintiff

17    must show actual damages.  It must lay a basis for a

18    reasonable estimate of the extent of the harm.

19         The general rule is that when the subject of the

20    contract has a market value, the measure of damages for

21    breach of contract is the difference between the contract

22    price and the market price.

23         If you decide to make an award of damages to

24    Netlist, you must next decide whether the amount of damages

25    you have awarded to Netlist should be reduced in whole or in

1    part because Netlist fails to use reasonable efforts to

2    reduce or avoid its losses.

3         Samsung bears the burden of proving by a

4    preponderance of the evidence that Netlist failed to use

5    reasonable efforts to reduce or avoid its losses.

6         The law requires a party injured by a breach of

7    contract to make reasonable efforts to reduce or avoid its

8    losses.  If the injured party fails to do so, then it may not

9    recover for any resulting increased loss.

10        The duty to reduce or avoid damages arises when it

11   is no longer reasonable to believe that the other party will

12   perform the contract.  If the injured party made reasonable

13   efforts to reduce or avoid its losses, it does not matter if,

14   in hindsight, another better means of limiting the financial

15   injury was possible.

16        If you find that Samsung established that Netlist

17   failed to use reasonable efforts to reduce or avoid its

18   losses after it was no longer reasonable to believe that

19   Samsung would perform the contract, then you should proceed

20   to calculate the amount that the damages sustained by Netlist

21   should be reduced and make no further calculations.

22        However, if you find that Samsung did not establish

23   that Netlist failed to use reasonable efforts to reduce or

24   avoid its losses after it was no longer reasonable to believe

25   that Samsung would perform the contract, then you should not

1    reduce the amount of Netlist's damages.

2           Okay.  Those are the jury instructions.  As I said,

3    you will have those back in the jury deliberation room.

4           We are going to take a break to let the parties kind

5    of set up for closing arguments.  So we'll come back in

6    10 minutes, we'll hear closing arguments, and then you will

7    be off to deliberate.  Thank you very much.

8           (Thereupon, the jury retired from the courtroom.)

9           THE COURT:  Everybody have a seat.  So when the --

10   when we come back, we'll do closing arguments, and then

11   we'll -- the jury will go in and deliberate.  What I'm going

12   to tell the jurors is they are welcome to stay and deliberate

13   as late as they want.  They are also welcome, if they want to

14   leave at 4:30 and come back on Monday, they can do that as

15   well.

16          Sound okay with everybody?

17          MR. YODER:  That's fine, Your Honor.

18          I do want to just state for the record an objection

19   to giving the pattern instruction paragraph that talks about

20   the general rule being when the subject of a contract has a

21   market value.  There was no evidence of that.  The damage

22   claim was cover damages.  We had asked for a special

23   instruction to describe cover damages for the jury.

24          So I just want the record to be clear that we object

25   to that portion that was given and do object to the Court's

```
 1          not giving the special instruction on cover damages as we
 2          requested.
 3                      THE COURT:  Thank you very much.
 4                      So we will stand in recess for 10 minutes, and then
 5          we'll start with closing.
 6                      On time, I think both sides have at least a half
 7          hour to put on their closing argument.  But if there is any
 8          question about timing, I can get you at least the Court's
 9          numbers.
10                      MR. YODER:  I think my calculation was 35 minutes,
11          so it's pretty close.
12                      THE COURT:  I've got Samsung at 33, Netlist at 31.
13          So it's, I mean, we can -- we can -- I think we'll -- we
14          ought to be fine.
15                      MR. DOREN:  Thank you, Your Honor.
16                      (Thereupon, there was a brief recess.)
17                      (Thereupon, the jury returned to the courtroom.)
18                      THE COURT:  Okay.  Mr. Doren, go ahead with your
19          closing argument.
20                      MR. DOREN:  Thank you, Your Honor.  And I'll reserve
21          10 minutes for rebuttal.
22                      THE COURT:  Great.
23                      MR. DOREN:  Ladies and gentlemen of the jury, it's
24          my pleasure to see you again after two and a half days of
25          sitting with my back to you.
```

 1          As you now know and have a much better understanding
 2     of, despite the fire hose you have been drinking from, this
 3     is a damage phase of this case after Samsung has been found
 4     to have breached its contract with Netlist.
 5          And that contract, as you also know -- and the
 6     clause of that contract that is at issue here is 6.2.  And it
 7     is an obligation of Samsung to supply NAND and DRAM products
 8     to Netlist on Netlist's request.
 9          And you know that Netlist submitted requests to
10     Samsung.  They did that in the form of formal forecasts, be
11     it on a quarterly or a monthly basis; they did that on an
12     ad hoc basis when there was a particular customer that had a
13     need.
14          But they would reach out to Samsung and they would
15     request that products be provided, that they be made
16     available.  And be supported, was the word we learned today.
17          And we also learned that in the spring of 2017, the
18     nature of the relationship between Samsung and Netlist
19     changed, giving rise to this breach and defining the damage
20     period for which Netlist is asking you to award damages.
21          So I would like, during my few minutes here with
22     you, to just review quickly what that framework is that gave
23     rise to the damages, and then we'll turn to the calculation
24     of those damages.
25          Now, you will recall that Mr. Hong testified, and

 1      there was -- it wasn't disputed at all that the purchases

 2      that Netlist made from Samsung of memory chips and SSDs --

 3      it's amazing all the words we've learned this week -- memory

 4      chips and SSDs went from a few thousand dollars a month, at

 5      the time the JDLA was signed, to millions of dollars a month

 6      by the time of the breach.

 7           And we also know from today, Mr. Knuth told us that

 8      he was extremely confident, years later, that he could get

 9      them to $2 to $3 million immediately.  Because -- either

10      because he's that good a salesman or because he knew that

11      since Netlist was paying millions of dollars a month several

12      years before, it would gladly do so again.

13           Mr. Knuth also told you that he knew that when

14      Samsung could not get what it -- excuse me -- when Netlist

15      could not get what it needed from Samsung, it would have to

16      go to third-party resellers if it was going to sustain its

17      business.

18           Now, in early 2017, Samsung changed the way it

19      interacted with Netlist.  Now, after the break, and after

20      Mr. Knuth met with his lawyers, he came back and said, Well,

21      we treat all our customers the same.

22           I don't really care.  Because what he also told you

23      was out of his 65 customers, Netlist was the only one that

24      had a contract with provision 6.2 in it.

25           And in February 2017, Mr. Knuth testified that he

1    began to tell Netlist, Don't send POs.  Don't send purchase

2    orders.  Headquarters does not want even purchase orders sent

3    until we confirm to you that we are willing to supply you.

4    Flipping the contract obligation on its head.  And saying

5    instead of we will supply you upon request, we will supply

6    you when we feel like it.

7            And you see again in March, Without headquarter's

8    support plan, we don't accept purchase orders.  Two days

9    later in March, Please stop sending purchase orders.

10           Now, why does that matter?  Well, specifically, it

11   matters because you may remember way back on day 2 of this

12   trial, we heard lots and lots of questions about, Well, can't

13   you just track through?  You take the unpaid purchase order,

14   you track it through to the reseller transaction, and you can

15   see if it was more or less.

16           No one was telling you yesterday, until Mr. Knuth

17   told you today, that there were no purchase orders for most

18   of these unfulfilled transactions.  Because starting in

19   February 2017, two months before the period we seek damages

20   for, which it starts in April, they told us not -- Samsung

21   told Netlist not to send purchase orders, to simply call, see

22   if they would be willing to help.  And then if they're not,

23   don't submit a purchase order, if you know what's good for

24   the relationship.

25           And remember, Mr. Knuth said that Netlist was doing

1    what it could for the good of the relationship when it

2    canceled a $2 million backlog, $2 million back order, to help

3    them clean up their books.

4            And that was the other thing that was going on in

5    the spring of 2017.  We saw on Exhibit 7 that the original

6    decision was to take the support for Netlist to zero, knowing

7    full well that Samsung was nearly 100 percent of their

8    support in revenue.

9            So what did Samsung know?  They knew that if Netlist

10   wouldn't have support and revenue, it was going to have to go

11   to resellers.  It wasn't a mystery.  They didn't need to be

12   told.  They understand -- understood it full well.  And that

13   was the message they were delivering to Netlist, was to go do

14   this, despite having Section 6.2 legally binding them to

15   provide the supply.

16           So on July 5th, after we saw the discussions around

17   zero, there was a discussion then around a $500,000 --

18   Mr. Knuth called it allocation, we have called it a cap.  I

19   think it's all the same, a capped allocation.

20           And then you will also remember that it was

21   ultimately pushed up to a million dollars about a week later.

22   It was the e-mail about JS Choi graciously has agreed to

23   increase the allocation to a million.

24           Well, so keep in mind now, we are in July 2017.

25   There is now an allocation cap of $1 million.  Three or four

1       months before, Netlist was purchasing multiple millions each

2       month.

3               So Samsung now knows that Netlist has to go

4       elsewhere to fill that gap, the gap in the supply that

5       Netlist was not providing, because it put a hard cap in

6       place.

7               And that cap stayed there.  Because you will

8       remember this, this document, where Mr. Knuth wrote -- in

9       April now.  We are a year later, 2018.  He asked if the

10      allocation could be increased.  He said that he could get

11      Netlist almost immediately to $2 to $3 million.  He said that

12      Netlist is currently limited to $500,000 per month starting

13      last month, again.  And meaning that in February, the

14      allocation had been zero.

15              So it was a million dollars until February 2018,

16      when it went to zero for a month, and then it went back to

17      $500,000.  And you heard Mr. Knuth say it stayed there.

18      There was this hard allocation cap in place, with Samsung

19      knowing full well that Netlist needed to go elsewhere to fill

20      its need.

21              What you also heard was testimony from Mr. Chuck

22      Hong, Mr. Paik Ki Hong, Mr. Jiang, Mr. Yu that when they

23      needed memory chips and SSDs, despite this cap, they would

24      always call, they would always reach out to Mr. Knuth, always

25      reach out to Samsung first.  First, before they went

 1     elsewhere.  Because they liked the warranty, they liked

 2     having to make one phone call instead of five, they liked one

 3     invoice instead of five, and they liked the security in

 4     knowing they were buying from the man, from the company

 5     itself.

 6              And you also heard testimony that the price there

 7     was generally better.  You heard Mr. Paik Ki Hong testify

 8     that it was 10 to 15 percent cheaper.  Or, rather, resellers

 9     were 10 to 15 percent more expensive.  Sometimes up to

10     50 percent more expensive.

11              Now, you have heard assertions that resellers are

12     cheaper.  You heard Mr. Knuth say resellers are cheaper

13     because that is how they stay in business.

14              He didn't really explain that one.  He didn't really

15     explain how a reseller can stay in business by selling for a

16     lower price than the entity that makes the product that they

17     are then selling to the reseller who sells to someone else.

18              But there is no data.  There is no evidence coming

19     in from Samsung that resellers are cheaper.  The only

20     testimony on that topic is from the people that were

21     purchasing from the resellers, and those were the people at

22     Netlist.

23              So the period we are looking at, the JDLA was signed

24     back in November 2015.  And then in February, purchase orders

25     started coming out of play.  There was a zero allocation

1    threat in May.  The $500,000, and then million dollar cap was

2    put in place in July.  Zero in February 2018.  And then

3    finally in March 2019, a $500,000 cap, on which the record is

4    that it continued on for the rest of the relationship.  Until

5    Netlist finally terminated the JDLA since it was not getting

6    what it needed from the relationship in July 2020.

7          Now, you have seen this diagram a fair amount.  And

8    you will remember in opening, I told you that what Samsung

9    wants you to do is ignore the entire right-hand side of this.

10   They want you to focus simply on purchase orders.

11         And you've heard now, and you now understand, that

12   the action really is on the right side of this diagram,

13   because once a forecast or a request or, as Mr. Knuth called

14   it in his e-mail, a Netlist product demand, once that was

15   rejected and Netlist was not permitted to submit a purchase

16   order, they had to go to resellers.

17         And remember Lane Kim, the gentleman who testified

18   via video from Korea, and his testimony.

19            (Thereupon, the video was played.)

20         So now let's turn to the thing that I'm sure you've

21   all come to love most, Excel spreadsheets.  And fortunately,

22   this is as close as we are going to get to any of them.

23         But I do want to talk about some of the results that

24   have been drawn from them.  And you heard Mr. Kidder up there

25   throwing rocks at Dr. Akemann.  And so the experts are

1    feuding, but there is some things that nobody is really

2    disputing about what that data shows.

3            And part of what it showed was this:  That right up

4    until about May 2017, just before May 2017, Netlist orders to

5    Samsung on a monthly basis, measured in dollars, were going

6    up.  They were going up each month.  And there was some

7    dispute over what the product was in March that got ordered.

8    But the bottom line is the trend is up.

9            And once it drops -- and why does it drop, and what

10   does that line up with?  Well, it lines up with the period

11   where there is the internal communications within Samsung

12   talking about canceling unconfirmed orders from Netlist and

13   not accepting purchase orders from Netlist.

14           And so what was the result?  Well, the result was

15   exactly the intended one, which was fewer orders from Netlist

16   to Samsung.  Because now the only orders that were accepted

17   were those that Samsung promised that it would fill, and then

18   a purchase order was submitted.

19           So what did Netlist do?  Well, the data shows us

20   that, too.  Netlist went to resellers.

21           Now, counsel for Samsung, you know, called this an

22   animal of a different color, might have been the phrase.  But

23   this is a cumulative line.  It shows the total amount of

24   reseller purchases.  Nobody is hiding from that.

25           The point is this:  Look where that line is in

1    April 2017.  It's at about zero.  What was happening in

2    April 2017?  No more purchase orders.  And let's cut their

3    unsupported backlog.  And then let's set caps.  That is what

4    was going on.  And what happened was Netlist turned to

5    resellers.  And that is what the data shows.  And no one has

6    disputed this data.

7          So when we talk about a causal link between the

8    breach and the injury, and the need to go to resellers -- and

9    we are going to hear, I am certain, lots of talk about all

10   the reasons we went to resellers.  Look when we started going

11   to resellers.  Facts don't lie.

12         And when you overlay the two, it becomes even more

13   obvious.  We started going to resellers when Samsung quit

14   delivering the product upon request under Section 6.2.

15         Now, Dr. Akemann testified yesterday -- it was

16   either yesterday or last week.  It's hard to remember.  And

17   Dr. Akemann told you what he did.  And what he did was he

18   took all of the data, all of the transaction data in terms of

19   invoices, in purchase orders, related to resellers and

20   related to Samsung.

21         And remember, though, that purchase orders to

22   Samsung, only so many were permitted to be -- to be submitted

23   to Samsung after April 2017.

24         And what Dr. Akemann did is he sorted through that

25   data.  And he first matched up parts, making sure we are

1        dealing with the exact same product.  And then he allowed for

2        transaction volume.  You know, are these roughly the same

3        size?  Are we taking into account pricing?  And then he used

4        his 90-day-in-each-direction window.

5               Now, I noticed when Mr. Kidder was up there and he

6        was poking -- you know, pointing out problems with that, he

7        went one direction.  He went forward from the data point that

8        he was looking at.

9               The reason you go 90 days in each direction is

10       because you heard testimony that prices changed on a

11       quarterly basis for some products, monthly basis for others.

12       And by going both directions, you are picking up trends in

13       that pricing.

14              So if it's trending up and then down, you are

15       getting both.  If it's trending up, you are capturing the

16       midpoint.  If it's trending down, you are capturing the

17       midpoint.  That was the rationale for going 90 days in both

18       directions.  And 90 days happens to be a quarter.

19              So it was a time control to capture the price

20       variations in the market.  Now, was it perfect?  Well,

21       Dr. Akemann didn't claim it was perfect.  It was the best he

22       could do with the data he had, given that he was analyzing

23       data for which purchase orders were not available for most of

24       the unfulfilled requests.

25              And Dr. Akemann calculated a price premium of

1    4.6 percent.  Y'all remember that.  And you just heard

2    Mr. Kidder acknowledge that that 4.6 percent mathematically

3    takes into account the fact that Netlist did indeed get lower

4    prices from some third-party resellers than it would have

5    gotten from Samsung.  And he captured that by the discount --

6    or, excuse me, by that differential being 4.6 percent instead

7    of some significantly higher amount.

8         He then applied that by the $53 million that you saw

9    started at about zero, started at about April of 2017, and

10   went up from there.  And he came up -- came to -- calculated

11   $2.474993 (sic).  And you may want to write that number down

12   because that is the number we are going to ask you for.

13        Now, Mr. Kidder did not have an opinion about what

14   the damage was.  He wasn't hired to figure out if Netlist was

15   damaged, because -- well, I don't know why.  One might

16   suspect they didn't want to know the answer.  Because if the

17   man came up with a positive damage number, he wouldn't do

18   them a lot of good on the stand.

19        But what we do know about Mr. Kidder is that when he

20   took Dr. Akemann's data and took it down to 14 days, he still

21   had a 2 percent price premium.  He was still in a positive

22   damage range.  And he very clearly stated that while he has

23   testified dozens of times on exact damage calculations, he

24   wasn't here to offer one, he was just here to say the other

25   one wasn't any good.

1          It's convenient.  And what you will find is that the

2     jury instruction you are going to -- you have received, and

3     you will read, is that the number may not be perfect.  It

4     needs to be a reasonable estimate.  And taking in all the

5     factors and all the real-life messiness that we've had to

6     deal with here, we have given you a reasonable estimate.

7          So when you retire to your deliberations, we are

8     going to ask you to find that Netlist did prove that it

9     suffered damages as a result of Samsung's failure to fulfill

10    Netlist's orders consistent with Section 6.2 of the JDLA.  We

11    are going to ask you to find that the amount of those damages

12    is $2,474,993.

13         And we are going to ask you to find that Samsung

14    failed to prove that -- well, that Samsung did not prove that

15    Netlist failed to use reasonable efforts to reduce or avoid

16    those damages.

17         And you know that is true, because everybody agreed

18    that when you went to resellers, you called five or six of

19    them.  When you went to the resellers, you did price shop.

20    Mr. Knuth said he knew that.  And you heard the folks from

21    Netlist tell you that that is exactly what they did.  They

22    tried to minimize the damage caused, but they could only

23    accomplish so much.

24         Ladies and gentlemen, I will spend a few more

25    minutes with you after counsel for Samsung completes his

1    closing.  I want to thank you again for your time and

2    attention and your hard work.

3              THE COURT:  Okay.  Counsel for Samsung?

4              MR. RHOW:  Yes.  We need to switch over the

5    technology.

6              Your Honor, may I proceed?

7              THE COURT:  Please.

8              MR. RHOW:  Ladies and gentlemen, first I want to

9    thank you guys for coming on this mad dash with us.  It was a

10   very fast trial.  A lot was thrown your way.  We apologize

11   for the time constraints, but it is more efficient this way.

12             I'm going to try to wade through the evidence with

13   you as quickly as I can.  There was a lot of evidence, and

14   I'm going to try to summarize it.  And hopefully it's helpful

15   to you.

16             As I indicated during the opening, the sole question

17   before all of you is really damages.  I agree with Mr. Doren

18   on that.  And that is, of course, the first question in the

19   verdict form you got.  Are there damages caused by Samsung,

20   that are Samsung's fault, as a result of the unfulfilled

21   orders?

22             Before you get to Question 1, though, you first have

23   to understand who has the burden of proof.  And it is Netlist

24   who has the burden of proof.  Mr. Kidder has no obligation to

25   do any calculation.  Nor does he have all the documents that

1    Netlist has to do that.

2            His only obligation -- I'm sorry.  It is Netlist's

3    obligation, and only Netlist's obligation.  Not your

4    obligation, not Samsung's obligation to prove the facts.  And

5    it's very important, this burden, because if you have

6    difficulty back there wading through the evidence, doing the

7    matching that I talked about, that is not your fault.  That

8    is not Samsung's fault.  That means the burden of proof has

9    not been met.

10           Now, the first question in this trial was always:

11   Did Netlist prove the starting point of Mr. Akemann's

12   calculation?  $53 million in reseller purchases that were

13   involuntary.  That is the starting point I asked you in

14   opening, and that is what we analyzed during the course of

15   the trial.

16           We know that starting point is not true, because we

17   know from Netlist's own employees they went directly to

18   resellers.

19           We see this from Exhibit 103-2.  They shopped with

20   other folks, went to distributors when there were cheaper

21   prices.  Mr. Yu testified very specifically, I go to

22   resellers for faster lead times.  That does not mean Samsung

23   is rejecting the product.  It just means if I want it faster

24   than Samsung has it available to me, I go to the reseller

25   because the lead time is slower.

1          And he admitted that.  They regularly went to

2    resellers.  Not because they were forced to go by Samsung,

3    but because they wanted to go on their own.  And Mr. Knuth

4    explained that, in this industry, it's very price-sensitive.

5    Everyone is price shopping.  That is a given, and that makes

6    sense.

7          The agreement.  The agreement contemplated this very

8    situation because the agreement says, under 6.4, that Netlist

9    is not required to buy from Samsung.  Chuck Hong testified he

10   wanted the freedom to go to resellers if he wanted.

11         The documents.  This is the e-mail from March 15,

12   2018, Steven Yu.  And he explains:  Not only do they go to

13   resellers, it is always the process.  They always compare

14   pricing to the market.  And as a result, they are selective

15   about what they take in.

16         They don't go to Samsung first.  They check pricing

17   first, then they decide whether to go to Samsung.  And all of

18   these situations reduce the $53 million starting point to a

19   lesser amount.

20         This is why you are here.  Literally, to analyze

21   Mr. Akemann's starting point and his calculation.

22         The e-mails that Mr. Doren went into, those e-mails

23   went to the breach issue.  That issue has been resolved, and

24   we are not here to relitigate that issue.  We are here to

25   decide whether the $2.4 million is supported as a

1          calculation.  That is why we are here.

2                These documents tell you that it must be reduced by

3          some amount.  And if they haven't shown you what that amount

4          is, because it's their burden of proof, the damages are not

5          there.

6                Now, perhaps the most important testimony on this

7          issue came from Mr. Steven Yu.  Recall him on the stand

8          telling me that based on the times they went to a reseller,

9          it was a minority of cases where it was because Samsung did

10         not approve the order.

