1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

4

5   NETLIST, INC., a Delaware              )
    corporation,                          )
6                                         ) CASE NO.
                    Plaintiff,            ) 20-CV-993-MCS
7                                         )
         vs.                              )
8                                         )
    SAMSUNG ELECTRONICS CO., LTD., a      )
9   Korean corporation,                   )
                                          )
10                  Defendant.            )
    _____)

11

12

13

14         REPORTER'S TRANSCRIPT OF JURY TRIAL

15                **DAY 1 - VOLUME I**

16               (PAGES 1 TO 135)

17          WEDNESDAY, DECEMBER 1, 2021

18                  8:35 A.M.

19             LOS ANGELES, CALIFORNIA

20

21

22
    _____
23
              MAREA WOOLRICH, CSR 12698, CCRR
24        FEDERAL OFFICIAL COURT REPORTER
          350 WEST FIRST STREET, SUITE 4311
25         LOS ANGELES, CALIFORNIA 90012
                 mareawoolrich@aol.com

                UNITED STATES DISTRICT COURT

```
1                    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFF:

4        GIBSON, DUNN & CRUTCHER LLP
         BY:  RICHARD DOREN
5        BY:  JASON LO
         BY:  JUNGEUN LEE
6        333 South Grand Avenue
         Los Angeles, CA 90071
7

8    FOR DEFENDANT:

9        BIRD, MARELLA, BOXER, WOLPERT,
         NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
10       BY:  EKWAN RHOW
         1875 Century Park East, 23rd Floor
11       Los Angeles, CA 90067

12       O'MELVENY & MYERS LLP
         BY:  MICHAEL YODER
13       BY:  MARC FEINSTEIN
         400 South Hope Street, 18th Floor
14       Los Angeles, CA 90071

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED  STATES  DISTRICT  COURT**

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 1, 2021

 2                            8:35 A.M.

 3                             -oOo-

 4

 5              THE COURTROOM DEPUTY:  Calling Item Number 1,

 6    SA CV 20-993, Netlist, Inc. vs. Samsung Electronics Co., Ltd.

 7              Counsel, state your appearances, please.

 8              MR. DOREN:  Richard Doren on behalf of Netlist.

 9              THE COURT:  Good morning.

10              MR. LO:  Good morning, Your Honor.  Jason Lo on

11    behalf of Netlist.

12              THE COURT:  Good morning.

13              MS. LEE:  Good morning, Your Honor.  JungEun Lee on

14    behalf of Netlist.

15              THE COURT:  Good morning.

16              MR. HONG:  Good morning, Your Honor.  Chuck Hong on

17    behalf of Netlist.

18              THE COURT:  Good morning.

19              MR. RHOW:  Good morning, Your Honor.  Ekwan Rhow on

20    behalf of Samsung Electronics.

21              THE COURT:  Good morning.

22              MR. YODER:  Michael Yoder also on behalf of Samsung.

23              And, Your Honor, just real quickly.  I know there

24    may be questions about my health.  I'm glad to report I have no

25    symptoms, and since my symptoms disappeared, I've had two PCR
```

```
 1   tests, both of which have been negative.  If there's any other
 2   accommodations though Your Honor thinks I should take, I'd be
 3   happy to do so.
 4          THE COURT:  I'm really happy to see you and happy to
 5   hear that you are okay.  Did it go away quickly or --
 6          MR. YODER:  You know, in hindsight it may have been
 7   a false positive, and my doctor put me on antibiotics which
 8   seemed to do the job.  So he doesn't think at this point that I
 9   have COVID but don't know for sure.
10          THE COURT:  We've heard about all these breakthrough
11   cases, you know, so even --
12          MR. YODER:  Well, I'm fully vaccinated.
13          THE COURT:  Yeah, right.  Exactly.  I think
14   LeBron James, they said, might have COVID now too.
15          MR. YODER:  I can't blame him for mine, just so you
16   know.
17          MR. FEINSTEIN:  And good morning, Your Honor.
18   Marc Feinstein for Samsung.
19          THE COURT:  Good morning, Mr. Feinstein.
20          And I don't know that I got your name.
21          MS. GEISE:  Sure.  Lara Geise.
22          THE COURT:  Oh, good morning.
23          Okay.  Welcome, everybody.  So we're here to start
24   the trial.  We have a couple issues we need to resolve before
25   the potential jurors get here.  The parties have competing
```

1   statements of the case, and we need to have -- we need to sort

2   of coalesce around one.

3          The Court proposes the following statement of the

4   case.  And so I want to read it to you all and then see if

5   there's objections and see if we can resolve them.  So here it

6   goes.

7          Plaintiff Netlist Incorporated designs, makes and

8   sells computer memory modules and components.  Defendant

9   Samsung Electronics Company Limited manufactures computer

10  memory modules and components.

11         This case involves a dispute over a contract between

12  Netlist and Samsung called the Joint Development and License

13  Agreement (JDLA).

14         Samsung breached it's obligations under the JDLA by,

15  one, not fulfilling its obligation to supply computer memory

16  products called NAND, N-A-N-D, and DRAM, D-R-A-M, to Netlist on

17  Netlist's request and withholding as taxes 1.32 million of an

18  8 million non-recurring engineering, NRE, fee due to Netlist.

19         Netlist claims it suffered damages for these

20  breaches.  Samsung denies that Netlist suffered damages and

21  asserts that Netlist did not use reasonable efforts to reduce

22  or avoid its damages.

23         That's the Court's proposed statement of the case.

24         MR. DOREN:  That's acceptable to Netlist,

25  Your Honor.

1              MR. RHOW:  It's fine with Samsung, Your Honor.

2              THE COURT:  Okay.  Good.

3              Samsung continues to object to the time limit, and I

4    just wanted to sort of give you the Court's rationale.  The

5    Court is going to overrule that objection.  But the parties

6    provided an estimate of three to four days in the proposed

7    final pretrial conference order.  That was before the Court

8    deemed three of Samsung's affirmative defenses abandoned and

9    before Netlist dropped one of its contract theories.

10             For trials of three or four days, the Court allots

11   7.5 hours per side.  So essentially the 10 hours Samsung seeks,

12   we weren't really even looking at at the beginning anyway.  So

13   we are going to go with 5.5 hours.  We think that's enough time

14   to resolve the limited damages issues remaining in the case.

15   Barring some wrinkle, we'll go with that and see how it works.

16             Are there any questions that the -- exhibit issues

17   that the Court needs to resolve before openings?

18             MR. RHOW:  Your Honor, there are two issues, and

19   this actually goes into the timing issue.  I mean, certainly

20   after the MILs given the judge's ruling, we attempted -- we are

21   going to construct a case of 5.5 hours based on those rulings.

22             Two issues, though, popped up.  One has popped up

23   from the opening slides.  The other pops up from exhibits they

24   intend to use with today's witnesses.  And we have set up a

25   very good meet-and-confer process.  I had a long discussion

1    with opposing counsel.  It was very cooperative and helpful.

2           But I think the issues that remain go to this issue

3    of the length of the trial and what we are trying here.  And if

4    I could, I do think it needs to get resolved before opening,

5    and it affects today's trial.

6           If I may, Your Honor, I wanted to hand to you the

7    opening slides.

8           THE COURT:  Okay.

9           MR. RHOW:  For -- any problem with me doing this?

10   This is your slides.

11          MR. DOREN:  Sure.

12          MR. RHOW:  So I just to, as a point of reference --

13          And the reason I'm handing that slide to Your Honor

14   is because during the MIL hearings, we did file an MIL to

15   exclude PWC fees on the basis it was consequential damages, and

16   Your Honor denied it, indicating it was not a proper vehicle

17   for an MSJ, and we understood that.

18          Nevertheless, the problem we face is, under New York

19   law, the issue of whether or not the PWC fees which are

20   undisputed in terms of amount are consequential or not is an

21   issue for Your Honor.  And so there's no jury instruction on

22   Section 12.5 which precludes consequential damages under the

23   JDLA, nor should there be, because you'd be asking the jury to

24   apply 12.5 and the law to that particular slide in fact.

25          And so by introducing this during the course of the

1  trial, first of all, we are going to spend time on this on what

2  should be an issue that ultimately Your Honor takes and rules

3  on in terms of either a motion or some sort of briefing.

4          And so the objection we had to the slide is really

5  getting guidance here.  Because in opening, am I supposed to

6  argue that it's not consequential damages or point to 12.5 and

7  explain to the jury what the evidence will show on that?

8          It seems to be using time that is unnecessary since

9  no one disputes that amount and the only issue is, under the

10  law, based on briefing, is this a consequential damage or not.

11          And recall, Your Honor, on the MSJ, you already

12  ruled that 12.5 does apply.  And, in fact, during the course of

13  this trial, consequential damages are not allowed.  And so at

14  this point, it's really applying the MSJ to that particular

15  document and coming up with a ruling, which we could do in

16  post-trial briefing.  We could do in briefing today.  But it

17  just seems to be taking up time with the jury that's

18  unnecessary.

19          THE COURT:  Okay.

20          Counsel?

21          MR. DOREN:  Your Honor, I would just cite the Court

22  to its order on the motions in limine, Docket 243 at page 11,

23  where the Court said, "To resolve Samsung's motion would

24  require the Court to decide whether the PWC expenses are

25  properly categorized as consequential damages.  The Court

1   declines to summarily adjudicate this issue.  Accordingly, the

2   Court will not preclude Netlist from putting forth evidence of

3   its expenses in hiring PWC."

4          The amount of time to be spent on this particular

5   issue is small.  The evidence is very straightforward.  The

6   Court will then have a chance to evaluate it.  We believe that

7   it fits squarely within the framework of direct or general

8   damages under New York law.  And we will make an efficient,

9   concise offering.  As Your Honor sees with the slide in front

10   of it, that is the evidence.  That is the document, along with

11   some limited testimony.  And we would ask to be permitted to

12   proceed consistent with the Court's MIL ruling.

13          THE COURT:  Okay.

14          Do you have a response, Counsel?

15          MR. RHOW:  Yes, Your Honor.

16          If it is true that both sides stipulate that that

17   fact is, in fact, the amount, then what is the jury to decide?

18   There's no instruction that you are going to be giving to them.

19   You are going to resolve this issue.  And so if the only issue

20   is the admission of two minutes of evidence on that, we would

21   stipulate that that is the amount, and we would stipulate that

22   the only remaining issue is, as a matter of law under New York

23   law -- which New York is clear.  The judge decides this.  You

24   decide this.

25          Let's take this from the jury.  It will add

1    confusion.  They will hear it.  They will wonder what do we do

2    with this?  They may even add that to the amount of damages at

3    the end of the trial based on the confusion when they shouldn't

4    be considering it because you first have to decide.  You will

5    be the only person who decides is it consequential or not.

6              So the admission of the evidence we have no issue

7    with to Your Honor.  It's stipulated.  That's the amount.  And

8    Your Honor then can decide, and that part of the case can be

9    resolved without wasting time in front of the jury.

10             THE COURT:  And so the stipulation would be to the

11   427051.6?

12             MR. RHOW:  Correct.

13             MR. DOREN:  Your Honor, if I may.

14             THE COURT:  Yeah, sure.

15             MR. DOREN:  I spoke a bit too quickly about that

16   being the only evidence.  It is the evidence in the amount, and

17   we are happy to accept a stipulation to the amount by which

18   Netlist is out of pocket.

19             There is also evidence that Samsung told Netlist to

20   go deal with the tax authority, thereby leading to the chain of

21   events that required Netlist to hire PWC and incur this

22   expense.

23             And to the extent that is part of the analysis as to

24   whether these are general direct damages, we'll be putting that

25   in evidence too.  Again, very quickly.

1          THE COURT:  And so are there any other damages

2  Netlist seeks for breach of 3.1 other than the PWC fees?

3          MR. DOREN:  No, Your Honor.

4          THE COURT:  And, Counsel, before you sit down, so

5  the -- is this an issue -- so we have these damages.  Are you

6  saying that they are direct damages and not consequential

7  damages?

8          MR. DOREN:  We are, Your Honor.

9          THE COURT:  So if the parties stipulate that these

10 are the damages and there's no other damages under 3.1, why

11 can't the Court just decide whether they are appropriate

12 consequential damages or not?

13         MR. DOREN:  Your Honor, so long as we can put in our

14 evidence as to how Netlist came to go to PWC and why it was

15 required to go there, we think the Court can make that ruling.

16 What we would suggest, Your Honor, though, is that, as the

17 Court suggested in its MIL ruling, that we be permitted to

18 present our evidence.  And if at the conclusion of that

19 evidence the Court concludes that it is an issue for the Court,

20 then obviously we would submit that issue to the Court.

21         THE COURT:  How can it not be an issue for the Court

22 though?

23         MR. DOREN:  Only in that Your Honor gave Netlist the

24 ability to present its evidence on those damages.  And,

25 Your Honor, it may well be an issue for the Court, but we would

1   want the Court to decide it on the full evidentiary record

2   which is, on the one hand, the testimony of the chief financial

3   officer from Netlist being told by Samsung that it should, in

4   order to -- rather than being sent the $1.32 million upon

5   request by Samsung, they were instructed to go deal with the

6   Korean tax service, which they then hired PWC to do and which

7   PWC then, upon it successfully recovering the wrongfully

8   withheld funds, took $427,051 as its fee.

9          Now, if those facts are all stipulated or that

10  evidence is all before the Court, then we would agree that the

11  Court can then decide whether that fits within the definition

12  of general damages or not.

13          THE COURT:  Counsel?

14          MR. RHOW:  Yes.  I'd have to think about, you know,

15  exactly how it's characterized.  But as an offer of proof, we

16  are not going to dispute that.  But more importantly, when you

17  say the evidence presented, the easy solution to avoid

18  prejudice and confusion to the jury is just to do this outside

19  the presence of the jury.

20          We are not here to present evidence to you

21  indirectly through a jury trial to you.  You can just take the

22  evidence directly.  The jury doesn't need to hear it.  They are

23  not going to adjudicate this issue based on what counsel just

24  said.  It's an issue for the judge.

25          So to me there's two solutions.  We can consider a

```
 1    stipulation, which we certainly will.  I've already told you
 2    the amount is not in dispute.  But, second, even assuming we
 3    can't, we can just hear this outside the presence of the jury.
 4    You can hear it directly.
 5            THE COURT:  Yeah, I'm convinced that since this is
 6    going to be an issue for the Court, we will hear it outside the
 7    presence of the jury.  So you can either come up with a
 8    stipulation, or we can figure out some sort of proceeding by
 9    way of declarations and -- or something to resolve it.  But I
10    think we can resolve it fairly quickly.  I think it's an
11    encapsulated issue.
12            MR. DOREN:  Thank you, Your Honor.
13            THE COURT:  Anything else we need to do before the
14    jury comes?
15            MR. RHOW:  Yes.  Sorry, Your Honor.  One more very
16    quickly.  And obviously that was why I raised it, to create an
17    efficiency here.  This issue goes to that as well.
18            During the MIL rulings on Netlist -- actually,
19    Netlist filed this motion -- MILs, it was kind of grouped
20    together in your Rulings 1 through 4 or 2 through 4.
21    Your Honor made the statement that allocations and the
22    existence of allocations are not admissible, are not relevant
23    to the case.  The commercial reasonableness of an order is not
24    relevant.  And we took that to heart in preparing the trial in
25    the 5.5 hours we have.
```

14

```
1          What we see in the initial exhibits presented for

2   P. K. Hong today are a series of exhibits that talk about that

3   very issue, allocation, and argue that the allocation was

4   unreasonable.

5          Certainly if the commercial reasonableness of an

6   order is not admissible, the commercial unreasonableness of an

7   order should not be admissible as well.  And your ruling was

8   very clear on this.

9          And so before we start, I think we need clarity that

10  certainly Netlist can prove a request, prove that we breached,

11  and do that, and that's fine.  The notion that we

12  anticipatorily breached by not giving an allocation goes to the

13  heart and right into the MIL ruling Your Honor made.  And that

14  ruling was clear, and I should quote it.

15         What Your Honor said is, "The reasonableness" -- I'm

16  sorry.

17         "The evidence of industry shortages and product

18  allocation" -- we were arguing that they were relevant to show

19  allocation of product, and the response that Your Honor wrote

20  is, "These reasons" -- this is page 8 of your MIL rulings.

21         "These reasons for introducing the evidence are not

22  relevant to any remaining issue to be decided by the jury.  The

23  reasonableness of Samsung's decision to breach its supply

24  obligation has no bearing on the measure of damages resulting

25  from the breach."
```

UNITED STATES DISTRICT COURT

 1          This door should not be opened by them.  It is

 2   unfair for them to be able to argue we were commercially

 3   unreasonable when the only issue before this Court, this jury,

 4   is the amount of damages.  So I would ask Your Honor to apply

 5   that ruling to both sides, and that would exclude, for the

 6   record, Exhibits 10, 152, and 1333, all of which literally say

 7   the word "allocation" in them and make an argument about

 8   allocation.

 9          THE COURT:  Counsel, you quoted me from the MIL

10   order.  Again, can you direct me to that page?

11          MR. RHOW:  Yes, Your Honor.  It starts at the bottom

12   of page 7.  And for completeness, it's that last paragraph

13   starting at page 7, line 18.  The part I read to you though

14   goes to page 8, lines 1 through 4.

15          THE COURT:  And so the argument you're making is

16   that the Court ruled that allocations, commercial

17   reasonableness of these particular sales to Netlist, were not

18   relevant based on what Samsung had said in discovery and based

19   on the issues already decided in the case.  So attempt by

20   Netlist to argue that their requests were reasonable seems to

21   open the door.

22          MR. RHOW:  It seems like commercial reasonableness,

23   if that's out, commercial unreasonableness is certainly out.

24   And the reasons why an order was breached or the reasons why a

25   particular order had a certain allocation is not relevant based

1   on what you said.

2            And that -- if reasonableness is part of this trial,

3   this then becomes, again, a much longer trial because

4   Mr. P. K. Hong testified during his deposition that all orders

5   have to be commercially reasonable.  That's literally the last

6   piece of testimony in the deposition I took he said.  He goes,

7   "That's a true statement, Mr. Rowe."

8            But Your Honor, and I understand, has cut that out.

9            So if it is true that these allocation e-mails come

10   in, we are opening the door to a lot of testimony that goes

11   into what Your Honor has excluded.  We literally have our hands

12   tied behind our back because we are not allowed to explain why

13   an allocation exists, why an allocation is for a certain

14   amount.

15            I can make an offer of proof this is going to open a

16   Pandora's box into Mr. Chuck Hong's friendship with the

17   president of the SSI division, which is a big factor in the

18   allocation.  While his best friend was there as president,

19   guess what?  He got a sweetheart allocation.  When his best

20   friend left literally in July of 2017, right when they claim

21   breach, the allocation drops.  Are we going to go into that

22   testimony?

23            I'm not implying we are because I cut all of that

24   out.  But in terms of applying this ruling fairly, if all that

25   evidence is out, and there's a mountain of that evidence, then

1    these allocation e-mails, anything that mentions allocation,

2    should be out as well.

3              THE COURT:  Okay.

4              Counsel?

5              MR. LO:  Good morning, Your Honor.

6              As with all evidence, the issue is what it is being

7    used for.  What the Court ruled in the MIL ruling was that

8    Samsung does not get to come into court and argue to the jury,

9    "In a given month, we only gave Netlist a million dollars'

10   worth of products, and that was reasonable and that is not a

11   breach."  And the Court said you already ruled on that on

12   summary judgment, and that's not coming in.

13             That is not what we are going to open the door for.

14   That is not the reason why we are arguing about allocation.

15             What we are going to do is put in evidence that,

16   having put in those allocations when they were not supposed to,

17   regardless of whether they were relevant -- whether they were

18   reasonable or not, that had an impact on our damages.

19             And the first document, which I'm happy to hand up

20   to the Court, is somebody, P. K. Hong, from our company,

21   calling Samsung saying, "Look.  You've put a $1 million limit

22   on us.  This is going to hurt our business.  We are not going

23   to be able to submit the purchase orders that we want."

24             So we are showing the impact of the allocations.  We

25   are not arguing whether the allocations are reasonable or not.

1   In fact, we start from the assumption that the Court already

2   ruled on that the allocations were improper.  They don't get to

3   limit us, and what we are introducing this evidence to show, is

4   the impact of them having to do so.

5            And what the Court will hear, I think, in the

6   opening today, based on what we saw in their slides, is that

7   unless Netlist submitted a purchase order to Samsung, there

8   can't be damages associated with that.  And that will become

9   clear in terms of the relevance in the Court.

10           But here's what our testimony will be.

11           When they limited us on an allocation per month to a

12  million dollars to $500,000 to zero, the message to us was

13  clear:  Do not submit a purchase order.  We will not fulfill

14  it.  So do not permit us a purchase order.

15           So what they are trying to do with this request on

16  the allocation is to basically wash away the actual breach

17  itself, because they capped us and they called us and said, "Do

18  not submit any purchase order."  And now what they are asking

19  the Court to do is we don't get to say, "Well, because Samsung

20  told us not to submit a purchase order, that's why we didn't

21  submit a purchase order.  Otherwise we would have."  And that

22  is the basis of our damages.

23           So we are using it for a completely different reason

24  and a reason that is entirely consistent with the Court's MSJ

25  ruling.

```
 1              THE COURT:  And so the argument is, from a damages
 2    standpoint, that the allocations -- the allocations kind of
 3    curbed your ability to send Samsung purchase orders.
 4              MR. LO:  Exactly.
 5              THE COURT:  And but for the -- but for the
 6    allocation from Samsung, you would have sent purchase orders.
 7    And the fact that you couldn't send purchase orders inure to
 8    your damages.
 9              MR. LO:  Exactly.  Because they will cross-examine
10    our witnesses and say, "But you didn't submit any purchase
11    orders in February of 2018, did you?"
12              And the answer will be, "No, we didn't, because you
13    told us in advance, 'You are past your allocation.  Don't
14    bother submitting anything.  It will not be fulfilled.'"
15              THE COURT:  And you are not making any arguments
16    that the allocations were reasonable?
17              MR. LO:  We're not -- no.  We are just saying we are
18    reacting to those allocations.  Well, we are going to argue
19    that we shouldn't have been limited by the allocations, but we
20    are -- but the premise, the real thrust of the testimony is
21    that we acted in accordance with their demands that we abide by
22    the allocations.
23              THE COURT:  All right.  Okay.
24              Counsel, do you want to respond?  It doesn't seem
25    like that we are talking about reasonableness of allocations.
```

1   We are just talking about allocations being used as a vehicle

2   to prevent Netlist from issuing purchase orders.

3            MR. RHOW:  Respectfully, Your Honor, I think it's a

4   little bit of semantics.  The way I heard him, Mr. Lo, say

5   this, look, the allocations curb the PO.  And then Your Honor

6   asked, "Are you going into reasonableness?"

7            And he then said, "Yes, we are going to talk about

8   how it's too low."

9            So what is my counter to that?  My counter to that

10  is no, it wasn't too low.  And here are the 900 factors that go

11  into the amount of the allocation and this then opens the door

12  to this entire line.

13           Your Honor, I would submit to you they can make all

14  of these arguments without these e-mails.  All they need to

15  show is the amount they are ordering on a monthly basis.  And I

16  did not object, Your Honor, to their Demonstrative 509 which

17  literally shows on a month-by-month basis how much they were

18  actually ordering.  Mr. P. K. Hong can then say that's not what

19  we needed.  We needed more.

20           That is what a damages trial is, is showing the

21  actual amount of request, and then they can certainly say from

22  509, look, we wanted to order more.

23           That -- I can't object to that.  The problem with

24  the e-mails -- and, Your Honor, I do think it's worth it to

25  show the e-mails because the first e-mail they talk about not

1    only goes into -- and I'm assuming if we are going to go into

2    these e-mails, everything comes out.  Because the first e-mail

3    doesn't just talk about zero allocation.  It talks about the

4    contract.  It talks about the interpretation of the contract,

5    which Your Honor has ruled on.  But it says, for example, "The

6    contract requires support for NVDIMM products," which was

7    exactly our argument in MSJ, which is this is not a broad

8    supply agreement.  This is an agreement solely limited to

9    NVDIMM.  We lost that.  I get it, Your Honor.

10           But then, now that -- having lost that, now they

11   want to introduce this e-mail to use it for a different

12   purpose.  But if I see this e-mail -- it has a lot of

13   prejudice.  But it also opens the door to many, many issues

14   which, frankly, in 5.5 hours, we were not prepared to litigate.

15   We can't litigate fairly.

16           And, again, in terms of the exhibits I mentioned to

17   you, every one of the arguments they are making, they can prove

18   without the e-mails.

19           They want to go into the e-mails to show the

20   allocation was unreasonable.  That's why they are doing it.

21   I'm going to quote the first e-mail to you.  This is

22   P. K. Hong's e-mail.  This is Exhibit 10.  "Steve, I was just

23   told that Samsung's North America has decided to give Netlist

24   zero allocation and no support.  This is a problem."

25           Right?  And so what's my response?  My response must

```
 1    be no.  This allocation was done because there was a market
 2    shortage.  This allocation was done because there was other
 3    reasons.
 4              Or, alternatively -- and this is the Pandora's
 5    box -- I then go into Mr. Hong's relationship with the CEO of
 6    SSI, who guess when he left?  He left prior to this e-mail.
 7    And when the new CEO came in, who was no fan of Mr. Hong, the
 8    allocation does change.  Is that a factor that I need to go
 9    into to defend myself?
10              And so, look.  I'm not saying they can't make the
11    argument.  Mr. Lo's argument that he just made, he can make a
12    hundred different ways with a hundred different documents.  The
13    problem with these three documents is they are trying to
14    backdoor in commercial unreasonableness.
15              THE COURT:  So the argument that it seems Netlist
16    wants to make is that they were damaged because the
17    allocation -- let's -- as an example, the allocation was zero
18    and they wanted to buy product.  So their inability to buy
19    product caused them damage.
20              You're saying they can still make that argument but
21    just not without these --
22              MR. RHOW:  A hundred different ways.  They have --
23    and, by the way, what this really is -- and I have a different
24    argument here.  What this e-mail shows is an anticipatory
25    repudiation.  It's basically saying don't even make requests.
```

1          Now, Your Honor, this has been applied to us a

2    couple times.  Never pled.  It's not part of the pleadings.

3    It's nowhere mentioned anywhere in discovery responses, in the

4    Complaint itself.  There is no anticipatory repudiation

5    argument.  This was really meant to be used on the

6    interpretation argument.  That's where these e-mails became

7    relevant.

8          But we are in damages now.  This issue was resolved.

9    This issue should not become part of this trial.  And as

10   Your Honor just indicated, they can make all of these arguments

11   by showing forecasts.  Doesn't need to mention allocation.  By

12   showing e-mail requests.  Doesn't need to mention allocation.

13         They can make every argument they intend to make

14   without these e-mails.  These e-mails open a Pandora's box, go

15   into a lot of irrelevant issues and, frankly, are in violation

16   of the MIL that they filed and you indicated you'd be granting.

17         THE COURT:  But can they still -- can they still

18   make the argument that they didn't place purchase orders

19   because of the low allocations?

20         MR. RHOW:  100 percent.  There's e-mails that I

21   haven't objected to that are directed to my friend Mr. Knuth

22   from Samsung, where he says -- tells them, "Don't submit a PO.

23   I don't have availability."

24         I'm not objecting to that because it's not tied to

25   the allocation.  It's literally Mr. Knuth telling him in an

1   e-mail, "Don't submit it."

2          Now, he will have a response to that, but my point

3   is they are not foreclosed at all from making any of these

4   arguments.  There's e-mail after e-mail after e-mail on this,

5   and I'm not objecting to those.

6          THE COURT:  Okay.

7          MR. RHOW:  The problem with these is they literally

8   say "allocation" in them, and we get into this separate world

9   that Your Honor took out of this trial.  And we prepared based

10  on that.  I cut out a lot of my outline based on that.

11         THE COURT:  And what are the three e-mails again?

12  What are the exhibit numbers?

13         MR. RHOW:  Your Honor, it's Exhibit 10, Exhibit 152,

14  Exhibit 1333.

15         THE COURT:  Okay.  Thanks, Counsel.

16         Let me ask counsel for Netlist.  Why can't you make

17  your arguments without these three e-mails?

18         MR. LO:  The distinction between the documents and

19  testimony makes no sense.  If we are allowed to argue by

20  testimony or put in evidence by testimony that the reason we

21  did not submit a purchase order in February is because they

22  told us in January that you have zero allocation, there's no

23  distinction between that testimony and putting up a document

24  that's from them or from us that says they've put us on zero

25  allocation and that is why we cannot do it.

1                I think, frankly, Samsung is manufacturing a

2    Pandora's box that does not exist.  The Court has ruled that

3    they did not get to place any caps on us.  It was on demand,

4    and they were supposed to fulfill those.  So if there is an

5    allocation, that is by definition a breach, and they don't get

6    to open a so-called Pandora's box by rearguing the breach

7    simply because we are now pointing out the consequences of the

8    breach and the damages that we suffered from the breach

9    because, if that were the case, then anything we do would open

10   up that Pandora's box.

11              THE COURT:  Okay.  Thanks, Counsel.

12              Can I just get copies of these three exhibits, and

13   I'll look at them.

14              Let me just ask our deputy here.  When are the

15   jurors ready?

16              (Discussion held off the record.)

17              MR. RHOW:  I'm sorry, Your Honor.  I do have to --

18   for the record, it was also 152B, which is an attachment to

19   152, which I'm going to hand up to Your Honor.

20              THE COURT:  All right.  Let me look at these

21   exhibits.  We'll take a short break, and we'll come back in

22   five minutes.

23              MR. YODER:  Your Honor, may I make one comment real

24   quickly?

25              THE COURT:  Yeah, please.

1          MR. YODER:  It occurred to me that given your ruling

2     on the tax withholding, the statement of the case may want to

3     be modified to take that out as well since the jury won't be

4     hearing evidence of that.  I think there's just a brief

5     reference to it.

6          THE COURT:  And that's the section that says -- the

7     paragraph reads, "Samsung breached its obligations under the

8     JDLA by, one, not fulfilling its obligations to supply computer

9     memory products called NAND and DRAM to Netlist on Netlist's

10    request and, two, withholding as taxes 1.32 million of an 8

11    million non-recurring engineering fee due to Netlist"?

12         MR. YODER:  Correct, Your Honor.  Since that issue

13    isn't going to the jury.

14         THE COURTROOM DEPUTY:  Can you read --

15         THE COURT:  I'm sorry.  I'm sorry.  Sorry about

16    that.  I always caution people not to do that.  I'll read that

17    again.

18         "Samsung breached its obligations under the JDLA by,

19    one, not fulfilling its obligations to supply computer memory

20    products called NAND, N-A-N-D, and DRAM, D-R-A-M, to Netlist on

21    Netlist's request; and two, withholding as taxes 1.32 million

22    of an 8 million non-recurring engineering, NRE, fee due to

23    Netlist."

24         And you think that second part should go out?

25         MR. YODER:  Just the second part, Your Honor.

```
 1              THE COURT:  Counsel?
 2              MR. DOREN:  That's fine, Your Honor.
 3              THE COURT:  Okay.  We will take a break and come
 4    back.  Stick around because the jurors will be here soon.
 5              MR. RHOW:  Thank you, Your Honor.
 6              THE COURTROOM DEPUTY:  All rise.  This court is in
 7    recess.
 8              (At 9:08 a.m. a brief recess was taken.)
 9              THE COURT:  I've gone through -- I've gone through
10    the exhibits, and I don't think that they really -- that they
11    really focus on -- or they raise issues of reasonableness of
12    allocation.  So I'm going to overrule the objection to these
13    exhibits on that basis.
14              Obviously I'm not ruling on the admissibility of
15    the exhibits in general.
16              I do want to caution the parties, though, that if
17    the parties stray into -- if the parties stray into this
18    reasonableness of allocation issue, you know, if Netlist is
19    arguing that their allocations were reasonable, I think that's
20    unfair because that's -- we've told Samsung that they can't
21    argue that allocations were unreasonable.
22              So if the parties stray into that, we will deal with
23    it via objections.  And the Court will try to keep an ear out
24    for that so I can head things off.
25              MR. RHOW:  Just to be clear, so if Netlist argued
```

1   that the allocations were unreasonable, that -- you are saying

2   that that would not be appropriate?

3            THE COURT:  If Netlist --

4            MR. RHOW:  -- arguing the allocations were

5   reasonable and --

6            THE COURT:  Yeah, the argument is that -- the motion

7   in limine was limiting Samsung from arguing that its

8   allocations were reasonable --

9            MR. RHOW:  Correct.

10           THE COURT:  -- and because of commercial

11   circumstances.  So Netlist can't argue that -- you know,

12   Netlist can't raise the argument in the converse to that.

13           MR. RHOW:  Understood, Your Honor.

14           MR. LO:  If I could address that, Your Honor.  In

15   the Court's -- I don't think the converse, with respect,

16   applies because what the Court's ruling said was that given the

17   way that Section 6.2 was drafted, Samsung did not get to place

18   artificial caps on us.

19           What Samsung was trying to do and what we

20   precluded -- or the Court precluded in the MIL was they don't

21   get to say that the caps are reasonable and, therefore, it's

22   not a breach.

23           Our damages case starts from that premise that there

24   was a cap, there shouldn't have been a cap in place, and here's

25   how we were damaged.

1          So that's really the extent of what we're going to

2    say, and I want to make sure that that's not in the Court's

3    eyes opening up the door because our witnesses are going to say

4    because they capped us at this, this is why we suffered

5    damages.  And I think that just starts from where the Court

6    ended on summary judgment and goes directly into damages.

7          Now, what Samsung, I think, gets to say is "Even

8    though we imposed a cap, you found the products cheaper

9    elsewhere," or "We imposed a cap, but we gave you the products

10   anyway."  So that's all fair game in terms of damages.  But

11   what they don't get to do is to suggest that it's -- that the

12   same analysis applies to both sides of that cap, that just

13   because they didn't get to put in a cap, we now don't get to

14   say that the cap damaged us somehow.

15          THE COURT:  You can say that the cap damaged you.

16   The question is was the cap reasonable or unreasonable.  So you

17   can say, "We're damaged because we wanted X amount of products.

18   Samsung capped us at Y, and we needed X."

19          MR. LO:  Okay.  I think we can live with that.

20   Thank you, Your Honor.

21          THE COURT:  Does that make sense, Counsel?

22          MR. RHOW:  Your Honor, yes, it does, and actually

23   we'll police that.  I think -- that's why I raised it through

24   the e-mails, though.  I think the e-mails imply it's

25   unreasonable.

```
 1            THE COURT:  Mm-hmm.
 2            MR. RHOW:  So to me the -- the sequence that might
 3    make more sense is if P. K. Hong -- I think this is coming
 4    after Mr. Hong.  If he wants to testify to that very fact,
 5    there were caps, they were unreasonable, and to the extent
 6    there's a dispute from our side, the documents could come in to
 7    rehabilitate that issue.
 8            But the documents imply they are unreasonable.
 9    That's the problem.  If you look at the way they're drafted,
10    definitely Exhibit 10 for sure says it's zero allocation, it's
11    not fair, et cetera, et cetera.  When Mr. Hong can say it's a
12    zero allocation.
13            And so I think Mr. Lo's attempt to clarify, to me,
14    has muddled it more, and we're pushing too close to the line.
15    I hear Your Honor directly but to me the boundary has already
16    been breached because Exhibit 10, 1333 and the other one I
17    mentioned, 152, all imply that.
18            In fact, some say that, that it's not reasonable.
19    In fact, one says, if I'm recalling, my prior cap, my prior
20    allocation was X.  Now it's Y.  That's not fair.  That's not
21    right.  That's not reasonable.
22            And I just think the e-mails -- that's why I never
23    have an objection to the testimony.  I wasn't going to have an
24    issue with that.  But the e-mails, to me, fall within the wrong
25    side of the boundary you've set.
```

1          THE COURT:  But the line I think we're drawing is

2    that -- Netlist is saying that any cap is a breach, right, as

3    opposed to this specific cap is reasonable or unreasonable

4    based on circumstances.  Correct?

5          MR. LO:  That is correct, Your Honor.  Yes.

6          THE COURT:  Yeah.

7          MR. LO:  So we are not going to draw a line that

8    somehow this cap was better than the other ones.  We're just

9    going to say this was the cap at this particular time.  But for

10   the cap, here's what we have -- we have done, and here's how we

11   were damaged.

12         THE COURT:  Right.

13         MR. RHOW:  And so, I guess, Your Honor, that's --

14   again, that's the point of why the document is not necessary,

15   because the document characterizes the cap as being a bad

16   thing, as being unfair separate and apart from being a breach.

17         I'm not disputing -- and 509, which is in, they can

18   show in a -- it's a month-by-month amount.  And P. K. Hong

19   could go through 509 and say, "What is the amount that they

20   were allowing you to submit orders on?"

21         "X amount."

22         "What is the amount you actually submitted orders

23   on?"

24         "Y amount."

25         That delta is fine.  The e-mail -- as targeted as

1    Mr. Lo is saying he will be with the questioning, the e-mails

2    automatically fall outside of that.  That's the problem.

3    Because what am I to do on cross?  Am I to just let it lie that

4    the inference is drawn that we somehow screwed -- sorry,

5    Your Honor, for lack of a better term, screwed over Netlist

6    because the cap was unreasonable?

7         152 is chock-full of cross on that, and I -- I don't

8    want to breach the MIL.

9         THE COURT:  No.  But I think what Netlist is arguing

10   is that -- correct me if I'm wrong -- but any cap is

11   unreasonable because it's a cap.

12        MR. RHOW:  And I agree with that.  And so that's the

13   point, which is you don't need the e-mails which characterize

14   the nature of the cap at 1 million, at zero, at whatever.  You

15   don't need the e-mails to do that.  That then goes over the

16   line.

17        Mr. Hong can testify to that exact issue.  "What was

18   the cap as you understood it in X month?"  You don't need the

19   e-mail for that.

20        THE COURT:  Well, I'm not convinced that the e-mails

21   are saying anything other than any cap is unreasonable.  That's

22   sort of the problem I'm having.

23        So let's look at Exhibit 10.

24        MR. RHOW:  Okay.

25        THE COURT:  Isn't Exhibit 10 saying that Samsung has

 1    decided to give Netlist zero allocation?  That's a problem?

 2                MR. RHOW:  Yes.

 3                THE COURT:  So that's saying that there's a cap, and

 4    the fact that there's -- there's an allocation, and the fact

 5    that there's an allocation of zero is a problem?

 6                MR. RHOW:  Right.  Which the implication, of course,

 7    it's not just a problem.  It's unreasonable.  Right?

 8                So this is a damages trial.  He can get up and say,

 9    without saying it's reasonable or unreasonable, without

10    comparing it to prior months -- because 152, if you go there,

11    if you look at that document, he is literally explaining, "We

12    cannot accept partial support.  We had prior support at X.  Now

13    it's at lower than X.  This is a problem.  This is

14    unacceptable."

15                And all of that then strays into -- and by

16    the way, if you look at the chart itself, it goes into the

17    historical allocations with a graph that looks very similar to

18    their opening slides that make this argument that it was

19    unreasonable.

20                And I didn't object to those opening slides even

21    though I think the implication of the slides in opening, where

22    they show this graph moving around, is that it was reasonable

23    in this month but not reasonable in this month.  And I just

24    don't think we are containing the impact of these documents.

25                When, as I indicated, Your Honor, if you look at

1    509, which you do not have, it's literally a month -- and I can

2    hand that up to you, Your Honor, if you'd like.

3            THE COURT:  I'm looking at 152.  Let's talk about

4    this.

5            MR. RHOW:  Okay.

6            THE COURT:  So this is -- this document is

7    essentially showing a history of allocations from November of

8    2015 to January of 2018.  We see that there's no limits on

9    allocations through 2000 -- second quarter of 2017.  Then

10   there's a limit in third quarter 2017.  I don't know that these

11   documents, though, are getting to the point of a limit being

12   reasonable or unreasonable.  They are just all complaining

13   about the limits in general.

14           MR. RHOW:  The second paragraph, the last sentence,

15   this is what Mr. Hong writes, "These drastic changes have

16   impacted our business and impacted our ability to support our

17   customers."

18           That goes to the unreasonableness of the allocation.

19   And if that is the ruling, then I am not allowed to then say,

20   well, let me explain the allocation.

21           And I understand Your Honor saying any allocation is

22   wrong.  But for credibility purposes, for a variety of

23   purposes, when unreasonableness is raised, when it dramatically

24   impacts our business, just for credibility purposes, Samsung

25   should explain -- be able to explain, well, it wasn't

1    arbitrary.  Here's the reasons why.  Here's the reasons why the

2    allocation exists.  Here's why it's reasonable, just for

3    credibility purposes.  And so that's why I'm saying it's a

4    Pandora's box.

5           When 509, which they have, and I didn't object to,

6    and I'm not going to object to testimony from P. K. Hong about

7    what do you believe the cap to be?  Did you want more than the

8    cap?  That gets in.  It's the characterization of the cap as

9    something different than a year before, as a dramatic change,

10   as impacting our customers, as being unacceptable, as being a

11   problem, the jury automatically is going to think, wait a

12   minute.  There was an unfairness to the cap beyond the breach

13   which Your Honor has already decided.

14          And then we get into -- and, you know, I hate go

15   back to Exhibit 10, but Exhibit 10, do I -- am I not allowed to

16   question on the last three sentences of Exhibit 10 which talk

17   about the interpretation of the agreement and whether the

18   e-mail that P. K. Hong wrote is reasonable?  Whether he had --

19   I should be able to go into the entire e-mail to show that

20   P. K. Hong's statement is not credible because the

21   third-to-last sentence talks about an interpretation of the

22   agreement that's contrary to what Your Honor ruled.

23          Should I then be saying, "Wait a minute, Mr. Hong.

24   Zero allocation is not a big deal because you agree that the

25   JDLA is limited to NVDIMM products only.  You agree with that,

1    so what was the big deal here?  Why was it a problem?"

2           I need to be able to rebut this is a problem and

3    cross-examine Mr. Hong and say, "This actually wasn't a

4    problem, was it, Mr. Hong?  You understood the agreement to be

5    limited in NVDIMM.  You are overstating an issue here."  And I

6    will then -- I can even -- I would be entitled to then attack

7    the fact that he's even saying it's a zero allocation.

8           And so that's -- that then becomes a much longer

9    trial and really beyond the scope of the intent of the MIL that

10   you granted, Your Honor.

11          And that's -- I'm not trying to stop them from

12   making the argument.  I'm trying to stop them from using

13   e-mails as a Trojan horse to present a lot of other issues

14   beyond the issue they actually want to raise.

15          I think Exhibit 10 is a poster child for that.  I

16   think Exhibit 152, it's even worse because it talks about

17   dramatic changes impacting customers.  That to any juror

18   would -- they would conclude, wait, this was unreasonable.

19   This is something that they did on purpose.  This is something

20   they did to hurt Netlist.  And those issues are not before the

21   jury and just open up a Pandora's box.

22          THE COURT:  So the issue of changing allocations,

23   you're saying are not before the jury?

24          MR. RHOW:  Correct.  It's not.  The only issue we

25   have on a request-by-request basis, they will -- the issue I

1   believe that is before the jury is Netlist will submit evidence

2   of a request.  They may try to do it as a forecast.  We'll

3   disagree, but they can try to do that as an e-mail request or a

4   purchase order for X amount.

5           The question then is did we fulfill that amount or

6   not?  That really is the essential part of this trial.  That's

7   the trial we believe we are trying.

8           If Mr. Hong wants to argue about allocation, that's,

9   to me, secondary to the issue of breach.  It's trying now to

10  get into the mind of Samsung.  Why did they do it?  Was there

11  an allocation?  Was the allocation fair or not fair?

12          So even the concept of allocation which goes to that

13  concept of anticipatory repudiation gets into intent, gets into

14  the whys, which Your Honor has already ruled is not part of

15  this trial.

16          And so I have to keep emphasizing, like, these --

17  these e-mails, that's what they're designed do, to show the

18  why, to show the bad intent, to show the dramatic effect on

19  customers.  When all of this is going to come in -- you are

20  going to see spreadsheet after spreadsheet after spreadsheet,

21  forecasts, e-mail requests.  There's a ton of those.  These are

22  not that.

23          THE COURT:  Let me ask Netlist.  When are you

24  intending to introduce these exhibits?

25          MR. LO:  These will be with Mr. Hong, who is the

UNITED STATES DISTRICT COURT

```
 1    chief operating -- Paik Ki Hong, the chief operating officer of
 2    Netlist.  And if -- and if I can just address this specific
 3    sentence that's in 152, I'll give the Court a -- a very
 4    specific example of what we get to do with this or what we
 5    think we're going to do with this document.
 6              THE COURT:  Okay.
 7              MR. LO:  In a damages trial, you get to talk about
 8    the nature of the breach.  In other words, if the damages are
 9    about my injuries as a result of a car hitting me, we get to
10    tell the jury did they run over me at 5 miles an hour or
11    60 miles an hour.
12              Now, what they -- so what they do get to do, when we
13    talk about the -- the extent of the breach and the damages
14    arising from it, they can say it doesn't matter that you were
15    hit at 60 miles an hour.  You walked away fine, and you ran,
16    you know, a marathon the next day.  That's all fair game.
17              What they don't get to do in a damages trial is to
18    come back and say, well, if they're going to say we hit them at
19    60 miles an hour, then we get to say you ran -- you know, you
20    ran into the street and you weren't looking both ways and it
21    was your fault that you got hit.  That's what a damages trial
22    is.
23              So looking at this sentence, these drastic changes,
24    that's the breach that the Court has already adjudicated.
25    That's the fact of them running us over, and that's the
```

```
 1    60 miles an hour as opposed to the 5 miles an hour.  That

 2    cannot be disputed, and we do get to tell the jury about that

 3    because, otherwise, how could they possibly assess the damages?

 4         What they do get to do is they do get to dispute the

 5    latter half of that sentence, "have impacted our business and

 6    impacted our ability to support our customers."

 7         If they want to argue that, notwithstanding their

 8    breach, our business took off, we got more customers, we made

 9    more money, we got all the parts that we need, that's perfectly

10    fair game for a trial, for a damages trial.

11         THE COURT:  Yeah, I guess I'm -- I'm disputing your

12    analogy about the 60 miles an hour versus 5 miles an hour

13    because we've already decided that Samsung breached the

14    contract.  So talking about the damages that flow from that

15    breach doesn't seem like we're -- I don't want to get into an

16    issue of, you know, Samsung's intent or Samsung's conduct

17    because that's really not at issue anymore.

18         MR. LO:  It's not about the intent.  But in any

19    given month, the allocation will be different.  Right?  They

20    can -- they can sometimes set it as zero and they can sometimes

21    set it at zero and they can sometimes set it at a million,

22    and -- and that's what we are putting in these documents for.

23         We are not putting it in to show that they were

24    being partic- -- to show intent.  It's just we are starting

25    from the fact that as a result in this month when it was zero,
```

1   here's what we did and here's how we were damaged.  In this

2   particular month it was a million, and this is what we did in

3   response to that, and this is how our business has suffered.

4          So the history of it has to be in evidence.  It's

5   our damages case.

6          MR. RHOW:  Your Honor, could I respond just briefly

7   to the analogy?

8          THE COURT:  Briefly.

9          MR. RHOW:  First of all, we're not objecting to that

10  evidence coming in.  It's these documents.

11         The 5-miles-per-hour, 60-miles-per-hour analogy, the

12  problem is you ruled on the 5 miles per hour.  You said I can't

13  go into the 5 miles per hour.  That's the reasonableness of the

14  speed.  And so the 60 doesn't come in either.  That analogy

15  highlights exactly the unfairness of the ruling if it's applied

16  to one side of the equation.

17         THE COURT:  Yeah, that's the issue.  So I'm going --

18  I'm going to give it some more thought, and we'll definitely

19  make a ruling on it before we get started.

20         I wanted to raise one more issue before we start

21  with the jurors.  And I probably should have raised this

22  earlier.  But I formerly was at O'Melveny & Myers years ago and

23  then went to Milbank in, I think, 2007.  And I have -- so I was

24  partners with both Mr. Feinstein and Mr. Yoder at O'Melveny &

25  Myers.  I don't know that I worked with Mr. Feinstein on a

```
 1   case.  I don't recall one.

 2           I know I worked with Mr. Yoder on a case maybe

 3   20 years ago, between 18 and 20 years ago.  I don't know them

 4   socially, you know, and haven't kept up any correspondence or

 5   dialogue with them a social context since, you know -- I

 6   probably haven't spoken with them since before 2007 when I went

 7   from O'Melveny to Milbank.  But so I wanted to raise that up to

 8   you.

 9           The other issue I wanted to raise is the jury

10   consultant that Samsung has employed, Dr. Geise, I've worked

11   with before myself on a couple of trials, probably more

12   recently, and I want to say maybe 2000 and -- oh, maybe 2012,

13   2013, somewhere along those lines.  On a couple cases I had

14   for -- when I was representing Apple, I employed Dr. Geise as a

15   jury consultant.

16           So I wanted you to know all that information, and if

17   you wanted to raise an objection, I am perfectly willing to

18   listen to it.  I don't think that any of these contacts are

19   going to bias the Court in any way, but I wanted to make you

20   aware of that.

21           Do you want some time to think about that?

22           MR. DOREN:  No, Your Honor.  We are -- actually, let

23   us confer with our client at the break.  All right?

24           THE COURT:  Okay.  Great.  Thank you.

25           MR. DOREN:  Just to be sure we're all on the same
```

```
 1   page.
 2              THE COURT:  Yeah.  And if you have an issue, we can
 3   talk about it and we can, you know, figure out what to do.
 4              MR. DOREN:  Thank you.
 5              THE COURT:  Okay.  I think we are ready for the
 6   jurors to come in.  So we'll start that process.
 7              (In the presence of the prospective jurors.)
 8              THE COURT:  Everyone, please have a seat.
 9              THE COURTROOM DEPUTY:  Calling Item Number 1,
10   SA CV 20-993, Netlist, Inc. vs. Samsung Electronics Co., Ltd.
11              Counsel, state your appearances, please.
12              MR. DOREN:  Good morning, Your Honor.  Richard Doren
13   on behalf of Netlist.
14              MR. LO:  Good morning, Your Honor.  Jason Lo also on
15   behalf of Netlist.
16              MS. LEE:  Good morning, Your Honor.  JungEun Lee on
17   behalf of Netlist.
18              MR. DOREN:  And, Your Honor, I'd like to introduce
19   Mr. Chuck Hong, the CEO of Netlist.
20              MR. HONG:  Good morning, Your Honor.
21              THE COURT:  Good morning.
22              MR. RHOW:  Good morning, Your Honor.  Ekwan Rhow on
23   behalf of Samsung.
24              And, very quickly, with me is Mr. Neal Knuth also
25   from Samsung.
```

1              THE COURT:  Good morning.

2              MR. YODER:  Michael Yoder also representing Samsung,

3   Your Honor.

4              THE COURT:  Good morning.

5              MR. YODER:  And we have a team member, Lara Geise,

6   with us today.

7              THE COURT:  Good morning.

8              MR. FEINSTEIN:  And Marc Feinstein, Your Honor, also

9   representing Samsung.

10             THE COURT:  Good morning.

11             Good morning, Counsel.

12             I want to welcome the jurors here today.  Thank you

13  for coming.  We really appreciate your involvement in this --

14  in this process.  You should all be commended for fulfilling

15  your civic duty and responding to the summons and going through

16  all the hassle, especially with these times of COVID.  We

17  really appreciate you all taking your obligations very

18  seriously in coming here this morning.  And so we welcome you.

19             We are going to go through some background

20  information about your role as jurors.  Then we are going to go

21  through this process which we call "voir dire," which is

22  essentially where we select the jurors for this case.

23             I'm going to be asking you a number of questions.

24  We'll get to know you a bit, and then the lawyers will have an

25  opportunity to make some challenges and then make some

```
 1   peremptory strikes, and we'll eventually get the jurors seated.
 2         We are going to try to do it this morning before
 3   lunch, although I'm not sure whether or not that timing will
 4   work.
 5         Eventually we are going to have eight jurors, and
 6   you'll be sitting in the jury box when you are selected.
 7         So just by way of orientation we are in Courtroom 7C
 8   at the federal courthouse.  The case we've got before us today
 9   is Netlist, Inc. vs. Samsung Electronics Company, Inc. --
10   Samsung Electronics Company, Limited.
11         Now, you've heard from the lawyers.  They've
12   introduced themselves this morning.  There's also a few
13   additional folks that are working with each side.  I know they
14   all stood up, but what I'm going to ask them to do is stand up
15   again and face the jury and just indicate their names again.
16         So we'll start with plaintiffs.
17         MR. DOREN:  Good morning.  I'm Richard Doren.
18         MR. LO:  Good morning.  I'm Jason Lo.
19         MS. LEE:  Good morning.  I'm JungEun Lee.
20         MR. HONG:  Good morning.  I'm Chuck Hong.
21         THE COURT:  And I'll ask the defendants as well.
22         MR. RHOW:  Good morning, everyone.  My name is Ekwan
23   Rhow.
24         MR. KNUTH:  Hi.  Neil Knuth.
25         MS. GEISE:  Good morning.  Lara Geise.
```

```
 1              MR. YODER:  Good morning.  I'm Michael Yoder.

 2              MR. FEINSTEIN:  Good morning.  Marc Feinstein.

 3              THE COURT:  Okay.  I want to ask the jurors, does

 4   anyone recognize any of the lawyers that have introduced

 5   themselves to you this morning?

 6              THE JURY:  (No audible response.)

 7              THE COURT:  Okay.  And I'm going to ask you some

 8   questions.  I'll just ask you to raise your hand if it's a yes.

 9              So let the record reflect that no one has raised

10   their hand.

11              You've obviously seen the courtroom deputy, and

12   there's some United States Marshals here and some other members

13   in the courtroom.  Does anyone recognize any of those members

14   of the Court staff?

15              Okay.  Let the record reflect that no one has raised

16   their hand.

17              So you all took an oath; correct?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  And that you would give true answers to

20   questions today that might be put to you touching upon your

21   qualifications to serve as jurors.  And I just want to talk

22   about an oath a little bit and explain why it's very important

23   for you to abide by the oath.

24              Providing any false or misleading information is a

25   violation of the oath.  And that's false or misleading
```

information for any reason.  What I'm talking about really is
so there's -- there are some people, believe it or not, who may
not want to sit on a jury, that might be here this morning and
think, I hope I don't get picked.  I hope it isn't me because
I've got other things to do and I'm just uncomfortable being on
a jury.  So you might answer some questions because you think,
you know, well, let me answer a question in a way that will get
me off this jury.  Well, if it's not true, it's a violation of
your oath.  So if you give false testimony today for any
reason, it's a violation of your oath.

So we want to make sure that we get a fair and
impartial jury.  We want to get eight jurors that are fair and
impartial.  We'll ask you a series of questions, and we need
you to answer honestly.  So it's important that you are not
thinking, what do they want to hear or what do they not want to
hear?

So, you know, don't answer what you think we want to
hear.  Some of you may want to be on a jury, and you'll think,
okay, I want to give answers so I'll get selected.  That's a
violation of your oath as well if they are not true.  Some of
you may not want to be on a jury.  It's just important to keep
that in mind.

Because really what we're trying to do is we're
trying get people that the parties are comfortable with, are
fair and impartial.  And there's, you know, plenty of you here.

1    If we hear from you honestly, the parties will be able to

2    select eight that they believe are fair and impartial.

3              So don't answer what you think we want to hear.

4    Don't answer what you think we don't want to hear.  That's very

5    important.

6              This is what's called a civil case.  And if you've

7    seen trials on TV or, you know, watched any of the trial

8    coverage from the recent trials in the press, a lot of those

9    are criminal trials.  And this is a civil case.  So civil cases

10   are essentially disputes between two parties, and they can be

11   business disputes.  It can be a civil rights case.  It could

12   products liability, construction, real estate.  This is a

13   contract dispute between two parties.  That's opposed to

14   criminal case like murder or robbery or kidnapping.  And

15   there's some differences between civil cases and criminal cases

16   that we're going to talk about with respect to the burden of

17   proof.

18             So let's talk about some rules here that you have to

19   abide by.

20             We are going to say this a lot, but don't

21   communicate with anybody about the case.  That's vitally

22   important.  The idea behind a jury trial is that the parties

23   get to build the evidentiary record through arguments and

24   through documents and witness testimony.  And all the jurors

25   get the same information.  So all the jurors hear the same

1    arguments.  All the jurors see the same documents.  All the

2    jurors hear the same witnesses.  Then they can go back and

3    deliberate based on a set body of facts and law.

4         If you talk with anybody about the case, you let

5    outsiders into the process.  So if you go home and you talk to

6    your boyfriend or girlfriend or husband or wife, partner, and

7    say here's what the case is about, and they say, you know, I

8    think you should do this or my opinion is this, well, then

9    you're letting outside information into the trial and you have

10   more opinions and information than other people do.  And that

11   really makes for an unfair trial.

12        So don't communicate about the case with anybody.

13   No family, no friends, certainly no lawyers.  You know, if you

14   have a friend who is a lawyer or relative who is a lawyer and

15   you're trying to get sort of some insight information, that's a

16   problem as well.  So you want to keep it closed.

17        And communication means any communication -- texts,

18   e-mails, Facebook.  No one post anything about the case.

19   That's going to be critically important.

20        And we'll say this to you over and over and over

21   again because it's such an important part of the process.

22        So the other thing we want to make sure you don't do

23   is in any outside research or investigation.  Some of you might

24   want to go home if you're on the jury and, you know, Google the

25   case or Google the companies or Google the lawyers and find out

1    a little bit more about it.  Again, in court, we go through a

2    process where we abide by the Rules of Evidence.  We've got big

3    books on procedure and evidence and all the different rules

4    about what can come into evidence and what can't come into

5    evidence.  And we want to make sure that what comes into

6    evidence is tested by the trial process, it's fully

7    cross-examined.  We can be reasonably careful about what comes

8    in.

9            If you do your outside research, you're actually

10   putting evidence into the case that doesn't go through the

11   Rules of Evidence.  It doesn't go through that process.  So

12   that's dangerous.  So we want to make sure you don't do any of

13   your outside research.

14           Now, let me ask, is anybody in the panel going to

15   have a particular problem not communicating with others about

16   the case?

17           Okay.  Let the record reflect that no one has raised

18   their hand.

19           Is anybody going to have a problem not doing

20   research on their own?

21           Okay.  Let the record reflect that no one has raised

22   their hand.

23           Now, you all have a badge on.  And right now you've

24   got numbers on top of that badge.  That's important for us

25   during this voir dire process to just keep track of who

1   everybody is.  When we ask, you know, questions, you know,

2   we'll have people stand up and we'll record their numbers.  So

3   if I said, you know, "How many people on the jury have a dog?

4   Raise your hand."

5           And we've got -- so we would say, okay, Number 3 has

6   a dog, Number 5 has a dog.  That's how we would go through the

7   process.  So remember your jury badge.

8           The other thing that's important about having the

9   jury badge is that as jurors no one is allowed to communicate

10  with you during the course of the trial.  So the lawyers can't

11  talk to you outside of the courtroom.  They -- again, because

12  we want to make sure that everybody -- everybody is going

13  through the Rules of Evidence, everybody is following the

14  process.  So no one can talk to you.

15          Lawyers have an ethical obligation not to talk to

16  jurors or prospective jurors outside the Court.  If you don't

17  have your badge on, then a lawyer could unknowingly get into a

18  conversation with you, breach their ethics obligation and then

19  we'd have to put them jail.  So it's really important that you

20  keep those jury badges on so no one talks to you.

21          And then you should be aware too that this is a very

22  serious thing.  So if you are in an elevator and one of the

23  lawyers is in the elevator and you say, you know, "Do you know

24  where the cafeteria is?"  They are going to not talk to you.

25  And it's not because they're being rude.  It's because they're

1    not allowed to talk to you.  So you should be aware that if

2    people are giving you the cold shoulder in the courthouse, it's

3    because no one is allowed to talk to you, and don't take it out

4    against them.

5           Now, when you get seated into the box, you'll have

6    assigned seats, and it's important that when you return to the

7    courtroom, you sit in the same seat.  That's because you'll

8    have jury notebooks where you can take notes, and your

9    notebooks will be kept in the courtroom on your seat.  So you

10   always want to return to the same seat.

11          Now, when you get seated for the jury, it's

12   important to be on time.  The jury has to hear and see

13   everything together.  So we can't start if one juror isn't

14   here.  So keep in mind that, you know, although sometimes it's

15   okay to come to a meeting late or come to a party late, you

16   can't be fashionably late for jury service because we are all

17   waiting until all the jurors are here.  So make sure you are

18   here on time.

19          If there's an emergency, please call.  The courtroom

20   deputy has instructed you on how to get in touch with him.

21          And we also want to make sure that your cellphones

22   are completely turned off.  We don't want anybody being

23   distracted during jury service by their cellphones.  Is anybody

24   going to have a problem turning their cellphones off during

25   jury trial?

1          Okay.  Let the record reflect that that no one has

2    raised their hand.

3          I want to talk about the potential witnesses in the

4    case and see if anybody recognizes these names.  I will go

5    through them and -- just so you have an understanding of who

6    they are:  Mike Akemann, C. K. "Chuck" Hong, Paik Ki Hong,

7    Raymond Jiang, Gail Sasaki, Hyeok-Sang Harrison Yoo, Steven Yu,

8    Douglas Kidder, Kyuhan Han, Byungyeop Jeon, Hyun Ki Ji, Ho-Jung

9    Kim, Indong Kim, Ji Bum Kim, Kihoon Kim, Steven Metz, Neal

10   Knuth, Lane Kim.

11         Does anyone know any of those witnesses that we just

12   identified?

13         Okay.  Let the record reflect that no one has raised

14   their hand.

15         If you come to the realization that you recognize a

16   witness or know a witness during the trial that maybe you

17   haven't, you know, seen before because you know a lot of people

18   with a particular name, please feel free to raise it with the

19   Court.

20         We are going to try to do jury selection today, get

21   into opening arguments and start the evidence.  We hope to

22   finish the trial on Friday.  We'll have closing arguments then,

23   and you can begin your deliberations.

24         You are welcome to, depending on the schedule, to

25   come back Monday and deliberate, Tuesday, as long as it takes,

1    but I wanted to give you the sense as to when the trial

2    schedule was.  So we are going to start today.  It should be a

3    relatively quick trial.  And you should be deliberating by

4    Friday.

5              Anybody have a problem with that schedule?

6              Okay.  Let the record reflect no one has raised

7    their hands.

8              Typical trial hours are going to 9:00 a.m. to 4:30

9    p.m. except for today.  Depending upon where we are, we might

10   go a little bit late today, but we'll get out for sure by 5.

11             Anybody have a problem with the trial hours,

12   9:00 a.m. to 4:30 p.m.?

13             Okay.  Let the record reflect that no one has raised

14   their hand.

15             When you start deliberating, lunch will be served.

16   So we'll have lunch for you on Friday.  So there's something to

17   look forward to hopefully.

18             I'm going to tell you a little about the case so you

19   know what the case is about.

20             Okay.  Plaintiff Netlist Incorporated, sitting over

21   here, designs, makes and sells computer memory modules and

22   components.  Defendant Samsung Electronics Company Limited

23   manufactures computer memory modules and components.

24             This case involves a dispute over a contract between

25   Netlist and Samsung called the Joint Development and License

1    Agreement, JDLA.  Samsung breached its obligation under the

2    JDLA by not fulfilling its obligation to supply computer memory

3    products called NAND, N-A-N-D, and DRAM, D-R-A-M, to Netlist on

4    Netlist's request.

5           Netlist claims it suffered damages for this breach.

6    Samsung denies that Netlist suffered damages and asserts that

7    Netlist did not use reasonable efforts to reduce or avoid its

8    damages.

9           So that's what the case is about.

10          Anybody, from reading that statement of the case,

11   feel like you're going to have a particular problem being fair

12   or impartial in this case?

13          Okay.  Let the record reflect that no one has raised

14   their hand.

15          So I want to talk a little bit about jury service

16   and sort of the importance of what you are here today to do.

17          As you know, this is a federal court.  So everything

18   we do is governed by the Constitution.  And that's where the

19   sort of -- that's where the laws come from for -- for the

20   Federal Government and for federal courts.

21          The Constitution, as you probably remember from

22   civics class, was hotly debated by the states, and one of the

23   things that was sort of done by way of compromise to get the

24   Constitution sort of over the line was the addition of what's

25   called the Bill of Rights.  These were rights that many states

1    wanted to make sure that the government, Federal Government

2    couldn't change.  They wanted protection from the Federal

3    Government changing any of these what they considered to be

4    very fundamental rights.

5              And the Bill of Rights came about in 1791.  And one

6    of the Bill of Rights that was critically important was the

7    right to a jury trial.  And that's in the Seventh Amendment to

8    the Constitution and part of the Bill of Rights.  In civil

9    suits the right of trial by jury shall be preserved.

10             So this was a critically important thing to the

11   founders, and it's kind of the one thing that sets us apart

12   from every other country is that we use jurors to handle civil

13   cases.  I don't believe there's another country that uses

14   jurors routinely in civil cases.

15             But we do.  And why do we do that?  I mean, most

16   other countries they just let the judge decide civil cases.

17   Sometimes they let the judge decide criminal cases.  And

18   sometimes they use juries in criminal cases.  But almost no one

19   lets juries decide civil cases.

20             Why do we do it?  Because we think that eight

21   fair-minded jurors will do a much better job coming up with the

22   right result than a judge.  We decided that we are a country of

23   the people, and the people ought to decide these things.  And

24   so we decided that jurors are the way to go in civil cases.  It

25   was critically important at the founding of our country and

1    it's critically important today.

2           And it's interesting, the Constitution really is a

3    limit on what the government can do and doesn't really require

4    citizens to do anything.  There's almost nothing in the

5    Constitution that requires a citizen to do anything.  We hear

6    about the First Amendment, freedom of speech.  That applies to

7    the government.  It doesn't apply to citizens.

8           There's very little restrictions that the

9    Constitution puts on citizens.  The one obligation you have

10   under the Constitution is sitting as jurors.  It's the only

11   part of the Constitution that requires individuals to

12   actually -- to actually do something.  It puts on obligation on

13   you.  And so I'm really pleased to see that you are all here

14   and that you've taken this so responsibly.

15          So let's talk about the jury's role in the case.  So

16   you are the fact finders.  So you decide the facts of the case.

17   You decide what the facts are based on the evidence presented

18   at trial.  So, for example, in a trial you are going to have

19   people disputing what the facts are.  Let's use a simple

20   example.

21          Let's say there was a car crash and one of the

22   drivers said he went through the light when it was green and

23   the other driver said no, he went through it when it was red.

24   Well, that's a fact dispute.  Someone needs to decide what

25   color the light was.  Was it green or was it red?  Who decides

1    that?  The jury decides that.  The Court doesn't decide it; the

2    jury decides that.  So you decide the facts.

3              And, again, it's only upon the evidence presented

4    here in court.

5              The judge gives you the law.  So I'll give you the

6    law that you'll apply to those facts.  You have to apply the

7    law to those facts even if you disagree with the law.  So

8    you're not allowed to change the law.  You're allowed to decide

9    the facts and apply the laws to the facts to the law.

10             Anyone going to have a problem with applying the law

11   as the Court explains it to you?

12             Okay.  Let the record reflect that no one has raised

13   their hand.

14             Again, we are looking at just information that's

15   admitted into court.  That's the evidence that you get to

16   decide the case on.  And that's going to be testimony from the

17   witnesses.  It's going to be exhibits that are introduced into

18   evidence.  That's the evidence that you'll be deciding the case

19   on.

20             Now, what's not admitted is everything else.  So you

21   can't use anything else in deciding the case.  Just the

22   testimony and the exhibits you see here in court.  So what

23   can't you use?  You can't use any outside research.  So, for

24   example, you can't go home tonight and research DRAM and NAND

25   memory products and decide, you know, what they are and how

1    they work and what the -- what damages might be for them.  I

2    know that's going to be disappointing to many of you that want

3    to look into DRAM and NAND products tonight, but you can't do

4    it.

5            You can't talk to other people about the case.  You

6    may have a friend or you might yourself be an engineer and you

7    might say what are these things?  What is this about?  You

8    don't that because that's going to be testimony and evidence

9    that's not introduced in court.

10           You can't compare other cases.  Some of you may have

11   been on juries before or you may have seen cases on TV and you

12   can't say, well, based on that case, I think we that we ought

13   to decide a matter a certain way.  Any other knowledge you have

14   about other cases, whether it's by prior jury service, you are

15   involved yourself in a lawsuit or anything you've seen on TV,

16   you can't use is that either.

17           So other cases, prior jury service, any other case.

18   Anyone able to consider only the evidence presented in court --

19   anybody feel like they're going to have a problem westbound

20   that rule?

21           Okay.  Let the record reflect that no one has -- oh,

22   sorry.  Juror number --

23           PROSPECTIVE JUROR:  What if we have a lot of

24   knowledge in this area.  I mean, how can I discount my

25   experience?

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  And, I'm sorry, juror, what number are
 2    you?
 3              PROSPECTIVE JUROR:  Number 1.
 4              THE COURT:  Juror Number 1.  We'll talk to you a
 5    little bit more about that as we get in the process.  But,
 6    essentially, you're not allowed to sort of be an expert.  So,
 7    for example, if there was no discussion about what a DRAM
 8    product is, right, and you get back to the jury room and the
 9    other jurors say, "Well, you know about DRAM products.  What
10    are they about and, you know, how are they important?"  You're
11    not allowed to supply that additional testimony during the jury
12    deliberations.  You are only to decide the case in what was
13    presented here.  So if the lawyers didn't explain it, the
14    witnesses didn't explain it, you'll have to decide the case
15    based on -- without that explanation about the products.
16              So you really do have to divorce your outside
17    knowledge from the things you learn here.  Sometimes, for some
18    people, it can be hard to do, but it's really important because
19    we want to decide the case only upon the evidence here.
20              So let's say, for example, the case was about -- was
21    about a particular product that you know about but the parties
22    have decided that they are going to describe the product in a
23    particular way and there's evidence about the product operating
24    in a particular way.  You have to go with the evidence
25    presented, not your prior knowledge.  That's how you have to
```

```
 1    resolve it.  But we'll talk a little bit more,

 2    Juror Number 1, about that as we get on.

 3           Okay.  Now, it's really important that you judge all

 4    the witnesses by the same standard out of the box.  So, for

 5    example, we all have predetermined biases.  You know, we all

 6    think that -- we all have life experiences that have sort of

 7    shaped our world.  So for example, we may think firefighters

 8    are like the best people in the world.  We may think

 9    firefighters are not the best people in the world because we've

10    had a bad experience with one.  Any of those sorts of biases

11    you have to put out of your head.

12           You have to judge everybody by the same standard out

13    of the box.  So, for example, you can't use someone's

14    profession as a predetermined bias and, well, I'm not going to

15    believe this person because this person is a lawyer and I don't

16    like lawyers, or this person is a dentist and I hate my

17    dentist.  You can't use race.  You can't use religion.  You

18    can't use gender.  You can't use anything like that.

19           We are going to be having witnesses here testifying

20    that might be from a different country and might speak a

21    different language and might need interpreters.  Well, you

22    can't say, well, I'm biased against that witness because they

23    are foreign, or I'm biased in favor of a witness because they

24    are not.  It's really important to judge all the witnesses by

25    the same standard.
```

1          You have to use your observation of them in court,

2    and you can use that to determine whether you think they are

3    truthful or not, but you can't use any preconceived notions

4    about gender or race or ethnicity or nationality or profession.

5          Anybody think they are going to have a problem with

6    that?

7          Okay.  Let the record reflect that no one has raised

8    their hands.

9          Okay.  We've talked a little about the difference

10   between civil cases and criminal cases.  The civil case, the

11   burden of proof is preponderance of the evidence.  That's

12   different from a criminal case where the burden of proof is

13   beyond a reasonable doubt.  So preponderance of the evidence is

14   a fancy legal term that means more likely than not.  So if a

15   party has to prove a fact, they've got to prove it to you as

16   more likely than not, not the higher standard of beyond a

17   reasonable doubt.

18         Anybody think they're going to have a problem

19   applying that preponderance of the evidence standard?

20         Okay.  Let the reflect that no one has raised their

21   hand.

22         And obviously beyond a reasonable doubt is a heavier

23   standard than preponderance of the evidence.  Preponderance of

24   the evidence is a little easier to meet.

25         So in civil cases the party with the burden must

1    prove the evidence in its favor as more likely true than not

2    true to prevail.

3           Okay.  I'm going to ask you some questions.  I'm

4    going to ask you to answer them by raising your hand, and I'm

5    just going to take note of who has answered the questions.  And

6    then what we're going to do after that is I'm going to have you

7    come up individually and we'll ask you some questions

8    individually.  And we'll inquire to some specific things that

9    you've raised your hands to.

10          Let me ask you this:  Has anyone here on the jury

11   been involved in a lawsuit before?

12          And if you can stand up just so I can get your jury

13   number.

14          So that's Juror Number 10.  Thank you.

15          Has anybody here ever had a contract dispute?

16          Has -- oh, I'm sorry.  Juror Number 8.  Is that 6 or

17   8?

18          PROSPECTIVE JUROR:  6.

19          THE COURT:  6.  Juror Number 6 has had a contract

20   dispute.

21          Juror Number 1?

22          PROSPECTIVE JUROR:  Yeah.

23          THE COURT:  Contract dispute?

24          PROSPECTIVE JUROR:  I had a contract dispute.

25          THE COURT:  Anybody else?

1          Okay.  Has anybody here ever -- does anybody here
2     work in the technology field where they would have had some
3     business relations to components such as NAND and DRAM?
4          Juror Number 1, Juror Number 2, and Juror Number 5;
5     is that correct?  Okay.
6          Anybody here work for Samsung or have relatives or
7     close family members that work for Samsung?
8          Can you stand up, please?  Juror Number 18.
9          Anybody here work for or have relatives that work
10    for Netlist?
11          Okay.  Anybody here have -- own a Samsung product?
12          Okay.  Let me see if I can do this.  We've got 1, 2,
13    3 -- you can lower your hands after I -- we've got 4, 5, 6, 8.
14    And then I'm going to ask the ones in the back to stand up just
15    so I can see your numbers.  Okay.  We've got 10, 11, 13, 17,
16    18, 22, 21, 20.  I think I've got everybody.
17          Okay.  Anybody own any Netlist products or know
18    whether they do own any Netlist products?  Okay.
19          Anybody here have a particular problem with a
20    Samsung product not working well for you, bad customer service,
21    issues like that?
22          Juror Number -- if you could please stand up.
23          PROSPECTIVE JUROR:  6.
24          THE COURT:  Juror Number 6.  Juror Number 5.
25          PROSPECTIVE JUROR:  18.

```
 1            THE COURT:  And Juror Number 18.  Okay.

 2            Anybody think that their experience with Samsung

 3   products or problems they may have had with Samsung products

 4   would make it hard for them to be an impartial juror here

 5   today?

 6            Juror Number 8.

 7            PROSPECTIVE JUROR:  6.

 8            THE COURT:  6.  Sorry.

 9            Anybody here hear about this dispute in the press or

10   in any media?  Anybody know anything about the dispute prior to

11   coming here today?

12            Okay.  Let the record reflect that no one has raised

13   their hand.

14            Has anybody had -- has anybody been impacted by the

15   lack of being able to procure electronics?

16            Juror Number 1, Juror Number 5, Juror Number 22.

17            Anybody have stock in Samsung or Netlist?

18            Okay.  Let the record reflect no one has raised

19   their hand.

20            Now, as I mentioned before, you're going to hear

21   from witnesses that might be from different countries.  I

22   know Samsung is a Korean country.  Anybody feel like they're

23   going to be biased against a Korean company in a lawsuit in the

24   United States?

25            Okay.  No one has raised their hand.
```

1          You know, there could be interpreters here.  Does

2    anybody have an issue with -- would be biased against somebody

3    that needs to use an interpreter?

4          I asked about contract disputes, but has anybody

5    ever been involved in a business deal where they feel like they

6    were damaged by that business deal?  Other than the contract

7    disputes.

8          Juror Number -- can you stand up, please, so I can

9    see your number -- 10.

10         Okay.  So I think that's enough of the general

11   questions for now.  I'm going to ask you some specific

12   questions.  And so what I'm going to ask you to do is come up

13   to the podium.  And we're going to do one at a time.  And I'll

14   ask you some specific questions.

15         The questions I'm going to ask you are -- let me get

16   my slides working here -- the area of your residence, where in

17   the LA area you live or beyond LA.  Your occupation.  I'm going

18   to ask whether you have a significant other and, if so, what

19   their occupation is.  Whether you have adult children and, if

20   so, what their occupations are.  And I'm going to ask you about

21   prior jury service.  And I'm going to ask you whether it was

22   civil or criminal, and I want to know whether the jurors were

23   able to reach a verdict.  I don't want to know what the verdict

24   was.

25         So, for example, if you had prior jury service and

```
 1   it was a civil case, I'm going to ask whether the jury reached
 2   a verdict.  I don't know whether it was plaintiff or defendant.
 3   Similarly, if you were on a criminal jury trial, I want to know
 4   if the jurors reached a verdict but not whether you decided to
 5   convict or acquit.
 6           So with that being said, let's start off with Juror
 7   Number 1.  If you can come up to the podium.
 8           And can you answer the questions on the board?
 9   Yeah.
10           PROSPECTIVE JUROR:  I can.
11           I live in Granada Hills.  My occupation, I work in
12   the motion picture industry in post production.  I am an
13   engineer.  And you've probably seen the movies we make.
14           THE COURT:  Okay.  Do you have a significant other
15   and, if so, are they employed?
16           PROSPECTIVE JUROR:  I don't.
17           THE COURT:  Adult children?
18           PROSPECTIVE JUROR:  I do have adult children.
19           THE COURT:  And what are their occupations?
20           PROSPECTIVE JUROR:  My son is also a geek.  He works
21   in the IT department at Ball Aerospace.
22           THE COURT:  Any other adult children that are
23   employed.
24           PROSPECTIVE JUROR:  I have a daughter, and she works
25   in the hotel hospitality industry.
```

```
 1              THE COURT:  Okay.  And have you been on a jury
 2    before?
 3              PROSPECTIVE JUROR:  I've never served on a jury
 4    before.
 5              THE COURT:  Great.
 6              So you are an engineer by education and experience?
 7              PROSPECTIVE JUROR:  I am.
 8              THE COURT:  What kind of engineering?
 9              PROSPECTIVE JUROR:  So motion pictures are --
10    involve everything from, you know, film to, you know, CCD
11    sensors and -- I mean, you know, I used to work the TV truck
12    circuit back when we still did TV.  And I ended up working
13    in -- you know, I mean, I was there when film went all digital.
14    So...
15              THE COURT:  So do you do a lot of work with
16    compression?
17              PROSPECTIVE JUROR:  No.  That's actually more of --
18    that's actually more of a delivery thing.  I work more on
19    the -- kind of more on the front end.
20              So when I was at Sony pictures, I was an executive
21    director of technology at Colorworks.  And when I left Sony, I
22    went to eFilm.  And so I've been there for, I don't know, seven
23    years now.
24              THE COURT:  What was your favorite picture to work
25    on?
```

1          PROSPECTIVE JUROR:  I slept there when we did *Rogue*

2     *One*.  It just -- they all go on and on, like, the last -- the

3     visual effects all deliver in the last week.  And, I mean, I

4     worked on a *Spider-Man*, and it was four days before delivery

5     and there was a 90-minute black hole in the 3D version.  It's

6     just -- so it's just chaos trying to get all the shots in and

7     make it right.

8          THE COURT:  I think the lawyers will sympathize with

9     you because that's kind of how trials work.  Right?  Some of

10    them might be a little blurry-eyed because they've been up all

11    night getting ready for today.

12         So you said you have been involved in a contract

13    dispute before.  Right?

14         PROSPECTIVE JUROR:  Yeah.  That was an employment

15    dispute.

16         THE COURT:  Okay.  And so that was an employment

17    dispute between you and your company?

18         PROSPECTIVE JUROR:  The company I had ended up being

19    with for 17 years, yes.

20         THE COURT:  Okay.  Do you feel that having that sort

21    of a dispute with a company would make it hard for you to be

22    fair and impartial here?

23         PROSPECTIVE JUROR:  I don't.

24         THE COURT:  Okay.  You said you own Samsung

25    products.  Correct?

1          PROSPECTIVE JUROR:  Well, "Samsung products" are

2   rather ubiquitous, particularly when you get into looking

3   inside hardware.  So although I'm not consciously aware that I

4   own any Samsung products personally, hundreds or thousands

5   where I work.

6          THE COURT:  Okay.

7          PROSPECTIVE JUROR:  I mean, our standard -- I mean,

8   our standard hard drive would be Samsung.

9          THE COURT:  What about yourself personally?  Do you

10  have a Samsung phone?

11         PROSPECTIVE JUROR:  I do not.  I have an iPhone.

12         THE COURT:  Okay.

13         PROSPECTIVE JUROR:  I mean, all I'm trying to say is

14  that the products are everywhere.  And, I mean, they're -- for

15  all I know, there's Samsung memory inside Apple products.

16         THE COURT:  Sure.

17         Let's see here.  And you know something about NAND

18  and DRAM products?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  And that comes from your work with them?

21         PROSPECTIVE JUROR:  I work with computers all day

22  long.  I mean, I'm the network guy.

23         THE COURT:  Okay.  And do you think you'd be able to

24  refrain from being the jury's technical expert and just, you

25  know, if somebody asked you technical questions, say, "Well, we

UNITED STATES DISTRICT COURT

1   have to look in the record and see if it was part of the

2   testimony or evidence in the case"?

3            PROSPECTIVE JUROR:  Yeah.  I mean, from what you

4   said about the case already, it's really more of a contract

5   dispute about obligations and delivery commitments, really not

6   so much technology.

7            THE COURT:  Okay.  You said you've been impacted by

8   sort of a lack of technical products.

9            PROSPECTIVE JUROR:  Uh-huh.

10           THE COURT:  How have you been impacted for that?

11           PROSPECTIVE JUROR:  The lead time for everything is

12  months where there would typically be stock.  If -- I mean, you

13  know, if you call Arista, they're like 120 days.  If you want

14  to buy, like, a high-end network switch, it's months out.

15           And certainly the render form that we placed an

16  order for in April for the facility on the West Side, we're

17  hoping that it will now get delivered before the end of the

18  year.  We don't even know.

19           THE COURT:  I think those are my questions.  So you

20  can go back and have a seat.  Thank you very much.

21           PROSPECTIVE JUROR:  Thank you.

22           THE COURT:  And can we talk to Juror Number 2.

23           You can move that down.  And just by way of -- I

24  know with COVID and masking, the CDC rules are -- you know,

25  still think it's a good idea to wear masks indoors.  That's why

1    we're kind of wearing masks.  I tend to take mine off when I

2    sit down because I do so much talking.

3            During the trial, I'm going to tell the lawyers that

4    when they're talking they can take their masks down.  I'm going

5    to tell the witnesses that when they're talking they can take

6    their masks down.  Similarly, the jurors, when they're talking,

7    they can take their masks down.

8            No one has to take their mask down.  I want to leave

9    it up to everybody.  If you feel more comfortable with a mask,

10   feel free continue wearing the mask.  And I'm going to have

11   that rule be for everybody.  So just by way of explanation

12   there.

13           So Juror Number 2, can you please answer the

14   questions?

15           PROSPECTIVE JUROR:  My residence is Antelope Valley,

16   Lancaster.  My occupation is I'm a telephone control operator

17   for the Air Force at Edwards.  I handle all the iPhones for the

18   government, along with the VoIP phones and our hotspot boxes.

19           My significant other -- I am married, and he's an

20   engineer for a water filtration place in Simi Valley.  In

21   regards to my adult children, one of them is -- she works at a

22   senior citizen home, and the other one -- I'm not exactly sure.

23   He lives in San Francisco.

24           And I've never been on a jury service.

25           THE COURT:  Okay.  Thank you.

```
 1              So you know something about DRAM, NAND, materials
 2    from your work.  Correct?
 3              PROSPECTIVE JUROR:  Yes.  Because my contract that
 4    we work for the government is an IT contract.  So we handle all
 5    the computers, laptops, all the IT stuff there on site.
 6              THE COURT:  And do you think you can refrain from
 7    being an expert for the jury back in the jury box -- back in
 8    the jury room?
 9              PROSPECTIVE JUROR:  From questions, yes.
10              THE COURT:  Okay.  What we really want to make sure
11    is the jurors are deciding the case based only on the evidence
12    presented in court.  So if you sit down in the jury room and
13    say, "Well, listen to me.  I'll tell you all about NAND and
14    DRAM products, you can avoid that?
15              PROSPECTIVE JUROR:  Yeah, I have -- I work in IT,
16    but I have a degree in psychology and criminal justice.  So...
17              THE COURT:  Okay.  So are you going to be able to
18    refrain from using your degree in psychology and criminal
19    justice from exerting undue influence over the rest of the
20    jurors?
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  Okay.  Now, you said you've got some
23    Samsung products.  Right?
24              PROSPECTIVE JUROR:  Yes.
25              THE COURT:  What do you have?
```

```
 1                 PROSPECTIVE JUROR:  A phone, my cellphone.
 2                 THE COURT:  Okay.  Having -- and do you like your
 3    phone?
 4                 PROSPECTIVE JUROR:  Yes.  That's -- I work with
 5    iPhones, and I will not buy one because I work with them.  So
 6    my choice is Samsung -- Samsung phones.  And I have other
 7    Samsung Electronics in the house because, I mean, I work in IT.
 8    So...
 9                 THE COURT:  Right.  Right.  Now, so the fact that
10    you like Samsung products, is that going bias you towards
11    wanting to side with Samsung?
12                 PROSPECTIVE JUROR:  No, not necessarily.  No.
13                 THE COURT:  Because it's important, you know, this
14    case -- to decide the case just on the facts of the case.  So
15    if you like the Samsung phone, it's not really fair for you to
16    say, "Well, I kind of want to rule for Samsung because I like
17    the phone."  You can avoid that?
18                 PROSPECTIVE JUROR:  Yes.
19                 THE COURT:  Any doubt in your mind in that?
20                 PROSPECTIVE JUROR:  No.
21                 THE COURT:  Okay.  Let me ask you this:  So you have
22    a couple adult children.  You're probably pretty busy at work,
23    but what do you like to do for fun?
24                 PROSPECTIVE JUROR:  Actually, I -- I'm -- I do paper
25    crafts, and I've actually gotten pretty popular on the
```

```
1    Internet, on my Instagram.  And currently I have a nonprofit

2    fund that I created.  And what it is, is there's people all

3    over the United States that are sending in to me, like, paper

4    crafts that we've made.  And they are going to be donated to

5    the kids at the Duarte City of Hope for Christmas.

6               THE COURT:  Oh, that's really neat.

7               PROSPECTIVE JUROR:  Yeah.

8               THE COURT:  Just because I'm not too familiar, what

9    are paper crafts?

10              PROSPECTIVE JUROR:  Like scrapbooking cards, party

11   favors.  But they're all made out of, you know.  Or like, for

12   instance, some of the things that we're making is, like, I have

13   Happy Meal boxes that I can make with my own paper and then

14   stick, like, little toys in there.

15              Or, like, some people are also bringing in or

16   sending in purses, like little paper purses that they've made,

17   and they're putting, like, hand cleanser and stuff like that.

18   Different things.

19              THE COURT:  Well, neat.  Neat.  Well, that's great

20   that you're doing that for Christmas.  I'm sure the kids will

21   be thrilled.

22              PROSPECTIVE JUROR:  Yeah, it just -- all of a

23   sudden -- I don't know.  As I was driving home from work, and I

24   work far from where I live, and it just came to do something

25   for the kids through crafting and it blew up.
```

```
 1              THE COURT:  It's great.  It's great.
 2              So in your answer you talked about how, you know,
 3    your crafts you put on Instagram.  Right?
 4              PROSPECTIVE JUROR:  Instagram.  Uh-huh.
 5              THE COURT:  Now, are you going to be able to avoid
 6    posting anything about this case on Instagram?
 7              PROSPECTIVE JUROR:  Yeah.  It's not, you know --
 8    yeah, no problem.
 9              THE COURT:  Okay.  And your husband is an engineer.
10    Are you going to have a problem -- you know, when you see him,
11    he's going to say, "What is the case about?"
12              And you're going to have to say, "Can't tell you."
13              Are you going to have a problem with that?
14              PROSPECTIVE JUROR:  No problem.  He won't even be
15    interested.
16              THE COURT:  Well, he might be.  If he comes back at
17    you and says, "Oh, come on.  You can tell me.  They'll never
18    know," how are you going to respond to that?
19              PROSPECTIVE JUROR:  "By law, I can't state
20    anything."
21              THE COURT:  Tell him the judge is very mean.  Okay,
22    good.
23              Okay.  Thank you, Juror Number 2.  I don't have
24    anymore questions for you right now.  Please have a seat.
25              Can we have Juror Number 3?
```

76

```
 1              Hi, Juror Number 3.  Can you please answer the
 2    questions on the board.
 3              PROSPECTIVE JUROR:  Yeah.  Area of residence,
 4    Santa Clarita.
 5              Occupation, I'm an electrical crew foreman for a
 6    high-voltage company.
 7              Significant other, I'm married.  No adult children.
 8    Got two young ones.
 9              No prior jury service.
10              THE COURT:  Okay.  And does your spouse work?
11              PROSPECTIVE JUROR:  Well, yes, but -- well, no, but
12    she's a housewife, mom, teacher, everything.
13              THE COURT:  Yeah, I should have said employed
14    outside of home.
15              PROSPECTIVE JUROR:  Yeah.
16              THE COURT:  That would have been a more better way
17    to say it.
18              Okay.  And you said you've got two young ones.  How
19    old?
20              PROSPECTIVE JUROR:  I've got an 11-year old boy and
21    9-year-old girl.
22              THE COURT:  That must be fun.
23              PROSPECTIVE JUROR:  It's amazing.
24              THE COURT:  Yeah, I can imagine.  Does your
25    11-year-old boy play any sports?
```

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  What does he play?

 3              PROSPECTIVE JUROR:  Soccer and baseball.

 4              THE COURT:  Okay.  That's great.  Are they -- I

 5    guess they're separate seasons.  Right?  They don't overlap?

 6              PROSPECTIVE JUROR:  Well, they overlap, but we made

 7    him commit to one and let the coach know of the other what his

 8    commitment is.

 9              THE COURT:  It's hard these days for kids.  You

10    know, everybody wants them to sort of play one sport and

11    coaches don't like when you play multiple sports.  But I don't

12    know.  Sometimes I think multiple sports allow them to develop

13    more skills.

14              PROSPECTIVE JUROR:  Absolutely.

15              THE COURT:  Yeah.  So did you pick soccer or

16    baseball?

17              PROSPECTIVE JUROR:  Soccer.  Well, he picked.

18              THE COURT:  Yeah, that's right.

19              So you said you had some Samsung products.  What

20    kind of products do you have?

21              PROSPECTIVE JUROR:  Phones, TVs, headphones.  I

22    think the wife has a laptop.

23              THE COURT:  Any problems with the products that sort

24    of have stuck with you?

25              PROSPECTIVE JUROR:  Just the one battery that was
```

78

```
1    catching on fire.  That creates a little bit of a head headache
2    for a while.
3              THE COURT:  Yeah, I can imagine.
4              That incident with the battery, does that cause you
5    to want to rule against Samsung in any way?
6              PROSPECTIVE JUROR:  I've still got Samsung products.
7              THE COURT:  Okay.  You like your TVs and stuff?
8              PROSPECTIVE JUROR:  Oh, yeah.
9              THE COURT:  Does your satisfaction with the products
10   make you want to rule in favor of Samsung?
11             PROSPECTIVE JUROR:  (No audible response.)
12             THE COURT:  Do you think you can come at this with a
13   blank slate?
14             PROSPECTIVE JUROR:  Yes.
15             THE COURT:  Okay.  You've never had a contract or
16   business dispute; is that correct?
17             PROSPECTIVE JUROR:  Never.
18             THE COURT:  Okay.  Do you think that -- do you have
19   any bias against parties that bring their disputes to court?
20   You know, do you think they should just take care of it
21   themselves?
22             PROSPECTIVE JUROR:  Well, it would be nice, but no,
23   no issues with it.
24             THE COURT:  Okay.  So you don't take any issue with
25   somebody availing themselves of the Court process?
```

```
 1                    PROSPECTIVE JUROR:  It's why it's here.

 2                    THE COURT:  Okay.  Are you on social media?

 3                    PROSPECTIVE JUROR:  Yeah.  Not very often.

 4                    THE COURT:  Okay.  Do you post a lot of stuff?

 5                    PROSPECTIVE JUROR:  Not really.

 6                    THE COURT:  Okay.  Do you think you can refrain from

 7      posting anything about the case?

 8                    PROSPECTIVE JUROR:  Absolutely.

 9                    THE COURT:  And, you know, you get home, your wife's

10      going to ask you where you've been.  You can say you've been in

11      court and, you know, you're on a jury.  But are you going to

12      have a hard time not talking to her about the case?

13                    PROSPECTIVE JUROR:  I won't have a hard time.

14      She'll want to know but...

15                    THE COURT:  Yeah.  And you can tell her that, you

16      know, after the case is over you can tell her all about it,

17      but, you know, it's really important you don't talk about it

18      now.  Does that make sense?

19                    PROSPECTIVE JUROR:  Yeah.

20                    THE COURT:  Now, obviously you're a busy guy with

21      work and with children, especially with your kids.  Is your

22      daughter involved in sports as well?

23                    PROSPECTIVE JUROR:  Yes.  She does soccer as well.

24                    THE COURT:  Soccer as well.  Wow.  Yeah, that's --

25      so probably a lot of driving getting them where they need to
```

```
 1   go.

 2               PROSPECTIVE JUROR:  A lot.

 3               THE COURT:  Do you get lucky at all they practice at

 4   the same field?

 5               PROSPECTIVE JUROR:  Yes.  Practice, yes.  Games

 6   are -- we're always going in two different directions.  They

 7   both do travel soccer, so...

 8               THE COURT:  Oh, yeah.  Yeah, that's -- I know that's

 9   a lot.  So obviously we know what you do with your spare time.

10   But is there anything else you like to do for fun?

11               PROSPECTIVE JUROR:  Outdoors.  We hunt a lot, and we

12   fish a lot and get to the mountains as much as we can, get away

13   from the, you know, the daily grind.

14               THE COURT:  Where do you go to fish?

15               PROSPECTIVE JUROR:  We go up to Mammoth.  We go --

16   there's a little lake in Palmdale that we hunt at -- or fish

17   at.  We're just members, and they stock it, and kids just get

18   to go there and fish.

19               THE COURT:  Oh, great, great.

20               You've not been on a jury before.  Right?

21               PROSPECTIVE JUROR:  (No audible response.)

22               THE COURT:  Any nervousness about the process?

23               PROSPECTIVE JUROR:  I got a bachelor's in criminal

24   justice also.

25               THE COURT:  Oh, you do.  Okay.  So you know a little
```

```
 1   bit about how -- how these things work.  Would you be able to,
 2   again, decide the case based just on the facts and the law
 3   presented and not any outside information?
 4              PROSPECTIVE JUROR:  Absolutely.
 5              THE COURT:  Okay.  I think I'm all set for now.
 6   Thank you, Juror Number 3.
 7              PROSPECTIVE JUROR:  Thank you.
 8              THE COURT:  Can we have Juror Number 4?
 9              Hi, Juror Number 4.  Can you please answer the
10   questions on the board.
11              PROSPECTIVE JUROR:  Yeah.  I live in the city of
12   La Verne.  I'm self-employed.  And I do elections for homeowner
13   associations.
14              My husband is a truck driver.  My adult kids, one is
15   a plumber.  The other works for a trailer manufacturing
16   company.
17              And I did have prior jury service, and we did reach
18   a conclusion.
19              THE COURT:  Okay.  And was that a civil trial or
20   criminal trial?
21              PROSPECTIVE JUROR:  Criminal.
22              THE COURT:  Okay.  And so elections for homeowner
23   associations.  Are those -- can those get pretty heated?
24              PROSPECTIVE JUROR:  Yeah, sometimes but not usually.
25   It's more people don't care.
```

1          THE COURT:  Okay.  And when you do that, do you work

2     all over the Southern California area?

3          PROSPECTIVE JUROR:  No, just driving distance.  Like

4     tonight I'm supposed to be in Mentone by 6:00, and I don't know

5     if I can make that.

6          THE COURT:  Where is Mentone?

7          PROSPECTIVE JUROR:  Out east.  Take the 10 for a

8     while.

9          THE COURT:  Yeah, I guess so.  You said you've had

10    some Samsung products.  What sorts of Samsung products do you

11    own?

12         PROSPECTIVE JUROR:  My husband and I used to have

13    the phones, and then he makes all the decisions, and he says,

14    "No.  No more of that.  We want iPhones."  So we have iPhones

15    now.  And TV.

16         THE COURT:  Okay.  Any issues with the Samsung

17    products?

18         PROSPECTIVE JUROR:  Not for me.

19         THE COURT:  Did you like the products?

20         PROSPECTIVE JUROR:  It was fine.  It was a phone,

21    you know.

22         THE COURT:  And any bias for or against Samsung

23    based on your ownership of products?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  When you're not -- when you're not

**UNITED STATES DISTRICT COURT**

```
 1   working, what do you like to do for fun?
 2           PROSPECTIVE JUROR:  Well, I work a lot but just
 3   gardening, time with family.
 4           THE COURT:  Are you active on social media?
 5           PROSPECTIVE JUROR:  I have a Facebook account, but
 6   I've never posted on it.
 7           THE COURT:  Okay.  And so you're comfortable you can
 8   refrain from posting anything about the case?
 9           PROSPECTIVE JUROR:  Yeah.
10           THE COURT:  Okay.  Is there -- your prior jury
11   service, in general, how did that go for you?  Did you find it
12   to be a rewarding process?
13           PROSPECTIVE JUROR:  Yeah, it was fine.  I did my
14   duty, and yeah, it was a lot closer.  So that made it nice.
15   This is quite a drive.
16           THE COURT:  Quite a drive from La Verne to here?
17           PROSPECTIVE JUROR:  Uh-huh.  If it wasn't for the
18   traffic.
19           THE COURT:  Yeah.  Oh, I know.  I know.
20           Now, it's important that you don't take anything
21   from that prior trial and bring it into here.  So, for example,
22   if somebody said, you know, "What did they mean by this," you
23   can't say, "Well, in my prior trial, this is what it meant."
24           PROSPECTIVE JUROR:  Oh, no.
25           THE COURT:  You can avoid that?
```

84

```
 1              PROSPECTIVE JUROR:  Right.  Yes.

 2              THE COURT:  Okay.  Great.

 3              Yeah, and just so everybody knows here, you have to

 4   say things out loud because the court reporter is taking

 5   everything down.

 6              PROSPECTIVE JUROR:  Okay.

 7              THE COURT:  And the head shakes and "uh-huh" and

 8   "unh-unh" sort of -- they write the same even though they sound

 9   different.

10              Any -- in your work, you've never had a contract or

11   business dispute before?

12              PROSPECTIVE JUROR:  In work?

13              THE COURT:  Yeah.

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  What about in your personal life,

16   contract or business?

17              PROSPECTIVE JUROR:  Small claims court but that's

18   it.

19              THE COURT:  Tell me about what happened in small

20   claims court.

21              PROSPECTIVE JUROR:  We had our kitchen redone, and

22   the product they used to cover it to -- I forgot what you call

23   it -- the varnish to make it shiny, it was substandard and it

24   got, like, all kinds of dry marks and stuff in it.  And so it

25   went to small claims court and we lost.
```

1              THE COURT:  Okay.  Anything about that dispute that

2    you are sort of still angry about that might influence how you

3    would act here?

4              PROSPECTIVE JUROR:  Just we didn't know how to

5    present our case I guess.

6              THE COURT:  You think if you presented your case

7    better, you could have done a better job.

8              PROSPECTIVE JUROR:  Well, yeah, because I believe

9    that the product was substandard and we couldn't convey that.

10   So yeah, if we knew better.

11             THE COURT:  Okay.  Well, thank you very much, Juror

12   Number 4.

13             Can we have Juror Number 5?

14             Juror Number 5, can you please answer the questions

15   on the board.

16             PROSPECTIVE JUROR:  Of course.

17             Area of residence, I live in West Hollywood.

18             My occupation, I'm a data analyst specialist at

19   Unifor.  They're a company kind of specialized in, like,

20   artificial intelligence, mainly for, like, phone systems.

21   Specifically right now we are focusing on, like, phone

22   companies, helping them develop AI kind of for their digital

23   phone systems there.

24             My significant other, I have a fiancée.  She is in

25   real estate.  She's a building manager for our apartment

1    complex we live in.  No children.

2              And no jury service I've served.

3              THE COURT:  Okay.  And when we talked earlier, you

4    indicated you've got some knowledge of the types of products

5    we're dealing with here, NAND and DRAM.

6              PROSPECTIVE JUROR:  Yes, definitely a bit.  I've

7    worked a lot with tech stuff.  Big computer person at home,

8    mainly for pleasure.  So I do know a little about the systems.

9    Not a ton.  I don't think it would influence my abilities to

10   serve on a jury.  But definitely knowledge of it.

11             THE COURT:  And do you think you could avoid being a

12   technical expert for the jury?

13             PROSPECTIVE JUROR:  Yeah, I think I could.

14             THE COURT:  Okay.  You said you own some Samsung

15   products and you actually had some problems with Samsung

16   products; is that right?

17             PROSPECTIVE JUROR:  Yeah, definitely in the past.  I

18   don't think I currently own any Samsung products, but I

19   definitely have in the past.  I think mainly I've purchased,

20   like, sound equipment from them, whether it was, like, speakers

21   or headphones.  Like I said, I don't currently own any, I don't

22   think.

23             THE COURT:  Okay.  And anything about those products

24   or your experience with them going to cause you to want to

25   favor one side or the other here?

1            PROSPECTIVE JUROR:  I definitely -- I mean, I

2  definitely favor, I think, Apple, Microsoft products a bit more

3  for most of my other kind of products now.  Sony as well.  But

4  nothing that I think would, like, cause a bias or anything like

5  that.

6            THE COURT:  So you're not coming into this thinking

7  you want to rule against Samsung because of your product

8  preferences?

9            PROSPECTIVE JUROR:  No not at all.

10           THE COURT:  Okay.  Do you know anything about the

11  plaintiff, Netlist.

12           PROSPECTIVE JUROR:  No, nothing.

13           THE COURT:  Let me ask you this:  When you're not --

14  when you're not working, you said you like to play around with

15  tech stuff at home.

16           PROSPECTIVE JUROR:  Yeah, definitely.  Definitely

17  big, like, computer gamer, film editing, and so any sort of,

18  like, you know, real tech stuff I do a lot of.

19           THE COURT:  And are you on social media?

20           PROSPECTIVE JUROR:  I am, yes.

21           THE COURT:  Okay.  Do you think you can avoid the

22  urge to post something about the case.

23           PROSPECTIVE JUROR:  Yes, I can resist the urge, yes.

24           THE COURT:  And what about research?  I know, like,

25  you know, for some of the jurors that aren't that familiar with

```
 1    NAND and DRAM products and product production and schedules,

 2    all that sort of stuff, they might not be all that interested

 3    in doing research, but you might be interested in it.  Do you

 4    think you can avoid doing that sort of research during the

 5    trial?

 6                 PROSPECTIVE JUROR:  Yes, I think I could.

 7                 THE COURT:  And you've not been on a jury before.

 8    Any nervousness about the jury process?

 9                 PROSPECTIVE JUROR:  No real nervousness, no.

10                 THE COURT:  And then other than sort of the

11    technical stuff you were talking about, gaming and film

12    editing, what else do you like to do for fun?

13                 PROSPECTIVE JUROR:  Like to read, movies, just kind

14    of, yeah, writing as well.

15                 THE COURT:  Your fiancée is going to ask you about

16    the case.  What are you going to tell her?

17                 PROSPECTIVE JUROR:  Nothing.

18                 THE COURT:  Okay.  It's just important that you

19    don't talk about it.  We don't want any outside opinions.

20                 PROSPECTIVE JUROR:  I think she's a plaintiff in an

21    ongoing case that she can't talk about.  So now we're even I

22    think.

23                 THE COURT:  Okay.  So she's currently involved in a

24    lawsuit; correct?

25                 PROSPECTIVE JUROR:  Yes.
```

```
 1              THE COURT:  What kind of lawsuit?

 2              PROSPECTIVE JUROR:  Civil, I believe.  Again, I

 3   don't know any info about it really because she hasn't been

 4   able to disclose it.  I think it is against, like, a pretty big

 5   company, but I don't know.

 6              THE COURT:  Okay.  And do you feel like that that

 7   experience might influence the way you're thinking here?  You

 8   know, if she's fighting a big company, you might want to fight

 9   a big company here.

10              PROSPECTIVE JUROR:  I don't think so, no.  Just

11   wanted to make sure it was known.

12              THE COURT:  Okay.  And probably it's a good idea

13   during the course of the trial not to inquire about her civil

14   case.  Do you think you could do that as well?

15              PROSPECTIVE JUROR:  Yes definitely.

16              THE COURT:  Just to keep the two things separate.

17              PROSPECTIVE JUROR:  Uh-huh.

18              THE COURT:  And you can always talk, you know, with

19   your fiancée about this case after it's over, but you just have

20   to keep it to yourself for now.  Do you think you'll have any

21   problem with that?

22              PROSPECTIVE JUROR:  No problems, no.

23              THE COURT:  Okay.  What else do you like to do for

24   fun?

25              PROSPECTIVE JUROR:  Like I said, I like to write a
```

 1  lot.  I've been kind of working on, like, a novel, screenplay

 2  writing of course as well.  So kind of involved in sort of film

 3  world that I really like to enjoy outside of just regular work,

 4  yeah.

 5          THE COURT:  Yeah, it will be interesting when films,

 6  you know, sort of -- it seems like we're still in this COVID

 7  thing.  Theaters are still closed and things.  And are you

 8  finding that most of the stuff is going to streaming services

 9  or do you think the theaters will bounce back.

10          PROSPECTIVE JUROR:  That's definitely a difficult

11  situation, I think.  It definitely seems like a lot of

12  companies are trying to move the streaming route, but I think

13  there is a large majority of audiences that still enjoy going

14  to the theaters.  So I think they will be around for a while.

15          THE COURT:  Yeah, let's hope so.

16          Okay.  Well, thank you, Juror Number 5.  Appreciate

17  it.

18          PROSPECTIVE JUROR:  Thank you.

19          THE COURT:  Can we have Juror Number 6?

20          Juror Number 6, can you please answer the questions

21  on the board.

22          PROSPECTIVE JUROR:  I live in the Silverlake area

23  fairly close to here.  I'm a screenwriter by trade, and I've

24  been a producer as well.

25          I'm married.  My wife is now a psychologist, though

```
 1   she was a film producer.  I have two adult children, one just
 2   graduating this year, but she's 18.  And my son, Walker, got
 3   out of UCLA not to long ago and hasn't yet found his place of
 4   work.  It would be nice if he did.
 5            THE COURT:  Great.  Now, you said you've had some
 6   experience with a contract dispute.  Tell us about that.
 7            PROSPECTIVE JUROR:  I sold a show to Fox in the room
 8   with the director, producers, the music -- guy who was going to
 9   do the music, and then they said they would buy it.  And then
10   later on they said, "We are buying the project, but you and
11   your writing partner have been taken off because we need to
12   employ someone who is more -- more different than you" for this
13   type of project that we were doing.  So that was a little
14   unsettling.  And we had to go to a dispute and finally, instead
15   of getting to write the show and be show runners on the show,
16   we just had to be a passive co-executive producer, and that
17   pissed me off.
18            THE COURT:  Yeah, I can imagine.
19            How did you resolve it?  Was there arbitration or a
20   trial or...
21            PROSPECTIVE JUROR:  We just got told that the best
22   course of action would be, by our lawyers, to accept this.  If
23   it did get made, we'd get passive money but wouldn't have any
24   say in the show.
25            THE COURT:  Did the show ever get made?
```

1              PROSPECTIVE JUROR:  It hasn't yet.  But that's the

2    nature of the business.  Things kick around and percolate

3    forever.

4              THE COURT:  Anything about that dispute you think

5    would influence your thinking in this case?

6              PROSPECTIVE JUROR:  It doesn't seem to have much

7    bearing, no.

8              THE COURT:  You said you own some Samsung products,

9    and, in fact, you had problems with Samsung products.  Correct?

10             PROSPECTIVE JUROR:  I did.  I had a refrigerator,

11   and I got it fixed three times, and every time the same thing

12   went wrong again.  And the guy who's trying to fix it told me

13   that it's a problem with the manufacturer, and I wouldn't buy

14   that.  So --

15             THE COURT:  Okay.  And were those -- were those

16   problems with the Samsung products -- you think they would bias

17   your thinking in this case?

18             PROSPECTIVE JUROR:  I don't think they would.

19             THE COURT:  Now, did you say it would be hard for

20   you to be impartial with respect to Samsung, or did I get that

21   wrong.

22             PROSPECTIVE JUROR:  I didn't say that, no.

23             THE COURT:  Okay.  The case would involve, you know,

24   sort of a business dispute.  You know, not really involving end

25   user products necessarily.  Do you think that you'd be able to

```
 1    come at it with an open mind?

 2              PROSPECTIVE JUROR:  I think so.

 3              THE COURT:  Any -- you've not had prior jury service

 4    before.  Correct?

 5              PROSPECTIVE JUROR:  I have.

 6              THE COURT:  Oh, you have.  I'm sorry.  Was that a

 7    civil or criminal case?

 8              PROSPECTIVE JUROR:  It was a civil case.

 9              THE COURT:  Okay.  Was the jury able to reach a

10    verdict?

11              PROSPECTIVE JUROR:  We were about to reach a

12    verdict.  We went through the four days, and then right before

13    we were going to come back in, they said, "Well, the parties

14    have settled."  They were actually, it seemed like, a one-time

15    spouse and, you know, the person over here on this side and

16    then this person had remarried.  So it seemed like it was

17    really nested in a lot of familial kind of things.  And it

18    seemed like at the end they all hugged and said, "We never

19    should have gone to court."  It was kind of funny.  I mean,

20    we'd spent all that time and we were kind of ready to get in

21    there and -- you know, if you're to spend that much time, we

22    wanted to get to verdict, but they got to one, so...

23              THE COURT:  Did that leave a bad taste in your mouth

24    with respect to jury service?

25              PROSPECTIVE JUROR:  Maybe a little bit but, you
```

1    know, not in the big picture I don't think.

2              THE COURT:  Anything about that case you think would

3    influence your decision in this case?

4              PROSPECTIVE JUROR:  I don't think so, no.

5              THE COURT:  Okay.  Are you working on any shows now

6    that are currently on TV?

7              PROSPECTIVE JUROR:  Old shows that still show up

8    every once in a while, but no ongoing series or anything.

9              THE COURT:  Okay.

10             PROSPECTIVE JUROR:  It's more in the film business

11   in the day.

12             THE COURT:  Has COVID sort of been a difficult

13   experience in your field?

14             PROSPECTIVE JUROR:  It slowed down, like, in-person

15   pitching, which was something that I was kind of -- maybe if I

16   was good at anything in the business, I was good at that.  So

17   you lost that.  But the ageism is probably the bigger thing in

18   the business.  So...

19             THE COURT:  Yeah, well, it's -- I guess that's the

20   one advantage of this job is that, you know, gray hair doesn't

21   necessarily disqualify you.

22             PROSPECTIVE JUROR:  It's blond, by the way, just so

23   you know.

24             THE COURT:  What a dopey judge.  Right?  Sorry about

25   that.  You brought up ageism; I didn't.

```
 1              PROSPECTIVE JUROR:  That's true.
 2              THE COURT:  Okay.  What do you like to do for fun?
 3              PROSPECTIVE JUROR:  I still try to play basketball.
 4    I coached my kids when they were young.  I liked that.  I still
 5    like to watch my daughter play volleyball.
 6              THE COURT:  Are you a Bruins fan or Trojan fan?
 7              PROSPECTIVE JUROR:  I was a Trojan at film school
 8    there.  So I'm -- don't mess with me about that powder blue
 9    stuff.
10              THE COURT:  But your son was a Bruin.  Right?
11              PROSPECTIVE JUROR:  He went to UCLA, yeah.  He got
12    into the math program there.  So...
13              THE COURT:  Do you guys, you know, go at it or...
14              PROSPECTIVE JUROR:  He cares nothing about sports.
15    I could try to rib him about it and do this and that, and he
16    won't even -- wouldn't even say a word.
17              THE COURT:  Pac-12 basketball versus the ACC.  What
18    do you think?
19              PROSPECTIVE JUROR:  I like the Trojans this year.
20    They've been recruiting big, and they're good.
21              THE COURT:  Yeah, what do you think about the new
22    football coach?
23              PROSPECTIVE JUROR:  I didn't even know they hired
24    yet.
25              THE COURT:  Yeah, they have a guy from Oklahoma.
```

1          PROSPECTIVE JUROR:  That's all I heard was that they

2     thought it was a good choice, whoever they grabbed, so...

3          THE COURT:  Yeah.  Yeah.  Were you in favor of them

4     getting a new coach?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Okay.  Okay.  I guess we could go on,

7     but we better move to the case.

8          Could we have Juror Number 7, please.

9          Good morning, Juror Number 7.  Can you please answer

10    the questions on the board.

11          PROSPECTIVE JUROR:  Yeah.  I live in Long Beach.

12    I'm a computer application specialist for Los Angeles Unified

13    School District.

14          I live with my boyfriend.  He's a quality analyst in

15    a warehouse.  I don't have adult children.

16          And no prior jury service.

17          THE COURT:  Okay.  So computer application support,

18    does that involve mostly software or...

19          PROSPECTIVE JUROR:  Mostly software, like the

20    student information system.  I also worked on an application

21    for special education students, their services, the

22    reimbursement for their services, tracking their services and

23    they're -- what's called an individualized education program.

24          THE COURT:  And is that mostly -- are you mostly

25    designing new applications or are you buying them off the shelf

1    or it's a combination?

2            PROSPECTIVE JUROR:  It's a combination.  We get

3    off-the-shelf products, but because LAUSD is so unique, there's

4    a lot of customization.  And so I'm a part of that software

5    development.  I'm not a developer, but I work with developers,

6    and I tend to be on the testing side also working with the end

7    users or the divisions that fund the application.  So when I

8    worked on a special education system, I worked with a lot of

9    the folks in special education.

10           THE COURT:  Okay.  And do you have some familiarity

11   with things like NAND and DRAM chips, or is it mostly software

12   stuff?

13           PROSPECTIVE JUROR:  Just the software side.

14           THE COURT:  Okay.  LAUSD, is that the biggest school

15   district in the country?

16           PROSPECTIVE JUROR:  It's the second after New York.

17           THE COURT:  How many students?

18           PROSPECTIVE JUROR:  I can't remember the number.

19   It's close to a million.

20           THE COURT:  Wow.  So, yeah, your job must be pretty

21   important to try to figure out how to manage that school

22   district with, you know, sufficient software systems that will

23   keep your arms around it.  Right?

24           PROSPECTIVE JUROR:  Yeah, it's more -- I try to

25   think of my job as making sure that what gets delivered from

```
1    these different software companies is useable and is what they

2    promised.  That kind of stuff.

3              THE COURT:  Right.  Right, because of the volume.

4    Right?  If you make a mistake, it could be a pretty

5    costly mistake.

6              PROSPECTIVE JUROR:  Right.  It means, like, a kid

7    doesn't get picked up on the corner from the -- the bus driver

8    doesn't pick up the kid on the corner, something like that.  Or

9    somebody -- yeah.

10             THE COURT:  So your boyfriend, you said, is an

11   analyst at a warehouse?

12             PROSPECTIVE JUROR:  Yeah, he does, like, the quality

13   control, that kind of stuff.

14             THE COURT:  Has he been impacted at all by this port

15   congestion issue?

16             PROSPECTIVE JUROR:  Not at all.

17             THE COURT:  That's good.

18             And LAUSD is fully back in person; is that right?

19             PROSPECTIVE JUROR:  Yes.  They do have an option for

20   kids who don't want to be in person, but for the most part, the

21   kids are back.

22             THE COURT:  Okay.  Obviously, you know, your job

23   probably keeps you pretty busy, but what do you like to do when

24   you're not working?

25             PROSPECTIVE JUROR:  I like to travel, but that kind
```

```
 1    of got shut down the last two years.  So I still like to look

 2    for cheap airfare and look at hotels and that kind of stuff.

 3              THE COURT:  Where has been your favorite place to

 4    go?

 5              PROSPECTIVE JUROR:  I guess most recently my

 6    favorite place to go was Bali.

 7              THE COURT:  What did you like about Bali?

 8              PROSPECTIVE JUROR:  It's just really laid back and

 9    you can walk around places.  You know, it's not really a thing

10    to do in LA, to walk around.  But when you go to these other

11    places, you can walk on the beach, walk in the little towns

12    and, you know, your money goes really far in Bali.

13              THE COURT:  It's good to know.  I'll have to put

14    that on my list.

15              Now, you said you've not been on a jury before?

16              PROSPECTIVE JUROR:  No.

17              THE COURT:  No.

18              Any nervousness about the jury process?

19              PROSPECTIVE JUROR:  No.

20              THE COURT:  Okay.  Do you think you'd be able to --

21    let's say you're back in the jury room and, you know, some of

22    the jurors are expressing an opinion about the evidence and you

23    think it's wrong.  Do you think you'd be able to speak your

24    mind?

25              PROSPECTIVE JUROR:  I think so.
```

1          THE COURT:  Okay.  Do you think you're -- do you

2    think you'd be able to resist the temptation to drown out other

3    people?

4          PROSPECTIVE JUROR:  To what?

5          THE COURT:  To drown out other people, to not listen

6    to others?

7          PROSPECTIVE JUROR:  I don't think so.

8          THE COURT:  Okay.  Any nervousness about the process

9    at all?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Okay.  What about social media?  What

12    social media do you use?

13          PROSPECTIVE JUROR:  I don't.

14          THE COURT:  No?  Okay.  So you're not going to post

15    anything about this case?

16          PROSPECTIVE JUROR:  I have nothing to post on.

17          THE COURT:  Okay.  And your boyfriend is going to

18    ask you about the case, what you're doing here in court.  Are

19    you going to be able to tell him, "I can't tell you anything

20    about it"?

21          PROSPECTIVE JUROR:  I will be able to tell him that.

22          THE COURT:  Okay.  And, again, after the case you

23    can talk as much as you want it about it, but not during the

24    case.  Is that a problem?

25          PROSPECTIVE JUROR:  It's not a problem.

```
1              THE COURT:  Okay.  You didn't raise your hand for
2    owning Samsung products.  Right?
3              PROSPECTIVE JUROR:  I can't remember if my TV is a
4    Samsung right now.
5              THE COURT:  Okay.
6              PROSPECTIVE JUROR:  It's either an LG or a Samsung.
7    I don't know why, but it's just blanking.
8              THE COURT:  Yeah.  I mean, all the TVs look the
9    same, so it's kind of hard to tell.
10             PROSPECTIVE JUROR:  Exactly.
11             THE COURT:  Yeah.  Do you have any bias for or
12   against Samsung?
13             PROSPECTIVE JUROR:  I don't think so.
14             THE COURT:  Okay.  If you thought Samsung was a good
15   company, made good products or not a good company, would you be
16   able to put that to the side and just decide the case based on
17   the dispute here.
18             PROSPECTIVE JUROR:  I think so.  It sounds like it's
19   a contract.
20             THE COURT:  Yeah.  It's a contract, and we are
21   trying to figure out what the damages were.  So you think you'd
22   be able to decide just on those facts?
23             PROSPECTIVE JUROR:  I think so.
24             THE COURT:  Okay.  When you say you think so, you're
25   not be uncertain; you're just being polite.  Is that right?
```

```
 1            PROSPECTIVE JUROR:  I'm not being polite.  Yes, I

 2   can.

 3            THE COURT:  You can?

 4            PROSPECTIVE JUROR:  Yes.

 5            THE COURT:  Thank you.  Just in case.  Because you

 6   know what's going to happen.  Somebody might say, "You know,

 7   Juror Number 7 said she thought so, but she wasn't certain."

 8   But you're certain?

 9            PROSPECTIVE JUROR:  I'm certain.

10            THE COURT:  Okay.  Thank you very much, Juror

11   Number 7.

12            Can we get Juror Number 8?

13            PROSPECTIVE JUROR:  Hello.

14            THE COURT:  Hi, Juror Number 8.  Can you please

15   answer the question.

16            PROSPECTIVE JUROR:  Sure.  I want to place my mask

17   on as well.

18            THE COURT:  That's fine.

19            PROSPECTIVE JUROR:  I currently reside in

20   San Gabriel, and my occupation is I'm self-employed.  I'm an

21   interpreter.

22            My significant other, I am married, and he's a

23   lawyer.  I have two adult stepchildren.  One is a lawyer, and

24   one is studying finance.

25            And I have no prior jury service.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Okay.  So you're an interpreter.  Do you
 2    work in -- for court or for some other organization?
 3              PROSPECTIVE JUROR:  No, not for court.  But mainly
 4    for more personal.  A lot of business owners, they hire
 5    interpreters when they come abroad.
 6              THE COURT:  Okay.  And what languages do you
 7    interpret?
 8              PROSPECTIVE JUROR:  Mandarin.
 9              THE COURT:  Okay.  And so you're not -- you
10    understand the interpretation process.  Here, you know, you
11    would be focused on -- I'm not sure out of the box what
12    languages we'd be interpreting from, but we'd be focused on
13    what the interpreter says as opposed to trying to guess what
14    the witness is saying.  Do you have any problem with that?
15              PROSPECTIVE JUROR:  No, I don't.
16              THE COURT:  Okay.  Because that would be the
17    official record would be what the interpreter says.  Do you
18    understand that?
19              PROSPECTIVE JUROR:  Right.  Right.
20              THE COURT:  Now, your husband is a lawyer.
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  What sort of law?
23              PROSPECTIVE JUROR:  He actually works for a
24    telecommunications company in Europe.  So more like security
25    law.
```

UNITED STATES DISTRICT COURT

```
 1                    THE COURT:  Okay.  And so he works for a company in
 2       Europe but works remotely from here?
 3                    PROSPECTIVE JUROR:  No, he's actually in Europe.
 4                    THE COURT:  He's actually in Europe.
 5                    PROSPECTIVE JUROR:  Yes.
 6                    THE COURT:  So it's sort of -- you said it is -- let
 7       me just look and see here.  So he doesn't do litigation then.
 8       Correct?
 9                    PROSPECTIVE JUROR:  No, he does not.
10                    THE COURT:  Okay.  And you have a child who is a
11       lawyer as well --
12                    PROSPECTIVE JUROR:  Two stepchildren.
13                    THE COURT:  Okay.
14                    PROSPECTIVE JUROR:  Adult stepchildren.  One is a
15       lawyer, just became a lawyer, and is interning at a firm in
16       Italy.  And another adult stepchild is studying finance.
17                    THE COURT:  And your adult child is studying
18       finance -- you adult stepchild who is studying finance is
19       studying where?
20                    PROSPECTIVE JUROR:  In home.
21                    THE COURT:  What are you doing here?
22                    PROSPECTIVE JUROR:  Right?  No.  My mother is here,
23       and she's not very well.  So I'm actually back to visit her.
24       And as I was telling the clerk earlier, I actually am scheduled
25       to leave on the 8th, and I was wondering if that was going to
```

**UNITED STATES DISTRICT COURT**

 1    be a problem, and they told me no.

 2              THE COURT:  Yeah, it shouldn't be.

 3              PROSPECTIVE JUROR:  Yeah.

 4              THE COURT:  Yeah, we should be able to get you out

 5    of here.  You're going to Italy on the 8th?

 6              PROSPECTIVE JUROR:  Uh-huh.

 7              THE COURT:  The stepson who is a lawyer, you know,

 8    new lawyers love to talk about the law.  Love to give their

 9    opinions.  They can be a little -- having been a new lawyer

10    once, they can be a little obnoxious about it.  Are you going

11    to be able to resist the temptation of telling him about the

12    case, him or her?

13              PROSPECTIVE JUROR:  Yes, for sure.

14              THE COURT:  And, you know, if he asks you about

15    it -- lawyers can be a little pushy too.

16              PROSPECTIVE JUROR:  "I have a mean judge.  I'm

17    afraid of him."

18              THE COURT:  There you go.  That's important.  That's

19    important.

20              And, you know, your husband, when you talk to him,

21    you know, he may ask you about the case.  You're going to tell

22    him you can't say anything?

23              PROSPECTIVE JUROR:  No.

24              THE COURT:  And, you know, you may be a little

25    confused maybe about some of the terms and stuff and so you

```
 1  might say, "Well, let me ask my husband or my stepson."  Do you
 2  think you can resist that temptation?
 3              PROSPECTIVE JUROR:  Very tempted but no.
 4              THE COURT:  Okay.  And then, like I said, you can
 5  talk to them both about the case after it's over.  It's just
 6  this week.  So you'll just have to keep that secret.  Any
 7  problem with that?
 8              PROSPECTIVE JUROR:  No.
 9              THE COURT:  Now, you're obviously, you know, busy
10  with your job and your family and your mom, but do you have any
11  other hobbies or things you like to do for fun?
12              PROSPECTIVE JUROR:  Yes.  I love running, and I'm
13  actually training for the marathon in Rome next year.  I love
14  doing that.
15              THE COURT:  When is the Rome marathon?
16              PROSPECTIVE JUROR:  It's in March next year.
17              THE COURT:  I have a son who is studying in Rome,
18  and he loves to run.  And he loves running all over the place.
19  And the nice thing about the city is that there's so many
20  interesting things to run by.  Right?
21              PROSPECTIVE JUROR:  Exactly.  Exactly.
22              THE COURT:  Where do you like to run in Rome?
23  What's your path?
24              PROSPECTIVE JUROR:  So we live by the airport.  So
25  there's -- it's called Pineta, which is, like, a huge forest
```

```
 1   next to the airport, and I usually run by there.
 2             THE COURT:  Okay.  As far as jury service, you've
 3   not been on a jury before?
 4             PROSPECTIVE JUROR:  Never.
 5             THE COURT:  Any nervousness about it?
 6             PROSPECTIVE JUROR:  To be honest, a little bit.
 7             THE COURT:  And what makes you nervous?
 8             PROSPECTIVE JUROR:  I don't know.  Just the whole
 9   process.  Like, don't know how I should compose myself.  Don't
10   know what to expect.
11             THE COURT:  Yeah, I'm sure a lot of the jurors share
12   that same thing because it's new.  Right?  So it's different.
13             PROSPECTIVE JUROR:  Yeah, exactly.
14             THE COURT:  I mean, I think, you know, the best
15   jurors are the jurors that are paying attention, you know, and
16   so that's why we've got notepads.  You can take notes and
17   thing.  Do you think you'd be able to do a good job paying
18   attention?
19             PROSPECTIVE JUROR:  I think so.
20             THE COURT:  And then, you know, also keeping an open
21   mind.  One of the things we tell jurors is don't decide the
22   case until all the evidence is over because you want to get a
23   full picture.  Do you think you'd be able to follow that
24   instruction.
25             PROSPECTIVE JUROR:  Yes.
```

```
1                THE COURT:  Okay.  And you said you own some Samsung

2     products.  Correct?

3                PROSPECTIVE JUROR:  Yes.  I think my first ever

4     cellphone was a Samsung.

5                THE COURT:  Okay.  Did you have a good experience

6     with that?

7                PROSPECTIVE JUROR:  Yeah, I think it was all right.

8                THE COURT:  Okay.  Anything about that product want

9     to cause you to rule for or against Samsung?

10               PROSPECTIVE JUROR:  No.

11               THE COURT:  You think you'd be able to put all your

12    Samsung experience to one side and decide the case just on the

13    facts?

14               PROSPECTIVE JUROR:  Sure.  Sure.

15               THE COURT:  Okay.  I don't think I have any

16    questions right now.  So thank you Juror Number 8.

17               PROSPECTIVE JUROR:  Thank you.

18               THE COURT:  Can we have Juror Number 9.

19               Okay.  Juror Number 9, can you please answer the

20    questions.

21               PROSPECTIVE JUROR:  Yeah.  I live in Lynwood.  I'm a

22    recent law school graduate, scheduled to take the bar in

23    February.

24               Single.  No children.

25               And no prior jury service.
```

```
 1              THE COURT:  Okay.  And you didn't answer yes to any
 2    of my questions.  Right?
 3              PROSPECTIVE JUROR:  Correct.
 4              THE COURT:  So you just got out of law school, huh?
 5              PROSPECTIVE JUROR:  Yeah.
 6              THE COURT:  And you're studying for the bar?
 7              PROSPECTIVE JUROR:  Correct.
 8              THE COURT:  That's sort of a -- to me I always found
 9    studying for the bar was, like, one of the best times because
10    you could always tell people, "Don't bother me.  I'm studying
11    for the bar."
12              You know, "Can you help me move?"
13              "Geez, I wish I could, but I'm studying for the
14    bar."
15              Are you taking advantage of that?
16              PROSPECTIVE JUROR:  Yeah.
17              THE COURT:  Okay.  Good.  Good.  What sort of law do
18    you want to practice?
19              PROSPECTIVE JUROR:  I'm not sure yet.  I'm leaning
20    towards business law, yeah.
21              THE COURT:  Did you take offense to all my snide
22    comments about new lawyers with the prior juror?
23              PROSPECTIVE JUROR:  No.  It's funny.
24              THE COURT:  Okay.  You know, I'm just trying to
25    be -- trying to make sure that you don't sort of talk about the
```

 1   case with anyone.

 2              Do you think you'd have a problem talking about the

 3   case with any of your friends or things?

 4              PROSPECTIVE JUROR:  No problem.

 5              THE COURT:  Okay.  Now, the judge will instruct the

 6   jury based on the law.  That's my job.  Are you going to be

 7   able to let me do my job and you do yours?

 8              PROSPECTIVE JUROR:  Yes.

 9              THE COURT:  Okay.  Because you can't go back in

10   there and say, "The judge said the law is this, but, you know,

11   you heard him.  He's not very bright."  You're not going to say

12   that, are you?

13              PROSPECTIVE JUROR:  I'm not.

14              THE COURT:  Okay.  The case involves damages on a

15   contract dispute, and so it could be an area of law you know

16   about, could be an area of law you haven't touched on in your

17   classes, but it's very important that you let the Court give

18   you the jury instructions and follow those as opposed to trying

19   to fill in the blanks.  Do you think you can do that?

20              PROSPECTIVE JUROR:  Yes, I can do that.

21              THE COURT:  So I know you're studying for the bar.

22   Is the bar in July still?

23              PROSPECTIVE JUROR:  In February.

24              THE COURT:  Oh, I'm sorry.  February.  The February

25   bar.  Right, right, right.

```
 1              How many days is it?

 2              PROSPECTIVE JUROR:  Two days.

 3              THE COURT:  Two days.  It used to be three.  So

 4   that's good.

 5              What do you think is going to be harder for you?

 6   The multistate or the essays?

 7              PROSPECTIVE JUROR:  The multistate most likely,

 8   yeah.

 9              THE COURT:  Do they still have that practical thing

10   on essays where you have to write a memo or something?

11              PROSPECTIVE JUROR:  Performance test, yeah.  One

12   90-minute performance test, yes.

13              THE COURT:  What was your favorite subject in law

14   school?

15              PROSPECTIVE JUROR:  Maybe con law.  Yeah.

16              THE COURT:  So you were familiar with what I was

17   talking about with the right to a jury trial and how it's so

18   important?

19              PROSPECTIVE JUROR:  Somewhat, yeah.

20              THE COURT:  Yeah.  It is interesting that we're the

21   only country that really puts that emphasis on it.  I think as

22   a country we want to put more faith in the citizens than in the

23   judges.  Do you think that's a good idea?

24              PROSPECTIVE JUROR:  In certain instances, yes.

25              THE COURT:  It was a tough question to see how you
```

```
 1    would handle it.

 2              Any nervousness about being on a jury?

 3              PROSPECTIVE JUROR:  No.

 4              THE COURT:  When you're not studying for the bar,

 5    what do you like to do for fun?

 6              PROSPECTIVE JUROR:  Read, movies, watch sports.

 7              THE COURT:  What sports do you like to watch?

 8              PROSPECTIVE JUROR:  Mainly I like boxing.

 9              THE COURT:  You know, UFC really seems to have

10    almost overshadowed boxing now.

11              PROSPECTIVE JUROR:  Yeah, it's very popular here.

12              THE COURT:  Yeah.  Are you a fan of UFC?

13              PROSPECTIVE JUROR:  Not really.

14              THE COURT:  You like the traditional boxing?

15              PROSPECTIVE JUROR:  Yeah, boxing.

16              THE COURT:  Who is your favorite boxer?

17              PROSPECTIVE JUROR:  There's many, but the most

18    popular one, Canelo Alvarez.

19              THE COURT:  I grew up in the Mike Tyson era.  So I

20    have a particular fondness for Mike Tyson -- who got back into

21    the ring recently.

22              PROSPECTIVE JUROR:  Yeah.

23              THE COURT:  What do you think about that, all these

24    old boxers coming back?

25              PROSPECTIVE JUROR:  If they can do it, and they are
```

1    still in shape, why not?

2              THE COURT:  Anything I haven't asked you as a

3    budding lawyer that you think I should have asked you?

4              PROSPECTIVE JUROR:  I'm sorry.  Can you repeat that?

5              THE COURT:  You know, as somebody who is, you know,

6    right on the cusp of becoming a lawyer, anything you think I

7    should have asked you that I haven't?

8              PROSPECTIVE JUROR:  I can't think of anything.

9              THE COURT:  Okay.  Okay.  We'll let you go back.

10   Thank you very much, Juror Number 9.

11             Can we have Juror Number 10?

12             Actually, Juror Number 10, before we do that, why

13   don't we take a 10-minute break since we've been going for a

14   bit.  So we'll take 10 minutes and we'll come back.

15             THE COURTROOM DEPUTY:  All rise.

16             (At 11:18 a.m. a brief recess was taken.)

17             THE COURT:  Good morning.  Have a seat, everybody.

18             Let's start with Juror Number 10.

19             Good morning, Juror Number 10.  Can you please

20   answer the questions on the board.

21             PROSPECTIVE JUROR:  I live in Santa Clarita.  My

22   occupation is I'm a police detective for City of Los Angeles.

23             My wife, she works for the LA County Sheriff's

24   Department as a secretary 5, captain's secretary, at

25   Santa Clarita.  I have two adult children.  My daughter is a

1    mental health counselor up in Santa Barbara, and my son just

2    graduated college out in Calvin University in Michigan, and

3    he's back home coaching lacrosse at West Ranch High School.

4             Prior jury service, never.  I'm not allowed to do

5    local juries.

6             THE COURT:  Okay.  And you said you've been involved

7    in lawsuits before.  Is that in relation to your employment?

8             PROSPECTIVE JUROR:  Correct.

9             THE COURT:  And you indicated that you would have

10   some bias based on business dealings?

11            PROSPECTIVE JUROR:  Well, I've had some issues with

12   some electronics.  It was LG.

13            THE COURT:  Okay.

14            PROSPECTIVE JUROR:  One of their compressors on our

15   refrigerator.  It's frustrating for me.  We're actually in the

16   course of a lawsuit against -- it's basically a class action

17   lawsuit.  We jumped on with that.

18            THE COURT:  And would that experience with that

19   lawsuit or those products you think would make it difficult for

20   you to be impartial here?

21            PROSPECTIVE JUROR:  No, I don't believe so.

22            THE COURT:  Okay.  You said that you own some

23   Samsung products.  Correct?

24            PROSPECTIVE JUROR:  Correct.  I have a Samsung

25   Note 21.  I have two Samsung TVs.  I think my son has a Samsung

```
 1   laptop.  Our department uses Samsung products.  So I'm very

 2   familiar with Samsung products.

 3            THE COURT:  Okay.  And what's been your experience

 4   with the products?  Have they been good products?

 5            PROSPECTIVE JUROR:  For the most part I've stuck

 6   with them.  My family uses Apple.

 7            THE COURT:  Okay.  Do you have any -- do you think

 8   you'd be biased towards Samsung because of your use of Samsung

 9   products?

10            PROSPECTIVE JUROR:  I don't believe so.

11            THE COURT:  Okay.  Do you think you'd be able to

12   handle the case just based on the facts and law.

13            PROSPECTIVE JUROR:  Yes.

14            THE COURT:  Now, you obviously have expertise being

15   in the field you're in.  Do you think you'd be able to put that

16   expertise to one side and just decide the case based on what

17   you hear here?

18            PROSPECTIVE JUROR:  I would like to think I would be

19   able to, but it's difficult.  I've been a detective for 20 -- I

20   mean on the police department 26 years, a detective past 10.  I

21   handle civil litigation right now for the City of Los Angeles.

22   I'm involved in the BLM lawsuits, so major lawsuits for the

23   city.  I'm an investigator for the City Attorney's Office in

24   LAPD capacity.

25            So I've been involved in employment law.  I've done
```

**UNITED STATES DISTRICT COURT**

```
 1    that as well.  I know discovery process.  I've done that for
 2    the past 11 years.  And then I've done criminal stuff prior
 3    that.  But I'd like to think I'd put that all aside for this.
 4              THE COURT:  And, I mean, here, since we're not
 5    dealing with criminal issues, we're just dealing with a
 6    contract dispute and damages, do you think you'd be able to
 7    take that experience -- I mean, I'm not sure how much of that
 8    experience even crosses over, but do you think you'd be able to
 9    just focus on the case at hand?
10              PROSPECTIVE JUROR:  I would like to think so, but
11    like I said, I'm doing civil litigation right now.  That's my
12    expertise for the department and the city.
13              THE COURT:  When you say you're doing civil
14    litigation, what specifically are you involved with?
15              PROSPECTIVE JUROR:  Right now it's traffic
16    accidents.  The city of Los Angeles is self-insured.  So we
17    have -- I work with the City Attorney's Office.  So I do do
18    some federal trials.  We do some local trials.  It just depends
19    on what the accusations are.  I defend the city right now.
20    But...
21              THE COURT:  Okay.  And when you're not working as a
22    detective or investigator, what do you like to do for fun?
23              PROSPECTIVE JUROR:  I like to play golf and plan my
24    retirement.
25              THE COURT:  Where do you like to play?
```

1          PROSPECTIVE JUROR:  I play Vista Valencia.  I played

2     up in Mammoth.  We have a big tournament every year, me and my

3     buddies from high school actually still get together.  We went

4     to a private school in the Valley, so all these years later, we

5     get together and we play a tournament every year.  So I like to

6     practice around.  We'll play at just local courses.  Simi.

7          THE COURT:  And you obviously have not been on a

8     jury before, and I guess your trepidation is that you're

9     involved in civil cases and so you don't know how that's going

10    to impact your work as a juror?

11         PROSPECTIVE JUROR:  I -- I'm just -- when we're in

12    deliberations, it's hard for me to set aside what I've been for

13    so many years as far as determining a case and stuff like that.

14    I can look at the evidence and things like that, but my

15    expertise may come into play.  And I'd like to say no, but it's

16    hard to set that aside.

17         THE COURT:  I guess you're representing the city.

18    I'm trying to think of how that would naturally impact this

19    case where we have a contract dispute between two businesses.

20         PROSPECTIVE JUROR:  Just the familiarity with

21    different things like that.  We do handle some contracts and

22    things of that nature.

23         THE COURT:  Do you think you could resist becoming

24    an expert in the jury box?

25         PROSPECTIVE JUROR:  Yes, I would like to try.  I

```
 1    would like to take a backseat.
 2              THE COURT:  Thank you very much, Juror Number 10.
 3              Let's get Juror Number 11.
 4              Hi, Juror Number 11.  Can you please answer the
 5    questions.
 6              PROSPECTIVE JUROR:  Yes.  Area of residence is
 7    Thousand Oaks, California.
 8              I've been in advertising and design for about
 9    30 years.
10              My spouse is from Germany, which is a good thing.
11    And I have three adult children, girls.  One is in the PR
12    field.  The other is up at Sacramento at the -- she's a
13    communications director for Betty Yee.  And another one is a
14    teacher.  And the middle one is with the Honey Board in PR.
15              Prior jury service, I did one criminal trial up in
16    Ojai, and they had a resolution to it.
17              THE COURT:  Okay.  And you said you own some Samsung
18    products.  Correct?
19              PROSPECTIVE JUROR:  A TV.
20              THE COURT:  What has been your experience?
21              PROSPECTIVE JUROR:  Good.
22              THE COURT:  And would that experience cause you to
23    want to favor one side or the other in this case?
24              PROSPECTIVE JUROR:  No.
25              THE COURT:  Any concern about your ability to be
```

```
 1   impartial here?

 2           PROSPECTIVE JUROR:  No.

 3           THE COURT:  You said you are in advertising design.

 4   In that work, have you had business or contract disputes?

 5           PROSPECTIVE JUROR:  No, none whatsoever.

 6           THE COURT:  Do you have any bias about parties who

 7   want to resolve their disputes in court?

 8           PROSPECTIVE JUROR:  No.

 9           THE COURT:  When you're not working, what do you

10   like to do for fun?

11           PROSPECTIVE JUROR:  Heavy into tennis.  Do a heck of

12   a lot in Photoshop just for fun and enjoyment.  I'm retired

13   now, but I still have a few clients.

14           THE COURT:  Okay.  Any problem with the restriction

15   about talking about the case during the proceedings?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  Your prior jury service, what was that

18   experience like?

19           PROSPECTIVE JUROR:  It was very interesting.  It

20   was.  It was a good experience.

21           THE COURT:  And anything about that case that causes

22   you to be reluctant to serve on a jury again?

23           PROSPECTIVE JUROR:  No.

24           THE COURT:  And would you be able to -- because that

25   was a criminal case, so different burden of proof, different
```

```
 1    law, and that sort of thing.  Would you be able to put that
 2    information outside of your mind when you're deciding this
 3    case?
 4             PROSPECTIVE JUROR:  Sure.
 5             THE COURT:  Okay.  And, you know, do you think you'd
 6    be able to not be an expert in the jury room with respect to
 7    the prior service?  So, you know, "When we did this before, we
 8    did this."  Do you think you could avoid that?
 9             PROSPECTIVE JUROR:  Yeah, I can avoid that.
10             THE COURT:  Okay.  Thank you very much, Juror
11    Number 11.
12             Let's look at Juror Number 12.
13             Okay.  Juror Number 12, can you please answer the
14    questions on the board.
15             PROSPECTIVE JUROR:  Sure.  I live in Montebello.
16    I'm a COVID tester mainly for the film industry.
17             I'm single.  I don't have any children.
18             And no prior service -- jury service.
19             THE COURT:  So you're a COVID tester.  That must
20    keep you busy.
21             PROSPECTIVE JUROR:  Yeah, especially right now.
22             THE COURT:  Yeah, I can imagine.
23             When did you get started in that?
24             PROSPECTIVE JUROR:  I started last year, actually,
25    around -- I want to say in July.  I started working for Sony,
```

```
 1    doing their testing there.  And then I switched from that job
 2    to work for a private lab.  And I just do concierge COVID
 3    testing.
 4              THE COURT:  And, you know, how is it looking?
 5              PROSPECTIVE JUROR:  We're still going up, honestly.
 6    Been testing a lot of people who are showing a lot of symptoms.
 7    So we'll see how that goes.
 8              THE COURT:  Okay.  That's not good news.
 9              What got you into this field?
10              PROSPECTIVE JUROR:  My family has always been in the
11    medical field.  So I just followed their footsteps.  My
12    grandmother is a nurse, and my mom is a nurse.  And I just
13    followed in their footsteps.
14              THE COURT:  All right.  When COVID is over, what are
15    you going to do?  Don't tell me COVID is never going to be
16    over.
17              PROSPECTIVE JUROR:  We'll see.  It looks like it.
18    Probably go look for a job at a hospital.  Go from there.
19              THE COURT:  Okay.  And when you are not working,
20    what do you like to do for fun?
21              PROSPECTIVE JUROR:  Skydiving.  I really got into
22    that.  It's sad that I was actually trying to get my license
23    for -- to skydive on my own, but because of COVID, they stopped
24    that for a while.
25              THE COURT:  Wow.  So you've actually been skydiving?
```

```
1            PROSPECTIVE JUROR:  Yeah.

2            THE COURT:  How many times have you gone?

3            PROSPECTIVE JUROR:  I lost count after 30.

4            THE COURT:  30 times jumping out of a plane?

5            PROSPECTIVE JUROR:  At least, yeah.

6            THE COURT:  What do you like about it?

7            PROSPECTIVE JUROR:  It's weird to say, but it's

8   actually relaxing.  When you -- I know.  I know.  But, like, as

9   soon as you jump off -- okay.  So the first two seconds are the

10  scariest, but after that, it's very bliss.  It honestly really

11  is.

12           THE COURT:  Okay.  I'll take your word for that.

13  That's great.

14           And you've not been on a jury before.  Any concern

15  about your ability to be a fair and impartial juror?

16           PROSPECTIVE JUROR:  No, none.

17           THE COURT:  Are you on social media?

18           PROSPECTIVE JUROR:  Yeah.

19           THE COURT:  And do you think you'll have a problem

20  not being able to post stuff about the case?

21           PROSPECTIVE JUROR:  Yeah, definitely.

22           THE COURT:  What about talking about the case or

23  doing research on the case?  Do you have any problem with those

24  restrictions?

25           PROSPECTIVE JUROR:  I mean, I won't talk about it.
```

1    I doubt I'll research it.

2              THE COURT:  What if the Court says you can't

3    research it?  Will you abide by that instruction?

4              PROSPECTIVE JUROR:  I mean, if -- because I like

5    trading in the stock market, if it comes up with Samsung, you

6    know, that's the only way I would technically research.

7              THE COURT:  Do you own Samsung or Netlist --

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  So if you're trading stocks -- and I'll

10   ask you just for the duration of the trial to avoid doing any

11   industry research in Samsung or Netlist.  Do you think you

12   could do that?

13             PROSPECTIVE JUROR:  Yeah, definitely.

14             THE COURT:  Afterwards you can go crazy, but as of

15   right now, you can't.  And you know, there could be legal

16   issues too with researching a case and then deciding the case

17   and owning stock.

18             PROSPECTIVE JUROR:  Yeah.

19             THE COURT:  So it's better to keep yourself --

20             PROSPECTIVE JUROR:  Oh, yeah, definitely.

21             THE COURT:  Okay.  [Okay.  Thank you very much,

22   Juror Number 12.

23             Can we talk to Juror Number 13.

24             Hi, Juror Number 13.  Can you please answer

25   questions.

```
 1              PROSPECTIVE JUROR:  I live in Hancock Park.  I'm a

 2    doctor.  I'm an interventional cardiologist.

 3              I do not have a significant other right now.  I have

 4    one daughter who is 22 who's working in the fashion

 5    merchandising and manufacturing fields.  Also have a son who is

 6    ten.

 7              And I've never been on a jury.

 8              THE COURT:  So a cardiologist, huh?

 9              PROSPECTIVE JUROR:  Yes, sir.

10              THE COURT:  How long do you have to go to school to

11    do that?

12              PROSPECTIVE JUROR:  That's so funny.  I was just

13    talking to someone about this the other day.

14              After high school I did 20 years of training -- of

15    extra years because I actually was a classical pianist until I

16    was 25 and then did a whoop-de-doo.

17              THE COURT:  Wow.  So you went from being a pianist

18    to being a cardiologist.

19              PROSPECTIVE JUROR:  Correct.

20              THE COURT:  What was the -- I mean, did you always

21    know you wanted to be a doctor?

22              PROSPECTIVE JUROR:  No, not at all.  My whole family

23    is in the arts, and my parents were devastated when I told them

24    I wanted to go to medical school because they spent all their

25    money on piano lessons.
```

1          THE COURT:  You might be the only cardiologist that

2     has disappointed parents.

3          PROSPECTIVE JUROR:  Well, they weren't disappointed

4     later, but they were initially.

5          THE COURT:  Yeah.  That's interesting.  You've not

6     been on a jury before?

7          PROSPECTIVE JUROR:  I have not.

8          THE COURT:  What about business disputes?  Have you

9     been -- in your practice have business or contract disputes?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  And you said you own some Samsung

12    products.  Right?

13         PROSPECTIVE JUROR:  I think my refrigerator is a

14    Samsung refrigerator.  But mine worked still.

15         THE COURT:  Okay.  And your satisfaction or

16    dissatisfaction with any Samsung products, would that influence

17    your decision-making this case?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Okay.  Now, being a cardiologist, jurors

20    might want to defer to you because you're a doctor and that's,

21    you know, sort of something that's, you know, fairly

22    impressive.  Do you think you could avoid having an

23    overpowering presence in the jury room?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  And make sure you listen to everybody?

```
1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  Do you -- when you're not, you know,

3    saving people's lives, what do you like to do for fun?

4              PROSPECTIVE JUROR:  So I work an awful lot.  So

5    whenever I'm not working, I'm with my son.  So...

6              THE COURT:  Okay.  And your son is ten.  Does he

7    play any sports?

8              PROSPECTIVE JUROR:  He was playing flag football

9    this fall, but then running in the school yard he fractured his

10   fifth toe and so then he ended up in a cast for four and a half

11   weeks.  But, yeah, and he wants to play volleyball in the

12   spring and run track in the spring.  So...

13             THE COURT:  Oh, boy.  Wow.  How far along is he in

14   the recovery process?

15             PROSPECTIVE JUROR:  He got his cast off about ten

16   days ago.  So he was happy.

17             THE COURT:  Okay.  And he wants to jump right back

18   into it, huh?

19             PROSPECTIVE JUROR:  Yeah.  They said he can't run

20   for four more weeks though.

21             THE COURT:  Yeah.  Well, good luck with that.

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Sounds like that's going to be a

24   challenge.

25             Any nervousness at all about being on a jury?
```

```
1              PROSPECTIVE JUROR:  No.

2              THE COURT:  Okay.  Any problem with not doing any

3    research on the case?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Okay.  Thank you very much, Juror

6    Number 13.

7              We'll go to Juror Number 14.

8              PROSPECTIVE JUROR:  Good morning.

9              THE COURT:  Good morning.  Can you please answer the

10   questions.

11             PROSPECTIVE JUROR:  I live in Ventura County in the

12   city of Moorpark.  I am a school office manager for a high

13   school in Conejo Valley Unified School District.

14             I do not have a significant other.  I have three

15   adult children.  One is unemployed.  One is -- he's, like, a

16   resident manager for wayward kids.  It's a nonprofit.  And my

17   daughter is a personal chef.

18             And I have had prior jury service.  I served on a

19   criminal trial years ago that resolved before we deliberated.

20   And I had the pleasure of serving on a grand jury down here for

21   three months a few years ago.

22             THE COURT:  Wow.  Well, thank you for your service.

23   That grand jury service can be grueling.  Thank you for that.

24   I commend you for your seriousness in your civic

25   responsibility.  The courts really appreciate that.  None of
```

```
1    this works without the jurors.
2              So you've -- you've been on juries before.  Anything
3    about those experiences that's going to make it hard for you to
4    be a juror here?
5              PROSPECTIVE JUROR:  No.
6              THE COURT:  Okay.  You think you could put that out
7    of your mind and not try to import things from those cases into
8    this case?
9              PROSPECTIVE JUROR:  No.
10             THE COURT:  You think you --
11             PROSPECTIVE JUROR:  Yes, I can put it out of my
12   mind.
13             THE COURT:  Yes?
14             PROSPECTIVE JUROR:  Yes.
15             THE COURT:  Okay.  As far as the work you do for the
16   school district, are you involved in any sort of technology
17   products?
18             PROSPECTIVE JUROR:  Well, I order everything for the
19   school.  I do all the purchasing.  So people give me quotes and
20   specs, and I have to reach out to our purchasing department,
21   and they order it from vendors.
22             THE COURT:  Do you ever have any contract disputes
23   with respect to vendors on, you know, ordering something and
24   not getting it, that sort of thing?
25             PROSPECTIVE JUROR:  Well, the district might, but it
```

```
 1   doesn't really -- I don't have anything to deal with as far as
 2   that goes.
 3           THE COURT:  Okay.  So you've not been involved in
 4   any contract disputes of any kind?
 5           PROSPECTIVE JUROR:  No.
 6           THE COURT:  What do you like to do for fun?
 7           PROSPECTIVE JUROR:  I love sports.  I love to watch
 8   sports.  I love to cook.  I like to sew and do needle work.
 9   And I love crossword puzzles.  I do one every day.
10           THE COURT:  Do you do the New York Times crossword
11   puzzle?
12           PROSPECTIVE JUROR:  I do.
13           THE COURT:  Do you do the one on Sunday as well?
14           PROSPECTIVE JUROR:  I try.  It's not the same since
15   Will Shortz stopped doing them.
16           THE COURT:  Oh, Will Shortz is not the puzzle editor
17   anymore?
18           PROSPECTIVE JUROR:  No.
19           THE COURT:  Oh, I didn't realize that.  And you have
20   noticed a decline in the quality?
21           PROSPECTIVE JUROR:  Well, they have a style.  They
22   all have a style, and you kind of learn the style.  And then
23   when it's a new person, it's not the same anymore.
24           THE COURT:  Yeah.  That can be frustrating, I'm
25   sure.
```

```
 1                    You said you like sports.  What kind of sports?

 2                    PROSPECTIVE JUROR:  Ice hockey is my favorite.

 3                    THE COURT:  Are you a big Kings fan?

 4                    PROSPECTIVE JUROR:  Yes.

 5                    THE COURT:  What kind of a season do you think they

 6       are going to have this year?

 7                    PROSPECTIVE JUROR:  It's hard to tell.  They started

 8       great and they had a bunch of wins in a row, and then they

 9       dipped down.  But they always do that.

10                    THE COURT:  Yeah, it's a long season at least.  So

11       that's good.  So you're not a Ducks fan.

12                    PROSPECTIVE JUROR:  No.

13                    THE COURT:  And not a Sharks fan?

14                    PROSPECTIVE JUROR:  No.

15                    THE COURT:  Okay.  Good, good.  I just wanted to

16       clear the air there.

17                    Any other sports you like to follow?

18                    PROSPECTIVE JUROR:  I like basketball.  I like

19       watching college ball.

20                    THE COURT:  Do you like the local teams or --

21                    PROSPECTIVE JUROR:  I do.  Not USC though.

22                    THE COURT:  Yeah?  Are you a Bruin fan?

23                    PROSPECTIVE JUROR:  (Nodding in the affirmative.)

24                    THE COURT:  Oh, well, that would be fun in the jury

25       box.
```

**UNITED STATES DISTRICT COURT**

1           The Bruins we'll see this year; right?  Because they

2   had that loss to Gonzaga.  That was tough.  We'll see how that

3   goes.

4           Your daughter is a personal chef.  That must be

5   nice.

6           PROSPECTIVE JUROR:  Yeah.

7           THE COURT:  What's the best thing she makes?

8           PROSPECTIVE JUROR:  Well, she does specialized diet

9   for gluten free, paleo, you know.  She caters to people's

10  dietary restrictions.  And so all her recipes are really good.

11  She's got a great blog.

12          THE COURT:  Okay.  Great.  Great.

13          And any trepidation about being on the jury?

14          PROSPECTIVE JUROR:  No.  Just the work I'm missing.

15  That's the hard part.

16          THE COURT:  We'll try to be as efficient as possible

17  so we don't take any more time than we have to.

18          Any concern about being able to voice your opinion

19  in the jury room?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Well, thank you very much, Juror

22  Number 14.

23          At this point I'm just going to talk to the parties

24  real quick on the side here.  It shouldn't take more than a

25  minute or two.

```
 1                    (The following was held at sidebar

 2                    outside the presence of the jury.)

 3              THE COURTROOM DEPUTY:  Counsel, this is the

 4    microphone.  So she's doing this remotely.  You need to speak

 5    into that.

 6              THE COURT:  Yeah, and if we all introduce ourselves

 7    before we talk, it will be easier for the court reporter to

 8    figure out who is saying what.

 9              So at this point, we've questioned 14 jurors, and I

10    wanted to see if the parties have any challenges for cause.

11              MR. RHOW:  The only issue we had was our -- sorry.

12    This is Ekwan Rhow for Samsung.

13              The only issue we had was with Juror Number 6.  And

14    the issue was when you had asked the question is anyone --

15    might have an issue with Samsung -- I can't remember the

16    question but -- might be impartial, he raised his hand.  And

17    what was just odd to us is when you asked him about it, he in

18    essence changed his answer.

19              THE COURT:  Yeah.

20              MR. RHOW:  And I didn't know why he -- at least on

21    our side, and we had a clear view, he clearly did raise his

22    hand on that.  And then when you asked him, he said, "No,

23    that's not the case."  And it just struck us as odd.  So on

24    that basis, it's not personal, but that would be a potential

25    for cause.
```

```
 1              THE COURT:  Any other challenges for cause?
 2         MR. RHOW:  No.
 3              THE COURT:  Okay.
 4         Counsel?
 5              MR. DOREN:  Your Honor --
 6              THE COURT:  Introduce yourself.
 7              MR. DOREN:  Thank you.  Thank you.  We'll get
 8    through this.  Richard Doren.
 9              Again, the only juror I have a potential issue with
10    is Number 10, who talked about his concerns about not being
11    able to keep his work as a civil litigator support for the city
12    out of the jury room.  And, you know, the risk that he would
13    bring things in from outside the record, and his expertise from
14    there as well.  So we would ask that he be excused for cause.
15              THE COURT:  What about Number 6?
16              MR. DOREN:  On Number 6, I did see him raise his
17    hand, but I did not really see him changing his answer so much
18    as explaining his position.  And I believe -- is he the one
19    whose refrigerator had a bad compressor or something?  And then
20    as he talked more about it, he said he could clearly be
21    impartial.  So I don't see it, Your Honor.
22              THE COURT:  Okay.
23              And, Counsel, what's your position on Juror
24    Number 10?
25              MR. RHOW:  If there is a for-cause challenge, we are
```

```
 1   fine with that.

 2            THE COURT:  Okay.  I think we will -- why don't I

 3   let you go back to your seats.  I'm just going to go over my

 4   notes quickly and then -- well, let me see.

 5            MR. DOREN:  Thank you, Your Honor.

 6            MR. RHOW:  Thank you, Your Honor.

 7            THE COURT:  You don't have to come back up.

 8            MR. LO:  Okay.  Thank you, Your Honor.

 9            (Held in open court.)

10            THE COURT:  At this point we are going to break for

11   lunch, and we are going to come back at five after 1:00 to

12   continue the process.

13            THE COURTROOM DEPUTY:  All rise.

14            (At 12:00 p.m. the lunch recess was taken.)

15

16

17

18

19

20

21

22

23

24

25
```

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6     COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7     FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8     THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9     THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12    IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13    CONFERENCE OF THE UNITED STATES.

14

15

16                          DATED THIS  1ST  DAY OF DECEMBER, 2021.

17

18

19                     /S/ MAREA WOOLRICH

20                     _____
                       MAREA WOOLRICH, CSR NO. 12698, CCRR
                       FEDERAL OFFICIAL COURT REPORTER
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**$**

**$1.32** [1] - 12:4
**$427,051** [1] - 12:8
**$500,000** [1] - 18:12

**'**

**'You** [1] - 19:13

**1**

**1** [15] - 3:1, 3:5, 13:20, 15:14, 17:21, 32:14, 42:9, 59:3, 59:4, 60:2, 62:21, 63:4, 63:12, 64:16, 66:7
**1.32** [3] - 5:17, 26:10, 26:21
**10** [25] - 6:11, 15:6, 21:22, 24:13, 30:10, 30:16, 32:23, 32:25, 35:15, 35:16, 36:15, 62:14, 63:15, 65:9, 82:7, 113:11, 113:12, 113:14, 113:18, 113:19, 115:20, 118:2, 133:10, 133:24
**10-minute** [1] - 113:13
**100** [1] - 23:20
**11** [6] - 8:22, 63:15, 116:2, 118:3, 118:4, 120:11
**11-year** [1] - 76:20
**11-year-old** [1] - 76:25
**11:18** [1] - 113:16
**12** [3] - 120:12, 120:13, 123:22
**12.5** [4] - 7:22, 7:24, 8:6, 8:12
**120** [1] - 70:13
**12:00** [1] - 134:14
**13** [4] - 63:15, 123:23, 123:24, 127:6
**1333** [3] - 15:6, 24:14, 30:16
**14** [3] - 127:7, 131:22, 132:9
**152** [9] - 15:6, 24:13, 25:19, 30:17, 32:7, 33:10, 34:3, 36:16, 38:3
**152B** [1] - 25:18
**17** [2] - 63:15, 68:19
**1791** [1] - 55:5
**18** [7] - 15:13, 41:3, 63:8, 63:16, 63:25, 64:1, 91:2
**1875** [1] - 2:10

**18th** [1] - 2:13
**1:00** [1] - 134:11

**2**

**2** [6] - 13:20, 63:4, 63:12, 70:22, 71:13, 75:23
**20** [5] - 41:3, 63:16, 115:19, 124:14
**20-993** [2] - 3:6, 42:10
**2000** [2] - 34:9, 41:12
**2007** [2] - 40:23, 41:6
**2012** [1] - 41:12
**2013** [1] - 41:13
**2015** [1] - 34:8
**2017** [3] - 16:20, 34:9, 34:10
**2018** [2] - 19:11, 34:8
**2021** [1] - 3:1
**21** [2] - 63:16, 114:25
**22** [3] - 63:16, 64:16, 124:4
**23rd** [1] - 2:10
**243** [1] - 8:22
**25** [1] - 114:16
**26** [1] - 115:20

**3**

**3** [5] - 50:5, 63:13, 75:25, 76:1, 81:6
**3.1** [2] - 11:2, 11:10
**30** [3] - 118:9, 122:3, 122:4
**333** [1] - 2:6
**3D** [1] - 68:5

**4**

**4** [7] - 13:20, 15:14, 63:13, 81:8, 81:9, 85:12
**400** [1] - 2:13
**427051.6** [1] - 10:11
**4:30** [2] - 62:8, 53:12

**5**

**5** [15] - 38:10, 39:1, 39:12, 40:12, 40:13, 50:6, 53:10, 63:4, 63:13, 63:24, 64:16, 85:13, 85:14, 90:16, 113:24
**5-miles-per-hour** [1] - 40:11
**5.5** [4] - 6:13, 6:21, 13:25, 21:14
**509** [6] - 20:16, 20:22,

31:17, 31:19, 34:1, 35:5

**6**

**6** [14] - 62:16, 62:18, 62:19, 63:13, 63:23, 63:24, 64:7, 64:8, 90:19, 90:20, 132:13, 133:15, 133:16
**6.2** [1] - 28:17
**60** [6] - 38:11, 38:15, 38:19, 39:1, 39:12, 40:14
**60-miles-per-hour** [1] - 40:11
**6:00** [1] - 82:4

**7**

**7** [6] - 15:12, 15:13, 96:8, 96:9, 102:7, 102:11
**7.5** [1] - 6:11
**7C** [1] - 44:7

**8**

**8** [12] - 5:18, 14:20, 15:14, 26:10, 26:22, 62:16, 62:17, 63:13, 64:6, 102:12, 102:14, 108:16
**8:35** [1] - 3:2
**8th** [2] - 104:25, 105:5

**9**

**9** [3] - 108:18, 108:19, 113:10
**9-year-old** [1] - 76:21
**90-minute** [2] - 68:5, 111:12
**900** [1] - 20:10
**90067** [1] - 2:11
**90071** [2] - 2:6, 2:14
**9:00** [2] - 53:8, 53:12
**9:08** [1] - 27:8

**A**

**A.M** [1] - 3:2
**a.m** [4] - 27:8, 53:8, 53:12, 113:16
**abandoned** [1] - 6:8
**abide** [5] - 19:21, 45:23, 47:19, 49:2, 123:3
**abilities** [1] - 86:9
**ability** [6] - 11:24,

19:3, 34:16, 39:6, 118:25, 122:15
**able** [40] - 15:2, 17:23, 34:25, 35:19, 36:2, 47:1, 58:18, 64:15, 65:23, 69:23, 72:17, 75:5, 81:1, 89:4, 92:25, 93:9, 99:20, 99:23, 100:2, 100:19, 100:21, 101:16, 101:22, 105:4, 105:11, 107:17, 107:23, 108:11, 110:7, 115:11, 115:15, 115:19, 116:6, 116:8, 119:24, 120:1, 120:6, 122:20, 131:18, 133:11
**abroad** [1] - 103:5
**absolutely** [3] - 77:14, 79:8, 81:4
**ACC** [1] - 95:17
**accept** [3] - 10:17, 33:12, 91:22
**acceptable** [1] - 5:24
**accidents** [1] - 116:16
**accommodations** [1] - 4:2
**accordance** [1] - 19:21
**accordingly** [1] - 9:1
**account** [1] - 83:5
**accusations** [1] - 116:19
**acquit** [1] - 66:5
**act** [1] - 85:3
**acted** [1] - 19:21
**action** [2] - 91:22, 114:16
**active** [1] - 83:4
**actual** [2] - 18:16, 20:21
**add** [2] - 9:25, 10:2
**addition** [1] - 54:24
**additional** [2] - 44:13, 59:11
**address** [2] - 28:14, 38:2
**adjudicate** [2] - 9:1, 12:23
**adjudicated** [1] - 38:24
**admissibility** [1] - 27:14
**admissible** [3] - 13:22, 14:6, 14:7
**admission** [2] - 9:20, 10:6

**admitted** [2] - 57:15, 57:20
**adult** [18] - 65:19, 66:17, 66:18, 66:22, 71:21, 73:22, 76:7, 81:14, 91:1, 96:15, 102:23, 104:14, 104:16, 104:17, 104:18, 113:25, 118:11, 127:15
**advance** [1] - 19:13
**advantage** [2] - 94:20, 109:15
**advertising** [2] - 118:8, 119:3
**Aerospace** [1] - 66:21
**affects** [1] - 7:5
**afraid** [1] - 105:17
**afterwards** [1] - 123:14
**ageism** [2] - 94:17, 94:25
**ago** [4] - 40:22, 41:3, 91:3, 126:16, 127:19, 127:21
**agree** [4] - 12:10, 32:12, 35:24, 35:25
**Agreement** [2] - 5:13, 54:1
**agreement** [5] - 21:8, 35:17, 35:22, 36:4
**AI** [1] - 85:22
**air** [1] - 130:16
**Air** [1] - 71:17
**airfare** [1] - 99:2
**airport** [2] - 106:24, 107:1
**Akemann** [1] - 52:6
**allocation** [56] - 14:3, 14:12, 14:18, 14:19, 15:7, 15:8, 15:25, 16:9, 16:13, 16:18, 16:19, 16:21, 17:1, 17:14, 18:11, 18:16, 19:6, 19:13, 20:11, 21:3, 21:20, 21:24, 22:1, 22:2, 22:8, 22:17, 23:11, 23:12, 23:25, 24:8, 24:22, 24:25, 25:5, 27:12, 27:18, 30:10, 30:12, 30:20, 33:1, 33:4, 33:5, 34:18, 34:20, 34:21, 35:2, 35:24, 36:7, 37:8, 37:11, 37:12, 39:19
**allocations** [26] - 13:21, 13:22, 15:16, 17:16, 17:24, 17:25, 18:2, 19:2, 19:16,

19:18, 19:19, 19:22, 19:25, 20:1, 20:5, 23:19, 27:19, 27:21, 28:1, 28:4, 28:8, 33:17, 34:7, 34:9, 36:22
**allots** [1] - 6:10
**allow** [1] - 77:12
**allowed** [13] - 8:13, 16:12, 24:19, 34:19, 35:15, 50:9, 51:1, 51:3, 57:8, 59:6, 59:11, 114:4
**allowing** [1] - 31:20
**almost** [3] - 55:18, 56:4, 112:10
**alternatively** [1] - 22:4
**Alvarez** [1] - 112:18
**amazing** [1] - 76:23
**Amendment** [2] - 55:7, 56:6
**America** [1] - 21:23
**amount** [23] - 7:20, 8:9, 9:4, 9:17, 9:21, 10:2, 10:7, 10:16, 10:17, 13:2, 15:4, 16:14, 20:11, 20:15, 20:21, 29:17, 31:18, 31:19, 31:21, 31:22, 31:24, 37:4, 37:5
**analogy** [4] - 39:12, 40:7, 40:11, 40:14
**analysis** [2] - 10:23, 29:12
**analyst** [3] - 85:18, 96:14, 98:11
**Angeles** [7] - 2:6, 2:11, 2:14, 96:12, 113:22, 115:21, 116:16
**ANGELES** [1] - 3:1
**angry** [1] - 85:2
**answer** [26] - 19:12, 46:6, 46:7, 46:14, 46:17, 47:3, 47:4, 62:4, 66:8, 71:13, 75:2, 76:1, 81:9, 85:14, 90:20, 96:9, 102:15, 108:19, 109:1, 113:20, 118:4, 120:13, 123:24, 127:9, 132:18, 133:17
**answered** [1] - 62:5
**answers** [2] - 45:19, 46:19
**Antelope** [1] - 71:15
**antibiotics** [1] - 4:7
**anticipatorily** [1] - 14:12

**anticipatory** [3] - 22:24, 23:4, 37:13
**anyway** [2] - 6:12, 29:10
**apart** [2] - 31:16, 55:11
**apartment** [1] - 85:25
**APPEARANCES** [1] - 2:1
**appearances** [2] - 3:7, 42:11
**Apple** [4] - 41:14, 69:15, 87:2, 115:6
**application** [4] - 96:12, 96:17, 96:20, 97:7
**applications** [1] - 96:25
**applied** [2] - 23:1, 40:15
**applies** [3] - 28:16, 29:12, 56:6
**apply** [7] - 7:24, 8:12, 15:4, 56:7, 57:6, 57:9
**applying** [4] - 8:14, 16:24, 57:10, 61:19
**appreciate** [4] - 43:13, 43:17, 90:16, 127:25
**appropriate** [2] - 11:11, 28:2
**April** [1] - 70:16
**arbitrary** [1] - 35:1
**arbitration** [1] - 91:19
**area** [10] - 58:24, 65:16, 65:17, 76:3, 82:2, 85:17, 90:22, 110:15, 110:16, 118:6
**argue** [11] - 8:6, 14:3, 15:2, 15:20, 17:8, 19:18, 24:19, 27:21, 28:11, 37:8, 39:7
**argued** [1] - 27:25
**arguing** [7] - 14:18, 17:14, 17:25, 27:19, 28:4, 28:7, 32:9
**argument** [17] - 15:7, 15:15, 19:1, 21:7, 22:11, 22:15, 22:20, 22:24, 23:5, 23:6, 23:13, 23:18, 28:6, 28:12, 33:18, 36:12
**arguments** [10] - 19:15, 20:14, 21:17, 23:10, 24:4, 24:17, 47:23, 48:1, 52:21, 52:22
**arising** [1] - 38:14
**Arista** [1] - 70:13

**arms** [1] - 97:23
**artificial** [2] - 28:18, 85:20
**arts** [1] - 124:23
**aside** [3] - 116:3, 117:12, 117:16
**asserts** [2] - 5:21, 54:6
**assess** [1] - 39:3
**assigned** [1] - 51:6
**associated** [1] - 18:8
**associations** [2] - 81:13, 81:23
**assuming** [2] - 13:2, 21:1
**assumption** [1] - 18:1
**attachment** [1] - 25:18
**attack** [1] - 36:6
**attempt** [2] - 15:19, 30:13
**attempted** [1] - 6:20
**attention** [2] - 107:15, 107:18
**Attorney's** [2] - 115:23, 116:17
**audible** [3] - 45:6, 78:11, 80:21
**audiences** [1] - 90:13
**authority** [1] - 10:20
**automatically** [2] - 32:2, 35:11
**availability** [1] - 23:23
**availing** [1] - 78:25
**Avenue** [1] - 2:6
**avoid** [14] - 5:22, 12:17, 54:7, 72:14, 73:17, 75:5, 83:25, 86:11, 87:21, 88:4, 120:8, 120:9, 123:10, 125:22
**aware** [4] - 41:20, 50:21, 51:1, 69:3
**awful** [1] - 126:4

## B

**bachelor's** [1] - 80:23
**backdoor** [1] - 22:14
**background** [1] - 43:19
**backseat** [1] - 118:1
**bad** [6] - 31:15, 37:18, 60:10, 63:20, 93:23, 133:19
**badge** [5] - 49:23, 49:24, 50:7, 50:9, 50:17
**badges** [1] - 50:20
**Bali** [3] - 99:6, 99:7, 99:12
**Ball** [1] - 66:21

**ball** [1] - 130:19
**bar** [9] - 108:22, 109:6, 109:9, 109:11, 109:14, 110:21, 110:22, 110:25, 112:4
**Barbara** [1] - 114:1
**barring** [1] - 6:15
**baseball** [2] - 77:3, 77:16
**based** [2] - 6:21, 8:10, 10:3, 12:23, 15:18, 15:25, 18:6, 24:9, 24:10, 31:4, 48:3, 56:17, 58:12, 59:15, 72:11, 81:2, 82:23, 101:16, 110:6, 114:10, 115:12, 115:16
**basis** [7] - 7:15, 18:22, 20:15, 20:17, 27:13, 36:25, 132:24
**basketball** [3] - 95:3, 95:17, 130:18
**battery** [2] - 77:25, 78:4
**beach** [1] - 99:11
**Beach** [1] - 96:11
**bearing** [2] - 14:24, 92:7
**became** [2] - 23:6, 104:15
**become** [2] - 18:8, 23:9
**becomes** [2] - 16:3, 36:8
**becoming** [2] - 113:6, 117:23
**begin** [1] - 52:23
**beginning** [1] - 6:12
**behalf** [10] - 3:8, 3:11, 3:14, 3:17, 3:20, 3:22, 42:13, 42:15, 42:17, 42:23
**behind** [2] - 16:12, 47:22
**best** [8] - 16:18, 16:19, 60:8, 60:9, 91:21, 107:14, 109:9, 131:7
**better** [9] - 31:8, 32:5, 55:21, 76:16, 85:7, 85:10, 96:7, 123:19
**Betty** [1] - 118:13
**between** [11] - 5:11, 24:18, 24:23, 41:3, 47:10, 47:13, 47:15, 53:24, 61:10, 68:17, 117:19
**beyond** [7] - 35:12, 36:9, 36:14, 61:13,

61:16, 61:22, 65:17
**bias** [10] - 41:19, 60:14, 73:10, 78:19, 82:22, 87:4, 92:16, 101:11, 114:10, 119:6
**biased** [5] - 60:22, 60:23, 64:23, 65:2, 115:8
**biases** [2] - 60:5, 60:10
**big** [13] - 16:17, 35:24, 36:1, 49:2, 86:7, 87:17, 89:4, 89:8, 89:9, 94:1, 95:20, 117:2, 130:3
**bigger** [1] - 94:17
**biggest** [1] - 97:14
**Bill** [4] - 54:25, 55:5, 55:6, 55:8
**BIRD** [1] - 2:9
**bit** [16] - 10:15, 20:4, 43:24, 45:22, 49:1, 53:10, 54:15, 59:5, 60:1, 78:1, 81:1, 86:6, 87:2, 93:25, 107:6, 113:14
**black** [1] - 68:5
**blame** [1] - 4:15
**blank** [1] - 78:13
**blanking** [1] - 101:7
**blanks** [1] - 110:19
**blew** [1] - 74:25
**bliss** [1] - 122:10
**BLM** [1] - 115:22
**blog** [1] - 131:11
**blond** [1] - 94:22
**blue** [1] - 95:8
**blurry** [1] - 68:10
**blurry-eyed** [1] - 68:10
**Board** [1] - 118:14
**board** [8] - 66:8, 76:2, 81:10, 85:15, 90:21, 96:10, 113:20, 120:14
**body** [1] - 48:3
**books** [1] - 49:3
**bother** [2] - 19:14, 109:10
**bottom** [1] - 15:11
**bounce** [1] - 90:9
**boundary** [2] - 30:15, 30:25
**box** [16] - 16:16, 22:5, 23:14, 25:2, 25:6, 25:10, 35:4, 36:21, 44:6, 51:5, 60:4, 60:13, 72:7, 103:11, 117:24, 130:25
**BOXER** [1] - 2:9

**boxer** [1] - 112:16
**boxers** [1] - 112:24
**boxes** [2] - 71:18, 74:13
**boxing** [4] - 112:8, 112:10, 112:14, 112:15
**boy** [3] - 76:20, 76:25, 126:13
**boyfriend** [4] - 48:6, 96:14, 98:10, 100:17
**breach** [23] - 11:2, 14:23, 14:25, 16:21, 17:11, 18:16, 25:5, 25:6, 25:8, 28:22, 31:2, 31:16, 32:8, 35:12, 37:9, 38:8, 38:13, 38:24, 39:8, 39:15, 50:18, 54:5
**breached** [9] - 5:14, 14:10, 14:12, 15:24, 26:7, 26:18, 30:16, 39:13, 54:1
**breaches** [1] - 5:20
**break** [5] - 25:21, 27:3, 41:23, 113:13, 134:10
**breakthrough** [1] - 4:10
**brief** [3] - 26:4, 27:8, 113:16
**briefing** [4] - 8:3, 8:10, 8:16
**briefly** [2] - 40:6, 40:8
**bright** [1] - 110:11
**bring** [3] - 78:19, 83:21, 133:13
**bringing** [1] - 74:15
**broad** [1] - 21:7
**brought** [1] - 94:25
**Bruin** [2] - 95:10, 130:22
**Bruins** [2] - 95:6, 131:1
**buddies** [1] - 117:3
**budding** [1] - 113:3
**build** [1] - 47:23
**building** [1] - 85:25
**Bum** [1] - 52:9
**bunch** [1] - 130:8
**burden** [5] - 47:16, 61:11, 61:12, 61:25, 119:25
**bus** [1] - 98:7
**business** [24] - 17:22, 34:16, 34:24, 39:5, 39:8, 40:3, 47:11, 63:3, 65:5, 65:6, 78:16, 84:11, 84:16, 92:2, 92:24, 94:10,

94:16, 94:18, 103:4, 109:20, 114:10, 119:4, 125:8, 125:9
**businesses** [1] - 117:19
**busy** [5] - 73:22, 79:20, 98:23, 106:9, 120:20
**but..** [2] - 79:14, 116:20
**buy** [6] - 22:18, 70:14, 73:5, 91:9, 92:13
**buying** [2] - 91:10, 96:25
**BY** [6] - 2:4, 2:5, 2:5, 2:10, 2:12, 2:13
**Byungyeop** [1] - 52:8

**C**

**CA** [3] - 2:6, 2:11, 2:14
**cafeteria** [1] - 50:24
**CALIFORNIA** [1] - 3:1
**California** [2] - 82:2, 118:7
**Calvin** [1] - 114:2
**Canelo** [1] - 112:18
**cannot** [2] - 24:25, 33:12, 39:2
**cap** [27] - 28:24, 29:8, 29:9, 29:12, 29:13, 29:14, 29:15, 29:16, 30:19, 31:2, 31:3, 31:8, 31:9, 31:10, 31:15, 32:6, 32:10, 32:11, 32:14, 32:18, 32:21, 33:3, 35:7, 35:8, 35:12
**capacity** [1] - 115:24
**capped** [3] - 18:17, 29:4, 29:18
**caps** [4] - 25:3, 28:18, 28:21, 30:5
**captain's** [1] - 113:24
**car** [2] - 38:9, 56:21
**cardiologist** [5] - 124:2, 124:8, 124:18, 125:1, 125:19
**cards** [1] - 74:10
**care** [2] - 78:20, 81:25
**careful** [1] - 49:7
**cares** [1] - 95:14
**case** [112] - 5:1, 5:4, 5:11, 5:23, 6:14, 6:21, 10:8, 13:23, 15:19, 25:9, 26:2, 28:23, 40:5, 41:1, 41:2, 43:22, 44:8, 47:6, 47:9, 47:11,

47:14, 47:21, 48:4, 48:7, 48:12, 48:18, 48:25, 49:10, 49:16, 52:4, 53:18, 53:19, 53:24, 54:9, 54:10, 54:12, 56:15, 56:16, 57:16, 57:18, 57:21, 58:5, 58:12, 58:17, 59:12, 59:14, 59:19, 59:20, 61:10, 61:12, 66:1, 70:2, 70:4, 72:11, 73:14, 75:6, 75:11, 79:7, 79:12, 79:16, 81:2, 83:8, 85:5, 85:6, 87:22, 88:16, 88:21, 89:14, 89:19, 92:5, 92:17, 92:23, 93:7, 93:8, 94:2, 94:3, 96:7, 100:15, 100:18, 100:22, 100:24, 101:16, 102:5, 105:12, 105:21, 106:5, 107:22, 108:12, 110:1, 110:3, 110:14, 115:12, 115:16, 116:9, 117:13, 117:19, 118:23, 119:15, 119:21, 119:25, 120:3, 122:20, 122:22, 122:23, 123:16, 125:17, 127:3, 128:8, 132:23
**cases** [21] - 4:11, 41:13, 47:9, 47:15, 55:13, 55:14, 55:16, 55:17, 55:18, 55:19, 55:24, 58:10, 58:11, 58:14, 58:17, 61:10, 61:25, 117:9, 128:7
**cast** [2] - 126:10, 126:15
**catching** [1] - 78:1
**categorized** [1] - 8:25
**caters** [1] - 131:9
**caused** [1] - 22:19
**causes** [1] - 119:21
**caution** [2] - 26:16, 27:16
**CCD** [1] - 67:10
**CDC** [1] - 70:24
**cellphone** [2] - 73:1, 108:4
**cellphones** [3] - 51:21, 51:23, 51:24
**Century** [1] - 2:10
**CEO** [3] - 22:5, 22:7, 42:19

**certain** [7] - 15:25, 16:13, 58:13, 102:7, 102:8, 102:9, 111:24
**certainly** [8] - 6:19, 13:1, 14:5, 14:10, 15:23, 20:21, 48:13, 70:15
**cetera** [2] - 30:11
**chain** [1] - 10:20
**challenge** [2] - 126:24, 133:25
**challenges** [3] - 43:25, 132:10, 133:1
**chance** [1] - 9:6
**change** [4] - 22:8, 35:9, 55:2, 57:8
**changed** [1] - 132:18
**changes** [3] - 34:15, 36:17, 38:23
**changing** [3] - 36:22, 55:3, 133:17
**chaos** [1] - 68:6
**characterization** [1] - 35:8
**characterize** [1] - 32:13
**characterized** [1] - 12:15
**characterizes** [1] - 31:15
**chart** [1] - 33:16
**cheap** [1] - 99:2
**cheaper** [1] - 29:8
**chef** [2] - 127:17, 131:4
**chief** [3] - 12:2, 38:1
**child** [3] - 36:15, 104:10, 104:17
**children** [16] - 65:19, 66:17, 66:18, 66:22, 71:21, 73:22, 76:7, 79:21, 86:1, 91:1, 96:15, 108:24, 113:25, 118:11, 120:17, 127:15
**chips** [1] - 97:11
**chock** [1] - 32:7
**chock-full** [1] - 32:7
**choice** [2] - 73:6, 96:2
**Christmas** [2] - 74:5, 74:20
**chuck** [1] - 16:16
**Chuck** [4] - 3:16, 42:19, 44:20, 52:6
**circuit** [1] - 67:12
**circumstances** [2] - 28:11, 31:4
**cite** [1] - 8:21
**citizen** [2] - 56:5, 71:22

**citizens** [4] - 56:4, 56:7, 56:9, 111:22
**city** [9] - 81:11, 106:19, 115:23, 116:12, 116:16, 116:19, 117:17, 127:12, 133:11
**City** [5] - 74:5, 113:22, 115:21, 115:23, 116:17
**civic** [2] - 43:15, 127:24
**civics** [1] - 54:22
**civil** [26] - 47:6, 47:9, 47:11, 47:15, 55:8, 55:12, 55:14, 55:16, 55:19, 55:24, 61:10, 61:25, 65:22, 66:1, 81:19, 89:2, 89:13, 93:7, 93:8, 115:21, 116:11, 116:13, 117:9, 133:11
**claim** [1] - 16:20
**claims** [5] - 5:19, 54:5, 84:17, 84:20, 84:25
**clarify** [1] - 30:13
**Clarita** [3] - 76:4, 113:21, 113:25
**clarity** [1] - 14:9
**class** [2] - 54:22, 114:16
**classes** [1] - 110:17
**classical** [1] - 124:15
**cleanser** [1] - 74:17
**clear** [8] - 9:23, 14:8, 14:14, 18:9, 18:13, 27:25, 130:16, 132:21
**clearly** [2] - 132:21, 133:20
**clerk** [1] - 104:24
**client** [1] - 41:23
**clients** [1] - 119:13
**close** [4] - 30:14, 63:7, 90:23, 97:19
**closed** [2] - 48:16, 90:7
**closer** [1] - 83:14
**closing** [1] - 52:22
**co** [1] - 91:16
**Co** [2] - 3:6, 42:10
**co-executive** [1] - 91:16
**coach** [3] - 77:7, 95:22, 96:4
**coached** [1] - 95:4
**coaches** [1] - 77:11
**coaching** [1] - 114:3
**coalesce** [1] - 5:2
**cold** [1] - 51:2

college [2] - 114:2, 130:19
color [1] - 56:25
Colorworks [1] - 67:21
combination [2] - 97:1, 97:2
comfortable [3] - 46:24, 71:9, 83:7
coming [10] - 8:15, 17:12, 30:3, 40:10, 43:13, 43:18, 55:21, 64:11, 87:6, 112:24
commend [1] - 127:24
commended [1] - 43:14
comment [1] - 25:23
comments [1] - 109:22
commercial [8] - 13:23, 14:5, 14:6, 15:16, 15:22, 15:23, 22:14, 28:10
commercially [2] - 15:2, 16:5
commit [1] - 77:7
commitment [1] - 77:8
commitments [1] - 70:5
communicate [3] - 47:21, 48:12, 50:9
communicating [1] - 49:15
communication [2] - 48:17
communications [1] - 118:13
companies [4] - 48:25, 85:22, 90:12, 98:1
company [15] - 17:20, 64:23, 68:17, 68:18, 68:21, 76:6, 81:16, 85:19, 89:5, 89:8, 89:9, 101:15, 103:24, 104:1
Company [4] - 5:9, 44:9, 44:10, 53:22
compare [1] - 58:10
comparing [1] - 33:10
competing [1] - 4:25
complaining [1] - 34:12
Complaint [1] - 23:4
completely [2] - 18:23, 51:22
completeness [1] - 15:12
complex [1] - 86:1
components [5] - 5:8,

5:10, 53:22, 53:23, 63:3
compose [1] - 107:9
compression [1] - 67:16
compressor [1] - 133:19
compressors [1] - 114:14
compromise [1] - 54:23
computer [12] - 5:8, 5:9, 5:15, 26:8, 26:19, 53:21, 53:23, 54:2, 86:7, 87:17, 96:12, 96:17
computers [2] - 69:21, 72:5
con [1] - 111:15
concept [2] - 37:12, 37:13
concern [3] - 118:25, 122:14, 131:18
concerns [1] - 133:10
concierge [1] - 121:2
concise [1] - 9:9
conclude [1] - 36:18
concludes [1] - 11:19
conclusion [2] - 11:18, 81:18
conduct [1] - 39:16
Conejo [1] - 127:13
confer [2] - 6:25, 41:23
conference [1] - 6:7
confused [1] - 105:25
confusion [3] - 10:1, 10:3, 12:18
congestion [1] - 98:15
consciously [1] - 69:3
consequences [1] - 25:7
consequential [10] - 7:15, 7:20, 7:22, 8:6, 8:10, 8:13, 8:25, 10:5, 11:6, 11:12
consider [2] - 12:25, 58:18
considered [1] - 55:3
considering [1] - 10:4
consistent [2] - 9:12, 18:24
Constitution [9] - 54:18, 54:21, 54:24, 55:8, 56:2, 56:5, 56:9, 56:10, 56:11
construct [1] - 6:21
construction [1] - 47:12
consultant [2] - 41:10,

41:15
contacts [1] - 41:18
containing [1] - 33:24
context [1] - 41:5
continue [2] - 71:10, 134:12
continues [1] - 6:3
contract [31] - 5:11, 6:9, 21:4, 21:6, 39:14, 47:13, 53:24, 62:15, 62:19, 62:23, 62:24, 65:4, 65:6, 68:12, 70:4, 72:3, 72:4, 78:15, 84:10, 84:16, 91:6, 101:19, 101:20, 110:15, 116:6, 117:19, 119:4, 125:9, 128:22, 129:4
contracts [1] - 117:21
contrary [1] - 35:22
control [2] - 71:16, 98:13
conversation [1] - 50:18
converse [2] - 28:12, 28:15
convey [1] - 85:9
convict [1] - 66:5
convinced [2] - 13:5, 32:20
cook [1] - 129:8
cooperative [1] - 7:1
copies [1] - 25:12
corner [2] - 98:7, 98:8
correct [24] - 10:12, 26:12, 28:9, 31:4, 31:5, 32:10, 36:24, 45:17, 63:5, 68:25, 72:2, 78:16, 88:24, 92:9, 93:4, 104:8, 108:2, 109:3, 109:7, 114:8, 114:23, 114:24, 118:18, 124:19
correspondence [1] - 41:4
costly [1] - 98:5
Counsel [7] - 9:14, 11:4, 24:15, 25:11, 29:21, 43:11, 133:23
counsel [13] - 3:7, 7:1, 8:20, 12:13, 12:23, 15:9, 17:4, 19:24, 24:16, 27:1, 42:11, 132:3, 133:4
COUNSEL [1] - 2:1
counselor [1] - 114:1
count [1] - 122:3
counter [2] - 20:9

countries [2] - 55:16, 64:21
country [9] - 55:12, 55:13, 55:22, 55:25, 60:20, 64:22, 97:15, 111:21, 111:22
County [2] - 113:23, 127:11
couple [5] - 4:24, 23:2, 41:11, 41:13, 73:22
course [9] - 7:25, 8:12, 33:6, 50:10, 85:16, 89:13, 90:2, 91:22, 114:16
courses [1] - 117:6
court [24] - 17:8, 27:6, 49:1, 54:17, 57:4, 57:15, 57:22, 58:9, 58:18, 61:1, 72:12, 78:19, 79:11, 84:4, 84:17, 84:20, 84:25, 93:19, 100:18, 103:2, 103:3, 119:7, 132:7, 134:9
Court [47] - 5:3, 6:5, 6:7, 6:10, 6:17, 8:21, 8:23, 8:24, 8:25, 9:2, 9:6, 11:11, 11:15, 11:17, 11:19, 11:20, 11:21, 11:25, 12:1, 12:10, 12:11, 13:6, 15:3, 15:16, 17:7, 17:11, 17:20, 18:1, 18:5, 18:9, 18:19, 25:2, 27:23, 28:20, 29:5, 38:3, 38:24, 41:19, 45:14, 50:16, 52:19, 57:1, 57:11, 78:25, 110:17, 123:2
COURT [440] - 3:9, 3:12, 3:15, 3:18, 3:21, 4:4, 4:10, 4:13, 4:19, 4:22, 6:2, 7:8, 8:19, 9:13, 10:10, 10:14, 11:1, 11:4, 11:9, 11:21, 12:13, 13:5, 13:13, 15:9, 15:15, 17:3, 19:1, 19:5, 19:15, 19:23, 22:15, 23:17, 24:6, 24:11, 24:15, 25:11, 25:20, 25:25, 26:6, 26:15, 27:1, 27:3, 27:9, 28:3, 28:6, 28:10, 29:15, 29:21, 30:1, 31:1, 31:6, 31:12, 32:9, 32:20, 32:25, 33:3, 34:3, 34:6, 36:22, 37:23,

38:6, 39:11, 40:8, 40:17, 41:24, 42:2, 42:5, 42:8, 42:21, 43:1, 43:4, 43:7, 43:10, 44:21, 45:3, 45:7, 45:19, 59:1, 59:4, 62:19, 62:23, 62:25, 63:24, 64:1, 64:8, 66:14, 66:17, 66:19, 66:22, 67:1, 67:5, 67:8, 67:15, 67:24, 68:8, 68:16, 68:20, 68:24, 69:6, 69:9, 69:12, 69:16, 69:20, 69:23, 70:7, 70:10, 70:19, 70:22, 71:25, 72:6, 72:10, 72:17, 72:22, 72:25, 73:2, 73:9, 73:13, 73:19, 73:21, 74:6, 74:8, 74:19, 75:1, 75:5, 75:9, 75:16, 75:21, 76:10, 76:13, 76:16, 76:22, 76:24, 77:2, 77:4, 77:9, 77:15, 77:18, 77:23, 78:3, 78:7, 78:9, 78:12, 78:15, 78:18, 78:24, 79:2, 79:4, 79:6, 79:9, 79:15, 79:20, 79:24, 80:3, 80:8, 80:14, 80:19, 80:22, 80:25, 81:5, 81:8, 81:19, 81:22, 82:1, 82:6, 82:9, 82:16, 82:19, 82:22, 82:25, 83:4, 83:7, 83:10, 83:16, 83:19, 83:25, 84:2, 84:7, 84:13, 84:15, 84:19, 85:1, 85:6, 85:11, 86:3, 86:11, 86:14, 86:23, 87:6, 87:10, 87:13, 87:19, 87:21, 87:24, 88:7, 88:10, 88:15, 88:18, 88:23, 89:1, 89:6, 89:12, 89:16, 89:18, 89:23, 90:5, 90:15, 90:19, 91:5, 91:18, 91:25, 92:4, 92:8, 92:15, 92:19, 92:23, 93:3, 93:6, 93:9, 93:23, 94:2, 94:5, 94:9, 94:12, 94:19, 94:24, 95:2, 95:6, 95:10, 95:13, 95:17, 95:21, 95:25, 96:3, 96:6, 96:17, 96:24, 97:10, 97:14, 97:17, 97:20, 98:3, 98:10, 98:14,

98:17, 98:22, 99:3, 99:7, 99:13, 99:17, 99:20, 100:1, 100:5, 100:8, 100:11, 100:14, 100:17, 100:22, 101:1, 101:5, 101:8, 101:11, 101:14, 101:20, 101:24, 102:3, 102:5, 102:10, 102:14, 102:18, 103:1, 103:6, 103:9, 103:16, 103:20, 103:22, 104:1, 104:4, 104:6, 104:10, 104:13, 104:17, 104:21, 105:2, 105:4, 105:7, 105:14, 105:18, 105:24, 106:4, 106:9, 106:15, 106:17, 106:22, 107:2, 107:5, 107:7, 107:11, 107:14, 107:20, 108:1, 108:5, 108:8, 108:11, 108:15, 108:18, 109:1, 109:4, 109:6, 109:8, 109:17, 109:21, 109:24, 110:5, 110:9, 110:14, 110:21, 110:24, 111:3, 111:9, 111:13, 111:16, 111:20, 111:25, 112:4, 112:7, 112:9, 112:12, 112:14, 112:16, 112:19, 112:23, 113:2, 113:5, 113:9, 113:17, 114:6, 114:9, 114:13, 114:18, 114:22, 115:3, 115:7, 115:11, 115:14, 116:4, 116:13, 116:21, 116:25, 117:7, 117:17, 117:23, 118:2, 118:17, 118:20, 118:22, 118:25, 119:3, 119:6, 119:9, 119:14, 119:17, 119:21, 119:24, 120:5, 120:10, 120:19, 120:22, 121:4, 121:8, 121:14, 121:19, 121:25, 122:2,

122:4, 122:6, 122:12, 122:17, 122:19, 122:22, 123:2, 123:7, 123:9, 123:14, 123:19, 123:21, 124:8, 124:10, 124:17, 124:20, 125:1, 125:5, 125:8, 125:11, 125:15, 125:19, 125:25, 126:2, 126:6, 126:13, 126:17, 126:21, 126:23, 127:2, 127:5, 127:9, 127:22, 128:6, 128:10, 128:13, 128:15, 128:22, 129:3, 129:6, 129:10, 129:13, 129:16, 129:19, 129:24, 130:3, 130:5, 130:10, 130:13, 130:15, 130:20, 130:22, 130:24, 131:7, 131:12, 131:16, 131:21, 132:6, 132:19, 133:1, 133:3, 133:6, 133:15, 133:22, 134:2, 134:7, 134:10
**Court's** [7] - 5:23, 6:4, 9:12, 18:24, 28:15, 28:16, 29:2
**courthouse** [2] - 44:8, 51:2
**COURTROOM** [7] - 3:5, 26:14, 27:6, 42:9, 113:15, 132:3, 134:13
**Courtroom** [1] - 44:7
**courtroom** [6] - 45:11, 45:13, 50:11, 51:7, 51:9, 51:19
**courts** [2] - 54:20, 127:25
**cover** [1] - 84:22
**coverage** [1] - 47:8
**COVID** [2] - 4:9, 4:14, 43:16, 70:24, 90:6, 94:12, 120:16, 120:19, 121:2, 121:14, 121:15, 121:23
**crafting** [1] - 74:25
**crafts** [4] - 73:25, 74:4, 74:9, 75:3
**crash** [1] - 56:21
**crazy** [1] - 123:14

**create** [1] - 13:16
**created** [1] - 74:2
**creates** [1] - 78:1
**credibility** [3] - 34:22, 34:24, 35:3
**credible** [1] - 35:20
**crew** [1] - 76:5
**criminal** [20] - 47:9, 47:14, 47:15, 55:17, 55:18, 61:10, 61:12, 65:22, 66:3, 72:16, 72:18, 80:23, 81:20, 81:21, 93:7, 116:2, 116:5, 118:15, 119:25, 127:19
**critically** [5] - 48:19, 55:6, 55:10, 55:25, 56:1
**cross** [5] - 19:9, 32:3, 32:7, 36:3, 49:7
**cross-examine** [2] - 19:9, 36:3
**cross-examined** [1] - 49:7
**crosses** [1] - 116:8
**crossword** [2] - 129:9, 129:10
**CRUTCHER** [1] - 2:4
**curb** [1] - 20:5
**curbed** [1] - 19:3
**cusp** [1] - 113:6
**customer** [1] - 63:20
**customers** [6] - 34:17, 35:10, 36:17, 37:19, 39:6, 39:8
**customization** [1] - 97:4
**cut** [3] - 16:8, 16:23, 24:10
**CV** [2] - 3:6, 42:10

# D

**daily** [1] - 80:13
**damage** [2] - 8:10, 22:19
**damaged** [8] - 22:16, 28:25, 29:14, 29:15, 29:17, 31:11, 40:1, 65:6
**damages** [52] - 5:19, 5:20, 5:22, 6:14, 7:15, 7:22, 8:6, 8:13, 8:25, 9:8, 10:2, 10:24, 11:1, 11:5, 11:6, 11:7, 11:10, 11:12, 11:24, 12:12, 14:24, 15:4, 17:18, 18:8, 18:22, 19:1, 19:8, 20:20, 23:8,

25:8, 28:23, 29:5, 29:6, 29:10, 33:8, 38:7, 38:8, 38:13, 38:17, 38:21, 39:3, 39:10, 39:14, 40:5, 54:5, 54:6, 54:8, 58:1, 101:21, 110:14, 116:6
**dangerous** [1] - 49:12
**data** [1] - 85:18
**daughter** [7] - 66:24, 79:22, 95:5, 113:25, 124:4, 127:17, 131:4
**days** [10] - 6:6, 6:10, 68:4, 70:13, 77:9, 93:12, 111:1, 111:2, 111:3, 126:16
**de** [1] - 124:16
**deal** [8] - 10:20, 12:5, 27:22, 35:24, 36:1, 65:5, 65:6, 129:1
**dealing** [3] - 86:5, 116:5
**dealings** [1] - 114:10
**debated** [1] - 54:22
**DECEMBER** [1] - 3:1
**decide** [31] - 8:24, 9:17, 9:24, 10:4, 10:8, 11:11, 12:1, 12:11, 55:16, 55:17, 55:19, 55:23, 56:16, 56:17, 56:24, 57:1, 57:2, 57:8, 57:16, 57:25, 58:13, 59:12, 59:14, 59:19, 73:14, 81:2, 101:16, 101:22, 107:21, 108:12, 115:16
**decided** [10] - 14:22, 15:19, 21:23, 33:1, 35:13, 39:13, 55:22, 55:24, 59:22, 66:4
**decides** [5] - 9:23, 10:5, 56:25, 57:1, 57:2
**deciding** [5] - 57:18, 57:21, 72:11, 120:2, 123:16
**decision** [3] - 14:23, 94:3, 125:17
**decision-making** [1] - 125:17
**decisions** [1] - 82:13
**declarations** [1] - 13:9
**decline** [1] - 129:20
**declines** [1] - 9:1
**deemed** [1] - 6:8
**defend** [2] - 22:9, 116:19
**DEFENDANT** [1] - 2:8

**defendant** [3] - 5:8, 53:22, 66:2
**defendants** [1] - 44:21
**defenses** [1] - 6:8
**defer** [1] - 125:20
**definitely** [16] - 30:10, 40:18, 86:6, 86:10, 86:17, 86:19, 87:1, 87:2, 87:16, 89:15, 90:10, 90:11, 122:21, 123:13, 123:20
**definition** [2] - 12:11, 25:5
**degree** [2] - 72:16, 72:18
**deliberate** [2] - 48:3, 52:25
**deliberated** [1] - 127:19
**deliberating** [2] - 53:3, 53:15
**deliberations** [3] - 52:23, 59:12, 117:12
**deliver** [1] - 68:3
**delivered** [2] - 70:17, 97:25
**delivery** [2] - 67:18, 68:4, 70:5
**delta** [1] - 31:25
**demand** [1] - 25:3
**demands** [1] - 19:21
**Demonstrative** [1] - 20:16
**denied** [1] - 7:16
**denies** [2] - 5:20, 54:6
**dentist** [2] - 60:16, 60:17
**Department** [1] - 113:24
**department** [5] - 66:21, 115:1, 115:20, 116:12, 128:20
**deposition** [2] - 16:4, 16:6
**DEPUTY** [7] - 3:5, 26:14, 27:6, 42:9, 113:15, 132:3, 134:13
**deputy** [3] - 25:14, 45:11, 51:20
**describe** [1] - 59:22
**design** [2] - 118:8, 119:3
**designed** [1] - 37:17
**designing** [1] - 96:25
**designs** [2] - 5:7, 53:21
**detective** [4] - 113:22,

115:19, 115:20, 116:22
**determine** [1] - 61:2
**determining** [1] - 117:13
**devastated** [1] - 124:23
**develop** [2] - 77:12, 85:22
**developer** [1] - 97:5
**developers** [1] - 97:5
**Development** [2] - 5:12, 53:25
**development** [1] - 97:5
**dialogue** [1] - 41:5
**diet** [1] - 131:8
**dietary** [1] - 131:10
**difference** [1] - 61:9
**differences** [1] - 47:15
**different** [22] - 18:23, 21:11, 22:12, 22:22, 22:23, 35:9, 39:19, 49:3, 60:20, 60:21, 61:12, 64:21, 74:18, 80:6, 84:9, 91:12, 98:1, 107:12, 117:21, 119:25
**difficult** [4] - 90:10, 94:12, 114:19, 115:19
**digital** [2] - 67:13, 85:22
**dipped** [1] - 130:9
**dire** [2] - 43:21, 49:25
**direct** [4] - 9:7, 10:24, 11:6, 15:10
**directed** [1] - 23:21
**directions** [1] - 80:6
**directly** [4] - 12:22, 13:4, 29:6, 30:15
**director** [3] - 67:21, 91:8, 118:13
**disagree** [2] - 37:3, 57:7
**disappeared** [1] - 3:25
**disappointed** [2] - 125:2, 125:3
**disappointing** [1] - 58:2
**disclose** [1] - 89:4
**discount** [1] - 58:24
**discovery** [3] - 15:18, 23:3, 116:1
**discussion** [2] - 6:25, 59:7
**Discussion** [1] - 25:16
**dispute** [30] - 5:11, 12:16, 13:2, 30:6, 39:4, 47:13, 53:24,

56:24, 62:15, 62:20, 62:23, 62:24, 64:9, 64:10, 68:13, 68:15, 68:17, 68:21, 70:5, 78:16, 84:11, 85:1, 91:6, 91:14, 92:4, 92:24, 101:17, 110:15, 116:6, 117:19
**disputed** [1] - 39:2
**disputes** [12] - 8:9, 47:10, 47:11, 65:4, 65:7, 78:19, 119:4, 119:7, 125:8, 125:9, 128:22, 129:4
**disputing** [3] - 31:17, 39:11, 56:19
**disqualify** [1] - 94:21
**dissatisfaction** [1] - 125:16
**distance** [1] - 82:3
**distinction** [2] - 24:18, 24:23
**distracted** [1] - 51:23
**District** [2] - 96:13, 127:13
**district** [4] - 97:15, 97:22, 128:16, 128:25
**division** [1] - 16:17
**divisions** [1] - 97:7
**divorce** [1] - 59:16
**Docket** [1] - 8:22
**doctor** [4] - 4:7, 124:2, 124:21, 125:20
**document** [9] - 8:15, 9:10, 17:19, 24:23, 31:14, 31:15, 33:11, 34:6, 38:5
**documents** [11] - 22:12, 22:13, 24:18, 30:6, 30:8, 33:24, 34:11, 39:22, 40:10, 47:24, 48:1
**dog** [3] - 50:3, 50:6
**dollars** [1] - 18:12
**dollars'** [1] - 17:9
**donated** [1] - 74:4
**done** [8] - 22:1, 22:2, 31:10, 54:23, 85:7, 115:25, 116:1, 116:2
**doo** [1] - 124:16
**door** [7] - 15:1, 15:21, 16:10, 17:13, 20:11, 21:13, 29:3
**dopey** [1] - 94:24
**Doren** [4] - 3:8, 42:12, 44:17, 133:8
**DOREN** [23] - 2:4, 3:8, 5:24, 7:11, 8:21,

10:13, 10:15, 11:3, 11:8, 11:13, 11:23, 13:12, 27:2, 41:22, 41:25, 42:4, 42:12, 42:18, 44:17, 133:5, 133:7, 133:16, 134:5
**doubt** [5] - 61:13, 61:17, 61:22, 73:19, 123:1
**Douglas** [1] - 52:8
**down** [13] - 11:4, 70:23, 71:2, 71:4, 71:6, 71:7, 71:8, 72:12, 84:5, 94:14, 99:1, 127:20, 130:9
**Dr** [2] - 41:10, 41:14
**drafted** [2] - 28:17, 30:9
**DRAM** [18] - 5:16, 26:9, 26:20, 54:3, 57:24, 58:3, 59:7, 59:9, 63:3, 69:18, 72:1, 72:14, 86:5, 88:1, 97:11
**dramatic** [3] - 35:9, 36:17, 37:18
**dramatically** [1] - 34:23
**drastic** [2] - 34:15, 38:23
**draw** [1] - 31:7
**drawing** [1] - 31:1
**drawn** [1] - 32:4
**drive** [3] - 69:8, 83:15, 83:16
**driver** [3] - 56:23, 81:14, 98:7
**drivers** [1] - 56:22
**driving** [3] - 74:23, 79:25, 82:3
**DROOKS** [1] - 2:9
**dropped** [1] - 6:9
**drops** [1] - 16:21
**drown** [2] - 100:2, 100:5
**dry** [1] - 84:24
**Duarte** [1] - 74:5
**Ducks** [1] - 130:11
**due** [3] - 5:18, 26:11, 26:22
**DUNN** [1] - 2:4
**duration** [1] - 123:10
**during** [16] - 7:14, 7:25, 8:12, 13:18, 16:4, 49:25, 50:10, 51:23, 51:24, 52:16, 59:11, 71:3, 88:4, 89:13, 100:23, 119:15
**duty** [2] - 43:15, 83:14

**E**

**e-mail** [19] - 20:25, 21:2, 21:11, 21:12, 21:21, 21:22, 22:6, 22:24, 23:12, 24:1, 24:4, 31:25, 32:19, 35:18, 35:19, 37:3, 37:21
**e-mails** [25] - 16:9, 17:1, 20:14, 20:24, 20:25, 21:2, 21:18, 21:19, 23:6, 23:14, 23:20, 24:11, 24:17, 29:24, 30:22, 30:24, 32:1, 32:13, 32:15, 32:20, 36:13, 37:17, 48:18
**ear** [1] - 27:23
**easier** [2] - 61:24, 132:7
**East** [1] - 2:10
**east** [1] - 82:7
**easy** [1] - 12:17
**editing** [2] - 87:17, 88:12
**editor** [1] - 129:16
**education** [5] - 67:6, 96:21, 96:23, 97:8, 97:9
**Edwards** [1] - 71:17
**effect** [1] - 37:18
**effects** [1] - 68:3
**efficiency** [1] - 13:17
**efficient** [2] - 9:8, 131:16
**efforts** [5] - 5:21, 54:7
**eFilm** [1] - 67:22
**eight** [4] - 44:5, 46:12, 47:2, 55:20
**either** [5] - 8:3, 13:7, 40:14, 58:16, 101:6
**Ekwan** [4] - 3:19, 42:22, 44:22, 132:12
**EKWAN** [1] - 2:10
**elections** [2] - 81:12, 81:22
**electrical** [1] - 76:5
**electronics** [2] - 64:15, 114:12
**Electronics** [8] - 3:6, 3:20, 5:9, 42:10, 44:9, 44:10, 53:22, 73:7
**elevator** [2] - 50:22, 50:23
**elsewhere** [1] - 29:9
**emergency** [1] - 51:19
**emphasis** [1] - 111:21
**emphasizing** [1] -

37:16
**employ** [1] - 91:12
**employed** [7] - 41:10, 41:14, 66:15, 66:23, 76:13, 81:12, 102:20
**employment** [4] - 68:14, 68:16, 114:7, 115:25
**encapsulated** [1] - 13:11
**end** [7] - 10:3, 67:19, 70:14, 70:17, 92:24, 93:18, 97:6
**ended** [4] - 29:6, 67:12, 68:18, 126:10
**engineer** [5] - 58:6, 66:13, 67:6, 71:20, 75:9
**engineering** [4] - 5:18, 26:11, 26:22, 67:8
**enjoy** [2] - 90:3, 90:13
**enjoyment** [1] - 119:12
**entire** [2] - 20:12, 35:19
**entirely** [1] - 18:24
**entitled** [1] - 36:6
**equation** [1] - 40:16
**equipment** [1] - 86:20
**era** [1] - 112:19
**especially** [3] - 43:16, 79:21, 120:21
**essays** [2] - 111:6, 111:10
**essence** [1] - 132:18
**essential** [1] - 37:6
**essentially** [5] - 6:11, 34:7, 43:22, 47:10, 59:6
**estate** [2] - 47:12, 85:25
**estimate** [1] - 6:6
**et** [2] - 30:11
**ethical** [1] - 50:15
**ethics** [1] - 50:18
**ethnicity** [1] - 61:4
**Europe** [4] - 103:24, 104:2, 104:3, 104:4
**evaluate** [1] - 9:6
**events** [1] - 10:21
**eventually** [2] - 44:1, 44:5
**everywhere** [1] - 69:14
**evidence** [57] - 8:7, 9:2, 9:5, 9:10, 9:20, 10:6, 10:16, 10:19, 10:25, 11:14, 11:18, 11:19, 11:24, 12:10, 12:17, 12:20, 12:22,

14:17, 14:21, 16:25, 17:6, 17:15, 18:3, 24:20, 26:4, 37:1, 40:4, 40:10, 49:3, 49:4, 49:5, 49:6, 49:10, 52:21, 56:17, 57:3, 57:15, 57:18, 58:8, 58:18, 59:19, 59:23, 59:24, 61:11, 61:13, 61:19, 61:23, 61:24, 62:1, 70:2, 72:11, 99:22, 107:22, 117:14
**Evidence** [3] - 49:2, 49:11, 50:13
**evidentiary** [2] - 12:1, 47:23
**exact** [1] - 32:17
**exactly** [11] - 4:13, 12:15, 19:4, 19:9, 21:7, 40:15, 71:22, 101:10, 106:21, 107:13
**examine** [2] - 19:9, 36:3
**examined** [1] - 49:7
**example** [13] - 21:5, 22:17, 38:4, 56:18, 56:20, 57:24, 59:7, 59:20, 60:5, 60:7, 60:13, 65:25, 83:21
**except** [1] - 53:9
**exclude** [2] - 7:15, 15:5
**excluded** [1] - 16:11
**excused** [1] - 133:14
**executive** [2] - 67:20, 91:16
**exerting** [1] - 72:19
**Exhibit** [13] - 21:22, 24:13, 24:14, 30:10, 30:16, 32:23, 32:25, 35:15, 35:16, 36:15, 36:16
**exhibit** [2] - 6:16, 24:12
**Exhibits** [1] - 15:6
**exhibits** [12] - 6:23, 14:1, 14:2, 21:16, 25:12, 25:21, 27:10, 27:13, 27:15, 37:24, 57:17, 57:22
**exist** [1] - 25:2
**existence** [1] - 13:22
**exists** [2] - 16:13, 35:2
**expect** [1] - 107:10
**expense** [1] - 10:22
**expenses** [2] - 8:24, 9:3
**experience** [18] -

58:25, 60:10, 64:2, 67:6, 86:24, 89:7, 91:6, 94:13, 108:5, 108:12, 114:18, 115:3, 116:7, 116:8, 118:20, 118:22, 119:18, 119:20
**experiences** [2] - 60:6, 128:3
**expert** [6] - 59:6, 69:24, 72:7, 86:12, 117:24, 120:6
**expertise** [5] - 115:14, 115:16, 116:12, 117:15, 133:13
**explain** [8] - 8:7, 16:12, 34:20, 34:25, 45:22, 59:13, 59:14
**explaining** [2] - 33:11, 133:18
**explains** [1] - 57:11
**explanation** [2] - 59:15, 71:11
**expressing** [1] - 99:22
**extent** [4] - 10:23, 29:1, 30:5, 38:13
**extra** [1] - 124:15
**eyed** [1] - 68:10
**eyes** [1] - 29:3

F

**face** [2] - 7:18, 44:15
**Facebook** [2] - 48:18, 83:5
**facility** [1] - 70:16
**fact** [19] - 7:24, 8:12, 9:17, 18:1, 19:7, 30:4, 30:18, 30:19, 33:4, 36:7, 38:25, 39:25, 56:16, 56:24, 61:15, 73:9, 92:9
**factor** [2] - 16:17, 22:8
**factors** [1] - 20:10
**facts** [15] - 12:9, 48:3, 56:16, 56:17, 56:19, 57:2, 57:6, 57:7, 57:9, 73:14, 81:2, 101:22, 108:13, 115:12
**fair** [16] - 29:10, 30:11, 30:20, 37:11, 38:16, 39:10, 46:11, 46:12, 46:25, 47:2, 54:11, 55:21, 68:22, 73:15, 122:15
**fair-minded** [1] - 55:21
**fairly** [5] - 13:10, 16:24, 21:15, 90:23,

125:21
**faith** [1] - 111:22
**fall** [3] - 30:24, 32:2, 126:9
**false** [4] - 4:7, 45:24, 45:25, 46:9
**familial** [1] - 93:17
**familiar** [4] - 74:8, 87:25, 111:16, 115:2
**familiarity** [2] - 97:10, 117:20
**family** [7] - 48:13, 63:7, 83:3, 106:10, 115:6, 121:10, 124:22
**fan** [8] - 22:7, 95:6, 112:12, 130:3, 130:11, 130:13, 130:22
**fancy** [1] - 61:14
**far** [7] - 74:24, 99:12, 107:2, 117:13, 126:13, 128:15, 129:1
**fashion** [1] - 124:4
**fashionably** [1] - 51:16
**fault** [1] - 38:21
**favor** [7] - 60:23, 62:1, 78:10, 86:25, 87:2, 96:3, 118:23
**favorite** [6] - 67:24, 99:3, 99:6, 111:13, 112:16, 130:2
**favors** [1] - 74:11
**February** [6] - 19:11, 24:21, 108:23, 110:23, 110:24
**federal** [4] - 44:8, 54:17, 54:20, 116:18
**Federal** [3] - 54:20, 55:1, 55:2
**fee** [4] - 5:18, 12:8, 26:11, 26:22
**fees** [3] - 7:15, 7:19, 11:2
**FEINSTEIN** [4] - 2:13, 4:17, 43:8, 45:2
**Feinstein** [4] - 4:18, 4:19, 40:24, 40:25, 43:8, 45:2
**few** [3] - 44:12, 119:13, 127:21
**fiancée** [3] - 85:24, 88:15, 89:19
**field** [7] - 63:2, 80:4, 94:13, 115:15, 118:12, 121:9, 121:11
**fields** [1] - 124:5

**fifth** [1] - 126:10
**fight** [1] - 89:8
**fighting** [1] - 89:8
**figure** [5] - 13:8, 42:3, 97:21, 101:21, 132:8
**file** [1] - 7:14
**filed** [2] - 13:19, 23:16
**fill** [1] - 110:19
**film** [9] - 67:10, 67:13, 87:17, 88:11, 90:2, 91:1, 94:10, 95:7, 120:16
**films** [1] - 90:5
**filtration** [1] - 71:20
**final** [1] - 6:7
**finally** [1] - 91:14
**finance** [4] - 102:24, 104:16, 104:18
**financial** [1] - 12:2
**finders** [1] - 56:16
**fine** [9] - 6:1, 14:11, 27:2, 31:25, 38:15, 82:20, 83:13, 102:18, 134:1
**finish** [1] - 52:22
**fire** [1] - 78:1
**firefighters** [2] - 60:7, 60:9
**firm** [1] - 104:15
**First** [1] - 56:6
**first** [9] - 8:1, 10:4, 17:19, 20:25, 21:2, 21:21, 40:9, 108:3, 122:9
**fish** [4] - 80:12, 80:14, 80:16, 80:18
**fits** [2] - 9:7, 12:11
**five** [2] - 25:22, 134:11
**fix** [1] - 92:12
**fixed** [1] - 92:11
**flag** [1] - 126:8
**Floor** [2] - 2:10, 2:13
**flow** [1] - 39:14
**focus** [2] - 27:11, 116:9
**focused** [2] - 103:11, 103:12
**focusing** [1] - 85:21
**folks** [2] - 44:13, 97:9
**follow** [3] - 107:23, 110:18, 130:17
**followed** [2] - 121:11, 121:13
**following** [3] - 5:3, 50:13, 132:1
**fondness** [1] - 112:20
**football** [2] - 95:22, 126:8
**footsteps** [2] - 121:11, 121:13

**FOR** [2] - 2:3, 2:8
**for-cause** [1] - 133:25
**Force** [1] - 71:17
**forecast** [1] - 37:2
**forecasts** [2] - 23:11, 37:21
**foreclosed** [1] - 24:3
**foreign** [1] - 60:23
**foreman** [1] - 76:5
**forest** [1] - 106:25
**forever** [1] - 92:3
**forgot** [1] - 84:22
**form** [1] - 70:15
**formerly** [1] - 40:22
**forth** [1] - 9:2
**forward** [1] - 53:17
**founders** [1] - 55:11
**founding** [1] - 55:25
**four** [6] - 6:6, 6:10, 68:4, 93:12, 126:10, 126:20
**Fox** [1] - 91:7
**fractured** [1] - 126:9
**framework** [1] - 9:7
**Francisco** [1] - 71:23
**frankly** [3] - 21:14, 23:15, 25:1
**free** [3] - 52:18, 71:10, 131:9
**freedom** [1] - 56:6
**Friday** [3] - 52:22, 53:4, 53:16
**friend** [5] - 16:18, 16:20, 23:21, 48:14, 58:6
**friends** [2] - 48:13, 110:3
**friendship** [1] - 16:16
**front** [3] - 9:9, 10:9, 67:19
**frustrating** [2] - 114:15, 129:24
**fulfill** [3] - 18:13, 25:4, 37:5
**fulfilled** [1] - 19:14
**fulfilling** [5] - 5:15, 26:8, 26:19, 43:14, 54:2
**full** [3] - 12:1, 32:7, 107:23
**fully** [3] - 4:12, 49:6, 98:18
**fun** [16] - 73:23, 76:22, 80:10, 83:1, 88:12, 89:24, 95:2, 106:11, 112:5, 116:22, 119:10, 119:12, 121:20, 126:3, 129:6, 130:24
**fund** [2] - 74:2, 97:7

**UNITED STATES DISTRICT COURT**

**fundamental** [1] - 55:4
**funds** [1] - 12:8
**funny** [3] - 93:19, 109:23, 124:12

**G**

**Gabriel** [1] - 102:20
**Gail** [1] - 52:7
**game** [3] - 29:10, 38:16, 39:10
**gamer** [1] - 87:17
**games** [1] - 80:5
**gaming** [1] - 88:11
**gardening** [1] - 83:3
**geek** [1] - 66:20
**Geez** [1] - 109:13
**GEISE** [2] - 4:21, 44:25
**Geise** [5] - 4:21, 41:10, 41:14, 43:5, 44:25
**gender** [2] - 60:18, 61:4
**general** [7] - 9:7, 10:24, 12:12, 27:15, 34:13, 65:10, 83:11
**Germany** [1] - 118:10
**GIBSON** [1] - 2:4
**girl** [1] - 76:21
**girlfriend** [1] - 48:6
**girls** [1] - 118:11
**given** [5] - 6:20, 17:9, 26:1, 28:16, 39:19
**glad** [1] - 3:24
**gluten** [1] - 131:9
**golf** [1] - 116:23
**Gonzaga** [1] - 131:2
**Google** [3] - 48:24, 48:25
**governed** [1] - 54:18
**Government** [3] - 54:20, 55:1, 55:3
**government** [5] - 55:1, 56:3, 56:7, 71:18, 72:4
**grabbed** [1] - 96:2
**graduate** [1] - 108:22
**graduated** [1] - 114:2
**graduating** [1] - 91:2
**Granada** [1] - 66:11
**grand** [2] - 127:20, 127:23
**Grand** [1] - 2:6
**grandmother** [1] - 121:12
**granted** [1] - 36:10
**granting** [1] - 23:16
**graph** [2] - 33:17, 33:22

**gray** [1] - 94:20
**great** [15] - 41:24, 67:5, 74:19, 75:1, 77:4, 80:19, 84:2, 91:5, 122:13, 130:8, 131:11, 131:12
**green** [2] - 56:22, 56:25
**grew** [1] - 112:19
**grind** [1] - 80:13
**grouped** [1] - 13:19
**grueling** [1] - 127:23
**guess** [13] - 16:19, 22:6, 31:13, 39:11, 77:5, 82:9, 85:5, 94:19, 96:6, 99:5, 103:13, 117:8, 117:17
**guidance** [1] - 8:5
**guy** [5] - 69:22, 79:20, 91:8, 92:12, 95:25
**guys** [1] - 95:13

**H**

**hair** [1] - 94:20
**half** [2] - 39:5, 126:10
**Han** [1] - 52:8
**Hancock** [1] - 124:1
**hand** [27] - 7:6, 12:2, 17:19, 25:19, 34:2, 45:8, 45:10, 45:16, 49:18, 49:22, 50:4, 52:2, 52:14, 53:14, 54:14, 57:13, 61:21, 62:4, 64:13, 64:19, 64:25, 74:17, 101:1, 116:9, 132:16, 132:22, 133:17
**handing** [1] - 7:13
**handle** [7] - 55:12, 71:17, 72:4, 112:1, 115:12, 115:21, 117:21
**hands** [5] - 16:11, 53:7, 61:8, 62:9, 63:13
**Happy** [1] - 74:13
**happy** [6] - 4:3, 4:4, 10:17, 17:19, 126:16
**hard** [14] - 59:18, 64:4, 68:21, 69:8, 77:9, 79:12, 79:13, 92:19, 101:9, 117:12, 117:16, 128:3, 130:7, 131:15
**harder** [1] - 111:5
**hardware** [1] - 69:3
**Harrison** [1] - 52:7
**hassle** [1] - 43:16

**hate** [2] - 35:14, 60:16
**head** [4] - 27:24, 60:11, 78:1, 84:7
**headache** [1] - 78:1
**headphones** [2] - 77:21, 86:21
**health** [2] - 3:24, 114:1
**hear** [21] - 4:5, 10:1, 12:22, 13:3, 13:4, 13:6, 18:5, 30:15, 46:15, 46:16, 46:18, 47:1, 47:3, 47:4, 47:25, 48:2, 51:12, 56:5, 64:9, 64:20, 115:17
**heard** [5] - 4:10, 20:4, 44:11, 96:1, 110:11
**hearing** [1] - 26:4
**hearings** [1] - 7:14
**heart** [2] - 13:24, 14:13
**heated** [1] - 81:23
**heavier** [1] - 61:22
**heavy** [1] - 119:11
**heck** [1] - 119:11
**Held** [1] - 134:9
**held** [2] - 25:16, 132:1
**hello** [1] - 102:13
**help** [1] - 109:12
**helpful** [1] - 7:1
**helping** [1] - 85:22
**hi** [3] - 44:24, 118:4, 123:24
**Hi** [3] - 76:1, 81:9, 102:14
**high** [5] - 70:14, 76:6, 117:3, 124:14, 127:12
**High** [1] - 114:3
**high-end** [1] - 70:14
**high-voltage** [1] - 76:6
**higher** [1] - 61:16
**highlights** [1] - 40:15
**Hills** [1] - 66:11
**hindsight** [1] - 4:6
**hire** [2] - 10:21, 103:4
**hired** [2] - 12:6, 95:23
**hiring** [1] - 9:3
**historical** [1] - 33:17
**history** [2] - 34:7, 40:4
**hit** [3] - 38:15, 38:18, 38:21
**hitting** [1] - 38:9
**hmm** [1] - 30:1
**Ho** [1] - 52:8
**Ho-Jung** [1] - 52:8
**hobbies** [1] - 106:11
**hockey** [1] - 130:2

**hole** [1] - 68:5
**Hollywood** [1] - 85:17
**home** [11] - 48:5, 48:24, 57:24, 71:22, 74:23, 76:14, 79:9, 86:7, 87:15, 104:20, 114:3
**homeowner** [2] - 81:12, 81:22
**honest** [1] - 107:6
**honestly** [4] - 46:14, 47:1, 121:5, 122:10
**Honey** [1] - 118:14
**HONG** [3] - 3:16, 42:20, 44:20
**Hong** [24] - 3:16, 14:2, 16:4, 17:20, 20:18, 22:7, 30:3, 30:4, 30:11, 31:18, 32:17, 34:15, 35:6, 35:18, 35:23, 36:3, 36:4, 37:8, 37:25, 38:1, 42:19, 44:20, 52:6
**Hong's** [4] - 16:16, 21:22, 22:5, 35:20
**Honor** [87] - 3:10, 3:13, 3:16, 3:19, 3:23, 4:2, 4:17, 5:25, 6:1, 6:18, 7:6, 7:13, 7:16, 7:21, 8:2, 8:11, 8:21, 9:9, 9:15, 10:7, 10:8, 10:13, 11:3, 11:8, 11:13, 11:16, 11:23, 11:25, 13:12, 13:15, 13:21, 14:13, 14:15, 14:19, 15:4, 15:11, 16:8, 16:11, 17:5, 20:3, 20:5, 20:13, 20:16, 20:24, 21:5, 21:9, 23:1, 23:10, 24:9, 24:13, 25:17, 25:19, 25:23, 26:12, 26:25, 27:2, 27:5, 28:13, 28:14, 29:20, 29:22, 30:15, 31:5, 31:13, 32:5, 33:25, 34:2, 34:21, 35:13, 35:22, 36:10, 37:14, 40:6, 41:22, 42:12, 42:14, 42:16, 42:18, 42:20, 42:22, 43:3, 43:8, 133:5, 133:21, 134:5, 134:6, 134:8
**hope** [4] - 46:4, 52:21, 90:15
**Hope** [2] - 2:13, 74:5
**hopefully** [1] - 53:17
**hoping** [1] - 70:17
**horse** [1] - 36:13

**hospital** [1] - 121:18
**hospitality** [1] - 66:25
**hotel** [1] - 66:25
**hotels** [1] - 99:2
**hotly** [1] - 54:22
**hotspot** [1] - 71:18
**hour** [10] - 38:10, 38:11, 38:15, 38:19, 39:1, 39:12, 40:12, 40:13
**hours** [8] - 6:11, 6:13, 6:21, 13:25, 21:14, 53:8, 53:11
**house** [1] - 73:7
**housewife** [1] - 76:12
**huge** [1] - 106:25
**hugged** [1] - 93:18
**hundred** [3] - 22:12, 22:22
**hundreds** [1] - 69:4
**hunt** [2] - 80:11, 80:16
**hurt** [2] - 17:22, 36:20
**husband** [7] - 48:6, 75:9, 81:14, 82:12, 103:20, 105:20, 106:1
**Hyeok** [1] - 52:7
**Hyeok-Sang** [1] - 52:7
**Hyun** [1] - 52:8

**I**

**Ice** [1] - 130:2
**idea** [4] - 47:22, 70:25, 89:12, 111:23
**identified** [1] - 52:12
**imagine** [4] - 76:24, 78:3, 91:18, 120:22
**impact** [6] - 17:18, 17:24, 18:4, 33:24, 117:10, 117:18
**impacted** [8] - 34:16, 39:5, 39:6, 64:14, 70:7, 70:10, 98:14
**impacting** [2] - 35:10, 36:17
**impacts** [1] - 34:24
**impartial** [13] - 46:12, 46:13, 46:25, 47:2, 54:12, 64:4, 68:22, 92:20, 114:20, 119:1, 122:15, 132:16, 133:21
**implication** [2] - 33:6, 33:21
**imply** [3] - 29:24, 30:8, 30:17
**implying** [1] - 16:23
**import** [1] - 128:7
**importance** [1] - 54:16

**important** [29] - 45:22, 46:14, 46:21, 47:5, 47:22, 48:19, 48:21, 49:24, 50:8, 50:19, 51:6, 51:12, 55:6, 55:10, 55:25, 56:1, 59:10, 59:18, 60:3, 60:24, 73:13, 79:17, 83:20, 88:18, 97:21, 105:18, 105:19, 110:17, 111:18
**importantly** [1] - 12:16
**imposed** [2] - 29:8, 29:9
**impressive** [1] - 125:22
**improper** [1] - 18:2
**in-person** [1] - 94:14
**inability** [1] - 22:18
**Inc** [4] - 3:6, 42:10, 44:9
**incident** [1] - 78:4
**Incorporated** [2] - 5:7, 53:20
**incur** [1] - 10:21
**indicate** [1] - 44:15
**indicated** [5] - 23:10, 23:16, 33:25, 86:4, 114:9
**indicating** [1] - 7:16
**indirectly** [1] - 12:21
**individualized** [1] - 96:23
**individually** [2] - 62:7, 62:8
**individuals** [1] - 56:11
**Indong** [1] - 52:9
**indoors** [1] - 70:25
**industry** [5] - 14:17, 66:12, 66:25, 120:16, 123:11
**inference** [1] - 32:4
**influence** [7] - 72:19, 85:2, 86:9, 89:7, 92:5, 94:3, 125:16
**info** [1] - 89:3
**information** [12] - 41:16, 43:20, 45:24, 46:1, 47:25, 48:9, 48:10, 48:15, 57:14, 81:3, 96:20, 120:2
**initial** [1] - 14:1
**injuries** [1] - 38:9
**inquire** [2] - 62:8, 89:13
**inside** [2] - 69:3, 69:15
**insight** [1] - 48:15
**Instagram** [4] - 74:1, 75:3, 75:4, 75:6
**instance** [1] - 74:12

**instances** [1] - 111:24
**instead** [1] - 91:14
**instruct** [1] - 110:5
**instructed** [2] - 12:5, 51:20
**instruction** [4] - 7:21, 9:18, 107:24, 123:3
**instructions** [1] - 110:18
**insured** [1] - 116:16
**intelligence** [1] - 85:20
**intend** [2] - 6:24, 23:13
**intending** [1] - 37:24
**intent** [6] - 36:9, 37:13, 37:18, 39:16, 39:18, 39:24
**interested** [3] - 75:15, 88:2, 88:3
**interesting** [6] - 56:2, 90:5, 106:20, 111:20, 119:19, 125:5
**Internet** [1] - 74:1
**interning** [1] - 104:15
**interpret** [1] - 103:7
**interpretation** [5] - 21:4, 23:6, 35:17, 35:21, 103:10
**interpreter** [5] - 65:3, 102:21, 103:1, 103:13, 103:17
**interpreters** [3] - 60:21, 65:1, 103:5
**interpreting** [1] - 103:12
**interventional** [1] - 124:2
**introduce** [5] - 21:11, 37:24, 42:18, 132:6, 133:6
**introduced** [4] - 44:12, 45:4, 57:17, 58:9
**introducing** [3] - 7:25, 14:21, 18:3
**inure** [1] - 19:7
**investigation** [1] - 48:23
**investigator** [2] - 115:23, 116:23
**involve** [3] - 67:10, 92:23, 96:18
**involved** [14] - 58:15, 62:11, 65:5, 68:12, 79:22, 88:23, 90:2, 114:6, 115:22, 115:25, 116:14, 117:9, 128:16, 129:3

**involvement** [1] - 43:13
**involves** [3] - 5:11, 53:24, 110:14
**involving** [1] - 92:24
**iPhone** [1] - 69:11
**iPhones** [4] - 71:17, 73:5, 82:14
**irrelevant** [1] - 23:15
**issue** [53] - 6:19, 7:2, 7:19, 7:21, 8:2, 8:9, 9:1, 9:5, 9:19, 9:22, 10:6, 11:5, 11:19, 11:20, 11:21, 11:25, 12:23, 12:24, 13:6, 13:11, 13:17, 14:3, 14:22, 15:3, 17:6, 23:8, 23:9, 26:12, 27:18, 30:7, 30:24, 32:17, 36:5, 36:14, 36:22, 36:24, 36:25, 37:9, 39:16, 39:17, 40:17, 40:20, 41:9, 42:2, 65:2, 78:24, 98:15, 132:11, 132:13, 132:14, 132:15, 133:9
**issues** [18] - 4:24, 6:14, 6:16, 6:18, 6:22, 7:2, 15:19, 21:13, 23:15, 27:11, 36:13, 36:20, 63:21, 78:23, 82:16, 114:11, 116:5, 123:16
**issuing** [1] - 20:2
**IT** [5] - 66:21, 72:4, 72:5, 72:15, 73:7
**Italy** [2] - 104:16, 105:5
**Item** [2] - 3:5, 42:9
**itself** [3] - 18:17, 23:4, 33:16

**J**

**jail** [1] - 50:19
**James** [1] - 4:14
**January** [2] - 24:22, 34:8
**JASON** [1] - 2:5
**Jason** [3] - 3:10, 42:14, 44:18
**JDLA** [7] - 5:14, 7:23, 26:8, 26:18, 35:25, 54:1, 54:2
**JDLA)** [1] - 5:13
**Jeon** [1] - 52:8
**Ji** [2] - 52:8, 52:9
**Jiang** [1] - 52:7

**job** [13] - 4:8, 55:21, 85:7, 94:20, 97:20, 97:25, 98:22, 106:10, 107:17, 110:6, 110:7, 121:1, 121:18
**Joint** [2] - 5:12, 53:25
**judge** [14] - 9:23, 12:24, 55:16, 55:17, 55:22, 57:5, 60:3, 60:12, 60:24, 75:21, 94:24, 105:16, 110:5, 110:10
**judge's** [1] - 6:20
**judges** [1] - 111:23
**judgment** [2] - 17:12, 29:6
**July** [3] - 16:20, 110:22, 120:25
**jump** [2] - 122:9, 126:17
**jumped** [1] - 114:17
**jumping** [1] - 122:4
**Jung** [1] - 52:8
**JungEun** [3] - 3:13, 42:16, 44:19
**JUNGEUN** [1] - 2:5
**juries** [5] - 55:18, 55:19, 58:11, 114:5, 128:2
**juror** [14] - 36:17, 51:13, 58:22, 59:1, 63:22, 63:24, 64:4, 65:8, 108:19, 109:22, 117:10, 122:15, 128:4, 133:9
**Juror** [58] - 59:4, 60:2, 62:14, 62:16, 62:19, 62:21, 63:4, 63:8, 63:24, 64:1, 64:6, 64:16, 66:6, 70:22, 71:13, 75:23, 75:25, 76:1, 81:6, 81:8, 81:9, 85:11, 85:13, 85:14, 90:16, 90:19, 90:20, 96:8, 96:9, 102:7, 102:10, 102:12, 102:14, 108:16, 108:18, 113:10, 113:11, 113:12, 113:18, 113:19, 118:2, 118:3, 118:4, 120:10, 120:12, 120:13, 123:22, 123:23, 123:24, 127:5, 127:7, 131:21, 132:13, 133:23
**JUROR** [353] - 45:18,

58:23, 59:3, 62:18, 62:22, 62:24, 63:23, 63:25, 64:7, 66:10, 66:16, 66:18, 66:20, 66:24, 67:3, 67:7, 67:9, 67:17, 68:1, 68:14, 68:18, 68:23, 69:1, 69:7, 69:11, 69:13, 69:19, 69:21, 70:3, 70:9, 70:11, 70:21, 71:15, 72:3, 72:9, 72:15, 72:21, 72:24, 73:1, 73:4, 73:12, 73:18, 73:20, 73:24, 74:7, 74:10, 74:22, 75:4, 75:7, 75:14, 75:19, 76:3, 76:11, 76:15, 76:20, 76:23, 77:1, 77:3, 77:6, 77:14, 77:17, 77:21, 77:25, 78:6, 78:8, 78:11, 78:14, 78:17, 78:22, 79:1, 79:3, 79:5, 79:8, 79:13, 79:19, 79:23, 80:2, 80:5, 80:11, 80:15, 80:21, 80:23, 81:4, 81:7, 81:11, 81:21, 81:24, 82:3, 82:7, 82:12, 82:18, 82:20, 82:24, 83:2, 83:5, 83:9, 83:13, 83:17, 83:24, 84:1, 84:6, 84:12, 84:14, 84:17, 84:21, 85:4, 85:8, 85:16, 86:6, 86:13, 86:17, 87:1, 87:9, 87:12, 87:16, 87:20, 87:23, 88:6, 88:9, 88:13, 88:17, 88:20, 88:25, 89:2, 89:10, 89:15, 89:17, 89:22, 89:25, 90:10, 90:18, 90:22, 91:7, 91:21, 92:1, 92:6, 92:10, 92:18, 92:22, 93:2, 93:5, 93:8, 93:11, 93:25, 94:4, 94:7, 94:10, 94:14, 94:22, 95:1, 95:3, 95:7, 95:11, 95:14, 95:19, 95:23, 96:1, 96:5, 96:11, 96:19, 97:2, 97:13, 97:16, 97:18, 97:24, 98:6, 98:12, 98:16, 98:19, 98:25, 99:5, 99:8, 99:16, 99:19, 99:25, 100:4, 100:7, 100:10, 100:13, 100:16, 100:21,

100:25, 101:3, 101:6, 101:10, 101:13, 101:18, 101:23, 102:1, 102:4, 102:9, 102:13, 102:16, 102:19, 103:3, 103:8, 103:15, 103:19, 103:21, 103:23, 104:3, 104:5, 104:9, 104:12, 104:14, 104:20, 104:22, 105:3, 105:6, 105:13, 105:16, 105:23, 106:3, 106:8, 106:12, 106:16, 106:21, 106:24, 107:4, 107:6, 107:8, 107:13, 107:19, 107:25, 108:3, 108:7, 108:10, 108:14, 108:17, 108:21, 109:3, 109:5, 109:7, 109:16, 109:19, 109:23, 110:4, 110:8, 110:13, 110:20, 110:23, 111:2, 111:7, 111:11, 111:15, 111:19, 111:24, 112:3, 112:6, 112:8, 112:11, 112:13, 112:15, 112:17, 112:22, 112:25, 113:4, 113:8, 113:21, 114:8, 114:11, 114:14, 114:21, 114:24, 115:5, 115:10, 115:13, 115:18, 116:10, 116:15, 116:23, 117:1, 117:11, 117:20, 117:25, 118:6, 118:19, 118:21, 118:24, 119:2, 119:5, 119:8, 119:11, 119:16, 119:19, 119:23, 120:4, 120:9, 120:15, 120:21, 120:24, 121:5, 121:10, 121:17, 121:21, 122:1, 122:3, 122:5, 122:7, 122:16, 122:18, 122:21, 122:25, 123:4, 123:8,

123:13, 123:18, 123:20, 124:1, 124:9, 124:12, 124:19, 124:22, 125:3, 125:7, 125:10, 125:13, 125:18, 125:24, 126:1, 126:4, 126:8, 126:15, 126:19, 126:22, 127:1, 127:4, 127:8, 127:11, 128:5, 128:9, 128:11, 128:14, 128:18, 128:25, 129:5, 129:7, 129:12, 129:14, 129:18, 129:21, 130:2, 130:4, 130:7, 130:12, 130:14, 130:18, 130:21, 130:23, 131:6, 131:8, 131:14, 131:20

**jurors** [42] - 4:25, 25:15, 27:4, 40:21, 42:6, 42:7, 43:12, 43:20, 43:22, 44:1, 44:5, 45:3, 45:21, 46:12, 47:24, 47:25, 48:1, 48:2, 50:9, 50:16, 51:17, 55:12, 55:14, 55:21, 55:24, 56:10, 59:9, 65:22, 66:4, 71:6, 72:11, 72:20, 87:25, 99:22, 107:11, 107:15, 107:21, 125:19, 128:1, 132:9

**JURY** [1] - 45:6

**jury** [116] - 7:21, 7:23, 8:7, 8:17, 9:17, 9:25, 10:9, 12:18, 12:19, 12:21, 12:22, 13:3, 13:7, 13:14, 14:22, 15:3, 17:8, 26:3, 26:13, 35:11, 36:21, 36:23, 37:1, 38:10, 39:2, 41:9, 41:15, 44:6, 44:15, 46:3, 46:6, 46:8, 46:12, 46:18, 46:21, 47:22, 48:24, 50:3, 50:7, 50:9, 50:20, 51:8, 51:11, 51:12, 51:16, 51:23, 51:25, 52:20, 54:15, 55:7, 55:9, 57:1, 57:2, 58:14, 58:17, 59:8, 59:11, 62:10, 62:12, 65:21, 65:25, 66:1, 66:3,

67:1, 67:3, 71:24, 72:7, 72:8, 72:12, 76:9, 79:11, 80:20, 81:17, 83:10, 86:2, 86:10, 86:12, 88:7, 88:8, 93:3, 93:9, 93:24, 96:16, 99:15, 99:18, 99:21, 102:25, 107:2, 107:3, 108:25, 110:6, 110:18, 111:17, 112:2, 114:4, 117:8, 117:24, 118:15, 119:17, 119:22, 120:6, 120:18, 122:14, 124:7, 125:6, 125:23, 126:25, 127:18, 127:20, 127:23, 130:24, 131:13, 131:19, 132:2, 133:12

**jury's** [2] - 56:15, 69:24

**justice** [3] - 72:16, 72:19, 80:24

## K

**keep** [14] - 27:23, 37:16, 46:21, 48:16, 49:25, 50:20, 51:14, 89:16, 89:20, 97:23, 106:6, 120:20, 123:19, 133:11

**keeping** [1] - 107:20

**keeps** [1] - 98:23

**kept** [2] - 41:4, 51:9

**Ki** [3] - 38:1, 52:6, 52:8

**kick** [1] - 92:2

**kid** [2] - 98:6, 98:8

**Kidder** [1] - 52:8

**kidnapping** [1] - 47:14

**kids** [11] - 74:5, 74:20, 74:25, 77:9, 79:21, 80:17, 81:14, 95:4, 98:20, 98:21, 127:16

**Kihoon** [1] - 52:9

**Kim** [5] - 52:9, 52:10

**kind** [29] - 13:19, 19:2, 55:11, 67:8, 67:19, 68:9, 71:1, 73:16, 77:20, 85:19, 85:22, 87:3, 88:13, 89:1, 90:1, 90:2, 93:17, 93:19, 93:20, 94:15, 98:2, 98:13, 98:25, 99:2, 101:9, 129:4,

129:22, 130:1, 130:5

**kinds** [1] - 84:24

**Kings** [1] - 130:3

**kitchen** [1] - 84:21

**knowledge** [6] - 58:13, 58:24, 59:17, 59:25, 86:4, 86:10

**known** [1] - 89:11

**knows** [1] - 84:3

**KNUTH** [1] - 44:24

**Knuth** [5] - 23:21, 23:25, 42:24, 44:24, 52:10

**Korean** [3] - 12:6, 64:22, 64:23

**Kyuhan** [1] - 52:8

## L

**LA** [4] - 65:17, 99:10, 113:23

**lab** [1] - 121:2

**lack** [3] - 32:5, 64:15, 70:8

**lacrosse** [1] - 114:3

**laid** [1] - 99:8

**lake** [1] - 80:16

**Lancaster** [1] - 71:16

**Lane** [1] - 52:10

**language** [1] - 60:21

**languages** [2] - 103:6, 103:12

**LAPD** [1] - 115:24

**laptop** [2] - 77:22, 115:1

**laptops** [1] - 72:5

**Lara** [3] - 4:21, 43:5, 44:25

**large** [1] - 90:13

**last** [9] - 15:12, 16:5, 34:14, 35:16, 35:21, 68:2, 68:3, 99:1, 120:24

**late** [4] - 51:15, 51:16, 53:10

**latter** [1] - 39:5

**LAUSD** [3] - 97:3, 97:14, 98:18

**law** [32] - 7:19, 7:24, 8:10, 9:8, 9:22, 9:23, 48:3, 57:5, 57:6, 57:7, 57:8, 57:9, 57:10, 75:19, 81:2, 103:22, 103:25, 105:8, 108:22, 109:4, 109:17, 109:20, 110:6, 110:10, 110:15, 110:16, 111:13, 111:15, 115:12,

115:25, 120:1

**laws** [2] - 54:19, 57:9

**lawsuit** [8] - 58:15, 62:11, 64:23, 88:24, 89:1, 114:16, 114:17, 114:19

**lawsuits** [3] - 114:7, 115:22

**lawyer** [14] - 48:14, 50:17, 60:15, 102:23, 103:20, 104:11, 104:15, 105:7, 105:9, 113:3, 113:6

**lawyers** [16] - 43:24, 44:11, 45:4, 48:13, 48:25, 50:10, 50:15, 50:23, 59:13, 60:16, 68:8, 71:3, 91:22, 105:8, 105:15, 109:22

**lead** [1] - 70:11

**leading** [1] - 10:20

**leaning** [1] - 109:19

**learn** [2] - 59:17, 129:22

**least** [3] - 122:5, 130:10, 132:20

**leave** [3] - 71:8, 93:23, 104:25

**LeBron** [1] - 4:14

**LEE** [4] - 2:5, 3:13, 42:16, 44:19

**Lee** [3] - 3:13, 42:16, 44:19

**left** [4] - 16:20, 22:6, 67:21

**legal** [2] - 61:14, 123:15

**length** [1] - 7:3

**lessons** [1] - 124:25

**letting** [1] - 48:9

**LG** [2] - 101:6, 114:12

**liability** [1] - 47:12

**license** [1] - 121:22

**License** [2] - 5:12, 53:25

**lie** [1] - 32:3

**life** [2] - 60:6, 84:15

**light** [2] - 56:22, 56:25

**likely** [4] - 61:14, 61:16, 62:1, 111:7

**limine** [2] - 8:22, 28:7

**limit** [6] - 6:3, 17:21, 18:3, 34:10, 34:11, 56:3

**limited** [7] - 6:14, 9:11, 18:11, 19:19, 21:8, 35:25, 36:5

**Limited** [3] - 5:9,

44:10, 53:22
**limiting** [1] - 28:7
**limits** [2] - 34:8, 34:13
**LINCENBERG** [1] - 2:9
**line** [7] - 15:13, 20:12, 30:14, 31:1, 31:7, 32:16, 54:24
**lines** [2] - 15:14, 41:13
**list** [1] - 99:14
**listen** [4] - 41:18, 72:13, 100:5, 125:25
**literally** [9] - 15:6, 16:5, 16:11, 16:20, 20:17, 23:25, 24:7, 33:11, 34:1
**litigate** [2] - 21:14, 21:15
**litigation** [4] - 104:7, 115:21, 116:11, 116:14
**litigator** [1] - 133:11
**live** [16] - 29:19, 65:17, 66:11, 74:24, 81:11, 85:17, 86:1, 90:22, 96:11, 96:14, 106:24, 108:21, 113:21, 120:15, 124:1, 127:11
**lives** [2] - 71:23, 126:3
**LLP** [2] - 2:4, 2:12
**Lo** [5] - 3:10, 20:4, 32:1, 42:14, 44:18
**LO** [17] - 2:5, 3:10, 17:5, 19:4, 19:9, 19:17, 24:18, 28:14, 29:19, 31:5, 31:7, 37:25, 38:7, 39:18, 42:14, 44:18, 134:8
**Lo's** [2] - 22:11, 30:13
**local** [4] - 114:5, 116:18, 117:6, 130:20
**look** [20] - 20:5, 20:22, 22:10, 25:13, 25:20, 30:9, 32:23, 33:11, 33:16, 33:25, 53:17, 58:3, 70:1, 99:1, 99:2, 101:8, 104:7, 117:14, 120:12, 121:18
**Look** [1] - 17:21
**looking** [7] - 6:12, 34:3, 38:20, 38:23, 57:14, 69:2, 121:4
**looks** [2] - 33:17, 121:17
**Los** [7] - 2:6, 2:11, 2:14, 96:12, 113:22, 115:21, 116:16

**LOS** [1] - 3:1
**loss** [1] - 131:2
**lost** [5] - 21:9, 21:10, 84:25, 94:17, 122:3
**loud** [1] - 84:4
**love** [8] - 105:8, 106:12, 106:13, 129:7, 129:8, 129:9
**loves** [2] - 106:18
**low** [3] - 20:8, 20:10, 23:19
**lower** [2] - 33:13, 63:13
**Ltd** [2] - 3:6, 42:10
**luck** [1] - 126:21
**lucky** [1] - 80:3
**lunch** [5] - 44:3, 53:15, 53:16, 134:11, 134:14
**Lynwood** [1] - 108:21

## M

**mail** [19] - 20:25, 21:2, 21:11, 21:12, 21:21, 21:22, 22:6, 22:24, 23:12, 24:1, 24:4, 31:25, 32:19, 35:18, 35:19, 37:3, 37:21
**mails** [25] - 16:9, 17:1, 20:14, 20:24, 20:25, 21:2, 21:18, 21:19, 23:6, 23:14, 23:20, 24:11, 24:17, 29:24, 30:22, 30:24, 32:1, 32:13, 32:15, 32:20, 36:13, 37:17, 48:18
**major** [1] - 115:22
**majority** [1] - 90:13
**Mammoth** [2] - 80:15, 117:2
**Man** [1] - 68:4
**manage** [1] - 97:21
**manager** [3] - 85:25, 127:12, 127:16
**Mandarin** [1] - 103:8
**manufacturer** [1] - 92:13
**manufactures** [2] - 5:9, 53:23
**manufacturing** [3] - 25:1, 81:15, 124:5
**marathon** [3] - 38:16, 106:13, 106:15
**Marc** [3] - 4:18, 43:8, 45:2
**MARC** [1] - 2:13
**March** [1] - 106:16
**MARELLA** [1] - 2:9
**market** [2] - 22:1,

123:5
**marks** [1] - 84:24
**married** [4] - 71:19, 76:7, 90:25, 102:22
**Marshals** [1] - 45:12
**mask** [4] - 71:8, 71:9, 71:10, 102:16
**masking** [1] - 70:24
**masks** [5] - 70:25, 71:1, 71:4, 71:6, 71:7
**materials** [1] - 72:1
**math** [1] - 95:12
**matter** [2] - 9:22, 38:14, 58:13
**Meal** [1] - 74:13
**mean** [27] - 6:19, 55:15, 58:24, 67:11, 67:13, 68:3, 69:7, 69:13, 69:14, 69:22, 70:3, 70:12, 73:7, 75:21, 83:22, 87:1, 93:19, 101:8, 105:16, 107:14, 115:20, 116:4, 116:7, 122:25, 123:4, 124:20
**means** [3] - 48:17, 61:14, 98:6
**meant** [2] - 23:5, 83:23
**measure** [1] - 14:24
**media** [7] - 64:10, 79:2, 83:4, 87:19, 100:11, 100:12, 122:17
**medical** [2] - 121:11, 124:24
**meet** [2] - 6:25, 61:24
**meet-and-confer** [1] - 6:25
**meeting** [1] - 51:15
**member** [1] - 43:5
**members** [4] - 45:12, 45:13, 63:7, 80:17
**memo** [1] - 111:10
**memory** [10] - 5:8, 5:10, 5:15, 26:9, 26:19, 53:21, 53:23, 54:2, 57:25, 69:15
**mental** [1] - 114:1
**mention** [2] - 23:11, 23:12
**mentioned** [4] - 21:16, 23:3, 30:17, 64:20
**mentions** [1] - 17:1
**Mentone** [2] - 82:4, 82:6
**merchandising** [1] - 124:5

**mess** [1] - 95:8
**message** [1] - 18:12
**Metz** [1] - 52:9
**Michael** [3] - 3:22, 43:2, 45:1
**MICHAEL** [1] - 2:12
**Michigan** [1] - 114:2
**microphone** [1] - 132:4
**Microsoft** [1] - 87:2
**middle** [1] - 118:14
**might** [28] - 4:14, 30:2, 45:20, 46:3, 46:6, 48:23, 53:9, 58:1, 58:6, 58:7, 60:20, 60:21, 64:21, 68:10, 75:16, 85:2, 88:2, 88:3, 89:7, 89:8, 102:6, 106:1, 125:1, 125:20, 128:25, 132:15, 132:16
**Mike** [3] - 52:6, 112:19, 112:20
**MIL** [13] - 7:14, 9:12, 11:17, 13:18, 14:13, 14:20, 15:9, 17:7, 23:16, 28:20, 32:8, 36:9
**Milbank** [2] - 40:23, 41:7
**miles** [10] - 38:10, 38:11, 38:15, 38:19, 39:1, 39:12, 40:12, 40:13
**million** [14] - 5:17, 5:18, 12:4, 17:9, 17:21, 18:12, 26:10, 26:11, 26:21, 26:22, 32:14, 39:21, 40:2, 97:19
**MILs** [2] - 6:20, 13:19
**mind** [10] - 37:10, 46:22, 51:14, 73:19, 93:1, 99:24, 107:21, 120:2, 128:7, 128:12
**minded** [1] - 55:21
**mine** [3] - 4:15, 71:1, 125:14
**minute** [2] - 35:12, 35:23, 131:25
**minutes** [3] - 9:20, 25:22, 113:14
**misleading** [2] - 45:24, 45:25
**missing** [1] - 131:14
**mistake** [2] - 98:4, 98:5
**modified** [1] - 26:3
**modules** [4] - 5:8, 5:10, 53:21, 53:23

**mom** [3] - 76:12, 106:10, 121:12
**Monday** [1] - 52:25
**money** [4] - 39:9, 91:23, 99:12, 124:25
**Montebello** [1] - 120:15
**month** [13] - 17:9, 18:11, 20:17, 31:18, 32:18, 33:23, 34:1, 39:19, 39:25, 40:2
**month-by-month** [2] - 20:17, 31:18
**monthly** [1] - 20:15
**months** [4] - 33:10, 70:12, 70:14, 127:21
**Moorpark** [1] - 127:12
**morning** [42] - 3:9, 3:10, 3:12, 3:13, 3:15, 3:16, 3:18, 3:19, 3:21, 4:17, 4:19, 4:22, 17:5, 42:12, 42:14, 42:16, 42:20, 42:21, 42:22, 43:1, 43:4, 43:7, 43:10, 43:11, 43:18, 44:2, 44:12, 44:17, 44:18, 44:19, 44:20, 44:22, 44:25, 45:1, 45:2, 45:5, 46:3, 96:9, 113:17, 113:19, 127:8, 127:9
**most** [8] - 55:15, 87:3, 90:8, 98:20, 99:5, 111:7, 112:17, 115:5
**mostly** [5] - 96:18, 96:19, 96:24, 97:11
**mother** [1] - 104:22
**motion** [6] - 8:3, 8:23, 13:19, 28:6, 66:12, 67:9
**motions** [1] - 8:22
**mountain** [1] - 16:25
**mountains** [1] - 80:12
**mouth** [1] - 93:23
**move** [4] - 70:23, 90:12, 96:7, 109:12
**movies** [3] - 66:13, 88:13, 112:6
**moving** [1] - 33:22
**MR** [96] - 3:8, 3:10, 3:16, 3:19, 3:22, 4:6, 4:12, 4:15, 4:17, 5:24, 6:1, 6:18, 7:9, 7:11, 7:12, 8:21, 9:15, 10:12, 10:13, 10:15, 11:3, 11:8, 11:13, 11:23, 12:14, 13:12, 13:15, 15:11, 15:22, 17:5, 19:4,

19:9, 19:17, 20:3, 22:22, 23:20, 24:7, 24:13, 24:18, 25:17, 25:23, 26:1, 26:12, 26:25, 27:2, 27:5, 27:25, 28:4, 28:9, 28:13, 28:14, 29:19, 29:22, 30:2, 31:5, 31:13, 32:12, 32:24, 33:2, 33:6, 34:5, 34:14, 36:24, 37:25, 38:7, 39:18, 40:6, 40:9, 41:22, 41:25, 42:4, 42:12, 42:14, 42:18, 42:20, 42:22, 43:2, 43:5, 43:8, 44:17, 44:18, 44:20, 44:22, 44:24, 45:1, 45:2, 132:11, 132:20, 133:2, 133:5, 133:7, 133:16, 133:25, 134:5, 134:6, 134:8

**MS** [5] - 3:13, 4:21, 42:16, 44:19, 44:25

**MSJ** [5] - 7:17, 8:11, 8:14, 18:24, 21:7

**muddled** [1] - 30:14

**multiple** [2] - 77:11, 77:12

**multistate** [1] - 111:6, 111:7

**murder** [1] - 47:14

**music** [2] - 91:8, 91:9

**must** [6] - 21:25, 61:25, 76:22, 97:20, 120:19, 131:4

**MYERS** [1] - 2:12

**Myers** [2] - 40:22, 40:25

### N

**name** [3] - 4:20, 44:22, 52:18

**names** [2] - 44:15, 52:4

**NAND** [16] - 5:16, 26:9, 26:20, 54:3, 57:24, 58:3, 63:3, 69:17, 72:1, 72:13, 86:5, 88:1, 97:11

**nationality** [1] - 61:4

**naturally** [1] - 117:16

**nature** [4] - 32:14, 38:8, 92:2, 117:22

**Neal** [2] - 42:24, 52:9

**neat** [3] - 74:6, 74:19

**necessarily** [3] - 73:12, 92:25, 94:21

**necessary** [1] - 31:14

**need** [20] - 4:24, 5:1, 12:22, 13:13, 14:9, 20:14, 22:8, 23:11, 23:12, 32:13, 32:15, 32:18, 36:2, 39:9, 46:13, 60:21, 79:25, 91:11, 132:4

**needed** [3] - 20:19, 29:18

**needle** [1] - 129:8

**needs** [4] - 6:17, 7:4, 56:24, 65:3

**negative** [1] - 4:1

**Neil** [1] - 44:24

**nervous** [1] - 107:7

**nervousness** [8] - 80:22, 88:8, 88:9, 99:18, 100:8, 107:5, 112:2, 126:25

**NESSIM** [1] - 2:9

**nested** [1] - 93:17

**Netlist** [69] - 3:6, 3:8, 3:11, 3:14, 3:17, 5:7, 5:12, 5:16, 5:18, 5:19, 5:20, 5:21, 5:24, 6:9, 9:2, 10:18, 10:19, 10:21, 11:2, 11:14, 11:23, 12:3, 13:18, 13:19, 14:10, 15:17, 15:20, 17:9, 18:7, 20:2, 21:23, 22:15, 24:16, 26:9, 26:11, 26:20, 26:23, 27:18, 27:25, 28:3, 28:11, 28:12, 31:2, 32:5, 32:9, 33:1, 36:20, 37:1, 37:23, 38:2, 42:10, 42:13, 42:15, 42:17, 42:19, 44:9, 53:20, 53:25, 54:3, 54:5, 54:6, 54:7, 63:10, 63:17, 63:18, 64:17, 87:11, 123:7, 123:11

**Netlist's** [4] - 5:17, 26:9, 26:21, 54:4

**network** [2] - 69:22, 70:14

**never** [14] - 23:2, 30:22, 67:3, 71:24, 75:17, 78:15, 78:17, 83:6, 84:10, 93:18, 107:4, 114:4, 121:15, 124:7

**nevertheless** [1] - 7:18

**new** [9] - 22:7, 95:21, 96:4, 96:25, 105:8, 105:9, 107:12,

109:22, 129:23

**New** [6] - 7:18, 9:8, 9:22, 9:23, 97:16, 129:10

**news** [1] - 121:8

**next** [4] - 38:16, 106:13, 106:16, 107:1

**nice** [5] - 78:22, 83:14, 91:4, 106:19, 131:5

**night** [1] - 68:11

**non** [3] - 5:18, 26:11, 26:22

**non-recurring** [3] - 5:18, 26:11, 26:22

**none** [3] - 119:5, 122:16, 127:25

**nonprofit** [2] - 74:1, 127:16

**North** [1] - 21:23

**note** [1] - 62:5

**Note** [1] - 114:25

**notebooks** [2] - 51:8, 51:9

**notepads** [1] - 107:16

**notes** [3] - 51:8, 107:16, 134:4

**nothing** [6] - 56:4, 87:4, 87:12, 88:17, 95:14, 100:16

**noticed** [1] - 129:20

**notion** [1] - 14:11

**notions** [1] - 61:3

**notwithstanding** [1] - 39:7

**novel** [1] - 90:1

**November** [1] - 34:7

**nowhere** [1] - 23:3

**NRE** [2] - 5:18, 26:22

**Number** [69] - 3:5, 42:9, 50:5, 50:6, 59:4, 60:2, 62:14, 62:16, 62:19, 62:21, 63:4, 63:8, 63:22, 63:24, 64:1, 64:6, 64:16, 65:8, 66:7, 70:22, 71:13, 75:23, 75:25, 76:1, 81:6, 81:8, 81:9, 85:12, 85:13, 85:14, 90:16, 90:19, 90:20, 96:8, 96:9, 102:7, 102:11, 102:12, 102:14, 108:16, 108:18, 108:19, 113:10, 113:11, 113:12, 113:18, 113:19, 118:2, 118:3, 118:4, 120:11, 120:12, 120:13, 123:22,

123:23, 123:24, 127:6, 127:7, 131:22, 132:13, 133:10, 133:15, 133:16, 133:24

**number** [7] - 43:23, 58:22, 59:1, 59:3, 62:13, 65:9, 97:18

**numbers** [4] - 24:12, 49:24, 50:2, 63:15

**nurse** [2] - 121:12

**NVDIMM** [1] - 21:6, 21:9, 35:25, 36:5

### O

**O'MELVENY** [1] - 2:12

**O'Melveny** [3] - 40:22, 40:24, 41:7

**Oaks** [1] - 118:7

**oath** [7] - 45:17, 45:22, 45:23, 45:25, 46:9, 46:10, 46:20

**object** [6] - 6:3, 20:16, 20:23, 33:20, 35:5, 35:6

**objected** [1] - 23:21

**objecting** [3] - 23:24, 24:5, 40:9

**objection** [5] - 6:5, 8:4, 27:12, 30:23, 41:17

**objections** [2] - 5:5, 27:23

**obligation** [8] - 5:15, 14:24, 50:15, 50:18, 54:1, 54:2, 56:9, 56:12

**obligations** [7] - 5:14, 26:7, 26:8, 26:18, 26:19, 43:17, 70:5

**obnoxious** [1] - 105:10

**observation** [1] - 61:1

**obviously** [11] - 11:20, 13:16, 27:14, 45:11, 61:22, 79:20, 80:9, 98:22, 106:9, 115:14, 117:7

**occupation** [8] - 65:17, 65:19, 66:11, 71:16, 76:5, 85:18, 102:20, 113:22

**occupations** [2] - 65:20, 66:19

**occurred** [1] - 26:1

**odd** [2] - 132:17, 132:23

**OF** [1] - 2:1

**off-the-shelf** [1] - 97:3

**offense** [1] - 109:21

**offer** [2] - 12:15, 16:15

**offering** [1] - 9:9

**office** [1] - 127:12

**Office** [2] - 115:23, 116:17

**officer** [2] - 12:3, 38:1

**official** [1] - 103:17

**often** [1] - 79:3

**Ojai** [1] - 118:16

**Oklahoma** [1] - 95:25

**old** [4] - 76:19, 76:20, 94:7, 112:24

**once** [2] - 94:8, 105:10

**one** [81] - 5:2, 5:15, 6:9, 6:22, 8:9, 12:2, 13:15, 21:17, 25:23, 26:8, 26:19, 30:16, 30:19, 40:16, 40:20, 41:1, 45:9, 45:15, 48:18, 49:17, 49:21, 50:9, 50:14, 50:20, 50:22, 51:3, 51:13, 52:1, 52:13, 53:6, 53:13, 54:13, 54:22, 55:5, 55:11, 55:18, 56:9, 56:21, 57:12, 58:21, 60:10, 61:7, 61:20, 64:12, 64:18, 64:25, 65:13, 71:8, 71:21, 71:22, 73:5, 77:7, 77:10, 77:25, 81:14, 86:25, 91:1, 93:14, 93:22, 94:20, 102:23, 102:24, 104:14, 107:21, 108:12, 109:9, 111:11, 112:18, 114:14, 115:16, 118:11, 118:13, 118:14, 118:15, 118:23, 124:4, 127:15, 129:9, 129:13, 133:18

**One** [1] - 68:2

**one-time** [1] - 93:14

**ones** [4] - 31:8, 63:14, 76:8, 76:18

**ongoing** [2] - 88:21, 94:8

**oOo** [1] - 3:3

**open** [10] - 15:21, 16:15, 17:13, 23:14, 25:6, 25:9, 36:21, 93:1, 107:20, 134:9

**opened** [1] - 15:1

**opening** [11] - 6:23, 7:4, 7:7, 8:5, 16:10, 18:6, 29:3, 33:18, 33:20, 33:21, 52:21

**openings** [1] - 6:17
**opens** [2] - 20:11, 21:13
**operating** [3] - 38:1, 59:23
**operator** [1] - 71:16
**opinion** [3] - 48:8, 99:22, 131:18
**opinions** [3] - 48:10, 88:19, 105:9
**opportunity** [1] - 43:25
**opposed** [5] - 31:3, 39:1, 47:13, 103:13, 110:18
**opposing** [1] - 7:1
**option** [1] - 98:19
**or..** [3] - 91:20, 95:13, 96:18
**order** [21] - 6:7, 8:22, 12:4, 13:23, 14:6, 14:7, 15:10, 15:24, 15:25, 18:7, 18:13, 18:14, 18:18, 18:20, 18:21, 20:22, 24:21, 37:4, 70:16, 128:18, 128:21
**ordering** [3] - 20:15, 20:18, 128:23
**orders** [10] - 16:4, 17:23, 19:3, 19:6, 19:7, 19:11, 20:2, 23:18, 31:20, 31:22
**organization** [1] - 103:2
**orientation** [1] - 44:7
**otherwise** [2] - 18:21, 39:3
**ought** [2] - 55:23, 58:12
**ourselves** [1] - 132:6
**outdoors** [1] - 80:11
**outline** [1] - 24:10
**outside** [19] - 12:18, 13:3, 13:6, 32:2, 48:9, 48:23, 49:9, 49:13, 50:11, 50:16, 57:23, 59:16, 76:14, 81:3, 88:19, 90:3, 120:2, 132:2, 133:13
**outsiders** [1] - 48:5
**overlap** [2] - 77:5, 77:6
**overpowering** [1] - 125:23
**overrule** [2] - 6:5, 27:12
**overshadowed** [1] - 112:10
**overstating** [1] - 36:5

**own** [18] - 49:20, 63:11, 63:17, 63:18, 68:24, 69:4, 74:13, 82:11, 86:14, 86:18, 86:21, 92:8, 108:1, 114:22, 118:17, 121:23, 123:7, 125:11
**owners** [1] - 103:4
**ownership** [1] - 82:23
**owning** [2] - 101:2, 123:17

## P

**P.C** [1] - 2:9
**p.m** [3] - 53:9, 53:12, 134:14
**Pac-12** [1] - 95:17
**page** [7] - 8:22, 14:20, 15:10, 15:12, 15:13, 15:14, 42:1
**Paik** [2] - 38:1, 52:6
**paleo** [1] - 131:9
**Palmdale** [1] - 80:16
**Pandora's** [8] - 16:16, 22:4, 23:14, 25:2, 25:6, 25:10, 35:4, 36:21
**panel** [1] - 49:14
**paper** [5] - 73:24, 74:3, 74:9, 74:13, 74:16
**paragraph** [3] - 15:12, 26:7, 34:14
**parents** [2] - 124:23, 125:2
**Park** [2] - 2:10, 124:1
**part** [18] - 10:8, 10:23, 15:13, 16:2, 23:2, 23:9, 26:24, 26:25, 37:6, 37:14, 48:21, 55:8, 56:11, 70:1, 97:4, 98:20, 115:5, 131:15
**partial** [1] - 33:12
**partic** [1] - 39:24
**particular** [15] - 7:24, 8:14, 9:4, 15:17, 15:25, 31:9, 40:2, 49:15, 52:18, 54:11, 59:21, 59:23, 59:24, 63:19, 112:20
**particularly** [1] - 69:2
**parties** [18] - 4:25, 6:5, 11:9, 27:16, 27:17, 27:22, 46:24, 47:1, 47:10, 47:13, 47:22, 59:21, 78:19, 93:13, 119:6, 131:23,

132:10
**partner** [2] - 48:6, 91:11
**partners** [1] - 40:24
**parts** [1] - 39:9
**party** [4] - 51:15, 61:15, 61:25, 74:10
**passive** [2] - 91:16, 91:23
**past** [5] - 19:13, 86:17, 86:19, 115:20, 116:2
**path** [1] - 106:23
**paying** [2] - 107:15, 107:17
**PCR** [1] - 3:25
**people** [23] - 26:16, 46:2, 46:24, 48:10, 50:2, 50:3, 51:2, 52:17, 55:23, 56:19, 58:5, 59:18, 60:8, 60:9, 74:2, 74:15, 81:25, 100:3, 100:5, 109:10, 121:6, 128:19
**people's** [2] - 126:3, 131:9
**per** [4] - 6:11, 18:11, 40:12, 40:13
**percent** [1] - 23:20
**percolate** [1] - 92:2
**peremptory** [1] - 44:1
**perfectly** [2] - 39:9, 41:17
**performance** [2] - 111:11, 111:12
**permit** [1] - 18:14
**permitted** [2] - 9:11, 11:17
**person** [11] - 10:5, 60:15, 60:16, 86:7, 93:15, 93:16, 94:14, 98:18, 98:20, 129:23
**personal** [2] - 84:15, 103:4, 127:17, 131:4, 132:24
**personally** [2] - 69:4, 69:9
**phone** [9] - 69:10, 73:1, 73:3, 73:15, 73:17, 82:20, 85:20, 85:21, 85:23
**phones** [4] - 71:18, 73:6, 77:21, 82:13
**Photoshop** [1] - 119:12
**pianist** [2] - 124:15, 124:17
**piano** [1] - 124:25
**pick** [2] - 77:15, 98:8
**picked** [3] - 46:4,

77:17, 98:7
**picture** [4] - 66:12, 67:24, 94:1, 107:23
**pictures** [2] - 67:9, 67:20
**piece** [1] - 16:6
**Pineta** [1] - 106:25
**pissed** [1] - 91:17
**pitching** [1] - 94:15
**place** [10] - 23:18, 25:3, 28:17, 28:24, 71:20, 91:3, 99:3, 99:6, 102:16, 106:18
**placed** [2] - 70:15
**places** [2] - 99:9, 99:11
**PLAINTIFF** [1] - 2:3
**plaintiff** [5] - 5:7, 53:20, 66:2, 87:11, 88:20
**plaintiffs** [1] - 44:16
**plan** [1] - 116:23
**plane** [1] - 12:2
**play** [15] - 76:25, 77:2, 77:10, 77:11, 87:14, 95:3, 95:5, 116:23, 116:25, 117:1, 117:5, 117:6, 117:15, 126:7, 126:11
**played** [1] - 117:1
**playing** [1] - 126:8
**pleadings** [1] - 23:2
**pleased** [1] - 56:13
**pleasure** [2] - 86:8, 127:20
**pled** [1] - 23:2
**plenty** [1] - 46:25
**plumber** [1] - 81:15
**PO** [2] - 20:5, 23:22
**pocket** [1] - 10:18
**podium** [2] - 65:13, 66:7
**point** [11] - 4:8, 7:12, 8:6, 8:14, 24:2, 31:14, 32:13, 34:11, 131:23, 132:9, 134:10
**pointing** [1] - 25:7
**police** [3] - 29:23, 113:22, 115:20
**polite** [2] - 101:25, 102:1
**popped** [1] - 6:22
**pops** [1] - 6:23
**popular** [3] - 73:25, 112:11, 112:18
**port** [1] - 98:14
**position** [2] - 133:18, 133:23

77:17, 98:7
**positive** [1] - 4:7
**possible** [1] - 131:16
**possibly** [1] - 39:3
**post** [8] - 8:16, 48:18, 66:12, 79:4, 87:22, 100:14, 100:16, 122:20
**post-trial** [1] - 8:16
**posted** [1] - 83:6
**poster** [1] - 36:15
**posting** [3] - 75:6, 79:7, 83:8
**potential** [4] - 4:25, 52:3, 132:24, 133:9
**powder** [1] - 95:8
**PR** [2] - 118:11, 118:14
**practical** [1] - 111:9
**practice** [5] - 80:3, 80:5, 109:18, 117:6, 125:9
**preclude** [1] - 9:2
**precluded** [2] - 28:20
**precludes** [1] - 7:22
**preconceived** [1] - 61:3
**predetermined** [2] - 60:5, 60:14
**preferences** [1] - 87:8
**prejudice** [2] - 12:18, 21:13
**premise** [2] - 19:20, 28:23
**prepared** [2] - 21:14, 24:9
**preparing** [1] - 13:24
**preponderance** [5] - 61:11, 61:13, 61:19, 61:23
**presence** [6] - 12:19, 13:3, 13:7, 42:7, 125:23, 132:2
**present** [5] - 11:18, 11:24, 12:20, 36:13, 85:5
**presented** [10] - 12:17, 14:1, 56:17, 57:3, 58:18, 59:13, 59:25, 72:12, 81:3, 85:6
**preserved** [1] - 55:9
**president** [2] - 16:17, 16:18
**press** [2] - 47:8, 64:9
**pretrial** [1] - 6:7
**pretty** [7] - 73:22, 73:25, 81:23, 89:4, 97:20, 98:4, 98:23
**prevail** [1] - 62:2
**prevent** [1] - 20:2

private [2] - 117:4, 121:2
problem [47] - 7:9, 7:18, 20:23, 21:24, 22:13, 24:7, 30:9, 32:2, 32:22, 33:1, 33:5, 33:7, 33:13, 35:11, 36:1, 36:2, 36:4, 40:12, 48:16, 49:15, 49:19, 51:24, 53:5, 53:11, 54:11, 57:10, 58:19, 61:5, 61:18, 63:19, 75:8, 75:10, 75:13, 75:14, 89:21, 92:13, 100:24, 100:25, 103:14, 105:1, 106:7, 110:2, 110:4, 119:14, 122:19, 122:23, 127:2
problems [6] - 64:3, 77:23, 86:15, 89:22, 92:9, 92:16
procedure [1] - 49:3
proceed [1] - 9:12
proceeding [1] - 13:8
proceedings [1] - 119:15
process [24] - 6:25, 42:6, 43:14, 43:21, 48:5, 48:21, 49:2, 49:6, 49:11, 49:25, 50:7, 50:14, 59:5, 78:25, 80:22, 83:12, 88:8, 99:18, 100:8, 103:10, 107:9, 116:1, 126:14, 134:12
procure [1] - 64:15
producer [3] - 90:24, 91:1, 91:16
producers [1] - 91:8
product [15] - 14:17, 14:19, 22:18, 22:19, 59:8, 59:21, 59:22, 59:23, 63:11, 63:20, 84:22, 85:9, 87:7, 88:1, 108:8
production [2] - 66:12, 88:1
products [66] - 5:16, 17:10, 21:6, 26:9, 26:20, 29:8, 29:9, 29:17, 35:25, 47:12, 54:3, 57:25, 58:3, 59:9, 59:15, 63:17, 63:18, 64:3, 68:25, 69:1, 69:4, 69:14, 69:15, 69:18, 70:8, 72:14, 72:23, 73:10,

77:19, 77:20, 77:23, 78:6, 78:9, 82:10, 82:17, 82:19, 82:23, 86:4, 86:15, 86:16, 86:18, 86:23, 87:2, 87:3, 88:1, 92:8, 92:9, 92:16, 92:25, 97:3, 101:2, 101:15, 108:2, 114:19, 114:23, 115:1, 115:2, 115:4, 115:9, 118:18, 125:12, 125:16, 128:17
profession [2] - 60:14, 61:4
program [2] - 95:12, 96:23
project [2] - 91:10, 91:13
promised [1] - 98:2
proof [6] - 12:15, 16:15, 47:17, 61:11, 61:12, 119:25
proper [1] - 7:16
properly [1] - 8:25
proposed [2] - 5:23, 6:6
proposes [1] - 5:3
PROSPECTIVE [353] - 45:18, 58:23, 59:3, 62:18, 62:22, 62:24, 63:23, 63:25, 64:7, 66:10, 66:16, 66:18, 66:20, 66:24, 67:3, 67:7, 67:9, 67:17, 68:1, 68:14, 68:18, 68:23, 69:1, 69:7, 69:11, 69:13, 69:19, 69:21, 70:3, 70:9, 70:11, 70:21, 71:15, 72:3, 72:9, 72:15, 72:21, 72:24, 73:1, 73:4, 73:12, 73:18, 73:20, 73:24, 74:7, 74:10, 74:22, 75:4, 75:7, 75:14, 75:19, 76:3, 76:11, 76:15, 76:20, 76:23, 77:1, 77:3, 77:6, 77:14, 77:17, 77:21, 77:25, 78:6, 78:8, 78:11, 78:14, 78:17, 78:22, 79:1, 79:3, 79:5, 79:8, 79:13, 79:19, 79:23, 80:2, 80:5, 80:11, 80:15, 80:21, 80:23, 81:4, 81:7, 81:11, 81:21, 81:24, 82:3, 82:7, 82:12, 82:18, 82:20, 82:24,

83:2, 83:5, 83:9, 83:13, 83:17, 83:24, 84:1, 84:6, 84:12, 84:14, 84:17, 84:21, 85:4, 85:8, 85:16, 86:6, 86:13, 86:17, 87:1, 87:9, 87:12, 87:16, 87:20, 87:23, 88:6, 88:9, 88:13, 88:17, 88:20, 88:25, 89:2, 89:10, 89:15, 89:17, 89:22, 89:25, 90:10, 90:18, 90:22, 91:7, 91:21, 92:1, 92:6, 92:10, 92:18, 92:22, 93:2, 93:5, 93:8, 93:11, 93:25, 94:4, 94:7, 94:10, 94:14, 94:22, 95:1, 95:3, 95:7, 95:11, 95:14, 95:19, 95:23, 96:1, 96:5, 96:11, 96:19, 97:2, 97:13, 97:16, 97:18, 97:24, 98:6, 98:12, 98:16, 98:19, 98:25, 99:5, 99:8, 99:16, 99:19, 99:25, 100:4, 100:7, 100:10, 100:13, 100:16, 100:21, 100:25, 101:3, 101:6, 101:10, 101:13, 101:18, 101:23, 102:1, 102:4, 102:9, 102:13, 102:16, 102:19, 103:3, 103:8, 103:15, 103:19, 103:21, 103:23, 104:3, 104:5, 104:9, 104:12, 104:14, 104:20, 104:22, 105:3, 105:6, 105:13, 105:16, 105:23, 106:3, 106:8, 106:12, 106:16, 106:21, 106:24, 107:4, 107:6, 107:8, 107:13, 107:19, 107:25, 108:3, 108:7, 108:10, 108:14, 108:17, 108:21, 109:3, 109:5, 109:7, 109:16, 109:19, 109:23, 110:4, 110:8, 110:13, 110:20, 110:23, 111:2, 111:7,

111:11, 111:15, 111:19, 111:24, 112:3, 112:6, 112:8, 112:11, 112:13, 112:15, 112:17, 112:22, 112:25, 113:4, 113:8, 113:21, 114:8, 114:11, 114:14, 114:21, 114:24, 115:5, 115:10, 115:13, 115:18, 116:10, 116:15, 116:23, 117:1, 117:11, 117:20, 117:25, 118:6, 118:19, 118:21, 118:24, 119:2, 119:5, 119:8, 119:11, 119:16, 119:19, 119:23, 120:4, 120:9, 120:15, 120:21, 120:24, 121:5, 121:10, 121:17, 121:21, 122:1, 122:3, 122:5, 122:7, 122:16, 122:18, 122:21, 122:25, 123:4, 123:8, 123:13, 123:18, 123:20, 124:1, 124:9, 124:12, 124:19, 124:22, 125:3, 125:7, 125:10, 125:13, 125:18, 125:24, 126:1, 126:4, 126:8, 126:15, 126:19, 126:22, 127:1, 127:4, 127:8, 127:11, 128:5, 128:9, 128:11, 128:14, 128:18, 128:25, 129:5, 129:7, 129:12, 129:14, 129:18, 129:21, 130:2, 130:4, 130:7, 130:12, 130:14, 130:18, 130:21, 130:23, 131:6, 131:8, 131:14, 131:20
prospective [2] - 42:7, 50:16
protection [1] - 55:2
prove [6] - 14:10, 21:17, 61:15, 62:1
provided [1] - 6:6

providing [1] - 45:24
psychologist [1] - 90:25
psychology [2] - 72:16, 72:18
purchase [15] - 17:23, 18:7, 18:13, 18:14, 18:18, 18:20, 18:21, 19:3, 19:6, 19:7, 19:10, 20:2, 23:18, 24:21, 37:4
purchased [1] - 86:19
purchasing [2] - 128:19, 128:20
purpose [2] - 21:12, 36:19
purposes [4] - 34:22, 34:23, 34:24, 35:3
purses [2] - 74:16
pushing [1] - 30:14
pushy [1] - 105:15
put [21] - 4:7, 11:13, 17:15, 17:16, 17:21, 24:20, 24:24, 29:13, 45:20, 50:19, 60:11, 75:3, 99:13, 101:16, 108:11, 111:22, 115:15, 116:3, 120:1, 128:6, 128:11
puts [3] - 56:9, 56:12, 111:21
putting [7] - 9:2, 10:24, 24:23, 39:22, 39:23, 49:10, 74:17
puzzle [2] - 129:11, 129:16
puzzles [1] - 129:9
PWC [9] - 7:15, 7:19, 8:24, 9:3, 10:21, 11:2, 11:14, 12:6, 12:7

## Q

qualifications [1] - 45:21
quality [3] - 96:14, 98:12, 129:20
quarter [2] - 34:9, 34:10
questioned [1] - 132:9
questioning [1] - 32:1
questions [34] - 3:24, 6:16, 43:23, 45:8, 45:20, 46:6, 46:13, 50:1, 62:3, 62:5, 62:7, 65:11, 65:12, 65:14, 65:15, 66:8, 69:25, 70:19, 71:14, 72:9, 75:24, 76:2,

81:10, 85:14, 90:20, 96:10, 108:16, 108:20, 109:2, 113:20, 118:5, 120:14, 123:25, 127:10
**quick** [2] - 53:3, 131:24
**quickly** [9] - 3:23, 4:5, 10:15, 10:25, 13:10, 13:16, 25:24, 42:24, 134:4
**quite** [2] - 83:15, 83:16
**quote** [2] - 14:14, 21:21
**quoted** [1] - 15:9
**quotes** [1] - 128:19

## R

**race** [2] - 60:17, 61:4
**raise** [13] - 27:11, 28:12, 36:14, 40:20, 41:7, 41:9, 41:17, 45:8, 50:4, 52:18, 101:1, 132:21, 133:16
**raised** [21] - 13:16, 29:23, 34:23, 40:21, 45:9, 45:15, 49:17, 49:21, 52:2, 52:13, 53:6, 53:13, 54:13, 57:12, 61:7, 61:20, 62:9, 64:12, 64:18, 64:25, 132:16
**raising** [1] - 62:4
**ran** [3] - 38:15, 38:19, 38:20
**Ranch** [1] - 114:3
**rather** [2] - 12:4, 69:2
**rationale** [1] - 6:4
**Raymond** [1] - 52:7
**reach** [5] - 65:23, 81:17, 93:9, 93:11, 128:20
**reached** [2] - 66:1, 66:4
**reacting** [1] - 19:18
**read** [6] - 5:4, 15:13, 26:14, 26:16, 88:13, 112:6
**reading** [1] - 54:10
**reads** [1] - 26:7
**ready** [4] - 25:15, 42:5, 68:11, 93:20
**real** [8] - 3:23, 19:20, 25:23, 47:12, 85:25, 87:18, 88:9, 131:24
**realization** [1] - 52:15

**realize** [1] - 129:19
**really** [48] - 4:4, 6:12, 8:4, 8:14, 22:23, 23:5, 27:10, 27:11, 29:1, 36:9, 37:6, 39:17, 43:13, 43:17, 46:1, 46:23, 48:11, 50:19, 56:2, 56:3, 56:13, 59:16, 59:18, 60:3, 60:24, 70:4, 70:5, 72:10, 73:15, 74:6, 79:5, 79:17, 89:3, 90:3, 92:24, 93:17, 99:8, 99:9, 99:12, 111:21, 112:9, 112:13, 121:21, 122:10, 127:25, 129:1, 131:10, 133:17
**rearguing** [1] - 25:6
**reason** [7] - 7:13, 17:14, 18:23, 18:24, 24:20, 46:1, 46:10
**reasonable** [25] - 5:21, 15:20, 16:5, 17:10, 17:18, 17:25, 19:16, 27:19, 28:5, 28:8, 28:21, 29:16, 30:18, 30:21, 31:3, 33:9, 33:22, 33:23, 34:12, 35:2, 35:18, 54:7, 61:13, 61:17, 61:22
**reasonableness** [12] - 13:23, 14:5, 14:15, 14:23, 15:17, 15:22, 16:2, 19:25, 20:6, 27:11, 27:18, 40:13
**reasonably** [1] - 49:7
**reasons** [7] - 14:20, 14:21, 15:24, 22:3, 35:1
**rebut** [1] - 36:2
**recalling** [1] - 30:19
**recent** [2] - 47:8, 108:22
**recently** [3] - 41:12, 99:5, 112:21
**recess** [4] - 27:7, 27:8, 113:16, 134:14
**recipes** [1] - 131:10
**recognize** [3] - 45:4, 45:13, 52:15
**recognizes** [1] - 52:4
**record** [23] - 12:1, 15:6, 25:16, 25:18, 45:9, 45:15, 47:23, 49:17, 49:21, 50:2, 52:1, 52:13, 53:6, 53:13, 54:13, 57:12, 58:21, 61:7, 64:12,

64:18, 70:1, 103:17, 133:13
**recovering** [1] - 12:7
**recovery** [1] - 126:14
**recruiting** [1] - 95:20
**recurring** [3] - 5:18, 26:11, 26:22
**red** [2] - 56:23, 56:25
**redone** [1] - 84:21
**reduce** [2] - 5:21, 54:7
**reference** [2] - 7:12, 26:5
**reflect** [15] - 45:9, 45:15, 49:17, 49:21, 52:1, 52:13, 53:6, 53:13, 54:13, 57:12, 58:21, 61:7, 61:20, 64:12, 64:18
**refrain** [5] - 69:24, 72:6, 72:18, 79:6, 83:8
**refrigerator** [5] - 92:10, 114:15, 125:13, 125:14, 133:19
**regardless** [1] - 17:17
**regards** [1] - 71:21
**regular** [1] - 90:3
**rehabilitate** [1] - 30:7
**reimbursement** [1] - 96:22
**relation** [1] - 114:7
**relations** [1] - 63:3
**relationship** [1] - 22:5
**relative** [1] - 48:14
**relatively** [1] - 53:3
**relatives** [2] - 63:6, 63:9
**relaxing** [1] - 122:8
**relevance** [1] - 18:9
**relevant** [8] - 13:22, 13:24, 14:18, 14:22, 15:18, 15:25, 17:17, 23:7
**religion** [1] - 60:17
**reluctant** [1] - 119:22
**remain** [1] - 7:2
**remaining** [3] - 6:14, 9:22, 14:22
**remarried** [1] - 93:16
**remember** [5] - 50:7, 54:21, 97:18, 101:3, 132:15
**remotely** [2] - 104:2, 132:4
**render** [1] - 70:15
**repeat** [1] - 113:4
**report** [1] - 3:24
**reporter** [2] - 84:4, 132:7

**representing** [4] - 41:14, 43:2, 43:9, 117:17
**repudiation** [3] - 22:25, 23:4, 37:13
**request** [12] - 5:17, 12:5, 14:10, 18:15, 20:21, 26:10, 26:21, 36:25, 37:2, 37:3, 54:4
**request-by-request** [1] - 36:25
**requests** [4] - 15:20, 22:25, 23:12, 37:21
**require** [2] - 8:24, 56:3
**required** [2] - 10:21, 11:15
**requires** [3] - 21:6, 56:5, 56:11
**research** [15] - 48:23, 49:9, 49:13, 49:20, 57:23, 57:24, 87:24, 88:3, 88:4, 122:23, 123:1, 123:3, 123:6, 123:11, 127:3
**researching** [1] - 123:16
**reside** [1] - 102:19
**residence** [5] - 65:16, 71:15, 76:3, 85:17, 118:6
**resident** [1] - 127:16
**resist** [5] - 87:23, 100:2, 105:11, 106:2, 117:23
**resolution** [1] - 118:16
**resolve** [11] - 4:24, 5:5, 6:14, 6:17, 8:23, 9:19, 13:9, 13:10, 60:1, 91:19, 119:7
**resolved** [4] - 7:4, 10:9, 23:8, 127:19
**respect** [6] - 28:15, 47:16, 92:20, 93:24, 120:6, 128:23
**respectfully** [1] - 20:3
**respond** [3] - 19:24, 40:6, 75:18
**responding** [1] - 43:15
**response** [9] - 9:14, 14:19, 21:25, 24:2, 40:3, 45:6, 78:11, 80:21
**responses** [1] - 23:3
**responsibility** [1] - 127:25
**responsibly** [1] - 56:14
**rest** [1] - 72:19

**restriction** [1] - 119:14
**restrictions** [3] - 56:8, 122:24, 131:10
**result** [3] - 38:9, 39:25, 55:22
**resulting** [1] - 14:24
**retired** [1] - 119:12
**retirement** [1] - 116:24
**return** [2] - 51:6, 51:10
**rewarding** [1] - 83:12
**Rhow** [4] - 3:19, 42:22, 44:23, 132:12
**RHOW** [43] - 2:9, 2:10, 3:19, 6:1, 6:18, 7:9, 7:12, 9:15, 10:12, 12:14, 13:15, 15:11, 15:22, 20:3, 22:22, 23:20, 24:7, 24:13, 25:17, 27:5, 27:25, 28:4, 28:9, 28:13, 29:22, 30:2, 31:13, 32:12, 32:24, 33:2, 33:6, 34:5, 34:14, 36:24, 40:6, 40:9, 42:22, 44:22, 132:11, 132:20, 133:2, 133:25, 134:6
**rib** [1] - 95:15
**Richard** [4] - 3:8, 42:12, 44:17, 133:8
**RICHARD** [1] - 2:4
**Rights** [4] - 54:25, 55:5, 55:6, 55:8
**rights** [3] - 47:11, 54:25, 55:4
**ring** [1] - 112:21
**rise** [3] - 27:6, 113:15, 134:13
**risk** [1] - 133:12
**robbery** [1] - 47:14
**Rogue** [1] - 68:1
**role** [2] - 43:20, 56:15
**Rome** [4] - 106:13, 106:15, 106:17, 106:22
**room** [9] - 59:8, 72:8, 72:12, 91:7, 99:21, 120:6, 125:23, 131:19, 133:12
**route** [1] - 90:12
**routinely** [1] - 55:14
**row** [1] - 130:8
**Rowe** [1] - 16:7
**rude** [1] - 50:25
**rule** [7] - 58:20, 71:11, 73:16, 78:5, 78:10, 87:7, 108:9
**ruled** [10] - 8:12, 15:16, 17:7, 17:11, 18:2, 21:5, 25:2,

35:22, 37:14, 40:12
**Rules** [3] - 49:2, 49:11, 50:13
**rules** [4] - 8:2, 47:18, 49:3, 70:24
**ruling** [18] - 6:20, 8:15, 9:12, 11:15, 11:17, 14:7, 14:13, 14:14, 15:5, 16:24, 17:7, 18:25, 26:1, 27:14, 28:16, 34:19, 40:15, 40:19
**Rulings** [1] - 13:20
**rulings** [3] - 6:21, 13:18, 14:20
**run** [7] - 38:10, 106:18, 106:20, 106:22, 107:1, 126:12, 126:19
**runners** [1] - 91:15
**running** [4] - 38:25, 106:12, 106:18, 126:9

## S

**SA** [2] - 3:6, 42:10
**Sacramento** [1] - 118:12
**sad** [1] - 121:22
**sales** [1] - 15:17
**Samsung** [111] - 3:6, 3:20, 3:22, 4:18, 5:9, 5:12, 5:14, 5:20, 6:1, 6:3, 6:11, 10:19, 12:3, 12:5, 15:18, 17:8, 17:21, 18:7, 18:19, 19:3, 19:6, 23:22, 25:1, 26:7, 26:18, 27:20, 28:7, 28:17, 28:19, 29:7, 29:18, 32:25, 34:24, 37:10, 39:13, 41:10, 42:10, 42:23, 42:25, 43:2, 43:9, 44:9, 44:10, 53:22, 53:25, 54:1, 54:6, 63:6, 63:7, 63:11, 63:20, 64:2, 64:3, 64:17, 64:22, 68:24, 69:1, 69:4, 69:8, 69:10, 69:15, 72:23, 73:6, 73:7, 73:10, 73:11, 73:15, 73:16, 77:19, 78:5, 78:6, 78:10, 82:10, 82:16, 82:22, 86:14, 86:15, 86:18, 87:7, 92:8, 92:9, 92:16, 92:20, 101:2, 101:4, 101:6,

101:12, 101:14, 108:1, 108:4, 108:9, 108:12, 114:23, 114:24, 114:25, 115:1, 115:2, 115:8, 118:17, 123:5, 123:7, 123:11, 125:11, 125:14, 125:16, 132:12, 132:15
**Samsung's** [6] - 6:8, 8:23, 14:23, 21:23, 39:16
**San** [2] - 71:23, 102:20
**Sang** [1] - 52:7
**Santa** [4] - 76:4, 113:21, 113:25, 114:1
**Sasaki** [1] - 52:7
**satisfaction** [2] - 78:9, 125:15
**saving** [1] - 126:3
**saw** [1] - 18:6
**scariest** [1] - 122:10
**schedule** [3] - 52:24, 53:2, 53:5
**scheduled** [2] - 104:24, 108:22
**schedules** [1] - 88:1
**school** [16] - 95:7, 97:14, 97:21, 108:22, 109:4, 111:14, 117:3, 117:4, 124:10, 124:14, 124:24, 126:9, 127:12, 127:13, 128:16, 128:19
**School** [3] - 96:13, 114:3, 127:13
**scope** [1] - 36:9
**scrapbooking** [1] - 74:10
**screenplay** [1] - 90:1
**screenwriter** [1] - 90:23
**screwed** [2] - 32:4, 32:5
**season** [2] - 130:5, 130:10
**seasons** [1] - 77:5
**seat** [7] - 42:8, 51:7, 51:9, 51:10, 70:20, 75:24, 113:17
**seated** [3] - 44:1, 51:5, 51:11
**seats** [2] - 51:6, 134:3
**second** [6] - 13:2, 26:24, 26:25, 34:9,

34:14, 97:16
**secondary** [1] - 37:9
**seconds** [1] - 122:9
**secret** [1] - 106:6
**secretary** [2] - 113:24
**Section** [2] - 7:22, 28:17
**section** [1] - 26:6
**security** [1] - 103:24
**see** [30] - 4:4, 5:4, 5:5, 6:15, 14:1, 21:12, 34:8, 37:20, 48:1, 51:12, 52:4, 56:13, 57:22, 63:12, 63:15, 65:9, 69:17, 70:1, 75:10, 104:7, 111:25, 121:7, 121:17, 131:1, 131:2, 132:10, 133:16, 133:17, 133:21, 134:4
**seeks** [2] - 6:11, 11:2
**seem** [3] - 19:24, 39:15, 92:6
**sees** [1] - 9:9
**select** [2] - 43:22, 47:2
**selected** [2] - 44:6, 46:19
**selection** [1] - 52:20
**self** [3] - 81:12, 102:20, 116:16
**self-employed** [2] - 81:12, 102:20
**self-insured** [1] - 116:16
**sells** [2] - 5:8, 53:21
**semantics** [1] - 20:4
**send** [2] - 19:3, 19:7
**sending** [2] - 74:3, 74:16
**senior** [1] - 71:22
**sense** [5] - 24:19, 29:21, 30:3, 53:1, 79:18
**sensors** [1] - 67:11
**sent** [2] - 12:4, 19:6
**sentence** [5] - 34:14, 35:21, 38:3, 38:23, 39:5
**sentences** [1] - 35:16
**separate** [4] - 24:8, 31:16, 77:5, 89:16
**sequence** [1] - 30:2
**series** [3] - 14:2, 46:13, 94:8
**serious** [1] - 50:22
**seriously** [1] - 43:18
**seriousness** [1] - 127:24
**serve** [3] - 45:21,

86:10, 119:22
**served** [4] - 53:15, 67:3, 86:2, 127:18
**service** [29] - 12:6, 51:16, 51:23, 54:15, 58:14, 58:17, 63:20, 65:21, 65:25, 71:24, 76:9, 81:17, 83:11, 86:2, 93:3, 93:24, 96:16, 102:25, 107:2, 108:25, 114:4, 118:15, 119:17, 120:7, 120:18, 127:18, 127:22, 127:23
**services** [4] - 90:8, 96:21, 96:22
**serving** [1] - 127:20
**set** [9] - 6:24, 30:25, 39:20, 39:21, 48:3, 81:5, 117:12, 117:16
**sets** [1] - 55:11
**settled** [1] - 93:14
**seven** [1] - 67:22
**Seventh** [1] - 55:7
**sew** [1] - 129:8
**shakes** [1] - 84:7
**shall** [1] - 55:9
**shape** [1] - 113:1
**shaped** [1] - 60:7
**share** [1] - 107:11
**Sharks** [1] - 130:13
**shelf** [2] - 96:25, 97:3
**Sheriff's** [1] - 113:23
**shiny** [1] - 84:23
**short** [1] - 25:21
**shortage** [1] - 22:2
**shortages** [1] - 14:17
**Shortz** [2] - 129:15, 129:16
**shots** [1] - 68:6
**shoulder** [1] - 51:2
**show** [21] - 8:7, 14:18, 18:3, 20:15, 20:25, 21:19, 31:18, 33:22, 35:19, 37:17, 37:18, 39:23, 39:24, 91:7, 91:15, 91:24, 91:25, 94:7
**showing** [6] - 17:24, 20:20, 23:11, 23:12, 34:7, 121:6
**shows** [4] - 20:17, 22:24, 94:5, 94:7
**shut** [1] - 99:1
**side** [16] - 6:11, 30:6, 30:25, 40:16, 44:13, 73:11, 86:25, 93:15, 97:6, 97:13, 101:16, 108:12, 115:16,

118:23, 131:24, 132:21
**Side** [1] - 70:16
**sidebar** [1] - 132:1
**sides** [3] - 9:16, 15:5, 29:12
**significant** [8] - 65:18, 66:14, 71:19, 76:7, 85:24, 102:22, 124:3, 127:14
**Silverlake** [1] - 90:22
**Simi** [2] - 71:20, 117:6
**similar** [1] - 33:17
**similarly** [2] - 66:3, 71:6
**simple** [1] - 56:19
**simply** [1] - 25:7
**single** [2] - 108:24, 120:17
**sit** [5] - 11:4, 46:3, 51:7, 71:2, 72:12
**site** [1] - 72:5
**sitting** [3] - 44:6, 53:20, 56:10
**situation** [1] - 90:11
**skills** [1] - 77:13
**skydive** [1] - 121:23
**skydiving** [2] - 121:21, 121:25
**slate** [1] - 78:13
**slept** [1] - 68:1
**slide** [4] - 7:13, 7:24, 8:4, 9:9
**slides** [8] - 6:23, 7:7, 7:10, 18:6, 33:18, 33:20, 33:21, 65:16
**slowed** [1] - 94:14
**small** [4] - 9:5, 84:17, 84:19, 84:25
**snide** [1] - 109:21
**so-called** [1] - 25:6
**so..** [10] - 67:14, 72:16, 73:8, 80:7, 93:22, 94:18, 95:12, 96:2, 126:5, 126:12
**soccer** [6] - 77:3, 77:15, 77:17, 79:23, 79:24, 80:7
**social** [7] - 41:5, 79:2, 83:4, 87:19, 100:11, 100:12, 122:17
**socially** [1] - 41:4
**software** [7] - 96:18, 96:19, 97:4, 97:11, 97:13, 97:22, 98:1
**sold** [1] - 91:7
**solely** [1] - 21:8
**solution** [1] - 12:17
**solutions** [1] - 12:25
**someone** [3] - 56:24,

91:12, 124:13
**sometimes** [9] - 39:20, 39:21, 51:14, 55:17, 55:18, 59:17, 77:12, 81:24
**somewhat** [1] - 111:19
**somewhere** [1] - 41:13
**son** [9] - 66:20, 91:2, 95:10, 106:17, 114:1, 114:25, 124:5, 126:5, 126:6
**Sony** [4] - 67:20, 67:21, 87:3, 120:25
**soon** [2] - 27:4, 122:9
**sorry** [16] - 13:15, 14:16, 25:17, 26:15, 32:4, 58:22, 59:1, 62:16, 64:8, 93:6, 94:24, 110:24, 113:4, 132:11
**sort** [35] - 5:1, 6:4, 8:3, 13:8, 32:22, 48:15, 54:16, 54:19, 54:23, 54:24, 59:6, 60:6, 68:20, 70:8, 77:10, 77:23, 84:8, 85:2, 87:17, 88:2, 88:4, 88:10, 90:2, 90:6, 92:24, 94:12, 103:22, 104:6, 109:8, 109:17, 109:25, 120:1, 125:21, 128:16, 128:24
**sorts** [2] - 60:10, 82:10
**sound** [2] - 84:8, 86:20
**sounds** [2] - 101:18, 126:23
**South** [2] - 2:6, 2:13
**Southern** [1] - 82:2
**spare** [1] - 80:9
**speakers** [1] - 86:20
**special** [3] - 96:21, 97:8, 97:9
**specialist** [2] - 85:18, 96:12
**specialized** [2] - 85:19, 131:8
**specific** [6] - 31:3, 38:2, 38:4, 62:8, 65:11, 65:14
**specifically** [2] - 85:21, 116:14
**specs** [1] - 128:20
**speech** [1] - 56:6
**speed** [1] - 40:14

**spend** [2] - 8:1, 93:21
**spent** [3] - 9:4, 93:20, 124:24
**Spider** [1] - 68:4
**Spider-Man** [1] - 68:4
**spoken** [1] - 41:6
**sport** [1] - 77:10
**sports** [13] - 76:25, 77:11, 77:12, 79:22, 95:14, 112:6, 112:7, 126:7, 129:7, 129:8, 130:1, 130:17
**spouse** [3] - 76:10, 93:15, 118:10
**spreadsheet** [3] - 37:20
**spring** [2] - 126:12
**squarely** [1] - 9:7
**SSI** [2] - 16:17, 22:6
**staff** [1] - 45:14
**stand** [7] - 44:14, 50:2, 62:12, 63:8, 63:14, 63:22, 65:8
**standard** [8] - 60:4, 60:12, 60:25, 61:16, 61:19, 61:23, 69:7, 69:8
**standpoint** [1] - 19:2
**start** [12] - 4:23, 14:9, 18:1, 40:20, 42:6, 44:16, 51:13, 52:21, 53:2, 53:15, 66:6, 113:18
**started** [5] - 40:19, 120:23, 120:24, 120:25, 130:7
**starting** [2] - 15:13, 39:24
**starts** [3] - 15:11, 28:23, 29:5
**state** [3] - 3:7, 42:11, 75:19
**statement** [7] - 5:3, 5:23, 13:21, 16:7, 26:2, 35:20, 54:10
**statements** [1] - 5:1
**states** [2] - 54:22, 54:25
**States** [3] - 45:12, 64:24, 74:3
**stepchild** [2] - 104:16, 104:18
**stepchildren** [3] - 102:23, 104:12, 104:14
**stepson** [2] - 105:7, 106:1
**Steve** [1] - 21:22
**Steven** [2] - 52:7, 52:9
**stick** [2] - 27:4, 74:14

**still** [21] - 22:20, 23:17, 67:12, 70:25, 78:6, 85:2, 90:6, 90:7, 90:13, 94:7, 95:3, 95:4, 99:1, 110:22, 111:9, 113:1, 117:3, 119:13, 121:5, 125:14
**stipulate** [4] - 9:16, 9:21, 11:9
**stipulated** [2] - 10:7, 12:9
**stipulation** [4] - 10:10, 10:17, 13:1, 13:8
**stock** [5] - 64:17, 70:12, 80:17, 123:5, 123:17
**stocks** [1] - 123:9
**stood** [1] - 44:14
**stop** [2] - 36:11, 36:12
**stopped** [2] - 121:23, 129:15
**straightforward** [1] - 9:5
**stray** [3] - 27:17, 27:22
**strays** [1] - 33:15
**streaming** [2] - 90:8, 90:12
**Street** [1] - 2:13
**street** [1] - 38:20
**strikes** [1] - 44:1
**struck** [1] - 132:23
**stuck** [2] - 77:24, 115:5
**student** [1] - 96:20
**students** [2] - 96:21, 97:17
**studying** [12] - 102:24, 104:16, 104:17, 104:18, 104:19, 106:17, 109:6, 109:9, 109:10, 109:13, 110:21, 112:4
**stuff** [20] - 72:5, 74:17, 78:7, 79:4, 84:24, 86:7, 87:15, 87:18, 88:2, 88:11, 90:8, 95:9, 97:12, 98:2, 98:13, 99:2, 105:25, 116:2, 117:13, 122:20
**style** [3] - 129:21, 129:22
**subject** [1] - 111:13
**submit** [13] - 11:20, 17:23, 18:13, 18:18, 18:20, 18:21, 19:10, 20:13, 23:22, 24:1,

24:21, 31:20, 37:1
**submitted** [2] - 18:7, 31:22
**submitting** [1] - 19:14
**substandard** [2] - 84:23, 85:9
**successfully** [1] - 12:7
**sudden** [1] - 74:23
**suffered** [5] - 5:19, 5:20, 25:8, 29:4, 40:3, 54:5, 54:6
**sufficient** [1] - 97:22
**suggest** [2] - 11:16, 29:11
**suggested** [1] - 11:17
**suits** [1] - 55:9
**summarily** [1] - 9:1
**summary** [2] - 17:12, 29:6
**summons** [1] - 43:15
**Sunday** [1] - 129:13
**supply** [7] - 5:15, 14:23, 21:8, 26:8, 26:19, 54:2, 59:11
**support** [8] - 21:6, 21:24, 33:12, 34:16, 39:6, 96:17, 133:11
**supposed** [4] - 8:5, 17:16, 25:4, 82:4
**sweetheart** [1] - 16:19
**switch** [1] - 70:14
**switched** [1] - 121:1
**sympathize** [1] - 68:8
**symptoms** [3] - 3:25, 121:6
**system** [2] - 96:20, 97:8
**systems** [4] - 85:20, 85:23, 86:8, 97:22

### T

**talks** [5] - 21:3, 21:4, 35:21, 36:16, 50:20
**targeted** [1] - 31:25
**taste** [1] - 93:23
**tax** [3] - 10:20, 12:6, 26:2
**taxes** [3] - 5:17, 26:10, 26:21
**teacher** [2] - 76:12, 118:14
**team** [1] - 43:5
**teams** [1] - 130:20
**tech** [3] - 86:7, 87:15, 87:18
**technical** [5] - 69:24, 69:25, 70:8, 86:12, 88:11
**technically** [1] - 123:6

**technology** [4] - 63:2, 67:21, 70:6, 128:16
**telecommunications** [1] - 103:24
**telephone** [1] - 71:16
**temptation** [3] - 100:2, 105:11, 106:2
**tempted** [1] - 106:3
**ten** [3] - 124:6, 126:6, 126:15
**tend** [2] - 71:1, 97:6
**tennis** [1] - 119:11
**term** [2] - 32:5, 61:14
**terms** [7] - 7:20, 8:3, 16:24, 18:9, 21:16, 29:10, 105:25
**test** [2] - 111:11, 111:12
**tested** [1] - 49:6
**tester** [2] - 120:16, 120:19
**testified** [1] - 16:4
**testify** [2] - 30:4, 32:17
**testifying** [1] - 60:19
**testimony** [20] - 9:11, 12:2, 16:6, 16:10, 16:22, 18:10, 19:20, 24:19, 24:20, 24:23, 30:23, 35:6, 46:9, 47:24, 57:16, 57:22, 58:8, 59:11, 70:2
**testing** [1] - 97:6, 121:1, 121:3, 121:6
**tests** [1] - 4:1
**texts** [1] - 48:17
**THE** [448] - 3:5, 3:9, 3:12, 3:15, 3:18, 3:21, 4:4, 4:10, 4:13, 4:19, 4:22, 6:2, 7:8, 8:19, 9:13, 10:10, 10:14, 11:1, 11:4, 11:9, 11:21, 12:13, 13:5, 13:13, 15:9, 15:15, 17:3, 19:1, 19:5, 19:15, 19:23, 22:15, 23:17, 24:6, 24:11, 24:15, 25:11, 25:20, 25:25, 26:6, 26:14, 26:15, 27:1, 27:3, 27:6, 27:9, 28:3, 28:6, 28:10, 29:15, 29:21, 30:1, 31:1, 31:6, 31:12, 32:9, 32:20, 32:25, 33:3, 34:3, 34:6, 36:22, 37:23, 38:6, 39:11, 40:8, 40:17, 41:24, 42:2, 42:5, 42:8, 42:9, 42:21, 43:1, 43:4, 43:7,

43:10, 44:21, 45:3, 45:6, 45:7, 45:19, 59:1, 59:4, 62:19, 62:23, 62:25, 63:24, 64:1, 64:8, 66:14, 66:17, 66:19, 66:22, 67:1, 67:5, 67:8, 67:15, 67:24, 68:8, 68:16, 68:20, 68:24, 69:6, 69:9, 69:12, 69:16, 69:20, 69:23, 70:7, 70:10, 70:19, 70:22, 71:25, 72:6, 72:10, 72:17, 72:22, 72:25, 73:2, 73:9, 73:13, 73:19, 73:21, 74:6, 74:8, 74:19, 75:1, 75:5, 75:9, 75:16, 75:21, 76:10, 76:13, 76:16, 76:22, 76:24, 77:2, 77:4, 77:9, 77:15, 77:18, 77:23, 78:3, 78:7, 78:9, 78:12, 78:15, 78:18, 78:24, 79:2, 79:4, 79:6, 79:9, 79:15, 79:20, 79:24, 80:3, 80:8, 80:14, 80:19, 80:22, 80:25, 81:5, 81:8, 81:19, 81:22, 82:1, 82:6, 82:9, 82:16, 82:19, 82:22, 82:25, 83:4, 83:7, 83:10, 83:16, 83:19, 83:25, 84:2, 84:7, 84:13, 84:15, 84:19, 85:1, 85:6, 85:11, 86:3, 86:11, 86:14, 86:23, 87:6, 87:10, 87:13, 87:19, 87:21, 87:24, 88:7, 88:10, 88:15, 88:18, 88:23, 89:1, 89:6, 89:12, 89:16, 89:18, 89:23, 90:5, 90:15, 90:19, 91:5, 91:18, 91:25, 92:4, 92:8, 92:15, 92:19, 92:23, 93:3, 93:6, 93:9, 93:23, 94:2, 94:5, 94:9, 94:12, 94:19, 94:24, 95:2, 95:6, 95:10, 95:13, 95:17, 95:21, 95:25, 96:3, 96:6, 96:17, 96:24, 97:10, 97:14, 97:17, 97:20, 98:3, 98:10, 98:14, 98:17, 98:22, 99:3, 99:7, 99:13, 99:17, 99:20, 100:1, 100:5, 100:8,

100:11, 100:14, 100:17, 100:22, 101:1, 101:5, 101:8, 101:11, 101:14, 101:20, 101:24, 102:3, 102:5, 102:10, 102:14, 102:18, 103:1, 103:6, 103:9, 103:16, 103:20, 103:22, 104:1, 104:4, 104:6, 104:10, 104:13, 104:17, 104:21, 105:2, 105:4, 105:7, 105:14, 105:18, 105:24, 106:4, 106:9, 106:15, 106:17, 106:22, 107:2, 107:5, 107:7, 107:11, 107:14, 107:20, 108:1, 108:5, 108:8, 108:11, 108:15, 108:18, 109:1, 109:4, 109:6, 109:8, 109:17, 109:21, 109:24, 110:5, 110:9, 110:14, 110:21, 110:24, 111:3, 111:9, 111:13, 111:16, 111:20, 111:25, 112:4, 112:7, 112:9, 112:12, 112:14, 112:16, 112:19, 112:23, 113:2, 113:5, 113:9, 113:15, 113:17, 114:6, 114:9, 114:13, 114:18, 114:22, 115:3, 115:7, 115:11, 115:14, 116:4, 116:13, 116:21, 116:25, 117:7, 117:17, 117:23, 118:2, 118:17, 118:20, 118:22, 118:25, 119:3, 119:6, 119:9, 119:14, 119:17, 119:21, 119:24, 120:5, 120:10, 120:19, 120:22, 121:4, 121:8, 121:14, 121:19, 121:25, 122:2, 122:4, 122:6, 122:12, 122:17, 122:19, 122:22,

123:2, 123:7, 123:9, 123:14, 123:19, 123:21, 124:8, 124:10, 124:17, 124:20, 125:1, 125:5, 125:8, 125:11, 125:15, 125:19, 125:25, 126:2, 126:6, 126:13, 126:17, 126:23, 127:2, 127:5, 127:9, 127:22, 128:6, 128:10, 128:13, 128:15, 128:22, 129:3, 129:6, 129:10, 129:13, 129:16, 129:19, 129:24, 130:3, 130:5, 130:10, 130:13, 130:15, 130:20, 130:22, 130:24, 131:7, 131:12, 131:16, 131:21, 132:3, 132:6, 132:19, 133:1, 133:3, 133:6, 133:15, 133:22, 134:2, 134:7, 134:10, 134:13
**theaters** [3] - 90:7, 90:9, 90:14
**themselves** [4] - 44:12, 45:5, 78:21, 78:25
**theories** [1] - 6:9
**thereby** [1] - 10:20
**therefore** [1] - 28:21
**they've** [6] - 24:24, 44:11, 61:15, 68:10, 74:16, 95:20
**thinking** [5] - 46:15, 87:6, 89:7, 92:5, 92:17
**thinks** [1] - 4:2
**third** [2] - 34:10, 35:21
**third-to-last** [1] - 35:21
**Thousand** [1] - 118:7
**thousands** [1] - 69:4
**three** [13] - 6:6, 6:8, 6:10, 22:13, 24:11, 24:17, 25:12, 35:16, 92:11, 111:3, 118:11, 127:14, 127:21
**thrilled** [1] - 74:21
**thrust** [1] - 19:20
**tied** [2] - 16:12, 23:24
**timing** [2] - 6:19, 44:3

**today** [17] - 8:16, 14:2, 18:6, 43:6, 43:12, 44:8, 45:20, 46:9, 52:20, 53:2, 53:9, 53:10, 54:16, 56:1, 64:5, 64:11, 68:11
**today's** [2] - 6:24, 7:5
**toe** [1] - 126:10
**together** [4] - 13:20, 51:13, 117:3, 117:5
**ton** [2] - 37:21, 86:9
**tonight** [3] - 57:24, 58:3, 82:4
**took** [6] - 12:8, 13:24, 16:6, 24:9, 39:8, 45:17
**top** [1] - 49:24
**touch** [1] - 51:20
**touched** [1] - 110:16
**touching** [1] - 45:20
**tough** [2] - 111:25, 131:2
**tournament** [2] - 117:2, 117:5
**towards** [3] - 73:10, 109:20, 115:8
**towns** [1] - 99:11
**toys** [1] - 74:14
**track** [2] - 49:25, 126:12
**tracking** [1] - 96:22
**trade** [1] - 90:23
**trading** [2] - 123:5, 123:9
**traditional** [1] - 112:14
**traffic** [2] - 83:18, 116:15
**trailer** [1] - 81:15
**training** [2] - 106:13, 124:14
**travel** [2] - 80:7, 98:25
**trepidation** [2] - 117:8, 131:13
**trial** [54] - 4:24, 7:3, 7:5, 8:1, 8:13, 8:16, 10:3, 12:21, 13:24, 16:2, 16:3, 20:20, 23:9, 24:9, 33:8, 36:9, 37:6, 37:7, 37:15, 38:7, 38:17, 38:21, 39:10, 47:7, 47:22, 48:9, 48:11, 49:6, 50:10, 51:25, 52:16, 52:22, 53:1, 53:3, 53:8, 53:11, 55:7, 55:9, 56:18, 66:3, 71:3, 81:19, 81:20, 83:21, 83:23, 88:5, 89:13, 91:20, 111:17, 118:15,

123:10, 127:19
**trials** [8] - 6:10, 41:11, 47:7, 47:8, 47:9, 68:9, 116:18
**Trojan** [3] - 36:13, 95:6, 95:7
**Trojans** [1] - 95:19
**truck** [2] - 67:11, 81:14
**true** [9] - 9:16, 16:7, 16:9, 45:19, 46:8, 46:20, 62:1, 62:2, 95:1
**truthful** [1] - 61:3
**try** [13] - 27:23, 37:2, 37:3, 44:2, 52:20, 95:3, 95:15, 97:21, 97:24, 117:25, 128:7, 129:14, 131:16
**trying** [22] - 7:3, 18:15, 22:13, 28:19, 36:11, 36:12, 37:7, 37:9, 46:23, 46:24, 48:15, 68:6, 69:13, 90:12, 92:12, 101:21, 103:13, 109:24, 109:25, 110:18, 117:18, 121:22
**Tuesday** [1] - 52:25
**turned** [1] - 51:22
**turning** [1] - 51:24
**TV** [9] - 47:7, 58:11, 58:15, 67:11, 67:12, 82:15, 94:6, 101:3, 118:19
**TVs** [4] - 77:21, 78:7, 101:8, 114:25
**two** [24] - 3:25, 6:18, 6:22, 9:20, 12:25, 26:10, 26:21, 47:10, 47:13, 76:8, 76:18, 80:6, 89:16, 91:1, 99:1, 102:23, 104:12, 111:2, 111:3, 113:25, 114:25, 117:19, 122:9, 131:25
**type** [1] - 91:13
**types** [1] - 86:4
**typical** [1] - 53:8
**typically** [1] - 70:12
**Tyson** [2] - 112:19, 112:20

---

## U

**ubiquitous** [1] - 69:2
**UCLA** [2] - 91:3, 95:11
**UFC** [2] - 112:9,

112:12
**ultimately** [1] - 8:2
**unacceptable** [2] - 33:14, 35:10
**uncertain** [1] - 101:25
**uncomfortable** [1] - 46:5
**under** [11] - 5:14, 7:18, 7:22, 8:9, 9:8, 9:22, 11:10, 26:7, 26:18, 54:1, 56:10
**understood** [4] - 7:17, 28:13, 32:18, 36:4
**undisputed** [1] - 7:20
**undue** [1] - 72:19
**unemployed** [1] - 127:15
**unfair** [4] - 15:2, 27:20, 31:16, 48:11
**unfairness** [2] - 35:12, 40:15
**unh** [2] - 84:8
**unh-unh** [1] - 84:8
**Unified** [2] - 96:12, 127:13
**Unifor** [1] - 85:19
**unique** [1] - 97:3
**United** [3] - 45:12, 64:24, 74:3
**University** [1] - 114:2
**unknowingly** [1] - 50:17
**unless** [1] - 18:7
**unnecessary** [2] - 8:8, 8:18
**unreasonable** [18] - 14:4, 15:3, 21:20, 27:21, 28:1, 29:16, 29:25, 30:5, 30:8, 31:3, 32:6, 32:11, 32:21, 33:7, 33:9, 33:19, 34:12, 36:18
**unreasonableness** [5] - 14:6, 15:23, 22:14, 34:18, 34:23
**unsettling** [1] - 91:14
**up** [48] - 6:22, 6:23, 6:24, 8:15, 8:17, 13:7, 17:19, 24:23, 25:10, 25:19, 29:3, 33:8, 34:2, 36:21, 41:4, 41:7, 44:14, 50:2, 55:21, 62:7, 62:12, 63:8, 63:14, 63:22, 65:8, 65:12, 66:7, 67:12, 68:10, 68:18, 71:9, 74:25, 80:15, 94:7, 94:25, 98:7, 98:8, 112:19, 114:1, 117:2,

118:12, 118:15, 121:5, 123:5, 126:10, 134:7
**urge** [2] - 87:22, 87:23
**USC** [1] - 130:21
**useable** [1] - 98:1
**user** [1] - 92:25
**users** [1] - 97:7
**uses** [3] - 55:13, 115:1, 115:6

## V

**vaccinated** [1] - 4:12
**Valencia** [1] - 117:1
**Valley** [4] - 71:15, 71:20, 117:4, 127:13
**variety** [1] - 34:22
**varnish** [1] - 84:23
**vehicle** [2] - 7:16, 20:1
**vendors** [2] - 128:21, 128:23
**Ventura** [1] - 127:11
**verdict** [7] - 65:23, 66:2, 66:4, 93:10, 93:12, 93:22
**Verne** [2] - 81:12, 83:16
**version** [1] - 68:5
**versus** [2] - 39:12, 95:17
**via** [1] - 27:23
**view** [1] - 132:21
**violation** [5] - 23:15, 45:25, 46:8, 46:10, 46:20
**visit** [1] - 104:23
**Vista** [1] - 117:1
**visual** [1] - 68:3
**vitally** [1] - 47:21
**voice** [1] - 131:18
**VoIP** [1] - 71:18
**voir** [2] - 43:21, 49:25
**volleyball** [2] - 95:5, 126:11
**voltage** [1] - 76:6
**volume** [1] - 98:3
**vs** [3] - 3:6, 42:10, 44:9

## W

**wait** [2] - 35:11, 36:18
**Wait** [1] - 35:23
**waiting** [1] - 51:17
**walk** [4] - 99:9, 99:10, 99:11
**walked** [1] - 38:15
**Walker** [1] - 91:2
**wants** [6] - 22:16,

30:4, 37:8, 77:10, 126:11, 126:17
**warehouse** [2] - 96:15, 98:11
**wash** [1] - 18:16
**wasting** [1] - 10:9
**watch** [4] - 95:5, 112:6, 112:7, 129:7
**watched** [1] - 47:7
**watching** [1] - 130:19
**water** [1] - 71:20
**ways** [3] - 22:12, 22:22, 38:20
**wayward** [1] - 127:16
**wear** [1] - 70:25
**wearing** [2] - 71:1, 71:10
**WEDNESDAY** [1] - 3:1
**week** [2] - 68:3, 106:6
**weeks** [2] - 126:11, 126:20
**weird** [1] - 122:7
**welcome** [4] - 4:23, 43:12, 43:18, 52:24
**West** [3] - 70:16, 85:17, 114:3
**westbound** [1] - 58:19
**whatsoever** [1] - 119:5
**whole** [2] - 107:8, 124:22
**whoop** [1] - 124:16
**whoop-de-doo** [1] - 124:16
**whys** [1] - 37:14
**wife** [4] - 48:6, 77:22, 90:25, 113:23
**wife's** [1] - 79:9
**willing** [1] - 41:17
**wins** [1] - 130:8
**wish** [1] - 109:13
**withheld** [1] - 12:8
**withholding** [4] - 5:17, 26:2, 26:10, 26:21
**witness** [6] - 47:24, 52:16, 60:22, 60:23, 103:14
**witnesses** [13] - 6:24, 19:10, 29:3, 48:2, 52:3, 52:11, 57:17, 59:14, 60:4, 60:19, 60:24, 64:21, 71:5
**WOLPERT** [1] - 2:9
**wonder** [1] - 10:1
**wondering** [1] - 104:25
**word** [3] - 15:7, 95:16, 122:12
**words** [1] - 38:8
**works** [10] - 6:15,

66:20, 66:24, 71:21, 81:15, 103:23, 104:1, 104:2, 113:23, 128:1
**world** [5] - 24:8, 60:7, 60:8, 60:9, 90:3
**worse** [1] - 36:16
**worth** [2] - 17:10, 20:24
**wow** [6] - 79:24, 97:20, 121:25, 124:17, 126:13, 127:22
**wrinkle** [1] - 6:15
**write** [4] - 84:8, 89:25, 91:15, 111:10
**writes** [1] - 34:15
**writing** [3] - 88:14, 90:2, 91:11
**wrongfully** [1] - 12:7
**wrote** [2] - 14:19, 35:18

## Y

**yard** [1] - 126:9
**year** [11] - 35:9, 70:18, 91:2, 95:19, 106:13, 106:16, 117:2, 117:5, 120:24, 130:6, 131:1
**years** [15] - 40:22, 41:3, 67:23, 68:19, 99:1, 115:20, 116:2, 117:4, 117:13, 118:9, 124:14, 124:15, 127:19, 127:21
**Yee** [1] - 118:13
**Yoder** [5] - 3:22, 40:24, 41:2, 43:2, 45:1
**YODER** [12] - 2:12, 3:22, 4:6, 4:12, 4:15, 25:23, 26:1, 26:12, 26:25, 43:2, 43:5, 45:1
**Yoo** [1] - 52:7
**York** [6] - 7:18, 9:8, 9:22, 9:23, 97:16, 129:10
**young** [3] - 76:8, 76:18, 95:4
**yourself** [6] - 58:6, 58:15, 69:9, 89:20, 123:19, 133:6
**Yu** [1] - 52:7

## Z

**zero** [16] - 18:12, 21:3, 21:24, 22:17, 24:22, 24:24, 30:10, 30:12, 32:14, 33:1, 33:5, 35:24, 36:7, 39:20, 39:21, 39:25