```
1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

4

5    NETLIST, INC., a Delaware            )
     corporation,                        )
6                                        ) CASE NO.
                        Plaintiff,       ) 20-CV-993-MCS
7                                        )
             vs.                         )
8                                        )
     SAMSUNG ELECTRONICS CO., LTD., a    )
9    Korean corporation,                 )
                                         )
10                      Defendant.       )
     _____)
11

12

13

14               REPORTER'S TRANSCRIPT OF JURY TRIAL

15                      DAY 2 - VOLUME III

16                 THURSDAY, DECEMBER 2, 2021

17                        8:38 A.M.

18                  LOS ANGELES, CALIFORNIA

19

20

21

22   _____

23            MAREA WOOLRICH, CSR 12698, CCRR
             FEDERAL OFFICIAL COURT REPORTER
             350 WEST FIRST STREET, SUITE 4311
24            LOS ANGELES, CALIFORNIA 90012
                 mareawoolrich@aol.com
25
```

```
 1                      APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF:

 4        GIBSON, DUNN & CRUTCHER LLP
          BY:  RICHARD DOREN
 5        BY:  JASON LO
          333 South Grand Avenue
 6        Los Angeles, CA 90071

 7

 8   FOR DEFENDANT:

 9        BIRD, MARELLA, BOXER, WOLPERT,
          NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
10        BY:  EKWAN RHOW
          1875 Century Park East, 23rd Floor
11        Los Angeles, CA 90067

12        O'MELVENY & MYERS LLP
          BY:  MARC FEINSTEIN
13        400 South Hope Street, 18th Floor
          Los Angeles, CA 90071
14
          O'MELVENY & MYERS LLP
15        BY:  MICHAEL YODER
          610 Newport Center Drive, Suite 1700
16        Newport Beach, CA 92660

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                           **I N D E X**

2                    THURSDAY, DECEMBER 2, 2021

3   **VOLUME III**

4
        ---------------------------------------------------------
5
                **CHRONOLOGICAL INDEX OF WITNESSES**
6

7
    **WITNESS**                                              **PAGE**
8
    PAIK KI HONG
9        DIRECT EXAMINATION (RESUMED) BY MR. LO            42
         CROSS-EXAMINATION BY MR. RHOW                     61
10

11

12      ---------------------------------------------------------

13                      **INDEX OF EXHIBITS**

14
                       <u>RECEIVED INTO EVIDENCE</u>
15

16  Exhibit No. 287                                         54
    Exhibit No. 313                                         59
17  Exhibit No. 355                                         51
    Exhibit Nos. 358 and 359                                47
18  Exhibit No. 380                                         57
    Exhibit No. 1024                                       103
19  Exhibit No. 1048                                       104
    Exhibit No. 1055                                       116
20  Exhibit No. 1086                                        83
    Exhibit No. 1245                                        62
21  Exhibit No. 1333                                        44
    Exhibit No. 1336                                        68
22  Exhibit No. 1350                                       117
    Exhibit No. 1352                                       102
23  Exhibit Nos. 1483, 1484, and 1487                       76
    Exhibit No. 1046                                        91
24  Exhibit No. 1353                                        93

25

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 2, 2021

 2                            8:38 A.M.

 3                             -oOo-

 4

 5              THE COURTROOM DEPUTY:  Calling Item Number 1,

 6    SA 20-993 Netlist Inc. vs. Samsung Electronics Co., Ltd.

 7              Counsel, state your appearances, please.

 8              MR. DOREN:  Good morning, Your Honor.  Richard Doren

 9    for Netlist.

10              THE COURT:  Good morning.

11              MR. LO:  Good morning, Your Honor.  Jason Lo for

12    Netlist.

13              THE COURT:  Good morning.

14              MR. BEST:  Good morning, Your Honor.  Timothy Best

15    also for Netlist.

16              THE COURT:  Good morning.

17              MR. HONG:  Good morning, Your Honor.  Chuck Hong for

18    Netlist.

19              THE COURT:  Good morning.

20              MR. RHOW:  Good morning, Your Honor.  Ekwan Rhow on

21    behalf of Samsung.

22              THE COURT:  Good morning.

23              MS. SHIN:  Good morning, Your Honor.  Kate Shin on

24    behalf of Samsung.

25              THE COURT:  Good morning.
```

1            MR. YODER:  Yes, Your Honor.  Michael Yoder for

2     Samsung.

3            THE COURT:  Good morning.

4            MR. FEINSTEIN:  Marc Feinstein for Samsung.

5            THE COURT:  Good morning.

6            Okay.  Good morning, everybody.  I just wanted to

7     talk about one of the disputed instructions.

8            So on jury instructions, I think there's still a

9     dispute over the instruction on claims and defenses.  The Court

10    is going to adopt Samsung's proposed instruction on claims and

11    defenses, but I'm going to remove the words "some of" in the

12    sentence:  "The Court determined that Samsung did not fulfill

13    some of Netlist's requests for NAND and DRAM products in breach

14    of Section 6.2."

15           And then the Court is also going to remove the

16    paragraph on the Section 3.1 theory.  I think that's more

17    consistent with the Court's order.

18           The Court is going to also remove some of the

19    instructions relating to the tax issue that we are not

20    discussing here.  What I'm going to do is I'm going to give you

21    a revised instruction on that, and then if there's any issues

22    on the Court's revised instruction, we can talk about it on the

23    next break.

24           Other than that, are there any other issues that the

25    parties have that we need to resolve?

1          MR. LO:  Good morning, Your Honor.  Jason Lo for

2    Netlist.

3          The parties have been exchanging exhibits the night

4    before to try to streamline some of the exhibit objections.

5    And in looking at the exchanges from yesterday evening, we

6    think there's one global issue that might benefit from the

7    Judge's guidance outside the presence of the jury.  And that

8    issue is this:

9          It appears that Samsung will be putting on

10   testimony, either through cross-examination or direct, that it

11   failed to fulfill some of the orders because Samsung doubted

12   Netlist's ability to pay either because it was at the credit

13   line or it was exceeding the credit line.

14         And our view of that is that that line of

15   examination is barred by the Court's MIL ruling, and

16   specifically the Court's -- excuse me, Your Honor --

17   Docket 243, page 8, lines 6 to 7.  And in that portion of the

18   MIL ruling, the judge -- Your Honor had reviewed Samsung's

19   Response to Interrogatory 2 and confirmed that when we asked

20   Samsung, "Tell us about all of the instances in which you

21   limited or restricted or cut off supply to Netlist, tell us

22   when those instances were and why did you do so."

23         And as the Court noted, Samsung's response had

24   nothing that was based on any conditions particular to Netlist

25   or its product orders.

1        And so for Samsung to now come in and say, "Well, we

2   couldn't fulfill this January 2018 order because your credit

3   was no good, because we doubted your ability to pay," that is

4   in violation of their discovery obligations with respect to

5   Rog Number 2.

6        And as the Court will recall, the version of Rog 2

7   that the Court considered for the MIL was one that they

8   actually supplemented after an order by Judge McCormick that

9   they had to respond to it, and they did.

10       And when we pressed further on it, both Samsung and

11  Judge McCormick noted, look, you know, they are taking a very

12  broad position that we are just -- we just didn't supply, and

13  it didn't matter what the reasons were.  And that's a lane

14  that's favorable to Netlist, and now they've got to stay in

15  that lane and not challenge any specific instances by saying,

16  "Well, we didn't supply because your credit was no good at the

17  moment."

18       In all candor with the Court, I did want to direct

19  the Court's attention to footnote 6 on the same page.  And in

20  that footnote Your Honor said that, you know, "Netlist's

21  creditworthiness and payment history with Samsung may inform

22  whether Netlist would have been able to complete NAND and DRAM

23  purchases."

24       So the Court did make that statement.

25       And the distinction I'm drawing here, Your Honor, is

1    that in order for the testimony to be admissible here, it's got

2    to be two things.  It's got to be relevant, and it's got to be

3    something that was disclosed during discovery.

4            So the Court's comment on footnote 6 -- and I can

5    address the relevance.  I do think we have a problem with the

6    relevance -- goes to relevance, but it's an "and" that Samsung

7    needs to satisfy.  It needs to be both relevant and have been

8    disclosed in discovery.  And I think, on this particular issue,

9    if the Court just looks at the discovery and the procedural

10   aspects of it, the Court never need reach the issue of

11   relevance.

12           THE COURT:  Can you remind me?  I know we talked

13   about this at the MIL hearing, but what was the interrogatory

14   and the answer?

15           MR. LO:  I can hand up the response if the Court

16   would find that helpful.

17           THE COURT:  Sure.

18           MR. LO:  And the request itself is on page 5, and

19   it's Interrogatory Number 2.  And the relevant language is on

20   line 23 where we are asking for not just denials but reduced,

21   limited or restricted as well.  And then we ask for the reasons

22   why such requests or orders were not fulfilled.

23           THE COURT:  Okay.  Thank you.

24           MR. LO:  Thank you.

25           THE COURT:  Let me hear from Samsung on this.

1          MR. RHOW:  Your Honor, first, I would note on

2    footnote 6 in terms of the relevance of the evidence, I don't

3    think either side disputes that.  That did not come up during

4    oral argument.  The broader point I would make is twofold.  One

5    is the -- and I think this was mentioned during the MIL.

6    Depositions in this case occurred right up to August 15th.  It

7    was during the last two depositions, which were P. K. Hong and

8    Chuck Hong, all of this -- all of the documents you are seeing

9    here today a lot of them, Mr. Hong was questioned on and gave

10   answers, and those answers are clearly things that they are

11   aware of and things that we went into.

12          I do not know or recall if there was supplemental

13   interrogatories given the day -- I think the cutoff was the day

14   we took Mr. Hong, Mr. P. K. Hong.  I don't know if

15   supplementals were given that day.  Obviously we got the

16   information that day.

17          But in terms of this particular rog, what this talks

18   about is ability to fulfill, which I don't think is related to

19   ability to complete to pay for that which we are giving an

20   allocation on.

21          And so the issue of allocation which we've talked

22   about a lot during the course of this trial is what this

23   interrogatory is geared toward.  In terms of causation, which

24   is why we are here today, that's a separate issue.  Assuming

25   there is an order that can be fulfilled, can Netlist pay for

1    it?  That's a causation issue related to -- excuse me --

2    damages.

3            And so in terms of disclosure, I would say this has

4    been litigated throughout this case.  Obviously litigated right

5    to the end of the discovery.  And now that this is a damage

6    trial only, this issue relates to causation.  And that's why we

7    are presenting it.  And it's relevant.

8            THE COURT:  As I read this interrogatory, it

9    essentially says tell us for every order that was not fulfilled

10   or reduced or capped or something, what were the reasons why.

11   And the response doesn't indicate anywhere that one of the

12   reasons why an order wasn't fulfilled or why an order was

13   capped or why there was a restriction, it doesn't indicate that

14   creditworthiness was a reason.

15           MR. RHOW:  So, Your Honor, in terms of fulfillment,

16   right, in terms of -- the allocation is a separate issue.

17   Right?  So allocation is a product availability issue.  That

18   occurs agnostic to the customers before a chip is ever made.

19           So, you know, there's a lead time of six to

20   eight weeks at the fabs.  You have a ton of purchase orders

21   coming in.  And then you make an allocation.  You could be

22   giving allocations to a lot of folks who can't pay for it or

23   can't afford it, or it might be going -- you know, might have

24   financial issues at the time the chips come due.

25           The purchase order is submitted, it's approved, it's

accepted, and so there's an agreement to allocate to fulfill.
This issue then becomes a finance issue on the back side,
that -- to me a causation issue as to whether it's linked to
damages because, if they couldn't pay for it anyways, there's
nothing -- they can't cover because they don't have the money
to pay for it or the credit to pay for it.

So that's why I think footnote 6 is important.  It's
relevant to an issue that's not covered by the interrogatory.

THE COURT:  And so creditworthiness is going to come
in with respect to their ability to cover?

MR. RHOW:  To me that's where it's related.  Because
on the back side -- in terms of the transaction and how it
works, and Mr. Knuth is the expert on this, the PO is accepted.
Product is allocated.  And when it's about to be shipped,
literally at that moment, there's an issue -- they check the
credit.

So it's creditworthiness to a certain extent, but
it's more availability of credit at that moment.  And if they
do not have that credit, the product's not shipped.

Now, if they -- the argument -- and this is really
for the jury to decide.  It's a question of fact to me.  If
they cannot afford that chip for whatever reason, then they
wouldn't be able to cover anyways on it because they don't
have -- they couldn't afford the chip in the first place.

And so to me the reason we are raising it is not

1   on -- because allocation -- you know, we are barred from

2   talking about it, and I understand that, but it's related to

3   causation.

4           THE COURT:  So you are saying you are not going to

5   try to bring in the creditworthiness issue to justify why

6   Samsung didn't ship product?

7           MR. RHOW:  Yeah.  It's going to be a causation

8   issue.  And the emails that come in talk about their ability to

9   pay at that time, which then I'm going to argue to the jury is

10  also a factor in whether or not they could have covered and

11  whether or not there's a corresponding cover purchase.

12          THE COURT:  So the argument goes that they can't

13  claim damages for their inability to get Samsung product

14  because they couldn't pay for it?

15          MR. RHOW:  Essentially.  It's a causation to damages

16  argument which is part of this trial.

17          THE COURT:  Okay.  Let me hear from counsel.

18          So the -- what I hear Samsung saying is they are not

19  bringing it in to justify their action.  They are bringing it

20  to limit your damages because how can you claim damages for a

21  product that you couldn't pay for?

22          MR. LO:  So we can make an offer of proof either in

23  front of the jury or outside.  But our damages theory are based

24  on reseller purchases that went through.  In other words, if we

25  couldn't pay for a reseller purchase and it didn't occur, that

1    is not a part of our damages model.  So by definition, every

2    purchase we made at the reseller level, we actually paid for

3    and got the product.

4            Then the other thing I want to draw the distinction

5    is --

6            THE COURT:  So to be clear, your damages are based

7    on -- are solely based on products that you bought from

8    resellers that you couldn't get from Samsung?

9            MR. LO:  Correct.  And if there is a suggestion that

10   we tried to get something from a reseller and we couldn't

11   afford it, if we couldn't afford it and that transaction did

12   not go through, it is not part of our damages model.  Our

13   damages model is based on $53 million of actual purchases from

14   resellers and the overcharge based on that.  That's the entire

15   of the damages model.

16           THE COURT:  Are there significant issues with

17   respect to timing in that you wanted to buy from Samsung --

18   excuse me -- you didn't have the credit to do it, some time

19   passed where your financial circumstances changed, and then you

20   were able to purchase products to cover?

21           MR. LO:  There's been no evidence of that, and none

22   of these documents speak to that.  These documents are really

23   just about why Samsung chose not to give it to us.

24           If they want to go through our -- we showed

25   Mr. Hong, or we will show Mr. Hong, a list of all of the

14

1    reseller purchases.  If they want to cross him and say, "On

2    this particular date, you didn't have enough money here,"

3    that's fine.  All I'm saying is what they don't get to do is to

4    say or justify the Samsung decision not to sell to us in the

5    first place because of a credit issue.

6           THE COURT:  Right.  Right.  And I think that's in

7    keeping with the discussion we had at the motion in limine and

8    certainly the interrogatory response that doesn't indicate

9    anything about creditworthiness.

10          And I understand it was late in the game, but

11   obviously it could have been supplemented post discovery.  And

12   I think the parties have an ongoing obligation to supplement

13   interrogatory responses if there's new information that they

14   tend to rely on at trial.

15          So it seems to me the issue we've got is -- I mean,

16   if counsel is right, that they are not going to be looking for

17   damages for products that they didn't buy, I don't see where

18   creditworthiness comes in.

19          MR. LO:  And if I could add one thing just to the

20   timeline.  There's no disagreement in terms of the timeline in

21   terms of whether they supplemented or not.  They didn't.  But I

22   have a slightly different characterization of why that was.

23          All of the emails for which they want to use this

24   credit issue have Samsung people on them.  They had these

25   emails the entire time.  And I think there was a decision not

1    to supplement before they took the depositions of Mr. Hong,

2    Mr. Paik Ki Hong, because they wanted the element of surprise

3    in the deposition.

4          And so they didn't disclose it before the deposition

5    even though these are their emails, and they did not supplement

6    after the deposition despite the fact that this specific

7    interrogatory was the subject of an order by Judge McCormick.

8          THE COURT:  And I'm right about that rule, the

9    parties have to supplement interrogatory responses up until

10   trial; correct?

11         MR. LO:  I believe that's correct.  It's 26(e) or --

12   but I believe that is correct.  And I will look at that.  But

13   in any event they could have supplemented before the close of

14   fact discovery, and they didn't even do that.

15         And, in fact, they did, as the Court may recall, on

16   the last day of fact discovery late in the evening, Samsung

17   made a series of supplemental disclosures in interrogatory

18   responses, and this was not one of them.

19         THE COURT:  I think you're right about 26(e).

20         Okay.  Let me hear from counsel for Samsung because

21   I think we don't have an issue here.  So tell me why we do.

22         MR. RHOW:  Don't have an issue in terms of how it

23   can be used in the course of the trial?

24         THE COURT:  Yeah, it doesn't seem like

25   creditworthiness comes in based on the facts that we're dealing

1    with.

2            MR. RHOW:  First of all, you have to accept one

3    fundamental premise, which we are literally trying this case

4    on, which is all of those reseller purchases are Samsung's

5    fault.  Right?  And the problem, as I mentioned in opening, is

6    this whole matching is the whole reason we are here.

7            Mr. Lo presented the exact question which creates

8    the relevance of this information.  What he said right now is

9    they are allowed to say on a particular date, "Did you have

10   enough money for this?  Could you have bought more?  Did you

11   have enough money to buy less?" -- I'm sorry -- "Did you not

12   have enough money to buy what you wanted to?  Is there reasons

13   why you did not cover on a particular date or not?"

14           All of these things come into play because we are

15   going to need to match up an unfulfilled order with a reseller

16   purchase on a particular date.  And if they are going to argue

17   that they are all Samsung's fault, that matching has to occur,

18   first of all.  And then, second, Mr. Lo just said it, I'm

19   allowed to ask Mr. Hong on a particular date, "Did you have

20   enough money or not?"

21           How does then the credit issues not come into play?

22   Because on those dates, and you'll see the emails where they're

23   saying, "Look, we can only buy up to X amount, only buy up to Y

24   amount."  That literally answered the question.

25               In fact, I don't have anything else to cross him on.

I can ask him the question, and he'll say whatever he says, but the way I cross him on that question that Mr. Lo just presented is then to show him these emails which show, well, no, you were having some issues here.

It's literally responsive to that question.

THE COURT:  But do you disagree with Mr. Lo's statement that they are only looking for damages for products they actually bought?

MR. RHOW:  They are for reseller purchases that they actually bought?

THE COURT:  Yes.  Right.

MR. RHOW:  Right?  I'm hoping that's the case.

THE COURT:  So if they are only looking for damages for purchases they actually bought, explain to me again, how does creditworthiness matter?

MR. RHOW:  Because -- and this is where the matching up, I believe, is important.  Because you're not going to see clean match-ups between requested chips on Exhibit 311 and the reseller purchase on 380.

Every -- there's going to be a thousand of these. And if Mr. Hong is going to testify specifically about them, which I don't think he will, I need to be able to explain why covered purchases occurred or did not occur in any particular time frame.

And just going to back to sort of -- I think we're

```
 1   down to --
 2            THE COURT:  Let me push back on this statement.  So
 3   are we -- why are we concerned with cover purchases that didn't
 4   occur?  Because as I understand it --
 5            MR. RHOW:  I'm not.  I'm not concerned about that.
 6            THE COURT:  As I understand it, they're not claiming
 7   damages for cover purchases that didn't occur; correct?
 8            MR. RHOW:  Correct.  Correct.  I'm not concerned
 9   about that.  I guess the argument I'm making is really about
10   causation to the ability to cover or not cover.  And so that's
11   where this information becomes relevant.
12            (Discussion held off the record.)
13            MR. RHOW:  On the reseller side, it is true.  I
14   mean, we are happy that they are only seeking damages on
15   reseller purchases that occurred.
16            Let me take a step back in terms of why this
17   evidence is important.  And maybe I didn't explain it right,
18   and maybe Marc at some point should explain it instead of me.
19            But in terms of not the decision as to whether or
20   not to fulfill but whether or not they could have made that
21   purchase, that's where the credit issues come in; right?  So I
22   think I'm still in the causation world when I'm explaining
23   this, which is it's not about allocation, which was the
24   original thrust of the interrogatory and was the original
25   thrust of the MIL.  You can't get into the reasons -- and this
```

```
 1    is the discussion from yesterday in essence; right?
 2            Allocation is out.  You can't talk about the reasons
 3    why you did or did allocate.  But this then goes to -- assuming
 4    allocation, assuming we are stuck with whatever the allocation
 5    is and all the evidence that's coming in on allocation, this
 6    goes to causation on their side, which is could they have
 7    purchased it anyways?
 8            And if they could not have purchased it, then the
 9    reseller purchases that they made don't match up.  That's --
10    and that -- that's the matching we need to do.
11            And so if they show us an unfulfilled order and they
12    go, "This matches to a reseller purchase," I think I'm allowed
13    to say, "Well, no.  That unfulfilled order is not a valid basis
14    for a covered purchase because on your side, Netlist, that
15    order never could have been fulfilled."
16            So it's not Samsung causing or not causing the
17    fulfillment.  It's Netlist on its side.
18            It would be no different, for example, and Mr. Lo
19    has not objected to emails relating to pure cancelation.  If
20    Netlist were to call us, I assume this is a much easier to
21    example, to call us and say, "You know that order I placed?  I
22    don't want it anymore.  I just don't want the product," that
23    clearly breaks the chain of causation.
24            This is no different than that.  It is on the
25    Netlist side where they are deciding by the fact of their
```

1    finances or their own volition that they no longer want that

2    order; and, therefore, how can you then match that up to a

3    reseller purchase that has nothing to do with it.  And, in

4    fact, it goes to my point in opening, which is a lot of these

5    reseller purchases were just voluntary purchases in the open

6    market.

7            THE COURT:  But, again, if they were able to cover,

8    if they were able to buy product, right, how can you say that

9    they weren't able to fulfill the original order?

10           So let's just take an example.  Let's say Netlist

11   placed an order for, you know, 100,000 DRAM chips and Samsung

12   doesn't fulfill that order either because there's no allocation

13   for Netlist or there's some other block along the chain.  And

14   Netlist shows evidence that they purchased the 100,000 DRAM

15   chips from a reseller.  How does creditworthiness come into

16   play there?

17           MR. RHOW:  See I think an order is probably -- when

18   you say "order" in this case, it means a lot of things.  So let

19   me use forecast as an example because I think forecast is

20   probably the better example.  It's not an order.  It's this

21   concept of how much you are going to buy during a particular

22   quarter in advance.

23           And they are throwing out some massive numbers that

24   they are going to claim was in a forecasted amount but not in a

25   purchase order.  So that's where this comes in.

1          The credit issues then come into play because, if

2     you compare the forecasted amount with their credit limits,

3     these forecasted amounts are phantom.  They are not true

4     because they could not afford them.

5          And so if they're going to go to the jury and say,

6     "Look, we have $50 million worth of forecasted amounts that we

7     would have ordered."  That's his testimony.  "I don't have an

8     actual purchase order.  I don't have actual evidence that I

9     ordered it, but I would have ordered it."  Certainly the

10    evidence should come in to say, well, guess what?  You have a

11    credit issue that shows what you're saying you would have

12    ordered, you couldn't have ordered.

13         So it breaks the chain on causation.

14         And that's the problem in this case, Your Honor, the

15    forecast.  On the POs, we could go head-to-head, and we could

16    battle on the POs and try to analyze every one of them.  But

17    it's on the forecast where this case has completely opened up.

18         And on email inquiries, of all things, where they

19    are arguing these tens of millions of dollars of forecasts come

20    in because P. K. Hong says, "You know what?  I did a forecast.

21    I wanted it fulfilled."

22         I have to be able to respond by saying no, actually,

23    you cancel a lot of orders.  You didn't have the money to pay

24    for these orders, et cetera, and it breaks the chain of

25    causation.

1           THE COURT:  Is this coming up this morning, this

2    issue?

3           MR. RHOW:  It will.  It will come up this morning, I

4    believe, on the cross of P. K. as well.

5           THE COURT:  Okay.

6           Mr. Lo, so it seems like if there's an issue with

7    Netlist saying it would have bought, you know, a million chips

8    and it turns out that Netlist couldn't have bought a million

9    chips, you know, how do you claim damages for that?

10          I get the causation issue.  We are not talking about

11   whether or not Samsung was right or wrong in declining to

12   fulfill an order.  We are talking whether or not the order was

13   realistic to begin with and you can claim damages nor it.

14          MR. LO:  Yeah.  And, first, the suggestion that

15   somehow this is relevant to causation, and this is what I was

16   saying in the beginning, Your Honor, I don't think the Court

17   needs to look at the relevance.  The interrogatory at issue was

18   not a causation interrogatory.  It was not a damages

19   interrogatory.  It was not a liability interrogatory.  It was

20   an interrogatory about the facts that you are going to use at

21   trial for any reason.

22          So coming up here and saying, "Well, we are just

23   using it for causation," doesn't get them out of the fact that

24   they did not disclose this in the interrogatory despite our

25   request and despite an order by Judge McCormick.

1            In terms of Your Honor's specific question, again,

2    we are only going to claim damages for reseller transactions

3    that actually occurred and that were actually paid for.  So the

4    testimony -- any testimony -- you know, Mr. Rowe mentioned the

5    $53 million amount.  That's $53 million that we actually spent

6    on cover transactions.

7            And I think Your Honor had it exactly correct in

8    terms of your understanding of our damages model.  We are not

9    suggesting that we would have covered more, that we would have

10   bought more with resellers.  We are saying this is the actual

11   amount we paid to resellers, and of that, 4.6 percent of that

12   was an overcharge, and that's our damages.

13           THE COURT:  Okay.  Yeah, I'd like to offer some

14   guidance on this, but it seems to me that if what you're saying

15   is correct, I don't see the causation issue, because it seems

16   like Netlist has the money to pay for these products.  So I

17   think I want to just wait to see how it comes up in testimony

18   and we'll deal with it then.

19           But thank you for the arguments.  They've certainly

20   been helpful on both sides.

21           MR. LO:  Thank you, Your Honor.

22           THE COURT:  I'd like to get the jury in just so we

23   don't keep them waiting.

24           THE COURTROOM DEPUTY:  We are missing one juror.

25           THE COURT:  We are missing a juror.  Okay.  So we're

1   missing a juror.

2          So, again, well see how this comes up because it

3   sounds like we may or may not have an issue.  I understand the

4   causation point that Samsung is raising, but according to what

5   Mr. Lo says, it doesn't seem like that's going to be an issue.

6          But I guess that you're saying it might be an issue

7   when we go to do the matching.

8          MR. RHOW:  It would clearly be an issue there.  And,

9   first of all, this is a fact issue.  And so, you know, this

10  could be circumstantial evidence of exactly what I'm saying.  I

11  may be wrong.  The jury may not care about it.  But this is a

12  fact issue that the jury can decide if it's relevant or not for

13  its own determination on this issue.

14         THE COURT:  Okay.  Well, we'll play it by ear and

15  see how it comes up.

16         Any other issues we need to talk about?  We have

17  probably a few minutes.

18         MR. RHOW:  I had one.

19         Do you want to go?

20         MR. LO:  I have a brief one, Your Honor.

21         After Mr. Hong testifies, we do have a depo

22  designation we'd like to play, and there's some objections to

23  that, and we wondered how the Court wants to resolve those

24  objections.

25         THE COURT:  Okay.  Do you have it on paper with

```
 1   objections and things?
 2              MR. LO:  We do, yes.
 3              We have your objections, yes.
 4              Would the Court like me to hand that up right now?
 5              THE COURT:  Yeah.  Is this going to be a video you
 6   are going to play?
 7              MR. LO:  It is.  It's a short video, and I think
 8   it's 11 minutes.
 9              THE COURT:  Okay.  I've got a copy of the transcript
10   here.  Can we look at the first objection and then we can talk
11   about it?
12              MR. LO:  Yes, Your Honor.
13              MR. RHOW:  I'm sorry, Your Honor.  The issue I
14   have -- I just want to check the protocol.  The protocol we
15   had, and I'm not implying -- there's so many emails flying
16   around.  But one of the protocols was that we would give
17   48 hours' heads-up on witnesses and for designations.  That
18   would be the specific designations because obviously if there's
19   counter-designations, there's an issue.
20              I'm not implying that was not done.  This looks like
21   more than I was given, but there are other members of the team
22   who get it, so I wanted to confirm that first.  And then if
23   that's true, and I have no doubt it's probably true, I just
24   can't confirm it because the one I saw was much shorter, and
25   this is a series of five designations.
```

UNITED STATES DISTRICT COURT

```
1          THE COURT:  Okay.  So are there specific objections

2   to the designations, or is it just a procedural objection that

3   maybe you all can work out?

4          MR. RHOW:  No, I think there are specific

5   designations.  I guess a part of my objection is just that this

6   is more than I thought.  But if we want to -- we might as well,

7   then, go through the objections and rule on them.  And then the

8   ones that -- and then we can meet and confer on what was

9   disclosed or not disclosed, and if it's not an issue, it's not

10  an issue.

11         THE COURT:  Okay.

12         MR. RHOW:  Okay.

13         MR. LO:  And, Your Honor, I just handed Mr. Rowe the

14  original designations that they lodged.  I think part of the

15  confusion may be we broke it down by the pages because they

16  are -- because they are not sequential.  And I think they

17  objected to a larger chunk.  So it probably looks like it's

18  more objections on the page than he did just because we broke

19  it down, but it should be the same designations.

20         THE COURT:  Okay.  Because what I'm looking at is a

21  series of pages with yellow highlighting on them.  I don't see

22  any objections on what I'm looking at.  Oh, I'm sorry.  Okay.

23  So the first objection is, what, page 26, line 23 through 27,

24  line 2?

25         MR. LO:  Yes, Your Honor.
```

1          THE COURT:  And then this is talking about

2     allocations to channel customers.  What's the relevance here?

3          MR. LO:  It's particular -- the Q and A is a little

4     bit mismatched because the witness answered something slightly

5     different, which is why we're designating it.  Particularly on

6     line 6 and 7, as the Court may recall during the opening, they

7     said it's got to be a purchase order, and this is a Samsung

8     witness saying that, you know, "Netlist would issue a lot of

9     purchase orders before we confirmed it, and we asked them not

10    to do so."

11          And it goes on to say, "We really wanted them not to

12    do that."

13          So it goes to the question of whether we were

14    obligated to submit purchase orders even when they said no or

15    allowed to submit purchase orders even when they said no.

16          THE COURT:  And so the question from a damages

17    standpoint, if you are claiming damages for requests that

18    didn't make it into purchase orders, this is evidence of why.

19          MR. LO:  Exactly, Your Honor.

20          THE COURT:  Okay.

21          Why isn't -- I mean, this seems like it would be

22    relevant.  Why isn't it?

23          MR. RHOW:  So I think there are some parts that seem

24    to be fine.  But like I said, I'm reading it right now on the

25    fly too, Your Honor.

1          THE COURT:  Okay.  Do you want to look at this and

2     then we'll talk about it at the next break?

3          MR. RHOW:  That would be helpful, Your Honor.

4          THE COURT:  Okay.

5          MR. RHOW:  Thank you.

6          MR. DOREN:  If we are still missing a juror,

7     Your Honor, there's one other issue, which is last evening we

8     received documents that Samsung expects to use with Mr. Knuth,

9     and we have a number of objections to a number of those

10    exhibits, and we just want to know how the Court would like

11    those handled.  Should we deal with them while the witness is

12    on the stand?  Should we try to resolve them or have the --

13    address them with the Court before then?  Because Samsung has

14    said they will stand on the documents.

15         THE COURT:  Okay.  Are there any global sorts of

16    objections, or are they very specific to this?

17         MR. DOREN:  One of the objections, it is global.  It

18    relates to the credit issue.  So when that is resolved, perhaps

19    that will resolve several of those documents.

20         Another global issue is that there are a series of

21    email chains where Mr. Knuth is included in some of the emails

22    low in the chain but not the final entries.  And the final

23    entries have testimony -- or excuse me -- entries generally

24    within Netlist alone, and they address the broader substance.

