1           UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

4

5   NETLIST, INC., a Delaware            )
    corporation,                         )
6                                        ) CASE NO.
                     Plaintiff,          ) 20-CV-993-MCS
7                                        )
           vs.                           )
8                                        )
    SAMSUNG ELECTRONICS CO., LTD., a     )
9   Korean corporation,                  )
                                         )
10                   Defendant.          )
    _____)
11

12

13

14         REPORTER'S TRANSCRIPT OF JURY TRIAL

15               **DAY 3 – VOLUME V**

16            FRIDAY, DECEMBER 3, 2021

17                  8:39 A.M.

18            LOS ANGELES, CALIFORNIA

19

20

21

22   _____

23          MAREA WOOLRICH, CSR 12698, CCRR
          FEDERAL OFFICIAL COURT REPORTER
          350 WEST FIRST STREET, SUITE 4311
24         LOS ANGELES, CALIFORNIA 90012
             mareawoolrich@aol.com

25

                  **UNITED STATES DISTRICT COURT**

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR PLAINTIFF:**

4        GIBSON, DUNN & CRUTCHER LLP
         BY:  RICHARD DOREN
5        BY:  JASON LO
         BY:  RAYMOND LAMAGNA
6        333 South Grand Avenue
         Los Angeles, CA 90071
7

8
     **FOR DEFENDANT:**
9
         BIRD, MARELLA, BOXER, WOLPERT,
10       NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
         BY:  EKWAN RHOW
11       1875 Century Park East, 23rd Floor
         Los Angeles, CA 90067
12
         O'MELVENY & MYERS LLP
13       BY:  MARC FEINSTEIN
         400 South Hope Street, 18th Floor
14       Los Angeles, CA 90071

15       O'MELVENY & MYERS LLP
         BY:  MICHAEL YODER
16       610 Newport Center Drive, Suite 1700
         Newport Beach, CA 92660
17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **I N D E X**

2              FRIDAY, DECEMBER 3, 2021

3    **VOLUME V**

4        --------------------------------------------------------

5            **CHRONOLOGICAL INDEX OF WITNESSES**

6

7
     **WITNESS**                                              **PAGE**
8

9    NEAL KNUTH
          DIRECT EXAMINATION BY MR. RHOW                      28
10         CROSS-EXAMINATION BY MR. DOREN                      32
          REDIRECT EXAMINATION BY MR. RHOW                   107
11         RECROSS-EXAMINATION BY MR. DOREN                   112

12   GAIL SASAKI
          CROSS-EXAMINATION BY MR. FEINSTEIN                 115
13         REDIRECT EXAMINATION BY MR. DOREN                  120

14

15       --------------------------------------------------------

16               **INDEX OF EXHIBITS**

17
                 RECEIVED INTO EVIDENCE
18

19   Exhibit No. 7                                            47
     Exhibit No. 29                                           40
20   Exhibit No. 141                                          93
     Exhibit No. 144                                          74
21   Exhibit No. 149                                          98
     Exhibit No. 251                                         101
22   Exhibit No. 257                                          60
     Exhibit No. 260                                          83
23   Exhibit No. 357                                          37
     Exhibit No. 497                                          35
24   Exhibit No. 510                                          97
     Exhibit No. 1020                                        117
25   Exhibit No. 1224                                        116

**UNITED STATES DISTRICT COURT**

1          LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 3, 2021

2                          8:39 A.M.

3                          -oOo-

4

5          THE COURTROOM DEPUTY:  Calling Item No. 1,

6  SA CV-20-993, Netlist, Inc. vs. Samsung Electronics Co. LTD.

7          Counsel, state your appearances, please.

8          MR. DOREN:  Good morning, Your Honor.  Richard Doren

9  for Netlist.

10          THE COURT:  Good morning.

11          MR. LO:  Good morning, Your Honor.  Jason Lo for

12  Netlist.

13          THE COURT:  Good morning.

14          MR. LAMAGNA:  Good morning, Your Honor.  Ray LaMagna

15  for Netlist.

16          THE COURT:  Good morning.

17          MR. HONG:  Good morning, Your Honor.  Chuck Hong for

18  Netlist.

19          THE COURT:  Good morning.

20          MR. RHOW:  Good morning, Your Honor.  Ekwan Rhow on

21  behalf of Samsung.

22          THE COURT:  Good morning.

23          MS. SHIN:  Good morning.  Kate Shin on behalf of

24  Samsung.

25          THE COURT:  Good morning.

1          MR. YODER:  Good morning, Your Honor.  Michael

2     Yoder, also for Samsung.

3          THE COURT:  Good morning.

4          MR. FEINSTEIN:  Good morning, Your Honor.  Marc

5     Feinstein, also for Samsung.

6          THE COURT:  Good morning.

7          MR. KNUTH:  Good morning.  Neal Knuth, also for

8     Samsung.

9          THE COURT:  Okay.  I wanted to talk a little about

10    some jury instructions issues, but I understand the parties

11    have an evidentiary issue they want to present this morning?

12          MR. FEINSTEIN:  Yes, Your Honor.  There are two

13    exhibits, trial exhibits, that we would like to move into

14    evidence.  Netlist has objected to them.

15          If you'd like -- these are both admissions by

16    Netlist that have already been authenticated.  If you'd like, I

17    can hand them up to you.

18          THE COURT:  Please, thanks.

19          MR. FEINSTEIN:  So, Your Honor, I handed up to you

20    Exhibit 1020 and Exhibit 1224.  Exhibit 1020 is a Form 10-Q for

21    Netlist for the period ending September 30th, 2017.

22          As I say, Netlist has already authenticated this

23    exhibit.  They don't object on authenticity grounds; only on

24    relevance and 401 and 403 grounds.

25          We are offering it, actually, just for one

1    statement, which is on page 33.  And I'm just going to read

2    from the very first sentence at the top of the page where it

3    says, "With respect to" -- "With respect to sales of our memory

4    subsystems, our original equipment manufacturer OEM customers

5    typically provide us with nonbinding forecasts of future

6    product demand over specific periods of time, but they

7    generally place orders with us no more than two weeks in

8    advance of the desired delivery date."

9           We are just offering this just as evidence that

10   forecasts are forecasts of future product demand and they are

11   not binding.

12          You know, this is a -- an official public, you know,

13   financial report that was signed by Mr. Hong as well as the CFO

14   Gail Sasaki.

15          THE COURT:  Okay.  And so that's the only part that

16   you want to show the jury?

17          MR. FEINSTEIN:  That's correct, Your Honor.

18          THE COURT:  Okay.  So let's talk about 1224.

19          MR. FEINSTEIN:  Okay.  And 1224 is -- it's an email

20   from Ms. Sasaki, again, the CFO, to a Dong-Su Kim of Samsung,

21   June 7th, 2016, with an attachment to it.

22          The only part of this that we are interested in

23   actually using in the case is the first sentence of the email

24   where it says, "Without a Samsung credit line, we would not

25   have sufficient cash to conduct this business for the short end

1   midterm."

2          THE COURT:  And that's relevant to your damages

3   theory that Samsung -- or I'm sorry -- that Netlist needed a

4   credit line in order to be able to buy the chips in the first

5   place, and if they didn't have it, they couldn't claim damages

6   for not being able to get allocations; is that correct?

7          MR. FEINSTEIN:  No, not to get allocations.  Not to

8   be able to complete the purchases of the chips.  Nothing to do

9   with allocation.  That has been excluded.

10          This is only about the issue of causation where we

11   are seeking to show and argue that given the allocation,

12   Netlist didn't have the financial ability, the cash, to

13   actually complete the purchases from Samsung.

14          We've already put into evidence, we've gotten

15   admissions, and Mr. Rowe will argue that there was only

16   a 200,000 or -- there was a minimum credit that was available

17   from Samsung.  So they would have to get cash to make these

18   purchases.

19          You've heard evidence from P. K. Hong yesterday that

20   they were seeking to purchase 4 million or $5 million a month

21   versus a credit limit that was in the low hundreds of

22   thousands.  So they would have had to come up with cash.

23          By the way, Samsung didn't even have an obligation

24   to sell these to them on credit under the JDLA.  Zero

25   obligation to do that.  And they could have just withdrawn that

1  credit.

2         But in any event, they would have had to come up

3  with cash.  And this is evidence that, at least it's an

4  admission, that they did not have the cash to do it.

5         And I should point out we were planning to call --

6  excuse me -- Netlist had Ms. Sasaki on their witness list.

7  They were going to call her as of yesterday.  They didn't

8  actually indicate to us that they had withdrawn her.  They just

9  simply did not call her.

10        And so, I mean, we can either offer these into

11 evidence, or we can call Mr. Hong, who we can also ask about

12 both of these documents, because he signed the 10-Q, and he's

13 also familiar with the fact that Ms. Sasaki is the chief

14 financial officer of this company and familiar with its -- its

15 credit.  Or we could call Ms. Sasaki.

16        But we thought we would shortcut this by simply

17 offering these into evidence.

18        THE COURT:  And who did this email from Ms. Sasaki

19 go to?

20        MR. FEINSTEIN:  Somebody in credit at Samsung.

21        THE COURT:  Okay.  So nobody that's -- that received

22 this email has testified; correct?

23        MR. FEINSTEIN:  Correct.

24        THE COURT:  Okay.  And this is -- I mean, the

25 evidence so far was that -- I think Samsung put on evidence, or

1    at least argued, that Netlist needed the credit limit in order

2    to purchase the chips.  And then Samsung -- a Netlist witness

3    testified that they never had a problem securing cash, and

4    they've never -- they've never had a problem being able to, you

5    know, come up with the money they need to buy chips.

6              MR. FEINSTEIN:  That's a disputed issue of fact.

7              THE COURT:  And so this is evidence that without the

8    credit line, they wouldn't have sufficient cash to conduct

9    their business?

10             MR. FEINSTEIN:  Correct.

11             THE COURT:  Okay.  Let me hear from Netlist counsel.

12             Mr. Doren?

13             MR. DOREN:  Thank you, Your Honor.  Good morning.

14             I think the extensive rhetoric around what these

15   documents mean to Netlist's case highlights the problem.

16   Mr. Hong was on the stand for an extended period on the first

17   day of trial.  He's the CEO of the company.

18             The cross-examination went beyond the scope of the

19   direct because he was on both parties' lists.  He's been

20   called, he's testified, now he's off the stand.  He could have

21   been asked about the 10-K, he wasn't.

22             Now to simply submit it without any testimony,

23   without any response from a witness so that it can be argued

24   off of, is prejudicial, and I would suggest also contrary to

25   the Rules of Evidence.

1           As to Ms. Sasaki, when Netlist suggested that the

2    tax issue be reserved and not be decided by the jury, that

3    eliminated our need to call Ms. Sasaki.  And we were not

4    notified by Netlist that they needed her as a witness or that

5    they intended to call her.  I'm sorry.  You can tell it's the

6    last day of trial.  That Samsung intended to call her.

7           And, Your Honor, so once again we have a document

8    where we've heard what extensive argument on the meaning of

9    this document is to the jury without a sponsoring witness and

10   without any explanation.

11          And I point out further, Your Honor, that this is

12   from June 7, 2016, a year before the breach -- breaches, or

13   almost a year before the breach began.

14          And again, while -- and there's nothing, no evidence

15   in the record, that any payment was not -- or excuse me -- that

16   any shipment was not ultimately paid for.  And that -- or that

17   Netlist lacked any amount of cash or credit it needed in order

18   to grow this business from June 2016 into the spring of 2017.

19          So it's -- these documents should not be admitted

20   without a sponsoring witness, and it's too late for there to be

21   one.

22          THE COURT:  With respect to the June 7, 2016 email,

23   are there damages sought from this time period?

24          MR. DOREN:  No, Your Honor.

25          THE COURT:  And remind me again.  When did the

```
 1   damages start?

 2           MR. DOREN:  Our damage period begins in April 2017

 3   through July 15th, 2020.

 4           THE COURT:  And getting back to the 10-K, this is

 5   the issue of forecast from customers being nonbinding.  Remind

 6   me.  Was that discussed in the testimony?  I think it was;

 7   right?

 8           MR. DOREN:  I believe it was, Your Honor.  I believe

 9   that Mr. Paik Ki said that when you make a forecast to Samsung,

10   Samsung is not bound by that forecast, but it becomes -- but

11   they -- that Netlist considers itself bound to purchase the

12   products that are approved by Samsung, and then upon Samsung's

13   approval of a forecast, then Samsung is bound.

14           I believe that's the gist of the testimony.

15           THE COURT:  But the 10-K is referring to Netlist

16   customer's forecast; correct?

17           MR. DOREN:  Yes, Your Honor.

18           THE COURT:  And has there been -- I believe there

19   was some questions about Netlist customer forecasts and whether

20   they were binding.

21           MR. DOREN:  There was, Your Honor.

22           THE COURT:  And what was -- do you recall the gist

23   of that testimony?

24           MR. DOREN:  Yeah, Your Honor, I think it was

25   equivocal, some were and some were not.
```

1          THE COURT:  That's what I recall, as well.

2          Let me ask Mr. Feinstein on these points.  With

3   respect to the June 7, 2016 email, I think I agree that there

4   needs to be a witness that can testify to this, so both sides

5   have an opportunity to present their interpretation of the

6   email, particularly with respect to the timing.

7          So I think the implication you'd be making is that

8   this issue existed in June 7th of 2016, and it, you know,

9   likely continued through April 2017 and beyond.

10          And I think through cross-examination, to be fair,

11   Counsel ought to be able to make the converse argument, that

12   that wasn't there.  So if you can have a sponsoring witness,

13   then we can discuss whether this comes in.

14          With respect to the 10-K, the -- again, I wonder

15   whether there's a witness that can testify to this statement,

16   because I think that the prior testimony was a little equivocal

17   on that.  And I'm wondering whether, again, having a witness on

18   the stand might help both sides be able to put forward their

19   interpretation.

20          Remind me what page it's on again.

21          MR. FEINSTEIN:  Page 33.

22          THE COURT:  33.

23          "With respect to sales of our memory subsystems, our

24   OEM customers typically provide us with nonbinding forecasts of

25   future product demand over specific time periods."

 1          So, you know, here we have "typically provide us

 2  with nonbinding forecasts."  So it seems somewhat equivocal in

 3  that I guess this is consistent with the testimony that

 4  sometimes they are binding; sometimes they are not.  Maybe more

 5  often than not they are nonbinding.

 6          But again, because of the equivocal nature of it, I

 7  think there ought to be a witness to discuss this with before

 8  it just comes into evidence.

 9          MR. FEINSTEIN:  And just to be clear, I think what

10  it means -- it means that they typically provide us forecasts.

11  Those forecasts are nonbinding.

12          THE COURT:  I see.

13          MR. FEINSTEIN:  That's how I would read it,

14  Your Honor.  It's not like no forecast is binding, period.  But

15  that's kind of, you know, that may be a disputed issue, but

16  it's also a matter of common sense.

17          In terms of witnesses, we could either have

18  Ms. Sasaki come or Mr. Hong.

19          By the way, Mr. Hong did not testify about credit or

20  forecasts.  So it didn't come up in his direct examination.  So

21  as a result, it wasn't raised otherwise.

22          So we would like to call Ms. Sasaki at some point

23  then today.  She was on our witness list.

24          THE COURT:  Okay.

25          MR. FEINSTEIN:  And she was on our witness list, and

```
 1    she's been here every day, as I recall.

 2              MR. DOREN:  We will check on her availability, and I

 3    believe we can make her available.

 4              THE COURT:  Okay.  Great.  Thanks.

 5              Okay.  Let's talk briefly about jury instructions.

 6    These are the Court's preliminary views on these.

 7              The parties agreed that there are some duplicative

 8    instructions that have already been read that should be reread

 9    prior to closing.  I don't know that we need to do that a

10    second time.  That's instructions 25 through 31.  The jury is

11    going to have a copy of those.

12              The parties included an instruction on evidence in

13    electronic form.  As the courtroom deputy has reminded you all,

14    the jury will not have access to a computer in the jury room.

15    So we won't be reading that instruction.

16              The parties included an instruction on readback or

17    play back and a post-discharge instruction.  And an instruction

18    to be read at the beginning of each day.  And those will not be

19    read.

20              The parties included instructions on the use of

21    interrogatories and RFAs.

22              Do the parties anticipate evidence via

23    interrogatories or RFAs?

24              MR. DOREN:  Not at this time, Your Honor.

25              MR. RHOW:  No, Your Honor.
```

1          THE COURT:  If there's no evidence, that won't come

2     in.

3          The Court took Netlist's proposed instruction on

4     impeachment evidence under advisement.  Was there any

5     impeachment testimony justifying the reading of this

6     instruction?

7          The instruction reads, "The evidence that

8     [a witness] may be considered along with other evidence in

9     deciding whether or not to believe the witness and how much

10    weight to give to the testimony of the witness and for no other

11    purpose."

12         I don't know that we've got an impeachment situation

13    here.  I know there's been some readback of deposition

14    testimony, but I don't know that that rises to the level we

15    need this instruction.

16         What are the parties' views?

17         MR. DOREN:  We agree with Your Honor.

18         MR. RHOW:  Your Honor, we are fine with that, too.

19         THE COURT:  The Court told the parties it would read

20    statements of law provided in the commentary to New York

21    Pattern Jury Instruction 420 that was agreed to by the parties,

22    and that the substantive modifications to the commentary text

23    would not be permitted.  So we were just going to go with the

24    commentary text.

25         The parties agreed upon damages instruction provides

1 the following statement of law that does not appear in the

2 commentary to the pattern instruction.  "After a breach of

3 contract for sale of goods, plaintiff may recover the

4 difference between the price that plaintiff would have paid to

5 defendant for the goods had defendant sold them to plaintiff

6 according to the contract and any higher price that plaintiff

7 instead had to pay to a third-party for the goods that

8 defendant failed to supply to the plaintiff."

9    What's the source of that instruction and why isn't

10 the commentary to the pattern instructions sufficient?

11    MR. DOREN:  Your Honor, we don't believe we need the

12 additional language.

13    MR. YODER:  Your Honor, I would say that I don't

14 know -- I don't have a packet of the instructions the Court is

15 planning to give.  So I'll make that qualification, because if

16 there is something in there that I'm missing, I apologize.

17    But I think the genesis of this instruction that the

18 parties agreed to the language was that you needed to instruct

19 the jury on cover damages.  They needed to have some guidance

20 as to what cover damages are from the Court since it's a legal

21 issue, as opposed to just hearing it from the witnesses.

22    There may not be any dispute amongst the witnesses

23 or the parties as to what cover damages are, but I do think

24 it's important that they hear from the Court as to what cover

25 damages are under the law.

```
 1              And as I think we talked a bit about when we had our
 2    conference on jury instructions, you know, the New York Pattern
 3    Instructions are just not as thorough as California.  And so
 4    there are gaps.  And sometimes you'll find language in the
 5    commentary that might fill those gaps, and sometimes you might
 6    not.
 7              But I believe the language the parties had agreed to
 8    comes from New York case law that defines what cover damages
 9    are.
10              MR. DOREN:  Your Honor?
11              THE COURT:  Did you have something to add?
12              MR. YODER:  The UCC was also considered, I think, in
13    drafting it, but my understanding really is that there's case
14    law that really sets this forth.
15              THE COURT:  And there's been no citation, though, to
16    the New York case law that this comes from; is that right?
17              MR. YODER:  I believe that when it was submitted,
18    maybe initially when the parties were meeting and conferring.
19    I don't have that in front of me.  We can try to track it down.
20    There certainly will be a UCC site, and I believe there's
21    additional cites, as well, but I don't know that for certain.
22    We would have to look.
23              THE COURT:  I'm sorry.  Mr. Doren?
24              MR. DOREN:  That's fine, Your Honor.  I apologize.
25              Looking at the submission, Your Honor, there is no
```

1    authority cited for that.

2         When that language was proposed by Netlist

3    originally, we acceded to the request, if you will.  But --

4    sorry.  Sorry.  Samsung proposed it.  I will stop doing that

5    before the jury gets here.

6         THE COURT:  Last day of trial, right?

7         MR. DOREN:  We acceded to the request.

8         But I need not tell the Court that the standard

9    practice is to use form instructions as presented for exactly

10   actually the reason that they are form instructions.  And we

11   don't think the language is necessary, given the Court's

12   concern and interest in it.

13        MR. YODER:  And I would say this, Your Honor, I

14   believe this language was actually proposed by Netlist, as well

15   as Samsung.

16        We had a meet and confer, and we agreed to it.  I

17   understand they are now backing out of that agreement.  I don't

18   think at this point in time in trial that's fair, quite

19   frankly.

20        But I would also say there are often times, as

21   Your Honor knows, where you may not have a form instruction

22   that covers all of the legal concepts that the jury needs to be

23   instructed to.

24        And I don't see how this jury can be asked to do

25   their job if the Court doesn't instruct them on what cover

```
 1   damages are.

 2          MR. DOREN:  I think Your Honor understands the

 3   nature of the discussions around this, the meet and confer

 4   process, the fact this was proposed by Samsung, and we

 5   acknowledged their request.

 6          But given where we are at this point in the trial,

 7   given the Court's issue, and given that it is a form

 8   instruction, we don't think it's necessary.

 9          MR. RHOW:  Your Honor, briefly?  And I apologize, I

10   was trying to get -- so this is in the commentary, this

11   statement right here.  As to damages for breach of contract to

12   sell goods, see UCC 2-708 to 2-715.  That instruction you have

13   is contained within UC --

14          THE COURT:  Okay.  Thank you.  I'll go back and look

15   at this as to whether or not we need it.

16          Mr. Doren, you don't believe this is an incorrect

17   statement of law, do you?

18          MR. DOREN:  Your Honor, I'm not in a position to

19   opine on that.

20          THE COURT:  Thank you.

21          MR. YODER:  There's one other item, Your Honor,

22   before we get to Mr. Kidder.  I don't know if we want to do it

23   now.

24          But before he gets on the stand, Netlist did

25   object to certain of the demonstratives that we plan to use
```

1   with him.  So I do think it would be important to try to

2   resolve those ahead of time.

3               THE COURT:  Okay.  What's the -- do we have the

4   jurors?

5               THE COURTROOM DEPUTY:  Yes.

6               THE COURT:  Can we spend a couple minutes doing it

7   quickly?  I don't want to keep the jurors waiting.

8               MR. YODER:  Absolutely, Your Honor.

9               May I approach?  And I have the demonstratives,

10  and I numbered the ones that they objected to.

11              THE COURT:  Okay.  So let's look at 5.

12              MR. YODER:  Yes, Your Honor.

13              And the objections they made were essentially that

14  it's outside the scope, and that it wasn't included in

15  Mr. Kidder's report.

16              And 5 is simply, as you'll see, an example of

17  cover damages that Mr. Kidder did address.  He didn't use this

18  particular graphic, but I'll note for the Court Dr. Akemann

19  used graphics that weren't in his report, either.  It's common

20  practice.  But this was a concept that was covered.  They had

21  every opportunity to ask him questions about it in his

22  deposition, and he ought to be able to use this as a

23  demonstrative.

24              To be clear, we are not seeking to admit any of

25  these as exhibits.  They are simply illustrations to aid in his

 1   testimony.

 2              THE COURT:  What's the objection to Demonstrative 5?

 3              MR. LO:  Yeah, and it's the same issue with several

 4   of these.  Mr. Kidder was very clear in his report and his

 5   deposition that he did not opine on cover damages.  He has no

 6   alternative damages of his own.

 7              All he does is he takes the specific things that

 8   Dr. Akemann did, the 90-day window, the volume control, and

 9   things like that, and say, "I'm going to" -- my paraphrasing --

10   nitpick at those specific issues.

11              He doesn't offer any broad opinions on what cover

12   damages are and what they are.  And for him to come in now and

13   suggest that he's actually had opinions on whether harm

14   occurred and the quantification of the harm, that's

15   inappropriate because we tried to depose him on both of those

16   issues.

17              THE COURT:  So your argument is that in his report,

18   he doesn't discuss what cover damages are?

19              MR. LO:  He does -- he has no opinions on cover

20   damages.  He may acknowledge what they are, but he offers no

21   opinion on what cover damages are.

22              MR. YODER:  And he does that, Your Honor, as a

23   predicate to then analyzing Dr. Akemann's opinion on cover

24   damages.

25              So even though he didn't try to quantify them or

1  calculate them, the starting point are what are cover

2  damages and --

3          THE COURT:  Right.  I mean, so he's not talking

4  about what the cover damages are, but does he at least in his

5  report explain what cover damages are?

6          MR. YODER:  Yes, Your Honor, and it came up in the

7  deposition too.  Just the concept of it.

8          MR. LO:  I'm sorry.  What paragraph?

9          MR. YODER:  I don't know what the paragraph is, but

10 it was the predicate to the analysis or the critique of

11 Dr. Akemann's opinion, what cover damages are.  It's the

12 difference between what you have to pay to get the cover goods

13 versus what the contract price was.

14          THE COURT:  I think 5 is pretty innocuous because

15 it's just an example of what cover damages are, and I think

16 it's consistent with how the parties have discussed them.

17          So let's move on to 14.

18          MR. YODER:  14 and 15, again, same objection.  They

19 say it's beyond the scope.

20          I will say, Your Honor, the data that shows on

21 this slide is a chart that is actually in the report at page

22 25.  It's the same data on Slides 12 and 13 to which Netlist

23 does not object.  All that was done was to add a title and some

24 descriptions to help in the explanation of this slide, similar

25 to what Dr. Akemann did on many of his slides.

1          MR. LO:  No issues with the title.

2              The issue on 14 is the description down below that

3     they should be determined by the price one day prior.  And on

4     the next one, they calculate it using a 180-day window.

5              We have no issue with the chart.  The issue is

6     that he did not -- Dr. Kidder -- Mr. Kidder, did not take a

7     position on what the right way do it.  He just said that the

8     way that Dr. Akemann did it is incorrect.

9              And certainly for 14, now he seems to be taking a

10    position that cover price should have been determined by the

11    Samsung price one day prior.

12         THE COURT:  And does that opinion, cover price

13    should have been determined by Samsung -- by the Samsung price

14    one day prior, does that appear in his report?

15         MR. YODER:  In his report he does -- and I can try

16    to find specific -- but he does talk about -- and it was asked

17    in his deposition, that if you are using Dr. Akemann's

18    methodology, that transactions closer to the reseller purchase

19    date would be far more relevant than transactions longer out.

20              And in one of the other slides they object to--

21         THE COURT:  This looks like a pretty clear opinion

22    that price should have been determined by the Samsung price one

23    day prior.

24              Is that --

25         MR. YODER:  Your Honor, we can delete the red bar on

1   both of them.  I don't think that matters, quite frankly.

2            THE COURT:  Does that solve your problem?

3            MR. LO:  That does solve the problem on the

4   demonstrative.

5            THE COURT:  Okay.  So let's turn to 16.

6            MR. YODER:  16 and 17, in his deposition, Mr. Kidder

7   showed up, and right at the beginning said, "There is something

8   that I didn't cover in my report I want to cover."  And that is

9   that many of these matched transactions that Dr. Akemann is

10  relying upon, actually show that the product was actually

11  purchased from a reseller for less -- for more than what it was

12  purchased from Samsung.  I mean, the other way.  Less.  So this

13  negative price premium that he talked about.   And that's at

14  page 10 to 12 of the deposition.

15           And then at pages 215 to 219, he is questioned about

16  that opinion.  And he specifically described how he determined

17  that.  He specifically described that about a third of these

18  matched transactions were actually negative price premiums.

19  All of that was discussed.

20             This is simply taking what he explained using

21  Dr. Akemann's data points and illustrating what he discussed

22  and what he was questioned about in his deposition.

23           THE COURT:  Okay.  Was this proper subject of the

24  deposition testimony?

25           MR. LO:  He was deposed on the matter.  Different

1    courts take different views.  When Dr. Akemann files his report

2    and Dr. Kidder comes after, I know a lot of courts give leeway

3    for the first expert to then respond to the second expert in a

4    deposition.

5            This is the opposite order.  Mr. Kidder came

6    second, and then he added something into his deposition, and

7    he'd never supplemented his report.

8            MR. YODER:  Your Honor, I would say there's no

9    requirement to.  It's a question of disclosure, and there was

10   fair disclosure.  They knew what the opinion was.  They had

11   Dr. Akemann if they wanted him to respond to it, and he could

12   have responded to it.

13           THE COURT:  So these are essentially opinions that

14   weren't in the report but discussed at the deposition.  And the

15   question really is whose obligation was it to address it prior

16   to now?

17           This issue, I guess, could have been raised via a

18   motion in limine, right?  Or a pretrial motion.  I'm -- what's

19   the -- so this issue of reseller prices being less than the

20   Samsung price, your contention is that it wasn't addressed in

21   the report; correct?

22           MR. LO:  That is correct.

23           And to be clear, it's not something that we asked

24   him about in the deposition and then it became a natural

25   conversation.  He came in.  He clearly had it in his mind.

1   Nobody informed us in advance of the deposition of this topic

2   and kind of blurted it out there, and left it to us to

3   immediately ask some questions about it.

4          MR. YODER:  Well, I don't think that's a fair

5   characterization, Your Honor.

6          And I think they did question Mr. Kidder about

7   this at the deposition.  They had every opportunity to.  And he

8   as Your Honor noted, they never raised it until last night,

9   late last night.

10          THE COURT:  Yeah.  I'm going to allow this in

11  because I think that the parties have had an opportunity to

12  examine the witness about it.

13          Is that also -- what about 18?

14          MR. YODER:  18 comes from Mr. Kidder's report at

15  page 18.

16          THE COURT:  Okay.

17          MR. YODER:  The only addition is the title, and then

18  the bar that says "more relevant comparisons."

19          MR. LO:  The bar is what we object to.  Again he

20  just, in his deposition --

21          MR. YODER:  Your Honor, we'll take the bar out.

22  It's not necessary.

23          THE COURT:  Okay.  Let's get the jury in.

24          (In the presence of the jury.)

25          THE COURT:  Good morning, jurors.  Welcome back.

1    Please have a seat.

2              It's the last day of trial.  Thanks all for your

3    willingness to serve and to pay such close attention.  The

4    parties really appreciate it.  We will get started right away

5    since you are here.

6              So I'll ask counsel to call their next witness.

7              MR. RHOW:  Thank you, Your Honor.  Samsung would

8    like to call Mr. Neal Knuth.

9              THE COURTROOM DEPUTY:  Please raise your right hand.

10   Right hand.

11             Do you solemnly swear that the testimony you shall

12   give in the cause now before this Court shall be the truth, the

13   whole truth, and nothing but the truth, so help you God?

14             THE WITNESS:  I do.

15             THE COURTROOM DEPUTY:  Please be seated.

16             Will you please state and spell your full name for

17   the record.

18             THE WITNESS:  Neal Knuth.  N-e-a-l, K n-u-t-h.

19             THE COURTROOM DEPUTY:  Thank you.

20             MR. RHOW:  Your Honor, may I proceed?

21             THE COURT:  Yes, please.

22             MR. RHOW:  Thank you, Your Honor.

23                        NEAL KNUTH,

24   called as a witness by the defense, was sworn and testified as

25   follows:

1                         DIRECT EXAMINATION

2    BY MR. RHOW:

3         Q      Good morning.

4         A      Good morning.

5         Q      Mr. Knuth, how long have you worked in the

6    semiconductor industry?

7         A      42 years.

8         Q      And how long have you worked with Samsung?

9         A      21 years.

10        Q      What is your current position?

11        A      I am the senior manager for the Southwest region.

12        Q      Were you the primary contact for Netlist at

13   Samsung from 2015 to the present?

14        A      Yes.

15        Q      And from November 2015 to July 2020, how often

16   did you deal with Netlist folks?

17        A      Daily.

18        Q      You've been sitting here throughout the trial,

19   obviously, we've seen you, and heard testimony from various

20   folks that Netlist went to Samsung first and did not go to

21   resellers on their own.

22               Now, based on your interactions with Netlist in

23   this timeframe, did Netlist shop amongst Samsung and resellers

24   for the best price?

25               MR. DOREN:  Objection, Your Honor.  Foundation.

```
 1              THE COURT:  I think he's asking him about his
 2    experience.
 3              Maybe you could do a little more foundation on how
 4    he would know what Netlist did.
 5    BY MR. RHOW:
 6         Q      Let me ask you:  You indicated that you talked to
 7    Netlist, did you say daily?
 8         A      Daily.
 9         Q      Did you talk -- can you name some of the folks
10    that you've spoken with on a daily basis?
11         A      Paik Ki Hong, Raymond Jiang, Devon Park.
12         Q      And did any of those folks tell you that Netlist
13    would shop nor the best prices?
14         A      Yes.
15         Q      And can you explain to the members of the jury
16    the extent of some of those communications about Netlist
17    shopping --
18         A      Sure.  Oftentimes --
19              MR. DOREN:  Objection, Your Honor.  Hearsay.
20              THE COURT:  Do you have a response to the hearsay
21    objection?
22              MR. RHOW:  Party admission.
23              THE COURT:  The witness can go ahead and testify.
24              THE WITNESS:  Can you repeat the question just to
25    make sure.
```

**UNITED STATES DISTRICT COURT**

```
 1   BY MR. RHOW:
 2       Q    Sure.  Could you explain to all of us some of
 3   those communications where Netlist would tell you that they
 4   were shopping for the best price?
 5       A    Sure.  It usually meant they'd come to me with
 6   target prices.  I'd have inventory, and they would come to me
 7   with target prices, and, "Neal, you need to meet this target
 8   price."
 9       Q    And what would the existence of a target price
10   communicate to you?
11       A    If I don't meet the target price, I don't get the
12   order.  Simple.
13       Q    Would it mean that they had already contacted a
14   reseller?
15       A    Yes.
16           MR. DOREN:  Speculation, Your Honor.
17           THE COURT:  Objection sustained.
18   BY MR. RHOW:
19       Q    To you what would the fact that they went to a
20   target price mean?
21           MR. DOREN:  Relevance.
22           THE COURT:  The witness can answer.
23            Go ahead.
24           THE WITNESS:  They basically came to me with a
25   target price and an opportunity I never saw before.  So that
```

UNITED STATES DISTRICT COURT

1    would make me believe that they already shopped and came to me

2    trying to meet that price.

3    BY MR. RHOW:

4         Q      Now, while you've been at Samsung, do you deal

5    with resellers?

6         A      I do.

7         Q      And based on your experience, are reseller prices

8    higher or lower than Samsung prices?

9         A      You know, typically lower, actually.

10        Q      And why is that?

11        A      That's how they stay in business.

12        Q      Can you give us an example of how resellers who

13   are selling Samsung chips can sell at a price lower than

14   Samsung?

15        A      Yeah, sure.  Like in an undersupply market where

16   demand is far exceeding supply, Samsung is going to be raising

17   the price.

