RICHARD DOREN, SBN 124666
   rdoren@gibsondunn.com
JASON C. LO, SBN 219030
   jlo@gibsondunn.com
MATTHEW BENJAMIN (*pro hac vice*)
   mbenjamin@gibsondunn.com
TIMOTHY BEST, SBN 254409
   tbest@gibsondunn.com
RAYMOND A. LAMAGNA, SBN 244821
   rlamagna@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

JASON SHEASBY, SBN 205455
   jsheasby@irell.com
IRELL & MANELLA LLP
1800 Ave. of the Stars
Los Angeles, CA 90067
Telephone: 310.203.7096
Facsimile: 310.203.7199

Attorneys for Plaintiff Netlist Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>     v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>                    Defendant. | CASE NO. 8:20-cv-993-MCS (ADS)<br><br>**PLAINTIFF NETLIST INC.'S NOTICE OF MOTION AND MOTION FOR FEES AND EXPENSES FOR DEFENDANT SAMSUNG'S FAILURE TO ADMIT REQUESTS FOR ADMISSION**<br><br>[Filed Concurrently with Supporting Declarations and [Proposed] Order]<br><br>Before Judge Mark C. Scarsi<br><br>**Posttrial Hearing on Motions:**<br>Date:   February 14, 2022<br>Time:   9 a.m. PT |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................... 1

II.     FACTUAL BACKGROUND .................................................................. 2

        A.      Samsung Failed to Admit Facts About the Limits It Placed on Sales ....... 2

        B.      Samsung Failed to Admit Facts about the Korean Tax Proceedings ......... 6

        C.      Samsung Failed to Admit Facts About Netlist's Termination ................... 7

        D.      Netlist Incurred Substantial Fees and Costs to Prove the Above
                Facts ...................................................................................... 10

III.    LEGAL STANDARDS .......................................................................... 11

IV.     ARGUMENT ....................................................................................... 12

        A.      Samsung Failed to Admit Basic and Ultimately Indisputable Facts ....... 12

        B.      Netlist Expended Significant Resources to Prove Up These Facts ......... 15

        C.      None of the Exceptions to Rule 37(c)(2) Apply Here ............................ 19

        D.      Rule 37(c)(2) Mandates an Award of Netlist's Reasonable Fees ............ 21

V.      CONCLUSION .................................................................................... 25

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**CASES**

4

*Amphastar Pharms. Inc. v. Aventis Pharma SA*,
5     2020 WL 8680070 (C.D. Cal. Nov. 13, 2020) ...................................................22, 23

6

*Asea, Inc. v. S. Pac. Transp. Co.*,
7     669 F.2d 1242 (9th Cir. 1981).................................................................................11

8

*Camacho v. Bridgeport Financial, Inc.*,
9     523 F.3d 973 (9th Cir. 2008)..................................................................................21

10

*Ceglia v. Zuckerberg*,
11     2012 WL 503810 (W.D.N.Y. Feb. 14, 2012) .........................................................22

12

*Diamond State Ins. Co. v. Deardorff*,
13     2011 WL 2414391 (E.D. Cal. June 8, 2011)..........................................................15

*Graham v. County of Los Angeles*,
14     2012 WL 5363533 (C.D. Cal. Oct. 30, 2012) ........................................................11

15

*Isaac v. USC Keck School of Med.*,
16     No. 19-8000-DSF (C.D. Cal. May 15, 2020)........................................................23

17

*Kimberly-Clark Corp. v. Extrusion Grp., LLC*,
18     No. 1:18-CV-04754-SDG (N.D. Ga. Apr. 2, 2020)..............................................23

19

*U.S. ex rel. Lee v. Corinthian Coll.*,
20     2013 WL 12114064 (C.D. Cal. June 6, 2013) .......................................................23

21

*Marchand v. Mercy Med. Ctr.*,
22     22 F.3d 933 (9th Cir. 1994)................................................1, 11, 12, 20, 24

23

*MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC*,
24     2017 WL 1194372 (S.D.N.Y. Mar. 30, 2017) .......................................................23

25

*Roberts v. City of Honolulu*,
    938 F.3d 1020 (9th Cir. 2019).................................................................................21

26

*Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*,
27     2021 WL 5174088 (Del. Ch. Nov. 8, 2021)..........................................................23

28

1
2

### TABLE OF AUTHORITIES
(continued)

3

Page(s)

4

*Trendsettah USA, Inc. v. Swisher Int'l Inc.*,
    2020 WL 11232926 (C.D. Cal. Dec. 2, 2020) ........................................ 22

5

6

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
    130 F. Supp. 3d 1331 (C.D. Cal. 2015).................................................. 22

7
8

**OTHER AUTHORITIES**

9

*Fed. Civ. Pro. Before Trial* (Rutter, Apr. 2021 update) ................................. 11

10

Fed. R. Civ. P. 36 advisory committee note (1970) ........................................ 1

11

Moore's Federal Practice § 37.74[1] (Matthew Bender, 3d ed.)................... 11

12

**RULES**

13

Fed. R. Civ. P. 26(e)(1) ................................................................................ 19

14

Fed. R. Civ. P. 36(a)(1)(A) .......................................................................... 11

15

Fed. R. Civ. P. 36(a)(4) ............................................................................... 19

16

Fed. R. Civ. P. 37(c)(2) .......................................................................... 11, 12

17
18
19
20
21
22
23
24
25
26
27
28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 14, 2022, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 7C of the United States District Court for the Central District of California, located at 350 W. 1st Street, Los Angeles, CA 90012, Plaintiff Netlist Inc. will and hereby does move for an order of fees and costs against Defendant Samsung Electronics Co., Ltd. ("Samsung") pursuant to Federal Rule of Civil Procedure 37(c)(2).

This motion is brought on the grounds that Samsung failed to admit proper requests for admission propounded by Netlist and instead denied salient facts that it knew to be true.  Samsung systematically denied true facts, improperly using evasion and word play, turning Netlist's requests for admission into a mere procedural exercise.  As a result, Netlist needlessly incurred considerable legal fees and costs to prove those facts.  Therefore, Netlist moves pursuant to Federal Rule of Civil Procedure 37(c)(2) for an order requiring Samsung to pay the reasonable expenses, including attorneys' fees, incurred in proving those salient facts that Samsung denied in response to requests for admission.[1]

Specifically, Plaintiff Netlist moves for an order of fees and costs under Rule 37(c)(2) in the amount of $657,045.02 (plus any later fees incurred for this motion) as further detailed and supported below.[2]  Samsung cannot show that any exception articulated in Rule 37(c)(2) applies here.  Accordingly, Netlist is entitled to an order of fees and costs in the amount requested.  *E.g.*, *Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 936 (9th Cir. 1994).

---

[1]  Plaintiff Netlist will file a separate bill for its taxable costs under Fed. R. Civ. P. 54(d)(1) after entry of judgment, as required by this Court's Local Rule 54-2.

[2]  $517,042.08 in attorneys' fees and $4,952.44 in costs to prove the facts Samsung refused to admit, plus $135,050.50 in attorneys' fees to bring the present motion, plus any later fees incurred for this motion.  Lo Decl. at ¶¶ 17–33.  *See generally* Lee, LaMagna, Best, Benjamin, Nadler and Choy Decls.

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Jason Lo, JungEun Lee, Raymond LaMagna, Matthew Benjamin, Timothy Best, Michael Nadler, and Soolean Choy, and the exhibits, authorities, and documents filed and/or cited herein, the pleadings, rulings, decisions, verdicts, and record in this case, and such other matters and argument as may be raised at the upcoming post-trial hearing.

This motion is made following a conference of counsel pursuant to L.R. 7-3 which took place on January 3, 2022, during which time counsel for Defendant Samsung indicated that it would not consent to Netlist's motion or agree to any payment of fees or costs requested therein.

Dated: January 10, 2022                    GIBSON, DUNN & CRUTCHER LLP


                                           By: /s/ Jason C. Lo
                                           Jason C. Lo
                                           333 South Grand Avenue
                                           Los Angeles, CA 90071
                                           213.229.7000
                                           jlo@gibsondunn.com

                                           Attorneys for Plaintiff Netlist Inc.

