MICHAEL G. YODER (SB 83059)
myoder@omm.com
MARC F. FEINSTEIN (SB 158901)
mfeinstein@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, Suite 1700
Newport Beach, California 92660
Telephone: (949) 823-6900
Facsimile: (949) 823-6994

EKWAN E. RHOW (SB 174604)
erhow@birdmarella.com
BIRD, MARELLA, BOXER,
WOLPERT, NESSIM, DROOKS,
LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Samsung
Electronics Co., Ltd.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETLIST INC. a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>Defendant. | CASE NO. 8:20-cv-00993-MCS-ADS<br><br>**DECLARATION OF MARC F. FEINSTEIN IN SUPPORT OF DEFENDANT SAMSUNG'S MOTION (A) FOR ENTRY OF JUDGMENT AS TO NETLIST'S FIRST AND SECOND CLAIMS FOR RELIEF, AND (B) AS TO NETLIST'S THIRD CLAIM FOR RELIEF, FOR ENTRY OF JUDGMENT OR, IN THE ALTERNATIVE, TRIAL ON THE THIRD CLAIM FOR RELIEF**<br><br>Date:   February 14, 2022<br>Time:   9:00 a.m. |

## DECLARATION OF MARC F. FEINSTEIN

I, Marc F. Feinstein, declare and state as follows:

1.      I am a partner of the law firm O'Melveny & Myers LLP, counsel of record for Defendant Samsung Electronics Co., Ltd. ("Samsung") in the above-captioned matter, and am admitted to practice in the State of California and before this Court.  I submit this declaration in support of Samsung's Motion (A) for Entry of Judgment as to Netlist's First and Second Claims for Relief, and (B) as to Netlist's Third Claim for Relief, for Entry of Judgment or, in the Alternative, Trial on the Third Claim for Relief ("Motion").  I have personal knowledge of the matters stated herein and could and would competently testify thereto based on my personal knowledge.

2.      Attached hereto as **Exhibit A** is a true and correct copy of excerpts of Reporter's Transcript of Jury Trial, Day 1 – Volume 1, which is the transcript of the a.m. session of the first day of trial in this matter, December 1, 2021.  During the first day of trial, counsel for Plaintiff Netlist, Inc. ("Netlist") informed the Court that the only damages Netlist sought for Samsung's breach of Section 3.1 of the Joint Development and Licensing Agreement ("JDLA") under Netlist's second claim for relief were the $427,051.60 in fees and expenses Netlist paid to PricewaterhouseCoopers ("PwC") for PwC's assistance in obtaining a refund of the $1.32 million payment that Samsung withheld and remitted to the Korean tax service (the "Tax Withholding").

3.      Attached as **Exhibit B** is a true and correct copy of the December 30, 2020 invoice from PwC to Netlist in the amount of $427,051.60 for PWC's services in connection with obtaining the refund of the Tax Withholding, produced by Netlist in this litigation with the beginning Bates Number NL08723 and identified by Netlist as Trial Exhibit 307.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the Complaint filed in the District Court for the Eastern District of Texas, Marshall

2

1  Division, styled *Netlist Inc. v. Samsung Electronics' Co. Ltd.*, Civil Action No.
2  2:21-cv-463, dated December 20, 2021, which is publicly available on the case
3  docket via PACER as Docket Entry No. 1.

4      5.      Attached as **Exhibit D** is a true and correct copy of the November 12,
5  2015 JDLA between Netlist and Samsung, produced by Samsung with the beginning
6  Bates Number SEC000001 and introduced and admitted into evidence at trial as
7  Exhibit 47.

8      6.      Prior to filing the instant motion, Samsung exchanged with Netlist
9  proposed forms of judgment and met and conferred regarding the grounds raised in
10  the instant Motion. The parties could not reach agreement on the judgment that
11  should be entered in this action or the relief sought in the Motion.

12      I declare under penalty of perjury under the laws of the United States that the
13  foregoing is true and correct.

14

15      Executed this 10th day of January, 2022, in Los Angeles, California.

16

17

18

19

Marc Feinstein

20

21

22

23

24

25

26

27

28

3

# Exhibit A

1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

4

5    NETLIST, INC., a Delaware          )
     corporation,                       )
6                                       ) CASE NO.
                    Plaintiff,          ) 20-CV-993-MCS
7                                       )
          vs.                           )
8                                       )
     SAMSUNG ELECTRONICS CO., LTD., a   )
9    Korean corporation,                )
                                        )
10                  Defendant.          )
     _____)

11

12

13

14           REPORTER'S TRANSCRIPT OF JURY TRIAL

15                 **DAY 1 – VOLUME I**

16               (PAGES 1 TO 135)

17           WEDNESDAY, DECEMBER 1, 2021

18                   8:35 A.M.

19             LOS ANGELES, CALIFORNIA

20

21

22

23   _____

24           MAREA WOOLRICH, CSR 12698, CCRR
             FEDERAL OFFICIAL COURT REPORTER
             350 WEST FIRST STREET, SUITE 4311
25           LOS ANGELES, CALIFORNIA 90012
                 mareawoolrich@aol.com

1              **APPEARANCES OF COUNSEL:**

2

3   **FOR PLAINTIFF:**

4       GIBSON, DUNN & CRUTCHER LLP
        BY:  RICHARD DOREN
5       BY:  JASON LO
        BY:  JUNGEUN LEE
6       333 South Grand Avenue
        Los Angeles, CA 90071
7

8   **FOR DEFENDANT:**

9       BIRD, MARELLA, BOXER, WOLPERT,
        NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
10      BY:  EKWAN RHOW
        1875 Century Park East, 23rd Floor
11      Los Angeles, CA 90067

12      O'MELVENY & MYERS LLP
        BY:  MICHAEL YODER
13      BY:  MARC FEINSTEIN
        400 South Hope Street, 18th Floor
14      Los Angeles, CA 90071

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          MR. RHOW:  It's fine with Samsung, Your Honor.

2          THE COURT:  Okay.  Good.

3          Samsung continues to object to the time limit, and I

4    just wanted to sort of give you the Court's rationale.  The

5    Court is going to overrule that objection.  But the parties

6    provided an estimate of three to four days in the proposed

7    final pretrial conference order.  That was before the Court

8    deemed three of Samsung's affirmative defenses abandoned and

9    before Netlist dropped one of its contract theories.

10         For trials of three or four days, the Court allots

11   7.5 hours per side.  So essentially the 10 hours Samsung seeks,

12   we weren't really even looking at at the beginning anyway.  So

13   we are going to go with 5.5 hours.  We think that's enough time

14   to resolve the limited damages issues remaining in the case.

15   Barring some wrinkle, we'll go with that and see how it works.

16         Are there any questions that the -- exhibit issues

17   that the Court needs to resolve before openings?

18         MR. RHOW:  Your Honor, there are two issues, and

19   this actually goes into the timing issue.  I mean, certainly

20   after the MILs given the judge's ruling, we attempted -- we are

21   going to construct a case of 5.5 hours based on those rulings.

22         Two issues, though, popped up.  One has popped up

23   from the opening slides.  The other pops up from exhibits they

24   intend to use with today's witnesses.  And we have set up a

25   very good meet-and-confer process.  I had a long discussion

1   with opposing counsel.  It was very cooperative and helpful.

2           But I think the issues that remain go to this issue

3   of the length of the trial and what we are trying here.  And if

4   I could, I do think it needs to get resolved before opening,

5   and it affects today's trial.

6           If I may, Your Honor, I wanted to hand to you the

7   opening slides.

8           THE COURT:  Okay.

9           MR. RHOW:  For -- any problem with me doing this?

10  This is your slides.

11          MR. DOREN:  Sure.

12          MR. RHOW:  So I just to, as a point of reference --

13          And the reason I'm handing that slide to Your Honor

14  is because during the MIL hearings, we did file an MIL to

15  exclude PWC fees on the basis it was consequential damages, and

16  Your Honor denied it, indicating it was not a proper vehicle

17  for an MSJ, and we understood that.

18          Nevertheless, the problem we face is, under New York

19  law, the issue of whether or not the PWC fees which are

20  undisputed in terms of amount are consequential or not is an

21  issue for Your Honor.  And so there's no jury instruction on

22  Section 12.5 which precludes consequential damages under the

23  JDLA, nor should there be, because you'd be asking the jury to

24  apply 12.5 and the law to that particular slide in fact.

25          And so by introducing this during the course of the

1   trial, first of all, we are going to spend time on this on what

2   should be an issue that ultimately Your Honor takes and rules

3   on in terms of either a motion or some sort of briefing.

4          And so the objection we had to the slide is really

5   getting guidance here.  Because in opening, am I supposed to

6   argue that it's not consequential damages or point to 12.5 and

7   explain to the jury what the evidence will show on that?

8          It seems to be using time that is unnecessary since

9   no one disputes that amount and the only issue is, under the

10   law, based on briefing, is this a consequential damage or not.

11          And recall, Your Honor, on the MSJ, you already

12   ruled that 12.5 does apply.  And, in fact, during the course of

13   this trial, consequential damages are not allowed.  And so at

14   this point, it's really applying the MSJ to that particular

15   document and coming up with a ruling, which we could do in

16   post-trial briefing.  We could do in briefing today.  But it

17   just seems to be taking up time with the jury that's

18   unnecessary.

19          THE COURT:  Okay.

20          Counsel?

21          MR. DOREN:  Your Honor, I would just cite the Court

22   to its order on the motions in limine, Docket 243 at page 11,

23   where the Court said, "To resolve Samsung's motion would

24   require the Court to decide whether the PWC expenses are

25   properly categorized as consequential damages.  The Court

1    declines to summarily adjudicate this issue.  Accordingly, the

2    Court will not preclude Netlist from putting forth evidence of

3    its expenses in hiring PWC."

4         The amount of time to be spent on this particular

5    issue is small.  The evidence is very straightforward.  The

6    Court will then have a chance to evaluate it.  We believe that

7    it fits squarely within the framework of direct or general

8    damages under New York law.  And we will make an efficient,

9    concise offering.  As Your Honor sees with the slide in front

10   of it, that is the evidence.  That is the document, along with

11   some limited testimony.  And we would ask to be permitted to

12   proceed consistent with the Court's MIL ruling.

13        THE COURT:  Okay.

14        Do you have a response, Counsel?

15        MR. RHOW:  Yes, Your Honor.

16        If it is true that both sides stipulate that that

17   fact is, in fact, the amount, then what is the jury to decide?

18   There's no instruction that you are going to be giving to them.

19   You are going to resolve this issue.  And so if the only issue

20   is the admission of two minutes of evidence on that, we would

21   stipulate that that is the amount, and we would stipulate that

22   the only remaining issue is, as a matter of law under New York

23   law -- which New York is clear.  The judge decides this.  You

24   decide this.

25        Let's take this from the jury.  It will add

 1  confusion.  They will hear it.  They will wonder what do we do

 2  with this?  They may even add that to the amount of damages at

 3  the end of the trial based on the confusion when they shouldn't

 4  be considering it because you first have to decide.  You will

 5  be the only person who decides is it consequential or not.

 6         So the admission of the evidence we have no issue

 7  with to Your Honor.  It's stipulated.  That's the amount.  And

 8  Your Honor then can decide, and that part of the case can be

 9  resolved without wasting time in front of the jury.

10         THE COURT:  And so the stipulation would be to the

11  427051.6?

12         MR. RHOW:  Correct.

13         MR. DOREN:  Your Honor, if I may.

14         THE COURT:  Yeah, sure.

15         MR. DOREN:  I spoke a bit too quickly about that

16  being the only evidence.  It is the evidence in the amount, and

17  we are happy to accept a stipulation to the amount by which

18  Netlist is out of pocket.

19         There is also evidence that Samsung told Netlist to

20  go deal with the tax authority, thereby leading to the chain of

21  events that required Netlist to hire PWC and incur this

22  expense.

23         And to the extent that is part of the analysis as to

24  whether these are general direct damages, we'll be putting that

25  in evidence too.  Again, very quickly.

