```
             UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
             (SOUTHERN DIVISION - SANTA ANA)




NETLIST, INC,                 ) CASE NO: 8:20-CV-00993-MCS-ADSx
                              )
            Plaintiff,        )           CIVIL
                              )
    vs.                       )      Santa Ana, California
                              )
SAMSUNG ELECTRONICS CO, LTD,  )   Wednesday, February 16, 2022
                              )     (10:21 a.m. to 10:59 a.m.)
            Defendant.        )    ( 1:40 p.m. to  2:42 p.m.)


            PLAINTIFF'S MOTION FOR FEES AND EXPENSES
     FOR DEFENDANT'S FAILURE TO ADMIT REQUESTS FOR ADMISSION
                        [DKT.NO.288]


          BEFORE THE HONORABLE AUTUMN D. SPAETH,
             UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:              SEE PAGE 2


Court Reporter:           Recorded; CourtSmart


Courtroom Deputy:         Kristee Hopkins


Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES:**


For Plaintiff:               RAYMOND A. LAMAGNA, ESQ.
                             TIMOTHY P. BEST, ESQ.
                             Gibson Dunn & Crutcher, LLP
                             333 S. Grand Ave.
                             Los Angeles, CA 90071


For Defendant:               EKWAN E. RHOW, ESQ.
                             JUMIN LEE, ESQ.
                             Bird Marella Boxer, et al.
                             1875 Century Park East
                             23rd Floor
                             Los Angeles, CA 90067

1    **Santa Ana, California; Wednesday, February 16, 2022; 10:21 a.m.**

2                    **(Telephonic/Video Conference)**

3                        **(Call to Order)**

4            **THE CLERK:**  We're on the record in this United States

5    District Court.  The Honorable Autumn D. Spaeth, United States

6    Magistrate Judge, presiding.  Calling Case SA CV-20-993

7    MCS(ADSx); Netlist, Inc., versus Samsung Electronics.

8            And, Counsel that are arguing, please state your

9    appearances, starting with Plaintiff.

10           **MR. BEST:**  Timothy Best of Gibson Dunn & Crutcher for

11   Netlist, and I'm joined by my colleague Ray LaMagna.

12           **THE COURT:**  Good morning.

13           **MR. BEST:**  Good morning, Your Honor.

14           **MR. RHOW:**  Good morning, Your Honor.  Ekwan Rhow and

15   Chris Lee representing Samsung.

16           **THE COURT:**  Good morning.

17           **MR. RHOW:**  Good morning.

18           **THE COURT:**  All right.  Counsel, we are here on

19   Netlist's Motion for Sanctions against Samsung.

20           Is everyone able to hear me okay, for those of you

21   who are arguing?  I guess I'll ask you, not the 150 other

22   people we've got on the line.

23           **MR. SPEAKER:**  We are, Your Honor.  Thank you.

24           **THE COURT:**  All right.  Okay.  Well, this is your

25   opportunity.  Let's start with the moving party.  And the floor

4

1    is yours.

2            **MR. BEST:**  Certainly.  Thank you, Your Honor.  Again,

3    Timothy Best for Netlist.  Netlist moved to -- for sanctions in

4    this matter because we had asked Samsung to admit certain facts

5    pertaining to basically three subject matters.  We simply went

6    to the core claims that we had in this case.

7            The first being the supply obligation that Samsung

8    had under the parties' agreement.

9            The second being its requirement to pay Netlist a sum

10   of money under that agreement without withholding it

11   unnecessarily.

12           And the third being our claim for termination of the

13   agreement and Netlist and Samsung's failure to respond to our

14   Notice of Breaches.

15           These are facts that, frankly, Samsung concedes, in

16   its papers, were straightforward.  They were facts that Samsung

17   knew were true.  They were facts that Samsung ultimately did

18   not dispute at summary judgment after we had incurred the cost

19   of proving them up.

20           These are the facts that the Court -- Judge Scarsi

21   relied upon in giving Netlist summary judgment on those three

22   claims, and giving judgment yesterday on those claims.

23           And, in consequence of Samsung's failure to admit on

24   those -- on those requests, we moved.  And this is because

25   compensation under the rule is mandatory in this situation.

1          When we asked whether Samsung had imposed supply caps

2    on what it would provide to Netlist, whether it had taken

3    Netlist to a zero-allocation of products, whether Samsung was

4    supplying other companies while choosing not to supply Netlist,

5    Samsung failed to (inaudible) those admissions.

6          And Netlist asked Samsung, did it withhold a sum of

7    money in contradiction of the agreement; whether it -- whether

8    the Court in Korea that not -- that -- whose decision basically

9    regulated whether that -- that withholding was ultimately found

10   appropriate; whether it found that, in fact, Netlist was

11   correct; and whether they received our Notice of Breach and

12   failed to respond to it.

13         They did not admit any of these facts.  And that's

14   the basis of our motion.  And in consequence of having to prove

15   up these facts, we spent a great deal of time on depositions,

16   document discovery, and so forth, and ultimately having to

17   prove them up in the summary judgment statement of facts

18   itself.

19         We prorated the cost of proving up -- first the costs

20   of those tasks versus other tasks that we did in the case, and

21   then even within those tasks, the amounts that were spent on

22   proving up those facts versus other issues.  And we provided

23   that information to the Court in our papers, both by

24   declaration and the numbers themselves.

25         And Samsung has not proved that any -- that it can

1   find refuge in any of the exceptions that apply under Rule 37.

2   And, in consequence, we ask for compensation for the cost of

3   proving up the facts.

4           **THE COURT:**  All right, thank you.  Now, is that the

5   extent of your oral argument or is that your opening statement?

6           **MR. BEST:**  That's my (inaudible) statement at this

7   point.  I'm prepared to entertain any questions that the Court

8   may have.  But at this point I'm happy to yield the floor

9   (inaudible) argument for which I have a larger audience than I

10  can ever recall.

11          **THE COURT:**  Yes.  I will admit that -- I guess I'm

12  apologizing for the technically that we're using for this

13  hearing.

14          We did not anticipate 150 people on attending the

15  hearing (inaudible) an open public forum and, you know, ensure

16  that (inaudible) distracted by the number of bings that we're

17  getting.  I assure you that, as far as I know, we have

18  absolutely no control and no absolutely to silence those tones.

19          And so I guess what I do (inaudible) at this point

20  you would refrain from hanging up until the hearing is over so

21  that we can reduce the number of calls.  And of course we can't

22  -- or the bings.  Unfortunately, we cannot control the number

23  of people that call in.

24          So let me then move to Counsel for Samsung.

25  Mr. Rhow, will you be arguing; is it Mr. Lee?

1          **MR. RHOW:**  Your Honor, it will be me, Mr. Rhow --

2     Ekwan Rhow.

3          **THE COURT:**  All right.  The floor is yours.

4          **MR. RHOW:**  Thank you, Your Honor.  I'll probably go a

5     little bit deeper into the motion and our opposition.  But, of

6     course, if you do have questions, Your Honor, I'm happy to

7     entertain them and focus my presentation.

8          But I want to really start with the actual responses;

9     not in general terms, but specific ones.  Because I think if

10    you dig into the actual responses, you will find that the

11    responses -- first of all, there were objections to many of the

12    responses.  And some of those objections were essentially

13    sustained.  And some of the objections have never been ruled

14    upon because Netlist has not moved on them.

15         But if you look at the substance of the responses, we

16    believe you'll find that they were accurate at the time and

17    they remain accurate today.

18         And there really is no -- there has been no finding

19    by either the jury -- which came back with zero damages -- or

20    by Judge Scarsi; that the responses themselves were inaccurate.

21         For sanctions to be awarded in this case, not only do

22    the responses have to be false or misleading -- which we

23    contend they were not -- but they also have to be material to

24    the disposition of the client -- of a client which, based on

25    how Judge Scarsi ruled on the MSJ, they were not material.

1    I'll explain that in a second.

2            And, third, the admission has to -- is not material

3    if the party requesting admission already had the information

4    they needed in connection with the request.

5            And I think on all three points the evidence is

6    pretty clear that sanctions really can't be awarded.

7            Let me start with the last point first, which is the

8    -- I think there's about 26 different RFAs.  But if you break

9    those down, Your Honor, they really fall into three categories.

10            The first category essentially is, did Samsung supply

11    Netlist or not, in essence.  And we call those the "Supply

12    RFAs" in our opposition.

13            The second set of RFAs relate to basically

14    characterizing what the Korean Tax Tribunal ruled on.

15            And the third set of RFAs basically requests

16    confirmation that Samsung received a termination notice.

17            On the first set of Supply RFAs, if you recall -- and

18    I think some of these RFAs, Your Honor, you actually ruled on.

19    And you request that we make certain amendments consistent with

20    the evidence, which we did, but basically admitted we do not

21    always supply whatever Netlist requested.  We admitted that.

22    And in fact that was cited to these RFA responses in the MSJ

23    that they want.

24            And so we're not -- we do not understand why our

25    response somehow is material to the client or was false and

1    misleading if they used it to positive effect for themselves.

2         In addition, what we don't understand is how they did

3    not already have this information.  They know exactly how much

4    they ordered.  They have their POs.  They know exactly how much

5    we gave them, which is reflected by deliveries back.

6    Obviously, they filed their complaint knowing exactly how much

7    they ordered and exactly how much they got back.

