```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    (SOUTHERN DIVISION - SANTA ANA)



NETLIST, INC,                    ) CASE NO: 8:20-CV-00993-MCS-ADSx
                                 )
              Plaintiff,         )            CIVIL
                                 )
      vs.                        )       Santa Ana, California
                                 )
SAMSUNG ELECTRONICS CO, LTD,     )       Monday, August 2, 2021
                                 )
_____Defendant._____ )       (1:10 p.m. to 2:58 p.m.)


      1) PLAINTIFF'S MOTION TO COMPEL DEPOSITIONS OF LUNG BAE LEE
              AND JOO SUN CHOI [DKT.NO.84];

          2) FURTHER INFORMAL DISCOVERY CONFERENCE


          BEFORE THE HONORABLE AUTUMN D. SPAETH,
              UNITED STATES MAGISTRATE JUDGE



APPEARANCES:              SEE PAGE 2


Court Reporter:          Recorded; CourtSmart


Courtroom Deputy:        Kristee Hopkins


Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

**APPEARANCES:**


For Plaintiff:          RAYMOND A. LAMAGNA, ESQ.
                              Gibson Dunn & Crutcher, LLP
                              333 S. Grand Ave.
                              Los Angeles, CA 90071

                              MATTHEW BENJAMIN, ESQ.
                              Gibson Dunn & Crutcher, LLP
                              200 Park Avenue
                              New York, NY 10166


For Defendant:         EKWAN E. RHOW, ESQ.
                              JONG-MIN CHOI, ESQ.
                              MARC E. MASTERS, ESQ.
                              Bird Marella Boxer, et al.
                              1875 Century Park East
                              23rd Floor
                              Los Angeles, CA 90067

1      **Santa Ana, California; Monday, August 2, 2021; 1:10 p.m.**

2                    **(Telephonic appearances)**

3                        **(Call to Order)**

4          **THE CLERK:**  We're on the record in this United States

5    District court, the Honorable Autumn D. Spaeth, United States

6    Magistrate Judge, presiding.  Calling Case SA CV-20-993,

7    *Netlist, Inc. versus Samsung Electronics Company.*

8          Counsel, please state your appearances starting with

9    Plaintiff.

10         **MR. LAMAGNA:**  This is Raymond LaMagna of Gibson Dunn

11   and Crutcher on behalf of Plaintiff Netlist, Inc. and I am

12   joined by my colleague Matthew Benjamin.

13         **MR. RHOW:**  Good afternoon --

14         **MR. CHOI:**  Good afternoon --

15         **MR. RHOW:**  Sorry.

16         **MR. CHOI:**  Go ahead.

17         **MR. RHOW:**  Good afternoon, Your Honor.  It's Ekwan

18   Rhow on behalf of Defendant Samsung and I believe Marc Masters

19   and Jong-Min Choi are also on the line.

20         **THE COURT:**  All right.  Good afternoon, everybody.

21         And is there anyone else on the line or making an

22   appearance?

23         **MR. LAMAGNA:**  Not for Plaintiff, Your Honor.

24         **MR. RHOW:**  Yeah, that's it for us, too.

25         **THE COURT:**  All right.  Well, welcome back to Day 3

4

1    of our marathon discovery -- informal discovery conferences.  I

2    don't know -- where do you guys want to start?  Let me hear

3    from the Plaintiff.

4             MR. LAMAGNA:  I believe the first thing on today's

5    agenda is the hearing on the Apex motion that we had brought.

6    So perhaps -- that's probably going to be the lengthier item

7    for today.  Maybe we should start with that.

8             THE COURT:  Okay.  And let me hear from the Defense.

9    What do you guys think should be our primary -- where we start?

10            MR. RHOW:  This is Ekwan Rhow and we agree.  I think

11   that's -- we scheduled that for today.  That makes sense to

12   start there.

13            THE COURT:  All right.  Well, for the moving party,

14   the floor is yours.

15            MR. LAMAGNA:  Thank you, Your Honor.  This is Ray

16   LaMagna for Plaintiff.  There are basically two prongs here

17   that we need to look at, I think, the factual question of were

18   the two witnesses that we've identified sufficiently involved

19   uniquely in the facts of the case so as to justify their

20   deposition and, secondly, in opposition, Samsung has raised a

21   legal question over whether Rule 30 to be used to obtain one of

22   those witnesses.

23            I think we should probably take those in turn, maybe

24   argue them perhaps separately just to avoid there being a big

25   -- doing everything at once, if Your Honor agrees.

1          **THE COURT:**  I'm fine with that.

2          **MR. LAMAGNA:**  Okay.

3          **THE COURT:**  Counsel for the Defense, do you have an

4    issue with that?

5          **MR. RHOW:**  This is Ekwan Rhow.  I do not.

6          **THE COURT:**  All right.  Let's proceed.

7          **MR. LAMAGNA:**  Beginning with the factual question,

8    Your Honor -- this is Ray again for Plaintiff Netlist.  This

9    case is about Samsung cutting Netlist's access to products

10   under supply agreement.  I want to direct the Court's attention

11   again just to sort of cut through this and focus on the most

12   particular evidence here to Exhibit K that we submitted.

13         If you go -- if you happen to have that in front of

14   you, Your Honor -- you may not.  I can describe it to you.  On

15   Page --

16         **THE COURT:**  I have it, yeah.

17         **MR. LAMAGNA:**  -- on Page 3 of Exhibit K, that's the

18   page that ends in Bates Number 260.  Mr. Choi, who is one of

19   our -- one of the target witnesses here, writes to Mr. Lee, the

20   other target witness, in 2016.  I think that Netlist is

21   deceptive in their use of the relationship with our company in

22   the market.

23         Just above that, Mr. Lee, the witness we are seeking,

24   says in response to Mr. Choi, "Understood, I will assess the

25   situation."

1    Just above that moving up in time, on Page 1, we have some

2    discussion about the current agreement where -- written to

3    Mr. Lee there is a summary of what the supply provision

4    provides.  It says here, "It is a provision limited to the

5    volume condition.  So Netlist claiming that it is a -- it is

6    low cost is an over-interpretation."

7            Now, as a side note, Your Honor, I will point out

8    that Plaintiff has -- I'm sorry -- Defendant has filed a motion

9    under Rule 12(c) for judgment on the pleadings on the basis --

10   the opposite of this point.  They take the position that the

11   pricing provision here at issue is flipped.  It is about

12   pricing -- I mean, I'm sorry.  The provision at issue is about

13   pricing.  It is not about volume.

14           And at the very top, Mr. Indong Kim writes back to a

15   person named Steve Metz who is another witness in the case.

16   And he says, "Both J.S. Choi and my boss J.B. Lee are quite

17   concerned about it."  So this is essentially a discussion going

18   on back and forth between J.B. Lee and Mr. Choi regarding

19   concern about overutilization of the contract by Netlist and

20   the discussion that it needs to be watched and controlled.

21           Now, if we look a little bit later in time -- I sent

22   Your Honor a -- or chambers a document.  I don't know if you

23   have it.  It ends in Bates Number SEC005984.  This was produced

24   the same day that Defendants gave up their opposition.  Do you

25   happen to have that, Your Honor?

1        **THE COURT:**  I do.

2        **MR. LAMAGNA:**  And if we look at the last page of

3   that, now we're in 2019 after the parties have been fighting

4   over supply which ultimately is what gave rise to this

5   litigation.  There is an email to a man named Harrison Yoo and

6   Neal Knuth who is -- more witnesses in our case.  It says,

7   "Please try to find ways to increase sales with Netlist."

8        Above that email on the last page, Mr. Knuth writes

9   to his boss Mr. Metz asking for some input and if we look at

10  the sentences -- the last sentence of the prior page ending in

11  Bates Number 5986, Steve Metz writes back, "Please send me the

12  background on this.  We were specifically directed by C.S. Choi

13  to minimize sales to Netlist," which is exactly the allegation

14  that underpins this litigation.

15       We go up one more email just above that a couple of

16  inches.  And the writer D.J. Shin (phonetic) writes back, "Hi

17  Steve, we have the approval from J.F. to increase sales with

18  Netlist to remedy the current situation."

19       So as Your Honor may have seen these, we submitted a

20  declaration from Pat Kehong (phonetic) in support of our papers

21  moving as well that said that he was informed by Mr. Knuth, who

22  is a participant in this email chain that I just showed you,

23  that the Choi -- the decision was made by Mr. Choi to cut

24  Netlist's allocation of products which gave rise to a series of

25  breaches which gives rise to this litigation.

8

1          Mr. Choi made a decision to inject himself directly

2    into the facts of this case.  We see him working directly in

3    these email chains with Mr. Lee who is the other witness that

4    we're seeking.  He appears to have made the decision directly

5    to limit sales to Netlist which is what we are contending is

6    the violation of supply agreement and we're entitled to know

7    why he made that decision.

8          As for Mr. Lee, he submitted a declaration saying

9    that basically he doesn't think he's involved in the facts of

10   this case.  We think that obviously based on what we've shown

11   you, that's not entirely fulsome.  I think we are entitled to

12   test the testimony that he's provided in that declaration and

13   test his recollection of these events.

14         Likewise, to be fair, Mr. Jungbae Lee was not just

15   passively copied on negotiation history documents.  Mr. Lee is

16   the person who signed the JDLA himself.  He's on over 140

17   emails with Netlist consistently copied on the lion's share of

18   the negotiation history.  Only he can speak and Mr. Choi can

19   speak to the issues that are going on here in Exhibit K and

20   what was the decision that was made, what were the efforts that

21   were put in place to monitor Netlist and why.

22         And I should also point out that -- and we will get

23   to this dispute, I think, later because it's a separate dispute

24   that we indicated in response to some of the interrogatory

25   responses being not very fulsome.  Samsung has yet to provide

1    an answer to us as to who made these decisions and why in their

2    interrogatory responses.  Not having done that, there should be

3    no reason for us not to be able to get these witnesses who

4    appear to be the ones that were at the heart of this decision-

5    making process.

6         So with that in mind, maybe what we should do is I

7    should pause a little bit here and let Defense counsel take

8    over, respond to that and then I can come back and we can move

9    on to the next issue.  I can respond to them and then move on

10   to the next issue.

11        **THE COURT:**  I'm okay with that.  Who is going to

12   speak today for the Defense?

13        **MR. RHOW:**  Your Honor, this is Ekwan Rhow.  I'll be

14   handling this Apex issue.

15        **THE COURT:**  All right, Mr. Rhow.

16        **MR. RHOW:**  Thank you, Your Honor.  So I hope I stay

17   within the lanes that were contemplated.  I'm not sure I can

18   given the argument but let me take a step back because the

19   issue in this motion really does not have anything to do with

20   whether or not these folks, Mr. Lee and Mr. Choi, have some

21   percipient knowledge.  In every Apex deposition issue that

22   arises, the Apex folks do have percipient knowledge.  That's

23   undisputed.

24        If they had no percipient knowledge, then there'd be

25   no basis for their deposition whatsoever.  But in the Apex

1  world, what you are analyzing is not whether or not they had

2  percipient knowledge -- surely they do -- but whether or not

3  given the fact that they are Apex within the organization,

4  whether or not that deposition is justified.

5       And so I don't think there's any dispute and I

6  haven't dispute on this that these two folks are Apex.

7  Mr. Choi -- and this will bleed into another argument -- is the

8  Apex of an entity that had no involvement in this case at all,

9  Samsung Display, CEO of a 25 billion-dollar company.  And then

10  Mr. Lee is the president of Samsung's Memory Division which

11  does have involvement in this case but that, too, puts him in

12  an Apex position.

