1 | IRELL & MANELLA LLP
Jason G. Sheasby (205455)
2 | jsheasby@irell.com
Michael D. Harbour (298185)
3 | MHarbour@irell.com
1800 Avenue of the Stars, Suite 900
4 | Los Angeles, California 90067
Telephone:   (310) 277-1010
5 | Facsimile:   (310) 203-7199

6 | IRELL & MANELLA LLP
A. Matthew Ashley (198235)
7 | mashley@irell.com
840 Newport Center Drive, Suite 400
8 | Newport Beach, CA 92660
Telephone:   (949) 760-0991
9 | Facsimile:   (949).760-5200

10 | Attorneys for Plaintiff Netlist Inc.

11 | UNITED STATES DISTRICT COURT

12 | CENTRAL DISTRICT OF CALIFORNIA

13 | SOUTHERN DIVISION

14 | NETLIST INC., a Delaware corporation,,

15 | Plaintiff,

16 | v.

17 | SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,,

19 | Defendant.

| | |
|---|---|
| NETLIST INC., a Delaware corporation,, | Case No. CASE NO. 8:20-cv-993-MCS (ADS) |
| Plaintiff, | **PLAINTIFF NETLIST, INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON CONTRACT INTERPRETATION** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,, | **[REDACTED PUBLIC VERSION]** |
| Defendant. | Date:         February 5, 2024<br>Time:         9 a.m. PT<br>Location:   Courtroom 7C<br>Judge:       Hon. Mark C. Scarsi |

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE
NOTICE that on February 5, 2024, at 9:00 a.m., or as soon thereafter as this matter
may be heard, in Courtroom 7C of the United States District Court for the Central
District of California, located at 350 W. 1st Street, Los Angeles, CA 90012, Plaintiff
Netlist Inc. will and hereby does move for summary judgment on interpretation of the
contract at issue in this case.

This Motion is based on this Notice; the concurrently filed Memorandum of
Points and Authorities; the Declaration of Michael Harbour and accompanying
exhibits; the Proposed Supplement to Statement of Uncontroverted Facts; the
concurrently lodged Proposed Order; such matters of which this Court may take
judicial notice; the other records, pleadings, and papers filed in this action; and any
other documentary evidence or arguments that may be presented to this Court at
hearing.

This motion is made following the conference of counsel pursuant to L.R. 7-3
which took place on November 22, 2023.

Dated: January 8, 2024

Respectfully submitted,

IRELL & MANELLA LLP
A. Matthew Ashley
Jason Sheasby
Michael Harbour

By: /s/ A. Matthew Ashley
    A. Matthew Ashley

1

# **<u>TABLE OF CONTENTS</u>**

2

**<u>Page</u>**

3   I.      INTRODUCTION ..................................................................................1

4   II.     BACKGROUND ...................................................................................3

5           A.    Netlist Agrees To The JDLA With Samsung In Exchange
                  For Supply Of NAND And DRAM Products ....................................3

6
7           B.    Samsung Initially Honors The JDLA, Then Cuts Off
                  Netlist's Supply Despite Warnings From Its Executives
                  That the JDLA Required Samsung To Provide The Supply
8                 It Was Refusing ................................................................................6

9           C.    Relevant Procedural History And Samsung's Disparate
                  Interpretations Of The JDLA's Supply Clause ...................................9

10
    III.    LEGAL STANDARD ..........................................................................12
11
    IV.     ARGUMENT ......................................................................................12
12
13          A.    Samsung's Interpretation Must Be Rejected Because It
                  Violates Settled New York Canons Of Construction ........................12

14          B.    Samsung's Interpretation Must Be Rejected Because The
                  Extrinsic Evidence Overwhelmingly Undercuts It .............................15
15
16                1.    Samsung's Own Admissions ....................................................16

17                2.    Course of Performance .............................................................17

18                3.    Negotiation History .................................................................19

    V.      CONCLUSION ..................................................................................21
19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986) ................................................................................ 12

*BDO Remit (USA), Inc. v. Stichting BDO*,
   2012 WL 12895658 (C.D. Cal. Sept. 19, 2012) .................................... 12

*Brobeck, Phleger & Harrison v. Telex Corp.*,
   602 F.2d 866 (9th Cir. 1979) ................................................................ 19

*Compagnie Financiere v. Merrill Lynch*,
   232 F.3d 153 (2d Cir. 2000) ................................................................. 15

*Desco Vitro Glaze v. Mech. Const.*,
   552 N.Y.S.2d 185 (1990) ...................................................................... 15

*Elbit Sys. v. Credit Suisse*,
   842 F. Supp. 2d 733 (S.D.N.Y. 2012) ................................................... 19

*Fireguard Sprinkler v. Scottsdale Ins.*,
   864 F.2d 648 (9th 1988) ........................................................................ 19

*Gulf Ins. v. Transatlantic Reinsurance*,
   886 N.Y.S.2d 133 (2009) ...................................................................... 17

*Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*,
   523 F. Supp. 2d 1113 (C.D. Cal. 2007) ................................................ 17

*Jujamcyn Theaters v. Fed. Ins. Co.*,
   659 F. Supp. 3d 372 (S.D.N.Y. 2023) ................................................... 13

*Last Time Beverage Corp. v. F & V Distrib. Co.*,
   951 N.Y.S.2d 77 (2012) ........................................................................ 13

*Netlist Inc. v. Samsung Elecs. Co.*,
   No. 22-55209, 2022 WL 2124372 (9th Cir. June 6, 2022) ............. 11, 15

*Netlist Inc. v. Samsung Elecs. Co.*,
   No. 22-55209, 2023 WL 6820683 (9th Cir. Oct. 17, 2023) ........... 2, 3, 9

NETLIST'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON CONTRACT INTERPRETATION
CASE NO. 8:20-CV-993-MCS (ADS)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

*Netlist v. Samsung*,
    No. 21-cv-463, Dkt. 426 .................................................................. 10

*Netlist, Inc., v. Samsung Electronics Co., LTD*,
    Case No. 2:22-cv-00293-JRG, Dkt. 291 (Dec. 21, 2023) ..................... 14

