JASON SHEASBY, SBN 205455
jsheasby@irell.com
MICHAEL HARBOUR, SBN 298185
mharbour@irell.com
IRELL & MANELLA LLP
1800 Ave. of the Stars
Los Angeles, CA 90067
Telephone: 310.203.7096
Facsimile:  310.203.7199

A. MATTHEW ASHLEY, SBN 198235
mashley@irell.com
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone: 949.760.0991
Facsimile:  949.760.5200

Attorneys for Plaintiff Netlist Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>　　　　　Defendant. | Case No. 8:20-cv-00993-MCS (ADS)<br><br>**JOINT DISPUTED JURY INSTRUCTIONS**<br><br>Judge Mark C. Scarsi<br><br>Final Pretrial Conference:<br>Date:　　　March 18, 2024<br>Time:　　　2:00 p.m.<br><br>Trial:  March 26, 2024 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

11305095

Plaintiff NETLIST, INC., by and through its undersigned counsel, and Defendant SAMSUNG ELECTRONICS CO., LTD., by and through its undersigned counsel, respectfully submit the following Disputed Jury Instructions.

### INDEX OF DISPUTED JURY INSTRUCTIONS

| Instruction No. | Title | Source | Party | Page No. |
|---|---|---|---|---|
| 1 | Claims And Defenses | **Plaintiff's Proposal:** Ninth Circuit Manual of Modern Jury Instructions, 1.5 (modified); Samsung's Supplemental Response to Interrogatory No. 21; Court's Ruling on Summary Judgment (Dkt. 186); Order Re: Motions In Limine (Dkt. 243); *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55209, 2023 WL 6820683, at *3 (9th Cir. Oct. 17, 2023) | Plaintiff/ Defendant | 24 |
| 2 | Established Facts | Verdict, Dkt. 276, at 1 | Defendant | 35 |
| 3 | Contract Interpretation | **Plaintiff's Proposal:** N.Y. Pattern Jury Instr.—Civil 4:1; Court's Ruling on Summary Judgment (Dkt. 186) **Defendant's Proposal:** *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 460 (2004); *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248-49 (N.Y. 1975); *Aeneas McDonald Police Benevolent Ass'n, Inc. v. City of Geneva*, 92 | Plaintiff/ Defendant | 39 |

| Instruction No. | Title | Source | Party | Page No. |
|---|---|---|---|---|
| | | N.Y.2d 326, 333 (1998); *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006); *Fed. Ins. Co. v. Ams. Ins. Co.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999); *In re MPM Silicones, LLC*, 874 F.3d 787, 796 (2d Cir. 2017); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 126 (2d Cir. 2006); *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 651 (1993) | | |
| 4 | Breach of contract | **Plaintiff's Proposal:** N.Y. Pattern Jury Instr.—Civil 4:1; Court's Ruling on Summary Judgment (Dkt. 186) at 9-10 ("Samsung does not dispute that it declined to fulfill all of Netlist's orders for NAND and DRAM products."); Minute Order Requiring the Parties to Revise Trial Filings (Dkt. 453) at 2 ("The law of the case likely requires a finding for Netlist on the issue of breach if the jury adopts Netlist's interpretation of JDLA § 6.2.")<br><br>**Defendant's Proposal:** Source: N.Y. Pattern Jury Instr.—Civil 4:1 | Plaintiff/ Defendant | 53 |

| Instruction No. | Title | Source | Party | Page No. |
|---|---|---|---|---|
| | | (Contracts—Elements) (modified)] | | |
| 5 | Material Breach | **Plaintiff's Proposal:** *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55209, 2023 WL 6820683, at *3 (9th Cir. Oct. 17, 2023); *Doner-Hedrick v. New York Inst. of Tech.*, 874 F. Supp. 2d 227, 242 (S.D.N.Y. 2012); *ESPN v. Office of Com'r*, 76 FS2d 416, 421 (SDNY 1999); *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55209, 2023 WL 6820683, at *2 (9th Cir. Oct. 17, 2023) *PRCM Advisers LLC v. Two Harbors Inv. Corp.* 2021 WL 2582132, at *7 (S.D.N.Y. June 23, 2021); *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993); *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 187 (1st Dep't. 2007), *aff'd*, 14 N.Y.3d 791 (2010).<br><br>**Defendant's Proposal:** 9th Circuit Memorandum Opinion, Dkt. 334, at 7 (citing *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997); *Hadden v. Consol. Edison Co. of N.Y., Inc.*, 312 N.E.2d 445, 449 (N.Y. | Plaintiff/ Defendant | 58 |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

| Instruction No. | Title | Source | Party | Page No. |
|---|---|---|---|---|
| | | 1974); Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981)) | | |

Approved as to form and content:

Dated: March 13, 2024                    Counsel for Plaintiff

*/s/ Jason G. Sheasby*
Jason Sheasby
A. Matthew Ashley
Michael Harbour
**IRELL & MANELLA LLP**
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660

***Attorneys for Plaintiff Netlist, Inc.***

Dated:  March 13, 2024                    Counsel for Defendant

By: */s/ Marc Feinstein*
Marc Feinstein
O'MELVENY & MYERS LLP
Attorneys for Defendant
Samsung Electronics Co., Ltd.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

11305095

***Parties' Positions on Threshold Issues of (1) whether the jury may make its own interpretation of the JDLA and (2) whether Netlist May Argue that Samsung Breached Section 6.2 of the JDLA under Samsung's proffered interpretation.***

**<u>Plaintiff's Position</u>**

> ***The jury is required to reach its own independent conclusion as to whether Samsung breached based on its own understanding of Section 6.2 of the JDLA.***
This Court's Minute Order noted that "Netlist should be given an opportunity to prove breach under the jury's interpretation even if that interpretation does not align with its own." Dkt. 453 at 3.  As this Court held, "Samsung's framework leaves uncertain what should result if the jury rejects both parties' interpretations and divines its own (for example, one of the interpretations of § 6.2 Samsung previously advanced, (see Proposed FPTCO 4–5))." Dtk. 453 at 2.  As a matter of law, the jury is not bound to accept either party's interpretation of the contract. *See, e.g., Pabban Dev. Inc. v. Sarl*, No. SA-cv-1000533-BRO-RN-BX, 2014 WL 12585802, at *5, n.4 (C.D. Cal. Aug. 8, 2014) ("[T]he jury here was not required to return a verdict that complied with the parties' understanding of the [contract]. Rather, it was required to weigh the evidence presented to it by the parties and render its verdict."). Indeed, it is well established that a jury need not base its verdict on either party's theory of the case so long as the jury's verdict is consistent with the record evidence.  *See, e.g., DeCaire v. Mukasey,* 530 F.3d 1, 20 n. 11 (1st Cir.2008) (stating that district court may rely on theory not advanced by either party because "[j]udges, like juries, may draw inferences, so long as they are supported by the evidence"); *Davis v. MPW Indus. Servs*., 535 F. App'x 220, 222 (4th Cir. 2013) (unpublished) (refusing to "jettison the jury's award because it is inconsistent with the parties' theories of the case"); *Gallo v. Crocker,* 321 F.2d 876, 879 (5th Cir. 1963) ("The jury was not required to accept, in its entirety, the theory of either party, and it was its duty to consider all the testimony of the witnesses in the light of the physical facts and the circumstances shown.").

Netlist's proposed jury instructions and verdict form allow the jury to determine

whether Samsung breached the JDLA under either Netlist's interpretation or the various interpretations Samsung has advanced. There will be substantial record evidence at trial to establish breach under multiple different interpretations. For example, one of Samsung's original interpretations of the clause was that it was a pure pricing clause with no supply obligation, without making any reference to NV-DIMM P:

> Defendant's business understanding is that Section 6.2 of the Agreement is a price-setting term that creates only the obligation to sell products at a competitive price, without the obligation to sell any particular quantity of products. This understanding has not change over time.

Samsung Response to Interrogatory No. 21. Section 6.2 defines a "competitive price" as "among customers producing similar volumes of similar products." And Samsung's internal documents evidence violation even under this interpretation:

----- Original Message -----
**Sender:** Yong Hwangbo  <yong.hwangbo@samsung.com> VP/Group Leader/Business Strategy Group(Memory)/ Samsung Electronics
**Date:** 2018-02-02 11:40 (GMT+9)
**Title:** Regarding the Netlist agreement
**To:** Joo Sun Choi <joosun.choi@samsung.com> Hyun-ki Ji <hyunki.ji@samsung.com>, Sung-han Kim <arniee.kim@samsung.com, Ho-jung Kim <hojung4623.kim@samsung.com>

Chief.

This is the part of the agreement related to N company's sales,
and there is an obligation to supply NAND/DRAM at a competitive price if N company makes a request.

You may have already received a report on it and have knowledge of this, but
The quantity for N company has been decreased a lot to the level of '17.1Q $8.2M → 4Q $2.5M,
and the supply price is somewhat higher than other similarly sized company (Smart Modular).
I will report this matter to the business director on Monday next week and will circle back.

Thank you.
Yong Hwangbo

**Section 6.   SUPPLY OF COMPONENTS**

6.1     Supply by Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer.

6.2     Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (i.e., among customers purchasing similar volumes of similar products).

Netlist Trial Exhibit (PX683) at 3 (highlight of supply clause in original). The recipients of these emails include JS Choi, the decision maker on pricing and supply for Netlist, and Ho-Jung Kim, one of the JDLA negotiators.

Moreover, constraining the jury to Samsung's current interpretation of the contract or Netlist's consistent interpretation of the contract since the time of breach creates significant due process concerns.  Samsung submitted verified interrogatory responses as to its interpretation of Section 6.2 that state "This understanding has not changed over time."  But Samsung has advanced two different interpretations in its interrogatories and is now advancing a third.

- Samsung Response to Interrogatory No. 21: ***Defendant's business understanding*** is that Section 6.2 of the Agreement is a price-setting term that creates only the obligation to sell products at a competitive price, without the obligation to sell any particular quantity of products. This ***understanding has not changed over time***.

- Samsung Supplemental Response to Interrogatory No. 21: ***Defendant's business understanding*** is that Section 6.2 of the Agreement is a price setting term that creates only the obligation to sell products at a competitive price, without the obligation to sell any particular quantity of products, where such products relate to and are required for the joint development of a new NVDIMM-P standard contemplated by the Agreement, and a supply of NAND and DRAM products as raw materials if and when the NVDIMM-P standard underwent successful productization and commercialization  as Chuck Hong confirmed in his deposition testimony. This ***understanding has not changed over time.***

- Samsung's Proposed Jury Instruction: "Samsung contends that Section 6.2 required it to supply Netlist with NAND and DRAM products only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized."

The Court will need to resolve whether Samsung should be allowed to change positions after its final interrogatory response.  But at minimum its interrogatory responses reflect facts in the record that the jury can consider.

***Netlist is entitled to argue that Samsung breached under its own new interpretation.*** Samsung contends that Netlist should not be entitled to argue to the

jury that Samsung breached the JDLA under Samsung's new interpretation of the agreement as reflected in its proposed jury instructions. This is incorrect.

As this Court stated in its Minute Order date March 8, 2024, "the Court is aware of no agreement between the parties that the breach issue must be resolved in Samsung's favor if the jury refuses Netlist's proffered interpretation." Dkt. at 453 at 2. Nor has Netlist ever conceded that there was no breach under Samsung's interpretation(s). Netlist's operative complaint alleges that "Samsung entered into an Agreement with Netlist that required Samsung to supply NAND and DRAM products to Netlist on Netlist's request at a competitive price. Samsung breached the Agreement by failing to supply these products to Netlist on request." Dkt. 22 ¶¶ 26-27. Similarly, in response to Samsung's interrogatory requesting that Netlist "DESCRIBE in detail all facts supporting your contention in Paragraph 20 of the FAC that 'Samsung's breaches preclude a material purpose of the Agreement,'" Netlist responded:

> Section 6.2 of the Agreement provided that "Samsung will supply NAND and DRAM products to Netlist on Netlist's request…." Netlist negotiated for this obligation by Samsung to obtain surety in the consistent and reliable supply of Samsung NAND and DRAM products. And Netlist paid substantial consideration for this assurance from Samsung—specifically, Netlist agreed to allow Samsung to practice Netlist's patents. Yet, as noted above, Samsung did not perform as obligated.

Netlist Corrected and Suppl. Responses to 1st Set of Interrogatories (Interrogatory No. 12). The allegations quoted above do not exclude the possibility that Samsung breached the JDLA under its current interpretation (which it just recently articulated prior to trial)—i.e., that Samsung's obligation to supply NAND and DRAM was limited to the joint development project or product (NVDIMM-P). In this case the jury will hear evidence that Samsung repudiated even its NVDIMM-P obligation. For example, internal Samsung documents indicate that it was withholding requests from netlist for NVDIMM pieces.