11               From that testimony alone, the $53 million must be

12         reduced by at least 50 percent.  Simple math.  He said it's a

13         minority of cases.  They are starting at $53 million.  We

14         know more than 50 percent of that is not Samsung's fault.

15         That was his testimony.  We went back and forth, as you

16         recall, but that is what came out of that testimony.  And

17         that is clear.

18               Now, it also makes sense, by the way, that they

19         would be price shopping, because they are resellers, too.  I

20         asked Mr. P. K. Hong, Do you care about price?  And he said

21         no.

22               It doesn't make sense.  Because if you look at their

23         business, their resale business, just as Mr. Doren showed

24         you, was going up.  They, themselves, were taking Samsung

25         chips, buying them from other resellers, buying them from

1    Samsung, and reselling them.  They're a broker.

2            Look at their margins.  Right-hand column of 1086.

3    Very tight.  Of course they are price-sensitive.  Of course

4    they are price shopping.  Of course there are times when they

5    are going straight to resellers and not to Samsung, because

6    this is the nature of their business.

7            They are brokers.  And this is the majority of their

8    business, as they testified.  This is simple common sense

9    that may have been buried during the course of the trial

10   because we threw a lot at you.

11           This document is in evidence.  Clearly shows what

12   they were doing during this time frame.  They are just trying

13   to buy chips from anywhere.  They buy a chip, they are

14   selling it; buying a chip, selling it.  They don't care if

15   it's a reseller or Samsung or whoever.  And they are not

16   going to Samsung first, because that reduces the amount of

17   their business.  Of course they are going to resellers on

18   their own.

19           Now, not only did Netlist fail to prove $53 million

20   in unfulfilled requests that -- I'm sorry.  Not only did they

21   fail to prove $53 million in reseller purchases that were all

22   our fault.  Remember the matching.  They also then have to

23   show $53 million in unfulfilled requests that then match to

24   the $53 million in reseller purchases.  And they didn't do

25   that.

1          The matching that Mr. Akemann acknowledged needs to

2     occur did not occur.  And they have a $50 million gap that

3     was never filled during the course of this trial.  You have

4     not seen one calculation from Mr. Akemann, from anyone, that

5     lets you fill this gap that exists.

6          We know forecasts don't do it.  Forecasts aren't

7     requests.  Mr. P. K. Hong said on the stand, point blank, Are

8     forecasts binding?  They are not.

9          Mr. Jiang confirmed that if there is no PO, if it's

10    a request by e-mail, that is not a request.  That is not

11    binding.  That can't fill the $50 million.

12         Purchase orders are requests; we do agree.  And

13    there is a lot of testimony on that.  They have quantity,

14    they have price, they have commitment.  It's common sense

15    they are.  But that only makes up $3.7 million of the

16    $53 million in reseller purchases.  The $50 million gap was

17    never filled by anyone during the course of this trial.

18         Now, a lot of time was spent -- sorry, I'm moving

19    fast.  A lot of time was spent on these forecasts, and I do

20    want to make a couple of points about them.

21         First of all, in terms of the JDLA -- sorry -- the

22    JDLA was signed in November 2015.  Recall the testimony from

23    Chuck Hong, who said at that time forecasts were not being

24    used.  $200 million of business from 2000 to 2015 are

25    processed through purchase orders.  That was the primary

1    vehicle.  Chuck Hong said it.  P. K. Hong also said it.

2            So how was Samsung supposed to know in November of

3    2015 that this provision meant that forecasts count, that

4    forecasts are equivalent to purchase orders, when the course

5    of conduct for 15 years has been to the contrary?  It doesn't

6    make sense.

7            Netlist, interestingly, has never claimed that

8    forecasts are binding.  They didn't do it at the time of the

9    JDLA.  They didn't do it in the JDLA.  You would expect them

10   to have negotiated that into the JDLA if that is what they

11   thought.  During the entire time the JDLA is operative, you

12   haven't seen one e-mail where they say, Hey, wait a minute,

13   this is a binding forecast.  You've got to fulfill the whole

14   thing.

15           You don't see it in the May 2020 termination letter.

16   You don't see it in the July 20th breach notice.  I got those

17   mixed up.  But those two letters, at the end, not once do

18   they go, Hey, by the way, those forecasts were binding.  You

19   breached them.  Never mentioned.  The first time everyone --

20   you have seen evidence that forecasts are binding is a

21   position of Netlist is this trial.

22           Now, something interesting came up just today that I

23   have to mention.  We have been talking about who has the

24   evidence to verify the amount of the request.

25           Why doesn't Mr. Akemann do it -- I'm sorry.  Why

1    doesn't Mr. Kidder do it?  Because the evidence is sitting

2    with Netlist.  Why are we spending time speculating during

3    these allocation limitation periods what Netlist would have

4    ordered?  We know we don't have that evidence.  And that is

5    why Mr. Akemann is here, to just speculate as to what they

6    would have ordered.

7            But we do.  We do, and we never saw it during the

8    course of this trial.  Exhibit 1020 came in late through

9    Ms. Has.  She admits there is nonbinding forecasts that the

10   customers of Netlist give to them.  Why is that important?

11   Because Mr. Yu admits that he doesn't make a request to

12   Samsung until he has a firm demand from his customers.

13           That demand from Netlist customers is not affected

14   by all this allocation limitation.  They are not involved in

15   that.  They are making requests.  Netlist then makes the

16   request to Samsung.

17           And so the best evidence of what Netlist really

18   wanted, really requested during the time frame is not

19   allocation caps and Akemann opinions and speculation.  Show

20   me the forecasts.  Show me the POs from Netlist's customers.

21   That would be the best evidence of what they actually needed

22   and requested from that period of time.

23           Dr. Akemann never looked at that.  Not a single

24   person here mentioned or showed to you those actual POs and

25   those actual forecasts.  And that would tell you whether it's

1    $53 million, $10 million, $5 million, or zero, whatever that

2    amount.  That would have been the best way to do it, not

3    speculation.

4            So rather than guess about what Netlist would have

5    ordered, the evidence is sitting somewhere in Netlist's files

6    and was not presented.

7            Now, in addition to Netlist having failed to prove

8    $53 million in reseller purchases that were our fault,

9    $53 million in unfulfilled requests that can match up, they

10   also failed to prove the third component, which is even the

11   $53 million requests are also -- wasn't caused by something

12   other than Samsung, sorry.

13           Now, first thing I want to mention is that if you

14   look at the two periods of time, everyone agrees the first

15   line was a period of full compliance.  Samsung and Netlist

16   were getting along great.  Chuck Hong was happy, P. K. Hong

17   was happy.  But look what this chart shows you.  In that time

18   frame, there was $25 million in unfulfilled purchase orders.

19   In the period of time when we are supposedly in breach, the

20   number is only $3.7 million.

21           Now, some of that will be explained, I'm sure

22   Mr. Doren will argue, by this allocation issue.  But my point

23   is a broader one, which is the mere fact that an order is not

24   fulfilled does not answer -- or does not mean that it was

25   Samsung's fault.  Clearly, it doesn't.  Because they do not

1    claim they were in breach during that time frame.

2         The reality is that during that time frame, and

3    during all time frames, Netlist regularly canceled orders

4    voluntarily.  It canceled orders because product didn't

5    exist, because they didn't like the price, they couldn't

6    afford it, and Netlist's customers changed their minds.  I'm

7    not going to have time to go through all of them.

8         The point, once again, is this chops into the

9    $53 million in unfulfilled requests.  That number -- even

10   assuming they can prove $53 million, whatever that number is

11   needs to be reduced.

12        Burden of proof.  Whose job was that to do that?  We

13   are pointing out the deficiencies and the problems with the

14   calculation.  I've shown you the admissions from Netlist's

15   witnesses saying each of these phenomena existed, but we

16   don't have the numbers.  We don't have any way to calculate

17   this.

18        And that means you cannot make a reasonable

19   estimate.  You can't get to reasonable certainty, like you

20   are being tasked to do by the jury instructions.

21        Now, I want to make a quick point about various

22   things.  Purchase orders being only submitted up to the

23   amount of the support, the fact that Mr. Neal Knuth at times

24   told Netlist to only submit purchase orders when there was

25   support.  Which, by the way, is common sense.

1          That is what you are doing when you are trying to

2     help your customer have transparency.  I'm not sure the lead

3     times work out, so please wait to submit the purchase order.

4     Wait until we have a better lead time with you.  This is not

5     Neal Knuth holding the product.  This is him trying to make

6     the process work.

7          The key on all these things that were raised

8     primarily on Mr. Knuth's testimony, these practices, whether

9     allocation, confirmed POs, approval before POs, they existed

10    during the period from 2015 to 2017, when Netlist and Samsung

11    were doing just fine.  When Netlist was conceding and

12    admitting that Samsung was in compliance under the agreement.

13         Let me talk briefly about credit.  Credit came --

14    was undisputed during the course of this case.  Exhibit 1350

15    tells you there is a $400,000 credit limit as of April 2018.

16    The math is really simple.  If you have a $4,000 credit

17    limit, isn't that a better explanation of why orders are

18    dropping to around a half million, to around a million, if

19    your credit limit is not allowing you to buy $10 million a

20    month?  Because that is what the evidence shows in 1350.

21    That was the credit limit, not disputed.

22         The other issue is:  If you look at the purchase

23    orders, a lot of them relate to ELO products.  So when

24    Samsung is not fulfilling an ELO product, is it their fault

25    that the product is end of life and not available?

1                The testimony, the documents will tell you that

2       there are parts that had horrible availability.  And Mr. Yu

3       testified, point blank, submitting forecasts or requests for

4       an ELO product is unreasonable.  That was Mr. Yu.

5                Again, the $53 million in unfulfilled requests,

6       you've got to drop it, got to drop it to a number less than

7       that.  We know that from these e-mails that come from

8       Netlist.

9                Now, the last part of, of course, the analysis is

10      the cover damages analysis.  And that was a battle between

11      Mr. Akemann and Mr. Kidder.  But I want to make a couple of

12      points.

13               First of all, there is no question, both sides

14      agree, cover damages is the methodology we need to follow.

15      And the cover damages methodology is matching up, on a

16      request-by-request basis, an unfulfilled request with a

17      subsequent -- not a prior -- a subsequent purchase at a lower

18      amount.

19               Hundred units of X at Y price, you need to find

20      another purchase.  It should be very soon, by the way.  Not

21      in three months.  If you are really covering, with the intent

22      of covering, it should be within a couple of weeks, maybe.

23      But it has to be at a higher price, because then you are

24      overpaying, and that is the concept.

25               Now, he understood that methodology, and he said

1      that to counsel on our side.  But he admitted he didn't do

2      it.  He did it backwards.  He didn't take an unfulfilled

3      order and match it.  And he had the documents to do it.

4      Exhibit 311, the documents I just mentioned, could help him

5      do it as well.

6              He didn't look at forecasts.  He didn't analyze

7      published price lists.  He invented prices on unmatched

8      purchases and then used the 180-day window.  Literally

9      inventing a methodology and doing it backwards.

10             Now, part of the reason he didn't do it is because

11     Mr. Jiang, himself, testified that he can't do it.  He

12     couldn't match up specific purchase orders with reseller

13     purchases.  Because guess what?  They didn't do cover

14     purchases.  Even Mr. Jiang couldn't do that.

15             The thing that Mr. Akemann did do -- he uses the

16     word "matching," but it's very deceiving.  It's not a cover

17     purchase match.  He's doing a price match, and only on price.

18     That is not cover.

19             Cover is:  Look at the product, look at the

20     quantity, look at the timing of the cover, calculate the

21     delta, add it up over the course of 100 requests, or how many

22     requests there are, and then you have damages.  He didn't do

23     that.

24             But the one he did do, interestingly, still doesn't

25     match up.  He could only match up, in one case, 17 percent of

1        the transactions he saw.  Is this reliable?  Is this a
2        reasonable estimate?  Or is this telling you that on
3        Exhibit 311, most of those unfulfilled purchases have nothing
4        to do with a reseller purchase.
5                This is his math.  And if you just apply this to the
6        analysis, you can reduce the total amount he's seeking by
7        whatever percentage makes sense in the numbers he's using.
8                Now, what is interesting in the documents that were
9        presented during the course of the case is no one actually
10       tried to do the cover matching analysis.  So we did it.
11               And what we did is we took transactions from
12       Exhibit 311 that were unfulfilled and we compared them to
13       transactions from 380.  And it's going to be hard to do.  But
14       if you look at 311, there is a column called Unfulfilled.
15       And what you then need to do is look at the part order, part
16       number -- I'm sorry, the part number and the quantity, and
17       try to find a transaction within a month or so.
18               And when we looked at the unfulfilled orders from
19       311, Mr. Akemann is right, there is a lot where there are no
20       damages.  Because here, the prices are lower.  And so for
21       each of these purchase orders, you cannot award damages.  You
22       can't.  Because there are no damages based on the
23       documentation that exists.  That is math.  They saved money
24       on these purchases.
25               I also then looked at some of the exhibits they

```
 1    presented where they said, Mr. Knuth, you have this
 2    particular part number?  We need 300 units.  Mr. Knuth says,
 3    No allocation, I can't support it.
 4           So then I looked for a cover purchase.  Did they
 5    really need this product?  Was it really that important to
 6    them?
 7           MR. DOREN:  Objection, Your Honor, counsel is now
 8    testifying.
 9           THE COURT:  He can testify to what is in the
10    exhibits.
11           So you are talking about what -- what is in the
12    exhibits the jury is going to have?
13           MR. RHOW:  No question.
14           THE COURT:  Go ahead.
15           MR. RHOW:  Thank you.
16           Exhibit 355 compared to Exhibit 380.  That is in
17    evidence.  That is the reseller purchase.  You can go look.
18    I don't need to do it, and it's not my burden to do it
19    anyways.  Neither is it yours, frankly.  It really was
20    Netlist's.
21           And this product code should be in Exhibit 380.  Not
22    there.  And if you actually do it for a lot of the exhibits
23    you saw, they don't match up.
24           Now, credibility in this case, it is important.  It
25    isn't just math.  Because foundationally, there are a lot of
```

1     statements made during this case which they need to prove in

2     order to get damages.

3            For example, they need to prove that they always

4     went to Samsung first.  And frankly, you heard it about 100

5     times from every witness.  Some witnesses, I don't think I

6     even asked them anything about it, and the first thing out of

7     their mouths is, We went to Samsung first.

8            And the reason there is a credibility instruction is

9     because if you believe that someone is lying to you about

10    something, you can believe they are lying to you about

11    everything.  About even the fundamental nature of their

12    damages theory.

13           And so you see it.  You heard this about 100 times,

14    I always went to Samsung first.  But you look at the

15    documents, they were selective about what they took in.  We

16    always took what Samsung allowed.  Then you look at the

17    documents, cannot take.

18           Just fundamentally false statements, but statements

19    that are crucial, absolutely crucial, to them proving

20    damages.

21           Very quick statement on failure to mitigate.  You

22    have that instruction.

23           Look at a couple of the letters.  Exhibit 47, I went

24    into this with you.  Did they give us an opportunity to cure?

25    A 2020 letter does not allow you to somehow supply product on

1      a 2017 purchase order.

2              Mr. Hong said it.  I actually didn't want the

3      product.  I want money.  That is what he said on the stand.

4      And that is the truth.  Because you see Mr. Akemann seeking

5      $2.4 million, instead of giving us a chance.  Send a letter.

6      Here are the purchase orders, here are the amounts, here is

7      the allocations we are not happy with.

8              There is a cure period within 30 days.  They

9      obviously have a law firm that can do it.  That is how it's

10     done.  That is the contract that they negotiated to make sure

11     there are clear rules governing potential disputes like this.

12             The letters you do see, they don't mention this

13     allocation issue, this forecast issue.  They don't mention

14     any specific purchase orders.  The cure letter you do see

15     actually says, We already filed a lawsuit.  I'm not sure that

16     is an invitation to cure.  That is basically saying, We have

17     decided, and we are already litigating.

18             Now, going into the verdict form.  Not surprisingly,

19     we would ask that you check different boxes.  On Box 1, it's

20     very important you break down the question.  Did Netlist

21     prove that it suffered damages as a result of Samsung's

22     failure?  There has to be causation, a causal link between

23     those damages and Samsung.

24             And so if Netlist is going directly to resellers a

25     majority of the time on their own, you know there is no link.

1        You know there is no link based on their own testimony.  If

2     they can't show that the purchase orders were caused by

3     Samsung canceling, versus Netlist canceling, they can't get

4     there.

5            That is Question 1.  And that is the question where

6     fundamentally I think it's possible you will spend the most

7     time.

8            Question 3 is the question of mitigation.  Do you

9     think that Netlist failed to use reasonable efforts to reduce

10     or avoid damages?  Could they have done that?  I just showed

11     you some evidence on that.  If you believe that to be true,

12     you check yes and then follow the rest of the verdict form.

13            Now, in closing -- in closing of my closing, the

14     burden of proof, again, I want to go back to, because the

15     burden of proof is entirely on Netlist.

16            And so the notion that Mr. Kidder is supposed to do

17     a calculation, when he doesn't even have all of Netlist's

18     documents, is just fundamentally wrong.  It puts this process

19     on its head.  Because as you heard in the opening set of

20     instructions, the burden of proof is very important.

21            Because what it means is plaintiffs decide to file a

22     lawsuit, decide to hire lawyers, decide to force defendants

23     to hire lawyers.  It's their burden of proof, because they

24     are the ones who are going to -- who are forcing this process

25     to occur.  And it is perfectly fine if they do that, but they

1    better meet their burden of proof, because it's 100 percent

2    on them.

3          Respectfully, we suggest that they haven't.  And I

4    won't go through it all, but they failed to prove the four

5    prongs I mentioned to you.  $53 million of involuntary

6    reseller purchases, $53 million of unfulfilled requests that

7    match up to those purchases, $53 million of unfulfilled

8    requests that are, in fact, Samsung's fault, and then a cover

9    damages calculation that does -- that makes sense.  They

10   didn't do that.

11         That wasn't your job.  And it won't be your job to

12   sift through everything and make assumptions, when they

13   didn't give you the evidence.

14         Our job is to put them to the task of meeting their

15   burden of proof, to ask hard questions to folks like

16   Dr. Akemann and make sure that the evidence, the facts, the

17   conclusions they are presenting to you are, in fact,

18   accurate.

19         Damages in this case, ladies and gentlemen, were

20   based on a simple formula.  Both sides agreed.  Mr. Akemann

21   agreed -- I'm sorry, Dr. Akemann agreed, we're in the cover

22   damages world.  This is something Dr. Akemann and his office

23   could have done with the exhibits and information they had

24   but they didn't do.  And by that fact alone, they didn't meet

25   their burden of proof.

1          The burden of proof requires you to follow the law,

2     apply facts to the law.  Not invent a different methodology,

3     not to create end-arounds the methodology.  If they don't do

4     that, they haven't met their burden of proof.

5          And the final question I really have is, why?  Why

6     didn't they do that?  Mr. Doren questioned Samsung's expert

7     and said, Why didn't you do that analysis -- I'm sorry.

8     Mr. Lo questioned Samsung's expert and said, Why didn't you

9     do that analysis?

10          First, it wasn't our burden of proof.  But the

11     better question is, why didn't they?  Why didn't they prove

12     the case like a plaintiff is supposed to prove the case, by

13     following the cover damages methodology that they agree makes

14     sense?

15          The reason is simple:  If they had followed that

16     methodology, the damages wouldn't be anything near what they

17     are seeking here today.

18          And not only does that failure create a failure to

19     meet a burden of proof, it actually creates a mess.  Because

20     you are now tasked with wading through assumption, wading

21     through thoughts on a chart, wading through pages and pages

22     and pages of spreadsheets that match up, or need to match up

23     but don't match up, to pages and pages and pages of another

24     spreadsheet, when the person and party that should have done

25     that is the one with the burden of proof.

1          And so if you go back in the jury room -- and it may

2     be frustrating, and certainly I think both sides will

3     apologize for that.  But if you throw up your hands at some

4     point and say, You know what?  This work -- I can't figure

5     out the pathway here, that means the burden of proof hasn't

6     been met.

7          And so we would respectfully submit that at the end

8     of, hopefully, your deliberations, you would return a verdict

9     in Samsung's favor.  And if you do not find they met their

10    burden of proof, that number should be zero or whatever

11    number you feel is a reasonable discount.

12          Thank you.

13          THE COURT:  Thank you.

14          Mr. Doren, you can give your rebuttal.

15          MR. DOREN:  Samsung has to be held responsible for

16    their breach and the consequences of the breach.  They come

17    in here and they say that we forced this process to occur.

18    They breached a contract.  We are here trying to recover the

19    consequences of the breach.  But they come in here and tell

20    you that we've forced this process to occur.

21          And then they say that all of our witnesses that

22    took the stand and said that they went to Samsung first,

23    because they did, they lied.  All of them.  Every single one.

24    Every witness that we brought in here day after day, witness

25    after witness, got on the stand and lied.

1          Now, you didn't hear me accuse Mr. Knuth of lying

2     when he went out there and met with his lawyers during the

3     break and came back in here and started acting all kinds of

4     different.  I give him the benefit of the doubt.

5          All these people are new witnesses, but my goodness.

6     They have to be held responsible for the consequences of

7     their breach.

8          Accusations and smoke screens is what you just

9     heard.  Purchase orders are requests, they said.  Purchase

10    orders, we agree, are requests.  You can point at those,

11    those are real, but we won't let you submit them.  The way we

12    breached the contract assures you can't prove damages the way

13    we want you to.  So you don't get anything for the proven

14    breach.

15         Forecasts aren't even mentioned in the JDLA.  Well,

16    I missed the part where purchase orders are.  The word is

17    "requests."  There are 3.7 million unfulfilled purchase

18    orders from 2017 forward, compared to so many more before it.

19    It's because they wouldn't let us send them.

20         They said that both sides agreed on a matching

21    methodology.  I missed that part where we all agreed on a

22    matching methodology.

23         Can you put up Exhibit 29, please?  Let's just pull

24    up that top one.  Now, actually go down to the request.