25    And there's obviously no foundation for Mr. Knuth to have seen

```
 1   or to testify about those or, we think, put those documents in
 2   evidence.  So that's another multi-exhibit issue.
 3              THE COURT:  Yeah, I think generally I would agree
 4   with the proposition that if there are emails that the witness
 5   didn't see, wasn't copied on, then they shouldn't come in
 6   through that witness.
 7              MR. DOREN:  Thank you, Your Honor.
 8              MR. RHOW:  And, Your Honor, I think some of the
 9   exhibits there were with anticipation they'd be already in
10   evidence at some point, but I don't know yet.  So I don't have
11   an issue.
12              But in a broader perspective with emails, because I
13   think both sides have been pretty cooperative in terms of
14   emails, this may come up later, but, you know, there's
15   different case law, circuit law on emails and their
16   admissibility of business records.  You know, there are
17   sometimes hearsay issues.  Some judges let all emails in no
18   matter what in the entire chain.  What is Your Honor's typical
19   view on that?  Are they business records, and can they be
20   admitted in that fashion?
21              THE COURT:  I think you can make the argument, but I
22   don't think that they would qualify under the hearsay rule as
23   business records, at least how I read the rule.
24              MR. RHOW:  Okay.
25              MR. DOREN:  And then, Your Honor, one other
```

```
1    multi-exhibit objection relates to post JDLA termination

2    communications between Samsung and Netlist.  These are

3    communications between Mr. Knuth and Steven Yu or Mr. Paik Ki

4    Hong about various orders in the fall of 2020.  They don't have

5    any relevance to conduct during the period of breach or

6    anything to do with damages.

7              THE COURT:  That would seem to make sense, Counsel.

8              MR. RHOW:  It's a backlog issue.  So these are

9    orders that were during the period of breach.  If it's in

10   October 2021, they terminate July 2021.  If you look at the

11   emails, they talk about backlog.  The backlog -- by its very

12   name, what happens, a purchase order comes in not to fill, put

13   on the backlog.  Every one of those emails are a backlog issue.

14   So they do relate to orders in the period.

15             MR. DOREN:  And, Your Honor, again, that's 403.  We

16   are now talking about what happened months later after the

17   termination with a backlog, if they point as these are relevant

18   transactions that are now five months old by the time of these

19   communications in October 2020.

20             THE COURT:  So are these transactions that you are

21   claiming damages on those?  So is this something where there

22   was a request made for product during the period of the

23   contract and then, five months later or after termination of

24   the contract, Samsung fulfilled the request?

25             MR. DOREN:  Your Honor, the transactions for which
```

1   we seek damages are those that were not fulfilled during the --

2   I'm sorry -- during the JDLA period and for which cover

3   purchases were then made.

4           So to the extent there were products that sat in on

5   backlog and were not fulfilled through July 2020 and to the

6   extent that resulted in a cover purchase, then the answer to

7   that would be yes.  But, again, these conversations are now

8   five months later, after that termination.

9           And we, with the passage of time, Your Honor, think

10  that at this point it's irrelevant and confusing to the jury to

11  suggest that what occurs and what communications occur about

12  what may or may not be going on with a backlog five months

13  later is irrelevant to the damage period.

14          THE COURT:  So is there any reasonable argument that

15  Samsung could make that Netlist jumped the gun on purchasing

16  product from a reseller?  It should have waited?

17          MR. DOREN:  I would say no, Your Honor.  As you

18  know -- and Your Honor -- first of all, Your Honor, no because

19  we've talked about quarterly projections and monthly

20  projections and ad hoc projections.  There is no evidence in

21  the record currently about having things put on backlog and

22  waiting patiently for half a year.

23          Secondly, Your Honor, let me be clear in my

24  description of our damage model.  We are not claiming that --

25  we are only claiming damages on resale transactions that closed

1    by July 2020.  So in other words, we had to have not received

2    the product by July 2020.  We had to have been gone out and

3    covered by July 15th, 2020.

4              So what happened five months later, if they then

5    came back to us five months later and said, "Oh, you know, now

6    we're willing to have a discussion about things that you needed

7    and went out and replaced prior to July 15, 2020," is

8    irrelevant and 403.

9              THE COURT:  Yeah, that would seem to make sense to

10   me.

11             Counsel, are you making an argument that Netlist was

12   too quick on the draw to cover?

13             MR. RHOW:  Yes.  I mean, the backlog -- backlogs

14   exist for a long period of time.  And the reseller purchases --

15   again, it's the matching is the problem.  If they are -- they

16   gave us and they are using the July -- I'm sorry -- the

17   May 2017 period to July 15, '21, for their damages period.  It

18   doesn't matter what the reseller purchases are.  That's their

19   damages period for unfulfilled orders.

20             And so I've said this too many times.  A matching

21   has to occur.  And so if they keep something on the backlog

22   from January 2020 through October 2021 -- which happens all the

23   time.  It's on the backlog for a long time -- and they are

24   claiming a resell match-up, a resell of purchase that matches

25   up as cover damages but we find out that it's still on the

backlog and they don't even want it, how does not that break

the chain of causation?  How is that not relevant?

        And so the emails I picked from that period relate

just to the backlog.  It's not relating to new orders from

October 21.  This literally is talking about the backlog and

how the backlog -- they are not accepting it.

        MR. DOREN:  Well, let me be very clear, Your Honor.

I'm looking now at Exhibit 1433, which is a chain between

Neal Knuth and from Steven Yu.  The first is an email from

October 1st from Yu to Knuth saying, "If we need some parts,

can we ship with September pricing?  Or is everything on hold

until the October price release?"

        And then Knuth said, "Let me know how many and I can

try."

        Then there's some questions about releasing certain

specific parts.

        And then on October 5th, Mr. Knuth says to Steven,

"I have the below.  Besides these two, could you go through

your backlog and highlight what I can ship in October?  I have

a lot of backlog scheduled for October."

        Then Mr. Knuth writes back, "Are you going to advise

on the SSD backlog?"

        Mr. Yu writes back, "For our SSD backlog, we will

review again first week of November."

        To which Mr. Knuth responds, "Are you saying you are

1  going to not take any parts after I have pushed out so much?  I

2  told you Q3 support, end of September, Q3 support would be

3  better and all this backlog still remains."

4       Nothing in this document suggests anything about

5  this backlog has anything to do with any time period from

6  July 15th or earlier.  It's only going to confuse the jury, and

7  it's not a proper inference or suggestion that this is relevant

8  to the damage period.  It simply raises in the abstract the

9  notion that in the fall of 2020, five months after the

10 termination of the JDLA, they were talking about whether a

11 backlog would be released in November under October pricing or

12 September pricing.  That's it.

13       THE COURT:  And the backlog discussed in this email,

14 was that based on orders placed during the contract period?

15       MR. DOREN:  That is not evident at all from the face

16 of the document, Your Honor.

17       THE COURT:  Yeah.  So I think with respect to this

18 issue, I think you'd need to lay a foundation that -- to

19 support your premise that Netlist jumped the gun on a cover

20 before this would become a relevant issue.

21       MR. RHOW:  And by the way, Your Honor, I'm perfectly

22 fine doing that.  1433 is not the one I'm focused on.  I'm

23 focused on 1434, and I'm looking at the literal PO that's

24 listed in there, and the date of the PO -- it's on Exhibit 311.

25 The date of the PO is December 11, 2019.

1            They are clearly seeking cover on that -- on
2    these -- this time frame of POs.
3            MR. DOREN:  Two comments, Your Honor.
4            MR. RHOW:  Well, hang on.  Let me finish.
5            And so that is the backlog we're talking about.
6    It's not six months later talking about new orders.  This is a
7    December 2019 order we are talking about in October 2020.
8            And if you look at the top of the email, the first
9    paragraph talks specifically about backlogs and push-outs.  And
10   what that means is when an order is placed in December 2019,
11   they don't take delivery.  They push it out and put it on the
12   backlog.  And what they end up doing is never accepting the
13   product at all.  That's their choice.
14           And that's akin to a cancelation.  If you are not
15   accepting shipment on a PO, putting it on a backlog, and then
16   saying ultimately, "I don't want it anymore."  It's the essence
17   of the case.
18           MR. DOREN:  So I take from that, Your Honor, that
19   1433 is likely out.
20           As for 1434, it's not about six months.  You just
21   heard counsel.  It's about ten months.  It's about 11 months.
22   From December 2019 to October 2020.  And the fact that during
23   that 11-month period, Netlist may have gone out and covered on
24   this is hardly probative of whether or not Netlist was pulling
25   the trigger too fast, Your Honor, given that, as we've talked

1    about before and as we see in 1433, these things are being

2    talked about on a monthly basis in terms of pricing and supply

3    and when things will be pushed out.

4           And here, "Merry Christmas," ten months late, in

5    October 2020, "We will give you what we did not give you in

6    December 2019," after the JDLA has been breached, after this

7    lawsuit has been filed, after the JDLA is terminated.  And now

8    we want to make some hay out of the fact that 11 months later

9    they come back to us and offer some product?  It's not

10   relevant, Your Honor, an, again, 403.

11          Now, Samsung is the party that forces products or

12   orders into backlog, not Netlist.  Netlist, as the testimony

13   has said, would take delivery of everything as ordered.  When

14   it makes a request, that is a commitment to purchase.

15          Samsung then puts these things on backlog, and given

16   the evolution of the products themselves -- you've heard the

17   testimony about pricing -- after six months, things on backlog

18   are of little value.  After ten months, they are paperweights,

19   tiny little paperweights.  And this, Your Honor, has no

20   relevance, and it's a mischaracterization of the business

21   practices, and it shouldn't come in.

22          THE COURT:  Yeah, it seems like the timing is such

23   that this is -- I mean, ten months after the fact -- it

24   doesn't seem like this is really going to be relevant to -- you

25   couldn't have expected Netlist to sit on an order for

1   ten months before covering; right?

2          MR. RHOW:  Your Honor, Mr. Doren's characterization

3   of this document -- just read the first paragraph.  Who is

4   doing the push-out?  It's Netlist.  Just read the first

5   paragraph.  It literally says, "I'm getting hassled on your

6   backlog and why I am allowing these push-outs."  That's

7   Neal Knuth talking.  And that is because Netlist is saying,

8   "Push it out.  I don't want it yet."  That's literally what's

9   happening here.

10          And then he writes -- this is Neal writing to Steve.

11   This is a Samsung employee telling Steve:  "I'm allowing these

12   push-outs, and Korea is all over me."  Next sentence.

13   "Highlight on your backlog today what I can ship next week.  It

14   is possible to ask for other things when Korea thinks I just

15   put backlog on and don't ship when secured because Netlist is

16   not accepting the product."

17          It's telling him push it out.  And that's literally

18   what Mr. Knuth is going to say.

19          So this whole characterization -- which, honestly, I

20   haven't heard any testimony about this.  This is Mr. Doren just

21   arguing that we pushed things out -- is not true.

22          But the broader point is this is an issue for the

23   jury.  This is for them to decide.  This is not MSJ on this

24   particular document.  This document's clearly relevant.  It

25   relates to a PO not just within the time frame, well within the

1    time frame.  And if Mr. Doren wants to make the argument he

2    made and if he believes there's evidence to support their

3    argument that we are at fault, great.

4         The document, which is what I believe the evidence

5    is, shows it is Netlist canceling the order -- I'm sorry --

6    pushing it out and then ultimately canceling.  That will be the

7    testimony.

8         I just don't get how this is not relevant to

9    causation in the case and whether these POs were even proper

10   requests if they are canceling.

11        THE COURT:  But the pushing out is occurring after

12   the contract period; right?

13        MR. RHOW:  No.  It's pushing out during the contract

14   period.  Literally, in December 2019, there's a push-out, then

15   there's another push-out, then there's another push-out.

16        MR. DOREN:  Your Honor --

17        MR. RHOW:  It's all happening.  It's all

18   happening -- and I'm going to make an offer of proof.

19   100 percent, it has to be happening through the contract

20   period.  To get from December 2019 to October, it has to be a

21   continuous push-out there.  That's the entire point.

22        I think evidence even beyond October 2020 is

23   relevant if and to the extent, like this email says, it is

24   Netlist pushing it out.

25        MR. DOREN:  Your Honor, again, the first email in

UNITED STATES DISTRICT COURT

1   this chain is October 9th, 2020.  It is Mr. Knuth saying, "We

2   want to ship against backlog," and asking what parts can be

3   released.

4           Mr. Yu responds and identifies certain parts that

5   can be released and that they will then submit updated purchase

6   orders to take those things -- updated purchase orders because

7   it's a year later.  So they are submitting new purchase orders

8   to get those things.

9           Now, Mr. Rowe suggested that -- he characterized

10  this document as talking about Netlist not being willing to

11  take products.  That statement is not in this document.  Even

12  the top email that counsel relies on is Mr. Knuth saying, "I'm

13  getting hassled on your backlog and why I'm allowing these

14  push-outs.  Why I am allowing them.  Why am I sending you

15  products even now in October 2020?  Highlights on your backlog

16  today after Dhruti sends what I can ship next week.  It is

17  impossible to ask for other things when Korea thinks I just put

18  backlog on and don't ship when secured."

19          In other words, don't ship once I have secured

20  support for that backlog order that has been out there for

21  ten months.  "And I'm not going to be able to get you any new

22  product outside of backlog until you help me clear some of this

23  out.  I have to make things up on Netlist's behalf as you are

24  not addressing the backlog within 30 days" because after

25  ten months, it takes Netlist a few minutes to figure out what

1    to do.

2         Your Honor, listen to this argument.  We are

3    spinning out to the long narrow edge of the branch in terms of

4    what the relevance arguments are, what to make of these phrases

5    in a document that is ten months, 11 months after this order

6    went on backlog and what it's significance is.  It's five

7    months after the breach period.

8         THE COURT:  Yeah, I mean, it seems to me -- well, I

9    guess I'm going to go back to, you know, we'll see how this

10   comes up and will rule on the documents as they come in.

11   Because unless you can create a chain of inference that there

12   was an order and Netlist wanted to hold that order or to push

13   it back, it doesn't seem like it's relevant.

14        Because I could see -- I can envision circumstances

15   where Netlist -- and I'm making all this up, but Netlist makes

16   an order.  Samsung doesn't fulfill the order.  Netlist covers.

17   And then, you know, Samsung has the ability to fulfill the

18   order much later, and Netlist says, "Yeah, let's talk about

19   that," because Netlist is looking for more product.

20        MR. RHOW:  No, and I --

21        THE COURT:  And that would seem like something

22   that's outside of the damages.

23        MR. RHOW:  Understood.  Assuming that's the chain as

24   opposed to what I consider the proper chain, which would be if

25   they submit a PO, it moves to backlog, and they cover, then

1   they cancel it.  I don't want it anymore.  I got what I needed.

2          But the fact that they are pushing it out, they are

3   saying, "No, I'm not covering.  I want it from you guys."  And

4   if they keep pushing it out, how can they then seek damages

5   from those POs from that time frame?  And I guess the broader

6   point is I could be wrong but --

7          THE COURT:  We'll deal with it as it comes up.

8          MR. RHOW:  Thank you, Your Honor.

9          THE COURT:  Are we ready for the jury?

10          THE COURTROOM DEPUTY:  No.

11          THE COURT:  Do we have an update?

12          THE COURTROOM DEPUTY:  I can call them but --

13          (Discussion held off the record.)

14          THE COURT:  Okay.  I'm trying to think if there's

15   any other issues we can resolve now.  Anybody have anything

16   else that they think is not something we are going to need to

17   see in context that we can speak about?

18          MR. DOREN:  I don't think so, Your Honor.

19          THE COURT:  Okay.

20          MR. RHOW:  No, Your Honor.

21          THE COURT:  Okay.  Well, we'll stand in recess until

22   the jurors come.  I think we've got one juror who arrived late.

23   I think he's the older gentleman in the first row on the end.

24   And the courtroom deputy is going down to see if he can

25   expedite his processing through security.  So he should be here

UNITED STATES DISTRICT COURT

```
 1    soon.
 2                 MR. DOREN:  Thank you, Your Honor.
 3                 MR. RHOW:  Thank you, Your Honor.
 4                 (At 9:34 a.m. a brief recess was taken.)
 5                 (In the presence of the jury.)
 6                 THE COURT:  Welcome the jurors back today.  Good to
 7    see everybody here.  I know we are getting started a little bit
 8    late.  Sorry about that.  But we'll go ahead.  We've got a
 9    witness on the stand.  We'll pick up right where we left off.
10                 Go ahead, Counsel.
11                 MR. LO:  Thank you, Your Honor.
12                 Mr. Kotarski, could you put up Exhibit 10, which was
13    admitted yesterday.
14                            PAIK KI HONG,
15    called as a witness by the plaintiff, was previously sworn and
16    testified as follows:
17                     DIRECT EXAMINATION (RESUMED)
18    BY MR. LO:
19          Q     Good morning, Mr. Hong.
20          A     Good morning.
21          Q     Just to recap for a minute, when we were
22    concluding yesterday, we were discussing some of the allocation
23    caps that were in place from time to time.  Do you recall that?
24          A     Yes.
25          Q     Okay.  Now, this email was from January 2018.
```

1   Was this the only period during which Samsung imposed a cap on

2   the amount of purchase orders that Netlist could submit?

3       A     No.  Samsung, the second half of 2017, gave us

4   zero allocation, told us we had zero allocation in their

5   support.

6              After scrambling and meeting with Samsung many

7   times and trying to fix this issue, it was decided that they

8   would support us with $1 million a month.  That was the cap.

9              And really it was -- I heard the management of

10  Samsung telling the people supporting us to just, "If you have

11  a million dollars worth of parts, go give it to them," is

12  really what the cap was.

13      Q     Did the cap ever affect -- we talked a little bit

14  yesterday about the forecasts that Netlist would submit from

15  time to time.  Did the cap impact in any way how Netlist went

16  about forecasting its demand?

17      A     Yes.  Not every part that a customer requested or

18  ordered could we get from resellers.  So -- we could only get

19  from Samsung.  We focused that million dollars on the parts

20  that we could --

21              THE REPORTER:  Can you please repeat --

22              THE WITNESS:  So we focused that $1 million cap

23  on the products that Samsung could support us, and we would

24  then buy everything we needed, which was -- again, I think I

25  testified to 4 to 5 million a month from resellers.

1        Q       In your binder, would you please turn to

2    Exhibit 1333.

3        A       Okay.

4        Q       Do you recognize this as an email from Mr. Jiang

5    at Netlist to Mr. Knuth at Samsung copying you, sir?

6        A       Yeah, this is an email from Mr. Jiang to

7    Mr. Knuth copying me.

8        Q       And it's dated July 2017, yes?

9        A       Yes.

10            MR. LO:  Your Honor, we seek to admit into evidence

11   Exhibit 1333.

12            THE COURT:  Objection?

13            MR. RHOW:  It was subject to our objection and --

14   that we talked about yesterday.

15            THE COURT:  Okay.  It can be admitted.

16            (Exhibit No. 1333 received into evidence.)

17   BY MR. LO:

18       Q       Let's go to the second page of this document.

19   And at the bottom half of the document, there's an email from

20   Mr. Jiang to Mr. Knuth.

21               Do you see where I'm at?

22       A       Yes.

23       Q       First, you may have mentioned it yesterday, but

24   who is Mr. Jiang?

25       A       Mr. Jiang was a procurement manager at Netlist

1    who reported to me.

2         Q      Okay.  And you are copied on this particular

3    email.  And in this email, Mr. Jiang writes, "Here's a list

4    of" -- I think it's "what we want in July and 1M/month

5    allocation for August and September for now.  But as discussed,

6    let's work on getting more allocation as we progress."

7               Do you see that?

8         A      Yes.

9         Q      Did you have an understanding as to what 1M/month

10   allocation is?

11        A      That is a million-dollar cap a month.  It is what

12   we were going to get from Samsung from -- again, in the

13   previous email, from zero.

14        Q      Okay.  If you look below in this email, there's a

15   large chart that extends into the next page.  Why don't you

16   take a look at this table.

17              What is this table, Mr. Hong?

18        A      It would be a sample of our forecast request that

19   we were making to Samsung by part number, by Samsung part

20   number.

21        Q      And at the bottom of this table, there are some

22   sums and -- for the Q3 total.

23              Do you see that, sir?

24        A      Yes.

25        Q      And during this period, was Netlist trying to

1   engineer its forecast, so to speak, to match the allocation set

2   by Samsung?

3        A    Yes.  We were putting the forecast together that

4   would be only $1 million amount of purchases because of the cap

5   of $1 million.

6        Q    And let's go back to Mr. Jiang's email.  At the

7   end of the sentence that we were just looking at, Mr. Jiang

8   writes, "Let's work on getting more allocation as we progress."

9             Do you see that, sir?

10       A    Yes.

11       Q    And this is -- again, this is an email from

12  July 2017.

13            Did you have an understanding of why this was

14  being sent to Samsung?

15       A    Because they are giving us 1 million allowance,

16  allocation, and it came -- it was zero before.  So he is trying

17  to continue to up the allocation amount so we could get more

18  products directly from Samsung.

19       Q    Okay.  So we've been talking about 2017 and 2018

20  forecasts.  I want to go a little bit forward in time and let's

21  take a look at something from 2019.  In your binder, would you

22  take a look at Exhibits 358 and 359.  And 359 is just the

23  attachment to 358.

24       A    Yes, I see the -- on 358 I see the email from

25  Steven Yu to -- communication between Steven Yu and Mr. Knuth

1    at Samsung which I am copied on.

2         Q      And do you recognize 359 as the attachment?

3         A      Yes, that is the attachment attached to that

4    email we just saw.

5              MR. LO:  Your Honor, we move into evidence Exhibits

6    358 and 359.

7              THE COURT:  Objection?

8              MR. RHOW:  No objection, Your Honor.

9              THE COURT:  They are moved in.  You can publish

10   them.

11        (Exhibit Nos. 358 and 359 received into evidence.)

12   BY MR. LO:

13        Q      First, let's start with the cover email and

14   Mr. Knuth's email to Steven.  I won't ask you to read it in

15   full, but can you explain to the jury what is being sent here?

16        A      It is Samsung's response to the forecast and

17   Mr. Knuth stating that headquarters, Samsung Electronics -- SEC

18   is Samsung Electronics Corporation, and the acronym is for

19   Korea -- to allow shipment for Q2 of parts of that -- parts of

20   the forecast that we provided.

21        Q      Okay.  So let's go to that response, and let's

22   take a look at Exhibit 359 which is the spreadsheet.

23              And I'll ask Mr. Kotarski to pull that up.  Let's

24   zoom in on that a little bit.

25              First, at a high level, what are we looking at in

1    this spreadsheet, Mr. Hong?

2         A      This is an example of a forecast that we would

3    provide to Samsung by a Samsung part number part in Column A.

4         Q      Okay.  And you mentioned that this particular

5    version is a Samsung response.  So what portions of this

6    document were prepared by Netlist, and what portions were

7    prepared by Samsung?

8         A      Column A, the part number.  Column B is the

9    quantity we were requesting.  Quantity C is what we expect the

10   price would be.  And Quantity D is the amount of -- it's just

11   the quantity times the budgetary price column.

12        Q      Okay.

13        A      That's what we would prepare.

14        Q      Okay.  So A through D were prepared by Netlist?

15        A      Yes.

16        Q      And which portions of this document are prepared

17   by Samsung?

18        A      Column E is Samsung's response by line item to

19   our forecast.

20        Q      Let's take a look at line 9 as an example.

21               First, in terms of just understanding how to read

22   this document, is the item in line 9 something that Netlist was

23   requesting?

24        A      Yes.  We were requesting 300 pieces of that part,

25   which is an SS -- Samsung SSD.

49

1        Q        And was Samsung's -- how did you understand

2    Samsung's response to this request to be?

3        A        They were -- they would support 300 pieces, and

4    it's ready to ship, and they were giving us permission to issue

5    a purchase order for 300 pieces.

6        Q        And did you get that from reading the comments in

7    Column E?

8        A        Yes.

9        Q        Okay.  Now let's take a look at -- let's go down

10   to Column 11 -- or Row 11.  I'm sorry.  Is this also an item

11   that Netlist was requesting?

12       A        Yes.  We were requesting 200 pieces of that

13   particular SSD.

14       Q        And how did you understand Samsung's response to

15   that forecast?

16       A        Samsung will not support and is not giving us

17   permission to order.

18       Q        And how do you know that?

19       A        Because there's no comments.  And that is an

20   indication of no support.

21       Q        Okay.  And are you -- is there a reason you know

22   that when it's empty that that means that they won't support?

23       A        It's -- that was the normal -- normal practice.

24   And we knew when they were saying 300 pieces ready and there's

25   no comments, it's no support.

1       Q       Let's take a look at Row 25.

2       A       Okay.

3       Q       Is this an item that Netlist was including as a

4   request in its forecast?

5       A       Yes.  We were requesting 150 pieces of that

6   particular SSD.

7       Q       And how did you understand Samsung's request to

8   this -- response to this request for this item?

9       A       We will support 100 pieces.  It's ready to ship.

10  And you have permission to issue a PO, purchase order, for

11  100 pieces.

12      Q       Okay.  So even though Netlist wanted 150, you

13  understood the response to mean Netlist could submit a PO for

14  100 pieces only?

15      A       Yes.

16      Q       Okay.  And just zooming out a little, in terms of

17  all of the other Column Es that are empty when there's a

18  request in the quantity, did you understand all of the empty

19  cells to indicate that those are the items that Samsung will

20  not support on this forecast?

21      A       Yes.  Samsung would not support those line items.

22      Q       Okay.  This forecast has a number of empty

23  comments in Column E.  Was that typical of the Samsung

24  responses during this period?

25      A       Yes.  This was a typical response from Samsung to

1    our forecast to our request for parts.

2        Q      Okay.  You have said a couple of times during

3    your testimony that if Samsung doesn't support a forecast,

4    Netlist does not issue a purchase order.  Do you recall that?

5        A      Yes.

6        Q      Has Samsung ever explicitly told Netlist, "You

7    can't submit a purchase order unless I've approved it"?

8        A      Yes.  That is common.

9        Q      Okay.  Let me show you -- why don't you take a

10   look in your binder at what's marked as Exhibit 355.

11       A      Okay.

12       Q      And do you recognize Exhibit 355 as an email

13   chain?  There are different recipients, but among others, with

14   Ms. Sasaki at Netlist as well as with Mr. Knuth at Samsung?

15       A      Yes.  This is an email chain that from the top is

16   an email from me to Ms. Sasaki.  And in the body of the email

17   trail, you'll see emails from Mr. Knuth to me and members of --

18   Netlist people.

19              MR. LO:  Your Honor, we seek to admit Exhibit 355

20   into evidence.

21              THE COURT:  Any objection?

22              MR. RHOW:  No objections, Your Honor.

23              THE COURT:  Exhibit 355 is admitted.

24              (Exhibit No. 355 received into evidence.)

25   BY MR. LO:

1      Q      Let's start at the bottom email on the first

2   page.  And it's from Mr. Park.  First, who is Mr. Park?

3      A      Mr. Park was a former VP of sales operations at

4   Netlist reporting to me.

5      Q      There's a CC in this email to SS product team.

6   Is that an email distribution list within Netlist?

7      A      Yes.  It is our internal Samsung support email

8   group that I am a part of.

9      Q      Mr. Park writes, "Neal, just received an update

10   from the customer.

11          "In what would be welcome news in any other

12   industry but ours, they have decided to purchase 350K today,

13   not 50K."

14          Do you see that, sir?

15      A      Yes.

16      Q      Do you remember the circumstances here in terms

17   of what's being referenced by the customer?

18      A      Yes.  The customer has ordered 350,000 pieces of

19   this Samsung part and not 50K is what he's referencing.  I

20   believe -- I know the nature of this transaction.  This was

21   from a new customer that we were trying to acquire called Zebra

22   Technologies, and they were asking us for support for the

23   Samsung part.

24          Under the clause of the JDLA, this is a DRAM NAND

25   part.  So we expected Samsung to support this part.  Because of

```
1    that, we in turn received POs of in excess of $5 million from

2    Zebra Technologies that we could not support.

3         Q    Okay.  Let's go to the next paragraph where

4    Mr. Park says, "We can issue a PO today or as soon as you can

5    work some magic."

6              Do you see that?

7         A    Yes.

8         Q    Do you know why Mr. Park was asking for whether

9    they could submit a PO instead of just submitting one

10   unilaterally?

11        A    Because, again, we would have to get permission

12   from Samsung to issue a purchase order.

13        Q    Okay.  And let's now take a look at Samsung's

14   response to this request, which is the second email on this

15   page.  And it's from Mr. Knuth to Mr. Park and copying the

16   distribution list of which you are a member.

17             And Mr. Knuth writes, "Please be very clear about

18   if we accept a PO or not.  At this time, no PO would be

19   accepted."

20             Do you see that, sir?

21        A    Yes.

22        Q    And how did Netlist understand this email in

23   terms of whether it could continue to proceed with this

24   potential new customer, Zebra?

25        A    We could not issue a PO for Samsung parts to
```

54

```
 1    support our customer.  And don't even bother issuing a PO.  We

 2    won't accept it.  So they are not giving us permission to issue

 3    a purchase order.

 4         Q     Let's go back to the main graphic that we had

 5    yesterday, the demonstrative about the process flow.

 6              We've been talking a lot about the forecast and

 7    the Samsung response forecast.  I do want to focus a little bit

 8    on the purchase order which is on the bottom left-hand side of

 9    this chart.

10              And in that vein, let me ask you to turn to

11    Exhibit 287 in your binder.

12         A     Okay.

13         Q     Do you recognize this as an email from Mr. Knuth

14    at Samsung to various individuals including yourself?

15         A     Yes.  This is an email from Mr. Knuth to

16    his Samsung inside support person, Joice, and members -- and

17    then and also members of Netlist.

18              MR. LO:  Your Honor, we seek to admit Exhibit 287.

19              THE COURT:  Any objection?

20              MR. RHOW:  No objection, Your Honor.

21              THE COURT:  287 is admitted.

22              MR. LO:  Thank you.

23              (Exhibit No. 287 received into evidence.)

24    BY MR. LO:

25         Q     This is an email from January 2019, and let's
```

1    focus on the top email here where Mr. Knuth is writing to

2    Joice Kim but copying you as well.

3              First, Mr. Hong, who is Joice Kim?  Do you know?

4         A    Joice Kim is Samsung's internal support person

5    supporting Mr. Knuth.

6         Q    Okay.  And Mr. Knuth is writing to Ms. Kim,

7    "Please cancel this line item off the system.  We will not

8    support Netlist on these."

9              Do you see that, sir?

10        A    Yes.

11        Q    Was this a reference to a backlogged item?

12        A    Yes.

13        Q    Okay.  And how do you know that?

14        A    I have knowledge of this particular transaction

15   as well.  This 80 pieces of this particular SSD was -- our

16   customer -- one of our largest customers, Mercury Systems,

17   issued us a purchase order for 80 pieces of this SSD, which is

18   $500,000 plus.  We could not support because Samsung could not

19   deliver.  And so Mr. Knuth is telling his inside person to

20   please just cancel the PO, we will not support Netlist.

21        Q    Was Netlist consulted at all before the decision

22   to cancel the item?

23        A    No.

24             MR. LO:  Thank you.  You can take that down.  Let's

25   put up Demonstrative Number 3 from yesterday, Mr. Kotarski.

 1   No, sorry.  Not this one.  The graph.  Thank you.

 2   BY MR. LO:

 3       Q      Yesterday we looked at some spreadsheets about

 4   these Netlist purchase orders directly from Samsung.  Do you

 5   recall that, sir?

 6       A      Yes.

 7       Q      Okay.  And now I want to ask -- we can take that

 8   one down.

 9              Now I want to ask a variation of that, which is

10   does Netlist also keep records about the purchases it makes of

11   Samsung products from resellers as opposed to directly from

12   Samsung?

13       A      Yes.  We would keep records through purchase

14   orders.

15       Q      Okay.  Let me ask you to turn to Exhibit 380 in

16   your binder.

17       A      Okay.

18       Q      Do you recognize what Exhibit 380 is?

19       A      380 is a list of purchase orders that we would

20   have placed to resellers.

21       Q      And where does the data in Exhibit 380 come from?

22       A      It comes from our ERPR internal operating

23   systems.

24       Q      Is that the same system in which Netlist also

25   tracks the orders directly from Samsung?

1       A       Yes.

2               MR. LO:  Your Honor, we seek to admit into evidence

3       Exhibit 380.

4               THE COURT:  Any objection?

5               MR. RHOW:  No objection, Your Honor.

6               THE COURT:  380 is admitted.

7               (Exhibit No. 380 received into evidence.)

8       BY MR. LO:

9       Q       Mr. Hong, does this spreadsheet include the data

10      about the various purchase orders that Netlist placed to

11      resellers?

12      A       Yes.  The first column, A, is the purchase order

13      number.  Column D would be the reseller we are issuing the

14      purchase order to.

15      Q       And are all of the transactions here for NAND and

16      DRAM products?

17      A       Yes.

18      Q       And are they for all four Samsung-branded NAND

19      and DRAM products?

20      A       Yes.

21      Q       Let's take a look at the last column, which is

22      the amount received or received amount, Column M.

23      A       Yes.

24      Q       What does that column represent?

25      A       The dollar amount that we received per purchase

58

```
 1   order.  So it's really the quantity received times the unit.

 2   It's Column C times Column K.

 3         Q      And if there is an amount --

 4         A      I'm sorry.  Column L.  COLUMN J times Column L.

 5         Q      Thank you.

 6         A      Amount received times the unit cost.

 7         Q      And if there is a number in the amount received,

 8   does that indicate whether Netlist actually received the

 9   products that were ordered?

10         A      Yes, that is what it's indicating.

11         Q      And if there is an amount -- if there is a

12   received amount indicated in Column M, does that indicate

13   whether Netlist actually paid for those parts?

14                In other words --

15         A      It's the amount received.

16         Q      Okay.  And do -- did Netlist always pay for the

17   amounts that are received is my question.

18         A      Yes, Netlist always paid for the amounts

19   received.

20         Q      So anything in Column M, is that something

21   Netlist previously paid for?

22         A      Yes.

23         Q      Thank you.

24                Would you turn to Exhibit 313 in your binder.

25         A      Okay.
```

 1        Q       Do you recognize what Exhibit 313 is?

 2        A       It is an Excel spreadsheet listing the purchases

 3   orders that we would have placed to resellers but including the

 4   invoice date and invoice due date.

 5        Q       And where does the data in Exhibit 313 come from?

 6        A       It comes from our ERP system, our internal

 7   operating system.

 8        Q       The same one we've been talking now for the other

 9   spreadsheets?

10        A       Yes.

11        Q       Okay.

12           MR. LO:  Your Honor, we seek to enter into evidence

13   Exhibit 313.

14              THE COURT:  Any objection?

15              MR. RHOW:  No objection.

16              THE COURT:  313 is admitted.

17              (Exhibit No. 313 received into evidence.)