18              And if -- even today I was reading this morning

19   that there's a lot of activity in the datacenter market, and if

20   the resellers could buy today and get product today, hold it

21   for two or three months as I'm raising the price over the next

22   two or three months, as we've talked about several times -- you

23   know, if they hold the parts, they can sell it for under the

24   price I'm charging in February or March.

25              MR. DOREN:  Objection, Your Honor.  Move to strike,

```
 1   hearsay.
 2             THE COURT:  Motion granted.
 3             The witness can testify as to his own personal
 4   knowledge, but not about things that he's read.
 5   BY MR. RHOW:
 6        Q     In terms of your own personal experiences with
 7   resellers, you sell to resellers?
 8        A     Correct.
 9        Q     And have you seen situations where resellers have
10   lower prices than what you can offer?
11        A     Daily.
12             MR. RHOW:  Nothing further, Your Honor.
13             THE COURT:  Okay.  Cross-examination, Mr. Doren?
14                         CROSS-EXAMINATION
15   BY MR. DOREN:
16        Q     Good morning, Mr. Knuth.
17        A     Good morning, Mr. Doren.
18        Q     I have not had the pleasure.  It's good to meet
19   you.
20        A     Nice to meet you, sir.
21        Q     Now, I was hoping you could start by helping us
22   out with just a couple of term that we've heard from time to
23   time through this trial.
24             We've talked about Samsung's ability to support a
25   purchase order.
```

1          What does that mean?

2     A     That means I accept the purchase order.  I enter

3 into our ERP system.  And then as -- depending on what the lead

4 time is, I ship the product when it comes in.

5     Q     So to support a purchase order is to accept it

6 and acknowledge that it will be fulfilled?

7     A     Yes.

8     Q     And when you say that the support is confirmed,

9 does that mean you are confirming that that particular purchase

10 order will, in fact, be fulfilled?

11     A     Yes.

12     Q     And if a purchase order is confirmed, does that

13 mean the same thing?

14     A     Repeat that question.

15     Q     In other words, if there's something called a

16 confirmed purchase order, as opposed to an unconfirmed purchase

17 order, would the confirmed purchase order be one for which

18 Samsung will provide support?

19     A     Yes.

20     Q     Thank you.

21          Now, in the first few months of 2017, in some of

22 your daily conversations with the good folks at Netlist, you

23 began to tell Netlist that Samsung did not want purchase orders

24 sent until support was confirmed; correct?

25          MR. RHOW:  Your Honor, this would be outside the

```
 1    scope of direct.
 2              MR. DOREN:  And, Your Honor, we did not rest as to
 3    Mr. Knuth.
 4              THE COURT:  Correct.  Yeah.  We discussed this
 5    yesterday.  This is part of plaintiff's case.
 6              MR. RHOW:  And that's fine, Your Honor.
 7              Then in terms of -- if I'm going to see any
 8    documents from this witness, those should have been disclosed
 9    at least last night, if not earlier.
10              MR. DOREN:  Your Honor, the agreement between
11    counsel is that when the party is adverse, there's no need to
12    exchange documents.
13              They've crossed all of the Netlist witnesses
14    without ever having shown us a shred of paper.  And this is the
15    one witness in this entire trial from Samsung, and we think
16    that rule applies with equal force here.
17              MR. RHOW:  Actually, I agree.
18              MR. DOREN:  Thank you.
19              THE COURT:  Makes my job easy.
20              Go ahead.
21              MR. DOREN:  Maybe we should all just step out into
22    the hall and see if we can work this out.
23              THE WITNESS:  Can we?
24    BY MR. DOREN:
25         Q    Mr. Knuth, I'll repeat the question.
```

```
 1        A       Thank you.

 2        Q       In the first few months of 2017, you began to

 3   communicate with the people at Netlist that Samsung did not

 4   want a purchase order sent until support was confirmed;

 5   correct?

 6        A       Yes.

 7        Q       And let's take a look -- and let me hand you up a

 8   binder of documents, if I can.  If you could -- I'm sorry.  If

 9   you could please turn in your binder to Exhibit 497.

10        A       I'm sorry.  I have to --

11        Q       Do you have Exhibit 497 in front of you?

12        A       I do, sir.

13        Q       And is that an email string between you and

14   Mr. Raymond Jiang at Netlist from February 3rd and 4th, 2017?

15        A       It does look like that.

16             MR. DOREN:  Your Honor, I'd move to admit

17   Exhibit 497.

18             THE COURT:  Any objection?

19             MR. RHOW:  No objection, Your Honor.

20             THE COURT:  497 is admitted.

21             (Exhibit No. 497 received into evidence.)

22   BY MR. DOREN:

23        Q       And so now that we have this document up before

24   the jury, Raymond Jiang writes to you on February 3rd and says,

25   "We need put more SSD purchase order in nor Q2.  I believe I've
```

 1    mentioned it early this week.  We'll have the purchase orders

 2    to you shortly with a Q2 forecast."

 3               Do you see that?

 4         A    Yes.

 5         Q    And then you respond on February 4th; correct?

 6         A    Yes.

 7         Q    And what you say is, "Don't send PO please.  Just

 8    put it on the backlog forecast.  Samsung does not want even

 9    purchase orders sent until support confirmed."

10               Correct?

11         A    Yes.

12         Q    So if Netlist followed this instruction, there

13    would be entry on a forecast for these pieces; correct --

14         A    Yes.

15         Q    -- for these products.

16               But there would not be a purchase order submitted

17    to Samsung for those products; correct?

18         A    Until I reviewed the forecast.

19         Q    Because once the forecast was reviewed and

20    approved, if the agreement was that support was confirmed, or

21    the forecast would be supported, then Netlist could submit a

22    purchase order; correct?

23         A    Yes.

24         Q    But if the decision was made that the forecast or

25    a portion of the forecast was not going to be supported, then

**UNITED STATES DISTRICT COURT**

```
 1    Samsung did not want to receive a purchase order from Netlist;
 2    correct?
 3         A      That would set false expectations.
 4         Q      And we've seen Mr. Kim testify to the same
 5    thought, right, that he did not want to see purchase orders
 6    submitted by Netlist until Samsung had committed to fulfill
 7    that purchase order; correct?
 8         A      Yes.
 9         Q      Let's take a look, please, at Exhibit 357, also
10    in your binder.
11               Do you have in front of you, sir?
12         A      Yes.
13         Q      And is Exhibit 357 an email chain between you and
14    Raymond Jiang and others on March 30th and March 31, 2017?
15         A      That's how I see it.
16               MR. DOREN:  Your Honor, I would move to admit
17    Exhibit 357.
18               THE COURT:  Any objection?
19               MR. RHOW:  No, Your Honor.
20               THE COURT:  Exhibit 357 is admitted.
21               MR. DOREN:  Thank you, Your Honor.
22               (Exhibit No. 357 received into evidence.)
23    BY MR. DOREN:
24         Q      And now that we have this before the jury, the
25    first email is from Raymond Jiang; correct?
```

UNITED STATES DISTRICT COURT

1      A      Yes.

2      Q      Mr. Jiang works at Netlist, and he's writing to

3  you.  And he says, "Neal, here's a PO I've mentioned for

4  additional samples of a particular product."  Correct?

5      A      Yes.

6      Q      And you respond the next day and you say,

7  "Raymond, please stop sending purchase orders until I confirm

8  allocation and approve purchase order placement.  We cannot

9  just add backlog right now.  I will explain on the call."

10             Did I read that correctly?

11      A      Yes.

12      Q      And once again, what you were telling Netlist was

13  do not submit purchases to Samsung unless and until Samsung

14  says that those purchase orders will be fulfilled; correct?

15      A      I have to verify if the part numbers are correct.

16      Q      Because otherwise you would be setting false

17  expectations if you told Netlist to submit a purchase order for

18  something Samsung was not going to provide Netlist; correct?

19      A      Yes.  For the wrong part number.

20      Q      Or if the part simply wasn't going to be provided

21  by Samsung; correct?

22      A      If it was -- samples sometimes aren't available

23  for months and months and months.

24      Q      Mr. Knuth, in early February, or in early 2017,

25  you began to inform Netlist, consistently and regularly, that

```
 1   it should not submit purchase orders until Samsung had said it

 2   would support that purchase order; correct?

 3        A       I have to make sure it fits within my allocation.

 4        Q       The answer is yes; correct?

 5        A       Yes.

 6        Q       Could you speak into the microphone, please?

 7        A       Yes.

 8               THE COURT:  And you can move that over to you

 9   closer.

10               THE WITNESS:  I thought my voice was loud.

11               THE COURT:  Sorry?

12               THE WITNESS:  I thought my voice was pretty loud.

13   BY MR. DOREN:

14        Q       Now, Mr. Knuth, after some months of reminding

15   Netlist not to submit purchase orders unless Samsung had

16   committed to fulfilling them, you got Netlist trained, didn't

17   you?

18               MR. RHOW:  Your Honor, argumentative.

19               MR. DOREN:  It's cross-examination, Your Honor.

20               THE COURT:  I will allow the question.

21               THE WITNESS:  I can't train anyone.

22               (Reporter requests clarification.)

23               THE WITNESS:  I don't train anyone.  I can't train

24   anyone.

25   BY MR. DOREN:
```

1      Q      Let's take a look, please, at Exhibit 29 in your

2    binder.

3             Let me know when you are there, Mr. Knuth.

4      A      I found in it.

5      Q      Thank you.  And take a moment to review it.

6             And then would you agree, sir, that this is an

7    email string between you and Paik Ki Hong, and others, between

8    December 5, 2017 and December 8, 2017?

9      A      '17, '17.  I guess the dates are correct.

10     Q      And is it also correct that this is an email

11   chain in which you participated in?

12     A      My name is here.

13            MR. DOREN:  Your Honor, I'd move into evidence

14   Exhibit 29.

15            THE COURT:  Any objection?

16            MR. RHOW:  No objection, Your Honor.

17            THE COURT:  Exhibit 29 is in evidence.

18            (Exhibit No. 29 received into evidence.)

19   BY MR. DOREN:

20     Q      Now, Mr. Knuth, this email chain is from

21   December 2017; right?

22     A      We've already agreed on that.

23     Q      Almost exactly four years ago at this point.

24            And this is several months, the best part of a

25   year, after you began telling Netlist that it should not submit

```
 1    purchase orders until and unless Samsung agreed to fulfill

 2    those purchase orders; correct?

 3         A       Timing is -- yes.

 4         Q       February, March to December; correct?

 5         A       Yes.  Something like that.

 6         Q       And in the meantime, you've been talking to

 7    people at Netlist virtually every day; right?

 8         A       Yes.

 9         Q       Various people at Netlist; correct?

10         A       Correct.

11         Q       And you've been telling them on a regular basis

12    not to submit purchase orders unless the forecast for those

13    particular products had been approved, and there would be

14    support from Samsung; correct?

15         A       Here and there I told them that.

16         Q       Repeatedly over the course of 2017; correct?

17         A       Not repeatedly.

18         Q       Well, we've seen twice, right, in February and

19    March?

20         A       Repeatedly for me is different.

21         Q       Okay.  Got it.

22                 And so let's take a look at Exhibit 29.  And if

23    you look at the first email in the chain from Mr. P. K. Hong,

24    it is him asking you whether particular parts could be

25    supported; correct?
```

```
1        A       Correct.

2        Q       In other words, if Netlist were to submit a

3   purchase order, would Samsung -- could Netlist submit a

4   purchase order for these parts; correct?

5        A       Yes.

6        Q       And that's on December 5th.

7                Then on December 8th, three days later, he writes

8   and he says, "Neal, following up.  Can Samsung support?  Need

9   to quote the customer.  Please let me know.  Thanks."

10               Do you see that?

11       A       Yes.

12       Q       And then later that day, you say back to

13  Mr. Hong, "I don't have current support on this one.  Sorry."

14               Correct?

15       A       Correct.  It's an EOL product.

16       Q       And your message to Mr. Hong was, "I can't

17  support it, so do not submit a purchase order."

18               Correct?

19       A       On an EOL product that is --

20       Q       On this product that ws being requested; correct?

21       A       Correct.

22       Q       And then a few minutes later, three minutes after

23  your response, Mr. Hong writes to you and says, "Neal, here's

24  some other parts, some other products that we may need.  Will

25  Samsung support that -- this order?"
```

```
 1                 Correct?

 2       A        It's the same part, I believe.

 3       Q        But, sir, there's a second request from Mr. Hong

 4   on December 8th; correct?

 5       A        On the same part.

 6       Q        And above that, your response is, "No allocation

 7   for this.  Need PA which I do not have."

 8                 Correct?

 9       A        Correct on the same part.

10       Q        I heard you, sir.

11                 Correct?

12       A        Correct.

13       Q        And "PA" means product allocation; correct?

14       A        Yes.

15       Q        So Mr. Hong was asking you on two occasions here,

16   between December 5th and December 8th, whether you could

17   support an order, and whether he could accordingly submit a

18   purchase order; correct?

19       A        On a part I can't support, yes.

20       Q        And therefore, the answer was no; correct?

21       A        Yes.

22       Q        Now, you had exchanges like this, whether by

23   email or over the phone, with Mr. Hong and others at Netlist

24   regularly over 2017, '18, '19; correct?

25       A        It's part of my job.  I do it every day with
```

1    every customer.

2         Q      So every day with every customer, including

3    Netlist, you get inquiries like this on random communications

4    asking for particular parts.  And you then tell people

5    whether -- various customers whether or not you can support

6    those parts; correct?  The orders for those parts?

7         A      Yes.

8         Q      And unless you tell them that Netlist -- that

9    Samsung will support the order, those customers should not be

10   submitting purchase orders to Netlist; correct?

11        A      If we have the ability to support or not, yes.

12        Q      I'm sorry, sir.  I said Netlist.  I meant to

13   Samsung.

14        A      It's confusing.

15        Q      Same answer?

16        A      Can you repeat that whole thing.

17        Q      Sure.  Sure.

18              So over the course of these communications that

19   you have every day, the communications that make up your job,

20   customers, including Netlist, will ask whether Samsung can

21   support certain parts and certain purchases; correct?

22        A      Yes.

23        Q      And you will look into that and you will let

24   those customers know whether Samsung can support those orders

25   or not; correct?

1        A        Yes.  That's my job.

2        Q        And if Samsung can fulfill those orders, then you

3    expect the customer, if they want those parts, to submit a

4    purchase order; correct?

5        A        Yes.

6        Q        And if Samsung cannot or will not support those

7    requests, then you do not expect to receive a purchase order

8    from the customer; correct?

9        A        Yes.

10       Q        In fact, you do not want to receive a purchase

11   order on orders that Samsung will not fulfill; correct?

12       A        Yes, but I can't stop them.

13       Q        Sure.  People will do what they will do, but

14   Samsung does not want to receive purchase orders; correct?

15       A        In those situations, yes.

16       Q        And Samsung, yourself included, tell people not

17   to submit purchase orders when Samsung does not intend to

18   fulfill a forecast request; correct?

19       A        Forecasts are not requests.

20       Q        Forecasts are not requests?

21       A        Correct.

22       Q        Now, earlier we talked about forecasts.  And you

23   said that until a forecast was approved, you did not want to

24   see a purchase order.  Is that statement still true?

25       A        Yes.

1          Q        And if a forecast is asking for certain parts in

2     the quarter ahead, you then respond to that forecast on a

3     part-by-part basis, on a product-by-product basis, and you tell

4     the customer what will be provided, or what can be provided and

5     what cannot; correct?

6          A        To the best of my ability.

7          Q        And where the -- where the forecast is approved,

8     then the customer may submit a purchase order; correct?

9          A        Can you repeat that?  Sorry.

10         Q        Where the forecast is approved for a particular

11    product, a customer may then submit a purchase order; correct?

12         A        Yes.

13         Q        And where a forecast is not approved, the

14    customer cannot submit a purchase order to Samsung; correct?

15         A        Yes.

16         Q        Now, there were other things going on at Samsung

17    in relation to Netlist in the spring of 2017, weren't there?

18         A        This is a very dynamic industry.

19         Q        Yes indeed.

20                   Let's take a look, please, at Exhibit 007 -- 0007.

21                   And this is an email string that begins on

22    May 21st and continues to May 24th, including you and others;

23    correct?

24         A        Yes.

25                   MR. DOREN:  Your Honor, I would move Exhibit 7 into

1    evidence.

2              THE COURT:  Any objection?

3              MR. RHOW:  Yes, Your Honor.  This is now moving into

4    the MIL discussion that we had before on allocation and

5    commercial reasonableness.

6              MR. DOREN:  Your Honor, I have no intention to ask

7    this gentleman about whether or not something is commercially

8    reasonable.

9              THE COURT:  With that qualification, I will let it

10   in.

11             Exhibit 7 is in evidence.

12             MR. DOREN:  Thank you, Your Honor.

13             (Exhibit No. 7 received into evidence.)

14   BY MR. DOREN:

15        Q     Mr. Knuth, look at the front page, if you

16   will, of Exhibit 7.  This is with the May 24th email from

17   Steven Metz.  Do you see that?

18        A     Yes.

19        Q     And you are the first person in the "to" line;

20   correct?

21        A     Yes, but I'm not sure it's to me, but...

22        Q     Well, sir, it says from Steven Metz to Neal Knuth

23   and Lane Kim; correct?

24        A     That is the head of the email.

25        Q     Okay.  And Lane Kim was the gentleman we saw by

```
 1  video yesterday; correct?

 2       A      Yes.

 3       Q      Mr. Metz is who?

 4       A      At the time, my supervisor.

 5       Q      And Mr. Metz writes to you and Mr. Kim, "I had a

 6  call with Paik Ki (VP of operations)."  And you understand that

 7  to be a reference to P. K. Hong of Netlist; correct?

 8       A      Yes.

 9       Q      "I had a call with Paik Ki today, and let him

10  know that Samsung had zero allocation in Q3 to support Netlist

11  and/or the end customers Netlist is currently supporting."

12              Do you see that?

13       A      Yes.

14       Q      And you know that happened; correct?

15       A      I can't recall that.

16       Q      Well, you recall having your own conversation

17  with Netlist where you told them that they would be getting no

18  support for Q3 in 2017, don't you?

19       A      I have 65 customers I have daily conversations

20  with.

21       Q      Well, in 2017, Netlist was your biggest customer,

22  wasn't it?

23       A      I don't have my sales numbers.

24       Q      Was your biggest source of revenue, wasn't it?

25       A      Honestly, I don't have my sales numbers.  It
```

1   changes all the time, and this is four years ago.

2        Q       Take a look at the second page of this exhibit

3   where you say, "Hi, Steve."  In the email from you to Mr. Metz.

4                In the second sentence you say, "I have let

5   Netlist know we have no support for Q3."

6                Do you see that?

7        A       Yes.

8        Q       Does that refresh your recollection?

9        A       No.

10       Q       But you are not saying this didn't happen, are

11  you?

12       A       No.

13       Q       Going back to the first email on Exhibit 7,

14  Mr. Metz goes on to say, "Since Samsung is nearly 100 percent

15  of their support and revenue, this will have a dramatic impact

16  on their financials and future business."

17               Do you see that statement?

18       A       Yes.

19       Q       And you knew in May 2017 that Netlist would have

20  to find replacement parts, didn't you?

21       A       I don't run their business.

22       Q       They may or may not, right?

23               But wouldn't disagree with your supervisor that

24  zero support from Samsung, since Samsung is nearly 100 percent

25  of their support and revenue, would have a dramatic impact on

 1   Netlist financials in future business, do you?  You don't

 2   question that?

 3        A      I -- I just don't run their business.  I --

 4        Q      I'm talking about Samsung running its business

 5   and its decision to take Netlist to zero in the spring of 2017.

 6             Do you have any question that Mr. Metz knew what

 7   he was saying when he said, "Since Samsung is nearly

 8   100 percent of their support and revenue, this cutting them to

 9   zero support will have a dramatic impact on their financials

10   and future business."

11        A      Yes.

12        Q      And you knew, sir, because you talked to them

13   every day.  You have 65 customers, but you talk to people from

14   Netlist every day.  You knew because they talked to you about

15   resellers.  You knew they would have to go out and find other

16   parts, didn't you?

17        A      They talked about resellers all the time.

18        Q      Including in May 2017 when you were threatening

19   to cut them to zero; correct?

20        A      (No audible response.)

21        Q      Do you recall?

22        A      Can you repeat that?

23        Q      Yes.

24             You talked to Netlist about resellers in May 2017

25   when you told Netlist you were cutting their support to zero,

1    didn't you?

2         A     I can't recall.

3         Q     But you do know you talked to them about

4    resellers all the time; you just don't know around the fact

5    that you were cutting them to zero; correct?

6         A     Correct.

7         Q     Okay.  Now, there was a lot more going on behind

8    the scenes around the time that this email was issued in

9    May 2017, wasn't there?

10        A     It's a very dynamic business.

11        Q     Well there was being -- Samsung was taking a very

12   dynamic approach to Netlist in the spring of 2017, wasn't it?

13        A     I don't remember details.

14        Q     Let's take a look, please, at Exhibit 257.

15             257 is an email string that begins on March 16,

16   2017, and continues through March 28, 2017.

17             And if you look at the first page of Exhibit 257,

18   you'll see the first email is from Steven Metz to you.

19             Do you see that, sir?

20        A     Yes.

21             MR. DOREN:  Your Honor, I would move Exhibit 257

22   into evidence.

23             THE COURT:  Any objection, Counsel?

24             MR. RHOW:  Yes, Your Honor.  We are now -- actually,

25   Your Honor, I would request a sidebar on some of this.

1          THE COURT:  Okay.  We can talk briefly on 257.

2          (The following was held at sidebar

3          outside the presence of the jury.)

4          MR. RHOW:  Your Honor, if I could --

5          THE COURT:  So what's the objection to 257?

6          MR. RHOW:  So in the prior email, Your Honor, my

7   concern, which is exactly what happened, is that Mr. Doren

8   would go into business impact, things of that nature, which is

9   not a damages claim in this case.  Loss profits are gone.

10          That essentially is -- goes to the reasonableness

11   or unreasonableness of the allocation.  So while he did not use

12   those words, we are literally relitigating breach right now.

13          Your Honor has found breach.  We understand that.

14   The only issue in this case is cover damages.

15          None of these documents go to that.  This document

16   here that we have in front of you literally talks nothing about

17   that.  What Mr. Doren is trying to do is show intentionality

18   behind their decision, to show whether it's reasonable or

19   unreasonable, you know, to what extent it exists.

20          That was my objection to the prior, and then he

21   went right for dramatic business effect, which literally is

22   irrelevant to this case because loss profits are not here.

23          So I would argue it's 401 and -- both, it's a 403

24   issue, Your Honor.  And we are going to -- I can -- having now

25   seen this document, it's a series of emails just like this --

1          THE COURT:  So what is the relevance of Samsung

2     cutting off Netflix -- I'm sorry -- Netlist, leaving Netlist

3     high and dry, all those sorts of things, to the damages case?

4          MR. DOREN:  Your Honor, their damages theory is that

5     Netlist should just be tracking purchase orders across.

6          And obviously, you have a purchase order that

7     Samsung denied, and then you have a purchase order from a

8     reseller, and you just compare the prices, and it's easy.  They

9     never let Netlist submit purchase orders.  They told them that

10    there would be no supply.

11         Now, we need to establish the period during which

12    damage occurred.  This goes to that because it shows when

13    things were cut off.

14         The topics we'll go into next include the setting of

15    the cap at $500,000 -- this is Richard Doren -- $500,000 and

16    then a million, with the point of that being that Netlist then

17    tailored its orders to the cap.

18         So that when these folks say there are only

19    $3 million of unapproved purchase orders after the breach,

20    clearly there isn't very much harm here.

21         The fact is, there were no purchase orders, and the

22    fact is that Netlist was doing its best to work with Samsung to

23    get what it needed up to the cap.

24         I don't care about intentionality, but they also

25    talk about a chance to cure.  Remember that on day one?  It was

1   all about an opportunity to cure, "If only you had told us.

2   You should have given us more notice."

3         This is evidence of an opportunity to cure.  This is

4   evidence of whether they intended to cure or not.  This is

5   evidence of the fact that they were doing this, knowing full

6   well what the impact would be on Netlist; and therefore, this

7   notion of there needing to be an opportunity to cure, they were

8   aware all the time of what they were doing, and they should

9   cure.

10        We are not asking for loss profit damages, that's

11   true.  But we need to frame the period of damage.  We need to

12   deal with the nature of their rebuttal to our damage claim,

13   which we need to undo the facts that they have asserted but not

14   proven, and we are proving the facts through this witness.

15        And we need to deal with the notion they would have

16   cured if we had just told them what was going on.

17        THE COURT:  So when Mr. Doren makes the point that

18   this cure -- I don't know if it's a defense or not, but this

19   cure issue is out there in the case.  And the cure issue

20   presupposes that there's no intentionality in the conduct.

21   These emails seem to show intentionality in the conduct.

22        MR. RHOW:  Cure has -- intentionality is not an

23   element of cure.  You either cure or don't cure.  Whether you

24   really want to or really don't want to, it's irrelevant.  Given

25   the opportunity, I can do it begrudgingly, I can do it happily,

```
 1    it doesn't matter.  Let's be honest --
 2            THE COURT:  I guess what Mr. Doren is saying is that
 3    the supposition that Samsung would have cured had it been aware
 4    of the issue is what he's getting at.
 5            MR. RHOW:  No, but, Your Honor, 13.2 isn't when we
 6    are aware, we cure.  13.2 is if you send us written notice and
 7    you list up the purchase orders and you list out the
 8    allocations that you think are unfair, we then have our
 9    opportunity under 13.2 to resolve it or not.
10            It's just in the ether.  It's specific to the
11    contract.  That is not why Mr. Doren wants to bring this in.
12    He wants to bring this in, quite clearly, to show
13    intentionality, and that is not an element of the case.
14            Breach has been determined, and the only thing that
15    matters is whether there's a request, unfulfilled, and covered.
16            Now, the prior email, I did object, and we obviously
17    didn't have a sidebar.  What is happening with that email is
18    what's going to happen with this email and a series of emails.
19            It is in evidence.  And Mr. Knuth did not deny there
20    was an allocation.  He didn't deny that.  You don't have to
21    impeach him on this.
22            And the other email about their allocation is in
23    over objection, but that is also in.  None of this is in
24    dispute.  The only question is are there damage that attach to
25    it.
```

1       This is now getting into intentionality and trying

2  to characterize the reasonableness or unreasonableness of the

3  decision, which Your Honor stopped me from going into, which I

4  understand.

5       And yesterday we talked about this more.  And I

6  think Your Honor agreed that if we get into intentionality, the

7  whys, which this is getting into, then we have a problem.

8       MR. DOREN:  Your Honor, this gets into the whats.

9       If you look at this page, this is where Samsung is

10  having internal discussions about canceling Netlist backlog.

11       You've heard testimony, or questions in this case

12  about Netlist voluntarily canceling its backlog, withdrawing

13  purchase orders, not really wanting what was it ordering.  This

14  proves that Samsung was unilaterally writing them off, and

15  unilaterally did that on several occasions.  There's also

16  evidence they convinced Netlist to cancel out the backlog.

17       This document also shows that they were -- that they

18  were going to be setting a $500,000 cap.  It again states,

19  "Without Samsung support, we don't accept purchase orders."

20       We don't have a lot of time.  We have two hours and

21  17 more minutes.  I do intend to move along, but adding

22  documentary evidence to this gentleman's testimony on the

23  progression of events, and on the rise and fall of these caps,

24  that go directly to the damage model, goes straight to the

25  damages.

```
 1              THE COURT:  It does seem they go to damages.

 2              MR. RHOW:  One last point though, Your Honor, just

 3    to be fair to us, it's March 28, 2017.  It's before -- this has

 4    nothing to do with the breach period at all.  And Your Honor

 5    has made a clear line on that.  This is March 28th.  It has

 6    nothing to do with it.

 7              And then on top of that, I want to keep reiterating,

 8    the prior document got in.  The zero allocation documents got

 9    in yesterday.  The additional 1333 got in.  All of that is in

10    evidence at this point.

11              The thrust of this document is not that, and

12    especially given the fact that the date is outside the damages

13    period --

14              MR. DOREN:  Your Honor, this document is three days

15    before the damage period begins, and it explains why the damage

16    period begins in April.

17              MR. RHOW:  In addition, I think it was quite clear

18    from Mr. Hong's testimony yesterday that the damages period

19    actually did not begin then --

20              MR. DOREN:  This sounds like closing argument.

21              MR. RHOW:  -- it began in May.  It began in May.

22    And they canceled a bunch of orders in April.

23              But the bright-line that Your Honor has enforced

24    here in terms of relevance has been that damages period which

25    unequivocally does not start until after.  So all
```

```
 1    that preconduct --

 2              MR. DOREN:  Your Honor, this is not the document

 3    they want to use.  It's from 2016.

 4              THE COURT:  I'm going to allow you to use this

 5    document.

 6              I'm going to caution you to try to move to the facts

 7    that relate to the damages and not to Samsung's -- the merits

 8    of Samsung's conduct.

 9              I want to ask about the beginning email, 257.  Why

10    does this beginning email need to come in?

11              MR. DOREN:  Well, Your Honor --

12              THE COURT:  And this is from Samsung to Samsung;

13    right?

14              MR. DOREN:  It is, Your Honor.  It's from Mr. Metz

15    to --

16              THE COURT:  From a 402 standpoint, I would like to

17    keep that out, unless there's a good reason for it to come in.

18              MR. RHOW:  I agree, Your Honor.  I mean, that's

19    really the thrust of my question.

20              MR. DOREN:  The question was to me, correct,

21    Your Honor?

22              THE COURT:  Yes.

23              MR. DOREN:  I'll just give you the facts, and then

24    the Court will rule.

25                   What you have here is an email string
```

```
 1    where there's discussion back and forth.  This is his largest

 2    customer.

 3                THE COURTROOM DEPUTY:  The court reporter can't hear

 4    you.

 5                MR. DOREN:  He's suggesting that -- and Mr. Metz

 6    sends a note to Korea asking if this really needs to be

 7    canceled.  And Mr. Knuth thanks him for sending it.  And then

 8    Mr. Metz says if they just wanted to stop doing business with

 9    Netlist, then they should have said so.

10                I'm fine with that second line coming out,

11    Your Honor.

12                THE COURT:  Let's keep that second line out.

13                MR. DOREN:  That's fine.

14                THE COURT:  The one with the -- okay.  Thank you,

15    Counsel.

16                (Held in open court in the presence of the jury.)

17                THE COURT:  I commend the jury for staying awake

18    during the white noise.  Sorry about that.  We'll get right

19    back to it.

20                MR. RHOW:  Your Honor, in terms of logistics, how

21    should that be submitted to the witness so it's not

22    inadvertently --

23                THE COURT:  Yeah, can you black it out, use the

24    Elmo?

25                MR. DOREN:  We are working on that, Your Honor.
```

```
 1              THE COURT:  Okay.  Thank you.

 2              MR. DOREN:  May I proceed?

 3              THE COURT:  Please.

 4   BY MR. DOREN:

 5        Q      Mr. Knuth, I apologize if I'm backtracking at

 6   all.  I just want to make sure I have not missed my place.

 7              MR. DOREN:  Your Honor, I would again move

 8   Exhibit 257 with the single redaction into evidence.

 9              THE COURT:  Okay.  It can be received into evidence

10   over counsel's objection.

11              MR. DOREN:  Thank you, Your Honor.

12              (Exhibit No. 257 received into evidence.)

13   BY MR. DOREN:

14        Q      Mr. Knuth, I direct your attention, please, in

15   the lower, right-hand corner of this landscape document, you

16   see there are numbers.

17              If you could go to the page that ends in 906,

18   please?  Are you there with me?

19        A      SEC 262906?

20        Q      That's the one.

21        A      Yes, sir, I'm here.

22        Q      At the bottom of that page, there's an email to

23   you from Mr. Yoo.

24              And who is Mr. Yoo?

25        A      I'll call him Harrison.  Harrison is one of my
```

```
 1    contacts in Korea.

 2         Q      Thank you.

 3                And you work with him in relation to the Netlist

 4    account?

 5         A      For specific product.

 6         Q      And do you work with him in relation to the

 7    Netlist account in the context of the JDLA?

 8         A      No.

 9         Q      And if you could look at this email.  And this is

10    from March 16, 2017; correct?

11         A      Yes.

12         Q      And he says to you, "Please screen for confirmed

13    POs only based on availability confirmation within product

14    allocation or" -- what's DP?

15         A      Demand planning.

16         Q      Thank you -- "or DP plan.  And please delete any

17    of nonconfirmed purchase orders which Netlist placed without

18    your commitment."

19                Do you see that?

20         A      Yes.

21         Q      And so in March 2017, along with communicating to

22    Netlist that it should no longer be submitting purchase orders

23    where there hasn't been a commitment made by Samsung, within

24    Samsung, you were being asked to go back through purchase

25    orders and identify any where Netlist had placed without your
```

```
1   commitment; correct?

2       A       Unconfirmed purchase orders.

3       Q       Yeah.  And then on the next line, Mr. Yoo says,

4   "We have to honor and support firm confirmed backlog that any

5   of non-confirmed won't be considered from now on."

6               Do you see that?

7       A       Yes.

8       Q       So as of March 16, 2017, your marching orders

9   from Mr. Yoo were that non-confirmed purchase orders would not

10  be considered from that point on; correct?

11      A       Samsung marching orders change monthly.

12      Q       Well, as of March 16, 2017, this is what you were

13  told; correct?

14      A       Yes.

15      Q       You'll point out to me if that ever changes along

16  the way?

17      A       It could have changed 100 times.

18      Q       But you stand by your earlier testimony today,

19  correct, there's nothing you want to correct?

20      A       No.

21      Q       Let's look, please, at page 905.  Here it is now

22  March 22, 2017.  Do you see that?  Page 905?

23      A       Yes.

24      Q       Mr. Yoo wishes you a nice vacation and then again

25  urges you "As I have requested a couple of times, please
```

1    finalize Netlist PO status"; correct?

2         A       Yes.

3         Q       Then carrying over from page 904 to 905, on that

4    same day, you respond to Mr. Yoo, and you say at the end of

5    that email, "Where do you see the issue?"  And then you go on

6    to say, "This is the first I hear of an issue with Netlist

7    backlog."  Do you see that?

8         A       Yes.

9         Q       Was that a true statement?

10        A       From what I read.

11        Q       And you intended it to be true when you wrote it,

12   didn't you?

13        A       Let me read it again.  Yes.

14        Q       Then let's go up, please, to page 902.  What are

15   OEM accounts?

16        A       Original equipment manufacturers.

17        Q       What are they?

18        A       Customers who actually have a physical product

19   that they sell.

20        Q       What is an OEM, from your perspective?

21        A       A customer I support that make an end product.

22        Q       What's an end customer?

23        A       The customer that actually consumes the product

24   or makes the final -- final good.