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3            To limit the number of facts that the parties would genuinely dispute and that

4    would entail expensive and duplicative efforts to prove, Netlist asked Samsung to

5    admit several facts that went to the heart of its claims.  Netlist asked Samsung to admit

6    that it placed limits on its sales of NAND and DRAM products to Netlist; that

7    Samsung nonetheless provided such products to other customers; that it withheld a

8    certain sum as taxes rather than pay them to Netlist; and that it received a notice of its

9    breaches.  In each case, Samsung knew the answer to these questions.  In each case,

10   the answers were clear.  In each case, Samsung nonetheless refused to admit them.

11   And in each case, Netlist ultimately proved those facts only after costly discovery and

12   summary judgment efforts.  There was—and is—no justification for Samsung's refusal

13   to admit these otherwise indisputable facts, and Samsung should not be permitted to

14   escape the financial consequences of its gamesmanship.

15           The Federal Rules authorize parties to lawsuits to request other parties admit

16   certain facts "first to facilitate proof with respect to issues that cannot be eliminated

17   from the case, and secondly, to narrow the issues by eliminating those that can be."

18   Fed. R. Civ. P. 36 advisory committee note (1970).  Netlist presented Samsung with

19   requests that were neither voluminous nor burdensome to admit following even a

20   cursory inquiry.  Yet, Samsung evaded those requests—only ultimately to drop any

21   pretense of disputing them during summary judgment.  In the interim, Netlist was

22   forced to spend hundreds of thousands of dollars to prove these facts by other means,

23   both through expensive translated depositions and exhaustive summary judgment

24   proceedings.  Forcing Netlist to assume these expenses for proving key facts to its

25   claims was unnecessary and unfair.  Under these circumstances, the Federal Rules

26   "mandate[] an award of expenses."  *Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 936

27   (9th Cir. 1994) (discussing award of expenses under Rule 37(c)(2)).  Netlist

28   respectfully requests that the Court do just that.

## II.    FACTUAL BACKGROUND

### A.    Samsung Failed to Admit Facts About the Limits It Placed on Sales

At the core of Netlist's first claim for breach of contract is the fact that, "[b]eginning in 2017, Samsung declined to fulfill all of Netlist's forecasts, requests and orders for NAND and DRAM products." Dkt. 186 at 4:20–22.  Specifically, as Netlist alleged (and ultimately proved as detailed below), Samsung executives ordered that Netlist's allocation go to zero and unilaterally placed "caps" or "allocation limits" on Netlist's purchases, notwithstanding the parties' supply agreement in Section 6.2 of the JDLA (as further discussed below).

To streamline the case, Netlist served Samsung with RFAs in an effort to narrow the facts in dispute and focus the case on questions of law (e.g., contract construction). Netlist thus served RFAs to confirm the fact that Samsung had set a cap or allocation limit on Netlist's purchase orders.[3]  Samsung admitted none of these RFAs.

Some of Netlist's RFAs were broad and should have been easy for Samsung to admit—for example, seeking to admit that, at some point in a range of time, Samsung had capped or limited Netlist's purchases:

Nos. 27–29:  "Admit that at some point between February 1, 2017 and May 18 2017, Samsung set a cap or [allocation limit] on the amount of NAND and DRAM Products that Netlist could purchase from Samsung [or that Samsung would support]."

Nos. 36–38:  "Admit that from May 19, 2017 to June 14, 2020, Samsung maintained a cap or [allocation limit] on the amount of NAND and DRAM Products that Netlist could purchase from Samsung [or that Samsung would support]."

Nos. 39–41:  "Admit that from June 15, 2020 to July 15, 2020, Samsung maintained a cap or [allocation limit] on the amount of NAND

_____

[3]   A table of Netlist's Requests for Admissions discussed here and Samsung's full responses are provided as Appendix A here.  Netlist's original RFAs are provided here as Ex. A (Set 1, Nos. 1–15) and Ex. B (Set 2, Nos. 16–61) to the Declaration of Raymond LaMagna, filed herewith.  Samsung's operative responses are provided as Ex. C (4/19/21 Samsung Resp. to RFA Set 1), Ex. D (7/8/21 Samsung Supp. Resp. to RFA Set 1 [Nos. 4 & 5]), Ex. E (7/8/21 Samsung Resp. to RFA Set 2), Ex. F (7/27/21 Samsung Supp. Resp. to RFA Set 2), Ex. G (8/9/21 Samsung Amend. Resp. to RFA Set 2 [Nos. 16–41]).

and DRAM Products that Netlist could purchase from Samsung [or that Samsung would support]."

Other RFAs were very specific—for example, admit the cap/limit was at specific times zero:

> No. 5:        "Admit that Netlist's allocation of Samsung NAND or DRAM Products was restricted to $0 worth of products at times."
>
> No. 30:       "Admit that as of May 18, 2017, the allocation of NAND and DRAM Products that Netlist could purchase from Samsung was set by Samsung at zero."
>
> No. 31:       "Admit that as of May 18, 2017, Samsung set the amount of NAND and DRAM Products that Netlist could purchase from Samsung at zero."
>
> No. 32:       "Admit that in May 2017, Samsung informed Netlist that it would not allocate any NAND or DRAM Products for sale to Netlist."
>
> Nos. 34–35:  "Admit that in May 2017, Samsung stopped accepting [supporting] any orders for NAND or DRAM Products from Netlist."

As shown above, Netlist served requests using different variations in wording to avoid semantic games from Samsung. For example, the same request was served alternately using the word "cap" or "allocation" (RFA Nos. 27 and 29, 36 and 38, 39 and 41), or alternately referring to "accepting" or "supporting" orders (RFA Nos. 27 and 28, 34 and 35, 36 and 37, 39 and 40). But regardless of wording, Samsung failed in each instance to admit any of the above requests.

Instead, for every one of the above RFAs, Samsung copied and pasted the *same* response: Samsung stated that it admitted "only" that it told Netlist—"as it would with any other similarly situated customer during the same time period"—that Samsung was "unable to support every request" Netlist made. Ex. D at 4–5 (Response to RFA No. 5); Ex. G at 16–32 ("Amended" Responses to RFA Nos. 27–32, 34–41). Samsung's cut-and-pasted responses do not even colorably engage the substance of Netlist's above requests to confirm caps, allocation limits, and most particularly, periods when allocations to Netlist were set at "zero" (i.e., times when Netlist was cut off entirely).

1    Nor did Netlist make any of these requests as shots in the dark—Netlist's

2  witnesses lived through the history of the failed contract, and subsequent documents

3  and written communications *from Samsung* confirmed these facts.  For example, on

4  April 21, 2017, Samsung executive Mr. Arnold Kim instructed colleagues to "Please

5  manage the sales [to Netlist] to dwindle down." Dkt. 142-4 (PMSJ Ex. 16) at -41.[4]  A

6  few weeks later on May 15, Samsung's sales lead for Netlist, Mr. Neal Knuth, was

7  instructed to "not accept" certain purchase orders from Netlist.  Dkt. 142-3 (PMSJ Ex.

8  15) at -97, -99.  The next week, Mr.  Knuth and his supervisor, Mr. Steve Metz, each

9  respectively confirmed they had "let Netlist know that [Samsung had] no support" and

10  "zero allocation" in Q3 2017 for Netlist, with Mr. Knuth confirming he had previously

11  "project[ed] $50M in 2017 revenue and $75M in 2018" from sales to Netlist.  Dkt.

12  142-5 (PMSJ Ex. 18) at -06; Dkt. 142-19 (PMSJ Ex. 50) at 49:6–14 (confirmation

13  testimony from Samsung executive Lane (Kihoon) Kim).  A few weeks later in mid-

14  2017, Mr. Knuth confirmed that he was "rejecting new orders" from Netlist and had

15  "rejected over $10 Million of business for Q3 already."  Dkt. 142-3 (PMSJ Ex. 15) at -

16  95.  While Samsung did allow Netlist some orders in later months, it again cut off

17  supply in 2018, with internal Samsung records stating that "there would be no more

18  from February [2018] onward."  Dkt. 142-10 (PMSJ Ex. 23) at -63.

19    Although Samsung refused to admit Netlist's RFAs, after Netlist had gone to the

20  expense of developing and proving these facts during numerous depositions and

21  summary judgment, Samsung was then forced to finally concede them.  *See, e.g.*, Dkt.