1          THE COURT:  And so are there any other damages
2    Netlist seeks for breach of 3.1 other than the PWC fees?
3          MR. DOREN:  No, Your Honor.
4          THE COURT:  And, Counsel, before you sit down, so
5    the -- is this an issue -- so we have these damages.  Are you
6    saying that they are direct damages and not consequential
7    damages?
8          MR. DOREN:  We are, Your Honor.
9          THE COURT:  So if the parties stipulate that these
10   are the damages and there's no other damages under 3.1, why
11   can't the Court just decide whether they are appropriate
12   consequential damages or not?
13         MR. DOREN:  Your Honor, so long as we can put in our
14   evidence as to how Netlist came to go to PWC and why it was
15   required to go there, we think the Court can make that ruling.
16   What we would suggest, Your Honor, though, is that, as the
17   Court suggested in its MIL ruling, that we be permitted to
18   present our evidence.  And if at the conclusion of that
19   evidence the Court concludes that it is an issue for the Court,
20   then obviously we would submit that issue to the Court.
21         THE COURT:  How can it not be an issue for the Court
22   though?
23         MR. DOREN:  Only in that Your Honor gave Netlist the
24   ability to present its evidence on those damages.  And,
25   Your Honor, it may well be an issue for the Court, but we would

1    want the Court to decide it on the full evidentiary record

2    which is, on the one hand, the testimony of the chief financial

3    officer from Netlist being told by Samsung that it should, in

4    order to -- rather than being sent the $1.32 million upon

5    request by Samsung, they were instructed to go deal with the

6    Korean tax service, which they then hired PWC to do and which

7    PWC then, upon it successfully recovering the wrongfully

8    withheld funds, took $427,051 as its fee.

9           Now, if those facts are all stipulated or that

10   evidence is all before the Court, then we would agree that the

11   Court can then decide whether that fits within the definition

12   of general damages or not.

13          THE COURT:  Counsel?

14          MR. RHOW:  Yes.  I'd have to think about, you know,

15   exactly how it's characterized.  But as an offer of proof, we

16   are not going to dispute that.  But more importantly, when you

17   say the evidence presented, the easy solution to avoid

18   prejudice and confusion to the jury is just to do this outside

19   the presence of the jury.

20          We are not here to present evidence to you

21   indirectly through a jury trial to you.  You can just take the

22   evidence directly.  The jury doesn't need to hear it.  They are

23   not going to adjudicate this issue based on what counsel just

24   said.  It's an issue for the judge.

25          So to me there's two solutions.  We can consider a

```
 1   stipulation, which we certainly will.  I've already told you
 2   the amount is not in dispute.  But, second, even assuming we
 3   can't, we can just hear this outside the presence of the jury.
 4   You can hear it directly.
 5           THE COURT:  Yeah, I'm convinced that since this is
 6   going to be an issue for the Court, we will hear it outside the
 7   presence of the jury.  So you can either come up with a
 8   stipulation, or we can figure out some sort of proceeding by
 9   way of declarations and -- or something to resolve it.  But I
10   think we can resolve it fairly quickly.  I think it's an
11   encapsulated issue.
12           MR. DOREN:  Thank you, Your Honor.
13           THE COURT:  Anything else we need to do before the
14   jury comes?
15           MR. RHOW:  Yes.  Sorry, Your Honor.  One more very
16   quickly.  And obviously that was why I raised it, to create an
17   efficiency here.  This issue goes to that as well.
18           During the MIL rulings on Netlist -- actually,
19   Netlist filed this motion -- MILs, it was kind of grouped
20   together in your Rulings 1 through 4 or 2 through 4.
21   Your Honor made the statement that allocations and the
22   existence of allocations are not admissible, are not relevant
23   to the case.  The commercial reasonableness of an order is not
24   relevant.  And we took that to heart in preparing the trial in
25   the 5.5 hours we have.
```

# Exhibit B





U.S.D.C CENTRAL DISTRICT OF CALIFORNIA

CASE NO. **8:20-cv-993-MCS (ADS)**

**Netlist Inc.**

VS. **Samsung Electronics Co., Ltd.**

PLAINTIFF'S EXHIBIT _____ **0307**

DATE _____ IDEN.

DATE _____ EVID.

BY _____
Deputy Clerk

December 30, 2020

**Netlist Inc.**

175 Technology, Suite 150
Irvine, CA 92618

We would like to submit a bill for our professional services rendered to **Netlist Inc.** ('the Company')
as below. Please note that this invoice for professional services rendered is payable within 30 days of
the invoice date shown above, and that an interest charge may be applied to any amounts which are
overdue.

| Description | Amount |
|---|---|
| **Tax Consulting Services** | USD 425,051.6 |
| **Writing Fee** | USD 2,000 |
| *Out of pocket expenses* | - |
| **Total** | USD 427,051.6 |
| *Value-added tax 10%* | - |
| ***Grand Total*** | USD 427,051.6 |

Very truly yours,

Samil PricewaterhouseCoopers

Invoice No. 20F02432
KJD/PKJ
[31257-41-000]

P.S.: Please transfer the above amount to our passbook account as below.

| | |
|---|---|
| Our bank: | KEB Hana Bank |
| Swift code: | KOEXKRSEXXX |
| Bank address: | 043-86 92, Hangang-daero, Yougsan-gu, Seoul |
| Account name: | Samil PricewaterhouseCoopers |
| Account No.: | 105-910004-90938 |

*Samil PricewaterhouseCoopers, 100 Hangang-daero, Yongsan-gu, Seoul 04386, Korea, www.samil.com*

## Summary of fees for the services rendered in relation to Netlist

| | | |
|---|---|---|
| Federal corporate income tax refund | | ₩1,408,080,000 |
| | 30% | **₩422,424,000** |
| Local corporate income tax refund | | ₩140,808,000 |
| | 30% | **₩42,242,400** |
| | | |
| Total fee in KRW | | ₩464,666,400 |
| Exchange rate as of 30th December 2020 | | 1,093.20 |
| | | |
| **Service fee** | | **$425,051.6** |
| **Wiring fee** | | **$2,000** |
| | | |
| **Total fee** | | **$427,051.6** |

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **NETLIST, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **SAMSUNG ELECTRONICS CO., LTD.,** | ) | |
| **SAMSUNG ELECTRONICS AMERICA,** | ) | |
| **INC., SAMSUNG SEMICONDUCTOR,** | ) | Civil Action No.2:21-cv-463 |
| **INC.** | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

1.     Plaintiff Netlist, Inc. ("Netlist"), by its undersigned counsel, for its Complaint against defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Semiconductor, Inc. ("SSI") (collectively, "Samsung" or "Defendants"), states as follows, with knowledge as to its own acts, and on information and belief as to the acts of others:

2.     This action involves three of Netlist's patents: U.S. Patent Nos. 10,860,506 (the "'506 Patent," Ex. 1), 10,949,339 (the "'339 Patent," Ex. 2), and 11,016,918 (the "'918 Patent," Ex. 3) (collectively, the "Patents-in-Suit").

## I.    **THE PARTIES**

3.    Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 111 Academy Drive, Suite 100, Irvine, CA 92617.

4.    On information and belief, SEC is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon, Gyeonggi, 16677, Republic of Korea.  On information and belief, SEC is the worldwide parent corporation for SEA and SSI, and is responsible for the infringing activities identified in this complaint.  On information and belief, SEC's Device Solutions division is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, SEC is also involved in the design, manufacture, and provision of products sold by SEA.

5.    On information and belief, SEA is a corporation organized and existing under the laws of the State of New York.  On information and belief, SEA, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  Defendant SEA maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  SEA may be served with process through its registered agent for service in Texas: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  SEA is a wholly owned subsidiary of SEC.

6.    On information and belief, SSI is a corporation organized and existing under the laws of the State of California.  On information and belief, SSI, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined

below.  Defendant SSI maintains facilities at 6625 Excellence Way, Plano, Texas 75023.
Defendant SSI may be served with process through its registered agent National Registered
Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.  On information and belief, SSI is
a wholly owned subsidiary of SEA.

7.    On information and belief, Defendants have used, sold or offered to sell products
and services, including the Accused Instrumentalities, in this judicial district.

## II.    JURISDICTION AND VENUE

8.    Subject matter jurisdiction is based on 28 U.S.C. § 1338, in that this action arises
under federal statute, the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*).

9.    Each Defendant is subject to this Court's personal jurisdiction consistent with the
principles of due process and/or the Texas Long Arm Statute.

10.    Personal jurisdiction exists generally over the Defendants because each Defendant
has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the
forum as a result of business conducted within the State of Texas and the Eastern District of Texas.
Personal jurisdiction also exists over each Defendant because each, directly or through
subsidiaries, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or
markets products within the State of Texas and the Eastern District of Texas that infringe one or
more claims of the Patents-in-Suit.  Further, on information and belief, Defendants have placed or
contributed to placing infringing products into the stream of commerce knowing or understanding
that such products would be sold and used in the United States, including in this District.

11.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or
1400(b).  For example, SEC maintains a regular and established place of business in this judicial
district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in
this judicial district.  As another example, SEA maintains a regular and established place of

business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district. Venue is also proper for SSI because it maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.

12. Defendants have not contested proper venue in this District. *See, e.g.*, Answer at ¶ 10, *Arbor Global Strategies LLC v. Samsung Elecs. Co., Ltd.*, No. 2:19-cv-333, Dkt. 43 (E.D. Tex. Apr. 27, 2020); Answer at ¶ 29, *Acorn Semi, LLC v. Samsung Elecs. Co., Ltd.*, No. 2:19-cv-347, Dkt. 14 (E.D. Tex. Feb. 12, 2020).

## III. FACTUAL ALLEGATIONS

### Background

13. Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies. Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets. Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time. These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.

14. Netlist has a long history of being the first to market with disruptive new products such as the first load-reduced dual in-line memory module ("LR-DIMM"), HyperCloud®, based on Netlist's distributed buffer architecture later adopted by the industry for DDR4 LRDIMM. Netlist was also the first to bring NAND flash to the memory channel with its NVvault® NVDIMM. These innovative products built on Netlist's early pioneering work in areas such as embedding passives into printed circuit boards to free up board real estate, doubling densities via quad-rank double data rate (DDR) technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

15.     Generally speaking, a memory module is a printed circuit board that contains, among other components, a plurality of individual memory devices (such as DRAMs). The memory devices are typically arranged in "ranks," which are accessible by a processor or memory controller of the host system. A memory module is typically installed into a memory slot on a computer motherboard.

16.     Memory modules are designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications. The structure, function, and operation of memory modules is defined, specified, and standardized by the JEDEC Solid State Technology Association ("JEDEC"), the standard-setting body for the microelectronics industry. Memory modules are typically characterized by, among other things, the generation of DRAM on the module (*e.g.*, DDR5, DDR4, DDR3) and the type of module (*e.g.*, RDIMM, LRDIMM).

### The Asserted Netlist Patents

**The '506 Patent**

17.     The '506 Patent is entitled "Memory Module With Timing-Controlled Data Buffering." Netlist owns the '506 Patent by assignment from the listed inventors Hyun Lee and Jayesh R. Bhakta. The '506 Patent was filed as Application No. 16/391,151 on April 22, 2019, issued as a patent on December 8, 2020, and claims priority to, among others, a utility application filed on July 27, 2013 (No. 13/952,599) and a provisional application filed on July 27, 2012 (No. 61/676,883).

18.     Samsung had knowledge of the '506 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket.

19.     As described in the '506 Patent, in conventional memory modules, the "distribution of control signals and a control clock signal in the memory module is subject to strict constraints"

to ensure that memory devices on the memory module can be properly accessed.  Ex. 1 at 2:16-17.  For example, in some conventional memory modules, "control wires are routed so there is an equal length to each memory component, in order to eliminate variation of the timing of the control signals and the control clock signal between different memory devices in the memory modules."  *Id.* at 2:20-24.  But as noted in the '506 Patent, "[t]he balancing of the length of the wires to each memory devices compromises system performance, limits the number of memory devices, and complicates their connections."  *Id.* at 2:24-27.  In yet other conventional memory systems, the memory controller includes mechanisms for compensating for unbalanced wire lengths on the memory module.  *Id.* at 2:30-32.  However, with increasing memory operating speed and memory density "such leveling mechanisms are also insufficient to ensure proper timing of the control and/or data signals received and/or transmitted by the memory modules."  *Id.* at 2:32-36.

20.     The '506 Patent discloses a memory module operable in a memory system with a memory controller that includes memory devices, a module control circuit, and a plurality of buffer circuits coupled between respective sets of data signal lines in a data bus and respective sets of the memory devices.  As summarized in the Abstract, "[e]ach respective buffer circuit is configured to receive the module control signals and the module clock signal, and to buffer a respective set of data signals in response to the module control signals and the module clock signal. Each respective buffer circuit includes a delay circuit configured to delay the respective set of data signals by an amount determined based on at least one of the module control signals."  *Id.*, Abstract.