8         They know the monthly trends based on the POs and the

9    delivery.  And so all of the rest is actually argument in terms

10   of the why.  But in terms of the facts, which they asked us to

11   admit to, it is true, there were months where the deliveries

12   were X or Y or Z.  And they know that precisely because they

13   have all the information and documents in their possession that

14   support that.  And so I think that's an important point because

15   that actually applies to all three sets of RFAs.

16        On the tax tribunal RFAs, the problem with the RFAs

17   in the first place -- which we did respond to.  But the

18   problem, you'll see, is they often ask for what are essentially

19   legal conclusions and they ask us to characterize what the tax

20   tribunal found or did not find.  And, that, Samsung is not

21   willing to do.

22        We know what the tax tribunal ruled upon.  Everyone

23   knows it because we all had copies of it.  But we're not

24   willing to infer, from that ruling, what was going through

25   their head, what they deemed improper, what they deemed

10

1   illegal, what they deemed needed -- you know, why they

2   concluded a refund was necessary.  None of that Samsung can

3   provide information on since we did not -- we can't get into

4   the heads of the tax tribunal.

5          But more importantly, once again, if you analyze,

6   under the Mannay (phonetic) case, where sanctions cannot be

7   awarded if they already had this information, rather than to

8   ask us to characterize what the tax tribunal ruling actual

9   said, they had a copy of it.  They used it to positive effect

10  an MSJ.

11         And so rather than send RFAs, all they needed to do,

12  instead of spending the 600,000 they said they spent, they just

13  needed to read the tax tribunal and submit it to the Court,

14  which is exactly what they did.

15         On the third set of RFAs -- and it think this is a

16  minor set.  I'm not sure if this is really the bulk or

17  supported by any of their fees.  They are arguing that we

18  should have admitted that we got a certain notice.  It's a

19  written notice.

20         Which if you review the response, we admitted that.

21  We admitted that we got it; we admitted that we returned it.

22  And, again, they know that because they have their DHL

23  receipts.  They know exactly when they sent it.  They know who

24  they sent it to.

25         And so none of these responses led them astray.  None

1    of these responses changed the tenor or their argument.  None

2    of these responses required them to do anymore work because

3    they had, in their possession, the documents, the facts, the

4    purchase orders, the invoices.  And the tax tribunal ruling had

5    told them exactly what they needed to know to make the

6    arguments they needed to make.

7            Now, part of the reason, though -- I'm moving now to

8    another prong in the case by the -- that talks about sanctions.

9    And essentially they're not appropriate if they're not material

10   to the disposition of a claim.

11           And what's important here is to understand how Judge

12   Scarsi ruled on the MSJ.  Judge Scarsi was very clear --

13           **(Voices in background)**

14           **THE COURT:**  Let me interrupt.  We just heard somebody

15   speaking.  If you are on this call and you are not the attorney

16   -- the specific attorney who is currently arguing, I beg you to

17   please keep yourself on silence.  I believe my CRD said that

18   that is a star-six.

19           I'm hoping that everyone has the ability to mute

20   themselves on their own phone.  Because it's the only way we'll

21   be able to have a clean record of this hearing.

22           Thank you so much.

23           Mr. Rhow, please continue.

24           **MR. RHOW:**  Thank you, Your Honor.  The point I was

25   going to make is that, when we analyze whether these particular

12

 1  responses were material to the disposition of a claim, we do

 2  have to look at precisely what happened at the jury trial, but

 3  also in the MSJ.

 4          In the MSJ ruling, the Judge was very careful in

 5  saying -- and this led to the foundation of the order -- was

 6  that he was not considering any extrinsic evidence.  He was

 7  basing his entire ruling on his interpretation of -- his

 8  interpretation of the agreement.  That's how, actually, the

 9  argument led.

10          He said, "If I believe that the sections at issue are

11  clear and unambiguous, do I need to look at any extrinsic

12  evidence?"  And if you look at his order, that's how he ended

13  up ruling, is that it was not ambiguous and therefore he did

14  not consider any extrinsic evidence.

15          All of these RFAs are extrinsic evidence that, in

16  fact, were not material to the client because he didn't rely on

17  them based on how he came out with his interpretation of the

18  agreement.  And I think that's an important fact here.

19          And the other thing I would say is, on the supply

20  RFA, Netlist focuses a lot on the extent of the breach.  But

21  they are not moving for any work done after the MSJ.  The

22  problem with their argument in the MSJ, the Judge made no

23  finding or quantification of the breach.  He just found one

24  breach.

25          And he wasn't attempting to quantify in any way the

13

1    number of breaches, the extent of harm caused by the breaches,

2    the extent of the monetary impact of those breaches.  He

3    specifically was reserving for trial causation and damages.

4           And at trial the jury found no damages.  The

5    judgments being entered are for nominal damages only.  A breach

6    and nominal damages; not for any actual quantification of

7    damages.

8           And if that is the case, it was a jury trial, zero

9    damages, then the response is certainly not material to the

10   disposition of the claim if the response were seeking

11   quantification of those amounts.  They're not even false or

12   misleading actually because the jury found no damages at all.

13          And so I think you do have to marry all of this to

14   what the Judge actually found and what the jury actually found,

15   rather than focus on generalized statements that, if we had

16   this information, we wouldn't have spent this money and it

17   would have changed how we litigated the case.

18          It really didn't.  And it really was not material

19   based on how the Judge and the jury ultimately adjudicated the

20   claims.

21          I was going to focus a little bit -- if you see, in

22   the briefing, we focus a little bit on the procedural aspects.

23   Some of those have been cured by the fact that Judge Scarsi

24   sent this to Your Honor.

25          But I do want to comment on the timing.  Because

14

1   there is case law in our motion that talks about the timing.

2   Not that it is improper necessarily to bring a Rule 37 Motion

3   after trial, but the timing becomes an issue if the party

4   seeking the sanctions did not move in a timely fashion to

5   assess the objections and to the adjudicate the objections.

6          So I think, on half of the 26 RFAs, they were brought

7   to either your attention or Judge McCormick's attention and the

8   objections were either sustained or assessed in some way.  But

9   supplemental responses were provide subject to those

10  objections.

11         And as to the remaining 13, both objections remain

12  and have never been adjudicated and are still live objections;

13  objections that -- that are subject to the responses we gave.

14  And so I think the timing of all of this means that -- and that

15  case law says, "If you do not timely have objections overruled

16  and have those objections assessed, then it calls into

17  credibility the importance of the actual RFAs to the overall

18  litigation."

19         So I do want to point that out.  You'll see that case

20  law on there.

21         The final point and the final area I wanted to cover

22  is really the fees.  And this is the part -- I didn't start

23  with this, but I could have.  But the way Netlist has presented

24  its fees in this case is contrary to Ninth Circuit precedent

25  that explains the Lodestar method is absolutely the protocol to

1    follow and must be followed here.

2           And not only did we not get billing statements, we

3    don't really see how that Lodestar procedure was followed at

4    all.  We see declarations giving estimates of time.  We have no

5    way to assess, based on the billing statements, whether these

6    were block-billed entries.  We don't even have the statements

7    themselves, and really what methodology was used to analyze the

8    work and how it attaches to the RFAs.

9           And I think we have quite a bit of briefing in there

10   on this.  And I think if we just look at how it's presented --

11   I've never seen it presented in this fashion.  Perhaps others

12   have.  And that -- you know, I can't opine on that.

13          But, clearly, the Lodestar -- the typical Lodestar

14   method was not followed here.  And that, I think -- I think

15   that should doom the entire request.  The case law is clear

16   that, if any aspect of the fees are unreasonable, that Your

17   Honor has discretion to not deny all of them.

18          The other thing I would say, the other problem is --

19   and since they haven't allocated these specific RFAs, even

20   categories of RFAs, there's no way for any sort of analysis to

21   be done.

22          We have 26 RFAs.  I broke them into three categories

23   for your convenience.  But the reality is, you really do need

24   to do an RFA-by-RFA analysis and objection-by-objection

25   analysis.  And since they have made no attempt to assign fees

Case 8:20-cv-00993-MCS-ADS  Document 322  Filed 04/26/22  Page 16 of 63  Page ID #:14437

1  to particular RFAs, or even to categories, Your Honor,

2  respectfully, I believe, is left with guessing -- even assuming

3  you find a violation of Rule 37, guessing as to what is the

4  proper amount.

5       And that burden is on Netlist to have presented in

6  its motion.  And they chose this methodology.  You know, I

7  can't -- I can't opine as to why.  But by choosing this

8  methodology, I think they've created almost an impossibility in

9  creating a framework to award fees even if you assume Rule 37

10 has been violated.

11      And so that is the sum and substance, Your Honor, of

12 our presentation.  Obviously, if you do have questions on any

13 of these issues, I'm free to answer them.

14      **THE COURT:**  All right, thank you.  Now, let's go back

15 to Mr. Best.  Mr. Best, do you have an oral argument in

16 response to Mr. Rhow's oral argument?

17      **MR. BEST:**  Certainly, Your Honor.  Thank you.  This

18 is Tim Best again for Netlist.

19      So let's start at the end.  Mr. Rhow suggests that

20 the Lodestar method is -- I forget the word he used, but it's

21 something like mandatory.  The briefing itself says that it's,

22 at best, customary.  And in the end, it doesn't actually

23 matter.

24      Because what you have to provide to fulfill the

25 Lodestar method is evidence that the rates that are being

1  charged are reasonable in the district and the region and an

2  accounting of the amounts that were -- that were incurred in

3  order to prove up the facts.