13       The issue that --

14       **THE COURT:**  I'm sorry.  So what I'm hearing is you're

15  not contesting the aspect of these two individuals have some

16  percipient knowledge; is that right?

17       **MR. RHOW:**  They have -- yeah, they have some

18  percipient knowledge.  I -- the issue though is whether it's

19  unique, first-hand, non-repetitive knowledge as the case law

20  dictates.  And --

21       **THE COURT:**  Why don't you hold right there?  And why

22  don't we go back to Mr. LaMagna for his argument regarding

23  whether it is unique, first-hand and non-repetitive?

24       **MR. LAMAGNA:**  Thank you, Your Honor.  Well, I think

25  that it's difficult to look at the documents we've just looked

1    at and say that these people simply have some knowledge, that

2    there was a meeting or a negotiation they were CC'd on and,

3    therefore, they were just once members of the audience of the

4    events.  These are the dealmakers who made the events.

5         Mr. Choi in multiple -- we have multiple pieces of

6    evidence pointing to Mr. Choi being the decision-maker who made

7    the call to engage in the act that gave rise to this litigation

8    to cut Netlist's allocation of products.  And so Mr. Choi is

9    not a casual observer.  He's not one of the guys at a meeting.

10   He is the guy who made that decision.  And I think --

11        **THE COURT:**  That makes -- that's because you make it

12   -- are there any other aspects that are unique to Mr. Choi or

13   can we move to Mr. Lee?

14        **MR. LAMAGNA:**  I think we can -- well, we can move to

15   Mr. Lee, if you like, Your Honor, of course.  Mr. Lee as well

16   -- as we saw in the email, Exhibit K, Mr. Lee is instructed by

17   Mr. Choi to take certain steps.  So I don't know what those

18   are.  I'd have to ask Mr. Lee what Mr. Lee did at Mr. Choi's

19   direction to monitor Netlist and to keep an eye on them, or

20   whatever the wording was.

21        But separately and apart from that, Mr. Lee is the

22   person who signed the agreement.  Why -- Samsung has offered us

23   no other person who is the decision-maker for the execution of

24   that agreement.  They have not -- I can only assume that the

25   person who signed it and the person who's copied on 140 emails

12

1 back and forth within the company, including most of the

2 negotiating history, is someone who would know what the party's

3 goals were for the agreement, why they were signing it,

4 et cetera. They've offered us no alternative person who made

5 that decision to Mr. Lee. So I think that he would have unique

6 knowledge.

7 I go back to the point that we raised in our brief.

8 I think this is on Page 6. We cited a case called, "*DR*

9 *Systems*" and I think -- on this point. The burden here is on

10 Samsung in order to -- we have a burden -- sort of a burden of

11 production, Your Honor. I have to show you a good-faith basis

12 for why we should depose these people but if they wanted a

13 26(c) protective order here, they have to establish why I'm

14 wrong.

15 They have not so far identified -- no, it wasn't

16 Mr. Lee who made the decision to enter -- or to agree to these

17 terms. It was somebody else. They haven't done that and so I

18 don't think that they can get a protective order on this.

19 I should note also to respond on to whether or not we

20 have enough, shall we say, Apexness and enough centrality of

21 unique knowledge here. Samsung has cited the *Apple Samsung*

22 case for that point. And one of the things that they omit in

23 their brief regarding and citing *Apple Samsung* is that the

24 Court in *Apple Samsung* ordered several key executives at

25 Samsung to be deposed, including one named Dale Sohn.

1          The Court there -- this is on Page 268 to 269 of that

2     decision and I'll -- that -- regarding him -- it showed that he

3     had "taken responsibility for developing and implementing

4     details for the U.S. market approach."  There's another witness

5     on Page 269, Joseph Chong (phonetic).  The Court there wrote

6     that that movant had "identified -- or had been identified by

7     other parties -- he had been identified" -- I'm sorry.  I

8     apologize, Your Honor.  "He had been identified by other

9     parties as the main decision-maker regarding certain issues

10    that were in dispute."  Under *Apple Samsung*, both Mr. Lee and

11    Mr. Choi qualify as being -- as having sufficiently unique

12    knowledge to be deposed despite their Apex status.

13          We also noted in regard to the Apex status, Your

14    Honor, that Samsung has about 240 subsidiaries.  Assuming that

15    the top few executives are considered to be Apex, that would be

16    hundreds and hundreds of Apex employees.  We're not talking

17    within the Samsung corporate governance of the peak of their

18    corporate governance.  We're talking about the people who sit

19    at the crests of all of the different foothills.  So let me

20    turn it back over to opposing counsel.

21          **THE COURT:**  All right, thank you.

22          **MR. RHOW:**  Your Honor, would you want me to respond?

23          **THE COURT:**  Yes, please.

24          **MR. RHOW:**  Okay.  Ekwan Rhow again.  So picking up on

25    where I left off, I still haven't heard how it's unique and

14

1    non-repetitive.  These email chains that Mr. LaMagna just

2    mentioned show that these were widely publicized decisions,

3    that the folks lower in the organizational chart who were

4    responsible for implementing these various directives are being

5    deposed.

6            Mr. Knuth, Mr. Metz, the various other folks, all of

7    them are being deposed on these exact same emails.  All of them

8    can testify as to exactly what they implemented which is

9    actually more germane than what anyone individually might have

10   thought.

11           The bottom line here is what was implemented as it

12   relates to Netlist and on that issue, none of the tech folks

13   know.  It is only the line folks who know that and those are

14   the folks that Mr. LaMagna and Ms. (indisc.) are deposing.

15   That's Mr. Knuth, that's Mr. Metz and that's some of the other

16   folks.  And, again, they are all over these email chains.  And

17   by the way, these email chains are admissions of the company.

18   They are party admissions.  They get into evidence.

19           If our folks are not called and aren't deposed,

20   they're not going to get -- be able to testify at trial.

21   That's our problem.  We won't be able to explain or change how

22   Mr. Knuth or how Mr. Metz testifies on these issues.  That is

23   our problem to the extent the Apex folks are not deposed.

24           But the case law is pretty clear, again, that it has

25   to be unique, has to be non-repetitive.  Other case law talks

1    about the fact that you really should first let the lower level

2    -- and I'm quoting -- "lower level employee testify first"

3    which is exactly what is happening here.

4            They can testify about exactly what the directive was

5    and how it was implemented and that's really what Netlist needs

6    to know because their breach claims depend on not what people

7    were thinking but what actually was implemented and how it was

8    implemented.  These are -- this case is -- and it is only a

9    breach-of-contract case, nothing more than that.

10           So I think on that basis, they haven't shown the

11   basic prerequisites that are necessary under the cases to get

12   Apex depositions and while there may be a lot of subsidiaries,

13   the notion that these are not top-of-the-line Apex folks are

14   belied by the facts.  Mr. Choi is the CEO of a 25 billion-

15   dollar company that, by the way, has nothing to do with this

16   case.  It's literally a separate subsidiary called, "Samsung

17   Display."

18           It has no involvement on this case which is, in part,

19   why the case that Mr. LaMagna sent over this afternoon has no

20   application.  These are not sister companies.  Samsung Display

21   had no involvement in the underlying case at all and so he is

22   literally an ex-employee and a stranger to this dispute

23   jurisdictionally because he's not subject to jurisdiction since

24   he's working for a separate company.

25           As to Mr. Lee, again, he is the president of the

16

 1   Memory Division which does have application here but is a

 2   massive company as well.  I don't know if it's 30 million, 40

 3   million, 40 billion at issue but the notion that he's a line

 4   employee of some sort -- and I'm not implying Mr. LaMagna said

 5   that but the notion that he's just one of many is belied by the

 6   facts.

 7           I mean, Samsung is, obviously, a very large company

 8   and so it would make sense that they have more Apex-level folks

 9   than a smaller company would.  And so I think on those two

10   points -- oh, by the way, one other point that Mr. LaMagna

11   raised is how is he going to figure out what intentions existed

12   -- what Samsung's intentions were.

13           Well, the vehicle to do that is what he's done

14   properly which is he's noticed a 30(b)(6) deposition.  And so

15   he will have binding admissions from the 30(b)(6)

16   representative as to every single question he has in the case.

17   If his question is, what was the directive, why did it occur,

18   all of these things will, by definition, come out as an

19   admission during the 30(b)(6) deposition and will be held to

20   that.  We won't be able to rebut it by our Apex witnesses

21   because they will not be allowed to testify at trial -- and

22   would stipulate to that, by the way -- to the extent that they

23   are not being deposed here.

24           So I think on the fundamental ground that exists in

25   connection with Apex deponents, respectfully, we don't think

1     those prerequisites have been satisfied.  And then the flip

2     side, of course, is in terms of prejudice, they are deposing

3     all of the lower-level employees and -- as well as their

4     30(b)(6) representative who will give them -- be required to

5     give them the admissions that they are looking for.

6               **THE COURT:**  All right.

7               **MR. LAMAGNA:**  I think what I should do, Your Honor --

8     this is Ray again for Plaintiff -- is just respond to that

9     really quickly and then move on to the second issue which is

10    the question regarding Samsung Display.

11              Just to quickly address Mr. Rhow's point, first of

12    all, this is not just a breach-of-contract case as he stated.

13    As we've mentioned before, we additionally have a declaratory

14    judgment action regarding the termination of the contract.

15    Netlist has terminated the contract and it's -- we have to,

16    therefore, establish whether under the provision in the

17    contract that requires termination only under certain events,

18    one of which is, for example, material breach -- whether or not

19    this breach rises to that.

20              Factors under New York law are considered

21    immateriality include, for example, whether or not the breach

22    was in good faith or bad faith, whether or not it looks like

23    it's going to be repeatable or continuing, et cetera.

24              So I think that the question of why Samsung breached

25    the agreement is as relevant as the fact that they breached it.

1    And what I believe Mr. Knuth can perhaps testify to, the lower-

2    level employee that Mr. Rhow identified, is the fact that they

3    breached it.

4         I don't know that he can testify to the law.  He

5    doesn't know -- as you can see from the email chain that we

6    provided Your Honor this morning, he doesn't appear to know why

7    this is done.  People at Samsung's U.S. subsidiary are asking

8    the corporate representative -- this is the document that I

9    provided this morning on the second page where Mr. Metz at the

10   bottom -- I'm sorry -- the third page ending in Bates Number

11   986.  Mr. Metz is asking someone back in Korea for background

12   on this because he was operating under a different

13   understanding.

14        And the person who has that background is Mr. Choi.

15   He's the one who made that decision.  So I don't want to

16   belabor this point.  As for whether or not we should depose

17   other people first, like I said, I don't think there's much

18   probability that the low-level employees will know what a boss

19   multiple levels above them was thinking.

20        But setting that aside, time is very short here, Your

21   Honor.  We shouldn't have to go and bring this motion again at

22   some later date when we have little belief that we are going to

23   get that type of testimony from a low-level employee.  As your

24   -- as we've also mentioned, we've asked for this in

25   interrogatories and they haven't provided it to us.  So we've

1   basically run out of time and now this is the option that is

2   left to us.

3          Also regarding 30(b)(6) deposition testimony, I

4   think, quite frankly, we are entitled to get this from the

5   mouth of the witness who made that decision, not from something

6   that has been processed through the legal team and then spit

7   out through a spokesman, especially when we can identify the

8   percipient witness who made the decision.