*Ocean Transp. Line, Inc. v. American Philippine Fiber Indus.*,
    743 F.2d 85 (2d Cir.1984) ................................................................... 17

*Quadrant Structured Prod. v. Veritin*,
    23 N.Y. 3d 549 (NY 2014) .......................................................... 13, 14

*San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*,
    132 F.3d 1303 (9th Cir. 1997) ............................................................ 16

*Sokolowski on Behalf of M.M. & P. Pension Plan v. Aetna Life & Cas.
Co.*,
    670 F. Supp. 1199 (S.D.N.Y. 1987) ................................................... 17

*W. & S. Life Ins. v. U.S. Bank*,
    173 N.Y.S.3d 543 (2022) ................................................................... 14

*Zeke N' Zoe Corp. v. Zeke N' Zoe LLC*,
    2002 WL 72947 (S.D.N.Y. Jan. 18, 2002) ......................................... 14

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................ 12

*Unless otherwise indicated, all emphasis (in case cites or otherwise) is added.

# I.      INTRODUCTION

In 2015, Samsung made Netlist an offer: in exchange for certain rights to Netlist technology, Samsung would provide Netlist with a supply of NAND and DRAM products. Netlist gave up its initial request for a substantial $85 million upfront license payment and ongoing patent royalties because of the substantial value a supply commitment from Samsung would provide. The parties memorialized this arrangement in a Joint Development and License Agreement ("JDLA") in which Samsung expressly agreed that it "will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price."

Samsung initially fulfilled Netlist's requests for saleable products for two years. But in 2017, it changed tack by refusing to comply with the agreement it made. Samsung's interpretation of the supply provision (§ 6.2) has been a moving target. Samsung initially argued (when moving for judgment on the pleadings) that § 6.2 is not even a supply provision at all, but instead "as a matter of law" it was just a "pricing term." When that proffered interpretation failed, Samsung changed course on summary judgment. It acknowledged that § 6.2 was in fact a supply obligation, but then claimed that the supply obligation never actually arose because Samsung was only obligated to supply NAND and DRAM "for the joint development product (NVDIMM-P) which was never commercialized." After that interpretation failed, Samsung tried yet a third interpretation on appeal (the one Samsung now has apparently settled on). Samsung admitted that § 6.2 is in fact a supply obligation, and that it did in fact arise, but argued that it was limited to the joint development project alone—i.e. that it was just an obligation to supply only the few raw NAND and DRAM needed for the R&D.[1]

This Court previously held on summary judgment that the JDLA

---

[1] At times, Samsung tweaks its position, claiming that 6.2 is an obligation to supply both for the joint development project and for the joint product hoped to come out of it (NVDIMM-P).

unambiguously required Samsung to supply Netlist with NAND and DRAM for any purpose. In a 2-1 split decision, the Ninth Circuit reversed on appeal, but its holding was narrow. The majority agreed that "[s]tanding alone, the plain language of § 6.2 favors Netlist's interpretation: that Samsung must fulfill all NAND and DRAM orders by Netlist for whatever purpose," but nevertheless found that § 6.2 was ambiguous when the JDLA was "read as an integrated whole." *Netlist Inc. v. Samsung Elecs. Co.,* No. 22-55209, 2023 WL 6820683, at *1 (9th Cir. Oct. 17, 2023). The Ninth Circuit "remand[ed] to the district court to consider in the first instance *whether the extrinsic evidence 'creates a genuine issue of material fact' as to the provision's meaning.*" *Id.* at *2.

Samsung's interpretation of the supply provision is untenable as a matter of law for two independent reasons. First, under New York canons of contract interpretation, even when a contract is "ambiguous," extrinsic evidence *cannot* be used to *insert a limitation* that sophisticated parties could have included but did not. That is precisely what Samsung is attempting to do here. Samsung seeks to add the words "joint development project" as a limitation to Samsung's supply obligation. Thus, the Ninth Circuit's question can be simply answered: the extrinsic evidence here *cannot* create a genuine issue of material fact as to the meaning of section 6.2. The "joint development project" term Samsung seeks to add into section 6.2 is a defined term in the JDLA. The parties could and would have used it to limit the scope of § 6.2 if they had intended to, but they did not.

Second, the only reasonable conclusion from the extrinsic evidence is that the parties did not intend for Samsung's supply obligation to be limited to the joint development project. This is demonstrated by the JDLA negotiations, the parties' course of performance after the agreement was signed, and Samsung's own admissions. For example, during negotiations, the parties deliberately rejected language that tied Samsung's supply obligation to NVDIMM-P. Then, after the JDLA was signed, Samsung started providing Netlist with millions of dollars of NAND and

DRAM products for resale—not raw NAND and DRAM components for building the joint development product—specifically at Netlist's request. Samsung's own witnesses have acknowledged—both in pre-suit communications and sworn testimony—that Samsung was required to supply Netlist with memory products on request. Under New York law, a court may grant summary judgment on contract interpretation where the extrinsic evidence is so one-sided. This is an additional, independent basis for summary judgment in Netlist's favor.

## II.  BACKGROUND

### A.  Netlist Agrees To The JDLA With Samsung In Exchange For Supply Of NAND And DRAM Products

Founded in 2000, Netlist is an innovator in memory technologies that designs and manufactures high-performance memory products used in servers and storage systems. SUF ¶¶ 1-2.[2] Customers engage Netlist to create custom, proprietary memory products to satisfy their unique requirements. *Id.* ¶ 3. One of the companies that was interested in Netlist's technology was Samsung.