1

2   Back in April of last year, we had a discussion on whether to go ahead with the components for Modular.

Back then, there was an opinion that as for the components for use in NVDIMM, it would be advisable to just go ahead
3   with other companies excluding NETLIST due to contractual (?) issues between the two companies.

4

5   So, before deciding on whether to confirm below samples, I'd like to ask you to check whether there would be any

6   serious issues even if our company proceeds with the components for NETLIST NVDIMM.

7

8   Have a great day today as well,

Thank you.

9

10   - SuJin Park

11

12   Netlist Trial Exhibit (PX72) at 5-6. Netlist affirmatively disputed Samsung's

13   contention that it was an "undisputed fact" that "Netlist received all of the chips it

14   needed to complete the initial phase of the NVDIMM-P." Dkt. 170 ¶ 46. As Netlist

15   explained "Defendant's cited supporting evidence does not support the fact. Mr.

16   Chuck Hong did not testify as to this fact. As noted below, the development of the

17   NVDIMM-P product itself was never finished under the JDLA." *Id.* Netlist has never

18   retracted its position.

19       The record evidence also supports a finding that Samsung breached even under

20   its own proffered interpretation. To take just one example, Samsung has never

21   disputed that, in May of 2017, it informed Netlist that "Samsung had zero allocation

22   in Q3 to support Netlist." Dkt. 168-1 ¶ 82. The record also demonstrates that, in the

23   beginning of 2018, "Samsung has stopped shipping Netlist NAND and DRAM

24   products altogether." Dkt. 355-1 at 7:24-26. Even if Samsung's supply obligation was

25   limited to the joint development project only, its decision to completely cutoff

26   Netlist's supply of NAND and DRAM entirely would constitute a breach of the

27   agreement. This is just one example. Netlist is entitled to introduce other evidence

28   that Samsung breached the JDLA under its own interpretation in both its affirmative

1  case and by cross-examining Samsung's witnesses.

2  Samsung argues below that the Ninth Circuit only held that two interpretations
3  were reasonable options and therefore the jury should be constrained to these two
4  options.  This does not answer the question however because the Ninth Circuit was
5  not presented with full briefing on the change in position Samsung is now attempting.
6  The Ninth Circuit held nothing more than that "It would also be reasonable to read
7  §§ 6.1 and 6.2 as complementary mirror provisions that describe the parties'
8  obligations to provide components of the **NVDIMM-P** product" and that the clause
9  could "reasonably be understood as restricted to the NVDIMM-P project."  CA 22-
10  55209, Dkt. 77-1, at 4, 5.  In Samsung's first interrogatory response, "the NVDIMM-
11  P product" was not referenced.  In Samsung's second interrogatory response, supply
12  obligation was constrained to "if and when the NVDIMM-P standard underwent
13  successful productization[.]"  In Samsung's jury instructions and in its argument
14  below, the interpretation is now a handful of chips for any product development tasks
15  that occur before productization.  Samsung's change is particularly pernicious
16  because the JDLA is not about productization.  Productization awaits another
17  agreement.

18

19  5.3   Productization. The Parties will work together to bring a Developed Product to market
20  according to the schedule for standardization and productization as specified in Appendix C
    attached hereto. Details for further technical collaboration for such productization and any Non-
21  Patent Background IPR licenses for commercialization will be negotiated in good faith at a later
    date.

22

23  The Federal Circuit was not faced with assessing the due process impact of the
24  material change in position Samsung is advancing.

25  Samsung spends the first portion of its statement below stating it has been
26  "ambush[ed]."  Netlist made its positions on the impropriety of changing positions in
27  its previous submissions to the Court, Netlist fully explained its position in meet and
28  confer on Monday.  Samsung and Netlist exchanged proposed verdict forms and jury

1  instructions within in minutes of each other at 11AM on Tuesday, March 12.
2  Samsung presented its arguments below at 2:30AM on Wednesday, March 13.  The
3  record speaks for itself.

4  **Defendant's Position**

5      As an initial matter, Netlist's counsel attempted to preclude Samsung from
6  adequately addressing to the Court why it should reject Netlist's new attempts to
7  present previously undisclosed theories of breach to the jury by refusing to disclose
8  any of these theories during the Court-ordered meet and confer.  Instead, Netlist
9  refused to provide answers to nearly every one of the questions the Court posed and
10 asked the parties to discuss, instead revealing them for the first time hours before
11 this filing is due.  Netlist's representations to this Court that it somehow "fully
12 explained its position in meet and confer on Monday" are simply not true.

13     Specifically, the Court ordered the parties to meet and confer to discuss the
14 particular questions in the March 8 order.  On March 9, Samsung's counsel emailed
15 Netlist's counsel to set up that meet and confer, but Netlist's counsel ignored it until
16 the following Monday, March 11.  When the parties began the call, Samsung's
17 counsel immediately told them the circumstances that led to the filing of the Joint
18 Statement for a Continuance earlier today, *see* Dkt. 455-1.  The parties then turned
19 to discussing the issues the Court had ordered for this filing.

20     During that discussion, the parties went through each question the Court had
21 ordered them to discuss, but Netlist's counsel refused to disclose any of Netlist's
22 positions on the jury instructions or verdict forms, despite Samsung asking
23 numerous times and despite counsel clearly laying out Samsung's positions.

24     Netlist disclosed only that it would not propose the jury be asked about
25 interpretation at all—which, as explained herein, is inappropriate and contrary to the
26 Ninth Circuit's mandate and the law—and it would propose the jury be presented
27 only with breach.  They refused to provide any information on what that meant,
28 stating only they would get back to Samsung.

1   Counsel likewise refused to say what Netlist's position was on whether a jury
2   could pick its own interpretation, again stating only Netlist would get back to
3   Samsung.  And while Netlist disclosed its position that if the jury were to adopt
4   Samsung's interpretation of Section 6.2 there still might be a breach, despite
5   numerous requests during the conference, Netlist's counsel refused to provide any
6   information about what theory or theories of breach Netlist might now intend to
7   pursue or what evidence it might now intend to present that might possibly establish
8   such an undisclosed theory.[1]

9   Given Netlist's counsel's refusal to participate in the conference in any
10  meaningful way to discuss the issues the Court provided or give any details on the
11  new theories of breach counsel had apparently decided over the weekend it would
12  pursue at trial, but which remained too half-baked to disclose, Netlist materially
13  prejudiced Samsung's ability to prepare its position papers.

14  The first time Netlist disclosed *any* of these new theories of breach to
15  Samsung was this evening, just hours before the filing deadline.  And along with
16  those new undisclosed theories of breach, Netlist also presented for the first time
17  undisclosed evidence that it cherry picked without any context and represents to the
18  Court will establish those previously undisclosed breach theories.  A case of trial by
19  ambush could not be more clear.

20  ***The jury is tasked with deciding between the two interpretations of Section***
21  ***6.2 that the Ninth Circuit has held are reasonable.***

22  Netlist's position it sent to Samsung this evening but refused to disclose
23  during the conference of counsel the Court ordered—that the jury is free to decide
24  on *any* interpretation of Section 6.2 "based on its own understanding" of the
25
26
27  [1] In light of Netlist's refusal to disclose to Samsung what theories of breach it
28  intended to present at trial, discussion of whether it would be appropriate to bifurcate interpretation from breach was impossible.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

provision, no matter how unreasonable and regardless of whether Netlist has ***ever*** asserted a breach under such a provision—is simply not the law.

Netlist has only ever asserted a single theory of breach of Section 6.2: that Samsung breached by failing to fulfill Netlist's requests for NAND and DRAM outside the context of the parties' joint-development project.  That is how Netlist pled its case, how it responded to discovery requests, how it opposed Samsung's motion for summary judgment both before and after remand, and how it argued its case to the Ninth Circuit.  And the Ninth Circuit held as a matter of law that Section 6.2 of the JDLA is reasonably susceptible to ***two*** interpretations.  Netlist's attempt to evade that history and conduct a "trial by ambush" contravenes New York law and fundamental fairness principles, and would be highly prejudicial to Samsung, for several independent reasons.

***First***, Netlist misconstrues the role of the jury in this case, which is to resolve the contractual ambiguity identified by the Ninth Circuit by considering the extrinsic evidence.  Under New York law, "[t]he threshold question of whether a writing is ambiguous 'is the exclusive province of the Court.'"  *Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 156 (N.Y. App. Div. 1983) (citation omitted); *accord, e.g.,* *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990); *Ocean Partners, LLC v. North River Ins. Co.*, 546 F. Supp. 2d 101, 104 (S.D.N.Y. 2008).  To find an ambiguity, a court must conclude that the language is "susceptible of two reasonable interpretations."  *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985).  Only if a court has found such an ambiguity—and the extrinsic evidence raises a triable issue of fact on the parties' intent—is a jury asked to resolve that ambiguity.

On appeal, the parties presented, and the Ninth Circuit considered, only two interpretations of Section 6.2.  Netlist's proffered interpretation was that "Samsung must fulfill all NAND and DRAM orders by Netlist for whatever purpose."  Dkt. 334 (Ninth Circuit Memorandum Opinion) at 3.  Samsung, on the other hand, contended that Section 6.2 required it to provide NAND and DRAM on Netlist's

request only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized. *Id.* at 2, 4. The Ninth Circuit, considering the text, structure, and purpose of the JDLA, held that Section 6.2 was reasonably susceptible to ***those two*** interpretations—not a hypothetical third interpretation. Whether such a third interpretation of Section 6.2 would be reasonable is "the exclusive province of the Court," *Schmidt*, 97 A.D.2d at 156, and the jury should not be permitted to divine its own interpretation of the provision, however unreasonable.

      Consistent with these principles, in cases in which a jury must resolve a contractual ambiguity via extrinsic evidence, courts regularly hold that the ***plaintiff bears the burden of proving its proffered interpretation***. *See D.S. Magazines, Inc. v. Warner Pub. Servs. Inc.*, 640 F. Supp. 1194, 1202 (S.D.N.Y 1986) ("[B]ecause plaintiff bears the burden of proof by a fair preponderance of the evidence, plaintiff has failed to prove that its interpretation of the contract was what the parties intended and, therefore, that Warner breached the contracts."); *Kramer v. Greene*, 142 A.D.3d 438, 440 (N.Y. App. Div. 2016) ("[T]he party seeking to enforce the contract bears the burden at trial to establish that a binding agreement was made and to prove its terms."); *see also* N.Y. Pattern Jury Instr.—Civil 4:1 (Contracts—Elements) ("AB has the burden of proving, by a preponderance of the evidence, that (he, she, it) had a contract with CD requiring that CD [state nature of defendant's alleged contractual promise(s)]…."); *cf. Centerline/Fleet Hous. P'ship, L.P. v. Hopkins Court Apartments, L.L.C.*, 195 A.D.3d 1375, 1377 (N.Y. App. Div. 2021) (at summary judgment, the moving party bears the burden of establishing that their "construction of the [contract] is the only construction [that] can fairly be placed thereon"); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 442-43 (2d Cir. 1995) (contract was ambiguous as to whether "inclement weather" referred to any weather that precluded construction of hotel or only "unusually severe weather" beyond that which was customary for the time of year; trial court was correct to

1  "charge[] the jury to decide which interpretation was intended by the contracting

2  parties").

3         Accordingly, where a court has determined that a provision is reasonably

4  susceptible to both parties' proffered interpretations, it is appropriate to (i) instruct

5  the jury to decide whether the breach-of-contract plaintiff has proven its proffered

6  interpretation of the disputed provision, and (ii) provide verdict forms requiring the

7  jury to find that the breach-of-contract plaintiff has so proven—rather than to permit

8  the jury to divine its own interpretation of the contract.  *See, e.g.*, *Catlin Spec. Ins.*

9  *Co. v. QA3 Fin. Corp.*, Case No. 10 Civ. 8844 (S.D.N.Y. Oct. 3, 2013), Dkt. 163 at

10 591:20-592:12 (instructing jury to decide between parties' proffered interpretations

11 in case involving breach-of-contract counterclaim), Dkt. 165 at 1 (verdict form

12 requiring jury to select among proffered interpretations).

13         ***Second***, Netlist filed this case nearly four years ago, litigating it through

14 discovery, through expert reports, through summary judgment, through pre-trial

15 filings and a trial on damages, to the Ninth Circuit and back, then through another

16 round of summary judgment, and through what were to be the parties' pre-trial

17 filings last week.  Yet until today, Netlist has ***never*** asserted a breach under any

18 interpretation other than the one it has advanced throughout this litigation—namely,

19 that Samsung was required to supply Netlist with whatever NAND and DRAM

20 products it requested, for any purpose.  Now, mere weeks before the start of trial,

21 and knowing the evidence in no way shows the parties intended Netlist's

22 interpretation of Section 6.2, Netlist saw an opportunity in the Court's March 8

23 order and attempts to use it to achieve trial by ambush, seeking to advance brand

24 new theories of liability—both under ***Samsung's*** interpretation of Section 6.2 and

25 under a hypothetical third interpretation that it contends the jury could divine.