25         Now, you may remember that we put this exhibit up

1     after we had put up several e-mails in a row where we were

2     instructed not to submit purchase orders.  And Mr. Knuth

3     agreed that this is the kind of request that he got from

4     Netlist every single day.

5          Because remember, he talked to people at Netlist

6     every single day about parts availability.  At least that is

7     the way it was for the first hour of his testimony.  And then

8     later, he had so many customers, he can't keep them all

9     straight.  But I actually accept both as the truth.

10         Now, here, you get an e-mail with a request, seeing

11    if there can be support.  And these happened all the time,

12    Mr. Knuth said.  And so now these folks, because they won't

13    let us submit purchase orders, things that could be traced,

14    want us to go through and pull all these.

15         Well, you will notice who is on that e-mail with the

16    folks from Netlist.  It's Mr. Knuth.  So if there was

17    something to prove here, other than going through the data

18    sheets and pulling out one line here and one line there and

19    saying, See what we have proven, they would have done it.

20         Let's look at page 895 of Exhibit 257.  We heard

21    about how our purchase -- we never -- we are the ones that

22    know what the forecasts are from our customers.  And if we

23    wanted to, we could have gone to those forecasts and we could

24    have done something.  I wasn't quite clear on what, because

25    nobody actually testified to that.

1          But go down to the Neal Knuth e-mail there.  Blow

2     that one up.

3          Attached is current customers for Netlist's SSD

4     backlog.  Now, you see, Mr. Knuth receives these -- this

5     data.  He has the list of current Netlist customers and the

6     products they want.  SSDs.  Remember those solid state

7     drives.

8          Then he goes down further.  And look down there at

9     line 3.  He says, "These are customers that are interested in

10    NVDIMM and other support from Netlist.  I also have other POs

11    to confirm."  We talked about that.  He didn't know what to

12    do with those.

13         And then he says, "These customers on this list

14    typically do not qualify for credit, need inventory stocked,

15    and Netlist provides technical support and special marking,

16    testing, and handling."

17         Netlist is out there doing this dirty work with

18    these small companies that Samsung doesn't want to deal with,

19    one by one by one.  And the evidence is that Samsung knows

20    who they are.  We don't hide anything from Samsung on this

21    sort of thing.

22         You don't get to breach a contract, set up a process

23    by which people cannot establish that what they need under

24    the contract is not being provided, and then say, You failed

25    to prove the damage caused by the breach.  It's not the way

1    it works.  It's not the way it should work.

2            So why did we force this process?  We forced this

3    process because of that.  And that is why we are here.

4    Because this is where we had to come for all of 2,000,400 --

5    2,490,000-some-odd dollars.  But we are here.  You are darn

6    right we forced this process.

7            Now, there was talk about the burden of proof.  And

8    you will read in the instructions that burden of proof means

9    more likely than not.

10           Now, you know, we've all seen the scales of justice.

11   More likely than not is that.  That is reasonable doubt.

12   That is when you go to jail.  This is when you pay

13   $2.5 million.  And we have carried that burden.

14           They said that Dr. Akemann did not take into account

15   product match, parts, quantity, or timing.  You remember that

16   one.  They say that -- put this up.  They said that going to

17   resellers is just something that was done all the time

18   because you are always shopping for options, always shopping

19   for cheaper prices.

20           Next one.  That one.

21           Well, remember this when you are analyzing that:

22   The dotted line going up is the cumulative reseller

23   transactions.  They only start accumulating after Samsung

24   breached.  And nobody disputes this data.

25           Ladies and gentlemen, we appreciate the work that

1    you are doing for us.  In case you didn't think we cared, now

2    you know we do.

3         These people breached a contract, and there are

4    consequences to that.  They did it in a way to try and

5    avoid -- now they are trying to avoid the consequences of it

6    by the system they created.  And we are asking you not to let

7    that happen.

8         Thank you again for your hard work.

9         THE COURT:  Thank you, Mr. Doren.  Thank you,

10   parties.

11        We are now at the point where the jury, it's up to

12   you to determine the case.  We are going to swear in a

13   bailiff who will be in charge of you all, make sure that no

14   one talks to you or no one bothers you while you are

15   deliberating.

16        Now, you can deliberate as long as you want today.

17   You can -- you can obviously come back Monday, as well, and

18   deliberate as long as you want then, too.  It's completely up

19   to you.  You can stay as late as you want tonight.  You can,

20   you know, leave when you think it's appropriate.  If you are

21   going to be coming back, it's completely up to you.  And just

22   let the bailiff know what your intentions are with respect to

23   that.

24        THE CLERK:  Please raise your right hand.

25        (Bailiff sworn.)

1          THE CLERK:  Will you please state your name for the

2     record.

3          THE WITNESS:  Officer Kevin Denman.

4          THE CLERK:  Thank you.

5          THE COURT:  Okay.  And with that, you can go back to

6     the jury room and begin deliberations.

7          (Thereupon, the jury retired from the courtroom.)

8          THE COURT:  Thank you, everybody.  I'm not sure if

9     the courtroom deputy needs any assistance with getting the

10    exhibits together.

11         THE CLERK:  Yes.

12         THE COURT:  So if counsel can make sure somebody is

13    available to assist the courtroom deputy with them, that

14    would be great.

15         Stick around, we'll let you know what we hear from

16    the jury.  If we get word the jury is going home, we'll let

17    you know.  On Monday, I'll ask you to be very close to the

18    courtroom in case they have questions or things, we can

19    answer them quickly.

20         Okay.  Thanks, everybody.

21         (Thereupon, the Court was in recess.)

22              *****     *****     *****

23

24

25

1

2     I certify that the foregoing is a correct transcript from the

3     record of proceedings in the above-titled matter.

4

5

6

7     ---------------------------

8

9     Amy C. Diaz, RPR, CRR              December 4, 2021

10    S/  Amy Diaz

11

12     Exhibit Number 23                                    20

13     DOUGLAS KIDDER                                       21

14     DIRECT EXAMINATION                                   21

15     BY MR. YODER

16     CROSS-EXAMINATION                                    39

17     BY MR. LO

18

19

20

21

22

23

24

25

**#**

**#4455** [1] - 1:23

**$**

**$10** [4] - 42:12, 42:13, 75:1, 77:19
**$2,474,993** [1] - 66:12
**$2.474993** [1] - 65:11
**$200** [1] - 72:24
**$25** [1] - 75:18
**$4,000** [1] - 77:16
**$400,000** [1] - 77:15
**$49** [1] - 33:20
**$50** [4] - 24:16, 72:2, 72:11, 72:16
**$500** [1] - 24:18
**$500,000** [5] - 58:17, 59:12, 59:17, 61:1, 61:3
**$53** [22] - 13:15, 13:22, 65:8, 68:12, 69:18, 70:11, 70:13, 71:19, 71:21, 71:23, 71:24, 72:16, 75:1, 75:8, 75:9, 75:11, 76:9, 76:10, 78:5, 85:5, 85:6, 85:7
**$55** [1] - 24:17
**$72** [1] - 33:19

**1**

**1** [4] - 58:25, 67:22, 83:19, 84:5
**10** [10] - 35:9, 35:18, 35:19, 37:3, 37:6, 53:6, 54:4, 54:21, 60:8, 60:9
**100** [5] - 58:7, 79:21, 82:4, 82:13, 85:1
**101** [1] - 11:13
**1020** [1] - 74:8
**103-2** [1] - 68:19
**1050** [1] - 2:8
**1086** [1] - 71:2
**120** [1] - 38:3
**1300** [1] - 23:7
**1350** [2] - 77:14, 77:20
**14** [1] - 65:20
**14-day** [3] - 38:8, 40:12, 40:23
**14.6** [1] - 37:7
**15** [4] - 60:8, 60:9, 69:11, 73:5
**16.5** [1] - 5:2
**17** [3] - 22:7, 39:13, 79:25
**1700** [1] - 2:17

**18** [2] - 40:7, 40:23
**180** [2] - 37:8, 38:12
**180-day** [9] - 5:4, 28:2, 28:15, 30:24, 31:3, 35:2, 37:23, 38:1, 79:8
**1875** [1] - 2:14
**18th** [1] - 2:19
**1st** [2] - 1:23, 31:7

**2**

**2** [8] - 38:9, 38:21, 56:9, 57:11, 58:2, 59:11, 65:21
**2,000,400** [1] - 91:4
**2,490,000-some-odd** [1] - 91:5
**2.4** [2] - 69:25, 83:5
**2.5** [1] - 91:13
**2.6** [1] - 5:17
**20** [2] - 22:7, 94:12
**2000** [1] - 72:24
**20018** [1] - 2:9
**2009** [1] - 12:20
**2015** [5] - 60:24, 72:22, 72:24, 73:3, 77:10
**2017** [7] - 18:15, 31:7, 55:17, 56:18, 56:25, 57:19, 58:5, 58:24, 62:4, 63:1, 63:2, 63:23, 65:9, 77:10, 83:1, 88:18
**2018** [5] - 59:9, 59:15, 61:2, 69:12, 77:15
**2019** [1] - 61:3
**2020** [3] - 61:6, 73:15, 82:25
**2021** [2] - 1:16, 94:9
**20th** [1] - 73:16
**21** [2] - 94:13, 94:14
**214/24** [1] - 9:21
**215/7** [1] - 9:21
**23** [8] - 3:25, 4:14, 9:21, 20:9, 20:19, 20:20, 20:22, 94:12
**23rd** [2] - 2:14
**240-day** [1] - 38:5
**257** [1] - 89:20
**26** [1] - 5:17
**29** [1] - 88:23

**3**

**3** [8] - 1:16, 13:19, 13:21, 13:24, 56:9, 59:11, 84:8, 90:9
**3.7** [3] - 72:15, 75:20, 88:17

**30** [2] - 37:20, 83:8
**300** [1] - 81:2
**31** [1] - 54:12
**311** [5] - 79:4, 80:3, 80:12, 80:14, 80:19
**312** [1] - 8:7
**313** [1] - 4:6
**33** [1] - 54:12
**333** [1] - 2:6
**35** [2] - 22:2, 54:10
**350** [1] - 1:23
**355** [1] - 81:16
**380** [3] - 80:13, 81:16, 81:21
**39** [1] - 94:16

**4**

**4** [1] - 94:9
**4.6** [15] - 5:20, 6:7, 6:21, 8:3, 30:5, 30:19, 36:24, 37:5, 37:24, 38:21, 39:22, 39:25, 65:1, 65:2, 65:6
**4/6/2017** [1] - 28:11
**400** [1] - 2:19
**412** [3] - 32:18, 32:22, 33:12
**46th** [1] - 2:6
**47** [1] - 82:23
**49** [3] - 33:21, 33:22, 34:1
**4:30** [1] - 53:14

**5**

**5** [1] - 75:1
**50** [4] - 10:16, 60:10, 70:12, 70:14
**500** [3] - 24:18, 32:19, 33:1
**500-unit** [2] - 33:16, 33:18
**53.3** [1] - 39:22
**53.4** [3] - 26:9, 29:6, 29:22
**54** [1] - 29:11
**5th** [1] - 58:16

**6**

**6** [2] - 5:17, 38:6
**6.2** [14] - 10:18, 10:22, 11:3, 11:5, 14:5, 15:15, 15:17, 19:10, 19:11, 55:6, 56:24, 64:3, 65:3, 91:14
**6.4** [1] - 69:8
**60** [1] - 37:21

**610** [1] - 2:17
**63** [2] - 28:21, 29:13
**65** [2] - 22:7, 56:23

**7**

**7** [3] - 38:8, 38:22, 58:5
**702** [2] - 7:18, 8:16
**702(c)** [1] - 4:23

**8**

**8** [1] - 40:19
**83** [2] - 28:20, 29:12
**83.5** [1] - 5:13
**895** [1] - 89:20
**8:20-CV-993-MCS** [1] - 1:8

**9**

**9,000** [1] - 8:9
**90** [12] - 4:25, 28:3, 31:8, 32:9, 37:18, 37:20, 38:2, 64:9, 64:17, 64:18
**90-day** [5] - 7:4, 27:25, 28:5, 32:11, 32:12
**90-day-in-each-direction** [1] - 64:4
**90012** [1] - 1:24
**90067** [1] - 2:15
**90071** [2] - 2:6, 2:20
**92660** [1] - 2:17

**A**

**able** [8] - 5:1, 5:11, 15:2, 23:1, 26:22, 28:15, 28:22, 35:23
**above-titled** [1] - 94:3
**absence** [1] - 16:9
**absolutely** [5] - 23:17, 30:2, 30:18, 30:23, 82:19
**accept** [6] - 16:20, 16:21, 49:17, 50:3, 57:8, 89:9
**accepted** [1] - 62:16
**accepting** [1] - 62:13
**accomplish** [1] - 66:23
**according** [4] - 32:23, 35:22, 39:19, 48:24
**account** [7] - 5:18, 6:23, 33:23, 40:1, 64:3, 65:3, 91:14
**Accounting** [1] - 22:17

**accounts** [1] - 46:19
**accumulating** [1] - 91:23
**accuracy** [1] - 47:12
**accurate** [2] - 34:2, 85:18
**accusations** [1] - 88:8
**accuse** [1] - 88:1
**acknowledge** [1] - 65:2
**acknowledged** [2] - 39:14, 72:1
**acquire** [1] - 35:9
**act** [1] - 11:13
**acting** [1] - 88:3
**action** [3] - 51:2, 51:6, 61:12
**active** [1] - 19:13
**actual** [9] - 18:1, 25:15, 25:16, 27:11, 51:12, 51:16, 51:17, 74:24, 74:25
**ad** [1] - 55:12
**add** [1] - 79:21
**adding** [1] - 41:9
**addition** [2] - 11:20, 75:7
**additional** [1] - 20:1
**address** [2] - 3:8, 3:9
**adjust** [1] - 5:19
**admissions** [1] - 76:14
**admits** [3] - 12:21, 74:9, 74:11
**admitted** [8] - 4:15, 20:3, 20:21, 50:8, 50:16, 50:19, 69:1, 79:1
**admitting** [1] - 77:12
**advise** [1] - 48:25
**affect** [2] - 26:19, 37:18
**affected** [1] - 74:13
**affects** [1] - 41:9
**afford** [1] - 76:6
**afternoon** [4] - 6:19, 39:10, 39:11, 44:8
**ago** [1] - 17:5
**agree** [10] - 7:5, 7:10, 38:19, 38:23, 44:20, 67:17, 72:12, 78:14, 86:13, 88:10
**agreed** [9] - 14:3, 58:22, 66:17, 85:20, 85:21, 88:20, 88:21, 89:3
**agreement** [7] - 11:17, 45:8, 48:23, 69:7, 69:8, 77:12
**agrees** [1] - 75:14

ahead [4] - 19:24, 20:6, 54:18, 81:14
Akemann [39] - 6:23, 7:14, 8:1, 23:19, 24:19, 25:5, 25:20, 29:7, 29:14, 30:25, 32:4, 32:21, 34:25, 35:22, 38:11, 38:15, 39:15, 40:22, 61:25, 63:15, 63:17, 63:24, 64:21, 64:25, 72:1, 72:4, 73:25, 74:5, 74:19, 74:23, 78:11, 79:15, 80:19, 83:4, 85:16, 85:20, 85:21, 85:22, 91:14
Akemann's [28] - 3:10, 3:23, 4:22, 15:11, 21:18, 23:1, 23:16, 26:1, 26:11, 26:19, 27:5, 27:11, 27:25, 29:23, 30:12, 33:3, 34:3, 36:5, 37:13, 37:22, 39:19, 39:21, 41:13, 42:22, 43:1, 65:20, 68:11, 69:21
alleged [1] - 18:2
allegedly [1] - 13:17
Allen [1] - 22:2
allocation [15] - 58:18, 58:19, 58:23, 58:25, 59:10, 59:14, 59:18, 60:25, 74:3, 74:14, 74:19, 75:22, 77:9, 81:3, 83:13
allocations [1] - 83:7
allow [3] - 4:1, 22:22, 82:25
allowed [6] - 4:14, 4:21, 9:21, 49:25, 64:1, 82:16
allowing [1] - 77:19
alluded [1] - 17:7
almost [2] - 13:16, 59:11
alone [3] - 7:17, 70:11, 85:24
amazing [1] - 56:3
amount [22] - 3:22, 27:22, 28:1, 29:21, 42:2, 42:24, 51:24, 52:20, 53:1, 61:7, 62:23, 65:7, 66:11, 69:19, 70:3, 71:16, 73:24, 75:2, 76:23, 78:18, 80:6
amounts [1] - 83:6
AMY [1] - 1:22
Amy [2] - 94:9, 94:10
analysis [18] - 7:20,

21:18, 22:1, 23:15, 23:16, 27:12, 37:11, 38:2, 38:4, 39:1, 39:19, 41:21, 78:9, 78:10, 80:6, 80:10, 86:7, 86:9
analyze [3] - 23:13, 69:20, 79:6
analyzed [2] - 39:15, 68:14
analyzing [2] - 64:22, 91:21
Angeles [5] - 1:15, 1:24, 2:6, 2:15, 2:20
animal [1] - 62:22
answer [8] - 37:19, 41:10, 41:15, 43:7, 48:17, 65:16, 75:24, 93:19
answered [2] - 41:20, 42:5
answering [1] - 48:15
answers [1] - 49:5
anticipatory [6] - 17:17, 17:25, 18:4, 18:9, 18:18, 19:12, 19:13
anyways [1] - 81:19
apologize [2] - 67:10, 87:3
appear [2] - 4:7, 26:7
APPEARANCES [1] - 2:1
appeared [1] - 39:16
applicable [1] - 28:9
application [1] - 46:8
applied [3] - 30:10, 37:13, 65:8
applies [6] - 5:10, 5:12, 5:13, 44:14, 46:11
apply [7] - 6:9, 11:12, 30:14, 36:21, 44:18, 80:5, 86:2
applying [2] - 8:2, 37:25
appreciate [1] - 91:25
approached [1] - 46:14
appropriate [2] - 6:7, 92:20
approval [1] - 77:9
approve [1] - 70:10
April [9] - 31:7, 33:1, 57:20, 59:9, 63:1, 63:2, 63:23, 65:9, 77:15
arbiter [1] - 7:19
argue [1] - 75:22
arguing [2] - 17:16,

17:17
argument [6] - 3:24, 7:14, 9:14, 17:14, 54:7, 54:19
arguments [5] - 19:23, 44:9, 53:5, 53:6, 53:10
arises [1] - 52:10
arising [1] - 14:2
arounds [1] - 86:3
articulates [1] - 7:17
ascertained [1] - 11:22
assertions [1] - 60:11
assess [1] - 34:4
assist [2] - 49:21, 93:13
assistance [1] - 93:9
assume [1] - 6:7
assumed [2] - 25:24, 29:7
assuming [2] - 26:12, 76:10
assumption [6] - 10:21, 25:3, 26:5, 26:6, 33:13, 86:20
assumptions [4] - 38:23, 39:1, 49:20, 85:12
assures [1] - 88:12
attached [1] - 90:3
attempt [3] - 5:14, 45:14, 48:9
attention [2] - 19:20, 67:2
Attorney [7] - 2:4, 2:5, 2:5, 2:8, 2:14, 2:16, 2:19
availability [2] - 78:2, 89:6
available [8] - 25:4, 25:5, 28:9, 55:16, 64:23, 68:24, 77:25, 93:13
Avenue [2] - 2:6, 2:8
average [5] - 5:3, 35:6, 35:7, 37:25, 38:9
averaging [1] - 39:20
avoid [11] - 52:2, 52:5, 52:7, 52:10, 52:13, 52:17, 52:24, 66:15, 84:10, 92:5
await [1] - 18:20
award [3] - 51:23, 55:20, 80:21
awarded [1] - 51:25
axis [4] - 31:21, 31:23, 36:7, 37:24

# B

background [1] - 21:20
backlog [3] - 58:2, 63:3, 90:4
backwards [6] - 3:22, 4:9, 24:22, 25:17, 79:2, 79:9
bad [5] - 38:23, 38:24, 39:1, 39:2
bailiff [4] - 48:7, 49:1, 92:13, 92:22, 92:25
bar [3] - 37:22, 40:14, 40:16
base [2] - 45:22, 50:25
based [14] - 4:4, 4:16, 5:24, 10:4, 10:20, 16:1, 23:12, 30:6, 47:20, 49:21, 70:8, 80:22, 84:1, 85:20
basic [2] - 11:12, 51:6
basing [1] - 8:19
basis [17] - 3:18, 6:8, 6:14, 7:7, 7:8, 10:3, 10:16, 12:25, 15:11, 32:13, 51:17, 55:11, 55:12, 62:5, 64:11, 78:16
battle [1] - 78:10
Beach [1] - 2:17
bears [1] - 52:3
becomes [2] - 48:6, 63:12
began [1] - 57:1
begin [3] - 3:20, 45:4, 93:6
beginning [3] - 18:7, 28:11, 44:1
behavior [1] - 49:10
behold [1] - 38:5
belief [1] - 45:20
believes [1] - 28:1
below [2] - 28:6, 36:14
benefit [1] - 88:4
Berkeley [1] - 21:23
best [4] - 64:21, 74:17, 74:21, 75:2
better [8] - 33:12, 52:14, 55:1, 60:7, 77:4, 77:17, 85:1, 86:11
between [11] - 3:16, 7:19, 12:3, 18:14, 51:3, 51:14, 51:21, 55:18, 63:7, 78:10, 83:22
beyond [1] - 8:20
big [2] - 34:8, 35:17
bigger [1] - 32:17

binding [13] - 11:9, 11:24, 12:5, 12:22, 14:8, 14:9, 58:14, 72:8, 72:11, 73:8, 73:13, 73:18, 73:20
BIRD [1] - 2:13
bit [4] - 4:19, 7:22, 35:3, 44:8
blank [2] - 72:7, 78:3
blog [1] - 46:7
blow [1] - 90:1
blue [4] - 31:19, 32:2, 34:13, 35:6
books [2] - 50:10, 58:3
Booz [1] - 22:2
bore [1] - 31:5
bothers [1] - 92:14
bottom [1] - 62:8
bought [10] - 25:24, 26:23, 27:4, 32:1, 32:2, 32:14, 32:15, 34:3, 34:4, 35:11
Box [1] - 83:19
box [1] - 29:22
BOXER [1] - 2:13
boxes [1] - 83:19
breach [31] - 4:12, 17:21, 18:1, 18:12, 19:10, 19:12, 19:14, 22:8, 26:10, 28:13, 29:8, 41:24, 51:2, 51:10, 51:14, 51:21, 52:6, 55:19, 56:6, 63:8, 69:23, 73:16, 75:19, 76:1, 87:16, 87:19, 88:7, 88:14, 90:22, 90:25
breached [1] - 55:4, 73:19, 87:18, 88:12, 91:24, 92:3
break [6] - 44:8, 53:4, 56:19, 83:20, 88:3
brief [3] - 17:3, 19:6, 54:16
briefing [1] - 18:5
briefly [1] - 77:13
bring [4] - 15:10, 19:17, 27:8, 37:10
bringing [1] - 18:20
broader [1] - 75:23
broker [1] - 71:1
brokers [1] - 71:7
brought [3] - 10:19, 50:17, 87:24
bucks [1] - 24:18
bunch [2] - 41:9, 44:2
burden [27] - 50:22, 51:14, 52:3, 67:23, 67:24, 68:5, 68:8,