18              MR. LO:  And rather than focus on 313, with the

19   Court's permission we'd like to publish the fourth

20   demonstrative, which I understand there's no objection.  It's

21   the reseller purchase --

22              MR. RHOW:  Correct, Your Honor.

23              THE COURT:  Okay.  Go ahead and publish it.

24   BY MR. LO:

25           Q       Mr. Hong, can you explain what information is on

**UNITED STATES DISTRICT COURT**

1    the screen at the moment.

2        A       These are the count of unique purchase orders

3    that we would have issued to resellers during the period of the

4    JDLA, end of 2015 to 2020.

5        Q       Okay.  And where does the underlying data come

6    from?

7        A       It comes from this Excel spreadsheet we just saw.

8    That comes from our internal operating system.

9        Q       Okay.  And now just focusing on the -- on the

10   graph in general, are there any trends here that you recognize

11   from your work at Netlist?

12       A       Yes.  From the signing of the JDLA when we came

13   to the -- when we signed the JDLA at the end of 2015 through

14   period of the -- end of the first half of 2017, we purchased

15   very little from resellers because most of our purchases were

16   from Samsung direct.

17               When Samsung cut all allocation in the second

18   half of 2017 to zero and soon after capping it at 1 million, we

19   could not buy what we needed from Samsung, so we had to buy

20   from resellers.  And you can see the increase of POs that we

21   had to cut from resellers from the period of second half of

22   2017 to some time in 2020.

23       Q       Your brother, Mr. Chuck Hong, testified that

24   Netlist has about 100 employees.  How many of those employees

25   are part of your team that are responsible for doing these

```
 1   reseller purchase transactions?
 2        A      I've had one to two employees doing this.
 3        Q      Okay.  And did having to engage in these
 4   additional reseller purchase transactions, did that impact your
 5   organization at all?
 6        A      Sure.  The number of transactions that we had to
 7   do impacted my people, my purchasing team and impacted many
 8   divisions of Netlist, as mentioned, the operations area and the
 9   finance area.
10        Q      Would Netlist have gone out and engaged in these
11   reseller purchase orders if they could just call Samsung and
12   request the parts directly from Samsung?
13        A      No.  We would have preferred issuing one purchase
14   order to Samsung and getting Samsung to support it than
15   issuing, I guess, 50 purchase orders at the peak to many
16   resellers.
17             MR. LO:  Thank you, Mr. Hong.
18             Your Honor, I have no further questions at this
19   time.
20             THE COURT:  Thank you.
21             Counsel, cross-examination?
22             MR. RHOW:  Thank you, Your Honor.
23                        CROSS-EXAMINATION
24   BY MR. RHOW:
25        Q      Good morning.  Good to see you again.
```

```
 1          A       Good morning.

 2          Q       How are you doing?

 3          A       Good.   Thank you.

 4                  MR. RHOW:  Let me start with Exhibit 1245, please,

 5     which I'd like to move to admit and publish.  And we have

 6     copies, yes.

 7                  MR. LO:  No objections, Your Honor.

 8                  THE COURT:  1245 can be admitted.

 9                  (Exhibit No. 1245 received into evidence.)

10                  MR. RHOW:  Publish 1245.

11     BY MR. RHOW:

12          Q       Mr. Hong, this is an example of a purchase order?

13          A       Yes.

14          Q       And is this a typical format that Netlist uses

15     for purchase orders?

16          A       Yes, the format is a typical format that Netlist

17     uses.

18          Q       What is the purpose of a purchase order?

19          A       To purchase product from our supplier, in this

20     case, Samsung.

21          Q       And does this purchase order contain a quantity?

22          A       Yes.  The quantity is 30,000 units.

23          Q       A price?

24          A       5.25, yes.

25          Q       And of course it does contain an item description
```

**UNITED STATES DISTRICT COURT**

1    for the product itself; correct?

2        A      Yes.  That is Netlist's internal part number for

3    the Samsung part that we were requesting.

4        Q      And in the first column there, there's a phrase

5    called "terms."

6               Do you see that?

7        A      Yes.

8        Q      And what does "terms" mean?

9        A      That is our payment terms to Samsung.

10       Q      Why are you telling that to Samsung?

11       A      Because we intend to pay you, and net 45 days is

12   the terms.

13       Q      So you would agree a purchase order contains a

14   commitment to pay; correct?

15       A      Yes.

16       Q      And "Dock Date" is on the left side of that

17   column.  Do you see that?

18       A      Yes.

19       Q      What is the purpose of a dock date.

20       A      We were requesting the Samsung parts to be

21   delivered by September 2nd of 2016.

22       Q      And why do you need to communicate that to

23   Samsung?

24       A      Because we are placing this order based on

25   customer demand, and probably a customer is requesting it by

```
 1   that date.
 2        Q      If you look at the body of the purchase order
 3   where it says "Date Required," it's about four lines down, it's
 4   right at the bottom there.  Do you see that, Mr. Hong?
 5        A      Yes.
 6        Q      Is that something Netlist put into this
 7   particular purchase order?
 8        A      Yes, it is a comment that Netlist put into the
 9   purchase order, but it is not common.
10        Q      I'm sorry?
11        A      It is not a common statement that we would put
12   into a purchase order.
13        Q      What does that mean in this particular --
14        A      With this particular purchase order of
15   particular -- this Samsung device, we needed the parts by
16   September 2nd.
17        Q      Okay.  And why did you need to communicate that
18   to Samsung?
19        A      Because we needed the parts delivered to
20   our customer and that's -- we needed Samsung parts by
21   September 2nd.
22        Q      And so is it fair to say a purchase order from
23   Netlist's side shows a commitment that you are going to pay for
24   these particular products based on these various conditions?
25   Is that a fair statement?
```

```
 1          A       It is a fair statement, yes.

 2          Q       Now, the bottom of the purchase order on page 1

 3   indicates "Purchase Order Terms and Conditions Attached."

 4                  Do you see that?

 5          A       Yes.

 6          Q       So in addition to the commitment to pay, the

 7   commitment to buy, Netlist also has various terms and

 8   conditions attached to the purchase order; correct?

 9          A       Yes.

10          Q       All right.  Let's turn the page on that, and the

11   first section is a sentence called "Acceptance."  And it's

12   quite small.  So I'll try to --

13                  MR. RHOW:  Or I guess we'll -- can we blow it up if

14   we can?

15   BY MR. RHOW:

16          Q       And I'll try to read it into the record even

17   though I'm having a hard time reading it too.  What it says

18   here is, "The terms and conditions hereof become the exclusive

19   and binding agreement between the parties covering the purchase

20   of goods or services ordered herein when the purchase order is

21   accepted," and then there's other words.

22                  Do you see that?

23          A       Yes.

24          Q       You agree that a purchase order is a contract

25   between Netlist and Samsung; correct?
```

```
 1        A       Yes.

 2        Q       And based on this term in the terms and

 3   conditions, it is the exclusive and binding agreement; correct?

 4        A       Yes, that is the language of what you

 5   highlighted.

 6        Q       So from Samsung's side, when it receives a

 7   request, the goal of a purchase order from Netlist's side is to

 8   make sure Samsung knows that beyond simply the quantity, beyond

 9   simply the product, there's all these other terms and

10   conditions; correct?

11        A       Yes.  When Samsung is giving us permission to

12   order parts, we issue a purchase order.  And, yes, those are --

13   these are the -- what you highlighted and what you are stating

14   is correct.

15        Q       Well, this is a 2016 purchase order.

16                Do you see that?

17        A       Yes.

18        Q       And in 2016, I think -- I think you've evidence

19   that that was a period of time when Samsung was in compliance

20   with the agreement?

21        A       I would say more Samsung was -- and Netlist was

22   building good faith and trying to build business together after

23   signing the JDLA at the end of 2015.  But it all went bad at

24   the second half of 2017 when Samsung said, "You are getting no

25   support."
```

1      Q      After 2017 and in 2017, Netlist continued to use

2  purchase orders; correct?

3      A      Yes.  But we would have to get permission from

4  Samsung to issue those purchase orders.

5      Q      Okay.  And we'll talk about that.  But in terms

6  of the protocol, this purchase order protocol continued from

7  2016 through 2020.  Fair?

8      A      Yes.

9      Q      All right.  Now, let's look at Exhibit 1336, if

10 we could.

11             THE COURT:  Counsel, before we turn --

12             MR. RHOW:  I'm sorry.  Actually, you can't publish

13 it.

14             THE COURT:  -- turn to that, Exhibit 1245, at least

15 the copy I have, doesn't have an exhibit sticker on it or a

16 number.  Does the witness's version have a number?

17             MR. RHOW:  It should have a number on it.  We are

18 having some copying issues here.  The one in the notebook

19 should have that.  I was making copies, Your Honor, for the

20 convenience of the witness instead of using the witness

21 binders.  But the ones in the binder do.

22             THE COURT:  Okay.  I just want to make sure.  We

23 just need to keep track of it so when it goes to the jurors,

24 the jurors know what exhibit is what.  And so that one has the

25 correct -- thank you.

```
 1              MR. RHOW:  Yeah.  I apologize, Your Honor.  We are
 2    going to have this issue a couple times only because of a
 3    copying issue relating to the notebooks that were used to copy
 4    the exhibits.
 5              THE COURT:  Just as long as -- because we're -- at
 6    the end of the evidence, we are going to gather all of the
 7    exhibits that have bee admitted and provide them to you in the
 8    jury room.  And they'll have exhibit numbers on them.  So I
 9    want to make sure the versions you get have exhibit numbers on
10    them so you can follow along.
11              So as long as we're clear on that, I'm fine.
12              Thank you.
13              MR. RHOW:  I'd like to move and admit -- move to
14    admit and publish 1336.  This one does not have an exhibit
15    sticker on it, but it is in the notebook, and I'm going to hand
16    it to both counsel and Your Honor.
17              MR. LO:  No objection, Your Honor.
18              THE COURT:  1336 is admitted.
19              (Exhibit No. 1336 received into evidence.)
20    BY MR. RHOW:
21         Q      Mr. Hong, if you could take a look at what is
22    Exhibit 1336 and tell us what it is.
23         A      This is an example of a component forecast that
24    we are providing Samsung for the first half of 2018.
25         Q      And so we've been talking about forecasts
```

1    throughout this trial, and so I just want to make sure when you

2    used the phrase "forecast" in prior testimony, Exhibit 1336 is

3    an example of such a forecast.  Fair?

4         A      Yes.

5         Q      Now, a forecast is a prediction of what Netlist

6    may need for the following quarter or half year.  Is that a

7    fair statement?

8         A      No.  Forecast is our request for support from

9    Samsung for the parts that we're -- for the quantities we are

10   asking for.

11        Q      Where in 1336 is a price?

12        A      We have to first get permission that Samsung will

13   support us with 20,000 units, let's say, for example, in

14   January, 20,000 units.  And then if we got permission that they

15   would support us and gave us permission to issue a purchase

16   order, then we would negotiate a price.

17        Q      So how is Samsung supposed to know if they can

18   support or not if they don't know the price Netlist wants to

19   buy at?

20        A      Well, Samsung publishes pricing every monthly for

21   DRAM and publishes pricing every quarterly for SSD.  So we

22   inherently know the price when we are sort of negotiating

23   quantities or we are trying to get support for quantities.

24        Q      But you know price changes based on what you just

25   said; correct?

1      A      Again, Samsung price changes once a month for

2  DRAM products to Netlist and once quarterly for SSD.  So it

3  doesn't change frequently.  It just monthly or quarterly based

4  on the product.

5      Q      Well, it changes; right?  Like you said, on a

6  monthly--

7      A      Monthly or quarterly it changes, yes.

8      Q      Right.  And a quarter -- or in this case you're

9  talking about a half year.  It says, "1H 2018."

10     A      Yes.

11     Q      That means there would be six monthly changes in

12  the price; correct?

13     A      No, not for SSDs.  Once for three-month period

14  and once for the second three-month period.  And DRAM-related

15  products, yes, six --

16     Q      The bottom line is before Samsung and Netlist can

17  agree on a purchase of a product, they do have to agree on

18  price; right?

19     A      We have to first get Samsung's support on the

20  quantity.  And then once Samsung came back and said they will

21  support us with the quality, yes, then we would agree on a

22  price and then issue a purchase order; correct.

23     Q      So let me just get the sequence down in terms of

24  pricing.

25             At some point in the process, whether it's at the

1   beginning or later, for there to be a purchase, you, Netlist,

2   and Samsung need to agree on an actual price; right?

3        A      Yes.

4        Q      Now, you didn't expect Samsung to start shipping

5   you product based on Exhibit 1336, did you?

6        A      No.  We would again have to wait for Samsung to

7   respond to our forecast.  And when they responded to our

8   forecast and said they could support it, then they would ask us

9   to issue a PO, and then I would expect to Samsung deliver.

10       Q      But you're missing a step there.  You're missing

11  price; right?  Before shipment can occur, Samsung and Netlist

12  have to agree on a price; right?

13       A      So they would publish pricing, again, monthly and

14  quarterly, and that price would be the price that we would

15  agree to based on the support for the quantity that they

16  ask for.

17              MR. RHOW:  Your Honor, I move to strike.  I'm

18  getting explanations.  I'm not getting a clean answer.

19              THE COURT:  Let me ask the witness, can you answer

20  the counsel's question yes or no?  Counsel asked, "Before

21  shipment can occur, Samsung and Netlist have to agree on a

22  price; right?"

23              THE WITNESS:  In principle, yes.

24              THE COURT:  Okay.  And then I would just say going

25  forward, this is cross-examination.  And so if you can, try to

1    answer the questions, just the questions asked.  Your counsel

2    will have an opportunity to come up later and ask you to

3    explain if you want, but since we are keeping everybody in

4    short time limits, I'll let you do the explanation on your own

5    counsel's clock.

6                THE WITNESS:  Thank you.

7    BY MR. RHOW:

8        Q      Forecasts are not binding on either Netlist or

9    Samsung; correct?

10       A      It is binding after Samsung responds to the

11   forecasts, yes.

12       Q      When you send the forecast, it is not binding;

13   correct?

14       A      Yes.

15       Q      "Yes," it is not binding?

16       A      When we send the forecast, it is our intention to

17   buy but it is not a binding.

18       Q      Now, there were times, Mr. Hong, where Samsung

19   would tell you a product was not available and Netlist would

20   still submit a purchase order; right?

21       A      With promises of future delivery and it's

22   backlogged, yes, we would issue a purchase order.

23       Q      Let me repeat the question.

24              There were times, Mr. Hong, when Net- -- Samsung

25   would tell Netlist a product is not available and Netlist would

```
 1   still issue a purchase order.  Just answer that question.  It's
 2   a yes or no.
 3        A     Yes.  Yes.
 4        Q     Okay.  Now, let's look at Exhibit 1231.
 5             MR. LO:  Your Honor, could we get a foundation on
 6   this?
 7             THE COURT:  So you are looking at 1231, Counsel.
 8   You haven't moved it into evidence yet.
 9             MR. RHOW:  I have not yet, Your Honor.
10             I'm not moving to admit or publish it.
11             MR. LO:  Oh, fine.  Okay.
12             MR. RHOW:  The witness has the document.
13             MR. LO:  Thank you, Your Honor.
14   BY MR. RHOW:
15        Q     Mr. Hong.
16        A     Yes.
17        Q     There were situations where Devon Park and
18   Raymond Jiang and others at Netlist would submit a PO after
19   Neal Knuth had told them that it could not be fulfilled with
20   the understanding that they would ask for the product later;
21   correct?
22        A     I have not seen -- I am not part of this email
23   trail.  So I have not seen this.
24        Q     I'm not asking --
25             THE COURT:  Put the document to the side and just
```

**UNITED STATES DISTRICT COURT**

```
 1    focus on the question.

 2              THE WITNESS:  Okay.  I'm sorry.  The question?

 3    BY MR. RHOW:

 4         Q     You are aware of the situation where Mr. Neal

 5    Knuth would indicate a product is sold out or not available and

 6    your team would still submit a PO to Samsung?

 7         A     I only believe we issued POs for -- purchase

 8    orders for when Samsung allowed us to.  So the answer is no.

 9         Q     I want you to look at the document to refresh.

10         A     Yes.

11         Q     I'm not trying to admit it.  I want you to read

12    the first two emails, and tell me if that refreshes your

13    recollection as to whether or not there are situations where

14    Netlist would submit POs to Samsung even though Neal Knuth had

15    indicated no availability.

16         A     I don't see where in this email that we issued a

17    purchase order.

18         Q     Okay.  I'm not asking you that, and I don't want

19    you to go into it.

20              You don't recall situations where Netlist would

21    place a PO and then reach out to Harrison Yoo for support on

22    that PO after Neal Knuth had said no?

23         A     No, I do not.

24         Q     All right.

25              THE COURT:  Counsel, it's about time for our morning
```

```
 1   break.  I know we haven't been going that long, but our court
 2   reporter has been here working away since 8:30.  So we'll take
 3   our morning break.  We'll come back in ten minutes.
 4            MR. RHOW:  Thank you, Your Honor.
 5            THE COURTROOM DEPUTY:  All rise.
 6            (At 10:31 a.m. a brief recess was taken.)
 7            THE COURT:  Okay.  We'll pick up right where we left
 8   off.
 9            Go ahead, Counsel.
10            MR. RHOW:  Thank you, Your Honor.
11   BY MR. RHOW:
12       Q     Mr. Hong, forecasts change; right?
13       A     From period to period, it changed.  But when we
14   submitted a forecast, it didn't change from that.
15            MR. RHOW:  I'd like to move to admit and publish
16   Exhibit 1483.
17            And just to save time, I'm going to be moving to
18   admit and publish 1484 and also 1487, which is right here.
19            Yeah, I would actually like to move all three
20   exhibits into evidence and publish them.  It's 1483, 1484, and
21   1487.
22            THE COURT:  Okay.  Any objection, Counsel.
23            MR. LO:  No objection.
24            MR. RHOW:  Let's actually --
25            THE COURT:  Excuse me one second.
```

```
 1              MR. RHOW:  My apologies.

 2              (Discussion held off the record.)

 3              MR. RHOW:  1483, 1484, 1487.

 4              MS. SHIN:  Yeah, those are the right ones.

 5              THE COURT:  Okay.  So, Counsel, you are asking to

 6    move 1483, 1484, and 1487 into evidence; correct?

 7              MR. RHOW:  Correct.

 8              THE COURT:  Any objections?

 9              MR. LO:  None, Your Honor.

10              THE COURT:  These three exhibits, 1483, 1484, and

11    1487 are admitted and can be published.

12                    (Exhibit Nos. 1483, 1484, and 1487

13                        received into evidence.)

14              MR. RHOW:  Thank you, Your Honor.

15    BY MR. RHOW:

16         Q      Mr. Hong, I first want to look at 1483.  And if

17    you look at that document, this is an April 4, 2017, email.  If

18    you look at the December 2017 row for the first product, you

19    see that it shows 400,000 units; correct?

20         A      Yes.

21         Q      And then -- by the way, in the email itself --

22    Raymond Jiang was in your procurement office; correct?

23         A      Yes.

24         Q      If you look at the actual email, the second

25    sentence underneath the box --
```

```
1              MR. RHOW:  Could you highlight that, please?

2    BY MR. RHOW:

3        Q       He writes, "Again, we need to work on price."

4    Correct?  Do you see that?

5        A       Yes.

6        Q       That was very common, after a forecast is sent,

7    you, Netlist, and Samsung would need to work on the price?

8        A       Not common.  This is a unique part that we were

9    buying from Samsung.  And, yes, for this particular part, price

10   had to be negotiated.

11       Q       And are you telling the jury that for no other

12   parts price had to be negotiated?

13       A       Well, pricing was set by Samsung on a monthly

14   basis for DRAM products and quarterly for SSDs.  There's no

15   negotiation.  It's Samsung dictating the price every month and

16   every quarter.

17       Q       And if Netlist didn't like that price, they could

18   go to resellers for a cheaper price; right?

19       A       No.  As I -- again, pricing was not the principal

20   factor of us making purchase decisions.  It was quality.  So we

21   would always buy from Samsung directly first because of quality

22   assurance.

23       Q       We'll get to that issue.

24       A       Okay.

25       Q       In 1483, you see the 400,000 units; correct?
```

```
 1          A      Yes.

 2          Q      Let's now go to 1487 -- sorry -- 1484.  My

 3   apologies.  If you go to the second page of the document, you

 4   see that same product with a different forecast for December?

 5   It's now 250,000?

 6          A      Yes.

 7          Q      And let's go to 1487.  And this is now a

 8   November 15, 2017, email.  And if you look at the first row and

 9   the column that says December 2017, you now see it's 25,000.

10                 Do you see that?

11          A      Yes.

12          Q      And so forecast did change from month to month;

13   correct?

14          A      You are showing me that it changed, but I don't

15   know the dates of these emails or -- yeah, I don't know the

16   context.

17          Q      And that's fine, but the emails will speak for

18   themselves and the jury will see them.  But as you sit here

19   today, having now looked at these particular documents and

20   recalling your earlier testimony where you said forecasts do

21   not change, is that still your testimony, that forecasts do not

22   change?

23          A      Forecasts do not change from a period that we

24   would have -- or a date that we would have submitted it, but it

25   would change if there was no agreement in terms of Samsung
```

```
 1    having -- having responded to our forecast and having agreed to

 2    support us.

 3            MR. RHOW:  Your Honor, I'd like to publish

 4    Exhibit 47, which I believe is in evidence.  It's the JDLA.

 5            THE COURT:  Yes.  Go ahead.

 6            MR. RHOW:  Thank you, Your Honor.

 7    BY MR. RHOW:

 8        Q     Exhibit 47 -- Mr. Hong, did Mr. Lo ask you about

 9    it?  I don't know if you've seen it before.

10        A     I do not.  I have not seen this.

11        Q     Have you ever seen Exhibit 47, the JDLA?

12        A     No.  I'm only familiar with the supply clause in

13    the JDLA.

14        Q     So you are familiar with that particular clause

15    but not the rest of the agreement?

16        A     Yes.  Yes.

17        Q     Let's go to 6.2 just so we have a reference

18    point.

19            Is this the provision in the JDLA that you are

20    familiar with?

21        A     Yes.

22        Q     Let me ask you.  Does the JDLA anywhere indicate

23    that forecasts are considered requests?

24        A     A forecast is a request from that list, but it

25    does not -- this clause does not indicate that; correct.
```

1    Q       I'm asking a broader question.  Are you aware of

2    any provision in the JDLA that makes clear to Samsung that

3    forecasts or email inquiries, things that are not purchase

4    orders, are in fact requests?

5    A       Yes.  It is part of the purchasing process that

6    we would have to forecast parts that we would need from

7    Samsung, and Samsung would then reply to that forecast.  So the

8    forecast for us was a request.

9    Q       I know that's the argument you're making.  What

10   I'm asking is are you aware of anywhere in the JDLA where it

11   says that?

12   A       I believe I'm only familiar with this clause.

13   And, yes, in this clause it does not say that.

14   Q       Now, at the time the JDLA is entered into -- and

15   I don't know if you were here for Mr. Chuck Hong's testimony --

16   do you recall if forecasts were being used or not?

17   A       I'm sorry.  The question again.

18   Q       In November 2015, and that's the date of the

19   JDLA, I believe -- and you weren't here for the testimony.  So

20   let me ask you was it your understanding that in November 2015,

21   the practice did not include forecasts because Netlist was not

22   a regular customer of Samsung?

23   A       So you're talking about the period from 2000 to

24   2015?

25   Q       No, I think -- and let me try to -- I'll try to

1  lay some foundation in terms of Mr. Hong's testimony, your

2  brother.  I think he indicated that in 2015, there was very

3  small amounts, 50,000 a month or less, and he indicated during

4  that period there was no point in doing forecasts because they

5  weren't getting product.  Do you recall that as well?

6       A     I do recall the 50K number, and Samsung was not

7  supporting us very well or much pre JDLA, yes.

8       Q     And you recall that as a result of that, Netlist

9  was not submitting forecasts regularly to Samsung?

10      A     The process became a formal process after the

11  JDLA, yes.  I do not recall that we were submitting forecasts

12  in that period that you are mentioning.

13      Q     And so that's my point.  At the time the JDLA is

14  entered into with the phrase "request," forecasts are not even

15  something that the parties are using; correct?

16      A     There were times when we did use forecasts in the

17  period of 2000 to 2015.  But if you're talking about just that

18  period of August 2015, we did not use a forecast because we

19  were not getting parts.

20      Q     But to the extent you were getting parts in 2015,

21  even if it was the $50,000 worth of parts that you talked

22  about, that was done by a PO; correct?

23      A     No.  That would probably be done by "Can you

24  support $50,000 worth of parts?" and then Samsung replying,

25  "Yes," and then we would issue a purchase order.  So, yes, in a

```
 1    way a forecast or request was made.

 2         Q      So in that period of time when Samsung is signing

 3    this agreement with Netlist, the only requests that are formal

 4    between the parties that Samsung would understand to be a

 5    request would be a purchase order based on what you just said?

 6         A      Yes, pre JDLA and pre this clause in the JDLA,

 7    yes, you are correct.

 8         Q      All right.  Let's move on.

 9                Now, I want to go back to now some of the

10    testimony you had with Mr. Lo, and we were talking about this

11    issue of chip quality.

12                And let me take a step back.

13                In the lead up -- strike that.

14                As -- sorry.

15                Netlist got into the resale business in a much

16    more significant way after the JDLA was executed; correct?

17         A      Correct.

18         MR. RHOW:  And I want to show a Document 1086.  I'd

19    like to move to it and publish it.

20         (Discussion held off the record.)

21         MR. RHOW:  I would move to admit and publish.

22         THE COURT:  And that's 1086; correct?

23         MR. RHOW:  Correct, 1086.

24         THE COURT:  Any objection?

25         MR. LO:  No objection.
```

```
 1              MR. RHOW:  1086 is on the screen --
 2              THE COURT:  And just for the record, just so the
 3    jury knows, when you look at this exhibit, this is
 4    Exhibit 1086, there's a sticker down in the corner that says
 5    "86."  This is not 86.  It's 1086 in case you're wondering.
 6              (Exhibit No. 1086 received into evidence.)
 7              MR. RHOW:  Apologies.  That was a transposition of
 8    depo exhibits.
 9              THE COURT:  Sure.  Yeah.
10    BY MR. RHOW:
11         Q     Mr. Hong, 1086 -- have you seen this document
12    before?
13         A     I have not seen this document before.
14         Q     Let me ask you.  You do recall, though, that in
15    the --
16              MR. RHOW:  Let's scroll back out.
17    BY MR. RHOW:
18         Q     -- that in the period from 2000 -- well, really
19    during the period of the JDLA, the amount of -- amount of
20    resale business that Netlist was doing was increasing?
21         A     Yes.
22         Q     Right.  And when I say "resale business," this
23    would be business where Netlist is buying a Samsung chip and
24    then reselling it to another customer who wants a Samsung chip.
25    That business was increasing for Netlist during the JDLA;
```

```
 1   correct?

 2        A       Correct.

 3        Q       In fact, in -- at some point, the resale business

 4   that we are talking about was the majority of Netlist business.

 5   Is that fair?

 6        A       Fair.

 7        Q       Do you have a percentage for the jury as to the

 8   amount of your overall business that was resale business in,

 9   say, 2017?

10        A       No, I do not know.

11        Q       Do you know if it was over 50 percent?

12        A       I do not know the exact number.

13        Q       But when you say it was significant, what did you

14   mean when you answered that question?

15        A       Well it was a big portion of Netlist's revenue,

16   but I do not know the exact number.

17        Q       Okay.  And I understand you don't know the exact

18   number.  Do you have an estimate?  Was it at any point greater

19   than 50 percent?  If you know.

20        A       It may have been.

21        Q       Now, in the situation where you are buying a chip

22   and reselling it to someone, I take it that you would not

23   knowingly sell substandard chips; correct?

24        A       Correct.

25        Q       You would only sell chips to those customers that
```

```
 1    you thought could meet their needs; correct?

 2         A       Correct.

 3         Q       And based on your testimony with Mr. Lo, you were

 4    buying chips from resellers and then selling them to other

 5    folks; correct?

 6         A       Correct.

 7         Q       And so those chips you bought from resellers, you

 8    believed those were adequate and sufficient for the needs of

 9    your customers.  Fair?

10         A       Fair, but I know I was taking risk.

11         Q       Do you know who Mr. Akemann is?

12         A       Yes.  I met him -- I met him, yeah, for this --

13    actually, this week for the first time.

14         Q       Do you know anything about his damages analysis?

15    And if you say no, I promise to move on.

16         A       I -- I know the date it's coming from, but I

17    don't know how he did the calculation.

18         Q       All right.  I'm going to move on to a slightly

19    different subject -- or a different subject.

20                 Oh, by the way, in terms of the Samsung chips you

21    are buying from resellers and then selling them on, those are

22    chips that were made by Samsung; right?

23         A       Yes.

24         Q       Those are chips that are made in the same

25    factories that make the chips Samsung sells directly to you;
```

```
 1   right?

 2        A      I'm not sure that -- I can't answer that question

 3   because Samsung has many factories.  But, yes, they were both

 4   manufactured by Samsung.

 5        Q      Now, is there an issue with counterfeit chips in

 6   the market?

 7        A      Yes, there is an issue.

 8        Q      And so there's an issue at times where, if you go

 9   to a reseller and there's availability, that would be a

10   counterfeit chip; correct?

11        A      Yes.  There are different type of resellers, yes.

12        Q      The 51 mill- --

13        A      The answer is yes.

14        Q      Sorry about that.

15               The 51 million in reseller -- in chips you bought

16   from resellers, are any of those counterfeit chips?

17        A      No, they were not.

18        Q      All right.  Let's go now to -- actually, I want

19   to go to the demonstratives that Mr. Lo used with you, and I

20   think it's the second one he used.  It's the third page of the

21   outline.

22               MR. RHOW:  Your Honor, may I publish?  This is -- I

23   think it was used during Mr. Lo's --

24               THE COURT:  Yes.

25               MR. RHOW:  -- examination.
```

```
 1   BY MR. RHOW:

 2        Q     Now, do you recall your testimony with Mr. Lo

 3   about this particular demonstrative?

 4        A     Yes.

 5        Q     And one of the things that you were testifying to

 6   is to show this spike up in orders and then it drops in, it

 7   looks like, around May of 2017; correct?

 8        A     Yes.

 9        Q     Now, in this document, the highest monthly amount

10   is -- it looks like it's in April 2017.

11        A     Yes.

12        Q     And I see, based on this document, it's about --

13   it looks like about $11 million worth of chips.

14              Do you see that?

15        A     Yes.

16              MR. RHOW:  I would like to publish a portion of

17   Exhibit 311, which is in evidence.

18              THE COURT:  All right.

19   BY MR. RHOW:

20        Q     Mr. Hong, we -- I think earlier in your

21   testimony, you testified about Exhibit 311.  This is the list

22   of purchase orders that were submitted by Netlist to Samsung.

23   Do you recall 311 in general?

24        A     Yes.

25        Q     All right.  Let's look at the April 2017 time
```

```
 1   frame.  And do you see -- this is on the screen, Mr. Hong.  You
 2   see four lines for an order for eMMC product.
 3               Do you see that?
 4        A     Yes.
 5        Q     And I just -- if you scroll -- so that's 550,000
 6   units for each of these eMMC products; right?
 7        A     Yes.
 8        Q     And if you scroll to the right, there's a price
 9   between 350 and 550.
10               Do you see that?
11        A     Yes.
12        Q     And so I'm going to do the math for you.
13               The total amount of these orders -- scroll back
14   to the left -- from April 5, 2017, is around $10 million.  Is
15   that fair?
16        A     I'll take your word.  I can't -- I didn't do the
17   math.  My head will --
18        Q     Someone else did it too.  But we'll both take
19   their word for it.
20               Netlist canceled these orders, didn't they?
21        A     The orders were canceled.
22        Q     Netlist canceled these orders; correct?
23        A     Correct.
24        Q     Let's go back to 509.
25               So the chart Mr. Lo showed you to show that
```

1    Samsung was at fault for the decrease in April 2017 includes
2    almost $10 million of orders that you canceled.
3         A     I believe -- I'm not sure how, again, this --
4    this chart was made.  But, yeah, from the data where -- I'm not
5    sure if it's -- it's what you are saying.  But, yes, we did see
6    $10 million worth of orders being canceled.  And we are seeing
7    a chart that shows 11 million -- roughly, approximately
8    11 million in April being purchased.
9         Q     Did you approve this chart?
10        A     Approve?
11        Q     Did you verify it was accurate?
12        A     The trend -- I reviewed the trend.  I did not
13   review the numbers in detail.
14        Q     All right.  Let me move on to something else.
15              I want to talk about -- and I alluded to this
16   topic earlier -- this notion of Netlist -- of going to Samsung
17   first.
18              MR. RHOW:  And you know what might be helpful?  I
19   think it might be helpful to show -- and this has already been
20   shown.  It's Slide 1 from P. K. Hong's demonstratives,
21   Your Honor.  May I publish?
22              THE COURT:  Yes.
23   BY MR. RHOW:
24        Q     And so, Mr. Hong, you yesterday talked about
25   Slide 1.  Do you recall that?  This is Slide 1 from the

```
 1    demonstratives from your examination.

 2        A       Yes.

 3        Q       Now, I think you said it several times, and so

 4    that's why I'm focused on it.  You said, "We always go to

 5    Samsung first."

 6        A       Yes.

 7        Q       And after you go to Samsung, and I think you said

 8    you check availability, you will then see if the price matches

 9    the price you want to pay; right?

10        A       No.

11        Q       So you accepted the price no matter what?

12        A       Whatever Samsung supported us, we -- it was -- if

13    they said they would support us -- if we asked for a thousand

14    pieces and they said they would support us with a thousand

15    pieces, yes, we would have to buy a thousand pieces.

16               As I mentioned previously, there are threats if

17    you don't buy a thousand pieces, you will never see support.

18    And that's what happened with eMMC.  So we're talking about an

19    order cancelation that -- previously, on our previous chart.

20    But since that cancellation, Samsung has never supplied us that

21    part ever.

22               MR. RHOW:  Let's look at -- I want to do 1046.  It's

23    going to be a little bit down.

24               Your Honor, I'd like to move to admit and publish.

25               THE COURT:  Objection, Counsel?
```

**UNITED STATES DISTRICT COURT**

```
 1            THE COURTROOM DEPUTY:  Exhibit number?

 2            MR. LO:  No objection, Your Honor.

 3            THE COURT:  1046 is admitted.

 4            (Exhibit No. 1046 received into evidence.)

 5  BY MR. RHOW:

 6       Q    Mr. Hong, I'm not going to go through the

 7  entirety, and I'll come back to that slide of the email.  And

 8  the email talks about a series of POs, and the jury will be

 9  able to look at it when they deliberate, but I'm focused on the

10  top email just because time is short.

11            And what I'm focused there is on the sentence --

12  and maybe I should go to the middle of the email.

13            If you look at the middle email, tell me,

14  Mr. Hong, if you see that there's a series of POs being

15  discussed.

16       A    (No audible response.)

17       Q    If you look at the second email down, it says,

18  "Sorry.  I've been checking availability for 300 pieces on

19  PO" --

20       A    Yes.

21       Q    Do you see that?

22       A    Yes.

23       Q    Okay.  And then if you look at the top email,

24  Raymond Jiang is writing to you:  "Price may still be an issue

25  though."
```

1                     Do you see that?

2          A      Yes.

3          Q      And so it's not true that you simply accepted

4     Samsung's prices if price was an issue, and it clearly was an

5     issue at times --

6          A      It's because Samsung had --

7          Q      Let me finish the question, please.

8          A      Okay.  Sorry.

9          Q      You're jumping in there.  Okay.

10                    It is true that at times price was an issue;

11    right?