25        Q       Thank you.

64

```
1                  And so on page 902, we see a March 24, 2017 email
2      from Mr. Metz; correct?
3           A       That's what it looks like.
4           Q       And he then says, "Hi all."  And in the second
5      sentence he says, "Please do the appropriate due diligence and
6      analysis on Netlist backlog"; correct?
7           A       I don't think I was copied on this.
8           Q       Well, you are in the string, aren't you, sir?
9           A       But I think I was taken off and then back on.
10          Q       Take a look at page 900.
11          A       This is -- I don't know.
12          Q       Take a look at page 900, please, sir, where
13     Thursday, March 23, 2017, from you to Mr. Metz.  Do you see
14     that?
15          A       From me to Mr. Metz?
16          Q       On page 900.  "As Steve mentioned, we would like
17     to know SSD purchase orders confirm status and end users";
18     correct?
19          A       That's from T. J. Jeong.
20          Q       And it's to you; correct?
21          A       Correct.
22          Q       And he is forwarding to you the original message
23     from Mr. Metz; correct?
24          A       Correct.
25          Q       And Mr. Metz in that email that was forwarded to
```

1   you says, "After item 5, we need to avoid any special

2   privileges given to Netlist"; correct?

3        A        Boy, you are losing me.

4        Q        Back on page 902, after --

5        A        Repeat the question, please.

6        Q        Mr. Metz said, "We need to avoid any special

7   privileges given to Netlist"; correct?

8        A        That's how I read this.

9        Q        And then at the bottom of the page, he says, "I

10  will be presenting a slide in the workshop in April disclosing

11  and promoting OEM, end customers and others."  Do you see that?

12       A        Yes.

13       Q        It then goes on to say, "Netlist was one of our

14  success stories.  With the new situation, we may promote the

15  end user engagements and downplay Netlist involvement."  Do you

16  see that?

17       A        Yes.

18       Q        And that was because in this March 24th -- late

19  March 24 time frame, the decision had been made to cut support

20  for Netlist; correct?

21       A        No idea what Mr. Metz was thinking.

22       Q        Let's take a look, please, at page 897, and 898.

23  Do you see this email?

24       A        I'm on 897.

25       Q        And you see the email from a Lee at Samsung,

 1   Daniel Lee?

 2        A        That's the second one, correct.

 3        Q        Yes.  And in that email Mr. Lee says, "Since we

 4   have to report to our top management regarding this issue" --

 5   and the issue was Netlist confirmed purchase orders; correct?

 6        A        (No audible response.)

 7        Q        The title of the email is "Netlist confirmed

 8   purchase orders to verify"; correct?

 9        A        Yes.

10        Q        And Mr. Lee says, "We would like to check the

11   final feedback from DSA."  What's that?

12        A        Digital signal -- wait.  It's my division.

13        Q        Okay.  It's where you work?

14        A        I'm a little nervous.

15        Q        That's all right, sir.  We'll take it as slow as

16   we need to take it.

17                 "For the current backlog status," do you see

18   that?

19        A        Yes.

20        Q        It goes on to say, "We considered green color as

21   a confirmed purchase order to support and orange color as

22   unconfirmed one to cancel."  Do you see that?

23        A        Yes.

24        Q        If we look down to page 898, we see the green and

25   the orange; correct?

1      A      Yes.

2      Q      There are a total of four products that are

3 considered confirmed; correct?

4      A      Yes.

5      Q      And all others are considered as unconfirmed to

6 be canceled by Samsung; correct?

7      A      Yes.

8      Q      Let's go on to page 896.  And in the middle there

9 is an email from Lane Kim to you dated March 28, 2017; correct?

10     A      Yes.

11     Q      And Mr. Lane who, again, we met by video says to

12 you, "Thanks.  Let's move quickly without SEC support."  What's

13 SEC?

14     A      The Samsung Electronics Corporation.  It's the

15 corporate office.

16     Q      In Korea?

17     A      Correct.

18     Q      That's the corporate office, if you will, that's

19 responsible for the manufacturing and distribution of the

20 memory chips?

21     A      It's the headquarters.

22     Q      Thank you.  "So without headquarters' support

23 plan, we don't accept purchase order especially on SSD."  Did I

24 read that correctly?

25     A      Yes.

1    Q      And again, this is consistent with your prior

2    testimony that in early 2017, the decision was made that

3    purchase orders would not be accepted unless there was

4    corporate support, headquarters' support, for providing a

5    product; correct?

6        A      Sure.

7        Q      Yes?

8        A      Yes.

9        Q      And then above that, you write back and you say,

10   "Attached is current customers covered under NDA for Netlist.

11   Netlist is also supporting many samples."  And then you go on

12   to say, "I forecast this business to be greater than

13   $35 million in SSD revenue in 2017 along with $15 million in

14   DRAM."  Did I read that correctly?

15       A      Yes.

16       Q      Then you go on to talk about the different

17   categories of customers that Netlist serves; correct?

18       A      Fair.

19       Q      And you say, "I also have other purchase

20   orders" -- this is the third line from the bottom.  "I also

21   have other purchase orders to confirm for Q2 and Q3.  Not sure

22   what to do at this time"; correct?

23       A      Yes.

24       Q      And that was because you didn't know what to do

25   about obtaining SEC support?

 1          A       I have to assume at the time I didn't have a big

 2     enough allocation.

 3          Q       And by the way, sir -- and I don't intend to pry

 4     and won't go far on this -- but some of your personal income is

 5     based on the amount of product you sell.  Is that fair?

 6          A       I get paid a salary and MBO, but I do not get

 7     paid a commission.

 8          Q       What's an MBO?

 9          A       It's quarterly targets, and it's really very

10     little on sales actually.

11          Q       By quarterly targets, is that revenue?

12          A       It's avoiding RMAs, on time -- avoiding -- end of

13     month shipments.

14          Q       Doing a good job?

15          A       No credit problems.  No AR receivable -- I got to

16     make sure my customers are paying, things like that.

17          Q       Thank you, sir.  I appreciate that.

18                  Now let's go up to page 892.  I'm sorry.  Let's

19     make it -- the very bottom of 892 and on to 893.  This is an

20     email from Steven Metz to Lane Kim.  Do you see that?

21          A       Yes.

22          Q       And again, it's regarding "Netlist confirmed

23     purchase orders to verify"; correct?

24          A       You are on page --

25          Q       That is at the bottom of page 892, the subject

```
 1    line.

 2         A      Okay.  I see that.

 3         Q      Great.  On the top of page 893, Mr. Kim -- or

 4    sorry -- Mr. Metz writes to Mr. Kim, "Can you help me

 5    understand the logic behind these decisions?"  Do you see that?

 6         A      This is an email.  I'm not on either, but I see

 7    that.

 8         Q      Let's talk about that for a second because go

 9    back to page 892.  And there's a note from you to Mr. Metz just

10    above the one we started looking at; right?

11         A      Yes.

12         Q      And you say, "Thanks.  I am BCC and will not

13    reply."  Do you see that?

14         A      Got it.  Okay.

15         Q      What's BCC?

16         A      Blind copied.

17         Q      So you did receive it.  You just weren't shown on

18    the to and the from; correct?

19         A      Yes.

20         Q      And Mr. Metz wrote, "Lane, can you help me

21    understand the logic behind these decisions?  I was about to

22    send the below to SEC, to headquarters, but I clearly don't

23    understand the politics behind this."  Did you know what the

24    politics were behind these decisions at the time, sir?

25         A      No, I'm a soldier.
```

1     Q      And then he goes on to say, "Or why Harrison" --

2  is that Mr. Yoo?

3     A      Yes.

4     Q      -- "does not want to sell anything but inventory

5  that nobody else wants."  Do you know if that was Mr. Metz'

6  view on the types of products that Samsung wished to sell

7  Netlist at this point in time?

8     A      I do not know.

9          MR. RHOW:  Belatedly let me object.  We are getting

10 into the why, Your Honor.

11         THE COURT:  Yeah, I'll just remind counsel of our

12 discussion.

13         MR. DOREN:  Thank you, Your Honor.  I'm moving on.

14    Q      Let's go up to page 892.  Again, we looked at the

15 email where it's stated to you -- sorry -- where you state to

16 Mr. Metz, "Thanks.  I am BCC and will not reply."  Do you see

17 that?

18    A      Yes.

19    Q      Mr. Metz replies, "Please don't.  If they just

20 wanted to stop doing business with Netlist, then they should

21 have said so."  Did I read that correctly?

22    A      Yes.

23    Q      Do you remember this email?

24    A      No.

25    Q      Do you remember discussions with Mr. Metz in

1    March 2017 around this topic?

2         A      No, sir.

3         Q      But you don't doubt that these exchanges took

4    place, do you?

5         A      I see them in writing.

6         Q      Let's go back to 357 just to orient ourselves.

7    This is March 28th.  And we go back now to 357, and 357 is

8    March 31; correct?

9         A      Yes, 2017.

10        Q      And on March 31, 2017, you wrote to Raymond Jiang

11   at Netlist; correct?

12        A      Yes.

13        Q      And this is the email we've looked at where you

14   say, "Please stop sending POs"; correct?

15        A      Yes, until I can make sure it's a right part

16   number.

17        Q      Then you go on to say, "I will explain on the

18   call"?

19        A      Yes.

20        Q      And you would have explained there that the rule

21   now at Samsung was don't submit purchase orders until they are

22   confirmed and will be supported; correct?

23        A      No.

24        Q      Do you remember what you talked about on that

25   call on March 31st?

1      A      As we talked about these samples are new and I

2   have to make sure that I have the right part numbers.  These

3   are very long part numbers, and they change.  So I need to make

4   sure I order the right samples.

5      Q      Do you remember the conversation, sir?

6      A      I -- not exact -- not the conversation.

7      Q      So you don't know whether or not you did explain

8   what you meant by "please stop sending POs"; that's correct?

9      A      Yes.

10     Q      You would agree at this point that Netlist did

11  the best it could to help you with its relationship with

12  Samsung, wouldn't you?

13     A      No.

14     Q      All right.  Let's look, please, at Exhibit 144.

15  This is another email string in our modern world.  And it's

16  again from March -- it begins in March 2017 and finishes in

17  June 2017.  Do you have this exhibit in front of you?

18     A      Number 144?

19     Q      Yes, sir.

20     A      Yes.

21     Q      If you look at the first page, do you see where

22  the second email down -- in other words, there's a "to from" at

23  the top, but the first email with substance is from Lane Kim to

24  you.

25     A      Yes.

1          MR. DOREN:  Your Honor, I'd move into evidence

2     Exhibit 144.

3          THE COURT:  Any objection, Your Honor?

4          MR. RHOW:  Yes, Your Honor, subject to the prior

5     discussion.  This is a 30-page document.  And just from my

6     brief review, I'm looking through it, there's a lot of what I

7     would consider 403 information.

8          THE COURT:  Well, anything specific, Counsel, you

9     want to direct my attention to?

10         MR. DOREN:  Sure, Your Honor.  Page 298 which is a

11    forecast from Netlist to Samsung that Mr. Knuth is then

12    forwarding to others.  There's also on page 296 the discussion

13    of a consensus guide of limiting Netlist to $500,000 in

14    products each month.  There's a -- page 295, Mr. Knuth assures

15    Mr. Yoo that they will be moving forward with the $500,000 a

16    month limit from now on and that he's rejecting new orders as

17    they will buy Samsung from other sources.

18              There's lots of relevant stuff in here, Your Honor.

19              THE COURT:  I'll let it in.  If there's issues we

20    get into on specifics, we can talk about redaction.  But for

21    now you can publish what you discussed to the jury.

22         MR. DOREN:  Thank you, Your Honor.

23         THE COURT:  Just for the record, this is Exhibit 144

24    is in evidence.

25              (Exhibit No. 144 received into evidence.)

1    BY MR. DOREN:

2         Q      Mr. Knuth, can you look at the page that ends

3    with numbers 5298.  Do you see that in front of you?

4         A      Yes.

5         Q      And in the table in that, that is Netlist's

6    third-quarter forecast for 2017; correct?

7         A      It's a Q3 demand, yes.

8         Q      I'm sorry, sir?

9         A      It looks like the Q3 forecast.

10        Q      Okay.  Thank you.  And you were forwarding it to

11   Harrison Yoo; correct?

12        A      Yes.

13        Q      Who you identified as someone you work wit in

14   Korea; correct?

15        A      Yes.

16        Q      And others of course; correct?

17        A      Yes.

18        Q      And you were forwarding Netlist's third-quarter

19   forecast for 2017; right?

20        A      (No audible response.)

21        Q      It's not a trick question.

22        A      Can you repeat that?

23        Q      You were forwarding to them Netlist's

24   third-quarter forecast for 2017?

25        A      I thought I heard "confirming."  Yes.

1      Q      And in the second line of your note, you include

2   the notation, "Can I confirm the below for Netlist?"  Do you

3   see that?  This is still on page 98 in your email.  You say,

4   "TJ and Harrison, here is the Q3 demand for Netlist.  Can I

5   confirm the below for Netlist?"  Do you see that?

6      A      Yes.

7      Q      This was part of trying to get headquarters'

8   support for forecasts from Netlist; correct?

9      A      Forecast -- it looks like forecast for Netlist

10  and others.

11     Q      Okay.  And so this was part of the process where

12  before you would permit a purchase order to be submitted, you

13  needed to get support from headquarters; correct?

14     A      For all my customers, yes.

15     Q      Including Netlist?

16     A      Yes.

17     Q      By the way, yesterday counsel for Samsung was

18  reading from I think it was Webster's dictionary about

19  "forecast."  Do you remember that?

20     A      It's a perfect description.

21     Q      I think there was something about unicorns and

22  rainbows in there if I remember right.  But that's not how you

23  think a forecast at Samsung, is it?

24     A      It is.

25     Q      Is it?

```
 1        A        Absolutely.

 2        Q        Sir, the re line on your email is "Netlist Q3 SSD

 3   demand."  Do you see that?

 4        A        Yes.

 5        Q        And in the first sentence of your email, you say

 6   "Here's the Q3 demand for Netlist."  Do you see that?

 7        A        Yes.

 8        Q        And you are referring to the forecast; correct?

 9        A        Yes.

10        Q        Thank you.  Let's take a look at page 597 -- Oh,

11   sorry, 297.  At the bottom third of that page, who is the

12   gentleman or the colleague who sent you this email?

13        A        There's several.  Which?

14        Q        Well, I'm talking about the May 15, 2017 email at

15   8:29 a.m.  Do you see that?

16        A        Okay.  Yes.

17        Q        And who sent you that email?

18        A        Tae-Jin Jeong.

19        Q        Who is Tae-Jin Jeong?

20        A        Similar to Harrison.

21        Q        They work at Samsung Electronics?

22        A        Yes.

23        Q        They support U.S. sales; correct?

24        A        Yes.

25        Q        And T. J. reports to you on the SSD demand for Q3
```

1    from Netlist; correct?

2           A       Yes.

3           Q       And says, "As we replied, we could not secure Q3

4    SSD product allocation for Netlist.  Please do not accept SSD

5    purchase orders from Netlist."  Did I read that correctly?

6           A       Yes.

7           Q       And you followed that instruction; correct?

8           A       I can't remember.

9           Q       You would have followed the direction from

10   Tae-Jin Jeong on how to handle purchase orders on this product,

11   wouldn't you?

12          A       Typically I would fight back.

13          Q       Do you have any recollection of having fought

14   back on this?

15          A       Every quarter I did.

16          Q       What you fight back for, sir, is approval?

17          A       I fight back for more allocation.

18          Q       For more support?

19          A       Yes.

20          Q       Unless you get that support, no purchase order

21   can be submitted; correct?

22          A       Yes.

23          Q       Directing your attention to 296 and the top half

24   of the page, there's an email from Kyong -- and I'm sorry I'm

25   struggling with the names -- but a Kyong-yong Lee, and who is

1    that?

2         A      That is Daniel.

3         Q      I thought it may be.  So Dan Lee writes to

4    Steven Metz with a copy to you and others; correct?

5         A      Yes.

6         Q      And Mr. Lee says, "I received the sales result of

7    Netlist for June, and it showed 1.6 million.  I think it is

8    more than the consensus guide 500,000 between Arnold and

9    JS Choi."  Do you have any background of this?  Who is

10   J. S. Choi?

11        A      At the time I'm not sure what his position was,

12   but he's a senior executive.

13        Q      Of Samsung?

14        A      Yes.

15        Q      Headquarters?

16        A      He's done both.

17        Q      Both being?

18        A      DSA, SSI is what I call my division, Samsung

19   Semiconductor Incorporated or Samsung Electronic Corporation.

20        Q      Thank you.  And Mr. J. S. Choi would have been in

21   a position to make some decisions about how much allocation

22   would be approved for Netlist?

23        A      Potentially, yes.

24        Q      And the question is put to Mr. Metz in the next

25   line, "Can we manage around $500,000 from July then?"  Do you

 1    see that?

 2         A      Yes.

 3         Q      And take a look, please, at the bottom of

 4    page 295.  It's an email from you back to Daniel Lee and others

 5    including Harrison Yoo, Steve Metz and others.  Do you see

 6    that?

 7         A      The emails being brought up here, do I need to

 8    compare in the book?

 9         Q      No, sir.  You have my word they are the same.  If

10    you prefer to look --

11         A      The glasses aren't working.

12         Q      I hear you.  Do you see the July 6, 2017 email

13    from you to your colleagues?

14         A      Yes.

15         Q      You write, "Daniel, we cleared backlog and will

16    be moving forward with the $500,000 a month limit now."  Do you

17    see that?

18         A      Yes.

19         Q      And that's a cap that started in the first week

20    of July 2017; correct?

21         A      It's an allocation.

22         Q      And that's a limit on the allocation, fair?

23         A      I used the word "allocation."

24         Q      Okay.  Okay.  Fair enough.  You pushed back on

25    that, didn't you?

```
 1          A       It's my job.

 2          Q       You go on to say in July, "Our backlog is very

 3   limited for Netlist, and I am rejecting new orders as they will

 4   buy Samsung from other sources."  Do you see that?

 5          A       Yes.

 6          Q       So your understanding was when Samsung rejected

 7   orders or refused to permit purchase orders, that Netlist would

 8   have to go buy product from resellers; correct?

 9          A       As Netlist often did, yes.

10          Q       And then you go on to say later in the same

11   line -- or sorry.  Down on the last line, "I have rejected over

12   $10 million of business for Q3 already."  Do you see that line?

13          A       Yes.

14          Q       That would be $10 million of business for which

15   no purchase orders were submitted to Samsung; correct?

16          A       Yes.  That's a sales strategy trying to get more

17   product.

18          Q       Okay.  Let's look, please, at the email that

19   begins at the bottom of 294 and carries over to the top of 295.

20   That's an email from you dated July 7, 2017?

21          A       Yes.

22          Q       That's to Mr. Lee, Steven Metz and others;

23   correct?

24          A       Yes.

25          Q       Including Lane Kim?
```

**UNITED STATES DISTRICT COURT**

1        A        Yes.

2        Q        And you write, "Thanks, Daniel.  Not really been

3    much fun.  Netlist also wants to help relationship.  And I have

4    convinced them to cancel the $2 million in backlog."  Do you

5    see that?

6        A        Yes.

7        Q        When you wrote that, that was a true statement;

8    right?

9        A        Yes.

10       Q        And so first of all, you intended to communicate

11   to your superiors that Netlist wants to help the relationship

12   with Samsung; correct?

13       A        Sales strategy.

14       Q        That's what you said; right?

15       A        Yes.

16       Q        And you went on to say that you have convinced

17   Netlist to cancel the $2 million in backlog; correct?  Is that

18   a sales strategy?

19       A        Yes, if I can't support.

20       Q        And you convinced Netlist on that based on

21   Netlist wanting to help the relationship.  That's what you are

22   telling your superiors here, isn't it?

23       A        I'm not sure.

24       Q        You don't remember?

25       A        I'm not sure if it ties together.

**UNITED STATES DISTRICT COURT**

1        Q       Okay.  And then at the end, you put parens, "(I

2   am trying)."  Do you see that?

3        A       Yes.

4        Q       And then a little winky face, a winking eye like

5   the joke is on them; right?

6        A       It's a sales -- no, it's a sales strategy.

7   Trying to --

8        Q       Got it.  And then you go on to say, "I will

9   advise the 500,000 mix tomorrow."  And that meant you were

10  going to tell Netlist about the $500,000 allocation the next

11  day; correct?

12       A       Yes.

13       Q       Let's look at Exhibit 260.  Exhibit 260 is

14  actually a single-page email, and it's dated July 13, 2017,

15  from you to various people with a copy to Lane Kim and others.

16  Do you see that?

17       A       Yes.

18              MR. DOREN:  Your Honor, I would move Exhibit 260

19  into evidence.

20              THE COURT:  Any objection?

21              MR. RHOW:  Subject to the prior discussion, no

22  objection.

23              THE COURT:  260 comes into evidence.

24              (Exhibit No. 260 received into evidence.)

25  BY MR. DOREN:

1          Q        Mr. Knuth, you recognize this as an email you

2     wrote to your colleagues on July 13th, 2017; correct?

3          A        Yes.

4          Q        And you state in the first sentence, "Lane" -- is

5     that Lane Kim?

6          A        Yes.

7          Q        And "Lane has discussed with J. S. Choi and

8     Mr. Choi has graciously granted Netlist allocation limit to be

9     increased to $1 million per month effective immediately."  Do

10    you see that?

11         A        Yes.

12         Q        Then down at the end of that email you say, "I

13    will manage with Netlist to keep the shipments close to this

14    total"; correct?

15         A        Yes.

16         Q        And what you meant was you would work with

17    Netlist to make sure that its orders were within that amount;

18    correct?

19         A        Yes.

20         Q        Now --

21                  THE COURT:  Counsel, I wonder if this is an okay

22    time to take our midmorning break?  As I said before, you've

23    only been here an hour and a half but we've been working since

24    early, and I want to give everybody a chance to stretch their

25    legs a bit.

1          So we'll take a ten-minute break, and we'll come

2    back at 10:40.

3          THE COURTROOM DEPUTY:  All rise.

4          (Outside the presence of the jury.)

5          THE COURT:  Okay.  We will take a ten-minute break.

6    We will stand in recess until 10:40.

7          (At 10:29 a.m. a brief recess was taken.)

8          (Outside the presence of the jury.)

9          THE COURT:  Okay.  There's an issue with a video?

10          MR. RHOW:  With a video deposition?

11          THE COURT:  Yes.  I was informed the parties had an

12    issue they needed to raise.

13          MR. LAMAGNA:  So thank you, Your Honor.  We are

14    going to be playing -- or actually Samsung will be playing a

15    deposition designation from Raymond Jiang, and we also have

16    plaintiff's designations interlaced with that.

17          We do have one objection with respect to one of the

18    passages.

19          THE COURT:  Okay.  Can I see it?

20          MR. LAMAGNA:  If it would assist the Court, I can

21    hand up the marked transcripts.

22          THE COURT:  Sure.

23          MR. LAMAGNA:  The passage that we are looking at is

24    at page 214 starting at line 24, to 215, line 7.

25          THE COURT:  Okay.  And this is a deposition of who?

1          MR. LAMAGNA:  This is Raymond Jiang who was formerly

2     the procurement manager at Netlist.  He's left the company and

3     lives out of state.

4          THE COURT:  Who is objecting to this?

5          MR. LAMAGNA:  Plaintiff Netlist is, Your Honor.

6     This is part of the designation submitted by Samsung.  Our

7     concern here is essentially that it lacks foundation.  And we

8     also have an in-line objection that was on the transcript with

9     respect to the question being vague.  And it's also a 401 and

10    403 objection.

11          And just to walk through those, you will see that

12    there is discussion in this passage regarding asking the

13    witness about a request that is, quote, "exactly like this

14    email."  So there's a document in front of the witness that is

15    being questioned on.

16          In the designations, that document is not actually

17    introduced.  So we don't actually know what that document is.

18    So the testimony is certainly unhelpful and at minimum

19    confusing because we don't know the context for that document.

20          And there's a reason for that.  Because if you look

21    back, I think it's one page, to where that document was

22    introduced into the deposition, that's page 213 around line 12,

23    you will see that there's an objection to a question on that

24    document.

25          This here was recross.  And during redirect, there

1    was no questioning on that document itself.  It happened to

2    be -- this was one of those Zoom depositions.  It had been in a

3    folder of exhibits, but it was never actually questioned on

4    during the redirect or during the direct -- the first cross.

5           But regardless, the document itself -- without

6    having that document in evidence, there's no foundation for

7    what the witness is being asked.

8           Ultimately the witness is being asked whether he

9    supposes that there is -- Samsung is required to support a

10   request like this.  That presents itself a question as to

11   whether he's being asked for a legal opinion, are they required

12   under the JDLA to support this, or are they required under some

13   sort of commercial norms of being reasonable, or you know what

14   is the metric or the yardstick here that this requirement is

15   being measured by?

16          And he goes ahead and answers it and says, "A

17   request like this they don't have to."

18          What is additionally confusing because you can't see

19   the document here, is this is a request that goes to an

20   end-of-life product.  So essentially he's asking in this email,

21   if we had it in front of us, the -- he's being asked do they

22   have to support this request for a product that they no longer

23   make, and he's saying no, I don't think they have to.

24          But that's a lot of context that's outside of this

25   passage.  And I don't think the probative value of the passage

1    is certainly outweighed by its capacity here to be confusing.

2              THE COURT:  Can I hear from counsel?

3              MR. RHOW:  Yes, Your Honor.  We'll add that

4    Exhibit 23 we have no issue with that.  That was really for

5    time purposes since time is ticking and we have very little

6    time.  But we are happy to add it if that makes a difference.

7              THE COURT:  It looks like this witness is maybe

8    opining upon what the obligations of the JDLA are.  And I don't

9    know that there's any foundation for that testimony.

10             MR. RHOW:  Well, he's not opining, and the JDLA was

11   not in front of him.  If you look at the actual question, while

12   the word "request" is used, it's not use in the context of the

13   JDLA at all.  The --

14             THE COURT:  I'm sorry.  Let's look at line 19.

15   That's your business obligation of the JDLA; right?

16             MR. RHOW:  Correct.

17             THE COURT:  So again, I don't know what this

18   witness --

19             MR. RHOW:  Sorry --

20             THE COURT:  I don't know that this witness has got

21   foundation to be testifying about the requirements of the JDLA.

22             MR. RHOW:  He is not testifying -- first of all, he

23   is the procurement manager.  Raymond Jiang was.  And he was

24   familiar with the JDLA.  He obviously operated pursuant to the

25   JDLA.  And other than P. K. Hong, he is the most knowledgeable

1    about sales and the JDLA at the company.

2         That particular question talks about are they

3    supposed to supply their requests, not necessarily from the

4    JDLA perspective, from his perspective.  From his business

5    perspective do they need to supply that.

6         THE COURT:  Why is his business perspective relevant

7    though?

8         MR. RHOW:  Because he's Netlist, and this goes to

9    causation.  It goes to -- the initial prong of the entire

10   analysis is is this a request -- if they are seeking damages on

11   it, is this a request that Samsung was supposed to fulfill?

12        And so if he believes -- and I actually am happy to

13   put in the email because the real point was the email.  The

14   email is just, hey, do you have availability of this particular

15   product?

16        And you've seen in this case a lot of emails like

17   that.  Do you have 20 pieces of X, Y, Z, and they are making

18   the argument we didn't fulfill those.  And our response is this

19   type of testimony, that these are not requests Netlist believes

20   are actual requests.  These are literally inquiries about

21   availability and nothing else.  Exhibit 23 is exactly that type

22   of document.

23        And I would also add Exhibit 23 was mentioned in

24   their discovery responses as a type of document that connotes a

25   request that they are making.  So that's why it was asked

1    about.

2            And so his testimony goes to the heart of this issue

3    as to whether they themselves, Netlist believed this was a

4    request that Samsung needed to actually fulfill.  Raymond said

5    no.  So why would that request be part of the damages, and

6    that's the point of this testimony to deal with a lot of these

7    emails that' are already in evidence and that we need rebut.

8            THE COURT:  So, Counsel, if the email comes in, it

9    certainly solves the confusion about what they are talking

10   about.  Does that resolve the objection?

11           MR. LAMAGNA:  Well, I don't think it does,

12   Your Honor, for a couple of reasons.  First of all, setting

13   aside that they didn't designate for the email to come in --

14   and we are not at this point then in a position to allow

15   Mr. Jiang to respond to the counter context of what you've just

16   heard from the -- what is essentially testimony from Mr. Rowe.

17           The most important issue here, Your Honor, is how

18   the jury is going to see this.  When he says a request like

19   this, they don't have to, I think that will be taken by the

20   jury as being lensed in terms of what's required under this

21   contract.  Since we are here on a breach of contract dispute,

22   they are naturally going to think that this is an opinion from

23   somebody about a contract where, as Your Honor well knows, his

24   opinion about the legal obligations is irrelevant.

25           That goes to Mr. Rowe suggesting that his opinion

1    about -- his personal views that the company should somehow be

2    relevant.  I don't think those are relevant either.

3          So I don't know that there's any relevance here.  As

4    to the question of the underlying email somehow being relevant

5    to show the types of requests that are at issue, the

6    end-of-life products that Samsung no longer manufactures are

7    not -- this product, this request, this email is not a part of

8    our damages request.

9          It's not in our -- this cover, if you want to call

10    it that, for this product is not part of our case.

11          THE COURT:  Based on the fact that this is not part

12    of the damages request, I'm going to keep it out under 403

13    because I think it's confusing.

14          MR. RHOW:  Your Honor, I'm sorry.  I just need

15    confirmation then about the other email request as to whether

16    they are part of the damages or not.  And that's part of the

17    problem in the case --

18          THE COURT:  Counsel, I'm ruling on whether this

19    testimony comes in, and I'm ruling that it doesn't come in

20    because I think it's confusing and not relevant because the

21    specific email that this is referring to is not part of the

22    damages case.  So let's bring in the jury and get started.

23          (In the presence of the jury.)

24          THE COURT:  Welcome back to the jurors.  We'll get

25    started right away.  Mr. Knuth is still on the stand.

```
1              Counsel, you can proceed.

2              MR. DOREN:  Thank you, Your Honor.

3   BY MR. DOREN:

4       Q      Since we've taken a break, let's change

5   directions here for just a second.  Can you look, please, at

6   Exhibit 141.

7              Mr. Knuth, do you recognize this as an email

8   string from January 2017 with the top email being from you to

9   Harrison Yoo and Lane Kim?

10      A      Yes.

11      Q      And you sent it on January 24, 2017, correct,

12  that first email in this chain?

13      A      Are they going to turn the monitor on?

14      Q      Just stay with me for a minute until we get it

15  admitted into evidence, and then we will.  That's the rules of

16  the process.

17      A      Sorry.  What was your question?

18      Q      Sure.  This is an email chain, the first in this

19  document which is from you to Harrison Yoo and Lane Kim on

20  January 24, 2017; correct?

21      A      Yes.

22             MR. DOREN:  Your Honor, I'd move Exhibit 141 into

23  evidence.

24             THE COURT:  Objections?

25             MR. RHOW:  No objection, Your Honor.
```

1                    THE COURT:  Exhibit 141 is in evidence.

2                    (Exhibit No. 141 received into evidence.)

3                    MR. DOREN:  Thank you, Your Honor.

4          Q       You can now look at the monitor and save yourself

5    some eye strain.

6                    Directing your attention to the carry-over email

7    at the bottom of 27 to the top of 28.  It's regarding eMMC

8    support plan for Netlist.  Do you see that?

9          A       Yes.

10         Q       At the top of the second page, there's a

11   statement, "Here are the Q1 BSPs."  Do you see that?

12         A       Yes.

13         Q       And what's a BSP?

14         A       Basic selling price.

15         Q       Then there are two product numbers; correct?

16         A       Yes.

17         Q       One is priced at $3 and one is priced at $4.80;

18   correct?

19         A       Yes.

20         Q       Then it goes on to say, "Q2 price is not fixed

21   yet but we expect as flat"; correct?

22         A       Yes.

23         Q       And then back on the first page, you get an email

24   from Mr. Yoo where he notes, "We are working positively for

25   securing the parts from March, but management is requesting our

```
 1   internal competitive pricing because we need to secure through
 2   sacrificing other accounts' product allocations to support
 3   Netlist."  Do you see that?
 4        A     Yes.
 5        Q     "First half pricing guides should be 3.50" -- "or
 6   3.50 and 5.50"; correct?
 7        A     Yes.
 8        Q     "Once Netlist is okay and we will provide support
 9   projection for Netlist"; correct?
10        A     Yes.
11        Q     And that was on January 22nd; correct?
12        A     Yes.
13        Q     And then above that you say, "Why the price
14   change?  I just confirmed this price to Netlist last week."
15   And you refer back to the $3 and $4.80 price scenarios;
16   correct?
17        A     Yes.
18        Q     In this situation, there were internal
19   communications that led to the price changing to Netlist from
20   $3.00 and $4.80 to $3.50 and $5.50; correct?
21        A     That is the discussion.  I'm not sure what
22   happened.
23        Q     You don't remember?
24        A     I don't remember what would happen afterwards.
25        Q     Thank you.  Let's turn now, please, sir, to
```

1    Exhibit 510 which is in your binder.

2              And, Mr. Knuth, I'll warn you in advance.  This

3    one will not be up on your monitor and it's very small print.

4    But I will keep it quick.  Okay?

5         A    It's brutal.

6         Q    And Exhibit 510 is an email exchange between you

7    and Raymond Jiang on June 6, 2017; correct?

8         A    Yes.

9         Q    And it relates to eMMC pricing; correct?

10        A    Yes.

11        Q    And you heard testimony about the question of

12   eMMC orders from Netlist and whether Netlist canceled them and

13   why and that sort of -- all of that topic?  Do you recall that?

14        A    Yes.

15        Q    If you look at the second page of this exhibit,

16   it shows the 2017 eMMC price trends; correct?

17        A    Yes.

18        Q    It shows that from January to May, the price for

19   a 16 gigabyte average price went from 6.46 to 5.28, $6.46 to

20   $5.28; correct?

21        A    Can I take your word for this?

22        Q    That is what the document says.  I will represent

23   to you I have accurately represented it.