22  168-1 at pp. 50–52, 58, 63 (Responses to alleged SUF Nos. 76, 78, 81–82, 88, 96).

23    Nor was this the only evidence Netlist developed and submitted to prove the

24  above facts.  For example, Netlist proved that, in June 2017 after the "zero allocation"

25  period discussed above, Samsung imposed a $500,000 cap on the products it would

26  sell to Netlist each month.  *See, e.g.*, Dkt. 142-8 (PMSJ Ex. 21) (Joo Sun Choi

27  _____

28  [4]   Evidence cited here to sealed filings at Dkt. 142 was later refiled publicly.  *See* Dkt.
    192-8, -9, -10, -11 and Dkt. 193-7, -8, -9, -12, -13, -14, -15, -18, -21.

4    NETLIST'S MOTION FOR ENTRY OF JUDGMENT
    CASE NO. 8:20-CV-993-MCS (ADS)

instructing that Netlist sales be "Minimize[d] at $0.5M"); Dkt. 142-14 (PMSJ Ex. 40)
("JS Choi . . . said ok this $500k / m run rate"); Dkt. 142-15 (PMSJ Ex. 43) at -07
("Netlist: Sales limited to $500k/mo per SEC [Samsung Electronics Corp.] request.");
Dkt. 142-22 (PMSJ Ex. 53) [Dep. Tr. of Samsung employee Steve Metz] at 93:22–
94:17, 103:11–24, 135:1–11); *cf.* Dkt. 142-2 (PMSJ SUF) at ¶ 85 (citing and
submitting same).[5]

And Netlist proved that Samsung continued to impose similar caps thereafter.
*See, e.g.*, Dkt. 142-3 (PMSJ Ex. 15) at -95–96 (July 2017, referencing "$500k a month
limit"); Dkt. 145-33 (PMSJ Ex. 29) (July 2017, Mr. Knuth "realized that we are
capped at $500k limit"); Dkt. 142-16 (PMSJ Ex. 44) (July 2017, "we need to be very
careful that we don't go over $500k per month"); Dkt. 142-9 (PMSJ Ex. 22) at -57-58
(May 2018, referencing "$500k bar . . . decided by the corporate president" and stating
sales representative "will be sure to follow the limit of $500k"); Dkt. 142-19 (PMSJ
Ex. 50) at 64:21-65:3 [Lane Kim Depo Tr.] ("around February of 2018" Samsung
reaffirmed "that Netlist could purchase up to $500,000 per month"); *cf.* Dkt. 142-2
(PMSJ SUF) at ¶ 86 (citing and submitting same).

At times, Samsung would not even sell $500K a month to Netlist, in fact cutting
Netlist back to "$0 allocation and no support" in early 2018.  Dkt. 145-38 (PMSJ Ex.
34); Dkt. 142-10 (PMSJ Ex. 23) at -63 (reporting $397k in January" 2018, and
threatening "no more from February onward"); *cf.* Dkt. 142-2 (PMSJ SUF) at ¶¶ 88,
106 (citing and submitting same).  A year later in 2019, Samsung sales executive
Mr. Metz confirmed again that his sales team had been "specifically directed by [Joo
Sun] Choi to minimize sales to Netlist."  Dkt. 142-13 (PMSJ Ex. 36) at -86; *cf.* Dkt.
142-2 (PMSJ SUF) at ¶ 110 (citing and submitting same).

---

[5]   Netlist also obtained evidence from Netlist's own executives that confirms
Samsung's documents and the facts that Samsung refused to admit. *See, e.g.*, Dkt.
142-2 (PMSJ SUF) at ¶¶ 77, 93, 106 and declarations cited therein (Dkts. 84–18 at
¶¶ 5–6, 8, 145-2 at ¶¶ 3, 145-3 at ¶ 10).

Yet, despite this overwhelming evidence—*all of which was in Samsung's knowledge and possession from the start*—Samsung improperly refused to admit any of Netlist's above requests for admission, whether broad or narrow.

Netlist also served other variations on requests to admit facts about Samsung's refusal to accept Netlist orders.  For example, Netlist asked Samsung to admit that it supplied goods to others while rejecting Netlist's requests *at the same time*:

> No. 6:  "Admit that Samsung supplied NAND and DRAM Products to other companies in the same fiscal quarters that Netlist's requests for products were unfulfilled, denied, restricted, limited, or reduced."

Yet Samsung also refused to admit this request as stated, responding instead with only the vague statement that Samsung supplies products "to companies other than Netlist."  Ex. C at 5.  Samsung refused to admit—*and thus denied*—the fact that Samsung supplied products to others *at the same time* it refused to supply to Netlist.  Samsung thus effectively refused to admit that supply constraints or lack of inventory was not why Samsung refused Netlist's orders.  But, after Netlist went to the expense to marshal the evidence to prove the above fact, Samsung conceded it, responding that it was "Undisputed."  *See, e.g.*, Dkt. 168-1 at p. 54 (response to alleged SUF 83).

For fact after fact, Netlist was put to the costly make-work of proving facts that Samsung knew to be true and that Samsung ultimately could not dispute.

### B.    Samsung Failed to Admit Facts about the Korean Tax Proceedings

Samsung likewise refused to admit that it withheld $1.32 million from the NRE payment it owed Netlist under the JDLA, what Samsung told Korean tax authorities, and that Korean tax authorities ultimately ruled that the withholding was not necessary.

First, Netlist asked Samsung to admit the foundational fact that it withheld fees:

> No. 7:   "Admit that Samsung withheld $1,320,000 from the $8 million NRE fee to be paid to Netlist under the Agreement."

Amazingly, Samsung responded:  "Deny."  Ex. C at 5.  After Netlist proved the fact and submitted evidence to the Court for summary judgment, Samsung did not dispute it.  *See, e.g.*, Dkt. 168-1 at p. 26 (response to alleged SUF 46); *cf.* Dkt. 186 at 4:12–13

("After entering the JDLA, Samsung deducted $1.32 million (16.5%) of the NRE fees to pay to the Korean tax authority. (PMSJ [SUF] ¶ 46; [D]MSJ GDMF ¶ 73.)").

Netlist also asked Samsung to admit that it told Korean tax authorities that it entered into the agreement to avoid patent infringement (the reason Samsung contended that the NRE payment was taxable):

> No. 10:  "Admit that Samsung stated to the Korean Tax Authority that Samsung was able to use patents belonging to Netlist without paying royalties as a result of entering into the Agreement."

Again, Samsung refused to admit the fact.  Ex. C at 6.  And again, after Netlist proved the fact and submitted documentary evidence to the Court for summary judgment, Samsung did not dispute it.  *See, e.g.*, Dkt. 168-1 at p. 24 (response to alleged SUF 42).

Netlist then asked Samsung to admit that Korean tax authorities ultimately determined that the NRE fee in the JDLA was not taxable:

> No. 46:  "Admit that the Korean Tax Tribunal determined that it was not necessary under Korean law to withhold $1.32 million for taxes on the $8 million fee owed to Netlist under the Agreement."

And again, despite the fact that the Korean Tax Tribunal had issued an express ruling to this fact (Dkt. 144-7 [PMSJ Ex. 13] at NL108733), Samsung responded:  "Deny."  Ex. E at 20.  After Netlist prepared and submitted proof of this fact to the Court, the Court confirmed that "The Korean tax authority ultimately determined that the NRE fees were not subject to tax withholding. (PMSJ [SUF] ¶ 53; see [P]MSJ GDMF ¶ 78.)"  Dkt. 186 at 4:17–19.

Thus again, for fact after fact, Netlist was put to costly make-work to prove facts that Samsung knew to be true and ultimately could not dispute.

## C.    Samsung Failed to Admit Facts About Netlist's Termination

In light of the breaches of the JDLA—that the Court confirmed on summary judgment—Netlist sent a pre-termination letter to Samsung in May 2020.  Samsung received that letter and failed to respond to it.  Netlist made multiple efforts to

communicate with Samsung prior to termination, and Samsung refused to admit basic facts as to those efforts.