21.     The buffer circuits (118, highlighted below) are associated with respective groups of memory devices and are distributed across the memory module at positions corresponding to the respective groups of memory devices as illustrated in the exemplary configuration of Figure 2A.



FIG. 2A

'506 Patent, Figure 2A. However, because the buffer circuits—or "isolation devices"—are distributed across the memory module, at high speeds of operation, the same set of module control signals may reach different buffer circuits at different times across one cycle of the system clock. *Id.* at 9:51-62 ("Because the isolation devices 118 are distributed across the memory module 110, during high speed operations, it may take more than one clock cycle time of the system clock MCK for the module control signals to travel along the module control signals lines 230 from the module control device 116 to the farthest positioned isolation devices 118, such as isolation device ID-1 and isolation device ID-(n−1) in the exemplary configuration shown in FIG. 2."). The '506 Patent discloses an embodiment wherein "each isolation devices includes signal alignment circuits that determine, during a write operation, a time interval between a time when one or more module control signals are received from the module control circuit 116 and a time when a write strobe or write data signal is received from the MCH 101. This time interval is used during a subsequent read operation to time the transmission of read data to the MCH 101, such that the read data follows a read command by a read latency value associated with the system 100." *Id.* at 10:11-21.

**The '339 Patent**

22.     The '339 Patent is entitled "Memory Module With Controlled Byte-Wise Buffers." Netlist owns the '339 Patent by assignment from the listed inventors Hyun Lee and Jayesh R. Bhakta.  The '339 Patent was filed as Application No. 15/470,856 on March 27, 2017, issued as a patent on March 16, 2021, and claims priority to U.S. Patent Application No. 12/504,131 filed on July 16, 2009, U.S. Patent Application No. 12/761,179 filed on April 15, 2010 and U.S. Application No. 13/970,606 filed on August 20, 2013.

23.     Samsung had knowledge of the '339 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket.

24.     As described in the '339 Patent, in optimizing performance of memory subsystems (e.g. memory modules) "consideration is always given to memory density, power dissipation (or thermal dissipation, speed, and cost."  Ex. 2 at 2:5-7.   The '339 Patent further explains that "[g]enerally, these attributes are not orthogonal to each other, meaning that optimizing one attribute may detrimentally affect another attribute. For example, increasing memory density typically causes higher power dissipation, slower operational speed, and higher costs."  *Id.* at 2:7-12.  The '339 Patent is generally directed to a memory module optimized to reduce the load experienced by a system memory controller via the use of configurable data transmission circuits.

25.     The '339 Patent discloses a memory module configured to communicate with a memory controller that includes DDR DRAM devices arranged in multiple ranks each of the same width as the memory module, and a module controller configured to receive and register input control signals for a read or write operation from the memory controller and to output registered address and control signals.  As summarized in the Abstract, "[t]he registered address and control signals selects one of the multiple ranks to perform the read or write operation. The module controller further outputs a set of module control signals in response to the input address and

control signals. The memory module further comprises a plurality of byte-wise buffers controlled by the set of module control signals to actively drive respective byte-wise sections of each data signal associated with the read or write operation between the memory controller and the selected rank." *Id.*, Abstract.

26. Figure 3A illustrates an example of a memory subsystem consistent with embodiments disclosed in the '339 patent.



**FIG. 3A**

'339 Patent, Figure 3A.  As shown above, Figure 3A depicts a memory subsystem 400 including memory modules 402 comprising memory devices 412, data transmission circuits 416 (highlighted above), and module control circuits 430.  The data transmission circuits 416 operate to reduce the load experienced by the memory controller 420 to improve performance of a read or write operation.  *Id.* at 17:14-44 ("Referring again to FIG. 3A, when the memory controller 420 executes read or write operations, each specific operation is targeted to a specific one of the ranks A, B, C, and D of a specific memory module 402. The data transmission circuit 416 on the specifically

targeted one of the memory modules 402 functions as a bidirectional repeater/multiplexor, such that it drives the data signal when connecting from the system memory controller 420 to the memory devices 412. The other data transmission circuits 416 on the remaining memory modules 402 are disabled for the specific operation. . . . Thus, the memory controller 420, when there are four four-rank memory modules, sees four load-reducing switching circuit loads, instead of sixteen memory device loads. The reduced load on the memory controller 420 enhances the performance and reduces the power requirements of the memory system . . . .").  In certain embodiments, "the data transmission circuit 416 comprises or functions as a byte-wise buffer. In certain such embodiments, each of the one or more data transmission circuits 416 has the same bit width as does the associated memory devices 412 per rank to which the data transmission circuit 416 is operatively coupled." *Id.* at 13:31-36.

**The '918 Patent**

27.      The '918 Patent is entitled "Flash-DRAM Hybrid Memory Module."  Netlist owns the '918 Patent by assignment from the listed inventors Chi-She Chen, Jeffrey C. Solomon , Scott H. Milton, and Jayesh Bhakta.  The '918 Patent was filed as Application No. 17/138,766 on December 30, 2020, issued as a patent on May 25, 2021, and claims priority to, among others, U.S. Application No. 13,559,476 filed on July 26, 2012, U.S. Application No. 12/240,916 filed on September 29, 2008, and U.S. Application No. 12/131,873 filed on June 2, 2008 as well as to two provisional applications, filed on June 1, 2007 (No. 60/941,586) and July 28, 2011 (No. 61/512,871).

28.      Samsung had knowledge of the '918 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket via notice of U.S. Patent Application No. 12/240,916 and U.S. Patent Application No. 12/131,873 on August 2, 2021.

29.     As summarized in the Abstract, the '918 Patent discloses a memory module that includes a printed circuit board with an interface that couples it to a host system for provision of power, data, address and control signals, and additionally features "[f]irst, second, and third buck converters [that] receive a pre-regulated input voltage and produce first, second and third regulated voltages. A converter circuit reduces the pre-regulated input voltage to provide a fourth regulated voltage. Synchronous dynamic random access memory (SDRAM) devices are coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, and a voltage monitor circuit monitors an input voltage and produces a signal in response to the input voltage having a voltage amplitude that is greater than a threshold voltage."  Ex. 3, Abstract.

30.     The '918 Patent discloses, *inter alia*, a power module that provides power to various components of the memory system as depicted in Figure 16, shown below.



*FIG. 16*

31.     The '918 Patent explains that "[t]he power module 1100 provides a plurality of voltages to the memory system 1010 comprising non-volatile and volatile memory subsystems

1030, 1040. The plurality of voltages comprises at least a first voltage 1102 and a second voltage 1104. The power module 1100 comprises an input 1106 providing a third voltage 1108 to the power module 1100 and a voltage conversion element 1120 configured to provide the second voltage 1104 to the memory system 1010. The power module 1100 further comprises a first power element 1130 configured to selectively provide a fourth voltage 1110 to the conversion element 1120. In certain embodiments, the first power element 1130 comprises a pulse-width modulation power controller." *Id.* at 28:3-15. "The conversion element 1120 can comprise one or more buck converters and/or one or more buck-boost converters." *Id.* at 29:18-19.

32. Relatedly, on December 10, 2021, the United States Patent and Trademark Office issued a Notice of Allowance for the pending claims of Application No. 17/138,019, a continuation of the '918 Patent. *See* Ex. 4 (allowed claims of App. No. 17/138,019). Netlist intends to assert the allowed claims of App. No. 17/138,019 upon issuance against Samsung.

33. The inventions of the '918 Patent and App. No. 17/138,019 provide for the effective operation of DDR5 memory modules, by enabling, among other benefits, greater power efficiency than previous generations of DDR technology. The DDR5 standard is characterized by the use of an on-module power management system. Samsung itself notes "[t]he on-DIMM PMIC further boosts power management efficiency and power supply stability." Ex. 12 at 5.

## Samsung's Infringing Activities

34. Samsung is a global technology company that manufactures semiconductor memory products such as DRAM, NAND Flash and MCP (Multi-Chip Package). Samsung develops, manufactures, sells and imports into the United States memory components and memory modules designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.

35.     Samsung was a licensee of Netlist until July 15, 2020.  *See Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 20-cv-993, Dkt. 186 at 20-21 (C.D. Cal. Oct. 14, 2021).  Immediately after Samsung's license was deemed terminated, Samsung filed an improper declaratory judgment action in the District of Delaware concerning unrelated patents directed at different aspects of memory module technology than the patents in the present suit.  *See Samsung Elecs. Co., Ltd. et al v. Netlist, Inc.*, No. 21-cv-1453, Dkt. 1 (D. Del. Oct. 15, 2021).  Netlist has moved to dismiss each count of Samsung's declaratory judgment complaint in Delaware.

36.     On information and belief, Samsung makes, uses, sells, offers to sell, and/or imports within this District and elsewhere in the United States, without authority, infringing DDR4 LRDIMMs, DDR5 LRDIMMs, DDR5 RDIMMs, DDR5 SODIMMs, DDR5 UDIMMs, and other products that have materially the same structures and designs in relevant parts (the "Accused Instrumentalities").

37.     The accused DDR4 LRDIMMs include, without limitation, any Samsung DDR4 LRDIMM products made, sold, used and/or imported into the United States by Samsung.  By way of non-limiting example, the accused DDR4 LRDIMMs products include, Samsung products having the following part numbers: M386A4K40BB0-CRC, M386A8K40BM1-CRC, M386A8K40BM2-CTD, M386A8K40BMB-CRC, M386A8K40CM2-CRC, M386A8K40CM2-CTD, M386A8K40CM2-CVF, M386A8K40DM2-CTD, M386A8K40DM2-CVF, M386A8K40DM2-CWE, M386AAG40AM3-CWE, M386AAG40MM2-CVF, M386AAG40MMB-CVF, M386AAK40B40-CUC, M386AAK40B40-CWD, M386ABG40M50-CYF, M386ABG40M51-CAE, M386ABG40M5B-CYF.  Further examples of Samsung's DDR4 LRDIMM products can be found via Samsung's module-selector web page. *See Module: Memory Modules For Extensive Use*, Samsung, *available at* https://www.samsung.com/semiconductor/dram/module.

38.     As further example, the Accused Instrumentalities include, without limitation, any Samsung DDR5 LRDIMM and DDR5 RDIMM products made, sold, used and/or imported into the United States by Samsung that are JEDEC-standard compliant memory modules.  By way of non-limiting example, the accused DDR5 LRDIMM and DDR5 RDIMM products include products marketed and publicized in an October 12, 2021 Samsung Press release, as shown below.



Ex. 5 at 1 (depiction of a Samsung DDR5 LRDIMM).



*Id.* at 3 (depiction of a Samsung DDR5 RDIMM).

## IV.     <u>FIRST CLAIM FOR RELIEF – '506 PATENT</u>

39.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

40.      On information and belief, Samsung directly infringed and is currently infringing at least one claim of the '506 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts.  For example, and as shown below, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts infringe at least claim 1 of the '506 Patent.[1]

41.      For example, to the extent the preamble is limiting, each of the accused DDR4 LRDIMMs comprise a memory module operable in a computer system to communicate with a memory controller of the computer system via a memory bus including control and address (C/A) signal lines and a data bus.  As an example, Samsung's website markets and contains datasheets for the accused DDR4 LRDIMMs.