4       And that's precisely what we did.  We provided

5  declarations on exactly that point.

6       Mr. Rhow cited no case, and we're aware of none, that

7  requires billing statements to be provided.  And, in fact,

8  there's a case that's not in our briefing.  But we know, to a

9  philosophical certainty, that Samsung knows about because they

10  sent it to us on Sunday; Henry against Gill Industries, 983

11  F.2d 943, in which the Ninth Circuit approves of a case in

12  which billing records were not provided.

13       **THE COURT:**  Would you provide me that citation again?

14       **MR. BEST:**  Sure.  It's 983 F.2d 943 (9th Cir. 1993).

15       **THE COURT:**  Okay.

16       **MR. BEST:**  And the pincite I'd go to -- it's at the

17  very beginning, so essentially page 1.

18       In terms of the timing issue -- so, you know,

19  Mr. Rose suggested that it's not ness -- I think he said, "not

20  necessarily improper to file a Motion for Sanctions after

21  trial."

22       I note that he cited no cases that suggested that --

23  that even suggest it would be improper.  And I'm happy to cite

24  cases that demonstrate that it's -- that it is proper.

25       The Marchand (phonetic case, which we cite within our

1   briefing early the Ninth Circuit held as much; the Hoffman

2   case, which we cited in our briefing; the Foster Poultry Farms

3   case, which we cited in our briefing.

4   And all of those -- those make sense in view of the

5   rule.  So the notes to Rule 37 itself state that -- that the --

6   a motion under Rule 37 (inaudible) is intended -- quote, is

7   intended to provide post-trial relief, close quote, of the type

8   that you're seeking.

9   So the notion that it's untimely makes no sense.

10  And, in fact, that makes a great deal of sense given the way

11  the rule was written, which is not only do we -- do we the

12  moving party have to demonstrate that we proved up the facts --

13  I mean, obviously, if we didn't prove them, it would be

14  inappropriate to seek a sanction for it.

15  But also that's -- that wholistic view of the case is

16  necessary in order to discern whether the non-moving party can

17  find refuge in the exception.  So it's clear that this is a

18  timely motion and brought correctly.

19  In terms of materiality, so -- or what Mr. Rhow

20  termed as materiality, he sort of took two different courses

21  with that.  And I'll start with his second course, which was to

22  say that, essentially, the responses that -- the requests that

23  we made had -- he didn't say it this way.  But I think the

24  point is -- quote, no substantial importance, close quote, to

25  the case.  And that would be one of the exceptions that Samsung

1    needs to prove applies in order to escape mandatory sanctions

2    here.

3         Now, he spent a lot of time talking about whether the

4    responses -- or the requests to the responses had anything to

5    do with monetary damages.  And, again, he seemed to suggest

6    that they do.  Of course they don't.  None of the requests

7    pertain to asking how much -- how much Netlist was hurt by and

8    give us some dollar statements.

9         What the requests pertain to -- the supply requests,

10   first, pertain to not nearly the fact of breach.  Did you

11   provide supply or not?  Did you take Netlist to zero or not?

12   But also, did -- were you supplying to --

13        **(Audio interference)**

14        **THE COURT:**  Excuse me.  All right.  Another unusual

15   sound appearing on (inaudible).

16        **MR. BEST:**  Yeah.

17        **THE COURT:**  I'm going to ask (inaudible) to make sure

18   are muted again.  And perhaps even (inaudible) and/or clients

19   who may be listening in.  (Inaudible) try to help us resolve

20   this distracting noise.

21        Let's give it just a brief (inaudible).

22        **MR. BEST:**  Presumably, whoever is calling (inaudible)

23   will give up.

24        **THE COURT:**  Again, I'll ask that perhaps if someone

25   would reach out (inaudible) might be on this call, and ask them

1    to check their phone.  They are the source of this (inaudible).

2            (Inaudible) just as an example of our brave new world

3    (inaudible).  Well --

4            **MR. BEST:**  It does have a certain (inaudible) quality

5    to it.

6            **THE COURT:**  How it would be possible for our phone --

7    do you all -- you who are available, would you mind reaching

8    out (inaudible) our IT folks to see if they are -- help us

9    resolve this ringing?

10            **MR. SPEAKER:**  It sounds like a call-waiting tone.

11            **MR. SPEAKER:**  Yeah.

12            **MR. SPEAKER:**  There you go.

13            **THE COURT:**  All right.  It appears that we have

14   resolve our ringing.  I appreciate whoever managed to fix that

15   problem.

16            Mr. Best, please continue.

17            **MR. BEST:**  Sure.  Thank you, Your Honor.  Before the

18   break, I was talking about this -- this notion of whether the

19   requests were substantially important to the case.

20            And as I was saying, certainly they -- the requests

21   did not ask for the number of monetary damages that needed to

22   be proved.  But they did go to the scope of the breach.  And

23   the scope of the breach was important because there was this

24   third claim in the case, which was to terminate whether -- if

25   Samsung had breached the agreement; whether Netlist's

1   subsequent termination of the agreement was proper.

2           And part of the analysis there, one of the elements

3   is, was the breach material to the agreement.  And it seems

4   clear to us that the -- whether Samsung was choosing to supply

5   other companies but not us, was taking us to zero and so forth

6   was -- was clearly aimed directly at what -- that we were

7   getting any benefit out of the -- out of the agreement.

8           And it was on those facts -- which, again, Samsung

9   ultimately did not dispute at summary judgment on which

10  judgment was granted, both summarily and also indeed even

11  yesterday.

12          The other form of materiality that -- or what

13  Mr. Rhow terms as materiality -- seem to go to an idea that --

14  no harm no foul.  This idea that, if a party that's requesting

15  admissions has reason to believe that those admissions are

16  true, that the -- that whether the receiving party responds to

17  them appropriately is irrelevant, frankly.

18          And that's just not correct.  It's not -- there's no

19  citation anywhere in the case law that goes to that point

20  (inaudible).  And indeed there would be none.  Because, as Rule

21  36 itself sets out in the advisory notes, it is certain that

22  part of the purpose of Rule 36 is to, quote, facilitate proof

23  with respect to issues that cannot be eliminated from the case,

24  close quote, to help determine what the facts are.

25          But the other part of -- the purpose of Rule 36 is,

1    quote, to narrow the issues by eliminating those that can't

2    (inaudible), close quote.  So, in other words, (inaudible).

3        **(Audio interference)**

4        **THE COURT:**  All right.  So I think at this point,

5    Mr. Best and Mr. Rhow -- you can tell me if you agree.  But

6    based on the number of distractions that are occurring due to

7    the format for this hearing; that it's telephonic and on our

8    system, which doesn't -- as far as I know and as far as my CRD

9    knows, does not permit us to mute -- forcibly mute others.  We

10   have no control over that.

11       And, of course the various bings -- that we are

12   getting from people joining or hanging up, we should probably

13   consider continuing this hearing.

14       So one question I have for you both is, do you agree

15   that the levels of the distraction is -- makes a continuous --

16   even if it's slight.  I mean, I would be open to, you know,

17   doing this in an hour on a different method of a hearing.  Or

18   we could set it for another day.

19       But let me know your thoughts.

20       **MR. BEST:**  Well, I'll start.  This is Mr. Best.  So

21   I'm happy to continue if it's best for the Court.  I'm also

22   happy to -- we would not object to particularly a short

23   continuance for an hour or whatever to -- perhaps another line

24   that doesn't get circulated beyond Counsel.

25       **MR. RHOW:**  Your Honor, this is Ekwan Rhow.  I think

 1   it makes sense to continue the hearing for a short period of

 2   time.  It could be either today -- and I'm looking at my

 3   calendar, if Your Honor's open tomorrow morning.

 4          But I agree a short continuance would be preferred.

 5          **THE COURT:**  All right.  What I'm thinking is that,

 6   given that the courtroom -- you know, for all intents and

 7   purposes, we are in a virtual courtroom, which is -- of course,

 8   is a public forum.

 9          What may make sense is for us to move this to Zoom.

10   That way we have the ability to control the distractions.

11   Let's see.  I'm also going to speak with my CRD.  Hold one

12   second, okay?

13          **MR. BEST:**  Sure.

14      **(The Court speaks briefly with Clerk)**

15          **THE COURT:**  All right, gentlemen.

16          Mr. Best and Mr. Rhow and as to Counsel who are doing

17   the oral argument, are you available if we were to continue

18   this to 1:00 o'clock -- I'm going to say my time, I'm not sure

19   exactly where you both are -- so that we can put this -- we can

20   use the -- my Zoom procedures that are available on my

21   procedures page?

22          **MR. BEST:**  One o'clock Pacific?  That would be fine

23   with me, Your Honor.  This is Tim Best.

24          **MR. RHOW:**  Your Honor, this Ekwan Rhow.  Would 1:30

25   be possible?  I don't know if your --

24

1       **THE COURT:**  I can do 1:30.

2       Does 1:30 work for you, Mr. Best?

3       **MR. BEST:**  It does.

4       **THE COURT:**  All right.  So let's do that so that we

5  can continue this hearing and reduce the distractions so that

6  the record is as clear as possible.

7       We are going to continue this hearing to 1:30.  And

8  we will utilize the Zoom procedures that are on my local

9  procedures page, which is publicly available.  And Mr. Best and

10 Mr. Rhow, my CRD, will email to you, specifically, the

11 instructions.

12      And unless I hear any other reason, let's continue

13 the hearing as of right now.  Does that work?