9          Turning to the legal question --

10          **MR. RHOW:**  Actually, Your Honor -- if I could, since

11   Mr. LaMagna did respond and if you're going to turn to a legal

12   question, I would want to respond at least to those points.

13          **THE COURT:**  Okay.  I agree.  Go ahead.

14          **MR. RHOW:**  The notion -- first of all, let's talk

15   about why we're in this position -- and by the way, I'm not

16   implying any blame because our side has some faults here, too,

17   but depositions in this case were noticed very late in the

18   ballgame, extremely late in the ballgame by both sides.  I'm

19   being -- I'm readily admitting to that being mutual.

20          And so this is -- this issue is really one of really

21   both parties' making.  In a normal situation, if the normal

22   progression of depositions had occurred, the lower-level

23   employees would have been taken many, many months ago and you

24   could then, instead of speculating and literally guessing right

25   now that lower-level employees will not have the knowledge that

20

1    is being sought -- and I will offer to the Court that they will

2    have that knowledge and I will offer to the Court that the

3    30(b)(6) witness absolutely will have that knowledge.

4            But in the normal progression of normal discovery,

5    all of that would have been -- occurred a long time ago and

6    those lower-level employees could have been deposed first.  By

7    choosing to depose everyone in sort of a time crunch near the

8    end, this issue is really one, again, of both parties' making

9    but it doesn't relieve the Plaintiffs of the case law that does

10   require that progression and doesn't allow them to just

11   speculate that, well, the lower-level employees, their

12   knowledge is likely repetitive.  So -- or non-repetitive.  So

13   we should take the Apex depositions anyways regardless of

14   whether or not it's repetitive, regardless of whether or not

15   it's unique.

16           And so I don't think that's a fair argument given how

17   discovery has unfolded here.  So I just wanted to note that

18   because this is really a product of, again, both parties taking

19   depositions at this stage.

20           **THE COURT:**  Okay.  All right, thank you.

21           Mr. LaMagna.  All right.  Mr. La Magna, go ahead.

22           **MR. LAMAGNA:**  Yes, Your Honor.  This is Ray LaMagna

23   again for Plaintiff.

24   Sorry, do you have anything else, Mr. Ekwan Rhow?

25           **MR. RHOW:**  Oh.  Not on this issue.  I assumed you

21

1    were -- this is Ekwan Rhow.  I assumed you were going through

2    the legal issues.  So that's why I stopped.

3           **MR. LAMAGNA:**  Okay, sorry.  This is Ray LaMagna for

4    Plaintiff Netlist again.  Just to close out that last point, I

5    direct the Court to our brief, Page 4, Footnote 7.  There's a

6    citation there to the *Finisar* case that says, "Formal

7    exhaustion of other requirements is not an absolute

8    requirement."  So I don't think that it is necessary that we

9    complete all of those.

10          As Your Honor knows, the Defendant here has not

11   produced yet the documents for these custodians which Your

12   Honor has ordered after a very long and protracted set of

13   negotiations and meeting and conferring and working with the

14   Magistrates for this Friday.  So the fact that we did not seek

15   to depose them at an earlier date is unsurprising.

16          Anyway, returning then to the legal issue, I think

17   the factual question of whether or not Samsung controls Samsung

18   Display -- Samsung the parent controls the subsidiary shouldn't

19   be seriously disputed.  We addressed this issue early on with

20   Judge McCormick where Samsung had initially disputed whether or

21   not they would have to provide discovery from their

22   subsidiaries that they controlled.  They pushed back on that.

23   We went back and forth in front of Judge McCormick and it was

24   agreed that Samsung would be providing discovery with respect

25   to its subsidiaries.

1          For example, we see right now -- we're talking about

2    Mr. Knuth here.  Mr. Knuth has his deposition scheduled.  It

3    was scheduled subject to a 30(b)(1) notice.  He is an employee

4    of Samsung Semiconductor, Incorporated, a U.S. company that is

5    a subsidiary of Samsung.

6          So the notion that a subsidiary does not have to

7    provide discovery or provide its witnesses is belied by the

8    record in this case and by the fact that they have witnesses of

9    -- that are their U.S. subsidiary witnesses that they are

10   providing subject to notice and not subject to Rule 45.

11          They also -- you'll note if you look at the Court's

12   order that's at Docket 93, if you look at Footnote 1, you will

13   see that both Mr. Choi and Mr. Lee are listed there as

14   custodians.  So Samsung is looking at the documents from

15   Mr. Lee and Mr. Choi as part of the schedule.  Mr. Lee is still

16   at Samsung.  I think we should focus on Mr. Choi.  Apologies,

17   Your Honor.

18          Mr. Choi's email address, in fact, remains at the

19   Samsung.com domain.  So his correspondence is part of this --

20   as part of his work at Samsung Display still is maintained in

21   the custody and control of the Defendant and they are searching

22   that.  Samsung clearly controls, therefore, its subsidiaries in

23   the records that they have and has the power to direct those

24   executives to cooperate in discovery.

25          If we look at our Exhibit F to our motion at Page 14,

1  it says there -- this is Samsung's own financial report,

2  Samsung the parent, the Defendant in this case, called "SEC."

3  It says, "SEC, as the controlling company, consolidates 238

4  subsidiaries including Samsung Display."  At that same

5  document, Exhibit F, at 20, it shows that SEC owns 85 percent

6  of Samsung Display.

7          I don't think given that record that there could be

8  any question that Joo Sun Choi is Samsung's managing agent at

9  Samsung Display and, therefore, within the reach of Rule 30.

10  Now, to rebut that, what they brought forward is this -- is a

11  case from Judge Thynge in -- Magistrate Judge Thynge in the

12  District of Delaware, the *Ethypharm versus Abbott* case.  And I

13  will admit, that case does go the other direction.

14          In the Third Circuit, Judge Thynge ruled that in that

15  case, Rule 30 could not be used to reach a sub.  But as we

16  provided Your Honor this morning, the *Calderon* case is a Ninth

17  Circuit.  We have authority that comes to the opposite result.

18  If we look at that case -- I don't know.  If Your Honor has

19  that case in front of her --

20          **THE COURT:**  I do.

21          **MR. LAMAGNA:**  -- on Page 5 of that case, spanning

22  what is the star pagination 512 to 513 but Page 5 of the PDF

23  that we sent --

24          **THE COURT:**  Uh-huh.

25          **MR. LAMAGNA:**  -- there is a paragraph that leads off.

24

1   It says, "Moreover, there is legal authority to support the

2   Magistrate Judge's decision treating EFC as a party for the

3   purposes of discovery."  EFC was the foreign subsidiary.  And

4   if we go down to the bottom of the page, there is a block quote

5   that the Court cites from Second Circuit authority.

6           "The ordinary discovery provisions of the Federal

7           Rules of Civil Procedure, rather than the more

8           complicated procedures of the Hague Convention,

9           generally apply to the discovery of information in

10          the custody and control of a party's foreign

11          affiliate.  This is true whether the information or

12          witness is located in a foreign country or whether

13          the corporate entity from whom the discovery is

14          sought is itself a party to the case."

15          And so in that case, they ordered, of course, the

16  witness to appear.

17          So where that leaves us is, yes, there is a case, of

18  course, in Delaware that went up and became the other way.  But

19  that is not binding authority.  It's not authority from this

20  circuit and, quite frankly, in this case, I think there's two

21  reasons it should go the other way.  One, we have authority for

22  the basis that a Rule 30 subpoena -- a subpoena is not needed,

23  that a Rule 30 notice is sufficient.

24          And that has been the process by which -- in front of

25  Judge McCormick that we have been proceeding in this case.  Had

1    Samsung raised this issue earlier or not made -- not indicated

2    that we wouldn't have to resort to Rule 45, we might have

3    started a different process many months ago but we didn't.

4         This did not get raised effectively, this question

5    based on the Delaware authority until July 27th when they

6    submit their opposition.  And with that, I will turn it back

7    over to my colleague from opposing counsel.

8         **THE COURT:**  All right.  Mr. Rhow, what do you have to

9    say about the argument that you have been producing documents

10   from emails from subs and that so far discovery has proceeded

11   against -- or with regards to subs up until now?

12        **MR. RHOW:**  Your Honor, it's Ekwan Rhow.  First of

13   all, let me be clear.  We are not producing any documents

14   relating to Samsung Display and this is where Mr. LaMagna is

15   actually misreading *Calderon* 100 percent.  This would make

16   sense if the chips were being sold through Samsung Display and

17   Samsung Display was somehow related to the case because if you

18   look in *Calderon*, the reason the judge ruled as he did in the

19   case is because the two underlying entities -- one was in the

20   United States, one was in Chile -- were involved in the exact

21   same underlying business that the Plaintiff's claim was rooted

22   in.

23        And so basically this is a credit reporting issue and

24   so I guess a credit issue either gets sent to the U.S. or gets

25   sent to Chile.  It's so much random and so they in that

26

situation were considered to be sister companies. But by the way, that wasn't sufficient. There was a lot of facts showing that the two companies were operationally connected in terms of the underlying credit-related business.

And that's the problem here. Samsung Display is a display company. It doesn't sell semiconductor chips of any kind, is not involved in memory chips of any kind. It's just a completely separate business. And so he -- Mr. La Magna has the analysis kind of backwards. Yes, Mr. Choi is a managing agent but he's a managing agent for Samsung Display. So if this case involved Samsung Display, I would get it.

Then I would see why *Calderon* might apply. But the problem is, the entity that he's employed by just had nothing at all to do with this case. He is an ex-employee of an entity that is involved in this case and it's this -- he moved to a completely different company 100 percent. He could have moved to Microsoft. That would be the equivalent of him moving to Samsung Display because neither Microsoft nor Samsung Display have anything to do with chip supply which is at the heart of the case.

And so if you dig into *Calderon* and, in fact, if you look at the case itself, the judge in the case says he did not base his decision solely on the representation that EIS and ESE, the two entities, were sister corporations. That was not sufficient. He had to look and see if those two underlying

1   corporations were actually involved in the issues that relate

2   directly to Plaintiffs.  Here we don't have that and *Calderon*

3   doesn't apply.

4          Second, I mean, just on sort of a basic level,

5   Samsung Display and Samsung Memory -- they are not sister

6   companies for the same reason I just stated.  They are not in

7   the same business.  They are completely different businesses

8   and so -- and by the way, the fact that we're looking at

9   Mr. Choi's emails makes sense because there was a period of

10  time that he was involved with the memory business.

11         So we should be looking at his emails regardless of

12  whether or not he's currently employed by the Memory Division.

13  And so that fact is -- really shows, I would think, our good

14  faith in making sure we're covering the right custodians.

15         The -- and the notion that us looking at SSI

16  documents as well is somehow a concession of the arguments here

17  is actually contradicted by *Calderon* because SSI, unlike,

18  Samsung Display, was involved in the underlying issues as it

19  relates to Netlist.  So, yes, you should look at those

20  documents to ensure complete production but we are not

21  producing a single document from Samsung Display because, for

22  obvious reasons, Samsung Display has nothing to do with the

23  facts of this case.

24         So the way we've approached discovery, understanding

25  that it's been late, understanding that this all started late

1  on our side and I know that's been covered in other parts of

2  this hearing but the way we've approached discovery is entirely

3  consistent with *Calderon*, entirely consistent with us trying in

4  good faith to identify those and those divisions which actually

5  relate to the issues in the case.