In 2015, Netlist and Samsung began discussing a potential patent license. *Id.* ¶ 12. On April 16, 2015, Netlist proposed to Samsung that Netlist license its patents for five years for $85 million and ongoing royalty payments ranging from 0.5% to 1.0%. *Id.* On May 18, 2015, Samsung provided a "counter-proposal" under which Netlist would receive far less cash and forego ongoing royalties, but as an alternative, Netlist would obtain a supply guarantee from Samsung. *Id.* ¶ 13. Specifically, Samsung proposed that Netlist would receive a supply of memory components from Samsung. *Id.*

To convince Netlist to accept, Samsung touted the enormous benefits that a supply commitment would provide. Samsung stressed that the "backing of Samsung should help

---

[2] The SUF refers to the Statement of Undisputed Facts filed by Netlist on August 16, 2021 at Dkt. 142-2. The exhibits referenced in the SUF were attached to the Declaration of Raymond LaMagna ("LaMagna Decl.") (Dkt. 145-4). References to Response SUF refer to the evidence cited in Netlist's response to Samsung's SUF in support of its prior summary judgment motion, which Netlist filed on October 21, 2021 (Dkt. 190-1).

Netlist as it endeavors to expand its business arrangements in the memory industry," and "the supply of NAND, DRAM, and NVDIMM-P related chipsets will help enable your vision of being a products company." *Id.* ¶ 14. Under Samsung's proposal, the parties would enter into a "Technology Collaboration" to jointly develop a new memory technology called NVDIMM-P. *Id.* ¶ 23.

The parties' respective supply obligations under the JDLA were heavily negotiated deal points. For instance, Samsung initially proposed that ███████████████ ███ ████████████ ████████ ████████ ████████ ████████ Dkt. 144-4 (LaMagna Decl. Ex. 4) at NL045856. During negotiations, however, the parties agreed to ████████████████████████████████████████. Dkt. 144-5 (LaMagna Decl. Ex. 5) at NL045885. Netlist in turn proposed that ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ Harbour Ex. 1 at NL049033; Proposed SSUF ¶ 1.[3]

The parties ultimately agreed that Netlist's supply obligation would be tied specifically to a particular component of the parties' joint development product (an "NVDIMM-P controller"), but Netlist had to supply this component for less than it sold NVDIMM-P controllers to its other customers. In contrast, Samsung's supply obligation generally encompassed NAND and DRAM products without reference to NVDIMM-P or the joint development project at all, but Samsung could charge Netlist a "competitive price" in comparison to other customers buying similar volumes of these products. The final version of the JDLA was executed on November 12, 2015. Section 6.1 states that "Netlist will provide Samsung any ***NVDIMM-P controller*** on Samsung's request at a

---

[3] References to "Harbour Ex. __" are to the Declaration of Michael Harbour ("Harbour Decl.") and references to "Proposed SSUF" are to Netlist's Proposed Supplement to Statement of Uncontroverted Facts, both filed concurrently herewith. As explained in Netlist's Motion to Supplement, this evidence should be considered because it is directly relevant to Netlist's motion and responsive to arguments that Samsung raised on appeal.

1   price lower than the price Netlist provides to any other buyer." SUF ¶ 33. Section 6.2 states

2   that "Samsung will supply *NAND and DRAM products* to Netlist on Netlist's request at

3   a competitive price (i.e., among customers purchasing similar volumes of similar

4   products)." *Id.* ¶ 34. Thus, under the JDLA, Netlist had a narrow supply obligation tied to

5   the joint development project, but was required to charge Samsung a more favorable price;

6   whereas Samsung has a broad supply obligation, but could charge Netlist a "competitive

7   price."

8        Netlist was willing to forego the $85 million payment and ongoing royalty that it

9   had originally proposed because the supply commitment from Samsung provided "crucial

10  value" to Netlist. *Id.* ¶ 15. This commitment would "elevat[e] Netlist into an elite group of

11  industry players and provid[e] assurances to Netlist's customers that if they engaged

12  Netlist, they would have good access to supply" and protect Netlist against "business risk"

13  stemming from possible supply shortages. *Id.* ¶¶ 16-17. In contrast, the supply

14  commitment was acceptable to Samsung given its relative size and prominence in the

15  market. Samsung's memory division supplies over 40% of all DRAM and 30% of

16  NAND memory chips sold worldwide, has tens of thousands of employees, and has

17  annual revenues of nearly $50 billion. *Id.* ¶¶ 6-8. Samsung's supply of DRAM and

18  NAND to Netlist, which had $8 million in total revenue in 2015, would thus be a drop

19  in the bucket from Samsung's perspective. *Id.* ¶¶ 5, 7, 11, 27.

20       Reflecting the importance that the JDLA's supply provision meant to Netlist's

21  business, Netlist mentioned the JDLA more than ten times in its 2015 Annual Report. SUF

22  ¶¶ 58-59. Netlist emphasized that, among other things, the JDLA "contractually commits

23  Samsung to supply NAND flash and DRAM products to [Netlist] on [its] Request." *Id.*

24  Similarly, in its 2016 10K, Netlist wrote that: "We also resell certain Samsung products

25  that we purchase under the terms of our JDLA." *See* Response SUF (Dkt. 190-1) ¶ 42

26  (quoting Dkt. 150-4 (Samsung MSJ Ex. 37) at 5, 7-8). Netlist also repeatedly reiterated

27  this (before any dispute with Samsung ever arose) in its public calls with investors and

28  analysts. *See id.* For example:

- "[W]e continue to benefit from the unique access we have . . . to certain Samsung products in the enterprise space. This includes enterprise-grade, high capacity SSDs and high-density DRAM modules. Product lines [that] Samsung is committed to supporting for the long-term." *Id.* ¶ 20 (Q3 2016 call).

- "The year-over-year increase in revenue primarily reflects the multiple benefits of our Joint Development Agreement with Samsung, which added the synergistic Samsung high-end memory products to our product offering. *Id.* (Q1 2017 call).

**B.    Samsung Initially Honors The JDLA, Then Cuts Off Netlist's Supply Despite Warnings From Its Executives That the JDLA Required Samsung To Provide The Supply It Was Refusing**

In the two years just prior to entering into the JDLA, Samsung supplied Netlist with effectively no product. SUF ¶ 70. Indeed, a senior member of Samsung's sales team had previously been "told not to support Netlist" and "actually was not allowed to visit Netlist" as of 2015. *Id.* ¶ 68. However, upon execution of the JDLA, Samsung sales personnel were "told to support Netlist." *Id.* ¶ 69.