26 Courts regularly prohibit parties from asserting such eleventh-hour theories because

27 of the obvious prejudice to the opposing party.  If Netlist wanted to seek to impose

28

1  liability on Samsung for any of these new theories, it must point to a basis already in

2  the record, not something that it cooked up over the weekend.

3      But Netlist did not present any theory of liability under Section 6.2 other than

4  Samsung's failure to provide NAND and DRAM products for Netlist to re-sell to its

5  customers in its original complaint.  *See* Compl. ¶ 11 ("Samsung deliberately began

6  to restrict Netlist's access to products and failed to fulfill its orders, often without

7  notice and always in violation of the Agreement."); *id.* ¶ 13 ("When Samsung failed

8  to fulfill Netlists' orders, Netlist could not supply its customers and lost business

9  opportunities and profits it otherwise would have earned had Samsung performed.").

10     Nor does Netlist's amended complaint allege that Samsung breached Section

11  6.2 *in any way other than by failing to provide NAND and DRAM products for*

12  *Netlist to re-sell to its customers*.  *See* FAC ¶ 14 ("When Samsung failed to fulfill

13  Netlists' orders, Netlist could not supply its customers and lost business

14  opportunities and profits it otherwise would have earned had Samsung performed.");

15  *id.* ¶ 27 ("Samsung breached the Agreement by failing to supply these products to

16  Netlist on request.").  Nothing in Netlist's First Amended Complaint remotely

17  suggests that Samsung breached Section 6.2 by failing to offer Netlist a

18  "competitive price" for NAND and DRAM "among customers producing similar

19  volumes of similar products," as Netlist now contends.

20     Nor did Netlist present these new theories of breach in its interrogatory

21  responses or amended interrogatory responses.  Nowhere in Netlist's interrogatory

22  responses or supplemental responses calling for such a new theory of breach did

23  Netlist ever identify one.  Samsung asked Netlist to identify the damages caused by

24  the alleged breaches (No. 5); facts supporting Netlist's allegations of deliberate

25  restriction in violation of the agreement (No. 8); lost business opportunities (No. 9);

26  how the material purpose of the agreement was precluded (No. 12); and the joint

27  development activities (No. 18).  *See* Netlist Obj. & Resp. to Samsung's Rogs (Aug.

28  1, 2021); Netlist Corrected & Suppl. Obj. & Resp. to Samsung's Rogs (Aug. 16,

2021).  Instead of presenting the breach theories it now presses on the eve of trial, Netlist routinely responded with failure to supply for re-sale as the obligation that was breached.[2]

Nor did Netlist present these new theories of breach in in its summary judgment motion.  *See* Dkt. 193 at 24 (Netlist describing Samsung's "breach of its supply obligation").  Or in its opposition to Samsung's summary judgment motion.  *See* Dkt. 171, at 1 (Netlist describing Section 6.2 as a "mandatory supply obligation").  Indeed, Samsung twice argued that it was ***entitled to summary judgment*** on Netlist's claim for breach of Section 6.2 on the grounds that Samsung's supply obligation was limited to the joint-development project.  *See* Dkt. 157-1 (Samsung's Motion for Summary Judgment) ("[T]he deal did not include an agreement to supply anything beyond what was necessary for the joint development project and only to the extent the NVDIMM-P was commercialized."); Dkt. 381 (Samsung's Supplemental Opening Summary Judgment Brief) at 5 ("Because there

_____

[2] *See* Netlist Obj. & Resp. to Samsung's Rogs (Aug. 1, 2021), at 14 ("Samsung's refusal of Netlist product requests and cancellation of Netlist orders violated Section 6.2."), 16 ("Netlist could not properly service its own customers' orders with respect to products requiring Samsung NAND or DRAM products if Samsung did not supply Netlist with the NAND and DRAM products Netlist requested."), 17 ("Samsung's failure to support, accept, and fulfill Netlist's NAND and DRAM product requests as required by Section 6.2 of the Agreement thus substantially impaired, if not effectively ended, Netlist's business operation directed to Samsung-focused NAND and DRAM customer solutions.").  Nor in its amended interrogatory responses.  *See* Netlist Corrected & Suppl. Obj. & Resp. to Samsung's Rogs (Aug. 16, 2021), at 14 ("Samsung's refusal of Netlist product requests and cancellation of Netlist orders violated Section 6.2."), 16 ("Netlist could not properly service its own customers' orders with respect to products requiring Samsung NAND or DRAM products if Samsung did not supply Netlist with the NAND and DRAM products Netlist requested."), 17 ("Samsung's failure to support, accept, and fulfill Netlist's NAND and DRAM product requests as required by Section 6.2 of the Agreement thus substantially impaired, if not effectively ended, Netlist's business operation directed to Samsung-focused NAND and DRAM customer solutions.").

is no dispute that Samsung fulfilled its obligation to supply Netlist with NAND and DRAM for the JDP, Samsung is entitled to judgment on Netlist's first claim for relief ….").  Netlist argued that summary judgment was inappropriate because Section 6.2 required Samsung to supply NAND and DRAM without any limitation to the JDP, *see, e.g.*, Dkt. 171 (Netlist's Opposition to Samsung's Motion for Summary Judgment) at 4-13; Dkt. 371-1 (Netlist's Supplemental Responsive Brief) at 9—*not* because there was any evidence of a breach under Samsung's interpretation or any other.

Undeterred, Netlist nevertheless argues that it "affirmatively disputed Samsung's contention that it was an 'undisputed fact' that 'Netlist received all of the chips it needed to complete the initial phase of the NVDIMM-P.' Dkt. 170 ¶ 46." *Supra* at 5.  To put it generously, Netlist misstates the facts.  Netlist submitted no evidence disputing Samsung's contention, relying on attorney argument instead that Samsung could not be correct because the NVDIMM-P product was never commercialized.  *See* Dkt. 170-1 ¶ 46.  Netlist also contended that such argument was immaterial because "Section 6.2 of the JDLA is not limited to the completion of the initial phase of the NVDIMM-P product." *Id.*  Citing Section 6.2, ***Netlist maintained that Section 6.2 is an unlimited supply provision***.  Having failed to raise such arguments in opposition to Samsung's motion for summary judgment, Netlist has now abandoned them.  *Cf.* Dkt. 243 at 4-6 (deeming Samsung's affirmative defenses abandoned because Samsung did not raise them in opposition to Netlist's motion for summary judgment).

Nor did Netlist present these new theories of breach at the 2021 damages trial.  *See* Dec. 1, 2021 PM Hearing Transcript at 40-41 (Netlist opening statement: "Samsung breached its contractual obligation to provide the . . . memory components upon request, that was the obligation[.]").  Or in its Ninth Circuit briefing.  *See* Case No. 22-55209, Dkt. 22, at 4 (Samsung "declined to fulfill all of Netlist's requests for NAND and DRAM products").  Or in its post-remand motion

1   for partial summary judgment on contract interpretation.  *See* Dkt. No. 355 at 8

2   ("[W]hen Samsung ceased supplying Netlist with NAND and DRAM, it was fully

3   aware that it was breaching the JDLA.").  Or in its supplemental summary judgment

4   responsive brief.  *See* Dkt. 371-1 at 9 ("[T]he JDLA required Samsung to provide

5   Netlist with NAND and DRAM products without restriction to the joint

6   development project.").  Or in its memorandum of fact and law that it filed two

7   weeks ago in advance of trial.  *See* Dkt. 406 at 12 ("The only claim to be tried to the

8   jury is Netlist's claim that Samsung materially breached its contract with Netlist by

9   failing to supply NAND and DRAM products to Netlist[.]").  Or in its statement of

10  the case that it filed last week.  *See* Dkt. 433 at 1 ("Netlist claims that Samsung

11  materially breached its contract with Netlist by failing to supply NAND and DRAM

12  products upon Netlist's request.").  Or, finally, in its jury instructions or verdict

13  form that it filed last week.  *See* Dkt. 437 at 4-5 (verdict form); Dkt. 439 at 1

14  ("Netlist claims that section 6.2 of the JDLA required Samsung to supply NAND

15  and DRAM products to Netlist on Netlist's request, and that Samsung breached this

16  provision by failing to fulfill Netlist's requests.").

17          Despite obviously never having asserted any of these theories of breach

18  before in this litigation, Netlist nevertheless attempts to present evidence—in a

19  filing about jury instructions, no less—that it says shows it can establish these

20  undisclosed theories of breach at trial.  As a threshold issue, it is highly improper for

21  Netlist to include screenshots of trial exhibits in its disputed jury instruction filing,

22  much less for it to do so for the first time.  But even were the Court to consider this

23  end-run around Netlist's failure to ever present this evidence at summary judgment,

24  in discovery, or at any other time, the evidence does not even establish what Netlist

25  claims.

26          <u>First</u>, Netlist cites an out-of-context partial screen grab of PX683 at 3 in a

27  misleading attempt to argue that there will be "substantial record evidence" to

28  establish breach under a previously undisclosed theory that Samsung supposedly

failed to competitively price products it sold to Netlist.  *Supra* at 2.  In the email Netlist improperly embeds and presents to the Court for the first time in its jury instruction statement, Yong Hwangbo, ***an employee of Samsung's strategic planning department with no personal knowledge of or responsibility for Samsung's sales <u>or</u> the technical performance of the joint development project***, states that "supply price [provided to Netlist] is somewhat higher than other similarly sized company (Smart Modular)."

This perfectly illustrates why courts prohibit the eleventh hour assertion of new theories of breach never previously presented:  In reality, Lane Kim—who was at the time ***Director of US Memory Sales and actually had personal knowledge of Samsung's sales to Netlist***—testified ***under oath*** during his deposition in this action ***that Mr. Hwangbo was mistaken in his email***, which was later forwarded to him by Arnold Kim.  *See* L. Kim Dep. Ex. 49.  Mr. Kim confirmed that "at the time the products were supplied [to Netlist] at a fair price."  L. Kim Dep. Tr. at 59:4-13, 60:19-23, 61:5-6.  Mr. Kim questioned how such a comparison to the prices given to Smart Modular would even have been made "when Smart Modular did not purchase any SSDs," and Smart Modular was not similar in size to Netlist.  L. Kim Dep. Tr. at 61:17-62:9.  In fact, Mr. Hwangbo was so far removed from Samsung's sales operations that ***Lane Kim did not even know who Mr. Hwangbo was***.  L. Kim Dep. Tr. at 59:2–59:3, 60:4–60:6.

<u>Next</u>, Netlist takes yet another email out of context in an attempt to argue that "Netlist is entitled to argue that Samsung breached under its own interpretation."  *Supra* at 2.  Netlist says it will present "internal Samsung documents indicate that [Samsung] was withholding requests from Netslist for NVDIMM pieces."  *Id*. at 5.[3]

---

[3] Netlist fails to explain how this newfound intent to prove that Samsung breached Section 6.2 by failing to provide chips for the NVDIMM-P can be squared with its statements elsewhere in the same document contending that Netlist intends

Netlist again misleadingly cites yet another out-of-context partial screen grab of an email written by an unknown person who is not a trial witness and who has ***not been shown to have any personal knowledge of the JDLA or its terms***, PX 72 at 5-6. Yet, not even the remainder of the thread supports a conclusion that Samsung ultimately failed to fulfil "requests from Netlist for NVDIMM pieces."

The email at the top of the thread in the actual PX 72, which Netlist unsurprisingly fails to mention or present to the Court, confirms that the relevant NVDIMM "***samples were already confirmed (I see these were confirmed last year) and are currently being prepared***"; per a prior email from Director of Memory Sales Hyeok-sang Yoo, instructed that confirmed purchase orders were not to be deleted.  PX 72 at SEC003541-542.

Given that Netlist's own "evidence" supporting these undisclosed theories of breach actually establishes that there was no such breach, it is not surprising that Netlist CEO Chuck Hong admitted in his deposition that ***Samsung never breached its NVDIMM-P supply obligation***:

> Q. To do the joint development work that you did that comprised the 10 million plus [dollars of investment by Netlist] we've been talking about, **did Netlist ever not have a sufficient amount of DRAM or NAND chips?**
>
> A. ***No***.[4]

Finally, Netlist claims that "the record evidence also supports a finding that Samsung breached even under its own proffered interpretation," which Samsung has

---

to prove "the plain language of the JDLA requires Samsung to supply products instead of chips." *Id.* at 11.