70:4, 76:12, 81:18,
84:14, 84:15, 84:20,
84:23, 85:1, 85:15,
85:25, 86:1, 86:4,
86:10, 86:19, 86:25,
87:5, 87:10, 91:7,
91:8, 91:13
**buried** [1] - 71:9
**business** [11] - 22:1,
22:3, 56:17, 60:13,
60:15, 70:23, 71:6,
71:8, 71:17, 72:24
**businesses** [1] - 22:4
**but-for** [1] - 25:19
**buy** [6] - 5:11, 24:16,
69:9, 71:13, 77:19
**buying** [5] - 31:11,
60:4, 70:25, 71:14
**BY** [4] - 21:15, 39:9,
94:15, 94:17

## C

**CA** [1] - 1:24
**calculate** [4] - 24:19,
52:20, 76:16, 79:20
**calculated** [10] - 5:24,
23:20, 30:6, 30:19,
36:6, 39:25, 40:5,
40:9, 64:25, 65:10
**calculates** [1] - 5:3
**calculation** [23] -
13:15, 23:2, 26:11,
26:19, 26:24, 26:25,
27:5, 28:1, 29:19,
36:8, 36:11, 36:15,
36:23, 54:10, 55:23,
67:25, 68:12, 69:21,
70:1, 72:4, 76:14,
84:17, 85:9
**calculations** [3] -
22:16, 52:21, 65:23
**CALIFORNIA** [1] - 1:2
**California** [5] - 1:15,
2:6, 2:15, 2:17, 2:20
**canceled** [3] - 58:2,
76:3, 76:4
**canceling** [3] - 62:12,
84:3
**cannot** [6] - 12:25,
15:3, 76:18, 80:21,
82:17, 90:23
**cap** [8] - 58:18, 58:25,
59:5, 59:7, 59:18,
59:23, 61:1, 61:3
**capped** [1] - 58:19
**caps** [2] - 63:3, 74:19
**capture** [1] - 64:19
**captured** [1] - 65:5
**capturing** [2] - 64:15,

64:16
**car** [1] - 31:11
**care** [3] - 56:22, 70:20,
71:14
**cared** [1] - 92:1
**carried** [1] - 91:13
**case** [49] - 3:2, 9:1,
12:19, 13:20, 15:6,
17:7, 17:16, 18:2,
18:3, 18:7, 19:4,
22:25, 35:18, 41:23,
43:21, 44:14, 44:18,
44:23, 45:10, 45:11,
45:23, 45:25, 46:1,
46:4, 46:5, 46:15,
46:19, 46:21, 46:24,
47:1, 47:3, 47:7,
47:10, 47:20, 48:12,
50:7, 50:11, 55:3,
77:14, 79:25, 80:9,
81:24, 82:1, 85:19,
86:12, 92:1, 92:12,
93:18
**cases** [5] - 22:7, 22:9,
42:4, 70:9, 70:13
**causal** [4] - 25:2,
51:13, 63:7, 83:22
**causation** [1] - 83:22
**caused** [6] - 26:10,
66:22, 67:19, 75:11,
84:2, 90:25
**Center** [1] - 2:17
**CENTRAL** [1] - 1:2
**Century** [1] - 2:14
**certain** [6] - 7:8,
11:18, 11:21, 50:8,
50:16, 63:9
**certainly** [2] - 16:13,
87:2
**certainty** [3] - 4:10,
26:15, 76:19
**certify** [1] - 94:2
**chain** [1] - 25:2
**challenge** [1] - 7:2
**chance** [1] - 83:5
**change** [3] - 38:2,
45:17, 45:19
**changed** [5] - 37:19,
55:19, 56:18, 64:10,
76:6
**characterizing** [1] -
12:13
**charge** [1] - 92:13
**chart** [5] - 31:13,
31:15, 37:16, 75:17,
86:21
**charts** [4] - 50:8,
50:12, 50:16, 50:18
**chat** [1] - 46:7
**cheaper** [6] - 60:8,

60:12, 60:19, 68:20,
91:19
**check** [3] - 69:16,
83:19, 84:12
**chip** [2] - 71:13, 71:14
**chips** [5] - 56:2, 56:4,
59:23, 70:25, 71:13
**Choi** [1] - 58:22
**chooses** [1] - 41:17
**chops** [1] - 76:8
**chose** [1] - 38:12
**Chuck** [5] - 59:21,
69:9, 72:23, 73:1,
75:16
**chunk** [1] - 41:13
**circuit** [1] - 7:21
**claim** [16] - 10:18,
10:20, 12:25, 14:20,
16:1, 17:25, 18:1,
18:3, 19:3, 19:4,
50:22, 50:24, 53:22,
64:21, 76:1
**claimed** [3] - 25:6,
51:16, 73:7
**claiming** [1] - 14:18
**claims** [1] - 5:22
**classic** [1] - 17:16
**clause** [1] - 55:6
**clean** [1] - 58:3
**clear** [7] - 7:25, 18:10,
30:5, 53:24, 70:17,
83:11, 89:24
**clearly** [4] - 25:23,
65:22, 71:11, 75:25
**CLERK** [7] - 21:3,
21:8, 21:13, 92:24,
93:1, 93:4, 93:11
**close** [3] - 54:11,
61:22, 93:17
**closed** [1] - 3:2
**closer** [4] - 38:13,
40:8, 40:12, 41:11
**closest** [1] - 33:15
**closing** [14] - 9:18,
19:23, 43:25, 44:9,
53:5, 53:6, 53:10,
54:5, 54:7, 54:19,
67:1, 84:13
**CO** [1] - 1:8
**code** [4] - 8:8, 27:20,
27:21, 81:21
**colleague** [1] - 10:10
**color** [1] - 62:22
**column** [1] - 71:2,
80:14
**columns** [2] - 27:15,
27:25
**coming** [4] - 60:18,
60:25, 67:9, 92:21
**commence** [1] - 11:6

**commentary** [1] -
46:19
**commitment** [3] -
11:24, 12:17, 72:14
**commitments** [1] -
12:6
**common** [3] - 71:8,
72:14, 76:25
**communicate** [5] -
46:2, 46:3, 48:7,
48:9, 48:11
**communicating** [1] -
46:11
**communications** [2] -
47:16, 62:11
**companies** [1] - 90:18
**company** [1] - 60:4
**comparable** [1] -
31:11
**compare** [1] - 69:13
**compared** [5] - 7:14,
7:16, 80:12, 81:16,
88:18
**compares** [2] - 35:3,
35:4
**comparing** [1] - 7:15
**comparison** [1] - 32:9
**comparisons** [2] -
40:13, 40:15
**competitive** [1] -
15:18
**Complaint** [1] - 18:3
**complete** [1] - 48:24
**completed** [1] - 16:10
**completely** [4] -
33:23, 34:6, 92:18,
92:21
**completes** [1] - 66:25
**compliance** [2] -
75:15, 77:12
**comply** [1] - 17:21
**component** [2] - 3:16,
75:10
**computer** [1] - 46:6
**conceding** [1] - 77:11
**concept** [1] - 78:24
**concerning** [1] - 48:12
**concludes** [1] - 20:24
**conclusion** [1] - 23:12
**conclusions** [1] -
85:17
**conduct** [1] - 73:5
**conference** [1] - 18:6
**conferring** [1] - 10:10
**confident** [1] - 56:8
**confirm** [2] - 57:3,
90:11
**confirmed** [2] - 72:9,
77:9
**Connecticut** [1] - 2:8

**conscientious** [1] -
45:16
**consequences** [5] -
87:16, 87:19, 88:6,
92:4, 92:5
**consider** [3] - 32:23,
49:6, 49:16
**considered** [1] - 45:12
**considering** [1] - 50:5
**considers** [1] - 28:12
**consistent** [1] - 66:10
**constitute** [1] - 12:17
**constraints** [1] - 67:11
**consult** [2] - 44:15,
48:14
**consulting** [2] - 22:3,
46:22
**contact** [1] - 46:17
**contain** [2] - 12:1,
12:7
**contemplated** [1] -
69:7
**contents** [1] - 50:10
**continue** [2] - 18:19,
48:16
**continued** [1] - 61:4
**contract** [32] - 11:15,
15:17, 16:20, 18:12,
18:19, 19:14, 22:8,
51:3, 51:6, 51:8,
51:11, 51:14, 51:20,
51:21, 52:7, 52:12,
52:19, 52:25, 53:20,
55:4, 55:5, 55:6,
56:24, 57:4, 83:10,
87:18, 88:12, 90:22,
90:24, 92:3
**contractual** [1] - 18:14
**contrary** [1] - 73:5
**control** [1] - 64:19
**controversial** [1] -
12:15
**convenient** [1] - 66:1
**copy** [1] - 44:14
**correct** [29] - 3:2,
9:13, 9:15, 10:8,
13:9, 26:2, 30:7,
30:8, 30:11, 33:17,
39:18, 39:24, 40:13,
41:7, 41:24, 41:25,
42:2, 42:3, 42:6,
42:7, 42:9, 42:10,
42:13, 42:16, 42:17,
42:20, 42:21, 43:2,
94:2
**correctly** [2] - 7:1,
11:3
**cost** [2] - 27:21, 27:23
**COUNSEL** [1] - 2:1
**counsel** [4] - 4:3,

10:7, 15:13, 16:5, 20:7, 62:21, 66:25, 67:3, 79:1, 81:7, 93:12
**Counsel** [6] - 5:16, 9:23, 16:11, 19:15, 20:4, 39:6
**count** [2] - 48:20, 73:3
**couple** [5] - 26:8, 72:20, 78:11, 78:22, 82:23
**course** [18] - 7:1, 22:17, 45:15, 67:18, 68:14, 71:3, 71:4, 71:9, 71:17, 72:3, 72:17, 73:4, 74:8, 77:14, 78:9, 79:21, 80:9
**Court** [16] - 4:1, 6:22, 8:4, 8:7, 11:2, 12:14, 12:15, 12:16, 15:19, 19:15, 22:10, 22:22, 46:17, 48:5, 48:19, 93:21
**COURT** [55] - 1:1, 3:1, 3:5, 5:16, 6:11, 6:16, 7:21, 8:20, 8:24, 9:3, 9:8, 9:14, 9:16, 9:22, 10:5, 10:13, 13:3, 13:10, 13:12, 15:13, 16:11, 17:2, 17:10, 19:5, 19:15, 19:19, 20:4, 20:6, 20:9, 20:12, 20:15, 20:17, 20:20, 20:25, 22:22, 39:6, 43:12, 43:14, 43:17, 43:21, 43:23, 53:9, 54:3, 54:12, 54:18, 54:22, 67:3, 67:7, 81:9, 81:14, 87:13, 92:9, 93:5, 93:8, 93:12
**court** [9] - 1:25, 38:11, 45:7, 47:11, 47:21, 48:13, 49:7, 49:15
**Court's** [6] - 3:8, 6:20, 7:19, 11:2, 53:25, 54:8
**courtroom** [9] - 19:18, 47:15, 49:1, 53:8, 54:17, 93:7, 93:9, 93:13, 93:18
**cover** [34] - 3:13, 4:3, 4:16, 10:4, 14:20, 14:25, 22:15, 23:21, 24:1, 24:4, 24:9, 24:18, 24:19, 25:9, 25:21, 25:25, 26:13, 34:21, 53:22, 53:23, 54:1, 78:10, 78:14,

78:15, 79:13, 79:16, 79:18, 79:19, 79:20, 80:10, 81:4, 85:8, 85:21, 86:13
**covered** [1] - 3:22
**covering** [2] - 78:21, 78:22
**Craigslist** [1] - 31:11
**create** [6] - 10:24, 10:25, 11:10, 15:16, 86:3, 86:18
**created** [2] - 23:5, 92:6
**creates** [1] - 86:19
**creating** [1] - 11:15
**credibility** [2] - 81:24, 82:8
**credit** [8] - 37:5, 77:13, 77:15, 77:16, 77:19, 77:21, 90:14
**cross** [4] - 7:3, 9:17, 9:25, 39:7
**CROSS** [2] - 39:8, 94:16
**cross-examination** [4] - 7:3, 9:17, 9:25, 39:7
**CROSS-EXAMINATION** [2] - 39:8, 94:16
**CRR** [2] - 1:22, 94:9
**crucial** [2] - 82:19
**CRUTCHER** [2] - 2:4, 2:7
**cumulative** [2] - 62:23, 91:22
**cure** [4] - 82:24, 83:8, 83:14, 83:16
**current** [2] - 90:3, 90:5
**curve** [1] - 31:24
**customer** [3] - 27:2, 55:12, 77:2
**customers** [13] - 56:21, 56:23, 74:10, 74:12, 74:13, 74:20, 76:6, 89:8, 89:22, 90:3, 90:5, 90:9, 90:13
**cut** [1] - 63:2
**cuts** [1] - 38:20

**D**

**damage** [14] - 5:24, 16:1, 16:2, 29:19, 36:23, 53:21, 55:3, 55:19, 65:14, 65:17, 65:22, 65:23, 66:22, 90:25
**damaged** [1] - 65:15

**damages** [87] - 3:13, 3:16, 4:3, 4:16, 9:1, 9:5, 10:8, 10:18, 10:20, 12:25, 13:15, 13:23, 14:2, 14:12, 14:14, 14:17, 15:3, 15:5, 15:8, 16:8, 16:9, 16:23, 18:12, 21:17, 22:15, 22:16, 22:17, 23:19, 23:21, 24:1, 24:4, 24:9, 24:18, 24:19, 34:21, 41:23, 42:1, 42:2, 42:9, 42:12, 51:5, 51:6, 51:12, 51:14, 51:16, 51:17, 51:20, 51:23, 51:24, 52:10, 52:20, 53:1, 53:22, 53:23, 54:1, 55:20, 55:23, 55:24, 57:19, 66:9, 66:11, 66:16, 67:17, 67:19, 70:4, 78:10, 78:14, 78:15, 79:22, 80:20, 80:21, 80:22, 82:2, 82:12, 82:20, 83:21, 83:23, 84:10, 85:9, 85:19, 85:22, 86:13, 86:16, 88:12
**darn** [1] - 91:5
**dash** [1] - 67:9
**data** [27] - 23:7, 23:9, 23:13, 23:14, 25:5, 33:9, 34:1, 38:25, 39:14, 40:5, 41:16, 60:18, 62:2, 62:19, 63:5, 63:6, 63:18, 63:25, 64:7, 64:22, 64:23, 65:20, 89:17, 90:5, 91:24
**database** [3] - 4:5, 4:6, 25:21
**date** [8] - 4:7, 12:1, 12:10, 27:20, 31:23, 36:10, 38:14, 48:25
**Daubert** [1] - 8:15
**days** [21] - 4:25, 28:3, 31:8, 32:9, 37:8, 37:18, 37:20, 37:21, 38:3, 38:8, 38:22, 54:24, 57:8, 64:9, 64:17, 64:18, 65:20, 83:8
**DC** [1] - 2:9
**deal** [2] - 66:6, 90:18
**dealing** [1] - 64:1
**deceiving** [1] - 79:16
**December** [2] - 1:16, 94:9
**decide** [12] - 7:3, 7:11,

44:23, 45:10, 47:20, 51:23, 51:24, 69:17, 69:25, 84:21, 84:22
**decided** [2] - 47:10, 83:17
**decision** [4] - 45:16, 45:18, 50:25, 58:6
**defeats** [1] - 16:17
**Defendant** [2] - 1:9, 2:11
**defendant** [2] - 3:7, 51:4
**defendant's** [1] - 51:4
**defendants** [2] - 43:18, 84:22
**defense** [1] - 3:5
**deficiencies** [1] - 76:13
**defining** [1] - 55:19
**definite** [3] - 11:10, 11:18, 12:6
**degree** [1] - 21:21
**deliberate** [5] - 53:7, 53:11, 53:12, 92:16, 92:18
**deliberating** [2] - 44:10, 92:15
**deliberation** [1] - 53:3
**deliberations** [10] - 44:16, 45:4, 45:6, 46:2, 48:6, 48:16, 48:25, 66:7, 87:8, 93:6
**delivering** [2] - 58:13, 63:14
**delivery** [4] - 12:1, 12:2, 12:10, 12:11
**delta** [2] - 5:25, 79:21
**demand** [4] - 12:22, 61:14, 74:12, 74:13
**demands** [1] - 15:20
**demonstrated** [1] - 40:23
**denied** [1] - 47:21
**denies** [1] - 19:16
**Denman** [1] - 93:3
**deny** [1] - 16:12
**deposition** [6] - 3:24, 4:13, 9:21, 20:1, 49:2, 49:7
**depositions** [1] - 23:7
**depth** [2] - 23:4, 23:8
**deputy** [2] - 93:9, 93:13
**describe** [1] - 53:23
**described** [1] - 31:10
**description** [2] - 8:9, 27:21
**deserves** [3] - 50:5, 50:15, 50:21

**designated** [1] - 18:20
**designations** [1] - 3:25
**despite** [3] - 55:2, 58:14, 59:23
**detail** [1] - 24:7
**details** [1] - 27:13
**determine** [5] - 5:6, 14:11, 25:20, 92:12
**devices** [1] - 47:1
**diagram** [2] - 61:7, 61:12
**Diaz** [2] - 94:9, 94:10
**DIAZ** [1] - 1:22
**dictionaries** [1] - 46:22
**difference** [10] - 33:8, 33:10, 34:2, 34:7, 34:8, 35:12, 35:15, 35:17, 37:12, 51:21
**different** [12] - 6:2, 6:3, 7:20, 17:24, 36:10, 49:19, 62:22, 83:19, 86:2, 88:4
**differential** [1] - 65:6
**differentiate** [2] - 3:16, 6:13
**difficulty** [1] - 68:6
**diligently** [1] - 45:8
**DIRECT** [2] - 21:14, 94:14
**direct** [1] - 40:19
**directed** [1] - 8:17
**direction** [2] - 64:7, 64:9
**directions** [2] - 64:12, 64:18
**directly** [2] - 68:17, 83:24
**dirty** [1] - 90:17
**disaggregate** [1] - 14:17
**discharged** [1] - 48:21
**discount** [2] - 65:5, 87:11
**discuss** [1] - 46:16
**discussed** [4] - 45:12, 46:25, 47:2, 49:2
**discussing** [2] - 46:1, 46:5
**discussion** [2] - 45:17, 58:17
**discussions** [1] - 58:16
**dislikes** [1] - 44:21
**Disney** [2] - 22:4, 22:5
**display** [1] - 20:2
**dispute** [5] - 8:22, 11:25, 12:2, 13:4, 62:7

disputed [3] - 56:1, 63:6, 77:21
disputes [2] - 83:11, 91:24
disputing [1] - 62:2
disregard [2] - 6:18, 49:19
disregarded [1] - 33:4
disregards [1] - 33:15
distributors [1] - 68:20
District [2] - 12:14, 12:20
DISTRICT [3] - 1:1, 1:2, 1:3
DIVISION [1] - 1:2
dizzying [1] - 8:10
document [4] - 10:6, 20:25, 59:8, 71:11
documentation [1] - 80:23
documents [11] - 50:10, 67:25, 69:11, 70:2, 78:1, 79:3, 79:4, 80:8, 82:15, 82:17, 84:18
dollar [5] - 29:8, 29:23, 30:4, 42:12, 61:1
dollars [12] - 28:22, 29:13, 29:16, 29:18, 30:10, 56:4, 56:5, 56:11, 58:21, 59:15, 62:5, 91:5
done [20] - 6:1, 7:1, 8:1, 18:16, 23:4, 25:8, 30:18, 31:13, 31:15, 32:16, 42:13, 43:23, 45:1, 83:10, 84:10, 85:23, 86:24, 89:19, 89:24, 91:17
DOREN [10] - 3:4, 15:14, 19:7, 20:16, 43:22, 54:15, 54:20, 54:23, 81:7, 87:15
Doren [9] - 2:4, 54:18, 67:17, 69:22, 70:23, 75:22, 86:6, 87:14, 92:9
dot [4] - 31:22, 34:13, 35:4, 36:9
dots [9] - 31:17, 31:18, 31:20, 31:25, 32:2, 35:6, 36:3, 36:4, 36:14
dotted [1] - 91:22
doubt [2] - 88:4, 91:11
Doug [1] - 21:2
DOUGLAS [3] - 21:5, 21:12, 94:13