12         A      Am I -- pricing is set every month.  And if

13    Samsung would delay shipment for many, many months, that price

14    at the particular time when Samsung delivered would be our

15    price.  So if that price was substantially higher, yes, that

16    would be an issue.

17                MR. RHOW:  Your Honor, move to strike.  I didn't get

18    a yes or no to that.

19                THE WITNESS:  I'm answering the question.

20                THE COURT:  I'll allow the answer, but you can

21    follow up.

22    BY MR. RHOW:

23         Q      It is true, as this email says, that at times,

24    based on whatever circumstances you want to explain, price was

25    an issue; right?

```
 1        A       At the time -- if Samsung delivered six months

 2   from the time we ordered -- and this is they're going through

 3   backlog.  I don't know the details, but they are going through

 4   a backlog report.  So it is looking at a shipment that hasn't

 5   been delivered yet.

 6                Yes, when that gets delivered, the price gets

 7   nego- -- well, it's not negotiated.  It's pretty much the price

 8   that Samsung publishes at the time of that delivery.  And, yes,

 9   if that price is substantially higher than when we ordered it,

10   yes, that could be a problem.

11                MR. RHOW:  Move to strike everything but the "yes."

12                THE COURT:  Move to strike is granted.  The witness

13   answered "yes."

14                MR. RHOW:  Let's go -- I'd like to move to admit and

15   publish Exhibit 1353.

16                THE COURT:  Counsel, any objection?

17                MR. LO:  No objection.

18                THE COURT:  1353 is admitted.

19                MR. RHOW:  Publish it.

20                (Exhibit No. 1353 received into evidence.)

21   BY MR. RHOW:

22        Q       And, again, I'm not going to go through the

23   entire email, but very quickly you'll see a list of POs.

24                Do you see that, Mr. Hong?

25        A       Yes.
```

1      Q      Let's go to the top email.  This.

2             Is an email from Raymond Jiang to Neal Knuth at

3      Samsung.  Raymond Jiang, again, is the head of procurement at

4      Netlist?

5      A      Procurement manager.

6      Q      Sorry.  Procurement manager at Netlist?

7      A      Yes.

8      Q      And what he writes to Neal, to Neal Knuth at

9      Samsung, is:  "Cannot take at these prices."

10            Do you see that?

11     A      Yes.

12     Q      And so it is true that at times, if the price was

13     not right, no pun intended, that Netlist wouldn't take; right?

14     A      That is what he's stating.

15     Q      Second sentence in that paragraph.

16            In fact, Netlist would look for quotes from

17     distributors; correct?

18     A      Again, after -- if Samsung could not support.  So

19     if you are looking at the PO, I see the -- they're talking

20     about backlogs and they're talking about deliveries.  So if

21     Samsung could not deliver by the dates that we needed, yes, we

22     would have to seek parts elsewhere.

23            MR. RHOW:  Move to strike, Your Honor.

24            THE COURT:  Move to be strike is granted.

25            Just try to answer the question.  And then, again,

```
 1   your counsel will get an opportunity to come up and ask you

 2   questions too.

 3                THE WITNESS:  I'm thinking I'm answering the

 4   question.  Sorry.

 5                THE COURT:  Well, listen carefully to the question.

 6   Typically they're going to ask for a yes or no sort of answer.

 7   Try to answer the question.  And then, again, your counsel will

 8   be able to come up and inquire further.

 9                THE WITNESS:  Okay.  Thank you, Judge.

10   BY MR. RHOW:

11        Q      Mr. Hong, at least in this situation, Netlist

12   considered a price from a Samsung distributor; correct?

13        A      Based on the email, yes.

14        Q      Just to be clear, a Samsung distributor is not

15   Samsung.  That's not buying direct from Samsung; right?

16        A      Well, yes, Netlist is not buying direct from

17   Samsung, but the distributor is getting parts directly --

18        Q      When Netlist is buying from a distributor, it's

19   not buying direct from Samsung; correct?

20        A      Correct.

21        Q      Thank you.

22                All right.  Let's go back to Slide Number 1 from

23   the P. K. Hong demonstrative.  And I want to go through the

24   slide and just make sure I understand what kind of records

25   Netlist keeps based on this Slide 1.
```

1                By the way, did you verify this slide is

2     accurate?

3         A       Yes.

4         Q       Did you see this slide before you testified?

5         A       Yes.

6         Q       Now, you testified that in the process that

7     Netlist attempted to follow, forecasts are first prepared;

8     right?

9         A       Netlist would prepare forecasts, yes.

10         Q       And those forecasts are sent to Samsung; correct?

11         A       Yes.

12         Q       And so there should be records of those

13     forecasts; correct?

14         A       On email, yes.

15         Q       And it is important to keep those types of

16     records in connection with operations of the business; right?

17         A       We do not keep formal records.  So I -- the

18     answer is I don't know what you are talking about there.

19         Q       So as to forecasts, do you or do you not keep

20     records of the forecasts that we can consider in this trial?

21         A       Again, it would be in the form of emails.

22         Q       Do you keep records of those emails so that we

23     have a clear record of the forecast for this trial?

24         A       We would be able to trace emails, yes.

25         Q       Based on the chart, and I'm just following the

1  flow chart, if Samsung says yes to a forecast, then the order

2  is either fulfilled, backlogged or canceled.  That's based on

3  that chart?

4       A    Yes.

5       Q    And, again, in connection with operations,

6  Netlist would have records to show which ones are fulfilled,

7  backlogged or canceled; correct?

8       A    Yes, there would be records.

9       Q    Why didn't the records show that those eMMC

10  orders that I just talked about were canceled by Netlist?

11       A    Sorry?

12       Q    Why didn't those records that you just said you

13  maintained -- why didn't they show what I asked you about, that

14  the eMMC orders, the 9.9 million in orders, were actually

15  canceled by you guys?

16       A    I cannot answer that.  I don't know.

17       Q    Do you know if the records that Netlist has been

18  keeping and using in this trial are accurate?

19       A    It is coming out of our operating system.  So I

20  believe them to be accurate.

21       Q    Now, we focused on the left side of the chart.  I

22  want to now focus on the right side of the chart.

23            Does Netlist keep records -- well, I assume

24  Netlist keeps records of reseller purchases; correct?

25       A    Through purchase orders, yes.

1      Q      And does Netlist keep records of the actual

2   purchase orders themselves?  Right?

3      A      Yes.

4      Q      And is it true with Netlist resell requests

5   that -- are those also potentially backlogged and canceled as

6   well?

7      A      There could be instances of it, but generally

8   speaking, they are -- when we buy from resellers, they are

9   shipped right away.

10      Q      And so do you have records of canceled and

11   backlogged reseller orders?

12      A      Again, they are rare.  I do not know if we have

13   records of that.

14      Q      Do you have records indicating and matching the

15   reseller purchases to the rejected line items in forecasts?

16      A      No, we do not have records of that.

17      Q      So based on the records that we have in this

18   trial, we can't do any matching up of rejected forecasts and

19   reseller purchases; correct?

20      A      Correct.  Correct.

21          MR. RHOW:  All right.  I'm going to move -- slightly

22   different.  I'm going to move to -- actually, these are in

23   evidence, Your Honor.  So I think I can go straight to them.

24          This is Exhibit 355, which I believe is in evidence,

25   Your Honor.

```
1              May I publish?

2              THE COURT:  Yes.

3              MR. RHOW:  Thank you, Your Honor.

4   BY MR. RHOW:

5       Q      Exhibit 355 is on the screen, Mr. Hong.  It's a

6   February 15, 2018 email that you went through with Mr. Lo.  Do

7   you recall that?

8       A      Yes.  Yes.

9       Q      Okay.  Go to the second page, the first line --

10  first -- I'm sorry -- second page talks about -- and Number 1.

11  Sorry.  It says, "Customer is well aware the SKU is going EOL

12  next year."

13             What EOL mean?

14      A      It's end of life.

15      Q      And can you explain to the jury, in the memory

16  chip world, what does "EOL" mean and how does that affect

17  availability?

18      A      Well, when Samsung is ready to end-of-life the

19  product, they will have a -- they will send out an EOL notice

20  with last-time purchase dates and last-time ship dates.  So

21  it's when Samsung is deciding to end-of-life a product line or

22  product SKU.

23      Q      And so for an EOL product, there will be a point

24  in time when the product is no longer being manufactured;

25  correct?
```

1     A     Yes.  So they will issue an EOL notice giving you

2  last-time purchase date, which is the last date that you can

3  purchase these products.

4     Q     And after that date, that product is not

5  available?

6     A     You cannot order them, yes.

7     Q     And is that -- does that --

8     A     It is available because the last-time ship is

9  usually about six months after the last-time buy.

10    Q     But there's a time when, once the EOL supply is

11 gone, even after that date is not available.  Is that fair?

12    A     Fair.

13    Q     Now, I believe you testified with Mr. Lo that

14 Exhibit 355 represented a request that was not fulfilled;

15 correct?

16    A     Yes.

17    Q     Now, Exhibit 380 is the list of reseller

18 purchases.  Do you recall that?

19    A     Yes.

20    Q     So have you attempted to match up Exhibit 355 and

21 the request contained in 355 with a reseller purchase in

22 Exhibit 380?

23    A     So we are talking about repurchase match-up or

24 repurchase purchase request with this line item?

25    Q     Correct.

```
1        A        No.  This part number -- this part is not

2    available through resellers.  So there wouldn't be any records

3    of that.

4        Q        So the reseller purchases that we are talking

5    about and that your expert is seeking damages on, Exhibit 355

6    has nothing to do with that; right?

7        A        It should not because we did not buy it from

8    resellers.  We just could not fulfill a customer $5 million

9    order.

10       Q        Okay.  And so the matching up I'm talking

11   about -- and let me ask this:  For all of the documents Mr. Lo

12   showed to you, it could save time, where various requests were

13   made, did you ever attempt to match those unfulfilled requests

14   with a reseller purchase?

15       A        There are 10s and 20,000 type transactions.  My

16   group was so busy trying to fulfill orders that, no, we did not

17   do that.

18       Q        Do you know if your expert tried to do that?

19       A        I do not know.

20       Q        And I know you're trying to fulfill orders.  But

21   to prepare for this trial and to prepare for this testimony and

22   the issues we are talking about, did anyone on your team even

23   start to try to do that?

24       A        I do not know the answer.

25       Q        Now, there were situations, Mr. Hong, where
```

```
 1    Netlist canceled backlog orders; correct?

 2         A      We may have, but I do not recollect.

 3                MR. RHOW:  1352.

 4                Your Honor, I move to admit and publish.

 5                THE COURT:  Any objection, Counsel?

 6                MR. LO:  No, Your Honor.

 7                THE COURT:  Exhibit 1352 is admitted.

 8                (Exhibit No. 1352 received into evidence.)

 9    BY MR. RHOW:

10         Q      Mr. Hong, this is a May 1st, 2018 email.  And so

11    the first line, that's where I'm focused on, it says, "Please

12    cancel the DRAM backlog in orange below."

13                Do you see that?

14         A      Yes.

15         Q      Netlist regularly canceled backlog orders;

16    correct?

17         A      No.  This would be a rare occasion if we did --

18    if it did occur.

19         Q      Let's go to --

20                MR. RHOW:  Your Honor, apologies.  This one is -- it

21    says "24."  It's actually 1024.  And the jurors' copy will

22    reflect that.

23                THE COURT:  Thank you, Counsel.

24                MR. RHOW:  I'd like to move and publish.

25                THE COURT:  Any objection to Exhibit 1024?
```

1           MR. LO:  No objection.

2           THE COURT:  Exhibit 1024 is admitted.

3           (Exhibit No. 1024 received into evidence.)

4    BY MR. RHOW:

5           Q       Mr. Hong, I'm focused on the second email,

6    February 16, 2017.  And I'm focused on the first three

7    sentences or first two sentences.  And you write this email.

8    You write:  "He would be worried we cannot take our backlog.

9    That would his worry about our stock."  I read that literally.

10   I think that maybe it should say "should be his worry."

11          But in any event, do you recall writing that,

12   Mr. Hong?

13          A       I do not recall writing it, but obviously I did

14   write it.

15          Q       And what you were talking about here is a

16   situation where Netlist had submitted an order, the order was

17   backlogged and you, Netlist, was -- were not willing to

18   ultimately take the orders represented by that backlog;

19   correct?

20          A       I'd have to see the whole email.  But I don't

21   know what I would be referencing in terms of "he."  Maybe it

22   would be Samsung.  I'm not sure.

23          Q       If you scroll down to the next email, it says,

24   "Discussed with Neal."

25          And so is the "he" that you were referring to

```
 1   Neal?
 2         A      I believe so.
 3         Q      And so given that "he" is Neal, what you are
 4   saying here is that Neal is worried, Neal who works for Samsung
 5   is worried that Netlist is submitting a purchase order but then
 6   not taking the product represented from the backlogged order;
 7   correct?
 8         A      I'm not sure.  Can you go back to the top email?
 9         Q      Yeah.  Feel free to take a look at the whole
10   email, if you want.
11         A      Okay.
12         Q      And we can show the whole thing.
13         A      And so I don't know exactly what we did, but I am
14   stating that Neal would be worried that we will not take his
15   backlog.  I'm not sure if we took it or did not take his
16   backlog.  But that is why he's worried about our -- if we had
17   stock.
18         Q      All right.
19                MR. RHOW:  1048.
20                Your Honor, Exhibit 1048 is being passed up, which I
21   would like to move to admit and publish.
22                THE COURT:  Counsel, any objection to 1048?
23                MR. LO:  No objection.
24                THE COURT:  Exhibit 1048 is admitted.
25                (Exhibit No. 1048 received into evidence.)
```

```
 1   BY MR. RHOW:
 2        Q     Mr. Hong, tell me when you're ready.  I'm going
 3   to focus on a particular part of it.
 4        A     Okay.
 5        Q     And the part I want to focus you on is the middle
 6   email that you write to Devon.  And, number one, you write
 7   there:  "The price is obvious.  You quoted $218.  Cost is
 8   214.50.  Not a big problem as we can raise pricing later."
 9              Do you see that?
10        A     Yes.
11        Q     So it is true that no matter what the price was
12   that was being quoted, you were still going to raise price at
13   some point; right?
14        A     I don't know if we did, but I am stating we will,
15   yes, raise pricing.
16        Q     Because that was the practice, Mr. Hong; correct?
17        A     Not every customer would accept a higher -- a
18   raised price.  It is not a practice.
19        Q     Certainly in connection with Samsung and in
20   connection with this email, you certainly believed that you
21   could raise the issue of pricing later; correct?
22        A     This is pricing to our customer later.
23              So the price is obvious.  We quoted 215 to -- 218
24   to our customer.  We were not getting product.  So Samsung,
25   when we quoted the product at 218, Samsung was at, I believe,
```

1  if we look at the below email, 192.  And we didn't get the

2  product.  So then they said they couldn't deliver.  So we

3  were -- they were raising the price to 214.

4           So I'm saying, yes, that is a problem that the

5  price of Samsung's part went up, and maybe it won't be a

6  problem because we can raise pricing to our customer later, I

7  believe is the context of this email.

8     Q     Do you believe, or do you know?

9     A     I know what?

10    Q     That that is, in fact, the context, that you are

11 trying to raise pricing with the customer not with Samsung?

12    A     "Not a problem.  We can raise pricing later."

13          We could not raising pricing to Samsung.  Samsung

14 dictated pricing to us.  I am referencing raising pricing to a

15 customer later.

16    Q     The second bullet point here is:  "The other

17 issue is availability."

18          Do you see that?

19    A     Yes.

20    Q     Okay.  And right here it says, "This part will

21 always have horrible availability."

22          Do you see that?

23    A     Yes.

24    Q     Now, is this one of the EOL products we talked

25 about?

```
 1        A       No.  This is a DDR3 LRDIMM.  There is really no
 2   market for a DDR3 LRDIMM.  So this part had horrible support.
 3   Always had horrible support.  And that is what I'm referencing.
 4        Q       Is that because less of that product is made?
 5        A       Yes.
 6        Q       And then what you write here is, in the last
 7   paragraph:  "Overall, this will be hard to support."
 8                Do you see that?  You see that; right?
 9        A       Yes.
10        Q       Now, so you understood that with certain parts
11   that had certain prices that had certain availabilities, that
12   for Samsung it would be hard to support that; correct?
13        A       I am writing to Devon saying it would be hard to
14   support the customer.  It's not referencing Samsung.
15        Q       Because the product, as you just mentioned, is
16   not widely produced; right?
17        A       Yes, that is what I wrote.
18        Q       And what you write here -- just to be clear, what
19   you write is:  "Samsung will not build much."
20        A       Because there was very little market for this
21   product.
22        Q       All right.  Okay.  Moving to a slightly different
23   subject.  When you bought from resellers -- and we are looking
24   at the Exhibit 380 list.  When you bought from resellers, did
25   Netlist buy on credit?
```

1          A      No.

2          Q      It always bought with cash?

3          A      Most of the times it was done on cash, but yes.

4          Q      And so no credit terms of any type were extended

5     by resellers?

6          A      No credit terms were extended by resellers.

7          Q      And I saw on the PO this net 45 concept.

8          A      So all credit lines with resellers were backed by

9     a standby LC backed by Netlist's collateral at a bank.  So --

10    and regards to your question, it is not a credit line.

11         Q      And that's what I'm getting at here.  When I

12    think of cash, I'm thinking about you delivering money.

13                So you had a line of credit of some sort; right?

14         A      That's established by Netlist collateral.  So

15    whatever collateral.  If we put a million dollars in a bank,

16    yes, our credit line was 1 million, yes.

17         Q      Details are important here, so maybe just break

18    this down.  Maybe my question was ambiguous when I said "cash."

19                But when you were buying from resellers, you were

20    using a line of credit; correct?

21         A      If we are buying from a reseller that we do have

22    a standby LC in place with, we are relying on credit and --

23         Q      Now, I'm going to say something obvious, but

24    perhaps it isn't.  You didn't -- you didn't expect Samsung to

25    ship products for free; right?

```
 1        A      No.

 2        Q      And let me present another example.  You didn't

 3   expect Samsung to be able to ship, say, a billion units of a

 4   product by tomorrow; right?

 5        A      No.

 6        Q      Now, you understood that to buy $5 million worth

 7   of Samsung parts from Samsung, you needed a $5 million credit

 8   line.  Fair?

 9        A      No.

10             MR. RHOW:  Your Honor, I'd like to read from Mr. P.

11   K. Hong's deposition.

12             Do we have a copy?

13             And the page numbers are 105, 4 through 10.

14             No, I'm sorry.  103 -- I'm sorry.  It's 103, 2

15   through 6.  My apologies.  I apologize.

16             THE COURT:  Counsel?

17             MR. LO:  Your Honor, we do have a 403 and 401 based

18   on our discussion this morning.

19             THE COURT:  Okay.  But I think I will allow this

20   because there was no objection to the original question and

21   this is impeaching.

22             Go ahead.

23             MR. LO:  Understood.

24             MR. RHOW:  Why don't we -- are we playing it?

25             Your Honor, may I publish the video testimony?
```

```
1              THE COURT:  Yes.

2              Just please before we do.

3              So lot's of witnesses before trial sit for

4    depositions, which is testimony under oath.  And if counsel

5    believes that a witness testifies inconsistent with that

6    deposition testimony, they can play that testimony for the jury

7    and introduce that earlier testimony into evidence.  That's

8    what's going on here.

9              (Video deposition played.)

10             MR. RHOW:  I -- is it 1055?

11             Your Honor, I'm handing up what is 1055 again.  It's

12   unfortunately marked "55," but it is, in fact, 1055.

13             And I would move to admit and publish.

14             MR. LO:  At this point we do object on the same

15   grounds.

16             THE COURT:  And your objection is 401, 403?

17             MR. LO:  Yes, Your Honor.  And also just based on

18   the disclosures.

19             THE COURT:  Let's have a brief discussion over here

20   if we can.

21             (The following was held at sidebar

22             outside the presence of the jury.)

23             THE COURT:  Again, just so the court reporter knows

24   who is speaking, if everyone could introduce themselves before

25   speaking.
```

1          I'm just looking at this exhibit, Counsel, and it

2   looks to me like it's talking about Netlist submitting finances

3   to Samsung, apparently to apply for some credit.  And I'm not

4   sure that that's relevant considering the Court's rulings on

5   the motions in limine.

6          MR. RHOW:  The only thing I was going to admit is on

7   page 2 indicating what the credit limit -- oh, I'm sorry.  This

8   is Ekwan Rhow for Samsung.  The only thing I was focused on is

9   on the second page indicating a credit limit of 200K.

10          THE COURT:  And what's the relevance of that?

11          MR. RHOW:  So I -- I'm want to -- sorry.  Sorry.  I

12   want --

13          THE COURT:  You want to get closer to the

14   microphone.

15          MR. RHOW:  Sorry.  The progression of the credit

16   line from 200K, and I'm going to preview the next exhibit is

17   indicating the credit line is 400K in the damages period, that

18   the credit limit, again, meant that even if POs were accepted,

19   even if Samsung intended to ship, that they could not ship

20   above the credit line.  And that was on Netlist's side because

21   they didn't have sufficient credit.

22          And based on what Mr. Hong said, he doesn't expect

23   Samsung to ship for free.  Obviously the way I'm going to argue

24   it is that that means they understood even there were limits in

25   terms of credit and payment terms.  And he admitted that.  Not

UNITED STATES DISTRICT COURT

1   objected to.

2          So this flows right into that.  And the only thing

3   that I want to do with this exhibit and then one more exhibit

4   is to show the amount of the credit line.

5          THE COURT:  So this is relevant to damages

6   because -- you would say that because, for example, let's say

7   Netlist is going to have a credit line of 200,000, and if they

8   were to claim that there were damages due to Samsung not

9   fulfilling orders over 400,000, they wouldn't be entitled to

10  those damages because they wouldn't -- their ability to buy the

11  products wouldn't have --

12         MR. RHOW:  This is Ekwan Rhow.

13         THE COURT:  Counsel, do you have a response here?

14         MR. LO:  Yeah.  This is Jason Lo for Netlist.

15  That's precisely the issue that they did not identify in their

16  interrogatory responses.  If they are going to say that you

17  couldn't get it from Samsung above a certain amount and we

18  restricted you, that's precisely what we asked them, that's

19  precisely what they refused to answer.

20         I let the earlier question go without an objection

21  because it was really about how did we pay for the reseller,

22  and it was important for us to establish that all of the

23  reseller transactions were paid for, and therefore we are not

24  subject to a credit risk.

25         But now that we are coming back to whether Samsung

1   chose to fulfill an order, whether Samsung had an obligation to

2   fulfill an order based on perceived credit risk, that's

3   precisely what they didn't disclose in Rog 2.

4        THE COURT:  And so your argument was that even if

5   there was a letter of credit for only 200,000, if Netlist asked

6   for parts beyond that credit limit, they can still claim

7   damages for Samsung's failure to procure those or to ship those

8   parts because Samsung stated in interrogatory responses that

9   its decision not to ship parts is only due to marketing

10  conditions and not in emails?

11       MR. LO:  This is Jason Lo for Netlist.  The way I

12  would put it is the issue of whether we could have paid for it

13  outside of the credit limit was never litigated and not the

14  subject of the discovery because they refused to identify

15  individual transactions and didn't allow us to a chance to know

16  we're going to point to this particular transaction and show

17  you.  That's why we served the rogs, and it was just not

18  litigated or fleshed out in discovery or in trial prep.

19       And that was, Your Honor, the argument that

20  Mr. LaMagna made to Judge McCormick on the transcript.  He

21  said, "Look, if they're going to challenge it at trial, we just

22  want to know what the transactions are they are going to

23  challenge."  And we didn't get a response to that.

24       THE COURT:  Yes, it is difficult because of the

25  interrogatory response.  I see your -- what I see Samsung

arguing is that, because they couldn't have completed the

purchase from Samsung because of the credit risk, then they

can't show that they are damaged for those amount of chips,

which does seem like a causation issue.  And so Samsung isn't

necessarily saying that they are not at fault for not shipping

the chips, but just that there's no causation for damages.

That's the line you're trying to draw; correct?

              MR. RHOW:  Yes.  This is Ekwan Rhow.  Yes.

              THE COURT:  Counsel, what's your response to that?

I mean, it does seem like you have a causation issue.  Right?

If you couldn't have bought the chips at the time anyway, how

can you claim that you were damaged by not being able to buy

the chips?

              MR. LO:  Because if the issue had been fleshed out,

we would have demonstrated that we could buy the chips.  We

could show, for example, on this particular date, this is how

much cash we had on hand, and we could have paid it off.  And

we could have prepared the witness to look at, you know, here

are the ten days in which Samsung says you couldn't afford it.

Show me your financial records.  Show me what your letter of

credit was on those days.  That's the exactly type of thing

that we would have fleshed out.

              The other part of it is that we pointed out this

morning, just logically it doesn't make sense because by

definition, if we are claiming damages, we went out, the

```
 1    witness just testified, we got the replacement parts, and we
 2    paid for it.  So we had the money.  And that's something we
 3    could have demonstrated had this been disclosed to us in
 4    discovery.
 5              THE COURT:  Counsel?
 6              MR. RHOW:  All right.  This is Ekwan Rhow.  First of
 7    all, the MIL order was very clear.  Exhibit 6 was a carveout
 8    that informed Netlist --
 9              THE COURT:  Footnote 6?
10              MR. RHOW:  Footnote 6.  Sorry.
11              Footnote 6 was very clear.  Your Honor ruled on this
12    and indicated that -- actually you were denying the MILs.  They
13    were denied actually.  We were waiting for the evidence.  And
14    you gave clear guidance to both sides with footnote 6 that
15    despite whatever showing had been made, that that evidence
16    could be relevant.  Not conditional relevant.  Relevant.
17              And so we are here today with full notice, both
18    sides of this issue.  There's no surprise.  Everyone knew this
19    was coming.  We put it in there, and Your Honor carved it out.
20    That's how we tried the case.
21              And we honored, to the best we could, you saw the
22    argument yesterday.  We really tried to honor that.  There's no
23    surprise here.  They knew this was coming, and Your Honor
24    informed them of that.
25              THE COURT:  I think that it is a causation issue.
```

```
 1   And -- but I think you can -- I think Netlist can argue that

 2   the fact it was able to cover shows that this is a nonissue or

 3   that what counsel is arguing isn't relevant.  So I'm going

 4   to -- I'm going to allow it to come in.

 5                 (Held in open court.)

 6                 MR. RHOW:  Your Honor, may I -- we move to admit and

 7   publish 1055.

 8                 THE COURT:  And 1055 can be admitted.

 9                 The objections on 1055 are 401 and 403; correct?

10                 MR. LO:  Yes, Your Honor.

11                 THE COURT:  So 1055 can be admitted.

12                 (Exhibit No. 1055 received into evidence.)

13   BY MR. RHOW:

14        Q      And I'm not going to spend a lot of time on this,

15   but if you go to the second page of the document, Mr. Hong,

16   this is, for purposes of the record, May 2016.

17                 Do you see that -- an indication that Netlist's

18   credit limit is 200K?  Do you see that?

19        A      Yes.

20        Q      That was an accurate statement; correct?

21        A      I'm not sure exactly what the credit limit was on

22   that date, but it is an email from Samsung internal support to

23   me.

24                 MR. RHOW:  Your Honor, I'm handing over Exhibit 1350

25   to Mr. Lo and to Your Honor.  I'd like to move to admit and
```

1    publish Exhibit 1350.

2              THE COURT:  Counsel, do you have any objection?

3              MR. LO:  It would be the same one, Your Honor.

4              THE COURT:  Okay.  So the objections are overruled.

5    You can admit it.

6              (Exhibit No. 1350 received into evidence.)

7    BY MR. RHOW:

8         Q    And this email is from April 18, 2018.  And,

9    again, Raymond Jiang is your procurement manager; correct?

10        A    Yes.

11        Q    If you look at the top email, he's indicating a

12   credit limit of 400,000 as of that date.

13             Do you see that?

14        A    Yes.

15             MR. RHOW:  And, Your Honor, all I have left is to

16   admit a series of purchase orders and emails.

17             THE COURT:  Okay.  Is there an agreement they're

18   admissible?

19             MR. RHOW:  I could take a break, if you like, to get

20   agreement.  I have no intention of asking questions on it.

21             THE COURT:  Okay.  Let's see here.  Well, why don't

22   we do this.  We will break for lunch.  I'll let the jurors go a

23   little bit early, and I'll allow the parties to use this time

24   to try to come to some agreement on the exhibits.  And then

25   when we come back after lunch, we can admit the exhibits if the

1    parties have agreement on it, and we can move on to redirect.

2                THE COURTROOM DEPUTY:  All rise.

3                THE COURT:  Okay.  We'll stand in recess until 1:00.

4                (At 11:51 a.m. the lunch recess was taken.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5             I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6 COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7 FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8 THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9 THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10 STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11 ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12 IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13 CONFERENCE OF THE UNITED STATES.