24              If you go back to the first page, Raymond Jiang

25   says, "Neal, we have a price issue regarding the 16 gigabyte

```
 1    eMMC.  The market price for 16 gigabyte eMMC has deteriorated

 2    further in recent weeks."  Do you see that?

 3         A     Yes.

 4         Q     You responded, "Didn't we agree on NC/NR and

 5    price per quarter?"

 6         A     (No audible response.)

 7         Q     You wrote that on June 6th; correct?

 8         A     I did.

 9         Q     And do you recall when these parts were ordered

10    by Netlist?

11         A     Sir, there's two sets of orders for eMMC.  One

12    order I believe shipped, and the second order Netlist canceled.

13         Q     And when was that second order -- when was the

14    purchase order first placed for the second order?

15         A     From my -- we showed it yesterday, and I believe

16    it was April.

17         Q     Okay.  And then you see above, Mr. Jiang says,

18    "We are not trying to cancel.  We just need pricing that

19    reflects changes in the market."  Do you see that?

20         A     Yes.

21         Q     Let's go back to our previous topic and the

22    product allocations through 2017 and forward.  And if you could

23    please look at Exhibit 149.

24               THE COURT:  Counsel, did you intend to move 510

25    into --
```

1          MR. DOREN:  Oh, thank you, Your Honor.  I apologize.

2     Yes, I ask that Exhibit 510 be admitted.

3          THE COURT:  Any objection, Counsel?

4          MR. RHOW:  No objection.

5          THE COURT:  Exhibit 510 is admitted.

6          MR. DOREN:  Thank you.

7          (Exhibit No. 510 received into evidence.)

8     BY MR. DOREN:

9     Q     We've moved on to Exhibit 149.  Do you have that

10    in front of you?

11    A     Yes.

12    Q     Do you recognize this as an email chain from

13    September 2017 between and you Lane Kim?

14    A     Yes.

15    Q     Now at this point in time, in September 2017, the

16    allocation for Netlist was $1 million, correct, per month?

17    A     I don't recall the exact -- I don't recall the

18    exact -- that's what it says.

19    Q     Okay.  And take a look, please, at the second

20    page of the email where you say, "Hi Lane.  We are currently at

21    $999,564.20 for Netlist's shipments in September."  And by the

22    way, numbers like that are what you meant by saying you would

23    work with Netlist to make sure they stayed within that

24    allocation; right?

25    A     Yes.

1     Q     And you then go on to say, "I would like to ship

2  the below samples, about $250,000.  Would it be okay?  These

3  are in HQ warehouse."  Do you see that?

4     A     Yes.

5     Q     You wanted to send an amount of product that

6  would take the September shipments above $1 million; correct?

7     A     Yes.

8           MR. DOREN:  Your Honor, I'd like to move into

9  evidence, please, Exhibit 149.

10          THE COURT:  Objection, Counsel?

11          MR. RHOW:  Subject to the prior discussion, no

12  objection, Your Honor.

13          THE COURT:  Exhibit 149 is admitted into evidence

14  subject to objections discussed with counsel.

15          (Exhibit No. 149 received into evidence.)

16          MR. DOREN:  My apologies to the Court and jury for

17  not having this up on the screen earlier.

18     Q     So we are on page 2.  And, Mr. Knuth, you see

19  there where you say, "I would like to ship the below samples,

20  about $250,000."  There you were asking for permission to ship

21  more than $1 million in products to Netlist; correct?

22     A     Same question as the last; right?

23     Q     Can you answer the one I just asked?

24     A     Yes.

25     Q     Is that the answer to my question, yes?

1      A      Yes.

2      Q      Thank you.  And then you say, "These are in HQ

3   warehouse."  So these products were on hand; is that right?

4      A      In Korea.

5      Q      They were available.  Let's put it that way.

6      A      Yes.  Transit time was probably a factor.

7      Q      Okay.  You can point out to me where transit time

8   comes up in the email, if you can.

9             And then on the bottom email on the first page,

10  Mr. Kim responds, "Neal, let's keep $1 million support plan and

11  ship these out in October.  We need to keep it."  Do you see

12  that?

13     A      Yes.

14     Q      And your response is, "I really need 100,000

15  more.  We were short in the past.  No way?"  Do you see that?

16     A      Yes.

17     Q      And then the response from Mr. Kim is, "Neal,

18  sorry.  Let's keep JS commitment.  It's not carryover."  What's

19  the JS commitment?  Is that Mr. J. S. Choi's $1 million

20  allocation decision?

21     A      It says, "JS commitment."

22     Q      That's what you understand that to mean; correct?

23     A      Probably.

24     Q      And then it goes on to say, "It's not carryover,"

25  meaning that just because in past months there may have been

 1   some dollars left under a million, they couldn't be used now;

 2   right?

 3        A       In this context, I'm not quite sure.

 4        Q       Okay.  You don't remember this exchange; is that

 5   right?

 6        A       No, I do not.

 7        Q       Now, in early 2018 -- so now we are moving into

 8   2018 -- you told Netlist that its allocation was going to be

 9   reduced to zero; right?

10        A       Can you repeat that question?

11        Q       Sure.  In early 2018, you told Netlist that its

12   allocation was being reduced to zero; correct?

13        A       I'm not sure if I told them.

14        Q       You know that Samsung told Netlist that its

15   allocation was being reduced to zero; correct?

16        A       I believe so.

17        Q       In fact, in February 2018, it was zero; correct?

18        A       As I recall.

19        Q       And so if Netlist wanted to purchase any memory

20   chips or any SSDs made by Samsung, it had to go to resellers or

21   some other source because Samsung would not provide them;

22   correct?

23        A       I believe in that month.

24        Q       Take a look, please -- well, let me ask you this.

25   Do you recall from zero it went up to $500,000?

**UNITED STATES DISTRICT COURT**

```
1        A       No.  But I do recall we made shipments in January

2   of '18, March of '18, and throughout the rest of the year.

3                MR. DOREN:  Your Honor, I'd move to strike

4   everything after "no."

5                THE COURT:  Motion granted.

6   BY MR. DOREN:

7        Q       Now, sir, take a look, please, at Exhibit 251.

8   251 is an email chain from April 12, 2018, between you,

9   Mr. Metz, and Lane Kim; correct?

10       A       Yes.

11               MR. DOREN:  Your Honor, I would move Exhibit 251

12  into evidence.

13               THE COURT:  Objection, Counsel?

14               MR. RHOW:  Sorry, Your Honor.  Let me -- Your Honor,

15  subject to the prior discussion, no objection.

16               THE COURT:  251 comes in subject to the objections

17  earlier.

18               (Exhibit No. 251 received into evidence.)

19  BY MR. DOREN:

20       Q       You wrote to your supervisor and you copied

21  Lane Kim at 9:14 a.m. that day, and you said, "I have to ask.

22  Considering possible market getting a bit softer, could we

23  increase Netlist allocation?"  Do you see that?

24       A       Yes.

25       Q       And then you say, "I could get them almost
```

1    immediately to $2 to $3 million per month."  And by that you

2    meant that with a higher allocation, you knew that Netlist

3    would purchase between $2 to $3 million in products each month;

4    correct?

5         A    Again, positioning as a salesperson, I'm trying

6    to get more product, yes.

7         Q    More product for your customer; right?

8         A    For all my customers.

9         Q    And right here Netlist; right?

10        A    Yes.

11        Q    You knew that if Netlist could have $2 to

12   $3 million in product upon request, it would take it; correct?

13        A    I positioned it that way.

14        Q    And you believed it; right?

15        A    (No audible response.)

16        Q    You weren't lying to Mr. Kim, were you?

17        A    I'm in sales.

18        Q    You lie?

19        A    I position it --

20        Q    You position things?

21        A    I position things carefully when I'm trying to

22   get more product.  It's my job.

23        Q    So did you or didn't you believe that you could

24   almost immediately get Netlist to $2 to $3 million per month in

25   memory chips and SSDs?

1      A      I hoped so.

2      Q      Did you believe it, sir?

3      A      (No audible response.)

4      Q      Did you tell Mr. Kim and Mr. Metz the truth?

5      A      I knew at some point -- I'm a very good

6  salesperson.  I thought I could.

7      Q      Because it would be that hard to get Netlist to

8  take more product?  Is that your testimony?

9      A      I don't know the market condition at this time.

10     Q      Sir, I've noticed your answers have changed a

11  little bit since the break.  Did you have an opportunity to

12  confer with counsel during the break?

13     A      Yes.

14     Q      I thought you might have.

15            So I'm going to ask you to please focus on the

16  questions I'm asking you and answer them just as you heard

17  Mr. Rowe ask the witnesses from Netlist to do.  All right?

18     A      Yes.

19     Q      Now, you wrote to Mr. Kim and your superiors on

20  April 12, 2018, that you could get Netlist almost immediately

21  to $2 to $3 million per month; correct?

22     A      That is what I wrote.

23     Q      And you heard Mr. Hong, Mr. Chuck Hong, testify

24  in this Court that at the time that we started seeing these

25  March and April 2017 emails, at that point in time, Netlist was

```
 1    purchasing about $2 million, multiple millions of dollars in

 2    product from Samsung every month, correct, in 2017?

 3         A      I would like to see the sales history.  I --

 4         Q      And you know that when the cap was set, the cap

 5    on the allocation was set, that that was far below what Netlist

 6    was using in the spring of 2017; right?

 7         A      Can you repeat that question?  It's very

 8    confusing.

 9         Q      It was confusing?

10         A      Yes.

11         Q      You know that Netlist was purchasing more product

12    before a limit was put on its allocation than after; correct?

13         A      Before the allocation, yes, I believe so.

14         Q      Before the allocation cap; correct?

15         A      The allocation, sir.

16         Q      So there was no allocation before?  It was

17    unlimited supply; correct?

18         A      In what period?

19         Q      Before the allocation.

20         A      Yes.

21         Q      So consistent with the JDLA which required that

22    Samsung will supply NAND and DRAM products to Netlist on

23    Netlist's request, there was no allocation prior to the spring

24    of 2017?

25              MR. RHOW:  Your Honor, that calls for a legal
```

1    conclusion.

2          THE COURT:  Yeah, I think that does.  I think he can

3    answer the question without reference to the JDLA.

4    BY MR. DOREN:

5          Q    So prior to the spring of 2017, Samsung made all

6    NAND and DRAM products available to Netlist upon request;

7    correct?

8          MR. RHOW:  Your Honor, that literally calls for a

9    legal conclusion based on the objection you granted --

10         THE COURT:  He can answer the question.

11         THE WITNESS:  If they would place a purchase order,

12   I'd do my best to service it.

13   BY MR. DOREN:

14         Q    So before April, May 2017, if Netlist submitted a

15   purchase order, you would do your best to service it; right?

16         A    That hasn't changed from the time I supported

17   Netlist.

18         Q    Well, but it did change though, didn't it?

19   Because now purchase orders cannot be submitted until after

20   support has been approved.  That's your testimony; correct?

21         A    I've worked 21 years for Samsung, and that's the

22   way it's been for 21 years.

23         Q    Okay.  I don't know what you are telling me, sir.

24         But prior to April 2017, Netlist would be

25   supplied with NAND and DRAM upon request, yes?

```
 1        A       With a purchase order.

 2        Q       Sure, if they filed a purchase order.

 3                After April 2017, Netlist was not entitled to

 4   DRAM and NAND products upon request; correct?

 5        A       I have to have a support plan for it.

 6        Q       You have to have headquarters' approval before

 7   you can agree to sell anything to Netlist from April 2017

 8   forward; correct?

 9        A       I have to have a support plan to ship product to

10   all my customers.

11        Q       Including Netlist; correct?

12        A       Yes.

13        Q       And by "support plan," you mean headquarters'

14   approval to sell the product to them; correct?

15        A       To sell to everybody.

16        Q       Including Netlist; correct?

17        A       Yes.

18        Q       Now, in this email, you go on to say, "Currently

19   limited to $500,000 per month starting last month again."  Does

20   that refresh your recollection that in April 2018 or

21   March 2018, the allocation was $500,000 per month?

22        A       Yes.

23        Q       And then you go on to say, "(February was zero)"

24   and that's consistent with your prior testimony that

25   February 2018, there was no allocation for Netlist; correct?
```

```
1      A       There were no sales to Netlist, correct.

2      Q       There was no allocation; right?

3      A       Sales.

4              MR. DOREN:  No further questions.

5              THE COURT:  Thank you, Counsel.

6              Any redirect?

7              MR. RHOW:  Yes.  Yes, Your Honor.

8                        REDIRECT EXAMINATION

9  BY MR. RHOW:

10     Q       Mr. Knuth, we are not going to go into documents,

11 and hopefully that will go faster.

12     A       Can I put these away?

13     Q       You can do that.

14             First of all, you said you were a little nervous.

15 As a salesman, do you testify -- or have you ever testified?

16     A       Never.

17     Q       Now, I want to focus on two things.  I think in

18 response to a number of Mr. Doren's questions, I think you kept

19 indicating that you do this for Netlist and for everybody, for

20 all your customers.

21     A       Correct.

22     Q       How many customers did you have in general in the

23 2015 to 2020 time frame?

24     A       Right now I have 65.  So I probably had about 60.

25     Q       And so we've seen a variety of different emails,
```

1    and I'm not going to go through them.  But all of that email

2    commotion that you've seen with Netlist, is that common with

3    your other customers as well?

4         A     A lot of it is.

5         Q     And we've used this word "allocation."  No one

6    has defined it for the jury.  So could you do that?  First of

7    all, "allocation" is a term of art in the chip industry?

8         A     It's a very common occurrence.

9         Q     Could you explain to the jury what that actually

10   means.

11        A     It really means there's people that want to buy

12   more of your product than you have.  It's limited on lead time.

13   You know, lead times as allocation.  As people want to buy more

14   of your product, the lead time keeps on going out and out and

15   out, and it goes out to 20 weeks, 30 weeks.  I think we heard

16   somebody in the jury talk about that.

17             You know and when you are accepting new orders,

18   it could be -- it has to be after the 30 weeks, 32 weeks.  So a

19   lot of times you kind of slow down because a lot of my backlog

20   gets canceled.

21             Some of the other factors of allocation are

22   price.  We talked about lead times, yields from the factory,

23   natural disasters.  We've had earthquakes that have closed down

24   support, supply.  We've had floods.  We've had fires.  We've

25   had pretty -- power outages.  All those factors create -- and

1    new product introductions from some customers, the iPhone

2    created a huge allocation during when Apple was launching the

3    iPhone.

4         Q        Another term that's been used quite a bit but no

5    one has defined is "lead time."  Can you explain to the jury

6    what "lead time" means.

7         A        Sure.  So from what I understand -- and I'm not

8    the manufacturing person -- but lead time is about -- from

9    start to finish to make a wafer that creates a semiconductor

10   takes about six to eight weeks.  So that six to eight weeks

11   doesn't include if you have any prior backlog.

12             So customers will start playing backlog.  And as

13   customers keep playing backlog -- placing backlog, that lead

14   time keeps going out farther and farther and farther, and it's

15   very challenging.

16             And at some point, I have -- as I'm managing this

17   business, I have to stop taking orders because it's just -- you

18   are not going to wait 40 weeks for a part.  So I just --

19        Q        We saw some situations where you did ask folks to

20   hold up on POs until you could get support.  Were lead times a

21   factor in those requests to customers?

22        A        Absolutely.  I have to make sure that a

23   customer -- I don't want bad backlog.  So I have to make sure a

24   customer understands what the lead time is.  I have to

25   understand what the lead time is because it can change.  And I

```
 1   have to go to the factory and just understand when I can get

 2   the next shipments.

 3        Q      And so in that situation where you are telling a

 4   customer to not yet issue a PO, as the lead times get smaller,

 5   would you expect them to issue a PO later?

 6        A      I would hope.

 7        Q      And by the way, in your discussions with Netlist,

 8   are the Netlist folks aware of this lead time issue?

 9            MR. DOREN:  Objection, Your Honor.  Foundation.

10            THE COURT:  I think you can maybe lay a little more

11   foundation for that.

12   BY MR. RHOW:

13        Q      Have you discussed lead time issues with folks at

14   Netlist?

15        A      Yes.

16        Q      Can you tell me some of the folks you've

17   discussed lead time issues with?

18        A      Paik Ki Hong, Devon Park, Raymond Jiang,

19   Steven Yu.

20        Q      In response to any of the emails we've seen to

21   Netlist where you have indicated that they might need to wait

22   on a PO, did you ever get an email, a phone call, a text from

23   anyone at Netlist indicating this is a breach of the JDLA?

24        A      No.

25        Q      Now, the allocation concept you just explained,
```

1    based on the customers you have, does that same allocation

2    dynamic apply to them?

3         A      Yes.

4         Q      So is that why in a lot of your answers you would

5    always say "and my other customer as well"?  This is an issue

6    that globally affects all your various customers?

7         A      It affects the semiconductor industry.  Everyone

8    understands lead time.

9         Q      One other thing we saw in some emails is the

10   concept -- I think there was a request from Samsung Korea -- I

11   can't remember -- for confirm backlog, confirm POs and from

12   here on out we need confirmation of certain things.  Why was

13   that important?

14        A      Because if a customer is looking to place, let's

15   say, a PO in Q1 of next year and my lead time is 16 weeks,

16   unless I can negotiate with the factory to somehow improve

17   that, I -- I'm setting false expectations for my customers that

18   they are going to get product within that time frame.

19        Q      Between 2015 -- well, strike that.

20               You were in the courtroom when you heard Mr.- --

21   I think both Mr. P. K. Hong and Mr. Chuck Hong talk about how

22   before May of 2017, everything was cool between Netlist and

23   Samsung.  Do you recall that testimony?

24        A      Yes.

25        Q      Now, between 2015 and 2020, in terms of your

```
 1    practices that you've been talking about with Mr. Doren, have

 2    your practices vis-a-vis Netlist ever changed?

 3         A      No.

 4         Q      And so the practices that Mr. Doren has been

 5    talking about from 2015 through the middle of 2017 which

 6    Samsung -- I'm sorry -- which Netlist was cool with, suddenly

 7    became an issue after that as far as you know; correct?

 8         A      Can you repeat that?

 9         Q      I'll withdraw.

10                Now, in terms of the -- I think Mr. Doren

11    mentioned that in February 2018, there was a zero allocation

12    month.

13         A      Yes.

14         Q      Other than that month, is it your recollection

15    that there was continuous supply to Netlist but at different

16    levels?

17         A      Yes.

18         Q      Is that common among your customers?

19         A      Absolutely.

20                MR. RHOW:  Nothing further, Your Honor.

21                THE COURT:  Any recross?

22                MR. DOREN:  Thank you, Your Honor.

23                        RECROSS-EXAMINATION

24    BY MR. DOREN:

25         Q      Mr. Knuth, I'm asking you this question to know
```

**UNITED STATES DISTRICT COURT**

```
 1    what facts you know on this.  I'm not asking you for a legal

 2    conclusion.  All right?

 3                     As to your 65 customers, do any other than

 4    Netlist have an agreement with Samsung that Samsung will supply

 5    NAND and DRAM products to them on request?

 6         A     I've had had but not currently.

 7         Q     Thank you.

 8               THE COURT:  Counsel?

 9               MR. RHOW:  Nothing further, Your Honor.

10               THE COURT:  Go ahead and call your next witness.

11               MR. RHOW:  Your Honor, I believe we would be playing

12    both clips from Mr. Jiang.

13               THE COURT:  Okay.

14               MR. RHOW:  Your Honor, I think we are ready to play

15    it if you are.

16               THE COURT:  Okay.  Go ahead.

17               MR. RHOW:  Your Honor, one point of clarification.

18    I think, if appropriate, this clip contains designations from

19    both sides.  And so it's -- not all the clips are being offered

20    by both sides just to be clear.

21               THE COURT:  So again to the jurors, this is a

22    deposition.  The witness is not available to testify, but the

23    parties have agreed that that's appropriate here.  We are

24    playing video portions of the person's deposition.

25                     Some of the testimony Netlist wants to put in.  Some
```

```
 1    of the testimony Samsung wants to put in.  It's all being put
 2    together in one video.  So it's not going to be immediately
 3    apparent which side is advocating it, but you'll see all the
 4    testimony together.
 5              (Video deposition playing of Raymond Jiang.)
 6              THE COURT:  Counsel, is that it for the video?
 7              MR. RHOW:  I believe so, Your Honor.
 8              THE COURT:  You can go ahead and call your next
 9    witness.
10              MR. RHOW:  Your Honor, I believe we are going to
11    call Ms. Sasaki right now.
12              THE COURT:  Okay.
13              MR. FEINSTEIN:  Before the witness comes,
14    Your Honor, we've already distributed the documents we intend
15    to use with her.  You should have them and same with counsel.
16              THE COURT:  Okay.
17              THE COURTROOM DEPUTY:  Please stand here for me.
18    Raise your right hand.
19              Do you solemnly swear that the testimony you shall
20    give in the cause now before this Court shall be the truth, the
21    whole truth, and nothing but the truth, so help you God?
22              THE WITNESS:  I do.
23              THE COURTROOM DEPUTY:  Please be seated.
24              THE COURT:  You can proceed, Counsel, when the
25    witness gets seated.
```

1          MR. FEINSTEIN:  Does the witness have the exhibits

2     too?

3          THE COURTROOM DEPUTY:  Will you please state and

4     spell your name for the record.

5          THE WITNESS:  Sure.  It's Gail Sasaki, G-a-i-l,

6     S-a-s-a-k-i.

7          THE COURTROOM DEPUTY:  Thank you.

8                    GAIL SASAKI,

9     called as a witness, was sworn and testified as follows:

10                   CROSS-EXAMINATION

11    BY MR. FEINSTEIN:

12         Q     Good afternoon, Ms. Sasaki.

13         A     Good afternoon.

14         Q     You are the chief financial officer for Netlist?

15         A     Yes, I am.

16         Q     And as the chief financial officer, you are

17    responsible for, among other things, the preparation of the

18    financial reports for the company?

19         A     Yes.

20         Q     All right.  You are also responsible for making

21    sure the company has enough cash or credit to conduct its

22    business; correct?

23         A     Yes.

24         Q     You should have an exhibit in front of you that's

25    been marked as Exhibit 1224.  Do you see that?

1        A        I do.

2               MR. FEINSTEIN:  Your Honor, I ask Exhibit 1224 be

3    admitted and published.

4               THE COURT:  Can you lay a little more foundation

5    just for the record what it is.

6               MR. FEINSTEIN:  Sure.

7        Q        Ms. Sasaki, this is an email from you to a

8    Dong-Su Kim at Samsung dated June 7, 2016, a one-page email

9    with an attachment; correct?

10       A        Dong-Su Kim, actually he works at Samsung

11   Ventures, not Samsung Electronics.

12       Q        Okay.  But he works at Samsung; correct?

13       A        An entity of Samsung, yes.

14       Q        And this is an email you sent to him on that

15   date; correct?

16       A        Yes.

17       Q        With the attachment; correct?

18       A        Yes.

19               MR. FEINSTEIN:  Your Honor, we move that it --

20               THE COURT:  Any objection?

21               MR. DOREN:  No objection, Your Honor.

22               THE COURT:  1224 is admitted into evidence.

23               (Exhibit No. 1224 received into evidence.)

24               MR. FEINSTEIN:  Can you publish as well.

25       Q        What I'd like to do is just read, Ms. Sasaki, the

1    first -- it's a short email, the first sentence of it which

2    says, quote, "Without a Samsung credit line, we would not have

3    sufficient cash to conduct this business for the short and mid

4    term."

5              And you were referring there to Netlist

6    purchasing products from Samsung; correct?

7         A    Yes.

8         Q    All right.  You should also have in front of you

9    a document that's been marked as Exhibit 1020.  Do you see in

10   the upper corner of 1020 it's the form 10-Q?  Do you see that?

11        A    I do.

12        Q    This is one of the financial reports that you are

13   responsible for filing with the U.S. regulatory body?

14        A    Yes to the SEC.

15        Q    Correct.  All right.  Your Honor, I'd like to

16   admit this into evidence and have it published?

17             THE COURT:  Any objection to 1020.

18             MR. DOREN:  No objection.

19             THE COURT:  Exhibit 1020 is admitted.

20             (Exhibit No. 1020 received into evidence.)

21   BY MR. FEINSTEIN:

22        Q    Exhibit 1020 is what's called a form 10-Q;

23   correct?

24        A    Yes.  It's a 10-Q.

25        Q    So a 10-Q for maybe those who aren't experienced

```
 1   with them are documents that are filed by a publicly-traded

 2   company quarterly with the United States Securities and

 3   Exchange Commission; correct?

 4        A     That's correct.

 5        Q     And you -- you signed this document; correct?

 6        A     Yes.

 7        Q     Can we turn to the very last page?

 8              So that shows your signature as the CFO, chief

 9   financial officer of the company; correct?

10        A     That's correct.

11        Q     This was -- you signed this November 14, 2017;

12   right?

13        A     Correct.

14        Q     Also signed by Mr. Chun K. Hong, the CEO of the

15   company; correct?

16        A     Yes.

17        Q     Same time period; right?

18        A     Yes.

19        Q     And Netlist files these financial reports every

20   quarter with the United States Securities and Exchange

21   Commission; right?

22        A     That's correct.

23        Q     These are official filings; correct?

24        A     Yes, that's correct.

25        Q     And you certified that the content of this
```

 1    document is correct?

 2         A      Yes.

 3         Q      And you understood at the time that investors,

 4    people who follow Netlist as a publicly-traded company, review

 5    these kinds of filings; right?

 6         A      Yes.

 7         Q      So I'd like to turn to page 33.

 8                And let's blow up the first paragraph.

 9                I'm just going to read a small part of this,

10    Ms. Sasaki.

11                The first sentence we can highligh which says,

12    quote, "With respect to sales of our memory subsystems, our

13    original equipment manufacturer customers typically provide us

14    with nonbinding forecasts of future product demand over

15    specific periods of time, but they generally place orders with

16    us no more than two weeks in advance of the desired delivery

17    date."

18                That was a true and correct statement in this

19    10-Q; correct?

20         A      Yes.

21                MR. FEINSTEIN:  I have no further questions.

22                THE COURT:  Thank you.  Any cross-examination?  Or

23    redirect?

24                MR. DOREN:  No cross-examination, Your Honor.

25                THE COURT:  Yes.

```
 1                    REDIRECT EXAMINATION

 2  BY MR. DOREN:

 3       Q     Ms. Sasaki, it's good to see you.  If I could

 4  direct your attention please to 1020 which is the 10-Q.

 5            The sentence that was just read to you, does that

 6  have anything to do with forecasts or requests for products

 7  submitted to Samsung by Netlist?

 8       A     No.

 9       Q     What does this pertain to?

10       A     This pertains to customers of ours, not vendors.

11       Q     Okay.  So these are the folks you sell your

12  products to?

13       A     Correct.

14       Q     And if I could ask you to look, please, at

15  Exhibit 1224.  Counsel didn't really ask you any questions

16  about what that document is.  Can you describe for the jury,

17  please, what you meant back in June 2016 about "Without a

18  Samsung credit line, we would not have sufficient cash to

19  conduct this business for the short and mid term"?

20       A     Sure.  The business that we were referring to

21  there was business that we were projecting out for 12 months in

22  the amount of -- I think I have several charts which I was

23  talking to Dong-Su about and about -- in the amount of about

24  20 million per quarter.  It was -- it didn't have anything to

25  do with the current business we were conducting with Samsung at
```

```
 1    the time.
 2              And as I mentioned earlier, Dong-Su was with the
 3    venture capital part of Samsung, and we were a portfolio
 4    company.  So he was trying -- you know, it was his job to help
 5    us to be successful with the JDLA which we had all envisioned
 6    would improve and grow our revenue significantly over time.
 7         Q    Did this have anything to do with how purchases
 8    of memory chips were financed?
 9         A    It could have if we were able to get to those
10    larger dollars which we were never able to because Samsung took
11    us to zero.
12         Q    And if you had been able to get to those extra
13    dollars, would you have had the money to grow the business?
14         A    Yes.
15         Q    And has Netlist ever lacked the money to purchase
16    the products that it has ordered from Samsung?
17         A    No.
18         Q    And in terms of kind of an ongoing credit line
19    with Samsung as part of the -- as part of your purchasing
20    memory chips from Samsung, is that collateralized in any way?
21         A    Yes.
22         Q    How is it collateralized?
23         A    So the current arrangement with Samsung even
24    today is that we set aside a portion of cash at our bank and we
25    reserve it for Samsung.
```

```
 1               So I think in this period of time, it was
 2  probably we put aside about a million dollars in our bank
 3  account so if Samsung, you know, ever went over their dollar
 4  amount which they had agreed to, say it was a million, and we
 5  didn't pay, then the bank would pay.
 6          Q      The bank would pay Samsung?
 7          A      Yes.
 8          Q      And was that arrangement in place from 2015
 9  through 2020?
10          A      Yes.  In about that dollar amount, yes.
11               MR. DOREN:  Thank you.  No further questions.
12               THE COURT:  Mr. Feinstein, any further questions?
13               MR. FEINSTEIN:  No.
14               THE COURT:  You are excused.
15               THE WITNESS:  Thank you.
16               THE COURT:  Don't look so happy.
17               We will break for lunch at this point, and we will
18  come back at 1:00.
19               THE COURTROOM DEPUTY:  All rise.
20               (Outside the presence of the jury.)
21               THE COURT:  What's left to do by way of witnesses?
22               MR. RHOW:  It is just -- I believe just our expert,
23  Your Honor.
24               THE COURT:  The expert will testify after lunch?
25               MR. RHOW:  Correct.
```

```
 1                THE COURT:  And then any time estimate for that?

 2                MR. YODER:  About 20 minutes, Your Honor.

 3                THE COURT:  What do you think for cross, Mr. Doren?

 4   Mr. Lo?

 5                MR. LO:  Very short, maybe five minutes.

 6                THE COURT:  When we come back at 1:00, we'll have

 7   the expert testimony.  And then once he's off the stand,

 8   Samsung will close.

 9                I'll read the closing jury instructions.  And then

10   we'll take a break for, say, 15 minutes so you can get your

11   papers together, and we'll do closing arguments.

12                Does that work?

13                MR. YODER:  Two things, Your Honor.  One, if we can

14   do a time check so we know how much time we have.

15                THE COURT:  Uh-huh.

16                MR. YODER:  By my calculations, I know we had an

17   hour and 17 minutes at the end of the day yesterday.  And my

18   notes show that the direct of Mr. Knuth was five minutes, the

19   redirect was six.

20                Our designation of Jiang was two and a half minutes,

21   and I believe that's been worked out with counsel.  And then

22   the direct of Ms. Sasaki was five minutes.

23                So as I tally that up, it's about 58 or 59 minutes

24   left.

25                THE COURT:  Does that equate with what Netlist has
```

**UNITED STATES DISTRICT COURT**

```
 1   got in its numbers?
 2            MR. DOREN:  It's the right order of magnitude,
 3   Your Honor, yes.
 4            THE COURT:  From the -- so the video, two and a half
 5   minutes of the video counts towards Samsung, the rest counts
 6   towards Netlist; is that right?
 7            MR. DOREN:  Yes.
 8            THE COURT:  And I think that's approximately where
 9   we are as well.  I don't -- I can get you our official numbers
10   shortly because I think we were trying to figure out -- you
11   know, with the video how it would count.  But that --
12            MR. YODER:  The second thing, Your Honor, I thought
13   we were going to have argument on our motion to strike and
14   motion for judgment.
15            THE COURT:  Right.  So I thought what we would do is
16   come back at -- the jury is going to come back at 1:00.
17            THE COURTROOM DEPUTY:  The food isn't here yet.  I
18   sent --
19            (Discussion held off the record.)
20            THE COURT:  So maybe we can come back at 12:45 and
21   hear those motions.
22            MR. YODER:  Fine with us, Your Honor.  Thank you.
23            THE COURT:  Okay.  Thank you, everybody.
24            MR. DOREN:  Thank you, Your Honor.
25            MR. RHOW:  Thank you, Your Honor.
```

**UNITED STATES DISTRICT COURT**

1          THE COURTROOM DEPUTY:  All rise.  Court is in

2    recess.

3          (At 12:00 p.m. the lunch recess was taken.)

1    **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5         I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7    FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8    THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9    THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12   IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13   CONFERENCE OF THE UNITED STATES.