For example, Samsung refused to admit that it even received Netlist's letter, or Netlist's follow up email attaching the letter (although Samsung had copies):

> No. 13    "Admit that Samsung received Netlist's letter dated May 27, 2020, notifying Samsung that Samsung had breached the Agreement."
>
> No. 14    "Admit that Samsung received Netlist's email on or around June 12, 2020 or June 13, 2020, notifying Samsung that Samsung had breached the Agreement."

*See* Ex. C at 7 (refusing to admit RFAs 13 and 14).  Even after Netlist gave Samsung further copies of the letter and proof of its delivery (including the follow-up email), Samsung still refused to admit the *contents* of the letter or that Netlist had sent it:

> No. 50    "Admit that, by June 14, 2020, Samsung had received Netlist's letter dated May 27, 2020, in which Netlist asserted that Samsung had breached the Agreement."

*See* Ex. F at 33 (7/27/21 Samsung Supp. Response to RFA No. 50 (mislabeled as response to RFA 45))[6].  Samsung responded only that "a" letter was received by it, but "otherwise denied" the RFA.  *Id.*  Samsung thus ***denied*** that the letter was even from Netlist, or that, in the letter, "Netlist asserted that Samsung had breached the Agreement," *id.*, notwithstanding that the text of the letter states exactly that.  Dkt. 145-45 (PMSJ Ex. 41 (pre-termination letter)); Dkt. 145-50 (Ex. 46 (email to Samsung attaching letter)).

Samsung also failed to respond to either Netlist's letter or its follow-up email. And again, Netlist served RFAs to confirm these facts, which were critical because the JDLA contained a 30-day "cure" period before termination.  *See* Dkt. 144-1 at § 13.2. Accordingly, Netlist asked Samsung to confirm that it did not respond to Netlist's pre-termination letter, or had not done so within 30 days of receipt of the letter:

---

[6]   Due to an apparent auto-numbering error in Samsung's July 26, 2021, "Supplemental" responses, several of Samsung's responses are misnumbered, as indicated here.  The correct numbering can be gleaned by matching the text of the RFA in Samsung's response to the original, or to the text reproduced here.

NETLIST'S MOTION FOR ENTRY OF JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

No. 52   "Admit that Samsung did not respond to Netlist's letter dated May 27, 2020, within 30 days of Samsung having received the letter."

No. 53   "Admit that Samsung never responded to Netlist's letter dated May 27, 2020, in which Netlist asserted Samsung had breached the Agreement."

And again, Samsung refused to admit these facts. *See* Ex. F at 35 (7/27/21 Supp. Response to RFA No. 52 (mislabeled as response to RFA No. 47)); Ex. E at 23 (Response to RFA No. 53, "deny").

To avoid semantics or word games from Samsung, Netlist also asked the question in different ways, such as asking Samsung to admit that it had not "asked to meet with Netlist" or taken "action to cure the breach or otherwise respond" to Netlist's letter:

No. 15   "Admit that Samsung did not take action to cure the breach or to otherwise respond to Netlist's letter dated May 27, 2020, notifying Samsung that Samsung had breached the Agreement, within thirty days of receiving the notification."

No. 55   "Admit that, as of May 27, 2021, Samsung had not asked to meet with Netlist to discuss its letter dated May 27, 2020, in which it asserted Samsung had breached the Agreement."

Again, the fact that Netlist sought to admit the facts in multiple ways did not matter—Samsung refused to admit any of them. Ex. C at 7 (Response to RFA No. 15, objections only); Ex. E at 24 (Response to RFA No. 55, "deny").

Accordingly, Netlist was forced to expend further effort in discovery and summary judgment. On summary judgment, Netlist presented evidence that, for example, Samsung had received Netlist's pre-termination letter. *See* Dkt. 145-45 (PMSJ Ex. 41 (pre-termination letter)); Dkt. 145-50 (Ex. 46 (email to Samsung attaching letter)). And again, after Netlist went to the expense to marshal the evidence on summary judgment to prove Samsung had received the letter, Samsung conceded it, responding that it was "Undisputed." *See, e.g.*, Dkt. 168-1 at pp. 75–76 (response to alleged SUF 125–127).

1    Nor did Samsung ultimately dispute that it did not respond to Netlist's pre-
2    termination letter within 30 days of receipt or prior to Netlist's termination letter in
3    July 2020.[7]  Accordingly, the Court found the necessary facts established, held that the
4    breaches "remain[ed] uncured" as of the termination, and that "Netlist's termination
5    comport[ed] with the JDLA's termination method."  Dkt. 186 at 4:23–25, 18:25–27.
6    But again, by refusing to simply admit these facts as it should have, Samsung forced
7    Netlist to incur the unnecessary cost of proving what Samsung knew to be true.

8        **D.    Netlist Incurred Substantial Fees and Costs to Prove the Above Facts**

9    Netlist expended significant resources in discovery and summary judgment to
10   prove the facts that Samsung should have admitted.  Between required depositions and
11   summary judgment, Netlist spent at least $521,994.52 to prove the facts Samsung
12   refused to admit.[8]  And that sum calculates for only the fees and costs attributed to and
13   allocated to the effort to prove these facts (separate from other issues).

14   As described in detail below, to prove the above facts, Netlist had to depose two
15   Samsung corporate deponents—one on topics related to Samsung's failure to supply
16   products to Netlist, and one on Samsung's withholding the NRE payment.  Netlist also
17   needed to depose the Samsung sales lead and his boss who directly implemented
18   Samsung's caps on orders.  Lastly, Netlist needed to depose two other executives
19   whose communications above confirmed the facts that Samsung refused to admit.
20   With that above evidence in hand, Netlist proved the above facts notwithstanding
21   Samsung's RFA responses and prevailed on those issues on summary judgment.

22   Accordingly, Netlist has brought this motion to recover the related expenses.

23
24
25
_____

26   [7]  Netlist provided evidence of the termination letter at Dkt. 145-49 (PMSJ Ex. 45);
     Dkt. 145-46 (PMSJ Ex. 42 (email to Samsung attaching termination letter)).

27   [8]  $517,042.08 in attorneys' fees and $4,952.44 in costs. Lo Decl. at ¶¶ 17–30.  This
28   does not include the $135,050.50 in attorneys' fees incurred to bring this motion,
     which Netlist also seeks, along with any later related expenses. *Id.* ¶¶ 31–33.

1    **III.   LEGAL STANDARDS**

2          Pursuant to Rule 36, "[a] party may serve on any other party a written request to

3    admit . . . the truth of any matters within the scope of Rule 26(b)(1) relating to . . .

4    facts, the application of law to fact, or opinions about either."  Fed. R. Civ. P.

5    36(a)(1)(A).  "The purpose of Rule 36(a) is to expedite trial by establishing certain

6    material facts as true and thus narrowing the range of issues for trial."  *Asea, Inc. v. S.*

7    *Pac. Transp. Co*., 669 F.2d 1242, 1245 (9th Cir. 1981).

8          "Parties may not view requests for admission as a mere procedural exercise

9    requiring minimally acceptable conduct.  They should focus on the goal of the Rules,

10   full and efficient discovery, not evasion and word play."  *Marchand*, 22 F.3d at 936.

11         As such, Rule 37 allows that, "[i]f a party fails to admit what is requested under

12   Rule 36 and if the requesting party later proves … the matter true, the requesting party

13   may" move for "reasonable expenses, *including attorney's fees*, incurred in making

14   that proof."  Fed. R. Civ. P. 37(c)(2) (emphasis added).  "Available sanctions under

15   FRCP 37(c)(2) also encompass reasonable attorney fees and costs incurred in applying

16   for the sanctions assessment."  *Fed. Civ. Pro. Before Trial*, ¶ 11:2118.1 (Rutter, Apr.

17   2021 update).  Rule 37(c)(2) "mandates an award of expenses" unless an express

18   exception applies.  *Marchand*, 22 F.3d at 936; FRCP Rule 37(c)(2); Moore's Federal

19   Practice § 37.74[1] (Matthew Bender, 3d ed.) (fee award is mandatory).

20         Thus, a defendant cannot give "misleading answers to requests for admission

21   that significantly affected the cost of [a plaintiff's] prosecution" without being liable

22   for attorneys' fees."  *Marchand*, 22 F.3d at 937.  "Enforcement encourages attorneys

23   and parties to identify undisputed issues early to avoid unnecessary costs.  Failure to

24   identify those issues wastes the resources of parties and courts."  *Id.* at 936.