## LRDIMM

**Load Reduced DIMM**

- Include a register for enhancing clock, command and control signals
- Enhanced data signal by placing data buffer
- Best solution for achieving high density with high speed
- Supports x4 Organization / up to 4 ranks per DIMM and 3DPC
- Application : Server

42.      Ex. 6 at 2 (depiction of a Samsung DDR4 LRDIMM).  Each LRDIMM includes "a register for enhancing clock, command and control signals" as well as data buffers for "[e]nhanced

---

[1] The theories set forth herein are based on Netlist's present understanding of the Samsung Accused Instrumentalities. Netlist reserves the right to supplement or amend these contentions as permitted by the Local Rules and any Orders of the Court as discovery progresses.  Further, Netlist's contentions contain images and examples illustrating Netlist's infringement theories. As such, the images and examples are not intended, and should not be read, as narrowing or limiting the scope of these contentions.

data signal." *Id.* It communicates with a server's memory controller via control and address signal lines in a memory bus as well as a data bus. For example:

Load Reduced DIMM datasheet Rev. 1.4 DDR4 SDRAM

## 5. Pin Description

| Pin Name | Description | Pin Name | Description |
|---|---|---|---|
| A0–A17[1] | Register address input | SCL | I2C serial bus clock for SPD/TS and register |
| BA0, BA1 | Register bank select input | SDA | I2C serial bus data line for SPD/TS and register |
| BG0, BG1 | Register bank group select input | SA0–SA2 | I2C slave address select for SPD/TS and register |
| RAS_n[2] | Register row address strobe input | PAR | Register parity input |
| CAS_n[3] | Register column address strobe input | VDD | SDRAM core power supply |
| WE_n[4] | Register write enable input | VPP | SDRAM activating power supply |
| CS0_n, CS1_n, CS2_n, CS3_n | DIMM Rank Select Lines input | VREFCA | SDRAM command/address reference supply |
| CKE0, CKE1 | Register clock enable lines input | VSS | Power supply return (ground) |
| ODT0, ODT1 | Register on-die termination control lines input | VDDSPD | Serial SPD/TS positive power supply |
| ACT_n | Register input for activate input | ALERT_n | Register ALERT_n output |
| DQ0–DQ63 | DIMM memory data bus | RESET_n | Set Register and SDRAMs to a Known State |
| CB0–CB7 | DIMM ECC check bits | EVENT_n | SPD signals a thermal event has occurred |
| DQS0_t–DQS17_t | Data Buffer data strobes (positive line of differential pair) | VTT | SDRAM I/O termination supply |
| DQS0_c–DQS17_c | Data Buffer data strobes (negative line of differential pair) | RFU | Reserved for future use |
| CK0_t, CK1_t | Register clock input (positive line of differential pair) | | |
| CK0_c, CK1_c | Register clocks input (negative line of differential pair) | | |

NOTE :
1. Address A17 is only valid for 16 Gb x4 based SDRAMs.
2. RAS_n is a multiplexed function with A16.
3. CAS_n is a multiplexed function with A15.
4. WE_n is a multiplexed function with A14.

Ex. 7 (M386AAK40B40 Datasheet) at 6.





Address, Command and Control lines

NOTE :
1. CK0_t, CK0_c terminated with 120Ω ± 5% resistor.
2. CK1_t, CK1_c terminated with 120Ω ± 5% resistor but not used.
3. Unless otherwise noted resistors are 22Ω ± 5%.

SAMSUNG

*Id.* at 10 (red lines in original).

43.    The accused DDR4 LRDIMMs further each comprise a module board having edge connections to be coupled to respective signal lines in the memory bus, as illustrated in the examples below.



Ex. 6 at 2 (depiction of a Samsung DDR4 LRDIMM); *see also* Ex. 7 (M386AAK40B40 Datasheet) at 42.

44.    The accused DDR4 LRDIMMs further each comprise a module control device on the module board configurable to receive input C/A signals corresponding to a memory read operation via the C/A signal lines and to output registered C/A signals in response to the input C/A signals and to output module control signals, as illustrated in the example below.





NOTE :
1. CK0_t, CK0_c terminated with 120Ω ± 5% resistor.
2. CK1_t, CK1_c terminated with 120Ω ± 5% resistor but not used.
3. Unless otherwise noted resistors are 22Ω ± 5%.

- 10 -

**SAMSUNG**

Ex. 7 (M386AAK40B40 Datasheet) at 10; *see also id.* at 42.



*Id.* at 11-12.

45.    The accused DDR4 LRDIMMs also each include memory devices arranged in multiple ranks on the module board and coupled to the module control device (*e.g.*, RCD) via module C/A signal lines that conduct the registered C/A signals, as illustrated in the examples below.



**9.1 128GB, 16Gx72 Module**
**(Populated as 2 physical ranks / 4 logical ranks of x4 DDR4 SDRAM**

*Id.* at 10; *see also id.* at 42.

46. In each accused DDR4 LRDIMM's memory devices, the registered C/A signals cause a selected rank of the multiple ranks to perform the memory read operation by outputting read data and read strobes associated with the memory read operation, and a first memory device in the selected rank is configurable to output at least a first section of the read data and at least a

first read strobe.  For example, each accused DDR4 LRDIMM follows the timing sequence for a

READ command shown below.



Ex. 9 (JEDEC JESD82-32A Standard), at 14 (annotated); *see also*, *e.g.*, Ex. 8 (M386A8K40BM1

Datasheet) at 11-12 (functional block for a representative product).



Ex. 8 (M386A8K40BM1 Datasheet) at 11-12.

47.     The accused DDR4 LRDIMMs further each include data buffers on the module board and coupled between the edge connections and the memory devices, wherein a respective data buffer of the data buffers is coupled to at least one respective memory device in each of the multiple ranks and is configurable to receive the module control signals from the module control device, as illustrated below.



Ex. 6 at 2 (depiction of a Samsung DDR4 LRDIMM).



Ex. 8 (M386A8K40BM1 Datasheet) at 11-12 (annotated to illustrate data buffers coupled between the plurality of 72-bit wide ranks and the 72-bit wide data bus).

48.     In each accused DDR4 LRDIMM, a first data buffer on the data buffers is coupled to the first memory device and is configurable to, in response to one or more of the module control signals: delay the first read strobe by a first predetermined amount to generate a first delayed read strobe; sample the first section of the read data using the first delayed read strobe; and transmit the first section of the read data to a first section of the data bus; wherein the first predetermined amount is determined based at least on signals received by the first data buffer during one or more previous operations.  For example, the strobes MDQSO_t and MDQSO_c are delayed by a variable delay circuitry and produce DQS0_t, DQS1_t and DQS0_c, DQS1_c.  The predetermined amount of delay is determined based on training.



Ex. 7 (M386AAK40B40 Datasheet) at 11-12.

49.     On information and belief, Samsung also indirectly infringes the '506 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States.  For example, on information

and belief, Samsung has induced, and currently induces, the infringement of the '506 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR4 LRDIMM and other materially similar products that infringe the '506 Patent. On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR4 LRDIMM products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

50. On information and belief, Samsung also indirectly infringes the '506 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States. For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '506 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR4 LRDIMM and other materially similar products that infringe the '506 Patent. On information and belief, the accused DDR4 LRDIMM products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Samsung is aware that the product or process that includes the accused DDR4 LRDIMM and other materially similar products would be covered by one or more claims of the '506 Patents. On information and belief, the use of the product or process that includes the accused DDR4 LRDIMM and other materially similar products infringes at least one claim of the '506 Patent.

51. Samsung's infringement of the '506 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '506 Patent since at least August 2, 2021. Samsung's infringement of the '506 Patent has been continuing and willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement,

and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## V. SECOND CLAIM FOR RELIEF – '339 PATENT

52.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

53.     On information and belief, Defendants directly infringed and are currently infringing at least one claim of the '339 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts.  For example and as shown below, the accused DDR4 LRDIMMs and other products with materially the same structures in relevant parts infringe at least claim 1 of the '339 Patent.

54.     For example, to the extent the preamble is limiting, each of the accused DDR4 LRDIMMs comprise a N-bit-wide memory module (*e.g.*, 72-bit-wide) mountable in a memory socket of a computer system and configurable to communicate with a memory controller of the computer system via address and control signal lines and N-bit wide data signal lines, the N-bit wide data signal lines including a plurality of sets of data signal lines, each set of data signal lines is a byte wide.  For instance, each LRDIMM includes "a register for enhancing clock, command and control signals" as well as data buffers for "[e]nhanced data signal."  Ex. 6 at 2.  It communicates with a server's memory controller via control and address signal lines in a memory bus as well as a data bus.



**LRDIMM**

**Load Reduced DIMM**

- Include a register for enhancing clock,
  command and control signals
- Enhanced data signal by placing data buffer
- Best solution for achieving high density with high speed
- Supports x4 Organization / up to 4 ranks per DIMM and 3DPC
- Application : Server

*Id.* at 2 (depiction of a Samsung DDR4 LRDIMM).

55.    In the configuration above, there are 9 sets of byte-wide data signal lines for a 72-bit wide data signal lines.  For example:



Ex. 8 (M386A8K40BM1 Datasheet) at 11-12.



**9.1 128GB, 16Gx72 Module**
**(Populated as 2 physical ranks / 4 logical ranks of x4 DDR4 SDRAM**

Ex. 7 (M386AAK40B40 Datasheet) at 10; *see also id.* at 42.

56. The accused DDR4 LRDIMMs each comprise a printed circuit board (PCB) having an edge connector comprising a plurality of electrical contacts which are positioned on an edge of

the PCB and configured to be releasably coupled to corresponding contacts of the memory socket. For example:



# LRDIMM

**Load Reduced DIMM**

- Include a register for enhancing clock,
  command and control signals
- Enhanced data signal by placing data buffer
- Best solution for achieving high density with high speed
- Supports x4 Organization / up to 4 ranks per DIMM and 3DPC
- Application : Server

Edge connector

Ex. 6 at 2 (depiction of a Samsung DDR4 LRDIMM).

57.     The accused DDR4 LRDIMMs each include double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and arranged in multiple N-bit-wide ranks.  As shown above, each DDR4 LRDIMM module includes 9 ranks of memory devices.

58.     The accused DDR4 LRDIMMs further comprise a module controller (such as a register clock driver, RCD) coupled to the PCB and operatively coupled to the DDR DRAM devices.  For example:



Ex. 7 (M386AAK40B40 Datasheet) at 10; *see also id.* at 42.

59.     The module controller is configurable to receive from the memory controller via the address and control signal lines (e.g., red lines above) input address and control signals for a

memory write operation to write N-bit-wide write data from the memory controller into a first N-bit-wide rank of the multiple N-bit-wide ranks, and to output registered address and control signals in response to receiving the input address and control signals, wherein the registered address and control signals cause the first N-bit-wide rank to perform the memory write operation (when BCOM [3:0] is 1000) by receiving the N-bit-wide write data, wherein the module controller is further configurable to output module control signals in response to at least some of the input address and control signals. For example, a Write burst operation results in a burst of data and data strobes received by the DDR4 LRDIMM via the DQS/DQ pins of the memory bus, and to write the data via data buffers into a memory device as determined by input address and control signal (e.g., CS signal).



### 4.25.5 Write Burst Operation

The following write timing diagram is to help understanding of each write parameter's meaning and just examples. The details of the definition of each parameter will be defined separately.

In these write timing diagram, CK and DQS are shown aligned and also DQS and DQ are shown center aligned for illustration purpose.

NOTE 1 BL = 8, WL = 9, AL = 0, CWL = 9, Preamble = 1tCK
NOTE 2 DIN n = data-in to column n.
NOTE 3 DES commands are shown for ease of illustration; other commands may be valid at these times.
NOTE 4 BL8 setting activated by either MR0[A1:A0 = 0:0] or MR0[A1:A0 = 0:1] and A12 = 1 during WRITE command at T0.
NOTE 5 CA Parity = Disable, CS to CA Latency = Disable, Write DBI = Disable.

**Figure 128 — WRITE Burst Operation WL = 9 (AL = 0, CWL = 9, BL8)**

*See, e.g.*, Ex. 10 (JESD79-4C DDR4 SDRAM Standard), at 122.

4.24.2   READ Burst Operation (cont'd)



NOTE 1  BL = 8, RL = 11 (CL = 11, AL = 0), Read Preamble = 1tCK, WL =9 (CWL = 9, AL = 0), Write Preamble = 1tCK
NOTE 2  DOUT n = data-out from column n, DIN b = data-in to column b.
NOTE 3  DES commands are shown for ease of illustration; other commands may be valid at these times.
NOTE 4  BL8 setting activated by either MR0[A1:A0 = 0:0] or MR0[A1:A0 = 0:1] and A12 = 1 during READ command at T0 and WRITE command at T8.
NOTE 5  CA Parity = Disable, CS to CA Latency = Disable, Read DBI = Disable, Write DBI = Disable, Write CRC = Disable.

**Figure 98 — READ (BL8) to WRITE (BL8) with 1tCK Preamble in Same or Different Bank Group**

*See, e.g.*, *id.* at 105 (annotated) (showing burst operations used by various ranks in the Accused

Instrumentality).



Ex. 8 (M386A8K40BM1 Datasheet) at 11-12.



### 9.1 128GB, 16Gx72 Module
### (Populated as 2 physical ranks / 4 logical ranks of x4 DDR4 SDRAM

Ex. 7 (M386AAK40B40 Datasheet) at 10; *see also id.* at 42.

60. Further, as illustrated above and below, the accused DDR4 LRDIMMs also each comprise a plurality of byte-wise buffers coupled to the PCB and configured to receive the module control signals, wherein each respective byte-wise buffer of the plurality of byte-wise buffers has a first side configured to be operatively coupled to a respective set of data signal lines, a second

side that is operatively coupled to at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks via respective module data lines, and a byte-wise data path between the first side and the second side, wherein the each respective byte-wise buffer is disposed on the PCB at a respective position corresponding to the respective set of the plurality of sets of data signal lines.