14      **MR. BEST:**  Certainly, Your Honor.

15      **MR. RHOW:**  It does, Your Honor.  Thank you.

16      **THE COURT:**  All right.  This concludes the hearing

17 for now.  We will continue at 1:30 Pacific time by Zoom.

18 (Inaudible).

19      Thank you.

20      **MR. BEST:**  Thank you, Your Honor.

21      **THE CLERK:**  Court is now adjourned.

22   **(Proceeding adjourned at 10:59 a.m. to reconvened at**

23 **1:40 p.m.)**

24 //

25 //

1        **THE CLERK:**  Recalling Case SACV-20-993 -- hold on

2   just one moment -- Netlist, Inc., versus Samsung Electronics.

3        And, Counsel, please state your appearances, starting

4   with Plaintiff.

5        **MR. BEST:**  This is Tim Best for Netlist.  And I have

6   with me my colleague Ray LaMagna.

7        **THE COURT:**  All right.  Good afternoon.

8        And, Mr. Best, just so you know, at least for me,

9   your audio is coming in kind of garbled.  Let's see how that

10  goes.  But I just wanted to let you know.

11       **MR. BEST:**  Okay.

12       **THE COURT:**  Okay.  Mr. Rhow?

13       **MR. RHOW:**  Good afternoon, Your Honor.  Ekwan Rhow

14  and Christopher Lee on behalf of Samsung.  And let me apologize

15  for the dress here.  I don't have coat and tie.

16       It was a phone conference.  I was debating, do I run

17  home?  And I figured I'd just risk it.  But I apologize in

18  advance.

19       **THE COURT:**  I appreciate that.  It occurred to me

20  after we got off that you all may be in that situation.

21  Thankfully, I have the handy-dandy robe that covers all.

22       So I appreciate your comments, and understand the

23  condition.  So I just appreciate your ability to be flexible.

24  And living with the -- or dealing with the -- you know, the

25  technology that we are limited to.  I suspect you all have --

26

1   in private practice, have better methods than we have when

2   we're dealing with the Federal bureaucracy.

3          Anyway, all right.  So we are here for the continued

4   hearing.  I understand that we have, for the record, 100 folks

5   who are listed as panelists on this hearing.  I believe we have

6   maxed out the size of the room.

7          I know to not -- and I guess I'll ask the two of you,

8   being that you are the interested parties here, if you have any

9   -- I'm sorry, 100 attendees; not panelists -- if you have any

10  concerns about the fact that we have maxed out the size of the

11  room.

12         So I don't know if you have constituencies that you

13  are concerned about having access to this hearing, since this

14  is a public hearing, that we might need to switch to a

15  different method where we have higher capacity.

16         **MR. BEST:**  No concerns here, Your Honor.

17         **MR. RHOW:**  And none on our side either, Your Honor.

18         **THE COURT:**  All right, thank you.  Okay.  All right.

19  Well, then let's continue.  We were with Mr. Best, I believe,

20  when we -- when we had the last final round of interruptions.

21         And so I will turn it back to you, Mr. Best.

22         **MR. BEST:**  Thank you, Your Honor.  And I'll try not

23  to repeat anything I've said before.  But bear with me, since I

24  don't have the transcript in front of me.

25         **THE COURT:**  Understandable.

1      **MR. BEST:**  I'd like to start with what I think

2  Mr. Rhow started with this morning, which was that he argues

3  that (inaudible) have been held objectionable.  And I think it

4  would terrible to Mr. Rhow if he said that they (inaudible)

5  essentially held objection.

6          And I think that he added that qualifier because he

7  knows just as well as I do that there was none on our end.  So

8  at any point in this case we're held objectionable (inaudible).

9  And I think it was (inaudible).

10         Now, Samsung's papers, as I (inaudible) do not argue

11 otherwise.  They focus not on our requests, but more on their

12 responses, which they say were (inaudible).

13         Now, frankly, that fails on its own logic since

14 (inaudible) requests had been held objectionable, they would

15 never have responded.  And so it wouldn't have been anything to

16 (inaudible) conclude.

17         It also fails legally, since the most we could ever

18 seek from Your Honor was an order that -- that Samsung answer

19 our -- our Request for Admission.  We certainly could not seek

20 the (inaudible) order saying that they have to admit that which

21 think is true.  That, of course, is not how Rule 36 works.

22         Insofar as the -- or any statements in the record of

23 -- of approval, it would -- it could not exceed the simple fact

24 that they had made any response; not that that response was

25 sufficient under Rule 36.  And it also fails factually since

1  they cite nothing in the record showing that it would

2  (inaudible), the requests withheld objectionable (inaudible)

3  information in the record.

4          So Mr. Rhow also suggested, I think, that a Motion to

5  Compel (inaudible).  It's not necessary that these important to

6  have been brought during discovery in order to justify the

7  Motion for Sanctions at this time.

8          And I think he, to be fair again, to had we conceded,

9  as he must.  But no such motion is required and Ninth Circuit

10 has been quite clear on that point on multiple occasions; in

11 the (inaudible) case, and the (inaudible) case, and the

12 (inaudible) case, and others.

13         But at most, what Mr. Rhow (inaudible) suggested that

14 the failure to bring a Motion to Compel could be considered as

15 a fact in the -- in the summation.

16         Now, whether or not that's the case -- I think they

17 cited a District Court case (inaudible) on that point.  The

18 fact is, this is simply not an instance where we sat on our

19 hands.

20         As the Court may recall, there were no (inaudible) at

21 which the requests we have made were discussed.  And so it's

22 not as if we simply ignored the problem and that we're -- you

23 know, we're addressing.

24         (Inaudible) Mr. Rhow was suggesting that -- this

25 morning, that because Netlist had information (inaudible)

1    substantiated the truth of the requests we were making.  But

2    there was no harm; no harm, no foul.

3             Sometimes, if there's no (inaudible) Rule 37, no such

4    (inaudible).  But the fact is that Rule 36 is there to permit

5    the parties to determine whether are a dispute and whether are

6    not.  And that's why (inaudible) that it's perfect is to,

7    quote, narrow the issues by eliminating those that can be,

8    close quote.

9             The purpose Rule 36 is to obviate spending the time

10   and the money investigating issues that most people (inaudible)

11   because they're a part of our case, but that there was no

12   dispute.  And, if anything, the fact that Netlist thought the

13   requests that it was seeking were true -- and certainly we did

14   think they were true.

15            The fact that we had information suggesting that and

16   that the Court (inaudible), we know that Samsung has

17   information (inaudible).  In no way did they have (inaudible),

18   but they had the discovery we had provided.  So they had the

19   documents.  (Inaudible) documents, Mr. Rhow was saying, "Well,

20   that's all that Plaintiffs needed.  They have those documents."

21            The very fact that they didn't admit what they should

22   have admitted makes the fact that they chose not more

23   egregious; not less so.

24            Now, I think Mr. Rhow referred to a -- I'm unsure how

25   it's pronounced, but I'm going to pronounce it (inaudible).

30

1    This was a case out the -- out of District of California in

2    which the requesting parties had deposed the other side two

3    years prior to seeking any requests for admission.

4          And in the interim, there had been no manifested

5    evidence disputing what had been said in that deposition.

6    There had been no manifested intent to pre-dispute the issue.

7    So the Court, in that instance -- and I believe the Court said

8    that it -- they limited its views to the circumstances of that

9    case -- suggested that it was important -- that it was

10   unnecessary to award intent.  Well, that's just not our case,

11   Your Honor.

12         Because in our instance, we were seeking the

13   admission contemporaneously with everything else that was going

14   on in the case.  Contemporaneously, (inaudible) of discovery,

15   contemporaneously with depositions.  That's just not been the

16   case that is at issue in (inaudible).

17         On many occasions this morning, Mr. Rhow suggested

18   that there were requests we had made that sought legal

19   conclusions.  (Inaudible) they were (inaudible) for some

20   reason.

21         (Inaudible), that is a discovery question.  That's a

22   question that should be (inaudible) upon -- on discovery that's

23   a potential objection that could be dealt with at that time.

24         The fact is that Rule 36 itself, on its expressed

25   wording, says that you can ask for admissions for, quote, facts

1   or (inaudible), close quote.  So the notion that they put it

2   somewhere in there been something relating to law is not a

3   legitimate basis not to admit.

4           Now, we understood -- and, well, I think we're at the

5   -- primarily, the third case of (inaudible) Request for

6   Admission.  And just to set the stage for that slightly, the

7   Court may recall when we had a contract with Samsung, under

8   that contract, Samsung was to pay us a certain sum of money.

9   They were permitted to withhold from that money actually only

10  if -- if and only Korean law required it.

11          And they did, in fact, withhold that money.  The

12  Korean law did not require it and not one of the breaches.  But

13  we wedged on the (inaudible) of the Court.

14          And one of those requests, for example, without

15  (inaudible) Samsung, quote, admit that, the Korean Tax Tribunal

16  determined that it would -- was not necessary, under Korean

17  law, to withhold that sum of money for taxes owed to Netlist

18  (inaudible).

19          Now, we were not asking Samsung to admit the Korean

20  law were -- does not -- or does require withholding.  We were

21  asking Samsung to admit, like the Korean Court had said, in

22  order to obviate (inaudible) to demonstrate that fact to the

23  Court.

24          Now, ultimately, Samsung didn't dispute (inaudible),

25  frankly, with all of these requests, during summary judgment

1   (inaudible) our motion.  But, in fact, that was simply not even

2   asking for a conclusion, nor were any of the other requests

3   that are at issue here.