6          But as to Mr. Choi, I don't think it's a close call.

7  He's employed by Samsung Display which, as I indicated, would

8  be like him being employed by Microsoft --

9          **MR. LAMAGNA:**  This is Ray for Plaintiff.  We may have

10  lost Mr. Rhow.

11          **THE COURT:**  I think Mr. Rhow may have accidentally

12  hit "hang up."  Let's give him a second.

13          **MR. MASTERS:**  This is Marc Masters.  I'm going to

14  email him just to --

15          **THE COURT:**  Let him know that he has disconnected

16  himself.  Thank you.

17          **MR. LAMAGNA:**  This is Ray again for Plaintiff.  I was

18  going to respond to that but in fairness to Mr. Rhow, I think

19  we should probably wait for him to rejoin.

20          **THE COURT:**  Great.

21    **(Pause)**

22          **MR. MASTERS:**  Your Honor, I understand -- this is

23  Marc Masters.  I understand Mr. Rhow is dialing back in.

24          **MR. RHOW:**  Your Honor, my apologies.  This is Ekwan

25  Rhow.  I got cut off there or perhaps it was a good cue to end

1    the argument because actually I was ending on that very point.

2         **THE COURT:**  All right.  Okay.  Mr. LaMagna, do you

3    have a reply?

4         **MR. LAMAGNA:**  Yes, this is Ray LaMagna for Plaintiff

5    again.  I think that Mr. Rhow is making the issue of *Calderon* a

6    little bit more confusing than it needs to be.  We are not

7    suggesting that they need to be going to Samsung Display for

8    documents or searching Samsung Display's files.  Obviously

9    that's over at SSI.  That was the chip company.

10        What happened here, Your Honor, is that the main

11   executive at Samsung that made the decision while he was

12   working in the Memory Division at Samsung changed subsidiaries

13   that he was working for in 2000 and -- I think at the end of

14   2020 or earlier this year, about seven months -- seven or

15   months ago.  He simply moved from one subsidiary to the other.

16        So, of course, after litigation started, the

17   percipient records that he has, his emails, his custodial files

18   that are pertinent here are the ones that were generated during

19   his tenure at the Memory Division.  But simply because he moves

20   from one subsidiary to a post -- a different subsidiary, that

21   doesn't answer the question as to whether Samsung, the parent,

22   has control over asking him or requiring him to appear for a

23   deposition.

24        So the central question here is, does the parent have

25   sufficient control over the subsidiary such that it can order

1    or seek, obtain the discovery that is sought?  So the question

2    really is, does Samsung have control over the -- Mr. Choi while

3    he's posted at Samsung Display?  And I think that answer --

4    Samsung explained it is not Microsoft.  As we saw in their

5    filings -- Samsung's own filings, they own 85 percent of

6    Samsung Display.

7          Mr. Choi undisputably continues to use an "at Samsung

8    dot com email."  Yes, he is physically housed under the

9    corporate umbrella inside of a subsidiary that is of a

10   different corporate entity but that, I think, the cases

11   addressed, as I'm sure Your Honor is likely familiar in other

12   cases where it's not uncommon that the party in front of the

13   Court as a Defendant or the Plaintiff will have to produce

14   discovery that is within their control that is -- even though

15   that discovery happens to be housed at a subsidiary.

16         In this case, it happens to be a witness but I think

17   the record is very clear that they could -- Samsung, the party

18   in front of the Court, could direct Mr. Choi as part of his

19   duties to sit for a deposition.  And that, I think, answers the

20   legal question.

21         **THE COURT:**  Mr. LaMagna, is there -- have you cited a

22   case that specifically stands for the proposition that a parent

23   corporation has legal control over a subsidiary for the

24   appointment of deposition?

25         **MR. LAMAGNA:**  Well, I think that -- so, like, as I

1  noted, we were not aware that Samsung was going to be taking

2  this position based on the history that we had with the --

3  before the Court.  So I think *Calderon* would stand for that

4  proposition.  As we said, Your Honor, it can -- and this goes

5  back to, I think, Page 512.  There is legal authority of the

6  Magistrate Judge's decision of treating EFC as a party for the

7  purpose of discovery and the discovery ordered here in *Calderon*

8  was a deposition.

9          **THE COURT:**  All right.  Mr. Rhow, did you have

10  something you wanted to say?

11          **MR. RHOW:**  Yes, very quickly.  So to answer your

12  question, there is no case law that supports that proposition.

13  Having read *Calderon* -- and I'm still reading it as we speak --

14  it does not say that.  It does not say a parent corporation, by

15  virtue of the fact that it owns -- in this case, not even

16  wholly owned but owns a subsidiary, therefore, can control the

17  employees of the subsidiary for purposes of a deposition.  It

18  does not hold that.

19          What *Calderon* holds is what I said which is that if

20  and to the extent Samsung Display was involved in the

21  underlying dispute in some fashion, for that reason, the judge

22  determined that they were, in addition to being sister

23  corporations, subject to this expanded jurisdiction role.

24          But if you read *Calderon* -- and I invite you to do

25  that -- on Page 512, it goes through the various reasons and it

32

1   is clear there is no rule.  There is no case law that says that

2   and it doesn't make sense, frankly, because under normal

3   concepts of corporate governance, the fact that you are a

4   subsidiary does not make you subject to service on the parent.

5   It does not make you subject to jurisdiction on the parent.

6   None of those things are true and it's certainly not true in

7   the context of depositions and the deposition issues we have

8   here.

9           **THE COURT:**  All right, thank you very much.

10          Okay.  Do we have any more argument on the Apex

11  motion?

12          **MR. LAMAGNA:**  I guess my -- this is Ray from Gibson

13  Dunn for Plaintiff.  My only response to that would be it's --

14  what Mr. Rhow is saying is inconsistent with the fact that we

15  noticed Neal Knuth and others at Samsung Semiconductor, Inc.,

16  the U.S. subsidiary, and those witnesses are being provided to

17  us subject to a Rule 30(b)(1) notice.

18          So I appreciate that they've changed positions now to

19  protect this particular witness but I think that they are

20  conflating the facts in *Calderon* which it is true that in that

21  instance, the subsidiary was involved in the facts of the case

22  with the legal point which is the question here is whether or

23  not the parent has control over providing the discovery

24  requested.

25          We should -- I'm ready to move on if it --

1          **MR. RHOW:**  Actually, Your Honor, could I respond

2     briefly because I did -- I thought I had answered that earlier?

3          **THE COURT:**  Go ahead, Mr. Rhow.

4          **MR. RHOW:**  In terms of SS -- thank you, Your Honor.

5     This is Ekwan Rhow.  And I think I mentioned this earlier.  So

6     let me repeat it.  The reason SSI is different from Samsung

7     Display is that it was involved in the sale of memory chips.

8     And, therefore, if you apply *Calderon* to the very facts I just

9     told you, it makes sense what we did.  It makes sense that we

10    would offer up documents that might be SSI as opposed to

11    Samsung Display.

12         So the example that Mr. LaMagna raises highlights the

13    very distinction that I'm raising and that *Calderon* makes and

14    it explains exactly why on the one hand this happened but on

15    the other hand, we're taking our position here.  The position

16    is entirely consistent with *Calderon*.

17         **THE COURT:**  All right, thank you.  One second,

18    please.

19       **(Pause)**

20         Okay.  I am ready to rule on the Apex motion.  I am

21    going to deny the -- well, actually, who is the moving party in

22    this case?  Is it the Plaintiff?  So you're moving to compel

23    these depositions?  I've got to come back to structure.

24         **MR. LAMAGNA:**  This is Ray for Plaintiff again, Your

25    Honor.  Yeah, I think the way we have this structured is we --

1    the Plaintiff moved to compel.

2         **THE COURT:**  All right, thank you.  In these informal

3    discovery conferences, it always makes it a little complicated.

4         All right.  So I am denying the motion at this time

5    without prejudice because I don't believe that the moving party

6    has established that they are not able to obtain the

7    information from other witnesses.  And so that's why I'm

8    denying it without prejudice.

9         I know you guys haven't had a chance to take these

10   lower-level depositions yet but I don't think, based on the

11   information in front of me, that you've met that prong of the

12   analysis as well as for the ability to come back with any

13   additional evidence that you may end up learning during your

14   depositions that would establish that sort of transactional

15   relationship between Samsung and Samsung Display.

16        So I am denying the motion as to both deponents at

17   this time.

18        **MR. LAMAGNA:**  Thank you, Your Honor.  I think that

19   that brings us -- this is Ray again for Plaintiff Netlist -- to

20   perhaps our next point of more of a housekeeping point.  As a

21   follow-up on our last discovery conference, Your Honor moved

22   the production deadline a little bit further down for Samsung

23   to -- I believe it's the 6th, this Friday.

24        And as we discussed before, there's potentially

25   voluminous records coming down the road.  We are going to be

1  approaching -- I believe we have to approach Judge Scarsi on

2  this but we were going to make a request to take depositions

3  out of time in order to give us time to assimilate, translate,

4  review the documents, et cetera, and push some of the

5  depositions down the road.

6          But I just want to confirm the Court's view on that.

7  In other words, that is a request, as I understand, that we

8  need to take to Judge Scarsi.  Do we have that correct?

9          **THE COURT:**  That is correct.  Any changes in

10  scheduling issues need to go back to the District judge.

11          **MR. LAMAGNA:**  Okay.  Thank you, Your Honor.

12          Then I think that turns us back to just the residual

13  questions that we have from our last hearing, the various

14  different discovery disputes subject to the Court's

15  availability on time.

16          **THE COURT:**  Give me one second real quick.

17      **(Pause)**

18          All right.  Well, where would you like to start?

19          **MR. LAMAGNA:**  I think given the discussion that we

20  just had, it may make sense for us to look at some of the

21  interrogatories that we had questions on, in particular to

22  start with, the responses to Interrogatories 1, 3 and 9.  This

23  should be fairly quick.  These can be found in what are called,

24  "Defendant Samsung Electronics Co., Ltd. Further Supplemental

25  Responses for Plaintiff's Interrogatories (Sets 1 and 2)."

1          **THE COURT:**  All right.  I have them.  Let me hear

2     actually from Counsel for the Defense.  Do you agree that this

3     is the next issue for me to hear?

4          **MR. MASTERS:**  Your Honor, this is Marc Masters and I

5     think it's fine if we pick up with the interrogatories.

6          **THE COURT:**  All right.  Let's go ahead.

7          **MR. LAMAGNA:**  So on Interrogatory Number 1, they have

8     a supplemental response, a supplemental response and a second

9     supplemental response that's on Page 6 of that document.  And

10    in sum, what they've done here, they've identified for us who

11    the cast of characters is by name but not really what roles

12    they're playing.  So this interrogatory deals with the

13    negotiation of the JDLA.

14         So the point here -- this goes back to our request

15    for Mr. Lee's deposition.  We don't know here who the decision-

16    maker is in deciding to accept the terms of the agreement or

17    overall enter into the agreement, et cetera.  We just have that

18    there was a list of five or six people that were involved -- I

19    think is the word that they used.  And, oddly, the person who

20    executed the agreement, Mr. Lee, is omitted from that list

21    notwithstanding that the rog asks about people involved in

22    executing the agreement.

23         So we just think not enough has been done here and

24    the same pattern will show up in the additional rogs.  I can

25    just run through those real quick.  When we turn to

1    Interrogatory Number 3, the second supplemental response, for

2    example, is on Page 8.  Middle of the page, you will see at

3    about Lines 8, 9, 10 in there, there's a response that lists a

4    bunch of people that were so-called involved in the allocation

5    of chips.