Samsung also provided Netlist with ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Harbour Ex. 2 at NL044947; Proposed SSUF ¶ 2.

From the execution of the JDLA until around the second quarter of 2017, Samsung provided Netlist with NAND and DRAM products upon Netlist's request. SUF ¶ 71. To put this in perspective: in the two years prior to signing the JDLA, Netlist was only able to purchase a small volume of memory products from Samsung totaling just $23,343.00 because Samsung had no mandatory supply obligation. Dkt. 171-3 (LaMagna Decl. Ex. 75) (Samsung invoices). But after the JDLA, Samsung's sales to Netlist immediately rose to approximately $9 million in 2016 and approximately $16 million in just the first half of 2017. Dkt. 168-1 (Samsung's Statement of Genuine Disputes of Material Fact) at ¶¶ 72-73. Samsung has never disputed that these purchases consisted of complete memory products for resale, and could not be used for developing NVDIMM-P.

Samsung's internal documentation demonstrates that Samsung knew it had an obligation to supply Netlist NAND and DRAM on demand, and that it was not limited to the joint development project or the joint development product (NVDIMM-P). For example, in June of 2016, some Samsung employees became concerned that Netlist was possibly representing itself as a "low cost" supplier of Samsung NAND and DRAM resale products. SUF ¶ 37, Dkt. 145-10 (LaMagna Decl. Ex. 6) at -59. Samsung's Principal Engineer for Memory Product Planning & Application Engineering, Indong Kim, responded to this in an internal email in which he quoted JDLA § 6.2 in full and described it as a "a provision limited to the volume condition," meaning Netlist is entitled to purchase NAND and DRAM at price consistent with "customers purchasing similar volumes of similar product." SUF ¶ 37, Dkt. 145-10 (LaMagna Decl. Ex. 6) at -59.  He notably did not say that the supply obligation was somehow limited to NVDIMM-P or the joint development project.

In Q2 2017, however, Samsung abruptly changed course and informed Netlist that it would no longer allocate it any memory products. SUF ¶ 82 (Samsung sales representative explaining that he had "let [Netlist] know that Samsung had zero allocation in Q3 to support Netlist."). After this point, Samsung indisputably failed to supply NAND and DRAM to Netlist on request. SUF ¶ 74-76, 78, 81, 107, 109, 110. Samsung conferred internally before deciding to "distribute[] [Netlist's product assignments] to other customers such as Ma Lab" and then limit Netlist's ongoing supply of products to "$500k per month" to "prevent noise on this." *See* Dkt. 193-7 (LaMagna Decl. Ex. 21). Samsung acknowledged in internal emails that, "[s]ince Samsung is nearly 100% of [Netlist's] support and Revenue this will have a dramatic impact on their financials and future business." SUF ¶ 82. By January of 2018, Samsung had stopped shipping Netlist NAND and DRAM products altogether, *id.* ¶¶ 106-107, even though it continued to supply these products to its other customers, *id.* ¶ 83.

After Samsung cut off supply, Netlist demanded that Samsung honor the terms of the parties' agreement in order to support Netlist's resale product customer base—

customers that had no relation to the parties' joint development project or an NVDIMM-P product that was never commercialized. On February 19, 2018, Paik Ki Hong (of Netlist) sent an email to Samsung confirming that "[t]hese drastic changes have impacted our business and impacted our ability to support our customers" and Netlist "cannot accept partial support." *Id.* ¶ 108. Mr. Hong presented a chart showing the dramatic decrease in product supply:



| | Nov. 15 | Q116 | Q216 | Q316 | Q416 | Q117 | Q217 | Q317 | Q417 | Q118 |
|---|---|---|---|---|---|---|---|---|---|---|
| Samsung Supply | $ - | $ 1.2 | $ 2.1 | $ 2.1 | $ 4.7 | $ 8.2 | $ 7.7 | $ 2.8 | $ 2.5 | $ 0.4 ** |
| Samsung Allocation | NoLimitSet | NoLimitSet | NoLimitSet | NoLimitSet | NoLimitSet | NoLimitSet | NoLimitSet | $3.0* | $ 3.0 | $ - |

*Id.,* Dkt. 145-39 (LaMagna Decl. Ex. 35).

Samsung's internal communications demonstrate that, when Samsung ceased supplying Netlist with NAND and DRAM, it was fully aware that it was breaching the JDLA. On January 18, 2018, Ho-Jung Kim (whom Samsung has identified in its interrogatories as a negotiator of the JDLA); *see* Harbour Ex. 3 at 5; Proposed SSUF ¶ 6, specifically flagged § 6.2 in an internal email noting that Samsung was obligated to provide NAND and DRAM to Netlist on request "[p]ursuant to the Agreement," pasting a screen capture of JDLA § 6.2 right into the email. Dkt. 145-11 (LaMagna Decl. Ex. 7). Moreover, during his deposition in the Eastern District of Texas, Indong Kim, Samsung's Vice President of Product Planning, admitted that Samsung's conduct both violated the JDLA and was unethical:

1    Q. And do you think that's consistent with giving Netlist quote
2    'Zero allocation and no support,' which is what Samsung announced in January of 2018?

3    A. *No. I think that there's inconsistency or the contract terms stating*
4    *that there should be supply contradicts the situation in which is supply was not being made*. . . .

5    Q. Was it ethical for Samsung to cut off a hundred percent of Netlist's product supply knowing that it would destroy Netlist's business?

6    A. If a yardstick based on whether something is ethical or not is forced
7    on me and I think I'm being forced to determine this, then *I would consider it to be unethical*. So the answer is yes.

8

9    Harbour Ex. 4 at 47:22- 48:6, 70:7-15 (objections omitted); Proposed SSUF ¶ 5.

10    When it became clear that Samsung had no intention of honoring its commitments

11    under the JDLA, Netlist sent a demand letter to Samsung on May 27, 2020 informing

12    Samsung that it was in material breach of JDLA § 6.2. SUF ¶ 125. After Samsung failed

13    to respond or make any attempt to cure its breach, Netlist sent notice formally terminating

14    the JDLA on July 15, 2020. *Id.* ¶ 128.