[4] C. Hong Dep. Tr. at 88:20-24. Other witnesses said the exact same thing. *See also* Yoo Dep. Tr. at 22:16-23:9 ("Q. You're not aware of ***any instance*** in which a request for NVDIMM-P by Netlist was refused by Samsung, is that your testimony? A. That's correct.  My understanding is that request for Samsung's memory products for development of NVDIMM-P had been supplied.").

supposedly never disputed.  *Supra* at 5.   Once again, ***Samsung has never before***
***needed to dispute such a theory of breach where Netlist has never before asserted***
***it***.[5]

\* \* \*

It goes without saying that permitting Netlist to assert brand-new theories of
breach, years after discovery has closed, as the parties are preparing for trial would
be highly prejudicial to Samsung.  Samsung has not had the opportunity to take
discovery on—or otherwise prepare to defend against—these theories.  For those
reasons, courts regularly preclude parties from asserting new theories of liability at
late stages in the case, and the Court do so here.  *See Krigsfeld v. Feldman*, 982
N.Y.S.2d 487, 488-89 (N.Y. App. Div. 2014) (holding that the trial court erred
"when it mischaracterized the nature of the plaintiffs' breach of contract cause of
action by charging the jury on a theory of liability that was not pleaded in the
complaint"); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291-92 (9th Cir. 2000)
(trial court properly precluded party from asserting new theory of liability at
summary judgment because "[a] complaint guides the parties' discovery, putting the
defendant on notice of the evidence it needs to adduce in order to defend against the
plaintiff's allegations" and permitting the new theory "after the close of discovery
would prejudice Quaker"); *Meyers v. Kaiser Found. Health Plan, Inc.*, 807 F. App'x
651, 654 (9th Cir. 2020) ("[T]his new theory of liability was not asserted in
[Plaintiff's] complaint but was raised for the first time in her opening trial brief.
[Plaintiff] thereby waived this claim."); *Gonzalez v. U.S.*, 589 F.2d 465, 469 (9th
Cir. 1979)  (where party raised respondeat superior theory of liability for the first

---

[5] But even if that alone did not dispose of this question, Netlist once again
misrepresents the facts.  Netlist cites Dkt. 168-1 ¶ 82, which in turn cites LaMagna
MSJ Decl. Ex. 18, an email thread that only discusses Netlist's requests for SSD
products.  See LaMagna MSJ Decl. Ex. 18 at SEC058105-106.  Indeed, Netlist's
own sales data show that Netlist purchased $5,352,306 of memory products from
Samsung in the second half of 2017.  Choi MSJ Decl. Ex. 51, NL117869.

time at trial, trial court properly excluded this "entirely different theory of liability" that "had come too late, was not contemplated in the pretrial order, and would result in prejudice to the defendant"); *IV Sols., Inc. v. Conn. Gen. Life Ins. Co.*, 2015 WL 12843822, at *14 (C.D. Cal. Jan. 29, 2015) (precluding party from asserting new fraud theory at summary judgment; "[a]llowing a plaintiff (or defendant) to allege one theory, but then pursue relief on an entirely different theory at summary judgment and trial, is inconsistent with the Federal Rules"); *Parapluie, Inc. v. Mills*, 2012 WL 12887556, at *12 (C.D. Cal. Apr. 30, 2012) (precluding new theory of liability at summary judgment that was "neither pled in the complaint nor asserted at any point in the litigation," which would create prejudice given "the lack of any reference" to the theory previously and would require the defendant to "adduce evidence concerning an entirely new theory of liability"); *Teetex LLC v. Zeetex, LLC*, 2022 WL 1203097, at *5 (N.D. Cal. Apr. 22, 2022) (precluding new theory of liability asserted "for the first time" at summary judgment; "discovery has closed and adding a new theory of liability would prejudice the [] Defendants.").

Unsurprisingly, none of the cases that Netlist cites hold that a jury is free to divine its own interpretation of an ambiguous contractual provision—much less find breach under a theory never asserted by the plaintiff until the eve of trial. Of the four cases Netlist cites, two do not even concern contract claims. *See DeCaire v. Mukasey*, 530 F.3d 1 (1st Cir. 2008) (employment discrimination claim); *Gallo v. Crocker*, 321 F.2d 876 (5th Cir. 1963) (negligence claim). Generic statements of law that juries need not accept the theories of the parties in their entirety do not resolve the specific question presented by the Court.

As for the two cases that do involve contract claims—neither of which are governed by New York law—neither case holds that a jury may develop its own interpretation of an ambiguous contract. *Pabban* simply held that, having found one defendant to have breached the contract, the jury was not required to find that the other defendant was also liable for the breach by virtue of a guarantee clause in the

contract just because plaintiff argued as much.  *Pabban Dev. Inc. v. Sarl*, 2014 WL 12585802, at *5 (C.D. Cal. Aug. 8, 2014).  In fact, *Pabban* notes that it was the plaintiff's burden to prove that the provision obligated the co-defendant to guarantee any liabilities, but the plaintiff failed to present any evidence to that effect.  *Id.*  And *Davis* merely concluded that when the defendant presented evidence to argue that no contract was formed in the first place, the jury could permissibly consider that same evidence in calculating damages after it determined that a contract was in fact formed.  *Davis v. MPW Indus. Servs.*, 535 F. App'x 220, 222 (4th Cir. 2013).  Neither case has any bearing on the jury's proper function in resolving a contractual ambiguity.

Finally, Netlist again argues that Samsung's has offered different interpretations of Section 6.2, and that this somehow raises "due process concerns."  But as discussed above, Netlist has never asserted a breach under any of the interpretations it attributes to Samsung, so if anything it would prejudice ***Samsung*** to permit Netlist to depart from the interpretation and theory of breach that it has always maintained in this case.  If Netlist believed that Samsung breached Section 6.2 under some interpretation, it should have said so at some point during this nearly three-year-long litigation.  It would severely prejudice Samsung to allow Netlist to argue a new breach theory to the jury (under an interpretation of Section 6.2 that no court has held to be reasonable) after years of hiding the ball.

Nor is it true, as Netlist suggests, that the interpretation Samsung advances here was never disclosed.  In the supplemental interrogatory response cited by Netlist, Samsung stated that its business understanding of Section 6.2 was that Samsung's supply obligation covered products that "relate to and are required for the joint development of a new NVDIMM-P standard contemplated by the Agreement, and a supply of NAND and DRAM products as raw materials if and when the NVDIMM-P standard underwent successful productization and commercialization."  Samsung Supplemental Response to Interrogatory No. 21.  In

its proposed jury instructions, Samsung essentially offers the same interpretation: "Samsung, on the other hand, contends that Section 6.2 required it to supply Netlist with NAND and DRAM products only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized." Slightly different words, but the same theory:  Samsung's obligation was limited to the Joint Development Project and, if it was successful, the manufacture and sale of the NVDIMM-P product.

### *Netlist may not now assert a breach under Samsung's proffered interpretation of Section 6.2.*

The foregoing should make clear that Netlist may not now assert, for the first time on the eve of trial, that Samsung breached Section 6.2 under *Samsung*'s proffered interpretation—that is, by failing to supply NAND and DRAM on Netlist's request for the parties' joint-development project.

As explained above, contrary to Netlist's contentions, it has never before articulated a theory that, even if Section 6.2 only required Samsung to supply NAND and DRAM in connection with the joint development project or product, Samsung nonetheless breached that obligation.  It argues that the allegations in its operative complaint "do not exclude the possibility that Samsung breached the JDLA under its current interpretation." *See supra* at 4.  But nor, as explained above, does the First Amended Complaint allege any failure to supply product for the purposes of the parties' NVDIMM-P collaboration or put Samsung on notice that Netlist believed that Samsung failed to do so—it alleged only the failure to supply for resale. *See supra* at 11.

Netlist next points to its response to Interrogatory No. 12—but that simply states that "Samsung did not perform as obligated" with no explanation of how Samsung failed to perform, let alone one that would constitute a breach even under Samsung's interpretation.  Next, Netlist argues that it disputed the fact that "Netlist

received all of the chips it needed to complete the initial phase of the NVDIMM-P." *See supra* at 5 (citing Dkt. 170 ¶ 46).  But it cited no **evidence** that Netlist did not receive all of those chips, and indeed Mr. Hong testified that Netlist never "did … not have a sufficient amount of NAND and DRAM chips" "[t]o do the joint development work."  Dkt. 187-9 at 20-24 (cited at Dkt. 170 ¶ 46).

Most importantly, as explained above, Samsung argued both before and after remand that Samsung was **entitled to judgment** on Netlist's claim for breach of Section 6.2 because Samsung's supply obligation under that provision was limited to the joint-development project, *see, e.g.*, Dkt. 381 (Samsung's Supplemental Opening Summary Judgment Brief) at 5 ("Because there is no dispute that Samsung fulfilled its obligation to supply Netlist with NAND and DRAM for the JDP, Samsung is entitled to judgment on Netlist's first claim for relief …."), and Netlist never asserted that Samsung breached even under that interpretation, or pointed to any evidence of such a breach.  For all the reasons detailed above, Netlist may not now disclose this theory for the first time and pursue it at trial.  *See, e.g.*, *Coleman*, 232 F.3d at 1291-92; *Gonzalez*, 589 Ff.2d at 469; *Meyers*, 807 F. App'x at 654; *Parapluie*, 2012 WL 12887556, at *12.

In any event, contrary to Netlist's assertion, none of the evidence Netlist discusses demonstrates any instance where it requested NAND or DRAM for the joint development project and Samsung refused to provide it.  Netlist first cites to a single email, devoid of any context, (PX72)" that on its face does not even indicate that any products for the NVDIMM project actually were withheld.  Similarly, Netlist points out that it disputed Samsung's fact that "Netlist received all of the chips it needed to complete the initial phase of the NVDIMM-P," Dkt. 170 ¶ 46, but the basis for Netlist disputing that fact is simply that "the NVDIMM-P product itself was never finished"—not that Samsung failed to provide products for it.  And finally, Netlist cites to stray evidence that at certain points Samsung allegedly did

not provide any NAND and DRAM, but does not suggest that Netlist had made any requests for NAND and DRAM for the joint development project in those periods.

## DISPUTED INSTRUCTION NO. 1

### Plaintiff's Proposed Instruction No. 1

### Claims And Defenses

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

The plaintiff, Netlist, and the defendant, Samsung, were parties to a contract called the Joint Development and License Agreement (or "JDLA"). Netlist claims that section 6.2 of the JDLA required Samsung to supply NAND and DRAM products to Netlist on Netlist's request, and that Samsung breached this provision by failing to fulfill Netlist's requests. Netlist further claims that this breach was material, which gave Netlist the right to terminate the JDLA.

The Court has already determined that section 6.2 constitutes a definite and binding obligation on Samsung. The Court has also already determined that section 6.2 is not simply a clause that sets the price of product should Samsung choose to supply product. The Court has also already determined that Netlist complied with all of its obligations under the JDLA. Samsung claims that section 6.2 did not obligate Samsung to supply Netlist with NAND and DRAM products. Instead, Samsung contends that it was only required to supply Netlist with NAND and DRAM chips if and to the extent that a specific NVDIMM-P-related product was ever commercialized, which Samsung claims never occurred.  Samsung further contends that the JDLA's license grant is perpetual and unlimited, and applies to any products, not just NVDIMM-P.

Source: Ninth Circuit Manual of Modern Jury Instructions, 1.5 (modified); Samsung's Supplemental Response to Interrogatory No. 21 ("Defendant's business understanding is that Section 6.2 of the Agreement is a price setting term that creates only the obligation to sell products at a competitive price, without the obligation to sell any particular quantity of products, where such products relate to and are required

for the joint development of a new NVDIMM-P standard contemplated by the Agreement, and a supply of NAND and DRAM products as raw materials if and when the NVDIMM-P standard underwent successful productization and commercialization, as Chuck Hong confirmed in his deposition testimony. This understanding has not changed over time."); Court's Ruling on Summary Judgment (Dkt. 186) at 10:4-12:9 ("The JDLA Is a Valid Contract Sufficiently Definite to Be Enforced"); *id.* at 13:28-14:1 ("There is no genuine dispute that Netlist performed its obligations under the JDLA."); *id.* at 6, n2 (noting the Court's prior "reject[ion] [of] Samsung's argument that § 6.2 is an unambiguous price obligation."); *id.* at 18:11-27 ("Netlist Complied with the Termination Term."); *id.* at 20:1-24 ("Netlist Did not Waive its Right to Terminate");Order Re: Motions In Limine (Dkt. 243) at 13:26-27 ("The Court deems abandoned Samsung's acquiescence, estoppel, and waiver affirmative defenses."); *Netlist Inc. v. Samsung Elecs. Co*., No. 22-55209, 2023 WL 6820683, at *3 (9th Cir. Oct. 17, 2023) ("We reject Samsung's contention that Netlist's declaratory-judgment claim fails for the independent reason that Netlist waived its right to terminate the contract by delaying termination proceedings until 2020. The district court properly determined that given the JDLA's no-waiver provision, Netlist's failure to act upon notice of the breach does not constitute a clear manifestation of intent to waive its termination rights."); *id.* ("The district court correctly precluded Samsung from asserting at trial affirmative defenses of waiver, estoppel, and acquiescence. Samsung pleaded all three defenses in its answer, but did not raise them in response to Netlist's motion for partial summary judgment or in its own motion for summary judgment. Samsung therefore abandoned the defenses.").