Douglas [1] - 21:11
down [17] - 5:19, 23:16, 33:24, 34:15, 38:7, 38:20, 38:21, 44:5, 64:14, 64:16, 65:11, 65:20, 83:20, 88:24, 90:1, 90:8
dozens [1] - 65:23
Dr [54] - 3:10, 3:23, 4:22, 6:23, 7:14, 8:1, 21:18, 23:1, 23:16, 23:19, 24:19, 25:5, 25:20, 26:1, 26:11, 26:19, 27:5, 27:11, 27:25, 29:7, 29:14, 29:23, 30:12, 30:25, 32:4, 32:21, 33:3, 34:3, 34:25, 35:22, 36:5, 37:13, 37:22, 38:11, 38:15, 39:15, 39:19, 39:21, 40:22, 41:13, 42:22, 43:1, 61:25, 63:15, 63:17, 63:24, 64:21, 64:25, 65:20, 74:23, 85:16, 85:21, 85:22, 91:14
DRAM [2] - 15:17, 55:7
drawn [3] - 31:13, 31:15, 61:24
drill [1] - 23:16
drinking [1] - 55:2
Drive [1] - 2:17
drives [1] - 90:7
DROOKS [1] - 2:13
drop [3] - 62:9, 78:6
dropping [1] - 77:18
drops [1] - 62:9
DUNN [2] - 2:4, 2:7
during [28] - 3:22, 16:2, 17:4, 33:3, 40:18, 44:15, 46:1, 47:2, 48:6, 55:21, 67:16, 68:14, 71:9, 71:12, 72:3, 72:17, 73:11, 74:2, 74:7, 74:18, 76:1, 76:2, 76:3, 77:10, 77:14, 80:9, 82:1, 88:2
duty [3] - 44:13, 44:17, 52:10

E

e-mail [13] - 4:8, 8:12, 14:15, 14:24, 46:7, 58:22, 61:14, 69:11, 72:10, 73:12, 89:10, 89:15, 90:1
e-mails [4] - 69:22,

78:7, 89:1
early [1] - 56:18
easily [1] - 5:24
East [1] - 2:14
Eastern [2] - 12:14, 12:20
economic [2] - 7:20
education [3] - 21:23, 49:25, 50:5
educational [1] - 21:20
effect [1] - 45:20
efficient [1] - 67:11
effort [6] - 3:15, 6:6, 6:13, 25:8, 25:11, 25:20
efforts [8] - 52:1, 52:5, 52:7, 52:13, 52:17, 52:23, 66:15, 84:9
eighth [1] - 28:23
either [4] - 18:12, 27:17, 56:9, 63:16
Ekwan [1] - 2:14
elect [1] - 45:5
ELECTRONICS [1] - 1:8
elements [1] - 51:2
ELO [3] - 77:23, 77:24, 78:4
elsewhere [3] - 59:4, 59:19, 60:1
employees [1] - 68:17
employer [1] - 46:12
end [6] - 26:18, 38:6, 73:17, 77:25, 86:3, 87:7
end-arounds [1] - 86:3
end-of-life [1] - 26:18
enforce [1] - 11:21
enforceable [4] - 10:24, 10:25, 11:10, 11:17
engineering [1] - 21:22
English [2] - 21:22, 49:13
entire [6] - 3:17, 26:25, 38:2, 48:2, 61:9, 73:11
entirely [1] - 84:15
entitled [3] - 7:2, 47:19
entity [1] - 60:16
entries [1] - 8:9
equally [1] - 51:9
equals [1] - 40:8
equivalent [1] - 73:4
essentially [3] - 17:7, 23:8, 31:24

establish [6] - 6:6, 51:13, 51:15, 52:22, 90:23
established [1] - 52:16
estimate [6] - 12:16, 51:18, 66:4, 66:6, 76:19, 80:2
evaluate [1] - 23:1
evaluating [1] - 10:3
event [3] - 4:20, 18:9, 33:14
evidence [52] - 8:13, 8:15, 10:17, 13:5, 14:11, 14:19, 14:23, 15:7, 16:16, 16:21, 20:22, 26:4, 44:13, 44:18, 44:24, 45:2, 45:12, 45:20, 45:23, 47:10, 49:17, 50:7, 50:9, 50:10, 50:13, 50:15, 50:17, 50:19, 50:21, 50:23, 50:24, 51:1, 52:4, 53:21, 60:18, 67:12, 67:13, 68:6, 71:11, 73:20, 73:24, 74:1, 74:4, 74:17, 74:21, 75:5, 77:20, 81:17, 84:11, 85:13, 85:16, 90:19
exact [2] - 64:1, 65:23
exactly [7] - 6:22, 34:12, 34:19, 35:11, 42:23, 62:15, 66:21
EXAMINATION [4] - 21:14, 39:8, 94:14, 94:16
examination [5] - 7:3, 9:17, 9:25, 39:7, 40:19
example [4] - 24:15, 26:16, 32:4, 82:3
Excel [1] - 61:21
except [3] - 45:25, 48:9, 48:12
excerpt [1] - 20:1
exchange [1] - 4:8
exclude [1] - 6:14
excuse [4] - 12:10, 27:18, 56:14, 65:6
excused [2] - 43:14, 47:5
Exhibit [24] - 3:25, 4:6, 4:14, 8:7, 9:21, 20:2, 20:9, 20:19, 20:20, 20:22, 58:5, 68:19, 74:8, 77:14, 79:4, 80:3, 80:12, 81:16, 81:21, 82:23, 88:23, 89:20, 94:12

exhibit [5] - 20:7, 20:10, 20:14, 27:17, 88:25
exhibits [7] - 27:16, 80:25, 81:10, 81:12, 81:22, 85:23, 93:10
exist [1] - 76:5
existed [2] - 76:15, 77:9
exists [2] - 72:5, 80:23
expect [1] - 73:9
expectation [1] - 15:21
expensive [2] - 60:9, 60:10
experience [5] - 21:24, 22:13, 23:11, 49:25, 50:5
expert [7] - 21:17, 22:21, 22:23, 24:4, 38:23, 86:6, 86:8
expertise [2] - 22:14, 43:6
experts [3] - 22:20, 49:23, 61:25
explain [6] - 21:19, 24:3, 29:5, 50:9, 60:14, 60:15
explained [2] - 69:4, 75:21
explains [1] - 69:12
explanation [1] - 77:17
exploratory [2] - 11:19
exposed [2] - 45:24, 48:4
extension [2] - 27:22, 29:21
extent [1] - 51:18
extremely [1] - 56:8

F

Facebook [1] - 46:9
fact [13] - 4:15, 12:21, 14:25, 16:2, 23:15, 33:10, 33:11, 65:3, 75:23, 76:23, 85:8, 85:17, 85:24
factors [1] - 66:5
facts [6] - 44:17, 44:18, 63:11, 68:4, 85:16, 86:2
fail [2] - 71:19, 71:21
failed [12] - 14:1, 33:23, 52:4, 52:17, 52:23, 66:14, 66:15, 75:7, 75:10, 84:9, 85:4, 90:24
fails [2] - 52:1, 52:8

**failure** [6] - 51:4, 66:9, 82:21, 83:22, 86:18
**fair** [4] - 3:22, 47:19, 47:22, 61:7
**fairness** [1] - 48:1
**false** [1] - 82:18
**family** [1] - 46:11
**far** [2] - 27:19, 28:5
**fashion** [1] - 24:19
**fast** [2] - 67:10, 72:19
**Fasteners** [1] - 12:19
**faster** [2] - 68:22, 68:23
**fault** [9] - 67:20, 68:7, 68:8, 70:14, 71:22, 75:8, 75:25, 77:24, 85:8
**favor** [1] - 87:9
**FCRR** [1] - 1:22
**February** [6] - 56:25, 57:19, 59:13, 59:15, 60:24, 61:2
**Federal** [2] - 1:23, 12:14
**federal** [1] - 12:12
**FEINSTEIN** [7] - 10:15, 13:8, 13:11, 13:13, 16:25, 17:3, 17:13
**Feinstein** [4] - 2:19, 3:9, 10:14, 14:4
**fellow** [1] - 46:1
**feuding** [1] - 62:1
**few** [3] - 55:21, 56:4, 66:24
**fewer** [3] - 41:1, 62:15
**field** [1] - 21:25
**figure** [8] - 14:14, 14:17, 15:3, 15:4, 20:11, 30:4, 65:14, 87:4
**file** [1] - 84:21
**filed** [1] - 83:15
**files** [3] - 23:6, 23:7, 75:5
**fill** [6] - 24:24, 59:4, 59:19, 62:17, 72:5, 72:11
**filled** [4] - 24:10, 25:6, 72:3, 72:17
**final** [3] - 6:12, 26:15, 86:5
**finally** [2] - 61:3, 61:5
**financial** [2] - 23:7, 52:14
**fine** [6] - 10:11, 40:17, 53:17, 54:14, 77:11, 84:25
**finish** [1] - 19:21
**fire** [1] - 55:2

**firm** [3] - 12:17, 74:12, 83:9
**first** [34] - 3:8, 3:10, 7:25, 8:7, 15:25, 18:15, 23:4, 27:24, 28:4, 28:10, 28:12, 28:14, 59:25, 63:25, 67:8, 67:18, 67:22, 68:10, 69:16, 69:17, 71:16, 72:21, 73:19, 75:13, 75:14, 78:13, 82:4, 82:6, 82:7, 82:14, 86:10, 87:22, 89:7
**five** [3] - 60:2, 60:3, 66:18
**flaws** [1] - 43:1
**Flexitech** [1] - 12:19
**flipping** [1] - 57:4
**Floor** [3] - 2:6, 2:14, 2:19
**focus** [1] - 61:10
**focused** [1] - 23:21
**folks** [3] - 66:20, 68:20, 85:15, 89:12, 89:16
**follow** [6] - 44:19, 47:23, 47:24, 78:14, 84:12, 86:1
**followed** [1] - 86:15
**following** [2] - 10:19, 86:13
**follows** [1] - 21:7
**force** [2] - 84:22, 91:2
**forced** [5] - 69:2, 87:17, 87:20, 91:2, 91:6
**forcing** [1] - 84:24
**forecast** [7] - 11:16, 12:16, 14:5, 14:24, 61:13, 73:13, 83:13
**forecasts** [32] - 10:21, 10:23, 10:25, 11:19, 12:5, 12:13, 12:21, 12:24, 13:2, 13:16, 13:25, 14:15, 15:19, 55:10, 72:6, 72:8, 72:19, 72:23, 73:3, 73:4, 73:8, 73:18, 73:20, 74:9, 74:20, 74:25, 78:3, 79:6, 88:15, 89:22, 89:23
**foregoing** [1] - 94:2
**forget** [1] - 5:17
**form** [9] - 11:9, 12:25, 46:10, 48:22, 48:24, 55:10, 67:19, 83:18, 84:12
**formal** [1] - 55:10
**formation** [1] - 51:3

**formula** [1] - 85:20
**forth** [1] - 70:15
**fortunately** [1] - 61:21
**forward** [2] - 64:7, 88:18
**foundationally** [1] - 81:25
**four** [3] - 35:6, 58:25, 85:4
**frame** [5] - 71:12, 74:18, 75:18, 76:1, 76:2
**frames** [1] - 76:3
**framework** [2] - 11:3, 55:22
**frankly** [2] - 81:19, 82:4
**freedom** [1] - 69:10
**Friday** [1] - 1:16
**frustrating** [1] - 87:2
**fulfill** [4] - 16:17, 17:22, 66:9, 73:13
**fulfilled** [3] - 13:6, 15:22, 75:24
**fulfilling** [1] - 77:24
**full** [5] - 21:9, 58:7, 58:12, 59:19, 75:15
**fully** [3] - 45:12, 51:8, 51:11
**fundamental** [3] - 7:13, 51:9, 82:11
**fundamentally** [3] - 82:18, 84:6, 84:18
**furthestmost** [1] - 32:7
**future** [2] - 11:4, 12:21

### G

**gain** [1] - 47:15
**gained** [1] - 51:10
**gap** [5] - 59:4, 72:2, 72:5, 72:16
**Gate** [1] - 22:18
**general** [3] - 7:8, 51:19, 53:20
**generally** [1] - 60:7
**gentleman** [1] - 61:17
**gentlemen** [5] - 54:23, 66:24, 67:8, 85:19, 91:25
**George** [1] - 21:11
**GEORGE** [1] - 21:12
**GIBSON** [2] - 2:4, 2:7
**gist** [1] - 9:14
**given** [6] - 4:15, 50:6, 53:25, 64:22, 66:6, 69:5
**gladly** [1] - 56:12
**Golden** [1] - 22:18

**goodness** [1] - 88:5
**governing** [1] - 83:11
**graciously** [1] - 58:22
**Graduate** [2] - 22:17
**Grand** [2] - 2:6
**grant** [1] - 16:24
**graph** [4] - 24:6, 34:12, 34:13, 34:15
**graphic** [2] - 27:10, 36:11, 40:12
**gray** [1] - 31:18
**great** [4] - 10:13, 54:22, 75:16, 93:14
**green** [1] - 36:14
**grounds** [1] - 10:19
**guess** [2] - 75:4, 79:13
**guidance** [2] - 42:5, 42:19
**guys** [1] - 67:9

### H

**half** [3] - 54:6, 54:24, 77:18
**Hamilton** [1] - 22:2
**hampered** [1] - 16:22
**hand** [5] - 12:5, 21:3, 61:9, 71:2, 92:24
**handling** [1] - 90:16
**hands** [2] - 33:6, 87:3
**hang** [1] - 24:5
**happy** [3] - 75:16, 75:17, 83:7
**hard** [7] - 59:5, 59:18, 63:16, 67:2, 80:13, 85:15, 92:8
**harm** [5] - 42:19, 42:24, 42:25, 43:7, 51:18
**head** [2] - 57:4, 84:19
**headquarter's** [1] - 57:7
**headquarters** [1] - 57:2
**hear** [8] - 30:12, 33:3, 38:11, 47:6, 53:6, 63:9, 88:1, 93:15
**heard** [27] - 7:6, 12:22, 15:1, 15:20, 33:7, 38:15, 44:12, 49:12, 49:23, 57:12, 59:17, 59:21, 60:6, 60:7, 60:11, 60:12, 61:11, 61:24, 64:10, 65:1, 66:20, 82:4, 82:13, 84:19, 88:9, 89:20
**held** [2] - 87:15, 88:6
**help** [6] - 27:8, 50:9, 57:22, 58:2, 77:2, 79:4

**goodness** [1] - 88:5
**governing** [1] - 83:11

**helped** [1] - 42:5
**helpful** [2] - 27:12, 67:14
**hereby** [1] - 10:15
**hesitate** [1] - 31:5
**hide** [1] - 90:20
**hiding** [1] - 62:24
**high** [1] - 31:16
**high-volume** [1] - 31:16
**higher** [3] - 6:25, 65:7, 78:23
**highlights** [2] - 3:21, 4:21
**himself** [1] - 79:11
**hindsight** [1] - 52:14
**hire** [3] - 42:18, 84:22, 84:23
**hired** [4] - 42:15, 43:2, 43:3, 65:14
**hoc** [1] - 55:12
**holding** [1] - 77:5
**home** [1] - 93:16
**honest** [1] - 45:20
**Hong** [14] - 12:23, 55:25, 59:22, 60:7, 69:9, 70:20, 72:7, 72:23, 73:1, 75:16, 83:2
**Honor** [38] - 3:4, 3:6, 3:20, 4:13, 6:12, 6:19, 8:6, 8:14, 8:18, 9:20, 10:10, 10:15, 10:23, 11:7, 12:12, 12:24, 14:3, 15:10, 15:14, 17:15, 18:8, 19:7, 19:25, 20:5, 20:11, 20:16, 20:24, 22:19, 39:5, 43:13, 43:16, 43:20, 43:22, 53:17, 54:15, 54:20, 67:6, 81:7
**HONORABLE** [1] - 1:3
**Hope** [1] - 2:19
**hopefully** [2] - 67:14, 87:8
**horizontal** [1] - 31:23
**horrible** [1] - 78:2
**horse** [1] - 18:6
**hose** [1] - 55:2
**hour** [2] - 54:7, 89:7
**hundred** [1] - 78:19

### I

**idea** [3] - 24:9, 30:2, 33:11
**identified** [1] - 13:20
**identify** [2] - 4:9, 30:25

**ignore** [2] - 34:24, 61:9
**illustrate** [1] - 50:17
**Imagineering** [1] - 22:4
**immediately** [4] - 27:4, 48:5, 56:9, 59:11
**impartial** [1] - 47:20
**implicitly** [1] - 37:2
**important** [10] - 45:14, 47:24, 49:16, 68:5, 70:6, 74:10, 81:5, 81:24, 83:20, 84:20
**importantly** [3] - 5:9, 5:13, 6:7
**improper** [2] - 7:18, 47:15
**inaccurate** [2] - 34:6, 47:17
**inadmissible** [1] - 15:12
**INC** [1] - 1:5
**include** [3] - 12:5, 14:14, 29:18
**included** [3] - 5:20, 30:3, 41:13
**includes** [2] - 29:25, 46:5
**including** [5] - 12:9, 36:25, 46:8, 47:4, 48:18
**incomplete** [1] - 47:17
**incorrectly** [1] - 41:8
**increase** [1] - 58:23
**increased** [2] - 52:9, 59:10
**indeed** [1] - 65:3
**indicated** [1] - 67:16
**indicating** [1] - 9:3
**industry** [1] - 69:4
**influenced** [2] - 44:21, 47:16
**information** [8] - 45:25, 46:20, 47:15, 47:17, 47:21, 48:4, 50:17, 85:23
**informational** [2] - 11:18, 11:19
**injured** [5] - 51:7, 51:9, 52:6, 52:8, 52:12
**injury** [2] - 52:15, 63:8
**inquiries** [1] - 14:16
**inquiry** [1] - 14:24
**insofar** [1] - 49:6
**Instagram** [1] - 46:9
**instead** [9] - 7:15, 8:2, 37:6, 38:1, 57:5, 60:2, 60:3, 65:6,
83:5
**instruct** [1] - 44:13
**instructed** [1] - 89:2
**instruction** [6] - 53:19, 53:23, 54:1, 66:2, 82:8, 82:22
**instructions** [13] - 19:22, 43:25, 44:2, 44:3, 44:7, 44:11, 44:14, 44:25, 45:23, 53:2, 76:20, 84:20, 91:8
**intended** [1] - 62:15
**intent** [1] - 78:21
**intentions** [1] - 92:22
**interacted** [1] - 56:19
**interested** [1] - 90:9
**interesting** [2] - 73:22, 80:8
**interestingly** [2] - 73:7, 79:24
**internal** [1] - 62:11
**Internet** [3] - 46:7, 46:22, 47:1
**interpreter** [2] - 49:15, 49:21
**interpreter's** [1] - 49:18
**interpreting** [1] - 12:13
**intervening** [1] - 33:24
**invent** [1] - 86:2
**invented** [1] - 79:7
**inventing** [1] - 79:9
**inventory** [1] - 90:14
**investigation** [2] - 46:23, 47:14
**invitation** [1] - 83:16
**invoice** [7] - 27:19, 32:8, 32:10, 34:17, 34:18, 34:21, 60:3
**invoices** [3] - 32:13, 34:19, 63:19
**invoked** [1] - 11:20
**involuntary** [2] - 68:13, 85:5
**involved** [5] - 22:8, 42:4, 46:13, 47:4, 74:14
**involves** [1] - 45:25
**irrelevant** [1] - 41:9
**issue** [15] - 8:21, 10:12, 16:15, 16:19, 17:6, 42:1, 55:6, 69:23, 69:24, 70:7, 75:22, 77:22, 83:13
**issues** [3] - 16:14, 41:22, 45:25
**item** [4] - 8:8, 8:9, 27:20, 27:21

**itself** [1] - 60:5

**J**

**jail** [1] - 91:12
**Jason** [2] - 2:5, 39:12
**JDLA** [12] - 10:18, 56:5, 60:23, 61:5, 66:10, 72:21, 72:22, 73:9, 73:10, 73:11, 88:15
**jeopardizes** [1] - 47:25
**Jiang** [6] - 3:25, 20:1, 59:22, 72:9, 79:11, 79:14
**JMOL** [1] - 16:13
**job** [5] - 42:20, 76:12, 85:11, 85:14
**JS** [1] - 58:22
**JUDGE** [1] - 1:3
**judged** [2] - 50:2, 50:3
**judgment** [6] - 8:16, 10:16, 11:2, 16:18, 16:24, 18:5
**July** [5] - 58:16, 58:24, 61:2, 61:6, 73:16
**jump** [2] - 13:12, 13:13
**JungEun** [1] - 2:8
**juror** [5] - 45:5, 45:6, 47:25, 48:4, 48:24
**jurors** [7] - 45:9, 45:13, 45:19, 46:1, 47:5, 49:16, 53:12
**JURY** [1] - 1:12
**jury** [40] - 3:18, 6:14, 6:18, 7:3, 7:11, 15:8, 19:17, 19:18, 21:19, 24:3, 29:5, 42:24, 43:25, 44:4, 44:7, 44:11, 44:12, 44:15, 45:7, 46:15, 47:20, 48:8, 48:11, 48:19, 53:2, 53:3, 53:8, 53:11, 53:23, 54:17, 54:23, 66:2, 76:20, 81:12, 87:1, 92:11, 93:6, 93:7, 93:16
**justice** [1] - 91:10
**justification** [7] - 5:4, 5:5, 5:8, 6:5, 33:4, 38:12, 38:15
**justify** [1] - 5:15
**justifying** [1] - 30:13

**K**

**K-i-d-d-e-r** [1] - 21:12
**keep** [2] - 58:24, 89:8

**Kevin** [1] - 93:3
**key** [1] - 77:7
**Ki** [2] - 59:22, 60:7
**Kidder** [18] - 21:2, 21:11, 21:16, 22:21, 27:9, 37:9, 39:10, 41:22, 43:14, 61:24, 64:5, 65:2, 65:13, 65:19, 67:24, 74:1, 78:11, 84:16
**KIDDER** [2] - 21:5, 94:13
**Kim** [1] - 61:17
**kind** [5] - 35:3, 36:9, 37:17, 53:4, 89:3
**kinds** [1] - 88:3
**knowing** [3] - 58:6, 59:19, 60:4
**knows** [3] - 38:16, 59:3, 90:19
**Knuth** [25] - 8:12, 56:7, 56:13, 56:20, 56:25, 57:16, 57:25, 58:18, 59:8, 59:17, 59:24, 60:12, 61:13, 66:20, 69:3, 76:23, 77:5, 81:1, 81:2, 88:1, 89:2, 89:12, 89:16, 90:1, 90:4
**Knuth's** [1] - 77:8
**Korea** [1] - 61:18
**Korean** [2] - 49:13, 49:16