14

15

16                   DATED THIS  2ND  DAY OF DECEMBER, 2021.

17

18

19             /S/ MAREA WOOLRICH

20             MAREA WOOLRICH, CSR NO. 12698, CCRR
            FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## $

**$10** [3] - 88:14, 89:2, 89:6
**$11** [1] - 87:13
**$218** [1] - 105:7
**$50** [1] - 21:6
**$50,000** [2] - 81:21, 81:24
**$500,000** [1] - 55:18
**$53** [3] - 13:13, 23:5

## '

**'21** [1] - 32:17

## 1

**1** [15] - 4:5, 43:8, 43:22, 46:4, 46:5, 46:15, 60:18, 65:2, 89:20, 89:25, 95:22, 95:25, 99:10, 108:16
**10** [2] - 42:12, 109:13
**100** [5] - 38:19, 50:9, 50:11, 50:14, 60:24
**100,000** [2] - 20:11, 20:14
**102** [1] - 3:22
**1024** [5] - 3:18, 102:21, 102:25, 103:2, 103:3
**103** [3] - 3:18, 109:14
**104** [1] - 3:19
**1046** [4] - 3:18, 90:22, 91:3, 91:4
**1048** [6] - 3:19, 104:19, 104:20, 104:22, 104:24, 104:25
**105** [1] - 109:13
**1050** [1] - 2:8
**1055** [9] - 3:23, 110:10, 110:11, 110:12, 116:7, 116:8, 116:9, 116:11, 116:12
**1086** [9] - 3:19, 82:18, 82:22, 82:23, 83:1, 83:4, 83:5, 83:6, 83:11
**10:31** [1] - 75:6
**10s** [1] - 101:15
**11** [9] - 25:8, 34:25, 35:21, 36:8, 40:5, 49:10, 89:7, 89:8
**11-month** [1] - 35:23
**116** [1] - 3:23
**117** [1] - 3:21
**11:51** [1] - 118:4

**1231** [2] - 73:4, 73:7
**1245** [6] - 3:20, 62:4, 62:8, 62:9, 62:10, 67:14
**1333** [4] - 3:20, 44:2, 44:11, 44:16
**1336** [9] - 3:21, 67:9, 68:14, 68:18, 68:19, 68:22, 69:2, 69:11, 71:5
**1350** [4] - 3:21, 116:24, 117:1, 117:6
**1352** [4] - 3:22, 102:3, 102:7, 102:8
**1353** [4] - 3:22, 93:15, 93:18, 93:20
**1433** [4] - 33:8, 34:22, 35:19, 36:1
**1434** [2] - 34:23, 35:20
**1483** [9] - 3:23, 75:16, 75:20, 76:3, 76:6, 76:10, 76:12, 76:16, 77:25
**1484** [8] - 3:23, 75:18, 75:20, 76:3, 76:6, 76:10, 76:12, 78:2
**1487** [9] - 3:23, 75:18, 75:21, 76:3, 76:6, 76:11, 76:12, 78:2, 78:7
**15** [4] - 32:7, 32:17, 78:8, 99:6
**150** [2] - 50:5, 50:12
**15th** [3] - 9:6, 32:3, 34:6
**16** [1] - 103:6
**1700** [1] - 2:17
**18** [1] - 117:8
**1875** [1] - 2:12
**18th** [1] - 2:15
**192** [1] - 106:1
**1:00** [1] - 118:3
**1H** [1] - 70:9
**1M/month** [2] - 45:4, 45:9
**1st** [2] - 33:10, 102:10

## 2

**2** [10] - 3:2, 4:1, 6:19, 7:5, 7:6, 8:19, 26:24, 109:14, 111:7, 113:3
**20,000** [3] - 69:13, 69:14, 101:15
**20-993** [1] - 4:6
**200** [1] - 49:12
**200,000** [2] - 112:7, 113:5
**2000** [3] - 80:23, 81:17, 83:18

**20018** [1] - 2:8
**200K** [3] - 111:9, 111:16, 116:18
**2015** [10] - 60:4, 60:13, 66:23, 80:18, 80:20, 80:24, 81:2, 81:17, 81:18, 81:20
**2016** [5] - 63:21, 66:15, 66:18, 67:7, 116:16
**2017** [22] - 32:17, 43:3, 44:8, 46:12, 46:19, 60:14, 60:18, 62:20, 66:24, 67:1, 76:17, 76:18, 78:8, 78:9, 84:9, 87:7, 87:10, 87:25, 88:14, 89:1, 103:6
**2018** [8] - 7:2, 42:25, 46:19, 68:24, 70:9, 99:6, 102:10, 117:8
**2019** [9] - 34:25, 35:7, 35:10, 35:22, 36:6, 38:14, 38:20, 46:21, 54:25
**2020** [18] - 30:4, 30:19, 31:5, 32:1, 32:2, 32:3, 32:7, 32:22, 34:9, 35:7, 35:22, 36:5, 38:22, 39:1, 39:15, 60:4, 60:22, 67:7
**2021** [5] - 3:2, 4:1, 30:10, 32:22
**21** [1] - 33:5
**214** [1] - 106:3
**214.50** [1] - 105:8
**215** [1] - 105:23
**218** [2] - 105:23, 105:25
**23** [2] - 8:20, 26:23
**23rd** [1] - 2:12
**24** [1] - 102:21
**243** [1] - 6:17
**25** [1] - 50:1
**25,000** [1] - 78:9
**250,000** [1] - 78:5
**26** [1] - 26:23
**26(e** [1] - 15:11
**26(e)** [1] - 15:19
**27** [1] - 26:23
**287** [5] - 3:15, 54:11, 54:18, 54:21, 54:23
**2nd** [2] - 63:21, 64:16, 64:21

## 3

**3** [1] - 55:25
**3.1** [1] - 5:16

**30** [1] - 39:24
**30,000** [1] - 62:22
**300** [5] - 48:24, 49:3, 49:5, 49:24, 91:18
**311** [5] - 17:18, 34:24, 87:17, 87:21, 87:23
**313** [8] - 3:16, 58:24, 59:1, 59:5, 59:13, 59:16, 59:17, 59:18
**333** [1] - 2:5
**350** [1] - 88:9
**350,000** [1] - 52:18
**350K** [1] - 52:12
**355** [12] - 3:16, 51:10, 51:12, 51:19, 51:23, 51:24, 98:24, 99:5, 100:14, 100:20, 100:21, 101:5
**358** [6] - 3:17, 46:22, 46:23, 46:24, 47:6, 47:11
**359** [7] - 3:17, 46:22, 47:2, 47:6, 47:11, 47:22
**380** [12] - 3:17, 17:19, 56:15, 56:18, 56:19, 56:21, 57:3, 57:6, 57:7, 100:17, 100:22, 107:24

## 4

**4** [3] - 43:25, 76:17, 109:13
**4.6** [1] - 23:11
**400** [1] - 2:15
**400,000** [4] - 76:19, 77:25, 112:9, 117:12
**400K** [1] - 111:17
**401** [3] - 109:17, 110:16, 116:9
**403** [6] - 30:15, 32:8, 36:10, 109:17, 110:16, 116:9
**42** [1] - 3:9
**44** [1] - 3:20
**45** [2] - 63:11, 108:7
**47** [4] - 3:17, 79:4, 79:8, 79:11
**48** [1] - 25:17

## 5

**5** [7] - 8:18, 43:25, 53:1, 88:14, 101:8, 109:6, 109:7
**5.25** [1] - 62:24
**50** [3] - 61:15, 84:11, 84:19
**50,000** [1] - 81:3

**509** [1] - 88:24
**50K** [3] - 52:13, 52:19, 81:6
**51** [3] - 3:16, 86:12, 86:15
**54** [1] - 3:15
**55** [1] - 110:12
**550** [1] - 88:9
**550,000** [1] - 88:5
**57** [1] - 3:17
**59** [1] - 3:16
**5th** [1] - 33:17

## 6

**6** [12] - 6:17, 7:19, 8:4, 9:2, 11:7, 27:6, 109:15, 115:7, 115:9, 115:10, 115:11, 115:14
**6.2** [2] - 5:14, 79:17
**61** [1] - 3:9
**610** [1] - 2:17
**62** [1] - 3:20
**68** [1] - 3:21

## 7

**7** [2] - 6:17, 27:6
**76** [1] - 3:23

## 8

**8** [1] - 6:17
**80** [2] - 55:15, 55:17
**83** [1] - 3:19
**86** [2] - 83:5
**8:30** [1] - 75:2
**8:38** [1] - 4:2

## 9

**9** [2] - 48:20, 48:22
**9.9** [1] - 97:14
**90067** [1] - 2:13
**90071** [2] - 2:6, 2:15
**91** [1] - 3:18
**92660** [1] - 2:18
**93** [1] - 3:22
**9:34** [1] - 42:4
**9th** [1] - 39:1

## A

**A.M** [1] - 4:2
**a.m** [3] - 42:4, 75:6, 118:4
**ability** [9] - 6:12, 7:3, 9:18, 9:19, 11:10, 12:8, 18:10, 40:17,

112:10
**able** [15] - 7:22, 11:23, 13:20, 17:22, 20:7, 20:8, 20:9, 21:22, 39:21, 91:9, 95:8, 96:24, 109:3, 114:12, 116:2
**abstract** [1] - 34:8
**accept** [4] - 16:2, 53:18, 54:2, 105:17
**Acceptance** [1] - 65:11
**accepted** [7] - 11:1, 11:13, 53:19, 65:21, 90:11, 92:3, 111:18
**accepting** [4] - 33:6, 35:12, 35:15, 37:16
**according** [1] - 24:4
**accurate** [5] - 89:11, 96:2, 97:18, 97:20, 116:20
**acquire** [1] - 52:21
**acronym** [1] - 47:18
**action** [1] - 12:19
**actual** [7] - 13:13, 21:8, 23:10, 71:2, 76:24, 98:1
**ad** [1] - 31:20
**add** [1] - 14:19
**addition** [1] - 65:6
**additional** [1] - 61:4
**address** [3] - 8:5, 28:13, 28:24
**addressing** [1] - 39:24
**adequate** [1] - 85:8
**admissibility** [1] - 29:16
**admissible** [2] - 8:1, 117:18
**admit** [23] - 44:10, 51:19, 54:18, 57:2, 62:5, 68:13, 68:14, 73:10, 74:11, 75:15, 75:18, 82:21, 90:24, 93:14, 102:4, 104:21, 110:13, 111:6, 116:6, 116:25, 117:5, 117:16, 117:25
**admitted** [19] - 29:20, 42:13, 44:15, 51:23, 54:21, 57:6, 59:16, 62:8, 68:7, 68:18, 76:11, 91:3, 93:18, 102:7, 103:2, 104:24, 111:25, 116:8, 116:11
**adopt** [1] - 5:10
**advance** [1] - 20:22
**advise** [1] - 33:21

**affect** [2] - 43:13, 99:16
**afford** [7] - 10:23, 11:22, 11:24, 13:11, 21:4, 114:19
**agnostic** [1] - 10:18
**agree** [10] - 29:3, 63:13, 65:24, 70:17, 70:21, 71:2, 71:12, 71:15, 71:21
**agreed** [1] - 79:1
**agreement** [11] - 11:1, 65:19, 66:3, 66:20, 78:25, 79:15, 82:3, 117:17, 117:20, 117:24, 118:1
**ahead** [6] - 42:8, 42:10, 59:23, 75:9, 79:5, 109:22
**Akemann** [1] - 85:11
**akin** [1] - 35:14
**allocate** [2] - 11:1, 19:3
**allocated** [1] - 11:14
**allocation** [23] - 9:20, 9:21, 10:16, 10:17, 10:21, 12:1, 18:23, 19:2, 19:4, 19:5, 20:12, 42:22, 43:4, 45:5, 45:6, 45:10, 46:1, 46:8, 46:16, 46:17, 60:17
**allocations** [2] - 10:22, 27:2
**allow** [6] - 47:19, 92:20, 109:19, 113:15, 116:4, 117:23
**allowance** [1] - 46:15
**allowed** [5] - 16:9, 16:19, 19:12, 27:15, 74:8
**allowing** [4] - 37:6, 37:11, 39:13, 39:14
**alluded** [1] - 89:15
**almost** [1] - 89:2
**alone** [1] - 28:24
**ambiguous** [1] - 108:18
**amount** [27] - 16:23, 16:24, 20:24, 21:2, 23:5, 23:11, 43:2, 46:4, 46:17, 48:10, 57:22, 57:25, 58:3, 58:6, 58:7, 58:11, 58:12, 58:15, 83:19, 84:8, 87:9, 88:13, 112:4, 112:17, 114:3
**amounts** [5] - 21:3, 21:6, 58:17, 58:18,

81:3
**analysis** [1] - 85:14
**analyze** [1] - 21:16
**Angeles** [3] - 2:6, 2:13, 2:15
**ANGELES** [1] - 4:1
**answer** [17] - 8:14, 31:6, 71:18, 71:19, 72:1, 73:1, 74:8, 86:2, 86:13, 92:20, 94:25, 95:6, 95:7, 96:18, 97:16, 101:24, 112:19
**answered** [4] - 16:24, 27:4, 84:14, 93:13
**answering** [2] - 92:19, 95:3
**answers** [2] - 9:10
**anticipation** [1] - 29:9
**anyway** [1] - 114:11
**anyways** [3] - 11:4, 11:23, 19:7
**apologies** [5] - 76:1, 78:3, 83:7, 102:20, 109:15
**apologize** [2] - 68:1, 109:15
**appearances** [1] - 4:7
**APPEARANCES** [1] - 2:1
**apply** [1] - 111:3
**approve** [2] - 89:9, 89:10
**approved** [2] - 10:25, 51:7
**April** [7] - 76:17, 87:10, 87:25, 88:14, 89:1, 89:8, 117:8
**area** [2] - 61:8, 61:9
**argue** [4] - 12:9, 16:16, 111:23, 116:1
**arguing** [4] - 21:19, 37:21, 114:1, 116:3
**argument** [15] - 9:4, 11:20, 12:12, 12:16, 18:9, 29:21, 31:14, 32:11, 38:1, 38:3, 40:2, 80:9, 113:4, 113:19, 115:22
**arguments** [2] - 23:19, 40:4
**arrived** [1] - 41:22
**aspects** [1] - 8:10
**assume** [1] - 19:20, 97:23
**assuming** [4] - 9:24, 19:3, 19:4, 40:23
**assurance** [1] - 77:22
**Attached** [1] - 65:3
**attached** [2] - 47:3,

65:8
**attachment** [3] - 46:23, 47:2, 47:3
**attempt** [1] - 101:13
**attempted** [2] - 96:7, 100:20
**attention** [1] - 7:19
**audible** [1] - 91:16
**August** [3] - 9:6, 45:5, 81:18
**availabilities** [1] - 107:11
**availability** [9] - 10:17, 11:18, 74:15, 86:9, 90:8, 91:18, 99:17, 106:17, 106:21
**available** [7] - 72:19, 72:25, 74:5, 100:5, 100:8, 100:11, 101:2
**Avenue** [2] - 2:5, 2:8
**aware** [5] - 9:11, 74:4, 80:1, 80:10, 99:11

## B

**backed** [2] - 108:8, 108:9
**backlog** [51] - 30:8, 30:11, 30:13, 30:17, 31:5, 31:12, 31:21, 32:13, 32:21, 32:23, 33:1, 33:4, 33:5, 33:6, 33:19, 33:20, 33:22, 33:23, 34:3, 34:5, 34:11, 34:13, 35:5, 35:12, 35:15, 36:12, 36:15, 36:17, 37:6, 37:13, 37:15, 39:2, 39:13, 39:15, 39:18, 39:20, 39:22, 39:24, 40:6, 40:25, 93:3, 93:4, 102:1, 102:12, 102:15, 103:8, 103:18, 104:15, 104:16
**backlogged** [8] - 55:11, 72:22, 97:2, 97:7, 98:5, 98:11, 103:17, 104:6
**backlogs** [3] - 32:13, 35:9, 94:20
**bad** [1] - 66:23
**bank** [2] - 108:9, 108:15
**barred** [2] - 6:15, 12:1
**based** [28] - 6:24, 12:23, 13:6, 13:7, 13:13, 13:14, 15:25, 34:14, 63:24, 64:24, 66:2, 69:24, 70:3,

71:5, 71:15, 82:5, 85:3, 87:12, 92:24, 95:13, 95:25, 96:25, 97:2, 98:17, 109:17, 110:17, 111:22, 113:2
**basis** [3] - 19:13, 36:2, 77:14
**battle** [1] - 21:16
**Beac** [1] - 2:18
**became** [1] - 81:10
**become** [3] - 34:20, 65:18
**becomes** [2] - 11:2, 18:11
**bee** [1] - 68:7
**begin** [1] - 22:13
**beginning** [2] - 22:16, 71:1
**behalf** [3] - 4:21, 4:24, 39:23
**believes** [2] - 38:2, 110:5
**below** [4] - 33:18, 45:14, 102:12, 106:1
**benefit** [1] - 6:6
**best** [1] - 115:21
**BEST** [1] - 4:14
**Best** [1] - 4:14
**better** [2] - 20:20, 34:3
**between** [9] - 17:18, 30:2, 30:3, 33:8, 46:25, 65:19, 65:25, 82:4, 88:9
**beyond** [4] - 38:22, 66:8, 113:6
**big** [2] - 84:15, 105:8
**billion** [1] - 109:3
**binder** [7] - 44:1, 46:21, 51:10, 54:11, 56:16, 58:24, 67:21
**binders** [1] - 67:21
**binding** [7] - 65:19, 66:3, 72:8, 72:10, 72:12, 72:15, 72:17
**BIRD** [1] - 2:11
**bit** [8] - 27:4, 42:7, 43:13, 46:20, 47:24, 54:7, 90:23, 117:23
**block** [1] - 20:13
**blow** [1] - 65:13
**body** [2] - 51:16, 64:2
**bother** [1] - 54:1
**bottom** [7] - 44:19, 45:21, 52:1, 54:8, 64:4, 65:2, 70:16
**bought** [14] - 13:7, 16:10, 17:6, 17:10, 17:14, 22:7, 22:8, 23:10, 85:7, 86:15,

107:23, 107:24, 108:2, 114:11
**box** [1] - 76:25
**BOXER** [1] - 2:11
**branch** [1] - 40:3
**branded** [1] - 57:18
**breach** [4] - 5:13, 30:5, 30:9, 40:7
**breached** [1] - 36:6
**break** [8] - 5:23, 28:2, 33:1, 75:1, 75:3, 108:17, 117:19, 117:22
**breaks** [3] - 19:23, 21:13, 21:24
**brief** [4] - 24:20, 42:4, 75:6, 110:19
**bring** [1] - 12:5
**bringing** [2] - 12:19
**broad** [1] - 7:12
**broader** [6] - 9:4, 28:24, 29:12, 37:22, 41:5, 80:1
**broke** [2] - 26:15, 26:18
**brother** [2] - 60:23, 81:2
**budgetary** [1] - 48:11
**build** [2] - 66:22, 107:19
**building** [1] - 66:22
**bullet** [1] - 106:16
**business** [15] - 29:16, 29:19, 29:23, 36:20, 66:22, 82:15, 83:20, 83:22, 83:23, 83:25, 84:3, 84:4, 84:8, 96:16
**busy** [1] - 101:16
**buy** [25] - 13:17, 14:17, 16:11, 16:12, 16:23, 20:8, 20:21, 43:24, 60:19, 65:7, 69:19, 72:17, 77:21, 90:15, 90:17, 98:8, 100:9, 101:7, 107:25, 109:6, 112:10, 114:12, 114:15
**buying** [11] - 77:9, 83:23, 84:21, 85:4, 85:21, 95:15, 95:16, 95:18, 95:19, 108:19, 108:21
**BY** [42] - 2:4, 2:5, 2:7, 2:12, 2:14, 2:17, 3:9, 3:9, 42:18, 44:17, 47:12, 51:25, 54:24, 56:2, 57:8, 59:24, 61:24, 62:11, 65:15,

68:20, 72:7, 73:14, 74:3, 75:11, 76:15, 77:2, 79:7, 83:10, 83:17, 87:1, 87:19, 89:23, 91:5, 92:22, 93:21, 95:10, 99:4, 102:9, 103:4, 105:1, 116:13, 117:7

---

### C

**CA** [4] - 2:6, 2:13, 2:15, 2:18
**calculation** [1] - 85:17
**CALIFORNIA** [1] - 4:1
**cancel** [6] - 21:23, 41:1, 55:7, 55:20, 55:22, 102:12
**cancelation** [3] - 19:19, 35:14, 90:19
**canceled** [13] - 88:20, 88:21, 88:22, 89:2, 89:6, 97:2, 97:7, 97:10, 97:15, 98:5, 98:10, 102:1, 102:15
**canceling** [3] - 38:5, 38:6, 38:10
**cancellation** [1] - 90:20
**candor** [1] - 7:18
**cannot** [5] - 11:22, 94:9, 97:16, 100:6, 103:8
**cap** [8] - 43:1, 43:8, 43:12, 43:13, 43:15, 43:22, 45:11, 46:4
**capped** [2] - 10:10, 10:13
**capping** [1] - 60:18
**caps** [1] - 42:23
**care** [1] - 24:11
**carefully** [1] - 95:5
**carved** [1] - 115:19
**carveout** [1] - 115:7
**case** [14] - 9:6, 10:4, 16:3, 17:12, 20:18, 21:14, 21:17, 29:15, 35:17, 38:9, 62:20, 70:8, 83:5, 115:20
**cash** [5] - 108:2, 108:3, 108:12, 108:18, 114:17
**causation** [25] - 9:23, 10:1, 10:6, 11:3, 12:3, 12:7, 12:15, 18:10, 18:22, 19:6, 19:23, 21:13, 21:25, 22:10, 22:15, 22:18, 22:23, 23:15, 24:4, 33:2, 38:9, 114:4,

114:6, 114:10, 115:25
**causing** [2] - 19:16
**CC** [1] - 52:5
**cells** [1] - 50:19
**Center** [1] - 2:17
**Century** [1] - 2:12
**certain** [7] - 11:17, 33:15, 39:4, 107:10, 107:11, 112:17
**certainly** [5] - 14:8, 21:9, 23:19, 105:19, 105:20
**cetera** [1] - 21:24
**chain** [14] - 19:23, 20:13, 21:13, 21:24, 28:22, 29:18, 33:2, 33:8, 39:1, 40:11, 40:23, 40:24, 51:13, 51:15
**chains** [1] - 28:21
**challenge** [3] - 7:15, 113:21, 113:23
**chance** [1] - 113:15
**change** [8] - 70:3, 75:12, 75:14, 78:12, 78:21, 78:22, 78:23, 78:25
**changed** [3] - 13:19, 75:13, 78:14
**changes** [5] - 69:24, 70:1, 70:5, 70:7, 70:11
**channel** [1] - 27:2
**characterization** [3] - 14:22, 37:2, 37:19
**characterized** [1] - 39:9
**chart** [12] - 45:15, 54:9, 88:25, 89:4, 89:7, 89:9, 90:19, 96:25, 97:1, 97:3, 97:21, 97:22
**cheaper** [1] - 77:18
**check** [3] - 11:15, 25:14, 90:8
**checking** [1] - 91:18
**chip** [9] - 10:18, 11:22, 11:24, 82:11, 83:23, 83:24, 84:21, 86:10, 99:16
**chips** [23] - 10:24, 17:18, 20:11, 20:15, 22:7, 22:9, 84:23, 84:25, 85:4, 85:7, 85:20, 85:22, 85:24, 85:25, 86:5, 86:15, 86:16, 87:13, 114:3, 114:6, 114:11, 114:13, 114:15

**choice** [1] - 35:13
**chose** [2] - 13:23, 113:1
**Christmas** [1] - 36:4
**CHRONOLOGICAL** [1] - 3:5
**Chuck** [4] - 4:17, 9:8, 60:23, 80:15
**chunk** [1] - 26:17
**circuit** [1] - 29:15
**circumstances** [4] - 13:19, 40:14, 52:16, 92:24
**circumstantial** [1] - 24:10
**claim** [9] - 12:13, 12:20, 20:24, 22:9, 22:13, 23:2, 112:8, 113:6, 114:12
**claiming** [7] - 18:6, 27:17, 30:21, 31:24, 31:25, 32:24, 114:25
**claims** [2] - 5:9, 5:10
**clause** [7] - 52:24, 79:12, 79:14, 79:25, 80:12, 80:13, 82:6
**clean** [2] - 17:18, 71:18
**clear** [13] - 13:6, 31:23, 33:7, 39:22, 53:17, 68:11, 80:2, 95:14, 96:23, 107:18, 115:7, 115:11, 115:14
**clearly** [6] - 9:10, 19:23, 24:8, 35:1, 37:24, 92:4
**clock** [1] - 72:5
**close** [1] - 15:13
**closed** [1] - 31:25
**closer** [1] - 111:13
**Co** [1] - 4:6
**collateral** [3] - 108:9, 108:14, 108:15
**Column** [14] - 48:3, 48:8, 48:18, 49:7, 49:10, 50:17, 50:23, 57:22, 58:2, 58:4, 58:12, 58:20
**COLUMN** [1] - 58:4
**column** [9] - 48:8, 48:11, 57:12, 57:13, 57:21, 57:24, 63:4, 63:17, 78:9
**coming** [9] - 10:21, 19:5, 22:1, 22:22, 85:16, 97:19, 112:25, 115:19, 115:23
**comment** [2] - 8:4,

64:8
**comments** [5] - 35:3, 49:6, 49:19, 49:25, 50:23
**commitment** [5] - 36:14, 63:14, 64:23, 65:6, 65:7
**common** [5] - 51:8, 64:9, 64:11, 77:6, 77:8
**communicate** [2] - 63:22, 64:17
**communication** [1] - 46:25
**communications** [4] - 30:2, 30:3, 30:19, 31:11
**compare** [1] - 21:2
**complete** [2] - 7:22, 9:19
**completed** [1] - 114:1
**completely** [1] - 21:17
**compliance** [1] - 66:19
**component** [1] - 68:23
**concept** [2] - 20:21, 108:7
**concerned** [3] - 18:3, 18:5, 18:8
**concluding** [1] - 42:22
**conditional** [1] - 115:16
**conditions** [7] - 6:24, 64:24, 65:8, 65:18, 66:3, 66:10, 113:10
**Conditions** [1] - 65:3
**conduct** [1] - 30:5
**confer** [1] - 26:8
**confirm** [2] - 25:22, 25:24
**confirmed** [2] - 6:19, 27:9
**confuse** [1] - 34:6
**confusing** [1] - 31:10
**confusion** [1] - 26:15
**Connecticut** [1] - 2:8
**connection** [4] - 96:16, 97:5, 105:19, 105:20
**consider** [2] - 40:24, 96:20
**considered** [3] - 7:7, 79:23, 95:12
**considering** [1] - 111:4
**consistent** [1] - 5:17
**consulted** [1] - 55:21
**contain** [2] - 62:21, 62:25
**contained** [1] - 100:21

contains [1] - 63:13
context [4] - 41:17, 78:16, 106:7, 106:10
continue [2] - 46:17, 53:23
continued [2] - 67:1, 67:6
continuous [1] - 38:21
contract [7] - 30:23, 30:24, 34:14, 38:12, 38:13, 38:19, 65:24
convenience [1] - 67:20
conversations [1] - 31:7
cooperative [1] - 29:13
copied [3] - 29:5, 45:2, 47:1
copies [2] - 62:6, 67:19
copy [5] - 25:9, 67:15, 68:3, 102:21, 109:12
copying [6] - 44:5, 44:7, 53:15, 55:2, 67:18, 68:3
corner [1] - 83:4
Corporation [1] - 47:18
correct [78] - 13:9, 15:10, 15:11, 15:12, 18:7, 18:8, 23:7, 23:15, 59:22, 63:1, 63:14, 65:8, 65:25, 66:3, 66:10, 66:14, 67:2, 67:25, 69:25, 70:12, 70:22, 72:9, 72:13, 73:21, 76:6, 76:7, 76:19, 76:22, 77:4, 77:25, 78:13, 79:25, 81:15, 81:22, 82:7, 82:16, 82:17, 82:22, 82:23, 84:1, 84:2, 84:23, 84:24, 85:1, 85:2, 85:5, 85:6, 86:10, 87:7, 88:22, 88:23, 94:17, 95:12, 95:19, 95:20, 96:10, 96:13, 97:7, 97:24, 98:19, 98:20, 99:25, 100:15, 100:25, 102:1, 102:16, 103:19, 104:7, 105:16, 105:21, 107:12, 108:20, 114:7, 116:9, 116:20, 117:9
corresponding [1] - 12:11
cost [2] - 58:6, 105:7

Counsel [11] - 30:7, 42:10, 73:7, 75:9, 75:22, 76:5, 90:25, 102:5, 102:23, 111:1, 117:2
counsel [23] - 4:7, 12:17, 14:16, 15:20, 32:11, 35:21, 39:12, 61:21, 67:11, 68:16, 71:20, 72:1, 74:25, 93:16, 95:1, 95:7, 104:22, 109:16, 110:4, 112:13, 114:9, 115:5, 116:3
COUNSEL [1] - 2:1
counsel's [2] - 71:20, 72:5
count [1] - 60:2
counter [1] - 25:19
counter-designations [1] - 25:19
counterfeit [3] - 86:5, 86:10, 86:16
couple [1] - 51:2, 68:2
course [3] - 9:22, 15:23, 62:25
court [3] - 75:1, 110:23, 116:5
COURT [144] - 4:10, 4:13, 4:16, 4:19, 4:22, 4:25, 5:3, 5:5, 8:12, 8:17, 8:23, 8:25, 10:8, 11:9, 12:4, 12:12, 12:17, 13:6, 13:16, 14:6, 15:8, 15:19, 15:24, 17:6, 17:11, 17:13, 18:2, 18:6, 20:7, 22:1, 22:5, 23:13, 23:22, 23:25, 24:14, 24:25, 25:5, 25:9, 26:1, 26:11, 26:20, 27:1, 27:16, 27:20, 28:1, 28:4, 28:15, 29:3, 29:21, 30:7, 30:20, 31:14, 32:9, 34:15, 34:17, 36:22, 38:11, 40:8, 40:21, 41:7, 41:9, 41:11, 41:14, 41:19, 41:21, 42:6, 44:12, 44:15, 47:7, 47:9, 51:21, 51:23, 54:19, 54:21, 57:4, 57:6, 59:14, 59:16, 59:23, 61:20, 62:8, 67:11, 67:14, 67:22, 68:5, 68:18, 71:19, 71:24, 73:7, 73:25, 74:25, 75:7,

75:22, 75:25, 76:5, 76:8, 76:10, 79:5, 82:22, 82:24, 83:2, 83:9, 86:24, 87:18, 89:22, 90:25, 91:3, 92:20, 93:12, 93:16, 93:18, 94:24, 95:5, 99:2, 102:5, 102:7, 102:23, 102:25, 103:2, 104:22, 104:24, 109:16, 109:19, 110:1, 110:16, 110:19, 110:23, 111:10, 111:13, 112:5, 112:13, 113:4, 113:24, 114:9, 115:5, 115:9, 115:25, 116:8, 116:11, 117:2, 117:4, 117:17, 117:21, 118:3
Court [19] - 5:9, 5:12, 5:15, 5:18, 6:23, 7:6, 7:7, 7:18, 7:24, 8:9, 8:10, 8:15, 15:15, 22:16, 24:23, 25:4, 27:6, 28:10, 28:13
Court's [8] - 5:17, 5:22, 6:15, 6:16, 7:19, 8:4, 59:19, 111:4
courtroom [1] - 41:24
COURTROOM [7] - 4:5, 23:24, 41:10, 41:12, 75:5, 91:1, 118:2
cover [21] - 11:5, 11:10, 11:23, 12:11, 13:20, 16:13, 18:3, 18:7, 18:10, 20:7, 23:6, 31:2, 31:6, 32:12, 32:25, 34:19, 35:1, 40:25, 47:13, 116:2
covered [7] - 11:8, 12:10, 17:23, 19:14, 23:9, 32:3, 35:23
covering [3] - 37:1, 41:3, 65:19
covers [1] - 40:16
create [1] - 40:11
creates [1] - 16:7
credit [48] - 6:12, 6:13, 7:2, 7:16, 11:6, 11:16, 11:18, 11:19, 13:18, 14:5, 14:24, 16:21, 18:21, 21:1, 21:2, 21:11, 28:18, 107:25, 108:4,

108:6, 108:8, 108:10, 108:13, 108:16, 108:20, 108:22, 109:7, 111:3, 111:7, 111:9, 111:15, 111:17, 111:18, 111:20, 111:21, 111:25, 112:4, 112:7, 112:24, 113:2, 113:5, 113:6, 113:13, 114:2, 114:21, 116:18, 116:21, 117:12
creditworthiness [10] - 7:21, 10:14, 11:9, 11:17, 12:5, 14:9, 14:18, 15:25, 17:15, 20:15
cross [7] - 6:10, 14:1, 16:25, 17:2, 22:4, 61:21, 71:25
CROSS [2] - 3:9, 61:23
cross-examination [3] - 6:10, 61:21, 71:25
CROSS-EXAMINATION [2] - 3:9, 61:23
CRUTCHER [2] - 2:4, 2:7
Customer [1] - 99:11
customer [21] - 43:17, 52:10, 52:17, 52:18, 52:21, 53:24, 54:1, 55:16, 63:25, 64:20, 80:22, 83:24, 101:8, 105:17, 105:22, 105:24, 106:6, 106:11, 106:15, 107:14
customers [5] - 10:18, 27:2, 55:16, 84:25, 85:9
cut [3] - 6:21, 60:17, 60:21
cutoff [1] - 9:13

D

damage [4] - 10:5, 31:13, 31:24, 34:8
damaged [2] - 114:3, 114:12
damages [43] - 10:2, 11:4, 12:13, 12:15, 12:20, 12:23, 13:1, 13:6, 13:12, 13:13, 13:15, 14:17, 17:7, 17:13, 18:7, 18:14,

22:9, 22:13, 22:18, 23:2, 23:8, 23:12, 27:16, 27:17, 30:6, 30:21, 31:1, 31:25, 32:17, 32:19, 32:25, 40:22, 41:4, 85:14, 101:5, 111:17, 112:5, 112:8, 112:10, 113:7, 114:6, 114:25
data [5] - 56:21, 57:9, 59:5, 60:5, 89:4
Date [2] - 63:16, 64:3
date [21] - 14:2, 16:9, 16:13, 16:16, 16:19, 34:24, 34:25, 59:4, 63:19, 64:1, 78:24, 80:18, 85:16, 100:2, 100:4, 100:11, 114:16, 116:22, 117:12
dated [1] - 44:8
dates [5] - 16:22, 78:15, 94:21, 99:20
days [4] - 39:24, 63:11, 114:19, 114:21
DC [1] - 2:8
DDR3 [2] - 107:1, 107:2
deal [2] - 23:18, 28:11, 41:7
dealing [1] - 15:25
DECEMBER [2] - 3:2, 4:1
December [10] - 34:25, 35:7, 35:10, 35:22, 36:6, 38:14, 38:20, 76:18, 78:4, 78:9
decide [3] - 11:21, 24:12, 37:23
decided [2] - 43:7, 52:12
deciding [2] - 19:25, 99:21
decision [5] - 14:4, 14:25, 18:19, 55:21, 113:9
decisions [1] - 77:20
declining [1] - 22:11
decrease [1] - 89:1
DEFENDANT [1] - 2:10
defenses [2] - 5:9, 5:11
definition [2] - 13:1, 114:25
delay [1] - 92:13
deliberate [1] - 91:9