14

15

16              DATED THIS  4TH  DAY OF DECEMBER, 2021.

17

18

19              /S/ MAREA WOOLRICH

20              _____
                MAREA WOOLRICH, CSR NO. 12698, CCRR
                FEDERAL OFFICIAL COURT REPORTER
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**$**

**$10** [2] - 81:12, 81:14
**$15** [1] - 68:13
**$250,000** [2] - 98:2, 98:20
**$3.00** [1] - 94:20
**$3.50** [1] - 94:20
**$35** [1] - 68:13
**$4.80** [3] - 93:17, 94:15, 94:20
**$5.28** [1] - 95:20
**$5.50** [1] - 94:20
**$500,000** [11] - 53:15, 56:18, 74:13, 74:15, 79:25, 80:16, 83:10, 100:25, 106:19, 106:21
**$6.46** [1] - 95:19
**$999,564.20** [1] - 97:21

**'**

**'17** [2] - 40:9
**'18** [3] - 43:24, 101:2
**'19** [1] - 43:24

**0**

**0007** [1] - 46:20
**007** [1] - 46:20

**1**

**1** [7] - 4:5, 84:9, 97:16, 98:6, 98:21, 99:10, 99:19
**1.6** [1] - 79:7
**10** [1] - 24:14
**10-K** [4] - 9:21, 11:4, 11:15, 12:14
**10-Q** [8] - 5:20, 8:12, 117:10, 117:22, 117:24, 117:25, 119:19, 120:4
**100** [4] - 49:14, 49:24, 50:8, 62:17
**100,000** [1] - 99:14
**101** [1] - 3:21
**1020** [10] - 3:24, 5:20, 117:9, 117:10, 117:17, 117:19, 117:20, 117:22, 120:4
**107** [1] - 3:10
**10:29** [1] - 85:7
**10:40** [2] - 85:2, 85:6
**112** [1] - 3:11
**115** [1] - 3:12

**116** [1] - 3:25
**117** [1] - 3:24
**12** [6] - 22:22, 24:14, 86:22, 101:8, 103:20, 120:21
**120** [1] - 3:13
**1224** [9] - 3:25, 5:20, 6:18, 6:19, 115:25, 116:2, 116:22, 116:23, 120:15
**12:00** [1] - 125:3
**12:45** [1] - 124:20
**13** [2] - 22:22, 83:14
**13.2** [3] - 55:5, 55:6, 55:9
**1333** [1] - 57:9
**13th** [1] - 84:2
**14** [5] - 22:17, 22:18, 23:2, 23:9, 118:11
**141** [5] - 3:20, 92:6, 92:22, 93:1, 93:2
**144** [6] - 3:20, 73:14, 73:18, 74:2, 74:23, 74:25
**149** [6] - 3:21, 96:23, 97:9, 98:9, 98:13, 98:15
**15** [3] - 22:18, 77:14, 123:10
**15th** [1] - 11:3
**16** [10] - 24:5, 24:6, 51:15, 61:10, 62:8, 62:12, 95:19, 95:25, 96:1, 111:15
**17** [3] - 24:6, 56:21, 123:17
**1700** [1] - 2:16
**18** [3] - 26:13, 26:14, 26:15
**180-day** [1] - 23:4
**1875** [1] - 2:11
**18th** [1] - 2:13
**19** [1] - 88:14
**1:00** [3] - 122:18, 123:6, 124:16

**2**

**2** [9] - 82:4, 82:17, 98:18, 102:1, 102:3, 102:11, 102:24, 103:21, 104:1
**2-708** [1] - 19:12
**2-715** [1] - 19:12
**20** [4] - 89:17, 108:15, 120:24, 123:2
**200,000** [1] - 7:16
**2015** [7] - 28:13, 28:15, 107:23, 111:19, 111:25,

**112**:5, 122:8
**2016** [9] - 6:21, 10:12, 10:18, 10:22, 12:3, 12:8, 58:3, 116:8, 120:17
**2017** [70] - 5:21, 10:18, 11:2, 12:9, 33:21, 35:2, 35:14, 37:14, 38:24, 40:8, 40:21, 41:16, 43:24, 46:17, 48:18, 48:21, 49:19, 50:5, 50:18, 50:24, 51:9, 51:12, 51:16, 57:3, 61:10, 61:21, 62:8, 62:12, 62:22, 64:1, 64:13, 67:9, 68:2, 68:13, 72:1, 72:9, 72:10, 73:16, 73:17, 75:6, 75:19, 75:24, 77:14, 80:12, 80:20, 81:20, 83:14, 84:2, 92:8, 92:11, 92:20, 95:7, 95:16, 96:22, 97:13, 97:15, 103:25, 104:2, 104:6, 104:24, 105:5, 105:14, 105:24, 106:3, 106:7, 111:22, 112:5, 118:11
**2018** [10] - 100:7, 100:8, 100:11, 100:17, 101:8, 103:20, 106:20, 106:21, 106:25, 112:11
**2020** [5] - 11:3, 28:15, 107:23, 111:25, 122:9
**2021** [2] - 3:2, 4:1
**21** [3] - 28:9, 105:21, 105:22
**213** [1] - 86:22
**214** [1] - 85:24
**215** [2] - 24:15, 85:24
**219** [1] - 24:15
**21st** [1] - 46:22
**22** [1] - 62:22
**22nd** [1] - 94:11
**23** [4] - 64:13, 88:4, 89:21, 89:23
**23rd** [1] - 2:11
**24** [5] - 64:1, 65:19, 85:24, 92:11, 92:20
**24th** [3] - 46:22, 47:16, 65:18
**25** [2] - 14:10, 22:22
**251** [6] - 3:21, 101:7, 101:8, 101:11, 101:16, 101:18

**257** [10] - 3:22, 51:14, 51:15, 51:17, 51:21, 52:1, 52:5, 58:9, 60:8, 60:12
**260** [6] - 3:22, 83:13, 83:18, 83:23, 83:24
**262906** [1] - 60:19
**27** [1] - 93:7
**28** [5] - 3:9, 51:16, 57:3, 67:9, 93:7
**28th** [2] - 57:5, 72:7
**29** [6] - 3:19, 40:1, 40:14, 40:17, 40:18, 41:22
**294** [1] - 81:19
**295** [3] - 74:14, 80:4, 81:19
**296** [2] - 74:12, 78:23
**297** [1] - 77:11
**298** [1] - 74:10

**3**

**3** [10] - 3:2, 4:1, 53:19, 93:17, 94:15, 102:1, 102:3, 102:12, 102:24, 103:21
**3.50** [2] - 94:5, 94:6
**30** [2] - 108:15, 108:18
**30-page** [1] - 74:5
**30th** [2] - 5:21, 37:14
**31** [4] - 14:10, 37:14, 72:8, 72:10
**31st** [1] - 72:25
**32** [2] - 3:10, 108:18
**33** [4] - 6:1, 12:21, 12:22, 119:7
**333** [1] - 2:6
**35** [1] - 3:23
**357** [9] - 3:23, 37:9, 37:13, 37:17, 37:20, 37:22, 72:6, 72:7
**37** [1] - 3:23
**3rd** [2] - 35:14, 35:24

**4**

**4** [1] - 7:20
**40** [2] - 3:19, 109:18
**400** [1] - 2:13
**401** [3] - 5:24, 52:23, 86:9
**402** [1] - 58:16
**403** [5] - 5:24, 52:23, 74:7, 86:10, 91:12
**42** [1] - 28:7
**420** [1] - 15:21
**47** [1] - 3:19
**497** [6] - 3:23, 35:9, 35:11, 35:17, 35:20,

**35**:21
**4th** [2] - 35:14, 36:5

**5**

**5** [7] - 7:20, 20:11, 20:16, 21:2, 22:14, 40:8, 65:1
**5.28** [1] - 95:19
**5.50** [1] - 94:6
**500,000** [2] - 79:8, 83:9
**510** [7] - 3:24, 95:1, 95:6, 96:24, 97:2, 97:5, 97:7
**5298** [1] - 75:3
**58** [1] - 123:23
**59** [1] - 123:23
**597** [1] - 77:10
**5th** [2] - 42:6, 43:16

**6**

**6** [2] - 80:12, 95:7
**6.46** [1] - 95:19
**60** [2] - 3:22, 107:24
**610** [1] - 2:16
**65** [4] - 48:19, 50:13, 107:24, 113:3
**6th** [1] - 96:7

**7**

**7** [12] - 3:19, 10:12, 10:22, 12:3, 46:25, 47:11, 47:13, 47:16, 49:13, 81:20, 85:24, 116:8
**74** [1] - 3:20
**7th** [2] - 6:21, 12:8

**8**

**8** [1] - 40:8
**83** [1] - 3:22
**892** [5] - 69:18, 69:19, 69:25, 70:9, 71:14
**893** [2] - 69:19, 70:3
**896** [1] - 67:8
**897** [2] - 65:22, 65:24
**898** [2] - 65:22, 66:24
**8:29** [1] - 77:15
**8:39** [1] - 4:2
**8th** [3] - 42:7, 43:4, 43:16

**9**

**90-day** [1] - 21:8
**900** [3] - 64:10, 64:12,

64:16
**90067** [1] - 2:11
**90071** [2] - 2:6, 2:14
**902** [3] - 63:14, 64:1, 65:4
**904** [1] - 63:3
**905** [3] - 62:21, 62:22, 63:3
**906** [1] - 60:17
**92660** [1] - 2:16
**93** [1] - 3:20
**97** [1] - 3:24
**98** [2] - 3:21, 76:3
**9:14** [1] - 101:21

**A**

**A.M** [1] - 4:2
**a.m** [3] - 77:15, 85:7, 101:21
**ability** [4] - 7:12, 32:24, 44:11, 46:6
**able** [10] - 7:4, 7:6, 7:8, 9:4, 12:11, 12:18, 20:22, 121:9, 121:10, 121:12
**absolutely** [4] - 20:8, 77:1, 109:22, 112:19
**acceded** [2] - 18:3, 18:7
**accept** [5] - 33:2, 33:5, 56:19, 67:23, 78:4
**accepted** [1] - 68:3
**accepting** [1] - 108:17
**access** [1] - 14:14
**according** [1] - 16:6
**accordingly** [1] - 43:17
**account** [3] - 61:4, 61:7, 122:3
**accounts** [1] - 63:15
**accounts'** [1] - 94:2
**accurately** [1] - 95:23
**acknowledge** [2] - 21:20, 33:6
**acknowledged** [1] - 19:5
**activity** [1] - 31:19
**actual** [2] - 88:11, 89:20
**add** [6] - 17:11, 22:23, 38:9, 88:3, 88:6, 89:23
**added** [1] - 25:6
**adding** [1] - 56:21
**addition** [2] - 26:17, 57:17
**additional** [4] - 16:12, 17:21, 38:4, 57:9
**additionally** [1] -

87:18
**address** [2] - 20:17, 25:15
**addressed** [1] - 25:20
**admission** [2] - 8:4, 29:22
**admissions** [2] - 5:15, 7:15
**admit** [4] - 20:24, 35:16, 37:16, 117:16
**admitted** [10] - 10:19, 35:20, 37:20, 92:15, 97:2, 97:5, 98:13, 116:3, 116:22, 117:19
**advance** [4] - 6:8, 26:1, 95:2, 119:16
**adverse** [1] - 34:11
**advise** [1] - 83:9
**advisement** [1] - 15:4
**advocating** [1] - 114:3
**affects** [2] - 111:6, 111:7
**afternoon** [2] - 115:12, 115:13
**afterwards** [1] - 94:24
**ago** [2] - 40:23, 49:1
**agree** [8] - 12:3, 15:17, 34:17, 40:6, 58:18, 73:10, 96:4, 106:7
**agreed** [11] - 14:7, 15:21, 15:25, 16:18, 17:7, 18:16, 40:22, 41:1, 56:6, 113:23, 122:4
**agreement** [4] - 18:17, 34:10, 36:20, 113:4
**ahead** [9] - 20:2, 29:23, 30:23, 34:20, 46:2, 87:16, 113:10, 113:16, 114:8
**aid** [1] - 20:25
**Akemann** [7] - 20:18, 21:8, 22:25, 23:8, 24:9, 25:1, 25:11
**Akemann's** [4] - 21:23, 22:11, 23:17, 24:21
**allocation** [49] - 7:9, 7:11, 38:8, 39:3, 43:6, 43:13, 47:4, 48:10, 52:11, 55:20, 55:22, 57:8, 61:14, 69:2, 78:4, 78:17, 79:21, 80:21, 80:22, 80:23, 83:10, 84:8, 97:16, 97:24, 99:20, 100:8, 100:12, 100:15, 101:23,

102:2, 104:5, 104:12, 104:13, 104:14, 104:15, 104:16, 104:19, 104:23, 106:21, 106:25, 107:2, 108:5, 108:7, 108:13, 108:21, 109:2, 110:25, 111:1, 112:11
**allocations** [5] - 7:6, 7:7, 55:8, 94:2, 96:22
**allow** [4] - 26:10, 39:20, 58:4, 90:14
**almost** [5] - 10:13, 40:23, 101:25, 102:24, 103:20
**alternative** [1] - 21:6
**amount** [8] - 10:17, 69:5, 84:17, 98:5, 120:22, 120:23, 122:4, 122:10
**analysis** [3] - 22:10, 64:6, 89:10
**analyzing** [1] - 21:23
**Angeles** [3] - 2:6, 2:11, 2:14
**ANGELES** [1] - 4:1
**answer** [9] - 30:22, 39:4, 43:20, 44:15, 98:23, 98:25, 103:16, 105:3, 105:10
**answers** [3] - 87:16, 103:10, 111:4
**anticipate** [1] - 14:22
**apologies** [1] - 98:16
**apologize** [5] - 16:16, 17:24, 19:9, 60:5, 97:1
**apparent** [1] - 114:3
**appear** [2] - 16:1, 23:14
**appearances** [1] - 4:7
**APPEARANCES** [1] - 2:1
**Apple** [1] - 109:2
**applies** [1] - 34:16
**apply** [1] - 111:2
**appreciate** [2] - 27:4, 69:17
**approach** [2] - 20:9, 51:12
**appropriate** [2] - 64:5, 113:18, 113:23
**approval** [4] - 11:13, 78:16, 106:6, 106:14
**approve** [1] - 38:8
**approved** [9] - 11:12,

36:20, 41:13, 45:23, 46:7, 46:10, 46:13, 79:22, 105:20
**April** [14] - 11:2, 12:9, 57:16, 57:22, 65:10, 96:16, 101:8, 103:20, 103:25, 105:14, 105:24, 106:3, 106:7, 106:20
**AR** [1] - 69:15
**argue** [3] - 7:11, 7:15, 52:23
**argued** [2] - 9:1, 9:23
**argument** [6] - 10:8, 12:11, 21:17, 57:20, 89:18, 124:13
**argumentative** [1] - 39:18
**arguments** [1] - 123:11
**Arnold** [1] - 79:8
**arrangement** [2] - 121:23, 122:8
**art** [1] - 108:7
**aside** [3] - 90:13, 121:24, 122:2
**asserted** [1] - 54:13
**assist** [1] - 85:20
**assume** [1] - 69:1
**assures** [1] - 74:14
**attach** [1] - 55:24
**Attached** [1] - 68:10
**attachment** [3] - 6:21, 116:9, 116:17
**attention** [6] - 27:3, 60:14, 74:9, 78:23, 93:6, 120:4
**audible** [6] - 50:20, 66:6, 75:20, 96:6, 102:15, 103:3
**authenticated** [2] - 5:16, 5:22
**authenticity** [1] - 5:23
**authority** [1] - 18:1
**availability** [4] - 14:2, 61:13, 89:14, 89:21
**available** [6] - 7:16, 14:3, 38:22, 99:5, 105:6, 113:22
**Avenue** [1] - 2:6
**average** [1] - 95:19
**avoid** [2] - 65:1, 65:6
**avoiding** [2] - 69:12
**awake** [1] - 59:17
**aware** [4] - 54:8, 55:3, 55:6, 110:8

**B**

**background** [1] - 79:9

**backing** [1] - 18:17
**backlog** [20] - 36:8, 38:9, 56:10, 56:12, 56:16, 62:4, 63:7, 64:6, 66:17, 80:15, 81:2, 82:4, 82:17, 108:19, 109:11, 109:12, 109:13, 109:23, 111:11
**backtracking** [1] - 60:5
**bad** [1] - 109:23
**bank** [4] - 121:24, 122:2, 122:5, 122:6
**bar** [4] - 23:25, 26:18, 26:19, 26:21
**based** [8] - 28:22, 31:7, 61:13, 69:5, 82:20, 91:11, 105:9, 111:1
**basic** [1] - 93:14
**basis** [4] - 29:10, 41:11, 46:3
**BCC** [3] - 70:12, 70:15, 71:16
**Beach** [1] - 2:16
**became** [2] - 25:24, 112:7
**becomes** [1] - 11:10
**began** [7] - 10:13, 33:23, 35:2, 38:25, 40:25, 57:21
**begin** [1] - 57:19
**beginning** [4] - 14:18, 24:7, 58:9, 58:10
**begins** [7] - 11:2, 46:21, 51:15, 57:15, 57:16, 73:16, 81:19
**begrudgingly** [1] - 54:25
**behalf** [2] - 4:21, 4:23
**behind** [6] - 51:7, 52:18, 70:5, 70:21, 70:23, 70:24
**belatedly** [1] - 71:9
**believes** [2] - 89:12, 89:19
**below** [7] - 23:2, 70:22, 76:2, 76:5, 98:2, 98:19, 104:5
**best** [9] - 28:24, 29:13, 30:4, 40:24, 46:6, 53:22, 73:11, 105:12, 105:15
**between** [16] - 16:4, 22:12, 34:10, 35:13, 37:13, 40:7, 43:16, 79:8, 95:6, 97:13, 101:8, 102:3, 111:19, 111:22,

111:25
**beyond** [3] - 9:18, 12:9, 22:19
**big** [1] - 69:1
**biggest** [2] - 48:21, 48:24
**binder** [5] - 35:8, 35:9, 37:10, 40:2, 95:1
**binding** [4] - 6:11, 11:20, 13:4, 13:14
**BIRD** [1] - 2:9
**bit** [5] - 17:1, 84:25, 101:22, 103:11, 109:4
**black** [1] - 59:23
**blind** [1] - 70:16
**blow** [1] - 119:8
**blurted** [1] - 26:2
**body** [1] - 117:13
**book** [1] - 80:8
**bottom** [10] - 60:22, 65:9, 68:20, 69:19, 69:25, 77:11, 80:3, 81:19, 93:7, 99:9
**bound** [3] - 11:10, 11:11, 11:13
**BOXER** [1] - 2:9
**boy** [1] - 65:3
**breach** [11] - 10:12, 10:13, 16:2, 19:11, 52:12, 52:13, 53:19, 55:14, 57:4, 90:21, 110:23
**breaches** [1] - 10:12
**break** [8] - 84:22, 85:1, 85:5, 92:4, 103:11, 103:12, 122:17, 123:10
**brief** [2] - 74:6, 85:7
**briefly** [3] - 14:5, 19:9, 52:1
**bright** [1] - 57:23
**bright-line** [1] - 57:23
**bring** [3] - 55:11, 55:12, 91:22
**broad** [1] - 21:11
**brought** [1] - 80:7
**brutal** [1] - 95:5
**BSP** [1] - 93:13
**BSPs** [1] - 93:11
**bunch** [1] - 57:22
**business** [29] - 6:25, 9:9, 10:18, 31:11, 49:16, 49:21, 50:1, 50:3, 50:4, 50:10, 51:10, 52:8, 52:21, 59:8, 68:12, 71:20, 81:12, 81:14, 88:15, 89:4, 89:6, 109:17, 115:22, 117:3,

120:19, 120:20, 120:21, 120:25, 121:13
**but..** [1] - 47:21
**buy** [8] - 7:4, 9:5, 31:20, 74:17, 81:4, 81:8, 108:11, 108:13
**BY** [42] - 2:4, 2:5, 2:5, 2:10, 2:13, 2:15, 3:9, 3:10, 3:10, 3:11, 3:12, 3:13, 28:2, 29:5, 30:1, 30:18, 31:3, 32:5, 32:15, 34:24, 35:22, 37:23, 39:13, 39:25, 40:19, 47:14, 60:4, 60:13, 75:1, 83:25, 92:3, 97:8, 101:6, 101:19, 105:4, 105:13, 107:9, 110:12, 112:24, 115:11, 117:21, 120:2

---

## C

**CA** [4] - 2:6, 2:11, 2:14, 2:16
**calculate** [2] - 22:1, 23:4
**calculations** [1] - 123:16
**CALIFORNIA** [1] - 4:1
**California** [1] - 17:3
**cancel** [5] - 56:16, 66:22, 82:4, 82:17, 96:18
**canceled** [6] - 57:22, 59:7, 67:6, 95:12, 96:12, 108:20
**canceling** [2] - 56:10, 56:12
**cannot** [5] - 38:8, 45:6, 46:5, 46:14, 105:19
**cap** [8] - 53:15, 53:17, 53:23, 56:18, 80:19, 104:4, 104:14
**capacity** [1] - 88:1
**capital** [1] - 121:3
**caps** [1] - 56:23
**care** [1] - 53:24
**carefully** [1] - 102:21
**carries** [1] - 81:19
**carry** [1] - 93:6
**carry-over** [1] - 93:6
**carrying** [1] - 63:3
**carryover** [2] - 99:18, 99:24
**case** [7] - 6:23, 9:15, 17:8, 17:13, 17:16,

34:5, 52:9, 52:14, 52:22, 53:3, 54:19, 55:13, 56:11, 89:16, 91:10, 91:17, 91:22
**cash** [13] - 6:25, 7:12, 7:17, 7:22, 8:3, 8:4, 9:3, 9:8, 10:17, 115:21, 117:3, 120:18, 121:24
**categories** [1] - 68:17
**causation** [2] - 7:10, 89:9
**caution** [1] - 58:6
**Center** [1] - 2:16
**Century** [1] - 2:11
**CEO** [2] - 9:17, 118:14
**certain** [6] - 17:21, 19:25, 44:21, 46:1, 111:12
**certainly** [5] - 17:20, 23:9, 86:18, 88:1, 90:9
**certified** [1] - 118:25
**CFO** [3] - 6:13, 6:20, 118:8
**chain** [8] - 37:13, 40:11, 40:20, 41:23, 92:12, 92:18, 97:12, 101:8
**challenging** [1] - 109:15
**chance** [2] - 53:25, 84:24
**change** [6] - 62:11, 73:3, 92:4, 94:14, 105:18, 109:25
**changed** [4] - 62:17, 103:10, 105:16, 112:2
**changes** [3] - 49:1, 62:15, 96:19
**changing** [1] - 94:19
**characterization** [1] - 26:5
**characterize** [1] - 56:2
**charging** [1] - 31:24
**chart** [2] - 22:21, 23:5
**charts** [1] - 120:22
**check** [3] - 14:2, 66:10, 123:14
**chief** [4] - 8:13, 115:14, 115:16, 118:8
**chip** [1] - 108:7
**chips** [10] - 7:4, 7:8, 9:2, 9:5, 31:13, 67:20, 100:20, 102:25, 121:8, 121:20
**Choi** [5] - 79:9, 79:10,

79:20, 84:7, 84:8
**Choi's** [1] - 99:19
**CHRONOLOGICAL** [1] - 3:5
**Chuck** [3] - 4:17, 103:23, 111:21
**Chun** [1] - 118:14
**citation** [1] - 17:15
**cited** [1] - 18:1
**cites** [1] - 17:21
**claim** [3] - 7:5, 52:9, 54:12
**clarification** [2] - 39:22, 113:17
**clear** [8] - 13:9, 20:24, 21:4, 23:21, 25:23, 57:5, 57:17, 113:20
**cleared** [1] - 86:17
**clearly** [4] - 25:25, 53:20, 55:12, 70:22
**clip** [1] - 113:18
**clips** [2] - 113:12, 113:19
**close** [3] - 27:3, 84:13, 123:8
**closed** [1] - 108:23
**closer** [2] - 23:18, 39:9
**closing** [4] - 14:9, 57:20, 123:9, 123:11
**Co** [1] - 4:6
**collateralized** [2] - 121:20, 121:22
**colleague** [1] - 77:12
**colleagues** [2] - 80:13, 84:2
**color** [2] - 66:20, 66:21
**coming** [1] - 59:10
**commend** [1] - 59:17
**commentary** [7] - 15:20, 15:22, 15:24, 16:2, 16:10, 17:5, 19:10
**commercial** [2] - 47:5, 87:13
**commercially** [1] - 47:7
**commission** [1] - 69:7
**Commission** [2] - 118:3, 118:21
**commitment** [6] - 61:18, 61:23, 62:1, 99:18, 99:19, 99:21
**committed** [2] - 37:6, 39:16
**common** [5] - 13:16, 20:19, 108:2, 108:8, 112:18
**commotion** [1] - 108:2

**communicate** [3] - 30:10, 35:3, 82:10
**communicating** [1] - 61:21
**communications** [6] - 29:16, 30:3, 44:3, 44:18, 44:19, 94:19
**company** [2] - 8:14, 9:17, 86:2, 89:1, 91:1, 115:18, 115:21, 118:2, 118:9, 118:15, 119:4, 121:4
**compare** [2] - 53:8, 80:8
**comparisons** [1] - 26:18
**competitive** [1] - 94:1
**complete** [2] - 7:8, 7:13
**computer** [1] - 14:14
**concept** [4] - 20:20, 22:7, 110:25, 111:10
**concepts** [1] - 18:22
**concern** [3] - 18:12, 52:7, 86:7
**conclusion** [3] - 105:1, 105:9, 113:2
**condition** [1] - 103:9
**conduct** [8] - 6:25, 9:8, 54:20, 54:21, 58:8, 115:21, 117:3, 120:19
**conducting** [1] - 120:25
**confer** [3] - 18:16, 19:3, 103:12
**conference** [1] - 17:2
**conferring** [1] - 17:18
**confirm** [7] - 38:7, 64:17, 68:21, 76:2, 76:5, 111:11
**confirmation** [3] - 61:13, 91:15, 111:12
**confirmed** [19] - 33:8, 33:12, 33:16, 33:17, 33:24, 35:4, 36:9, 36:20, 61:12, 62:4, 62:5, 62:9, 66:5, 66:7, 66:21, 67:3, 69:22, 72:22, 94:14
**confirming** [2] - 33:9, 75:25
**confusing** [8] - 44:14, 86:19, 87:18, 88:1, 91:13, 91:20, 104:8, 104:9
**confusion** [1] - 90:9
**connotes** [1] - 89:24
**consensus** [2] -

74:13, 79:8
**consider** [1] - 74:7
**considered** [7] - 15:8, 17:12, 62:5, 62:10, 66:20, 67:3, 67:5
**considering** [1] - 101:22
**considers** [1] - 11:11
**consistent** [5] - 13:3, 22:16, 68:1, 104:21, 106:24
**consistently** [1] - 38:25
**consumes** [1] - 63:23
**contact** [1] - 28:12
**contacted** [1] - 30:13
**contacts** [1] - 61:1
**contained** [1] - 19:13
**contains** [1] - 113:18
**content** [1] - 118:25
**contention** [1] - 25:20
**context** [6] - 61:7, 86:19, 87:24, 88:12, 90:15, 100:3
**continued** [1] - 12:9
**continues** [2] - 46:22, 51:16
**continuous** [1] - 112:15
**contract** [8] - 16:3, 16:6, 19:11, 22:13, 55:11, 90:21, 90:23
**contrary** [1] - 9:24
**control** [1] - 21:8
**conversation** [4] - 25:25, 48:16, 73:5, 73:6
**conversations** [2] - 33:22, 48:19
**converse** [1] - 12:11
**convinced** [4] - 56:16, 82:4, 82:16, 82:20
**cool** [2] - 111:22, 112:6
**copied** [1] - 64:7, 70:16, 101:20
**copy** [3] - 14:11, 79:4, 83:15
**corner** [2] - 60:15, 117:10
**corporate** [3] - 67:15, 67:18, 68:4
**Corporation** [2] - 67:14, 79:19
**correct** [200] - 6:17, 7:6, 8:22, 8:23, 9:10, 11:16, 25:21, 25:22, 32:8, 33:24, 34:4, 35:5, 36:5, 36:10, 36:13, 36:17, 36:22,

37:2, 37:7, 37:25, 38:4, 38:14, 38:15, 38:18, 38:21, 39:2, 39:4, 40:9, 40:10, 41:2, 41:4, 41:9, 41:10, 41:14, 41:16, 41:25, 42:1, 42:4, 42:14, 42:15, 42:18, 42:20, 42:21, 43:1, 43:4, 43:8, 43:9, 43:11, 43:12, 43:13, 43:18, 43:20, 43:24, 44:6, 44:10, 44:21, 44:25, 45:4, 45:8, 45:11, 45:14, 45:18, 45:21, 46:5, 46:8, 46:11, 46:14, 46:23, 47:20, 47:23, 48:1, 48:7, 48:14, 50:19, 51:5, 51:6, 58:20, 61:10, 62:1, 62:10, 62:13, 62:19, 63:1, 64:2, 64:6, 64:18, 64:20, 64:21, 64:23, 64:24, 65:2, 65:7, 65:20, 66:2, 66:5, 66:8, 66:25, 67:3, 67:6, 67:9, 67:17, 68:5, 68:17, 68:22, 69:23, 70:18, 72:8, 72:11, 72:14, 72:22, 73:8, 75:6, 75:11, 75:14, 75:16, 76:8, 76:13, 77:8, 77:23, 78:1, 78:7, 78:21, 79:4, 80:20, 81:8, 81:15, 81:23, 82:12, 82:17, 83:11, 84:2, 84:14, 84:18, 88:16, 92:11, 92:20, 93:15, 93:18, 93:21, 94:6, 94:9, 94:11, 94:16, 94:20, 95:7, 95:9, 95:16, 95:20, 96:7, 97:16, 98:6, 98:21, 99:22, 100:12, 100:15, 100:17, 100:22, 101:9, 102:4, 102:12, 103:21, 104:2, 104:12, 104:14, 104:17, 105:7, 105:20, 106:4, 106:8, 106:11, 106:14, 106:16, 106:25, 107:1, 107:21, 112:7, 115:22, 116:9, 116:12, 116:15, 116:17, 117:6, 117:15, 117:23,

118:3, 118:4, 118:5, 118:9, 118:10, 118:13, 118:15, 118:22, 118:23, 118:24, 119:1, 119:18, 119:19, 120:13, 122:25
**correctly** [5] - 38:10, 67:24, 68:14, 71:21, 78:5
**counsel** [18] - 4:7, 9:11, 27:6, 34:11, 71:11, 76:17, 84:21, 88:2, 91:18, 92:1, 96:24, 98:14, 103:12, 113:8, 114:6, 114:15, 120:15, 123:21
**COUNSEL** [1] - 2:1
**Counsel** [10] - 12:11, 51:23, 59:15, 74:8, 90:8, 97:3, 98:10, 101:13, 107:5, 114:24
**counsel's** [1] - 60:10
**count** [1] - 124:11
**counter** [1] - 90:15
**counts** [2] - 124:5
**couple** [4] - 20:6, 32:22, 62:25, 90:12
**course** [3] - 41:16, 44:18, 75:16
**court** [3] - 59:3, 59:16, 125:1
**COURT** [165] - 4:10, 4:13, 4:16, 4:19, 4:22, 4:25, 5:3, 5:6, 5:9, 5:18, 6:15, 6:18, 7:2, 8:18, 8:21, 8:24, 9:7, 9:11, 10:22, 10:25, 11:4, 11:15, 11:18, 11:22, 12:1, 12:22, 13:12, 13:24, 14:4, 15:1, 15:19, 17:11, 17:15, 17:23, 18:6, 19:14, 19:20, 20:3, 20:6, 20:11, 21:2, 21:17, 22:3, 22:14, 23:12, 23:21, 24:2, 24:5, 24:23, 25:13, 26:10, 26:16, 26:23, 26:25, 27:21, 29:1, 29:20, 29:23, 30:17, 30:22, 32:2, 32:13, 34:4, 34:19, 35:18, 35:20, 37:18, 37:20, 39:8, 39:11, 39:20, 40:15, 40:17, 47:2, 47:9, 51:23, 52:1, 52:5, 53:1,

54:17, 55:2, 57:1, 58:4, 58:12, 58:16, 58:22, 59:12, 59:14, 59:17, 59:23, 60:1, 60:3, 60:9, 71:11, 74:3, 74:8, 74:19, 74:23, 83:20, 83:23, 84:21, 85:5, 85:9, 85:11, 85:19, 85:22, 85:25, 86:4, 88:2, 88:7, 88:14, 88:17, 88:20, 89:6, 90:8, 91:11, 91:18, 91:24, 92:24, 93:1, 96:24, 97:3, 97:5, 98:10, 98:13, 101:5, 101:13, 101:16, 105:2, 105:10, 107:5, 110:10, 112:21, 113:8, 113:10, 113:13, 113:16, 113:21, 114:6, 114:8, 114:12, 114:16, 114:24, 116:4, 116:20, 116:22, 117:17, 117:19, 119:22, 119:25, 122:12, 122:14, 122:16, 122:21, 122:24, 123:1, 123:3, 123:6, 123:15, 123:25, 124:4, 124:8, 124:15, 124:20, 124:23
**Court** [14] - 15:3, 15:19, 16:14, 16:20, 16:24, 18:8, 18:25, 20:18, 27:12, 58:24, 85:20, 98:16, 103:24, 114:20
**Court's** [3] - 14:6, 18:11, 19:7
**COURTROOM** [14] - 4:5, 20:5, 27:9, 27:15, 27:19, 59:3, 85:3, 114:17, 114:23, 115:3, 115:7, 122:19, 124:17, 125:1
**courtroom** [2] - 14:13, 111:20
**courts** [2] - 25:1, 25:2
**cover** [25] - 16:19, 16:20, 16:23, 16:24, 17:8, 18:25, 20:17, 21:5, 21:11, 21:18, 21:19, 21:21, 21:23, 22:1, 22:4, 22:5,

22:11, 22:12, 22:15, 23:10, 23:12, 24:8, 52:14, 91:9
**covered** [3] - 20:20, 55:15, 68:10
**covers** [1] - 18:22
**create** [1] - 108:25
**created** [1] - 109:2
**creates** [1] - 109:9
**credit** [17] - 6:24, 7:4, 7:16, 7:21, 7:24, 8:1, 8:15, 8:20, 9:1, 9:8, 10:17, 13:19, 69:15, 115:21, 117:2, 120:18, 121:18
**critique** [1] - 22:10
**CROSS** [4] - 3:10, 3:12, 32:14, 115:10
**cross** [8] - 9:18, 12:10, 32:13, 39:19, 87:4, 119:22, 119:24, 123:3
**CROSS-EXAMINATION** [4] - 3:10, 3:12, 32:14, 115:10
**cross-examination** [6] - 9:18, 12:10, 32:13, 39:19, 119:22, 119:24
**crossed** [1] - 34:13
**CRUTCHER** [1] - 2:4
**cure** [14] - 53:25, 54:1, 54:3, 54:4, 54:7, 54:9, 54:18, 54:19, 54:22, 54:23, 55:6
**cured** [2] - 54:16, 55:3
**current** [4] - 28:10, 42:13, 66:17, 68:10, 120:25, 121:23
**customer** [21] - 11:19, 42:9, 44:1, 44:2, 45:3, 45:8, 46:4, 46:8, 46:11, 46:14, 48:21, 59:2, 63:21, 63:22, 63:23, 102:7, 109:23, 109:24, 110:4, 111:5, 111:14
**customer's** [1] - 11:16
**customers** [32] - 6:4, 11:5, 12:24, 44:5, 44:9, 44:20, 44:24, 48:11, 48:19, 50:13, 63:18, 65:11, 68:10, 68:17, 69:16, 76:14, 102:8, 106:10, 107:20, 107:22, 108:3, 109:1, 109:12, 109:13, 109:21, 111:1,

111:6, 111:17, 112:18, 113:3, 119:13, 120:10
**cut** [3] - 50:19, 53:13, 65:19
**cutting** [4] - 50:8, 50:25, 51:5, 53:2
**CV-20-993** [1] - 4:6

## D

**daily** [7] - 28:17, 29:7, 29:8, 29:10, 32:11, 33:22, 48:19
**damage** [8] - 11:2, 53:12, 54:11, 54:12, 55:24, 56:24, 57:15
**damages** [42] - 7:2, 7:5, 10:23, 11:1, 15:25, 16:19, 16:20, 16:23, 16:25, 17:8, 19:1, 19:11, 20:17, 21:5, 21:6, 21:12, 21:18, 21:20, 21:21, 21:24, 22:2, 22:4, 22:5, 22:11, 22:15, 52:9, 52:14, 53:3, 53:4, 54:10, 56:25, 57:1, 57:12, 57:18, 57:24, 58:7, 89:10, 90:5, 91:8, 91:12, 91:16, 91:22
**Dan** [1] - 79:3
**Daniel** [5] - 66:1, 79:2, 80:4, 80:15, 82:2
**data** [3] - 22:20, 22:22, 24:21
**datacenter** [1] - 31:19
**date** [5] - 6:8, 23:19, 57:12, 116:15, 119:17
**dated** [4] - 67:9, 81:20, 83:14, 116:8
**dates** [1] - 40:9
**days** [2] - 42:7, 57:14
**deal** [5] - 28:16, 31:4, 54:12, 54:15, 90:6
**DECEMBER** [2] - 3:2, 4:1
**December** [9] - 40:8, 40:21, 41:4, 42:6, 42:7, 43:4, 43:16
**decided** [1] - 10:2
**deciding** [1] - 15:9
**decision** [7] - 36:24, 50:5, 52:18, 56:3, 65:19, 68:2, 99:20
**decisions** [4] - 70:5, 70:21, 70:24, 79:21
**defendant** [3] - 16:5,