25         Courts regularly entertain Rule 37 motions post-trial.  *E.g.*, *Graham v. County of*

26   *Los Angeles*, 2012 WL 5363533, at *1 (C.D. Cal. Oct. 30, 2012).

27

28

## IV.   ARGUMENT

Samsung was obligated to respond fairly to Netlist's RFAs.  And Samsung refused to perform its duty.  Samsung turned a tool for narrowing disputes and conserving resources into just the opposite.  Samsung subverted the RFA process, seizing an opportunity to obstruct discovery, thereby furthering Samsung's aggressive discovery tactics.  When Samsung refused to admit foundational facts—*facts known to Samsung and in Samsung's possession*—Netlist "was put to the expense of proving" them and thus "may recover 'the reasonable expenses incurred in making that proof.'" *Marchand*, 22 F.3d at 939 (quoting Fed. R. Civ. P. 37(c) and awarding fees for "25% of the total hours spent on the case").  Here, Netlist calculates this cost at $657,045.02, including the fees incurred so far on bringing this present motion.[9]  None of the exceptions under Rule 37(c)(2) apply.  Thus, Rule 37(c)(2) mandates an award to Netlist in that amount.

### A.   Samsung Failed to Admit Basic and Ultimately Indisputable Facts

The ultimate disputes in this case center on questions of legal interpretation—namely, how provisions in the JDLA should be construed.  The underlying operative facts never truly were in dispute.  As detailed above, ample evidence in Samsung's own possession undeniably proves that Samsung capped or limited sales to Netlist (including at times to zero).  Likewise, there is no dispute that Samsung withheld $1.32 million from NRE fees owed to Netlist, or that Korean tax authorities ruled the fees were not taxable.  Or that Samsung received Netlist's pre-termination letter, that Samsung did not respond, and that Netlist properly terminated the JDLA.

Yet, as shown above, Samsung failed to admit all of the above RFAs directed to these facts.  Samsung's own documents and witnesses in depositions demonstrated that Samsung should have admitted the RFAs.  Instead, Netlist was forced to expend time

---

[9]   $517,042.08 in attorneys' fees and $4,952.44 in costs to prove the facts Samsung refused to admit, plus $135,050.50 in attorneys' fees to bring the present motion, plus any later fees incurred for this motion.  Lo Decl. at ¶¶ 17–33.  *See generally* Lee, LaMagna, Best, Benjamin, Nadler and Choy Decls.

and resources to prove what was undisputed.  After Netlist incurred its expenses,
Samsung then admitted the above facts were undisputed, further reflecting that
Samsung's responses were in bad faith.  *See, e.g.*, Dkt. 168-1 at pp. 24, 26, 50–52, 54,
58, 63, 75–76 (response to alleged SUF 42, 46, 76, 78, 81–83, 88, 96, 125–127).

> ***Regarding Netlist's claim for breach of the supply provision***—Samsung
refused any admission that it imposed caps or limits on sales from 2017 (often set at
zero).  Ex. D at 4–5 (Response to RFA No. 5); Ex. G at 16–32 ("Amended" Responses
to RFA Nos. 27–32, 34–41).  Instead, Samsung cut and pasted the same response to
each RFA, saying only that it treated Netlist like "any other similarly situated
customer" and was thus "unable to support every request."  Samsung's cut-and-pasted
responses did not, of course, admit the ***facts*** of the caps or the specific conduct in
breach, which Netlist then had to prove to obtain summary judgment.

And prove it Netlist did.  Netlist provided substantial evidence of breach and
that the requested facts were true, as summarized in Section II.A above.  *See* Dkt. 142-
3 (PMSJ Ex. 15 at -95 to -97), 142-4 (Ex. 16), 142-5 (Ex. 18 at -06), 142-8 (Ex. 21),
142-9 (Ex. 22 at -57 to -58), 142-10 (Ex. 23 at -63), 142 -13 (Ex. 36 at -86), 142-14
(Ex. 40), 142-15 (Ex. 43 at -07), 142-16 (Ex. 44), 142-19 (Ex. 50 at 49:6–14, 64:21–
65:3), 142-22 (Ex. 53 at 93:22–94:17, 103:11–24, 135:1–11), and Dkt. 145-33 (Ex.
29), 145-38 (Ex. 34); *cf.* Dkt. 142-2 (PMSJ SUF) at ¶¶ 76, 78, 81–83, 85–86, 88, 93,
96, 106, 110 (citing and submitting same along with evidence from Netlist's own
employees).  And, Samsung ultimately did not and could not dispute the facts it
improperly refused to admit.  *See, e.g.*, Dkt. 168-1 at pp. 50–52, 54, 58, 63 (Responses
to alleged SUF Nos. 76, 78, 81–83, 88, 96).

> ***Regarding Netlist's claim for breach of the NRE fee provision***—Samsung
refused to admit that it "withheld $1,320,000 from the $8 million NRE fee to be paid
to Netlist," refused to admit the rationale it stated for doing so to Korean tax
authorities, and refused to admit that Korean tax authorities ruled that the fees were not
taxable.  Ex. C at 5–6 (Responses to RFA Nos. 7, 10); Ex. E at 20 (Response to RFA

No. 46).  And again, evidence of these facts was in Samsung's own possession, in its
own documents, and known to its own witnesses, as Netlist ultimately proved. *See* Dkt.
142-2 (PMSJ SUF) at ¶¶ 42, 46, 53; Dkt. 144-7 (PMSJ Ex. 13) at NL108733 (Tax
Tribunal Decision).  As such, Samsung did not dispute these facts after Netlist had
gone to the cost of taking discovery and making its summary judgment filings.  *See,
e.g*, Dkt. 168-1 at p. 24, 26 (response to alleged SUF 42, 46).  Accordingly, the Court
held that "Samsung deducted $1.32 million (16.5%) of the NRE fees to pay to the
Korean tax authority," Dkt. 186 at 4:12–13 (citing PMSJ SUF ¶ 46; PMSJ Def. Stm. of
GDMF ¶ 73), and that "[t]he Korean tax authority ultimately determined that the NRE
fees were not subject to tax withholding." *Id*. at 4:17–19 (citing PMSJ SUF ¶ 53,
PMSJ Def. GDMF ¶ 78).

>    ***Regarding Netlist's claim concerning termination***—Samsung refused to admit
that it received a pre-termination letter from Netlist, or the nature of the letter, or that it
did not respond to the letter.  *See* Ex. C at 7 (Responses to RFA Nos. 13–15); Ex. F at
33, 35 (7/27/21 Supp. Response to RFA Nos. 50 and 52 (mislabeled as response to
RFA Nos. 45 and 47 respectively)); Ex. E at 23–24 (Response to RFA Nos. 53, 55).

>    And again, evidence of these facts was in Samsung's possession and known to
its own witnesses, as Netlist proved.  *See* Dkt. 142-2 (PMSJ SUF) at ¶¶ 125–127; Dkt.
145-45, -46, -49, -50 (PMSJ Exs. 41, 42, 45, 46).  And once again, after Netlist had
gone to the cost and effort to prove these facts, Samsung conceded that the facts were
undisputed. *See, e.g*., Dkt. 168-1 at pp. 75–76 (response to alleged SUF 125–127).
Accordingly, the Court held that Samsung's breaches "remain[ed] uncured" as of
termination, and that "Netlist's termination comport[ed] with the JDLA's termination
method."  Dkt. 186 at 4:23–25, 18:25–27.

>    In sum, Samsung repeatedly and improperly refused to admit facts known to it
(including based on documents in its own possession).  Instead, it forced Netlist to
incur great expense to prove those facts, and only then did Samsung concede the facts.

## B.   Netlist Expended Significant Resources to Prove Up These Facts

To prove the above facts, Netlist incurred well in excess of $517,042.08 in attorneys' fees and $4,952.44 in expenses (the amount claimed in this motion).  Lo Decl. ¶¶ 17–30.  These are calculated from: (1) efforts to identify evidence, prepare for, and take depositions to confirm the testimony and documents needed to prove the facts that Samsung did not admit, and (2) efforts to prepare, brief, and argue on summary judgment to prove these facts. *Id.* at ¶¶ 9–15; LaMagna Decl. at ¶¶ 4–11; Best Decl. at ¶ 2–8; Lee Decl. at ¶¶ 2–12, 15–17; Benjamin Decl. at ¶¶ 3–7; Nadler Decl. at ¶¶ 3–7; Choy Decl. at ¶¶ 2–7.