**Figure 3 — LRDIMM Topologies**

Ex. 11 (JEDEC 21C Standard), at 4.20.27-17.

61.     In each of the accused DDR4 LRDIMMs, the each respective byte-wise buffer further includes logic configurable to control the byte-wise data path in response to the module control signals and the byte-wise data path includes first tristate buffers, and the logic in response to the module control signals is configured to enable the first tristate buffers to drive the respective byte-wise section of the N-bit wide write data to the respective module data lines during the first time period.  For example:

4.61  Logic Diagram



**Figure 15 — Logic Diagram**

Ex. 9 (JESD82-32A Standard), at 95.

62.     The MDQ/MDQS driver can be disabled or enabled based on DRAM Interface MDQ Driver control word, such as DA[3:0] = 0xxx (enabled) and 1xxx (disabled).

63.     In each of the accused DDR4 LRDIMMs, the byte-wise data path is enabled for a first time period in accordance with a latency parameter to actively drive a respective byte-wise section of the N-bit wide write data associated with the memory operation from the first side to the second side during the first time period.  For example:





*Id.* at 13.

*Id.* at 165.

**Figure 56 — tPDM_WR Latency Measurement**

Table 146 — WRITE Output Timings

| Parameter | Symbol | DDR4-1600/ 1866/2133 Min | DDR4-1600/ 1866/2133 Max | DDR4-2400/ 2666 Min | DDR4-2400/ 2666 Max | DDR4-2933 Min | DDR4-2933 Max | DDR4-3200 Min | DDR4-3200 Max | Units | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Data Timing** | | | | | | | | | | | |
| tDVB | Data valid before MDQS | 0.38 | - | 0.36 | - | 0.36 | - | 0.36 | - | UI | |
| tDVA | Data valid after MDQS | 0.38 | - | 0.36 | - | 0.36 | - | 0.36 | - | UI | |
| **Data Strobe Timing** | | | | | | | | | | | |
| MDQS_t - MDQS_c differential output low time | tMQSL | 0.46 | - | 0.46 | - | 0.46 | - | 0.46 | - | tCK | 1, 3 |
| MDQS_t - MDQS_c differential output high time | tMQSH | 0.46 | - | 0.46 | - | 0.46 | - | 0.46 | - | tCK | 2, 3 |

Unit  UI = tCK(avg).min/2
NOTE 1: tMQSL describes the instantaneous differential output low pulse width on MDQS_t - MDQS_c, as measured from on failing edge to the next consecutive rising edge
NOTE 2: tMQSH describes the instantaneous differential output high pulse width on MDQS_t - MDQS_c, as measured from on rising edge to the next consecutive falling edge
NOTE 3: The specification values are affected by the amount of clock jitter applied (i.e. tJIT(per), tJIT(cc), etc.). However, these parameters should be met whether clock jitter is present or not.

*Id.* at 169.

64.     On information and belief, Samsung also indirectly infringes the '339 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '339 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR4 LRDIMM products and other materially similar products that infringe the '339 Patent.   On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR4 LRDIMM products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

65.     On information and belief, Samsung also indirectly infringes the '339 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States.  For example, on

information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '339 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR4 LRDIMM products and other materially similar products that infringe the '339 Patent. On information and belief, the accused DDR4 LRDIMM and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Samsung is aware that the product or process that includes the accused DDR4 LRDIMM products and other materially similar products would be covered by one or more claims of the '339 Patent. On information and belief, the use of the product or process that includes the accused DDR4 LRDIMM products infringes at least one claim of the '339 Patent.

66.     Samsung's infringement of the '339 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '339 Patent since at least August 2, 2021. Samsung's infringement of the '339 Patent has been continuing and willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## VI.    THIRD CLAIM FOR RELIEF – '918 PATENT

67.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

68.     On information and belief, Defendants directly infringed and are currently infringing at least one claim of the '918 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused DDR5 LRDIMMs, DDR5 RDIMMs, DDR5 SODIMMs, DDR5 UDIMMs, and other products with materially the same structures in relevant parts. For example, and as

shown below, the accused DDR5 memory modules and other products with materially the same structures in relevant parts infringe at least one claim of the '918 patent.

69.     For example, the accused DDR5 products comprise a memory module comprising: a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system, as illustrated below.



Ex. 5 at 1 (depiction of a Samsung DDR5 LRDIMM).



*Id.* at 3 (depiction of a Samsung DDR5 RDIMM).

70.     The accused DDR5 products further comprise a first buck converter configured to provide a first regulated voltage having a first voltage amplitude; a second buck converter configured to provide a second regulated voltage having a second voltage amplitude; a third buck converter configured to provide a third regulated voltage having a third voltage amplitude; and a converter circuit configured to provide a fourth regulated voltage having a fourth voltage amplitude.  For example, Samsung notes on its web site that its DDR5 modules include an "on-DIMM PMIC" that "further boosts power management efficiency and power supply stability." Ex. 12 at 5; *see also* Ex. 13 at 2 ("One major design improvement to the newest generation DRAM solution involves integrating the PMIC into the memory module — previous generations placed the PMIC on the motherboard — offering increased compatibility and signal integrity, and providing a more reliable and sustained performance.").

71.     Samsung's PMIC for DDR5 includes a high-efficiency hybrid gate driver and an asynchronous-based dual-phase buck control scheme.  *Id.*  The dual-phase buck control scheme "allows the DC voltage to step down from high to low with a fast transient response to changes in the output load current and adapts the conversion accordingly to efficiently regulate its output voltage at near-constant levels."  *Id.*

72.     The PMIC provides the required regulated voltages, in accordance with the latest DDR5 standards.



Ex. 5 at 1 (depiction of a Samsung DDR5 LRDIMM).



**Figure 9 — Dual Phase Regulator Example Schematic**

Ex. 14 (JEDEC Power Management Specification for DDR5) (annotated), at 19; *see also id.* at 20.

73.     The accused DDR5 products further comprise a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, the plurality of components comprising: a plurality of synchronous dynamic random access memory (SDRAM) devices coupled to the first regulated voltage, and at least one circuit (*e.g.*, RCD) coupled between a first portion of the plurality of edge connections and the plurality of SDRAM devices, as illustrated below.



Ex. 5 at 3 (depiction of a Samsung DDR5 RDIMM).



Ex. 5 at 1 (depiction of a Samsung DDR5 LRDIMM).

### 2.4 DDR5 SDRAM X4/8 Ballout using MO-210

Table 1 provides the ballout for DDR5 SDRAM X4/8 using MO-210.

**Table 1 — DDR5 SDRAM X4/8 Ballout Using MO-210**

| AN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | |
|----|---|---|---|---|---|---|---|---|---|----|----|---|
| AL | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | |
| A | DNU | LBDQ | VSS | VPP | | | | ZQ | VSS | LBDQS | DNU | A |
| B | | VDD | VDDQ | DQ2 | | | | DQ3 | VDDQ | VDD | | B |
| C | | VSS | DQ0 | DQS_t | | | | DM_n, TDQS_t | DQ1 | VSS | | C |
| D | | VDDQ | VSS | DQS_c | | | | TDQS_c | VSS | VDDQ | | D |
| E | | VDD | DQ4 | DQ6 | | | | DQ7 | DQ5 | VDD | | E |
| F | | VSS | VDDQ | VSS | | | | VSS | VDDQ | VSS | | F |
| G | | CA_ODT | MIR | VDD | | | | CK_t | VDDQ | TEN | | G |
| H | | ALERT_n | VSS | CS_n | | | | CK_c | VSS | VDD | | H |
| J | | VDDQ | CA4 | CA0 | | | | CA1 | CA5 | VDDQ | | J |
| K | | VDD | CA6 | CA2 | | | | CA3 | CA7 | VDD | | K |
| L | | VDDQ | VSS | CA8 | | | | CA9 | VSS | VDDQ | | L |
| M | | CAI | CA10 | CA12 | | | | CA13 | CA11 | RESET_n | | M |
| N | DNU | VDD | VSS | VDD | | | | VPP | VSS | VDD | DNU | N |

Ex. 15 (JEDEC 79-5 DDR5 SDRAM Standard), at 3.

**Table 3 — Pinout Description (Continued)**

| Symbol | Type | Function |
|--------|------|----------|
| LBDQ | Output | Loopback Data Output: The output of this device on the Loopback Output Select defined in MR53:OP[4:0]. When Loopback is enabled, it is in driver mode using the default RON described in the Loopback Function section. When Loopback is disabled, the pin is either terminated or HiZ based on MR36:OP[2:0]. |
| LBDQS | Output | Loopback Data Strobe: This is a single ended strobe with the Rising edge-aligned with Loopback data edge, falling edge aligned with data center. When Loopback is enabled, it is in driver mode using the default RON described in the Loopback Function section. When Loopback is disabled, the pin is either terminated or HiZ based on MR36:OP[2:0]. |
| RFU | Input/Output | Reserved for future use |
| NC | | No Connect: No internal electrical connection is present. |
| VDDQ | Supply | DQ Power Supply: 1.1 V |
| VDD | Supply | Power Supply: 1.1 V |
| VSS | Supply | Ground |
| VPP | Supply | DRAM Activating Power Supply: 1.8V |
| ZQ | Reference | Reference Pin for ZQ calibration. This ball is tied to an external 240 ohm resistor(RZQ), which is tied to $V_{SS}$. |

*Id.* at 5.

## 10.1 Operating Electrical Characteristics

The DDR5RCD01 parametric values are specified for the device default control word settings, unless otherwise stated.

**Table 189 — Operating Electrical Characteristics**

| Symbol | Parameter | Condition | Min | Nom | Max | Unit |
|--------|-----------|-----------|-----|-----|-----|------|
| $V_{DD}$ | DC Supply voltage[1] | 1.1 V Operation | 1.067 (-3%) | 1.1 | 1.166 (+6%) | V |
| $V_{DDIO}$ | DDR5RCD01 Sideband Interface I/O Supply Voltage | | 0.95 | 1.0 | 1.05 | V |
| | | | | | | |

Ex. 16 (JEDEC DDR5 RCD Standard, JESD 82-511), at 176.

74.     The at least one circuit (e.g., RCD) is operable to (i) receive a first plurality of address and control signals via the first portion of the plurality of edge connections, and (ii) output a second plurality of address and control signals to the plurality of SDRAM devices.  For example:

## 3.1 Description

The DDR5RCD01 is a registering clock driver used on DDR5 RDIMMs and LRDIMMs. Its primary function is to buffer the Command/Address (CA) bus, chip selects, and clock between the host controller and the DRAMs. It also creates a BCOM bus which controls the data buffers for LRDIMMs.

*Id.* at 5.

75. The at least one circuit is coupled to both the second regulated voltage and the fourth regulated voltage. For example, the RCD receives both 1.0V VDDIO and 1.1V VDD input, with the amplitude of VDDIO being less than the amplitude of VDD.



*Id.* at 3.



*Id.* at 176.

76. On information and belief, Samsung also indirectly infringes the '918 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States. For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '918 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the accused DDR5 products and other materially similar products that infringe the '918

Patent. On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused DDR5 memory modules and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement.

77. On information and belief, Samsung also indirectly infringes the '918 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States. For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers and end-users infringement of the '918 Patent through its affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the accused DDR5 memory modules and other materially similar products that infringe the '918 Patent. On information and belief, the accused DDR5 products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Samsung is aware that the product or process that includes the accused DDR5 products and other materially similar products may be covered by one or more claims of the '918 Patent. On information and belief, the use of the product or process that includes the accused DDR5 products and other materially similar products infringes at least one claim of the '918 Patent.

78. Samsung's infringement of the '918 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '918 Patent since at least August 2, 2021. Samsung's infringement of the '506 Patent has been continuing and willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## VII.  **DEMAND FOR JURY TRIAL**

79.     Pursuant to Federal Rule of Civil Procedure 38(b), Netlist hereby demands a trial by jury on all issues triable to a jury.