4         Mr. Rhow, in multiple instances this morning,

5   referred briefly to what Judge Scarsi may or may not have said

6   concerning some of the issues that are at issue here.  So I'd

7   like to focus on exactly what it is that Judge Scarsi had said.

8         And so, for example, in the summary judgment order,

9   Docket 186, at 19, it's talking about the supply terms and the

10  obligation that Samsung has to supply our client with products

11  under the agreement.

12        He said, quote, under the unambiguous meaning of the

13  provision, the term is (inaudible) on the part of the

14  agreement.  (Inaudible) demonstrated by its negotiation and --

15  and this is important -- and post-execution conduct, close

16  quote.

17        It's exactly that post-execution conduct that we were

18  asking for (inaudible).  And we have a sense of what the truth

19  of those matters were.  Absolutely we did.  That's why we were

20  asking for those admissions, because they would establish these

21  points to allow us to demonstrate materiality.

22        And, in fact, that was what Judge Scarsi relied upon

23  in finding materiality.  There are some discussion of whether

24  Judge Scarsi -- whether the jury's decision not to award

25  damages has some impact on -- on this (inaudible) issues.

1          I just point the Court to Judge Scarsi's opinion of

2   yesterday, Topic 305, at page 8, where it -- where he said,

3   quote, materiality does not depend upon the amount of provable

4   money damages.  It depends upon whether the non-breaching party

5   lost the benefit of its bargain, close quote.

6          And it goes on, quote, Samsung's breach to

7   (inaudible) Netlist of the benefit is justifiably (inaudible),

8   close quote.  Those were the exact factual underpinnings of

9   materiality focused of -- on our claim.  And those were the --

10  the legal issues of our requests sought to demonstrate.

11         Now, Mr. Rhow talked briefly about how the timing of

12  this motion seemed (inaudible).  But I addressed this this

13  morning.  The only thing I would add to -- to the fact that the

14  Ninth Circuit make clearly the -- and, in fact, Rule 36 and

15  Rule 37 (inaudible) falling on 37, it's clear the post-trial is

16  appropriate.

17         I think it's worth pointing out that certainly

18  Samsung doesn't point to a single case in which it found

19  inappropriate to make a motion after trial.  So this is clearly

20  (inaudible).

21         And then, finally, Mr. Rhow focused on our attempts

22  to substantiate the costs that we are saying were -- were spent

23  on these matters.  Now, it's clear that we do not need to

24  submit billing records (inaudible) more on that point.

25         I think Mr. Rhow suggested that it has to be

34

1  established on an RFA-by-RFA basis.  There's no law saying

2  that.  That was Mr. Rhow saying that.  They've quoted him no

3  case that requires that.  There is no case that requires that.

4        Arguably, if that was required by -- by the Ninth

5  Circuit, no one would ever get (inaudible).  Because in a case

6  where there's such egregious inability or unwillingness, or

7  whatever, to admit, it's almost as if by failing to admit more,

8  they're getting themselves a get-out-of-jail-free card by

9  making the issues so complicated.  But it would un-windable.

10  And that can't be right.

11        We provided detailed declarations.  The Court can

12  look at them.  But maybe the most sort of common physical point

13  that we can refer to is the fact that our client -- who it must

14  be conceded as the smaller of the co -- the parties in this

15  case -- pay for the bills.

16        It saw the bills.  It saw our billing requests.  It

17  saw the task (inaudible).  So that, if nothing else, suggests

18  the reasonableness of -- of what we did.

19        I will yield the floor at this point to any questions

20  the Court may have.

21        **THE COURT:**  All right, thank you.  One question I

22  have for both of you.  What is the burden of the moving party

23  in this case, and what is the burden of the opposing party in

24  this case?

25        I noticed that neither of you particularly briefed

1   the specific burdens.  And I think it's an interesting question

2   here.  So I'd like to hear from both of you.

3           Why don't we start with you, Mr. Best, as the moving

4   party.

5           **MR. BEST:**  Absolutely.  So it is clear, Your Honor,

6   from -- from the case law, and frankly from the wording of the

7   Rule 36 and the sanctions rules under Rule 37.  But we must

8   demonstrate the -- the requests that we provided were on issues

9   that we ultimately proved.  I think there can be no question of

10  them.

11          And, in fact, we did provide a great deal of

12  (inaudible) on that, referring back to where -- where, in the

13  docket, is (inaudible) that information lies.

14          I think it's also clear that to justify the expenses

15  that we (inaudible), that we're seeking compensation for, we

16  have to set forth the very reasonable -- and that has at least

17  two components; the first component being that our rates are

18  reasonable and the fact (inaudible) the time that we actually

19  spent doing that.

20          And so we had to not be seeking compensation

21  (inaudible) that were unrelated or -- or what have you.  And,

22  of course, we were, if anything, conservative in every instance

23  that we could be.  For example, the -- the withholding issue,

24  there was one where we ultimately sought expert -- an expert

25  opinion to demonstrate that, in fact, the fact that (inaudible)

1    said.

2         We didn't seek fees for this because frankly they

3    were aimed not very large and in cop -- comparison to the

4    larger cost of hiring an expert.  But, certainly, we'd incur

5    the costs there.  And if we were being -- but we could have

6    done more, but (inaudible).

7         I think those are the issues that we need to

8    demonstrate.  And I think it lies upon the other side to

9    demonstrate (inaudible) seek refuge in any of the exceptions

10   that are (inaudible) under Rule 37.

11        So those are the numerated exceptions.  And so

12   natural information that -- that's (inaudible) within the

13   (inaudible) of the receiving party.  For what it's worth, we,

14   in our moving papers, made the point that none of those

15   applied.  But that seems to be something they (inaudible).

16        **THE COURT:**  But just so that I'm clear, based on your

17   answer, what I'm hearing is that for the burden, you're relying

18   on the language of Rule 36 and Rule 37?

19        **MR. BEST:**  As we understand it, it's been interpreted

20   by the Ninth Circuit.  That's correct.

21        **THE COURT:**  Okay.  As interpreted by the Ninth

22   Circuit, is there a specific case that you'd like to point the

23   Court to that you think clearly lays out the burden on it, for

24   Rule 37(c)(2) sanctions?

25        **MR. BEST:**  I think the closest probably -- the

1   closest (inaudible) case is the Marchand case.  It's a little

2   longer, but it's the one that keeps getting being quoted by

3   later circuit cases, (inaudible) later District Court cases.

4           **THE COURT:**  All right.  Okay, thank you.

5           **MR. BEST:**  Sure.

6           **THE COURT:**  Mr. Rhow, same question to you.

7           **MR. RHOW:**  Your Honor, I think, in some respect, on

8   this question, I think there's some agreement.

9           I think that the -- our understanding of the burden

10  is that Netlist would have the burden to show that the

11  responses were unreasonable or in bad faith.  That is in

12  Marchand.  That's also in Garrison.

13          They would have the burden to show that the responses

14  -- and subject matter responses were material to the

15  disposition of a claim.  And I think that's Washington

16  Department of Transportation and Reedwright (phonetic).

17          And then I think, on the point that we've been

18  making, that sanctions are only warranted when a different

19  admission would have given the requesting party information

20  they did not have -- that's from the main case.

21          **THE COURT:**  I'm sorry.  Would you say that last part

22  again?

23          **MR. RHOW:**  On the point as to whether a different

24  admission would have given the requesting party information

25  they did not already have, that burden comes from the main

38

1    case.  And we think, based on those various cases, that the

2    burden of proof would lie with Netlist as the moving party.

3         On the issue of the fees, I think that burden

4    entirely lies on Netlist as well.  And let me add to the

5    burden.  The burden isn't just to prove reasonable rates and

6    work, it's also to link that work to the RFAs at issue.  So if

7    an RFA response caused them problems, obviously, if work is

8    done before the RFA response is served, that can't be linked.

9    That's an obvious one.

10        But even if they provide evidence of work being done,

11   the fact that they write depo prep or document review doesn't

12   really give the Court sufficient evidence or basis to link that

13   work to a particular RFA.

14        Which I do think is important here.  Because, as I

15   mentioned, I think on half of the RFAs at issue, they were

16   never brought to the attention of a Court.  There's a standing

17   objection that has not been ruled on.

18        On the other 13 that were ruled upon, I want to be

19   really clear, Judge -- Your Honor, you actually ruled on a

20   bunch of them.  And at the end of the process we had, our

21   amended responses indicated, "subject to the objections," and

22   then we amended it.

23        And if you read those responses -- I mean, I submit

24   again, they're entirely truthful.  But I think the

25   understanding of how your Court assessed the objections was

39

1   that they indeed were objectionable.  But if we provided an

2   amended response, subject to the objection, Netlist was getting

3   the information they wanted.

4          But my point in going through the responses is that,

5   in terms of the burden of proof, they now have to link, in this

6   massive work that they apparently did -- link that work to a

7   specific deficiency in a specific RFA, and they can't tag it

8   generally.

9          And on that, by the way, the case that Mr. Best

10  mentioned this morning -- the Henry versus Gill Industries

11  case, that's 983 F.2d 943 -- it is true that bills are not

12  required.  But that doesn't relieve the moving party of

13  providing essentially what a bill would provide anyway, which

14  is date, a specific task, and a manner and a basis for Your

15  Honor to link that work and the timing of the work to a

16  specific RFA.