6           Now, oddly, again, we don't see Mr. Choi's name here

7    despite the fact that we know that he was certainly involved in

8    the allocation of chips.  But we don't know who the decision-

9    makers are or what their respective roles.  So, again, we're

10   stuck and this is a bit like knowing that there's a play.  It's

11   got some characters in it named Hamlet, Ophelia, Fortinbras but

12   we don't know what their respective roles are.

13          The same issue comes up with Number 9 which is -- if

14   we skip to the supplemental response which is on Page 9,

15   roughly around Line 20, we know again who is involved in

16   decisions but we don't know who actually made the decision.  In

17   this case, this involved taxes.  Who made the decision to

18   withhold the taxes?

19          So at bottom, we don't know who made the decision to

20   approve terms of the JDLA, who made the decision to withhold

21   product from Netlist and who made the decision to withhold

22   funds from Netlist that were due owed to it under the contract.

23          **THE COURT:**  All right.  Is it Mr. Masters who's going

24   to be arguing on behalf of the Defense?

25          **MR. MASTERS:**  No, Your Honor.  It will be my

1  colleague Jong-Min Choi.

2          **THE COURT:**  Okay.  Mr. Choi.

3          **MR. CHOI:**  Thank you, Your Honor.  I'm terribly sorry

4  but I think my phone cut off while -- a few seconds while

5  Mr. LaMagna was talking.  We are not here about the

6  interrogatory and Samsung's second supplemental, right?

7          **MR. LAMAGNA:**  This is the further supplemental

8  responses.  This is Ray again for Plaintiff.  I think that the

9  most current answers to Interrogatories 1, 3 and 9 can be found

10  in something called, "Further Supplemental Responses."

11          **MR. CHOI:**  Yes, I (indisc.).

12      **(Pause)**

13          **THE COURT:**  Mr. Choi, are you prepared to discuss the

14  Interrogatories Number 1, 3 and 9?

15          **MR. RHOW:**  Your Honor, this is Ekwan Rhow.  I think

16  we had an organizational snafu on our side which is my fault.

17  I don't think I assigned it to the people who thought they were

18  being assigned to.  Can we come back to this at the end of the

19  hearing so that the issues that Mr. Masters is handling can be

20  handled first?

21          **THE COURT:**  Okay.

22          **MR. RHOW:**  I apologize for that.  I -- Mr. Choi just

23  came running in here and I saw fear in his eyes because he

24  realized I had screwed up the assignments.

25          **THE COURT:**  All right.  Fear is appropriate.  I

1   understand.  What do you recommend we move on from?  Should we

2   leave interrogatories or are there different interrogatories

3   that Mr. Choi was not -- that somebody else can speak to?

4          **MR. RHOW:**  Mr. Masters, can you -- this is Ekwan.

5   Can you chime in?

6          **MR. MASTERS:**  Yes.  This is Mr. Masters, Your Honor.

7   I think the interrogatories we should wait for Mr. Choi but if

8   there are other topics that Mr. LaMagna would like to bring up,

9   we can recover with those.

10          **MR. LAMAGNA:**  This is Mr. LaMagna for Plaintiff.

11   That's fine, Your Honor.  The order isn't that specific.  So

12   one of the issues that we had discussed in our last conference

13   was our 30(b)(6) deposition notice Topic 15 which also

14   corresponded to RFP 16.  This was regarding agreements to

15   provide NAND or DRAM products to others.

16          And to refresh the Court's recollection, there was

17   some disagreement over what the scope of such agreements should

18   be produced should be should -- and how -- what sort of efforts

19   should happen.  This is where we were looking for the umbrella

20   agreements.  We were -- we met and conferred subsequently and

21   so far have not been able to reach an agreement in the meeting-

22   and-conferring process.

23          **MR. MASTERS:**  Your Honor, this is Marc Masters.  I

24   think I might be able to address that.

25          **THE COURT:**  I'm sorry.  I was on mute myself.  Go

40

1    ahead.

2           **MR. MASTERS:**  Okay.  Again, Marc Masters on behalf of

3    Samsung speaking.  Mr. LaMagna is correct that we -- I think in

4    the last hearing, we left off after having a fulsome discussion

5    that the parties were going to meet and confer.  As I explained

6    to Mr. LaMagna that given that the client is in Korea, there

7    was some delay in getting but I do now have some further

8    information with regard to these -- this topic.

9           I'd like to first just back up before I provide that

10   information to kind of provide context as to where we are with

11   regard to this topic.  The topic of supply contracts -- I think

12   we had talked about the potential relevance or lack of

13   relevance of these contracts and we had talked about trying to

14   limit the scope to see if there was any relevance.  And so I

15   think Your Honor had suggested that we take a look for

16   similarly situated customers to determine whether there were

17   any supply contracts in the first instance and go from there.

18          So the client has informed me that they've conducted

19   that search at Your Honor's suggestion.  What we've found so

20   far is a single contract among the entire channel of similar

21   customers -- and by "similar," I mean similar volume purchasers

22   of product from Samsung.  And within that channel, there's a

23   single contract and it's dated.  It's a while back.

24          It has to do with a -- one particular -- the largest

25   supply -- purchaser in the channel and it is very different

1   from the JDLA here which is a joint development and licensing

2   agreement.  That contract is an MOU regarding supply

3   cooperation.  It's very different.  There are minimum

4   requirements for purchase built into that contract and the

5   amount of volume that's required -- the minimum requirement is

6   significantly beyond what Netlist purchases.

7          That said, we are willing to produce that contract in

8   discovery though we don't think it's particularly relevant.  We

9   only ask that it be redacted for the sake of having removing

10  certain information that's not relevant to Netlist including

11  the name of the other entity with whom the contract was entered

12  into and other trade-secret-type information but all the kind

13  of essential information that I think Netlist would be

14  interested in and not particularly helpful for them we're

15  willing to produce and provide.

16         Beyond that, to date, we found no other contracts in

17  the channel that are for supply and so I think on that basis,

18  we can agree to provide the document and to provide a 30(b)(6)

19  witness on that topic with respect to that document to discuss

20  that document in the absence of others.

21         **THE COURT:**  Mr. LaMagna?

22         **MR. LAMAGNA:**  Yeah, this is Ray for Plaintiff again.

23  So a couple of issues.  As to the very specific document that

24  he's providing, I appreciate them providing us at least one

25  agreement.  I don't see how it works if you redact the name of

1   who the party is because -- who the counterparty in the

2   agreement is.  We have no idea then of judging similarity or

3   not.

4          But setting aside, I think what Mr. Masters has sort

5   of done there is imply certain limitations on the scope of our

6   request by suggesting that Your Honor has sort of directed them

7   to limit their efforts to, in their own estimation, so-called

8   similarly situation customers or customers that are so-called

9   in the channel.

10          Now, I don't know exactly what they mean by those two

11   terms.  If that means similarly situated as in other customers

12   for NAND or DRAM products or that's the channel, then that's

13   fine because we would agree that NAND or DRAM products is a

14   limitation here like we talked about before.  And we're only

15   looking for the sort of umbrella contracts.  We're not looking

16   for the purchase-order-type contracts.

17          But hypothetically, let's assume for sake of argument

18   that Samsung has an agreement with Dell to sell Dell NAND or

19   DRAM chips for their manufacturing of computers and tablets and

20   so forth.  If that -- if they are going to contend that that

21   imposes an obligation on them to supply -- a supply agreement,

22   then I think that we would be entitled to get a copy of that.

23          Now, Mr. Masters is going to tell you, well, what

24   they do at Dell is irrelevant to this case.  But it is relevant

25   because the question here is whether or not they were singling

1   out Netlist because I think we've seen that they are based on

2   the emails that we looked at in the earlier part of the

3   hearing.  But were they singling out in that list during 2017,

4   '18, '19 or were they treating us all equally?

5        So as we'll see later when we look at some RFA

6   responses, they repeatedly take the position that they told us,

7   just like all their other customers, that they couldn't always

8   fill orders.  Does that they mean that they are treating

9   Netlist the same as everybody else?  So if they couldn't fill,

10  let's say, a third of our orders or half of our orders, is that

11  the same as how they treated, say, Dell in my example?

12       And if the answer is "Yes," then that's -- we will

13  see that on a separate order that Judge McCormick ordered where

14  he asked them to provide us sales data with respect to other

15  customers.  If the answer is "No," then it is probative to know

16  if there's a contract or not because if they don't have a

17  supply obligation to Dell and yet they have a supply obligation

18  to Netlist and they're cutting Netlist's allocation, then that

19  certainly shows that what they're doing is treating Netlist

20  very differently than they're treating their other customers.

21       And that goes, again, to the heart of the question of

22  materiality here of the contract.  So I guess this -- what I'm

23  a little bit concerned about here is not the getting of this

24  one document although I think that would have to come to us at

25  least with the name unredacted.  I mean, there are other terms

44

1    of the agreement that could be redacted.

2           But I'm not willing to suggest here that similarly

3    situated or in the channel, depending on what they mean by

4    that, is an effective limitation or an appropriate limitation.

5           **THE COURT:**  Okay.  Just so that I'm clear, what I'm

6    hearing from you now, Mr. LaMagna, is that simply limiting the

7    contracts that are to be produced and the deposition testimony

8    to supply agreements is not sufficient.  What you are looking

9    for is all contracts for NAND and DRAM products; am I

10   understanding that right?

11          **MR. LAMAGNA:**  This is Ray again for Plaintiff.

12   Apologies, Your Honor.  I may have just accidentally confused

13   the Court.  No, that's not correct.  We're only looking for

14   agreements that have supply provision obligations.  So assume

15   that we -- that there was an agreement that someone has with a

16   company that Samsung has with, say, Dell.  We'll use that as an

17   example -- where it does not obligate Samsung to supply NAND or

18   DRAM products to Dell.  It simply sets forth, for example,

19   pricing terms.

20          By way of example, it might say what the lead time

21   needs to be for orders or what the --

22          **THE COURT:**  I understand.  So what you're saying is

23   in this context, you would not need the Dell.  You just need

24   the contracts for their supply conditions?

25          **MR. LAMAGNA:**  Right.  If the contract with Dell

1    obligates them, like as we contend our contract obligates them

2    to supply us.  If they have other contracts out there that

3    obligate them to supply folks, then we contend that we'd be

4    entitled to take a look at those not only for comparative

5    purposes but also to answer the question here as to who those

6    companies are.

7         So the reason this is important is assume for the

8    sake of argument that we showed that in a given period, Your

9    Honor, that our allocation got cut by 80 percent by them and

10   they say, well, we did the same thing to Dell in my example.

11   My question goes to, well, did you have a contract with Dell

12   obligating you to supply them as well?  Because if you didn't,

13   then you cut the allocation equally notwithstanding that we had

14   a contract with them.

15        We are in that way not similarly situated but with

16   Dell not just because we are a smaller company than them but

17   also because we have a contract and they do not.  On the other

18   hand, if they do have a contract with Dell, then that may

19   change the equation.  So without knowing that variable for the

20   different customers that they're selling to, do they have

21   contracts that obligate them to supply or don't they, it's very

22   difficult for us to then evaluate whether or not Netlist is

23   being treated differently or not.

24        **THE COURT:**  All right.  Mr. Masters, so originally

25   you started out explaining a specific channel and sort of the

1    limiting language regarding the supply agreement.  What do you

2    have to say about this argument that they should -- that they

3    are entitled to all supply agreements or contracts that require

4    -- obligate your client to supply these products?