15    **C.    Relevant Procedural History And Samsung's Disparate**
16    **Interpretations Of The JDLA's Supply Clause**

17    Netlist brought suit against Samsung alleging that Samsung had breached the

18    JDLA by failing to supply NAND and DRAM products to Netlist on request and that

19    Netlist had properly terminated the JDLA as a result. Dkt. 1. On August 16, 2021, the

20    parties cross moved for summary judgment on the issues of breach and termination.

21    Dkts. 142, 150. The Court granted Netlist's motion and denied Samsung's. Dkt. 186.

22    The case then proceeded to a trial on Netlist's claim for cost-of-cover damages for

23    breach of the supply obligation under § 6.2 of the JDLA. Following trial, Samsung

24    appealed to the Ninth Circuit. Dkt. 309. In an unpublished 2-1 decision, the majority

25    upheld multiple rulings of this Court, but reversed the grant of summary judgment on

26    the supply clause, § 6.2. *Netlist Inc.*, 2023 WL 6820683, at *2.

27    In securing this reversal, Samsung made several inconsistent representations to

28    the 9th Circuit:

1    First, Samsung argued to the Ninth Circuit that Netlist's license grant was

2    similarly tied to the parties' joint development project even though the license grant

3    also makes no mention of joint development:

4

5    8.2    <u>License to Samsung.</u> Netlist, on its own behalf and on behalf of its Subsidiaries, hereby grants, and shall grant, to Samsung and its Subsidiaries a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Netlist's Licensed Patents to make and have made (subject to Section 8.4) Samsung's Licensed Products, and to use, sell, offer for sale, import and otherwise transfer or dispose of such products.

6

7

8    Dkt. 144-1 (LaMagna Decl. Ex. 1). Specifically, Samsung relied on the JDLA's fourth

9    recital to tie the license grant to the joint development project:

10   [T]he recitals are very clear – and parties put recitals in agreements to make sure language isn't tortured down the

11   road by lawyers and courts, right? Here's what our purpose is, interpret this agreement consistent with our purpose.

12   And when you look at the recitals, what does it say about the licenses? Whereas in connection with their

13   collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents. **The**

14   **licenses are being given in connection with the collaboration. That's the joint development projec**t.

15

16   Harbour Ex. 5 (9th Cir. Hearing Transcript) at 15:10-21; Proposed SSUF ¶ 3. This,

17   however, directly contradicts Samsung's license defense arguments in the Eastern

18   District of Texas. *Netlist v. Samsung*, No. 21-cv-463 ("*Samsung I*"), Dkt. 426 (Pretrial

19   Conference Tr.) at 28:8-29:14 ("[T]he reality is that JDLA was in no way limited to

20   jointly developed products.").

21   Second, Samsung told the Ninth Circuit that the JDLA's $8 million NRE fee

22   that Samsung paid to Netlist was not a license fee, but instead payment for the joint

23   development project:

24   There's other provisions in the contract that clearly relate to the joint development project, that don't also say in

25   connection with the joint development project. That's why you have to look at the structure of the agreement in order

26   to interpret specific language. For example, in Section 3.1, there's an $8 million NRE [non-recurring engineering] fee

27   that's paid. **It's clearly for the joint development project, but it doesn't say it's specifically for the joint development**

28   **projec**t.

1    Harbour Ex. 5 at 8:16-24; Proposed SSUF ¶ 3. This contradicts Samsung's prior
2    representation to this Court (and the Eastern District of Texas) that Samsung
3    "considered the $ 8 million as consideration for Netlist's grant of patent licenses."
4    Dkt.168-2 (Samsung's Statement of Additional Material Facts), ¶ 62.

5         Finally, in the Ninth Circuit, Samsung argued that the supply clause as interpreted
6    by Netlist was entirely unique and unprecedented in Samsung's history. *Netlist Inc. v.*
7    *Samsung Elecs. Co.*, No. 22-55209, 2022 WL 2124372 (9th Cir. June 6, 2022) (Samsung
8    First Brief on Cross Appeal) at 34-35 ("No ordinary businessperson in Samsung's position
9    would agree to supply an unquantified amount of DRAM and NAND to a single customer
10   on 'request at a competitive price.'"). But its corporate representative in East Texas
11   testified to the opposite, testimony Samsung refuses to allow this Court to see and has
12   threatened to move for sanctions if Netlists presents this testimony to the Court.

13        Taking inconsistent positions has been Samsung's consistent tact throughout
14   this litigation. Indeed, Samsung has offered multiple different and inconsistent
15   interpretations of the JDLA's supply provision before this Court. Initially, Samsung
16   filed a motion for judgment on the pleadings, arguing that "[t]he JDLA contains no
17   supply obligation of any kind[.]" Dkt. 60 at 8. Instead, according to Samsung, this
18   clause was ████████████████████ Dkt. 58-1 at 11. The Court denied Samsung's
19   motion. Dkt. 120 at 4 ("The Court declines to conclude that the only reasonable
20   interpretation of the provision is that it governs price only.").

21        Samsung then changed course. In its motion for summary judgment on contract
22   interpretation, Samsung did not dispute that § 6.2 required it to supply memory
23   products to Netlist. According to Samsung, however, ██████████████████
24   ██████████████████████████████████████████████
25   ██████████████ Dkt. 157-2 (Samsung's SUF) ¶ 21. The Court rejected this
26   interpretation as well in denying Samsung's summary judgment motion. Dkt. 186 at
27   9.

28        On appeal before the Ninth Circuit, Samsung proffered yet a third interpretation

of the JDLA's supply clause. Tracking Samsung's own proffered separate statement of fact to this Court (quoted above), Justice Desai asked Samsung:  "So is it your position that Samsung never had any supply obligation under the agreement, based on the language I think that you cite that says 6.2 imposed a supply obligation if the joint development product ever, quote, became commercialized?" Harbour Ex. 5 at 6:10-14; Proposed SSUF ¶ 4. In response, and contrary to its proffered statement of fact #21 to this Court on summary judgment, Samsung stated: "There was an obligation under 6.2 We don't deny that. There was an obligation to supply the memory chips in connection with the joint development project. There was an obligation to supply it during the development stage so they had access to those chips and if the project were successful and the NVDIMM-P product were commercialized, there would be an obligation supply those memory chips to Netlist, in order for Netlist to sell the product." Harbour Ex. 5 at 7:18-8:1; Proposed SSUF ¶ 4.