**Defendant's Proposed Instruction No. 1**

**Claims and Defenses**

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

The plaintiff, Netlist, and the defendant, Samsung, were parties to a contract called the Joint Development and License Agreement (or "JDLA").  The parties disagree as to the meaning of Section 6.2 of the JDLA.  Netlist contends that Section 6.2 imposed on Samsung an obligation to supply Netlist with NAND and DRAM products at Netlist's request with no limitation, meaning that Samsung was required to supply Netlist with whatever NAND and DRAM products it requested, for any purpose.  Samsung, on the other hand, contends that Section 6.2 required it to supply Netlist with NAND and DRAM products only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized.

Netlist contends that under its interpretation, Samsung materially breached the JDLA, thus entitling Netlist to terminate the JDLA.  Samsung denies that it breached the JDLA and denies that any breach would be material.

**Defendant's <u>Conditional</u> Proposed Instruction No. 1**

**(proposed only in the event the Court permits Netlist to claim that Samsung breached Section 6.2 under Samsung's own proffered interpretation)**

**Claims and Defenses**

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

The plaintiff, Netlist, and the defendant, Samsung, were parties to a contract called the Joint Development and License Agreement (or "JDLA").  The parties disagree as to the meaning of Section 6.2 of the JDLA.  Netlist contends that Section 6.2 imposed on Samsung an obligation to supply Netlist with NAND and DRAM products at Netlist's request with no limitation, meaning that Samsung was required to supply Netlist with whatever NAND and DRAM products it requested, for any purpose.  Samsung, on the other hand, contends that Section 6.2 required it to supply Netlist with NAND and DRAM products only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized.

Netlist contends that under either interpretation, Samsung materially breached the JDLA, thus entitling Netlist to terminate the JDLA.  Samsung denies that it breached the JDLA and denies that any breach would be material.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

11305095

**Plaintiff's Position on Disputed Instruction No. 1**

Netlist's proposed instructions more accurately reflect the parties' positions in this case and the issues in dispute.

First, Samsung's representation of Netlist's position is inaccurate and prejudicial. It misleadingly implies that Samsung was required to supply Netlist with "unlimited" NAND and DRAM without any preconditions. This is not Netlist's position. Instead, Netlist's position is that, consistent with the JDLA's plain language Samsung was required "supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of product)," Dkt. 344-2 § 6.2, meaning Netlist was required to fully compensate Samsung for any product it received. Samsung's instruction thus presents a strawman designed to make Netlist's position sound absurd.

Second, Samsung's instruction is an improper attempt to re-litigate its argument that the contract is insufficiently definite to the jury, which this Court previously rejected at summary judgment. In its summary judgment briefing, Samsung argued that Netlist's interpretation of the supply provision would render the JDLA unenforceable because "Section 6.2 is too indefinite to state a valid quantity term. . . . Rather, Netlist's theory is that it can request any quantity it wants." Dkt. 157-1 at 26:8-14. The Court, however, rejected this argument, concluding that "the agreement establishes a framework for future transactions: Samsung agreed to fulfill Netlist's requests for NAND and DRAM products at a competitive price. . . . [T]he agreement is sufficiently definite in its articulation of the framework by which the parties would engage in such transactions to be enforceable." Dkt. 186 at 11:1-22. Samsung did not appeal this ruling, and it is thus law of the case. *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 775 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019) ("[I]ssues that were previously resolved and were not raised on appeal are the law of the case and are not subject to relitigation absent a motion for leave to file a motion for reconsideration"); *Sec. Inv. Prot. Corp. v. Vigman*, 74 F.3d

932, 937 (9th Cir. 1996) (holding that theory could not be relitigated where it was "either subsumed within [the district court's] summary judgment on causation, and thus is law of the case, or abandoned on appeal, and therefore is waived"). Yet, now Samsung is trying instruct the jury on the same theory that this Court rejected, i.e., that Netlist's interpretation somehow converts the JDLA's supply provision into an unreasonable "unlimited" commitment from Samsung.

Third, Samsung's instruction is also inconsistent with the positions it disclosed during discovery. Specifically, Samsung previously argued that it had satisfied its supply obligation because "Netlist received all of the **chips** it needed to complete the initial phase of the NVDIMM-P," not "**products**." *See, e.g.,* Ex. A (Samsung Responses to Netlists Interrogatory Nos. 14, 17, 20) at 13, 23, 30. This is significant because, as Netlist will demonstrate at trial, there is a significant difference completed NAND and DRAM products, which can be resold to other customers as is, and NAND and DRAM chips, which must be first incorporated into completed product. The plain language of the JDLA requires Samsung to supply products instead of chips. Dkt. 344-2 § 6.2 ("Samsung will supply NAND and DRAM products . . . ."). Netlist's proposed Instruction No 2 above more accurately reflects the position that Samsung took during discovery. Samsung should not be permitted to deviate from that position on the eve of trial.

Finally, while Samsung accuses Netlist of misrepresenting Samsung's position in this case, Samsung is improperly presenting the jury a theory that it did not disclose in discovery. Samsung's original interrogatory response stated that Section 6.2 was just a pricing clause:

> Subject to and without waiving its objections, Defendant responds as follows: **Defendant's business understanding** is that Section 6.2 of the Agreement is a price-setting term that creates only the obligation to sell products at a competitive price, without the obligation to sell any particular quantity of products. This **understanding has not changed over time**.

Samsung Response to Interrogatory No. 21. Samsung than changed to a new position, which it ironically again stated has never changed, which is that Section 6.2 only obligated supply "if and when the NVDIMM-P standard underwent successful productization and commercialization":

> Subject to and without waiving its objections, ***Defendant responds as follows: Defendant's*** business understanding is that Section 6.2 of the Agreement is a price setting term that creates only the obligation to sell products at a competitive price, without the obligation to sell any particular quantity of products, where such products relate to and are required for the joint development of a new NVDIMM-P standard contemplated by the Agreement, and a supply of NAND and DRAM products as raw materials if and when the NVDIMM-P standard underwent successful productization and commercialization as Chuck Hong confirmed in his deposition testimony. This ***understanding has not changed over time.***

Samsung Supplemental Response to Interrogatory No. 21.

Now Samsung intends to pursue yet a third interpretation at trial, i.e., that "Section 6.2 required it to supply Netlist with NAND and DRAM only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P ***and*** for the manufacture and sale of the NVDIMM-P product if it was ever commercialized," as stated below. Samsung is now saying that the supply clause was for the purpose of making sample products during development as well as for use in collaboration." This new interpretation is not present in any interrogatory response presented during discovery. An interrogatory response as to "understanding" of the company is not a nose of wax that lawyers can manipulate over time; it is a statement under oath by the company. Nor can Samsung take positions on the eve of trial that it did not disclose during discovery. Fed. R. Civ. P. ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

**Defendant's Position on Disputed Instruction No. 1**

Whether Samsung will revise its proposed jury instructions and verdict form depends on the Court's resolution of a threshold issue: whether Netlist will be permitted to argue that Samsung breached Section 6.2 of the JDLA under Samsung's proffered interpretation. If the Court agrees with Samsung that Netlist may not now assert a breach under Samsung's interpretation, then Samsung's proposal is "Defendant's Proposed Instruction No. 1," above, which is the same as Samsung's proposal in the parties' March 4 joint submission. If, on the other hand, the Court permits Netlist to assert such a breach, Samsung would revise its proposed jury instructions and verdict form as shown in "Defendant's Conditional Proposed Instruction No. 1."

These (conditional) revisions should be unnecessary because, as explained above, Netlist should not be permitted to argue that Samsung breached under Samsung's proffered interpretation—that is, that Section 6.2 required Samsung to supply Netlist with NAND and DRAM products only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized. Netlist has never raised this theory of breach at any stage in this litigation, has never pointed to any evidence supporting such a theory of breach, and failed to raise this theory in opposition to Samsung's motion for summary judgment on the grounds that the Section 6.2 supply obligation was limited to the joint-development project. Netlist may not now claim breach under a theory it has never advanced and that it (at the very least) abandoned at summary judgment. Nevertheless, Samsung submits these (conditional) revised proposed jury instructions in the event the Court rules that Netlist may pursue such a theory of breach at trial.

Samsung respectfully submits that its proposed instruction accurately and neutrally reflects the parties' positions regarding the interpretation of Section 6.2 and materiality, and requests that it be given instead of Netlist's proposed instruction.

Netlist's proposed instruction continues to inaccurately characterize the parties' respective interpretations of Section 6.2, is highly prejudicial to Samsung, and risks confusing the jury. Netlist's proposed instruction describes Netlist's interpretation of Section 6.2 by simply repeating the language of Section 6.2, and then describes Samsung's interpretation as the opposite. But the Ninth Circuit held that the language of Section 6.2 is ambiguous, *Netlist Inc. v. Samsung Elecs. Co.*, 2023 WL 6820683, at *1-2 (9th Cir. Oct. 17, 2023), and given this Court's finding that the extrinsic evidence raises genuine issues of material fact, Dkt. 390 at 8-9, the jury will be called upon to determine the parties' intent at the time they entered into the JDLA, *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004), and not how the language of Section 6.2 should be interpreted on its own. *See also Netlist*, 2023 WL 6820683, at *1 (interpretation of a contract must not "isolate[e] distinct provisions of the agreement"). Netlist's proposed instruction thus misstates the jury's role. Further, it mischaracterizes Samsung's position, as here, contrary to Netlist's assertion, ***both*** parties agree that Section 6.2 "obligate[d] Samsung to supply Netlist with NAND and DRAM" on Netlist's request. The question before the jury is whether that supply obligation was limited to the parties' NVDIMM-P collaboration or unlimited.

Similarly, contrary to Netlist's proposed instruction, Samsung does ***not*** contend that its obligation to supply Netlist with NAND and DRAM would arise only if a specific NVDIMM-P-related product was ever commercialized. Samsung's position is that Section 6.2 required it to supply Netlist with NAND and DRAM only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P ***and*** for the manufacture and sale of the NVDIMM-P product if it was ever commercialized. Moreover, contrary to Netlist's objection to Samsung's proposed instruction, Samsung is not taking the position that the JDLA is insufficiently definite or that it contains no price term. Rather, Samsung's proposed instruction read as a whole is intended to instruct the jury about the principal difference between the parties' competing positions about Section 6.2's scope:

1   Samsung believes its supply obligation was limited to the parties' joint-development

2   project, and Netlist believes the supply obligation was not so limited and instead

3   extended to any request for NAND and DRAM products Netlist made.

4        Netlist's newly added assertion that Samsung's obligation to supply Netlist

5   with NAND and DRAM products at its request at a competitive price means that

6   "Netlist was required to fully compensate Samsung for any product it received" is

7   nonsensical.  This is the first Samsung has heard of this assertion.  And it makes no

8   sense because Section 6.2 does not say anything of the sort.  Netlist has always

9   contended that Section 6.2's supply obligation is not limited to any particular purpose,

10  and Netlist cannot abandon that theory on the eve of trial.

11       Samsung further objects to the statements that the Court has already determined

12  that Section 6.2 "constitutes a definite and binding obligation," that Section 6.2 is not

13  merely a pricing provision, and that Netlist has complied with its obligations under

14  the JDLA.  The Court's prior determinations in this regard are not relevant to the

15  issues before the jury.  Similarly, the last sentence in Netlist's proposal, concerning

16  the scope of the patent license, is unnecessary because the scope of the license is not

17  at issue in this case.  Instructing the jury on these matters would only serve to confuse

18  the jury and distract from the issues and needlessly creates the risk of unfairly

19  prejudicing Samsung.

20       Finally, Netlist argues that Samsung's proposed instruction is presenting a

21  theory not disclosed during discovery.  Not so.  In the supplemental interrogatory

22  response cited by Netlist, Samsung stated that its business understanding of Section

23  6.2 was that Samsung's supply obligation covered products that "relate to and are

24  required for the joint development of a new NVDIMM-P standard contemplated by

25  the Agreement, and a supply of NAND and DRAM products as raw materials if and

26  when the NVDIMM-P standard underwent successful productization and

27  commercialization . . ."  Samsung Supplemental Response to Interrogatory No. 21.

28  In its proposed jury instruction, Samsung essentially offers the same interpretation:

"Samsung, on the other hand, contends that Section 6.2 required it to supply Netlist with NAND and DRAM products only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized."  Slightly different words, but the same theory:   Samsung's obligation was limited to the Joint Development Project and, if it was successful, the manufacture and sale of the NVDIMM-P product.