**L**

**ladies** [5] - 54:23, 66:24, 67:8, 85:19, 91:25
**LaMagna** [1] - 2:5
**Lane** [1] - 61:17
**language** [4] - 49:13, 49:14, 49:16
**last** [5] - 37:8, 37:10, 59:13, 63:16, 78:9
**late** [3] - 53:13, 74:8, 92:19
**Law** [7] - 2:4, 2:5, 2:5, 2:8, 2:14, 2:16, 2:19
**law** [19] - 10:16, 10:23, 11:8, 11:12, 11:13, 11:20, 12:12, 13:4, 16:18, 18:9, 19:2, 44:13, 44:18, 44:19, 47:3, 52:6, 83:9, 86:1, 86:2
**lawsuit** [2] - 83:15, 84:22
**lawyers** [7] - 47:5, 48:15, 49:4, 56:20,

84:22, 84:23, 88:2
**lay** [1] - 51:17
**lead** [5] - 27:3, 68:22, 68:25, 77:2, 77:4
**learn** [1] - 46:24
**learned** [3] - 55:16, 55:17, 56:3
**least** [6] - 4:1, 17:14, 54:6, 54:8, 70:12, 89:6
**leave** [3] - 51:7, 53:14, 92:20
**Lee** [1] - 2:8
**left** [2] - 27:19, 32:7
**legal** [3] - 11:14, 12:8, 15:16
**legally** [3] - 10:17, 15:7, 58:14
**less** [14] - 5:12, 34:5, 35:23, 36:15, 36:17, 37:3, 38:9, 38:17, 38:19, 40:24, 41:12, 57:15, 78:6
**lesser** [1] - 69:19
**letter** [4] - 73:15, 82:25, 83:5, 83:14
**letters** [3] - 73:17, 82:23, 83:12
**LICENBERG** [1] - 2:13
**lie** [1] - 63:11
**lied** [2] - 87:23, 87:25
**lieu** [2] - 49:7, 49:8
**life** [3] - 26:18, 66:5, 77:25
**likely** [2] - 91:9, 91:11
**limit** [5] - 32:22, 77:15, 77:17, 77:19, 77:21
**limitation** [2] - 74:3, 74:14
**limited** [2] - 46:8, 59:12
**limiting** [1] - 52:14
**line** [10] - 36:14, 62:8, 62:10, 62:23, 62:25, 75:15, 89:18, 90:9, 91:22
**lines** [2] - 36:9, 62:10
**link** [4] - 63:7, 83:22, 83:25, 84:1
**LinkedIn** [1] - 46:9
**list** [7] - 5:6, 7:12, 8:8, 8:11, 8:20, 90:5, 90:13
**listen** [1] - 46:18
**listened** [1] - 45:13
**lists** [1] - 79:7
**literally** [2] - 69:20, 79:8
**litigating** [1] - 83:17
**litigation** [1] - 22:6

**live** [1] - 49:8
**LLP** [4] - 2:4, 2:7, 2:16, 2:18
**Lo** [3] - 2:5, 39:12, 86:8
**lo** [1] - 38:5
**LO** [15] - 6:19, 7:24, 8:15, 8:23, 9:2, 9:7, 9:13, 9:15, 9:24, 10:9, 20:5, 20:18, 39:9, 43:11, 94:17
**look** [29] - 8:3, 8:5, 23:3, 30:24, 32:9, 33:9, 34:15, 34:17, 34:20, 43:1, 62:25, 63:10, 70:22, 71:2, 75:14, 75:17, 77:22, 79:6, 79:19, 79:20, 80:14, 80:15, 81:17, 82:14, 82:16, 82:23, 89:20, 90:8
**Look** [1] - 24:22
**looked** [9] - 4:5, 12:12, 23:6, 23:8, 31:7, 74:23, 80:18, 80:25, 81:4
**looking** [9] - 13:3, 22:4, 27:9, 31:18, 34:10, 36:2, 41:16, 60:23, 64:8
**looks** [1] - 8:11
**Los** [5] - 1:15, 1:24, 2:6, 2:15, 2:20
**loss** [1] - 52:9
**losses** [6] - 52:2, 52:5, 52:8, 52:13, 52:18, 52:24
**love** [1] - 61:21
**lower** [7] - 26:23, 39:16, 40:8, 60:16, 65:3, 78:17, 80:20
**LTD** [1] - 1:8
**lunch** [1] - 19:19
**lying** [3] - 82:9, 82:10, 88:1

## M

**mad** [1] - 67:9
**mail** [13] - 4:8, 8:12, 14:15, 14:24, 46:7, 58:22, 61:14, 69:11, 72:10, 73:12, 89:10, 89:15, 90:1
**mails** [4] - 69:22, 78:7, 89:1
**majority** [6] - 6:9, 28:25, 29:17, 30:9, 71:7, 83:25
**man** [2] - 60:4, 65:17

**Marc** [1] - 2:19
**March** [5] - 57:7, 57:9, 61:3, 62:7, 69:11
**MARELLA** [1] - 2:13
**margins** [1] - 71:2
**MARK** [1] - 1:3
**market** [5] - 51:20, 51:22, 53:21, 64:20, 69:14
**marking** [1] - 90:15
**master's** [1] - 21:22
**match** [19] - 4:25, 9:9, 9:10, 25:9, 29:10, 71:23, 75:9, 79:3, 79:12, 79:17, 79:25, 81:23, 85:7, 86:22, 86:23, 91:15
**matched** [13] - 3:17, 3:19, 6:8, 6:10, 6:15, 7:22, 8:25, 30:6, 30:13, 30:19, 41:2, 41:5, 63:25
**matches** [2] - 5:14, 29:17
**matching** [15] - 3:14, 5:1, 28:22, 29:15, 30:1, 30:25, 35:21, 68:7, 71:22, 72:1, 78:15, 79:16, 80:10, 88:20, 88:22
**material** [2] - 12:1, 12:9
**materials** [1] - 46:23
**math** [7] - 30:1, 39:21, 70:12, 77:16, 80:5, 80:23, 81:25
**mathematical** [3] - 40:2, 41:6, 41:21
**mathematically** [3] - 6:25, 41:19, 65:2
**mathematics** [1] - 21:21
**matter** [10] - 10:16, 10:23, 13:4, 14:5, 16:18, 19:20, 46:16, 52:13, 57:10, 94:3
**matters** [1] - 57:11
**mean** [16] - 5:16, 26:10, 26:12, 26:20, 28:8, 30:15, 35:18, 54:13, 68:22, 75:24
**meaning** [3] - 10:22, 49:19, 59:13
**means** [13] - 13:24, 28:9, 44:23, 46:6, 50:23, 52:14, 68:8, 68:23, 76:18, 84:21, 87:5, 91:8
**meant** [1] - 73:3
**measure** [1] - 51:20

**measured** [1] - 62:5
**mechanical** [1] - 38:3
**media** [4] - 46:10, 46:12, 46:18, 47:7
**meet** [6] - 4:22, 11:23, 12:3, 85:1, 85:24, 86:19
**meeting** [1] - 85:14
**members** [4] - 44:12, 45:5, 46:12, 48:8, 48:11
**memory** [3] - 56:2, 56:3, 59:23
**mention** [4] - 73:23, 75:13, 83:12, 83:13
**mentioned** [5] - 73:19, 74:24, 79:4, 85:5, 88:15
**mere** [1] - 75:23
**merits** [1] - 46:4
**mess** [1] - 86:19
**message** [2] - 46:7, 58:13
**messiness** [1] - 66:5
**met** [7] - 16:3, 56:20, 68:9, 86:4, 87:6, 87:9, 88:2
**methodology** [15] - 3:21, 6:6, 36:19, 36:20, 37:13, 78:14, 78:15, 78:25, 79:9, 86:2, 86:3, 86:13, 86:16, 88:21, 88:22
**Michael** [2] - 2:16, 3:6
**Michigan** [2] - 12:14, 12:20
**middle** [3] - 29:22, 35:4, 36:9
**midpoint** [2] - 64:16, 64:17
**might** [4] - 23:22, 37:3, 62:22, 65:15
**million** [55] - 13:15, 13:19, 13:21, 13:22, 13:24, 26:9, 29:6, 29:22, 39:22, 42:13, 56:9, 58:2, 58:21, 58:23, 58:25, 59:11, 59:15, 61:1, 65:8, 68:12, 69:18, 69:25, 70:11, 70:13, 71:19, 71:21, 71:23, 71:24, 72:2, 72:11, 72:15, 72:16, 72:24, 75:1, 75:8, 75:9, 75:11, 75:18, 75:20, 76:9, 76:10, 77:18, 77:19, 78:5, 83:5, 85:5, 85:6, 85:7, 88:17, 91:13

**millions** [3] - 56:5, 56:11, 59:1
**mind** [1] - 58:24
**minds** [1] - 76:6
**minimize** [1] - 66:22
**minimum** [2] - 3:12, 4:20
**minority** [3] - 30:6, 70:9, 70:13
**minus** [9] - 28:3, 37:6, 37:18, 37:20, 37:21, 38:8, 38:22
**minute** [3] - 8:5, 24:5, 73:12
**minutes** [6] - 53:6, 54:4, 54:10, 54:21, 55:21, 66:25
**misleading** [1] - 47:17
**missed** [2] - 88:16, 88:21
**mistrial** [1] - 48:1
**mitigate** [1] - 82:21
**mitigation** [1] - 84:8
**mixed** [1] - 73:17
**model** [1] - 23:5
**modified** [1] - 5:19
**moment** [2] - 17:5, 31:14
**Monday** [3] - 53:14, 92:17, 93:17
**monetary** [3] - 42:1, 42:24, 42:25
**money** [2] - 80:23, 83:3
**month** [10] - 56:4, 56:5, 56:11, 59:2, 59:12, 59:13, 59:16, 62:6, 77:20, 80:17
**monthly** [4] - 7:8, 55:11, 62:5, 64:11
**months** [4] - 33:20, 57:19, 59:1, 78:21
**morning** [3] - 3:24, 15:20
**most** [10] - 5:13, 6:7, 29:15, 57:17, 61:21, 64:23, 70:6, 80:3, 84:6
**motion** [15] - 3:5, 3:10, 7:18, 8:16, 8:17, 9:16, 9:19, 10:14, 10:19, 13:4, 15:11, 16:12, 16:14, 19:16
**motions** [1] - 3:7
**mouths** [1] - 82:7
**move** [3] - 7:21, 8:20, 40:12
**moves** [1] - 10:15
**moving** [1] - 72:18

**MR** [58] - 3:4, 3:6, 5:20, 6:12, 6:17, 6:19, 7:24, 8:13, 8:15, 8:18, 8:23, 9:2, 9:7, 9:13, 9:15, 9:20, 9:24, 10:9, 10:15, 13:8, 13:11, 13:13, 15:14, 16:25, 17:3, 17:13, 19:7, 19:25, 20:5, 20:8, 20:11, 20:13, 20:16, 20:18, 20:24, 21:2, 21:15, 22:19, 22:24, 39:4, 39:9, 43:11, 43:13, 43:20, 43:22, 53:17, 54:10, 54:15, 54:20, 54:23, 67:4, 67:8, 81:7, 81:13, 81:15, 87:15, 94:15, 94:17
**multiple** [1] - 59:1
**multiplies** [1] - 39:22
**must** [22] - 11:6, 11:9, 11:18, 11:21, 44:19, 44:20, 44:23, 45:10, 45:22, 45:24, 46:15, 49:17, 49:19, 49:20, 50:23, 51:13, 51:17, 51:24, 70:2, 70:11
**MYERS** [2] - 2:16, 2:18
**mystery** [1] - 58:11

## N

**NA** [4] - 28:4, 28:7, 28:8, 28:14
**name** [4] - 14:15, 21:9, 39:12, 93:1
**NAND** [2] - 15:17, 55:7
**narrow** [3] - 38:7, 38:8, 38:21
**nature** [3] - 55:18, 71:6, 82:11
**Neal** [4] - 8:12, 76:23, 77:5, 90:1
**near** [1] - 86:16
**nearly** [1] - 58:7
**necessary** [1] - 48:6
**need** [20] - 3:23, 15:10, 24:2, 44:4, 55:13, 58:11, 59:20, 63:8, 67:4, 78:14, 78:19, 80:15, 81:2, 81:5, 81:18, 82:1, 82:3, 86:22, 90:14, 90:23
**needed** [7] - 24:17, 27:2, 56:15, 59:19, 59:23, 61:6, 74:21
**needs** [4] - 66:4, 72:1,

76:11, 93:9
**negative** [7] - 5:21, 5:23, 6:24, 36:13, 36:22, 40:1
**negotiable** [1] - 5:7
**negotiated** [3] - 14:6, 73:10, 83:10
**NESSIM** [1] - 2:13
**Netlist** [113] - 4:3, 5:11, 10:17, 10:21, 11:1, 11:6, 12:7, 12:21, 13:14, 14:1, 14:13, 15:21, 15:22, 16:22, 17:8, 18:10, 23:22, 24:9, 24:12, 24:17, 24:23, 25:5, 26:17, 26:22, 27:1, 28:2, 28:16, 35:22, 36:17, 39:12, 41:23, 42:19, 42:24, 42:25, 51:24, 51:25, 52:1, 52:4, 52:16, 52:20, 52:23, 54:12, 55:4, 55:8, 55:9, 55:18, 55:20, 56:2, 56:11, 56:14, 56:19, 56:23, 57:1, 57:21, 57:25, 58:6, 58:9, 58:13, 59:1, 59:3, 59:5, 59:11, 59:12, 59:19, 60:22, 61:5, 61:14, 61:15, 62:4, 62:12, 62:13, 62:15, 62:19, 62:20, 63:4, 65:3, 65:14, 66:8, 66:15, 66:21, 67:23, 68:1, 68:11, 69:8, 71:19, 73:7, 73:21, 74:2, 74:3, 74:10, 74:13, 74:15, 74:17, 75:4, 75:7, 75:15, 76:3, 76:24, 77:10, 77:11, 78:8, 83:20, 83:24, 84:3, 84:9, 84:15, 89:4, 89:5, 89:16, 90:5, 90:10, 90:15, 90:17
**NETLIST** [1] - 1:5
**Netlist's** [15] - 10:20, 16:23, 53:1, 55:8, 66:10, 68:2, 68:3, 68:17, 74:20, 75:5, 76:6, 76:14, 81:20, 84:17, 90:3
**never** [8] - 33:9, 72:3, 72:17, 73:7, 73:19, 74:7, 74:23, 89:21
**New** [3] - 11:8, 18:9, 19:2
**new** [2] - 22:4, 88:5

**Newport** [2] - 2:17, 2:17
**news** [2] - 46:18, 46:20
**next** [9] - 21:1, 32:16, 32:20, 34:9, 34:15, 35:1, 35:20, 51:24, 91:20
**nobody** [4] - 62:1, 62:24, 89:25, 91:24
**non** [1] - 5:7
**non-negotiable** [1] - 5:7
**nonbinding** [2] - 12:16, 74:9
**none** [1] - 43:13
**note** [1] - 48:7
**nothing** [1] - 80:3
**notice** [2] - 73:16, 89:15
**noticed** [1] - 64:5
**notify** [1] - 48:5
**notion** [1] - 84:16
**November** [3] - 60:24, 72:22, 73:2
**number** [24] - 20:7, 20:10, 20:14, 26:15, 27:23, 30:20, 39:13, 40:7, 40:19, 40:20, 41:5, 65:11, 65:12, 65:17, 66:3, 75:20, 76:9, 76:10, 78:6, 80:16, 81:2, 87:10, 87:11
**Number** [2] - 20:22, 94:12
**numbers** [7] - 8:10, 23:11, 23:12, 27:17, 54:9, 76:16, 80:7
**NVDIMM** [1] - 90:10
**NW** [1] - 2:8

# O

**O'MELVENY** [2] - 2:16, 2:18
**oath** [4] - 44:24, 47:11, 47:23, 49:4
**object** [3] - 8:18, 53:24, 53:25
**objection** [3] - 20:4, 53:18, 81:7
**objections** [1] - 4:1
**obligation** [15] - 10:24, 11:1, 11:10, 11:15, 14:9, 16:3, 17:22, 55:7, 57:4, 67:24, 68:2, 68:3, 68:4
**observation** [1] -

12:15
**observed** [1] - 11:3
**obvious** [3] - 32:17, 37:17, 63:13
**obviously** [2] - 83:9, 92:17
**occasions** [1] - 42:11
**occur** [5] - 72:2, 84:25, 87:17, 87:20
**occurred** [3] - 10:2, 39:16, 43:7
**OF** [3] - 1:2, 1:12, 2:1
**offer** [10] - 5:4, 5:5, 11:9, 11:13, 11:17, 12:9, 12:10, 15:16, 22:10, 65:24
**offered** [3] - 3:12, 6:8, 15:4
**offering** [1] - 24:16
**offers** [1] - 5:7
**office** [1] - 85:22
**officer** [1] - 93:3
**official** [1] - 1:23
**Official** [1] - 1:23
**once** [7] - 18:23, 38:3, 61:13, 61:14, 62:9, 73:17, 76:8
**one** [59] - 7:17, 11:14, 14:14, 16:14, 16:25, 17:3, 18:11, 19:6, 24:5, 24:12, 31:15, 31:16, 31:17, 31:18, 31:19, 33:15, 34:18, 35:13, 40:8, 40:11, 41:4, 41:17, 41:20, 41:22, 43:5, 43:6, 45:5, 48:8, 56:23, 57:16, 60:2, 60:14, 62:15, 63:5, 64:7, 65:15, 65:24, 65:25, 72:4, 73:12, 75:23, 79:24, 79:25, 80:9, 86:25, 87:23, 88:24, 89:18, 90:2, 90:19, 91:16, 91:20, 92:14
**ones** [4] - 5:23, 26:14, 84:24, 89:21
**ongoing** [1] - 19:14
**only"** [1] - 12:17
**open** [2] - 25:16, 48:13
**opening** [4] - 61:8, 67:16, 68:14, 84:19
**operative** [1] - 73:11
**opined** [2] - 42:8, 42:11
**opinion** [11] - 3:11, 3:12, 3:17, 37:22, 43:4, 45:2, 45:17, 49:24, 50:2, 50:6,

65:13
**opinions** [8] - 15:11, 22:11, 23:1, 38:24, 44:21, 49:24, 74:19
**opportunity** [1] - 82:24
**opposed** [2] - 23:24, 35:10
**option** [3] - 18:11, 18:15, 18:22
**options** [1] - 91:18
**orange** [1] - 31:25
**order** [26] - 1:25, 4:10, 10:11, 11:2, 11:10, 14:20, 14:24, 15:16, 15:23, 18:6, 18:24, 19:9, 23:24, 50:9, 57:13, 57:23, 58:2, 61:16, 62:18, 70:10, 75:23, 77:3, 79:3, 80:15, 82:2, 83:1
**ordered** [5] - 46:16, 62:7, 74:4, 74:6, 75:5
**orders** [63] - 11:23, 11:25, 12:3, 13:1, 13:6, 13:20, 13:21, 13:24, 14:2, 14:12, 14:16, 15:5, 16:15, 16:16, 16:20, 16:22, 17:9, 17:10, 25:5, 25:7, 25:9, 57:2, 57:8, 57:9, 57:17, 57:21, 60:24, 61:10, 62:4, 62:12, 62:13, 62:15, 62:16, 63:2, 63:19, 63:21, 64:23, 66:10, 67:21, 72:12, 72:25, 73:4, 75:18, 76:3, 76:4, 76:22, 76:24, 77:17, 77:23, 79:12, 80:18, 80:21, 83:6, 83:14, 84:2, 88:9, 88:10, 88:16, 88:18, 89:2, 89:13
**original** [1] - 58:5
**otherwise** [1] - 48:20
**ought** [1] - 54:14
**outcome** [2] - 39:2, 39:3
**outside** [2] - 47:14, 48:4
**overall** [1] - 14:14
**overlay** [1] - 63:12
**overpaying** [1] - 78:24
**overrule** [1] - 9:16
**own** [8] - 4:15, 45:16, 46:24, 68:17, 69:3, 71:18, 83:25, 84:1

# P

**page** [3] - 29:22, 32:16, 89:20
**pages** [6] - 86:21, 86:22, 86:23
**paid** [13] - 23:23, 24:18, 25:16, 25:18, 28:2, 30:3, 31:22, 33:22, 34:6, 35:8, 36:18, 37:3, 37:4
**Paik** [2] - 59:22, 60:7
**paragraph** [1] - 53:19
**Park** [1] - 2:14
**part** [14] - 4:2, 8:10, 11:13, 16:23, 52:1, 62:3, 78:9, 79:10, 80:15, 80:16, 81:2, 88:16, 88:21
**particular** [6] - 31:16, 32:1, 32:3, 34:21, 55:12, 81:2
**parties** [9] - 12:3, 14:6, 18:14, 22:19, 47:4, 47:19, 47:22, 53:4, 92:10
**parts** [4] - 63:25, 78:2, 89:6, 91:15
**party** [17] - 18:25, 42:8, 42:11, 49:5, 49:22, 50:22, 51:1, 51:7, 51:9, 51:10, 52:6, 52:8, 52:11, 52:12, 56:16, 65:4, 86:24
**party's** [1] - 47:9
**pass** [1] - 39:4
**path** [1] - 19:1
**pathway** [1] - 87:5
**pattern** [1] - 53:19
**patterns** [1] - 6:3
**pay** [2] - 28:6, 91:12
**paying** [1] - 56:11
**payment** [2] - 12:2, 12:11
**people** [8] - 46:12, 47:3, 60:20, 60:21, 88:5, 89:5, 90:23, 92:3
**per** [2] - 27:22, 59:12
**percent** [41] - 5:2, 5:13, 5:20, 6:21, 8:3, 28:20, 28:21, 29:11, 29:12, 29:13, 30:5, 30:19, 33:21, 33:22, 34:1, 35:9, 35:18, 35:19, 36:24, 37:3, 37:6, 37:7, 37:24, 38:6, 38:9, 38:21, 39:22, 39:25, 58:7,