**deliver** [4] - 55:19, 71:9, 94:21, 106:2
**delivered** [6] - 63:21, 64:19, 92:14, 93:1, 93:5, 93:6
**deliveries** [1] - 94:20
**delivering** [1] - 108:12
**delivery** [4] - 35:11, 36:13, 72:21, 93:8
**demand** [2] - 43:16, 63:25
**demonstrated** [2] - 114:15, 115:3
**demonstrative** [4] - 54:5, 59:20, 87:3, 95:23
**Demonstrative** [1] - 55:25
**demonstratives** [3] - 86:19, 89:20, 90:1
**denials** [1] - 8:20
**denied** [1] - 115:13
**denying** [1] - 115:12
**depo** [2] - 24:21, 83:8
**deposition** [6] - 15:3, 15:4, 15:6, 109:11, 110:6, 110:9
**depositions** [4] - 9:6, 9:7, 15:1, 110:4
**deputy** [1] - 41:24
**DEPUTY** [7] - 4:5, 23:24, 41:10, 41:12, 75:5, 91:1, 118:2
**description** [2] - 31:24, 62:25
**designating** [1] - 27:5
**designation** [1] - 24:22
**designations** [8] - 25:17, 25:18, 25:19, 25:25, 26:2, 26:5, 26:14, 26:19
**despite** [4] - 15:6, 22:24, 22:25, 115:15
**detail** [1] - 89:13
**details** [2] - 93:3, 108:17
**determination** [1] - 24:13
**determined** [1] - 5:12
**device** [1] - 64:15
**Devon** [3] - 73:17, 105:6, 107:13
**Dhruti** [1] - 39:16
**dictated** [1] - 106:14
**dictating** [1] - 77:15
**different** [12] - 14:22, 19:18, 19:24, 27:5, 29:15, 51:13, 78:4, 85:19, 86:11, 98:22,

107:22
**difficult** [1] - 113:24
**DIRECT** [2] - 3:9, 42:17
**direct** [6] - 6:10, 7:18, 60:16, 95:15, 95:16, 95:19
**directly** [8] - 46:18, 56:4, 56:11, 56:25, 61:12, 77:21, 85:25, 95:17
**disagree** [1] - 17:6
**disagreement** [1] - 14:20
**disclose** [3] - 15:4, 22:24, 113:3
**disclosed** [5] - 8:3, 8:8, 26:9, 115:3
**disclosure** [1] - 10:3
**disclosures** [2] - 15:17, 110:18
**discovery** [11] - 7:4, 8:3, 8:8, 8:9, 10:5, 14:11, 15:14, 15:16, 113:14, 113:18, 115:4
**Discussed** [1] - 103:24
**discussed** [3] - 34:13, 45:5, 91:15
**discussing** [2] - 5:20, 42:22
**discussion** [6] - 14:7, 19:1, 32:6, 82:20, 109:18, 110:19
**Discussion** [3] - 18:12, 41:13, 76:2
**dispute** [1] - 5:9
**disputed** [1] - 5:7
**disputes** [1] - 9:3
**distinction** [2] - 7:25, 13:4
**distribution** [2] - 52:6, 53:16
**distributor** [4] - 95:12, 95:14, 95:17, 95:18
**distributors** [1] - 94:17
**divisions** [1] - 61:8
**Dock** [1] - 63:16
**dock** [1] - 63:19
**Docket** [1] - 6:17
**Document** [1] - 82:18
**document** [23] - 34:4, 34:16, 37:3, 37:24, 38:4, 39:10, 39:11, 40:5, 44:18, 44:19, 48:6, 48:16, 48:22, 73:12, 73:25, 74:9, 76:17, 78:3, 83:11,

83:13, 87:9, 87:12, 116:15
**document's** [1] - 37:24
**documents** [10] - 9:8, 13:22, 28:8, 28:14, 28:19, 29:1, 40:10, 78:19, 101:11
**dollar** [2] - 45:11, 57:25
**dollars** [4] - 21:19, 43:11, 43:19, 108:15
**done** [4] - 25:20, 81:22, 81:23, 108:3
**DOREN** [17] - 2:4, 4:8, 28:6, 28:17, 29:7, 29:25, 30:15, 30:25, 31:17, 33:7, 34:15, 35:3, 35:18, 38:16, 38:25, 41:18, 42:2
**Doren** [3] - 4:8, 37:20, 38:1
**Doren's** [1] - 37:2
**doubt** [1] - 25:23
**doubted** [2] - 6:11, 7:3
**down** [14] - 18:1, 26:15, 26:19, 41:24, 49:9, 55:24, 56:8, 64:3, 70:23, 83:4, 90:23, 91:17, 103:23, 108:18
**DRAM** [12] - 5:13, 7:22, 20:11, 20:14, 52:24, 57:16, 57:19, 69:21, 70:2, 70:14, 77:14, 102:12
**DRAM-related** [1] - 70:14
**draw** [3] - 13:4, 32:12, 114:7
**drawing** [1] - 7:25
**Drive** [1] - 2:17
**DROOKS** [1] - 2:11
**drops** [1] - 87:6
**due** [4] - 10:24, 59:4, 112:8, 113:9
**DUNN** [2] - 2:4, 2:7
**during** [24] - 8:3, 9:3, 9:5, 9:7, 9:22, 20:21, 27:6, 30:5, 30:9, 30:22, 31:1, 31:2, 34:14, 35:22, 38:13, 43:1, 45:25, 50:24, 51:2, 60:3, 81:3, 83:19, 83:25, 86:23

**E**

**ear** [1] - 24:14
**early** [1] - 117:23

**easier** [1] - 19:20
**East** [1] - 2:12
**edge** [1] - 40:3
**eight** [1] - 10:20
**either** [7] - 6:10, 6:12, 9:3, 12:22, 20:12, 72:8, 97:2
**EKWAN** [1] - 2:12
**Ekwan** [5] - 4:20, 111:8, 112:12, 114:8, 115:6
**Electronics** [3] - 4:6, 47:17, 47:18
**element** [1] - 15:2
**elsewhere** [1] - 94:22
**email** [71] - 21:18, 28:21, 33:9, 34:13, 35:8, 38:23, 38:25, 39:12, 42:25, 44:4, 44:6, 44:19, 45:3, 45:13, 45:14, 46:6, 46:11, 46:24, 47:4, 47:13, 47:14, 51:12, 51:15, 51:16, 52:1, 52:5, 52:6, 52:7, 53:14, 53:22, 54:13, 54:15, 54:25, 55:1, 73:22, 74:16, 76:17, 76:21, 76:24, 78:8, 80:3, 91:7, 91:8, 91:10, 91:12, 91:13, 91:17, 91:23, 92:23, 93:23, 94:1, 94:2, 95:13, 96:14, 99:6, 102:10, 103:5, 103:7, 103:20, 103:23, 104:8, 104:10, 105:6, 105:20, 106:1, 106:7, 116:22, 117:8, 117:11
**emails** [26] - 12:8, 14:23, 14:25, 15:5, 16:22, 17:3, 19:19, 25:15, 28:21, 29:4, 29:12, 29:14, 29:15, 29:17, 30:11, 30:13, 33:3, 51:17, 74:12, 78:15, 78:17, 96:21, 96:22, 96:24, 113:10, 117:16
**eMMC** [5] - 88:2, 88:6, 90:18, 97:9, 97:14
**employee** [1] - 37:11
**employees** [3] - 60:24, 61:2
**empty** [4] - 49:22, 50:17, 50:18, 50:24
**end** [13] - 10:5, 34:2, 35:12, 41:23, 46:7,

60:4, 60:13, 60:14, 66:23, 68:6, 99:14, 99:18, 99:21
**end-of-life** [2] - 99:18, 99:21
**engage** [1] - 61:3
**engaged** [1] - 61:10
**engineer** [1] - 46:1
**enter** [1] - 59:12
**entered** [2] - 80:14, 81:14
**entire** [5] - 13:14, 14:25, 29:18, 38:21, 93:23
**entirety** [1] - 91:7
**entitled** [1] - 112:9
**entries** [2] - 28:22, 28:23
**envision** [1] - 40:14
**EOL** [8] - 99:11, 99:13, 99:16, 99:19, 99:23, 100:1, 100:10, 106:24
**ERP** [1] - 59:6
**ERPR** [1] - 56:22
**Es** [1] - 50:17
**essence** [2] - 19:1, 35:16
**essentially** [2] - 10:9, 12:15
**establish** [1] - 112:22
**established** [1] - 108:14
**estimate** [1] - 84:18
**et** [1] - 21:24
**evening** [3] - 6:5, 15:16, 28:7
**event** [2] - 15:13, 103:11
**EVIDENCE** [1] - 3:14
**evidence** [49] - 9:2, 13:21, 18:17, 19:5, 20:14, 21:8, 21:10, 24:10, 27:18, 29:2, 29:10, 31:20, 38:2, 38:4, 38:22, 44:10, 44:16, 47:5, 47:11, 51:20, 51:24, 54:23, 57:2, 57:7, 59:12, 59:17, 62:9, 66:18, 68:6, 68:19, 73:8, 75:20, 76:6, 76:13, 79:4, 83:6, 87:17, 91:4, 93:20, 98:23, 98:24, 102:8, 103:3, 104:25, 110:7, 115:13, 115:15, 116:12, 117:6
**evident** [1] - 34:15
**evolution** [1] - 36:16

**UNITED STATES DISTRICT COURT**

**exact** [4] - 16:7, 84:12, 84:16, 84:17
**exactly** [6] - 23:7, 24:10, 27:19, 104:13, 114:21, 116:21
**examination** [6] - 6:10, 6:15, 61:21, 71:25, 86:25, 90:1
**EXAMINATION** [4] - 3:9, 3:9, 42:17, 61:23
**example** [14] - 19:18, 19:21, 20:10, 20:19, 20:20, 48:2, 48:20, 62:12, 68:23, 69:3, 69:13, 109:2, 112:6, 114:16
**exceeding** [1] - 6:13
**Excel** [2] - 59:2, 60:7
**excess** [1] - 53:1
**exchanges** [1] - 6:5
**exchanging** [1] - 6:3
**exclusive** [2] - 65:18, 66:3
**excuse** [5] - 6:16, 10:1, 13:18, 28:23, 75:25
**executed** [1] - 82:16
**exhibit** [13] - 6:4, 29:2, 30:1, 67:15, 67:24, 68:8, 68:9, 68:14, 83:3, 111:1, 111:16, 112:3
**Exhibit** [87] - 3:15, 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23, 17:18, 33:8, 34:24, 42:12, 44:2, 44:11, 44:16, 47:11, 47:22, 51:10, 51:12, 51:19, 51:23, 51:24, 54:11, 54:18, 54:23, 56:15, 56:18, 56:21, 57:3, 57:7, 58:24, 59:1, 59:5, 59:13, 59:17, 62:4, 62:9, 67:9, 67:14, 68:19, 68:22, 69:2, 71:5, 73:4, 75:16, 76:12, 79:4, 79:8, 79:11, 83:4, 83:6, 87:17, 87:21, 91:1, 91:4, 93:15, 93:20, 98:24, 99:5, 100:14, 100:17, 100:20, 100:22, 101:5,

102:7, 102:8, 102:25, 103:2, 103:3, 104:20, 104:24, 104:25, 107:24, 115:7, 116:12, 116:24, 117:1, 117:6
**Exhibits** [2] - 46:22, 47:5
**exhibits** [10] - 6:3, 28:10, 29:9, 68:4, 68:7, 75:20, 76:10, 83:8, 117:24, 117:25
**EXHIBITS** [1] - 3:12
**exist** [1] - 32:14
**expect** [6] - 48:9, 71:4, 71:9, 108:24, 109:3, 111:22
**expected** [2] - 36:25, 52:25
**expects** [1] - 28:8
**expedite** [1] - 41:25
**expert** [3] - 11:13, 101:5, 101:18
**explain** [9] - 17:14, 17:22, 18:17, 18:18, 47:15, 59:25, 72:3, 92:24, 99:15
**explaining** [1] - 18:22
**explanation** [1] - 72:4
**explanations** [1] - 71:18
**explicitly** [1] - 51:6
**extended** [2] - 108:4, 108:6
**extends** [1] - 45:15
**extent** [5] - 11:17, 31:4, 31:6, 38:23, 81:20

**F**

**fabs** [1] - 10:20
**face** [1] - 34:15
**fact** [21] - 11:21, 15:6, 15:14, 15:15, 15:16, 16:25, 19:25, 20:4, 22:23, 24:9, 24:12, 35:22, 36:8, 36:23, 41:2, 80:4, 84:3, 94:16, 106:10, 110:12, 116:2
**factor** [2] - 12:10, 77:20
**factories** [2] - 85:25, 86:3
**facts** [2] - 15:25, 22:20
**failed** [1] - 6:11
**failure** [1] - 113:7
**fair** [14] - 64:22, 64:25,

65:1, 67:7, 69:3, 69:7, 84:5, 84:6, 85:9, 85:10, 88:15, 100:11, 100:12, 109:8
**faith** [1] - 66:22
**fall** [2] - 30:4, 34:9
**familiar** [4] - 79:12, 79:14, 79:20, 80:12
**fashion** [1] - 29:20
**fast** [1] - 35:25
**fault** [5] - 16:5, 16:17, 38:3, 89:1, 114:5
**favorable** [1] - 7:14
**February** [2] - 99:6, 103:6
**Feinstein** [1] - 5:4
**FEINSTEIN** [2] - 2:14, 5:4
**few** [2] - 24:17, 39:25
**figure** [1] - 39:25
**filed** [1] - 36:7
**fill** [1] - 30:12
**final** [2] - 28:22
**finance** [2] - 11:2, 61:9
**finances** [2] - 20:1, 111:2
**financial** [3] - 10:24, 13:19, 114:20
**fine** [6] - 14:3, 27:24, 34:22, 68:11, 73:11, 78:17
**finish** [2] - 35:4, 92:7
**first** [47] - 9:1, 11:24, 14:5, 16:2, 16:18, 22:14, 24:9, 25:10, 25:22, 26:23, 31:18, 33:9, 33:24, 35:8, 37:3, 37:4, 38:25, 41:23, 44:23, 47:13, 47:25, 48:21, 52:1, 52:2, 55:3, 57:12, 60:14, 63:4, 65:11, 68:24, 69:12, 70:19, 74:12, 76:16, 76:18, 77:21, 78:8, 85:13, 89:17, 90:5, 96:7, 99:9, 99:10, 102:11, 103:6, 103:7, 115:6
**five** [9] - 25:25, 30:18, 30:23, 31:8, 31:12, 32:4, 32:5, 34:9, 40:6
**fix** [1] - 43:7
**fleshed** [3] - 113:18, 114:14, 114:22
**Floor** [2] - 2:12, 2:15
**flow** [2] - 54:5, 97:1
**flows** [1] - 112:2

**fly** [1] - 27:25
**flying** [1] - 25:15
**focus** [7] - 54:7, 55:1, 59:18, 74:1, 97:22, 105:3, 105:5
**focused** [12] - 34:22, 34:23, 43:19, 43:22, 90:4, 91:9, 91:11, 97:21, 102:11, 103:5, 103:6, 111:8
**focusing** [1] - 60:9
**folks** [2] - 10:22, 85:5
**follow** [3] - 68:10, 92:21, 96:7
**following** [3] - 69:6, 96:25, 110:21
**follows** [1] - 42:16
**footnote** [9] - 7:19, 7:20, 8:4, 9:2, 11:7, 115:9, 115:10, 115:11, 115:14
**FOR** [2] - 2:3, 2:10
**forces** [1] - 36:11
**forecast** [42] - 20:19, 21:15, 21:17, 21:20, 45:18, 46:1, 46:3, 47:16, 47:20, 48:2, 48:19, 49:15, 50:4, 50:20, 50:22, 51:1, 51:3, 54:6, 54:7, 68:23, 69:2, 69:3, 69:5, 69:8, 71:7, 71:8, 72:12, 72:16, 75:14, 77:6, 78:4, 78:12, 79:1, 79:24, 80:6, 80:7, 80:8, 81:18, 82:1, 96:23, 97:1
**forecasted** [4] - 20:24, 21:2, 21:3, 21:6
**forecasting** [1] - 43:16
**forecasts** [27] - 21:19, 43:14, 46:20, 68:25, 72:8, 72:11, 75:12, 78:20, 78:21, 78:23, 79:23, 80:3, 80:16, 80:21, 81:4, 81:9, 81:11, 81:14, 81:16, 96:7, 96:9, 96:10, 96:13, 96:19, 96:20, 98:15, 98:18
**form** [1] - 96:21
**formal** [3] - 81:10, 82:3, 96:17
**format** [2] - 62:14, 62:16
**former** [1] - 52:3
**forward** [2] - 46:20, 71:25
**foundation** [4] -

28:25, 34:18, 73:5, 81:1
**four** [3] - 57:18, 64:3, 88:2
**fourth** [1] - 59:19
**frame** [6] - 17:24, 35:2, 37:25, 38:1, 41:5, 88:1
**free** [3] - 104:9, 108:25, 111:23
**frequently** [1] - 70:3
**front** [1] - 12:23
**fulfill** [16] - 5:12, 6:11, 7:2, 9:18, 11:1, 18:20, 20:9, 20:12, 22:12, 40:16, 40:17, 101:8, 101:16, 101:20, 113:1, 113:2
**fulfilled** [13] - 8:22, 9:25, 10:9, 10:12, 19:15, 21:21, 30:24, 31:1, 31:5, 73:19, 97:2, 97:6, 100:14
**fulfilling** [1] - 112:9
**fulfillment** [2] - 10:15, 19:17
**full** [2] - 47:15, 115:17
**fundamental** [1] - 16:3
**future** [1] - 72:21

**G**

**game** [1] - 14:10
**gather** [1] - 68:6
**geared** [1] - 9:23
**general** [2] - 60:10, 87:23
**generally** [3] - 28:23, 29:3, 98:7
**gentleman** [1] - 41:23
**GIBSON** [2] - 2:4, 2:7
**given** [6] - 9:13, 9:15, 25:21, 35:25, 36:15, 104:3
**global** [4] - 6:6, 28:15, 28:17, 28:20
**goal** [1] - 66:7
**goods** [1] - 65:20
**Grand** [1] - 2:5
**granted** [2] - 93:12, 94:24
**graph** [2] - 56:1, 60:10
**graphic** [2] - 54:4
**great** [1] - 38:3
**greater** [1] - 84:18
**grounds** [1] - 110:15
**group** [2] - 52:8, 101:16
**guess** [8] - 18:9, 21:10, 24:6, 26:5,

40:9, 41:5, 61:15, 65:13
**guidance** [3] - 6:7, 23:14, 115:14
**gun** [2] - 31:15, 34:19
**guys** [2] - 41:3, 97:15

## H

**half** [10] - 31:22, 43:3, 44:19, 60:14, 60:18, 60:21, 66:24, 68:24, 69:6, 70:9
**hand** [5] - 8:15, 25:4, 54:8, 68:15, 114:17
**handed** [1] - 26:13
**handing** [2] - 110:11, 116:24
**handled** [1] - 28:11
**hang** [1] - 35:4
**happy** [1] - 18:14
**hard** [4] - 65:17, 107:7, 107:12, 107:13
**hardly** [1] - 35:24
**Harrison** [1] - 74:21
**hassled** [2] - 37:5, 39:13
**hay** [1] - 36:8
**head** [4] - 21:15, 88:17, 94:3
**head-to-head** [1] - 21:15
**headquarters** [1] - 47:17
**heads** [1] - 25:17
**heads-up** [1] - 25:17
**hear** [4] - 8:25, 12:17, 12:18, 15:20
**heard** [4] - 35:21, 36:16, 37:20, 43:9
**hearing** [1] - 8:13
**hearsay** [2] - 29:17, 29:22
**Held** [1] - 116:5
**held** [5] - 18:12, 41:13, 76:2, 82:20, 110:21
**help** [1] - 39:22
**helpful** [5] - 8:16, 23:20, 28:3, 89:18, 89:19
**herein** [1] - 65:20
**hereof** [1] - 65:18
**high** [1] - 47:25
**higher** [3] - 92:15, 93:9, 105:17
**highest** [1] - 87:9
**highlight** [3] - 33:19, 37:13, 77:1
**highlighted** [2] - 66:5,

66:13
**highlighting** [1] - 26:21
**highlights** [1] - 39:15
**history** [1] - 7:21
**hoc** [1] - 31:20
**hold** [2] - 33:11, 40:12
**honestly** [1] - 37:19
**HONG** [3] - 3:8, 4:17, 42:14
**Hong** [50] - 4:17, 9:7, 9:8, 9:9, 9:9, 9:14, 13:25, 15:1, 15:2, 16:19, 17:21, 21:20, 24:21, 30:4, 42:19, 45:17, 48:1, 55:3, 57:9, 59:25, 60:23, 61:17, 62:12, 64:4, 68:21, 72:18, 72:24, 73:15, 75:12, 76:16, 79:8, 83:11, 87:20, 88:1, 89:24, 91:6, 91:14, 93:24, 95:11, 95:23, 99:5, 101:25, 102:10, 103:5, 103:12, 105:2, 105:16, 111:22, 116:15
**Hong's** [4] - 80:15, 81:1, 89:20, 109:11
**honor** [1] - 115:22
**Honor** [111] - 4:8, 4:11, 4:14, 4:17, 4:20, 4:23, 5:1, 6:1, 6:16, 6:18, 7:20, 7:25, 9:1, 10:15, 21:14, 22:16, 23:7, 23:21, 24:20, 25:12, 25:13, 26:13, 26:25, 27:19, 27:25, 28:3, 28:7, 29:7, 29:8, 29:25, 30:15, 30:25, 31:9, 31:17, 31:18, 31:23, 33:7, 34:16, 34:21, 35:3, 35:18, 35:25, 36:10, 36:19, 37:2, 38:16, 38:25, 40:2, 41:8, 41:18, 41:20, 42:2, 42:3, 42:11, 44:10, 47:5, 47:8, 51:19, 51:22, 54:18, 54:20, 57:2, 57:5, 59:12, 59:22, 61:18, 61:22, 62:7, 67:19, 68:1, 68:16, 68:17, 71:17, 73:5, 73:9, 73:13, 75:4, 75:10, 76:9, 76:14, 79:3, 79:6, 86:22, 89:21, 90:24, 91:2,

92:17, 94:23, 98:23, 98:25, 99:3, 102:4, 102:6, 102:20, 104:20, 109:10, 109:17, 109:25, 110:11, 110:17, 113:19, 115:11, 115:19, 115:23, 116:6, 116:10, 116:24, 116:25, 117:3, 117:15
**Honor's** [2] - 23:1, 29:18
**honored** [1] - 115:21
**Hope** [1] - 2:15
**hoping** [1] - 17:12
**horrible** [3] - 106:21, 107:2, 107:3
**hours'** [1] - 25:17

## I

**identifies** [1] - 39:4
**identify** [2] - 112:15, 113:14
**impact** [2] - 43:15, 61:4
**impacted** [2] - 61:7
**impeaching** [1] - 109:21
**implying** [2] - 25:15, 25:20
**important** [6] - 11:7, 17:17, 18:17, 96:15, 108:17, 112:22
**imposed** [1] - 43:1
**impossible** [1] - 39:17
**inability** [1] - 12:13
**Inc** [1] - 4:6
**include** [2] - 57:9, 80:21
**included** [1] - 28:21
**includes** [1] - 89:1
**including** [5] - 50:3, 54:14, 59:3
**inconsistent** [1] - 110:5
**increase** [1] - 60:20
**increasing** [2] - 83:20, 83:25
**INDEX** [2] - 3:5, 3:12
**indicate** [9] - 10:11, 10:13, 14:8, 50:19, 58:8, 58:12, 74:5, 79:22, 79:25
**indicated** [5] - 58:12, 74:15, 81:2, 81:3, 115:12
**indicates** [1] - 65:3
**indicating** [6] - 58:10,

98:14, 111:7, 111:9, 111:17, 117:11
**indication** [2] - 49:20, 116:17
**individual** [1] - 113:15
**individuals** [1] - 54:14
**industry** [1] - 52:12
**inference** [2] - 34:7, 40:11
**inform** [1] - 7:21
**information** [9] - 9:16, 14:13, 16:8, 18:11, 59:25
**informed** [2] - 115:8, 115:24
**inherently** [1] - 69:22
**inquire** [1] - 95:8
**inquiries** [2] - 21:18, 80:3
**inside** [2] - 54:16, 55:19
**instances** [4] - 6:20, 6:22, 7:15, 98:7
**instead** [3] - 18:18, 53:9, 67:20
**instruction** [4] - 5:9, 5:10, 5:21, 5:22
**instructions** [3] - 5:7, 5:8, 5:19
**intend** [1] - 63:11
**intended** [2] - 94:13, 111:19
**intention** [2] - 72:16, 117:20
**internal** [7] - 52:7, 55:4, 56:22, 59:6, 60:8, 63:2, 116:22
**interrogatories** [1] - 9:13
**Interrogatory** [2] - 6:19, 8:19
**interrogatory** [19] - 8:13, 9:23, 10:8, 11:8, 14:8, 14:13, 15:7, 15:9, 15:17, 18:24, 22:17, 22:18, 22:19, 22:20, 22:24, 112:16, 113:8, 113:25
**INTO** [1] - 3:14
**introduce** [2] - 110:7, 110:24
**invoice** [1] - 59:4
**irrelevant** [3] - 31:10, 31:13, 32:8
**issue** [90] - 5:19, 6:6, 6:8, 8:8, 8:10, 9:21, 9:24, 10:1, 10:6, 10:16, 10:17, 11:2, 11:3, 11:8, 11:15,

12:5, 12:8, 14:5, 14:15, 14:24, 15:21, 15:22, 21:11, 22:2, 22:6, 22:10, 22:17, 23:15, 24:3, 24:5, 24:6, 24:8, 24:9, 24:12, 24:13, 25:13, 25:19, 26:9, 26:10, 27:8, 28:7, 28:18, 28:20, 29:2, 29:11, 30:8, 30:13, 34:18, 34:20, 37:22, 43:7, 49:4, 50:10, 51:4, 53:4, 53:12, 53:25, 54:2, 66:12, 67:4, 68:2, 68:3, 69:15, 70:22, 71:9, 72:22, 73:1, 77:23, 81:25, 82:11, 86:5, 86:7, 86:8, 91:24, 92:4, 92:5, 92:10, 92:16, 92:25, 100:1, 105:21, 106:17, 112:15, 113:12, 114:4, 114:10, 114:14, 115:18, 115:25
**issued** [4] - 55:17, 60:3, 74:7, 74:16
**issues** [13] - 5:21, 5:24, 10:24, 13:16, 16:21, 17:4, 18:21, 21:1, 24:16, 29:17, 41:15, 67:18, 101:22
**issuing** [4] - 54:1, 57:13, 61:13, 61:15
**item** [10] - 48:18, 48:22, 49:10, 50:3, 50:8, 55:7, 55:11, 55:22, 62:25, 100:24
**Item** [1] - 4:5
**items** [3] - 50:19, 50:21, 98:15
**itself** [3] - 8:18, 63:1, 76:21

## J

**January** [5] - 7:2, 32:22, 42:25, 54:25, 69:14
**JASON** [1] - 2:5
**Jason** [4] - 4:11, 6:1, 112:14, 113:11
**JDLA** [27] - 30:1, 31:2, 34:10, 36:6, 36:7, 52:24, 60:4, 60:12, 60:13, 66:23, 79:4, 79:11, 79:13, 79:19, 79:22, 80:2, 80:10,

80:14, 80:19, 81:7, 81:11, 81:13, 82:6, 82:16, 83:19, 83:25
**Jiang** [13] - 44:4, 44:6, 44:20, 44:24, 44:25, 45:3, 46:7, 73:18, 76:22, 91:24, 94:2, 94:3, 117:9
**Jiang's** [1] - 46:6
**Joice** [4] - 54:16, 55:2, 55:3, 55:4
**judge** [1] - 6:18
**Judge** [6] - 7:8, 7:11, 15:7, 22:25, 95:9, 113:20
**Judge's** [1] - 6:7
**judges** [1] - 29:17
**July** [12] - 30:10, 31:5, 32:1, 32:2, 32:3, 32:7, 32:16, 32:17, 34:6, 44:8, 45:4, 46:12
**jumped** [2] - 31:15, 34:19
**jumping** [1] - 92:9
**JUNGEUN** [1] - 2:7
**juror** [5] - 23:24, 23:25, 24:1, 28:6, 41:22
**jurors** [5] - 41:22, 42:6, 67:23, 67:24, 117:22
**jurors'** [1] - 102:21
**jury** [24] - 5:8, 6:7, 11:21, 12:9, 12:23, 21:5, 23:22, 24:11, 24:12, 31:10, 34:6, 37:23, 41:9, 42:5, 47:15, 68:8, 77:11, 78:18, 83:3, 84:7, 91:8, 99:15, 110:6, 110:22
**justify** [3] - 12:5, 12:19, 14:4

### K

**Kate** [1] - 4:23
**keep** [12] - 23:23, 32:21, 41:4, 56:10, 56:13, 67:23, 96:15, 96:17, 96:19, 96:22, 97:23, 98:1
**keeping** [3] - 14:7, 72:3, 97:18
**keeps** [2] - 95:25, 97:24
**KI** [2] - 3:8, 42:14
**Ki** [2] - 15:2, 30:3
**Kim** [4] - 55:2, 55:3,

55:4, 55:6
**kind** [1] - 95:24
**knowingly** [1] - 84:23
**knowledge** [1] - 55:14
**knows** [3] - 66:8, 83:3, 110:23
**Knuth** [36] - 11:13, 28:8, 28:21, 28:25, 30:3, 33:9, 33:10, 33:13, 33:17, 33:21, 33:25, 37:7, 37:18, 39:1, 39:12, 44:5, 44:7, 44:20, 46:25, 47:17, 51:14, 51:17, 53:15, 53:17, 54:13, 54:15, 55:1, 55:5, 55:6, 55:19, 73:19, 74:5, 74:14, 74:22, 94:2, 94:8
**Knuth's** [1] - 47:14
**Korea** [4] - 37:12, 37:14, 39:17, 47:19
**Kotarski** [3] - 42:12, 47:23, 55:25

### L

**LaMagna** [1] - 113:20
**lane** [2] - 7:13, 7:15
**language** [2] - 8:19, 66:4
**large** [1] - 45:15
**larger** [1] - 26:17
**largest** [1] - 55:16
**last** [11] - 9:7, 15:16, 28:7, 57:21, 99:20, 100:2, 100:8, 100:9, 107:6
**last-time** [5] - 99:20, 100:2, 100:8, 100:9
**late** [5] - 14:10, 15:16, 36:4, 41:22, 42:8
**law** [2] - 29:15
**lawsuit** [1] - 36:7
**lay** [2] - 34:18, 81:1
**LC** [2] - 108:9, 108:22
**lead** [2] - 10:19, 82:13
**least** [3] - 29:23, 67:14, 95:11
**LEE** [1] - 2:7
**left** [7] - 42:9, 54:8, 63:16, 75:7, 88:14, 97:21, 117:15
**left-hand** [1] - 54:8
**less** [3] - 16:11, 81:3, 107:4
**letter** [1] - 113:5, 114:20
**level** [2] - 13:2, 47:25
**liability** [1] - 22:19

**life** [3] - 99:14, 99:18, 99:21
**likely** [1] - 35:19
**limine** [2] - 14:7, 111:5
**limit** [9] - 12:20, 111:7, 111:9, 111:18, 113:6, 113:13, 116:18, 116:21, 117:12
**limited** [2] - 6:21, 8:21
**limits** [3] - 21:2, 72:4, 111:24
**LINCENBERG** [1] - 2:11
**line** [29] - 6:13, 6:14, 8:20, 26:23, 26:24, 27:6, 48:18, 48:20, 48:22, 50:21, 55:7, 70:16, 98:15, 99:9, 99:21, 100:24, 102:11, 108:10, 108:13, 108:16, 108:20, 109:8, 111:16, 111:17, 111:20, 112:4, 112:7, 114:7
**lines** [4] - 6:17, 64:3, 88:2, 108:8
**linked** [1] - 11:3
**list** [10] - 13:25, 45:3, 52:6, 53:16, 56:19, 79:24, 87:21, 93:23, 100:17, 107:24
**listed** [1] - 34:24
**listen** [2] - 40:2, 95:5
**listing** [1] - 59:2
**literal** [1] - 34:23
**literally** [10] - 11:15, 16:3, 16:24, 17:5, 33:5, 37:5, 37:8, 37:17, 38:14, 103:9
**litigated** [4] - 10:4, 113:13, 113:18
**LLP** [4] - 2:4, 2:7, 2:14, 2:16
**Lo** [20] - 4:11, 6:1, 16:7, 16:18, 17:2, 19:18, 22:6, 24:5, 79:8, 82:10, 85:3, 86:19, 87:2, 88:25, 99:6, 100:13, 101:11, 112:14, 113:11, 116:25
**LO** [63] - 2:5, 3:9, 4:11, 6:1, 8:15, 8:18, 8:24, 12:22, 13:9, 13:21, 14:19, 15:11, 22:14, 23:21, 24:20, 25:2, 25:7, 25:12, 26:13, 26:25, 27:3,