16:8
**DEFENDANT** [1] - 2:8
**defense** [2] - 27:24, 54:18
**defined** [2] - 108:6, 109:5
**defines** [1] - 17:8
**delete** [2] - 23:25, 61:16
**delivery** [2] - 6:8, 119:16
**demand** [11] - 6:6, 6:10, 12:25, 31:16, 61:15, 75:7, 76:4, 77:3, 77:6, 77:25, 119:14
**demonstrative** [2] - 20:23, 24:4
**Demonstrative** [1] - 21:2
**demonstratives** [2] - 19:25, 20:9
**denied** [1] - 53:7
**deny** [2] - 55:19, 55:20
**depose** [1] - 21:15
**deposed** [1] - 24:25
**deposition** [23] - 15:13, 20:22, 21:5, 22:7, 23:17, 24:6, 24:14, 24:22, 24:24, 25:4, 25:6, 25:14, 25:24, 26:1, 26:7, 26:20, 85:10, 85:15, 85:25, 86:22, 113:22, 113:24, 114:5
**depositions** [1] - 87:2
**DEPUTY** [14] - 4:5, 20:5, 27:9, 27:15, 27:19, 59:3, 85:3, 114:17, 114:23, 115:3, 115:7, 122:19, 124:17, 125:1
**deputy** [1] - 14:13
**describe** [1] - 120:16
**described** [2] - 24:16, 24:17
**description** [2] - 23:2, 76:20
**descriptions** [1] - 22:24
**designate** [1] - 90:13
**designation** [3] - 85:15, 86:6, 123:20
**designations** [2] - 85:16, 86:16, 113:18
**desired** [2] - 6:8, 119:16
**details** [1] - 51:13

**deteriorated** [1] - 96:1
**determined** [6] - 23:3, 23:10, 23:13, 23:22, 24:16, 55:14
**Devon** [2] - 29:11, 110:18
**dictionary** [1] - 76:18
**difference** [3] - 16:4, 22:12, 88:6
**different** [6] - 24:25, 25:1, 41:20, 68:16, 107:25, 112:15
**digital** [1] - 66:12
**diligence** [1] - 64:5
**direct** [9] - 9:19, 13:20, 34:1, 60:14, 74:9, 87:4, 120:4, 123:18, 123:22
**DIRECT** [2] - 3:9, 28:1
**directing** [2] - 78:23, 93:6
**direction** [1] - 78:9
**directions** [1] - 92:5
**directly** [1] - 56:24
**disagree** [1] - 49:23
**disasters** [1] - 108:23
**discharge** [1] - 14:17
**disclosed** [1] - 34:8
**disclosing** [1] - 65:10
**disclosure** [2] - 25:9, 25:10
**discovery** [1] - 89:24
**discuss** [3] - 12:13, 13:7, 21:18
**discussed** [11] - 11:6, 22:16, 24:19, 24:21, 25:14, 34:4, 74:21, 84:7, 98:14, 110:13, 110:17
**discussion** [10] - 47:4, 59:1, 71:12, 74:5, 74:12, 83:21, 86:12, 94:21, 98:11, 101:15
**Discussion** [1] - 124:19
**discussions** [4] - 19:3, 56:10, 71:25, 110:7
**dispute** [3] - 16:22, 55:24, 90:21
**disputed** [2] - 9:6, 13:15
**distributed** [1] - 114:14
**distribution** [1] - 67:19
**division** [2] - 66:12, 79:18
**document** [31] - 10:7, 10:9, 35:23, 52:15,

52:25, 56:17, 57:8, 57:11, 57:14, 58:2, 58:5, 60:15, 74:5, 86:14, 86:16, 86:17, 86:19, 86:21, 86:24, 87:1, 87:5, 87:6, 87:19, 89:22, 89:24, 92:19, 95:22, 117:9, 118:5, 119:1, 120:16
**documentary** [1] - 56:22
**documents** [11] - 8:12, 9:15, 10:19, 34:8, 34:12, 35:8, 52:15, 57:8, 107:10, 114:14, 118:1
**dollar** [2] - 122:3, 122:10
**dollars** [5] - 100:1, 104:1, 121:10, 121:13, 122:2
**done** [2] - 22:23, 79:16
**Dong** [5] - 6:20, 116:8, 116:10, 120:23, 121:2
**Dong-Su** [5] - 6:20, 116:8, 116:10, 120:23, 121:2
**Doren** [16] - 4:8, 9:12, 17:23, 19:16, 32:13, 32:17, 52:7, 52:17, 53:15, 54:17, 55:2, 55:11, 112:1, 112:4, 112:10, 123:3
**DOREN** [98] - 2:4, 3:10, 3:11, 3:13, 4:8, 9:13, 10:24, 11:2, 11:8, 11:17, 11:21, 11:24, 14:2, 14:24, 15:17, 16:11, 17:10, 17:24, 18:7, 19:2, 19:18, 28:25, 29:19, 30:16, 30:21, 31:25, 32:15, 34:2, 34:10, 34:18, 34:21, 34:24, 35:16, 35:22, 37:16, 37:21, 37:23, 39:13, 39:19, 39:25, 40:13, 40:19, 46:25, 47:6, 47:12, 47:14, 51:21, 53:4, 56:8, 57:14, 57:20, 58:2, 58:11, 58:14, 58:20, 58:23, 59:5, 59:13, 59:25, 60:2, 60:4, 60:7, 60:11, 60:13, 71:13, 74:1, 74:10, 74:22, 75:1, 83:18, 83:25, 92:2, 92:3, 92:22,

93:3, 97:1, 97:6, 97:8, 98:8, 98:16, 101:3, 101:6, 101:11, 101:19, 105:4, 105:13, 107:4, 110:9, 112:22, 112:24, 116:21, 117:18, 119:24, 120:2, 122:11, 124:2, 124:7, 124:24
**Doren's** [1] - 107:18
**doubt** [1] - 72:3
**down** [8] - 17:19, 23:2, 66:24, 73:22, 81:11, 84:12, 108:19, 108:23
**downplay** [1] - 65:15
**DP** [2] - 61:14, 61:16
**Dr** [13] - 20:18, 21:8, 21:23, 22:11, 22:25, 23:6, 23:8, 23:17, 24:9, 24:21, 25:1, 25:2, 25:11
**drafting** [1] - 17:13
**DRAM** [6] - 68:14, 104:22, 105:6, 105:25, 106:4, 113:5
**dramatic** [4] - 49:15, 49:25, 50:9, 52:21
**Drive** [1] - 2:16
**DROOKS** [1] - 2:10
**dry** [1] - 53:3
**DSA** [2] - 66:11, 79:18
**due** [1] - 64:5
**DUNN** [1] - 2:4
**duplicative** [1] - 14:7
**during** [7] - 53:11, 59:18, 86:25, 87:4, 103:12, 109:2
**dynamic** [4] - 46:18, 51:10, 51:12, 111:2

## E

**early** [7] - 36:1, 38:24, 68:2, 84:24, 100:7, 100:11
**earthquakes** [1] - 108:23
**East** [1] - 2:11
**easy** [2] - 34:19, 53:8
**effect** [1] - 52:21
**effective** [1] - 84:9
**eight** [2] - 109:10
**either** [6] - 8:10, 13:17, 20:19, 54:23, 70:6, 91:2
**EKWAN** [1] - 2:10
**Ekwan** [1] - 4:20

**UNITED STATES DISTRICT COURT**

**Electronic** [1] - 79:19
**electronic** [1] - 14:13
**Electronics** [4] - 4:6, 67:14, 77:21, 116:11
**element** [2] - 54:23, 55:13
**eliminated** [1] - 10:3
**Elmo** [1] - 59:24
**email** [93] - 6:19, 6:23, 8:18, 8:22, 10:22, 12:3, 12:6, 35:13, 37:13, 37:25, 40:7, 40:10, 40:20, 41:23, 43:23, 46:21, 47:16, 47:24, 49:3, 49:13, 51:8, 51:15, 51:18, 52:6, 55:16, 55:17, 55:18, 55:22, 58:9, 58:10, 58:25, 60:22, 61:9, 63:5, 64:1, 64:25, 65:23, 65:25, 66:3, 66:7, 67:9, 69:20, 70:6, 71:15, 71:23, 72:13, 73:15, 73:22, 73:23, 76:3, 77:2, 77:5, 77:12, 77:14, 77:17, 78:24, 80:4, 80:12, 81:18, 81:20, 83:14, 84:1, 84:12, 86:14, 87:20, 89:13, 89:14, 90:8, 90:13, 91:4, 91:7, 91:15, 91:21, 92:7, 92:8, 92:12, 92:18, 93:6, 93:23, 95:6, 97:12, 97:20, 99:8, 99:9, 101:8, 106:18, 108:1, 110:22, 116:7, 116:8, 116:14, 117:1
**emails** [10] - 52:25, 54:21, 55:18, 80:7, 89:16, 90:7, 103:25, 107:25, 110:20, 111:9
**eMMC** [7] - 93:7, 95:9, 95:12, 95:16, 96:1, 96:11
**end** [14] - 6:25, 48:11, 63:4, 63:21, 63:22, 64:17, 65:11, 65:15, 69:12, 83:1, 84:12, 87:20, 91:6, 123:17
**end-of-life** [2] - 87:20, 91:6
**ending** [1] - 5:21
**ends** [2] - 60:17, 75:2
**enforced** [1] - 57:23
**engagements** [1] - 65:15

**enter** [1] - 33:2
**entire** [2] - 34:15, 89:9
**entitled** [1] - 106:3
**entity** [1] - 116:13
**entry** [1] - 36:13
**envisioned** [1] - 121:5
**EOL** [2] - 42:15, 42:19
**equal** [1] - 34:16
**equate** [1] - 123:25
**equipment** [3] - 6:4, 63:16, 119:13
**equivocal** [4] - 11:25, 12:16, 13:2, 13:6
**ERP** [1] - 33:3
**especially** [2] - 57:12, 67:23
**essentially** [6] - 20:13, 25:13, 52:10, 86:7, 87:20, 90:16
**establish** [1] - 53:11
**estimate** [1] - 123:1
**ether** [1] - 55:10
**event** [1] - 8:2
**events** [1] - 56:23
**Evidence** [1] - 9:25
**EVIDENCE** [1] - 3:17
**evidence** [59] - 5:14, 6:9, 7:14, 7:19, 8:3, 8:11, 8:17, 8:25, 9:7, 10:14, 13:8, 14:12, 14:22, 15:1, 15:4, 15:7, 15:8, 35:21, 37:22, 40:13, 40:17, 40:18, 47:1, 47:11, 47:13, 51:22, 54:3, 54:4, 54:5, 55:19, 56:16, 56:22, 57:10, 60:8, 60:9, 60:12, 74:1, 74:24, 74:25, 83:19, 83:23, 83:24, 87:6, 90:7, 92:15, 92:23, 93:1, 93:2, 97:7, 98:9, 98:13, 98:15, 101:12, 101:18, 116:22, 116:23, 117:16, 117:20
**evidentiary** [1] - 5:11
**exact** [3] - 73:6, 97:17, 97:18
**exactly** [5] - 18:9, 40:23, 52:7, 86:13, 89:21
**EXAMINATION** [12] - 3:9, 3:10, 3:10, 3:11, 3:12, 3:13, 28:1, 32:14, 107:8, 112:23, 115:10, 120:1
**examination** [7] -

9:18, 12:10, 13:20, 32:13, 39:19, 119:22, 119:24
**examine** [1] - 26:12
**example** [3] - 20:16, 22:15, 31:12
**exceeding** [1] - 31:16
**exchange** [3] - 34:12, 95:6, 100:4
**Exchange** [2] - 118:3, 118:20
**exchanges** [2] - 43:22, 72:3
**excluded** [1] - 7:9
**excuse** [2] - 8:6, 10:15
**excused** [1] - 122:14
**executive** [1] - 79:12
**exhibit** [5] - 5:23, 49:2, 73:17, 95:15, 115:24
**Exhibit** [77] - 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23, 3:24, 3:24, 3:25, 5:20, 35:9, 35:11, 35:17, 35:21, 37:9, 37:13, 37:17, 37:20, 37:22, 40:1, 40:14, 40:17, 40:18, 41:22, 46:20, 46:25, 47:11, 47:13, 47:16, 49:13, 51:14, 51:17, 51:21, 60:8, 60:12, 73:14, 74:2, 74:23, 74:25, 83:13, 83:18, 83:24, 88:4, 89:21, 89:23, 92:6, 92:22, 93:1, 93:2, 95:1, 95:6, 96:23, 97:2, 97:5, 97:7, 97:9, 98:9, 98:13, 98:15, 101:7, 101:11, 101:18, 115:25, 116:2, 116:23, 117:9, 117:19, 117:20, 117:22, 120:15
**exhibits** [5] - 5:13, 20:25, 87:3, 115:1
**EXHIBITS** [1] - 3:16
**existed** [1] - 12:8
**existence** [1] - 30:9
**exists** [1] - 52:19
**expect** [4] - 45:3, 45:7, 93:21, 110:5
**expectations** [3] - 37:3, 38:17, 111:17
**experience** [2] - 29:2, 31:7
**experienced** [1] -

117:25
**experiences** [1] - 32:6
**expert** [5] - 25:3, 122:22, 122:24, 123:7
**explain** [8] - 22:5, 29:15, 30:2, 38:9, 72:17, 73:7, 108:9, 109:5
**explained** [3] - 24:20, 72:20, 110:25
**explains** [1] - 57:15
**explanation** [2] - 10:10, 22:24
**extended** [1] - 9:16
**extensive** [2] - 9:14, 10:8
**extent** [2] - 29:16, 52:19
**extra** [1] - 121:12
**eye** [2] - 83:4, 93:5

## F

**face** [1] - 83:4
**fact** [13] - 8:13, 9:6, 19:4, 30:19, 33:10, 45:10, 51:4, 53:21, 53:22, 54:5, 57:12, 91:11, 100:17
**factor** [2] - 99:6, 109:21
**factors** [2] - 108:21, 108:25
**factory** [3] - 108:22, 110:1, 111:16
**facts** [5] - 54:13, 54:14, 58:6, 58:23, 113:1
**failed** [1] - 16:8
**fair** [9] - 12:10, 18:18, 25:10, 26:4, 57:3, 68:18, 69:5, 80:22, 80:24
**fall** [1] - 56:23
**false** [3] - 37:3, 38:16, 111:17
**familiar** [3] - 8:13, 8:14, 88:24
**far** [6] - 8:25, 23:19, 31:16, 69:4, 104:5, 112:7
**faster** [1] - 107:11
**February** [11] - 31:24, 35:14, 35:24, 36:5, 38:24, 41:4, 41:18, 100:17, 106:23, 106:25, 112:11
**feedback** [1] - 66:11
**Feinstein** [3] - 5:5,

12:2, 122:12
**FEINSTEIN** [26] - 2:13, 3:12, 5:4, 5:12, 5:19, 6:17, 6:19, 7:7, 8:20, 8:23, 9:6, 9:10, 12:21, 13:9, 13:13, 13:25, 114:13, 115:1, 115:11, 116:2, 116:6, 116:19, 116:24, 117:21, 119:21, 122:13
**few** [3] - 33:21, 35:2, 42:22
**fight** [3] - 78:12, 78:16, 78:17
**figure** [1] - 124:10
**filed** [2] - 106:2, 118:1
**files** [1] - 25:1, 118:19
**filing** [1] - 117:13
**filings** [2] - 118:23, 119:5
**fill** [1] - 17:5
**final** [3] - 63:24, 66:11
**finalize** [1] - 63:1
**financed** [1] - 121:8
**financial** [9] - 6:13, 7:12, 8:14, 115:14, 115:16, 115:18, 117:12, 118:9, 118:19
**financials** [3] - 49:16, 50:1, 50:9
**fine** [6] - 15:18, 17:24, 34:6, 59:10, 59:13, 124:22
**finish** [1] - 109:9
**finishes** [1] - 73:16
**fires** [1] - 108:24
**firm** [1] - 62:4
**first** [37] - 6:2, 6:23, 7:4, 9:16, 25:3, 28:20, 33:21, 35:2, 37:25, 41:23, 47:19, 49:13, 51:17, 51:18, 63:6, 73:21, 73:23, 77:5, 80:19, 82:10, 84:4, 87:4, 88:22, 90:12, 92:12, 92:18, 93:23, 94:5, 95:24, 96:14, 99:9, 107:14, 108:6, 117:1, 119:8, 119:11
**fits** [1] - 39:3
**five** [2] - 123:5, 123:18, 123:22
**fixed** [1] - 93:20
**flat** [1] - 93:21
**floods** [1] - 108:24
**Floor** [2] - 2:11, 2:13

**focus** [2] - 103:15, 107:17
**folder** [1] - 87:3
**folks** [11] - 28:16, 28:20, 29:9, 29:12, 33:22, 53:18, 109:19, 110:8, 110:13, 110:16, 120:11
**follow** [1] - 119:4
**followed** [2] - 36:12, 78:7, 78:9
**following** [3] - 16:1, 42:8, 52:2
**follows** [2] - 27:25, 115:9
**food** [1] - 124:17
**FOR** [2] - 2:3, 2:8
**force** [1] - 34:16
**forecast** [33] - 11:5, 11:9, 11:10, 11:13, 11:16, 13:14, 36:2, 36:8, 36:13, 36:18, 36:19, 36:21, 36:24, 36:25, 41:12, 45:18, 45:23, 46:1, 46:2, 46:7, 46:10, 46:13, 68:12, 74:11, 75:6, 75:9, 75:19, 75:24, 76:9, 76:19, 76:23, 77:8
**forecasts** [15] - 6:5, 6:10, 11:19, 12:24, 13:2, 13:10, 13:11, 13:20, 45:19, 45:20, 45:22, 76:8, 119:14, 120:6
**form** [7] - 14:13, 18:9, 18:10, 18:21, 19:7, 117:10, 117:22
**Form** [1] - 5:20
**formerly** [1] - 86:1
**forth** [2] - 17:14, 59:1
**forward** [5] - 12:18, 74:15, 80:16, 96:22, 106:8
**forwarded** [1] - 64:25
**forwarding** [5] - 64:22, 74:12, 75:10, 75:18, 75:23
**fought** [1] - 78:13
**foundation** [9] - 28:25, 29:3, 86:7, 87:6, 88:9, 88:21, 110:9, 110:11, 116:4
**four** [3] - 40:23, 49:1, 67:2
**frame** [4] - 54:11, 65:19, 107:23, 111:18

**frankly** [2] - 18:19, 24:1
**FRIDAY** [2] - 3:2, 4:1
**front** [13] - 17:19, 35:11, 37:11, 47:15, 52:16, 73:17, 75:3, 86:14, 87:21, 88:11, 97:10, 115:24, 117:8
**fulfill** [8] - 37:6, 41:1, 45:2, 45:11, 45:18, 89:11, 89:18, 90:4
**fulfilled** [3] - 33:6, 33:10, 38:14
**fulfilling** [1] - 39:16
**full** [2] - 27:16, 54:5
**fun** [1] - 82:3
**future** [7] - 6:5, 6:10, 12:25, 49:16, 50:1, 50:10, 119:14

## G

**GAIL** [3] - 3:12, 115:5, 115:8
**Gail** [2] - 6:14, 115:5
**gaps** [2] - 17:4, 17:5
**general** [1] - 107:22
**generally** [2] - 6:7, 119:15
**genesis** [1] - 16:17
**gentleman** [3] - 47:7, 47:25, 77:12
**gentleman's** [1] - 56:22
**GIBSON** [1] - 2:4
**gigabyte** [3] - 95:19, 95:25, 96:1
**gist** [2] - 11:14, 11:22
**given** [10] - 7:11, 18:11, 19:6, 19:7, 54:2, 54:24, 57:12, 65:2, 65:7
**glasses** [1] - 80:11
**globally** [1] - 111:6
**God** [2] - 27:13, 114:21
**goods** [5] - 16:3, 16:5, 16:7, 19:12, 22:12
**graciously** [1] - 84:8
**Grand** [1] - 2:6
**granted** [4] - 32:2, 84:8, 101:5, 105:9
**graphic** [1] - 20:18
**graphics** [1] - 20:19
**great** [2] - 14:4, 70:3
**greater** [1] - 68:12
**green** [2] - 66:20, 66:24
**grounds** [2] - 5:23, 5:24

**grow** [3] - 10:18, 121:6, 121:13
**guess** [4] - 13:3, 25:17, 40:9, 55:2
**guidance** [1] - 16:19
**guide** [2] - 74:13, 79:8
**guides** [1] - 94:5

## H

**half** [5] - 78:23, 84:23, 94:5, 123:20, 124:4
**hall** [1] - 34:22
**hand** [8] - 5:17, 27:9, 27:10, 35:7, 60:15, 85:21, 99:3, 114:18
**handed** [1] - 5:19
**handle** [1] - 78:10
**happily** [1] - 54:25
**happy** [3] - 88:6, 89:12, 122:16
**hard** [1] - 103:7
**harm** [3] - 21:13, 21:14, 53:20
**Harrison** [9] - 60:25, 71:1, 75:11, 76:4, 77:20, 80:5, 92:9, 92:19
**head** [1] - 47:24
**headquarters** [4] - 67:21, 70:22, 76:13, 79:15
**headquarters'** [5] - 67:22, 68:4, 76:7, 106:6, 106:13
**hear** [7] - 9:11, 16:24, 59:3, 63:6, 80:12, 88:2, 124:21
**heard** [13] - 7:19, 10:8, 28:19, 32:22, 43:10, 56:11, 75:25, 90:16, 95:11, 103:16, 103:23, 108:15, 111:20
**hearing** [1] - 16:21
**hearsay** [3] - 29:19, 29:20, 32:1
**heart** [1] - 90:2
**Held** [1] - 59:16
**held** [2] - 52:2, 124:19
**help** [11] - 12:18, 22:24, 27:13, 70:4, 70:20, 73:11, 82:3, 82:11, 82:21, 114:21, 121:4
**helping** [1] - 32:21
**Hi** [3] - 49:3, 64:4, 97:20
**high** [1] - 53:3
**higher** [3] - 16:6, 31:8,

102:2
**highlight** [1] - 119:11
**highlights** [1] - 9:15
**history** [1] - 104:3
**hold** [3] - 31:20, 31:23, 109:20
**honest** [1] - 55:1
**honestly** [1] - 48:25
**HONG** [1] - 4:17
**Hong** [24] - 4:17, 6:13, 7:19, 8:11, 9:16, 13:18, 13:19, 29:11, 40:7, 41:23, 42:13, 42:16, 42:23, 43:3, 43:15, 43:23, 48:7, 88:25, 103:23, 110:18, 111:21, 118:14
**Hong's** [1] - 57:18
**honor** [1] - 62:4
**Honor** [148] - 4:8, 4:11, 4:14, 4:17, 4:20, 5:1, 5:4, 5:12, 5:19, 6:17, 9:13, 10:7, 10:11, 10:24, 11:8, 11:17, 11:21, 11:24, 13:14, 14:24, 14:25, 15:17, 15:18, 16:11, 16:13, 17:10, 17:24, 17:25, 18:13, 18:21, 19:2, 19:9, 19:18, 19:21, 20:8, 20:12, 21:22, 22:6, 22:20, 23:25, 25:8, 26:5, 26:8, 26:21, 27:7, 27:20, 27:22, 28:25, 29:19, 30:16, 31:25, 32:12, 33:25, 34:2, 34:6, 34:10, 35:16, 35:19, 37:16, 37:19, 37:21, 39:18, 39:19, 40:13, 40:16, 46:25, 47:3, 47:6, 47:12, 51:21, 51:24, 51:25, 52:4, 52:6, 52:13, 52:24, 53:4, 55:5, 56:3, 56:6, 56:8, 57:2, 57:4, 57:14, 57:23, 58:2, 58:11, 58:14, 58:18, 58:21, 59:11, 59:20, 59:25, 60:7, 60:11, 71:10, 71:13, 74:1, 74:3, 74:4, 74:10, 74:18, 74:22, 83:18, 85:13, 86:5, 88:3, 90:12, 90:17, 90:23, 91:14, 92:2, 92:22, 92:25, 93:3, 97:1, 98:8, 98:12, 101:3,

101:11, 101:14, 104:25, 105:8, 107:7, 110:9, 112:20, 112:22, 113:9, 113:11, 113:14, 113:17, 114:7, 114:10, 114:14, 116:2, 116:19, 116:21, 117:15, 119:24, 122:23, 123:2, 123:13, 124:3, 124:12, 124:22, 124:24, 124:25
**Hope** [1] - 2:13
**hope** [1] - 110:6
**hoped** [1] - 103:1
**hopefully** [1] - 107:11
**hoping** [1] - 32:21
**hour** [2] - 84:23, 123:17
**hours** [1] - 56:20
**HQ** [2] - 98:3, 99:2
**huge** [1] - 109:2
**hundreds** [1] - 7:21

## I

**idea** [1] - 65:21
**identified** [1] - 75:13
**identify** [1] - 61:25
**illustrating** [1] - 24:21
**illustrations** [1] - 20:25
**immediately** [6] - 26:3, 84:9, 102:1, 102:24, 103:20, 114:2
**impact** [5] - 49:15, 49:25, 50:9, 52:8, 54:6
**impeach** [1] - 55:21
**impeachment** [3] - 15:4, 15:5, 15:12
**implication** [1] - 12:7
**important** [4] - 16:24, 20:1, 90:17, 111:13
**improve** [2] - 111:16, 121:6
**in-line** [1] - 86:8
**inadvertently** [1] - 59:22
**inappropriate** [1] - 21:15
**Inc** [1] - 4:6
**include** [3] - 53:14, 76:1, 109:11
**included** [5] - 14:12, 14:16, 14:20, 20:14, 45:16

**including** [9] - 44:2, 44:20, 46:22, 50:18, 76:15, 80:5, 81:25, 106:11, 106:16
**income** [1] - 69:4
**Incorporated** [1] - 79:19
**incorrect** [2] - 19:16, 23:8
**increase** [1] - 101:23
**increased** [1] - 84:9
**indeed** [1] - 46:19
**INDEX** [2] - 3:5, 3:16
**indicate** [1] - 8:8
**indicated** [2] - 29:6, 110:21
**indicating** [2] - 107:19, 110:23
**industry** [4] - 28:6, 46:18, 108:7, 111:7
**inform** [1] - 38:25
**information** [2] - 74:7
**informed** [2] - 26:1, 85:11
**initial** [1] - 89:9
**innocuous** [1] - 22:14
**inquiries** [2] - 44:3, 89:20
**instead** [1] - 16:7
**instruct** [2] - 16:18, 18:25
**instructed** [1] - 18:23
**instruction** [18] - 14:12, 14:15, 14:16, 14:17, 15:3, 15:6, 15:7, 15:15, 15:25, 16:2, 16:9, 16:17, 18:21, 19:8, 19:12, 36:12, 78:7
**Instruction** [1] - 15:21
**instructions** [11] - 5:10, 14:5, 14:8, 14:10, 14:20, 16:10, 16:14, 17:2, 18:9, 18:10, 123:9
**Instructions** [1] - 17:3
**intend** [5] - 45:17, 56:21, 69:3, 96:24, 114:14
**intended** [5] - 10:5, 10:6, 54:4, 63:11, 82:10
**intention** [1] - 47:6
**intentionality** [8] - 52:17, 53:24, 54:20, 54:21, 54:22, 55:13, 56:1, 56:6
**interactions** [1] - 28:22
**interest** [1] - 18:12

**interested** [1] - 6:22
**interlaced** [1] - 85:16
**internal** [3] - 56:10, 94:1, 94:18
**interpretation** [2] - 12:5, 12:19
**interrogatories** [2] - 14:21, 14:23
**INTO** [1] - 3:17
**introduced** [2] - 86:17, 86:22
**introductions** [1] - 109:1
**inventory** [2] - 30:6, 71:4
**investors** [1] - 119:3
**involvement** [1] - 65:15
**iPhone** [2] - 109:1, 109:3
**irrelevant** [3] - 52:22, 54:24, 90:24
**issue** [36] - 5:11, 7:10, 9:6, 10:2, 11:5, 12:8, 13:15, 16:21, 19:7, 21:3, 23:2, 23:5, 25:17, 25:19, 52:14, 52:24, 54:19, 55:4, 63:5, 63:6, 66:4, 66:5, 85:9, 85:12, 88:4, 90:2, 90:17, 91:5, 95:25, 110:4, 110:5, 110:8, 111:5, 112:7
**issued** [1] - 51:8
**issues** [7] - 5:10, 21:10, 21:16, 23:1, 74:19, 110:13, 110:17
**item** [2] - 19:21, 65:1
**Item** [1] - 4:5
**itself** [4] - 11:11, 87:1, 87:5, 87:10

**J**

**January** [6] - 92:8, 92:11, 92:20, 94:11, 95:18, 101:1
**Jason** [1] - 4:11
**JASON** [1] - 2:5
**JDLA** [16] - 7:24, 61:7, 87:12, 88:8, 88:10, 88:13, 88:15, 88:21, 88:24, 88:25, 89:1, 89:4, 104:21, 105:3, 110:23, 121:5
**Jeong** [4] - 64:19, 77:18, 77:19, 78:10
**Jiang** [18] - 29:11,

35:14, 35:24, 37:14, 37:25, 38:2, 72:10, 85:15, 86:1, 88:23, 90:15, 95:7, 95:24, 96:17, 110:18, 113:12, 114:5, 123:20
**Jin** [3] - 77:18, 77:19, 78:10
**job** [9] - 18:25, 34:19, 43:25, 44:19, 45:1, 69:14, 81:1, 102:22, 121:4
**joke** [1] - 83:5
**JS** [4] - 79:9, 99:18, 99:19, 99:21
**judgment** [1] - 124:14
**July** [9] - 11:3, 28:15, 79:25, 80:12, 80:20, 81:2, 81:20, 83:14, 84:2
**June** [12] - 6:21, 10:12, 10:18, 10:22, 12:3, 12:8, 73:17, 79:7, 95:7, 96:7, 116:8, 120:17
**jurors** [5] - 20:4, 20:7, 26:25, 91:24, 113:21
**Jury** [1] - 15:21
**jury** [37] - 5:10, 6:16, 10:2, 10:9, 14:5, 14:10, 14:14, 16:19, 17:2, 18:5, 18:22, 18:24, 26:23, 26:24, 29:15, 35:24, 37:24, 52:3, 59:16, 59:17, 74:21, 85:4, 85:8, 90:18, 90:20, 91:22, 91:23, 98:16, 108:6, 108:9, 108:16, 109:5, 120:16, 122:20, 123:9, 124:16
**justifying** [1] - 15:5

**K**

**Kate** [1] - 4:23
**keep** [11] - 20:7, 57:7, 58:17, 59:12, 84:13, 91:12, 95:4, 99:10, 99:11, 99:18, 109:13
**keeps** [2] - 108:14, 109:14
**kept** [1] - 107:18
**Ki** [6] - 11:9, 29:11, 40:7, 48:6, 48:9, 110:18
**Kidder** [7] - 19:22, 23:6, 24:6, 25:2,

25:5, 26:6
**kidder** [2] - 20:17, 21:4
**Kidder's** [2] - 20:15, 26:14
**Kim** [25] - 6:20, 37:4, 47:23, 47:25, 48:5, 67:9, 69:20, 70:3, 70:4, 73:23, 81:25, 83:15, 84:5, 92:9, 92:19, 97:13, 99:10, 99:17, 101:9, 101:21, 102:16, 103:4, 103:19, 116:8, 116:10
**kind** [4] - 13:15, 26:2, 108:19, 121:18
**kinds** [1] - 119:5
**knowing** [1] - 54:5
**knowledge** [1] - 32:4
**knowledgeable** [1] - 88:25
**knows** [2] - 18:21, 90:23
**Knuth** [28] - 5:7, 27:8, 27:18, 28:5, 32:16, 34:3, 34:25, 38:24, 39:14, 40:3, 40:20, 47:15, 47:22, 55:19, 59:7, 60:5, 60:14, 74:11, 74:14, 75:2, 84:1, 91:25, 92:7, 95:2, 98:18, 107:10, 112:25, 123:18
**KNUTH** [3] - 3:9, 5:7, 27:23
**Korea** [6] - 59:6, 61:1, 67:16, 75:14, 99:4, 111:10
**Kyong** [2] - 78:24, 78:25
**Kyong-yong** [1] - 78:25

**L**

**lacked** [2] - 10:17, 121:15
**lacks** [1] - 86:7
**LAMAGNA** [2] - 2:5, 4:14, 85:13, 85:20, 85:23, 86:1, 86:5, 86:11
**LaMagna** [1] - 4:14
**landscape** [1] - 60:15
**lane** [1] - 67:11
**Lane** [17] - 47:23, 47:25, 67:9, 69:20, 70:20, 73:23, 81:25, 83:15, 84:4, 84:5,

84:7, 92:9, 92:19, 97:13, 97:20, 101:9, 101:21
**language** [7] - 16:12, 16:18, 17:4, 17:7, 18:2, 18:11, 18:14
**larger** [1] - 121:10
**largest** [1] - 59:1
**last** [12] - 10:6, 18:6, 26:8, 26:9, 27:2, 34:9, 57:2, 81:11, 94:14, 98:22, 106:19, 118:7
**late** [3] - 10:20, 26:9, 65:18
**launching** [1] - 109:2
**law** [7] - 15:20, 16:1, 16:25, 17:8, 17:14, 17:16, 19:17
**lay** [2] - 110:10, 116:4
**lead** [18] - 33:3, 108:12, 108:13, 108:14, 108:22, 109:5, 109:6, 109:8, 109:13, 109:20, 109:24, 109:25, 110:4, 110:8, 110:13, 110:17, 111:8, 111:15
**least** [4] - 8:3, 9:1, 22:4, 34:9
**leaving** [1] - 53:2
**led** [1] - 94:19
**Lee** [9] - 65:25, 66:1, 66:3, 66:10, 78:25, 79:3, 79:6, 80:4, 81:22
**leeway** [1] - 25:2
**left** [5] - 26:2, 86:2, 100:1, 122:21, 123:24
**legal** [7] - 16:20, 18:22, 87:11, 90:24, 104:25, 105:9, 113:1
**legs** [1] - 84:25
**lensed** [1] - 90:20
**less** [3] - 24:11, 24:12, 25:19
**level** [1] - 15:14
**levels** [1] - 112:16
**lie** [1] - 102:18
**life** [2] - 87:20, 91:6
**likely** [1] - 12:9
**limine** [1] - 25:18
**limit** [7] - 7:21, 9:1, 74:16, 80:16, 80:22, 84:8, 104:12
**limited** [3] - 81:3, 106:19, 108:12
**limiting** [1] - 74:13