This motion also seeks $135,050.50 in attorneys' fees incurred in preparing this motion, along with any fees incurred later. [10]  Lo Decl. at ¶¶ 16, 31–33; *see also* LaMagna Decl. at ¶¶ 12–13; Best Decl. at ¶ 9; Lee Decl. at ¶¶ 13–14.  As such, Netlist requests a total of $657,045.02 plus any further fees incurred in litigating this motion.

***With respect to obtaining evidence and taking depositions***,[11] Netlist is seeking here to recover for *part of* its efforts to identify and collect evidence to prove the facts that Samsung refused to admit, and specifically as needed to prepare for and take *six* depositions:  First, Netlist is seeking *part of* its fees for the deposition of Samsung's two Rule 30(b)(6) designees—Mr. Byungyeop Jeon (who was factually involved with the disputed tax withholding issues and designated on those topics, as well as on Samsung's receipt of and response to Netlist's pre-termination letter)[12] and Mr. Hyeoksang "Harrison" Yoo (Samsung's Director of Memory Sales, who was

---

[10]  Netlist respectfully requests the opportunity to amend these calculations after this motion is granted to include fees made necessary after this date.

[11]  Discovery-related costs are directly recoverable under Rule 37(c)(2).  *E.g., Diamond State Ins. Co. v. Deardorff,* 2011 WL 2414391, at *11 (E.D. Cal. June 8, 2011) (awarding fees for taking and attending depositions to prove facts).

[12]  Mr. Jeon was designated on Netlist's 30(b)(6) Topics Nos. 4, 11–12, and 17, which covered Samsung's failure to pay all of the required NRE fees and tax withholding, communications from Korean tax authorities, and Samsung's receipt and response to Netlist's pre-termination notice of breach and demand for cure.  *See* Ex. H.

1    designated on the caps or limits Samsung placed on Netlist's orders).[13]  Second, Netlist

2    is seeking part of its fees to depose the Samsung sales representative, Mr. Neal Knuth,

3    and his boss, Mr. Steven Metz, who communicated with Netlist concerning Samsung's

4    caps and refusals to fill orders.  Third, Netlist is seeking part of its fees for deposing

5    Mr. Lane Kim (Samsung's General Manager overseeing memory sales) and Mr.

6    Hojung Kim (another Samsung executive) who communicated regarding the limits

7    Samsung placed on Netlist's orders or concerning the disputed tax withholding.

8         These depositions were required not only to obtain testimony establishing the

9    facts that Samsung refused to admit, but to confirm the documentary evidence that

10   Netlist ultimately used to prove those facts.  To identify the portion of fees and costs

11   attributable from these depositions to proving these facts, the attorneys involved have

12   reviewed the transcripts and related exhibits and estimated the portion attributable to

13   addressing the issues that Samsung refused to admit.[14]  The attorneys' time spent

14   preparing for and attending and taking those depositions is then allocated for this

15   motion as follows:  Mr. Jeon (10%), Mr. Yoo (35%), Mr. Knuth (30%), Mr. Metz

16   (25%), Mr. Lane Kim (25%), Mr. Hojung Kim (10%).  Time billed by these attorneys

17   to general preparation for these depositions collectively (i.e., selection of overall

18   exhibits and preparation of joint question outlines) is set here at 20% to reflect the

19   portion attributed to the issues that are the subject of this motion, with the exception of

20   for one attorney (Ms. Lee) who conducted more targeted work directed specifically to

21   the factual issues above.  *See* Lee Decl. at ¶¶ 6. 8.  Time billed in discovery efforts to

22   obtain and identify the evidence used at these depositions and submitted on summary

23   judgment is likewise allocated so that only the portion applicable to the above facts is

24   requested here.  *See id*. at ¶¶ 5–7, 11, 15 (summarizing attorney review efforts and

25

26   _____

27   [13]  Mr. Yoo was designated on Netlist's 30(b)(6) Topics Nos. 6–8, which covered why
     and when Samsung had failed to Netlist fill orders, and related caps.  *See* Ex. H.

28   [14]  *See* Lo Decl. at ¶¶ 9–15; LaMagna Decl. at ¶¶ 4–11; Best Decl. at ¶¶ 2–8; Lee Decl.
     at ¶¶ 2–12; Benjamin Decl. at ¶¶ 3–7; Nadler Decl. at ¶¶ 3–7; Choy Decl. at ¶¶ 2–7.

expenses necessary to identify evidence prove these issues and identify exhibits for the above depositions); LaMagna Decl. ¶¶ 6–7, 10 (same for efforts to obtain evidence from Samsung necessary to prove the above issues).

*With respect to summary judgment*, the primary attorneys involved likewise reviewed the factual submissions, exhibits, and briefing and identified the portion related to the facts at issue in this motion.  As such, Netlist here seeks only 20% of the fees attributable to these attorneys' work on summary judgment.[15]  This covers the portion of relevant summary judgment efforts necessary to marshal the above evidence collected in discovery, prepare and file Rule 56 Statement of Genuine Undisputed Facts and related papers concerning this evidence, and prepare related portions of its briefing.  Samsung did not concede that the facts were undisputed until *after* Netlist went to these efforts.  *See, e.g.*, *See, e.g.*, Dkt. 168-1 at pp. 24, 26, 50–52, 54, 58, 63, 75–76 (response to alleged SUF 42, 46, 76, 78, 81–83, 88, 96, 125–127).

*With respect to the present motion*, for the opening brief, Netlist is only asserting the fees associated with the *principal* attorneys responsible for preparing and drafters these moving papers.  *See* LaMagna Decl. at ¶¶ 12–13; Lo Decl. at ¶¶ 16, 31; Best Decl. at ¶ 9; Lee Decl. at ¶¶ 13–14.  Netlist's calculations here are conservative as they omit time from multiple attorneys assisting in this motion, paralegal time, and any time necessary for the review of billing, transcripts, and exhibits necessary to prepare the accompanying declarations.  *See* LaMagna Decl. at ¶ 13.  As noted above, Netlist intends to update this request with additional fees incurred in reply or at the hearing.

*Netlist's calculations here are conservative*, as they are taken from only the specific tasks described here to identify evidence, take depositions and brief summary judgment that are attributed *directly* to proving these facts.  *See* Lo Decl. at ¶¶ 12–14, 17; LaMagna Decl. at ¶¶ 6–11; Best Decl. at ¶¶ 4–7; Lee Decl. at ¶¶ 4–11; Benjamin

---

[15] *See* Lo Decl. at ¶¶ 13–14; LaMagna Decl. at ¶¶ 9–10; Best Decl. at ¶¶ 6–7; Choy Decl. at ¶¶ 5–6; Benjamin Decl. at ¶¶ 4–6; Nadler Decl. at ¶¶ 4–6.  As Ms. Lee explains, her allocation is different given her targeted focus.  Lee Decl. at ¶¶ 10–11.

Decl. at ¶¶ 5–6; Nadler Decl. at ¶¶ 5–6; Choy Decl. at ¶¶ 4–6.  Netlist has not, for example, sought a portion of its fees and expenses spent on legal research, or related costs (as opposed to preparation of factual submissions and exhibits).  E.g., Nadler Decl. at ¶ 5.  Moreover, Netlist has *not* included here fees for all time keepers billed to Netlist that were involved in even deposition and summary judgment efforts (or this motion).  Rather, Netlist's application is limited to only work performed by the *primary* attorneys handling the core depositions and summary judgment efforts.  Nor has Netlist included any fees billed to Netlist from non-attorney time-keepers in this request (such as paralegals), despite the fact that their support was necessary for these efforts and paid for by Netlist.