## VIII.  **PRAYER FOR RELIEF**

WHEREFORE, Netlist respectfully requests that this Court enter judgment in its favor ordering, finding, declaring, and/or awarding Netlist relief as follows:

A.      that Samsung infringes the Patents-in-Suit;

B.      all equitable relief the Court deems just and proper as a result of Samsung's infringement;

C.      an award of damages resulting from Samsung's acts of infringement in accordance with 35 U.S.C. § 284;

D.      that Samsung's infringement of the Patents-in-Suit is willful;

E.      enhanced damages pursuant to 35 U.S.C. § 284;

F.      that this is an exceptional case and awarding Netlist its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G.      an accounting for acts of infringement and supplemental damages, without limitation, prejudgment and post-judgment interest; and

H.      such other equitable relief which may be requested and to which Netlist is entitled.

Dated: December 20, 2021

Respectfully submitted,

/s/ Sam Baxter

_____

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
Co-Counsel:

**IRELL & MANELLA LLP**

Jason Sheasby (CA #205455)
Annita Zhong (CA #266924)
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

**Attorneys for Plaintiff Netlist, Inc.**

# Exhibit D

U.S.D.C CENTRAL DISTRICT OF CALIFORNIA

CASE NO. **8:20-cv-993-MCS (ADS)**

**Netlist Inc.**

VS **Samsung Electronics Co., Ltd.**

PLAINTIFF'S EXHIBIT _____**0047**_____

DATE _____IDEN.

DATE _____EVID.

BY _____
　　　　Deputy Clerk

FINAL 11/12/15

# JOINT DEVELOPMENT AND LICENSE AGREEMENT

This Joint Development and License Agreement (this "Agreement") is made and entered into as of November 12, 2015 ("Effective Date") by and between Netlist, Inc., having its principal place of business at 175 Technology, Suite 150, Irvine, CA 92618 (hereinafter referred to as "Netlist") and Samsung Electronics Co., Ltd., having its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon-Si, Gyeonggi-do, Korea (hereinafter referred to as "Samsung"). (Each of Netlist and Samsung is referred to as a "Party" and collectively the "Parties".)

WHEREAS, Samsung develops and manufactures, among other things, memory components and memory modules, and Netlist develops and manufactures memory components and memory modules;

WHEREAS, the Parties intend to work together to jointly develop an interface and associated technologies for certain memory modules and promote such interface to standards-setting organizations;

WHEREAS, the Parties are concurrently executing an agreement for convertible note financing; and

WHEREAS, in connection with their collaboration hereunder, the Parties wish to grant to each other a cross license under each Party's patents.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the Parties agree as follows:

## Section 1. DEFINITIONS

"Background IPR" of a Party means Technology and IPR which is owned or controlled by such Party prior to the Effective Date or created or developed outside the scope of the JDP and without use of or reference to the other Party's Confidential Information.

"Capture Period" means a period of five (5) years beginning on the Effective Date, subject to Sections 10.1.4 and 10.2.4.

"Change of Control" means (i) an acquisition of a Party or its Parent Company by another entity, including by way of merger or consolidation of such Party or its Parent Company with or into another entity, as a result of which transaction the shareholders that had Control of the Party or its Parent Company immediately prior to such transaction do not have Control, immediately after such transaction, of such Party, or its Parent Company, or the surviving entity; or (ii) the sale to another entity of all or substantially all of the assets of a Party or its Parent Company. Such other entity that acquires Control or assets pursuant to the foregoing is referred to herein as the "Acquirer". An internal reorganization as a result of which ultimate Control of the entity in question does not change is not a Change of Control.

sf-3584904

1

**Exhibit
PX 0047**

FINAL 11/12/15

**"Control"** means (a) possession, directly or indirectly, of the power to direct or cause direction of the management or policies of an entity, and (b) beneficial ownership of more than fifty percent (50%) of the voting securities or other ownership interest or other comparable equity interests of an entity.

**"Deliverables"** means any Technology specifically identified as a "deliverable" in, and required to be provided by one Party to the other Party pursuant to, the Statement of Work.

**"Developed Product"** means an NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications.

**"Foundry Product"** means, subject to Section 8.3, any product produced by a Party or its Subsidiary for a third party (a) based on designs, specifications, and working drawings owned by such third party and (b) that the manufacturing Party does not have a right to sell to others as its own product.

**"Intellectual Property Rights"** or **"IPR"** means all rights in all countries or jurisdictions of the world that arise under or are associated with: (i) patents (of all types including patents, utility models and design patents, including originals or divisions, continuations, continuations-in-part or reissues) ("Patents"); (ii) copyrights and similar rights in works of authorship, including in software; (iii) trade secret rights and similar rights in confidential business or technical information or materials; (iv) any similar or equivalent rights to any of the foregoing; and all (v) registrations, applications, originals divisions, continuations, continuations-in-part or reissues, as the case may be, of, or for, any of the foregoing.

**"JDP"** or **"Joint Development Project"** means the collaborative efforts by the Parties to develop the Product Specifications and the Developed Product under this Agreement pursuant to, and within the scope of, the Statement of Work, and to promote a standard interface for the Developed Product pursuant to the Development Milestones and otherwise as set forth in this Agreement.

**"Joint Collaboration IPR"** means (a) Non-Patent IPR in Technology jointly created by the Parties in the course and within the scope of the JDP ("**Joint Non-Patent IPR**" and "**Joint Technology**," respectively), and (b) Patents seeking protection for and/or issuing on inventions that are jointly invented by the Parties in the course and within the scope of the JDP ("**Joint Inventions**"). Whether Technology was "jointly" created or inventions were "jointly" made shall be determined by applicable joint authorship or joint inventorship standards under U.S. law. Joint Collaboration IPR does not include Background IPR.

**"Licensed Patents"** means Netlist's Licensed Patents and Samsung's Licensed Patents, as applicable.

**"Licensed Products"** means Netlist's Licensed Products and Samsung's Licensed Products, as applicable.

CONFIDENTIAL                                                   SEC000002

FINAL 11/12/15

**"Memory Solution Product"** means a memory controller or a combination of memory and a memory controller (e.g., memory module or MCP), together with any supporting circuitry. Example of the Memory Solution Product includes, without limitation, NVDIMM-P Product.

**"Netlist's Licensed Patents"** means any and all Patents owned or controlled by Netlist or any of its Subsidiaries and having an effective first filing date on or prior to the end of Capture Period.

**"Netlist's Licensed Products"** means all Memory Solution Products manufactured or have manufactured by or for Netlist or its Subsidiaries, but excluding any Foundry Products (other than as set forth in Section 8.3).

**"Non-Patent IPR"** means all Intellectual Property Rights other than Patents and trademarks and **"Non-Patent Background IPR"** means Non-Patent IPR that is Background IPR.

**"NVDIMM-P Product"** means non-volatile dual in-line memory module, which combines a smaller density of fast memory like DRAM with a higher density of slower memory like NAND or other device such as PRAM and controller IC for the foregoing memory within the same package or on the same board, together with any supporting circuitry. This module can be considered as large (non-volatile) memory or fast storage in system.

**"Parent Company"** means, with respect to a first entity, any other entity that directly or indirectly Controls the first entity, but only for so long as such Control exists.

**"Product Specifications"** means the target specifications for the Developed Product as set forth in Appendix A attached hereto, as may be amended by the Parties from time to time.

**"Restricted Information"** means Deliverables or other Technology of a Party, if any, that such Party considers highly confidential and that are identified as "restricted" in the Statement of Work or in writing at the time of delivery.

**"Samsung's Licensed Patents"** means any and all Patents owned or controlled by Samsung or any of its Subsidiaries and having an effective first filing date on or prior to the end of Capture Period.

**"Samsung's Licensed Products"** means all semiconductor products manufactured or have manufactured by or for Samsung or its Subsidiaries, but excluding Foundry Products (other than as set forth in Section 8.3).

**"Sole Collaboration IPR"** means (a) Non-Patent IPR in Sole Collaboration Technology, and (b) Patents seeking protection for and/or issuing on inventions included in Sole Collaboration Technology. Sole Collaboration IPR does not include any Background IPR.

**"Sole Collaboration Technology"** means Technology, other than Joint Technology, created by a Party in the course and within the scope of the JDP. Sole Collaboration Technology does not include any Background IPR.

sf-3584904

3

CONFIDENTIAL

SEC000003

FINAL 11/12/15

"**Subsidiary**" means, with respect to a first entity, any other entity that is directly or indirectly Controlled by the first entity, but only for so long as such Control exists.

"**Technology**" means inventions, creations, know-how, processes, designs, design information, databases, schematics, layouts, RTL files, libraries, interface information, specifications, algorithms, software and other copyrightable material (in object code and source code format), technical information, IP blocks, and other developments and technology.

"**Term**" means the period beginning the Effective Date and ending with the expiration of the last to expire of the Licensed Patents.

## Section 2.   COLLABORATIVE DEVELOPMENT WORK

2.1     JDP. The Parties shall perform the collaborative development work in accordance with the Product Specifications and the Development Milestones as set forth in Appendix A ("Development Milestones") and the Statement of Work set forth in Appendix B ("Statement of Work"). For the avoidance of doubt, the scope of JDP shall be limited to the items specified in the Statement of Work and be limited to demonstrations and high-level discussions, without disclosing detailed information, as provided in Section 2.1.1 unless the parties agree in advance to expand the scope as contemplated in Section 2.1.2. Notwithstanding anything to the contrary, Samsung shall be under no obligation to complete any phase of the JDP, and reserves the right to suspend the JDP at any time for any reason.

2.1.1     Initial Phase. The initial phase of the JDP as set forth in the Statement of Work shall be limited to (a) demonstrations of products and technology, and (b) high-level discussion of performance metrics, product roadmaps and industry trends, and evaluation/characterization data. Neither Party shall disclose any detailed specifications, schematics, algorithms, or source code during this initial phase. The Parties may only proceed to subsequent phases upon the approval of the management of both Parties.

2.1.2     Subsequent Phases. Upon the approval of the management of the Parties, subsequent phases of the JDP shall proceed in accordance with the Statement of Work.

2.1.3     In all Phases in JDP, Netlist shall identify whether each Deliverable is Non-Patent Background IPR or not before Netlist's delivery of such Deliverable to Samsung for Samsung's decision to receive such Deliverable. Samsung may not receive, at its sole discretion, any Deliverable which is identified as Netlist's Non-Patent Background IPR.

2.2     Deliverables. Each Party shall provide the Deliverables to the other Party as stated in the Statement of Work in accordance with the Development Milestones.

2.3     Acceptance. Samsung shall evaluate the Developed Product in accordance with the Product Specifications. Netlist shall provide Samsung with samples and relevant information and reports therefor. In the event that, as a result of such evaluation, the Developed Product does not

4

sf-3584904

CONFIDENTIAL                                          SEC000004

FINAL 11/12/15

satisfy the Product Specifications, both Parties shall use their best efforts to resolve the problem and conform the Developed Product to the Product Specifications. For the purpose of this Agreement, the JDP shall be deemed completed when the evaluation result is accepted by Samsung, provided that such acceptance shall not be unreasonably withheld.

## Section 3.  DEVELOPMENT COSTS

3.1  Fees and Costs. Samsung shall pay to Netlist eight million United States dollars (US $8,000,000) as non-refundable NRE fees within seven (7) business days from the date of Samsung's receipt of invoice issued by Netlist on or after the Effective Date. Except as provided herein, each Party shall bear its own costs and expenses with respect to any development work and provision of any Deliverables under this Agreement.

3.2  Taxes. All taxes imposed as a result of the existence or performance of this Agreement shall be borne and paid by the Party required to do so by applicable law. To the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea in remitting payment to Netlist under this Agreement, provided that Samsung shall pay such withholding taxes to the Korean tax authorities and promptly provide Netlist with a certificate of payment for such withholding tax, as required by applicable law or treaty, and reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes.

## Section 4.  IPR OWNERSHIP

4.1  Background and Sole IPR. Samsung and Netlist shall each retain sole ownership of their respective Background IPR, Sole Collaboration IPR, and any other Technology and IPR created or developed by or for each of them that is not Joint Collaboration IPR.

4.2  Solely- and Jointly-Owned Patents. Any inventions arising out of the JDP (and any Patents resulting therefrom) shall belong to the Party whose employees made the invention. Notwithstanding the foregoing, the Parties shall jointly own Joint Inventions and any Patents seeking protection for and/or issuing on Joint Inventions ("Joint Patent").

4.3  Administration of Joint Patents. Regardless of which Party files and prosecutes such application for a Joint Patent, any Joint Patent issued therefrom shall be jointly owned and each Party shall own a one-half undivided interest in each such Joint Patent without accounting to the other. The Parties shall share equally the costs of, and shall cooperate with one another in, filing and maintaining such Joint Patents and in any action to enforce such Joint Patents against third parties. Notwithstanding the foregoing, if a Party does not wish to share in the costs and duties associated with filing or maintaining any Joint Patent in any country (or countries), it shall, at no charge, transfer all of its interest in such Joint Patent in such country (or countries), subject to a retained perpetual, royalty-free, non-exclusive, worldwide license under such Joint Patent to make, have made, use, sell, offer to sell, and import any products and practice any process or method.

sf-3584904

5

CONFIDENTIAL

SEC000005

FINAL 11/12/15

4.4    Joint Non-Patent IPR.    Joint Non-Patent IPR shall be jointly owned and each Party shall own a one-half undivided interest in such Joint Non-Patent IPR without accounting to the other, and each Party shall have the right, under such Joint Non-Patent IPR, to freely use and exploit Joint Technology in its own products without consent by the other Party.