17         And I think that's clear from the Gill case.  It's

18  also clear from a case called Youngevity International versus

19  Smith.  I can give you the pincite.  I think it's the Southern

20  District of California District Court case; 2021 WL 2559456, at

21  page 3.

22         And so all that is to say that, I think, based on --

23  that case is based on other cases we cited, the burden of proof

24  on the fee issue, including linking the work to the deficient

25  response falls on Netlist.

40

1        **THE COURT:**  Mr. Rhow, did you provide, in the

2   opposition, a transcript of the hearing that we had that you're

3   referring to?

4        **MR. RHOW:**  We tried to get a -- get that transcript.

5   We were not able to get it.  And I think, for some of the

6   earlier hearings there was, a transcript now -- if that

7   transcript's available -- you know, we did try to order.  And

8   we couldn't locate it.

9        Let me give one data point though.  What we did

10  attach to the opposition is the history of the back-and-forth,

11  which we think corroborates what we recall as to the hearing.

12       There's an initial IDC letter that Netlist submit.

13  That's Exhibit 6 to our opposition.  The fact that Your Honor

14  ordered certain supplementation is then demonstrated by the

15  fact that we supplemented.  If you had ordered more extensive

16  supplementation, we would have supplemented even more on that.

17       And given the fact that Netlist never thereafter

18  contended we were in violation of Your Honor's ruling, that is

19  confirmation that -- that we did, indeed, comport with what

20  Your Honor had requested.  I mean, that the paper trail.

21       And this also, by the way, goes to the issue of the

22  timing.  Not that -- and I've never said, to be clear, that you

23  cannot file a motion post-trial.  That's not my point.

24       My point is exactly what's happening here, which is,

25  the fact that you wait after Your Honor has ordered certain

1    supplementation that we think is documented by what we in fact

2    provided as supplemented responses, and now argue that -- if

3    you look at the declaration, it's very clear the -- the

4    attorney for Netlist is saying, "We have no recollection."

5              Not indicating a contrary history or pattern of facts

6    that I think is documented by the IDC letter and our

7    supplemented response.  Which is very clear to say, subject to

8    objection, which means the objections were analyzed.

9              And I'm not -- I don't have how you phrased it during

10   the hearing in terms that they're granted.  But it was subject

11   to these objections we supplemented.  That was the agreement

12   reached before Your Honor.  Those responses, I submit if you

13   read them, are still accurate.  It said we did not supply,

14   which is -- that's the heart of the issue.

15             But the point being, the original request had

16   infirmity in terms of being overbroad, in terms of being

17   ambiguous.  And the supplemented response was meant to respond

18   only to that part of the original request that Your Honor had

19   deemed appropriate.  That's why it said, "subject to the

20   objection."

21             **THE COURT:**  So this really highlights for me --

22             Well, before we get there, let me hear, Mr. Rhow,

23   your opinion on who has the burden for the Rule 37 exception.

24             **MR. RHOW:**  So it's not clear to me.  You know, the

25   case law, I think, is the better guidance on that.  The case

42

1    law, you know, puts some of the burden on Netlist in terms of

2    those exceptions.

3         Because some of them go to the materiality of the

4    response.  It goes to the truth or falsity of the response.

5    And so some of the exceptions blend into that.  And I think the

6    case law, the way I read the case law, puts the burden overall

7    on Netlist.

8         And in terms of, you know, when the burden is

9    shifted, it's not clear, frankly, from the case law, but

10   because many of those exceptions fall within the areas that

11   Netlist has the burden, I think they still have the burden

12   overall.

13        **THE COURT:**  All right, thank you.  What I'm saying is

14   that this sort of highlights this issue of -- for example, the

15   objection really highlights the importance here of the legal

16   issue, which is who has got the burden.

17        Is the burden on the moving party to show that the

18   request was proper -- the RFA was proper and not objectionably

19   and, therefore, there was an improper response that then moved

20   us into the Rule 37 sanctions?

21        Or is the exception the burden -- the exception

22   being, for example here, that the request was objectionable

23   would rely -- would be the responding parties.

24        And this may be a very important issue to the

25   determination of this case -- or at least this motion.  Not the

43

1  case, but the motion, or at least for some of these requests.

2  And obviously it's something we'll be looking more closely at.

3          But as I sit here right now, it's an open question in

4  my mind.

5          **MR. BEST:**  And if I may respond to a couple points

6  that my colleague raised there.

7          So the notes to Rule 37 say, quote, the provision --

8  the provision being (inaudible) -- places the burden on the

9  disobedient party to avoid expenses by showing that his -- its

10 failure is justified or that special circumstances make an

11 award of expenses unjust.  Now, in allocating the burden in

12 this way conforms to the provisions according to Rule 37, and

13 close quote.

14         There is -- this, of course -- I'm not sure how --

15 how much of a distinction there really is to draw between the

16 idea that the -- the objectionable (inaudible) has to be

17 established by one quoting the other.  Because the fact is that

18 none were held objectionable.  That is the fact.

19         There is no place in the record that Mr. Rhow has

20 pointed to where that is not the case.  And I'm afraid that --

21 and we said that it's not the case.  So where would that lie

22 when, in fact, (inaudible) was not.

23         Now, on this RFA-by-RFA analysis that Mr. Rhow played

24 to, again -- once again, points to no cases.  But it

25 (inaudible).  We're aware of none.  If we were, we'd say so.

1          A lot of what Mr. Rhow said in response to Your

2    Honor's question suggested that -- that Your Honor had ruled on

3    the substantive propriety of the responses.  And I'm still not

4    (inaudible) because we never asked for them.  We didn't ask for

5    it because we can't ask for it.

6          It is not appropriate to ask the Court to say, "The

7    (inaudible) party receiving the request should admit X, Y, or

8    Z."  It is only that we can request that the receiving party

9    actually clarify a response or provide any sort of response

10   other than objections.  That's what we (inaudible) in some

11   cases, what we received.

12         When Mr. Rhow says that there were transcripts where

13   this, that, or the other thing happened, I'm not sure what he's

14   claiming.  I am aware of the July 27th transcript where it was

15   clear that there was several requests that were still open,

16   (inaudible) and the Court acknowledged that fact.  But that was

17   the end of it.

18         When Mr. Rhow suggested that the Marchand case puts a

19   bad faith requirement on the burden of proof, that -- let's

20   just say we don't read the case that way.  Those words don't

21   appear in the case.

22         We're unaware of any case that puts a bad faith -- an

23   extra bad faith requirement.  I mean, there may well be bad

24   faith (inaudible).  But that doesn't seem to be some sort of

25   extra spice that the -- the requested party has demonstrated.

1   It's certainly not, you know, Rule 37 or Rule 36.

2         **MR. RHOW:**  Your Honor, if I could briefly respond on

3   one or two points?

4         **THE COURT:**  Yes, please.

5         **MR. RHOW:**  A couple -- you know, in terms of Marchand

6   -- and, Your Honor can tell I was very focused on the burden of

7   proof.  Marchand is not clear on that burden of proof.  It

8   doesn't indicate that, as to the exception, that is the burden

9   of the party against who sanctions are sought.

10         Now, Benson (phonetic) is not -- you know, it is a

11   District Court case in Oregon.  But that is a case that

12   grapples with this issue of objection in the context of a Rule

13   37 motion.  And it grapples with what we're dealing with here.

14         When you deal with these issues late, that then

15   becomes probative on the overall issue.  And I think Benson

16   deserves a closer look here.  I know we cited it in our

17   opposition.  But I think that does deal with the situation.

18         And there, they said they put the burden on the

19   moving party because they had not -- they did not have a clear

20   record.  They had not gotten objections ruled upon.  And that's

21   very similar to what we have here.

22         If you go under Rule 37, Your Honor, it does -- I

23   think it's clear that it -- the moving party, Netlist, needs to

24   prove that that which it requested later proved false.  I

25   probably read it backwards.  But that they proved something

1    else later.

2           Imbedded in that discussion has to be a discussion

3    about whether the original request was objectionable --

4    objectionable or not.  How do you prove if a response was

5    accurate or inaccurate unless you analyze whether the original

6    request was ambiguous, whether it was clear, whether it was

7    direct, how the parties were both interpreting that request.

8           Because there is not an assessment of the objection.

9    And if you look at the remainder of Rule 37, then if Samsung is

10   interpreting it in a different way than Netlist contends, how

11   can its response have been false if that's how it was

12   interpreting it?

13          And so, unless you do some sort of analysis of

14   objections -- ambiguity, overbreadth, time frame, all these

15   sorts of things -- to get to what clearly Netlist has the

16   burden on, i.e., proving that it's false, you can't get there.

17          So that's what I meant earlier when I -- when I said

18   it's all embedded into one.  And Benson, I think, is a good

19   example of that, and it distinguishes Marchand and sort of the

20   fact the Marchand is not clear on this issue.

21          Because for you to even analyze that something is

22   false -- which clearly is Netlist's burden -- you got to look

23   at the request and see if it was objectionable or not.

24          **MR. BEST:**  Just one point, Your Honor.  A rule itself

25   (inaudible) objectionable -- held objectionable.  Whoever is

 1   proving it has to prove that it was held objectionable.  That

 2   is not what anyone has done here.

 3            And, clearly, in consequence, cannot be an exception

 4   that apply sort of regardless of what the -- the statements of

 5   the burden is.  That's got to be clear.  It's not clear to me

 6   that the word "burden" appears in Benson.