5          **MR. MASTERS:**  Your Honor, I believe that that's an

6    incredible overreach on their behalf.  Let's start with --

7    first of all, Dell has nothing to do with Netlist.  They are

8    different types of customers that are treated differently, as

9    one would expect, because they purchase different volumes of

10   product.  They are entirely different types of customers.

11         And so in order to figure out whether or not Netlist

12   has somehow been discriminated against, you wouldn't look to

13   compare with a company that, of course, if going to be treated

14   differently.  You would look to companies that you would

15   anticipate to be treated the same.

16         And this -- let's just start with the contract itself

17   and I'm surprised that Mr. LaMagna does not know what that

18   terminology means in terms of similarly situated because their

19   allegations in this case are that Section 6.2 is the provision

20   that was breached by Netlist but Section 6.2 builds in the

21   concept of similarly situated entities.  What it says is,

22   Samsung will supply NAND and DRAM products to Netlist on

23   Netlist's request at a competitive price, i.e. among customers

24   purchasing similar volumes of similar products.

25         And so what Mr. LaMagna is now saying is, well, we

1  can stick with the part that says similar products, NAND and

2  DRAM, but I don't want to be limited by this provision in the

3  contract that says "similar volume" even though that's the

4  provision that we're using to base our breach-of-contract

5  claim.

6       I think it's just completely irrelevant what these

7  other contracts may or may not say and I think it's an

8  overreach, not to mention that it's an extreme burden to go

9  around the company globally to look for -- as we discussed last

10 time, to look for all contracts that may or may not have a

11 provision embedded with them -- embedded within them concerning

12 supply obligations.

13      It's not proportional and so I would ask that your

14 Honor limit this to something that's meaningful and use the

15 contract itself that they're basing their claim on to limit it

16 to similarly situated entities and by that, I mean that

17 purchase similar volumes.

18      **THE COURT:**  How do we define "similar volumes"?

19      **MR. MASTERS:**  Well, Your Honor, that's -- that

20 provision is in the contract and so it's a term that's used by

21 both parties.  Presumably there was some sort of meeting of the

22 minds as to that term.  Whether I can tell you what their

23 understanding of similar volumes is at the time, I can't but as

24 for us, I know that internally we have -- and this is --

25 predates the litigation.

48

1          We have a particular channel where we follow like

2     Netlist that tend to purchase similar volume.  It's a range.

3     It's not a tight range.  It's a full, large range.  As I

4     mentioned, the one contract that we did find had a

5     significantly higher volume than Netlist but they're all within

6     this channel of customers.

7          And so I would say that we start here.  Let's see

8     what the testimony is and then if Mr. LaMagna believes that

9     there's some basis to come back to the Court, then we can see

10    at that time.

11         **MR. LAMAGNA:**  This is Mr. LaMagna again for

12    Plaintiff, if I could respond to that.

13         **THE COURT:**  Yes, please.

14         **MR. LAMAGNA:**  So it should come as no surprise to the

15    Court that the parties have differing views on how Section 6.2

16    should be read and so one of the things that -- what we're

17    trying -- what Mr. Masters is saying is that the discovery that

18    I'm seeking is not relevant to his theory of the case.  And

19    I'll give him that.  That may be true.

20         The problem is that the discovery is relevant to

21    Plaintiff's theory of the case.  The question here is how

22    Samsung understands and conducts itself with respect to the

23    supply provision for us and with respect to other companies.

24    Well, let's -- if we can look just -- I apologize for doing

25    this, Your Honor, but the language that Mr. Masters quoted, I

1    think it sort of misdirects the Court to this similar volumes

2    point.

3            The language of the disputed provision here says,

4    "Samsung will supply NAND and DRAM products to Netlist on

5    Netlist's request."  And it then goes on to say, "at a

6    competitive price."  And that is defined -- "competitive price"

7    is defined as, "i.e. among customers purchasing similar volumes

8    of similar products."

9            So the "similar volumes, similar products, similar

10   customers," that language defines what the pricing should be.

11   That language does not define in that sentence -- just as a

12   matter of English, the antecedent to the "similar customers"

13   language is not the obligation to supply the products.  That

14   language stands alone in the sentence.  It says, "Samsung will

15   supply NAND and DRAM products to Netlist on Netlist's request."

16           So going back to my example with Dell, I will

17   concede.  Dell certainly probably has a bigger book of business

18   with Samsung than we do if they're a customer.  That is not the

19   point.  The point is that we have a supply obligation that we

20   paid for with a patent license to them that is worth, as we

21   discussed earlier, in the high tens of millions if not low

22   hundreds of millions of dollars.

23           We paid greatly for a supply provision that allows us

24   to buy products from us -- from them that essentially sends us

25   to the front of the line.  We can think of this as if the

1    Samsung supply window is like a fancy club and there are some

2    people lined up at the red rope to be let into the club.  We

3    paid a lot of money to be able to go to the front of that line

4    and be assured that our product orders would be fulfilled.

5          And it is -- therefore, if they're letting, say, Dell

6    into the club ahead of us, they need to explain why they're

7    doing that.  Do they have an agreement with Dell or not or some

8    other company?  And what they've said is that the -- what their

9    defense has been -- this is what they've articulated to us is

10   that chips were short and so they had to tell people that they

11   couldn't fill orders.

12         Well, in order to analyze that, we have to know when

13   you were telling other people that you're comparing us to that

14   you -- that, oh, we told other companies, too, that we didn't

15   have to -- that we weren't going to fill their orders, who were

16   those other companies and did they or did they not have an

17   agreement with you?  Because we paid, like, a hundred million

18   dollars for the right to get to the front of that line.

19         So I'll turn it back over to the Court or opposing

20   counsel as you prefer, Your Honor.

21         **MR. MASTERS:**  Your Honor, this is Marc Masters.  I'm

22   happy to respond if you would like.

23         **THE COURT:**  Is it short?

24         **MR. MASTERS:**  I believe so.

25         **THE COURT:**  All right.  Go ahead and then argument is

1    over and I'm ready to roll.

2             **MR. MASTERS:**  Okay.

3             **THE COURT:**  All right.

4             **MR. MASTERS:**  So Mr. LaMagna is referring to 6.2 and

5    not reading it the way it reads.  He's reading as if the term

6    "competitive price" is somehow taken out of the sentence and

7    then that alone is modified by the similar volumes.  The entire

8    provision is read as a single sentence and it says, "Samsung

9    will supply NAND and DRAM products to Netlist on Netlist's

10   request at a competitive price, i.e. among customers purchasing

11   similar volume of similar products."

12            There's no reason why there should be any discovery

13   into Dell or any other entities like them.  They're not

14   similar.  Otherwise -- the way that Mr. LaMagna wants to read

15   this provision is that "similar" means all.  And that's not

16   what "similar" means.  It doesn't mean all.  And so we are --

17   we're the only side that's proposing what "similar" means and

18   "similar" means similar -- it means that 10 to 15 resellers

19   that are in this channel that are like Netlist in terms of the

20   volume that they're purchasing.

21            Mr. LaMagna wants everything and if you say

22   "everything," then you read out the term "similar" out of this

23   contract and it's the very provision that they're relying on

24   for their breach claim.

25            **THE COURT:**  All right, thank you.

52

1          With regard to the -- let's see.  We are talking

2  about Deposition Topic 15 and Request for Production Number 16.

3  I am going to grant -- I don't believe that at this point what

4  you -- the argument really concentrated over a dispute

5  regarding the terms of the contract and what it means and as a

6  result, the discovery is relevant to the claims and defenses of

7  one, if not both, parties and I don't believe that Samsung has

8  established its burden to provide and explain to me what the

9  undue burden is here.  I have no specific information regarding

10 the undue burden of Samsung as having to produce the broader

11 category of documents.  So the motion is granted.

12          **MR. MASTERS:**  Your Honor, may I just quickly add one

13 thing on that note?  And I understand if it doesn't change Your

14 Honor's mind but with regard to burden, we discussed that at

15 the last hearing.  And just to be clear, Mr. Lee is not here.

16 He has the more updated information but my understanding is

17 that there are literally thousands, if not more, of these type

18 of contracts, not supply agreements.

19          **THE COURT:**  Okay.

20          **MR. MASTERS:**  But in order to go through these

21 thousands --

22          **THE COURT:**  Okay.  So we clarify --

23          **MR. MASTERS:**  -- or even more, tens of thousands, to

24 find a provision buried perhaps is incredibly burdensome when

25 you're talking about a company that has a worldwide reach.  It

53

1   has subsidiaries all over the world doing business.  And so

2   it's a massive burden.  If Your Honor would like, we could

3   brief it and provide some additional information but this is an

4   incredible burden for the client and it's just not relevant to

5   the case.  It's not proportional at all.

6        **THE COURT:**  Well, here the -- we've had briefing.  Is

7   there a declaration that you can point me to that establishes

8   the burden?

9        **MR. MASTERS:**  Your Honor, I do not believe we've had

10  briefing on this particular issue.  We've had briefing on other

11  issues but I, at least, do not recall any briefing as to Topic

12  15 and those -- maybe -- I don't know.  Mr. LaMagna may be able

13  to explain as to the interrogatories or document requests in

14  question but as far as I'm aware, there's been no briefing on

15  that.

16       And so I would like to offer the Court -- we can get

17  you a declaration so that you can better understand the burden

18  that's involved because it is massive from what I've been

19  informed.

20       **THE COURT:**  All right.  Mr. LaMagna, I think he's

21  right actually about the briefing.  So I'll turn it to you in

22  terms of correcting both of us but I don't think that there has

23  actually been detailed briefing with regard to Topic 15 and RFP

24  16; is that right?

25       **MR. LAMAGNA:**  Well, I guess it depends on what one

54

1    means by "detailed briefing."  We have submitted this issue and

2    discussed it with Your Honor.  It was submitted in a letter

3    briefing going back to -- with Judge McCormick.  There has been

4    a process, as you know, Your Honor, where certain things have

5    been briefed in more detail and others have not.  If we -- the

6    point that I think going through the informal process is that

7    both sides benefit from not having to do formal briefing on

8    every issue.  We get the benefit of Your Honor's experience

9    without the need and the burden of going through that.

10          As to the question here of burden, certainly -- well,

11    let me put it this way.  Certainly nothing would have prevented

12    the opposing side here from providing that declaration as part

13    of this process or having come forth prior to Your Honor

14    granting the order.  This is -- there's been a pattern of this

15    where once we get an order on something and then there's a

16    challenge or there's more evidence to it and we run into a

17    little bit of a law in motion Ground Hog Day of never having

18    any true finality in something, I think.

19          But setting that aside, as Your Honor also knows,

20    it's two weeks before our summary judgment deadline.  We at

21    some point need to bring the curtain down on this discovery.  I

22    think one concern I have on the question of burden is there's a

23    bit of a strawman argument happening here.  We're not asking

24    them to look at every contract.

25          We're asking for umbrella contracts limited to NAND

55

1   and DRAM purchasers just to begin with, not all memory

2   purchasers -- limited to these products, umbrella contracts

3   that they have with customers and ones that have supply

4   provisions in them.  I would be very surprised if they have a

5   contracting department -- if they have a legal department that

6   they don't know what contracts have that provision in it.