## III.   LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Although on summary judgment a court is obligated to draw all inferences in favor of the nonmoving party, the inferences drawn must be reasonable." *BDO Remit (USA), Inc. v. Stichting BDO*, 2012 WL 12895658, at *24 (C.D. Cal. Sept. 19, 2012). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

## IV.   ARGUMENT

Even when considering the extrinsic evidence, it is beyond reasonable dispute that the supply clause required Samsung to provide Netlist with NAND and DRAM products for any purpose on request.

### A.   Samsung's Interpretation Must Be Rejected Because It Violates Settled New York Canons Of Construction

Under New York law (which governs the JDLA), even if a contract is ambiguous, courts may grant judgment as a matter of law where the non-moving parties' interpretation conflicts with established canons of contract interpretation. *See, e.g., Last Time Beverage Corp. v. F & V Distrib. Co.*, 951 N.Y.S.2d 77, 81 (2012) ("[T]o the extent that [the contract provision in question] may be ambiguous, the Supreme Court properly resorted to the canons of construction. . . ."); *Jujamcyn Theaters v. Fed. Ins. Co.*, 659 F. Supp. 3d 372, 382 (S.D.N.Y. 2023) ("on summary judgment," New York courts may "appl[y] canons of construction to resolve ambiguities in contractual language."). According to New York's highest court (the Court of Appeals), one of those canons holds that, ***"[e]ven where there is ambiguity, if the parties to a contract omit terms—particularly terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission***." *Quadrant Structured Prod. v. Veritin*, 23 N.Y. 3d 549, 560 (NY 2014). This is particularly true where, as here, the contract involves sophisticated parties. *Id.*

Samsung's attempt to read an implicit joint-project-development limitation into the JDLA's supply clause based on the extrinsic evidence violates this canon of construction. As noted above, while Netlist's supply obligation under § 6.1 is expressly limited to the joint development product (NVDIMM-P), the parties chose ***not*** to include any such limitation for Samsung's supply obligation under § 6.2:

**Section 6.   SUPPLY OF COMPONENTS**

6.1   Supply by Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer.

6.2   Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products).

Dkt. 144-1 (LaMagna Decl. Ex. 1). If the parties had intended to limit § 6.2 to the joint development project, there were multiple ways that they could have done so. Indeed, "Joint Development Project" (or "JDP") is an expressly defined term in the JDLA, and the parties could and certainly would have used this term if they had

intended to limit § 6.2 to joint development. *Id.* § 1. The JDLA also contains the defined terms "NVDIMM-P Product," and "Developed Product," and the parties used these terms throughout the agreement when they intended for them to apply. *See, e.g.*, *Id.* § 4.2 (Solely- and Jointly-Owned Patents); § 5.1 (Standardization); § 5.2 (Right of First Refusal); § 5.3 (Productization); § 5.4 (Sole Collaboration IPR License); § 16.3 (Compliance With Laws). Similarly, other contractual provisions are expressly limited to the parties' "development work," including all of § 2 which governs "Collaborative Development Work," and § 3 which governs "Development Costs."

Section 6.2, however, makes no mention of the "Developed Product," "Joint Development Project," "JDP," "NVDIMM-P," or "development work." Under *Quadrant* and the other authority cited above, this omission **must** be regarded as intentional regardless of ambiguity. 23 N.Y. 3d at 560; *W. & S. Life Ins. v. U.S. Bank*, 173 N.Y.S.3d 543, 551-52 (2022) ("[E]ven if there were an ambiguity, we would be compelled to conclude that the parties' omission of terms that are readily found in other, similar contracts was intentional.").

Moreover, Samsung's attempt to selectively read an implicit "joint development project" (and sometimes "joint development product" and other times "joint development project and product") limitation into some provisions of the JDLA but not others is arbitrary and unreasonable. *See Zeke N' Zoe Corp. v. Zeke N' Zoe LLC*, 2002 WL 72947, at *2 (S.D.N.Y. Jan. 18, 2002) (A "wholly implausible" interpretation cannot "defeat summary judgment" "even if the license agreement were deemed ambiguous.") (applying New York law). Samsung claims in East Texas that the JDLA's license grant is *not* limited to the joint development project because it does not mention any such limitation. *Netlist, Inc., v. Samsung Electronics Co., LTD*, Case No. 2:22-cv-00293-JRG ("*Samsung 2*"), Dkt. 291 at 11 (Dec. 21, 2023) ("[T]he parties intended to, and did, exchange unambiguously broad license rights in JDLA § 8."). Yet Samsung successfully argued in the Ninth Circuit that JDLA provisions— namely the license clause, supply clause and the $8 million NRE fee—which make

no mention of the joint development project, should nevertheless be read as limited to the joint development project. Samsung cannot reach into the ether and imply the addition of a joint development limitation into the supply clause yet elide that same limitation when it comes to the license grant.

In addition to being internally inconsistent with Samsung's proffered interpretation of the license grant, as demonstrated above, Samsung's interpretation of the supply clause has been woefully inconsistent. Samsung first claimed § 6.2 was ███████████████████████████████████ Dkt. 50-1 at 15; then Samsung claimed that ████████████████████████████████████████████ ████████████████████████████████████████ Dkt. 157-2 (Samsung's SUF) ¶ 21; and finally, Samsung claimed that the supply obligation was limited to the joint development ***project,*** which ended in 2017, *Netlist Inc.*, 2022 WL 2124372 (Samsung's First Brief on Cross Appeal) at 29. Even assuming any of these varying "interpretations" were viable, Samsung has produced no evidence that would allow a jury to principally choose one over the other.