Finally, Samsung notes that in response to the Court's March 8 order, Netlist has only moved backwards in clarifying its positions.   For example, Netlist has removed language that Samsung "disputes Netlist's interpretation of what section 6.2 requires," hoping to give the jury the impression that Netlist bears no burden of proof on the issue of interpretation.   Netlist also now says that Samsung "claims" that the NVDIMM-P product was never commercialized, where it previously said that Samsung "has confirmed" that fact—despite the fact that there is absolutely no dispute as to that fact. *See* Dkt. 179-1 ¶ 47 (Netlist indicating it is "[u]ndisputed" that the NVDIMM-P product was never commercialized).  This is another example where Netlist is suddenly pursing allegations it has never previously made.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

11305095

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>INSTRUCTION NO. 2</u>

### Defendant's Proposed Instruction No. 2

### Established Facts

You must accept as a fact that Netlist did not suffer any direct damages under the JDLA as a result of any failure by Samsung to supply NAND and DRAM to Netlist.

[Source: Verdict, Dkt. 276, at 1]

## Plaintiff's Position on Proposed Instruction No. 2

This instruction has no legal basis and is highly prejudicial. Netlist has filed a Motion In Limine To Exclude Evidence Regarding Prior Jury's Finding of No Cover Damages (Dkt. 418). The Court should reject Samsung's proposed jury instruction for the same reason.

First, the question of whether Netlist suffered direct damages is wholly irrelevant to the only dispute the jury will be deciding, i.e., whether Samsung materially breached the JDLA's supply provision. As this Court has already held, "[m]ateriality does not depend upon the amount of provable money damages, it depends on whether the non-breaching party lost the benefit of its bargain." Dkt. 305 at 8:7-9 (quoting *Doner-Hedrick v. N.Y. Inst. of Tech.*, 874 F. Supp. 2d 227, 242 (S.D.N.Y. 2012)). Thus, a party may still assert that a breach was material even when it suffers no recoverable damages at all. *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F.Supp.2d 416, 421 (S.D.N.Y.1999) ("[A]lthough Baseball is only entitled to nominal damages, it may still present evidence and argument to the effect that ESPN's breach was material."); *see also Raymond Weil, S.A. v. Theron,* 585 F. Supp. 2d 473, 488 (S.D.N.Y. 2008) (finding that, because the plaintiff had proven "material breach," "it has the right to go to trial to prove whatever damages it can prove—and, if it can prove none, to an award of nominal damages.").

Second, even setting aside its total irrelevance, Samsung's proposed instruction is highly prejudicial. In the first trial, Netlist was limited to a narrow type of damages called "cover" damages.  New York law allows for both direct and consequential damages for breach of contract cases, but this Court ruled that Netlist could only seek direct damages because it construed the contract as forbidding recovery of consequential damages. In the supply context, direct damages consist of the price differential between what Netlist obtained in the open market (i.e. "cover") and the price it would have received from the breaching party. *Exp. Dev. Canada v. Elec. Apparatus & Power, L.L.C.*, 2008 WL 4900557, at *18 (S.D.N.Y. Nov. 14, 2008)

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

11305095

- 36 -

("[C]over damages are measured by the difference between the cost of the replacement goods and the contract price of the goods."). But such damages do not include the damages that Netlist suffered as a result of NAND and DRAM products that it was unable to secure on the open market after Samsung cut off Netlist's supply. These include things such as the lost customers, lost profits, and substantial harm to Netlists business reputation.  Dkt. 418 at 2-3.

If the jury is instructed that Netlist "did not suffer any direct damages," they will likely be confused and think that Netlist did not suffer any harm at all as a result of Netlist's breach. The jury is unlikely to understand the complex differences between direct and consequential damages, as these concepts often confuse judges and lawyers. *See, e.g.*, *Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, No. C.A. 5688, 2011 WL 549163, at *7 (Del. Ch. Feb. 16, 2011) (noting "the amorphous state of the law and its confusing efforts to clearly delineate the difference between general damages, on the one hand, and consequential or special damages, on the other" and that even lawyers sometimes do not know "what those terms actually mean"); *Connecticut Gen. Life Ins. Co. v. Grodsky Serv., Inc.*, 781 F. Supp. 897, 901 (D. Conn. 1991) ("Although the terms direct damages and consequential damages are frequently employed, the line between the two can become more metaphysical than real."). Samsung's proposed instruction is thus prejudicial and will require Netlist to spend substantial time explaining to the jury (1) the difference between consequential damages and direct damages, and (2) why Netlist was not able to recover the former in the prior trial.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

11305095

1

**Defendant's Position on Disputed Instruction No. 2**

2     The jury's verdict from the damages trial in this case conclusively established

3  that Netlist suffered no direct damages as a result of Samsung's failure to fulfill

4  Netlist's orders for NAND and DRAM products in breach of Section 6.2 of the JDLA.

5  Dkt. 276, at 1.  The fact that Netlist suffered no direct damages is directly relevant to

6  whether any breach of Section 6.2 by Samsung was material, as Samsung explains in

7  its Opposition to Netlist's Motion *in Limine* to Exclude Evidence Regarding Prior

8  Jury's Finding of No Cover Damages, being concurrently filed today.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DISPUTED INSTRUCTION NO. 3

### Plaintiff's Proposed Instruction No. 3

### Contract Interpretation

As you have heard, the plaintiff Netlist claims that the defendant Samsung breached the parties' Joint Development and License Agreement or JDLA by failing to supply Netlist with NAND and DRAM products to Netlist on Netlist's request. On the other hand, the defendant Samsung claims that it was only required to supply NAND and DRAM chips for use in manufacturing an NVDIMM-P product.

In deciding what the words of section 6.2 of the JDLA mean, you must decide what the parties intended at the time they entered into the contract.

The best evidence of the parties' intent is what they express in their written contract. If the parties omit terms—particularly, words that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission. Similarly, when certain words are omitted from a provision in a contract but placed in other provisions, it must be assumed that the omission was intentional.

In addition to the words of the JDLA, you may also consider evidence of the parties' prior negotiations, the circumstances surrounding the signing of the JDLA, and how the parties interpreted the contract in practice after it was signed but before any dispute arose. You may also consider the parties' apparent purpose in entering the contract.

You may only consider the parties' intent as indicated by their expressed words and actions. You may not consider evidence of one party's intent or understanding that was not communicated to the other party except to the extent that it sheds light on the parties' overt words and actions.

Source: N.Y. Pattern Jury Instr.—Civil 4:1; Court's Ruling on Summary Judgment (Dkt. 186) at 13:28-14:1 ("There is no genuine dispute that Netlist performed its obligations under the JDLA.").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

11305095

- 39 -

**Defendant's Proposed Instruction No. 3**

**Contract Interpretation**

As you have heard, the parties in this case disagree about the scope of Samsung's supply obligation under Section 6.2.  Netlist contends that Section 6.2 imposed on Samsung an obligation to supply Netlist with NAND and DRAM products at Netlist's request with no limitation, meaning that Samsung was required to supply Netlist with whatever NAND and DRAM products it requested, for any purpose.  Samsung, on the other hand, contends that Section 6.2 required it to supply Netlist with NAND and DRAM only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized.

Netlist has the burden of proving that its interpretation is correct by a preponderance of the evidence.  It is for you to decide whether Netlist has met that burden.

In determining the meaning of Section 6.2, you must ascertain the intention of the parties at the time they entered into the JDLA.  I instruct you that the language of the JDLA, as set forth within the four corners of the agreement, can reasonably be read to mean what Netlist has argued, or what Samsung has argued.  Thus, you must look beyond the words of the JDLA to determine the intent of the parties at the time of contracting.

In determining the parties' intent, you may consider evidence of the parties' prior negotiations; the circumstances surrounding the signing of the JDLA; the past practice of the parties; industry custom and practice; and the parties' course of conduct throughout the life of the contract. You may also consider what would be commercially reasonable.

You may only consider the parties' intent as indicated by their expressed words and actions.  You may not consider evidence of one party's intent or understanding that was not communicated to the other party.  One party's claim of a right under the

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

11305095

- 40 -

JDLA is not relevant evidence of the parties' intent unless the other party knew of and acquiesced to that claim.

[Sources: *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 460 (2004); *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248-49 (N.Y. 1975); *Aeneas McDonald Police Benevolent Ass'n, Inc. v. City of Geneva*, 92 N.Y.2d 326, 333 (1998); *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006); *Fed. Ins. Co. v. Ams. Ins. Co.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999); *In re MPM Silicones, LLC*, 874 F.3d 787, 796 (2d Cir. 2017); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 126 (2d Cir. 2006); *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 651 (1993)]

**Defendant's <u>Conditional</u> Proposed Instruction No. 3**

**(proposed only in the event the Court permits Netlist to claim that Samsung breached Section 6.2 under Samsung's own proffered interpretation)**

**Contract Interpretation**

As you have heard, the parties in this case disagree about the scope of Samsung's supply obligation under Section 6.2.  Netlist contends that Section 6.2 imposed on Samsung an obligation to supply Netlist with NAND and DRAM products at Netlist's request with no limitation, meaning that Samsung was required to supply Netlist with whatever NAND and DRAM products it requested, for any purpose.  Samsung, on the other hand, contends that Section 6.2 required it to supply Netlist with NAND and DRAM only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized.

Netlist has the burden of proving, by a preponderance of the evidence, that it had a contract with Samsung requiring that Samsung supply Netlist with NAND and DRAM products at Netlist's request with no limitation, meaning that Samsung was required to supply Netlist with whatever NAND and DRAM products it requested, for any purpose.  It is for you to decide whether Netlist has met that burden.

In determining the meaning of Section 6.2, you must ascertain the intention of the parties at the time they entered into the JDLA.  I instruct you that the language of the JDLA, as set forth within the four corners of the agreement, can reasonably be read to mean what Netlist has argued, or what Samsung has argued.  Thus, you must look beyond the words of the JDLA to determine the intent of the parties at the time of contracting.

In determining the parties' intent, you may consider evidence of the parties' prior negotiations; the circumstances surrounding the signing of the JDLA; the past practice of the parties; industry custom and practice; and the parties' course of conduct

throughout the life of the contract. You may also consider what would be commercially reasonable.

You may only consider the parties' intent as indicated by their expressed words and actions. You may not consider evidence of one party's intent or understanding that was not communicated to the other party. One party's claim of a right under the JDLA is not relevant evidence of the parties' intent unless the other party knew of and acquiesced to that claim.

[Sources: *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 460 (2004); *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248-49 (N.Y. 1975); *Aeneas McDonald Police Benevolent Ass'n, Inc. v. City of Geneva*, 92 N.Y.2d 326, 333 (1998); *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006); *Fed. Ins. Co. v. Ams. Ins. Co.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999); *In re MPM Silicones, LLC*, 874 F.3d 787, 796 (2d Cir. 2017); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 126 (2d Cir. 2006); *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 651 (1993); N.Y. Pattern Jury Instr.—Civil 4:1 (Contracts—Elements) (modified)]

**Plaintiff's Position on Disputed Instruction No. 3**

Samsung's instruction is inconsistent with New York contract law, which governs the JDLA.

First, Samsung's assertion that the jury can only "look beyond the words of the JDLA to determine the intent of the parties at the time of contracting" is incorrect. As set forth in the comments to the New York pattern jury instructions, "the best evidence of the parties' intent is what they express in their written contract." N.Y. Pattern Jury Instr.--Civil 4:1 (citing *Tomhannock, LLC v Roustabout Resources*, *LLC*, 33 NY3d 1080, 104 NYS3d 596, 128 NE3d 674 (2019)). Juries thus not only can, but must consider the contractual language when interpreting a contract. *Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 486 (S.D.N.Y. 2011), *aff'd*, 476 F. App'x 275 (2d Cir. 2012) ("[T]he jury was directed first to consider the 'plain and ordinary meaning of the words used' in interpreting the 2003 Contract."); *see also Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp*., No. 88-CV-819, 1992 WL 265941, at *3 (N.D.N.Y. Oct. 2, 1992) ("One of the court's instructions explained that in interpreting the contract, the jury 'may consider ***the terms of the contract itself*** . . . .'"). New York's approach is consistent with other jurisdictions. *See, e.g., Lust v. Animal Logic Ent.*, 2021 WL 6618677, at *5 (C.D. Cal. Aug. 25, 2021) ("You may consider the usual and ordinary meaning of the language used in the contract as well as the circumstances surrounding the making of the contract.") (quoting Judicial Council of California, Civil Jury Instructions (CACI) 314, Interpretation—Disputed Words); *Sprint Nextel Corp. v. Middle Man, Inc*., No. 2:12-CV-02159-JTM, 2017 WL 2306340, at *1 (D. Kan. May 26, 2017) ("The jury was told it had to determine the meaning the parties attached to the contract terms, and that in doing so it could consider 'all of the evidence, including the words used in the agreement . . . .'").