60:8, 60:9, 60:10, 65:1, 65:2, 65:6, 65:21, 70:12, 70:14, 79:25, 85:1

**percentage** [10] - 5:9, 5:17, 5:18, 6:25, 28:6, 30:10, 30:13, 32:5, 38:20, 80:7

**perfect** [3] - 64:20, 64:21, 66:3

**perfectly** [1] - 84:25

**perform** [5] - 18:25, 51:5, 52:12, 52:19, 52:25

**performance** [3] - 18:1, 18:20, 51:4

**performed** [2] - 51:8, 51:11

**perhaps** [1] - 70:6

**period** [14] - 9:4, 16:2, 28:13, 37:12, 41:17, 55:20, 57:19, 60:23, 62:10, 74:22, 75:15, 75:19, 77:10, 83:8

**periods** [2] - 74:3, 75:14

**permission** [1] - 3:8

**permitted** [2] - 61:15, 63:22

**person** [5] - 11:14, 46:5, 49:11, 74:24, 86:24

**personal** [1] - 44:21

**persuaded** [1] - 50:24

**persuades** [1] - 45:18

**phase** [1] - 55:3

**phenomena** [1] - 76:15

**phone** [2] - 46:6, 60:2

**phrase** [1] - 62:22

**picked** [1] - 31:17

**picking** [1] - 64:12

**place** [8] - 12:2, 12:10, 46:25, 47:2, 49:10, 59:6, 59:18, 61:2

**placed** [2] - 25:5, 49:4

**plainly** [1] - 11:5

**plaintiff** [8] - 3:1, 51:3, 51:4, 51:13, 51:15, 51:16, 86:12

**Plaintiff** [1] - 1:6, 2:2

**Plaintiff's** [1] - 20:2

**plaintiffs** [1] - 84:21

**plan** [1] - 57:8

**play** [4] - 9:21, 10:11, 19:25, 60:25

**played** [2] - 20:23, 61:19

**plead** [1] - 18:3

**pleaded** [1] - 51:12

**pleadings** [1] - 8:17

**pleasure** [1] - 54:24

**plenty** [2] - 42:4, 42:13

**plus** [7] - 28:3, 37:18, 37:20, 37:21, 38:7, 38:22

**PM** [1] - 1:14

**PO** [1] - 72:9

**point** [34] - 3:1, 4:19, 4:24, 6:12, 6:20, 8:24, 13:15, 17:3, 18:8, 23:1, 29:14, 30:15, 32:8, 32:25, 38:25, 40:5, 41:11, 43:19, 43:24, 62:25, 64:7, 68:11, 68:13, 68:16, 69:18, 69:21, 72:7, 75:22, 76:8, 76:21, 78:3, 87:4, 88:10, 92:11

**pointing** [2] - 64:6, 76:13

**points** [5] - 9:17, 9:18, 34:13, 72:20, 78:12

**poking** [1] - 35:3, 64:6

**portion** [1] - 53:25

**POs** [6] - 57:1, 74:20, 74:24, 77:9, 90:10

**position** [3] - 11:7, 51:7, 73:21

**positive** [4] - 5:21, 5:25, 65:17, 65:21

**possible** [3] - 49:6, 52:15, 84:6

**potential** [1] - 83:11

**potentially** [1] - 13:1

**power** [2] - 11:14, 11:20

**practices** [1] - 77:8

**prejudices** [1] - 44:22

**premise** [1] - 15:25

**premium** [27] - 6:24, 23:22, 28:5, 30:2, 30:5, 32:5, 33:22, 34:1, 35:9, 35:12, 36:6, 36:8, 36:12, 36:21, 36:22, 37:14, 38:6, 38:10, 39:22, 39:25, 40:1, 40:9, 41:12, 41:13, 64:25, 65:21

**premiums** [3] - 5:3, 5:21

**prepared** [2] - 27:10, 48:22

**preponderance** [2] - 50:23, 52:4

**present** [1] - 49:9

**presentation** [1] - 17:5

**presented** [9] - 10:17, 14:13, 47:10, 47:21, 49:7, 51:1, 75:6, 80:9, 81:1

**presenting** [1] - 85:17

**preside** [1] - 45:6

**president** [1] - 22:3

**presiding** [3] - 45:5, 45:6, 48:24

**press** [1] - 46:12

**pretrial** [1] - 18:6

**pretty** [1] - 54:11

**prevented** [1] - 17:8

**previously** [1] - 24:1

**price** [68] - 3:14, 5:6, 5:7, 5:21, 7:12, 7:15, 8:11, 8:20, 12:1, 12:10, 15:18, 23:22, 24:15, 25:16, 25:18, 26:23, 27:25, 28:5, 28:7, 28:15, 29:15, 30:2, 31:21, 32:9, 32:25, 33:12, 33:14, 33:15, 33:16, 33:18, 33:21, 33:24, 34:2, 34:19, 34:23, 35:11, 36:6, 36:8, 36:12, 36:15, 36:16, 37:14, 39:17, 51:22, 60:6, 60:16, 64:19, 64:25, 65:21, 66:19, 69:4, 69:5, 70:19, 70:20, 71:3, 71:4, 72:14, 76:5, 78:19, 78:23, 79:7, 79:17

**price-sensitive** [2] - 69:4, 71:3

**prices** [1] - 5:19, 8:3, 8:5, 31:24, 38:16, 64:10, 65:4, 68:21, 79:7, 80:20, 91:19

**pricing** [6] - 6:2, 6:3, 64:3, 64:13, 69:14, 69:16

**primarily** [1] - 77:8

**primary** [1] - 72:25

**principle** [1] - 51:6

**principles** [1] - 11:12

**problem** [4] - 3:21, 4:21, 17:24, 40:2

**problems** [3] - 17:14, 64:6, 76:13

**proceed** [2] - 52:19, 67:6

**proceedings** [4] - 21:6, 21:7, 48:1, 94:3

**process** [3] - 47:13, 47:18, 48:2, 69:13, 77:6, 84:18, 84:24,

87:17, 87:20, 90:22, 91:2, 91:3, 91:6

**processed** [1] - 72:25

**product** [37] - 4:4, 5:12, 6:1, 11:1, 12:18, 12:22, 15:2, 16:3, 26:18, 26:22, 27:2, 28:16, 31:9, 31:16, 32:1, 32:3, 35:9, 35:23, 36:17, 60:16, 61:14, 62:7, 63:14, 64:1, 68:23, 76:4, 77:5, 77:24, 77:25, 78:4, 79:19, 81:5, 81:21, 82:25, 83:3, 91:15

**products** [12] - 4:7, 4:17, 6:2, 12:8, 15:17, 15:23, 31:17, 55:7, 55:15, 64:11, 77:23, 90:6

**proficient** [1] - 49:14

**programs** [1] - 47:1

**prohibited** [1] - 9:12

**promise** [3] - 11:21, 12:7, 12:9

**promised** [2] - 11:22, 62:17

**prongs** [1] - 85:5

**proof** [21] - 67:23, 67:24, 68:8, 70:4, 76:12, 84:14, 84:15, 84:20, 84:23, 85:1, 85:15, 85:25, 86:1, 86:4, 86:10, 86:19, 86:25, 87:5, 87:10, 91:7, 91:8

**protect** [1] - 47:9

**prove** [20] - 14:2, 66:8, 66:14, 68:4, 68:11, 71:19, 71:21, 75:7, 75:10, 76:10, 82:1, 82:3, 83:21, 85:4, 86:11, 86:12, 88:12, 89:17, 90:25

**proved** [1] - 51:13

**proven** [2] - 88:13, 89:19

**provide** [3] - 16:3, 38:12, 58:15

**provided** [6] - 10:21, 14:23, 15:18, 32:13, 55:15, 90:24

**Provided** [1] - 11:3

**provides** [2] - 11:5, 90:15

**providing** [1] - 59:5

**proving** [3] - 50:22, 52:3, 82:19

**provision** [2] - 56:24,

73:3

**published** [5] - 5:6, 7:12, 8:3, 8:4, 79:7

**pull** [2] - 88:23, 89:14

**pulling** [2] - 27:10, 89:18

**purchase** [93] - 3:13, 4:11, 4:17, 11:23, 11:24, 11:25, 12:3, 12:6, 12:8, 12:18, 12:25, 13:1, 13:6, 13:19, 13:21, 13:24, 14:2, 14:12, 14:16, 14:20, 14:21, 14:24, 14:25, 15:5, 15:16, 16:15, 16:16, 16:20, 16:21, 17:8, 17:10, 18:24, 19:9, 23:23, 24:23, 25:7, 25:10, 26:9, 26:13, 30:7, 32:18, 32:25, 33:11, 33:12, 33:19, 33:20, 35:14, 38:14, 57:1, 57:2, 57:8, 57:9, 57:13, 57:17, 57:21, 57:23, 60:24, 61:10, 61:15, 62:13, 62:18, 63:2, 63:19, 63:21, 64:23, 72:12, 72:25, 73:4, 75:18, 76:22, 76:24, 77:3, 77:22, 78:17, 78:20, 79:12, 79:17, 80:4, 80:21, 81:4, 81:17, 83:1, 83:6, 83:14, 84:2, 88:9, 88:16, 88:17, 89:2, 89:13, 89:21

**purchased** [2] - 28:16, 31:9

**purchases** [32] - 4:7, 4:24, 5:11, 13:16, 13:22, 16:6, 25:21, 25:22, 26:17, 26:21, 27:1, 28:18, 29:7, 29:18, 29:19, 32:18, 35:5, 36:25, 56:1, 62:24, 68:12, 71:21, 71:24, 72:16, 75:8, 79:8, 79:13, 79:14, 80:3, 80:24, 85:6, 85:7

**purchasing** [2] - 59:1, 60:21

**purports** [1] - 14:14

**pursue** [1] - 19:3

**pushed** [1] - 58:21

**put** [13] - 3:3, 15:8, 24:6, 36:9, 40:14, 54:7, 59:5, 61:2, 85:14, 88:23, 88:25,

89:1, 91:16
**puts** [1] - 84:18
**PX** [1] - 20:16
**PX23** [3] - 20:2, 20:8, 20:17

## Q

**qualifications** [1] - 43:6
**qualified** [2] - 22:10, 22:20
**qualify** [1] - 90:14
**quantities** [1] - 28:17
**quantity** [6] - 12:1, 12:18, 72:13, 79:20, 80:16, 91:15
**quarter** [3] - 7:9, 64:18
**quarterly** [3] - 7:7, 55:11, 64:11
**questioned** [2] - 86:6, 86:8
**questions** [11] - 26:8, 37:9, 39:4, 42:6, 43:11, 49:5, 49:11, 57:12, 85:15, 93:18
**quick** [2] - 76:21, 82:21
**quickly** [5] - 10:14, 27:2, 55:22, 67:13, 93:19
**quit** [1] - 63:13
**quite** [1] - 89:24

## R

**raise** [2] - 21:3, 92:24
**raised** [1] - 77:7
**ran** [1] - 25:1
**range** [1] - 65:22
**rather** [3] - 38:12, 60:8, 75:4
**rationale** [1] - 64:17
**raw** [1] - 23:8
**Raymond** [3] - 2:5, 3:25, 20:1
**re** [2] - 23:5, 38:1
**re-created** [1] - 23:5
**re-replicated** [1] - 38:1
**reach** [6] - 45:8, 45:14, 45:21, 55:14, 59:24, 59:25
**reached** [2] - 48:20, 48:23
**read** [9] - 43:25, 44:2, 44:6, 44:25, 46:18, 47:6, 86:3, 91:8
**reading** [2] - 27:20, 49:11
**ready** [1] - 49:1

**real** [3] - 4:10, 66:5, 88:11
**real-life** [1] - 66:5
**reality** [1] - 76:2
**really** [22] - 3:21, 4:21, 5:4, 5:5, 23:3, 23:8, 23:14, 23:21, 56:22, 60:14, 61:12, 62:1, 67:17, 74:17, 74:18, 77:16, 78:21, 81:5, 81:19, 86:5
**reason** [5] - 14:13, 64:9, 79:10, 82:8, 86:15
**reasonable** [19] - 51:18, 52:1, 52:5, 52:7, 52:11, 52:12, 52:17, 52:18, 52:23, 52:24, 66:4, 66:6, 66:15, 76:18, 76:19, 80:2, 84:9, 87:11, 91:11
**reasonably** [1] - 38:3
**reasons** [3] - 49:24, 50:6, 63:10
**rebuttal** [3] - 43:21, 54:21, 87:14
**received** [3] - 20:22, 45:23, 66:2
**receives** [1] - 90:4
**recess** [3] - 54:4, 54:16, 93:21
**recognized** [1] - 27:16
**record** [13] - 13:5, 14:11, 14:19, 15:1, 15:10, 16:16, 17:1, 21:10, 53:18, 53:24, 61:3, 93:2, 94:3
**recorded** [1] - 49:6
**records** [2] - 4:16, 50:10
**recover** [3] - 51:10, 52:9, 87:18
**red** [5] - 29:21, 31:19, 34:13, 35:3, 37:22
**red-and-blue** [1] - 34:13
**reduce** [1] - 52:2, 52:5, 52:7, 52:10, 52:13, 52:17, 52:23, 53:1, 66:15, 69:18, 80:6, 84:9
**reduced** [5] - 51:25, 52:21, 70:2, 70:12, 76:11
**reduces** [1] - 71:16
**reference** [1] - 46:23
**referred** [2] - 15:20, 34:12
**reflect** [1] - 34:1

**reflection** [1] - 34:2
**refusal** [2] - 16:20, 16:21
**regard** [1] - 11:25
**regarding** [1] - 45:2
**regardless** [1] - 51:1
**regularly** [2] - 69:1, 76:3
**reject** [1] - 50:4
**rejected** [3] - 19:8, 19:10, 61:15
**rejecting** [1] - 68:23
**relate** [1] - 77:23
**related** [2] - 63:19, 63:20
**relates** [1] - 40:19
**relation** [1] - 18:14
**relationship** [6] - 51:13, 55:18, 57:24, 58:1, 61:4, 61:6
**relevant** [7] - 9:4, 38:17, 38:19, 38:20, 40:13, 40:14, 41:14
**reliable** [5] - 6:6, 23:15, 39:3, 43:3, 80:1
**relitigate** [1] - 69:24
**relying** [1] - 23:9
**remember** [7] - 27:17, 47:23, 48:18, 57:11, 57:25, 58:20, 59:8, 61:8, 61:17, 63:16, 63:21, 65:1, 71:22, 88:25, 89:5, 90:6, 91:15, 91:21
**remind** [1] - 45:24
**repeat** [1] - 3:23
**replace** [1] - 15:23
**replicated** [1] - 38:1
**report** [4] - 27:11, 43:1, 46:17, 47:7
**Reporter** [1] - 1:23
**REPORTER'S** [1] - 1:12
**reports** [1] - 46:21
**represent** [1] - 39:12
**representation** [1] - 10:6
**representations** [1] - 4:2
**representative** [1] - 30:17
**represents** [1] - 31:22
**repudiation** [7] - 17:17, 17:25, 18:4, 18:10, 18:13, 18:18, 19:13
**request** [30] - 11:6, 11:8, 14:5, 14:7, 14:8, 14:22, 15:18,

16:4, 16:19, 18:23, 24:10, 24:12, 24:24, 55:8, 55:15, 57:5, 61:13, 63:14, 72:10, 73:24, 74:11, 74:16, 78:16, 88:24, 89:3, 89:10
**request-by-request** [1] - 78:16
**requested** [3] - 54:2, 74:18, 74:22
**requests** [29] - 4:4, 9:10, 9:11, 10:22, 17:8, 17:19, 17:22, 19:8, 19:9, 24:25, 55:9, 64:24, 71:20, 71:23, 72:7, 72:12, 74:15, 75:9, 75:11, 76:9, 78:3, 78:5, 79:21, 79:22, 85:6, 85:8, 88:9, 88:10, 88:17
**require** [1] - 15:15
**required** [1] - 69:9
**requirements** [3] - 4:23, 11:23, 12:4
**requires** [3] - 19:2, 52:6, 86:1
**resale** [4] - 16:6, 16:9, 16:10, 70:23
**research** [3] - 46:21, 47:3, 47:14
**reseller** [63] - 3:13, 4:7, 4:11, 4:24, 5:10, 7:15, 9:4, 9:6, 9:9, 13:16, 13:22, 14:21, 16:1, 23:23, 24:14, 24:16, 24:23, 25:14, 25:16, 25:21, 25:24, 26:9, 26:22, 26:23, 27:4, 28:18, 29:7, 29:18, 29:24, 30:7, 31:25, 32:1, 32:8, 32:10, 32:14, 33:15, 34:17, 35:4, 35:8, 35:10, 35:13, 35:23, 36:15, 37:3, 38:14, 39:16, 57:14, 60:15, 60:17, 62:24, 68:12, 68:24, 70:8, 71:15, 71:21, 71:24, 72:16, 75:8, 79:12, 80:4, 81:17, 85:6, 91:22
**resellers** [33] - 15:23, 24:13, 24:14, 36:25, 56:16, 58:11, 60:8, 60:11, 60:12, 60:19, 60:21, 61:16, 62:20, 63:5, 63:8, 63:10, 63:11, 63:13, 63:19,

65:4, 66:18, 66:19, 68:18, 68:22, 69:2, 69:10, 69:13, 70:19, 70:25, 71:5, 71:17, 83:24, 91:17
**reselling** [1] - 71:1
**reserve** [1] - 54:20
**resolve** [1] - 10:11
**resolved** [2] - 13:4, 69:23
**respect** [5] - 3:13, 7:4, 7:12, 7:13, 92:22
**respectfully** [1] - 85:3, 87:7
**respond** [1] - 46:15
**response** [2] - 9:22, 15:13, 19:6
**responsible** [2] - 87:15, 88:6
**rest** [5] - 13:25, 43:18, 44:3, 61:4, 84:12
**restrictions** [2] - 41:5, 47:25
**result** [14] - 4:12, 14:21, 16:2, 40:24, 41:18, 41:23, 48:2, 62:14, 66:9, 67:20, 69:14, 83:21
**resulted** [2] - 14:20, 14:25
**resulting** [2] - 51:5, 52:9
**results** [1] - 61:23
**retained** [1] - 21:17
**retire** [1] - 66:7
**retired** [2] - 53:8, 93:7
**return** [2] - 49:1, 87:8
**returned** [2] - 19:18, 54:17
**revenue** [2] - 58:8, 58:10
**reverse** [1] - 37:13
**review** [4] - 21:18, 42:21, 43:3, 55:22
**reviewed** [2] - 23:6, 26:5
**RHOW** [6] - 2:13, 43:20, 67:4, 67:8, 81:13, 81:15
**Rhow** [1] - 2:14
**Richard** [1] - 2:4
**rid** [1] - 38:18
**right-hand** [2] - 61:9, 71:2
**rise** [3] - 11:17, 55:19, 55:23
**road** [1] - 19:1
**rocks** [1] - 61:25
**rode** [1] - 18:7
**role** [1] - 7:19

**room** [6] - 44:4, 44:15, 46:7, 53:3, 87:1, 93:6
**roughly** [2] - 33:1, 64:2
**row** [3] - 27:18, 28:4, 89:1
**rows** [1] - 28:14
**RPR** [2] - 1:22, 94:9
**Rule** [2] - 4:23, 10:16
**rule** [2] - 51:19, 53:20
**ruled** [1] - 22:10
**rules** [4] - 47:9, 47:24, 83:11