27:19, 42:11, 42:18, 44:10, 44:17, 47:5, 47:12, 51:19, 51:25, 54:18, 54:22, 54:24, 55:24, 56:2, 57:2, 57:8, 59:12, 59:18, 59:24, 61:17, 62:7, 68:17, 73:5, 73:11, 73:13, 75:23, 76:9, 82:25, 91:2, 93:17, 102:6, 103:1, 104:23, 109:17, 109:23, 110:14, 110:17, 112:14, 113:11, 114:14, 116:10, 117:3
**Lo's** [2] - 17:6, 86:23
**lodged** [1] - 26:14
**logically** [1] - 114:24
**look** [40] - 7:11, 15:12, 22:17, 25:10, 28:1, 30:10, 35:8, 45:14, 45:16, 46:21, 46:22, 47:22, 48:20, 49:9, 50:1, 51:10, 53:13, 57:21, 64:2, 67:9, 68:21, 73:4, 74:9, 76:16, 76:17, 76:18, 76:24, 78:8, 83:3, 87:25, 90:22, 91:9, 91:13, 91:17, 91:23, 94:16, 104:9, 106:1, 114:18, 117:11
**Look** [3] - 16:23, 21:6, 113:21
**looked** [2] - 56:3, 78:19
**looking** [16] - 6:5, 14:16, 17:7, 17:13, 26:20, 26:22, 33:8, 34:23, 40:19, 46:7, 47:25, 73:7, 93:4, 94:19, 107:23, 111:1
**looks** [7] - 8:9, 25:20, 26:17, 87:7, 87:10, 87:13, 111:2
**Los** [3] - 2:6, 2:13, 2:15
**LOS** [1] - 4:1
**lot's** [1] - 110:3
**low** [1] - 28:22
**LRDIMM** [2] - 107:1, 107:2
**Ltd** [1] - 4:6
**lunch** [3] - 117:22, 117:25, 118:4

### M

**magic** [1] - 53:5

**main** [1] - 54:4
**maintained** [1] - 97:13
**majority** [1] - 84:4
**management** [1] - 43:9
**manager** [4] - 44:25, 94:5, 94:6, 117:9
**manufactured** [2] - 86:4, 99:24
**Marc** [2] - 5:4, 18:18
**MARC** [1] - 2:14
**MARELLA** [1] - 2:11
**marked** [2] - 51:10, 110:12
**market** [4] - 20:6, 86:6, 107:2, 107:20
**marketing** [1] - 113:9
**massive** [1] - 20:23
**match** [9] - 16:15, 17:18, 19:9, 20:2, 32:24, 46:1, 100:20, 100:23, 101:13
**match-up** [2] - 32:24, 100:23
**match-ups** [1] - 17:18
**matches** [3] - 19:12, 32:24, 90:8
**matching** [10] - 16:6, 16:17, 17:16, 19:10, 24:7, 32:15, 32:20, 98:14, 98:18, 101:10
**math** [2] - 88:12, 88:17
**matter** [6] - 7:13, 17:15, 29:18, 32:18, 90:11, 105:11
**McCormick** [5] - 7:8, 7:11, 15:7, 22:25, 113:20
**mean** [13] - 14:15, 18:14, 27:21, 32:13, 36:23, 40:8, 50:13, 63:8, 64:13, 84:14, 99:13, 99:16, 114:10
**means** [5] - 20:18, 35:10, 49:22, 70:11, 111:24
**meant** [1] - 111:18
**meet** [2] - 26:8, 85:1
**meeting** [1] - 43:6
**member** [1] - 53:16
**members** [4] - 25:21, 51:17, 54:16, 54:17
**memory** [1] - 99:15
**mentioned** [8] - 9:5, 16:5, 23:4, 44:23, 48:4, 61:8, 90:16, 107:15
**mentioning** [1] - 81:12
**Mercury** [1] - 55:16

**Merry** [1] - 36:4
**met** [2] - 85:12
**Michael** [1] - 5:1
**MICHAEL** [1] - 2:17
**microphone** [1] - 111:14
**middle** [3] - 91:12, 91:13, 105:5
**might** [7] - 6:6, 10:23, 24:6, 26:6, 89:18, 89:19
**MIL** [7] - 6:15, 6:18, 7:7, 8:13, 9:5, 18:25, 115:7
**mill** [1] - 86:12
**million** [30] - 13:13, 21:6, 22:7, 22:8, 23:5, 43:8, 43:11, 43:19, 43:22, 43:25, 45:11, 46:4, 46:5, 46:15, 53:1, 60:18, 86:15, 87:13, 88:14, 89:2, 89:6, 89:7, 89:8, 97:14, 101:8, 108:15, 108:16, 109:6, 109:7
**million-dollar** [1] - 45:11
**millions** [1] - 21:19
**MILs** [1] - 115:12
**minute** [1] - 42:21
**minutes** [4] - 24:17, 25:8, 39:25, 75:3
**mischaracterization** [1] - 36:20
**mismatched** [1] - 27:4
**missing** [6] - 23:24, 23:25, 24:1, 28:6, 71:10
**model** [6] - 13:1, 13:12, 13:13, 13:15, 23:8, 31:24
**moment** [4] - 7:17, 11:15, 11:18, 60:1
**money** [10] - 11:5, 14:2, 16:10, 16:11, 16:12, 16:20, 21:23, 23:16, 108:12, 115:2
**month** [11] - 43:8, 43:25, 45:11, 70:1, 70:13, 70:14, 77:15, 78:12, 81:3, 92:12
**monthly** [10] - 31:19, 36:2, 69:20, 70:3, 70:6, 70:7, 70:11, 71:13, 77:13, 87:9
**months** [26] - 30:16, 30:18, 30:23, 31:8, 31:12, 32:4, 32:5, 34:9, 35:6, 35:20,

35:21, 36:4, 36:8, 36:17, 36:18, 36:23, 37:1, 39:21, 39:25, 40:5, 40:7, 92:13, 93:1, 100:9
**morning** [26] - 4:8, 4:10, 4:11, 4:13, 4:14, 4:16, 4:17, 4:19, 4:20, 4:22, 4:23, 4:25, 5:3, 5:5, 5:6, 6:1, 22:1, 22:3, 42:19, 42:20, 61:25, 62:1, 74:25, 75:3, 109:18, 114:24
**most** [2] - 60:15, 108:3
**motion** [1] - 14:7
**motions** [1] - 111:5
**move** [30] - 47:5, 62:5, 68:13, 71:17, 75:15, 75:19, 76:6, 82:8, 82:19, 82:21, 85:15, 85:18, 89:14, 90:24, 92:17, 93:11, 93:12, 93:14, 94:23, 94:24, 98:21, 98:22, 102:4, 102:24, 104:21, 110:13, 116:6, 116:25, 118:1
**moved** [2] - 47:9, 73:8
**moves** [1] - 40:25
**moving** [3] - 73:10, 75:17, 107:22
**MR** [212] - 3:9, 3:9, 4:8, 4:11, 4:14, 4:17, 4:20, 5:1, 5:4, 6:1, 8:15, 8:18, 8:24, 9:1, 10:15, 11:11, 12:7, 12:15, 12:22, 13:9, 13:21, 14:19, 15:11, 15:22, 16:2, 17:9, 17:12, 17:16, 18:5, 18:8, 18:13, 20:17, 22:3, 22:14, 23:21, 24:8, 24:18, 24:20, 25:2, 25:7, 25:12, 25:13, 26:4, 26:12, 26:13, 26:25, 27:3, 27:19, 27:23, 28:3, 28:5, 28:6, 28:17, 29:7, 29:8, 29:24, 29:25, 30:8, 30:15, 30:25, 31:17, 32:13, 33:7, 34:15, 34:21, 35:3, 35:4, 35:18, 37:2, 38:13, 38:16, 38:17, 38:25, 40:20, 40:23, 41:8, 41:18, 41:20, 42:2, 42:3, 42:11, 42:18, 44:10,

44:13, 44:17, 47:5, 47:8, 47:12, 51:19, 51:22, 51:25, 54:18, 54:20, 54:22, 54:24, 55:24, 56:2, 57:2, 57:5, 57:8, 59:12, 59:15, 59:18, 59:22, 59:24, 61:17, 61:22, 61:24, 62:4, 62:7, 62:10, 62:11, 65:13, 65:15, 67:12, 67:17, 68:1, 68:13, 68:17, 68:20, 71:17, 72:7, 73:5, 73:9, 73:11, 73:12, 73:13, 73:14, 74:3, 75:4, 75:10, 75:11, 75:15, 75:23, 75:24, 76:1, 76:3, 76:7, 76:9, 76:14, 76:15, 77:1, 77:2, 79:3, 79:6, 79:7, 82:18, 82:21, 82:23, 82:25, 83:1, 83:7, 83:10, 83:16, 83:17, 86:22, 86:25, 87:1, 87:16, 87:19, 89:18, 89:23, 90:22, 91:2, 91:5, 92:17, 92:22, 93:11, 93:14, 93:17, 93:19, 93:21, 94:23, 95:10, 98:21, 99:3, 99:4, 102:3, 102:6, 102:9, 102:20, 102:24, 103:1, 103:4, 104:19, 104:23, 105:1, 109:10, 109:17, 109:23, 109:24, 110:10, 110:14, 110:17, 111:6, 111:11, 111:15, 112:12, 112:14, 113:11, 114:8, 114:14, 115:6, 115:10, 116:6, 116:10, 116:13, 116:24, 117:3, 117:7, 117:15, 117:19
**MS** [2] - 4:23, 76:4
**MSJ** [1] - 37:23
**multi** [2] - 29:2, 30:1
**multi-exhibit** [2] - 29:2, 30:1
**MYERS** [2] - 2:14, 2:16

## N

**name** [1] - 30:12
**NAND** [5] - 5:13, 7:22,

52:24, 57:15, 57:18
**narrow** [1] - 40:3
**nature** [1] - 52:20
**Neal** [17] - 33:9, 37:7, 37:10, 52:9, 73:19, 74:4, 74:14, 74:22, 94:2, 94:8, 103:24, 104:1, 104:3, 104:4, 104:14
**necessarily** [1] - 114:5
**need** [17] - 5:25, 8:10, 16:15, 17:22, 19:10, 24:16, 33:10, 34:18, 41:16, 63:22, 64:17, 67:23, 69:6, 71:2, 77:3, 77:7, 80:6
**needed** [9] - 32:6, 41:1, 43:24, 60:19, 64:15, 64:19, 64:20, 94:21, 109:7
**needs** [5] - 8:7, 22:17, 85:1, 85:8
**nego** [1] - 93:7
**negotiate** [1] - 69:16
**negotiated** [3] - 77:10, 77:12, 93:7
**negotiating** [1] - 69:22
**negotiation** [1] - 77:15
**NESSIM** [1] - 2:11
**Net** [1] - 72:24
**net** [2] - 63:11, 108:7
**Netlist** [149] - 4:6, 4:9, 4:12, 4:15, 4:18, 6:2, 6:21, 6:24, 7:14, 7:22, 9:25, 19:14, 19:17, 19:20, 19:25, 20:10, 20:13, 20:14, 22:7, 22:8, 23:16, 27:8, 28:24, 30:2, 31:15, 32:11, 34:19, 35:23, 35:24, 36:12, 36:25, 37:4, 37:7, 37:15, 38:5, 38:24, 39:10, 39:25, 40:12, 40:15, 40:16, 40:18, 40:19, 43:2, 43:14, 43:15, 44:5, 44:25, 45:25, 48:6, 48:14, 48:22, 49:11, 50:3, 50:12, 50:13, 51:4, 51:6, 51:14, 51:18, 52:4, 52:6, 53:22, 54:17, 55:8, 55:20, 55:21, 56:4, 56:10, 56:24, 57:10, 58:8, 58:13, 58:16, 58:18, 58:21, 60:11, 60:24, 61:8, 61:10, 62:14, 62:16, 64:6, 64:8, 65:7, 65:25, 66:21,

67:1, 69:5, 69:18, 70:2, 70:16, 71:1, 71:11, 71:21, 72:8, 72:19, 72:25, 73:18, 74:14, 74:20, 77:7, 77:17, 80:21, 81:8, 82:3, 82:15, 83:20, 83:23, 83:25, 84:4, 87:22, 88:20, 88:22, 89:16, 94:4, 94:6, 94:13, 94:16, 95:11, 95:16, 95:18, 95:25, 96:7, 96:9, 97:6, 97:10, 97:17, 97:23, 97:24, 98:1, 98:4, 102:1, 102:15, 103:16, 103:17, 104:5, 107:25, 108:14, 111:2, 112:7, 112:14, 113:5, 113:11, 115:8, 116:1
**Netlist's** [11] - 5:13, 6:12, 7:20, 39:23, 63:2, 64:23, 66:7, 84:15, 108:9, 111:20, 116:17
**never** [6] - 8:10, 19:15, 35:12, 90:17, 90:20, 113:13
**new** [7] - 14:13, 33:4, 35:6, 39:7, 39:21, 52:21, 53:24
**Newport** [2] - 2:17, 2:18
**news** [1] - 52:11
**next** [10] - 5:23, 28:2, 37:12, 37:13, 39:16, 45:15, 53:3, 99:12, 103:23, 111:16
**night** [1] - 6:3
**none** [2] - 13:21, 76:9
**nonissue** [1] - 116:2
**normal** [2] - 49:23
**Nos** [4] - 3:17, 3:23, 47:11, 76:12
**note** [1] - 9:1
**notebook** [2] - 67:18, 68:15
**notebooks** [1] - 68:3
**noted** [2] - 6:23, 7:11
**nothing** [5] - 6:24, 11:5, 20:3, 34:4, 101:6
**notice** [3] - 99:19, 100:1, 115:17
**notion** [2] - 34:9, 89:16
**November** [5] - 33:24, 34:11, 78:8, 80:18,

80:20
**number** [21] - 28:9,
45:19, 45:20, 48:3,
48:8, 50:22, 57:13,
58:7, 61:6, 63:2,
67:16, 67:17, 81:6,
84:12, 84:16, 84:18,
91:1, 101:1, 105:6
**Number** [6] - 4:5, 7:5,
8:19, 55:25, 95:22,
99:10
**numbers** [5] - 20:23,
68:8, 68:9, 89:13,
109:13
**NW** [1] - 2:8

**O**

**O'MELVENY** [2] -
2:14, 2:16
**oath** [1] - 110:4
**object** [1] - 110:14
**objected** [3] - 19:19,
26:17, 112:1
**objection** [35] - 25:10,
26:2, 26:5, 26:23,
30:1, 44:12, 44:13,
47:7, 47:8, 51:21,
54:19, 54:20, 57:4,
57:5, 59:14, 59:15,
59:20, 68:17, 75:22,
75:23, 82:24, 82:25,
90:25, 91:2, 93:16,
93:17, 102:5,
102:25, 103:1,
104:22, 104:23,
109:20, 110:16,
112:20, 117:2
**objections** [17] - 6:4,
24:22, 24:24, 25:1,
25:3, 26:1, 26:7,
26:18, 26:22, 28:9,
28:16, 28:17, 51:22,
62:7, 76:8, 116:9,
117:4
**obligated** [1] - 27:14
**obligation** [2] - 14:12,
113:1
**obligations** [1] - 7:4
**obvious** [3] - 105:7,
105:23, 108:23
**obviously** [7] - 9:15,
10:4, 14:11, 25:18,
28:25, 103:13,
111:23
**occasion** [1] - 102:17
**occur** [10] - 12:25,
16:17, 17:23, 18:4,
18:7, 31:11, 32:21,
71:11, 71:21, 102:18

occurred [4] - 9:6,
17:23, 18:15, 23:3
**occurring** [1] - 38:11
**occurs** [2] - 10:18,
31:11
**October** [17] - 30:10,
30:19, 32:22, 33:5,
33:10, 33:12, 33:17,
33:19, 33:20, 34:11,
35:7, 35:22, 36:5,
38:20, 38:22, 39:1,
39:15
**OF** [3] - 2:1, 3:5, 3:12
**offer** [4] - 12:22,
23:13, 36:9, 38:18
**office** [1] - 76:22
**old** [1] - 30:18
**older** [1] - 41:23
**once** [7] - 39:19, 70:1,
70:2, 70:13, 70:14,
70:20, 100:10
**one** [38] - 5:7, 6:6, 7:7,
9:4, 10:11, 14:19,
15:18, 16:2, 21:16,
23:24, 24:18, 24:20,
25:16, 25:24, 28:7,
28:17, 29:25, 30:13,
34:22, 41:22, 53:9,
55:16, 56:1, 56:8,
59:8, 61:2, 61:13,
67:18, 67:24, 68:14,
75:25, 86:20, 87:5,
102:20, 105:6,
106:24, 112:3, 117:3
**ones** [4] - 26:8, 67:21,
76:4, 97:6
**ongoing** [1] - 14:12
**oOo** [1] - 4:3
**open** [2] - 20:5, 116:5
**opened** [1] - 21:17
**opening** [3] - 16:5,
20:4, 27:6
**operating** [4] - 56:22,
59:7, 60:8, 97:19
**operations** [4] - 52:3,
61:8, 96:16, 97:5
**opportunity** [2] - 72:2,
95:1
**opposed** [2] - 40:24,
56:11
**oral** [1] - 9:4
**orange** [1] - 102:12
**order** [93] - 5:17, 7:2,
7:8, 8:1, 9:25, 10:9,
10:12, 10:25, 15:7,
16:15, 19:11, 19:13,
19:15, 19:21, 20:2,
20:9, 20:11, 20:12,
20:17, 20:18, 20:20,
20:25, 21:8, 22:12,

22:25, 27:7, 30:12,
35:7, 35:10, 36:25,
38:5, 39:20, 40:5,
40:12, 40:16, 40:18,
49:5, 49:17, 50:10,
51:4, 51:7, 53:12,
54:3, 54:8, 55:17,
57:12, 57:14, 58:1,
61:14, 62:12, 62:18,
62:21, 63:13, 63:24,
64:2, 64:7, 64:9,
64:12, 64:14, 64:22,
65:2, 65:8, 65:20,
65:24, 66:7, 66:12,
66:15, 67:6, 69:16,
70:22, 72:20, 72:22,
73:1, 74:17, 81:25,
82:5, 88:2, 90:19,
97:1, 100:6, 101:9,
103:16, 104:5,
104:6, 113:1, 113:2,
115:7
**Order** [1] - 65:3
**ordered** [12] - 21:7,
21:9, 21:12, 36:13,
43:18, 52:18, 58:9,
65:20, 93:2, 93:9
**orders** [57] - 6:11,
6:25, 8:22, 10:20,
21:23, 21:24, 27:9,
27:14, 27:15, 27:18,
30:4, 30:9, 30:14,
32:19, 33:4, 34:14,
35:6, 36:12, 39:6,
39:7, 43:2, 56:4,
56:14, 56:19, 56:25,
57:10, 59:3, 60:2,
61:11, 61:15, 62:15,
67:2, 67:4, 74:8,
80:4, 87:6, 87:22,
88:13, 88:20, 88:21,
88:22, 89:2, 89:6,
97:10, 97:14, 97:25,
98:2, 98:11, 101:16,
101:20, 102:1,
102:15, 103:18,
112:9, 117:16
**organization** [1] - 61:5
**original** [5] - 18:24,
20:9, 26:14, 109:20
**outline** [1] - 86:21
**outs** [4] - 35:9, 37:6,
37:12, 39:14
**outside** [6] - 6:7,
12:23, 39:22, 40:22,
110:22, 113:13
**overall** [2] - 84:8,
107:7
**overcharge** [2] -
13:14, 23:12

**overruled** [1] - 117:4
**own** [3] - 20:1, 24:13,
72:4

**P**

**P.C** [1] - 2:11
**page** [19] - 6:17, 7:19,
8:18, 26:18, 26:23,
44:18, 45:15, 52:2,
53:15, 65:2, 65:10,
78:3, 86:20, 99:9,
99:10, 109:13,
111:7, 111:9, 116:15
**PAGE** [1] - 3:7
**pages** [2] - 26:15,
26:21
**paid** [10] - 13:2, 23:3,
23:11, 58:13, 58:18,
58:21, 112:23,
113:12, 114:17,
115:2
**Paik** [2] - 15:2, 30:3
**PAIK** [2] - 3:8, 42:14
**paper** [1] - 24:25
**paperweights** [2] -
36:18, 36:19
**paragraph** [7] - 5:16,
35:9, 37:3, 37:5,
53:3, 94:15, 107:7
**Park** [9] - 2:12, 52:2,
52:3, 52:9, 53:4,
53:8, 53:15, 73:17
**part** [33] - 12:16, 13:1,
13:12, 26:5, 26:14,
43:17, 45:19, 48:3,
48:8, 48:24, 52:8,
52:19, 52:23, 52:25,
60:25, 63:2, 63:3,
73:22, 77:8, 77:9,
80:5, 90:21, 101:1,
105:3, 105:5, 106:5,
106:20, 107:2,
114:23
**particular** [31] - 6:24,
8:8, 9:17, 14:2, 16:9,
16:13, 16:16, 16:19,
17:23, 20:21, 27:3,
37:24, 45:2, 48:4,
49:13, 50:6, 55:14,
55:15, 64:7, 64:13,
64:14, 64:15, 64:24,
77:9, 78:19, 79:14,
87:3, 92:14, 105:3,
113:16, 114:16
**particularly** [1] - 27:5
**parties** [9] - 5:25, 6:3,
14:12, 15:9, 65:19,
81:15, 82:4, 117:23,
118:1

**parts** [34] - 27:23,
33:10, 33:16, 34:1,
39:2, 39:4, 43:11,
43:19, 47:19, 51:1,
53:25, 58:13, 61:12,
63:20, 64:15, 64:19,
64:20, 66:12, 69:9,
77:12, 80:6, 81:19,
81:20, 81:21, 81:24,
94:22, 95:17,
107:10, 109:7,
113:6, 113:8, 113:9,
115:1
**party** [1] - 36:11
**passage** [1] - 31:9
**passed** [2] - 13:19,
104:20
**patiently** [1] - 31:22
**pay** [21] - 6:12, 7:3,
9:19, 9:25, 10:22,
11:4, 11:6, 12:9,
12:14, 12:21, 12:25,
21:23, 23:16, 58:16,
63:11, 63:14, 64:23,
65:6, 90:9, 112:21
**payment** [3] - 7:21,
63:9, 111:25
**peak** [1] - 61:15
**people** [4] - 14:24,
43:10, 51:18, 61:7
**per** [1] - 57:25
**perceived** [1] - 113:2
**percent** [4] - 23:11,
38:19, 84:11, 84:19
**percentage** [1] - 84:7
**perfectly** [1] - 34:21
**perhaps** [2] - 28:18,
108:24
**period** [40] - 30:5,
30:9, 30:14, 30:22,
31:2, 31:13, 32:14,
32:17, 32:19, 33:3,
34:5, 34:8, 34:14,
35:23, 38:12, 38:14,
38:20, 40:7, 43:1,
45:25, 50:24, 60:3,
60:14, 60:21, 66:19,
70:13, 70:14, 75:13,
78:23, 80:23, 81:4,
81:12, 81:17, 81:18,
82:2, 83:18, 83:19,
111:17
**permission** [11] -
49:4, 49:17, 50:10,
53:11, 54:2, 59:19,
66:11, 67:3, 69:12,
69:14, 69:15
**person** [3] - 54:16,
55:4, 55:19
**perspective** [1] -

29:12
**phantom** [1] - 21:3
**phrase** [3] - 63:4, 69:2, 81:14
**phrases** [1] - 40:4
**pick** [2] - 42:9, 75:7
**picked** [1] - 33:3
**pieces** [17] - 48:24, 49:3, 49:5, 49:12, 49:24, 50:5, 50:9, 50:11, 50:14, 52:18, 55:15, 55:17, 90:14, 90:15, 90:17, 91:18
**place** [5] - 11:24, 14:5, 42:23, 74:21, 108:22
**placed** [7] - 19:21, 20:11, 34:14, 35:10, 56:20, 57:10, 59:3
**placing** [1] - 63:24
**plaintiff** [1] - 42:15
**PLAINTIFF** [1] - 2:3
**play** [8] - 16:14, 16:21, 20:16, 21:1, 24:14, 24:22, 25:6, 110:6
**played** [1] - 110:9
**playing** [1] - 109:24
**plus** [1] - 55:18
**PO** [25] - 11:13, 34:23, 34:24, 34:25, 35:15, 37:25, 40:25, 50:10, 50:13, 53:4, 53:9, 53:18, 53:25, 54:1, 55:20, 71:9, 73:18, 74:6, 74:21, 74:22, 81:22, 91:19, 94:19, 108:7
**point** [21] - 9:4, 18:18, 20:4, 24:4, 29:10, 30:17, 31:10, 37:22, 38:21, 41:6, 70:25, 79:18, 81:4, 81:13, 84:3, 84:18, 99:23, 105:13, 106:16, 110:14, 113:16
**pointed** [1] - 114:23
**portion** [3] - 6:17, 84:15, 87:16
**portions** [3] - 48:5, 48:6, 48:16
**POs** [13] - 21:15, 21:16, 35:2, 38:9, 41:5, 53:1, 60:20, 74:7, 74:14, 91:8, 91:14, 93:23, 111:18
**position** [1] - 7:12
**possible** [1] - 37:14
**post** [2] - 14:11, 30:1
**potential** [1] - 53:24
**potentially** [1] - 98:5
**practice** [4] - 49:23,

80:21, 105:16, 105:18
**practices** [1] - 36:21
**pre** [3] - 81:7, 82:6
**precisely** [4] - 112:15, 112:18, 112:19, 113:3
**prediction** [1] - 69:5
**preferred** [1] - 61:13
**premise** [2] - 16:3, 34:19
**prep** [1] - 113:18
**prepare** [4] - 48:13, 96:9, 101:21
**prepared** [6] - 48:6, 48:7, 48:14, 48:16, 96:7, 114:18
**presence** [3] - 6:7, 42:5, 110:22
**present** [1] - 109:2
**presented** [2] - 16:7, 17:2
**presenting** [1] - 10:7
**pressed** [1] - 7:10
**pretty** [2] - 29:13, 93:7
**preview** [1] - 111:16
**previous** [2] - 45:13, 90:19
**previously** [4] - 42:15, 58:21, 90:16, 90:19
**price** [48] - 33:12, 48:10, 48:11, 62:23, 69:11, 69:16, 69:18, 69:22, 69:24, 70:1, 70:12, 70:18, 70:22, 71:2, 71:11, 71:12, 71:14, 71:22, 77:3, 77:7, 77:9, 77:12, 77:15, 77:17, 77:18, 88:8, 90:8, 90:9, 90:11, 92:4, 92:10, 92:13, 92:15, 92:24, 93:6, 93:7, 93:9, 94:12, 95:12, 105:7, 105:11, 105:12, 105:18, 105:23, 106:3, 106:5
**Price** [1] - 91:24
**prices** [3] - 92:4, 94:9, 107:11
**pricing** [22] - 33:11, 34:11, 34:12, 36:2, 36:17, 69:20, 69:21, 70:24, 71:13, 77:13, 77:19, 92:12, 105:8, 105:15, 105:21, 105:22, 106:6, 106:11, 106:12, 106:13, 106:14
**principal** [1] - 77:19

**principle** [1] - 71:23
**probative** [1] - 35:24
**problem** [9] - 8:5, 16:5, 21:14, 32:15, 93:10, 105:8, 106:4, 106:6, 106:12
**procedural** [2] - 8:9, 26:2
**proceed** [1] - 53:23
**process** [6] - 54:5, 70:25, 80:5, 81:10, 96:6
**processing** [1] - 41:25
**procure** [1] - 113:7
**procurement** [6] - 44:25, 76:22, 94:3, 94:5, 94:6, 117:9
**produced** [1] - 107:16
**product** [46] - 6:25, 10:17, 11:14, 12:6, 12:13, 12:21, 13:3, 19:22, 20:8, 30:22, 31:16, 32:2, 35:13, 36:9, 37:16, 39:22, 40:19, 52:5, 62:19, 63:1, 66:9, 70:4, 70:17, 71:5, 72:19, 72:25, 73:20, 74:5, 76:18, 78:4, 81:5, 88:2, 99:19, 99:21, 99:22, 99:23, 99:24, 100:4, 104:6, 105:24, 105:25, 106:2, 107:4, 107:15, 107:21, 109:4
**product's** [1] - 11:19
**products** [26] - 5:13, 13:7, 13:20, 14:17, 17:7, 23:16, 31:4, 36:11, 36:16, 39:11, 39:15, 43:23, 46:18, 56:11, 57:16, 57:19, 58:9, 64:24, 70:2, 70:15, 77:14, 88:6, 100:3, 106:24, 108:25, 112:11
**progress** [2] - 45:6, 46:8
**progression** [1] - 111:15
**projections** [3] - 31:19, 31:20
**promise** [1] - 85:15
**promises** [1] - 72:21
**proof** [2] - 12:22, 38:18
**proper** [3] - 34:7, 38:9, 40:24
**proposed** [1] - 5:10

**proposition** [1] - 29:4
**protocol** [4] - 25:14, 67:6
**protocols** [1] - 25:16
**provide** [2] - 48:3, 68:7
**provided** [1] - 47:20
**providing** [1] - 68:24
**provision** [2] - 79:19, 80:2
**publish** [29] - 47:9, 59:19, 59:23, 62:5, 62:10, 67:12, 68:14, 71:13, 73:10, 75:15, 75:18, 75:20, 79:3, 82:19, 82:21, 86:22, 87:16, 89:21, 90:24, 93:15, 93:19, 99:1, 102:4, 102:24, 104:21, 109:25, 110:13, 116:7, 117:1
**published** [1] - 76:11
**publishes** [4] - 69:20, 69:21, 93:8
**pull** [1] - 47:23
**pulling** [1] - 35:24
**pun** [1] - 94:13
**Purchase** [1] - 65:3
**purchase** [98] - 10:20, 10:25, 12:11, 12:25, 13:2, 13:20, 16:16, 17:19, 18:21, 19:12, 19:14, 20:3, 20:25, 21:8, 27:7, 27:9, 27:14, 27:15, 27:18, 30:12, 31:6, 32:24, 36:14, 39:5, 39:6, 39:7, 43:2, 49:5, 50:10, 51:4, 51:7, 52:12, 53:12, 54:3, 54:8, 55:17, 56:4, 56:13, 56:19, 57:10, 57:12, 57:14, 57:25, 59:21, 60:2, 61:1, 61:4, 61:11, 61:13, 61:15, 62:12, 62:15, 62:18, 62:19, 62:21, 63:13, 64:2, 64:7, 64:9, 64:12, 64:14, 64:22, 65:2, 65:8, 65:19, 65:20, 65:24, 66:7, 66:12, 66:15, 67:2, 67:4, 67:6, 69:15, 70:17, 70:22, 71:1, 72:20, 72:22, 73:1, 74:7, 74:17, 77:20, 80:3, 81:25, 82:5, 87:22, 97:25, 98:2, 99:20, 100:2, 100:3, 100:21,

100:24, 101:14, 104:5, 114:2, 117:16
**purchased** [5] - 19:7, 19:8, 20:14, 60:14, 89:8
**purchases** [26] - 7:23, 12:24, 13:13, 14:1, 16:4, 17:9, 17:14, 17:23, 18:3, 18:7, 18:15, 19:9, 20:5, 31:3, 32:14, 32:18, 46:4, 56:10, 59:2, 60:15, 97:24, 98:15, 98:19, 100:18, 101:4
**purchasing** [3] - 31:15, 61:7, 80:5
**pure** [1] - 19:19
**purpose** [2] - 62:18, 63:19
**purposes** [1] - 116:16
**push** [13] - 18:2, 35:9, 35:11, 37:4, 37:6, 37:12, 37:17, 38:14, 38:15, 38:21, 39:14, 40:12
**Push** [1] - 37:8
**push-out** [5] - 37:4, 38:14, 38:15, 38:21
**push-outs** [4] - 35:9, 37:6, 37:12, 39:14
**pushed** [3] - 34:1, 36:3, 37:21
**pushing** [6] - 38:6, 38:11, 38:13, 38:24, 41:2, 41:4
**put** [15] - 29:1, 30:12, 31:21, 35:11, 37:15, 39:17, 42:12, 55:25, 64:6, 64:8, 64:11, 73:25, 108:15, 113:12, 115:19
**puts** [1] - 36:15
**putting** [3] - 6:9, 35:15, 46:3

---

## Q

**Q2** [1] - 47:19
**Q3** [3] - 34:2, 45:22
**qualify** [1] - 29:22
**quality** [4] - 70:21, 77:20, 77:21, 82:11
**quantities** [3] - 69:9, 69:23
**quantity** [9] - 48:9, 48:11, 50:18, 58:1, 62:21, 62:22, 66:8, 70:20, 71:15
**Quantity** [2] - 48:9, 48:10

**UNITED STATES DISTRICT COURT**

**quarter** [4] - 20:22, 69:6, 70:8, 77:16
**quarterly** [7] - 31:19, 69:21, 70:2, 70:3, 70:7, 71:14, 77:14
**questioned** [1] - 9:9
**questions** [6] - 33:15, 61:18, 72:1, 95:2, 117:20
**quick** [1] - 32:12
**quickly** [1] - 93:23
**quite** [1] - 65:12
**quoted** [4] - 105:7, 105:12, 105:23, 105:25
**quotes** [1] - 94:16

**R**

**raise** [7] - 105:8, 105:12, 105:15, 105:21, 106:6, 106:11, 106:12
**raised** [1] - 105:18
**raises** [1] - 34:8
**raising** [5] - 11:25, 24:4, 106:3, 106:13, 106:14
**rare** [2] - 98:12, 102:17
**rather** [1] - 59:18
**Raymond** [6] - 73:18, 76:22, 91:24, 94:2, 94:3, 117:9
**reach** [2] - 8:10, 74:21
**read** [10] - 10:8, 29:23, 37:3, 37:4, 47:14, 48:21, 65:16, 74:11, 103:9, 109:10
**reading** [3] - 27:24, 49:6, 65:17
**ready** [6] - 41:9, 49:4, 49:24, 50:9, 99:18, 105:2
**realistic** [1] - 22:13
**really** [12] - 11:20, 13:22, 18:9, 27:11, 36:24, 43:9, 43:12, 58:1, 83:18, 107:1, 112:21, 115:22
**reason** [6] - 10:14, 11:22, 11:25, 16:6, 22:21, 49:21
**reasonable** [1] - 31:14
**reasons** [7] - 7:13, 8:21, 10:10, 10:12, 16:12, 18:25, 19:2
**recalling** [1] - 78:20
**recap** [1] - 42:21
**received** [32] - 28:8,