**UNITED STATES DISTRICT COURT**

**LINCENBERG** [1] - 2:10
**line** [25] - 6:24, 7:4, 9:8, 47:19, 57:5, 57:23, 59:10, 59:12, 62:3, 68:20, 70:1, 76:1, 77:2, 79:25, 81:11, 81:12, 85:24, 86:8, 86:22, 88:14, 117:2, 120:18, 121:18
**list** [5] - 8:6, 13:23, 13:25, 55:7
**lists** [1] - 9:19
**literally** [5] - 52:12, 52:16, 52:21, 89:20, 105:8
**lives** [1] - 86:3
**LLP** [3] - 2:4, 2:12, 2:15
**Lo** [2] - 4:11, 123:4
**LO** [11] - 2:5, 4:11, 21:3, 21:19, 22:8, 23:1, 24:3, 24:25, 25:22, 26:19, 123:5
**logic** [2] - 70:5, 70:21
**logistics** [1] - 59:20
**look** [42] - 17:22, 19:14, 20:11, 35:7, 35:15, 37:9, 40:1, 41:22, 41:23, 44:23, 46:20, 47:15, 49:2, 51:14, 51:17, 56:9, 61:9, 62:21, 64:10, 64:12, 65:22, 66:24, 73:14, 73:21, 75:2, 77:10, 80:3, 80:10, 81:18, 83:13, 86:20, 88:11, 88:14, 92:5, 93:4, 95:15, 96:23, 97:19, 100:24, 101:7, 120:14, 122:16
**looked** [2] - 71:14, 72:13
**looking** [5] - 17:25, 70:10, 74:6, 85:23, 111:14
**looks** [5] - 23:21, 64:3, 75:9, 76:9, 88:7
**Los** [3] - 2:6, 2:11, 2:14
**LOS** [1] - 4:1
**losing** [1] - 65:3
**loss** [3] - 52:9, 52:22, 54:10
**loud** [2] - 39:10, 39:12
**low** [1] - 7:21
**lower** [5] - 31:8, 31:9, 31:13, 32:10, 60:15

**LTD** [1] - 4:6
**lunch** [3] - 122:17, 122:24, 125:3
**lying** [1] - 102:16

**M**

**magnitude** [1] - 124:2
**manage** [2] - 79:25, 84:13
**management** [2] - 66:4, 93:25
**manager** [3] - 28:11, 86:2, 88:23
**managing** [1] - 109:16
**manufacturer** [2] - 6:4, 119:13
**manufacturers** [1] - 63:16
**manufactures** [1] - 91:6
**manufacturing** [2] - 67:19, 109:8
**MARC** [1] - 2:13
**Marc** [1] - 5:4
**March** [30] - 31:24, 37:14, 41:4, 41:19, 51:15, 51:16, 57:3, 57:5, 61:10, 61:21, 62:8, 62:12, 62:22, 64:1, 64:13, 65:18, 65:19, 67:9, 72:1, 72:7, 72:8, 72:10, 72:25, 73:16, 93:25, 101:2, 103:25, 106:21
**marching** [2] - 62:8, 62:11
**MARELLA** [1] - 2:9
**marked** [3] - 85:21, 115:25, 117:9
**market** [6] - 31:15, 31:19, 96:1, 96:19, 101:22, 103:9
**matched** [2] - 24:9, 24:18
**matter** [3] - 13:16, 24:25, 55:1
**matters** [2] - 24:1, 55:15
**MBO** [2] - 69:6, 69:8
**mean** [13] - 8:10, 8:24, 9:15, 22:3, 24:12, 30:13, 30:20, 33:1, 33:9, 33:13, 58:18, 99:22, 106:13
**meaning** [2] - 10:8, 99:25
**means** [7] - 13:10, 33:2, 43:13, 108:10,

108:11, 109:6
**meant** [8] - 30:5, 44:12, 73:8, 83:9, 84:16, 97:22, 102:2, 120:17
**meantime** [1] - 41:6
**measured** [2] - 87:15
**meet** [7] - 18:16, 19:3, 30:7, 30:11, 31:2, 32:18, 32:20
**meeting** [1] - 17:18
**members** [1] - 29:15
**memory** [8] - 6:3, 12:23, 67:20, 100:19, 102:25, 119:12, 121:8, 121:20
**mentioned** [6] - 36:1, 38:3, 64:16, 89:23, 112:11, 121:2
**merits** [1] - 58:7
**message** [2] - 42:16, 64:22
**met** [1] - 67:11
**methodology** [1] - 23:18
**metric** [1] - 87:14
**Metz** [31] - 47:17, 47:22, 48:3, 48:5, 49:3, 49:14, 50:6, 51:18, 58:14, 59:5, 59:8, 64:2, 64:13, 64:15, 64:23, 64:25, 65:6, 65:21, 69:20, 70:4, 70:9, 70:20, 71:16, 71:19, 71:25, 79:4, 79:24, 80:5, 82:12, 101:9, 103:4
**Metz'** [1] - 71:5
**Michael** [1] - 5:1
**MICHAEL** [1] - 2:15
**microphone** [1] - 39:6
**mid** [2] - 117:3, 120:19
**middle** [2] - 67:8, 112:5
**midmorning** [1] - 84:22
**midterm** [1] - 7:1
**might** [5] - 12:18, 17:5, 103:14, 110:21
**MIL** [1] - 47:4
**million** [27] - 7:20, 53:16, 53:19, 68:13, 79:7, 81:12, 81:14, 82:4, 82:17, 84:9, 97:16, 98:6, 98:21, 99:10, 99:19, 100:1, 102:1, 102:3, 102:12, 102:24, 103:21, 104:1,

120:24, 122:2, 122:4
**millions** [1] - 104:1
**mind** [1] - 25:25
**minimum** [2] - 7:16, 86:18
**minute** [3] - 85:1, 85:5, 92:14
**minutes** [13] - 20:6, 42:22, 56:21, 123:2, 123:5, 123:10, 123:17, 123:18, 123:20, 123:22, 123:23, 124:5
**missed** [1] - 60:6
**missing** [1] - 16:16
**mix** [1] - 83:9
**model** [1] - 56:24
**modern** [1] - 73:15
**modifications** [1] - 15:22
**moment** [1] - 40:5
**money** [3] - 9:5, 121:13, 121:15
**monitor** [3] - 92:13, 93:4, 95:3
**month** [18] - 7:20, 69:13, 74:14, 74:16, 80:16, 84:9, 97:16, 100:23, 102:1, 102:3, 102:24, 103:21, 104:2, 106:19, 106:21, 112:12, 112:14
**monthly** [1] - 62:11
**months** [11] - 31:21, 31:22, 33:21, 35:2, 38:23, 39:14, 40:24, 99:25, 120:21
**morning** [25] - 4:8, 4:10, 4:11, 4:13, 4:14, 4:16, 4:17, 4:19, 4:20, 4:22, 4:23, 4:25, 5:1, 5:3, 5:4, 5:6, 5:7, 5:11, 9:13, 26:25, 28:3, 28:4, 31:18, 32:16, 32:17
**most** [2] - 88:25, 90:17
**motion** [6] - 25:18, 32:2, 101:5, 124:13, 124:14
**motions** [1] - 124:21
**move** [21] - 5:13, 22:17, 31:25, 35:16, 37:16, 39:8, 40:13, 46:25, 51:21, 56:21, 58:6, 60:7, 67:12, 74:1, 83:18, 92:22, 96:24, 98:8, 101:3,

101:11, 116:19
**moved** [1] - 97:9
**moving** [5] - 47:3, 71:13, 74:15, 80:16, 100:7
**MR** [231] - 3:9, 3:10, 3:10, 3:11, 3:12, 3:13, 4:8, 4:11, 4:14, 4:17, 4:20, 5:1, 5:4, 5:7, 5:12, 5:19, 6:17, 6:19, 7:7, 8:20, 8:23, 9:6, 9:10, 9:13, 10:24, 11:2, 11:8, 11:17, 11:21, 11:24, 12:21, 13:9, 13:13, 13:25, 14:2, 14:24, 14:25, 15:17, 15:18, 16:11, 16:13, 17:10, 17:12, 17:17, 17:24, 18:7, 18:13, 19:2, 19:9, 19:18, 19:21, 20:8, 20:12, 21:3, 21:19, 21:22, 22:6, 22:8, 22:9, 22:18, 23:1, 23:15, 23:25, 24:3, 24:6, 24:25, 25:8, 25:22, 26:4, 26:14, 26:17, 26:19, 26:21, 27:7, 27:20, 27:22, 28:2, 28:25, 29:5, 29:19, 29:22, 30:1, 30:16, 30:18, 30:21, 31:3, 31:25, 32:5, 32:12, 32:15, 33:25, 34:2, 34:6, 34:10, 34:17, 34:18, 34:21, 34:24, 35:16, 35:19, 35:22, 37:16, 37:19, 37:21, 37:23, 39:13, 39:18, 39:19, 39:25, 40:13, 40:16, 40:19, 46:25, 47:3, 47:6, 47:12, 47:14, 51:21, 51:24, 52:4, 52:6, 53:4, 54:22, 55:5, 56:8, 57:2, 57:14, 57:17, 57:20, 57:21, 58:2, 58:11, 58:14, 58:18, 58:20, 58:23, 59:5, 59:13, 59:20, 59:25, 60:2, 60:4, 60:7, 60:11, 60:13, 71:9, 71:13, 74:1, 74:4, 74:10, 74:22, 75:1, 83:18, 83:21, 83:25, 85:10, 85:13, 85:20, 85:23, 86:1, 86:5, 88:3, 88:10, 88:16, 88:19, 88:22, 89:8, 90:11, 91:14, 92:2, 92:3,

92:22, 92:25, 93:3, 97:1, 97:4, 97:6, 97:8, 98:8, 98:11, 98:16, 101:3, 101:6, 101:11, 101:14, 101:19, 104:25, 105:4, 105:8, 105:13, 107:4, 107:7, 107:9, 110:9, 110:12, 112:20, 112:22, 112:24, 113:9, 113:11, 113:14, 113:17, 114:7, 114:10, 114:13, 115:1, 115:11, 116:2, 116:6, 116:19, 116:21, 116:24, 117:18, 117:21, 119:21, 119:24, 120:2, 122:11, 122:13, 122:22, 122:25, 123:2, 123:5, 123:13, 123:16, 124:2, 124:7, 124:12, 124:22, 124:24, 124:25
**MS** [1] - 4:23
**multiple** [1] - 104:1
**MYERS** [2] - 2:12, 2:15

**N**

**n-u-t-h** [1] - 27:18
**name** [4] - 27:16, 29:9, 40:12, 115:4
**names** [1] - 78:25
**NAND** [5] - 104:22, 105:6, 105:25, 106:4, 113:5
**natural** [2] - 25:24, 108:23
**naturally** [1] - 90:22
**nature** [4] - 13:6, 19:3, 52:8, 54:12
**NC/NR** [1] - 96:4
**NDA** [1] - 68:10
**Neal** [11] - 5:7, 27:8, 27:18, 30:7, 38:3, 42:8, 42:23, 47:22, 95:25, 99:10, 99:17
**NEAL** [3] - 3:9, 27:18, 27:23
**nearly** [3] - 49:14, 49:24, 50:7
**necessarily** [1] - 89:3
**necessary** [3] - 18:11, 19:8, 26:22

**need** [33] - 9:5, 10:3, 14:9, 15:15, 16:11, 18:8, 19:15, 30:7, 34:11, 35:25, 42:8, 42:24, 43:7, 53:11, 54:11, 54:13, 54:15, 58:10, 65:1, 65:6, 66:16, 73:3, 80:7, 89:5, 90:7, 91:14, 94:1, 96:18, 99:11, 99:14, 110:21, 111:12
**needed** [10] - 7:3, 9:1, 10:4, 10:17, 16:18, 16:19, 53:23, 76:13, 85:12, 90:4
**needing** [1] - 54:7
**needs** [3] - 12:4, 18:22, 59:6
**negative** [2] - 24:13, 24:18
**negotiate** [1] - 111:16
**nervous** [2] - 66:14, 107:14
**NESSIM** [1] - 2:10
**Netflix** [1] - 53:2
**netlist** [1] - 68:11
**Netlist** [201] - 4:6, 4:9, 4:12, 4:15, 4:18, 5:14, 5:16, 5:21, 5:22, 7:3, 7:12, 8:6, 9:1, 9:2, 9:11, 10:1, 10:4, 10:17, 11:11, 11:15, 11:19, 18:2, 18:14, 19:24, 22:22, 28:12, 28:16, 28:20, 28:22, 28:23, 29:4, 29:7, 29:12, 29:16, 30:3, 33:22, 33:23, 34:13, 35:3, 35:14, 36:12, 36:21, 37:1, 37:6, 38:2, 38:12, 38:17, 38:18, 38:25, 39:15, 39:16, 40:25, 41:7, 41:9, 42:2, 42:3, 43:23, 44:3, 44:8, 44:10, 44:12, 44:20, 46:17, 48:7, 48:10, 48:11, 48:17, 48:21, 49:5, 49:19, 50:1, 50:5, 50:14, 50:24, 50:25, 51:12, 53:2, 53:5, 53:9, 53:16, 53:22, 54:6, 56:10, 56:12, 56:16, 59:9, 61:3, 61:7, 61:17, 61:22, 61:25, 63:1, 63:6, 64:6, 65:2, 65:7, 65:13, 65:15, 65:20, 66:5,

66:7, 68:10, 68:17, 69:22, 71:7, 71:20, 72:11, 73:10, 74:11, 74:13, 76:2, 76:4, 76:5, 76:8, 76:9, 76:15, 77:2, 77:6, 78:1, 78:4, 78:5, 79:7, 79:22, 81:3, 81:7, 81:9, 82:3, 82:11, 82:17, 82:20, 82:21, 83:10, 84:8, 84:13, 84:17, 86:2, 86:5, 89:8, 89:19, 90:3, 93:8, 94:3, 94:8, 94:9, 94:14, 94:19, 95:12, 96:10, 96:12, 97:16, 97:23, 98:21, 100:8, 100:11, 100:14, 100:19, 101:23, 102:2, 102:9, 102:11, 102:24, 103:7, 103:17, 103:20, 103:25, 104:5, 104:11, 104:22, 105:6, 105:14, 105:17, 105:24, 106:3, 106:7, 106:11, 106:16, 106:25, 107:1, 107:19, 108:2, 110:7, 110:8, 110:14, 110:21, 110:23, 111:22, 112:2, 112:6, 112:15, 113:4, 113:25, 115:14, 117:5, 118:19, 119:4, 120:7, 121:15, 123:25, 124:6
**Netlist's** [7] - 9:15, 15:3, 75:5, 75:18, 75:23, 97:21, 104:23
**never** [10] - 9:3, 9:4, 25:7, 26:8, 30:25, 53:9, 87:3, 107:16, 121:10
**New** [4] - 15:20, 17:2, 17:8, 17:16
**new** [6] - 65:14, 73:1, 74:16, 81:3, 108:17, 109:1
**Newport** [2] - 2:16, 2:16
**next** [12] - 23:4, 27:6, 31:21, 38:6, 53:14, 62:3, 79:24, 83:10, 110:2, 111:15, 113:10, 114:8

**nice** [2] - 32:20, 62:24
**night** [3] - 26:8, 26:9, 34:9
**nitpick** [1] - 21:10
**nobody** [3] - 8:21, 26:1, 71:5
**noise** [1] - 59:18
**non** [2] - 62:5, 62:9
**non-confirmed** [2] - 62:5, 62:9
**nonbinding** [7] - 6:5, 11:5, 12:24, 13:2, 13:5, 13:11, 119:14
**nonconfirmed** [1] - 61:17
**none** [2] - 52:15, 55:23
**norms** [1] - 87:13
**notation** [1] - 76:2
**note** [4] - 20:18, 59:6, 70:9, 76:1
**noted** [1] - 26:8
**notes** [2] - 93:24, 123:18
**nothing** [12] - 7:8, 10:14, 27:13, 32:12, 52:16, 57:4, 57:6, 62:19, 89:21, 112:20, 113:9, 114:21
**notice** [2] - 54:2, 55:6
**noticed** [1] - 103:10
**notified** [1] - 10:4
**notion** [2] - 54:7, 54:15
**November** [2] - 28:15, 118:11
**number** [2] - 38:19, 72:16, 107:18
**Number** [1] - 73:18
**numbered** [1] - 20:10
**numbers** [11] - 38:15, 48:23, 48:25, 60:16, 73:2, 73:3, 75:3, 93:15, 97:22, 124:1, 124:9

**O**

**O'MELVENY** [2] - 2:12, 2:15
**object** [7] - 5:23, 19:25, 22:23, 23:20, 26:19, 55:16, 71:9
**objected** [2] - 5:14, 20:10
**objecting** [1] - 86:4
**objection** [39] - 21:2, 22:18, 28:25, 29:19, 29:21, 30:17, 31:25,

35:18, 35:19, 37:18, 40:15, 40:16, 47:2, 51:23, 52:5, 52:20, 55:23, 60:10, 74:3, 83:20, 83:22, 85:17, 86:8, 86:10, 86:23, 90:10, 92:25, 97:3, 97:4, 98:10, 98:12, 101:13, 101:15, 105:9, 110:9, 116:20, 116:21, 117:17, 117:18
**objections** [4] - 20:13, 92:24, 98:14, 101:16
**obligation** [4] - 7:23, 7:25, 25:15, 88:15
**obligations** [2] - 88:8, 90:24
**obtaining** [1] - 68:25
**obviously** [4] - 28:19, 53:6, 55:16, 88:24
**occasions** [2] - 43:15, 56:15
**occurred** [2] - 21:14, 53:12
**occurrence** [1] - 108:8
**October** [1] - 99:11
**OEM** [5] - 6:4, 12:24, 63:15, 63:20, 65:11
**OF** [3] - 2:1, 3:5, 3:16
**offer** [3] - 8:10, 21:11, 32:10
**offered** [1] - 113:19
**offering** [3] - 5:25, 6:9, 8:17
**offers** [1] - 21:20
**office** [2] - 67:15, 67:18
**officer** [4] - 8:14, 115:14, 115:16, 118:9
**official** [3] - 6:12, 118:23, 124:9
**often** [4] - 13:5, 18:20, 28:15, 81:9
**oftentimes** [1] - 29:18
**once** [5] - 10:7, 36:19, 38:12, 94:8, 123:7
**one** [38] - 5:25, 10:21, 19:21, 23:3, 23:4, 23:11, 23:14, 23:20, 23:22, 33:17, 34:15, 42:13, 53:25, 57:2, 59:14, 60:20, 60:25, 65:13, 66:2, 66:22, 70:10, 85:17, 86:21, 87:2, 93:17, 95:3, 96:11, 98:23, 108:5, 109:5, 111:9, 113:17, 114:2,

116:8, 117:12, 123:13
**one-page** [1] - 116:8
**ones** [1] - 20:10
**ongoing** [1] - 121:18
**oOo** [1] - 4:3
**open** [1] - 59:16
**operated** [1] - 88:24
**operations)** [1] - 48:6
**opine** [2] - 19:19, 21:5
**opining** [2] - 88:8, 88:10
**opinion** [11] - 21:21, 21:23, 22:11, 23:12, 23:21, 24:16, 25:10, 87:11, 90:22, 90:24, 90:25
**opinions** [4] - 21:11, 21:13, 21:19, 25:13
**opportunity** [11] - 12:5, 20:21, 26:7, 26:11, 30:25, 54:1, 54:3, 54:7, 54:25, 55:9, 103:11
**opposed** [2] - 16:21, 33:16
**opposite** [1] - 25:5
**orange** [2] - 66:21, 66:25
**order** [53] - 7:4, 9:1, 10:17, 25:5, 30:12, 32:25, 33:2, 33:5, 33:10, 33:12, 33:16, 33:17, 35:4, 35:25, 36:16, 36:22, 37:1, 37:7, 38:8, 38:17, 39:2, 42:3, 42:4, 42:17, 42:25, 43:17, 43:18, 44:9, 45:4, 45:7, 45:11, 45:24, 46:8, 46:11, 46:14, 53:6, 53:7, 66:21, 67:23, 73:4, 76:12, 78:20, 96:12, 96:13, 96:14, 105:11, 105:15, 106:1, 106:2, 124:2
**ordered** [2] - 96:9, 121:16
**ordering** [1] - 56:13
**orders** [57] - 6:7, 33:23, 36:1, 36:9, 37:5, 38:7, 38:14, 39:1, 39:15, 41:1, 41:2, 41:12, 44:6, 44:10, 44:24, 45:2, 45:11, 45:14, 45:17, 53:5, 53:9, 53:17, 53:19, 53:21, 55:7, 56:13, 56:19, 57:22,

61:17, 61:22, 61:25, 62:2, 62:8, 62:9, 62:11, 64:17, 66:5, 66:8, 68:3, 68:20, 68:21, 69:23, 72:21, 74:16, 78:5, 78:10, 81:3, 81:7, 81:15, 84:17, 95:12, 96:11, 105:19, 108:17, 109:17, 119:15
**orient** [1] - 72:6
**original** [4] - 6:4, 63:16, 64:22, 119:13
**originally** [1] - 18:3
**otherwise** [2] - 13:21, 38:16
**ought** [3] - 12:11, 13:7, 20:22
**ourselves** [1] - 72:6
**outages** [1] - 108:25
**outside** [8] - 20:14, 33:25, 52:3, 57:12, 85:4, 85:8, 87:24, 122:20
**outweighed** [1] - 88:1
**own** [5] - 21:6, 28:21, 32:3, 32:6, 48:16

**P**

**P.C** [1] - 2:10
**p.m** [1] - 125:3
**PA** [2] - 43:7, 43:13
**packet** [1] - 16:14
**page** [56] - 6:1, 6:2, 12:20, 12:21, 22:21, 24:14, 26:15, 47:15, 49:2, 51:17, 56:9, 60:17, 60:22, 62:21, 62:22, 63:3, 63:14, 64:1, 64:10, 64:12, 64:16, 65:4, 65:9, 65:22, 66:24, 67:8, 69:18, 69:24, 69:25, 70:3, 70:9, 71:14, 73:21, 74:10, 74:12, 74:14, 75:2, 76:3, 77:10, 77:11, 78:24, 80:4, 83:14, 85:24, 86:21, 86:22, 93:10, 93:23, 95:15, 95:24, 97:20, 98:18, 99:9, 116:8, 118:7, 119:7
**PAGE** [1] - 3:7
**pages** [1] - 24:15
**paid** [4] - 10:16, 16:4, 69:6, 69:7
**Paik** [6] - 11:9, 29:11, 40:7, 48:6, 48:9, 110:18

**paper** [1] - 34:14
**papers** [1] - 123:11
**paragraph** [3] - 22:8, 22:9, 119:8
**paraphrasing** [1] - 21:9
**parens** [1] - 83:1
**Park** [3] - 2:11, 29:11, 110:18
**part** [32] - 6:15, 6:22, 34:5, 38:15, 38:19, 38:20, 40:24, 43:2, 43:5, 43:9, 43:19, 43:25, 46:3, 72:15, 73:2, 73:3, 76:7, 76:11, 86:6, 90:5, 91:7, 91:10, 91:11, 91:16, 91:21, 109:18, 119:9, 121:3, 121:19
**part-by-part** [1] - 46:3
**participated** [1] - 40:11
**particular** [9] - 20:18, 33:9, 38:4, 41:13, 41:24, 44:4, 46:10, 89:2, 89:14
**particularly** [1] - 12:6
**parties** [18] - 5:10, 14:7, 14:12, 14:16, 14:20, 14:22, 15:19, 15:21, 15:25, 16:18, 16:23, 17:7, 17:18, 22:16, 26:11, 27:4, 85:11, 113:23
**parties'** [2] - 9:19, 15:16
**parts** [14] - 31:23, 41:24, 42:4, 42:24, 44:4, 44:6, 44:21, 45:3, 46:1, 49:20, 50:16, 93:25, 96:9
**party** [3] - 16:7, 29:22, 34:11
**passage** [4] - 85:23, 86:12, 87:25
**passages** [1] - 85:18
**past** [2] - 99:15, 99:25
**Pattern** [1] - 15:21, 17:2
**pattern** [1] - 16:2, 16:10
**pay** [6] - 16:7, 22:12, 27:3, 122:5, 122:6
**paying** [1] - 69:16
**payment** [1] - 10:15
**people** [11] - 35:3, 41:7, 41:9, 44:4, 45:13, 45:16, 50:13, 83:15, 108:11,

108:13, 119:4
**per** [9] - 84:9, 96:5, 97:16, 102:1, 102:24, 103:21, 106:19, 106:21, 120:24
**percent** [3] - 49:14, 49:24, 50:8
**perfect** [1] - 76:20
**period** [16] - 5:21, 9:16, 10:23, 11:2, 13:14, 53:11, 54:11, 57:4, 57:13, 57:15, 57:16, 57:18, 57:24, 104:18, 118:17, 122:1
**periods** [3] - 6:6, 12:25, 119:15
**permission** [1] - 98:20
**permit** [2] - 76:12, 81:7
**permitted** [1] - 15:23
**person** [2] - 47:19, 109:8
**person's** [1] - 113:24
**personal** [4] - 32:3, 32:6, 69:4, 91:1
**perspective** [5] - 63:20, 89:4, 89:5, 89:6
**pertain** [1] - 120:9
**pertains** [1] - 120:10
**phone** [2] - 43:23, 110:22
**physical** [1] - 63:18
**pieces** [2] - 36:13, 89:17
**place** [8] - 6:7, 7:5, 60:6, 72:4, 105:11, 111:14, 119:15, 122:8
**placed** [3] - 61:17, 61:25, 96:14
**placement** [1] - 38:8
**placing** [1] - 109:13
**plaintiff** [6] - 16:3, 16:4, 16:5, 16:6, 16:8, 86:5
**PLAINTIFF** [1] - 2:3
**plaintiff's** [2] - 34:5, 85:16
**plan** [8] - 19:25, 61:16, 67:23, 93:8, 99:10, 106:5, 106:9, 106:13
**planning** [3] - 8:5, 6:15, 61:15
**play** [2] - 14:17, 113:14
**playing** [7] - 85:14, 109:12, 109:13,

113:11, 113:24, 114:5
**pleasure** [1] - 32:18
**PO** [7] - 36:7, 38:3, 63:1, 110:4, 110:5, 110:22, 111:15
**point** [25] - 8:5, 10:11, 13:22, 18:18, 19:6, 22:1, 40:23, 53:16, 54:17, 57:2, 57:10, 62:10, 62:15, 71:7, 73:10, 89:13, 90:6, 90:14, 97:15, 99:7, 103:5, 103:25, 109:16, 113:17, 122:17
**points** [2] - 12:2, 24:21
**politics** [2] - 70:23, 70:24
**portfolio** [1] - 121:3
**portion** [2] - 36:25, 121:24
**portions** [1] - 113:24
**POs** [5] - 61:13, 72:14, 73:8, 109:20, 111:11
**position** [10] - 19:18, 23:7, 23:10, 28:10, 79:11, 79:21, 90:14, 102:19, 102:20, 102:21
**positioned** [1] - 102:13
**positioning** [1] - 102:5
**positively** [1] - 93:24
**possible** [1] - 101:22
**post** [1] - 14:17
**post-discharge** [1] - 14:17
**potentially** [1] - 79:23
**power** [1] - 108:25
**practice** [2] - 18:9, 20:20
**practices** [3] - 112:1, 112:2, 112:4
**preconduct** [1] - 58:1
**predicate** [2] - 21:23, 22:10
**prefer** [1] - 80:10
**prejudicial** [1] - 9:24
**preliminary** [1] - 14:6
**premium** [1] - 24:13
**premiums** [1] - 24:18
**preparation** [1] - 115:17
**presence** [7] - 26:24, 52:3, 59:16, 85:4, 85:8, 91:23, 122:20
**present** [3] - 5:11, 12:5, 28:13

**presented** [1] - 18:9
**presenting** [1] - 65:10
**presents** [1] - 87:10
**presupposes** [1] - 54:20
**pretrial** [1] - 25:18
**pretty** [4] - 22:14, 23:21, 39:12, 108:25
**previous** [1] - 96:21
**price** [38] - 16:4, 16:6, 22:13, 23:3, 23:10, 23:11, 23:12, 23:13, 23:22, 24:13, 24:18, 25:20, 28:24, 30:4, 30:8, 30:9, 30:11, 30:20, 30:25, 31:2, 31:13, 31:17, 31:21, 31:24, 93:14, 93:20, 94:13, 94:14, 94:15, 94:19, 95:16, 95:18, 95:19, 95:25, 96:1, 96:5, 108:22
**priced** [2] - 93:17
**prices** [8] - 25:19, 29:13, 30:6, 30:7, 31:7, 31:8, 32:10, 53:8
**pricing** [4] - 94:1, 94:5, 95:9, 96:18
**primary** [1] - 28:12
**print** [1] - 95:3
**privileges** [2] - 65:2, 65:7
**probative** [1] - 87:25
**problem** [7] - 9:3, 9:4, 9:15, 24:2, 24:3, 56:7, 91:17
**problems** [1] - 69:15
**proceed** [4] - 27:20, 60:2, 92:1, 114:24
**process** [3] - 19:4, 76:11, 92:16
**procurement** [2] - 86:2, 88:23
**product** [48] - 6:6, 6:10, 12:25, 24:10, 31:20, 33:4, 38:4, 42:15, 42:19, 42:20, 43:13, 46:3, 46:11, 61:5, 61:13, 63:18, 63:21, 63:23, 68:5, 69:5, 78:4, 78:10, 81:8, 81:17, 87:20, 87:22, 89:15, 91:7, 91:10, 93:15, 94:2, 96:22, 98:5, 102:6, 102:7, 102:12, 102:22, 103:8, 104:2, 104:11, 106:9, 106:14,

108:12, 108:14, 109:1, 111:18, 119:14
**product-by-product** [1] - 46:3
**products** [20] - 11:12, 36:15, 36:17, 41:13, 42:24, 67:2, 71:6, 74:14, 91:6, 98:21, 99:3, 102:3, 104:22, 105:6, 106:4, 113:5, 117:6, 120:6, 120:12, 121:16
**profit** [1] - 54:10
**profits** [2] - 52:9, 52:22
**progression** [1] - 56:23
**projecting** [1] - 120:21
**projection** [1] - 94:9
**promote** [1] - 65:11
**promoting** [1] - 65:11
**prong** [1] - 89:9
**proper** [1] - 24:23
**proposed** [5] - 15:3, 18:2, 18:4, 18:14, 19:4
**proven** [1] - 54:14
**proves** [1] - 56:14
**provide** [9] - 6:5, 12:24, 13:1, 13:10, 33:18, 38:18, 94:8, 100:21, 119:13
**provided** [4] - 15:20, 38:20, 46:4
**provides** [1] - 15:25
**providing** [1] - 68:4
**proving** [1] - 54:14
**pry** [1] - 69:3
**public** [1] - 6:12
**publicly** [2] - 118:1, 119:4
**publicly-traded** [2] - 118:1, 119:4
**publish** [2] - 74:21, 116:24
**published** [2] - 116:3, 117:16
**purchase** [85] - 7:20, 9:2, 11:11, 23:18, 32:25, 33:2, 33:5, 33:9, 33:12, 33:16, 33:17, 33:23, 35:4, 35:25, 36:1, 36:9, 36:16, 36:22, 37:1, 37:5, 37:7, 38:7, 38:8, 38:14, 38:17, 39:1, 39:2, 39:15, 41:1, 41:2, 41:12, 42:3, 42:4, 42:17,

43:18, 44:10, 45:4, 45:7, 45:10, 45:14, 45:17, 45:24, 46:8, 46:11, 46:14, 53:5, 53:6, 53:7, 53:9, 53:19, 53:21, 55:7, 56:13, 56:19, 61:17, 61:22, 61:24, 62:2, 62:9, 64:17, 66:5, 66:8, 66:21, 67:23, 68:3, 68:19, 68:21, 69:23, 72:21, 76:12, 78:5, 78:10, 78:20, 81:7, 81:15, 96:14, 100:19, 102:3, 105:11, 105:15, 105:19, 106:1, 106:2, 121:15
**purchased** [2] - 24:11, 24:12
**purchases** [6] - 7:8, 7:13, 7:18, 38:13, 44:21, 121:7
**purchasing** [4] - 104:1, 104:11, 117:6, 121:19
**purpose** [1] - 15:11
**purposes** [1] - 88:5
**pursuant** [1] - 88:24
**pushed** [1] - 80:24
**put** [15] - 7:14, 8:25, 12:18, 35:25, 36:8, 79:24, 83:1, 89:13, 99:5, 104:12, 107:12, 113:25, 114:1, 122:2

**Q**

**Q1** [2] - 93:11, 111:15
**Q2** [4] - 35:25, 36:2, 68:21, 93:20
**Q3** [12] - 48:10, 48:18, 49:5, 68:21, 75:7, 75:9, 76:4, 77:2, 77:6, 77:25, 78:3, 81:12
**qualification** [2] - 16:15, 47:9
**quantification** [1] - 21:14
**quantify** [1] - 21:25
**quarter** [8] - 46:2, 75:6, 75:18, 75:24, 78:15, 96:5, 118:20, 120:24
**quarterly** [1] - 69:9, 69:11, 118:2
**questioned** [4] - 24:15, 24:22, 86:15,

87:3
**questioning** [1] - 87:1
**questions** [11] - 11:19, 20:21, 26:3, 56:11, 103:16, 107:4, 107:18, 119:21, 120:15, 122:11, 122:12
**quick** [1] - 95:4
**quickly** [2] - 20:7, 67:12
**quite** [6] - 18:18, 24:1, 55:12, 57:17, 100:3, 109:4
**quote** [4] - 42:9, 86:13, 117:2, 119:12

**R**

**rainbows** [1] - 76:22
**raise** [3] - 27:9, 85:12, 114:18
**raised** [3] - 13:21, 25:17, 26:8
**raising** [2] - 31:16, 31:21
**random** [1] - 44:3
**Ray** [1] - 4:14
**Raymond** [15] - 29:11, 35:14, 35:24, 37:14, 37:25, 38:7, 72:10, 85:15, 86:1, 88:23, 90:4, 95:7, 95:24, 110:18, 114:5
**RAYMOND** [1] - 2:5
**re** [1] - 77:2
**read** [19] - 6:1, 13:13, 14:8, 14:18, 14:19, 15:19, 32:4, 38:10, 63:10, 63:13, 65:8, 67:24, 68:14, 71:21, 78:5, 116:25, 119:9, 120:5, 123:9
**readback** [2] - 14:16, 15:13
**reading** [4] - 14:15, 15:5, 31:18, 76:18
**reads** [1] - 15:7
**ready** [1] - 113:14
**real** [1] - 89:13
**really** [15] - 17:13, 17:14, 25:15, 27:4, 54:24, 56:13, 58:19, 59:6, 69:9, 82:2, 88:4, 99:14, 108:11, 120:15
**reason** [3] - 18:10, 58:17, 86:20
**reasonable** [3] - 47:8, 52:18, 87:13