Netlist's calculations of non-attorney fee expenses are also conservative here because Netlist's request is very narrow.  Namely, Netlist is seeking only its reasonable costs for (1) translating the documents cited above that were submitted to the Court on summary judgment to prove the facts Samsung refused to admit, and (2) a pro-rata cost for the translators for the above-described depositions.  Lo Decl. at ¶¶ 28–30; Lee Decl. at ¶¶ 16–17.  No other expenses for the above discovery efforts or summary judgment are included here, despite those expenses being required aspects of Netlist's efforts to prove the above facts.  For example, Netlist has not included the costs for court reporters' transcripts, videography, copying, etc.

***Lastly, Netlist has in fact paid all fees incurred in proof requested here.***  As confirmed by the accompanying declaration of Jason Lo, all fees and costs requested here to prove the facts Samsung failed to admit were billed by Gibson Dunn at the hourly rates requested here and already paid by Netlist.  Lo Decl. at ¶¶ 18–19.[16]  No part of the motion for those fees or costs covers sums that Netlist has not in fact

---

[16]   The fees sought for this present motion have not yet been billed and paid.  To be conservative, fees calculated for this motion at rates Gibson Dunn charged Netlist during 2021, notwithstanding any increases in rates for time billed in 2022.

1  incurred and paid.  As such, the totals calculated and requested here are net and

2  inclusive of any discounts or write-offs.  Lo Decl. at ¶ 18.

3       **C.**    **None of the Exceptions to Rule 37(c)(2) Apply Here**

4       ***First, Samsung asserted no reasonable objection to Netlist's RFAs—***

5  Samsung's objections were, at best, boilerplate.  For example, Samsung asserted that

6  many requests were "vague" or "nonsensical," despite their plain wording.  Ex. C at 4–

7  6 (Response to RFA Nos. 6, 10); Ex. D at 4–5 (Supp. Response to RFA No. 5); Ex. G

8  at 16–32 ("Amended" Responses to RFA Nos. 27–32, 34–41); Ex. F at 35 (7/27/21

9  Supp. Response to RFA No. 52 (mislabeled as response to RFA No. 47).

10       Samsung also objected that the facts were not within Samsung's "knowledge,"

11  despite the requests being about facts uniquely *in* Samsung's possession.  Ex. D at 4–5

12  (Supp. Response to RFA No. 5); Ex. G at 16–32 ("Amended" Responses to RFA Nos.

13  27–32, 34–41).  Samsung further objected that the requests called for "confidential,

14  proprietary, or trade secret information," despite this being factually inaccurate (and

15  despite the protective order in this matter).  Ex. D at 4–5 (Supp. Response to RFA No.

16  5); Ex. C at 4–5 (Response to RFA No. 6); Ex. G at 16–32 ("Amended" Responses to

17  RFA Nos. 27–32, 34–41).

18       Samsung also objected that requests called for a legal conclusion (although they

19  did not), and despite Rule 36 expressly allowing requests "the application of law to

20  fact."  Ex. C at 4–5, 7 (Response to RFA Nos. 6, 15); Ex. D at 4–5 (Supp. Response to

21  RFA No. 5); Ex. E at 20, 23 (Response to RFA Nos. 46, 53); Ex. F at 33, 35 (7/27/21

22  Samsung Supp. Response to RFA Nos. 50, 52 (mislabeled as response to RFA Nos.

23  45, 47 respectively)).

24       Samsung also raised privilege where it was not cognizable, Ex. E at 20

25  (Response to RFA No. 46), and asserted that it had "not yet completed its

26  investigation" as an excuse not to answer, Ex. C at 7 (Response to RFA Nos. 13, 14);

27  Ex. G at 16–32 ("Amended" Responses to RFA Nos. 27–32, 34–41); Ex. E at 23

28  (Response to RFA No. 53); Ex. F at 33, 35 (7/27/21 Samsung Supp. Response to RFA

Nos. 50, 52 (mislabeled as response to RFA Nos. 45, 47 respectively)).[17]  In some instances, Samsung offered no objection at all.  Ex. C at 5 (Response to RFA No. 7); Ex. E at 24 (Response to RFA No. 55).

None of these objections hold merit, much less excuse Samsung from its obligations under Rule 36.  To the contrary, as Rule 36 expressly states:

> *Answer*:  If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it. A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest. The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny.

Fed. R. Civ. P. 36(a)(4).

Samsung's responses here do not "state in detail" why Samsung cannot "truthfully admit" the requests.  Nor as "good faith requires" did Samsung admit all of what it could, as the later proven facts show.  Nor did Samsung ever state how based on "reasonable inquiry" it could not "readily obtain" facts to admit the requests.  In short, no Samsung objection excuses its failure to respond to Netlist's RFAs.

***Second, the requests were all of substantial importance***—the facts at issue in these requests all went to the core elements of Netlist's three claims: (i) whether Samsung had capped or limited sales to Netlist; (ii) whether it had withheld a portion of the NRE payment when not required by law; and (iii) whether Netlist had properly served pre-termination and termination notices in conformity with the JDLA.

***Third, Samsung could not have reasonably believed it would prevail on the facts being different than they are***—these requests asked about **facts**.  The facts are

---

[17]  Samsung's response that it had "not yet completed its investigation" cannot excuse a response as, even if true, Samsung was under an obligation to amend its responses once that investigation was complete.  *See* Fed. R. Civ. P. 26(e)(1).

the facts.  Samsung could not have reasonably thought that, for example, it would turn out that it had not capped sales to Netlist, or not withheld part of the NRE fees, or not received Netlist's letters.  Netlist's RFAs all went to facts in Samsung's possession. Samsung had no good faith basis to deny them.

*Fourth, there is no other good reason for Samsung's failure*.  Aggressiveness and obstruction in discovery are not "good reasons" to refuse to admit RFAs.

In sum, no rationale stated in Rule 37(c)(2) excuses Samsung's failure.

### D.    Rule 37(c)(2) Mandates an Award of Netlist's Reasonable Fees

Absent an applicable exception, Rule 37(c)(2) provides that the Court "must" award reasonable expenses, including attorneys' fees, where a party has improperly refused to admit RFAs.  *E.g.*, *Marchand*, 22 F.3d at 936 (the Rule "mandates an award of expenses.").  Here, there is no excuse for Samsung's failure to admit the above foundational facts of the case, and Netlist was forced to unnecessarily expend resources and fees to prove these facts.  Accordingly, under Rule 37(c)(2), the Court must award Netlist its reasonable fees for this proof.  *Id*.

Gibson Dunn's requested fees—which have been carefully calculated as they relate to the Rule 36 and 37 matters—are reasonable for this matter.  To determine reasonableness, courts evaluate the relevant forum, hourly rate and the number of hours expended.

*Forum and hourly rates.*  To determine reasonableness of the hourly rates of various counsel, courts examine the rates "prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho v. Bridgeport Financial, Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (reversing and remanding for a determination of the reasonable hourly rate based on the prevailing rates in the forum or a comparable one).  As the Ninth Circuit has made clear, the hourly rates are to reflect *current* market realities, and "a district court abuses its discretion to the extent it relies on cases decided years before the attorneys actually rendered their services."  *Id.* at 981; *accord Roberts v. City of Honolulu,* 938 F.3d

1020, 1024 (9th Cir. 2019) (reversing and remanding for determination under *Camacho*, after proper evaluation of evidence submitted by attorneys seeking fees).

Here, the relevant forum is the Central District of California, although this Court may consider rates in comparable forums, particularly where necessary to address "specialization required to handle properly the case." *Camacho,* 523 F.3d at 980. The reliance on counsel within and outside the Central District is particularly relevant in this case involving New York law (and thus benefitting from work by New York barred attorneys such as Messrs. Benjamin and Nadler) and a Korean company, given that primary evidence in the case required review by an attorney fluent in Korean (Ms. Lee) and the assistance of bilingual contract attorneys for cost efficiency. *See* Lee Decl. at ¶¶ 2, 7–8, 10; Nadler Decl. at ¶ 2; Benjamin Decl. at ¶ 2.

Gibson Dunn's rates are reasonable in this matter, as they are consistent with current, prevailing market rates for counsel, given the complexity and skill of the work on this matter. Lo Decl. at ¶¶ 4–6, 19. As this District recognized seven years ago in 2015, at that time the "Valeo Hourly Rates Database for Los Angeles and Orange County show[ed] that intellectual property partners at major law firms bill[ed] in the range of approximately $600 to $1,100 per hour." *Universal Elecs., Inc. v. Universal Remote Control, Inc*., 130 F. Supp. 3d 1331 (C.D. Cal. 2015). Given that in the interim large firms have typically increased rates 4–5% per year, that equates to $800 to $1,475 in 2021, wholly consistent with Gibson Dunn's rates and those at issue here.