## Section 5.   TECHNOLOGY STANDARDIZATION AND PRODUCTIZATION

5.1    Standardization. The Parties will work together to standardize NVDIMM-P Product specifications with appropriate standards bodies according to the schedule for standardization as specified in Appendix C attached hereto. This effort will be limited to the form factor and interface protocol between the NVDIMM-P Product and the computing system and will not define the design of the NVDIMM-P Product, the on-DIMM controller, or the product driver. The Parties agree to abide by the terms of the intellectual property policy of the relevant standards body with respect to any Patents of the Parties that are essential to the portion of any such adopted standard that is directed to such form factor and/or interface protocol as proposed by the Parties.   Notwithstanding the foregoing, nothing herein requires a Party to agree to grant Patent licenses with respect to any portion of any implementation of any such adopted standard beyond such form factor and/or interface protocol as proposed by the Parties.

5.2    Right of First Refusal. Netlist will provide Samsung a right of first refusal to acquire Netlist's NVDIMM-P technology in a separate, subsequent transaction before Netlist offers such technology to any third party.

5.3    Productization. The Parties will work together to bring a Developed Product to market according to the schedule for standardization and productization as specified in Appendix C attached hereto. Details for further technical collaboration for such productization and any Non-Patent Background IPR licenses for commercialization will be negotiated in good faith at a later date.

5.4    Sole Collaboration IPR License. Each Party, as grantor, agrees to grant and shall hereby grant to the other Party, as grantee, a non-exclusive, perpetual, paid-up, irrevocable, non-transferable, worldwide license (without a right to sublicense) under the grantor Party's Non-Patent IPR included in its Sole Collaboration IPR to use, copy, and modify the grantor Party's Sole Collaboration IPR that is included in the Deliverables and Product Specifications in the grantee Party's manufacture of, and distribute the same as part of, Developed Products that are Licensed Products of the grantee Party.

## Section 6.   SUPPLY OF COMPONENTS

6.1    Supply by Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer.

6.2    Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of

6

sf-3584904

CONFIDENTIAL                         SEC000006

FINAL 11/12/15

similar products).

6.3     Nothing in this Agreement shall prevent either Party from making semiconductor components using its own Technology and from selling such components to any third party, as long as no Confidential Information of the other Party is used or referenced in such components or the development or manufacture thereof.

6.4     Nothing in this Agreement shall be deemed to require either Party to purchase any products from the other Party.

## Section 7.  RELEASE

7.1     Release of Samsung. Netlist, on behalf of itself and its respective Subsidiaries, successors and assigns hereby releases, acquits and forever discharges Samsung and its current Subsidiaries, and their directors, officers, employees, agents, successors, and assigns, each only in their capacity as such, from any and all actions, causes of action, suits, debts, liability, claims and demands for infringement of Netlist's Licensed Patents, whether known or unknown, matured or unmatured, by reason of any action, omission, or other conduct whatsoever by Samsung or its current Subsidiaries occurring prior to the Effective Date and relating to Samsung's Licensed Products only to the extent that such Samsung's Licensed Products would have been licensed under the licenses granted in Section 8 below if such licenses had been in existence prior to the Effective Date.

7.2     Release of Netlist. Samsung, on behalf of itself and its respective Subsidiaries, successors and assigns hereby releases, acquits and forever discharges Netlist and its current Subsidiaries, and their directors, officers, employees, agents, successors, assigns, each only in their capacity as such, from any and all actions, causes of action, suits, debts, liability, claims and demands for infringement of Samsung's Licensed Patents, whether known or unknown, matured or unmatured, by reason of any action, omission, or other conduct whatsoever by Netlist or its current Subsidiaries occurring prior to the Effective Date and relating to Netlist's Licensed Products only to the extent that such Netlist's Licensed Products would have been licensed under the licenses granted in Section 8 below if such licenses had been in existence prior to the Effective Date.

7.3     Unknown Claims. The Parties expressly understand and acknowledge the possibility that unknown claims may exist that arise from or relate to the claims being released in this Agreement, and that the Parties have bargained for a full accord, satisfaction and discharge of all such claims as expressly set forth in Sections 7.1 and 7.2, respectively. Consequently, each Party expressly waives all rights under section 1542 of the California Civil Code and all statutes or other law of similar effect in other jurisdictions throughout the world. Section 1542 reads as follows:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the**

7

CONFIDENTIAL                              SEC000007

debtor.

## Section 8. GRANT OF LICENSE

8.1     License to Netlist. Samsung, on its own behalf and on behalf of its Subsidiaries, hereby grants, and shall grant, to Netlist and its Subsidiaries a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Samsung's Licensed Patents to make and have made (subject to Section 8.4) Netlist's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of such products.

8.2     License to Samsung. Netlist, on its own behalf and on behalf of its Subsidiaries, hereby grants, and shall grant, to Samsung and its Subsidiaries a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Netlist's Licensed Patents to make and have made (subject to Section 8.4) Samsung's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of such products.

8.3     Foundry Products. For the avoidance of doubt, a Party's or its Subsidiary's Foundry Products are not Licensed Product, provided that, notwithstanding anything to the contrary, any portions, and only those portions, of such Foundry Products that embody a Party's or its Subsidiary's own (a) designs, (b) manufacturing processes, and (c) semiconductor packaging technologies shall be deemed to be released and licensed, respectively, under Sections 7 and 8.

8.4     Have Made Rights. The licenses in Section 8.1 and 8.2 to "have made" Licensed Products shall only apply when (a) all or substantially all the designs, specifications, and working drawings for such products were designed by or exclusively for a Party or its Subsidiary, and (b) such products are sold exclusively to Netlist or Samsung, respectively (or their respective Subsidiaries). For the avoidance of doubt, off-the-shelf products of a third party shall not receive the benefit of the "have made" rights in Section 8.1 and 8.2.

8.5     Subsidiaries. Each Party must ensure that its Subsidiaries are bound by, and comply with, all provisions of this Agreement applicable to them, which includes ensuring that the releases and licenses granted by a Party under this Agreement are effective under Licensed Patents held or licensable by such Party's Subsidiaries. A Party's license to and release of the other Party's Subsidiaries under Sections 7 and 8 are contingent on such Subsidiary's Licensed Patents being validly licensed and released to such first Party hereunder.

## Section 9. RESERVATION OF RIGHTS

Except for the release and licenses expressly granted hereunder, nothing contained in the Agreement confers, or will be construed as conferring, any other rights, whether by implication, estoppel or otherwise, under any IPR, including Non-Patent Background IPR, of a Party or its Subsidiaries.

## Section 10. CHANGE OF CONTROL

sf-3584904

8

CONFIDENTIAL                                        SEC000008

FINAL 11/12/15

10.1 <u>Change of Control of Netlist</u>. In the event Netlist experiences a Change of Control:

    10.1.1 Netlist shall promptly give notice of such Change of Control to Samsung including an identification of the Acquirer;

    10.1.2 the licenses granted pursuant to this Agreement by Samsung to Netlist shall automatically terminate, effective as of the effective date of the Change of Control;

    10.1.3 the licenses granted pursuant to this Agreement by Netlist to Samsung shall survive, subject to Section 10.1.4 below; and

    10.1.4 the Capture Period shall automatically end effective as of the effective date of the Change of Control and after the effective date of the Change of Control of Netlist, Netlist's Licensed Patents that are subject to this Agreement shall include only those Netlist's Licensed Patents owned or controlled by Netlist or its Subsidiaries immediately prior to the effective date of the Change of Control, and any subsequently filed patents and patent applications claiming priority to any of those Netlist's Licensed Patents (but will in no event include any other Patents of the Acquirer or its other affiliates).

10.2 <u>Change of Control of Samsung</u>. In the event Samsung experiences a Change of Control:

    10.2.1 Samsung shall promptly give notice of such Change of Control to Netlist including an identification of the Acquirer;

    10.2.2 the licenses granted pursuant to this Agreement by Netlist to Samsung shall automatically terminate, effective as of the effective date of the Change of Control;

    10.2.3 the licenses granted pursuant to this Agreement by Samsung to Netlist shall survive, subject to Section 10.2.4 below; and

    10.2.4 the Capture Period shall automatically end effective as of the effective date of the Change of Control and after the effective date of the Change of Control of Samsung, Samsung's Licensed Patents that are subject to this Agreement shall include only those Samsung's Licensed Patents owned or controlled by Samsung or its Subsidiaries immediately prior to the effective date of the Change of Control, and any subsequently filed patents and patent applications claiming priority to any of those Samsung's Licensed Patents (but will in no event include any other Patents of the Acquirer or its other affiliates).

**Section 11.  CONFIDENTIALITY**

11.1    <u>Confidential Information</u>. Each Party acknowledges that all business, financial, contractual, and/or marketing information, including Deliverables and other Technology, received from the other Party may be considered confidential and proprietary. Such information may be furnished in any tangible or intangible form including, but not limited to, writings, drawings, computer tapes and other electronic media, email, samples, and verbal

sf-3584904

9

CONFIDENTIAL

SEC000009

FINAL 11/12/15

communications.   "Confidential Information" of Party means any such information, including
Deliverables and other Technology, disclosed by or on behalf of such Party ("Discloser"),
directly or through its Subsidiaries or representatives, to the other Party ("Recipient"), directly or
through its Subsidiaries or representatives, by any of the foregoing means, to the extent such
information (a) if disclosed in writing, is marked "confidential", "proprietary" or with another
similar marking at the time of disclosure, or (b) if provided orally or visually, it is identified as
confidential at the time of disclosure and confirmed in writing to Recipient within fifteen (15)
days of such disclosure, or (d) constitutes Restricted Information. Discloser's Confidential
Information also includes any copies, portions, and extracts of any of the foregoing that may be
made or obtained by Recipient.

11.2     Restrictions.    Recipient will not disclose Confidential Information of Discloser to
anyone without the prior written consent of Discloser, except to Recipient's employees with a
need to know to carry out this Agreement and who are bound by use and disclosure restrictions
consistent with those herein.    Recipient will protect Discloser's Confidential Information from
disclosure to others with at least the same degree of care as Recipient exercises to protect its own
information of similar type and importance, but in no event with less than reasonable care.
Recipient shall not use Discloser's Confidential Information for any purpose other than in
furtherance of the JDP as expressly permitted in this Agreement, and shall return such
Confidential Information to Discloser at any time upon request.

11.3     Term; Exceptions.    These obligations of confidentiality will continue for a period of
eight (8) years, with respect to Restricted Information, and five (5) years, with respect to other
Confidential Information, from the date of disclosures notwithstanding any expiration,
termination, or cancellation of this Agreement; provided, however, that the restrictions pursuant
to Section 11.2 will not apply, or will cease to apply, to any information to the extent such
information:

(a) was known to Recipient prior to its receipt hereunder as evidenced by Recipient's pre-
existing written records;
(b) is or becomes publicly available without breach of this Agreement;
(c) is received from another party without an obligation of confidentiality to Discloser and
without breach of this Agreement;
(d) is developed independently by employees of Recipient who have not had access to
Discloser's Confidential Information and without use of or reference to such information as
evidenced by Recipient.

In addition, Recipient's disclosure of Discloser's Confidential Information will not be a violation
of Section 11.2 to the extent such disclosure is compelled by court order provided that Discloser
is given a reasonable opportunity to object to or restrict such disclosure requirement to the extent
practicable, and then such disclosure will be permitted only subject to the terms and conditions
of such order.

11.4     Other Restrictions.    Neither Party will (a) attempt to decompile, disassemble, or reverse
engineer any Confidential Information of the other Party, or (b) attempt to decrypt or circumvent

sf-3584904

10

CONFIDENTIAL     SEC000010

FINAL 11/12/15

any controls, restrictions, or security measures applied to any Confidential Information of the other Party.

11.5     Restricted Information.   Restricted Information is subject to such additional terms and conditions as may be set forth in the Statement of Work.