 7            But put that aside --

 8        **THE COURT:**  Can I ask this question.  Did either of

 9   you specifically research what it means to be held

10   objectionable?  In other words, when the timing is that it has

11   to have been held, did you do that specific research?

12        **MR. BEST:**  Yes.  That actually appears in -- if the

13   Court will bear with me.  If I can just take a second.

14            But it appears in one of the (inaudible) cited.

15   Either in (inaudible).

16        **THE COURT:**  That's okay.  While you're doing what --

17   that, let me -- let's have Mr. Rhow answer, if he can, that

18   specific issue.

19        **MR. RHOW:**  So I'll be honest, Your Honor, I turned to

20   Mr. Lee on that one.  And he did say -- and we'd have to find

21   the cite that held objectionable, at least in some cases --

22   and, again, I don't have case cites.  And I'm saying this based

23   on our recollection of the law, of the cases we saw.  There are

24   some that don't take it so literally.  That means there's like

25   an official ruling on that.

48

1            But I guess the problem here, though, is because some

2    of the -- that the later hearings are not transcribed, and I

3    have to piece it together, there's no question these objections

4    were put to Your Honor -- you know, these issues were put to

5    Your Honor.  And especially on the big chunk of them, the prior

6    RFAs, I think Your Honor ruled on 12 of them.

7            That's the heart of this motion.  I can't imagine

8    they spent a lot of work on the tax tribunal RFA.  Once they

9    saw our response, they had tax tribunal ruling.  That takes an

10   hour or less -- or really no time to understand a -- there's no

11   extra work to be done there.

12           On the third set of RFAs, which is the notice RFA,

13   what's the extra work?  I don't get it.  I don't see what extra

14   work you need to do after you get our response.  You have your

15   letter.  You submit that to the Court.  It's not rebutted.

16           The tax -- the prior RFAs, though, I don't understand

17   the work -- the extra work they did.  But that -- those are the

18   ones, Your Honor, that you actually ruled upon.  And the

19   history shows that they were held objectionable, which is

20   exactly why Your Honor allowed a supplemental response.

21           (Inaudible) to that, when we added in the fact that

22   we did not supply all the requests that they -- that Netlist

23   made, we were done.  And we did move forward.  I view that as

24   those requests were held objectionable, which is exactly why

25   our resp -- our supplemental response -- that's subject to the

1   objection, and then we supplemented.

2           And that was the subject of a lot of debate with Your

3   Honor.

4           **THE COURT:**  Okay.  Let me go to Mr. Best.

5           **MR. BEST:**  Sure.  Just a couple of points.  The first

6   is that Mr. Rhow keeps using the word "ruled on."  (Inaudible)

7   has never used yet is that Your Honor held objectionable

8   (inaudible) our requests.

9           Now, that's because, to our knowledge, (inaudible)

10  transcripts are available.  To our understanding, we have, I

11  think, all but maybe one of them.  And I put a -- presume we --

12  our adversaries put up (inaudible) as well.

13          The point I was making, Your Honor, (inaudible)

14  practice, which we decided to do, Your Honor.  (Inaudible) a

15  Motion to Compel has been made (inaudible) has been denied.

16          And then, on Benson, once again, I've confirmed my --

17  my suspicion, which was earlier that in no place does Benson

18  say this burden (inaudible), except something referring to

19  bifurcation, which is irrelevant to this case, but applies

20  under Rule 37.

21          **THE COURT:**  All right.  Let's move to a different

22  question that I have.  This question is for Netlist.

23          Specifically, I'm pointing you to the -- or thinking

24  of the supply RFAs.  And there's some aspect that the supply

25  RFAs that encompasses a time frame in 2020, right?  So we've

1    got different periods of time.  But some of these request --

2    these RFAs have a very broad period of time, including 2020.

3            And the motion basically has a paragraph where you

4    sort of cite all of the evidence that you say is evidence of

5    proof, that you prove these RFAs.

6            Can you point to me -- point me to where there is

7    proof, let's see, regarding that -- that Samsung maintains a

8    supply cap or a limit in 2020?

9            So we found evidence regarding other years that

10   you've cited to.  But what I'm specifically for would relate to

11   2020.

12           **MR. BEST:**  Understood, Your Honor.  I don't have it

13   at hand.  I will confess, if we can follow up with the letter,

14   that would be helpful (inaudible).

15           But they -- I'm sure whatever (inaudible) no

16   respondence with exchange between the parties that I -- I don't

17   know specifically the citation (inaudible).

18           **THE COURT:**  All right.  Mr. Rhow, I know that

19   question was for Netlist, but I'll give you the opportunity to

20   have your -- say your piece if you have a comment.

21           **MR. RHOW:**  Yeah.  I don't have a specific comment on

22   that.  That would be whatever is in the evidence.

23           The only -- I guess the only point I would make on

24   those particular RFAs is -- is going, again, back to the

25   original request and how they're drafted.  But the reason we

1   did the supplemental response was to cover all the time frames.

2          And I think that -- that's why that original

3   response, the way the hearing went, is the order was to have

4   that response be the same response to all the time frames

5   because, whether it was in 2020 or 2017, that -- they would

6   still be a breach.

7          **THE COURT:**  Thank you.  Now, what's Netlist's

8   response to Samsung's argument that Netlist was already in

9   possession of the facts, and that that obviate -- or removed

10  the ability to obtain a sanction for it?

11         **MR. BEST:**  Sure.  I mean, I guess that we might first

12  -- and I don't mean it to be flip.  So my first response is

13  (inaudible).

14         But putting that aside, you can understand why there

15  would not be.  And that's because the request of Rule 36 has

16  been (inaudible) is to narrow the issues by limiting those

17  issues that can be set aside as undisputed.

18         So in whether we had information (inaudible) request

19  for admission is sort of beside the point, except that it

20  suggests that it be -- we are asking for something we actually

21  do believe to be true as opposed to a fishing expedition.

22         The point is to get an admission from the other side

23  or not.  If we get an admission -- that's why Rule 36 comes

24  with -- an admission under Rule 36 comes with -- have the

25  effect of (inaudible) matter conclusively (inaudible) of the

1  elements in the case.

2       The point is to obviate those points for further

3  discovery.  So if it were the case that, because the requested

4  party has information suggesting (inaudible) admission, that

5  that somehow excuses the receiving party from -- from admitting

6  the truth that they know to be true.  But they also

7  (inaudible).

8       It suggests to me that Rule 36 sort of is irrelevant

9  because what will be determined.  And that's just not the way

10 it has been interpreted.  I see no case that does.  They cite

11 none that does.  Okay, so that seems to be the way it has to

12 be.

13       **THE COURT:**  All right, thank you.

14       Again, Mr. Rhow, I know that question was for

15 Netlist.  But do you have anything that you'd like to say?

16       **MR. RHOW:**  Yeah, very briefly.  We did cite the main

17 case.  Let me also point Your Honor in the direction of the

18 Holdenbrim (phonetic) case.  Because it relates not just to

19 Holdenbrim -- which is I think in our brief.  It relates not

20 just to one of the sort of elements to prove sanctions, it

21 relates to the sanction themselves.

22       Because if, in fact, a party has the information it

23 needs on a particular RFA, then how could additional work or

24 fees result?  I mean, it's sort of logically.

25       Using the most obvious example, the tax tribunal

53

1    decision, if your admitting us -- asking Samsung to admit that

2    the tax tribunal decision, you know, indicated X, Y, Z, and we

3    object because it calls for a legal conclusion -- and the way

4    you phrased it as ambiguous.  But we nevertheless kind of

5    endorsed that or provided supplemental or amended response on

6    that.

7            If you're not happy with the response, you have the

8    tax tribunal decision.  You just hand that over to the Court.

9    And so it really hits two issues -- is what is their initial

10   burden to prove falsity of the response.  And then, second, it

11   goes to was there any fees.

12           And under Holdenbrim, there wouldn't be any fees

13   because the work directly linked to the RFA, you already have

14   the information in your possession.  So there's no additional

15   work.

16           **MR. BEST:**  If I can make just two quick points, Your

17   Honor.

18           **THE COURT:**  Quickly.

19           **MR. BEST:**  There was a statement there that we have

20   to prove falsity.  There's no -- nothing in the rule that

21   (inaudible).  We have proof that we proved (inaudible).  But we

22   don't have to prove that what they said was false.

23           The second point, where it goes to this idea of, is

24   there extra work.  If we think we have evidence of the truth,

25   Your Honor, (inaudible) assertion (inaudible).  The very point

54

1    is that having evidence (inaudible).  It has to be established.

2    We have to prove up our claim, and proving up the claim could

3    be disputed.

4         And so (inaudible) whether the question already

5    passed evidence, unless it has been declared undisputed.

6    Nothing's been admitted.  We still have to go to the

7    (inaudible).  Having the evidence in our hands is not

8    sufficient.  And (inaudible) no litigator worth his salt

9    (inaudible) would permit the other side to just proclaim they

10   won on a point because they have a document (inaudible).

11        **THE COURT:**  All right, thank you.

12        Mr. Rhow, just in case, do you have anything further

13   on that point?

14        **MR. RHOW:**  I'm good, Your Honor.  Thank you.

15        **THE COURT:**  Okay.  Now, for Samsung, I understand one

16   of your arguments in your briefing regarding the May 27, 2020

17   letter and whether or not it was received and whether or not it

18   was responded to.