7         I'm not -- they -- I don't think they have to go and

8   look page by page at every contract they've ever entered into

9   at Samsung.  They should have a legal department that knows the

10   answers to which contracts have a patent license, which

11   contracts have a supply obligation, et cetera.  And so this is

12   not a mountain to climb.

13         **MR. MASTERS:**  Your Honor, may I briefly respond?

14         **THE COURT:**  Yes.

15         **MR. MASTERS:**  Marc Masters, Your Honor, on behalf of

16   Samsung.  The notion that there was nothing to prevent us from

17   submitting a declaration is a red herring.  There was no motion

18   filed and so declarations have not been submitted during this

19   informal process.  We're happy to do so in an expedited way to

20   actually provide facts to Your Honor regarding the burden

21   rather than having Mr. LaMagna speculate self-servingly as to

22   what the burden might be and what Samsung in-house counsel

23   should and should not know about contracts.

24         Samsung is a global company and I don't think that

25   lawyer speculation should be inserted for facts.  We can turn

1  around and get a declaration to Your Honor on an expedited

2  basis so that Your Honor can actually assess the burden based

3  on facts rather than speculation.

4        **THE COURT:**  All right.  So this is what we're going

5  to do.  So that we are all clear about what we are talking

6  about, we are talking about the production of umbrella

7  agreements regarding the sale of NAND and DRAM products where

8  there is a contractual requirement or obligation for Samsung to

9  sell the products.

10        I'm going to order that -- today is August 2nd --

11  that by August 5th that Samsung file a declaration with the

12  facts that it wants to provide regarding the burden of that

13  production.  I'm going to order the production of the one

14  contract and grant as to the one contract and the 30(b)(6)

15  deposition topic with regard to that one contract that was

16  already discussed.  And now what I'll be looking at will be the

17  burden as established by that declaration and I will issue a

18  ruling after reading it.

19        **MR. MASTERS:**  Thank you, Your Honor.  And this is

20  Marc Masters.  Just to confirm, did you -- did Your Honor say

21  the deadline for the declaration is August 5th?

22        **THE COURT:**  Yes.

23        **MR. MASTERS:**  Okay.  Thank you, Your Honor.

24        **THE COURT:**  Feel free to file it earlier but by no

25  later than August 5th and I'll make --

57

1          **MR. MASTERS:**  Yes, Your Honor.

2          **THE COURT:**  -- the decision on the factual evidence

3    regarding the burden of that limited category.  And please be

4    careful to make sure that your declarant is directly addressing

5    the burden of that description.  I don't want a declaration

6    that talks about the production of all contracts or anything

7    like that.  It needs to be addressed to this very -- more

8    limited category.  Otherwise, it won't address the issues and

9    the motion will be granted.  All right.

10          **MR. MASTERS:**  Understood, Your Honor, completely fair

11   and I will communicate that to the client and we will get that

12   declaration for you.

13          **MR. LAMAGNA:**  And this is Ray LaMagna for Plaintiff.

14   Again, Your Honor, as I said, we are not asking them to do a

15   page-by-page term review of all their contracts.  Our position

16   is that this is -- they should have some internal direction as

17   to which customers qualify or have this kind of a contract.  So

18   I just want to be sure --

19          **THE COURT:**  I agree.  There's got to be somebody

20   there who knows whether or not they have to -- they have a

21   supply agreement.  I agree but we'll see what it says.  I don't

22   want to act in a vacuum and given that we've done everything

23   and we want to give them this final opportunity to establish

24   the burden that they are saying this will require.

25          So let's move on.  What's next?

58

1          **MR. LAMAGNA:**  The next category, Your Honor, is this

2    is the last of the 30(b)(6) topics and the -- which is this

3    Topic 16.  It is the NAND or DRAM sales to others.  This is the

4    one where there's a corresponding order from Judge McCormick.

5    That was at Docket 76.  So Docket 76, as the Court may recall,

6    granted our RFP 11, to compel that and granted to compel

7    Interrogatory Number 9 for them to disclose sales data to other

8    -- and pricing data to other customers on basically a rolled-up

9    basis.  We're not looking for all the data.  We are looking for

10   basically monthly totals to other customers.

11          And I guess I should bring to the Court's attention

12   that last night Defendant informed us that they intend to

13   challenge this order to the District Court.  I'm not sure that

14   -- set aside -- they're -- I believe they're going to do that

15   today.  So setting aside the merits of that, the argument that

16   we had previously raised with Your Honor is, look, this is

17   something that Judge McCormick has ordered.  We're just asking

18   for a deponent on this -- on the items that they produced on

19   that subject matter.

20          We did confer on that further and we were,

21   unfortunately, not able to reach a narrower resolution.  But

22   now there is a wrinkle where I believe that Judge McCormick's

23   order may be taken up to the District judge.

24          **MR. MASTERS:**  Your Honor, this is Marc Masters.  I

25   can address that and hopefully make this quick.

1          **THE COURT:**  Okay.

2          **MR. MASTERS:**  So Mr. LaMagna is correct to the extent

3    he refers to the fact that we do intend to file today on an

4    ex parte basis a challenge to the underlying order and the

5    reasons are set forth in there.  I will not bore the Court and

6    take the Court's time with those.  That will be up to Judge

7    Scarsi and we will live by whatever the ruling is there.

8          So with regard to Topic 16, what that means as far as

9    I'm aware is that to the extent that we're successful in our

10   challenge -- and our challenge is not to the entire order, by

11   the way.  It's just to the order to the extent it's beyond the

12   channel -- it's beyond the channel for the same reasons we

13   talked about earlier.

14         And if we're successful, then we would want that

15   topic to mirror our success on that challenge and so it would

16   be limited to channel customers, retailers.  If we're

17   unsuccessful in that challenge, then the topic would remain as

18   it is.  Either way, we're going to designate in compliance with

19   Judge Scarsi's rule.  So I don't know if there's really

20   anything for Your Honor to trouble yourself with but that's the

21   background.

22         **THE COURT:**  All right, thank you.

23         **MR. LAMAGNA:**  And this is Ray again -- Ray LaMagna

24   for Plaintiff.  Do I understand what Defense counsel is

25   proposing here is that they would provide a witness on the

60

1  topic -- on the scope of Topic 16 that is commiserate with

2  whatever Judge Scarsi decides is the appropriate scope of the

3  order that Judge McCormick entered?  Do I have that correct?

4       **MR. MASTERS:**  Your Honor, Marc Masters.  Yes, that is

5  correct.

6       **MR. LAMAGNA:**  Okay.  This is Ray LaMagna again for

7  Plaintiff.  I think that the -- I'm not sure that there's

8  anything, Your Honor, that we can do about that.  I mean, in

9  other words, given that they're taking up the issue from Judge

10 McCormick, I assume that Your Honor may be reluctant to then

11 sort of jump ahead of that process.

12       I will note again that that's going to be problematic

13 because I don't know that Judge McCormick is going to decide

14 this issue necessarily on the timeline that they want and the

15 witnesses that may be put up by them on a 30(b)(6) basis may

16 already have sat for their depositions.

17       So I think that -- what I would propose is should

18 that happen that they agree to put yet again another witness up

19 to address that topic.

20       **THE COURT:**  I guess I'm not understanding the

21 distinction.

22       **MR. LAMAGNA:**  In other words, we're in the middle of

23 trying to take depositions right now, Your Honor, and if they

24 are taking one of these topics off the table because Judge

25 Scarsi is going to be deciding the scope of a different order

61

1  that is sort of a sister request, if you will, and decides that

2  after the deponent -- their 30(b)(6) deponent has sat, we

3  believe that it should be undisputed that we get another

4  30(b)(6) deponent to sit for this topic.

5           **THE COURT:**  Understood.

6           Mr. Masters, do you agree to that?

7           **MR. MASTERS:**  I need to make sure I understand what

8  the request is from Mr. LaMagna but we do intend to designate

9  someone on that topic either in the limited fashion that we're

10  proposing in our challenge or to the full extent if Judge

11  Scarsi denies our challenge.  We're filing it ex parte today.

12  I anticipate we're going to have a ruling rather quickly.

13           Their deposition with regard to that topic is not

14  until late last week and in addition to that, they just

15  indicated earlier today that they will be seeking even more

16  time.  So I'm not sure I'm following what the time issue is for

17  Netlist.  I think that the resolution will come well in advance

18  of the deposition and we'll know the full extent before the

19  deposition.

20           **MR. LAMAGNA:**  Your Honor, this is Ray LaMagna for

21  Plaintiff.  Maybe it would be easier if given that this is now

22  bound up with another dispute timeline-wise, rather than trying

23  to game out when it's going to happen if we can just all agree

24  that to the extent that there is a further dispute about this

25  topic, we can bring it back to the Court.

1          **THE COURT:**  I think that makes sense that what we are

2   doing is tabling Topic Number 16 on the 30(b)(6) witnesses

3   pending some resolution of the ex parte application related to

4   the sister discovery order.  Does that make sense?

5          **MR. LAMAGNA:**  It does, Your Honor.

6          **MR. MASTERS:**  This is Marc Masters.  Yes, Your Honor.

7          **THE COURT:**  All right.

8          **MR. LAMAGNA:**  This is Ray LaMagna again for

9   Plaintiff, Your Honor.  Except for the rogs that we were

10  starting to get into earlier, we've actually reached, I think,

11  the last of the items that we had dispute categories which is

12  the RFAs.  And there's really only one fairly narrow issue

13  there.  So perhaps we could just cover that really quickly and

14  then we can decide if we have time for the rogs or not.

15         **THE COURT:**  So what you are doing, Mr. LaMagna, is

16  transitioning us to the Request for Admission?

17         **MR. LAMAGNA:**  Yes, I think we're done with RFPs.

18  We're done with 30(b)(6), Your Honor, and I think we're now

19  going on to RFAs.

20         **THE COURT:**  So what about Topic Number 10?

21         **MR. LAMAGNA:**  I think we've been able to work that

22  out by identifying for Defendant which event we were talking

23  about.  I think there may have been some confusion as to their

24  -- on their part as to what the need was.

25         **THE COURT:**  Okay.  That's resolved.  I don't need to

63

1    worry about it.

2             **MR. LAMAGNA:**  Yes.

3             **THE COURT:**  All right.

4             **MR. LAMAGNA:**  So the remaining issue on RFAs is the

5    span of RFAs, what we call 16 through 41 and the latest

6    response here from Defendant is in their -- let me just see --

7    make sure I have the right one.  Apologies, Your Honor.  I want

8    to make sure I give you the correct title.  It's the

9    supplemental -- give me one second, Your Honor.  There's so

10   many papers.

11            I know that there is a supplemental response to our

12   RFA Number 2.  I don't know if Your Honor has that in front of

13   her.

14            **THE COURT:**  Yes, I do.  I have the second Samsung

15   supplemental responses and objections to Plaintiff for Request

16   for Admission Set 2.

17            **MR. LAMAGNA:**  Okay.  Yes, yes, the supplemental

18   responses.  I found my copy of it, Your Honor.  I think we can

19   illustrate this by --

20            **THE COURT:**  Well, before you get there, we're in RFA

21   Set 2.  Which RFAs are at issue?

22            **MR. LAMAGNA:**  It's the same exact issue repeated for

23   RFAs 16 to 41.  So I suggest we look at 16 and I think that

24   that will -- the issue populates across all of those RFAs

25   because it's an identically worded response and an identical

64

1    semantical issue.