### B.   Samsung's Interpretation Must Be Rejected Because The Extrinsic Evidence Overwhelmingly Undercuts It

Even assuming that Samsung's internally inconsistent and ever-varying interpretation(s) of Samsung's supply provision were plausible, it is unsupported by relevant extrinsic evidence. "[W]here on summary judgment the opposing party fails to submit extrinsic evidence in support of its interpretation of a contract or other instrument, the resolution of any ambiguity in terms is a matter of law for the court. . . ." *Desco Vitro Glaze v. Mech. Const.*, 552 N.Y.S.2d 185, 186–87 (1990). Moreover, a "[c]ourt may resolve the ambiguity in the contractual language as a matter of law . . . if the extrinsic evidence is so-one sided that no reasonable factfinder could decide contrary to one party's interpretation." *Compagnie Financiere v. Merrill Lynch*, 232 F.3d 153, 159 (2d Cir. 2000). This is consistent with Ninth Circuit precedent: "This circuit has not, however, adopted a rigid rule prohibiting reference to extrinsic

evidence in resolving a contractual ambiguity on a summary judgment motion." *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd*., 132 F.3d 1303, 1307 (9th Cir. 1997). Thus, "[o]nly if the ambiguity could be" resolved "consistent[ly] with the non-moving party's claim . . . would summary judgment be denied." *Id.*

Here, the extrinsic evidence is wholly inconsistent with Samsung's interpretation of the supply provision as demonstrated by (1) Samsung's post breach admissions; (2) the parties' subsequent conduct after the JDLA was signed; and (3) the parties' negotiations.

### 1.   Samsung's Own Admissions

Samsung has acknowledged—both in internal communications and sworn deposition testimony—that the JDLA required it to provide Netlist with NAND and DRAM products on request. On January 18, 2018, which was after Samsung had told Netlist it had "zero allocation" to support Netlist, Ho-Jung Kim (whom Samsung has identified in its interrogatories as a negotiator of the JDLA) specifically flagged § 6.2 in an internal email noting that "[p]ursuant to the agreement, supply for NAND and DRAM products is necessary if there is a request from Netlist."

| | |
|---|---|
| From: | Ho-jung Kim [hojung4623.kim@samsung.com] |
| Sent: | 1/18/2018 1:09:06 PM |
| To: | Hyeok-sang Yoo[hsang.yoo@samsung.com] |
| Subject: | Netlist JDLA Agreement |
| Attachments: | 151113_Netlist Agreement (Signed version).pdf |

Director,

Please refer to the attached JDLA agreement with Netlist.
Pursuant to the agreement, supply for NAND and DRAM products is necessary if there is a request from Netlist.

6.2   Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of

similar products).

SUF ¶ 38, Dkt. 145-11 (LaMagna Decl. Ex. 7) at -69.

Notably, this email was sent *after* Samsung asserts that the joint development project was "abandoned," which according to Samsung occurred "at some point before 2017." Dkt. 168 at 24; Dkt. 145-30 at 9 (Samsung's interrogatory response stating

that "joint development activities" "were concluded in late 2017."). Thus, it could not have been referring to an obligation to supply Netlist solely for the joint development project. Nor could it have been referring to supply for the joint development product (NVDIMM-P), as Samsung admits ███████████████████████. Dkt. 157-2 (Samsung's SUF) ¶ 21. Thus, Samsung knew full well that it had an obligation to supply NAND and DRAM to Netlist on Netlist's request, and that this obligation was not limited to the joint development project or NVDIMM-P. *Sokolowski on Behalf of M.M. & P. Pension Plan v. Aetna Life & Cas. Co.*, 670 F. Supp. 1199, 1206 (S.D.N.Y. 1987) (One important type of "extrinsic evidence" is how a party "itself interpreted the disputed provision"); *see also Ocean Transp. Line, Inc. v. American Philippine Fiber Indus.*, 743 F.2d 85, 91 (2d Cir.1984) ("[T]he 'parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent.").

Moreover, as discussed above, Indong Kim, Samsung's Vice President of Product Planning, admitted during his deposition in the Eastern District of Texas case, that Samsung's failure to supply NAND and DRAM on Netlist's request was inconsistent with the JDLA. Harbour Ex. 4 at 47:22- 48:6; Proposed SSUF ¶ 5. He further acknowledged that it was "unethical" for Samsung to have cut off Netlist's supply, which would make no sense if Samsung's supply obligation was somehow limited to the joint development project or NVDIMM-P. Harbour Ex. 4 at 70:7-15; Proposed SSUF ¶ 5. A party's sworn admission is "[p]erhaps the most compelling extrinsic evidence" of the parties' intent. *Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1129 (C.D. Cal. 2007) (granting summary judgment).

### 2. Course of Performance

The parties' subsequent course of performance after the JDLA was signed further shows that Samsung understood that it was required to provide Samsung with NAND and DRAM products upon Netlist's request, unlimited to the joint development project or product. *Gulf Ins. v. Transatlantic Reinsurance*, 886 N.Y.S.2d 133, 143 (2009) ("[T]he parties' course of performance under the contract is

1  considered to be the 'most persuasive evidence of the agreed intention of the
2  parties.'"). In the two years prior to signing the JDLA, Netlist was only able to
3  purchase a small volume of memory products from Samsung totaling just $23,343
4  because it had no mandatory supply obligation. Dkt. 171-1 ¶ 2, Dkt. 171-3 (LaMagna
5  Decl. Ex. 75). In comparison, after the execution of the JDLA, Netlist requested and
6  obtained large quantities of memory products: $ 9 million in 2016 and $ 16 million in
7  just part of the first half of 2017. Dkt. 168-1 (Samsung's Statement of Genuine Disputes
8  of Material Fact) at ¶¶ 72-73.