The Court should accordingly instruct the jury that it should consider the words of the JDLA itself in interpreting the supply provision, as set forth in Netlist's Proposed Instruction No. 2. Samsung claims that the authorities Netlist has cited

1    above are distinguishable because the Ninth Circuit in this case held that the contract
2    was ambiguous. But the Ninth Circuit did not hold that the plain language of the
3    agreement was irrelevant. On the contrary, the Ninth Circuit recognized that
4    "[s]tanding alone, *the plain language of § 6.2 favors Netlist's interpretation*: that
5    Samsung must fulfill all NAND and DRAM orders by Netlist for whatever purpose."
6    *Netlist Inc. v. Samsung Elecs. Co*., No. 22-55209, 2023 WL 6820683, at *1 (9th Cir.
7    Oct. 17, 2023). It would thus be legally incorrect and highly prejudicial to inform the
8    jury that it cannot even consider this evidence. Moreover, the fact that the contract is
9    ambiguous does not preclude the jury from considering the language of the contract
10   under New York law. Indeed, any time a jury is interpreting a contract, the contract
11   must be ambiguous. Otherwise, contract interpretation would solely be a question of
12   law for the Court. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009)
13   (Under New York law, "[i]f the contract is unambiguous, its meaning is likewise a
14   question of law for the court to decide."). Yet, as explained above, New York courts
15   instruct juries "to consider the 'plain and ordinary meaning of the words used' in
16   interpreting the . . . [c]ontract" in addition to extrinsic evidence.

17        Second, the jury should also be instructed on relevant principles of New York
18   contract law, as set forth in the New York Pattern Jury Instructions. These include the
19   principle that "[i]f the parties omit terms—particularly, words that are readily found
20   in other, similar contracts—the inescapable conclusion is that the parties intended the
21   omission." N.Y. Pattern Jury Instr.--Civil 4:1 (citing *Quadrant Structured Products
22   Co., Ltd. v Verti*n, 23 NY3d 549 (2014)). The jury should also be instructed that,
23   "when certain words are omitted from a provision in a contract but placed in other
24   provisions, it must be assumed that the omission was intentional." *Id.* (citing New
25   York cases). Samsung has argued that this Court and the Ninth Circuit already
26   rejected the applications of these principles of constructions. Not so. This Court's
27   recent summary judgment ruling and the Ninth Circuit's order held only that Netlist's
28   interpretation of the JDLA was not compelled as a *matter of law*. That does not render

these basic principles of New York contract interpretation irrelevant. It just means that it is for the jury to apply these principles in light of the disputed facts.

Third, Samsung's instruction that the jury may consider what is "commercially reasonable" is improper. As the Court previously concluded prior to the last trial, the JDLA's supply clause does not contain a limitation for commercial reasonableness, and Samsung failed to disclose this theory in any event:

> Nothing in the JDLA or the Court's order on summary judgment limits Samsung's supply obligation to a "commercially reasonable amount." The Court declines to read a new term into the JDLA to limit the obligation. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("[I]f parties to a contract omit terms[,] . . . the inescapable conclusion is that the parties intended the omission."). In any event, Samsung admitted in discovery that it declined to fulfill Netlist's product orders due to "overall market conditions"—not because any particular order was unreasonable. (Def. Samsung's 2d Suppl. Resps. to Pl. Netlist's 1st Set of Interrogatories 6.)

Dkt. 243 at 8:15-22. Samsung did not appeal this ruling, and it should be precluded from trying to relitigate it in front of the jury.

Finally, Samsung's objections to the last sentence of Netlist's proposed instruction—"You may not consider evidence of one party's intent or understanding that was not communicated to the other party except to the extent that it sheds light on the parties' overt words and actions"—is baseless. Samsung initially included this exact language in its proposed jury instruction and it accurately states New York law.

**Defendant's Position on Disputed Instruction No. 3**

Whether Samsung will revise its proposed jury instructions and verdict form depends on the Court's resolution of a threshold issue: whether Netlist will be permitted to argue that Samsung breached Section 6.2 of the JDLA under Samsung's proffered interpretation.  If the Court agrees with Samsung that Netlist may not now assert a breach under Samsung's interpretation, then Samsung's proposal is "Defendant's Proposed Instruction No. 3," above, which is the same as Samsung's proposal in the parties' March 4 joint submission.  If, on the other hand, the Court permits Netlist to assert such a breach, Samsung would revise its proposed jury instructions and verdict form as shown in "Defendant's Conditional Proposed Instruction No. 3."

These (conditional) revisions should be unnecessary because, as explained above, Netlist should not be permitted to argue that Samsung breached under Samsung's proffered interpretation—that is, that Section 6.2 required Samsung to supply Netlist with NAND and DRAM products only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized. Netlist has never raised this theory of breach at any stage in this litigation, has never pointed to any evidence supporting such a theory of breach, and failed to raise this theory in opposition to Samsung's motion for summary judgment on the grounds that the Section 6.2 supply obligation was limited to the joint-development project.  Netlist may not now claim breach under a theory it has never advanced and that it (at the very least) abandoned at summary judgment. Nevertheless, Samsung submits these (conditional) revised proposed jury instructions in the event the Court rules that Netlist may pursue such a theory of breach at trial.

Samsung respectfully submits that its proposed instruction accurately and neutrally reflects the legal principles governing the jury's consideration of the intent

1  of the parties with respect to the meaning of Section 6.2, and requests that it be given

2  instead of Netlist's proposed instruction.

3  As stated in Samsung's Position Statement Regarding Disputed Instruction No.

4  1, Netlist's proposed instruction inaccurately characterizes the parties' respective

5  interpretations of Section 6.2, is highly prejudicial to Samsung, and risks confusing

6  the jury.  Netlist's proposed instruction describes Netlist's interpretation of Section

7  6.2 by simply repeating the language of Section 6.2.  But the Ninth Circuit held that

8  the language of Section 6.2 is ambiguous, *Netlist Inc. v. Samsung Elecs. Co.*, 2023

9  WL 6820683, at *1-2 (9th Cir. Oct. 17, 2023), and given this Court's finding that the

10  extrinsic evidence raises genuine issues of material fact, Dkt. 390 at 8-9, the jury will

11  be called upon to determine the parties' intent at the time they entered into the JDLA,

12  *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004), and not how the language

13  of Section 6.2 should be interpreted on its own.  *See also Netlist*, 2023 WL 6820683,

14  at *1 (interpretation of a contract must not "isolate[e] distinct provisions of the

15  agreement").

16  Netlist misleadingly suggests that the standard from *Quadrant Structured*

17  *Products Co., Ltd. V. Vertin*, 23 N.Y.3d 549 (2014), in which the contract was

18  construed by the Court rather than a jury, is found in New York's Pattern Jury

19  Instructions.  That is not so—Netlist's quotation is found deep in the commentary on

20  New York's generic breach-of-contract pattern instruction—an instruction that does

21  not include the construction of ambiguous contracts at all.  In fact, there is no New

22  York pattern instruction on the construction of ambiguous contracts, which is why the

23  parties have proposed competing instructions based on the precedent.

24  Moreover, Netlist's reliance on the Ninth Circuit's statement that "[s]tanding

25  alone, the plain language of § 6.2 favors Netlist's interpretation" is also misplaced

26  because it is incomplete.  The next sentence in the Ninth Circuit's opinion is:  "Read

27  as an integrated whole, however, the contract's apparent purpose as derived from its

28  title, structure, and related provisions make § 6.2 reasonably susceptible of more than

1   one interpretation." *Netlist Inc. v. Samsung Elecs. Co.*, 2023 WL 6820683, at *1 (9th
2   Cir. Oct. 17, 2023) (quotation omitted).  Netlist's proposed instruction does not reflect
3   that countervailing holding, and it misunderstands the jury's role, which is to resolve
4   the contract ambiguity by determining the parties' intent based on the extrinsic
5   evidence.

6        Netlist's reliance on precedent it believes instructed the jury to consider the
7   words of the contract is also misleading.  For example, in *Barton Grp., Inc. v. NCR*
8   *Corp.*, 796 F. Supp. 2d 473 (S.D.N.Y. 2011), the jury was instructed to consider the
9   "the plain and ordinary meaning of the words," but then because "this may not always
10  illuminate what a contract requires, the jury was instructed that, if that approach
11  failed, it should 'decide the appropriate meaning of [the 2003 Contract's] terms' by
12  considering the intent of the parties and the circumstances surrounding the Contract's
13  formation." *Id.* at 488.  The Ninth Circuit already held in this case that the "plain and
14  ordinary meaning of the words" of Section 6.2 were not illuminating in light of its
15  context and structure, so the only question for the jury is to determine the intent of the
16  parties based on the extrinsic evidence, which is the only question that the Ninth
17  Circuit's remand tasked this Court (or the jury) with answering as to the meaning of
18  Section 6.2.  *See Netlist Inc.*, 2023 WL 6820683, at *2 .  And while Netlist also cites
19  a more-than-thirty-year-old case (the only other New York case it cites) that instructed
20  the jury to look at the contract language, that court also instructed the jury to look at
21  the "contract as a whole," *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g*
22  *Corp.*, 1992 WL 265941, at *3 (N.D.N.Y. Oct. 2, 1992).  And there is no indication
23  in *Niagra Mohawk* of a prior judicial determination of the sort that the Ninth Circuit
24  handed down here—*viz.*, that the words of the contract read in light of the contract as
25  a whole do not illuminate the parties' intent and thus that their intent must be
26  discerned from the extrinsic evidence.

27        Further, contrary to Netlist's proposed instruction, Samsung does ***not*** contend
28  that its obligation to supply Netlist with NAND and DRAM would arise "only for use

in manufacturing an NVDIMM-P product." Samsung's position is that Section 6.2 required it to supply Netlist with NAND and DRAM only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P **and** for the manufacture and sale of the NVDIMM-P product if it was ever commercialized.

In response to the Court's March 8 order, Netlist removed language from its proposed instruction indicating that Netlist bears the burden of "proving, by a preponderance of the evidence, that Samsung breached the JDLA by failing to supply Netlist with NAND and DRAM products to Netlist, on Netlist's request, under the JDLA." Netlist's proposed jury instructions now **nowhere** state that Netlist has the burden of proof on any of its claims.

Samsung's proposal accurately instructs the jury on Netlist's burden of proof. As stated in Samsung's Position Statement Regarding Threshold Issues, the Ninth Circuit has held that Section 6.2 is reasonably susceptible to two interpretations: (1) that Samsung was obligated to supply NAND and DRAM at Netlist's request with no limitation, meaning that Samsung was required to supply Netlist with whatever NAND and DRAM products it requested, for any purpose; or (2) that Samsung was obligated to supply Netlist with NAND and DRAM only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized. It is Netlist's burden to prove that its interpretation was intended by the parties. The jury should be instructed accordingly, and Netlist's proposed instruction incorrectly suggests that the jury is free to divine its own interpretation of Section 6.2 and fails to properly instruct the jury as to the burden of proof.

Samsung objects to the third paragraph of Netlist's proposed instruction in its entirety as an inaccurate or misleading statement of the applicable law in light of the Ninth Circuit's ruling in this case:

- The Ninth Circuit has already held that the written JDLA is ambiguous. 9th Circuit Memorandum Opinion, Dkt. 334, at 2-5.  In other words, it has "determined that the 'best evidence' of the parties' intent—the parties' words as memorialized in the agreement—failed to indicate the parties' intent.  The fact finder then must look to extrinsic evidence to determine the parties' intent."  *Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 342 (S.D.N.Y. 2014).  Netlist cites no authority that where a contract is ambiguous, the words in the contract deserve more weight than any other evidence of the parties' intent.  Thus, it is highly misleading to instruct the jury that the words of the contract are of paramount importance to the question before the jury.

- The proposition that "[i]f the parties omit terms—particularly, words that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission" relates to construction of a contract as a matter of law by a court, not consideration of extrinsic evidence by a jury.  And both the Ninth Circuit and this Court have rejected Netlist's argument that application of that legal rule here compels Netlist's interpretation.  *See* 9th Circuit Memorandum Opinion, Dkt. 334, at 4; Dkt. 390 at 8-9.

- Similarly, the proposition that "when certain words are omitted from a provision in a contract but placed in other provisions, it must be assumed that the omission was intentional" relates to construction of a contract as a matter of law by a court, not consideration of extrinsic evidence by a jury, and the Ninth Circuit has similarly rejected Netlist's argument that application of that legal rule here compels Netlist's interpretation.  *See* 9th Circuit Memorandum Opinion, Dkt. 334, at 4; Dkt. 390 at 8-9.