# S

**sales** [1] - 4:25
**salesman** [1] - 56:10
**sample** [2] - 30:16, 30:17
**Samsung** [136] - 3:7, 3:14, 4:25, 5:12, 7:14, 7:25, 9:10, 9:11, 10:8, 10:15, 10:22, 11:1, 11:6, 11:11, 13:7, 13:17, 15:21, 15:24, 16:2, 16:17, 17:8, 17:11, 17:18, 17:20, 21:17, 23:24, 24:10, 24:15, 24:24, 25:6, 25:7, 25:18, 26:10, 26:17, 27:3, 27:25, 28:2, 28:7, 28:17, 29:8, 31:8, 32:2, 32:3, 32:13, 32:15, 32:19, 33:1, 33:14, 33:20, 34:4, 34:18, 35:5, 35:10, 35:24, 36:16, 36:18, 37:4, 39:17, 42:15, 42:18, 43:2, 43:5, 43:9, 52:3, 52:16, 52:19, 52:22, 52:25, 54:12, 55:3, 55:7, 55:10, 55:14, 55:18, 56:2, 56:14, 56:15, 56:18, 57:20, 58:7, 58:9, 59:3, 59:18, 59:25, 60:19, 61:8, 62:5, 62:11, 62:16, 62:17, 62:21, 63:13, 63:20, 63:22, 63:23, 65:5, 66:13, 66:14, 66:25, 67:3, 67:19, 68:22, 68:24, 69:2, 69:9, 69:16, 69:17, 70:9, 70:24, 71:1, 71:5, 71:15, 71:16, 73:2, 74:12,
74:16, 75:12, 75:15, 77:10, 77:12, 77:24, 82:4, 82:7, 82:14, 82:16, 83:23, 84:3, 87:15, 87:22, 90:18, 90:19, 90:20, 91:23
**SAMSUNG** [1] - 1:8
**Samsung's** [14] - 16:20, 16:21, 41:24, 66:9, 67:20, 68:4, 68:8, 70:14, 75:25, 83:21, 85:8, 86:6, 86:8, 87:9
**saved** [1] - 80:23
**saw** [6] - 58:5, 58:16, 65:8, 74:7, 80:1, 81:23
**scales** [1] - 91:10
**SCARSI** [1] - 1:3
**school** [1] - 11:13
**School** [1] - 22:17
**science** [1] - 21:22
**scramble** [1] - 15:1
**scrambling** [1] - 16:7
**scratch** [1] - 44:4
**screens** [1] - 88:8
**search** [1] - 47:1
**searching** [1] - 46:22
**seat** [1] - 53:9
**seated** [1] - 21:8
**second** [4] - 3:9, 18:22, 29:2, 33:2
**section** [1] - 27:11
**Section** [9] - 10:18, 10:22, 11:3, 11:5, 15:15, 15:17, 58:14, 63:14, 66:10
**security** [1] - 60:3
**see** [41] - 14:4, 18:5, 18:23, 18:25, 23:15, 24:25, 25:11, 25:17, 27:19, 27:24, 28:4, 28:11, 28:14, 29:20, 29:21, 29:25, 30:25, 31:8, 31:23, 33:10, 34:20, 35:3, 36:8, 37:11, 37:23, 37:24, 43:3, 54:24, 57:7, 57:15, 57:21, 68:19, 73:15, 73:16, 82:13, 83:4, 83:12, 83:14, 90:4
**See** [1] - 89:19
**seeing** [1] - 89:10
**seek** [2] - 18:12, 57:19
**seeking** [9] - 4:3, 10:8, 13:23, 16:8, 16:9, 18:13, 80:6, 83:4, 86:17
**selective** [2] - 69:14,
82:15
**selling** [4] - 60:15, 60:17, 71:14
**sells** [1] - 60:17
**send** [7] - 48:7, 48:14, 57:1, 57:21, 83:5, 88:19
**sending** [1] - 57:9
**sense** [12] - 6:1, 40:2, 69:6, 70:18, 70:22, 71:8, 72:14, 73:6, 76:25, 80:7, 85:9, 86:14
**sensitive** [2] - 69:4, 71:3
**sent** [3] - 15:20, 44:15, 57:2
**separate** [3] - 3:18, 15:16, 31:22
**serve** [1] - 45:6
**service** [1] - 46:15
**Session** [1] - 1:14
**set** [5] - 37:9, 53:5, 63:3, 84:19, 90:22
**several** [2] - 56:11, 89:1
**shall** [1] - 45:8
**sheets** [1] - 89:18
**shop** [1] - 66:19
**shopped** [1] - 68:19
**shopping** [5] - 69:5, 70:19, 71:4, 91:18
**short** [1] - 7:21
**short-circuit** [1] - 7:21
**shorter** [2] - 38:13, 41:17
**show** [7] - 8:4, 37:16, 51:17, 71:23, 74:19, 74:20, 84:2
**showed** [5] - 32:13, 62:3, 70:23, 74:24, 84:10
**showing** [1] - 36:11
**shown** [4] - 24:15, 50:9, 70:3, 76:14
**shows** [7] - 62:2, 62:19, 62:23, 63:5, 71:11, 75:17, 77:20
**sic)** [1] - 65:11
**side** [3] - 61:9, 61:12, 79:1
**sides** [5] - 54:6, 78:13, 85:20, 87:2, 88:20
**sift** [1] - 85:12
**sign** [1] - 48:25
**signed** [5] - 48:8, 48:9, 56:5, 60:23, 72:22
**significance** [1] - 49:10
**significantly** [2] - 10:20, 65:7
**similar** [1] - 28:17
**simple** [5] - 70:12, 71:8, 77:16, 85:20, 86:15
**simply** [7] - 6:13, 11:18, 12:7, 45:19, 45:21, 57:21, 61:10
**single** [6] - 24:23, 40:5, 74:23, 87:23, 89:4, 89:6
**sitting** [3] - 54:25, 74:1, 75:5
**situation** [1] - 69:8
**situations** [3] - 16:5, 42:8, 69:18
**six** [2] - 22:18, 66:18
**size** [2] - 32:23, 64:3
**skipped** [1] - 17:4
**slide** [14] - 23:25, 27:8, 29:3, 29:20, 32:20, 34:9, 34:10, 35:1, 35:20, 37:10, 39:13, 40:7, 40:19, 40:23
**slightly** [1] - 38:9
**slower** [1] - 68:25
**small** [1] - 90:18
**smoke** [1] - 88:8
**Snapchat** [1] - 46:9
**social** [1] - 46:10
**sole** [1] - 67:16
**solely** [3] - 30:6, 44:23, 49:21
**solid** [1] - 90:6
**someone** [2] - 60:17, 82:9
**sometimes** [1] - 60:9
**somewhere** [2] - 24:11, 75:5
**soon** [1] - 78:20
**sophisticated** [1] - 18:25
**sorry** [13] - 29:4, 29:11, 41:1, 43:16, 68:2, 71:20, 72:18, 72:21, 73:25, 75:12, 80:16, 85:21, 86:7
**sort** [10] - 16:17, 25:1, 27:13, 27:20, 27:24, 29:22, 32:17, 33:6, 37:13, 90:21
**sorted** [1] - 63:24
**sound** [1] - 53:16
**South** [2] - 2:6, 2:19
**special** [3] - 53:22, 54:1, 90:15
**specific** [8] - 9:9, 10:5, 11:22, 12:18, 27:18,
36:10, 79:12, 83:14
**specifically** [2] - 57:10, 68:21
**speculate** [1] - 74:5
**speculating** [2] - 4:19, 74:2
**speculation** [3] - 4:11, 74:19, 75:3
**spell** [1] - 21:9
**spend** [3] - 24:2, 66:24, 84:6
**spending** [1] - 74:2
**spent** [2] - 72:18, 72:19
**spokesperson** [1] - 45:7
**spreadsheet** [1] - 86:24
**spreadsheets** [2] - 61:21, 86:22
**spring** [2] - 55:17, 58:5
**SSD** [1] - 90:3
**SSDs** [4] - 56:2, 56:4, 59:23, 90:6
**stand** [7] - 54:4, 65:18, 70:7, 72:7, 83:3, 87:22, 87:25
**stands** [1] - 48:19
**start** [8] - 4:18, 6:20, 19:21, 32:7, 39:13, 44:10, 54:5, 91:23
**started** [9] - 19:17, 25:14, 28:11, 60:25, 63:10, 63:13, 65:9, 88:3
**starting** [12] - 4:18, 4:24, 22:2, 48:3, 57:18, 59:12, 68:11, 68:13, 68:16, 69:18, 69:21, 70:13
**starts** [1] - 57:20
**state** [5] - 21:9, 38:15, 53:18, 90:6, 93:1
**statement** [1] - 82:21
**statements** [3] - 82:1, 82:18
**STATES** [1] - 1:1
**statistical** [1] - 30:15
**statistician** [1] - 30:22
**stay** [4] - 53:12, 60:13, 60:15, 92:19
**stayed** [2] - 59:7, 59:17
**Steven** [2] - 69:12, 70:7
**stick** [1] - 93:15
**still** [5] - 29:18, 31:18, 65:20, 65:21, 79:24
**stipulated** [1] - 22:20

stocked [1] - 90:14
stop [2] - 33:2, 57:9
straight [1] - 71:5, 89:9
straightforward [1] - 11:8
strategy [1] - 22:3
Street [2] - 1:23, 2:19
stricken [2] - 3:18, 6:17
strike [1] - 3:10
strive [1] - 45:8
subject [2] - 51:19, 53:20
submit [9] - 18:24, 57:23, 61:15, 76:24, 77:3, 87:7, 88:11, 89:2, 89:13
submitted [6] - 13:17, 19:9, 55:9, 62:18, 63:22, 76:22
submitting [2] - 17:8, 78:3
subsequent [2] - 78:17
subset [1] - 9:5
substantially [2] - 33:25, 38:20
sued [1] - 18:18
suffer [1] - 42:12
suffered [7] - 41:23, 42:9, 42:19, 42:24, 42:25, 66:9, 83:21
sufficient [4] - 10:17, 10:24, 10:25, 15:7
sufficiently [3] - 11:9, 11:21, 12:6
suggest [1] - 85:3
suggesting [1] - 8:1
suit [1] - 18:21
Suite [1] - 2:17
sum [1] - 36:25
summaries [4] - 50:8, 50:12, 50:16, 50:18
summarize [1] - 67:14
summary [1] - 11:2, 16:24, 18:4
Sundram [1] - 12:19
supply [9] - 10:24, 11:1, 55:7, 57:3, 57:5, 58:15, 59:4, 82:25
support [15] - 10:18, 13:18, 14:19, 17:18, 18:17, 57:8, 58:6, 58:8, 58:10, 76:23, 76:25, 81:3, 89:11, 90:10, 90:15
supported [2] - 55:16, 69:25

supports [2] - 50:13, 50:19
supposed [3] - 73:2, 84:16, 86:12
supposedly [1] - 75:19
surprisingly [1] - 83:18
surrounding [1] - 39:17
suspect [1] - 65:16
sustain [1] - 56:16
sustained [2] - 4:1, 52:20
swear [1] - 92:12
switch [1] - 67:4
sworn [2] - 49:2, 92:25
sympathy [1] - 44:22
system [1] - 92:6

## T

tablet [1] - 46:6
tag [1] - 20:13
talks [2] - 53:19, 92:14
task [1] - 85:14
tasked [2] - 76:20, 86:20
taught [1] - 22:16
technical [1] - 90:15
technology [1] - 67:5
Techtronics [3] - 32:18, 32:22, 33:19
tender [1] - 22:21
terminated [1] - 61:5
terminating [1] - 18:13
termination [1] - 73:15
terms [13] - 6:20, 11:10, 12:1, 12:2, 12:6, 12:9, 12:11, 14:8, 25:4, 28:20, 48:19, 63:18, 72:21
tested [2] - 47:12, 47:18
testified [18] - 12:23, 22:7, 22:9, 25:12, 40:18, 49:12, 49:23, 55:25, 56:25, 61:17, 63:15, 65:23, 68:21, 69:9, 71:8, 78:3, 79:11, 89:25
testifies [1] - 21:7
testify [6] - 22:22, 26:4, 49:9, 49:14, 60:7, 81:9
testifying [1] - 81:8
testimony [45] - 3:11,

3:12, 3:23, 4:14, 4:22, 6:23, 7:1, 7:5, 7:6, 8:19, 15:19, 17:11, 23:25, 26:1, 30:12, 33:3, 40:9, 43:23, 47:12, 49:3, 49:7, 49:8, 49:12, 49:18, 49:23, 49:25, 50:2, 50:3, 50:19, 59:21, 60:6, 60:20, 61:18, 64:10, 70:6, 70:11, 70:15, 70:16, 72:13, 72:22, 77:8, 78:1, 84:1, 89:7
testing [1] - 90:16
text [1] - 46:7
THE [64] - 3:1, 3:5, 5:16, 6:11, 6:16, 7:21, 8:20, 8:24, 9:3, 9:8, 9:14, 9:16, 9:22, 10:5, 10:13, 13:3, 13:10, 13:12, 15:13, 16:11, 17:2, 17:10, 19:5, 19:15, 19:19, 20:4, 20:6, 20:9, 20:12, 20:15, 20:17, 20:20, 20:25, 21:3, 21:8, 21:11, 21:13, 22:22, 39:6, 43:12, 43:14, 43:16, 43:17, 43:21, 43:23, 53:9, 54:3, 54:12, 54:18, 54:22, 67:3, 67:7, 81:9, 81:14, 87:13, 92:9, 92:24, 93:1, 93:3, 93:4, 93:5, 93:8, 93:11, 93:12
themselves [1] - 70:24
theories [1] - 7:20
theory [2] - 16:24, 82:12
thereby [3] - 18:12, 18:13
therefore [6] - 12:24, 19:9, 26:23, 49:17, 50:14, 50:20
THEREUPON [1] - 21:4
Thereupon [8] - 19:18, 20:23, 53:8, 54:16, 54:17, 61:19, 93:7, 93:21
third [4] - 28:23, 56:16, 65:4, 75:10
third-party [2] - 56:16, 65:4
thoughts [1] - 86:21
thousand [5] - 32:19, 32:24, 33:4, 33:11, 56:4

thousand-unit [1] - 33:4
threat [1] - 61:1
three [2] - 58:25, 78:21
threw [1] - 71:10
throw [1] - 87:3
throwing [1] - 61:25
thrown [1] - 67:10
tight [1] - 71:3
TikTok [1] - 46:10
timing [3] - 54:8, 79:20, 91:15
titled [1] - 94:3
today [7] - 18:7, 55:16, 56:7, 57:17, 73:22, 86:17, 92:16
together [2] - 24:7, 93:10
tone [1] - 49:11
tonight [1] - 92:19
took [11] - 5:18, 26:6, 30:9, 44:24, 63:18, 65:20, 80:11, 82:15, 82:16, 87:22
top [1] - 88:24
topic [1] - 60:20
total [8] - 23:7, 27:22, 27:23, 28:23, 29:23, 30:3, 62:23, 80:6
touching [2] - 47:6, 47:7
traced [1] - 49:9
track [2] - 57:13, 57:14
tradeoff [1] - 41:8
tradeoffs [1] - 41:4
transaction [31] - 6:24, 10:4, 10:6, 10:7, 16:1, 16:9, 25:14, 25:15, 27:18, 28:10, 28:12, 28:16, 28:25, 30:2, 31:6, 31:22, 32:23, 33:5, 33:21, 34:22, 35:5, 35:8, 35:13, 36:10, 36:12, 38:16, 39:16, 57:14, 63:18, 64:2, 80:17
transactions [55] - 3:14, 3:17, 5:1, 5:14, 6:8, 6:9, 6:24, 7:23, 8:2, 8:8, 8:25, 9:4, 9:5, 9:6, 9:9, 10:2, 11:4, 11:5, 16:10, 28:23, 29:12, 29:15, 29:24, 30:7, 30:13, 30:14, 30:20, 30:21, 31:1, 31:25, 32:2, 35:22, 36:6, 36:21, 36:22, 38:7, 38:13,

38:19, 39:15, 39:18, 40:1, 40:20, 40:24, 41:2, 41:3, 41:5, 41:9, 41:14, 41:17, 41:18, 57:18, 80:1, 80:11, 80:13, 91:23
TRANSCRIPT [1] - 1:12
transcript [1] - 94:2
transcripts [1] - 1:25
translation [1] - 49:18
transparency [1] - 77:2
traveled [1] - 19:1
treat [2] - 18:19, 56:21
trend [1] - 62:12
trending [3] - 64:14, 64:15, 64:16
trends [2] - 7:8, 64:12
TRIAL [1] - 1:12
trial [20] - 20:13, 20:18, 44:1, 46:13, 47:2, 47:13, 47:18, 47:22, 48:2, 49:3, 50:17, 57:12, 67:10, 68:10, 68:15, 71:9, 72:3, 72:17, 73:21, 74:8
Trial [1] - 20:20
tried [2] - 66:22, 80:10
tries [1] - 4:24
true [5] - 50:25, 66:17, 68:16, 84:11
truth [5] - 41:6, 47:12, 49:4, 83:4, 89:9
try [12] - 25:9, 25:12, 25:20, 26:5, 37:11, 37:14, 43:1, 46:24, 67:12, 67:14, 80:17, 92:4
trying [7] - 30:25, 34:4, 71:12, 77:1, 77:5, 87:18, 92:5
turn [1] - 55:23, 61:20
turned [1] - 26:16, 63:4
turns [2] - 26:8, 38:3
Twitter [1] - 46:9
two [13] - 3:7, 16:14, 17:14, 18:11, 28:14, 32:12, 34:18, 54:24, 57:8, 57:19, 63:12, 73:17, 75:14
type [1] - 23:19
types [1] - 42:5
typically [1] - 90:14

## U

U.S [1] - 1:3

**UC** [1] - 21:23
**ultimately** [1] - 58:21
**unable** [1] - 29:10
**unanimous** [4] - 45:10, 45:15, 48:20, 48:23
**unconfirmed** [1] - 62:12
**under** [12] - 10:16, 10:18, 11:8, 14:5, 18:9, 18:22, 19:10, 49:4, 63:14, 69:8, 77:12, 90:23
**undergraduate** [1] - 21:21
**underlying** [4] - 26:4, 50:13, 50:15, 50:21
**understood** [4] - 4:2, 23:5, 58:12, 78:25
**undisputed** [1] - 77:14
**unfilled** [16] - 4:10, 13:1, 13:19, 13:21, 13:24, 14:2, 14:12, 14:15, 14:16, 14:19, 14:21, 14:24, 15:5, 25:1, 25:9
**unfulfilled** [17] - 57:18, 64:24, 67:20, 71:20, 71:23, 75:9, 75:18, 76:9, 78:5, 78:16, 79:2, 80:3, 80:12, 80:18, 85:6, 85:7, 88:17
**Unfulfilled** [1] - 80:14
**unit** [7] - 5:13, 24:16, 24:17, 27:21, 27:22, 33:4
**UNITED** [1] - 1:1
**units** [13] - 5:2, 27:23, 28:20, 28:21, 29:12, 32:18, 32:22, 32:24, 33:1, 33:11, 33:12, 78:19, 81:2
**universe** [5] - 4:23, 29:5, 29:6, 29:7, 29:10
**University** [1] - 22:18
**unmatched** [16] - 3:19, 6:14, 7:22, 8:2, 8:25, 28:18, 29:1, 29:19, 30:9, 30:14, 30:20, 40:20, 40:24, 41:2, 41:18, 79:7
**unpaid** [1] - 57:13
**unravels** [1] - 15:6
**unreasonable** [1] - 78:4
**unreliable** [1] - 15:12
**unsupported** [1] - 63:3

**unwilling** [1] - 45:17
**up** [59] - 4:25, 5:19, 9:9, 9:10, 17:6, 19:21, 27:8, 32:4, 32:13, 36:22, 37:10, 37:14, 53:5, 58:3, 58:21, 60:9, 61:24, 62:3, 62:6, 62:8, 62:10, 63:25, 64:5, 64:12, 64:14, 64:15, 65:10, 65:17, 70:24, 72:15, 73:17, 73:22, 75:9, 76:22, 78:15, 79:12, 79:21, 79:25, 81:23, 85:7, 86:22, 86:23, 87:3, 88:23, 88:24, 88:25, 89:1, 90:2, 90:22, 91:16, 91:22, 92:11, 92:18, 92:21
**upstream** [1] - 25:2
**uses** [2] - 33:16, 79:15

**V**

**valid** [1] - 18:19
**value** [3] - 29:23, 51:20, 53:21
**variations** [1] - 64:20
**various** [2] - 27:15, 76:21
**vehicle** [1] - 73:1
**verdict** [15] - 8:17, 45:2, 45:9, 45:15, 45:21, 45:22, 47:16, 48:21, 48:22, 48:23, 48:24, 67:19, 83:18, 84:12, 87:8
**verify** [3] - 26:5, 26:7, 73:24
**versus** [5] - 3:16, 7:22, 8:25, 35:14, 84:3
**vertical** [1] - 31:21, 36:7, 37:24
**VI** [1] - 1:13
**via** [3] - 46:6, 46:7, 61:18
**vice** [1] - 22:3
**video** [5] - 20:1, 20:23, 49:11, 61:18, 61:19
**view** [5] - 24:3, 30:15, 35:8, 46:25, 47:2
**views** [1] - 45:13
**violates** [1] - 47:25
**visit** [1] - 46:25
**volume** [6] - 28:24, 28:25, 31:16, 33:7, 33:10, 64:2
**VOLUME** [1] - 1:13
**voluntarily** [1] - 76:4

**vote** [1] - 48:19
**vs** [2] - 1:7, 12:19

**W**

**wade** [1] - 67:12
**wading** [4] - 68:6, 86:20, 86:21
**wait** [4] - 18:22, 73:12, 77:3, 77:4
**waiting** [1] - 48:16
**walk** [1] - 27:8
**Walt** [1] - 22:4
**wants** [1] - 61:9
**warranty** [1] - 60:1
**Washington** [1] - 2:9
**watch** [1] - 46:18
**waved** [1] - 33:6
**website** [1] - 46:8
**week** [3] - 56:3, 58:21, 63:16
**weeks** [1] - 78:22
**weight** [4] - 45:20, 50:4, 50:14, 50:20
**welcome** [3] - 19:19, 53:12, 53:13
**West** [1] - 1:23
**WESTERN** [1] - 1:2
**whereby** [1] - 11:14
**whole** [3] - 15:6, 51:25, 73:13
**willing** [2] - 57:3, 57:22
**window** [21] - 5:4, 7:4, 28:3, 28:15, 30:24, 31:3, 31:9, 32:11, 32:12, 35:2, 37:19, 37:23, 38:1, 38:5, 38:7, 38:8, 40:12, 40:23, 64:4, 79:8
**witness** [12] - 21:1, 39:4, 49:3, 49:9, 49:12, 49:20, 49:22, 82:5, 87:24, 87:25
**WITNESS** [3] - 21:11, 43:16, 93:3
**witness's** [2] - 49:18, 50:5
**witnesses** [9] - 19:22, 47:4, 47:11, 49:13, 50:1, 76:15, 82:5, 87:21, 88:5
**WOLPERT** [1] - 2:13
**word** [5] - 10:1, 55:16, 79:16, 88:16, 93:16
**words** [3] - 17:20, 42:23, 56:3
**works** [2] - 38:4, 91:1
**world** [2] - 25:19, 85:22

**worse** [1] - 33:12
**write** [1] - 65:11
**writing** [3] - 46:6, 48:10, 48:12
**wrote** [1] - 59:8
**www.
amydiazfedreporter
.com** [1] - 1:25

**Y**

**y'all** [1] - 65:1
**year** [1] - 59:9
**years** [8] - 22:2, 22:7, 22:16, 22:18, 56:8, 56:12, 73:5
**yellow** [1] - 32:12
**yellowed** [1] - 27:24
**yesterday** [3] - 57:16, 63:15, 63:16
**YODER** [21] - 3:6, 5:20, 6:12, 6:17, 8:13, 8:18, 9:20, 19:25, 20:8, 20:11, 20:13, 20:24, 21:2, 21:15, 22:19, 22:24, 39:4, 43:13, 53:17, 54:10, 94:15
**Yoder** [7] - 2:16, 3:6, 9:25, 14:13, 19:24, 20:6, 43:12
**York** [3] - 11:8, 18:9, 19:2
**yourself** [1] - 45:11
**YouTube** [1] - 46:9
**Yu** [7] - 59:22, 68:21, 69:12, 70:7, 74:11, 78:2, 78:4

**Z**

**zero** [13] - 35:18, 36:8, 36:14, 58:6, 58:17, 59:14, 59:16, 60:25, 61:2, 63:1, 65:9, 75:1, 87:10