32:1, 44:16, 47:11, 51:24, 52:9, 53:1, 54:23, 57:7, 57:22, 57:25, 58:1, 58:6, 58:7, 58:8, 58:12, 58:15, 58:17, 58:19, 59:17, 62:9, 68:19, 76:13, 83:6, 91:4, 93:20, 102:8, 103:3, 104:25, 116:12, 117:6
**RECEIVED** [1] - 3:14
**receives** [1] - 66:6
**recess** [5] - 41:21, 42:4, 75:6, 118:3, 118:4
**recipients** [1] - 51:13
**recognize** [4] - 44:4, 47:2, 51:12, 54:13, 56:18, 59:1, 60:10
**recollect** [1] - 102:2
**recollection** [1] - 74:13
**record** [9] - 18:12, 31:21, 41:13, 65:16, 76:2, 82:20, 83:2, 96:23, 116:16
**records** [26] - 29:16, 29:19, 29:23, 56:10, 56:13, 95:24, 96:12, 96:16, 96:17, 96:20, 96:22, 97:6, 97:8, 97:9, 97:12, 97:17, 97:23, 97:24, 98:1, 98:10, 98:13, 98:14, 98:16, 98:17, 101:2, 114:20
**redirect** [1] - 118:1
**reduced** [2] - 8:20, 10:10
**reference** [2] - 55:11, 79:17
**referenced** [1] - 52:17
**referencing** [5] - 52:19, 103:21, 106:14, 107:3, 107:14
**referring** [1] - 103:25
**reflect** [1] - 102:22
**refresh** [1] - 74:9
**refreshes** [1] - 74:12
**refused** [2] - 112:19, 113:14
**regards** [1] - 108:10
**regular** [1] - 80:22
**regularly** [2] - 81:9, 102:15
**rejected** [2] - 98:15, 98:18
**relate** [2] - 30:14, 33:3

**related** [5] - 9:18, 10:1, 11:11, 12:2, 70:14
**relates** [4] - 10:6, 28:18, 30:1, 37:25
**relating** [4] - 5:19, 19:19, 33:4, 68:3
**release** [1] - 33:12
**released** [3] - 34:11, 39:3, 39:5
**releasing** [1] - 33:15
**relevance** [12] - 8:5, 8:6, 8:11, 9:2, 16:8, 22:17, 27:2, 30:5, 36:20, 40:4, 111:10
**relevant** [25] - 8:2, 8:7, 8:19, 10:7, 11:8, 18:11, 22:15, 24:12, 27:22, 30:17, 33:2, 34:7, 34:20, 36:10, 36:24, 37:24, 38:8, 38:23, 40:13, 111:4, 112:5, 115:16, 116:3
**relies** [1] - 39:12
**rely** [1] - 14:14
**relying** [1] - 68:22
**remains** [1] - 34:3
**remember** [1] - 52:16
**remind** [1] - 8:12
**remove** [3] - 5:11, 5:15, 5:18
**repeat** [2] - 43:21, 72:23
**replaced** [1] - 32:7
**replacement** [1] - 115:1
**reply** [1] - 80:7
**replying** [1] - 81:24
**report** [1] - 93:4
**reported** [1] - 45:1
**reporter** [2] - 75:2, 110:23
**REPORTER** [1] - 43:21
**reporting** [1] - 52:4
**represent** [1] - 57:24
**represented** [3] - 100:14, 103:18, 104:6
**repurchase** [2] - 100:23, 100:24
**request** [24] - 8:18, 22:25, 30:22, 30:24, 36:14, 45:18, 49:2, 50:4, 50:7, 50:8, 50:18, 51:1, 53:14, 61:12, 66:7, 69:8, 79:24, 80:8, 81:14, 82:1, 82:5, 100:14, 100:21, 100:24

**requested** [2] - 17:18, 43:17
**requesting** [9] - 48:9, 48:23, 48:24, 49:11, 49:12, 50:5, 63:3, 63:20, 63:25
**requests** [10] - 5:13, 8:22, 27:17, 38:10, 79:23, 80:4, 82:3, 98:4, 101:12, 101:13
**Required** [1] - 64:3
**resale** [6] - 31:25, 82:15, 83:20, 83:22, 84:3, 84:8
**resell** [3] - 32:24, 98:4
**reseller** [38] - 12:24, 12:25, 13:2, 13:10, 14:1, 16:4, 16:15, 17:9, 17:19, 18:13, 18:15, 19:9, 19:12, 20:3, 20:5, 20:15, 23:2, 31:16, 32:14, 32:18, 57:13, 59:21, 61:1, 61:4, 61:11, 86:9, 86:15, 97:24, 98:11, 98:15, 98:19, 100:17, 100:21, 101:4, 101:14, 108:21, 112:21, 112:23
**resellers** [30] - 13:8, 13:14, 23:10, 23:11, 43:18, 43:25, 56:11, 56:20, 57:11, 59:3, 60:3, 60:15, 60:20, 60:21, 61:16, 77:18, 85:4, 85:7, 85:21, 86:11, 86:16, 98:8, 101:2, 101:8, 107:23, 107:24, 108:5, 108:6, 108:8, 108:19
**reselling** [2] - 83:24, 84:22
**resolve** [5] - 5:25, 24:23, 28:12, 28:19, 41:15
**resolved** [1] - 28:18
**respect** [4] - 7:4, 11:10, 13:17, 34:17
**respond** [3] - 7:9, 21:22, 71:7
**responded** [2] - 71:7, 79:1
**responds** [3] - 33:25, 39:4, 72:10
**Response** [1] - 6:19
**response** [20] - 6:23, 8:15, 10:11, 14:8, 47:16, 47:21, 48:5,

48:18, 49:2, 49:14, 50:8, 50:13, 50:25, 53:14, 54:7, 91:16, 112:13, 113:23, 113:25, 114:9
**responses** [6] - 14:13, 15:9, 15:18, 50:24, 112:16, 113:8
**responsible** [1] - 60:25
**responsive** [1] - 17:5
**rest** [1] - 79:15
**restricted** [3] - 6:21, 8:21, 112:18
**restriction** [1] - 10:13
**result** [1] - 81:8
**resulted** [1] - 31:6
**RESUMED** [2] - 3:9, 42:17
**revenue** [1] - 84:15
**review** [2] - 33:24, 89:13
**reviewed** [2] - 6:18, 89:12
**revised** [2] - 5:21, 5:22
**Rhow** [5] - 4:20, 111:8, 112:12, 114:8, 115:6
**RHOW** [132] - 2:11, 2:12, 3:9, 4:20, 9:1, 10:15, 11:11, 12:7, 12:15, 15:22, 16:2, 17:9, 17:12, 17:16, 18:5, 18:8, 18:13, 20:17, 22:3, 24:8, 24:18, 25:13, 26:4, 26:12, 27:23, 28:3, 28:5, 29:8, 29:24, 30:8, 32:13, 34:21, 35:4, 37:2, 38:13, 38:17, 40:20, 40:23, 41:8, 41:20, 42:3, 44:13, 47:8, 51:22, 54:20, 57:5, 59:15, 59:22, 61:22, 61:24, 62:4, 62:10, 62:11, 65:13, 65:15, 67:12, 67:17, 68:1, 68:13, 68:20, 71:17, 72:7, 73:9, 73:12, 73:14, 74:3, 75:4, 75:10, 75:11, 75:15, 75:24, 76:1, 76:3, 76:7, 76:14, 76:15, 77:1, 77:2, 79:3, 79:6, 79:7, 82:18, 82:21, 82:23, 83:1, 83:7, 83:10, 83:16, 83:17, 86:22, 86:25, 87:1, 87:16, 87:19, 89:18,

89:23, 90:22, 91:5,
92:17, 92:22, 93:11,
93:14, 93:19, 93:21,
94:23, 95:10, 98:21,
99:3, 99:4, 102:3,
102:9, 102:20,
102:24, 103:4,
104:19, 105:1,
109:10, 109:24,
110:10, 111:6,
111:11, 111:15,
112:12, 114:8,
115:6, 115:10,
116:6, 116:13,
116:24, 117:7,
117:15, 117:19
**Richard** [1] - 4:8
**RICHARD** [1] - 2:4
**rise** [2] - 75:5, 118:2
**risk** [4] - 85:10,
112:24, 113:2, 114:2
**rog** [1] - 9:17
**Rog** [3] - 7:5, 7:6,
113:3
**rogs** [1] - 113:17
**room** [1] - 68:8
**roughly** [1] - 89:7
**Row** [2] - 49:10, 50:1
**row** [3] - 41:23, 76:18,
78:8
**Rowe** [3] - 23:4,
26:13, 39:9
**rule** [5] - 15:8, 26:7,
29:22, 29:23, 40:10
**ruled** [1] - 115:11
**ruling** [2] - 6:15, 6:18
**rulings** [1] - 111:4

## S

**SA** [1] - 4:6
**sales** [1] - 52:3
**sample** [1] - 45:18
**Samsung** [205] - 4:6,
4:21, 4:24, 5:2, 5:4,
5:12, 6:9, 6:11, 6:20,
7:1, 7:10, 7:21, 8:6,
8:25, 12:6, 12:13,
12:18, 13:8, 13:17,
13:23, 14:4, 14:24,
15:16, 15:20, 19:16,
20:11, 22:11, 24:4,
27:7, 28:8, 28:13,
30:2, 30:24, 31:15,
36:11, 36:15, 37:11,
40:16, 40:17, 43:1,
43:3, 43:6, 43:10,
43:19, 43:23, 44:5,
45:12, 45:19, 46:2,
46:14, 46:18, 47:1,
47:17, 47:18, 48:3,
48:5, 48:7, 48:17,
48:25, 49:16, 50:19,
50:21, 50:23, 50:25,
51:3, 51:6, 51:14,
52:7, 52:19, 52:23,
52:25, 53:12, 53:25,
54:7, 54:14, 54:16,
55:18, 56:4, 56:11,
56:12, 56:25, 57:18,
60:16, 60:17, 60:19,
61:11, 61:12, 61:14,
62:20, 63:3, 63:9,
63:10, 63:20, 63:23,
64:15, 64:18, 64:20,
65:25, 66:8, 66:11,
66:19, 66:21, 66:24,
67:4, 68:24, 69:9,
69:12, 69:17, 69:20,
70:1, 70:16, 70:20,
71:2, 71:4, 71:6,
71:9, 71:11, 71:21,
72:9, 72:10, 72:18,
72:24, 74:6, 74:8,
74:14, 77:7, 77:9,
77:13, 77:15, 77:21,
78:25, 80:2, 80:7,
80:22, 81:6, 81:9,
81:24, 82:2, 82:4,
83:23, 83:24, 85:20,
85:22, 85:25, 86:3,
86:4, 87:22, 89:1,
89:16, 90:5, 90:7,
90:12, 90:20, 92:6,
92:13, 92:14, 93:1,
93:8, 94:3, 94:9,
94:18, 94:21, 95:12,
95:14, 95:15, 95:17,
95:19, 96:10, 97:1,
99:18, 99:21,
103:22, 104:4,
105:19, 105:24,
105:25, 106:11,
106:13, 107:12,
107:14, 107:19,
108:24, 109:3,
109:7, 111:3, 111:8,
111:19, 111:23,
112:8, 112:17,
112:25, 113:1,
113:8, 113:25,
114:2, 114:4,
114:19, 116:22
**Samsung's** [18] - 5:10,
6:18, 6:23, 16:4,
16:17, 47:16, 48:18,
49:1, 49:2, 49:14,
50:7, 53:13, 55:4,
66:6, 70:19, 92:4,
106:5, 113:7
**Samsung-branded** [1]

- 57:18
**Sasaki** [2] - 51:14,
51:16
**sat** [1] - 31:4
**satisfy** [1] - 8:7
**save** [2] - 75:17,
101:12
**saw** [5] - 25:24, 47:4,
60:7, 108:7, 115:21
**scheduled** [1] - 33:20
**scrambling** [1] - 43:6
**screen** [4] - 60:1,
83:1, 88:1, 99:5
**scroll** [5] - 83:16,
88:5, 88:8, 88:13,
103:23
**SEC** [1] - 47:17
**second** [20] - 16:18,
43:3, 44:18, 53:14,
60:17, 60:21, 66:24,
70:14, 75:25, 76:24,
78:3, 86:20, 91:17,
94:15, 99:9, 99:10,
103:5, 106:16,
111:9, 116:15
**secondly** [1] - 31:23
**Section** [2] - 5:14,
5:16
**section** [1] - 65:11
**secured** [3] - 37:15,
39:18, 39:19
**security** [1] - 41:25
**See** [1] - 20:17
**see** [72] - 14:17, 16:22,
17:17, 23:15, 23:17,
24:2, 24:15, 26:21,
29:5, 36:1, 40:9,
40:14, 41:17, 41:24,
42:7, 44:21, 45:7,
45:23, 46:9, 46:24,
51:17, 52:14, 53:6,
53:20, 55:9, 60:20,
61:25, 63:6, 63:17,
64:4, 65:4, 65:22,
66:16, 74:16, 76:19,
77:4, 77:25, 78:4,
78:9, 78:10, 78:18,
87:12, 87:14, 88:1,
88:2, 88:3, 88:10,
89:5, 90:8, 90:17,
91:14, 91:21, 92:1,
93:23, 93:24, 94:10,
94:19, 96:4, 102:13,
103:20, 105:9,
106:18, 106:22,
107:8, 113:25,
116:17, 116:18,
117:13, 117:21
**seeing** [2] - 9:8, 89:6
**seek** [8] - 31:1, 41:4,

44:10, 51:19, 54:18,
57:2, 59:12, 94:22
**seeking** [3] - 18:14,
35:1, 101:5
**seem** [10] - 15:24,
24:5, 27:23, 30:7,
32:9, 36:24, 40:13,
40:21, 114:4, 114:10
**sell** [3] - 14:4, 84:23,
84:25
**selling** [2] - 85:4,
85:21
**sells** [1] - 85:25
**send** [3] - 72:12,
72:16, 99:19
**sending** [1] - 39:14
**sends** [1] - 39:16
**sense** [3] - 30:7, 32:9,
114:24
**sent** [4] - 46:14, 47:15,
77:6, 96:10
**sentence** [7] - 5:12,
37:12, 46:7, 65:11,
76:25, 91:11, 94:15
**sentences** [2] - 103:7
**separate** [2] - 9:24,
10:16
**September** [7] - 33:11,
34:2, 34:12, 45:5,
63:21, 64:16, 64:21
**sequence** [1] - 70:23
**sequential** [2] - 26:16
**series** [7] - 15:17,
25:25, 26:21, 28:20,
91:8, 91:14, 117:16
**served** [1] - 113:17
**services** [1] - 65:20
**set** [3] - 46:1, 77:13,
92:12
**several** [2] - 28:19,
90:3
**SHIN** [2] - 4:23, 76:4
**Shin** [1] - 4:23
**ship** [20] - 12:6, 33:11,
33:19, 37:13, 37:15,
39:2, 39:16, 39:18,
39:19, 49:4, 50:9,
99:20, 100:8,
108:25, 109:3,
111:19, 111:23,
113:7, 113:9
**shipment** [6] - 35:15,
47:19, 71:11, 71:21,
92:13, 93:4
**shipped** [3] - 11:14,
11:19, 98:9
**shipping** [2] - 71:4,
114:5
**short** [3] - 25:7, 72:4,
91:10

**shorter** [1] - 25:24
**show** [19] - 13:25,
17:3, 19:11, 51:9,
82:18, 87:6, 88:25,
89:19, 97:6, 97:9,
97:13, 104:12,
112:4, 113:16,
114:3, 114:16,
114:20
**showed** [3] - 13:24,
88:25, 101:12
**showing** [2] - 78:14,
115:15
**shown** [1] - 89:20
**shows** [7] - 20:14,
21:11, 38:5, 64:23,
76:19, 89:7, 116:2
**side** [17] - 9:3, 11:2,
11:12, 18:13, 19:6,
19:14, 19:17, 19:25,
54:8, 63:16, 64:23,
66:6, 66:7, 73:25,
97:21, 97:22, 111:20
**sidebar** [1] - 110:21
**sides** [4] - 23:20,
29:13, 115:14,
115:18
**signed** [1] - 60:13
**significance** [1] - 40:6
**significant** [3] - 13:16,
82:16, 84:13
**signing** [3] - 60:12,
66:23, 82:2
**simply** [4] - 34:8, 66:8,
66:9, 92:3
**sit** [3] - 36:25, 78:18,
110:3
**situation** [4] - 74:4,
84:21, 95:11, 103:16
**situations** [4] - 73:17,
74:13, 74:20, 101:25
**six** [8] - 10:19, 35:6,
35:20, 36:17, 70:11,
70:15, 93:1, 100:9
**SKU** [2] - 99:11, 99:22
**Slide** [5] - 89:20,
89:25, 95:22, 95:25
**slide** [4] - 91:7, 95:24,
96:1, 96:4
**slightly** [5] - 14:22,
27:4, 85:18, 98:21,
107:22
**small** [2] - 65:12, 81:3
**sold** [1] - 74:5
**solely** [1] - 13:7
**someone** [2] - 84:22,
88:18
**sometimes** [1] - 29:17
**soon** [3] - 42:1, 53:4,
60:18

**Sorry** [1] - 91:18
**sorry** [30] - 16:11, 25:13, 26:22, 31:2, 32:16, 38:5, 42:8, 49:10, 56:1, 58:4, 64:10, 67:12, 74:2, 78:2, 80:17, 82:14, 86:14, 92:8, 94:6, 95:4, 97:11, 99:10, 99:11, 109:14, 111:7, 111:11, 111:15, 115:10
**sort** [4] - 17:25, 69:22, 95:6, 108:13
**sorts** [1] - 28:15
**sounds** [1] - 24:3
**South** [2] - 2:5, 2:15
**speaking** [3] - 98:8, 110:24, 110:25
**specific** [8] - 7:15, 15:6, 23:1, 25:18, 26:1, 26:4, 28:16, 33:16
**specifically** [3] - 6:16, 17:21, 35:9
**spend** [1] - 116:14
**spent** [1] - 23:5
**spike** [1] - 87:6
**spinning** [1] - 40:3
**spreadsheet** [5] - 47:22, 48:1, 57:9, 59:2, 60:7
**spreadsheets** [2] - 56:3, 59:9
**SS** [2] - 48:25, 52:5
**SSD** [9] - 33:22, 33:23, 48:25, 49:13, 50:6, 55:15, 55:17, 69:21, 70:2
**SSDs** [2] - 70:13, 77:14
**stand** [5] - 28:12, 28:14, 41:21, 42:9, 118:3
**standby** [1] - 108:9, 108:22
**standpoint** [1] - 27:17
**start** [5] - 47:13, 52:1, 62:4, 71:4, 101:23
**started** [1] - 42:7
**state** [1] - 4:7
**statement** [9] - 7:24, 17:7, 18:2, 39:11, 64:11, 64:25, 65:1, 69:7, 116:20
**stating** [5] - 47:17, 66:13, 94:14, 104:14, 105:14
**stay** [1] - 7:14
**step** [3] - 18:16, 71:10,

82:12
**Steve** [2] - 37:10, 37:11
**Steven** [6] - 30:3, 33:9, 33:17, 46:25, 47:14
**sticker** [3] - 67:15, 68:15, 83:4
**still** [12] - 5:8, 18:22, 28:6, 32:25, 34:3, 72:20, 73:1, 74:6, 78:21, 91:24, 105:12, 113:6
**stock** [2] - 103:9, 104:17
**straight** [1] - 98:23
**streamline** [1] - 6:4
**Street** [1] - 2:15
**strike** [7] - 71:17, 82:13, 92:17, 93:11, 93:12, 94:23, 94:24
**stuck** [1] - 19:4
**subject** [17] - 15:7, 44:13, 85:19, 107:23, 112:24, 113:14
**submit** [13] - 27:14, 27:15, 39:5, 40:25, 43:2, 43:14, 50:13, 51:7, 53:9, 72:20, 73:18, 74:6, 74:14
**submitted** [5] - 10:25, 75:14, 78:24, 87:22, 103:16
**submitting** [6] - 39:7, 53:9, 81:9, 81:11, 104:5, 111:2
**substance** [1] - 28:24
**substandard** [1] - 84:23
**substantially** [2] - 92:15, 93:9
**sufficient** [2] - 85:8, 111:21
**suggest** [1] - 31:11
**suggested** [1] - 39:9
**suggesting** [1] - 23:9
**suggestion** [3] - 13:9, 22:14, 34:7
**suggests** [1] - 34:4
**Suite** [1] - 2:17
**sums** [1] - 45:22
**supplement** [4] - 14:12, 15:1, 15:5, 15:9
**supplemental** [2] - 9:12, 15:17
**supplementals** [1] - 9:15
**supplemented** [4] -

7:8, 14:11, 14:21, 15:13
**supplied** [1] - 90:20
**supplier** [1] - 62:19
**supply** [6] - 6:21, 7:12, 7:16, 36:2, 79:12, 100:10
**support** [51] - 34:2, 34:19, 38:2, 39:20, 43:5, 43:8, 43:23, 49:3, 49:16, 49:20, 49:22, 49:25, 50:9, 50:20, 50:21, 51:3, 52:7, 52:22, 52:25, 53:2, 54:1, 54:16, 55:4, 55:8, 55:18, 55:20, 61:14, 66:25, 69:8, 69:13, 69:15, 69:18, 69:23, 70:19, 70:21, 71:8, 71:15, 74:21, 79:2, 81:24, 90:13, 90:14, 90:17, 94:18, 107:2, 107:3, 107:7, 107:12, 107:14, 116:22
**supported** [1] - 90:12
**supporting** [3] - 43:10, 55:5, 81:7
**supposed** [1] - 69:17
**surprise** [3] - 15:2, 115:18, 115:23
**sworn** [1] - 42:15
**system** [6] - 55:7, 56:24, 59:6, 59:7, 60:8, 97:19
**systems** [1] - 56:23
**Systems** [1] - 55:16

---

## T

**table** [3] - 45:16, 45:17, 45:21
**talks** [4] - 9:17, 35:9, 91:8, 99:10
**tax** [1] - 5:19
**team** [6] - 25:21, 52:5, 60:25, 61:7, 74:6, 101:22
**Technologies** [2] - 52:22, 53:2
**ten** [10] - 35:21, 36:4, 36:18, 36:23, 37:1, 39:21, 39:25, 40:5, 75:3, 114:19
**tend** [1] - 14:14
**tens** [1] - 21:19
**term** [1] - 66:2
**terminate** [1] - 30:10
**terminated** [1] - 36:7
**termination** [5] - 30:1,

30:17, 30:23, 31:8, 34:10
**terms** [39] - 9:2, 9:17, 9:23, 10:3, 10:15, 10:16, 11:12, 14:20, 14:21, 15:22, 18:16, 18:19, 23:1, 23:8, 29:13, 36:2, 40:3, 48:21, 50:16, 52:16, 53:23, 63:5, 63:8, 63:9, 63:12, 65:7, 65:18, 66:2, 66:9, 67:5, 70:23, 78:25, 81:1, 85:20, 103:21, 108:4, 108:6, 111:25
**Terms** [1] - 65:3
**testified** [8] - 42:16, 43:25, 60:23, 87:21, 96:4, 96:6, 100:13, 115:1
**testifies** [2] - 24:21, 110:5
**testify** [2] - 17:21, 29:1
**testifying** [1] - 87:5
**testimony** [28] - 6:10, 8:1, 21:7, 23:4, 23:17, 28:23, 36:12, 36:17, 37:20, 38:7, 51:3, 69:2, 78:20, 78:21, 80:15, 80:19, 81:1, 82:10, 85:3, 87:2, 87:21, 101:21, 109:25, 110:4, 110:6, 110:7
**THE** [159] - 4:5, 4:10, 4:13, 4:16, 4:19, 4:22, 4:25, 5:3, 5:5, 8:12, 8:17, 8:23, 8:25, 10:8, 11:9, 12:4, 12:12, 12:17, 13:6, 13:16, 14:6, 15:8, 15:19, 15:24, 17:6, 17:11, 17:13, 18:2, 18:6, 20:7, 22:1, 22:5, 23:13, 23:22, 23:24, 23:25, 24:14, 24:25, 25:5, 25:9, 26:1, 26:11, 26:20, 27:1, 27:16, 27:20, 28:1, 28:4, 28:15, 29:3, 29:21, 30:7, 30:20, 31:14, 32:9, 34:13, 34:17, 36:22, 38:11, 40:8, 40:21, 41:7, 41:9, 41:10, 41:11, 41:12, 41:14, 41:19, 41:21, 42:6, 43:21, 43:22, 44:12, 44:15, 47:7, 47:9, 51:21, 51:23,

54:19, 54:21, 57:4, 57:6, 59:14, 59:16, 59:23, 61:20, 62:8, 67:11, 67:14, 67:22, 68:5, 68:18, 71:19, 71:23, 71:24, 72:6, 73:7, 73:25, 74:2, 74:25, 75:5, 75:7, 75:22, 75:25, 76:5, 76:8, 76:10, 79:5, 82:22, 82:24, 83:2, 83:9, 86:24, 87:18, 89:22, 90:25, 91:1, 91:3, 92:19, 92:20, 93:12, 93:16, 93:18, 94:24, 95:3, 95:5, 95:9, 99:2, 102:5, 102:7, 102:23, 102:25, 103:2, 104:22, 104:24, 109:16, 109:19, 110:1, 110:16, 110:19, 110:23, 111:10, 111:13, 112:5, 112:13, 113:4, 113:24, 114:9, 115:5, 115:9, 115:25, 116:8, 116:11, 117:2, 117:4, 117:17, 117:21, 118:2, 118:3
**themselves** [4] - 36:16, 78:18, 98:2, 110:24
**theory** [2] - 5:16, 12:23
**therefore** [2] - 20:2, 112:23
**they've** [2] - 7:14, 23:19
**thinking** [2] - 95:3, 108:12
**thinks** [2] - 37:14, 39:17
**third** [1] - 86:20
**thousand** [5] - 17:20, 90:13, 90:14, 90:15, 90:17
**threats** [1] - 90:16
**three** [5] - 70:13, 70:14, 75:19, 76:10, 103:6
**three-month** [2] - 70:13, 70:14
**throughout** [2] - 10:4, 69:1
**throwing** [1] - 20:23
**thrust** [2] - 18:24, 18:25
**THURSDAY** [2] - 3:2,

4:1
**timeline** [2] - 14:20
**timing** [1] - 13:17, 36:22
**Timothy** [1] - 4:14
**tiny** [1] - 36:19
**today** [9] - 9:9, 9:24, 37:13, 39:16, 42:6, 52:12, 53:4, 78:19, 115:17
**together** [2] - 46:3, 66:22
**tomorrow** [1] - 109:4
**ton** [1] - 10:20
**took** [3] - 9:14, 15:1, 104:15
**top** [9] - 35:8, 39:12, 51:15, 55:1, 91:10, 91:23, 94:1, 104:8, 117:11
**topic** [1] - 89:16
**total** [2] - 45:22, 88:13
**toward** [1] - 9:23
**trace** [1] - 96:24
**track** [1] - 67:23
**tracks** [1] - 56:25
**trail** [2] - 51:17, 73:23
**transaction** [5] - 11:12, 13:11, 52:20, 55:14, 113:16
**transactions** [14] - 23:2, 23:6, 30:18, 30:20, 30:25, 31:25, 57:15, 61:1, 61:4, 61:6, 101:15, 112:23, 113:15, 113:22
**transcript** [2] - 25:9, 113:20
**transposition** [1] - 83:7
**trend** [2] - 89:12
**trends** [1] - 60:10
**trial** [16] - 9:22, 10:6, 12:16, 14:14, 15:10, 15:23, 22:21, 69:1, 96:20, 96:23, 97:18, 98:18, 101:21, 110:3, 113:18, 113:21
**tried** [4] - 13:10, 101:18, 115:20, 115:22
**trigger** [1] - 35:25
**true** [11] - 18:13, 21:3, 25:23, 37:21, 92:3, 92:10, 92:23, 94:12, 98:4, 105:11
**try** [14] - 6:4, 12:5, 21:16, 28:12, 33:14,

65:12, 65:16, 71:25, 80:25, 94:25, 95:7, 101:23, 117:24
**trying** [13] - 16:3, 41:14, 43:7, 45:25, 46:16, 52:21, 66:22, 69:23, 74:11, 101:16, 101:20, 106:11, 114:7
**turn** [8] - 44:1, 53:1, 54:10, 56:15, 58:24, 65:10, 67:11, 67:14
**turns** [1] - 22:8
**two** [7] - 8:2, 9:7, 33:18, 35:3, 61:2, 74:12, 103:7
**twofold** [1] - 9:4
**type** [4] - 86:11, 101:15, 108:4, 114:21
**types** [1] - 96:15
**typical** [5] - 29:18, 50:23, 50:25, 62:14, 62:16
**typically** [1] - 95:6

U

**ultimately** [3] - 35:16, 38:6, 103:18
**under** [4] - 29:22, 34:11, 52:24, 110:4
**underlying** [1] - 60:5
**underneath** [1] - 76:25
**understood** [6] - 40:23, 50:13, 107:10, 109:6, 109:23, 111:24
**unfortunately** [1] - 110:12
**unfulfilled** [5] - 16:15, 19:11, 19:13, 32:19, 101:13
**unilaterally** [1] - 53:10
**unique** [2] - 60:2, 77:8
**unit** [2] - 58:1, 58:6
**units** [7] - 62:22, 69:13, 69:14, 76:19, 77:25, 88:6, 109:3
**unless** [2] - 40:11, 51:7
**up** [47] - 8:15, 9:3, 9:6, 15:9, 16:15, 16:23, 17:17, 19:9, 20:2, 21:17, 22:1, 22:3, 22:22, 23:17, 24:2, 24:15, 25:4, 25:17, 29:14, 32:24, 32:25, 35:12, 39:23, 40:10,

40:15, 41:7, 42:9, 42:12, 46:17, 47:23, 55:25, 65:13, 72:2, 75:7, 82:13, 87:6, 92:21, 95:1, 95:8, 98:18, 100:20, 100:23, 101:10, 104:20, 106:5, 110:11
**update** [2] - 41:11, 52:9
**updated** [2] - 39:5, 52:9
**ups** [1] - 17:18
**uses** [2] - 62:14, 62:17

V

**valid** [1] - 19:13
**value** [1] - 36:18
**variation** [1] - 56:9
**various** [6] - 30:4, 54:14, 57:10, 64:24, 65:7, 101:12
**vein** [1] - 54:10
**verify** [2] - 89:11, 96:1
**version** [3] - 7:6, 48:5, 67:16
**versions** [1] - 68:9
**video** [4] - 25:5, 25:7, 109:25, 110:9
**view** [2] - 6:14, 29:19
**violation** [1] - 7:4
**volition** [1] - 20:1
**VOLUME** [1] - 3:3
**voluntary** [1] - 20:5
**VP** [1] - 52:3
**vs** [1] - 4:6

W

**wait** [2] - 23:17, 71:6
**waited** [1] - 31:16
**waiting** [3] - 23:23, 31:22, 115:13
**wants** [4] - 24:23, 38:1, 69:18, 83:24
**Washington** [1] - 2:8
**week** [4] - 33:24, 37:13, 39:16, 85:13
**weeks** [1] - 10:20
**welcome** [2] - 42:6, 52:11
**whole** [6] - 16:6, 37:19, 103:20, 104:9, 104:12
**widely** [1] - 107:16
**willing** [3] - 32:6, 39:10, 103:17
**witness** [15] - 27:4,

27:8, 28:11, 29:4, 29:6, 42:9, 42:15, 67:20, 71:19, 73:12, 93:12, 110:5, 114:18, 115:1
**WITNESS** [8] - 3:7, 43:22, 71:23, 72:6, 74:2, 92:19, 95:3, 95:9
**witness's** [1] - 67:16
**WITNESSES** [1] - 3:5
**witnesses** [2] - 25:17, 110:3
**WOLPERT** [1] - 2:11
**wondered** [1] - 24:23
**wondering** [1] - 83:5
**word** [2] - 88:16, 88:19
**words** [6] - 5:11, 12:24, 32:1, 39:19, 58:14, 65:21
**works** [2] - 11:13, 104:4
**world** [2] - 18:22, 99:16
**worried** [5] - 103:8, 104:4, 104:5, 104:14, 104:16
**worry** [2] - 103:9, 103:10
**worth** [7] - 21:6, 43:11, 81:21, 81:24, 87:13, 89:6, 109:6
**write** [8] - 103:7, 103:8, 103:14, 105:6, 107:6, 107:18, 107:19
**writes** [9] - 33:21, 33:23, 37:10, 45:3, 46:8, 52:9, 53:17, 77:3, 94:8
**writing** [7] - 37:10, 55:1, 55:6, 91:24, 103:11, 103:13, 107:13
**wrote** [1] - 107:17

Y

**year** [5] - 31:22, 39:7, 69:6, 70:9, 99:12
**yellow** [1] - 26:21
**yesterday** [12] - 6:5, 19:1, 42:13, 42:22, 43:14, 44:14, 44:23, 54:5, 55:25, 56:3, 89:24, 115:22
**Yoder** [1] - 5:1
**YODER** [2] - 2:17, 5:1
**Yoo** [1] - 74:21

**yourself** [1] - 54:14
**Yu** [7] - 30:3, 33:9, 33:10, 33:23, 39:4, 46:25

Z

**Zebra** [3] - 52:21, 53:2, 53:24
**zero** [5] - 43:4, 45:13, 46:16, 60:18
**zoom** [1] - 47:24
**zooming** [1] - 50:16