**reasonableness** [3] - 47:5, 52:10, 56:2
**reasons** [1] - 90:12
**rebut** [1] - 90:7
**rebuttal** [1] - 54:12
**receivable** [1] - 69:15
**receive** [5] - 37:1, 45:7, 45:10, 45:14, 70:17
**RECEIVED** [1] - 3:17
**received** [16] - 8:21, 35:21, 37:22, 40:18, 47:13, 60:9, 60:12, 74:25, 79:6, 83:24, 93:2, 97:7, 98:15, 101:18, 116:23, 117:20
**recent** [1] - 96:2
**recess** [4] - 85:6, 85:7, 125:2, 125:3
**recognize** [3] - 84:1, 92:7, 97:12
**recollection** [4] - 49:8, 78:13, 106:20, 112:14
**record** [6] - 10:15, 27:17, 74:23, 115:4, 116:5, 124:19
**recover** [1] - 16:3
**recross** [2] - 86:25, 112:21
**RECROSS** [2] - 3:11, 112:23
**RECROSS-EXAMINATION** [2] - 3:11, 112:23
**red** [1] - 23:25
**redaction** [2] - 60:8, 74:20
**REDIRECT** [4] - 3:10, 3:13, 107:8, 120:1
**redirect** [5] - 86:25, 87:4, 107:6, 119:23, 123:19
**reduced** [3] - 100:9, 100:12, 100:15
**refer** [1] - 94:15
**reference** [2] - 48:7, 105:3
**referring** [5] - 11:15, 77:8, 91:21, 117:5, 120:20
**reflects** [1] - 96:19
**refresh** [2] - 49:8, 106:20
**refused** [1] - 81:7
**regarding** [5] - 66:4, 69:22, 86:12, 93:7, 95:25
**regardless** [1] - 87:5

**region** [1] - 28:11
**regular** [1] - 41:11
**regularly** [2] - 38:25, 43:24
**regulatory** [1] - 117:13
**reiterating** [1] - 57:7
**rejected** [2] - 81:6, 81:11
**rejecting** [2] - 74:16, 81:3
**relate** [1] - 58:7
**relates** [1] - 95:9
**relation** [3] - 46:17, 61:3, 61:6
**relationship** [4] - 73:11, 82:3, 82:11, 82:21
**relevance** [5] - 5:24, 30:21, 53:1, 57:24, 91:3
**relevant** [9] - 7:2, 23:19, 26:18, 74:18, 89:6, 91:2, 91:4, 91:20
**relitigating** [1] - 52:12
**relying** [1] - 24:10
**remember** [14] - 51:13, 53:25, 71:23, 71:25, 72:24, 73:5, 76:19, 76:22, 78:8, 82:24, 94:23, 94:24, 100:4, 111:11
**remind** [4] - 10:25, 11:5, 12:20, 71:11
**reminded** [1] - 14:13
**reminding** [1] - 39:14
**repeat** [11] - 29:24, 33:14, 34:25, 44:16, 46:9, 50:22, 65:5, 75:22, 100:10, 104:7, 112:8
**repeatedly** [3] - 41:16, 41:17, 41:20
**replacement** [1] - 49:20
**replied** [1] - 78:3
**replies** [1] - 71:19
**reply** [2] - 70:13, 71:16
**report** [16] - 6:13, 20:15, 20:19, 21:4, 21:17, 22:5, 22:21, 23:14, 23:15, 24:8, 25:1, 25:7, 25:14, 25:21, 26:14, 66:4
**reporter** [1] - 59:3
**Reporter** [1] - 39:22
**reports** [4] - 77:25, 115:18, 117:12, 118:19
**represent** [1] - 95:22

**represented** [1] - 95:23
**request** [30] - 18:3, 18:7, 19:5, 43:3, 45:18, 51:25, 55:15, 86:13, 87:10, 87:17, 87:19, 87:22, 88:12, 89:10, 89:11, 89:25, 90:4, 90:5, 90:18, 91:7, 91:8, 91:12, 91:15, 102:12, 104:23, 105:6, 105:25, 106:4, 111:10, 113:5
**requested** [2] - 42:20, 62:25
**requesting** [1] - 93:25
**requests** [10] - 39:22, 45:7, 45:19, 45:20, 89:3, 89:19, 89:20, 91:5, 109:21, 120:6
**required** [5] - 87:9, 87:11, 87:12, 90:20, 104:21
**requirement** [2] - 25:9, 87:14
**requirements** [1] - 88:21
**reread** [1] - 14:8
**reseller** [6] - 23:18, 24:11, 25:19, 30:14, 31:7, 53:8
**resellers** [14] - 28:21, 28:23, 31:5, 31:12, 31:20, 32:7, 32:9, 50:15, 50:17, 50:24, 51:4, 81:8, 100:20
**reserve** [1] - 121:25
**reserved** [3] - 10:2, 55:9, 90:10
**respect** [10] - 6:3, 10:22, 12:3, 12:6, 12:14, 12:23, 85:17, 86:9, 119:12
**respond** [7] - 25:3, 25:11, 36:5, 38:6, 46:2, 63:4, 90:15
**responded** [2] - 25:12, 96:4
**responds** [1] - 99:10
**response** [15] - 9:23, 29:20, 42:23, 43:6, 50:20, 66:6, 75:20, 89:18, 96:6, 99:14, 99:17, 102:15, 103:3, 107:18, 110:20
**responses** [1] - 89:24
**responsible** [4] -

67:19, 115:17, 115:20, 117:13
**rest** [3] - 34:2, 101:2, 124:5
**result** [2] - 13:21, 79:6
**revenue** [7] - 48:24, 49:15, 49:25, 50:8, 68:13, 69:11, 121:6
**review** [4] - 40:5, 74:6, 119:4
**reviewed** [2] - 36:18, 36:19
**RFAs** [2] - 14:21, 14:23
**rhetoric** [1] - 9:14
**RHOW** [67] - 2:10, 2:10, 3:9, 3:10, 4:20, 14:25, 15:18, 19:9, 27:7, 27:20, 27:22, 28:2, 29:5, 29:22, 30:1, 30:18, 31:3, 32:5, 32:12, 33:25, 34:6, 34:17, 35:19, 37:19, 39:18, 40:16, 47:3, 51:24, 52:4, 52:6, 54:22, 55:5, 57:2, 57:17, 57:21, 58:18, 59:20, 71:9, 74:4, 83:21, 85:10, 88:3, 88:10, 88:16, 88:19, 88:22, 89:8, 91:14, 92:25, 97:4, 98:11, 101:14, 104:25, 105:8, 107:7, 107:9, 110:12, 112:20, 113:9, 113:11, 113:14, 113:17, 114:7, 114:10, 122:22, 122:25, 124:25
**Rhow** [1] - 4:20
**RICHARD** [1] - 2:4
**Richard** [2] - 4:8, 53:15
**right-hand** [1] - 60:15
**rise** [4] - 56:23, 85:3, 122:19, 125:1
**rises** [1] - 15:14
**RMAs** [1] - 69:12
**room** [1] - 14:14
**Rowe** [4] - 7:15, 90:16, 90:25, 103:17
**rule** [3] - 34:16, 58:24, 72:20
**Rules** [1] - 9:25
**rules** [1] - 92:15
**ruling** [2] - 91:18, 91:19
**run** [2] - 49:21, 50:3

**running** [1] - 50:4

## S

**S-a-s-a-k-i** [1] - 115:6
**SA** [1] - 4:6
**sacrificing** [1] - 94:2
**salary** [1] - 69:6
**sale** [1] - 16:3
**sales** [18] - 6:3, 12:23, 48:23, 48:25, 69:10, 77:23, 79:6, 81:16, 82:13, 82:18, 83:6, 89:1, 102:17, 104:3, 107:1, 107:3, 119:12
**salesman** [1] - 107:15
**salesperson** [2] - 102:5, 103:6
**samples** [7] - 38:4, 38:22, 68:11, 73:1, 73:4, 98:2, 98:19
**Samsung** [147] - 4:6, 4:21, 4:24, 5:2, 5:5, 5:8, 6:20, 6:24, 7:3, 7:13, 7:17, 7:23, 8:20, 8:25, 9:2, 10:6, 11:9, 11:10, 11:12, 11:13, 18:4, 18:15, 19:4, 23:11, 23:13, 23:22, 24:12, 25:20, 27:7, 28:8, 28:13, 28:20, 28:23, 31:4, 31:8, 31:13, 31:14, 31:16, 33:18, 33:23, 34:15, 35:3, 36:8, 36:17, 37:1, 37:6, 38:13, 38:18, 38:21, 39:1, 39:15, 41:1, 41:14, 42:3, 42:8, 42:25, 44:9, 44:13, 44:20, 44:24, 45:2, 45:6, 45:11, 45:14, 45:16, 45:17, 46:14, 46:16, 48:10, 49:14, 49:24, 50:4, 50:7, 51:11, 53:1, 53:7, 53:22, 55:3, 56:9, 56:14, 56:19, 58:12, 61:23, 61:24, 62:11, 65:25, 67:6, 67:14, 71:6, 72:21, 73:12, 74:11, 74:17, 76:17, 76:23, 77:21, 79:13, 79:18, 79:19, 81:4, 81:6, 81:15, 82:12, 85:14, 86:6, 87:9, 89:11, 90:4, 91:6, 100:14, 100:20, 100:21, 104:2, 104:22, 105:5,

105:21, 111:10, 111:23, 112:6, 113:4, 114:1, 116:8, 116:10, 116:11, 116:12, 116:13, 117:2, 117:6, 120:7, 120:18, 120:25, 121:3, 121:10, 121:16, 121:19, 121:20, 121:23, 121:25, 122:3, 122:6, 123:8, 124:5
**Samsung's** [4] - 11:12, 32:24, 58:7, 58:8
**Sasaki** [18] - 6:14, 6:20, 8:6, 8:13, 8:15, 8:18, 10:1, 10:3, 13:18, 13:22, 114:11, 115:5, 115:12, 116:7, 116:25, 119:10, 120:3, 123:22
**SASAKI** [2] - 3:12, 115:8
**save** [1] - 93:4
**saw** [4] - 30:25, 47:25, 109:19, 111:9
**scenarios** [1] - 94:15
**scenes** [1] - 51:8
**scope** [4] - 9:18, 20:14, 22:19, 34:1
**screen** [2] - 61:12, 98:17
**seat** [1] - 27:1
**seated** [3] - 27:15, 114:23, 114:25
**SEC** [6] - 60:19, 67:12, 67:13, 68:25, 70:22, 117:14
**second** [21] - 14:10, 25:3, 25:6, 43:3, 49:2, 49:4, 59:10, 59:12, 64:4, 66:2, 70:8, 73:22, 76:1, 92:5, 93:10, 95:15, 96:12, 96:13, 96:14, 97:19, 124:12
**secure** [2] - 78:3, 94:1
**securing** [2] - 9:3, 93:25
**Securities** [2] - 118:2, 118:20
**see** [78] - 13:12, 18:24, 19:12, 20:16, 34:7, 34:22, 36:3, 37:5, 37:15, 42:10, 45:24, 47:17, 48:12, 49:6, 49:17, 51:18, 51:19, 60:16, 61:19, 62:6,

62:22, 63:5, 63:7, 64:1, 64:13, 65:11, 65:16, 65:23, 65:25, 66:17, 66:22, 66:24, 69:20, 70:2, 70:5, 70:6, 70:13, 71:16, 72:5, 73:21, 75:3, 76:3, 76:5, 77:3, 77:6, 77:15, 80:1, 80:5, 80:12, 80:17, 81:4, 81:12, 82:5, 83:2, 83:16, 84:10, 85:19, 86:11, 86:23, 87:18, 90:18, 93:8, 93:11, 94:3, 96:2, 96:17, 96:19, 98:3, 98:18, 99:11, 99:15, 101:23, 104:3, 114:3, 115:25, 117:9, 117:10, 120:3
**seeing** [1] - 103:24
**seeking** [4] - 7:11, 7:20, 20:24, 89:10
**seem** [2] - 54:21, 57:1
**sell** [13] - 7:24, 19:12, 31:13, 31:23, 32:7, 63:19, 69:5, 71:4, 71:6, 106:7, 106:14, 106:15, 120:11
**selling** [2] - 31:13, 93:14
**semiconductor** [3] - 28:6, 109:9, 111:7
**Semiconductor** [1] - 79:19
**send** [4] - 36:7, 55:6, 70:22, 98:5
**sending** [4] - 38:7, 59:7, 72:14, 73:8
**sends** [1] - 59:6
**senior** [2] - 28:11, 79:12
**sense** [1] - 13:16
**sent** [8] - 33:24, 35:4, 36:9, 77:12, 77:17, 92:11, 116:14, 124:18
**sentence** [9] - 6:2, 6:23, 49:4, 64:5, 77:5, 84:4, 117:1, 119:11, 120:5
**September** [5] - 5:21, 97:13, 97:15, 97:21, 98:6
**series** [2] - 52:25, 55:18
**serve** [1] - 27:3
**serves** [1] - 68:17
**service** [2] - 105:12, 105:15

**set** [4] - 37:3, 104:4, 104:5, 121:24
**sets** [2] - 17:14, 96:11
**setting** [5] - 38:16, 53:14, 56:18, 90:12, 111:17
**several** [6] - 21:3, 31:22, 40:24, 56:15, 77:13, 120:22
**shall** [4] - 27:11, 27:12, 114:19, 114:20
**SHIN** [1] - 4:23
**Shin** [1] - 4:23
**ship** [6] - 33:4, 98:1, 98:19, 98:20, 99:11, 106:9
**shipment** [1] - 10:16
**shipments** [6] - 69:13, 84:13, 97:21, 98:6, 101:1, 110:2
**shipped** [1] - 96:12
**shop** [2] - 28:23, 29:13
**shopped** [1] - 31:1
**shopping** [2] - 29:17, 30:4
**short** [6] - 6:25, 99:15, 117:1, 117:3, 120:19, 123:5
**shortcut** [1] - 8:16
**shortly** [2] - 36:2, 124:10
**show** [9] - 6:16, 7:11, 24:10, 52:17, 52:18, 54:21, 55:12, 91:5, 123:18
**showed** [3] - 24:7, 79:7, 96:15
**shown** [2] - 34:14, 70:17
**shows** [6] - 22:20, 53:12, 56:17, 95:16, 95:18, 118:8
**shred** [1] - 34:14
**side** [1] - 114:3
**sidebar** [3] - 51:25, 52:2, 55:17
**sides** [4] - 12:4, 12:18, 113:19, 113:20
**signal** [1] - 66:12
**signature** [1] - 118:8
**signed** [5] - 6:13, 8:12, 118:5, 118:11, 118:14
**significantly** [1] - 121:6
**similar** [2] - 22:24, 77:20
**simple** [1] - 30:12

**simply** [7] - 8:9, 8:16, 9:22, 20:16, 20:25, 24:20, 38:20
**single** [2] - 60:8, 83:14
**single-page** [1] - 83:14
**site** [1] - 17:20
**sitting** [1] - 28:18
**situation** [4] - 15:12, 65:14, 94:18, 110:3
**situations** [3] - 32:9, 45:15, 109:19
**six** [3] - 109:10, 123:19
**slide** [3] - 22:21, 22:24, 65:10
**Slides** [1] - 22:22
**slides** [2] - 22:25, 23:20
**slow** [2] - 66:15, 108:19
**small** [2] - 95:3, 119:9
**smaller** [1] - 110:4
**softer** [1] - 101:22
**sold** [1] - 16:5
**soldier** [1] - 70:25
**solemnly** [2] - 27:11, 114:19
**solve** [2] - 24:2, 24:3
**solves** [1] - 90:9
**someone** [1] - 75:13
**sometimes** [5] - 13:4, 17:4, 17:5, 38:22
**somewhat** [1] - 13:2
**Sorry** [1] - 46:9
**sorry** [27] - 7:3, 10:5, 17:23, 18:4, 22:8, 35:8, 35:10, 39:11, 42:13, 44:12, 53:2, 59:18, 69:18, 70:4, 71:15, 75:8, 77:11, 78:24, 81:11, 88:14, 88:19, 91:14, 92:17, 99:18, 101:14, 112:6
**sort** [2] - 87:13, 95:13
**sorts** [1] - 53:3
**sought** [1] - 10:23
**sounds** [1] - 57:20
**source** [3] - 16:9, 48:24, 100:21
**sources** [2] - 74:17, 81:4
**South** [2] - 2:6, 2:13
**Southwest** [1] - 28:11
**special** [2] - 65:1, 65:6
**specific** [10] - 6:6, 12:25, 21:7, 21:10, 23:16, 55:10, 61:5, 74:8, 91:21, 119:15
**specifically** [2] -

24:16, 24:17
**specifics** [1] - 74:20
**speculation** [1] - 30:16
**spell** [2] - 27:16, 115:4
**spend** [1] - 20:6
**spoken** [1] - 29:10
**sponsoring** [3] - 10:9, 10:20, 12:12
**spring** [7] - 10:18, 46:17, 50:5, 51:12, 104:6, 104:23, 105:5
**SSD** [8] - 35:25, 64:17, 67:23, 68:13, 77:2, 77:25, 78:4
**SSDs** [2] - 100:20, 102:25
**SSI** [1] - 79:18
**stand** [9] - 9:16, 9:20, 12:18, 19:24, 62:18, 85:6, 91:25, 114:17, 123:7
**standard** [1] - 18:8
**standpoint** [1] - 58:16
**start** [5] - 11:1, 32:21, 57:25, 109:9, 109:12
**started** [6] - 27:4, 70:10, 80:19, 91:22, 91:25, 103:24
**starting** [3] - 22:1, 85:24, 106:19
**state** [6] - 4:7, 27:16, 71:15, 84:4, 86:3, 115:3
**statement** [11] - 6:1, 12:15, 16:1, 19:11, 19:17, 45:24, 49:17, 63:9, 82:7, 93:11, 119:18
**statements** [1] - 15:20
**states** [1] - 56:18
**States** [2] - 118:2, 118:20
**status** [2] - 63:1, 64:17, 66:17
**stay** [2] - 31:11, 92:14
**stayed** [1] - 97:23
**staying** [1] - 59:17
**step** [1] - 34:21
**Steve** [3] - 49:3, 64:16, 80:5
**Steven** [7] - 47:17, 47:22, 51:18, 69:20, 79:4, 81:22, 110:19
**still** [3] - 45:24, 76:3, 91:25
**stop** [8] - 18:4, 38:7, 45:12, 59:8, 71:20, 72:14, 73:8, 109:17
**stopped** [1] - 56:3

**stories** [1] - 65:14
**straight** [1] - 56:24
**strain** [1] - 93:5
**strategy** [4] - 81:16, 82:13, 82:18, 83:6
**Street** [1] - 2:13
**stretch** [1] - 84:24
**strike** [4] - 31:25, 101:3, 111:19, 124:13
**string** [8] - 35:13, 40:7, 46:21, 51:15, 58:25, 64:8, 73:15, 92:8
**struggling** [1] - 78:25
**stuff** [1] - 74:18
**Su** [5] - 6:20, 116:8, 116:10, 120:23, 121:2
**subject** [8] - 24:23, 69:25, 74:4, 83:21, 98:11, 98:14, 101:15, 101:16
**submission** [1] - 17:25
**submit** [19] - 9:22, 36:21, 38:13, 38:17, 39:1, 39:15, 40:25, 41:12, 42:2, 42:3, 42:17, 43:17, 45:3, 45:17, 46:8, 46:11, 46:14, 53:9, 72:21
**submitted** [11] - 17:17, 36:16, 37:6, 59:21, 76:12, 78:21, 81:15, 86:6, 105:14, 105:19, 120:7
**submitting** [2] - 44:10, 61:22
**substance** [1] - 73:23
**substantive** [1] - 15:22
**subsystems** [3] - 6:4, 12:23, 119:12
**success** [1] - 65:14
**successful** [1] - 121:5
**suddenly** [1] - 112:6
**sufficient** [5] - 6:25, 9:8, 16:10, 117:3, 120:18
**suggest** [2] - 9:24, 21:13
**suggested** [1] - 10:1
**suggesting** [2] - 59:5, 90:25
**Suite** [1] - 2:16
**superiors** [3] - 82:11, 82:22, 103:19
**supervisor** [3] - 48:4, 49:23, 101:20

**supplemented** [1] - 25:7
**supplied** [1] - 105:25
**supply** [10] - 16:8, 31:16, 53:10, 89:3, 89:5, 104:17, 104:22, 108:24, 112:15, 113:4
**support** [60] - 32:24, 33:5, 33:8, 33:18, 33:24, 35:4, 36:9, 36:20, 39:2, 41:14, 42:8, 42:13, 42:17, 42:25, 43:17, 43:19, 44:5, 44:9, 44:11, 44:21, 44:24, 45:6, 48:10, 48:18, 49:5, 49:15, 49:24, 49:25, 50:8, 50:9, 50:25, 56:19, 62:4, 63:21, 65:19, 66:21, 67:12, 67:22, 68:4, 68:25, 76:8, 76:13, 77:23, 78:18, 78:20, 82:19, 87:9, 87:12, 87:22, 93:8, 94:2, 94:8, 99:10, 105:20, 106:5, 106:9, 106:13, 108:24, 109:20
**supported** [5] - 36:21, 36:25, 41:25, 72:22, 105:16
**supporting** [2] - 48:11, 68:11
**supposed** [2] - 89:3, 89:11
**supposes** [1] - 87:9
**supposition** [1] - 55:3
**sustained** [1] - 30:17
**swear** [1] - 27:11, 114:19
**sworn** [2] - 27:24, 115:9
**system** [1] - 33:3

### T

**table** [1] - 75:5
**Tae** [3] - 77:18, 77:19, 78:10
**Tae-Jin** [3] - 77:18, 77:19, 78:10
**tailored** [1] - 53:17
**talks** [2] - 52:16, 89:2
**tally** [1] - 123:23
**target** [7] - 30:6, 30:7, 30:9, 30:11, 30:20, 30:25
**targets** [2] - 69:9,

69:11
**tax** [1] - 10:2
**ten** [2] - 85:1, 85:5
**ten-minute** [2] - 85:1, 85:5
**term** [5] - 32:22, 108:7, 109:4, 117:4, 120:19
**terms** [9] - 13:17, 32:6, 34:7, 57:24, 59:20, 90:20, 111:25, 112:10, 121:18
**testified** [6] - 8:22, 9:3, 9:20, 27:24, 107:15, 115:9
**testify** [10] - 12:4, 12:15, 13:19, 29:23, 32:3, 37:4, 103:23, 107:15, 113:22, 122:24
**testifying** [2] - 88:21, 88:22
**testimony** [35] - 9:22, 11:6, 11:14, 11:23, 12:16, 13:3, 15:5, 15:10, 15:14, 21:1, 24:24, 27:11, 28:19, 56:11, 56:22, 57:18, 62:18, 68:2, 86:18, 88:9, 89:19, 90:2, 90:6, 90:16, 91:19, 95:11, 103:8, 105:20, 106:24, 111:23, 113:25, 114:1, 114:4, 114:19, 123:7
**text** [1] - 15:22, 15:24, 110:22
**that'** [1] - 90:7
**THE** [192] - 4:5, 4:10, 4:13, 4:16, 4:19, 4:22, 4:25, 5:3, 5:6, 5:9, 5:18, 6:15, 6:18, 7:2, 8:18, 8:21, 8:24, 9:7, 9:11, 10:22, 10:25, 11:4, 11:15, 11:18, 11:22, 12:1, 12:22, 13:12, 13:24, 14:4, 15:1, 15:19, 17:11, 17:15, 17:23, 18:6, 19:14, 19:20, 20:3, 20:5, 20:6, 20:11, 21:2, 21:17, 22:3, 22:14, 23:12, 23:21, 24:2, 24:5, 24:23, 25:13, 26:10, 26:16, 26:23, 26:25, 27:9, 27:14, 27:15, 27:18, 27:19, 27:21,

29:1, 29:20, 29:23, 29:24, 30:17, 30:22, 30:24, 32:2, 32:13, 34:4, 34:19, 34:23, 35:18, 35:20, 37:18, 37:20, 39:8, 39:10, 39:11, 39:12, 39:20, 39:21, 39:23, 40:15, 40:17, 47:2, 47:9, 51:23, 52:1, 52:5, 53:1, 54:17, 55:2, 57:1, 58:4, 58:12, 58:16, 58:22, 59:3, 59:12, 59:14, 59:17, 59:23, 60:1, 60:3, 60:9, 71:11, 74:3, 74:8, 74:19, 74:23, 83:20, 83:23, 84:21, 85:3, 85:5, 85:9, 85:11, 85:19, 85:22, 85:25, 86:4, 88:2, 88:7, 88:14, 88:17, 88:20, 89:6, 90:8, 91:11, 91:18, 91:24, 92:24, 93:1, 96:24, 97:3, 97:5, 98:10, 98:13, 101:5, 101:13, 101:16, 105:2, 105:10, 105:11, 107:5, 110:10, 112:21, 113:8, 113:10, 113:13, 113:16, 113:21, 114:6, 114:8, 114:12, 114:16, 114:17, 114:22, 114:23, 114:24, 115:3, 115:5, 115:7, 116:4, 116:20, 116:22, 117:17, 117:19, 119:22, 119:25, 122:12, 122:14, 122:15, 122:16, 122:19, 122:21, 122:24, 123:1, 123:3, 123:6, 123:15, 123:25, 124:4, 124:8, 124:15, 124:17, 124:20, 124:23, 125:1
**themselves** [1] - 90:3
**theory** [2] - 7:3, 53:4
**therefore** [2] - 43:20, 54:6
**they've** [3] - 9:4, 34:13
**thinking** [1] - 65:21
**third** [7] - 16:7, 24:17, 68:20, 75:6, 75:18,

75:24, 77:11
**third-party** [1] - 16:7
**third-quarter** [3] - 75:6, 75:18, 75:24
**thorough** [1] - 17:3
**thousands** [1] - 7:22
**threatening** [1] - 50:18
**three** [5] - 31:21, 31:22, 42:7, 42:22, 57:14
**throughout** [2] - 28:18, 101:2
**thrust** [2] - 57:11, 58:19
**Thursday** [1] - 64:13
**ticking** [1] - 88:5
**ties** [1] - 82:25
**timeframe** [1] - 28:23
**timing** [2] - 12:6, 41:3
**title** [4] - 22:23, 23:1, 26:17, 66:7
**TJ** [1] - 76:4
**today** [7] - 13:23, 31:18, 31:20, 48:9, 62:18, 121:24
**together** [4] - 82:25, 114:2, 114:4, 123:11
**tomorrow** [1] - 83:9
**took** [3] - 15:3, 72:3, 121:10
**top** [10] - 6:2, 57:7, 66:4, 70:3, 73:23, 78:23, 81:19, 92:8, 93:7, 93:10
**topic** [4] - 26:1, 72:1, 95:13, 96:21
**topics** [1] - 53:14
**total** [2] - 67:2, 84:14
**towards** [2] - 124:5, 124:6
**track** [1] - 17:19
**tracking** [1] - 53:5
**traded** [2] - 118:1, 119:4
**train** [3] - 39:21, 39:23
**trained** [1] - 39:16
**transactions** [4] - 23:18, 23:19, 24:9, 24:18
**transcript** [1] - 86:8
**transcripts** [1] - 85:21
**transit** [2] - 99:6, 99:7
**trends** [1] - 95:16
**trial** [10] - 5:13, 9:17, 10:6, 18:6, 18:18, 19:6, 27:2, 28:18, 32:23, 34:15
**trick** [1] - 75:21
**tried** [1] - 21:15

**true** [6] - 45:24, 54:11, 63:9, 63:11, 82:7, 119:18
**truth** [7] - 27:12, 27:13, 103:4, 114:20, 114:21
**try** [5] - 17:19, 20:1, 21:25, 23:15, 58:6
**trying** [12] - 19:10, 31:2, 52:17, 56:1, 76:7, 81:16, 83:7, 96:18, 102:5, 102:21, 121:4, 124:10
**trying** [1] - 83:2
**turn** [6] - 24:5, 35:9, 92:13, 94:25, 118:7, 119:7
**twice** [1] - 41:18
**two** [13] - 5:12, 6:7, 31:21, 31:22, 43:15, 56:20, 93:15, 96:11, 107:17, 119:16, 123:13, 123:20, 124:4
**type** [3] - 89:19, 89:21, 89:24
**types** [2] - 71:6, 91:5
**typically** [7] - 6:5, 12:24, 13:1, 13:10, 31:9, 78:12, 119:13

### U

**U.S** [2] - 77:23, 117:13
**UC** [1] - 19:13
**UCC** [3] - 17:12, 17:20, 19:12
**ultimately** [2] - 10:16, 87:8
**unapproved** [1] - 53:19
**unconfirmed** [4] - 33:16, 62:2, 66:22, 67:5
**under** [11] - 7:24, 15:4, 16:25, 31:23, 55:9, 68:10, 87:12, 90:20, 91:12, 100:1
**underlying** [1] - 91:4
**understood** [1] - 119:3
**undersupply** [1] - 31:15
**undo** [1] - 54:13
**unequivocally** [1] - 57:25
**unfair** [1] - 55:8
**unfulfilled** [1] - 55:15
**unhelpful** [1] - 86:18

**unicorns** [1] - 76:21
**unilaterally** [2] - 56:14, 56:15
**United** [2] - 118:2, 118:20
**unless** [9] - 38:13, 39:15, 41:1, 41:12, 44:8, 58:17, 68:3, 78:20, 111:16
**unlimited** [1] - 104:17
**unreasonable** [1] - 52:19
**unreasonableness** [2] - 52:11, 56:2
**up** [26] - 5:17, 5:19, 7:22, 8:2, 9:5, 13:20, 22:6, 24:7, 35:7, 35:23, 42:8, 44:19, 53:23, 55:7, 63:14, 69:18, 71:14, 80:7, 85:21, 95:3, 98:17, 99:8, 100:25, 109:20, 119:8, 123:23
**upper** [1] - 117:10
**urges** [1] - 62:25
**user** [1] - 65:15
**users** [1] - 64:17

V

**vacation** [1] - 62:24
**vague** [1] - 86:9
**value** [1] - 87:25
**variety** [1] - 107:25
**various** [5] - 28:19, 41:9, 44:5, 83:15, 111:6
**vendors** [1] - 120:10
**venture** [1] - 121:3
**Ventures** [1] - 116:11
**verify** [3] - 38:15, 66:8, 69:23
**versus** [2] - 7:21, 22:13
**via** [2] - 14:22, 25:17
**video** [11] - 48:1, 67:11, 85:9, 85:10, 113:24, 114:2, 114:5, 114:6, 124:4, 124:5, 124:11
**view** [1] - 71:6
**views** [4] - 14:6, 15:16, 25:1, 91:1
**virtually** [1] - 41:7
**vis** [2] - 112:2
**vis-a-vis** [1] - 112:2
**voice** [2] - 39:10, 39:12
**volume** [1] - 21:8

**VOLUME** [1] - 3:3
**voluntarily** [1] - 56:12
**VP** [1] - 48:6
**vs** [1] - 4:6

W

**wafer** [1] - 109:9
**wait** [3] - 66:12, 109:18, 110:21
**waiting** [1] - 20:7
**walk** [1] - 86:11
**wants** [7] - 55:11, 55:12, 71:5, 82:3, 82:11, 113:25, 114:1
**warehouse** [2] - 98:3, 99:3
**warn** [1] - 95:2
**Webster's** [1] - 76:18
**week** [3] - 36:1, 80:19, 94:14
**weeks** [11] - 6:7, 96:2, 108:15, 108:18, 109:10, 109:18, 111:15, 119:16
**weight** [1] - 15:10
**welcome** [2] - 26:25, 91:24
**white** [1] - 59:18
**whole** [3] - 27:13, 44:16, 114:21
**whys** [1] - 56:7
**willingness** [1] - 27:3
**window** [2] - 21:8, 23:4
**winking** [1] - 83:4
**winky** [1] - 83:4
**wished** [1] - 71:6
**wishes** [1] - 62:24
**wit** [1] - 75:13
**withdraw** [1] - 112:9
**withdrawing** [1] - 56:12
**withdrawn** [2] - 7:25, 8:8
**WITNESS** [14] - 3:7, 27:14, 27:18, 29:24, 30:24, 34:23, 39:10, 39:12, 39:21, 39:23, 105:11, 114:22, 115:5, 122:15
**witness** [40] - 8:6, 9:2, 9:23, 10:4, 10:9, 10:20, 12:4, 12:12, 12:15, 12:17, 13:7, 13:23, 13:25, 15:8, 15:9, 15:10, 26:12, 27:6, 27:24, 29:23, 30:22, 32:3, 34:8, 34:15, 54:14, 59:21,

86:13, 86:14, 87:7, 87:8, 88:7, 88:18, 88:20, 113:10, 113:22, 114:9, 114:13, 114:25, 115:1, 115:9
**witnesses** [6] - 13:17, 16:21, 16:22, 34:13, 103:17, 122:21
**WITNESSES** [1] - 3:5
**WOLPERT** [1] - 2:9
**wonder** [2] - 12:14, 84:21
**wondering** [1] - 12:17
**word** [5] - 80:9, 80:23, 88:12, 95:21, 108:5
**words** [4] - 33:15, 42:2, 52:12, 73:22
**works** [3] - 38:2, 116:10, 116:12
**workshop** [1] - 65:10
**world** [1] - 73:15
**write** [3] - 68:9, 80:15, 82:2
**writes** [6] - 35:24, 42:7, 42:23, 48:5, 70:4, 79:3
**writing** [3] - 38:2, 56:14, 72:5
**written** [1] - 55:6
**wrote** [9] - 63:11, 70:20, 72:10, 82:7, 84:2, 96:7, 101:20, 103:19, 103:22
**ws** [1] - 42:20

Y

**yardstick** [1] - 87:14
**year** [5] - 10:12, 10:13, 40:25, 101:2, 111:15
**years** [6] - 28:7, 28:9, 40:23, 49:1, 105:21, 105:22
**yesterday** [10] - 7:19, 8:7, 34:5, 48:1, 56:5, 57:9, 57:18, 76:17, 96:15, 123:17
**yields** [1] - 108:22
**Yoder** [1] - 5:2
**YODER** [26] - 2:15, 5:1, 16:13, 17:12, 17:17, 18:13, 19:21, 20:8, 20:12, 21:22, 22:6, 22:9, 22:18, 23:15, 23:25, 24:6, 25:8, 26:4, 26:14, 26:17, 26:21, 123:2, 123:13, 123:16, 124:12, 124:22

**yong** [1] - 78:25
**Yoo** [13] - 60:23, 60:24, 62:3, 62:9, 62:24, 63:4, 71:2, 74:15, 75:11, 80:5, 92:9, 92:19, 93:24
**York** [4] - 15:20, 17:2, 17:8, 17:16
**yourself** [2] - 45:16, 93:4
**Yu** [1] - 110:19

Z

**zero** [16] - 48:10, 49:24, 50:5, 50:9, 50:19, 50:25, 51:5, 57:8, 100:9, 100:12, 100:15, 100:17, 100:25, 106:23, 112:11, 121:11
**Zero** [1] - 7:24
**Zoom** [1] - 87:2