Moreover, both Gibson Dunn and Samsung's counsel, O'Melveny & Myers, are peer firms with similar rate structures. This Court should be highly skeptical of any claim by Samsung that Netlist should have hired counsel with substantially lesser rates than its own lawyers.[18] Samsung cannot argue that the rates it pays its own lawyers are unreasonable.

---

[18] *See Ceglia v. Zuckerberg*, 2012 WL 503810, at *11, 16 (W.D.N.Y. Feb. 14, 2012) (finding Gibson's rates "in line with the prevailing market rates for attorneys of similar credentials at large New York City law firms," and noting that *the party*

*(Cont'd on next page)*

With respect to the overall hourly rates billed by Gibson Dunn, a substantial portion of the legal fees for which Netlist seeks reimbursement were billed at very modest rates for contract attorneys. Lo Decl. at ¶¶ 20–22; Lee Decl. at ¶ 15. As described in the accompanying declarations, Gibson Dunn took exceptional efforts to be cost efficient and push work down to appropriate levels and rates. Lo Decl. at ¶¶ 21–22; Lee Decl. at ¶ 15. As such, the actual average rates for legal work reflected in this application is below what would typically be seen in a case like this. Lo Decl. at ¶ 22 (weighted average hourly rate of $185.24 for attorney time).

Given the size of the firm and expertise of its lawyers, Gibson Dunn's rates have repeatedly been held to be reasonable, including in this district. *E.g.*, *Trendsettah USA, Inc. v. Swisher Int'l Inc.*, 2020 WL 11232926, at *6 (C.D. Cal. Dec. 2, 2020) ("The Court agrees that [Gibson's] rates are reasonable given the prevailing rates in the Central District of California."); *Amphastar Pharms. Inc. v. Aventis Pharma SA*, 2020 WL 8680070, *25 (C.D. Cal. Nov. 13, 2020) (finding Gibson Dunn's rates "in line with the prevailing rates in the Central District of California for similar services by lawyers of reasonably comparable skill, experience, and reputation.").[19]

As the court in *Amphastar* further found, Gibson's hourly rates are reasonable "for the additional reason that [clients] actually [pay] Gibson this rate," *id*. at *27, which is equally true here—the fees for proof that Netlist seeks were in fact already paid to Gibson Dunn by Netlist. Lo Decl. at ¶ 18. The rates that Gibson Dunn charged Netlist in this matter are also its customary billing rates that Gibson Dunn regularly charged its clients for other matters this last year. *Id*. at ¶ 19.

---

sanctioned under Rule 37 was represented by a large New York law firm whose hourly rates matched Gibson's rates). Moreover, "sanctions awarded pursuant to Rule 37 are also intended as a deterrent to misbehavior in litigation." *Id*. at *7. As such, "district courts have discretion in determining the amount of an attorney's fee awarded as sanctions." *Id*.

[19] *See also Isaac v. USC Keck School of Med.*, No. 19-8000-DSF, at Dkt. 112 at 3 (C.D. Cal. May 15, 2020) (finding Gibson's rate reasonable because it was in "the range charged in the local market for attorneys of comparable quality and size").

As the court in *Amphastar* also emphasized, Gibson's rates are reasonable "because of the complexity and high stakes nature of this litigation and because of Gibson's reputation and successful handling of this case where … Gibson successfully navigated multiple discovery issues….", 2020 WL 8680070, *25, factors that also apply in this case.[20]   There can be little doubt that Samsung made Gibson Dunn run the discovery gauntlet to prove these facts, including requiring Gibson to prevail on motions to compel.  Dkts. 93 and 133; *see also* Dkt. 76.[21]  As detailed in Netlist's supporting declarations (and as the Court knows from prior motions and applications), Samsung fought discovery at every turn and ultimately put Gibson Dunn to detailed summary judgment briefing to prove the facts at issue here. *E.g.*, Lo Decl. at ¶¶ 23–26.  Gibson Dunn's fees thus reflect the complexity of the case and the results obtained.

**Reasonableness of hours expended.**  Netlist's fee request includes *only* work attributable to proving facts that Samsung improperly refused to admit.  Netlist is not seeking all, or even most, of its legal expenses in the case.  Nor is Netlist even seeking most of its expenses spent on discovery or on summary judgment.  Rather, Netlist is seeking only what it incurred in making the above proof. *E.g., Marchand,* 22 F.3d at 939 (affirming order awarding Rule 37(c) sanctions apportioning 25% of attorneys'

---

[20] Cases from earlier years similarly support the same conclusion, albeit reflecting Gibson Dunn's lesser rates from some 7–10 years ago. *See U.S. ex rel. Lee v. Corinthian Coll.*, 2013 WL 12114064, at *7 (C.D. Cal. June 6, 2013) (overruled on other grounds) ($900 per hour for work Gibson performed up to and before 2012 was "not unreasonable for experienced lawyers in the Los Angeles market").

Likewise, cases from other jurisdictions support the same conclusion. *E.g., Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, 2021 WL 5174088, at *5–6 (Del. Ch. Nov. 8, 2021) (finding Gibson's rates reasonable); *Kimberly-Clark Corp. v. Extrusion Grp., LLC*, No. 1:18-CV-04754-SDG, Dkt. 208 at 12 (N.D. Ga. Apr. 2, 2020) (Gibson rates "within the average billable rates for similar services by lawyers of reasonably comparable skills, experience, and reputation"); *MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC*, 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (finding reasonable Gibson's rates five years ago of 569.02 to 753.42 for associates and $874.60 to $1,048.47 for partners, "given the experience and work performed by the particular individuals").

[21] For a chronology of the discovery conferences required, see Dkts. 47, 51, 68, 69, 73, 90, 91, 95, 103, 130.

---

24       NETLIST'S MOTION FOR ENTRY OF JUDGMENT
         CASE NO. 8:20-CV-993-MCS (ADS)

fees incurred in case to defendant's improper refusal to admit key discovery requests).
Thus, Netlist is entitled to an order of these requested fees.

Samsung's discovery recalcitrance *is* the reason Gibson has the number of hours
billed that it does.  It was only after Netlist incurred these expenses of successfully
moving to compel document and interrogatory responses that Samsung substantively
responded to Netlist's discovery, including by dumping over a million pages of
documents on Netlist in the final week or so before summary judgment.  Dkt. 93; Lo
Decl. at ¶¶ 23–25.  The number of hours spent (which were economically directed
primarily to lower cost contract attorneys) was a direct result of Samsung's "go fish"
style document dumps, coupled with Samsung's refusal to confirm facts known to it
early in litigation.  Lee Decl. at ¶ 7; Lo Decl. at ¶¶ 22–25; LaMagna Decl. at ¶ 6.

In sum, Samsung's behavior—forcing motion practice and hiding facts in a
blizzard of documents—resulted in the fees reflected in this application.  Lo Decl. at
¶¶ 23–26; LaMagna Decl. at ¶ 6; Lee Decl. at ¶¶ 7, 15.  Samsung cannot with unclean
discovery hands be heard to complain that Netlist had to spend hundreds of thousands
of dollars to sift through over a hundred thousand documents produced late in the case
so as to prove facts that Samsung knew to be true from the start.  Samsung should not
be permitted to exploit a "heads it wins, tails Netlist loses" strategy to discovery abuse.

## V.    CONCLUSION

For the reasons stated above, Netlist is entitled to an award of $657,045.02 in
fees and costs under Rule 37(c)(2), in addition to any other fees incurred in bringing
this motion.  Netlist respectfully requests a corresponding order.

Dated: January 10, 2022             GIBSON, DUNN & CRUTCHER LLP


                                    By: /s/ *Jason C. Lo*
                                    Jason C. Lo
                                    333 South Grand Avenue
                                    Los Angeles, CA 90071
                                    213.229.7000
                                    jlo@gibsondunn.com

                                    Attorneys for Plaintiff Netlist Inc.