## Section 12.   REPRESENTATIONS, WARRANTIES AND DISCLAIMERS

12.1     Corporate Authority. Each Party represents and warrants to each other Party and its Subsidiaries that: (a) it has all requisite corporate power and authority, on behalf of itself and its Subsidiaries, to execute and deliver this Agreement and to carry out the provisions of this Agreement, and (b) the execution, delivery, and performance of this Agreement by such Party and its Subsidiaries has been approved by all requisite action on the part of such Party and its Subsidiaries, and no other proceedings, approvals, consents, authorizations, or other acts on the part of such Party or its Subsidiaries are necessary to authorize this Agreement.

12.2     Authority to Grant Licenses and Releases. Each Party represents and warrants that it has the right to grant the licenses and releases under its Licensed Patents of the full scope set forth in this Agreement.

12.3     No Sale of Patent. Netlist warrants that it has not sold, assigned or transferred any patents to any third party within twelve (12) months prior to the Effective Date.

12.4     No Warranty. ALL INFORMATION, TECHNOLOGY, SUPPORT AND/OR ASSISTANCE PROVIDED UNDER THIS AGREEMENT ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND. NEITHER PARTY MAKES, AND EACH PARTY HEREBY EXPRESSLY DISCLAIMS, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, REGARDING INFORMATION, TECHNOLOGY, SUPPORT AND/OR ASSISTANCE, OR OTHERWISE WITH RESPECT TO THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF PERFORMANCE, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF ANY THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, OR ANY WARRANTY THAT MAY ARISE FROM COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

12.5     Consequential Damages. EXCEPT FOR CLAIMS RESULTING FROM EITHER PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS OR OTHER OBLIGATIONS UNDER SECTION 11, IN NO EVENT SHALL (A) EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHERE EXCLUDED DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, LOSS OF SAVINGS, LOSS OF USE OR PUNITIVE DAMAGES, AND (B) EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT (EXCLUDING PAYMENT OBLIGATIONS UNDER SECTION 3) EXCEED

sf-3584904

11

FINAL 11/12/15

THE AMOUNT OF NRE FEES RECEIVED BY NETLIST (IN THE CASE OF NETLIST'S LIABILITY) OR AN AMOUNT EQUAL TO THE AMOUNT OF NRE FEES PAYABLE TO NETLIST (IN THE CASE OF SAMSUNG'S LIABILITY) HEREUNDER.

## Section 13.   TERM AND TERMINATION

13.1    Term. This Agreement, including the license, shall become effective on the Effective Date and shall remain in effect until the expiration of the Term unless earlier terminated as provided herein.

13.2    Termination. Notwithstanding the Term of this Agreement as set forth in Section 13.1 herein above, the other Party shall have a right to terminate this Agreement upon written notice to a Party if:

> 1) such Party is in material breach of this Agreement and it is not cured within thirty (30) days period from the other Party's written demand, or as a consequence of the breach the purpose of this Agreement cannot be achieved; or
> 2) such Party becomes insolvent or files or has a petition filed against it under bankruptcy or insolvency law, makes an assignment for the benefit of creditors or takes any similar action under applicable bankruptcy or insolvency law.

13.3    Effect of Termination. Upon the earlier termination of this Agreement by reason of material breach or insolvency pursuant to Section 13.2 1) and 2) by a Party, all licenses and other rights granted to such defaulting Party pursuant to this Agreement will cease forthwith as of the effective date of such termination; provided, however, that the license granted to the non-defaulting Party will continue in full force and effect.   Upon any expiration or termination of this Agreement, each Party shall return all Confidential Information of the other Party in such first Party's possession or under such first Party's control and certify in writing its compliance with such obligation.

## Section 14.   GOVERNING LAW

This Agreement shall be construed under and governed by the state laws of the State of New York without reference to its conflicts of law principles.

## Section 15.   NOTICES

All notices required hereunder shall be in writing and sent by registered or certified mail or facsimile and shall be valid upon receipt thereof by the addressee. The addresses of the Parties hereto shall be as follows (or such other address as a Party may give notice of hereunder):

If to Netlist :

Name: Noel Whitley

12

sf-3584904

FINAL 11/12/15

Title: VP IP & Licensing
Address: 175 Technology, Irvine, CA 92618
Phone: 949-679-0115
Email: nwhitley@netlist.com

If to Samsung :

Name: Seung Min Sung
Title: Director
Address: San #16 Banwol-Dong, Hwasung City, Gyeongi-Do 445-701, Korea
Phone: +82-31-208-1732
Email: jeff.sung@samsung.com

## Section 16.  GENERAL PROVISIONS

16.1    Assignment. The rights and obligations of each Party under this Agreement shall not be assigned or transferred, in whole or in part, to any third party without prior written consent of the other Party and any attempt to do so without such consent shall be null and void, including in connection with a Change of Control.

16.2    No Waiver. The failure by either Party to enforce any of the terms and conditions of this Agreement shall not constitute a waiver of such Party's right thereafter to enforce that or any other terms and conditions of this Agreement.

16.3    Compliance with Laws. Either Party shall comply with all applicable laws, rules, and regulations of any governmental or quasi-governmental authority or any country having authority over such matters with respect to the development, and provision of, the Developed Product; and either Party shall require and verify that its employees, or any subcontractor (if permitted hereunder) has complied with all applicable laws, rules and regulations of any governmental authority or quasi-governmental authority or any country having authority over such matters with respect to the JDP, and shall be responsible and liable for any act, inaction, non-compliance, performance, non-performance, or breach of this Agreement, applicable laws, rules and regulations by either Party's employees or third parties engaged by such Party, as applicable.

16.4    Independent Contractors. Samsung and Netlist are independent contractors. Neither Party nor their employees, consultants, contractors or agents are agents, employees or joint ventures of the other Party, nor do they have the authority to bind the other Party by contract or otherwise to any obligation. Neither Party will represent to the contrary, either expressly, implicitly, by appearance or otherwise.

16.5    Survival. Sections 1, 4, 7, 8 (subject to Section 13.3), 9, 10, 11, 12, 13.3, 14, 15, and 16 will survive the termination or expiration of this Agreement to the extent applicable, subject to Section 13.3.

sf-3584904

13

CONFIDENTIAL

SEC000013

FINAL 11/12/15

16.6    Severability. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, such provision shall be severed from this Agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

16.7    Complete Agreement. Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement. Any amendment to this Agreement and any Appendices attached hereto requires the signatures of the authorized representatives of the Parties.

16.8    Press-Release. Upon execution of this Agreement Netlist may issue a press release announcing the transaction in the form as agreed by both Parties in writing prior to such press release. Except for such press release, neither Party shall, without the approval of the other, make any press release or other public announcement concerning this Agreement or the transactions contemplated by this Agreement; provided, however, that the foregoing shall not preclude communications or disclosures required under accounting, stock exchange or federal securities or labor relations laws.

16.9    Non-Solicitation. Subject to applicable laws, neither Party and its Subsidiaries shall, during the term of Parties' collaboration under this Agreement and for two years thereafter, directly or indirectly, whether through their employees, officers, representatives, agents, advisors or otherwise, solicit the employment of, or seek or enter into an independent contractor relationship with any employees of the other Party that are engaged in the JDP under this Agreement without the other Party's prior written consent. The term "solicit the employment" shall not be deemed to include generalized searches for employees through media advertisements of general circulation, job fairs or employment firms; provided, however, that the Party does not focus on or target or identify any of such Party's employees.

*[Signature Page to Follow]*

sf-3584904

CONFIDENTIAL                                    SEC000014

FINAL 11/12/15

IN WITNESS WHEREOF, the Parties hereto have caused this Joint Development and License Agreement to be executed by their duly authorized representatives.

**Samsung Electronics Co., Ltd.**

By: _____

Name: JUNG-BAE LEE

Title: SVP

Date: 11/13/2015

**Netlist, Inc.**

By: _____

Name: CHUN K. HONG

Title: CHAIRMAN, CEO

Date: 11/12/2015

15

CONFIDENTIAL

SEC000015

FINAL 11/12/15

**Appendix A**

## Product Specifications and Development Milestone

### 1. Product Specifications

(a)     NVDIMM-P Product Specification for Standardization.    A protocol spec which defines the interface protocol for NVDIMM-P working as large memory (Storage Class Memory) and fast storage, by handling a heterogeneous (various) memory media latencies. The interface protocol includes (not limited to) details about expanding address space, handshaking method and block IO transfer method based on standard DDR based protocol.   The Parties will work together to standardize NVDIMM-P Product specifications with appropriate standards bodies as set forth in Section 5.1 of the Agreement.   Details to be discussed.

### 2. Development Milestone

| | 2015 | | 2016 | | | |
|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| NVDIMM-P SPEC | | Joint Workshop by Dec 1 | Joint Development of Spec by Mar 31 | | | Joint Standardization by Dec 31 |
| NVDIMM-P Customer Sample | | | | | | Joint Development of the customer sample by Dec 31 |

\* Development Milestone may be modified by both Parties' mutual consent.

16

sf-3584904

CONFIDENTIAL                    SEC000016

CONFIDENTIAL

FINAL 11/12/15

**Appendix B**

## Statement of Work

| Milestones | R&R | |
| --- | --- | --- |
| | Netlist | Samsung |
| 1. Hold workshop to level-set on Netlist technology & view of the market- by December 1, 2015 (the parties acknowledge that the workshop discussions will be consistent with Section 2.1). | a. Explain product roadmaps for NV Vault and Hypervault products<br><br>b. Provide product definition & specification for: current NV Vault & HyperVault products and components thereof i.e. controller logic and data buffer, as well as for other data IO related products where potential partnership opportunities may exist (ex. data buffer for DDR4 and beyond) including the following information:<br> - Architecture (detailed block diagram),<br> - Data IO path definition i.e. speed / timing,<br> - Required command sets & addressing scheme<br> - Memory/Flash device management scheme<br> - Component requirement<br> - Required SW (BIOS, API, Library, Host side requirements, special algorithm for NVDIMM operation and data management)<br> - Power/thermal evaluation<br> - End to end Data protection<br> - Test chip/proto type demo<br><br>c. Tutorial on test & qual process for data buffer and NVDIMM products including:<br> -Evaluation/characterization details for critical passive devices i.e. super capacitors<br> -Evaluation/characterization for other passive/active devices | a. Share DRAM and NAND roadmap and discuss how to help Enable Netlist's NV Vault & Hypervault products<br><br>b. Explain Samsung's view of the key trends in DRAM and NAND industry and where the industry is likely to head including overview of relevant future products<br> - potential post DDR4 solutions<br> - expected impact of Apache Pass and PRAM in general<br><br><br><br><br><br><br><br><br><br><br>c. Share Samsung's current status and plan for NVDIMM-P development work.<br> - Technical details about preliminary specification<br> - Development plan |

sf-3584904

85

SEC000017

CONFIDENTIAL

FINAL 11/12/15

| | | |
|---|---|---|
| | - Test script and related documentation<br>- Application level test<br><br>d. Share use case analysis for current NV Vault and HyperVault products including, to the extent possible, impact on system resource utilization and modeled or measured advantage of Netlist product over alternative technological solutions for each use case ex. NVDIMM-P vs. DRAM + PCIe SSD<br>   - CPU, cache, memory, storage resource impact<br>   - Required SW stack change and its impact<br>   - results at application & behavior level i.e. Verilog with a description of the evaluation method | d. Share Samsung's view of  design constraints ex. maximum tolerable system resource usages, performance impact, and cost |
| 2.   Jointly develop specification for NVDIMM-P product- by March 31, 2016 | Joint development of specification.    Details to be discussed. | |
| 3.   Joint standardization of form factor, interface, and protocol in JEDEC JC 40,45- by end of 2016 | The Parties will work together to standardize NVDIMM-P Product specifications with appropriate standards bodies as set forth in Section 5.1 of the Agreement.    Samsung's current view is that the appropriate standardization body is JEDEC JC40,45.    Details to be discussed. | |
| 4. Joint development of the specified product-customer sample by December 1, 2016 | Joint development of the specified product-customer sample.    Details to be discussed then formalized in a follow-up SoW. | |

86

SEC000018

FINAL 11/12/15

**Appendix C**

## Schedule for Standardization and Productization

| | 2015 | | 2016 | | | |
|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| NVDIMM-P SPEC | | Joint Workshop by Dec 1 | Joint Development of Spec by Mar 31 | | | Joint Standardization by Dec 31 |
| NVDIMM-P Customer Sample | | | | | | Joint Development of the customer sample by Dec 31 |

\* Detailed schedule will be discussed further.

sf-3584904

CONFIDENTIAL

SEC000019