19        I saw the argument that Samsung, at one point, says

20   subsequent communications with Netlist were a response to that

21   letter.  And I know I'm overly simplifying what you said.  But

22   big picture.

23        And my question for is, am I accurately stating that

24   position?  And then if that's true, how could that be the case

25   when Samsung didn't admit that it received the letter?

1      **MR. RHOW:**  Okay.  So first of all, let me just break

2  that down.  I want to make sure I have the question right.

3          I'm on -- and I just -- I have a mass of paper here.

4  But I'm on, I think, RFA 50, 52, 53, and 55.  And I think that,

5  as to receipt, my understanding is we admitted we did receive

6  it.

7      **THE COURT:**  Okay.

8      **MR. RHOW:**  We indicated --

9      **THE COURT:**  Okay.

10     **MR. RHOW:**  So we admitted -- I'm reading the

11  response.  "Admit that a letter, dated May 27, 2020, was

12  received by Defendant's mailroom and returned to sender the

13  next day," which is actually what happened.

14     **THE COURT:**  Okay.

15     **MR. RHOW:**  Otherwise, denied.  So we literally gave

16  the facts as we understood those to be.

17          And then in terms of the sort of -- okay.  So then

18  the reason we are talking about the conduct is because -- the

19  response, again, we deny it.  Because it's truthful.  Netlist

20  served its complaint on May 28, 2020, which was literally a day

21  after the May 27th letter.

22          So once they had served the complaint, we're in --

23  you know, we're in litigation, right?  So we are, for now,

24  participating in the litigation by answer.

25          So it's really the timing of the letter that makes

1  this kind of issue to me like, you know, making a mountain out

2  of a molehill.  They served the May 27th letter.  We admit

3  truthfully the circumstances upon which we receive it.  They

4  literally serve a complaint the next day.  We're litigating at

5  that point.

6         So I think that's how we -- we -- that's why we deny

7  it.  To say we never responded to Netlist's letter -- first of

8  all, again, this is what the objection and their interpretation

9  of the RFAs comes into play.  Never responded could mean a

10 direct letter, could mean ignoring the complaint.

11        But, here, because the complaint was filed -- of

12 course, we filed an answer, and we're in litigation.  So that's

13 how we interpreted it.  And that's why we denied it.

14        **THE COURT:**  All right, thank you.

15        **MR. BEST:**  If I may, I have a couple of points that I

16 want to try to (inaudible).

17        **THE COURT:**  Go ahead.

18        **MR. BEST:**  Two things.  So the request that Mr. Rhow

19 was first discussing, where he says they admitted that they

20 received the letter -- I mean, I'm looking at it -- the

21 response to request for the 15th.

22        It asked whether on -- by June 14, 2020, Samsung had

23 received Netlist's letter.  And (inaudible) Netlist to serving

24 (inaudible) breached.  Okay, no part of the response that

25 Mr. Rhow read or that Samsung served on us (inaudible) at this

1   point.  And those were points that were (inaudible), which was

2   that we had the right to terminate due to their briefings.

3          Like most contracts, these contracts have a notice --

4   an opportunity to cure provision.  And we gave them the notice.

5   They had an opportunity to cure, and they didn't.  But this was

6   proving up those points.  And those were points we had to prove

7   up.

8          And the second point was, if you look at any of the

9   responses concerning -- concerning the letter -- I've heard a

10  lot of discussion about, we characterized the litigation in his

11  response (inaudible).

12         Whether that was in their heads or not, I don't know.

13  I do know it's not even responsive.  I also know that there was

14  (inaudible) reasonable (inaudible) that they might prevail on

15  an issue (inaudible) reasonable date.  And (inaudible) the

16  notion that we got into litigation is not -- there's no

17  objectively, reasonable view that that is a response to the

18  request (inaudible).

19         **MR. RHOW:**  Your Honor, I have one small point in

20  response.

21         **THE COURT:**  Okay.

22         **MR. RHOW:**  It's somewhat -- I just find this a little

23  bit remarkable.  I mean, the discussions that were being had --

24  it's not just the litigation.  I was talking directly with the

25  Gibson lawyers about this.

1          I mean, what happened was, once they served the

2   letter, once they served the complaint, there were ongoing

3   discussions on the business side, ongoing discussions on the

4   legal side about all of this.

5          And so what does response mean then?  This is being

6   discussed, you know, with the letter, the complaint, the

7   claims.  And so I really do think -- I'm not sure the technical

8   effect of a denial or admission, but I think in our opposition,

9   we made clear that there were ongoing discussions at all times.

10          And, again, I'm -- again, I just don't see what the

11   extra work is here or how they did not have these facts in

12   their head.  They were participating on their side, and

13   reaching out to Samsung at the highest level directly, from

14   Chuck Hong to folks at Samsung to discuss resolution, discuss

15   all these things in connection with the letter.

16          So I throw that out there, because I want to make it

17   sound like -- it's like, you know, participation equals

18   response.  It was actual responses occurring that go beyond

19   simply the letter.  And so that is why, in context, the

20   responses were accurate.  And I also just don't know how the

21   material -- or causes any extra work.

22          **THE COURT:**  Okay, thank you.

23          Now, let's -- this question is for Netlist.  With

24   regard to RFA Number 55, which has to do with 2021, can you

25   explain to me the relevance and the materiality of that RFA?

1   Because it's dealing with a year after the lawsuit was filed.

2         **MR. BEST:**  Yeah.  So Mr. LaMagna may have more

3   details on this.

4         But I think that it's pretty clear that I'm -- the

5   point here is that not only did Samsung not respond within the

6   30 days (inaudible) notice -- which this request would

7   incorporate -- they didn't ever respond in a way that actually

8   made the point that -- that they had -- that they had received

9   the letter and that they have made some attempt to cure it or

10  not.

11        You know, there's a lot of artful language in

12  Mr. Rhow's previous response.  But none of it is in these

13  responses that they served on us.

14        **THE COURT:**  Okay, thank you.

15        Mr. Rhow, do you have a response or a statement?

16        **MR. RHOW:**  Yeah.  We never really, you know,

17  understood the relevance of how, you know, not responding

18  within 365 days made a difference or not.  But so I rest on

19  what Mr. Best said, because I don't actually see the relevance

20  that way.

21        **THE COURT:**  All right.  Okay, thank you.

22        Now, a question for both of you is, if I were to find

23  that some, but not all, of the RFAs should have been responded

24  to differently, were proven, you know, essentially that a

25  sanction is appropriate; if I were to do that with regard to

60

 1  some, but not all, of these RFAs, how is the Court supposed to

 2  determine the amount of sanction?

 3          What's your opinion on that?

 4          MR. BEST:  Sure.  I'm going to go first.  I mean, I

 5  think the answer, in the abstract, is hard to deal with

 6  because, let's say that the Court is saying some, but not all,

 7  of the requests concerning supply, if the responses were

 8  sanctionable.

 9          The fact is, we still had to go to all the same

10  trouble to obtain discovery on whichever ones were sanctioned.

11  So there's not really a distinction there to my knowledge.

12          If, on the other hand, there's a decision that -- for

13  example, the supply -- the responses to the supply request and

14  the breach request -- breach notice (inaudible) request, there

15  were sanctions (inaudible) withholding requests.

16          I think the answer there is because of the concern it

17  might be the (inaudible) possible.  But I think that there

18  would be different ways to prorate it, given the number

19  (inaudible).

20          But that would be my sort of off-the-cuff suggestion.

21          THE COURT:  All right.  Mr. Rhow?

22          MR. RHOW:  I think this is where the case law answers

23  the question.  Holdenbrim, even the Henry-Gill case that we

24  just talked about, it is -- it is their burden to tie the fees

25  that resulted from (inaudible) it.  It is an abuse of

61

1    discretion toward anything than the fees that, quote, resulted

2    from, end quote, the deficient responses.

3             And so the problem with the manner in which they

4    decided to submit their fees is what we highlighted, that you

5    can -- you simply cannot do that.

6             I think there's other case law that indicates, if you

7    can't parse it out, Your Honor, from what they provided, you

8    have discretion to deny sanctions in its entirety, unless there

9    is a problematic RFA or series of RFAs.

10            So I think if you looked at the case law -- and this

11   is why we've highlighted -- they chose not to do it in a

12   different way.  They did it the way they did, and put it all

13   together.  I think you have discretion to not award fees at

14   all.

15            **MR. BEST:**  And I'll just point out that it seems like

16   there's a little bit of advantage being taken from the fact

17   that there were so many requests to which they failed to

18   response that now we -- that we are stuck (inaudible).

19            I propose that there's nothing in (inaudible) anymore

20   than (inaudible).

21       **(No Audio from 2:37:36 to 2:41:13)**

22            **THE COURT:**  And do what you would do if you decided

23   to go that route is notify my -- through emailing my chamber's

24   email address that the parties have settled the motion, and

25   then stipulate to take it off calendar.

62

1            I'm not saying that you have to do it.  But I'd just

2   like to remind the non-bankruptcy litigators of the Tribunal

3   Court.  So that is something that is done, and it's done

4   frequently, and can be done.  And then it removes some of the

5   risks for both parties.  All right?

6            That would not offend me at all.

7            Now, thank you very much, and have a good day.

8       **(Proceedings Concluded)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

63

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **April 24, 2022**

          **Signed**                                                    **Dated**


*TONI HUDSON, TRANSCRIBER*