2              THE COURT:  Okay.

3              MR. LAMAGNA:  So if you look at RFA 16, it says,

4    Admit that between certain dates Samsung canceled some orders

5    for NAND or DRAM products that Netlist placed.  So at the

6    bottom, this is, admit that Samsung canceled orders although

7    there's a date limitation.  If we go to the supplemental

8    response which is identical to the prior response -- they've

9    added the words "otherwise deny" which we had sort of implied

10   in there before.

11             They say, Defendant responds as follows.  They admit

12   only that Defendant has indicated routinely to Plaintiff

13   throughout the time period that's listed as it would with any

14   other similarly situated customer during the same time period

15   that it is unable to support every request for products

16   otherwise denied.

17             So the question that I have is, is that an admission

18   or a denial that they canceled some orders?  So to use an

19   analogy, assume that Mr. Masters invites me over to his office

20   to confer on Friday and I indicate to him that I don't know

21   that I'll be able to make it.  That doesn't necessarily answer

22   the question as to whether or not I actually did go to his

23   office or not.  I could have declined the RSVP and nevertheless

24   showed up or I could have accepted the -- RSVP'd and

25   nevertheless not shown up.

 1          So the question here is, did they or did they not

 2    cancel orders?  The response is that they indicated that

 3    they're unable to support every order and then the otherwise

 4    denial.  And I think logistically what that means is they

 5    otherwise deny is that all they're saying is that they told us

 6    they couldn't fulfill other orders they otherwise deny.  That

 7    means that they're denying that they canceled.  So that is a

 8    denial.

 9          So now on summary judgment, we are entitled under the

10    rules here -- under 2(a) admission or denial.  I can't point on

11    summary judgment and say that it's undisputed that they

12    canceled the orders, see response to RFA 16 because all that's

13    undisputed is that they told us that they couldn't fill orders.

14    It's not undisputed whether they actually canceled them or not.

15          So when I go in front of Judge Scarsi on an MSJ, I

16    can't use this RFA the way RFAs are intended to narrow the

17    dispute on the MSJ.  On the other hand, later in the case, I'm

18    sure, when we go for fees having then to continue to have to

19    prove up that point, we won't be able to use the RFA because

20    then I'm sure Mr. Masters will take a different position and

21    say, no, no, no, that was actually an admission that we

22    canceled.  You should -- you're reading it wrong.

23          So I think this could just be cleared up perhaps on

24    the record from Mr. Masters letting us know here for these RFAs

25    16 to 41, is this denying the RFA or is it admitting the RFA

 1  because it is a nonresponsive answer.

 2          **THE COURT:**  All right.  Mr. Masters.

 3          **MR. MASTERS:**  Your Honor, this is Marc Masters.  My

 4  colleague Jong-Min Choi will be addressing the Court with

 5  respect to the written discovery here.

 6          **THE COURT:**  All right.  Mr. Choi, are you prepared to

 7  talk about these RFAs?

 8          **MR. CHOI:**  Yes, Your Honor.  I even have the right

 9  file open this time.

10          **THE COURT:**  That's a good start.  So what do you have

11  to say in response to Mr. LaMagna's comment that it's -- that

12  it looks like this is a denial but it's a little bit unclear?

13          **MR. CHOI:**  Well, Your Honor, what Mr. LaMagna is

14  really doing here is forcing -- trying to force Samsung to

15  answer in the way that Netlist would like them to answer using

16  whatever terminology.  And if you look at RFAs 16 through 41,

17  it's really trying to say the same thing in a different way.

18  Samsung canceled orders, refused to sell or agree -- did not

19  agree to sell.  It's all really part of the same thing.  That's

20  why Samsung is (indisc.) the same which is Samsung did indicate

21  to Netlist on multiple occasions and routinely that it is

22  unable to support every request for product.  And if it's a

23  line you're looking for and a representation that there were

24  times when Samsung indicated it would not support every request

25  for product and that actually did not support every request for

1  product, that's a representation we could make.

2        What we do object to is Mr. LaMagna's use of the word

3  "cancel order" to describe what Samsung did or Mr. LaMagna's

4  use of the word "refuse to sell" to describe what Samsung did.

5  So if we -- the legal here -- what we are arguing about this is

6  we all agree on what Samsung did exactly that should warrant

7  that Samsung indicated that some (indisc.) would not be

8  supported and as a matter of fact, they weren't and that has,

9  in fact, occurred.

10       **THE COURT:**  Okay.  So I will just tell you both that

11  when I first read this answer, I thought that Samsung's answer

12  was that it was admitting that it canceled orders or at least

13  denied filling the orders and then now that I go through it, I

14  agree with Mr. LaMagna that it could be read to, in fact, just

15  mean generally Samsung said these things and then denied and so

16  Samsung is denying that it canceled orders.

17       So I myself, having read this response on two

18  different occasions, agree that it says potentially two

19  different things and, therefore, it's vague and ambiguous and

20  there isn't a clear answer from Samsung on -- and that might

21  have been different if the answer said, upon receiving a

22  purchase order, something like that so that it's clear that

23  these statements were in response to a purchase order and that

24  after a purchase order, product was not provided.

25       But I agree with Mr. LaMagna that this is -- these

 1  answers are not clear.  And so I am going to grant the request

 2  that these answers, because they are at this point vague and

 3  ambiguous, that a supplemental response be provided.

 4          **MR. CHOI:**  Yes, Your Honor.

 5          **THE COURT:**  Now, can that be done -- when can that be

 6  done?

 7          **MR. MASTERS:**  Your Honor, if I may interject.  This

 8  is Marc Masters.  I'm not quite sure on the timing.  I'll let

 9  Mr. Choi respond to that but I would suggest that if the time

10  is going to be pushed out, the urgency for the amended

11  responses is not as great as we previously represented.  And so

12  I would ask for some reasonable amount of time but I'll let my

13  colleague propose a specific time.

14          **MR. LAMAGNA:**  And this is Ray LaMagna for Plaintiff

15  again.  Just to clarify, Your Honor, we're going to be seeking

16  permission to take some depositions out of time and then

17  potentially move also the discovery disclosure for the expert

18  correspondingly.  We're not going to be seeking to move the MSJ

19  deadline.  So we still have an MSJ deadline on the 16th and,

20  therefore, we need to get responses in advance of that so we

21  can cite them in the MSJ.

22          **THE COURT:**  Okay.

23          **MR. MASTERS:**  And, Your Honor, just to clarify -- I

24  apologize, Your Honor.  This is Marc Masters.  Just to clarify,

25  to the extent that they go in and seek that type of an

69

1  extension with regard to our witnesses and the expert

2  disclosure deadline but not the MSJ deadline, we would in the

3  alternative request that the MSJ deadline be pushed out as well

4  so that the MSJs are filed after the close of discovery.

5          **THE COURT:**  I understand and, again, those are issues

6  for Judge Scarsi.

7          Mr. Choi, when can you prepare and provide

8  supplemental responses?

9          **MR. CHOI:**  Your Honor, could we ask five court days?

10          **THE COURT:**  So that is August 9th?

11          **MR. CHOI:**  Yes, Your Honor.  And that's the function

12  of a -- having to communicate with a client that is 16 hours

13  ahead.

14          **THE COURT:**  All right.  I think that is reasonable

15  having heard all of the argument.  So I'll order that further

16  supplemental responses to RFAs 16 to 41 be provided by August

17  -- close of business on August 9th, 2021.

18          **MR. LAMAGNA:**  And then --

19          **THE COURT:**  All right.  Go ahead.

20          **MR. LAMAGNA:**  Sorry, Your Honor.  We've actually now

21  nominally hit on most everything.  This is Ray for Plaintiff

22  again.  We -- the only thing left is the miscellaneous rog

23  responses which basically are just sufficiency questions.  I'm

24  happy to go through those or not.

25          **THE COURT:**  Well, we are currently at 2:54 p.m.  So I

1   have given you guys two hours of my time.  I have a hard time

2   believing we can get this -- the interrogatory arguments done

3   in six minutes.  Do you agree?

4           MR. LAMAGNA:  That may be a challenge for these

5   parties, Your Honor.

6           THE COURT:  So I think we need to schedule another

7   date because I cannot spend any more time today on these

8   issues.  So do you have a proposal?

9           MR. LAMAGNA:  I don't know if there's a date later

10  this week that works for the Court.  I don't -- is there -- are

11  there particular days that the Court prefers to hold these or

12  rather the opposite, not hold these types of events?

13          THE COURT:  That's a great question.  But there are

14  no dates this week.  I tend not to like to have these kinds of

15  hearings when I'm on criminal duty which is a side of the

16  Magistrate judge workload that civil lawyers never or rarely

17  see but that is not what I have this week.  So why don't you

18  purpose a date and time and I can check my calendar and Defense

19  counsel can check their calendar?

20          MR. LAMAGNA:  We could come back on the 9th if that

21  works for Your Honor or the 10th.  That's Monday or Tuesday of

22  next week.

23          THE COURT:  We're talking about this week.

24          MR. LAMAGNA:  I'm sorry.  Pardon, Your Honor?

25          THE COURT:  We're talking about this week?

71

1          **MR. LAMAGNA:**  Oh, I'm sorry.  I misunderstood the

2     Court.  I thought you said you did not have time this week and

3     we needed then to look at next week.

4          **THE COURT:**  Oh, I'm sorry.  Just to be clear, let's

5     talk about this week.

6          **MR. LAMAGNA:**  Well, I believe that Plaintiff is

7     available tomorrow, Wednesday or Friday.

8          **MR. MASTERS:**  Your Honor, this is Marc Masters.  I

9     would suggest that we do it on Friday.  I think that would

10    probably be the date that works best at least for me.  I can't

11    speak for my colleagues but I think that that date works best.

12         **THE COURT:**  All right.  Mr. LaMagna, what is your

13    schedule on Friday?

14         **MR. LAMAGNA:**  It's fairly flexible, Your Honor, but

15    the mornings -- earlier in the day is a little bit better.

16         **THE COURT:**  Actually, is it going to be Mr. Choi who

17    is arguing it on Friday?

18         **MR. CHOI:**  Yes, Your Honor, and that works with me.

19         **THE COURT:**  Okay.  Do you have any time constraints

20    on Friday?

21         **MR. CHOI:**  No, Your Honor.

22         **THE COURT:**  All right.  Let's do 10:00 a.m. on

23    Friday.  Does that work for everyone?

24         **MR. LAMAGNA:**  This is Ray LaMagna for Plaintiff.  I

25    think that's great for us.

72

1          **MR. CHOI:**  The same for me.

2          **THE COURT:**  Mr. Choi, that was you?

3          **MR. CHOI:**  Yes, Your Honor.  This is Jong-Min Choi

4   for Defendant and, yes.

5          **THE COURT:**  All right.  Mr. Masters?

6          **MR. MASTERS:**  Yes, Your Honor.  Thank you.

7          **THE COURT:**  All right.  So we will continue this

8   informal discovery conference to Friday, August 5th at 10:00

9   a.m.  All right, everybody.  I look forward to talking with you

10   then.  Have a good rest of your week.

11          **MR. LAMAGNA:**  Thank you, Your Honor.

12          **MR. MASTERS:**  Thank you, Your Honor.

13          **MR. RHOW:**  Thank you so much, Your Honor.

14          **THE COURT:**  All right, bye-bye.

15          **THE CLERK:**  This court is now adjourned.

16      **(This proceeding adjourned at 2:58 p.m.)**

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **April 24, 2022**

            Signed                                                    Dated

*TONI HUDSON, TRANSCRIBER*