9        Samsung also provided Netlist with ████████████████████████████
10 ███████████████████████████████████████████████████████████████
11 ███████████████████████████████████████████████ Harbour
12 Ex. 2 at -47; Proposed SSUF ¶ 2. This confirmation makes no sense if the supply
13 commitment was limited to the never-developed NVDIMM-P or to joint development
14 work (i.e. R&D), neither of which would involve resale of Samsung product to Netlist's
15 customers. Moreover, when certain employees inquired about the scope of Samsung's
16 supply obligation to determine whether Netlist's representations to its customers were
17 accurate, Indong Kim, described § 6.2 as a "a provision limited to the volume condition,"
18 not to NVDIMM-P or the joint development project. SUF ¶ 37.

19       Netlist's communications to its investors right after the JDLA was signed also
20 show that Netlist understood Samsung's supply obligation to be unlimited. In the first 10-
21 K Netlist issued after the JDLA was signed, Netlist emphasized that the JDLA
22 "contractually com[mits] Samsung to supply NAND flash and DRAM products to
23 [Netlist] on [its] request." Id. ¶ 59. Netlist similarly highlighted the benefits of Samsung's
24 supply commitment on subsequent investor calls. See, supra, Section II.A. These
25 statements were made before any dispute with Samsung, and none of them would make
26 any sense if Samsung's supply clause were limited to the joint development project or the
27 never-developed NVDIMM-P.

28

### 3. Negotiation History

The JDLA negotiation history further confirms Netlist's interpretation. As discussed above, Samsung convinced Netlist to forego an $85 million payment and ongoing royalties in exchange for "[s]upply of NAND, DRAM and/or NVDIMM-P controllers," SUF ¶ 13, which, according to Samsung, would "help Netlist as it endeavors to expand its business arrangements in the memory industry" and "enable [Netlist's] vision of being a products company." *Id.* ¶ 14. This makes no sense if the supply commitment was limited to the joint development project or a product that might never even result in a commercial product.

The negotiation history also demonstrates that the parties' specifically intended to limit Netlist's supply to the joint development product (NVDIMM-P), but not Samsung's. Samsung proposed language ███████████████████████████████████████████████████████████████ Dkt. 144-4 (LaMagna Decl. Ex. 4) at NL045856. Netlist in turn proposed language that ██████████████████████████████████████████████████████ Dkt. 144-5 (LaMagna Decl. Ex. 5) at NL045885. Both of these proposals, however, were rejected. Dkt. 144-1 (LaMagna Decl. Ex. 1). The fact that the parties expressly chose to ████████████████████████████████████████████████████████████████████████████████ demonstrates that the parties specifically intended for Samsung's supply obligation to be broad in scope. *See Elbit Sys. v. Credit Suisse*, 842 F. Supp. 2d 733, 743 (S.D.N.Y. 2012) (declining to adopt interpretation that parties "rejected" during negotiations). Indeed, "[w]ords deleted from a contract may be the strongest evidence of the intention of the parties." *Fireguard Sprinkler v. Scottstdale Ins.*, 864 F.2d 648, 651 (9th 1988). Samsung cannot insert a limitation into a contractual provision that the parties considered but chose not to include. *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 874 (9th Cir. 1979) ("We think that the only correct inference

1   to be drawn from the omission of Telex's proposal in the final contract is that the

2   parties agreed that Brobeck would be entitled to its additional fee" without limitation).

3       Samsung cannot point to any extrinsic evidence that creates a material dispute of

4   fact in light of the above. Samsung has previously relied on a reference to █████████

5   ████████████████████████████████████████████████████████████████

6   █████████████████████████████████ Dkt. 157-1 at 16-18; Dkt. 343 at 12.

7   Nothing supports this inference. As an initial matter, the JDLA expressly supersedes the

8   MOU, Dkt. 144-1 (LaMagna Decl. Ex. 1) (JDLA) § 16.7, and the MOU itself states that

9   ████████████████████████████████████████████████████████████████

10  ███████████████████████████████████ Dkt. 188-4 (Choi Decl. Ex. 21)

11  at NL069668. But even setting that aside, nothing in the MOU limits Samsung's supply

12  obligation to the joint development project or NVDIMM-P. ████████████████████

13  ████████████████████████████████████████████████████████████████

14  ███████████████████████ . *Id.* at NL069669 ██████████████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████

17      Samsung previously pointed to snippets of the deposition testimony of Chuck Hong

18  (Netlist's CEO) wherein he noted (uncontroversially) that NAND and DRAM would go

19  into the NVDIMM-P product if it was ever developed. Dkt. 190-1 ¶ 26. Samsung notably

20  did not ask whether, and Mr. Hong did not testify that, NAND and DRAM were *only* for

21  the NVDIMM-P product in case it was ever developed. On the contrary, Mr. Hong made

22  crystal clear that Samsung's supply obligation was not limited to supply for the potential

23  joint development product. Ex. 171-12 (Hong C.D. Cal. Dep.) at 220:3-220:6 ("Q When

24  you signed the JDLA, did you understand the supply provision there to be limited to

25  NVDIMM-P? A No, absolutely not."); *id.* at 221:11-221:14 ("Q Did anyone at Samsung

26  ever say that they -- that Samsung wanted to have that provision limited to components for

27  making NVDIMM-P products? A No."). Nor did Mr. Hong ever testify that the supply

28  obligation was just for the joint development project; indeed, he expressly testified that

would make no sense because the research and development work would amount to nothing more than a few hundred parts, which is not something the parties would have been bargaining over. *Id.* at 222:6-22.

In sum, the extrinsic evidence exclusively favors Netlist's interpretation. This is an independent reason to grant summary judgment on contract interpretation to Netlist.

## V.    CONCLUSION

For the reasons explained above, Netlist's Motion should be granted.

Dated:  January 8, 2024                    Respectfully submitted,

                                                    IRELL & MANELLA LLP
                                                    Jason Sheasby
                                                    A. Matthew Ashley
                                                    Michael Harbour

                                                    By: */s/ A. Matthew Ashley*
                                                            A. Matthew Ashley

                                                    Attorneys for Plaintiff Netlist Inc.

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Netlist, Inc., certifies that this brief contains 6,998 words, which complies with the word limit of L.R. 11-6.1.

Dated: January 8, 2024                    By: */s/ A. Matthew Ashley*
                                                    A. Matthew Ahsley