The final sentence of Netlist's proposed instruction—"You may not consider evidence of one party's intent or understanding that was not communicated to the

other party except to the extent that it sheds light on the parties' overt words and actions"—is confusing and potentially misleading absent further explanation of the very limited purpose for which such evidence may be considered by a jury under New York law.  If the Court is inclined to give the last sentence of Netlist's proposed instruction, Samsung proposes adding the following explanation: "A party's intent that is not communicated to the other party has no bearing on the meaning of an ambiguous contract; only the intent indicated by words and acts that are made known to the other party may be considered.  To the extent that you heard witnesses testify about their own understanding and assumptions about certain events that they did not communicate to the other party, that testimony was received only to help explain the witness's own actions and statements.  However, a witness's own understandings that are not communicated to another party cannot change the meaning of statements and acts that are communicated to that other party."  *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 126 (2d Cir. 2006).

Netlist's proposed instruction also omits relevant and controlling rules contained in Samsung's proposed instruction.

## DISPUTED INSTRUCTION NO. 4

### Plaintiff's Proposed Instruction No. 4

### Breach of Contract

It is not disputed that Netlist made requests for supply of NAND and DRAM products that Samsung refused. You must determine whether Samsung breached the parties' contract by failing to do what it was required to do under the correct interpretation of 6.2.


Source: N.Y. Pattern Jury Instr.—Civil 4:1; Court's Ruling on Summary Judgment (Dkt. 186) at 9-10 ("Samsung does not dispute that it declined to fulfill all of Netlist's orders for NAND and DRAM products."); Minute Order Requiring the Parties to Revise Trial Filings (Dkt. 453) at 2 ("The law of the case likely requires a finding for Netlist on the issue of breach if the jury adopts Netlist's interpretation of JDLA § 6.2.")

**Defendant's <u>Conditional</u> Proposed Instruction No. 4**

**(proposed only in the event the Court permits Netlist to claim that Samsung**

**breached Section 6.2 under Samsung's proffered interpretation)**

**Breach of Contract**

Netlist has the burden of proving that Samsung breached the contract by not doing what it was required to do under the contract.

If you find that Netlist has met its burden of proving, by a preponderance of the evidence, that it had a contract with Samsung requiring that Samsung supply Netlist with NAND and DRAM products at Netlist's request with no limitation, meaning that Samsung was required to supply Netlist with whatever NAND and DRAM products it requested, for any purpose, then you must accept as a fact that Samsung breached its obligation under Section 6.2.

If, on the other hand, you find that Netlist has not met its burden to prove its interpretation is correct by a preponderance of the evidence, then you must decide whether Netlist has proven by a preponderance of the evidence that Samsung breached its obligation under Samsung's interpretation—in other words, you must determine whether Samsung failed to supply Netlist with NAND and DRAM as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P or for the manufacture and sale of the NVDIMM-P product if it was ever commercialized.

[Source: N.Y. Pattern Jury Instr.—Civil 4:1 (Contracts—Elements) (modified)]

1

**Plaintiff's Position on Disputed Instruction No. 4**

2    As explained above, Samsung's proposed instruction number 4 improperly
3 limits the jury to adopting either Netlist's interpretation or Samsung's interpretation
4 of the JDLA. But the jury has the inherent authority to adopt any interpretation of the
5 JDLA that is consistent with the record evidence and to find that Samsung breached
6 the JDLA under that interpretation. Netlist's proposed instruction in contrast is
7 simple, easy to understand, and does not improperly limit the jury's authority to adopt
8 its own interpretation.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendant's Position on Disputed Instruction No. 4**

Defendant proposes giving its Conditional Proposed Instruction No. 4 ***only*** if the Court permits Netlist to assert a breach of Section 6.2 under Samsung's proffered interpretation.  If the Court agrees with Samsung that Netlist may not now assert a breach under Samsung's interpretation, then Disputed Instruction No. 4 is entirely unnecessary because Samsung agrees that if the jury finds that Netlist has proven that its interpretation is correct, then the jury must find breach, whereas if Netlist fails to prove that its interpretation is correct, then the only other interpretation properly before the jury is Samsung's.  *See* Samsung's Position Statement Regarding Threshold Issues.

If the Court determines there is a need for a Breach of Contract instruction, then Samsung respectfully submits that its proposed instruction accurately and neutrally reflects the legal principles governing the jury's consideration of breach, and requests that it be given instead of Netlist's proposed instruction.

First, as explained in Samsung's Position Statements Regarding Threshold Issues and Disputed Instruction No. 3, the Ninth Circuit has held that Section 6.2 is reasonably susceptible to two interpretations: (1) that Samsung was obligated to supply NAND and DRAM at Netlist's request with no limitation, meaning that Samsung was required to supply Netlist with whatever NAND and DRAM products it requested, for any purpose; or (2) that Samsung was obligated to supply Netlist with NAND and DRAM only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized.  Netlist's proposed instruction incorrectly suggests that the jury is free to divine its own interpretation of Section 6.2. Indeed, Netlist's proposed instruction entirely fails to identify the nature of the alleged contractual promise.  Samsung's conditional proposed instruction, on the other hand, tracks language in the New York Pattern Jury Instructions and properly instructs the jury that if Netlist fails to prove its interpretation by a preponderance of the evidence,

1   then the jury must determine whether Netlist has proved by a preponderance of the

2   evidence that Samsung breached Section 6.2 under Samsung's proffered

3   interpretation.

4          Second, Netlist's proposed instruction fails to instruct the jury that Netlist bears

5   the burden of proof.

6          Third, Netlist's proposed instruction is highly prejudicial to Samsung and risks

7   confusing and misleading the jury.  By beginning with a vague and purportedly

8   undisputed "fact" that Samsung "refused" Netlist's requests for supply of NAND and

9   DRAM before asking the jury to determine whether Samsung committed a breach

10  under Section 6.2, Netlist's proposed instruction invites the jury to assume that that

11  "fact" is relevant to whether Samsung breached.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DISPUTED INSTRUCTION NO. 5

### Plaintiff's Proposed Instruction No. 5

### Material Breach

If you determine that Samsung breached Section 6.2 of the JDLA, then you must determine whether this breach was material.

Samsung's breach would be material if it goes to the root of the agreement between the parties. In considering whether a breach is material, you may consider the following non-exhaustive factors: the extent to which the injured party will be deprived of the benefit which it reasonably expected, the likelihood that the party failing to perform or to offer to perform will cure its failure, the quantitative character of the default, and the breaching party's good faith or willfulness.

Materiality does not depend upon the amount of monetary damages Netlist suffered. Instead, materiality depends upon whether Netlist lost the benefit of its bargain with Samsung. The timing of Netlist's notice of breach is not a relevant factor to be considered in determining whether Samsung materially breached the JDLA.

Sources: *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55209, 2023 WL 6820683, at *3 (9th Cir. Oct. 17, 2023); JDLA § 13.2 ("[T]he other Party shall have a right to terminate this Agreement upon written notice to a Party if such Party is in material breach of this Agreement and it is not cured within thirty (30) days period from the other Party's written demand . . . ."); *Doner-Hedrick v. New York Inst. of Tech*., 874 F. Supp. 2d 227, 242 (S.D.N.Y. 2012) ("Materiality does not depend upon the amount of provable money damages, it depends upon whether the nonbreaching party lost the benefit of its bargain."); *ESPN v. Office of Com'r*, 76 FS2d 416, 421 (SDNY 1999) (same); *Netlist Inc. v. Samsung Elecs. Co*., No. 22-55209, 2023 WL 6820683, at *2 (9th Cir. Oct. 17, 2023) ("To the extent Samsung contends that the district court independently erred by awarding nominal damages following the jury's finding that Netlist had not suffered actual damages from the breach of § 6.2, we disagree.")

1  (citing *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993)); *PRCM Advisers*
2  *LLC v. Two Harbors Inv. Corp.* 2021 WL 2582132, at *7 (S.D.N.Y. June 23, 2021)
3  ("Two Harbors' delay in terminating for cause indicated that the events were not
4  material 'conflat[es] two analytically distinct issues – waiver and materiality.'
5  Instead, Two Harbors' delay is 'irrelevant to the issue of materiality. Were it
6  otherwise, the agreement's non-waiver provision would be rendered superfluous.")
7  (quoting *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 187 (1st Dep't. 2007),
8  *aff'd*, 14 N.Y.3d 791 (2010)).

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendant's Proposed Instruction No. 5**

**Material Breach**

If you find that Netlist's interpretation is correct, then you must accept as a fact that Samsung breached its obligation under Section 6.2. You must then decide whether that breach was material. Netlist has the burden of proving that any breach by Samsung was material.

For a breach to be material, the breach must go to the root of the parties' agreement. To determine whether a breach is material, you should consider the extent to which the injured party will be deprived of the benefit which he reasonably expected, the likelihood that the party failing to perform or to offer to perform will cure his failure, the quantitative character of the default, and the breaching party's good faith or willfulness.

[Sources: 9th Circuit Memorandum Opinion, Dkt. 334, at 7 (citing *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc*., 111 F.3d 284, 289 (2d Cir. 1997); *Hadden v. Consol. Edison Co. of N.Y., Inc*., 312 N.E.2d 445, 449 (N.Y. 1974); Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981))]

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations
11305095

**Defendant's <u>Conditional</u> Proposed Instruction No. 5**

**(proposed only in the event the Court permits Netlist to claim that Samsung breached Section 6.2 under Samsung's proffered interpretation)**

**Material Breach**

If you decide that Samsung breached Section 6.2, you must then decide whether that breach was material. Netlist has the burden of proving that any breach by Samsung was material.

For a breach to be material, the breach must go to the root of the parties' agreement. To determine whether a breach is material, you should consider the extent to which the injured party will be deprived of the benefit which he reasonably expected, the likelihood that the party failing to perform or to offer to perform will cure his failure, the quantitative character of the default, and the breaching party's good faith or willfulness.

[Sources: 9th Circuit Memorandum Opinion, Dkt. 334, at 7 (citing Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997); Hadden v. Consol. Edison Co. of N.Y., Inc., 312 N.E.2d 445, 449 (N.Y. 1974); Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981))]

**Plaintiff's Position on Disputed Instruction No. 5**

Samsung's instruction fails to instruct the jury that the issue of recoverable damages is irrelevant to whether a breach was material under New York law. *Doner-Hedrick v. New York Inst. of Tech.*, 874 F. Supp. 2d 227, 242 (S.D.N.Y. 2012) ("Materiality does not depend upon the amount of provable money damages, it depends upon whether the nonbreaching party lost the benefit of its bargain."); *ESPN v. Office of Com'r*, 76 FS2d 416, 421 (SDNY 1999) (same). This instruction is necessary because, as explained in Netlist's position on Samsung's proposed third instruction discussed above, Samsung is improperly attempting to inform the jury that Netlist did not recover any direct damages in the first trial. The Court should accordingly adopt Netlist's proposed instruction instead.

### Defendant's Position on Disputed Instruction No. 5

Whether Samsung will revise its proposed jury instructions in response to the Court's March 8 order depends on the Court's resolution of a threshold issue: whether Netlist will be permitted to argue that Samsung breached Section 6.2 of the JDLA under Samsung's proffered interpretation.  If the Court agrees with Samsung that Netlist may not now assert a breach under Samsung's interpretation, then Samsung's proposal is "Defendant's Proposed Instruction No. 5," above, which is the same as Samsung's proposal in the parties' March 4 joint submission.  If, on the other hand, the Court permits Netlist to assert such a breach, Samsung would revise its proposed jury instructions and verdict form as shown in "Defendant's Conditional Proposed Instruction No. 5."

These (conditional) revisions should be unnecessary because, as explained above, Netlist should not be permitted to argue that Samsung breached under Samsung's proffered interpretation—that is, that Section 6.2 required Samsung to supply Netlist with NAND and DRAM products only as raw materials or components for the parties' collaboration to develop a product called NVDIMM-P and for the manufacture and sale of the NVDIMM-P product if it was ever commercialized. Netlist has never raised this theory of breach at any stage in this litigation, has never pointed to any evidence supporting such a theory of breach, and failed to raise this theory in opposition to Samsung's motion for summary judgment on the grounds that the Section 6.2 supply obligation was limited to the joint-development project.  Netlist may not now claim breach under a theory it has never advanced and that it (at the very least) abandoned at summary judgment. Nevertheless, Samsung submits these (conditional) revised proposed jury instructions in the event the Court rules that Netlist may pursue such a theory of breach at trial.

Samsung respectfully submits that its proposed instruction accurately reflects the governing law regarding materiality, and requests that it be given instead of Netlist's proposed instruction.

1    Samsung objects to the final paragraph of Netlist's proposed instruction, which
2    relies on one-off statements from federal district court cases taken out of context and
3    misstates the rules of those cases.  Contrary to Netlist's proposed instruction, the
4    extent to which Netlist suffered harm is relevant to whether any breach was material.
5    The fact that Netlist remained silent for nearly four and a half years before giving
6    notice of breach is also relevant to whether any breach was material—Netlist certainly
7    did not act at the time like Samsung materially breached the agreement.  The
8    principles governing the materiality inquiry under New York law have been set forth
9    authoritatively by the Ninth Circuit, and there is no reason to depart from those
10   principles.